Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985,
c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.


— and —


**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | |
| NORTEL NETWORKS INC., *et al*., | Chapter 11 |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |


**PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW OF THE US INTERESTS**

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT

I. BACKGROUND ...................................................................................... 1

    A. The Parties ..................................................................................1

    B. Fact Witnesses .............................................................................3

II. PRE-PETITION OPERATIONS OF THE NORTEL GROUP ................... 4

    A. The Nortel Group's Corporate Structure.....................................4

        1. Description of Nortel's Principal Holding and Operating Companies ..........4

        2. Integrated Entities vs. Limited Risk Entities .................................................5

        3. The Nortel Group's "Matrix" Structure .........................................................6

    B. Corporate Separateness of the Nortel Companies .........................8

        1. The Nortel Group Respected Corporate Separateness ..................................8

        2. Nortel Entities Maintained Corporate Separateness in Financial Filings and Practices ...........9

        3. Individual Nortel Debtors Held Themselves Out to and Were Treated by Creditors as Separate Legal Entities.................................................9

        4. Nortel Bondholders Relied on the Corporate Separateness of the Nortel Entities ...........11

        5. The US Court and the Canadian Court Have Recognized the Nortel Debtors as Separate Entities Both Pre- and Post-Petition ............................12

    C. NNI's Role in the Nortel Group...................................................13

        1. NNI Performed and Funded Extensive Research and Development ..........14

        2. NNI Had Nortel's Most Important Customer Relationships ......................16

        3. NNI Earned Most of Nortel's Revenue ........................................................18

        4. NNI Provided Essential Credit Support to the Nortel Group .....................20

        5. NNI Possessed Additional Administrative and Operational Capacities Important to the Nortel Group's Global Business...........................................24

    D. The Nortel's Group's Research And Development Practices................................25

        1. All Nortel R&D Was Intended to Produce Products And Sustain Innovation..................26

        2. The Nortel Group's Patents and Patenting Practices...................................29

III. NORTEL'S TRANSFER PRICING REGIME AND INTELLECTUAL PROPERTY OWNERSHIP.....................................................43

    A. Transfer Pricing Background......................................................43

        1. Goals of Transfer Pricing and Related Regulations .....................................43

2.    Advanced Pricing Arrangements ........................................46

B.    The Nortel Group's Cost Sharing Agreement Era .................................48

1.    Background to the Cost Sharing Agreements .................................48

2.    NNI Directly or Indirectly Funded the Bulk of the Nortel Group's R&D During the 1990s ........................................49

3.    NNI and Other Cost Sharing Participants Gained Steadily Increasing Rights in Nortel IP as Their Businesses and the R&D CSAs Evolved .........50

4.    Retention of Economic Ownership of IP by Cost Sharing Participants Was a Requirement of Nortel's Agreements with Tax Authorities and Transfer Pricing Regulations........................................53

5.    The Nortel Group's Operations Reflected the CSPs' Exclusive Territorial Licenses to Exploit the Group's IP ........................................56

C.    Termination of the Cost Sharing Agreements and Adoption of a Residual Profit Split Methodology ........................................58

1.    Nortel Develops a New Transfer Pricing Arrangement .................................58

2.    The March 2002 APA Applications ........................................62

3.    Mechanics of Nortel's RPSM ........................................63

4.    Nortel's RPSM Was Designed to Move Cash from NNI to NNL to Reduce the Nortel Group's Taxes ........................................65

5.    NNI's Large Transfer Pricing Payments Under the RPSM Funded NNL and the Nortel Group's R&D ........................................70

6.    The Tax Authorities Declined to Approve Nortel's APA Requests, and Determined that NNI Overpaid NNL by $2 Billion ........................................72

D.    The Master R&D Agreement........................................73

1.    Rights to Intellectual Property Under the MRDA........................................74

2.    Allocation of Operating Profits Under the MRDA ........................................98

IV.    NORTEL'S INSOLVENCY AND THE SALE OF NORTEL'S ASSETS .................103

A.    Post-Filing Intercompany Agreements ........................................103

1.    The Interim Funding and Settlement Agreement........................................103

2.    The Final Canadian Funding and Settlement Agreement .................................106

B.    The Sale of Nortel's Business Lines ........................................108

1.    Overview of the Sales........................................109

2.    NNI's Lucrative Market Was of Significant Value to Purchasers of the Business Lines ........................................111

3.    NNI Led Transition Services Provided to Purchasers .................................113

C.    Nortel Considers Options for Monetizing Its Patent Portfolio .............................114

1.    Patent Segmentation Process ........................................115

2.      Nortel's Existing and Proposed Licensing Business .....................................118

3.      Initial Post-Petition Consideration of IP Monetization Options ...............119

4.      The IP Monetization Evaluation Process.......................................................121

5.      The Comprehensive Vetting of the IPCo Model ...........................................125

6.      IPCo Was a Viable Option...............................................................................135

7.      All of the Integrated Entities Expected to Benefit From IP Monetization 137

D.    The Sale of Nortel's Patent Portfolio ..........................................................140

1.      Negotiations With Google ...............................................................................141

2.      The Patent Portfolio Auction ........................................................................145

3.      The Rockstar Sale Approval Hearing............................................................147

E.    Mediation History ...........................................................................................148

F.    The Monitor's Post-Petition Conduct ...........................................................150

PROPOSED CONCLUSIONS OF LAW ................................................................ 158

I.      THERE MUST BE AN ALLOCATION TO EACH ESTATE BASED ON
PRINCIPLES OF FAIR MARKET VALUE ........................................................ 158

A.    Allocation Should Be Based on the Relative Fair Market Value of the Assets
Each Debtor Transferred or Relinquished that Generated the Sales Proceeds.158

1.      The Touchstone for Valuation Is Fair Market Value...................................158

2.      Fair Market Value Principles Are Consistent with the MRDA .................161

3.      The Income-Based Approach Is the Most Appropriate Methodology for
Determining Fair Market Value in this Case ...............................................162

B.    Under Both US and Canadian Bankruptcy Law, Creditors Must Be Paid
Before Equity....................................................................................................163

II.     UNDER THE MRDA, EACH PARTICIPANT EXCLUSIVELY HELD ALL
VALUABLE RIGHTS TO NORTEL'S INTELLECTUAL PROPERTY IN ITS
RESPECTIVE TERRITORY............................................................................... 164

A.    Governing Law and Applicable Principles of Contract Interpretation..............164

B.    The Valuable "Bundle of Rights" that a Patent Affords.....................................168

C.    The Plain Terms of the MRDA Confirm that Each Participant Exclusively
Held All Valuable Rights to NN Technology, Including Patents, in Its
Respective Territory .......................................................................................171

1.      Under the MRDA, Each Participant Held the Exclusive Right to Practice
NN Technology, Including Patents, in Its Respective Territory.................171

2.      Under the MRDA, Each Licensed Participant Held the Right to
Sublicense in Its Exclusive Territory ............................................................173

     3.    **Under the MRDA, the Licensed Participants Held the Right to Assert Actions, Recover Damages and Pursue Other Remedies for Infringement of NN Technology, Including Patents, in Their Respective Territories.....175**

     4.    **The MRDA's Recitals, Schedules and Amendments Further Confirm that All Valuable Rights to NN Technology Were Held by Each Participant in Its Respective Territory......................................................................178**

     5.    **Additional Provisions of the MRDA Are Consistent Only with an Interpretation that the Licensed Participants Had Broad Ownership Rights ..................................................................................................179**

   D.    **In Light of the Foregoing, NNL Had Nothing of Value to Sell in the Licensed Participants' Exclusive Territories ........................................................181**

   E.    **The MRDA's Factual Matrix Confirms the Licensed Participants' Beneficial Ownership of NN Technology in Their Exclusive Territories ............................183**

     1.    **Contracts Should Be Interpreted with Reference to the Factual Matrix ..183**

     2.    **The Factual Matrix Surrounding Transfer Pricing, Historical Business Practices and Custom of the Industry...........................................188**

   F.    **Insofar as the Monitor Contends that the Licensed Participants' Exclusive Licenses Are Worthless, the Monitor's Position Is Subject to Estoppel by Convention.......................................................................................192**

**III.   THE MONITOR'S ARGUMENTS SEEKING TO LIMIT NNI'S EXCLUSIVE LICENSES ARE WITHOUT MERIT............................................................ 195**

   A.    **The Monitor's Construction of the MRDA Is Inconsistent with the Valuable Intellectual Property Rights that the Licensed Participants Held in Their Respective Territories.....................................................................195**

     1.    **The "Products" Argument........................................................195**

     2.    **The "Non-Transferability" Argument.........................................199**

     3.    **The "Administrative Rights" Argument ......................................200**

**IV.   THERE IS NO BASIS FOR THE COURT TO APPLY THE "PRO RATA" DISTRIBUTION THEORY............................................................................. 203**

   A.    **Distribution to Creditors Is Not Before the Courts in This Proceeding .............203**

   B.    **There Is No Legal or Factual Basis for the Pro Rata Distribution Model..........204**

   C.    **Pro Rata Distribution Would Prejudice Creditors Who Relied Upon Nortel's Corporate Separateness.................................................................208**

   D.    **Implementation of the Pro Rata Distribution Model Would Be Akin to an Impermissible *Sub Rosa* Plan..........................................................209**

   E.    **The Courts' Equitable Powers Do Not Provide an Avenue for Implementation of the Pro Rata Distribution Model...................................................211**

   F.    **The Pro Rata Distribution Theory Is Unadministrable in This Case .................213**

**CONCLUSION ......................................................................................... 215**

iv

**APPENDIX A** ................................................................................................................ **A-1**
**APPENDIX B** ................................................................................................................ **B-1**
**APPENDIX C** ................................................................................................................ **C-1**
**APPENDIX D** ................................................................................................................ **D-1**
**APPENDIX E** ................................................................................................................ **E-1**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors") and the Official Committee of Unsecured Creditors (the "UCC," and together with the US Debtors, the "US Interests"), respectfully submit these proposed post-trial findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

I.    **BACKGROUND**

   A.    **The Parties**

1.    The US Debtors refers to Nortel Networks Inc. and its affiliates, including Nortel Networks Capital Corporation, Alteon WebSystems, Inc. (now known as Nortel Altsystems Inc.), Alteon WebSystems International, Inc. (now known as Nortel Altsystems International Inc.), Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. ("NN CALA").[1]

2.    The "Canadian Debtors" refers to Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and its affiliates, including Nortel Networks Global Corporation, Nortel Networks International Corporation, and Nortel Networks Technology Corporation. The Canadian Debtors are represented by Ernst & Young Canada ("E&Y Canada"), the court-appointed monitor (the "Monitor").

---

[1] References herein to "Nortel," the "Nortel Group" or the "Group" refer to all affiliated entities in the Nortel Group of companies.  For ease of reference, the US Debtors use the name of each Nortel entity as of the Petition Date, although a given entity may have been known by different names previously.  For example, Nortel's primary US operating company is referred to throughout this document as Nortel Networks Incorporated or NNI even though it was previously named Northern Telecom International.  A reference guide to commonly used terms and abbreviations is attached as Appendix A hereto.

3.      The "EMEA Debtors" refers to Nortel Networks UK Limited ("NNUK"), Nortel

Networks (Ireland) Limited ("NN Ireland"); Nortel Networks S.A. ("NNSA"); Nortel Networks

NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel

Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel

Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko,

s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB;

Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.  The

EMEA Debtors are represented by the court-appointed Joint Administrators, Alan Bloom, Chris

Hill, Stephen Harris and Alan Hudson, with the exception of NN Ireland, which is represented by

Alan Bloom and David Hughes as the Joint Administrators (the "Joint Administrators").

4.      The UK Pension Claimants ("UKPC") refers to the Trustee of Nortel Networks UK

Pension Plan and the Board of the Pension Protection Fund.

5.      The UCC, a statutory fiduciary, was appointed by the US Trustee to represent the

interests of the US Debtors' unsecured creditors.  TR50126 (US D.I. 141 Order re Appointment

of UCC).  The membership of the UCC has changed over time and currently consists of (i) Law

Debenture Trust Company of New York, as indenture trustee, (ii) Pension Benefit Guaranty

Corporation ("PBGC") and (iii) The Bank of New York Mellon, as indenture trustee.

        TR40272 (2011 NNC Form 10-K) at 59.

6.      The *ad hoc* Group of Bondholders (the "Bondholder Group") are the representatives for

holders of $2.2 billion[1] principal of bonds, issued by NNC,  NNL or NNCC and guaranteed or

supported by NNI.  The Bondholder Group was designated a "Core Party" in the Allocation

Protocol governing this litigation and has actively participated before both the US and Canadian

Courts.

---

[1] All figures given in these proposed findings of fact are in US dollars, unless otherwise noted.

7.      The Canadian Creditors Committee (the "Canadian Creditors Committee" or "CCC")
refers to an *ad hoc* group of representatives of certain employee and employee benefits creditors
asserting claims only against the Canadian Debtors, that, on April 23, 2013, entered a limited
appearance in the US Proceedings "solely for the purpose of and expressly limited to the
litigation over allocation of global proceeds."   The CCC is represented by three court-appointed
administrators, including Morneau Sheppell Limited, as the Administrator for the two Canadian
pension plans, the Superintendent of Pension of Ontario, as the Administrator of the Pensions
Benefits Guarantee Fund, and Unifor for the Canadian Autoworkers, the representative of former
Nortel employees who are members of the Canadian autoworkers.  The CCC was designated a
"Core Party" in the Allocation Protocol governing this litigation and has actively participated
before both the US and Canadian Courts.

> U.S. D.I. 10761 at 1-2, Amended Verified Statement Regarding CCC Pursuant to
> Bankruptcy Rule 2019; *see also* U.S. D.I. 10385 Verified Statement Regarding
> CCC Pursuant to Bankruptcy Rule 2019.

8.      Wilmington Trust National Association is the indenture trustee for the $200 million notes
offering by NNL in 1988, for which the notes mature in 2023.  It is an unsecured creditor of
NNL.

9.      Bank of New York Mellon is the indenture trustee for approximately $4 billion principal
of bonds issued by NNL and NNC, and guaranteed by NNI.   It is a member of the UCC.

10.     The Law Debenture Trust Company of New York is the indenture trustee for the $150
million principal notes offering in February 1996 issued by NNCC and NNL, guaranteed by
NNL, and supported by NNI, for which the notes mature in 2026.  It is a member of the UCC.

## B.      Fact Witnesses

11.     An index of fact witnesses who appeared either live or through deposition and are
referenced in these proposed findings of fact appears in Appendix B.

3

II.      **PRE-PETITION OPERATIONS OF THE NORTEL GROUP**

     A.      **The Nortel Group's Corporate Structure**

          1.      **Description of Nortel's Principal Holding and Operating Companies**

12.      The Nortel Group consists of more than 140 separate corporate entities located in 60 separate sovereign jurisdictions including Canada, the United States and the EMEA region, as well as the Caribbean and Latin America and Asia.

        TR21539 (Doolittle Plan of Compromise Aff.) ¶ 2; TR43849 (Entity Structure as of Jan. 5, 2009).

13.      NNC, the Nortel Group's ultimate parent holding company, was publicly listed and traded on both the Toronto Stock Exchange and the New York Stock Exchange.

        TR21540 (Doolittle Chapter 11 Decl.) ¶ 10; TR47103 (NNL 2009 Transfer Pricing Report) at 4.

14.      As a holding company, substantially all of NNC's assets consist of equity in other Nortel entities.

        TR21539 (Doolittle Plan of Compromise Aff.) ¶¶ 2, 19-22; TR21540 (Doolittle Chapter 11 Decl.) ¶ 3 and Sched. 1.

15.      One of NNC's direct subsidiaries is NNL, the Canadian operating company of the Nortel Group.

        TR21540 (Doolittle Chapter 11 Decl.) ¶ 10.

16.      NNL in turn owns 100% of the equity of each of NNI, the Nortel Group's operating company in the United States; NNUK, the Nortel Group's operating company in the United Kingdom; and NN Ireland, the Nortel Group's operating company in Ireland; and 91.17% of the equity of NNSA, the Nortel Group's operating company in France.[2]

---

[2] As of the Petition Date, the remaining 8.83% of NNSA was owned by Nortel Networks International Finance & Holding, B.V. TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity Structure and Funding") at 10.

TR21539 (Doolittle Plan of Compromise Aff.) ¶¶ 23-27; TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity Structure and Funding") at 10.

## 2. Integrated Entities vs. Limited Risk Entities

17.    NNL, NNI, NNUK, NN Ireland and NNSA were referred to by the Nortel Group (and are

referred to herein) as the Integrated Entities (the "IEs").

TR22078 (2008 Joint APA Request) at 6, 11-12.

18.    Collectively, the IEs performed nearly all of the Nortel Group's research and

development ("R&D").  They created the Nortel Group's intellectual property ("IP") and

generated the vast majority of the Nortel Group's global revenue.

TR22078 (2008 Joint APA Request) at 6, 11-12; TR21003[3] (MRDA) at 18 (Sched. A).

19.    In addition to performing R&D and creating IP, the IEs each performed all of the

functions required to operate a business, including providing manufacturing support, providing

distribution services, marketing products and solutions and developing and maintaining

relationships with key customers.

Trial Tr. 554:8-555:1 (Currie); TR22078 (2008 Joint APA Request) at 6, 11, 12; TR47223.01 (2009 NNL Transfer Pricing Report) at 34 ("In addition to performing ongoing R&D functions, the IEs are fully integrated, meaning they perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets.").

20.    NNL's business functions were similar to the other IEs.  As the Monitor stated in

submissions it prepared for the Internal Revenue Service ("IRS") and Canada Revenue Agency

---

[3] For the Court's convenience, pincites for TR21003, the MRDA, are to the end-bates number as opposed to the documents pagination, which repeats.

("CRA")[4] "NNI and NNL can both be characterized as fully integrated companies" that perform

an identical list of functions.

> TR47221.02 (2009 NNI Transfer Pricing Report) at 35; TR22078 (2008 Joint
> APA Request) at 22.

21.     In addition to the IEs, the Nortel Group consisted of Limited Risk Entities (the "LREs").

LREs distributed Nortel products within their jurisdictions in exchange for a fixed return and did

not participate in R&D or bear the associated risks and benefits of such participation.

> TR47221.02 (2009 NNI Transfer Pricing Report) at 35-36, 66-67.

### 3.      The Nortel Group's "Matrix" Structure

22.     By 1996, Nortel had moved to a structure organized around lines of business based on the

products and services it sold to customers.

> TR00001 (Currie Aff.) ¶16.

23.     The names and number of Nortel's lines of business changed over time, but as of January

the 14, 2009 (the "Petition Date"), Nortel had four operational lines of business ("Business

Lines").

- The "Carrier Networks" segment provided wireless networking solutions that enabled
  service providers and cable operators to supply mobile voice, data and multimedia
  communications to individuals and enterprises using mobile phone and other wireless
  devices.  The Carrier Networks business also offered products providing local, toll,
  long distance and international gateway capabilities to telephone service providers as
  well as providing support to customers transitioning from one network to another.
  The Carrier Networks business's operations included Global System for Mobile
  Communications ("GSM"), Code Division for Mobile Communications ("CDMA"),
  Carrier Voice Over Internet Protocol Applications Solutions ("CVAS") and the
  development of long-term evolution ("LTE") wireless technology.

- The "Enterprise Solutions" segment provided enterprise communications solutions
  addressing the headquarters, branch and home office needs of large and small
  businesses.  The Enterprise Solutions segment's offerings included, among other
  things, Unified Communications, Ethernet routing and multiservice switching, IP and

---

[4] The CRA was formerly known as the Canadian Customs and Revenue Agency, or CCRA.  Its name was changed
to CRA circa December 2003.  For clarity, the agency is referred to as "CRA" throughout this submission.

digital telephony (including phones), wireless LANs, security, IP and SIP contact centers, self-service solutions, messaging, conferencing and SIP-based multimedia solutions.

- The Metro Ethernet Networks ("MEN") segment provided carrier-grade Ethernet transport capabilities focused on meeting customers' needs for higher performance and lower cost emerging video-intensive applications.  MEN included optical networking, carrier Ethernet switching products and multi-service switching products.

- The "Global Services" segment provided a broad range of services and solutions including network implementation services, network support services, network managed services (which related to the monitoring and management of customer networks and hosted solutions) and network application services.

> TR00018 (Ricaurte Decl.) ¶ 5; TR44000 (NNC 2009 Form 10-K) at 4; TR00009A-B (Hamilton Aff.) ¶ 9; TR21278 (Jan. 14, 2009 Report of the Monitor) at 5; TR40189 (NNC 2008 Annual Report Form 10-K) at 6, 8, 10, 9, 50.

24.    The Business Lines' headquarters were either in the United States or Canada.  Of the four Business Lines, the two largest by revenue were Carrier Networks and Enterprise Solutions, both of which were headquartered in the United States, operated primarily by NNI and led by NNI employees.

> TR32076 (Edwards Plan of Compromise Aff.) ¶ 18; Riedel Dep. 146:16-147:2; Edwards Dep. 108:12-15, 108:18-21; TR00020 (Ray Decl.) ¶ 17; TR00018 (Ricaurte Decl.) ¶ 5.

25.    As of the Petition Date, Carrier Networks accounted for approximately 40% and Enterprise Solutions approximately 25% of Nortel's revenues.

> TR21278 (Jan. 14, 2009 Report of the Monitor) at 5; TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity Structure and Funding") at 4.

26.    Nortel's operating structure, with Business Lines that functioned across entities in different jurisdictions and resulted in multiple lines of reporting, was referred to as a "matrix" structure.  Nortel personnel viewed the matrix structure as best enabling Nortel to provide its full line of products and services to its customers globally.

> TR00001 (Currie Aff.) ¶ 22-23;  TR00004 (McFadden Aff.) ¶31; Trial Tr.
> 537:21-539:2 (Currie);  Bifield Dep. 161:10-162:23; Dadyburjor Dep. 37:17-
> 38:13.

27.    Matrix organizations are a common corporate structure among multinational enterprises

("MNEs").

> Zafirovski Dep. 31:20-32:12; TR47223.01 (NNL 2009 Transfer Pricing Report) at
> 41; TR00057 (McConnell Rebuttal) ¶ 65.

28.    Nortel modeled its structure on well established companies such as GE, Cisco Systems,

and IBM.

> Donovan Dep. 199:17-200:10.

**B.    Corporate Separateness of the Nortel Companies**

**1.    The Nortel Group Respected Corporate Separateness**

29.    As discussed below, the Nortel Group respected corporate separateness both pre- and

post-petition, and Nortel's customers, creditors, officers, and employees and this Court relied

upon the corporate separateness of the Nortel entities.

30.    Within the Nortel Group, companies were treated as separate legal entities.  Each had its

own books and records, financial statements, bank accounts and cash reserves.  The Treasury

Department respected the separate legal Nortel entities and forecasted cash needs on an entity-

by-entity basis.  Each company was organized in accordance with and operated under local laws.

> TR00014 (Binning Aff.) ¶ 9; TR00007A-B (McCorkle Aff.) ¶¶ 16, 17; Doolittle
> Dep. 258:15-259:3; Trial Tr. 815:11-816:8 (McCorkle); TR21322 (Corporate
> Procedure 303.37 discussing Regional/Global Cash Pooling); Freemantle Dep.
> 204:6-204:15;  Rolston Dep. 34:6-35:2.

### 2. Nortel Entities Maintained Corporate Separateness in Financial Filings and Practices

31.    Every "significant subsidiary" within the Nortel Group filed separate financial statements

with the appropriate local regulatory agency and the Nortel Group kept detailed revenue figures

for different countries and regions.

> TR00001 (Currie Aff.) ¶ 39; Binning Dep. 148:13-23; Freemantle Dep. 416:7-17;
> *see also* TR40269 (NNC 2008 Form 10-K) at 54-59, 197-206, 281.

32.    Nortel entities also had separate boards of directors and complied with local laws.

> Trial Tr. 543:21-546:12 (Currie); *id.* 1069:14-1070:20 (Binning); TR00001
> (Currie Aff.) ¶ 39; TR00014 (Binning Aff.) ¶ 9; TR00020 (Ray Decl.) ¶¶ 16, 30;
> TR00013 (G. Davies Aff.) ¶¶ 14, 18; Rolston Dep. 159:22-160:13.

33.    The IEs operated as fully-functioning subsidiaries with cash management functions that

respected corporate formalities.

> TR22078 (2008 Joint APA Request) at 6 ("An Integrated Entity (IE) is an entity
> that performs all of the activities required to fulfill customer contracts and
> effectively orchestrate Nortel's value chain. Each IE performs the functions of
> R&D, manufacturing support, distribution and extraterritorial services to varying
> degrees in a very united and reliant manner."); TR21322 (Corporate Procedure
> 303.37 discussing Regional/Global Cash Pooling); Trial Tr. 553:19-555:1
> (Currie); *id.* 816:5-8, 817:13-24 (McCorkle); TR 00007A-B (McCorkle Aff.) ¶
> 16; TR00013 (G. Davies Aff.) ¶ 26; TR00001 (Currie Aff.) ¶¶ 42-46, 70, 78.

34.    The Nortel Group respected corporate formalities in negotiating and documenting

intercompany loans and transactions.

> TR11148 (2004 Loan agreement between NNL and NNI); TR50773 (2006 loan
> agreement between NNL and NNI); TR00014 (Binning Aff.) ¶ 35; TR00007A-B
> (McCorkle Aff.) ¶¶ 20-21; TR00001 (Currie Aff.) ¶ 75; Doolittle Dep. 40:15-
> 41:04, 43:16-44:24; Trial Tr. 816:5-817:24, 834:2-16 (McCorkle); TR00013 (G.
> Davies Aff.) ¶ 26; Rolston Dep. 161:24-163:9; Freemantle Dep. 204:25-205:11.

### 3. Individual Nortel Debtors Held Themselves Out to and Were Treated by Creditors as Separate Legal Entities

35.    Creditors treated the Nortel entities as separate legal entities, including by lending money

to specific Nortel entities.

> Trial Tr. 1057:2-25, 1070:21-1071:3 (Binning); *see, e.g.*, TR44715 (Feb. 14, 2006 Guarantee Agreement).

36.     NNI was both the Nortel Group's largest entity and its largest cash flow positive entity.

> Trial Tr. 821:22-822:12 (McCorkle).

37.     As discussed in more detail below, NNI guaranteed a number of NNC's and NNL's bond offerings, totaling  nearly $4 billion principal.

> *See* TR11360 (Monthly Operating Report No. 5) at 7; TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity Structure and Funding") at 8; TR50744 (Monthly Operating Report No. 17) at 8-9; TR44700 (Offering Memorandum, $2 billion); TR44615 (Offering Memorandum, $1 billion); TR40119 (Offering Memorandum $675 million).

38.     NNI's guarantees were a critical term of certain of NNC's and NNL's bonds and enabled NNC and NNL to obtain a more favorable covenant structure.

> *See* TR00001 (Currie Aff.) ¶ 90; Trial Tr. 548:3-550:2 (Currie); *see also* Williams Dep. 197:22-198:7, 198-:16-20, 199:3-10, 199:17-200:2; Trial Tr. 1057:12-25 (Binning); *id.* 820:24-821:15, 821:22-822:12 (McCorkle).

39.     Investment banks specifically requested a guarantee from NNI and advised NNL that its bonds would get a "better reception" with a guarantee from NNI and that NNL would be able to raise higher amounts with a lower interest rate.

> Williams Dep. 197:22-200:2; Trial Tr. 820:24-821:15 (McCorkle).

40.     The UKPC negotiated for its own guarantees from NNL with respect to NNUK obligations to the UKPC.

> TR41344 (Nov. 2006 Guarantee); TR31169 (Dec. 2007 Guarantee); TR48995, (June 2006 Email from M. McCorkle to K. Stevenson regarding provision of NNL guarantee of NNUK pension deficit); Trial Tr. 821:16-21, 845:4-25 (McCorkle); TR00007A-B (McCorkle Aff.) ¶ 58; Hern Dep. 75:10-17, 84:21-85:6.

### 4. Nortel Bondholders Relied on the Corporate Separateness of the Nortel Entities

41.    Potential bond investors were informed by NNC and NNL at issuance that bonds issued without a guarantee by a specific subsidiary would have no claims against that subsidiary and that there was a risk of subordination to higher priority claims.  For example, a December 2007 prospectus for NNC convertible debt guaranteed by NNI made clear that:

> The . . . notes are senior unsecured obligations of the company [NNC] and rank *pari passu* with all other senior obligations of the company.  The notes are effectively subordinated to all liabilities of the subsidiaries of NNC that are not guarantors to the extent of the value of such subsidiaries.
>
> In the event of a bankruptcy, liquidation or reorganization of any direct or indirect non-guarantor subsidiary of the company, all of the creditors of that subsidiary . . . and third parties having the benefit of liens . . . against that subsidiary's assets will generally be entitled to payment of their claims from the assets of such non-guarantor subsidiary before any of those assets are made available for distribution to any issuer that is a shareholder of such subsidiary.
>
> TR40180 (Prospectus, $1.150 billion) at 3, 9-10.

42.    Further, the Offering Memoranda and prospectuses for Nortel's 2006-2008 bond offerings informed potential investors that Nortel's subsidiaries are "separate and distinct legal entities" and explicitly stated that non-guarantor subsidiaries have "no obligation" to pay amounts due under the notes.

> TR44700 (Offering Memorandum) at 25 ("The Issuers' subsidiaries are separate and distinct legal entities and any subsidiary that is not a Guarantor will have no obligation, contingent or otherwise, to pay amounts due under the Notes or the Guarantees or to make any funds available to pay those amounts, whether by dividend, distribution, loan or other payment."); TR44704 (Prospectus) at 17; TR44615 (Offering Memorandum) at 10; TR40180 (Prospectus) at 5; TR40119 (Offering Memorandum) at 18; Trial Tr. 4801:2-4802:16 (McConnell); DEM00024 (US Interests McConnell Demonstratives ) at 6; Trial Tr. 819:21-820:23 (McCorkle); *see also* Trial Tr. 1056:20-1057:11; 1070:21-1071:8 (Binning) (testifying that trade creditors and bondholders dealt with specific Nortel entities).

11

43.    NNL's and NNC's bond prices reflected the value of the NNI guarantees, including post-petition when bonds with an NNI guarantee traded at substantially higher prices than bonds without an NNI guarantee.

> TR00057 (McConnell Rebuttal) ¶¶ 53-56, Ex. 2, 3; Trial Tr. 4791:20-4795:21
> (McConnell); DEM00024 at 4-5, US Interests McConnell Demonstratives;
> TR00001 (Currie Aff.) ¶ 90; Trial Tr. 548:3-550:2 (Currie); *see also* Williams
> Dep. 197:22-200:2; Trial Tr. 1057:12-25 (Binning).

44.    The post-petition trading data – particularly in the period immediately following the Petition Date – is illustrative because upon bankruptcy, many factors that normally render it difficult to measure the effect of guarantees on bond prices (such as different maturity dates, call or conversion provisions and coupon rates) disappear.

> Trial Tr. 4790:15-4791:19 (McConnell).

**5.    The US Court and the Canadian Court Have Recognized the
Nortel Debtors as Separate Entities Both Pre- and Post-
Petition**

45.    Post-petition, NNI has remained separate from NNC and NNL throughout the insolvency process.  For example, the US Court and the Canadian Court have recognized the Nortel debtors as separate and distinct corporate entities in cash management and interim-funding orders and by allowing more than $2 billion in intercompany claims in favor of NNI against NNL.

> TR50194 (US D.I. 58 Order Approving Continued Use of Cash Management
> System, etc.); TR50048 (Jan. 14, 2009 Canadian Fifth Amended and Restated
> Initial Order) ¶¶ 34-38; TR50146 (US D.I. 2347 Order Approving FCFSA) at 2;
> TR50431 (Canadian Order Approving the FCFSA);  TR50046 (Canadian
> Endorsement re Approval of the FCFSA); TR00020 (Ray Decl.) ¶¶ 42-43.

46.    As the Court-appointed Monitor's pleadings acknowledged,

> The Nortel companies had a separate and distinct existence.  Employees were
> employed by the specific company they worked for.  Trade creditors contracted
> with specific Nortel entities.  Bondholders invested with or lent to specific Nortel
> members of the Nortel Group. Where applicable, guarantees were negotiated from
> specific Nortel Group members.  The . . . *ex post facto* characterization of

12

creditors dealing indiscriminately with members of the Nortel Group is entirely incorrect and unsubstantiated.

Moreover, the Monitor confirmed that his team was able to reconcile all intercompany transactions with the Nortel Group, identify creditors of and liquidate the Nortel entities in the Asia Pacific region and ascertain from the Nortel Groups' books and records which legal entity or entities owned assets.

>TR40711 (Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings) ¶41;  McDonald Dep. 207:13-213:23, 214:15-215:10, 215:23-216:7, 216:12-217:4, 217:7-217:16.

47.    The December 2013 court-approved settlement of claims between the EMEA Debtors and NNI and the recent settlement between the EMEA Debtors and NNL also demonstrate that the Nortel companies are treated as separate corporate entities.

>TR50121 (US D.I. 12785 Order Approving the US Claims Litigation Settlement); Canadian Order Approving Agreement Settling EMEA Canadian Claims and Related Claims, July 16, 2014.

### C.    NNI's Role in the Nortel Group

48.     NNI, Nortel's principal operating subsidiary in the United States, was incorporated in 1972.

>TR50854 (Official Website of the State of Delaware, Division of Corporations, https://delecorp.delaware.gov/tin/GINameSearch.jsp); TR00002 (Allen Aff.) ¶ 16.

49.    As discussed below, NNI was Nortel's largest legal entity worldwide by a number of measures and operated the Nortel Group's businesses in its largest market, the United States. NNI performed a substantial portion of Nortel's R&D, had the most important customers and was the primary revenue generator of the Group.

>Trial Tr. 821:22-822:12 (McCorkle); TR31304 (Email from A. Anderson to A. Millard et al. December 12,200, attaching, Foreign Filing PRACTICE NOTE) at 2; Trial Tr. 754:5-756:5 (DeWilton); TR22078 (2007-2011 APA Request) at 15 (showing NNI's 2007 R&D expense as 41% of the total expense by IEs); Trial Tr. 1655:24-1656:6 (Newcombe); TR49192 at tab "New reconciliation;" TR49187 at

tab "New reconciliation;" TR49188 at tab "New reconciliation;" TR49194 at tab "New reconciliation;" TR49190 at tab "New reconciliation;" TR49191 at tab "A-100 Reconciliation;" TR49193 at tab "Q4 2007 SAP Con;" TR49189 at tab "Q4 2008 SAP Con".

50.     Although it grew to be the largest Nortel legal entity, NNI started small by opening one factory in Michigan in 1972 and then a second in Raleigh, North Carolina in 1980 to manufacture digital switching systems.  By the mid-1980s, however, the US market had become far more important to the Nortel Group than the Canadian market.

> TR50286 (NNC History of Nortel) at 2; TR40245 (1987 NNL Form 10-K) at 5; TR21101 (Discussion Following the Remarks of Mr. Allen from the Canada-United States Law Journal) at 416.

### 1.     NNI Performed and Funded Extensive Research and Development

51.     NNI conducted R&D at a number of US facilities, including in Richardson, Texas; Billerica, Massachusetts (along the Route 128 technology corridor outside Boston); Santa Clara, California (in Silicon Valley); Raleigh, North Carolina (in Research Triangle Park); Long Island, New York; and Batavia, New York.

> Trial Tr. 647:16-648:6 (McFadden); TR33056 (PowerPoint Presentation titled "Global R&D Investment Strategy and recommendations for Nortel Networks") at 6-9; TR21205 (PowerPoint Presentation titled "Nortel R&D Talent for Discussion") at 3; TR21201A (PowerPoint Presentation titled "Nortel Global R&D Site Strategy Discussion") at 3-4; TR00020 (Ray Decl.) ¶ 13; Horn Dep. 16:17-22.

52.     R&D labs where there were employees with particular technical expertise in Nortel technologies were considered "centers of excellence."  NNI's US labs included "centers of excellence" for global products, such as Research Triangle Park for switching and DSM products; Richardson for wireless CDMA technology; and Santa Clara for certain Enterprise Solutions technologies.

> TR12016 (Email attaching presentation titled "The State of R&D at Nortel") attachment at 18; TR21205 (Email attaching presentation titled "Nortel R&D

> Talent) attachment at 3; TR21203 (email exchange between M. Langlois, B. McFadden and L. Clark regarding Top Strategic R&D sites); Trial Tr. 648:13-649:9 (McFadden).

53.    From the 1980s through 2000, NNI performed an ever-increasing share of Nortel's global R&D, with its workforce growing from 27% to 48% of Nortel's North American R&D employees.

- In 1985 there were approximately 3,500 R&D employees in Canada spread across 8 facilities and 1,300 R&D employees in the US spread across 5 facilities.

  > TR49841 at 9, 1985 Northern Telecom Ltd. Form 10-K;

- In 1995 there were approximately 6,300 R&D employees in Canada and 4,000 R&D employees in the US.

  > TR40253 at 11, 1995 Northern Telecom Ltd. Form 10-K;

- At its peak in 2000-2001, there were approximately 12,600 R&D employees in Canada and 10,500 R&D employees in the US.

  > TR40259 at 14, 2000 Nortel Networks Corporation Form 10-K; and

- As of December 31, 2004, there were approximately 5,000 full-time R&D employees in Canada, 4,630 full-time R&D employees in the US and 2,150 full-time R&D employees in EMEA.

  > TR41564 at 24, 2004 NNC Form 10-K.

54.    Even after Nortel's economic fortunes declined following the collapse of the internet bubble in 2001, resulting in nearly a decade of downsizing by the Nortel Group, "there was a big [R&D] presence in the US." (Trial Tr. 1062:4 (Binning)).  As of January 14, 2009, NNI employed nearly 10,000 people at 80 locations in the United States, including at four primary R&D facilities that together employed 1,848 active R&D employees.  Most of the senior management for the Business Lines in the advanced technology group were US-based.

> TR44075 (2009 NNL Transfer Pricing Report) at 6; Trial Tr. 643:15-645:14 (McFadden).

55.     From 2001-2008, $6.5 billion was spent on R&D performed at NNI facilities while

$7.4 billion was spent on R&D performed at NNL facilities.

>        TR00019 (Orlando Decl.) ¶ 12; *see also* TR21015 (Jan 16, 2008 Email chain
>        including J. Payne and M. Orlando re Q4 2007 TP Forecast Model) at 3.

56.     In 2007, NNI accounted for 41% of the IEs' collective R&D expenditures.

>        TR22078 (2007-2011 APA Request) at 16

57.     In addition, as discussed below, much of the spending on R&D performed at the facilities

of IEs other than NNI was funded through transfer pricing payments from NNI and loans and

guarantees by NNI.  NNL would have been unable to fund its R&D on its own.

>        Trial Tr. 625:2-7 (Allen); Trial Tr. 823:1-10 (McCorkle) ("Q. And NNL's
>        expenditures were funded in part by the movement of cash from other entities to
>        Canada; correct?  A. Yes, that's correct.  Q. And that included large amounts of
>        cash from NNI?  A. Yes.  Q. Okay, and isn't it fair to say, Mr. McCorkle, that
>        NNI indirectly funded NNL's R&D?  A. A portion thereof, yes."); *see also*
>        Binning Aff. ¶ 34; Beatty Dep. 224:8-20.

### 2.      NNI Had Nortel's Most Important Customer Relationships

58.     It was by selling products and services, a function performed by the sales teams, that

Nortel generated the vast majority of its profits.

>        Trial Tr. 1652:24-1653:22 (Newcombe).

59.     The world's largest telecom companies were NNI customers.

>        Trial Tr. 1655:24-1656:6 (Newcombe).

60.     Verizon – an NNI customer – was Nortel's largest customer and by itself accounted for

more than 10% of the Nortel Group's global revenue in 2007.

>        TR22078 (2008 Joint APA Request) at 11 (App. C); TR00010A-C (Hamilton
>        Reply Aff.) ¶ 6; Trial Tr. 1620:4-14 (Newcombe).

61.     Two other NNI customers – Sprint Nextel and AT&T/SBC – were among the largest of

all customers of the Nortel Group, each accounting for over 5% of Nortel's global revenue.

> TR22078 (2008 Joint APA Request) at 11 (App. C); Trial Tr. 1620:4-14
> (Newcombe); TR22078 at 25 (App. C); Roese Dep. 101:2-17, 396:20-396:21.

62.     MCI WorldCom, another major telecommunications company, was also an NNI customer.

> Trial Tr. 641:19-22 (McFadden); TR40258 at 10, NNC Form 10-K for the year
> ended December 31, 1999.

63.     Each Nortel entity was responsible for selling into its own geographic region with its own

sales and marketing teams.  As such, NNI was responsible for developing and maintaining its

customer relationships.

> TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity
> Structure and Funding") at 4; TR22078 (2008 Joint APA Request) at 22;
> TR12017 (Dec. 2006 General Purchase Agreement between Verizon and NNI);
> Zafirovski Dep. 27:11-28:21, 86:6-86:25; Trial Tr. 700:5-18 (McFadden);
> Newcombe Aff. ¶45; Rolston Dep. 145:15-146:6 ("Q. Would you agree that
> generally it was Nortel policy that customer relationships for Nortel's largest
> customers were handled in a manner that could best service the customer?  A. I
> would say that the intent of how we structured our global accounts was in order to
> address customer needs most effectively.  Q. Much better said than I said my
> question.  Therefore, in order to best meet Verizon, V-E-R-I-Z-O-N, needs, the
> global account director for Verizon was based in the United States, correct?  A.
> Yes."); *see also R. v. Dunn*, 2013 ONSC 137 at para. 175;

64.     In the competitive technology market, the relationship a salesperson had with a customer

could determine whether or not the company got a sale.

> Trial Tr. 1653:14-18 (Newcombe) ("Q. And when you're faced with competition,
> the relationship a salesperson may have with a customer, in fact, often is the
> reason you get a sale or don't get a sale; correct?  A. That's correct.").

65.     In the Business Line Sales (as defined below) through which Nortel liquidated its

operating segments after insolvency, which are discussed in more detail below in Sec. IV.B.,

customer relationships and their ability to generate revenue were important selling points.

> Trial Tr. 1653:14-164:24-54 (Newcombe). TR12004 (Aug. 7, 2009 Testimony
> before the House of Commons Standing Committee on Industry, Science and
> Technology) at 23, 55 ("Mr. Mark Henderson [President and CEO of Ericsson
> Canada Inc.]:…As it's become apparent that the CDMA technology is mature and
> will slowly be phased out, from our perspective and what we've seen from the
> past when other technologies are weaned out of the market and we've had

17

examples in the past of another technology that used to be here in Canada called TDMA, that even though the technology is being overlaid with a more advanced platform, that that technology continues to operate in the market for quite a few years and it is basically sunseted out of things. So the idea here is because the CDMA customer base is so attractive and is large in North America, that that's an opportunity for growth for Ericsson, that we continue to support these networks as they're growing, and hopefully bring new technological solutions to that customer base when those solutions are required."); *id.* at 23.

### 3.    NNI Earned Most of Nortel's Revenue

66.    In 1972, one year after its incorporation, NNI accounted for roughly $35 million in

revenue.

> TR50885 (Northern Electric Company listing statement for Toronto Stock Exchange) at 5; TR50875 (Northern Telecom Limited 1982 Annual Report) at 3.

67.    In 1985, NNI generated 68% of the Nortel Group's total revenue and, from 1989 to 2000,

on average, it generated 56% of the Group's revenue.

> TR49595 (2000 Annual Report) at 25 (Revenue in the US in 2000 was $18.150 billion); TR44004 (1999 Annual Report) at 16 (Revenue in the US in 1999 was $12.758 billion); TR50684 (1998 Annual Report) at 13 (Revenue in the US in 1998 was $9.841); TR44003 (1997 Annual Report) at 34 (Revenue in the US in 1997 was $8.30 billion); TR43993 (1996 Annual Report) at 31 (Revenue in the US in 1996 was $6.86 billion); TR44477 (1995 Annual Report) at 28 (Revenue in the US in 1995 was $5.35 billion); TR44476 (1994 Annual Report) at 44 (Revenue in the US in 1994 was $4.85 billion); TR40251 (1993 Northern Telecom Form 10-K) at 16 (Revenue in the US in 1993 was $4.43 billion); TR49577 (1992 Northern Telecom Form 10-K) at 17 (Revenue in the US in 1992 was $4.50 billion); TR49578 (1991 Northern Telecom Form 10-K) at 16 (Revenue in the US in 1991 was $4.34 billion); TR40248 (1990 Northern Telecom Form 10-K) at 15 (Revenue in the US in 1990 was $3.94 billion); TR40247 (1989 Northern Telecom Form 10-K) at 15 (Revenue in the US in 1989 was $3.62 billion); TR50878 (Northern Telecom Limited 1985 Annual Report) at 9.

68.    From 2001 to 2009, NNI generated approximately $45.955 billion in revenue, which

amounted to 69.5% of the revenue generated by the IEs during that same period.  Also during

that period, NNI generated 75.9% of the cashflow of the IEs.

> TR49192 at tabs "New reconciliation," "Rona;" TR49187 at tabs "New reconciliation," "Rona;" TR49188 at tabs "New reconciliation," "Rona;"

> TR49194 at tabs "New reconciliation," "Profit Split Profit;" TR49190 at tabs
> "New reconciliation," "Profit Split Profit;"TR49191 at tab "A-100
> Reconciliation," 'RPS Calculation;" TR49193 at tabs "Q4 2007 SAP Con," "RPS
> Calculation," and "RPS Participants;" TR49189 at tabs "Q4 2008 SAP Con," "FY
> RPS Calculation," "RPS Participants;" TR49389 at tabs "Q4 2009 SAP Con,"
> "RPS Participants"; Pahapill Dep. 231:3-17.

69.    NNI was generally cash-flow positive, even during periods when the Nortel Group's

other entities were losing money.

> Trial Tr. 822:6-12 (McCorkle); Doolittle Dep. 49:14-19 ("Q. Okay.  So during
> your years at Nortel was it generally the case that the cash outflows or expenses
> of the Canadian entity exceeded the earnings that were generated by that entity?
> A. Yes."); *id*. at 50:11-17 ("Q. Was it generally the case, sir, during your years at
> Nortel that NNI, the US entity, generated excess cash that was available to be sent
> to the parent company?  A. It was -- yes, NNI did generate excess cash and on
> occasion that cash was sent to the Canadian company.").

70.    From 2001-2009, NNL never accounted for more than 13.9% of Nortel's revenue among

IEs and on average, it accounted for 12.5%

> TR00051 (Kinrich Report) at 105 (Ex. 6); TR49192 at "New reconciliation" tab,
> 2001 Transfer Pricing Worksheet; TR49187 at "New Reconciliation" tab, 2002
> Transfer Pricing Worksheet; TR49188 at "New reconciliation" tab, 2003 Transfer
> Pricing Worksheet; TR49194 at "New reconciliation" tab, 2004 Transfer Pricing
> Worksheet; TR49190 at "New reconciliation" tab, 2005 Transfer Pricing
> Worksheet; TR49191 at "A-100 Reconciliation" tab, 2006 Transfer Pricing
> Worksheet; TR49193 at "Q4 2007 SAP Con" tab, 2007 Transfer Pricing
> Worksheet; TR49189 at "Q4 2008 SAP Con" tab, 2008 Transfer Pricing
> Worksheet; TR49389 at "Q4 2009 SAP Con" tab, 2009 Transfer Pricing
> Worksheet.

71.    During that same time, the EMEA IEs accounted for 18.4% of the revenue among IEs on

average.

> TR00051 (Kinrich Report) at 105 (Ex. 6); TR49192 at "New reconciliation" tab,
> 2001 Transfer Pricing Worksheet; TR49187 at "New Reconciliation" tab, 2002
> Transfer Pricing Worksheet; TR49188 at "New reconciliation" tab, 2003 Transfer
> Pricing Worksheet; TR49194 at "New reconciliation" tab, 2004 Transfer Pricing
> Worksheet; TR49190 at "New reconciliation" tab, 2005 Transfer Pricing
> Worksheet; TR49191 at "A-100 Reconciliation" tab, 2006 Transfer Pricing
> Worksheet; TR49193 at "Q4 2007 SAP Con" tab, 2007 Transfer Pricing
> Worksheet; TR49189 at "Q4 2008 SAP Con" tab, 2008 Transfer Pricing

Worksheet; TR49389 at "Q4 2009 SAP Con" tab, 2009 Transfer Pricing
Worksheet.

### 4. NNI Provided Essential Credit Support to the Nortel Group

72.    As discussed in Section II.B.3, above, it was only because of NNI's strong financial

position that other Nortel entities were able to obtain credit on favorable terms and meet liquidity

requirements.

### *a.* NNI Guarantees Enabled the Nortel Group to Borrow on Acceptable Terms

73.    In 2006, it was clear to Nortel's CFO, Peter Currie, that NNI would need to provide

support to NNL for NNL to access the liquidity the Nortel Group was seeking.

Trial Tr. 549:8-18 (Currie).

74.    Thereafter, NNI was the only NNL subsidiary to guarantee the Nortel Group's debt or

financing.

TR50725 (2007 NNC Annual Report) at 156-164, (Supplemental condensed
consolidating financial information providing financial information for NNI as the
"Guarantor Subsidiary" and "subsidiaries of Nortel that are not issuers or
guarantors of the July 2006 Notes and the Convertible Notes (the 'Non-Guarantor
Subsidiaries')"; Trial Tr. 819:21-820:11 (McCorkle); Williams Dep. 198:12-
199:10.

75.    In February 2006, NNI entered into a one year credit facility (the "2006 Credit Facility")

under which NNI borrowed $1.3 billion, the proceeds of which were used to pay off

$1.275 billion in NNL bonds that were approaching maturity.

TR11003 (2005 Form 10-K) at 102; Currie Dep. 259:12-260:6; Trial Tr. 550:8-14
(Currie).

76.    The 2006 Credit Facility triggered a threshold for indebtedness in an earlier Support

Facility (the "EDC Support Facility") NNL had with Export Development Canada ("EDC"),

Canada's federal export credit agency.  The EDC Support Facility provided $750 million

financing support to NNL for ordinary course performance related business activities.

TR40264 (2003 NNC Form 10-K) at F-56.

77.    The EDC Support Facility, an unsecured obligation, had required that if NNL or one of

its subsidiaries, including NNI, incurred or guaranteed future indebtedness above a certain

threshold, guarantees of NNL's obligations to EDC under the EDC Support Facility would be

required.

TR11003 (2005 NNC Form 10-K) at 104.

78.    The EDC Support Facility was an important source of liquidity for the Nortel Group.

Trial Tr. 550:22-25 (Currie).

79.    As a result of this trigger, NNI was required to guarantee the EDC Support Facility

beginning in February 2006.

TR11003 (2005 NNC Form 10-K) at 61, 104; TR44715 (Feb. 14, 2006 Guarantee
Agreement between NNI, NNL, NNC and EDC).

80.    To repay the 2006 Credit Facility, in the summer of 2006, NNL and NNC issued $2

billion in public debt, again guaranteed by NNI (the "2006 Bond Issuance").

Trial Tr. 548:2-8 (Currie); TR44700 (Offering Memorandum, $2 billion) at 11
("We will use $1.3 billion of the net proceeds of this offering to repay the 2006
Credit Facility.").

81.    The funds generated by the 2006 Bond Issuance were also used to pay NNL and NNC

corporate obligations, including $575 million in cash payments to former shareholders of NNC

in settlement of securities class action claims arising from four financial restatements during the

2000-2005 fiscal year period and related investigations by the Ontario Securities Commission

and US Securities and Exchange Commission  at the NNC/NNL level.

See TR50725 (2007 NNC Annual Report) at 152-53; see also TR50734 (June 23,
2006 Email from A. Huey to M. Weisz titled "Memo re:  funding of civil
litigation settlement payment"); TR44700 (Offering Memorandum, $2 billion) at
18; TR21539 (Doolittle Plan of Compromise Aff.) ¶ 14.

82.     Similar to the 2006 Credit Facility, the 2006 Bond Issuance triggered the clause in the

EDC Support Facility Amendment requiring a guarantee by NNI of NNL's obligations under the

EDC Support Facility.

>    TR44993 (July 5, 2006 Officer Certificate and Note Indenture) at 1; *id*. § 1005.

83.     In 2007, NNC issued $1.150 billion in public debt, all guaranteed by NNI, and in 2008,

NNL issued an additional approximately $675 million in public debt also guaranteed by NNI

(together with the 2006 Bond Issuance, the "NNI Guaranteed Bonds").

>    Trial Tr. 548:3-14 (Currie); TR40180 (Prospectus, $1.150 billion); TR40119
>    (Offering Memorandum, $675 million).

84.     NNI's guarantees of the NNI Guaranteed Bonds reduced the interest rate paid by the

issuer (either NNC or NNL), made the debt issuance possible in the first place or both.

>    *See* Trial Tr. 548:3-549:23 (Currie); Trial Tr. 821:2-15 (McCorkle); Williams
>    Dep. 198:12 198:20; K. Stevenson Dep. 126:3-128:21; Currie Dep. 263:13-
>    263:21;  *See also* TR21312 (May 16, 2006 Email from J. Williams to K.
>    Stevenson titled "Update on strategy"); TR44710 (Mar. 8, 2007 Email from M.
>    McCorkle to K. Stevenson titled "NNI guarantee"); TR44738 (Standard & Poors
>    Canadian Credit Rating for Nortel Networks Ltd.)

85.     At the time of each of these offerings, NNC's and NNL's credit ratings were below

investment grade and in the eight years prior to the Petition Date, NNL had generated only 13%

of the IEs' aggregate revenue.

>    *See* TR49192 at tab "New reconciliation;" TR49187 at tab "New reconciliation;"
>    TR49188 at tab "New reconciliation;" TR49194 at tab "New reconciliation;"
>    TR49190 at tab "New reconciliation;" TR49191 at tab "A-100 Reconciliation;"
>    TR49193 at tab "Q4 2007 SAP Con;" TR49189 at tab "Q4 2008 SAP Con";
>    Williams Dep. 198:12-200:2; K. Stevenson Dep. 126:18-128:21.

86.     J. P. Morgan and Citibank, among others, told Michael McCorkle, the Nortel Group's

Treasurer, that Nortel would be able to raise greater funds at lower interest rates if NNI

guaranteed the debt.

> Trial Tr. 821:2-6 (McCorkle); *see also* TR00001 (Currie Aff.) ¶ 90; Trial Tr. 549:3-23 (Currie).

87.     Paviter Binning, NNL's CFO from November 2007 to March 2010, agreed that "creditors were looking for those guarantees because they wanted to look at the assets of NNI as a support for lending to NNL."

> Binning Dep. 148:13-150:16; *see also* Trial Tr. 1057:2-25 (Binning).

88.     Only a comparatively small amount of financial debt, $200 million, was issued by NNL or NNC as of December 2008 without a guaranty from NNI.

> *See* TR22075 (Dec. 2008 PowerPoint Presentation titled "Overview of Entity Structure and Functioning") at 8.

### b.     NNI Provided Critical Credit Directly to NNL

89.     In addition to supporting third-party debt, NNI provided NNL with a revolving credit agreement of up to $2 billion to allow NNL to meet its working capital requirements pending receipt of transfer pricing payments.

> *See* TR50771 (Mar. 28, 2001 Credit Agreement between NNL and NNI); TR11148 (Mar. 23, 2004 Revolving Loan Agreement between NNI and NNL); TR50773 (Mar. 22, 2006 Revolving Loan Agreement between NNI and NNL).

90.     NNL needed this infusion of cash from NNI to continue operating.  In the words of NNL's Treasurer Kate Stevenson, "it is clear that we were dependent on NNI."

> K. Stevenson Dep. 157:7-158:7; *see also* K. Stevenson Dep. 155:24-157:2; Beatty Dep. 44:8-12.

91.     NNL also relied on intercompany loans from NNI in order to satisfy the Canadian Business Corporations Act solvency test each quarter, which, among other things, allowed NNL to pay dividends on its preferred shares.

> Trial Tr. 823:18-824:4 (McCorkle) ("Q. And is it true that NNL relied on intercompany loans from NNI in order to satisfy the [Canada Business Corporations Act] solvency test each quarter?  A. Generally speaking yes.  We set up those preferred shares, we knew that NNL did not normally have sufficient

funds for the purpose of the solvency test, so we always made sure that we had intercompany facilities available that it could access if needed and we used those as part of the calculation and NNI was the largest portion of that for sure."); TR21063 (Nov. 2006 Email exchange between K. Stevenson and M. McCorkle) at 2 ("NNL Controller must be in position to sign monthly 'solvency letter' in support of dividend payments on NNL's preferred shares:  NNL is a cost center, spending about 400m per quarter.  Controller relies on availability of interco loan from NNI in amounts of at least 400m.").

### 5.    NNI Possessed Additional Administrative and Operational Capacities Important to the Nortel Group's Global Business

92.    In addition to the significance of its R&D, customer relationships, revenues and role in providing credit support to its corporate parent, NNI possessed administrative and operational capacities, including senior accounting, human resources, legal, real estate, operations, logistics and information technology personnel who supported NNI's operations as well as operations of Nortel Group affiliates around the world.

TR00020 (Ray Decl.) ¶¶ 15-16; TR00018 (Ricaurte Decl.) ¶¶ 4, 7.

93.    While NNL provided certain headquarters functions for the Nortel Group, NNI had corresponding teams in the United States, including those with expertise in accounting, tax, internal audit, compliance, revenue recognition, accounts receivable and payable and payroll.

TR00020 (Ray Decl.) ¶ 19.

94.    Other top managers who performed essential functions for the Nortel Group were also NNI employees.  For example, George Riedel, an NNI employee, led the Nortel Group's M&A/Strategy function.  John Veschi, an NNI employee, led the Intellectual Property group.

Riedel Dep. 32:3-6, 28:18-29:22; Veschi Dep. 47:13-25, 244:9-14, 245:21-246:19.

95.    Further, NNI was the center of the Nortel Group's global operations.  NNI employees Joseph Flanagan and Christopher Ricaurte led the 3,600-employee Global Operations unit, which

was responsible for "supporting and fulfilling, from beginning to end orders from Nortel customers around the world."

> TR00018 (Ricaurte Decl.) ¶ 4; *see also* TR48623 (NNL and NNI Bilateral APA) at 9-14 (App. D); T. Collins Dep. 29:21-30:10; Zafirovski Dep. 91:7-18.

96.     The Global Operations group's Supply Chain Management; Manufacturing Support, Procurement and Logistics; and Technology Introduction and Support groups each provided essential services without which the Nortel Group's Business Lines could not operate.

> TR00018 (Ricaurte Decl.) ¶¶ 8-28; *see also* TR48623 (NNL and NNI Bilateral APA) at 9-14 (App. D).

97.     NNI's operational capacity was such that, after the Nortel companies' insolvency filings, NNI led the newly created Nortel Business Services (the "<u>NBS</u>") unit, providing essential transitional business services to the purchasers of the Business Lines – including human resources, finance, IT and other support required to meet obligations to the purchasers – without which the Nortel Group could not have fulfilled its obligations to customers and purchasers.

> TR00018 (Ricaurte Decl.) ¶¶ 29-38; TR00020 (Ray Decl.) ¶¶ 19, 21-22; *see also* TR40030 (Mar. 2, 2010 PowerPoint Presentation titled "2010 Budget Review"); TR50736 (May 11, 2009 Email from J. Flanagan to Nortel Employees titled "Organizational Changes:  Nortel Business Services").

> ### D.     The Nortel's Group's Research And Development Practices

98.     As discussed above, substantial R&D was performed by each of the IEs.

99.     From 1989 to 2000, NNL's direct spending on R&D totaled approximately $7.6 billion while NNI's totaled $9.6 billion.

> TR00055 (Ryan Report) 15, Ex. D.1.

100.     During the period 2001 to 2008, NNL's direct spending on R&D – including amounts subsidized by other entities – totaled approximately $7.4 billion.  Direct spending on R&D by

NNI, NNUK, NNSA and NN Ireland totaled $9.2 billion, with NNI spending at least $6.5 billion of that total on R&D conducted at its facilities.

> TR00050 (Reichert Rebuttal) at 23, n.22; TR00019 (Orlando Decl.) ¶ 40 & Figure 1.

101.    The $7.4 billion spent on R&D at NNL's facilities was funded in part by transfer pricing payments from NNI, which payments totaled more than $4.7 billion, $2 billion of which the Canadian and US tax authorities ultimately required to be reversed ███████████████████

███████████████████████████████████████████████

> TR00019 (Orlando Decl.) ¶ 41 & Figure 2; ███████████████████████
> ███████████████████████████████████████████.

### 1.    All Nortel R&D Was Intended to Produce Products And Sustain Innovation

102.    The definition of "Products" under the MRDA, discussed in more detail in the Conclusions of Law Section II.C.1.  includes products or services developed, manufactured or proposed at any time.

> TR21003 (MRDA) at 4 (Art. 1(g)).

103.    Even under the Monitor's interpretation of "Products," the IPCo Model, discussed in Section IV.C., which employed all Nortel patents not currently associated with existing Business Line products, was a "Product" as defined in the MRDA because it was a service proposed to be developed that would market to other companies licenses to Nortel's Patent Portfolio  in exchange for royalties.  As such, all Nortel patents fell within the definition of a "Product," regardless of whether one adopts a narrow or broad view.

> TR00020 (Ray Decl.) ¶¶52, 54-62; TR21003 (MRDA) at 4 (Art. 1(g)); *see* Burshtein Dep. 187:7-15 (Monitor's expert agreeing that "the licensing of intellectual property and intellectual property rights" can be a "service").

104.    Additionally, given that the definition of "Products" includes "at any time," patents that

did not immediately manifest themselves in products still qualified as "Products" under the

MRDA because all R&D performed by Nortel was ultimately intended to culminate in a product.

> Trial Tr. 1925:23-1926:3 (Hall); Trial Tr. 2176:10-18 (Anderson); Trial Tr.
> 635:7-16, 651:4-16 (McFadden); Trial Tr. 559:6-560:14 (Currie)

105.    The competitive nature of the technology market required that Nortel not only focus on

R&D that could be incorporated into existing products but forward-looking R&D that could be

utilized in the next generation of products.

> Roese Dep. 32:10-15; McColgan Dep. 207:21-209:2; Trial Tr. 1925:23-1926:3
> (Hall); Trial Tr. 2176:10-18 (Anderson); Trial Tr. 635:7-16, 651:4-16
> (McFadden); Trial Tr. 559:6-560:14 (Currie); Trial Tr. 651:4-16 (McFadden);
> Trial Tr. 558:3-560:14 (Currie); TR21126 (2007 Budget Presentation, Feb. 21,
> 2007) at 11 (chart breaking R&D budget down by line of business and then by
> product programs within each line of business).

106.    Relevant economic literature emphasizes and Nortel employees recognized the need for

high-technology organizations to "leap" from one technology cycle known as an "S-curve" to the

next in order to remain competitive.  A high-technology business that incentivized only

incremental improvements to its existing technologies and failed to make the leap from one S-

curve to the next would quickly find its products and services supplanted by competitors.

> TR00056 (Tucker Rebuttal) ¶¶ 27-29, 31-33; Trial Tr. 4655:3-8 (Tucker) ("In a
> high-tech firm whose lifeblood is R&D, such as Nortel, what's going to be
> particularly important are the incentives towards R&D, and in particular the idea
> that the incentives should be directed towards forward-looking innovation.");
> Trial Tr. 4659:22-4661:11 (Tucker); Roese Dep. 32:10-15 ("[A] technology
> company that only builds for the present eventually fails in the future.  And your
> ability to deliver future products requires investment in R&D in those products
> before they actually are necessary."); McColgan Dep. 207:21-209:2; TR11055
> (Horst Frisch Report) at 4.

107.    Nortel's regulatory filings, communications with tax authorities and statements by

management indicate that Nortel was well aware of the imperative to innovate and indeed

emphasized a long-held commitment to developing next-generation technologies:

- Reflecting on various cost reductions necessitated by market conditions, NNC's 2003 10-K stated "[o]ur R&D expense did not decline to the same extent as our SG&A expense on a percentage basis due to our technology focus and commitment to invest in next generation solutions."

    TR40264 (2003 NNC Form 10-K) at 41.

- NNC's 2006 10-K reiterated this, stating, "[w]e are seeking to generate profitable growth by using this focus to identify markets and technologies where we can attain a market leadership position. . . .  Some areas in which we are increasing investment include 4G broadband and wireless technologies."

    TR40426 (2006 NNC Form 10-K) at 3.

- In a 2007 interview, Roese observed that "if you take your eye off the ball, you suddenly find out a few years later that most of your people are working on legacy products which is probably not a very good way to run a business."

    TR50835 (*Catching Up With Nortel CTO John Roese*, http://www.networkworld.com/podcasts/panorama/2007/062607pan-nortel.html) at 36:00-36:43.

- NNL and NNI's 2008 joint request for a bilateral advance pricing agreement with the Canadian and US taxing authorities emphasized that Nortel had "[a]ccelerated the shift of R&D dollars towards new and emerging markets and technologies."

    TR22078 (2008 Joint APA Request) at App. B, p. 5.

- The 2008 joint APA request, submitted along with the functional analysis prepared by Nortel and Ernst & Young Inc. ("E&Y"), described IEs as "entitled to participate in the on-going benefits from their historical IP and bear the risks associated with the continuing value of that IP.  The IEs maintain their historical IP and continue to develop new IP from which they anticipate sharing in the future benefits.  These entities are responsible for on-going entrepreneurship and risk-taking functions with respect to their on-going IP activities."

    TR22078 (2008 Joint APA Request) at 11 (Executive Summary); Trial Tr. 1280:3-1281:5 (Orlando).

108.    Forward-looking R&D was not divorced from the development of proposed Products.

Even R&D done in Nortel's Advanced Technology program, which operated independently from

the Business Lines, was ultimately intended to result in the development of products.

    Trial Tr. 1925:23-1926:3 (Hall); Trial Tr. 635:9-16 (McFadden); Roese Dep. 32:10-15; Debon Dep. 175:24-176:3.

109.    For example, Nortel prioritized investments in developing 4G technology at a time when

2G and 3G technologies were still dominant and it was one of the first developers of WiMax

technology, which nearly a decade later became an integral component of LTE, or 4G

technology.

> TR40266 (2005 NNC Form 10-K) at 2, 6; Roese Dep. 103:17-22; Trial Tr. 654:6-
> 655:19 (McFadden); *see also* TR11282 (Sept. 26, 2007 Background Notes from
> John Roese Remarks at Ottawa Patent Awards Ceremony) (recounting how Nortel
> filed a "click to call" patent more than ten years before voice over internet
> protocol products became a reality) ¶ 6; *see also* McColgan Dep. 206:10-25.

110.    From an economic perspective, the optimal way to incentivize such innovation is to

provide the R&D risk-takers with entrepreneurial ownership of the intellectual property

developed through R&D investments.

> Trial Tr. 4654:21-4655:12 (Tucker).

111.    As is discussed in further detail in Section III.B, Nortel's intercompany arrangements

governing transfer pricing and the ownership of IP generated by Nortel's R&D – which were

required by applicable laws and regulations to reflect what arm's length parties would have

agreed to in a comparable transaction – as well as its statements to tax authorities regarding those

arrangements, provided that each of the IEs enjoyed "the full entrepreneurial risk and benefits for

the Nortel Networks business" and owned the technology created as a result of the innovative

R&D they performed in their respective territories of operation.

## 2.    The Nortel Group's Patents and Patenting Practices

### a.    Patent Decision-Making Was Decentralized and Not Controlled by NNL

112.    As discussed below, Nortel established procedures for determining which patents to file

and where.

113.    These decisions were not made centrally but were delegated to patent review boards,

which were comprised of representatives from Nortel's IP Law Group and the Business Lines.

> T. Collins Dep. 39:2-39:18 ("A. So Nortel Networks Limited and the group of companies had a process which was managed by the intellectual property law group and that involved invention disclosure" and "a patent review board, a board that reviewed and assessed the invention disclosures for the merit of the invention to determine its particular value."); *id.* 124:13-16 ("any group that was generating invention disclosures from the R&D perspective would have had their patents go up through …a patent review board."); TR00032 (Anderson Reply Aff.) ¶ 15; TR40126 (Corporate Procedure No. 501.03 titled "Inventions by Employees – Patents, Industrial Designs and Invention Disclosures") ¶ 5.2(b ("The IP Law Group and the appropriate Line of Business will review all inventive ideas submitted and decide on appropriate protection based on the technical merit of each submitted idea."); *Id.* ¶ 4.6 ("The IP Law Group is responsible on a worldwide basis for receiving and reviewing (in conjunction with the appropriate Line of Business) new technical developments throughout Nortel Networks and obtaining patent and industrial design protection where appropriate."); Cianciolo Dep. 23:3-6 (Q.  All right.  And whose decision would it be about whether to file or not?  A.  That would be a collective decision amongst the – the patent review board for that business.").[5]

114.    The patent review boards were organized along Business Lines.

> Cianciolo Dep. 164:25-165:13 ("Q. Okay.  Were they – were the patent review boards at Nortel aligned with any particular legal entities within Nortel?  A. No.  Q. How were patent review boards organized at Nortel?  A. Along business unit lines.  And – and within business units, it could be on technology lines.  … Q. Am I correct that those business lines were not organized geographically?  A. Correct.").

115.    The IP Law Group, whose members participated on patent review boards, consisted of

attorneys from different geographic entities.  Art Fisher, the head of the group, from whom the

sub-groups derived their authority, was employed at various times by NNI.

> TR11084 (Email attaching Nortel Networks Multilateral APA Response to IRS Information and Document Request for a Functional Analysis) attachment at 32 ("The IP Law Group has personnel in the [sic] Canada, U.S., the U.K. and other countries.  Personnel in each of the countries perform substantially the same

---

[5] While Section 4(d) of the Master R&D Agreement provided that "NNL shall have the exclusive right but not the obligation to file and prosecute any applications in its name for patents . . . ," as the sole owner of all of the equity in its subsidiaries like NNI and NNUK, NNL was obviously incentivized to pursue patent applications whenever it was in the financial interest of its subsidiaries to do so and thus their interests were completely aligned.

responsibilities with respect to protecting Nortel's IP.") Trial Tr. 2172:8-23, 2192:3-2193:4 (Anderson); TR11152 (July 24, 2006 PowerPoint Presentation titled "Powering IP to Win IP Strategy") at 8, (IP Law Group organization chart, listing employees locations); TR11102 (June 15, 2006 PowerPoint Presentation titled "IP Law Group Business Analysis") at 5; TR21216 (Responses of the Monitor and Canadian Debtors to the 'Persons' Consolidated Interrogatories) at 20 (chart listing Art Fisher as employed by NNI in 2000, 2001 and 2003).

116.    The Patent Review Board's decision-making was based on objective criteria – technical contribution, inventive contribution and commercial contribution – resulting in a combined "TIC" score and patent applications were pursued for all inventions which surpassed a threshold TIC score.

TR00032 (Anderson Reply Aff.) ¶¶ 16-18; Trial Tr. 2173:24-2176:9 (Anderson); Cianciolo Dep. 186:17-25; DeWilton Dep. 158:20-159:12.

117.    The Patent Practice Group set guidelines for where patent applications would be filed for inventions that met the threshold TIC criteria and thus in which jurisdiction or jurisdictions a given Nortel invention would receive intellectual property protection.  A subgroup of the IP Law Group, the Patent Practice Group was based in the United States and comprised of representatives of NNL, NNI and Nortel's EMEA entities.

Anderson Dep. 57:25-58:6, 61:17-23 ("Q. Was there one Patent Practice Group for the entire I.P. Department at Nortel?  A. Yes.  Q. Across all geographies?  A. Across all geographies and all business units."); TR00032 (Anderson Reply Aff.) ¶12; Anderson Dep. 61:17-23 ("Q. At all times when you were a member of the Patent Practice Group – A. Mm-hm. Q. –were there members from all of the U.K., Canada, the US and France?  A. Always.  Occasionally there wasn't France, but I represented France when that wasn't the case."); Trial Tr. 2192:23-24 (Anderson) ("the person that was running the patent group was in the States.").

118.    It was Nortel's policy from 2001 to 2008 to file all patent applications in the United States.

Trial Tr. 2180:2-2181:2 (Anderson); TR31304 (December 12, 2000 Email from A. Anderson to A. Millard et al., attaching, Foreign Filing PRACTICE NOTE) attachment at 1;  TR21447 (May 11, 2006 Email from B. Junkin titled "Further Filing Proposal – in words and detailed reasoning") at 1, 3;" TR21460 (May 12,

> 2005 Email from A. deWilton to C. Cianciolo attaching "Patent Strategy Focus Group: Optimizing the Patent Portfolio") attachment at 18.

119.    It was also Nortel's policy, as set by the Patent Practice Group, to file patent applications in the United States before other jurisdictions, if any, except in limited circumstances such as where the local law of the place of invention required a patent to be filed in that country first.

> TR00032 (Anderson Reply Aff.) ¶¶ 19-20; deWilton Dep. 64:10-65:11 ("Q. Okay. Let's just go through this and get your understanding. Okay. It says, 'Recommendations are summarized by this chart,' by which I take it that's referring to the first page of the spreadsheet? A. Yes. Q. Okay. So I see – look – referring to the chart, I see under 'North American,' it says 'for all technologies,' and I see a big box that says a hundred percent. A. Yes. Q. So what does that mean? A. It means that if we were going to file a patent application based on an invention, it would be filed in the U.S. Q. So if it made the cut – A. Yes, if it made the cut – Q. – to be filed at all? A. – it would be filed in the U.S. Q. It would be filed in – a hundred percent of it would be filed in the U.S. A. Yes. Q. Would that be the priority case? A. That would be anything that got approved for patenting would be filed in the U.S.").

120.    Nortel maintained this practice because it recognized that US patents provided the greatest value for its business for a number of reasons, including the relative size of the US market, the market in which exclusively NNI operated.

> Trial Tr. 2180:2-2181:2 (Anderson); TR31304 (December 12, 2000 Email from A. Anderson to A. Millard et al., attaching, Foreign Filing PRACTICE NOTE) attachment at 1 ("Keep filing all cases in the US. Reasons: This captures more of the market than any other single filing and gives you predictable prosecution and enforceability at the lowest cost per market %. Our US portfolio still carries the weight of our licensing and defence programs.").

121.    According to Angela deWilton, having a strong US portfolio was "fundamental," and patents were filed first in the US because it was the largest market, particularly for the telecom industry. Having a strong US portfolio also acted as a deterrent to foreign competitors because it would not be cost effective, in most cases, for a foreign competitor to manufacture a product for the rest of the world if it were unable to market it in the US.

> Trial Tr. 754:5-756:5 (deWilton) ("Q. And the US – the practice of filing in the US first was a consistent practice during all that time informally and then later

formally; is that right?  A. I believe that in the very early days that I joined the
group perhaps we filed equally in Canada and the US, but as soon as we began to
ramp up the patent filing program, the US filings were definitely the primary
filing.  Q. And I think you had said one reason for that is because the US is such a
significant market, and in fact the most significant market for telecom products; is
that right?  A. It's a very significant market for many different products, but
particularly for the telecom industry at the time I was there.  Q. And another
reason was for Nortel particularly, it had a large part of its business and its sales
in the US and the patent protection there would help further those sales; is that
right?  A. I think that that's tied into what I was saying about the largest market
being the US not only for Nortel but for its competitors as well.  So there's clearly
high value in filing a patent application in the US or in other markets which are
important both to your own company and to potential competitors who may be
using the technology.  Q. And I believe that you had explained in your deposition
as well that the US patent portfolio, you would also want to keep the US patent
portfolio, in a strong portfolio because the US portfolio is a primary focus for
licensing and other business negotiations and, as you said, it's fundamental to
most North American companies to keep a strong US portfolio; is that right?  A. I
think it's fundamental to most global companies to have a strong US portfolio
because the value of US portfolio is not only in protecting your own home market
there or discouraging US competitors, it has value more globally because all
major telecom players in the global market had to be part of the US market.  So
the US portfolio also acts as a deterrent to foreign competitors because it would
not be cost effective in most cases for them to manufacture a product for the rest
of the world if it can't also market it in the US.").

122.    Angela Anderson confirmed that the US offered the best marketplace with a single filing.

A patent in the US "capture[d] more of the market than any other single filing, hit[] the home

base of more [Nortel] competitors and technology users than any other single filing and g[ave

Nortel] predictable prosecution and enforceability at the lower cost per market percentage."

> TR31304 (December 12, 2000 Email from A. Anderson to A. Millard et al.,
> attaching, Foreign Filing PRACTICE NOTE) attachment at 1; Trial Tr. 2180,
> 2216:4-2217:7 (Anderson).

123.    In contrast to the US, Canada was not at any pertinent time during the MRDA period the

principal market for Nortel products given its smaller customer base.

> Trial Tr. 657:6-10 (McFadden) ("Q. Canada wasn't going to be the major market
> for LTE technology?  A. Canada was never the major market for all of our
> products because of the population size of Canada.); deWilton Dep. 65:22-66:24
> ("Q. So subject to that, complying with whatever those requirements were, policy
> would be to file first in the United States?  A. Yes.  Q. And then looking at the

next column, it has 'Canada' – that 'CA' is Canada, right?  A. Yes. Q. And then
the technologies, it lists some technologies.  A. Yes.  Q. It says – it says 5 percent,
10 percent of budget.  Do you see that?  A. Yes.  Q. Was that the recommendation
was – you were very selective about what you filed in Canada?  A. Correct, yes.
Q. Okay.  Is that because Canada was a smaller market?  A. Yes, and I should
clarify that 5 percent would be the 5 percent of foreign filing budget not of the
patent budget.  Q. Oh.  And what was the foreign filing budget?  A. That was a
very small percentage of the total budget.");  deWilton Dep. 171:10-25 ("Q. Well,
on the very next page, you can see there's a bolded sentence that says: 'So
Canadian patents are still cost-effective but falling behind CN and EP(3) in terms
of incremental added value – however we still need to show the flag.'  A. Okay.
So my interpretation of that in the context of this email from Bill Junkin is that for
political reasons, being a Canadian-based company, there is some benefit to
having a patent portfolio in Canada apart from business reasons.");  TR21463
(Email from Bill Junkin to P. Hashim, A. deWilton et. al re: Further Filing Plan)
at 9 ("So Canadian patents are still cost effective, but falling behind CN and
EP(3) in terms of incremental added value – however we still need to show the
flag.");  TR32109 (Aug. 31, 2005 Email from V. Raimondo to K. Stephens and M.
Weisz) at 1-2, ("NNL's third party sales represent less than 10% of the third party
sales of the entire company.  The company's growth appears to be in countries
other than Canada.");  TR32109 (Aug. 30, 2005 Email from V. Raimondo to M.
Weisz RE: BuyOut of RPS Participants) at 3 ("[F]rankly I am not convinced that
NNL does not need to be bought out.  The Company has an abundance of losses
and ITC's and its technology value is arguable as low as ever.  So a migration
now may make sense depending on our business plans.  Future growth for Nortel
is not in Canada anyways.").

124.  Pursuant to policies set by the Patent Practice Group, patent applications were selectively
"further filed" in additional jurisdictions based upon whether the patents were relevant to
customers and competitors in those jurisdictions.

Anderson Dep. 188:2-13; TR21447 (May 11, 2006 Email from B. Junkin titled
"Further Filing Proposal – in words and detailed reasoning") at 1.

125.  With respect to the culling of patents, the Patent Practice Group, along with the business
unit teams, was responsible for deciding when it was not cost-effective to maintain a patent in
the portfolio.  Patents were regularly evaluated to determine whether they should be maintained.

Trial Tr. 2192:3-2193:4, 2185:7-2186:2 (Anderson).

### b.    Patent Assignments Were Governed By Standard Employment Agreements

126.    Employment agreements that were introduced by the Monitor at trial show that patents

invented by Nortel employees were assigned to the entity that employed them pursuant to

Nortel's standard employment agreements.

> TR45736 (Agreement relating to intellectual property and confidentiality) ¶ 9 ("In the event that my employment by the Company [in this case NNL] is succeeded by employment with an affiliate company, the terms of this Agreement apply until an agreement relating to this subject matter is signed with the affiliate company, and if I do not execute an agreement with such affiliate company relating to this subject matter, terms identical to those set forth in this Agreement shall apply immediately in favour of such affiliate company upon commencement of my employment and until such an agreement is executed with such affiliate company."); TR45737 (Agreement relating to intellectual property and confidentiality); deWilton Dep. 31:16-32:4 ("Q. Okay.  Was there a written policy that required inventors to assign their patent applications?  A. Yes.  Q. And what's your best recollection of what that policy said?  A. Okay.  Well, first of all, at the time a person is hired or was hired as an employee or a contractor, they signed an employee agreement or a contractor agreement in which they assigned – agreed to assign the rights and inventions and other forms of intellectual property to the company that was employing them."); TR50691 (Corporate Procedure No. 501.03, Inventions By Employees – Patents, Industrial Designs and Invention Disclosures) ¶5.2(e) ("If it is decided to file an application for patent or for registration of an industrial design, the IP Law Group shall: (i) prepare or have prepared the application together with the necessary petition and assignment of the Invention to Nortel Networks"); *see also* TR48819 (Acknowledgment on Notification Regarding Limits on Assignment of Inventions); TR48821 (Employment Agreement); TR48824 (Employment Agreement); TR48828 (Employment Agreement), TR48823 (Employment Agreement); TR48820 (Employment Agreement); TR48827 (Employment Agreement); TR48822 (Employment Agreement); TR48825 (Employment Agreement).

127.    Where inventions were initially assigned to an employer other than NNL, legal title was

ultimately assigned to NNL by the applicable Nortel entity, in accordance with the exchange

contemplated in the MRDA, discussed in greater detail in Section III.D.1.

> TR21003 (MRDA) at 6 (Art. 4(a)); Trial Tr. 747:8-20 (deWilton); TR00006 (deWilton Aff.) ¶8.

### c.    Patent Applications Were Assigned to NNL for Administrative Reasons

128.    There was significant administrative convenience to having legal title to the Group's

patent portfolio held by one entity.

> Trial Tr. 1142:21-24 (Henderson) ("Q. And you understood, did you not, that NNL's holding of legal title was a matter of administrative convenience, correct? A. That's correct."); TR00032 (Anderson Reply Aff.) ¶ 18 ("My understanding is that [all patent applications were generally filed in the name of [NNL] for historical reasons, administrative convenience and potentially for tax reasons…"); TR22079 (Nov. 7, 2001 Email from T. Collins to N. DeRoma, Arthur Fisher et al. titled "Modification of Nortel Networks' R&D Cost Sharing Agreement") at 1 ("Under the new model proposed by the Tax Group, each 'Residual Profit Sharing' participant would be granted a non-exclusive license to exploit all of the intellectual property owned by all members of the Nortel group of companies. Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity.").

129.    NNL's  Director of Intellectual Property, the boss of NNL trial witness, Angela deWilton,

articulated the administrative reasons for assigning legal title to NNL:

- By assigning all of the patents to NNL, efficiencies were realized that made it less likely for documentation errors to occur, such as identifying the wrong party as the owner or assignee, that could ultimately result in a patent becoming invalidated;

- Spreading ownership of IP among different entities would make documentation errors more likely and make it more difficult to file patent applications, pay maintenance fees and organize further filings;

- Having patents assigned to multiple entities would also create a duplication of the centralized role that was the Intellectual Property Law Group.  Having smaller organizations managing IP in different jurisdictions would be less efficient and would likely create more errors; and

- Maintaining patents in one entity also simplifies the process when signatures are required.

> T. Collins Dep. 94:3-96:7, 94:22-95:7, 95:9-20, 95:24-96:7; *see also* TR11065 (Dec. 12, 2001PowerPoint Presentation titled "Residual Profit Split Arrangement (RPSA) Proposal – Legal Issues") at 1 (Presentation prepared by Tim Collins stating, "Suggest maintaining NNL as IPR owner for administrative simplicity."); TR22143 (Dec. 3, 2001 Modification of R&D Cost Sharing Arrangement) at 1 ("While it is not required by the new model, for administrative simplicity it is

expected that all of Nortel's IPR will continue to be owned by Nortel Networks Limited."); Trial Tr. 764:2-8 (deWilton).

> ### d.    Nortel's Patents Had A Useful Life of Many Years

130.    US patents are granted for a 20-year period.

> TR50843 (Intellectual Property Valuation: A Primer for Identifying and Determining Value) at 74 (Patents are granted by governments and provide legal protection for a fixed period of time, currently 20 years from the earliest date of filing in the United States, as well as in most industrialized nations.

131.    A patent is within its economic useful life if it can be sold.  As Canadian Debtors' expert Timothy Reichert wrote in an article, "commercial transferability is the most objective of the three definitions of economic life."

> TR40710 ("The Meaning of Economic Life") at 6-7, ("In a sense commercial transferability is the most objective of the three definitions of economic life.  The test here is a standard market test- are the intangible assets saleable?  Would a buyer be willing to pay for the intangibles?  The primary advantage of this approach is that it sidesteps the question of whether or not current or previously 'functioning' generations of the intangible matter.  The question asked is, simply, 'for how long would a third party be willing to pay for your current portfolio- however you definite it – of intangible assets?'"); *see also* Trial Tr. 4010:12-14 (Reichert) ("The intangible in question, sure, if you can sell it, it remains within its economic useful life").

132.    When measuring the useful life of a patent, it is necessary to distinguish between the life of a product utilizing a patent and the life of a technology or patent itself.  While a particular product may become obsolete in a relatively short period, the patents incorporated into that product may survive through many generations of products and be utilized and built upon for a far longer period than the initial product itself.

> Trial Tr. 668:25-69:25 (McFadden) (Q. Okay.  You then skip forward to page 29. I'm just looking at the first paragraph there.  It says: 'Generally, the patent life tends to be long, while the commercial life of the products incorporating the patented intellectual property tends to be relatively short without continuing investment in R&D.  Continuing investment in R&D is essential in extending the commercial life of products throughout the term of the related patents."  Would you agree with that?  A. Yes, but I would – I would add that sometimes the commercialization of those patents takes many years after the patents were

written, and – because the timing of a discovery versus the commercial viability of that patent isn't always coincident.  Q. That's a very good point.  So you may have a situation where R&D is done, and then five, ten years pass before you actually get a product that goes into market?  A. That's correct."); Trial Tr. 1595:13-1596:2 (Brueckheimer) ("Q. Or [research] might lead to a patent but the patent ends up having a short useful life?  A. I don't agree with that, no.  It depends on the nature of the patent.  Q. Well, but you would agree that if you're unable to develop a product that uses that patent, that patent wouldn't end up having a very long useful life in terms of protecting Nortel's products; is that correct?  A. No, I don't think so.  I think if you file a patent and you see it through to issuance, then it has a 20-year life, and it may not be that Nortel wished to make – take advantage of what was embodied in it, but it doesn't mean to say, you know, it's got a short life."); Trial Tr. 2868:10-2869:1 (Felgran) ("Q. Well, certain, products have their own life cycle.  A. Right.  Q. And a technology might go on beyond a particular product; isn't that right?  A. Yes, that is absolutely correct, yes.  Q. So the economic life of intellectual property is not tied to the product, is it?  A. Right. It is not tied to it.  Q. Now, so would I be right in taking that if there is someone out there who actually wants to buy a patent, who is willing to pay good money for a patent, that that patent is ipso facto still within its economic life?  A. Yes."); Trial Tr. 2270:20-25 (Malackowski) ("Many of those studies were focused on product life, not intellectual property life, and there is a very big difference.  Products are updated frequently.  Underlying IP like CDMA technology last much, much longer."); Trial Tr. 2457:22-2458:5 (Malackowski) ("In part it is important to understand the distinction between technology and R&D that is used here versus patent life, but ultimately the most important thing is look at the assets that were sold and what was their life.  Those are the assets I'm valuing, and we know from slide 31 and technology and the patent analysis that the life of the assets I'm studying exceeds the five-year look-back period."); TR31355 (Nortel Networks Functional Analysis for the years ended December 31) at 29 ("Generally, the patent life tends to be long, while the commercial life of the products incorporating the patented intellectual property tends to be relatively short without continuing investment in R&D."); TR44077 (Presentation, Nortel Pre-Filing Conference with CRA) at 5 ("Although IP has a long legal (patent) life, its technological life is short- 5 or fewer years."); Tr. 4678:9-22 (Tucker) ("Q. Professor Tucker, what does the nature of high-tech patents mean for their value over time?  A. So, basically high-tech patents have – from this building block nature, basically we tend to view them as having a far longer lifespan than any one single embodiment in a product, and in particular the building block nature is important because it means that though any one technology cycle can be brutal, fast and disruptive, intellectual property can actually stem into many different generations of technology as a building block and potentially have a far longer lifespan.").

133.    The useful life of Nortel patents well exceeded five years.

Trial Tr. 628:2-6 (Allen) ("Q. Do you have a view – do you believe that the useful life of Nortel's technology is five years?  A. No.  No, it's much longer than

38

that."); Trial Tr. 2662:19-2663:2 (Cooper) ("On the other hand, I think the five-year look-back, as I say, when I saw it the first time, even without understanding, it just struck m[e] as inappropriate.  I've never done that before.  I don't know if I have ever seen it or not, but I've never done that before.  Because what you're staying [sic] is a dollar of IT spent five years ago had 100 percent value, and a dollar spent the year before that had no value."); TR48711.02 (Presentation  titled "Summary of Portfolio Key Datapoints & Examples of Other Available Workproduct") at 33 ("Patent Cradle-to-Grave Process (20.5 Yrs.)").

134.    Given the forward looking nature of Nortel's R&D, the technology that was developed frequently would not find its way into a product for several years.  An example of this is LTE, which Nortel was developing for seven to eight years before it became an industry standard in smart phones.

Trial Tr. 654:6-56:18; 668:25-669:25 (McFadden); Trial Tr. 670:10-18 (McFadden) ("Q. Okay.  But it wouldn't be out of the ordinary at Nortel for R&D spending in year one to produce a product that hits the market in year ten?  That's why it's advanced research, right?  A. It's possible.  Q. And LTE was an example of that, correct?  A. Well, LTE was a little shorter than ten years, yes."); Trial Tr. 1610:2-13 (Newcombe) ("A. If you're doing advanced technology, as we were speaking about earlier, typically the time would be 10 years before you'd come to market.  So the MIMO technology for LTE, we were researching that ten years before we shipped the first LTE trial.  Q. How about UMTS technology?  A. UMTS was the same.  We were probably doing foundation research that went into UMTS probably eight to ten years before we started shipping UMTS."); Trial Tr. 1663:24-1665:15 (Jeffries); Trial Tr. 654:19-23 (McFadden); McFadden Dep. 42:10-43:8 ("And the advanced technology would be, you know, how are we going to -- a good example would be in 2002 or 2003, Al Javed was working on the LTE technology in the lab.  We basically had LTE wireless technology working in the advanced technology lab in 2003.  It took seven, eight years to get that standardized so that now you talk about LTE in the marketplace as ubiquitous in North America.  It took that long for the standards to work through the technology, adopt the technology and standardize it so that the phone could talk to the base station.  Q. So LTE is a technology in use today, correct?  A. Yes.  Q. Would it be common to have something like that where you said Al Javed was working on in 2003 and then ten years later it becomes sort of industry standard?  A. Very common."); Trial Tr. 1569:15-1571:17 (Brueckheimer); Mumford Dep. 95:22-96:20.

135.    In relation to the sale of Nortel's patent portfolio following the insolvency of the Nortel Group, discussed in Section IV.D. below, the vast majority of the patents that sold collectively for approximately $4.5 billion were more than a decade old at the time of the sale.

TR00033 (Malackowski Report Sec. 11.1.3 at Figure 1); TR00033 (Malackowski Report) at Sec. 7.2, citing TR41471 (Nortel Final Residual Patent List) and TR48835 (Issues Patents and Pending Patent Applications Asset List as of April 15, 2010); Trial Tr. 2281:2-12 (Malackowski) ("Q. So slide 22, are you applying the same analysis for the residual patents?  A.  Yes, but limited to the high interest residual patents, as we talked about we want to focus on where the value resides and the results are frankly even more dramatic.  So here you note again that the activity occurred largely in the late 1990s, early into 2000, and that by the end of 2005, 99 percent of the high interest residual patent related R&D work was already complete."); Trial Tr. 2287:1-20 (Malackowski) ("Q. All other things being equal, so I understand all things aren't always equal, but take a hypothetical, all other things being equal, would Rockstar have any incentive to select older or newer patents to assert for infringement?  A. Well, that is a critical question because it explains why this analysis is meaningful.  Your Honour, what Rockstar would ideally like to do is they would like to select patents that were the newest they could get so that when they negotiate with these defendants, they can talk about 20 years into the future, or if there was actual notice they would like to select patents that were six years old, so they could go back six years and recover damages and then 14 years in the future.  The only reason they would go to these older patents is because they believed they were more valuable than the newer ones, confirming again the period of look-back."); TR00035 (Cooper Report) at Sec. 4.4)  ("The Residual IP sale demonstrates the severe shortcomings of Nortel's five-year look back.  In that sale, as illustrated in the Malackowski Report, a significant portion of the more valuable ('High Interest') patents sold in 2011 were actually filed before 2006."); Trial Tr. 2814:5-13 (Cooper) ("Q. And I am just looking at the last sentence on the bottom of the page that carries over.  You wrote: 'In that sale, as illustrated in the Malackowski report, a significant portion of the more valuable (high interest) patents sold in 2011 were actually filed before 2006.'  A. Correct."); Trial Tr. 2051:5-11 (Huffard) ("[F]rom my point of view, it seems patently obvious that five years, which is the period of time prescribed in the RPS, is not the right period of time.  We've just sold the Rockstar portfolio as the single largest transaction, and most of the IP in that deal originated in the '90s and early 2000s, so well before that five-year period."); *see also* TR21011 (Email from L. Hinz to R. Horn) at 2 (includes response to survey regarding what percent of R&D performed in various years is still useful in 2001); TR21013 (Questionnaire Results) at 1, Compiled results of R&D useful life survey (Results show that on average, R&D personnel at facilities around the world thought 18% of R&D performed in 1991 was useful 10 years later, 21% was useful 9 years later, 25% was useful 8 years later, 29% was useful 7 years later, and 36% was useful 6 years later.).

136.    Nortel's valuable patents were largely created in the late 1990s to early 2000s, corresponding to Nortel's peak.

Trial Tr. 2266:22-2267:9 (Malackowski) ("Q. Right.  So this chart starts with 1991.  How did you select 1991 as the starting point for your chart?  A. I first

looked at the patent portfolio, tried to understand the age of the patents that were actually transferred.  I focused that analysis not just on every patent but on what are considered the high interest or the more valuable patents, and I included date for the earliest high interest patent that was unexpired and transferred, which was 1992, plus one year, understanding that the research would have been done largely the year before."); DEM00011 (EMEA Debtors Malackowski Demonstratives); Trial Tr. 2276:16-2278:7 (Malackowski) ("Q. Why does the analysis of what is a high interest or not a high interest patent matter?  How does that play into your valuation and allocation?  A. Anyone in this profession will readily recognize that not all patents are created equal, that as a matter of fact, it is a subset of patents that have the real value, and in order to understand a proper matching of value to contribution, I focused my analysis on those high interest patents to be certain that the matching wouldn't be biased or skewed by the many unvaluable patents, the low interest patents.  Q. And does that relate at all – you'll recall a question by Judge Gross this morning of Mr. Huffard.  Does the answer you just gave bear at all on Judge Gross's question about high value and low value patents?  A. It does.  In particular we have used the best available evidence directly here to match the R&D spending over time to the patents that were the most valuable and then, as we'll see later, we were actually able to test that work by looking at specific inventors and where they lived and the number of patents they created.  Q. So we'll come back to that in a moment.  So looking at slide 19 again, what conclusions, if any, do you draw about when the value of the Nortel portfolio, the IP portfolio was created?  A. The most obvious conclusion and why this chart is so powerful in my point of view is it is very clear that the value that was created in both the business sales as well as the high interest or as well as the residual patent sale was predominantly in the late '90s to the early 2000s.  And that in order to properly allocate the value received from the sale of these assets, you have to take into account the effort that was extended during that period.  If you limited yourself to the last few years, you would have an inaccurate conclusion.") (discussing DEM00011 at 19); Trial Tr. 4679:1-4680:10 (Tucker) ("Have you taken a look at Mr. Malackowski's work?  A. Yes.  So, actually I pulled up this slide simply because I thought it really did quite a nice job of illustrating this point about the longevity of high-tech patents due to their building block nature.  And what you can see, and Mr. Malackowski went through it in his presentation, is it's simply a histogram that shows many of the high-interest patents that Rockstar paid $4.5 billion for, are actually older patents, and I think that's explained by their building block nature.  Q. And did you do any independent work to verify Mr. Malackowski's conclusions?  A. So, I did, and I think it's in figures 3 and 5 of my report.  What I did was – in economics the way we measure whether or not a patent is valuable is by measuring how many forward citations it has, and basically the analysis in figures 3 and 5 in my report give the same conclusion as Mr. Malackowski's slide, which is that it was the older patents which are more valuable.  Q. And a forward citation is what?  A. A forward citation is whether another company, another tech company is basically building on your technology and is therefore citing your patent in their patent.  Q. And so the more forward citations the more – A. The more fundamental or more

41

of a building block that patent is, the more other technology is stemming from it.").

137.    99% of the high-interest patents that were sold to a consortium of bidders known as

Rockstar Bidco ("Rockstar") had been developed before 2006, more than 5 years before the sale

to Rockstar in 2011.

> Trial Tr. 2281:2-12 (Malackowski) ("Q. So slide 22, are you applying the same analysis for the residual patents?  A. Yes, but limited to the high interest residual patents, as we talked about we want to focus on where the value resides and the results are frankly even more dramatic.  So here you note again that the activity occurred largely in the late 1990s, early into 2000, and that by the end of 2005, 99 percent of the high interest residual patent related R&D work was already complete.") (discussing DEM00011 at 22); *see also* TR00034 (Malackowski Rebuttal) at 31 (Table 7).

138.    80% of the high-interest patents sold to Rockstar were developed in 2000 or earlier,

during the period that Nortel employed a cost-sharing arrangement to fund R&D.

> Trial Tr. 4511:15-4512:22 (Ryan) ("Q. Okay.  Let's go back to slide 9 for a moment, and there is just one final area I would like to explore and then we will be done.  And that is the middle column that you have on this page where you say that is only the CSA period.  I would like to pull up from Mr. Malackowski's testimony, again from his demonstratives, slide 22, if we can please have that on the screen.  Thank you.  And you will see in this slide Mr. Malackowski is looking at the invention date of what were categorized as the high interest patents from the residual patent portfolio sale.  Is this slide, the information set forth on this slide, Ms. Ryan, relevant to that middle column that we just looked at, the CSA-only period?  A. It is in that it is interesting that the total of the high interest patent count during the period one, which is the CSA period, is quite high.  Q. And where does period one end for purposes of looking at these patents?  A. So while period one ends in 2000, Mr. Malackowski testified, and it is in his report too, that the spending in a particular period, the high interest patent is solidified the year after.  So for purposes of this chart, the number of high interest patents that relate to period one, one needs to look through 2001 to get the total.  And if you kind of follow that up, it looks approximately around 80 percent-plus of the total high interest patents that were developed during period one.").

139.    The residual profit split transfer pricing methodology later adopted by Nortel, and

described more fully in Section III, employed a 5-year useful life of patents as part of its formula

for allocating operating profits.  That formula was not based upon the actual useful life of the

Nortel Group's patents.  That formula also did not conform to the useful life of the patents

actually sold to Rockstar (the "Patent Portfolio Sale").

III.     **NORTEL'S TRANSFER PRICING REGIME AND INTELLECTUAL PROPERTY OWNERSHIP**

      A.     **Transfer Pricing Background**

            1.     **Goals of Transfer Pricing and Related Regulations**

140.    Transfer pricing is the process by which an MNE sets prices for transactions between

related corporate entities across taxing jurisdictions.

> TR00062 (Eden Report) ¶ 20 ("In this report, *transfer pricing* refers specifically to the pricing of related party transactions among entities in an MNE, such as Nortel, for the corporate income tax ("CIT") purposes."); TR00049 (Reichert Report) at 13 ("Transfer prices are usually assigned to movements of resources or contributions occurring inside of an MNE, but across taxing jurisdictions."); TR00035 (Cooper Report) ¶ 3.1 ("'Transfer pricing' is a tool used to evaluate and, if necessary, assign prices reflecting economic realities in transactions and activities among divisions or constituents of commonly controlled enterprises.").

141.    Because these intercompany transactions take place between entities that are commonly

controlled, transfer prices are assigned by management rather than being the result of arm's-

length negotiation between parties.

> TR00049 (Reichert Report) at 13 ("Intercompany transactions are also often referred to as 'controlled' or 'related party' transactions, since they take place between entities that are commonly controlled . . . Saying that transfer prices are 'assigned' implies that, unlike market prices, transfer prices do not arise spontaneously as a result of bargaining and trade . . . firms operate as parts of the economy wherein economic activity is consciously directed by managers and entrepreneurs.").

142.     Further, because transfer prices are assigned rather than bargained for and effective tax

rates across jurisdictions may vary, MNEs are incentivized to minimize their global effective tax

rate when setting transfer prices.

> TR00062 (Eden Report) ¶ 24 ("Since transfer prices are set within the MNE group, this creates the risk that an MNE group may manipulate transfer prices so as to shift their profits from higher to lower tax jurisdictions."); TR00049

(Reichert Report) at 14 ("[M]anagers assigning intercompany transfer prices also face another incentive – that of tax minimization."); Trial Tr. 2632:4-3632:14 (Cooper) ("And so the key that the transfer pricing official faces, the key that the tax authority faces, and the key that the company faces is really two things: How to prevent tax avoidance, because other things equal, companies would like to reduce their taxes; but at the same time, how to reduce double taxation, because tax authorities would like to tax as much income as they can."); TR00016 (Henderson Decl.) ¶ 8.

143.    For example, MNEs may raise prices paid to entities operating in low-tax jurisdictions (increasing their taxable income) while decreasing prices paid to entities operating in high-tax jurisdictions (decreasing their taxable income), reducing the net global taxes paid by the MNE.

TR00062 (Eden Report) ¶ 24 ("As an MNE group raises or lowers its transfer prices in order to avoid taxes, not only are divisional/entity profits affected, but also the taxable income the MNE group declares to tax authorities in different countries.  Since transfer prices are set within the MNE group, this creates the risk that an MNE group may manipulate transfer prices so as to shift their profits from higher to lower tax jurisdictions."); TR00049 (Reichert Report) at 14 ("[M]anagers can simply increase transfer prices paid to entities in low-tax jurisdictions.  Similarly, they can decrease transfer prices paid to entities in high-tax jurisdictions.  This is the most obvious, and mechanical, way in which managers can respond to tax minimization incentives through transfer pricing . . . ."); DEM00013 (Cooper Demonstratives) at 5 ("[M]ultinational enterprises are motivated to attribute income to lowest tax jurisdiction").

144.    In light of these incentives, taxing authorities have implemented regulations that govern transfer pricing, which as a general matter require that intercompany transactions be priced in a manner consistent with the way that similarly situated, uncontrolled parties would price comparable transactions at arm's length (the "arm's length standard").

TR00062 (Eden Report) ¶ 24 ("Not surprisingly, governments have developed a dense regulatory framework for transfer pricing due to worries about the potentially negative impacts that transfer pricing can have on government tax and customs duty revenue, as well as other issues such as home and host country balance of payments and the location of international production and employment."); id. ¶ 26 ("The touchstone for transfer pricing regulations is the the 'arm's length standard.'"); TR00049 (Reichert Report) at 16 ("The arm's length principle is a convention among governments that says that intercompany transactions should be priced in a manner that is consistent with the way in which similarly situated uncontrolled parties, bargaining at arm's length, would price the

transactions."); TR00035 (Cooper Report) ¶ 3.1 ("[Transfer Pricing] is motivated by the fact that such enterprises are subject to tax in multiple jurisdictions, and that relevant tax authorities will not want to see taxable revenue shifted out of their jurisdictions as a result of non-arm's length intercompany pricing. Transfer pricing evaluates whether pricing meets the arm's length standard, and, if not, adjusts the pricing associated with related party transactions to approximate the corresponding pricing that would have applied in arm's length transactions.").

145.    Transfer pricing regulations permit the use of a variety of methods to arrive at an arm's length price.  For each method there may be a range of arm's length prices that result from its application.  For example, as the Monitor's transfer pricing expert stated, "[t]he residual profit split method is designed to produce a range of arm's length profit allocations in [some] settings . . . ."

> TR00049 (Reichert Report) at 28; *see also* TR00062 (Eden Report) ¶ 35 ("U.S. and Canadian tax law and the OECD Transfer Pricing Guidelines all recommend various 'methods' that an MNE group may choose from and adopt to adhere to the arm's length standard. It is important to recognize that 'transfer pricing is not an exact science.' Accordingly, it may be impossible to determine a single arm's length price.  For each method there may be a range of 'equally reliable' prices – the 'arm's length range' – that result from the application of that method."); Trial Tr. 2636:10-2637:15 (Cooper) ("What you end up with is an arm's-length price. And typically because prices are not exact, we typically end up with a range as opposed to a point estimate.  And it's very important to – that  as long as you are in that range, that's the important thing.").

146.    MNEs will nonetheless seek to structure their transfer pricing arrangements to minimize their effective global tax rate within the acceptable range of arm's-length prices.

> TR00062 (Eden Report) ¶ 15.A ("As a general matter, a multi-national corporate group will typically adopt a transfer pricing policy that minimizes the overall tax burden on the group, within the confines that the MNE in good faith believes the transfer pricing results will pass muster with tax authorities under the 'arm's length' standard."); TR00016 (Henderson Decl.) ¶ 8.

147.    Tax authorities will disregard legal agreements governing intercompany transactions where form differs from substance.  Transfer pricing must also reflect the "functions, assets and risks" undertaken by each entity in the MNE.  It is therefore necessary that transfer pricing arrangements reflect the substantive economic reality of how the business actually operates.

TR00062 (Eden Report) ¶¶ 64-66 ("Where there is no contemporaneous written legal contract [regarding IP ownership], the tax authority can impute one based on the economic substance of the transactions between the related parties. From a transfer pricing perspective, the division of legal title and economic ownership is acceptable as long as profits are allocated among entities consistent with the economic substance of the transaction (i.e., the functions performed, assets used, and risks borne). For example, the IRC Section 482 Regulations state that the 'greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the parties . . .[but, if] the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.'"); TR00035 (Cooper Report) ¶ 3.1 ("Revenue authorities such as the IRS, the CRA, and HMRC assess tax liabilities based on economic realities (i.e., the true costs and benefits of the company's operations), whether or not such realities are reflected in the company's books and records."); Trial Tr. 1136:1-5 (Henderson); Trial Tr. 1866:18-22 (Weisz) ("Q. And am I right that it is important for the transfer pricing agreements to reflect the actual way the business is being operated? A. Absolutely, yes."); *see also id.* 1328:5-13 (Orlando) ("Q. Sure. And when you describe rights as economic ownership or beneficial ownership, you are referring to the bundle of rights contained in the MRDA, correct? A. Well, I'm referring to the contractual rights in the MRDA. I'm also referring to the business reality, you know, what I represented to the tax authorities as how our business operates.").

## 2.    Advanced Pricing Arrangements

148.    If a tax authority disagrees with the transfer pricing methodology reflected in an MNE's tax return for a particular year, the tax authority may initiate an audit, which could potentially lead to an adjustment in taxes owed by the MNE, penalties, tax court litigation and/or double taxation.

TR00062 (Eden Report) ¶ 77; TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶ 9.

149.    To mitigate this risk, taxpayers may avail themselves of the advanced pricing arrangement ("APA") process offered by tax authorities. An APA is a contract between a member of an MNE, such as NNL, and a tax authority, such as the CRA, typically specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time. APAs can include multiple tax authorities and members of an MNE. For example, a

bilateral APA among the Nortel Group and the US and Canadian tax authorities would involve negotiation and agreement between the CRA and the IRS, NNI and the IRS, and NNL and the CRA.  An APA helps the MNE avoid the uncertainty of future tax adjustments, penalties and double taxation by securing the assent of the tax authority to the MNE's transfer pricing regime.

> TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶¶ 10, 12.

150.    To start the APA process, a taxpayer must request an APA from the appropriate tax authority (or authorities).  The last stage of the APA process is the documentation and signing of a binding contract (*i.e.*, the APA).

> TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶ 11.

151.    As part of the APA application process, the tax authorities often require the submission of a functional analysis, which is an assessment of the functions, assets and risks of the MNE entities engaged in transfer pricing.

> TR00049 (Reichert Report) at C-13 to C-15; Trial Tr. 1278:6-16 (Orlando).

152.    A functional analysis is helpful to the tax authorities' understanding what functions, assets and risks need to be compensated through transfer pricing and to determine comparability to parties operating at arm's length.  Typically, an APA is conditioned on the functions, assets and risks of the MNE remaining the same over the term of the APA.

> TR00062 (Eden Report) ¶ 36; Trial Tr. 2638:9-18 (Reichert); Trial Tr. 1277:7-1278:22 (Orlando); *see, e.g.*, TR50829 (1996 NNI-IRS APA) § 7; TR46875 (1996 NNL-CRA APA) § 1.3.

153.    For example, both the 1996 APA between NNI and the IRS and the 1996 APA between NNL and the CRA relating to Nortel's then cost sharing arrangement were expressly conditioned upon the "critical assumption" that the business activities of each cost sharing participant would

remain substantially the same as described in the APA requests, and provided that the APA could

be cancelled or revised in the event that the business activities changed.

> TR50829 (1996 NNI-IRS APA) § 7; TR46875 (1996 NNL-CRA APA) § 1.3.

## B.    The Nortel Group's Cost Sharing Agreement Era

### 1.    Background to the Cost Sharing Agreements

154.    From the late 1970s to December 31, 2000, the Nortel Group operated under a series of

Cost Sharing Agreements (each a "CSA"), which were bilateral agreements between NNL and

each of the other R&D performing Nortel entities, including NNI, NNUK, NN Ireland and

NNSA (referred to together with NNL as the "Cost Sharing Participants" or "CSPs").

> TR46882 (1978 NNL-NNI R&D CSA); TR45048 (1983 NNL-NNI R&D CSA);
> TR45741 (1985 NNL-NNI R&D CSA); TR45740 (1985 NNL-NNUK R&D
> CSA); TR45739 (1985 NNL-NN Ireland R&D CSA); TR21002 (1992 NNL-NNI
> R&D CSA); TR33067 (1995 NNL-NNUK R&D CSA); TR46945 (2000 NNL-
> NNSA R&D CSA);[6] TR11055 (Horst Frisch Report) at 1-2; TR00016 (Henderson
> Decl.) ¶ 14.

155.    At least during the period of the final series of CSAs, NNL and each of the other CSPs

entered into three separate cost-sharing agreements, which governed pricing for different types

of intercompany transactions:  an agreement governing R&D (an "R&D CSA"), another for

tangible property and another for headquarters expenses.

> TR11055 (Horst Frisch Report) at 1, 10-12.

156.    The last R&D CSA between NNL and NNI was drafted in 1996 and made effective from

January 1, 1992 to reflect the terms of a 1996 APA between NNL, NNI, the CRA and the IRS.

> TR21002 (1992 NNL-NNI R&D CSA) at 1 (giving effective date, and also
> reciting the parties' intent "to amend, amplify and clarify certain matters related
> to the Cost Sharing Agreement to comply with the provisions of the Advance

---

[6] Other CSPs included Nortel Networks Australia and Nortel Networks Japan.  In addition, Northern Telecom do
Brasil Industria e Comercio Ltda., a Brazilian Nortel affiliate, executed an R&D cost sharing agreement with NNL,
but did not ultimately effectively share in R&D expenses due to reasons associated with Brazilian tax law.
(TR11055 (Horst Frisch Report) at 2 & n.1.)

> Pricing Agreement between [NNL] and the [CRA] and the Advance Pricing
> Agreement between [NNI] and the [IRS]"); TR00016 (Henderson Decl.) ¶ 15.

157.    The 1992 NNL-NNI R&D CSA provided a mechanism for sharing the "costs and risks of

research and development services or activities in return for interests in any NT Technology that

[was] produced by such services or activities." As with the other R&D CSAs, it used revenue as

the measurement for compensating the parties for their investment in the Nortel Group's IP. As

discussed below, the terms of the 1992 NNL-NNI R&D CSA gave NNI an exclusive, perpetual,

royalty-free license and the mandatory obligation and right to enforce intellectual property rights

in the United States.

> TR21002 (1992 NNL-NNI R&D CSA) Art. 3, 5 (Third Recital).

158.    An R&D CSA between NNL and NNUK was effective from January 1, 1995, and

contained substantially the same terms as the 1992 NNL-NNI R&D CSA. An R&D CSA

between NNL and NNSA was effective from January 1, 2000 and likewise contained

substantially the same terms as the 1992 NNL-NNI R&D CSA. An R&D CSA between NNL

and NN Ireland was also in place at this time, and similarly appears to have contained

substantially the same terms as the 1992 NNL-NNI R&D CSA.

> TR31309 (1995 NNL-NNUK R&D CSA); TR46945 (2000 NNL-NNSA R&D
> CSA); TR11055 (Horst Frisch Report) at 10, 38.

> **2.      NNI Directly or Indirectly Funded the Bulk of the Nortel
> Group's R&D During the 1990s**

159.    Nortel recorded and tracked the transfer pricing payments and overall R&D spending

using transfer pricing worksheets.

> *See* TR00055 (Ryan Rebuttal) at 2-3; TR00033 (Malackowski Report) at 47 &
> n.148; TR47129 (cost sharing worksheet).

160.    The transfer pricing worksheets for the CSA period reflect the direct R&D spending

incurred by each CSA Participant ("Direct R&D Spend"), as well the amount of R&D funding

that each entity paid or received through transfer pricing payments each year ("TP R&D"),

leaving no doubt as to the total amount of R&D funded ("Total R&D Funded").

> TR00055 (Ryan Rebuttal) at 2-3, 15-17, Ex. D; Trial Tr. 4494:19-4495:9, 4578:5-23 (Ryan); *see, e.g.*, TR47129 (cost sharing worksheet, including data for NNL, NNI, NN Ireland, and, for 1995-2000, NNUK ), Tab "Post Transfer Pricing Dec 31st", Row 193 (listing "R&D Expense," which equates to Direct R&D Spend), Row 482, (listing the "Inc(Dec) in R&D Allocation," which equates to TP R&D); *id.* at Row 464 (listing "Total R&D Allocation," which equates to Total R&D Funded); *see also* TR45752 (NNUK 1992 financial statement); TR45753 (NNUK 1993 financial statement); TR45754 (1995 NNUK financial statement); and TR49192 (R&D data for France from 1992-1999).

161.    The Total R&D Funded in the CSA period is reflected in the table below:

**Table 1:  R&D Funding Under the CSA, 1989-2000[7]**

|  | *NNL* | *NNI* | *EMEA* | *Total* |
|---|---|---|---|---|
| *Direct R&D* | 7,584 | 9,632 | 1,999 | 19,215 |
| *TP – R&D* | -3,571 | 4,417 | -865 | -19 |
| *Total R&D Funded* | **4,013** | **14,048** | **1,134** | **19,196** |
| *% of Total R&D Funded Directly and Indirectly* | **21%** | **73%** | **6%** | **100%** |

### 3.      NNI and Other Cost Sharing Participants Gained Steadily Increasing Rights in Nortel IP as Their Businesses and the R&D CSAs Evolved

162.    Consistent with the touchstones of transfer pricing and its arm's-length test (the assets

held, functions performed, and risks borne by the cost-sharing participants), the structure of the

CSAs changed dramatically from the 1970s to the 1990s as the Nortel Group's business evolved

and NNL's subsidiaries grew substantially in size and capability.

> *See* TR00062 (Eden Report) ¶¶ 26-36, 65-66; DEM00003 (US Interests' Opening Compendium) at 13-26 (describing increasing significance of NNI's business in United States, and citing sources), *id.* at 42-58 (highlighting changes to R&D CSAs).

---

[7] *See* TR00055 (Ryan Report) Exh. D.1. at 2.

163.    The CSPs gained steadily broader license rights to the Nortel Group's intellectual

property over time as Nortel's business and those agreements evolved from the 1970s to the

1990s, corresponding with the fact that NNI and the other CSPs earned an increasing proportion

of the Nortel Group's revenue and the increasing importance of R&D performed by those

subsidiaries.

164.    The early CSAs from the 1970s granted only limited rights to the license holding CSPs.

For example, in the 1978 NNI-NNL R&D CSA:

- NNI was granted only "non-exclusive rights to use" the IP.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 4.

- NNI held the right to sublicense only with NNL's permission.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 4.

- The rights were limited to a five-year period.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 4.

- NNL had unilateral the right to terminate the agreement at any time,
  without providing compensation other than refunding of a portion of
  NNI's costs.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 9, 10.

- The "Products" discussed in the non-exclusive license grant were
  limited to a circumscribed list.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 1(a).

- The agreement specified that the covered IP was and would continue
  to be the "property" of NNL.

    TR46882 (1978 NNL-NNI R&D CSA) Art. 4.

165.    By contrast, under the 1985 NNI-NNL R&D CSA –  by which time NNI earned more

revenue than the rest of the Nortel Group combined ($3.9 billion, 68% of the global total),  and

employed 22,000 of the Nortel Group's 46,500 employees (including 1,300 R&D employees at 5 facilities)[8] – NNI held vastly greater rights:

- NNI was granted an exclusive, royalty-free license to IP in its territory.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 5.

- NNI's right to sublicense was no longer subject to NNL's permission.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 5.

- NNI's rights were perpetual.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 5.

- Upon expiration or termination, NNI was entitled to a "fully paid up license" permitting it to continue to exploit the IP with no further obligation to make cost-sharing payments.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 10.

- The definition of "Products" was expanded to include "all products, software and services manufactured or marketed or proposed to be manufactured or marketed, at any time by [NNL and its subsidiaries], and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing."

   TR45741 (1985 NNL-NNI R&D CSA) Art. 1(c).

- NNL was now "vested" with "legal title" to the substantial IP by then being created and funded by NNI, rather than that IP being described as NNL's "property" as it had been in the 1978 NNI-NNL R&D CSA.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 4.

- NNI now held the "primary right and obligation" to bring and defend legal actions in the and for the United States relating to the alleged infringement of its rights in the IP.

   TR45741 (1985 NNL-NNI R&D CSA) Art. 7.

166.    The last R&D CSAs, such as the 1992 NNI-NNL R&D CSA, also granted the CSPs exclusive, perpetual and royalty-free rights to exploit the Nortel Group's IP in their respective

---

[8] TR50878 (NNL 1985 Annual Report) at 9; TR49841 (NNL 1985 10-K) at 9.

territories ("Exclusive Territories"), including the right to bring suits to enforce their rights in NT

Technology, which included "any and all intangible assets (including but not limited to

patents . . .) produced or conceived" as a result of the CSPs' R&D efforts."

> TR21002 (1992 NNL-NNI R&D CSA) Art. 1(k), 5, 7; TR31309
> (1995 NNL-NNUK R&D CSA) Art. 1(k), 5, 7; TR46945 (2000 NNL-NNSA
> R&D CSA) Art. 1(k), 5, 7.

167.    NNI's Exclusive Territory consisted of the United States and Puerto Rico.

> TR21002 (1992 NNL-NNI R&D CSA) Art. 1(z), 5.

168.    NNUK's Exclusive Territory consisted of the United Kingdom.

> TR31309 (1995 NNL-NNUK R&D CSA) Art. 1(z), 5.

169.    NN Ireland's Exclusive Territory consisted of Ireland.

> TR11055 (Horst Frisch Report) at 10.

170.    NNSA's Exclusive Territory consisted of France.

> TR46945 (2000 NNL-NNSA R&D CSA) Art. 5.

### 4.    Retention of Economic Ownership of IP by Cost Sharing Participants Was a Requirement of Nortel's Agreements with Tax Authorities and Transfer Pricing Regulations

171.    As the Nortel Group informed the CRA, IRS and Inland Revenue[9], the licenses to exploit

NT Technology held by NNI, NNUK, NN Ireland and NNSA under the last R&D CSAs

rendered them economic owners of Nortel's patents and other covered technology within their

respective designated exclusive territories:  "From an economic standpoint, each R&D cost

sharing participant could be considered to 'own' the NT Technology as it related to its specific

region."

> TR11055 (Horst Frisch Report) at 10.

---

[9] Inland Revenue was formerly known as Her Majesty's Revenue and Customs, or HMRC.  For clarity, the agency is referred to as Inland Revenue throughout this submission

172.     In economic terms, the key right under a patent is the right to exclude.  If an entity has the "right to exclude other parties from an asset, that means that [it] can enjoy all the benefits that derive or the stream of value that derives from a particular asset."  The corollary to the right to exclude is the right to include, which can be done through sublicensing and together with the right to exclude and the right to "practice" the patent generates benefits of economic ownership of IP.

> Trial Tr. 4655:23-4656:1 (Tucker); TR00056 (Tucker Report) ¶¶ 15, 95-119; TR00051 (Kinrich Report) ¶ 67; TR50849 (screenshot of Canadian Intellectual Property Office website, A Guide to Patents) at 16, App. C ("A patent is a government grant giving the right to exclude others from making, using or selling an invention."); TR50857 (US Patent and Trademark Office website, What is a Patent?) at 1 ("A patent is an intellectual property right granted by the Government of the United States of America to an inventor "to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States" for a limited time in exchange for public disclosure of the invention when the patent is granted."); TR50975 (UK Intellectual Property Office website, What is a Patent?) at 1 ("If a patent application is granted, it gives the owner the ability to take a legal action under civil law to try to stop others from making, using, importing or selling the invention without permission.").

173.     The CSPs' exclusive economic ownership of NT Technology in their respective territories was reflected in the terms of the 1996 APAs which the R&D CSAs were drafted to memorialize.  Making clear that NNL's entitlement to "Benefit" from the exploitation of NT Technology did not include the US market, the 1996 NNL-CRA APA expressly stated that "the Taxpayer [NNL], as a CSP, is entitled to all Benefits in all geographical markets except for the part(s) thereof granted to another CSP" and that the United States and Puerto Rico were NNI's market.

> TR46875 (1996 NNL-CRA APA) § 1.

174.    The 1996 APA between NNI and the IRS similarly explained that "[NNL] is entitled to all Benefits in its geographic market, the entire world except for the geographic rights that [NNL] has granted to other Cost Sharing Participants, in return for contribution to R&D Expenses."

> TR50829 (1996 NNI-IRS APA) § 5.2, *see also* TR50828 (memorandum forwarding 1996 NNI-IRS APA).

175.    As Nortel tax personnel were aware, the 1996 NNL-CRA APA and 1996 NNI-IRS APA were binding agreements with the tax authorities; the Nortel Group could lose the benefits of the APAs and face penalties if the economic and business realities of the Nortel Group diverged from the representations made to the CRA and IRS.

> TR00016 (Henderson Decl.) ¶ 11; Trial Tr. 1130:9-13 (Henderson) ("Q.  Was it your understanding that [the APA] was a binding agreement between Northern Telecom Limited and the Canadian Revenue authority?  A.  Yes, that would be my understanding."); TR50829 (1996 NNI-IRS APA) §§ 7, 9-10; TR46875 (1996 NNL-CRA APA) §§ 1.3, 3-4, App. B § 2.05-06.

176.    Transfer pricing regulations enacted during this period confirm that this structure was necessary and appropriate.  From 1997, the OECD Guidelines explicitly stated that each party to a CSA must be "entitled to exploit its interest in the [CSA] separately as an effective owner thereof."  If NNI's contributions under the 1992 NNI-NNL R&D CSA had entitled it "only a right to use intangible property . . . and [NNI] [did] not also obtain a beneficial interest in the intangible property itself," then that contribution "would constitute a royalty for the use of intangible property," which would have been taxable, denying the Nortel Group CSPs the full benefit of a CSA.

> 1997 OECD Guidelines ¶¶ 8.3, 8.23; *see also* TR11391 (2010  OECD Guidelines) ¶¶ 8.3, 8.23.

177.    CRA Information Circular 87-2R, published in 1999, similarly confirmed that to enjoy the benefits of a CSA, "each participant [in a CSA] is not required to be a legal owner of the

property, but each participant must enjoy substantially similar rights, benefits and privileges as a legal owner (effective or beneficial ownership)."

> TR50295 (CRA Information Circular 87-2R) ¶ 121.

178.    The 1992 NNL-NNI R&D CSA, drafted in 1996, was consistent with the 1997 OECD Guidelines and 1999 CRA Information Circular.

179.    That the Nortel Group and its advisors understood these principles is underscored by a 2003 report on the Nortel Group's transfer pricing policies for the 1998 tax year prepared by the Nortel Group's UK tax advisor, KPMG.  KPMG  informed Inland Revenue that in a CSA, the parties must each "contribute to the development of the intangible, and as such share in its ownership."  KPMG further explained:

> Importantly when adopting a C.S.A., it is the responsibility of each participant of the R&D agreement to exploit that technology to its full advantage.  That is, all participants to the R&D C.S.A. are provided with the same opportunities – the opportunity to exploit all Nortel technology to as great an extent as possible within their respective geographic area.
>
> TR43814 at 25, 28; *see also* Stephens Dep. 173:7-24, 254:16; Bush Dep. 49:20-24.

### 5.    The Nortel Group's Operations Reflected the CSPs' Exclusive Territorial Licenses to Exploit the Group's IP

180.    As explained in the testimony of Walter Henderson, who assisted in drafting the 1992 NNL-NNI R&D CSA and was later the leader of the 2002 APA team, consistent with the above arrangements, all US-sourced income for the Nortel Group was earned by NNI, and NNI was the only Nortel Group member subject to a CSA that paid corporate income taxes in the United States,.

> TR00016 (Henderson Decl.) ¶ 21.

181.    At the time when Nortel was preparing to terminate the R&D CSAs, NNL's Director of IP thus explained to NNL Chief Legal Officer Nick DeRoma, Vice President for IP Law Art

Fisher and other senior Nortel personnel that "each of the R&D Cost Sharing participants assigns ownership of all of its intellectual property to Nortel Networks Limited in return for the exclusive right to exploit all of Nortel Networks Limited's intellectual property within the participant's designated territory."

> TR11114 (Nov. 7, 2001 Email from T. Collins titled "Modification of Nortel Networks R&D Cost Sharing Arrangement") at 1.

182.    The "most valuable" IP right held by any R&D CSA Participant was "the exclusive right to exploit all of Nortel's [IP rights] in the US enjoyed by NNI."

> TR11114 (Nov. 7, 2001 Email from T. Collins titled "Modification of Nortel Networks R&D Cost Sharing Arrangement") at 2.

183.    The Monitor and Canadian Debtors offered the testimony of Clive Allen, one of NNL's former Chief Legal Officers, in an effort to disclaim the beneficial ownership rights of Nortel subsidiaries such as NNI and NNUK under the terms of the R&D CSAs.

> TR00003 (Allen Reply Aff.); Trial Tr. 606-07 (Allen).

184.    Allen's testimony on this point, however, appears focused on his recollection of the 1970s CSAs, is contrary to the 1992 R&D CSAs and was both unpersuasive and irrelevant:

- Allen's recollection as to the CSAs was incomplete.  He claimed to have been heavily involved in the drafting of Nortel's first CSAs in the 1970s, but could not remember basic provisions, such as whether the licensees had been granted exclusive or non-exclusive licenses or the effect of termination of the CSAs on license rights.

  Trial Tr. 611:1-615:4 (Allen).

- Allen acknowledged that he had no direct involvement with subsequent CSAs in the 1980s and 1990s.

  Trial Tr. 611:1-21 (Allen).

- Although Allen testified that subordinates "would have known better" than to seek changes to the CSAs that represented "[f]undamental changes in principle," he admitted that he was not involved in the drafting of CSAs in later decades (such as those covering the 1990s)

and acknowledged that the structure of the CSAs would have changed
(and in fact did change) over the decades as Nortel's business
environment and "structural environment" evolved.

> Trial Tr. 612:2-9, 614:17-615:9 (Allen).

- Allen was also not involved in and had no knowledge about the 1996
APAs, the agreements between Nortel and taxing authorities upon
which the last R&D CSAs were predicated.

> Trial Tr. 618:2-7 (Allen).

- Allen testified that he had no knowledge of or involvement in Nortel's
transfer pricing policies when he was at Nortel and no one with such
responsibilities reported to him.

> Trial Tr. 618:8-23 (Allen).

- Finally, Allen's testimony is irrelevant to the MRDA period because
he acknowledged having had no personal knowledge of the MRDA.
He left Nortel in 1999, long before either the 2004 MRDA or Nortel's
RPSM was conceived.

> Trial Tr. 608:15-610:12 (Allen).

185.    From the above evidence it is clear that even in the latter half of the CSA period, NNI

was the beneficial and economic owner of all NT Technology in the United States and that NNI

had the exclusive right to exploit the NT Technology in the United States.

186.    Although NNL held legal title under the R&D CSAs, NNL did not have any substantive

economic or beneficial rights to NT Technology in the other CSPs' exclusive territories.

### C.    Termination of the Cost Sharing Agreements and Adoption of a Residual Profit Split Methodology

#### 1.    Nortel Develops a New Transfer Pricing Arrangement

187.    At the end of 1999, each of the three CSA APAs in effect between NNL and each of the

other then-CSPs (governing R&D, tangible property, and headquarters cost sharing) had expired

or was nearing expiration.

> TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of
> Objectives of December 12, 2001 Presentation") attachment at 1.

188.    The CRA, IRS and Inland Revenue did not want to renew the R&D CSA APA after 1999

and had encouraged Nortel to adopt a RPSM, including because the R&D CSAs did not

effectively allocate R&D expenses among participants during 2001 due to large operating losses

and because of the administrative complexity of maintaining APAs for each of the three CSAs to

which each CSP was a signatory.

> TR00016 (Henderson Decl. ) ¶ 30; TR47347 (July 19, 2000 Memorandum titled
> "Tangible Property APA - Discussion with CCRA") at 1 (noting that "Bob
> Kirschembaum [of the IRS] has mentioned residual profit split as an alternative,
> which he would like to pursue for the upcoming APA renewals"); TR11058
> (Executive summary for  Dec. 12, 2001 meeting with management) attachment at
> 1; TR11053 (Dec. 2001 presentation, "Overview of Transfer Pricing APA and
> Recommendation") at 5 (noting administrative complexity and other factors
> leading to reluctance of IRS and CRA to extend the R&D CSA).

189.    Beginning in late 2000, Nortel formed a team of employees tasked with determining the

appropriate transfer pricing policy to propose to taxing authorities in the upcoming APA process.

By 2001, Walter Henderson of NNI had been appointed as a project leader for the APA team.

> TR00016 (Henderson Decl.) ¶¶ 26, 28.

190.    In addition to Henderson, team members included David Burn (who was then NNL's

Vice President of Tax and who signed the 1996 APA on behalf of NNL), Kriss Bush (who

replaced David Burn in 2001), Marlene Gilbert, Bob Ashby, Karina O, MaryAnne Pahapill,

Gilles Fortier, and Kishor Badiani.  Other employees within the Nortel organization were

consulted as needed.

> TR00016 (Henderson Decl.) ¶ 26.

191.    The APA Team received tax-related legal advice from Jerry Cohen of Sutherland

Asbill & Brennan LLP ("Sutherland").

> TR00016 (Henderson Decl.) ¶ 27.

192.    Sutherland engaged Horst Frisch Inc. ("Horst Frisch"), an economics consulting firm, to help it select and design the new transfer pricing methodology, run modeling and draft the economic analysis that ultimately formed part of the APA applications. Economists Bill Morgan and Tom Horst were the primary contacts at Horst Frisch.

> TR00016 (Henderson Decl.) ¶ 27.

193.    The APA team presented its recommendation to senior NNL management – including Doug Beatty (Vice President and Controller), Kate Stevenson (Treasurer and Head of Business Development), John Doolittle (Assistant Treasurer), Terry Hungle (Vice President of Finance and Business Development), Nick DeRoma (Chief Legal Officer), Arthur Fisher (Vice President of Intellectual Property Law) and Kriss Bush – at a meeting in Brampton, Ontario in December 2001.

> TR00016 (Henderson Decl.) ¶¶ 30-32; *see also* TR11053 (Dec. 2001 presentation, Overview of Transfer Pricing APA and Recommendation).

194.    As NNL management was informed prior to the meeting, the Nortel Group APA Team had investigated alternatives to the R&D CSA "[i]n an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient and to, over time, improve the global allocation of profits among Nortel affiliates." The APA Team recommended that Nortel adopt a RPSM in place of the previous cost sharing method.

> TR 11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of Objectives of December 12, 2001 Presentation") attachment at 1; TR11053 (Dec. 2001 presentation titled, "Overview of Transfer Pricing APA and Recommendation").

195.    In December 2001, Nortel's R&D CSAs were terminated effective January 1, 2001.

> TR11103 (2001 Termination of Amended NNL-NNI R&D CSA); TR31016 (2001 Termination of Amended NNL-NNUK R&D CSA); TR 45043( 2001 Termination of Amended NNL-NN Ireland R&D CSA); TR32240 (2001 Termination of NNL-NNSA R&D CSA).

60

196.     As discussed above, termination of the R&D CSAs resulted in each license-holding CSP

receiving "a fully paid up license" to all Nortel intellectual property in existence as of that date

with respect to its Exclusive Territory, which for NNI was the United States.

> TR21002 (1992 NNL-NNI R&D CSA ) Art. 10; TR31309 (1992 NNL-NNUK
> R&D CSA ) Art. 10; TR46945 (2000 NNL-NNSA R&D CSA ) Art. 10.

197.     Had the Licensed Participants' rights under the CSAs been terminated as a result of the

transition from the CSAs to the RPSM, the Licensed Participants would have had to receive a

buyout payment.

> Trial Tr. 1859:7-1859:18 (Weisz) ("Q.  And do you see the reference on page 10
> [of TR11055, the Horst Frisch Report]:  'Under the arrangement, each cost
> sharing participant (CSP) had the right to use intangible property developed
> pursuant to the R&D cost-sharing arrangement (i.e. the NT Technology) in its
> respective market.  From an economic standpoint, each R&D cost-sharing
> participant could be considered to 'own' the NT technology as it related to its
> specific region.'  Do you see that?  A.  I do.  Q.  And that was related to the cost-
> sharing participants.  Was that or was that not something that was intended to be
> continued under the MRDA and the RPSM?  A.  That was intended to be carried
> over into the RPS model.  There were discussions about that.  Any alteration to
> this raised issues of value being lost by a participant and whether a buyout
> payment would be necessary. And so for ease, it was determined that the rights
> that existed in the R&D cost-sharing would continue to exist going forward.");
> Weisz Dep. 65:4-66:16 ("So it was always our understanding, as we moved from
> cost sharing to residual profit split, that there was really no change in the
> economics.  And, therefore as you could see in our answer here, there was no
> need for a buyout payment."); TR11305 (Oct. 1, 2004 Email from M. Weisz to K.
> Stephens, forwarding an email from M. Weisz to B. Morgan, subject: IP
> agreement) ("When we spoke last week there was discussion about buy in/buy
> out. I feel this may not be necessary as the old R&D CS participants have the
> same rights as the new RPS participants. More importantly, Nortel has not
> changed the way it has transacted its business. Under the R&D CSA each
> participant received a fully paid up license which continued in perpetuity. The
> same terms and conditions exist under RPS."); TR21531 (Oct. 17, 2005 Email
> from M. Weisz to J. Doolittle, subject: RPS agreement) (noting that "to help other
> positions like a "buyout payment" we kept the exclusivity clause in the
> [MRDA]").

198.     In 2001, though the Nortel Group was operating under the RPSM, the method had yet to

be formally adopted in writing.  It would take years for Nortel to do so.

Trial Tr. 1140-41 (Henderson);*id*. 1716:3-1717:21 (Stephens);*id*. 1848:3-1848:11 (Weisz) ("Q.  What was the purpose of the MRDA?  A.  The purpose of it was to contractualize the arrangements that the participants had and had been ongoing for quite some time since 2001.  Nortel had, prior to that, an R&D cost-sharing agreement which had expired; and a new arrangement had to be entered into between the parties, as each of the parties continued to perform R&D.").

## 2.      The March 2002 APA Applications

199.    From December 2001 through March 2002, the Nortel tax group worked with external

advisors to craft the specific mechanics of a RPSM for Nortel that could be submitted

simultaneously to the CRA, IRS and Inland Revenue as the basis for proposed APAs for the

2000 to 2004 period.

> TR00016 (Henderson Decl.) ¶ 32.

200.    The resulting APA applications to those three tax authorities were filed on or about

March 14, 2002.

> TR22122 (attaching letters submitting 2002 APA applications to IRS, CRA and
> Inland Revenue); TR00016 (Henderson Decl.) ¶ 33.

201.    Each APA application included a functional analysis prepared by Horst Frisch entitled

"Economic Analysis of Nortel Networks' Intercompany Transactions" (the "Horst Frisch

Report"), setting forth the Nortel Group's justification for its proposed RPSM on the basis of

various Nortel affiliates' roles and functions, as required to demonstrate that the proposed RPSM

satisfied the arm's length standard.

> TR11055 (Horst Frisch Report); TR22122 (Letters submitting 2002 APA
> Application to IRS, CRA and Inland Revenue) at EY-NRTL-001402 ("[t]he
> specific details of the proposed RPS methodology are provided in the economic
> analysis prepared by Horst Frisch Inc., which is attached as *Appendix 1* to this
> APA Request"); *id*. at  EY-NRTL-001406; *id.* at EY-NRTL-001413; TR00016
> (Henderson Decl.) ¶ 33.

202.    The APA applications were later amended to cover the 2001-2005 period.

TR47317 (Dec. 17, 2004 Letter to IRS requesting amendment of APA); TR44839 (Dec. 21, 2005 Letter to IRS, Inland Revenue, and CRA requesting amendment of the APA term to include  2005).

### 3.    Mechanics of Nortel's RPSM

203.    As explained in the Horst Frisch Report, Nortel's RPSM distinguished between the IEs (then consisting of NNL, NNI, NNUK, NN Ireland, NNSA and Nortel Networks Australia) – who, as discussed above, performed ongoing R&D, had previously been parties to R&D CSAs and performed the full range of functions – and LREs, who were routine distributors whose primary function was to sell Nortel products in their respective geographic regions, did not perform R&D and had not previously participated in an R&D CSA.

TR11055 (Horst Frisch Report) at 35; TR00016 (Henderson Decl.) ¶ 35.

204.    The RPSM allocated operating profits or losses to IEs and LREs under a two-step process.

TR11055 (Horst Frisch Report) at 34; TR00016 (Henderson Decl.) ¶ 35.

### a.    First Step:  Allocation of Routine Returns

205.    To determine the total "pool" of operating profits (or losses) to be allocated among the IEs and LREs, the RPSM started with Nortel's consolidated operating profits or losses and recalculated this figure on an "economic" basis for each entity through a series of adjustments including adding back R&D expenses and then subtracting an amortized portion of those expenses.  This calculation resulted in the gross "economic profit or loss."

TR11055 (Horst Frisch Report) at 37-40; TR00016 (Henderson Decl.) ¶ 37; TR21003 (MRDA) at 18-19 (Sched. A).

206.    Both the IEs and LREs were provided with a "routine return" for the performance of routine activities, such as the manufacture or distribution of Nortel Group products.

TR11055 (Horst Frisch Report) at 41-55; TR21003 (MRDA) at 18-19 (Sched. A).

### b.    Second Step:  Allocation of Residual Operating Profits or Losses

207.    In the second step of the RPSM, "residual" operating profits or losses remaining after the

payout of routine returns were allocated to the IEs only, based on each IE's relative proportion of

capitalized R&D expenses from that year and preceding years, assuming a 30% amortization rate.

> TR11055 (Horst Frisch Report) at 34-35, 40, 55; TR21003 (MRDA) at 18-19
> (Sched. A).[10]

208.    Only the IEs were entitled to a portion of the residual profit (or loss), because the IEs

alone bore the full entrepreneurial risks and benefits of the Nortel business within their Exclusive

Territories.

> TR11055 (Horst Frisch Report) at 34; TR21003 (MRDA) at 18-19 (Sched. A).

209.    Although the RPSM was devised based on the assumption that the Nortel Group would

return to and sustain its profitability, at the time it was proposed, Nortel was experiencing

significant losses.

> TR11053 (Dec. 11, 2001 PowerPoint Presentation titled "Overview of Transfer
> Pricing APA and Recommendations") at 21 ("Long-term planning assumes that
> residual profits exist in the future."); TR00016 (Henderson Decl.) ¶ 39.

210.    The formulas used to determine an IE's entitlement to routine returns, on the one hand,

and to a percentage of residual operating profit, on the other, were not the same and there was no

reason for there to be a correlation between the two.  As the US Interests' expert Jeffrey Kinrich

testified at trial, there was never any such correlation.

> Trial Tr. 4205:19-4206:10 (Kinrich), *see also* TR00052 (Kinrich Rebuttal) at 28-
> 29 & Table 6.

---

[10] The RPSM was subsequently adjusted for the period from 2006 onward.  In that period, the IEs' share of the
residual profit was based on each IE's R&D spend for the five years preceding the relevant calculation year.
TR21003 (MRDA) at 48-49 (Third Addendum).  The IEs' routine returns – which were previously based on their
return on net assets – were changed to include (1) a return based upon comparable independent distributors and (2) a
return for global operations, sales and marketing and general and administrative costs incurred by each IE to support
extraterritorial revenues.  TR00019 (Orlando Decl.) ¶ 35; *see also* TR21003 (MRDA) at 48 (Second Amendment to
Third Addendum) ("A functional rate of return is provided to each Participant as compensation for its distribution
function and other activities that support revenue outside of the Participant's country of residence.").

### 4.    Nortel's RPSM Was Designed to Move Cash from NNI to NNL to Reduce the Nortel Group's Taxes

211.    One of the objectives of the Nortel Group when implementing the RPSM was to

minimize tax payments globally as set forth below.

212.    While acknowledging that managers are incentivized to minimize taxes when structuring

an MNE's transfer pricing system, the expert reports of Timothy Reichert proffered by the

Monitor assert that there is no basis to conclude that Nortel's RPSM was designed to shift

Nortel's income to low tax jurisdictions, including because the IEs "were in high tax

jurisdictions," and because "the Nortel RPS was at the behest of tax authorities."

> TR00050 (Reichert Rebuttal) at 147-48; *see also* TR00049 (Reichert Report) at 5
> (noting that the "RPEs did not operate in low-tax rate jurisdictions and their
> identification (and the Nortel RPS) was transparent to and sanctioned by the
> primary tax authorities[,] . . . [which] is indicative of the Nortel RPS not having
> been designated to divert operating income to low tax-rate jurisdictions").

213.    Reichert's assertions are without basis.  The record shows that tax minimization was a

central goal of Nortel's RPSM.  As an initial matter, although the IRS and CRA supported

Nortel's use of a RPSM, a RPSM could have been designed and implemented by Nortel in any

number of different ways.  Thus the tax authorities' endorsement of a residual profit split

approach, as a general matter, is not inconsistent with an effort by Nortel to shift income to low

tax jurisdictions when designing Nortel's specific RPSM.

> TR00049 (Reichert Report) at 21 n.13; *see also* TR47347 (July 19, 2000
> Memorandum titled "Tangible Property APA – Discussion with CCRA") at 1-2;
> TR11055 (Horst Frisch Report) at 34.

214.    Effective tax rates varied widely across the jurisdictions in which the IEs operated.

During the CSA period, the effect of most operating income remaining at NNI (which earned the

income) resulted in a relatively high effective tax rate (and high tax burden) for the Nortel Group

because NNI's effective US tax rate was substantially higher than NNL's effective tax rate in

Canada due to the availability of R&D tax credits in Canada.  By way of example, as of the year

2000, NNI's effective US tax rate was 38% while NNL's effective Canadian tax rate was 12%.

> *See* TR11053 (Dec. 11, 2001 PowerPoint Presentation titled "Overview of
> Transfer Pricing APA and Recommendations") at 17 (showing NNL cash tax rate
> of 12% for NNL as compared to 38% for NNI); Canada Revenue Agency,
> Overview of the Scientific Research and Experimental Development (SR&ED)
> Tax Incentive Program, RC 4472(E) Rev. 08 (2008), available at
> http://www.craarc.gc.ca/E/pub/tg/rc-4472/rc4472-08e.pdf.

215.    Numerous Nortel documents show that Nortel personnel and advisors working on the

development of its RPSM were very attuned to these differences in tax rates and to the hoped-for

impact that a shift to the RPSM would have upon Nortel's net global taxes and that they

designed the RPSM to shift taxable income from NNI to NNL:

- The executive summary emailed to senior NNL management on
December 2, 2001 listed "minimiz[ing] Nortel's long-term effective
tax rate" as the first among several criteria that led to the APA team's
recommendation that Nortel adopt the RPSM.

    > TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of
    > Objectives of December 12, 2001 Presentation") attachment at 1.

- The December 2001 presentation prepared for senior management
recommending the RPSM included a slide entitled "Benefits of the
New Proposed Method from a Tax Perspective," which showed an
estimated impact of the proposed RPSM to operating income of the
IEs and LREs, with an anticipated $4.266 billion increase in NNL's
operating income and a $3.36 billion decrease in that of NNI.

    > TR11053 (Dec. 11, 2001 PowerPoint Presentation titled "Overview of Transfer
    > Pricing APA and Recommendations") at 15; *see also id.* at 16-18.

- On March 17, 2002, days after the IRS APA submission and the
accompanying Horst Frisch Report were filed, a "Mission
Accomplished!" email sent by Walter Henderson, the outgoing leader
of the APA team, estimated that application of the RPSM "resulted in
a $1.6 billion decrease to NNI's income" in 2001 alone.

    > TR11068 (Mar. 17, 2002 Email from W. Henderson titled "Mission
    > Accomplished!") at NNI_01503492.

- A "Global Tax Practice" presentation by Kriss Bush in July of 2002, indicated that "TP [Transfer pricing] is key to Nortel's global tax planning and management of our tax rate [.]"

  TR22121 (July 5, 2002 Email from R. Prgomet attaching July 11, 2002 PowerPoint Presentation titled "Global Tax Practice") attachment at 13.

- As negotiations with the tax authorities continued, Sutherland partner Jerry Cohen, former Chief Counsel to the IRS and who was advising NNL on the APA process, recorded in his notes of a December 2003 phone call: "The APA strategy does one thing. Takes losses out of Canada and attributes them to the US. . . The reason that they will not abandon the APA is because it will help push losses out of Canada to higher tax jurisdictions."

  TR11341 (Dec. 17, 2003 Call Notes).

- In a November 2005 email to senior colleagues in the treasury group, John Doolittle made clear that "[t]his is exactly the way we designed our transfer pricing i.e. take as much out of the US as we could. The problem seems to occur because the transfer pricing adjustments are not nearly enough to fund all of the costs in Canada like the debt and the company overall is draining cash."

  TR21525 (Nov. 23, 2005 Email from J. Doolittle to K. Stevenson and M. McCorkle).

- When Nortel considered changes to portions of its RPSM formula in 2006, Mark Weisz, Leader of International Tax, who was asked to lead the APA process in 2004, emphasized that "the global strategy is to drive profits & cash to Canada."

  TR21169 (Dec. 18, 2005 Email from M. Weisz to M. Orlando) at 1; *see also* TR00028 (Weisz Decl.) ¶¶ 3-4.

- A 2007 "Tax Town Hall" presentation providing an overview of Nortel's still-ongoing APA negotiations to the Nortel Group's CFO explained that the "RPS method allocated more profit to Canada in the long term and takes advantage of Canada as a tax haven."

  TR21170 (Dec. 5, 2007 Presentation titled "Global Tax Town Hall" ) at 7, 17.

- An October 2007 email from Roseanne Culina, former Leader of Tax for Canada and an NNL officer, stated that "[b]ecause we do a significant amount of R&D in Canada, our transfer pricing methodology then allows a significant portion of our global profits to be allocated to Canada and therefore use up our losses and credits

(even though Canada accounts for such a small proportion of our sales).  This represents a real advantage to Nortel from a cashflow and after tax earnings perspective."

> TR21164  (Oct. 22, 2007 Email from R. Culina to P. Carbone) at EMEAPRIV0089376 ; *see also id.* attachment at 1.

- A May 2008 presentation by Peter Look, a senior officer at NNL and Nortel's Vice President of Tax, to Nortel's audit committee represented on a slide entitled "APA Background" that the "Goal" of Nortel's RPSM transfer pricing regime was "to attribute more income to Canada."

> TR45137 (May 6, 2008 Presentation titled "Tax Matters Update Audit Committee Meeting") at 3.

216.    As Henderson, the leader of the APA team, testified, "[o]ne of the purposes of the RPSM was to minimize Nortel's long-term effective global tax rate while remaining compliant with the tax laws.  At the time the RPSM was designed, NNI generated the majority of the Company's taxable income, while NNL generated a significantly smaller amount.  For example, the Horst Frisch Report stated that NNI and NNL reported approximately 46% and 8.7%, respectively, of the Company's total third party sales in 2001.

> TR00016 (Henderson Decl.) ¶ 40 (citing TR11055 (Horst Frisch Report) at 49).

217.    Three decisions regarding the design of Nortel's RPSM were made specifically in order to shift revenue from NNI to NNL:

- A provision that would have provided routine returns based on sales and manufacturing was rejected in favor of one based on return on net assets.

> TR00016 (Henderson Decl.) ¶ 47; TR49737A (Feb 18, 2002 Telephone Call Notes).

- Use of sale, general and administrative expenses as part of the "allocation key" for residual operating profits was rejected in favor of a key that focused solely on R&D expenses.

> TR00016 (Henderson Decl.) ¶ 50; TR49737H (Feb 25, 2002 Telephone Call Notes ) at SUTHERLAND_00001922-23; TR49737F (Nov. 7, 2001 Email from

> D. Clark attaching Residual Profit Split – Open Items Memorandum) attachment at 2.

- An aggressive amortization rate was chosen that presumed a very short lifespan of Nortel Group technology, thus reducing or eliminating the significance of NNI's large past R&D expenditures in determining its allocation of operating income.

  > TR00016 (Henderson Decl.) ¶ 53.

218.    The testimony of senior NNL tax employees further confirms that minimizing tax was a key goal of the RPSM and of Nortel's transfer pricing policies more generally:

- John Doolittle, Vice President of Tax for Nortel starting in 2002 and an NNL officer, testified in his deposition that "[t]he thesis behind the [RPSM] . . . was that to the extent laws permitted it, we would move as much profit and hence cash into Canada and as a consequence we would . . . minimize the tax on the entire corporation."

  > Doolittle Dep. 52:7-12.[11]

- Peter Look, who succeeded Doolittle as Vice President of Tax, confirmed that "[t]he RPS model was a tax model," and that "[t]he Nortel tax group always sought, within the confines of applicable laws and regulations, to minimize its tax exposure."

  > Look Dep. 62:21-62:22, 307:6-9.

- Roseanne Culina, former Leader of Tax for Canada and an NNL officer, testified that "[t]ransfer pricing was a key part of [Nortel's] tax strategy," and that "one of the objectives in redeveloping the transfer pricing mechanism was getting cash to Canada," where there was a "low effective tax rate."

  > Culina Dep. 164:17-18, 186:2-6; *see also id.* 163:14-164:25.

219.    Trial testimony of NNL's former chief financial officers further corroborates that minimizing tax was a key goal for Nortel:

---

[11] *See also* Doolittle Dep. 104:14-25 (A. "…[T]here were a few different objectives of the overall transfer pricing methodology and, you know, one of them was tax minimization and I think by [November 2005] we may have been profitable and so, you know, our highest tax costs would have been in the US. So I'm saying that's what we intended it to do. Q. Take as much of that profit out of the US as you could to the extent permissible by applicable regulations and laws? A. Correct. Correct.").

- Peter Currie testified that it was Nortel's objective to optimize tax payments globally by matching revenues and costs in the most tax-advantageous manner possible on a global basis while still complying with all applicable local laws and requirements as it would be for any MNE.

  Trial Tr. 552-53 (Currie); TR00001 (Currie Decl.) ¶ 73.

- Paviter Binning testified that it was in the interests of all of the Nortel entities to minimize taxes, which was the function of the Nortel Tax group.

  Trial Tr. 1063 (Binning).

220.    In addition, the Nortel Group tax team negotiating the APA anticipated that the RPSM might have to be adjusted as a result of negotiations with tax authorities.  Accordingly the RPSM not only sought to minimize taxes by shifting income to NNL, but represented an aggressive, "going in" position with the expectation that the IRS would oppose and the CRA would support a methodology that shifted taxable income from NNI to NNL.

  TR00016 (Henderson Decl.) ¶¶ 34, 42, 50, 53.

**5.    NNI's Large Transfer Pricing Payments Under the RPSM Funded NNL and the Nortel Group's R&D**

221.    Over the course of eight years (2001-2008) as APA negotiations with the tax authorities continued regarding Nortel's RPSM, the Integrated Entities made or received billions of dollars in transfer pricing payments under that system.  As summarized in the following table, NNL was the chief recipient of these payments, totaling more than $4.7 billion, while NNI was the largest payor, transferring over $6.7 billion to other Nortel entities:

**Table 2:  Transfer Pricing Payments, 2001-2008**[12]

| IE | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| NNL | 589.0 | 482.3 | 391.0 | 652.4 | 496.0 | 511.1 | 725.9 | 879.8 | 4,727.5 |
| NNI | -1,931.2 | -1,140.2 | -857.8 | -722.7 | -631.8 | -371.8 | -508.9 | -537.3 | -6,701.7 |
| NNUK | 902.7 | 198.0 | 443.8 | 307.2 | 205.5 | 36.5 | 28.1 | 20.5 | 2,142.3 |
| NNSA | -92.1 | 81.1 | -27.4 | -145.7 | -12.7 | 3.7 | -95.3 | -46.9 | -335.3 |
| NN Ireland | -44.2 | -70.5 | -67.4 | -64.9 | -50.0 | -102.6 | -119.5 | -147.6 | -666.7 |
| NN Australia | 38.2 | 24.2 | -17.8 | 1.5 | 8.2 | -95.6 | -0.4 | 0.0 | -41.7 |

222.    As shown, in each year covered by the RPSM, NNI paid out hundreds of millions of

dollars – more than a billion dollars in some years – to the other IEs.

223.    NNL received hundreds of millions of dollars in transfer pricing payments each year.

224.    In part, these transfer pricing payments by NNI were used by NNL to fund its R&D.

> Trial Tr. 822:13-823:10 (McCorkle)  ("Q.  Now, we have heard a little bit about
> contributions over the past few days, and I would just like to confirm as Assistant
> Treasurer a few things from you.  Is it fair to say that during your period of time
> as Assistant Treasurer, you were able to use NNI's cash to help fund NNL;
> correct?  A.  The way we were set up was that all global cash was used as needed,
> including NNI's, yes.  Q.  And NNL spent money on R&D, for example?  A.
> Yes.  Q.  And NNL's expenditures were funded in part by the movement of cash
> from other entities to Canada; correct?  A.  Yes, that's correct.  Q.  And that
> included large amounts of cash from NNI?  A.  Yes.  Q.  Okay, and isn't it fair to
> say, Mr. McCorkle, that NNI indirectly funded NNL's R&D?  A.  A portion
> thereof, yes."); *see also* Binning Aff. at 11-12, ¶ 34 ("If an entity did not need all
> the cash that it held to fund existing or foreseeable obligations, it was in the
> broader group's interest to make more effective use of it elsewhere in the group.
> The individual entities ultimately benefitted from the efficient use of surplus cash
> across the organization to reduce external debt, fund headquarter and R&D costs,
> support growth initiatives and enable the broader group to provide continued
> support . . . .").

---

[12] *See* Orlando Decl. at 14, Figure 2 2 (citing TR49192 at "Rona" tab, 2001 Transfer Pricing Worksheet; TR49187 at
"Rona" tab, 2002 Transfer Pricing Worksheet; TR49188 at "Rona" tab, 2003 Transfer Pricing Worksheet; TR49194
at "Profit split profit" tab, 2004 Transfer Pricing Worksheet; TR49190 at "Profit split profit" tab, 2005 Transfer
Pricing Worksheet; TR49191 at "RPS Calculation" tab, 2006 Transfer Pricing Worksheet; TR49193 at "RPS
Calculation" tab, 2007 Transfer Pricing Worksheet; TR49189 at "FY RPS Calculation" tab, 2008 Transfer Pricing
Worksheet.)

225.    The amount of transfer pricing payments attributable to R&D and the Total R&D Funded

for each entity each year in the MRDA period are summarized below.

**Table 3:  R&D Funding Under the RPSM, 2001-2008**[13]

|  | *NNL* | *NNI* | *EMEA* | *Total* |
|---|---|---|---|---|
| *Direct R&D* | 7,372 | 6,467 | 2,667 | 16,506 |
| *TP – R&D* | (2,986) | 3,006 | (205) | (185) |
| *Total R&D Funded* | **4,385** | **9,473** | **2,462** | **16,321** |
| *% of Total R&D Funded Directly and Indirectly* | **27%** | **58%** | **15%** | **100%** |

**6.      The Tax Authorities Declined to Approve Nortel's APA Requests, and Determined that NNI Overpaid NNL by $2 Billion**

226.    In 2006, after years of negotiations regarding Nortel's RPSM, the IRS expressed serious

criticism of Nortel's RPSM in a position paper.

TR11237 (Mar. 22, 2006 IRS Memo).

227.    The grounds upon which the IRS criticized the RPSM included:

- That Nortel did not provide any differentiation among the Business Lines despite each one being separately managed and having very different profits and revenues.

- The methods by which Nortel calculated the routine returns awarded under the RPSM.

- That NNL did not bear all vendor financing losses, which instead were shared by the IEs under the RPSM.

TR11237 (Mar. 22, 2006 IRS Memo) at 15, 18-22, 30-31.

228.    Ultimately, neither the IRS nor the CRA approved Nortel's RPSM.  In 2009, following

the Nortel Group's insolvency and more than seven years after the 2002 APA applications, the

IRS and CRA agreed that ███████████████████████████████

---

[13] Trial Tr., 4505:12-4509:13 (Ryan); DEM00022 at 7; TR55 at 15-17, Ryan Report.

███████████████, and required an income adjustment of $2 billion from NNL to NNI as

a condition for resolving the APA for those years.

████████████████████████████████████████

229.    In late 2008, NNL and NNI filed a second APA application requesting the tax authorities'

approval of its RPSM for the years 2006-2011, but this application also was never approved.

> TR22078 (2008 Joint APA Request).

230.    NNL and NNI withdrew that 2006-2011 application at the request of the CRA.

> TR43792 (June 30, 2009 letter from CRA requesting withdrawal of 2006-2011
> APA request); TR50574.02 (Mar. 9, 2010 NNI letter to IRS withdrawing APA
> request); TR48633 (Mar. 25, 2010 NNL letter to CRA withdrawing APA request).

### D.    The Master R&D Agreement[14]

231.    From 2001 until the end of 2004, the Nortel Group operated under the RPSM without any

written intercompany agreement memorializing its terms.

> Trial Tr. 1140:5-23 (Henderson); *id*. 1716:3-1717:21 (Stephens); Stephens
> Dep.34:15-35; Trial Tr. 1848:3-:11 (Weisz) ("Q.  What was the purpose of the
> MRDA?  A.  The purpose of it was to contractualize the arrangements that the
> participants had and had been ongoing for quite some time since 2001.  Nortel
> had, prior to that, an R&D cost-sharing agreement which had expired; and a new
> arrangement had to be entered into between the parties, as each of the parties
> continued to perform R&D."); Lebrun Dep. 213:18-214:6.

232.    John Doolittle, Vice-President of Tax for NNL, engaged Sutherland on behalf of NNL

and its subsidiaries to assist in drafting an agreement to memorialize (1) the RPSM under which

Nortel had been operating for several years and (2) the parties' understanding of their respective

rights to intellectual property resulting from their R&D efforts.

> TR11338 (Apr. 7, 2004 Letter to J. Doolittle attaching Sutherland Engagement
> Letter).

---

[14] See Section C of the Proposed Conclusions of Law for a more detailed examination of the MRDA provisions.

233.    Giovanna Sparagna, a tax partner from Sutherland, was one of the principal drafters of

the agreement that ultimately became the MRDA along with personnel from Nortel's tax group,

Mark Weisz and John Doolittle in particular; Bob Ackerman and Dave Canale of Ernst & Young;

and Scott Wilkie, a Canadian tax attorney from Oslers.  Wilkie represented only NNL.

> Trial Tr. 1847:6-23 (Weisz); Wilkie Dep. 37:7-38:19.

234.    In December 2004, Mark Weisz circulated the final Master R&D Agreement ("MRDA")

to the Integrated Entities for execution.  The agreement was signed by NNL, NNI, NNUK,

NNSA and NN Ireland at various dates and made effective January 1, 2001.  John Doolittle

signed the MRDA on behalf of NNL.

> TR11236 (Dec. 22, 2004 Email from Mark Weisz enclosing the Final Master
> R&D Agreement ) at 5; TR21003 (MRDA) at 13-17 (Signature Blocks).

### 1.    Rights to Intellectual Property Under the MRDA

235.    The MRDA sets forth a clear exchange of consideration between the signatories.

Pursuant to Article 4(a), each Licensed Participant vested legal title in NNL to the intellectual

property it created.  Expressly "in consideration therefor," NNL granted an exclusive license

("Exclusive License") back to each Participant:

> Except as otherwise specifically agreed, legal title to any and all NN Technology
> whether now in existence or acquired or developed pursuant to the terms of this
> Agreement shall be vested in NNL.  In consideration therefor, NNL agrees in
> enter into an Exclusive License with each of the Licensed Participants as set forth
> in Article 5.

> TR21003 (MRDA) at 6 (Art. 4(a)).

236.    As a result of this exchange, as explained in detail in Section II.C. of the Conclusions of

Law, the MRDA granted the Licensed Participants broad licenses in their Exclusive Territories

amounting to full economic and beneficial ownership of NN Technology in those territories.

Except by virtue of its equity in its subsidiaries, NNL held no economic rights to the NN

Technology in the Exclusive Territories other than in Canada.

237.    By the MRDA's terms, the Licensed Participants received no compensation for vesting in

NNL legal title to patents for their inventions other than their Exclusive Licenses.

>    TR21003 (MRDA) at 6 (Art. 4(a)).

238.    Like the other Participants, NNL held the right to exploit all NN Technology in its own

exclusive territory, Canada.  (It also held the exclusive right to exploit all NN Technology in the

rest of the world not covered by an Exclusive License, a benefit which the Third Addendum

corrected to reflect the Nortel Group's actual practice of having all IEs hold non-exclusive rights

in those jurisdictions.)  Like the other Participants, NNL held no right to exploit NN Technology

in any other Participant's Exclusive Territory.

> TR21003 (MRDA) at 4 (Art. 1(l)) (describing territories under MRDA as
> originally drafted), 40-42 (Third Addendum) (providing all Participants with non-
> exclusive rights outside of the exclusive territories); TR43376 (Dec. 29, 2008
> email chain) at EMEAPROD1478246.

> *a.*    **The MRDA Was A Tax Driven Document Intended to Satisfy Tax**
> **Authorities**

239.    The risk that Nortel would be audited by tax authorities without an agreement in place

prompted Nortel to draft the MRDA.   As Mark Weisz testified at trial:

> The purpose of [the MRDA] was to contractualize the
> arrangements that the participants had and had been ongoing for
> quite some time since 2001.  Nortel had, prior to that, an R&D
> cost-sharing agreement which had expired; and a new arrangement
> had to be entered into between the parties, as each of the parties
> continued to perform R&D. Somewhere when I started to get
> involved, no contract existed and it was important to contractualize
> the arrangement because other jurisdictions who around the world
> were participants but not party to the APA could be subject to audit
> at any time.  And so it was prudent to get a document to reflect the
> economics of what has been transacting in our business for quite
> some time.

Trial Tr. 1848:3-20 (Weisz).

240.    Accordingly, the MRDA was a tax-driven contract, drafted primarily by the Nortel

Group's tax team and external tax counsel, and it was intended to memorialize the group's

transfer pricing policy in place from 2001 forward.

> Trial Tr. 1275:6-7 (Orlando) (stating that the MRDA is a "tax document that
> underscores [Nortel's] transfer pricing policy"); *id.* 1725:19-25 (Stephens); Trial
> Tr. 1847:3-1849:10 (Weisz); TR00028 (Weisz Decl.) ¶ 9 ("The MRDA set forth
> the agreement among Nortel entities governing intercompany transactions for tax
> purposes and created ownership and licensing rights to Nortel technology created
> by the MRDA parties."); Sparagna Dep. 233:11-21 (testifying that the MRDA is
> "primarily focused on transfer pricing" which is "part of tax law," and it is
> "primarily [a] tax law document").

241.    Nortel also was aware that the transfer pricing policies it had proposed in its 2002 APA

application and which were reflected in the MRDA were subject to approval by the tax

authorities, and intended that arrangements in the MRDA would ultimately either be approved by

those authorities or be revised to secure approval.  This was reflected in a number of provisions

of the MRDA that anticipated amendment if required by the tax authorities:

- "WHEREAS Participants acknowledge that as a result of a collective
  review by the Canadian Customs and Revenue Agency, the US
  Internal Revenue Service and the UK Inland Revenue (collectively, the
  "Revenue Authorities") regarding the application of the RPSM, the
  calculation of the RPSM as set forth in Schedule A may be amended
  which amendments would require the consent of the Participants."

  TR21003 (MRDA) at 2 (final recital).

- "The R&D Allocation will be computed pursuant Schedule A which
  sets forth the basis of the RPSM as originally proposed to the Revenue
  Authorities.  The Participants understand that the RPSM is the subject
  of review, discussions and negotiations with the Revenue Authorities.
  The Participants agree to amend this Agreement and to adjust the
  RPSM to the extent necessary to reflect any negotiated determination
  with the Revenue Authorities as to the final R&D Allocation."

  TR21003 (MRDA) at 5 (Art. 3(c)).

- "The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any taxing authority that would affect the RPSM calculations for such taxable year."

> TR21003 (MRDA) at 19 n.2 (Schedule A).

- "The Participants agree to amend the terms of Article 11 [governing retirement of Participants] in order to reflect any negotiated determinations with a Revenue Authority."

> TR21003(MRDA) at 29 (Addendum to MRDA replacing, *inter alia*, Art. 11(d)).

242.    As a result of continuing negotiations with the tax authorities, Nortel did in fact revise Schedule A to the MRDA, though these revisions were never approved by the tax authorities and remained the subject of continued negotiations that were ultimately discontinued at the insistence of the CRA.

> *See* TR21003 (MRDA) at 39 (Third Addendum) ("Whereas Nortel expected that the RPSM attached to the Original Agreement as <u>Schedule A</u> would apply for an indefinite period beginning in January 1, 2001;  however it was determined in discussions with certain Revenue Authorities in 2007 that certain amendments thereto retroactive from January 1, 2006 were necessary or desirable, as reflected in the revised RPSM attached as a revised <u>Schedule A</u> to the Second Addendum: and it has been determined at this time as a result of further discussions with Revenue Authorities that further amendments thereto, retroactive to the Third Addendum Effective Date, are necessary or desirable due to changes in the Nortel business, primarily as a result or Nortel's completion of the process of outsourcing its manufacturing activities, which changes have been reflected in the financial statements of each Participant since the Third Addendum Effective Date;"); TR50574.02 (Mar. 9, 2010 NNI letter to IRS withdrawing APA request); TR48633 (Mar. 25, 2010 NNL letter to CRA withdrawing APA request).

### *b.*    The MRDA Was Drafted to Fulfill the Shared Tax and Business Purposes of Members of the Nortel Group

243.    The continuation in the MRDA of the perpetual and royalty free Exclusive Licenses that conferred all valuable rights in NN Technology to each Licensed Participant in its Exclusive Territory was fundamental to achieving the Nortel Group's business purposes in drafting the MRDA.  It was important for Nortel to maintain separate and distinct legal entities in order to,

among other things, avoid NNL having a "permanent establishment" in another jurisdiction by

conducting business there.

244.    NNL avoiding permanent establishment status in the United States was a particularly

important goal.  Accordingly, by design, NNI was the only Nortel IE that operated (and thus had

to pay corporate income tax) in the United States.

> TR32138 (Jan. 25, 2001 email attaching memorandum from VP of Tax David
> Burn) attachment at 2 ("[I]t is important to note that [NNL] should make all sales
> for deliveries to and services provided to Canadian customers and [NNI] must
> make all sales to U.S. customers.  Any deviations must be brought to the attention
> of Taxation as this is a key issue between CCRA (formerly Revenue Canada) and
> the IRS (US Internal Revenue Service)."); Trial Tr. 1868:10-25 (Weisz)
> (explaining why the policy in Burn's memorandum was "an important goal of the
> tax department."); TR00016 (Henderson Decl.) ¶ 21 ("US income was booked in
> NNI and NNI was the only CSA Participant that paid corporate income tax in the
> United States."); O Dep. 145:14-148:21 ("Q.  If I can ask you to turn that
> document [TR31086] to page 9.  A. Okay.  Q. And it has at the top of the page the
> term 'permanent establishment'?  A. Yes.  Q. Are you familiar with that term?  A.
> Yes.  Q. And can you explain to me what you understand it to mean?  A.
> Essentially, it is equivalent to for layperson's wording, it determines whether you
> have a taxable presence in the tax jurisdiction and you know, so that is what we
> usually use that term for.  Q. So when you say 'a taxable presence' that would not
> typically be expected to be there?  So for instance, NNI would have a taxable
> presence in the United States; correct?  A. That's right.  Essentially this is a
> defined term in a lot of the tax treaties, and it sort of determined, for example, if
> you negotiated contracts or if you habitually sign contracts on behalf of somebody
> else, you have employees in another jurisdiction, it may trigger a presence in
> another jurisdiction.  So NNI, if they are doing some of those things in Canada,
> for example, it could trigger a permanent establishment in Canada…Q. And were
> permanent establishments to be avoided?  A. Yes.").

245.    Indeed, when considering NNL's and NNI's respective rights to patents in the United

States under the R&D CSAs, Nortel's tax experts "seemed mortified at the prospect of creating a

taxable entity in the USA called NNL (i.e. the Canadian parent).  Accordingly, the decision was

made to make the license to IPRs in the USA exclusive to NNI."

> TR22083 (Nov. 7, 2002 email chain entitled "NNI's rights under NNL's patents")
> at 4.

246.    As the MRDA is a tax document memorializing the parties' transfer pricing arrangements, the permanent establishment concern received specific attention during its drafting.

> TR11344 (Aug. 5, 2004 email from S. Wilkie to G. Sparagna, M. Weisz, and J. Doolittle) at 1 (noting "various potential issues, notably PE, carrying on business and withholding tax (royalties)"); TR50974 (Sept. 16, 2004 Email from S. Wilkie to M. Weisz, subject: IP Contract Issues) at 1 (discussing concern that "characterizing [Nortel's transfer pricing methodology] as a contractual matter as a 'services' agreement may unnecessarily lead to a number of potentially difficult tax issues, at least in Canada, including fapi, withholding tax, business presence (PE, carrying on business), and buy-in/buy-out issues.").

247.    The drafters of the MRDA thus sought to avoid giving any entity other than NNI economic rights in the United States.  In addition to being reflected in the Exclusive Licenses that defined the IEs' rights to Nortel Group IP on the basis of their Exclusive Territories, the intent of the parties to avoid permanent establishment was reflected in Article 13, stating that their relationship "shall not constitute a partnership or joint venture for any purpose."  Nortel management was aware that under US tax law, if a partnership is engaged in a US trade or business, non-US resident partners that own an interest in that partnership are also deemed to have a US trade or business, and may be subject to tax in the United States if that trade or business is treated as creating a permanent establishment for the non-US partner.  As former Nortel Group Director of Corporate Taxation Karina O testified, there was some concern that tax authorities might interpret the MRDA as a partnership "because everybody had the same rights.  Everybody was doing the same things," and "that is where you would have created some of these [permanent establishment] issues, because yes, the way partnerships are taxed, the partners are usually taxed in whatever jurisdiction it is, so that would mean, for example, suddenly the Canadian entity may be taxed in the U.S., in the UK, wherever there is a participant."

> TR21003 (MRDA) at 12 (Art. 13); O Dep. 172:25-173:25; *see also id.* 174:4-9; TR00062 (Eden Report) ¶¶ 124-126 ("Nortel's concerns about taxation are also

reflected in Article 13 of the MRDA, which states that "[t]he relationship of the [IEs] under th[e] [MRDA] shall not constitute a partnership or joint venture for any purpose.").

248.    A subsequent Memorandum of Understanding – signed by the parties on the eve of the insolvency filings amid significant concern about audits of the MRDA by tax authorities given the Nortel Group's failure to secure an APA – reiterated that each of the MRDA Participants were "acting in and carrying on its own business in its own right in its own Territory," and that "[n]either the RPSM, the [MRDA], nor this MOU is intended . . . to represent an agreement of partnership."

> TR48944 (MOU) at 3; *see* O Dep. 172:25-181:18 (discussing circumstances surrounding drafting of the MOU).

249.    In 2002, when the RPSM was first proposed, Nortel considered moving from exclusive licenses by geography as provided under the CSA to global non-exclusive licenses, but was concerned that elimination of the Exclusive Licenses created several risks, including that NNL could be deemed to have a permanent establishment in the United States.

> TR00016 (Henderson Decl.) ¶ 55 ("Implementation of the RPSM was not expected to change the legal ownership of IP:  for administrative ease, NNL was to continue to hold legal title.  With respect to economic and beneficial ownership, we anticipated terminating the R&D CSA and providing each IE with a non-exclusive, worldwide license to Nortel IP, rather than the exclusive, regional license the IEs previously enjoyed as former participants to the R&D CSA.  However, moving to a non-exclusive license structure posed multiple risks, including permanent establishment risk if other entities operated outside their territories as a result of global license rights.").

250.    In addition, Nortel was concerned that any reduction in the CSA Participants' IP ownership interests in their respective territories under the MRDA would have entitled each, particularly NNI, to a buy-out payment equal to the difference in value of a global non-exclusive license and the full equitable and beneficial ownership in its Exclusive Territory that each enjoyed under the CSA.

Trial Tr. 1858:18-1860:6 (Weisz); TR11114 (Nov. 7, 2001 Email from T. Collins) at 2 (When contemplating a transition to non-exclusive licenses, Collins wrote, "I believe the transition will also require a valuation of the current intellectual property rights enjoyed by the participants that they will be giving up as part of the new model (the most valuable being the exclusive right to exploit all of Nortel's IPR in the US enjoyed by NNI). I am certain that upon closer examination the transition will raise a number of complex legal issues of which I am currently unaware."); TR11304 (Sept. 29, 2004 Email from M. Weisz to B. Morgan RE: IP Agreement) at 1 ("When we spoke last week there was discussion about buy in/buy out. I feel that this may not be necessary as the old R&D CS participants have the same rights as the new RPS participants. More importantly Nortel has not changed the way it has transacted its business. Under the R&D CSA each participant received a fully paid up license which continued in perpetuity. The same terms and conditions exist under RPS. The main difference between R&D CSA versus RPS is the remuneration."); TR43733 (Apr. 26, 2004 Nortel Networks Multilateral APA Responses to IRS Information and Document Request) at 5 ("Under the R&D CSA, each participant obtained certain rights with respect to its share of the intangibles developed under the CSA…With the CSA termination, such former participants are deemed to have acquired a fully paid up license permitting the former participant to continue to exercise the rights it obtained under the CSA. As such, no buy-out payment is necessary because each former CSA participant continues to own the rights it acquired during the CSA upon CSA termination.").

251.    The evidence of these concerns underlying the MRDA – avoiding NNL having a

permanent establishment in the US and avoiding NNL having to make buy-out payments – was

unrebutted at trial.

### c.    The Parties Intended to Contractualize Their Pre-Existing Arrangement.

252.    The purpose in drafting the MRDA was to "contractualize" the parties' pre-existing

business arrangement "that all the participants had full economic rights and benefits to exploit

Nortel technology in the[ir] country of incorporation," as had existed under the R&D CSAs and

continued to serve the parties' tax and business goals thereafter.

Trial Tr. 1848:3-1849:2 (Weisz); *see also id.* 1854:6 8-1860:6 (Weisz); TR00028 (Weisz Decl. ) ¶¶ 3, 10, 12-14 ("[F]rom an economic perspective, the MRDA parties intended that each of the MRDA parties would exclusively own the rights to fully exploit technology in their [E]xclusive [T]erritories." Weisz "did not understand the scope of the exclusive licenses provided to the Licensed Participants to be limited in any way other than with respect to the geographic

territory." "This structure was created to reflect the business reality of the economic ownership of IP rights."); Sparagna Dep. 211:18-212:18 ("Q. All right. So when there is -- Mr. Doolittle advises you that after discussion with Legal, IP legal ownership is to stay as it was, I take it you understood that, in fulfilling your tax mandate, you weren't supposed to change that from an IP perspective, correct? A. Correct. Q. And, in fact, when you refresh your recollection about the MRDA, do you agree there wasn't any intention to change the old ownership structure, as you described it, under the CSA, there was still title in NNL's name and the grant of licenses? A. I expected the title to remain in NNL and I expected there to be perpetual licenses. Q. And we saw licenses in the cost sharing agreements. So to that extent, if both documents had title in NNL's name and licenses, to that extent they were similar? A. They were broadly similar. Q. I understand the sharing of profits or cost were different under one or the other. A. Correct.").

253.    As John Doolittle – a senior NNL officer and Nortel's Vice President of Tax, who signed the MRDA on behalf of NNL – put it, the "objective in the MRDA was to accurately reflect the economic realities of how Nortel operated."

> TR21003 (MRDA) at 14, 23, 42 (Signature Blocks); Doolittle Dep. 106:13-25 (Doolittle explains that he "was head of the tax group when [the MRDA] was signed . . . and it was the agreement that documented the arrangement between the R&D participants and so I was certainly involved in it."); Doolittle Dep. 107:9-13; *see also id.* 106:19-25 (the purpose of the MRDA was "to document the rights, obligations, benefits of the parties that were participants to the R&D – parties that performed R&D that were participants to the agreement.").

254.    As such, as Doolittle explained, the MRDA was designed to provide "each of the RPS participants beneficial ownership but not legal ownership to the technology," that beneficial ownership included the right of each IE "to exploit the Nortel technology in its territory."

> Doolittle Dep. 94:24-95:3, 95:14-17.

255.    As Doolittle testified, there were no "exceptions to the exclusive right of the [IEs] to the economic and beneficial ownership of Nortel technology within their respective territories."

> Doolittle Dep. 110:4-9, 110:11-12.

256.    In light of that purpose, Giovanna Sparagna worked toward drafting an agreement that reflected the relationship of the parties whereby the Participants were the "entrepreneurs" of

Nortel who bore "the upside risk and downside risk" of their R&D investment and the Licensed

Participants were the "beneficial owners" of Nortel's IP in their Exclusive Territories.  Therefore,

she and the other drafters structured the MRDA to grant the Licensed Participants a "legal

entitlement as beneficial owners of the technology" in the form of a royalty-free "perpetual

license."

> Sparagna Dep. 25:12-19, 83:16-84:22, 84:24-85:3, 85:5-85:14, 151:17-21,
> 163:21-164:5, 180:8-17.

257.    Although the Monitor has suggested that this beneficial ownership afforded something

less than complete economic ownership of IP to each Licensed Participant in its respective

Exclusive Territory, every witness who testified at trial on this issue confirmed that the factual

context in which the MRDA was created led the parties to grant each Participant full economic

and beneficial ownership of the IP.[15]

> *See* Trial Tr. 452:12-458:7 (Opening Statement of the Monitor).

258.    Weisz testified that the purpose of the MRDA was to "contractualize" the parties' pre-

existing arrangement "that all the Participants had full economic rights and benefits to exploit

Nortel technology in the[ir] country of incorporation."

> Trial Tr. 1848:3-1849:2 (Weisz); *see also* TR00028 (Weisz Decl.) ¶¶ 3, 10, 12-14.

259.    Michael Orlando, former Transfer Pricing Leader at NNI, confirmed that Nortel and its

advisors understood the Licensed Participants were "responsible for ongoing entrepreneurship

and risk-taking functions with respect to their ongoing IP activities," and as a result, they each

"maintain[ed] an economic ownership in the IP" that was formalized through the grant of

Exclusive Licenses.

---

[15] The Canadian Debtors, the Monitor and the CCC declined to call any witnesses knowledgeable about the MRDA at trial, even though several of them live in Ontario and all of them appeared voluntarily for deposition when requested and were represented by counsel for the Monitor and/or CCC at deposition.  Because the Canadian Debtors did not offer an affidavit from these witnesses, they could not be called at trial by any party.  *See* Proposed Joint Trial Protocol [D.I. 12863-1] at 7.

Trial Tr. 1275:8-14, 1280:5-23, 1281:12-18 (Orlando).  *See also See also*
TR00019 (Orlando Decl.) ¶¶ 16, 23 ("The IEs were the entrepreneurs and risk-
takers of Nortel because they were the entities responsible for Nortel's R&D
activities.  Because of their entrepreneurial and risk-taking function, each of the
IEs were entitled to enjoy the benefits from Nortel's R&D investments and they
maintained economic and beneficial ownership of Nortel's IP in their respective
geographic territories . . . It was and is my understanding, as well as the
understanding of other tax personnel and businesspeople at Nortel, that the
MRDA was intended to provide each of the IEs with economic and beneficial
ownership of Nortel's IP within their exclusive territories, e.g., the US in the case
of NNI or the UK in the case of NNUK.").

260.    As also confirmed by Kerry Stephens, an NNUK tax officer, IP under the MRDA "was

economically owned, for which one might read beneficially owned, by the RPSM participants."

Stephens Dep. 56:10-57:21.

261.    As described in the Section II.C.4 of the Conclusions of Law, the MRDA itself contains

repeated references to the IEs' ownership rights in the NN Technology, which were reiterated as

the agreement was amended over time.

262.    Witnesses knowledgeable regarding the creation of the MRDA and contemporary

documents confirm that NNL's status as title holder was not understood to confer upon it any

additional entitlement to benefit from the Nortel Group's IP:

- Stephens noted that no one at Nortel ever suggested "that NNL, as the
  holder of legal title of the intellectual property, had a greater beneficial
  interest in the IP" than the Licensed Participants.

    Trial Tr. (Stephens) 1740:13-19.

- Weisz and Orlando both stated that tax authorities were never told that
  NNL had any greater interest than NNI or the other Licensed Participants
  in NN Technology.

    TR00019 (Orlando Decl.) ¶ 28 ("I am not aware of any instance in which Nortel
    or its advisors informed the tax authorities that if Nortel sold its patents, the
    proceeds from that sale would be recognized exclusively by NNL.  That outcome
    would have been inconsistent with Nortel's representations to tax authorities . . .
    ."); TR00028 (Weisz Decl.) ¶ 16 (In all communications with tax authorities, "it
    was made clear that full economic ownership . . . of Nortel technology in each of
    the exclusive territories was held by the MRDA participant for that exclusive

territory. . . NNL's legal title of the Nortel technology was virtually irrelevant. . . .").

- Weisz and Orlando both testified that legal title was placed in NNL only for administrative simplicity.  Weisz testified that "IP legal ownership, for convenience, was with NNL," and Orlando confirmed that legal title was placed in NNL "for administrative convenience."

  Trial Tr. 1855:14-15 (Weisz); *id.* 1333:17-20 (Orlando).

- A 2001 memorandum from in-house lawyers similarly explained that "for administrative simplicity it is expected that all of Nortel's [IP] will continue to be owned by [NNL]."

  TR22143 (Dec. 3, 2001 Modification of R&D Cost Sharing Arrangement) at 1. *See also, e.g.*, TR11114 (Nov. 7, 2001 Email from T. Collins titled "Modification of Nortel Networks R&D Cost Sharing Arrangement") at 1 ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity."); TR11065 at 1, at. p. 1 (NNL attorney circulates presentation "[s]uggest[ing] maintaining NNL as IPR owner [under the planned RPS agreement] for administrative simplicity").

263.    When language was proposed in an early draft of the MRDA to the effect that "legal title and legal ownership to any and all NN Technology . . . will be held solely by NNL," NNL's legal adviser Wilkie opposed the inclusion of any reference to NNL having "legal ownership" as inconsistent with the parties' existing economic and business reality, observing:

> The philosophical concern that I have . . . is a stronger implication that NNL is the "real owner" of the IP and that the Participants derive their rights from NNL, as licensees, rather than as a consequence of having earned them in their own right as participants in the R&D program. Among other things this colours the royalty free licence differently than under the 'former' arrangements.

As Wilkie argued, the Executive Licenses merely served as a "mechani[sm] to document the benefit/rights that participants had earned in their own right."

  TR11349 (Oct. 19, 2004 Email from S. Wilkie to M .Weisz, subject: Revised Master R&D Agreement) at 1, attachment p. 7 .

### d.    Representations to Tax Authorities Regarding the Participants' Rights in Nortel Group IP

264.    Nortel's repeated representations to tax authorities regarding the IEs' rights in Nortel Group IP reflect the tax context and commercial goals of the MRDA.  In its first submissions requesting an APA in March 2002, the Nortel Group reported to the IRS, CRA and Inland Revenue that from an economic standpoint dating back to the previous R&D CSAs, each IE "could be considered to 'own' the [Nortel] technology as it related to its specific region."  The IRS took specific note of this representation in a subsequent review of NNI's tax liabilities.

> TR11055 (Horst Frisch Report) at 10; TR11343 (IRS Notice of Adjustment) attachment at 3 (reflecting the understanding of the IRS that "each of the cost share participants (CSPs) were treated as owning the technology created by all CSPs and were entitled to use that technology in their respective geographic markets").

265.    Based on information provided by NNL, Ian Barton, Nortel's Director of European Taxation had made a similar representation previously in response to questions by Inland Revenue, stating that "although Nortel Canada has legal ownership of Nortel's Intellectual Property, each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation."

> TR31022 (Feb. 27, 2001  Letter from I. Barton to A. Miller) at 2; Barton Dep. 117:6-7; 117:9-13.

266.    Repeated representations by the Nortel Group to the tax authorities that the Licensed Participants had economic ownership of the patents followed:

- In September 2003, in response to questions posed by the IRS  and CRA in connection with the Nortel Group's APA applications, Nortel stated that all IEs were "owners of the intangible property."

  > TR11169 (Sept. 2003 Nortel APA Responses to Questions Posed by Inland Revenue, IRS, and CRA) at 25.

- In November 2004, Nortel explained in a response to an IRS Information and Document Request for Functional Analysis that the

IEs "have agreed to continue participating in the future benefits of new IP" under the RPSM because they were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts."

> TR11084 (Dec. 2, 2004 Email from K. Stephens to E. Morris and M. Weisz, attaching Nortel Multilateral APA Response to IRS Information and Document Request for a Functional Analysis ("Cover Letter"), Perjury Statement, and Nortel Functional Analysis) cover letter at 2.

- In 2008, in a joint request for a new APA to cover the years 2006-2011, prepared with the assistance of Ernst & Young, NNL and NNI told the CRA and IRS that although IP was "registered" in NNL's name, "[e]ach IE maintain[ed] an economic ownership in the IP."

> TR22078 (2008 Joint APA Request) App. A, at 4; *see also* Trial Tr. 1280:20-23, 1281:24-1282:9 (Orlando); TR00019 (Orlando Decl. ) ¶ 27.

- NNL's transfer pricing report for the tax year ended December 31, 2009, stated that "NNL and the other integrated entities ('IEs') are the primary owners of intangibles developed by the Nortel Group and bear the risk of development." The report further classified each of NNL, NNI, NNUK, NNSA and NN Ireland as possessing "intangible ownership," in contrast to the LREs.

> TR47223.01 (2009 NNL Transfer Pricing Report) at 1-2.

- NNI's transfer pricing report for the same year contained the same classifications and likewise stated that "NNI, NNL and other integrated entities . . . are the primary owners of intangibles developed by the Group and bear the risk of development."

> TR47221.02 (2009 NNI Transfer Pricing Report) at 1.

267.    A "Functional Activity Chart" from NNL's and NNI's 2008 APA request, excerpted below, listed various activities performed by the IEs, which were either "in support of local and extraterritorial revenues" (designated with an "X") or "in support of local revenues only" (designated with a "Y"). The table stated that each of the Participants – including Licensed Participants NNI, NNUK, NNSA, and NN Ireland – had "Intellectual Property Ownership" in their local jurisdictions (their respective Exclusive Territories) while NNL had only one R&D activity distinct from the other Participants, "Registration of Intellectual Property."

TR22078 App. A at 1-2.

| Activity | NNL | NNI | NNUK | NNSA | NN Ireland | NN Australia | LREs |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **Research, Design and Development** | | | | | | | |
| R&D | X | X | X | X | X | | |
| Registration of Intellectual Property | X | | | | | | |
| Intellectual Property Ownership | Y | Y | Y | Y | Y | | |
| Product Development | X | X | X | X | X | | |
| Common Engineering | X | X | X | X | X | | |

268.    In his trial testimony, Orlando – the Transfer Pricing Leader at the time this APA request was submitted – explained that "a lot of time" was spent preparing this chart following functional analysis interviews with the relevant personnel, that Ernst & Young Canada was involved in the preparation of the chart, and that it was approved by senior NNL management, including Look, the Vice President of Tax.

Trial Tr. 1281:24-1282:9, 1283:13-20 (Orlando).

269.    A virtually identical chart appeared in the 2009 transfer pricing reports for both NNL and NNI.  These reports were prepared in 2010, after the Nortel Group's insolvency, by Nortel Group tax personnel and representatives of Ernst & Young Canada – including Sean Kruger, who was and is an advisor to the Monitor and attended depositions in this litigation as its representative[16] – in order to comply with CRA and IRS regulations requiring accurate documentation of companies' transfer pricing policies.

> TR48622.02 (2009 NNL Transfer Pricing Report) at 39; TR47221.02 (2009 NNI Transfer Pricing Report) at 37; Trial Tr.1284:3-10, 1284:15-1285:13 (Orlando) (noting that the transfer pricing reports were prepared in 2010; that they were a "joint effort" by Orlando, his transfer pricing team "and Ernst & Young Canada," including Sean Kruger; and that "[r]eports like these" are "[r]equired by the tax authorities" in order "to document the company's transfer pricing policy"); *see also* TR48622.02 at 1 (indicating that the 2009 NNL Transfer Pricing Report was

---

[16] Sean Kruger attended the depositions of Culina, Look, Morgan, Stephens, and Weisz on behalf of the Monitor. *See* Culina Dep. 14:1-2; Look Dep. 12:23-24; Morgan Dep. 12:20-21, Stephens Dep. 23:20-21; Weisz Dep. 11:23-25; *see also* Trial Tr. 893:6-17 (Hamilton) (referencing Kruger's role).

prepared "under the framework set out in subparagraphs 247(4)(a)(i) through (vi) of the Income Tax Act (Canada)"); TR47221.02 (2009 NNI Transfer Pricing Report) at 1 (indicating that the 2009 NNI Transfer Pricing Report was prepared "for purposes of determining compliance with the reasonableness requirements of [IRC] § 1.6662-6(d)").

270.    Numerous witnesses acknowledged that when they communicated with taxation authorities, it was critically important that the information provided was accurate, honest and complete.

> Trial Tr. 567:9-15 (Currie); Trial Tr. 1139-1140 (Henderson); Sparagna Dep. 243:17-24; Stephens Dep. 253:5-253:12; Look Dep. 210:12- 211:9.

271.    The Monitor has argued that terms used in the MRDA such as economic and beneficial ownership have different meanings in different contexts.

> Trial Tr. 452:12-458:7 (Opening Statement of the Monitor and Canadian Debtors) (suggesting that terms such as "beneficial ownership" that appear in the MRDA have different meanings in the "tax and transfer pricing context" than in other contexts); Monitor's Pre-trial Br. ¶¶ 100-03 (similarly suggesting that "beneficial ownership" had a special meaning in the tax context).

272.    However, the evidence does not support that assertion.  All of the witnesses knowledgeable about this issue testified that tax reality must reflect business and economic reality.

> Sparagna Dep. 80:5-80:13 ("Q.  And there's a distinction between legal title and beneficial or economic ownership; is that right?  A.  For tax purposes, yes.  Q. And could you describe that to me?  A.  For tax purposes, bare legal title does not necessarily mean economic title, that you're entitled to the returns or the losses attributable to that property."); id. 109:5-109:10 ("Q.  Now, when you -- when you were talking about economic ownership versus legal title and you said, from a tax perspective, now, it's true, though, from a tax perspective the tax authorities are looking at the economic reality; isn't that correct?  A.  Correct."); Doolittle Dep. 107:90-13 (the "objective in the MRDA was to accurately reflect the economic realities of how Nortel operated"); Trial Tr. 1281:19-23 (Orlando) ("Q. When you used the phrase 'economic ownership' did that have any meaning in the tax context distinct from the business context?  A. No.  It has the same meaning in tax and business context."); id. at 1328:5-1328:13 ("Q. Sure.  And when you describe rights as economic ownership or beneficial ownership, you are referring to the bundle of rights contained in the MRDA, correct?  A. Well, I'm referring to the contractual rights in the MRDA.  I'm also referring to the business

reality, you know, what I represented to the tax authorities as how our business
operates."); *id.* at 1850:11-1850:18 (Weisz) ("Q. What did you mean by
'beneficial ownership'? A. It was understood by all the parties that the
participants had full ownership and rights to exploit Nortel technology in their
country of incorporation. And I was expressing here that that's exactly what we
were going to contractualize in the agreement.").

273.    Likewise, when communicating with taxing authorities regarding the entrepreneurship

and risk-taking functions of the IEs, Nortel representatives understood and intended its

statements to have the same meaning in the tax and business contexts.

> Trial Tr. 1280:24-1281:5 (Orlando) ((discussing TR22078, the 2007-2011 APA
> request and the accompanying functional analysis created by Orlando) "Q. When
> you used phrase 'on-going entrepreneurship and risk-taking functions with respect
> to their on-going IP activities," did that have any meaning in the tax context
> distinct from the business context? A. No, not distinct. The tax context and the
> business context would be the same."); *id.* 1166:15-21 (Henderson) ("Q. When
> you hear the word 'economists,' when you heard economists talk about an
> exclusive licence equating to economically owning something, people talk to you
> about that in the transfer pricing world, correct? A. I wouldn't limit it to transfer
> pricing.").

274.    No statement was ever made to a tax authority indicating that the IEs' respective

ownership rights in the Nortel Group's IP were limited in any way other than by the geographic

scope of the Exclusive Licenses.

> TR00028 (Weisz Decl.) ¶ 17; TR00019 (Orlando Decl.) ¶ 28.

### *e.*    The Participants' Business Practices Under the MRDA

275.    The Nortel Group's IP enforcement and sublicensing practices also reflected the IEs'

exclusive rights in their respective Exclusive Territories.

### (i)    Enforcement of Nortel Group Patents in the United States

276.    Even before the Nortel Group adopted the MRDA, Nortel's legal department recognized

that NNI was an essential plaintiff when pursuing claims for infringement of the Nortel Group's

patents in the United States and that NNI's rights to exclusively exploit the Nortel Group's

intellectual property were sufficient in all respects to confer standing to sue. NNI was a named

plaintiff and was described as the "exclusive licensee" of Nortel's US patents in infringement

suits in 2001 against Foundry Networks and Extreme Networks and in 2002 against Kyocera

Wireless Corp., during the time when Nortel was operating under the RPSM but had not yet

entered into the MRDA.  Before bringing suit against Kyocera, Nortel's lawyers conferred and

concluded that NNI could have sued without joining NNL.

> See TR22084 (Mar. 14, 2001 NNI-NNL Complaint against Foundry Networks);
> TR40777 (Mar. 14, 2001 NNI-NNL Complaint against Extreme Networks);
> TR40788 (Mar. 15, 2002 Amended NNI-NNL Complaint against Kyocera
> Wireless Corp.); TR50593.01 (Nov. 14, 2002 email exchange bet.  Art Fischer
> and Grant Lynds re:  "Attorneys Eyes Only Documents") at 1 (discussing the
> Kyocera lawsuit and noting "NNI could have sued in its own name, but we named
> NNL (the usual practice) in any event as a co-plaintiff"); TR22151 (Dec. 24, 2001
> email chain) at 1.

277.    While the Monitor has suggested that NNI's Exclusive License was limited to products

made by Nortel, or at least cases involving third-party products akin to those being made by

Nortel, NNI was a plaintiff in the infringement suit against Kyocera even though the alleged

infringement concerned Kyocera's manufacture and sale of mobile handsets – not a product that

Nortel made or sold.

> See TR50593.01 (Nov. 14, 2002 email chain involving A. Fisher, E. Jensen and
> G. Lynds) at 1 (discussing the Kyocera suit, VP of Intellectual Property Art Fisher
> notes that Nortel is "not in the terminals business"); see also TR21456 (Dec. 19,
> 2001 email from H. Greenberg to A. Fisher, A. DeWilton, and others) attachment
> at 1 (discussing infringing Kyocera mobile terminals); DeWilton Dep. 127:24-
> 128:9 (confirming that the infringing "terminals" were mobile handsets).

278.    Further, the Foundry, Extreme and Kyocera litigations all involved patents which,

according to exhibits proffered by the Monitor, ██████████████████████████████████

██████████████████████████████████████ and, as to which, the Monitor asserts were

purportedly "not used" in current a Nortel product.  NNI was nevertheless a plaintiff in each of

these lawsuits.

> *See* TR22084 (Mar. 14, 2001 NNI-NNL Complaint against Foundry Networks) at
> ¶¶ 18-35  (asserting infringement claims based upon Nortel Group patents '252,
> '554, and '080); TR40777 (Mar. 14, 2001 NNI-NNL Complaint against Extreme
> Networks) ¶¶12-17, 36-41 (asserting infringement claims based upon Nortel
> Group patents '252 and '554); TR40788 (Mar. 15, 2002 Amended NNI-NNL
> Complaint against Kyocera Wireless Corp.) ¶¶ 6-9, 12 (asserting infringement
> claims based upon Nortel Group patents '411, '578, and '028);



279.    After the MRDA was signed, NNI exercised its rights in Nortel's IP pursuant to its

MRDA Exclusive License and the enforcement provision of Article 4(e) to sue Vonage, a

commercial voice over internet protocol (VoIP) provider.  NNI had initially been sued by

Vonage's predecessor in interest Digital Packet Licensing, Inc., but after Vonage became a party,

NNI – without joining NNL – moved to file counter-counterclaims alleging that Vonage was

infringing Nortel Group patents in the United States, NNI's exclusive territory.  When Vonage

objected that NNI lacked standing to sue without joining NNL, NNI responded in a court filing

that:

> Nortel Networks Inc. is the exclusive licensee of all United States
> patents legally owned by Nortel Networks Ltd and possesses
> substantially all rights with respect to those patents.  As exclusive
> licensee Nortel Networks Inc. has standing to assert these patents
> against infringers such as Vonage.
>
> TR50518 (Reply to Vonage's Opposition To Motion For Leave (N.D. Tex.)) at 6;
> *see also* TR50516 (Nortel's First Amended Reply To Vonage's Counterclaim and
> Counter-Counterclaims (N.D. Tex.)) ¶ 3; TR50231 (Order Partially Granting and
> Partially Denying [NNI's] Motion for Leave to File an Amended Response . . .
> (N.D. Tex.)) at 2-3 (providing case history).

280.    In addition to being NNI's parent, NNL was clearly aware of NNI's representations to the

court because of a parallel litigation in another federal court in which both it and NNI were

parties.  NNL did not dispute that NNI had substantially all rights to the Nortel Group's US

patents.[17]

> TR50218 (Vonage's Complaint for Declaratory Judgment (D. Del.)) ¶16 (noting
> NNI's motion to bring claims against Vonage in Texas, even though NNL was not
> a party to the Texas action).

281.    Like the Foundry, Extreme and Kyocera lawsuits, the Vonage suit in which NNI, with

NNL's knowledge, claimed "substantially all rights" in the Nortel Group's US patents involved

patents that were sold as part of the Patent Portfolio Sale and which are listed as "not used," with

respect to a current product, on the spreadsheet relied upon by the Monitor (see ¶¶ 365-367).

> TR50516 (Nortel's First Amended Reply To Vonage's Counterclaim and
> Counter-Counterclaims (N.D. Tex.)) ¶¶ 7-9 (asserting infringement claims based
> upon Nortel Group patents '808, '695, and '861);



### (ii)   Nortel Group Sublicensing Practices

282.    Similar to its enforcement rights, NNI exercised the full range of sublicensing rights

when the 1992 R&D CSA was in effect, during the RPSM period before the MRDA was signed,

and later after the MRDA was adopted.  Responding to a question raised by the IRS in response

to the 2002 APA applications, NNL, NNI and NNUK represented that:

> The Nortel Group licenses its proprietary technology to third
> parties.  The three Nortel entities that license that technology are
> NNL, NNI and NNUK.  In 2002, NNL earned US$7.2 million in
> licensing income; NNI earned US$11.4 million; and NNUK earned
> $2.6 million. . . .
>
> TR21080 (APA Responses to Questions Posed by Inland Revenue, IRS, CRA) at
> NNC-NNL002746 (response to IRS question #14); *id.* at NNC-NNL002814

---

[17] The court ultimately denied NNI permission to assert the counter-counterclaims against Vonage on timeliness
grounds and did not reach the standing issue.  *See* TR50231 (Order Partially Granting and Partially Denying [NNI's]
Motion for Leave to File an Amended Response . . . (N.D. Tex.)) at 4-9.

(appendix to question #14, providing schedule of licensing income, technologies licensed, and listing NNI as the licensor in 34 of 55 programs listed); *see also id.* at NNC-NNL002708 ("This document provides responses on behalf of NNL, NN UK and NNI to the aforementioned questions posed by the CCRA, Inland Revenue and IRS.").

283.    Nortel's Director of Intellectual Property acknowledged at his deposition that each IE had the exclusive right in its Exclusive Territory to grant "a license where the [third party] is already making their own product and is seeking a license from [the IE] so that they will not be infringing." He further acknowledged that "the regional subsidiaries who [we]re licensees of NNL ha[d] the exclusive rights to license NNL's IPR within their regions."

T. Collins Dep. 219:8-11, 219:25-220:10.

284.    NNI's exercise of the full breadth of its right to sublicense Nortel Group patents to third parties for use in the third parties' own businesses (i.e., not merely as manufacturers or suppliers for Nortel) is evidenced in numerous patent sublicenses in which NNI was a licensor.

*See, e.g.*, TR48848 (████████████████████████████████████████ ████████████████████████.); TR48927 (████████████████████████ ████████████████████████████████); TR48849 (████████████ ████████████████████████.).

285.    In addition, NNL granted dozens of sublicenses to third parties "on behalf of itself and of its Subsidiaries."

*See, e.g.,*TR48885 (████████████████████████████████████ ████████████████████); TR48840, (████████████████████ ████████████████████); TR48865 (████████████████ ████████████████████).

286.    The evidence shows that "on behalf of itself and of its Subsidiaries" was understood by the Nortel Group, including NNL employees, to mean that "in each of the relevant jurisdictions, the licenses were being granted by the subsidiary which is the exclusive licensee for that jurisdiction." In this fashion, NNI granted third parties sublicenses to use Nortel Group IP in the third parties' own businesses and for their own purposes and products.

TR22080 (Mar. 29, 2002 Email chain) at 3; *id*. at 1 (agreeing with significance of the "on behalf of its subsidiaries" languages); *see also* TR22154 (Oct. 5, 2000 email chain) at 1 (noting "the Tax people view this language as being broad enough so that NNL will be viewed as licensing the Canadian rights, NNI the U.S. rights," and that this structure "avoid[ed] any cross-border IPR transfers which may trigger tax liability.").

### *f.*   Industry Custom & Practice

287.   From an intellectual property custom and practice perspective, a sophisticated business person would have understood that the MRDA conveyed to the Licensed Participants within their own jurisdictions (1) the right "to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology," where Products is broadly defined to encompass all conceptions of the word; (2) the right to all Nortel patents (and other intellectual property including technical know-how); and (3) the right to sub-license the rights in (1) and (2) to a third party for its own use.

> Bereskin Rebuttal ¶ 38; *see also id.* ¶ 30 (explaining that, as a matter of custom and practice, where there is a limitation on the permitted field of use for which a license is granted, one would expect that limitation to be explicitly and clearly stated); *id.*¶ 45 (explaining that although Reichert and Green assert the licenses to the Licensed Participants were not assignable under Article 14(a) of the MRDA, "Article 5 explicitly provides Licensed Participants with the right in effect to transfer or to assign the economic benefits of the License through a license or sublicense.").

288.   These rights conveyed to the Licensed Participants are exclusive, perpetual and royalty-free for each Licensed Participant in its Exclusive Territory and "essentially comprise all attributes of ownership deemed by custom and practice to be commercially important and valuable."

> Bereskin Rebuttal ¶¶ 38-39.

289.   It is a "fundamental custom and practice of licensing that the scope of a licensee's enforcement right is coextensive with the scope of its license."  Because Article 4(e) of the MRDA gives each Licensed Participant an unrestricted right to enforce NN Technology within

its Exclusive Territory, as a matter of custom and practice, the affirmative grant of license rights

in Article 5 would be read to be coextensive and likewise unrestricted.

> Bereskin Rebuttal ¶ 35.

290.    From a commercial point of view, the grant of such broad exclusive rights excluded NNL

from directly or indirectly exploiting any of the rights in relation to the NN Technology in the

geographical areas respectively assigned to the Licensed Participants.  Accordingly, the

commercially relevant ownership is the equitable and beneficial ownership provided in the

MRDA to the Licensed Participants by virtue of their Exclusive License rights and not the legal

title provided to NNL.

> Bereskin Rebuttal ¶ 39.

291.    No rational buyer would have purchased the Patent Portfolio without the Licensed

Participants first terminating or disavowing their interests in the Patent Portfolio.  A prospective

purchaser of Nortel's Patent Portfolio would have been aware that merely acquiring legal title to

the intellectual property in that portfolio "would not have provided [the purchaser] with anything

of commercial value in the Territory of each Licensed Participant . . . ."

> Bereskin Rebuttal ¶¶ 46, 48, 54.

292.    This custom and practice was reflected in the lead-up to the Patent Portfolio Sale, in

which, as discussed in more detail below in Section IV.D, both Google and Rockstar conditioned

Nortel's sale of the Patent Portfolio on termination of the Licensed Participants' rights to the

intellectual property.

> Riedel Dep. 138:9-139:5; Veschi Dep. 53:13-54:6; Cianciolo Dep. 193:7-194:9;
> TR11173 (email from Kevin Cunningham to multiple recipients with attachment
> "Summary of Outcome of Business Call re:  Project Iceberg," ) at 4 ("Purchaser
> proposes that the Asset Sale Agreement (and Sale Order) provide that (a) the
> MRDA will terminate at Closing and (b) all other intercompany licenses will
> terminate at Closing…"); TR12013 (Feb. 25, 2011 Email from K. Cunningham
> titled attaching Bidder 1 Issues List).

293.    The Monitor did not call an expert witness to express "a view as to the custom and
practice with respect to the MRDA."

>   Mot. To Strike Expert Reports and Testimony of Bereskin and Stratton ¶¶ 13, 16,
>   17.

### g.    Commercial Reasonableness and the MRDA

294.    The provision of an Exclusive License affording full economic rights and benefits to each
Licensed Participant to exploit Nortel technology in its country of incorporation also was
commercially reasonable.  As discussed above in Section III.C.5, during the period in which the
RPSM was in effect, the Licensed Participants expended billions of dollars on R&D.

>   *See* Section III.C.5; TR00063 (Eden Rebuttal) ¶ 47.

295.    The RPSM allocated billions of dollars of residual operating losses to the Participants in
proportion to these R&D expenditures, "reflect[ing] the downside of [the IEs'] risk-taking during
the 2001-2008 period."

>   TR00063 (Eden Rebuttal) ¶ 49.

296.    NNI, in particular, paid $6.7 billion in transfer pricing payments to NNL during the
period 2001 to 2008.

>   *See* Section III.C.5; TR00063 (Eden Rebuttal) ¶ 48.

297.    As discussed below, after the Nortel Group's insolvency, the sale of its Patent Portfolio to
Rockstar produced roughly $4.5 billion in revenue, which represented, as described by the US
Interests' expert Professor Eden, the "previously unrealized value of Nortel's R&D efforts" and
the potential "upside" of the MRDA participants' risk-taking.

>   *See* Section IV.C.5; TR00063 (Eden Rebuttal) ¶ 50.

298.    Contrary to the Monitor's position that the Exclusive Licenses conferred only limited
rights to utilize Nortel's IP in existing products, no economically rational firm in an arm's-length

negotiation would have agreed to an arrangement in which all parties would bear billions of

dollars in firm-wide losses, but only one party would be entitled to the realized value of the

firm's R&D efforts.

> TR00063 (Eden Rebuttal) ¶¶ 47-50, *see* also id. ¶ 51 (The Canadian Interests'
> interpretation of the MRDA "implies that NNI, NNSA, NNUK, and NN Ireland
> were willing to invest in R&D knowing that if the IP was not used by them to
> make or sell products, but rather the IP was sold by Nortel to a third party, they
> would not receive any return on their investment in R&D because all sale rights
> (and thus all profits from the sales of IP) belonged to NNL. This would not be an
> arm's length relationship."); Cooper Report  5.1; Felgran Report ¶ 12; Trial Tr.
> 2690:7-15 (Cooper "can't imagine under any circumstances that it would be
> remotely economically rational" to enter into such an arrangement.); Trial Tr.
> 2860:10-23 (Felgran "can't see any scenario in which two parties would agree" to
> this arrangement and notes that a tax authority would demand that the entity
> losing its rights receive "the fair market value of what it is … giving up.").

299.     In order to provide the arm's length incentives required by transfer pricing regulations,

the MRDA had to provide the Licensed Participants with the right to share in the gains from

investments in future technologies that would enable the Nortel Group to remain at the forefront

of innovation, rather than just the gains from selling existing products.  As the US Interests'

expert Catherine Tucker explained, high-tech industries are "characterized by very short, brutal

product cycles,"  and accordingly a rational company must be focused on incentivizing

innovation, with the best way to do that being "to give entrepreneurial ownership of the risks and

benefits associated with the R&D investments."  The exclusive, perpetual and royalty-free rights

to exploit Nortel intellectual property found in Article 5 of the MRDA provided to each Licensed

Participant precisely this incentive.  The Monitor's interpretation of the MRDA would not do so.

> *See* Section II.D.1; Trial Tr. 4659:22-4660:7, 4663:4-15, 4655:9-12, 4656:18-20
> (Tucker); TR00056 (Tucker Rebuttal) ¶¶ 41-43.

## 2.     Allocation of Operating Profits Under the MRDA

300.     As already discussed, the second purpose of the MRDA was to memorialize the RPSM

under which the IEs had been sharing operating profits since 2001.  As discussed above in

Section III.D.1, the RPSM regime was implemented by terms in both the body of the MRDA and in Schedule A to the agreement, which contains the RPSM formula.

301.    Gains or losses on the sale of a business were not subject to allocation by Schedule A's RPSM formula.  As originally drafted, the MRDA excluded such proceeds from allocation under Schedule A through silence, because proceeds from the sale of a business were not categorized as "operating income" under US GAAP.

> Trial Tr. 1797:5-1799:4 (Stephens); *see also* Trial Tr. 1307:10-1308:6 (Orlando).

302.    When US GAAP changed, reclassifying the proceeds from the sale of a business as operating income, Nortel amended the MRDA to expressly provide that gain or loss on the sale of a business would continue to be excluded from sharing per the RPSM.

> TR21003 (MRDA) at 49 (Second Amendment to Sched. A, excluding "gain/loss on the sale of business"); Trial Tr. 1797:24-1799:4 (Stephens); *see also* Trial Tr. 1290:12-17 (Orlando) ("Q. Was the MRDA amended at this time to provide that allocations would be made under the RPSM for sales of any Nortel businesses? A. It was amended to explicitly exclude gains or losses on the sale of business from the RPSM calculation.").

303.    The exclusion of gains or losses on the sale of a business from the sharing of operating profits is consistent with transfer pricing principles, which generally exclude extraordinary events like the sale of a business from profit shared by a RPSM.

> Trial Tr. (Eden) 4984:22-4985:12; Trial Tr. 4030:4-22 (Reichert).

304.    The record shows that Nortel did not have a standardized practice of allocating the sales of proceeds from business sales pre-petition.  For example, in 2001, Nortel sold its Fraud Solutions business to Argo, after Nortel started operating under the RPSM but before the MRDA was signed.

> TR32120 (Sept. 22, 2009 e-mail from K. Stephens to Lorraine Tuckey of E&Y "RE: Business Disposals") at 4; Trial Tr. 1806:24-1808:17 (Stephens).

305.    In that sale, Nortel did not use the RPSM to allocate proceeds.

Trial Tr. 1808:4-8 (Stephens).

306.    Later, in December 2006, Nortel sold its Universal Mobile Telecommunications System ("UMTS") business to Alcatel-Lucent (the "Alcatel Sale") while operating under the MRDA.

TR31585 (Share and Asset Sale Agreement between Nortel and Alcatel Lucent).

307.    Nortel's tax department had to determine a way to allocate the sale proceeds because the proceeds from the sale of a business did not constitute "operating income" and accordingly would not be covered by Schedule A to the RPSM.

Trial Tr. 1797:5-1798:14 (Stephens); 1288:14-1290:21 (Orlando).

308.    Ultimately the decision was made to use the RPS percentages to allocate sales proceeds relating to IP.

Trial Tr. 1289:1-8 (Orlando).

309.    However, Nortel Group management considered that the use of the RPSM to allocate certain proceeds from the Alcatel Sale did "not constitute any real precedent."

TR44400 (Jan. 5, 2009 Email from Kerry Stephens to David Gregory (EY), copying L. Farr, P. Look and S. Brady, RE: Copperhead) at 1; Stephens Dep. 211:6-7 ("Inland Revenue never agreed it was a precedent. We didn't put it to them as a precedent either.").

310.    After using the RPS percentages in the Alcatel Sale, Nortel gave consideration to whether it wished to amend the MRDA to require the proceeds from the sale of a business to be allocated by RPS percentages.

TR21162 (Feb. 14, 2007 Email from K. Stephens to M. Orlando and M. Weisz, copying R. Culina, R. Smith and L. Farr, re:UMTS and RPS).

311.    However, Nortel in fact did the opposite. As already noted, when GAAP changed subsequent to the Alcatel Sale to treat gains or losses on the sale of a business as operating profits, Nortel amended the MRDA to expressly exclude such gains or losses from the allocation of operating profit under the RPSM.

TR21003 (MRDA) at 49 (Second Amendment to Sched. A, excluding "gain/loss on the sale of business"); Trial Tr. 1797:24-1799:14 (Stephens).

312.    The EMEA Debtors have proffered a 2002 document entitled "APA Kick Off Meeting: Potential Questions and Sample Answers" and suggested that the draft response to question #31 ("Question 31") – which suggests that "[p]roceeds from the sale of IP" would be apportioned on the basis of the RPSM – should cause the Court to conclude that their "contribution" approach is appropriate under the MRDA.

See TR22020 (APA Kick Off Meeting:  Potential Questions and Sample Answers) at 39; Trial Tr. 2434:25-2436:10 (Malackowski) (relying on TR22020); id. at 2152:8:2154:8 (Huffard) (same).

313.    The inference that the EMEA Debtors seek to draw – that the Nortel Group agreed to allocate proceeds from the sale of IP in accordance with the RPSM formula – not only finds no support in the MRDA, but it is contradicted by the undisputed language of the subsequent Third Addendum, as acknowledged by EMEA's own witnesses at trial and conceded by EMEA's counsel during his opening remarks.

See Trial Tr. 1797:24-1799:4 (Stephens) ("Q.  And we can turn it up if you'd like, but I think you are familiar with the third amendment to the MRDA -- A.  Yes. Q.  – which, in fact, expressly provides to the contrary.  It excludes the inclusion of the business sale proceeds from the RPSM model; correct?  A.  The reason it does that  – I agree it does  – was a change in US GAAP on which this was all predicated in that, up to 2006 I think under US GAAP, gain/loss on business divestment was below the line or below the operating profit line, but it then changed to put gain/loss on business divestment above the operating profit line, so it needed to be specifically excluded. Q. And it needed to be specifically excluded because the parties didn't want to include it and it would  have otherwise been included as a result of the change in US GAAP; correct?  A. Because also that gain/loss on sale of business divestment, as in the case of UMTS, may include all sorts of other assets where RPS is not the appropriate allocator.  Q. So we agree that, in fact, what happened in the third addendum was the express exclusion of gain and loss on sale of business from the operation of the RPSM model; correct? A.  Which was consistent  – which was consistent with the original and the second addendum, yes.").

*Id.* 30:19-22 (EMEA's opening statement) (The MRDA "govern[s] the annual operating profits it addresses and [does] not [ ] govern[] the proceeds that are allocated on a sale, which is the question directly before the Courts.").

314.    In addition, there is no basis to credit this document as supporting the EMEA Debtors'

position because:

- The evidence reveals that question #31 and its answer were prepared by Deloitte & Touche, NNL's auditor, rather than either Nortel personnel or any of Nortel's outside advisors who assisted Nortel in the APA process.

    *See* TR22017 (Memo to Nortel Files from Rob O'Connor re Potential APA Questions (Deloitte & Touche) (listing "potential question that [he] felt might be posed during the meeting with the government representatives" – including what became question #31 – and his "brief answers" that are "supportive of Nortel's proposed APA," but noting "however, I believe these questions are deserving of further research and analysis"); Henderson Decl. ¶¶ 26-28 (identifying internal and external "APA Team," which did not list Deloitte & Touche).

- No witness offered evidence that this question or its answer was ever considered by Nortel personnel or its tax or transfer pricing advisors during their preparation for the APA kick off meeting.  Indeed, the only fact witness examined on this document testified that she did not participate in its drafting and did not have had the expertise to understand whether the questions and answers were accurate.

    *See* Pahapill (Poland) Dep. Tr. 248:10-249:4 ("Q. Okay.  And I – you were taken through a number of questions concerning the meeting with the IRS that you attended in approximately June of 2002, correct? A.   Correct. Q.   I take it – well, do you have any recollection, any specific recollection, of any of the questions in this exhibit or any of the answers in [TR22020] being given at that meeting? A.   I can't remember. Q.   Okay.  And do you have – or did you at the time have the expertise in this area necessary to understand whether the questions and answers on this exhibit are accurate? A. I relied on expert outside consultants, KPMG and Deloitte.  Q.  Did you have any involvement in drafting this document? A. No, I did not.").

- There is no evidence that Nortel ever made this representation to any tax authorities.  To the contrary, based on the post-meeting minutes and summaries of questions asked by tax authorities, it appears that it was not, and counsel for the EMEA Debtors acknowledged that they have no evidence that it was.

    *See* TR43679 (June 19, 2002 APA conference meeting minutes); TR44934 (summary of questions raised by tax authorities); Poland Dep. Tr. 248:15-19 ("Q.

I take it – well, do you have any recollection, any specific recollection, of any of the questions in this exhibit or any of the answers in [TR22020] being given at that meeting? A. I can't remember."); Trial Tr. 2155:14-2155:21 (counsel for EMEA) ("I think counsel is absolutely correct that there is nothing in the record that shows that that document was provided to the authorities or, indeed, that that specific answer was given or that that question was asked at the tripartite meeting. I don't believe there is anything in the record that shows that that actually happened.").

- Likewise, Nortel's actual presentation for the kick-off meeting nowhere mentions a potential sale of IP.

    *See* TR47174.02 (PowerPoint entitled "Nortel's Proposed APA: Presentation to the Competent Authorities of Canada, The United Kingdom, and The United States – June 19, 2002").

## IV.    NORTEL'S INSOLVENCY AND THE SALE OF NORTEL'S ASSETS

### A.    Post-Filing Intercompany Agreements[18]

#### 1.    The Interim Funding and Settlement Agreement

315.    On the Petition Date, with the approval of the US Court, NNI loaned to NNL $75 million under a new revolving loan agreement (the "Intercompany DIP Loan").  The amounts owing to NNI under the Intercompany DIP Loan were repaid with proceeds from the sale of Nortel's Carling facility.

    TR50194 (US D.I. 58 Order Approving Continued Use of Cash Management) ¶ 8; TR50003 (Nov. 8, 2010 Endorsement re NNI Loan Agreement and Certain Matters Involving Allocation) ¶ 3.

316.    Also in January 2009, NNI paid to NNL an additional $30 million, as a transfer pricing payment.

    TR12032 (IFSA) at 2.

317.    On June 9, 2009, the US Debtors (excluding NN CALA, which had not yet filed for bankruptcy), Canadian Debtors and EMEA Debtors (excluding NNSA, who later acceded to the

---

[18] An overview of the Insolvency Filings is provided at Appendix C.

agreement)[19] entered into the Interim Funding and Settlement Agreement ("IFSA") to address both interim funding of NNL as well as principles under which collaborative sales of Nortel's businesses and assets could take place.

TR12032 (IFSA).

318.    The IFSA provided for a payment by NNI to NNL of $157 million (net of the $30 million previously paid in January) in full settlement of any transfer pricing and other claims NNL might have had against NNI for the period from the Petition Date through September 30, 2009.  In April 2009, the Monitor reported that NNL needed this payment in order to have "adequate cash resources to fund operations."

*See* TR12032 (IFSA) § 1; TR45561 (Apr. 24, 2009 Report of the Monitor) ¶¶ 50-51.

319.    The IFSA set in motion the sale process that led to the present litigation.  The process allowed, but did not obligate, the US Debtors, Canadian Debtors and EMEA Debtors (collectively, the "Estates") to jointly sell Nortel's assets without a prior agreement on allocation, but it required the parties to negotiate in good faith to reach agreement on allocation before submitting the question to the courts.

*See* TR12032 (IFSA) § 12(c), (d).

320.    The Estates agreed in the IFSA to cooperate in the anticipated sales of the Nortel Group's assets, without conditioning their participation in the sales upon a prior agreement on allocation and to place all sale proceeds in escrow.

*Id.* § 12(b).

---

[19] NNSA and Nortel Networks AG acceded to the IFSA as EMEA Debtors on or about September 11, 2009 with each agreeing "to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof."  *See* TR47051 (Sept. 11, 2009 Accession and Amendment Agreement relating to the IFSA).

321.    Importantly, the IFSA made explicit that there was no obligation for any Debtor to
proceed with a sale transaction if it determined that it was not in the best interests of its creditors.

> *Id.* § 12(e).

322.    Similarly, the IFSA required that any agreement or determination by either the US
Debtors or Canadian Debtors related to license termination agreements and the allocation of Sale
Proceeds required the prior consent of the Bondholder Group, acting in good faith.  The US
Debtors had to obtain similar consent from the UCC.

> *Id.* § 12(g).

323.    Each Licensed Participant agreed under the IFSA that if and only if, it determined to
participate in a sale that was in the best interests of its creditors, it would enter into a license
termination agreement relinquishing its Exclusive License.

> *Id.* ¶¶ 11(a).

324.    The IFSA also provided that the termination or relinquishment of a license would be
deemed a sale with the Licensed Participant being deemed a seller.

> *Id.* §11(d) ("Where any Debtor enters into any Appropriate License Termination
> in accordance with the provisions of this Section 11, such Debtor shall be deemed
> to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be
> Sale Proceeds . . ."); *see also* TR44149 (CDMA-LTE License Termination
> Agreement) at /2 ("Whereas, NNL and certain of the Nortel Licensees (together,
> 'Sellers' ) have entered into (i) an Asset Sale Agreement dated July 24, 2009…of
> certain assets and for the assumption by the Purchaser of certain liability of the
> Sellers, and (ii) an Intellectual Property License Agreement dated as of the date
> herefor (the 'License Agreement') . . .Whereas, in accordance with Section 11 of
> the IFSA in order to facilitate the transfer and/or licensing of the Transaction IP to
> the Purchaser as contemplated in the Sale Agreement and the License Agreement
> and in consideration of a right to an allocation, to be determined in accordance
> with the IFSA, of portions of the sale proceeds from the Sale, each of the Nortel
> Licensees has agreed to enter into this Agreement to provide for the termination
> of its respective IP Licenses in respect of the Transaction IP and the other rights
> and obligations provided herein."); *id*. at Art. 2.08 ("Each Nortel Licensee shall
> have a right to an allocation of a portion of the sale proceeds from the Sale
> deposited in escrow pursuant to the escrow agreement dated as of the Closing
> Date").

325.    The IFSA made clear that any such license terminations would be provided "in consideration of a right to an allocation" from such sale.

> TR12032 (IFSA) § 11(a); *see also id.* § 11(d).

326.    The IFSA was not an "amendment, modification or waiver of rights" of any party under any other agreement, including the MRDA.

> *Id.* § 20.

327.    The US Court and Canadian Court entered orders approving the IFSA following a joint hearing on June 29, 2009.

> *See* TR40824 (Motion (A) Approving the IFSA and (B) Granting Related Relief); TR50057 (Canadian Order Approving the IFSA).

## 2.    The Final Canadian Funding and Settlement Agreement

328.    At the end of 2009, NNL approached NNI and requested additional financing, stating that without additional cash, NNL would have to shut down.

> *See* TR46910 (FCFSA) at 2.

329.    At the time of NNL's request for additional financing, NNL's and NNI's requests to the CRA and IRS for approval of an APA governing the RPSM regime for the 2001-2005 and 2006-2011 periods were still unresolved.

> *See*, *supra*, Section III.6.C.  *See also* TR46910 (FCFSA); TR11239 (Feb. 18 2010 NNI and IRS APA).

330.    The IRS had filed separate proofs of claim against NNI in February, May and August 2009, asserting claims of approximately $3 billion.

> TR50986 (Notice of Motion for an Order Approving the Settlement Stipulation Between Nortel Networks Inc. and the IRS, attaching the Motion to Approve an Order Approving the Settlement Stipulation Between Nortel Networks Inc. and the IRS) ¶ 27.

331.    While the IRS claims were being filed, the IRS verbally informed NNI that, in its view, NNI had overpaid NNL from 2001-2005 in respect of transfer pricing payments.

> *Id.* ¶ 24.

332.    The IRS and CRA agreed that NNI's income should be adjusted upward and NNL's income adjusted downward by $2 billion ██████████████████████████ ████████████████ .

> *Id.* ¶¶ 25, 29; Trial Tr. 1276-77 (Orlando); TR11242 (Jan. 6, 2010 Transfer Pricing Q4 09 FIN48 Memo) at 1 ("On June 26, 2009 the IRS and CRA held a meeting with Nortel and verbally conveyed their settlement of the 2001-2005 APA to the company.  This settlement was a negotiated amount as no TPM calculation could be agreed upon.  The settlement consists of a $2 billion increase ████████████ to NNL's tax losses and a reduction of $2 billion to NNI's tax losses.  The tax authorities have also asked Nortel to withdraw their 2006-2012 APA application.").

333.    The parties addressed both NNL's cash needs and the tax settlement in a new agreement entitled the Final Canadian Funding and Settlement Agreement (the "FCFSA").  The provisions of the FCFSA included the following:

- NNI agreed to pay NNL $190.8 million in full and final settlement of any and all claims that NNL might have (or could have through the final conclusion of the Canadian Debtors' proceedings) against NNI, whether based on transfer pricing arrangements, other intercompany agreements or otherwise.

> TR46910 (FCFSA) § 1.

- NNI and NNL agreed to enter into APAs with the IRS and CRA, respectively, for the years 2001-2005 on the terms set by the tax authorities, including acceptance of the tax authorities' position that Nortel's transfer pricing system had resulted in more than $2 billion ████████████████ by NNI to NNL.

> *See id.* § 9.

- NNL granted NNI an allowed $2.06 billion claim in NNL's Companies' Creditors Arrangement Act ("CCAA") proceedings, with such claim not being subject to offset or reduction.

> *See id.* § 10.

- NNL and NNI agreed not to exercise any rights of termination under the MRDA without the prior written consent of the other parties to the MRDA, the UCC and the Bondholder Group.

       *See id.* § 28.[20]

334.    After the CRA explicitly rejected Nortel's APA request for the 2006-2011 period in June 2009, NNL and NNI formally withdrew their request for a bilateral APA from the IRS and CRA by letter on March 9, 2010.

> TR50574.02 (Mar. 9, 2010 Letter titled "Nortel Networks Incorporated Withdrawal of Bilateral APA Request with Canada") at 1 ("Nortel Networks Incorporated . . . formally withdraws its bilateral Advance Pricing Agreement . . . request, that was filed with the IRS APA Program in October 2008 for the APA term of 2007 – 2011.  We will similarly inform the [CRA] of this withdrawal for the Canadian taxpayer, Nortel Networks Limited."); TR43792 (June 30, 2009 Letter re: "Bilateral Advance Pricing Arrangement, Nortel Networks Limited (Canada), Nortel Networks Inc. (United States), 2006 through 2010 Taxation Years") at 1-2 (stating CRA's conclusion that "given the uncertainties associated with Nortel's business structure for the foreseeable future, it will not be possible to conclude a BAPA for the 2006-2010 taxation years.").

335.    On December 23, 2009, NNI, NNL, the Monitor and other US and Canadian Debtors executed the FCFSA.

> TR46910 (FCFSA) § 1.

336.    The US Court and Canadian Court entered orders approving the FCFSA following a joint hearing on January 21, 2010.  The order entered by the Canadian Court approving the FCFSA expressly allowed NNI's $2.06 billion claim against NNL, which was not subject to offset or reduction.

> TR40271 (2011 NNC Form 10-K) at 32; TR50431 (Jan. 21, 2010 Canadian Order Approving FCFSA); TR50146 (US D.I. 2347 Order Approving FCFSA).

**B.**    **The Sale of Nortel's Business Lines**

337.    Nortel's Business Lines were sold in a consensual, "cooperative and coordinated fashion."

---

[20]   The EMEA Debtors and NNL separately agreed that they would not exercise any right of termination.  *See* TR48613 (Letter Agreement Between NNL and NNUK, NNSA, and  Nortel Networks (Ireland) Limited).

TR00009A-C (Hamilton Aff.) ¶ 37; Trial Tr. 3208:7-19 (Green); Trial Tr. 4172:2-5 (Kinrich).

### 1.    Overview of the Sales

338.    From shortly after the IFSA was approved through April 4, 2011, all parties worked together and successfully sold the following businesses in coordinated, consensual, joint sale processes across multiple jurisdictions, most of which involved vigorous auctions conducted pursuant to Section 363 of the United States Bankruptcy Code and Court-approved sales processes in accordance with the CCAA.[21]  These sales (together, the "Business Line Sales") are set out in a chart found at Appendix D.[22]

339.    As part of the Business Line Sales process, the US and EMEA Debtors as sellers entered into License Termination Agreements (the "LTAs"); prior to the US Debtors executing an LTA for any Business Line Sale, the US Creditors Committee and the Bondholder Group needed to, and did, consent to the transaction.

> See, e.g., TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA); TR12032 (IFSA)
> § 11(a).

340.    Only some of Nortel's patents were sold in the Business Line Sales.  If a patent was not "predominantly used" in a Business Line it was not transferred to a purchaser, and the purchaser was generally granted a nonexclusive right to practice the patent in a limited field of use.[23]

> See, e.g., TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA).

---

[21] The Monitor agrees that "[w]ith the IFSA framework in place, the Debtor Estates embarked on a process that resulted in a series of sales of the various business lines, which occurred from mid-2009 through late 2010, with the last transaction (the MSS sale) closing in March 2011. Each of NNL, NNI and (with the exception of the CDMA/LTE sale) NNUK, along with various other Nortel entities, were named as 'sellers' in the transaction documents."  (Monitor's Pre-Trial Brief ¶ 57).
[22] Nortel had four operating units at the Petition Date, some of which were further divided into the Business Lines that were sold.
[23] In the MEN sale and the Enterprise sale, the purchasers were entitled to certain exclusive rights, however, these rights were limited to particular explicitly-listed products and (in the case of Enterprise) short time periods. See TR48099 at 10; TR50611 at 9.  Notably, no buyers received the right to enforce any of the licensed IP. See, e.g. id.

341.    NNI's representatives took a lead role in the Business Line Sales.  Not only were the auctions all held at the offices of NNI's counsel in New York, but the auctions were also conducted by NNI's counsel.

> TR50100 (Order Authorizing the Debtors' Entry into the Asset Sale Agreement and Authorizing and Approving the Bidding Procedures for the Sale of the CDMA/LTE Business) ¶ 23 ("The Auction is scheduled for 9:30 am (ET) on July 24, 2009 at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006"); TR50120 (Order Authorizing Debtors' Entry into the Asset and Share Sale Agreement and Approving the Bidding Procedures for the Sale of the Enterprise Business) at Ex. 1 (stating the Sellers will conduct an auction "on September 11, 2009, at the offices of Cleary Steen & Hamilton LLP"); TR50135 (Order Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement and Authorizing and Approving the Bidding Procedures for the Sale of the MEN Business) ¶ 29 ("the Auction is scheduled for 9:30 am (ET) on November 13, 2009 at the offices of Cleary Gottlieb Steen & Hamilton LLP"); TR50134 (Order Authorizing and Approving (I) Bidding Procedures, (II) Notice Procedures, and (III) Setting a Date for Sale Hearing, For the Sale of Certain Assets of Debtors' GSM/GSM-R Business) (approving the bidding procedures attached at TR50132 Ex. 1 at 10 ("the Sellers will conduct an auction…at 9:30 a.m. on November 9, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP")); TR50145 (Order Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement and Authorizing and Approving the Bidding Procedures for the Sale of the CVAS Business) ¶ 28 ("The Auction is scheduled for 9:00 a.m. (ET) on February 25, 2010 at the offices of Cleary Gottlieb Steen & Hamilton LLP"); TR50169 (Order Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement and Authorizing and Approving the Bidding Procedures for the Sale of the MSS Business) ¶ 28 ("The Auction is scheduled for 9:00 a.m. (ET) on September 24, 2010 at the offices of Cleary Gottlieb Steen & Hamilton LLP").

342.    As all Estates and the CCC agree, the sales proceeds generated through the auction process represent the fair market value of the Business Lines.

> Trial Tr. 2120:13-2120:20 (Huffard) ("Q. Now, would you agree with me that the purchase prices paid for the business lines represent the fair market value of those business lines? A. From everything that I can see, it was a complete and robust auction process that was run. I think that would define the fair market value of those assets."); Trial Tr. 3420:25-3421:7 (Britven) ("Q. And the fair market value, just so we understand that, of the lines of business is what the buyers paid for them; correct? A. The fair market value is what the buyers paid, yes.  Those numbers are close enough. Price and fair market value are really different concepts, but let's assume that they are the same for this case."); Trial Tr. 3220:23-3221:5 (Green) ("Q. . . . So we know the total business sale proceeds is

110

$2.9 billion; right? A: Yes.  Q. That is the fair market value of all the business lines; right?  A: It's the fair market value of the business lines and of the – that was paid by purchasers, yes."); Trial Tr. 4104:1-4104:12 (Kinrich) ("Q. . . . Can you discuss the initial steps you took when approaching the issue of how to value this portfolio. A. Yes.  I will start with what I think I have already mentioned, which is I knew the fair market value of the assets sold.  I knew how much the lines of business sold for. And I did each of the eight lines of business separately. I didn't lump them all together. I may talk about them in aggregate, but I did them individually. I knew they sold for a total of about $2.8 billion. . . .").

343.    As of December 31, 2013, the available proceeds to allocate from the Business Line Sales is US $2.85 billion.[24]

> TR50021 (Dec. 31, 2013 Cash Summary) at tab "Escrow Accounts";  TR00051 (Kinrich Report) ¶35 (Table 2) (summarizing the escrow accounts).

### 2.    NNI's Lucrative Market Was of Significant Value to Purchasers of the Business Lines

344.    As discussed *supra* in sections II.C.2-3, the US market – in which NNI had an Exclusive License over NN Technology – was the Nortel Group's most lucrative market.  NNI had some of Nortel's largest customers and earned the most revenue.

345.    From 2001 to 2009, NNI generated 69.5% of the revenue (approximately $46 billion) and 75.9% of the cash flow generated by all of the IEs,  two metrics that represent the key drivers of the value of any business.

> *See* TR49192 at tab "New reconciliation," TR49187 at tab "New reconciliation," TR49188 at tab "New reconciliation," TR49194 at tab "New reconciliation," TR49190 at tab "New reconciliation," TR49191 at tab "A-100 Reconciliation," TR49193 at tab "Q4 2007 SAP Con," TR49189 at tab "Q4 2008 SAP Con" (together with TR49389, the "Transfer Pricing Worksheets").  *See also* Roese Dep. 401:7-402:13; *Market Results for Stocks, Bonds, Bills, and Inflation, in* IBBOTSON SBBI 2010 VALUATION YEARBOOK (1926-2009) 19 (James P. Harrington, ed., 2010); Michael Pellegrino, BVR'S GUIDE TO INTELLECTUAL PROPERTY VALUATION 4-5 (2009).

346.    Nortel's Business Lines had valuable blue-chip customers in the US, including Verizon and AT&T, which was a key selling point for most of the Business Line Sales.

---

[24] Some of the proceeds from the Business Line Sales were used to pay Nortel affiliates other than the Estates who sold assets as part of the Business Line Sales, as more fully outlined in Appendix E.

Trial Tr. 1656:3-13 (Newcombe) ("Q. In fact, some of the largest – we don't have to name them -- but were US customers correct?  A. That's correct.  Q. And when companies were looking to buy Nortel's lines of business, they were also looking to buy those blue-chip customer relationships; correct?  A. Are we talking about in the MEN context or all of the businesses?  The majority of the trade sales, yes."); TR22078 (2008 Joint APA Request) at 11 (App. C); TR48945 (MEN Teaser) at 30.

347.    For example, the primary value of Nortel's CDMA business was seen in its customer

relationships and access to the lucrative American market, rather than for its technology and IP

associated with the business, which was viewed as "legacy technology" at the time of the sale.

TR43865 (Ericsson 2009 20-F) at 38 ("Ericsson's installed base is an important asset for sales of upgrades, network convergence and systems integration.  Now also Nortel's US customer base is added, providing additional opportunities in CDMA and LTE."); TR 50452 (July 25, 2009 Ericsson Press Release) at 1 ("Acquiring Nortel's North American CDMA business allows us to serve this important region better as we build relationships for the future migration to LTE. . . . The agreement includes important CDMA contracts with North American operators such as Verizon, Sprint, U.S. Cellular, Bell Canada and Leap. . . ."); Binning Dep. 123:11-124:9: ("Q. And who were the leading perspective purchasers for the CDMA and LTE business?  A. Hmm, the two companies, the two strategic companies that we had discussions with on that business were Nokia Siemens and Ericsson.  Q. Right.  And what did you learn from those discussions, Mr. Binning, about the motivations of Nokia Siemens and why they were interested in acquiring this line of business?  A. Nokia Siemens were behind in terms of LTE technology.  And one of their primary drivers, and certainly if they wanted to have a strong position in the American market as well as other markets around the world, was to have a leading position in LTE.  And for them, one, getting their hands on, you know, one of the leading solutions in the LTE arena at that point in time was a major driver.  And, obviously, you know, that would also, with their install base, give them access to the U.K. -- U.S. market."); Trial Tr. 1622:13-17 (Newcombe) (Discussing that CDMA and GSM were legacy technologies and stating "[w]ell I think from a strategic standpoint -- and, you know, this is saying it from someone who is involved in the strategic planning process.  I think that their interest was primarily access to the North American market."); Trial Tr. 2026:8-22 (Huffard) (noting that purchasers, such as CDMA, purchased Nortel's Business Lines for access to customers rather than IP); [25]

---

[25] Such motivations were familiar to Nortel, having purchased the UK company STC for its relationship with British Telecom rather than for its technology.  Trial Tr. 1808-09 (Stephens); *see also* TR33041, NNUK LTD Acquisition of STC/post STC U.K business and R&D (undated).

TR48482 at 3 (October 27, 2009 Letter to US Department of State confirming that no Nortel LTE patents were transferred in the sales to Ericsson or Hitachi);

TR12020 at 32 (Oct. 15, 2008 Presentation titled "Discussions with Ekberg) (showing the top CDMA customers for 2007 and 2008 were Verizon and Sprint)

348.    For example, customer relationships, distribution channels, accounts and contracts underpinned the revenues of the MEN business and were viewed as a key selling point by Nortel management.

TR00024 (Newcombe Aff.) ¶ 51; Trial. Tr. 1654-55 (Newcombe); TR48945 (MEN Teaser) at 30.

349.    The assembled sales force also added significant value to potential purchasers of the Business Lines.

TR48945 (Oct. 2009 Management Presentation titled "Metro Ethernet Networks Project Snow") at 47 (Presentation to potential purchasers of MEN Business Line highlighting MEN's "Customer Relationship Management: 50 customer service touch points; End-to-End operational leadership allows sales to spend their time selling; Aligns operational readiness with the account strategy; Processes and metrics drive problem resolution and customer satisfaction"); Trial Tr. 1655:3-9 (Newcombe) ("Q. Those sales guys were incredibly valuable to Nortel?  A. Yes, they were.  Q. And they're incredibly valuable to someone who is thinking about buying Nortel's businesses, weren't they?  A. That's correct, yes.").

350.    At the time of the MEN sale, for example the sales force in the US was three times larger than  the sales force in Canada.

TR48945 (Oct. 2009 Management Presentation titled "Metro Ethernet Networks Project Snow") at 54; Trial Tr. 1657:5-10 (Newcombe).

**3.    NNI Led Transition Services Provided to Purchasers**

351.    As part of the Business Line Sales, Nortel agreed to provide transition services to the purchasers – including human resources, finance, IT and other support – that were necessary to continue the operations of the Business Lines during their transfer to their new owners and meet the businesses' obligations to customers.

352.    Failure to perform under these agreements could have led to substantial damage claims in favor of the purchasers and materially decreased the sale proceeds available to allocate.

TR00020 (Ray Decl.) ¶¶ 21-22.

353.    NNI employees were critical to fulfilling Nortel's obligations under these agreements through the NBS unit.  NBS was formed in May 2009, with NNI employees Joseph Flanagan (then head of Global Operations) and Christopher Ricaurte (then Vice President of Financial Planning and Analysis for Global Operations) as its leader and second-in-command, respectively.

TR00018 (Ricaurte Decl.) ¶¶ 29-30.

354.    NBS's two major contracts were with Avaya for the enterprise business and Ericsson for the CDMA business.  The contracts were largely US-based, most of the revenue was US-based and the services were US-based.

Trial Tr. 1213:21-25 (Ricaurte).

355.    Without the work performed by NBS, the Nortel Group would not have been able to fulfill its obligations to the new business owners, which would have reduced the sale proceeds available for distribution in this litigation.

TR00018 (Ricaurte Decl.) ¶ 36.

C.    **Nortel Considers Options for Monetizing Its Patent Portfolio**

356.    After completing the Business Line Sales, Nortel retained a substantial number of intellectual property assets (the "Patent Portfolio").

357.    Over the course of more than a year, the Estates, other stakeholders and their advisors carefully weighed a possible sale of Nortel's Patent Portfolio against the alternative of an IP licensing service and enforcement business ("IPCo"), a proposed business that Nortel began developing even before the insolvency filings as set forth below.

>Trial Tr. 1075:2-1076:2 (Binning); Trial Tr. 933:6-12 (Hamilton) ("Q. I haven't made myself clear, I'm back in September 2010 when you are working on IPCo and you are sending emails saying we have to keep it as an option because we don't know if we are going to get any bids that are going to be worthwhile. That was your position, right? A. Yes."); Trial Tr. 1359:4-1360:15 (Ray); TR49799 (June 19, 2009 Nortel News Release titled "Nortel To Sell CDMA Business and LTE Assets") at 1.[26]

358. "[T]he premise of IPCo. was that the Residual IP would be monetized by attempting to license various patents to technology companies that were suspected of infringing on them in exchange for the payment of royalties. IPCo's licensing attempts would be backed by the threat of patent infringement litigation and, ultimately litigation, if necessary."

>TR00009A-C (Hamilton Aff.) ¶ 73.

### 1.    Patent Segmentation Process

359. When the Business Lines were being sold, Nortel's IP Group undertook a patent segmentation process to determine which patents would be transferred with each of the Business Lines. The standard for transfer of a patent in the sales was whether the IP in question was "predominantly used" in a given Business Line. IP that was used in multiple Business Lines ("shared" IP) was not sold with the businesses and rights to use that IP were instead conveyed to Business Line purchasers as necessary generally via limited, non-exclusive licenses.[27]

>McColgan Dep. 123:14-22 ("Q. For determining whether -- sorry, what was the predominant use standard? A. Predominant use standard had been agreed by the executives as the standard that would be used for assignment of patents to a business unit that was for sale. If it met the standard of predominant use, it would be assigned to that division; if it didn't, it would be retained."); Veschi Dep. 125:6-126:8 ("Because my view was and I think it's the accurate view, you're not going to get an additional dime for the patents you throw in, so why would you throw them in. And the counter view was well, it's going to make it harder to sell the businesses so why would you keep them back. If our goal is to sell the businesses, let's just sell the businesses and move on. So I came up with

---

[26] The Monitor agrees that "[e]ven before the conclusion of the Business Sales, representatives of the Debtor Estates began to consider how best to maximize the value of what was expected to be a sizable residual patent portfolio. Two options were considered [sale and licensing business]." Monitor's Pre-Trial Brief ¶64.
[27] As discussed above, limited exclusive licenses were granted in two of the Business Line Sales.

'predominant.' I remember waking up one morning, 'predominant,' and that's what we need to use. And it was defined as -- loosely defined as if the patent is used in a business almost exclusively, or largely, it's largely there or they're the sponsor and it's, you know -- so if you looked at the overall Nortel use, business A is using this patent everywhere and maybe businesses B and C are just tangentially using it a little bit, maybe we would say that is predominant. We didn't define it, and the way I set it up was Gillian would arbitrate and manage the process, and if the techies couldn't agree, the first level of appeal would be to me and if after they appealed to me there was still disagreement, the next level of appeal would be to Gordon Davies.").

360.    There is no evidence that, pre-petition, Nortel had ever undertaken such an exercise to determine whether a given patent was predominantly used in a specific Business Line, used in multiple Business Lines or not used in any Business Line in the normal course of its business or that Nortel ever monitored which patents were used or not used in Business Lines.[28]

361.    In conducting the patent segmentation process, Nortel's IP Group sought to reduce the number of patents sold in the Business Line Sales.

        Veschi Dep. 124:10-20.

362.    This was done to maximize the number of patents that would remain outside the Business Line Sales because Veschi believed that retaining such patents as part of a large portfolio would maximize value for creditors.

        Veschi Dep. 124:10-20; *id.* at 146:7-17 (testimony that Veschi "was still focused personally in the beginning in trying to continue to run and build the business that [he] was chartered to create, because it was [his] view that that was the best way to, at the worst case, maximize value for the creditors. And [the Nortel Group would] make the best decisions if [it] always viewed [itself] as building a business that's going to potentially emerge out of bankruptcy even if it's just the licensing business."); *see also* TR48932 (Presentation titled "Overview") at 8; TR43641.03

---

[28] To the contrary, the evidence suggests that it was not until the post-petition period that Nortel ever conducted a review of which patents were used or not used in a given Business Line. *See* Trial Tr. 1005:3-18 (Hamilton) ("So what happened is at the beginning and in early 2009 before the first sale process, Nortel conducted a review of all of its patents and the guiding principle or the decision that was made is that if there is a patent that is used primarily in one business line only, then that patent would be sold with that business line and go along with it. If there's a patent that is used in multiple business lines or not used at all, it would be retained, a license would be granted to the line of business buyers to allow them to use those patents within their field of use, but it would be retained, because if you sold it with the first deal, you know, the next deal wouldn't be possible."); McColgan Dep. 128:7-25 (explaining the process and that they had to filter through "everything").

(Presentation titled "Project Iceberg") at 1-3, (espousing the breadth and depth of the residual patent portfolio); TR40745 (May 21, 2012 Wired.com article, "How Apple and Microsoft Armed 4,000 Patent Warheads").

363.    There were many conditions other than the use of Nortel Group IP in multiple Business Lines which led to Nortel's retention of IP, including:

- IP that had been used in past Nortel Group products or developed for Nortel Group products but was not then being used (e.g. broadband WiMax wireless communication patents).

    McColgan Dep. 130:21-131:18.

- IP that had been developed for Nortel's Business Lines but was not yet being used by a business at the time of the sales (such as the fourth generation wireless LTE technology patents).

    McColgan Dep. 131:19-132:7; TR44142 (Nov. 13, 2009 CDMA & LTE Intellectual Property License Agreement.) ¶¶ 1.01(p), 2.01; TR47150 (Apr. 20, 2009 Email from D. Smith to G. McColgan titled "Another question for you both wrt EN").

- IP incorporated in products manufactured by original equipment manufacturers ("OEMs") and then sold by Nortel under its brand name

    McColgan Dep. 126:21-27:7.

364.    The only evidence offered at trial for which of the patents were shared by Business Lines is TR22107, an email chain attaching a draft spreadsheet containing only a partial listing of the Patent Portfolio.  The draft spreadsheet was created solely to determine whether non-exclusive licenses to the patents would be granted to purchasers in the Business Line Sales.

    TR22107 (Jan. 12, 2010 Email from G. McColgan to C. McGran at E&Y titled "Patent questions" attaching Excel Spreadsheet); McColgan Dep. 124:14-125:21; 128:17-25 ("It became probably a year by the time we were done, but the initial goals and criteria were six weeks to do it, filter through everything, make some determinations and the standard for assignment will be predominant use.  And anything that doesn't get assigned, we'll just worry about that later, we don't have time to deal with it at this point, we just need to get the businesses ready.").

365.    The draft spreadsheet did not identify patents used in past Nortel products, patents proposed for future use, patents used in products manufactured by OEMs, patents proposed for

use in the IPCo business, or patents otherwise categorized in any manner other than shared by a

Business Line.  Every patent besides "shared" was lumped together in a single category called

"not used."

> TR22107 (Jan. 12, 2010 Email from G. McColgan to C. McGran at E&Y titled "Patent questions" attaching Excel Spreadsheet) at 2 ("You will also see in Column H indications of whether each patent is Not Used (in Product or Plan of any Nortel divestiture or remaining division) or Shared (Use by more than one Nortel business"); McColgan Dep. 125:22-127:9; *id.* 132:8-133:10.

366.    Further work on this draft spreadsheet ceased after January 2010.

> McColgan Dep. 137:4-15.

## 2.    Nortel's Existing and Proposed Licensing Business

367.    The IPCo Model represented the continued development of a business plan initiated

before the insolvency filings were even contemplated.

> TR50639 (Aug. 2010 PowerPoint Presentation titled "Nortel's IP Team and Patent Portfolio") at 3, (describing efforts of John Veschi, beginning in 2008, and his impact on the Nortel Group's licensing program). *See also* § III.D.1.e (discussing Nortel's pre-petition license enforcement practices).

368.    Early in 2008, as discussed below, the Nortel Group began to explore options for more

effectively monetizing its intellectual property through developing a more robust licensing and

enforcement business than it had to date.

369.    John Veschi was hired by NNI in July 2008 as Chief Intellectual Property Officer to

"look at options for licensing."

> Trial Tr. 1073:2-22 (Binning); Veschi Dep. 45:4-7, 47:13-25.

370.    Veschi had extensive licensing and IP experience.

> Veschi Dep. 42:5-42:23 ("Q. But it's on there.  You were, I take it, you were pretty interested -- you were pretty excited about the fact that you're coming into a situation where there's not a whole lot of existing licenses, correct?  A. Yes. The time I'd spent at Lucent, Agere, LSI dealing with licensing, the infringement portion was in some cases the easy part of the equation, and who was licensed and how licensed they are based on reorganizations, et cetera, et cetera was often the

harder part of the equation. And I remember as I was running those businesses
and figuring out the strategy to work around existing encumbrances with potential
new licensing partners, thinking often it would be nice to figure out a way to – to
get rid of these or often I'd have to figure out the strategy for dealing with
them."); *id.* at 39:11-40:6; 232:21-233:12; TR 44998 (Appointment Notice for
John Veschi).

371.    The intent was for the licensing business to be a separate Business Line with direct

reporting to Nortel's CEO.

       Veschi Dep. 38:6-38:23.

372.    Veschi initiated a program to license group IP to infringing third-parties in four initial

technology families or "franchises" – mobile handsets, internet search, TV/display/projector and

video game/PC – with plans to license to additional franchises as the licensing business

progressed.

       Veschi Dep. 148:18-153:9; TR22102 (Dec. 4, 2008 Email from J. Veschi titled
       "FW:  IP Org Update").

373.    Coordinating with the leaders of the Nortel Group's Business Lines, in November 2008,

Veschi and his team prepared notices of infringement.

       TR50711 (Nov. 6, 2008 Email from J. Veschi to G. Davies, J. Roese and D.
       Drinkwater titled "FW: Updated clen WiMax DRIVE) (requesting approval to
       issue infringement letter against license target Clearwire); Veschi Dep. 156:6-
       157:3 (noting that "everything [Veschi] did had to be coordinated with Richard
       [Lowe]," head of the Wireless business, when targeting potential licensees in the
       wireless space); TR11150 (July 8, 2009 PowerPoint Presentation titled "IP
       Aspects of Residual Co") at 7.

**3.    Initial Post-Petition Consideration of IP Monetization Options**

374.    Post-Petition, Veschi's team made presentations in the summer of 2009 addressing the

options for monetizing the Patent Portfolio.

       Veschi Dep. 70:18-71:12, 94:2–13 (discussing TR22097), 69:18–71:12
       (describing TR11150 (PowerPoint slide deck titled "IP Aspects of Residual Co.")
       as a presentation given on July 8, 2009 to "the creditors in general from the
       various estates"); TR11150 (July 8, 2009 PowerPoint Presentation titled "IP
       Aspects of Residual Co") at 7, 10-11; TR22106 (Aug. 12, 2009 PowerPoint

Presentation titled "Strategic Alternatives for IP") at 2 (elaborating upon five potential "Strategic Alternatives for IP Business," including (i) "Stay the Course;" (ii) "Double Down on IP;" (iii) "Establish Independent Entity;" (iv) "Sell the IP Business;" (v) "Orderly Disposition (Sale) of Patents"); TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One – Ottawa Presentation").

375.    Several monetization alternatives were considered: the sale of patents, further developing and operating IPCo, or further developing and then selling IPCo.

Trial Tr. 1075:2-1076:2 (Binning).

376.    Following these presentations, the Estates issued a request for proposals to find a firm to assist in the evaluation of the Patent Portfolio and the further development of IPCo.

Veschi Dep. 73:25-77:4.

377.    Thereafter, the Estates jointly retained the Global IP Law Group ("Global IP") in October 2009.

TR48716 (Oct. 15, 2009, Master Consulting Agreement ("MCA")) at Annex A to Exhibit A, at 15.[29]

378.    Global IP was retained to provide advice on monetizing the portfolio, including exploring monetization "options for licensing as opposed to outright sale."

TR48716 (MCA) at 15; *see also* McColgan Dep. 106:19-107:11; Trial Tr. 907:11-15 (Hamilton).

379.    On March 20, 2009, the US Court entered an order approving the retention of Lazard Freres & Co. LLC as financial advisor to the debtors ("Lazard").  The US Court subsequently entered an order amending the terms of Lazard's compensation to allow for a "IP Transaction Fee" if Nortel consummated "a restructuring and reorganization around all or substantially all of the Company's intellectual property assets".

---

[29] NNSA became a party to the MCA by a separate accession letter on Nov. 30, 2009.  *See* TR50403 (Nov. 30, 2009 Letter titled "Re: Nortel—Global IP Law Group Agreement, NNSA Accession).

TR50182 (US D.I. 507 Order Authorizing Retention and Employment of Lazard Freres); TR00001 (Currie Aff.) ¶ 85.

US D.1. 2561 Order Approving An Amendment to the Terms of Compensation of Lazard Frères.

380.   Lazard was involved in evaluating the financial aspects of IPCo on behalf of all Estates.

Trial Tr. 907:24-908:5 (Hamilton); Trial Tr. 1363:6-11 (Ray); Ray Decl. ¶ 54.

381.   As part of its evaluation, Global IP reviewed more than 11,000 patent claims, categorized patents by technology field, mapped claims to markets for potential enforcement and licensing and screened the patents for encumbrances.

TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One") at 11-12.

382.   Global IP confirmed that Nortel's Patent Portfolio was valuable.

Veschi Dep. 92:6-15 ("Q. We talked a little bit about Global IP.  Is it your recollection that Global IP was able to validate your message that the Nortel Patent Portfolio was very valuable?  A. Yeah, I think the way I say it is that the hiring of them as an independent party was an important inflection point in the process, because they certainly vouched for what we were saying and were important players in the overall scheme of things.").

383.   Global IP presented its initial findings to stakeholders of the Estates in December 2009.

TR50754 (Dec. 11, 2009 Email RE: "December 16 Logistics") (listing attendees of December 2009 meeting).

384.   Global IP and Lazard made a follow-on presentation to the boards of directors of NNC and NNL in January 2010.

TR43655 (Jan. 29, 2010 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One:  Board of Directors Presentation").

### 4.   The IP Monetization Evaluation Process

385.   The Estates weighed several options for monetizing the Patent Portfolio.  Contrary to the Monitor's representatives' assertions, stakeholders from the EMEA, Canadian and US Debtors seriously considered IPCo as an alternative to the sale of the Patent Portfolio.  Between John

Veschi's initial presentation in June 2009 and the eventual signing of the stalking horse

agreement for the Patent Portfolio sale, the Estates, their creditors and their respective advisors

received frequent updates on the development of IPCo as well as expressions of interest from

market participants in the Patent Portfolio.

386.    A committee of representatives of the Estates and their advisors (the "IP Steering

Committee") was formed in January 2010, which led the evaluation process.

> TR50634.02 (Jan. 22 2010 Draft PowerPoint Presentation) at 1; TR00020 (Ray
> Decl.) ¶¶ 51-52; Riedel Dep. 117:20-118:4, 118:6-13.

387.    The IP Steering Committee included, among others, John Ray on behalf of NNI, Allan

Bloom on behalf of the UK Administrator and Murray McDonald on behalf of the Monitor.

> Trial Tr. 1361:3-1362-2 (Ray); TR00011 (US Interests Hamilton IPCo
> Demonstrative); TR00020 (Ray Decl.) ¶¶ 51-52; Riedel Dep. 117:20-118:4,
> 118:6-13; Trial Tr. 1075:14-18 (Binning).

388.    As Hamilton acknowledged in her testimony, she was not a formal member of the IP

Steering Committee, but she did frequently appear as a stand-in for McDonald.

> Trial Tr. 911:16-912:9 (Hamilton).

389.    A broader working group was also formed that included advisors to the Committee and

the Bondholder Group (the "Working Group").

> Trial Tr. 912:10-17 (Hamilton); TR00020 (Ray Decl.) ¶ 54.

390.    The evaluation of IP monetization alternatives took place in phases.

391.    In the first phase, the IP Steering Committee led the development of an "actionable

licensing business plan" for IPCo which involved defining the different patents, doing research

and mapping out claim charts, developing financial models and doing other due diligence

necessary to support the development of IPCo.

> TR50634.02 (Jan. 22 2010 Draft PowerPoint Presentation) at 1; Trial Tr. 1362:15-
> 1363:11 (Ray).

392.   In the second phase, the IP Steering Committee approved Global IP, Lazard and the

Nortel IP team to approach potential buyers of the Patent Portfolio.

>  TR50634.02 (Jan. 22 2010 Draft PowerPoint Presentation) at 1; TR00020 (Ray
>  Decl.) ¶¶ 51-52; Trial Tr. 1363:12-1364:3 (Ray).

393.   The goal of the second phase was to engage in an informed assessment of how best to

monetize Nortel's IP.

>  TR00020 (Ray Decl.) ¶¶ 52, 54 ("Each of these options were carefully considered
>  and thoroughly evaluated for nearly one-and-a-half years before the Patent
>  Portfolio was eventually sold to Rockstar Bidco. . . .  From January 2010 until
>  early 2011, the Nortel Group pursued these approaches in parallel:  the IP
>  Steering Committee approved approaching potential buyers while developing an
>  actionable model business plan for monetizing the Patent Portfolio known as the
>  IPCo Business ('IPCo Business Model').  The working group that developed the
>  IPCo Business Model included me, Murray McDonald and Sharon Hamilton of
>  Ernst & Young Canada as Monitor, David Descoteaux of Lazard Freres & Co.
>  ("Lazard"), George Riedel of NNI and the advisors to the Committee (Capstone
>  Advisory Group LLC and Akin Gump Strauss Hauer & Feld LLP) and the
>  Bondholders Group (FTI Consulting, Inc. and Milbank, Tweed, Hadley &
>  McCloy LLP).  This group seriously evaluated a number of options for
>  monetization, and the deliberations show how strongly we considered the IPCo
>  Business Model."); TR50634.02 (Jan. 22, 2010, Draft PowerPoint Presentation) at
>  2 ("Nortel and its advisors have developed an integrated work plan to evaluate the
>  potential alternatives to monetize Nortel's intellectual property portfolio").

394.   The IPCo option and the sale option were considered in parallel, so the Estates could

determine how best to monetize the patent assets.  In the words of the Monitor's lead

representative Murray McDonald, IPCo and a sale were considered "concurrently" as "parallel

alternatives."

>  McDonald Dep. 165:19-166:10 ("Q. Is it your understanding that prior to selling
>  the residual IP assets to Rockstar, the Nortel estates gave consideration to other
>  alternatives, including reorganizing and keeping ownership of the residual IP?  A.
>  I wouldn't say before.  It was done concurrently.  Q. What I meant by 'before' is
>  before the sale actually closed, consideration had been given to alternatives,
>  correct?  A. Parallel alternatives were considered.  Q. And one of the parallel
>  alternatives was the retention of the residual IP for the Nortel estates, correct?  A.
>  Yes.  Q. And in fact, you had external advisors perform considerable analysis as
>  to the value of retaining those assets, correct?  A. Yes.").

395.    Between September 2009 and June 2010, there were 7 in-person meetings, 32 telephonic meetings and "countless" informal calls with stakeholders to discuss monetization strategy for the Patent Portfolio.

>    TR40035 (Sep. 30, 2010 Email forwarding letter from G. Riedel to Bondholder
>    Group) at 1.

396.    In September 2010, the Monitor advised the IP Steering Committee that IPCo should remain an option for consideration.

>    TR50656 (Sept. 30, 2010 Email from S. Hamilton titled "Nortel IP Valuation
>    Protocol"); Trial Tr. 933:6-12 (Hamilton) ("Q. I haven't made myself clear, I'm
>    back in September 2010 when you are working on IPCo and you are sending
>    emails saying we have to keep it as an option because we don't know if we are
>    going to get any bids that are going to be worthwhile.  That was your position,
>    right?  A. Yes.").

397.    In their 2010 10-K, filed with the US Securities and Exchange Commission, NNC disclosed that "[w]e are seeking expressions of interest from potential buyers and partners regarding options that could maximize the value of our intellectual property portfolio. No decision has been made as to how to realize this value, whether through sale, licensing, some combination of the two or other alternatives."

>    TR21541 (2010 NNC 10-K) at 22.

398.    Preparations to launch IPCo continued even as the Estates received expressions of interest in the Patent Portfolio from potential buyers.  In order to give stakeholders the ability to weigh various options for IPCo against each other and against the option of selling the Patent Portfolio, a "teaser" was circulated to 105 potential buyers in May 2010, but "the stakeholders [were] adamant that no outcome ha[d] been preordained."

>    TR22099 (May 3, 2010 Email from J. Veschi titled "RE:  IP GROUP GIS) at 1;"
>    *see also* TR50634.02 (Jan. 22, 2010 Draft PowerPoint Presentation) at 7.

399.    IPCo remained a viable option into 2011.

*See* TR50783 (Oct. 4, 2010 Email from G. Riedel to J. Veschi titled "Speaker Invitation – The IP Summit 2010:  The Power of IP for Business Success"); TR47264 (Jan. 24, 2011 Email from G. McColgan to H. Chambers titled "FW: Nortel IP Follow-Up Information Request"); TR50797 (Jan. 10, 2011 Email from M. Spragg titled "RE:  Nortel IP")); TR00009A-C (Hamilton Aff.) ¶ 69 ("Both options were considered in parallel from mid-2009 through early 2011"); TR21541 (2010 NNC 10-K) at 22 ("We are seeking expressions of interest from potential buyers and partners regarding options that could maximize the value of our intellectual property portfolio. No decision has been made as to how to realize this value, whether through sale, licensing, some combination of the two or other alternatives. The solicitation process is being conducted in a manner similar to the court-approved sales of our significant businesses.").

### 5.     The Comprehensive Vetting of the IPCo Model

400.    As discussed herein, the thorough consideration of the proposal to develop IPCo reflects that it was a viable option.  The IPCo Model itself was frequently reviewed and revised by stakeholders of the Estates to incorporate feedback received in numerous emails, conference calls, and in-person meetings.  The Model reflected a variety of inputs, which each were subject to scrutiny from all of the stakeholders.  The Model looked at types of technology to target and estimated revenue based on market size, litigation strategy and royalty rates.  It also considered various other costs associated with running a business.

401.    As the Monitor's representative testified, "[o]ver the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP, prepared various versions of a model that attempted to forecast the revenues that could be earned by IP Co. so that its potential economic benefits could be assessed.  The initial IP Co. model had three different sub-models that forecast the revenues that IP Co. based on different scenarios, in particular the amount of litigation that IP Co. would engage in as part of its business model."

TR00009A-C (Hamilton Aff.) ¶ 74; *see also* TR00020 (Ray Decl.) ¶ 58; Trial Tr. 1359:25-1360:6 (Ray).

402.    The details of the IPCo Model were updated and refined in several revised versions culminating in the final version 3.1.[30]

> See TR22098 (Mar. 17, 2010 PowerPoint titled "Nortel IP Update to Creditor Committees") (reflecting first version of the model); TR50825 (Apr. 28, 2010 PowerPoint Presentation titled "IP Co. Update to Credit Advisor Working Group") (version 2.0); TR43658 (May 5, 2010 PowerPoint Presentation titled "IPCO. Model 2.2 Update") (version 2.2); TR50823 (May 3, 2010 Email from J. Veschi titled "IP Co. Presentation Materials for Creditor Fas") (explaining the evolution from version 2.0 to 2.2); TR43715 (PowerPoint Presentation titled "Model 3.0 Preliminary Valuations") (version 3.0); TR22108 (Oct. 25, 2010 PowerPoint Presentation titled "Project Copperhead IPR Model") (version 3.1); see also TR00020 (Ray Decl.) ¶ 59. There were also IPCo Updates for Leadership Teams/Boards. See, e.g., TR50804 (Feb. 23, 2010); TR50817.02 (Mar. 10, 2010); TR50814.04 (Mar. 26, 2010); TR43861 (Apr. 27, 2010). Lazard provided IPCo Financial Projections as well. See, e.g., TR43654 (Apr. 19, 2010); TR47157 (May 12, 2010); TR40022 (June 30, 2010); TR22108 (Oct. 25, 2010); TR48697.02 (Nov. 18, 2010). Mercer also provided an IPCo Management Compensation Analysis. TR50780.02 (Oct. 2010); see also TR00011 (US Interests Hamilton IPCo Demonstrative) at 1.

403.    John Veschi led the day-to-day development of IPCo.

> Reidel Dep. 64:11-20 ("Q. Was it Veschi's responsibility on a day-to-day basis to develop IP Co.? A. It was. Q. Is he the person who had principal responsibility? … A. He had principal responsibility for operating the business. I had principal responsibility for monetizing the IP.").

404.    IPCo reflected the input of many parties.

> See generally Ray Decl. ¶ 54; Riedel Dep. 63:18–64:3, id. 124:21–125:4.

405.    These included:

- Nortel's IP Group.

> Riedel Dep. 63:18–64:3.

---

[30]There was a subsequent version 4.0 that did not address the full scope of the Patent Portfolio as it excluded wireless patents. It was disclaimed as an incompelete model and it did not supercede the assumptions set forth in version 3.1. TR50762 (Jan. 5, 2011 Emails between G. McColgan and C. Keenan) at 1, 4 (email discussing version 4.0 which excluded the wireless portfolio even though that "Nortel and its advisors do not believe that the preparation of a non-Wireless model is necessary…" and that they were "not doing anything" with 4.0 at that time); TR48684.01 (Jan. 5, 2011 Email from Lazard to Nortel's Advisors and Others) at 1 ("The assumptions set forth in Model 3.1 remain Management's current view of the Business.").

- Global IP.

    Riedel Dep. 63:18–64:3; Trial Tr. 905:15-907:15 (Hamilton).

- Lazard.

    Riedel Dep. 63:18–64:3.

- the IP Steering Committee (which, as discussed above, included representatives from each Estate).

    Trial Tr. 1363:8-11 (Ray).

- the Working Group.

    Riedel Dep. 118:10–11, 124:21–125:4, 126:14–20; TR22098 (Mar. 17, 2010 Email to John Ray, creditors and others attaching "the discussion materials for today's meeting" titled, "Nortel IP Update to Creditor Committees").

406.    All of these parties received IPCo materials and had the opportunity to provide feedback to the other parties on the materials.

    TR50569.01/TR50659.02 (Feb. 28, 2010 Email from Lazard re: Discussion materials for weekly update call with Creditor Advisor Working Group, attaching a presentation titled "IP Co. Business Plan: Assumptions"); TR50817.01/TR50817.02 (Mar 10, 2010 email from K. Bhatia attaching IP Co. discussion materials for a meeting the next day); TR50572.01/TR50572.02 (Mar. 22, 2010 Email from C. Kavanagh to the IP Leadership Team, attaching an Iceberg Process Update for a call the next day (one of a weekly series of IP Update calls)); TR50818.01/TR50818.02 (Apr 20, 2010 Email from D. Berten to the IP Steering Committee, attaching an IP Co. Update); TR50823 (May 3, 2010 Email chain between Veschi, Riedel, Lazard, McColgan, Chambers and Global IP, discussing/commenting on an IP Co. Presentation for Creditor FA's); TR48685.01/TR48685.02 (July 6, 2010 Email from A. Navaratnam to Lazard and Global IP, asking Lazard to review the attached IP Co. presentation, to be able to provide their perspective); TR48617.01/TR48617.02 (July 2010 Email from Lazard to the creditors, attaching Model 3.0, noting that they would like to review this model in the near future with  representatives from Lazard and the Nortel IP team, to answer any questions they might have)); TR49827.01 (Email from Lazard to Spragg (FTI Consulting), Jeffries, RSM Richter, Farber Financial, cc'ing Riedel, Doolittle, Ray, Hamilton, Lazard and Global IP, attaching IP Co. Model 3.1).

### a.    IPCo Considered Numerous Licensing Franchises

407.    The IPCo Model considered eight technology franchises: wireless handsets, wireless

infrastructure, data networking, optical, internet advertising, PC, enterprise voice, and carrier

voice.

> TR49827.02 (IP Co. Model 3.1) at tab "Royalty Rates Output."

408.    The IPCo Model reflected estimated market sizes, which were evaluated by the

stakeholders and their advisors.

> *See*, *e.g.*, TR49827.01 (Email from Lazard to several recipients attaching IP Co.
> Model 3.1); TR49827.02 (IP Co. Model 3.1) at tab "Global Revenue."

409.    The estimated market sizes were reasonable.

> Trial Tr. 4133:21-4134:3 (Kinrich).

### b.    Litigation Strategy and Costs Were Integrated in the IPCo Model

410.    The IPCo Model incorporated projected litigation costs for various enforcement scenarios

(after consultation with specialty IP law firms).

> TR00020 Ray Decl. ¶ 57; Trial Tr. 1419:4-11 (Ray); TR50819 (Apr. 12, 2010
> Email from C. Cianciolo to J. Veschi, subject: Draft IP-Co. plan input) at 2
> ("With respect to the Litigation counsel project, you may want to add: We are
> engaging with litigation counsel to clear conflicts and obtain quotes (contingency,
> hourly and hybrid models) for various types of litigation for many of the
> franchises. Through this effort, we will also obtain insight into the quality of the
> portfolio and potential for success from the perspective of a diverse set of
> seasoned patent litigators"); TR49827.02 (IP Co. Model 3.1) at tabs "Franchise
> Business Plan", "Vendor Business Plan", "Costs", and "Vendor Costs".

411.    The IPCo Model reflects a number of target companies for licensing and enforcement

activities, which were evaluated by the stakeholders and their advisors.

> *See*, *e.g.*, TR49827.01 (Email from Lazard to several recipients attaching IP Co.
> Model 3.1); TR49827.02 (IP Co. Model 3.1) at tabs "Operational Approach,"
> "Vendor Business Plan," and "Franchise Bucket."

412.    These target companies, which appeared to be using Nortel patents, represented a large

percentage, usually 80 to 95%, of the participants in a given territory.

> Trial Tr. 4134:4-8 (Kinrich).

413.    The first version of IPCo analyzed three strategies:  harvest, litigation light and litigation

heavy.

> TR00009A-C (Hamilton Aff.) ¶ 74; Trial Tr. 1359:25-1360:15 (Ray) ("And then
> IPCo itself had a few different tiers and approaches in how it would develop.
> There was sort of a harvest approach and then a couple of different stages of
> litigation light, litigation heavy, that were sort of tiered approaches in the way the
> business would effectively run. Q.  And what was the harvest approach? A.  The
> harvest approach is to pursue licensing activities in the various jurisdictions with
> the customers in those jurisdictions, you know, in exchange for royalty payments
> versus a more perceived aggressive strategy of beyond putting people simply on
> notice of filing litigation against a notice of the claim. Beyond that, pursuing
> litigation strategies.")

414.    By the second version of IPCo, the model contemplated taking different enforcement

strategies with respect to different target companies over time.

> TR50825 (Apr. 28, 2010 PowerPoint Presentation titled "IP Co. Update to Credit
> Advisor Working Group") at 11-12 (version 2.0); TR43658 May 5, 2010
> PowerPoint Presentation titled "IP CO. Model 2.2 Update" (version 2.2) at 11.

### *c.*    Royalty Rates Were Evaluated by Stakeholders

415.    The IPCo Model reflects a range of anticipated royalty rates, which were evaluated by the

stakeholders and their advisors.

> Ray Reply Decl. ¶ 7 & n.5 (noting that Hamilton and Ray, among others, received
> presentations with "royalty rate ranges based on different strategies and franchises"
> and citing TR50659.01, TR50659.02, TR50815.01 and TR50815.02).

416.    The royalty rates used in IPCo are consistent with those observed in the market.

> Trial Tr. 4133:14-20 (Kinrich); TR50817.02 (March 2010 IPCo Update for
> Leadership Teams) at 14 ("Support items for Royalty Rate selection" include
> research, discussions with various licensing companies, feedback from licensors
> in the industry, and Nortel's own licensing experience).

417.    These royalty rates were between ████████████ %

TR40169 (IP Co. Model v3.1); TR50814.04 at 20-21 (Supporting items for
Royalty Rate Selection and Summary of Licensing Rate Assumptions).

### d.    Geographic Revenue Projections

418.    The IPCo revenue projections were included in the presentations and models circulated to

stakeholders for comment.

See, e.g., TR49827.01 (Email from Lazard to several recipients attaching IP Co.
Model 3.1); TR49827.02 (IP Co. Model 3.1) at tabs "Global Revenue",
"Franchise Bucket", "Enterprise Licensee Adress Rev.", "Voice Licensee Adress
Rev.", "PC Licensee Adress Rev.", "Internet Licensee Adress Rev.", "Data Net.
Licensee Adress Rev.", "Optical Licensee Adress Rev.", "Infra. Adress Rev." and
"Handset Licensee Adress Rev."

419.    The US is the most profitable market for exploiting patents.

Trial Tr. 4124:12-4125:24 (Kinrich); DEM00019 (Kinrich Demonstrative) at 16
("Market Size for Exclusive Territories").

420.    While the IPCo Model did not separate North American revenue between Canada and the

United States, the vast majority of North American revenue from IPCo would have been earned

in the United States.

TR00051 (Kinrich Report) at Ex. 31; Trial Tr. 4138:19-24 (Kinrich).

421.    This is consistent with where the patents in the portfolio were filed because the value of a

patent comes from the right to exploit, license and enforce that patent and can only be extracted

in the jurisdiction where that patent is filed.

Trial Tr. 2208:16-19 (Anderson) ("Q. Now, a patent granted in the United States
only gives rights for the United States; correct?  A. Correct."); Trial Tr. 4114:21-
4115:12 (Kinrich); TR50857 (United States Patent and Trademark Office Screen
Shot) at 1 ("A patent is an intellectual property right granted by the Government
of the United States to an inventor 'to exclude others from making, using, offering
for sale, or selling the invention throughout the United States or importing the
invention into the United States' for a limited time in exchange for public
disclosure of the invention when the patent is granted."); TR50849 (Canadian
Intellectual Property Office – A Guide to Patents) at 9, 11; TR50975 (UK
Intellectual Property Office – "What is a patent?").

422.    Nortel assembled its IP into groups, or "technologies," which represented an idea that was patented (or one for which an application was filed) in one or more territories.

> Trial Tr. 4121:15-4123:5 (Kinrich); TR00051 (Kinrich Report) ¶ 79.

423.    97% of Nortel's technologies (which includes all patents and applications in a family) were protected by patents filed in the United States.

> DEM00019 at 14, US Interests Kinrich Demonstrative, citing TR00051 (Kinrich Report) Exs. 21-22.

424.    73% of Nortel's technologies were protected by patents filed only in the United States.

> *Id*.

425.    Of the highest value patents that were in IPCo, as determined by Global IP, 99.5% of Nortel's Technologies were protected by patents filed in the United States.

> Trial Tr. 4123:23-4124:8 (Kinrich).

426.    Of the highest value patents that were in IPCo, as determined by Global IP, 77% of Nortel's technologies were protected by patents filed only in the United States.

> *Id*.

427.    Versions 2.0 and onward of the IPCo Model added a toggle to allow stakeholders to consider the model both including and excluding projected revenues from China.

> Riedel Dep. 127:25-128:13; Trial Tr. 4134:12-4135:10 (Kinrich); TR40105 (IPCo Model version 2.0); TR40106 (IPCo Model version 2.2.); TR40168 (IPCo Model version 3.0); TR 40169 (IPCo Model version 3.1).

428.    China was the only geographic market to have such a toggle to include or exclude revenues.

> Trial Tr. 4135:3-10 (Kinrich); *Id*. at 4155:18-4156:3 ("Q. Mr. Kinrich, let me ask you quickly: Why did you run it with and without China?  A. Because the IPCo model itself provides the toggle to include China or not include China. It is the only toggle in the model that affects geographies.  It is the only decision in the model. And I recognized that they had provided for that capability, so I used the model as provided to find out what the results were in each case.");  TR00051

(Kinrich Report) ¶ 104 ("The IPCo Model included an option to exclude or include China as an addressable market, thereby allowing its users to exclude or include revenue derived from the Chinese market."); Trial Tr. 2608:13-2608:15 (Malackowski) ("Q. And the only geography which IPCo model had a toggle for was China, is that right?  A. That's correct on geography."); TR40168 (IP Co. Model v3.0) (*See* Tab "China Add. Rev and China Royalty Revenue").

429.    At the time, purchasers in the open market were ascribing little to no value to Chinese patents in the open market.

Trial Tr. 4403:20-4404:4 (Zenkich) ("Q. Mr. Zenkich, turning to your opinion regarding the value of Chinese patents, you were also asked to provide an opinion regarding the value of Chinese patents in the open market in the 2009-2010 timeframe. Can you please tell the Courts the opinion you reached with respect to the Chinese patents.  A. Yes. In 2009 to 2010 the market would have generally ascribed little to no value to Chinese patents on the open market."); TR00054 (Zenkich Report) ¶ 3(a) ("Based on my experience and study, as well as the common practices in the intellectual property consulting industry, I opine that: In 2009-2010, the market would have generally ascribed little to no value to Chinese patents on the open market."); *see also* TR50068 (C. Bailey, *China's Emerging Patent Trading Market*, INTELLECTUAL ASSET MANAGEMENT MAGAZINE, July/August 2011) at 79 ("In this context, with patents as commodities, it is unsurprising that they have a low value as weapons in litigation.").

430.    The IPCo Model captured territories representing 95% of Nortel's patents.

Trial Tr. 4135:11-4136:3 (Kinrich).

> *e.*    **The Fair Market Value of the Patent Portfolio Is Consistent With Discount Rates Used by Nortel and Observed in the Market**

431.    As all Estates agree, the fair market value of the Patent Portfolio, as determined by its sale price to Rockstar (discussed below), was $4.5 billion.

Trial Tr. 4143:18-4146:15 (Kinrich); *id*. at 4104:12-18 ("….I knew that the patent portfolio sold for $4-1/2 billion.  I knew those were the fair market values of the assets sold.  Already that makes it different than a somewhat more traditional valuation assignment.  Because I know the total fair market value, I don't have to figure it out, and that influences my analysis."); Trial Tr. 3179:16-19 (Green) ("Q. Fair market value of what was sold in the Rockstar sale was $4.5 billion; right? A. I think we can all agree on that, yes."); Trial Tr. 2572:15-20 (Malackowski) ("Q. Fair enough, the residual patents.  And for that you agree that the sale price of 4 and a half billion dollars is the fair market value of that patent portfolio, right? A. Yes, ma'am, as of the date of the sale.")

432.    Knowing the present value of the Portfolio as well as the projected future cash flows allows one to derive an appropriate discount rate based on the actual known fair market value of the portfolio, using the following accepted discounted cash flow formula

$$\sum_{t=0}^{T} \frac{Cash\ Flows\ in\ Year\ t}{(1 + Discount\ Rate)^t} * (1 + Discount\ Rate)^{0.5}$$

Trial Tr. 4040:18-21, 4142:19-4143:8 (Kinrich)

433.    Based on this formula, the discount rate with China cash flows included was 15.7% and with China cash flows not included was 12.2%.

TR00051 (Kinrich Report) ¶ 118; *see also* DEM00019 (Kinrich Demonstratives) at 19.

434.    A discount rate of 12% to 16% was within the range of discount rates observable in the market.

Trial Tr. 4143:15-4146:15 (Kinrich).

435.    Such a range is consistent with the weighted average cost of capital (WACC) for communications equipment companies – the companies from which a patent licensing business would obtain the majority of its royalties, which ranged from 11.3% to 16.5%.

DEM00019 (Kinrich Demonstratives) at 20 ("Discount Rate Consistent With Relevant Market Data."); Trial Tr. 4143:18-4144:2 (Kinrich).

436.    When developing IPCo, Lazard found that the median cost of equity for publicly traded IP Licensing companies was "around fifteen percent."

TR50777 (Mar. 1, 2010 PowerPoint Presentation regarding "Cost of Capital Backup Materials") at 3; Trial. Tr. 4144:3-12 (Kinrich); DEM00019 (Kinrich Demonstratives) at 20 ("Discount Rate Consistent With Relevant Market Data").

437.    The cost of equity is higher than weighted average cost of capital, so if the cost of equity is around 15 percent then the discount rate that would apply would be something less than 15 percent.

Trial Tr. 4144:13-20 (Kinrich).

438.    The WACC for the Rockstar Consortium members, ranged from 8.3% to 15.7% in the

year of the sale.

Trial Tr. 4144:13-4146:10 (Kinrich); DEM00019 (Kinrich Demonstratives) at 20
("Discount Rate Consistent With Relevant Market Data").

439.    The WACC for the Rockstar Consortium members is relevant because, as Mr. Kinrich

explained, "auction theory, economic theory, says that the bidders compete with each other and

bid up to approximately their cost of capital . . . and they typically will not spend more than their

cost of capital."

Trial Tr. 4146:2-3 (Kinrich).

440.    The discount rates that Lazard used in some of its presentations concerning IPCo were

"illustrative" rates only.

Trial Tr. 4146:23-25 (Kinrich); *see also* Trial Tr. 4147:18-25 (Kinrich noting that
"nowhere in the Lazard analysis that [he] found at least do they conclude as to a
discount rate.  They use it for illustrative purposes and do not say they know what
their opinion would be.  But more importantly, we have the benefit of knowing
the transaction. That is of great influence to me"); *see also, e.g.* TR43712 ("Patent
portfolio valuation based on various illustrative discount rates").

441.    Even were they not illustrative, the discount rates used by Lazard are not appropriate here

because those rates were for Nortel to operate the business, not a sale of the Portfolio, which is

what occurred here.

Trial Tr.  4147:3-17, 4148:1-4149:14 (Kinrich).

### *f.*    **Nortel Reviewed Similar Businesses**

442.    Other companies operated businesses similar to IPCo.

Trial Tr. 1076:6-17 (Binning).

443.     The IPCo presentations included discussions of such comparable companies as a way for

stakeholders to compare the business model against entities engaged in the same business that

IPCo planned to conduct.

> TR50817.01/ TR50817.02 (Mar. 10, 2010 Email to S. Hamilton titled "IP Review
> -Toronto@ Ogilvy's office" attaching PowerPoint Presentation titled "IPCo.
> Update to Nortel Leadership Team") (showing comparisons to other market
> participants).

444.     Stakeholders reviewed slides discussing these comparable companies in the course of

evaluating different strategies for IPCo.

> TR00020 (Ray Decl.) ¶ 7.

### g.     Details of Operating the IPCo Business

445.     The parties evaluated tax attributes of the IPCo Model.

> TR48685.02 (PowerPoint Presentation titled "IP Monetization – Structure
> Alternatives") at 6-7; TR00021 (Ray Reply Decl.) ¶ 10.

446.     The IPCo Model considered overhead, startup and operating costs.

> TR22108 (Oct. 25, 2010 PowerPoint Presentation titled "Project Copperhead IPR
> Model") at 5; TR44763 (Dec. 18, 2009 Email from J. Veschi to J. Doolittle titled
> "RE:  Next phase"); TR50780.02 (Oct. 2010 PowerPoint Presentation titled "IP
> Co. Cost of Management"); TR50781.02 (Nov. 2010 PowerPoint Presentation
> titled "IP CO. Compensation Benchmarking"); TR00021 (Ray Reply Decl.) ¶¶ 7,
> 9.

447.     Planning for IPCo included specific plans for personnel retention and hiring.

> TR50780.02 (Oct. 2010 PowerPoint Presentation titled "IP Co. Cost of
> Management"); TR00021 (Ray Reply Decl.) ¶¶ 7, 10.

448.     The parties reviewed options for joint ventures with potential business partners.

> TR50821 (Feb. 5, 2010 Email from J. Veschi titled "Notes from Mosaid
> Meeting").

### 6.     IPCo Was a Viable Option

449.     Had the members of the Nortel Group decided not to go ahead with the Patent Portfolio

Sale, they had the ability, including the financial wherewithal, to have pursued IPCo.

> TR50639 (Aug. 2010 PowerPoint Presentation titled "Nortel's IP Team and Patent Portfolio") at 11 ("We have the team. . . . We know the patents. . . . We know the markets. . . . We have a plan and are poised to execute."); TR00021 (Ray Reply Decl.) ¶ 9.

450.    The Monitor's representative testified that it would have cost $417 million to start IPCo, but this was the highest estimated cost of any strategy (contained in version 1.0).  The same presentation relied on by the Monitor's representative for this proposition even includes the updated model – version 2.0 – which shows an estimated start-up cost of $82 million.

> TR00009A-C (Hamilton Aff.) ¶ 79; TR44758 (May 12, 2010 PowerPoint Presentation titled "Strategic and IP Update" from George Riedel to Board of Directors) at 14.  The $417 million figure came from adding the costs of 2010 ($29), 2011 ($58), 2012 ($130) and 2013 ($200) before reaching profitability in 2014 under the litigation heavy approach under version 1.0.  By the same measure, version 2.0 would cost only $82 million, calculated by adding the costs in 2010 and 2011 of $26 and $56, respectively, before reaching profitability in 2012.  *See also* TR00021 (Ray Reply Decl.) ¶¶ 9 (discussing four year cost of $269 million under version 2.0 and a profit starting in 2012).

451.    Even under the worst-case scenario requiring $417 million, NNI alone had adequate funding to establish and start operating IPCo.

> TR00021 (Ray Reply Decl.) ¶ 9; Trial Tr. 1365:17–1366:23 (Ray) ("Q. Had the principal estates not decided to go forward with the Rockstar sale, do you believe that -- do you have a view whether the estates could have obtained funding to proceed with IPCo?  A. I do have a view.  The US Estate at that time had approximately somewhere between 900 and a billion dollars of cash.  I'm less certain about the funding status and the liquidity of the other two estates.  But we certainly had adequate funding to establish the business.  We had projections that were done in the IPCo model.  And again, it varied depending on whether you're looking at sort of a light or heavy litigation model and whether or not -- depending on how you modeled the business would obviously establish a range of what the funding obligation would be, but certainly was within our wherewithal.  And I guess additionally and as I've indicated, we did look -- and there was at least an expression of interest when we had the indicative bids in the fall of 2010, indicative bids in the fall of 2010, where third parties would come in and invest in IPCo.  So we certainly had it in the NNI estate from a liquidity standpoint, certainly there was enough funding there that it could have funded the entirety of IPCo.  But more importantly or equally important is that there was third-party investors, I believe, who were willing to invest money, so there was a source of liquidity there, no doubt.").

452.     Currently, Rockstar's business is to enforce and license the NN Technology it acquired in the sale.  Rockstar is headed by Veschi.

> Veschi Dep. 27:19-28:12 ("Q. Okay.  So you're currently CEO of Rockstar; is that correct?  A. That's correct.  Q. Actually, what company are you the CEO of, what's the exact name of the company?  A. I think there's, like with the alphabet soup you described, I think there is a similar set of companies, so I believe I am CEO of more than one, that there is a Rockstar U.S., a Rockstar Canada, it's also a partnership and I think I am the CEO of what's the general partner.  Q. Good.  Take it a step at a time.  What does Rockstar do?  A. Well, you can go to our website, ip-rockstar.com, but generally our charter is to assert and license the former Nortel patent portfolio that went to Rockstar at the end of the auction."); Trial Tr. 1076:6-17 (Binning); Trial Tr. 1369:15-1370:14 (Ray).

453.     Rockstar is currently suing several of the companies that were proposed as targets for either litigation or seeking licensing revenue in the IPCo Model including ████████████, and ███████.

> TR49827.02 (IP Co. Model 3.1) at tab "Franchise Bucket;" ██████████████████████ ██████████████████████████████████ ████████████████████████.

454.     In addition to Veschi, several other former Nortel employees who worked on developing IPCo, such as Gillian McColgan, are employed by Rockstar.

> TR45467 (Report re Transferred Employees); TR00042 (Green Report) at Appendix I.

### 7.     All of the Integrated Entities Expected to Benefit From IP Monetization

455.     While the stakeholders were considering the alternatives for IP monetization, the expectation was always that the Licensed Participants, and in turn their creditors, would benefit from an eventual sale of the Patent Portfolio or running a business based off of the IPCo Model.

456.     As the Monitor's representative noted at trial, the IEs cooperated to maximize the value of the Patent Portfolio, including developing the IPCo Model.

> Trial Tr. 897:16-898:1, 900:10-17 (Hamilton).

457.    The expectation that the Licensed Participants would share in the benefit from the

monetization of the Patent Portfolio is reflected by the financial burdens they shared in

evaluating that option.

458.    For instance, the IEs jointly retained Global IP.

> Trial Tr. 905:8-14 (Hamilton); TR49824 (Twenty-Fifth Report of the Monitor) at ¶ 79; TR48716 (MCA) at 1.

459.    The IEs agreed to share Global IP's fees and expenses, which would be paid by NNL and

reimbursed by the other Estates pursuant to a separate agreement.

> TR00021 (Ray Reply Decl.) ¶ 7; Trial Tr. 905:10-14 (Hamilton) ("Q. …The only point was that in that report the Monitor reported to the Courts that Global IP had been jointly engaged by NNL, NNI, NNUK and Nortel Networks Ireland; do you remember that?  A.  Yes").

460.    Pursuant to the Master Consulting Agreement signed by representatives of the Estates

and approved by the US Court, the IEs jointly owned all "[d]eliverables, including Intellectual

Property rights in the Deliverables" created by Global IP.

> TR48716 (MCA) ¶ 6(a).

461.    Never during the very long evaluation process did the Monitor inform any representative

of NNI, the UCC or the Bondholder Group that it believed that the only party that held any rights

in the Patent Portfolio was NNL.

> Trial Tr. 934:11-16 (Hamilton) ("Q.  And you didn't warn people that they shouldn't be bothering with this process because it was all going to go to the Monitor's client?  A.  I just told you that I hadn't concluded either way."); Trial Tr. 1372:17-1373:17 (Ray)  ("Q. Now, prior to May 2013, which is just for reference the date of the filing of allocation briefs in this case, the opening briefs, did the Monitor or its representatives ever inform you that it was the Monitor's position that NNL was entitled to all of the proceeds from the sale of the residual patent portfolio?  A. No. I was never told anything like that.  Q. Prior to May 2013, did the Monitor ever inform you that it was the Monitor's position that after the close of the operating business line sales, NNI's exclusive and royalty-free license in NN technology was worthless or had no value?  A. No.  Q. Now, Ms. Hamilton provided evidence in her witness statement that Mr. McDonald told you at a meeting in May 2010 that NNL could take everything in the patents because

138

they owned it.  Do you recall that being said to you at that meeting?  A. I distinctly remember that meeting, very vivid recollection of that meeting, and those words were not spoken. No recollection of that at all."); *id*. at 1463:8-1463:18 ("Q. You were asked earlier about the parties not having to put in their litigation filings, their litigation positions and no assurances were given. Did you expect the Monitor during the good-faith negotiations to mislead you?  A. Absolutely not.  Q. That was not your expectation?  A. No, that was not my expectation. As I said, the other Monitor I thought and believed was an officer of the court, and as I am.")

462.    The Monitor likewise did not inform its Ernst & Young partners serving as the Joint Administrators for the EMEA Debtors of its position that only NNL had rights in the Patent Portfolio.  Alan Bloom, one of the Joint Administrators, was "astonish[ed]" to learn that this was the Monitor's position when it was first disclosed in May 2013.

Bloom Dep. 95:12-14.

463.    One of the many structuring options considered for IPCo was having it operated through NNL in order to take advantage of  NNL's tax credits in Canada.

TR00009A-C (Hamilton Aff.) ¶ 72; Trial Tr. 922:11-923:8 (Hamilton); Trial Tr. 1364:21-1365:3 (Ray); TR00021 (Ray Reply Decl.) ¶ 10.

464.    This idea was short lived because most of IPCo's business was to be the enforcement of patents in the US market, generating US income, and none of the advisors hired by the Estates could devise a strategy "under which the tax assets in Canada could be used in some way to shelter US income."

Trial Tr. 1365:4-11 (Ray).

465.    However, even if the Estates had decided to run IPCo out of Canada, NNL would have needed to pay for the IEs' Exclusive Licenses.  In a July 2010 presentation on IPCo tax issues to the Monitor, Lazard, Global IP and Chief Strategy Officer George Riedel, NNL tax leader Roseanne Culina stated unequivocally that if IPCo were to be operated through NNL, "NNL will

need to 'buyout' the other RPS participants; current MRDA provides licenses to other RPS

participants."

> TR48685.02 (PowerPoint Presentation titled "IP Monetization – Structure
> Alternatives.") at 3; TR48685.01 (July 6, 2010 Email from Atulan Navaratnam
> titled "Tax attributes and IP Co.").

466.    These issues were also addressed in an email received by numerous stakeholders of the

Estates, including the Monitor.

> TR48684.01 (Jan. 5, 2011 Email received by Hamilton titled "Nortel IP | Follow-
> Up Information Request") at 5 (noting that "the monetization of tax attributes has
> been looked at in great depth by Nortel's tax personnel, E&Y tax specialists and
> Ogilvy's tax counsel."); *see also* TR00021 (Ray Reply Decl.) ¶ 10.

467.    The broad participation by numerous stakeholders in the development of IPCo reflected

the contemporaneous understanding that each of the IEs would be entitled to a portion of the

proceeds from the monetization of the Patent Portfolio, whether via the operation of IPCo, the

whole or partial sale of an operating IPCo to a third party or through one or more sales of the

assets in the Patent Portfolio.

> TR40035 (Sep. 30, 2010 Email forwarding letter from G. Riedel to Bondholder
> Group) at 1-2 ("Every person on the Nortel IP Team and all of our advisors
> recognize that the IPCo alternative is important and no one has reached any
> conclusion one way or the other about the appropriate means by which to
> recognize the most value from Nortel's IP…Once we receive expressions, we will
> again sit down with the advisors to the bonds and the UCC to assess the lay of the
> land.  It may be that one or more sales are the best means to maximize value, it
> may be that IPCo is best, or there may be a hybrid of the two."); TR43655 (Jan.
> 29, 2010 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One:
> Board of Directors Presentation.") at 25.

**D.    The Sale of Nortel's Patent Portfolio**

468.    Through the end of 2010, many indications of interest were received, but the proposed

purchase prices were relatively low and  Nortel did not pursue negotiations with these parties.

Given the proposed low purchase prices, the Nortel Group at that time had little interest in

pursuing negotiations to attempt to reach a stalking horse transaction.

TR50634.01/TR50634.02 (Jan. 22, 2010 Email titled "FW: IPR Steering Committee Discussion Materials" attaching "IP Process Overview 01-22-10.") at 7; TR00021 (Ray Reply Decl.) ¶ 8. *See, e.g.*, TR50766 (Dec. 20, 2010 Letter from Norpax LLC); TR50658 (Presentation titled "Project Iceberg: Round I Bids Overview – Bids Received September 17, 2010"); TR40003 (Sept. 30, 2010 Email from A. Pisa to G. Riedel titled "RE: Nortel IP Valuation Protocol").

## 1.   Negotiations With Google

469.   Only when Google submitted a non-binding indication of interest of $900 million in February 2011 was the proposed price sufficient for the Estates to discuss a sale as a credible alternative to IPCo.

TR00021 (Ray Reply Decl.) ¶¶ 8,18.

470.   After extensive consultation among the Estates, the UCC and the Bondholder Group, it was determined that negotiations with Google should proceed in an attempt to reach a stalking horse agreement.

TR00009A-C (Hamilton Aff.) ¶ 85.

471.   Negotiations with Google commenced in earnest in early 2011.

TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset Sale Agreement Issues" attaching Bidder 1 Issues List).

472.   Among many issues discussed during the negotiations between Nortel and Google, two issues are pertinent to the allocation litigation.  First, Google wanted assurances that Nortel would not withdraw from the auction to pursue IPCo.  Second, Google was aware of and required termination of the MRDA licenses as a condition of any sale transaction.

### a.   Pursuit of IPCo Remained an Option for Nortel Even After the Signing of the Stalking Horse Agreement

473.   With regard to the first issue, Google was aware of the IPCo Model and business plan and considered it when negotiating the auction provisions.

TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw:  Iceberg:  Asset Sale Agreement Issues" attaching Bidder 1 Issues List).

474.     When negotiating the IP Stalking Horse Agreement, Google remained concerned that

Nortel would abandon the deal in favor of pursuing IPCo.

> Trial Tr. 1368:17-1369:1, 1471:5-12 (Ray); TR00009A-C (Hamilton Aff.) at ¶ 81
> ("During the course of discussions concerning a potential sale of the Residual IP
> to Google Inc. ('Google'), Google became aware that the Estates were still
> considering the possibility of IP Co. and Google insisted as part of the
> negotiations pertaining to what ultimately became the stalking-horse sale
> agreement for the Residual IP that Nortel definitively agree to sell the Residual IP
> to a third party.").

475.     In the IP Stalking Horse Agreement, Google requested a provision pursuant to which

Nortel definitively agreed to sell the Residual IP to a third party.

> TR00009A-C (Hamilton Aff.) ¶ 81.

476.     The Estates therefore agreed to terminate consideration of IPCo as part of the sale process.

> TR00009A-C (Hamilton Aff.) ¶¶ 82-83 ("Each of the Estates agreed and a joint
> decision was taken to pursue a sale process for the Residual IP and terminate
> consideration of IP Co.").

477.     However, the IP Stalking Horse Agreement provided that the IPCo option could be

pursued if done in the context of a qualified competing bid, such as a proposal by a third party to

sponsor a transaction that would allow Nortel to retain the Patent Portfolio and operate IPCo.

> TR50184 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset
> Sale Agreement) at Ex. A § 5.13(b).  *See also* TR00021 (Ray Reply Decl.) ¶ 19.

> ### *b.*     Google Recognized the Value of the MRDA's Exclusive Licenses and
> Insisted Upon Their Termination as a Condition of Sale

478.     With regard to the second issue, Google was very concerned that the Patent Portfolio was

encumbered by licenses and insisted that the current licenses be terminated as part of the sale.

> Riedel Dep. 138:9-139:5 ("Q. Do you recall that Google as bidder one required
> that the MRDA would terminate at closing?  A. I do.  Q. Do you recall that it
> wanted all other intra-company licenses to also terminate at closing?  A. Correct.
> Q. Do you recall why Google wanted those provisions?  A. Two part answer.
> They were very concerned about what's euphemistically referred to as a back
> door license entry meaning someone could buy NN India and end up with a
> license to this portfolio that they were hoping to assert it against them therefore

terminating those agreements with the exception of the run off of contracts and
wind down of entities was deemed as important to them because it would
diminish the value that they were prepared to pay."); Veschi Dep. 53:13-54:6;
TR00009A-C (Hamilton Aff.) ¶¶ 98-100; Cianciolo Dep. 193:7-194:9; TR12013
(Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset Sale
Agreement Issues" attaching Bidder 1 Issues List) at 4 ("Purchaser proposes that
the Asset Sale Agreement (and Sale Order) provide that (a) the MRDA will
terminate at Closing and (b) all other intercompany licenses will terminate at
Closing…").

479.    Google demanded a covenant requiring that the MRDA and the Exclusive Licenses be

terminated as a condition to the closing of any sale transaction.

>   TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset
>   Sale Agreement Issues" attaching Bidder 1 Issues List).

480.    Without license terminations, Google would not negotiate a deal.

>   Trial Tr. 1371:23-1372:7 (Ray).

481.    Google had demanded this provision early in the negotiations and never deviated from

the requirement that the Patent Portfolio be sold free from the substantial encumbrances of the

Exclusive Licenses.

>   TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset
>   Sale Agreement Issues" attaching Bidder 1 Issues List). *See also* TR50184 (US
>   D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement)
>   at Ex. A, § 5.13(b).

### *c.*    The IP Stalking Horse Agreement

482.    These extensive negotiations culminated with the signing of a stalking horse agreement

dated April 4, 2011 between each of the IEs as Sellers and Ranger, Inc. ("Ranger"), a wholly

owned subsidiary of Google for a purchase price of $900 million. (the "IP Stalking Horse

Agreement").

>   TR43640.01 (Apr. 4, 2011 ASA between Nortel Entities and Ranger Inc.);
>   TR00009A-C (Hamilton Aff.) ¶ 85 ("The sale process for the Residual IP was
>   similar to the LOB sale processes described above at paragraph 49. After
>   significant negotiation the two prospective purchasers, on April 4, 2011, NNC,
>   NNL, NNI and NNUK (amongst other Nortel entities) entered into a stalking-

>   horse asset sale agreement with Ranger Inc. ("Ranger"), a wholly owned
>   subsidiary of Google Inc. ("Google"), to sell the Residual IP for $900 million.")

483.    The IP Stalking Horse Agreement was a heavily negotiated document, with Google being

represented by the Wachtell Lipton and Bingham McCutcheon law firms.

>   TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw:  Iceberg:  Asset
>   Sale Agreement Issues" attaching Bidder 1 Issues List).

484.    Based on the Business Line Sales and the market interest in the Patent Portfolio,

stakeholders expected the eventual sale price to substantially exceed the floor set by the stalking

horse.

>   Trial Tr. 1367:14-1369:10 (Ray).

485.    The US and Canadian Debtors each filed motions seeking approval of their entry into the

IP Stalking Horse Agreement and the related auction process.

>   TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset
>   Sale Agreement); TR49974 (Apr. 7 2011 Motion Record for Canadian Sales
>   Process Order regarding Certain Patents and other Assets).

486.    The Monitor filed a report in support of the Canadian Debtors' entry into the IP Stalking

Horse Agreement in which it stated, as it had 16 times before, that title to the Nortel Group's

intellectual property was held by NNL, but that each of the IEs had Exclusive Licenses to that

intellectual property in their Exclusive Territories.

>   TR21281 (Sixty-Third Report of the Monitor); *see also* TR21278 (Report of the
>   Monitor); TR40141 (Second Report of the Monitor); TR21279 (Fifth Report of
>   the Monitor); TR50260 (Fourteenth Report of the Monitor); TR21280
>   (Seventeenth Report of the Monitor); TR40881 (Eighteenth Report of the
>   Monitor); TR40621 (Twentieth Report of the Monitor); TR49875 (Twenty-Fourth
>   Report of the Monitor); TR49876 (Twenty-Sixth Report of the Monitor);
>   TR49877 (Twenty-Eighth Report of the Monitor); TR49878 (Twenty-Ninth
>   Report of the Monitor); TR49879 (Thirty-Fourth Report of the Monitor);
>   TR49880 (Fortieth Report of the Monitor); TR49882 (Fifty-Second Report of the
>   Monitor); TR49883 (Fifty-Fourth Report of the Monitor).

487.    A joint hearing was held before the US and Canadian Courts to consider these motions on

May 2, 2011.

> TR50187 (US D.I. 5368 May 2, 2011 Hearing Transcript).

488.    The US and Canadian Courts issued orders approving the entry into the agreement for a

purchase price of $900 million and the rules for the conduct of a subsequent auction for the

Patent Portfolio.

> TR50196 (US D.I. 5935 Order Authorizing and Approving Sale); TR50428
> (May 2, 2011 Canadian Order re Certain Patents); TR50184 (U.S. D.I. 5202
> Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) § 2.2.1;
> TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset
> Sale Agreement) ¶ 11; TR50187 (U.S. D.I. 5368 May 2, 2011 Hearing Transcript)
> 6:24-7:5.

## 2.    The Patent Portfolio Auction

489.    The IP Stalking Horse Agreement provided a detailed process for the submission of

competing bids and the conduct of an auction.

> TR50184 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset
> Sale Agreement) at 10-17 & Ex. C.

490.    Following approval of the stalking horse agreement, there was substantial interest from a

large number of leading tech companies participating in the auction, including Apple, Microsoft,

Intel, Sony, Ericsson, RIM (now Blackberry) and EMC, among others.

> TR21282 (Seventy-First Report of the Monitor) ¶ 17.

491.    When the auction commenced on June 27, 2011, senior representatives of all of these

entities and many others assembled at the New York offices of NNI's counsel.

> TR21509 (July 11, 2011 Hearing Transcript) 40:24-25; TR21282 (Seventy-First
> Report of the Monitor).

492.    Over the course of four days in late June 2011, vigorous bidding took place.

> TR00009A-C (Hamilton Aff.) ¶ 95 ("Over the course of the next 11 rounds of
> bidding, Ranger and Apple exchanged bids in US $100 million increments,

driving the price up a further US $1.1 billion to the US $4.5 billion total, with
Apple (in partnership with Rockstar) emerging as the ultimate winner.").

493.    The final winning bid of $4.5 billion came from Rockstar.

> TR00009A-C (Hamilton Aff.) ¶¶ 85, 93, 95; TR22085 (June 30, 2011 ASA
> between Nortel Entities and Rockstar Bidco, LP).

494.    As part of the Rockstar sale transaction, the relevant US and EMEA Sellers executed a

License Termination Agreement pursuant to which their license rights in relation to the residual

patents were terminated and they would be granted a right to an allocation of the sales proceeds

in consideration for such termination.

> TR21508 (Rockstar License Termination Agreement) Arts. 2.01-2.04; TR43794
> (IFSA) § 11(a) ("Each of the US Debtors and the EMEA Debtors hereby agrees to
> enter into an Appropriate License Termination…with respect to the licenses and
> rights granted by NNL to such Debtors…in consideration of a right to an
> allocation…to such Debtors of portions of the sale proceeds…").

495.    Through the Rockstar Sale Agreement and the License Termination Agreement, the

MRDA Participants agreed to transfer all of their rights in the Patent Portfolio to Rockstar.

> TR21508 (Rockstar License Termination Agreement); TR22085 (June 30, 2011
> ASA between Nortel Entities and Rockstar Bidco, LP) § 5.13(b) ("Effective as of
> the Closing, the Sellers shall terminate all license rights granted under the Master
> R&D Agreement to the extent such license rights are under any of the Transferred
> Patents, Specified UK Patents or Undisclosed Patent Interests. . . .").

496.    The Licensed Participants were all considered "Sellers" regardless of whether they

transferred their rights, or they terminated their licenses to allow for the transfer or their rights to

the buyer.

> TR22085 (June 30, 2011 ASA between Nortel Entities and Rockstar Bidco, LP) at
> cover page (indicating that the Asset Sale Agreement is "by and among," *inter
> alia*, NNC, NNL, NNI, NNUK, NN Ireland and NNSA); *id.* at Preamble ("This
> Asset Sale Agreement is dated as of June 30, 2011, among (i) Nortel Networks
> Corporation, a corporation organized under the laws of Canada ('NNC');
> (ii) Nortel Networks Limited, a corporation organized under the laws of Canada
> ('NNL'); (iii) Nortel Networks Inc., a corporation organized under the laws of
> Delaware ('NNI,' and, together with NNC and NNL, the "NA Sellers"); (iv) the
> entities listed in Exhibit A hereto (the 'EMEA Sellers')…"); TR21638 (IFSA) §

11(d) ("Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.").

### 3.    The Rockstar Sale Approval Hearing

497.    The Rockstar Sale Agreement was presented for approval to the US and Canadian Courts at a joint hearing on July 11, 2011.

TR21509 (July 11, 2011 Hearing Transcript).

498.    At that hearing, attended by, among others, Hamilton for the Monitor and Ray for the US Debtors, representations were made about the sale process and the substantial benefit of the result for all of the IEs, including NNI.

TR21509 (July 11, 2011 Hearing Transcript) 56:10-18, 101:1-5, 110:6-111:8.

499.    Both the US and Canadian Courts approved the sale.

TR50034 (July 11, 2011 Canadian Approval and Vesting Order (Certain Patents and Other Assets)); TR50196 (US D.I. 5935 Order Authorizing and Approving Sale).

500.    As the US Court commented in finding the sale terms as the "highest and best available" to and in the best interests of the US Debtors and their creditors, it would be a "four and a half billion dollar mistake" not to approve the sale.

TR21509 (July 11, 2011 Hearing Transcript) 110:5-111:11.

501.    Nothing was said orally or in writing to either Court that the Monitor or the Canadian Debtors believed that the entirety of the $4.5 billion should go to NNL or that the IEs' Exclusive Licenses were worthless.

TR21509 (July 11, 2011 Hearing Transcript); TR40928 (July 5, 2011 Amended and Restated Motion Record re Canadian Approval and Vesting Order regarding Certain Patents and Other Assets); TR50184 (US D.I. 5202 Debtors' Motion re Stalking Horse Asset Sale Agreement).

502.    To the contrary, the Monitor's public report recommending the sale to the Courts

represented that NNL's legal title in the Patent Portfolio was "subject to . . . intercompany

licensing agreements with other Nortel legal entities around the world . . . in some cases on an

exclusive basis," referring to NNI and the other Licensed Participants.

>   TR21281 (Sixty-Third Report of the Monitor) ¶ 82.

**E.    Mediation History**

503.    During the second and third quarters of 2010, the Canadian Debtors, the Monitor, the US

Debtors, the UCC, the CCC, the EMEA Debtors, the Joint Administrators, the Bondholder

Group, and certain other parties (the "Negotiating Parties") met on several occasions to outline,

on a confidential and without prejudice basis, their respective allocation methodologies and

respective potential intercompany claims that may be asserted (the "Allocation Negotiations").

>   TR40190 (2011 NNC Form 10-K) at 8.

504.    During the Allocation Negotiations, the Negotiating Parties agreed that the Allocation

Negotiations would be aided by the appointment of Hon. Layn R. Phillips as a neutral mediator.

>   *Id*.

505.    On October 27, 2010, more than half a year prior to the Patent Portfolio Sale, and even

prior to the IP Stalking Horse Agreement, the US Court and the Canadian Court approved the

appointment of Hon. Layn R. Phillips as mediator.

>   TR40190 (2011 NNC Form 10-K); TR40906 (the Compendium of the CCC (part
>   of the 59th Report of the Monitor)) Tab 1 ¶ 99(a).

506.    The Negotiating Parties attended two confidential, non-binding mediation sessions from

November 11-16, 2010 and from April 11-13, 2011, each prior to the Patent Portfolio Sale with

the first session occurring even prior to the IP Stalking Horse Agreement and the second session

148

occurring days after the IP Stalking Horse Agreement was signed, in an effort to agree on the

allocation of the proceeds from the Business Line Sales and unresolved inter-estate matters.

> TR40190 (2011 NNC Form 10-K) at 8; TR50185 (Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the IFSA, and for Related Relief) ¶ 19.

507.    The Negotiating Parties failed to reach an agreement following the mediation sessions

with Hon. Phillips.

> TR40190 (2011 NNC Form 10-K) at 8 ("On April 13, 2011, we announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of our various business and asset divestitures and other inter- estate matters, including inter- company claims, had ended without resolution of the matters in dispute.").

508.    Just weeks before the auction that culminated in the Patent Portfolio Sale, the US Court

and the Canadian Court each entered orders on June 17, 2011 directing the Negotiating Parties to

participate in a further round of mediation.

> TR50193 (US D.I. 5752 Order Directing Mediation); TR50059 (June 17, 2010 Canadian Order Directing Mediation).

509.    On June 29, 2011, the US Court and the Canadian Court each entered orders appointing

Warren K. Winkler, Chief Justice of Ontario, as mediator.

> TR50195 (U.S. D.I. 5825 Approval Order); TR50050 (June 29, 2011 Canadian Approval Order).

510.    On April 24, 2012, Chief Justice Winkler opened the confidential, non-binding mediation.

> TR40032 (2Q 2011 NNC Form 10-Q) at 10 ("Following the U.S. Court's March 20, 2012 decision, pursuant to a letter dated March 26, 2012 from the Mediator to Mediation Parties, an introductory mediation session was held on April 24, 2012 whereby Mediation Parties had the opportunity to meet privately with the Mediator.").

511.    Plenary sessions for the mediation before Chief Justice Winkler were held in Toronto

from January 14-22, 2013 (the "Mediation Plenary Sessions").

> Press Release, NNC, Nortel Announces Unsuccessful Conclusion of Mediation Proceedings, *available at* http://www.marketwired.com/press-release/nortel-announces-unsuccessful-conclusion-of-mediation-proceedings-otcbb-nrtlq-1749612.htm ("Following the holding of an all-party mediation session which began on January 14, 2013 and ended on January 22, 2013 without any agreement having been reached on the matters in dispute, the mediator announced on January 24, 2013 his decision to terminate the mediation based on his conclusion that further effort at mediation are no longer worthwhile.").

512.    Representatives of the US Debtors, the Canadian Debtors, the EMEA Debtors, the Monitor, the UCC, the Bondholder Group, the CCC, the Joint Administrators, the UK Pension Claimants, and certain other parties attended the Mediation Plenary Sessions.

> *Id.*

513.    On January 24, 2013, Chief Justice Winkler determined that further efforts at mediation would not be productive and declared the end of the mediation.

> TR41251 (Jan. 24, 2013 Email from P. Le Vay on behalf of Chief Justice Winkler).

### F.    The Monitor's Post-Petition Conduct

514.    In its May 2013 filing, the Monitor took the position that NNL is entitled to the entirety of the proceeds from the Patent Portfolio Sale.  This position was adopted for litigation purposes; prior to the commencement of this litigation,  neither the Monitor nor the Canadian Debtors ever held this view despite years of access to information and both the opportunity and the obligation to consider their position.

515.    Prior to May 2013, the Monitor consistently represented – including in 18 reports publicly-filed with the Court– that NNL's legal title to NN Technology was encumbered by the Exclusive Licenses granted to the Licensed Participants in the MRDA.   For example, in Monitor's Reports filed in these proceedings, the Monitor stated:

- January 2009 (pre-filing report):

> "[Nortel's transfer pricing method] provides [the IEs] with exclusive rights within their geographic area and non-exclusive rights elsewhere to exploit the IP."
>
> TR21278 (Jan.14, 2009 Report of the Monitor) ¶ 43(b).

- March and July 2009 (reports seeking approval of Business Line Sales):

  > "[T]he Applicants have an interest in intellectual property of the [Business Line] which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis."
  >
  > TR45565 (Mar. 26, 2009 Fifth Report of the Monitor) ¶ 14; TR49834 (July 27, 2009 Seventeenth Report of the Monitor) ¶ 37.

- June 2011 (report seeking approval of the allocation protocol):

  > "[T]he Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, which intellectual property was and is licensed to its affiliates, in some cases on an exclusive basis and in other cases on a non-exclusive basis."
  >
  > TR50487 (June 2, 2011 Sixty-Seventh Report of the Monitor) ¶ 14.

- April and July 2011 (reports seeking approval of the Patent Portfolio Sale):

  > "NNL holds legal title to the Residual IP which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis."
  >
  > TR21281 (Apr. 14, 2011 Sixty-Third Report of the Monitor) ¶ 82; TR21282 (July 6, 2011 Seventy-First Report of the Monitor) ¶ 49.

516.    The Monitor's representations in its reports were echoed in NNC's contemporary public filings.  NNC's 2010 10-K, stated that "IP is generally owned by NNL and licensed to participating Nortel affiliates (i.e., NNI and certain EMEA Debtors) through exclusive and non-exclusive licenses."

> TR21541 (2010 NNC 10-K) at 5; *see also* TR40272 (NNC's 2011 10-K) at 4; TR40270 (NNC's 2009 10-K) at 11.

517.    These representations were not only made to the Court and in public filings, but in August 2009, lead counsel for the Canadian Debtors, Derrick Tay, testified before the Standing Committee on Industry, Science and Technology of the House of Commons about encumbrances on the Exclusive Licenses with regard to the LTE patents licensed as part the CDMA sale to Ericsson.  Mr. Tay testified that "while Nortel Canada owns those patents, licenses have been granted worldwide to the other Nortel entities, and so Nortel is not in a position to simply deal with these patents.  Nortel Canada is not in a position to simply deal with this in complete disregard of the rest of the world and in complete disregard of the insolvency processes going on in the rest of the world, so it's an integrated issue."

> TR12004 (Aug. 7, 2009 Minutes – Standing Committee on Industry, Science and Technology) at 21.

518.    Not all sales of Nortel assets were conducted jointly.  On those occasions when the Monitor took the position that the Canadian Debtors held the sole interest in particular assets, the Monitor conducted asset sales without the involvement of the other Estates.

> McDonald Dep. 161:22-162:16.  ("Q. From time to time there were assets that were sold that the Canadian Debtors believed the entire proceeds belonged to the Canadian estate, correct?  A. Yes.  Q. And from time to time in connection with those sales, there were disagreements that the Canadian Debtors and the U.S. Debtors had with regards to whether the U.S. Debtors had any entitlement to proceeds, correct?  A. Correct.  Q. And is one of those instances the sale of IP addresses?  A. Yes.  Q. And in connection with the sale of IP addresses, the Monitor's position was that the Canadian estate was entitled to all of the proceeds from the sale, correct?  A. Correct."); *id.* 215:23-216:7; 216:12-217:4; 217:7-16 ("Q. Mr. McDonald, we've touched upon this morning the fact that there were certain business sales that were conducted exclusively by the Canadian estates, correct?  A. Yes.  Q. And those were entities that the Monitor concluded were entities owned entirely by the Canadian estates, correct?  A. Entities or assets, yes.  Q. In analysing the ownership of those entities or assets, were you able to ascertain from Nortel's books and records the legal entity or entities that held the ownership?  A. Yes.  Q. Some of those sales were the LG/Nortel Joint Venture, correct?  A. The shares in that, yes.  Q. GDNT?  A. Yes.  Q. Some Calgary real estate?  A. Calgary warehouse, yes.  Q. Carling?  A. The Carling asset, yes.  Q. And I think we discussed this morning the IP addresses, correct?  A. Correct.  Q. Did you have any difficulty understanding the ownership structure of those

assets from Nortel's books and records?  A. No.  Q. By the way, did the proceeds
of all those sales go to the Canadian estate?  A. Well, let's just go through them.
LG is in possession of the Canadian Debtor; the Calgary warehouse went to the
Canadian Debtor; Carling, yes; and the IP addresses, yes.")

519.     In contrast to those asset sales, in which the Canadian Debtors claimed full entitlement to

the proceeds, the US Debtors were heavily involved in the Patent Portfolio Sale.

> *See supra* § IV.D; McDonald Dep. 139:21-140:17 ("Q. There was a long,
> expensive process to accomplish this sale, correct?  A. That's fair.  Q. U.S.
> Debtors participated actively in this process?  A. Yes.  Q. U.S. Debtors spent a lot
> of money to accomplish this four and a half billion dollar sale?  A. I think so.  Q.
> In fact, you were working at times side by side with some of the hard working
> people for the U.S. Debtors trying to achieve this four and a half billion dollar
> sale, correct?  A. Alongside some people from the company, yes.  Q. People from
> the Monitor, people from the company, people from the U.S. Debtors – A. Correct.
> Q. -- all collaborated?  A. Yes.").

520.     In the years prior to filing their litigation position in May 2013, the Monitor and

Canadian Debtors had ample opportunity to evaluate the Exclusive Licenses under the MRDA.

521.     As reflected by the representations made in its reports, the Monitor was aware of the

MRDA and the significance of the Exclusive Licenses at all times during these negotiations.

> *See also* TR12032 (IFSA) at Annex A ("Amendments to and Related
> Understandings Regarding Master Research and Development Agreement dated
> as of December 22, 2004").

522.     By virtue of its appointment as the Monitor, E&Y had extensive access to Nortel's

personnel and files.

> Trial Tr. 881:1-5; 885:3-886:4 (Hamilton).

523.     Even before being appointed Monitor, E&Y personnel were involved in Nortel's transfer

pricing and APA discussions.

> *See generally* § III.B.

524.     E&Y remained involved in Nortel's transfer pricing even after its appointment as

Monitor.

> Trial Tr. 893:6-896:1 (Hamilton) (discussing TR48622.01/TR48622.02 (Oct. 29, 2010 Email from K. Salsbury copying S. Kruger titled "Nortel Networks Limited – 2009 Canadian transfer pricing report FINAL" attaching NNL 2009 Transfer Pricing Report).

525.    The Monitor's extensive access provided it with information regarding the MRDA, Nortel's operating history under that agreement and the pre-existing transfer pricing regime that it memorialized, Nortel's representation to tax authorities, and the understanding of Nortel's management and consultants regarding the MRDA.

526.    Notwithstanding the extensive information available to the Monitor, its representative testified at trial that she relied on no evidence other than the MRDA (a document the Monitor contends is clear and unambiguous and which the Monitor has had since prior to the commencement of these proceedings) for the position that the Exclusive Licenses are worthless.

> Trial Tr. 987:9-988:7 (Hamilton) (testifying in response to a question from the US Court that she only relies on the MRDA).

527.    In considering the Monitor's conduct and position, the following points are important.

528.    First, the Monitor understood that it had a duty to provide the Courts with information and objective advice which should be accurate and relevant and not chosen selectively to induce the Courts to a particular result.

> Trial Tr. 959:1-960:6 (Hamilton).

529.    Second, the parties had a duty to negotiate in good faith under the IFSA.

> TR12032  (IFSA) § 12(d) ("The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of Sale Proceeds . . . .").

530.    Indeed, there were extensive negotiations including the three rounds of post-petition mediation ordered by the Courts – one of which proceeded in parallel with the Patent Portfolio Sale process and in which the parties were obliged to negotiate in good faith and thus evaluate and disclose their positions.

*See*, *supra*, § IV.E.

531.    The Monitor's representatives have alternatively asserted:

(i) that the Monitor did not form a position on whether it possessed sole ownership under the MRDA prior to the Patent Portfolio Sale because it was focused exclusively on the sale and not allocation (despite its obligation to negotiate in good faith and full access to relevant Nortel personnel and records);

Trial Tr. 934:11-16 (Hamilton) ("Q.  And you didn't warn people that they shouldn't be bothering with this process because it was all going to go to the Monitor's client?  A.  I just told you that I hadn't concluded either way.").

(ii) that it is a "ridiculous allegation" to say that the Monitor had not yet formed the opinion that it was entitled to all of the sale proceeds at the time of the court hearing to approve the Patent Portfolio Sale; and

Trial Tr. 975:10-14 (Hamilton) ("Well, let me suggest to you that maybe you didn't instruct your counsel to speak up at the hearing because you hadn't thought up the claim yet.  A.  That's a ridiculous allegation.").

(iii) that the Monitor did advise NNI representatives prior to the Patent Portfolio Sale that NNL had exclusive ownership of the intellectual property.

McDonald Dep. 99:22-101:10; TR00009A-C (Hamilton Aff.) ¶ 42-44.

532.    This testimony is not only internally inconsistent, but it cannot be reconciled with the

following additional pieces of evidence:

(i) the senior representative of the Monitor, Murray McDonald, testified that he "had no view on the value of the intercompany licenses before the" failure of the third mediation but that it was not his view "at the time of the Rockstar sale that the intercompany licenses had no value."

McDonald Dep. 144:25-146:5; 146:9-17.

(ii) the Monitor participated in court-ordered mediations on November 11-16, 2010 and April 11-13, 2011 – prior to the Patent Portfolio Sale – and thus had a good faith obligation to consider the parties' respective rights under the operative agreement prior to the Patent Portfolio Sale.

TR40190 (2011 NNC Form 10-K) at 8; [31] TR50185 (US D.I. 5307 Joint Motion for Order Establishing an Allocation Protocol Pursuant to IFSA ) ¶19 ("The Mediation Attendees submitted briefs to Judge Phillips and conducted five

---

[31] Another round of mediation was ordered by the Courts shortly before the auction.  (TR50193, U.S. D.I. 5752 Order Directing Mediation;  TR50059, June 17, 2011 Canadian Order Directing Mediation).

in-person, full day mediation sessions between November 11, 2010 and November 16, 2010 in New York. At those sessions, approximately 125 representatives of the Mediation Attendees participated in an attempt to resolve allocation. Thereafter, the Mediation Attendees had further negotiations and, in addition, the Mediation Attendees engaged in further in-person full-day mediation sessions in New York with Judge Phillips over three days from April 11, 2011 through April 13, 2011, with approximately 115 individuals attending."); TR40015 (IFSA) § 12(d) ("The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds."); Trial Tr. 1449:9-11 (Ray) ("I'm a fiduciary. The Monitor is a fiduciary. We both had an obligation to negotiate in good faith over this.").

533.    The Monitor's representations and conduct before May 2013 cannot be reconciled with its current position that the Exclusive Licenses have no value.

534.    The US Debtors and EMEA Debtors were shocked to learn of the Monitor's litigation position when it was disclosed in 2013. John Ray testified that prior to May 2013, the Monitor never informed him that, according to the Monitor, the Exclusive Licenses had no value and that NNL was entitled to all of the proceeds from the sale of the Patent Portfolio, or even "anything like that." Similarly, Cosme Rogeau testified that until May 2013, no one on behalf of the Monitor or the Canadian Debtors had suggested to anyone on behalf of NNSA that NNSA's Exclusive Licenses sold in the Patent Portfolio Sale would have no value. Allan Bloom, likewise, was astonished, to learn the Monitor's position as set forth in its allocation brief.

McDonald Dep. 124:2-11 ("Q. Subsequent to the May 2010 meeting -- A. Yes. Q. -- when's the next time that any representative of the Monitor told any representative of NNI that the Monitor could take that position? A. Well, I think it was after the failed mediations and we were into the litigation and the pleading from May of 2013.") Trial Tr. 934:11-16 (Hamilton) ("Q. And you didn't warn people that they shouldn't be bothering with this process because it was all going to go to the Monitor's client? A. I just told you that I hadn't concluded either way."); Trial Tr. 1372:17-25 (Ray) ("Q. Now, prior to May 2013, which is just for reference the date of the filing of allocation briefs in this case, the opening briefs, did the Monitor or its representatives ever inform you that it was the Monitor's position that NNL was entitled to all of the proceeds from the sale of the residual

patent portfolio?  A. No.  I was never told anything like that."); Rogeau Dep. 78:6-25 ("Q. You first knew of this position when you were informed that NNL had taken it when they filed this allocation brief I just read to you?  A. Yes. . . . Q. I will represent to you, as you can see at the top of this page, that this was filed in May 2013.  Prior to May 2013, did anyone on behalf of the Canadian monitor or debtors ever suggest to anyone on behalf of NNSA that the NNSA's exclusive licenses were irrelevant to the Rockstar sale?  . . .  A. No one."); Bloom Dep. 95:6-14 (Q. During the entire period prior to May 2013 had you ever seen or heard of such a products arguments from any source?  . . .  A. No.  Q. What was your reaction when you read Canada's allocation brief?  A. Astonishment.").

535.    Had the position that NNL was entitled to all of the proceeds of the Patent Portfolio Sale been disclosed to NNI prior to the sale's closing, NNI never would have proceeded with the sale.

Trial Tr. 1374:17-1376:5 (Ray).

## <u>PROPOSED CONCLUSIONS OF LAW</u>

In light of the foregoing findings of fact and the detailed arguments contained in the US Interests' Post-Trial Brief, these proposed conclusions of law will generally focus on three particular areas:  legal authorities, the interpretation of the MRDA and the pro rata distribution theory.  For all other issues of law, the US Interests respectfully refer the Courts to the US Interests' Post-Trial Brief.

I.      **THERE MUST BE AN ALLOCATION TO EACH ESTATE BASED ON PRINCIPLES OF FAIR MARKET VALUE**

      A.      **Allocation Should Be Based on the Relative Fair Market Value of the Assets Each Debtor Transferred or Relinquished that Generated the Sales Proceeds**

            1.      **The Touchstone for Valuation Is Fair Market Value**

1.      As all of the Selling Debtors agree, the task of the Courts in this litigation is to determine the relative value of the interests and rights of each debtor in the assets that generated the Sales proceeds received from the buyers.  *See* Monitor Pretrial Br. – Allocation ¶ 72 ("[P]roceeds should be allocated based upon the value of the property rights transferred or surrendered by each Debtor Estate in connection with the various sales."); EMEA Pretrial Br. – Allocation ¶ 82 (advocating an allocation approach that gives the Canadian, EMEA, and US Debtors "the value of the economic rights they relinquished in the asset sales"); US Interests' Pretrial Br. at 1-2 (arguing that the task of the Courts "is to determine the fair market value of the assets each selling debtor sold or relinquished in each transaction"); *see also* TR21283 (Monitor Allocation Position) ¶ 4; TR40731 (EMEA Allocation Position) ¶ 3, TR50223 (US Interests' Allocation Position) at 1.

2.      Fair market value, which is widely accepted in law and economics throughout the world, is the foundational asset valuation methodology that courts have applied.  *See, e.g.*, *United States*

*v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59 at para. 197 (Can. Alta. Q.B.), *aff'd* (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value").

3.      Under both US and Canadian law, the fair market value of a business or asset is defined as the highest amount that a reasonably well-informed purchaser would pay in an arm's length transaction in an open and unrestricted market.  *See, e.g.*, *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay . . . ."); *Cartwright*, 411 U.S. at 551 (noting that "[t]he willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves"); *Henderson v. Minister of Nat'l Revenue*, [1973], C.T.C. 636 at para. 21 (Can. Tax Ct.); *see also* TR50450 (Pratt & Niculita, Valuing a Business) at 41-42 (explaining that fair market value of an asset is "[t]he amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts" (citation and internal quotations omitted)).

4.      Courts in the United States and Canada have applied the fair market value method in myriad contexts to assess the value of property.  Most pertinent here are in (a) insolvency proceedings, *see, e.g.*, *Syracuse Eng'g Co. v. Haight*, 110 F.2d 468, 471 (2d Cir. 1940) ("A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard."); Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 36.1 (incorporating the Bankruptcy and Insolvency Act, R.S.C., 1985, c. B-3, § 96 (requiring a trustee in bankruptcy to provide the court with "the fair market value of the property or services" at issue to enable the court to determine that a transfer at undervalue is void)); *see also Lids Corp. v. Marathon Inv. Partners, L.P. (In re*

*Lids Corp.)*, 281 B.R. 535, 545-46 (Bankr. D. Del. 2002) (in determining a debtor's solvency, "a court should ask:  What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?" (internal quotations omitted)); *Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, Bankruptcy No. 02-02250, No. 04-10366, 2008 WL 2037592, at *8 (Bankr. D.D.C. May 12, 2008) (assessing fair market value of subsidiary hospital to determine whether transaction was fraudulent conveyance); (b) the merger and acquisition context, *see, e.g.*, *Hechinger Litig. Trust v. Bankboston Retail Fin., Inc. (In re Hechinger Inv. Co. of Del.)*, 147 F. App'x 248, 251 (3d Cir. 2005); *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1072 (11th Cir. 2012); *Standard Fed. Bank v. United States*, No. 95-CV-478, 2002 WL 31947572, at *1 (Fed. Cl. Dec. 30, 2002); *First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 776 n.2 (Fed. Cl. 2002); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59 at paras. 338-40 (Can. Alta. Q.B.) (explaining that fair market value is the main criterion to be utilized in establishing the fair value of shares under the various Canadian Business Corporation Acts); and (c) valuing real and intellectual property, *see, e.g.*, *United States v. 50 Acres of Land*, 469 U.S. 24, 25-26 (1984) (stating that just compensation for condemned property is "normally measured by fair market value"); *Pleasant Summit Land Corp. v. Comm'r of Internal Revenue*, 863 F.2d 263, 272 (3d Cir. 1988); *R.M. Smith, Inc. v. Comm'r of Internal Revenue*, 591 F.2d 248, 251 (3d Cir. 1979) (determining fair market value of patents following corporate liquidation); *Broadcast Music, Inc. v. DMX Inc.*, 683 F.3d 32, 45 (2d Cir. 2012) (noting court's determination of reasonable copyright royalty rate is determined by the "fair market value of the music"); *507582 B.C. Ltd. v. R.*, 2008 TCC 220; *Eli Lilly & Co. v. Apotex Inc.*, 2009 FC 991 (Can. F.C.).

5.      Well-established methodologies exist to determine fair market value that are both used

every day by investment bankers, economists and valuation experts and are routinely accepted

and analyzed by courts in all relevant jurisdictions – these are the market, income and asset-

based approaches.  *See, e.g.*, *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 348

B.R. 234, 274 (Bankr. D. Del. 2005) (market, income and asset approaches are the "three

standard approaches" to determining fair market value); *Nordetek Envtl., Inc. v. RDP Techs.,*

*Inc.*, 862 F. Supp. 2d 406, 416 (E.D. Pa. 2012) (measurement of fair market value involves

consideration of the market approach, income approach and asset-based approach in context of

determining equity interest in corporation); *In re Greater Se. Cmty. Hosp.*, 2008 WL 2037592, at

*8 (citing Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 203.2 (15th ed. 2005));

TR50450 (Pratt & Niculita, Valuing a Business) (applying the three basic methodologies to

determine fair market value in fraudulent conveyance case); *Pocklington Foods Inc. v. Alberta*

*(Provincial Treasurer)* (1998), 218 A.R. 59 at para. 201 (Can. Alta. Q.B.) (there are three basic

approaches for valuing a business:  asset base, income, and market).

### 2.      Fair Market Value Principles Are Consistent with the MRDA

6.      An allocation that is based on the fair market value of the rights and interests of each

debtor in the Business Line and Patent Portfolio asset sales comports with the requirements of

the MRDA.

7.      Under the MRDA, if a Licensed Participant becomes insolvent, it may be required to

surrender its exclusive license.  *See* TR21003 (MRDA) at 10 (Art. 11(b), (c)).  However, in such

an instance, the Licensed Participant is entitled to the fair market value of that license.  *See id.* at

4 (Art. 1(j)) (defining "Retirement Allocation" as "the fair market value (at the time of

retirement) of the Exclusive License provided in Article 5 and any prior License to the NN

Technology granted by NNL to such retiring Participant"); *id.* at 10 (Art. 11(d)) (providing that a "retiring Participant shall be entitled to a Retirement Allocation from NNL").

8.      Application of fair market value further comports with the Second Amendment to Schedule A of the MRDA, which explicitly provides that a "gain/loss on the sale of business" is not to be allocated among the Participants through the RPSM formula. *Id.* at 49 (2d Amend. to Sched. A).

9.      Conversely, application of the RPSM percentages here would not be fair market value and their use is not appropriate for allocation. *See* Post-Trial Brief, Section V.

### 3.      The Income-Based Approach Is the Most Appropriate Methodology for Determining Fair Market Value in this Case

10.      An income-based approach to determining fair market value is a well-established valuation methodology embraced by courts in the United States and Canada, and is widely used by the financial community. *See* TR50990 (Smith & Parr, Valuation of Intellectual Property and Intangible Assets) at 170 (The income approach is "best suited for the appraisal of . . . Contracts; Licenses . . . ; Patents . . . [and] Business enterprises."); TR50450 (Pratt & Niculita, Valuing a Business) at 369 ("Other technology-related, engineering-related, and marketing-related intangible assets are also likely candidates for an application of the income approach. These intangible assets may include patents . . . ."); *see also In re Winstar Commc'ns*, 348 B.R. at 274; *Nordetek Envtl.*, 862 F. Supp. 2d at 416; *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 201 (Can. Alta. Q.B.).

11.      Given the circumstances surrounding Nortel's sales, an income-based valuation method is most appropriate here. An income-based valuation method captures the value of all of the individual tangible and intangible assets operating together, which is consistent with the fact that both the Business Lines and Patent Portfolio were sold as complete businesses, for which

synergies existed between the individual assets that comprised the businesses.  *See* TR50450

(Pratt & Niculita, Valuing a Business) at 276 ("Going-concern value tends to be based largely –

and sometimes entirely – on income and cash flow analyses.").

      **B.**    **Under Both US and Canadian Bankruptcy Law, Creditors Must Be Paid Before Equity**

12.      In insolvency, a debtor's assets must be made available to satisfy the allowed claims of

creditors of that debtor before equity may recover anything.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii)

(2010); *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33 at para. 36 (Can. Ont. Ct. J. (Gen.

Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.); *see also* Companies'

Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 6(8).

13.      In the United States, this is known as the "absolute priority rule."  Codified in 11 U.S.C.

§ 1129(b)(2)(B), it requires that "creditors be paid before the stockholders . . . retain equity

interests for any purpose whatever."  *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d

Cir. 2005) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526

U.S. 434, 444 (1999)) (internal quotations and alterations omitted); *see also* TR50470 (Standing

Senate Comm. on Banking, Trade & Commerce, Debtors and Creditors Sharing the Burden:  A

Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act)

at 159 ("[Holders of equity] should be afforded lower ranking than secured and unsecured

creditors, and the law – in the interests of fairness and predictability – should reflect both this

lower priority for holders of equity and the notion that they will not participate in a restructuring

or recover anything until all other creditors have been paid in full."); Roy Goode, *Principles of

Corporate Insolvency Law* ¶ 1-04 (4th ed. 2011) ("[O]nly when creditors have been paid in full

(which is rarely the case) do shareholders come in to participate in the surplus remaining."

(citation omitted)); Douglas G. Baird & Anthony J. Casey, *No Exit? Withdrawal Rights and the*

*Law of Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013) (to ensure this absolute priority scheme is followed, bankruptcy focuses "on legal entities, not on corporate groups").

14.     Similarly, in Canada, equity claimants do not rank *pari passu* with unsecured creditors and they may only receive their shares of Estate assets after unsecured creditors have been paid in full.  *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33 at para. 36 (Can. Ont. Ct. J. (Gen. Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.).

15.     In the present allocation proceedings, the absolute priority rule must be respected, and the proceeds of the asset sales must be allocated to each Debtor for the benefit of and distribution to its creditors in accordance with the laws and rules governing its own proceeding.  An allocation of value that is not based on fair market value or that expropriates value from one Estate to another is improper and should not be awarded.

16.     The US Interests' valuation methodology is consistent with and respects these fundamental principles.

II.     **UNDER THE MRDA, EACH PARTICIPANT EXCLUSIVELY HELD ALL VALUABLE RIGHTS TO NORTEL'S INTELLECTUAL PROPERTY IN ITS RESPECTIVE TERRITORY**

A.     **Governing Law and Applicable Principles of Contract Interpretation**

17.     The MRDA is governed by Ontario law.  *See* TR21003 (MRDA) at 13 (Art. 14(f)) ("This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.").

18.     The rules of contractual interpretation under Ontario law do not differ from general US law on contractual interpretation.  *Cf. Flintkote Co. v. Gen. Accident Assurance Co. of Can.*, No. C 04-1827 MHP, 2009 WL 3568644, at *2 (N.D. Cal. Oct. 27, 2009) (noting that "there are no material differences" between the laws of Ontario and California in the interpretation of a contract and thus applying the law of California); *Nortel Networks Corporation, Re*, 2013 ONCA

427 at para. 8 (no error in failing to apply New York law to the interpretation of the IFSA since

the result would be the same); *Skyway Canada Ltd. v. Clara Industrial Services Ltd.*, [2005] O.J.

No. 4887 at para. 26 (Can. Ont. S.C.J.) (finding "no evidence . . . to suggest that the law of New

York is in any way different from the law of Ontario" in a breach of contract case).

19.      The goal of contractual interpretation is to give effect to the underlying objective

intention of the contracting parties.  *See, e.g.*, *Sattva Capital Corp. v. Creston Moly Corp.*, 2014

SCC 53 at para. 47 (The "interpretation of contracts has evolved towards a practical, common-

sense approach not dominated by technical rules of construction.  The overriding concern is to

determine 'the intent of the parties and the scope of their understanding.'"); *Consolidated-*

*Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co*., [1980] 1 S.C.R. 888 at

paras. 25-26 (stating that a court must interpret the contract in a manner "which, from the whole

of the contract, would appear to promote or advance the true intent of the parties at the time of

entry into the contract"); *Toronto-Dominion Bank v. Leigh Instruments Ltd*., 1998 ONSC 14806,

para. 415 (Can. Ont. S.C.J.).[32]

20.      To determine the parties' intent, the court examines two related components: (i) the words

of the contract and (ii) their context.  *See* G. R. Hall, *Canadian Contractual Interpretation*

(Markham: LexisNexis Canada, 2d ed. 2012) at 9; *Sattva Capital Corp. v. Creston Moly Corp*.,

2014 SCC 53 at para. 50 (holding that "[c]ontractual interpretation involves issues of mixed fact

and law as it is an exercise in which the principles of contractual interpretation are applied to the

words of the written contract, considered in light of the factual matrix.").  As the Supreme Court

of Canada has recently held, "[t]he parole evidence rule does not apply to preclude evidence of

---

[32] *Accord In re Plassein*, 377 B.R. 126, 135 (Bankr. D. Del. 2007) (Gross, J.) (stating that "the objective intent of the parties" is "'a court's paramount consideration' in construing a contract" (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980))).

the surrounding circumstances." *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 60.

21.     Interpretation "must begin with the words of the document," "giv[ing] meaning to all of its terms and avoid[ing] an interpretation that would render one or more of its terms ineffective." *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24; *see also Elliott v. Billings (Township) Board of Education,* [1960] O.R. 583 at 587 (Can. Ont. C.A.); *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 (S.C.C.); *Scanlon v. Castlepoint Development Corp.*, [1992] O.J. No. 2692 (Can. Ont. C.A.); *Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd.*, [2003] B.C.J. No. 2508 at para. 17 (Can. B.C.C.A.).[33]

22.     Words of one provision must not be read in isolation, but should be considered in harmony with the rest of the contract. *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* [1999] O.J. No. 3290 at para. 9 (Can. Ont. C.A.); *see also Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 at para. 64; *Canadian Newspapers Co. v. Kansa General Insurance Co.*, [1996] O.J. No. 3054, 30 O.R. (3d) 257 (Ont. C.A.); *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24 (Can. Ont. C.A.).[34]

23.     The primary purposes of reading each provision in light of the whole contract are to (a) achieve interpretive accuracy, *Ryan v. Sun Life Assurance Co. of Canada*, [2005] N.S.J. No. 24, 249 D.L.R. (4th) 628 at para. 26 (Can. N.S.C.A.) (holding that particular words and phrases should not be considered in isolation, but rather in the "context, scheme and objectives" of the

---

[33] *Accord In re Plassein*, 377 B.R. at 132-33 ("The Court must determine the parties' intention from the express language of the agreement[,] and construe their intention from the entire agreement, giving effect to all of the provisions." (citations omitted)); *In re G-I Holdings, Inc.*, -- F.3d --, Nos. 13-3335, 13-3336, 2014 WL 2724129, at *5, 6 (3d Cir. June 17, 2014) (Under Delaware law, in interpreting a contract, a court must "give each provision and term effect, so as not to render any part of the contract mere surplusage," and "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.").
[34] *Accord In re G-I Holdings, Inc.*, 2014 WL 2724129, at *5.

entire contract); *Campbell-MacIsaac v. Deveaux*, [2004] N.S.J. No. 250, 224 N.S.R. (2d) 315 at

para. 62 (Can. N.S.C.A),[35] and (b) avoid inconsistency, *Bowater Newfoundland Ltd. v.*

*Newfoundland and Labrador Hydro*, [1978] N.J. No. 14, 15 Nfld. & P.E.I.R. 301 at para. 28

(Can. Nfld. C.A.).[36]

24.      Although the introductory recitals in a contract may not alter the operative terms of the

contract, recitals may be used as an interpretive guide to the parties' intent.  *See, e.g.*, *Eli Lilly &*

*Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 57 (relying on recitals to determine whether

an agreement was a sublicense); *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Newbould, J.) at

paras. 25-26 (using recitals to find that a party had an equitable interest in the property at

issue).[37]

25.      Finally, a contract should always be interpreted "so as to accord with sound commercial

principles and good business sense, and avoid commercial absurdity."  *Downey v. Ecore*

*International Inc.*, 2012 ONCA 480 at para. 38 (quoting *Salah v. Timothy's Coffees of the World*

*Inc.*, 2010 ONCA 673 at para. 16); *see also Unique Broadband Systems, Inc. (Re)*, 2014 ONCA

538 at para. 88 ("[A]n interpretation which defeats the intentions of the parties and their

objective in entering into the commercial transaction in the first place should be discarded in

favour of an interpretation of the policy which promotes a sensible commercial result." (quoting

*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, 1979 CanLII

10 (SCC), [1980] 1 S.C.R. 888, at p. 901)); *id.* at para. 89 ("[C]ommercial contracts should be

---

[35] *Accord In re G-I Holdings, Inc.*, 2014 WL 2724129, at *5 ("A court should interpret the contract in such a way as to not render any of its provisions illusory or meaningless." (internal quotations omitted)).

[36] *Accord In re G-I Holdings, Inc., 2014 WL 2724129* at *6 (declining to read one contractual provision in a manner that would "drain" another contractual provision of meaning).

[37] *Accord Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1048 (10th Cir. 2004) (relying on a preamble to determine the purpose of a licensing agreement); *Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470 (Fed. Cl. 2005) (noting that "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties" (internal quotations omitted)); *see also Stowers v. Cmty. Med. Ctr., Inc.*, 172 P.3d 1252, 1255 (Mont. 2007) ("Recitals in a contract should be reconciled with the operative clauses of the contract and given effect as far as possible.").

'interpreted in the way in which a reasonable commercial person would construe them.'").[38]  In this analysis, courts may also consider objective manifestations of the parties' intent.  *See Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57 (holding that the purpose of examining the "surrounding circumstances" of a contract "is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract" ).

26.     The foregoing ordinary principles of contract law apply equally to the interpretation of a license agreement such as the MRDA.  *See, e.g., Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 (Can. F.C.); *Hemosol Corp., Re*, [2006] O.J. No. 4018 (Can. Ont. S.C.J. [Commercial List]); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *Walt Disney Co. (Canada) Ltd. v. Philhobar Design Canada Ltd.*; (2008), 47 B.L.R. (4th) 306 (Can. Ont. S.C.J.); *White v. E.B.F. Manufacturing Ltd.*, 2005 NSCA 167; *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820; *see also* Roger T. Hughes & Dino P. Clarizio, *Halsbury's Laws of Canada - Patents, Trade Secrets and Industrial Designs (2012 Reissue)* at para. HPT-138 (QL).[39]

### B.     The Valuable "Bundle of Rights" that a Patent Affords

27.     In assessing the value of rights that each Participant held under the MRDA with respect to Nortel intellectual property, it is helpful to review the rights conferred by a patent, including in particular a US patent.

---

[38] *Accord Pan Am. Realty Trust v. Twenty One Kings, Inc.*, 408 F.2d 937, 939 n.4 (3d Cir. 1969) ("Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (quoting *N. German Lloyd v. Guar. Trust Co. of New York*, 244 U.S. 12, 24 (1917) (internal quotations omitted))); *see also Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004) ("When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided.").

[39] *Accord McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) ("Whether express or implied, a license is a contract 'governed by ordinary principles of state contract law.'" (quoting *Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989))); *see also E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (stating that the "fundamental rules of contract construction . . . apply equally to the construction of patent licenses").

28.     A patent confers valuable exclusivity by providing the party holding rights to the patent the ability to prevent others from making, using or selling the patented invention.  *See* 35 U.S.C. § 154(a)(1) (stating that "[e]very patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process"); Patent Act (Canada), § 42 (providing that a Canadian patent confers in Canada "the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to the adjudication in respect thereof before any court of competent jurisdiction").

29.     Patents are territorial; thus, a patent filed in the United States, for example, excludes others from utilizing the patent or the patented invention in the United States or importing the patented product into the United States.  *See* 35 U.S.C. § 271(a) (providing that a party infringes a patent if it "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention"); *see also* United States Patent and Trademark Office, Glossary, *available at* http://www.uspto.gov/main/glossary/ (defining a patent as "a property right granted by the Government of the United States of America to an inventor 'to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States for a limited time in exchange for public disclosure of the invention when the patent is granted").

30.     A Canadian patent likewise confers in Canada "the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to the

adjudication in respect thereof before any court of competent jurisdiction." Patent Act (Canada), § 42.

31.    A patent "is a bundle of rights which may be retained in whole or in part, divided and assigned." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 n.8 (Fed. Cir. 2007); *see also* Patent Act (Canada), § 42; *Harvard College v. Canada*, [2002] 4 S.C.R. 45 at para. 64 (noting that the Patent Act "gives the owner, as against the rest of the world, 'the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used' . . . and in that respect is framed as a positive right, its effect is essentially to prevent others from practising an invention that, but for the patent monopoly, they would be permitted to practice" (citations omitted)).

32.    The "bundle of rights" that comprise a patent may also be transferred to another party through a license. *See, e.g.*, *McCoy*, 67 F.3d at 920 (noting that "[t]he right to exclude may be waived in whole or in part," and that "a patent or trademark owner" may therefore "contract to confer a license on another party" (internal quotations and alterations omitted)); *see also* Patent Act (Canada), § 50(2); *Rite Manufacturing Ltd. v. Ever-Tite Coupling Co.* (1976), 27 C.P.R. (2d) 257 at para. 20 (Can. Registrar of Trade Marks) citing *National Carbonising Co., Ltd. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (C.A.) at 56-57 (noting that "a patentee is fully entitled to assign his rights under the Letters Patent to another").

33.    Where a patent license is exclusive, parties other than the licensee – including the patentee itself – are prohibited from practicing the patent in the fields of use for which it was granted, or in the geographic territory covered by the license. *See, e.g.*, *Wilson v. Rousseau*, 45 U.S. 646, 686 (1846) (where an agreement granted the right to use two patented machines in the same town, "[a]lthough limited to the use of two machines within the town, the right to use them

is exclusive.  No other party, not even the patentee, can use a right under the patent within the territory without infringing the grant."); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 937 (D.N.J. 1983) ("The patentee has no more right to practice his patent in a field of use where an exclusive license has been given, than does a stranger."); *see also American Cyanamid Co. v. Novopharm Ltd.*, [1972] F.C. 739 at para. 19 (Can. F.C.A.) (holding that an exclusive licensee has "an exclusive right in the property (carved out of the patentee's full ownership rights)").

34.    Exclusivity increases the value of a license.  *See* Trial Tr. 4115:13-18 (Kinrich) ("If you have exclusive rights to the intellectual property, this enhances the value.  If you don't have exclusive rights to a technology, then someone else may also be able to utilize it.  But if you have exclusive rights, others cannot utilize it, and that has more value.").

> **C.**    **The Plain Terms of the MRDA Confirm that Each Participant Exclusively Held All Valuable Rights to NN Technology, Including Patents, in Its Respective Territory**

35.    As detailed below, the MRDA states that each participant holds exclusive rights to practice, sublicense and enforce NN Technology, including patents, in its territory.  *See* TR21003 (MRDA) at 20 (Sched. B) (defining the exclusive territory of each Participant as the United States and Puerto Rico for NNI, the United Kingdom for NNUK, France for NNSA and the Republic of Ireland for NN Ireland).

> **1.**    **Under the MRDA, Each Participant Held the Exclusive Right to Practice NN Technology, Including Patents, in Its Respective Territory**

36.    The parties to the MRDA agreed to conduct research and development and to grant to each Participant, in its respective territory, an exclusive license to the patents and other intellectual property generated as a result of such research and development.  *See id.* at 4, 6 (Arts. 2(a), 4(a)).

37.     Specifically, in Article 4 – titled "Legal Title to NN Technology" – the parties agreed to vest "legal title" to NN Technology in NNL "in consideration" for a grant to each of the Licensed Participants of exclusive, perpetual, and royalty-free rights to NN Technology in its respective territory.  *See id.* at 6 (Art. 4(a)); *see also* Burshtein Dep. 96:14-20, 96:23-97:11, 99:19-22, 25 (the Monitor's expert, Sheldon Burshtein, acknowledging that NNL only received legal title in consideration for granting the Exclusive Licenses and that without that exchange, NNL would not have had legal title to NN Technology).

38.     "NN Technology" is broadly defined as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."  *See* TR21003 (MRDA) at 3 (Art. 1(f)).

39.     Under Article 5(a) of the MRDA, NNL agreed that the Licensed Participants would have "an exclusive, royalty-free license, including (i) the right to sublicense, which except as hereinafter provided shall be in perpetuity, (ii) rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ('Exclusive License')."  *Id.* at 6-7 (Art. 5(a)).

40.     The word "including," which follows the words "exclusive, royalty-free license" in Article 5(a), is not a limitation on the license rights granted to the Licensed Participants, but to the contrary, is an extension or enlargement of the kinds of rights that would ordinarily be

included in an exclusive, royalty-free license.  *See, e.g.*, *Mahaffey, Re* (1922), 52 O.L.R. 369

(Can. Ont. H.C.) (the word "including" is ordinarily construed as a word of extension, indicating

an enlargement or addition to those things that would ordinarily be included within the definition

of the word that follows); *Duncombe Estate, Re* (1902), 3 O.L.R. 510, 1 O.W.R. 153 (Can. Ont.

Chambers) ("including" imports addition).[40]

41.     Thus, for example, under the MRDA, each Participant held the exclusive right to practice

NN Technology, including patents, in its respective territory, in perpetuity, and no other Nortel

entity – including NNL – had the right to exploit NN Technology in the territory of another

Participant.

### 2.    Under the MRDA, Each Licensed Participant Held the Right to Sublicense in Its Exclusive Territory

42.     The right to sublicense enables a licensee to grant another party the ability to stand in its

shoes and exercise its rights.  *See, e.g.*, *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at

para. 48 ("As a general matter, a sublicence amounts to a grant by a licensee of certain licensed

rights to a third party, the sublicensee.  That is, the licensee in effect transfers or licenses some or

all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to

the primary licence, including the right to exercise independently certain rights enjoyed by the

licensee pursuant to its licence.  It has been said, in fact, that 'a sublicence is simply another

name for the indirect granting of a licence.' (quoting Leslie W. Melville, *Forms and Agreements*

*on Intellectual Property and International Licensing* (3rd ed. rev 1997) § 3.18)); *accord*

Brunsvold et al., *Drafting Patent License Agreements* 84 (7th ed. 2012) (A sublicense "permits

the sublicensee to act independently of the licensee (subject to the terms of the sublicense

agreement).  A sublicensee is in effect another licensee."); *E.I. du Pont de Nemours & Co.*, 498

---

[40] *Accord Am. Sur. Co. v. Marotta*, 287 U.S. 513, 517 (1933).

A.2d at 1115-16 (a sublicensee has the right to practice the patented invention for its own benefit or the benefit of another).

43.    Under the plain language of the MRDA, the exclusive license of each Licensed Participant includes the right to "sublicense" to other parties.  *See* TR21003 (MRDA) at 6 (Art. 5(a)) (granting each Licensed Participant "an exclusive, royalty-free license, including," *inter alia*, "the right to sublicense").

44.    Moreover, Article 6(d)(iii) of the MRDA specifically contemplates that each Licensed Participant would sublicense NN Technology to third parties for their own purposes.  *Id.* at 7 (Art. 6(d)(iii)).  This article allows each Participant "to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated."  *Id.*

45.    A right to sublicense is distinct from a "have made" right.  *See, e.g.*, *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1073 (Fed. Cir. 2009) ("A right to have made is not a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee."); *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1387-88 (Fed. Cir. 1996); *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 231 (D. Del. 2001); *accord Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 75-76 (noting the distinction between a sublicense and a "have made" right under a license).

46.    This distinction is reflected in the plain language of the MRDA, which grants the Licensed Participants both a "have made" right and the right to sublicense.  Article 5(a) states that the exclusive license includes the "rights to make, have made, use, lease, license, offer to sell, and sell."  *See* TR21003 (MRDA) at 6 (Art. 5(a)).  Article 5(a) also grants the Licensed Participants "an exclusive, royalty-free license, including the right to sublicense."  *Id.*

47.     If a right to sublicense and a "have made" right were the same, there would have been no

reason to expressly include both in the MRDA, and the word "sublicense" in Article 5(a) would

be superfluous.  As a matter of universally accepted contract interpretation principles, courts do

not read contracts in such a way.  *See Ventas Inc. v. Sunrise Senior Living Real Estate Investment*

*Trust* 2007 ONCA 205 at paras. 24, 45 (contract interpretation "must begin with the words of the

document," "giv[ing] meaning to all of its terms and avoid[ing] an interpretation that would

render one or more of its terms ineffective"); *accord In re Plassein*, 377 B.R. at 133-34.

Accordingly, each Licensed Participant held the right to sublicense in its exclusive territory

distinct from any right to have a supplier make products for a Participant.

> **3.      Under the MRDA, the Licensed Participants Held the Right to
> Assert Actions, Recover Damages and Pursue Other Remedies
> for Infringement of NN Technology, Including Patents, in
> Their Respective Territories**

> *a.*      **Article 4(e) Grants Each Licensed Participant the Right to Assert
> Actions and Recover Damages**

48.     Under Article 4(e) of the MRDA, the "Licensed Participants have the right to assert

actions and recover damages or other remedies in their respective Territories for infringement or

misappropriation of NN Technology by others," with no requirement to join NNL or any other

entity as a plaintiff.  TR21003 (MRDA) at 6 (Art. 4(e)).

49.     Article 4(e) grants the Licensed Participants the right to enforce any infringement or

misappropriation of NN Technology "by others," which includes third parties and other

Participants.  *Id.*; *see also Wilson*, 45 U.S. at 686 (an exclusive licensee may exclude even the

patentee from practicing the patented invention); *Sanofi*, 565 F. Supp. at 937 (same); *see also*

*American Cyanamid Co. v. Novopharm Ltd.*, [1972] F.C. 739 at para. 19 (Can. F.C.A.) (holding

that an exclusive licensee has "an exclusive right in the property (carved out of the patentee's full

ownership rights)").

50.     Moreover, the enforcement right in Article 4(e) "survive[s] notwithstanding the expiry of [the MRDA], or any termination of [the MRDA] for any cause whatsoever."  TR21003 (MRDA) at 9 (Art. 9(c)).

### b.     NNI Alone Also Had the Right to Bring Infringement Suits Under US Law

51.     US patent law governs NNI's standing to bring a suit asserting infringement of a Nortel patent in the United States.  *See Morrow*, 499 F.3d at 1336 ("[T]he patent statutes have long been recognized as the law that governs who has the right to bring suit . . . . [Thus,] [w]here parties have contractually divided patent rights, [courts] have analyzed standing to file the infringement suit under patent law principles."); *see also Innovus Prime, LLC v. Panasonic Corp.*, No. C-12-00660-RMW, 2013 WL 3354390, at *3 (N.D. Cal. July 2, 2013) (noting that "federal law applies to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right" (internal quotations omitted)); Burshtein Dep. 222:25-223:6 (the Monitor's expert acknowledging that standing to enforce a patent in the United States is an issue to be determined under US law); *accord* J. Walker, ed., *Castel & Walker, Canadian Conflict of Laws*, 6th ed., vol. 2 (Markham: LexisNexis Canada, 2005+) at 24-2; *Canadian Bronze Co. v. Shrum*, 1980 CarswellOnt 404 (Ont. S.C.[Master's Chambers]).

52.     If the license agreement conveys "all substantial rights" in the licensed patents to the exclusive licensee, the licensee alone has the right to bring infringement suits, without joining the patentee.  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873-76 (Fed. Cir. 1991); *Morrow*, 499 F.3d at 1339-40.

53.     As explained by the US Court of Appeals for the Federal Circuit, a specialized appellate court with nationwide jurisdiction over patent matters, "a transferee that receives all substantial patent rights from a transferor would never need consent from the transferor to file suit because

such an assignment essentially transfers title in the patent to the transferee." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1344 (Fed. Cir. 2001).

54.    In determining whether a license agreement conveys "all substantial rights" in a patent, courts consider the extent of the rights held by the licensee and any veto or control rights retained by the patentee. *Vaupel*, 944 F.2d at 875; *Intellectual Prop. Dev.*, 248 F.3d at 1342-43.

55.    A licensee's right to bring infringement suits is a particularly critical factor in the "all substantial rights" analysis. *See, e.g.*, *Vaupel*, 944 F.2d at 875 ("This grant [of the right to sue for infringement] is particularly dispositive here because the ultimate question confronting us is whether [the licensee] can bring suit on its own or whether [the patentee] must be joined as a party.").

56.    In light of the expansive scope of rights that the MRDA conveyed to NNI, the MRDA comfortably meets the "all substantial rights" rights test, such that NNI could unilaterally bring infringement actions in the United States.[41]    Indeed, in *Vaupel*, the Federal Circuit found this standard satisfied even though the patentee retained significant control rights not present here. *Id.* at 875.

57.    For the foregoing reasons, the Licensed Participants held the right to assert actions and recover damages and other remedies for infringement of NN Technology, including patents, in their respective territories, and NNL could not prevent such infringement actions.

---

[41] Even if NNI did not have "all substantial rights" to NN Technology in the United States, NNI could enforce its rights as an exclusive licensee simply by joining or inviting NNL as a party, which NNL could not prevent. *See, e.g.*, *Intellectual Prop. Dev.*, 248 F.3d at 1348 ("As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the [Article III standing] requirements."); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) ("A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a proper case, made an involuntary plaintiff if it is not subject to service of process."); *see also Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469 (1926).

58.     NNL had no right to practice any Nortel patent in the United States or to confer a right to do so on any third party.  Nor did NNL have any right or ability to protect a third party from an infringement suit brought by NNI with respect to any Nortel patent or other NN Technology.

**4.      The MRDA's Recitals, Schedules and Amendments Further Confirm that All Valuable Rights to NN Technology Were Held by Each Participant in Its Respective Territory**

59.     As explained above in Sections II.C.1-3, Articles 4 and 5(a) of the MRDA grant the Licensed Participants the rights to exploit, exclude, and sublicense in their exclusive territories. Consistent with the broad scope of that grant, the MRDA and its amendments repeatedly describe the Licensed Participants as having "ownership" of NN Technology in their respective territories.

60.     As noted above in Section II.A, recitals may be used as an interpretive guide to ascertaining the parties' contractual intent.

61.     The recitals to the MRDA describe the Participants' ownership rights, stating that "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under [NN] Technology" for its exclusive territory under the R&D CSAs and that "it is the intent of NNL and the Licensed Participants that the Licensed Participants continue . . . to hold and enjoy such rights."  TR21003 (MRDA) at 2 (second recital).

62.     The MRDA further states that each Participant "bears the full entrepreneurial risks and benefits for the Nortel Network business."  *Id.* (Whereas Clauses).

63.     Schedule A to the MRDA – an operative provision – repeats these statements, explaining that the "Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."  *Id.* at 18 (Sched. A).  Amended Schedule A to the Second Addendum, signed in December 2007, also provides that the "Participants bear the full entrepreneurial risk of the

Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology." *Id.* at 30 (Second Addendum, Sched. A). Likewise, the Second Amended Schedule A, introduced as part of the Third Addendum signed in December 2008 through January 2009, provides that the "Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology." *Id.* at 48 (Third Addendum, Sched. A).

64.     Furthermore, a recital to the Second Addendum states that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology." *Id.* at 27 (Second Addendum, Whereas Clauses).

65.     Similarly, the Memorandum of Understanding ("MOU") – which was drafted "to provide a record of" the Participants' "understandings" with respect to the MRDA and related agreements – states that the Licensed Participants enjoyed "ownership" of NN Technology. *See* TR48944 (MOU) at 1 & ¶¶ 3, 6.

66.     Specifically, the MOU explains that the MRDA "memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and ownership of the NN Technology, with NNL holding legal title thereto." *Id.* ¶ 3.

67.     These provisions confirm the parties' shared intent that the Licensed Participants hold all valuable rights to NN Technology in their respective territories and be considered the owners of such technology.

>     **5.     Additional Provisions of the MRDA Are Consistent Only with an Interpretation that the Licensed Participants Had Broad Ownership Rights**

68.     In addition to Articles 4 and 5, the recitals, Schedule A, the addenda and the MOU, several other provisions of the MRDA compel the conclusion that NNI and the other Licensed

Participants were the exclusive owners of all of the valuable rights to NN Technology in their respective Exclusive Territories.

69.     For example, Article 6 requires each Licensed Participant to maintain confidentiality with respect to "any of the NN Technology." *See* TR21003 (MRDA) at 7 (Art. 6(b)).  However, Participants are permitted to "communicate relevant portions of the NN Technology to suppliers," to "customers purchasing the Products," and to "third persons licensing rights to use NN Technology." *Id.* at 7-8 (Arts. 6(d)(i)-(iii)).  That Article 6 permits disclosure to third-party licensees distinct from customers and suppliers undermines the Monitor's premise that NNI's licensing rights were limited to customers and suppliers.

70.     Additionally, Article 7 distributes risk in a manner that is consistent with the separation of legal title from equitable and beneficial ownership.  Article 7(b) provides that "[e]ach Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology." *Id.* at 8 (Art. 7(b)).  The breadth of this provision – indemnifying NNL, without any limitation, for all claims arising in a Licensed Participant's territory with respect to NN Technology – confirms that each Licensed Participant bears full responsibility for the exploitation of NN Technology in its Exclusive Territory.  This provision would make no sense if the Licensed Participants did not have full control over the NN Technology in their Exclusive Territories.  It makes even less sense that NNL would be indemnified by the Licensed Participants for claims resulting from NNL's conduct, as this provision would provide if NNL has rights over NN Technology in the Licensed Participants' Exclusive Territories.

71.      Under Article 9(b), upon termination of the MRDA, each Licensed Participant "shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued."  *Id.* at 9 (Art. 9(b)).  Further, under Article 9(c), the provisions of Article 4 (the Licensed Participants' enforcement rights with respect to NN Technology) continue.  *Id.* at 9 (Art. 9(c)).  Additional provisions of the MRDA also continue in force, such as the obligation to indemnify and the confidentiality obligations.  *Id.*

72.      Article 10(a) underscores that NNL's rights are not greater than those of the Licensed Participants insofar as decisions regarding entry of new Participants are subject to unanimous consent of all Participants.  *Id.* at 9 (Art. 10(a)).  In other words, NNL was powerless to add Participants without the consent of all others.

73.      Under Article 11, when a Participant exits from the MRDA due to insolvency, NNL is obligated to pay fair market value in exchange for the cancellation of the exclusive license and the acquisition by NNL of the rights held by the former Licensed Participant.  *See id.* at 10 (Art. 11(d)).  The entitlement of each Licensed Participant to be paid fair market value for its exclusive license in an insolvency scenario confirms the breadth of the Licensed Participants' rights to NN Technology.

###      D.      In Light of the Foregoing, NNL Had Nothing of Value to Sell in the Licensed Participants' Exclusive Territories

74.      As explained above, NNI held the right to enforce all the NN Technology in the United States, including the patents included in the Patent Portfolio, and no other party was entitled to control or interfere with NNI's enforcement rights.  As a result, no buyer of the Patent Portfolio would have purchased the patents and other intellectual property rights in the sales unless NNI terminated those rights.  Absent such termination, if the buyer had sought to exploit NN

Technology in the United States, NNI would have had the right and ability to prevent the buyer from doing so.

75.     The effect of a transfer of title to a US patent on the rights of an existing licensee to the patent is governed by US patent law, even if the underlying license agreement is governed by foreign law.  *Innovus Prime*, 2013 WL 3354390, at *3.

76.     Under US law, a party cannot place a buyer of its patent interests in any better position than the party itself occupied or confer upon the buyer rights that the party itself did not hold. *See id.* at *5 ("Patent owners cannot transfer an interest greater than what they possess, so assignees 'take[] a patent subject to the legal encumbrances thereon.'" (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (alteration in original)); *TransCore, LLC v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) ("[O]ne cannot convey what one does not own."); *see also Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).

77.     The same is true under Ontario law.  *See National Carbonising Co., Ltd. v. British Coal Distillation, Ltd.* (1937), 54 R.P.C. 41 (C.A.) (holding that an assignment of a patent cannot defeat the rights of the licensee under a licence); *see also* P. Bradley Limpert, *Technology Contracting: Law, Precedents and Commentary* (Toronto: Carswell, 2011) at 5-31.

78.     Therefore, because NNL had no right to practice or otherwise exploit Nortel patents or other NN Technology in the United States and could not place a buyer of its interests in any better position than NNL itself occupied or protect such a buyer from an infringement suit by NNI, NNL had nothing of value to sell in the United States.

E.     **The MRDA's Factual Matrix Confirms the Licensed Participants' Beneficial Ownership of NN Technology in Their Exclusive Territories**

1.     **Contracts Should Be Interpreted with Reference to the Factual Matrix**

79.     In addition to the plain language of the MRDA, courts should also look to the "factual matrix" or the circumstances surrounding the making and performance of the contract in order to "search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of the entry into the contract." *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co*., [1980] 1 S.C.R. 888 at para. 26; *see also Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 47 ("[A] decision-maker must read the contract as whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract."); *Unique Broadband Systems, Inc. (Re)*, 2014 ONCA 538 at para. 84 ("There is only one rule in modern interpretation, namely, courts are obliged to determine the meaning of that which is to be judicially interpreted in its total context, having regard to its purpose, the consequences of proposed interpretations, the presumptions and special rules of interpretation, as well as admissible external aids.  In other words, the courts must consider and take into account all relevant and admissible indicators of meaning." (quoting *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415, at pp. 439-40) (internal alterations omitted)); *Computershare v. Crystallex*, 2011 ONSC 5748 at para. 20 (Newbould, J.) ("The plain meaning of the words is to be given effect, read harmoniously and in the context of other provisions of the contract, and in light of the factual matrix as a whole."); *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at para. 67 ("[B]ecause words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case." (quoting *Hi-Tech Group Inc. v. Sears Canada*

*Inc.* (2001), 52 O.R. (3d) 97 (Can. Ont. C.A.))); *Jacobsen v. Bergman*, [2002] B.C.J. No. 323 at

paras. 3-4 (Can. B.C.C.A.); *Glaswegian Enterprises Ltd. v. B.C. Tel Mobility*, [1997] B.C.J. No.

2946 at paras. 18-20, 49 (Can. B.C.C.A.).[42]

80.     Consideration of the factual matrix is critical because the "meaning of words [in a

contract are] often derived from a number of contextual factors, including the purpose of the

agreement and the nature of the relationship created by the agreement," and thus whereas the

"meaning of words is a matter of dictionaries and grammars . . . the meaning of the document is

what the parties using those words against the relevant background would reasonably have

understood to mean." *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 48

(quoting *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All

E.R. 98 at 115 (H.L.).) Accordingly, "[t]he goal of examining such evidence is to deepen a

decision-maker's understanding of the mutual and objective intentions of the parties as expressed

in the words of the contract." *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para.

57.

81.     Under Ontario law, the factual matrix is to be considered in contract interpretation even if

the contract is unambiguous. *See Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53;

*Ventas, Inc. v. Sunrise Senior Living Real Estate Inv. Trust*, 2007 ONCA 205 at para. 24;

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at paras. 24-

25 (Can. Ont. C.A.); *Dumbrell v. Regional Group of Companies Inc.*, [2007] O.J. No. 298 at

para. 54 (Can. Ont. C.A.) ("A consideration of the context in which the written agreement was

made is an integral part of the interpretative process and is not something that is resorted to only

---

[42] *Accord In re Plassein*, 377 B.R. at 135 (in considering "the objective intent of the parties," which is "'a court's
paramount consideration' in construing a contract," a court may "consider not only the language in the contract but
also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which
they sought to accomplish").

where the words viewed in isolation suggest some ambiguity."); *3869130 Canada Inc. v I.C.B. Distribution Inc*. [2008] O.J. No. 1947, at para. 32 (Can. Ont. C.A.)).[43]

82.    The scope of the factual matrix "will vary from case to case," but will generally include any factors which assist the court in discerning the parties' intent, *Kentucky Fried Chicken Canada v. Scott's Food Services Inc*., [1998] O.J. No. 4368 at para. 26 (Can. Ont. C.A.), including the "genesis of the transaction, the background, the context, [and] the market in which the parties are operating." *Kentucky Fried Chicken Canada v. Scott's Food Services Inc*., [1998] O.J. No. 4368 at para. 25 (Can. Ont. C.A.); *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at paras. 67-69; *see also Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 58 (quoting *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 at 114 (H.L.).) (factual matrix evidence may not include the subjective intent of the parties, but subject to that restriction can include "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man"); *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co*., [1980] 1 S.C.R. 888 at para. 901; *Nexxtep Resources Ltd. v. Talisman Energy Inc.*, 2013 ABCA 40 at paras. 33-35; *B.C. Rail Partnership v. Standard Car Truck Co.*, 2009 NSSC 240 at para. 25; *Leuthold v. Canadian Broadcasting Corp.*, 2012 FC 748 at para. 71

---

[43] *Accord In re Plassein*, 377 B.R. at 135 (applying Delaware law); *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 & n.8 (3d Cir. 2013) (stating that federal common law is "consistent" with general rules of contract interpretation in New Jersey, where "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement," even where "the contract on its face is free from ambiguity"); *see also Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) ("[In determining whether a contract is ambiguous under federal common law], a court must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.  The objective, extrinsic evidence proffered may include, for example, 'the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'"); Restatement (Second) of Contracts § 223 cmt. b ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.").

(Can. F.C.) (evidence showed that it was "industry understanding" that a Canadian broadcast includes all time zones as part of "one broadcast").

83.     For instance, courts may consider other contracts that a party has entered into to determine the meaning and normal usage of terms used in the contract at issue in the case at hand.  *See Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at para. 24 (Can. Ont. C.A.); *Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC*, [2009] O.J. No. 761 at paras. 72-74 (Can. Ont. S.C.J.), aff'd  2009 ONCA 713; *Leuthold v. Canadian Broadcasting Corp.,* 2012 FC 748 at para. 89 (Can. F.C.) (court looked at CBC's normal usage of the words with other rights' holders to determine whether license for "one broadcast" included broadcast on sister network).

84.     The factual matrix may further include communications among counsel, communications with financial advisors, communications with tax authorities, or tax authority rulings that inform the meaning of a contract.  *See, e.g.*, *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at paras. 21-23, 83-88 (ruling that correspondence with the CRA regarding the potential adverse tax consequences of a proposed amendment to a contract, as well as a CRA advanced ruling on that subject, must be considered to discern the parties' intent).  Canadian courts will consider the source and nature of representations made in respect of patents in order to ascertain the identity of the beneficial owner of such patents.  *See C.I. Covington Fund Inc. v. White*, 2000 CarswellOnt 4680, 10 B.L.R. (3d) 173 (Can. Ont. S.C.J.) at para. 47; *see also Turbocristal Inc. v. Handfield*, [1991] 41 C.P.R. (3d) 540 (Can. Que. S.C.) at 551 (holding that even if the relevant agreements did not do so, "the attitude, the comportment, the facts and actions and writings which the defendant was aware of and approved, and which he signed" were

an "acknowledgement of the exclusivity of the rights granted to [the plaintiff] to use the patents

and even, in several cases, of the ownership of the intellectual part of the invention.").

85.     In addition, courts may consider expert testimony on industry custom and practice.

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at para. 24

(Can. Ont. C.A.) (Ontario law considers the "custom of the industry . . . as part of the factual

matrix that must be looked at in interpreting [an] agreement."); *Stetson Oil & Gas Ltd. v. Stifel*

*Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 61-62, 97, 101-07, 111-17 (Newbould, J.)

(considering evidence from securities partner at Goodmans LLP as to how a reasonable market

actor would interpret a standard contract clause); *Leuthold v. Canadian Broadcasting Corp.*,

2012 FC 748 at paras. 59, 61, 89-90 (Can. F.C.) (expert's knowledge of industry licensing

practices is relevant to interpretation of license governed by laws of Ontario); *Toronto-Dominion*

*Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Can. Ont. Ct. J., Gen. Div.

[Commercial List]) at para. 391 (relying on expert testimony providing "commercial context" of

comfort letters); *Georgia Construction Co. v. Pacific Great Eastern Railway Co.*, [1929] S.C.R.

630 at para. 8 (noting that a court may require expert evidence on the accepted industry customs

that underlie or enhance the terms of a contract in order to make a determination of the duties of

the parties to the agreement).[44]

86.     In considering the custom of the industry as part of the factual matrix, courts should

interpret a contract "so as to accord with sound commercial principles and good business sense,

and avoid commercial absurdity." *Downey v. Ecore International Inc.*, 2012 ONCA 480 at

---

[44] *Accord Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 178 (S.D.N.Y. 2008) (courts frequently rely on custom and practice experts to explain "complicated terms and concepts inherent" in their field); *Mylan*, 723 F.3d at 419 n.10 & 420 (describing custom and practice testimony as "particularly instructive when interpreting the meaning of disputed contractual language" and reversing the district court's refusal to consider expert testimony as to the custom and practice of the pharmaceutical industry to help interpret a license agreement); *GRT v. Marathon GTF Tech., Ltd.*, Civil Action No. 5571-CS, 2011 WL 2682898, at *10, 16 (Del. Ch. July 11, 2011) (considering "the commercial realities and business context facing the parties at the time the [agreement] was negotiated and consummated" to construe unambiguous contract language).

para. 38 (quoting *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673 at para. 16).

Commercial reasonableness is an integral part of the factual matrix. A court will not adopt an

interpretation that is commercially absurd.  *SimEx Inc v. IMAX Corp.*, [2005] O.J. No. 5389 at

para. 23 (Can. Ont. C.A.).

### 2.  The Factual Matrix Surrounding Transfer Pricing, Historical Business Practices and Custom of the Industry

87.    The determination that the MRDA grants the Licensed Participants all valuable rights to

and beneficial ownership in NN Technology in their respective territories is further confirmed by

(i) the purpose, rules, and representations underlying Nortel's transfer pricing agreements,

including the R&D CSAs and the MRDA; (ii) Nortel's pre-petition business practices; and (iii)

custom in the industry.

88.    As an initial matter, the MRDA was subject to continual amendment until December 31,

2008, *see* TR21003 (MRDA) at 59 (4th Addendum), such that the factual matrix throughout the

pre-petition period must be considered.

89.    Transfer Pricing:  Transfer pricing rules and regulations require that each entity in an

MNE "price its related party transactions as if the entity were at arm's length from its parent and

affiliated entities within the MNE."  *See* TR11412 (Eden Report) ¶ 26.  In the context of IP

transferred among different MNE affiliates, transfer pricing regulations emphasize *economic*

ownership – the ownership that arises from the actual functions, assets, and risks of each entity –

rather than the holding of legal title.  *See* Trial Tr. 2667:14-2669:1 (Cooper); 5042:9-5043:17

(Eden).

90.    For example, the OECD Guidelines state that each party to a CSA must be "entitled to

exploit its interest in the [CSA] separately as an effective owner thereof and not as a licensee."

TR40713 (1997 OECD Guidelines) ¶ 8.3; TR11391 (2010 OECD Guidelines) ¶ 8.3.  If a CSA

participant's "contribution entitles [that party] to obtain only a right to use intangible property

. . . and the [party] does not also obtain a beneficial interest in the intangible property itself," then

that contribution "would constitute a royalty for the use of intangible property." TR40713 (1997

OECD Guidelines) ¶ 8.23; TR11391 (2010 OECD Guidelines) ¶ 8.23. Likewise, CRA

Information Circular 87-2R expressly affirms these principles, providing that "each participant in

a [CSA] is not required to be a legal owner of [intangible] property, but each participant must

enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial

ownership)." TR50295 (IC 87-2R) ¶ 121.

91.    Nortel's transfer pricing agreements satisfied these principles:

- The final R&D CSAs, the cost-sharing agreements that preceded the MRDA, provided that each CSP other than NNL held an "Exclusive Royalty-Free License to NT Technology" in the geographic territory assigned to that CSP, while "legal title to all NT Technology whether now in existence or developed pursuant to the terms of [the] Cost Sharing Agreement[s]" was vested in NNL. TR21002 (1992 NNL-NNI R&D CSA) at 7-8 (Arts. 4, 5); TR31309 (1995 NNL NNUK R&D CSA) at 7 (Arts. 4, 5); TR46945 (2000 NNL-NNSA R&D CSA) at 8 (Arts. 4, 5).

- The third recital of the final R&D CSAs provided that the CSPs "wish[ed] to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities." TR21002 (1992 NNL-NNI R&D CSA) at 1 (Whereas Clauses); TR31309 (1995 NNL-NNUK R&D CSA) at 1 (Whereas Clauses); TR46945 (2000 NNL-NNSA R&D CSA) at 1 (Whereas Clauses).

- Article 7 of the final R&D CSAs provided that each licensed CSP held "the primary right and obligation to bring and defend in and for [its exclusive territory], at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties," with NNL having the right to enforce only if the licensed CSP failed to do so. TR21002 (1992 NNL-NNI R&D CSA) at 9-10 (Art. 7); TR31309 (1995 NNL-NNUK R&D CSA) at 9 (Art. 7); TR46945 (2000 NNL-NNSA R&D CSA) at 10 (Art. 7).

- Article 10 of the final R&D CSAs established that upon the expiration or termination of the agreement, each licensed CSP acquired "a fully paid up license" permitting it to continue to exercise its rights in its exclusive territory, without being subject to any further cost sharing payments to NNL. TR21002 (1992 NNL-NNI R&D CSA) at 10

(Art. 10); TR 31309 (1995 NNL-NNUK R&D CSA) at 10 (Art. 10); TR46945 (2000 NNL-NNSA R&D CSA) at 11 (Art. 10).[45]

- The Licensed Participants maintained their effective ownership of NN Technology under the MRDA. *See, e.g.*, *supra* Findings of Fact, Section III.C.1 (explaining how tax authorities would have required NNL to make "buy out" payments had the Licensed Participants' rights to Nortel technology been diminished during the transition from the 1992 R&D CSA to the MRDA).

92.     Furthermore, Nortel personnel represented to tax authorities that each Licensed

Participant enjoyed economic and beneficial ownership of Nortel IP in its exclusive territory

under the R&D CSAs and the MRDA. *See, e.g.*, *The Canada Trust Co. v. Russell Browne et al.*,

[2012] ONCA 862 at paras. 21-23, 83-88 (ruling that correspondence with the CRA regarding

the potential adverse tax consequences of a proposed amendment to a contract, as well as a CRA

advanced ruling on that subject, must be considered to discern the parties' intent).  For example:

- In March 2002, the Nortel Group reported to the IRS, CRA and Inland Revenue that from an economic standpoint dating back to the previous R&D CSA, each IE "could be considered to 'own' the [Nortel] technology as it related to its specific region." *See supra* Findings of Fact, Section III.B.4.

- This echoed the Nortel Group's previous representation to Inland Revenue that "although Nortel Canada has legal ownership of Nortel's Intellectual Property, each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation." *See supra* Findings of Fact, Section III.D.1.

- In July 2003, Nortel wrote in its Transfer Pricing Report that the parties to the R&D CSA each "contribute to the development of the intangible, and as such share in its ownership." *See* TR48969.03 (2003 Transfer Pricing Report) at 25.

- In 2003, in response to questions posed by the relevant taxing authorities, Nortel stated that all IEs were "owners of the intangible property." *See supra* Findings of Fact, Section III.D.1.

- In November 2004, in a response to an IRS Information and Document Request for Functional Analysis, Nortel explained that the IEs "have agreed to continue participating in the future benefits of new IP" under the RPSM because they were "responsible for ongoing entrepreneurship and risk-taking functions with respect to

---

[45] *See also* Trial Tr. 1165:17-22 (Henderson) ("[W]hen I read that language . . . what I understood it to mean is that when you have a fully paid up perpetual exclusive license, you're effectively the economic owner.  That's commonly understood in – certainly in transfer pricing and I think in general economics.").

the IP arising from their collective R&D efforts." *See supra* Findings of Fact, Section III.D.1.

- In 2008, in a joint request for a new APA to cover the years 2006-2011, NNL and NNI told the CRA and IRS that although IP was "registered" in NNL's name, "[e]ach IE maintain[ed] an economic ownership in the IP." *See supra* Findings of Fact, Section III.D.1.

93.    Moreover, no statement was ever made to a tax authority indicating that the IE's respective ownership rights in the Nortel Group's IP were limited in any way other than by the geographic scope of the Exclusive Licenses. *See supra* Findings of Fact, Section III.D.1.

94.    <u>Pre-Petition Business Practices</u>:  The Nortel Group's enforcement and sublicensing practices confirm the Licensed Participants' exclusive economic and beneficial ownership and rights.  For example:

- NNI exercised its enforcement rights with respect to Nortel IP by suing third parties for infringement of Nortel Group patents in the United States, even when NNI was not in the business of making anything similar to the third party's infringing products. *See supra* Findings of Fact, Section III.D.1.

- Nortel's legal department recognized that NNI, as the exclusive license holder in the United States, held substantially all rights to Nortel's US patents, and therefore had the right to bring such suits on its own. *See supra* Findings of Fact, Section III.D.1.

- In 2004, NNI pleaded in *NNI v. Vonage Holdings Corp.* that it was the "exclusive licensee" of all US patents legally owned by NNL and that it "possesse[d] substantially all rights" with respect to these patents, such that it "ha[d] standing to assert these patents against infringers."  NNL was aware of this pleading and never disputed NNI's position. *See supra* Findings of Fact, Section III.D.1.

- During the MRDA period, NNL entered into worldwide IP sublicenses "on behalf of itself and its Subsidiaries," because the Licensed Participants, not NNL, had the right to sublicense Nortel IP in their respective territories. *See supra* Findings of Fact, Section III.D.1.

- The Licensed Participants granted licenses to third parties that conveyed the right to use Nortel IP in the third parties' *own* businesses, with no requirement that such third parties engage in the manufacture, use or sale of products for Nortel and often permitted the third parties to use the IP for a business in which the Nortel Group did not operate. *See supra* Findings of Fact, Section III.D.1.

95.    <u>Custom of the Industry</u>:  This interpretation of the MRDA is further supported by

evidence on custom and practice.  Daniel Bereskin, an expert on the custom and practice in the

field of intellectual property, concluded that a sophisticated business person would understand

the MRDA as follows:

- The MRDA conveyed to the Licensed Participants (1) the right to use, make and have made "Products" embodying NN Technology, where "Products" is broadly defined; (2) the right to all Nortel patents (and other intellectual property including technical know-how); and (3) the right to sublicense the rights in (1) and (2) to a third party for its own use.  *See supra* Findings of Fact, Section III.D.1.

- These rights conveyed to the Licensed Participants are exclusive, perpetual, and royalty-free for each Licensed Participant in its Exclusive Territory and "essentially comprise all attributes of ownership deemed by custom and practice to be commercially important and valuable."  *See supra* Findings of Fact, Section III.D.1.

- Because Article 4(e) of the MRDA gives each Licensed Participant an unrestricted right to enforce NN Technology within its exclusive territory, the affirmative grant of license rights in Article 5 would be read to be coextensive and likewise unrestricted.  *See supra* Findings of Fact, Section III.D.1.

- The grant of such broad exclusive rights excludes NNL from directly or indirectly exploiting any of the rights in relation to the NN Technology in the geographical areas respectively assigned to the Licensed Participants.  *See supra* Findings of Fact, Section III.D.1.

- No rational buyer would have purchased the Patent Portfolio without the Licensed Participants first terminating or disavowing their interests in the Patent Portfolio.  *See supra* Findings of Fact, Section III.D.1.

**F.    Insofar as the Monitor Contends that the Licensed Participants' Exclusive Licenses Are Worthless, the Monitor's Position Is Subject to Estoppel by Convention**

96.    "Applied in the context of contractual meaning, estoppel by convention provides that if

the parties to a contract have based their dealings on a shared assumption as to the proper

interpretation of their contract and one party has relied upon that interpretation to its detriment,

the other party will not be allowed to resile from the common assumption and seek enforcement

of another meaning of the contract."  G. R. Hall, *Canadian Contractual Interpretation*, 2nd ed.

(Markham: LexisNexis Canada, 2012) at 172-173.  *See also Alberta Oil Sands Pipeline Ltd. v.*

*Canadian Oil Sands Ltd*, 2012 ABQB 524; *Adtronics Signs Ltd. v Sicon Group*, [2004] B.C.J.

No. 1885.

97.    Here, the parties clearly had a shared assumption about the proper interpretation of the

contract.  For example, and as detailed more fully in the post-trial brief and above in the

proposed findings of fact:

- Following the insolvency filings, the Estates jointly retained Lazard and Global IP, and the Estates, their advisors, and their creditor constituencies worked together to determine the best way to monetize their assets, including the Nortel patents and other NN Technology, in a way that would be in the best economic interests of each Estate's creditors.  *See supra* Findings of Fact, Sections IV.C.3-4.

- As part of the Patent Portfolio Sale, and consistent with the IFSA, each of the Licensed Participants terminated their Exclusive Licenses, and both the License Termination Agreements and Asset Sale Agreement specified that the Licensed Participants were Sellers who were entitled to an allocation of a portion of the sales proceeds as a result of those terminations.  *See supra* Findings of Fact, Sections IV.D.1-2.

- A lead lawyer for the Canadian Debtors testified before the Canadian House of Commons in 2009 that "while Nortel Canada owns those patents, licenses have been granted worldwide to the other Nortel entities . . . . Nortel Canada is not in a position to simply deal with this in complete disregard of the rest of the world . . . ."  *See supra* Findings of Fact, Section IV.F.

- Prior to May 2013, the Monitor filed 18 separate reports representing that NNL's legal title to NN Technology was encumbered by the Exclusive Licenses granted to the Licensed Participants; several of these reports were filed *after* the Business Line Sales were completed.  *See supra* Findings of Fact, Section IV.F.

- As the Monitor's witnesses acknowledged, prior to the Patent Portfolio Sale, the Monitor never informed either the US Debtors or the EMEA Debtors that Nortel's patents were not subject to licenses.  *See supra* Findings of Fact, Sections IV.C.7, IV.F.

98.    The Licensed Participants relied upon that understanding to their detriment in selling the

Patent Portfolio and terminating the licenses.  *See supra* Findings of Fact, Section IV.F.

99.    The application of the equitable doctrine of estoppel by convention is particularly appropriate given the Monitor's role in the CCAA proceedings.  The Monitor is required to account to the Court, act independently and treat all parties reasonably and fairly, including creditors and the debtor; and the Monitor must act and be seen to act without interest or bias, and should represent the facts to the Court in a dispassionate, non-adversarial manner.  *See Re Confederation Treasury Services Ltd.* (1995), 37 C.B.R. (3d) 237 (Can. Ont. Ct. J. (Gen. Div.), In Bank.) at para. 8, citing Lloyd W. Houlden and Carl H. Morawetz, *Houlden and Morawetz, Bankruptcy Law in Canada*, 3rd ed. (Toronto:  Carswell, 1995) at pp. 1-61/2 on the principles underlying the role of trustees, which principles are also applicable to Monitors; *Re T. Eaton Co.* (1999), 14 C.B.R. (4th) 298 (Can. Ont. S.C.J. [Commercial List]) at para. 2.

100.    Canadian courts have been critical of officers of the Court who stray from these principles.  *Touche Ross Ltd. v. Weldwood of Canada Sales Ltd.* (1983), 48 C.B.R. (N.S.) 83 (Can. Ont. Sup. Ct., In Bank.) at para. 9 (holding that the trustee "assumed an adversarial and even slightly hostile role from the witness stand which I considered to be dissonant having regard to the nature of his duties as an officer of the court").  Officers of the court are required to do the "fullest equity" and "will be ordered to do what the Court considers to be morally right and honest, even in a case in which no claim can be sustained against him in law or in equity." *Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of)* (1993), 23 C.B.R. (3d) 161 at para. 147 (Can. Ont. Bktcy.), aff'd (1997), 50 C.B.R. (3d) 79 (Can. Ont. C.A.); *Re Condon; Ex parte James* (1874), 9 Ch. App. 609, [1874-80] All E.R. Rep. 388 (C.A.); *Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd.* (1984), 51 C.B.R. (N.S.) 21 at para. 26 (Can. N.S.S.C., T.D.) citing Duncan and Honsberger, *Bankruptcy in Canada*, 3rd ed. (1961), at pp. 102-103).

III.   **THE MONITOR'S ARGUMENTS SEEKING TO LIMIT NNI'S EXCLUSIVE LICENSES ARE WITHOUT MERIT**

A.   **The Monitor's Construction of the MRDA Is Inconsistent with the Valuable Intellectual Property Rights that the Licensed Participants Held in Their Respective Territories**

101.   The Monitor denies the value of the Licensed Participants' exclusive license rights in Nortel's intellectual property.  Broadly speaking, the Monitor's three primary arguments can be characterized as the "Products" argument, the "non-transferability" argument and the "administrative rights" argument.  Each of these arguments is unpersuasive and fails for the reasons discussed below.

1.   **The "Products" Argument**

102.   The Monitor's first argument in favor of a narrow reading of the exclusive licenses is that the MRDA gave the Licensed Participants nothing more than the right to make or sell the precise products that Nortel was actually making or selling at the time it decided to sell its Business Lines.  *See* Monitor Pretrial Br. – Allocation ¶¶ 106-12.  The Monitor rests this argument on Article 5(a) of the MRDA, which grants each Licensed Participant the exclusive right in its respective territory to, among other things, "make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology."  TR21003 (MRDA) at 7 (Art. 5(a)).

103.   The Monitor's isolated construction of a single clause of Article 5(a), however, ignores the remainder of Article 5(a), and many other provisions of the MRDA which are inconsistent with or ineffective under the Monitor's reading.  Accordingly, the "Products" argument must be rejected.  *See, e.g.*, *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* 2007 ONCA 205 at para. 24 (contractual interpretation must give meaning to all terms of a contract and avoid an interpretation that would render one or more of its terms ineffective); *accord In re Plassein*, 377 B.R. at 133-34.

       **a.**    **The Monitor's Products Argument Disregards the Entirety of Article 5(a)**

104.    The Monitor's proffered construction seeks to have this Court write the word "including" out of Article 5(a).  As stated above in Section II.C.1, the word "including" acts not to limit, but to extend or enlarge the kinds of rights that would ordinarily be included in an exclusive, royalty-free license.  The plain language of the MRDA states that the exclusive licenses are not limited to actual products or services, or those proposed at any time.  Rather, rights concerning such products are "included" among the exclusive license rights.

105.    Furthermore, the final clause of Article 5(a) states that the Exclusive Licenses include "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."  TR21003 (MRDA) at 7 (Art. 5(a)).  By its plain language, the rights granted in this final clause are not limited to "Products."

106.    While the Monitor contends that the words "in connection therewith" incorporate the "Products" limitation into the entire final clause, Monitor Pretrial Br. – Allocation ¶ 109, the plain meaning of this limitation is that it modifies only the words "technical know-how" that directly precede it, *see* Post-Trial Br., Section II.B.3.

107.    The Monitor's interpretation would impermissibly render the final clause of Article 5(a) meaningless.  The clause "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology" already includes "patents, industrial designs [and] technical know-how," all of which are expressly part of the definition of NN Technology.  TR21003 (MRDA) at 3 (Art. 1(f)).  Thus, for the final clause to have any meaning, its scope must be greater than the right to make or sell Products set forth in the prior clause.

108.    Moreover, Article 5(a) provides that the Licensed Participants have yet another broad

right: the "right to sublicense" NN Technology "in perpetuity." *Id.* at 6-7 (Art. 5(a)).

### b.    The Monitor's Products Argument Disregards the Definition of "Products"

109.    The word "Products" – central to the clause upon which the Monitor relies – is broadly

defined in a manner that squarely contradicts the Monitor's proffered temporal limitation.

110.    "Products" is defined as "all products, software and services designed, developed,

manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at

any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features,

software associated with or incorporated in any of the foregoing, and all improvements,

upgrades, updates, enhancements or other derivatives associated with or incorporated in any of

the foregoing." *Id.* at 4 (Art. 1(g)).

111.    Notably, the definition of "Products" includes not only products made or sold by Nortel

at the time it decided to sell the business lines, but also (i) all products or services "proposed to

be designed, developed, manufactured or marketed" (ii) "at any time." *Id.*

112.    This is consistent with the "perpetual" nature of the Exclusive Licenses generally and

confirms that the value of NNI's rights to practice NN Technology was not "limited to Nortel's

ongoing operations," as the Monitor wrongly contends. *See, e.g.*, Monitor Pretrial Br. ¶ 101.

### c.    The Monitor's Products Argument Conflicts with Numerous Other Provisions of the MRDA

113.    As discussed above in Sections II.C.3-5, many other provisions of the MRDA are

irreconcilable with the Monitor's assertion that the Licensed Participants had no rights to NN

Technology other than to make or sell existing Nortel products.  These include Article 4(e) (the

"right to assert actions and recover damages"), Article 6 (permitting disclosure with respect to

NN Technology to suppliers, customers and third persons) and Article 7 (indemnifying NNL from claims and liabilities).

> *d.* **The Monitor's Products Argument Is Inconsistent with the Expressed, Objective Intent of the Parties**

114.    Further, the Monitor's argument is inconsistent with the expressed intent of the parties as to the scope of the Licensed Participants' rights.  For example, as discussed above, the recitals to the MRDA provide that "it is the intent of NNL and the Licensed Participants that the Licensed Participants continue . . . to hold and enjoy" "equitable and beneficial ownership of certain exclusive rights under [NN] Technology" for their exclusive territories.  *See supra* Section II.C.4; TR21003 (MRDA) at 2 (second recital).  Similarly, the MOU – which was drafted "to provide a record of" the Participants' "understandings" with respect to the MRDA and related agreements – states that the Licensed Participants enjoyed "ownership" of NN Technology.  *See supra* Section II.C.4; TR48944 (MOU) at 1-2.[46]

115.    The parties' representations to tax authorities, as discussed above in Section II.E.2, similarly confirm that the parties intended the Licensed Participants to hold greater rights than the Monitor now claims.  For instance, the 2009 Transfer Pricing report states that "NNL and other integrated entities ('IEs') are the primary owners of intangibles developed by the Nortel Group," and that each of NNI, NNUK, NNSA, NN Ireland and NNL have "Intellectual Property Ownership" in their respective jurisdictions.  *See supra* Findings of Fact, Section III.D.1; TR48622.02 (2009 NNL Transfer Pricing Report) at 1, 39.

---

[46] The Monitor relies on Article 13 to suggest that NNI could not have had equitable and beneficial ownership because that is only possible in a fiduciary relationship, which Article 13 waives.  Trial Tr. 425:2-24 (Monitor's Opening Statement).  However, there are examples in law where legal title is separated from equitable and beneficial ownership without a fiduciary relationship, a legal mortgage being just one example.  *See, e.g.*, J. Falconbridge & W. Traub, *Falconbridge on mortgages*, 5th ed., looseleaf (Aurora: Canada Law Book, 2003) at para. 22:10; *Canada Business Corporations Act*, R.S.C. 1985 c. C-44, s. 2(1): "'beneficial ownership' includes ownership through any trustee, legal representative, agent or mandatary, or other intermediary"; *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] AC 669 at 707: ("[e]ven in cases where the whole beneficial interest is vested in B and bare legal interest is in A, A is not necessarily a trustee").

116.    These and other examples of the parties' intent are inconsistent with the Monitor's

current position that the Licensed Participants had no rights to NN Technology other than to

make or sell existing Nortel products.

### 2.    The "Non-Transferability" Argument

117.    The Monitor's second argument is that NNL's rights under the MRDA were greater than

those of the Licensed Participants because the exclusive licenses were non-transferable while

NNL's rights were transferable.  The Monitor relies on Article 14(a) for this argument.  Trial Tr.

449:7-17 (Monitor's Opening Statement).  This argument is untenable.

118.    Article 14(a) provides that "[t]his Agreement shall not be assigned by any Participant

except with the written consent of each of the other Participants."  *See* TR21003 (MRDA) at 12

(Art. 14(a)).  The plain language thus exposes two fundamental flaws in the Monitor's position.

119.    First, contrary to the Monitor's assertions and the critical assumptions of its experts, *see*

Trial Tr. 3211:21-3214:18 (Green); Green Dep. 23:16-24:7, Article 14(a) does not prohibit

assignment but rather its plain language permits assignment "with the written consent of each of

the other Participants," *see* TR21003 (MRDA) at 12 (Art. 14(a)).  The Business Sales and Patent

Portfolio Sale all occurred with the unanimous consent of the Participants and thus were

expressly permitted by Article 14(a).

120.    Second, any prohibition on assignment applied to all "Participants" – including NNL –

rather than only "Licensed Participants."  NNL had no greater rights of assignment than any

other Participant and thus to the extent Article 14(a) impacted the value of the assets sold in the

Business Sales and the Patent Portfolio Sale, all Participants were equally affected.  *See, e.g.,*

*American Cyanamid Co. v. Novopharm Ltd.*, [1972] F.C. 739 at para. 21 (Can. F.C.A.) (holding

that an exclusive licensee has "an exclusive right in the property (carved out of the patentee's full

ownership rights)").

199

121.    In addition, as discussed above, each Licensed Participant's right to grant sublicenses in its respective territory to other parties gave the Licensed Participant the right and ability to extend its exclusive license to NN Technology to other parties, regardless of any assignment restrictions.

### 3.    The "Administrative Rights" Argument

122.    During the trial, the Monitor asserted that Articles 4(b), (c) and (d) of the MRDA – which vested NNL with certain administrative powers, such as to file and prosecute patent applications – supported its position that the exclusive licenses were of limited value.  These provisions, part of NNL's agreement in Article 3(d) to "administer" the MRDA, *see* TR21003 (MRDA) at 5 (Art. 3(d)), do not diminish the equitable and beneficial ownership of the Licensed Participants or the rights that they held under their exclusive licenses.

123.    Article 4(b) – which the Monitor has argued bolsters NNL's "ownership" claim, *see* Trial Tr. 418:20-419:2 – requires each Licensed Participant to "execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing," *i.e.*, the vesting of legal title in NNL and grant of Exclusive Licenses to the Licensed Participants, *see* TR21003 (MRDA) at 6 (Arts. 4(a), (b)).  But these are not substantive rights; they are administrative obligations in furtherance of "the foregoing."

124.    Article 4(c) – upon which the Monitor also relies, *see* Trial Tr. 418:20-419:2 – provides that each Licensed Participant shall "promptly upon receipt of NNL request [*sic*] and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant," *see* TR21003 (MRDA) at 6 (Art. 4(c)).  This provision plainly does not convey substantive rights, or detract from the Licensed Participants' interests.  Indeed, NNL had virtually identical obligations to the Licensed Participants in Article 5(b) of the MRDA, which mandated that "NNL shall . . . promptly upon

200

receipt of a Licensed Participant's request, and at such Licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology." *Id.* at 7 (Art. 5(b)).

125.    Finally, the Monitor invokes Article 4(d), which provides NNL "the exclusive right but not the obligation to file and prosecute" patent applications. *See id.* at 6 (Art. 4(d)); *see also* Trial Tr. 419:3-14 (Monitor's Opening Statement) (counsel for the Monitor arguing that Article 4 provides NNL "a critical right, the only right to obtain the patent without any obligation to anyone else to do so which is consistent with ownership and not with the holding of title on behalf of someone else").

126.    This has nothing to do with substantive rights.  Instead, it is nothing more than an administrative right.  There is no dispute among the parties that NNL held legal title and was charged with administrative responsibilities.  But the structure of the MRDA – and, indeed, Nortel's corporate structure – aligned the parties' interests and incentivized NNL to perform all appropriate acts that would serve to benefit NNI.  Not only did NNL benefit under the RPSM from its right to share in NNI's profits (or have NNI share NNL's losses), but as the owner of 100% of the equity of NNI, it was in NNL's interest to seek to maximize value for NNI.

127.    In any event, the evidence established that the Licensed Participants shared these responsibilities, including the decisions as to which potential patents to pursue and where to file them.  *See supra* Findings of Fact, Section II.D.2.

128.    Article 4(d) is also irrelevant to the present action insofar as every patent and application conveyed in the Business Sales or Patent Portfolio Sale had already been filed.

129.    Finally, with respect to culling of patents, the responsibility for making such decisions was held by the Patent Practice Group along with the business unit teams, which was comprised

of employees from around the world.  Trial Tr. 2185-87; 2192:3-2193:8 (Anderson).  Further,

NNL could not have culled patents to the detriment of NNI, as the MRDA – like every contract –

contained an implied covenant of good faith and fair dealing that would have prevented NNL

from frustrating NNI's purpose in entering into such licensing agreement.  To the extent that the

culling of patents constituted the exercise of discretionary powers by NNL, this activity is

subject to an implied duty of good faith under Canadian law.  *See Greenberg v. Meffert*, [1985]

O.J. No. 2539 at para. 26 (Can. Ont. C.A.) (Discretion must be "exercised honestly and in good

faith.  That proposition is so fundamental as to require no elaboration."); *Imperial Oil Ltd. v.

Young*, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280) at para. 161 (Can. Nfld. C.A.) (holding

that "even where the language of an agreement appears to give an unfettered discretion to one

party to act with reference solely to his or her own interests, such a discretion may be

circumscribed by obligations of good faith once the language is construed in the context of the

relationship of the parties"); *accord Bentley Sys., Inc. v. Intergraph Corp.*, No. CIV. A. 98-3489,

1998 WL 800344, at *6 (E.D. Pa. Nov. 16, 1998) ("[U]nder Delaware law, the implied covenant

of good faith and fair dealing exists in every contract.  The purpose of this implied covenant is to

protect the reasonable expectations of parties to a contract." (internal citation omitted));

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 283 (3d Cir. 2010) ("Under Delaware law, a

party breaches the implied covenant of good faith and fair dealing by engaging in 'arbitrary or

unreasonable conduct which has the effect of preventing the other party to the contract from

receiving the fruits of the bargain,' or by 'frustrat[ing] the overarching purpose of the contract by

taking advantage of [its] position to control implementation of the agreement's terms.'" (quoting

*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

IV.     **THERE IS NO BASIS FOR THE COURT TO APPLY THE "PRO RATA" DISTRIBUTION THEORY**

130.    The UKPC and CCC request an allocation of the sale proceeds in a manner that would result in equal, pro rata recoveries for all of Nortel's creditors, regardless of the entity against which they hold their claims, which they term a "pro rata distribution."  *See* TR40851 (UKPC Allocation Position) ¶ 3; TR21511 (CCC Allocation Position) ¶ 5(b).

131.    The Court lacks jurisdiction to grant this remedy.  It is also not an appropriate basis for allocation because it is contrary to applicable law, is not practical to administer and could unduly delay distributions to the creditors of Nortel's various affiliates.

A.     **Distribution to Creditors Is Not Before the Courts in This Proceeding**

132.    The Allocation Protocol entered by the Courts established "binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors."  TR50102 (Allocation Protocol) ¶ 1.  The Allocation Protocol is consistent with the IFSA, which contemplates that each selling debtor relinquished its rights "in consideration of a right to an allocation" from the proceeds of the asset sales.  *See* TR12032 (IFSA) § 11(a).

133.    The debtors' goal throughout has been to "allocate [the] assets among numerous entities in many countries and then distribute the assets" to creditors.  *In re Nortel Networks Corp.*, 426 B.R. 84, 93 (Bankr. D. Del. 2010).

134.    The ultimate distributions to be made to the creditors of a particular debtor is a matter strictly within the purview of the Court in which the debtor's case is pending to be made in accordance with its insolvency regime.  The US Court has jurisdiction to resolve claims and approve a Chapter 11 plan in the US Debtors' Chapter 11 cases.  28 U.S.C. § 157(b).  The Canadian Court similarly has jurisdiction to resolve claims against the Canadian Debtors under the CCAA, R.S.C. 1985, c. C-36.  The EMEA Debtors are subject to separate UK administration

proceedings overseen by the High Court of Justice of England and Wales, which has jurisdiction

to resolve claims as against those Debtors pursuant to the Insolvency Act 1986.  The Allocation

Protocol did not grant the Courts joint jurisdiction over claims matters for the various Estates

and, to the contrary, generally excluded claims matters from the scope of the allocation litigation.

*See generally* Amendment and Supplement to the Joint Trial Protocol, Notice of Filing of

Proposed Amendment and Supplement to the Joint Trial Protocol, Ex. A, Mar. 10, 2014, D.I.

13132.

### B.    There Is No Legal or Factual Basis for the Pro Rata Distribution Model

135.    The pro rata distribution theory is not legally or factually supportable as a basis for

allocation.  Allocation must be based on the relative fair market value of the assets each debtor

transferred or relinquished.  In a bankruptcy, each debtor's assets are marshaled for the benefit of

its own creditors and stakeholders, to be distributed in accordance with the applicable legal

priorities for payment of such parties.  *See, e.g.*, 11 U.S.C. §§ 541, 1129.  While a debtor may

sell its assets in a bankruptcy, such sales typically are done through a public auction process in

order to obtain the highest and best price for such assets.  *See id.* § 363; *see also In re Delaware*

*& Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (in determining whether there is a sound

business purpose for an asset sale, a court may consider "the amount of proceeds to be obtained

from the sale versus appraised values of the property"); *In re Filene's Basement, LLC*, No.

11013511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (the sale price must

be "fair and reasonable" (internal quotations omitted)).

136.    Consistent with the foregoing, in approving the Sales of the Business Lines and the

Patent Portfolio, the US Court found that NNI's sale of those assets was in the "best interests" of

NNI and its creditors, as NNI secured the highest bid for the sale of its assets.  *See* TR50196

(Order Approving Sale) at 9-10; *see also* TR21509 (Tr. of July 11, 2011 Hr'g) at 110:5-24.

137.    The pro rata distribution theory does not even attempt to allocate to each Selling Debtor the fair market value of the assets it sold or relinquished in the Sales and instead renders as irrelevant the identity of which seller owned each of the assets transferred or relinquished in the sales.  As the CCC's own expert acknowledged, the fair market value of the US Debtors' assets is more than $1 billion, but application of the pro rata approach would allocate only $182 million to the US Debtors, and would do so irrespective of the nature of or amount of assets actually determined to have been sold by the US Debtors.  *See* Britven Dep. 274:10-23.  Because the pro rata distribution model would deprive NNI of the fair market value of the assets it sold or relinquished, it would also violate the absolute priority rule insofar as NNL – NNI's equityholder – would recover before NNI's own creditors from the proceeds generated by the sale of NNI's property interests.  For these reasons alone, the theory must be rejected.

138.    The pro rata distribution model effectively seeks unprecedented global "substantive consolidation" of the Canadian Debtors, the EMEA Debtors and the US Debtors without legal basis.  Substantive consolidation is an extraordinary equitable remedy of "last resort," not to be employed merely for administrative convenience.  *Credit Suisse First Boston v. Owens Corning (In re Owens Corning)*, 419 F.3d 195, 211 (3d Cir. 2005); *cf. In re Bippert,* 311 B.R. 456, 464 (Bankr. W.D. Tex. 2004) (Clark, J.) (substantive consolidation should be invoked "sparingly" and the burden on the moving party is "exacting" (internal quotations omitted)); *Northland Properties Ltd., Re.*, [1988] 69 C.B.R. (N.S.) 266 at paras. 58-59 (Can. B.C. S.C.) citing *Re Snider Bros.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982) (noting that "[i]t must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors . . . A review of the case law reveals that equity has provided the remedy of consolidation in those instances where it has been shown that the possibility of economic

prejudice which would result from continued corporate separateness outweighed the minimal prejudice that consolidation would cause.").

139.    No precedent exists in either the United States or Canada for the nonconsensual consolidation of debtor estates across legal jurisdictions.  Moreover, no rule exists in either the United States or Canada or under international law for the presumptive use of a common pool distribution for multinational enterprises.  Westbrook Dep. 170:22-171:23; *see also id.* 37:7-38:4, 72:22-73:2; Clark Dep. 109:23-110:10, 112:3-113:9.

140.    Even if such remedy theoretically were available, the legal tests for substantive consolidation under US or Canadian law have not been met.

141.    Under US law, a proponent of substantive consolidation must show that either "[1] prepetition [the debtors] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or [2] postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d at 211.

142.    In assessing whether this extraordinary remedy should be applied, courts take account of the following principles: (1) the "general expectation" is that "courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play"; (2) the "harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness"; (3) "[m]ere benefit to the administration of the case . . . is hardly a harm calling substantive consolidation into play"; (4) the "rough justice" remedy of substantive consolidation "should be rare and, in any event, one of last resort after considering and rejecting other remedies"; and (5) substantive consolidation "may not be used offensively (for example, having a primary purpose to

disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." *Id.* at 211.

143.    These stringent standards must be satisfied even where a substantive consolidation plan preserves inter-estate liabilities (which is not typically the case) or is achieved by a compromise settlement, because the aggregation of claims and assets under such a plan still creates "increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually." *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591-92 (D. Del. 2009) (holding that even where the plan does not present a "typical substantive consolidation scenario," the standards of *Owens Corning* must be met to combat the "aggregation's potentially deleterious effects on creditors").

144.    Similarly, under Canadian law, the propriety of ordering substantive consolidation is determined by a balancing of interests and an analysis of whether creditors will suffer greater prejudice in the absence of consolidation than the debtors (and any objecting creditors) will suffer from its imposition. *Northland Properties Ltd., Re*., [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C. S.C.) citing *Re Baker and Getty Fin. Services Inc*., 78 B.R. 139 (Ohio Bankruptcy Court, 1987).  This is accomplished with reference to the following seven factors:  (1) difficulty in segregating assets; (2) presence of consolidated financial statements; (3) profitability of consolidation at a single location; (4) commingling of assets and business functions; (5) unity of interests in ownership; (6) existence of intercorporate loan guarantees; and (7) transfer of assets without observance of corporate formalities. *Northland Properties Ltd., Re*., [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C.S.C.) citing *In re Vecco Constr. Indus., Inc*., 4 B.R. 407, 410 (Bankr. E.D. Va. 1980).  Furthermore, the party seeking such a remedy would have to

demonstrate the "intertwined" nature of the subject entities.  *See PSINet Ltd., Re.*, [2002] O.J. 1156 at para. 2 (Can. Ont. S.C.J. [Commercial List]) (sanctioning a plan of arrangement that consolidated Canadian applicants where the applicants essentially operated as a single unit and only one applicant had employees).

145.    As detailed above and in the proposed findings of fact, the record of Nortel's operations does not satisfy the legal and factual requirements for substantive consolidation.  While Nortel operated as a highly integrated multinational enterprise, the evidence establishes that the Nortel affiliates respected corporate formalities and did not commingle their distinct assets or liabilities post-petition.  *See supra* Findings of Fact, Sections II.B.1-3.

146.    Additionally, the evidence demonstrates that creditors were aware of and relied upon the separate corporate and legal identities of each Nortel entity.  *See supra* Findings of Fact, Sections II.B.3-4.

147.    Given that Nortel respected and maintained corporate separateness among its distinct legal entities both before and during its insolvency, substantive consolidation cannot be applied in this case.

### C.    Pro Rata Distribution Would Prejudice Creditors Who Relied Upon Nortel's Corporate Separateness

148.    Furthermore, the UKPC's and CCC's pro rata distribution theory is not legally or equitably supportable in this case because it would result in substantial prejudice to creditors who have bargained for separate contractual rights.  *See supra* Findings of Fact, Sections II.B.3-4.

149.    Pro rata distribution would result in the sale proceeds being made available for distribution to all debtor entities regardless of whether a debtor sold assets in a particular sale,

with the practical effect of moving cash from one Estate to another to the detriment of creditors.

Trial Tr. 3054:13-3055:22; 3074:25-3076:1 (Bazelon); TR00041 (DEM00014) at 5.

150.     Implementation of a pro rata distribution would further prejudice creditors by unwinding

the effect of Court-approved settlements and intercompany claims.  Trial Tr. 3039:3-3044:21;

3055:3-3057:11; 3072:1-3073:20 (Bazelon); TR00041 (DEM00014) at 4.

151.     This would result in unequal treatment of similarly situated creditor and debtor groups in

that creditor groups would be entitled to keep the proceeds from any previously court-approved

settlements (these proceeds would come "out of the system"), whereas settlement proceeds

directed toward debtor groups would remain part of the worldwide assets subject to

redistribution among the Estates on a pro rata basis.  Trial Tr. 3039:3-3044:21 (Bazelon).

     **D.**     **Implementation of the Pro Rata Distribution Model Would Be Akin to an Impermissible *Sub Rosa* Plan**

152.     Further, an allocation based on predicted creditor recoveries in each Estate, even if

limited to the allocation of sale proceeds, is impermissible as it would constitute a *sub rosa* plan.

153.     US courts have refused to approve transactions that "short circuit the requirements of

Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub*

*rosa*." *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700

F.2d 935, 940 (5th Cir. 1983).

154.     If a settlement or transaction effectively mandates the terms of a plan, that agreement

must meet the requirements of plan confirmation under Bankruptcy Code section 1129.  *Official*

*Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power*

*Coop., Inc.),* 119 F.3d 349, 354 (5th Cir. 1997) (the requirements for confirmation of a

reorganization plan cannot be short-circuited by establishing the terms of a plan in connection

with a sale of assets) (quoting *In re Braniff Airways*, 700 F.2d at 940); *see also* 11 U.S.C. §
1129(a)(8).

155.    Among the factors US Courts have looked to are whether the transaction (1) ''dictate[s]
the priority scheme'' or the ''timing and amount of money paid to creditors,'' (2) restricts
creditors' right to vote or (3) requires creditors to release all claims against a debtor.  *In re Shubh
Hotels Pittsburgh, LLC*, 439 B.R. 637, 645 (Bankr. W.D. Pa. 2010); *In re Capmark Fin. Grp.
Inc.*, 438 B.R. 471, 513-14 (Bankr. D. Del. 2010).

156.    The operative question is whether the ''proposed transaction might improperly and
indirectly lock the estate into any particular plan mode prematurely, and without the protection
afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a
plan of reorganization.''  *In re Pub. Serv. Co. of N.H.*, 90 B.R. 575, 581 (Bankr. D.N.H. 1988).

157.    Under these standards, a transaction amounts to a *sub rosa* plan "if [it] seeks to allocate
or dictate the distribution of . . . proceeds among different classes of creditors."  *In re Gen.
Motors Corp.*, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009) (finding that a sale was not a *sub rosa*
plan where the sale did not dictate the terms of a plan or restructure creditors' rights, but merely
created certain obligations for the purchaser).

158.    Similarly, under Canadian law, an agreement or transaction which deprives creditors of
their rights, including rights to sue for and enforce judgments, must meet the voting and other
requirements of a plan of arrangement or compromise under the CCAA.  *See Crystallex
International Corp. (Re)*, 2012 ONSC 2125 at para. 50 (Newbould, J.), aff'd 2012 ONCA 404;
*see also* CCAA, R.S.C. 1985, c. C-36, § 6(1).

159.    The pro rata theory aims to achieve equal recoveries for all unsecured creditors regardless
of the legal entity against which their claims were filed and to nullify certain guarantee and

intercompany claims. The pro rata theory would necessarily compromise creditors' rights without the legal and procedural protections provided by the Bankruptcy Code and the CCAA. Accordingly, such a theory cannot be used as a basis for the allocation of sales proceeds. 11 U.S.C. §§ 1125, 1129(a)(8); CCAA, R.S.C. 1985, c. C-36, § 6(1).

160.    While the UKPC and CCC suggest that after each Estate is given an allocation sufficient to enable a pro rata distribution, it can be free to choose how to distribute those funds, this suggestion is inconsistent with the expressed rationale of a pro rata allocation. If the Estates do not distribute their assets pro rata among creditors, there is no justification for allocating the sale proceeds for the purpose of achieving a pro rata distribution. The ultimate effect is just asset-shifting between Estates.

### E.    The Courts' Equitable Powers Do Not Provide an Avenue for Implementation of the Pro Rata Distribution Model

161.    The UKPC and CCC suggest that the US Court would be "justified" to rely upon its equitable powers under section 105 of the Bankruptcy Code to implement the pro rata distribution theory. UKPC Mem. Opposing Mot. to Strike Expert Reports ¶¶ 66, 69, Apr. 28, 2014, D.I. 13418; CCC Mem. Opposing Mot. to Strike Expert Reports at 8-9, Apr. 28, 2014, D.I. 13411.

162.    However, section 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), does not provide an avenue for the US Court to implement the pro rata distribution theory.

163.    The US Court's equitable powers under section 105(a) "can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 134 S.Ct. 1188, 1194 (2014) (internal quotations omitted). Indeed, "[i]t is hornbook law that § 105(a) does not allow the bankruptcy

court to override explicit mandates of other sections of the Bankruptcy Code." *Id.* (internal quotations omitted).

164.    "The fact that a bankruptcy proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his or her personal views of justice and fairness, however enlightened those views may be." *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (internal quotations and alterations omitted).

165.     "'[B]ecause of their very potency, inherent powers must be exercised with restraint and discretion.'" *Solow v. Kalikow*, 602 F.3d 82, 97 (2d Cir. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).  Section 105 of the Bankruptcy Code "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Smart World Tech., LLC*, 423 F.3d 166, 184 (2d Cir. 2005).

166.    At the core of the Bankruptcy Code are many provisions that safeguard the interests of creditors through informed voting rights and the plan of reorganization process. *See, e.g.*, 11 U.S.C. §§ 1125, 1129(a)(8).

167.    The pro rata distribution theory would have the US Court dictate, in a proceeding to address the allocation of sale proceeds to debtor entities, ultimate recoveries to US creditors entirely outside of the plan voting and solicitation process.

168.    Such a result would be tantamount to using section 105(a) to eviscerate the very protections that the Bankruptcy Code affords to creditors.

169.    The Canadian Court is similarly precluded from using its equitable powers to determine allocation in accordance with the UKPC's and CCC's views of equity.  Under Canadian law, CCAA courts must first rely on the authority provided by the terms of the CCAA itself, rather

212

than attempting to resort to equitable or inherent jurisdiction. *Century Services Ltd.*, *Re*, 2010 SCC 60 ¶¶ 64-65. Furthermore, the Canadian Court's residual inherent authority "does not operate where Parliament or the Legislature has acted," and therefore "if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play." *Stelco Inc.*, *Re* (2005), 75 O.R. (3d) 5 (C.A.) ¶ 35; *see also Skeena Cellulose Inc.*, *Re*, 2003 BCCA 344 ¶¶ 45-47.

170.    While there may be policy reasons to protect certain rights or claims in an insolvency, "it is for Parliament, not the courts, to do so." *Ivaco Inc.*, *Re* (2006), 83 O.R. (3d) 108 (C.A.) ¶ 75. In any event, Canadian law does not treat different creditors differently solely on the basis of their identities. *Id.*

### F.    The Pro Rata Distribution Theory Is Unadministrable in This Case

171.    Aside from the fact that it is legally unsupportable, a pro rata distribution cannot be practically implemented in this case.

172.    A pro rata distribution could not possibly be implemented until the unknown point in time at which the claims process has been finally concluded in each of 23 Estates, any remaining assets in those Estates have been liquidated, and all priority and administrative expenses in every Estate have been finally determined and satisfied in cash. *See* Trial Tr. 3035:1-19; 3036:18-3039:2; 3045:1-3047:21; 3069:3-3071:13; 3073:21-3074:24 (Bazelon); TR50310 (10th Report of the Monitor) at 9; TR00041 (DEM00014) at 1, 4, 5.

173.    Further, the UKPC's expert Mr. Bazelon admitted that as part of the pro rata approach, he advocates that intercompany claims and guarantee claims be disregarded, even if already allowed by the Courts. *See* Trial Tr. 2953:14-2955:7; 3054:7-12; 3058:15-18; 3076:2-3078:17 (Bazelon). The Court has no legal authority to do that.

174.    The CCC's expert Mr. Britven failed to offer an opinion on how a pro rata distribution could be implemented, providing nothing more than an "illustrative" calculation of what pro rata recoveries would be if intercompany and guarantee claims were ignored, his methodology were adopted and all the assumptions he was provided by counsel regarding claims turned out to be true.  TR00045 (Britven Report) at Sched. 6; Trial Tr. 3481:8-3483:7; 3397:12-25 (Britven); DEM00016 (Britven Demonstratives) at 26, 35.

175.    The report of the UKPC's experts Messrs. Clark & Westbrook, too, is silent regarding the mechanics of actually implementing a pro rata distribution theory.  Westbrook Dep. 216:21-25; Clark Dep. 50:13-52:16; 66:8-16.  Although Clark testified at trial regarding a potential "synthetic distribution mechanism," this was neither set forth in his report nor discussed with the co-author of his report, Westbrook.  Therefore, Clark's testimony concerning the "synthetic distribution mechanism" is not entitled to any evidentiary weight.  *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 289 F. Supp. 2d 493, 499-500 (D. Del. 2003) (excluding expert testimony not contained in expert report); *Johnson v. Vanguard Mfg., Inc.*, 34 F. App'x 858, 859 (3d Cir. 2002) (same); *Marchand (Litig. Guardian of) v. Pub. Gen. Hosp. Soc'y of Chatham*, [2000] O.J. No. 4428 (ONCA), ¶ 38 (expert's report "must set out the expert's opinion, and the basis for that opinion"); *see also* Fed. R. Civ. P. 26(a)(2)(B).

176.    In summary, the UKPC and the CCC have failed to demonstrate any evidence of a practicable method for implementing a pro rata approach, and indeed, there is none.

## CONCLUSION

177.    For the foregoing reasons, allocation must be based on the relative fair market value of the assets that each debtor transferred or relinquished in the Business Line and Patent Portfolio asset sales.

178.    With respect to the Business Line Sales, Kinrich's use of a revenue multiple income approach to value each selling debtor's contribution to the sales is most appropriate, particularly given that here the business was routinely suffering losses or had erratic earnings year to year.

179.    Based on Kinrich's calculation, the proceeds of the Business Line Sales should be allocated 11.9% to the Canadian Debtors, 18.0% to the EMEA Debtors and 70.0% to the US Debtors.

180.    With respect to the Patent Portfolio sold to Rockstar, Kinrich's use of a discounted cash flow ("DCF") methodology is most appropriate to value the assets relinquished by each selling debtor.

181.    Based on Kinrich's calculation, the proceeds of the Patent Portfolio Sale should be allocated 9.7% to the Canadian Debtors, 16.0% to the EMEA Debtors and 74.3% to the US Debtors.

182.    The "contribution" valuation methodology put forth by the EMEA Debtors is rejected. Among other infirmities, it does not allocate based on the fair market value of each selling debtor's rights and assets sold or relinquished in the Sales.

183.    The methodologies proposed by the Canadian Debtors are likewise rejected.  Among other infirmities, they are based on neither the parties' interests under the MRDA nor the fair market value of each selling debtor's right and assets sold or relinquished in the Sales.

184.    The "pro rata" distribution theory put forth by the UKPC and CCC is rejected.  Among other infirmities, there is no legal or factual basis for this approach, it is impractical to administer

and it fails to allocate based on the fair market value of each selling debtor's rights and assets

sold or relinquished in the Sales.

Dated:  August 7, 2014               TORYS LLP
Wilmington, Delaware

Sheila Block
Andrew Gray
Scott Bomhof
79 Wellington St, Suite 3000
Box 270, TD Centre
Toronto, ON M5K 1N2
Telephone: (416)865-0040
Facsimile: (416) 865-7380

- and -

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
Neil P. Forrest (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s Ann C. Cordo
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

216

*Counsel for the Debtors and Debtors in Possession*

    - and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Robert Johnson (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

    - and -

RICHARDS, LAYTON & FINGER, P.A.

/s Christopher M. Samis
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel to the Official Committee of Unsecured Creditors*
*of Nortel Networks Inc., et al.*

## APPENDIX A

### Guide to Common Terms and Abbreviations

**1992 NNL-NNI R&D CSA** – means the 1992 Research and Development Cost Sharing Agreement
between NNI and NNL..

**Alcatel Sale** – refers to the Nortel Group's December 2006 sale of UMTS to Alcatel-Lucent.

**APA** – means advanced pricing agreement (or arrangement).

**Bondholder Group** – refers to the representatives for the *ad hoc* group of bondholders of $2.2 billion[1] principal of bonds, issued by NNC, NNL, or NNCC and guaranteed or supported by NNI.

**Business Lines** – refers to the Nortel Group's operating lines of business.

**Business Line Sales** – refers to the sale of Nortel's operating lines of business occurring from March 2009 through March 2011.

**Canadian Creditors Committee** (or **CCC**) – refers to an *ad hoc* group of representatives of certain employee and employee benefits creditors asserting claims only against the Canadian Debtors.

**Canadian Debtors** – refers to NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

**Carrier Networks** – refers to one of Nortel's four Business Lines as of the Petition Date.

**CCAA** – means the Companies' Creditors Arrangement Act (Canada).

**CCRA** – means the Canada Customs and Revenue Agency, now known as the Canadian Revenue Agency.

**CDMA** – means the Code Division for Mobile Communications.

**CRA** – means the Canada Revenue Agency, previously known as the Canada Customs and Revenue Agency.

**CSA** – means cost sharing agreement.

**CVAS** – means the Carrier Voice Over Internet Protocol Applications Solutions division of Carrier Networks.

---

[1] All figures given in these proposed findings of fact are in US dollars, unless otherwise noted.

**DCF** – means discounted cash flow.

**E&Y Canada** – refers to Ernst & Young Canada, the court-appointed Monitor for the Canadian Debtors.

**EDC** – means Export Development Canada.

**EMEA** – refers to the Europe, Middle East and Africa region.

**EMEA Debtors** – means NNUK, NN Ireland; NNSA; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

**Enterprise Solutions** – refers to one of Nortel's four Business Lines as of the Petition Date.

**Exclusive Licenses** – refers to the exclusive licenses granted in the MRDA.

**Exclusive Territory** – refers to the designated geographic area for each Licensed Participant's Exclusive License under the MRDA.

**Estates** – refers to the US Debtors, Canadian Debtors and EMEA Debtors.

**FCFSA** – means the Final Canadian Funding and Settlement Agreement, dated as of December 23, 2009.

**First Addendum** – refers to the first addendum to the MRDA.

**Global IP** – refers to the Global IP Law Group.

**Global Services** – refers to one of Nortel's four Business Lines as of the Petition Date.

**GSM** – means the Global System for Mobile Communications division of Carrier Networks.

**Horst Frisch** – refers to Horst Frisch Inc., the economics consulting firm Sutherland engaged to help it select and design the new transfer pricing methodology, run modeling and draft the economic analysis.

**Horst Frisch Report** – refers to a document entitled "Economic Analysis of Nortel Networks' Intercompany Transactions," dated March 14, 2002.

**HMRC** – means Her Majesty's Revenue and Customs, the tax authority in the United Kingdom, now known as Inland Revenue.

**IE** or **Integrated Entity** – refers to NNL, NNI, NNUK, NNSA and NN Ireland.

**IFSA** – means the Interim Funding and Settlement Agreement, dated as of June 9, 2009.

**Inland Revenue** – refers to the former tax authority in the United Kingdom, previously known as Her Majesty's Revenue and Customs.

**IP Steering Committee** – refers to a committee of representatives of the Estates and their advisors formed in 2010 with respect to monetizing Nortel's intellectual property.

**IP** – means intellectual property.

**IPCo** – means the IP licensing service and enforcement business Nortel was developing.

**IRS** – means the Internal Revenue Service, the tax authority in the United States.

**Joint Administrators** – refers to individuals from Ernst & Young LLP who were appointed as the administrators of the EMEA Debtors' Estate by the High Court of Justice of England and Wales.

**Lazard** – refers to Lazard Frères & Co., LLC.

**Licensed Participants** – refers to NNI, NNUK, NNSA and NN Ireland.

**LREs** or **Limited Risk Entities** – describes the Nortel distribution entities.

**MEN** – means the Nortel Group's Metro Ethernet business line, one Nortel's of four Business Lines as of the Petition Date.

**MNE** – means multinational enterprise.

**Moody's** – means Moody's Investors Service.

**Monitor** – refers to the Canadian Monitor.

**MOU** – means the Memorandum of Understanding, which was entered into by the IEs, dated December 31, 2008.

**MRDA** – refers collectively to the Master R&D Agreement, dated as of December 22, 2004, as amended.

**NBS** – means Nortel Business Services.

**NN Australia** – means Nortel Networks Pty. Ltd., which was formerly a party to the MRDA.

**NN CALA** – means Nortel Networks (CALA) Inc.

**NN Ireland** – means Nortel Networks (Ireland) Ltd.

**NNC** – means Nortel Networks Corporation.

**NNI** – means Nortel Networks Inc.

**NNL** – means Nortel Networks Limited.

**NNSA** – means Nortel Networks S.A.

**NNUK** – means Nortel Networks UK Limited.

**Nortel** or **Nortel Group** – refers collectively to all entities that are or ever were a direct or indirect subsidiary or affiliate of Nortel Networks Corporation, including any jointly owned ventures of any such subsidiary or affiliate.

**NTI** – refers to Northern Telecom, Inc., now known as NNI.

**NTL** – means Northern Telecom Ltd., now known as NNL.

**NN Technology** – has the meaning as defined in the MRDA.

**OEMs**– means original equipment manufacturers.

**Participants** – refers to the parties to the MRDA.

**Patent Portfolio** – refers to the collection of patents and patent applications that were not sold in connection with the Business Line Sales and were later sold in the Patent Portfolio Sale.

**Patent Portfolio Sale** – means the sale of the Patent Portfolio to Rockstar.

**Petition Date** – refers to January 14, 2009, when NNC and NNL voluntarily filed for protection under the Companies' Creditors Arrangement Act (Canada) in the Canadian Court and the US Debtors, other than NN CALA, voluntarily filed for bankruptcy protection under Chapter 11 in the US Court. Similarly, the EMEA Debtors sought orders from the High Court of Justice of England and Wales placing the other EMEA Debtors into administration and appointing individuals from Ernst & Young LLP as administrators.

**R&D** – means research and development.

**Rockstar** – means the consortium of bidders consisting Apple, EMC, Ericsson, Microsoft, Research in Motion and Sony known as Rockstar Bidco who purchased the Patent Portfolio.

**Rockstar Sale Agreement** – means the agreement that memorialized the sale of the Patent Portfolio

to Rockstar.

**RPSM** – means the residual profit split methodology set forth in the MRDA.

**Sales** – means the Business Lines Sales and the Patent Portfolio Sale.

**Second Addendum** – refers to the second addendum to the MRDA.

**Schedule A** – refers to the first schedule to the MRDA.

**STC** – means UK's STC plc.

**Third Addendum** – refers to the third addendum to the MRDA.

**UCC –** refers to the Official Committee of Unsecured Creditors.

**UKPC** – refers to the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund

**UMTS** – means Universal Mobile Telecommunications System.

**US Debtors** – means NNI and its affiliates, including Nortel Networks Capital Corporation, Alteon WebSystems, Inc. (now known as Nortel Altsystems Inc.), Alteon WebSystems International, Inc. (now known as Nortel Altsystems International Inc.), Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and NN CALA.

**US Interests** – refers to the US Debtors and the UCC.

**APPENDIX B**

**Index of Fact Witnesses[47]**

Fact Witnesses for the Canadian Interests

**Clive Allen** was Chief Legal Officer, from 1974 until June 1999. Trial Tr. 604:18-604:23 (Allen).

**Douglas Beatty** held various positions from 1995 until 2004, including Controller from 1999 until July 2002 and CFO from July 2002 until March 2004.  Beatty Dep. 21:14-22:24.

**Allan Bifield** was employed by NNUK, but served in various roles in Canada from 1998 to 2009.  (Bifield Dep. 26:11-28:11).  He was the CFO of Nortel's Carrier Data Network business in 2001, the CFO of Nortel's Enterprise Voice business from 2001 until 2004, the VP of Finance Transformation from 2005 until 2007 and ultimately the VP of Finance for Corporate Financial Planning.  Bifield Dep. 29:9-34:20.

**Paviter Binning** was Executive VP and CFO of NNC and NNL from November 2007 until March 2010.  (Trial Tr. 1052:25-1053:5 (Binning)).  Binning was also Nortel's Chief Restructuring Officer from February 2009 until March 2010.  Trial Tr. 1075:2-1075:11, 1083:2-1083:5 (Binning).

**Ernie Briard** held various positions within the office of the Chief Technology Officer from 2004 to 2009.  Briard Dep. 15:6-15:24, 26:23-28:10.

**Kriss Bush** was Vice President of Taxation from about July 2001 until about October 2002.  Bush Dep. 20:22-21:8, 23:14-24:8.

**Timothy Collins** held various positions from 1999 until 2009, including Director of Intellectual Property, M&A for NNL from 1999 to 2001, Lead Counsel for Optical Networks from 2001 to 2004, Lead Counsel for Global Operations from October 2002 to October 2005 and Vice-President and Assistant General Counsel for IP from 2005 to October 2008.  Collins Dep. 20:7-22:10.

**Rosanne Culina** held various tax-related positions from 2002 to 2011, including Leader of Canadian Tax and Leader of Global Initiatives.  Culina Dep. 26:23-31:20.

**Peter Currie** was CFO from 1994 until 1997 and then again from 2005 to 2007.  Trial Tr. 535:18-536:11 (Currie).

---

[47]While some portions of deposition testimony cited herein was not designated, this appendix is included solely for the convenience of the Court and not to support findings of fact.  While witnesses on this list are included with the Estate with whom they were most closely associated, in some circumstances the witness was neither presented, prepared, nor represented by counsel for that Estate.

**Khush Dadyburjor** held various positions within the Nortel Group from 1991 to 2010, including as Senior Advisor in the M&A Group and ultimately VP and Head of Mergers & Acquisitions from 2002 until December 2010.  Dadyburjor Dep. 14:25-16:19.

**Gordon Davies** held various position from 1993 to 2009, including General Counsel and Corporate Secretary of NNC and NNL from November 2004 until December 2008, acting Chief Legal Officer in 2005 and 2007 and Chief Legal Officer and Corporate Secretary from January 2009 until his departure in August 2009.  TR00013 (Davies Aff.) ¶ 11; Trial Tr. 1045:20-1046:9 (Davies); Davies Dep. 21:7-21:10).

**Nicholas DeRoma** held various positions from 1997 until 2005, including Chief Legal Officer of NNL from 2000 until about 2005.  DeRoma Dep. 22:2-22:24, 28:5-28:9.

**Angela DeWilton** held several positions from 1989 through 2007, including Director of IP in the IP Law Group (formerly the Patent Group) and Director of IP Strategy from 2001 until 2007.  Trial Tr. 734:4-735:2 (DeWilton).

**John Doolittle** held various tax and treasury positions within the Nortel Group from 1990 until 2011, including VP of Tax from 2002 to 2005, Treasurer from early 2008 until January 2009 and ultimately CFO and Senior VP of Corporate Affairs until the end of 2011.  Doolittle Dep. 31:2-35:6, 151:19-151:25.

**David Drinkwater** served as Chief Legal Officer from 2005 until 2008 and was also interim CFO in 2007.  Drinkwater Dep. 19:19-19:24, 26:8-26:18, 32:3-32:15.

**Gilles Fortier** held various analyst and accounting positions between 1981 and 2000 before assuming his ultimate position as Taxation Manager of Transfer Pricing, a position he held from 2001 until 2005.  Fortier Dep. 19:4-27:12, 42:12-43:11.

**James Gatley** was a Leader of Transfer Pricing at Nortel, a position which he held from 2002 until 2004.  Gatley Dep. 24:21-32:21.

**Sharon Hamilton** is a partner with Ernst & Young's Canadian affiliate and acts for Ernst & Young in its role as Monitor for the Canadian Debtors.  (Trial Tr. 860:24-861:6 (Hamilton)). Hamilton was not involved with Nortel prior to the petition date.  Trial Tr. 861:20-861:24 (Hamilton).

**Ron Horn** held various positions from 1984 until 2010, including positions in the Product Line Planning Group, the Legal and Business development groups and Senior Manager of Tax, Technical R&D.  Horn Dep. 13:24-15:22.

**William Kerr** held various positions from 1994 until 2001, including Controller, Treasurer, SVP of Finance and Business Development and SVP of Corporate Business Development.  Kerr returned to Nortel as CFO from March 2004 until February 2005.  Kerr Dep. 21:4-24:2, 27:16-28:4, 33:19-33:21.

**William Lasalle** held various legal positions from 1999 until 2009, including General Counsel of EMEA from 2001 until 2002, General Counsel for Nortel Networks Operations in Canada

from 2002 until 2008 and ultimately General Counsel for the Enterprise business until his departure in 2009.  Lasalle Dep. 18:22-26:18.

**Michelle Lee** held various positions from 1997 until 2011, including as Lead Counsel of the IP Law Group for Acquisitions and Divestitures from 2002 until 2003 and again in 2009 and Lead Counsel of the IP Law Group for Standards and Copyrights from 2003 until 2011.  Lee Dep. 40:14-40:16, 49:15-51:15.

**Peter Look** was a VP of Tax from 2006 until 2010.  Look Dep. 15:24-18:9, 29:10-29:13.

**Roy MacLean** held various positions from 2004 until 2009, including VP of Services Edge R&D from 2004 until 2005, VP of North American Enterprise Operations & Service from 2005 until 2007 and VP of Global Enterprise Field Performance from 2008 until 2009.  MacLean Dep. 74:20-75:12, 75:19-75:22; TR50889 (Responses of the Monitor and Canadian Debtors to the Non "Persons Consolidated Interrogatories"); TR45467 (Spreadsheet of Transferred Employees).

**Michael McCorkle** held various positions at Nortel from 1997 until 2009, including Assistant Treasurer from 2005 until 2007 and again in mid-2008 until January 2009 and Treasurer from August 2007 until mid-2008.  Trial Tr. 811:3-812:22 (McCorkle).

**Murray McDonald** is the President of Ernst & Young Inc., a subsidiary of E&Y Canada through which Ernst &Young Inc. conducts its insolvency and restructuring practice in Canada. (McDonald Dep. 256:25-257:16).  McDonald was first retained by Nortel in September 2008 to be a financial advisor for NNC and certain of its subsidiaries, a role that continued until January 2009, when he was appointed as representative of the Monitor for the Canadian Debtors. McDonald Dep. 21:18-25:16, TR21504 (engagement letter between Ernst & Young Inc. and Nortel Networks Corporation).

**Brian McFadden** held various positions from 1979 until 2005, including President of Optical Long Haul Networks from 2001 until 2004 and Chief Technology Officer from August 2004 until 2005.  Trial Tr. 633:18-634:19.

**Gregory Mumford** held various positions from 1971 until 2005, including President of the Optical Transmission Business from 2000 until 2002, Chief Technology Officer from 2002 until 2004 and special advisor to the CEO from October 2004 until his retirement in 2005.  Mumford Dep. 17:15-21:18.

**Karina O** held various tax positions from 1987 until 2009, including Director of Corporate Taxation beginning in 2000, Leader of Finance Transformation from about 2005 until 2007 and Leader of Tax Planning from 2008 until May 2009.  O Dep. 18:22-23:25.

**Mary Anne Poland (Pahapill)** held various positions from 1998 until 2005, including Assistant Controller in 2000, VP of Canadian Taxation in 2002, Assistant Treasurer from 2003 until 2004 and Controller from March 2004 until January 2005.  Poland Dep. 30:21-35:9, 42:15-43:5, 61:6-67:11.

**Vince Raimondo** held various positions from 2004 until 2006, including Leader of the Global Tax Accounting Group and Director of Canadian Tax.  Raimondo Dep. 19:11-20:19, 31:11-31:23, 49:6-49:7.

**Graham Richardson** held various positions from 1987 until 2010, including Director of GSM Product Management Introduction and Regulatory Approval from 1995 to 1998, VP of GSM and UMTS Access Research and Development from 2002 until 2005 and ultimately General Manager of GSM/CDMA from 2006 until about May 2010.  Richardson Dep. 15:18-20:7, 22:2-24:22; 31:9-34:7; 35:11-38:14.

**John Roese** was the Chief Technology Officer from June 2006 until his departure in 2009.  Roese Dep. 29:14-30:6, 130:16-130:19.

**Giovanna Sparagna** is a partner at Sutherland Asbill & Brennan, where she began to work on Nortel related matters, including drafting the MRDA, around 2004.  Sparagna Dep. 25:12-26:5, 77:10-77:19.

**Donald Sproule** held various positions at Nortel from about 1974 until 2005, including VP of Director of Product Line Management for Carrier Data Networks in 1999 and General Manager of Product Line Management for Carrier Data Networks in 2001.  TR00008 (Sproule Aff).  ¶¶ 5, 6, 7.

**Katherine Stevenson** began as Assistant Treasurer in 1995 and served as Treasurer from 2000 until August 2007.  K. Stevenson Dep. 20:23-21:13.

**Scott Wilkie** is an attorney who worked on Nortel related matters during his employment at Stikeman Elliot from 1983 until 1997, Oglivy Renault from 1997 until 1999 and Osler Hoskin and Harcourt from 1999 until 2011.  Wilkie Dep. 19:10-19:25, 22:19-22:24; 24:12-24:15; 24:24-25:9; 28:14-28:18.

**John Williams** worked in various finance positions during his time at Nortel from 1992 until 2010, becoming Senior Manager of Corporate finance in 2000, Director of Corporate Finance from 2002 until 2009 and ultimately Treasury Leader from 2009 until December 2010.  Williams Dep. 10:14-23:15.

**Mike Zafirovski** was the CEO of NNL and NNC, a position he held from November 2005 until August 2009.  Zafirovski Dep. 10:24-11:4.

Fact Witnesses for the US Interests

**Christopher Cianciolo** served as Senior IP Counsel at NNI from 1999 until 2003 and from 2004 until 2011, when he was also the VP of Intellectual Property.  Cianciolo Dep. 17:8-18:2.

**Mary Cross** held various positions at Nortel from 1983 and worked in the finance department from 1996 until her departure in November 2005, where her ultimate position was the VP of Finance Services and Controller North America.  Cross was also the President of NNI from 2001 until 2005.  Cross Dep. 21:21-26:23, 58:5-58:11, 59:3-59:20.

**William Donovan** held various positions at Nortel from 1985 until 2009, becoming SVP of Human Resources from 2000 until 2006 and SVP of Business Transformation from April 2006 until December 2009.  Donovan Dep. 22:7-24:16.

**Walter Henderson** held positions at Nortel during two different period, serving as Senior Tax Manager for NNI from January 1998 until February 1999 and as part of NNI's tax department from September 2000 until March 2002.  Henderson worked at Sutherland Asbill & Brennan before and between his periods of employment at Nortel, from 1993 and 1997 and from March 1999 until September 2000, mostly on NNI's tax and transfer pricing matters.  TR00016 (Henderson Decl.) ¶¶ 13, 16, 17, 18).  .

**Eric Jensen** was an IP lawyer for NNI from 1998 until 2007.  Jensen Dep. 21:22-22:17

**Laurie Krebs** was a Senior Manager of US Tax at NNI from April 2002 until January 2003, when she became the US Tax Director until her departure in October 2007.  Krebs Dep. 39:18-39:21, 53:11-53:15, 56:14-56:18.

**Gillian McColgan** held various positions at Nortel from 1991 until July 2011, including positions in optical, wireless, telephone, product line management and in the CTO office; she was an employee of NNI from 2001 until her departure.  McColgan Dep. 25:4-28:20.

**Michael Orlando** held various tax positions at NNI from 2002 until 2011, including Senior Tax Associate from 2002 until 2004, Senior Tax Manager in 2004 and ultimately Transfer Pricing Leader from 2007 until October 2011.  TR00019 (Orlando Decl.) ¶¶ 1, 2, 4.

**John Ray** is the Principal Officer of NNI and the other US Debtors, a position which he has held since his appointment by the Bankruptcy Court in December 2009.  Trial Tr. 1358:17-1358:22 (Ray).

**Christopher Ricaurte** held several positions at NNI from 2007 until 2011, including VP of Financial Planning & Analysis for Global Operations from April 2007 until May 2009, Senior VP of Finance for Nortel Business Services from May 2009 until February 2010 and ultimately President of Nortel Business Services from February 2010 until September 2011.  TR00018 (Ricaurte Decl.) ¶ 1, Trial Tr. 1244:1-1244:12 (Ricaurte).

**George Riedel** was a Chief Strategy Officer of NNC and NNL, a position he held from March 2006 until October 2011; in 2010, his title expanded to include President of Business Units.  Riedel Dep. 27:9-28:8, 31:15-31:18.

**Elizabeth Smith** held various positions at NNI from 1998 until 2012, starting as a Senior Accountant/Staff Accountant in the Technical Accounting Group from 1998 until 2003, joining the Finance Group in 2003, moving to the Technical Accounting Group from 2004 until 2007 and then joining the Policies and Procedures Group in 2007.  E. Smith Dep. 14:3-14:19, 15:19-16:17, 17:14-17:19.

**John Veschi** is a former Chief Intellectual Property Officer, a position which he held from July 2008 until 2011.  Veschi Dep. 45:4-47:25, 81:7-81:19.

**Mark Weisz** held various positions in the tax department from 1997 until 2007, including Senior Manager for Latin American Tax in 1997, Director of Tax for CALA until 2000, Director of Tax Planning for the Americas at NNI from 2000 until 2003 and ultimately Leader of International Tax at NNI from 2003 until September 2007.  TR00028 (Weisz Decl.) ¶¶ 1, 2, 3.

**Jeff Wood** was Leader of US and CALA Tax, a position which he held from August 2008 until June 2010.  Wood Dep. 30:15-32:19.

Fact Witnesses for the EMEA Interests

**Philippe Albert-Lebrun** held  various positions from 1997-2012, including Assistant Treasurer and Treasurer for certain French Nortel affiliates from 1997 to 2001, Financial Controller of the those entities from 2003 until 2007, and EMEA Financial Controller from 2007 to 2012.  Trial Tr. 1479:13-1480:24 (Lebrun); TR00022 (Lebrun Aff.) ¶10.

**Angela Anderson** was Director of Patents, from 2000 until December 2004, head of Nortel's European IP Law Group. TR00032 (Anderson Aff.) ¶ 10; Trial Tr. 2171:18-2172:7 (Anderson); Anderson Dep. 22:8-22:10.

**Kishor Badiani** held various positions from 1992 to2002, including EMEA Director of Tax, from 2000 to 2002.  Badiani Dep. 27:11-27:15, 160:3-160:11.

**Ian Barton** held various positions at Nortel from 1994 to 2001 including Director of European Tax from 1998 to 2001.  Barton Dep. 18:11-20:17.

**Allan Bloom** is a partner in the restructuring practice of Ernst & Young UK.  .  Bloom serves as a Joint Administrator in the Nortel insolvency proceedings for the EMEA Debtors.  Bloom Dep. 37:7-37:13, 53:10-53:15.

**Simon Brueckheimer** held various positions at Nortel from around 1991 through 2009, including Senior Research Engineer, Principal Research Engineer and Director of Strategic Technology.  Brueckheimer Dep. 26:3-27:6; TR00023 (Brueckheimer Aff.) (affirmed Apr. 9, 2014)).

**Malcolm Collins** held various roles at Nortel, including VP of Customer Premises Equipment Business from 1992 to 1995 in the UK, Managing Director of EMEA for Magellan in the UK from 1995-2000, President of Next Generation Service Providers from 2000 to 2001, President Northern Europe from 2001 to 2002 and President of Enterprise Networks, working out of Research Park Triangle, from 2002 until 2005.  Collins Dep. 34:23-43:19, 70:19-71:23

**Michel Clement** held various positions at Nortel from 1993 to 2009, serving as President of Nortel Networks SA from 2000-2002, CEO and CO of Nortel Matra, which later became Northern Telecom France, until 2009 and, during the same time, monitoring and managing the market activities of Nortel in the EMEA region.  Clement Dep. 29:23-32:22.

**Pascal Debon** held various positions at Nortel from around 1991 until 2005, including President of EMEA and President of Switching, Optical and Carrier Worldwide until he left Nortel in 2005.  Debon Dep. 16:20-21:21.

**Darryl Edwards** held various positions at Nortel from 1992-2009, including President of the EMEA Region from 2006-2009.  Edwards Dep. 21:14-21:15, 42:16-43:5, 56:7-56:8.

**Kenneth Fox** held various positions at Nortel from 1995 until 2009 including serving as Senior Manager for the e-business suite of tools.  Starting in 2004 Fox was as Senior Manager for the e-business suite of tools until he left Nortel for Avaya in 2009.  Fox Dep. 16:6-20:23.

**Simon Freemantle** began at Nortel in 2000 and served in various positions, including director of Treasury Operations for EMEA from 2005 to 2007, Director of Global Treasury Operations from 2007 to 2009 and Manager of the European treasury team throughout the administration proceedings.  Freemantle Dep. 17:22-22:17, 26:18-27:15.

**Dara Gill** held various legal positions at Nortel Networks UK, including corporate and senior counsel from 2002-2008 and General Counsel of Enterprise Solutions in EMEA until he left in 2009.  Gill Dep. 30:5-35:8.

**Michael Gollogly** held various positions at Nortel from 1998 to 2004, including Assistant Controller, Vice President of Finance for GSM from 1998 to 1999, Vice President of Finance for Asia Pacific from 1999-2001, Vice President of Finance for Europe in 2001, Vice President of Wireless from 2001-2002 and Controller of Nortel from 2002 until he left Nortel in 2004. Gollogly Dep. 29:15-40:12.

**Geoffrey Hall** held various positions at Nortel from 1985 to 2008 including VP of R&D in Maidenhead in 1999, and CTO for EMEA from 2003 to 2008. TR00029 (Hall Aff.) at ¶¶ 5, 12, 16-19.

**Lorraine Harper** was employed by Nortel Networks UK and held various positions, beginning in 2007 as EMEA Senior Tax Manager and serving until 2009 when she was Leader of EMEA Tax.  Harper Dep. 15:19-17:10.

**John William Hern** held various positions at Nortel from 2000 to 2009 including Manger for International Software Translation from 2000 to 2001, Manager for Centrix IP from 2001 to 2004, Innovation Architect for the Maidenhead Regional Technical Center from 2004 to 2006, Service Practice Leader for the Nortel Professional Services Organization from 2006 to 2008 and Solution Architect for Enterprise from 2008 until he left Nortel in 2009.  Hern Dep. 18:24 - 37:12.

**Christopher Hill** is the executive director for Ernst & Young, Limited, Ltd. in the British Virgin Islands and serves as Joint Administrator for all of the filed EMEA entities except for Nortel Networks Ireland.  Hill Dep. 14:23-15:8, 19:6-20:19.

**Andrew Jeffries** joined Nortel Networks UK in 1991 and served as department manager of the Government and External Contracts Group, doing project management and technical work from 1997 until 2005.  From 2005 until the bankruptcy filing, Jeffries acted as Senior Manager of the Government and External Contracts Group.  Trial Tr. 1660:14-1660:23 (Jeffries); Jeffries Dep. 18:2-26:17.

**Jean-Marie Lesur** held various position at Nortel from 2000 to 2009, including Head of Finance for the UMTS line of business from 2002 to 2009.  Lesur Dep. 27:11-28:17.

**Geoff Lloyd** had various role in the human resources department of Nortel from 1992 - 2006 including President of Human Resources for Global Professional Services from 1999-2001 and Human Resources Vice President of EMEA, from 2001 to 2006.  Lloyd Dep. 21:18-30:11.

**Hitesh Mehta** held various corporate development and sales positions at NNUK from 1998 until 2008.  Mehta Dep. 22:19-28:18

**Iain Morgan** held various roles at Nortel from 1987 until 2004 including managing director of a Dutch subsidiary, Northern Telecom International Finance BV, working out of Switzerland from 1987-1996.  He was VP of Vendor Finance for NNUK from 1996 to 2004.  Morgan Dep. 21:10-22:6; 25:13-26:16.

**Peter Newcombe** had various roles, including technology, sales and marketing functions in NN UK from 1990 until 2010.  Trial Tr. 1605:15-1606:14 (Newcombe); Newcombe Dep. 23:9-26:13

**Gareth Pugh** held various positions, including Finance Director for Europe and Financial Controller for the EMEA region from 1999 until 2005.  Pugh Dep. 16:6 - 17:22

**Steven Pusey** held various positions from 1982 to 2006, including running the British Telecom sales team for NN UK from 1989 to 1994, running the European group to sell carrier infrastructure beginning in 1994, President of Alternate Operators for NNI and President of EMEA from 2001 to 2006.  Pusey Dep. 17:15-24:20.

**Nigel Rees** held various positions from 1987 to 2000, including Product Manager for Switch Remote in the US from 1989 to 1990, Director for Product Marketing Management for all platforms from 1990 to 1992, Assistant Vice President for Switching of Asia Pacific, Assistant Vice President of International Switching from 1994 to 1998 and Vice President and General Manager for Broadband Wireless Access for Europe from 1998 to 2000.  Rees Dep. 26:12-26:20, 34:9-46:16, 52:21-53:4

**Cosme Rogeau** was appointed as liquidator by the Versailles Commercial Court for the NNSA insolvency proceedings.  Rogeau Dep. 22:3-28:8

**Sharon Rolston** held various finance positions from 1992 until 2011, including Controller for EMEA from 2006 to 2007 and Vice President of Finance for EMEA from 2007 to 2011.  Rolston Dep. 18:16-23:19, 107:19-107:25

**Simon Schofield** held various positions with NNUK from 2003 to 2006, including Senior Tax Manager for EMEA (excluding the UK, Ireland and Germany) in 2003 to 2004 and Leader for EMEA taxes from 2004 to 2006.  Schofield Dep. 14:24-16:21.

**Margaret Fraser (n/k/a/Margaret Smith)** held various positions from 1998 to 2007 including, Global Process Lead for the Treasury in NNUK from 2005 to 2006, Manager for Treasury Global Processes from 2008 to 2009 and EMEA Treasury Manager after insolvency proceedings commenced.  Smith Dep. 16:13-18:19.

**Gerard Staunton** held various positions at Nortel from 1980 to 2007, including a position with the Nortel Headquarters Finance Team in NNUK, finance positions with Nortel Networks Ireland, NNI and EMEA, including the Director of Accounting and Control in 2000-2001, and again from 2007 until 2008, and a role in Accounting and Control from 2002 until 2006. Staunton Dep. 17:4-21:15, 25:22-26:4, 152:9-153:17, TR50889 (Responses of the Monitor and Canadian Debtors to the Non "Persons Consolidated Interrogatories").

**Kerry Stephens** is a tax consultant at NNUK, from 2003 to present.  Trial Tr. 1713:4-1714:7 (Stephens).

**Ian Stevenson** held various finance position at Nortel from 1982 to 2010. Stevenson Dep. 17:13-28:21.

**Christian Waida** was the General Counsel for EMEA in 2004 until 2008, during which time he was an NNUK employee.  Waida Dep. 33:8-41:2, 52:10-53:11, 200:13-19; TR50889 at 294 (Responses of the Monitor and Canadian Debtors to the Non-"Persons" Consolidated Interrogatories).

**Timothy Watkins** held various sales positions from 1993 to 2008.  Watkins Dep. 18:13-26:20

**Ian Widdowson**, an NNUK employee served as a Senior Tax Manager for EMEA from 2001 to 2007.  Widdowson Dep. 14:4-16:16.

## APPENDIX C

### The Insolvency Filings

1.    On the Petition Date, NNI and its subsidiaries filed voluntary petitions for Chapter 11 relief in the US Court.  NN CALA filed a voluntary petition for relief on July 14, 2009.

> *See* TR50364 (NNI Chapter 11 Petition); TR50727 (NN CALA Chapter 11 Petition).

2.    Also on the Petition Date, the Canadian Debtors sought protection from their creditors under the Companies' Creditors Arrangement Act (Canada) ("CCAA") with filings in Canadian Court.  E&Y Canada was appointed Monitor.

> TR50049 (Jan 14. 2009 Canadian Debtors Initial Order); TR50796 (Jan 14. 2009 Canadian Debtors Second Amended and Restated Initial Order).

3.    Also on the Petition Date, the High Court of England and Wales (the "English Court") appointed Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill from Ernst & Young LLP as joint administrators and authorized foreign representatives (the "Joint Administrators") of Nortel Networks UK Limited ("NNUK") and the following of its affiliates located in the Europe, Middle East and Africa region ("EMEA"): Nortel Networks SA ("NNSA"), Nortel Networks France SAS, Nortel Networks (Ireland) Limited ("NN Ireland") (in respect of which David Hughes and Alan Bloom serve as joint administrators), Nortel Networks NV, Nortel Networks SpA, Nortel Networks BV, Nortel Networks Polska Sp z.o.o., Nortel Networks Hispania SA, Nortel Networks (Austria) GmbH, Nortel Networks s.r.o., Nortel Networks Engineering Services Kft, Nortel Networks Portugal SA, Nortel Networks Slovensko s.r.o., Nortel Networks Romania SRL, Nortel GmbH, Nortel Networks Oy, Nortel Networks AB, Nortel Networks International Finance & Holding BV ("NNIF"), Nortel Networks AG, Nortel Networks Scandinavia AS, Nortel Networks South Africa (Proprietary) Limited and Nortel Networks O.O.O. ("Nortel Russia") (collectively, the

"EMEA Debtors," and together with the US Debtors, Canadian Debtors and their filed and non-filed affiliates, "Nortel" or the "Nortel Group").  On the same date, the EMEA Debtors were placed into administration by the English Court, represented by the Joint Administrators.

> TR50119 (US D.I.12618 US Motion for Entry of an Order Approving US Claims Litigation Settlement Agreement) ¶ 7 & n.4.

4.     NNSA commenced secondary proceedings before the Commercial Court of Versailles, France on May 28, 2009, but the English Proceedings are the main proceedings in respect of NNSA.  The secondary proceedings before the Commercial Court of Versailles issued a judgment appointing Cosme Rogeau as liquidator of NNSA.

> *See* TR50113 (Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors); TR40055 (Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Relief with Respect to the EMEA Debtors); TR31666 (July 11, 2011 French Order).

5.     On the Petition Date, the Canadian Court granted an order recognizing in Canada NNI and its subsidiaries' (excluding NN CALA) Chapter 11 proceedings as foreign proceedings under section 18.6 of the CCAA.

> TR50049 (Jan. 14, 2009 Endorsement for Recognition of Foreign Proceedings).

6.     On February 27, 2009, the US Court entered an order recognizing in the United States the Canadian Proceedings as foreign main proceedings under Chapter 15 of the US Bankruptcy Code.

> TR50859 (US D.I. 40, Feb. 27, 2009 Recognition Order).

7.     On June 26, 2009, the US Court entered an order recognizing in the United States NNUK's administration proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

> TR50167 (US D.I. 36, June 26, 2009 NNUK Recognition Order) ¶¶ j-k.

8.      On August 14, 2009, the Canadian Court granted an order recognizing in Canada NN

CALA's Chapter 11 proceeding as a foreign proceeding under section 18.6 of the CCAA.

> TR49999 (Aug. 14, 2009 Canadian Endorsement re Addition of NN CALA).

9.      On January 31, 2011, the US Court entered an order recognizing in the United States the

additional EMEA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy

Code with respect to the EMEA Debtors other than NNUK.

> TR50113 (US D.I. 116, Jan. 31, 2011 EMEA Recognition Order.

**APPENDIX D**

**Reference Guide to Business Line Sales[1]**

| Asset Name (Code Name) | Key Dates | Stalking Horse (Code Name) | Auction | Other bidders | Purchaser & Price |
|---|---|---|---|---|---|
| Layer 4-7 (Velocity) | Sale hearing: 3/26/2009 Signing: 2/19/2009 Closing: 3/31/2009 | Radware (Velocity) SH agmt. signed: 2/19/2009 | No auction | N/A | Radware **$17.7 million** |
| CDMA/LTE (Eckberg) | Sale hearing: 7/28/2009 Signing 7/24/2009 Closing: 11/13/2009 | Nokia Siemens Networks (Narnia) SH agmt. signed: 6/19/2009 | Auction 7/24/2009 | Yes | Ericsson **$1.13 billion** |
| Enterprise (Equinox) | Sale hearing: 9/16/2009 Signing : 9/14/2009 Closing: 12/18/2009 | Avaya (Equinox) SH agmt. signed: 7/20/2009 | Auction 9/11/2009-9/14/2009 | Yes | Avaya **$900 million** |
| Next Generation Packet Core (Seville) | Sale hearing: 10/28/2009 Signing: 10/25/2009 Closing: 12/8/2009 | N/A | Auction | No | Hitachi **$10 million** |
| Metro Ethernet Networks (Snow) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/19/2010 | Ciena (Snow) SH agmt. signed: 10/7/2009 | Auction 11/20/2009-11/22/2009 | Yes | Ciena **$774 million** |
| GSM/GSM-R (Isis) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/31/2010 | N/A | Auction 11/24/2009 | Yes | Ericsson & Kapsch CarrierCom **$103 million[i]** |
| CVAS (Paragon) | Sale hearing: 3/3/2010 Signing: 12/22/2009 Closing: 5/28/2010 | GENBAND (Paragon) SH agmt. signed: 12/22/2009 | No auction | N/A | GENBAND **$282 million** |
| GSM Retained Contracts (Horus) | Sale hearing: 5/24/2010 Signing: 5/11/2010 Closing: 6/4/2010 | N/A | No auction | N/A | Ericsson **$2 million** (add-on to GSM sale) |
| Multi Service Switch (Pluto) | Sale hearing: 9/30/2010 Signing: 9/24/2010 Closing: 3/11/2011 | PSP Holding LLC (Marlin) SH agmt. signed: 8/26/2010 | Auction 9/24/2010 | Yes | Ericsson **$65 million** |

[1] **Layer 4-7**: See TR50324 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Layer 4-7 Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 38 (Closing Date); TR50165 (U.S. Motion to Approve the Layer 4-7 Sale) at 2,8 (Signing Date and Purchase Price); TR50188 (U.S. D.I. 539 Sale Order re Layer 4-7), TR50033 (Mar. 30 2009 Layer 4-7 Approval and Vesting Order) (Sale Approval).

**CDMA/LTE**: See TR50114 at 2 (U.S. D.I. 1205 CDMA and LTE Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39 (Closing Date); TR49971 (Canadian Motion Record, Approval and Vesting Order CDMA & LTE Business Sale Transaction) at 5 (Signing Date); TR21541 (2010 NNC 10-K) Purchase Price) at 24-25; TR50114 (U.S. D.I. 1205 CDMA and LTE Sale Order), TR50029 (July 28, 2009 CDMA and LTE Approval and Vesting Order), TR49998 (Oct. 28, 2009 Amendment to Approval and Vesting Order re CDMA and LTE) (Sale Approval).

**Enterprise**: See TR50128 (U.S. D.I. 1514 Enterprise Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39-40 (Closing Date); TR50570 (Canadian Motion Record, Approval and Vesting Order Enterprise Solution Business) at 5 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50128 (U.S. D.I. 1514 Enterprise Sale Order), TR50030 (Sept. 16, 2009 Enterprise Approval and Vesting Order) (Sale Approval).

**Next Generation Packet Core**: See TR50361 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Next Generation Packet Core Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 40 (Closing Date); TR50136 (U.S. D.I. 1760 Next Generation Sale Order) at 1 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50136 (U.S. D.I. 1760 Next Generation Sale Order), TR50001 (Oct. 28, 2009 Next Generation Approval and Vesting Order) (Sale Approval).

**Metro Ethernet Networks (MEN)**: See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) Ex. B at 3-4 (Closing Date); TR40551 (Canadian Motion Record, Approval and Vesting Order MEN) (Signing Date) at 5; TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50140 (U.S. D.I. 2070 MEN Sale Order), TR50060 (Dec. 2, 2009 MEN Approval and Vesting Order) (Sale Approval).

**GSM/GSM-R**: See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 42 (Closing Date); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (Purchase Price); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order), TR50032 (Dec. 2, 2009 GSM/GSM-R Approving and Vesting Order) (Sale Approval)

**CVAS**: See TR50149 (U.S. D.I. 2632 CVAS Sale Order) at 2 (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 43 (Closing Date); TR50141 (U.S. Motion to Approve the CVAS Sale) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (NTD: SEE CHART – Purchase Price slightly inconsistent) (Purchase Price); TR50055 (Mar. 3, 2010 CVAS Approval and Vesting Order), TR50149 (U.S. D.I. 2632 CVAS Sale Order) (Sale Approval).

The initial purchase price was for $282 million subject to balance sheet and other adjustments of approximately $100 million resulting in a final purchase price at closing of $182 million.  Subsequently a dispute arose between the parties over a defined term in the asset sale agreement which would impact the final purchase price.  To resolve the dispute the parties engaged in settlement discussions resulting in the final purchase price of $157 million.  The settlement was approved by the U.S. Court and Canadian Court on August 23, 2011.  *See* TR40190 (2011 NNC 10K) at 25.

**GSM Retained Contracts**: See TR50271 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: GSM Retained Contracts Sale) (Hearing Date); TR50171 NNI Proposed Disclosure Statement) at 42 ( (Closing Date); TR50157 (U.S. Motion to Approve the Sale of Certain Assets of the GSM/GSM R

Business) at 2, 9 (Signing Date and Purchase Price); TR47776 (Canadian Approval and Vesting Order, GSM/GSM-R Remaining Contracts), TR50159 (D.I 3048, U.S. Order Approving the Sale of Certain Assets of the GSM/GSM-R Business) (Sale Approval).

**Multi Service Switch (MSS)**: See TR50172 (U.S. D.I. 4054 MSS Sale Order) at 2 (Hearing Date); TR40190 (2011 NNC 10-K) at 25 (Closing Date); TR40633 (Canadian Motion Record, Approval and Vesting Order, MSS Business) at 4 (Signing Date); TR21541 (2010 NNC 10-K) at 27 (Purchase Price); TR50172 (U.S. D.I. 4054 MSS Sale Order), TR50056 (Sept. 30, 2010 Approval and Vesting Order MSS Business) (Sale Approval).

[1] Total value.  There were separate sales for the North America; Caribbean & Latin America (CALA); and Europe, Middle East & Africa (EMEA) regions.

## APPENDIX E

### Settlements

1.      On June 19, 2012, the Canadian Debtors, the US Debtors, the EMEA Debtors, the

Joint Administrators, NNSA, the Monitor and the UCC entered into a settlement agreement (the

"Fourth Estate Agreement") with certain non-filed NNC subsidiaries in the Asia Pacific region

(the "APAC Entities"), certain non-filed NNC subsidiaries in the CALA region (the "CALA

Entities") and certain non-filed affiliates of the EMEA Debtors (the "EMEA NFEs").

>      TR21468 (Fourth Estate Settlement Agreement).

2.      The APAC Entities, the CALA Entities and the EMEA NFEs collectively

received an allocation of $44,900,000 from the Business Line Sales proceeds, which were paid

from the relevant Business Line Sales escrow accounts.

>      TR21468 (Fourth Estate Settlement Agreement) ¶ 1.1(a).

3.      In accordance with the Fourth Estate Agreement, each of the relevant escrow

agreements were amended to remove the APAC Entities, the CALA Entities and the EMEA

NFEs as parties.

>      TR21468 (Non-Filed Entity Settlement Agreement) ¶ 6.1.

### A.  Nortel Israel

4.      NNI, NNUK, Nortel Networks Israel (Sales and Marketing) Ltd. and Nortel

Communications Holdings (1997) Ltd. (together with Nortel Networks Israel (Sales and

Marketing) Ltd., "Nortel Israel") and the Joint Administrators entered into a Letter of Agreement

dated as of April 13, 2011 (the "Israel Agreement"), settling certain matters among the parties.

>      TR47280 (Apr. 13, 2001 Letter of Agreement between NNI, NNUK, and Nortel
>      Israel).

5.      Pursuant to the Israel Agreement, Nortel Israel transferred to NNI and NNUK, jointly, any and all right, title and interest it may have had in the proceeds of the MEN, CVAS, Layer 4-7, Enterprise Solutions and MSS Sales.

> TR45576 (June 3, 2011 Sixty-Eighth Report of the Monitor); TR47280 (Apr. 13, 2001 Letter of Agreement between NNI, NNUK, and Nortel Israel) ¶ 4.

6.      Pursuant to the Israel Agreement, NNI and NNUK agreed to provide cash consideration of $2 million to Nortel Israel, $813,819 of which NNI paid and $1,186,181 of which NNUK paid.

> TR47280 (Apr. 13, 2001 Letter of Agreement between NNI, NNUK, and Nortel Israel) ¶ 4.

7.      The Israel Agreement and its supporting documentation, including the amendments to certain escrow agreements to reflect this settlement, were approved by the US Court on June 6, 2011.  The Canadian Court approved this settlement on June 7, 2011.

> TR50191 (U.S. D.I. 5603 Order Approving Agreement with NN UK and NN Israel); TR49934 (June 7, 2011 Canadian Order Approving the Settlement).

## B.  Nortel Russia

8.      Nortel Russia is 99% owned by NNIF and 1% owned by Nortel Networks BV, which is a wholly owned subsidiary of NNIFH.  NNIFH is a wholly owned subsidiary of NNUK.

> TR50482 (Aug.16, 2011 Seventy-Second Report of the Monitor ) ¶ 36.

9.      Nortel Russia was a party to the escrow agreements associated with the MEN, CVAS, GSM and Enterprise Sales.

> TR50482 (Aug.16, 2011 Seventy-Second Report of the Monitor ) ¶ 38.

10.     Nortel Russia received proceeds of sales from the Enterprise Solutions and GSM Sales as a result of local sale agreements.

> TR50482 (Aug.16, 2011 Seventy-Second Report of the Monitor ) ¶ 44.

E-2

11.    Nortel Russia did not receive any proceeds from the CVAS or MEN sale

transactions.

TR50482 (Aug.16, 2011 Seventy-Second Report of the Monitor ) ¶ 44.

12.    Pursuant to the escrow agreements associated with the MEN, CVAS, GSM and

Enterprise Sales, Nortel Russia's consent was required for any consensual release of funds from

the relevant escrow accounts and any amendment to the relevant escrow agreements.

TR44197 (GSM Side Agreement); TR44198 (MEN Side Agreement); TR44195
(CVAS Side Agreement); TR44196 (Enterprise Side Agreement).

13.    To facilitate payments from the escrow accounts associated with the MEN,

CVAS, GSM and Enterprise Sales and to secure Nortel Russia's consent to certain other inter-

estate agreements, NNIF, Nortel Russia and all other Nortel entities that were parties to at least

one of the relevant escrow agreements executed four side letters, each dated August 19, 2011,

with respect to each of the four relevant escrow agreements.

TR44197 (GSM Side Agreement); TR44198 (MEN Side Agreement); TR44195
(CVAS Side Agreement); TR44196 (Enterprise Side Agreement).

**C.  Nortel Colombia**

14.    Nortel Colombia was a party to the MEN Escrow Agreement.

TR48110 (Mar. 19, 2010 MEN Distribution Escrow Agreement).

15.    The MEN Escrow Agreement provides that the proceeds from the MEN Sale

cannot be released without either a final determination on allocation or the execution of a letter

of direction to JPMorgan as distribution agent by all of the Nortel entities that are a party to the

MEN Escrow Agreement (the "Depositors") and that any amendment to the MEN Escrow

Agreement requires the consent of all Depositors.

TR48110 (Mar. 19, 2010 MEN Distribution Escrow Agreement).

16.     As part of the MEN Sales, Nortel Colombia was paid approximately $117,000 for inventory transferred to Ciena by Nortel Colombia.

    TR45576 (June 3, 2011 Sixty-Eighth Report of the Monitor) ¶ 17.

17.     Nortel Colombia commenced liquidation in April 2010.  The liquidator of Nortel Colombia subsequently resigned.

    TR45576 (June 3, 2011 Sixty-Eighth Report of the Monitor) ¶ 18.

18.     As of May 2011, no replacement liquidator had been appointed for Nortel Colombia and as a result, no individual or entity had authority to execute documents on its behalf.

    TR50190 (U.S. D.I. 5472 Motion for Entry of an Order Authorizing Action Under the MEN Sale Escrow Agreement without the Participation of Nortel Colombia) ¶ 4.

19.     The US Debtors and the Canadian Debtors filed motions (the "Nortel Colombia Motions") with the US Court and the Canadian Court on May 23, 2011 and May 26, 2011, respectively, requesting that both courts authorize JPMorgan as distribution agent under the MEN Escrow Agreement to take all acts required by the Depositors under the MEN Escrow Agreement without the consent or participation of Nortel Colombia.  The relief sought was without prejudice to Nortel Colombia's rights, if any, to an allocation of the MEN sale proceeds

    TR50190 (U.S. D.I. 5472 Motion for Entry of an Order Authorizing Action Under the MEN Sale Escrow Agreemeny without the Participation of Nortel Colombia); TR49960 (May 26, 2011 Canadian Motion Record Re: Nortel Colombia).

20.     The US Court and Canadian Court approved the relief requested in the Nortel Colombia Motions on June 15, 2011 and June 21, 2011, respectively.

    TR50192 (US D.I. 5726 Order Authorizing Action under the MEN Sale Escrow Agreement without the Participation of Nortel Colombia); TR50429 (June 21, 2011 Canadian Order Re: Nortel Colombia).

_____