Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Nortel Networks, Inc., et al. | : | Case No. 09-10138 (KG) |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------- x

**POST-TRIAL BRIEF OF WILMINGTON TRUST,
NATIONAL ASSOCIATION, AS SUCCESSOR INDENTURE TRUSTEE**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .........................................................................................................................5

I.     Allocation of Sale Proceeds Should be Primarily to NNL, as NNL Indisputably Owned the Nortel IP. ....................................................................................................5

       A.     The MRDA Should Be Interpreted According To Its Plain Language......................7

       B.     The MRDA Established That The Licensed Participants Held Ownership Rights Only In Their Limited Licenses. ................................................................11

II.    Licensees' Arguments That Results Arising from Plain Reading of MRDA Are Unfair or Contrary to Rational Behavior Are Self-Serving And Lack Factual And Legal Support...........................................................................................................12

       A.     The MRDA is Not Fundamentally Unfair Because it Does Not Contain a Provision Allocating Post-Liquidation Proceeds to the Licensed Participants.........13

       B.     Nortel Accurately Represented the Ownership of the Nortel IP to Taxing Authorities as Vested in NNL...........................................................................15

       C.     The Evidence Presented at Trial Proves that the Monitor Did Not Act in Bad Faith by Failing to Discuss its Theory of Allocation................................................16

              1.     All Core Parties Agreed that Their Allocation Rights were Preserved in the IFSA. ...............................................................................................17

              2.     Deferring the Question of Allocation Until After the Asset Sales was Clearly in Everyone's Best Interests and Failing to Mention its Allocation Theory at the Time Was Not A Misrepresentation. .....................18

              3.     The Licensees' Argument That, Had They Known the Monitor's Allocation Position, They Would have Pursued IPCo. is Both Speculative and Fails to Address Allocation. ...............................................20

III.   In the Alternative, If the Courts Should Desire to Allocate the Assets to all Creditors on an Equitable Basis, the Assets Should be Distributed *Pro Rata*...................22

CONCLUSION......................................................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*,
    584 F.3d 575 (3d Cir. 2009)...........................................................................8

*Bauer v. Bank of Montreal*
    [1980] 2 S.C.R. 102 ....................................................................................8

*Carman Construction Ltd. v. Canadian Pacific Railway*
    [1982] 1 S.C.R. 958 ....................................................................................8

*Coface Collections N. Am. Inc. v. Newton,*
    430 F. App'x 162 (3d Cir. 2011) ................................................................8

*Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*,
    [1982] 1 S.C.R. 907 (S.C.C.)....................................................................11

*Hawrish v. Bank of Montreal*
    [1969] S.C.R. 515 .......................................................................................8

*Heap v. Hartley*
    (1889) 42 Ch.D. 461 .................................................................................11

*Jedfro Investments (U.S.A.) Ltd. v. Jacyk*
    [2007] 3 SCR 679 .....................................................................................14

*Merck & Co. Inc. v. Apotex Inc.*,
    2010 FC 1265, 91 CPR (4th) *aff'd* 2011 FCA 363, 102 CPR (4th) 321 ....................8

*Pacific National Investments Ltd. v. Victoria (City)*
    [2000] 2 S.C.R. 919 ..................................................................................14

*United States v. Saferstein,*
    673 F.3d 237 (3d Cir. 2012)........................................................................8

*Vita Food Products Inc. v. Unus Shipping Co.* (JCPC)
    [1939] A.C. 277 .........................................................................................7

**Statutes**

11 U.S.C. § 541(a)(1)...........................................................................................5

*Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B 3 § 67(1)(c), (d) ................................5

Wilmington Trust, National Association, exclusively in its capacity as indenture trustee for the Notes[1] (in such capacity, "Wilmington Trust" or the "Trustee"), by and through its undersigned attorneys, submits this post-trial brief with respect to the allocation of certain lockbox proceeds from the sale of Nortel's intellectual property assets (the "Nortel IP"), and in furtherance thereof, respectfully submits as follows:[2]

## PRELIMINARY STATEMENT

1.      After 21 days of trial, 36 witnesses and over 130 hours of testimony, the answer to the ultimate legal question in this Allocation Proceeding[3] remains identical to the answer that the Trustee submitted in its initial Allocation Pleading (*see* Trustee Allocation Brief ¶ 10-12): that the proceeds from the sale of the Nortel IP should be distributed according to the legal ownership interests in those assets established by the unambiguous written agreement of the parties, and that NNL is the legal owner of the Nortel IP.  The evidence received by these Courts supports a conclusion that the value of the license rights, the only property interest of the Licensed Participants (as defined in the Master R&D Agreement ("MRDA") (Ex. TR21003)) with respect to the Nortel IP, should be determined by analyzing the value of those licenses had Nortel continued operation.  Once that determination is made, such value should be distributed to those respective Licensed Participants.  The remainder of the proceeds, which the Trustee

---

[1] Nortel Networks Limited 6.875% Notes due 2023, issued pursuant to that certain Indenture, dated as of November 30, 1988 (as amended, supplemented or modified) between Nortel Networks Limited and the Trustee, as successor trustee to The Bank of New York Mellon (formerly known as The Bank of New York) as successor trustee to the Toronto-Dominion Bank Trust Company.

[2] The Trustee is not submitting a Proposed Statements of Fact and Conclusions of Law, but reserves its rights to join in any of the submissions of other Core Parties, including with respect to such Core Parties' Statements of Facts and Conclusions of Law.

[3] Capitalized terms not otherwise defined herein shall have the same meaning as attributed to them in the Trial Protocol.  Emphasis set forth herein is the Trustee's unless otherwise indicated.

expects to be the vast majority thereof, would then inure to the unquestioned title holder and the only party with a legally recognized ownership interest in those assets, NNL.

2.      Distribution along those lines not only accords with the plain language of the contract enacted by the Debtors during their years as a going concern, it ultimately provides the most equitable distribution amongst the creditors of the various Debtors, and, as the evidence showed, is consistent with the intent of the drafters of the MRDA. (*See, e.g.,* Affidavit of Clive Allen[4] (Ex. TR00002) ¶ 33.)

3.      The Bondholder Group, Committee and US Debtors (collectively, the "US Interests"), along with the EMEA Debtors (together with the US Interests, the "Licensees") seek to have these Courts: (i) rewrite the clear terms of the MRDA so that they are more to the Licensees' liking and (ii) engage in a hindsight reevaluation of the propriety of the conduct of the parties and their respective disclosures in the sale process. The Licensees' post-facto arguments cannot change the plain meaning of the MRDA, or the fact that all of the parties acted in the best interests of all of Nortel's estates (the "Estates") when pursuing sales that undisputedly maximized value for all of the Estates and their respective creditors, while prudently setting aside what all knew could be protracted and heated disagreement about allocation.

4.      The efforts of the Licensees to introduce parol evidence and self-serving post-facto assertions about what they would have done if they knew then what they know now ring hollow in light of the evidentiary record developed during the Allocation Proceeding, and is a disingenuous and self-serving attempt to have these Courts rewrite the parties' respective legal rights with the benefit of "20/20 hindsight." These efforts should not distract the Courts from a

---

[4] Clive Allen testified on behalf of the Canadian Interests during the Allocation Trial as a retired, senior officer of NNL, who had served as NNL's Chief Legal Officer and handled legal matters relating to corporate governance and intellectual property matters on a worldwide basis.

straightforward analysis of the agreements of the Parties. As much as the Licensees may wish to rewrite the MRDA and history, they are not permitted to do so.

5.      There is no question that NNL owned the Nortel IP. The testimony, including testimony of witnesses of the US Interests, makes clear that the only source of rights of any of the parties to the Nortel IP arise from the terms of the MRDA. (*See* M. Orlando,[5] Trial Tr. 1327:20-1328:4; M. Weisz,[6] Trial Tr. 1891:10-13.) The MRDA could not be more clear that NNL owned the Nortel IP and *licensed* the use of specific Nortel IP in specifically designated territories to the Licensees. The Licensees owned beneficial interests in such *license rights*—such rights themselves constituting only an ownership of an intangible for transfer pricing purposes—but did not own rights to the Nortel IP itself. (*See, e.g.,* M. Orlando, Trial Tr. 1341:12-23.)

6.      The undisputed evidence adduced at trial also made clear that the MRDA does not address the rights of the Licensees to any share of the value of the Nortel IP, except as arising from the split of the profits and losses from Nortel's operations and sales of Products (as defined in the MRDA). It does not provide terms for the allocation of sale proceeds from the ultimate sale of the Nortel IP. (*See* M. Orlando, Trial Tr. 1288:14-16; M. Weisz, Trial Tr. 1872:5-11, 1892:3-9; Dr. Reichert, Trial Tr. 3834:12-3835:5; L. Eden, Trial Tr. 4982:1-8.) Equally important, notwithstanding the allegations and innuendo to the contrary, the uncontroverted evidence revealed that the various taxing authorities who were provided with copies of the MRDA were never told that the MRDA dictated how the proceeds of any ultimate sale might be

---

[5] Michael Orlando testified on behalf of the US Interests during the Allocation Trial as a retired employee of NNI, who had served as NNI's director of transfer pricing.

[6] Mark Weisz testified on behalf of the US Interests during the Allocation Trial as a retired employee of the Nortel tax department, who had served as Leader of International Tax with NNI and was involved in Nortel's global transfer pricing policy.

distributed or that there was any other agreement that did so. (*See* M. Orlando, Trial Tr. 1343:17-1344:10; K. Stephens, Trial Tr. 1764:6-14.) Indeed, as Mr. Weisz admits, when the taxing authorities asked who the legal owner of the Nortel IP was, they were told that it was NNL. (*See* M. Weisz, Trial Tr. 1896:8-11.)

7.      As much as the Licensees, with hindsight, say that they would never have agreed to make substantial investments in research and development ("R&D") if they thought that they would only be compensated for the value of their licenses upon any ultimate sale of such Nortel IP, the agreement they actually signed is not ambiguous. Nor is it unfair. While the Licensees did not have defined rights in the ultimate sale of Nortel IP, the Licensees did "benefit[] initially by being able to commence operations without substantial up-front costs for Technology and thereafter by having access to a much greater pool of Technology than they could ever afford…." (Affidavit of Clive Allen (Ex. TR00002), ¶ 36.) And, as Dr. Reichert explains, the Licensees were compensated for their contribution to R&D through the MRDA from the split of the profits and losses and through their entitlement to compensation for the value of the only ownership interests that they would surrender in such a sale—their ownership of their license rights. (*See* Dr. Reichert, Trial Tr. 3851:7-17.)

8.      Notwithstanding the Licensees' complaint that the ownership theory of the Monitor, CCC and the Trustee (collectively, the "Canadian Interests") is somehow unfair because it allocates so much to the Canadian entity that owned the Nortel IP, reviewing the potential outcome of the various theories, it is really the theory of the US Interests that is unfair and leads to lopsided results. (*See* Rebuttal Report of Thomas Britven (Ex. TR00046) at p. 5, Table 1.) By contrast, even under the Canadian Interests' ownership theory, the US Interests

may well receive a par or near par recovery and far more on a percentage basis than either the Canadian or EMEA creditors. (*See id.*)

9.      Finally, if these Courts conclude that the MRDA is not clear with respect to the ownership of the assets that were surrendered in the sale, and choose to allocate the sale proceeds instead in a manner tailored to combat unfairness, the Trustee submits that an approach based on the UK Pension Claimants' and/or the CCC's "*pro rata*" theory (the "Pro Rata Theory"), and development of a methodology on that basis, leads to the most equitable result. If the Courts reject allocation based on the MRDA, they will have to choose from the variety of non-ownership based allocation theories that have been advanced by the parties, including the US Interests' "revenue" theory (the "Revenue Theory"), the EMEA Debtors' "contribution" theory (the "Contribution Theory") and the Pro Rata Theory. The Trustee respectfully submits that none of these "theories" is based on the actual ownership of the assets that the Licensees claim is the key question for allocation. If the Courts must go off the legal grid to find an equitable and fair methodology for allocation, then an allocation methodology that reflects Nortel's operating model, which promoted the operation of an integrated global entity that endeavored to treat all of Nortel's creditors fairly, and substantially similarly, makes the most sense and leads to the most equitable outcome.

## ARGUMENT

## I.      Allocation of Sale Proceeds Should be Primarily to NNL, as NNL Indisputably Owned the Nortel IP.

10.      By operation of the Bankruptcy Code, a bankruptcy "estate is comprised of…all legal or equitable interest of the debtor in property." 11 U.S.C. § 541(a)(1). Canadian bankruptcy law, as articulated in sections 67(1)(c) and (d) of the *Bankruptcy and Insolvency Act* R.S.C. 1985, c. B-3, as amended ("BIA"), adopts the same approach. In both the United States

and Canada a bankruptcy estate is thus, axiomatically, legally entitled to the proceeds of the sale of any of its property.

11.     The vast majority of the proceeds that these Allocation Proceedings are intended to distribute resulted from the sale of the Nortel IP assets.  Ownership of the Nortel IP (precisely the assets whose proceeds are the primary subject of the current proceeding) was determined exclusively by the MRDA.  (*See* M. Orlando, Trial Tr. 1327:20-1328:4; M. Weisz, Trial Tr. 1891:10-1891:13.)   In the words of the US Debtors and UCC, "the MRDA set forth the agreement among the key Nortel entities concerning the creation, ownership and licensing of Nortel's intellectual property."  (US Allocation Brief at 10.)  It is similarly undisputed that **title** to Nortel's considerable IP assets was vested exclusively in NNL, as stated in the MRDA: "WHEREAS legal title to all NN Technology is held in the name of NNL."  (MRDA at 2; US Allocation Brief at 11 ("[T]he vast majority of Nortel's IP...is nominally filed in the name of NNL...."); US Interests Pre-Trial Brief at 39 ("...NNL was designated as the entity that would hold title to the resulting patents....").)

12.     As the US Interests, Canadian Interests and the EMEA Debtors agree, the central question of allocation is what is the value of the interests surrendered.[7]  If allocation turns on the

---

[7] (*See* Bondholder Group Allocation Brief ¶ 3 ("The Courts are now being asked to determine how much of the *aggregate* sale proceeds each Nortel Estate is entitled to receive in exchange for the *individual* assets it sold and the *individual* rights it relinquished from their respective estates as components of the various sale transaction." (emphases in original)); CCC Allocation Brief ¶ 5(a) (requesting "an Order...allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets..."); EMEA Debtors Allocation Brief ¶ 3 ("To determine the proper allocation of the Sale Proceeds, first the classes of assets sold in a particular Asset Sale must be identified, then the proportion of Sale Proceeds attributable to each class of assets should be determined, and finally it should be determined which Selling Debtor owned (or had an entitlement to or interest in) which assets."); Monitor Allocation Brief ¶ 4 ("What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or US Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?"); Trustee Allocation Brief ¶¶ 10-11 ("Because of NNL's ownership of the intellectual property, it may be appropriate for all or nearly all of the value attributable to such sales to be allocated to NNL in the first instance. . . . Any determination of allocation based simply on what some have termed a 'fair market value' approach for all of the proceeds does not properly account for the true contributions of value of the different entities."); US

ownership interests of the respective parties, as the Trustee believes it should, then the Courts need only look to the MRDA for the delineation of those respective ownership rights. As title holder to the Nortel IP assets pursuant to the MRDA, NNL should, in the first instance, receive the allocation of the proceeds of sales of its assets, less the share of the proceeds attributable to the licenses of the Licensed Participants. The value of the property interests surrendered by the Licensed Participants should be measured by valuing the license rights that they surrendered by terminating their licenses. As Mr. Green, Mr. Berenblut and Mr. Cox demonstrate, that value is measured by reference to the value that the Licensed Participants could have received if Nortel had continued to operate. (*See* P. Green, Trial Tr. 3125:15-3127:3; M. Berenblut, Trial Tr. 3661:22-3662:5; Report of Philip Green (Ex. TR00042) at 4; Report of Mark L. Berenblut and Alan J. Cox (Ex. TR00047) ¶¶ 65-67.)

### A.    The MRDA Should Be Interpreted According To Its Plain Language.

13.    The Licensees' attempts to muddy the waters, by introducing parol evidence to explain the plain meaning of the MRDA, should be dismissed by these Courts as irrelevant. Contract interpretation is governed by the law specified in the contract. In Canada, *see Vita Food Products Inc. v. Unus Shipping Co.* (JCPC) [1939] A.C. 277 ("*Vita Food*") par. 12 ("The proper law of the contract does indeed fix the interpretation and construction of its express terms and supply the relevant background of statutory or implied terms."). In the case of the MRDA, that is the law of Ontario, Canada. (*See* MRDA, Article 14(f).) Both the Canadian and US Courts give effect to such choice of law provisions, and thus the MRDA must be interpreted under Canadian law, as a matter of law. *See, e.g., Vita-Food* at par. 12 ("….and where there is an express statement by the parties of their intention to select the law of the contract, it is

---

Allocation Brief at 1 ("The Courts must determine the value of the assets and rights transferred by each of the separate and legally distinct Selling Debtors to allocate over US$7 billion in sale proceeds now sitting in escrow.").)

difficult to see what qualifications are possible, provided the intention expressed is bona fide and legal, and provided there is no reason for avoiding the choice on the ground of public policy."); *Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 166 (3d Cir. 2011) (noting contract's choice-of-law provision should be applied if contract was voluntarily entered into and enforceable). As Justice Newbould has stated, "in the end it is going to be for Judge Gross and for me to figure out what that agreement means." (Newbould, J., Trial Tr. 871:9-11.)

14.     In both Canada and the United States, parol evidence can only be used if there is an ambiguity in the contract. If a clause is unambiguous then the parol evidence rule precludes extrinsic evidence in an attempt to contradict the written agreement. *E.g.,* in Canada, *see Hawrish v. Bank of Montreal* [1969] S.C.R. 515; *Bauer v. Bank of Montreal* [1980] 2 S.C.R. 102; *Carman Construction Ltd. v. Canadian Pacific Railway* [1982] 1 S.C.R. 958; *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 ("As I understand the state of the Canadian law of contracts, the express language of the parties to a contract is the core of their contractual obligations. Where the words of a contract are clear and unambiguous, a court need not look beyond those clear words to determine its intent and effect."); in U.S. s*ee United States v. Saferstein*, 673 F.3d 237, 242 (3d Cir. 2012) (citing *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 594 (3d Cir. 2009))). There is no such ambiguity in the MRDA; instead the MRDA clearly states that "legal title to all NN Technology is held in the name of NNL." (MRDA at 2.) The phrase is susceptible to no other interpretation. Nor is there any ambiguity in the statement that NNI, and all of the other Nortel subsidiaries, are likewise indisputably "Licensed Participants" with equitable and beneficial ownership in *license rights* granted by NNL to them in the MRDA.[8]

---

[8] *See* MRDA at 2 ("Whereas legal title to all NN Technology is held in the name of NNL;"), 2 ("Whereas each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory…"). The unambiguous language establishing NNL as the owner of the Nortel IP, and the Licensed Participants as owners of specified **rights** in the IP stands in contrast to the language relied

The uncontroverted evidence at trial reveals that such Licensed Participants do not hold title or any legally recognized property interest in the Nortel IP itself. (*See, e.g.,* S. Hamilton,[9] Trial Tr. 875:6-877:1 (noting Licensed Participants provided only with licensed rights); M. Orlando, Trial Tr. 1327:20-1328:4 (admitting MRDA is only source of rights of any party to the Nortel IP); M. Weisz, Trial Tr. 1889:13-1890:8, 1890:19-22 (stating Licensees' ownership rights, if any, are found only in the MRDA); Dr. Timothy Reichert Direct Examination Demonstrative (Ex. DEM00018) at 8 ("**Limited rights** in intangibles are commonly transferred by means of a license or other similar contractual arrangement, whether written oral, or implied… Such limited rights in intangibles are themselves intangibles." (Emphasis in original; citation omitted).)

15.    Even if the Courts were to consider the parol evidence offered at trial, the record has made clear that the Licensed Participants were licensees, not owners of the Nortel IP. Despite attempts to portray NNL's holding of legal title under the MRDA as only for "administrative convenience" (*see, e.g.,* W. Henderson, Trial Tr. 1142:21-24), having NNL hold legal title to the Nortel IP was, in fact, "***best practices***" for a global entity such as Nortel (A. Anderson, Trial Tr. 2195:24-2196:13 ("I don't know a company that doesn't [have one entity hold title], and I have worked for quite a few and experienced others"); *see also* Reply Affidavit of Clive Allen (Ex. TR00003 ¶ 6) (rejecting Henderson's characterization as "historically incorrect"); C. Allen, Trial Tr. 622:11-18 (noting NNL ownership of Nortel IP was "deliberate

---

upon by the US Interests to justify their claims of ownership, which merely echo the terms of the MRDA (*id.* at 27 ("Whereas each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the [MRDA];")) or recognize that NNL and its Licensed Participants **collectively**, bear the risk attendant with the ongoing operation of the global business (*id.* at 18 ("...the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."), 30 (same), 48 (same)). Statements that attribute ownership of the Nortel IP to all Participants in the MRDA cannot be read to grant nor even suggest any greater "ownership right" by certain of those Participants than that provided by the clear terms of the MRDA.

[9] Sharon Hamilton testified on behalf of the Canadian Monitor during the Allocation Trial, having been an active participant in the Monitor's work in the Nortel asset sales.

decision by senior management"); M. Weisz, Trial Tr. 1333:17-1334:4 (admitting that the words "administrative convenience" were not included in the MRDA or any amendments thereto)).

16.     The MRDA's establishment of NNL as title holder and licensor, and thus in the case of sale or liquidation of the Nortel IP to which it held title, the recipient of the proceeds, makes sense given the context in which the MRDA's predecessor, the cost-sharing agreement (the "CSA"), was drafted in the 1970s.  (*See* Reply Affidavit of Clive Allen (Ex. TR00003) ¶ 5 ("Under the Cost Sharing Agreements, the subsidiaries received licenses which granted them permission to use Technology owned by NNL...no ownership interest in the Technology was ever transferred to any subsidiaries and there was no intention to do so")).  Notably, the only changes to relevant provisions of the CSA in subsequent revisions thereto were merely to defined terms and dates, not the core concepts.  (*See* W. Henderson, Trial Tr. 1150:12-1153:18.)

17.     At the inception of the Nortel subsidiaries, "[NNL] entered into a series of agreements with a variety of subsidiaries in order to, in effect, set them up in business, because they had nothing beforehand."  (C. Allen, Trial Tr. 613:4-7.)  As the parent corporation, the original owner of the Nortel IP, and the licensor, it was entirely sensible for NNL to retain residual ownership rights in that Nortel IP, even as it was supplemented by work from the various Nortel subsidiaries.  In fact, "[h]aving NNL own NN technology was a deliberate decision by senior management of a storied Canadian-based technology company that was increasingly beginning to carry on business through subsidiaries incorporated in various jurisdictions throughout the world." (C. Allen, Trial Tr. 622:11-18; *see also* A. DeWilton, Trial Tr. 762:8-24 (noting that "[i]t is a matter of good corporate practice that one entity owns the patent portfolio and therefore has ownership and control over those patent rights")).  Vesting title in NNL was "essential because it allowed NNL to control the use of Technology, to settle

differences between subsidiaries and licensees, to determine the strategic direction of R&D, and to enter into advantageous licensing and cross-licensing arrangements with third parties." (Affidavit of Clive Allen, Ex. TR00002 ¶ 35.)  Mr. Allen's testimony on those facts was not contradicted.

**B.      The MRDA Established That The Licensed Participants Held Ownership Rights Only In Their Limited Licenses.**

18.      The Licensees cherry pick the terms "Economic and Beneficial Ownership" from the MRDA to support their strained and self-serving notion that the Licensees possessed some ownership interest in the Nortel IP.  This effort is unavailing.  It is undisputed that the Licensed Participants, including NNI, NNUK, NNSA, Nortel Networks Australia and Nortel Networks Ireland, were just that: *licensees*.  (*See, e.g.,* M. Orlando, Trial Tr. 1275:12-14 ("[The MRDA] granted exclusive licenses to each of the participants to the MRDA in exchange for legal title to NNL."); Affidavit of Gordon Davies (Ex. TR00013) ¶ 39.)  The only ownership interest they received in an intangible asset by operation of the MRDA was the limited license with respect to "Products" that NNL granted on a non-salable basis, effective only in the respective Licensee's territory, and continuing only for so long as the Licensees continued to make their R&D contributions.  *See Domco Industries Ltd. v. Armstrong Cork Canada Ltd.,* [1982] 1 S.C.R. 907 (S.C.C.) at p.912, (1982), 66 C.P.R. (2d) 46 (S.C.C.), adopting the comments of Fry L.J. at p. 470, in *Heap v. Hartley* (1889) 42 Ch.D. 461 ("An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing.") (emphasis in original).

19.      Attempts to confuse ownership of license rights with ownership of the Nortel IP fail as a matter of law, and are belied by the evidence in the case.  As explained by Dr. Reichert,

the term "economic and beneficial ownership" is a term primarily used with respect to transfer pricing arrangements among parent and subsidiary corporations, and is a term of art that is exclusively relevant for arrangements with taxing authorities. Indeed, Dr. Reichert testified that "transfer pricing regulations and guidelines do not purport to dictate legal or property interests either in insolvency or in a going concern context, or for that matter entitlement to proceeds from sale of assets, either again in an insolvency context or going concern context." (Dr. Reichert, Trial Tr. 3834:24-3835:5.) In the context of transfer pricing: "Economic ownership . . . [is] consistent with the OECD guidelines – as the right to benefit from some or all of an income stream as a result of a defined undertaking or activity." (Dr. Reichert, Trial Tr. 3830:4-8.)

## II.   Licensees' Arguments That Results Arising from Plain Reading of MRDA Are Unfair or Contrary to Rational Behavior Are Self-Serving And Lack Factual And Legal Support.

20.    The Licensees' allocation positions ignore Nortel's corporate functioning and structure, the plain language of the contracts, and common sense. Their only justification for this departure from both the law and the facts has been a continuing refrain echoing throughout these proceedings, that adhering to the rights delineated in the MRDA, and thus allocating sale proceeds according to the method proposed by the Canadian Interests, would be "unfair." This is tantamount to arguing that simply enforcing the MRDA as written is "unfair."

21.    The US Interests even go so far as to accuse the Monitor of making misrepresentations to the Core Parties, and to the Courts, by "unfairly" concealing its allocation position, despite having no basis in fact or law for making such a claim. It is perhaps more remarkable that the US Interests make such continuing appeals to "fairness" given the fact that, under most of the proposed allocations, they will be receiving at or near par value for their bonds, an enviable position that none of the other Core Parties can approach. In fact, while the US Interests argue for contract rate post-petition interest on top of the 100 cents on the dollar that

they are expecting, the recovery by Canadian creditors, under their own best case allocation proposals, hovers around only 60 cents on the dollar. Canadian recovery under the US Interests' theory decreases to a mere 11 cents on the dollar. (*See* T. Britven, Trial Tr. 3374:13-21; Rebuttal Report of Thomas Britven (Ex. TR00046) at p. 5, Table 1.)

> **A.     The MRDA is Not Fundamentally Unfair Because it Does Not Contain a Provision Allocating Post-Liquidation Proceeds to the Licensed Participants.**

22.     The Licensees argue that the Licensed Participants would not have entered into the MRDA if they had understood that they would have not been considered "owners" for the purposes of receiving proceeds of sales of the Nortel IP. As a threshold matter, such an arrangement is not surprising in a licensee/licensor relationship, where royalty payments (in this case in the form of R&D contributions) secure limited licensing rights and not ownership. (Dr. Reichert, Trial Tr. 3851:7-17.) NNI, in fact, would not have been able to survive as a standalone entity without such a relationship. (Reply Affidavit of Brian McFadden (Ex. TR00005) ¶ 3.) The US Interests have failed to adduce any evidence that NNI considered, let alone highly valued, its potential rights in the event of a Nortel liquidation proceeding at the time of contracting for the MRDA. In fact, the uncontroverted evidence is that the parties to the MRDA entered into that contract to govern the operation of their businesses as going concerns, and without placing any import on the potential outcome of a liquidation. (*See* M. Orlando, Trial Tr. 1323:7-23; M. Weisz, Trial Tr. 1892:3-15.) At the time the MRDA was signed in 2001, the arrangement was rational for all parties, even though the Licensed Participants did not have rights to the proceeds of a sale of the Nortel IP assets. As Dr. Reichert explained:

> Is it rational? Yes, it is, it happens in the open marketplace with great frequency. Think about entering into this arrangement in 1/1 of 2001. Remember, these entities anticipated, and in fact they got R&D activity payments for eight years, and there was no reason for them to anticipate going into the arrangement that – that the entity would become, Nortel would become insolvent or that, you know,

13

the events that transpired would have transpired. It was a perfectly rational arrangement for them to have entered into.

(Dr. Reichert, Trial Tr. 4018:21-4019:7.)

23.    The Licensees' argument that NNI would not have entered into a license contract that did not provide rights to sale proceeds is pure hindsight speculation. The parties could have included specific provisions pertaining to the parties' respective rights in the Nortel IP in the event of a sale of the business or liquidation; however, they did not choose to do so. It is not appropriate for the Licensees to ask these Courts to effectively rewrite the MRDA to include such a provision to their benefit at this juncture. *See, Pacific National Investments Ltd. v. Victoria (City); Jedfro Investments (U.S.A.) Ltd. v. Jacyk* [2007] 3 SCR 679 ("The general rule, of course, is that it is not the function of the court to rewrite a contract for the parties. Nor is it their role to relieve one of the parties against the consequences of an improvident contract.").

24.    Nor is it true that, in the absence of a right to receive proceeds from the sale of the Nortel IP assets, the Licensed Participants were unfairly under-compensated for their R&D expenditures. As Dr. Reichert explains, the Licensed Participants received valuable consideration for their R&D contributions, "the R&D effort and investment…is consideration. Consideration for the make/sell right, and it's consideration for a limited interest in residual profit. It's in essence then a substitute for a traditional royalty that you might see in a licensing arrangement." (Dr. Reichert, Trial Tr. 3851:9-17.) As Mr. Green provides:

> License value is measured by the present value of the benefit (usually cash flow) that would result from a Licensed Participant exploiting the license by continuing to operate.

> This is the appropriate [fair market value] measure of the licenses because the licensee's alternative to surrendering its license would be to continue to operate under the MRDA.

14

(Philip Green Direct Examination Demonstrative (Ex. DEM00015) at 13.) "[T]he purchasers [of the Nortel IP] actually bought ***ownership rights***. They bought the patents; they bought the technology and the rights to it. The US and EMEA Debtors only had ***license rights***, which are a subset of ownership rights." (P. Green, Trial Tr. 3117:4-9.)

> **B.     Nortel Accurately Represented the Ownership of the Nortel IP to Taxing Authorities as Vested in NNL.**

25.     Contrary to the US Interests' assertions that Nortel's transfer pricing agreements, as shared with the taxing authorities, represented the Licensees as owners of the Nortel IP, the evidence produced at trial is strictly to the contrary. As Mr. Weisz admitted, when the taxing authorities asked who owned title to the Nortel IP, they were told it was NNL. (M. Weisz, Trial Tr. 1898:8-11.) Moreover, the trial revealed that taxing authorities who analyzed Nortel's transfer pricing arrangements were focused on properly evaluating operating profits for purposes of levying taxes, not on determining the results of hypothetical sales of the underlying Nortel IP. (*See* M. Orlando, Trial Tr. 1343:17-1344:10; K. Stephens, Trial Tr. 1764:6-14; M. Weisz, Trial Tr. 1896:8-16, Ex. TR21041 (identifying representations made to taxing authorities)). The question of the ultimate legal title holder and the resultant allocation of potential liquidation proceeds was simply not relevant to their investigations. (*See, e.g.,* W. Henderson, Trial Tr. 1135:22-1136:9 (noting taxing authorities were interested in substance, not form)).

26.     Nor did the IRS and CRA cast doubt on the MRDA and the residual profit-split methodology ("RPSM") when they levied the additional US$2 billion charge on NNI. In that instance, the taxing authorities accepted the corporate form as represented by the MRDA, and questioned only Nortel's quantification. (*See* Dr. Reichert, Trial Tr. 4028:15-4029:16.) The Licensees cannot find support in a quantification error to bolster their attempts to rewrite the agreement among the parties for their own benefit. Indeed, the US Estates' entitlement to these

funds is recognized by their allowed US$2 billion claim against NNL.  The Courts should take note that this claim is the single largest claim against NNL, and that any funds allocated to Canada will be used in large part towards the satisfaction of that claim, which redounds to the ultimate benefit of the creditors of the US Estates.  (*See* J. Ray, Trial Tr. 1456:25-1457:5; T. Britven, Trial Tr. 3407:9-23.)

### C.     The Evidence Presented at Trial Proves that the Monitor Did Not Act in Bad Faith by Failing to Discuss its Theory of Allocation

27.     The Licensees insistence that the Monitor acted in bad faith by failing to announce its theory of allocation is frankly farcical.  *First*, it cannot have been a surprise to anyone that the Canadian Interests would read the MRDA to mean exactly what it said – that NNL held valuable title to the Nortel IP assets.  The Canadian Interests have, in fact, consistently maintained that NNL was the owner of Nortel's IP, from the Debtor's first Report in the CCAA proceeding that was filed on January 14, 2009, stating "Nortel's intellectual property (IP) is principally owned by NNL," and the Canadian Monitor's Reports filed in connection with the Residual IP sales which stated that NNL held title to the Residual IP, subject to inter-company licenses.  (Reply Affidavit of Sharon Hamilton (Ex. TR00010A) ¶¶ 37-38.)  *Second*, in order to facilitate the sale of the Nortel IP assets, a sale which all agreed was in everyone's best interest at the time (in hindsight, an entirely correct conclusion), all the parties agreed to table discussion of the allocation of the proceeds until after the sale.  The Licensees cannot seriously believe that after signing the Interim Funding and Settlement Agreement ("IFSA") (Ex. TR40015), which contained numerous reservations of rights related to the allocation dispute, the Monitor was required to announce its allocation theory to all parties.  Nor can the Licensees credibly assert that they would have made a different decision with regard to the asset sales had they known of the Monitor's theory, as failing to sell the assets would have gutted the recovery of the US

Creditors.  The potential alternative of IPCo. never rose above the level of speculation, nor would it have solved the ultimate issue of allocation.  (*See, e.g.,* S. Hamilton, Trial Tr. 925:6-11 ("[W]e had many times articulated that at the end of the day we didn't see [IPCo.] as viable, and I think, you know, the first email that you showed me indicates that the Bondholders were getting the impression from the US Debtors that they didn't think it was viable either")).  *Finally,* the Licensees cannot accuse the Monitor of bad faith for failure to disclose its allocation position, when, at the same time, the US Interests never informed Justice Morawetz that their allocation position would leave creditors of the Canadian Debtors with only 10 cents on the dollar.  (*See* J. Ray, Trial Tr. 1454:7-17)  All parties understood the uncertainty involved in the sale of the Nortel IP.  The Canadian Debtors, like the US Debtors and EMEA Debtors, incurred significant obligations maintaining and selling the Nortel IP, all while taking a risk that such costs would not be recovered.  (*See* Reply Affidavit of Sharon Hamilton (Ex. TR00010A) ¶ 30.)

### 1.    All Core Parties Agreed that Their Allocation Rights were Preserved in the IFSA.

28.    The inevitable dispute over the allocation of sale proceeds was universally anticipated.  In their sophistication, the Core Parties chose to contract around the controversy, by selling the assets while settlement of the allocation was ongoing.  "Cleary Gottlieb [counsel for the US Debtors] proposed the structure of, you know, selling the assets first and worrying about whose assets they were and how you would allocate proceeds until later."  (S. Hamilton, Trial Tr. 927:8-12.)  In order to induce all the Estates to take part in the sale, the Core Parties entered into an agreement called the IFSA, which stated that consenting to the asset sale would not compromise any of their rights to advocate for allocation of the proceeds.  The IFSA contained several such provisions:

Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

. . .

Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements…applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom….

(IFSA §§ 12(f), 20.)  As key parties who negotiated, and agreed to, the IFSA, the Licensees cannot now argue that the Monitor acted improperly by asserting the rights which all agreed had been expressly reserved to them.

> **2.  Deferring the Question of Allocation Until After the Asset Sales was Clearly in Everyone's Best Interests and Failing to Mention its Allocation Theory at the Time Was Not A Misrepresentation.**

29.    At the time the US Interests told the US Court that the sale (the "Rockstar Sale") of residual Nortel IP assets to Rockstar Bidco, LP ("Rockstar") was in its constituents' best interests, that was, in fact, the case.  Whatever the final allocation of the proceeds, it was clear at the time that it was imperative to sell the assets quickly, in order to preserve as much value as possible for Nortel creditors.  "[W]hat everybody proposed and everybody agreed to was that if we got bogged down in dealing with [allocation] at the outset, we'll never get the assets sold, the value will diminish." (S. Hamilton, Trial Tr. 928:22-25.)  It would have been in no one's interest to delay the sale in favor of a, likely extended, allocation dispute, held while the value of the assets disintegrated.  In hindsight, it is indisputable that completing the Rockstar Sale was in everyone's best interests.  Not only did the transaction yield proceeds well in excess of anyone's previous expectations, the five years since the first sale of Nortel's assets demonstrate what would have actually happened if allocation had been required prior to sale.  These five years

have been filled with failed settlement negotiations and an Allocation Proceeding, which, as correctly characterized by Judge Gross, has been an "extremely expensive, imposing proceeding based largely on the issue of the ownership of the NN Technology." (Gross, J., Trial Tr. 987:14-16.)

30.     Moreover, the suggestion that the Monitor deceived Judge Gross to receive his approval of the Rockstar Sale by remaining "silent, knowing that huge amounts of money were being spent by all the estates to sell a Canadian-only asset" (S. Block, Trial Tr. 890:6-8) is disingenuous at best.  Regardless of whether the Nortel IP assets were "Canadian-only assets" (a position the Canadian Interests do not take, as they all agree there is some value to the licensing rights held by the other Estates), the money spent to effectuate the Rockstar Sale was intended to, expected to, and will—even if the Monitor's allocation position succeeds—render the US Estate close to, or actually, solvent.  (*See* Rebuttal Report of Thomas Britven (Ex. TR00046) at p. 5, Table 1.)  It is difficult to countenance the argument that the Rockstar Sale would not be in the best interests of the creditors of the US Debtors if the Monitor's position prevails, given the fact that the Monitor proposes a near 100% recovery to creditors of the US Debtors (based on principal and interest accrued through the Petition Date).  Importantly, no one from the US Interests informed Justice Morawetz of their view that Canada was only entitled to approximately 10% of the proceeds of the sale before asking him to approve the sales on behalf of the Canadian estates.  (*See* J. Ray, Trial Tr. 1454:7-17; S. Hamilton, Trial Tr. 972:20-23 ("I don't recall the US Debtors or anybody else disclosing to me their legal position that they may take at some point in the future in these proceedings")).

3.    **The Licensees' Argument That, Had They Known the Monitor's Allocation Position, They Would have Pursued IPCo. is Both Speculative and Fails to Address Allocation.**

31.    The Licensees seek to rewrite history when they state that, had they known of the Monitor's position, they would have rejected the Rockstar Sale. *First*, this hindsight assertion is disingenuous speculation – it is far more likely that, in the event the Monitor explained its position on legal title, that the Licensees would have simply disagreed while reserving all of their rights to oppose any such argument[10] and moved on to a sale of the assets that generated billions of dollars more for the estates than anyone had expected up to that point.

32.    *Second,* particularly with respect to the US Interests, they would have moved forward with the sale secure in the knowledge that even if the Monitor were successful in convincing the Courts to decide allocation on a legal title basis that, because of their US$2 billion claim against NNL and the claims of the Crossover Bondholders,[11] there was no question that the lion's share of any proceeds awarded to NNL would actually come back to the benefit of the US Debtors and their creditors. (*See* J. Ray, Trial Tr. 1456:25-1457:5 ("Q: So when you told this Court that the Rockstar transaction was in the best interests of the US estates, you knew that there would be a meaningful or significant recovery to the US creditors from the Rockstar transaction; correct? A: Yes."); T. Britven, Trial Tr. 3407:16-23.) It would have been irrational for the Licensees to reject the Rockstar Sale, and a recovery of billions of dollars for the Nortel estates. Indeed, the Licensees clearly recognized the truth of this when they agreed that *all* arguments with respect to allocation were expressly reserved. (IFSA §§ 12(f), 20.)

---

[10] Which in fact they did by agreeing to the terms of the IFSA. (*See* IFSA §§ 12(f), 20.)

[11] "Crossover Bondholders" means the holders of certain unsecured claims against one or more of the Canadian Debtors and one or more of the US Debtors for amounts owing in respect of guaranteed or "cross-over" bonds issued or guaranteed by certain of the Canadian and US Debtors.

33.     *Third*, the bold post-facto assertion that the Licensees would have instead moved forward with an IP licensing and enforcement business ("IPCo.") is revisionist history that ignores the realities of the situation at the time of the sales. A trade of Rockstar for IPCo. would have been an exchange of billions of dollars of guaranteed proceeds for speculative revenue from a business that did not have a concrete source of funding, and which the US Debtors had no experience running. (*See* S. Hamilton, Trial Tr. 1008:13-1009:1 (stating that Nortel had "no material experience" in operating a licensing business")). There is no evidence that the US Debtors would have made such a risky choice, let alone that the other parties would have agreed to the idea. John Ray's testimony to the contrary is implausible in light of the testimony of Ms. Hamilton, who noted that during the efforts to monetize the Nortel IP assets "not once did any party ever come forward and say, we believe in IPCo. so strongly that we are willing to put dollars on the table to implement it,"[12] and in light of Mr. Ray's own admission that at the time of the sale he recognized significant proceeds would come to the US regardless of the allocation among the estates. (*See* J. Ray, Trial Tr. 1456:25-1457:5.) Moreover, even had the parties agreed to enter into an IPCo. venture, such agreement would not have resolved the allocation of the Nortel IP or the expected profits or losses with respect to any such venture. (Affidavit of Sharon Hamilton (Ex. TR00009A), ¶ 76 ("[A]t no point in any discussion or communication I had concerning IP Co. was there ever any consideration let alone agreement regarding: (i) what, if any, ownership or similar interest a particular Estate would have in IP Co., or; (ii) the terms of the transfer of the ownership of the Residual IP from NLL to the new IP Co")). There would still have been a dispute over allocation, and the Monitor's position would be just as applicable in an

---

[12] (S. Hamilton; Trial Tr. 924:15-18; *see also* Affidavit of Sharon Hamilton (Ex. TR00009A) ¶ 72 ("Ultimately, consideration [of IPCo.] never progressed to the point where this issue was considered in significant detail."), ¶¶ 74-84; Reply Affidavit of Sharon Hamilton (Ex. TR00010A) ¶ 34 ("...IP Co.'s 'business model' was almost entirely speculative and was more in the nature of a straw-man that the Estates used to benchmark the sale process for the Residual IP against")).

IPCo. context. Thus, the Licensees would be facing the same risk that a larger share of the proceeds than they desired would be allocated to Canada, but the amount of those proceeds would be unknown and unknowable.

### III.    In the Alternative, If the Courts Should Desire to Allocate the Assets to all Creditors on an Equitable Basis, the Assets Should be Distributed *Pro Rata*.

34.    As described above, the Trustee respectfully submits that the answer to the allocation question can be determined by interpreting the clear terms of the MRDA under Ontario law. The ownership of the assets surrendered and sold is determinable and well within the purview of the Courts. However, if the Courts disagree, then the equitable answer to the allocation question is a *pro rata* split of the assets among the creditors of Nortel.

35.    Neither the US Interests' "Revenue Theory" nor the EMEA Debtors' "Contribution Theory" has any basis in the law or from the terms of the MRDA—the document that all agreed was the only source of rights to the Nortel IP for any party. (*See* M. Orlando, Trial Tr. 1327:20-1328:4; M. Weisz, Trial Tr. 1891:10-1891:13.)

36.    The Revenue Theory completely ignores the operation of the MRDA and the fact that the Nortel entities were interdependent for the development of NN Technology (as defined in the MRDA) and the sales of Products. While the US may have had the largest market, looking at their revenue alone ignores the costs and expense that NNL and the Licensed Participants contributed to make that revenue possible. Indeed, it ignores that the revenue was subject to the RPSM requirements of the MRDA. (*See, e.g.,* R. Cooper, Trial Tr. 2745:14-2748:11 (commenting on flaws of US Interests' approach, including failure to recognize that a Licensee's rights cannot be divorced from the terms of the RPSM, which would result in a windfall to the US Debtors)).

37.     The Contribution Theory, while it may have an equitable ring, also ignores the legal realities and operations of Nortel.  There is no necessary correlation or basis to assume that any particular contributions to R&D in any finite period led to the creation of the particular Nortel IP that was sold or what the relationship of the R&D spend was to the actual value of any Nortel IP.  Technologies that cost hundreds of millions of US dollars to create may have been worthless while technologies that required a minimal investment may have resulted in IP worth hundreds of millions of US dollars.  (*See, e.g.,* J. Kinrich, Trial Tr. 4171:18-22 ("Contribution approach is not a way to determine fair market value.  Costs incurred are not equal to fair market value, so you can't measure them through what is being termed a contribution approach")).  In light of the illusory connection between R&D and the actual value of the Nortel IP sold, the Contribution Theory provides no reliable basis for a fair allocation.  In fact, it is agreed that it is "virtually impossible to trace R&D in one location to a particular patent."  (M. Orlando, Trial Tr. 1315:21-1316:1.)  Moreover, there is no legal requirement to apply such a methodology, as the evidence is uncontroverted that the MRDA does not address the split of profits or losses on the ultimate sale of any of the Nortel IP.  (*See* M. Weisz, Trial Tr. 1891:24-1892:9; Dr. Reichert, Trial Tr. 3834:24-3835:5 ("The transfer pricing regulations and guidelines do not purport to dictate legal or property interests either in insolvency or in a going concern context, or for that matter entitlement to proceeds from sale of assets, either again in an insolvency context or going concern context")).

38.     While the Licensees have been dismissive of the "Pro Rata Theory," the simple truth is that their theories present no stronger legal bases.  The Licensees' theories are based solely in alleged equity, but only the Pro Rata Theory looks to how Nortel actually operated to determine an equitable allocation of the proceeds from the lockbox.

39.     Throughout the entirety of the Allocation Proceeding, it was not disputed that Nortel was a fully integrated, global enterprise, working to create value for the entity as a whole. The testimony was clear that Nortel "had to have the collectively [*sic*] of those markets, and this was all driven throughout the whole corporation worldwide. That's why we ran it as a global corporation." (C. Allen, Trial Tr. 626:18-21; *see also* S. Bruckheimer, Trial Tr. 1583:16-18 (characterizing Nortel as "all for one and one for all" and as "the Three Musketeers"); M. Weisz, Trial Tr. 1879:2-15.) Moreover, the evidence is clear and uncontroverted that it is not possible to trace the source of funds or all of the personnel that developed any specific patent or NN Technology. (*See* M. Orlando, Trial Tr. 1315:21-1316:1.)

40.     Thus, in the event that the Courts are not able to determine ownership rights in the Nortel IP by reference to the MRDA, or conclude that there is some shared ownership of the Nortel IP assets, the only fair and equitable allocation that would be consistent with how Nortel's business was run would be a *pro rata* distribution to all creditors of the various Estates. While the precise methodology for applying the Pro Rata Theory may not yet have been determined, the Courts could provide the parties with guidance on how certain issues, such as the guarantee claims or inter-company claims could be treated so that the appropriate methodology leading to the most equitable result could be implemented.

## CONCLUSION

41.     The agreed task of these Courts in the Allocation Proceeding is to determine "[w]hat portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or US Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?" (Monitor Allocation Brief ¶ 4.) The central answer to this question can be found in the unambiguous

terms of the MRDA.  NNL owns legal title to the Nortel IP, and the US Debtors and EMEA Debtors owned license rights to the NN Technology.

42.    With respect to the allocation of value attributable to the Nortel IP, the Courts must determine the value of the license rights that were owned and surrendered by the Licensees because that was their property interest in the assets that were the subject of the transaction.[13] Once the Licensees have received the value of their license rights, the remaining value attributable to the Nortel IP must be allocated to NNL.  The methodology for this determination can be found in the expert submissions of the CCC and the Monitor.  (*See* Expert Report of Thomas Britven (Ex. TR00045) § 6; Expert Report of Mark L. Berenblut and Alan J. Cox (Ex. TR00047) §§ 7-8).  If the evidence presented during the Allocation Proceeding does not permit the Courts to determine the ownership of the Nortel IP assets that were sold, then for the reasons set forth above, the most equitable and appropriate method for allocation is a pro rata distribution to all of the creditors of Nortel.  While this distribution approach will need more work to determine the methodology for such a distribution, the Expert Report of Thomas Britven (Ex. TR00045) § 8 and the Expert Report of Coleman Bazelon (Ex. TR00039) § IV.D offer starting points for development of such a methodology.

---

[13] The allocation of the other assets, including tangible assets in the business sales are more straightforward allocation issues, and the Trustee joins in the position of the Monitor and its experts with respect to the allocation of those assets.

Dated:   August 25, 2014
         Wilmington, Delaware

**COUSINS CHIPMAN & BROWN, LLP**


_____ /s/ Ann M. Kashishian _____
Scott D. Cousins (No. 3079)
Mark D. Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:        cousins@ccbllp.com
              olivere@ccbllp.com
              kashishian@ccbllp.com

– and –

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
Email: craig.barbarosh@kattenlaw.com
       david.crichlow@kattenlaw.com
       karen.dine@kattenlaw.com

– and –

Kenneth Kraft
John Salmas
DENTONS CANADA LLP
77 King Street West, Suite 400
Toronto, Ontario M5K 0A1
Canada
Telephone: (416) 863-4511
Facsimile: (416) 863-4592
Email: kenneth.kraft@dentons.com
       john.salmas@dentons.com


*Attorneys for Wilmington Trust, National
Association, solely in its capacity as Successor
Indenture Trustee and not in its individual capacity*

26