Court File No.: 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

- and -

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

## ALLOCATION POST-TRIAL BRIEF OF NORTEL NETWORKS UK PENSION TRUST LIMITED AND THE BOARD OF THE PENSION PROTECTION FUND

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

August 7, 2014

**THORNTON GROUT FINNIGAN LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario
M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Rebecca Lewis** (LSUC# 61146S)
**Michael S. Shakra** (LSUC# 64604K)

Tel:    416-304-1616
Fax:    416-304-1313

*Canadian Counsel to Nortel Networks UK*
*Pension Trust Limited and the Board of the*
*Pension Protection Fund*

**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A

**Brian E. O'Connor**
**Eugene L. Chang**
**Sameer Advani**
**Heather M. Schneider**
**Robert Kofsky**
**Andrew Hanrahan**
Tel:    212-728-8000
Fax:    212-728-8111

**BAYARD, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)
Tel: 302-655-5000
Fax: 302-658-6395

*US Counsel to Nortel Networks UK Pension*
*Trust Limited and the Board of the Pension*
*Protection Fund*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

I.     Nortel Operated as One Highly Integrated, Global Enterprise. ........................... 4

     A.     Nortel's Matrix Structure ....................................................................... 4

     B.     Nortel Presented Itself as a Single Globally Integrated Enterprise ......... 6

     C.     Nortel Managed Cash Centrally And For the Benefit of the Group. ........ 7

     D.     Nortel's Research & Development Functions Were Cross-Geographic and Collaborative. ...................................................................................... 8

II.    Nortel's Patent Portfolio .................................................................................... 9

     A.     Nortel Coordinated Its Patent Filings Globally to Promote the Interests of the Group as a Whole. ............................................................................ 9

     B.     Nortel's Patent Portfolio Promoted the Interests of the Group as a Whole. .......... 11

     C.     Nortel's Patent Portfolio Reflected the Integrated Nature of the Group. ............. 11

III.   NNUK Made Significant Contributions to Nortel's Patents and Technology. ................. 13

IV.   Nortel's Tax and Transfer Pricing Policies Were Designed to Benefit the Group as a Whole. ................................................................................................... 15

     A.     The MRDA Introduced the RPSM. ..................................................... 15

     B.     The MRDA Only Partially Reflected Business Practice at Nortel. ....... 16

     C.     The MRDA Does Not Address the Allocation of Funds in a Global Insolvency. ......................................................................................... 16

V.    The Insolvency of the Nortel Group. ............................................................... 18

     A.     Commencement of Insolvency Proceedings ........................................ 18

     B.     Restructuring Options and the Signing of the IFSA .............................. 18

C.     Segmentation of Patents For Sale Within Nortel's LOBs or Residual Portfolio .................................................................................................19

D.     Business Line Sales.........................................................................................19

E.     Sale of the Residual Patent Portfolio ...........................................................20

ARGUMENT ...................................................................................................................21

I.     No Agreement Exists in Which the Nortel Debtors Agreed *Ex Ante* on How the Proceeds of the Group's Liquidation Would Be Allocated Among the Estates. ...............21

A.     The MRDA Does Not Address, Much Less Govern, the Allocation Dispute Before the Courts.........................................................................21

B.     The IFSA Does Not Provide an Answer to the Allocation Dispute, and Nothing in It Is Inconsistent With or Precludes Allocation of the Lockbox Funds Pursuant to the Pro Rata Distribution Model. ...............................24

II.     The Pro Rata Distribution Model Is Consistent with the Facts of this Case and the Courts' Equitable Powers. ...............................................................................25

A.     The Courts Have Broad Equitable Powers To Fashion an Appropriate Allocation Mechanism in this Unprecedented Case. ...............................25

(1)     The Joint Venture Analogy Is Consistent with Nortel's Operation as a Highly Integrated Global Enterprise...................................27

(2)     Avoidance of Unjust Enrichment is Consistent with the Entangled and Commingled Nature of Nortel's IP. .......................................31

(3)     Equitable Receivership Principles Are Also Consistent With Nortel's Entangled IP...............................................................33

B.     The Pro Rata Distribution Model Is Consistent with The Economic Rationality of the RPEs.........................................................................35

III.     Implementation Of The Pro Rata Distribution Model Is Straightforward. ........................37

A.     The Pro Rata Distribution Model Is Simple and Flexible.....................................37

B.     While the Pro Rata Distribution Model Is Flexible Enough to Accommodate Guarantees, There Is No Need for the Courts To Give Them Effect. .........................................................................................41

IV.     The Pro Rata Distribution Model is Consistent with Domestic and International Principles of Insolvency Law...............................................................................45

A.      Principles of Domestic and International Insolvency Law Support a Pro
        Rata Distribution. ................................................................................................45

        (1)     The Development of Modified Universalism and Principles of
                International Insolvency ............................................................................46

        (2)     Modified Universalism's Application is Both Procedural and
                Substantive. ...............................................................................................50

B.      The Pro Rata Distribution Model Properly Applies the Hotchpot Rule. ...............53

C.      The Pro Rata Distribution Model is Not "Global Substantive
        Consolidation" But Is Consistent with the Underlying Principles ........................56

CONCLUSION ...................................................................................................................57

**Case**                                                                 **Page(s)**

## US LAW

*In re ABC Learning Centres Ltd.*,
    728 F.3d 301 (3rd Cir. 2013) ...............................................................49, 52, 53

*In re Board of Directors of Telecom Argentina, S.A.*,
    528 F.3d 162 (2d Cir. 2008)...................................................................................51

*Carlson v. Samuel & Co.*,
    212 N.Y.S.2d 890 (Sup. Ct. 1961)........................................................................29

*Commodity Futures Trading Comm'n v. Eustace*,
    Civ. No. 05-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008) .........................34

*Counihan v. Allstate Ins. Co.*,
    194 F.3d 357 (2d Cir. 1999)...................................................................................31

*Cunningham v. Brown*,
    265 U.S. 1 (1924)...................................................................................................33

*Dundes v. Fuersich*,
    791 N.Y.S.2d 893 (Sup. Ct. 2004)........................................................................29

*Evans v. Warner*,
    47 N.Y.S. 16 (App. Div. 1897) .......................................................................29, 30

*Kovacik v. Reed*,
    49 Cal.2d 166 (Cal. 1957).....................................................................................30

*In re Maxwell Commc'n Corp. plc*,
    170 B.R. 800 (Bankr. S.D.N.Y. 1994)
    *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995) ..............................................................47, 52

*In re Metcalfe & Mansfield Alternative Investments*,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010)..................................................................51

*In re NWFX, Inc.*,
    864 F.2d 588 (8th Cir. 1988) .................................................................................26

*In re Pollmann*,
    156 F. 221 (S.D.N.Y. 1907)..................................................................................54

*SEC v. Sunwest Mgmt, Inc.*, Civ.
    No. 09-6056-HO, 2009 WL 3245879, at *7 (D. Or. Oct. 2, 2009)....................34

*United States v. BCCI Holdings (Luxembourg) S.A.*,
    48 F.3d 551 (D.D.C. 1995) ...................................................................................47

*United States v. Durham*,
    86 F.3d 70 (5th Cir. 1996) ..........................................................................................33

*United States Sec. & Exch. Comm'n v. Forex Asset Mgmt. LLC*,
    242 F.3d 325 (5th Cir. 2001) ......................................................................................33

*United States Sec. & Exch. Comm'n v. Infinity Grp.*, Co.,
    226 Fed. App'x 217 (3d Cir. 2007)..............................................................................33

*Young v. United States*,
    535 U.S. 43 (2002)......................................................................................................26

## CANADIAN LAW

*80 Wellesley St East Ltd. V. Fundy Bay Builders Ltd. et al.*, [1972] 2 O.R. 280 (C.A.) ...............26

*ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* 2008 CarswellOnt
    4811, 2008 ONCA 587 ...............................................................................................51

*Central Mortgage Housing Corp v. Graham* 1973 CarswellNS 192 ...........................................29

*Companies' Creditors Arrangement Act*, R.S.C., 1985 c C.-36, s. 11........................................26

*Cummings Estate v. Peopledge HR Services Inc.,* 2013 ONSC 2781 .........................................34

*Kerr v. Baranow,*2011 CarswellBC 240, 2011 SCC 10 ..............................................................31

## UK LAW

*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of
    Navigator Holdings plc*,
    [2007] 1 AC 508 .........................................................................................................49

*Ex parte Wilson. In re Douglas*, (1872) L.R. 7 Ch.App. 490 ......................................................54

## AUSTRALIAN LAW

*Muschinski v. Dodds,* [1985] HCA 78 .........................................................................................30

**OTHER AUTHORITIES**

The Honourable Allan L. Gropper, "The Payment of Priority Claims in Cross-Border Insolvency Cases", 46 Texas International Law Journal  559 (2011) .............................................................50

Andrew T. Guzman, "International Bankruptcy: In Defense of Universalism", 98 Mich. L. Rev. 2177, 2178 (2000) ...............................................................................................................47, 49

Jay Lawrence Westbrook, "A Global Solution to Multinational Default" 98 Mich. L. Rev. 2276 (2000) .....................................................................................................................................47

## INTRODUCTION

1.      This Post-Trial Allocation Brief is submitted on behalf of the Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund (the "**UK Pension Claimants**" or "**UKPC**"), which represent over 36,000 pension creditors of Nortel Networks Corporation and its global subsidiaries ("**Nortel**" or the "**Nortel Group**").[2]  As of January 14, 2009, the Nortel Networks UK Pension Plan (the "**Plan**"), which was sponsored by Nortel Networks UK Limited ("**NNUK**"), had a funding deficit of over $3 billion.[3]  The UK Pension Claimants respectfully request that the Courts adopt a pro rata distribution model to allocate the Lockbox Funds among the Estates of the Selling Debtors so that Nortel's worldwide creditors, particularly its involuntary creditors such as pensioners, are treated in a fair and equitable way. The UK Pension Claimants' Proposed Findings of Fact and Conclusions of Law in support of the pro rata distribution model are annexed as **Appendix A** to this submission.

## PRELIMINARY STATEMENT

2.      The UK Pension Claimants' Allocation Pre-Trial brief and opening statements to the Courts advanced several propositions that support the pro rata distribution model.  All of those propositions are supported by the evidence and were proven at trial.

3.      First, the UK Pension Claimants directed the Courts' attention to the massive swings in allocable value produced by the Estates' competing allocation metrics:

---

[2]      Unless otherwise indicated, all capitalized terms shall have the same meaning ascribed to them in the Allocation Pre-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund, dated May 2, 2104 (D.I. 13451).

[3]      Unless otherwise indicated, all monetary amounts are expressed in US dollars.



4.    These widely divergent views of allocation are driven by alternative views of the manner in which the value attributed to the Nortel patents or NN Technology is allocated to each of the Estates.  For this reason, it is imperative that the Courts consider the undisputed facts with respect to the creation and deployment of the NN Technology.

5.    The evidence at trial confirmed without question that the Master R&D Agreement ("**MRDA**") among Nortel's Residual Profit Entities ("**RPEs**") does not, and was never intended to, govern the allocation of the proceeds of the liquidation of the Group's assets.  A group-wide insolvency was simply never contemplated by the Nortel debtors, and neither the MRDA nor any other agreement governs the allocation issues before the Courts.  Despite that acknowledgement, the US and Canadian Estates each urge the Courts to construe select provisions—albeit different provisions—of the MRDA as providing an appropriate distribution metric, as if the Nortel debtors had in fact allocated the global insolvency risk *ex ante* in the MRDA.  But these wildly divergent distribution metrics, based on cherry-picked provisions of the MRDA, only serve to

-2-

illustrate the absence in fact of an *ex ante* agreement among the Nortel debtors to allocate insolvency risk, and the economic irrationality of the self-serving *ex post* constructions of the MRDA now urged on the Courts by the US and Canadian Estates (and by the EMEA Estate in its alternative license theory of allocation).  As the UK Pension Claimants counseled, the Courts must look beyond the confines of the MRDA, or any contractual agreement for that matter, to determine a fair and equitable allocation of the Lockbox Funds.

6.      Second, the UK Pension Claimants emphasized that there are virtually no disputes of material fact among the parties relating to the business and operations of the Nortel Group prior to its insolvency.  The parties agree that Nortel operated as a highly integrated global enterprise, both internally and externally.  The Courts  heard from numerous witnesses  that Nortel was a "matrix organization" that operated as "One Nortel" without regard to geographic borders or legal entities.  That evidence is uncontroverted.  The parties likewise agree that the crown jewel of Nortel was its intellectual property ("**IP**").  The trial evidence demonstrated unequivocally that Nortel's IP—a collaboratively created, entangled, and commingled portfolio-- was the engine that drove Nortel's business.

7.      Third, the UK Pension Claimants cautioned, however, that this is where consensus would end.  The parties that worked together so seamlessly when Nortel was a going concern have been engaged in a costly, intractable litigation for over five years.  While the debtors are engaged in a no-holds-barred territorial tug-of-war, the true parties in interest – Nortel's pensioners and other creditors – watch their recoveries erode by the day.  The UK Pension Claimants are particularly harmed by this seemingly endless internecine battle because, unlike the Estates and other Core Parties in the Allocation Litigation, the UK Pension Claimants

are paying their own litigation costs in an effort to obtain a fair recovery from the very pool of

Nortel's assets being eaten away by litigation costs and tactics of the other Core Parties.

8.    Fourth, and most importantly for purposes of this brief, the UK Pension Claimants

offered the Courts an alternative to the parochial, territorial allocation metrics proposed by the

Estates, which entirely disregard the manner in which Nortel operated pre-insolvency.  The UK

Pension Claimants explained why the pro rata distribution model is the legally correct approach,

as well as being fair and equitable, and being consistent both with the manner in which Nortel

operated pre-insolvency to create its entangled assets and with the manner in which it operated

post-insolvency to  maximize the proceeds of their sale.  Predicated on core insolvency

principles of *pro rata pari passu* treatment of unsecured creditors,  the pro rata distribution

model is economically rational, unlike the Canadian and US parties' allocation metrics, and is

straightforward to implement.

9.    Finally, the pro rata distribution model is consistent with common law principles

of equity that courts have used for years to distribute a pool of commingled assets among

competing claimants,  as well as with existing and evolving principles of international insolvency

law formulated to address  the unique issues posed by complex cross-border insolvencies.

## STATEMENT OF FACTS[4]

### I.    Nortel Operated as One Highly Integrated, Global Enterprise.

#### A.    Nortel's Matrix Structure

10.    It is undisputed that, prior to insolvency, the Nortel Group operated along

business lines as a highly integrated multinational enterprise with a matrix structure that

---

[4]    Attached hereto as Appendix A are  the UK Pension Claimants' Proposed Findings of Fact and
Conclusions of Law, which provide a detailed overview of the factual record.  Accordingly, the Statement
of Facts contained herein is limited to the key factual propositions supporting the UK Pension Claimants'
pro rata distribution model.

transcended geographic boundaries and legal entities.

11.     Nortel's matrix structure meant that key functions were coordinated across the various geographical and legal Nortel entities in order to serve the global R&D, manufacturing, sales, and marketing needs for the products and services offered by each of Nortel's lines of business.  "From the perspective of the Nortel group's senior management, the LOBs [lines of business] were the primary organizational divisions within Nortel."[5]  The Nortel Group's matrix structure "allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.*, sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to need." [6]

12.     In addition to the lines of business, Nortel was also comprised of legal entities organized in various countries around the world,[7] each of which observed necessary corporate formalities.[8] These entities, however, "had no real strategic process surrounding them,"[9] and, from an organizational standpoint, they were secondary to the business segments.[10]  Business and management decisions were typically made without regard for the particular geographic entities.[11]  At bottom, Nortel's legal entities were not free-standing companies, and could not feasibly have been "hived off" and operated independently.[12]

---

[5]     TR000001 (Currie Aff.) ¶28; Trial Trans. Day 3, 538:7–10 (Currie); Day 6, 1317:20-1318:21 (Orlando) (leadership evaluated success or failure based on lines of business).

[6]     TR00001 (Currie Aff.) ¶27; Bifield Deposition ("**Dep.**"). 257:5–24.

[7]     Trial Trans. Day 3, 538:11–14, 539:8–19 (Currie);

[8]     TR00014 (Binning Aff.) ¶9.

[9]     Trial Trans. Day 3, 540:4–7 (Currie).

[10]     Binning Dep. 133:13–24; Edwards Dep. 171:24–172:5; Pugh Dep. 141:22–142:2.

[11]     Briard Dep. 21:4–14 (discussing R&D allocation).

[12]     Trial Trans. Day 3, 539:20–540:11 (Currie).

## B.    Nortel Presented Itself as a Single Globally Integrated Enterprise.

13.    The manner in which Nortel presented itself both internally and externally reinforced the notion that it was a single, globally integrated business.  Nortel's businesses were "highly integrated across the globe", and their value derived from this global integration.[13]  In fact, Nortel's business activities used a "globe" trademark ubiquitously on internal and external documents to portray Nortel as a single global organization:

   

As Brian McFadden, a former Nortel Chief Technology Officer, testified, that symbol was used to represent the entire Nortel organization, not any particular legal entity:  "It was Nortel Networks and the symbol applied across all of Nortel."[14]

14.    Internally, Nortel's officers and employees often did not consider or distinguish between Nortel's different legal entities in the course of their duties.  For example, Simon Brueckheimer, a Nortel Fellow and prolific inventor based in the UK, testified that in customer-facing activities he "was representing Nortel.  I didn't differentiate any particular geography . . . . I took on the mantle essentially of representing the company as a whole."[15]

---

[13]    Trial Trans. Day 4, 1001:9-12; 1002:12-22 (Hamilton).

[14]    Trial Trans. Day 3, 711:15-712:11  (McFadden).

[15]    Trial Trans. Day 7, 1578:5–1579:21 (Brueckheimer); *see also* Drinkwater Dep. 21:23–22:10 (considered his employer to be "Nortel . . . [t]he global organization."); Dadyburjor Dep. 37:7–13 (legal entity that employed him was irrelevant from the standpoint of his job responsibilities); Briard Dep. 17:4–18 ("as far as I was concerned,  I was employed by Nortel, and I provided services to many regions and many entities . . ."); Richardson Dep. 16:6–17, 26:22–25, 31:9–14 (did not know which Nortel entity employed

-6-

15.     Externally, the Nortel Networks name and logo was used to refer to the Company as an integrated whole.  To the outside world, including Nortel's customers and suppliers, the logo referred to all of Nortel, and not to any one geographic entity.[16]  Those customers and suppliers were concerned with the reliability of Nortel as a whole, rather than the reliability of any one particular geographic or legal entity.  Consideration for which legal entity contracted with the supplier was seen as merely a formality.[17]  Nortel's customer contracts were in "spirit . . . with all of Nortel," notwithstanding the "mechanics" of contracting with individual legal entities.[18]

### C.    Nortel Managed Cash Centrally And For the Benefit of the Group.

16.     In furtherance of Nortel's integrated global business operations, the Nortel entities used a shared cash management system to transfer funds among one another, to allocate costs and profits, to comply with tax laws, and to manage the operations and cash needs of the enterprise.[19]  As part of this system, Nortel's revenues were distributed throughout Nortel to pay expenses of the global enterprise and "the fact that cash is generated in one jurisdiction [did] not mean that it [was] earmarked for utilization in that jurisdiction."[20]  Because of the way Nortel centrally managed liquidity on a group-wide basis, efforts were made to keep cash out of the UK to avoid restrictions on cash movement as a result of new pension regulations in the UK.[21]

---

him and did not consider that fact important); Hern Dep. 155:12–17 ("I just thought of Nortel as a global entity, and we might be on different sites, but we were a part of the same organization, overall.").

[16]    Trial Trans. Day 3, 711:11–712:11 (McFadden).

[17]    Briard Dep. 89:9–90:2.

[18]    Zafirovski Dep. 27:18–28:9.

[19]    TR21540 (Doolittle Decl.) ¶64.

[20]    Currie Dep. 183:3–23.

[21]    *See, e.g.*, TR50724.

**D.     Nortel's Research & Development Functions Were Cross-Geographic and Collaborative.**

17.     The "guts" of Nortel's business was its intellectual property, which was created through Nortel's collaborative R&D efforts.[22]  Unlike other high-technology companies with centralized R&D efforts, like Microsoft and Cisco, Nortel performed research at labs around the world.[23]  Cross-border collaboration was encouraged at Nortel,[24] and its patents often had multiple unique inventors from different geographic entities.[25]

18.     Nortel's R&D was organized differently than most other global high technology companies, and this had a direct impact on the entangled nature of its IP.  Nortel's R&D personnel and resources were more geographically diverse, spread out across different countries, than most other global technology companies.[26]  Telecommunications technology assisted the flow of ideas and collaboration between Nortel's R&D teams around the world.  For example, it was very common for team members from around the world to log on to Nortel's computer network and participate in conferences as if they were working in the next room.[27]   As a former Nortel CTO testified: "At Cisco they'd use a water cooler.  We used telephones."[28]

19.     By 2002, Nortel had 14,000 R&D employees in more than 20 regions, with its most significant presence in Canada, the US, and the UK.[29]  Nortel did not allocate R&D budgets

---

[22]     Trial Trans. Day 6, 1315:12–20 (Orlando); TR00023 (Brueckheimer Aff.) ¶5.

[23]     Trial Trans. Day 3, 708:14-710:19 (McFadden).

[24]     Trial Trans. Day 3, 712:12-713:11 (McFadden).

[25]     Trial Trans. Day 3, 773:4-775:14 (DeWilton).

[26]     Trial Trans. Day 3 710:15-19 (McFadden).

[27]     Trial Trans. Day 9, 1920:6-1921:17 (Hall).

[28]     Trial Trans. Day 3, 713:10–11 (McFadden).

[29]     TR21188 p. 4.

by geographic entity or subsidiary, but rather by line of business, which cut across multiple

geographies and legal entities.[30]  The R&D budget was set by NNL,[31] with the Nortel RPEs

performing  R&D to enhance their own revenues as well as global revenues.[32]  "Everybody [was]

trading to maximize the global revenues from the exploitation of Nortel technology."[33]

## II.    Nortel's Patent Portfolio

### A.    Nortel Coordinated Its Patent Filings Globally to Promote the Interests of the Group as a Whole.

20.    Nortel had centralized patent policies that were put in place for the benefit of the

entire Group, without regard for whether they operated to the detriment of particular RPEs.

Inventions were selected for filing based on their "TIC" score, which rated an invention based on

its technology, innovation, and commercial use.[34]  Nortel filed patents first in the United States,

because it was the largest market, and also set guidelines and quotas for filings outside the

United States. [35]  During the relevant time, Nortel had a target of filing the top 25 percent of its

patents as foreign filings, which meant that, at most, one out of four patents would be filed in the

UK.[36]  The limiting factor on foreign filings was the Group's budget, which applied globally and

was set by NNL.[37]  Nortel also had a process of regularly culling patents (i.e., deciding to

---

[30]     TR00004 (McFadden Aff.) ¶20.

[31]     Trial Trans. Day 9, 1922:21-1924:7 (Hall).

[32]     Trial Trans. Day 6, 1281:24-1282:24 (Orlando).

[33]     Trial Trans. Day 8, 1751:11-19 (Stephens).

[34]     See Trial Trans. Day 10, 2173:24-2176:9 (Anderson).

[35]     See Trial Trans. Day 3, 752:20-753:5; 753:6-754:4 (DeWilton); Trial Trans. Day 10, 2179:22-2182:25 (Anderson).

[36]     See Trial Trans. Day 3, 765:7-766:18 (DeWilton); Trial Trans. Day 10, 2181:3-15 (Anderson).

[37]     See Trial Trans. Day 3, 767:6-17 (DeWilton).

abandon patents to avoid paying the periodic maintenance fees), and all of the patents that existed at the time of the Residual IP sale survived this process.[38]

21.     In addition, Nortel had a policy requiring all patents to be assigned to NNL, regardless of geography.[39]  Legal title to Nortel's patents was vested in NNL for administrative convenience, tax reasons, and best practice.[40]  The assignment of patents to NNL was different than the default law in many countries.  For example, under the UK Patent Act, an inventor's employer, here NNUK, would own the inventions of its employees.[41]  When title for a UK invention was assigned to NNL instead of NNUK, NNUK did not receive any transfer of fair value at that time.[42]

22.     Although legal title to patents was assigned to NNL, it did not receive any special rights to the proceeds of the intellectual property as a result.[43]  No one ever suggested that, because legal title was vested in it, NNL had a greater beneficial interest in the IP than any other RPE.[44]  Nor, on the flip side, has it been suggested that NNL alone was required to bear all the costs to resolve an infringement claim if Nortel was accused of infringement.[45]

---

[38]     *See* Trial Trans. Day 3, 769:5-771:11 (DeWilton);  Trial Trans. Day 10, 2184:18-2187:4 (Anderson).

[39]     *See* Trial Trans. Day 3, 775:6-14 (DeWilton); Trial Trans. Day 10, 2178:8-2179:4 (Anderson).

[40]     *See* Trial Trans. Day 9, 1890:23-1891:6 (Weisz); Trial Trans. Day 10, 2195:14-2197:6 (Anderson).

[41]     *See* Trial Trans. Day 10, 2177:11-2178:7 (Anderson).

[42]     *See* Trial Trans. Day 10, 2179:5-13 (Anderson).

[43]     *See* Trial Trans. Day 5,  1142:10-20 (Henderson) ("Q. It's also your understanding, is it not, Mr. Henderson, that under the profit split model, NNL was going to hold legal title to the jointly created intellectual property?  A. Yes, that was our understanding.  Q.  We can also agree, Mr. Henderson, that NNL didn't get any special rights to the proceeds of the intellectual property under the profit split model as a result of this holding of legal title, correct?  A. That's correct.").

[44]     Trial Trans. Day 8, 1740:13-19 (Stephens).

[45]     Trial Trans. Day 8, 1727:11-1729:5 (Stephens).

**B.     Nortel's Patent Portfolio Promoted the Interests of the Group as a Whole.**

23.     Nortel's patent portfolio, which was the product of the Group's collaborative R&D, provided value prior to insolvency to the entire Nortel Group.  A functional analysis prepared for tax authorities explained that IP was the value of Nortel, and that the RPEs were entrepreneurs that jointly owned, contributed to, invested in, and derived the benefit of Nortel's IP.[46]

24.     Part of that value was defensive.  Sharon Hamilton, partner at Ernst & Young LLP in Canada, testified that Nortel's patent portfolio provided an "economic benefit" to the entire group because it "created huge defensive value. . . . [I]t was basically a prohibition on industry players . . . suing you for patent infringement because you had this huge trove of patents with which to counter-sue."[47]  Similarly, former Chief Technology Officer Brian McFadden testified that the portfolio enabled "freedom from patent infringement allegations" and "enables cross licensing agreements" that "provided real value to Nortel," meaning  the entire Nortel Group.[48]

**C.     Nortel's Patent Portfolio Reflected the Integrated Nature of the Group.**

25.     It is undisputed that Nortel's IP was created through a collaborative effort expended around the world.  The IP that resulted from that R&D was technologically and geographically entangled – the IP was "so interrelated, the transactions are so interrelated that we would have difficulty allocating the profits across the different types of technology."[49]

---

[46]     Trial Trans. Day 6, 1485:8-1486:21 (LeBrun); Trial Trans. Day 6, 1278-81 (Orlando).

[47]     Trial Trans. Day 4, 1009:18–1010:6 (Hamilton).

[48]     *See* Trial Trans. Day 3, 703:1-24 (McFadden).

[49]     Trial Trans. Day 6, 1315:1-11 (Orlando).

26.     Patents in Nortel's portfolio frequently cited to other Nortel patents and frequently had inventors from two or more countries on a single patent.[50]  This is indicative of a high degree of integration in the portfolio, and "shows how difficult it would be to disentangle the value, the production process of Nortel's intellectual property and sort of put a fence around any one geographic area."[51]

27.     The high level of interconnectedness – both technologically and geographically – of Nortel's IP was demonstrated by the undisputed forward citation analysis performed by the UK Pension Claimants' economic expert, Dr. Coleman Bazelon, as reflected in the following diagram:[52]

---

[50]     TR00039 (Bazelon Report) Fig. 5.; Trial Trans. Day 12, 2917:2–19,  2917:23–2918:1, 2918:15–2919:10 (Bazelon); Trial Trans. Day 10, 2177:2–10 (Anderson).

[51]     Trial Trans. Day 12, 2924:9–17 (Bazelon).

[52]     Trial Trans. Day 12, 2916:2-2917:1 (Bazelon); figure is based on Figure 7 of Dr. Bazelon's Expert Report, TR 00039.



28.     Based on his experience, Dr. Bazelon opined that this level of interconnection is unique and is not seen in typical technology companies, making it very difficult to disentangle the IP to allocate value across geographies or legal entities.

**III.     NNUK Made Significant Contributions to Nortel's Patents and Technology.**

29.     NNUK participated in high-value R&D for the benefit of the Nortel Group.  By 2000, Europe accounted for around 30 percent of Nortel's overall business.  At its height, NNUK employed nearly 2,000 R&D professionals.[53]  NNUK was frequently consulted by groups in the US and Canada on matters for its expertise relating to voice-over-packet technologies and the

---

[53]     TR00029 (Hall Aff.) ¶37.

Nortel Succession products.[54]  NNUK also contributed technological experts to assist in customer bids around the world.[55]

30.      Inventors at NNUK were significant contributors to Nortel's global IP portfolio.[56] One marketing document noted that Harlow UK inventors contributed one of every five patents in Nortel's portfolio.[57]  NNUK employees like Simon Brueckheimer and Andrew Jeffries spearheaded the development of technology in the mid-1990s that is still in use today.[58]

31.      Not only was NNUK's contribution technologically significant, but, when it came to invention, NNUK also "punched above its weight" relative to its share of the Group's R&D spending.  For example, between 2001 and 2008, NNUK's share of R&D was 5.5 percent.[59] Generally, however, between 15 and 20 percent of Nortel's new patent applications were based on invention disclosures from UK labs.[60]  Further, as Dr. Bazelon testified at trial, NNUK contributed at least 15 percent of the Rockstar portfolio which was more than three times its R&D spending under the MRDA.[61]

---

[54]      TR00023 (Brueckheimer Aff.) ¶42.

[55]      *See* Section I(C)(3) of Appendix A.

[56]      *See, e.g.*, Trial Trans. Day 3, 724:8-727:5 (McFadden) (explaining that Simon Brueckheimer, member of the Royal Academy of Engineering, was a "very prolific inventor within Nortel"; that he was "one of the top inventors at Nortel"; that he was a "prime contributor to intellectual property"; and that his work "played a significant role in establishing Nortel's leadership in a number of areas, including VoIP.").

[57]      Trial Trans. Day 7, 1601:9-21 (Brueckheimer); TR 21236.

[58]      *See, e.g.*, Trial Trans. Day 7, 1570:3-1571:17 (Brueckheimer); Trial Trans. Day 7, 1664:20-1665:15; 1671:20-1673:14 (Jeffries).

[59]      TR00033 (Malackowski Report) p. 53 Table 24.

[60]      Trial Trans. Day 3, 778:12–779:6 (DeWilton); TR00023 (Brueckheimer Aff.) Exh. E.

[61]      Trial Trans. Day 12, 2930:11-16 (Bazelon); *see also* TR00040 (Bazelon Rebuttal Report) p. 47, Table 15.

IV.    **Nortel's Tax and Transfer Pricing Policies Were Designed to Benefit the Group as a Whole.**

A.    **The MRDA Introduced the RPSM.**

32.    The MRDA was dated December 22, 2004, effective retroactively to January 1, 2001, and was signed in the first quarter of 2005.[62]   The parties to the MRDA were NNL, NNI, NNUK, NNSA, NN Ireland, and NN Australia,[63] and were referred to as "**Participants**" or "Integrated Entities" ("**IEs**") or RPEs.

33.    The MRDA implemented a residual profit sharing methodology ("**RPSM**")[64] that was designed to allocate the Group's annual operating profit (or loss) among participants based on their relative share of certain R&D costs over the preceding five years.[65]   This five-year look-back period was purportedly based on views within Nortel's R&D organizations as to the average useful life of R&D spending.[66]   It assumed that Nortel would continue into the future as a going concern.

34.    The MRDA recognized that NNL granted the other Participants exclusive rights to certain intellectual property in their home territories,[67] and that legal title to patents was assigned to and vested in NNL regardless of where the patents were invented.[68]   The RPSM did

---

[62]    TR21003 (MRDA) pp. 1–2.

[63]    NN Australia retired from the MRDA effective December 31, 2007, pursuant to the terms of the Second Addendum to the MRDA.  The Second Addendum provides that if an IE ceases to perform R&D for two consecutive years – as NN Australia had as of August 2005 – that IE is terminated as a Participant.  *See* TR21003 (MRDA) at 27-37; TR22077 at 12 n.5.

[64]    TR21003 (MRDA) p. 2.

[65]    TR21540 (Doolittle Decl.) ¶40. A variant on that allocation key, based on R&D Capital Stock rather than the last five years' R&D spending, had been used between 2001 and 2005.

[66]    Trial Trans. Day 3, 669:21–25 (McFadden).

[67]    TR21003 (MRDA) Art. 5.

[68]    TR21003 Art. 4.

not bestow any special rights on NNL by virtue of the fact that legal title was vested in it: it

received a share of residual operating profits or losses based on its R&D capital stock just like

the other Participants, and according to the same formula.[69]

### B.    The MRDA Only Partially Reflected Business Practice at Nortel.

35.    The MRDA was first and foremost a tax document.[70]  From an operations point of

view, the MRDA was not a consideration for the Group's R&D managers.  Brian McFadden,

who served as Chief Technology Officer from 2004 to 2005, had not even heard of the MRDA

during his time at Nortel.[71]  Furthermore, notwithstanding that under the MRDA, profits were

split in proportion to R&D spending only during the preceding five years, R&D could prove

useful, and generate profits, well after five years.[72]  In circumstances where as high a proportion

as 99% of the high-interest patents sold to Rockstar had been filed prior to 2006,[73] that

proposition cannot now tenably be disputed.

### C.    The MRDA Does Not Address the Allocation of Funds in a Global Insolvency.

36.    The MRDA plainly does not include any provisions addressing the global

insolvency or liquidation of the Nortel Group.  The evidence at trial was overwhelming and

undisputed that the MRDA was not intended to address that contingency:

---

[69]    Trial Trans. Day 5, 1141:19–1142:20 (Henderson).  This remained true for the period from 2006 when the RPEs' last five years of R&D spending was used as the allocation key for residual profits/losses, rather than R&D Capital Stock.

[70]    Despite Nortel's representations to the Canadian and US tax authorities that the RPSM reflected the economic realities of Nortel's business, those authorities determined that the model needed to be adjusted by $2 billion for the period 2001-2005.  Trial Trans. Day 6, 1319:12–1320:1; 1320:25–1321:7 (Orlando).

[71]    Trial Trans. Day 3, 658:5–16 (McFadden).

[72]    *See* Section III(A) of Appendix A.

[73]    DEM00011 (Malackowski) p.22; Trial Trans. Day 10, 2281: 2-12 (Malackowski).

- Former Chief Legal Officer Clive Allen testified that the group-wide insolvency and liquidation of the Nortel enterprise was "inconceivable" and never a risk he addressed;[74]

- Former Sutherland Asbill & Brennan attorney Walter Henderson, who worked on transfer pricing for Nortel, testified that no consideration was given to how the RPSM methodology would work in the event of a liquidation of the Nortel entities "because we never thought about that eventuality coming to pass";[75]

- Former director of transfer pricing at Nortel Michael Orlando testified that there is no provision in the MRDA that deals with the insolvency of the entire organization;[76] and

- Former director of international tax at Nortel Mark Weisz testified that the MRDA "was not intended to address [global] insolvency" and Nortel did not have any discussions about what would happen in the event of global insolvency.[77]

37.    Moreover, pursuant to an amendment executed in December 2008 to January 2009 and effective retroactive to January 1, 2006, proceeds from business sales are expressly excluded from global revenues within the RPSM calculation.[78]  Mr. Orlando confirmed that the MRDA did not address how to allocate proceeds from the sale of any Nortel business and that the third addendum made explicit that the MRDA did not apply to asset sales.[79]  Rather, the MRDA was an attempt to allocate annual operating profits, and sales of assets were non-operating activities.[80]

---

[74]    Trial Trans. Day 3, 630:25-631:20 (Allen).

[75]    Trial Trans. Day  5, 1143:19-1144:8 (Henderson).

[76]    Trial Trans. Day 6, 1324:19-1325:7 (Orlando).

[77]    Trial Trans. Day 9, 1877:18-1878:1.

[78]    TR21003(MRDA) pp. 39, 42–47, 49.

[79]    Trial Trans. Day 6, 1288:14-16; 1323:7-23 (Orlando).

[80]    Trial Trans. Day 6, 1323:7-23 (Orlando).

V.      **The Insolvency of the Nortel Group.**

A.      **Commencement of Insolvency Proceedings**

38.     On January 14, 2009 (the "**Petition Date**"), in light of the impact of deteriorating

market conditions, looming debt service payment, pension funding obligations in the UK, and

weakening customer commitments, Nortel made the decision to commence formal bankruptcy

and insolvency proceedings in Canada, the US, and England (in respect of various EMEA

entities).[81]

B.      **Restructuring Options and the Signing of the IFSA**

39.     In June 2009, Nortel decided to proceed with a liquidating insolvency in which all

of Nortel's LOBs and other assets would be sold.[82]  Due to the "integrated, co-dependent

business relationship" and "overlapping assets and obligations" among Nortel entities, the Nortel

Estates committed to a joint and coordinated reorganization and/or sale of Nortel's business

operations.[83]

40.     On June 9, 2009, the Nortel entities (and the UCC and Bondholder Group)

entered into the Interim Funding and Settlement Agreement (the "**IFSA**"). The Canadian, US,

and EMEA Estates agreed to cooperate in selling the Nortel Group's assets, while deferring the

issue of how the sale proceeds would be allocated among the Estates.[84]

---

[81]     TR00014 (Binning Aff.) ¶41.

[82]     TR00009 (Hamilton Aff.) ¶21.

[83]     TR21540 (Doolittle Decl.) ¶42.

[84]     TR40015 (IFSA) § 12(d).

C.    **Segmentation of Patents For Sale Within Nortel's LOBs or Residual Portfolio**

41.    Each of Nortel's businesses were sold with certain subsets of patents identified as predominantly and only used by that business.[85]  Patents that were "predominantly used" by a particular business line were designated to be sold with that business.[86]  Patents that were "shared" among multiple business lines or patents that were designated as "not used" were retained in Nortel's residual patent portfolio.[87]  Simply because a patent was designated "not used" does not mean it had never been used in Nortel's business.  For example, it included patents relating only to products and services that Nortel had discontinued, or had proposed but never brought to market.[88]  It also included patents that covered products that Nortel was selling but sourcing from others.[89]

D.    **Business Line Sales**

42.    The global nature of Nortel's LOBs was perceived to be a source of their value.[90]  As Sharon Hamilton testified, a cooperative multi-jurisdictional sale of the businesses was viewed as the only way to maximize the value to creditors.[91]  The Estates recognized that "these were not Canadian businesses or American businesses or English businesses; they were worldwide businesses."[92]  Nortel's businesses were highly integrated across the globe – as

---

[85]    Trial Trans. Day 10, 2256:1–10 (Malackowski).

[86]    McColgan Dep. 183:21–185:3.

[87]    McColgan Dep. 124:21–125:21; TR44764 (Granted patents not on business sale assign lists) col. H.

[88]    McColgan Dep. 125:22–126:15; 130:21–131:7, 132:8–16.

[89]    McColgan Dep. 132:17–133:10.

[90]    Trial Trans. Day 4, 1000:8–16 (Hamilton).

[91]    Trial Trans. Day 4, 1000:22–1001:12 (Hamilton).

[92]    Trial Trans. Day 4, 1001:4-8 (Hamilton).

evidenced by the "One Nortel" globe trademark – and their value derived from this global integration.[93]

43.    Beginning in early 2009, and carrying on through mid-2010, the Nortel Estates cooperatively sold the following lines of business: Layer 4-7, CDMA/LTE, Enterprise, Global Systems for Mobile Communications, Optical Networking and Carrier Ethernet, Next Generation Packet Core, Carrier VoIP and Applications Solutions, and Multi-Service Switch.  In total, the business line sales obtained more than $3 billion in proceeds for the Estates' creditors.

### E.    Sale of the Residual Patent Portfolio

44.    Nortel's residual patent portfolio was comprised of patents that were not sold as part of the business sales.  Some were subject to licenses to the purchasers of the lines of business. These patents included ones designated as "shared" and "not used" during the segmentation process.  As with the line of business sales, the Estates recognized that a collaborative sale of the residual IP would create the most value for creditors.[94]  The fact that the patent portfolio had global coverage was perceived as a source of value.[95]

45.    An auction was commenced on June 27, 2011.[96]  After 19 rounds of bidding, Rockstar BidCo, LP ("**Rockstar**"), a consortium of Apple Inc., EMC Corporation, Ericsson AB, Microsoft Corporation, Research in Motion Limited and Sony Corporation, emerged as the winning bidder with a cash purchase price of US$4,500,000,000.[97]

---

[93]    *See supra* Statement of Facts Section I.B.

[94]    *See, e.g.*, Trans. Day 5, 1077:18-25 (Binning).

[95]    Veschi Dep. 73:3–24.

[96]    TR47279 (71st Report of the Monitor) ¶¶17–24.

[97]    TR47279 (71st Report of the Monitor) ¶¶25–31.

## ARGUMENT

I.    **No Agreement Exists in Which the Nortel Debtors Agreed *Ex Ante* on How the Proceeds of the Group's Liquidation Would Be Allocated Among the Estates.**

A.    **The MRDA Does Not Address, Much Less Govern, the Allocation Dispute Before the Courts.**

46.    Put simply, the MRDA does not answer the question: "How should the proceeds of sale of Nortel's global assets be divided among the bankrupt estates?"

47.    The MRDA was a tax-driven document.  It and its predecessor Research and Development Cost Sharing Agreements were entered into in an attempt to allocate the world-wide profit and loss from the ongoing operation of the Nortel Group in a manner that would be seen by taxing authorities in multiple jurisdictions as complying with their respective transfer pricing laws and regulations.  Those documents were prepared by Nortel's tax team, assisted by their tax advisers, for tax purposes.[98]

48.    The MRDA codified the way the RPEs had been interacting and operating for years prior to execution.[99]  The MRDA contains clear statements of its commercial purpose as an agreement on the division of profits (or losses) from operating the business.  The formula in Schedule 'A' of the MRDA is a mechanism for the calculation of residual profits and losses from operation of the Nortel global business year to year. That formula is predicated on there being an ongoing business (indeed all transfer pricing reports assume a going concern[100]).

---

[98]    Brian McFadden, who served as CTO during the time the MRDA was drafted and executed, was not involved in drafting or executing the MRDA, and had not even heard of the MRDA during his time at Nortel. Trial Trans. Day 3, 658:5–16 (McFadden).

[99]    According to Mark Weisz, a director of international tax with responsibilities for Europe, Asia, and Latin America at Nortel until 2007, the MRDA "contractualize[d] the arrangements that the participants had and had been ongoing for quite some time since 2001."  Trial Trans. Day 9, 1847:24–1848:20 (Weisz).

[100]    Trial Trans. Day 12, 2852:20 – 2853:14 (Felgran); *see also* Trial Trans, Day 21, 5077:3-11 (Eden) ("[T]he transfer pricing rules were developed with the idea of ongoing… entities for purposes of determining their corporate income tax.").

49.     The evidence at trial was overwhelming and undisputed that neither the MRDA nor its predecessors was ever intended to address how the proceeds of sale of the jointly created property should be divided upon insolvency. [101]  The MRDA is incapable on its face of applying in that situation because there would be no "operating profits" to share.  In fact, the evidence at trial showed that the prospect of a group insolvency was never contemplated by the drafters of the MRDA.[102]  Instead, an express provision in the 3rd Addendum to the MRDA provides that the MRDA, and the underlying RPSM calculation, does not apply to gains and losses from the sale of a business.[103]

50.     In sum, the MRDA does not provide and was never intended to answer the question of how the Lockbox Funds should be allocated among the Nortel estates.  It is a tool that is not fit for the purpose of the allocation task.

51.     Moreover, because the MRDA was intended to reflect the actual operation of Nortel's business, its provisions must be viewed together, as one integrated whole.  Thus, to rely on the legal title of NN Technology being vested in NNL by the MRDA (as the Canadian Debtors do), or to rely on the exclusive and non-exclusive licences to NN Technology conferred on each RPE by the MRDA (as the US Parties do), fails to understand that those rights were recognized as part of the on-going sharing of profits and losses reflecting the fully integrated collaborative operation of the Group as "One Nortel."  It is not proper to "cherry pick" particular

---

[101]     *See supra* Statement of Facts Section III.C.

[102]     *See* for example Trial Trans Day 5, 1143:19 – 1144:8 where Walter Henderson explained that during the drafting process of the MRDA, no consideration was given as to how Nortel's RPSM would apply in an insolvency because the drafters of the MRDA "never thought about that eventuality coming to pass". *See* also Trial Trans. Day 6, 1323:4 – 1325:7 where Michael Orlando confirmed that the MRDA does not address the sale of the Nortel Group's assets upon a global insolvency and liquidation.

[103]     TR21003 (MRDA) pp. 39, 42–47, 49; *see also* Trial Trans., Day 12, 2725:17-2726:7 (Cooper, confirming a proposition from Mr. Smith for the Canadian Debtors).

provisions and view them in isolation.  The MRDA clearly is not a straightforward IP assignment

agreement, transferring full ownership for fair market value, nor is it a standalone exclusive

license agreement granting the licensee alone the full benefit of the license in the licensee's

exclusive territory.  Those rights were not conferred 'free and clear' in such a manner as to allow

them to be invoked by any party to secure a windfall in a group insolvency. To do so would cut

directly across the very nature of the sharing arrangements under which those rights were

conferred in the first place.

52.    To the extent the MRDA is relevant at all, it simply confirms the cooperative and

integrated relationship among the RPEs with respect to the IP they jointly created.  At its core,

this relationship was simple:  work together as "One Nortel" to develop IP collaboratively;

exploit that IP to earn revenues for the benefit of the Group; pay the Group's creditors off the

top; pay certain routine returns within the Group; and divide the remaining profits among the

RPEs based on their respective R&D spend.  As explained in the following sections, the only

allocation mechanism that accurately reflects that relationship is the pro rata distribution

model.[104]

---

[104]    Moreover, the allocation positions that rely on portions of the MRDA fail to account properly for pension costs.  As the UK Pension Claimants' economic expert, Dr. Coleman Bazelon, explained at trial, prior to insolvency, the purpose of the MRDA was to divide operating profits among the RPEs based on their relative proportion of R&D capital stock.  Trial Trans. Day 12, 2932:20-34:6.  Under the MRDA, some (but not all) pension costs, like other worldwide operating expenses, were subtracted from revenues in the calculation of the residual profit or loss that was distributed.  Trial Trans. 2934:7-35:13.  If Nortel had continued as a going concern, at least those pension costs included within the RPSM formula would be paid off as an operating expense, reducing the operating profits available for sharing under the MRDA.  Trial Trans. 2935:17-24.  On an annual basis, some share, but not a full accounting of those costs, would flow through the company's annual income statement.  Trial Trans. 2936:5-14.  If that same methodology was applied to asset sales, such as the sales that created the Lockbox Funds, one would have to deduct any of the unpaid operating liabilities (such as the unpaid portion of the pension costs) before calculating the profit or loss that would fall to be distributed under the MRDA.  Trial Trans. 2936:15-37:7.  Thus, if the Courts looked to the MRDA as the operative analogy for distributing the Lockbox Funds, which Dr. Bazelon did not agree was appropriate, the only economically appropriate way to treat the unpaid operating liabilities would be to pay them prior to distributing any so-called residual profit.  Trial Trans. 2937:2-21.

**B.      The IFSA Does Not Provide an Answer to the Allocation Dispute, and Nothing in It Is Inconsistent With or Precludes Allocation of the Lockbox Funds Pursuant to the Pro Rata Distribution Model.**

53.      The IFSA contemplated that the Estates would negotiate and attempt to reach agreement on an "Interim Sales Protocol" to resolve any disputes concerning the allocation of sales proceeds.[105]  As the Courts are well aware, although the parties to the IFSA were extremely successful in their joint endeavor to maximize the proceeds of the sale of the Group's assets, they were unable to agree on an Interim Sales Protocol.  Thus, the IFSA does not itself provide a metric for allocation of the Lockbox Funds.  It does, however, make clear that the parties placed no constraints on the Courts' adoption of an allocation metric where, as here, the parties have been unable to reach agreement among themselves.  Quite the contrary, section 12(f) of the IFSA expressly preserves all rights of the parties with respect to seeking an entitlement to the Lockbox Funds.[106]  As a result, nothing in the IFSA is inconsistent with or precludes the Courts from adopting the pro rata distribution model, given the failure of the parties to agree on an allocation metric among themselves.

54.      To the contrary, as this was a liquidating insolvency by June 9, 2009, the parties to the IFSA recognized that the Group's assets were being sold for the Estates' *creditors* and that it was the best interests of the Estates' *creditors* that was paramount. [107]  Thus, unless each Selling Debtor had believed  the business sales and the Rockstar sale were  in the best interests of the Estates' *creditors*, it would not  have agreed to the  sales.  Similarly, the Courts should ensure that the allocation method it orders for the proceeds generated by those sale is in the best

---

[105]      TR40015 (IFSA), §12(c).

[106]      TR40015 (IFSA), §12(f) ("Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party to seek its entitlement to Sale Proceeds from any Sale Transaction.")

[107]      *See* TR40015 (IFSA), §12(e).

interests of the Estates' *creditors*.   As demonstrated below, the pro rata distribution model is the only proposed method which meets this requirement.

## II.     The Pro Rata Distribution Model Is Consistent with the Facts of this Case and the Courts' Equitable Powers.

### A.     The Courts Have Broad Equitable Powers To Fashion an Appropriate Allocation Mechanism in this Unprecedented Case.

55.     The Nortel worldwide bankruptcy is unprecedented in many respects.  As the former Chief Justice of Ontario Warren Winkler noted two years ago in his published opening remarks upon being appointed mediator by the Courts:  "The Nortel insolvency is one of the most complex trans-national legal proceedings in history." [108]   Now well into their fifth year, these complicated, inter-related, multi-jurisdictional insolvency proceedings involve numerous Nortel entities located across the globe that, during Nortel's existence, worked cooperatively to jointly develop, own, and use the Group's valuable IP assets in support of the "One Nortel" global business enterprise.

56.     Following the liquidation of the Group's assets in these insolvency proceedings, the Estates now function as purely administrative vehicles whose sole purpose is – and can only be – to facilitate a distribution to their creditors.  As the ultimate recipients of the Lockbox Funds, those creditors are the only parties with an economic interest in the outcome of the Allocation Litigation.  The UK Pension Claimants submit that the task before the Courts is thus

---

[108]     Opening Remarks of Chief Justice Warren K. Winkler, The Nortel Mediation (24 April 2012) online: Nortel Mediation <http://www.nortelmediation.com/li/pdf/Nortel _Mediation_Opening_Remarks_of_the_Mediator_April_24_2012.pdf > at pp. 2-6.  Likewise, Justice Morawetz previously expressed a similar sentiment, observing that "there is no simple solution to the legal predicament that faces all parties" in these "multi-jurisdictional" proceedings.  Written Endorsement of the Honourable Mr. Justice Morawetz dated June 29, 2011 at para. 15.

to determine how those Lockbox proceeds should be distributed such as to treat those ultimately entitled to those funds – Nortel's creditors – in a fair and equitable manner.[109]

57.    In determining the ultimate allocation methodology, both Courts, as courts of equity, enjoy broad latitude under their respective inherent equitable powers to draw upon on principles of equity.[110]  Further, both the Bankruptcy Code and the CCAA vest in the Courts broad discretion to issue orders and grant relief to facilitate the conduct of insolvency proceedings.[111]

58.    As demonstrated below, the pro rata distribution model is the only proposed allocation theory that properly reflects the way in which the Nortel Group operated as a unified common endeavor, the entangled nature of Nortel's jointly-created IP – the Group's principal value-generating assets – and the way in which they monetized the fruits of their common efforts through the collaborative business line and residual portfolio sales process.  The pro rata distribution model is also the only allocation methodology to provide an economically rational result that accurately reflects the underlying economics of the "One Nortel" integrated global business.

59.    In stark contrast, the allocation theories advanced by the US Interests and the Canadian Parties ignore the fundamentally integrated nature of Nortel's operations and its IP and

---

[109]    For the avoidance of doubt, the UK Pension Claimants do not contend that distributions should be made from the Lockbox directly to individual creditors of any entity.

[110]    *See, e.g.*, *Young v. United States*, 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts . . . are courts of equity and 'apply the principles and rules of equity jurisprudence.'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939); *In re NWFX, Inc.*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern."); *80 Wellesley St East Ltd. V. Fundy Bay Builders Ltd. et al.*, [1972] 2 O.R. 280 (C.A.) at para. 9. ("As a superior Court of general jurisdiction, the [Superior Court of Justice] has all of the powers that are necessary to do justice between the parties.").

[111]    *See* 11 U.S.C § 105(a) (Bankruptcy court may "issue any order, process, or judgment that is necessary or *appropriate* to carry out the provisions of [the Code].");  *Companies' Creditors Arrangement Act*, R.S.C., 1985 c C.-36, s. 11 (Court "may, subject to the restrictions set out in this Act . . . make any order that it considers appropriate in the circumstances").

the complete absence of any *ex ante* agreement among the Nortel entities as to the division of assets in the event of a global insolvency.  Instead, they are predicated on the erroneous notion that the individual geographic regions functioned autonomously and can thus claim credit for, and retain proceeds from the sale of, the Group's assets.  It is therefore not surprising, as noted above, that those theories result in wildly divergent allocation outcomes with each proponent purporting to "scoop up" virtually all of the proceeds as if it were a stand-alone entity solely responsible for the creation of that value.  The Courts can, and should, exercise their broad equitable powers to avoid such an unjust and irrational result.

60.    As demonstrated below, allocation of the Lockbox Funds in a manner that provides as closely as possible for a common dividend rate for Nortel's creditors is supported by the unique factual evidence in this case and a number of broadly applicable equitable doctrines and principles that courts have utilized when faced with the task – as the Courts are here – of dividing up a single pool of commingled assets among multiple claimants in the absence of any *ex ante* agreement providing for a distribution mechanism.

### (1)    The Joint Venture Analogy Is Consistent with Nortel's Operation as a Highly Integrated Global Enterprise.

61.    The evidence at trial was overwhelming that Nortel's RPEs collaborated across geographies to jointly create Nortel's most valuable asset, its IP portfolio.  It is undisputed that Nortel operated as a highly integrated global company – as evidenced by the "One Nortel" logo. This decades-long practice of cross-border collaboration that was undertaken by the Nortel entities in support of the global "One Nortel" business is directly analogous to a joint venture in which parties work cooperatively and share in the fruits of their common endeavor.[112]

---

[112]    The UK Pension Claimants do not suggest that the Nortel Group constituted an actual joint venture.  The MRDA specifically provided that the RPEs were not operating as a joint venture.  *See* TR21003 (MRDA) at § 13 ("The relationship of the Participants under this Agreement shall not constitute a partnership or joint

62.     Indeed, Kerry Stephens, an NNUK employee who was heavily involved in Nortel's tax and transfer pricing operations under the MRDA, testified at trial that the Nortel Group functioned like a joint venture because "[t]hey were exploiting the IP jointly, not in competition with each other, supporting other entities in the group, and agreeing to pool the profits or losses, as the case may be."[113]   The EMEA Debtors' transfer pricing expert, Dr. Richard Cooper, drew a similar conclusion noting that the relationship between the RPEs "may not be literally a joint venture or legally a joint venture, but it really operates and behaves like a joint venture."[114]   The evidence at trial clearly demonstrated that Nortel operated as a common endeavor akin to a joint venture:

- While Nortel was an operating entity, it was the RPEs' intent to make a profit from their collective business efforts;

- That intent was reflected in the arrangements that were contractualized in the MRDA;

- Each of the RPEs made contributions to the Group's business to achieve that goal;

- For example, each RPE performed and paid for R&D, performed sales and marketing functions, and performed global operations such as manufacturing support, procurement, demand planning, quality control, and inventory supply maintenance;

- In performing these functions, the RPEs worked together for the benefit of the Group as a whole; and

---

venture for any purpose.").  However, given the similarities between the structure and operation of the Nortel Group and a joint venture, the equitable principles used to distribute assets upon the termination of a joint venture provide foundational support for the application of pro rata distribution in this case.

[113]     Trial Trans. Day 8, 1719:14-20; *see also* 1721:20-21 (Stephens) ("If it is not a joint venture, I do not know what it is.").

[114]     Trial Trans. Day 11, 2648:13-18 (Cooper)

- The RPEs agreed to share in the profits and losses of the Group as a whole.[115]

63.      The RPEs' common endeavor to maximize global profits was further reflected in the way they sold the Group's assets in insolvency.  The parties signed the IFSA, affirming that they would share proceeds from the sales to further the best interests of Nortel's creditors.  They recognized that a cooperative, multi-jurisdictional sale of the lines of business was the only way to maximize proceeds.  Nortel's businesses were highly integrated across the globe (as evidence by the "One Nortel" globe trademark) and their value derived from this global integration.  Likewise, the RPEs recognized that a collaborative sale of the residual IP would create the most value and they agreed to facilitate that sale by executing license termination agreements.  Although they also agreed to negotiate to reach agreement on an Interim Sales Protocol to address how the sales proceeds would be allocated, they were unable to reach agreement, leaving that question for the Courts to decide.

64.      Courts in various common law jurisdictions, including the United States and Canada, have recognized, in the context of a joint venture where no *ex ante* agreement exists with respect to the distribution of assets upon termination, that assets of the joint venture will generally be distributed equally among parties to the joint venture.[116]

---

[115]    Trial Trans. Day 9, 1878:7-1879:15 (Weisz).  Under Canadian law, the following factors must be present to establish a joint venture: (i) a contractual agreement among the parties; (ii) intention to enter a joint venture; (iii) a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; (iv) a joint property interest in the subject matter of the venture; (v) a right of mutual control or management of the enterprise; (vi) expectation of profit; (vii) a right to participate in the profits; (viii) limitation of the objective to a single undertaking or ad hoc enterprise.  *Central Mortgage Housing Corp v. Graham* 1973 CarswellNS 192 [*Central Housing*].  The elements necessary to establish a joint venture under United States law are similar.  They include: (i) acts manifesting the intent of the parties to be associated as joint venturers; (ii) mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill, or knowledge; (iii) a measure of joint proprietorship and control over the enterprise; and (iv) a provision for the sharing of profits and losses.  *Dundes v. Fuersich*, 791 N.Y.S.2d 893 (N.Y. Sup. Ct. 2004).

[116]    *Carlson v. Samuel & Co.*, 212 N.Y.S.2d 890 (N.Y. Sup. Ct. 1961); *Evans v. Warner*, 47 N.Y.S. 16 (N.Y. App. Div. 1897) ("The profits of a co-partnership are to be divided equally unless there is a contrary

65.     This presumption in favor of an equal distribution of assets among joint venturers rests on the bedrock principle of fairness and "a presumption of law in favor of equality of interest in the property" of a joint venture.[117]

66.     The core principle underlying the Courts' distribution of a joint venture's assets upon termination – that all members of the joint venture should receive an equal benefit – supports the application of a pro rata distribution in this case.  As noted above, the Estates are merely pass-through entities that remain in existence for the sole purpose of channeling distributions to their creditors.  Credit provided by those creditors funded the Nortel Group's global operations and enabled it to generate the assets that were subsequently sold and gave rise to the Lockbox Funds.

67.     Thus, now that the Group has been liquidated, it is the Estates' creditors who should be viewed as the "joint venturers" entitled to the presumption of equality of treatment upon dissolution of the common endeavor they funded.  A pro rata distribution will treat all creditor dollar contributions to the Nortel Group equally and will leave all creditors similarly situated.

68.     In contrast, giving effect to an allocation theory that provides a windfall to one subset of creditors, as would the theories proposed by the US and Canadian Debtors, would be contrary to both the parties' expectations and the Courts' expressed presumption in favor of

stipulation or unless some fact or circumstances exist from which it may be inferred that the parties intended that the profits should be divided in unequal proportions…"); *Kovacik v. Reed*, 49 Cal.2d 166, 169 (Cal. 1957) ("It is the general rule that in the absence of an agreement to the contrary the law presumes that partners and joint adventurers intended to participate equally in the profits and losses of the common enterprise…").

[117]   *Evans* 20 A.D. at 233.  Similarly, the Court in *Muschinski v. Dodds* [1985] HCA (AUS) 78 imposed a constructive trust upon the collapse of a joint venture that held the residue of the joint venture for each joint venture member in equal shares.  The Court found that it would be inequitable to leave the property of the joint venture vested in one or other of the joint venturers where such a result was not intended by the parties.

equality of treatment.  Rather, the *only* allocation theory that preserves that bedrock principle of equity is pro rata.

(2)      **Avoidance of Unjust Enrichment is Consistent with the Entangled and Commingled Nature of Nortel's IP.**

69.     The evidence at trial was undisputed that Nortel's IP was the result of integrated R&D and was both technologically and geographically entangled.  Given the integrated manner in which the Group's IP was created and exploited, adoption of the allocation positions proposed by either the Canadian or US Interests would amount to unjust enrichment.  Unjust enrichment occurs where a party obtains a benefit which, under the circumstances and in light of the relationship between the parties, it would be inequitable to retain.[118]

70.     In this case, the entangled IP assets were developed by the Nortel entities for the purpose of exploiting them for the mutual benefit of the Group.  There was no *ex ante* agreement among the parties as to how the proceeds from these assets would be shared upon global dissolution.[119]  The facts demonstrate that the Canadian and US Interests would be unjustly enriched if their respective allocation theories were adopted, and there is no contractual basis for the enrichment.  Each of Nortel's RPEs enriched the Canadian entity, NNL, through their creation of IP whose legal title was assigned to NNL.  However, when NNUK allowed its employees to assign inventions to NNL, NNUK did not receive any transfer of fair value at that time.  This is only consistent with a global enterprise wherein employees and the assets they

---

[118]     *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999); *see also Kerr v. Baranow*, 2011 CarswellBC 240, 2011 SCC 10 (unjust enrichment claimant must show that the defendant (i) received a benefit; (ii) the claimant suffered a loss corresponding in some way to the benefit; and (iii) there was no juristic reason for the benefit and the loss).

[119]     To prevent the unjust enrichment of one party who may be in possession or control of the disputed property, courts in the US and Canada can impose a constructive trust to recognize the claimant's interest in the property. *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999); *Kerr v. Baranow*, 2011 Carswell BC 240, 2011 SCC 10.  Here, however, because the disputed property is already before the Courts in a collective pool, *i.e.*, the Lockbox Funds, there is no need for a constructive trust.

-31-

created were considered an integrated part of a worldwide Group, rather than employed or owned by one specific entity within a Group.  All of these activities were undertaken to benefit the Group as a whole, not to bestow a windfall on NNL or, in an insolvency, its creditors.  Under the Canadian Interests' theory, the RPEs would receive the benefit of the patent portfolio under the MRDA when the business was operating, but would not get *any* of the value of those assets (specifically, the Rockstar portfolio) when it was sold.[120]  It would be unjust to permit NNL to retain all of the value of that IP without appropriate compensation to the RPEs that developed it.

71.    Similarly, Nortel's RPEs enriched the US entity, NNI, through their creation of patents that were filed in the United States.  This policy made sense in terms of maximizing overall profits for the Group, as the United States provided a large market with a robust patent enforcement mechanism for a relatively low amount of patent-related fees.  However, under the MRDA, NNI was required to share the revenues and profits it made exploiting those patents in the United States with the other RPEs through the RPSM.  It was not entitled simply to keep for itself US-based revenues or US-based profits.  It would be unjust to permit NNI to receive an allocation of the Lockbox Funds based on its historic revenues in the United States, or projected future revenues from Nortel's businesses and IP in the United States, without the other RPEs receiving appropriate compensation for their contributions to the inventions that were sold to fund the Lockbox.

72.    A pro rata distribution of the Lockbox Funds provides an equitable means to ensure that there is no unjust enrichment of any party.  The size of each Estate's creditor claims pool provides a good proxy for the value of the "benefit/enrichment" conferred by the RPEs on NNL and NNI because it was those creditors who provided the funds and/or credit necessary

---

[120]    *See* Trial Trans. Day 4, 1013:11-1014:1 (Hamilton).

when Nortel was operating to fund its operations and create the Nortel IP.  In other words, the uncompensated creditor pool represents the uncompensated contribution to Nortel's business and IP assets.  Because there are insufficient funds to meet all those creditor claims (*i.e.*, repay the "enrichment" conferred), a pro-rata distribution is the most equitable way to ensure each RPE (through its creditors) is "made whole" to the same extent.

### (3)    Equitable Receivership Principles Are Also Consistent With Nortel's Entangled IP.

73.    Beyond unjust enrichment, the Courts may also look to equitable common law jurisprudence relating to the pro rata distribution of funds pursuant to an equitable receivership. Where an equitable receiver is tasked with distributing a single pool of commingled funds to multiple claimants – much like the task before the Courts here – a pro rata distribution is the preferred method of ensuring that each claimant receives an equitable share.[121]

74.    The preference for a pro rata distribution in the equitable receiver context is so strong that courts have approved a pro rata plan even where a particular claimant may be able to trace an entitlement to a specific part of the commingled assets.[122]  As courts have explained, one claimant's fortuitous ability to trace his assets should not elevate him above others with whom he expected to be on equal ground.[123]

---

[121]    *See, e.g., United States Sec. & Exch. Comm'n v. Infinity Grp.*, Co., 226 Fed. App'x 217, 218-19 (3d Cir. 2007); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming the approval of a pro rata distribution plan because "[f]or us to hold otherwise would be to chain the hands of the court in Equity to do what is right under the circumstances").

[122]    *See, e.g., Cunningham v. Brown*, 265 U.S. 1, 13 (1924).

[123]    *Infinity Grp.*, 226 Fed. App'x at 219 (finding "no equitable basis to distinguish between . . . investors" and that "all investors should thus be treated the same") (internal quotations omitted)); *United States Sec. & Exch. Comm'n v. Forex Asset Mgmt. LLC*, 242 F.3d 325 (5th Cir. 2001) (affirming district court's approval of plan of pro rata distribution where the funds of certain investors were segregated from others).

75.    Courts have endorsed a pro rata distribution by an equitable receiver even where the funds are maintained by notionally distinct legal entities.[124]    A pro rata distribution is appropriate where the entities (i) are managed and marketed as a single unit; (ii) pool and manage cash based on its best use within the group; and (iii) presented themselves to third parties as a single enterprise.[125]    As discussed *supra* in Argument Section II.B, the trial evidence demonstrates that the Nortel Group exhibited all of these attributes.

76.    Finally, in *Cummings Estate v. Peopledge HR Services Inc.*,[126] Newbould J. was recently faced with the distribution of a commingled fund held by an insolvent company in receivership.  A large portion of the fund was comprised of customer payroll deposits that were not intended to form part of the bankrupt's estate available to its creditors, but had never been treated as trust funds or segregated as such.  Newbould J. confirmed that the customer payroll deposits were subject to a constructive trust and that under Canadian law, a constructive trust could be applied "where good conscious so requires".

77.    In determining the appropriate method of the fund's distribution to the trust claimants, the receiver contended that a "a distribution methodology should be selected which best balances the relative benefits and prejudices to the Claimants, applies a reasonably justified principled approach to Claimants' distribution and seeks to reduce further professional cost to

---

[124]    *See Commodity Futures Trading Comm'n v. Eustace*, Civ. No. 05-2973, 2008 WL 471574, at *7-9 (E.D. Pa. Feb. 19, 2008).  The equitable consolidation of multiple entities that were operated as one is distinct from substantive consolidation under the Bankruptcy Code, as the former finds authority in the Court's equitable powers while the latter implicates a court's Bankruptcy powers.  *See Eustace,* 2008 WL 471574, at *6.

[125]    *See Eustace*, 2008 WL 471574, at *6; *SEC v. Sunwest Mgmt, Inc.*, Civ. No. 09-6056-HO, 2009 WL 3245879, at *7 (D. Or. Oct. 2, 2009) (approving distribution plan that treated multiple entities as a unitary enterprise, since the "[e]nterprise decided how and where to use funds on a 'who-needs-the-cash now' basis"); *Eustace*, 2008 WL 471574, at *7 (finding the joint marketing of the entities relevant because it encouraged creditors to perceive them as a single entity).

[126]    *Cummings Estate v. Peopledge HR Services Inc.,* 2013 ONSC 2781

-34-

the greatest extent possible to maximize Claimants' recovery".[127]  Ultimately, based on the

complexity of determining each trust claimant's entitlement to the commingled fund using

tracing techniques or other accounting rules, Newbould J. held that the fund should be distributed

to trust claimants using a *pari passu ex post facto pro rata* approach.

> **B.     The Pro Rata Distribution Model Is Consistent with The Economic
> Rationality of the RPEs.**

78.     Unlike the extreme positions advanced by the Canadian and US Parties, the pro

rata distribution model reflects how economically rational actors would have agreed *ex ante* to

distribute proceeds from the sale of their jointly-created IP had they addressed that contingency

and allocated its risk.

79.     For example, as noted above, under UK patent law, any invention made by a UK

employee would have been legally and beneficially owned by NNUK.  NNUK allowed its

employees to assign legal title to NNL without receiving any transfer of value at that time.  No

economically rational entity would have agreed to give up the value of its contribution to the

creation of IP if it understood that it would receive nothing in the event the Group's assets were

sold in a liquidation.  Yet that is precisely what the Canadian Debtors and the Monitor now urge

the Courts to conclude.

80.     The Canadian Debtors and Monitor may argue that NNUK gave up its assignment

of IP as part of the bargain to share in operating profits under the MRDA.  However, as Dr.

Bazelon testified at trial, it would not be economically rational for the RPEs to accept payments

under the MRDA as full compensation for their efforts in creating patents.  The RPEs' efforts in

creating patents led to a full set of entitlements from those patents, while the compensation under

---

[127]      *Ibid.* at para 21.

-35-

the MRDA was only for a subset of those entitlements.[128]  It would have been irrational to

contribute to the creation of IP and agree to no entitlement to the proceeds of the sale of that IP

on insolvency.[129]

81.    The economic expert for the Canadian Estate and Monitor, Dr. Timothy Reichert,

opined that the RPEs would invest in creating IP if the net present value ("NPV") of that

investment was greater than zero.  However, Dr. Bazelon testified that Dr. Reichert provided an

incomplete view of investments because "[i]nvestors want to maximize the NPV of their

investments, not simply meet the threshold of not losing money on an investment."[130]   In fact,

Dr. Reichert admitted at trial that, if the Courts determine the RPEs had more than limited

product "make-sell" rights in Nortel's IP, then it would have been economically irrational for

them to enter such an arrangement.[131]

82.    The US Interests' position is similarly irrational.  As explained above, Nortel had

a policy of filing patents first in the United States.  However, at all times, the revenues generated

from those patentable inventions – both in the United States and elsewhere – were pooled for the

benefit of the whole Group and profits were distributed only after (most) costs were paid.  It thus

would be economically irrational to allocate sale proceeds based on geographic revenues without

recognizing the costs associated with generating those revenues and the sharing mechanism

under the RPSM.  Stated differently, the US Interests' argument posits that – contrary to the way

Nortel operated – NNI is entitled to all the revenues earned in its jurisdiction free and clear of the

---

[128]    Trial Trans. Day 12, 2964:2-11 (Bazelon).

[129]    Trial Trans. Day 12, 2966:7-14 (Bazelon).

[130]    Trial Trans. Day 12, 2965:23-2966:6 (Bazelon).

[131]    Trial Trans. Day 16, Trial Trans. 4051:12-25 (Reichert) ("[I]n your hypothetical, it's a joint venture going
in, walking in the door, they have all the residual interests.  Of course it would be irrational for them to give
those residual interests away without payment.  Of course.").

costs incurred by the Group as a whole (including NNUK's pension costs) in jointly developing the IP that contributed to those United States revenues – an extreme proposition to which no rational arms-length actor would have agreed.

## III.    Implementation Of The Pro Rata Distribution Model Is Straightforward.

### A.    The Pro Rata Distribution Model Is Simple and Flexible.

83.    Implementation of the pro rata distribution model is consistent with Nortel's operational structure, in which it portrayed the Group (internally and externally) as a single integrated entity.  In its simplest form, Nortel's remaining worldwide assets (the Lockbox Funds and the cash remaining in each Estate) ("**WWA**") are divided by the worldwide unsecured debts ("**WWD**") to yield a pro rata ration (A%):[132]

**Pure Pro Rata:**

$$\frac{WWA}{WWD} = A\%$$

This provides all worldwide unsecured creditors of "One Nortel" with the same percentage recovery (A%) for debts they are owed.  Based on the pro rata ratio, the cash in each Nortel entity is supplemented by funds from the Lockbox so that each unsecured creditor of that entity may be paid its pro rata amount.  Thus, it is not necessary to consolidate the cash from each Nortel entity and redistribute it – the model instead calculates how the Lockbox Funds should be distributed to the estates to pay each creditor a pro rata amount.  For any Estate where, based on assets already in hand, creditors already stand to receive a recovery above A%, no distribution to

---

[132]    TR00041 (Bazelon Dem.) at 2.

that estate from the Lockbox would need to be made and the assets and debts of that estate would be removed from the pro rata calculation.

84.     The pro rata distribution model is flexible and can accommodate decisions by the Courts to give effect to loan guarantees given by a second Nortel entity or to intercompany claims.  The pro rata distribution model would give effect to a loan guarantee by treating it as a second debt owed by Nortel as a whole since there are two Nortel entities owing the debt.  The overall pro rata percentage would be calculated by adding the guarantee amount to the total debt amount:[133]



Worldwide claims would be compensated pro rata at the revised pro rata ratio (B%), while the amount of the debt that the Courts determine to be guaranteed would be compensated at double that ratio to reflect the guarantee.  If this would result in a recovery of more than 100 percent of the guaranteed debt, the debt would be repaid at only 100 percent.  The global pro rata ratio (A%) would then be calculated, with the guaranteed debt removed from both worldwide assets and worldwide debt.

85.     For intercompany claims, such as the NNI's $2 billion claim against NNL, the pro rata distribution model could give effect to the claim in one of two ways.  First, the intercompany claim could be treated in the same way as a loan guarantee, i.e. as an additional debt.  In that

---

[133]     TR00041 (Bazelon Dem.) at 3.

case, the intercompany claim would be added to the worldwide debt (in the denominator) in calculating the global pro rata ratio:[134]

$$\text{\$2 Billion Intercompany Claim:}$$

$$\frac{WWA}{(WWD + \$2\text{ billion})} = C\%$$

A% is greater than C%

(Tr. Exh. 41 at 4.)  In that case, the global pro rata ratio (C%) would apply to worldwide claims, and the Nortel entity with the intercompany claim would have an additional amount (the intercompany claim multiplied by C%) to distribute to its creditors, or provide to its equity holders as surplus.

86.    A second way intercompany claims could be treated, and the one that is most consistent with the "One Nortel" prior to insolvency, would be to recognize that the amount recovered under the intercompany claim (the intercompany claim multiplied by the pro rata ratio) is itself an asset of Nortel.  Based on this recognition, the intercompany claim is added to the worldwide debts in the pro rata model, and the pro rata recovery under that claim is added to the worldwide assets.  Because the ratio of asset to debt being added is exactly the pro rata percentage, the model can be reduced to the first equation above (i.e. A%).  If viewed in this way, the intercompany claim is given effect, but washes out of the model because it is both an asset and a debt.

87.    The Courts' prior recognition of the $2 billion inter-company claim in favor of NNI against the estate of NNL does not limit the Courts in determining the appropriate allocation of the Lockbox Funds on any basis.  Since the commencement of the multi-jurisdictional

---

[134]    TR00041 (Bazelon Dem.) at 4.

-39-

insolvency filings and the adoption of the Cross-Border Insolvency Protocol by the Canadian and US Courts in January 2009, it has always been open to the Courts to order a full substantive consolidation of the Canadian and US Debtors,[135] which would have the effect of extinguishing any inter-company or related-party guarantee claims.

88.    Although the final global pro rata ratio to be received by all creditors cannot be calculated until all the worldwide claims are determined in each jurisdiction, the pro rata distribution model can be implemented through interim distributions even before all the claims are resolved in each of the Estates.  The conclusion of any Estate insolvency proceeding would not be delayed by implementing the pro rata distribution model.  Sufficient Lockbox Funds could be held back to account for any uncertainty over the validity of claims in each Estate, such that there would be no need to claw back any funds distributed.  The remaining funds could be distributed.  Under the pro rata distribution model, that holdback amount would be less than the amount of the uncertain claims, and less than the amount that would be held back under any of the other proposed allocation methods.[136]  To take an illustrative example, if the total assets were $7 billion, allowed claims were $9 billion and there were an additional $1 billion in uncertain claims yet to be determined, $6.3 billion of the $7 billion could be distributed in interim distributions.  Only $700 million would need to be held back to cover the worst case scenario in which the entire $1 billion in claims were allowed, which would then be compensated at a pro rata percentage of 70 percent ($7 billion total assets divided by $10 billion allowed claims).

---

[135]    *See* para. 15(viii) of the Cross-Border Insolvency Protocol which indicates that the Courts have the right to conduct a Joint Hearing with respect to a motion or relief sought to "substantively consolidate the Debtors' estates."   For the avoidance of doubt, that is *not* what is being sought by the UK Pension Claimants.

[136]    Trial Trans. Day 12, 2949:5-2950:5 (Bazelon).

**B.**     **While the Pro Rata Distribution Model Is Flexible Enough to Accommodate Guarantees, There Is No Need for the Courts To Give Them Effect.**

89.     The UK Pension Claimants submit that if the Courts adopt the pro rata distribution model there is no need to give additional effect to the guarantees provided to the Nortel Bondholders or to Nortel Networks UK Pension Trust[137].   In essence these guarantees provided that the beneficiaries of these guarantees would have a right of recovery from the assets of NNL or NNC and NNI.  A pro rata allocation would provide not only access to the assets of NNL or NNC and NNI but would provide the creditors holding these guarantees with access to the assets of every other Nortel entity.

90.     The evidence demonstrates that providing the holders of guarantees with a pro rata allocation will meet the legitimate expectations of these creditors.

91.     While the guarantees provided access to assets, they did not limit the other claims that could be asserted against those same assets either before or after bankruptcy.

92.     Nortel's bond documents expressly warned of the possibility of substantive consolidation in a domestic context.[138]  In fact this is one of the options being considered by the Monitor.[139]

93.     Prospective bondholders were warned that the laws of Canada and the US may apply such that the principal and interest of those bonds might not be repaid.[140]

94.     The guaranteed bonds were not perceived by the market as conferring any significant financial advantage over non-guaranteed bonds.[141]

---

[137]     A 'pure' pro-rata allocation would eliminate the need for the Canadian Court to determine any of the claims asserted by UKPI in the Claims Trial, including even the guarantees asserted by the UK Pension Claimants.

[138]     TR40117 (June 29, 2006 Offering Memorandum for NNL $2B Notes due 2011, 2013, and 2016)  at 30.

[139]     Trial Trans. Day 4, 998: 3-8 (Hamilton)

[140]     Trial Trans. Day 4, 828:7–21 (McCorkle).

95.    Between 2006 and 2008, numerous rating agency reports confirmed that the market did not distinguish between Nortel's bonds that were guaranteed by NNI and those that were not guaranteed by NNI.[142]

96.    In a Credit Opinion dated December 16, 2008, Moody's noted: "Nortel issues debt in three legal entities: Nortel Networks Corporation, Nortel Networks Limited and Nortel Networks Capital Corporation.  All of the group's debt is unsecured and is rated equally with the Caa2 CFR. . . .  In general, a system of cross-guarantees causes all debt to be interpreted as *pari passu*.  Technically however, there are two note issues that are not *pari passu*. However, since the financial consequences of this situation are not determinable and are, in any case, thought to be minimal, Moody's rates all of the Nortel group of companies' debts as if they were *pari passu*."[143]

97.    Throughout various times between 2006 and 2008, Nortel bonds lacking intercompany guarantees were trading at narrower spreads than Nortel guaranteed bonds.  This is consistent with the market assigning no additional value to the guarantees.[144]

98.    With respect to the bond guarantees, Mr. Binning, the former CFO of Nortel confirmed:

        a)    The bonds were sub-investment grade credit based upon the overall Nortel credit;

---

[141]    Trial Trans. Day 3, 584:3-549:2 (Currie); Trial Trans. Day 5, 1105:5–1107:18 (Binning).

[142]    TR12036 (Moody's Rating Action,  June 16, 2006)  at 2; TR12037 (DBRS Credit Rating Report, July 16, 2006) at 1–2; TR12038 (Moody's Rating Action, Mar. 22, 2007) at 1; TR12039 (DBRS Rating Report, Nov. 9, 2007) at 1-2; TR12040 (Moody's Rating Action, May 21, 2008) at 1; TR12041 (DBRS Report, July 14, 2008) at 2; TR12042 (Moody's Rating Action, Dec. 15, 2008) at 1; and TR12045 (Moody's Credit Opinion, Dec. 16, 2009) at 3.

[143]    TR12045 (Moody's Credit Opinion, Dec. 16, 2009) at 3 (emphasis added).

[144]    Trial Trans. Day 5, 1105:5–1107:18 (Binning); TR12044B; *see also* TR00058 (UKPC McConnell cross-exam. demonstrative).

b)      The bonds contained no maintenance covenants under which any debtor agreed to maintain a fixed coverage ratio;

c)      The bonds contained no limitations on investment or asset sales other than substantially all of the assets;

d)      Secured debt could have been placed ahead of the bonds;

e)      The guarantors NNL and NNI could have guaranteed the debts of all of the other Nortel entities; and

f)      The controls on funded debt and were measured at a consolidated Nortel level rather than at the level of the debtor or guarantor corporations.[145]

99.      Mr. Binning testified that the Offering Memorandum associated with the Guaranteed Bonds attempted to ensure that Nortel communicated that the guarantees were weak because of the ability to move assets around within the organization.[146]

100.      No bondholder provided any evidence to contradict Mr. Binning's testimony or provided any evidence as to Bondholder expectations.  In fact, the Bondholders apparently chose not to have the experts they retained speak to any Bondholders in order to determine what their actual expectations might have been at any time.[147]

101.      Professor McConnell, the witness called to testify to bondholder expectations, did not meet with or speak to any bondholders.[148]  Professor McConnell offered no analysis of

---

[145]      Trial Trans. Day 5, 1105:19-1117:7 (Binning).

[146]      Trial Trans. Day 5, 1117:8-24 (Binning).

[147]      Professor John McConnell and Robert Kilimnik, two experts proffered by the US Debtors, the UCC, and the Bondholders respectively, both confirmed that they did not speak to any Nortel bondholders in forming the expert opinions they provided to the Courts (which included opinions on the expectations of bondholders).  *See* Trial Trans. Day 20, 4804:20-4805:5 (McConnell) and Kilimnik Dep. Trans. 15:7-11.

[148]      Trial Trans. Day 20, 4804:23-4805:5 (McConnell).

bond prices prior to insolvency.[149]  Professor McConnell offered no opinion on whether a pro

rata allocation in this case would have any effect on the ability of issuers to issue bonds.[150]

102.    In respect of measuring the expectations of Nortel's bondholders, the only

relevant expectations are those that existed prior to the insolvency filings. Counsel to the Ad Hoc

Group of Bondholders acknowledged this in open court.[151]

103.    In mid-September 2008, Nortel issued a profit warning, indicating that would not

meet its financial targets for the year.  As a result of the profit warning, ratings agencies lowered

their credit rating on Nortel to "credit watch" or "credit watch" with a negative implication.[152]

104.    Mr. Binning, the CFO of Nortel, offered an analysis to the Nortel Board of

Directors in September 2008.   In testimony he amplified his view of the bond market leading up

to and after insolvency.   He noted that there was a substantial change in the type of bondholder

and their motivation.   Prior to the threat of insolvency, the bonds traded on a yield to maturity

basis.  This meant that bondholders take all of the payments that would be expected to be made if

the bond is held to maturity, and then calculate a percentage yield based upon the price paid for

the bonds.[153]

105.    Once insolvency or financial distress is anticipated, Mr. Binning testified that

bonds trade in the hands of distressed investors who trade in a classic arbitrage market based

upon price and expectations of future price.[154]

---

[149]    Trial Trans. Day 20, 4825:17-20 (McConnell).

[150]    Trial Trans. Day 20, 4806:20-4807:2 (McConnell).

[151]    Trial Trans. Day 2, 369:20–24 (Opening Statement on Behalf of Ad Hoc Bondholders - LeBlanc).

[152]    Trial Trans. Day 5, 1093:6–20 (Binning).

[153]    Trial Trans. Day 5, 1089:7-21; 1098:22-1099:5 (Binning).

[154]    Trial Trans. Day 5, 1099:6-1100:21 (Binning).

106.     The current and former holders of the Nortel bonds at issue in these proceedings have never provided the Courts with evidence as to their actual expectations at any time.

107.     A pro rata distribution without providing for double recovery for the bonds would meet the legitimate expectations imbedded in the terms of the bonds.  These weak covenant bonds did not contain any term which would create an expectation either before or after insolvency that the assets from which the bondholders could seek recovery would not be encumbered by the liabilities of other Nortel entities.

**IV.     The Pro Rata Distribution Model is Consistent with Domestic and International Principles of Insolvency Law.**

      **A.     Principles of Domestic and International Insolvency Law Support a Pro Rata Distribution.**

108.     It is universally accepted that there are certain "foundational" principles of bankruptcy and insolvency law which are accepted in common law jurisdictions throughout the world.  None is more universally recognized than the principle that creditors of equal rank or priority are to receive distributions on a pro rata *pari passu* basis from all available proceeds, relative to the amount of their claim.[155]

109.     As global economic activity has accelerated and expanded, bankruptcy and insolvency law has transformed from a largely domestic practice to one which is most often cross-border and international in scope.  As is typical with most areas of the law, legislative reform has struggled to keep pace with the evolution of bankruptcy and insolvency in a global environment.  Nevertheless, Canada and the US have a well-established framework for dealing with international insolvency cases, owing to the number of cross-border cases which arise due

---

[155]     *See* ¶¶ 25 and 26 of the Brief of Canadian Law and Argument of the *Ad Hoc* Group of Bondholders, the Bank of  New York Mellon and Law Debenture Trust Company of New York on Post-Filing Interest (July 15, 2014).

to geographic proximity, economic dependence and familiarity with each jurisdiction's

bankruptcy and insolvency laws.

110.    Canadian and US statutes that address international insolvency share certain

fundamental principles, including those that are expressly outlined in the Preamble to the

UNCITRAL Model Law (as defined below), and adopted in section 44 of the CCAA and section

1501(a) of the Bankruptcy Code:

**Cross-Border Insolvencies**

**Purpose**

44.  The purpose of this Part is to provide mechanisms for dealing with cases of cross-border insolvencies and to promote

(a) cooperation between the courts and other competent authorities in Canada with those of foreign jurisdictions in cases of cross-border insolvencies;

(b) greater legal certainty for trade and investment;

(c) the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtor companies;

(d) the protection and the maximization of the value of debtor company's property; and

(e) the rescue of financially troubled businesses to protect investment and preserve employment.

**(1)    The Development of Modified Universalism and Principles of International Insolvency**

111.    For centuries, insolvency was a territorial exercise. Although international

commerce exposed the strains of territorialist answers to cross-national questions, for most of

that time that solution was not so inadequate as to compel reform.  Insurance, maritime rules for

the arrest of vessels, bills of lading – all were attempts to answer the problem of enforcement of

claims across borders. By the late 19th century, as commerce among nations accelerated, the

-46-

need for ways to cooperate became more critical.  Technological development further pushed the

world to devise ever more sophisticated ways to accommodate global enterprise, and by

extension, global insolvency.  Regional agreements began to emerge among countries whose

commerce, laws, and culture placed cross-border agreements within their reach.[156]

112.    In the development of modern international insolvency, the Universalist model -

in which a global insolvency was conducted under the insolvency law of a single forum – was

suggested as providing the most logical model for managing the insolvency of a global

enterprise.[157] However, it was also acknowledged that, as a practical matter, some

accommodation to local interests was necessary.[158] The response was the development of

Modified Universalism, under which an insolvency proceeding might be centrally coordinated in

a single forum, with ancillary proceedings opened in service to the needs of a "main

proceeding," but also incorporating means to accommodate strong local interests.[159]

113.    With the development of Modified Universalism, work accelerated on seeking out

mechanisms to put the construct into action. The *ad hoc* solutions developed in cases such as

*BCCI*[160] and *Maxwell*[161] later became the template for opening the frontiers of international

---

[156]    *See* Clark and Westbrook Report at para. 8.

[157]    *See* Jay Lawrence Westbrook, "A Global Solution to Multinational Default" 98 Mich. L. Rev. 2276, 2282 (2000); *see also* Andrew T. Guzman, "International Bankruptcy: In Defense of Universalism", 98 Mich. L. Rev. 2177, 2178 (2000).

[158]    Jay Lawrence Westbrook, "A Global Solution to Multinational Default," 98 Mich. L. Rev. 2276, 2282 (2000).

[159]    The ALI project and its Principles were the product of national reporters from each of the NAFTA countries assisted by advisory committees from each country. Jay Westbrook the was national reporter for the United States delegation.

[160]    *United States v. BCCI Holdings (Luxembourg) S.A.,* 48 F.3d 551 (D.D.C. 1995).

[161]    *Maxwell Commc'n Corp. v. Barclays Bank (In re Maxwell Commc'n Corp.),* 170 B.R. 800, 816 (Bankr. S.D.N.Y. 1994) *aff'd sub nom, Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.),* 186 B.R. 807 (S.D.N.Y. 1995), *aff'd,* 93 F.3d 1036 (2d Cir. 1996).

insolvency law, leading to the ground-breaking work of the United Nations Commission on International Trade Law ("**UNCITRAL**").  Canada and the United States have been at the forefront of these developments.  The reforms reflected in current insolvency statutes were informed and driven by the innovations of judges and lawyers in an expanding number of international cases.

114.    UNCITRAL was established by the United Nations General Assembly by its Resolution 2205 (XXI) on December 17, 1996 "to promote the progressive harmonization and unification of international trade law."  As part of this mandate, in 1997, UNCITRAL developed the Model Law on Cross-border Insolvency (the "**Model Law**").[162] While the Model Law is not binding, it was created as a legislative text that provides a framework for effective cross-border coordination and cooperation in insolvency. All UNCITRAL Model Laws are recommended to states for enactment as part of their national law.

115.    The Model Law and the various forms in which it has been enacted by governments – including Chapter 15 of the US Bankruptcy Code and Part IV of the CCAA – embody the true essence of Modified Universalism in international insolvency.

116.    In a decision released on August 27, 2013, the US Court of Appeals for the Third Circuit provided an overview of the current status of international insolvency law and its acceptance as part of the statutory framework in the US  Citing with approval the work of the UK Pension Claimants' experts Jay Westbrook and Leif Clark, the court stated:

> The Model Law reflects a universalism approach to transnational insolvency. It treats the multinational bankruptcy as a single process in the foreign main proceeding, with other courts assisting in that single proceeding. Westbrook, *supra*, at 715. In contrast, under a territorialism approach a debtor must initiate insolvency actions in each country where

---

[162]    *Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law*, UN GAOR, 52nd Sess., annex, Agenda Item 148, UN Doc.A/RES/52/158 (1998) [*Model Law*].

its property is found. *Id.* This approach is the so-called "grab rule" where each country seizes assets and distributes them according to each country's insolvency proceedings. *Id.*; *see also* Andrew T. Guzman, *International Bankruptcy: In Defense of Universalism*, 98 Mich. L. Rev. 2177, 2179 (2000).

Chapter 15 embraces the universalism approach. The ancillary nature of Chapter 15 proceedings "emphasizes the United States policy in favor of a general rule" that our courts "act . . . in aid of the main proceedings, in preference to a system of full bankruptcies . . . in each state where assets are found." *H.R. Rep. No. 109–31(I), at 109 (2005) reprinted in 2005 U.S.C.C.A.N. 88, 171.* Congress rejected the territorialism approach, the "system of full bankruptcies," in favor of aiding one main proceeding. *Id.* "The purpose is to maximize assistance to the foreign court conducting the main proceeding." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 678-79 (S.D.N.Y. 2011) (citing *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010)).

…

Chapter 15 improved predictability by mandating recognition when a foreign proceeding meets Section 1517 recognition requirements. Leif M. Clark, *Ancillary and Other Cross–Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code* 10–11 (2008). Before the Model Law, many countries did not assist US insolvency proceedings, even though the United States opened its courts to foreign representatives. *In re Condor Ins., Ltd.,* 601 F.3d 319, 321–22 (5th Cir.2010). One of the reasons Congress changed so little of the wording in the Model Law was to endorse it wholesale, and encourage wide adoption by other nations. Westbrook, *supra,* at 719.[163] (emphasis added)

117.    A statement made by Lord Hoffman illustrates the basis for a universalist

approach in international insolvency:

[f]airness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove.  No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated.[164] (emphasis added)

---

[163]    *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306 (3rd Cir. 2013) ("*re ABC Learning Centres*").

[164]    *Cambridge Gas Transp. Corp v. Official Comm. of Unsecured Creditors of Navigator Holdings PLC*, [2007] 1 A.C. 508, at para. 17.

118.    In citing with approval this statement by Lord Hoffman, US Bankruptcy Judge

Gropper, has stated:

> [on application for turnover of assets or proceeds to another jurisdiction] For holders of general unsecured claims, on the other hand, a strong argument can be made that the principle stated by Lord Hoffman, quoted at the outset of this paper, is preserved, and similarly situated general unsecured creditors should receive the same distribution without regard to the assets available or the amount of debt located in a particular jurisdiction.  As Lord Hoffmann has stated, the principle of equality among similarly situated creditors is embedded in the common law.[165]

### (2)    Modified Universalism's Application is Both Procedural and Substantive.

119.    The way in which the Allocation Litigation and Nortel's restructuring have

unfolded demonstrate that the issues before these Courts demand a solution that draws upon both

the procedural and substantive aspects of Modified Universalism.

120.    The application of the Model Law itself does in fact affect the substantive rights

of parties. One example includes the codification of the "Hotchpot Rule" under Article 32 of the

Model Law.[166]

121.    While it may have evolved from the idea that communication and cooperation

between courts is desirable, Modified Universalism means more than simply exchanging phone

numbers and promising to "keep-in-touch."  The joint trial and over five years of joint

proceedings in this case is a recognition of Modified Universalism's broad scope and application

– it recognizes that the rules applicable in an international insolvency context may take

precedence over the domestic law of a particular jurisdiction.

---

[165]    The Honourable Allan L. Gropper, "The Payment of Priority Claims in Cross-Border Insolvency Cases," 46 Tex. Int'l L.J.  559, 566 (2011).

[166]    The Hotchot Rule is discussed in more detail *infra* at Section IV.B.

122.    If Modified Universalism was limited to purely procedural aspects of cross-border insolvency law, the restructuring of Canada's asset-backed commercial paper ("ABCP") market would not have been possible. In *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*,[167] the Ontario Court of Appeal affirmed an Amended Sanction Order and Plan Implementation Order which granted broad third-party non-debtor releases and injunctions that were necessary to the unprecedented restructuring of Canada's ABCP market.  Despite case law from the Second Circuit that suggested the US Court did not have jurisdiction to issue non-debtor releases such as the ones sought in the Sanction Order and Plan Order, Judge Glenn granted an Order enforcing the Sanction Order and Plan Order in the US[168]  Such a result would not have been possible if aspects of cross-border cooperation between the US and Canadian Courts was limited to merely procedural matters. Similarly *In re Board of Directors of Telecom Argentina, S.A*,[169]  Judge Sotomayor (then of the Second Circuit, now of the US Supreme Court), rejected a US creditor's challenge to a foreign debtor's attempts to implement the terms of an Argentinean Plan of Reorganization in the US despite a number of difficulties that would have arisen if US domestic law was strictly applied without regard to the underlying Argentinean proceedings.  Again, this demonstrates that the principles of Modified Universalism are not limited to the procedural aspects of the law.

123.    Although the US Debtors and other parties with which they are aligned may object to the substantive application of Modified Universalism on the basis that such application lacks express statutory support, it is important to recall that insolvency case law typically

---

[167]    2008 CarswellOnt 4811, 2008 ONCA 587.

[168]    *In re Metcalfe & Mansfield Alternative Investments,* 421 B.R. 685 (Bankr. S.D.N.Y. 2010).

[169]    *In re Board of Directors of Telecom Argentina, S.A.* 528 F.3d 162 (2d Cir. 2008).

precedes and lays the foundation for future legislative reform.[170] The most oft-cited example of

case law preceding legislative reform is the global insolvency of Maxwell Communication

Corporation. In *In re Maxwell Communication Corporation plc* - a case close to 20 years old -

worldwide distributions were made to creditors from a single pool of assets notwithstanding

multiple insolvency filings in separate jurisdictions.[171]   The Courts in *Maxwell* did not have the

benefit of legislative guidance – procedurally or substantively – in ordering a worldwide

distribution from one pool.  The Model Law did not exist and no legal precedent was available to

provide a path forward.  Judicial innovation and pragmatism overcame territorial and technical

limitations.  The *Maxwell* case continues to be cited as the gold standard in resolving contentious

disputes regarding distribution of assets in an international insolvency setting.

124.    Finally, the Courts should not feel constrained by any procedural / substantive

distinction raised in respect of Modified Universalism. The application of the legal or equitable

principles set forth herein promote, rather than undermine the public policy considerations of

both the US and Canada, and therefore comport with the standards set forth in section 1506 of

the US Bankruptcy Code and section 61(2) of the CCAA.[172]

---

[170]        Jay Westbrook Dep. Tr. at 205:7 –206:21.

[171]        *Maxwell*, 170 B.R. 800.

[172]        Section 1506 of the Bankruptcy Code provides:

**Public Policy Exception**

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the
action would be manifestly contrary to the public policy of the United States.  11 U.S.C. § 1506.

Section 61(2) of the CCAA provides:

**Public Policy Exceptions**

Nothing in this Part prevents the court from refusing to do something that would be contrary to public
policy.

In *In re ABC Learning Centres*, the Third Circuit cited a number of sources which confirmed that the
Public Policy Exception should be interpreted narrowly and should only be invoked in exceptional
circumstances:

### B.      The Pro Rata Distribution Model Properly Applies the Hotchpot Rule.

125.     A central tenet of Modified Universalism and a *pari passu* pro rata recovery for

similarly-situated creditors is the Hotchpot Rule – a long-recognized substantive rule of

international insolvency that has been codified in Section 1532 of title 11 of the Bankruptcy

Code, Section 60 of the CCAA and Article 32 of the Model Law.[173]

---

"The public policy exception has been narrowly construed, because the "word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." H.R.Rep. No. 109–31(1), at 109 (2005) reprinted in U.S.C.C.A.N. 88, 172; see also *In re Ephedra Prods. Liab. Litig*., 349 B.R. 333, 336 (S.D.N.Y.2006) (explaining why the exception is a narrow one). "The purpose of the expression 'manifestly', ... is to emphasize that public policy exceptions should be interpreted restrictively and that [the exception] is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State." U.N. Comm'n on Int'l Trade Law, Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, ¶ 89, U.N. Doc A/ CN.9/442 (1997)." *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013).

[173]    Prior to the adoption of chapter 15 of the Bankruptcy Code in 2005, the Hotchpot Rule was codified under former Section 508(a).

Section 1532 of the Bankruptcy Code provides:

**Rule of Payment in Concurrent Proceedings**

Without prejudice to secured claims or rights *in rem*, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title [such as, e.g., chapter 11] regarding the debtor, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.  11 U.S.C. § 1532.

Section 60 of the CCAA provides:

**Credit for recovery in other jurisdictions**

60. (1) In making a compromise or an arrangement of a debtor company, the following shall be taken into account in the distribution of dividends to the company's creditors in Canada as if they were a part of that distribution:

(a) the amount that a creditor receives or is entitled to receive outside Canada by way of a dividend in a foreign proceeding in respect of the company; and

(b) the value of any property of the company that the creditor acquires outside Canada on account of a provable claim of the creditor or that the creditor acquires outside Canada by way of a transfer that, if it were subject to this Act, would be a preference over other creditors or a transfer at undervalue.

**Restriction**

(2) Despite subsection (1), the creditor is not entitled to receive a dividend from the distribution in Canada until every other creditor who has a claim of equal rank in the order of priority established under this Act has received a dividend whose amount is the same percentage of that other creditor's claim as the aggregate of the amount referred to in paragraph (1)(a) and the value referred to in paragraph (1)(b) is of that creditor's claim.

126.    In a nutshell, the Hotchpot Rule requires a creditor who has received a payment in respect of its claim in a foreign insolvency proceeding to account for such distribution (or "contribute to the hotchpot") before receiving any recovery on its claim in a domestic proceeding.  The purpose of the Hotchpot Rule is to ensure that such creditors do not recover proportionally more than similarly-situated creditors who have only a single source of payment.[174] This clear restriction on the substantive rights of creditors in an international insolvency is reflected through the language of the Cross-Border Claims Protocol in this proceeding and comports with the very essence of the pro rata distribution model which provides an equal recovery for all unsecured creditors of the Nortel Group.[175]

127.    Typically, the Hotchpot Rule is invoked in cases where claims are asserted by a creditor in multiple, concurrent insolvency proceedings against the same debtor where assets and proceeds available for distribution are separate and distinct in each jurisdiction.[176]   Although parties such as the *Ad Hoc* Group of Bondholders have objected to the application of the Hotchpot Rule in these proceedings, such objections ignore the reality of the way in which the

---

[174]    *See In re Pollmann*, 156 F. 221, 222-23 (S.D.N.Y. 1907) (concluding that the Hotchpot Rule and the power to void preferential payments produce the same result, and serve to further the exercise of the court's equitable powers by preventing "the destruction of equality" among creditors).

[175]    Section 25 of the Cross-Border Claims Protocol specifically provides that the rights and defenses of the parties regarding the resolution (*i.e.*, allowance or provability) of Overlapping Claims, such as the claims advanced by the Ad Hoc Group of Bondholders, are "*subject to any applicable limitations on distributions to which a creditor may be allowed to recover for its claim.*" Given the unique facts of the Nortel Group's insolvency, the Hotchpot Rule is an applicable limitation on creditor claims which militates in favour of the pro rata distribution model.

[176]    *See Ex parte Wilson, In re Douglas.* (1872) L.R. 7 Ch.App. 490. In this case, the debtor carried on business in England and Brazil under two different firms. The debtor filed for bankruptcy protection and his assets in Brazil were administered under Brazilian bankruptcy law. After receiving a dividend in the Brazilian bankruptcy proceeding, certain Brazilian creditors filed claims in the English bankruptcy proceedings. The English Court of Appeal held that, despite the fact that the debtor carried on business under two separate firms in two jurisdictions, the debtor's bankruptcy really only involved one estate (*i.e.*, one pool of assets) which was partially administered in England and Brazil. Accordingly, based on the long-standing principle that a creditor cannot make a second recovery from the same estate, the Court ruled that the Brazilian creditors could not make a second recovery in England until all other creditors of the bankrupt's estate had received the same proportional recovery on their claims (the Hotchpot Rule).

Nortel Group operated prior to its insolvency and the events that have transpired since January 14, 2009.  Regardless of which allocation methodology is adopted by the Courts, *all creditors* in this proceeding will all recover from the same, single pot of commingled assets, which consists of proceeds from the sale of assets that were jointly created, used by all entities and ultimately sold collaboratively by the Nortel Group.

128.    The Hotchpot Rule applies in the Nortel proceeding because there is one single, indistinguishable pool of assets for the entire Group – a pool created by the Estates themselves – and an Overlapping Claim that: "(i) has been filed in both the Canadian Proceedings and the chapter 11 cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction ... including ... where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction…."[177]

129.    The Hotchpot Rule will not be uniformly available in all cases involving separate legal entities with direct and guarantee claims asserted by the same parties, such as for example where the assets of those entities are, in fact, separate and identifiable as belonging to a particular entity.  However, it is appropriate to apply it in cases involving highly integrated debtors where the underlying assets available to satisfy creditor claims are in fact from one source, and represent joint assets prior to bankruptcy or assets in which multiple debtors have an interest.

130.    Applying the Hotchpot Rule, the Lockbox Funds represent a single indistinguishable pool of assets from which a double recovery should not be permitted unless creditors of the same class (*i.e.*, other unsecured creditors claiming in the global bankruptcy proceeding) receive a distribution that is proportionately similar. The Hotchpot Rule prevents

---

[177]    Cross-Border Claims Protocol, § 11 (definition of "**Overlapping Claims**").

creditors with multiple claims in the Nortel proceedings from making multiple recoveries on those claims from the Lockbox funds, directly or indirectly.[178] Ultimately, the application of the Hotchpot Rule to all claims in the Nortel Group's insolvency leads to the conclusion that the pure pro rata distribution method – which provides one equal recovery from the Lockbox Funds to all unsecured creditors – is the most logical and legally-supportable solution to the allocation litigation.

### C.  The Pro Rata Distribution Model is Not "Global Substantive Consolidation" But Is Consistent with the Underlying Principles.

131.  A pro rata distribution of the Lockbox Funds does not equate to a global substantive consolidation of the Estates. Although global substantive consolidation is not requested by the UK Pension Claimants, and is not required in order to effect a pro rata distribution model, the principles underlying substantive consolidation in Canadian and US case law also support the pro rata distribution model as the appropriate allocation method.[179]

---

[178]  In a discussion of the inherent injustice created when creditors with access to more than one source of payment are able to recover more than otherwise similarly-entitled creditors with a single source of payment, Westbrook and Clark note that "[t]he Model Law offers an antidote in the latter context not dissimilar to the one offered by Professor Widen. It is the hotchpot rule, which provides that a creditor with a claim that can be asserted in two countries should not be able to participate on a pro rata basis with creditors with claims that can only be asserted in one of those countries until the latter creditors have received a percentage recovery equal to what the two-country creditor received in the other country." *See* Clark and Westbrook Report at n. 39.

[179]  Overall, allocation on the basis of territory or entity can be undesirable in liquidation cases involving multinational corporate groups because: (a) There is a high likelihood in cases of international corporate groups that entity and territorial lines were largely irrelevant to their finance and operations; (b) from the fact of integration flows the reality that in most, although not all cases, creditor expectations (the only relevant policy supporting the corporate form in a liquidation) are most likely based on capacities of the global group; (c) there is enormous waste and difficulty in trying to create pools of value that were never intended to exist, costing creditors time and money a liquidation estate can ill afford; and (d) this expense and delay is greatly increased by the difficult choice of law questions-- questions of applicable corporate, tort, contract, and insolvency law just to start--that make the corporate unraveling a lawyer's career and a creditor's nightmare.

**CONCLUSION**

132.    For all of the reasons described above, the UK Pension Claimants respectfully request that the Courts adopt the pro rata distribution model for allocating the Lockbox Funds. To that end, the UK Pension Claimants further respectfully request that the Courts enter the Proposed Findings of Fact and Conclusions of Law annexed hereto as Appendix A.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 7th day of August 2014.


August 7, 2014                        */s/ Michael E. Barrack*
                                      **Thornton Grout Finnigan LLP**
                                      Barristers and Solicitors
                                      100 Wellington Street West, Suite 3200
                                      Toronto, Ontario, M5K 1K7

                                      **Michael E. Barrack** (LSUC# 21941W)
                                      **John Finnigan** (LSUC # 24040L)
                                      **D. J. Miller** (LSUC# 34393P)
                                      **Andrea McEwan** (LSUC# 53781P)
                                      **Rebecca (Lewis) Kennedy** (LSUC# 61146S)

                                      Tel:    416-304-1616
                                      Fax:    416-304-1313

                                      */s/ Brian E. O'Connor*
                                      **Willkie Farr & Gallagher LLP**
                                      787 Seventh Avenue
                                      New York, N.Y. 10019-6099, U.S.A

                                      **Brian E. O'Connor**
                                      **Eugene L. Chang**
                                      **Sameer Advani**
                                      **Heather M. Schneider**
                                      **Robert Kofsky**
                                      **Andrew Hanrahan**

                                      Tel:    212-728-8000
                                      Fax:    212-728-8111

                                      */s/ Justin R. Alberto*
                                      **Bayard, P.A.**
                                      222 Delaware Avenue, Suite 900
                                      Wilmington, Delaware 19899

                                      **Charlene D. Davis** (No. 2336)
                                      **Justin Alberto** (No. 5126)
                                      Tel: 302-655-5000
                                      Fax: 302-658-6395
                                      cdavis@bayardlaw.com
                                      jalberto@bayardlaw.com

Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION, AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

APPENDIX A:


POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF NORTEL NETWORKS UK PENSION TRUST LIMITED AND THE BOARD OF
THE PENSION PROTECTION FUND (COLLECTIVELY, THE "UK PENSION
CLAIMANTS")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

PROPOSED FINDINGS OF FACT ..........................................................................1

I.    NORTEL OPERATED AS ONE HIGHLY INTEGRATED GLOBAL
ENTERPRISE.........................................................................................................1

    A.    Nortel's Matrix Organization.......................................................................1

        (1)    Lines of business.............................................................................2

        (2)    Legal entities ..................................................................................3

            (a)    Canadian entities .................................................................4

            (b)    US entities ...........................................................................5

            (c)    European entities.................................................................6

        (3)    Global general and administrative support functions ..................7

    B.    Nortel Was Perceived as, and Represented Itself to Be, a Single, Globally
Integrated Enterprise ..................................................................................8

    C.    Nortel's Research and Development Functions Were Cross-Geographic
and Collaborative. ....................................................................................13

        (1)    R&D was geographically distributed.............................................13

        (2)    R&D involved cross-border collaboration...................................14

        (3)    R&D priorities and budgets were determined globally, without
regard for geographic or legal entity divisions. .........................16

        (4)    The ultimate goal of Nortel's R&D was to develop technologies it
could commercially exploit..........................................................17

II.    NORTEL'S PATENT PORTFOLIO ................................................................18

    A.    Nortel Coordinated Its Patent Filings Globally to Promote the Interests of
the Group. .................................................................................................18

    B.    Nortel's Patents Reflect the Integrated Nature of the Group. ...............23

        (1)    Nortel's patents exhibit a high degree of technological
entanglement. ..............................................................................24

        (2)    Nortel's patents exhibit a high degree of geographic entanglement...........25

    C.    Most of the Patent Portfolio Resulted from Research Conducted Prior to 2006.................................................................................................................26

III.    AS PART OF THE GROUP, NNUK MADE SIGNIFICANT CONTRIBUTIONS TO NORTEL'S PATENTS AND TECHNOLOGY. .......................................27

    A.    NNUK Participated in High-Value Research and Development for the Benefit of the Nortel Group. ..............................................................................28

    B.    When It Came to Invention, NNUK "Punched Above Its Weight." ....................34

IV.    NORTEL'S TAX AND TRANSFER PRICING POLICIES ............................................36

    A.    Transfer Pricing Prior to 2001 Was Governed by a Series of Bilateral Cost Sharing Agreements.............................................................................................38

    B.    The Residual Profit Split Methodology ..............................................................40

    C.    The Master R&D Agreement ..............................................................................44

        (1)    The RPSM dictated the sharing of the Group's annual operating profit or loss and thus the annual financial outcome for each RPE. ..........45

        (2)    The RPSM had as one of its objectives the localization of profits in Canada.............................................................................................................47

        (3)    The RPSM and the MRDA do not address a Group-wide insolvency. ......................................................................................................48

        (4)    The RPSM and the MRDA do not apply to the proceeds from asset sales...................................................................................................................50

V.    NORTEL MANAGED CASH CENTRALLY AND FOR THE BENEFIT OF THE GROUP .................................................................................................................51

VI.    THE REASONABLE EXPECTATIONS OF NORTEL'S CREDITORS WERE BASED ON ITS GROUP-WIDE BUSINESS AND FINANCES ...................................54

    A.    Bondholders .......................................................................................................54

    B.    Trustees of the UK Pension Plan .......................................................................60

VII.    NORTEL'S INSOLVENCY SALES AND AGREEMENTS ..........................................61

    A.    Commencement of Global Insolvency Proceedings .............................................61

    B.    To Maximize Returns, Nortel Sold its aAssets on a Global Basis........................62

(1)   Segmentation of patents for sale with the business or residual portfolio.........................................................................................63

(2)   The IFSA............................................................................................66

(3)   Business line sales..............................................................................67

        (a)   Layer 4–7 sale ...........................................................................67

        (b)   CDMA/LTE sale........................................................................68

        (c)   Enterprise sale ...........................................................................68

        (d)   GSM sale....................................................................................69

        (e)   MEN sale ...................................................................................71

        (f)   Next Generation Packet Core sale ..............................................72

        (g)   CVAS sale..................................................................................72

        (h)   MSS sale ....................................................................................73

(4)   Sale of the residual patent portfolio .........................................................74

C.   Interests Diverge Over Allocation ...........................................................76

D.   The Various Allocation Positions Do Not Provide for Any Allocation on the Estate or Creditor Level. .................................................................77

PROPOSED CONCLUSIONS OF LAW ..........................................................................78

I.   THE NORTEL DEBTORS DID NOT AGREE *EX ANTE* ON HOW THE PROCEEDS OF THE GROUP'S LIQUIDATION WOULD BE ALLOCATED AMONG THE ESTATES............................................................................................78

II.   THE COURTS HAVE BROAD EQUITABLE POWERS TO FASHION AN APPROPRIATE ALLOCATION MECHANISM IN THIS UNPRECEDENTED CASE. ..............................................................................................................78

III.   THE PRO RATA DISTRIBUTION MODEL IS  MOST CONSISTENT WITH THE FACTS REGARDING THE MANNER IN WHICH NORTEL OPERATED PRIOR TO INSOLVENCY..........................................................................................80

IV.   THE PRO RATA DISTRIBUTION MODEL IS SIMPLE AND FLEXIBLE TO IMPLEMENT. ...............................................................................................80

V.   PRINCIPLES OF DOMESTIC AND INTERNATIONAL INSOLVENCY LAW SUPPORT A PRO RATA DISTRIBUTION. .................................................81

## PROPOSED FINDINGS OF FACT

1.      The findings set forth herein constitute the Court's findings of fact.  To the extent

any of the following findings of fact constitute conclusions of law, they are adopted as such.

## I.    NORTEL OPERATED AS ONE HIGHLY INTEGRATED GLOBAL ENTERPRISE

### A.    Nortel's Matrix Organization

2.      Nortel[2] was organized as a multi-dimensional matrix of business lines, legal

entities, and administrative support functions.[3]

3.      The first and primary dimension of the matrix consisted of business segments, or

lines of business.[4]  "From the perspective of the Nortel Group's senior management, the

LOBs [lines of business] were the primary organizational divisions within Nortel."[5]  These

lines of business "operated across legal and geographic boundaries,"[6] and were responsible for

much of Nortel's research, product development, and manufacturing.[7]

4.      The second dimension of Nortel's matrix organization was geography.  Nortel

was comprised of legal entities organized in various countries around the world.[8]  These

---

[2] The terms "**Nortel**" or "**Nortel Group**" are used throughout to refer to the global enterprise comprising parent
     holding company Nortel Networks Corporation and its predecessors and all direct and indirect subsidiaries.

[3] Allocation Trial Transcript ("**Trial Trans.**") Day 3, 538:5–7, 538:20–539:2 (Currie); TR000001 (Currie Affidavit
     ("**Aff.**").) ¶¶23, 29.

[4] Pugh Deposition ("**Dep.**"). 140:5–14.

[5] TR000001 (Currie Aff.) ¶28; Trial Trans. Day 3, 538:7–10 (Currie); Day 6, 1317:20–1318:21 (Orlando)
     (leadership evaluated success or failure based on lines of business).

[6] TR000001 (Currie Aff.) ¶28; Riedel Dep. 82:3–83:14; Pugh Dep. 141:15–21.

[7] Dadyburjor Dep. 37:21–3.

[8] Trial Trans. Day 3, 538:11–14, 539:8–19 (Currie).

entities observed corporate formalities,[9] but "had no real strategic process surrounding them."[10]

5.      The third dimension of Nortel's matrix organization consisted of corporate infrastructure, such as legal, tax, finance, human resources, and information technology, that served the various lines of business and geographic entities.[11]

**(1)    Lines of business**

6.      At the time of its insolvency, Nortel had four business lines.

7.      The Carrier Networks ("**Carrier**") business sold wireless products and services to wireless carriers.[12]

8.      The Enterprise Solutions ("**Enterprise**") business sold communications products and services to businesses and large organizations. [13]

9.      The Global Services business provided a broad range of network support services, including installation, maintenance, and technical support. [14]

10.     The Metro Ethernet Networks ("**MEN**") business provided optical networking products and Ethernet technology. [15]

11.     Nortel's business segments were separately managed, and their managers reported directly to Nortel's Group CEO.[16]

---

[9] TR00014 (Binning Aff.) ¶9.

[10] Trial Trans. Day 3, 540:4–7 (Currie).

[11] Trial Trans. Day 3, 538:14–19 (Currie); Dadyburjor Dep. 38:8–13; Edwards Dep. 120:2–17.

[12] TR40136 (Jan. 14, 2009 Report of the Monitor) ¶17; TR43999 (2008 10K) p. 6.

[13] TR40136 (Jan. 14, 2009 Report of the Monitor) ¶17; TR43999 (2008 10K) p. 8.

[14] TR40136 (Jan. 14, 2009 Report of the Monitor) ¶17; TR43999 (2008 10K) p. 9.

[15] TR40136 (Jan. 14, 2009 Report of the Monitor) ¶17; TR43999 (2008 10K) p. 10.

12.    At Nortel, "[t]he primary reporting vehicle was the line of business management results."[17]  Nortel's "management set of books" consisted of the profit and loss statements, budgets, and financial targets of the business segments.  While Nortel kept a separate set of books by legal entity for official filings and for tax purposes, these books were not the focus for people who ran and managed Nortel's business.[18]

### (2)    Legal entities

13.    Nortel was also comprised of subsidiaries organized in different countries around the world, although from an organization standpoint these geographic divisions were secondary to its business segments.[19]  As by Pavi Binning, Nortel's Executive Vice President and Chief Financial Officer of NNC from November 2007 through March 2010, and also its Chief Restructuring Officer, testified:

> When you run a business on a global basis . . . legal entities are
> quite secondary in terms of the management structure that you use
> to operate the business, whether it be in a particular, you know,
> sort of territory or across territories . . . [b]ecause groups organize
> themselves around management responsibility and
> accountability.[20]

14.    The assets and employees of Nortel's business segments were distributed across the world in various legal entities.[21]

---

[16] TR46952 (2001 10K) p. F-43.

[17] Pugh Dep. 140:15–141:3.

[18] Briard Dep. 30:12–31:12.

[19] Edwards Dep. 171:24–172:5, 173:12–21; Pugh Dep. 141:22–142:2.

[20] Binning Dep. 133:13–24.

[21] Binning Dep. 132:25–133:13, 134:5–8.

15.    While employees were generally employed by entities organized in the countries of their residence, their particular skills or expertise would be called upon no matter where the need arose.[22]

(a)    **Canadian entities**

16.    At the time of the insolvency, Nortel Networks Corporation ("**NNC**") was the ultimate parent holding company.[23]  NNC was originally incorporated under the *Canada Business Corporations Act* on March 7, 2000.  NNC's most significant asset was, and is, its investments in its direct and indirect subsidiaries.[24]

17.    Nortel Networks Limited ("**NNL**"), Nortel's principal Canadian operating subsidiary, was originally incorporated in 1914.  NNC holds all of the outstanding common shares of NNL and is the direct or indirect parent of 128 subsidiaries, including Nortel's principal foreign operating subsidiaries, Nortel Networks Inc. ("**NNI**") and Nortel Networks UK Limited ("**NNUK**").[25]

18.    Nortel Networks Technology Corporation ("**NNTC**") is a wholly-owned subsidiary of NNL and was a research and development ("**R&D**") company that employed approximately 3,000 employees in Ottawa, Ontario.  NNTC did not produce any third-party revenue and relied on NNL for all of its funding, including payroll.  NNTC performed R&D for NNL, thereby allowing NNL to receive tax credits.[26]

---

[22] Bifield Dep. 257:5–258:5; Trial Trans. Day 7, 1573:13–25 (Brueckheimer).

[23] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶¶2, 19–20.

[24] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶21(a).

[25] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶21(b).

[26] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶21(c).

19.     Nortel Networks International Corporation ("**NNIC**") is a wholly-owned subsidiary of NNL having no business or assets other than a minority equity interest in a number of foreign Nortel companies.[27]

20.     Nortel Networks Global Corporation ("**NNGC**") is a wholly-owned subsidiary of NNL with representative offices in various countries on behalf of other Nortel companies.  It had no business or assets other than a minor amount of revenue from other Nortel entities and a minority interest in certain foreign Nortel entities.  Its costs were reimbursed by these companies.[28]

21.     The boards of NNC and NNL were comprised of the same directors and had the same non-executive chair.  Meetings of the boards of NNC and NNL were generally held together as joint meetings.  NNC and NNL's corporate governance was conducted from Toronto, board meetings were held there, the majority of the directors were resident in Canada, and the companies' headquarters were in Toronto.[29]

(b)    **US entities**

22.     Nortel's US business was mainly conducted through its primary US operating subsidiary, NNI, which is a direct wholly-owned subsidiary of NNL.  NNI was incorporated pursuant to the laws of the State of Delaware on September 16, 1971.  All of the US Debtors are direct or indirect subsidiaries of the Canadian parents NNL or NNC.[30]

---

[27] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶21(d).

[28] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶21(e).

[29] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶¶44, 189.

[30] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶23.

### (c)     European entities

23.     Nortel's Europe, Middle East, and Africa operations ("**EMEA**") were headquartered in NNUK's offices in England.  NNUK was incorporated in England on February 25, 2000 pursuant to the *Companies Act* 1985 and its registered office is at Maidenhead Office Park, Maidenhead, Berkshire, England.[31]  NNUK was by far the largest Nortel entity in EMEA.[32]

24.     The majority of the EMEA Debtors are subsidiaries of NNUK.  Nortel Networks SA ("**NN France**") remains jointly owned by NNL (91.17 percent) and Nortel International Finance & Holding BV ("**NNIF**") (8.83 percent), a wholly-owned subsidiary of NNUK. Nortel Networks France SAS ("**NN France SAS**") is a subsidiary of NN France.  Nortel Networks (Ireland) Limited ("**NN Ireland**"), a wholly-owned subsidiary of NNL. [33]

25.     NN France was a joint venture until 1999.  As part of a transaction undertaken on December 18, 2007, the remaining shares in NN France held by NNIF were to be transferred to NNUK. The completion of that share transaction was delayed until 2008 and was ultimately not completed at the time of the global insolvency proceedings commenced by the Nortel Group.  Notwithstanding the failure to complete that share transfer, at the time of the insolvency filing, NN France was considered by Nortel to be "an economic subsidiary" of NNUK.[34]

---

[31] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶25.

[32] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶27.

[33] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶26.

[34] TR21539 (Doolittle Aff. Jan. 14, 2009) ¶27.

### (3)    Global general and administrative support functions

26.    Much of Nortel's global General and Administrative support ("**G&A**") was performed by the Canadian operating entity, NNL.  There were four primary global G&A organizations within Nortel:  (1) Finance; (2) Information Technology; (3) Human Resources, and (4) Other (an organizing encompassing Real Estate, Legal, Compliance, and Strategy groups). [35]

27.    As one of Nortel's Chief Technology Officers testified, there was "intertwining of the tightest nature" between these different planes of the matrix, such as in the interactions between customers on the one hand and the product and sales organizations on the other.[36] Although Nortel's sales and distribution tended to be organized regionally, Nortel would leverage skilled employees from around the world in interacting with customers.[37]

28.    The matrix structure "allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.*, sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to need." [38]

29.    In this fashion, Nortel operated as "an integrated, global whole,"[39] with its composite parts worked as part of a common endeavor for the benefit of the Group.[40]

---

[35] TR22078 (2007–2011 APA) Appx. A pp. 9–10; Drinkwater Dep. 45:21–46:24.

[36] Mumford Dep. 38:3–13.

[37] Dadyburjor Dep. 38:4–7, 14–19; 38:20–39:16.

[38] TR00001 (Currie Aff.) ¶27; Bifield Dep. 257:5–24.

[39] Trial Trans. Day 3, 539:20–540:11 (Currie).

[40] Trial Trans. Days 11–12, 2647:17–2648:18, 2718:16–20, 2737:12–19 (Cooper) (debtors engaged in a common endeavor akin to a joint venture among related parties); Day 8, 1719:6–15, 1721:16–20, 1751:16–25 (Stephens) (MRDA participants appeared to engage in a form of a joint venture to maximize global revenues).

30.     Business and management decisions were typically made without regard for the fact that the Nortel Group was made up of multiple legal entities.  Ernie Briard, an accountant with the Chief Technology Office, testified:  "[W]e did not run the business with any real knowledge of the statutory entities at all.  We ran it as a global Nortel corporation."[41]  "[O]ur whole company was being run on a one-Nortel basis with—our profit, motivation, bonus schemes, everything had to do with—a big chunk of it had to do with your total Nortel."[42]

31.     Douglass Beatty, who worked in the treasury department in the 1990s and as Chief Financial Officer from mid-2002 to mid-2004, testified that decisions to allocate resources and performance were not based on legal entity lines, but by lines of business.[43] Nortel reported its finances on a consolidated basis without regard for its different legal entities.[44]  Nortel's legal entities were not free-standing companies, and could not feasibly have been "hived off" and operated independently.[45]

**B.      Nortel Was Perceived as, and Represented Itself to Be, a Single, Globally Integrated Enterprise**

32.     The manner in which Nortel was viewed internally (*e.g.*, by employees) and presented itself externally (*e.g.*, to customers, vendors, lenders, and competitors) reinforced the notion that it was a single, globally integrated business.

33.     Nortel's officers and employees often did not consider or distinguish among Nortel's different legal entities in the course of their duties.

---

[41] Briard Dep. 21:4–14 (discussing R&D allocation).

[42] Briard Dep. 79:21–24.

[43] Beatty Dep. 22:3–11, 178:19–179:3.

[44] Trial Trans. Day 3, 571:13–572:5 (Currie); Day18, 4599:7–15 (Ryan).

[45] Trial Trans. Day 3, 539:20–540:11 (Currie).

34.    David Drinkwater, a Nortel Chief Legal Officer, considered his employer to be "Nortel . . . [t]he global organization."[46]

35.    George Riedel, Nortel's Chief Strategy Officer, was aware that the legal entity that was his employer at Nortel changed over time, but this did not affect his responsibilities. According to Riedel:  "I didn't think of it as entities, it was Nortel."[47]

36.    Kush Dadyburjor, Nortel's Vice President of Mergers and Acquisitions, testified that the legal entity that employed him was irrelevant from the standpoint of his job responsibilities.[48]

37.    Ernie Briard, an accountant with the Chief Technology Office, was aware that Nortel was made up of different legal entities due to his background in finance, but testified that "as far as I was concerned, I was employed by Nortel, and I provided services to many regions and many entities . . ."[49]

38.    Simon Brueckheimer, a Nortel Fellow and prolific inventor based in the UK, testified that in customer-facing activities such as attending Mobile World Congress or addressing the UK Trade and Investment Organization, he "was representing Nortel.  I didn't differentiate any particular geography . . . .  I took on the mantle essentially of representing the company as a whole."[50]

---

[46] Drinkwater Dep. 21:23–22:10.

[47] Riedel Dep. 113:16–23.

[48] Dadyburjor Dep. 37:7–13.

[49] Briard Dep. 17:4–18.

[50] Trial Trans. Day 7, 1578:5–1579:22 (Brueckheimer)

39.     Graham Richardson, who over an approximately 20 year career at Nortel held product development and R&D management roles within the GSM and CDMA businesses,[51] testified that he did not know at any point which legal entity employed him, nor did he consider it important.[52]  Mr. Richardson appreciated that there were different Nortel legal entities around the world "Only . . . at a cursory level.  We didn't worry about that."[53]

40.     William Hern, a software architect and development manager at the Maidenhead, UK facility and also a member of the UK Pension Plan Trustee board,[54] testified:  "[B]efore I became a Trustee, whilst I was a normal Nortel person, I did not particularly think of NNUK. I just thought of Nortel as a global entity, and we might be on different sites, but we were a part of the same organization, overall."[55]

41.     This outlook extended to the lines of business as well.  A Gregory Mumford, one of Nortel's Chief Technology Officers, testified:  "[E]ven though we may have been organized in product groups or solution groups, for that matter, you know, we are one company."[56]

42.     Although formally employed by a particular legal entity, employee work responsibilities were with respect to the entire Nortel Group.[57]

---

[51] Richardson Dep. 20:5–7.

[52] Richardson Dep. 16:6–17, 26:22–25, 31:9–14.

[53] Richardson Dep. 49:3–8.

[54] Hern Dep. 18:24–20:9.

[55] Hern Dep. 155:12–17.

[56] Mumford Dep. 154:24–155:11.

[57] Bifield Dep. 256:10–258:25.

43.    In addition to working in the treasury department in the 1990s and as Chief

Financial Officer from mid-2002 to mid-2004, Douglass Beatty also served on the board of

NNUK. [58]  With regard to his duties as an NNUK board member, Mr. Beatty testified that he

saw his role as acting in the interests of both NNL and NNUK:  "No one ever laid them out

what they were, so there was no, I recall, written document as to what they were.  My

response would be to act in the bests interest of the Global Corporation while sitting on

NNUK's board."[59]

44.    The Nortel Networks name and logo were used throughout Nortel to refer to the

Group as an integrated whole.  To the outside world, including Nortel's customers, suppliers,

and the rest of the world, the logo referred to all of Nortel, and not to any one geographic

entity.[60]  Within Nortel, employees "use[d] the term 'Nortel Networks' to be the consolidated

global Nortel Networks . . . irrespective of any entity or jurisdiction.  It was the total—it was

the one Nortel."[61]

45.    Mr. Briard served for several years a Director of Finance for operations, and

testified that suppliers were concerned with the reliability of Nortel as a whole, while

consideration for which legal entity contracted with the supplier regarded as merely a

formality:

> . . . I think they [suppliers] needed to know which entity to bill and
> where to send the bills to.  As far as that, I spent a lot of time with
> suppliers so I know this area quite well.  As long as the suppliers

---

[58] Beatty Dep. 22:3–11, 117:3–11.

[59] Beatty Dep. 22:3–11, 117:17–21.

[60] Trial Trans. Day 3, 711:11–712:11 (McFadden).

[61] Briard Dep. 76:10–19.

knew it was Nortel, the consolidated Nortel, that's where they
based our credit reliability on, not a particular entity.[62]

46.    Mr. Briard testified that in some instances, suppliers insisted that the backing of a

subsidiary's debts by Nortel's Canadian parent be formalized in a guarantee:

[T]he ones that were more wanting to have things more legally in
place in case something happened, they would—the odd time I saw
them insisting on certain guarantees, those types of things put in
place.[63]

47.    Chief Executive Officer Mike Zafirovski characterized Nortel's customer

contracts as being, in "spirit . . . with all of Nortel," notwithstanding the "mechanics" of

contracting with individual Nortel legal entities.[64]

48.    Nortel's integration extended to its dealings with creditors.  Mr. Currie, Nortel's

Chief Financial Officer and a director of NNUK, testified that Nortel's creditors "had a line of

sight to the total, the integrated public company NNC."[65]  Mr. Currie did not recall

subsidiaries such as NNUK having "material-specific creditors other than those that were

entered into under the umbrella of the overall global corporation," and was unaware of any

specific creditors having concerns with respect to the liquidity of subsidiaries such as

NNUK.[66]

49.    Mary Anne Poland, who served in the tax and treasury departments from 2002 to

2005, testified that when it came to assessing the financial health of Nortel's parent company

as opposed to that of its subsidiaries: "I don't think anyone ever looked at it as an individual

---

[62] Briard Dep. 89:9–90:2.

[63] Briard Dep. 90:11–91:20.

[64] Zafirovski Dep. 27:18–28:9.

[65] Currie Dep. 65:20–22.

[66] Currie Dep. 65:5–8.

statutory entity. . . .  Everyone looked at Nortel in total . . . [l]ike on a global basis as opposed to statutorily."[67]

### C.    Nortel's Research and Development Functions Were Cross-Geographic and Collaborative.

#### (1)    R&D was geographically distributed.

50.    Nortel's R&D operations were distributed and were conducted across the globe. "Nortel's R&D function [was] a global undertaking aligned with its business strategy of technology leadership.  Engineers in each of Nortel's geographic markets work[ed] to develop next generation products."[68]

51.    By 2002, Nortel had 14,000 R&D employees spread across over 20 regions, with its most significant presence in Canada, the US, and the UK.[69]

52.    R&D operations relating to Nortel's lines of business—*e.g.*, Wireless, Enterprise, and Optical—were distributed globally as well.[70]

53.    Nortel's globally distributed R&D distinguished it from other high technology companies which centralized their R&D in a single site.  Microsoft, for example, conducted over 90 percent of its R&D at a its core facility in Seattle.  Likewise, Cisco Systems conducted over 80 percent of its R&D at its San Francisco Bay campus.[71]

---

[67] Poland Dep. 42:4–43:5, 241:9–19.

[68] TR11352 (Letter, Apr. 6, 2006) at NNI_01534867.

[69] TR21188 (Global R&D Investment Strategy) p. 4.

[70] TR21188 (Global R&D Investment Strategy) pp. 5–8.

[71] TR21188 (Global R&D Investment Strategy) pp. 9–10; Trial Trans. Day 3, 709:14–710:19 (McFadden).

### (2)    R&D involved cross-border collaboration

54.    Nortel's laboratories often worked collaboratively and as a unified whole to

develop technology.  As Simon Brueckheimer testified:

> Research & Development . . . at Nortel was generally a
> collaborative process.  Other NNUK employees and I not only
> worked together, we routinely shared our expertise, developed
> foundational technologies and also co-invented patents with Nortel
> employees based in other geographic locations, which was to the
> advantage of the Nortel Group.  I never perceived that there was
> any difference between particular Nortel entities, always thinking
> of Nortel as a unified whole.[72]

55.    As Mr. Fadden, one of Nortel's CTOs, testified:

> [T]he way it worked was, typically, if you had a project and it had
> consisted of multiple of modules, if you want to call them, of
> different technologies, what typically happened was the director of
> R&D for that project would look for the expertise that was
> available in any given place to work on that module, so it is
> possible you could do a module in Europe, a module in Canada, a
> module in the US and bring it together into a product.  It was not
> the preferred way to do it, but in some cases, the expertise you
> needed on certain modules may be in a certain location so that you
> would have to contract it out, if you want to call it that way, to that
> lab.[73]

56.    Because "modules have to work together as a whole," the labs could not operate

independently.  "[T]here would be collaboration across the various labs to make sure that

those modules worked together." [74]  Such collaboration "was very common in Nortel."[75]

---

[72] TR00023 (Brueckheimer Aff.) ¶5.

[73] Trial Trans. Day 3, 662:6–19 (McFadden).

[74] McFadden Dep. 53:6–20.

[75] McFadden Dep. 53:21–22.

57.     Just one example of collaboration among research sites was Project Rainbow, in which research relating to Asynchronous Transfer Mode ("**ATM**") network technology was coordinated among various Nortel labs from around the world.[76]

58.     Telecommunications technology assisted the flow of ideas and collaboration.  As Mr. McFadden testified:  "At Cisco they'd use a water cooler.  We used telephones."[77]

59.     Cross-site collaboration on software projects was facilitated by change-control processes and remote access and teleconference technology.  These mechanisms proved so effective that they replaced face-to-face meetings even among personnel in close proximity.[78]

60.     It was common for R&D personnel from around the world to be involved in the process of addressing customer requests and responding to customer bids.  Nortel's bid response to AT&T in 1997 involved the collaboration of multiple labs.  The effort was led by Simon Brueckheimer, who along with others at Nortel's Harlow, UK lab contributed the voice compression solution selected for the bid.[79]

61.     Such cross-geographic involvement was typical when new solutions had to be devised.[80]  As Mr. Brueckheimer testified:  "[I]n my experience on many, many bid responses, for example the [British Telecom] bid response in 2004, again which I ran, I had 85 people reporting to me from many labs around the world."[81]

---

[76] Trial Trans. Day 7, 1567:4–25 (Brueckheimer).

[77] Trial Trans. Day 3, 713:10–11 (McFadden).

[78] Trial Trans. Day 9, 1920:8–1921:17 (Hall).

[79] Trial Trans. Day 7, 1573:4–12 (Brueckheimer).

[80] Trial Trans. Day 7, 1573:13–16 (Brueckheimer).

[81] Trial Trans. Day 7, 1573:22–25 (Brueckheimer).

62.     R&D personnel often had significant contact with customers and potential customers, and their involvement was important to gaining new customers.[82]  Mr. Mumford testified that "[c]ustomer visits were an important part of connecting the product innovation to the customer requirements, and those visits happened both at the customer and the product development sites."[83]

> **(3)     R&D priorities and budgets were determined globally, without regard for geographic or legal entity divisions.**

63.     Nortel did not allocate R&D budgets by geographic entity or subsidiary, but rather by line of business.[84]

64.     R&D leaders provided input on their needs for the upcoming year based on requested new product features.[85]  Spending on R&D was against the budget for the appropriate line of business, regardless of the geographic location in which it occurred.[86]

65.     As an exception to this process, the budget for the Advanced Technology Program was typically managed globally by Nortel's Chief Technology Officer and allocated separately from the lines of business.[87]

66.     In either case, Nortel's R&D budget process was ultimately set by global leadership, with only indirect input from—and no direct control by—individual laboratories.[88]

67.     Most Nortel laboratories did work pertaining to multiple lines of business.[89]

---

[82] Trial Trans. Day 9, 1935:2–13 (Hall).

[83] Mumford Dep. 202:19–203:3.

[84] TR00004 (McFadden Aff.) ¶20.

[85] Trial Trans. Day 9, 1923:1–17 (Hall).

[86] TR00004 (McFadden Aff.) ¶20.

[87] TR00004 (McFadden Aff.) ¶20; Mumford Dep. 50:23–53:8.

[88] Trial Trans. Day 9, 1923:18–1924:7 (Hall).

68.    It was common among certain business divisions to share common technological platforms.  Thus, a Digital Multiplex Switch (DMS) or Communications Server 2000 (CS-2000) originally designed for the Carrier business was also utilized by the Enterprise business.[90]

(4)    **The ultimate goal of Nortel's R&D was to develop technologies it could commercially exploit.**

69.    The goal of Nortel's R&D was to create technology that could be commercialized, although it was not necessarily possible to trace research efforts to immediate commercial results.  In its Functional Analysis (2000–2004) prepared for the tax authorities, Nortel explained:

> All R&D projects are ultimately intended to produce commercially exploitable products or knowledge; however, there may be R&D undertaken for which no recognizable commercial gain is immediately evident.  Long-term research projects are undertaken in a somewhat academic environment with the long-term goal of producing a commercially exploitable product.  The information obtained from those projects is intellectual property; however, the ability to commercially exploit that knowledge is not yet available.[91]

70.    Nortel prioritized advanced research likely to be valuable to its business and to be of interest to customers.[92]  Geoffrey Hall, head of the EMEA branch of Nortel's Chief Technology Office, testified:

> [T]ypically with advanced technology if you're being novel and innovative and really trying hard, you're going to generate many more ideas than a), will work, and  b), more ideas than you can execute.

---

[89] TR00004 (McFadden Aff.) ¶21; TR21188 pp. 5–8.

[90] Trial Trans. Day 9, 1921:18–1922:11 (Hall).

[91] TR31355 (2000–2004 Functional Analysis) p. 24.

[92] Trial Trans. Day 9, 1924:8–1925:7 (Hall).

So there's going to be a prioritization and in fact of course more
ideas than you could fund to develop to the next stage.  So there's
got to be a prioritization and say how do we take this good idea,
are we going to build on it, are we going to execute it into products
or what we are going to do with it, and that has to be a
prioritization decision.[93]

## II.    NORTEL'S PATENT PORTFOLIO

### A.    Nortel Coordinated Its Patent Filings Globally to Promote the Interests of the Group.

71.    The "guts" of Nortel's business was its intellectual property ("**IP**"), which was created through Nortel's collaborative R&D efforts.[94]

72.    The Nortel entities that engaged in R&D contributed to and invested in Nortel's intellectual property, and shared in the benefits stemming from that intellectual property.[95]

73.    Nortel's patent portfolio in particular provided an "economic benefit" to the Group because it "created huge defensive value. . . . [I]t was basically a prohibition on industry players . . . suing you for patent infringement because you had this huge trove of patents with which to counter-sue."[96]

74.    The defensive value of Nortel's patent portfolio also manifested in the ability to enter into cross licenses with other industry players.[97]

75.    Nortel's patent filings were managed by a cross-national team within Nortel's IP group.[98]

---

[93] Trial Trans. Day 9, 1925:10–22 (Hall).

[94] Trial Trans. Day 6, 1315:12–20 (Orlando).

[95] Trial Trans. Day 6, 1280:3–23 (Orlando); 1486:10–21 (Albert-LeBrun).

[96] Trial Trans. Day 4, 1009:18–1010:6 (Hamilton).

[97] Trial Trans. Day 3, 703:1–24 (McFadden).

[98] Trial Trans. Day 10, 2172:8–23 (Anderson).

76.     Nortel had a limited patent budget that was determined centrally for all of

Nortel.[99]  The limited patent budget constrained the number of patents that Nortel could apply

for and maintain.[100]

77.     Geoffrey Hall, head of the EMEA branch of the Chief Technology Office and also

known as the EMEA CTO, testified:

> Especially towards the end of Nortel, there was a lot of pressure on
> making sure that you were only picking things that were really
> valuable because there wasn't huge funds to develop as there had
> been in the good times.  So there was a filter process in there to
> decide what to spend your money on, what needed protection, what
> would have great value.[101]

78.     As the fist step in a potential new patent filing, an inventor would complete a

disclosure form and submit it to the intellectual property group.[102]

79.     In order to determine whether, and in which countries, Nortel would file a patent

application on an invention, disclosures were assessed by teams of reviewers.[103]  There were

multinational patent review teams for each business or technology area.[104]  These review

teams included technical as well as commercial personnel.[105]

---

[99] Trial Trans. Day 3, 767:13–17 (DeWilton); Day 10, 2183:21–24 (Anderson); McFadden Dep. 96:15–17, 96:20–97:4.

[100] Trial Trans. Day 3, 767:6–12 (DeWilton); Day 10, 2182:14–2183:20 (Anderson).

[101] Trial Trans. Day 9, 1929:18–1930:3 (Hall).

[102] Trial Trans. Day 10, 2172:24–2173:9 (Anderson); Day 7, 1666:22–1667:3 (Jeffries).

[103] Trial Trans. Day 7, 1667:3–10 (Jeffries).

[104] Trial Trans. Day 10, 2172:10–23 (Anderson).

[105] Trial Trans. Day 10, 2173:10–23 (Anderson).

80.     Invention disclosures were reviewed and scored on the basis of Technology, Inventiveness, and Commercial criteria, or what were referred to as TIC scores.[106]

a)      The Technology score took into account the relative importance or breadth of the invention in its field.[107]

b)      The Inventiveness score considered the likelihood that the invention would yield a viable patent in terms of the scope of protection it would offer.[108]

c)      The Commercial score took into account the commercial relevance of the technology to the products Nortel was offering or might offer in the future.[109]

81.     Mr. Hall testified that the patent assessment process involved "looking for relevancy to Nortel's business, so it could either be relevancy to product lines that were already being built on, or it would be an adjacent area that Nortel felt it could commercially exploit."[110] Mr. Hall "wasn't aware of patents that fell outside" of these parameters.[111]

82.     Likewise, Roy MacLean, an R&D vice president, testified that because the patent budget was constrained, Nortel looked to patent strategically.  "If we didn't think we could make a buck at it, we didn't patent it."[112]

---

[106] Trial Trans. Day 10, 2173:24–2176:9 (Anderson).

[107] Trial Trans. Day 10, 2174:8–19 (Anderson).

[108] Trial Trans. Day 10, 2174:20–2175:12 (Anderson).

[109] Trial Trans. Day 10, 2175:15–2176:5 (Anderson).

[110] Trial Trans. Day 9, 1947:2–20 (Hall).

[111] Trial Trans. Day 9, 1947:21–22 (Hall).

[112] MacLean Dep. 74:20–75:12, 75:19–76:7, 124:13–24.

83.     The choice of jurisdictions in which a patent application would be filed generally bore no correlation to where efforts were undertaken to develop the invention.[113]

84.     Nearly all inventions selected for filing were filed as a US patent application.  US patents were considered cost-effective because they were relatively inexpensive and quick to obtain, and because of the significance of the US market.[114]

85.     Approximately the top 25 percent of patents, based on TIC scores, were selected for further filing outside of the US.  Most of these "foreign" filings would occur in one or more of the UK, Germany, France, or Canada.[115]

86.     A smaller percentage of inventions were additionally filed in countries outside of the US, UK, Germany, France, and Canada.  Roughly the top 3 percent of patents were selected for filing in China.[116]

87.     Patents and pending patent applications were regularly re-evaluated based on their TIC score and relation to current products, services, and industry standards.  If a patent was deemed to be low value, it was "culled," meaning that Nortel would no longer pay maintenance fees or take other necessary actions in relation to the patent or application, leading to abandonment.[117]

88.     Partly as a result of these selective filing and culling policies, the overall quality of Nortel's patents at the time it filed for bankruptcy was high.  John Veschi, who served as Nortel's Chief IP Officer and is now CEO of the Rockstar Consortium, testified that as a

---

[113] TR31355 (2000–2004 Functional Analysis) p. 30.

[114] Trial Trans. Day 10, 2180:11–2181:2 (Anderson).

[115] Trial Trans. Day 3, 765:7–766:10 (DeWilton); Day 10, 2181:3–15 (Anderson).

[116] Trial Trans. Day 10, 2181:16–2182:15 (Anderson); TR00032 (Anderson Aff.) Exh. A.

[117] Trial Trans. Day 10, 2184:18–2186:16 (Anderson).

result of Nortel's budget-conscious policies, there was "probably higher density of high quality patents than in general."[118]  In particular, the foreign (non-US) patents in the Nortel portfolio at the time of bankruptcy were necessarily the ones that overcame higher thresholds for filing and for surviving culling.[119]

89.   Nortel's patent portfolio included a significant number of Chinese patents.[120] Despite Nortel's highly selective patent filing and culling policies that emphasized filings in the US and a handful of other jurisdictions,[121] roughly 15 percent of foreign (non-US) patents and applications in Nortel's residual patent portfolio were filed in China.[122]

90.   As a matter of policy and for administrative convenience, legal title to nearly all of Nortel's patents was assigned to NNL.[123]  Angela Anderson, Nortel's head of IP in Europe, testified that it was common, and a matter of best practice among companies, to assign legal title to a single entity, as it greatly simplified portfolio management.[124]  Absent an assignment, title would have resided with the inventors or their immediate employer (such as NNUK, in the case of a UK employee).[125]

---

[118] Veschi Dep. 90:17–91:2.

[119] Trial Trans. Day 10, 2186:17–2187:4 (Anderson).

[120] TR43650 (Nortel's Patent Portfolio:  An Overview) p. 7.

[121] *Supra* ¶¶81–87.

[122] TR00040 (Bazelon Rebuttal Report) pp. 39–40 and Table 12.

[123] Lee Dep. 82:11–17.

[124] Trial Trans. Day 10, 2178:8–2179:4, 2195:24–2196:13 (Anderson).

[125] Trial Trans. Day 10, 2177:11–2178:714 (Anderson).

91.     Engineers generally understood that they were assigning rights in their inventions to Nortel, but were generally not concerned with the particulars of the assignment process, including which particular legal entity would own their inventions.[126]

92.     As discussed further in Part IV below, certain Nortel legal entities —NNL, NNI, NNUK, NN France and NN Ireland—continued to enjoy and exercise exclusive rights to Nortel's intellectual property in their own territories, and occasionally entered into sublicenses.[127]  The Technology License Agreement between NNUK and British Telecom dated January 1, 1995 is an example of such an agreement in which rights to Nortel copyrights in trade secret intellectual property was sublicensed to a third party.[128]

**B.      Nortel's Patents Reflect the Integrated Nature of the Group.**

93.     Dr. Coleman Bazelon is an economist and principal of the Brattle Group specializing in the telecommunications and media industries and having particular expertise in valuation and policy aspects of complex telecommunications assets.[129]  Dr. Bazelon was retained by the UK Pension claimants as an expert in this matter to opine on the best method for allocating funds from an economic standpoint.[130]

94.     As part of his analysis, Dr. Bazelon objectively assessed the relationships between patents in Nortel's patent portfolio.[131]  Many of Nortel's patents cite to other patents in Nortel's portfolio.  Patents typically cite other patents or documents identified during

---

[126] Trial Trans. Day 7, 1667:19–1668:11 (Jeffries).

[127] TR00032 (Anderson Aff.) ¶40.

[128] TR00032 (Anderson Aff.) Exh. H.

[129] Trial Trans. Day 12, 2898:14–2899:7 (Bazelon); TR00039 (Bazelon Report) p. 3.

[130] Trial Trans. Day 12, 2906:22–2907:1 (Bazelon); TR00039 (Bazelon Report) p. 2.

[131] Trial Trans. Day 12, 2916:2–12 (Bazelon).

prosecution as potential prior art or otherwise deemed to be relevant to the invention disclosed and claimed in the patent.  An analysis of citations to other patents, known as a forward citation analysis, is a common tool used for assessing the complexity of a portfolio.[132]

(1)    **Nortel's patents exhibit a high degree of technological entanglement.**

95.    One feature of Nortel's residual patent portfolio revealed by citations between patents is its high degree of technological interconnectedness between inventions.

96.    Prior to the sale of its residual patent portfolio to Rockstar, Nortel engaged an outside consultant, the Global IP Law Group ("**Global IP**") to conduct an assessment of its portfolio.[133]  Global IP's reports provide information about Nortel's patent portfolio from around the time of its insolvency.  As part of its analysis, Global IP assigned patent families to one or more technology areas or franchises.[134]

97.    Dr. Bazelon's analysis combined publicly available citation information with Global IP's  technology area assignments.  His analysis revealed that patents in Nortel's residual portfolio frequently cited to other Nortel patents in different technology areas.[135] This is indicative of a high degree of integration between technology areas covered by Nortel's portfolio, and demonstrates that "the intellectual production process" behind Nortel's different technology areas was "very interconnected."[136]

---

[132] Trial Trans. Day 12, 2915:17–2916:20 (Bazelon).

[133] Trial Trans. Day 17, 4123:13–22 (Kinrich).

[134] Trial Trans. Day 12, 2918:2–9 (Bazelon); TR43481 (Issued patents and pending patent applications asset list) Assets Tab Col. X.

[135] TR00039 (Bazelon Report) Fig. 5.; Trial Trans. Day 12, 2917:2–19,  2917:23–2918:1, 2918:15–2919:10 (Bazelon).

[136] Trial Trans. Day 12, 2916:21–2917:1, 2919:11–17 (Bazelon); *accord* Day 19, 4702:12–25 (Tucker) (high forward citation count, and citations by many firms for many different purposes, reflected high level of interconnectivity).

-24-

**(2)    Nortel's patents exhibit a high degree of geographic entanglement.**

98.    It was common for Nortel patents to include inventors from two or more countries, indicating the high degree of integration between R&D across geographies.[137] Forward citation analysis further confirms the geographic interconnectedness between patented inventions at Nortel.

99.    Inventor location information appears on the face of the patent.[138] Overlaying this location information with the citation analysis reveals the frequency with which patents in Nortel's residual portfolio cite to other Nortel patents having inventors from other locations around the world.[139] As Dr. Bazelon testified, this provides a further demonstration of the high degree of integration between R&D functions across geographies.[140]

100.    The significant degree of entanglement in the processes by which Nortel's patents were generated make it practically impossible to disentangle the individual contributions of Nortel Group member.[141] In particular, Dr. Bazelon's forward citation analysis "shows how difficult it would be to disentangle the value, the production process of Nortel's intellectual property and sort of put a fence around any one geographic area."[142]

101.    Nortel's representations to the taxing authorities confirm that, due to the globally integrated nature of to the integrated nature of Nortel's R&D, simply tallying patents and

---

[137] Trial Trans. Day 10, 2177:2–10 (Anderson).

[138] Trial Trans. Day 12, 2920:16–19 (Bazelon).

[139] TR00039 (Bazelon Report) Figs. 6–7; Trial Trans. Day 12, 2920:3–15, 2920:20–2921:24 (Bazelon).

[140] Trial Trans. Day 12, 2920:3–23, 2922:10–2924:8 (Bazelon).

[141] Trial Trans. Day 12, 2919:18–2920:2 (Bazelon).

[142] Trial Trans. Day 12, 2924:9–17 (Bazelon).

inventors provides a simplistic and incomplete view of the relative contributions to Nortel's

patent portfolio.  As Nortel explained in its 2000–2004 Functional Analysis:

> The above figures show that the efforts undertaken by R&D
> personnel in Canada are producing the greatest number of patent
> applications, followed by the U.S. and the U.K.  This appears to
> indicate that, perhaps, R&D efforts undertaken by Canada are
> more "patentable".  This may not be the case, however, and it is
> important to discuss why such an approach is likely incorrect.
> Much of Nortel's R&D is interrelated, and one specific project
> may be developed based upon older R&D projects or platforms.
> For example, assume that the U.K. undertakes certain R&D that is
> not patented (e.g. possibly because it is not yet in a patentable
> form, or it would not meet the legal requirements to be patented).
> A year later, a portion of the information and intellectual property
> from the U.K.'s R&D is utilized by R&D personnel in Canada.
> Canada patents the results of its efforts.  In this example, it is
> difficult to state that the patentable invention was purely the result
> of Canada's efforts.  Clearly, the U.K.'s R&D efforts contributed to
> the patentable invention, however, this is not reflected . . . .[143]

102.    R&D spending data also merely approximates the relative contribution of Group

members to the patent portfolio.[144]  Nortel did not track the various contributions made by

individual labs in developing a product.  Mr. Currie testified:  "The regional contributions was

actually not of much interest.  It was a function of what was being developed on a product line

sense.  So the output of the lab was tracked, for sure.  And it was tracked in a product line

context.  But there was . . . no description of that to a region per se."[145]

**C.      Most of the Patent Portfolio Resulted from Research Conducted Prior to 2006.**

103.    James Malackowski, a patent licensing and valuation expert retained by the

EMEA Debtors, reviewed data relating to Nortel's patents in order to determine when they

---

[143] TR31355 (2000–2004 Functional Analysis) p. 30.

[144] Trial Trans. Day 10, 2347:5–2348:1 (Malackowski).

[145] Trial Trans. Day 3, 597:11–598:20 (Currie).

were invented.  Mr. Malackowski also employed data generated by Global IP in its portfolio analysis.  In particular, Global IP had identified subsets of patents it deemed to be of high interest (*) and highest interest (**).[146]

104.    Focusing on patents identified by Global IP as high or highest interest, Mr. Malackowski determined that the vast majority—over 99 percent—were invented prior to 2006.[147]

105.    The value of patents on Nortel's pre-2006 inventions is confirmed by subsequent patent litigation initiated by their new owner, Rockstar.  A small number of the patents sold by Nortel to Rockstar have been asserted in litigation against accused infringers.  All of the patents Rockstar has sued upon date from before 2005.[148]  More than half of the asserted patents date from before 1999.[149]

## III.    AS PART OF THE GROUP, NNUK MADE SIGNIFICANT CONTRIBUTIONS TO NORTEL'S PATENTS AND TECHNOLOGY.

106.    Historically and through the 1980s, Nortel had only a limited presence in the EMEA regions.[150]  NNUK, known previously as BNR Limited ("**BNR**"), was a subsidiary of the Nortel Group based in Maidenhead, UK.[151]

107.    Seeking to improve access to the EMEA region, Nortel—through NNUK—acquired STC Plc. ("**STC**") in 1991.[152]  At the time of the acquisition, STC had significant

---

[146] TR43481 (Issued patents and pending patent applications asset list) Introduction Tab, Assets Tab Col. T.

[147] DEM00011 (Malackowski) p. 22; Trial Trans. Day 10, 2281:2–12 (Malackowski).

[148] DEM00011 (Malackowski) p. 30.

[149] DEM00011 (Malackowski) p. 22.

[150] TR00029 (Hall Aff.) ¶25.

[151] TR00029 (Hall Aff.) ¶¶4, 11.

[152] TR00029 (Hall Aff.) ¶¶35–38.

clients such as British Telecomm ("**BT**"), and laboratory facilities in Harlow, New Southgate, and Paignton in England, and Monkstown in Northern Ireland.

108.    STC's Harlow lab had a strong reputation for R&D, particularly in the areas of long haul fiber optic cables and transport technology such as wireless amplifiers and antennas.[153]  Professor Charles Kao had been awarded the Nobel Prize for his groundbreaking work at the Harlow lab establishing that optical fibers could be used to carry data signals.[154]

109.    By 2000, Europe accounted for around 30 percent of Nortel's overall business. At its height, NNUK employed nearly 2,000 R&D professionals.[155]

   **A.    NNUK Participated in High-Value Research and Development for the Benefit of the Nortel Group.**

110.    Engineers from NNUK were intimately involved in developing Nortel's next generation "Succession" products for carrier networks.  Dr. Philip Hargrave, Roy Mauger, and Simon Brueckheimer—all from the UK—were among ten senior engineers responsible for the architecture of these Succession products.[156]

111.    Among the Succession products that the UK's Harlow and Maidenhead labs helped to develop were the CS2000 call server, which was used for routing incoming calls through a phone network, and media gateways, used for connecting additional services to phone networks.[157]

---

[153] TR00029 (Hall Aff.) ¶¶39–40.

[154] Trial Trans. Day 3, 681:21–682:11 (McFadden).

[155] TR00029 (Hall Aff.) ¶37.

[156] TR00023 (Brueckheimer Aff.) ¶54.

[157] TR00023 (Brueckheimer Aff.) ¶¶53, 55–56, 58–60.

112.    The CS2000 in particular was one of the highest impact products sold by Nortel's Carrier division.  Initial development and proof-of-concept work for the CS2000 was conducted in the UK and involved labs in the US and Canada as well.[158]

113.    NNUK was frequently consulted by groups in the US and Canada on matters for their expertise relating to voice-over-packet technologies and the Nortel Succession products.[159]

114.    Other significant work performed at NNUK included transforming Nortel's DMS 100 digital multiplex system for use outside of North America.  This required adapting the product according to international standards (in particular the European ETSI standards), redesigning components, rewriting code, and introducing Europe-specific functionality.[160] This work was significant in expanding Nortel's global footprint outside of North America, and by extension allowed Nortel's North American customers, including WorldCom, to grow internationally.[161]

115.    NNUK was also the site of important research relating to wireless.[162]  Andrew Jeffries served as a manager and senior manager in the wireless technology group in Harlow from 1998 to 2005.[163]

116.    Mr. Jeffries testified that the wireless technology group in Harlow was involved in the early development of multiple-input and multiple-output ("**MIMO**") antenna

---

[158] TR00029 (Hall Aff.) ¶¶59–62.

[159] TR00023 (Breckheimer Aff.) ¶42.

[160] TR00029 (Hall Aff.) ¶53.

[161] TR00029 (Hall Aff.) ¶¶54–56.

[162] TR00032 (Anderson Aff.) ¶¶31–32.

[163] Trial Trans. Day 7, 1662:11–15 (Jeffries).

technology in the late 1990s and early 2000s.[164]   MIMO technology allowed for dramatic

improvement in wireless data transmission:

> [A] normal wireless system up to that time would basically have a
> single transmit antenna talking to a receiver, which could have a
> number of receive antennas; one or two was typical.
>
> With MIMO what you did was you split your transmitter into
> multiple antennas.  So now you've got, as MIMO stands for, a
> multiple input/multiple output.  You've got multiple transmit
> antennas talking to multiple receive antennas.  And what that
> means is that you can get a much greater capacity on the link, you
> can get much higher data rates, and you can get a much greater
> range in the system.[165]

117.    MIMO is fundamental to fourth-generation wireless technologies such as LTE

and WiMAX and distinguishes them from older,  third-generation technologies.  MIMO

remains in use today.[166]

118.    A cross-border team of researchers at the Ottawa and Harlow wireless technology

labs worked to develop a prototype wireless, over-the-air demonstration of MIMO system.  As

Mr. Jeffries testified:

> I ran the program.  I had a team in Harlow where we developed the
> MIMO algorithms.  And then I had a team in Ottawa where we
> actually put those algorithms into some existing equipment that we
> had there so we could actually demonstrate.  And from that
> demonstration basically came the world's first over-the-air
> demonstration of MIMO using, at the time it was a CDMA air
> interface.[167]

---

[164] Trial Trans. Day 7, 1662:19–22 (Jeffries); TR31003 (Gala remarks of T. Collins) p. 3.

[165] Trial Trans. Day 7, 1663:10–23 (Jeffries).

[166] Trial Trans. Day 7, 1665:7–15 (Jeffries).

[167] Trial Trans. Day 7, 1663:24–1664:23 (Jeffries).

119.    Work at the Harlow wireless technology lab generated patents that would subsequently be recognized as relevant to LTE, although that term did not exist at the time.[168] Among these patents is U.S. Patent No. 6,870,515, which was filed in October 2001 and is directed to an orthogonal antenna polarization, was included in Nortel's 2009 LTE product portfolio, and is in use today, assigned to Apple Inc.[169]

120.    Harlow was a center for research relating to Asynchronous Transfer Mode (ATM) packet technology as part of Project Rainbow, an initiative that included Nortel labs in Canada, the US, and Europe.[170] This work led to patents, including U.S. Patent No. 6,519,257 (the "**'257 patent**").[171]

121.    Core principals relating to voice-over-packet technology disclosed in the '257 patent were incorporated into Nortel's Succession products, including the CS-2000, AS-2000, and media gateway products.[172] Research underlying the patented technology was conducted in Harlow 1995, and is still found in voice over internet protocol ("**VoIP**") applications today, including Skype.[173] The '257 patent was sold to Rockstar as part of Nortel's residual patent portfolio.[174]

---

[168] Trial Trans. Day 7, 1665:24–1666:15 (Jeffries).

[169] Trial Trans. Day 7, 1672:19–1673:1 (Jeffries); TR00026 (U.S. Patent No. 6,870,515).

[170] Trial Trans. Day 7, 1567:4–25 (Brueckheimer).

[171] Trial Trans. Day 7, 1569:3–1570:14 (Brueckheimer).

[172] Trial Trans. Day 7, 1570:15–20 (Brueckheimer).

[173] Trial Trans. Day 7, 1570:3–1571:17 (Brueckheimer).

[174] Trial Trans. Day 7, 1571:18–25 (Brueckheimer).

122.    As a main development site, Harlow would host customer visits.  Such visits were considered "an important part of connecting the product innovation to the customer requirements."[175]

123.    NNUK frequently contributed technological experts to assist in customer bids.[176] In 1997, following a competition among Nortel labs, a voice compression technology developed by the UK's Harlow lab was selected for Nortel's bid response to AT&T.  Simon Brueckheimer was appointed design authority for the bid response and for a follow-up bid response in 1998.[177]

124.    Work in relation to the AT&T bid resulted in several patent filings on the underlying voice compression technology.[178]  Although development of this technology began as early as 1994 or 1995, it led to patents that remain in force today.[179]  One such patent, U.S. Patent No. 6,266,342, was recently highlighted in Rockstar's Winter 2012 Catalog as one of seven former Nortel patents that might be of interest to buyers.[180]

125.    NNUK engineers were directly involved in Nortel's bids for further US-based carrier network customers, including MCI/Worldcom in 1998 and 1999, SouthWestern Bell Corporation in 1999, and Sprint in 2001.[181]

---

[175] Mumford Dep. 202:23–203:7.

[176] *Supra* ¶¶57–62.

[177] Trial Trans. Day 7, 1572:8–1573:12 (Brueckheimer).

[178] Trial Trans. Day 7, 1574:1–10 (Brueckheimer).

[179] Trial Trans. Day 7, 1570:9–1571:17 (Brueckheimer).

[180] TR00023 (Brueckheimer Aff.) Exh. G p. 5; *see* Veschi Dep. 129:17–25 ("The purpose of the catalogue is to offer to people patents that we might be interested in selling to them," and that they might want to buy.).

[181] TR00023 (Brueckheimer Aff.) ¶62.

126.    NNUK employees were recognized as Nortel Fellows, the highest honor bestowed upon employees for technical contribution.  Of the only nine active Fellows that were ever recognized, two came from NNUK's Harlow lab.  Simon Brueckheimer was selected as one of five initial Nortel Fellows, and he was later joined by Nigel Bragg.[182]

127.    Nortel Fellows like Simon Brueckheimer and Nigel Bragg comprised "an elite group of technologists with broadly impacting influence and responsibility across the corporation and within the industry, and who further Nortel's global industry leadership."[183] Fellows were selected by a committee of top executives[184] "for their exceptional technical/business-impacting contributions, their exemplary leadership behaviors and their significant influence both inside Nortel and across the broader communications industry."[185] Fellows were expected to continue to serve as mentors and facilitators throughout all of Nortel, and as outward representatives of Nortel to industry.[186]

128.    Maidenhead, UK was the site of Nortel's CTO Field Office for the EMEA region. The CTO field office was led by Geoffrey Hall from 2003 to 2008.[187]  In this role, Mr. Hall engaged directly with Nortel's customers to learn about their concerns and identify technical solutions that Nortel could provide.[188]  After 2006, the CTO Field Office was increasingly

---

[182] TR00023 (Brueckheimer Aff.) ¶25.

[183] TR00023 (Brueckheimer Aff.) Exh. C p. 1.

[184] Trial Trans. Day 7, 1589:18–1592:19 (Brueckheimer).

[185] TR00023 (Brueckheimer Aff.) Exh. C p. 1.

[186] Trial Trans. Day 7 1577:10–1578:4, 1592:15–19 (Brueckheimer).

[187] Trial Trans. Day 9, 1918:14–21 (Hall); TR00029 (Hall Aff.) ¶28.

[188] TR00029 (Hall Aff.) ¶¶29–32.

tasked with indentifying problems and innovative ways of resolving these problems outside of the existing lines of business.[189]

129.    R&D at NNUK were drastically scaled back beginning in around 2001.  This was not a reflection on the quality of work perfumed in the UK but was an effort to reduce costs.[190]  However, NNUK's loaded labor rate, which reflected the cost per employee for a particular project, was on par with Nortel's Canadian R&D sites and lower than in the US.[191]

**B.    When It Came to Invention, NNUK "Punched Above Its Weight."**

130.    The number of patents from NNUK inventors characteristically exceeded the NNUK's relative share of R&D spending.  Between 1991 and 2006, NNUK accounted for only 8.73& of Nortel's R&D spending between 1991 and 2006.[192]  Between 2001 and 2008, NNUK's share of R&D was only 5.5 percent,[193] and was less than 4 percent of Nortel's total R&D spending during the five-year period reported in Nortel's 2008 transfer pricing documentation.[194]

131.    Yet, generally between 15 and 20 percent of Nortel's new patent applications were based on invention disclosures from UK labs.[195]  Internally, Nortel boasted that UK employees contributed one of every five patents issued to Nortel.[196]

---

[189] Trial Trans. Day 9, 1931:19–1932:16; TR00029 (Hall Aff.) ¶33.

[190] TR00029 (Hall Aff.) ¶78.

[191] TR00029 (Hall Aff.) ¶79.

[192] TR00033 (Malackowski Report) p. 53, Table 24.

[193] TR00033 (Malackowski Report) p. 53, Table 24.

[194] TR00040 (Bazelon Rebuttal Report) p. 47, Table 15.

[195] Trial Trans. Day 3, 778:12–779:4 (DeWilton).

[196] TR00023 (Brueckheimer Aff.) Exh. E.

132.    Mr. Hall testified that the Harlow lab had "a significant history in generating patents and the knowledge of the processes and how to do it and that spirit."[197]  As an R&D leader in the UK's Maidenhead facility, Mr. Hall was tasked with encouraging this spirit, including in Maidenhead.[198]  The push to innovate and file patents proved  so successful that Mr. Hall was "asked to slow down" because the UK was "taking a disproportionate  amount of the budget allocated for processing  patents," which Mr. Hall understood to mean resources "per head."[199]

133.    NNUK was home to individuals recognized as "prolific inventors" within Nortel. These included Simon Brueckheimer and Richard Epworth, who are each inventors on at least roughly 50 patents. [200]  Other NNUK employees, including Martin Smith, were also recognized for their significant patents.[201]  Harlow in the UK was one of just a few sites around the world at which Nortel hosted award ceremonies for its patentees.[202]

134.    Despite constant culling of Nortel's patent portfolio,[203] a significant portion of Nortel's patent portfolio came from inventors in the UK.  Of the patents and applications in the residual patent portfolio sold to Rockstar, 16 percent named UK inventors.[204]

---

[197] Trial Trans. Day 9, 1927:13–16 (Hall).

[198] Trial Trans. Day 9, 1926:18–1927:12 (Hall).

[199] Trial Trans. Day 9, 1928:11–25 (Hall).

[200] TR00023 (Brueckheimer Aff.) ¶26; TR00032 (Anderson Aff.) ¶29.

[201] TR00032 (Anderson Aff.) ¶30.

[202] TR00032 (Anderson Aff.) ¶31; TR00023 (Brueckheimer Aff.) Exh. F (2002 award ceremony recognizing more than 70 NNUK and other EMEA inventors).

[203] *Supra* ¶¶87–88.

[204] TR00040 (Bazelon Rebuttal Report) p. 47, Table 15.

135.    Patents from NNUK inventors comprised a substantial portion of the patents identified outside the context of the present allocation dispute as Nortel's "top" patents.  Prior to its insolvency, and as a condition of certain financing, Nortel periodically identified a list of its "Top 100" patents or other intellectual property.[205]  A review of available "Top 100" lists demonstrates that 14 percent of top patents came from UK inventors.[206]

136.    In the course of its analysis of Nortel's patent portfolio, Global IP identified patents it characterized as high interest (*) and highest interest (**).[207]  Fourteen percent of these high or highest interest UK patents had UK inventors.[208]

## IV.    NORTEL'S TAX AND TRANSFER PRICING POLICIES

137.    Nortel's tax function was led by the Vice President of Tax based in Canada, who oversaw tax compliance in each of the countries in which Nortel conducted business.  The VP of Tax reported directly to Nortel's Chief Financial Officer.[209]  The VP of Tax was also responsible for Nortel's transfer pricing policy.[210]

138.    Transfer pricing is a tax compliance exercise.  It relates to the manner in which income is allocated amongst different entities within a multinational enterprise that participate

---

[205] *E.g.*, TR44682 (Patent and trademark list, Apr. 27, 2006); Cianciolo Dep. 184:5–15; T. Collins Dep. 59:21–60:6.

[206] TR00039 (Bazelon Report) p. 18, Table 1.

[207] TR43481 (Issued patents and pending patent applications asset list) Introduction Tab, Assets Tab Col T; Trial Trans. Day 12, 2927:18–25 (Bazelon).

[208] TR00040 (Bazelon Rebuttal Report) p. 48, Revised Table 2.

[209] Look Dep. 16:4–25.

[210] Stephens Dep. 33:23–34:10; Look Dep. 64:2–8.

in the affairs of the business.[211]  Transfer pricing rules were set up specifically for the

purposes of reporting taxable income on an annual basis by related or controlled parties. [212]

139.    Multinational groups need to have transfer prices that are consistent with arm's-

length standards in place in order to be in compliance with tax rules and regulations around

the world.[213]  The arm's-length standard is applied because the entities within the

multinational group are subject to common control.  The purpose of the arm's-length standard

is to mimic the arrangements that independent, hard-bargaining parties would reach if they

were independent.[214]

140.    The application of the arm's-length standard can give rise to a range of prices.[215]

Within that range, multinational groups "push to the low tax end" with a view to minimizing

tax and thereby maximizing returns to the group's shareholders.[216]  Tax minimization is one of

the key motives for transfer pricing.[217]

141.    A goal of Nortel's transfer pricing practice was to reduce the overall tax burden of

the Nortel Group as a whole. According to Kerry Stephens, who worked in Nortel's tax

department on special projects, all of his tax planning activities prior to Nortel's insolvency

were aimed at maximizing the joint revenue of "[a] single global enterprise in which the IEs

---

[211] Trial Trans. Day 11, 2630:14–17 (Cooper).

[212] Trial Trans. Day 21, 4982:20–23 (Eden); Trial Trans. Day 16, 3962:2–6 (Reichert).

[213] Trial Trans. Day 12, 2844:13–17 (Felgran).

[214] Trial Trans. Day 16, 3965:6–8, 19–25 (Reichert).

[215] Trial Trans. Day 21, 4987:2–9 (Eden).

[216] Trial Trans. Day 21, 5056:16–5057:13 (Eden).

[217] Trial Trans. Day 21, 5045:9–14 (Eden).

[Integrated Entities, otherwise referred to as Residual Profit Entities ("**RPEs**")] all participated."[218]

142.    Walter Henderson, a member of Nortel's tax department and outside counsel to Nortel involved in its transfer pricing, also testified:  "Tax minimization is an objective I would expect most [multinational enterprises] to seek to achieve, and was a goal I aimed to achieve while advising or employed by NNI."[219]

143.    Nortel had a dedicated transfer pricing group based in either Canada or the US.[220] In connection with its transfer pricing activities, Nortel and its advisers regularly engaged with relevant tax authorities including the IRS and CRA.[221]

144.    It was important for Nortel to provide complete, honest and accurate information to the relevant tax authorities.[222]  Indeed, several of Nortel's communications with the IRS and CRA were expressly stated to be "under the penalties of perjury,"[223] as required by the IRS when dealing with Advance Pricing Agreements.

**A.    Transfer Pricing Prior to 2001 Was Governed by a Series of Bilateral Cost Sharing Agreements.**

145.    Nortel's transfer pricing prior to 2001 was governed by a series of bilateral Cost Sharing Agreements ("**CSAs**") between NNL and other Group entities including NNI, NNUK

---

[218] Trial Trans. Day 8, 1751:20–1752:2 (Stephens).

[219] Trial Trans. Day 5, 1124:17–24 (Henderson); TR00016 (Henderson Decl.) ¶8.

[220] Stephens Dep. 33:23–34:10.

[221] *See, e.g.*, TR22122 (Advanced Pricing Agreement ("**APA**") for 2001–2005); DEM00027 (Eden Dem.) p. 14.

[222] Trial Trans. Day 16, 3994:4–12 (Reichert).

[223] TR43747 (Letter from Nortel to the IRS and other tax authorities dated February 15, 2008 signed by Michael Orlando) p. 7.

and NNSA.[224]  Those CSAs included R&D CSAs, Headquarters Costs CSAs, and tangible

inventory property sales CSAs.[225]  Each type of CSA involved the sharing of relevant costs by

the CSA participants pursuant to a specified formula.

146.    The R&D CSAs allocated R&D costs among the participants using a three-factor

formula.  Costs were allocated by reference to each participant's annual ratio (as against the

participants' annual total) of royalty income, third party sales, and modified operating

income.[226]  In essence, each participant shared in the costs of R&D performed globally by the

Nortel Group in proportion to the economic benefit received by the participant in its

geographic territory.[227]

147.    The R&D CSAs were terminated by bilateral written agreements effective

January 1, 2001.[228]  Those agreements provided that the relevant parties would "mutually

agree upon a basis to equitably apportion the benefits resulting from their collective

contributions to research and development expenses during 2001 and prior years and would

formalize their agreement upon such basis in an agreement as soon as practicable."[229]

148.    No buy-out or buy-in payments were made by any Nortel entity to any other

Nortel entity as part of, or in consequence of, the move from a cost-sharing transfer pricing

system under the R&D CSAs to a residual profit split method of transfer pricing. [230]

---

[224] TR21003 (MRDA) p. 2.

[225] Trial Trans. Day 21, 5009:11–13 (Eden); *e.g.*, TR31309 (R&D CSA between NNL (then Northern Telecom
        Limited) and Nortel Limited (a predecessor of NNUK).

[226] TR00062 (Eden Report) p. 45.

[227] TR00035 (Cooper Report) p. 13.

[228] TR21041 (Summary of IP representations) p. NNI_01549128.

[229] *See, e.g.* TR11103 (R&D CSA Termination between NNL and NNI) § 2.

[230] Trial Trans. Day 21, 5016:13–5017:6 (Eden); *see infra* Part IV.B.

149.    Nortel justified the lack of any buy-in or buy-out to the IRS as follows:

> Specifically, a CSA participant obtained a royalty-free license to use the technology developed under the CSA. With the CSA termination, such former participants are deemed to have acquired a fully paid up license permitting the former participant to continue to exercise the right it obtained under the CSA.  As such, no buy-out payment is necessary because each former CSA participant continues to own the rights it acquired during the CSA upon CSA termination.[231]

150.    During Nortel's R&D CSA period, the participants did not pay royalties to one another.[232]  If a participant to a cost sharing agreement were to receive only a make/sell license rather than receiving an effective ownership interest, that participant's contribution under the agreement would ***not*** have the benefit of being excluded from treatment as a royalty for tax purposes.[233]

151.    In the period between the termination of the R&D CSAs and entry into the Master R&D Agreement ("**MRDA**"), no contract existed setting out the transfer pricing arrangements or related entitlements as among Nortel Group entities. [234]

**B.    The Residual Profit Split Methodology**

152.    From January 1, 2001, Nortel adopted different transfer arrangements known as the residual profit sharing methodology ("**RPSM**").[235]  This replaced the cost-sharing approach of the earlier CSAs.

---

[231] TR21041 (Summary of IP representations) p. NNI_01549128; Trial Trans. Day 9, 1859:7–18 (Weisz).

[232] Trial Trans. Day 21, 5011:18–21 (Eden).

[233] Trial Trans. Day 21, 5009:18–5015:5 (Eden).

[234] Trial Trans. Day 9, 1848: 3-20 (Weisz); Trial Trans. Day 9, 1904:11–15 (Weisz); *see infra* Part IV.B.

[235] TR21003 (MRDA) p. 2.

153.     The move CSAs to an RPSM was considered by NNL senior management at a meeting in Brampton, Ontario in December 2001. [236]  Despite NN France being an RPE, no one in France was involved in the decision to move to the RPSM.[237]

154.     The RPSM distinguished between the residual profit entities ("**RPEs**") within the Nortel Group, and limited risk entities ("**LREs**").  The RPEs were NNL, NNI, NNUK, NN France and NN Ireland.[238]

155.     Nortel described the RPEs (referring to them as Integrated Entities) to the IRS and CRA as being those who, in addition to performing ongoing R&D functions, were fully integrated—meaning that they performed all functions related to the customer fulfillment process, including manufacturing support and distribution functions, both inside and outside of their respective geographic markets.[239]

156.     Further, Nortel represented to the IRS and CRA that these RPEs "are entitled to participate in the ongoing benefits from their historical [intangible property] and bear the risks associated with the continuing value of that [intangible property].  The [RPEs] maintain their historical [intangible property] and continue to develop new [intangible property] from which they anticipate sharing in the future benefits.  These entities are responsible for ongoing entrepreneurship and risk-taking functions with respect to their ongoing [intangible property] activities."[240]

---

[236] TR00016 (Henderson Decl.) ¶¶30–32.

[237] Trial Trans. Day 6, 1495:4–11 (Lebrun).

[238] Trial Trans. Day11, 2657:8-–14 (Cooper).  Nortel Australia was also an RPE for part of the period 2001–2008, but had ceased to be so prior to the group's insolvency.

[239] TR45100.03 (Request for Bilateral APA) p. 11.

[240] TR45100.03 (Request for Bilateral APA) pp. 11, 13 ("Each of the [RPEs] performs similar functions and assumes similar risks and together perform all of the critical activities of Nortel's value chain").

157.    In contrast, the LREs were largely distributor entities, and they received a return for their distributor functions. [241]

158.    The RPSM formula was explained in Schedule A to the MRDA[242] (as varied from time to time).  It can be summarized as follows:

a)    Calculate the Group's operating profit (earnings) or loss for the year under US GAAP;

b)    Make certain identified adjustments to that figure to arrive at an adjusted operating profit (earnings) or loss figure;

c)    Allocate routine returns to both the LREs and the RPEs in respect of their routine functions, such as distribution;[243]

d)    Calculate the residual pool of total profits or losses having allocated the routine returns; and

e)    Share the residual pool of total profits or losses among the RPEs in accordance with either:  (i) their respective shares of total R&D Capital Stock amortizing at 30 percent per anum (for the application of the RPSM in the years 2001–2005); or  (ii) their respective shares of total R&D spend in the preceding five years (for the application of the RPSM thereafter).[244]

---

[241] Trial Trans. Day 11, 2659:1–11 (Cooper).

[242] TR21003 (MRDA) pp. 48–49.

[243] RPEs also carried out routine functions, rather than such functions merely being carried out by LREs. In the period 2001-2005, their routine return was based on a 'return on net assets (RONA) whereas in the 2006–2008 period their routine returns related to distribution. Trial Trans. Day 11, 2657:8–2658:23 (Cooper).

[244] Trial Trans. Day 11, 2653:1–19 (Cooper).

159.     Transfer pricing adjustments were made to bring each RPE from its income position pre-adjustment to its correct post-adjustment position as per the RPSM formula. Such transfer pricing adjustments were part of the sharing of profits but were not a reimbursement of R&D costs incurred by the recipient.[245]

160.     In order to determine operating profit under the RPSM formula, global revenues were pooled, and certain expenses were deducted.[246]

161.     Certain worldwide pension costs were among the worldwide costs deducted "above the line" from global revenues to determine operating profit.[247]  Likewise, cost of goods sold, and SG&A (sales, general and administrative expenses) were taken into account in arriving at the operating profit figure. [248]

162.     Within the RPSM, the residual profit is the remaining part of the enterprise's profit once routine returns have been taken into account.  Nortel used the relative R&D spend of the five RPEs as the allocation key to distribute residual profits or losses.[249]  Because Nortel's R&D played an integral and primary role in generating revenue, the residual profit or loss was allocated to the RPEs pro rata to their contribution of intangible property as determined by their R&D activities.[250]

---

[245] Trial Trans. Day 12, 2863:5–20 (Felgran).

[246] Trial Trans. Day 14, 3340:18–3341:5 (Green).

[247] Trial Trans. Day 8, 1747:3–18 (Stephens); Day 9, 1881:24–1882:8 (Weisz); Day 14, 3341:3–5 (Green).

[248] Trial Trans. Day 21, 5045:15–5046:6 (Eden).

[249] Trial Trans, Day 11, 2645:18–2647:12 (Cooper); TR21003 (MRDA); Trial Trans. Day 11, 2654:6–12 (Cooper).

[250] TR45100.03 (Request for Bilateral APA) p. 49.

163.    Importantly, for this purpose, **_no_** distinction was made within Nortel as between the value of spending on R&D in one location or another.[251]

### C.    The Master R&D Agreement

164.    The MRDA was entered into on or after December 22, 2004, and is stated on its face to be effective retroactive as of January 1, 2001.[252]  The MRDA was not "fully signed up" until 2005. [253]

165.    Mark Weisz, a director of international tax with responsibilities for Europe, Asia, and Latin America at Nortel until 2007,[254] testified that the MRDA "contractualize[d] the arrangements that the participants had and had been ongoing for quite some time since 2001."[255]

166.     However, the MRDA was not a consideration for Nortel's R&D managers.  Brian McFadden, who served as CTO from 2004 to 2005, was not involved in drafting or executing the MRDA, and had not even heard of the MRDA during his time at Nortel.[256]

167.    A recital to the MRDA recorded that each RPE (referred to as a Participant) "bears the full entrepreneurial risks and benefits for the Nortel Networks business."[257]

168.    Dr. Richard Cooper, a transfer pricing and valuation expert, opined that the residual profit-split method envisions the entrepreneurs as the ones that are taking risk in

---

[251] Trial Trans. Day 11, 2654:13–22 (Cooper).

[252] TR21003 (MRDA) pp. 1–2.

[253] Trial Trans. Day 9, 1904:4–6 (Weisz).

[254] Trial Trans. Day 9, 1845:14–1846:3 (Weisz).

[255] Trial Trans. Day 9, 1847:24–1848:20 (Weisz).

[256] Trial Trans. Day 3, 658:5–16 (McFadden).

[257] TR21003 (MRDA) p. 2.

order to get future gain.  Dr. Cooper explained that concept as what "the core of the model is about."[258]

169.    Under the MRDA, as under the CSAs, legal title to patents was assigned to NNL regardless of where they were invented.[259]  The MRDA included a term under which NNL granted to the other RPEs certain exclusive rights in their home territories.[260]

170.    After the MRDA was executed, RPEs engaged in sales outside their exclusive territories—an occurrence that Mr. Stephens characterized as "daily."[261]  In the Third Addendum to the MRDA dated on or around December 19, 2008, each RPE was expressly granted a non-exclusive worldwide license in respect of all territories other than the exclusive home territories of the other RPEs.[262]

**(1)    The RPSM dictated the sharing of the Group's annual operating profit or loss and thus the annual financial outcome for each RPE.**

171.    The RPSM, as reflected in the MRDA, did ***not*** permit RPEs to retain for themselves the benefit of revenues they generated by exploiting Nortel IP in their exclusive territories. Instead, the profit or loss resulting from the revenues of the Group were shared according to the RPSM formula irrespective of where that revenue came from.[263]

---

[258] Trial Trans., Day 11. 2647:13-25 (Cooper); Trial Trans., Day 6, 1485:8–1486:21 (Lebrun) ("being an entrepreneur, they would contribute to that IP, invest in that IP, get all the benefit coming from that IP. And suffer the losses if the investment was wrong").

[259] TR21003 (MRDA) Art. 4.

[260] TR21003 (MRDA) Art. 5.

[261] Trial Trans. Day 8, 1726:4–9 (Stephens).

[262] TR21003 (MRDA) pp. 39–42.

[263] Trial Trans. Day 12, 2719:19–2720:1 (Cooper).

172.     The purpose of the MRDA was to allow the RPEs to share in the profit or loss from an ongoing common endeavor akin to a joint venture among related parties.[264]

173.     According to Kerry Stephens, the relationship between RPEs was "a form of joint venture. . . .  They [the RPEs] were exploiting the IP jointly, not in competition with each other, supporting other entities in the group, and agreeing to pool the profits or losses, as the case may be."[265]  Such a joint venture relationship was better than either a partnership or a licensing and royalty arrangement for reducing the Nortel Group's overall tax burden.[266]

174.     Mr. Stephens also testified that although revenue might be earned in one jurisdiction, that revenue was the result of costs and efforts in other jurisdictions as well:  as he put it, "part and parcel of the global joint venture.  Everybody trading to maximize the global revenues from the exploitation of Nortel technology."[267]

175.     Michael Orlando, a director of Nortel's transfer pricing, testified that "the intellectual property is so interrelated, the transactions are so interrelated that we would have difficulty allocating the profits across the different types of technology" other than via some profit splitting method.[268]

176.     The RPSM did not accord NNL any special rights by virtue of its status as corporate parent or as legal title holder of any intellectual property.[269]  NNL received a share of residual profits or losses based on its R&D capital stock just like the other RPEs, and

---

[264] Trial Trans. Day 12, 2717:20–2718:20 (Cooper).

[265] Trial Trans. Day 8, 1719:6–20 (Stephens).

[266] Trial Trans. Day 8, 1719:21–1721:15 (Stephens).

[267] Trial Trans. Day 8, 1751:11–19 (Stephens).

[268] Trial Trans. Day 6, 1315:7–11 (Orlando).

[269] Trial Trans. Day 21, 5043:13–17 (Eden).

according to the same formula.[270]  As Dr. Stephen Felgran, an economist and expert in the field of transfer pricing, testified:  ". . . the methodology treated Canada the same way as the four remaining RPEs. There is nothing different about Canada."[271]

177.    Notwithstanding that under the MRDA profits were split in proportion to R&D spending only during the preceding five years, R&D could prove useful, and generate profits, well after five years. [272]  CTO Brian McFadden acknowledged that it may have been five or ten years before R&D resulted in a product that goes into market.[273]

178.    Moreover, patents generated from the R&D process could have an enforceable life of at least twenty years, again far exceeding the five-year useful life estimated by the MRDA.[274]

### (2)    The RPSM had as one of its objectives the localization of profits in Canada.

179.     It was an objective of Nortel's transfer pricing practices to localize more of the Group's profits in Canada.[275]

180.    Nortel obtained significant R&D tax credits in Canada. These included scientific research and experimental tax (SR&ED) credits credits as well as provincial tax credits and other incentives that were specifically available related to R&D. [276]

---

[270] Trial Trans. Day 5, 1141:19–1142:20 (Henderson).

[271] Trial Trans. Day 12, 2866:1–9 (Felgran).

[272] *See supra* ¶¶117, 121, 120 (NNUK research from two decades ago still relevant today).

[273] Trial Trans. Day 3, 669:21–25 (McFadden).

[274] Trial Trans. Day 10, 2183:12–13 (Anderson).

[275] Trial Trans. Day 5, 1217:15–17 (Ricaurte).

[276] Trial Trans. Day 21, 4990:1–22 (Eden).

181.    As a result, Canada was, for Nortel, a tax haven in comparison to the other jurisdictions in which it operated.[277]

182.    At the time that the RPSM was designed, the effective tax rate paid by NNI in the US was higher than that paid by NNL in Canada due in part to Canada's generous R&D tax credits.[278]  Accordingly, Nortel's APA team working on the RPSM sought to maximize NNL's share of routine returns and share of residual profits in a manner that it was thought the IRS would accept.[279]

183.    By June 2007, Nortel had accrued several billion dollars in unused tax losses and credits in Canada, and sought to allocate as much profit as possible to Canada in order to take advantage of those losses and credits.[280]

184.    As a presentation by Nortel's tax team put it succinctly, the "RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven."[281]

### (3)    The RPSM and the MRDA do not address a Group-wide insolvency.

185.    The MRDA contains no express terms which envisaged or provided for an insolvency of the Nortel Group.[282]

186.    Likewise, the prior R&D CSAs contained no express terms that envisaged or provided for an insolvency of the Nortel Group.  Nortel's Chief Legal Officer from 1974 to

---

[277] Trial Trans. Day 12, 2889:22–2890:6 (Felgran); Trial Trans. Day 21, 4989:7–25 (Eden).

[278] TR00016 (Henderson Decl.) ¶41.

[279] TR00016 (Henderson Decl.) ¶42.

[280] Trial Trans. Day 5, 1217:23–1219:1 (Ricaurte).

[281] TR21170 (Global Tax Town Hall) p. 17.

[282] Trial Trans. Day 16, 4030:4–8 (Reichert); Trial Trans. Day 8, 1785:2–10, 1787:9–24 (Stephens).

1999, Clive Allen, regarded the insolvency of the Nortel Group to be "inconceivable" and it was not a risk that was addressed in intercompany arrangements of that period.[283]

187.    Walter Henderson testified that consideration was not given as to how the RPSM would work in bankruptcy because "we never thought about that eventuality coming to pass."[284]

188.    Michael Orlando, who worked within the Nortel transfer pricing team and ultimately became Director of Transfer Pricing, was asked if Group-wide insolvency was commonly a risk allocated in a transfer pricing agreement.  He replied:  "I have never seen it."[285]

189.    Mark Weisz, part of Nortel's transfer pricing team until his departure in 2007, testified that the MRDA was not intended to address insolvency and that he was never involved in any discussions about what would happen in the event of an insolvency.[286]

190.    Indeed, it would be unusual for a transfer pricing arrangement to address the insolvency of the Group.  Professor Lorraine Eden testified that insolvency and bankruptcy are not mentioned in her 700-page textbook on transfer pricing.[287]  Dr. Felgran testified that in his 20 years of experience, he had never seen a transfer pricing agreement that had provisions addressing what would happen in the event of an insolvency.[288]

---

[283] Trial Trans. Day 3, 630:25–631:20 (Allen).

[284] Trial Trans. Day 5, 1124:17–24, 1143:19–1144:8 (Henderson).

[285] Trial Trans. Day 6, 1325:4–7 (Orlando).

[286] Trial Trans. Day 9, 1877:18–1878:1 (Weisz).

[287] Trial Trans. Day 21, 4984:8–11 (Eden).

[288] Trial Trans. Day 12, 2853:15-20 (Felgran).

191.    Further, all transfer pricing arrangements assume a going concern.  Transfer pricing is "about the year in/year out operating income," and whether that operating income is the correct operating income for the entity, or whether it overpaid some other party or was undercompensated by some other party.[289]

(4)    **The RPSM and the MRDA do not apply to the proceeds from asset sales.**

192.    The RPSM does not apply to the proceeds of the sale of a business.[290]  The RPSM "was never . . ., from the get-go, a split of profit from the sale of businesses or sale of underlying assets."[291]

193.    The MRDA was originally silent on how proceeds from the sale of a business should be allocated among Participants.[292]  However, pursuant to an amendment executed in December 2008 to January 2009 and effective retroactive to January 1, 2006, such proceeds are expressly excluded from the calculation of global revenues.[293]

194.    Mr. Weisz testified that "the MRDA just dealt with how the profits would be split from our operations, not sales of technology."[294]

195.    Kerry Stephens testified that he regarded the MRDA's lack of provisions determining what should happen in the event of a sale of assets in respect of which there were

---

[289] Trial Trans. Day 12, 2852:20–2853:14 (Felgran); Trial Trans. Day 21, 5077:3–11 (Eden) ("[T]he transfer pricing rules were developed with the idea of ongoing . . . entities for purposes of determining their corporate income tax").

[290] Trial Trans. Day 12, 2773:1–6 (Felgran).

[291] Trial Trans. Day 12, 2725:17–2726:7 (Cooper).

[292] Trial Trans. Day 6, 1289:4–5 (Orlando).

[293] TR21003 (MRDA) pp. 39, 42–47, 49; Trial Trans. Day 7, 1290:12–17 (Orlando).

[294] Trial Trans. Day 9, 1872:5–11 (Weisz); Trial Trans. Day 9, 1907:2–6 (Weisz).

rights granted under the MRDA as "a major failing of the MRDA, but there was nothing there covering that."[295]

196.    On one occasion while Nortel was a going concern, the RPSM was utilized as a guide when allocating certain proceeds and costs relating to a sale of part of its business.  On December 31, 2006, Nortel concluded a sale of its UMTS Access business to Alcatel-Lucent for an adjusted purchase price of US$306 million.[296]

197.    Proceeds from the sale of the UMTS Access business were allocated among selling Nortel entities according to the RPSM.  However, Mr. Weisz, who was involved in determining how proceeds from the Alcatel sale should be allocated, testified that the MRDA did **not** automatically apply the RPSM to such proceeds:  "There was no guidance in this, and so I recall that we had specific discussions.  And given that we were an operating company and going forward, we used the agreement as guidance."[297]

## V.    NORTEL MANAGED CASH CENTRALLY AND FOR THE BENEFIT OF THE GROUP

198.    In furtherance of Nortel's integrated global business operations, the Nortel entities used a shared cash management system to transfer funds among one another, to allocate costs and profits, to comply with tax laws, and manage the operations and cash needs of the enterprise.[298]

199.    As part of this cash management system, Nortel's revenues were distributed throughout Nortel, without regard for where they were earned, to pay expenses of the global

---

[295] Trial Trans. Day 8, 1787:13–19 (Stephens).

[296] TR21139 (Nortel 2006 Annual Report) p. 43.

[297] Trial Trans. Day 9, 1907:2–23 (Weisz).

[298] TR21540 (Doolittle Decl.) ¶64.

enterprise.  Nortel's Chief Financial Officer, Peter Currie testified:  "The cash is generated globally from various operations and it is deployed globally for requirements around the world.  So the fact that cash is generated in one jurisdiction does not mean it is earmarked for utilization in that jurisdiction.  Cash is totally fungible."[299]

200.    Nortel's cash management system was integrated with Nortel's sales, purchasing, supply, and distribution networks.[300]

201.    Nortel's senior management considered liquidity and cash issues on a Group-wide basis.[301]  Nortel's treasury group within NNL was responsible for "the management of Nortel's global cash, capital markets activity, foreign exchange, [and] derivatives. . . ."[302]

202.    One way in which Nortel moved cash between entities was through intercompany loans.[303]  Intercompany funding was coordinated and managed out of Canada.  From time to time, separate Nortel legal entities made intercompany loans to each other, and all such loans were approved by the treasurer or assistant treasurer of NNL.[304]  Michael McCorkle, Assistant Treasurer at NNL from 2005 to mid-2008, testified: "[t]he way we [Nortel] were set up was that all global cash was used as needed . . . ."[305]

203.    Transfer pricing provided other mechanisms by which Nortel moved cash between entities.

---

[299] Currie Dep. 183:3–23.

[300] TR21540 (Doolittle Decl.) ¶26.

[301] Williams Dep. 44:4–45:15.

[302] Trial Trans. Day 4, 811:18–813:9 (McCorkle).

[303] Trial Trans. Day 4, 825:14–17 (McCorkle).

[304] Trial Trans. Day 4, 816:4–16 (McCorkle).

[305] Trial Trans. Day 4, 811:18–812:19, 822:19–823:9 (McCorkle).

204.    The RPSM was based upon target level of profits that entities were expected to

earn.  Because it was extremely unlikely that the entities would generate exactly these profits,

transfer pricing adjustments, or additional payments, were required.[306]

205.    Transfer pricing adjustments were recorded as accounting entries but often were

not paid as cash to the party receiving the adjustment.[307]

206.    Unpaid transfer pricing adjustments amounted to interest-free loans from the

recipient to the payor of the adjustment.   In particular, as Dr. Felgran testified,

> NNL owed NNUK a lot of money in the form of transfer pricing
> adjustments.  Starting in 2003, that money ceased to be paid.
> Instead there was a loan that was issued by [NN]UK to NNL that
> was required by Canada.  Canada said to NNUK, "You have to
> pay.  You have to issue this loan to us in lieu of our paying you."
> And I think the frosting on the cake here is that no interest was
> paid on that loan . . .[308]

207.    Pension funding was managed centrally as part of Nortel's overall liquidity

management.  Decisions regarding the funding of Nortel's pension plans rested with the NNL

Pension Fund Policy Committee or the board of NNL and NNC.[309]  On its own, NNUK's

board could not approve contributions to the NNUK pension plan.[310]

208.    Nortel viewed the NNUK pension deficit as a serious obligation of the

Company.[311]  At the same time, Nortel sought to limit the cash and other assets placed in the

---

[306] Trial Trans. Day 12, 2848:25–2849:17 (Felgran).

[307] Trial Trans. Day 4, 826:10–19 (McCorkle); Day 10, 2338:20–2339:3 (Malackowski).

[308] Trial Trans. Day 12, 2848:21–24, 2849:18–2850:6 (Felgran).

[309] Donovan Dep. 122:17–123:18.

[310] LaSalle Dep. 137:2–20.

[311] Trial Trans. Day 4, 843:18–21 (McCorkle).

UK to avoid restrictions on cash movement as a result of new pension regulations in the UK.[312]

## VI.    THE REASONABLE EXPECTATIONS OF NORTEL'S CREDITORS WERE BASED ON ITS GROUP-WIDE BUSINESS AND FINANCES

209.    For almost its entire modern history, the Nortel Group provided financial disclosures on a consolidated basis. An entity by entity break down of assets held by NNL, NNI and other Nortel Group subsidiaries  (which did not include the residual  IP) was only first provided in February 2008, when Nortel Networks Corporation's 2007 Annual Report was released.[313]

210.    The absence of unconsolidated financial information had the effect of eliminating inter-company amounts owed, guarantees, and other factors which may have otherwise painted a different picture for individual creditors to assess.

211.    Nortel's intellectual property assets were never recognized on the balance sheets of the Nortel Group, except to the extent they were included in goodwill.[314]

212.    After expressing concerns with the Nortel Group's financial position, significant customers were assured that they had the support of the whole Nortel global enterprise.[315]

### A.    Bondholders

213.    At various point in its existence, Nortel financed its operations by issuing bonds.

---

[312] TR50724 (Email re NNUK tax issues) p. /2 ("Since the Regulator has ruled out its new policies, we have been looking for ways to reduce assets directly under control of the Regulator.").

[313] TR40268 (Nortel 2007 Annual Report).

[314] Trial Trans. Day 3, 541:23–543:3, 590:19–591:1 (Currie).

[315] TR00015 (Binning Reply Aff.) ¶12.

214.    Certain of Nortel's bonds outstanding as at the CCAA filing or Chapter 11 petition date were guaranteed by NNI.[316]  The guarantees associated with these bonds gave bondholders access to assets in Canada and in the US without certainty as to what those assets would be at any given time.[317]

215.    In respect of measuring the expectations of Nortel's bondholders, the only relevant expectations are those that existed prior to the insolvency filings.  Counsel to the Ad Hoc Group of Bondholders acknowledged this in open court.[318]

216.    As summarized in Nortel's June 29, 2006 Offering Memorandum, Nortel was not restricted, as a term of the bond indentures, from moving assets and liabilities around the globe, or granting guarantees to other creditors:

> The covenants in the indenture governing the Notes and Guarantees contain significant exceptions and 'carve outs' in order to provide significant operating flexibility for NNC and its subsidiaries.  These exceptions may provide less protection to holders of Notes than indentures governing securities of non-investment grade rated companies.  In particular, you should be aware that the indenture governing the Notes and the Guarantees will:
>
> ● not restrict the ability of NNC or its subsidiaries to lend cash to or make investments in non-guarantor subsidiaries, joint ventures, customers or other third parties other than in connection with a transfer of all or substantially all of the assets of NNC, the Company or NNI;

---

[316] The following notes were guaranteed by NNL:  NNL's Floating Rate Senior Notes Due 2011; 1.75% Convertible Senior Notes Due 2012; 10.125% Senior Notes Due 2013; 2.125% Convertible Senior Notes Due 2014; and 10.750% Senior Notes Due 2016.  TR40117 (June 29, 2006 Offering Memorandum for NNL $2B Notes due 2011, 2013, and 20016); TR40115 (March 22, 2007 Offering Memorandum for NNL $1B Convertible Notes due 2012 and 2014).

[317] Trial Trans. Day 5, 1111:18–23 (Binning).

[318] Trial Trans. Day 2, 369:20–24 (Opening Statement on behalf of Ad Hoc Group of Bondholders).

● permit NNC or its subsidiaries to incur substantial amounts of additional indebtedness, including indebtedness to finance the acquisition of additional assets;

● permit any indebtedness allowed under the indenture to be incurred by any of NNC's non-guarantor subsidiaries without requiring such subsidiaries to guarantee the Notes;

. . .

● not restrict the ability of NNC's subsidiaries to incur contractual restrictions on their ability to make transfers and pay dividends to NNC and its other subsidiaries . . . . [319]

217.    Nortel's bond documents expressly warned of the possibility of substantive consolidation in a domestic context.[320]

218.    Prospective bondholders were warned that the laws of Canada and the US may apply such that the principal and interest of those bonds might not be repaid.[321]

219.    The guaranteed bonds were not perceived as conferring any significant financial advantage over non-guaranteed bonds.[322]

220.    Between 2006 and 2008, numerous rating agency reports confirmed that the market did not distinguish between Nortel's bonds that were guaranteed by NNI and those that were not guaranteed by NNI:

a)       In a Rating Action report dated June 16, 2006, Moody's Investors Service ("**Moody's**") assigned an identical B3 credit rating to NNL's proposed $2 billion offering which was guaranteed by NNI and NNL's 6.875 percent

---

[319] TR40117 (June 29, 2006 Offering Memorandum for NNL $2B Note due 2011, 2013, and 2016)  p. 30; Trial Trans. Day 5, 1112:3–1114:21 (Binning).

[320] TR40117 (June 29, 2006 Offering Memorandum for NNL $2B Notes due 2011, 2013, and 2016)  p. 30.

[321] Trial Trans. Day 4, 828:7–21 (McCorkle).

[322] Trial Trans. Day 3, 584:3-549:2 (Currie); Day 5, 1105:5–1107:18 (Binning).

and NNC's 7.875 percent senior notes which did not enjoy an NNI guarantee.[323]

b)    In a Credit Rating Report dated July 16, 2006, Dominion Bond Rating Service ("**DBRS**") assigned all of Nortel's outstanding debt at the time with an identical B Low rating. This outstanding debt included bonds that were guaranteed by NNI and bonds that did not enjoy an NNI guarantee.[324]

c)    In a Rating Action report dated March 22, 2007, Moody's assigned an identical B3 credit rating to NNC's proposed $1billion convertible offering which was guaranteed by NNI, NNL's $2 billion offering which was guaranteed by NNI, NNL's 6.875 percent senior notes which did not enjoy an NNI guarantee and NNC's 7.875 percent senior notes which did not enjoy an NNI guarantee. In addition, Moody's assigned all of Nortel's outstanding bonds with an expected Loss Given Default[325] of 67 percent.[326]

d)    In a Rating Report dated November 9, 2007, DBRS once again assigned all of Nortel's outstanding debt an identical B Low rating. This

---

[323] TR12036 (Moody's Rating Action,  June 16, 2006)  p. 2.

[324] TR12037 (DBRS Credit Rating Report, July 16, 2006) pp. 1–2.

[325] Moody's defines Loss Given Default or LGD as "the difference between value received at default resolution (either through bankruptcy resolution, distressed exchange, or outright cure) and principal outstanding and accrued interest due at resolution. The expected LGD rate is expected LGD divided by the expected amount of principal and interest due at resolution. Equivalently, the LGD assessment is expected LGD discounted by the coupon rate back to the date the last coupon payment was made." *See* TR50455 (Moody's Rating Methodology) p. 5.

[326] TR12038 (Moody's Rating Action, Mar. 22, 2007) p. 1.

outstanding debt included bonds that were guaranteed by NNI and bonds that did not enjoy an NNI guarantee.[327]

e)      In a Rating Action report dated May 21, 2008, Moody's assigned an identical B3 credit rating to all of Nortel's outstanding bonds, which included bonds that were guaranteed by NNI and bonds that did not enjoy an NNI guarantee.  In addition, all of Nortel's outstanding bonds received a Loss Given Default of 66 percent.[328]

f)      In a report dated July 14, 2008, DBRS noted that "Some of Nortel's debt carries a guarantee from its U.S. subsidiary Nortel Networks Inc. (NNI), which DBRS believes gives these notes superior recovery prospects versus the notes that do not carry such a guarantee.  However, the notes that mature in 2023 and 2026 that do not carry a guarantee from the U.S. operating subsidiary NNI have default recovery prospects that are not sufficiently inferior to cause them to be rated differently.  All of these notes have an expected recovery in default that DBRS considers average and consistent with a recovery rating of RR4 and an instrument rating of B (low)."[329]

g)      In a Rating Action report dated December 15, 2008, Moody's assigned an identical Caa2 credit rating to  NNC's $1billion convertible offering which was guaranteed by NNI, NNL's $2 billion offering which was guaranteed

---

[327] TR12039 (DBRS Rating Report, Nov. 9, 2007) pp. 1–2.

[328] TR12040 (Moody's Rating Action, May 21, 2008) p. 1.

[329] TR12041 (DBRS Report, July 14, 2008) p. 2.

by NNI, and NNCC's senior notes which did not enjoy an NNI

guarantee.[330]

221.    In a Credit Opinion dated December 16, 2008, Moody's noted:

> Nortel issues debt in three legal entities:  Nortel Networks
> Corporation, Nortel Networks Limited and Nortel Networks
> Capital Corporation.  All of the Group's debt is unsecured and is
> rated equally with the Caa2 CFR. . . .  In general, a system of
> cross-guarantees causes all debt to be interpreted as pari passu.
> Technically however, there are two note issues that are not pari
> passu.  However, since the financial consequences of this situation
> are not determinable and are, in any case, thought to be minimal,
> Moody's rates all of the Nortel group of companies' debts as if
> they were pari passu.[331]

222.    Throughout various times between 2006 and 2008, Nortel bonds lacking

intercompany guarantees were trading at narrower spreads than Nortel guaranteed bonds.

This is consistent with the market assigning no additional value to the guarantees.[332]

223.    In mid-September 2008, Nortel issued a profit warning, indicating that it would

not meet its financial targets for the year.  As a result of the profit warning, ratings agencies

lowered their credit rating on Nortel to "credit watch" or "credit watch" with a negative

implication.[333]

---

[330] TR12042 (Moody's Rating Action, Dec. 15, 2008) p. 1.

[331] TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3.

[332] Trial Trans. Day 5, 1105:5–1107:18 (Binning); TR12044B; *see also* TR00058 (UK Pension Claimants'
   McConnell cross-exam. demonstrative).

[333] Trial Trans. Day 5, 1093:6–20 (Binning).

224.    By the close of September 2008, Nortel bonds were trading on a value basis rather than a yield-to-maturity basis, implying that bondholders were focused on what could be recovered or gained in insolvency.[334]

225.    To date, the current and former holders of the Nortel bonds at issue in these proceedings have never provided the Courts with evidence as to their actual expectations at any time.

226.    Professor John McConnell and Robert Kilimnik, two experts proffered by the US Debtors, the UCC, and bondholders respectively, both confirmed that they did not speak to any Nortel bondholders in forming the expert opinions they provided to the Courts (which included opinions on the expectations of bondholders).[335]

227.    Professor John McConnell also affirmatively testified that he did not look at pre-insolvency data in forming the opinions contained in his expert report.[336]

**B.    Trustees of the UK Pension Plan**

228.    The Trustees of the UK Pension Plan were assured by senior officers of NNL and NNC that they should consider the covenant of the Nortel Group as a whole, rather than simply the financial capability of NNUK.[337]

229.    Michael McCorkle, a Vice President and Treasury executive with NNL, testified that such representations were made to the Trustees of the UK Pension Plan.[338]

---

[334] TR22055 (Liquidity and Financing Alternatives, Sept. 30, 2008) p. 7; Trial Trans. Day 5, 1098:15–1100:11 (Binning).

[335] Trial Trans. Day 20, 4804:20–4805:5 (McConnell); Kilimnik Dep. 15:7–15:11.

[336] Trial Trans. Day 20, 4856:11–4857:25 (McConnell).

[337] TR21368 (Email from Mark Cooper (Global head of employment law) to David Drinkwater (Chief Legal Officer) and Pavi Binning) p. EMEAPRIV0293648 ("[W]e have always said that the Trustees should look at the strength of the Nortel group rather than NNUK in isolation. The Trustees will be looking more at the strength of the global covenant . . . .").

## VII.   NORTEL'S INSOLVENCY SALES AND AGREEMENTS

### A.   Commencement of Global Insolvency Proceedings

230.     On January 14, 2009 (the "**Petition Date**"), Nortel Networks, Inc. ("**NNI**") and its

US affiliates[339] filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy

Code in the US Bankruptcy Court for the District of Delaware.[340]

231.     On July 14, 2009, Nortel Networks (CALA) Inc. ("**NN CALA**," and together with

the U.S. Filing Parties, the "**US Debtors**") filed a voluntary petition for relief under Chapter

11 of the U.S. Bankruptcy Code.[341]

232.     On the Petition Date, Nortel Networks Corporation ("**NNC**"), Nortel Networks

Limited ("**NNL**"), and their Canadian affiliates filed applications with the Ontario Superior

Court of Justice, seeking relief from their creditors.  The filing affiliates were:  Nortel

Networks Global Corp., Nortel Networks International Corp. and Nortel Networks

Technology Corporation ("**NNTC**") (together with NNC and NNL, the "**Canadian**

**Debtors**").

233.     Ernst & Young, Inc. was appointed monitor (the "**Monitor**") under the Canadian

Proceedings.

---

[338] Trial Trans. Day 4, 847:19—849:7 (McCorkle).

[339] The filing US affiliates were:  Nortel Networks Capital Corporation, Nortel Altsystems Inc. (previously known as Alteon Websystems, Inc.), Nortel Altsystems International Inc. (previously known as Alteon Websystems International, Inc.) Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

[340] TR50099 (D.I. 1).

[341] TR50107 (D.I. 1098).

234.    On the Petition Date, the High Court of England and Wales placed Nortel

Networks UK Limited ("**NNUK**") and its European affiliates and subsidiaries (collectively,

the "**EMEA Debtors**") into administration.[342]

235.    The English Court appointed Alan Robert Bloom, Stephen John Harris, Alan

Michael Hudson and Christopher John Wilkinson Hill from Ernst & Young LLP as

administrators of all the EMEA Debtors (other than NN Ireland, for which David Hughes and

Alan Bloom serve as joint administrators) (the "**Joint Administrators**").

236.    On May 28, 2009, at the request of the Joint Administrators, NNSA entered into

secondary insolvency proceedings in the Commercial Court of Versailles, which issued a

judgment appointing Cosme Rogeau as liquidator.

**B.      To Maximize Returns, Nortel Sold its aAssets on a Global Basis.**

237.    On January 13, 2009, the Canadian, U.S., and EMEA Debtors entered into an

agreement with Lazard Freres & Co. LLC ("**Lazard**") for Lazard to render investment

banking and financial advisory services to the Nortel Group, including with respect to the

sales of Nortel's businesses and patent portfolio.[343]

238.    In the aftermath of the insolvency filings, Nortel initially considered two

restructuring options:  (i) the sale of all of Nortel's lines of business, except for the CDMA

wireless business and its LTE technology, followed by a reemergence from bankruptcy

---

[342] The additional European affiliates and subsidiaries placed into administration were:  Nortel Networks SA, Nortel
Networks France S.A.S., Nortel Networks (Ireland) Limited, Nortel Networks NV, Nortel Networks SpA,
Nortel Networks BV, Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, SA, Nortel Networks
(Austria) GmbH, Nortel Networks GmbH, Nortel Networks s.r.o., Nortel Networks Engineering Services
Kft, Nortel Networks Portugal SA, Nortel Networks Slovensko, s.r.o., Nortel Networks Romania SRL,
Nortel GmbH, Nortel Networks OY, Nortel Networks AB, and Nortel Networks International Finance &
Holding BV.

[343] TR50155 (D.I. 294); TR50171 (D.I. 3874) p. 26.

focused on the CDMA/LTE business; or (ii) a liquidating insolvency involving a sale of all of Nortel's lines of business and other assets worldwide.[344]

239.    In June 2009, Nortel, in consultation with Lazard, the UCC, the bondholders, and various Canadian creditors, determined that the best means of realizing value for creditors would be to proceed with a liquidating insolvency.[345]

### (1)    Segmentation of patents for sale with the business or residual portfolio

240.    Nortel's businesses were sold with sets of Nortel patents identified as predominantly and only used by the business.[346]  The process of identifying and dividing up Nortel's patents for purposes of the sales, referred to as "segmentation," was led by Gillian McColgan, a member of  the Nortel IP law group.[347]

241.    The patent segmentation team employed a standard for dividing the patents it referred to as "predominant use."  According to this standard, Nortel's patents were categorized in one of three ways—"predominantly used"; "shared"; or "not used"—depending on the extent of their use in Nortel's then-current business operations.

242.    A patent was categorized as "predominantly used" in a single business if it was traced to an existing revenue stream or in-development product of exactly one Nortel business.  Predominantly used patents were designated to be sold with the business utilizing them.[348]

---

[344] TR00009B (Hamilton Aff.) ¶¶17–18; TR00014 (Binning Aff.) ¶43.

[345] TR00009B (Hamilton Aff.) ¶21.

[346] Trial Trans. Day 10, 2256:1–10 (Malackowski).

[347] McColgan Dep. 128:7–15.

[348] McColgan Dep. 183:21–185:3.

243.    In-development products included those appearing on a "plan of record," which generally included products and features to be released in the upcoming year, or a "plan of intent," which included additional products and features up to three or five years out.[349]

244.    Patents that were not "predominantly used" were further characterized as either "shared" and "not used" by the businesses.  A patent was designated as "shared" if it was traced to an existing revenue stream, or to a product or service in the pan of record or plan of intent, of two or more Nortel businesses.  Shared patents were not sold with the businesses but remained in Nortel's residual patent portfolio and licensed out to the buyers.[350]

245.    A patent was designated "not used"  if it  could not be traced to an existing revenue  stream, or item on any plan of record or plan of intent.[351]  This included patents relating to products and services that Nortel had discontinued, or had proposed but never brought to market. [352]

246.    Ms. McColgan illustrated the methodology for determining which patents were "not used" using the wireless technology WiMAX[353] as an example:

> One of the examples I will give of an area that there were a group of patents that were ultimately identified to be not used was the WiMAX area, and WiMAX was an area we had put a lot of effort into, we had actually developed a prototype product and then we had made the decision pre-bankruptcy to shut the product down.

---

[349] Roese Dep.151:17–25.

[350] McColgan Dep. 124:21–125:21; TR44764 (Granted patents not on business sale assign lists) Col. H.

[351] McColgan Dep. 125:22–126:9.

[352] McColgan Dep. 125:22–126:9; 130:21–131:7, 132:8–16.

[353] *See supra* ¶117 (NNUK researching concerning MIMO relevant today to 4G wireless technologies including WiMAX and LTE).

> Under the criteria of predominance or assignment the WiMAX
> patents could not be assigned to the wireless, any of the wireless
> groups because that product did not exist at that point in time.[354]

247.    A patent was also deemed "not used" if it covered a product that Nortel was selling but sourcing from a third party, including (a) components Nortel purchased from a supplier for use within a Nortel product, such as an integrated circuit; or (b) equipment Nortel purchased form a supplier and then rebranded and sold as its own.[355]

248.    Nortel's head of IP at the time, John Veschi, devised the predominant use standard to be a flexible alternative to a more stringent "exclusive use" standard and less stringent "primary use" standard.[356]

249.    The patent segmentation process took roughly a year to complete.[357]  Initially, each business was tasked with identifying patents it believed to be used in its products. According to Ms. McColgan, this resulted in a "land grab" in which each business over-claimed patents.[358]

250.    In subsequent rounds of the segmentation process, the IP law group worked together with representatives from the businesses to resolve disputes and arrive at an agreed division of patents.[359]

---

[354] McColgan Dep. 131:8–18.

[355] McColgan Dep. 132:17–133:10.

[356] Veschi Dep. 122:6–127:10.

[357] McColgan Dep. 128:16–22.

[358] McColgan Dep. 129:12–25.

[359] McColgan Dep. 130:8–20.

(2)    **The IFSA**

251.    Due to the "integrated, co-dependent business relationship" and "overlapping assets and obligations" among Nortel entities, the Canadian and US Debtors committed to a joint and coordinated reorganization and/or sale of Nortel's business operations.[360]

252.    On June 9, 2009, the Nortel entities entered into an Interim Funding and Settlement Agreement ("**IFSA**").  The Canadian, US, and EMEA Debtors agreed to cooperate in selling the Nortel Group's assets while deferring the issue of how the sale proceeds would be allocated among the estates.[361]  Proceeds from the asset sales were to be placed in escrow pending agreement among the estates regarding allocation or, failing such agreement, resolution of any dispute over allocation.[362]

253.    The IFSA provided that "Nothing . . . shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction."[363]

254.    Following a hearing by both Courts,[364] the IFSA was approved on June 29, 2009.[365]

---

[360] TR21540 (Doolittle Decl.) ¶42.

[361] TR40015 (IFSA).

[362] TR40015 (IFSA) § 12(b).

[363] TR40015 (IFSA) § 12(f).

[364] TR50281 (Transcript of June 29, 2009 hearing).

[365] TR50214 (Order approving IFSA).

(3)    **Business line sales**

255.    Nortel's business lines operated across jurisdictional boundaries, employing assets in various countries and implicating multiple debtors.[366]  The global nature of the businesses was perceived to be a source of their value.[367]

256.    A cooperative multi-jurisdictional sale of the businesses was viewed to be the only way to maximize the value to creditors from their sales.[368]  Sharon Hamilton, a Senior Vice President of Ernst & Young working on behalf of the Monitor,[369] testified that "they [the businesses] really needed to be kept together as a global business to be able to maintain maximum value."[370]

(a)    **Layer 4–7 sale**

257.    On February 19, 2009, Nortel entities from around the world[371] entered into an agreement to sell worldwide assets relating to Nortel's Layer 4–7 data portfolio business  to Radware Ltd. ("Radware") for US$17,650,000 (the "**Layer 4–7 Sale**").[372]  No higher bid was received, and the sale was completed on March 31, 2009. [373]

---

[366] Trial Trans. Day 4,1000:3–21 (Hamilton).

[367] Trial Trans. Day 4, 1000:6–18 (Hamilton).

[368] Trial Trans. Day 4, 1000:22–1001:14 (Hamilton).

[369] TR00009A (Hamilton Aff.) ¶¶1, 5.

[370] Trial Trans. Day 4, 1002:20–22 (Hamilton).

[371] The entities identified as sellers in the Layer 4–7 Sale were:  NNI, Alteon Websystems Inc., NNL, NNTC, NNUK, Nortel Networks N.V., NNSA, Nortel Networks France S.A.S, Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o, Nortel Networks AB-Denmark Branch, Nortel Networks B.V., Nortel Germany GmbH & Co KG, NN Ireland, Nortel Networks S.p.A, Nortel Networks Polska Sp. z.o.o., Nortel Networks Portugal S.A., Nortel Networks Romania SRL., and the Joint Administrators.

[372] TR45470 (Layer 4–7 Asset Purchase Agreement).

[373] TR40270 (Nortel 2009 Annual Report) p. 60.

258.    After post-closing purchase price adjustments, as of December 31, 2013, proceeds from the Layer 4–7 Sale totaled US$18,095,951.[374]

### (b)    CDMA/LTE sale

259.    On June 19, 2009, Nortel entities from around the world[375] entered into an agreement with Nokia Siemens Networks B.V. ("**Nokia**") for substantially all of Nortel's Code Division Multiple Access  ("**CDMA**") business and Long Term Evolution ("**LTE**") Access assets for US$650 million (the "**CDMA/LTE Sale**").[376]

260.    An auction was held, at which Telefonaktiebolaget LM Ericsson (publ) ("**Ericsson**") emerged as the successful bidder in the CDMA/LTE Sale at a purchase price of US$1,130,000,000.  The sale was completed on November 13, 2009.[377]

261.    After post-closing adjustments and releases, as of December 31, 2013, proceeds from the CDMA/LTE Sale in escrow totaled US$1,052,733,278.[378]

### (c)    Enterprise sale

262.    On July 20, 2009, Nortel entities from around the world[379] entered into an agreement with Avaya Inc. ("**Avaya**") to sell substantially all of Nortel's global Enterprise

---

[374] TR50021 (Cash Summary) Escrow Accounts tab.

[375] The entities identified as sellers in the CDMA/LTE Sale were NNC, NNL, NNI, NNTC, NN CALA, and Nortel Networks (China) Limited.

[376] TR40270 (Nortel 2009 Annual Report) p. 120.

[377] TR44138 (CDMA/LTE Sale Agreement); TR40270 (Nortel 2009 Annual Report) p. 120.

[378] TR50021 (Cash Summary) Escrow Accounts tab.

[379] The EMEA entities identified as sellers in the Enterprise Sale were:  NNUK, NN Ireland, Nortel Networks France S.A.S., Nortel GmbH, Nortel Networks SpA, Nortel Networks Hispania S.A., Nortel Networks B.V., Nortel Networks AB, Nortel Networks N.V., Nortel Networks (Austria) GmbH, Nortel Networks Polska Sp. z.o.o., Nortel Networks Oy, Nortel Networks Portugal S.A., Nortel Networks s.r.o., Nortel Networks Romania s.r.l., Nortel Networks Engineering Service kft, Nortel Russia, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks AS, Nortel Communications Holdings (1997) Limited, Nortel Israel, and Nortel Networks Slovensko s.r.o.

business, along with shares of NNI subsidiaries Nortel Government Solutions Incorporated ("**NGS**") and DiamondWare, Ltd. ("**Diamondware**") for a cumulative purchase price of US$475,000,000 (collectively, the "**Enterprise Sale**").[380]

263.    An auction as held, and Avaya emerged as the successful bidder for the Enterprise business with an improved purchase price US$900 million in cash and an additional pool of US$15 million reserved for an employee retention program.[381]  The Enterprise Sale closed on December 18, 2009.[382]

264.    After post-closing adjustments and certain releases, as of December 31, 2013, proceeds from the Enterprise Sale in escrow totaled US$842,833,710.[383]

### (d)    GSM sale

265.    On September 30, 2009, NNL, NNI, NNUK and NNSA, along with certain other Nortel entities, announced a plan to sell substantially all of Nortel's Global Systems for Mobile Communications ("**GSM**") and Global Systems for Mobile Railway Communications ("**GSM-R**") businesses (together, the "**GSM Business**") at an open auction.[384]

266.    An auction for the GSM Business was held, and Ericsson and Kapsch CarrierCom AG ("**Kapsch**") emerged as the successful bidders with an aggregate purchase price of US$103 million in cash, subject to certain purchase price adjustments.[385]

---

[380] TR45065 (Enterprise Sale Agreement).

[381] TR47463 (Amended and Restated Enterprise Sale Agreement).

[382] TR40270 (Nortel 2009 Annual Report) p. 121.

[383] TR50021 (Cash Summary) Escrow Accounts tab.

[384] TR40270 (Nortel 2009 Annual Report) p. 122.

[385] TR40270 (Nortel 2009 Annual Report) p. 122.

267.    The relationships that Nortel's GSM Business had with customers were important for the sale of that business.[386]  As a condition of the sale of the GSM Business, Ericsson required that 75 percent of customer contracts would be assigned Ericsson.[387]

268.    On November 24, 2009, Nortel entities entered into simultaneous agreements to sell certain North American portions of the GSM business to Ericsson, and EMEA portions of the GSM Business to Kapsch (collective, the "**GSM Sale**"). [388]  The sale closed on March 31, 2010.[389]

269.    Pursuant to the contractual post-closing purchase price adjustment provisions, the final purchase price for the GSM Sale agreement with Ericsson was reduced by US$6 million, and the final purchase price for the GSM Sale agreement with Kapsch was increased by US$3 million.[390]

270.    On May 11, 2010, NNI, NN CALA, Nortel Networks de Guatemala, Ltda., Nortel Networks del Paraguay S.A., Nortel Networks del Uruguay S.A. and Nortel Networks de Argentina S.A. entered into an agreement with Ericsson to the sell the Caribbean and Latin American ("CALA") portions of the GSM Business for US$2 million (the "**CALA GSM Sale**").[391]  The CALA GSM Sale closed on June 4, 2010.[392]

---

[386] Trial Trans. Day 5, 1087:12–19 (Binning).

[387] TR12006 (Email of November 26, 2009); Trial Trans. Day 5, 1086:25–1087:19 (Binning).

[388] TR44245 (GSM Sale Agreement); TR44247 (GSM EMEA Sale Agreement).  The EMEA entities identified as sellers in the GSM Sale were:  Nortel Networks (Austria) GmbH, Nortel Networks N.V., Nortel GmbH, Nortel Networks Engineering Service kft, NN Ireland, Nortel Networks SpA, Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Russia, Nortel Networks s.r.o., Nortel Networks Slovensko s.r.o., Nortel Networks Hispania SA, Nortel Networks AG, NNUK, Nortel Networks France S.A.S., Nortel Networks Romania Srl, and Nortel Networks (Northern Ireland) Limited.

[389] TR40271 (Nortel 2010 Annual Report) p. 26.

[390] TR40271 (Nortel 2010 Annual Report) p. 26; TR40272 (Nortel 2011 Annual Report) p. 25.

[391] TR45006 (CALA GSM Sale Agreement).

271.    As of December 31, 2013, proceeds from the GSM Sale in escrow totaled

$104,465,192, while proceeds from the CALA GSM Sale in escrow totaled US$1,501,286.[393]

**(e)    MEN sale**

272.    On October 7, 2009, Nortel entities from around the world entered into an

agreement with Ciena Corporation ("**Ciena**") to sell the global Optical Networking and

Carrier Ethernet businesses for a total purchase price of US$390 million in cash and

10 million shares of Ciena common stock (collectively, the "**MEN Sale**").[394]

273.    An auction was held, and Ciena emerged as the successful bidder.  Ciena agreed

to pay for the MEN Sale a total purchase price of US$530 million in cash, subject to certain

post-closing purchase price adjustments, plus US$239 million principal amount of Ciena

convertible notes due June 2017.[395]  Per their agreement, Ciena elected to replace the

US$239 million principal amount of convertible notes with cash consideration of US$244

million, and thus pay an all-cash purchase price of approximately US$773.8 million.  The

MEN Sale was concluded on March 19, 2010. [396]

274.    After post-closing adjustments and certain releases, as of December 31, 2013,

proceeds from the MEN Sale in escrow totaled US$631,840,127.[397]

---

[392] TR45005 (CALA GSM Sale Closing Documents Index).

[393] TR50021 (Cash Summary) Escrow Accounts tab.

[394] TR40271 (Nortel 2010 Annual Report) p. 25.

[395] TR40271 (Nortel 2010 Annual Report) p. 25.

[396] TR40271 (Nortel 2010 Annual Report) p. 25.

[397] TR50021 (Cash Summary) Escrow Accounts tab.

(f)    **Next Generation Packet Core sale**

275.    Nortel held an open auction for its next generation packet core assets of its wireless networks business, and on October 25, 2009, NNL and NNI entered into an agreement with Hitachi Ltd. ("**Hitachi**") to sell its next generation packet core business for US$10,000,000 (the "**Next Generation Packet Core Sale**").  The sale was concluded on December 8, 2009.[398]

276.    On May 3, 2010, the parties to the Next Generation Packet Core Sale entered into an amendment pursuant to which Hitachi paid an additional US$500,000 in exchange for expanded rights.[399]

277.    As of December 13, 2013, proceeds from the Next Generation Packet Core Sale in escrow totaled US$10,370,273.[400]

(g)    **CVAS sale**

278.    On December 22, 2009, Nortel entities from around the world[401]entered into an agreement with GENBAND Inc. (now known as GENBAND US LLC) ("**GENBAND**") for

---

[398] TR40270 (Nortel 2009 Annual Report) pp. 120–21.

[399] TR50156 (Motion, US Docket Index ("**D.I.**") 2945); TR50160 (Order, D.I. 3049).

[400] TR50021 (Cash Summary) Escrow Accounts tab.

[401] The entities identified as sellers in the CVAS Sale were:  NNC, NNL, NNI, NNTC, NN CALA, Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks Peru S.A.C., Nortel Networks International Inc., Nortel Networks Australia Pty Limited, Nortel Networks (India) Private Limited, Nortel Networks Japan, Nortel Networks Malaysia Sdn. Bhd. Nortel Networks New Zealand Limited, Nortel Networks Singapore Pte. Ltd., Nortel Networks (Thailand) Ltd., Nortel Networks (Asia) Limited (except the Pakistan branch), Nortel Networks (China) Limited, PT Nortel Networks Indonesia, Nortel Networks de Guatemala, Ltda., Nortel Vietnam Limited, NNUK, NN Ireland, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks SpA, Nortel Networks Hispania S.A., Nortel Networks Polska Sp. z.o.o., Nortel Networks AB, Nortel Networks BV, Nortel Networks NV, Nortel Networks (Austria) GmbH, Nortel Networks Portugal, S.A., Nortel Networks A.G., Nortel Russia, Nortel Networks Israel (Sales and Marketing) Limited, Nortel Networks s.r.o., Nortel Networks Slovensko s.r.o., and Nortel Networks Romania Srl.

Nortel's global Carrier VoIP and Applications Solutions business for a total purchase price of US$282 million (the "**CVAS Sale**").[402]  The CVAS Sale was completed on May 28, 2010.[403]

279.    A subsequent dispute relating to post-closing purchase price adjustments was resolved by a settlement agreement pursuant to which the final purchase price was reduced by approximately US$25 million.[404]

280.    After post-closing adjustments and certain  releases, as of December 31, 2013, proceeds from the CVAS Sale in escrow totaled US$140,068,149.[405]

### (h)    MSS sale

281.    On August 26, 2010, Nortel entities from around the world[406] entered into an agreement with PSP Holding LLC for Nortel's global Multi-Service Switch business for a total purchase price of US$39 million, subject to working capital and other adjustments.[407]

---

[402] TR40272 (Nortel 2011 Annual Report) p. 25; TR40620 (CVAS Sale Agreement).

[403] TR40272 (Nortel 2011 Annual Report) p. 25.

[404] TR40272 (Nortel 2011 Annual Report) p. 25; TR50203 (Order, D.I. 6192).

[405] TR50021 (Cash Summary) Escrow Accounts tab.

[406] The entities identified as sellers in the MSS Sale were NNC, NNL, NNI, NNTC, Nortel Networks International Corporation, Nortel Networks Global Corporation, NN CALA, Nortel Networks International Inc., Nortel Altsystems Inc., Nortel Networks India International Inc., Nortel Networks de Argentina, S.A., Nortel Networks Chile S.A., Nortel Networks del Ecuador, S.A., Nortel Networks de Guatemala, Ltda., Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks del Paraguay S.A., Nortel Networks Peru S.A.C., Nortel Networks del Uruguay, S.A., Nortel Networks de Venezuela, C.A., Nortel Networks de Columbia, S.A.S., Nortel Trinidad and Tobago Limited, Nortel Networks Australia Pty Limited, Nortel Networks (India) Private Limited, PT Nortel Networks Indonesia, Nortel Networks Japan, Nortel Networks Korea Limited, Nortel Networks Malaysia Sdn. Bhd., Nortel Networks New Zealand Limited, Nortel Networks (Asia) Limited, Nortel Networks Singapore Pte. Ltd., Nortel Networks (Thailand) Ltd., Nortel Vietnam Limited, Nortel Networks (China) Limited, Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd., Nortel Technology Excellence Centre Private Limited, NNUK, NN Ireland, Nortel Gmbh, Nortel Networks France S.A.S., Nortel Networks SpA, Nortel Networks Hispania, SA, Nortel Networks BV, Nortel Networks NV, Nortel Networks (Austria) GmbH, Nortel Networks Polska Sp. z.o.o., Nortel Networks Portugal, S.A., Nortel Networks s.r.o. (Czech Republic), Nortel Networks Romania Srl, Nortel Networks Slovenski, s.r.o., Nortel Networks AG, Nortel Russia, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Networks AB.

[407] TR40272 (Nortel 2011 Annual Report) p. 25; TR50588 (MSS Sale Agreement).

282.    An auction was concluded on September 24, 2010, after which Ericsson emerged as the successful bidder with a cash purchase price of US$65 million, subject to certain post-closing purchase price adjustments.[408]  The sale was completed on March 11, 2011.[409]

283.    After post-closing adjustments and certain releases, as of December 31, 2013, total proceeds from the MSS Sale in escrow totaled $46,015,759.[410]

### (4)    Sale of the residual patent portfolio

284.    Beginning on October 15, 2009, the Nortel estates retained Global IP to advise on aspects of Nortel's patent portfolio.[411]

285.    The residual patent portfolio included Nortel's patents that were not sold as part of the business sales—*i.e.*, those "shared" by two or more businesses, or "not used" by any businesses at the time.[412]

286.    Beginning in January 2010, a steering committee was formed to consider various options for monetizing the patent portfolio, including selling all or parts of the portfolio, or creating a stand-alone licensing business.[413]

287.    As with the business line sales, the fact that the patent portfolio had global coverage, including particularly outside the US in Europe and Asia, was perceived as a source of value.[414]

---

[408] TR40272 (Nortel 2011 Annual Report) p. 25.

[409] TR40272 (Nortel 2011 Annual Report) p. 25.

[410] TR50021 (Cash Summary) Escrow Accounts tab.

[411] TR50137 (Motion, D.I. 1796).

[412] *Supra* Part VII.B(1).

[413] TR50634.02 (Draft IP Process Overview) pp. 1–2; Trial Trans. Day 5, 1076:23–1077:3 (Binning).

[414] Veschi Dep. 73:3–24.

288.    On April 4, 2011, certain Nortel sellers[415] entered into a stalking horse agreement with an acquisition vehicle of Google Inc., Ranger Inc., to sell the patent portfolio for US$900 million.[416]

289.    As a term of its stalking horse bid, Google insisted that Nortel terminate or transfer the exclusive patent licenses granted by NNL to the MRDA Participants to Google.[417] George Riedel, Nortel's Chief Strategy Officer involved in the negotiations, recalled Google's concern that the intercompany patent licenses "would diminish the value" of the portfolio and might permit third party acquirers to become licensees.[418]

290.    The Courts approved the Google stalking horse agreement along with procedures for an auction to allow qualified bidders to submit higher or otherwise better offers for the patent portfolio.[419]   Four qualified bids for the patent portfolio were received, and an auction was commenced on June 27, 2011.[420]

291.    After 19 rounds of bidding, Rockstar BidCo, LP ("**Rockstar**"), a consortium of Apple Inc., EMC Corporation, Ericsson AB, Microsoft Corporation, Research in Motion Limited, and Sony Corporation, emerged as the winning bidder with a cash purchase price of

---

[415] The sellers identified in the Google stalking horse agreement were:  NNC, NNL, NNI, NNUK, NNSA, NN Ireland, Nortel Networks France S.A.S, Nortel GmbH, Nortel Applications Management Solutions Inc., Nortel Altsystems, Inc., CoreTek, Inc., Qtera Corporation, and Xros, Inc.

[416] TR43640.01 (Google Stalking Horse Agreement).

[417] TR12013 (Email attaching open issues) at GIP_Nortel_00136190; Trial Trans. Day 6, 1371:13–1372:7 (Ray).

[418] Riedel Dep. 138:9–139:5.

[419] TR50186 (Order, D.I. 5359).

[420] TR47279 (71st Report of the Monitor) ¶¶17–24.

US$4,500,000,000.[421]  A sale agreement was entered into on June 30, 2011,[422] and the sale was concluded on July 29, 2011.[423]

292.    As of December 31, 2013, proceeds in escrow from the residual patent sale totaled US$4,454,374,371.[424]

### C.    Interests Diverge Over Allocation

293.    Despite operating as "one Nortel" prior to insolvency, the interests of Nortel's estates and their creditors began to diverge in insolvency.  John Veschi, Nortel's Chief IP Officer and current CEO of Rockstar, testified that "once we filed for bankruptcy . . . nobody was thinking—besides the IP team, I don't think anyone else was thinking about Nortel as Nortel."[425]

294.    The MRDA, which had never served as a governing document prior to insolvency, upon insolvency suddenly became a focal point of contention between the estates and their creditors.  Mr. Veschi testified that the MRDA "wasn't anything we even looked at when we were figuring out how we were going to run our business," and "only became an important document when the bankruptcy came up and all of a sudden the estates became opponents or portions of the company became opponents."[426]

295.    Negotiations over the allocation of proceeds from the proceeds business sales and patent portfolio sale did not result in an agreement.  On May 17, 2013, the Canadian and US

---

[421] TR47279 (71st Report of the Monitor) ¶¶25–31.

[422] TR22085 (Rockstar Sale Agreement) pp. 30–31.

[423] TR40272 (Nortel 2011 Annual Report) p. 26.

[424] TR50021 (Cash Summary) Escrow Accounts tab.

[425] Veschi Dep. 60:24–61:8.

[426] Veschi Dep. 58:7–59:13.

Courts entered orders approving a protocol for determining the allocation for the sale proceeds by joint hearing.[427]

**D.    The Various Allocation Positions Do Not Provide for Any Allocation on the Estate or Creditor Level.**

296.    Neither the Monitor nor the Trustee for the US Debtors has set forth any plan for distributing the Lockbox proceeds from debtor groups who receive an allocation, to the individual estates or creditors within the debtor groups.

297.    Ms. Hamilton testified that the Monitor had not yet decided how funds would be allocated among the Canadian Debtors, although a substantive consolidation of the Canadian Debtors would be considered.[428]

298.    John Ray, the Trustee for the US Debtors, testified that among the US Debtors, only NNI would be receiving an allocation under their proposed allocation.[429]

---

[427] TR50025 (Order—Allocation Protocol); TR50102 (Order, D.I. 10565).

[428] Trial Trans. Day 4, 997:19–998:11 (Hamilton).

[429] Trial Trans. Day 6, 1379:8–14 (Ray).

## PROPOSED CONCLUSIONS OF LAW

**I.     THE NORTEL DEBTORS DID NOT AGREE *EX ANTE* ON HOW THE PROCEEDS OF THE GROUP'S LIQUIDATION WOULD BE ALLOCATED AMONG THE ESTATES.**

1.      The MRDA governed the sharing of profit and loss from the Group's operating businesses for transfer pricing purposes.  It does not address the distribution of proceeds from the sale of the Group's assets in a liquidating insolvency.

2.      In the IFSA, the Selling Debtors agreed to negotiate in good faith to develop a protocol for the allocation of the proceeds from the sale of the Group's assets, but were unable to do so.   They did recognize, however, that the best interests of the Estates' creditors were paramount.

3.      The Courts must look outside the MRDA, the IFSA or any contract among the Nortel Debtors to devise an allocation metric that is fair and equitable and in the best interests of the Estates' creditors.

4.      The pro rata distribution model is fair and equitable and in the best interests of the Estates' creditors.

**II.     THE COURTS HAVE BROAD EQUITABLE POWERS TO FASHION AN APPROPRIATE ALLOCATION MECHANISM IN THIS UNPRECEDENTED CASE.**

5.      In determining the ultimate allocation methodology, both Courts, as courts of equity, enjoy broad latitude under their respective inherent equitable powers to draw upon on principles of equity.

6.      The Courts have jurisdiction under applicable bankruptcy law, including CCCA S. 11 and 11 U.S.C. § 105(a), to order an allocation of lockbox proceeds pursuant to any methodology that is fair and equitable to the creditors of the Nortel debtors.

7.      There is no precedent to assist in the allocation of the proceeds of assets jointly sold by all of the debtors in three bankruptcy estates by two Courts, where the value from these sales derived from highly entangled and commingled assets.  It is a matter of first impression.

8.      Assets of the joint venture should be distributed equally among parties to the joint venture where no *ex ante* agreement exists with respect to the distribution of assets upon termination.

9.      Given that the Nortel Group has been liquidated, it is the Estates' creditors who should be viewed as the "joint venturers" entitled to the presumption of equality of treatment upon dissolution of the common endeavor they funded.

10.      Unjust enrichment occurs where a party retains a benefit which, under the circumstances and in light of the relationship between the parties, it would be inequitable to retain.  Given the integrated manner in which the Nortel Group's IP was created and exploited, adoption of the allocation positions proposed by either the Canadian or U.S. Interests would amount to unjust enrichment.  In contrast, a pro rata distribution of the Lockbox Funds provides an equitable means to ensure that there is no unjust enrichment to any party.

11.      The task before the Courts is to distribute a single pool of commingled funds to multiple claimants.  In analogous circumstances involving an equitable receiver tasked with distributing a single pool of commingled funds, a pro rata distribution is the preferred method of ensuring that each claimant receives an equitable share.

12.      A pro rata distribution is appropriate where the entities (i) are managed and marketed as a single unit; (ii) pool and manage cash based on its best use within the group;

-79-

and (iii) presented themselves to third parties as a single enterprise.  The trial evidence

demonstrates that the Nortel Group exhibited all of these attributes.

III.    **THE PRO RATA DISTRIBUTION MODEL IS  MOST CONSISTENT WITH THE FACTS REGARDING THE MANNER IN WHICH NORTEL OPERATED PRIOR TO INSOLVENCY.**

13.    The pro rata distribution model is most consistent with, and reflects, the manner

in which Nortel operated as a single, integrated global enterprise.

14.    The pro rata distribution model is most consistent with, and reflects, the manner

in which the Nortel Group's principal value driver—Nortel's IP—was jointly created, owned,

used, and ultimately sold.

15.    The pro rata distribution model is most consistent with, and reflects, the

collaborative sales process adopted by various estates and their advisors to maximize the

monetization of the Nortel Group's business lines and residual patent portfolio.

16.    The pro rata distribution model is most consistent with, and reflects, the manner

in which members of the Nortel Group were engaged in a common endeavor.

17.    The pro rata distribution model is most consistent with, and reflects the manner in

which, revenue was available to pay obligations of the Group wherever incurred, and not only

jurisdiction where the revenue was earned.

18.    The pro rata distribution model is most consistent with the principle that expenses

of the Group were to be paid before counting and dividing profits or losses.

19.    Therefore, the pro rata distribution model is the most economically rational

methodology for allocating the Lockbox Funds.

IV.    **THE PRO RATA DISTRIBUTION MODEL IS SIMPLE AND FLEXIBLE TO IMPLEMENT.**

20.    The pro rata distribution model is straightforward to implement.

21.     The pro rata distribution model is flexible and can accommodate decisions by the Courts to give effect to a loan guarantee given by a second Nortel entity and/or to any intercompany claims.

22.     Although additional effect could be given to the guarantees under the pro rata distribution model, it is not necessary to do so because a pro rata allocation provides not only access to the assets of NNL or NNC and NNI, but would provide the creditors holding these guarantees with access to the assets of every other Nortel entity.

23.     The pro rata distribution model can be implemented through interim distributions even before all the claims are resolved in each of the Estates.

## V.     PRINCIPLES OF DOMESTIC AND INTERNATIONAL INSOLVENCY LAW SUPPORT A PRO RATA DISTRIBUTION.

24.     The pro rata distribution model is consistent with and supported by U.S., Canadian, and international insolvency law.

25.     It is a universally recognized principle of insolvency law that creditors of equal rank or priority are should receive distributions on a pro rata *pari passu* basis from all available proceeds, relative to the amount of their claim.

26.     The doctrine of Modified Universalism treats a multinational bankruptcy as a single process in a foreign "main" proceeding, with courts in other jurisdictions assisting in that single proceeding.

27.     The UNCITRAL Model Law on Cross-border Insolvency and the form in which it has been enacted in the U.S. and Canada by governments – Chapter 15 of the U.S. Bankruptcy Code and Part IV of the CCAA – embody the doctrine of Modified Universalism in international insolvency.

28.     The pro rata distribution model is most consistent with application of the Hotchpot rule such that no one creditor recovers proportionately more than other similarly situated creditors.

29.     A pro rata distribution of the Lockbox Funds does not equate to a "global substantive consolidation" of the Estates.

APPENDIX "B"

Relevant Statutes

# UNITED STATES

## BANKRUPTCY CODE

### § 105. Power of court

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

(b) Notwithstanding subsection (a) of this section, a court may not appoint a receiver in a case under this title.

(c) The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation.

(d) The court, on its own motion or on the request of a party in interest--

(1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

(2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that--

(A) sets the date by which the trustee must assume or reject an executory contract or unexpired lease; or

(B) in a case under chapter 11 of this title--

(i) sets a date by which the debtor, or trustee if one has been appointed, shall file a disclosure statement and plan;

(ii) sets a date by which the debtor, or trustee if one has been appointed, shall solicit acceptances of a plan;

(iii) sets the date by which a party in interest other than a debtor may file a plan;

(iv) sets a date by which a proponent of a plan, other than the debtor, shall solicit acceptances of such plan;

(v) fixes the scope and format of the notice to be provided regarding the hearing on approval of the disclosure statement; or

(vi) provides that the hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan.

## § 1506. Public Policy Exception

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States

## § 1532. Rule of payment in concurrent proceedings

Without prejudice to secured claims or rights in rem, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title regarding the debtor, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

## CANADA

*Companies Creditors' Arrangement Act,* RSC 1985, c. C-36

**General power of court**

11. Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act,* if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

[ ... ]

***

*Income Tax Act*, RSC 1985, c 1 (5th Supp)

## PART XVI.1 TRANSFER PRICING

**Definitions**

**247.** (1) The definitions in this subsection apply in this section.

"arm's length allocation"

"arm's length allocation" means, in respect of a transaction, an allocation of profit or loss that would have occurred between the participants in the transaction if they had been dealing at arm's length with each other.

"arm's length transfer price"

"arm's length transfer price" means, in respect of a transaction, an amount that would have been a transfer price in respect of the transaction if the participants in the transaction had been dealing at arm's length with each other.

"documentation-due date"

"documentation-due date" for a taxation year or fiscal period of a person or partnership means

(*a*) in the case of a person, the person's filing-due date for the year; or

(*b*) in the case of a partnership, the day on or before which a return is required by section 229 of the *Income Tax Regulations* to be filed in respect of the period or would be required to be so filed if that section applied to the partnership.

**"qualifying cost contribution arrangement"**

"qualifying cost contribution arrangement" means an arrangement under which reasonable efforts are made by the participants in the arrangement to establish a basis for contributing to, and to contribute on that basis to, the cost of producing, developing or acquiring any property, or acquiring or performing any services, in proportion to the benefits which each participant is reasonably expected to derive from the property or services, as the case may be, as a result of the arrangement.

"tax benefit"

"tax benefit" has the meaning assigned by subsection 245(1).

"transaction"

"transaction" includes an arrangement or event.

"transfer price"

"transfer price" means, in respect of a transaction, an amount paid or payable or an amount received or receivable, as the case may be, by a participant in the transaction as a price, a rental, a royalty, a premium or other payment for, or for the use, production or reproduction of, property or as consideration for services (including services provided as an employee and the insurance or reinsurance of risks) as part of the transaction.

"transfer pricing capital adjustment"

"transfer pricing capital adjustment" of a taxpayer for a taxation year means the total of

(*a*) all amounts each of which is

(i) 1/2 of the amount, if any, by which the adjusted cost base to the taxpayer of a capital property (other than a depreciable property) is reduced in the year because of an adjustment made under subsection (2),

(ii) 3/4 of the amount, if any, by which the adjusted cost base to the taxpayer of an eligible capital expenditure of the taxpayer in respect of a business is reduced in the year because of an adjustment made under subsection (2), or

(iii) the amount, if any, by which the capital cost to the taxpayer of a depreciable property is reduced in the year because of an adjustment made under subsection (2); and

(*b*) all amounts each of which is that proportion of the total of

(i) 1/2 of the amount, if any, by which the adjusted cost base to a partnership of a capital property (other than a depreciable property) is reduced in a fiscal period that ends in the year because of an adjustment made under subsection (2),

(ii) 3/4 of the amount, if any, by which the adjusted cost base to a partnership of an eligible capital expenditure of the partnership in respect of a business is reduced in a fiscal period that ends in the year because of an adjustment made under subsection (2), and

(iii) the amount, if any, by which the capital cost to a partnership of a depreciable property is reduced in the period because of an adjustment made under subsection (2),

that

(iv) the taxpayer's share of the income or loss of the partnership for the period

is of

(v) the income or loss of the partnership for the period,

and where the income and loss of the partnership are nil for the period, the income of the partnership for the period is deemed to be $1,000,000 for the purpose of determining a taxpayer's share of the partnership's income for the purpose of this definition.

"transfer pricing capital setoff adjustment"

"transfer pricing capital setoff adjustment" of a taxpayer for a taxation year means the amount, if any, that would be the taxpayer's transfer pricing capital adjustment for the year if the references, in the definition "transfer pricing capital adjustment", to "reduced" were read as "increased".

"transfer pricing income adjustment"

"transfer pricing income adjustment" of a taxpayer for a taxation year means the total of all amounts each of which is the amount, if any, by which an adjustment made under subsection 247(2) (other than an adjustment included in determining a transfer pricing capital adjustment of the taxpayer for a taxation year) would result in an increase in the taxpayer's income for the year or a decrease in a loss of the taxpayer for the year from a source if that adjustment were the only adjustment made under subsection 247(2).

"transfer pricing income setoff adjustment"

"transfer pricing income setoff adjustment" of a taxpayer for a taxation year means the total of all amounts each of which is the amount, if any, by which an adjustment made under subsection 247(2) (other than an adjustment included in determining a transfer pricing capital setoff adjustment of the taxpayer for a taxation year) would result in a decrease in the taxpayer's income for the year or an increase in a loss of the taxpayer for the year from a source if that adjustment were the only adjustment made under subsection 247(2).

**Transfer pricing adjustment**

(2) Where a taxpayer or a partnership and a non-resident person with whom the taxpayer or the partnership, or a member of the partnership, does not deal at arm's length (or a partnership of which the non-resident person is a member) are participants in a transaction or a series of transactions and

> (*a*) the terms or conditions made or imposed, in respect of the transaction or series, between any of the participants in the transaction or series differ from those that would have been made between persons dealing at arm's length, or

> (*b*) the transaction or series

>> (i) would not have been entered into between persons dealing at arm's length, and

>> (ii) can reasonably be considered not to have been entered into primarily for *bona fide* purposes other than to obtain a tax benefit,

any amounts that, but for this section and section 245, would be determined for the purposes of this Act in respect of the taxpayer or the partnership for a taxation year or fiscal period shall be adjusted (in this section referred to as an "adjustment") to the quantum or nature of the amounts that would have been determined if,

> (*c*) where only paragraph 247(2)(*a*) applies, the terms and conditions made or imposed, in respect of the transaction or series, between the participants in the transaction or series had been those that would have been made between persons dealing at arm's length, or

> (*d*) where paragraph 247(2)(*b*) applies, the transaction or series entered into between the participants had been the transaction or series that would have been entered into between persons dealing at arm's length, under terms and conditions that would have been made between persons dealing at arm's length.

**Penalty**

(3) A taxpayer (other than a taxpayer all of whose taxable income for the year is exempt from tax under Part I) is liable to a penalty for a taxation year equal to 10% of the amount determined under paragraph 247(3)(*a*) in respect of the taxpayer for the year, where

> (*a*) the amount, if any, by which

>> (i) the total of

>>> (A) the taxpayer's transfer pricing capital adjustment for the year, and

>>> (B) the taxpayer's transfer pricing income adjustment for the year

>>> exceeds the total of

>> (ii) the total of all amounts each of which is the portion of the taxpayer's transfer pricing capital adjustment or transfer pricing income adjustment for the year that can reasonably be considered to relate to a particular transaction, where

>>> (A) the transaction is a qualifying cost contribution arrangement in which the taxpayer or a partnership of which the taxpayer is a member is a participant, or

(B) in any other case, the taxpayer or a partnership of which the taxpayer is a member made reasonable efforts to determine arm's length transfer prices or arm's length allocations in respect of the transaction, and to use those prices or allocations for the purposes of this Act, and

(iii) the total of all amounts, each of which is the portion of the taxpayer's transfer pricing capital setoff adjustment or transfer pricing income setoff adjustment for the year that can reasonably be considered to relate to a particular transaction, where

(A) the transaction is a qualifying cost contribution arrangement in which the taxpayer or a partnership of which the taxpayer is a member is a participant, or

(B) in any other case, the taxpayer or a partnership of which the taxpayer is a member made reasonable efforts to determine arm's length transfer prices or arm's length allocations in respect of the transaction, and to use those prices or allocations for the purposes of this Act,

is greater than

(*b*) the lesser of

(i) 10% of the amount that would be the taxpayer's gross revenue for the year if this Act were read without reference to subsection 247(2), subsections 69(1) and 69(1.2) and section 245, and

(ii) $5,000,000.

**Contemporaneous documentation**

(4) For the purposes of subsection 247(3) and the definition "qualifying cost contribution arrangement" in subsection 247(1), a taxpayer or a partnership is deemed not to have made reasonable efforts to determine and use arm's length transfer prices or arm's length allocations in respect of a transaction or not to have participated in a transaction that is a qualifying cost contribution arrangement, unless the taxpayer or the partnership, as the case may be,

(*a*) makes or obtains, on or before the taxpayer's or partnership's documentation-due date for the taxation year or fiscal period, as the case may be, in which the transaction is entered into, records or documents that provide a description that is complete and accurate in all material respects of

(i) the property or services to which the transaction relates,

(ii) the terms and conditions of the transaction and their relationship, if any, to the terms and conditions of each other transaction entered into between the participants in the transaction,

(iii) the identity of the participants in the transaction and their relationship to each other at the time the transaction was entered into,

(iv) the functions performed, the property used or contributed and the risks assumed, in respect of the transaction, by the participants in the transaction,

(v) the data and methods considered and the analysis performed to determine the transfer prices or the allocations of profits or losses or contributions to costs, as the case may be, in respect of the transaction, and

(vi) the assumptions, strategies and policies, if any, that influenced the determination of the transfer prices or the allocations of profits or losses or contributions to costs, as the case may be, in respect of the transaction;

(*b*) for each subsequent taxation year or fiscal period, if any, in which the transaction continues, makes or obtains, on or before the taxpayer's or partnership's documentation-due date for that year or period, as the case may be, records or documents that completely and accurately describe each material change in the year or period to the matters referred to in any of subparagraphs 247(4)(*a*)(i) to 247(4)(*a*)(vi) in respect of the transaction; and

(*c*) provides the records or documents described in paragraphs 247(4)(*a*) and 247(4)(*b*) to the Minister within 3 months after service, made personally or by registered or certified mail, of a written request therefor.

**Partner's gross revenue**

(5) For the purpose of subparagraph 247(3)(*b*)(i), where a taxpayer is a member of a partnership in a taxation year, the taxpayer's gross revenue for the year as a member of the partnership from any activities carried on by means of the partnership is deemed to be that proportion of the amount that would be the partnership's gross revenue from the activities if it were a taxpayer (to the extent that amount does not include amounts received or receivable from other partnerships of which the taxpayer is a member in the year), for a fiscal period of the partnership that ends in the year, that

(*a*) the taxpayer's share of the income or loss of the partnership from its activities for the period

is of

(*b*) the income or loss of the partnership from its activities for the period,

and where the income and loss of the partnership from its activities are nil for the period, the income of the partnership from its activities for the period is deemed to be $1,000,000 for the purpose of determining a taxpayer's share of the partnership's income from its activities for the purpose of this subsection.

**Deemed member of partnership**

(6) For the purposes of this section, where a person is a member of a partnership that is a member of another partnership,

(*a*) the person is deemed to be a member of the other partnership; and

(*b*) the person's share of the income or loss of the other partnership is deemed to be equal to the amount of that income or loss to which the person is directly or indirectly entitled.

**Exclusion for loans to certain controlled foreign affiliates**

(7) Where, in a taxation year of a corporation resident in Canada, a non-resident person owes an amount to the corporation, the non-resident person is a controlled foreign affiliate of the corporation for the purpose of section 17 throughout the period in the year during which the amount is owing and it is established that the amount owing is an amount owing described in paragraph 17(8)(*a*) or (*b*), subsection (2) does not apply to adjust the amount of interest paid, payable or accruing in the year on the amount owing.

## Exclusion — certain guarantees

(7.1) Subsection (2) does not apply to adjust an amount of consideration paid, payable or accruing to a corporation resident in Canada (in this subsection referred to as the "parent") in a taxation year of the parent for the provision of a guarantee to a person or partnership (in this subsection referred to as the "lender") for the repayment, in whole or in part, of a particular amount owing to the lender by a non-resident person, if

> (*a*) the non-resident person is a controlled foreign affiliate of the parent for the purposes of section 17 throughout the period in the year during which the particular amount is owing; and

> (*b*) it is established that the particular amount would be an amount owing described in paragraph 17(8)(*a*) or (*b*) if it were owed to the parent.

## Provisions not applicable

(8) Where subsection 247(2) would, if this Act were read without reference to sections 67 and 68 and subsections 69(1) and 69(1.2), apply to adjust an amount under this Act, sections 67 and 68 and subsections 69(1) and 69(1.2) shall not apply to determine the amount if subsection 247(2) is applied to adjust the amount.

## Anti-avoidance

(9) For the purposes of determining a taxpayer's gross revenue under subparagraph 247(3)(*b*)(i) and subsection 247(5), a transaction or series of transactions is deemed not to have occurred, if one of the purposes of the transaction or series was to increase the taxpayer's gross revenue for the purpose of subsection 247(3).

## No adjustment unless appropriate

(10) An adjustment (other than an adjustment that results in or increases a transfer pricing capital adjustment or a transfer pricing income adjustment of a taxpayer for a taxation year) shall not be made under subsection 247(2) unless, in the opinion of the Minister, the circumstances are such that it would be appropriate that the adjustment be made.

## Provisions applicable to Part

(11) Sections 152, 158, 159, 162 to 167 and Division J of Part I apply to this Part, with such modifications as the circumstances require.

**Deemed dividends to non-residents**

(12) For the purposes of Part XIII, if a particular corporation that is a resident of Canada for the purposes of Part XIII would have a transfer pricing capital adjustment or a transfer pricing income adjustment for a taxation year, if the particular corporation, or a partnership of which the particular corporation is a member, had undertaken no transactions or series of transactions other than those in which a particular non-resident person, or a partnership of which the particular non-resident person is a member, that does not deal at arm's length with the particular corporation (other than a corporation that was for the purposes of section 17 a controlled foreign affiliate of the particular corporation throughout the period during which the transaction or series of transactions occurred) was a participant,

(*a*) a dividend is deemed to have been paid by the particular corporation and received by the particular non-resident person immediately before the end of the taxation year; and

(*b*) the amount of the dividend is the amount, if any, by which

(i) the amount that would be the portion of the total of the particular corporation's transfer pricing capital adjustment and transfer pricing income adjustment for the taxation year that could reasonably be considered to relate to the particular non-resident person if

(A) the only transactions or series of transactions undertaken by the particular corporation were those in which the particular non-resident person was a participant, and

(B) the definition "transfer pricing capital adjustment" in subsection (1) were read without reference to the references therein to "1/2 of" and "3/4 of"

exceeds

(ii) the amount that would be the portion of the total of the particular corporation's transfer pricing capital setoff adjustment, and transfer pricing income setoff adjustment, for the taxation year that could reasonably be considered to relate to the particular non-resident person if

(A) the only transactions or series of transactions undertaken by the particular corporation were those in which the particular non-resident person was a participant, and

(B) the definition "transfer pricing capital adjustment" in subsection (1) were read without reference to the references therein to "1/2 of" and "3/4 of".

**Repatriation**

(13) If a dividend is deemed by subsection (12) to have been paid by a corporation and received by a non-resident person, and a particular amount has been paid with the concurrence of the Minister by the non-resident person to the corporation,

(*a*) the amount of the dividend may be reduced by the amount (in this subsection referred to as the "reduction") that the Minister considers appropriate, having regard to all the circumstances, and

(*b*) subsections 227(8.1) and (8.3) apply as if

(i) the amount of the dividend were not reduced, and

(ii) on the day on which the particular amount was paid, the corporation paid to the Receiver General an amount equal to the amount that would be required to be withheld and remitted under Part XIII in respect of the reduction.

## Repatriation — interest

(14) If the amount of a dividend is reduced under paragraph (13)(*a*), the amount of interest payable by a taxpayer because of paragraph (13)(*b*) may be reduced to the amount that the Minister considers appropriate, having regard to all the circumstances, including the provision of reciprocal treatment by the country in which the non-resident person referred to in subsection (13) is resident.

## Non-application of provisions

(15) Section 15, subsections 56(2) and 212.3(2) and section 246 do not apply in respect of an amount to the extent that a dividend is deemed by subsection (12) (determined without reference to subsection (13)) to have been paid in respect of the amount.