**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and -

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**BOOK OF AUTHORITIES OF THE**
**JOINT ADMINISTRATORS' POST-HEARING REPLY SUBMISSION REGARDING**
**ALLOCATION OF THE PROCEEDS OF THE NORTEL ASSET SALES**

- 2 -

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)

Tel.:   302-571-6600
Fax:   302-571-1253


LAX O'SULLIVAN SCOTT LISUS LLP

Suite 2750
145 King Street West
Toronto, ON M5H 1J8
Matthew P. Gottlieb (LSUC#: 32268B)
mgottlieb@counsel-toronto.com
Tel.:   416-598-1744
Fax:   416-598-3730

HUGHES HUBBARD & REED LLP

One Battery Park Plaza
New York, New York 10004

William R. Maguire (admitted *pro hac vice*)
Derek J.T. Adler (admitted *pro hac vice*)
Neil J. Oxford (admitted *pro hac vice*)

Tel.:   212-837-6000
Fax:   212-422-4726


DAVIES WARD PHILLIPS & VINEBERG LLP

155 Wellington Street West
Toronto, Ontario M5V 3J7
James W.E. Doris (LSUC#:  33236P)
jdoris@dwpv.com
Matthew Milne-Smith (LSUC#: 44266P)
mmilne-smith@dwpv.com
Tel.:   416-863-0900
Fax:   416-863-0871


*Counsel for the Joint Administrators*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and -

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

# I N D E X

**TAB**    **DOCUMENT**

**Canadian Cases**

1.    *Atco Electric Ltd. v. Alberta (Energy & Utilities Board)*, 2004 ABCA 215

2.    *Bledin v. Landsburg*, 2013 N.S.J. No. 688 (S.C)

| **TAB** | **DOCUMENT** |
|---------|-------------|
| 3. | *Bramalea Ltd. v. Vancouver School Board No. 39*, [1992] B.C.J. No. 811 (C.A.) |
| 4. | *Campeau v. Desjardins Financial Security Life Assurance Co.*, 2005 MBCA 148 |
| 5. | *Canadian Faces Inc. v. Cosmetic Manufacturing Inc.*, 2011 ONSC 6171 |
| 6. | *Corporate Properties Ltd. v. Manufacturers Life Insurance Co.*, [1989] O.J. No. 2278 (C.A.) |
| 7. | *Csak v. Aumon*, [1990] O.J. No. 534 (H.C.J.) |
| 8. | *Denison Mines Ltd. v. Ontario Hydro* (2002), 58 O.R. (3d) 26 (C.A.) |
| 9. | *Di Michele v. Di Michele*, 2014 ONCA 261 |
| 10. | *Dynamic Fuel Systems Inc. v. Synergic Distribution Inc.*, 2013 ONSC 4081 (Div. Ct.) |
| 11. | *Fillion v. Fillion*, [2011] B.C.J. No. 2230 |
| 12. | *First Place, Hamilton v. Hamilton (City)* (1979), 12 R.P.R. 121 |
| 13. | *Long v. Delta Catalytic Industrial Services Inc.*, [1998] A.J. No 131 (Q.B.) |
| 14. | *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415 |
| 15. | *Mitchell v. Minister of National Revenue*, 2001 S.C.C. 33 |
| 16. | *Mount Royal/Walsh Inc. v. Jensen Star*, [1989] F.C.J. No. 450 (C.A.) |
| 17. | *National Bank of Greece (Canada) v. Katsikonouris*, [1990] 2 S.C.R. 1029 |
| 18. | *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) |
| 19. | *Paxton v. Canada*, [1996] F.C.J. No. 1634 (C.A.) |
| 20. | *R. v. Roy*, 2012 SCC 26 |
| 21. | *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 |
| 22. | *Shelanu v. Print Three Franchising Corp.*, [2003] O.J. No. 1919 (C.A.) |
| 23. | *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, [2014] O.J. No. 1815 (S.C.J. (Commercial List)) |
| 24. | *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Commercial List) |
| 25. | *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, [1998] O.J. No. 2637, |

**TAB**       **DOCUMENT**

*aff'd* [1999] O.J. No. 3290 (C.A.), *leave to appeal refused* 139 O.A.C. 399 (note) (S.C.C.)

**Canadian Secondary Sources**

26.       Donovan Waters, *Waters' Law of Trusts in Canada*, 4th ed. (US: Thomson Reuters, 2012)

**U.S. Cases**

27.       *Caracci v. Comm'r of Internal Revenue*, 456 F.3d 444, 462 (5th Cir. 2006)

28.       *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996)

29.       *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575 (3d Cir. 2010)

30.       *PNC Bank, N.A. v. Varsity Sodding Serv. (In re Varsity Sodding Serv.)*, 139 F.3d 154 (3d Cir. 1998)

31.       *Upper Freehold Reg'l Bd. of Educ. v. T. W.*, 496 F. App'x 238 (3d Cir. 2012)

**U.K. Cases**

32.       *Beaufort Developments (N.I.) Ltd. v. Gilbert-Ash N.I. Ltd.*, [1999] 1 A.C. 226 (H.L.)

*Case Name:*

# ATCO Electric Ltd. v. Alberta (Energy and Utilities Board)

**Between**
**ATCO Electric Limited, appellant, and**
**Alberta Energy and Utilities Board, respondent**

[2004] A.J. No. 823

2004 ABCA 215

[2004] 11 W.W.R. 220

31 Alta. L.R. (4th) 16

361 A.R. 1

18 Admin. L.R. (4th) 243

132 A.C.W.S. (3d) 803

Docket Nos.: CA01-00476; 0201-0013-AC; 0201-0023-AC

Alberta Court of Appeal
Calgary, Alberta

**Fraser C.J.A. and McFadyen and Picard JJ.A.**

Heard: January 15, 2004.
Judgment: filed July 13, 2004.

(192 paras.)

On appeal from Decisions 2001-83, 2001-92 and 2001-93 of the Alberta Energy and Utilities Board

**Counsel:**

H.M. Kay, Q.C. and L.G. Keough for the Appellant

J.R. McKee and A.E. Domes for the Respondent

---

REASONS FOR JUDGMENT

Reasons for judgment were delivered by Fraser C.J.A. Concurred in by McFadyen J.A.. Concurred in by Picard J.A.

TABLE OF CONTENTS

Paragraph No.

I.

   INTRODUCTION                                              [1]


   II.      BACKGROUND INFORMATION


   A.      The Move to Deregulation of the
           Electric Energy Industry                         [11]
   B.      Key Elements of the Restructured
           Industry Model                                   [14]
   C.      Refining the Electric Energy Industry
           Model


1.               Power Purchase Arrangements                [16]
2.               Balancing Pool                             [19]
3.               Deregulating Retailing                     [20]
4.               Legislated Hedges                          [22]


   D.      Board Authority under the Restructured
           Model                                            [23]

III.    FACTS AND BOARD DECISIONS

A.    Rationale for Using Deferral Accounts          [25]
B.    Government Actions in 2000 Restricting
       Collection of Pool Price



       Deferral Accounts                              [32]


C.    ATCO's Deferral Accounts under the
       1999/2000 Settlement                           [34]
D.    Board Decisions under Appeal                    [36]


1.              Decision 2001-83                       [37]
2.              Decision 2001-92                       [39]
3.              Decision 2001-93                       [43]



E.    Aspects of Decisions Appealed by ATCO          [45]


IV.
       ISSUES                                          [48]

V.    STANDARD OF REVIEW                               [49]


       A.    ATCO's Claim for 2000 Carrying Costs on the Deferral Accounts


1.              Privative Clause or Statutory Right
                of Appeal                              [52]
2.              Expertise of the Tribunal              [53]
3.              Purpose of the Legislation             [56]
4.              The Nature of the Question             [57]

B.      Board's Method of Calculating 2001
        Carrying Costs and 2002 Carrying Costs          [60]


VI.     ATCO'S CLAIM FOR 2000 CARRYING COSTS ON DEFERRAL
        ACCOUNTS


A.      Board Decision and ATCO's Response              [65]
B.      Deferral Accounts Regulation: Why It Does
        Not Help ATCO                                   [67]
C.      Contractual Claim: Interpretation of
        the Negotiated Settlements                      [75]


1.              Principles of Contractual
                Interpretation                          [76]
2.              Does the 1999/2000 Settlement
                Provide for 2000 Carrying Costs?        [78]


        a.      Treatment of ATCO's Distribution Deferral Accounts:


                NPPDAs and PPDAs                        [79]


        b.      Clause 39: What Does it Mean?           [86]
        c.      Clause 1: Entire Contract Clause
                Except for Explicitly Exempted
                Issues                                  [96]


        d.      What Did ATCO Identify as
                Unresolved Issues?                      [104]
        e.      Clause 3: Package Deal                  [108]


3.              Does the 2001/2002 TFO Settlement
                Provide for 2000 Carrying Costs?        [111]

4.                    Conclusions                          [117]


     D.     ATCO's Discrimination Claim              [118]
     E.     Effect of Interim Board Decision on
            ATCO's Claim to 2000 Carrying Costs       [122]


     VII.   BOARD'S ROLE VIS À VIS NEGOTIATED SETTLEMENTS


     A.     ATCO's Position                          [123]
     B.     Board's Jurisdiction to Approve
            Negotiated Settlements and Set Rates      [125]


1.                    Statutory Interpretation            [127]
2.                    Statutory Provisions Affecting
                      "Just and Reasonable" Rates        [128]
3.                    Board's Duty to Act in the Public
                      Interest
                                                          [132]
4.                    What is Meant by the "Public
                      Interest"?                          [134]
5.                    Redefining the Public Interest
                      in the Context of Negotiated
                      Settlements


            a.     Board's Discretion Cannot be
                   Fettered by Negotiated Settlement      [137]
            b.     Taking into Account the Public
                   Interest                               [140]
            c.     Why Restructuring Calls for a
                   Redefinition of the Public
                   Interest                               [144]


     C.     Board Variance of a Negotiated Settlement    [162]
     D.     Conclusion                               [164]

VIII.  BOARD METHODOLOGY IN CALCULATING COSTS OF FINANCING

A.    Standard of Review                                          [165]
B.    Sources of Board's Jurisdiction to
      Determine Methodology                                       [166]
C.    Board's Reasons                                             [171]

1.            Board's Reliance on Stand-Alone
              Principle                                           [175]
2.            Capital Structure - 85%/15%
              Debt/Equity Ratio                                   [182]
3.            Risk and ATCO's Deferral Accounts                   [186]
4.            Further Reasons in Support of the
              Reasonableness of Board's Conclusions               [187]

D.    Summary                          [190]

IX.
      CONCLUSION                        [191]

APPENDIX A

Reasons for Judgment

FRASER C.J.A.:--

## I. INTRODUCTION

**1**    In 1995, the Alberta government decided to deregulate, or more precisely, restructure certain aspects of the electrical industry in this province.[1] As a result, it passed new legislation paving the way for deregulation: Electric Utilities Act, S.A. 1995, c. E-5.5 (the 1995 Act). The restructuring model selected in aid of this objective was subsequently refined through legislative amendments made in 1998 and 2003: Electric Utilities Amendment Act, S.A. 1998, c. 13; and Electric Utilities Act, S.A. 2003, c. E-5.1. For purposes of this appeal, the 1998 version of the Act is the most relevant and I refer to it as the 1998 Act and the 2003 version as the EU Act. To shift from

regulated public utilities exercising significant market power to a more competitive market structure, the Legislature restructured the electrical industry along functional lines - generation, transmission, distribution and retail. Generation and retail functions were to be deregulated, and largely have been; transmission and distribution were to remain regulated by the Alberta Energy and Utilities Board, but under a revised legislative regime.[2]

**2**    A key element present from the start - allowing a utility to negotiate an agreement, that is a negotiated settlement, with its customers and other interested parties to resolve issues prescribed by the relevant legislation rather than going through the traditional hearing process - is a central issue in this appeal. The roots of negotiated settlements lie in one of the stated purposes of the 1995 Act, to minimize regulatory costs in the electric industry: s. 6(e).[3] To assist in realizing this objective, the Legislature, for the first time, provided for the possibility of a utility's entering into a negotiated settlement rather than proceeding to full regulatory hearings before the Board: ss. 64 - 66.

**3**    Although the negotiated settlement process constitutes an alternative to the traditional regulatory process before the Board, that does not mean that the Board does not play a critical supervisory and regulatory role in the process and in the settlements themselves. To the contrary. The Board's role is pivotal to the negotiated settlement process - and intended to be so. The Board is authorized to issue rules that encourage and facilitate negotiated settlements.[4] That it has done: Negotiated Settlement Guidelines, 15 May 1998 as amended February 4, 2003. I refer to the 1998 Guidelines, the ones engaged in this appeal, as the Original Guidelines, and to the 2003 version as the Guidelines.[5]

**4**    Most important, however, no negotiated settlement is effective unless and until it is approved by the Board: s. 67(1) of the 1998 Act and s. 134(1) of the EU Act; and s. 12 of both the Original Guidelines and Guidelines. In determining whether to approve a negotiated settlement, the Board must be satisfied that it is not contrary to the public interest. Accordingly, the negotiated settlement process permits private sector settlement of disputes by regulated utilities, but subject to compliance with the public interest.

**5**    This appeal involves two negotiated settlements entered into by ATCO Electric Ltd. establishing utility rates payable to it for electricity services provided for the years 1999/2000 and 2001/2002.[6] The first arises out of ATCO's application to the Board for approval of proposed power rates for the years 1999 and 2000: ATCO Phase I General Tariff Application No. 980545 (Phase I Application). Thereafter, ATCO and Intervenors to the Phase I proceedings concluded the 1999/2000 Tariff Application Phase I Negotiated Settlement (1999/2000 Settlement).[7] ATCO sought and received Board approval for this Settlement: Decision U99046.

**6**    The following year, ATCO and certain Intervenors concluded the 2001/2002 Transmission Facility Owner Negotiated Settlement (2001/2002 TFO Settlement) after ATCO had filed with the Board its Phase 1 and 2 Transmission Facility Owner General Tariff Application with respect to the years 2001 and 2002: Application No. 2000132 (TFO Application).[8] The 2001/2002 TFO

Settlement was also approved by the Board: Decision 2000-65. I sometimes refer to both the 1999/2000 Settlement and the 2001/2002 TFO Settlement as the Negotiated Settlements.

**7**    ATCO appeals three Board Decisions relating to the Negotiated Settlements.[9] Given its interpretation of the Negotiated Settlements, the Board denied ATCO any carrying costs for the year 2000 on certain deferral accounts and awarded ATCO a smaller total of carrying costs for 2001 and 2002 than ATCO had claimed.[10] The issues in dispute involve two quite different aspects of these Negotiated Settlements. First, did the Board err in its interpretation of the Negotiated Settlements? Second, what is the duty of the Board in determining whether to approve a negotiated settlement? There are two stages at which this latter issue could theoretically arise: (1) at the time an application is made for Board approval of a negotiated settlement; and (2) during the implementation phase of the negotiated settlement, following Board approval.

**8**    Viewed from this perspective, the questions posed on this appeal include the following. Does the Board have the jurisdiction to approve a negotiated settlement even though it does not provide the utility with fair and reasonable compensation for all its costs? In ATCO's view, the answer is no. Further, should a negotiated settlement be varied or set aside by the Board following Board approval to allow for recovery of carrying costs on deficits a utility will eventually recover from customers? Again, ATCO's position is clear. The answer is yes. On this basis, therefore, ATCO contends that the Board lacked the jurisdiction to approve the Negotiated Settlements or alternatively, must now vary those Negotiated Settlements to allow ATCO to recover the carrying costs claimed by it. ATCO raised neither of these arguments before the Board.

**9**    I have concluded that when the Board is presented with a "package deal" negotiated settlement agreed to by a utility, the Board is under no obligation to consider the utility's economic interests in assessing whether that negotiated settlement is in the public interest. The Board may instead take it as a given that the negotiated settlement is in the best interests of the utility. In other words, the Board's duty to consider the public interest does not extend to saving a utility from itself. I discuss this further below (Part VII). I have also determined that the Board did not err in approving the Negotiated Settlements nor in declining to vary them as ATCO now demands. Nor did the Board err in the way in which it treated ATCO's claim to carrying costs on certain deferral accounts for 2000, 2001 and 2002. Thus, for the reasons that follow, ATCO's appeal must be dismissed.

**10**    I first propose to review certain background information to place the restructuring of the electric energy industry in Alberta - and the relevant legislative changes - in their proper historical context (Part II below). It must be emphasized that in doing so, it is not my intention to comment on the competing merits of the electrical deregulation debate. That is for others to assess in the fullness of time. My review is undertaken to determine the Legislature's intention with respect to the operation and effect of negotiated settlements and the scope of the Board's regulatory role relating thereto. In addition, this review assists in understanding the rationale for the use of deferral accounts in the electric energy industry. Next, I turn to the relevant facts and the Board Decisions dealing with the Negotiated Settlements (Part III). I then summarize the specific issues in dispute on which

leave has been granted (Part IV). Thereafter, I consider the standard of review applicable to each issue (Part V). Finally, I analyze each issue in turn (Parts VI, VII and VIII) before summarizing my conclusions (Part IX). For ease of reference, all defined terms I refer to in this judgment are also contained in Appendix A attached.

## II. BACKGROUND INFORMATION

### A.   The Move to Deregulation of the Electric Energy Industry

**11**   By the 1980's, disparities in the cost of electricity had arisen between customers in southern and northern Alberta. To eliminate this imbalance, the Alberta government passed legislation pooling and averaging generation and transmission costs of electrical power province-wide: Electrical Energy Marketing Act, S.A. 1981, c. E-4.1. By the early 1990's, deregulation proponents claimed that allowing generating costs to be averaged province-wide punished efficient generators of electrical power and rewarded the inefficient. Or as some deregulation proponents contended, the rate equalization process had led to subsidization of expensive electrical generating plants.

**12**   In 1995, when the Alberta government decided to proceed with deregulation of the electrical industry,[11] two large investor-owned utility companies and one large municipally-owned one continued to dominate the electrical system.[12] Each company operated in a certain geographic area and each was vertically integrated, meaning that it was responsible for all aspects of the provision of electrical power, from generation to distribution. Changing this market structure - by opening it to competition - was seen as essential to successful deregulation.

**13**   For this reason, one of the key purposes of the 1995 Act was to provide a framework for a competitive power pool so that an efficient market for electricity based on fair and open competition could develop in Alberta: s. 6(b). To enhance the likelihood of increased competition, the goal was to separate, that is unbundle, electricity services along functional lines - generation, transmission and distribution - and to treat each separately for accounting, regulatory and operational purposes. Hence the Legislature's adoption of a new industry model designed to eliminate monopolistic power, promote market entry, and foster and strengthen competition.

### B.   Key Elements of the Restructured Industry Model

**14**   The 1995 Act, which came into effect on January 1, 1996, included the following key elements, most of which were intended to assist in promoting one of the central purposes of deregulation of the electric energy industry - strengthened competition:

- Create a separate corporate entity, the Power Pool Council, to set the rules for a centralized, open and independent power pool, the Power Pool of Alberta, where utilities and others could buy and sell electricity;
- Provide for a power pool administrator to administer the financial transactions arising out of the exchange of power through the Power Pool

of Alberta;

- Provide for the price of power bought and sold in the Power Pool of Alberta to be determined by market forces;[13]
- Deregulate the generation of new power;
- Allow for negotiated settlements;
- Retain regulatory control over transmission and distribution service costs to avoid unnecessary duplication caused by competing sets of electrical wires across Alberta;
- Provide for an independent Transmission Administrator[14] to act as a single transmission service agent for all transmission wire owners[15] and to ensure open access to the interconnected transmission grid by both sellers and buyers.[16]

**15**    As a result, since January 1, 1996, all electricity entering or leaving Alberta's interconnected electric system has been required to be bought and sold through the Power Pool of Alberta.[17]

C.    Refining the Electric Energy Industry Model

1.    Power Purchase Arrangements

**16**    Further refinements to the restructured industry model were made in the 1998 Act. Perhaps the most significant was the introduction of Power Purchase Arrangements (PPAs) designed to overcome continuing concerns about concentration of market power in Alberta in too few hands. One option then available to government was to break up the generation companies with concentrated market power through forced divestiture of assets.[18] The government did not choose this option. Instead, it decided to try to create competition by requiring Alberta power producers to sell the output of their regulated generating units under PPAs.

**17**    PPAs are long-term contracts, for a maximum of 20 years, entitling the party holding the contract rights to the electrical output of a power generating unit. The plan was to sell the PPAs by auction: s. 45.93 of the 1998 Act. All PPAs required Board approval and the Board could, in certain circumstances, vary the terms of the PPAs: s. 45.91 of the 1998 Act.[19] The auction rules under which the PPAs were to be sold were codified in the Power Purchase Arrangement Auction Regulation, Alta. Reg. 85/2000. These Auction Rules set limits respecting the maximum generating capacity a party could ultimately control through winning bids. The purpose of this limitation - to minimize the risk that one or more buyers might control a disproportionate market share and thereby defeat the objective of increased competition.

**18**    The theory was that by compelling this generation capacity of the Alberta power producers to be disposed of under PPAs, it would increase the number of parties selling electricity which would, in turn, increase competition and result in lower prices for electricity.[20] As a consequence of this new legislative regime, PPAs cover the electrical output of most regulated plants (those in existence

prior to the 1995 Act) from January 1, 2001 until December 31, 2020.[21] PPA buyers have the right to sell that output directly to consumers or through the Power Pool of Alberta. Viewed in this light, PPAs represent an example of the government's attempts, on restructuring, to increase competition and promote a more balanced relationship, in terms of bargaining power, between utilities and their customers.

2.    Balancing Pool

**19**    The 1998 Act provided for the creation of another important body involved in the electricity market and PPAs called the Balancing Pool: s. 45.97(r) of the 1998 Act and the Balancing Pool Regulation, Alta. Reg. 169/99. The purpose of the Balancing Pool is to manage the financial accounts relating to the auction of PPAs and to meet obligations and responsibilities under unsold PPAs as the "default" purchaser: s. 8 of the Power Purchase Arrangements Regulation, Alta. Reg. 170/99.[22] Proceeds realized on the sale of PPAs were first used to cover the obligations to owners of regulated generating units. Any excess value went into the Balancing Pool on behalf of customers. Any negative value (where the highest bid did not cover the costs of generating the electricity) was paid out of the Balancing Pool. The Balancing Pool is required to be wound up by June 2021.[23] In the intervening years, all excesses and shortfalls from the Balancing Pool - together with whatever risks this entails - are allocated to consumers.

3.    Deregulating Retailing

**20**    The 1998 Act also provided for the retailing function to be deregulated as of January 1, 2001. At this time, licensed retailers were permitted to market and supply services to customers, the intention being that customers would have a choice of retailers and a choice of supply contracts to meet their needs: s. 31.992 of the 1998 Act. Deregulation of this retailing function was intended to be another building block in promoting competition and choice for consumers.

**21**    To ease the transition while customers became familiar with available options, distribution companies were required to offer customers a default option or "regulated rate option" (RRO) to be approved by the Board. The Board held hearings in 2000 to determine the RRO tariff. By then, a number of factors had caused energy prices to increase dramatically. As a result, the government stepped in and required utilities to offer their residential, farm, irrigation and small business customers the option to continue to purchase power at a capped RRO tariff. That tariff was initially set at 8 cents per kilowatt hour in late 2000 and later raised to 11 cents per kilowatt hour.[24] Since then, government has not played a direct role in setting RRO tariffs and RROs are scheduled to expire June 30, 2006.

4.    Legislated Hedges

**22**    Finally, it should be noted that while the cost of electricity was in theory to be determined by the market as of January 1, 1996, legislated hedges were put in place between distributors, on behalf of customers, and the owners of previously regulated generation facilities.[25] The intent of these

hedges was to partially protect consumers from the anticipated volatility of pool prices. These were kept in place until the price of electrical power was fully deregulated January 1, 2001.

    D.    Board Authority under the Restructured Model

**23**    Today, therefore, while the Board no longer regulates the prices paid to generators of electrical power in Alberta, it retains the exclusive jurisdiction to review and approve rates charged by electric utilities[26] for the transmission and distribution of electricity in this province.[27] These rates may be determined by the Board either upon application by a utility and after a hearing, or following a negotiated settlement concluded in compliance with the negotiated settlement process and Guidelines.[28]

**24**    For purposes of this appeal, the most important point to understand is the critical role that competition is designed to play in the restructured electrical industry in Alberta. Competition is the touchstone running through all aspects of the legislative scheme governing the electrical industry now in effect in Alberta. Accordingly, in interpreting relevant legislation - and that most certainly includes the Board's role and responsibilities in respect of negotiated settlements - this core objective must necessarily inform and guide that analysis.

## III. FACTS AND BOARD DECISIONS

    A.    Rationale for Using Deferral Accounts

**25**    To put the dispute about ATCO's deferral accounts under the Negotiated Settlements in perspective, I must first review the rationale for the use of deferral accounts in the rate-setting process.

**26**    By the end of 1999, the forecasting of electrical energy costs had become an extremely difficult exercise. This led to concerns about how to address the risks associated with potentially volatile changes in the market price of electricity and other variable costs. One option devised to allocate the risks inherent in fluctuating costs was the use of deferral accounts. Deferral accounts allow a utility to accumulate variances between a utility's approved rate based on forecasted costs and the utility's actual costs for a given period. Typically, at the end of the period, a utility will then collect from customers through a rate rider any balances in the deferral accounts owing by them and refund any balances owing to them.

**27**    When the Board approved the 1999/2000 Settlement, it implicitly approved ATCO's use of deferral accounts for a wide variety of expenses. However, the rationale for the Board's approving the use of deferral accounts can best be seen in a decision in which ATCO intervened in 1999: Decision U99099.

**28**    In that case, the Board was called on to consider the appropriateness of using deferral accounts to balance the legitimate concerns of both consumers and distribution utilities given the volatile

electric energy market. ATCO and other Intervenors made representations to the Board supporting the use of deferral accounts. The argument was that this option was preferable to one in which utilities would use conservative forecasting costs or high returns on capital to cover off the higher risks associated with market volatility and then immediately pass these costs onto consumers in the form of higher rates. Other Intervenors disagreed. They opposed the use of deferral accounts on the grounds that if a utility could simply flow all costs through to customers, it would have no incentive to manage risks effectively.

**29**　The Board concluded it would be difficult to accurately forecast electricity pool prices in 1999 and 2000 because of a number of factors: limited supply of electricity, increased demand, rising natural gas prices, and the potential for generating companies to use their market power to affect pool prices.[29] Given the limited options available, the Board approved the use of deferral accounts.

**30**　In effect, the reasoning accepted by the Board was that it would be less costly to consumers to run the risk of higher prices tomorrow - a possibility only - as opposed to paying higher prices today - a certainty - were utilities required to assume the risks of rising electricity charges. Accordingly, under the deferral accounts approach, as Albertans began to experience the first effects of deregulation, the risk of higher prices for electricity than those forecast by utilities was borne by consumers.

**31**　Of significance to this appeal is the fact that ATCO agreed to the use of deferral accounts in the 1999/2000 Settlement. In fact, ATCO, as one of the parties to the 1999/2000 Settlement, expressly agreed that it was "fair and appropriate" that ATCO establish certain deferral accounts and that those accounts were "a key component of this Negotiated Settlement": s. 16. ATCO later reconfirmed its support for the use of deferral accounts when it intervened in Decision U99099. And later yet, ATCO again agreed to the use of deferral accounts in the 2001/2002 TFO Settlement. In these circumstances, therefore, it would not be accurate to characterize the use of deferral accounts in the Negotiated Settlements as something that was "imposed" on ATCO.

　　B.　Government Actions in 2000 Restricting Collection of Pool Price Deferral Accounts

**32**　Substantial increases in electrical costs in 2000 led to relatively significant deficiencies in the deferral accounts of many utilities. Ordinarily, a utility would have been able to recover deficiencies in its deferral accounts under a rate rider in 2001. However, in late 2000, with additional increases in electrical costs projected for 2001, the government decided to prohibit utilities engaged in the distribution of electricity from collecting - for one (1) year - pool price deferral account balances accumulated during 2000.

**33**　As a result, it passed the Deferral Accounts Deficiency Correction Regulation, Alta. Reg. 240/2000, filed November 28, 2000, as amended by Alta. Reg. 6/2001, filed January 17, 2001 ("Deferral Accounts Regulation" or "Regulation").[30] This meant that deficiency balances in a utility's 2000 distribution pool price deferral accounts could not be recovered in 2001. However, the Deferral Accounts Regulation did provide for a utility to recoup those balances over no more than a

three year period beginning January 1, 2002 along with its costs of financing those balances, both as approved by the applicable regulatory authority. In ATCO's case, that was the Board.

### C.    ATCO's Deferral Accounts under the 1999/2000 Settlement

**34**    Under the 1999/2000 Settlement, ATCO agreed to maintain certain distribution deferral accounts in two different categories: (1) non-pool price deferral accounts; and (2) pool price deferral accounts. As events unfolded, the actual cost of electricity in 2000 was higher than ATCO had forecast for that year. This, along with other increased costs, led to deficiencies in ATCO's distribution deferral accounts, both non-pool price and pool price, for the year 2000. I refer to ATCO's distribution non-pool price deferral accounts for 2000 as the "NPPDAs" and its distribution pool price deferral accounts for 2000 as the "PPDAs". I refer to the two collectively as the "Deferral Accounts".

**35**    ATCO and the other parties to the 1999/2000 Settlement were unable to agree on the balances in ATCO's Deferral Accounts. In 2001, in accordance with the procedure prescribed in Clause 43(a) of the 1999/2000 Settlement to resolve disagreements on this issue, ATCO applied to the Board for approval of its calculations of the balances in the Deferral Accounts. It also applied for carrying costs on those Accounts for the year 2000 and following, until the Accounts were collected in full. The rationale for this claim was that it should receive compensation for carrying costs pending Board approval of the balances in the Deferral Accounts and ATCO's subsequent recovery of the approved sums from ATCO's customers. I refer to the carrying costs which ATCO claims for the year 2000 on the Deferral Accounts as "2000 Carrying Costs", the carrying costs it claims for 2001 on the Deferral Accounts as the "2001 Carrying Costs" and those for 2002 as the "2002 Carrying Costs".

### D.    Board Decisions under Appeal

**36**    In three separate rulings, Decisions 2001-83, 2001-92 and 2001-93 (collectively, the "Decisions"), the Board dealt with all of ATCO's claims. Its essential conclusions, now appealed by ATCO, were these: ATCO was not entitled to recover 2000 Carrying Costs on the Deferral Accounts nor was ATCO entitled to the full amount of the 2001 Carrying Costs and 2002 Carrying Costs ATCO sought on the Deferral Accounts.

#### 1.    Decision 2001-83

**37**    This Decision dealt with the NPPDAs established by Clause 32, Transmission Access Payment[31], Clause 33, Reservation Payments[32], and Clause 36, Property Taxes[33], of the 1999/2000 Settlement. The Board approved all the balances claimed by ATCO in its NPPDAs.[34] However, the Board denied ATCO any of the approximately $1.5 million in 2000 Carrying Costs claimed on the NPPDAs. ATCO appeals this aspect of the Decision.

**38**    Although the Board awarded ATCO 2001 Carrying Costs and 2002 Carrying Costs on the

NPPDAs, it deferred the calculation of these Costs to Decision 2001-92 in which the Board was scheduled to deal with ATCO's claims regarding the PPDAs. It did however confirm that the 2001 carrying cost rate on the NPPDAs would be the same rate as that determined by the Board to be applicable to the PPDAs.[35]

### 2.    Decision 2001-92

**39**    In this Decision, the Board was called on to determine the appropriate methodology to be used in calculating carrying costs for a number of utilities under the Deferral Accounts Regulation. That included, in ATCO's case, calculating carrying cost rates for 2001 and the first quarter of 2002 on both the PPDAs and the NPPDAs. The Board's task: to assess the "prudent" cost of financing ATCO's Deferral Accounts.

**40**    After considering a number of alternatives, the Board ruled that the cost of financing was to be based on the weighted average cost of capital (WACC) for a "stand-alone" deferral account business unit operated under the umbrella of an integrated utility.[36] This required the Board to assess the business risk associated with the operation of this deferral account unit within ATCO's integrated utility operations as they existed in 2000 rather than, for example, confining the analysis to a "stand-alone" unit within what the Board refers to as AE DISCO, AE meaning ATCO and DISCO, meaning distribution company. It also meant the Board's determining an appropriate "notional" capital structure for this deferral accounts business unit. The Board's conclusions - the business risk associated with this function would be low, meaning that debt financing, which is typically less costly to consumers than equity financing, should be readily available. Thus, in the Board's view, the cost of capital to finance the Deferral Accounts, both pool and non-pool, was properly based on a relatively high debt/equity ratio, namely 85% debt and 15% equity.

**41**    ATCO disagrees and therefore appeals the methodology employed by the Board in calculating 2001 Carrying Costs and 2002 Carrying Costs on the Deferral Accounts.

**42**    The Board also set the time period - one year from April 1, 2002 - during which ATCO could recover the Deferral Accounts along with approved 2001 Carrying Costs and 2002 Carrying Costs. ATCO does not challenge this aspect of the Decision.

### 3.    Decision 2001-93

**43**    It was in this Decision that the Board approved the principal amount of the balances claimed by ATCO in its PPDAs[37]. However, as with the NPPDAs, the Board rejected ATCO's claim to 2000 Carrying Costs on the PPDAs. The Board also provided supplementary reasons for concluding in Decision 2001-83 that ATCO was not entitled under the 1999/2000 Settlement to any 2000 Carrying Costs, whether on the NPPDAs or the PPDAs. ATCO appeals the Board's decision on this point.

**44**    The Board also calculated ATCO's 2001 Carrying Costs and 2002 Carrying Costs on the

PPDAs based on the methodology and rates the Board approved in Decision 2001-92.[38] Since ATCO objects to the methodology chosen by the Board, it follows that ATCO also challenges the resulting calculations.

 E. Aspects of Decisions Appealed by ATCO

**45** In summary, therefore, what is in issue in this appeal are not the balances claimed by ATCO in the Deferral Accounts - these were approved by the Board - but the carrying costs sought by ATCO on these Accounts for each of 2000, 2001 and the first quarter of 2002. In this regard, ATCO contends that the Board erred (1) in disallowing ATCO's claim to 2000 Carrying Costs; and (2) in the methodology used to calculate 2001 Carrying Costs and 2002 Carrying Costs on the Deferral Accounts.

**46** To give some idea of the amount of the disputed carrying costs, ATCO claimed approximately $5.3 million for 2000 Carrying Costs; the Board awarded nothing. ATCO claimed approximately $14.6 million for 2001 Carrying Costs[39]; the Board awarded approximately $8.95 million. The difference between the carrying costs sought by ATCO and those awarded by the Board amounts to approximately $11 million.[40]

| Year of Carrying Costs | Type of 2000 deferral accounts on which carrying costs are claimed | Amount Claimed | Amount Awarded |
|---|---|---|---|
| 2000 | PPDAs | $3,849,000 (AB Vol. III, F450) | 0 |
| | NPPDAs | $1,545,000 (AB Vol. I, F30) | 0 |
| 2001 | PPDAs | $12,184,000 (AB Vol. III, F450) | $7,499,000 (AB Vol. III, F450) |

| | | | |
|---|---|---|---|
| | NPPDAs | $2,441,000 (AB Vol. I, F30) | $1,462,000 (Decision 2002-54 at p. 25) |
| 2002 (First Quarter) | PPDAs | $1,523,000 (AB Vol. III, F450) | $1,287,000 (AB Vol. III, F450) |
| | NPPDAs | Not claimed, just calculated in refilings | $22,000 (Decision 2002-54 at p. 25) |
| Total per account | PPDAs | $17,556,000 | $8,786,000 |
| | NPPDAs | [Just for 2000 and 2001] $3,986,000 | [Just for 2000 and 2001] $1,462,000 |
| Total Claimed vs. Total Awarded | PPDAs and NPPDAs | $21,542,000 | (includes $ from 2002 for NPPDAs $10,270,000 |
| Difference | | $11,272,000 | |

**47**   Further, ATCO appeals on the basis that if the Board did not err in its interpretation of the Negotiated Settlements, then the Board erred in approving the Negotiated Settlements in the first place or alternatively, in subsequently failing to vary those Settlements to allow ATCO to recover 2000 Carrying Costs. This argument is based on the proposition that if the Negotiated Settlements do not permit ATCO to recover 2000 Carrying Costs, then the Board breached its statutory

obligation to set just and reasonable rates by not allowing ATCO a reasonable opportunity to recover all its costs. Thus, it follows, on ATCO's theory, that the Negotiated Settlements contravene the law.

## IV. ISSUES

**48**    ATCO was granted leave to appeal the Decisions on nine (9) issues[41] and all three appeals were heard together. Given the overlap in the facts and arguments relating to the Decisions, the grounds of appeal may be reduced to three issues:

> (1)    Did the Board err in finding that ATCO was not entitled to 2000 Carrying Costs on the Deferral Accounts;
>
> (2)    Did the Board err in approving the Negotiated Settlements or alternatively, in failing to vary the Negotiated Settlements;
>
> (3)    Did the Board err in the methodology it used to calculate ATCO's 2001 Carrying Costs and 2002 Carrying Costs on the Deferral Accounts?

## V.    STANDARD OF REVIEW

**49**    The appropriate standard of review for a reviewing court to apply to an administrative decision is determined using the pragmatic and functional approach: Pushpanathan v. Canada (Minister of Citizenship and Immigration) [1998] 1 S.C.R. 982; Law Society of New Brunswick v. Ryan [2003] 1 S.C.R. 247, 2003 SCC 20; Toronto (City) v. C.U.P.E., Local 79 [2003] 3 S.C.R. 77, 2003 SCC 63. The standard of review must be considered on an issue by issue basis. The purpose of the exercise is to determine whether the contested issue is one which the legislators intended to be left to the exclusive jurisdiction of the administrative tribunal: Pushpanathan, supra; Dr. Q. v. College of Physicians and Surgeons of British Columbia [2003] 1 S.C.R. 226, 2003 SCC 19. This approach requires that a reviewing court use four contextual factors to determine the applicable standard of review:

> (1)    the presence or absence of a privative clause or statutory right of appeal;
>
> (2)    the expertise of the tribunal relative to that of the reviewing court on the issue in question;
>
> (3)    the purposes of the governing legislation and the provision in particular; and
>
> (4)    the nature of the question - law, fact, or mixed law and fact: Pushpanathan, supra at 1006-1010.

**50**    No one factor is determinative but after considering all factors, a reviewing court is to select one of three standards: correctness, reasonableness, or patent unreasonableness.

**51**    I will examine each of the four factors in light of the issues before this Court. However, since the argument about the Board's role vis à vis the Negotiated Settlements was never made to the Board, and not therefore dealt with by it, the question of the appropriate standard of review, as it relates to this issue, does not arise.

      A.      ATCO's Claim for 2000 Carrying Costs on the Deferral Accounts

      1.      Privative Clause or Statutory Right of Appeal

**52**    Section 26 of the Alberta Energy and Utilities Board Act, R.S.A. 2000, c. A-17 (AEUB Act) and s. 70 of the Public Utilities Board Act, R.S.A. 2000, c. P-45 (PUB Act) both provide a statutory right of appeal from decisions of the Board but only on a question of law or jurisdiction.[42] This suggests that, unlike other issues before the Board, questions of law are not ones for which the Legislature contemplated particular deference: Barrie Public Utilities v. Canadian Cable Television Assn. [2003] 1 S.C.R. 476, 2003 SCC 28. Thus, in Alberta Energy Company Ltd. v. Goodwell Petroleum Corporation Ltd. (2003) 233 D.L.R. (4th) 341, 2003 ABCA 277, this Court concluded that s. 26 of the AEUB Act implied a more searching, that is less deferential, standard of review. That reasoning applies with equal force to s. 70 of the PUB Act.

      2.      Expertise of the Tribunal

**53**    This factor calls on this Court to consider the expertise of the Board relative to the Court's on the particular issue in question. The Board is a specialized tribunal with an acknowledged expertise in regulation of transmission and distribution utilities in the electrical industry. It possesses considerable technical expertise in all aspects of the electric energy industry, including setting rates and tariffs, balancing competing interests amongst utilities and consumers, and assessing the public interest: Industrial Power Consumers Assn. of Alberta v. TransAlta Utilities Corp. (2000) 255 A.R. 194, 2000 ABCA 186; ATCO Ltd. v. Calgary Power Ltd. [1982] 2 S.C.R. 557.

**54**    Determining whether ATCO is entitled to recover 2000 Carrying Costs on the Deferral Accounts calls for an interpretation of the Negotiated Settlements. It is true that this contractual interpretive exercise is not conducted in a vacuum but rather against a specialized statutory background involving the electric energy industry in Alberta, a subject on which the Board possesses considerable expertise. This is especially so since negotiated settlements must be approved by the Board. These considerations therefore arguably militate in favour of a more deferential standard of review.

**55**    On the other hand, contractual interpretation would ordinarily be something particularly suited to this Court's expertise. As stated by this Court in Goodwell at para. 26, this Court's expertise in determining legal issues, especially those which involve analyzing and applying case law and interpreting contracts and statutes, is superior to that of the Board's. Therefore, in the result, this factor points to a less deferential standard of review.

### 3.    Purpose of the Legislation

**56**    The Board and its predecessors have been granted significant discretion under electric energy legislation to make, administer and apply legislation and rules relating to electric utilities and the operation of the electrical system in Alberta: TransAlta Utilities Corp. v. Alberta Public Utilities Board (1986) 68 A.R. 171 (C.A.). A statutory scheme designed to allow a tribunal to address policy issues and balance interests - as the Board must do in ensuring that utility rates for transmission and distribution are just and reasonable - and deal with issues requiring technical or specific expertise suggests that a tribunal should be granted greater deference: Pezim v. British Columbia (Superintendent of Brokers) [1994] 2 s. C.R. 557 at 591-592. Accordingly, this factor suggests that generally, a more deferential standard should be applied to Board decisions.

### 4.    The Nature of the Question

**57**    This case involves an interpretation of the Negotiated Settlements and contractual interpretation has been held to be a question of law: Alberta v. Western Irrigation District (2002) 312 A.R. 358, 2002 ABCA 200. Nevertheless, there are situations where the Board's interpretation of a contract or statute may engage its expertise: Goodwell at para. 25. Where the Board's expertise is engaged on a question of law, a decision of the Board may be given deference.

**58**    However, legal questions of general import which transcend the facts of a case are generally held to attract less judicial deference: Pushpanathan, supra at 1011; Chieu v. Canada (Minister of Citizenship and Immigration) [2002] 1 S.C.R. 84, 2002 SCC 3 at para. 23. The interpretation of the Negotiated Settlements relating to ATCO's claimed entitlement to carrying costs does not directly engage the Board's expertise. Thus, this factor suggests a less deferential standard. Further, negotiated settlements - and the Board's role in approving and supervising their implementation - are of considerable import to the utility industry. Therefore, the generality of the issues involving negotiated settlements and deferral accounts raised by this appeal also suggests minimal deference.

**59**    In summary, while the role of the Board in regulating the electric energy industry and the wide grant of discretion it has been given by the Legislature supports the application of a more deferential standard, the nature of the question before the Board and its expertise in interpreting contracts compared with that of this Court supports a less deferential standard. I therefore conclude that the appropriate standard to apply to the Board's decision on ATCO's claimed entitlement to 2000 Carrying Costs is in the mid-range of the judicial review spectrum, that is reasonableness. I also note that during argument, both the Board and ATCO agreed this was the appropriate standard of review for this issue.

### B.    Board's Method of Calculating 2001 Carrying Costs and 2002 Carrying Costs

**60**    While the same statutory right of appeal applies to the methodology the Board used to calculate 2001 Carrying Costs and 2002 Carrying Costs as to the interpretation of the Negotiated Settlements, a consideration of the other Pushpanathan factors suggests that the applicable standard

of review on this issue is patent unreasonableness. This presupposes that a question of law or jurisdiction lies embedded in the methodology the Board selected.

**61**    On this issue, the stated question of law on which leave was granted is whether, in calculating the 2001 Carrying Costs and the 2002 Carrying Costs on the Deferral Accounts, the Board erred in applying a weighted average cost of capital for a notional deferral account business with an 85% debt and 15% equity structure. I would characterize the possible question of law this way: Did the Board err in treating a discrete function of an integrated utility as a separate stand-alone business unit for purposes of calculating costs of financing that function and in determining an appropriate notional capital structure for it?

**62**    Regardless of how the Board's determination of the proper method of calculating 2001 Carrying Costs and 2002 Carrying Costs on the Deferral Accounts is characterized - whether point of law or not - I am satisfied that it falls within the Board's expertise. Both the nature of the question and the expertise required to resolve it make it well suited for determination by the Board. One of the Board's principal roles is to review and assess costs and expenses of utilities in setting rates for those utilities still regulated by the Board. This requires knowledge in a wide range of areas: economics, financial markets, financing techniques and the operation of regulated utilities generally. Thus, the Board enjoys expertise superior to this Court in determining the appropriate methodology for calculating prudent costs of financing a particular segment of a utility's operations.

**63**    In addition, the nature of the disputed issue makes a more deferential standard appropriate. With restructuring of the electric energy industry, and the widespread use of deferral accounts, determining the appropriate methodology to be used in calculating prudent costs of financing these deferral accounts engages the Board's specialized expertise. This requires in turn an understanding of the interrelationship between regulated and deregulated business functions of an integrated utility, and the risks, business and financial, attached to each. Further, both the 1998 Act (and EU Act) as well as the Deferral Accounts Regulation place the assessment of prudent carrying costs squarely before the Board, reflecting the intent of the Legislature to leave this issue to the Board's determination.

**64**    For these reasons, I have concluded that the methodology used by the Board in calculating 2001 Carrying Costs and 2002 Carrying Costs is a matter within the Board's discretion and expertise. Following a consideration of the Pushpanathan factors, I am satisfied that the appropriate standard to apply to this Board decision is patent unreasonableness.

## VI. ATCO'S CLAIM FOR 2000 CARRYING COSTS ON DEFERRAL ACCOUNTS

### A.    Board Decision and ATCO's Response

**65**    The Board's decision denying ATCO 2000 Carrying Costs on the Deferral Accounts can be summarized this simply. Neither the 1999/2000 Settlement, the 2001/2002 TFO Settlement nor the Deferral Accounts Regulation entitle ATCO to the claimed Carrying Costs. The reasonableness

standard requires that this Court make a somewhat probing examination of this Board decision and determine whether the reasons given, when taken as a whole, support the decision: Ryan at para. 47. Or to put it another way, is there a rational basis for the decision in light of the statutory framework and circumstances of the case: Cartaway Resources (Re) 2004 SCC 26 at para. 49.

**66**    On what basis then does ATCO claim an entitlement under the Negotiated Settlements to 2000 Carrying Costs on its Deferral Accounts? First, it contends the Negotiated Settlements evince an intention to allow ATCO to recover the disputed carrying costs. Next, it argues that if the Settlements are silent on the issue, then ATCO remains free to advance a claim for 2000 Carrying Costs.

      B.    Deferral Accounts Regulation: Why It Does Not Help ATCO

**67**    Before turning to the Negotiated Settlements, I must first explain why the Deferral Accounts Regulation does not assist ATCO in its claimed entitlement to 2000 Carrying Costs and why the focus of this analysis must therefore be the Negotiated Settlements as the Board concluded. The first point to emphasize is that the Regulation only applied to ATCO's PPDAs and not its NPPDAs. Hence, the Regulation could not, in any event, be the source of any entitlement to interest on ATCO's NPPDAs.

**68**    As noted, the main purpose of the Deferral Accounts Regulation was to prohibit utilities within its scope from collecting from Alberta consumers for one year any deficiencies accumulated in the utilities' 2000 distribution pool price deferral accounts. The Regulation did however provide for costs of financing those accounts as a result of the delay imposed by the Regulation to be recouped by the utilities. In this regard, the Regulation required a utility to apply to the Board for a review of prescribed distribution pool price deferral accounts accrued in 2000: s. 3(1). The 2000 distribution pool price deferral accounts for ATCO were expressly defined under the Regulation as those "referred to in clauses 28, 29, 30 and 31" of the 1999/2000 Settlement: s. 1(a). Thus, there can be no doubt that the Regulation covers ATCO's PPDAs.

**69**    Under the Regulation, the Board was charged with approving the balances in a utility's distribution pool price deferral accounts and with calculating the amount that the utility would be entitled to recover for the "prudent" costs of financing its 2000 distribution pool price deferral account deficiencies: ss. 3(2) and 4(1). What is most noteworthy for purposes of this appeal is that the costs of financing 2000 distribution pool price deferral accounts would only be recoverable for the period commencing January 1, 2001. In other words, the Deferral Accounts Regulation did not provide for a utility to recover any costs of financing deficiencies in its 2000 distribution pool price deferral accounts for the year 2000.

**70**    This limitation makes considerable sense. The primary purpose of the Deferral Accounts Regulation was to prevent utilities covered by it from recovering the 2000 distribution pool price deferral accounts balance for one year only. Absent the Regulation, a utility could have recouped its 2000 distribution pool price deferral account balances through a rate rider imposed on customers in

2001. Since the one year prohibition on collection mandated by the Regulation prevented that from happening, it was appropriate and reasonable for the government to provide for the affected utilities to be compensated, but only for the carrying costs linked to the consequential delay caused by the Regulation.

**71**    This explains why the Regulation provided for the costs of financing a utility's 2000 distribution pool price deferral accounts to be calculated only from the start of the one year prohibition period - January 1, 2001. Thus, s. 4(1) provides:

> The Board must determine an amount that is payable in 2001 to the owner of an electric distribution system in respect of the cost of financing the amounts in the owner's deferral accounts in 2001.

**72**    In the result, therefore, nothing in the Deferral Accounts Regulation entitles ATCO to claim costs of financing its PPDAs during the year 2000. In fact, the contrary is so. Recoverable costs of financing ATCO's PPDAs begins only on January 1, 2001. The Board was alive to this point. Indeed, in Decision 2001-93, when dealing with ATCO's PPDAs, it concluded, correctly in my view, that the only material impact of the Deferral Accounts Regulation was to authorize ATCO to recover its 2001 Carrying Costs for its PPDAs from the Balancing Pool rather than directly from its customers.[43]

**73**    In that same Decision, the Board then turned its attention to whether there was any basis on which it should nevertheless include a calculated or notional carrying cost for the year 2000 in ATCO's opening PPDAs balances for 2001. This was because in calculating 2001 costs of financing of 2000 distribution pool price deferral accounts, a starting point was required. That starting point would necessarily be the opening balance in a utility's distribution pool price deferral accounts as of January 1, 2001. The Board quite properly looked to the Negotiated Settlements to determine whether ATCO was entitled to 2000 Carrying Costs. In the Board's view, it was not.

**74**    Since the Deferral Accounts Regulation did not grant a utility carrying costs for the year 2000 on its 2000 distribution pool price deferral accounts, it follows that the Board was correct in focussing on the Negotiated Settlements to determine whether ATCO was entitled to 2000 Carrying Costs on its PPDAs, and as well, on its NPPDAs. It is to those Settlements that I now turn.

C.    Contractual Claim: Interpretation of the Negotiated Settlements

**75**    I begin then with a consideration of the Negotiated Settlements. While the Negotiated Settlements require Board approval, that does not mean they lack contractual force.[44] Section 10.1 of the Original Guidelines provides that, once an application for Board approval of a negotiated settlement has been filed, the Settlement binds all signatories, subject to a party's right to withdraw acceptance or support on certain conditions prior to Board approval.[45] Since no signatory has sought to withdraw from the Negotiated Settlements at any time, each Settlement binds its respective parties in accordance with its terms. Therefore, ATCO's claim to interest on the Deferral Accounts

involves a question of contractual interpretation.

> 1.    Principles of Contractual Interpretation

**76**    In analyzing the terms and conditions of the subject Settlements, it is helpful to keep in mind the objective of contractual interpretation.[46] That is to ascertain the parties' intentions having regard to the relevant background context known to the parties. How does one determine the parties' intentions? In B.C.C.I. v. Ali [2001] 1 All E.R. 961 (H.L.) at 965, Lord Bingham of Cornhill provided a concise and compelling summary of the law in this area:

> To ascertain the intention of the parties the court reads the terms of the contract as a whole, giving the words used their natural and ordinary meaning in the context of the agreement, the parties' relationship and all the relevant facts surrounding the transaction so far as known to the parties. To ascertain the parties' intentions the court does not of course inquire into the parties' subjective states of mind but makes an objective judgment based on the materials already identified.

**77**    It must be understood therefore that the search for the parties' intentions is conducted on an objective basis, meaning that the focus is on what a reasonable person would infer from the words used.[47] This interpretive exercise must be undertaken with due regard to the entire contract. One cannot simply pick and choose clauses - or parts of clauses - without considering the contract as a whole. It also means being alive to the relevant background against which the contract was concluded, the purpose of the exercise being to ascribe to the written text the most appropriate meaning which the words can properly bear.[48] Or to put it the way that Lord Hoffman did in Jumbo King Ltd. v. Faithful Properties Ltd. [1999] H.K.C.F.A.R. 279:

> The construction of a document is not a game with words. It is an attempt to discover what a reasonable person would have understood the parties to mean. And this involves having regard, not merely to the individual words they have used, but to the agreement as a whole, the factual and legal background against which it was concluded and the practical objectives which it was intended to achieve.

> 2.    Does the 1999/2000 Settlement Provide for 2000 Carrying Costs?

**78**    ATCO asserts that its entitlement to 2000 Carrying Costs on both the PPDAs and NPPDAs may be found in Clauses 39 and 43(a) of the 1999/2000 Settlement and Clause 29 of the 2001/2002 TFO Settlement. Before considering these Clauses in particular, it is important to understand the overall approach in the 1999/2000 Settlement to the PPDAs and NPPDAs.

> a.    Treatment of ATCO's Distribution Deferral Accounts: NPPDAs and

PPDAs

**79**    A thorough review of the 1999/2000 Settlement reveals that in each and every Clause dealing
with the NPPDAs and PPDAs on which ATCO now claims 2000 Carrying Costs, the parties
contemplated a one time adjustment on December 31, 2000. All Clauses are identical in import.[49] A
typical PPDA Clause states:

> At ...December 31, 2000 a positive balance in the [deferral account] would be
> collected from customers, whereas a negative balance would be refunded to
> customers.

**80**    The NPPDA Clauses are worded differently but only because the defined amounts in these
Clauses were accumulated throughout the calendar year and were not tied to fluctuating balances.
Regardless of the differences in wording, however, the intention was the same: the balance in each
deferral account - NPPDAs and PPDAs alike - was to be netted out at year end, with a one time
adjustment.

**81**    What do the Deferral Accounts Clauses tell us? Most significant, none mentions any
requirement to pay ATCO interest or carrying costs on the balances in those Accounts nor for that
matter the method for calculating and collecting any such interest or carrying costs. This latter
omission is telling in its own right. Had the parties to the 1999/2000 Settlement contemplated the
payment of interest or carrying costs on the Deferral Accounts, whether by ATCO to its customers
or by the customers to ATCO, it would have been necessary to address a number of obvious
practical issues. Chief amongst them would have been the methodology to be used to calculate
interest payable by, or to, ATCO. Given the fluctuating nature of the PPDAs, if interest were to
have been payable, it would have been necessary to stipulate how that interest would be calculated,
whether daily, weekly, monthly or yearly and on what basis, simple or compounded interest.

**82**    The reality is that not one of the PPDA or NPPDA Clauses contemplates the payment of
interest or carrying costs or the method to be used for calculating the same. Instead, all contemplate
a one-time year end adjustment based only on the balance in each deferral account, whether positive
or negative. Read in context, therefore, that balance refers to the principal amount in the applicable
Deferral Account at year end.

**83**    Clause 43(a), which outlines the procedure to be followed if the parties to the Settlement
cannot agree on the final balances in the Deferral Accounts, is to the same effect. In the event of a
dispute about final balances, the Board is authorized to review and approve the Deferral Accounts.
Clause 43(a) provides in relevant part:

> With respect to the deferral accounts established by clauses 17, 18, 19, 20, 28,
> 29, 30, 31, and 38, ATCO will make a one time adjustment, at the end of 1999
> and 2000, respectively, in order to pass through the balances in each account to
> the affected DISCO's. ATCO will provide parties to this Negotiated Settlement

> an accounting of the final balances in the deferral accounts and their disposition as early as is reasonably possible after the calendar year-end for each of 1999 and 2000....

**84**    Again, as with the other Clauses, Clause 43(a) does not provide for interest or carrying costs on the Deferral Accounts. And similarly, as with the other Clauses, the clear implication is that the principal balance alone in each Account, whether positive or negative, would be flowed though to ATCO's distribution entity, AE DISCO.

**85**    Taken together, therefore, these Clauses reflect a collective intention that no interest or carrying costs would be paid to ATCO on any of the Deferral Accounts under the 1999/2000 Settlement. Nor can there be any suggestion that the possibility of deficiencies in the Deferral Accounts was unexpected and accordingly, overlooked. All Clauses contemplated a positive or negative variance. Thus, the parties to the Settlement were well aware of the fact that at the end of the year in which the deferral account balances were accrued, monies could either be owing to, or by, ATCO. It would have been a simple matter for them to provide for 2000 Carrying Costs in any of the Clauses dealing with the Deferral Accounts. They did not.

> b.    Clause 39: What Does it Mean?

**86**    Is there any other provision in the 1999/2000 Settlement entitling ATCO to 2000 Carrying Costs on the Deferral Accounts? ATCO places considerable weight on Clause 39, maintaining that it expressly reserves to ATCO an entitlement to interest on the Deferral Accounts. Clause 39, found in a section of the 1999/2000 Settlement entitled "General", provides as follows:

> ATCO will pay interest on any refund associated with the 1999 Aggregate Reservation Tariff, Transmission Tariff and the wires component of Distribution Revenue Requirement, excluding deferral account balances as outlined in clauses 17, 18, 19, 20, 28, 29, 30, 31 and 38. Interest is payable at ATCO's short term financing rate of 5.5%. Any interest payable by ATCO hereunder shall be paid by the shareholders of ATCO and shall not be charged to customers. The agreement that, for purposes of this Negotiated Settlement, interest will be payable at 5.5% shall not prejudice the ability of any party to argue that some other rate(s) of interest should apply for any other purpose.

**87**    ATCO argues that this Clause was intended to address only a few of the many circumstances where interest might be payable and that the last sentence left open the possibility that interest would be payable in other, unstated, circumstances. ATCO interprets the last sentence as conferring on ATCO an entitlement to 2000 Carrying Costs. The Board found otherwise. Having reviewed the Board's reasoning, I see no error in its conclusion on this point.

**88**    There are, as the Board recognized, several flaws with ATCO's interpretation of Clause 39. First, read in context, Clause 39 deals with payment of interest by ATCO, not to ATCO. On its face,

therefore, the Clause does not provide for any right or entitlement by ATCO to receive interest from its customers for any purpose, whether on the Deferral Accounts or otherwise.

**89**     Second, even if the last sentence were to be interpreted to allow ATCO to argue that its customers should pay ATCO some other rate of interest for some other purpose, it would not assist ATCO on this appeal. This contention confuses a right to dispute a rate of interest with an entitlement to interest. The two are not the same. While I appreciate that one can assert, as does ATCO, that a right to argue for a different rate of interest presupposes an entitlement to it, this too misses the point. A right to argue for a rate for some other undefined purpose does not by itself confer an entitlement to interest for a specific purpose, much less all purposes. ATCO's entitlement to 2000 Carrying Costs must still be found somewhere. Put simply, this Clause does not recognize any entitlement on ATCO's part to interest, whether on the 2000 Deferral Accounts or otherwise.

**90**     Third, although Clause 39 requires ATCO to pay interest on certain specific sums, it expressly relieves ATCO of any obligation to pay interest to its customers on deferral accounts in Clauses 17, 18, 19, 20, 28, 29, 30, 31 and 38. And yet, Clauses 28, 29, 30 and 31 represent the same PPDAs on which ATCO is now claiming 2000 Carrying Costs from its customers. This being so, it would be inconsistent with the parties' reasonable expectations to interpret this Settlement as conferring on ATCO a right to interest, or a right to claim interest, from its customers in the very same circumstances in which ATCO has no reciprocal obligation to its customers. To accept ATCO's interpretation of this Clause would effectively mean that with respect to costs of financing the PPDAs, ATCO's customers assumed all of the risks associated with a deficiency but were entitled to none of the benefits associated with a surplus. This cannot be. Any interpretation leading to this result should be rejected.

**91**     In response to this point, ATCO contended during oral argument that despite the portion of Clause 39 relieving it of liability for interest on the PPDAs, it did not follow that no interest was payable to customers by ATCO. Indeed, ATCO asserts the reverse. In its view, Clause 39 entitles ATCO's customers to interest in the event of a surplus in the PPDAs, or at least to argue for interest, but just not at the rate of 5.5% per year. For this reason, this Court was invited to conclude that had the variances worked the other way, ATCO's customers would have been entitled to interest on those accounts. In my view, this is not an interpretation which this Clause can reasonably bear. The only possible basis for ATCO's customers to claim a right to interest at other than 5.5% per year would be under the last sentence of Clause 39. But as already noted, the concluding sentence provides that a party's right to argue for another rate of interest only applies for "any other purpose". How ATCO's customers could assert an entitlement to interest on the PPDAs at some rate other than 5.5% per annum when that claim is for precisely the same purpose - interest on the PPDAs - for which ATCO already enjoys an exemption was never explained by ATCO. And it cannot be.

**92**     Fourth, even if the last sentence entitled ATCO to argue for a rate of interest other than 5.5% on the Deferral Accounts, ATCO's claim for 2000 Carrying Costs goes well beyond "interest". ATCO contends that it is entitled to all costs of financing the Deferral Accounts for 2000. In

ATCO's view, that includes not only interest on debt financing but also claimed returns on equity (at even higher rates) assuming, as does ATCO, that the Deferral Accounts should be treated as having been financed by a combination of debt and equity (See Part VIII below). However, to repeat, there is nothing in Clause 39 that makes any reference to reimbursing ATCO for interest, much less costs of financing generally, whether in terms of the Deferral Accounts or otherwise. Thus, this claimed reach of Clause 39 cannot be sustained.

**93**    Fifth, even if Clause 39 applies, as ATCO submits, to 1999 deferral accounts only and not at all to the 2000 Deferral Accounts, again, this does not assist ATCO. Even if this were so, one would simply come full circle back to the determinative starting point: Clause 39 does not confer on ATCO an entitlement to either interest or carrying costs on the Deferral Accounts. Silence does not equal entitlement.

**94**    What then did the parties intend by the last sentence in Clause 39? In my view, "other purposes" necessarily means purposes outside the scope of the Negotiated Settlement. The parties never intended that an ability to argue about a rate of interest for some purpose would include a purpose under the 1999/2000 Settlement since the last sentence of Clause 39 makes it clear that "for purposes of this Negotiated Settlement, interest will be payable at 5.5%." Thus, I have concluded that this sentence was inserted out of an abundance of caution to preserve the parties' rights to argue for different rates of interest in the context of other issues, at other times, in other contractual negotiations or Board proceedings. Including a "without prejudice clause" in respect of "other purposes" was arguably prudent legal drafting given the on-going business relationships amongst the parties to the 1999/2000 Settlement. In this regard, the signatories to the 1999/2000 Settlement were all parties to the later 2001/2002 TFO Settlement.

**95**    No matter how much one parses the last sentence in Clause 39, it cannot reasonably be construed in the manner now urged by ATCO. While one of the guidelines of contractual interpretation requires that effect be given to each part of the contract, if it is possible to do so, that does not mean adopting an interpretation of a part of a clause which cannot be reasonably supported given the document as a whole, or worse yet, which is inconsistent with other parts of the contract. Put simply, as the Board found, the last sentence of Clause 39 does not confer on ATCO an entitlement to 2000 Carrying Costs on the Deferral Accounts from its customers.

<div align="center">c.    Clause 1: Entire Contract Clause Except for Explicitly Exempted Issues</div>

**96**    This then takes me to ATCO's alternative argument about the 1999/2000 Settlement. It asserts that even if the Settlement is silent on ATCO's entitlement to interest on the Deferral Accounts, that silence does not prevent ATCO from now claiming a right to interest or carrying costs. This thesis rests on the proposition that silence means no settlement on this issue; and no settlement means that ATCO remains free to pursue this claim. The Board did not accept this submission. Neither do I. Hence, I see nothing unreasonable in the Board's conclusion on this point.

**97**    Having regard to the Settlement as a whole, this argument cannot be sustained. It is clear from

the express terms of the 1999/2000 Settlement that, but for a few issues expressly reserved, the parties intended that it settle all outstanding issues relating to ATCO's Phase I Application. Thus, unless an issue is settled by, or expressly reserved under, the Settlement - and ATCO's claimed entitlement to interest for 2000 on the Deferral Accounts falls into neither category - it is off the contractual table for all purposes. In other words, the parties' decision not to provide for any right by ATCO to 2000 Carrying Costs under the 1999/2000 Settlement means that no such entitlement exists.

98    Clause 1 of the 1999/2000 Settlement could not be more definitive on this point:

> ATCO has concluded this Negotiated Settlement with the parties hereto for the years 1999 and 2000 covering the generation, transmission and distribution functions performed by ATCO. Except as explicitly exempted from this Negotiated Settlement below, all issues raised by ATCO's 1999/2000 Phase I application are disposed of in accordance with the terms hereof. [Emphasis added]

99    What does this Clause mean? Since it confirms that all issues are disposed of, that is resolved, except those "explicitly exempted .... below", it follows that any issues excluded from the scope of the Settlement must not only be express, that is definite and clear, but also specifically identified and excluded from the Settlement in the body of the contract.

100    Which issues are specifically identified as exempt from the 1999/2000 Settlement? A review of the Settlement reveals that the only issues identified as outstanding are those in Clauses 15, 21, 24 and 25. None of these four Clauses refers to ATCO's claimed entitlement to 2000 Carrying Costs as an outstanding issue. Further, when the parties exempted an issue from the Settlement, they identified the precise unresolved issue and, not surprisingly, they also provided how the issue was to be ultimately resolved. In every case, the Settlement provides that this will be done through litigation before the Board in the context of the Phase I proceedings. For example, Clause 15 provides:

> The parties have not reached agreement concerning the disposition of the generation portion of the Reserve for Injuries and Damages at December 31, 2000, which is therefore to be litigated by the parties in the current public hearings before the Board to consider the ... Phase I proceedings.

101    Similarly, though the wording is different, Clause 21 expressly excludes another issue from the Settlement:

> The terms and conditions of service pursuant to which ATCO's generation units provide ancillary services will be considered outside this Negotiated Settlement and are to be adjudicated as part of the Phase 1 proceedings.

**102**    Clause 24 identifies yet another unresolved issue to be dealt with in the Phase I proceedings:

> Matters relating to the Roles and Responsibilities of the Transmission
> Administrator ... and ATCO, as a Transmission Facilities Owner ... including the
> allocation of Roles and Responsibilities and the Terms and Conditions for wires
> services are excluded from this Negotiated Settlement and are to be adjudicated
> as part of the Phase I proceedings.

**103**    Finally, Clause 25 is to the same effect in identifying the outstanding issue and providing for its resolution:

> The treatment of transmission capital additions shall also be considered by the
> Board as part of the Phase I proceedings ....

>      d.      What Did ATCO Identify as Unresolved Issues?

**104**    From this, it is evident that the parties to the 1999/2000 Settlement intended that it would resolve all outstanding issues related to ATCO's Phase I Application except only for those referred to in Clauses 15, 21, 24 and 25. This interpretation was apparently shared by ATCO at the time it applied to the Board for approval of the Settlement. Under the Original Guidelines, a utility seeking approval of a negotiated settlement was required not only to file an application with the Board but also to describe in the application any "outstanding issues": Original Guidelines, s. 10.1. An applicant's obligation to disclose unresolved issues was reinforced by s. 10.3 of the Original Guidelines which called not only for identification of the issues but also for details relating thereto:

> The Board expects the following material, at a minimum, to be included in the
> support of an application: ....

>           details of issues not resolved, ...

**105**    The same requirements exist today under the Guidelines: ss. 10.1 and 10.3. The purpose of these requirements is to bring to light any outstanding issues so that they might be addressed when the Board considers an application to approve a negotiated settlement. The reasons for these requirements are obvious. In deciding whether to approve a settlement, the Board must, in light of the public interest, understand what has been - and has not been - resolved. Springing issues on parties to a negotiated settlement following Board approval would compromise the Board's ability to determine what is - and what is not - in the public interest when first considering whether to approve a negotiated settlement.

**106**    What then did ATCO disclose as unresolved when it applied for Board approval of the 1999/2000 Settlement? ATCO's application constitutes an integral part of the background factual

matrix to the 1999/2000 Settlement and thus assists in determining what the Settlement would convey to a reasonable person. That application reinforces the conclusion that the contracting parties intended the Settlement to resolve all outstanding issues except for those mentioned in Clauses 15, 21, 24 and 25. What the application says on this point is revealing:

> ATCO has been successful in reaching a Negotiated Settlement with the Intervenors, who are signatories to the attached agreement, regarding all issues raised by ATCO's Phase I filing, except for those matters explicitly exempted from the Negotiated Settlement pursuant to clauses 15, 21, 24 and 25 thereof.[50] [Emphasis added]

**107**    As is apparent, the only issues ATCO identified as outstanding were those in Clauses 15, 21, 24 and 25; ATCO's claimed entitlement to 2000 Carrying Costs on the Deferral Accounts was not one of them. Therefore, ATCO's argument that the 1999/2000 Settlement's silence on the issue of 2000 Carrying Costs means that ATCO now has a right to those Costs independent of the Settlement, or at least a right to claim them, flies in the face of Clause 1 of the Settlement and the contract read as a whole.

> e.    Clause 3: Package Deal

**108**    Further, when the 1999/2000 Settlement was presented to the Board for approval, all signatories represented that it was a "package deal". Indeed, this is mentioned not only in ATCO's application but also in Clause 3 of the Settlement itself which states:

> The terms of the Negotiated Settlement reflect a "package deal" and, therefore, it is not possible for the [Board] to accept only parts of the Negotiated Settlement and still reflect the overall agreement reached as between the parties....

**109**    I appreciate that there may be circumstances where a package deal does not represent the entirety of the contract amongst the contracting parties to a negotiated settlement but only resolves certain issues in dispute on which the parties seek the Board's approval and leaves others unmentioned and unresolved. In other words, it is only a package deal in the sense that the Board must approve or reject what is in it. But this is not one of those cases.

**110**    Read in context with the balance of the 1999/2000 Settlement, Clause 3 reinforces the parties' intention that this Settlement represented the entire contract on all issues in dispute relating to the Phase I Application except for those specifically identified as exempted from it. Clause 3 says that what is included in the Settlement is there for a reason - and equally important, what is not included is not there for a reason. In other words, the Settlement represents the sum total of the "giving and taking" which occurs during contractual negotiations and thus represents a complete "package deal". A party is not permitted to add to and subtract from a package deal in these circumstances simply because it decides, after the package has been sealed, that it no longer likes what's in it. This underscores why ATCO's present view of the Settlement - that silence preserves

ATCO's right to 2000 Carrying Costs - must be rejected as inconsistent with the express terms of the Settlement and thus, with the reasonable expectations of the parties.

>3.    Does the 2001/2002 TFO Settlement Provide for 2000 Carrying Costs?

**111**    ATCO claims that Clause 29 of the 2001/2002 TFO Settlement supports its demand for 2000 Carrying Costs. As a starting point, it must be understood that, absent a finding of ambiguity in the 1999/2000 Settlement, this Clause is not relevant to the interpretation of that Settlement. No such ambiguity exists for the reasons already explained.

**112**    Nevertheless, assuming for the sake of argument that Clause 29 is relevant, the Board's conclusion that it does not support ATCO's position is not only reasonable; it is one with which I agree. Nothing in this Clause is inconsistent with the Board's interpretation of the 1999/2000 Settlement. Nor does the Clause grant ATCO a right to 2000 Carrying Costs on the Deferral Accounts. The relevant part of this Clause provides:

> With respect to all deferral accounts contained in this agreement, as well as the final settlement of deferral accounts identified in Section 43(a) of the 1999/2000 Settlement for the Year 2000, carrying costs will be applied to all variances from forecast. The carrying cost rate for 2001 and 2002 will be determined as follows ....

**113**    ATCO's argument is this. Because the Clause contains the phrase "carrying costs are to be paid on all variances from forecasts", this means that the parties agreed that 2000 Carrying Costs would be payable to ATCO on the Deferral Accounts. However, this argument demonstrates the danger in looking at a phrase acontextually. There are two separate issues. First, on what amounts did the parties agree that carrying costs would be paid? Second, for what years are those costs to be paid? Viewed from this perspective, Clause 29 identifies (1) the subject matter on which certain carrying costs will apply; and (2) the specific time frame during which the carrying costs will be calculated. As to the first point, the subject matter, the parties clearly agreed that carrying costs are to be payable on the principal sum of ATCO's deferral accounts in the 2001/2002 TFO Settlement plus ATCO's Deferral Accounts under the 1999/2000 Settlement.

**114**    But for what years will those carrying costs be paid? That is the critical issue. It is here that ATCO's argument collapses. It fails to distinguish between the principal amount of the deferral accounts on which interest will be calculated - the subject matter of the clause - and the period of time during which that interest will be payable. The mere fact that the principal amount includes the Deferral Accounts does not mean that interest is payable on these Accounts for the year 2000. There is no confusion on this point in Clause 29. It prescribes the agreed-upon time frame during which carrying costs will be payable to ATCO on the defined total. And what years does it refer to? The answer - 2001 and 2002 only. No carrying cost rate or entitlement to interest is specified for 2000. Accordingly, the clear implication - and rightly found to be so by the Board - is that the parties intended that carrying costs would be payable on the defined principal amounts, but only for the

years 2001 and 2002.

**115**    This is entirely reasonable since the 2001/2002 TFO Settlement deals only with 2001 and 2002. The parties' intention, to confine this Settlement to 2001 and 2002, is reinforced throughout the contract. For example, Clause 1 confirms that "ATCO ... has concluded this Negotiated Settlement with the parties hereto for the years 2001 and 2002."

**116**    Therefore, there is nothing in Clause 29 of the 2001/2002 TFO Settlement that contradicts or varies the clear import of the 1999/2000 Settlement on the issue of ATCO's claimed entitlement to 2000 Carrying Costs. Nor does the 2001/2002 TFO Settlement confer on ATCO a substantive right to those Costs.

       4.    Conclusions

**117**    For these reasons, I have concluded that the Board's interpretation of the Negotiated Settlements, as it relates to ATCO's claimed entitlement to 2000 Carrying Costs, is not only reasonable; in my view, it is correct. The textual wording of the relevant Clauses in the 1999/2000 Settlement; the absence of any provision in the Settlement conferring on ATCO a right to 2000 Carrying Costs, the critical flaws with ATCO's interpretation of the one Clause in the 1999/2000 Settlement that mentions the word "interest"; the evident intention of the parties to the 1999/2000 Settlement to contract for a complete package; and the failure to identify carrying costs on the Deferral Accounts as an outstanding issue in the Settlement or in the application for its approval - all substantiate and reinforce the Board's conclusion that ATCO is not entitled, under the Negotiated Settlements, to 2000 Carrying Costs on the Deferral Accounts.

    D.    ATCO's Discrimination Claim

**118**    ATCO claims that the Board's granting another utility carrying costs for 2000 on its deferral accounts contravenes s. 51(1) of the 1998 Act. This section provides that the Board "shall ensure" that the tariff of a utility is "just and reasonable" and that the tariff is "not unduly preferential, arbitrarily or unjustly discriminatory or inconsistent with or in contravention of this or any other enactment or law."[51] In my view, the fact that the Board saw fit to grant another utility carrying costs for 2000 on its deferral accounts - where that other utility did not enter into a negotiated settlement on the same terms as ATCO - is irrelevant.

**119**    Discrimination, in this context, means differential treatment on an impermissible ground. Neither the 1998 Act nor the EU Act protects a regulated utility from differential treatment based solely on the settlement that utility has chosen to conclude. Simply because one utility is not treated exactly the same on one issue as another utility does not amount to "unjust discrimination" where the differential treatment arises out of a negotiated settlement agreed to by the utility claiming discrimination. Otherwise, when one utility concludes a negotiated settlement, other utilities in Alberta would be able to claim the benefit of the same terms relating to rates and tariffs if those terms happened to be more favourable than the ones already negotiated and agreed to by the utilities

claiming discrimination. And of course, this would then continue on and on into the future as other negotiated settlements were concluded and utilities sought the benefit of higher rates or better terms. This contractual leapfrogging makes no sense from a business, public policy or accountability perspective. It cannot be permitted.

**120**    To accede to a finding of unjust discrimination in these circumstances would undercut the notion of open competition and the legislative intention that Alberta consumers are to benefit from that competition. Even where utilities continue to be regulated - and the number of market players is limited - competition still plays a key role. While these limited numbers might restrict the effectiveness of the competition, they do not constrain the scope of what can be dealt with in a negotiated settlement, nor the substantive terms and conditions agreed to by a utility and its customers. In this regard, s. 6 of the EU Act provides that market participants, and that includes any person who distributes or sells electric energy, will "conduct themselves in a manner that supports the fair, efficient and openly competitive operation of the market".[52] This provision reflects a legislative intention to hold market participants to the deals they make. One negotiated settlement may be less advantageous to a utility than a settlement concluded by another utility or even a Board decision made in the absence of a negotiated settlement. But this result is, in my view, an intended and desirable consequence of the newly restructured Alberta electric energy industry and the competition it is designed to cultivate.

**121**    To be clear, therefore, it is not unjust discrimination under Alberta law simply because a utility is required to comply with the deal it has made under a negotiated settlement even if that settlement is less advantageous than another negotiated settlement or Board decision.

E.    Effect of Interim Board Decision on ATCO's Claim to 2000 Carrying Costs

**122**    ATCO also argues that an interim decision of the Board (Decision 2001-8), not under appeal, favours a different interpretation of Clause 29 of the 2001/2002 TFO Settlement. This decision was made under s. 4(3) of the Deferral Accounts Regulation which allowed a utility to recover carrying costs for 2001 based on a utility's estimate of the balances in its 2000 distribution pool price deferral accounts.[53] ATCO initially included 2000 Carrying Costs in its estimate of the balances in its PPDAs for 2000. The Board excluded from ATCO's estimated balances any amount in respect of 2000 Carrying Costs and allowed ATCO to recover 2001 Carrying Costs on the remaining balances. While the Board left open the option for ATCO to argue in its final application that it was entitled to 2000 Carrying Costs, the Board did not render any substantive decision on ATCO's claimed entitlement to these Costs. In any case, this Decision was an interim one only, and not final. ATCO's argument on this point is without merit.

VII. BOARD'S ROLE VIS À VIS NEGOTIATED SETTLEMENTS

A.    ATCO's Position

**123**    I now turn to one of the main arguments ATCO urged this Court to accept. It is this. If

ATCO is not entitled to recover 2000 Carrying Costs under the Negotiated Settlements, then the Board erred in approving the Negotiated Settlements.

**124**    ATCO's argument follows this line of reasoning. In approving a negotiated settlement and setting tariffs, which is the end result of that approval process, the Board must act in the public interest. This does not simply mean the broader public interest; it also includes the utility's economic interests. The Board must also ensure that a utility is given a "reasonable opportunity to recover" its financing costs. Since this is a mandatory requirement of s. 52(1) of the 1998 Act, the Board is required to intervene where a negotiated settlement does not allow the utility to recover its financing costs even if the utility has agreed to the settlement.[54] Indeed, ATCO goes so far as to argue that the Board has an obligation, in the event of any ambiguity in a negotiated settlement, to resolve that ambiguity in favour of the utility. Therefore, in ATCO's view, the Board erred in approving the Negotiated Settlements and in subsequently failing to vary them to allow for ATCO's recovery of 2000 Carrying Costs.

   B.  Board's Jurisdiction to Approve Negotiated Settlements and Set Rates

**125**    What then is the Board's role in reviewing and approving negotiated settlements? And how does this relate to the Board's role in the context of its rate-setting jurisdiction? More to the point, to the extent that both engage the public interest, what is meant by the public interest?

**126**    To appreciate the linkage amongst these issues, I must first briefly place the Board's traditional rate-setting obligations in context. The history of public utility regulation in Canada, as in a number of other countries, has been a search for how best to strike an appropriate balance between the interests of regulated utilities and their customers. The chosen vehicle to regulate public utilities - an independent commission - and the legislative mandate typically conferred on it - to set just and reasonable rates - both have a long and distinguished pedigree.[55] I do not intend to review that history. Suffice to say that these continue to be the foundational bases for rate regulation of those parts of the electric energy industry in Alberta - transmission and distribution of electricity - that remain regulated despite industry restructuring.

   1.  Statutory Interpretation

**127**    In interpreting the Board's roles and responsibilities under the applicable statutory legislation, one must bear in mind that this is governed by the purposive and contextual approach to statutory interpretation repeatedly endorsed by the Supreme Court of Canada: Re Rizzo & Rizzo Shoes [1998] 1 S.C.R. 27; Bell Express Vu Limited Partnership v. Rex [2002] 2 S.C.R. 559, 2002 SCC 42. The purposive approach requires that a court assess legislation in light of its purpose since legislative intent, the object of the interpretive exercise, is directly linked to legislative purpose. The contextual approach requires, in turn, that the words chosen must be assessed in the entire context in which they have been used. Any attempt to deduce legislative intent therefore cannot be undertaken in a vacuum: Love v. Flagstaff (County) Subdivision and Development Appeal Board (2002) 317 A.R. 261, 2002 ABCA 292 at paras. 20-21.

### 2.    Statutory Provisions Affecting "Just and Reasonable" Rates

**128**    When ATCO sought Board approval of the Negotiated Settlements, the Board's jurisdiction to set just and reasonable rates could be found in two sections of the 1998 Act. Section 51(1) required the Board to ensure just and reasonable compensation for a utility as did s. 81 of the Public Utilities Board Act, R.S.A. 1980, c. P-37.[56] The relevant portion of s. 51(1) follows:

> When considering whether to approve a tariff that is to have effect after December 31, 1995, the Board shall ensure

> (a)    that the tariff is just and reasonable,

....

**129**    Section 52(1) of the 1998 Act defined the framework within which that discretion was to be exercised. In particular, it provided in relevant part:

> When considering an application [for approval of a tariff], the Board shall have regard for the principle that a tariff approved by it must provide the owner with a reasonable opportunity to recover [its prudent costs associated with distribution of electricity].

**130**    Section 52(1) also identified a number of categories of costs potentially recoverable by a utility along with a catch-all section, s. 52(1)(e) which stated: "any other prudent costs and expenses that the Board considers appropriate, including a fair allocation of the owner's costs that relate to any or all of the owner's electric utilities." Identical provisions exist today under the EU Act: ss. 121(2) and 122(1).

**131**    Thus, both then and now, in assessing a utility's legitimate needs, the Board is required to ensure that the utility has a reasonable opportunity to recover its costs, providing they are prudent: British Columbia Electric Railway Co. v. British Columbia (Utilities Commission) [1960] S.C.R. 837 at 843. Within this statutory framework, the Board's discretion in fixing just and reasonable rates is relatively wide. As explained by this Court in TransAlta Utilities Corp. v. Alberta Public Utilities Board (1986) 68 A.R. 171 (C.A.) at 177:

> The key power of this Board is to fix "fair and reasonable" rates. This is a good example of a wide discretion.

### 3.    Board's Duty to Act in the Public Interest

**132**    In fixing just and reasonable rates, the Board is to exercise its discretion in what is typically characterized as the "public interest": ATCO Ltd. v. Calgary Power Ltd. [1982] 2 S.C.R. 557. For

example, the Board's mission statement provides that in regulating utility services, it will ensure that this is done "in the public interest."[57] Considerable attention has been paid to the definition of this public interest standard under a regulated public utility system: Re City of Dartmouth (1976) 17 N.S.R. (2d) 425 (S.C.(A.D.)); Kenora (Town) Hydro Electric Commission v. Vacationland Dairy Cooperative Ltd. [1994] 1 S.C.R. 80; British Columbia Electric Railway Co. v. British Columbia (Utilities Commission) [1960] S.C.R. 837; and Newfoundland (Board of Commissioners of Public Utilities) (Re) (1998) 164 Nfld. & P.E.I.R. 60 (Nfld. C.A.). When used in this context, the fixing of rates in the "public interest" has historically meant consideration of both sides of the rate-paying equation: the payors, that is the customers receiving the utility service, and their right to fair and reasonable rates; and the payee, that is the utility providing the service, and its right to recover its prudent costs and expenses associated therewith: Edmonton (City) v. Northwestern Utilities Ltd. [1961] S.C.R. 392.

**133**    The Board, as the independent regulator of public utility services, is therefore required to assess whether the tariffs claimed strike an appropriate balance between the utility's legitimate interests and those of the rate-paying public: Yukon Energy Corp. v. Yukon (Utilities Board) (1996) 74 B.C.A.C. 58; and Board of Commissioners of Public Utilities v. Nova Scotia Power Corporation, et al. (1976) 18 N.S.R. (2d) 692 (S.C.(A.D.)). This is not an easy task given the inherent conflict between consumers' collective interest in low utility rates for safe, reliable service, on the one hand, and a utility's interest in receiving the maximum return possible on its investment, on the other. Traditionally, the Board's task - determining what is in the public interest in fixing just and reasonable rates - requires a careful weighing and balancing of these competing interests:

> The fixing of tolls and tariffs that are "just and reasonable" necessarily involves ... regulation of the revenues of the regulated entity as the administrative tribunal must balance the interests of the customers with the necessity of ensuring that the regulated entity is allowed to make sufficient revenues to finance the costs of the services it sells to the public: Bell Canada v. Canada (Canadian Radio-Television and Telecommunications Commission [1989] 1 S.C.R. 1722 at 1724 and 1747 et seq.

4.    What is Meant by the "Public Interest"?

**134**    However, what is in the public interest is not a static concept.[58] Given the amorphous nature of the standard, the public interest will vary with the circumstances and the context in which it arises: Portage la Prairie (City) v. Inter-City Gas Utilities Ltd. (1970) 12 D.L.R. (3d) 388 (Man. C.A.). In addition, the shape and contour of the public interest standard is necessarily dependent on the legislative framework in effect. In this regard, Alberta has moved from a fully regulated electric energy industry to deregulation and unbundling of the generation and retailing functions and re-regulation of the transmission and distribution functions. In doing so, it has also adopted a negotiated settlement process to allow regulated utilities and interested parties to contractually agree

to settle all issues in dispute relating to a rate application subject to compliance with Board Guidelines.

**135**    The purpose behind the adoption of this negotiated settlement process was that it would serve as an alternative - a less costly, complex or lengthy one - to the traditional rate base regulation before the Board. Equally important, negotiated settlements constitute an integral part of the legislative framework adopted to achieve a central objective of restructuring - fair and open competition. Competition is the oxygen required for a robust and healthy marketplace. If that competition is stifled, the development of consumer muscle will be inhibited, leaving the consuming public effectively powerless. Hence, the emphasis, through the negotiated settlement process, on allowing parties to negotiate their own contractual arrangements though under Board supervision. The expectation is that this will in turn encourage more meaningful public participation and oversight, more creative solutions for problems and in the end, more effective competition.

**136**    Competition therefore constitutes a fundamental value in the restructured electric energy industry in this province. As noted earlier, in determining the Board's role in the negotiated settlement process and how that process has in turn affected the definition of the "public interest", that value - competition, and the importance of fostering and strengthening it - must inform this analysis.

      5.     Redefining the Public Interest in the Context of Negotiated Settlements
      a.     Board's Discretion Cannot be Fettered by Negotiated Settlement

**137**    Section 67(1) of the 1998 Act, as with s. 134(1) of the EU Act, authorizes the Board to approve a negotiated settlement. In doing so, the Board must, in compliance with its rate-setting mandate, ensure that the tariffs contained therein are just and reasonable. What then is the Board's obligation when determining whether it will - or will not - approve a settlement? The first point is this. Regardless of whether the settlement is unanimous (dissenting views are permitted), the Board retains the jurisdiction to conduct an independent review of the negotiated settlement to determine if it is in the "public interest". The Board's duty to consider the public interest as part of this review process is explicitly identified in both s. 12.3 of the Original Guidelines and s. 12.2 of the Guidelines as follows:

> In determining the acceptability of a settlement agreement, the Board will address any deviation from existing law and policies of the Board and will consider inter alia, whether the agreement is in the public interest....

**138**    The ultimate responsibility for approving negotiated settlements - and ensuring that the process operates in a fair and reasonable manner - must rest with an independent body. That body is the Board. The rationale for impressing this overriding supervisory authority on the Board is to ensure that the negotiated settlement process does not lead to abuse. Further, all consumers cannot be parties to negotiations conducted under the negotiated settlement process. One or more of the interested parties to the settlement may represent some consumers; but none will represent all. And

even a broad range of Intervenors will not necessarily translate into a wide spectrum of positions since parties may make trade-offs which leave other issues unresolved, unaddressed or compromised.

**139**    Thus, as long as the distribution and transmission functions of electric utilities remain regulated, the negotiated settlement process does not replace an appropriate and informed review by the Board as to what is in the overall public interest. Otherwise, members of the consuming public may rightly ask: "Who's protecting our interest?" The answer, at the end of the day, is the Board. That is why negotiated settlements require Board approval. And it is also why the Board's discretion in controlling rates as mandated by statute cannot be fettered by a negotiated settlement: Utilities Consumers' Group v. Yukon (Utilities Board) 2001 YKCA 5, 35 Admin. L.R. (3d) 113. The overriding public interest demands no less.

> b.    Taking into Account the Public Interest

**140**    Accordingly, under the restructured electric utility industry, there are two senses in which the Board is required to consider the public interest: (1) when assessing whether to approve a negotiated settlement; and (2) when assessing whether a proposed tariff is just and reasonable. Is the "public interest" the same under each? And what precisely does it mean? In other words, is the public interest the Board is to consider in evaluating a negotiated settlement equivalent to the public interest that comes into play in evaluating whether a tariff is "just and reasonable"?

**141**    I have concluded that, when the Board is reviewing a utility's application to approve a negotiated settlement agreed to by that utility and determining whether the rates and tariffs contained therein are just and reasonable, the public interest then remaining to be considered by the Board in both instances is the same. In these circumstances, that public interest - redefined to comport with the context in which the interest arises - means the interests of the rate-paying public only, and not the interests of the utility. Thus, for purposes of determining whether to approve the settlement and rates, the Board need not evaluate whether the settlement adequately protects the utility's economic interests.

**142**    I do wish to emphasize that my reasons are confined to the case where a negotiated settlement is presented to the Board for approval and the Board approves the settlement in its entirety. This may occur in one of two ways: (1) if the settlement is presented as a package deal and approved as such by the Board; or (2) if the settlement is not presented as a package deal but is nonetheless approved in its entirety by the Board. In both events, the Board need not have regard to the utility's interests in deciding whether to approve the negotiated settlement. That is the case here since the Negotiated Settlements were presented as package deals and approved by the Board as such.

**143**    However, in other circumstances, for example, if the Board alters or proposes to alter terms and conditions in a negotiated settlement, then the Board's consideration of the public interest will necessarily include the utility's economic interests along with those of the consuming public.

Whether that will be required in respect of all the terms and conditions in the negotiated settlement or only those terms not acceptable to the Board will depend on the wording of the negotiated settlement and the Board's jurisdiction to consider parts of the settlement independent of each other.

     c.    Why Restructuring Calls for a Redefinition of the Public Interest

**144**    There are several reasons why redefining the public interest in the context of a negotiated settlement in the circumstances I have outlined best accords with the purposes of restructuring the electric energy industry, the accompanying legislative changes, the philosophy underlying negotiated settlements and finally, commercial realities.

**145**    First and foremost, when a utility concludes a negotiated settlement and applies, as it is required to do, for Board approval, the Board is entitled to assume that what the utility has negotiated and agreed to is in fact in the utility's best interests. After all, it is difficult to conceive of any party more capable of negotiating the best possible arrangement for a utility than the utility itself. Here, ATCO is a sophisticated corporate investor with ready access to trained personnel and expert assistance in a wide range of highly technical areas. Who better to decide what is in ATCO's interests than ATCO?

**146**    That means in determining whether a negotiated settlement submitted for approval by a utility is in the public interest and whether the rates and tariffs therein are "just and reasonable", the Board is not obliged at this point to consider whether the settlement adequately protects the utility's interests. The Board is instead entitled to proceed on the basis that the negotiated settlement fully satisfies the utility's interests. Thus, the Board need only assess the public interest from the perspective of the consuming public.

**147**    Second, the negotiated settlement process was not designed to allow a utility to cut one deal with interested parties; and then try to secure an even better one before the Board. Hence, it would be contrary to the public interest for the Board to reject a negotiated settlement on the grounds it did not go far enough in protecting the utility's interests. And yet this is essentially what ATCO contends the Board should have done with the Negotiated Settlements. However, allowing the negotiated settlement process to operate in this fashion would be akin to a one way ratchet which would only tighten against Alberta consumers and never loosen - where prices and profits only went up, never down. This would be inconsistent with the legislative intention. Thus, an interpretation leading to this result must be rejected. It follows therefore that Alberta law is not contravened if, during implementation of a negotiated settlement, where a utility has received the very rates and tariff it contracted for, the utility does not earn the level of profits it anticipated, or for that matter, incurs a loss. This is but one example of the restructured electric energy industry in operation in Alberta.

**148**    Third, and this is closely linked to the two prior reasons, there is no statutory obligation on the Board, whether under the negotiated settlement review process or under its rate-setting authority, to bestow upon a utility more than the utility is requesting. Indeed, if a regulatory board

were to do so, that board would likely be failing in its duty to the general public. The reason that, absent a negotiated settlement, the Board is required to have due regard to the utility's interest in setting just and reasonable rates is that typically, the question is whether the utility, which is entitled to a fair rate of return on its investment, should receive everything it is asking for.

**149**    But when a negotiated settlement is presented to the Board as a package deal and approved by it, the utility receives precisely what it has contracted for. To permit a utility to argue, following Board approval, that it ought to have been awarded more by the Board than what it requested - and represented was fair and reasonable on the tariff front - would contravene the legislative emphasis on competition. It would also unacceptably diminish corporate responsibility and accountability for one's actions. When a utility represents to the Board, as ATCO did in seeking approval of both Negotiated Settlements, that it is content with a negotiated settlement and that the tariffs therein are fair and reasonable, the Board is under no obligation to second guess the utility's business decisions.

**150**    Fourth, a utility should not be permitted to resile from its representation to the Board that the tariffs in a negotiated settlement are fair and reasonable from the utility's perspective. When a utility applies for approval of a negotiated settlement or a proposed tariff, the statutory burden rests on the utility to establish that the tariffs it is proposing are in fact fair and reasonable: s. 51(3) of the 1998 Act.[59] In the 1999/2000 Settlement, ATCO expressly acknowledged that the tariffs "as proposed herein, are fair, reasonable and in the public interest." To suggest that the Board was not entitled to rely on this representation - and ought to have rejected the 1999/2000 Settlement despite this representation - runs counter to the philosophy underlying the negotiated settlement process. Parties to a negotiated settlement are bound by it. They have a right to withdraw from the settlement after an application has been filed but only "if evidence is introduced that affects the terms or conditions of a settlement agreement", and subject to compliance with certain procedural requirements: s. 11.1 of the Original Guidelines and Guidelines.

**151**    Nor is this a case where an action by the Board rendered ATCO's representation nugatory. ATCO knew when it made the representation that the Board would not be approving bits and pieces of the Settlement. The Settlement contained a clause, permitted by statute, requiring that the Board accept the Settlement in its entirety and not approve parts only: See para. 3 of the Application for Approval of the 1999/2000 Settlement and s. 68 of the 1998 Act and s. 135 of the EU Act. Therefore, ATCO was well aware when it sought Board approval that the result would either be approval of the 1999/2000 Settlement - with all the terms ATCO had agreed to; or rejection of the Settlement - and full rate litigation and Board hearings. This being so, there was no risk to ATCO that the terms and conditions would be modified or deleted and that its interests would be compromised in some way not contractually agreed to by ATCO. Thus, ATCO's representation that the tariffs were "fair, reasonable and in the public interest" remained in full force and effect throughout. The Board was entitled to rely on that representation without cross-examining ATCO on its reasons for agreeing to the 1999/2000 Settlement.

**152**    Fifth, when a utility chooses to utilize the negotiated settlement process, it cannot complain

that the Board has not given it a "reasonable opportunity" to recover its costs and thus, the utility's interests must remain on the table even after its agreement to the negotiated settlement. In a fully regulated public utility scheme, utilities were never guaranteed full recovery of all costs but simply a reasonable opportunity to do so: Newfoundland (Board of Commissioners of Public Utilities) (Re), supra. With restructuring of the electrical industry, the notion of recovery being limited to a reasonable opportunity has not changed. But what has changed is the Legislature's adoption of a negotiated settlement regime under which those utilities still regulated are free to negotiate settlements on terms acceptable to them, subject to Board approval. This is a process which the Board has spent considerable time defining, and refining, in its Guidelines.

**153**     Therefore, when a utility avails itself of the negotiated settlement process, as ATCO did with respect to both Negotiated Settlements, its reasonable opportunity to achieve recovery of its costs is subsumed in that process. As part of that process, a utility is, of course, free to bargain away any rights it might have in exchange for other terms and conditions acceptable to it. Thus, once a settlement has been concluded on terms agreed to by the utility, the utility's "reasonable opportunity" to recover costs incurred has been spent, unless of course, the Board rejects the negotiated settlement in whole or in part.

**154**     To suggest otherwise would effectively gut the negotiated settlement process. Which parties adverse in interest to a utility would participate in this process if they knew that any deal made, with any and all compromises it might involve, could simply be undone before the Board - and worse yet, at the request of the utility? Were this approach permitted, then the negotiated settlement process would set a floor only for what a utility could receive, not a ceiling. This cannot have been intended by the Legislature. Thus, there is nothing inherently unfair or unreasonable about the Board's assuming a negotiated settlement concluded by a utility adequately protects that utility's interests.

**155**     Sixth, the fact that a negotiated settlement requires a utility to bear some risk does not by itself warrant the Board's considering the utility's interests when deciding if that allocation is in the public interest. A fair allocation of risk between consumers and a utility is a natural byproduct of the negotiated settlement process. Indeed, risk is an integral part of competition. If there were no consequences flowing from bad business decisions, what would be the incentive to make good ones? Therefore, the fact that a utility is at risk for some loss, whether under a negotiated settlement or otherwise, is arguably very much in the public interest.

**156**     Restructuring was never intended to confer on utilities all the benefits of a restructured electric energy system and impose on consumers all the burdens. So in the end, a fair allocation of risk as between consumers and utilities not only strikes an appropriate balance amongst competing interests, it also promotes the overall public interest. After all, if, as a result of inopportune business decisions, the only consequence was that the Board raised rates, it would not take long before the public could not afford the services or the government intervened and either way, this would not be in a utility's own enlightened self-interest.

**157**    Seventh, when, as here with respect to both Negotiated Settlements, a utility presents a negotiated settlement to the Board as a "package deal", this too militates strongly against Board intervention in favour of the utility's interests. When parties negotiate settlements, tradeoffs and compromises are not uncommon as the Board itself recognizes in its Guidelines: s. 12.3. See also Radhakrishnan v. University of Calgary (2002) 312 A.R. 143, 2002 ABCA 182 at para. 43. This is why it is dangerous to assess one aspect of a negotiated settlement in a vacuum.

**158**    The issue of 2000 Carrying Costs is a perfect example of this. ATCO now wants to be paid 2000 Carrying Costs on the Deferral Accounts, one of its arguments being that the amounts in question are significant.[60] However, the flip side of this argument is that the carrying costs are significant because the principal amount of the Deferral Accounts is much higher than anticipated. What this means above all is that someone must pay for the higher than expected deficiencies in ATCO's Deferral Accounts - and that someone is ATCO's customers. Viewed from this perspective, therefore, it will be apparent that the risks assumed by ATCO in terms of 2000 Carrying Costs pale by comparison with those borne by ATCO's customers.

**159**    Indeed, when ATCO sought approval of the balances in its Deferral Accounts, at least one party contended that the Board should not approve the amounts sought because ATCO had failed to hedge its position on certain pool price deferral accounts.[61] Municipally-owned utilities had hedged, but not so investor-owned utilities like ATCO. ATCO's answer was essentially that the 1999/2000 Settlement was a "package deal"; it had no obligation to manage risk in this way under the 1999/2000 Settlement; and a deal is a deal.[62] The Board accepted ATCO's argument and approved all the deficiencies ATCO claimed in its Deferral Accounts. However, the corollary to ATCO's argument is that the 1999/2000 Settlement cannot be a deal to which only one side - ATCO's customers - are bound. This points out the error in approaching the issue of 2000 Carrying Costs in isolation from the other issues to which it is firmly tethered.

**160**    For these reasons, therefore, when the Board is called on to review a negotiated settlement agreed to by a utility in the circumstances I have outlined, the public interest to be considered by the Board in these circumstances is that of the consuming public generally. This public interest standard applies with equal force to the Board's assessment of whether the tariffs in the negotiated settlement are "just and reasonable" meaning that here too, the Board must have due regard to the interests of the rate-paying public and not the utility's economic interests.

**161**    I note, on this point, the Board has confirmed that if a unanimous negotiated settlement is "patently against the public interest", it will intervene: s. 12.5 of the Guidelines. I decline to comment on whether this formulation of the Board's authority sufficiently protects the public interest of Albertans as required under the applicable legislation. That must await another day. It is enough to confirm that the Board is entitled to assume that when a utility applies for approval of a negotiated settlement agreed to by it, that settlement is in the utility's interests; the question remaining for the Board is whether it is in the public interest generally.

C.    Board Variance of a Negotiated Settlement

**162**    This redefinition of the public interest in these circumstances is entirely reasonable given the overall legislative scheme. This is especially so considering that the legislation contains a safety valve in the event of unforeseen circumstances. Both the 1998 Act and the EU Act allow for the Board to revisit and vary an approved negotiated settlement in this event. This option exists under the Board's general authority to review, rescind or vary a tariff since Board approval of a negotiated settlement constitutes, in effect, approval of the tariffs contained therein. The relevant portion of s. 57(2) of the 1998 Act, dealing with the Board's variance powers, provides:

> Any person affected by an order approving a tariff may ask the Board to review the order...

> (c)    if, since the date of the order, circumstances have changed in a substantial and unforeseen manner that renders the continuation of the tariff unjust and unreasonable....[63]

**163**    The Board made the point in Decision 2001-93 that no one, including ATCO, had applied to vary the Negotiated Settlements under this provision.[64] In considering a variance application, the Board would, of course, need to take into account the full extent of negotiated compromises in evaluating whether one party to the negotiated settlement is entitled, after the fact, to raise claimed unforeseen circumstances when seeking an additional benefit. This review would necessarily require an assessment of a number of factors including:

> (1)    whether the event could or should have been foreseen with reasonable diligence;
> (2)    whether reasonable business practices, such as, for example, hedging, would have protected against the consequences of unforseen events and should have been pursued;
> (3)    whether the parties have already allocated the risk of unforeseen events under the negotiated settlement and to whom; and
> (4)    whether the required degree of relative significance has been met.

Even assuming the required degree of materiality has been met, in the end, the question comes down to allocation of risk and who should bear it - or share it.

D.    Conclusion

**164**    For all the reasons explained, I have concluded that the Board did not err in approving the Negotiated Settlements nor in failing to vary them after the fact to allow ATCO to recover 2000 Carrying Costs. The legislative scheme now in effect for the electric energy industry in Alberta militates strongly in favour of requiring a utility to be bound by a negotiated settlement once the

utility files an application for Board approval of that settlement. The Negotiated Settlements were voluntarily agreed to by ATCO with several interested parties; ATCO applied to the Board for approval of the Negotiated Settlements; ATCO represented that the Negotiated Settlements were fair and reasonable and in the public interest; ATCO adduced no evidence of any improprieties in the negotiated settlement process or non-compliance with the Original Guidelines with respect to either Settlement; ATCO has relied on the terms of the Negotiated Settlements - and on the fact "a deal is a deal" - to defend the principal amount of the deficiencies claimed in the Deferral Accounts; and ATCO has received everything it contracted for under the Negotiated Settlements. This ground of appeal must be dismissed.

## VIII. BOARD METHODOLOGY IN CALCULATING COSTS OF FINANCING

A.    Standard of Review

**165**    This then takes me to the final ground of appeal. ATCO challenges the methodology the Board used in calculating 2001 Carrying Costs and 2002 Carrying Costs. Since this decision of the Board is subject to the patently unreasonable standard of review, the decision must be clearly wrong. A patently unreasonable decision is one that is so flawed, no amount of deference can justify letting it stand. A patently unreasonable decision has also been described as "clearly irrational" or "evidently not in accordance with reason": See Ryan at para. 52 citing Canada (Attorney General) v. Public Service Alliance of Canada [1993] 1 S.C.R. 941 at 963-64, per Cory J.; Centre communautaire juridique de l'Estrie v. Sherbrooke (City) [1996] 3 S.C.R. 84 at 91-93, per Gonthier J. Having carefully reviewed the Board's decision on this issue, there is no basis for finding that it is patently unreasonable. Indeed, the Board's decision is well-reasoned and amply supported.

B.    Sources of Board's Jurisdiction to Determine Methodology

**166**    The Board's authority to determine the methodology to be used in calculating the cost of financing the Deferral Accounts flows from three sources - one contractual, and two statutory. All complement each other. Under Clause 29(d) of the 2001/2002 TFO Settlement, if the parties were unable to agree on a "weighted average cost of capital rate for 2001 and 2002" on the Deferral Accounts, they would then "request the [Board] to determine that rate for 2001 and 2002". That is what happened here. Hence, the Board was, by the 2001/2002 TFO Settlement, responsible for determining the WACC for the Deferral Accounts, both PPDAs and NPPDAs. Since the Settlement did not impose any limits on the exercise of the Board's discretion, it is necessary and appropriate to look to the statutory sources of the Board's jurisdiction to determine how that discretion ought to be exercised.

**167**    As for those statutory sources, first, the 1998 Act required the Board to assess "prudent costs" of financing, the "prudent costs" standard being a fundamental principle of utility regulation.[65] Second, under the Deferral Accounts Regulation, the Board was also required to assess the "prudent" costs of financing distribution pool price deferral accounts.[66] As noted by the Board, while this requirement under the Regulation was limited to distribution pool price accounts, it

simply repeated the same obligation already imposed on the Board under existing legislation. There is no dispute on this point. Accordingly, the Board was entitled to rely on its statutory jurisdiction to determine "prudent costs" of financing, there being no inconsistency between these sources and the Board's contractual mandate.

**168**    What then were the Board's obligations under the Deferral Accounts Regulation? Section 4(1) conferred on the Board the authority to determine the costs of financing certain deferral accounts of a utility:

> The Board must determine an amount that is payable in 2001 to the owner of an electric distribution system in respect of the cost of financing the amounts in the owner's deferral accounts in 2001.

**169**    Section 4(2) of the Deferral Accounts Regulation defined in turn the kinds of costs to be recovered by the utility:

> In determining an amount under subsection (1), the Board must ensure that an owner is able to recover the prudent cost of financing the amounts in its deferral accounts which may include debt financing, equity financing or a combination of debt and equity financing.

**170**    In the result, therefore, given the dual statutory source of the Board's authority coupled with the contractual authority, the Board had the jurisdiction to determine ATCO's carrying costs for the Deferral Accounts, both PPDAs and NPPDAs, in accordance with the "prudent costs" standard. It should be noted that the Board's use of a WACC approach for purposes of calculating those carrying costs - under which the overall rate of return would be calculated as a weighted average of the rates of return on the various components - is not in issue. Nor is there any disagreement about ATCO's entitlement to carrying costs for 2001 and the first quarter of 2002 on the Deferral Accounts. What is in dispute is the level of those carrying costs and in particular the basis on which the Board established the WACC for calculation of those costs.

C.    Board's Reasons

**171**    The Board used the stand-alone principle as a critical element in its assessment of carrying costs on the deferral accounts of a number of utilities before it in Decision 2001-92, one of which was ATCO. The purpose of the stand-alone principle is to notionally isolate and categorize - for accounting and rate-making purposes - the costs incurred in the operation of a discrete business function of a utility. The Board distinguished between two recognized applications of the stand-alone principle. First, the principle could be used to allocate costs as between regulated and non-regulated activities of an integrated utility, the theory being that customers should pay only for the costs of the utility's providing the regulated service, not the costs of other non-regulated activities. Hence the need to isolate the utility's costs associated only with the regulated service. However, the Board concluded that this application of the stand-alone principle, frequently relied on

in utility regulation, was not relevant to the task before the Board.

**172**    What was relevant in the Board's view though was the second accepted application of the stand-alone principle. This application involves allocating costs incurred by an integrated utility amongst its various business functions - for instance, the costs incurred in administering deferral accounts - so that just and reasonable rates might be set for each business function. In using this principle to determine a utility's costs of financing the administration of deferral accounts, the Board essentially had three options open to it.

**173**    The first, which some distribution utilities who were parties to Decision 2001-92 urged on the Board, was to determine a WACC for a stand-alone deferral accounts operation that would be required to seek financing in the marketplace on the basis of that business alone. The second was to treat the deferral accounts operation as a stand-alone business unit but one that was part of a distribution utility's business operations. The third, and the one selected by the Board, was to treat the deferral accounts operation as a stand-alone business unit but one that was part of an integrated utility's business operations. At the hearing before the Board, it appears that ATCO argued in support of the first option. ATCO now disagrees with all three, arguing that reliance on the stand-alone principle is misplaced since there was no separate deferral accounts business.

**174**    ATCO also challenges the Board's conclusions that the deferral account business function was low risk and that only a 15% equity component was therefore warranted. ATCO insists that the applicable WACC should be based on the standard WACC for the overall ATCO corporate entity because the administration of the deferral accounts was not a separate business service. With respect to the risk the Board assigned to the "deferral account business", ATCO argues that since the Board was empowered to review ATCO's Deferral Accounts, and other parties were seeking to disallow certain amounts, ATCO was exposed to more risk than that assigned by the Board. In ATCO's view, there was a very real potential for disallowances.

         1.     Board's Reliance on Stand-Alone Principle

**175**    I do not find ATCO's arguments on this issue persuasive. ATCO's primary challenge is to the Board's basing its determination of a WACC on what it characterizes as a "fictional" deferral accounts business. It is true that the administration of the deferral accounts was not operated as a separate stand-alone business by any of the utilities. But that is not the point. The issue facing the Board was how to evaluate the risks associated with the administration of these deferral accounts for the purposes of calculating "prudent" financing costs thereon. Thus, the focus of the Board's analysis was on risk, both business and financial, of this particular business function. The key point - and the one which ATCO appears to ignore - is the Board's conclusion that the risks associated with the administration of deferral accounts were far less than the risks associated with the other business functions of an integrated utility. Hence, in determining the appropriate WACC to apply to the operation of the deferral accounts, the Board concluded that it would not be proper to calculate those costs as if the deferral accounts were in the same category of risk as the other business

functions of an integrated utility when they were not.

**176**    That is the reason the Board chose to treat the administration of the deferral accounts as a separate stand-alone business unit within the totality of an integrated electric utility and to calculate the costs of financing on this basis. I see no error by the Board in its application of the stand-alone principle. The Board explained at length its rationale for, and method of, applying the "stand-alone" principle to the administration of deferral accounts: Decision 2001-92 at pp. 24-29, AB Vol. II, F105-F110. In particular, it pointed out that under restructuring, it was necessary to determine business risk and return by function so that the Board might fix rates and tariffs by business function: Decision 2001-92 at p. 26, AB Vol. II, F107. This approach is entirely reasonable.

**177**    The Board also emphasized that treating the administration of deferral accounts on a "stand-alone" basis but within the context of an integrated utility was wholly consistent with the Board's approach in Decision U99099 for three other business functions of an integrated utility: generation, transmission and distribution services. The fact that the deferral accounts were treated in a similar fashion to other business functions of an integrated utility represents a significant factor supporting the reasonableness of the Board's approach.

**178**    I also note that the evidence of the Independent Financial Experts to the Board, Messrs. Demcoe and McCormick (collectively the "IFE"), supports the Board's approach. The IFE testified that the stand-alone principle was developed as a shield to protect customers from higher rates due to subsidization of non-regulated activities. Therefore, in the IFE's view, it ought not to be used as a sword to require customers to pay higher rates simply because of a notional separation of what remained as integrated business functions. The IFE also argued that the stand-alone principle did not reflect the reality of how a utility accessed the capital market. When a utility sought financing, this was not done on behalf of some discrete business function in the organization but rather on behalf of the larger corporate entity itself. For these reasons, the IFE concluded that:

> ... the Board should "not apply the stand-alone principle by rote. Instead the Board should deal with the reality, utilize independence of thought, question assumptions and think through whether an approach that has been applied in the past in different circumstances should be applied now in new circumstances. Such an approach should lead the Board to deal with reality and to decline to apply the stand-alone principle to the detriment of the customers of the [distribution companies].[67]

**179**    This is precisely what the Board did. It fully considered a number of separate issues affecting calculation of carrying costs and examined the business risk elements inherent in that calculation. Its conclusion was that the business risks, including the capital recovery risks, associated with the administration of the deferral accounts were, by their nature, very low: Decision 2001-92 at p. 46, AB Vol. II, F127. Further, that risk was "significantly lower than the business risk of any of the three business functions" of an integrated utility: Decision 2001-92 at p. 53, AB Vol. II, F134. Thus,

the Board decided that it would be fair and reasonable to consider the deferral accounts operation as a separate stand-alone business unit but within the totality of the integrated electric utility as it existed in the year 2000. The Board recognized that if this were not done, and the deferral accounts operation were treated purely as a stand-alone business as more than one party had urged at hearing, this would have "likely led to a windfall for the integrated utility"[68]. The Board also noted, correctly in my view, that while prudent costs does not mean the lowest possible costs "financing costs that are unnecessary and inflated, or alternatively, result in windfall profits to the utility cannot be considered prudent."[69] These are conclusions which the Board was entitled to reach on this evidentiary record - and they are conclusions which weigh heavily in favour of the reasonableness of the Board's approach.

**180**    More fundamentally, though, the question of what financial model to use in calculating carrying costs of a particular business function of a utility's operations is precisely the kind of issue which the Legislature intended to leave to the Board's discretion. As noted, an important feature of this analysis is the determination of the level of business and financial risk associated with a particular function. The fact a utility chooses to order its affairs in a particular fashion for internal purposes does not immunize it from Board scrutiny to determine what a fair and appropriate allocation of financing costs would be for a specific business function regardless of how the utility has structured its operations.

**181**    Nor can a utility complain where the Board recognizes that some aspects of an integrated utility's business functions are less risky than others - and calculates financing costs accordingly. The Board is under no obligation to use an integrated utility's highest risk functions as the basis for setting the capital requirements of its lowest risk functions. That would be to ignore commercial realities. Thus, the Board has the jurisdiction to segregate business functions of an integrated utility - and determine a notional corporate organizational model - for purposes of evaluating risk and calculating prudent carrying costs associated therewith.

2.    Capital Structure - 85%/15% Debt/Equity Ratio

**182**    The Board's assessment of the level of risk associated with the administration of the deferral accounts also affected its view of the notional capital structure to be used to finance those accounts. As noted, the Board concluded that those risks were much lower than the risks of any of the three other business functions of an integrated utility. That conclusion is not only reasonable; it is beyond dispute. As long as the balances in the Deferral Accounts were properly incurred, ATCO had a right to recover the same under the terms of the 1999/2000 Settlement. Hence, the Deferral Accounts were clearly impressed with less risk than would reasonably attach to any of ATCO's other business functions - generation, distribution or transmission. The only question that arose was when recovery of the Deferral Accounts would occur. And the Deferral Accounts Regulation provided that this would be within no more than a defined three year period, concluding December 31, 2004.

**183**    As a result, the Board determined that the appropriate debt-equity ratio was 85%-15%. The

Board also concluded, not only reasonably, but correctly in my view, that the debt should be short to intermediate given the fast payback. This finding is incontrovertible since the Board itself allowed ATCO to recover the Deferral Accounts from customers by March 31, 2003.[70] Nor can it be argued that the Board wrongly based its decision on the assumption that securitization of the deferral accounts had been possible during the time frame in question even though it was not. A careful review of the Board's reasons confirm that in determining the appropriate capital structure, the Board found that securitization should not be factored into its calculations. The Board approved a prudent debt cost for 2001 at 6.45% for an investor-owned utility like ATCO and 5% for the first quarter of 2002 given falling interest rates. With respect to a return on equity, it approved a 9.5% return for 2001 and 9% for the first quarter of 2002.

**184**    For these reasons, I disagree with the assertion that the Board erred in the capital structure - 85% debt, 15% equity - assigned to the deferral accounts business. For the Board to base its decision on a notional blend of capital requirements is clearly permitted under Alberta law. The Deferral Accounts Regulation, which reflects existing jurisprudence, recognized that the Board could choose debt financing alone or a combination of debt and equity. In fact, in the opinion of the IFE, costs of financing the Deferral Accounts should have been based almost exclusively on debt financing, which would have been more advantageous to consumers than the approach taken by the Board.

**185**    It is not therefore an error of law or jurisdiction when the Board decides on a notional capital structure after properly considering the evidence before it. As one author compellingly points out:

> When a commission in determining cost of capital disregards the ... capital structure proposed by management it is no more invading the domain of management than when it disregards unreasonable expenses for labour, fuel, or other productive factors in prescribing rates.[71]

### 3.    Risk and ATCO's Deferral Accounts

**186**    ATCO nevertheless contends that there were significant risks associated with repayment of the Deferral Accounts. It argues that it had no assurance that the principal balance of its Deferral Accounts would be approved by the Board. The Board was authorized to review the balances under the 1999/2000 Settlement since the parties were unable to agree on the amount of the Deferral Accounts. Further, the Deferral Accounts Regulation itself required the Board to review the balances, at least those in the PPDAs: s. 2. ATCO uses this prudency review by the Board to support its claim that a higher risk was therefore attached to recovery of the Deferral Accounts since some might be disallowed by the Board. However, ATCO's argument is inherently flawed. A utility is not entitled to receive a higher rate of return on prudent expenditures simply because of the risk the Board will deny recovery of imprudent ones. To accede to this argument would reward imprudence. This cannot be. ATCO - and not its customers - bears the risks associated with any

improper expenditures on its part.

    4.    Further Reasons in Support of the Reasonableness of Board's Conclusions

**187**    It must also be remembered that oftentimes the Board is engaged in an assessment of a utility's prospective costs for the purposes of setting rates. This is a complex task given the unknowns the future holds. Part of this exercise requires the Board to determine the reasonableness of a debt to equity ratio and the financing methods available to a utility. When the Board makes a decision based on forecasted costs and expenses, it does so without any certainty as to the utility's actual future expenses nor for that matter future financing rates.

**188**    Here, however, the problems facing the Board were far less acute than those involved in prospective rate setting. The Board was dealing with a largely retrospective examination of actual deferral account carrying costs. When it made its decision on calculation of costs of financing, the Board knew both the principal amount of the Deferral Accounts on which those costs would accrue and the length of time during which the Deferral Accounts and costs of financing would be recovered by ATCO. Despite objections by some Intervenors, the Board allowed ATCO to recoup all of its 2000 Deferral Accounts and costs of financing over the time frame claimed by ATCO, that is by March 31, 2003.

**189**    What does this all mean? First, the reasonableness of the debt to equity ratio in financing the Deferral Accounts is a matter that falls squarely within the Board's expertise and considerable deference should be paid to the Board when engaged in this analytical exercise. Second, the time frame during which ATCO was required to carry the burden of unpaid deferral accounts until repayment began was very short - from January 1, 2001 until July, 2001 for the NPPDAs and from January 1, 2001 until July, 2002 for the PPDAs. Third, the Board had a clear picture of actual interest rates in effect during most of that time frame as well as of ATCO's actual embedded debt costs during most of that same time frame. Fourth, because the Board allowed ATCO to recover all these costs by March 31, 2003, the Board was well aware of the limited risks being assumed by ATCO. Put simply, there was no regulatory risk attached to ATCO's recovery of the Deferral Accounts. Finally, from a practical perspective, the Board is entitled to even more deference when dealing with known facts since a utility's ability to assert that the Board has relied on improbable or unfair assumptions in assessing future costs and recovery periods is correspondingly diminished.

    D.    Summary

**190**    For these reasons, having regard to the standard of review, the Board did not err in the methodology it used to assess an appropriate capital structure for the costs of financing ATCO's Deferral Accounts. Not only are the Board's reasons not patently unreasonable, in my view, they are entirely reasonable.

IX. CONCLUSION

**191**    The answers to the three questions posed above are as follows:

Question 1:              Did the Board err in finding that ATCO was not entitled to 2000 Carrying
                         Costs on the Deferral Accounts?

Answer:    No.

Question 2:              Did the Board err in approving the Negotiated Settlements or alternatively, in
                         failing to vary the Negotiated Settlements?

Answer:              No.

Question 3:              Did the Board err in the methodology it used to calculate ATCO's 2001 Car-
                         rying Costs and 2002 Carrying Costs on the Deferral Accounts?

Answer:    No.

**192**    The appeal is dismissed. In accordance with s. 26(10)(c) of the AEUB Act, I hereby confirm
the Decisions of the Board.

FRASER C.J.A.
 MCFADYEN J.A.:-- I concur.
 PICARD J.A.:-- I concur.

* * * * *

APPENDIX A - DEFINITIONS

1995 Act
                         Electric Utilities Act, S.A. 1995, c. E-5.5.

1998 Act                 1995 Act as amended by the Electric Utilities Amendment Act, S.A.
                         1998, c. 13.

| | |
|---|---|
| 2000 Carrying Costs | carrying costs for 2000 on the 2000 distribution pool price and non- pool price deferral accounts under the 1999/2000 Settlement. |
| 2001 Carrying Costs | carrying costs for 2001 on the 2000 distribution pool price and non-pool price deferral accounts under the 1999/2000 Settlement. |
| 2002 Carrying Costs | carrying costs for 2002 on the 2000 distribution pool price and non-pool price deferral accounts under the 1999/2000 Settlement. |
| 1999/2000 Settlement | 1999/2000 Tariff Application Phase I Negotiated Settlement. |
| 2001/2002 TFO Settlement | 2001/2002 Transmission Facility Owner Negotiated Settlement. |
| AEUB Act | Alberta Energy and Utilities Board Act, R.S.A. 2000, c. A-17. |
| ATCO | ATCO Electric Ltd. |
| Auction Rules | rules set out in the Power Purchase Arrangement Auction Regulation, Alta. Reg. 85/2000 pursuant to which the PPAs were to be sold. |
| Board | Alberta Energy and Utilities Board. |
| Board Rules | Alberta Energy and Utilities Board Rules of Practice, Alta. Reg. 101/2001. |
| Decisions | Board Decisions 2001-83, 2001-92 and 2001-93. |
| Deferral Accounts | PPDAs and NPPDAs. |
| Deferral Accounts Regulation | Deferral Accounts Deficiency Correction Regulation, Alta. Reg. 240/2000 as amended by Alta. Reg. 6/2001. |
| EU Act | Electric Utilities Act, S.A. 2003, c. E-5.1. |
| Guidelines | Original Guidelines as amended by the Board on February 4, 2003. |
| IFE | Independent Financial Expert to the Board (Messrs. Demcoe and Mc- |

Cormick) referred to in Decision 2001-92.

NPPDAs                          2000 distribution non-pool price deferral accounts under the 1999/2000
                                Settlement.

Original Guidelines             Negotiated Settlement Guidelines issued by the Board on May 15, 1998.

PPAs                            power purchase arrangements.

PPDAs                           2000 distribution pool price deferral accounts under the 1999/2000 Set-
                                tlement.

PUB Act                         Public Utilities Board Act, R.S.A. 2000, c. P-45.

Regulation                      Deferral Accounts Regulation.

Rules                           Public Utilities Board Rules of Practice, Alta. Reg. 602/57.

WACC                            weighted average cost of capital.

1 In "Electricity Deregulation in Canada: An Idea Which Has Yet to be Tried?" (2002) 40
Alta. L. Rev. 97 at 100, Andrew J. Roman challenges the use of the term deregulation: "The
problem of assessing benefits and costs to consumers is compounded by the fact that
deregulation is not a precise term signifying something specific. Rather, it refers to a series of
different activities undertaken by government over an extended time period, resulting quite
possibly in more, albeit different, regulation as the process evolves. That is why it is
sometimes referred to as reregulation' rather than deregulation."

2 The Board remains the regulatory authority with respect to transmission and distribution
functions for all investor-owned utilities. That includes the appellant in this case, ATCO

Electric Ltd. Under the EU Act, as with the 1998 Act before it, the Board does not regulate rates charged by municipally-owned utilities unless a municipality passes a bylaw authorizing the municipally-owned utility to be governed for these purposes by the Board. In this event, the Board becomes the regulatory authority for purposes of setting rates for transmission and distribution functions of the municipally-owned utility. A rural electrification association (REA) is an association under the Rural Utilities Act, R.S.A. 2000, c. R-21, that has as its principal object the supply of electricity to its members. Rates for REAs are regulated by the board of directors for each REA: s. 102 of the EU Act. In the result, the Board is the regulatory authority for transmission and distribution functions for investor-owned utilities and those municipally-owned utilities brought under the EU Act by bylaw of the subject municipality.

3 As explained by the Hon. Richard Magnus when moving second reading of Bill 34, Electric Utilities Act, "The third area of reform involves the regulatory system....The cost of regulation will also be reduced by greater reliance on the negotiated settlement of regulatory issues rather than through costly and lengthy hearings": Alberta Hansard, (2 May 1998) at p. 1488 (Hon. Richard Magnus).

4 See s. 65(1) of the 1995 Act and 1998 Act; and s. 132(1)(a) of the EU Act.

5 The Board requires that proper notice be provided by the utility to all interested parties as a precondition to settlement negotiations: s. 3.1 of the Original Guidelines and Guidelines. The Guidelines now set forth an additional number of terms and conditions which must be met by parties participating in the negotiated settlement process. For example, the Guidelines provide that Board approval is required before parties may even commence settlement negotiations: s. 4.1. The Board may also decide what can - and cannot - be the subject of a Negotiated Settlement: s. 4.1.

6 At the time of conclusion of the 1999/2000 Settlement and the Application which preceded it, ATCO was named Alberta Power Ltd. Thus, the Application and Settlement are both in the name of Alberta Power Ltd. For ease of reference, I refer throughout this judgment to the company's current name, ATCO.

7 The Intervenors and signatories to the 1999/2000 Settlement were the Alberta Association of Municipal Districts and Counties, Alberta Federation of REA's Ltd., Alberta Irrigation Projects Association, City of Lethbridge, City of Red Deer, Consumers Coalition of Alberta, Enmax Corporation, ESBI Power Ltd., Independent Power Producers Society of Alberta, Industrial Power Consumers Association of Alberta, Municipal Intervenors, Public Institutional Consumers of Alberta and Senior Petroleum Producers Association.

8 The Intervenors and signatories to the 2001/2002 TFO Settlement were Alberta Cogenerators Council, Alberta Association of Municipal Districts and Counties, Alberta Federation of REA's Ltd., Alberta Irrigation Projects Association, Alberta Urban

Municipalities Association, City of Calgary, City of Lethbridge, City of Red Deer, Consumers' Coalition of Alberta, Enmax Corporation, ESBI Alberta Ltd., Independent Power Producers Society of Alberta, Industrial Power Consumers and Cogenerators Association of Alberta, Public Institutional Consumers of Alberta, Senior Petroleum Producers Association and TransCanada Energy Ltd.

9 These are discussed in Part III below.

10 Further details of the disputed carrying costs are provided in Part III below.

11 The stated rationale was expressed this way: "This Bill establishes a new structure for the Alberta electric industry. The new structure has been designed to preserve and enhance the Alberta advantage by putting downward pressure on electricity prices...": Alberta Hansard (2 May 1998) at p. 1488 (Hon. Richard Magnus).

12 There were others involved in the industry, for example, the City of Medicine Hat, but they did not play a major role in the marketplace.

13 It was not until early 2001 that the price for the majority of transactions was determined in the market and not under regulated contracts.

14 It was in 1998 that the first independent Transmission Administrator, ESBI Alberta Ltd., was appointed. The duties of the Transmission Administrator were transferred in 2003 to an independent body, the Alberta Electric System Operator.

15 Transmission wire owners own the system of high-voltage power lines and related facilities that link generating units and customer loads throughout Alberta. Distribution wire owners own the low-voltage power lines and related facilities that connect customer sites to the system.

16 The Transmission Administrator is responsible for setting province-wide tariffs for system access subject to regulatory approval by the Board.

17 Exceptions were provided for exempted industrial systems that produced power for their own use and generators in remote areas not connected to the grid. Alberta is part of an interconnected grid which includes British Columbia and the western U.S.

18 For a summary of the changes in the early stages of restructuring in Alberta, see Black, A.J., "Electricity Competition and Fair Market Access in Canada", (1999) 20 Energy Law Journal 291.

19 The terms and conditions of the PPAs were approved by the Board in Decision U99113 dated December 24, 1999.

20 Not everyone agreed this would work. See Submission of the Consortium (Alberta Association of Municipal Districts and Counties, the Alberta Federation of REA's Ltd., Alberta Irrigation Projects Association, Alberta Urban Municipalities Association, City of Calgary, City of Lethbridge, City of Red Deer, Consumers' Coalition of Alberta, IPPSA/SPPA, the Industrial Power Consumers Association of Alberta, the Municipal Intervenors and the Public Institutional Consumers of Alberta) entitled "Evidence and Recommendations of the Consortium" in proceeding 990277 before the Board on October 13-17, 1999 prepared by Drazen Consulting Group.

21 It must be emphasized that under the restructured electric energy industry model, any power generating units built after the 1995 Act came into effect were not regulated under the applicable legislation. Thus, power from these new units, when built, was to be excluded from the PPAs.

22 The PPA auction was held in August 2000. In accordance with the Auction Rules, it was held by an auction firm appointed by the Minister of Resource Development and the Minister was the auctioneer: s. 2 of the Auction Rules. The proceeds from this auction were more than $1.1 billion. However, many PPAs remained unsold and the Balancing Pool assumed these unsold PPAs. It has since implemented two programs of sale, Market Achievement Plans I and II, in which it offered the unsold energy in future oriented contracts. The first sale was in December, 2001 and the second took place throughout 2002 and 2003. Under these contracts, the Balancing Pool remains liable for the obligations owed to owners of the generating units but receives revenue from the purchasers over the term of the contracts. The Balancing Pool is now governed by Part 4 of the EU Act.

23 See s. 87(b) of the EU Act.

24 See orders issued by the Minister of Resource Development: Ministerial Order 74/2000, issued November 30, 2000, and Ministerial Order 80/2000, issued December 20, 2000.

25 The hedge was designed to ensure that in any hour, the distributer could purchase an amount of power equivalent to their entitlement share of the energy generated by a generating unit, called the unit obligation amount, at a net price equivalent to each unit's cost to produce that amount. The distributors' entitlement shares were based on a forecast of their share of the load for that hour.

26 The utilities subject to regulatory control by the Board are (1) investor-owned utilities; and (2) municipally-owned utilities where the municipality has passed a bylaw designating the Board as the applicable regulatory body for its municipal distribution system.

27 The Board's authority to control the prices charged by generators of electrical power ended December 31, 2000 when deregulation of prices charged by generators came into effect. This is the largest component of the cost of electricity. It has been estimated that generation costs

account for approximately 70% of the cost of electricity; transmission and distribution for only about 30%: Andrew J. Roman, "Electricity Deregulation in Canada: An Idea Which Has Yet to be Tried?" (2002) 40 Alta. L. Rev. 97 at 114.

28 Whether a hearing is required before the Board as part of the approval process for a negotiated settlement is subject to determination by the Board: s. 35 of the Alberta Energy and Utilities Board Rules of Practice, Alta. Reg. 101/2001. Before the Board Rules were in effect, the Rules of Practice, Alta. Reg. 602/57 passed under the Public Utilities Board Act, R.S.A. 1980, c. P-37 governed. Under these Rules too, the Board also had the discretion to determine when to call a hearing. The Board's powers also extend to requiring the parties to return to the negotiated settlement process to attempt to resolve any parts of a negotiated settlement not acceptable to the Board: s. 33 of the Board Rules.

29 See Decision U99099 at p. 202.

30 The Deferral Accounts Regulation, which came into effect on November 28, 2000, was subsequently repealed and replaced by the Deficiency Correction Regulation, 2002, Alta. Reg. 53/2002 on March 20, 2002. However, the Deficiency Correction Regulation, 2002 essentially re-enacted the Deferral Accounts Regulation as Part 2 of the 2002 Regulation. Since the 2002 Regulation was not in force at the time of the Board Decisions under appeal, all section reference numbers are to the Deferral Accounts Regulation.

31 Established by Clause 32 of the 1999/2000 Settlement, this deferral account accumulated the difference in Transmission Access Payments paid by ATCO between the forecast cost and actual cost for each of 1999 and 2000. ATCO claimed the balance in this account for 2000 was $20,515,000.00.

32 Established by Clause 33 of the 1999/2000 Settlement, this deferral account accumulated the difference in Reservation Payments paid by ATCO between the forecast cost and actual cost for each of 1999 and 2000. ATCO claimed the balance in this account for 2000 was $3,817,000.00.

33 Established by Clause 36 of the 1999/2000 Settlement, this deferral account contemplated the flow through to customers of any costs relating to generation, transmission and distribution functions for 1999 and 2000 resulting from legislative changes. In 1998, there was a change in the Minister's Guidelines resulting in a change in the property taxes charged on distribution assets. The balance in this deferral account relating to the distribution function (the deferral accounts relating to distribution being the only ones in issue on this appeal) was -$31,000.00. Since this was a credit to customers, this amount was set off against the total balance of the NPPDAs owing to ATCO.

34 The only change the Board made was set out in an addendum to Decision 2001-83 in which the Board ordered ATCO to remove from its Reservation Payments deferral account a

$9,500,000 credit received from TransAlta's generation function and apply it in a refiling to ATCO's 2000 PPDAs. This amounted in the result to a bookkeeping adjustment as between the balances in ATCO's PPDAs and NPPDAs, and not a substantive change in the total amount in the Deferral Accounts owing to ATCO.

35 Decision 2001-83 at p. 19, AB Vol. I, F29.

36 Decision 2001-92 at pp. 28-29 and pp. 41-42, AB Vol. II, F109-F110 and F122-F123.

37 These were the pool price deferral accounts established under the heading Distribution in the 1999/2000 Settlement in Clauses 28, 29, 30 and 31.

38 The 2001 Carrying Costs and 2002 Carrying Costs were later the subject of further recalculations and refinement based on required adjustments in certain deferral accounts due in part to upstream adjustments by ATCO's generation arm, referred to in the Decisions as GENCO.

39 Of this total, $2.4 million represented 2001 Carrying Costs on the NNPDAs and the remainder, $12.2 million represented 2001 Carrying Costs on the PPDAs.

40 The following chart summarizes the results of the Decisions along with subsequent Board decisions refining the amounts in each category. PPDAs and NPPDAs are as defined above.

41 The issues on which this Court granted leave under three separate orders follow: (1) Whether the Board erred in its interpretation of the 1999/2000 Settlement and the 2001/2002 TFO Settlement by denying to ATCO carrying costs and the right to seek any such carrying costs for the year 2000 respecting the year 2000 pool price deferral account balances; (2) Whether the decision of the Board to deny ATCO any carrying costs for 2000 is consistent with the Board's mandate to establish just and reasonable tolls, provide ATCO just and reasonable compensation for the services it is obliged to perform, provide ATCO a reasonable opportunity to recover its costs and treat ATCO in a fair and non-discriminatory manner; (3) Whether the Board can adopt and approve a negotiated settlement if the settlement does not provide the subject utility fair and reasonable compensation for its costs; (4) Whether the Board failed to afford ATCO fair and reasonable compensation; (5) Whether the Board erred in utilizing a weighted average cost of capital (WACC) for a notional deferral account business with an 85% debt and 15% equity capital structure, instead of the approach contained in the 2001/2002 TFO Settlement, for calculating the carrying costs on the pool price deferral account balances for the year 2001 and the first quarter of 2002, and for calculating carrying costs for year 2001 non-pool deferral account balances not otherwise dealt with in Decision 2001-83; (6) Whether the Board's utilization of this notional deferral account business for calculating carrying costs failed to afford ATCO fair and reasonable compensation; (7) Whether the Board's Decision is consistent with the requirements of section 68 of the Electric Utilities Act, given its impact on the 2001/2002 TFO Negotiated

Settlement; (8) Whether the Board's Decision 2001-92 is consistent with the requirements of the Deferral Accounts Deficiency Correction Regulation, Alta. Reg. 240/2000; (9) Whether the Board rendered decisions contrary to the only evidence before it or in the absence of evidence.

42 Both the AEUB Act and the PUB Act apply because all legislation governing the Public Utilities Board, which operated as a separate board regulating the activities of utilities before the Board came into existence in 1994, applies to the Board by virtue of ss. 13, 15 and 17 of the AEUB Act.

43 Decision 2001-93 at p. 19, AB Vol. III, F373.

44 Indeed, s. 5.1 of the Original Guidelines makes it clear that a party's representative to a settlement agreement must have the required authority to settle issues on behalf of the party: "A party's representative at a negotiated settlement process must have authority to settle issues on behalf of the party, and to enter into a settlement agreement. Any limitations on the representative's authority and/or steps necessary for ratification of any matters agreed to, must be disclosed at the outset of the process." The current Guidelines contain a similar provision: s. 5.1.

45 Section 10.1 provides in part: "Once an application is filed, the settlement is binding on all parties who have agreed to it (subject to the right to withdraw described in Section 11)". Section 11.1 provides in part: "If evidence is introduced that affects the terms or conditions of a settlement agreement, a party may withdraw its acceptance or support for the settlement prior to approval of the settlement by the Board." Sections 10.1 and 11.1 of the Guidelines are to the same effect.

46 In Investors Compensation Scheme v. West Bromwich Building Society [1998] 1 W.L.R. 896, Lord Hoffman provided a useful summary of five key principles of contractual interpretation.

47 As Waddams succinctly puts it in The Law of Contracts, Fourth Edition, (Aurora: Canada Law Book Inc., 1999) at 105: "The principal function of the law of contracts is to protect reasonable expectations engendered by promises....[T]he test of whether a promise is made ... does not and should not depend on an enquiry into the state of mind of the promisor, but on how the promisor's conduct would strike a reasonable person in the position of the promisee."

48 Per Lord Steyn in Equitable Life Assurance Society v. Hyman [2000] 3 All E.R. 961 at 969.

49 The Clauses dealing with the PPDAs which are the subject of this appeal are Clauses 28, 29, 30 and 31. The Clauses dealing with the NPPDAs are Clauses 32, 33 and 36.

50 AB Vol. IV, p. 1.

51 Sections 51(1)(a) and (c) of the 1998 Act. The EU Act contains the same provisions in ss. 121(2)(a) and (b).

52 Further, ss. 2(2)(a) and (b) of Code of Conduct Regulation, Alta. Reg. 156/2000 states that the objects of the this regulation are to "(a) further the development of competitive electricity markets in Alberta, (b) foster fair competition for all participants in those electricity markets ...."

53 Subsection 4(5) provided for the repayment or recovery of excess financing costs recovered under s. 4(3) once the Board made a proper determination under s. 4(1).

54 This same provision is contained in s. 122(1) of the EU Act.

55 For those readers curious about the origins of "just and reasonable" tariffs, the following concise summary may be of interest. As explained by Martin Glaeser in Public Utilities in American Capitalism (New York: Macmillan, 1957) at 196-197, and as cited by Stefan Krieger in "Problems for Captive Ratepayers in Nonunanimous Settlements of Public Utility Rate Cases" (1995) 12 Yale J. on Reg. 257 at fn.57: "The idea that a common carrier is entitled to a reasonable rate for his services has its roots in the English common law.... [C]ommon law courts declared that common carrier rates must be reasonable. In his treatise De Portibus Maris, 1 Harg. Law Tracts 78 (1670), Sir Matthew Hale, Chief Justice to King James I of England, wrote that when private property is affected with the public interest, the rates for public use must be reasonable and moderate.... The common law notion of reasonable rates can be traced back to the Church Fathers' doctrine of just price...."

56 Section 81 provided: "The Board ... may by order in writing fix just and reasonable individual rates, joint rates, tolls or charges or schedules thereof ... which shall be imposed, observed and followed thereafter by the owner of the public utility...." A similar provision exists in the PUB Act: s. 89.

57 See Mission of the Board as set out at http://www.eub.gov.ab.ca/bbs/eubinfo/default.htm#mission which states: To ensure that the discovery, development, and delivery of Alberta's energy resources and utility services takes place in a manner that is fair, responsible, and in the public interest.

58 In "The Privatization of Regulation: Five Models of Self-Regulation" (1997-98) 29 Ottawa L. Rev. 233, the author, Margot Priest, explores the use of a public policy framework for purposes of evaluating the public interest. That framework uses the following criteria: efficiency; effectiveness; openness; fairness; and accountability.

59 This onus is also reflected in s. 121(4) of the EU Act.

60 It is evident from the record of proceedings before the Board that ATCO viewed the provisions in the 1999/2000 Settlement dealing with the way in which certain deferral account amounts would be calculated as an incentive in its favour. This is clear from Decision 2001-93 at pp. 12 and 14-15, AB Vol. III, F366 and F368-F369 where ATCO's arguments are summarized by the Board: "The Negotiated Settlement Agreement explicitly contemplates that the deferral account balances will be derived according to a detailed formula, which utilizes the difference between the actual hourly pool price and the hourly forecast of pool price....ATCO... responded appropriately to the <u>incentives contained in the Negotiated Settlement Agreement, including specifically with respect to the Generation volume deferral account.</u> During cross-examination parties acknowledged that they knew and understood the <u>incentives</u> contained in the Negotiated Settlement Agreement and that they knowingly and willingly supported the approval of the Negotiated Settlement Agreement, which contained these incentives. Furthermore, these parties specifically acknowledged that the deferral accounts were a "key" component to the Negotiated Settlement Agreement... ATCO cannot read the minds of parties with whom it is negotiating. It can only assume that when a comprehensive settlement of all issues is reached it is intended to be a comprehensive settlement, as all parties specifically acknowledge and agree." [Emphasis added]

61 See Decision 2001-93 at p. 10, AB Vol. III, F364.

62 See Decision 2001-93 at pp. 9-16, AB Vol. III, F363-F370.

63 See s. 126(2)(c) of the EU Act to the same effect.

64 Decision 2001-93 at p. 17, AB Vol. III, F371.

65 Section 52(1) of the 1998 Act. Its counterpart is s. 122(1) of the EU Act.

66 Sections 4(1) and 4(2).

67 Decision 2001-92 at p. 221, AB Vol II, F303.

68 Decision 2001-92 at p. 26, AB Vol II, F107.

69 Decision 2001-92 at p. 37, AB Vol. II, F118.

70 However, as a result of refilings, part of this collection was delayed. All NPPDA balances were collected by December 31, 2002; in fact, ATCO started collecting them in July, 2001. ATCO started collecting PPDA balances July, 2002 and all PPDA balances were collected by July 31, 2003: see pp. 20 and 24 of Decision 2002-54, Omnibus Decision.

71 See Rose, J.R., "The Cost of Capital' in Public Utility Rate Regulation" (1957) 43 Virginia Law Review 1079 at 1088-1089 quoted at 371 of Phillips, The Regulation of Public Utilities (Virginia: Public Utilities Reports, Inc., 1988).

*Case Name:*
# Bledin v. Landsburg

**Between**
**Lori Bledin and Martin Kaelble, Applicants, and**
**Brent Landsburg, Jo-Anne Landsburg, Tylomar Landscaping Inc.**
**and Black Horse Construction Inc., Respondents**

**[2013] N.S.J. No. 688**

2013 NSSC 418

340 N.S.R. (2d) 119

Docket: Hfx No. 404339

Registry: Halifax

Nova Scotia Supreme Court
Halifax, Nova Scotia

**D. MacAdam J.**

Heard: May 22-24, 2013; written submissions, May 27,
2013.
Judgment: December 17, 2013.

(67 paras.)

*Corporations, partnerships and associations law -- Corporations -- Oppression remedy -- Standing -- Complainant -- Grounds -- Conduct that unfairly disregarded the interest of any security holder, creditor, director or officer -- Application by Bledin and Kaelble for oppression remedies and re-turn of two motor vehicles allowed in part -- Parties incorporated landscaping company -- All shares issued to respondents -- Bledin provided $65,000 paid to respondent Landsburg as incentive to work for company -- Bledin also guaranteed financing for two vehicles to be used by company -- Respondents transferred vehicles to their new company and refused to issue shares to applicants -- Applicants had standing to seek oppression remedies -- Payment of $65,00 was a gift to Landsburg -- Vehicles were assets of company and ordered to be returned.*

Application by Bledin and Kaelble for oppression remedies and the return of two motor vehicles. The applicants and respondents formed a landscaping and snowplowing company, Tylomar Inc. Shares were only issued in the names of the respondents, who also became the directors and officers of the company. There was no written shareholders' agreement. Bledin provided $65,000 paid to the respondent Landsburg, who left his previous job to work for Tylomar. Bledin also guaranteed the financing for two vehicles to be used by the company and Landsburg's wife. The applicants failed to make the monthly bonus payments they had undertaken. When the relationship between the individual parties deteriorated, the applicants asked that shares be issued to them. No shares were ever issued to them and Tylomar ceased operations. The respondents then started a new company and transferred the vehicles guaranteed by Bledin out of Tylomar to the new company and Landsburg's wife. The applicants sought the issuance of shares in their names, an accounting, disgorgement of profits and judgment in favour of Bledin against Landsburg and Tylomar for the loans totalling $69,600.

HELD: Application allowed in part. The $65,000 was a gift intended to induce Landsburg to leave his employment and to undertake responsibility for Tylomar's landscaping work. The applicants' decision to delay taking shares in their names did not detract from the parties' agreement that Tylomar's shares would be held by the four of them equally. The applicants were entitled to shares in Tylomar equivalent to the shares now held by the individual respondents. Although the applicants were not shareholders of Tylomar, they were entitled to own shares in the company and were thus security holders for the purpose of seeking oppression relief. Although the applicants had not come to court with clean hands, this did not preclude their claims for equitable relief, considering the respondent's conduct in refusing to issue shares to the applicants, in transferring the vehicles, and in shutting the applicants out of any information respecting the performance of Tylomar. This conduct amounted to oppressive conduct. An accounting of Tylomar and of the new company and a disgorging of any profits by the new company to Tylomar was not appropriate since there was no agreement between the parties preventing the individual respondents from creating and operating their new company. The applicants did not meet their own obligations under the parties' agreement. As the applicants had not challenged Tylomar's financial records, a further accounting would be of no use. The vehicles were assets of Tylomar and were ordered to be returned to Tylomar. The applicants were entitled to judgment against Landsburg for repayment of a loan of $4,600.

**Statutes, Regulations and Rules Cited:**

Companies Act, R.S.N.S. 1989, c. 81, s. 5, s. 7(5)(b)

**Court Summary:**

Corporations -- Oppression remedies.

The individual parties agreed to form a landscaping and snowplowing company called Tylomar. The applicants did not wish to have shares in their names, and shares were only issued in the names of the individual respondents, who also became the directors and officers of the company. There was no written shareholders' agreement, share-purchase options, or other written agreement setting out the individual parties' relationship to each other or the company. The applicant Bledin provided $65,000.00, which was paid to the respondent Mr. Landsburg, who was leaving his previous job to work for the new company. The sum was equivalent to his previous salary. Bledin also guaranteed the financing for a Ford truck registered in the company's name and a Ford Edge, also registered in

the company's name but for Mrs. Landsburg's use, as well as advancing occasional funds for payroll and other purposes. As landscape work became rarer, the company began doing construction work, which eventually made up the bulk of Tylomar's work. Eventually the relationship between the individual parties deteriorated. The applicants requested that shares be issued to them, but this was not done. Tylomar ceased operating after 13 months. The individual respondents then incorporated a new construction company, Black Horse. Both vehicles guaranteed by Bledin were transferred out of the company, the truck to Black Horse and the Edge to Mrs. Landsburg.

**Issue**: (1) Were the applicants complainants for the purpose of seeking an oppression remedy under the Third Schedule of the Nova Scotia *Companies Act*? (2) If so, was oppression established? (3) If oppression was established, what remedies were appropriate? (4) Was Bledin entitled to judgment against Mr. Landsburg and Tylomar on account of various loans? (5) Were the applicants entitled to recover the two vehicles?

**Result**: The applicants were complainants by virtue of claiming as creditors of Tylomar. They also qualified as security holders. The respondents argued that certain remedies sought by the applicants were equitable ones, and that the applicants failed to come before the court with "clean hands." This argument was rejected. The evidence established that the manner in which the individual respondents controlled the company amounted to oppressive behaviour. The individual respondents treated Tylomar as their company, and the applicants as investors. This did not reflect the agreement between the parties, by which they were to be equal shareholders. The applicants' decision to delay taking shares did not change this. There was no basis in law for the individual respondents' refusal to issue shares to the applicants. The applicants were entitled to equal shares in the company to those held by the individual respondents. They were not entitled to an accounting from Tylomar, and there was no basis for a remedy based on any alleged non-competition obligation. They were not entitled to an accounting or disgorgement remedy from Black Horse. The vehicles belonged to Tylomar. The $65,000.00 advanced by Bledin was a gift to Mr. Lansdburg, although there was a suggestion by the company solicitor of possible mechanisms by which the applicants could recover this amount out of Tylomar's profits. There were no profits out of which to recover this amount. It was not possible to determine the amount of any debt owed to the applicants by the company. The applicants were entitled to retain certain equipment whose purchase they had financed for the company. The company did not seek to recover it.

*[Note: This summary does not form part of the Court's judgment. Quotations must be from the judgment, not this summary.]*

**Counsel:**

Lori Bledin and Martin Kaelble, Self-represented.

James D. MacNeil, for the Respondents.

---

**1    D. MacADAM J.**:-- The applicants, Lori Bledin ("Bledin") and Martin Kaelble, also known as Martin Graf ("Kaelble" or "Graf"), began discussions about entering the landscaping business with the individual respondents, Jo-Anne Landsburg and Brent Landsburg ("Mrs. Landsburg" and "Mr. Landsburg", respectively; collectively, "the Landsburgs") in or around December 2011. At that

time, Mr. Landsburg was employed by PCL Construction. As a result of their discussions, the individual parties agreed to form a landscaping company, which would also do snowplowing during the winter. John Dillon Q.C. ("Dillon"), of the law firm Crowe Dillon Robinson, was retained to set up the company and provide legal advice. Dillon incorporated Tylomar Landscaping Inc. ("Tylomar" or "the company") on April 18, 2011.

**2**     Bledin and Graf advised that they did not want shares registered in their names, due to Bledin's involvement in litigation in Ontario. Consequently, shares were only issued in the names of the Landsburgs. Mr. Landsburg became the sole director and president of Tylomar, while Mrs. Landsburg became corporate secretary. In an e-mail to Dillon dated April 15, 2011, Graf referred to a cheque to Mrs. Landsburg for $1,000.00 to open the corporate bank account. Graf wrote that this amount was to go towards options on 50% of shares to be exercisable within five years. He asked Dillon to draw up a form to be signed in respect of this. He also wrote that he and Bledin wished to remain off the company's books at that time.

**3**     In her affidavit of March 18, 2013, Mrs. Landsburg stated that the applicants advised her that they "did not initially want an ownership interest in the business, as they wanted to hide assets in said business, to keep them out of touch of a potential judgment creditor in Ontario" (para. 13). Mrs. Landsburg then referenced Graf's e-mail of April 15, 2011, wherein he stated that he and Bledin wanted to remain off the books "for now" (para. 14).

**4**     The intention was for Mr. Landsburg to leave his employment with PCL construction and perform any contracts obtained by Tylomar. Mrs. Landsburg, at least initially, would deal with office administration and financial accounts. The applicants would provide funding, including startup capital, and take financial responsibility for certain government remittances in the event that the company lacked sufficient funds. As the company required a vehicle, a Ford F-350 ("the truck") was purchased and registered in the name of the company with the financing agreement for the purchase guaranteed by Bledin. Bledin also provided the sum of $65,000.00, which was paid to Mr. Landsburg. The respondents say this was a gift, with no obligation on the part of themselves or Tylomar to repay it. The respondents did, however, indicate an intention to do so by having the company pay the first $65,000.00 of its profits to Bledin. The applicants say it was agreed that the $65,000.00 would be paid by Tylomar and that if Tylomar was unable to repay this amount, Mr. Landsburg would be personally liable.

**5**     The advance of the $65,000.00, and the conditions under which it was advanced, is one of the areas of dispute between the parties. In an e-mail to Mrs. Landsburg dated May 25, 2011, Graf stated:

> We are not at all uncomfortable with our contributions. Until you brought it up, they were never mentioned.
>
> Deal is as follows, and it follows the agreement we formed in the attorney's office.
>
> Brent $65,000 gift, truck paid.
>
> Lori & I are then entitled to the same amount out of the company, and additional profits split 50/50.

Nothing has changed, it has been 50/50 since the beginning, and in order to get all of us more money, we need Brent to be out of PCL.

The benefit to Brent and yourself for all the running around that you guys are doing is that you won't have to pay for the truck, the $65,000 will be a gift to Brent and therefore not taxable. So you are saving the taxes on $65,000, as well as a $1400 per month bonus.

I think that is fair compensation, and I think in the long run will make us all a lot more money.

**6**    Graf testified that Bledin was unhappy with the wording of this email, apparently due to his description of the $65,000.00 advance as a "gift." He acknowledged that he never indicated to the respondents that the email of May 25, 2011, contained an error in respect to the payment of the $65,000.00. It also appears that the reference to the $1,400.00 monthly bonus to be paid by the applicants related to the monthly payments on the truck.

**7**    In an affidavit dated March 27, 2013, Bledin deposed:

6.    I was not in a position to gift Mr. Landsburg $65,000, nor would I gift $65,000 to someone I had known for such a short period of time. The $65,000 was classified as a gift for CRA purposes so as to not attract tax consequences to Mr. Landsburg.

7.    It was understood, and agreed to that the first $65,000 of profits from Tylomar would flow to me, and in the event Tylomar ... did not make it, then Mr. Landsburg would repay the loan.

8.    Brent Landsburg ... makes reference to an e-mail sent on May 25th, from Martin Kaelble. The loan to Mr. Landsburg was made on June 20th, 2011. Much discussion took place between May 25th, 2011, and June 20th, 2011 as I was not comfortable with the contents of Mr. Kaelble's e-mail. ...

**8**    The respondents maintain the $65,000.00 was intended as an incentive for Landsburg leaving his job at PCL construction. At one point Kaelble enquired of Mrs. Landsburg as to the annual salary received by Mr. Landsburg from PCL construction, which amount was $65,000.00. The respondents say there was no obligation by Mr. Landsburg to repay this money. Counsel references correspondence of July 19, 2011, forwarded by Dillon to Kaelble and Mr. Landsburg:

With reference to our meeting regarding the various financial matters of Tylomar Landscaping Inc., I believe the following is the situation and the potential matters that should be discussed in relation to the handling of the various transactions:

It is my understanding that Martin and Lori do not wish to be part of the Company due to certain personal matters that hopefully will be rectified within the next couple of years. However, Martin and Lori do wish to help Brent and Joanne with the Company, and in that regard have personally lent funds to Brent and Joanne for the purchase of certain equipment and assets for the Company. I believe the funds to be approximately $24,000.

> Our idea was to have Brent and Joanne sign a Promissory Note to Martin for these funds, then Brent and Joanne would lend the funds to the Company as a Shareholders' Loan. My understanding is that payments from the Company to Brent and Joanne would then be tax free as it is simply a re-payment of the loan, and then they could in turn re-pay the loan they owe to Martin.

> The more complex matter would be the fact that Martin gifted $65,000 to Brent and Joanne to allow Brent to terminate his employment and work full-time for the Company. As this was a gift, Brent and Joanne are not legally obligated to re-pay the funds so gifted, however it is my understanding that they do wish to some day re-imburse Martin these funds. The difficulty I see is how to have funds flow to Brent and Joanne to allow them to re-imburse the gift without attracting taxes.

**9**     The characterization of the $65,000.00 payment as a gift was made by Dillon, the company's solicitor, in his correspondence of July 19, 2011. The Dillon letter contains two suggestions to enable payment of the $65,000.00 by the company to the applicants, as well as discussion of the potential tax consequences of each alternative and a suggestion to speak to tax accountant John Oakey.

**10**     There was other correspondence from Dillon to the parties, including draft agreements. He asked for comments on the draft agreements. He received no comments in reply, and the agreements were never signed. There is no shareholders' agreement, no written option to purchase shares, nor any written agreement between the parties setting out their relationship in reference to the company and their respective obligations. The terms of any agreement must therefore be deciphered from the correspondence, primarily e-mails, between the parties, the solicitor's letters, and the affidavits and oral evidence.

**11**     In his affidavit of March 18, 2013, Mr. Landsburg states that he received the $65,000.00 as a gift, not a loan. By his account, he considered repaying it as a goodwill gesture, but was never under the impression that he was required to do so. He said this money was an incentive for him to leave PCL and devote his time to Tylomar. The amount represented his annual salary and benefits at PCL. He references the Dillon letter, and an e-mail from John Oakey, a tax accountant, to Mrs. Landsburg, Mr. Kaelble and Dillon on August 23, 2011. Mr. Landsburg stated that the description by Mr. Oakey was correct, except that the gift was only to himself and did not include Mrs. Landsburg. He further deposed that if it had been a loan, rather than a gift, he would not have accepted it.

**12**     Mrs. Landsburg stated in her affidavit that the $65,000.00 paid to Mr. Landsburg was a personal gift to him and was never the property of either herself or the company. However, in an e-mail dated July 28, 2011, Mrs. Landsburg wrote the following to Graf:

> After thinking about our conversation this morning, and thinking and thinking ... it appears to me that you guys are angry with Brent and I for Brent's continued involvement with PCL. If Brent and I both remember correctly, it was said by both you and Lori that Brent should "milk it" with PCL as long as we could in regards to income. Since the 65K Brent has never taken one second of his time away from Tylomar and given it to PCL. In fact, He [sic] has been busting his ass for Tylomar. So I'm left wondering why this little bit of "free money" from them

has changed our agreement and made it "unfair". Before Tylomar, Brent made 65K plus he supported his income with side jobs which helped us out a great deal. I was also on a pension then which added to our income. Now, He [sic] is not allowed to do side jobs and is bound to his 65K debt to Lori. I am also wondering why the agreement of cash jobs has changed. Even more so, I'm wondering when We [sic] were going to be told.

Where did the money go from the walkway job in Bedford? Did that go towards Brent's debt? I think that for now on, Brent and I should work as employees and pay off the debt asap. In addition the IOU's need to be done. I cannot have this debt hanging over our heads and you guys bitter as to when it will be paid. In fact, I'm starting to believe this was not a good idea.

...

Brent will give you the money He [sic] owes you. We will also work diligently to repay the 65 back as I think it was a bad business idea. Brent just phoned and He [sic] is through with PCL as they wanted him to work days again.

**13**     Mrs. Landsburg testified that when she wrote this e-mail she was frustrated with the applicants. Nevertheless, the message referred to a debt owed to Bledin. In addition, however, there is a reference to "free money," although it was suggested that the following phrase, "from them", indicated that this was not meant to refer to the applicants, but to the monies that Mr. Landsburg had been receiving from PCL while also working full time for Tylomar. However, Mrs. Landsburg's testimony that this e-mail was written in frustration does not detract from her references to it as a debt. In Graf's May 25 e-mail to Mrs. Landsburg, after referencing the $65,000.00 gift and the payment on the truck, Graf stated that he and Bledin were "entitled to the same amount out of the company, and additional profits split 50/50." He did not refer to any obligation by Mr. Landsburg to repay the $65,000.00. Since Graf referred to the payment as a gift, the absence of any obligation on the part of Mr. Landsburg to repay it is apparent.

**14**     I am satisfied that there was no commitment by Mr. Landsburg to repay the $65,000.00 he received from Bledin. What was agreed, and what was referred to in the e-mail of May 25, 2011, was that the company would pay the applicants the amount of the gift given to Mr. Landsburg. It is in this context that Dillon, in his letter of July 19, 2011, suggested two alternatives by which this could be effected. Any additional profits would be divided 50/50. Despite Bledin's assertions in her affidavit and similar statements by Kaelble in both his affidavit and oral testimony, I am satisfied that the $65,000.00 was a gift intended to induce Mr. Landsburg to leave his employment with PCL and to undertake responsibility for Tylomar's landscaping work. It is noteworthy that in 2011 Mr. Landsburg received no salary, while the gift equalled the salary he had received in his previous employment.

**15**     Initially the majority of Tylomar's work involved landscaping or related construction, such as building decks. It was also expected that there would be snowplowing work in the winter. However, as landscaping work became rarer the company ventured into additional areas of construction, including installing windows and doors. By the fall of 2011, it appears, construction comprised the bulk of Tylomar's work, there being neither landscaping nor snowplowing work sufficient to keep the company busy.

**16**    During the 13 months Tylomar operated, it appears Bledin advanced three payments in re-
spect to the truck. She apparently also advanced money for payroll and provided $4600.00 to Mr.
Landsburg in November 2011. However, it appears that the company's accounts were not kept
up-to-date and no payroll remittances were made. As a consequence, according to Mrs. Landsburg,
the company is indebted to various government agencies in an amount more than $30,000.00. The
respondents note that Mr. Landsburg, as the sole director, may have personal liability for some or
all of this indebtedness. This is not a matter before this Court. For purposes of this proceeding I am
only prepared to recognize it as a potential liability, rather than an existing liability of Mr. Lands-
burg.

**17**    The relationship between the parties deteriorated between the fall of 2011 and the spring of
2012. In early 2012 the applicants requested that shares be issued in their names equivalent to the
shares held by the Landsburgs. Mrs. Landsburg instructed Dillon that there were to be no shares is-
sued to the applicants. In her affidavit she stated that the instruction to Dillon was the result of a
suggested unauthorized withdrawal by the applicants from the company's bank account, as well as
the continuing deterioration of their relationship with the applicants. She deposed that she and Mr.
Landsburg decided not to sell the applicants any shares because it "would not be in the best interest
of the company."

**18**    It is apparent that for some time the Landsburgs regarded Tylomar as their company and the
applicants as mere investors by way of periodic loans and advances. This perception did not reflect
the agreement between the parties. The absence of a written agreement does not disentitle the ap-
plicants from the benefit of that agreement. In this regard the following excerpts from Mrs. Lands-
burg's affidavit are telling:

> 11.    The Applicants, myself and my husband, Brent Landsburg, had a meeting
> with legal counsel, Mr. John Dillon, to discuss the corporate structure and
> the flow of monies and responsibilities in advance of incorporation.
>
> 12.    During these meetings the Applicants made assurances, which we verily
> believed to be true, that they would cover all of the business's expenses
> such as vehicle payments, tax installments, equipment costs and any other
> fees related to the business, and that they would ensure that payroll was
> covered in the event that the business did not have sufficient funds to pay
> same.
>
> 13.    I was further informed by the Applicants and verily believe to be true that
> the Applicants did not initially want to have any ownership interest in the
> business, as they wanted to hide assets in said business, to keep them out
> of touch of a potential judgment creditor in Ontario.
>
> 14.    The Applicants intention was further reiterated by Martin Kaelble's email
> to Mr. John Dillon, dated April 15, 2011, which stated in part:
>
>> ... Lori and I would like to remain off the books for now...
>
>> ...
>
> 15.    In or about early April, 2011, I alone met with John Oakey, CA, tax ac-
> countant at Collins Barrow, to discuss the business' prospective corporate

> structure. It was decided that the company would be set up to have four identical classes of common shares, Class A, Class B, Class, C, and Class D.
>
> 16.   Class A and Class B shares were to be issued to myself and my husband, respectively.
>
> 17.   Email correspondence from Mr. Oakey to Mr. Kaelble and I dated April 14, 2011, confirms this structure. ...
>
> 18.   The above-mentioned email from Mr. Oakey, further contained the following advice:
>
> > I would also suggest a shareholder agreement be prepared, and you must [sic] also wish to put a share issuance agreement in place to state Martin, his wife or family trust are allowed to purchase 50% of the company for $50 at a later date.
>
> 19.   At no time was any share holder agreement or share issuance agreement ever put in place.

**19**      Clearly the parties intended to be equal shareholders in Tylomar. The applicants' decision to delay taking shares in their names, for whatever reason, does not detract from the parties' agreement that Tylomar's shares would be held by the four of them equally. Mrs. Landsburg's position, as evidenced in both her affidavit and oral testimony, appears to be that the applicants have no right to any involvement in Tylomar and since they are not shareholders have no shareholder rights. However, instructions to the company solicitor, Dillon, not to issue shares to the applicants, primarily because of the deterioration in their relationship, had no basis in law.

**20**      Mrs. Landsburg deposed that the company is insolvent and owes significant amounts to the Canadian Revenue Agency and the Worker's Compensation Board. These amounts include deficiencies in payroll remittances and HST payments of more than $33,000.00, and more than $2,100.00 to the Worker's Compensation Board. She further deposed that for the 2012 fiscal year, up to and including July 2012, there was a net loss of $19,015.46. She concluded her analysis by stating that Tylomar was insolvent, with significant debts owing to CRA and WCB, "in addition to general creditors, such as the Applicants."

**21**      By mid-May 2012 the Landsburgs decided to have Tylomar cease operations, considering it a failing business. Mr. Landsburg testified that by the spring of 2012 there was little landscaping work. The company's ledger and financial records indicated that, whereas initially the majority of Tylomar's work was landscaping, by the spring of 2012, there was more construction activity. In his affidavit, Mr. Landsburg stated:

> 40.   There was difficulty in obtaining a sufficient work load in the landscaping industry. Therefore, from time to time I would use my knowledge in the construction business to secure construction contracts on behalf of Tylomar in an effort to subsidize Tylomar's landscaping jobs. These construction jobs would include construction related to landscaping, such as constructing decks and fences, as well as some general carpentry work.

> 41. When Tylomar became insolvent, my wife and I decided to use my con-
> struction knowledge and open a construction company entitled Black
> Horse Construction.
> 42. Black Horse Construction does not do landscaping projects.

**22**    In 2011 the applicants and the Landsburgs both withdrew $13,000.00 from the profits of the company. Mr. Landsburg received no salary, having received the $65,000.00 gift from Bledin. The general ledger shows that in April 2012 Mr. Landsburg withdrew $4,924.80; in May, $6,187.50; and in June, $2,245.46. This total withdrawal of $13,357.76 was made without the knowledge or approval of the applicants. The evidence did not establish that Mr. Landsburg was being reimbursed for expenses incurred. As to the suggestion that this might have represented salary, the agreement reflected in the email of May 25, 2011, only contemplated that the parties were to share the profits, with no provision for Mr. Landsburg to receive a salary over and above his share of the profits.

**23**    In April 2012 the Landsburgs incorporated "Black Horse Construction Inc" (Black Horse), intending it to be a construction company, and they began advertising around the middle of May. Mr. Landsburg testified that although Black Horse was a construction company, the nature of its business was different than Tylomar's. He said Tylomar's construction work consisted primarily of residential construction work, such as window and door installation. Black Horse, by contrast, did commercial construction.

**24**    In December 2011, Tylomar signed an agreement for the purchase of a Ford Edge motor ve-hicle, intended for Mrs. Landsburg's personal use. Bledin guaranteed the financing, as she had done in respect to the purchase of the F-350 truck. Both vehicles were transferred out of Tylomar in the spring of 2012, the F-350 to Black Horse and the Ford Edge to Mrs. Landsburg. These transfers were not approved by the applicants.

**25**    After the hearing the applicants filed a Notice of Motion to require the respondents to "de-liver the Ford F-350, and Ford Edge originally registered to Tylomar" to Bledin. The court sched-uled to hear the motion directed the hearing be included as part of this hearing. As a consequence, this application was re-opened to permit the parties to address this further claim by the applicants.

**Issues**

**26**    In their notice of application the applicants request an order pursuant to s. 5 of the Third Schedule to the *Companies Act*, R.S.N.S. 1989, c. 81, s. 1, as follows:

> i. Directing the Respondent, Brent Landsburg, as sole director of Tylomar, to issue common shares to the Applicants;
> ii. Directing Tylomar to provide a financial accounting to the Applicants commencing from the date of its incorporation on April 18, 2011;
> iii. Directing Black Horse to provide a financial accounting to the Applicants commencing from the date of its incorporation on April 23, 2012;
> iv. Requiring the Respondents Brent Landsburg and Jo-Ann Landsburg to personally compensate the Applicants such that the Applicants are placed in the same position they would have been in were it not for the actions of the Respondents. Jo-Anne Landsburg and Brent Landsburg.
> v. Directing that Black Horse disgorge any profits to Tylomar.

    vi.    Restraining the Respondents Brent Landsburg and Jo-Ann Landsburg from using any Tylomar assets in any business other than Tylomar.

    vii.   Restraining Black Horse from competing with Tylomar.

**27**    In addition, the applicants seek Judgment in favour of Bledin against Mr. Landsburg and Tylomar, jointly and severally, for the loans totalling $69,600.00. Further, the applicants seek to recover for Bledin the two vehicles previously registered to Tylomar.

**The law**

**28**    As noted, the applicants rely on s. 5 of the Third Schedule to the Nova Scotia *Companies Act*. Section 5 provides for the so-called oppression remedy:

> 5 (1) A complainant may apply to the court for an order under this Section.

> (2)    If, upon an application under subsection (1) of this Section, the court is satisfied that in respect of a company or any of its affiliates (a) any act or omission of the company or any of its affiliates effects a result;

> (b)    the business or affairs of the company or any of its affiliates are or have been carried on or conducted in a manner; or

> (c)    the powers of the directors of the company or any of its affiliates are or have been exercised in a manner,

> that it is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, the court may make an order to rectify the matters complained of.

> (3)    In connection with an application under this Section, the court may make any interim or final order it thinks fit including, without limiting the generality of the foregoing,

> (a) an order restraining the conduct complained of;

> ...

> (d)    an order directing an issue or exchange of securities;

> ...

> (h)    an order varying or setting aside a transaction or contract to which a company is a party and compensating the company or any other party to the transaction or contract;

> (I)    an order requiring a company, within a time specified by the court, to produce to the court or an interested person financial statements in the form required under the Act or an accounting in such other form as the court may determine;

> (j) an order compensating an aggrieved person;

(k)    an order directing rectification of the registers or other records of a company re-
quired under the Act;

...

(5)    A company shall not make a payment to a shareholder under clause (f) or (g) of
subsection (3) of this Section if there are reasonable grounds for believing that
(a) a company is or would after that payment be unable to pay its liabilities as
they become due; or

(b)    the realizable value of the company's assets would thereby be less than the ag-
gregate of its liabilities.

**29**    Also relevant is the definition of "complainant" as it relates to the application of s. 5, found
in s. 7(5)(b) of the Third Schedule:

(b)    "complainant" means

(i)    a registered holder or beneficial owner, and a former registered holder or
beneficial owner, of a security of a company or any of its affiliates,

(ii)    a director or an officer or a former director or officer of a company or of
any of its affiliates,

(iia)   a creditor of a company or any of its affiliates,

(iii)   the Registrar, or

(iv)    any other person who, in the discretion of the court, is a proper person to
make an application under this Section.

**30**    Initially the respondents took the position that although the applicants might have been cred-
itors of Tylomar, they had no standing to seek a remedy under s. 5. They relied on *J.S.M. Corp.
(Ontario) Ltd. v. Brick Furniture Warehouse Ltd.,* 2008 ONCA 183, where it was held that the op-
pression remedy was not intended for use by creditors who failed to protect themselves in the
course of their business transactions with the company. However, the relevant provisions of the
Nova Scotia legislation include creditors among the classes of potential complainants: Third Sched-
ule, s. 7(5)(b)(iia). In *Directors ands Officers in Canada: Law and Practice*, (Carswell, Volume 3),
Carol Hansell observes, at 16-15, that the Nova Scotia legislation is an exception to the rule in most
Canadian jurisdictions that creditors do not have automatic standing to seek an oppression remedy.
As such, if the applicants are creditors of Tylomar they are entitled to maintain a proceeding for op-
pression.

**31**    The applicants seek an issue of Tylomar shares equivalent to the number of shares the
Landsburgs hold in the company. This raises the question of whether they are entitled to maintain
an oppression action in the character of security holders, pursuant to s. 7(5)(b)(I) of the Third
Schedule, which includes within the definition of "complainant" a "registered holder or beneficial
owner, and a former registered holder or beneficial owner, of a security of a company ..." The ap-
plicants are not shareholders at the present time, since no shares have been issued to them. The issue
is whether they are beneficial owners.

**32**    The applicants cite *Fedel v. Tan* (2008), 93 O.R. (3d) 274, 2008 CanLII 46697 (Ont. Sup.
Ct. J.), where Cumming J. undertook an extensive analysis of the scope of the definition, particu-

larly as it related to alleged beneficial shareholders. Cumming J. observed that the oppression remedy is remedial, and that "the term 'security holder' is to be read expansively to protect a 'complainant' who has a reasonable expectation by reason of an agreement to become a shareholder (para. 207). Cumming J. continued, at paras. 209-217 (some citations omitted):

[209] The case law has adopted an expansive interpretation. *Csak v. Aumon* reflex, (1990), 69 D.L.R. (4th) 567 at p. 570 (Ont. H.C.), involved the Respondents' refusal to issue the shares that the applicants were contractually entitled to receive. Allowing the oppression claim, the court held that a beneficial shareholder is one who has an equitable claim to shares whether or not they have been issued and appropriated to him.

[210] In *Mackenzie v. Craig* (1997), 205 A.R. 363 (Q.B.), rev'd 1999 ABCA 84 (CanlII), 171 D.L.R. (4th) 268 (Alta C.A.), the question was whether parties claiming to be entitled to shares under a Memorandum of Understanding were beneficial shareholders and therefore complainants in a derivative action under the Alberta *Business Corporations Act*, S.A. 1981, c. B-15. The trial court found, at para. 24, that the definition of beneficial owner should be broadly interpreted to include anticipated shareholders if there is some evidence that the party has a legitimate claim to those shares. The Court of Appeal reversed on procedural grounds, finding that the plaintiffs should first have proven that they were anticipated shareholders before seeking leave to launch a derivative action. It did not, however, disagree with the trial judge's finding that anticipated shareholders could have dgpghlekcriqy pgtuj kr0'

[211] *Evans v. Facey*, [2000] O.J. No. 2276 (Sup. Ct.) is a case analogous to the one at hand, where the parties agreed that Evans, the plaintiff, would be a shareholder, but where the required formalities were never completed by the defendant. Allowing the plaintiff's oppression claim, the court found that there was a contract between the parties that this contract was partly performed and entitled Evans to the shares, and that as a result of this contractual entitlement, the plaintiff had dgpghlekcriqy pgtuj kr sufficient for an oppression claim.

[212] *Anthopoulos v. LaPalme*, [2003] O.J. No. 5452 (Sup. Ct.), aff'd 2004 CanlII 42925 (ONCA), (2004), 192 O.A.C. 163 (C.A.) also involved an agreement providing that the plaintiffs would receive shares. The agreement was breached and they never received those shares. Finding oppression, the court held, at para. 89, that "there really is no issue that the plaintiffs are complainants within the definition of [*CBCA*] s. 245" and found that they were beneficial shareholders of the corporation.

[213] In *Abdalla v. Skalin*, [2004] O.J. No. 2981 (Sup. Ct.), the plaintiff alleged that he was a beneficial shareholder because, based on a contractual agreement for the purchase of shares, he had a reasonable expectation of becoming a registered shareholder. The court found that the core nature of his claim was an oppression claim within the meaning of s. 248(2) of the OBCA.

[214] In *Smith v. Dawgs Canada Distribution Ltd.*, <u>2008 SKQB 219 (CanLII)</u>, 2008 SKQB 219, the plaintiff claimed that he had contributed $23,000 in exchange for a promise of shares in a corporation to be created. The defendant established the corporation, but did not issue the shares. The court held, at para. 16, that "[it] seems incongruous to suggest that a person who has not been issued shares due to alleged oppressive conduct cannot bring an action or a remedy against oppressive conduct simply because the oppressive conduct prevented him from being issued the shares". The court subsequently denied the plaintiff's request for interim relief on the facts.

[215] It is not enough to simply have reasonable expectations to become a shareholder based upon a general sense of fairness. Reasonable expectations must be tied to legal or equitable rights as a security holder, whether as a registered owner or as a beneficial owner ... These reasonable expectations must also arise from an agreement that specifies the exact nature of the shares that a party would receive; a promise of shares made during negotiation of an agreement is not enough when no agreement pertaining to the shares was ever reached ...

[216] These authorities establish that the term "beneficial owner" is to be interpreted broadly and expansively. It is not limited merely to ownership through a trustee or legal representative, agent or other intermediary. In my view, the evidentiary record establishes a contractual obligation upon Mr. Tan to give effect to Mr. Fedel's claim to a shareholding interest in GPI and BVI/WW. Mr. Fedel acted upon, and relied upon, the oral agreement that he was to have an ownership interest in GPI and BVI/WW. He provided both financial consideration and services in reliance upon the agreement. Mr. Tan is in breach of his contractual obligation.

[217] Given the evidentiary record, Mr. Fedel has equitable rights because of the oral agreement between Mr. Tan and Mr. Fedel and the promise made (and repeated) by Mr. Tan that his partner, Mr. Fedel, had an equity interest. Mr. Fedel relied upon the promise in making significant contributions to the business. GPI and BVI/WW were essentially incorporated partnerships, albeit with Mr. Fedel having a minority, 40 per cent, interest. In such instances, the statutory oppression remedy will afford redress ...

**33**     Cumming J. went on to find that the authorities indicated that oppression does not require actual illegality. In the circumstances, the appropriate remedy was an order compensating Fedel, and ensuring that the relationship between the two men was severed (paras. 218-220). On appeal, at 2010 ONCA 473, the Ontario Court of Appeal said, at paras. 52-56 and 69:

[52] Tan argues that the application judge erred in finding that Fedel was entitled to a remedy under s. 248 of the OBCA. He makes two arguments.

[53] First, Tan argues that if the application judge was correct in finding that Fedel had a contractual right to a 40 per cent ownership interest in GPI, Fedel

was limited to suing Tan for breach of contract. He argues that the application judge, in effect, impermissibly granted Fedel equitable relief under s. 248 on the basis of a finding of a breach of contract. He submits that a court must give full effect to a contract without recourse to s. 248 when there is an unambiguous contract on which a party can sue. Several of the application judge's awards for compensation would not have been available in an action for breach of contract.

[54] In making these arguments, Tan relies on the decision of this court in *J.S.M. Corp. (Ontario) Ltd. v. Brick Furniture Warehouse Ltd.*, 2008 ONCA 183 (CanLII, (2008), 234 O.A.C. 59, which held that an oppression remedy was not intended to be a substitute for an ordinary right of action in contract. Where the sole complaint is that of a breach of contract, the contract action should be pursued.

[55] The difficulty with Tan's argument is that Fedel's complaints against Tan and the corporate respondents exceeded a simple breach of contract claim. The application judge found that Tan and Fedel's businesses were essentially "incorporated partnerships". Fedel had a reasonable expectation that Tan was operating the businesses of GPI and WW in a proper manner and that he was protecting Fedel's 40 per cent ownership interest in those companies. The remedies that Fedel sought under s. 248 of the OBCA went well beyond remedies that were available to him for Tan's breach of his agreement to deliver 40 per cent of the shares to him. To succeed, however, Fedel needed to establish that he had a sufficient interest in GPI to entitle him to remedies under s. 248.

[56] In my view, *J.S.M.* does not assist Tan. In that case, the court held that a contractual remedy should be sought where the sole complaint is that of a breach of contract. It does not, however, suggest that the mere fact that a claim could be brought for breach of contract precludes the application of the oppression remedy where its application is otherwise appropriate. In *J.S.M.*, at para. 66, the court reasoned that the oppression remedy is not intended to give a creditor after-the-fact protection against the risks assumed when entering into an agreement with a corporation, but is an appropriate remedy in situations where a creditor finds its "interest as a creditor compromised by unlawful and internal corporate manoeuvres against which the creditor cannot effectively protect itself". In my view, that reasoning applies equally to a case such as the present, where the interest asserted by the applicant is an ownership interest rather than that of a creditor and where the applicant establishes that its interest has been harmed by conduct that is protected by s. 248 of the OBCA.

...

[69] Section 248 protects the interests of a "security holder, creditor, director or officer of the corporation". The application judge found that Fedel was a security holder within the meaning of the section. A "security holder" is not defined in the OBCA. However, it is well established that a security holder includes a benefi-

cial owner of shares: see, e.g., *Joncas v. Spruce Falls Power and Paper Co.*, 2001 CanLII 6156 (ONCA), (2001), 144 O.A.C. 289 (C.A.), at paras. 9 and 10; *Csak*, at p. 570; *Evans*, at paras. 99-103. Although the application judge did not specifically use the term "beneficial owner" in describing Fedel's interest in GPI, it is implicit in his findings that Fedel was one. "**Beneficial ownership**", defined in s. 1 of the OBCA, includes "ownership through a trustee, legal representative, agent or other intermediary" -- situations in which a person's interest in a company is held by another.

**34**     The respondents argue that *Fedel* is distinguishable on the basis that all of the shares had been created and issued. I see no relevant distinction. Whether all of the authorized share capital of the company has been created and the shares issued, or whether shares remain to be issued, is irrelevant in determining whether a complainant is "entitled" to own shares in the company. The applicants are "security holders"for the purpose of seeking relief under the Third Schedule of the *Companies Act*.

**"Clean hands" and equitable relief**

**35**     The respondents also argue that since accounting and disgorgement of profits are equitable remedies, it is necessary that the party seeking relief come to court with "clean hands". In *Pro Swing Inc. v. Elta Golf Inc.*, 2006 SCC 52, Deschamps J. said, at para 22:

> At common law, the typical remedy is an award for damages. However, a wide range of equitable remedies are available, and they take various forms. Their commonality is that they are awarded at the judge's discretion. Judges do not apply strict rules, but follow general guidelines illustrated by such maxims as "Equity follows the law", "Delay defeats equities", "Where the equities are equal the law prevails", "He who comes to equity must come with clean hands" and "Equity acts in personam" (*Hanbury & Martin Modern Equity* (17th ed. 2005), at paras. 1-024 to 1-036, and I. C. F. Spry, *The Principles of Equitable Remedies: Specific Performance, Injunctions, Rectification and Equitable Damages* (6th ed. 2001), at p. 6). The application of equitable principles is largely dependent on the social fabric. As Spry puts it:
>
>> ... the maxims of equity are of significance, for they reflect the ethical quality of the body of principles that has tended not so much to the formation of fixed and immutable rules, as rather to a determination of the conscionability or justice of the behaviour of the parties according to recognised moral principles. This ethical quality remains, and its presence explains to a large extent the adoption by courts of equity of broad general principles that may be applied with flexibility to new situations as they arise.

**36**     In arguing that the applicants lack "clean hands", the respondents point to their alleged refusal to return to Tylomar certain landscaping equipment. Although Mrs. Landsburg appeared to assert a claim for its return in one of her affidavits, the respondents' oral testimony suggested that they were making no claim. As such, I see no basis to treat this as a basis for finding "unclean hands" on the part of the applicants.

**37**     The respondents raise a second alleged basis to find "unclean hands" on the applicants' part. The Dillon letter referenced Graf transferring his Porsche to the company. Title to the Porsche was transferred back to Graf in early 2012 at the request of the respondents. Mr. Landsburg stated in his affidavit that, upon learning that Kaelble did not have a driver's license, he told Kaelble to remove his motor vehicle from the company's insurance coverage. He further stated that the Porsche is no longer registered in the company's name, nor is it covered by the company's insurance policy. The respondents claim that the vehicle was placed in Tylomar's name in order to hide assets from potential judgment creditors. Even if this were the case, given that the individual respondents were the only registered shareholders, officers, and director, it can hardly be said that the applicants engaged in the alleged misconduct on their own. I cannot conclude that this was anything but an agreement between the parties, whatever its purpose may have been.

**38**     The respondents go on to describe other incidents that allegedly point to "unclean hands" on the part of the applicants; for instance, an occasion when Graf, using another name, inquired about having work done, supposedly to determine the nature of the work being carried on by Mr. Landsburg at the time. As well, the respondents allege that the applicants treated corporate assets as their own, such as by transferring funds from the company's bank account to Bledin's personal account.

**39**     On the other hand, there was the evidence that Mrs. Landsburg directed the solicitor to refuse to issue shares to the applicants; that the Ford Edge purchased by Tylomar with Bledin's guarantee was transferred to Mrs. Landsburg; and that the F-350 truck was transferred to the Landsburgs' new company, Black Horse. Moreover, it is evident that, over time, the respondents shut the applicants out of any information respecting the performance of Tylomar.

**40**     In the circumstances, neither party has come to this Court with "clean hands". In *Belliveau v. Belliveau*, 2011 NSSC 397, Duncan J. observed:

> "While a finding that the plaintiff does not come to court with clean hands carries some weight, it is not necessarily determinative of the final issue. It may be possible for a plaintiff without clean hands to yet obtain equitable relief. The clean hands doctrine serves to deny equitable relief only where the misdeeds or misconduct has "an immediate and necessary relation to the equity sued for": *Hongkong Bank of Canada v. Wheeler Holdings Ltd.*, 1993 CanLII 148 (SCC), [1993] 1 S.C.R. 167; *DeJesus v. Shariff* 2010 BCCA 121 (CanLII), 2010 BCCA 121, at paras. 84 to 86.

**41**     While the respondents submit that the applicants' misconduct had such an "immediate and necessary" relation to the equity they are now suing for that their actions had direct implications for the very business in which the applicants now claim an interest, having regard to the conduct of all the individual parties, I see no convincing basis to preclude the applicants from seeking the remedies provided for under the Third Schedule of the *Companies Act*.

**Oppression**

**42**     The issue with respect to the oppression remedy is whether the evidence establishes that any act or omission of the company or its directors, or the manner in which its business affairs were carried on or conducted, was oppressive or unfairly prejudicial to, or unfairly disregarded the interests of, the applicants. The individual respondents shut the applicants out of Tylomar, denied them information about its operations, refused to issue shares to the applicants, transferred assets of the

company for their own benefit, and eliminated the company's cash holdings, while also terminating its operations. Whether other laws were breached is not, however, before the Court at this time; the question is whether this conduct amounted to oppressive conduct within the Third Schedule of the *Companies Act*. Having regard to the evidence, both oral and documentary, I conclude that this question must be answered in the affirmative.

**Remedies**

**43**    As noted earlier the applicants are entitled to shares in Tylomar equivalent to the shares now held by the individual respondents.

**44**    A further remedy sought by the applicants was for the accounting of Tylomar and of Black Horse and directing Black Horse to disgorge any profits to Tylomar. Although such a remedy could be available, I have determined that in these circumstances it is not appropriate.

**45**    There was no agreement, written or oral, preventing the individual respondents from creating and operating Black Horse. To the extent it may have been in competition with Tylomar, there was no agreement that prevented any party from engaging in a similar line of work, particularly upon the failure of Tylomar. There was no non-competition clause.

**46**    Secondly, the applicants did not meet their own obligations. The agreement summarized in the Graf email of May 2011 included a commitment to pay $1400 monthly, which apparently represented the amount of the monthly payment on the F-350 truck. In the 13 months of Tylomar's operations, the applicants made only three such payments, either by advancing the funds to the company or making the payment themselves. The applicants were in breach of their own commitment under the agreement between the individual parties.

**47**    The applicants have not challenged the Tylomar financial records that are before the court, and the evidence has not pointed to any impropriety in the records themselves. As such, nothing would be served by requiring a further accounting or financial investigation of the company.

**48**    As to the applicants' claim for an accounting and disgorgement of any Black Horse profits to Tylomar, I am satisfied that such a remedy is not justified. There was no non-competition agreement. Nothing prevented Mr. Landsburg from creating a construction company to do types of construction work not undertaken by Tylomar. Kaelble acknowledged that the landscaping business had not been successful. Neither Tylomar nor the applicants are entitled to an interest in Black Horse or its profits.

**Tylomar assets**

**49**    The applicants submit that, being the only shareholders of Tylomar, and Mr. Landsburg the only director, and in view of the lack of value in the vehicles over and above the secured financing, they were entitled to transfer the vehicles to Black Horse and Mrs. Landsburg respectively. I would note, however, that I have previously determined that the applicants were entitled to shares in Tylomar.

**50**    Additionally, it is not enough for the Landsburgs to say that CRA and WCB have no interest in these vehicles, and that they are consequently within their rights to transfer them for their own benefit. Although Mrs. Landsburg testified there were no trade or supplier creditors, in her affidavit she deposed that "Tylomar is an insolvent business with significant debt owing to the CRA, WCB, in addition to general creditors, such as the Applicants." Recognizing the applicants as being among a class of general creditors, the respondents were not entitled to transfer the only significant assets

of Tylomar to their own company. Additionally, there was no satisfactory evidence of the value of the two vehicles. It is not sufficient for the Landsburgs to simply assert that there was no equity. More than this is required in order to justify the transfer of the vehicles to their own company and to Mrs. Landsburg. The vehicles being assets of Tylomar, and there being no satisfactory evidence as to their value and whether it exceeded the amounts owing to the financing institutions, they belong to Tylomar.

**51**      The applicants submit that the return of the two vehicles to Bledin was required by the agreements whereby she guaranteed the financing of each vehicle. The email dated April 15, 2011, from Graf to Dillon concludes:

> Also, would you draw up a side agreement as we discussed whereby in the event of company dissolution the truck is to be returned to Lori & I. Also, that any and all equipment is to be returned to Lori & I. Also, perhaps a generic promissory note for Jo & Brent to sign when we give them funds for the company as amounts will change each time depending on circumstances. And, also that we are preferred creditors to the company

**52**      There was no agreement by Tylomar for the transfer of its assets to Bledin. These are Tylomar's vehicles, subject only to the secured claims of the financing institution. Private agreements between shareholders of a company do not determine title to assets owned by the company. Any equity belongs to the creditors; it is only any surplus that would belong to the shareholders.

**53**      Accordingly, the two vehicles must be returned to Tylomar, and any expenses relating to the registration of these vehicles in the name of Tylomar are the responsibility of Black Horse (for the F-350 truck) and Mrs. Landsburg (for the Edge), respectively. If not for the evidence of Mrs. Landsburg that the return of the Porsche was at the request of the Landsburgs, a similar direction would have been made in respect of the Porsche. However since it is the individual respondents who requested that the Porsche be removed from the company, there will be no similar order for its return to Tylomar.

**54**      Although not directly raised by the applicants, the cash withdrawals by Mr. Landsburg in April, May, and June 2012, while Tylomar was in the process of ceasing activities and Black Horse was being set up, must be returned to Tylomar. These withdrawals were not authorized by the agreements by which Tylomar was established and operated.

**55**      In respect to the $65,000.00.00 advanced by Bledin I am satisfied it was a gift to Mr. Landsburg, although there was an understanding between the parties that prior to any division of profits, the applicants would receive an equivalent sum. However, in 2011 the profits, presumably by agreement, were distributed equally between the parties. There were no subsequent profits. There are thus no profits from which to pay Bledin the agreed $65,000.00. The applicants are not entitled to a judgment for $65,000 as against Tylomar. There was no agreement by the company to pay this amount to the applicants, other than the parties' understanding that there would be an equivalent amount paid from profits before dividing any profits among themselves. Dillon suggested possible mechanisms by which an obligation could be created for the company to make the payment. There is no evidence that any of these were put in place, and therefore no record of any obligation by the company to the applicants in respect to this $65,000.00. The monies were advanced to Mr. Landsburg, not to the company. They were a gift to him, although, as earlier noted, they were apparently intended as an inducement for him to leave PCL Construction and work for Tylomar.

**56**    The applicants may have also been creditors for monies advanced by Bledin to the company during the course of its operations. In one of their written submissions, the applicants say that they paid the legal and accounting fees to incorporate the company, paid payroll on three occasions, and made payments on the F-350 truck. They also assert that they gave the respondents $1,000 to open a bank account for the company and that the respondents opened the account with a balance of zero, yet had cashed their $1,000 cheque. The respondents did not dispute these assertions. However, the evidence is that the applicants received certain monies from the company, over and above sharing the $26,000.00 in profits with the respondents. There was no accounting or other evidence provided as to whether amounts that were received from the company by the applicants equalled the amounts allegedly advanced by Bledin. There was evidence of some payments made to Bledin, as well as the landscaping equipment purchased by the company with funds advanced by Bledin, which equipment was retained by the applicants. On the evidence before the court, it is not possible to determine the extent of any debt owed to the applicants by the company.

**57**    There is no claim by the respondents or the company for the applicants to return any company assets. As noted, the applicants advanced funds for the purchase of certain landscaping equipment, which is now in their possession. The respondents suggested that the applicants' retention of this equipment represented the repayment of the advances the applicants made for its acquisition by the company. However, at law, if the equipment was purchased by the company, or was placed in the company's name, it belongs to the company. The applicants would be creditors for the amount they advanced. If title to this equipment was never held by the company, then it is the applicants' equipment, notwithstanding its use by Tylomar, and the applicants are entitled to retain it.

**58**    In their trial brief the respondents state that the applicants provided capital in the amount of $38,234.25, including $20,136.25 worth of landscaping equipment. They further submit that Tylomar paid back $13,383.00. Counsel also references two other payments, totalling $1,960.00, made by Tylomar to the applicants in 2012. The written submission therefore appears to assert a claim by Tylomar to the equipment, and recognition of an indebtedness to the applicant of $22,891.25 ($38,234.25 minus payments of $13,383.00 and $1,960.00.) However, neither the individual respondents nor Tylomar claim return of this equipment in their Notice of Contest, and their counsel advanced no such claim in the hearing. It is unclear whether their position is that any indebtedness owing to Bledin should be offset by the landscaping equipment, now retained by the applicants.

**59**    In their rebuttal brief, the applicants refer to the equipment which they have retained. They submit that Bledin lent Mr. Landsburg $65,000.00 from a tax-free home equity line of credit on her home. The applicants were then entitled to the first $65,000.00 in profits; in the event the company failed, Mr. Landsburg would be liable. The equipment was allegedly placed in Tylomar's name as a shareholder loan carrying no tax consequences, to help offset the loan of $65,000.00 to Mr. Landsburg. In short, they submit, the equipment was purchased by the applicants, registered to Tylomar, with the intention that the proceeds would help set off the loan to Mr. Landsburg.

**60**    Unclear is why placing this equipment in the company's name would assist in the company's repayment of the loan to Mr. Landsburg. Regardless, the applicants acknowledge that the equipment was in the company's name. Absent some lien or charge on the equipment, it would belong to the company and be available to its creditors. The evidence does not appear to establish any legal entitlement by the applicants to this equipment. I note that the applicants filed a further Notice of Motion claiming entitlement to the F-350 truck and the Ford Edge. They could also have advanced a claim to include the landscaping equipment.

**61**      In her March 18, 2013, affidavit, Mrs. Landsburg stated that the landscaping equipment was purchased by Tylomar, though it was in the applicants' possession. She then deposed that the applicants refused numerous requests for its return; she asserted that the absence of this equipment had "further disrupted" Tylomar's ability to carry out landscaping work or to use the equipment to pay off the company's debts (para. 105). However, as I have noted, there was no claim for return of this equipment in the respondents' Notice of Contest. Notwithstanding the apparent entitlement of Tylomar to the equipment, the applicants will remain entitled to its possession. However, in retaining this equipment, their claim for monies advanced to Tylomar to purchase the equipment is rejected on the basis that they now have this equipment in their possession.

**62**      To summarize, the applicants may retain this equipment, but in doing so, they are no longer entitled to be reimbursed for the monies advanced to the company for its purchase. What is unclear is whether the applicants remain creditors of Tylomar, and, if so, in what amount. Consequently, I am not able to set any specific amount as owing by the company to the applicants. I am, however, satisfied that they are creditors, as deposed to by Mrs. Landsburg, but in an undetermined amount.

**63**      Kaelble testified (and it was suggested in submissions) that if the applicants had known that Mr. Landsburg had previously operated a company that went bankrupt, they would not have gone into business with the respondents. Obviously they failed to make proper inquiries. The applicants also state that the individual respondents had advised that creditworthiness was an issue, and this was the reason that Bledin would have to guarantee the loan for the truck. Obviously they were aware of some credit issues involving the individual respondents. The failure to make further inquiries is not a basis for any claim against the individual respondents or the company.

**64**      Mr. Landsburg acknowledged that a loan of $4,600.00 which the respondents initially alleged was to the company was, in fact, to him personally, and that he accepted responsibility for its repayment. The applicants shall therefore have judgment against Mr. Landsburg for the sum of $4,600.00.

## Conclusion

**65**      The applicants have established an oppression claim. They are not, however, entitled to judgment for $65,000.00 as against Tylomar or Mr. Landsburg. The F-350 truck and the Ford Edge must be returned to Tylomar. There was no request for recovery of the landscaping equipment by Tylomar. The applicants are entitled to judgment against Mr. Landsburg for $4,600.00.

## Costs

**66**      Neither party is entitled to costs. Although each of the individual parties was partially successful, the decision to deny costs is principally based on their respective misconduct in carrying out their obligations under the agreements they entered into with each other. The applicants failed to make the monthly "bonus" payments they had undertaken. The respondents' failures include their refusal to cause the company to issue shares to the applicants. Regardless of the applicants' conduct, they were entitled by the original agreement between the parties to equivalent shares in the company. Additionally, the transfer of assets and withdrawal of much of the cash balance of the company, shortly before termination of its activities, disentitles the respondents to costs.

**67**      Judgment accordingly.

D. MacADAM J.

*Indexed as:*
# Bramalea Ltd. v. Vancouver School Board No. 39 (B.C.C.A.)

**Between**
**Bramalea Limited, Plaintiff, (Respondent), and**
**The Board of School Trustees of School Board No. 39**
**(Vancouver), Defendant, (Appellant)**

23 W.A.C. 229

12 B.C.A.C. 229

65 B.C.L.R. (2d) 334

[1992] B.C.J. No. 811

Vancouver Registry: CA013933

British Columbia Court of Appeal

**McEachern, C.J.B.C., Locke and Proudfoot JJ.A.**

Heard: March 6, 1992
Judgment: April 10, 1992

(10 pp.)

*Contracts -- Interpretation -- Amending agreement allowing one party to make changes to terms of agreement -- Whether term "changes" had limited meaning -- Return of deposit.*

This was an appeal from a judgment. Wishing to relocate, the Board entered into an agreement to lease its land to the plaintiff for 99 years in exchange for a large rental payment. An amending agreement was entered into when the Board was unable to give up possession on time. Under the agreement the Board was to deliver a portion of the land at an earlier date. If the parties were unable to reach an agreement by a specified date as to the rent for that portion and "other changes to the terms of the agreement if required by the plaintiff" then the agreement was void and the deposit was to be returned. The plaintiff required certain changes regarding the determination of market value of the land and the nature of the title to the residential portion of the land. The Board refused to agree to the changes, arguing that the clause allowing changes to the agreement was limited to the timing

of further turnover of the land. The plaintiff took the position that the agreement was null and void. The Board appealed from the judgment ordering the return of the deposit.

HELD: The appeal was dismissed. There was no basis for giving a limited meaning to the clause. The clause was to be interpreted in light of the commercial purpose of the agreement. It should be interpreted to keep the transaction alive and be given its natural meaning.

Counsel for the Respondent: J. Edward Gouge.
Counsel for the Appellant: R.J. Olson.

---

Reasons for judgment delivered by Locke J.A., dismissing the appeal, concurred in by Proudfoot J.A. Separate reasons delivered by McEachern C.J.B.C., concurring in part.

**LOCKE J.A.**:-- I would uphold the judgment for the reasons of the trial judge but in deference to the careful arguments addressed to us I wish to add some short comments.

The facts found by the trial judge were basically uncontested. The argument that the procedures of Rule 18A were unsuitable was not pressed, in my opinion, correctly. The legal problem was whether the amending letter of August 25 ought to be construed "narrowly" to relate to matters of phasing alone or "widely" to refer to any matter covered in the original letter agreement of March 4, 1988.

A principal argument was that it was not reasonable to assume that the Board would agree to the wide interpretation which would mean that the developer would have - in effect - an option without payment and one as to which it could dictate its own terms or else walk away. Colourful as this statement is, in my view it ignores the facts surrounding the negotiation of the amending letter. Those facts show that both parties not only had concerns about the transaction and that each knew the other's problems, but that in particular the Board could not deliver the land on time and the developer would soon be able to declare the agreement in default, reclaim the deposit and commence charging rent.

It was pointed out that as a matter of construction while it can be argued that one of two meanings should be adopted simply on the basis that one of them is more reasonable under all the circumstances, the same forgiving threshold is not the case where it is sought to imply a term. There the proponent must demonstrate that the implication is necessary, and this is a heavier burden. The onus is not met in this case, either as to construction or implication.

The amending agreement was an attempt - and neither party alleged it was not in good faith - to salvage the original transaction with some alterations, albeit of significant proportions. I think that in this regard the situation of the parties was exactly as mentioned by Lord Wilberforce in Prenn v. Simmonds, [1971] 1 W.L.R. 1381 where he said at p. 1385:

> "... It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact. Cardozo J. thought so in the Utica Bank case. And if it can be shown that one interpretation

completely frustrates that object, to the extent of rendering the contract futile,
that may be a strong argument for an alternative interpretation, if that can rea-
sonably be found. But beyond that it may be difficult to go: it may be a matter of
degree, or of judgment, how far one interpretation, or another, gives effect to a
common intention; the parties indeed, may be pursuing that intention with dif-
fering emphasis, and hoping to achieve it to an extent which may differ, and in
different ways. The words used may, and often do, represent a formula which
means different things to each side, yet may be accepted because that is the only
way to get "agreement" and in the hope that disputes will not arise. The only
course then can be to try to ascertain the "natural" meaning. Far more, and indeed
totally, dangerous is it to admit evidence of one party's objective - even if this is
known to the other party...."

In my view the circumstances militate against the implication of any term, and in particular it
is not needed to save from an absurd commercial result. Further - and most important - the words
are clear and not dubious of meaning and no confining construction as is asked for is warranted.
The natural meaning makes complete sense. In the result the appeal should be dismissed.

Since writing the above, I have had the privilege of reading the judgment of the Chief Justice.
I agree with it.

LOCKE J.A.
 PROUDFOOT J.A.
 MCEACHERN C.J.B.C.:-- Mr. Justice Locke has written the first
 judgment on this appeal. I agree with his conclusions. I wish,
 however, to add some thoughts of my own for which it will be
 necessary briefly to mention some of the facts.

The Defendant School Board owns a large block of land at a desirable location on which is
situate its administrative offices. Wishing to relocate, the Board entered into a Letter Agreement
with an assignee of the Plaintiff (which I shall call the "Plaintiff") to lease this block of land for 99
years for a large rental payment, participation in rental revenue from the non-residential portion of
the proposed development, and for rent revisions at twenty year intervals based on a percentage of
the market value of the land. A deposit of $1,050,00 was furnished by the Plaintiff and the School
Board agreed to pay substantial liquidated damages if it failed to deliver possession on time.

Various extensions of time for complete were agreed upon between the parties. The School
Board was having trouble finding a new site and the Plaintiff came to realize that the financial ar-
rangements for the development were not viable. The parties discussed the possible participation of
the School Board in the project, revisions to the rent structure, a different form of title which could
be marketed for the residential portion, phased delivery of the site to the Plaintiff, and other matters.

Eventually, the parties agreed to an Amending Agreement which provided that the School
Board would deliver the East portion of the lands on an earlier date than the West portion, that
pending delivery of the entire site rent would be paid by the Plaintiff in an amount to be "agreed
upon". and this important provision:

If Trilea and the Board are unable to reach agreement in
writing by 5:00 p.m., Vancouver time, 1989 November 30

(a)    as to the rent to be paid by Trilea for the East Portion of the Lands,

(b)    as to <u>other changes</u> to the terms of the Letter Agreement, if any, requested prior to such time by Trilea, and

(c)    Trilea gives written notice prior to such time to the Board of Trilea's election to terminate the Letter Agreement,

the Letter Agreement shall be rendered null and void and the deposit of $1,050,000.00, and any interest accrued thereon shall be returned to Trilea by the Board.

If the Letter Agreement is not rendered null and void as aforesaid, the deposit and said interest shall be:

(a)    held by the Board and credited against the Basic Rent as it comes due, or

(b)    if Trilea should repudiate the transaction, forfeited to the Board.

<div align="center">(my emphasis)</div>

It is the position of the School Board that the "other terms" which the Plaintiff could request were limited to the question of "phasing," that is the dates when portions of the lands would be delivered to the Plaintiff for development. There is some support for this contention in: (a) the Plaintiff's letter transmitting the Amending Agreement which confirmed that both parties were "...committed to negotiating in good faith the terms to amend the agreement <u>to permit phasing of the construction</u>", (my emphasis); and, (b) in the argument advanced that if "other terms" really meant <u>"any&lt;/u other terms," then the agreement became an option because the Plaintiff could ask for anything, and a refusal to agree would permit the Plaintiff to terminate the agreement and recover the deposit.</u>

<u>With respect, I agree with the legal principles argued by Mr. Olson that a commercial contract should, if possible, be given business efficacy. If the amending agreement made the remaining contract between these parties "commercially absurd", as Mr. Olson contends in his Factum, then I would seek some non-absurd meaning arising out of this matrix of facts either by imposing some other interpretation upon the language of the amending agreement, or possibly by implying an appropriate term to their agreement.</u>

<u>Such was the result of Qualico Devs Ltd. v. Calgary (City), [1987] 5 W.W.R. 361 (Alta Q.B.) where the City by agreement took land and agreed that any land not required for a freeway would be returned at the original purchase price. The written agreement, however provided for the return of any land "not required by the City." When the City found it did not need the land for the freeway it nevertheless sought to keep it as it was said to be "required for other municipal purposes."</u>

<u>In giving judgment against the City, Virtue J. had not difficulty concluding that the agreement should be given the interpretation which an objective person would give it having regard to the commercial or business object of the transaction as revealed by the context in which agreement was reached. He accordingly held that the City could only "require" this particular land for freeway purposes.</u>

I would gladly follow that authority if those were the facts of this case. In my judgment, however, the ordinary, natural meaning of the amending agreement, in the matrix of admissible facts, does not produce an absurdity.

I rely, of course, on Prenn v. Simmonds, [1971] 3 All E.R. 237 (H.L.), mentioned by Mr. Justice Locke, and I shall not repeat the important passage he has quoted from that Report; see also Delisle v. Bulman Group Ltd. (1991), 54 B.C.L.R. (2d) 343 (B.C.S.C.).

The circumstances in which those negotiations were conducted establish the factual matrix in which the Agreement was intended to operate. Thus it was established by admissible evidence that the underlying purpose of the agreement, or its genesis, was that the School Board would give up its land and premises for the term of the lease in exchange for a substantial rent, and for the Plaintiff to acquire this site for commercial and residential development.

It must be remembered, however, that the matrix of fact created by the Amending Agreement may also be considered in determining the proper meaning to be given to its terms. By the time of the Amending Agreement, It was known to both parties that the School Board was having difficulty finding a new location, and that the 20 year rent revisions based upon fair market value, and the leasehold interests that would be available to market the proposed residential units made the project doubtfully viable.

What happened was the parties reached agreement on interim rent, and they agreed to defer attempting to define when the first twenty year rental period would begin, but then the Plaintiff requested two major changes:

> (1)    The Letter Agreement provided that the land would be used to its highest and best use, and the Plaintiff was concerned that, in 20 years time, the improvements would not service a rent based upon market value, so it requested a definition of market value as one based upon existing use having due regard for the quality and age of the improvements;

> (b)    That the Plaintiff obtain free-hold title to the residential portion of the development so that it could market free-hold housing units instead of lease-hold units.

The School Board refused to agree to these "changes" so the Plaintiff took the position that the entire agreement had been "...rendered null and void", and demanded the return of this deposit. The board treated this as a repudiation and claimed the deposit was forfeited.

The Plaintiff obtained judgment under Rule 18A for the return of the deposit, and the School Board brought this appeal. i agree with the trial judge and with Mr. justice Locke that the case was suitable for trial under that Rule.

In my judgment, the Plaintiff should succeed because, on the admissible evidence, the commercial purpose of the Amending Agreement was to keep this transaction alive on the terms stated. This was desirable because the Board wished more time, and it faced a substantial liability for liquidated damages. The Plaintiff, on the other hand, wished to restructure the transaction because the site was a good one, but it needed substantial changes to the agreement. These facts explain the contest in which the language of the agreement must be construed.

Viewed this way, it cannot be said that it is absurd to give the phrase "other changes" its natural meaning, that is one which permitted the Plaintiff to request any changes in the agreement on such requests, the deposit would be returned. Having regard to the "genesis and aim of the transaction" and the factual matrix, there is no reasons to impose a restrictive meaning on the phrase "other changes".

I accordingly agree with the conclusion reached by the learned trial judge, and I to would dismiss this appeal.

MCEACHERN C.J.B.C.

*Case Name:*

# Campeau v. Desjardins Financial Security Life Assurance Co.

**Between**
**Aurèle C. Campeau, (plaintiff) respondent, and**
**Desjardins Financial Security Life Assurance Co.,**
**(defendant) appellant**

[2005] M.J. No. 448

**2005 MBCA 148**

201 Man.R. (2d) 119

144 A.C.W.S. (3d) 254

Docket No. AI04-30-05942

Manitoba Court of Appeal

**Twaddle, Kroft and Freedman JJ.A.**

Heard: September 19, 2005.
Judgment: December 14, 2005.

(72 paras.)

*Damages -- Contracts -- Breach of contract -- Appeal from award of damages for breach of contract allowed -- Plaintiff was not entitled more than what was required to put him into the same position he would have been had no breach occurred.*

Appeal by the defendant, Desjardins Financial Security Life Assurance, from the quantification of damages awarded to the plaintiff, Campeau, for breach of contract. Campeau worked his entire career with Desjardins as an insurance salesperson and executive. After the elimination of his management position, Campeau agreed to return to sales as an independent contractor and licensed sales agent of Desjardins. Under the agreement, Campeau was permitted to sell other insurers' products. The agreement provided that Campeau, age 55, was entitled to use of office space and

secretarial assistance until he turned 71. When Desjardins closed its office, Campeau bore the cost of establishing a home office. Campeau commenced an action and sought damages of $430,000 to fund the past and future cost of office and secretarial assistance. The trial judge held that Desjardins breached its agreement with Campeau and fixed damages at $250,000.

HELD: Appeal allowed. The trial judge did not reach a definitive conclusion on the extent to which Campeau was obliged to produce sales for Desjardins to be entitled to the benefits he claimed. In the absence of such conclusion, it was not possible to make a proper assessment of damages. It was commercially unrealistic that Desjardins would provide Campeau with office space and secretarial assistance beyond a minimal level for the next 16 years without any regard to the sales of its own products. Campeau was not entitled to damages calculated without any regard to either his production of sales for Desjardins, or the recognition of contingencies that might occur prior to age 71. Campeau was entitled to be placed in the same position he would have been in had no breach of the agreement occurred. Accordingly, the damages award was reduced to the cost of the home office established by Campeau.

**Counsel:**

H. I. Schachter and J. W. Feldschmid for the Appellant

W. C. Kushneryk, Q.C. for the Respondent

---

The judgment of the Court was delivered by

**FREEDMAN J.A.**:--

Overview

**1**    This appeal involves the quantification of damages suffered by the plaintiff, when the defendant breached its agreement with him. A judge awarded the plaintiff $250,000 in general damages (his oral decision was given January 21, 2004). The defendant says that the evidence cannot support such an award. That is the basic issue on this appeal, and on that issue I agree with the defendant. The damage award cannot be sustained.

Facts

**2**    The plaintiff is a very experienced and successful life insurance executive and salesman. He is now in his mid-60's. He started his career in the industry in 1959, with Imperial Life Assurance Company of Canada, of which the defendant is the successor. He worked for the defendant as a sales representative, and ultimately became a branch manager for 15 years, from 1979 until 1994.

**3**    Then, by mutual agreement, the plaintiff ceased to be in management and returned to sales, as an independent contractor and a licensed sales agent of the defendant. This change was triggered by the defendant's reorganization and elimination of the position of branch manager. The plaintiff was agreeable to the change. The plaintiff's status change was dealt with in a letter agreement (the Agreement) dated October 8, 1993 between the parties.

**4**    Under the Agreement, the plaintiff received several types of benefits. Of relevance here was his entitlement to the use of certain office space and to certain secretarial assistance, until he reached age 71. At the time the Agreement was made, the plaintiff was 55 years old.

**5**    In 2000, the defendant closed its Winnipeg office (and all offices in Canada). The plaintiff, who had used the defendant's facilities until then, and who wished to continue in business, established an office in his home, at a cost to him of $44,044.

**6**    The plaintiff sued the defendant (in fact, the suit was started in 1999) claiming:

. . . . .

    c)    A declaration that the Defendant is obligated to provide the Plaintiff with office and secretarial assistance to support the requirements of the Plaintiff until the Plaintiff reaches the age of 71 years;

    d)    A lump sum payment of $430,000 to fund the past and future cost of office and secretarial assistance to support the requirements of the Plaintiff until the Plaintiff reaches the age of 71 years ...

He also sought additional relief not relevant here.

**7**    In his claim, the plaintiff outlined how he arrived at the sum of $430,000. The amount was based entirely on a report dated November 14, 2002 (preceded by a report dated May 17, 1999), prepared for the plaintiff by Stafford F. Swain, a chartered business valuator.

**8**    After a trial, at which the plaintiff and Mr. Swain both testified, as did representatives of the defendant, the judge found that the defendant had breached its obligations, commencing some time before April 2000, when services to the plaintiff were reduced, and continuing thereafter when no further office space was provided by the defendant. That finding has not been appealed by the defendant, and liability is not at issue here.

**9**    The judge rejected Mr. Swain's approach to quantifying damages, which was based on a replacement cost approach. He then fixed damages at $250,000, and the defendant now appeals that award. It also appeals the award of costs made against it.

The Agreement

**10**    The plaintiff's entitlement to office space and secretarial assistance is set out in paras. 6-7 of

the Agreement, but, as in the case of the construction of any written instrument, it is important to read those provisions in context. To understand what is meant by paras. 6-7, the entire Agreement must be taken into account. See BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12 (at pp. 23-24):

> It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the parties as evident from the contract as a whole: K. Lewison, The Interpretation of Contracts (1989), at p. 124; Chitty on Contracts (26th ed. 1989), vol. I, at p. 520. Where there are apparent inconsistencies between different terms of a contract, the court should attempt to find an interpretation which can reasonably give meaning to each of the terms in question. ....

**11**    A number of words and phrases used in the Agreement are not defined in it (e.g. "non-housed contract," "PPGR," "override," "effective representative levels of satisfactory production," "full-time production," and "performance credits"). The Agreement is premised on the parties' understanding of the industry, the defendant's method of dealing with and compensating its sales force, and the role played by the plaintiff in his years with the defendant.

**12**    The opening paragraph of the Agreement states that it "is intended to set out all the terms" of the plaintiff "relinquishing the position of Branch Manager" and his "returning to personal production as an independent contractor." That phrase, "personal production," is not defined, but based on the evidence, and reading the Agreement as a whole, it seems that it refers to sales of life insurance or other products effected by the efforts of the plaintiff. What is not as clear is whether such sales are only of the defendant's products, or may also include sales of other insurance companies' products.

**13**    Paragraphs 1-2 deal with severance payments. The defendant agreed to pay the plaintiff over $300,000 regarding the termination of his employment as Branch Manager, in full settlement of any obligations owed to the plaintiff on the termination. The slate was clean as the parties entered into a new relationship.

**14**    Paragraph 3, the relevance of which I will discuss later, reads:

> I [the defendant] confirm that you [the plaintiff] have the option upon your return to personal production of either remaining under your present Imperial Life Agency Agreement - Vested or, becoming a PPGR. In either case, you have the option of using a corporation to carry on your personal production activities. If you choose to become a PPGR, you would have to bear all the costs of carrying on business such as housing, travelling, and administrative expenses. Regardless of whether you remain under your present Agreement or become a PPGR, you would receive a 20% override on your personal and corporation production and receive a Performance Bonus as earned.

**15**    Paragraphs 4-5 deal with sales awards the plaintiff had already won, and are not relevant to this appeal.

**16**    Paragraphs 6-7 set out the plaintiff's entitlement to be given office space and secretarial assistance, in the following terms:

> You would continue to use your current private office until the end of the existing premises lease which expires March 31, 1995. Beyond that point in time until you reach 71 years of age, you would need to qualify to have an office, but as long as you maintain qualification for the President's Club, you would retain private office space. Other office space, within the Branch, would be provided until you reach 71 years of age in the event that you did not qualify for the President's Club. It is believed reasonable to expect effective representative levels of satisfactory production, as they may be from time to time (currently 24,000 performance credits), for you to be housed in a private office after the end of the current lease period.

> If you wish to be housed outside of the Branch, that would be at your option. If you were housed outside of the Branch, we would pay you the non-housed contract which is normal earnings plus an additional bonus based on performance credits. This bonus is 20% and it would be paid in addition to the 20% special override outlined in paragraph three of this letter. It should be understood, however, that if you choose to be non-housed, all expenses associated with being non-housed, e.g., rent, secretarial assistance, etc., are your responsibility.

> Until age 71 you would continue to have appropriate secretarial assistance to support fully your requirements in full-time production and, in any event, for the remainder of 1993, you would continue to have the use of a full-time secretary.

**17**    Paragraphs 8-9 deal with other benefits not relevant here, and para. 10 and the execution paragraph also deal with matters not of relevance.

**18**    The issues before the judge that are now under appeal relate directly to paras. 6-7. The plaintiff did not "maintain qualification for the President's Club" (which related to selling a certain amount of product for the defendant), so he was not entitled to private office space, but he was entitled to "[o]ther office space, within the Branch" until he reached 71. This was not provided to him, from the time the defendant closed its Winnipeg office in April 2000. He was "housed outside of the Branch," but that was not his choice. Moreover, the defendant did not give him secretarial assistance from the time he left the Branch premises.

The Claim and the Defence

**19**    The issue before us is limited to quantification of the plaintiff's damages for breach of contract. It is important to set out the basis on which this claim was advanced, and the evidence that was tendered, which I will do in this and following sections.

**20**    As noted earlier, the plaintiff sought a declaration that the defendant was obligated to provide him with office and secretarial assistance "to support [his] requirements" until age 71. The plaintiff asserted that the sum of $430,000 was required to fund those requirements.

**21**    The amount of $430,000 was Mr. Swain's estimate of the lump sum amount, as of January 1, 2003, to fund the "past and future costs of an appropriate office facility" for the plaintiff. The costs were "one-time costs" to establish and equip an office, such as tenant's improvements, capital costs of equipment, and signage, and "annual operating costs," such as rent, secretarial support, and computers. The judge accurately described this as a "replacement cost" approach.

**22**    The defendant acknowledged that the plaintiff was an independent insurance agent and that he sold products of other insurance companies as well as of the defendant. It denied liability, denied that the plaintiff had suffered any loss and alleged a failure to mitigate.

The Judge's Decision

**23**    The plaintiff's claim was not based on any alleged income loss occasioned by the breach. In fact, the defendant had attempted on discovery to elicit from the plaintiff information related to his income from other insurance companies, but the plaintiff refused to answer. On the defendant's motion to a Master to compel a response, the Master agreed with the plaintiff that his income and the sources of it were not relevant to the claim he had advanced, and so he declined the defendant's motion. The defendant appealed unsuccessfully to a Queen's Bench judge. The defendant argued before that judge that the nature, source and amount of income that the plaintiff earned from other companies was relevant to determine if the plaintiff had suffered a loss as a result of any breach. The judge agreed with the plaintiff that income issues were not relevant to the claim. Her ruling was not appealed.

**24**    The evidence at trial for the plaintiff relating to quantification of damages came from two sources. The plaintiff testified that he established an office in his home at a cost of $44,044. Those costs were not disputed by the defendant. The main evidence was Mr. Swain's, who explained his analysis and his report.

**25**    What follows are the relevant extracts from the judge's decision on the matters under appeal:

> The problem, however, having found that there is a breach, is in quantifying damages. The approach reflected in Swain's report is not acceptable. Basically, Swain's report assumes a replacement cost. Forget about the argument about how much, and how you calculate and so on, but essentially, it presumes a replacement, as if something was taken away and was going to be replaced. The

office cannot be replaced, certainly not in the past. It would simply put money in the plaintiff's pocket that he would not have had, had the office and secretary been provided. So it's a breach, but it's not the kind of a breach that you can talk about replacing what was taken away and then valuing, whether through Swain's approach or otherwise. As to the future, I do not know how long he would have used the office, if it was available.

It seems to me that the appropriate approach to compensate for this breach is by way of general damages, as opposed to quantifying a replacement cost. There is not much evidence, specifically, on how one quantifies general damages, but I have looked at the following factors. First of all, he spent $44,000, approximately, to mitigate, and it seems to me that in the overall general damages he should recover that amount. Secondly, there is evidence indicating that office and secretary formed a fairly important issue to both sides. In terms of words, and lines, however you want to measure it, they formed a substantial portion of the mutual commitments in the October 8th, 1993 agreement. It talked about it a lot. The defendant, I note, had precision about performance when it came to private office space, so clearly, the defendant, as well as the plaintiff, through these pieces of evidence, seems to feel that office space, whether private or otherwise, and secretarial is an important matter. I look at the other alternative of a 20 percent override. That also indicates what the defendant feels about how important an office space is. I look at Swain's basic figures to indicate the value of the office, not as to what general damages to assess, specifically, but just to get a ball park.

I take into account all of those factors, including the factor that for a period of time prior to being evicted there was less of a breach, but there was a breach because the services were being reduced. So taking all that into account for the past and future damages, for loss of office and secretary, and including the money the plaintiff spent to fix up an office for himself of some forty thousand-odd dollars, I fix the general damages at $250,000.

Decision

    A)    General Principles

        i)    Damages for Breach of Contract

**26**    An award of general damages may be made for a breach of contract, but damages must be proved, even if the plaintiff is not able to quantify precisely all aspects of the claim. See D. R.

Harris, ed., Chitty on Contracts, 27th ed. (London: Sweet & Maxwell, 1994) at 1199-1200, para. 26-002.

**27**    The purpose of a damages award in contract cases is, so far as possible, to put the injured party in the position he or she would have been in, had there been no breach (BG Checo at pp. 16, 37, and Asamera Oil Corporation Ltd. v. Sea Oil General Corporation et al., [1979] 1 S.C.R. 633 at 645). It will be apparent that, to arrive at a damages award, one must decide what that position would have been. One must determine, so far as possible, the benefits which would have accrued to the injured party, had there been no breach. In my opinion, to understand the real consequences to the plaintiff of the breach of contract, one must understand the bargain made by the parties.

**28**    This raises a fundamental issue, not fully dealt with in the judgment below; that is, to what extent was the defendant's promise of office and secretarial assistance linked to the volume of sales the plaintiff would be producing for the defendant?

**29**    In BG Checo, the Supreme Court said (see p. 40) that breach of contract normally is concerned with "expectation" damages while tort claims raise "reliance" damages (see L. L. Fuller and W. R. Purdue, "The Reliance Interest in Contract Damages" (1936-37) 46 Yale L.J., 52 and 373). Contract promisees can normally expect to recover what they have lost by the failure of the promisor to abide by the contract. So far as possible, this will be consistent with the fundamental principle applicable to measuring breach of contract damages, of "restitutio in integrum" (see e.g., Bowlay Logging Ltd. v. Domtar Ltd. (1978), 87 D.L.R. (3d) 325, at 335 (B.C.S.C.), aff'd (1982), 135 D.L.R. (3d) 179 (B.C.C.A.). This principle ensures, as Berger J. said at trial in Bowlay (at p. 335), that the law of contract compensates for the consequences of the breach, not for the consequences of entering into the contract.

ii)    Construing Agreements

**30**    In construing an agreement, including for the purposes of assessing damages for breach of that agreement, a judge should consider the agreement as a whole, and the commercial context and realities applicable to it.

**31**    As a general rule, where "the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary or interpret in any way the words used in the writing," the rationale being that the true intentions of the parties are plainly revealed by the written terms of the contract: Professor G. H. L. Fridman, Q.C., The Law of Contract, 4th ed. (Scarborough: Carswell, 1999) at 480. See Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129 at paras. 55-56, and Manulife Bank of Canada v. Conlin, [1996] 3 S.C.R. 415 at para. 79.

**32**    Where a contract is ambiguous, however, and that ambiguity cannot be resolved contextually within the four corners of the contract, the court may suspend the parol evidence rule and allow extrinsic evidence to be admitted. Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.) (at p. 502):

> Where the language in a contract is clear and unambiguous, it alone can be looked at to ascertain the intent of the parties. Where, however, as here, the words are ambiguous, in the sense that they are susceptible of more than one meaning, evidence of the surrounding circumstances may be admitted, not to vary, add to, or contradict the terms of the contract, but to enable the Court to read and construe the language in relation to the facts and circumstances in which they adopted it to express their intention.

**33**    A consideration of the surrounding circumstances or factual context may be helpful in construing a legally ambiguous provision. The definitive statement of the law on this point was set down by Viscount Haldane L.C. in Charrington & Co., Limited v. Wooder, [1914] A.C. 71 (H.L.) (at p. 77):

> ... [I]f the description of the subject-matter is susceptible of more than one interpretation, evidence is admissible to shew what were the facts to which the contract relates. If there are circumstances which the parties must be taken to have had in view when entering into the contract, it is necessary that the Court which construes the contract should have these circumstances before it.

See also Hill v. Nova Scotia (Attorney General), [1997] 1 S.C.R. 69, White et al. v. Central Trust Co. et al. (1984), 7 D.L.R. (4th) 236 (N.B. C.A.), Manitoba Hydro Electric v. Inglis (John) Co. et al. (1999), 142 Man.R. (2d) 1 (C.A.), and Moore Realty Inc. v. Manitoba Motor League (2003), 173 Man.R. (2d) 300, 2003 MBCA 71.

**34**    In questions of ambiguity arising out of commercial agreements, a court should consider the commercial context in which the words were used. See, e.g., Paddon-Hughes Development Co. v. Pancontinental Oil Ltd., [1999] 5 W.W.R. 726, 1998 ABCA 333, and H.W. Liebig & Company Limited v. Leading Investments Limited, [1986] 1 S.C.R. 70. The principle is expressed in the oft-quoted passage from Lord Wilberforce's decision in Reardon Smith Line Ltd. v. Hansen-Tangen, [1976] 3 All E.R. 570 (H.L.) (at p. 574):

> ... No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating. ...

**35**    At all times an effort should be made to "avoid an interpretation that would result in a commercial absurdity. Rather, the document should be construed in accordance with sound commercial principles and good business sense. Care must be taken, however, to do this objectively" (Goudge J.A., for the Ontario Court of Appeal in Kentucky Fried Chicken Canada v.

Scott's Food Services Inc. et al. (1998), 114 O.A.C. 357 at para. 27).

B)    The Bargain Between the Parties

**36**    The issue identified earlier, that is, the extent to which the defendant's obligations are linked to the plaintiff's production for the defendant, is not clearly and unambiguously resolved in the text of the Agreement (for example, as noted earlier, some key phrases are undefined). It is, presumably, because of the lack of textual clarity that evidence that touched on that issue was admitted.

**37**    The plaintiff was "returning to personal production as an independent contractor." He was permitted to sell other insurers' products. The trial judge did not reach a definitive conclusion on the extent to which the plaintiff was obliged to produce sales for the defendant to be entitled to the benefits he claimed. So far as possible, such a conclusion should be reached, so that a proper assessment of his damages can be made. The evidence was clear that, as a broker, he was not precluded from selling products of other companies, but it was less clear on the circumstances when that could occur.

**38**    On reading the Agreement in context of the surrounding circumstances, it is my view that it was part of the bargain that the resources to be provided by the defendant were intended to facilitate the plaintiff's sales of the defendant's products, at least to a reasonable degree. Absent such sales, the resources to be provided had to be no more than minimal. To find that there was no such element in the bargain, in the absence of explicit wording in the Agreement, or very clear and consistent evidence, would be to give the Agreement an unreasonable interpretation. It would be commercially unrealistic to think that the defendant, which was paying a large sum in full settlement of all its obligations to the plaintiff regarding his employment, was also prepared to provide him with office space and secretarial assistance for about 16 years (1993 to 2009), beyond a minimal level, without any regard whatsoever to whether this would in any way enhance sales of its own products. Such an interpretation would be quite unrealistic, almost absurd. I find support for this view in both the Agreement and in the evidence.

i)    The Agreement

**39**    Paragraph 3 of the Agreement is helpful in setting paras. 6-7 in context. The plaintiff was given the choice to return to personal production or to become a "PPGR." In the evidence it was explained that a PPGR is a "personal producing general representative." According to the Agreement, had the plaintiff chosen to become a PPGR (which he did not do) he would have been responsible to "bear all the costs of carrying on business such as housing, travelling, and administrative expenses." As a broker, the plaintiff would have been entirely free to sell products of whichever company best met his clients' needs. In such a case, however, his continued connection to the defendant would have been tentative at best. So it is not surprising that the Agreement provides that the plaintiff would have to bear all administrative costs if he chose to become a PPGR. Similarly, if the plaintiff chose to be housed outside the branch, the Agreement provides that he would be responsible for the associated expenses, including rent and secretarial assistance.

Choosing to be housed outside the branch, like becoming a PPGR, indicates a reduced connection to the business of the defendant. Signing (or maintaining) the Agency Agreement, which is what happened, indicates a stronger connection to the business of the defendant.

**40**    If the plaintiff chose to remain housed in the branch under the terms of the "Imperial Life Agency Agreement - Vested," para. 6 of the Agreement indicates that continued access to private office space is tied to performance (i.e., sales of the defendant's products). Thus, "private office space" was to be provided if the plaintiff was able to "maintain qualification for the President's Club." Short of such a qualification, retention of a private office was contingent upon reasonably good performance: "It is believed reasonable to expect effective representative levels of satisfactory production ... for you to be housed in a private office after the end of the current lease period."

**41**    Paragraph 6 also provides that "[o]ther office space, within the Branch, would be provided until you reach 71 years of age in the event that you did not qualify for the President's Club." While this promise seems to be unqualified, it cannot be read in isolation from the remainder of para. 6 or the Agreement as a whole. As Mr. Kane, a vice-president of the defendant, explained, with a housed person, there would be an expected production requirement. With a non-housed person, that would not be the case, but, of course, the non-housed person would be paying his or her own expenses.

**42**    So, too, para. 7 states that appropriate secretarial assistance would be provided "to support fully your requirements in full-time production." "Full-time production" is not defined in the Agreement. Mr. Kane said that meant the person was devoting his talents, time and energy "to the production of business for the [defendant]." Even if it could include some time spent selling the products of others, the Agreement cannot reasonably be construed to include a promise that a secretary would be provided to "support" the plaintiff's efforts even if he sold none of the defendant's products. Although, given the nature of the industry, the history of the parties, and the new role of the plaintiff, the defendant could not object if the plaintiff also sold for others, it is stretching matters to construe the Agreement to mean that the defendant was to provide all these resources for over a decade and a half without any consideration of the extent to which it would also benefit from the resources having been provided.

      ii)    The Evidence

**43**    The plaintiff testified that he was never told that he had to produce any particular amount of sales for the defendant. He had, however, acknowledged in discovery that the para. 7 (secretarial assistance) obligation, to support him in full-time production, meant full-time production for Imperial Life business. He changed that evidence at trial. He said that he gave the defendant business when he could, and if the defendant was not competitive, he would sell products for other companies.

**44**    Two witnesses for the defendant were asked about this general issue. Mr. Place is a retired senior vice-president of the defendant who negotiated the Agreement with the plaintiff. The plaintiff said that Mr. Place was asked if he had any understanding or thoughts as to what might occur if the

plaintiff's performance decreased significantly. He responded "[n]o, other than we knew that if he didn't reach these levels, that we wouldn't be obligated to provide a private office." But Mr. Place had immediately previously been asked, and answered:

> Q        And what are the arrangements in accordance with this paragraph [6] ... in the event that Mr. Campeau did not reach that level of performance? ["effective representative levels of satisfactory production ... currently 24,000 performance credits"]
>
> A        Other space within the branch would be provided and that space would vary in size, depending on availability and on production levels. It can range from a small private office to a cubicle to something different.
>
> Q        What, ... if any, expectation did you have with respect to Mr. Campeau's performance in relation to this issue of office space?
>
> A        His history had always been to have high levels of production. ...

<div align="center">[Emphasis added]</div>

**45**    Mr. Campeau was asked whether both he and the defendant were hoping that on his return to personal production, he would make "lots of money for yourself and lots of money for the company." He responded: "I would assume so."

**46**    Mr. Place said that the plaintiff's production was significantly lower than he had expected, and that it "was assumed that his production would continue at a very high level because that had been the history with Imperial Life." He also said that at some point they would have discussed minimum production levels (the plaintiff disagreed).

**47**    The plaintiff did not become a PPGR. Instead, he operated under the Imperial Life Agency Agreement - Vested. Mr. Place said that this contract obliged the plaintiff to tender to the defendant "every application obtained by him." Mr. Kane described this as a "right of first refusal." Mr. Kane also said it was open to the plaintiff to sell products of other companies and there was no understanding that every sale, however small, had to be offered to the defendant. Mr. Place said that under the Agency Agreement, the agent was to give the defendant first refusal on any insurance application. There was more latitude for a PPGR, because the defendant was not paying costs for the PPGR. The plaintiff said that the defendant was not always competitive.

**48**    This evidence shows the relevant commercial context and illustrates the perspectives the parties had on the extent to which the plaintiff had to produce for the defendant, under his arrangement with the defendant. As noted, the judge made no definitive finding on this question. I find that on the whole this evidence supports the commercially rational interpretation of the Agreement articulated above, that the office space and secretarial assistance to be provided by the defendant was to facilitate the plaintiff's sales of the defendant's products, at least to a reasonable

degree.

<div style="text-align:center">iii)    The Plaintiff's Production</div>

**49**    From the plaintiff's perspective, his move from management to sales was income-related. He testified that he moved back to sales because: "They were starting to look at reducing the compensation [for sales] for management - for managers, and I figured this might be a good time for me to leave management and go back to sales."

**50**    While the income the plaintiff earned from other companies was not in evidence, what he earned from the defendant was obviously available to it, and some evidence on that was produced. In 1994, his total commission income was over $54,000 (this amount excludes bonuses and management compensation). Of this, his first year commission income was $38,965 and he had related "production credits" of 29,027. In 1995, his total commission income rose to $59,394, his first year commission income was stable at $39,335, with production credits of 30,404. In the next few years his total and first-year commission income earned from the defendant dropped, as did the related production credits, as follows:

|  | Total Commission Income | First Year Commission Income | Production Credits |
|---|---|---|---|
| 1996 | $30,066 | $8,411 | 806 |
| 1997 | 43,176 | 14,850 | 8,574 |
| 1998 | 27,202 | 9,223 | N/A |
| 1999 | 16,043 | 1,325 | N/A |
| 2000 | 10,014 | 1,133 | N/A |

| 2001 | 5,574 | 497 | N/A |
|---|---|---|---|
| 2002 | 5,097 | 1,056 | N/A |

**51**    Performance credits, which appear to be the same as production credits, are awarded for new business. These credits, as Mr. Kane said, represent "the value to the organization from all lines of business adjusted for the type of business that the producer is selling." Everything is geared towards sales of the defendant's products. This is perfectly logical and commercially realistic.

**52**    Manifestly, the plaintiff's personal production for the defendant (as measured by his new sales, or first-year commission income) became minimal before the defendant's breach, and dropped well below the 24,000 production credits required in 1993 for private office entitlement. The plaintiff said he was still very active in the insurance business, on a full-time basis. Clearly, then, he earned the greater part of his income from other sources, and the defendant makes no complaint about this, as he has no obligation to sell any specified minimum amount of product for the defendant. But the defendant says, with justification in my view, that the Agreement must be understood in the context of these commercial realities. Extremely clear wording, which is certainly not present here, would be required to read the Agreement as an expression that the parties intended that for many years, while the plaintiff produced almost no new sales for the defendant, the defendant would nevertheless provide office space and secretarial assistance to him, beyond the bare minimum level which was required to support his minimal efforts for the defendant.

        C)     Reasonable Expectations on a Breach

**53**    The defendant breached its obligations. The reasonable expectations of the plaintiff in relation to those obligations must be assessed against the Agreement as a whole, and the construction of the Agreement reflecting the intention of the parties, as evidenced by the Agreement itself.

**54**    The approach relied upon by the plaintiff at trial does not seek to put him in the position he would have been in had there been no breach. That position would depend in large measure on the levels of his production for the defendant. With very low levels of production, as was the case, he might be entitled, as Mr. Place said, to only "a cubicle," and to very minimal secretarial help. But the plaintiff's approach to loss recovery attempted to put an exact dollar value on the promise, detached from any performance level or from any actual loss. Moreover, as the judge pointed out in questioning Mr. Swain, his approach took no account whatsoever of such contingencies as the plaintiff retiring from work at an early age, or I might add, in becoming unable to work for any reason. The judge clearly recognized that Mr. Swain's replacement cost approach was premised on providing the plaintiff with facilities far beyond those contemplated by the Agreement, given the minimal production of sales generated for the defendant. That would amount to a windfall, and would be unwarranted.

**55**    So, how should damages be assessed here? Several factors may be relevant. These could include any proven loss of income the plaintiff suffered as a result of the breach, and any expenditures the plaintiff needed to make to provide for himself what was promised to him by the defendant. The absence of secretarial support may be relevant to quantum, and if the plaintiff had to hire a secretary, this would be relevant to its assessment. Again, in the absence of an actual hiring or the demonstration of real need, the hypothetical cost of hiring a secretary goes beyond normal expectation damages.

**56**    As to lost income, not much more need be said. The plaintiff resisted all efforts of the defendant to gain disclosure of income earned from other sources. No evidence of any such income was adduced at trial. The consequence is that a court, whether at trial or on appeal, is unable to make any assessment on the basis of lost income. This is not a situation where, with less than adequate evidence on lost income, the court should nevertheless do its best to arrive at an appropriate amount of compensation based on income loss. See Chaplin v. Hicks, [1911] 2 K.B. 786 (C.A.). See also the observations of Prof. Fridman, ibid., at p. 796, and the decision of this court in Abraham v. Wingate Properties Limited (1986), 36 Man.R. (2d) 264 at para. 12, varied upon reconsideration (1986), 37 Man.R. (2d) 267.

**57**    In the Ontario Court of Appeal decision in Martin v. Goldfarb et al. (1998), 41 O.R. (3d) 161, the court made the following comments, which appear particularly pertinent (at pp. 186-87):

> ... The case in appeal involves circumstances where, by the appellant's own conduct, the court is not furnished with evidence necessary to properly dispose of the damages portion of the case. This is not the "impossibility" to which Davies J. refers [in Chaplin]. The impossibility to which the cases refer is an impossibility in precisely calculating damages due to the nature of the damages and the conduct giving rise to such losses. For example, a future contingency which can not be accurately characterized and calculated should not prevent the award of substantial damages where a breach has been made out and damages flowing from the breach have been established to the satisfaction of the court. Specifically, I do not read the cases as departing in any way from the general principle that the plaintiff carries the burden of establishing a breach and the damages, including the quantum of damages, flowing from the breach: see T.T.C. v. Aqua Taxi Ltd., [1957] O.W.N. 65 (H.C.J.). As a result, the trial judge's reliance on guess work is not supported by the authorities to which he refers as they reflected courts' attempts to resolve complex damages questions in the face of future contingencies which could not easily be quantified. Such is not the case in the appeal in question. The difficulty in the present case arises where evidence is available but not adduced. Seemingly, any impossibility arising on the facts could have been cured by holding the appellant to his burden of establishing the damages and the quantum of damages through sufficient evidence.

> ... it is a well established principle that where damages in a particular case are by their inherent nature difficult to assess, the court must do the best it can in the circumstances. That is not to say, however, that a litigant is relieved of his or her duty to prove the facts upon which the damages are estimated. The distinction drawn in the various authorities, as I see it, is that where the assessment is difficult because of the nature of the damage proved, the difficulty of assessment is no ground for refusing substantial damages even to the point of resorting to guess work. However, where the absence of evidence makes it impossible to assess damages, the litigant is entitled to nominal damages at best.

**58**    See also the comments of Kroft J.A. in Andronyk v. Klimchuk, [2000] M.J. No. 92 (at para. 6):

> A plaintiff must prove its claim. Where there is a paucity of relevant evidence a court cannot simply wash its hands of the matter. It must do its best on the material available. Having said that, the plaintiff must accept that where it has not adduced the evidence that might have been expected, then he has only himself to blame if the assessment is lower than hoped for. In such a situation there will inevitably be an element of arbitrariness to a court's decision.

**59**    The plaintiff seems to seek a mathematical valuation of the promise made to him. He wants to be paid the cost of office space and secretarial support to age 71, but calculated without any regard to either his production of sales for the defendant, or the recognition of contingencies that might occur prior to age 71. This court's decision in Abraham is helpful here. That was a breach of contract case. A building had been purchased, but contrary to the agreement it did not meet city by-law standards. The measure of damages for the breach was held to be the difference in value of the building as it was warranted to be, and as it was in fact.

**60**    The result in Abraham suggests that the plaintiff is entitled only to compensation for any reduced ability to earn income as a result of the breach, taking into account any amounts he needed to spend to return him to the level of selling efficiency he would have enjoyed had there been no breach. But there is no evidence at all on the question of any reduction in his ability to earn income as a result of the breach.

**61**    The plaintiff unequivocally takes the position that his "income is irrelevant to a calculation of [the] loss" and that "income loss is not the proper measure of damages for the loss of benefit." For that reason, and because there is no evidence at all showing an income loss of any kind caused by or related to the breach, I conclude that no attempt should be made to quantify the damages on an income basis.

   D)    Assessment of the Plaintiff's Damages

**62**    The judge quite properly rejected Mr. Swain's evidence. But he then considered Mr. Swain's

report "to get a ball park" on general damages. In my view, since Mr. Swain's approach to replacement cost was rejected, the report and its analysis became irrelevant.

**63**    There is no basis in the evidence to warrant the amount of $250,000 awarded to the plaintiff. The judge did not explain how that number, as opposed to some lower or higher number, was reached. With respect, this approach constitutes an error in law.

**64**    In the recent decision of the New Brunswick Court of Appeal in Saulnier v. LeBlanc (2005), 20 M.V.R. (5th) 179, 2005 NBCA 79, in an appeal in a motor vehicle accident case where damages had been assessed at trial, the court had this to say (at para. 51):

> ... [T]he awards for the various future loss claims were arrived at by the trial judge without any consistency or rational analysis and are not tied to any sort of mathematical or actuarial calculation. In so doing, the trial judge chose a number without giving any explanation. This is not the correct approach to the assessment of damages ... without a rational approach, how can one determine how the trial judge arrived at the figure of $160,000 for future loss of income? Nobody is able to explain that figure. ....

**65**    Although Saulnier was a tort case, the comments are applicable here. Also pertinent are the comments of the then Chief Justice of New Brunswick in Vincent v. Abu-Bakare (2003), 259 N.B.R. (2d) 66 (C.A.), quoted in Saulnier with the following introductory remark (at para. 54):

> ... The decision strongly cautions trial judges not to award damages without a proper evidentiary foundation and to avoid instances where awards are arbitrary in nature. The Chief Justice states at para. 58:
>
> > The common law - certainly in its modern state - seeks to reflect reason. It rightly finds arbitrariness repugnant. Of course, trial judges routinely - and quite properly - make judgment calls to identify which future scenario would most likely have unfolded but for the accident, and which will most likely play itself out in the aftermath of the trial. There is, however, an important difference between a logical choice of scenarios and quantum based on identified data (degree of risk, baseline income, duration of loss, etc.) and the picking of a totally arbitrary global sum out of thin air. I would add that if a trial judge is unable to articulate any rational foundation for his or her assessment of future pecuniary loss, the problem is likely sourced in the claimant's failure to provide essential evidence.

**66**    This appeal must be decided without reference to evidence of the income the plaintiff earned from other sources. Such evidence would have facilitated assessing the extent to which loss flowed from the breach. Income evidence would have assisted in determining whether the money spent to

set up the home office was a useful measure of loss flowing from the breach. If the home office was necessary for the plaintiff to function effectively in selling the defendant's product, then the costs associated with it are relevant on the issue of damages. If the office mainly supports work for insurance companies other than the defendant, then it is difficult to characterize the costs as arising from the defendant's breach.

**67**    There was some discussion at the hearing, and thus in the supplementary factums, about whether it might be a useful approach to remit the matter back to the judge to hear evidence on income loss. The plaintiff adamantly insists that income and income loss are not relevant. The defendant suggests that may be because there is no real loss of income at all. Whatever their reasons are, both parties agree that this matter should not be sent back for further evidence. I agree with them.

**68**    There is no single rule or methodology that must be followed for quantifying the result of the breach of contract that occurred here. The governing principle is to award damages which attempt to put the plaintiff into the position he would have been in had there been no breach.

**69**    On the evidence, and especially having regard to the minimal production for the defendant in the years before the breach, it is possible to do no more than hazard a guess that had there been no breach the plaintiff would have been housed in a very small space, perhaps the cubicle mentioned by Mr. Place, with some limited secretarial assistance being provided to him. In other words, while the plaintiff probably lost something as a result of the breach, it was likely very little.

**70**    The defendant acknowledged that it would be "fair and just" for the plaintiff to be compensated his out-of-pocket expenses spent on his home office, as a rough proxy for the damages he suffered. I am prepared to accept that approach, although absent such concession, I might have awarded only nominal damages for the admitted breach.

**71**    I would allow the appeal and reduce the amount awarded at trial to $44,044.

       E)    Costs

**72**    The defendant made an offer to settle which was rejected by the plaintiff. That offer exceeded the amount given at trial, as modified by this decision. Costs in the Court of Queen's Bench go to the defendant in accordance with the settlement provisions in the Queen's Bench Rules. Costs in this court go to the defendant.

FREEDMAN J.A.
 KROFT J.A.:-- I agree.
 TWADDLE J.A.:-- I agree.

*Case Name:*

# Canadian Faces Inc. v. Cosmetic Manufacturing Inc.

**Between**
**Canadian Faces Inc., a body corporate, Plaintiff, and**
**Cosmetic Manufacturing Inc., a body corporate, Defendant**

[2011] O.J. No. 4766

**2011 ONSC 6171**

Court File No. 08-CV-349874PD2

Ontario Superior Court of Justice

**B.A. Allen J.**

Heard: September 19-22, 2011.
Judgment: October 18, 2011.

(78 paras.)

*Damages -- In contract -- Breach of contract -- Loss of profits -- Consequent to breach -- Action for breach of contract allowed in part -- Counterclaim for amounts owing under contract dismissed -- Plaintiff contracted with defendant for defendant to market plaintiff's product on a UK shopping channel -- Defendant never marketed defendant's product anywhere -- Plaintiff entitled to repayment of $105,000 paid to defendant -- No damages for lost profits awarded due to lack of evidence -- Viable proof of quantum of future lost profits was difficult to achieve with a new business that lacked a proven historical track record in the business.*

*Contracts -- Breach of contract -- Fundamental breach -- Action for breach of contract allowed in part -- Counterclaim for amounts owing under contract dismissed -- Plaintiff contracted with defendant for defendant to market plaintiff's product on a UK shopping channel -- Defendant never marketed defendant's product anywhere -- Contract of June 5 was valid and binding on parties -- June 30 contract altered and relied on by defendant was not valid as it was never signed by plaintiff -- Defendant failed to deliver plaintiff's products to shopping channel for airing on television and clearly breached the June 5 contract by failing to do so.*

Action for breach of contract. Counterclaim for amounts owing under the contract. The defendant manufactured, marketed and distributed cosmetics. The plaintiff retained the defendant to manufacture, distribute and initially to assist with marketing an anti-aging skin care product, the plaintiff's first and only product. In June 2006, the parties entered a contract in which the defendant undertook to manufacture and to assist with the distribution of the product on a television shopping Channel in the UK. The product was in fact never advertised or distributed through a shopping channel or otherwise. The plaintiff now sued for the $105,000 it paid the defendant and for consequential damages for loss of future profits it alleges result from the defendant's breach of its obligations under the contract. The defendant insisted that the plaintiff wanted to market the product through a US, not a UK, shopping channel and that the defendant advised it that the defendant had no connection with a US shopping channel. The plaintiff argued that the June 5 contract was valid and governed the parties' arrangement. The defendant argued a subsequent June 30 contract was the operative and valid contract. The plaintiff argued it had never seen the June 30 contract. The June 30 contract altered the plaintiff's financial obligations under the June 5 contract in a fundamental way. The defendant based its counterclaim on the June 30 contract. The defendant admitted it made the changes to the contacts and simply removed the signature page from the June 5 contract and attached it to the altered contract. The plaintiff never signed the June 30 contract.

HELD: Action allowed in part. The plaintiff was awarded judgment for $105,000. The counterclaim failed as being based on the invalid June 30 contract. The June 5 contact was binding upon the parties. It was evident from the recitals that the intent of the parties was for defendant to enter into a contract with the UK Shopping Channel to air the plaintiff's product. Based on the context set by the recitals, a term could reasonably be implied that the defendant undertook to enter into a contract with the shopping channel to provide it with the plaintiff's product to be aired on the shopping channel. The defendant failed to deliver the plaintiff's products to the shopping channel for airing on television. The defendant clearly breached the June 5 contract by failing to do so. The plaintiff was not awarded damages for loss of future profits due to lack of evidence. Viable proof of quantum of future lost profits was difficult to achieve with a new business that lacked a proven historical track record in the business. Absent a supporting evidentiary basis from which to assess the plaintiff's lost future profits, the plaintiff's special damage claim was founded on not much more than conjecture. The defendant failed to meet its burden to prove that the plaintiff failed to take reasonable steps to mitigate its loss.

**Counsel:**

Jane O'Neill, for the Plaintiff.

James Morton, for the Defendant.

<u>**REASONS FOR DECISION**</u>

B.A. ALLEN J.:--

**THE PARTIES AND THE CLAIMS**

**1**    Canadian Faces Inc. ("CFI") brings this action seeking damages from Cosmetic Manufacturers Inc. ("CMI") for breach of contract, or in the alternative, negligent representation. CFI's stronger claim lies in breach of contract and I will therefore decide the matter in contract.

**2**    CMI counterclaims for amounts it alleges CFI owes for breach of another version of the contract.

**3**    CMI is engaged in the business of manufacturing, marketing and distributing cosmetics. CFI sought the services of CMI to manufacture, distribute and initially to assist with marketing a product called NeoDerm, an anti-aging skin care product. NeoDerm was developed by a pharmacist who is the aunt of the principals of CFI. The evidence seems to be that at the time of the contract, NeoDerm had unique qualities that would potentially have rendered it a success in the market. CFI was established with the sole purpose of seeking a manufacturer and market for NeoDerm.

**4**    The principals of CFI, Tracy Williams ("Williams") and Neil Vibert ("Vibert") are siblings who in 2006 began to search the internet for a manufacturer. Neither of them had any previous experience with the cosmetics industry. The search turned up CMI. In June 2006, CFI and CMI entered a contract in which CMI undertook to manufacture and to assist with the distribution of NeoDerm on a television shopping channel. CFI paid CMI for the production of a portion of the product which ultimately was not advertised or distributed through a shopping channel or otherwise.

**5**    Williams and Vibert drew on limited personal funds and a line of credit to pay CMI. CFI sues for the $105,000 it paid CMI and for consequential damages for loss of future profits it alleges result from CMI's breach of its obligations under the contract.

**6**    Valerie Dicianna ("Dicianna"), the President of CMI and a self-described, self-taught chemist and an aesthetician, and Kirit Kumar Patel ("Patel"), a manager and chemist, and the second in command at CMI, testified on behalf of CMI.

**EVIDENCE AND FINDINGS**

**Credibility**

**7**    Credibility is at the heart of this case. It will become clear from the evidence why I prefer the evidence of Williams and Vibert over that Dicianna's and Patel's. I was astounded by the testimony and conduct of Dicianna -- that she would attempt to persuade the court to accept some of the most absurd and implausible versions of what happened in her dealings with Williams and Vibert -- accounts the court would have to be a fool to believe.

**The April 7, 2006 Meeting**

**8**    CMI has for many years been involved in the development, packaging, distribution and, marketing of its own products and those of other companies. Dicianna says she has had extensive experience and success with promoting products on shopping channels, particularly in Canada. This, in addition to CMI being a Canadian company, is what made involvement with CMI exciting for Williams and Vibert.

**9**    On about April 7, 2006, Williams and Vibert met for several hours with Dicianna at the CMI facilities ("the meeting"). Williams and Vibert brought to the meeting samples of the three lines of their NeoDerm product, the day cream, night cream and eye cream. Dicianna was very excited about the product referring to it as "cutting edge". There is wide divergence between Williams' and Vibert's version of that meeting on one hand and Dicianna's on the other. Both Williams and Vibert took contemporaneous notes of the meeting which were before the court. Dicianna took no notes of what transpired. Williams and Neil testified that certain agreements were nailed down at that meeting. Dicianna denies this.

**10**    In chief and cross, Williams and Neil were questioned extensively about the meeting principally by reference to their respective contemporaneous notes and the confirmatory e-mails they sent to Dicianna following the meeting.

**11**    Williams' confirmatory e-mail dated April 10, 2006, Vibert's dated April 13, 2006 and their testimonies are essentially uniform in providing evidence that the following agreements were made at the meeting:

> *    that Dicianna would contact QVC UK to market and distribute the products
> *    that CMI would produce four additional lines -- a toner, cleanser, eye serum and face serum, making a total of seven lines
> *    that CMI would produce and ship to QVC UK a total of 35,000 units, 5000 of each of the seven lines
> *    that CFI would cover the cost of 1000 of each of the seven products (7000 units) for a total price of $85,100 and CMI would cover the cost of 4000 of each of the seven products (28,000 units)
> *    CFI was to pay $42,550 up front and pay the balance before shipment to the UK
> *    that QVC UK would pay in 60 days for the products sold
> *    that from sales QVC UK would take its 10% fee, then CMI would take its cost per unit and CFI would be paid the balance
> *    the segment on QVC UK marketing the product would first air at the end of June 2006

**12**    Vibert sent his April 13, 2006 e-mail to Dicianna and requested she advise if his summary

contained any inaccuracies. CFI never received a response from Dicianna or anyone from CMI disputing the contents of either Williams' or Vibert's e-mails.

**13**     Subsequent to the meeting, Williams spoke on the telephone with Dicianna several times making notes of the calls, and e-mailed Dicianna numerous times from April 2006 to the end of the year about the contract, pricing, CFI's and CMI's payment obligations, production, packaging, clinical trials, before and after pictures, and about the date of airing. It is clear from those communications Williams understood QVC UK was the shopping channel Dicianna was accessing to sell CFI's product. The communications contained references to QVC, the UK and QVC UK as the place where the product was to be aired and marketed. There is no reference to any other entity in the UK or to QVC US. Nor did anyone from CMI ever respond that CFI was mistaken about where the product would be aired.

**14**     Dicianna's evidence is that not much was agreed upon at the meeting. She said she agreed to give initial assistance to Williams and Vibert to market their product with a shopping channel in the UK. She insisted there was no discussion at all about QVC UK because she had no connection with that company. Dicianna further contends however she did not mention the name of the shopping channel with which that she had a business arrangement. She says the discussion about QVC was about QVC US and that Williams and Vibert had said they had contacts at QVC US and had come to the meeting with an interest in pursuing QVC US. Dicianna says she told Williams and Vibert she had no connections with QVC US and she could not help them distribute their product through that channel.

**15**     In contrast, Williams' and Vibert's evidence is that they had no contacts at QVC US. They say they had taken up a friend's suggestion to approach QVC US with their product so they came to the meeting with an application for QVC US hoping to get assistance from Dicianna with completing it. They abandoned the idea of QVC US when they learned Dicianna was connected to QVC UK. Williams testified it was not until a phone call with Dicianna on October 7, 2006 that Williams first heard that the shopping channel was called Ideal World. Although none of CMI's e-mails or correspondence had mentioned Ideal World up to that point, and CMI never corrected CFI's references to QVC UK, Dicianna maintained to Williams and at trial that Ideal World was always the shopping channel where she was planning to have CFI's product aired.

**16**     Williams' and Vibert's testimonies on the one hand, and Dicianna's on the other, are a study in contrasts. Williams' and Vibert's testimonies were clear, straightforward and consistent with each other and with their respective contemporaneous notes. They were both very well organized and business-like witnesses. Despite their obvious frustrating experiences with CMI, they remained objective and dispassionate in their presentations. I found their notes of the meeting and of subsequent conversations with CMI and their follow-up e-mails to be indicative of their diligence and efficiency in their dealings with CMI.

**17**     I find Dicianna's evidence about the meeting for the most part cannot be believed. In addition

to the fact that her version of the meeting is not plausible, her presentation as a witness was remarkable in the negative. She wavered back and forth on both controversial and uncontroversial matters at times giving different answers to the same question, so much so that at times I had difficulty making heads or tails of what her evidence was. Dicianna contradicted her testimony from discovery, for instance, as to when her brother Sam Dicianna was employed at CMI. This evidence is important as we will see because of the peculiar evidence as to who witnessed Dicianna's signature on the contract. She gave different evidence at trial than she did at discovery as to whether she told Williams and Vibert at the meeting about her contact with Graham Wright of Ideal World. These are a small sampling of the many ways in which Dicianna evaded questions and contradicted her own evidence.

**18**    Without reservation, I prefer Williams' and Vibert's evidence. To believe Dicianna that the discussion about QVC was about CFI's interest in pursuing QVC US, that Ideal World rather than QVC UK was all along the operative shopping channel and that there were few if any terms agreed to between CMI and CFI at the meeting would be for me to accept, as Dicianna alleges, that Williams and Vibert fabricated their detailed accounts of the meeting. There is absolutely nothing that leads me to believe they colluded or concocted anything or misunderstood the name of the shopping channel or the terms agreed to. I am further fortified in my view by evidence pertaining to the contract as I discuss below.

**Parties' Performance under the Contract**

**19**    CFI fulfilled its payment obligation to cover the cost of the initial 1000 units of each of the seven lines. CFI was also without prior agreement asked to make additional payments to CMI. In April 2006, CFI made the first payment of $42,550, paid $2,530 for the production of four samples and covered the associated shipping costs. At the end of June 2006, CFI made the remaining payment of $42,550.

**20**    In the fall of 2006, without prior agreement, CMI requested additional payments from CFI. To CFI's surprise, CMI asked for $1,000 for a DIN number, $2,200 to register a trade mark in the UK and the European Union, and $6,000 for clinical trials. I discuss more fully below the problem that developed over the clinical trials. Also without previous notice, Dicianna advised CFI that before and after pictures were required which would cost $72,000 if done professionally. Williams and Vibert decided to do the pictures themselves and delivered them to CMI.

**21**    Adding insult to the injuries already meted out by Dicianna, Williams found out through speaking directly to Debbie Houghton an assistant buyer for Ideal World that Ideal World had never heard of NeoDerm or CFI.

**22**    CMI filed a letter and two invoices dated June 19, 2007 indicating CMI was holding two lots of products for CFI, a lot of smaller quantities of the product for which CFI had paid and a lot of approximately 4,000[1] of each line that was unpaid for, which CMI contends in its counterclaim that CFI is required to pay. CMI offers that CFI pick up the first lot immediately and the second lot upon

payment. Because of the offer to pick up the products, I am prepared to accept that CMI produced in excess of the 5000 of each of the seven lines of NeoDerm, although CFI only saw small quantities of the product.

**Which Contract**

**23**   CFI argues the contract dated June 5, 2006 signed by Williams and Dicianna is a valid contract that governed the obligations of CMI and CFI. CMI argues a subsequent contract dated June 30, 2006 was the operative and valid contract.

**24**   Subsequent to the meeting, by e-mail dated May 29, 2006, Dicianna forwarded a draft form of contract to CFI. The draft contract contains the terms as to production, payment and the air time that Williams and Vibert testified were agreed to at the meeting. However, neither the Recitals nor subsequent clauses identify the broadcaster that would air the product.

**25**   In an e-mail dated May 24, 2006, Tracey advised Dicianna of changes CFI wished to make to the draft to which Dicianna responded that the changes should be made and delivered for CMI's review. In an e-mail dated May 26, 2006, Williams outlined in considerable detail the proposed changes mainly to clarify payment terms, the relationship between the parties and the identity of the broadcaster. Attached to an e-mail to Dicianna dated May 26, 2006, Williams sent CFI's re-draft of the contract prepared by CFI's counsel.

**26**   On June 5, 2006, Williams sent by FedEx two notarized copies of the contract dated June 5, 2006 ("the June 5 contract") containing CFI's corporate seal and Williams' witnessed signature, signed in her capacity as President and CEO of CFI. On June 6, 2006, Dicianna returned a copy of the June 5 contract with Dicianna's signature in her capacity as President and CEO of CMI, her signature witnessed by "Sam Dicianna".

**27**   CMI offers another version of the contract dated June 30, 2006 ("the June 30 contract") as the valid agreement between the parties. Williams and Vibert however testified they had never seen the June 30 contract before CMI produced it for discovery. The June 30 contract alters clauses in the June 5 contract in a fundamental way. Most important among those alterations are the changes to the clause that confers on CMI the obligation to pay for the remaining 4,000 of the 5,000 of each of the seven lines of products and the removal of QVC UK as the broadcaster including instead reference to "any shopping channel in the UK.". Under the June 30 contract CFI purportedly agrees to pay for the remaining 4,000.

**28**   CMI founds its counterclaim on the June 30 contract alleging CFI breached its obligation to pay for the remaining 4,000 units of each of the seven lines of NeoDerm and owes CMI $325,000.

**29**   The circumstances around the generation of the June 30 contract are peculiar to say the least. When asked about the origin of the June 30 contract, Dicianna indicated she simply used the June 5 contract, re-dated it to June 30, 2006 and made changes to the recitals and to some clauses and she

and "Sam Dicianna" initialled the changes. She admitted she simply removed the signature page from the June 5 contract and attached it to the altered contract. Dicianna testified she then sent the June 30 contract to Williams for signature, but Williams never returned it.

**30**    When asked about who witnessed her signature, the evidence was nothing short of incredible. Although the name under the witness signature line is handwritten as "Sam Dicianna" and the signature is "S. Dicianna", Dicianna testified her production manager, Kirit Kumar Patel, signed Sam Dicianna's name, that Patel also goes by the name "Sam" and that he had a blanket authorization to sign Sam Dicianna's name. Both Dicianna and Patel testified that the e-mails to Williams and Vibert from "Sam" were actually from Patel going under the name "Sam".

**31**    Patel supported that evidence in his testimony, although he appeared less than enthusiastic when doing so. Perhaps, he felt his position with CMI might be at stake if he did not go along with the charade.

**32**    It appears for some reason Dicianna is attempting to protect her brother from this litigation even to the extend she would advance what I find to be a preposterous story about Patel also being called "Sam" and having a blanket authorization to in effect forge Sam Dicianna's signature on legal documents. I do not believe Patel signed Sam Dicianna's name. That fabrication simply adds to the already mounting reasons why I accept Williams' and Vibert's versions of the evidence over Dicianna's.

**33**    I fully believe Williams' and Vibert's evidence that they never saw the June 30 contract until document discovery. There is no correspondence or e-mail that shows Dicianna delivered it and given Williams' diligent practice of e-mailing and calling Dicianna and making notes even about less significant matters, it stands to reason Williams would have communicated her concern to Dicianna about such a substantial change in CFI's obligations. There is no such communication to CMI.

**34**    It is clear to me that the generation of the June 30 contract was a dishonest and opportunistic attempt by Dicianna to avoid CMI's financial obligations and to foist them upon CFI. I do not accept the June 30 contract as valid and binding on the parties.

**35**    I find the contract that binds CMI and CFI is the June 5 contract. It was signed by the principals of both parties, contains their corporate seals. Neither party claims the validity of either version of the contract should be affected by the manner in which Dicianna's signature was witnessed and I do not see the June 5 contract should be set aside for that reason. There is no dispute that the June 5 contract contains Dicianna's signature.

## Breach of Contract

**36**    CMI raised the argument that there is no term in the contract by which CMI undertakes to arrange for CFI's product to be aired on QCV UK. The only mention of QVC UK is contained in the

recitals which CMI argues have no binding effect. This being the case according to CMI, CMI did not breach an undertaking to arrange for the broadcast on QVC UK.

**37**    CFI argues on the other hand that the intent that CMI undertook to arrange for airing on QVC UK can be derived through reading the contract as a whole.

**38**    I think the basic principles of contract law operate in favour in CFI's position. The principles that govern the interpretation of a contract are of long standing. The goal in interpreting a contract is to arrive at an understanding of the objective intentions of the parties at the time the contract was made. Evidence of one party's subjective intention has no independent place in this determination [*Bank of Credit & Commerce International SA (In Liquidation) v. Ali (No.1)* , [2002] 1 A.C. 251 (Eng. H.L.); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, paras. 54-56; and *Metropolitan Toronto Condominium Corp. No 1250 v. Mastercraft Group Inc.* (2009), 310 D.L.R. (4th) 256, at para. 59, (Ont. C.A.)] To achieve that goal, the courts have interpreted the various parts of an agreement in the context of the intentions of the parties as evident from the contract as a whole.

**39**    It is recognized that the recitals or preamble to a contract standing alone are not legally binding. However, courts have turned to recitals to resolve ambiguity in the operative provisions of the contract and to answer concerns about the intent or goals of the parties.

> The preamble to a contract is nothing more than an introduction to that about which the parties have actually agreed. It puts the agreement into context. It describes the goals of the agreement. It speaks to what went before and the spirit in which agreement was achieved. On the other hand, it does not contain any promises. It does not contain any restrictions or commitments.

> [*Sherbrooke Community Centre v. Service Employees International Union*, 2002 SKQB 101 (SKQB), at para. 16]

**40**    Terms in a contract can be implied by statute, by custom, or by the court as a matter of fact. In the latter situation the court may imply terms because it is obvious from the contract as a whole such a term should be implied to make sense of the agreement.

**41**    The recitals in the June 5 contract bear being reproduced:

> **AND WHEREAS** the Contractor is engaged in the development, manufacture, marketing and distribution of cosmetics products;

> **AND WHEREAS** the Sub-Contractor has developed a number of cosmetic products marketed under the Trademark NeoDerm;

> **AND WHEREAS** the Contactor has entered into a contract with QVC UK
> ("Broadcaster") to provide products to be marketed and sold through television
> broadcasts and websites;

> **AND WHEREAS** the Contractor and Sub-Contractor wish to enter into a
> relationship in which and the Contractor will manufacture NeoDerm products to
> be sold through the Broadcaster and to other customers of the Contractor;

**42**    I find it is evident from the recitals that the intent of the parties was for CMI, the Contractor, to enter into a contract with QVC UK, the Broadcaster, to air CFI's, the Sub-Contractor's, product NeoDerm. The terms under Article 2 "Remuneration and Benefits" speak of: the products being aired on television; CMI's obligation to produce and ship the product for the first showing; CFI's payment obligations prior to shipment to the Broadcaster; and the arrangement as between CMI, QVC UK and CFI for payment from the funds raised through airing the product.

**43**    I find based on the context set by the recitals that a term can reasonably be implied that CMI undertook to enter into a contract with QVC UK to provide QCV UK with CFI's product to be aired on the QVC UK shopping channel. Otherwise, the other terms of the contract make no practical sense.

**44**    There is no dispute CMI failed to deliver CFI's products to QVC UK for airing on television. CMI clearly breached the June 5 contract by failing to do so.

**Amount of Damages**

**45**    CFI claims $105,000 for out-of-pocket amounts paid to CMI: $89,527 (including the $4,427.50 deposit) for the production and packaging of 1000 of each of the seven lines of NeoDerm, and various amounts for the production and shipping of samples, for trademarks for the U.S. and Europe, for a DIN number, for brokerage fees, for inserts and for clinical trials.

**46**    CFI also claims special damages of $384,393 for lost future profits. Vibert calculated that about $1.5 million (CDN) in gross sales would have been generated if 5,000 units of each of the products had been sold. Vibert prepared a document he entitled "NeoDerm Projected Income Statement". Based on the Vibert's calculations, CFI argues that but for CMI's breach it could have earned net income of $67,691 for 2007, $112,750 for 2008 and $162,852 for 2009, totalling $384,393, after deductions for the cost of sales, business expenses and taxes. Vibert arrived at prices for each of the seven products through internet searches of similar products produced in the U.S.

**47**    It is no doubt difficult to prove loss of anticipated profits. Courts have long held to prove future loss the plaintiff must establish the loss is the direct and natural consequence of the breach; it

is reasonably probable the profits would have been earned except for the breach; and that the amount of loss can be shown with reasonable certainty [*Hadley v. Baxendale* (1854), [1843-60] All E.R. Rep. 461 (Ex. Div.) and *Victoria Laundry (Windsor) Ltd. v. Newman Industries Ltd.*, [1949] 2 K.B. 528 (C.A.)]. On the question of determining the amount of future losses, the Supreme Court of Canada held that difficulty in arriving at an amount should not alone foreclose an award beyond nominal damages:

> The fact that assessment is difficult is no ground for awarding nominal damages: *Messer v. J. Clark & Son Ltd.*, [1961] N.B.J. No. 8 [5]. The broad general rule is that damages which are uncertain, contingent and speculative in their nature cannot be made a basis of recovery; but this rule against recovery of uncertain damages is directed against uncertainty as to the cause rather than as to the extent or measure: *Kranz v. McCutcheon*, [1920] O.J. No. 539 [6].

> [*Webb & Knapp (Canada) Limited et al. v. City of Edmonton*, [1970] S.C.R. 588].

**48**    In addition to the broader problem I address below, I find there are intrinsic weaknesses in CFI assessment of future lost profits. The projections for the three years are based on full success in selling all units of NeoDerm each year without considering some percentage discount for contingencies. There is also an absence of supporting corporate financial data to justify the amounts for the costs of sales and expenses.

**49**    Courts have grappled with quantifying damages where there is no expert evidence and where limited or no historical economic data is available to the court. The Ontario Court of Justice, General Division, drawing on U.S. jurisprudence, addresses the issue of proof of loss of future profits for a new enterprise:

> In assessing the reliability of projected future profits, a record of past earnings will obviously increase the certainty of such a prediction. However, a lack of evidence of past earnings does not automatically preclude a new business from recovering for lost profits. Rather, a new business must be allowed to prove lost profits to a reasonable level of certainty by expert testimony, by evidence of actual profits of similar businesses, by evidence of proven managerial experience and expertise, and by evidence of subsequent earnings if such evidence is available. Nevertheless, damages should not be awarded for lost profits which are entirely speculative and uncertain. See *Al Edwards* v. *Container Craft Carton and Paper Supply Company*, 327 P. 2d 622 (Calif. Dist. Ctr. App. 1958) and *Cooke Associates Inc.* v. *Warnick et al*, 664 P. 2d 1161 (Utah Sup. Ct.1983). But once a defendant has been shown to have caused a loss, liability should not be escaped because the amount of the loss cannot be proven with precision.

> Consequently, the reasonable level of certainty required to establish 'the amount' of the loss is generally lower than that required to establish 'the fact or cause of a loss'. See *Cooke Associates* v. *Warnick, supra*, at p. 156 and *Bradshaw Construction Ltd.* v. *Bank of Nova Scotia, [1992] B.C.J. No. 1656, supra*, at p. 28.

> [*Murano et al* v. *Bank of Montreal and Peat Marwick Thorne* (1995), 31 C.B.R. (3d) 1, supplementary reasons 41 C.P.C. (3d) 143 (O.C.J. Gen. Div., Comm. Court); upheld in part on appeal, aff'd on the issue of damages for future business losses at 41 O.R. (3d) 222 (Ont. C.A.)].

**50**  *Murano* cited the following passage from a South Carolina Court of Appeal decision:

> If the fact of damages is established, the law does not require the amount of damage to be proven with mathematical certainty; damages may be recovered if there is evidence upon which a reasonable assessment of the loss can be made. The estimation of damages, however, cannot be based on conjecture or speculation; it must pass the realm of opinion not founded on the facts and must rest on evidence from which a reasonable accurate conclusion regarding the amount of loss can be logically and rationally drawn. There must be a certain standard or fixed method by which the loss may be estimated with a fair degree of accuracy.

**51**  The court concluded in *Murano* that where expert evidence is tendered and the entrepreneur has established a track-record, it may be possible to assess damages with the required certainty.

**52**  Vibert and Williams have no past experience in the production, marketing or sale of cosmetics. Vibert is a civil engineer with some seven years' experience in sales related to industrial products and has a two-year diploma in business tailored to engineers. He is by no means, nor does he purport to be, an expert on sales projections and trends in the cosmetics market. CFI is asking the court to consider Dicianna's past success in television channel sales as a basis to support CFI's projections of substantial success. I have some difficulty doing this for a number of reasons. It appears not in dispute that Dicianna only offered to help with the television sales on a start up basis. But the more critical problem is the obvious credibility concerns with Dicianna being the main source of the evidence of her prowess in television cosmetic sales.

**53**  It might not be beyond reason to think that were CMI to have honoured its obligation to deliver the products for airing with QVC UK, CFI might have earned some amount of income. However, viable proof of quantum of future lost profits is difficult to achieve with a new business like CFI that lacks a proven historical track record in the business. Expert evidence, empirical data and industry publications forecasting industry growth and profitability during the three years might have assisted the court in arriving at a reasonable assessment of CFI's future lost profits. Absent a

supporting evidentiary basis from which to assess CFI's lost future profits, CFI's special damage claim is founded on not much more than conjecture. I therefore will not allow that claim.

**54**    I will allow CFI's claim for damages of $105,000.

## Mitigation of Damages

**55**    CMI says CFI failed to mitigate its damages. It argues CFI had the opportunity to mitigate if it had taken CMI's offer in June 2007 to pick up the product held in CMI's warehouse. CFI says it made reasonable efforts to attempt mitigation but could not find a financially feasible avenue through which to sell its product and recoup its losses.

**56**    The law does not permit a plaintiff to stand idly by and allow losses to accumulate while expecting to recover damages for losses they should have avoided. The common law obligation is clearly set out by the Supreme Court of Canada:

> The general rule of mitigation of damage applicable to both breach of contract and tort is that the aggrieved party must take all reasonable steps to mitigate the loss and cannot claim for avoidable loss ... In the case of contract, damages for breach are reduced by the amount of loss that should have been avoided if the plaintiff had taken reasonable steps to mitigate.

> [*Janiak v Ippolito* (1985), 16 D.L.R. (4th) 1 (S.C.C.)]

**57**    Professor Waddams discusses the notions that underlie that principle:

> A further restriction on recoverable damages lies in the principle that the plaintiff cannot recover for losses that could have been reasonably avoided ... behind this principle there lie two notions, one of causation, that the defendant's breach does not cause losses that were reasonably avoidable, the other of the desirability of avoiding economic waste.

[S.M. Waddams, *The Law of Contracts*, 5th edition (Toronto: 2005), pp 543-544].

**58**    It is the defendant that carries the burden to prove the plaintiff has failed in his duty to mitigate. [*Red Deer College v. Michaels* (1975), 57 D.L.R. (3d) 386 (S.C.C.)]. The plaintiff is not expected to take every possible avenue to reduce the loss caused by the defendant's breach. He is required to take all reasonable steps to mitigate his loss and may recover loss incurred in taking reasonable steps even though he did not succeed. [*Pilkington v Wood*, [1953] Ch 770]. It has been held that the reasonableness of the plaintiff's decision is not to be scrutinized too harshly by the defendant since it was the defendant's breach that brought about the necessity to make that decision so it does not lie with the breaker of the contract to be overly critical. [*Banco de Portugal v.*

*Waterloo & Sons Ltd.*, [1932] A.C. 452 (H.L.) and *Kamlee Construction v. Town of Oakville* (1906), 26 D.L.R. (2d) 166 (S.C.C.)].

**59**    Williams and Vibert took a number of steps with the view to trying to mitigate their loss. When it was clear to them CMI would not be assisting them with airing their product through QVC UK, they began investigating other avenues for marketing and distribution.

**60**    In October 2006, Williams and Vibert contacted Beauty Links, a cosmetic distribution company in the UK. Vibert made contemporaneous notes of the discussion that Williams and he had with Beauty Links. They learned that an up-front amount of $15,000 to $20,000 would be required for a test launch of the product and that sales staff for the launch would have to be retained. Vibert testified Beauty Links wanted to take only 100 products per month. CFI shipped a small number of samples of NeoDerm products to Beauty Links but Williams and Vibert realized the expenses to launch and to travel back and forth to and from the UK would be prohibitive given the amount of money they had already paid to CMI. Furthermore, at 100 products per month it would take an eternity to sell the $85,000 worth of products through Beauty Links.

**61**    In November 2006, Williams contacted Michael Long of MGL Associates in New York City, a company that tests the viability of products and then sells them through retail stores like Macy's. Williams made contemporaneous notes of this discussion. However, MGL also required considerable funds up-front for marketing, money which Williams and Vibert say they were not in a position to expend.

**62**    In November 2006, Vibert made contact with Tom Czar of QVC US to inquire about marketing and distributing the product. Czar indicated third party clinical trials would have to be conducted. In their previous dealings with Dicianna, Williams and Vibert had learned the cost of third party clinical trials would be about $25,000 per product. Dicianna had charged only $6,000 agreeing to be compensated for the balance of the cost from sales. On the strength of Dicianna's assurance that third party clinical trials had been done in preparation for QVC UK airing, Vibert and Williams attempted to obtain the clinical trial report from Dicianna.

**63**    After some delay, Dicianna eventually sent the clinical trial report to Vibert. However, the trials were not conducted by a third party but rather by CMI itself, and the trials were conducted not on all seven lines but just on the day cream. Dicianna denied undertaking to have third party trials conducted. However, I have no difficulty accepting that Dicianna had once again deceived Vibert and Williams and was also attempting to deceive the court.

**64**    Vibert and Williams were discouraged by the additional funds they would have to invest to do business with QVC US and withdrew their interest.

**65**    I find CMI has failed to meet its burden to prove CFI failed to take reasonable steps to mitigate its loss. As previous courts have observed, the wrong doer or contract breaker is not in a position to too closely scrutinize the reasonableness of the innocent party's attempts to mitigate. I

find that principle is ever so applicable to the case before me. Given Dicianna's multifaceted deceit in breaching her company's contractual obligations and her subsequent attempts to cover up her misdeeds, it does not lie with CMI to cast too disparaging an eye on CFI's attempts to get out of the financial jam CMI drew it into.

**66**    The reasonableness of attempts to mitigate is a question of fact. I am satisfied in all the circumstances that Williams and Vibert took reasonable steps in contacting the other companies to look into the marketing and sale of their products. The innocent party is not obligated to search out every avenue. Williams and Vibert had already invested $105,000 and lost it entirely. I do not find they should be required to undergo any further financial risk.

## THE COUNTERCLAIM

**67**    The counterclaim must fail as being based on the June 30, 2006 contract which I found to be invalid and unenforceable.

## COSTS

**68**    The trial occurred over three and a half days from September 19 to September 22, 2011.

**69**    CFI was substantially successful in the action. It succeeded on the principal damage claim and failed on the future loss claim, the latter being the more difficult claim to prove. In accordance with the principle that costs follow the cause, I award the plaintiff a substantial portion of their costs. The question of quantum of costs is to be determined.

**70**    CFI bills costs, exclusive of HST, as follows: $51,290 on a partial indemnity scale; $76,935 on a substantial indemnity scale and $55,340 as actual costs. Disbursements total $5,646.59.

**71**    In addition to the factor of success, I took the other factors set out in Rule 57.01(1) of the *Rules of Civil Procedure* into account.

**72**    I do not find the issues raised in this action were particularly complex or novel and the materials filed were not extensive. The breach of contract and quantum of damages issues raised have long been settled by the courts.

**73**    While the proceeding in itself was not lengthy, it was made more lengthy than necessary by Dicianna's conduct in the witness stand. I cannot leave this case without summarizing my impressions of Dicianna and I find when deciding costs is an appropriate time to register my concerns.

**74**    I have rarely, if ever, experienced a witness like Dicianna. Throughout the several hours she spent on the stand she routinely avoided answering questions, obfuscated, made bald denials, contradicted herself and generally attempted to advance the most implausible versions of her various interactions and dealings with Williams and Vibert. On countless occasions, the court had to

interject and direct Dicianna to answer questions.

**75**    Of course, underlying Dicianna's conduct at trial was her attempt to avoid owning up to her deceptive and dishonest business practices which I find permeated her relationship with Williams and Vibert from start to finish. Dicianna ought to have known CMI's position was unsustainable but she persevered and in doing so wasted Williams', Vibert's, their counsel's and the court's time and expense. This cannot be overlooked in deciding costs.

**76**    The Ontario Court of Appeal sets out the principle that the objective of a determination on costs is to fix an amount the unsuccessful party is required to pay that is fair and reasonable rather than an amount reflecting the actual costs of the successful party. The quantum of costs allowed must be fair, within the reasonable expectations of the parties, and in accord with the principles set out by the Court of Appeal in *Boucher v. Public Accountants Council for the Province of Ontario* (2004), 71 O.R. (3d) 291 (Ont. C.A.).

**77**    I find an award of costs fixed at $50,000 to be reasonable. I think that amount is fair, within the reasonable expectations of the parties and in accord with the principles set out by the Court of Appeal in *Boucher*.

## ORDER

**78**    **THIS COURT ORDERS:**

> (a)    judgment to the plaintiff Canadian Faces Inc. for damages in the amount of $105,000 (CDN) bearing pre-and post-judgment interest pursuant to s. 128 and s. 129 respectively of the *Courts of Justice Act*, R.S.O. 1990, C. c-43 as amended; and
>
> (b)    costs in the amount of $50,000 to the plaintiff Canadian Faces Inc. inclusive of H.S.T. and disbursements payable within 30 days of this Judgment.

B.A. ALLEN J.

1 The invoices actually show that CMI billed CFI for several hundred more than 4,000 of each of the seven lines.

*Indexed as:*

# Corporate Properties Ltd. v. Manufacturers Life Insurance Co.

**Corporate Properties Ltd. v. Manufacturers Life Insurance Co. et al.**

**[1989] O.J. No. 2278**

70 O.R. (2d) 737

63 D.L.R. (4th) 703

36 O.A.C. 204

9 R.P.R. (2d) 1

18 A.C.W.S. (3d) 988

Action No. 573/87

Ontario
Court of Appeal

**Finlayson and Griffiths JJ.A. and Anderson J. (ad hoc)**

December 20, 1989.

**Counsel:**

F.J.C. Newbould, Q.C., for appellant, Manufacturers Life Insurance Company.

J.M. Steiner and D.A. Dadson, for respondent, Corporate Properties Limited.

W.G. Dingwall, Q.C., for respondent, 102 Bloor West Limited.

**1    FINLAYSON J.A.**:-- This is an appeal by the defendant, the Manufacturers Life Insurance Company ("Manulife"), from the judgment of the Honourable Mr. Justice Eberle dated July 24, 1987, after a trial in which all of the evidence, except for one witness, was by way of an agreed statement of facts. The judgment is now reported at 60 O.R. (2d) 263, 40 D.L.R. (4th) 506. The appeal named only the plaintiff Corporate Properties Limited ("Corporate Properties") as a respondent, but the co- defendant 102 Bloor West Limited ("Bloor West"), appeared at the hearing and supported the position taken by Corporate Properties.

**2**    The issue before the court is the interpretation of the obligation of Bloor West as lessee to pay rent to the appellant Manulife under a ground lease covering certain lands in the City of Toronto.

**3**    Eberle J. held that the participating percentage rent to be paid should be in accordance with the interpretation of the lease documents contended for by Corporate Properties. He held that there had been an overpayment by Corporate Properties to Manulife from 1971 to 1986 inclusive. However, for reasons that will be developed, he held that Corporate Properties was not entitled to the return of overpayments of percentage rent of $324,193.92 made from 1971 to 1983, but that Manulife should repay to Corporate Properties the overpayments of percentage rent of $226,997.63 made from 1984 to 1986, with prejudgment interest thereon. Eberle J. further ordered that the action against Bloor West, the ground lessee, be dismissed.

**4**    The relevant facts are succinctly summarized by the trial judge. I have quoted them below with some modification so that they can be read in the context of the appeal:

    1.    By September 1966, Bloor West owned the land in question and had built thereon a substantial office and commercial building.

    2.    In September, 1966, as part of a financing plan, three things were done:

(a)    Bloor West sold the land only to Manulife for $700,000;

    (b) Manulife leased the land only back to Bloor West. This ground lease is the first key document: ex. 2;

    (c) Bloor West mortgaged the lease and the building to Manulife.

    3.    In December 1966, a refinancing took place under which:

    (a) Bloor West subleased the land and building to Corporate Properties;

(b)    Manulife consented in writing to that sublease;

(c) the shares of Bloor West, theretofore owned substantially by the shareholders of Corporate Properties, were sold to a group of investors in the name of James J.P. Walsh "in trust" with an option to repurchase.

4.     In late 1970, another refinancing took place involving the following transactions:

(a) in October, the shares of Bloor West were repurchased and immediately resold to a third group of investors referred to as Lehndorff Corporation;

(b) in December, the previous sublease to Corporate Properties was cancelled and a new sublease entered into by Bloor West with Corporate Properties as subtenant, on terms slightly different from those in the earlier sublease. This is the second key document and it is still in effect: ex. 9;

(c) also in December, Manulife gave its written consent to this second sublease. This is the third key document: ex. 8.

By way of additional explanation, the only relevance of the share transactions concerning the shares in Bloor West would appear to be as follows: when the ground lease between Manulife and Bloor West was entered into in September, 1966, the shares of Bloor West were held substantially by the shareholders of Corporate Properties. However, from December, 1966 on, the shares of Bloor West were held by one or another different group of investors not connected with the owners of the shares in Corporate Properties. Therefore, Bloor West and Corporate Properties were unconnected at the time that the second sublease in question was signed.

The three key documents are as follows:

(1)    The ground lease dated September 1966: ex. 2;
(2)    the second sublease dated December 1970: ex. 9;
(3)    Manulife's consent to the second sublease dated December, 1970: ex. 8.

**5**    In my opinion, the only documents that I need give consideration to are the ground lease (ex. 2), as amended on January 1, 1971 (ex. 10), the consent to surrender and sublease dated December 15, 1970 (ex. 8) and the second sublease dated December 16, 1970 (ex. 9).

**6**    The ground lease, as amended, provided that the rent was to be calculated as follows:

(1)    $49,000 per annum payable in equal monthly instalments of $4,083.33;

(2)    a sum equal to ten per cent (10%) of the amount by which the gross annual income from all sources derived from the lands and premises in each year exceeds the amount of Six Hundred Thousand Dollars ($600,000) which sum is payable on or before the 31st day of May in the year immediately following and shall be accompanied by audited income and expense statements pertaining to the operation of the property for the year for which the payment is being made duly certified by a qualified accountant, together with the annual leasing schedule.

The expression "gross annual income from all sources" shall not, however, include amounts received under the provisions of a lease which represents reimbursement for increased real property taxes or increased maintenance charge or for tenant improvements where such improvements are paid for by the lessor and the cost thereof is amortized in the rental over the initial term of the lease.

**7**    The ground lease also provided that, "except for sub-leases to bona fide sub-lessees of portions of any building or buildings now or hereafter erected on the said lands", the lessee shall not "assign this lease or the term thereof, nor sub-let any part of the said lands or premises or said terms ... without in each case the prior written consent of the Lessor being first had and obtained ...". The ground lease also stated:

PROVIDED FURTHER, that notwithstanding the giving of such written consent by the Lessor, the Lessee herein shall not be relieved or released thereby from its liability for the payment of rent and the performance, keeping and observance of all terms, covenants and conditions of this Lease on the part of the Lessee to be performed, kept and observed.

**8**    The second sublease by Bloor West to Corporate Properties provided three amounts as payment of rent:

(1)    One Hundred and Fifty-Five Thousand One Hundred Dollars ($155,100.00), being 10.34 per cent per annum of One Million Five Hundred Thousand Dollars ($1,500,000.00).

(2)    An amount equal to all sums required to be paid pursuant to the Ground Lease.

(3)    An amount equal to all sums required to be paid pursuant to the mortgage by Bloor West to Manulife.

**9**    The consent to surrender and sublease provided:

The within consent is conditional upon the Second Sublease being subject to

the terms, covenants and conditions of the above recited lease between the undersigned and 102 Bloor West Limited and that all matters and things set out in the said lease shall govern all matters and things set out in the said Second Sublease between 102 Bloor West Limited and Sussman Properties Limited.

**10**    From all of the above it is clear, in my opinion, that by the ground lease, as amended, Manulife had bargained for and received:

(1)    a fixed rental based upon 7% of the value of the land; and

(2)    a participating rent of 10% of the amount by which the gross annual income from all sources derived from the lands and premises in each year exceeded the sum of $600,000.

**11**    Additionally and separately, Manulife had made a loan to Bloor West of $2,600,000 on the security of a first mortgage on the building and ground lease repayable in blended payments with interest at the rate of 7 1/2% per annum.

**12**    Bloor West for its part, in entering into the second sublease, had provided for itself:

(1)    a base rent of $155,100;

(2)    an amount sufficient to satisfy its responsibilities under the ground lease;

(3)    an amount necessary to meet all of its obligations pursuant to the first mortgage; and

(4)    as participating rent, an amount equal to 15% of the gross annual revenue of the head tenant (Corporate Properties) in excess of $900,000.

**13**    I need add only five paragraphs from the agreed statement of facts to complete the factual picture:

[1] Bloor West directed Corporate Properties to pay the sums referred to in paragraphs (2) and (3) above directly to Manulife.

[2] The gross annual income from all sources derived from the property by Bloor West has never exceeded $600,000.

[3] The gross annual income of Corporate Properties did not exceed $600,000 in any year during the period from 1966 to 1970 inclusive.

[4] The gross annual income of Corporate Properties exceeded $600,000 for each year during the period from 1971 to 1985 inclusive.

. . . . .

> [5] Corporate Properties paid Percentage Rent for the years 1971 to 1985
> inclusive but for the years 1983 to 1985 inclusive the payments were made under
> protest and objection and for the purpose of avoiding any question of default
> under the second sublease.

**14**    In summary then, Bloor West agreed to pay certain rentals to Manulife under the ground lease, and with the consent of Manulife, it sublet the building to Corporate Properties under terms which included payment by Corporate Properties to Bloor West of any amount which Bloor West owed to Manulife under the ground lease. For convenience, Bloor West then directed Corporate Properties to make these ground lease rentals directly to Manulife. This resulted in Manulife and Corporate Properties dealing directly on the calculation of the rentals and later on the interpretation of the ground lease. This direct dealing appears to have confused the parties as to the respective obligations of the three parties to this litigation.

**15**    In the submission of counsel for Corporate Properties, the annual rental that Manulife was entitled to for the period 1966 to 1986 inclusive was the sum of $49,000 per year representing a 7% return on the land as valued in 1966. It was not entitled to any participation in the income from the building during this period because the rentals payable by Corporate Properties to Bloor West (i.e., the sum of $155,100 and the 15% of Corporate Properties rental from its subtenants) did not exceed $600,000 per year. He thus focuses on the income of Bloor West as determinative.

**16**    Counsel for Manulife submits that the focus should not be on the income of the lessee under the ground lease or under the sublease, but should be on the income from the land and buildings. He submits that the annual income that attracts the 10% participating rent should be the sum of the rentals Bloor West receives from Corporate Properties and the rentals Corporate Properties receives from its tenants, i.e., $155,100 plus the total of the incomes of the tenants of Corporate Properties. This is in fact what Manulife has been receiving, albeit under protest, since 1983.

**17**    Counsel for Corporate Properties suggests that Manulife may well be entitled to a participating rent in the future. However, I note that, accepting his formula, and applying some rough arithmetic, the rental income of Corporate Properties would have to reach $3,000,000 before Bloor West would receive the minimum $600,000 that would make any participating rent available to Manulife:

$$\frac{[(15 \times 3,000,000)] + 155,100 = \$605,100]}{100}$$

The figures available to us from the agreed statement of facts show the contested percentage payments. There is no rental income shown for 1966 to 1970, and, from 1971 to 1985, the highest payment of the 10% participating rent is approximately $80,000 for 1985. I can only assume it

derives from an annual income of Corporate Properties of approximately $645,000. My arithmetic is as follows:

$$\$155,000 \times 10\% = 15,500$$

$$645,000 \times 10\% = 64,500$$

$ 80,000

**18**    What the submission of counsel for Corporate Properties boils down to is that instead of a participating rent in "the annual revenue from all sources derived from the land and premises in each year ...", Manulife should receive no portion of the first $600,000 received by Bloor West, and thereafter should be restricted to 10% of the 15% Bloor West is entitled to from Corporate Properties. This interpretation of the lease, on the figures on this record, results in a commercial absurdity. It means that the participating rent is in fact illusory and Manulife receives nothing by way of rent from the building in question. I note that the term of the ground lease is 30 years, but is subject to options for extension by the lessee of 25 years, 25 years and 19 years, so that the total term is 99 years. The ground rental at 7% is subject to change because of re-evaluations of the value of the land, but the formula for participating rent remains the same.

**19**    A clear statement is found in Toronto (City) v. W.H. Hotel Ltd. (1966), 56 D.L.R. (2d) 539, [1966] S.C.R. 434 (S.C.C.), that contracts are to be interpreted so as to avoid commercial absurdity. Spence J., at p. 548, says:

> ... I agree that this transaction [a lease] being an ordinary commercial transaction it is the duty of the Court in interpreting that document to avoid such an interpretation as would result in commercial absurdity. Duff J., in Reddy v. Strople (1911), 44 S.C.R. 246 at p. 257, added to the canon that the primary meaning if unambiguous should be adopted, the proviso that it should be "sensible with reference to the extrinsic circumstances ...".

**20**    The trial judge gave effect to the submissions of Corporate Properties and Bloor West by postulating what, in my view, was the wrong issue. He said in reference to the clause in the ground lease which I have quoted [p. 273 O.R., p. 516 D.L.R.]:

> The issue arising out of those words is whether the "gross annual income" referred to therein is the gross annual income of Bloor West, or is the gross annual income of the plaintiff, which is not a party to the ground lease. If the

words mean the gross annual income of Bloor West, no additional percentage rent is yet due. On the other hand, if the gross annual income is that of the plaintiff, the amounts paid (as set out in para. 23 of the agreed statement of facts) were properly paid because the additional percentage rent calculations have, from the beginning, always been based on the gross annual income of the plaintiff.

**21**    In arriving at this conclusion, the trial judge had to insert the words "102 Bloor West" after the words "gross annual income". These reasons are reflected in the formal judgment, para. (1) of which states:

> THIS COURT DECLARES that the percentage rent reserved in clause 2 on page 2a of the indenture of ground lease made as of the 30th day of September, 1966, between the Defendant The Manufacturers Life Insurance Company, as lessor, and the Defendant 102 Bloor West Limited, as lessee, shall be calculated on the basis of the gross annual income from all sources of the Defendant 102 Bloor West Limited derived from the lands and premises more particularly described in the said indenture of ground lease.

In my view, he was not justified in placing such a construction on the clause. It is not the income of one of the parties we are concerned with, but the income from the property, i.e., the rentals that the lands and premises yield.

**22**    Manulife was to receive a ground rental on the land equivalent to 7% of the value of the land. This is the classic ground rent, the rent of the land as opposed to the buildings thereon: see Jowitt's Dictionary of English Law, 2nd ed. (1977), p. 875; Stroud's Judicial Dictionary (1986), vol. 2, p. 1128; Halsbury's Laws of England, 4th ed. (1981), vol. 27, para. 211n. In addition, it bargained for and received a participation in the rental income of the building equal to 10%. It is a participation in all annual income from all sources derived, not by the ground lessee, but from the lands and premises save for the first $600,000. It is for this reason that Bloor West was obliged to submit an audited expense statement, not with respect to Bloor West's earnings from all sources, but pertaining to "the operation of the property". It is significant that in its sublease to Corporate Properties, Bloor West extracted a similar commitment from Corporate Properties. The annual income from all sources derived from the lands and premises means the annual income from the head tenant, any subtenant and any tenants of the subtenants.

**23**    There was a good deal of discussion about the definition of "gross annual income from all sources" in the sense of just what expenses it was intended to exclude, but I do not think that is relevant to our deliberation. The parties have agreed to the calculations for the financial years ending December 31, 1971 to 1983 inclusive, and they have been paid. They were paid on a basis that included not only the moneys received by Bloor West from Corporate Properties but also the rental incomes received by Corporate Properties from its subleases. From 1983 forward, the amounts, calculated in the same way, were paid under protest, but as I understand it, the

calculations themselves are not in issue.

**24**    In my view, the language of the ground lease, as amended, is the only language which the court needs to construe. In my opinion, it is clear and unambiguous, but if there is any ambiguity, it is evident that the parties by their conduct adopted the interpretation that Manulife placed on the document for the years 1971 to 1982 inclusive.

**25**    To the extent that I am entitled to look at extraneous evidence, I would note that the memorandum of agreement between Manulife and Bloor West dated August 18, 1966 (ex. 4), provided:

> As additional ground rent throughout the full term of the lease, you are to pay to us annually 10% of the amount by which the gross annual income from all sources derived from the land and buildings erected thereon, exceeds $600,000. Such gross income is not to include payments from tenants under present leases for tax or other escalation clauses. In this regard, annual audited financial statements pertaining to the operation of the property and to be submitted to us prior to May 31st of each year, together with payment of this additional ground rent.

**26**    This language is tracked into the original ground lease (ex. 2) and is modified in the amendment (ex. 10). It was acted on by the parties in the manner contended by Manulife. I am entitled to look to the conduct of the parties and method of performance of the contract as evidence of what the parties intended: Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co. (Incorporated), [1969] 1 O.R. 469 at pp. 523-5, 3 D.L.R. (3d) 161 at pp. 215-7 (H.C.J.); Re C.N.R. Co. and C.P. Ltd. (1978), 95 D.L.R. (3d) 242 at pp. 262-4, [1979] 1 W.W.R. 358 (B.C.C.A.); Watchan v. A.-G. of the East African Protectorate, [1919] A.C. 533 (P.C.), at pp. 538-40.

**27**    Eberle J. made the following findings on this issue [at p. 278 O.R., p. 521 D.L.R.]:

> Did the actions of the parties effectively interpret the lease before 1983?

> In this earlier period, the overpayments were made without reservation of rights or protest, and there is no evidence of any pressure of circumstances upon the plaintiff.

> The plaintiff relied on the evidence of Mr. Paul but, in my view, that evidence does not assist the plaintiff. His evidence, and the documentary evidence filed (particularly at exs. 12, 13, 14, 24, 25 and 33), make it clear that the initial calculations were made by Manulife and based upon the income of the plaintiff rather than the income of Bloor West. However, in doing so, nothing was hidden

from the plaintiff. Manulife possessed no knowledge which was not common also to the plaintiff. The correspondence between the parties made it perfectly clear to the plaintiff that Manulife was calculating the percentage rent on the basis of the plaintiff's gross annual income. There was no overreaching by Manulife, which had no special knowledge of the figures involved; they were the plaintiff's own figures. It was simply a question of whose gross annual income was being used as the basis for the rent. It was not suggested that there was any fraud, undue influence or breach of fiduciary duty by Manulife.

The plaintiff and Manulife had equal access to the lease documents. The plaintiff had its own resources, facilities and personnel to deal properly with the issue of calculation of the rent. It failed to do an adequate job. The plaintiff is simply the author of its own misfortune.

I do not find that the clauses in the relevant lease documents are ambiguous, thus requiring one to look at the actions of the parties to see how they interpreted those provisions. On the other hand, in accepting the calculations made by Manulife and in making payments for 12 years, accordingly, it is my opinion that the plaintiff has put an interpretation upon the documents from which it cannot now resile and is not entitled to recover the overpayments for the period prior to 1983 on that ground.

In support of that view, I refer to Re C.N.R. Co. and City of Ottawa, [1925] S.C.R. 494 at p. 497, where the Supreme Court of Canada said:

"The language being fairly susceptible of this construction, it seems reasonable to read it in light of the existing course of procedure, and, in ascertaining its true construction, it is quite impossible to ignore the subsequent practice under the agreement."

**28**    I note that the learned trial judge was of the view that Corporate Properties Limited had put an interpretation upon the documents from which it cannot resile for the period prior to 1983. My demurrer is twofold. It is not the construction that Corporate Properties puts on the document that is important, it is that of Bloor West. Bloor West is the lessee and it is the lease as between Manulife and Bloor West that must be interpreted, notwithstanding that Bloor West contracted its obligation under the ground lease to Corporate Properties and provided it with a direction to deal directly with Manulife. However, Bloor West has always adopted Corporate Properties' position, and I probably am being somewhat technical. My second demurrer is of more substance. Having found that the

parties to an agreement had placed a certain interpretation upon the agreement, it is not appropriate to limit that finding as to time. The fact that the interpretation was agreed upon is a fact in assisting the court in its own interpretation as to what the parties meant. The fact that a corporate officer, who was not involved in the initial agreement, should later form a different view of Corporate Properties' obligations, is irrelevant.

**29**    There is a cross-appeal by Corporate Properties with respect to the alleged overpayments for the years 1971 to 1983. It was conceded that it must fail if the appeal is allowed. For the reasons given, I would allow the appeal, dismiss the cross- appeal, set aside the judgment of Eberle J. and substitute an order dismissing this action against Manulife and Bloor West. The appellant is entitled to its costs here and below against Corporate Properties. Bloor West is in the same interest as Corporate Properties and should receive no costs, here or below.

**30**    GRIFFITHS J.A. concurs with FINLAYSON J.A.

**31**    ANDERSON J.:-- I have had the benefit of reading the reasons given by Finlayson J.A. I agree with the result but would arrive at it by a somewhat different course. The facts are as set out by him.

**32**    The issue is narrow: what is the proper construction of the words, "... gross annual income from all sources derived from the lands and premises ...". In my view the words are ambiguous in that they can reasonably bear the meaning ascribed to them by each of the conflicting interests. They may mean such "gross annual income" received by 102 Bloor West Limited, as found by the learned trial judge and as advanced by the respondent on this appeal. Or they may mean such "gross annual income" without limitation by any necessary reference to the recipient and, hence, may mean such "gross annual income" as received by Corporate Properties, this being the position advanced by the appellant. It seems to me to be the classic case in which the court, in finding the intention of the parties, should seek guidance in surrounding circumstances.

**33**    In such pursuit both Eberle J. and Finlayson J.A. examined the conduct of the parties from the inception of the transaction until a review of its position by the respondent in 1983 led to the litigation in which this appeal is taken. They found that conduct compelling in favour of the interpretation sought by the appellant. So do I. And I agree with Finlayson J.A. in his second demurrer to the reasons of Eberle J., namely, that such interpretation should not be limited as to time.

**34**    I would allow the appeal and dismiss the cross-appeal, with the disposition of costs as provided in the reasons of Finlayson J.A.

Appeal allowed; cross-appeal dismissed.

1990 CarswellOnt 915, [1990] C.L.D. 593, [1990] O.J. No. 534, 20 A.C.W.S. (3d) 372...

1990 CarswellOnt 915
Ontario Supreme Court

Csak v. Aumon

1990 CarswellOnt 915, [1990] C.L.D. 593, [1990] O.J. No. 534, 20 A.C.W.S. (3d) 372, 69 D.L.R. (4th) 567

# Re Excel Wire Erosion (Canada) Limited

Miklos Nicholas Csak and Brian William Boon, Applicants v. George
Aumon and Excel Wire Erosion (Canada) Limited, Respondents

Lane J.

Judgment: April 9, 1990
Docket: Doc. RE2348/89

Counsel: *Miss J. Demaray*, for the Applicants.
*Ms. L. Rosenblatt*, for the Respondents.

Subject: Corporate and Commercial

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Corporations --- Shareholders — Shareholders' remedies — Relief from oppression — Standing to apply**

Shareholders — Shareholders' remedies — Relief from oppression — Standing to apply — Use of oppression remedy in Act available to person claiming shares under pre-incorporation contract — Canada Business Corporations Act, R.S.C. 1985, c. C-44, ss. 2(1), 238(a), (d), 242(2).

Applicants agreed to provide expertise and funding under a pre-incorporation contract in return for shares in corporation. Upon incorporation, respondent president of the company, who was the sole incorporator, issued shares to himself alone, alleging that the conditions for issuance of the shares had not been met. Applicants brought an application for relief from oppression pursuant to the Act and corporation brought a motion for dismissal of the application on the grounds the Act did not apply. Held, the motion was dismissed. Being remedial legislation, the Act contemplated a large and sweeping jurisdiction. Unless there had been a reason inherent in the legislation, applicants were within the definition of "complainant" as contemplated in the Act. Applicants were also "security holders" as defined in s. 242(2) and entitled to claim the oppression remedy.

**Lane J.:**

1    This application raises the issue of whether persons claiming under a pre-incorporation contract to be entitled to shares in a corporation can obtain these shares through the use of s. 241 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 ("CBCA"). By agreement, the issue of the entitlement of these applicants to employ the mechanism of the CBCA was argued as a threshold question of law.

2    The respondent George Aumon is the president, sole director and sole shareholder of the respondent Excel Wire Erosion (Canada) Limited which carries on business in the City of Brampton, Ontario as a spark erosion sub-contractor servicing the tool and dye industry in Canada. In 1978 and 1979, discussions were held between the applicants and the respondent Aumon as to the

possibility of establishing a spark erosion sub-contract business employing the applicants' methods in Canada. The applicants say that in or about 1979 an agreement was reached between them and Aumon for the establishment of such a business. The applicants agreed to make start-up funding available and to provide on-going technical advice and assistance to the business. The applicants were to continue to carry on other business ventures elsewhere and Aumon was to be the full-time manager in Canada. The business was to be incorporated and the applicants say they were each to receive 33 1/3% of the shares. The respondent admits that discussions took place but says that any agreement as to providing shares to the applicants was premised on the applicant Csak moving to Canada within two years of the incorporation of Excel to assist in the running of the business. Csak did not move to Canada until October 1987.

3    Excel was incorporated by Aumon on July 16, 1979. Its initial financing included $125,000 obtained by Aumon as a loan from his bank and $165,600 advanced by the applicants as an interest free demand loan. The loan from the applicants was repaid on March 31, 1988.

4    The applicants also claim that they made technical advice and assistance available to Aumon and Excel between 1979 and 1987. Any such assistance given by the applicants is minimized to the point of triviality by Aumon.

5    The applicants' complaint is that the respondents have refused to issue shares to the applicants pursuant to the alleged agreement and have failed and are continuing to fail to provide the information which ought to be provided to shareholders. Put briefly, the status of the applicants as shareholders is denied. The gist of the applicants' position is that they qualify as "complainants" under s. 238 of the CBCA because they are "beneficial owners" of securities of Excel. They say that the refusal of Excel and Aumon to issue their share certificates to them is oppressive or unfairly prejudicial or unfairly disregards their interests as security holders of Excel within the meaning of s. 241 of the CBCA.

6    The gist of the respondents' position is that the applicants can neither bring themselves within the definition of complainant, nor within the last portion of s. 241(2) of the Act which defines the persons entitled to relief as follows:

> ...that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, ...

They say in effect that persons who claim to be entitled to the issuance of shares are not security holders and hence are not persons for whom relief is available. They say that the remedies available under s. 241 of the Act are limited to remedies against the corporation and do not extend to situations where the remedy sought is based upon an agreement to which the corporation was not a party.

7    *Are the applicants "complainants"*?:

8    Section 238 reads as follows:

9    *238.* In this Part, ...

> *"complainant"* means,

> (a) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a corporation or any of its affiliates, ...

> . . . . .

> (d) any other person who, in the discretion of a court, is a proper person to make an application under this Part.

Section 2 defines "beneficial ownership" as including "ownership through a trustee, legal representative, agent or other intermediary." The applicants say they are beneficial owners of securities within the meaning of the foregoing definitions. It is apparent from the language of the statute that it contemplates a class of complainant without registered ownership. The applicant argues that any person having an equitable claim to shares in the company would qualify as a beneficial owner whether or not there are shares issued and appropriated to that person but held in the name of someone else. The respondent submits that

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1990 CarswellOnt 915, [1990] C.L.D. 593, [1990] O.J. No. 534, 20 A.C.W.S. (3d) 372...

beneficial owner means a person whose shares have actually been issued but are held in the name of someone else as legal owner. In such circumstances, the acknowledged beneficial owner can bring the application directly without involving the registered owner. On the respondents' view of things, a person who claims to be the beneficial owner of shares which have not actually been issued is not able to take advantage of Part XX of the CBCA.

10     In my view, the applicants do fall within the phrase "beneficial owner" as it is used in s. 238. A beneficial owner is one who is the real owner of property even though it is in someone else's name. The nominal owner has legal title to the property but the real owner can require the nominal owner to convey the property to him and transfer legal title to him. See: *MacKeen Estate v. Minister of Finance of the Province of Nova Scotia* (1978), C.T.C. 557 (N.S.S.C., App. Div.). This is the situation in which the applicants say they find themselves. The respondent Aumon is the registered owner of 100% of the issued shares of Excel and the applicants say he holds 2/3 of them in trust for them or that he is contractually bound to cause the company to issue to each of them the same number of shares as are held by him.

11     However, the respondent argues that the applicants' entitlement is a matter of dispute and until the dispute is resolved in favour of the applicants by the issue of a decree of specific performance, the applicants do not have standing as beneficial owners. In support of this proposition, counsel relied upon the case of *Bernstein v. 335861 (Alberta) Ltd. et al.*, unreported, decided by W.J. Quinn, Master in Chambers of the Court of Queen's Bench of Alberta on August 15, 1986. That case, like the present, involved a pre-incorporation agreement in which the applicant was to receive shares in a company to be incorporated in return for the applicant's efforts in developing the business opportunity which was to be explored by the company. The exact amount of the applicant's share ownership was not determined and in the end the other parties went ahead and incorporated the company without including the applicant. He applied to the Alberta Court under the corresponding provisions of the *Alberta Business Corporations Act*. He argued that he was a prospective shareholder of the company and as such was a proper person to be granted status pursuant to the Alberta equivalent of s 238(d) of the CBCA, that is that he was "any other person who, in the discretion of a court, is a proper person to make an application under this Part". Counsel for the respondent in that case submitted that the applicant was not "a security holder, creditor, director or officer" of the company pursuant to s. 234(2) of the Alberta Act (which is equivalent to s. 241(2) of the CBCA) and that accordingly the applicant as a mere "anticipated security holder" could not obtain relief. The Master dismissed the application on these grounds. It does not appear from the case that the possible effect of the reference to "beneficial owner" in the definition of complainant was drawn to the learned Master's attention.

12     In my opinion, the phrase "beneficial owner" in s. 238 is capable of bearing either of the meanings attributed to it by counsel in this case. It could be restricted to situations where issued shares are registered in someone else's name and the applicant is the acknowledged beneficial owner thereof; or it could refer to situations in which applicants claim to be beneficial owners of shares which ought to have been issued to them. The Act is remedial legislation and contemplates a large and somewhat sweeping jurisdiction. Unless there is some reason inherent in the legislation or of policy to restrict the meaning of beneficial owner to that contended for by the respondent, it would be in accord with the remedial nature of the Act to give the section the broader meaning.

13     An examination of the Act persuades me that there is no inherent reason to restrict the term "beneficial owner" to the narrower view. Firstly, the definition of "beneficial ownership" (supra) is inclusive, not exclusive and "complainant" includes not only the persons itemized in s. 238(a), (b) and (c), but also (d), "any other person who in the discretion of a court is a proper person...". Given this broad formulation of those who may seek the benefit of the Act it is hard to see why one who claims to be the beneficial owner of unissued shares should not qualify. Secondly, s. 238(a) refers to the ...beneficial owner...of a security of a corporation...". The term security is defined in s. 2(1) as follows:

"security" means a share of any class or series of shares or a debt obligation of a corporation and *includes a certificate evidencing such a share* or debt obligation; (Emphasis added)

14     Applicant's counsel argued that the underlined words particularly "includes", indicate that ownership of a security means more than being the holder of a certificate and that a larger property notion than the certificate itself is intended by the term security. In my opinion this is a fair reading of that definition and lends support to the view that it is not necessary that an actual certificate be issued in order that someone may be the beneficial owner of securities within the meaning of s. 238. It should

1990 CarswellOnt 915, [1990] C.L.D. 593, [1990] O.J. No. 534, 20 A.C.W.S. (3d) 372...

further be noted that the remedies available under s. 241(3) include "(d) an order directing an issue or exchange of securities". Parliament contemplated that a person without shares would be entitled to require them to be issued to him or her. In the context of a remedial act, it makes no sense to think that a person holding one registered share and claiming to be entitled to the issuance of a million more would be entitled to use the Act and the person holding no registered shares and claiming to be entitled to the issuance of a million would not be able to use it.

15    As to the policy involved, the argument was made that the CBCA was not intended as a shortcut to avoid the process of establishing rights by actions such as specific performance. It is apparent from the reasons of the learned Master that such thinking was a factor in his decision in *Bernstein, supra*. In my view, if any person claiming a relevant status under ss. 238 or 241 by reason of being a registered shareholder, beneficial owner, creditor, a director or the like, could be turned away without a hearing by the simple denial of the existence of the relevant status, much of the remedial effect of the CBCA would be demolished. In effect, the respondents' contention would re-write the legislation by redefining "creditor" in s. 241 as judgment creditor" and "beneficial owner" in s. 238 as "beneficial owner whose status as such has been confirmed by the Court or is not in any way contested." Since by definition a beneficial owner is one who does not have legal title, every such person is at risk that he may have to go to the law to enforce his right to turn beneficial ownership into legal ownership. In my view, Parliament did not intend the absence of legal title to prevent the applicants here from bringing an application under ss. 238 and 241 until some other court had passed upon the validity of their claim to beneficial ownership. Their status is to be dealt with within the CBCA application and not as a condition precedent.

16    Continuing with the policy analysis, one must ask whether Parliament intended to have issues such as a claim for specific performance of an agreement for shares tried on an application where the evidence, initially at least, is by affidavit. Cases of oppression present legal, factual and credibility problems every bit as difficult as are presented in specific performance actions, yet there is clear jurisdiction under the CBCA to deal with oppression claims on affidavit in a proper case or to direct the trial of an issue if that is required. I see no policy reason why the kind of claim made by the applicants here could not if necessary be the subject of the trial of an issue. Finally, a rule requiring a party to establish the status of creditor, beneficial owner or the like in a separate proceeding before coming to the court under the CBCA to obtain relief would multiply litigation to no good purpose.

17    For the foregoing reasons the applicants qualify under s. 238 as complainants by reason of their claim to be beneficial owners of securities of the respondent company.

18    *Are the applicants "security holders" within the meaning of s. 241(2)?*

19    Counsel for the respondent contends that the phrase "any security holder" found in s. 241 is not broad enough to include the present applicants because they are not registered security holders. She argues that even if the applicants qualify under s. 238 as complainants, they nevertheless are not entitled to relief because they are not security holders. In support of this, she relies upon the definition of "holder" in Part VII of the CBCA. Neither "security holder" nor "holder" are defined for the Act as a whole nor for Part XX, which contains the oppression remedy. However, s. 48(2) defines "holder" for the purposes of Part VII, as follows:

"holder" means a person in possession of a security issued or endorsed to him or to bearer or in blank.

20    Counsel for the respondent argues that a similar restricted meaning should be given to "security holder" in s. 241. I do not agree. The definition of "holder" in s. 48(2) is expressly confined to Part VII of the Act, and thus has no necessary implication for the meaning of "security holder" in Part XX. It would, in my opinion, be an absurd construction to find that former registered security holders may be complainants, but are nevertheless to be denied relief. Counsel for the respondents relies also upon the case of *Michalak v. Biotech Electronics Ltd; Puetter et al.* (1986), 35 B.L.R. 1 (Que. S.C.) where the applicants were former shareholders. It was held that they qualified as complainants but were nevertheless denied a remedy. Counsel says that this case establishes that an applicant could qualify as a complainant and could show oppression but nevertheless not be entitled to relief because of not being a security holder. In my view, the gist of the decision was that the oppression complained of existed in the past and there was at the time of the application nothing in the nature of current oppression which could provide a foundation for relief: see the remarks of Martin J. at p. 11 (B.L.R.). Counsel further contends that s. 241(2) is deliberately different from s. 238 in that complainants who are "any other proper person" under s. 238(d) do not qualify for relief under

1990 CarswellOnt 915, [1990] C.L.D. 593, [1990] O.J. No. 534, 20 A.C.W.S. (3d) 372...

s. 241(2) because they are not security holders. I do not accept this premise but for the present case the short answer is that the applicants here do not come before the Court as "any other person...", but as security holders alleging that their status as such is being oppressively denied to them.

21    I do not think that the differences between ss. 238 and 241 lead to the conclusion that relief is only available to registered security holders under s. 241. The Act specifically contemplates relief to unregistered shareholders by the use of the term beneficial owner in s. 238(a), by the provisions of s. 243 relating to rectification of the register and by the power in s. 241(3) (d) to order an issue of securities. Once again we return to the underlying issue. Is s. 241 confined to persons who have an undisputed status at the outset of the application? Bearing in mind the remedial nature of this Act and the considerations already discussed in connection with the analysis of s. 238, the answer must be that persons claiming the status of security holder are entitled to use the mechanism of the CBCA to attempt to prove that status as part of their effort to obtain relief against oppressive conduct. To establish a threshold requirement of undisputed status would undermine the broad, remedial scope of this Act.

22    The respondent further argues that since the corporation is not a party to the contract under which the shares were to be issued, there can be no claim against it and hence use of the oppression remedy is misconceived. She relies on *Canadian Commercial Bank v. Prudential Steel Ltd.* (1986), 66 C.B.R. 172 (Alta. Q.B.). In that case the Bank, as secured creditor of B. Ltd. sought to set aside, as a fraudulent preference, a re-sale for credit by B. Ltd. of certain inventory to the defendant, which was one of B. Ltd.'s suppliers. In addition, the Bank sought relief against the defendant as a complainant under s. 234 of the *Alberta Business Corporations Act*, where the definition of complainant is the same as that in the CBCA. It was held that the Bank was not a complainant because the security which it claimed to enforce was given to it by B. Ltd. and not by the defendant corporation. That case is quite distinguishable from the case at bar. The claim of the applicants here is to have the corporation recognize their status as shareholders. It can be brought only against the corporation whose shares they claim to own, the respondent Excel and its sole director. In my opinion, *Canadian Commercial Bank* (supra) is not a relevant authority in the case at bar. That the resolution of the applicants' right to be recognized as shareholders by Excel and Mr. Aumon involves the review of a pre-incorporation agreement is, in my view, no bar to the use of the CBCA oppression mechanism.

23    I am not to be taken as saying that the applicants' claim to the relevant status can never be challenged before the main hearing. If at any stage of the proceedings it becomes apparent that the applicants' claim to the relevant status of beneficial owner or creditor or the like is in bad faith, frivolous or a sham, the Court has ample powers to dispose of the application in a summary way.

24    As noted above, counsel agreed that only the so-called threshold question would be argued on this occasion. Accordingly the issue of whether the refusal of Aumon as a director of Excel to cause Excel to issue shares to the applicants is an act of oppression within the meaning of s. 241 is not before me and I express no opinion on it.

25    The respondents' motion to dismiss this application fails. Costs of this motion are reserved for disposition to the judge hearing the main application.

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Denison Mines Ltd. v. Ontario Hydro
## [Indexed as: Denison Mines Ltd.
## v. Ontario Hydro]

**58 O.R. (3d) 26**

[2002] O.J. No. 91

Docket No. C35227

Court of Appeal for Ontario

**Carthy, Abella and Sharpe JJ.A.**

January 18, 2002

*Arbitration -- Appeal -- Sale agreement between parties contained arbitration clause which precluded appeal -- Dispute arose -- Applicant filed notice of arbitration under sale agreement -- Respondent commenced action against applicant and another party -- All three parties agreed to arbitrate dispute and entered written arbitration agreement -- Arbitration agreement did not expressly exclude appeal -- Arbitration agreement constituted freestanding agreement and not mere amendment to sale agreement -- Arbitration agreement governed arbitration -- Applicant had right to apply for leave to appeal decision of arbitration panel dismissing its claim.*

The parties entered into a sale agreement in 1977 which contained an arbitration clause. The wording of that clause precluded any appeal. A dispute arose between the parties and the applicant filed a notice of arbitration under the sale agreement in respect of its claim that the respondent had breached that agreement. The respondent commenced an action in the Ontario Court (General Division) against the applicant and another party, TD, in respect of its claims. After the action was commenced, all three parties agreed to arbitrate the dispute. They entered a written arbitration agreement in 1992 staying the respondent's action and providing the terms for the arbitration. The arbitration agreement did not expressly exclude an appeal. The Arbitration Act, 1991, S.O. 1991, c. 17 came into force after the date of the sale agreement but before the date of the arbitration agreement. Section 45(1) of the Act provides that where the parties have not by agreement excluded an appeal, one lies with leave on a question of law. The applicant's claim was dismissed by a majority of the arbitration panel. The applicant sought leave to appeal pursuant to s. 45(1) of the Act. The application judge found that the arbitration was governed by the sale agreement, that the

arbitration agreement did not, on its own, represent the contractual intention of the parties but rather constituted an amendment to the sale agreement, and that, accordingly, she had no jurisdiction to grant leave to appeal. The applicant appealed.

Held, the appeal should be allowed.

Per Sharpe J.A. (Carthy J.A. concurring): The application judge erred in her interpretation and appreciation of the legal effect of the arbitration agreement. On its face, the arbitration agreement was unambiguous. It was a complete and comprehensive agreement providing for the arbitration of a dispute between the contracting parties. If it were nothing more than an amendment to the sale agreement, one would expect to find some reference to that earlier document in the recitals or elsewhere in the text. No such reference existed. The arbitration agreement bore all the hallmarks of a free-standing agreement rather than an amendment to the sale agreement. It was significant that the parties to the arbitration agreement were different. As TD was not a party to the sale agreement, it was difficult to see how it could be held to the terms of that agreement precluding any right of appeal. It would surely be anomalous if one party to a tripartite agreement had the right to seek leave to appeal under s. 45(1) of the Act, but the other two parties did not.

The applicant's formal pleading in the arbitration stated that the arbitration was brought under the sale agreement. However, that did not amount to an admission on the applicant's part that the sale agreement governed. At the time the formal Statement of Position was delivered, the issue of the relative status of the sale agreement and the arbitration agreement had not been raised. There was nothing to suggest that the applicant or the other parties raised or adverted to the point at issue here and, therefore, there was nothing for the applicant to admit. Nor was there any evidence that the respondent relied on this aspect of the applicant's pleading or that it took, or failed to take, any action because of it.

In the circumstances, the Arbitration Act, 1991 and the right to seek leave to appeal under s. 45(1) applied.

Labourers' International Union of North America, Local 183 v. Carpenters and Allied Workers, Local 27 (1997), 34 O.R. (3d) 472, 97 C.L.L.C. 220-057 (C.A.), distd

Per Abella J.A. (dissenting): Section 3 of the Arbitration Act, 1991 defers to the intentions of the parties in determining the finality of arbitrations. The intention of the parties in this case, as set out in the operative sale agreement, was to have arbitral finality. The subsequent arbitration agreement did not displace this intention. It was merely an agreement to accommodate the participation of the TD in protecting its contingent interest in the resolution of the dispute between the applicant and the respondent under the sale agreement.

Other cases referred to

Denison Mines Ltd. v. Ontario Hydro (2001), 56 O.R. (3d) 181, [2001] O.J. No. 3870 (C.A.); Eli Lilly and Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129, 152 F.T.R. 160n, 161 D.L.R. (4th) 1, 227 N.R. 201, 80 C.P.R. (3d) 321
Statutes referred to

Arbitration Act, 1991, S.O. 1991, c. 17, ss. 3, 45(1)


APPEAL from a judgment dismissing an application for leave to appeal arbitration award.


David Stockwood, Q.C., and Johanna Braden, for appellant.
Joseph M. Steiner and Joseph A. Starkman, for respondent.

---

[1] **SHARPE J.A.** (CARTHY J.A. concurring): -- The issue in this case is whether there is a right of appeal from an arbitration award resolving a dispute between Denison Mines Limited ("Denison"), Ontario Hydro ("Hydro") and the Toronto Dominion Bank ("TD").

Facts

[2] Denison and Hydro entered an agreement for the supply of uranium in December 1977 (the "Sale Agreement"). Article XI of the Sale Agreement contained an arbitration clause. It is common ground that the wording of that clause precluded any appeal. It is in the following terms:

> Art. XI. Except as otherwise specifically provided in this agreement or expressly otherwise agreed to by the parties, all disputes arising in connection with this agreement shall be finally settled under the provisions of the Arbitrations Act of Ontario by three arbitrators. Each of the parties hereto shall appoint one arbitrator and the two arbitrators so appointed shall appoint the third arbitrator. The proceedings before the arbitrators shall take place in Toronto, Ontario or such other place as the arbitrators may determine.

[3] A dispute arose between Denison and Hydro. Denison alleged breach of the Sale Agreement and claimed that Hydro had failed to pay $12.5 million due under certain invoices. Denison filed a Notice of Arbitration under the Sale Agreement for this claim. Hydro admitted the validity of the invoices, but claimed a right of set-off for the entire amount and alleged a conspiracy between Denison and the Toronto Dominion Bank ("TD") arising from a related tripartite financing arrangement between Denison, Hydro and TD. Hydro commenced an action in the Ontario Court of

Justice (General Division) against Denison and TD in respect of its claims. After the Hydro action was commenced, all three parties agreed to arbitrate the dispute. They entered a written arbitration agreement dated September 2, 1992 (the "Arbitration Agreement") staying Hydro's action and providing the terms for the arbitration.

[4] The Arbitration Agreement, the terms of which are set out in full in the Appendix to these reasons, did not expressly exclude an appeal. The Arbitration Act, 1991, S.O. 1991, c. 17, (the "Act") came into force after the date of the Sale Agreement but before the date of the Arbitration Agreement. The Act changed the law respecting rights of appeal. Section 45(1) provides that where the parties have not by agreement excluded an appeal, one lies with leave on a question of law:

> 45(1) If the arbitration agreement does not deal with appeals on questions of law, a party may appeal an award to the court on a question of law with leave, which the court shall grant only if it is satisfied that,

> > (a)　the importance to the parties of the matters at stake in the arbitration justifies an appeal; and
> > (b)　determination of the question of law at issue will significantly affect the rights of the parties.

[5] The matter proceeded to arbitration and Denison's claim was dismissed by a majority of the arbitration panel. Denison then sought leave to appeal pursuant to s. 45(1) of the Act. On the application for leave to appeal, it was agreed that the application judge would deal first with the issue of jurisdiction to grant leave to appeal. The application judge found that that arbitration was governed by Article XI of the Sale Agreement precluding an appeal. She concluded that the Arbitration Agreement did not, on its own, represent the contractual intention of the parties, but that it was more appropriately interpreted as an amendment to the Sale Agreement, made to accommodate TD in the arbitration. She held, accordingly, that she had no jurisdiction to grant leave to appeal.

[6] Denison appeals to this court on the ground that the arbitration was governed by the Arbitration Agreement, not the Sale Agreement, and that, accordingly, it has the right to seek leave to appeal pursuant to s. 45 of the Act. Hydro's motion to quash the appeal on the ground that the order refusing leave to appeal was interlocutory in nature was dismissed by another panel of this court: Denison Mines Ltd. v. Ontario Hydro (2001), 56 O.R. (3d) 181, [2001] O.J. No. 3870 (C.A.).

Issue

[7] The following issue arises on this appeal:

Did the application judge err in finding that she had no jurisdiction to entertain Denison's application for leave to appeal?

Analysis

[8] It is common ground between the parties that if the arbitration is governed by the terms of the Sale Agreement, there is no right of appeal, but that if the arbitration is governed by the Arbitration Agreement, Denison does have the right to apply for leave to appeal.

[9] In my respectful view, the application judge erred in her interpretation and appreciation of the legal effect of the Arbitration Agreement. On its face, the Arbitration Agreement is unambiguous. It is a complete and comprehensive agreement providing for the arbitration of a dispute between the three contracting parties. If it were nothing more than an amendment to the Sale Agreement, one would expect to find some reference to that earlier document in the recitals or elsewhere in the text of the Arbitration Agreement. The recitals, however, refer only to Hydro's action and the agreement of the parties to have that dispute settled by arbitration. The recitals provide that the dispute between the parties is to be referred to arbitration "on the terms set out below". The "terms set out below" make no reference whatsoever to the terms of the Sale Agreement. Clause 6 explicitly distinguishes the tripartite arbitration to be conducted under its terms from "the previous arbitration between Denison and Hydro pur suant to the Notice of Arbitration delivered by Denison dated February 26, 1992". While this refers to an earlier arbitration of another dispute between Denison and Hydro, it is significant that the only aspect of the Arbitration Agreement that even remotely refers to the Sale Agreement serves to distance it from the arbitration at issue here.

[10] The Arbitration Agreement deals comprehensively with the conduct of the arbitration. It sets out a different method of appointing the panel from that contemplated by the Sale Agreement. It provides for the terms of discovery, the jurisdiction of the panel to award costs and interest and even the method of setting down the time and place of the arbitration. In this respect as well, it bears all the hallmarks of a free-standing agreement rather than an amendment to the Sale Agreement.

[11] Perhaps even more significant is the fact that the parties to the Arbitration Agreement are different. As TD was not a party to the Sale Agreement, it is difficult to see how it could be held to the terms of that agreement precluding any right of appeal. It would surely be anomalous if one party to a tripartite agreement had the right to seek leave to appeal under s. 45(1) of the Act, but the other two parties did not.

[12] In my view, in the face of the terms of the Arbitration Agreement, Hydro's assertion that its purpose and effect was "merely to adjust the process to accommodate TD's presence in the arbitration" is untenable. It seems to me to be flatly inconsistent with the terms of the agreement TD and the other parties signed.

[13] Throughout her reasons for judgment, the application judge referred to the Arbitration Agreement as "the Amending Agreement". In reaching the conclusion that the Arbitration Agreement merely amended the Sale Agreement, and that the arbitration clause of the Sale Agreement was therefore controlling, the application judge relied on Denison's pleadings in the arbitration. In its formal Statement of Position in the arbitration, Denison stated: "This arbitration is

brought pursuant to Article XI of the Sale Agreement." All of Denison's documents in the arbitration bore the caption "ARBITRATION UNDER ARTICLE XI OF THE DECEMBER 15, 1977 AGREEMENT BETWEEN ONTARIO HYDRO AND DENISON MINES LIMITED".

[14] Denison's formal pleading in the arbitration does not, in my view, amount to an admission that the Sale Agreement governs. At the time Denison submitted this document, the issue of the relative status of the Sale Agreement and the Arbitration Agreement had not been raised. There is nothing to suggest that Denison or the other two parties raised or adverted to the point at issue here and therefore there was nothing for Denison to admit. Nor is there any evidence that Hydro relied on this aspect of Denison's pleading or that Hydro took or failed to take any action because of it.

[15] Denison submits that the pleading should not even be considered as it constitutes parol evidence that is inadmissible in the face of the unambiguous terms of the Arbitration Agreement, citing Eli Lilly and Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129, 161 D.L.R. (4th) 1. Hydro submits that the pleading should not be excluded as extrinsic or parol evidence, but that it forms part and parcel of the arbitration itself. I do not find it necessary to deal with the issue of admissibility. Assuming, without deciding, that it is admissible, Denison's pleading, standing alone and without any other evidence, does not provide an adequate basis to ignore or overcome the very clear language and effect of the Arbitration Agreement.

[16] In my view, this case is distinguishable from Labourers' International Union of North America, Local 183 v. Carpenters and Allied Workers, Local 27 (1997), 34 O.R. (3d) 472, 97 C.L.L.C. 220-057 (C.A.). In that case, the parties had entered into an arbitration agreement before the date the Act came into force, but the arbitration itself took place after the operative date of the Act. The arbitration agreement provided that the arbitration would be "final and binding" and was otherwise silent as to appeals. The applicant argued that since the arbitration agreement was silent on the question of an appeal, it could have recourse to the new s. 45(1) and apply for leave to appeal. This court rejected that submission, finding that the arbitration agreement had to be interpreted in light of legal regime prevailing at the date it was written. When the parties entered the agreement, it was not necessary to exclude a right of appeal expressly. The words "final and binding" indicated an intention to exclude any right of appeal, and the parties could not be expected to have expressly contracted out of a legislative scheme that did not exist when they wrote the agreement. In the case at bar, the situation is different. The parties did turn their minds to the terms of the arbitration after the new Act came into effect. They entered a complete and comprehensive agreement that made no reference to the Sale Agreement or to rights of appeal. In these circumstances, the 1992 Act and the right to seek leave to appeal under s. 45(1) apply.

Conclusion

[17] For these reasons, I would allow the appeal with costs here and before the application judge, and direct that Denison's application for leave to appeal proceed before the Superior Court of Justice.

[18] ABELLA J.A. (dissenting): -- I have had the benefit of reading the reasons of Sharpe J.A. but do not, with respect, agree with his conclusion. In my view, essentially for the reasons of Macdonald J., the appeal should be dismissed.

[19] Section 3 of the current Arbitration Act, 1991, S.O. 1991, c. 17 defers to the intentions of the parties in determining the finality of arbitrations. The intention of Denison and Hydro, as set out in the operative Sale Agreement, was to have arbitral finality. The subsequent September 2, 1992 Tripartite Agreement does not displace this intention. It is merely an agreement to accommodate the participation of the Bank in protecting its contingent interests in the resolution of a dispute between Hydro and Denison under the Sale Agreement.

[20] The dispute arose as a result of Denison's allegation that Hydro was in breach of its obligations to Denison under the Sale Agreement in making payments to the Bank instead of to Denison. When Hydro suspected -- correctly, as Denison conceded at the arbitration -- that Denison had devised a scheme to force Hydro, as guarantor, to pay Denison's debt to the Bank, Hydro prepaid the full guarantee to the Bank and set off the amount of these prepayments against amounts it owed Denison for the final shipments of uranium.

[21] Denison, in response to these deductions of prepayments, delivered Notices of Arbitration to Hydro, alleging that Hydro had breached the Sale Agreement by failing to pay for the uranium deliveries. This is what the arbitration was about -- a dispute between Denison and Hydro about whether Hydro had breached the Sale Agreement.

[22] Denison's position is set out in the numerous Notices of Arbitration it submitted to Hydro. These Notices, as well as Denison's pleadings in the arbitration, all set out clearly that the arbitration is under Article XI of the Sale Agreement. These pleadings are not extrinsic evidence. They are explicitly mentioned in the first paragraph of the 1992 Tripartite Agreement and are thereby incorporated by reference into that agreement. That paragraph states:

> The parties hereby submit to arbitration at Toronto all issues in respect of the Tripartite Agreement which are raised in the Statement of Claim in the Action, and in the Statements of Position to be filed by the parties on this arbitration, including all claims and defences which properly could be raised under the Rules of Civil Procedure were the matter to proceed by way of action in the Ontario Court (General Division).

(Emphasis added)

[23] The pleadings are therefore relevant in determining the intentions of the parties. Denison styled its Amended Statement of Position as "Arbitration Under Article XI of the December 15, 1977 Agreement Between Ontario Hydro and Denison Mines Limited". Similarly, the majority of the arbitration panel styled the award: "IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ONTARIO ARBITRATIONS ACT", referring to the legislation that governed arbitrations at the time the Sale Agreement was signed, and was designated as binding in Article XI. It is

therefore incongruous for Denison to now argue that its declared intention, when it was actually participating in the arbitration, can be retroactively retracted.

[24] This declared intention should be respected as having been genuine at the time, if only because of the undue prejudice that imputing a contrary intention would impose on Hydro. In taking at face value Denison's representation that the arbitration was under Article XI, Hydro lost the opportunity, prior to embarking on the expense of the arbitration, to address the possibility that its confidence in the finality protected under Article XI might be misplaced.

[25] In my view, therefore, the 1992 Tripartite Agreement, on its face, manifests the parties' intention not to displace the Sale Agreement. In addition, the context in which the 1992 Tripartite Agreement was signed also illuminates the intentions of Hydro and Denison at the time as being to preserve the finality agreed to in Article XI of the Sale Agreement. (See Labourers' International Union of North America, Local 183 v. Carpenters and Allied Workers, Local 27, supra.

[26] The issues raised in the Statements of Position all relate to the core dispute between Denison and Hydro under the Sale Agreement. The Statement of Claim by Hydro against the Bank was contingent on the outcome of this central dispute, with Hydro claiming that if it were found liable to Denison under the Sale Agreement, the Bank should correspondingly be found liable to Hydro. Denison asserted no claim against the Bank and the Bank asserted no claim against Denison.

[27] The Bank agreed to participate in the arbitration as a party with interests derivative of those of Hydro, and Hydro accordingly abandoned its court action to permit the resolution in one forum of all the issues related to Denison's Notices of Arbitration. In so doing, Hydro did not abandon, and should not be penalized by being held to have abandoned, its pre-existing rights under the Sale Agreement with Denison. And Denison should not now be permitted to assert that the Bank's participation in its claim against Hydro nullified its agreement with Hydro that there would be no appeal from an arbitrator without a clear expression that this was the parties' joint intention.

[28] The procedure in Article XI for selecting the arbitrators necessarily anticipated the participation of only Denison and Hydro and therefore needed revision to accommodate the presence of a third party in the arbitration. It is, in my view, only for the limited purpose of facilitating the presence of the Bank that the 1992 Tripartite Agreement was entered into. It did not change what the arbitration was about: the determination of the respective rights of Denison and Hydro under their Sale Agreement.

[29] The essence of the dispute, as reflected not only in the parties' Statements of Position, but also in the arbitral award, involved the interpretation of the Sale Agreement, including the Aggregate Advance Payment Provision in Article IV, s. 8, and the propriety of Hydro's payments to the Bank under the May 7, 1991 Amending Agreement, s. 9 of which provided for the remedy of set-off that Hydro purported to invoke when it made the prepayments to the Bank.

[30] Far from being a free-standing agreement with an independent life of its own, the 1992

Tripartite Agreement is meaningless without reference to the Sale Agreement. The Tripartite Agreement did not change what was at the heart of the dispute. In particular, it did not change the underlying agreement between Hydro and Denison or shift the intentions of the parties, including the intention, as set out in Article XI of the Sale Agreement, that all disputes arising in connection with that agreement be "finally settled" except as "expressly otherwise agreed to by the parties".

[31] Under Article XI, Hydro and Denison not only expressed their clear intention regarding appeal rights, but also declared that this intention could only be displaced by express language. The 1992 Tripartite Agreement is silent about whether its provisions supercede this provision in Article XI. The parties' intentions in the Sale Agreement that finality can be amended only by express language, should not be implicitly displaced by the failure in the 1992 Tripartite Agreement to express any intention at all.

[32] In fact, there is nothing in the 1992 Tripartite Agreement to displace the intended finality of any arbitrated disputes between Hydro and Denison as explicitly expressed in the Sale Agreement. And while I do not have to decide the issue of the Bank's appeal rights under the 1992 Tripartite Agreement, I would see nothing anomalous or unduly prejudicial in the possibility that the Bank might not be bound to this finality.

[33] This is, in short, an arbitration under the Sale Agreement, which expressed a clear substantive intention concerning the finality of arbitration, an intention that should not be displaced by the ambiguity of a subsequent procedural agreement. The 1992 Tripartite Agreement, in my view, does not supercede the intended finality expressed in the Sale Agreement, and is not a rewriting of its core terms and express intentions. It is nothing more than an adjunct to the Sale Agreement designed to facilitate the Bank's ability to respond to the possibility that its contingent interests could be triggered by the outcome of the arbitrated dispute between Hydro and Denison.

[34] I would therefore dismiss the appeal with costs.


 Appeal allowed.


APPENDIX

THIS AGREEMENT MADE as of September 2, 1992

BETWEEN:

ONTARIO HYDRO ("Hydro")

- and -

DENISON MINES LIMITED ("Denison")

- and -

THE TORONTO-DOMINION BANK ("the Bank")

RECITALS:

A. Whereas Hydro has commenced Action no. B175/92 in the Ontario Court (General Division) -- Commercial list at Toronto claiming certain relief in respect of an arrangement ("the Tripartite Arrangement") between the parties.

B. And whereas the parties have consented to an Order that the Action be stayed and the matters raised therein, and any related matters, be referred to arbitration on the terms set out below.

THE PARTIES THEREFORE AGREE AS FOLLOWS:

1.  The parties hereby submit to arbitration at Toronto all issues in respect of the Tripartite Agreement which are raised in the Statement of Claim in the Action, and in the Statements of Position to be filed by the parties on this arbitration, including all claims and defences which properly could be raised under the Rules of Civil Procedure were the matter to proceed by way of action in the Ontario Court (General Division).

2.  (a) It is understood and agreed that the relief sought by Denison in the arbitration is payment by Hydro of the sum of $12,500,000, said by Denison to be owing by Hydro in respect of deliveries of uranium, and that the $12,500,000 paid by Hydro to the Bank is not repayable to Hydro.

   (b) It is further understood and agreed that the relief sought by Hydro in the arbitration is an award which will result in Hydro not being obliged to pay the aforesaid sum of $12,500,000, or any part thereof, to Denison unless it is also entitled to recover the same sum from the Bank and is correspondingly released from its undertaking to the Bank.

   (c) It is further understood and agreed that the Bank's position in the arbitration is that, under no circumstances, is it obliged to return to Hydro all or any portion of the sum of $12,500,000 paid by Hydro to the Bank and applied by the Bank to Denison's indebtedness under the Nordic Lake Housing Mortgage.

3.      Thus the parties contemplate that the outcome of the arbitration will be one of the following:

    (a) Hydro is required to pay Denison all or part of the sum of $12,500,000 and the Bank is required to pay all or part of the sum of $12,500,000 to Hydro;

    (b) Hydro is required to pay Denison all or part of the sum of $12,500,000 but is not entitled to any recovery from the bank; or

    (c) No party is required to make any payment to any other party.

4.      The arbitrators will also have jurisdiction to make awards in respect of interest and prepayment penalties consistent with their award in respect of the aforesaid sum of $12,500,000.

5.      There will be three arbitrators, one appointed jointly by Denison and the Bank, one appointed by Hydro and the third, who shall be the chairperson, appointed by agreement of the parties or, failing such agreement, by the other two arbitrators.

6.      The arbitration will be separate from and before an entirely different panel of arbitrators than the previous arbitration between Denison and Hydro pursuant to the notice of Arbitration delivered by Denison dated February 26, 1992.

7.      The parties will make production of documents by way of unsworn lists of documents, the scope of such production to be the same as if these issues were proceeding in an action in the Ontario Court (General Division).

8.      Hydro will be entitled to pre-hearing oral discovery of Denison and the Bank. Denison and the Bank will be entitled to pre-hearing oral discovery of Hydro.

9.      The arbitration hearing will be conducted at a time and place to be agreed by the parties and the arbitrators and, failing such agreement, to be determined by the arbitrators.

10.     The Action will be dismissed on consent without costs and there will be no costs of the motions of Denison and the Bank returnable on September 2, 1992.

11.     The costs of the arbitration will be in the discretion of the arbitrators. Until the disposition of costs by the arbitrators, Denison and the Bank will pay the fees and disbursements of the arbitrator nominated by them, Hydro will pay the fees and disbursements of the arbitrator nominated by it, and Denison and the Bank, on the one hand, and Hydro, on the other hand, will each pay fifty percent of the fees and disbursements of the chairperson.

# COURT OF APPEAL FOR ONTARIO

CITATION: Di Michele v. Di Michele, 2014 ONCA 261
DATE: 20140403
DOCKET: C56711 and C56712

2014 ONCA 261 (CanLII)

MacPherson, Cronk and Gillese JJ.A.

In the Matter of the *Partition Act*, R.S.O. 1990, c. P.4, ss. 2 and 3

And in the Matter of the *Mortgages Act*, R.S.O. 1990, c. M.40, s. 24

And in the Matter of the *Trustee Act*, R.S.O. 1990, c. T.23, ss. 5(1), 16(1) and 16(2)

And in the Matter of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, rules 14.05(c), (d) and (e)

BETWEEN

Roberto Di Michele

Applicant (Appellant/
Respondent by way of cross-appeal)

and

Antonio Di Michele, Estate Trustee of the Estate of Adalgisa Di Michele, deceased, Antonio Di Michele, Michele Di Michele, <u>909403 Ontario Limited, Marsica Investments Limited, Cesidio Ranieri, Gilberto Olivieri, Alberto Ramelli</u>, Capital One Bank and Avrum Slodovnick, and The Director of Titles, party pursuant to s. 57(14) of the *Land Titles Act*

Respondents (<u>Respondents/
Appellants by way of cross-appeal</u>)

AND BETWEEN

909403 Ontario Limited, Marsica Investments Ltd., Cesidio Ranieri and Alberto Ramelli

Page:  2

2014 ONCA 261 (CanLII)

Applicants  (Respondents/
Appellants  by way of cross-appeal)

and

Antonio  Di Michele  also known  as Tony  Di Michele,  Michele  Di Michele  also
known  as Michael  Di Michele,  and  Roberto  Di Michele  also known  as Robert  Di
Michele

Respondents  (Appellant/
Respondent  by way of cross-appeal)

D. Loucks,  for the appellant/respondent  by way of cross-appeal

Mark  Ross,  for the respondents/appellants  by way of cross-appeal

Heard:  February  24, 2014

On  appeal  from  the  judgment  of  Justice  Beth  A.  Allen  of  the  Superior  Court  of
Justice,  dated  February  6,  2013,  with  reasons  reported  at  2013  ONSC  870,  86
E.T.R.  (3d)  178.

**Gillese  J.A.:**

[1]      This  appeal  raises  significant  questions  about  the  scope  of  an  estate

trustee's  power  to  mortgage  property  governed  by  the  *Land  Titles  Act*,  R.S.O.

1990,  c. L.5.

**OVERVIEW**

[2]      Adalgisa  Di  Michele  died  on  September  5,  1996,  leaving  behind  her  three

sons:  Roberto,  Michele  and  Antonio.  Under  Mrs.  Di  Michele's  will  (the  "Will"),

Antonio  was  named  the  estate  trustee.   Because  the  three  brothers  have  the

same  last  names,  I  will  refer  to  each  of  them  by  their  first  names.

Page:  3

[3]     The Will provided that after all debts had been paid, Mrs. Di Michele's estate was to go, in equal shares, to those of her "issue alive at the date of distribution".

[4]     On March 21, 2002, in his capacity as estate trustee, Antonio registered a Transmission by Personal Representative to take title to the family home that his mother had owned and lived in until her death.  The home was located at 269 Angelene Street, Mississauga, Ontario (the "Property") and is within the land titles system.  By that point, all the estate debts had been paid and it was ready for distribution.

[5]     Roberto and Michele never registered on title any interest in, or claim to, the Property.

[6]     Starting in 2002, Antonio was embroiled in personal litigation with 909403 Ontario Limited, Marsica Investments Ltd., Cesidio Ranieri and Alberto Ramelli (collectively "Marsica" or the "respondents").

[7]     In June 2008, Antonio put up the Property as security in favour of Marsica by means of a mortgage (the "Mortgage").

[8]     In 2010, Marsica obtained judgment for $1.5 million against Antonio.

[9]     In 2011, Marsica brought an application in which it sought to have the Property sold.

2014 ONCA 261 (CanLII)

Page:  4

2014 ONCA 261 (CanLII)

[10]    Roberto (the "appellant") lived with his parents on the Property for many years prior to their deaths.   He and his wife have continued to live on the Property until the present time.   He says that he and his brothers agreed that after their mother's death, the Property would be his.

[11]    Roberto brought a counter-application, disputing Marsica's right to sell the Property and asserting sole entitlement to it.

[12]    By judgment dated February 6, 2013 (the "Judgment"), among other things, the trial judge:

> 1.    declared that the Property vested in Antonio, Roberto and Michele on March 21, 2002, in equal one-third shares;
> 2.    declared the Mortgage to be valid;
> 3.    ordered the partition and/or sale of the Property "in accordance with the interests of the parties entitled to share in it"; and
> 4.    dismissed Roberto's counter-application.

[13]    Roberto appeals.   He asks this court to set aside the Mortgage and that part of the Judgment giving relief under the *Partition Act*, R.S.O. 1990, c. P.4, and order that he replace Antonio as the estate trustee.

[14]    Marsica cross-appeals, arguing that the trial judge erred in finding that the Mortgage binds only Antonio's one-third interest in the Property.

[15]    For the reasons that follow, I would allow the appeal in part and allow the cross-appeal.

Page:  5

2014 ONCA 261 (CanLII)

**BACKGROUND**

**The Will**

[16]    The key provisions in Mrs. Di Michele's Will are set out below.  As will become evident, the breadth of the power to postpone sale given to the estate trustee is significant to the resolution of this appeal.

> I GIVE, DEVISE AND BEQUEATH all of my estate, both real and personal, … unto my Trustee upon the following trusts, namely:
>
> a)    To pay all my just debts, funeral expenses and testamentary expenses …;
>
> b)    To pay out of the residue of my estate all [duties and taxes];
>
> c)    **To deliver all the rest and residue of my estate then remaining to my issue alive at the date of distribution in equal shares per stirpes**.
>
> IN ORDER TO CARRY OUT the provisions of this my Will, **I give my Trustee power to sell**, call in **and convert into money**, **all of my estate at such time or times, in such manner and upon such terms as my Trustee in his discretion may decide upon, with power and discretion to postpone such conversion** of such estate or any part or parts thereof, **for such length of time as he may think best**, and I hereby declare that **my Trustee may retain any portion of my estate in the form in which it may be at my death … for such length of time as my Trustee in his discretion may deem advisable,** without responsibility for loss, to the intent that investments or assets so retained shall be deemed to be authorized investments for all purposes of this my Will. [Emphasis added.]

Page:  6

2014 ONCA 261 (CanLII)

### Antonio Acts as Estate Trustee

[17]    On December 16, 1997, Antonio obtained a Certificate of Appointment of Estate Trustee with a Will. The estate's only asset was the Property.

[18]    On March 21, 2002, the Property was transferred to Antonio by Transmission by Personal Representative.

[19]    The Property had been the Di Michele family home for several decades. The parents of the Di Michele brothers lived on the Property until their deaths. The father died in 1987 and the mother in 1996.  The mother gained title to the Property on her husband's death.

[20]    At the time of the Property transfer to Antonio, he signed a certificate confirming that all the estate debts had been paid.

### The 2002 action against Antonio

[21]    In 2002, Marsica commenced an action against Antonio in connection with a failed real estate investment scheme (the "2002 action").

[22]    A trial date was scheduled for March 31, 2008.  In the weeks leading up to trial, it appeared that the matter would settle on the basis of a payment over time secured by a mortgage from Antonio over his cottage property in Bala, Ontario.

Page:  7

[23]    Antonio's lawyer, Avrum Slodovnick ("Slodovnick") told Marsica's lawyer Simon Schonblum ("Schonblum") that the settlement was 99% completed and that Antonio was just waiting for the blessing of his financial advisor.

[24]    The estimated length of the trial was 10 days.   On the basis that the parties were so close to a settlement,  counsel agreed to vacate the trial date.

[25]    Shortly after the trial date was vacated, Schonblum searched title for the Bala cottage property and found that Antonio had registered a $350,000.00 mortgage against it on April 4, 2008, thereby exhausting the remaining equity in the property.

### Antonio seeks adjournment of 2002 action and grants the Mortgage

[26]    On June 4, 2008, a pre-trial conference was held in relation to the 2002 action.   At that point, the trial was scheduled to proceed on June 16, 2008. Antonio sought an adjournment of the trial because he did not have his financial evidence in order.

[27]    Faced with yet another possible delay in the trial and in light of Antonio having encumbered the Bala cottage property after having offered it to Marsica as security,  Marsica was concerned about securing funds for a possible judgment in the 2002 action.

2014 ONCA 261 (CanLII)

2014 ONCA 261 (CanLII)

[28]    A suggestion was made that Antonio might provide mortgage security in exchange for an adjournment so that Antonio could provide further documents and obtain a forensic accounting.

[29]    The parties were caucusing separately.   At one point, Slodovnick pulled Schonblum out of his room and said that Antonio had given him instructions to mortgage the Property as security for any judgment that might follow trial.   In exchange, Marsica was to consent to an adjournment to allow Antonio to obtain a forensic accounting.

[30]    Slodovnick then showed Schonblum a parcel register for the Property. On the face of the parcel register, under "Owners' Names", it said Antonio Di Michele. Under "Capacity" were the initials "TWW", which stand for "Trustee With a Will".

[31]    The parties ultimately reached an agreement, under the terms of which: Marsica agreed to adjourn the trial; Antonio granted security for any judgment that might arise in relation to the 2002 action by means of a blanket mortgage of $350,000.00 on the Bala cottage property and the Property; and the parties agreed to jointly retain a forensic accountant and split the cost of a review of further productions from Antonio of the books and records relating to the real estate investment (the "Agreement").   The parties were to return for a further pre-trial conference in November  2008.

Page:  9

[32]    On June 6, 2008, in his capacity as Antonio's lawyer, Slodovnick registered the mortgage against the Property.

### Antonio's defence struck and judgment obtained in 2002 action

[33]    On April 1, 2010, Antonio's defence was struck by order of Master Dash. On June 22, 2010, Antonio's appeal of Master Dash's order was dismissed.

[34]    On October 11, 2010, the trial proceeded as an undefended trial before Stinson J.

[35]    By judgment dated October 14, 2010, Stinson J. awarded Marsica damages against Antonio in the sum of approximately $1.5 million.

### Attempted enforcement of judgment in 2002 action

[36]    Acting on the judgment obtained in the 2002 action, the respondents obtained a writ of seizure and sale.  They filed the writ against the Property with the Sheriff in the Peel region.

[37]    The Sheriff posted a notice at the Property that there would be a sheriff's sale.  Roberto and his wife were living in the house. Roberto had lived at the Property while his parents were alive and continued living there after their deaths.  By the time of trial, he had lived on the Property for some 50 years.  He claimed that after his mother's death, he and his brothers had agreed that the Property would be his.

2014 ONCA 261 (CanLII)

2014 ONCA 261 (CanLII)

[38]    Roberto's lawyer wrote to counsel and the Sheriff to advise that he would be bringing an application to assert his interest in the Property.

### The Application and Counter-Application

[39]    The respondents brought an application in which they sought, among other things, the sale of the Property.   Roberto brought a counter-application in which he asserted sole ownership of the Property.   He sought, among other things, an order directing Antonio to transfer the Property to him and appointing him in Antonio's stead as the estate trustee.

[40]    The two matters were converted into trials and heard together.

[41]    At trial, Michele took no position and filed no documents.    Antonio appeared on his own behalf.   He denied knowledge of the Will, his appointment as the estate trustee, and that the Property had been transmitted to him.

## THE TRIAL DECISION

[42]    The trial judge rejected Antonio's evidence, stating that he was a "most unreliable and deceptive witness".   She rejected his claim that someone else applied for the Certificate of Estate Trustee with a Will in his name and then registered the transmission of the Property to him as estate trustee without his knowledge.   She found that Antonio was aware of the Will, of his appointment as estate trustee, and that the Property had been registered in his name as estate trustee.

[43]    The trial judge set out the parties' positions on the many issues that had been raised.

[44]    She then analysed and rejected Roberto's arguments that the Mortgage was fraudulent and invalid because Antonio had given it and he had no interest in the Property.    She concluded that while Antonio was not forthright about the nature of his interest in the Property – that he held title only as estate trustee and that he shared beneficial interest in the Property with his two brothers – this alone did not place him within the bounds of fraud as defined in s. 1 of the *Land Titles Act*.    Antonio was the registered owner of the property, he was not posing as a fictitious person, and there was no forgery.

[45]    The trial judge also rejected Roberto's argument that Antonio had no property interest in the Property when he gave the Mortgage, though she did not conclude that Antonio owned the whole Property.    In her view, the Property automatically vested in the estate's beneficiaries (the three brothers), three years after Mrs. Di Michele's death, pursuant to s. 9 of the *Estates Administration Act*, R.S.O. 1990, c. E. 22.    As a result, rather than owning the whole Property as estate trustee, Antonio owned only the third of the property to which he was beneficially entitled under the Will.    The trial judge took note of s. 10 of the *Estates Administration Act*, which provides that nothing in s. 9 derogates from a power granted to an estate trustee in a will.    She concluded that although the Will gave the estate trustee the power to sell the Property and to postpone such sale

Page:  12

2014 ONCA 261 (CanLII)

for such length of time as he deems advisable, this did not evidence a clear intent to oust s. 9 and delay the vesting of the estate.

[46]    The trial judge concluded that the Mortgage was valid.    However, because she found that the brothers' beneficial interests in the Property had vested by the time that Antonio granted the Mortgage in 2008, she concluded that Antonio could only have granted a mortgage against his interest in the Property.

[47]    The trial judge further found that because the 2002 action was against Antonio personally, and not in his capacity as the estate trustee, he could only give as security that which he owned in his personal capacity.

[48]    Accordingly, the trial judge found the Mortgage to be enforceable only against Antonio's one-third interest in the Property.

[49]    She then ordered partition or sale of the Property in accordance with the interests of the parties entitled to share in it.

**THE ISSUES**

[50]    The appellant raises a number of issues that can be summarized as follows.  Did the motion judge err in:

> 1.    finding that the Mortgage was valid;
>
> 2.    finding that the respondents were entitled to a remedy under the *Partition Act*; and

2014 ONCA 261 (CanLII)

3.    failing to appoint Roberto as the estate trustee?

[51]    The respondents raise one issue by way of cross-appeal. Did the motion judge err in:

4.    failing to find that the Mortgage bound the entire Property?

**ANALYSIS**

**1. Was the Mortgage valid?**

[52]    The appellant makes three arguments going to the validity of the Mortgage. First, he submits that Antonio had no interest in the Property, either personally or in his capacity as estate trustee, over which he could grant a mortgage. Second, he argues that the respondents were not *bona fide* purchasers for value without notice. Third, he says that the lawyers involved at the time that the Mortgage was granted were unaware that Antonio was not the legal owner of the Property. Consequently, he contends, the Mortgage was a product of Antonio's fraudulent representation that he was the owner of the Property and, therefore, is a nullity.

[53]    I would not accept any of these submissions.

**(a) Did Antonio have an interest in the Property?**

[54]    The appellant's first submission – that Antonio had no interest in the Property – cannot stand in light of the relevant statutory provisions.

Page:  14

[55]    Section 2(1) of the *Estates Administration Act* provides that upon a person's death, all of that person's property vests in the estate trustee:

> ***All real and personal property that is vested in a person*** without a right in any other person to take by survivorship, ***on the person's death***, whether testate or intestate and despite any testamentary disposition, ***devolves to and becomes vested in his or her personal representative*** from time to time as trustee for the persons by law beneficially entitled thereto, and, subject to the payment of the person's debts and so far as such property is not disposed of by deed, will, contract or other effectual disposition, it shall be administered, dealt with and distributed as if it were personal property not so disposed of. [Emphasis added.]

[56]    Pursuant to s. 120 of the *Land Titles Act*, on Mrs. Di Michele's death, the land registrar was entitled, upon receiving an application from the estate trustee, to register the estate trustee as owner in place of the deceased:

> ***On the death of the sole registered owner*** or of the survivor of several joint registered owners ***of freehold land, such person shall be registered as owner*** in the place of the deceased owner or owners ***as may***, on the application of any person interested in the land, ***be appointed by the land registrar, regard being had*** to the rights of the several persons interested in the land and ***in particular to the selection of any such person as for the time being appears to the land registrar to be entitled according to law to be so appointed***, subject to an appeal to the Divisional Court in the prescribed manner by any person aggrieved by an order of the land registrar under this section. [Emphasis added.]

[57]    Section 63 of the *Land Titles Act* provides that in respect of registered dealings with land, the person registered in the place of a deceased owner is in the same position as if that person had taken the land under a transfer for valuable consideration:

2014 ONCA 261 (CanLII)

Page:  15

> *Any person registered in the place of a deceased owner* or to whom a patent is issued as executor[,] administrator or estate trustee or in any representative capacity shall hold the land or charge, in respect of which the person is registered, upon the trusts and for the purposes to which the same is applicable by law and subject to any unregistered estates, rights, interests or equities subject to which the deceased owner held the same, but otherwise in all respects, *and in particular as respects any registered dealings with such land or charge, the person shall be in the same position as if the person had taken the land or charge under a transfer for valuable consideration.* [Emphasis added.][1]

[58]    As a result of these provisions, it is clear that Antonio had the legal right to grant the Mortgage.   The Property vested in him, as the estate trustee, on his mother's death: *Estates Administration Act*, s. 2(1).   He was entitled to be registered as owner of the Property in his mother's stead: *Land Titles Act*, s. 120. He had the Property transferred into his name.   He was thereafter the person registered in the place of his mother, the deceased owner: *Land Titles Act*, s. 63. The Mortgage was a registered dealing with the Property.   Antonio was in the same position as if he had become the registered owner of the Property under a transfer for valuable consideration: *Land Titles Act*, s. 63.   A registered owner has the right to grant a mortgage over his or her land: *Land Titles Act*, s. 93(1).[2]

---

[1] I have quoted this provision of the *Land Titles Act* as it exists today, rather than as it existed at the time of Mrs. Di Michele's death in 1996.  In 1998, the Ontario legislature amended this provision to include a reference to estate trustees (the previous versions of s. 63 had referred only to executors and administrators, which are categories of estate trustees): S.O. 1998, c. 18, Sched. E, s. 126.  This amendment has no bearing on the issues raised in this appeal.
[2] Section 93(1) reads as follows: "A registered owner may in the prescribed manner charge the land with the payment at an appointed time of any principal sum of money either with or without interest or as security for any other purpose and with or without a power of sale."

[59]    Accordingly, it cannot be said that Antonio had no interest in the Property that entitled him to grant the Mortgage.

### (b) Were the respondents *bona fide* purchasers for value without notice?

[60]    With respect to this submission, I begin by noting that the questions of value and consideration were not raised before the trial judge.  Issues ought not to be raised for the first time on appeal.  In any event, however, the contention that the respondents were not *bona fide* purchasers for value without notice must fail.

[61]    The first question is whether the respondents were *bona fides* when they took the Mortgage.  In my view, the fact that Antonio's lawyer offered the mortgage as security eliminates any question of a lack of *bona fides*.  Because Antonio's lawyer offered the Property as security, the respondents were entitled to operate on the assumption that Antonio was acting lawfully in granting the Mortgage.  They were not obliged to go behind that implicit representation.

[62]    The next question is whether the respondents gave value for the Mortgage.  This, too, is easily disposed of.

[63]    The Mortgage was granted as part of the Agreement.  In exchange for the Mortgage, the respondents agreed to adjourn the trial and share the cost of the forensic accountant that Antonio required.  Even if the adjournment alone does not constitute value within the meaning of the term "*bona fide* purchaser for value

2014 ONCA 261 (CanLII)

Page:  17

without notice", the cost of the forensic accountant borne by the respondents clearly does.

[64]    I turn next to the question of notice.

[65]    The appellant points to the fact that the Property register shows Antonio as holding the Property in the capacity of "TWW", meaning "Trustee With a Will". He says that this shows that the respondents had actual notice of the Will. Accordingly, he says, the respondents could not have simply accepted the Mortgage as security – they had to first inquire into whether Antonio could lawfully mortgage the Property.

[66]    I would reject this argument.  In my view, s. 62(2) of the *Land Titles Act* provides a complete answer to it.

[67]    It is correct that when the parties entered into the Agreement, they were aware that Antonio held the Property as estate trustee. As the appellant points out, the lawyers for both parties had the parcel register in hand at that time and the parcel register showed Antonio as owner but in the capacity of "TWW" (Trustee With a Will).

[68]    However, s. 62(2) of the *Land Titles Act* provides that: (1) describing the owner of land as a trustee shall be deemed **not** to constitute notice of a trust, and (2) the description (of the owner as trustee) does **not** impose a duty on the

2014 ONCA 261 (CanLII)

person dealing with the owner to make inquiry as to the power of the owner in respect of the property.  Section 62(2) reads as follows:

> **Describing the owner of** freehold or leasehold **land** or of a charge **as a trustee**, whether the beneficiary or object of the trust is or is not mentioned, **shall be deemed not to be a notice of a trust** within the meaning of this section, **nor shall such description impose upon any person dealing with the owner the duty of making any inquiry as to the power of the owner in respect of the land or charge** or the money secured by the charge, or otherwise, **but, subject to the registration of any caution or inhibition, the owner may deal with the land or charge as if such description had not been inserted.** [Emphasis added.]

[69]    Thus, Antonio's description as "TWW" (Trustee With a Will) is deemed not to be notice of a trust and it imposed no duty on the respondents to make any inquiry as to his power as owner to charge the Property.

[70]    Further, s. 62(2) provides that the owner may deal with the land as if the description as a trustee had not been inserted.  This is subject to the registration of any caution or inhibition.  However, in the present case, no caution or inhibition had been registered on the title to the Property.

[71]    Accordingly, I would reject the appellant's contention that the respondents were not *bona fide* purchasers for value without notice.

### (c) Were the Lawyers operating under a misapprehension that Antonio was the owner?

[72]    In light of the evidence about the parcel register, the appellant's contention that the parties were all labouring under a misapprehension that Antonio was the owner of the Property must fail and with it, his argument that the

Page:  19

Mortgage was obtained by fraud on Antonio's part.  In this regard, the appellant has confused the notion of a fraudulent transaction with a valid transaction that might amount to a breach of trust.  The former may invalidate the transaction. The latter does not.  Rather, it gives rise to an action by the beneficiaries against the trustee.

[73]    While Roberto and Michele may have recourse against Antonio for what appears to be a breach of his obligations as the estate trustee, that does not mean that the Mortgage was granted fraudulently nor does it render the Mortgage invalid.

### (d) Conclusion

[74]    For these reasons, I would dismiss this ground of appeal.

### 2. Were the respondents entitled to a remedy under the *Partition Act*?

[75]    The appellant contends that even if the Mortgage were valid, an order under the *Partition Act* could not be made because Marsica does not have a crystallized right of possession.

[76]    Marsica concedes this point.  However, it contends that the end result of enforcement of the Mortgage will be such an order and the relief ordered pursuant to the *Partition Act* was an attempt by the trial judge to save the parties the cost and trouble of going through the intermediate steps relating to foreclosure.

2014 ONCA 261 (CanLII)

Page:  20

[77]    Marsica is likely correct about the trial judge's motivation in ordering partition and sale.    However, the law is clear: only persons entitled to the immediate possession of an estate in property may bring an action or make an application for its partition or sale.

[78]    Section 3(1) of the *Partition Act* reads as follows:

> ***Any person interested in land*** in Ontario, or the guardian of a minor ***entitled to the immediate possession of an estate therein***, ***may bring an action or make an application for the partition*** of such land ***or for the sale thereof*** under the directions of the court if such sale is considered by the court to be more advantageous to the parties interested.  [Emphasis added.]

[79]    This court has interpreted s. 3(1) and its predecessors as permitting only those entitled to immediate possession of the property to apply for partition: see *Morrison v. Morrison* (1917), 39 O.L.R. 163  (S.C. (A.D.)), at pp. 168 and 171-72; and *Ferrier v. Civiero* (2001), 147 O.A.C. 196 (C.A.), at paras. 6 and 8.

[80]    Because the respondents were not entitled to immediate possession of an estate in the Property, they were not entitled to a remedy under the *Partition Act.*

[81]    Accordingly, I would allow this ground of appeal.

### 3. Should Roberto be appointed Estate Trustee in Antonio's stead?

[82]    In his counter-application, Roberto asked to be appointed as the estate trustee in Antonio's stead.    The trial judge did not address this aspect of his

2014 ONCA 261 (CanLII)

Page:  21

counter-application.   Roberto renews his request in this court, saying that Antonio and Michele "do not claim any interest in the estate" and "have shown that they have no interest in receiving a share of the estate".   Roberto also states that Antonio "gifted" his share of the estate to him.

[83]     Section 37(1) of the *Trustee Act*, R.S.O. 1990, c. T.23, empowers the court to remove a personal representative (which is another term for an estate trustee)[3] and appoint "some other proper person".   Section 37(1) reads as follows:

> The Superior Court of Justice may remove a personal representative upon any ground upon which the court may remove any other trustee, and may appoint some other proper person or persons to act in the place of the executor or administrator so removed.

[84]     The court will remove an estate trustee only if doing so is clearly necessary to ensure the proper management of the trust: *Re Weil*, [1961] O.R. 888 (C.A.), at p. 889.   Situations in which removal may be justified include where the estate trustee has acted in a way that has endangered the trust property or otherwise shown a lack of honesty, proper capacity, or reasonable fidelity: *Letterstedt v. Broers* (1884), 9 A.C. 371 (P.C.), at pp. 385-86; *Bathgate v.*

---

[3] A "personal representative" and an "estate trustee" are both defined as an executor, administrator, or administrator with the will annexed.  Under s. 1 of the *Trustee Act* personal representative is defined as "an executor, an administrator, and an administrator with the will annexed") and under rule 74.01 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, estate trustee is defined as "an executor, administrator or administrator with the will annexed".

Page:  22

*National Hockey League Pension Society* (1994), 16 O.R. (3d) 761 (C.A.), at p. 778.

[85]    Thus, on the record, it appears that there may be good reason to remove Antonio as the estate trustee.

[86]    However, in my view, Roberto is not a "proper" person to serve as his replacement.   I say this because Roberto's personal interests would seriously conflict with the obligations he would undertake as the estate trustee.

[87]    As a general rule, a person will not be appointed as a trustee if that person's duties as trustee would conflict with either his or her personal interests or duties which that person has undertaken apart from as trustee: see *Re Parsons*, [1940] Ch. 973, at p. 983; *Re Moorhouse*, [1946] 4 D.L.R. 542 (Ont. H.C.), at p. 544; and *Re Becker* (1986), 57 O.R. (2d) 495 (Surr. Ct.), at pp. 498-99.

[88]    Two examples illustrate why Roberto's appointment as replacement estate trustee would run afoul of the general rule precluding those in a conflict position from being named estate trustee.

[89]    The first example flows from the estate trustee's overriding obligation to duly administer the estate.   As the legal owner of the Property, the estate trustee will have to comply with the court orders flowing from these proceedings, including those relating to the Mortgage.   However, the record makes it plain that

2014 ONCA 261 (CanLII)

Page:  23

Roberto claims the Property as his own and that he plans on appropriating the Property for himself.  Rather than respecting and implementing the court orders in respect of the Property, it seems likely that he will resist all actions associated with enforcement of the Mortgage.  In any event, his personal interests would be in conflict with his duties as the estate trustee in this regard.

[90]    The second example flows from the successor estate trustee's obligation to take steps to recover, for the estate, any losses caused by the prior estate trustee's defaults: see *Bennett v. Burgis* (1846), 5 Hare 295 (Ch.), at p. 297.  This would require Roberto, if he were appointed the successor estate trustee, to consider taking action against Antonio for any losses that Antonio may have caused the estate in his capacity as the initial estate trustee.  But, it will be recalled, Roberto claims that Antonio made a gift to him of his interest in the estate.  So, if Roberto *qua* estate trustee found that he ought to pursue Antonio, would he have to consider attacking the gift?  It is self-evident that in such a situation, Roberto's obligation if he were the estate trustee would conflict with his personal interests.

[91]    I would add that the foregoing examples stand apart from the respondents' contention that the alleged gift from Antonio to Roberto of his interest in the estate was for the purpose of defeating, hindering or avoiding a creditor.  By virtue of accepting the "gift" of Antonio's interest, Roberto would be

Page:  24

complicit in such an act.   Thus, this allegation also raises serious questions about whether Roberto is a proper person to serve as estate trustee.

[92]    Accordingly, I would dismiss this ground of appeal.

## THE CROSS-APPEAL

### 4. Did the Mortgage bind the entire Property?

[93]    The trial judge concluded that although the Mortgage was valid, it was binding only on the one-third share that she found Antonio was entitled to receive as a beneficiary under the Will.   In reaching this conclusion, the trial judge relied on s. 9 of the *Estates Administration Act*.

[94]    Section 9 of the *Estates Administration Act* reads as follows:

> ***Real property not*** disposed of, conveyed to, divided or ***distributed among the persons beneficially entitled thereto*** under section 17 by the personal representative ***within three years after the death of the deceased is*** … ***thenceforth vested in the persons beneficially entitled thereto under the will*** … unless such personal representative, if any, has signed and registered, in the proper land registry office, a caution in Form 1 ... [Emphasis added.]

[95]    The trial judge saw that the Will gave Antonio, as estate trustee, an unqualified power to postpone sale of the Property.   Nonetheless, in her view, "there is no clear intention in the Will that … Anthony have discretion beyond three years" to distribute the estate.

[96]    As a result, pursuant to s. 9 of the *Estates Administration Act*, the trial judge found that the Property vested in the beneficiaries three years after Mrs. Di

2014 ONCA 261 (CanLII)

Page:  25

Michele's death, in the same manner as if the estate trustee had conveyed it to them.   On this view, the vesting occurred before the Mortgage was granted. Therefore, the Mortgage could attach only to Antonio's one-third beneficial interest in the Property.

[97]    With respect, I do not agree.   In my view, the Mortgage is binding on the whole of the Property.   I reach this conclusion for three reasons.

[98]    First, s. 9 of the *Estates Administration Act* does not apply in the circumstances of this case.   Section 9 (and its predecessors) was not enacted to limit the powers given to an estate trustee under a will.   Rather, it was intended to give estate trustees additional powers, but only to the extent that the additional powers do not conflict with the provisions of the will.   The intention of the deceased, as expressed in his or her will, is always paramount: *Re Leblanc* (1978), 18 O.R. (2d) 507 (C.A.), at pp. 513-15.

[99]    This can be seen from s. 10 of the *Estates Administration Act*, which provides that nothing in s. 9 derogates from any right possessed by a trustee under the will.   Section 10 reads as follows:

> Nothing in section 9 derogates from any right possessed by an executor or administrator with the will annexed under a will or under the Trustee Act or from any right possessed by a trustee under a will.

[100]   The paramountcy of the testator's intention is confirmed in the jurisprudence.   Where a will gives the estate trustee a power to sell property at

2014 ONCA 261 (CanLII)

such times and in such manner as the estate trustee sees fit, s. 9 of the *Estates Administration Act* will not limit the scope of that power by requiring that the property vest after a specific period of time: *Re Proudfoot Estate* (1994), 3 E.T.R. (2d) 283 (Ont. Gen. Div.), at paras. 8 and 11-12, var'd on other grounds (1997), 19 E.T.R. (2d) 150 (Ont. C.A.).  See also *Re Leblanc*, at p. 515.

[101]   It will be recalled that the Will gave Antonio, as estate trustee, the power to sell the Property "at such time or times, in such manner and upon such terms as my Trustee in his discretion may decide upon".   It went on to expressly provide that the estate trustee could postpone sale:

> for such length of time as he may think best, and I hereby declare that my Trustee may retain any portion of my estate in the form in which it may be at my death … for such length of time as my Trustee in his discretion may deem advisable...

[102]   On a plain reading of these provisions in the Will, the estate trustee was given the power to postpone sale of the Property for whatever length of time he deemed advisable.   Thus, in my view, the trial judge erred in finding that the Will contained no clear intention that Antonio had the discretion to delay selling the Property beyond the three year limit in s. 9 of the *Estates Administration Act*. Consequently, s. 9 did not apply and the Property did not vest in the beneficiaries.

[103]   Second, the beneficiaries' entitlement under the Will did not amount to a property interest in the Property.   The Will does not give the beneficiaries a

Page: 27

specific bequest of the Property.    Rather, it gives them a contingent interest in the residue of the estate.    In this regard it will be recalled that the Will provided that the residue of the estate was to go to Mrs. Di Michele's "issue alive at the date of distribution". Accordingly, to become entitled, a beneficiary had to be alive on the date of distribution.    Until distribution, the beneficiaries had only a contingent beneficial interest in the residue of the estate, as well as the personal right to compel the estate trustee to duly administer the estate.

[104]    A contingent beneficial interest in an estate does not give rise to a property interest in any specific asset of the estate, prior to or absent an appropriation of such asset to the beneficiary by the trustee: *Spencer v. Riesberry*, 2012 ONCA 418, 114 O.R. (3d) 575, at para. 37.

[105]    The estate had not been distributed at the time that the Mortgage was granted.    Therefore, the beneficiaries' contingent interests in the residue had not vested.    Hence, Antonio did not have a one-third interest in the Property at the time of the Mortgage.

[106]    Third, pursuant to s. 93(3) of the *Land Titles Act*, the Mortgage was registered free from any unregistered interest of the beneficiaries.    Section 93(3) reads as follows:

> The charge, when registered, confers upon the chargee a charge upon the interest of the chargor as appearing in the register subject to the encumbrances and qualifications to which the chargor's interest is subject, but free from any unregistered interest in the land.

2014 ONCA 261 (CanLII)

[107]   Under Ontario's land titles system, the rights of a *bona fide* purchaser (which includes a mortgagee) for value who has registered its interest in the property trump any prior unregistered interests in the property: *719083 Ontario Limited v. 2174112 Ontario Inc.*, 2013 ONCA 11, 28 R.P.R. (5th) 1, at para. 12; *MacIsaac v. Salo*, 2013 ONCA 98, 114 O.R. (3d) 226, at para. 39.

[108]   In the present case, as I have already explained, the respondents were *bona fide* purchasers for value without notice.  They registered their interest (the Mortgage) in the Property.   Their interest would trump those with a prior unregistered interest in it.   Therefore, even if the beneficiaries had an interest in the Property that pre-existed the granting of the Mortgage, that interest was unregistered and therefore was trumped by the registered Mortgage.

[109]   Accordingly, the Mortgage binds the entire Property.

[110]   Thus, I would allow the cross-appeal.

**DISPOSITION**

[111]   Accordingly, I would allow the appeal in part and delete the references in the Judgment to relief under the *Partition Act*.   I would allow the cross-appeal and, therefore, delete para. 2 of the Judgment.

[112]   The appellant succeeded only in respect of the second issue, which the respondents had conceded and which occupied a very small part of the appeal.

Page:  29

In all other respects, the respondents were successful.   Accordingly, I would order costs in favour of the respondents, fixed at $13,500, all inclusive.

Released:  April 3, 2014 ("J.C.M.")

<div align="right">

"E.E. Gillese  J.A."
"I agree. J.C. MacPherson  J.A."
"I agree. E.A. Cronk  J.A."

</div>

2014 ONCA 261 (CanLII)

*Case Name:*

# Dynamic Fuel Systems Inc. v. Synergic Distribution Inc.

**RE: Dynamic Fuel Systems Inc., Thomas Fairfull, Gerald
Feldman, Allen Koffman, David Eric Whitnall and Douglas
Pattison, Plaintiffs/Appellants, and
Synergic Distribution Inc. and Paul Bearance,
Defendants/respondents
And between
Paul Douglas Bearance;, Plaintiff by Counterclaim, and
Dynamic Fuel Systems Inc., Thomas Fairfull, Gerald Feldman,
Allen Koffman, David Eric Whitnall and Douglas Pattison,
Defendants to the Counterclaim**

[2013] O.J. No. 2708

2013 ONSC 4081

Court File No. 12-1875

Ontario Superior Court of Justice
Divisional Court

**G.T.S. Valin, B.G.A. MacDougall and H.A. Rady JJ.**

Heard: June 12, 2012.
Judgment: June 12, 2013.

(31 paras.)

*Civil litigation -- Limitation of actions -- Time -- When time begins to run -- Appeal by plaintiff
from decision dismissing its motion for summary judgment dismissing counterclaim as statute
barred allowed -- Respondent, a shareholder in appellant, purchased a fuel savings device from
appellant -- A 2005 engineer's report confirmed that device did not work -- After respondent
commenced fraud action against appellant, appellant commenced present action against respondent
-- Counterclaim issued in 2008 -- Motions judge erred in finding that appellant had not pled
Limitations Act and in basing findings on pleadings in counterclaim without affidavit evidence --
Discoverable date was at least date of the engineer's report in 2005.*

Appeal by the plaintiff from a decision dismissing its motion for summary judgment to dismiss the counterclaim on the ground that it was statute barred. The appellant manufactured a device which allegedly lowered emissions and reduced fuel consumptions when installed in trucks. The respondent, a shareholder in the appellant, purchased such unit in 2004. Testing by an engineer concluded in 2004 that the results achieved were insignificant. The engineer's report was issued in 2005. The respondent commenced a fraud action in Small Claims in 2007. The appellant then commenced the present action for defamation, wrongful interference with economic relations, and injurious falsehood. The counterclaim was filed in 2008 alleging deceit and fraudulent misrepresentation regarding the ability of the appellant's product to significantly reduce emissions and fuel consumption in combustion engines. The parties then agreed to have the Small Claims action dismissed. The motion judge dismissed the summary judgment motion on the ground that the appellant had not pleaded the two-year limitation provisions of the Limitations Act.

HELD: Appeal allowed. The motions judge erred in finding that the appellant had not pled the Limitations Act. The motion judge's findings were based on the pleadings in the counterclaim without any affidavit evidence that there was a triable issue on the Limitations Act. The motions judge erred in finding that the engineer's report filed in 2005 only raised suspicions when in fact the report clearly gave the opinion that the product did not work. The discoverable date was at least the date of the engineer's report in June 2005, even though the respondent was aware at an earlier date of the findings and conclusions. The respondent commenced his Small Claims Court action in September 2007 and therefore was outside the two year limitation period under the Limitations Act.

**Statutes, Regulations and Rules Cited:**

Limitations Act, S.O. 2002, c. 24, Schedule B, s. 15(c)

Rules of Civil Procedure, Rule 20

**Counsel:**

P. Fruitman, for Thomas Fairfull, Gerald Feldman, Allen Koffman, David Eric Whitnall and Douglas Pattison; Plaintiffs/Defendants to the Counterclaim.

C. Bittle, for Dynamic Fuel Systems Inc.; Plaintiff.

Paul Bearance, self-represented.

---

## ENDORSEMENT

The following judgment was delivered by

**1**    THE COURT:-- The Appellant, (Plaintiff/Defendant by Counterclaim), Dynamic Fuel Systems Inc. (Dynamic), is the manufacturer of a product called "Jetstar" which purportedly is a device that is installed in trucks to reduce emissions and decrease fuel consumption. Between August 2002 and September 2003 the Respondent (Plaintiff by Counterclaim), Paul Bearance (Bearance) purchased shares in the Appellant company, Dynamic.

**2**    In March 2004, Bearance purchased a Jetstar unit from Dynamic and had it installed in a truck in his possession. Bearance wanted verification of the emissions and fuel consumption that the Jetstar product was supposed to achieve and arranged to have the device tested by Peter Barton, an engineer with Environment Canada.

**3**    In mid April 2004, Bearance received a telephone call from Peter Barton where he reported that the testing by Environment Canada was of the Jetstar device only showed that results that were "statistically insignificant".

**4**    In Bearance's affidavit sworn May 15, 2013, filed on this appeal with consent of the Appellants, Bearance deposes that:

> 13.    At that moment in time, [referring to the telephone call from Peter Barton] there was no question in my mind that I was in harm's way for the following reasons. (a) My investment as a shareholder would produce a loss. This has proven to be true for anyone who purchased shares pre-IPO didn't engage in short selling. (b) Having been displayed as a distributor on Dynamic Fuel Systems website, in the event of a legal action, I could be included as a party to the action. This is one of the reasons that I approached the multitude of regulators, law enforcement agencies, politicians, bureaucrats, shareholders and former "would-be" distributors.
>
> 14.    This fear was confirmed when I was interviewed by the Competition Bureau in early July, 2004. I informed the regulators in order to bring to their attention that I was not a part of what in my mind amounted to fraudulent misrepresentation.

**5**    Mr. Barton sent his final report dated June 1, 2005 (the Barton report) to Bearance. The report concluded that the Jetstar product which Mr. Bearance had purchased from Dynamic:

> "... failed in its effectiveness in reducing emissions and giving better fuel consumption for vehicles and did not affect combustion efficiency of the test vehicle engine nor did it improve exhaust emission rates or fuel consumption of the vehicle".

**6**    Bearance acknowledged in his pleadings that he had received that report from Environment Canada, and that he had forwarded it on to Dynamic, to the Ontario Securities Commission, as well as to a number of government and other agencies.

**7**    On September 19, 2007, Bearance commenced a Small Claims Court action against Dynamic seeking damages alleging that Dynamic was fraudulent and had been deceitful in its promotion of the Jetstar product.

**8**    On July 3, 2008, Dynamic and the officers and directors of Dynamic (being the personal plaintiffs, Defendants by Counterclaim) commenced this action against Bearance for damages in the amount of $3.5 million for, among other things, defamation, wrongful interference with economic relations, and injurious falsehood.

**9**    On July 30, 2008, Bearance filed his Statement of Defence and Counterclaim against Dynamic and the personal plaintiffs for general damages among other things, alleging deceit and fraudulent misrepresentation regarding the ability of the Jetstar product to significantly reduce emissions and fuel consumption in combustion engines.

**10**    In Bearance's Counterclaim, he quoted the Barton report that the Jetstar did not work.

**11**    As a result of this Superior Court action being commenced, the parties agreed to have the Small Claims Court dismissed on a "without prejudice" basis.

**12**    Dynamic and the personal defendants brought a motion for Summary Judgment seeking to have the counterclaim dismissed, firstly in the grounds that the counterclaim was barred by the *Limitations Act* and secondly under Rule 21, on the ground that there was no cause of action against the individual defendants by Counterclaim.

**13**    The motions judge dismissed the motions for Summary Judgment with reasons. Dynamic sought and obtained leave to appeal only the dismissal of the motion regarding the *Limitations Act* issue.

**14**    The Appellants have raised several grounds for appeal. However, in our view, it will not be necessary for us to deal with all of the grounds as we as we find that the motion judge has made errors that are reversible errors of law. Accordingly, the appeal is allowed and the Summary Judgment motion will be granted.

**15**    The Respondent Bearance was self-represented before the motion judge and was self-represented on this appeal.

**16**    We find that the motion judge was mistaken in finding that the corporate plaintiff had not pleasded the two year limitation provisions of the *Limitations Act*. Both the personal appellants and corporate appellants in their separate pleadings did plead the provisions of the *Limitations Act*.

**17**    We also find that, in dismissing the Summary Judgment motion, the motion judge based his determination on allegations in the Respondent's pleading unsupported by any evidence in the motion record as required by rule 20 of the *Rules of Civil Procedure*.

**18**    We have reviewed the transcript of the discussion between the motions judge and Bearance. The motion judge repeatedly asking Bearance for an explanation as to why he had not filed any material on the Summary Judgment motion.

**19**    The only explanation Bearance provided was that he understood (mistakenly) that the limitation period did not start to run until he was served with the Plaintiffs' Statement of Claim.

**20**    Rule 29.02(2) provides:

> In response to affidavit material or other evidence supporting a motion for summary judgment, the responding party may not rest solely on the allegations or denials in the party's pleadings, but must set out, in affidavit material or other evidence, specific facts showing that there is a genuine issue requiring a trial.

**21**    As noted, the central feature of Bearance's cause of action in the Counterclaim was that the plaintiffs were promoting their Jetstar product as a device that would reduce combustion efficiency and exhaust emissions and their rates of fuel consumption when they knew the product did not work and that they were engaging in fraudulent misrepresentation, among other things.

**22**    In addition to having acknowledged in his pleadings that the Barton report of June 2005 confirmed that the Jetstar product did not work, in para.72 of his Counterclaim, Bearance pled:

> The defendants state that the plaintiffs made fraudulent misrepresentations regarding the ability of the Jetstar to significantly reduce emissions and fuel consumption in combustion engines. As set out above, and misrepresentations were made fraudulently, or in the alternative, negligently to induce the defendants rely upon the representations and purchased stock in the sham Corporation. The defence did rely on the representations, did purchase stock, and have suffered damages as set out in this counterclaim.

**23**    Further, Bearance did not take the position before the motion judge that he "discovered" his cause of action at some point after the Barton report.

**24**    The motion judge, however, in paragraphs 11 and 12 of his reasons stated:

> ... The defendant's pleading is that in January 2005, he only sent a copy of the Environment Canada report [casting doubt on "Jetstar"] to the plaintiff for comment. It is pleaded that the plaintiff himself sent out a circular to their shareholders in May 2005 questioning the Environment Canada report. According to the pleadings it was not until the fall of 2007 that a Surcell report was completed and that additional opinion was available as to the questionable value of "Jetstar".

It is not clear from the defendants pleading that he knew in January, 2005 that "JetStar" was not what it claimed to be. Suspicion is not enough to trigger the limitation. There is insufficient evidence on this motion to allow for a finding that January 2005 was the commencement of the limitation. A full appreciation of the evidence on this point must await the trial.

**25**    In *Kowal v. Shyiak* [2012] O.J. No. 3420 (C.A.), on the issue as to when time begins to run under the *Limitations Act*, S. E. Pepall J.A. writing for the court, stated that certainty of a defendant's responsibility for the act or omission that caused or contributed to the loss is not a requirement. It is enough to have *prima facie* grounds to infer that the acts or omissions were caused by the party or parties identified.

**26**    Bearance is now raising another provision of the *Limitations Act* being section 15(c) which provides that the two-year limitation period does not run during any time in which the person against whom the claim is made, (i) wilfully conceals from the person with the claim the fact that injury, loss, or damage has occurred, that it was caused by or contributed to by an act or omission or that the act or omission was that of the person against whom the claim is made, or (ii) wilfully misleads the person with the claim as to the appropriateness of a proceeding as a means of remedying the injury, loss or damage.

**27**    Neither in the material before us nor in the Bearance's pleadings is there any facts supporting Bearance's contention that the limitation period should not have run from at least the date he received the final report from Environment Canada.

**28**    We find that the discoverable date was at least the date of the Barton report on June 1, 2005, even though Bearance was aware at an earlier date of Paul Barton's findings and conclusions on his testing of the Jetstar product. Bearance commenced his Small Claims Court action September 19, 2007 and therefore, was outside the two year limitation period under the *Limitations Act.*

**29**    For these reasons, we find that the errors and misapprehension of the facts as referred to constitute, in these circumstances, palpable and overriding errors by:

(i)    finding that the corporate Plaintiff had not pled the *Limitations Act*;

(ii)    findings based on pleadings in Bearance's Counterclaim without any affidavit evidence that there was a triable issue on the *Limitations Act*; and

(iii)    finding that the Barton report filed by Environment Canada in 2005, only raised suspicions when in fact the report clearly gave the opinion that the Jetstar product did not work.

**30**    The appeal is allowed. The motion is granted for Summary Judgment dismissing Bearance's Counterclaim.

**31**    We fix the Appellants' costs as follows:

For the Corporate Appellant Dynamic, including costs below, $10,000 all inclusive

For the personal Appellants, including costs below, $7500 all inclusive.

G.T.S. VALIN J.
 B.G.A. MacDOUGALL J.
 H.A. RADY J.

cp/e/qllqs/qlpmg

*Case Name:*
# Fillion v. Fillion


**Between**
**Wendy Fillion, George Fay and DWG Contracting Ltd.,**
**Plaintiffs, and**
**Chelsey Fillion, Jared Fillion, 1437592 Alberta Ltd. and**
**0839074 B.C. Ltd., Defendants**

[2011] B.C.J. No. 2230

2011 BCSC 1593

Docket: 1037344

Registry: Prince George


British Columbia Supreme Court
Prince George, British Columbia

**E.J. Adair J.**

Heard: August 22-26, 29-31, September 1 and 2, 2011.
Judgment: November 23, 2011.

(200 paras.)

*Contracts -- Interpretation -- Action by mother and step-father for declaration of property owner-ship and damages for breach of privacy and other torts allowed in part and counterclaim by num-bered companies for breach of contract allowed in part -- GF and corporate plaintiff entered into agreement with defendants whereby corporate defendants purchased light towers which they rented to corporate plaintiff which rented them to oil company -- DWG agreed to rent towers for 12-month minimum and pay $4,500 monthly -- Agreement terminated after 12-month period ended, but DWG did not pay all rent owing -- DWG to pay rent for remaining months as calculated by counsel.*

*Contracts -- Breach of contract -- Action by mother and step-father for declaration of property ownership and damages for breach of privacy and other torts allowed in part and counterclaim by numbered companies for breach of contract allowed in part -- GF and corporate plaintiff entered into agreement with defendants whereby corporate defendants purchased light towers which they rented to corporate plaintiff which rented them to oil company -- DWG agreed to rent towers for*

*12-month minimum and pay $4,500 monthly -- Agreement terminated after 12-month period ended, but DWG did not pay all rent owing -- DWG to pay rent for remaining months as calculated by counsel.*

*Real property law -- Interests in land -- Equitable interests -- Resulting trusts -- Action by mother and step-father for declaration of ownership in property and damages for property-related torts allowed in part and counterclaim by numbered companies for breach of contract allowed in part -- Mother advanced $125,000 for purchase of home, daughter obtained mortgage for balance of purchase and home registered in daughter's name -- Mother had 42 per cent interest and daughter had 58 per cent interest in home -- Daughter failed to rebut presumption of resulting trust as mother's advance of funds for purchase was not a gift.*

*Tort law -- Trespass -- To goods -- Conversion -- Detinue -- Action by mother and step-father for damages for breach of privacy, conversion, detinue and trespass and other relief allowed in part and counterclaim by numbered companies for breach of contract allowed in part -- Mother and daughter resided together in home -- After dispute arose, daughter moved out, but returned to home to obtain her property -- CF admitted looking at and copying documents and was liable for nominal damages of $150 -- With respect to the other property torts, plaintiffs failed to prove what was taken, who was responsible for taking and damages that resulted.*

*Tort law -- Invasion of privacy -- Action by mother and step-father for damages for breach of privacy, conversion, detinue and trespass and other relief allowed in part and counterclaim by numbered companies for breach of contract allowed in part -- Mother and daughter resided together in home -- After dispute arose, daughter moved out, but returned to home to obtain her property -- CF admitted looking at and copying documents and was liable for nominal damages of $150 -- With respect to the other property torts, plaintiffs failed to prove what was taken, who was responsible for taking and damages that resulted.*

Action by the plaintiffs for damages for breach of privacy and various property-related torts and counterclaim by numbered companies for breach of contract payment of amounts owing under contracts. The individual plaintiffs, WF and GF, were the mother and step-father of the individual defendants. The plaintiff GF operated the plaintiff DWG Contracting Ltd. ("DWG"), which was in the business of renting light towers and other equipment to oil companies. In 2008, GF advised the defendants CF and JF of an opportunity to rent light towers to an oil company. They each incorporated one of the defendant numbered companies and purchased two light towers. They rented the light towers to DWG, who in turn rented the light towers to the oil company. Both CF and JF understood that the light towers would be rented to the oil company continuously for a 12 to 18 month period. However, GF denied making any such assurances. DWG paid rent to one number company for six full months and three part months and to the second numbered company for seven full months and two part months. However, by the end of 2009, the oil company had changed its arrangements with DWG, with the result that not all of DWG's light towers were used and, according to GF, the light towers belonging to the two numbered companies were not rented out. In June 2009, CF became the owner of a property in BC. She alleged that she received $125,000 for the down payment as a gift from WF, which WF denied. In 2010, the relationship between the parties broke down. GF terminated the relationship between DWG and the numbered companies and stopped using their light towers. CF moved out of the property and WF changed the locks. Despite not living on the proper-

ty, CF continued to make all of the mortgage, tax and utility payments. WF claimed that CF entered the property without her permission, read through her personal files, caused damaged to certain property including a computer and took other property. CF denied taking any of the plaintiffs' property and alleged that she took only that what belonged to her. The plaintiffs claimed a resulting trust in the BC property. In addition, they alleged that the individual defendants had breached their privacy rights and took personal property from the home. They sought damages, including punitive damages, for breach of privacy, conversion, detinue and trespass to chattels. Each of the numbered companies claimed that DWG breached the rental agreements and owed them a significant amount of rent.

HELD: Action allowed in part and counterclaim allowed in part. WF had a 42 per cent interest and CF had 58 per cent interest in the family home. CF had failed to rebut the presumption of a resulting trust as, based on the family history, it was unlikely that WF's advancement of cash to CF for the purchase of the home was a gift, but instead was consistent with the plaintiffs' desire to assist CF in building equity for herself and the help her get a house in which several members of the family would live. There was no evidence that JF looked at or took any of the plaintiffs' documents or computer files. While CF was entitled to search for and retrieve her own belongings from the home and in doing so was not a breach of privacy, she admitted looking at and copying documents that were not hers and in doing so she breached the plaintiffs' privacy. As a result of the breach, the DWG was entitled to nominal damages of $50 and WF was entitled to nominal damages of $100. With respect to the other property torts, the plaintiffs failed to prove what was taken, who was responsible for the taking and the damages that resulted. With respect to the light towers, the relevant parties agreed that DWG would rent the towers for a minimum of 12 months and would pay rent of $4,500 plus GST. The agreements were terminated after the minimum 12 month period. However, DWG had not paid rent for all months and owed to the corporate defendants rent as calculated by counsel.

**Statutes, Regulations and Rules Cited:**

Court Order Interest Act, RSBC 1996, CHAPTER 79,

Privacy Act, RSBC 1996, CHAPTER 373, s. 1, s. 2(2)

Supreme Court Civil Rules, Rule 11-6(1)

**Counsel:**

Counsel for the Plaintiffs: Charles G. Fletcher.

Counsel for the Defendants: Robin H. Craig.

---

**Reasons for Judgment**

E.J. ADAIR J.:--

**<u>Introduction</u>**

**1**      This case pits a mother and her spouse against the mother's two adult children from her first marriage. Pursuing financial and business dealings - but not in conventional ways - among the family members has had most unfortunate results. There have been serious misunderstandings; relationships have been fractured; harsh and hurtful words have been spoken. Family members are now suing one another.

**2**      The plaintiffs Wendy Fillion and George Fay are the mother and step-father of the defendants Chelsey Fillion and Jared Fillion. The plaintiff DWG Contracting Ltd. ("DWG") was incorporated by George Fay to carry on business renting equipment - primarily light towers - to the oil patch in Alberta and B.C. The defendants 1437592 Alberta Ltd. ("143") and 0839074 B.C. Ltd. ("083") were incorporated by Chelsey Fillion and Jared Fillion, respectively, to engage in a business venture with DWG.

**3**      As was done during the trial, I will refer to the individual parties in these proceedings by their given names. In doing so, I intend no disrespect.

**4**      Each side makes a number of complaints against the other.

**5**      In June 2009, Chelsey became the sole registered owner of a house in Prince George. I will refer to this property as "Stauble Road." Chelsey says that she received the cash down payment as an absolute gift from Wendy, and asserts that she is the sole legal and beneficial owner of Stauble Road. However, Wendy says that there was never any intention to make a gift to Chelsey. She says that Chelsey's interest in Stauble Road is subject to a resulting trust in favour of Wendy, and seeks a declaration to that effect.

**6**      Chelsey has made all of the mortgage payments on Stauble Road, and paid the property taxes and city utilities. However, Chelsey has not lived at Stauble Road since early May 2010, when there was an ugly altercation between the family members during which police were called. Since then, Wendy and "DF" (her son with George) have been living at Stauble Road.

**7**      In addition to the resulting trust claim, Wendy, George and DWG assert that Chelsey and Jared breached Wendy's, George's and DWG's privacy rights. Further, they allege that Chelsey and Jared unlawfully took personal property from Stauble Road. Wendy, George and DWG seek damages, including punitive damages, for breach of privacy and for "conversion, detinue and trespass to chattels." Chelsey and Jared deny any breach of any privacy rights and deny any unlawful taking of personal property belonging to any of the plaintiffs.

**8**      There are also disputes concerning a business arrangement DWG made with each of 143 and 083 in late 2008. The arrangement involved the purchase from DWG of two light towers each by 143 and 083, and the rental by DWG of those light towers. The parties disagree over the terms on which DWG agreed to rent 143's and 083's light towers. 143 and 083 say that DWG breached the rental agreements and owes each of them a significant amount of rent. DWG says that it performed the agreements and nothing is owing.

**9**      Accordingly, the main issues are:

(a)    whether Chelsey holds a part of her interest in Stauble Road on a resulting trust, or whether she received the $125,000 cash down payment as an absolute gift?

(b)    are any of the defendants liable in damages for a breach of the privacy rights of either Wendy, George or DWG?

(c)    are any of the defendants liable to either Wendy, George or DWG for conversion or trespass to chattels, and, if so, who is entitled to recover damages from whom and in what amount?

(d)    what are the terms of the agreement respecting rental of 143's and 083's light towers, and does DWG owe rent to either company?

**10**    Issues concerning the identification of the light towers sold by DWG to 143 and 083 (respectively) had been largely resolved by the close of submissions, but I will address them briefly for the parties' benefit.

## Review of the Evidence

**11**    I will first review the evidence concerning the family's background. I will then review the evidence concerning DWG's business and the business venture (the rental of the light towers) at issue in this action. I will then discuss the circumstances in which Stauble Road was purchased.

**12**    Finally, I will discuss the evidence concerning the breakdown of the relationships among the family members which began in January 2010 and carried into May 2010. The claims (such as the breach of privacy claim) arising out of these events are not large in terms of dollars. However, the events, and each family member's perception of those events, have created a great deal of the bitterness and ill-feeling that now exists among the family members.

### (a)    Family Background

**13**    Wendy and George have been together as spouses for over 20 years. Their son, DF, is now in his early teens. Chelsey and Jared are Wendy's children from her first marriage, to Tim Fillion. Chelsey was born in April 1982 and is now 29. Jared was born in January 1986 and is now 25.

**14**    In October 2001, Wendy, George, Chelsey and DF moved from B.C. to Alberta, near Grande Prairie. Wendy and George had been operating a resort and store in a community near 100 Mile House. Neither business was successful, and the idea was that the family would move to Alberta to make a fresh start. Wendy and George had $45,000 available to make a down payment on a house. However, Wendy and George wanted to protect their assets from claims by creditors and potential creditors they had left behind in B.C. Wendy and George prevailed on Chelsey to have the family's new home, which I will call "Beaverlodge," registered in her name. Wendy and George asked Chelsey to take out a mortgage on Beaverlodge, which she did. Chelsey was then 19 years old.

**15**    When the family first moved to Alberta, none of the adults had jobs. Chelsey was concerned about how the mortgage payments would be made, and she found the uncertainty very stressful. Nevertheless, eventually Wendy, George and Chelsey found employment. The mortgage and other household expenses were paid.

**16**    When Chelsey was about 20 or 21, she and Wendy went into business together, running a lunch truck. Chelsey had received about $40,000 as a settlement from a motor vehicle accident claim, and, at Wendy's suggestion, Chelsey invested $20,000 of that money into the new business. Chelsey left a full-time job. She and Wendy then ran the lunch truck business for about a year or 18

months. Unfortunately, the business was not profitable. The revenues did not allow for repayment of Chelsey's $20,000 investment.

### (b)    DWG's Light Tower Rental Business

**17**    In 2004, George, who had been working as a roughneck in the oil patch, incorporated DWG. He intended to start a new business, renting out light towers. These were used in the oil patch to provide power and illumination on work sites. George wanted to purchase (through DWG) two light towers. However, DWG had no money. Again, George and Wendy prevailed on Chelsey to take out a line of credit secured against Beaverlodge. The amount borrowed was about $50,000, and this money was used to purchase the light towers for DWG's business. Chelsey testified that the additional debt in her name added to her stress.

**18**    DWG rented the light towers essentially on an as-needed basis. According to George, there was little certainty and little predictability, and the rentals were generally short-term, sometimes only a few days.

**19**    About a year after DWG purchased the two light towers, George and Wendy asked Chelsey to take out another loan secured against Beaverlodge so that George could buy a new truck for DWG's business. Chelsey was concerned about having more debt in her name. Nevertheless, somewhere between $45,000 (according to George) and $60,000 (according to Chelsey) was borrowed to purchase the truck. Between 2005 to 2008, DWG acquired more equipment. Beaverlodge was being used as collateral for loans, and Chelsey, as registered owner, again had to sign loan documents. As far as the bank was concerned, Chelsey, not Wendy or George or DWG, was personally liable for the debts.

**20**    By early 2008, DWG had acquired about eleven light towers for rent. George was the person responsible for finding work for DWG. He explained that he dealt with consultants, who in turn dealt with the oil companies. DWG never had any written agreements with either the consultants or the oil companies, according to George. As George described it, DWG did not have any say in period of time during which that equipment would be rented. Rather, that was up to the consultant and the oil company. However, the rental amount was a product of discussions between George and the consultant. George explained that it was usually a daily rate. Moreover, work in the oil patch was not steady work for 12 months of the year. As George explained, there were seasonal slow-downs, and the need for government permits or development of engineering programs could also affect the availability of work.

### (c)    The BP Project

**21**    However, in 2008 George became aware of a significant business opportunity for DWG. A major oil company, BP, was starting a large project, building a compressor facility (the "BP Project"). George understood there would be as many as eight sites that would need light towers. It would be steady, long-term work, not subject to the usual slow-downs. George visited the job sites, and explained to the consultant ("Channel Two") that he thought BP would need between twenty and twenty-five light towers. According to George, he was also working with other consultants on other projects, and DWG's eleven existing light towers were mostly rented out. Thus, DWG did not have enough light towers to service both existing projects and the BP Project.

**22**      By the fall of 2008, George had decided that DWG would acquire more light towers to service the BP Project. He had spent a fair amount of time with representatives from BP and Channel Two, putting a deal together for DWG. According to George, they had discussed and agreed on a rental rate of $125 per day per tower, or $3,750 per month, plus expenses (including travel). Before the end of 2008, the agreed rate had been revised, to a flat rate of $150 per day or $4,500 per month (including expenses).

**23**      Chelsey, who had been working as a medic, heard about the BP Project from both Wendy and George. Chelsey recalled George being very excited. The expectation was that it was a year minimum but most likely eighteen months.

**24**      Around October 2008, George, Wendy and Chelsey discussed an arrangement whereby Chelsey would buy two light towers, and George (through DWG) would then make them available for rent for the BP Project. George recalled telling Chelsey that the BP Project was going to be a year to a year-and-a-half long, although he denied telling her that her light towers would be rented throughout. He also recalled telling her that there were no guarantees about the duration of the Project.

**25**      Wendy testified that, around this time, she told Jared about what had been offered to Chelsey and asked him if he was also interested in purchasing two light towers, which he was. Both Chelsey and Jared were told that, so far as BP was concerned, DWG was providing the light towers for the BP Project. Wendy and George were concerned that if BP learned light towers were owned by others, it could jeopardize DWG's ability to rent the equipment.

**26**      George also talked to Jared about the opportunity. According to George, he told both Chelsey and Jared that if the majority of DWG's towers were "out," i.e., being rented on the BP Project, then their towers would also be out. That, according to George, was the extent of DWG's commitment to rent Chelsey's and Jared's light towers. George denied telling Jared that the towers would be rented out for the whole project.

**27**      The BP Project started at the end of October 2008. Some of DWG's existing eleven towers went out for rent at that time. George went to see Hammer Equipment ("Hammer"), a local equipment dealer with whom DWG regularly did business, to acquire more light towers. George testified that the representative at Hammer told him he could get DWG a total of 21 towers. There were seven used towers, manufactured by "Terex," already in Hammer's yard. All seven were tagged for DWG. Fourteen new light towers, with the brand-name "Allmand," were ordered from the factory for DWG.

**28**      Chelsey's recollection of events and discussions around October 2008 is somewhat different from Wendy's and George's. She testified that she and Wendy discussed Chelsey's purchase of two light towers, and that the towers would be "out" (i.e., rented) for the duration of the BP Project, whether a year or 18 months. Chelsey recalled discussing that DWG would pay rent of $3,750 per month, for a minimum of a year. Chelsey testified that the two light towers were going to cost $52,500 (including $2,500 for GST), a point on which everyone agrees. Chelsey recalls George telling her that, in order to get that price for two towers, DWG had to buy the towers from Hammer and would then sell them Chelsey (and Jared) at the same price.

**29**      However, according to Chelsey, she did not have the money and could not borrow because of all of the things she had already signed for on behalf of DWG, in her capacity as registered own-

er of Beaverlodge. Chelsey, who had incorporated 143, contacted the Royal Bank about 143 making an application for a small business loan.

**30**    Among the documents tendered in evidence at trial was a one page form of letter agreement, unsigned, dated October 28, 2008 (the "October 28 Letter"). Chelsey testified that she created the document, with Wendy's help. (Wendy, on the other hand, testified that she did not know who drafted the document.) The document is addressed to George and DWG, and reads as follows (**bold** in original):

### <u>Contract between: Chelsey Fillion & DWG Contracting Ltd.</u>

I _____, owner/operator of DWG Contracting Ltd. hereby guarantee a year long rental contract with Chelsey Fillion. This contract will be for two 20 kilowatt light towers. The amount paid for each unit will be $3750.00 per month, for a 12 month period. With the possibility of an extension in the event the job is not complete within a year. The first month of the contract will be pro-rated at $125.00 per day. The rental invoices will be paid within a minimum of thirty days, maximum 45 days from the invoice billing date.

Both parties are in agreement with the above noted contract.

George Fay _____

Chelsey Fillion _____

Witness _____

**31**    Chelsey identified the October 28 Letter as the contract for the rental of her towers by DWG. She testified that both she and George signed the document, and that her boss at the time signed as the witness. Chelsey testified that she provided a copy of the signed document to the Royal Bank, in connection with the small business loan. She testified that she kept the original with other documents at Beaverlodge but, as of trial, had not seen the document for several years. No signed copy of the October 28 Letter was produced at the trial.

**32**    In his evidence at trial, George denied signing the October 28 Letter and denied ever seeing a signed copy of the document. He reiterated that the arrangement was that when Chelsey's and Jared's towers were "out," they would get paid rent, and said that he did not guarantee to rent their towers any time there was work available.

**33**    However, when he was examined for discovery, George testified as follows:

Q.    Mr. Fay, DWG entered into an agreement with Chelsey Fillion's company, 1437592 Alberta Ltd., sometime in 2008; is that correct?
A.    Yes.
Q.    What were the terms of that arrangement?
A.    They'd get their towers out as long as I was on the job.

> Q.   Isn't it true that you or DWG or - well, I don't ask about Wendy. Isn't it true that you or DWG promised or agreed that Chelsey's towers would be rented for a minimum of one year with a possibility of a further extension?
>
> A.   You asked me two questions, which one do you want me to answer first? You want the end one? The extension, no. I gave Chelsey a letter for the Royal Bank so that she could get a loan and I put on the piece of paper it'd be a minimum of one year.

**34**    This discovery evidence was put to George at the trial. He indicated that he misspoke at his examination for discovery, and that (rather than the October 28 Letter) he had in fact been thinking about a sales agreement with Hammer. He asserted that he did not sign any agreement with Chelsey.

**35**    A copy of a Hammer Sales Agreement, dated November 12, 2008, signed by George, and stated to be for the sale of two light towers with serial numbers ending in 195 and 197, was admitted into evidence at trial. There is nothing on the document concerning rental of the towers to Chelsey or 143 or about "a minimum of one year." Based on its contents, this cannot be the document George was describing at his examination for discovery, and I found George's attempt at trial to explain the evidence he had given on discovery unconvincing. I prefer George's discovery evidence over his evidence at trial concerning the October 28 Letter, and concerning the terms of the arrangement for the rental of 143's and 083's light towers.

**36**    DWG received the purchase price of $52,500 from 143 for the purchase of two light towers. DWG advanced $8,500 as a down payment (which was then repaid out of the rentals), and the balance was paid from the proceeds of 143's small business loan. However, there is a dispute over which light towers 143 in fact purchased from DWG.

**37**    George's evidence was to the effect that he told both Chelsey and Jared they could choose whatever towers they wanted. George thought they would want and choose the newest ones. These were the Allmand light towers. However, the Allmands did not start arriving from the factory until about mid-December. While, as far as George was concerned, DWG was selling Allmands to 143 and 083, I find that he did not communicate this to either Chelsey or Jared. Moreover, if Chelsey and Jared had the right to choose the light towers being purchased by their respective companies, George could not do that for either of them.

**38**    I find that, in order to proceed with 143's loan application, Chelsey needed to satisfy the lender that 143's acquisition of the light towers was a legitimate transaction and she needed some proof about where the loan funds were going. In short, she needed serial numbers and an invoice or bill of sale. George testified that he went to the Hammer Equipment salesperson and explained that Chelsey needed two serial numbers, and that, since the Allmands had not yet arrived, the salesperson took serial numbers from two of the seven Terex towers that had been tagged in the yard for DWG. Wendy then created an invoice from DWG to 143 dated December 1, 2008, invoicing 143 for the sale of two light towers (with serial numbers ending in 195 and 197) at $25,000 each. The total purchase price, including GST, was $52,500. A copy of this invoice is also found in the bundle of documents produced by the Royal Bank in connection with 143's loan, indicating that the bank had been provided with a copy.

**39**    The implication of George's and Wendy's evidence is that the invoice did not reflect the facts and, in particular, did not reflect what DWG was actually selling and 143 was actually buying.

Rather (according to George and Wendy), it was created as a matter of convenience to provide to the Royal Bank, so that 143 could proceed with its loan application.

**40** Chelsey's evidence is to the opposite effect: that the invoice was intended as genuine, and to describe, accurately, what 143 was purchasing from DWG including the serial numbers of the two light towers. I find that DWG sold to 143, and 143 purchased, two light towers with serial numbers ending in 195 and 197, and that, at the time the agreement of purchase and sale was made, DWG never communicated to 143 any intention to sell (nor did 143 agree to buy) some other light towers.

**41** The purchase of light towers by 083 (Jared's company) was also not straightforward. Jared understood from what George had told him about the BP Project that the work was consistent and not subject to the downtime typical with other jobs in the oil patch. This is consistent with George's evidence concerning what he was told about the Project in the fall of 2008. In his evidence at trial, Jared testified that George had given him a guarantee of rental income for 12 months, with the possibility of more.

**42** Jared was interested in making the investment in two light towers. However, he needed to finance some of the purchase price. He and his fiancée (and now wife) Karly Barrette had saved $10,000 for their wedding, which Jared was prepared to use as part of the purchase price. Jared was able to get a loan for another $42,500 secured by a mortgage on his home. He then made a loan of $52,500 to 083.

**43** When he spoke to George in October 2008, Jared understood that the BP Project was about to start, so there was no time to waste. He spoke to George about going with him to Hammer to buy 083's light towers. As far as Jared was concerned, he was investing a large sum of money, including money that had been saved for his and Karly's wedding. He wanted to be there when the light towers were purchased and get a bill of sale. However, Jared recalled George telling him that DWG had to purchase the towers from Hammer, and that DWG would then sell the towers to 083. This is consistent with Wendy's and George's evidence that, as far as BP was concerned, all of the towers had to belong to DWG.

**44** In the end, Jared did not make the trip to Hammer. He recalled that when he gave the money to George for the purchase, George told him that he was going to Hammer to buy the two towers. As far as Jared was concerned, George was going to Hammer to buy two light towers specifically for 083, using 083's money.

**45** There is no dispute that in November 2008, 083 paid DWG $52,500 for two light towers. The money DWG received from both 143 and 083 simply went into DWG's bank account, rather than being used to purchase specific light towers.

**46** Jared testified that he asked for a bill of sale in exchange for payment, and George told him that Wendy would prepare one. According to Jared, he followed up from time to time with Wendy, but she was always behind with DWG's books. According to Wendy, she told Jared just to go and pick out two towers and give her the serial numbers; she would then prepare a bill of sale. But, according to Wendy, that never happened. I conclude there was another unfortunate misunderstanding between family members. Jared's understanding was that DWG had purchased two specific light towers for 083, and he needed the serial numbers for those towers. Wendy was under the impression that Jared could pick out any light towers he wanted for 083, and then give her the serial numbers. In my view, what Wendy was telling Jared to do was neither reasonable nor businesslike. I conclude further that, in addition to not telling either Chelsey or Jared, George did not tell Wendy, in her ca-

pacity as DWG's bookkeeper, about the arrangements he had in mind concerning four of the All-
mands.

**47**     Eventually, Jared needed the bill of sale for 083's year end. Wendy prepared an invoice dat-
ed November 15, 2008 for the sale of two light towers by DWG to 083, and gave it to Karly around
the beginning of July 2009. The serial numbers shown end in 046 and 997. As Wendy explained,
she had simply taken a couple of serial numbers at random from some insurance papers. I find that
Wendy knew that the invoice did not reflect the true facts of the sale of light towers by DWG to
083, but Jared did not. Rather, he treated the document as genuine and confirming the details of
what 083 had purchased.

**48**     Even though, according to George, the light towers he intended DWG to sell to 083 and 143
had not yet arrived from the factory, DWG began paying rent (on the basis of $4,500 per month
plus GST) to each of 083 and 143 as soon as it received the purchase money for the towers.

**49**     083's practice was to submit an invoice to DWG for rent. Jared explained that Wendy would
tell him when 083 should submit an invoice and what to put in it. DWG paid rent to 083 for the
months of November (part) and December 2008, January to May 2009, and for part of June and
August 2009. DWG's last cheque, in the amount of $4,725.00, is dated October 21, 2009 and (based
on 083's invoice no. 13) paid rent for one light tower for the month of August 2009. Over the whole
period, DWG paid 083 approximately $65,000 in rent (excluding GST).

**50**     143 never submitted any invoices to DWG. Nevertheless, DWG paid rent to 143 for part of
December 2008, and in 2009, in January to April, May (part), June, July and part of September.
DWG's last cheque payable to 143 for tower rentals is dated November 2, 2009 and in the sum of
$4,725, and (although not very legible) appears to be for September. Over the whole period, DWG
paid 143 approximately $66,000 in rent (excluding GST).

**51**     However, in about June 2009, there was a change in the arrangements as between DWG and
Channel Two. George explained that he was told that Channel Two wanted to replace light towers
on the BP Project with generator sets, or "gensets." One genset would replace seven light towers,
although some of the light towers were going to be kept on the BP Project to provide lighting.
George felt DWG had little choice but to go along. In the end, DWG purchased two gensets for the
BP Project. DWG returned seven light towers (which DWG has not yet paid for) to Hammer. Based
on the evidence at trial, DWG did not return four Allmands, did not return the towers described in
the invoice DWG issued to 143 and did not return one of the towers described in the invoice issued
to 083. The fate of the other tower is somewhat a mystery.

**52**     According to a summary table prepared by Wendy and tendered in evidence at trial, DWG
continued to have light towers "out" on the BP Project between July and December 2009. George
claims that none of 143's nor 083's towers were "out," during this period. However, there was no
independent corroborating evidence, for example, records of the make or serial numbers of the tow-
ers in fact in use. Without some corroboration, I am not prepared to accept George's evidence on
this point. At the time, George (if no one else) apparently believed that four of the Allmand towers
belonged to 143 and 083. His evidence that he moved four Allmand towers to a neighbour's proper-
ty in early January 2010 suggests to me that these towers were being rented. I have serious doubts
about the basis on which George could testify that neither 143's nor 083's towers were in use in the
last six months of 2009. He could not know whether they were in use so long as there was a dispute
about the identification of the towers 143 and 083 in fact purchased. Chelsey's evidence that she lo-

cated one of 143's towers (with serial number 197) in the field in the spring of 2010 (something that none of the plaintiffs disputes), is also, in my view, inconsistent with George's assertion that none of 143's towers were "out" during the relevant time.

### (d)    Purchase of Stauble Road

**53**    In the fall of 2008, Wendy moved to Prince George with DF, to give him the opportunity to play hockey. George and Chelsey remained at Beaverlodge. However, Chelsey moved to Prince George in April 2009 to take up a new job. Wendy and DF were renting a house, and Chelsey moved in with them.

**54**    However, the owner was selling the house. Wendy and Chelsey began discussing buying a house in Prince George, and they began looking at houses in about May 2009. They looked at between four to six houses in total, and George came to Prince George at least once to look with them. They identified Stauble Road as the property they wished to buy. Ultimately, Stauble Road was purchased for $300,000 on June 19, 2009. The purchase price was paid by $125,000 in cash and the proceeds of a mortgage given by Chelsey to Scotiabank for $175,000. Chelsey was the sole registered owner. With respect to the down payment of $125,000, Wendy wrote a cheque for $100,000 payable to Chelsey, and DWG wrote a cheque for $25,000 payable to Chelsey. There is general agreement on these points.

**55**    However, on other points the evidence conflicts.

**56**    According to Wendy, she and Chelsey discussed the down payment and mortgage options. Chelsey had no money of her own for a down payment, a point Chelsey does not dispute. However, according to Wendy, she and Chelsey reached agreement on the arrangements that would permit them to buy Stauble Road. George and Wendy would contribute $125,000. Chelsey was to take out mortgage for $175,000 representing her contribution to the purchase price. Chelsey would own half the house, and Wendy and George would own the other half. According to Wendy, in 2010, she and George would contribute another $25,000, to equalize the contributions to the $300,000 purchase price. (I note that this payment has never been made.) In the meantime, Wendy would pay the household expenses, and Chelsey would make the mortgage payments. According to Wendy, if the house was sold to a third party, after payment of the balance owing on Chelsey's mortgage, Wendy and George would get $125,000 (or $150,000 if the additional $25,000 had been paid) and then the equity would be shared 50-50.

**57**    According to Wendy, Stauble Road was going to be registered in Chelsey's name as the legal owner only because Chelsey was going to apply for a mortgage. In other words, Chelsey had to be shown as the registered owner to get a mortgage. Wendy denied that there was ever any discussion about Chelsey being the sole owner, at least as far as Chelsey, Wendy and George were concerned.

**58**    Wendy admits that she signed a letter (the "Gift Letter") confirming that she was making a gift to Chelsey of $125,000 to make the down payment for the purchase. She explained that she agreed to sign the Gift Letter so that Chelsey could get a mortgage. Thus, Wendy knew the purpose of the document and that it would be provided to the mortgage lender.

**59**    The Gift Letter, which is partly typed and partly handwritten, reads as follows (handwritten portions are underlined; *italics* in original):

GIFT LETTER

To Whom it May Concern:

This letter confirms that the undersigned is making a financial gift of $125,000 to:

Chelsey Rae Fillion

*Print names of Recipients*

for use towards the purchase of the property located at: [address] Stauble Rd., Prince George B.C. [postal code]

*Address of property being mortgaged*

We, the undersigned Recipients and Donors, hereby certify that:

* these funds are a genuine gift from the Donors and don't ever have to be repaid, and

* no part of the financial gift is being provided by any third party having any interest (direct or indirect) in the sale of the subject property, *and*

* the Donor is an immediate family member.

The Gift Letter is dated June 3, 2009, and was signed by Chelsey as the recipient and Wendy as the donor. Wendy identified herself as Chelsey's mother.

**60**     Wendy denied that there was any discussion with Chelsey about making a gift to her of the down payment of $125,000. She denied that Chelsey ever asked to be compensated for either helping Wendy and George purchase Beaverlodge, or for pledging her credit for DWG's business.

**61**     Chelsey's evidence is not completely at odds with Wendy's, but there are significant conflicts, especially concerning the $125,000. Chelsey recalled that she and Wendy discussed buying a house in Prince George, rather than continuing to rent. According to Chelsey, the arrangement they discussed went back to the purchase of Beaverlodge, when Chelsey agreed that Wendy and George could use her name to get credit. In exchange, according to Chelsey, Wendy and George were to help Chelsey get into her own house when the time was right (something George acknowledged in his evidence). Chelsey testified that this was discussed several times over the years, although there was no discussion about any particular amount of a contribution to "help" her get into a house.

**62**     According to Chelsey, the first time an amount was discussed was in connection with the down payment for Stauble Road. The idea was that Wendy would make the down payment (essentially in place of rent) and would make a gift to Chelsey of that money. Chelsey would then get a mortgage for the balance of the purchase price for Stauble Road.

**63**     According to Chelsey, the arrangement was that once Stauble Road was purchased, she, Wendy and DF would live there together. George would live there too when he was in Prince

George. However, there was another BP project in Fernie, and the expectation was that George and Wendy would leave Prince George and move there in due course. Chelsey explained that Stauble Road was a large house, and the plan was that when George and Wendy moved, she would sell Stauble Road and buy something smaller. If Chelsey made a profit on the sale of Stauble Road, then she would share that profit with Wendy and George. According to Chelsey, there was never any discussion about her paying back the $125,000.

**64**    Chelsey testified that she brought the Gift Letter to Wendy and told her that she needed Wendy to sign it. Chelsey explained that she told Wendy that, in connection with her getting a mortgage, the bank wanted something in writing saying that the down payment was a gift. Providing the Gift Letter was a step in getting financing to buy Stauble Road. Chelsey's and Wendy's evidence does not conflict on these points.

**65**    Stauble Road is a split level. When Chelsey, Wendy and DF moved in, Chelsey had her bedroom and bathroom on the lower level. According to Chelsey, that area was intended to be her part of the house. However, she also had belongings in other areas of the house, and no part of the house was off-limits to her. Wendy did not dispute this. There was a home office on the upper level, with a computer, filing cabinets and some other office equipment. Wendy acknowledged in her evidence that Chelsey had some of her personal files in the home office. Chelsey testified that she was free to, and did, use the office and the computer, although it was used mostly by Wendy. Chelsey had electronic documents, including her resumé, saved on the computer. Wendy knew that Chelsey used the computer occasionally. Wendy testified that she kept DWG's records stored on the computer, and used QuickBooks for DWG's accounting. However, Wendy said that everything was password-protected, and she did not give the password to anyone, including George.

**66**    Both Wendy and Chelsey gave evidence about some renovations and improvements that were done to Stauble Road after they moved in. These included such things as: the purchase of new kitchen appliances; the installation of some pot lights and some new light fixtures; installing heating in the garage; the construction (at a cost of over $5,000) of an outdoor, moveable shed; and planting about $160 worth of bulbs and perennials in the yard. According to Wendy, the total of all of these items is $15,616.58, and she seeks to have this amount added to the $125,000 for the purpose of calculating her interest in Stauble Road.

**67**    However, according to Chelsey, she did not see the need for these expenses, which were incurred at Wendy's instigation. As far as Chelsey was concerned, the existing kitchen appliances were good enough and new appliances were unnecessary. Nevertheless, she went along with what her mother wanted to do in the house. Chelsey told her mother that Wendy could keep the new stove, fridge and microwave when Wendy, George and DF moved from Stauble Road. In addition, from Chelsey's perspective, the outdoor shed was something else that George and Wendy were going to take with them when they moved. It was not going to remain permanently at Stauble Road.

**68**    Although she has not lived there since early January 2010 (apart from the brief period between April 30 and May 6, 2010), Chelsey has made all of the mortgage payments for Stauble Road, as well as paying the property taxes and city utilities. Wendy has paid nothing to Chelsey.

### (e)    Family Breakdown

**69**    Beginning on January 1, 2010, the relationship between Wendy and George on the one hand, and Chelsey and Jared, on the other, broke down. As with many family disputes, the origins

were in misunderstandings and miscommunications. Things then escalated quickly, especially between Wendy and her two children after the three of them returned to Prince George from Beaverlodge.

70      Chelsey's boyfriend, Lyle Ludwig, had been working for DWG since about the end of October 2009. For reasons that were never very satisfactorily explained, George and Lyle had a falling out, and Lyle either quit or George fired him. This event appeared to trigger an avalanche of angry words and hurt feelings, beginning at Beaverlodge and continuing when Wendy, Chelsey and Jared returned to Prince George.

71      One result of events at Beaverlodge on January 1 was that George took four Allmand light towers - which he identified as belonging to 143 and 083 - and moved them to a neighbour's place. He explained that he had decided Jared and Chelsey were "done" with DWG. He did not want light towers that he considered theirs to be mixed up with DWG's other towers, and he did not want those towers going "out." According to George, as of the trial, the four Allmand towers are still on his neighbour's property.

72      By January 4, 2010, Wendy, Jared and Chelsey were all back in Prince George. During Chelsey's lunch hour, she and Jared went together to Stauble Road to talk to Wendy. Chelsey was also going to move some of her belongings out of Stauble Road temporarily.

73      Before going over to see Wendy, Chelsey and Jared had discussed what they were going to say. They wanted to try and resolve things. They were concerned about how the business relationships were affecting the family relationships, and they wanted to salvage family over business. As Chelsey described it, she and Jared wanted to come up with a way to end the business relationships and still maintain the family. Jared and Chelsey wrote out their proposal. Among other things, they were proposing that DWG pay $34,000 to each of 143 and 083 to buy back the light towers. They proposed further that seven months' rentals of $66,500 be paid to each of them. Moreover, Chelsey wanted "written proof" from the bank that she was no longer financially responsible for Beaverlodge.

74      Chelsey and Jared sat down with Wendy, and gave her the written proposal. Jared's recollection is that Wendy said she would have to discuss it with George. Instead, that, effectively, was the end of his and Chelsey's relationship with their mother.

75      Wendy's recollection of the meeting was that her children berated her. She did not see the written proposal as something being presented for discussion, but a wholly unreasonable demand letter. Later in the afternoon on January 4, Wendy sent a very emotional e-mail message to both Chelsey and Jared. Among other things, she mentioned that she and DF would be moving out of Stauble Road at the end of June and "you will not be seeing us too much after that." She said that Chelsey and Jared had "absolutely broken my heart forever."

76      After January 4, 2010, Wendy had the locks changed at Stauble Road.

77      At the beginning of February 2010, Wendy and George left on a planned one-week trip to Boston. Wendy asked a friend, Farren Edmunds, to look after Stauble Road while she and George were away. Mr. Edmunds was given a house key and the alarm code. According to Mr. Edmunds, just before Wendy and George left for Boston, they all did a walk-through of the house. Mr. Edmunds testified that he noted the computer and monitor in the home office, and that there were a

few file folders, neatly organized on the desk. This is consistent with Wendy's evidence of how she left the office. She testified that the computer was off.

**78**    According to Mr. Edmunds, he checked on Stauble Road daily during the week that Wendy and George were in Boston. He testified that the computer in the home office was always off.

**79**    Wendy and George were due to return on Sunday, February 7, 2010. Mr. Edmunds testified that on February 5 (Friday), he heard from Chelsey, who wanted to pick up more of her belongings from Stauble Road. Mr. Edmunds agreed to meet Chelsey at Stauble Road that evening. He went to the house about 5:30 and waited inside. However, Chelsey had not turned up after a couple of hours, and Mr. Edmunds went home. Chelsey explained that she had been unable to get to Stauble Road that evening.

**80**    Mr. Edmunds testified that he talked to Chelsey later in the evening on February 5, and that they agreed to meet at Stauble Road at 9 a.m. the following morning. Chelsey was unable to recall such a discussion. According to Mr. Edmunds, he went to Stauble Road at the appointed time and waited for Chelsey until about 10:30 a.m. However, she did not turn up. Mr. Edmunds testified that he returned home and asked his daughters to let him know if they noticed any activity at the house.

**81**    Chelsey arrived at Stauble Road probably sometime later in the morning on February 6. She testified that she did not feel comfortable leaving her belongings there, and she went to the house to pick up the rest of her things. Chelsey testified that she tried to get into the house, but the locks had been changed and she needed a locksmith to help her. Jared and Tim Fillion (Chelsey's and Jared's father) were among those who had come to the house to help Chelsey retrieve her belongings. Chelsey testified that she spent most of her time in the lower level, packing. However, she also had some belongings in the home office: for example, her bank statements and credit card statements. This is something Wendy does not dispute. According to Chelsey, she had asked Wendy to drop Chelsey's files off at Chelsey's grandmother's, but Wendy had not done this. Chelsey's resumé was one of the documents saved on the computer, and she wanted to e-mail it to herself. Chelsey testified that when she went into the office, the computer was on. She testified that she used the computer to retrieve her resumé, but did not use it for anything else. Chelsey found what she described as a "will" document (the "Will Document") belonging to Wendy on the desk in the office, and she made a copy of it. The Will Document, which is dated January 10, 2010, purports to disinherit and disown Chelsey and Jared.

**82**    Chelsey testified that she had to make a second trip to Stauble Road on February 6. When she arrived the second time, Mr. Edmunds and his wife (Alane) were there. She recalled that Mr. Edmunds was seated at the kitchen table. According to Chelsey, when she attempted to go back into the home office, Alane Edmunds told her she should wait until Wendy got home. Chelsey did not take anything more from the office, but loaded up the rest of her belongings and left Stauble Road. According to Chelsey, she did not return to Stauble Road until the end of April 2010.

**83**    Mr. Edmunds testified that when he and his wife left Stauble Road on February 6, the file folders were still on the desk in the home office and the computer was off. He testified that he later went back to the house. According to Mr. Edmunds, the computer was on. He hit "recent documents" and turned up Chelsey's resume among other things. Mr. Edmunds testified that files were open and there were papers all over the desk, one of which was a document Mr. Edmunds described as Wendy's "will." This was probably the Will Document. Mr. Edmunds testified that he then

packed up the computer and documents and took them to his home until Wendy and George got back from Boston.

**84**    In late April 2010, Wendy and George and the Edmunds went to Costa Rica on a vacation. Wendy and George left DF in Prince George with a family friend, Tracey Roe. Earlier in the month, there had been problems with BP. According to Wendy, a representative from BP came to Stauble Road to do an audit. However, Wendy refused to provide copies of any DWG documents.

**85**    On April 30, 2010, while Wendy and George were in Costa Rica, Chelsey went back to Stauble Road. She intended to move back into the house, and brought personal belongings and food with her. Again, Chelsey needed the help of a locksmith to get into the house. She was angry with Wendy, who kept locking her out of what Chelsey considered her house, sending her mail back to sender and removing Chelsey's name from the security system. The house was in good order when Chelsey entered. She found some spoiled food, which she threw away. Chelsey denied ever turning off the refrigerator or the freezer, and she denied damaging anything in the house or the hot tub outside.

**86**    Chelsey testified that, when she got back into Stauble Road, she went into the home office and there were papers and files on the desk. She moved the computer mouse and found the computer was on. According to Chelsey, Wendy's e-mail was open. She looked at the e-mail but could not recall what it said or who it was from. Chelsey testified that she then began looking for the rest of her files.

**87**    According to Chelsey, she noticed a letter from BP dated April 26, 2010 to DWG on the fax machine in the office. Chelsey testified that she read the letter, which said, in part:

>    **Re: Contract Termination**
>
>    As a result of the recent financial audit, effective immediately, [BP] is terminating the Master Service Contract - Agreement No. 30347-010-3726 executed on March 10, 2010.
>
>    BP would like to conduct an orderly transition to minimize operational impacts. BP requests that [DWG] provide a list of all equipment on the Noel Work Sites by the close of business Tuesday April 27th. This list should include equipment type, current location of equipment and whether the equipment is owned or leased/rented by DWG.
>
>    DWG can arrange pick up of any equipment that is directly owned by DWG . . . . It is BP's preference to assume the rental of all third party equipment on the Noel Work sites. BP will work with DWG and the rental companies to effect this change.
>
>    Access to the Noel Work Sites can be arrangement by contacting Keith Briggeman . . . .

**88**    The contract referred to in this letter was never tendered in evidence at the trial. I do not know what the terms were, or whether the document related to the BP Project, although Chelsey appears to have assumed that it did. She was probably correct, since the BP Project was referred to

from time to time as the "Noel" project. The letter indicates that a financial audit had been done, although Wendy's evidence implied that she (on behalf of DWG) refused to participate. I think it unlikely that, given the importance of the BP Project to DWG's business, if BP requested an audit, DWG would have refused unless DWG, George and Wendy had things they wanted to hide from BP.

**89**    According to Chelsey, when she read the letter, she panicked. She concluded Wendy and George had lost the BP Project, and she was concerned that she and Jared would not get their light towers back. Chelsey testified that she contacted Mr. Briggeman (the contact person mentioned in the letter) about retrieving her towers. Chelsey showed the letter from BP to Jared. Jared discussed the letter with Karly, and also let Ms. Roe know that there was trouble, with a view to protecting DF from the fallout when his parents returned from Costa Rica.

**90**    Wendy and George were informed of BP's communication while they were in Costa Rica, and knew there were problems. According to George, he had a friend read him the letter over the phone.

**91**    Wendy and George returned from Costa Rica on May 6. According to Wendy, she, George and the Edmunds arrived at Stauble Road about 10:00 a.m. She saw cars and people in front of the house, and people - including Chelsey and Jared - in the house.

**92**    Chelsey, Jared, their father Tim Fillion and other family members were at the house. According to Wendy, Chelsey's and Jared's uncle attempted to prevent her from entering the house. She claims that Jared slammed her against the corner of a wall, and at trial, identified photographs showing bruising on her arm. However, I conclude that Wendy bumping into the wall was more likely an accident, as Wendy pushed her way into the house.

**93**    Someone called 911 and the RCMP arrived. Wendy, George and the Edmunds left Stauble Road. When they returned later in the day, Chelsey and the others were gone. Chelsey explained that she left for her own safety. Wendy changed the locks again, and installed a new security system.

**94**    May 6, 2010 was the last time Chelsey or Jared were in the house at Stauble Road.

**95**    According to Wendy, when she and the others came back to Stauble Road the afternoon of May 6, the heat in the house had been turned up to the maximum. The refrigerator and freezer has been turned off, and food was spoiled. The kitchen was a mess. Wendy testified that people had been drinking her wine. Both she and Mr. Edmunds concluded something had been put in the water in the hot tub, which was not running.

**96**    A box of DWG files that Wendy had received back from DWG's accountant was on the floor in the home office. Wendy testified that, before leaving for Costa Rica, she had hunted, unsuccessfully, in the box for an envelope in which she had placed a memory stick with all of DWG's QuickBooks accounting information on it. She had written the password on the front of the envelope. According to Wendy, when she went into the office on May 6, she could see the envelope with the memory stick attached by a paper clip to a file folder.

**97**    According to Wendy, when she got back into the house, she tried to use the computer in the home office, but was unable to. She said that it was "frozen," and inoperable. The computer was packed up and shipped over to a computer specialist and technician in Victoria, Scott Brown at Scotia Computer Systems.

**98**    At trial, the plaintiffs tendered in evidence a report and a "supplementary report" from Mr. Brown, in which he describes his observations and states his opinion concerning occasions on which the computer and files on the computer were accessed in the periods February 2 to 7, 2010, and April 25 to May 6, 2010. These reports were tendered in support of the plaintiffs' breach of privacy claims. In addition, Wendy claims that repairs to the computer cost $1,280.16, and seeks to recover this amount as damages in this action.

**99**    According to Wendy, a number of items belonging to her or George or DF had been taken from Stauble Road. Chelsey admitted that she had taken Wendy's engagement ring and wedding band given to her by Chelsey's father. However, there is no dispute that these items were returned to Wendy within a few weeks of being taken.

**100**    Wendy listed other items that she claimed were either missing, consumed or damaged when she and George returned to Stauble Road on May 6, 2010, and what she considered the value of these items, as follows:

| Item | Make/Retailer | $ Value claimed |
|---|---|---|
| pressure washer | GP Mazda | *$400 |
| weed trimmer | Gaudins Honda | *$607.95 |
| chain saw | Northern Metalic | *$472.45 |
| elliptical | Fitness Depot | *$952.00 (Wendy says: "my half") |
| crystal vase | Rob McIntosh Crystal | $280 |
| industrial meat slicer | Meat Processing Prod. | $895.94 |
| Telus satellite receiver | Telus | *$296.80 |
| TV stand | Canadian Tire | $69.99 |
| 12V air pump | Canadian Tire | $44.79 |
| Coleman cooler | Canadian Tire | $112.00 |
| wet suits and life vests | Canadian Tire | $487.16 |
| sunglasses | Oakley | *$179.20 |
| wallet | American Eagle | $25.00 |
| jewellery box | Jewellery Chests | $89.21 |
| hot tub repair | Eric's World of Leisure | *$134.28 |
| wine | Mission Hill Estates | $247.85 |
| American money |  | $100.00 |
| food consumption and spoilage |  | $250.00 (est.) |
| hockey cards in album |  | $1000.00 (est.) |

**101**    Including the computer repairs, there is a claim in this action for $7,924.78 for all of these items. The amount claimed is a mixture of expenses incurred (indicated with an * above) and estimated replacement cost (for example, some of the dollar amounts come from print-outs from Canadian Tire's website made on May 30, 2011). Wendy claims that the wallet, sunglasses and hockey card collection all belonged to DF.

**102**    I heard little from either Wendy or George about the age of items such as the pressure washer, weed trimmer and chain saw they claim were missing from Stauble Road when they returned from Costa Rica, which have been replaced with brand new items. The industrial meat slicer was in fact left over from the lunch truck business.

**103**    Chelsey's and Jared's evidence was to the effect that they took only what belonged to them. Jared testified that the Oakley sunglasses had distinctive features and were in fact his, not DF's. Jared admits that he took a Coleman cooler, but says that it belonged to him and was far from new. Chelsey testified that she took one wet suit and one life vest, both of which she bought at Costco. Chelsey also admitted taking the TV stand, which she said was very old, and the elliptical. Jared testified that these had been removed in February. Chelsey testified that, when she left Stauble Road on May 6, the hot tub was operating, and in fact had been used during the week she was back living at Stauble Road. She denied that anyone had tampered with it. Both Jared and Chelsey said that they did not drink any wine. According to Chelsey, she had used the computer to go on the internet and check her e-mail. She denied accessing any DWG financial or tax records, including anything using QuickBooks. There is no evidence that Jared used the computer at any time.

**104**    In May 2010, Chelsey and Jared took steps to locate the light towers that, so far as they were concerned, their respective companies had purchased from DWG. Chelsey located the tower with serial number 195 at Beaverlodge. The light tower with serial number 197 was at Dawson Creek, where she and Jared also located one of the light towers listed on DWG's invoice to 083. They brought all three light towers back to Prince George. According to Chelsey, they have been storing the light towers at their uncle's and have not made any attempts to rent them.

## Discussion and Analysis

**105**    Before turning to my discussion and analysis of the claims advanced, I will comment briefly on credibility and on the pleadings in this case.

### (a)    Credibility

**106**    Most of the key issues in dispute in this case are factual. I heard conflicting testimony from the key witnesses: Wendy, Chelsey and George. The reliability of documents (such as the Gift Letter) has been called into question because, based on oral testimony (and depending on who was testifying), the documents were never intended to be treated as genuine or reflect the true facts, at least as between the family members who are now suing one another. It was not disputed by Wendy and George that they used Chelsey's name to buy a family home in Alberta and develop DWG's business, thus painting a picture for their creditors and potential creditors left behind in B.C., as well as new creditors in Alberta, at odds with reality. DWG wanted to hide from BP that it did not own all of the light towers being provided to the BP Project. Both Wendy and George admit to signing or creating documents (the Gift Letter and the invoice from DWG to 143) they now assert are false, in order to induce a financial institution to lend money. For her part, Chelsey claims that she has financial obligations in Alberta in connection with Beaverlodge, but none of these were disclosed in

her mortgage application for Stauble Road. At trial, Chelsey gave incredible testimony about how, in a later version of the October 28 Letter, $3,750 became $4,500.

**107**    The factors to be considered when assessing credibility were summarized by Dillon J. in ***Bradshaw v. Stenner***, 2010 BCSC 1398, at para. 186:

> [186] Credibility involves an assessment of the trustworthiness of a witness' testimony based upon the veracity or sincerity of a witness and the accuracy of the evidence that the witness provides [citation omitted]. The art of assessment involves examination of various factors such as the ability and opportunity to observe events, the firmness of his memory, the ability to resist the influence of interest to modify his recollection, whether the witness' evidence harmonizes with independent evidence that has been accepted, whether the witness changes his testimony during direct and cross-examination, whether the witness' testimony seems unreasonable, impossible, or unlikely, whether a witness has a motive to lie, and the demeanour of a witness generally [citations omitted]. Ultimately, the validity of the evidence depends on whether the evidence is consistent with the probabilities affecting the case as a whole and shown to be in existence at the time [citation omitted].

**108**    In the often-cited case of ***Faryna v. Chorny***, [1952] 2 D.L.R. 354 (B.C.C.A.), O'Halloran J.A. wrote (at p. 357):

> [T]he real test of the truth of the story of a witness in such a case must be its harmony with the preponderance of the probabilities which a practical and informed person would readily recognize as reasonable in that place and in those conditions.

**109**    Of course, the court can accept some, all or none of the evidence of a witness. The party who asserts the affirmative of an issue (for example, Wendy and George assert that Chelsey and Jared damaged the hot tub at Stauble Road) must carry the burden of proving it on a balance of probabilities.

**110**    In this case, I have concluded that generally, Jared, Karly and Ms. Roe are credible witnesses. Ms. Roe was not cross-examined at all, and Karly was cross-examined only briefly in relation to Ms. Roe's care of DF. Jared has a motive to support his sister. However, unlike Wendy and George, he had no pattern of hiding the truth and I found that generally, his description of events was reasonable and credible.

**111**    I have concluded that I need to exercise some caution with respect to Mr. Edmunds' evidence. In my view, he clearly favours Wendy and George and demonstrated some dislike (if not outright animosity) towards Chelsey. I also found the level of detail in his recollection remarkable, given the passage of time, although Mr. Edmunds may simply have a good memory for detail and the events may have been, in the circumstances, especially memorable for him.

**112**    I turn then to Wendy, George and Chelsey.

**113**    I have concluded that I needed to be particularly cautious with Wendy's and George's evidence because they have demonstrated over a number of years, and including in connection with events that are the subject of this action, a pattern of hiding the truth when convenient or expedient

to do so. Wendy appeared to me to see nothing wrong with deliberately representing to a financial institution, to induce the institution to lend a substantial sum of money, something she says was false. Some of the claims advanced in this action - for example for $160 for flowers planted at Stauble Road - has led me to question the lengths to which Wendy and George are prepared to go to vindicate perceived wrongs. Thus, their conduct has undermined their credibility. As I noted above, I found George's attempt to explain an important contradiction between his discovery evidence and evidence at trial unconvincing.

**114**    Mr. Fletcher argues forcefully that Chelsey was not a credible witness. Above, I have touched on some of the problematic areas in Chelsey's evidence. However, I have concluded that the problems with Chelsey's evidence are less severe than those of her mother and step-father. I note, for example, that Chelsey admitted to conduct (such as taking her mother's engagement and wedding rings) that was wrongful, and acknowledged as much.

**115**    Accordingly, in assessing Wendy's, George's and Chelsey's evidence, I have looked for points on which they generally agree or on which there is (at least) no serious dispute. I have also looked for consistency with other evidence that I have concluded I can accept. I have considered whether the testimony is reasonable, consistent and makes sense. I have also kept in mind where the onus of proof lies.

### (b)    The Pleadings and relief claimed

**116**    I regret to say that this case was not made easier by pleadings that were long on narrative and redundant verbiage, and that often lumped everyone together (as "the plaintiffs" and "the defendants") in an unhelpful way given the range of claims and causes of action advanced. Colourful and emotional language, and narrative, can be effective in a submission. However, they are much less useful in a document whose purpose is to set out - concisely - the material facts, but not the evidence by which those facts will be proved, and to clearly define the issues of fact and law to be determined by the court.

**117**    At trial, sections in both pleadings that concerned Beaverlodge were struck out (essentially by consent) on the grounds they were unnecessary and embarrassing. A spoliation claim was also struck out.

**118**    During the trial, I raised with counsel my concerns about the pleadings, and, in particular the relief that each side was asking the Court to grant. As a result, in their closing submissions, both Mr. Fletcher and Ms. Craig provided me with a revised statement of the relief being sought. These statements were further revised in the course of closing submissions.

**119**    I will come back to the revised statements of relief as I discuss each of the claims. However, at this point I note that DWG withdrew its claim against Jared Fillion and 083 for damages for conversion, detinue and trespass to chattels with respect to the alleged taking of a light tower. The tower that was taken has now been returned to DWG. DWG also withdrew claims against Jared and 083 "for the taking of" DWG's "information from its computerized records."

**120**    During trial, George confirmed that he (on behalf of DWG) is ready, willing and able to transfer title to two of the Allmand light towers to 083. This should be sufficient to address 083's claim for damages for breach of contract, on the basis that DWG failed to deliver the two light towers purchased. The claims originally advanced by DWG to the effect that 143 had unlawfully "con-

verted" the light towers with serial numbers 195 and 197 have been abandoned. I have found in any event that those were the light towers DWG sold and 143 purchased.

**(c)    Ownership of Stauble Road**

**121**    In the amended notice of civil claim (the "Amended Claim"), all three plaintiffs advanced a claim to an interest in Stauble Road, on the grounds that all three of them contributed money to the property. There was also an alternative claim based on an "oral binding contractual agreement" between Chelsey and all three plaintiffs, which Chelsey was alleged to have breached. However, in closing argument, Mr. Fletcher submitted that the order being sought, and that he wished me to make, is that title to Stauble Road be transferred into the names of Wendy and Chelsey only, as joint tenants.

**122**    Wendy's evidence is to the effect that the $125,000 advanced to Chelsey, and used as the down payment, was never intended as a gift. Although Stauble Road was initially to be registered in Chelsey's name only, that was simply to facilitate Chelsey financing the purchase of her share of the property and was never intended to be permanent. She and Chelsey were to own the property jointly, and both were entitled to live there. There was an understanding about what was to happen if either of them wanted to buy the other out, or no longer wished to live in the home together.

**123**    On the other hand, Chelsey's position is that the $125,000 is an absolute gift to her made by Wendy, against a background of promises that Wendy and George would help her get into her own home as compensation for Chelsey agreeing to undertake financial obligations in Alberta, including in connection with the purchase of Beaverlodge. She says that Stauble Road was registered in her name because she was intended to be the sole legal and beneficial owner.

**124**    Chelsey is seeking a declaration that she received $125,000 from Wendy as an absolute gift and a further declaration that she is the sole registered and beneficial owner of Stauble Road, free of any claims by any of the plaintiffs.

**125**    I will first address the plaintiffs' claim in contract.

**126**    A legally enforceable agreement requires agreement - *consensus ad idem* - on basic terms, and the court cannot make a contract for the parties. The court cannot enforce an apparent bargain if its terms are unclear: see ***Anchorage Management Services Ltd. v. 465404 B.C. Inc.***, [1998] B.C.J. No. 580, 1998 CanLII 6334 (B.C.S.C.), aff'd 1999 BCCA 771, 72 B.C.L.R. (3d) 389, at paras. 54 and following.

**127**    Here, there is no such agreement. The evidence simply does not support the conclusion that one side ever agreed with the other on the terms on which Stauble Road was being purchased. The plaintiffs' claim in contract is dismissed.

**128**    However, the intentions of the donor or donors of the $125,000, used for the down payment on Stauble Road, are relevant to the trust claim and to Chelsey's contrary assertion that she received the money as an absolute gift.

**129**    The law on this point has been reviewed recently by the Court of Appeal in ***Rascal Trucking Ltd. v. Nishi***, 2011 BCCA 348, 21 B.C.L.R. (5th) 330, at paras. 34 and following:

> [34] Where property is transferred without consideration, the common law creates a presumption of resulting trust. The presumption is founded on the principle

that equity presumes bargains and not gifts; accordingly, at common law, it is presumed that the transferor intended to create a trust, rather than to make a gift: *Kerr*, [2011] 1 S.C.R. 269, at para. 19.

[35] The presumption of resulting trust is rebuttable. Where a transfer is made for no consideration, the onus is placed on the transferee to demonstrate that a gift was intended: Waters, at 375; *Pecore v. Pecore*, 2007 SCC 17 at para. 24, [2007] 1 S.C.R. 795. The presumption of resulting trust therefore alters the normal rule that a plaintiff bears the burden in a civil case. Rather, the onus is on the transferee to rebut the presumption of the resulting trust: *Pecore*, at para. 25.

[36] In determining whether a resulting trust exists, the governing consideration is the actual intention of the transferor: *Pecore*, at para. 43; *Kerr*, at para. 19. In order to displace the presumption of resulting trust, the transferee must provide evidence of the transferor's contrary intention on the civil standard of proof.

. . .

[38] It is now clear that in Canada, a resulting trust is not concerned with the common intention of the parties; it is solely the intention of the grantor or transferor that governs the inquiry . . . .

Purchase Money Resulting Trust

[39] Resulting trusts are commonly found where one party has contributed to the purchase price of property but legal title is put in another party's name. In this situation, equity presumes a resulting trust over the property in proportion to the amount of the monetary contribution. In the American case law, this type of trust is called a "purchase money resulting trust" or "purchase price resulting trust". This terminology has been adopted by the courts in Ontario, Newfoundland, and the Northwest Territories [citations omitted].

[40] A purchase money resulting trust is simply a specific kind of gratuitous transfer resulting trust. Accordingly, the same principles outlined above under "Gratuitous Transfers" apply in this context.

[41] The classic statement of the principles underlying a purchase money resulting trust is found is Chief Baron Eyre's judgment in *Dyer v. Dyer* (1788), 30 E.R. 42 at 43, 2 Cox Eq. Cas. 92 (Eng. Ch. Div.):

> The clear result of all the cases, without a single exception, is that the trust of a legal estate, whether freehold, copyhold, or leasehold; whether taken in the names of the purchasers and others jointly, or in the names of others without that of the purchaser; whether in one name or several; whether jointly or successive, <u>results to the man who advances the purchase-money</u>.

[Emphasis added.]

[42] In order to take advantage of a purchase money resulting trust, the claimant must show that he, in fact, advanced the purchase money (or a portion of the purchase money), and that he acted throughout as a purchaser and not as a lender or creditor for the alleged trustee who holds legal title to the property: Waters, at 368.

See also **Beaverstock v. Beaverstock**, 2011 BCCA 413, at para. 9.

**130**    The first question I must address is the source of the $125,000. Does it come from Wendy alone? Does it come from both Wendy and DWG, who both wrote cheques to Chelsey? Does it come from Wendy and George, but not DWG? Or does it come from all of Wendy, DWG and George? By the revised statement of relief presented during closing submissions, Mr. Fletcher asked me to find that the money came from all three plaintiffs. However, as I noted above, Mr. Fletcher went on to submit that, if I concluded the money was not a gift, I should order that title to Stauble Road be transferred into the names of Wendy and Chelsey only. This result would be consistent with the money coming from Wendy alone, so far as Chelsey was concerned.

**131**    I conclude that Wendy should be treated as the source of the $125,000. There is clear evidence that Wendy was the source of $100,000 that Chelsey received. Although the cheque for the remaining $25,000 was drawn on DWG's account, rather than Wendy's, I conclude that this was done by Wendy (and George) simply as a matter of convenience (rather than writing two cheques), and that neither Wendy nor George intended that, by drawing the cheque on DWG's account, DWG would thereby acquire an interest in Stauble Road. So far as Chelsey was concerned, the $25,000 was going to be treated as if it came from Wendy, just like the $100,000. Wendy also represented in the Gift Letter that she was the source of the funds.

**132**    Accordingly, it is Wendy's intention that is relevant for the purposes of the trust analysis. Chelsey bears the onus to rebut the presumption of resulting trust.

**133**    Based on Wendy's evidence (which is corroborated to some extent by George), Wendy did not intend to make a gift of $125,000 to Chelsey. Rather, her intention was to help Chelsey acquire a true ownership interest in a home (as opposed to an interest that existed only on paper). In other words, it was to help Chelsey "get into a house." By providing the $125,000 for the down payment, Wendy was providing Chelsey (who, by her own admission, had no money) with the means to borrow enough money to complete the purchase of Stauble Road, for the benefit of both of them. Wendy's intention was that Chelsey would in fact have an ownership interest in Stauble Road, and an interest in the equity in the property. However, Wendy would also have an ownership interest, acquired through the contribution of the down payment.

**134**    Unfortunately, as was the custom among these family members, nothing was done in a straightforward way, and documents do not reflect what Wendy says are the facts. Moreover, based on Wendy's evidence, the true facts were deliberately hidden from Chelsey's mortgage lender.

**135**    Chelsey relies on the Gift Letter as evidence rebutting the presumption of resulting trust, and establishing that the $125,000 was an absolute gift. She argues that the Gift Letter is the true expression of Wendy's intentions. However, I do not agree.

**136**    Wendy's evidence is to the effect that she signed the Gift Letter, knowing that what she was certifying was false, but also knowing that the letter was going to be provided to a financial institution so that Chelsey could obtain a mortgage. Such deception is very troubling indeed. However, I have concluded that Wendy did not really see what she was certifying as a lie. It would not be completely a lie if the $125,000 was not a loan but instead was being advanced to acquire an interest (subject to the bank's mortgage) in the property.

**137**    On the other hand, Chelsey's evidence is to the effect that she treated the Gift Letter as genuine. She considered that she had earned - and was entitled to - the money as a result of the contributions and sacrifices she had made by allowing her mother and step-father to pledge her credit to buy Beaverlodge and build DWG's business.

**138**    I am sympathetic towards Chelsey's situation, and I have little doubt that she continues to feel both hurt and used as a result of her treatment by her mother and step-father after the family moved to Alberta. However, I conclude that, based on the family history, if Chelsey believed the Gift Letter was genuine, it was more out of hope (and probably some denial about the reality of her complicated relationship with her mother) than looking at the situation realistically. In my view, an outright gift in the order of $125,000 would have been completely out of character for both Wendy and George. On the other hand, "helping" Chelsey to get into a house that family members living in Prince George were going to share, and helping Chelsey to start building equity for herself, was something both Wendy and George were prepared to do, and not inconsistent with what they had discussed with Chelsey from time to time.

**139**    I conclude therefore that Chelsey has failed to rebut the presumption of resulting trust. I find that Wendy did not intend to make a gift to Chelsey of $125,000, but rather advanced the money subject to a purchase money resulting trust. Accordingly, Wendy advanced the $125,000 as a purchaser, and not as Chelsey's lender or creditor. To that extent, Wendy's representation in the Gift Letter that the funds "don't ever have to be repaid" was true.

**140**    Wendy and George asserted that the so-called renovation costs should be added to the $125,000, and be treated as part of the purchase money resulting trust. I disagree. When Stauble Road was purchased, Wendy and DF (and George when he was in Prince George) were to live there with Chelsey. I accept Chelsey's evidence that, from her perspective, the renovations were unnecessary, but she went along with Wendy's wishes. I find that Wendy (as a person with an interest in the property), along with George, made the decisions about what should be upgraded or renovated, and decided what they were prepared to spend. Chelsey's views or wishes were irrelevant. I find further that the renovations were done primarily for Wendy's comfort and convenience, and the comfort and convenience of DF and George, and that was the intention behind incurring the expenses. Chelsey was indifferent. Moreover, except for a couple of weeks in April and May 2010, Chelsey has not lived at Stauble Road since early January 2010. As a result, Wendy, DF and George, as the actual occupants of the house, have had all of the benefit of the renovations. I see no unfairness in Wendy and George having to pay for them, without any contribution from Chelsey.

**141**    The result is that Wendy has an interest in Stauble Road in proportion to the amount of her monetary contribution ($125,000) to the purchase price ($300,000). I calculate that proportion to be 42%. Chelsey therefore has a 58% interest. The Scotiabank mortgage charges the entire property. This is simply the result of the manner in which Wendy and Chelsey decided Stauble Road would be purchased and financed, and Wendy's decision to provide the Gift Letter to Chelsey's mortgage lender. Since the $125,000 was provided to acquire an interest in the property, and not as a loan,

Wendy is not entitled to priority for repayment of that amount, if and when Stauble Road is sold. She is however entitled to be indemnified by Chelsey in respect of the Scotiabank mortgage. In other words, as between Chelsey and Wendy <u>only</u>, the Scotiabank mortgage is not to charge Wendy's interest.

**142**    Mr. Fletcher sought an order that title to Stauble Road be transferred into Wendy's and Chelsey's names as joint tenants, presumably based on the premise that each had an equal interest in the property. However, I have concluded otherwise. There will therefore be a declaration that Chelsey holds Stauble Road in trust for Wendy as a tenant-in-common: see **_Rascal Trucking_**, at para. 53

**143**    In the Amended Claim and in closing submissions, Mr. Fletcher sought an order for partition and sale of Stauble Road (along with other consequential orders, e.g., that the property be appraised), in the event I made a declaration that Wendy had a interest in the property. In Chelsey's pleadings and in closing submissions, Ms. Craig (on behalf of Chelsey) advanced a claim against Wendy and DWG for occupation rent, and for damages for trespass.

**144**    These claims by Wendy and Chelsey were given very short shrift in closing argument. Essentially, they were mentioned, but I was not provided with any considered submissions by either side. Moreover, I was not provided with any authority that might guide my consideration of the relevant issues and assist me to come to a determination whether some relief should be granted and, if so, the form it should take and any terms that might be appropriate. As a result, and while the expected course at a trial is to deal with everything at once, once and for all, I have concluded it would not be just, with respect to these particular claims, either to grant relief or to dismiss these claims at this time. It may be that, with the benefit of my ruling concerning the ownership of Stauble Road, the parties can proceed to resolve matters between them, and I would urge counsel to assist their respective clients to that end. However, I am declining to rule on these issues now.

### (d)    Breach of Privacy

**145**    I turn next to the breach of privacy claims.

**146**    The complaints relate in particular to: documents relating to the renovation expenses; personal files and documents (whether paper or electronic) belonging to Wendy and George; DWG paper files that were in the home office; DWG electronic accounting data stored on the memory stick and on the computer in the home office; and correspondence relating to a dispute between DWG and BP (including, DWG alleges, privileged documents). Based on the contents of the Amended Claim, there appears to be some overlap between the breach of privacy claims and the "conversion, detinue and trespass to chattels" claims, especially concerning DWG records.

**147**    This was a particularly confusing part of the Amended Claim. The relief requested appeared under the heading "The Individual Plaintiffs also claim." In the first two paragraphs, only Wendy and George claim damages against Chelsey and Jared for breach of privacy. There is no claim by or against the corporate parties. However, para. 5 of this part begins "The plaintiffs and each of them . . .", thus creating a troublesome ambiguity, although in this paragraph the relief was requested against Chelsey and Jared only.

**148**    In his closing submissions, Mr. Fletcher clarified that:

> (a)    Wendy and George are seeking damages (general, special and punitive) against Chelsey and Jared; and

(b)   all plaintiffs are seeking damages (general, special and punitive) against all defendants for breach of privacy, specifically the taking of corporate documents and the taking of corporate information from Wendy's computer.

**149**    The plaintiffs rely on the ***Privacy Act***, R.S.B.C. 1996, c. 373, which provides that:

1    (1)    It is a tort, actionable without proof of damage, for a person, wilfully and without a claim of right, to violate the privacy of another.

(2)    The nature and degree of privacy to which a person is entitled in a situation or in relation to a matter is that which is reasonable in the circumstances, giving due regard to the lawful interests of others.

(3)    In determining whether the act or conduct of a person is a violation of another's privacy, regard must be given to the nature, incidence and occasion of the act or conduct and to any domestic or other relationship between the parties.

(4)    Without limiting subsections (1) to (3), privacy may be violated by eavesdropping or surveillance, whether or not accomplished by trespass.

. . .

2    (2)    An act or conduct is not a violation of privacy if any of the following applies:

(a)    it is consented to by some person entitled to consent;

(b)    the act or conduct was incidental to the exercise of a lawful right of defence of person or property;

**150**    During argument, I raised with counsel the question whether a corporation had a right of action under the ***Privacy Act***. Both Mr. Fletcher and Ms. Craig were content to have the claims dealt with on the basis that a corporation could sue under the ***Act***.

**151**    I am dismissing the claims advanced against 143 and 083. Based on allegations in the Amended Claim, these claims were flimsy at best. It is significant, in my view, that no relief was claimed against these defendants in the Amended Claim. At trial and in final argument, the claims appeared to be based on little more than the proposition that if Chelsey and/or Jared were liable for unlawful acts, the corporations must be liable too because Chelsey and Jared held 100% of the shares.

**152**    I turn next to the claims against Jared.

**153**    In my view, there is little evidence to support a finding of liability against Jared. Rather, the plaintiffs' argument appears to be based mostly on guilt by association: since Jared and Chelsey are close to one another, they must be doing everything together. However, that does not amount to

proof on a balance of probabilities of unlawful acts by Jared. There is evidence that Jared was among the people at Stauble Road when Wendy and George returned from Costa Rica. But that does not establish that Jared ever went into the home office (and he denied doing so), ever looked at or took any documents that were in that room (including the box of DWG financial records) or ever touched the computer. Moreover, I find that the plaintiffs have failed to demonstrate any connection between Jared and the documents (including, apparently, a draft letter Mr. Fletcher sent to Wendy and George, his clients) that have been produced by BP in separate litigation in Alberta (which I mention below).

**154**    Jared did see a copy of the April 26, 2010 letter BP sent to DWG. Chelsey showed a copy to him. However, in my view, that is insufficient to establish a claim by any plaintiff (although presumably it is DWG's privacy that is breached, if anyone's) against Jared. The plaintiffs' claims for damages against Jared for breach of privacy are dismissed.

**155**    I turn then to the claims against Chelsey.

**156**    In my view, the claims alleged in the Amended Claim (for example, that George's Royal Bank file was removed from Stauble Road) were simply not proven on a balance of probabilities. Even if there was proof that (for example) some of George's personal documents were at Stauble Road at some point, and that at some later point George, or Wendy, or both of them, concluded they were missing, it does not follow either logically or necessarily that Chelsey took them. Documents may simply have been misplaced, something that is not unheard of even when an individual is not living in two different places. At trial, Chelsey denied that she took, read or copied most of the documents her mother and step-father accused her of taking, reading or copying.

**157**    Chelsey had personal files in the home office and on Wendy's computer (something that Wendy does not dispute). When Wendy and Chelsey were living together at Stauble Road, Chelsey used the computer to check her e-mail and to access the internet. Wendy does not dispute this either. It appears that family members kept electronic documents and information private by the use of passwords. Because Chelsey had some of her own personal documents in the home office, and because of the intertwining of business with personal affairs among the members of this family, I think it was almost inevitable that when Chelsey was searching for her own papers and documents in the home office and on the computer, she would come across other documents, including George's, Wendy's and DWG's. In my view, Chelsey was entitled to search for and retrieve her own personal documents and files, whether paper or electronic, and it was not a breach of anyone's privacy for Chelsey to look for her own property at Stauble Road.

**158**    On the other hand, Chelsey admitted that she did look at and take copies of some documents.

**159**    One of documents Chelsey admitted reading and copying was the Will Document, which she said she found in the home office when she was at Stauble Road in February. Based on Mr. Edmunds' evidence concerning the state of home office when he was looking after Stauble Road at that time, I conclude that, contrary to Chelsey's evidence, the Will Document was probably not left out in the open on the desk in the office, for anyone to see.

**160**    In February, Chelsey was looking for her own files and documents in the home office. I conclude that she probably came across the Will Document during her search. Naturally, the document would be of interest to Chelsey. But since Wendy had not seen fit to communicate the con-

tents of the document to either Chelsey or Jared, I find that Chelsey breached Wendy's privacy by reading and taking a copy of that document. Chelsey provided a copy only to her lawyer.

**161**　　Another document that Chelsey admitted reading and coping was the April 26, 2010 letter from BP to DWG. Chelsey reviewed this document when she was living at Stauble Road and when Wendy, George and the Edmunds were in Costa Rica. Again, Chelsey was able to get into the house only by calling a locksmith, because Wendy had changed the locks. But even Wendy does not dispute that Chelsey had both a legal and beneficial interest in Stauble Road, and Wendy had simply taken self-help measures to keep her daughter out of a house of which her daughter was at least a part owner.

**162**　　At trial, Chelsey explained that she found the copy of BP's letter on the fax machine in her mother's home office, something that Wendy asserts is an impossibility. I have serious doubts that, if members of the family had still been talking to one another in a civilized way, Chelsey's reading of the BP letter would have become the subject of a claim for damages in a lawsuit. Nevertheless, there was no reason for Chelsey to be looking at what was on the fax machine in the home office at Stauble Road. However Chelsey came across the document, and despite her explanation for why she looked at the letter, it was not addressed to her and it was not something she was entitled to read without permission. I find that, by looking at this correspondence, she breached DWG's privacy.

**163**　　With respect to the computer and electronic records in the home office, Chelsey's evidence was that when she went back to Stauble Road in late April 2010, she intended to move back into the house. Chelsey testified that when she moved the mouse on the computer, the computer was on. Again, Wendy says that she turned everything off before leaving for Costa Rica. But Wendy would not be the first person to think she had shut down and turned off a computer, only to find later that had not happened. Chelsey denied accessing electronic documents that were not hers. The plaintiffs have the onus to prove, on a balance of probabilities, that she did.

**164**　　In support of the breach of privacy claim, the plaintiffs tendered in evidence a report and a supplementary report from a computer expert, Scott Brown, who examined the computer after Wendy and George returned from Costa Rica. Mr. Brown did not give oral evidence at trial. Although the reports failed to comply with Rule 11-6(1) in a number of respects, Ms. Craig did not object to their admissibility, but said their defects should go to weight.

**165**　　The conclusion expressed in the main report is as follows:

　　　　1.　That issue [sic] that this report relates to is breach of privacy.
　　　　2.　Someone present in the room where the computer is located tried to or did access the Quickbooks information between April 25, 2010 and May 06, 2010 on [sic] several times. These accesses were either viewing or copying Quickbook files and links. See attached Schedule A.

According to Schedule A, the vast majority by far of what I will call "access QuickBooks attempts" (because there is no evidence about what actually happened) occurred later in the day on May 6, 2010, after Chelsey was gone from Stauble Road.

**166**　　Almost as an afterthought, the supplementary report addresses the question about the time of day, and offers an explanation for how the computer files could have been accessed at a time when Chelsey was still at Stauble Road. However, the facts underlying the explanation were not proven by other evidence at trial.

**167**     I am asked, based on the expert report and the supplementary report, and Chelsey's evidence that she was in the home office and used the computer, to conclude that she was the one accessing the records. Chelsey has denied this. Given Chelsey's denial, the undisputed evidence that there were other people in the house at Stauble Road, the initial conclusion in the main report that most of the access attempts occurred after Chelsey left Stauble Road and the lack of factual support for the conclusions drawn in the supplementary report, I am not prepared to conclude that Chelsey was the individual who made the access QuickBooks attempts.

**168**     During the trial, there was considerable to-do over documents BP had produced in separate litigation underway in Alberta in which DWG, George and Wendy are suing BP and an another individual. During her evidence-in-chief, Wendy was asked about several documents that have been produced by BP on discovery in that litigation. The documents include, for example, an unsigned copy of a letter to BP dated May 20, 2010 and authored by Mr. Fletcher and a revised version of that same letter, signed on behalf of Mr. Fletcher. The evidence was tendered during the plaintiffs' case in support of the breach of privacy claims and (I gather) also the claims for damages for conversion and trespass to chattels. However, there was also evidence indicating that Chelsey had been sent the unsigned copy of the May 20 letter by Mr. Jim Hutchins, who was apparently acting as an agent for BP and looking after equipment after the relationship between BP and DWG was terminated.

**169**     Mr. Fletcher asks me to conclude, as part of the plaintiffs' breach of privacy claim, that Chelsey or Jared (or both) took the documents unlawfully and provided them to BP. I am not prepared to do this. DWG can hardly complain if BP has copies of documents relating to DWG that originated with BP or that were sent to BP. BP could have obtained documents from third parties. Neither George nor Wendy have control over BP's communications, including with third parties. In my view, the evidence tendered by the plaintiffs is inconclusive, and there are other reasonable explanations, other than that Wendy's children acted unlawfully, for how the documents may have come into BP's possession. I find that the plaintiffs have failed to prove on a balance of probabilities that Wendy's children were the source.

**170**     During his evidence, George complained that Chelsey and Jared passed on DWG documents to others, without his permission. But I was left to speculate on the nature of the documents and who the "others" were. George also complained about having to quash "rumours." However, again, I was left to speculate about what in fact happened. In those circumstances, I am unable to give George's complaints and feelings much weight.

**171**     I find myself in a similar position concerning Wendy's evidence in relation to the other breach of privacy claims. In my view, it is too speculative to conclude that either Chelsey or Jared is the source of or responsible for perceived problems.

**172**     In summary, I find that Chelsey breached DWG's privacy by reading and copying the April 26, 2010 letter from BP to DWG, and breached Wendy's privacy by reading and copying the Will Document. The balance of the breach of privacy claims are dismissed.

**173**     I turn next to damages for breach of privacy. In closing submissions, Mr. Fletcher relied on Madam Justice Bruce's decision in ***Watts v. Klaemt***, 2007 BCSC 662, 71 B.C.L.R. (4th) 362 to support his argument concerning the appropriate range of damages in this case. In ***Watts***, the court awarded the plaintiff $30,000 in damages. However, in that case, the defendant had unlawfully invaded the plaintiff's privacy by intercepting and recording private cordless telephone conversations

and by presenting the recordings to plaintiff's employer, which resulted in her dismissal. There was evidence that plaintiff suffered severe depression and post traumatic stress disorder, and never recovered from being fired. Moreover, expert opinion evidence from a psychiatrist supported the plaintiff's claims concerning the devastating effect the breach of privacy had on her. There is nothing remotely similar here.

**174**      At trial Wendy gave evidence about how she has been affected by her perception that her privacy has been invaded and that the invasion was widespread and persistent. At the close of her examination-in-chief, she became very emotional when describing how she felt that her whole life had been invaded, given the nature of the documents and information she kept in the home office at Stauble Road. She also testified about unsettling behaviour she is observing from DF, which she linked to an invasion of the family's privacy. But I did not hear from DF himself, and, once again, there are other possible explanations for a teenage boy's behaviour. He may simply be reacting to a major and bitter family breakdown and litigation between his parents and his half-siblings, with whom (according to Chelsey and Jared) he had a close relationship.

**175**      Wendy became quite emotional when giving her evidence at this stage of the trial. But Chelsey and Jared also demonstrated high emotions - what one would expect with this kind of estrangement from a parent and family turmoil - when giving their evidence. The current situation is clearly very upsetting for both Wendy and her two oldest children. One can only hope that the parties will be able to move on when this litigation is concluded.

**176**      I conclude that, in this case, the damages for breach of privacy should be nominal. In the case of DWG, I award $50 payable by Chelsey. In Wendy's case, I award $100, also payable by Chelsey.

### (e)      Conversion and trespass to chattels

**177**      In argument, Mr. Fletcher clarified that:

> (a)      Wendy and George are claiming damages against Chelsey and Jared for the taking and/or unauthorized use of personal property located at Stauble Road. Wendy and George say that this property included, not only such things as food and wine, but also the file of receipts for the renovations at Stauble Road;
>
> (b)      DWG claims damages against all four defendants for the taking or unauthorized copying of the physical records and documents of DWG that were located at Stauble; and
>
> (c)      DWG claims against Chelsey and 143 only for the taking of DWG's information from its computerized records.

**178**      For the reasons given above under the discussion of the breach of privacy claims, I dismiss the claims against 143 and 083, and I also dismiss the claims against Jared so far as they relate to documents and records.

**179**      For the reasons given above under the discussion of the breach of privacy claims, I dismiss the claim by DWG against Chelsey for the alleged taking of DWG's information from its computerized records, and for the alleged taking or unauthorized copying of physical records and documents of DWG located at Stauble.

**180**    In my view, Wendy and George have failed to prove, on a balance of probabilities, that Chelsey took or copied the paper records (such as the receipts for the renovation costs) they accuse her of taking and copying. At trial, Chelsey denied such conduct, while, on the other hand, admitting to taking other items (such as Wendy's engagement ring from her marriage to Tim Fillion) and documents. It does not follow that, because something cannot be located, Chelsey took it.

**181**    As I noted above, Wendy and George claim to have suffered damages in the sum of $7,924.78. This amount includes $1,000, which is the estimated value of DF's hockey cards, $25 for a wallet and $895.94 for the industrial meat slicer purchased when Wendy and Chelsey were in the lunch truck business together. As I also noted above, in some cases, Wendy and George have purchased new items to replace what they claim were taken.

**182**    I have also noted above Chelsey and Jared's evidence concerning property they admit taking, which they say was their property. I accept that evidence.

**183**    Wendy and George, as plaintiffs, bear the burden of proof. They must prove with respect to each item, that one or more of the defendants is responsible for its loss, and the damage suffered.

**184**    I cannot award damages of $1,000 for a hockey card collection when the evidence whether Chelsey or Jared touched it at any point in this sad tale is inconclusive at best, and I have no idea what the estimate is based on. I have very serious doubts that either Chelsey or Jared would do something that would hurt DF. There is little independent evidence that particular items, now the subject of a claim, were at Stauble Road at the relevant period of time, and I am not prepared in this area to accept Wendy's and George's evidence to the effect that each item was at Stauble Road when they left for Costa Rica, and the value of each item was as claimed, in the absence of some independent evidence. Moreover, the evidence is clear that there were other individuals at Stauble Road when Wendy and George returned from Costa Rica.

**185**    I have concluded, with respect to this part of the claim, that Wendy and George have failed to satisfy the burden on them to prove: what was taken, that either Chelsey or Jared was responsible for taking it and the resulting damage. The claims for damages for the taking and unauthorized use of personal property located at Stauble Road are, accordingly, dismissed.

### (f)    Rental of the Light Towers

**186**    I turn then to the claims by 143 and 083 against DWG for unpaid rent and damages for breach of contract with respect to their two light towers. 143 and 083, who assert that they are entitled to rents pursuant to a concluded agreement, have the onus to prove the terms of that agreement.

**187**    Ms. Craig submits that the terms of 143's and 083's agreements with DWG were that:

(a)    DWG would rent the towers for a minimum of 12 months, and if the BP Project went beyond 12 months, DWG would rent the towers for the duration of the project;

(b)    the monthly rental for each tower was $4,500 plus GST.

**188**    Mr. Fletcher submits that the terms of the agreements between DWG and 143 and 083 were that:

(a)    each tower would be rented for $3,750 per month plus GST. Shortly after the ini-
tial agreement was reached, the monthly rental amount was increased to $4,500
plus GST;

(b)    the towers would be rented in connection with the BP Project and for a minimum
of 12 months, but not necessarily 12 consecutive months;

(c)    143's and 083's towers would be rented when the majority of DWG's towers were
also rented, and DWG would make its best efforts to rent (i.e., use) 143's and
083's towers on the BP Project.

**189**    As compared with Stauble Road, I do not think it is open to me to find that the parties nev-
er reached any concluded agreement concerning the rental of the light towers. DWG in fact paid
rents to both 143 and 083. The question is: what are the terms of the agreements by which rents
were paid?

**190**    Here, I find that there was no written agreement between DWG and either 143 or 083.
However, the court can consider (among other things) the conduct of the parties in determining the
terms of an oral agreement. Madam Justice Newbury observed in *De Cotis v. Viam Holdings Ltd.*,
2010 BCCA 368, 7 B.C.L.R. (5th) 253 (at para. 21):

> As G.H.L. Fridman notes in The Law of Contracts in Canada (5th ed., 2006)
> "[i]n the case of a completely oral contract there is greater flexibility in the nature
> of the evidence that is admissible to prove the contents of the contract and the
> meaning of the language used by the parties." (At 440.) This flexibility follows
> intuitively from the recognition that oral contracts must often be construed with-
> out the key interpretive tool used to understand written contracts - the words of
> the agreement.

**191**    The same basic principles applicable in the interpretation of written contracts also apply
when interpreting oral contracts.

**192**    The "factual matrix" in this case includes the purchase by 143 and 083 of two light towers
each from DWG. DWG received approximately $100,000 in connection with those purchases, and
used the money for its own purposes. Neither 143 nor 083 had any use for the light towers unless
they were earning rents, and each company was incorporated specifically for the purpose of acquir-
ing light towers from DWG, and then renting them to DWG. Moreover, the BP Project was differ-
ent from the other types of projects on which DWG had supplied equipment. All of the witnesses
agree on this point. It offered steady, long-term work, for twelve months, with the possibility of
more. The witnesses generally agree on this too. At the time the arrangements were being discussed
in the fall of 2008, light towers, and only light towers, were going to be used; there was no talk of
gensets being used. The same arrangements were being offered to both 143 (Chelsey) and 083 (Jar-
ed).

**193**    In addition, 143 relies, at least to some degree, on the October 28 Letter. As I explained
above, I prefer George's discovery evidence concerning this document, over his unconvincing evi-
dence at trial. This letter cannot represent the "contract," since (among other things) there is no
mention of 143. However, I have concluded I can consider this document, in the context in which it
was signed, as part of the evidence relevant to the terms on which DWG agreed to rent light towers
from each of 143 and 083. Based on evidence that I accept, DWG was prepared to represent the ex-
istence of a particular business arrangement to a financial institution in order to obtain money that

was ultimately destined for DWG. The business arrangement described in the October 28 Letter reflected what DWG was prepared to offer, and what 143 and 083 ultimately accepted by purchasing light towers from DWG.

**194**    Despite George's assertion that he had designated four Allmand towers as the towers being purchased by 143 and 083, DWG began paying rents to 143 and 083 as soon as it received the purchase money for the towers. The Allmands had not yet arrived from the factory. The timing of the payment of rents is more consistent with 143's and 083's version of the terms of the agreements, in my view.

**195**    The result is that DWG's version of the agreements - based on payment when 143's and 083's light towers are "out" and provided the majority of DWG's towers are "out" - does not make commercial sense and is inconsistent with what in fact happened. Moreover, DWG had not tendered evidence based on which I could conclude DWG performed the terms of the agreement it asserts. DWG identifies 143's and 083's light towers as Allmands. But it never communicated that to either 143 or 083, or their principals. Moreover, DWG paid rents before any Allmands were "out." DWG also never communicated to 143 or 083 when their respective light towers were not "out," nor was there any independent evidence on this point at trial. A communication that towers were not "out" would be unnecessary if the terms of the agreements are those asserted by 143 and 083, and DWG was obligated to pay for 12 consecutive months (the first year of the BP Project).

**196**    I find therefore that the terms of 143's and 083's agreements with DWG in respect of the light tower rentals are that:

> (a)    DWG would rent the towers from each of 143 and 083 for a minimum of 12 consecutive months (beginning in the month when DWG sold the towers to 143 and 083);
>
> (b)    if the BP Project went beyond 12 months, DWG would rent the towers for the duration of the project; and
>
> (c)    the monthly rental was $4,500 plus GST (pro-rated for the first month) for each light tower sold by DWG to 143 and 083.

**197**    143 and 083 say that they are each entitled to rents into 2010, for so long as the BP Project continued. However, I conclude that both Chelsey and Jared recognized when they had the final meeting with Wendy on January 4, 2010 that the light tower rental arrangement was over, and the agreements were terminated. They were not prepared to sacrifice their family for the business arrangements. Certainly, DWG considered the arrangements were finished, and removed the light towers it considered belonged to 143 and 083 from service.

**198**    I conclude, therefore, that, 143 and 083 are each entitled to rent payments from DWG for each month in 2009, terminating December 31, 2009. Some of those rents have already been paid. I will leave counsel to do the necessary calculations.

## Summary and Disposition

**199**    In summary:

> (a)    I declare that Chelsey holds her interest in Stauble Road in trust for Wendy as a tenant-in-common, in the proportion of 58% to Chelsey and 42% to Wendy. The mortgage granted to Scotiabank continues to charge 100% of the property;

(b)     I make no order at this time concerning the Wendy's claim for partition and sale of Stauble Road or concerning Chelsey's claim for occupation rent. However, if either party requires a ruling in respect of either claim, she has leave to make the appropriate application for such. If, in respect of a claim, no application is made within six months of the date of this judgment, that claim will then stand as dismissed;

(c)     I award DWG judgment against Chelsey for $50 in damages for breach of privacy;

(d)     I award Wendy judgment against Chelsey for $100 in damages for breach of privacy;

(e)     143 and 083 are each entitled to the payment of rents by DWG in accordance with these reasons. I will leave counsel to make the necessary calculations of the amounts owing, following which 143 and 083 will each have judgment for those amounts, together with interest under the ***Court Order Interest Act***, R.S.B.C. 1996, c. 79;

(f)     if 083 and DWG have difficulty resolving satisfactorily the transfer of two Allmand light towers from DWG to 083, free and clear of any encumbrances, they have leave to apply for any necessary directions or further orders; and

(g)     the balance of the claims in the amended notice of civil claim and the counterclaim are dismissed.

**200**     If the parties wish to make submissions on costs, they must take the necessary steps, within 30 days of the date of this judgment, to schedule a hearing for that purpose. Otherwise, since success on each side has been divided, each side will bear its own costs. This might be seen as unfair to Jared and 083, for example. All claims were dismissed as against them, and 083 was successful on its claim against DWG concerning rental of 083's light towers. However, all parties on one side were represented by the same counsel, and (in the absence of further submissions on costs) I consider having each side bear its own costs to be the appropriate order here.

E.J. ADAIR J.

cp/ci/e/qlrds/qlvxw/qlced/qlbdp

*Indexed as:*
# First Place, Hamilton v. Hamilton (City)

**IN THE MATTER OF The Assessment Act being R.S.O. c. 32 as amended
AND IN THE MATTER OF The Supplementary Assessment in 1976 for Taxation in 1976 and Assessment in 1976 for Taxation in 1977 of First Place, Hamilton in respect of premises known Municipally as No. 350-360 King Street East, in The City of Hamilton, in the Regional Municipality of Hamilton-Wentworth Between First Place, Hamilton, applicant, and The Corporation of the City of Hamilton and the Assessment Commissioner of the Regional Municipality of Hamilton-Wentworth, respondents**

**[1979] O.J. No. 182**

9 M.P.L.R. 119

12 R.P.R. 121

1 A.C.W.S. (2d) 27

Ontario Supreme Court - High Court of Justice
Motions Court

**Goodman J.**

Heard: December 19, 1978 and June 25, 1979.
Judgment: December 6, 1979.

(53 pp.)

**Counsel:**

C.E. Wollcombe, Q.C. & M.E. Porjes, for the applicant.
George Yates, Q.C., for the Assessment Commissioner of the Regional Municipality of Hamilton-Wentworth, respondent.

**1    GOODMAN J.**:-- This is an application made pursuant to the provisions of s. 66(1) of The Assessment Act, R.S.O. 1970, c. 32 for an order that certain lands and premises known as 350-360 King Street East in the City of Hamilton, said to be owned by the applicant, are exempt from taxation pursuant to s. 3(12) of The Assessment Act and for a further order directing that the assessment roll of the respondent corporation be amended accordingly.

**2**    The entire lands and buildings, except for the place of worship area contained therein, were assessed for realty taxes, a supplementary assessment having been made in 1976 for taxation in 1976 and an assessment having been made in 1976 for taxation in the year 1977. The building was erected in 1976.

**3**    Both the applicant and the respondent, The Assessment Commissioner of the Regional Municipality of Hamilton-Wentworth, were represented on the hearing. No one appeared for the Corporation of the City of Hamilton but Mr. Yates advised that said Corporation took the same position as the one which he took on behalf of his client.

**4**    The facts which gave rise to this application are as follows. At the time of the incorporation of the applicant, the Trustees of the Congregation of the First United Church in Hamilton had from 1930 owned all of the lands in question on which had been erected a church which was destroyed by fire and part of said lands since 1823.

**5**    The applicant was incorporated as a non-profit organization without share capital under Part III of The Corporations Act, R.S.O. 1970, c. 89 by Letters Patent dated November 27, 1973. The objects of the corporation as set forth in the Letters Patent are as follows:- (a) TO acquire by purchase, concession, exchange, lease or otherwise and to hold the lands, and any premises thereon, at 275 Main Street East, in the said City of Hamilton, and to plan, construct, erect, operate, maintain and manage a building complex on the said lands for the accomodation and convenience of the residents of the community, regardless of race, creed, colour, or religion, and generally to operate the said building complex for the purpose of relief of poverty, the advancement of any exclusively charitable aspect of education and religion and such other charitable purposes as are beneficial to the community;

> (b)    TO sell, alienate and convey the said lands, and any premises thereon, when no longer necessary for the actual use and occupation of the Corporation or for carrying on its undertaking; and
>
> (c)    Subject to The Mortmain and Charitable Uses Act and to The Charitable Gifts Act, to receive, acquire and hold gifts, donations, devises and bequests.

**6**    By-law Number 1 of the Corporation provided that the affairs of the Corporation shall be

managed by a Board of twelve directors who shall receive no remuneration for acting as such. It further provided that the membership shall consist of the applicants for incorporation, who were twelve in number and who were the first directors of the Corporation, together with all those persons who on or after the 27th day of January, 1974, for the time being, are members of the Congregation of the First United Church of Hamilton, and such other individuals and such corporations, partnerships and other legal entities as are admitted as members by the Board of Directors.

**7**     The Letters Patent further provided that "and it is hereby further ordained and declared that upon dissolution of the Corporation and after the payment of all debts and liabilities, its remaining property shall be distributed or disposed of to charitable organizations which carry on their works only in Canada".

**8**     By deed dated May 15, 1974 and executed by a majority of the Trustees of the Congregation of the First United Church, the lands were conveyed to the applicant. The deed purports to grant the lands unto the applicant in fee simple and contains a release by the grantors of "all their claims upon the said lands". The deed was duly registered on October 21, 1974. Accompanying the deed was an affidavit made pursuant to the provisions of The Land Transfer Tax Act, R.S.O. 1970, c. 235 by the solicitor for the grantee attesting to the fact that the total consideration for the land, buildings, fixtures and good will was $1.00. In paragraph 6 of the affidavit, it was stated under the heading "Other Remarks and Explanations if Necessary":- On the termination of the "life" of the building to be erected on the lands, the lands will be reconveyed to the grantors as set forth in the affidavit of the secretary of the grantee filed with the Ministry of Revenue.

A further affidavit made by Clifford William Briggs, the secretary of the applicant, sworn on April 21, 1974, was filed with the Ministry of Revenue. The relevant parts thereof insofar as it relates to ownership are as follows:

> 2(b) The Congregation of the First United Church of Hamilton own the lands and has agreed to transfer such lands for the nominal consideration of $1.00, to First Place Hamilton, the directors of which, with the exception of one who represents the Hamilton Presbytery, are all members of the Congregation of the First United Church Hamilton, for the purpose of enabling First Place, Hamilton, to erect a building complex consisting of a high rise apartment tower (to be partially used for senior citizens) [my emphasis], certain commercial space, part of which will be used for community services and after the "life" of the building is ended, the said lands will be reconveyed by First Place, Hamilton, to the Congregation of the First United Church of Hamilton.

>    ...

2(d) While First Place, Hamilton, will only hold title to the land during the "life" of the building that is erected on the land, it will maintain, operate, and manage the building complex itself during such "life".

2(e) No value or consideration in any form whatsoever will pass to or from First Place, Hamilton to or from the beneficial owner, the Congregation of the First United Church of Hamilton or between them directly or indirectly, other than the above-referred to nominal consideration of $1.00.

2(f) That all obligations including any mortgage obligations, responsibilities, acts or omissions pertaining to the land during the period of time it will be vested in First Place, Hamilton will be performed or omitted to be performed by First Place, Hamilton, for The Congregation of the First United Church of Hamilton.

2(g) That First Place, Hamilton will not be indemnified and saved harmless by the Congregation of the First United Church Hamilton, from any claims, charges, encumbrances, obligations, responsibilities, acts or omissions during the entire period of time that the land will be vested in First Place, Hamilton, as all such matters will be the full responsibility of First Place, Hamilton, during the period of time it has the right to occupy the lands. [my emphasis]

2(h) There is no document in writing pertaining to the Trust as, save as aforesaid, the members and directors of First Place, Hamilton, are members of the Congregation of the First United Church of Hamilton and so First Place, Hamilton, cannot take any step contrary to the provisions of the Trust.

...

2(j) The books and records of First Place Hamilton, will only record the property as an asset during the "life" of the building as set forth above, but the profit, if any, made by First Place, Hamilton, during its use and occupation of the lands shall be used entirely for charitable purposes, its Charter stating that its objects are "generally to operate the building complex for the purposes of relief of poverty, the advancement of any exclusively charitable aspect of education and religion and such other charitable purposes as are beneficial to the community" and the Charter further provides that the Corporation shall be carried on without the purposes of gain for its members.

3. The substance of this transaction is that during the "life" of the building to be erected by First Place, Hamilton it shall have the right to use and occupy the said lands [my emphasis] for the said total consideration of $1.00 and on such "life" terminating First Place, Hamilton shall reconvey the said lands back to the beneficial owner, the Congregation of the First United Church of Hamilton.

**9**    By supplementary Letters Patent dated March 4, 1975, the provisions of the Letters Patent were varied by deleting the clause beginning with the words "and it is hereby further ordained and declared that, upon the dissolution" and ending with the words "solely in Canada" and substituting therefore the following:- AND IT IS HEREBY FURTHER ORDAINED AND DECLARED that, upon the dissolution of the Corporation and after the payment of all debts and liabilities, its remaining property shall be distributed or disposed of to charitable organizations which carry on their work solely in Canada or to the congregation of the First United Church of Hamilton, or to the United Church of Canada.

**10**    The applicant in due course caused to be constructed on the lands a building complex of 22 floors of residential apartments, consisting of 62 bachelor units, 388 one bedroom units and 2 two bedroom units for the residential apartment's superintendent and janitor. The first floor of the building comprises approximately 33,000 square feet of retail store space. The second floor comprises approximately 28,000 square feet of office or commercial space and 9,086 square feet of church or "place of worship" area. The third floor of the premises comprises approximately 35,000 square feet of recreation or community activity area, which provides the following amenities for the residential tenants in the building and for the people in the neighbourhood surrounding the community: space for social, religious, recreational or hobby oriented activities such as garden clubs, bridge clubs, service clubs, craft groups, hobby clubs and senior citizens clubs; activity areas and rooms for shuffleboard, square dances, wheel chair dances, bingo, physical fitness activities, billiards, meetings, public health nurse visits, all of which are said to provide a healthy atmosphere for elderly people. There is also outdoor recreational space in the "open" part of the third floor for lawn bowling, croquet, swimming and resting. Church services and other normal religious activities of the First United Church are provided in the "place of worship" area. Space on the third floor is made available to the Pastime Club which operates an "Over Sixty-five Club" composed of congregational members of two churches, to Tempo - an organization to provide better facilities for the handicapped people in the Hamilton area and for organizations providing library services for senior citizens and the blind and community services for people of all ages.

**11**    As of June 12, 1978, the commercial and office section of the building had been leased to a grocery store (23,545 square feet - since vacated), a restaurant and coffee shop, a travel agency, a finishing school, a physiotherapist, Central Nortgage and Housing Corporation office and the Family Services of Hamilton-Wentworth organization, which does social and family counselling. The applicant proposed that for the remaining vacant space, tenants would be lawyers, doctors,

dentists, accountants, insurance agents and other professional and personal service businesses.

**12**    Funds for construction of the building were provided by a first mortgage in favour of Central Mortgage and Housing Corporation in the amount of $10,434,200. Central Mortgage and Housing Corporation, the Minister of Housing and the Corporation of the City of Hamilton directly subsidized the rents of 25 per cent (113) of the residential units in the building and, in addition, the Minister of Housing pays a further rental subsidy of $22.05 per month for each of the 450 units, which subsidy will remain at this rate for the first five years and then will be reduced over the subsequent ten years, subject to renewals of ten years each thereafter for a total period not in excess of fifty years. The Corporation of the City of Hamilton makes an annual grant of $10,000 as a contribution towards the salary of the program director and recreational activities on the third floor of the building and makes a capital grant of $50,000 with respect to the construction and furnishing of the "community centre" facilities in the building. The Ontario Department of Health and Welfare has committed itself to making a grant for such equipment and facilities for an amount not known at the time of this application and the applicant applied for a grant pursuant to the provisions of The Elderly Persons Centres Act, R.S.O. 1970, c. 140. There was no evidence that any such grant was ever made.

**13**    The applicant is registered with Revenue Canada as a Canadian Charitable Organization.

**14**    The applicant intends that any surplus funds derived from commercial tenants in the building will be applied to reduce the apartment rents and defray the costs of the community activities.

**15**    The applicant has set $10,000 household income as the maximum allowable yearly income of which a proposed tenant may be in receipt in order to become or remain a tenant, that is to say, the occupant or occupants (combined income in the case of a man and wife) could not have a larger income. At least 95 per cent of the tenants in the building have incomes of less than $7,500 per annum.

**16**    No applicant has been turned away because of insufficient income. The material filed does not disclose, however, whether or not there is any minimum requirement of annual income as a condition of acceptance as a tenant. Applications were refused where the physical or mental condition of the applicant was such that nursing home care was needed by such applicant.

**17**    The applicant requires prospective tenants to reveal their capital assets as well as their income, but it is common ground between the parties that income is the governing factor in determining whether an applicant qualifies for acceptance as a tenant if room is available and assets are not one of the criteria. There was no material filed to indicate whether a person with a lower income with modest assets has any priority over persons with a higher income under $10,000 per year and substantial assets. Nor does the material filed indicate the amount being charged by the applicant for the different types of accomodation available.

**18**    There is no dispute between the parties with respect to the facts set forth above.

**19**    The applicant claims that the lands and buildings are exempt from taxation pursuant to the provisions of s. 3(12) of the Act which reads as follows:- 3. All real property in Ontario is liable to assessment and taxation, subject to the following exemptions from taxation:

> 12.    Land of an incorporated charitable institution organized for the relief of the poor, The Canadian Red Cross Society, St. John Ambulance Association, or any similar incorporated institution conducted on philanthropic principles and not for the purpose of profit or gain, that is supported, in part at least, by public funds, but only when the land is owned by the institution and occupied and used for the purposes of the institution.

**20**    That paragraph provides four distinct categories of exemption for taxation, namely land of (1) an incorporated charitable institution organized for the relief of the poor; (2) Canadian Red Cross Society; (3) St. John Ambulance Association; and (4) any similar incorporated institution conducted on philanthropic principles and not for the purpose of profit or gain, that is supported, in part at least, by public funds.

**21**    It further provides that the land of any such institution is exempt only when the land is owned by the institution and occupied and used for the purposes of the institution.

**22**    The applicant claims exemption from taxation under Category 1 or, in the alternative, under Category 4.

**23**    It is settled law that the onus is on the applicant to establish that its case falls within the exemption in order to claim the benefit thereof. In Assessment Commissioner of the Village of Stouffville v. Mennonite Home Association of Yorkville (1973), 31 D.L.R. (3d) 237, Spence, J. said at p. 240:

> ...It is, of course, clearly established that although the words of the statute must plainly assess the tax in order to bring the subject within the levy, the subject must, in turn, clearly establish that his case falls within the exemption in order to claim his benefits.

**24**    I consider firstly the applicant's claim for exemption under Category 1. The objects of the Corporation as set forth in the Letters Patent clearly contemplate the operation of the building complex for the purpose of the relief of poverty as well as the advancement of any exclusively charitable aspect of education and religion and such other charitable purposes as are beneficial to the community and, in achieving such purposes, the objects clause contemplates the management of the building for the accomodation and convenience of the residents of the community without restrictions as to race, creed, colour or religion.

**25**    If the applicant satisfies the onus of showing that it is an institution which falls within Category 1 or Category 4, it still must discharge the onus of showing that the land is (1) owned by

the institution and (2) occupied and used for the purposes of the institution.

**26**    I propose to deal firstly with the question of ownership of the lands. The respondents take the position that the Congregation of the First United Church of Hamilton was, and still is, the beneficial owner of the land. They rely on the contents of the land transfer tax affidavit attached to the deed and on the contents of the affidavit filed with the Ministry of Revenue for the Province of Ontario. Paragraphs 2(b) and 2(d) of the affidavits set forth above make it quite clear that the land was conveyed to the applicant to enable it to construct the building on the understanding that upon the expiration of the "life" of the building, it would reconvey the land to the grantors named in the deed. Paragraph 2(f) acknowledges that during the period of time that the land is vested in the applicant, obligations pertaining to the land will be performed by the applicant for the Congregation of the First United Church of Hamilton. Paragraph 2(g) refers to that period of time as the period of time it has the right to occupy and use the land. Paragraph 2(h) makes express reference to "the trust". Paragraph 2(j) refers to profit derived by the applicant during its "use and occupation" of the land and not during its ownership. Paragraph 3 is quite explicit in stating that the substance of the transaction was that during the "life" of the building to be erected, the applicant "shall have the right to use and occupy the said lands...and on such "life" terminating First Place, Hamilton shall reconvey the property back to the beneficial owner, the Congregation of the First United Church of Hamilton". In my opinion, at the time this affidavit was made, it is quite clear that the Congregation was the beneficial owner of the land and that the land was to be vested in the applicant as trustees for the Trustees of the Congregation subject to the right of the applicant to use and occupy same during the "life" of the building. The substance of the transaction is that the Trustees of the Congregation have leased the land to the applicant for the term of the "life" of the building. A long lease of lands to an institution which otherwise would qualify for an exemption under s. 3(12), does not place the lessee in the position of an owner within the meaning of s. 3(12). (Re Markham York Hospital et al. and Town of Markham (1976), 12 O.R. (2d) 378, where a lease for 99 years was held not to place the lessee in the position of owner; City of London et al. v. City of St. Thomas (1958), S.C.R. 249).

**27**    It was for this reason inter alia that the respondent commissioner assessed for taxation all of the lands and buildings excluding the "place of worship" as appears from an affidavit of A.D. McGratten, a valuation manager employed by the Ministry of Revenue for the Province of Ontario, filed. A supplementary affidavit of Doctor D.C. Little, the applicant's chairman, was then filed in response to Mr. McGratten's affidavit, in which Doctor Little stated that if a trust ever existed in favour of the grantors, as indicated in the affidavit, such trust is no longer in existence. No details were set forth in the affidavit indicating the manner in which or the date upon which such trust was terminated. On the initial hearing of this application, after full argument, I was troubled by this matter and adjourned the hearing to give the applicant the opportunity to file a further supplementary affidavit with respect to the matter of ownership if it desired to do so. The applicant then filed affidavits of Clifford W. Briggs, secretary of the applicant, and Charles O. Stacy, treasurer and one of the trustees of the Board of Trustees of the First United Church of Hamilton, both of which were sworn on January 29, 1979. Cross-examinations on these affidavits took place

on March 9, 1979 and I heard further submissions from counsel with respect to the issue of ownership on June 25, 1979. As I understand the contents of paragraph 4 of Mr. Briggs' affidavit, the delivery of the deed from the trustees to the applicant was indeed subject to the trust arrangement which has been outlined above. He then stated in the affidavit that upon obtaining supplementary Letters Patent on March 4, 1975, the trust was terminated. The supplementary Letters Patent directed that upon dissolution of the Corporation, the remaining property of the Corporation be distributed or disposed of to charitable organizations which carry on their work solely in Canada or to the Congregation of the First United Church of Hamilton, or to the United Church of Canada. Prior to the issuance of the supplementary Letters Patent, such property could not be distributed or disposed of to the Congregation or to the United Church upon dissolution of the applicant Corporation. It is clear to me that the amendment to the Letters Patent made by the supplementary Letters Patent in no way replaced the protection which the Congregation enjoyed under the trust agreement. That trust agreement contemplated a reconveyance prior to the dissolution of the Corporation or upon its dissolution. On the wording of the Letters Patent, the Corporation, upon its dissolution, would not have had the power to carry out the terms of the trust. The supplementary Letters Patent made it possible for the Corporation to carry out the terms of the trust upon its dissolution if the reconveyance of the lands had not been accomplished prior thereto. It seems clear to me that this was the reason for the Corporation obtaining the supplementary Letters Patent. Mr. Briggs, however, stated in his affidavit that the trust terminated on March 4, 1975, when the Letters Patent were amended. He stated that that was so because there was no longer a prohibition against a reconveyance in the future to the Congregation upon the dissolution of First Place, Hamilton. I have no doubt that his conclusion that the trust was terminated is based on a misunderstanding on his part as to the purpose of obtaining the amendment to the Letters Patent. This is borne out by the answers given by him on his cross-examination on his affidavit. He stated unequivocally that the purpose of having the Letters Patent amended was to ensure that the Congregation would not lose title to the property and that the property "was to revert to the First United Church after the life of the building". He said later in his cross-examination "...if at some future date way down the road the building has no further use, it's the intention to turn the title of the lands back to First United Church". His answers indicate a reaffirmation of the trust agreement rather than a termination of the trust.

**28**    Mr. Stacy's affidavit confirmed the contents of Mr. Briggs' affidavit. He also stated that the trust terminated upon the issuance of the supplementary Letters Patent and that the Congregation concurred in such termination. Once again, I am of the opinion that the affiant was mistaken in his conclusion that the trust was terminated. His answers on cross-examination on his affidavit support this view. The following is the pertinent question and answer:- Q.8 And you speak of the trust, in paragraph 4, being terminated upon the supplementary letters patent being issued on the 4th day of March, 1975 and you say that the congregation, meaning of course, the congregation of First United Church, concurred in such termination. Now was it your understanding in connection with supplementary letters patent that it was necessary to obtain the supplementary letters patent in order to carry out the intention of the congregation of First United Church of Hamilton, that the title to the lands upon which First Place is now located would revert back to the congregation of First United

Church when the life of the building had expired and, of course, all the debt of the corporation was paid?

> A.  Correct. That was the understanding of the congregation, that it would come back, and we were advised by our solicitor, that under the original letters patent that it couldn't come back to the church and as it was the member's wishes that the land would revert at some future date to the congregation, the supplementary letters were put on, I believe.

**29**   I am satisfied on the basis of the contents of the affidavits and the answers given on the cross-examination thereon that a trust did exist as previously outlined and that it had not been terminated up to the date of this application.

**30**   The respondent argued that the deed conveyed an estate in fee simple to the applicant and that regard must be had to the provisions of The Conveyancing and Law of Property Act, R.S.O. 1970, c. 85, s. 5(3), which provides that where no words of limitation are used, the conveyance passes all the estate, right, title, interest, claim and demand that the conveying parties have in, to, or on the property conveyed, or expressed or intended so to be, or that they have power to convey in, to or on the same. Those provisions do not prevent the parties to the deed from impressing a trust in favour of the grantor upon the lands conveyed. Indeed, the law provides that there is a presumption that, where there is a conveyance from a grantor to a grantee who is a stranger to the grantor, no consideration having been given, the grantee holds the lands in trust for the grantor. In the present case, it may very well be that the applicant could convey a good title to the lands to a bona fide purchaser for value who takes conveyance without notice of the trust, but the fact remains that, as between the parties, there was a valid trust acknowledged in writing by an officer of the grantee and that trust was valid as between them. In my view, the Congregation of the First United Church of Hamilton is the beneficial owner of the lands.

**31**   The word "owner" is not defined in The Assessment Act. The applicant argued that, in the absence of any such definition, "owner" means the legal owner. He relied on a judgment in Re McMaster University and City of Hamilton et al. (1974), 1 O.R. (2d) 378 where Kelly, J.A. said at p. 383:- As an owner is not defined in the Act I would take it that this term is used to refer to the legal owner. A tenant is by the Act defined to include an occupant and the person in possession other than the owner.

**32**   In that case, the exemption for taxation was claimed under s. 3(4) which does not make ownership of the lands a pre-requisite to obtaining an exemption. The exemption was based on use and occupation. Kelly, J.A. did not have to deal with the distinction between a registered owner and a beneficial owner. In that case, the university was the owner of the land which it had purported to "demise and let" to the Ontario Student Housing Corporation who financed and constructed student accomodation on the land and appointed the university as its attorney in fact to allot accomodation and to charge and collect rents. It was argued that the words "demise and let" were equivalent to a

lease and that there was no reconveyance of any immediate estate in the lands to the university. At p. 386, Kelly, J.A. said with respect to this matter:- It is to be noted that the parties thereto by their conduct have clearly indicated what they interpret it to mean and unless there be proof of lack of bona fide in their doing so the contention of a third party must give way to what the parties themselves have from the outset deemed to be the meaning of the agreement and the nature of the relationship between them.

I take that passage to mean, in the context in which it was used, that it is the substance of the agreement which must be considered, not just the formal written documents that are used to carry out the agreement.

**33**    In my opinion, the words "when the land is owned by the institution" contained in s. 3(12) of The Assessment Act, refer to the beneficial ownership and, accordingly, as I have found the applicant is not the beneficial owner, this application must fail.

**34**    This finding is, of course, in itself sufficient to dispose of the application. In view of the full submissions made by counsel with respect to a number of other issues involved in this application, I deem it advisable to deal with those matters as well in any event.

**35**    Even if the applicant were deemed to be an owner of the lands for the purposes of s. 3 of The Assessment Act, it is encumbent upon the applicant to satisfy the court that it is an institution which falls within either Category 1 or Category 4 mentioned above. The applicant argued in the first instance that it was indeed an incorporated charitable institution organized for the relief of the poor.

**36**    The word "poor" has been the subject of considerable judicial interpretation. The leading case on this subject is Assessment Commissioner of the Village of Stouffville v. Mennonite Home Association of York County, supra. In that case, Spence, J. said at p. 242 in delivering the majority opinion of the court:- I adopt the test of the word "poor" from the judgment of Romer, J., in Re Clarke, [1923] 2 Ch. 407 at pp. 411-2, where he cited with approval the judgment of Channell, J., in A.-G. v. Wilkinson (1839), 1 Beav. 370, 48 E.R. 983:

> "That seems to lead to the conclusion that the expression 'poor person' in a trust for the benefit of poor persons does not mean the very poorest, the absolutely destitute; the word 'poor' is more or less relative." ... "I do not know any standard of poverty, nor how I can lay down any rule; the only thing to guide me is this: these ladies go to the institution for the sole reason that they are poor, and the institution is absolutely charitable."

And at p.
 243:-
 "A rate of $175 per month is $2,100 per year and I am of the opinion that this Court may take judicial notice that an income of $2,100 per year is far below the poverty level under any modern welfare standard in effect in Canada. Although the means test is applied to check the person

desiring to become an occupant, I agree with Jessup, J.A., when he said [at p. 104]:

> "Clearly its purpose in providing such necessities at bare cost is to relieve those who, if they are not poor, are in very similar circumstances. I do not think it affects such obvious and controlling purpose that it is impossible, though improbable, some individuals of affluence might avail themselves of the charitable bounty of the respondent."

> I, therefore, am of the opinion that this institution is similar to one incorporated for the relief of the poor in that it operates for the relief of the poor."

37    Several matters should be noted concerning the facts of that case:

    (a)    it dealt with an assessment made in 1967 for taxation in 1968;

    (b)    the object of the institution as recited in its charter did not specifically include "relief of the poor" but did include inter alia the provision of a home for the care and security of the aged;

    (c)    the $175 monthly charge included a room and meals in a nursing home operated by the applicant which provided normal care but not special or bed care. Fifty-five of the sixty-two residents paid their own way. The only requirement for admission was the applicants be aged people who were in need of the services of the home.

38    Spence, J. took judicial notice of the fact that an income of $2,100 per year in the year 1968 was far below the poverty level. I believe I can take judicial notice of the fact that there has been substantial inflation during the period 1968 to 1977, the material date in this application. I do not think, however, that I am in a position to take judicial notice that an income of $7,500 to $10,000 per year is below the poverty level as of the year 1977. In view of the fact that there is nothing in the reasons for judgment of Spence, J. to indicate that the material before him indicated the actual income of the residents of the nursing home, it may be that he intended in referring to the $2,100 per year charge for accomodation and meals to indicate that where an institution supplies accomodation, meals and care for an amount which is within the means of persons whose income is below the poverty level, that is a relevant factor to be considered in determining if the institution is operating for the relief of the poor.

39    In Re St. Anne's Tower Corporation of Toronto and City of Toronto (1974), 1 O.R. (2d) 717, the objects of the applicant Corporation as set out in its charter were inter alia:-

    (a)    to acquire, construct, provide, hold and manage housing accomodation for the elderly together with appropriate cultural facilities;

40    In that case, the rates for a single room varied from $150 per month to $165 per month and for

a double room for two persons, they varied from $270 to $285 per month including three meals per day and a cafeteria for the residents, situate in the building. Income was taken into consideration when applications were received and priority was given to persons with lower incomes as against those who could more readily pay. In addition to accomodation, the institution provided some forms of recreation. The minimum age requirement was sixty years. One hundred and two out of one hundred and five persons paid the full fee. Only three were subsidised by the applicant and by government assistance. The applicant required that prospective tenants be able to care for themselves. The stated purpose of the institution was to provide, in addition to meals and accomodation, "companionship of a congenial and mutually satisfying kind to keep alive the spirit and morale of persons who might otherwise succumb to the loneliness of old age".

**41**    On that set of facts, Henry, J. held that the Mennonite Home case applied and that, in any event, the applicant was "organized for the relief of the poor".

**42**    In Re United Way of Greater London and City of London et al. [1978], 80 D.L.R. (3d) 422, Winter, Co.Ct.J. held that a corporation, one of whose objects was "to study health, welfare and recreational needs of the community and by cooperative effort to meet these needs through the development of an efficient, economical and constructive program", having regard to the means of implementation used in attaining such objects, was "an incorporated, charitable organization organized for the relief of the poor".

**43**    On the other hand, there have been several recent cases involving facts somewhat similar to the present case where the applicants were held not to be exempt from taxation. In St. Andrew's Place v. The Regional Municipality of Sudbury, Loukidelis, Co.Ct.J., gave reasons for judgment released on July 14, 1974 (unreported). That case dealt with a complex built in the years 1971 and 1972. The buildings were constructed on lands initially owned by St. Andrew's United Church which were leased to St. Andrew's Place which in turn leased back a portion of the building to the church for 99 years for the sum of $1.00 for use as a sanctuary and church offices. The applicant corporation was incorporated as a non-profit organization under The Corporation's Act and was supported in part by public funds. The building contained a sub-basement for storage, locker space and parking and a basement used or to be used for a nursery school, Sunday school, credit union and offices, and a day-care centre. On the first floor were a number of stores and offices leased out at commercial rates to a travel agency, a beauty salon, a jewellery store and to a business equipment supplier. There was a senior citizens' lounge used by a Senior Citizens' Club. The church sanctuary was suitable for use as a concert hall. There was an activity area used for gymnastics, youth functions and Y.W.C.A. and a 1000 square foot meeting room used mainly by youth groups. The fifth and sixth floors were leased to the Y.W.C.A. which provided a residential facility for 72 girls. The apartment tower contained 99 one-bedroom apartments and 8 bachelor apartments. The building was financed with a C.M.H.C. mortgage. Financial assistance in construction was obtained under The Elderly Persons Housing Aid Act. The age limit for the apartments was a minimum age of 60 and all residents with the exception of deaf mutes were between the ages of 60 and 82. Income qualifications of tenants was a minimum income of $3,500 and a maximum income of

$7,000. There was no provision for the admission of persons whose income was below $3,500 unless their families assisted them. The income derived from commercial rentals was used to reduce apartment rents. There was no evidence that any government provided assistance in payment of rents. The objects of the corporation, as set forth in its charter, were "to build, maintain and manage premises at 121 Larch Street in the City of Sudbury, for the accomodation, convenience and recreation of the residents of the community, regardless of race, colour, creed or religion". The stated objects of the applicant were in part to use the institutionally held land for creative social purposes, for example, to meet the housing needs of select groups of persons not "served" in the open housing market and to accomplish it through the provision of "assisted" senior citizen housing, and through residential accomodation for the clients of the Y.W.C.A., delivered at cost to that agency.

**44**    On those facts, Loukidelis, J. found that "in the circumstances here the income levels established would be, in my opinion, beyond those who would fall within the definition of poor". He further stated that "while a corporation known as St. Andrew's Place had provided an imaginative residential and social community concept and while it has provided a measure of subsidy for a large number of senior citizens, it cannot be said, at the present time, to be a corporation organized for the relief of the poor or a similar incorporated institution". Finally, he stated that St. Andrew's Place was not the sole user of the premises, accomodation having been provided for the church and the Y.W.C.A. and that while both these groups paid their share of upkeep and costs, it could not be said that their occupation of their portion of the buildings were for the purposes of St. Andrew's Place and, accordingly, it could not be said that the occupation of the church and Y.W.C.A. portion would be used for the purposes of the institution either as defined in the objects clause of the corporation or the stated intention of those who directed and governed the corporation.

**45**    On December 5, 1978, Dupont, J. released oral reasons for judgment in the case of Rexdale Presbyterian Senior Citizens Corporation and The Corporation of the Borough of Etobicoke et al., (not yet reported). This case dealt specifically with the provisions of s. 3(12). In this case, the applicant corporation was incorporated by Letters Patent dated November 5, 1975 with the following objects inter alia:- (a) to construct, acquire hold, manage maintain and provide housing accomodation for the care and security of elderly persons, together with appropriate cultural facilities;

> (b)    to establish and operate an elderly persons centre in accordance with the provisions of The Elderly Persons Centre Act;
>
> (c)    to provide services for the care of the needy or indigent elderly persons;
>
> (d)    to create service opportunity
>
> (e)    to carry out the mission of the Presbyterian Church in Canada and to be a symbol of its faith and practice;
>
> (f)    to sponsor, promote, organize and facilitate recreational and community services and activities.

**46**    It was incorporated as a non-profit organization and was registered under the Income Tax Act, R.S.C. 1970, c. I-5 as a registered Canadian charitable organization. The lands upon which the buildings in question were erected were purchased for valuable consideration from the Rexdale Presbyterian Church. It was supported in part by public funds and the province of Ontario contributed a direct rent reduction grant of approximately $26 per month for each apartment in the building. In addition, it obligated itself through further subsidies for 50 units occupied by tenants whose rent is geared to income. The building contained 12 bachelor apartments renting at $140 per month and 181 one-bedroom apartments renting at $188 per month. Tenants need not be affiliated with the church but must be 65 years of age or over. Applicants with lower incomes receive priority providing such incomes were not less than twice the amount of the rent payable and e somewhat lower minimum with respect to the 50 units due to an additional subsidy from the Ontario Housing Corporation and for these units the tenant was required to pay twenty-one per cent of his income and the balance was paid by Ontario Housing Corporation. Apartments were not available to persons needing nursing or special care. Applicants were required to disclose their income but not their assets.

**47**    It was agreed by the parties that the applicant satisfied all the requirements of s. 3(12) except that the requirement that it was "organized for the relief of the poor" or was a "similar incorporated institution" remained in issue.

**48**    At p. 7 of his oral reasons as recorded, DuPont, J. said:- Whether an institution is organized for the relief of the poor must, of course, be determined by considering all facts which relate not only to the articles of incorporation of such institution and the objects revealed therein, but particularly to the circumstances surrounding the actual operation of the institution as administered....

With that statement, I agree. In this case, as in the St. Andrew's case, but unlike the Mennonite Home and St. Anne's Tower case, tenants were given the right to occupy the apartments, without personal care in the form of meals, although some recreational activities were available. In this case, the average monthly income of the tenants occupying the 50 unit group representing 25 per cent of the total units was $316 per month, that is $3,792 per year and the average monthly income of the tenants occupying the remaining 75 per cent of the units was $531 per month, that is $6,374 per year. Sixteen tenants had incomes varying from $800 to $1,300 per month. There were apartments of a similar kind available in the area at the same or lower rentals. The costs attributed to the church directed on the applicant's property were entered into the general costs of the building and considered in determining the rents of the apartments to be paid by the tenants, which in turn were subsidised in part by the government. Dupont, J. stated that the cummulative effect of such facts led him to the conclusion that the applicant had not discharged the onus of establishing that it fell within the exemption provisions.

**49**    The present case, it may be readily seen, is similar in many respects to all of the cases cited but it is dissimilar in other respects. To begin with, it is the only case in which the objects clause of

the Corporation specifically states that its object is to operate a building "for the purpose of relief of poverty". In my view, that in itself is not sufficient to establish that the institution is one "organized for the relief of the poor". The crucial matter is the manner in which it operated the building it administered.

**50**   In this case, the applicant has failed to make available to the court information which might more readily have shown the buildings were operated for the relief of the poor. I deal firstly with the question of the income and assets of residential tenants. It was stated that the maximum allowable tenant income was $10,000. It is clear that five per cent of the tenants had incomes of between $7,500 and $10,000 and 95 per cent had incomes of less than $7,500. Unfortunately, the average income of the 95 per cent is not given and I have no way of knowing how much less than $7,500 the income of any particular tenants may have been nor the number of tenants whose income may be considerably less than $7,500 per annum. I would have thought that if their average income was substantially lower than $7,500 per year, the applicant would have made that information available in order to assist in discharging its onus. As it has not done so, I do not feel that I can draw the inference that a considerable number of the tenants have an individual or family income substantially less than $7,500. This amount is, of course, substantially more than the average incomes mentioned in the Rexdale Presbyterian case. Furthermore, the maximum allowable income of $10,000 in this case is substantially more than the maximum allowable income of $7,000 in the St. Andrew's case. In addition, it has been admitted by the applicant that it is income which is the governing factor in determining acceptance of tenants. Although the prospective tenant was required to state his assets, counsel for the applicant candidly admitted that substantial assets would not disqualify a prospective tenant whose income was $10,000 per annum or less. Unlike the Mennonite Home and St. Anne's Tower cases, no meals are provided by the applicant Corporation. Another important feature of this case is that nowhere is it shown in the material that a prospective tenant will not be disqualified by reason of having insufficient income. As I have pointed out before, Mr. Little, in his affidavit filed in support of the application, stated that no person had been refused an apartment because of insufficient income. That statement is consistent with there being no minimum income requirement. It is equally consistent, however, with the fact that no person with a very low income may have been amongst the applicants for an apartment. I would have thought that the applicant herein could have made it quite clear that there is no minimum income requirement if such were the case. Furthermore, there is nothing in the material to indicate that the persons with lower incomes would receive priority over persons with incomes at a higher level not exceeding $10,000 per year.

**51**   A further difficulty presents itself in the present case in that the material filed does not disclose the rent charged for the apartment accomodation nor does it disclose whether the First United Church Congregation pays any amount for rent or for expenses for upkeep, maintenance and heating for the place of worship area in which it conducts its church services and other religious activities. In all of the cases cited, the rents charged to tenants for accomodation with or without meals were clearly stated and, indeed, in the Mennonite Homes case, it appears that Spence, J. placed great emphasis on the fact that the rate charged for rooms and food was one that to use the

words of Henry, J. in the St. Anne's Tower case was "within the compass of an income below the poverty level under modern Canadian welfare standard". I am not able to determine that in the present case.

**52**    I am of the opinion that it is a proper inference to be drawn that the bachelor apartments would be occupied by one person only and that the one-bedroom apartments could be occupied by one or two persons. It is clear, therefore, that there are at least 62 units which would undoubtedly be occupied by only one person whose income may be up to $10,000 per year and a large number of other units which might be occupied by such persons. The material does not disclose how many of the 388 one-bedroom units were or may be occupied by one person.

**53**    In determining whether an institution is being operated for the relief of poverty or for the relief of the poor, each case must be decided on its particular facts, bearing in mind the principles of law as set forth in previous decisions. In dealing with the meaning of the word poor in the sense of a person not having adequate funds to supply himself with the necessities of life such as food, clothing and lodging, the meaning is not the very poorest or the absolute destitute but rather one of relative poverty. The determination of "relative poverty" cannot be precise. There are, of course, cases where the test is easily met by persons having extremely low incomes. A person with an income of $2,500 per year and no assets would certainly qualify as a poor person at this time in this country, no matter to whom such person's income or assets might be compared. On the other hand, a person with an income of $15,000 per year with assets of $100,000 could hardly meet the relative poverty test simply because there are persons who have substantially more income and assets. The difficulty arises in determining at what point does a person qualify as a poor person. It may be that a person who has only himself to support and has an income of $7,500 to $10,000 per year should not be classified as poor. Certainly such a person would be subject to the payment of income tax on his income. It would seem somewhat incongruous to hold that such a person's income was below the poverty level and yet his income would be decreased by tax levied by his government.

**54**    On the other hand, a man and wife with children, whose combined income is in the $7,500 to $10,000 per annum range might very well qualify as being "poor" on the basis of the relative poverty test.

**55**    No material was filed in this case to indicate the amount of money which was required in the year 1977 to provide one or two persons with adequate food, clothing and accomodation and otherwise permit them to live with reasonable dignity. No doubt that arises from the fact that it is really not possible to state precisely at what level of income a person may be said to be "poor". Whatever that level may be, it is certainly one that changes from time to time and place to place. The onus is upon the applicant to prove that the land and the building situate thereon was being occupied and used for the "relief of the poor".

**56**    In the Mennonite Home case, Jessup, J.A. said at p. 104 as quoted in part, supra:- ... The respondent provides food and lodging for an aged person for $165 or $175 a month. Clearly its

purpose in providing such necessities at bare cost is to relieve those who, if they are not poor, are in very similar circumstances. I do not think it affects such obvious and controlling purpose that it is possible, though improbable, some individuals of affluence might avail themselves of the charitable bounty of the respondent.

In the present case, I am of the view that a different situation prevails and that is that it is quite possible that a number of persons who meet the test of relative poverty may have obtained accomodation in the applicant's building at the date upon which the application was made or will do so in the future, but it is quite probable that many persons who, although not affluent, do not meet such test and yet may have obtained such accomodation at the date upon which this application was made or will do so in the future.

**57**    Since dictating this judgment, there has been brought to my attention the reasons for judgment delivered by O'Leary, J. on November 7, 1979 in the case of Pentecostal Benevolent Association of Ontario and The Corporation of the Borough of Scarborough and The Regional Assessment Commissioner Region Number 11. This case dealt with a claim for exemption for a home for the aged. The income for the tenants occupying 210 of 263 available apartment units (i.e. 80 per cent) was $10,000 or less for the year 1977. The remaining 53 units were occupied by persons having incomes between $10,000 and $32,000 per annum, 40 of which were in the $10,000 to $14,000 range. He said in referring to the Mennonite Home case:- In my view it was essential to the reasoning of Spence, J. (and to the reasoning of Jessup, J.A. with whom he agreed) that it was improbable that some individuals of affluence might avail themselves of the charitable bounty of the Mennonite Home Association. A soup kitchen operated by the Salvation Army at one of its hostels would continue to be classified as a project operated for the relief of the poor, even if some persons of affluence managed to get free meals there.

> However, because of the methods used by the applicant, it was probable that persons who were not poor would be, and in fact have been, accepted as tenants at Shepherd Manor...

**58**    In my opinion the reasoning is equally applicable to the present case. It is my view that the material filed upon this application is insufficient in the following respects:

> (a)    It has not satisfied me that an income in the range between $7,500 to $10,000 per annum for one person places such person in the category of "poor". Although the material states that 95 per cent of the occupants at the time of the application had incomes of less than $7,500 per annum, it did not state the amount of such deficiency on the part of individual occupants or, in the alternative, their average income.
>
> (b)    The material does not disclose the number of single persons as opposed to couples who are occupying the apartment units and, accordingly, it cannot be determined how many of the occupants are couples with a combined

income of $10,000 or less.

(c)   There is no evidence to indicate the value of assets owned by the occupants of the units as distinct from their income and there is no ceiling on the value of assets which a tenant may own before being disqualified as a tenant.

(d)   There is no evidence to indicate that there is no minimum income level which would have the effect of excluding any prospective tenant.

(e)   The evidence does not disclose the rent charged for any of the accomodation.

(f)   The evidence does not indicate that persons with lower levels of income and assets will receive priority over persons with higher levels of income and assets.

In my view, the applicant has failed to discharge the onus of showing that the obvious and controlling purpose of the operation of the building is for relief of the "poor" and, accordingly, the applicant has not shown that it is an incorporated charitable institution organized for the relief of the poor whose lands are being used for that purpose within the meaning of s. 3(12).

**59**    The applicant submits that if it does not qualify as an incorporated institution organized for the relief of the poor, it does qualify as a "similar incorporated institution conducted on philanthropic principles and not for the purpose of profit or gain, that is supported, in part at least, by public funds". I am satisfied that it is indeed conducted on philanthropic principles and not for the purpose of gain and that it is supported, in part at least, by public funds, within the meaning of those words as found by the majority of the Supreme Court of Canada in the Mennonite Home case. The only matter that gives me any concern is the question whether the institution is similar to one organized for the relief of the poor; the Canadian Red Cross, St. John Ambulance Association. The law is well settled that the "ejusdem generis" rule of construction should not be applied to determine the meaning of the word "similar" and that "similar" means substantially similar. Re Assessment Commissioner of the Village of Stouffville v. Mennonite Home Association of York County (1973), 31 D.L.R. (3d) 237 at p. 241 per Spence, J. Re Mennonite Home Association of York County and Village of Stouffville et al. (1970), 12 D.L.R. (3d) 97 at p. 103 per Jessup, J.A.

**60**    The position of the applicant is that it is similar to an institution organized for the relief of the poor in that it is relieving the needs of indigent, elderly and other helpless persons through the activities it sponsors and by the subsidized living accomodation it provides and that it provides cultural and recreational services and accomodation to provide and improve the spirit and morale of persons of advanced age in need of financial or moral support. It should be noted that persons who required special care were not eligible as tenants. Nevertheless, that feature has been held to be not in itself a ground for disqualification of an institution as one "similar" to an institution organized for relief of the poor (see Mennonite Home case and St. Anne's Tower case). Furthermore, those cases have held that institutions whose purposes are to provide homes for the aged or elderly and did in fact do so, qualified as "similar incorporated institutions" under s. 3(12). It is to be noted, however,

that in those cases the buildings were used almost entirely, if not entirely, for such purpose and the aged persons in the Mennonite Home case were financially poor.

**61**    The difficulty in the present case is that the material before the court does not make it apparent nor does it satisfy me that it is a dominant characteristic that the applicant in the operation of the building caters to the aged or elderly. A review of the material shows that one of the objects of the applicant was to manage a building for the accomodation and convenience of the residents of the community regardless of race, creed, colour or religion and generally to operate the said building complex for the purposes of relief of poverty. I have already dealt with the question of relief of the poor and relief of poverty. I now point out that the objects clause makes no mention of the aged or elderly. Although there is an indication in paragraph 2(b) of the affidavit of Mr. Briggs filed with the Ministry of Revenue that the apartment tower was "to be partially used for senior citizens", nowhere does the material disclose the number of such units that were set aside for such purpose or the number of units that have been occupied by persons who may be classified as aged or elderly. The material does not indicate in any way the age limit for persons whom the applicant might deem to qualify under the category of senior citizens nor the number of units which are occupied by persons whom the applicant at least deems to qualify under such category. The material does not indicate that there is any restriction or requirement as to age with respect to use and occupation of any of the apartment units.

**62**    The applicant relies on the contents of the affidavits of Doctor D.C. Lyttle, sworn May 10, 1977 and June 28, 1978. The contents of those affidavits make it clear that the recreational and community activity areas, particularly in the third floor of the building, are available to residential tenants and to people in the neighbourhood and that the services of the tenants, both proposed and actual in the retail and commercial areas of the building are available to the residential tenants and people living in the neighbourhood as well as the general public. There is nothing to suggest that the neighbourhood in which the building complex is situated is what might be called a disadvantaged neighbourhood or that there is any considerable number of persons in that neighbourhood who are disadvantaged in an economic or social sense. There can be no doubt that some of the community services provided by the applicant in its building are particularly adapted to aged persons and to persons otherwise handicapped. Many of the services would be useful to persons in all age and financial categories. I think it is fair to say that most of the recreational and community services and services provided by the retail and office tenants are useful to the community at large although some of them are particularly adapted to the use of the poor, aged and handicapped who form a part of the community. The most important statement of Doctor Lyttle, from the standpoint of the applicant, is contained in paragraph 11 of his earlier affidavit, wherein he states that the overriding principles and policies of the applicant in the operation of the building were "to provide (a) to the extent possible, a completely integrated service building, that is one that will make available 'within its four walls' practically every service an elderly human being needs, irrespective of whether the services are of a social nature, a religious nature, a physical nature or a cultural nature, except nursing home care; and (b) residential accomodation for elderly persons as inexpensive as possible...". Unfortunately, as indicated, the affidavits do not disclose whether in fact any

substantial number of aged persons are being assisted in this way. The affidavits are sadly lacking in detail in this regard.

**63**    I have, with regret, reached the conclusion that the applicant has not discharged the onus which rests upon it of showing that it is "any similar incorporated institution" within the meaning of s. 3(12).

**64**    Even if I had found in favour of the applicant on all of the issues which I have discussed up to this time, the applicant faces yet another difficulty. The exemption under s. 3(12) applies "only when the land is owned by the institution and occupied and used for the purposes of the institution". In the subject buildings, approximately 70,000 square feet have been set aside for retail, commercial and office use and substantial space has been allocated for use for religious purposes and for use by community and social organizations.

**65**    The applicant takes the position that there is no requirement in the statute that the land be occupied and used exclusively for the purposes of the institution but that, in any event, the land is occupied and used for the purposes of the institution as the services which are provided by the applicant and its lessees are in furtherance of the objects of the applicant.

**66**    In support of its position, the applicant referred to the following cases:

>    Re: Sisters of the Congregation of Notre Dame and City of Ottawa (1912), 1 D.L.R. 320 (Ont. C.A.)

>    Re: City of Ottawa and Grey Nuns (1913), 15 D.L.R. 725 (Ontario Supreme Court, App. Div.)

>    City of Toronto v. The Governor of the University of Toronto et al., [1946] O.R. 215 at p. 222, per Laidlaw, J.A. and p. 227-8 per Hogg, J.A. (C.A.)

>    Re: Queens University and City of Kingston (1976), 8 O.R. (2d) 135 at p. 139, 141 per Cory, J. (Ont. High Court)

**67**    The Notre Dame case does not support the applicant's position. As I read that judgment, the applicant claimed exemption for its buildings and grounds used in connection with and for the purposes of its seminary, pursuant to the provisions of s. 5(3) of The Assessment Act, 4 Edw. VII, Ont. c. 23, as amended by 10 Edw. VII, Ont. c. 81, s. 1. That subsection provided that the "grounds and buildings shall be exempt only while actually used and occupied by such seminary". In fact, the applicant let rooms in one of the buildings to lady normal school students. The revenue derived from them was entirely devoted to the purposes of the seminary. The court held that the letting of

the rooms did not render all of the seminary buildings liable to taxation but did render the whole of the building in which the rooms were let subject to taxation. (The head note in the Dominion Law Reports set forth incorrectly the decision in this case).

**68**    The Grey Nuns case is also of little assistance to the applicant. In that case, a small portion of the real property of a religious order whose dominant purpose was charitable, was used as a boarding place for peoples attending a school conducted by the order. The Grey Nuns claimed exemption under paragraph 9 of the last above mentioned Act, which granted them exemption from taxation for the real property belonging to or connected with any charitable institution conducted on philanthropic principles and not for the purpose of gain. In this case, Meredith, C.J.O. held that even if the boarding of pupils attending schools did not constitute charitable work, it formed only a very small part of the work of the religious order and could not deprive the institution of its character as a charitable institution and, accordingly, the exemption was allowed. He was quite careful to point out that paragraph 9 contained no such limitation as "shall be exempt only while used and occupied by such seminary" as was the case with paragraph 3(a) of s. 5 considered in the Notre Dame case and distinguished that case on that ground. In my view, the present case is similar to the Notre Dame case and dissimilar to the Grey Nuns case because s. 3(12) of the present Act does contain a "use and occupation" provision.

**69**    The University of Toronto case considered an exemption claim for buildings and grounds used in connection with and for purposes of an university pursuant to s. 3(4) of The Assessment Act. That paragraph provides that the exemption is applicable "so long as such buildings and grounds are actually used and occupied by such institution but not if otherwise occupied". Ownership of the property by the institution is not a prerequisite as is the case under s. 3(12). The facts of the University of Toronto case were that the owner of the building in question, a subsidiary of the T. Eaton Company Limited, leased the premises to the Board of Governors of the University for a term of five years which established a school of physical health and education for the University. It then gave permission to the Eaton Girl's Club to use portions of the premises at such time as the Board was not using them for the purposes of a physical and health education department of the University. In that case, Laidlaw, J.A., who delivered reasons for judgment with which Henderson, J.A. agreed, said at p. 221-2:- ...I do not read the words in the subsection, "so long as such buildings and grounds are actually used and occupied by such institution, but not if otherwise occupied", to mean "so long as every part of such building and grounds is used and occupied by such institution, but not if otherwise occupied or used in part". If such a meaning had been intended, appropriate language would no doubt have been used to make that meaning plain.

And further, at p.
 222:- ...One must look at all the circumstances and conditions under which the assessed premises are used, and decide from the evidence whether it can reasonably be found therefrom as a fact that the building in question is actually used by the university, and in so doing one must not confuse the use of part or parts of the building with the use of the building as a whole. I reach the conclusion in this case that the building is actually used by the Board for the purposes of the university,

notwithstanding the use, as described, by other persons.

**70**    Hogg, J.A. delivered a separate judgment in which he concurred in the conclusion reached by Laidlaw, J.A. He was, however, obviously troubled by the words "actually used" and the fact that the Eaton Girl's Club did use part of the premises at the time. It would appear that he was hesitant to concur in reasons which might be interpreted to mean that buildings and grounds were exempt from taxation so long as any part was used and occupied by the institution. He said at p. 228:-

> The dominant or principal use of the building which is concerned in this appeal is for the purposes carried on by the university in such building. The use made of part of the building by others does not detract from the paramount use by the university for its own purposes... In the case at bar, the university has so limited the use by others of part of the building that it can make use of the whole of such building whenever it sees fit to do so.

**71**    Insofar as the elements which consitute occupation within the meaning of rating law are concerned, I accept the statement of Laidlaw, J.A. at p. 222:- Two principles at least can be deduced from the cases: (1) occupation depends on the right of regulation and control of the premises in question; and (2) it does not depend on legal title.

The principles are set forth clearly in Mayor, etc. of The City of Westminster v. The Southern Railway Company et al., [1936] A.C. 511 at 529 and particularly in a passage therefrom quoted by Laidlaw, J.A. at p. 223 as follows:

> In Mayor, etc. of The City of Westminster v. The Southern Railway Company et al., [1936] A.C. 511 at 529, Lord Russel of Killowen says..."in certain cases there may be a rival occupancy in some person, who, to some extent, may have occupance rights over the premises. The question in every such case must be one of fact - namely, whose position in relation to occupation is paramount, and whose position in relation to occupation is subordinate; but in my opinion, the question must be considered and answered in regard to the position and rights of the parties in respect of the premises in question, and in regard to the purpose of the occupation of those premises."

> At p. 530, he says: "The general principle applicable to the cases where persons occupy parts of a larger hereditament seems to be that if the owner of the hereditament (being also in occupation by himself or his servants) retains to himself general control over the occupied parts, the owner will be treated as being in rateable occupation; if he retains to himself no control, the occupiers of the various parts will be treated as in rateable occupation of those parts.

And at p. 532 he says: "In truth the effect of the alleged control upon the question of rateable occupation must depend upon the facts in every case; and in my opinion in each case the degree of the control must be examined, and the examination must be directed to the extent to which its exercise would interfere with the enjoyment by the occupant of the premises in his possession for the purposes for which he occupies them, or would be inconsistent with his enjoyment of them to the substantial exclusion of all other persons."

**72**    The Queen's University case was one where the court found on the facts placed before it that the right of regulation and control of the lands in question remained with the institution claiming exemption and therefore that the lands were occupied by it.

**73**    In the present case, it is encumbent upon the applicant to show not only that the land is owned by it, (I have already dealt with that matter) but assuming that it is the owner, it must also show that the lands are occupied and used for the purposes of the institution. In my opinion, the wording of s. 3(12) is such that it need not show that the institution occupied and used the lands for its purposes. It is sufficient that the land be occupied and used by anyone for the purposes of the institution.

**74**    It is my view that in the present case, when the apartment units, office and retail space and place of worship were leased to tenants, the applicant ceased to be the occupant of such space. I believe it to be a fair inference to be drawn that the tenants position would be paramount and the applicant's position would be subordinate. There is nothing in the material filed to suggest that the applicant would have the right to interfere with the enjoyment by a tenant of the premises in his possession for the purposes for which he occupies them, or any right the exercise of which would be inconsistent with the tenant's enjoyment of the premises to the substantial exclusion of all other persons. If such is the case, then it is necessary to look at the use which the tenants make of the premises. There is no doubt in my mind that if it were found that the tenants of apartment units were persons who were "poor" or in similar circumstances, it follows logically that those persons, in addition to occupying the premises, used the premises for the purposes of the applicant.

**75**    I do not think, however, that the same conclusion can be arrived at with respect to the office and retail commercial space. Assuming that all other findings had been made in favour of the applicant to bring it within the provisions of s. 3(12), I am satisfied that the office and retail commercial tenants are the occupants of space leased to them. I am further satisfied that the primary purpose for which those tenants occupy that space is to operate their business or practise their profession at a profit in the ordinary course of business. There is nothing in the material filed to indicate that such tenants were required by the terms of their leases to provide their goods and services to the residential tenants at a price less than the going price level in order to assist persons who are poor or in similar circumstances. There is nothing to indicate that their business or professions would be operated or conducted in any way other than the normal course of business. It may be that the location of some or all of them in the building might be a convenience to the residential tenants but I do not think it can be said that that was the primary purpose of the

occupation of the commercial space by such tenants.

**76**    It is true that the applicant intended that any profits derived from the commercial leases would be used to reduce rents and to that extent the use might be said to be for the purposes of the applicant. But that is immaterial in this case because the applicant is not the occupier of that portion of the building leased for commercial purposes and s. 3(12) requires both occupation and use for the purposes of the institution. As I have indicated, it is my view that the commercial tenants cannot be deemed from their standpoint to be using the premises for the purpose of reducing the residential rents. In any event, the decision in the Notre Dame case (supra) indicates that the fact that revenue derived from a use other than one for the purposes of the institution, is devoted to the purposes of the institution, does not make available the exemption for the portion of the building which is used otherwise than for such purposes.

**77**    For all of the above reasons, I have reached the conclusion that the above application must be dismissed. It is my view that the dismissal should be without costs. There can be no doubt that the applicant did and does intend to benefit a substantial portion of the community by providing apartments at subsidized rentals together with a broad variety of community services, undoubtedly involving a great amount of work on the part of its members without profit to itself. It is evident that s. 3(12) has provided fertile ground for litigation over a long period of time. No doubt much of this litigation has resulted from the fact that the nature of philanthropic institutions and the manner in which they endeavour to achieve their objects by the provision of housing accomodation and community and social services has changed drastically since s. 3(12) was originally drafted and enacted. In my view, it is far from easy to determine from prior decisions of the court whether the land of a particular institution (in this case those of the applicant) qualify for exemption from taxation under s. 3 of The Assessment Act. I do not think it should be penalized in costs for making this application, albeit unsuccessfully, to ascertain its rights.

GOODMAN J.

qp/s/ljg/jjh

*Indexed as:*
## Long v. Delta Catalytic Industrial Services Inc.

**Between**
**Tom Long, plaintiff, and**
**Delta Catalytic Industrial Services Inc., defendant**

**[1998] A.J. No. 131**

[1998] 6 W.W.R. 792

58 Alta. L.R. (3d) 115

35 C.C.E.L. (2d) 70

77 A.C.W.S. (3d) 109

Action No. 9401-15261

Alberta Court of Queen's Bench
Judicial District of Calgary

**Fruman J.**

February 3, 1998.

(9 pp.)

**Counsel:**

T.M. Lee, for the plaintiff.
J.D. Vallis, for the defendant.

---

REASONS FOR JUDGMENT

**1    FRUMAN J.**:-- Can an employee agree to place his severance fate solely in the hands of his

employer? Yes. Did Tom Long make that agreement with his employer, Delta Catalytic Industrial Services Inc.? No.

**2**    Mr. Long was originally employed by Stearns Catalytic Ltd. as a maintenance superintendent at the Suncor Project in Fort McMurray, Alberta. When Delta acquired the assets of Stearns in 1987, it agreed to hire all the Stearns employees. Delta presented the employees, including Mr. Long, with an offer of employment which stated that severance would be based on Delta's severance policy in effect at the time of termination of employment. Mr. Long accepted the offer by signing it.

**3**    Mr. Long was an exemplary and highly respected employee. He was promoted within Delta to project superintendent, an upper-middle management position. He worked at Delta projects in various locations, including the Shell Caroline project near Rocky Mountain House, Alberta. When the contract for that project was not renewed, Mr. Long, then 55, was terminated, effective November 19, 1993. Cause was not alleged and Delta purported to rely on the offer signed by Mr. Long in 1987 in order to apply Delta's then current severance policy. Delta calculated severance pay on the basis of two weeks severance for each full year with Delta and the predecessor employer, Stearns, a total of eleven years.

**4**    Mr. Long sued for damages for wrongful dismissal. He claimed that the severance provision was not binding and that he was entitled to damages in accordance with the common law. The validity of the accepted offer and Delta's right to change the severance provisions unilaterally were the central issues in this litigation. As is customary in these cases, a long list of additional matters was raised, dealing with the appropriate term of notice, entitlement to various benefits, mitigation and deductibility of mitigation expenses. In an oral judgment delivered on January 23, 1998 I decided that Mr. Long was not bound by the severance provisions, set the term of notice at 14 months and dealt with each of the issues on the long list. All involved the application of a specific fact situation to established law; none raised novel legal points.

**5**    Although my oral reasons addressed the issue of the validity of the severance provision, with counsels' concurrence I agreed to provide more comprehensive reasons on that specific area in a written decision. For purposes of any appeal of my ruling on validity, these written reasons will govern.

FACTS

**6**    Mr. Long was employed on a full time basis with Stearns from August, 1982 to April, 1987, when its assets were purchased by Delta. Sometime in February, 1987 all Stearns employees at the Fort McMurray location, including Mr. Long, received three documents. The first, a letter from Stearns dated February 11, 1987, explained the sale and an employee's choices. The relevant portion reads as follows:

> Most importantly, SCL has given a high priority to ensuring the continued employment of as many employees as possible. In your case, SCL understands

> that DPL is offering you employment on substantially similar terms. Should you accept employment with DPL, any layoff benefits with DPL will be based on service since your employment date with SCL. In addition, if during the first year of your employment with DPL you are laid off for lack of work, SCL will pay any difference between the DPL layoff policy and the SCL layoff policy.

> If you choose not to accept DPL's offer of employment, your employment will be continued by SCL until April 17, 1987, at which time your employment will be terminated.

**7**    Mr. Long also received two documents from Delta: a confidentiality agreement, which is not relevant to these discussions, and an offer of employment dated February 12, 1987, which was conditional on closing the acquisition. In the offer of employment Delta offered Mr. Long the same position, reporting relationship, salary and assignment conditions and indicated that the employee benefit programs and pension plan would be changed to Delta's plans. The offer contains the following provision dealing with severance:

> Past service with Stearns Catalytic Ltd. will be recognized as continuous and uninterrupted for the purpose of calculating vacation and severance. Severance, however, from the date of acceptance of employment, will be based on Delta's severance policy.

> As you are aware, our industry often experiences wide fluctuations in workload and consequently our workload varies depending on the economic conditions. Should the situation occur where we are forced to terminate your employment due to a reduced workload, you will be entitled to the severance policy in effect at that time.

**8**    Mr. Long accepted all three agreements by signing them on February 16, 1987. It seems that one or more meetings were held around this time to explain the acquisition to the employees. No one remembered any dates or even the sequence of events. Mr. Long recalled a small Stearns meeting held at the Suncor plant. He believed he signed the contracts at that meeting. Two other former Stearns employees remembered a large meeting convened by Delta at a Fort McMurray hotel. One witness specifically recalled that Mr. Long was present and actively asked questions. I don't doubt that Delta held a meeting and that Mr. Long participated. Neither of the two former Stearns employees could recall the particulars of any discussions at the meeting, although it seems that Delta generally touched on its policies, including the termination policy. Neither could remember any specific questions about that policy.

**9**    Mr. Long testified that he did not receive a copy of Delta's severance policy and was told nothing about it. He had no recollection that he was told that his severance rights might be reduced.

He believed there was some urgency to signing the documents. Mr. Long said that he read the offer, understood it and had an opportunity to ask questions about it before he signed it. He did not remember receiving a copy of the signed Delta agreements before the litigation started.

**10**    Delta provided no evidence about the timing of events, disclosures made and explanations given at the meeting, nor about its practices in delivering copies of documents to employees. In fact, no one who was employed by Delta at the time of the 1987 acquisition testified at the trial. Delta was unable to locate the severance policy as it existed in 1987. That policy was superseded by a new policy in 1988 and that too has not been found. Delta provided a 1989 policy and the 1993 policy, which was in effect when Mr. Long was terminated, and which improved the 1989 severance package.

VALIDITY OF CONTRACT

**11**    Delta relied on the terms of the accepted offer to limit Mr. Long's notice period on termination. Mr. Long submitted that the severance provision is not binding.

**12**    There is an implied term in every contract of employment that an employer will provide reasonable notice of termination. Failure to provide notice is a breach of contract which entitles the employee to damages. The implied term can be negatived by a specific agreement, but clear and express language must be used by the parties: Chadburn v. Sinclair Canada Oil Co., (1966), 57 W.W.R. 477 at 483 (Alta. S.C.); Bagby v. Gustavson International Drilling Co. Ltd. et al, (1980), 24 A.R. 181 at 191 (C.A.). Courts will enforce a severance provision which defines the length of notice, provided it is expressed in clear and unambiguous language: Jobber v. Addressograph Multigraph of Canada Ltd. (1980), 1 C.C.E.L. 87 at 91 (Ont. C.A.); Mahon v. Paul Revere Life Insurance Company (1982), 19 Man. R. (2d) 388 at 391 (Q.B.); Wallace v. Toronto-Dominion Bank (1983), 41 O.R. (2d) 161 at 181 (C.A.); Matthewson v. Aiton Power Ltd. (1985), 8 C.C.E.L. 312 at 314 (Ont. C.A.).

**13**    If Delta intended to rely upon the severance provision contained in the offer, it had the onus of proving that it represented the agreement of the parties. The severance provision was somewhat unique. It referred to some future severance policy of Delta: one that would be ascertainable at the time of termination but was not ascertainable at the time of signing. Additionally, it was Delta's practice to make unilateral changes to the severance policy without Mr. Long's or any other employee's consent. It did so on three occasions.

**14**    Unilateral changes to employment contracts seem to be a touchy subject in our jurisprudence. Generally, a unilateral notification of a change in severance entitlement by an employer after an employee has commenced working is insufficient to bind an employee. The employer must show that the employee had "an expression of agreement, express or implied": Brode v. Fitzwright Co. (1992), 41 C.C.E.L. 289 at 295 (B.C.S.C.). Acceptance cannot necessarily be inferred from an employee's continuing to report to work after receipt of a new policy: Lyonde v. Canadian Acceptance Corporation Ltd. (1983), 3 C.C.E.L. 220 at 224 (Ont. H.C.J.) Nor, in my view, is an

employee required to object to the amended policy once he learns of it, in order not to be bound. Finally, If the new policy reduces an employee's severance rights, issues of consideration for the new contract arise: Rahemtulla v. Vanfed Credit Union, [1984] 3 W.W.R. 296 at 304 (B.C.S.C.).

**15**    The courts have developed a complex set of legal and evidentiary principles to ensure that employees are treated fairly at the time of termination. The preoccupation with fairness seems to elevate the contractual standards for provisions which limit severance, surpassing normal principles of offer and acceptance in an arms' length negotiation. The standards for severance policies that may be changed unilaterally by an employer appear to be higher still. Courts have shown some reluctance to enforce those policies: Bienvenu et al. v. Zellers Inc. (1984), 5 C.C.E.L. 30 (N.S.S.C.); Clark et al v. Optyl (Canada) Ltd. (1985), 7 C.C.E.L. 1 (N.B.C.A.)

**16**    But what of an agreement by an employee at the commencement of employment to have his severance entitlement determined by the severance policy in effect at the time of the termination, even though that policy is unknown. And what if that policy is solely within the control and discretion of the employer.

**17**    I fine nothing objectionable in these concepts. A provision in a contract of employment which incorporates by reference a clear, ascertainable, albeit future policy of a company is neither uncertain nor ambiguous. And calling something a "policy" does not make it any less binding. The name given to a document does not affect its enforceability, so long as both parties are bound to comply with it. Nor does the fact that a policy may be unilaterally changed by the employer mysteriously taint it with a presumption of unenforceability. Every provision that purports to define the length of notice must be approached in the same way: examine the provision to determine whether it is clear, express and unambiguous; then decide whether the employee is bound.

**18**    I begin with an examination of the provision. Two considerations arise. First, while an employee is free to delegate his severance to the whim of his employer, however foolhardy that might appear to be in retrospect, it must be clear that was the nature of his agreement. In this case the wording of the offer refers to the severance policy in effect at the time of termination, but does not clarify how changes to that policy will come about, or that the company may unilaterally change it for the worse. Perhaps that was explained at the meeting, but there is no evidence. I am left to look at the words of the offer standing alone, and those words do not go far enough. They do not clearly and expressly constitute Mr. Long's agreement to have his severance unilaterally determined by the company. The implication is that changes to the severance policy must be consented to by Mr. Long in order to be effective.

**19**    Some might argue that this interpretation makes the provision redundant, for any term of any agreement may be amended with the consent of the parties and there is no need to pick out severance for special treatment. That may well be the case, but it won't be the first time that a repetitive provision has been inserted in an agreement. Redundancy alone is insufficient to support the other interpretation.

**20**    To uphold the contract, then, we move to the second consideration. It may not matter that the severance policy was unilaterally changed by Delta so long as since 1987 the policy was never unilaterally changed for the worse. It may not matter that Mr. Long's consent to a change was required, for if Delta improved its policy, his consent would be implied or waived. If Delta could prove the terms of the policy as it existed at the time of hire in 1987, show that those terms were explained to Mr. Long and demonstrate that the 1993 severance package was as good as or better than the 1987 package, Mr. Long would be bound by them.

**21**    But the evidence need not go even this far. It might be enough for Delta to show that the terms of the severance policy in place in 1987 were explained at the meeting and to demonstrate that it was Delta's continued practice over the years, when modifying its termination policy, never to reduce an employee's severance benefits. Delta has presented no evidence on any of these points. While I am sympathetic to the fact that the 1987 and 1988 severance plan documents cannot be located despite diligent efforts to find them, and while I understand that the Delta employee who convened the meeting in 1987 is no longer employed by the company, Delta is not relieved from its evidentiary burden.

**22**    Ironically, Mr. Long, as project superintendent on the job site, was the employee responsible for maintaining the Delta Policy and Procedure Manual. He was in charge of inserting new and amended policies into the manual, reviewing them and communicating significant changes in policies to employees at the site. While Mr. Long denied knowledge of changes in the severance policy, we can impute notice to him. He of all people should have known. Willful ignorance or a failure to perform a job responsibility hardly provides an excuse.

**23**    It is possible that this knowledge would demonstrate a formal understanding of a change and that his conduct, in some manner, would constitute his agreement to be bound. There is no evidentiary basis to reach that conclusion. Furthermore, without knowing the 1987 policy and tracing it through to determine whether Mr. Long's severance rights were ever reduced, I can neither consider his conduct in context nor deal with the issue of consideration.

**24**    I conclude that Delta has not proven, on a balance of probabilities, a clear, express and unambiguous agreement by Mr. Long to have his severance rights determined by Delta in accordance with the 1993 policy, the severance policy in place at the time of termination. Delta has not negatived the implied term in every contract of employment of reasonable notice of termination.

**25**    In matters of employment, economic clout most often translates into contractual control. Usually the employer can boldly dictate the terms of employment; the severance clause is not the place to become bashful. There is no inherent unfairness in the employer's strong bargaining stance, so long as the employee understands what he's getting into and what he's giving up. The employee, after all, retains the ultimate choice to decline the job offer. But if an employer wants specific termination provisions to apply, not to mention the right to change them for the worse, it has to say so in clear and express terms. Any ambiguity will almost certainly be resolved in favour of the

employee.

**26**    While this case turns on an interpretation of the contract, even a clear and unambiguous provision will not necessarily limit an employee's notice on termination. A court must also find that an employee knew and understood what he was signing: Nardocchio v. Canadian Imperial Bank of Commerce (1979), 41 N.S.R. (2d) 26 at 41; 76 A.P.R. 26 at 41 (N.S.S.C.); Risi v. Benson & Hedges (Canada) Inc., [1986] O.J. No. 2044 (Ont. Dist. Ct.) (QUICKLAW); and agreed to be bound by the severance provision: Buerman v. Canada (Attorney General) (1996), 19 C.C.E.L. (2d) 127 at 131 (Ont. Ct. (Gen. Div.)). In appropriate cases a court may also consider coercion, improper influence or oppressive conduct: Wallace at 180.

**27**    Had I had sufficient evidence to find a clear, express and unambiguous contract limiting Mr. Long's severance entitlement, I would have had no hesitation determining that Mr. Long understood the provision and agreed to be bound. He read and understood the offer, had an opportunity to ask questions before he signed and had continued familiarity with the severance policy in carrying out his job responsibilities. I see no hint of coercion, duress, improper influence or oppressive conduct. Mr. Long was given a reasonable choice, in fact the only choice that can be given when one company sells its assets to another. He could accept a job with Delta, the new employer, and agree to Delta's terms or he could decline the offer and trigger his severance entitlement with his old employer, Stearns.

**28**    Employers bear the onus of proving a contract which limits severance entitlement. They can anticipate a stiff evidentiary battle. It is incumbent on an employer to keep detailed records of everything relevant to the formation of the contract, including timing of events, meetings and delivery of documents; copies of letters, agreements and other documents given to employees; outlines of explanations and disclosures made at meetings and interviews; recommendations made and opportunities given to employees to obtain independent advice; and particulars of delivery of signed agreements to employees. If an employer relies on its dismissed employee to supply this information, it might expect to find itself at the wrong end of a judgment more often than not.

cp/d/bbd

*Indexed as:*

# Manulife Bank of Canada v. Conlin

**Manulife Bank of Canada, appellant;**
**v.**
**John Joseph Conlin, respondent.**

**[1996] 3 S.C.R. 415**

[1996] S.C.J. No. 101

File No.: 24499.

Supreme Court of Canada

1996: May 30 / 1996: October 31.

**Present: La Forest, L'Heureux-Dubé, Sopinka, Gonthier,**
**Cory, Iacobucci and Major JJ.**
**on appeal from the court of appeal for ontario**

*Mortgages -- Guarantee -- Renewal agreement -- Release of guarantor from liability -- Mortgagor's husband guaranteeing mortgage -- Mortgage clause providing that guarantors liable "as principal debtors and not as sureties"-- Guarantee to remain binding "notwithstanding the giving of time for payment . . . or the varying of the terms of payment"-- Mortgagor renewing mortgage at different interest rate -- Renewal agreement not signed by guarantor -- Whether guarantor waived equitable right to be released when principal loan renewed.*

 *Courts -- Jurisdiction -- Mortgagor defaulting on mortgage -- Bank obtaining summary judgment against mortgagor and guarantor -- Whether Court of Appeal exceeded its jurisdiction in setting aside judgment and dismissing action against guarantor.*

The respondent guaranteed a mortgage for a three-year term with an interest rate of 11.5 percent per annum which his wife had provided as security for a loan from the appellant bank. In clause 34 of the mortgage agreement, the guarantors promised, as "principal debtors and not as sureties", to pay the money secured by the mortgage. The guarantee was to remain binding "notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon". Shortly before the mortgage was to mature, the mortgagor and the bank

executed an agreement which renewed the mortgage for a further three-year term at a yearly interest rate of 13 percent. The renewal forms provided spaces for the signature of the "registered owner" and the "guarantor", but the agreement was signed only by the mortgagor. The mortgagor defaulted on the mortgage, and the bank obtained a summary judgment against the mortgagor and the guarantors for the principal owing under the mortgage with interest at 13 percent per annum. The Court of Appeal, in a majority decision, set aside the judgment and dismissed the action against the respondent guarantor. This appeal is to determine (1) whether the Court of Appeal exceeded its jurisdiction in allowing the appeal and dismissing the action, rather than sending the matter back to trial, and (2) whether under the terms of the loan agreement, the respondent was released from his promise to pay the principal sum and other moneys secured by the mortgage when the term of the mortgage was extended and the rate of interest increased, without notice to him.

Held (L'Heureux-Dubé, Gonthier and Iacobucci JJ. dissenting): The appeal should be dismissed.

(1)    Jurisdiction

The Court of Appeal has jurisdiction to make any order or decision that ought to or could have been made by the court or tribunal appealed from. Considered in light of Rule 1.04(1), which provides that the rules are to be liberally construed, Rules 20.04(2) and (4) of the Rules of Civil Procedure gave the motions court judge the jurisdiction to dismiss the action against the respondent. The judge could either have found that there was no genuine issue for trial or he could have found that the only genuine issue was an issue of law. In either case, it would have been within his jurisdiction and, by extension, within the jurisdiction of the Court of Appeal, to dispose of the matter by dismissing the appellant's claim. The appellant was not deprived of its right to have its case fully heard and to test all of the respondent's evidence. Under Rule 39.02(1), a party to a motion may cross-examine the deponent of any affidavit served by a party who is adverse in interest on the motion. The appellant chose not to exercise this right and left the respondent's evidence unchallenged.

(2)    Release from liability

Per La Forest, Sopinka, Cory and Major JJ.: It has long been clear that a guarantor will be released from liability on the guarantee in circumstances where the creditor and the principal debtor agree to a material alteration of the terms of the contract of debt without the consent of the guarantor. A surety can contract out of the protection provided to a guarantor by the common law or equity, but any contracting out of the equitable principle must be clear. The issue as to whether a surety remains liable will be determined by interpreting the contract between the parties and determining the intention of the parties as demonstrated by the words of the contract and the events and circumstances surrounding the transaction as a whole. If there is any ambiguity in the terms used in the guarantee, the words of the documents should be construed against the party which drew it, by applying the contra proferentem rule. As well, this Court has stated that the surety is a favoured creditor in the eyes of the law whose obligation should be strictly examined and strictly enforced.

The guarantor in this case comes within the class of accommodation sureties, or those who enter into the guarantee in the expectation of little or no remuneration. The law has protected such guarantors by strictly construing their obligations and limiting them to the precise terms of the contract of surety.

Clause 34 and clause 7, dealing with renewal or extension of time, unambiguously indicate that the respondent was not bound by the renewal agreement. If the guarantor is to be treated as a principal debtor and not as a guarantor, then the failure of the bank to notify the respondent of the renewal agreement and the new terms of the contract must release him from his obligations since he is not a party to the renewal. Moreover, even if it were thought that the principal debtor clause does not convert the guarantor into a principal debtor, the equitable or common law rules relieving the surety from liability where the contract has been materially altered by the creditor and the principal debtor without notice to the surety would apply, in the absence of an express agreement to the contrary. Two aspects of the renewal agreement itself lead to the conclusion that the guarantor is not to be bound. First, the renewal agreement is once again a standard form prepared and used by the bank and it calls for the signature of the guarantor. Secondly, the renewal agreement states that the terms of the old mortgage will form part of the agreement, and by doing so indicates that this is a new agreement rather than merely an extension of an old agreement. Further, clause 7 of the original mortgage specifically distinguishes between extensions and renewals both in its heading and in its text. The failure to refer to a renewal agreement or even to a renewal in clause 34 strongly suggests that it has no application to a renewal. The words used in clauses 34 and 7 are sufficiently clear to conclude that the guarantor did not waive his equitable and common law rights either as a principal debtor or as a guarantor. If the wording of the two clauses should be found to be ambiguous, the contra proferentem rule must be applied against the bank. The wording of clause 34 binding the guarantor to variations in the event of an extension of the mortgage should not be applied to bind the guarantor to a renewal without notice since there is ambiguity as to whether clause 34 applies to renewals at all. In these circumstances as well, the guarantor should be relieved of liability.

Per Gonthier and Iacobucci JJ. (dissenting): Clause 34 amounts to a waiver of the respondent's right to be discharged as a result of a material variation of the principal contract. Guarantee contracts are basically contracts, like any others, and should be construed according to the ordinary rules of contractual interpretation. The cardinal interpretive rule of contracts is that the court should give effect to the intentions of parties as expressed in their written document. The court will deviate from the plain meaning of the words only if a literal interpretation of the contractual language would lead either to an absurd result or to a result which is plainly repugnant to the intention of the parties. By clause 34, the guarantors agree to remain bound by the guarantee contract notwithstanding the giving of time for payment of the mortgage or the varying of the rate of interest. While clause 34 does not refer to "renewal" agreements by name, it does contain a clear waiver of the guarantors' right to be discharged in the event of an extension of time or an increase in the rate of interest. The plain ordinary meaning of the words "the giving of time for payment . . . or the varying of the terms of payment" encompasses the renewal agreement. While the parties used a renewal agreement, at bottom, that renewal agreement extended the time for payment and increased the interest rate,

events that are expressly covered in clause 34. Under clause 34, the bank did not have to notify the guarantors of the renewal agreement. The language of the clause is clear, and it would be odd to infer a condition of notice when the undertaking is so clear and unambiguous. As "principal debtors", the guarantors would not be expected to sign the renewal agreement. The evident intention of the parties, in using this kind of language, was to preserve the liability of the surety even in circumstances where the principal obligation was no longer enforceable. The space for the guarantors' signature on the renewal agreement is not helpful in trying to interpret the guarantee contract, since the wording or form of another subsequent contract, entered into three years later, cannot change the meaning of the original agreement. The respondent promised to guarantee the payment of the money secured by the original mortgage, and the terms of that mortgage thus determine the extent of his liability. The respondent is not liable for interest at the increased rate of 13 percent, but simply to repay the balance owing on the principal sum with interest charged at 11.5 percent per annum.

Per L'Heureux-Dubé J. (dissenting): Subject to the following comment, Iacobucci J.'s reasons are substantially agreed with. Courts should generally use the "modern contextual approach" as the standard, normative approach to judicial interpretation, and may exceptionally resort to the old "plain meaning" rule in appropriate circumstances. To determine the appropriate definition of the phrase "the giving of time for payment . . . or the varying of the terms of payment" in the present context, Iacobucci J. reviewed the provisions in their immediate context, the contract as a whole, the consequences of proposed interpretations, the applicable presumptions and rules of interpretation, and admissible external aids. This process is not an application of the "plain meaning" approach but rather an application of the "modern contextual approach" to judicial interpretation. The rules which govern the interpretation of deeds and contracts generally are essentially the same as the rules for statutory interpretation. The "modern contextual approach" for statutory interpretation, with appropriate adaptations, is equally applicable to contractual interpretation. Statutory interpretation and contractual interpretation are but two species of the general category of judicial interpretation. Here, the resulting interpretation did not come from the "plain meaning" of the words, but from their "meaning in law", because they are "legal terms of art". Where an instrument uses a legal term of art, there is a presumption that the term of art is used in its correct legal sense, and this is the presumption that is resorted to by Iacobucci J. when he makes use of admissible external aids in determining the correct meaning of the phrase "to give time".

**Cases Cited**

By Cory J.

Referred to:  Holme v. Brunskill (1878), 3 Q.B.D. 495; Bank of Montreal v. Wilder, [1986] 2 S.C.R. 551; Bauer v. Bank of Montreal, [1980] 2 S.C.R. 102; First City Capital Ltd. v. Hall (1993), 11 O.R. (3d) 792; Holland-Canada Mortgage Co. v. Hutchings, [1936] S.C.R. 165; Alberta Opportunity Co. v. Schinnour, [1991] 2 W.W.R. 624; Citadel General Assurance Co. v. Johns-Manville Canada Inc., [1983] 1 S.C.R. 513; Canadian Imperial Bank of Commerce v. Patel

(1990), 72 O.R. (2d) 109; Co-operative Trust Co. of Canada v. Kirkby, [1986] 6 W.W.R. 90; Royal Trust Corp. of Canada v. Reid (1985), 40 R.P.R. 287; Veteran Appliance Service Co. v. 109272 Development Ltd. (1985), 67 A.R. 117.

By Iacobucci J. (dissenting)

Holme v. Brunskill (1878), 3 Q.B.D. 495; Re Rotenberg and Borough of York (No. 2) (1976), 13 O.R. (2d) 101; Keltic Leasing Corp. v. Curtis (1993), 133 N.B.R. (2d) 73; Bank of Montreal v. Wilder, [1986] 2 S.C.R. 551; Bauer v. Bank of Montreal, [1980] 2 S.C.R. 102; Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888; Stevenson v. Reliance Petroleum Ltd., [1956] S.C.R. 936; Cornish v. Accident Insurance Co. (1889), 23 Q.B.D. 453; Citadel General Assurance Co. v. Johns-Manville Canada Inc., [1983] 1 S.C.R. 513.

By L'Heureux-Dubé J. (dissenting)

River Wear Commissioners v. Adamson (1877), 2 App. Cas. 743; Sydall v. Castings Ltd., [1967] 1 Q.B. 302; Inland Revenue Commissioners v. Williams, [1969] 1 W.L.R. 1197.

**Statutes and Regulations Cited**

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 134(1).
Rules of Civil Procedure, R.R.O. 1990, Reg. 194, Rules 1.04(1), 20.04(2), (4), 39.02(1).

**Authors Cited**

Black's Law Dictionary, 5th ed.  St. Paul, Minn.:  West Publishing, 1979, "renewal", "extension".
Concise Oxford Dictionary of Current English, 9th ed. Oxford: Clarendon Press, 1995, "extend", "renew".
Côté, Pierre-André.  The Interpretation of Legislation in Canada, 2nd ed.  Cowansville:  Yvon Blais, 1991.
Driedger on the Construction of Statutes, 3rd ed.  By Ruth Sullivan.  Toronto:  Butterworths, 1994.
Fridman, G. H. L.  The Law of Contract in Canada, 3rd ed. Scarborough, Ont.:  Carswell, 1994.
McGuinness, Kevin Patrick.  The Law of Guarantee, 2nd ed. Scarborough, Ont.:  Carswell, 1996.


APPEAL from a judgment of the Ontario Court of Appeal (1994), 20 O.R. (3d) 499, 120 D.L.R. (4th) 234, 41 R.P.R. (2d) 283, 75 O.A.C. 117, 17 B.L.R. (2d) 143, reversing a decision of the Ontario Court (General Division) finding the respondent liable to pay under a mortgage. Appeal dismissed, L'Heureux-Dubé, Gonthier and Iacobucci JJ. dissenting.


H. Stephen Lee, for the appellant.
Raymond F. Leach and Barbara F. Fischer, for the respondent.

Solicitors for the appellant: Lee, Bowden, Concord, Ontario.
Solicitors for the respondent: Siskind, Cromarty, Ivey & Dowler, London, Ontario.

_____

The judgment of La Forest, Sopinka, Cory and Major JJ. was delivered by

**1    CORY J.**:-- I have read with great interest the clear and concise reasons of Justice Iacobucci. I am in agreement with his finding that the Court of Appeal had jurisdiction to make the order dismissing the action against the respondent. However, I must differ with his conclusion that by the terms of the guarantee, the respondent waived the equitable right of a guarantor to be released upon renewal of the mortgage loan with a different term and interest rates to which the guarantor did not consent.

The Position of a Guarantor as Defined by Equity and the Common Law

**2    **It has long been clear that a guarantor will be released from liability on the guarantee in circumstances where the creditor and the principal debtor agree to a material alteration of the terms of the contract of debt without the consent of the guarantor. The principle was enunciated by Cotton L.J. in Holme v. Brunskill (1878), 3 Q.B.D. 495 (C.A.), at pp. 505-6, in this way:

> The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court . . . will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged.

This rule has been adopted in a number of Canadian cases. See for example Bank of Montreal v. Wilder, [1986] 2 S.C.R. 551, at p. 562.

**3    **The basis for the rule is that any material alteration of the principal contract will result in a change of the terms upon which the surety was to become liable, which will, in turn, result in a change in the surety's risk. The rationale was set out in The Law of Guarantee (2nd ed. 1996) by Professor K. P. McGuinness in this way, at p. 534:

> The foundation of the rule in equity is certainly consistent with traditional

thinking, but it is a fair question whether it is necessary to invoke the aid of equity at all in order to conclude that in a case where the principal contract is varied materially without the surety's consent, the surety is not liable for any subsequent default. Essentially, a specific or discrete guarantee (as opposed to an all accounts guarantee) is an undertaking by the surety against the risks arising from a particular contract with the principal. If that contract is varied so as to change the nature or extent of the risks arising under it, then the effect of the variation is not so much to cancel the liability of the surety as to remove the creditor from the scope of the protection that the guarantee affords. When so viewed, the foundation of the surety's defence appears in law rather than equity: it is not that the surety is no longer liable for the original contract as it is that the original contract for which the surety assumed liability has ceased to apply. In varying the principal contract without the consent of the surety, the creditor embarks upon a frolic of his own, and if misfortune occurs it occurs at the sole risk of the creditor. A law based approach to the defence is in certain respects attractive, because it moves the surety's right of defence in the case of material variation from the discretionary and therefore relatively unsettled realm of equity into the more absolute and certain realm of law. In any event, it is clear quite certainly in equity and quite probably in law as well, that the material variation of the principal contract without the surety's consent (unless subsequently ratified by the surety) will result in the discharge of the surety from liability under the guarantee.

And further at p. 541, he wrote:

Where the risk to which the surety is exposed is changed, the rationale for the complete release of the surety is easily explained. To change the principal contract is to change the basis upon which the surety agreed to become liable. A surety's liability extends only to the contract which he has agreed to guarantee. If the terms of that contract (and consequently the terms of the surety's risk) are varied then the creditor should no longer be entitled to hold the surety to his obligation under the guarantee. To require a surety to maintain a guarantee in such a situation would be to allow the creditor and the principal to impose a guarantee upon the surety in respect of a new transaction. Such a power in the hands of the principal and creditor would amount to a radical departure from the principles of consensus and voluntary assumption of duty that form the basis of the law of contract.

The Right of a Guarantor to Contract Out of the Protection Provided by the Common Law

**4**    Generally, it is open to parties to make their own arrangements. It follows that a surety can contract out of the protection provided to a guarantor by the common law or equity. See for

example Bauer v. Bank of Montreal, [1980] 2 S.C.R. 102, at p. 107. The Ontario Court of Appeal, correctly in my view, added that any contracting out of the equitable principle must be clear. See First City Capital Ltd. v. Hall (1993), 11 O.R. (3d) 792 (C.A.), at p. 796.

**5**    The principle was explained by Professor McGuinness in The Law of Guarantee, supra, at p. 546, in these words:

> There are certain types of amendment that may be made to the terms of a principal contract (or departures from the terms of the principal contract) that will not have the effect of discharging the surety under that contract, even though those changes may be of a material nature. For instance, where the changes that have been made to the principal contract were specifically authorized by the surety or were otherwise within the contemplation of the contract, the surety will not be discharged. Similarly, changes which are authorized within the guarantee will not relieve the surety from liability.
>
> It is a question of interpretation whether such changes are authorized or contemplated.

The author added at p. 547 the following sage advice to lending institutions:

> Since the courts have tended to give a narrow construction to provisions in standard form guarantees which authorize such changes, it would be most unwise for a creditor to agree to changes without first obtaining the consent of the surety, except where there is clear authorization for him to act solely upon his own initiative. Where the creditor seeks to show that the guarantee agreement provides a blanket authorization to make material alterations to the principal contract, the wording must be very clear that such a right was intended. [Emphasis added.]

**6**    The issue as to whether a surety remains liable will be determined by interpreting the contract between the parties and determining the intention of the parties as demonstrated by the words of the contract and the events and circumstances surrounding the transaction as a whole.

Principles of Interpretation

**7**    In many if not most cases of guarantees a contract of adhesion is involved. That is to say the document is drawn by the lending institution on a standard form. The borrower and the guarantor have little or no part in the negotiation of the agreement. They have no choice but to comply with its terms if the loan is to be granted. Often the guarantors are family members with limited commercial experience. As a matter of accommodation for a family member or friend they sign the guarantee. Many guarantors are unsophisticated and vulnerable. Yet the guarantee extended as a favour may

result in a financial tragedy for the guarantor. If the submissions of the bank are accepted, it will mean in effect that a guarantor, without the benefit of notice or any further consideration, will be bound indefinitely to further mortgages signed by the mortgagor at varying rates of interest and terms. The guarantor is without any control over the situation. The position adopted by the bank, if it is correct, could in the long run have serious consequences. Guarantors, once they become aware of the extent of their liability, will inevitably drop out of the picture with the result that many simple and straightforward loans will not proceed since they could not be secured by guarantors.

**8**    In my view, it is eminently fair that if there is any ambiguity in the terms used in the guarantee, the words of the documents should be construed against the party which drew it, by applying the contra proferentem rule. This is a sensible and satisfactory way of approaching the situation since the lending institutions that normally draft these agreements can readily amend their documents to ensure that they are free from ambiguity. The principle is supported by academic writers.

**9**    G. H. L. Fridman, in his text The Law of Contract in Canada (3rd ed. 1994), at pp. 470-71, puts the position in this way:

> The contra proferentem rule is of great importance, especially where the clause being construed creates an exemption, exclusion or limitation of liability. . . .
>
> Where the contract is ambiguous, the application of the contra proferentem rule ensures that the meaning least favourable to the author of the document prevails.

Professor McGuinness, in his work The Law of Guarantee, supra, at pp. 612-13, explains the application of the rule as follows:

> . . . the contra proferentum rule of construction (under which the provisions of an agreement that were inserted by a party for his own protection are subjected to a strict interpretation) provides one method through which the courts can restrict the scope of extremely broad provisions which purport to eliminate the rights of the surety. The justification for giving such provisions a narrow construction is clear: it is one thing to say that a party may, if he so chooses, agree to assume an excessive burden, and to waive the rights which the law generally recognizes as existing for his protection. It is quite another thing to assume that parties necessarily intend to enter into such obligations. The more natural assumption is the exact opposite. Where the guarantee was drafted by the creditor, and there is any ambiguity or imprecision in the terms of a provision which purports to limit the rights of a surety, it is only fair that the ambiguity be resolved against the party who prepared the document. If the creditor wishes to take away a right belonging to the surety, he should use clear language in the document.

McGuinness further explains the principle and its justification in these words, at p. 244:

> Where it is the creditor who drafted the terms of the contract, consistence of principle would call for the guarantee to be construed narrowly and thus in effect against the creditor. It is submitted that the correct rule is that where there is only one reasonable interpretation that the words used in a guarantee can bear, the guarantee should be given that interpretation. In such a case, the contra proferentum rule would not come into play. Where, however, the agreement is ambiguous in the sense that there are two or more interpretations that might reasonably be given to its terms, the guarantee should be construed against the party who prepared it or proposed its adoption, whether that be the creditor or the surety.

**10**     As well, this Court has stated that the surety is a favoured creditor in the eyes of the law whose obligation should be strictly examined and strictly enforced. This appears from the reasons of Davis J. in Holland-Canada Mortgage Co. v. Hutchings, [1936] S.C.R. 165, at p. 172:

> A surety has always been a favoured creditor in the eyes of the law. His obligation is strictly examined and strictly enforced.

He goes on to say:

> "It must always be recollected," said Lord Westbury in Blest v. Brown (1862), 4 De G. F. & J. 367, at 376,

> in what manner a surety is bound. You bind him to the letter of his engagement. Beyond the proper interpretation of that engagement you have no hold upon him. He receives no benefit and no consideration. He is bound, therefore, merely according to the proper meaning and effect of the written engagement that he entered into. If that written engagement is altered in a single line, no matter whether it be altered for his benefit, no matter whether the alteration be innocently made, he has a right to say, "The contract is no longer that for which I engaged to be surety; you have put an end to the contract that I guaranteed, and my obligation, therefore, is at an end."

> Apart from any express stipulation to the contrary, where the change is in respect of a matter that cannot "plainly be seen without inquiry to be unsubstantial or necessarily beneficial to the surety," . . . the surety, if he has not consented to remain liable notwithstanding the alteration, will be discharged whether he is in fact prejudiced or not.

Those comments are as true today as they were at the time they were written.

**11**    The appellant contends that this principle of interpretation has been abandoned and for that proposition relies upon the reasons of this Court in Bauer, supra. I cannot agree with this submission. The issue in that case was whether a particular clause within the guarantee was an exemption clause and thus subject to the special rules of construction applying to those clauses. It was held that the clause in question was not, in fact, an exemption clause. The general question as to whether the scope of surety obligations should be construed strictly was not explicitly addressed by the Court. It is also significant that the Alberta Court of Appeal in Alberta Opportunity Co. v. Schinnour, [1991] 2 W.W.R. 624, found that the clause they were considering was analogous to that in issue in Bauer. Nonetheless they determined, correctly in my view, that it should be interpreted in accordance with the general rules of construction. Those rules should, in my view, include the contra proferentem rule and thus will be generally applicable to guarantee or surety clauses.

**12**    The position set out in Holland-Canada Mortgage Co., supra, was confirmed in Citadel General Assurance Co. v. Johns-Manville Canada Inc., [1983] 1 S.C.R. 513. At p. 521 of that case, it was said that "accommodation sureties" are those who entered into the guarantee "in the expectation of little or no remuneration and for the purpose of accommodating others or of assisting others in the accomplishment of their plans". The protection offered to this class of guarantors was explained also at p. 521:

> In respect of them, the law has been astute to protect them by strictly construing their obligations and limiting them to the precise terms of the contract of surety.

**13**    These sureties were contrasted with "compensated sureties" whose business consists of guaranteeing performance and payment in return for a premium. With respect to this latter class of sureties it was held at p. 524:

> . . . in the case of the compensated surety it cannot be every variation in the guaranteed contract, however minor, or every failure of a claimant to meet the conditions imposed by the bond, however trivial, which will enable the surety to escape liability.

Although the primary issue in the case was the distinction between accommodation sureties and those who receive compensation, these words nonetheless represent the considered opinion of the Court. In my view, they are correct.

**14**    I would note in passing that the guarantor in this case comes within the class of accommodation sureties.

**15**    It follows that if there is a doubt or ambiguity as to the construction or meaning of the clauses binding the guarantor in this case, they must be strictly interpreted and resolved in favour of the guarantor. Further, as a result of the favoured position of guarantors, the clauses binding them must

be strictly construed.

**16**    Finally, when the guarantee clause is interpreted, it must be considered in the context of the entire transaction. This flows logically from the bank's position that the renewal agreement was an integral part of the original contract of guarantee. This position I believe is correct. It follows that fairness demands that the entire transaction be considered and this must include the terms and arrangements for the renewal agreement.

Application of the Principles of Interpretation to the Guarantee and Renewal Agreement Presented in this Case

**17**    It may be helpful to set out once again clauses 34 and 7 of the original guarantee agreement and recall that the renewal agreement called for the signature of the guarantor.

Clause 34:
> Guarantee and Indemnity

> IT IS A CONDITION of the making of the loan secured by the within mortgage that the covenants set forth herein should be entered into by us, the Guarantors, namely John Joseph Conlin and Conlin Engineering & Planning Ltd. and now we the said Guarantors, and each of us, on behalf of ourselves, our respective heirs, executors, administrators and assigns, in consideration of the making of the said loan by the Mortgagee, do hereby jointly and severally covenant, promise and agree as principal debtors and not as sureties, that we and each of us shall and will well and truly pay or cause to be paid to the Mortgagee, the principal sum and all other moneys hereby secured, together with interest upon the same on the days and times and in the manner set forth in this mortgage, and will in all matters pertaining to this mortgage well and truly do, observe, fulfill and keep all and singular the covenants, provisos, conditions, agreements and stipulations contained in this mortgage, and do hereby agree to all the covenants, provisos, conditions, agreements and stipulations by this mortgage made binding upon the Mortgagor; and do further agree that this covenant shall bind us, and each of us notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon or the giving of a release or partial release or covenant not to sue to any of us; and we and each of us agree that the Mortgagee may waive breaches and accept other covenants, sureties or securities without notice to us or any of us and without relieving us from our liability hereunder, which shall be a continuous liability and shall subsist until payment in full of the principal sum and all other moneys hereby secured.

Clause 7:
           Renewal or Extension of Time

          PROVIDED that no extension of time given by the Mortgagee to the
          Mortgagor, or anyone claiming under it, or any other dealing by the Mortgagee
          with the owner of the equity of redemption of said lands, shall in any way affect
          or prejudice the rights of the Mortgagee against the Mortgagor or any other
          person liable for the payment of the monies hereby secured, and that this
          Mortgage may be renewed by an agreement in writing for any term with or
          without an increased rate of interest, or amended from time to time as to any of
          its terms including without limitation increasing the interest rate or principal
          amount notwithstanding that there may be subsequent encumbrances. And it shall
          not be necessary to register any such agreement in order to retain the priority of
          this Mortgage so altered over any instrument delivered or registered subsequent
          to this Mortgage.

**18**    Counsel for the appellant contended that there was no ambiguity in these clauses and that they
made it clear that the respondent's obligations as guarantor continued in spite of the renewal
agreement. Counsel for the respondent came to exactly the opposite conclusion. He submitted that
on the plain meaning of the clauses, the guarantor was not bound. A somewhat cynical observer
might conclude that it should not be unexpected that counsel for the opposing parties would take
these positions. However, the same conclusion cannot possibly be reached with regard to the judges
who have considered these clauses. The trial judge and the minority in the Court of Appeal came to
the same conclusion as the appellant. The majority in the Court of Appeal came to the opposite
conclusion. That skilled and experienced judges could come to opposite conclusions with regard to
the clauses might well lead one to suspect that the meaning of the clauses is unclear; in a word, they
are ambiguous. Of course, if that be the case, the contra proferentem rule should be applied.
However, for the reasons set out above, my view is that the clauses unambiguously indicate that the
respondent was not bound by the renewal agreement. If I am in error and if the contra proferentem
rule were applied it would strengthen and support my conclusion as to the interpretation of the
clauses.

The Effect of the "Principal Debtor Obligation" Set Out in Clause 34

**19**    In Canadian Imperial Bank of Commerce v. Patel (1990), 72 O.R. (2d) 109 (H.C.), at p. 119, it
was held that a principal debtor clause converts a guarantor into a full-fledged principal debtor. I
agree with this conclusion. If the guarantor is to be treated as a principal debtor and not as a
guarantor, then the failure of the bank to notify the respondent of the renewal agreement and the
new terms of the contract must release him from his obligations since he is not a party to the
renewal. This conclusion does not require recourse to equitable rules regarding material variation of

contracts of surety. It is simply apparent from the contract that a principal debtor must have notice of material changes and consent to them. Of course, a guarantor who, by virtue of a principal debtor clause, has a right to notice of material changes, may, by the terms of the contract, waive these rights. However, in the absence of a clear waiver of these rights, such a guarantor must be given notice of the material changes and, if he is to be bound, consent to them.

**20**    The appellant contended that the words in clause 34 which provide "the said guarantors . . . covenant, promise and agree as principal debtors and not as sureties" indicate that the respondent is bound as a principal debtor yet without any of the usual rights and benefits of a principal debtor such as notice with regard to renewal, and the opportunity to negotiate and consent to its terms. To take this position seems to me to be unfair and unreasonable.

**21**    The mortgagor as a principal debtor must be given notice of the renewal agreement. This is evident from the requirement that the mortgagor sign the renewal agreement. The principal debtor clause converts the guarantor into a full-fledged principal debtor with all the duties and obligations which that term implies. If the guarantor is to be responsible to the lending institution as a "full-fledged principal debtor" then he or she is entitled to the same notice of a renewal agreement as the principal debtor mortgagor. That is undoubtedly the reason the standard form of the renewal agreement provides a place for the guarantor to sign. Not just fairness and equity but the designation of the guarantor as a principal debtor leads to the conclusion that the guarantor must have notice of and agree to the renewal before he is bound by its terms. A guarantor reading clause 34 would be led to believe that as a principal debtor he would have the same notice of a renewal agreement as would the principal debtor mortgagor. If a lending institution wishes to have the guarantor obligated as a principal debtor, then the guarantor must be entitled to the same rights as the principal debtor which would include both notice and agreement as a party to a renewal.

**22**    Even if it were thought that the principal debtor clause does not convert the guarantor into a principal debtor, the equitable or common law rules relieving the surety from liability where the contract has been materially altered by the creditor and the principal debtor without notice to the surety would apply, in the absence of an express agreement to the contrary. The question is whether in this case, either as principal debtor or as surety, the guarantor has expressly contracted out of the normal protections accorded to him. This question must be determined as a matter of interpretation of the clauses of the agreement, through consideration of the transaction as a whole, and the application of the appropriate rules of construction.

Effect of the Renewal Agreement

**23**    In my view, the renewal agreement must be considered an integral part of the transaction. There are two aspects of the renewal agreement itself which lead to the conclusion that the guarantor is not to be bound. First, the renewal agreement is once again a standard form prepared and used by the bank and it calls for the signature of the guarantor. It must be assumed that all these standard form agreements prepared by the bank as a lending institution were meant to mesh with

and complement each other. The requirement by the standard form of a signature by the guarantor then supports the respondent's position that he was not, by the terms of the original loan agreement, deprived of the equitable and common law protection ordinarily extended to guarantors. Rather, he was expected to sign the renewal agreement. His signature would confirm his notice of the agreement and his consent to it.

**24**    The appellant submitted that the renewal agreement is simply an extension of the original mortgage which was contemplated by the terms of that mortgage. This submission should not be accepted. The original mortgage was for a period of three years, a term not uncommon in today's mortgage market. The renewal agreement provides for an agreement as to the term of a new mortgage and the new rate of interest. The document itself appears to indicate that the renewal agreement constitutes a new mortgage arrangement. This can be gathered from the provision which reads:

> All the covenants, conditions, powers and matters in the said mortgage shall apply to and form part of this agreement, except those amended herein. [Emphasis added.]

**25**    The standard form indicates that many variations in the original mortgage are to be agreed upon. For example, the mortgagor can select the length of the term of the loan; the rate of interest is to be agreed upon between the mortgagor and the lending institution. If the renewal agreement is no more than the extension of the original mortgage, the mischief that that position creates becomes obvious. What if the renewal provided for an extension of the term to 25 years at a substantially increased rate of interest? What if the situation with regard to the security had changed remarkably as a result of new zoning regulations or a new building code or there had been a marked change of use in the surrounding lands? To say that despite the changed circumstances the guarantor is, beyond the strict terms of the agreement, bound without any notice to an indefinite guarantee of a mortgage containing substantial changes in the term of the loan and the interest rate is worrisome indeed.

**26**    Further, it is significant that the renewal agreement states that the terms of the old mortgage will form part of the agreement. By doing so it indicates that this is a new agreement rather than merely an extension of an old agreement. This serves to strengthen my view that the respondent was no longer bound by the terms of the original guarantee upon the execution without notice to him of the renewal agreement.

Significance of Clause 7 of the Original Agreement

**27**    The reasons of Finlayson and Carthy JJ.A. forming the majority of this case in the Court of Appeal are in my view correct. Finlayson J.A. wrote ((1994), 20 O.R. (3d) 499, at p. 513):

> The reference in cl. 7 to the renewal agreement taking priority over subsequent encumbrancers indicates to me that the mortgagee was not directing

its corporate mind to the guarantors when negotiating this document. . . . Certainly, there is no express reference to the renewal agreement in cl. 34. On balance, and keeping in mind that these documents were all drawn and presented by the mortgagee, I conclude that the renewal agreement was a material change to the original mortgage debt not contemplated by the language of the guarantee and has the effect of releasing the guarantors from their obligations as sureties.

**28**    Carthy J.A.'s interpretation of the contract supports that of Finlayson J.A. but emphasizes different aspects. First, he stresses that clause 34 makes no reference to renewals. In his view, this is significant because it is a term commonly used with respect to mortgages and it is explicitly used in other clauses such as clause 7. Moreover, he found that clause 34 is perfectly capable of coherently referring to changes in the terms within the period of the original mortgage itself.

**29**    It is, I think, noteworthy and telling that clause 7 specifically distinguishes between extensions and renewals both in its heading and its text. This leads me to conclude that these terms do not refer to the same eventuality. Since clause 7 so carefully distinguishes between extensions and renewals, they must be referring to different situations. Both Black's legal dictionary and The Oxford Dictionary give separate and distinct definitions of the terms extension and renewal. Black's Law Dictionary (5th ed. 1979) at p. 1165 defines "renewal" as "[t]he act of renewing or reviving. A revival or rehabilitation of an expiring subject; that which is made anew or re-established" while it defines "extension" at p. 523 as "[a]n increase in length of time (e.g. of expiration date of lease, or due date of note). The word 'extension' ordinarily implies the existence of something to be extended". This clearly indicates that an "extension" refers to extending an agreement which already exists, while a renewal refers to the revival of an agreement which has expired. This distinction is confirmed by The Concise Oxford Dictionary of Current English (9th ed. 1995) at p. 476, which defines "extend" as "lengthen or make larger in space or time" while "renew" is defined at p. 1164 as "revive; regenerate; make new again; restore to the original state". It follows that the failure to refer to a renewal agreement or even to a renewal in clause 34 strongly suggests that it has no application to a renewal. If the lending institutions wished to have clause 34 apply to renewals, it would be a simple matter to use the specific term which is well known in the commercial world of mortgages.

**30**    Finally, the renewal agreement refers to incorporating the mortgage terms into the agreement. Clause 3 of the renewal agreement provides that:

> All the covenants, conditions, powers and matters in the said mortgage shall apply to and form part of this agreement, except those amended herein. [Emphasis added.]

This, too, suggests that the renewal agreement is a new agreement and not an extension, since the original mortgage terms are only incorporated to the extent that they are not altered by the renewal. Although clause 34 contemplates a change in the interest rate, an extension would not ordinarily

involve an alteration of the original terms, but rather a continuation of the same terms over a longer time period.

**31**    The appellant sought comfort from Co-operative Trust Co. of Canada v. Kirkby, [1986] 6 W.W.R. 90 (Sask. Q.B.). In that case, Armstrong J. noted that in some cases, a mortgage extension or renewal agreement could have exactly the same effect as a new mortgage. However, he concluded, correctly I believe, that on the facts of that case, there was no evidence to support the contention that the mortgage extension agreement was in fact a new mortgage. In my view, such a determination will involve a review of the particular guarantee clause and the whole transaction between the parties. The appellant also referred to the decisions in Royal Trust Corp. of Canada v. Reid (1985), 40 R.P.R. 287 (P.E.I. C.A.), and Veteran Appliance Service Co. v. 109272 Development Ltd. (1985), 67 A.R. 117 (Q.B.). In both those decisions, the terms renewal and extension agreement were used interchangeably. Yet I think that it becomes clear in reading both these decisions that this was not a central or major issue in the case. To repeat, it will be a question of fact to be determined on the particular transaction, agreement and circumstances presented in each case whether a renewal agreement is a new contract or simply an extension of the existing agreement.

**32**    It follows I find that the words used in clauses 34 and 7 are sufficiently clear to conclude that the guarantor did not waive his equitable and common law rights either as a principal debtor or as a guarantor. The renewal agreement which was entered into without notice to, or the agreement of, the guarantor materially altered the provisions of the original loan agreement. The guarantor was thereby relieved of his obligation.

**33**    If the wording of the two clauses should be found to be ambiguous, the contra proferentem rule must be applied against the bank. The wording of clause 34 binding the guarantor to variations in the event of an extension of the mortgage should not be applied to bind the guarantor to a renewal without notice since there is ambiguity as to whether clause 34 applies to renewals at all. In these circumstances as well, the guarantor should be relieved of liability.

Disposition

**34**    I would dismiss the appeal with costs.

The following are the reasons delivered by

**35**    L'HEUREUX-DUBÉ J. (dissenting):-- I substantially agree with my colleague Justice Iacobucci's reasons and the result he reaches. I have only one comment which relates to the judicial interpretation methodology relied upon by my colleague.

**36**    The "modern contextual approach" is, in my view, the standard, normative approach to judicial interpretation, and one may exceptionally resort to the old "plain meaning" rule in appropriate circumstances. One example of the latter is statutory interpretation in the area of

taxation, where the words and expressions used in legislative provisions quite often have a well-defined "plain meaning" within the business community.

**37**    In the case at bar, our Court is called upon to determine the appropriate definition of the phrase "the giving of time for payment ... or the varying of the terms of payment", in the context and factual situation of the instant case.

**38**    My colleague decides the issue by going through a contractual interpretation exercise as follows. Firstly, the impugned contractual provisions are reviewed in the context of the whole contract. Secondly, the issue of the contra proferentem rule is addressed. Thirdly, the issue of the difference between "accommodating" and "compensated" sureties is examined. Fourthly, an authoritative academic text is relied upon: K. P. McGuinness, The Law of Guarantee (2nd ed. 1996).

**39**    Thus, after reviewing the provisions in their immediate context, the contract as a whole, the consequences of proposed interpretations, the applicable presumptions and rules of interpretation, and admissible external aids, my colleague comes to a contextual interpretation of the impugned phrase. I fully agree with both the process used and the conclusions he arrived at. However, with respect, that process is not an application of the "plain meaning" approach: in fact, the "modern contextual approach" to judicial interpretation is the one that is actually used in the instant case.

**40**    I agree with my colleague that "[t]he rules respecting the interpretation of guarantees are essentially the same as the rules which govern the interpretation of deeds and contracts generally". But the rules which govern the interpretation of deeds and contracts generally are essentially the same as the rules for statutory interpretation. As Lord Blackburn stated in River Wear Commissioners v. Adamson (1877), 2 App. Cas. 743 (H.L.), at pp. 763-65:

> . . . I shall therefore state, as precisely as I can, what I understand from the decided cases to be the principles on which the Courts of Law act in construing instruments in writing; and a statute is an instrument in writing. In all cases the object is to see what is the intention expressed by the words used. . . .

> In construing written instruments I think the same principle applies. In the cases of wills the testator is speaking of and concerning all his affairs; . . .

> In the case of a contract, the two parties are speaking of certain things only. . . . [In both cases] the Court . . . declares what the intention, indicated by the words used under such circumstances, really is.

> And this, as applied to the construction of statutes, is no new
> doctrine. . . . My Lords, mutatis mutandis, I think this is applicable to the
> construction of statutes as much as of wills. And I think it is correct.
> [Emphasis added.]

**41**    Therefore, the "modern contextual approach" for statutory interpretation, with appropriate
adaptations, is equally applicable to contractual interpretation. Statutory interpretation and
contractual interpretation are but two species of the general category of judicial interpretation. In the
instant case, the methodological reference provided by R. Sullivan in Driedger on the Construction
of Statutes (3rd ed. 1994), at p. 131, applies equally to contractual interpretation:

> There is only one rule in modern interpretation, namely, courts are
> obliged to determine the meaning of [that which is to be judicially
> interpreted] in its total context, having regard to [its] purpose . . ., the
> consequences of proposed interpretations, the presumptions and special
> rules of interpretation, as well as admissible external aids. In other words,
> the courts must consider and take into account all relevant and admissible
> indicators of [. . .] meaning. After taking these into account, the court must
> them adopt an interpretation that is appropriate. An appropriate
> interpretation is one that can be justified in terms of (a) its plausibility, that
> is, its compliance with the [. . .] text; (b) its efficacy, that is, its promotion
> of the [. . .] purpose; and (c) its acceptability, that is, the outcome is
> reasonable and just. [Emphasis added.]

**42**    This methodology was indeed the one followed by my colleague. In the case at bar, however,
the resulting interpretation did not really come from the "plain meaning" of the words, but from
their "meaning in law", because they are "legal terms of art". As Lord Diplock explained in Sydall
v. Castings Ltd., [1967] 1 Q.B. 302, at pp. 313-14:

> Documents which are intended to give rise to legally enforceable
> rights and duties contemplate enforcement by due process of law which
> involves their being interpreted by courts composed of judges, each one of
> whom has his personal idiosyncrasies of sentiment and upbringing, not to
> speak of age. Such documents would fail in their object if the rights and
> duties which could be enforced depended on the personal idiosyncrasies of
> the individual judge or judges upon whom the task of construing them
> chanced to fall. It is to avoid this that lawyers, whose profession it is to
> draft and to construe such documents, have been compelled to evolve an
> English language, of which the constituent words and phrases are more
> precise in their meaning than they are in the language of Shakespeare or of
> any of the passengers on the Clapham omnibus this morning. These words
> and phrases to which a more precise meaning is so ascribed are called by

> lawyers "terms of art" but are in popular parlance known as "legal jargon".
> [Emphasis added.]

**43**     After having specified the nature of "legal terms of art", Lord Diplock stated the basic rule of judicial interpretation, as well as the methodology, that are applicable in that context (at p. 314):

> > The words and phrases . . . which are "terms of art" must therefore be given the meaning which attaches to them as terms of art; . . .

> > The lexicon of terms of art is to be found in the decided cases and in the textbooks consulted by legal practitioners.

**44**     It is quite obvious that where courts expound judicial interpretations of "legal terms of art" using such external aids as legal textbooks, the resulting outcome cannot appropriately be labelled a "plain meaning" definition.

**45**     Where an instrument uses a legal term of art, there is a presumption that the term of art is used in its correct legal sense: Inland Revenue Commissioners v. Williams, [1969] 1 W.L.R. 1197 (Ch.; Megarry J.).

**46**     This is the presumption that is resorted to by my colleague Iacobucci J. when he makes use of admissible external aids -- i.e.: McGuinness, supra, -- in determining the correct meaning of the phrase "to give time". As McGuinness reviews extensive case-law authority that establishes the generally accepted "meaning in law" of these "legal terms of art", it is an admissible external aid to judicial interpretation: see Driedger, supra, at pp. 428, 468 and 474; see also P.-A. Côté, The Interpretation of Legislation in Canada (2nd ed. 1991), at pp. 449-53 and 457-58.

**47**     Subject to the above considerations, I concur with my colleague's disposition of the appeal.

> The reasons of Gonthier and Iacobucci JJ. were delivered
by

**48**     IACOBUCCI J. (dissenting):-- This appeal raises questions regarding the proper method for interpreting guarantees. Specifically, we are asked to determine whether the wording of the contract in issue was clear enough to waive the guarantors' equitable right to be released when the principal loan was renewed.

        I.     Background

**49**     On February 20, 1987, the appellant Manulife Bank of Canada (at the time known as The Regional Trust Company) made a loan of $275,000 to Dina Conlin. The loan was for a term of three years and bore interest at the rate of 11.5 percent per annum. Dina Conlin provided security for the

loan in the form of a first mortgage against lands located in Welland, Ontario.

**50**    The terms of the loan required the signature of two guarantors: the respondent John Joseph Conlin, who was the mortgagor's husband; and Conlin Engineering and Planning Limited, an Ontario corporation. In clause 34 of the mortgage agreement, the two promised, "as principal debtors and not as sureties", to pay the money secured by the mortgage. They further agreed to all of the particular conditions and stipulations of the mortgage which were binding upon the mortgagor.

**51**    The guarantee was to remain binding "notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon". The liability of the guarantors was stated to be continuous, subsisting "until payment in full of the principal sum and all other moneys hereby secured".

**52**    In 1989, the respondent and Dina Conlin separated.

**53**    In 1990, shortly before the mortgage was to mature, Dina Conlin and the appellant executed an agreement which renewed the mortgage for a further three-year term at a yearly interest rate of 13 percent. The renewal forms provided spaces for the signature of the "registered owner" and the "guarantor", but the agreement was signed only by Dina Conlin. The respondent had no notice or knowledge of the renewal.

**54**    In March of 1992, Dina Conlin defaulted on the mortgage.

**55**    After fruitless efforts to sell the Welland lands, the bank initiated proceedings for summary judgment against Dina Conlin and the guarantors. The bank claimed the principal owing under the mortgage with interest at the rate of 13 percent per annum. Judgment was obtained on the motion. However, a majority of the Court of Appeal set aside the judgment and dismissed the action against the respondent: (1994), 20 O.R. (3d) 499, 120 D.L.R. (4th) 234, 41 R.P.R. (2d) 283, 75 O.A.C. 117, 17 B.L.R. (2d) 143.

II.    Relevant Contractual Provisions

**56**    (7) RENEWAL OR EXTENSION OF TIME

PROVIDED that no extension of time given by the Mortgagee to the Mortgagor, or anyone claiming under it, or any other dealing by the Mortgagee with the owner of the equity of redemption of said lands, shall in any way affect or prejudice the rights of the Mortgagee against the Mortgagor or any other person liable for the payment of the monies hereby secured, and that this Mortgage may be renewed by an agreement in writing for any term with or without an increased rate of interest, or amended from time to time as to any of its terms including without limitation increasing the interest rate or principal

amount notwithstanding that there may be subsequent encumbrances. And it shall not be necessary to register any such agreement in order to retain the priority of this Mortgage so altered over any instrument delivered or registered subsequent to this Mortgage.

(34)  GUARANTEE AND INDEMNITY

IT IS A CONDITION of the making of the loan secured by the within mortgage that the covenants set forth herein should be entered into by us, the Guarantors, namely John Joseph Conlin and Conlin Engineering & Planning Ltd. and now we the said Guarantors, and each of us, on behalf of ourselves, our respective heirs, executors, administrators and assigns, in consideration of the making of the said loan by the Mortgagee, do hereby jointly and severally covenant, promise and agree as principal debtors and not as sureties, that we and each of us shall and will well and truly pay or cause to be paid to the Mortgagee, the principal sum and all other moneys hereby secured, together with interest upon the same on the days and times and in the manner set forth in this mortgage, and will in all matters pertaining to this mortgage well and truly do, observe, fulfill and keep all and singular the covenants, provisos, conditions, agreements and stipulations contained in this mortgage, and do hereby agree to all the covenants, provisos, conditions, agreements and stipulations by this mortgage made binding upon the Mortgagor; and do further agree that this covenant shall bind us, and each of us notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon or the giving of a release or partial release or covenant not to sue to any of us; and we and each of us agree that the Mortgagee may waive breaches and accept other covenants, sureties or securities without notice to us or any of us and without relieving us from our liability hereunder, which shall be a continuous liability and shall subsist until payment in full of the principal sum and all other moneys hereby secured.

III.  Judgments Appealed From
A.   Ontario Court (General Division)

**57**   In a very succinct judgment, Killeen J. granted the bank's motion for summary judgment against both Dina Conlin and the respondent. He found that, according to the "clear and unequivocal language" of clauses 7 and 34, the respondent was liable under his guarantee despite the renewal of the mortgage and despite the increase in the rate of interest: "In my view, there is no escape for the guarantor".

B.    Ontario Court of Appeal (1994), 20 O.R. (3d) 499

(a)    Finlayson J.A.

**58**    Finlayson J.A. first considered the following language in clause 34: "the said guarantors . . . covenant, promise and agree as principal debtors and not as sureties . . ." (emphasis added). He found an apparent inconsistency between this last phrase and the fact that, on the face of the contract, the respondent appeared to be signing as a surety and not as a principal debtor. Having briefly discussed the difference between contracts of indemnity and contracts of guarantee, Finlayson J.A. concluded that it was unnecessary to resolve the exact nature of the guarantor's status, stating: "the reference to the guarantor as principal debtor can be disregarded for the purposes of this appeal" (p. 511).

**59**    Finlayson J.A. then turned to the main issue of whether the renewal agreement extinguished the respondent's liability under his guarantee. He noted that, in equity, either an increase of the interest rate or an extension of the mortgage's term constitutes a material change of the original contract which will extinguish a guarantor's liability.

**60**    Therefore, it was necessary to determine whether clause 34 constituted a waiver, on the part of the sureties, of these equitable rights. After reviewing several cases where the language of a particular guarantee was held to embrace a renewal agreement, Finlayson J.A. stated that "each of these cases must be confined to its own wording" (pp. 511-12). Furthermore, the language of the Manulife guarantee clause did not, in the opinion of Finlayson J.A., clearly contemplate the renewal agreement. Accordingly, the material change to the loan, effected through the renewal agreement, released the guarantors from their respective obligations.

(b)    Carthy J.A. (concurring with Finlayson J.A. in the result)

**61**    Carthy J.A. began by stating that the law has always treated sureties as "favoured" creditors. While a surety can contract out of his legal rights, the language used to do so must be clear.

**62**    Applying a "strict" interpretation to the loan agreement, Carthy J.A. concluded that the guarantee agreement was not "explicit enough to embrace a renewal" (p. 515). Furthermore, he found that the wording of clause 7 did not stipulate clearly that the loan could be renewed by an agreement which was not signed by the guarantors. The guarantors had not waived their equitable rights and, accordingly, the renewal agreement extinguished their liability.

(c)    Robins J.A. (dissenting)

**63**    Robins J.A. first reviewed the rule in Holme v. Brunskill (1878), 3 Q.B.D. 495 (C.A.) which states that any material variation of the principal contract without the surety's consent will discharge the surety. He went on to note that a guarantor can contract out of this equitable protection.

**64**    Robins J.A. then looked at the terms of clause 34 which stated that the guarantee would remain binding "notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon". He concluded that these words clearly contemplated both the extension of the mortgage's term and the increase in the interest rate, as implemented by the renewal agreement. In other words, by clause 34, the guarantors waived their equitable rights to be released from their obligations in the event of these particular changes to the loan contract.

**65**    Having decided that the respondent was liable as a guarantor, Robins J.A. did not find it necessary to consider whether the guarantors were, in fact, "principal debtors".

**66**    However, while he found the respondent to be liable under the guarantee, Robins J.A. would have varied the order of the motions court judge such that Conlin would only be liable for the principal amount secured under the mortgage and interest thereon calculated at 11.5 percent per annum. He based this variation on the finding that the guarantors agreed to be liable for the moneys secured under the original mortgage. In his view, although they agreed to be liable notwithstanding any change in the interest rate, they did not agree to be liable for that higher rate of interest.

IV.    Issues

**67**    Before our Court, the appellant raised a threshold issue of jurisdiction. It claimed that the Court of Appeal had erred in dismissing the action when that order was not requested by either party at the motion for summary judgment or on appeal and when neither counsel nor the courts ever discussed this form of relief. Accordingly, there are two major issues before us:

> 1.    Did the majority of the Ontario Court of Appeal exceed its jurisdiction in allowing the appeal and dismissing the action, rather than sending the matter back to trial?
>
> 2.    Under the terms of the loan agreement, was the respondent John Joseph Conlin released from his promise to pay the principal sum and other moneys secured by the mortgage, when the term of the mortgage was extended and the rate of interest increased, without notice to the respondent?

V.    Analysis
A.    Did the Court of Appeal have jurisdiction to dismiss the action as against the respondent?

**68**    Section 134(1) of the Courts of Justice Act, R.S.O. 1990, c. C.43, states as follows:

> 134.    -- (1) Unless otherwise provided, a court to which an appeal is taken may,
>
> (a)    make any order or decision that ought to or could have been made by the court or

>           tribunal appealed from;

(b)    order a new trial;

(c)    make any other order or decision that is considered just.

**69**    The order originally appealed from was granted on a motion for summary judgment brought by the bank. The respondent Conlin had brought no cross-motion for summary judgment dismissing the action. There had been no examination for discovery and no trial. Given that an appeal court may not make an order which the trial judge would not have had the jurisdiction to make (Re Rotenberg and Borough of York (No. 2) (1976), 13 O.R. (2d) 101 (C.A.), at p. 110), the appellant argued before us that the Court of Appeal had jurisdiction only to set aside the order for summary judgment and send the matter back for trial. The question to be answered, therefore, is whether the motions court judge had the jurisdiction to dismiss the action against the respondent.

**70**    The original motion for summary judgment was brought pursuant to Rule 20 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. Rule 20.04(2) states:

>           Where the court is satisfied that there is no genuine issue for trial with respect to a claim or defence, the court shall grant summary judgment accordingly.

Rule 20.04(4) states:

>           Where the court is satisfied that the only genuine issue is a question of law, the court may determine the question and grant judgment accordingly, . . .

The interpretive guide to the rules is set out in Rule 1.04(1):

>           These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

**71**    Considered in light of Rule 1.04(1), in my opinion, Rules 20.04(2) and (4) gave Killeen J. the jurisdiction to dismiss the action against the respondent. The motions court judge could either have found that there was no genuine issue for trial or he could have found that the only genuine issue was an issue of law. In either case, it would have been within his jurisdiction and, by extension, within the jurisdiction of the Court of Appeal, to dispose of the matter by dismissing Manulife's claim.

**72**    However, the appellant further argues that Finlayson and Carthy JJ.A. erred in basing their decisions on the unproven assertion that Conlin had never consented to the 1990 renewal agreement. The appellant claims that it had no opportunity to fully test Conlin's affidavit evidence with regard to consent and that, therefore, it was denied the right to have its case fully heard.

**73**    I do not agree with this assertion. The appellant did, in fact, have the opportunity to test

Conlin's evidence. Rule 39.02(1) of the Rules of Civil Procedure says that a party to a motion may cross-examine the deponent of any affidavit served by a party who is adverse in interest on the motion. However, the bank chose not to exercise this right and left Conlin's evidence unchallenged. Therefore, in my opinion, the appellant was not deprived of its right to have its case fully heard and to test all of the respondent's evidence.

**74**    This case is far from the circumstances that arose in Keltic Leasing Corp. v. Curtis (1993), 133 N.B.R. (2d) 73 (C.A.). In that case, the trial judge erred in making a finding of fact on a question which had not been addressed at all by the parties. The Court of Appeal found that this deprived the plaintiff of its right to adduce evidence in support of its position. However, in the case before us, the question of Conlin's consent, or lack thereof, to the renewal agreement was addressed before Killeen J. and, as discussed above, the appellant had full opportunity to counter this with evidence to the contrary.

**75**    For these reasons, it is my view that there is no reason to interfere with the Court of Appeal's procedural handling of this case.

> B.    Under the terms of the loan agreement, was the respondent released from his promise to pay the principal sum and other moneys secured by the mortgage when the term of the mortgage was extended and the rate of interest increased without the respondent's consent?

**76**    It is well accepted that any material variation of the terms of a contract between debtor and creditor, which is prejudicial to the guarantor and which is made without the guarantor's consent, will discharge the guarantor: Holme v. Brunskill, supra, at pp. 505-6; Bank of Montreal v. Wilder, [1986] 2 S.C.R. 551, at p. 562. An increase in the rate of interest and an extension of the time for payment are both material changes to the loan agreement sufficient to discharge a surety: K. P. McGuinness, The Law of Guarantee (2nd ed. 1996), at par. par. 10.23 and 10.51.

**77**    However, this right to be discharged as a result of a material variation of the principal contract can be waived by the surety. As McIntyre J. said in Bauer v. Bank of Montreal, [1980] 2 S.C.R. 102, at p. 107, "it is open to the parties to make their own arrangements, and a surety is competent to contract himself out of the protection of the equitable rule". The question to be resolved, therefore, is whether clause 34 amounts to a waiver of the respondent's equitable rights. Before dealing with this question, I believe it would be helpful to discuss briefly some of the interpretive principles relating to guarantees.

> (a)    Interpretive principles relating to guarantees

**78**    In my opinion, there is no special rule of construction for guarantees. Guarantee contracts are basically contracts, like any others, and should be construed according to the ordinary rules of contractual interpretation. As McGuinness states, supra, at p. 238, "The rules respecting the interpretation of guarantees are essentially the same as the rules which govern the interpretation of

deeds and contracts generally."

**79**    The cardinal interpretive rule of contracts is that the court should give effect to the intentions of parties as expressed in their written document. As Estey J. said in Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888, at p. 899, quoting Meredith J.A. in Pense v. Northern Life Assurance Co. (1907), 15 O.L.R. 131, at p. 137: "[In all contracts], effect must be given to the intention of the parties, to be gathered from the words they have used." The court will deviate from the plain meaning of the words only if a literal interpretation of the contractual language would lead either to an absurd result or to a result which is "plainly repugnant to the intention of the parties": McGuinness, supra, at p. 239; and see the reasons of Estey J. in Consolidated-Bathurst, supra, at p. 901.

**80**    When interpreting guarantees, like other contracts, the court may apply the contra proferentem rule where the wording of the guarantee supports more than one meaning. According to this rule, the ambiguity will be resolved in favour of the party who did not draft the contract. This is an interpretive rule of last resort, to be used only when all other means of ascertaining the intentions of the parties, as expressed by their written contract, have failed. See the words of Cartwright J. in Stevenson v. Reliance Petroleum Ltd., [1956] S.C.R. 936, at p. 953. As Lindley L.J. said in Cornish v. Accident Insurance Co. (1889), 23 Q.B.D. 453, at p. 456:

> . . . this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.

**81**    There is some suggestion in the case law that guarantee agreements entered into by an "uncompensated" or "accommodating" surety will be interpreted more strictly than those entered into by a compensated surety. In this respect, most notable is the decision of the Court in Citadel General Assurance Co. v. Johns-Manville Canada Inc., [1983] 1 S.C.R. 513.

**82**    In that case, the respondent, Johns-Manville, had entered into a contract with a supplier. That supplier had entered into a payment bond which named the appellant, Citadel, as guarantor of the supply contract. A condition of the bond was that no suit could be commenced under the bond without proper notice being given to the appellant surety and to the supplier. The supplier defaulted and the respondent commenced an action against the guarantor, Citadel. The respondent gave proper notice to the guarantor. However, while notice was given to the supplier, it did not strictly comply with the requirements of the bonding agreement. The guarantor denied liability under the bond on the basis that the notice provisions of the bond had not been complied with.

**83**    The Court rejected this argument and held that the guarantor was liable under the bonding agreement despite the respondent's failure to comply strictly with the terms of the contract. The basis for the decision was that guarantee agreements entered into for valuable consideration should be interpreted according to the ordinary rules of contractual construction. In obiter, McIntyre J., at pp. 521 and 523, went on to suggest that a different, stricter rule would apply to guarantors who had

not received compensation:

> In respect of them [i.e., uncompensated sureties], the law has been astute to protect them by strictly construing their obligations and limiting them to the precise terms of the contract of surety. Any material variation in the terms of the guaranteed indebtedness and any extension of time or postponement of the debtor's obligation, or any discharge or relinquishment of any security for the debt without the consent of the surety will discharge him. In other words, courts have adopted the strictissimi juris construction of the surety contract.

> . . . surety contracts should be more liberally construed in favour of claimants in the case of compensated sureties than in the case of accommodation sureties.

**84**    In my opinion, the above statement should be understood in the context in which it was made. In Citadel General Assurance, the issue was not one of contractual interpretation. Rather, it was a question of what consequences were to flow from a clear breach of the contract. For these reasons, it is my view that the comments in Citadel General Assurance are not a sufficient basis for holding generally that guarantee contracts should be subject to special, stricter rules of interpretation if the guarantor has not received compensation.

> (b)    Application of the rules of interpretation to the contract between Conlin and Manulife

**85**    In applying the above principles to this case, a number of sub-questions arise from the arguments of the parties which I now will address.

> (i)    Does clause 34 amount to a waiver of the respondent's equitable rights?

**86**    By clause 34, the guarantors agree to remain bound by the guarantee contract notwithstanding the giving of time for payment of the mortgage or the varying of the rate of interest.

**87**    The respondent argued that clause 34 does not include a waiver of the guarantors' right to be discharged in the event of a renewal of the mortgage. According to this argument, since the renewal agreement constituted a material change, it discharged the guarantors.

**88**    It is true, as the respondent contends, that clause 34 does not refer to "renewal" agreements by name. However, the clause does contain a clear waiver of the guarantors' right to be discharged in the event of an extension of time or an increase in the rate of interest:

> . . . this covenant shall bind us, and each of us notwithstanding the giving of time for payment of this mortgage or the varying of the terms of payment hereof or the rate of interest hereon . . .

**89**    The respondent maintained that a renewal was not the same thing as the giving of time for payment. He pointed out that clause 7 uses the term "renewal" while clause 34 does not. According to this line of argument, if the parties had intended the guarantee agreement to include a waiver of the right of discharge in the event of a renewal of the mortgage, they would have said so explicitly in clause 34.

**90**    However, I do not find this argument persuasive. The plain ordinary meaning of the words, "the giving of time for payment . . . or the varying of the terms of payment" encompasses the renewal agreement. Through this agreement, the appellant bank extended the term of the loan by three years and increased the rate of interest charged on the debt. I can see no support for the respondent's contention that the "giving of time for payment", as detailed in clause 34, does not include the giving of time for payment as effected by the renewal agreement.

**91**    In his book The Law of Guarantee, supra, at p. 556, McGuinness discusses the effect of agreements "to give time" to the principal debtor and says that the "giving of time" includes those agreements "which provide specifically for an extension of time for performance. . . . [for] further time in which to pay ... the guaranteed debt". This is precisely what the renewal agreement accomplished and, thus, this is what was contemplated by the language of the guarantee agreement.

**92**    In other words, what we must consider is the substantive effect of the renewal agreement, rather than the form of the instrument by which it was executed. The parties did use a renewal agreement, but, at bottom, that renewal agreement extended the time for payment and increased the interest rate, events that are expressly covered in clause 34.

**93**    With respect, I do not agree with Carthy J.A. when he says that the words "notwithstanding the giving of time for payment" should be interpreted to refer only to forbearance by the bank to pursue remedies during the original term of the mortgage. This is a case where we should heed the warning of Lindley L.J. in Cornish v. Accident Insurance Co., supra, and not use the contra proferentem doctrine in any guise to create a doubt, or to magnify an ambiguity. Like Killeen J., I am of the view that the plain wording of the agreement in question raises no real difficulty.

> (ii)    Under clause 34, did the appellant have to notify the guarantors of the renewal agreement?

**94**    One of the last phrases of clause 34 reads as follows: "we and each of us agree that the Mortgagee may waive breaches and accept other covenants, sureties or securities without notice to us" (emphasis added). By contrast, the preceding phrase which waives the guarantors' rights to be discharged in the event of certain material changes to the principal contract does not contain this phrase, "without notice to us". The respondent contends that this omission means that, if the bank failed to notify the guarantors of the relevant material changes, the guarantors would be discharged from their obligations. Because the respondent received no notice of the renewal agreement, he was released from his liability.

**95**    Again, I am unable to agree with this line of argument. As already stated, the language of clause 34 is clear: the guarantor unconditionally promises to remain bound notwithstanding the extending of time or the changing of the rate of interest charged. It is rather odd to infer a condition of notice when the undertaking is so clear and unambiguous. Of course, the parties could have included a requirement of notice, but, as the language of the waiver in clause 34 is so clear, they would have had to do so explicitly. It may be that the insertion of the words "without notice to us", in connection with the waiver of breaches and the accepting of other covenants, sureties or securities, was simply made out of an abundance of caution, but, regardless, this cannot affect the clear waiver relating to extending time and changing the interest rate.

> (iii)    What is the effect of the respondent promising "as a principal debtor and not as a surety"?

**96**    Clause 34 provides that the respondent and Conlin Engineering enter the agreement "as principal debtors and not as sureties". In his concurring judgment, Carthy J.A. reasoned that, as "principal debtors", the guarantors would be "expected" to be signatories to the renewal agreement. With respect, I do not agree.

**97**    I agree with Robins J.A.'s conclusion that the evident intention of the parties, in using this kind of language, was to preserve the liability of the surety even in circumstances where the principal obligation was no longer enforceable, although I express no opinion on whether the language is sufficient to accomplish such an objective. In any event, it is unnecessary to consider whether this clause was sufficient to turn clause 34 into an indemnity agreement, because I am of the opinion that the respondent is liable as a guarantor.

> (iv)    What is the significance of the fact that the renewal form provides a space for the guarantor's signature?

**98**    The respondent points to the fact that the renewal agreement had a space for the signature of the guarantor as proof that the reasonable expectations of the parties were that, in the absence of the guarantors' consent to a renewal agreement, any such agreement would discharge the guarantors. With respect, I do not agree.

**99**    Our primary task is to determine the meaning of the guarantee contained in clause 34. This agreement was entered into in 1987. The wording or form of another subsequent contract, entered into three years later, cannot change the meaning of the original agreement. In my opinion, the space for the guarantors' signature on the renewal agreement is not helpful in trying to interpret the guarantee contract.

> (v)    What exactly is the extent of the respondent's obligation?

**100**    The respondent promised to guarantee the payment of the money secured by the 1987 mortgage. In my view, the terms of that mortgage determine the extent of the respondent's liability.

Clause 34 does include a waiver of the guarantors' rights to be discharged in the case of material variation of the terms of the loan agreement. However, the fact that the renewal agreement does not discharge the respondent does not mean that the respondent is liable for the money secured by that renewal agreement -- a contract to which he never consented. In clause 34, the guarantors promise to pay "the principal sum and all other moneys hereby secured" (emphasis added), i.e., secured by the original mortgage agreement. In other words, the respondent is not liable for interest at the increased rate of 13 percent. Rather, his responsibility, as specified in the 1987 agreement, and as found by Robins J.A. in the Court of Appeal, is to repay the balance owing on the principal sum with interest charged at the rate of 11.5 percent.

VI.   Disposition

**101**    For the foregoing reasons, I would allow the appeal, with costs here and below, set aside the judgment of the Court of Appeal, and substitute therefor an order to the effect that the respondent is liable under his guarantee to pay the balance owing on the principal amount with interest at 11.5 percent per annum.

*Case Name:*

# Mitchell v. Canada (Minister of National Revenue - M.N.R.)


**Minister of National Revenue, appellant;**
**v.**
**Grand Chief Michael Mitchell also known as Kanentakeron,**
**respondent, and**
**The Attorney General of Quebec, the Attorney General for**
**New Brunswick, the Attorney General of Manitoba, the**
**Attorney General of British Columbia, the Mohawk Council**
**of Kahnawake, the Assembly of First Nations and the**
**Union of New Brunswick Indians, interveners.**

[2001] S.C.J. No. 33

[2001] A.C.S. no 33

2001 SCC 33

2001 CSC 33

[2001] 1 S.C.R. 911

[2001] 1 R.C.S. 911

199 D.L.R. (4th) 385

269 N.R. 207

J.E. 2001-1066

[2001] 3 C.N.L.R. 122

83 C.R.R. (2d) 1

[2002] 3 C.T.C. 359

5 T.T.R. (2d) 567

105 A.C.W.S. (3d) 361

REJB 2001-24177

File No.: 27066.

Supreme Court of Canada

2000: June 16 / 2001: May 24.

**Present: McLachlin C.J. and Gonthier, Iacobucci,
Major, Binnie, Arbour and LeBel JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL (174 paras.)

*Constitutional law -- Aboriginal rights -- Right to bring goods across St. Lawrence River for purposes of trade -- Whether Mohawks of Akwesasne have right to bring goods into Canada from U.S. for trading purposes without paying customs duties -- Whether claimed right incompatible with Canadian sovereignty -- Constitution Act, 1982, s. 35(1).*

*Evidence -- Aboriginal rights -- Evidence to be adduced to establish aboriginal right -- Assessment of evidence in aboriginal claims.*

The respondent is a Mohawk of Akwesasne and a descendant of the Mohawk nation, one of the polities of the Iroquois Confederacy prior to the arrival of Europeans. In 1988, the respondent crossed the international border bearing goods purchased in the United States. He declared the goods to Canadian customs agents but asserted that aboriginal and treaty rights exempted him from paying duty. He was permitted to continue into Canada but advised he would be charged duty. The goods except some motor oil were presented to the Mohawk community of Tyendinaga as gifts. The oil was taken to a store in Akwesasne for resale to members of that community. The respondent was served with a claim for unpaid duty and sought declaratory relief. The Federal Court, Trial Division held that the respondent had an aboriginal right to cross the border freely without having to pay customs duties on goods destined for personal and community use as well as for noncommercial scale trade with other First Nations. The Federal Court of Appeal affirmed an aboriginal right to bring goods into Canada duty-free, subject to limitations based on the evidence of the traditional range of Mohawk trading.

Held: The appeal should be allowed. The claimed aboriginal right has not been established. The respondent must pay duty on the goods imported into Canada.

Per McLachlin C.J. and Gonthier, Iacobucci, Arbour and LeBel JJ.: Under English colonial law, the

pre-existing laws and interests of aboriginal societies were absorbed into the common law as rights upon the Crown's assertion of sovereignty unless these rights were surrendered, extinguished or inconsistent with Crown sovereignty. The enactment of s. 35(1) of the Constitution Act, 1982 accorded constitutional status to existing aboriginal and treaty rights, including the aboriginal rights recognized at common law. However, the government retained the jurisdiction to limit aboriginal rights for justifiable reasons in the pursuit of substantial and compelling public objectives. The test to establish an aboriginal right focuses on the integral, defining features of the relevant aboriginal society before the Crown's assertion of sovereignty. A claimant must prove that a modern practice, custom or tradition has a reasonable degree of continuity with a practice, tradition or custom that was in existence prior to contact with the Europeans. The practice, tradition or custom must have been integral to the distinctive culture of the aboriginal people in the sense that it distinguished or characterized their traditional culture and lay at the core of the aboriginal people's identity.

The initial step is to ascertain the true nature of the claimed right, without assessing its merits or artificially broadening or narrowing the right. This requires examining (1) the nature of the action which the applicant is claiming was done pursuant to an aboriginal right; (2) the nature of the governmental legislation or action alleged to infringe the right, i.e. the conflict between the claim and the limitation; and (3) the ancestral traditions and practices relied upon to establish the right. An application of these factors in this case suggests that the claimed right is properly characterized as the right to bring goods across the Canada-United States boundary at the St. Lawrence River for purposes of trade. The claim is for a right to trade simpliciter and necessarily entails a mobility right because the right to bring goods across the St. Lawrence River for purposes of trade involves travel. The right should not be qualified as a right to bring goods without paying duty or taxes because such a limitation should be considered at the infringement stage. Technically, the right should be characterized as a right to bring goods across the St. Lawrence River as opposed to the international border, a construction of newcomers. However, in modern terms, the river and the border are equivalent.

Aboriginal rights claims give rise to inherent evidentiary difficulties. However, the rights protected under s. 35(1) should not be rendered illusory by imposing an impossible burden of proof. The rules of evidence must therefore be applied flexibly, in a manner commensurate with the inherent difficulties posed by aboriginal claims. Since claimants must demonstrate features of pre-contact society in the absence of written records, oral histories may offer otherwise unavailable evidence of ancestral practices and aboriginal perspectives. Oral histories are admissible as evidence where they are both useful and reasonably reliable, subject always to the exclusionary discretion of the trial judge. In determining the usefulness and reliability of oral histories, judges must resist facile assumptions based on Eurocentric traditions of gathering and passing on historical facts. Here, the parties presented evidence from historians and archeologists. The aboriginal perspective was supplied by oral histories of elders such as the respondent. The respondent's testimony, confirmed by archaeological and historical evidence, was useful and the trial judge did not err in finding the respondent's evidence to be credible and reliable.

There are no precise rules or absolute principles governing the interpretation or weighing of evidence in support of aboriginal claims. The laws of evidence must ensure that the aboriginal perspective is given due weight but consciousness of the special nature of aboriginal claims does not negate general principles governing evidence. Claims must still be established on persuasive evidence demonstrating validity on a balance of probabilities. In the present case, the evidence indicates that the Mohawks travelled north on occasion and trade was a distinguishing feature of their society. The evidence does not show, however, an ancestral practice of trading north of the St. Lawrence River. Mohawk trade at the time of contact fell predominantly along an east-west axis. The relevant evidence supporting the claim consists of a single ceremonial knife, treaties that make no reference to pre-existing trade, and the mere fact of Mohawk involvement in the fur trade. While appellate courts grant considerable deference to findings of fact made by trial judges, the finding of a cross-border trading right in this case represents, in view of the paucity of the evidence, a "palpable and overriding error". Evidentiary principles must be sensitively applied to aboriginal claims but they cannot be strained beyond reason.

In any event, even if deference were granted to the trial judge's finding of pre-contact trade relations between the Mohawks and First Nations north of the St. Lawrence River, the evidence does not establish this northerly trade as a defining feature of the Mohawk culture. The claimed right implicates an international boundary and, consequently, geographical considerations are clearly relevant to the determination of whether the trading in this case is integral to the Mohawks' culture. Even if the trial judge's generous interpretation of the evidence were accepted, it discloses negligible transportation and trade of goods by the Mohawks north of the St. Lawrence River prior to contact. This trade was not vital to the Mohawks' collective identity. It follows that no aboriginal right to bring goods across the border for the purposes of trade has been established.

Since the respondent has not proven his claim to an aboriginal right, there is no need to comment on the extent, if any, to which colonial laws of sovereign succession are relevant to the definition of aboriginal rights under s. 35(1) of the Constitution Act, 1982.

Per Major and Binnie JJ.: It is agreed that even if Mohawks did occasionally trade goods across the St. Lawrence River with First Nations to the north prior to contact, this practice was neither a defining feature of their culture nor vital to their collective identity. There are, however, additional considerations for allowing the appeal. In this case, an issue arises about the sovereignty implications of the international trading and mobility right claimed by the respondent as a citizen of the Iroquois Confederacy.

Akwesasne lies at the jurisdictional epicentre of the St. Lawrence River and straddles the Canada-United States border, as well as provincial and state borders. This crisscrossing of borders through the Mohawk community goes beyond mere inconvenience and constitutes a significant burden on everyday living. The Mohawk people seek to diminish the border disruption in their lives, reunite a divided community, and find economic advantage in the international boundary. That economic value of their claim is created by non-aboriginal society is not fatal to its existence.

A frozen rights theory is incompatible with s. 35(1) and aboriginal rights are capable of growth and evolution.

An aboriginal right must be derived from pre-contact activity that was an element of a practice, custom or tradition integral to the aboriginal community's distinctive culture. Traditional Mohawk homelands were in the Mohawk Valley (N.Y. State) but the Mohawks historically travelled as far north as the St. Lawrence River valley. In that era, the Mohawks were, and acted as, a fully autonomous people within the Iroquois Confederacy. Territorial boundaries changed as a militarily powerful Iroquois Confederacy spread to and along the St. Lawrence River displacing other aboriginal inhabitants. While none of the boundaries between First Nation Territories in pre-contact times corresponded with the present international boundary at Akwesasne, such boundaries existed and, under traditional practices and customs, they were respected by the Mohawks in times of peace.

Counsel for the respondent does not dispute Canadian sovereignty. He seeks Mohawk autonomy within the broader framework of Canadian sovereignty. The respondent's claim is not just about physical movement of people or goods in and about Akwesasne. It is about the Mohawks' aspiration to live as if the international boundary did not exist.

Whereas historically the Crown may have been portrayed as an entity across the seas with which aboriginal people could scarcely be expected to identify, this was no longer the case in 1982 when the s. 35(1) reconciliation process was established. The Constitution was patriated and all aspects of our sovereignty became firmly located within our borders. If the principle of "merged sovereignty" articulated by the Royal Commission on Aboriginal Peoples is to have any true meaning, it must include at least the idea that aboriginal and non-aboriginal Canadians together form a sovereign entity with a measure of common purpose and united effort. It is this new entity, as inheritor of the historical attributes of sovereignty, with which existing aboriginal and treaty rights must be reconciled. The constitutional objective is reconciliation not mutual isolation. What is significant is that the Royal Commission itself sees aboriginal peoples as full participants with non-aboriginal peoples in a shared Canadian sovereignty. Aboriginal peoples do not stand in opposition to, nor are they subjugated by, Canadian sovereignty. They are part of it.

The respondent's claim presents two defining elements. He asserts a trading and mobility right across the international boundary and he attaches this right to his current citizenship not of Canada but of the Haudenosaunee (Iroquois) Confederacy with its capital in Onondaga, New York State.

A treaty right is an affirmative promise by the Crown which will be interpreted generously and enforced in a way that upholds the honour of the Crown. In the case of aboriginal rights, there is no historical event comparable to the treaty-making process in which the Crown negotiated the right or obligation sought to be enforced. The respondent's claim is rooted in practices which he says long preceded the Mohawks' first contact with Europeans in 1609.

British colonial law presumed that the Crown intended to respect aboriginal rights that were neither

unconscionable nor incompatible with the Crown's sovereignty. Courts have extended this recognition to practices, customs or traditions integral to the aboriginal community's distinctive culture. While care must be taken not to carry forward doctrines of British colonial law into interpretations of s. 35(1) without careful reflection, s. 35(1) was not a wholesale repudiation of the common law. The notion of incompatibility with Crown sovereignty was a defining characteristic of sovereign succession and therefore a limitation on the scope of aboriginal rights. For example, important as they may have been to the Mohawk identity as a people, it could not be said that pre-contact warrior activities gave rise under successor regimes to a legal right under s. 35(1) to engage in military adventures on Canadian territory. This concept of sovereign incompatibility continues to be an element in the s. 35(1) analysis, albeit a limitation that will be sparingly applied. For the most part, the protection of practices, traditions and customs that are distinctive to aboriginal cultures in Canada does not raise legitimate sovereignty issues at the definitional stage.

With the creation of the international boundary in 1783, Akwesasne became the point at which British (and later Canadian) sovereignty came face to face with the sovereignty of the U.S. Control over the mobility of persons and goods across a border has always been a fundamental attribute and incident of sovereignty. States are expected to exercise their authority over borders in the public interest. The duty cannot be abdicated to the vagaries of an earlier regime whose sovereignty has been eclipsed. Therefore, the international trading/mobility right claimed by the respondent is incompatible with the historical attributes of Canadian sovereignty. Since the claimed aboriginal right did not survive the transition to non-Mohawk sovereignty, there was nothing in existence in 1982 to which s. 35(1) protection of existing aboriginal rights could attach.

This conclusion is not at odds with the purpose of s. 35(1) to bring about a reconciliation of the interests of aboriginal peoples with Canadian sovereignty. Aboriginal people are part of Canadian sovereignty and the accommodation of their rights is not a zero-sum relationship between minority rights and citizenship. Affirmation of the sovereign interest of Canadians as a whole, including aboriginal peoples, should not in this case be seen as a loss of legitimate constitutional space for aboriginal peoples. To extend constitutional protection to the respondent's claim would overshoot the purpose of s. 35(1). In terms of sovereign incompatibility, the respondent's claim relates to national interests that all of us have in common rather than to distinctive interests that for some purposes differentiate an aboriginal community. Reconciliation of these interests in this particular case favours an affirmation of our collective sovereignty. This conclusion neither forecloses nor endorses any position on the compatibility or incompatibility of internal self-governing institutions of First Nations with Crown sovereignty, either past or present.

**Cases Cited**

By McLachlin C.J.

Applied: Delgamuukw v. British Columbia, [1997] 3 S.C.R. 1010, aff'g in part [1993] 5 W.W.R. 97; R. v. Van der Peet, [1996] 2 S.C.R. 507; R. v. Pamajewon, [1996] 2 S.C.R. 821; referred to: R.

v. Sparrow, [1990] 1 S.C.R. 1075; Guerin v. The Queen, [1984] 2 S.C.R. 335; Calder v. Attorney-General of British Columbia, [1973] S.C.R. 313; Mabo v. Queensland (1992), 175 C.L.R. 1; St. Catherine's Milling and Lumber Co. v. The Queen (1888), 14 App. Cas. 46; R. v. Gladstone, [1996] 2 S.C.R. 723; Watt v. Liebelt, [1999] 2 F.C. 455; R. v. Campbell (2000), 6 Imm. L.R. (3d) 1; R. v. Côté, [1996] 3 S.C.R. 139;  R. v. Adams, [1996] 3 S.C.R. 101; R. v. Nikal, [1996] 1 S.C.R. 1013; R. v. Badger, [1996] 1 S.C.R. 771; Simon v. The Queen, [1985] 2 S.C.R. 387; R. v. Levogiannis, [1993] 4 S.C.R. 475; R. v. Marshall, [1999] 3 S.C.R. 456; R. v. N.T.C. Smokehouse Ltd., [1996] 2 S.C.R. 672;  Inasa v. Oshodi, [1934] A.C. 99; R. v. Jacobs, [1999] 3 C.N.L.R. 239.

By Binnie J.

Applied: R. v. Sparrow, [1990] 1 S.C.R. 1075; R. v. Van der Peet, [1996] 2 S.C.R. 507; R. v. N.T.C. Smokehouse Ltd., [1996] 2 S.C.R. 672; explained: Calder v. Attorney-General of British Columbia, [1973] S.C.R. 313; distinguished: Watt v. Liebelt, [1999] 2 F.C. 455; referred to: R. v. Gladstone, [1996] 2 S.C.R. 723; R. v. Adams, [1996] 3 S.C.R. 101; United States v. Garrow, 88 F.2d 318 (1937); R. v. Côté, [1996] 3 S.C.R. 139; Attorney General for Canada v. Cain, [1906] A.C. 542; Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1832); R. v. Pamajewon, [1996] 2 S.C.R. 821; Nowegijick v. The Queen, [1983] 1 S.C.R. 29; Natural Parents v. Superintendent of Child Welfare, [1976] 2 S.C.R. 751; Dick v. The Queen, [1985] 2 S.C.R. 309; Delgamuukw v. British Columbia, [1997] 3 S.C.R. 1010, aff'g in part [1993] 5 W.W.R. 97; Attorney-General for Ontario v. Attorney-General for Canada, [1912] A.C. 571; Campbell v. British Columbia (Attorney General) (2000), 79 B.C.L.R. (3d) 122, 2000 BCSC 1123; Corbiere v. Canada (Minister of Indian and Northern Affairs), [1999] 2 S.C.R. 203; R. v. Taylor (1981), 62 C.C.C. (2d) 227; R. v. Badger, [1996] 1 S.C.R. 771; R. v. Marshall, [1999] 3 S.C.R. 456; Campbell v. Hall (1774), 1 Cowp. 204, 98 E.R. 1045; Amodu Tijani v. Southern Nigeria (Secretary), [1921] 2 A.C. 399; Oyekan v. Adele, [1957] 2 All E.R. 785; Guerin v. The Queen, [1984] 2 S.C.R. 335; Mabo v. Queensland (1992), 175 C.L.R. 1; Wik Peoples v. Queensland (1996), 187 C.L.R. 1; R. v. Eninew (1984), 12 C.C.C. (3d) 365; R. v. Hare (1985), 20 C.C.C. (3d) 1; R. v. Simmons, [1988] 2 S.C.R. 495; R. v. Jacques, [1996] 3 S.C.R. 312, Almeida-Sanchez v. United States, 413 U.S. 266 (1973); United States v. Ramsey, 431 U.S. 606 (1977); Chae Chan Ping v. United States, 130 U.S. 581 (1889); Ekiu v. United States, 142 U.S. 651 (1892); Fong Yue Ting v. United States, 149 U.S. 698 (1893); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831); United States v. Wheeler, 435 U.S. 313 (1978); Akins v. United States, 551 F.2d 1222 (1977); Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543 (1823).

## Statutes and Regulations Cited

Akwesasne Residents Remission Order, SOR/91-412.
Canadian Charter of Rights and Freedoms.
Constitution Act, 1867, s. 91(24).
Constitution Act, 1982, s. 35(1).
Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries. General

Conference of the International Labour Organisation, June 27, 1989, Art. 32.

Customs Act, R.S.C. 1985, c. 1 (2nd Supp.), ss. 17, 31, 131, 153(c), 159.

Customs Tariff, R.S.C. 1985, c. 41 (3rd Supp.).

Draft of the Inter-American Declaration on the Rights of Indigenous Peoples. Inter-American Commission on Human Rights, September 18, 1995, Art. 24.

Draft United Nations declaration on the rights of indigenous peoples. Sub-Commission on Prevention of Discrimination and Protection of Minorities, Res. 1994/45, Art. 35.

Immigration Act, R.S.C. 1985, c. I-2.

Royal Proclamation (1763), R.S.C. 1985, App. II, No.1.

Treaty of Paris (1763).

Treaty of Paris (1783).

## Authors Cited

Barsh, Russel L., and James Y. Henderson. "The Supreme Court's Van der Peet Trilogy: Naive Imperialism and Ropes of Sand" (1997), 42 McGill L.J. 993.

Blackstone, William. Commentaries on the Laws of England, 4th ed. Oxford: Clarendon Press, 1770.

Borrows, John. "The Trickster: Integral to a Distinctive Culture" (1997), 8 Constitutional Forum 27.

Borrows, John. "Uncertain Citizens: Aboriginal Peoples and the Supreme Court" (2001), 80 Can. Bar Rev. 15.

Canada. House of Commons. Special Committee on Indian Self-Government. Indian Self-Government in Canada: Report of the Special Committee. Ottawa: Queen's Printer for Canada, 1983.

Canada. National Film Board. Between Friends/Entre Amis. Toronto: McClelland & Stewart, 1976.

Canada. Royal Commission on Aboriginal Peoples. Partners in Confederation: Aboriginal Peoples, Self-Government, and the Constitution. Ottawa: The Commission, 1993.

Canada. Royal Commission on Aboriginal Peoples. Report of the Royal Commission on Aboriginal Peoples, vol. 2, Restructuring the Relationship. Ottawa: The Commission, 1996.

Greschner, Donna. "Aboriginal Women, the Constitution and Criminal Justice", [1992] U.B.C. L. Rev. (Sp. ed.) 338.

Hogg, Peter W., and Mary Ellen Turpel. "Implementing Aboriginal Self-Government: Constitutional and Jurisdictional Issues" (1995), 74 Can. Bar Rev. 187.

Kymlicka, Will, and Wayne Norman, eds. Citizenship in Diverse Societies. New York: Oxford University Press, 2000.

Nicholson, Norman L. The Boundaries of the Canadian Confederation. Toronto: Macmillan of Canada, 1979.

Richter, Daniel K. The Ordeal of the Longhouse: The Peoples of the Iroquois League in the Era of European Colonization. Chapel Hill, N.C.: University of North Carolina Press, 1992.

Ritchie, William A. The Archaeology of New York State, rev. ed.,  Harrison, N.Y.: Harbor Hill Books, 1980.

Slattery, Brian. "Making Sense of Aboriginal and Treaty Rights" (2000), 79 Can. Bar Rev. 196.

Slattery, Brian. "Understanding Aboriginal Rights" (1987), 66 Can. Bar Rev. 727.

Sopinka, John, and Sidney N. Lederman. The Law of Evidence in Civil Cases. Toronto: Butterworths, 1974.

Story, Joseph. Commentaries on the Constitution of the United States, 4th ed., vol. II. Boston: Little, Brown, 1873.


Vattel, Emer de. The Law of Nations; or, Principles of the Law of Nature, Applied to  the Conduct and Affairs of Nations and Sovereigns, Book II, new edition by Joseph Chitty. London: S. Sweet, 1834.

Woodward, Jack. Native Law. Toronto: Carswell, 1994 (loose-leaf updated 2000, release 2).


APPEAL from a judgment of the Federal Court of Appeal, [1999] 1 F.C. 375, 167 D.L.R. (4th) 702, 233 N.R. 129, [1999] 1 C.N.L.R. 112, [1998] F.C.J. No. 1513 (QL), affirming in part a judgment of the Trial Division, [1997] 4 C.N.L.R. 103, 134 F.T.R. 1, [1997] F.C.J. No. 882 (QL). Appeal allowed.


Graham Garton, Q.C., and Sandra Phillips, for the appellant.

Peter W. Hutchins, Anjali Choksi, Micha J. Menczer and Paul Williams, for the respondent.

René Morin, for the intervener, the Attorney General of Quebec.

Gabriel Bourgeois, for the intervener, the Attorney General for New Brunswick.

Kenneth J. Tyler and Robert J. C. Deane, for the intervener, the Attorney General of Manitoba.

Timothy Leadem and Kathryn Kickbush, for the intervener, the Attorney General of British Columbia.

Murray Marshall and François Dandonneau, for the intervener, the Mohawk Council of Kahnawake.

Jack R. London, Q.C., and Martin S. Minuk, for the intervener, the Assembly of First Nations.

Henry J. Bear, for the intervener, the Union of New Brunswick Indians.

Solicitor for the appellant: The Deputy Attorney General of Canada, Ottawa.

Solicitors for the respondent: Hutchins, Soroka & Dionne, Montréal.

Solicitor for the intervener, the Attorney General of Quebec: The Department of Justice, Sainte-Foy.

Solicitor for the intervener, the Attorney General for New Brunswick: The Solicitor General for the Province of New Brunswick, Fredericton.

Solicitors for the intervener, the Attorney General of Manitoba: Borden Ladner Gervais, Vancouver.

Solicitor for the intervener, the Attorney General of British Columbia: The Attorney General of British Columbia, Victoria.

Solicitors for the intervener, the Mohawk Council of Kahnawake: The Mohawk Council of Kahnawake Legal Services, Kahnawake.

Solicitors for the intervener, the Assembly of First Nations: Pitblado Buchwald Asper, Winnipeg.

Solicitor for the intervener, the Union of New Brunswick Indians: Bear Law Office, Maliseet, New Brunswick.

The judgment of McLachlin C.J. and Gonthier, Iacobucci, Arbour and LeBel JJ. was delivered by

**McLACHLIN C.J.**:--

I.    Introduction

**1**    This case raises the issue of whether the Mohawk Canadians of Akwesasne have the right to bring goods into Canada from the United States for collective use and trade with other First Nations without paying customs duties. Grand Chief Michael Mitchell claims that his people have an aboriginal right that ousts Canadian customs law. The government replies that no such right exists, first because the evidence does not support it and second because such a right would be fundamentally contrary to Canadian sovereignty. At the heart of the case lies the question of the evidence that must be adduced to establish an aboriginal right.

**2**    Chief Mitchell is a Mohawk of Akwesasne, a Mohawk community located just west of Montreal, and a descendant of the Mohawk nation, one of the polities comprising the Iroquois Confederacy prior to the arrival of Europeans. On March 22, 1988, Chief Mitchell crossed the international border from the United States into Canada, arriving at the Cornwall customs office. He brought with him some blankets, bibles, motor oil, food, clothing, and a washing machine, all of which had been purchased in the United States. He declared the goods to the Canadian customs agents but asserted that he had aboriginal and treaty rights which exempted him from paying duty on the goods. After some discussion, the customs agents notified Chief Mitchell that he would be charged $142.88 in duty, and they permitted him to continue into Canada. Chief Mitchell, along with other Mohawks of Akwesasne, presented everything but the motor oil to the Mohawk community of Tyendinaga. The gifts were intended to symbolize the renewal of the historic trading relationship between the two communities. The oil was taken to a store in Akwesasne territory for resale to members of that community. In September of 1989, Chief Mitchell was served with a Notice of Ascertained Forfeiture claiming $361.64 for unpaid duty, taxes and penalties.

**3**    I conclude that the aboriginal right claimed has not been established. The sparse and tenuous evidence advanced in this case to prove the existence of pre-contact Mohawk trading north of the Canada-United States boundary simply cannot support the claimed right. Even if deference is paid to the trial judge on this finding, any such trade was clearly incidental, and not integral, to the Mohawk culture. As a result, Chief Mitchell must pay duty on the goods he imported to Canada.

II.    Enactments

**4**    Constitution Act, 1982

35. (1) The existing aboriginal and treaty rights of the aboriginal peoples of Canada are hereby recognized and affirmed.

Customs Act, R.S.C. 1985, c. 1 (2nd Supp.)

17. (1) Imported goods are charged with duties thereon from the time of importation thereof until such time as the duties are paid or the charge is otherwise removed.

(2) Subject to this Act, the rates of duties on imported goods shall be the rates applicable to the goods at the time they are accounted for under subsection 32(1), (2) or (5).

(3) Whenever the importer of goods that have been released or any person authorized pursuant to paragraph 32(6)(a) to account for goods becomes liable under this Act to pay duties thereon, the owner of the goods at the time of release becomes jointly and severally liable, with the importer or person authorized, to pay the duties.

31. Subject to section 19, no goods shall be removed from a customs office, sufferance warehouse, bonded warehouse or duty free shop by any person other than an officer in the performance of his duties under this or any other Act of Parliament unless the goods have been released by an officer.

153.   No person shall

...

(c) wilfully, in any manner, evade or attempt to evade compliance with any provision of this Act or evade or attempt to evade the payment of duties under this Act.

159. Every person commits an offence who smuggles or attempts to smuggle into Canada, whether clandestinely or not, any goods subject to duties, or any goods the importation of which is prohibited, controlled or regulated by or pursuant to this or any other Act of Parliament.

III.    Decisions

**5**    At trial ((1997), 134 F.T.R. 1), McKeown J. declared that Chief Mitchell possesses an existing aboriginal but not a treaty right "to pass and repass freely across what is now the Canada-United States boundary including the right to bring goods from the United States into Canada for personal and community use without having to pay customs duties on those goods.... The aboriginal right includes the right to bring these goods from the United States into Canada for noncommercial scale trade with other First Nations" (p. 75). He found that the ancestors of the Akwesasne Mohawks lived in present-day New York State, with the Adirondack mountains representing the northern boundary of their territory. They travelled north into what is now Canada and crossed what is now the Canada-United States boundary, carrying with them goods for personal and community use. Further, he concluded that the area around Akwesasne was used by the Mohawks prior to the arrival of Europeans for the purposes of travel, diplomacy and trade. This history, he concluded, established an aboriginal right to bring goods across the present border free of duty, and to trade these goods with other First Nations.

**6**    McKeown J. accepted that the Mohawks, like other aboriginal societies of North America, were accustomed to the concept of boundaries and paying for the privilege of crossing arbitrary lines established by other peoples. However, he concluded that this did not negate a modern right to cross such boundaries duty-free because it merely constituted regulation of the underlying aboriginal right to bring goods across boundaries freely. The Customs Act did not extinguish this right because it too was merely regulatory.

**7**    The Federal Court of Appeal ([1999] 1 F.C. 375), per Sexton J.A., Isaac C.J. concurring, affirmed McKeown J.'s finding of an aboriginal right to bring goods into Canada duty-free, subject to limitations based on the evidence of the traditional range of Mohawk trading: the goods must have been purchased in New York State; the goods must be brought to a border crossing between New York and either Ontario or Quebec; and if destined for trade, such trade must be only with other aboriginal communities in those two provinces. Létourneau J.A. would have further narrowed the right by excluding a separate right of free passage across the border, requiring Mohawks seeking to exercise the right to report at the Cornwall customs office, and excluding a right to bring goods into Canada for trade purposes without the payment of customs duties.

IV.    Issues

**8**    The issue on appeal is whether Chief Mitchell has an aboriginal right which precludes the imposition of duty under the Customs Act on certain imported goods. The issue can be addressed in the following manner:

> A.    What is the Nature of Aboriginal Rights?
> B.    What is the Aboriginal Right Claimed?
> C.    Has the Claimed Aboriginal Right Been Established?

(1)     Evidentiary Concerns - Proving Aboriginal Rights

      (a)     Admissibility of Evidence in Aboriginal Right Claims
      (b)     The Interpretation of Evidence in Aboriginal Right Claims

(2)     Does the Evidence Show an Ancestral Mohawk Practice of Trading North of the St. Lawrence River?
(3)     Does the Evidence Establish that the Alleged Practice of Trading Across the St. Lawrence River Was Integral to Mohawk Culture and Continuous to the Present Day?

D.     Is the Claimed Right Barred from Recognition as Inconsistent with Crown Sovereignty?

Because I conclude that Chief Mitchell has not established an aboriginal right, I need not address questions of extinguishment, infringement and justification.

V.     Analysis

A. What is the Nature of Aboriginal Rights?

**9**     Long before Europeans explored and settled North America, aboriginal peoples were occupying and using most of this vast expanse of land in organized, distinctive societies with their own social and political structures. The part of North America we now call Canada was first settled by the French and the British who, from the first days of exploration, claimed sovereignty over the land on behalf of their nations. English law, which ultimately came to govern aboriginal rights, accepted that the aboriginal peoples possessed pre-existing laws and interests, and recognized their continuance in the absence of extinguishment, by cession, conquest, or legislation: see, e.g., the Royal Proclamation of 1763, R.S.C. 1985, App. II, No. 1, and R. v. Sparrow, [1990] 1 S.C.R. 1075, at p. 1103. At the same time, however, the Crown asserted that sovereignty over the land, and ownership of its underlying title, vested in the Crown: Sparrow, supra. With this assertion arose an obligation to treat aboriginal peoples fairly and honourably, and to protect them from exploitation, a duty characterized as "fiduciary" in Guerin v. The Queen, [1984] 2 S.C.R. 335.

**10**     Accordingly, European settlement did not terminate the interests of aboriginal peoples arising from their historical occupation and use of the land. To the contrary, aboriginal interests and customary laws were presumed to survive the assertion of sovereignty, and were absorbed into the common law as rights, unless (1) they were incompatible with the Crown's assertion of sovereignty, (2) they were surrendered voluntarily via the treaty process, or (3) the government extinguished them: see B. Slattery, "Understanding Aboriginal Rights" (1987), 66 Can. Bar Rev. 727. Barring

one of these exceptions, the practices, customs and traditions that defined the various aboriginal societies as distinctive cultures continued as part of the law of Canada: see Calder v. Attorney-General of British Columbia, [1973] S.C.R. 313, and Mabo v. Queensland (1992), 175 C.L.R. 1, at p. 57 (per Brennan J.), pp. 81-82 (per Deane and Gaudron JJ.), and pp. 182-83 (per Toohey J.).

**11**    The common law status of aboriginal rights rendered them vulnerable to unilateral extinguishment, and thus they were "dependent upon the good will of the Sovereign": see St. Catherine's Milling and Lumber Co. v. The Queen (1888), 14 App. Cas. 46 (P.C.), at p. 54. This situation changed in 1982, when Canada's constitution was amended to entrench existing aboriginal and treaty rights: Constitution Act, 1982, s. 35(1). The enactment of s. 35(1) elevated existing common law aboriginal rights to constitutional status (although, it is important to note, the protection offered by s. 35(1) also extends beyond the aboriginal rights recognized at common law: Delgamuukw v. British Columbia, [1997] 3 S.C.R. 1010, at para. 136). Henceforward, aboriginal rights falling within the constitutional protection of s. 35(1) could not be unilaterally abrogated by the government. However, the government retained the jurisdiction to limit aboriginal rights for justifiable reasons, in the pursuit of substantial and compelling public objectives: see R. v. Gladstone, [1996] 2 S.C.R. 723, and Delgamuukw, supra.

**12**    In the seminal cases of R. v. Van der Peet, [1996] 2 S.C.R. 507, and Delgamuukw, supra, this Court affirmed the foregoing principles and set out the test for establishing an aboriginal right. Since s. 35(1) is aimed at reconciling the prior occupation of North America by aboriginal societies with the Crown's assertion of sovereignty, the test for establishing an aboriginal right focuses on identifying the integral, defining features of those societies. Stripped to essentials, an aboriginal claimant must prove a modern practice, tradition or custom that has a reasonable degree of continuity with the practices, traditions or customs that existed prior to contact. The practice, custom or tradition must have been "integral to the distinctive culture" of the aboriginal peoples, in the sense that it distinguished or characterized their traditional culture and lay at the core of the peoples' identity. It must be a "defining feature" of the aboriginal society, such that the culture would be "fundamentally altered" without it. It must be a feature of "central significance" to the peoples' culture, one that "truly made the society what it was" (Van der Peet, supra, at paras. 54-59 (emphasis in original)). This excludes practices, traditions and customs that are only marginal or incidental to the aboriginal society's cultural identity, and emphasizes practices, traditions and customs that are vital to the life, culture and identity of the aboriginal society in question.

**13**    Once an aboriginal right is established, the issue is whether the act which gave rise to the case at bar is an expression of that right. Aboriginal rights are not frozen in their pre-contact form: ancestral rights may find modern expression. The question is whether the impugned act represents the modern exercise of an ancestral practice, custom or tradition.

B. What is the Aboriginal Right Claimed?

**14**    Before we can address the question of whether an aboriginal right has been established, we must first characterize the right claimed. The event giving rise to litigation merely represents an alleged exercise of an underlying right; it does not, in itself, tell us the scope of the right claimed. Therefore it is necessary to determine the nature of the claimed right. At this initial stage of characterization, the focus is on ascertaining the true nature of the claim, not assessing the merits of this claim or the evidence offered in its support.

**15**    In Van der Peet, supra, at para. 53, the majority of this Court provided three factors that should guide a court's characterization of a claimed aboriginal right: (1) the nature of the action which the applicant is claiming was done pursuant to an aboriginal right; (2) the nature of the governmental legislation or action alleged to infringe the right, i.e. the conflict between the claim and the limitation; and (3) the ancestral traditions and practices relied upon to establish the right. The right claimed must be characterized in context and not distorted to fit the desired result. It must be neither artificially broadened nor narrowed. An overly narrow characterization risks the dismissal of valid claims and an overly broad characterization risks distorting the right by neglecting the specific culture and history of the claimant's society: see R. v. Pamajewon, [1996] 2 S.C.R. 821.

**16**    Chief Mitchell characterizes his claim as the right to enter Canada from the United States with personal and community goods, without paying customs or duties, and the right to trade these goods with other First Nations. On the strength of this claimed right, he crossed the Canada-United States boundary with personal and community goods, the action giving rise to the case at bar. Although the motor oil was the only item transported by Chief Mitchell that was destined for resale, it can only be concluded that Chief Mitchell's actions - and his case - focused in fact on trade. The claimants asserted that "trade and commerce [is] central to their soul". Witness after witness was asked to describe historical Mohawk trading practices. Furthermore, when Chief Mitchell exercised his alleged right, all of the goods brought into Canada were trade-related: they were intended as gifts to seal a trade agreement with Tyendinaga and to signify renewed trading relations, in accordance with customary practice. Therefore the first factor, the action claimed as an exercise of an aboriginal right, suggests that the heart of the claim is the right to bring goods across the Canada-United States border for purposes of trade.

**17**    The second factor, the nature of the conflict between the claimed right and the relevant legislation, while more neutral, does not displace this conclusion. The law in conflict with the alleged right is the Customs Act. It applies both to personal goods and goods for trade.

**18**    The third factor to be considered in characterizing the claim is the relevant traditions and practices of the aboriginal people in question. The ancestral aboriginal practices upon which the claimant relies provide a strong indication of the nature and scope of the right claimed. In this case, the claimants emphasize their ancestral trading practices; indeed these practices and the alleged limitations on them raised by the appellant, lie at the heart of the case. As noted, the claimants assert that historically "trade and commerce [is] central to their soul". One of the claimant's expert

witnesses testified that trade "came as easily to the Iroquois as living and breathing". The government, while not denying that the Mohawks traditionally traded, asserts that such trade did not extend north into what is now Canada and that, in any event, the Mohawks traditionally accepted the custom of paying tributes and duties to cross boundaries established by other polities.

**19**    I conclude that the Van der Peet factors of the impugned action, the governmental action or legislation with which it conflicts, and the ancestral practice relied on, all suggest the claim here is properly characterized as the right to bring goods across the Canada-United States boundary at the St. Lawrence River for purposes of trade.

**20**    It may be tempting for a claimant or a court to tailor the right claimed to the contours of the specific act at issue. In this case, for example, Chief Mitchell seeks to limit the scope of his claimed trading rights by designating specified trading partners. Originally, he claimed the right to trade with other First Nations in Canada. After the Federal Court of Appeal decision, he further limited his claim to trade with First Nations in Quebec and Ontario. These self-imposed limitations may represent part of Chief Mitchell's commendable strategy of negotiating with the government and minimizing the potential effects on its border control. However, narrowing the claim cannot narrow the aboriginal practice relied upon, which is what defines the right. The essence of the alleged Mohawk tradition was not to bring goods across the St. Lawrence River to trade with designated communities, but rather to simply bring goods to trade. As a matter of necessity, pre-contact trading partners were confined to other First Nations, but this historical fact is incidental to the claim - the right to cross the St. Lawrence River with goods for personal use and trade. For example, in Gladstone, supra, the majority of this Court found an aboriginal right to engage in the commercial trade of herring spawn, but did not then proceed to restrict the Heiltsuk to their pre-contact First Nations trading partners. Moreover, it is difficult to imagine how limitations on trading partners would operate in practice. If Chief Mitchell trades goods to First Nations in Ontario and Quebec, there is nothing to prevent them from trading the goods with anyone else in Canada, aboriginal or not. Thus, the limitations placed on the trading right by Chief Mitchell and the courts below artificially narrow the claimed right and would, at any rate, prove illusory in practice.

**21**    The trial judge characterized the right claimed as including a right to engage in "small, noncommercial scale trade" (p. 12). He does not make it clear what inferences arise from this characterization, but one possible inference might be that evidence of minimal pre-contact trade would suffice to establish the right. I note without comment the practical difficulties inherent in defining "small, noncommercial scale trade" and the obvious fact that many small acts of trade may add up to more major trade. For purposes of this appeal, it suffices to note that Chief Mitchell did not seek at trial to limit his claim to small-scale or noncommercial trade. While he did not claim a right to trade goods brought across the border in the commercial mainstream, he did assert a right to trade with other First Nations, without qualifying the scale of such trade. He then called evidence emphasizing the centrality of trade to the ancestral Mohawk way of life. Moreover, his express purpose in transporting the goods across the border was the revival of trading relations with a neighbouring community. In these circumstances, it seems inappropriate to place much weight on

the limitation proposed by the Federal Court, and the claimed right is best characterized as a right to trade simpliciter.

**22**     In another attempt at limitation, Chief Mitchell denies that his claim entails the right to pass freely over the border, i.e., mobility rights. Perhaps recognizing that mobility has become a contentious issue in recent cases (e.g., Watt v. Liebelt, [1999] 2 F.C. 455 (C.A.); R. v. Campbell (2000), 6 Imm. L.R. (3d) 1 (B.C.S.C.)), he answers that his claim is contingent on his existing right to enter Canada pursuant to the Canadian Charter of Rights and Freedoms and the Immigration Act, R.S.C. 1985, c. I-2. He does not seek a right to enter Canada because he does not require such a right. Again, however, narrowing the claim cannot narrow the aboriginal practice that defines the claimed right. An aboriginal right, once established, generally encompasses other rights necessary to its meaningful exercise. In R. v. Côté, [1996] 3 S.C.R. 139, for example, it was held that the right to fish for food in a specified territory necessarily encompassed a right of physical access to that territory. The evidence in the present case showed that trade involved travel. It follows that any finding of a trading right would also confirm a mobility right.

**23**     The Attorney General of Manitoba raises two additional points about the characterization of the right. First, he argues that the claim should not be characterized in the negative. The original claim was to bring goods across the border "without having to pay any duty or taxes whatsoever to any Canadian government or authority". Manitoba argues that the right should be characterized simply as a right to bring goods, without qualification. I agree. As in the fishing and hunting cases, once an existing right is established, any restriction on that right through the imposition of duties or taxes should be considered at the infringement stage: see, e.g., R. v. Adams, [1996] 3 S.C.R. 101; Côté, supra; R. v. Nikal, [1996] 1 S.C.R. 1013; Gladstone, supra; see also R. v. Badger, [1996] 1 S.C.R. 771. The right claimed in those cases was not the right "to fish (or hunt) without restriction". Similarly, here the right is not "to bring trade goods without having to pay duty"; properly defined, the right claimed is to bring trade goods simpliciter.

**24**     Manitoba also argues that the right should not be construed as a right to cross the border. Technically this argument is correct, as the border is a construction of newcomers. Aboriginal rights are based on aboriginal practices, customs and traditions, not those of newcomers. This objection can be dealt with simply: the right claimed should be to bring goods across the St. Lawrence River (which always existed) rather than across the border. In modern terms, the two are equivalent.

**25**     Properly characterized, then, the right claimed in this case is the right to bring goods across the St. Lawrence River for the purposes of trade.

C. Has the Claimed Aboriginal Right Been Established?

**26**     Van der Peet set out the test for establishing an aboriginal right protected under s. 35(1). Briefly stated, the claimant is required to prove: (1) the existence of the ancestral practice, custom or tradition advanced as supporting the claimed right; (2) that this practice, custom or tradition was "integral" to his or her pre-contact society in the sense it marked it as distinctive; and (3) reasonable

continuity between the pre-contact practice and the contemporary claim. I will consider each of these elements in turn. First, however, it is necessary to consider the evidence upon which claims may be proved, and the approach courts should adopt in interpreting such evidence.

(1)    Evidentiary Concerns - Proving Aboriginal Rights

**27**    Aboriginal right claims give rise to unique and inherent evidentiary difficulties. Claimants are called upon to demonstrate features of their pre-contact society, across a gulf of centuries and without the aid of written records. Recognizing these difficulties, this Court has cautioned that the rights protected under s. 35(1) should not be rendered illusory by imposing an impossible burden of proof on those claiming this protection (Simon v. The Queen, [1985] 2 S.C.R. 387, at p. 408). Thus in Van der Peet, supra, the majority of this Court stated that "a court should approach the rules of evidence, and interpret the evidence that exists, with a consciousness of the special nature of aboriginal claims, and of the evidentiary difficulties in proving a right which originates in times where there were no written records of the practices, customs and traditions engaged in" (para. 68).

**28**    This guideline applies both to the admissibility of evidence and weighing of aboriginal oral history (Van der Peet, supra; Delgamuukw, supra, at para. 82).

(a)    Admissibility of Evidence in Aboriginal Right Claims

**29**    Courts render decisions on the basis of evidence. This fundamental principle applies to aboriginal claims as much as to any other claim. Van der Peet and Delgamuukw affirm the continued applicability of the rules of evidence, while cautioning that these rules must be applied flexibly, in a manner commensurate with the inherent difficulties posed by such claims and the promise of reconciliation embodied in s. 35(1). This flexible application of the rules of evidence permits, for example, the admissibility of evidence of post-contact activities to prove continuity with pre-contact practices, customs and traditions (Van der Peet, supra, at para. 62) and the meaningful consideration of various forms of oral history (Delgamuukw, supra).

**30**    The flexible adaptation of traditional rules of evidence to the challenge of doing justice in aboriginal claims is but an application of the time-honoured principle that the rules of evidence are not "cast in stone, nor are they enacted in a vacuum" (R. v. Levogiannis, [1993] 4 S.C.R. 475, at p. 487). Rather, they are animated by broad, flexible principles, applied purposively to promote truth-finding and fairness. The rules of evidence should facilitate justice, not stand in its way. Underlying the diverse rules on the admissibility of evidence are three simple ideas. First, the evidence must be useful in the sense of tending to prove a fact relevant to the issues in the case. Second, the evidence must be reasonably reliable; unreliable evidence may hinder the search for the truth more than help it. Third, even useful and reasonably reliable evidence may be excluded in the discretion of the trial judge if its probative value is overshadowed by its potential for prejudice.

**31**    In Delgamuukw, mindful of these principles, the majority of this Court held that the rules of evidence must be adapted to accommodate oral histories, but did not mandate the blanket

admissibility of such evidence or the weight it should be accorded by the trier of fact; rather, it emphasized that admissibility must be determined on a case-by-case basis (para. 87). Oral histories are admissible as evidence where they are both useful and reasonably reliable, subject always to the exclusionary discretion of the trial judge.

**32**    Aboriginal oral histories may meet the test of usefulness on two grounds. First, they may offer evidence of ancestral practices and their significance that would not otherwise be available. No other means of obtaining the same evidence may exist, given the absence of contemporaneous records. Second, oral histories may provide the aboriginal perspective on the right claimed. Without such evidence, it might be impossible to gain a true picture of the aboriginal practice relied on or its significance to the society in question. Determining what practices existed, and distinguishing central, defining features of a culture from traits that are marginal or peripheral, is no easy task at a remove of 400 years. Cultural identity is a subjective matter and not easily discerned: see R. L. Barsh and J. Y. Henderson, "The Supreme Court's Van der Peet Trilogy: Naive Imperialism and Ropes of Sand" (1997), 42 McGill L.J. 993, at p. 1000, and J. Woodward, Native Law (loose-leaf), at p. 137. Also see Sparrow, supra, at p. 1103; Delgamuukw, supra, at paras. 82-87, and J. Borrows, "The Trickster: Integral to a Distinctive Culture" (1997), 8 Constitutional Forum 27.

**33**    The second factor that must be considered in determining the admissibility of evidence in aboriginal cases is reliability: does the witness represent a reasonably reliable source of the particular people's history? The trial judge need not go so far as to find a special guarantee of reliability. However, inquiries as to the witness's ability to know and testify to orally transmitted aboriginal traditions and history may be appropriate both on the question of admissibility and the weight to be assigned the evidence if admitted.

**34**    In determining the usefulness and reliability of oral histories, judges must resist facile assumptions based on Eurocentric traditions of gathering and passing on historical facts and traditions. Oral histories reflect the distinctive perspectives and cultures of the communities from which they originate and should not be discounted simply because they do not conform to the expectations of the non-aboriginal perspective. Thus, Delgamuukw cautions against facilely rejecting oral histories simply because they do not convey "historical" truth, contain elements that may be classified as mythology, lack precise detail, embody material tangential to the judicial process, or are confined to the community whose history is being recounted.

**35**    In this case, the parties presented evidence from historians and archaeologists. The aboriginal perspective was supplied by oral histories of elders such as Grand Chief Mitchell. Grand Chief Mitchell's testimony, confirmed by archaeological and historical evidence, was especially useful because he was trained from an early age in the history of his community. The trial judge found his evidence credible and relied on it. He did not err in doing so and we may do the same.

(b)    The Interpretation of Evidence in Aboriginal Right Claims

**36**    The second facet of the Van der Peet approach to evidence, and the more contentious issue in

the present case, relates to the interpretation and weighing of evidence in support of aboriginal claims once it has cleared the threshold for admission. For the most part, the rules of evidence are concerned with issues of admissibility and the means by which facts may be proved. As J. Sopinka and S. N. Lederman observe, "[t]he value to be given to such facts does not ... lend itself as readily to precise rules. Accordingly, there are no absolute principles which govern the assessment of evidence by the trial judge" (The Law of Evidence in Civil Cases (1974), at p. 524). This Court has not attempted to set out "precise rules" or "absolute principles" governing the interpretation or weighing of evidence in aboriginal claims. This reticence is appropriate, as this process is generally the domain of the trial judge, who is best situated to assess the evidence as it is presented, and is consequently accorded significant latitude in this regard. Moreover, weighing evidence is an exercise inherently specific to the case at hand.

**37**    Nonetheless, the present case requires us to clarify the general principles laid down in Van der Peet and Delgamuukw regarding the assessment of evidence in aboriginal right claims. The requirement that courts interpret and weigh the evidence with a consciousness of the special nature of aboriginal claims is critical to the meaningful protection of s. 35(1) rights. As Lamer C.J. observed in Delgamuukw, the admission of oral histories represents a hollow recognition of the aboriginal perspective where this evidence is then systematically and consistently undervalued or deprived of all independent weight (para. 98). Thus, it is imperative that the laws of evidence operate to ensure that the aboriginal perspective is "given due weight by the courts" (para. 84).

**38**    Again, however, it must be emphasized that a consciousness of the special nature of aboriginal claims does not negate the operation of general evidentiary principles. While evidence adduced in support of aboriginal claims must not be undervalued, neither should it be interpreted or weighed in a manner that fundamentally contravenes the principles of evidence law, which, as they relate to the valuing of evidence, are often synonymous with the "general principles of common sense" (Sopinka and Lederman, supra, at p. 524). As Lamer C.J. emphasized in Delgamuukw, supra, at para. 82:

> [A]boriginal rights are truly sui generis, and demand a unique approach to the treatment of evidence which accords due weight to the perspective of aboriginal peoples. However, that accommodation must be done in a manner which does not strain "the Canadian legal and constitutional structure" [Van der Peet at para. 49]. Both the principles laid down in Van der Peet - first, that trial courts must approach the rules of evidence in light of the evidentiary difficulties inherent in adjudicating aboriginal claims, and second, that trial courts must interpret that evidence in the same spirit - must be understood against this background. [Emphasis added.]

**39**    There is a boundary that must not be crossed between a sensitive application and a complete abandonment of the rules of evidence. As Binnie J. observed in the context of treaty rights, "[g]enerous rules of interpretation should not be confused with a vague sense of after-the-fact largesse" (R. v. Marshall, [1999] 3 S.C.R. 456, at para. 14). In particular, the Van der Peet approach

does not operate to amplify the cogency of evidence adduced in support of an aboriginal claim. Evidence advanced in support of aboriginal claims, like the evidence offered in any case, can run the gamut of cogency from the highly compelling to the highly dubious. Claims must still be established on the basis of persuasive evidence demonstrating their validity on the balance of probabilities. Placing "due weight" on the aboriginal perspective, or ensuring its supporting evidence an "equal footing" with more familiar forms of evidence, means precisely what these phrases suggest: equal and due treatment. While the evidence presented by aboriginal claimants should not be undervalued "simply because that evidence does not conform precisely with the evidentiary standards that would be applied in, for example, a private law torts case" (Van der Peet, supra, at para. 68), neither should it be artificially strained to carry more weight than it can reasonably support. If this is an obvious proposition, it must nonetheless be stated.

**40**   With these principles in mind, I turn now to the consideration of whether the evidence offered in the present case in fact supports an aboriginal right to bring goods across the St. Lawrence River for the purposes of trade.

> (2)   Does the Evidence Show an Ancestral Mohawk Practice of Trading North of the St. Lawrence River?

**41**   While the ancestral home of the Mohawks lay in the Mohawk Valley of present-day New York State, the evidence establishes that, before the arrival of Europeans, they travelled north on occasion across the St. Lawrence River. We may assume they travelled with goods to sustain themselves. There was also ample evidence before McKeown J. to support his finding that trade was a central, distinguishing feature of the Iroquois in general and the Mohawks in particular. This evidence indicates the Mohawks were well situated for trade, and engaged in small-scale exchange with other First Nations. A critical question in this case, however, is whether these trading practices and northerly travel coincided prior to the arrival of Europeans; that is, does the evidence establish an ancestral Mohawk practice of transporting goods across the St. Lawrence River for the purposes of trade? Only if this ancestral practice is established does it become necessary to determine whether it is an integral feature of Mohawk culture with continuity to the present day.

**42**   With respect, the trial judge's affirmative response to this question finds virtually no support in the evidentiary record. Indeed, McKeown J. concedes as much (at p. 44):

> There is little direct evidence that the Mohawks, prior to the arrival of the Europeans, brought goods from their homeland and traded with other First Nations on the Canadian side of the boundary....

Nonetheless, he goes on to state:

> [H]owever, I am satisfied that Mohawk society is distinctive, that trade was an integral part of Mohawk tradition and that the Mohawks travelled freely across the border to expand trading territory and to obtain goods for the purposes of

> trade.... I find that the plaintiff and the Mohawks of Akwesasne have established
> an aboriginal right to pass and repass freely what is now the Canada-United
> States boundary with goods for personal and community use and for trade with
> other First Nations.

These statements are contradictory on two levels. First, the findings in the second statement do not lead logically to its conclusion: Mohawks travel across the border in attempts to expand trading territory through "commercially motivated warfare" (as it was called at trial (p. 33)) or to obtain goods for trade elsewhere simply does not address the question of whether goods were brought across the border for purposes of trade with First Nations to the north. On this question, McKeown J. was quite correct to state there exists "little direct evidence". This leads to the second contradiction: the inconsistency between this concession of little direct evidence and the finding of an aboriginal right. This is not to suggest that an aboriginal claim can never be established on the basis of minimal evidence, direct or otherwise, provided it is sufficiently compelling and supports the conclusions reached. In this case, however, the "little direct evidence" relied upon by the trial judge is, at best, tenuous and scant, and is perhaps better characterized as an absence of even minimally cogent evidence. This conclusion seems inescapable after a review of the evidence upon which McKeown J. relied in support of his holding. In particular, McKeown J. relied upon archaeological evidence; the testimony of Chief Mitchell and Dr. Venables, a cultural historian; and post-contact Mohawk involvement in treaty-making and the fur trade.

**43**    The archaeological evidence consisted of two works, submitted by expert witnesses, purportedly documenting an historical north-south trade in copper and ceremonial knives, respectively. Sexton J.A., writing for the majority of the Federal Court of Appeal in upholding the trial judge's finding of a cross-border trading right, placed significant emphasis on the former. He concluded at para. 50 that D. K. Richter's book, The Ordeal of the Longhouse: The Peoples of the Iroquois League in the Era of European Colonization (1992), demonstrated

> that the Iroquois living in what is now the State of New York traded in copper
> which originated from the north shore of Lake Superior. Justice McKeown
> recognized that this was clear archaeological evidence of North-South trade
> across what is now the Canada-United States border.

**44**    This is, with respect, an overly generous interpretation of both the book and the trial judgment. The book merely states that plates of worked copper originating in the Great Lakes region were particularly prized as gifts by the members of the Five Nations Confederacy (Richter, supra, at p. 28). It indicates that this copper originated to the north of the Mohawk Valley, not that the Mohawks obtained this copper through direct trading with their northern neighbours. Indeed, Richter's book confirms that long-distance Mohawk trade, at least at the time of contact, fell along an east-west axis. The Mohawks traded with the Wenros and Neutrals to the west (in the Niagra Region, south of the Great Lakes) and the Mohicans in the east, but not with their enemies in the disputed territory to the north. Richter contends that warfare between the Five Nations and their

northern neighbours precluded the possibility of trade (at pp. 28-29):

> The lack of any need for large-scale trade helps explain not just the isolationism of Five Nations villages from each other and outsiders but their wars with such sixteenth-century neighbors as the Hurons, the Susquehannocks, the Algonquins, and the St. Lawrence Iroquoians. Because relationships among people rested on the alliances of spiritual power that came from reciprocity, a lack of reciprocity, as epitomized by the absence of trading relationships, could easily lead to a presumption of hostility. Just as a shaman or an other-than-human person could be expected to wreak havoc when denied respect and reciprocity, so too could people of another village with whom no exchange relationships existed. [Underlining added; italics in original.]

**45**    Richter then proceeds to note that the opposite dynamic prevailed where trading occurred between nations: reciprocal trade facilitated and signified peaceful relations between communities. In a passage not quoted by McKeown J., Richter concludes that the copper plates, originating in the Great Lakes region and prized by the Confederacy for their spiritual power, were obtained indirectly along the east-west trade axis, not directly from the north as implied by the trial judge and asserted by the Court of Appeal (at p. 29):

> [A]mong the few neighboring peoples with whom all of the autonomous villages of the Five Nations seem to have been regularly at peace during the period when Europeans first arrived on the Turtle's Back were the Neutrals and Wenros to the west and the Mahicans and River Indians to the east. Each sat astride routes to the sources of exotic commodities associated with spiritual power that were not available in the homelands of the Five Nations: Great Lakes copper and other minerals linked with spiritual power came from beyond the country of the Neutrals and Wenros, and shell beads arrived from the coast of Long Island Sound presumably by way of the Mahicans and River Indians. [Emphasis added.]

**46**    Consequently, while Richter's book may support the pre-contact existence of north-south trade routes, it refutes the direct involvement of the Mohawks in this trade. This is a significant fact, given the reliance by the trial judge on this evidence in concluding the aboriginal right was established, and in rejecting the testimony of the appellant's expert witness, Dr. von Gernet, to the effect that he had "yet to find a single archeological site anywhere in Ontario dating to the prehistoric, the protohistoric or the early historical period which has in any way ever been associated with the Mohawks" (p. 30).

**47**    The second item of archaeological evidence relates to an alleged trade in chalcedony ceremonial knives, raised by the claimant's expert witness, Dr. Venables, on the basis of W. A. Ritchie's The Archaeology of New York State (rev. ed. 1980). Again, Ritchie describes the Iroquois trade networks as falling "chiefly westward toward the Upper Great Lakes, where also the strongest

cultural ties are found" (p. 196 (emphasis added)). The only evidence of northerly trade is found in a single "smoky chalcedony ceremonial (?) knife," from which Ritchie postulates a potential trade route "evidently to the north in Quebec" (p. 196) established somewhere between 3000 B.C. and 300 B.C. This evidence, standing alone, can hardly be called compelling.

**48**    The trial judge preferred the evidence of Dr. Venables and Chief Mitchell where it conflicted with that of Dr. von Gernet. He properly admitted the testimony of Chief Mitchell relaying the oral history of his people, correctly stating, in accordance with Van der Peet, that the weight he accorded "to oral history and to documentary evidence does not depend on the form in which the evidence was presented to the court" (p. 25). However, Chief Mitchell did not discuss Mohawk trading activity north of the St. Lawrence River. Referring to Akwesasne, he simply stated that "[a]ccording to our traditions it had always been one of our areas where we did all our planting, we did our fishing and we did our hunting". Dr. Venables testimony was equally limited. He referred to extensive trade between the Mohawks and their Iroquois confederates to the west, but did not identify any direct evidence of trade to the north. Dr. Venables cited the works by Richter and Ritchie but, as discussed above, the latter offers only the most tenuous support for northerly trade and the former, if anything, refutes the existence of such trade during the time preceding contact. Dr. Venables also referred to the Historical Atlas of Canada, but the trial judge found at p. 29 that this text "does not demonstrate cross-border trade by the Mohawks".

**49**    Finally, the trial judge relied on post-contact Mohawk activity as proof of continuity with pre-contact practices, an adaptation of the rules of evidence approved in Van der Peet. He found it "particularly noteworthy that the early treaties entered into by the Mohawks and other Iroquois were largely concerned with trade" (p. 43). None of these early treaties, however, support a reasonable inference of pre-contact cross-river trade. For example, the trial judge relied on a 1645 treaty between the Hurons, French and Mohawks. The Mohawks had defeated the Hurons (allies of the French) and now sought to restrict their trade and travel through the peace treaty, to their own benefit. Dr. Venables interpreted the Mohawk negotiator's speech at the treaty conference as demonstrating the integrity of trade to Mohawk culture. The Mohawk negotiator did not actually refer to pre-existing trade, nor did Dr. Venables claim he had. The Mohawks had warred against the Hurons and Algonquins for years. While the treaty might suggest the existence of trade during the uneasy year of peace before it was broken, it offers no evidence of pre-contact trade across the St. Lawrence River.

**50**    The trial judge also relied on evidence of Mohawk participation in the Montreal-Albany fur trade as suggesting pre-contact trade along a northerly route. He rejected the assertion that this fur trade activity arose solely in response to the arrival of Europeans, reasoning that "it seems highly unlikely that the Mohawks would start trading immediately upon the arrival of the Europeans if they had not been involved in some prior trade" (p. 39). In his view, "a north-south trade existed prior to the European presence and after the arrival of the Europeans, the trade was expanded to include furs" (p. 37). While this inference may indeed be drawn from the evidence, it is drawn in the absence of any other evidence - oral or documentary, aboriginal or settler, direct or otherwise -

substantiating the existence of this pre-contact trade route. It cannot carry much force.

**51**    As discussed in the previous section, claims must be proven on the basis of cogent evidence establishing their validity on the balance of probabilities. Sparse, doubtful and equivocal evidence cannot serve as the foundation for a successful claim. With respect, this is exactly what has occurred in the present case. The contradiction between McKeown J.'s statement that little direct evidence supports a cross-river trading right and his conclusion that such a right exists suggests the application of a very relaxed standard of proof (or, perhaps more accurately, an unreasonably generous weighing of tenuous evidence). The Van der Peet approach, while mandating the equal and due treatment of evidence supporting aboriginal claims, does not bolster or enhance the cogency of this evidence. The relevant evidence in this case - a single knife, treaties that make no reference to pre-existing trade, and the mere fact of Mohawk involvement in the fur trade - can only support the conclusion reached by the trial judge if strained beyond the weight they can reasonably hold. Such a result is not contemplated by Van der Peet or s. 35(1). While appellate courts grant considerable deference to findings of fact made by trial judges, I am satisfied that the findings in the present case represent a "palpable and overriding error" warranting the substitution of a different result (Delgamuukw, supra, at paras. 78-80). I conclude that the claimant has not established an ancestral practice of transporting goods across the St. Lawrence River for the purposes of trade.

**52**    This holding should not be read as imposing upon aboriginal claimants the "next to impossible task of producing conclusive evidence from pre-contact times about the practices, customs and traditions of their community" (Van der Peet, supra, at para. 62). McKeown J. correctly observed that indisputable evidence is not required to establish an aboriginal right (p. 20). Neither must the claim be established on the basis of direct evidence of pre-contact practices, customs and traditions, which is inevitably scarce. Either requirement would "preclude in practice any successful claim for the existence" of an aboriginal right (Van der Peet, supra, at para. 62). My conclusion, rather, is premised on the distinction between sensitively applying evidentiary principles and straining these principles beyond reason. In Adams, supra, this Court recognized a Mohawk right to fish on the St. Lawrence River, but this was on the basis of evidence that "clearly demonstrated" (para. 46 (emphasis added)) that fishing for subsistence in the area constituted a significant aspect of Mohawk life at the time of contact. Similarly, the recognition in Gladstone of an aboriginal right to engage in the commercial trade of herring spawn was founded firmly on an indisputable historical and anthropological record that "readily bear[s] this out" (para. 26), complemented by written documentation by European observers of such inter-tribal trade at the time of contact (paras. 26-27). This Court concluded that the claimant had "provided clear evidence from which it can be inferred that, prior to contact, Heiltsuk society was, in significant part, based on such trade" (para. 28 (emphasis added)). Here, no such "clear evidence" of a trading practice north of St. Lawrence River exists and no comparable inference can be drawn.

**53**    In view of the paucity of evidence of Mohawk trade north of the St. Lawrence River, I need not consider the argument that, even if it were established, any Mohawk trading right should be characterized as inherently subject to border controls, tolls and duties imposed by other peoples, as

recognized by ancestral aboriginal custom.

    (3)    Does the Evidence Establish that the Alleged Practice of Trading Across the St. Lawrence River Was Integral to Mohawk Culture and Continuous to the Present Day?

**54**    Even if deference were granted to the trial judge's finding of pre-contact trade relations between the Mohawks and First Nations north of the St. Lawrence River, the evidence does not establish this northerly trade as a defining feature of the Mohawk culture. As discussed earlier, the Van der Peet test identifies as aboriginal rights only those activities that represent "an element of a practice, custom or tradition integral to the distinctive culture of the aboriginal group claiming the right" (para. 46 (emphasis added)). It is therefore incumbent upon Chief Mitchell in this case to demonstrate not only that personal and community goods were transported across the St. Lawrence River for trade purposes prior to contact, but also that this practice is integral to the Mohawk people.

**55**    The importance of trade - in and of itself - to Mohawk culture is not determinative of the issue. It is necessary on the facts of this case to demonstrate the integrality of this practice to the Mohawk in the specific geographical region in which it is alleged to have been exercised (i.e., north of the St. Lawrence River), rather than in the abstract. This Court has frequently considered the geographical reach of a claimed right in assessing its centrality to the aboriginal culture claiming it. For example, in recognizing a constitutionally protected Mohawk fishing right in Adams, supra, the majority of this Court framed the Van der Peet test as follows (at para. 34):

> The appellant argues that the Mohawks have an aboriginal right to fish in Lake St. Francis. In order to succeed in this argument the appellant must demonstrate that, pursuant to the test laid out by this Court in Van der Peet, fishing in Lake St. Francis was "an element of a practice, custom or tradition integral to the distinctive culture" of the Mohawks. [Emphasis added.]

The majority, in assessing the integrality of this practice to the Mohawks in Adams, consistently tied the claimed right to the specific area at issue - the region of Lake St. Francis (see paras. 37 and 45). Côté, supra, similarly emphasized that it is the exercise of the claimed right in a specific geographical area that must be integral (paras. 41-78). In that case, the Court stated that "[a]n aboriginal practice, custom or tradition entitled to protection as an aboriginal right will frequently be limited to a specific territory or location, depending on the actual pattern of exercise of such an activity prior to contact" (para. 39).

**56**    Thus, geographical considerations are clearly relevant to the determination of whether an activity is integral in at least some cases, most notably where the activity is intrinsically linked to specific tracts of land. However, as Lamer C.J. observed in Delgamuukw, "aboriginal rights ... fall along a spectrum with respect to their degree of connection with the land" (para. 138). In this regard, I note that the relevance of geography is much clearer in hunting and fishing cases such as

Adams and Côté, which involve activities inherently tied to the land, than it is in relation to more free-ranging rights, such as a general right to trade, which fall on the opposite end of the spectrum. General trading rights lack an inherent connection to a specific tract of land. Thus, geography was not a relevant factor in the aboriginal rights trilogy of Van der Peet, supra, R. v. N.T.C. Smokehouse Ltd., [1996] 2 S.C.R. 672, and Gladstone, supra, all cases involving claimed rights of exchange or trade. The claimants in these cases were only required to demonstrate the integrality of the claimed trading practice in general, rather than in relation to a specific region. Moreover, in Gladstone, where the Heiltsuk successfully established an aboriginal right to engage in the commercial trade of herring spawn on kelp, the Court did not confine the scope of this trade to its historical reach. Such a restriction would unduly cement the right in its pre-contact form and frustrate its modern exercise, contrary to the principles set out in Van der Peet. Consequently, trading rights will seldom attract geographical restrictions.

**57**    In the present case, however, the right to trade is only one aspect, and perhaps a peripheral one, of the broader claim advanced by Chief Mitchell: the right to convey goods across an international boundary for the purposes of trade. For this reason, Chief Mitchell's claim cannot simply be equated with the claims in the aboriginal rights trilogy as involving a broad "right to trade". This distinction is manifest in the contrasting manners in which the claimed rights are framed in these cases, pursuant to the Van der Peet factors.

**58**    In the present case, unlike past trading cases, all three Van der Peet touchstones resonate with considerations of geography. The action giving rise to the case is Chief Mitchell arriving at the Cornwall International Bridge and claiming a right to cross this international boundary with goods for trade. Absent a border, this case would not be before the Court. Similarly, the government restriction alleged to infringe the right arises from provisions of the Customs Act regulating the importation of goods. Unlike the provisions implicated in the aboriginal rights trilogy, the Customs Act is fundamentally concerned with the geographical origins and destinations of goods. The ancestral practice relied upon in support of the right, while argued broadly, also involved allegations of an historical trade route north across the St. Lawrence River. Chief Mitchell's characterization of his claim, while not determinative, reflects the undeniable geographical element of the claim: he asserts the right to enter Canada from the United States with personal and community goods, without paying customs and other duties, for trade with First Nations.

**59**    Ultimately, the characterization of the claimed right in this case, as in Adams and Côté, imports a necessary geographical element, and its integrality to the Mohawk culture should be assessed on this basis. By contrast, geographical considerations were irrelevant to the framing of the claimed trading right in the aboriginal rights trilogy, and were therefore equally irrelevant to whether the claimed trade constituted a defining feature of the cultures in question and the scope of the right if successfully established. In this manner, the Van der Peet approach to characterizing the claimed right will generally determine when - and to what extent - geographical considerations are relevant to the claim.

**60**    The claimed right in the present case implicates an international boundary and, consequently, imports a geographical element into the inquiry. Instead of asking whether the right to trade - in the abstract - is integral to the Mohawk people, this Court must ask whether the right to trade across the St. Lawrence River is integral to the Mohawks. The evidence establishes that it is not. Even if the trial judge's generous interpretation of the evidence were accepted, it discloses negligible transportation and trade of goods by the Mohawks north of the St. Lawrence River prior to contact. If the Mohawks did transport trade goods across the St. Lawrence River for trade, such occasions were few and far between. Certainly it cannot be said that the Mohawk culture would have been "fundamentally altered" without this trade, in the language of Van der Peet, supra, at para. 59. It was not vital to the Mohawks' collective identity. It was not something that "truly made the society what it was" (Van der Peet, at para. 55 (emphasis in original)). Participation in northerly trade was therefore not a practice integral to the distinctive culture of the Mohawk people. It follows that no aboriginal right to bring goods across the border for the purposes of trade has been established.

> **D.**    Is the Claimed Right Barred from Recognition as Inconsistent with Crown Sovereignty?

**61**    The conclusion that the right claimed is not established on the evidence suffices to dispose of this appeal. I add a note, however, on the government's contention that s. 35(1) of the Constitution Act, 1982 extends constitutional protection only to those aboriginal practices, customs and traditions that are compatible with the historical and modern exercise of Crown sovereignty. Pursuant to this argument, any Mohawk practice of cross-border trade, even if established on the evidence, would be barred from recognition under s. 35(1) as incompatible with the Crown's sovereign interest in regulating its borders.

**62**    This argument finds its source in the doctrine of continuity, which governed the absorption of aboriginal laws and customs into the new legal regime upon the assertion of Crown sovereignty over the region. As discussed above, this incorporation of local laws and customs into the common law was subject to an exception for those interests that were inconsistent with the sovereignty of the new regime: see Slattery, supra, at p. 738; see also Delgamuukw v. British Columbia, [1993] 5 W.W.R. 97 (B.C.C.A.), at paras. 1021-24, per Lambert J.A.; Mabo, supra, at p. 61, per Brennan J.; Inasa v. Oshodi, [1934] A.C. 99 (P.C.); and R. v. Jacobs, [1999] 3 C.N.L.R. 239 (B.C.S.C.).

**63**    This Court has not expressly invoked the doctrine of "sovereign incompatibility" in defining the rights protected under s. 35(1). In the Van der Peet trilogy, this Court identified the aboriginal rights protected under s. 35(1) as those practices, customs and traditions integral to the distinctive cultures of aboriginal societies: Van der Peet, supra, at para. 46. Subsequent cases affirmed this approach to identifying aboriginal rights falling within the aegis of s. 35(1) (Pamajewon, supra, at paras. 23-25; Adams, supra, at para. 33; Côté, supra, at para. 54; see also: Woodward, supra, at p. 75) and have affirmed the doctrines of extinguishment, infringement and justification as the appropriate framework for resolving conflicts between aboriginal rights and competing claims, including claims based on Crown sovereignty.

**64**    The Crown now contends that "sovereign incompatibility" is an implicit element of the Van der Peet test for identifying protected aboriginal rights, or at least a necessary addition. In view of my conclusion that Chief Mitchell has not established that the Mohawks traditionally transported goods for trade across the present Canada-U.S. border, and hence has not proven his claim to an aboriginal right, I need not consider the merits of this submission. Rather, I would prefer to refrain from comment on the extent, if any, to which colonial laws of sovereign succession are relevant to the definition of aboriginal rights under s. 35(1) until such time as it is necessary for the Court to resolve this issue.

VI.    Conclusion

**65**    I would allow the appeal. Chief Mitchell must pay the duty claimed by the government. I note that the government has undertaken to pay Chief Mitchell's costs.

The reasons of Major and Binnie JJ. were delivered by

**66**    BINNIE J.:-- I have read the reasons of the Chief Justice and I concur in the result and with her conclusion that even if Mohawks did occasionally trade goods across the St. Lawrence River with First Nations to the north, this practice was not on the evidence a "defining feature of the Mohawk culture" (para. 54) or "vital to the Mohawk's collective identity" (para. 60) in pre-contact times. There are, however, some additional considerations that have led me to conclude that the appeal must be allowed.

**67**    It has been almost 30 years since this Court emphatically rejected the argument that the mere assertion of sovereignty by the European powers in North America was necessarily incompatible with the survival and continuation of aboriginal rights: Calder v. Attorney-General of British Columbia, [1973] S.C.R. 313. Because not all customs and traditions of aboriginal First Nations are incompatible with Canadian sovereignty, however, does not mean that none of them can be in such conflict. The Chief Justice refrains from addressing the sovereignty issue (para. 64) but she holds, correctly in my view, that "any finding of a trading right would also confirm a mobility right" (para. 22 (emphasis added)). The scope of the trading/mobility right also bothered the Federal Court of Appeal: [1999] 1 F.C. 375. Létourneau J.A. (for the entire court on this aspect) commented at para. 18:

> The respondent claims his international mobility right as a citizen of the Mohawk nation. I would be inclined to agree with counsel for the appellant that an aboriginal right to enter a sovereign state that is not based on citizenship of that state cannot be reconciled with that state's right to self-preservation by effecting an appropriate control of its borders. [Emphasis added.]

**68**    The Federal Court of Appeal circumnavigated this problem by characterizing the respondent's claim as a claim for a tax exemption, but as the Chief Justice demonstrates (at para. 23), any such claim can only be conceptualized as a restriction on mobility. The aboriginal claim to a trading right

must relate back to a pre-contact practice, custom or tradition. Mobility existed in pre-contact times. Customs duties at the present international border within Mohawk territory came along almost 180 years later.

**69**    Having rejected the approach of the Federal Court of Appeal to narrow the claimed aboriginal right to tax exemptions, however, we are left with that court's legitimate concern about the sovereignty implications of the international trading/mobility right claimed by the respondent, as pointed out by Létourneau J.A., "as a citizen of the Mohawk nation" (para. 18). Much of the debate during the 35-day trial implicated this issue, as did much of the argument on appeal to this Court, and I therefore think it desirable to address at least some aspects of the sovereignty controversy.

**70**    Counsel for the respondent does not challenge the reality of Canadian sovereignty, but he seeks for the Mohawk people of the Iroquois Confederacy the maximum degree of legal autonomy to which he believes they are entitled because of their long history at Akwesasne and elsewhere in eastern North America. This asserted autonomy, to be sure, does not presently flow from the ancient Iroquois legal order that is said to have created it, but from the Constitution Act, 1982. Section 35(1), adopted by the elected representatives of Canadians, recognizes and affirms existing aboriginal and treaty rights. If the respondent's claimed aboriginal right is to prevail, it does so not because of its own inherent strength, but because the Constitution Act, 1982 brings about that result.

**71**    The aspect of Mohawk autonomy at issue in this case is reflected in the declaration granted by the Trial Division of the Federal Court ((1997), 134 F.T.R. 1, at p. 4):

> ... that the plaintiff as a Mohawk of Akwesasne resident in Canada has an existing aboriginal right which is constitutionally protected by ss. 35 and 52 of the Constitution Act, 1982 to pass and repass freely across what is now the Canada-United States boundary including the right to bring goods into Canada for personal and community use, including for trade with other First Nations, without having to pay any duty or taxes whatsoever to any Canadian Government or authority.... [Emphasis added.]

This is essentially a description of a trading/mobility right of people and their goods across the international boundary subject only to such restrictions as can be justified by the government under the principles laid down in R. v. Sparrow, [1990] 1 S.C.R. 1075.

**72**    The Crown's argument on the appeal is that such a claim goes beyond the sort of economic or cultural activity or land-based interest that the courts have previously recognized under s. 35(1) in such cases as R. v. Van der Peet, [1996] 2 S.C.R. 507, R. v. Gladstone, [1996] 2 S.C.R. 723, R. v. N.T.C. Smokehouse Ltd., [1996] 2 S.C.R. 672, and R. v. Adams, [1996] 3 S.C.R. 101.

**73**    In terms of traditional aboriginal law, the issue, as I see it, is whether trading/mobility activities asserted by the respondent not as a Canadian citizen but as an heir of the Mohawk regime that existed prior to the arrival of the Europeans, created a legal right to cross international

boundaries under succeeding sovereigns. This aspect of the debate, to be clear, is not at the level of fact about the effectiveness of border controls in the 18th century. (Nor is it about the compatibility of internal aboriginal self-government with Canadian sovereignty.) The issue is at the level of law about the alleged incompatibility between European (now Canadian) sovereignty and mobility rights across non-aboriginal borders said by the trial judge to have been acquired by the Mohawks of Akwesasne by reason of their conduct prior to 1609.

**74**    In terms of post-1982 aboriginal law, consideration should be given to whether the international trading/mobility right asserted by the respondent would advance the objective of reconciliation of aboriginal peoples with Canadian sovereignty which, as established by the Van der Peet trilogy, is the purpose that lies at the heart of s. 35(1).

**75**    The dispute therefore raises issues of considerable importance. I propose to deal with the relevant points in the following order:

(1)    the strategic location of the Mohawk reserve at Akwesasne on the international boundary between Canada and the United States;

(2)    the respondent's border challenge on March 22, 1988;

(3)    the Mohawk strategy to turn the border burden into an economic benefit;

(4)    the basis of the respondent's aboriginal rights claims;

(5)    the sovereignty objection;

(6)    the effect of non-assertion of aspects of the respondent's potential claim;

(7)    the real substance of the Mohawk position;

(8)    the legal basis of the respondent's claim, including relevant distinctions between aboriginal and treaty rights;

(9)    the limitation of "sovereign incompatibility";

(10)    the alleged incompatibility between the aboriginal right as disclosed by the evidence and Canadian sovereignty;

(11)    implications for internal aboriginal self-government.

**76**    The importance of the Crown's argument is that even if the respondent's claim could be said to be distinctive and integral to Mohawk culture, it would still not give rise to an aboriginal right. The Crown says it fails the basic requirement of compatibility with the sovereignty of the legal regimes that came afterwards. The question also arises, as noted, whether acceptance of it would advance or undermine the s. 35(1) objective of reconciliation.

1.    Strategic Location of Akwesasne

**77**    Akwesasne ("the place where the partridge dwells or drums") consists of a string of islands about 130 kilometres long that stretches from east of Prescott, Ontario to near Valleyfield, Quebec. It is home to 12 to 13 thousand people, approximately two-thirds of whom live in Canada. It lies at the jurisdictional epicentre of the St. Lawrence River. Not only do the islands straddle the Ontario-Quebec border in Canada, but they are bisected by the international boundary that divides

the St. Lawrence River. While the respondent conceives of Akwesasne as part of the Mohawk homelands, which itself constitutes one of the elements of the Iroquois Confederacy ("Haudenosaunee" or "People of the Longhouse") that formerly extended over large tracts of eastern Canada and northern New York State, the territory of Akwesasne is also parcelled out among five different governments in Canada, Quebec, Ontario, the United States and New York State. Mohawk institutions are similarly divided territorially among the Mohawk Council of Akwesasne, the St. Regis Tribal Council and the Mohawk Nation Council of Chiefs. The resulting boundary problems complicate the everyday existence of the Mohawks. As the respondent stated in his evidence:

> We did not ask that this International Boundary line separate our community in half. We certainly didn't ask for the New York State border to be placed in our territory. We certainly didn't ask that our other half be separated by Quebec and Ontario.

> It is a reality that we find ourselves in. We admit very easily that it is a very difficult and unique situation to be in....

> We wish to change that and by exercising our aboriginal rights we have to modernize a lot of what we mean by what our rights are and how we execute them.

**78**    Akwesasne people routinely pass back and forth across the international boundary several times a day. Supplies from the mainland encounter customs problems. In 1991, the Canadian government sought to reduce the tax burden on residents by the Akwesasne Residents Remission Order, SOR/91-412, under the Customs Tariff, R.S.C. 1985, c. 41 (3rd Supp.).

**79**    I accept that this crisscrossing of borders through the Mohawk community goes beyond mere inconvenience and does constitute a significant burden on everyday living. It is, of course, a burden to border communities everywhere. Jurisdictional patchworks, and their ability to complicate one's existence, are not special to aboriginal communities. Elsewhere in Quebec, there are similar difficulties. In Estcourt, the international boundary runs through the living-room of the Béchard family. In Stanhope, Quebec, the billiard room of the Dundee Line Hotel is neatly bifurcated by the boundary with New York State: National Film Board, Between Friends/Entre Amis (1976), at pp. 213 and 246-47.

**80**    Having said that, the purpose of s. 35(1) of the Constitution Act, 1982 is to reconcile "the pre-existence of aboriginal societies with the sovereignty of the Crown" (Van der Peet, supra, at para. 31). In this respect, the respondent argued with some passion in the witness box that the jurisdictional divisions carry deeper meaning for the Mohawks of Akwesasne because they represent the intrusion of non-aboriginal governing institutions in the everyday life of Akwesasne and their relations with other members of the Haudenosaunee (Iroquois Confederacy). The border

complexities are a constant reminder to the Mohawks of their frustration and inability to control the destiny of their own communities.

**81**    There is some international support for special recognition of the plight of indigenous peoples in this respect. The Draft United Nations declaration on the rights of indigenous peoples, adopted by the U.N. Sub-Commission on Prevention of Discrimination and Protection of Minorities by its resolution 1994/45, August 26, 1994, provides in Article 35 that:

> Indigenous peoples, in particular those divided by international borders, have the right to maintain and develop contacts, relations and cooperation, including activities for spiritual, cultural, political, economic and social purposes, with other peoples across borders.

**82**    Similarly, Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries, adopted by the General Conference of the International Labour Organisation, June 27, 1989, provides in Article 32:

> Governments shall take appropriate measures, including by means of international agreements, to facilitate contacts and co-operation between indigenous and tribal peoples across borders, including activities in the economic, social, cultural, spiritual and environmental fields.

**83**    Comparable language is found in the Draft of the Inter-American Declaration on the Rights of Indigenous Peoples, approved by the Inter-American Commission on Human Rights on September 18, 1995, although it also provides specifically in Article 24 that:

> Nothing in this instrument shall be construed as granting any rights to ignore boundaries between States.

**84**    Canada has taken various concrete steps to try to minimize the disruption of Akwesasne created by the international boundary. These measures, according to the respondent, fall well short of recognizing Mohawk entitlement.

2.    The Respondent's Border Challenge

**85**    With much publicity and notice to the Canadian government, the respondent accompanied by Mohawk supporters performed a symbolic border crossing on March 22, 1988. He brought with him into Canada one washing machine, 20 Bibles, 10 blankets, used clothing, one case of lubricating motor oil, 10 loaves of bread, two pounds of butter, four gallons of whole milk, six bags of cookies and 12 cans of soup. The box of motor oil remained on the Akwesasne reserve. Everything else went to another Mohawk community in Canada, Tyendinaga, west of Kingston, Ontario, in the Bay of Quinte area.

**86**    The respondent submitted to the usual border procedures but refused to pay duty. Customs officers let him enter Canada with the goods but a year later, on September 15, 1989, he was served with a Notice of Ascertained Forfeiture of the goods under the Customs Act and a claim of $361.64. Having unsuccessfully challenged the decision under s. 131 of the Customs Act, the respondent commenced the present declaratory action.

**87**    The respondent contended that the Mohawks of Akwesasne are entitled to purchase goods on the U.S. side of the boundary and move those goods into Canada without payment of customs dues or other levies, including GST, for personal consumption, commercial trade at Akwesasne, or for trade with other First Nations in Canada. (A claim by Akwesasne Mohawks from St. Regis to carry goods duty free into the United States was rejected in United States v. Garrow, 88 F.2d 318 (C.C.P.A. 1937).)

**88**    With respect to commercial trade at Akwesasne, the respondent's evidence was that the case of motor oil brought across the border without payment of duty was placed for resale in Jock's Store, a general store located on the Canadian side of Akwesasne, but open to natives and passing non-native motorists alike. Non-aboriginal purchasers, likely minimal in number, may therefore obtain the benefit of duty-free prices.

**89**    With respect to trade off the reserve, the respondent said that the bulk of the symbolic importation was delivered to the Tyendinaga Band which had apparently contributed money to finance the purchases in the first place. Further, the respondent described ongoing negotiation of "an extensive trade and commerce agreement" between Akwesasne and the Ojibway/Cree First Nations with whom the respondent says there was a historic trading relationship. The respondent says the importation was at a "non-commercial level", i.e., a small-scale transaction typical of a barter economy. The issue of larger "commercial scale" trade is to be addressed, it seems, by another court on another occasion.

> 3.    The Mohawk Strategy to Turn the Border Burden into an Economic Benefit

**90**    Understandably, the respondent and the other Mohawk people are looking for opportunities not only to diminish the border disruption in their lives, but to reunite a community divided by boundaries that are not of Mohawk making, and to turn the solution of these complexities to their collective economic advantage.

**91**    There was likely little economic profit in moving goods from one side of the Akwesasne community to the other prior to creation of the international boundary in 1783, apart from meeting the needs of everyday living. There is real profit now only because the international boundary runs through it. The policies of the Canadian government have attributed a financial significance to what is otherwise an arbitrary line drawn on a map.

**92**    It is obvious that the "collective advantage" for the Mohawk community of duty-free imports into Canada would not be derived from a continuation of the aboriginal way of life, but is a direct

artifact of the financial and tariff arrangements of the non-aboriginal Canadian government. While the respondent argued that the Court need not concern itself in the appeal with other cross-border First Nation communities in Canada, the logic of the Mohawk position would apply equally to any First Nation with a proven history of trade whose homeland in Canada straddles the international boundary.

**93**    The respondent, it should be noted, dissociates the present claim from the smuggling problems at Akwesasne which he points out have brought much grief to his community:

> Our people in Akwesasne have shown that they are against smuggling; they have co-operated with police, and our own Mohawk police have made a number of drug busts. Cigarettes are perhaps the least of our worries. Drugs, liquor, and automatic weapons, all of which are harmful to our people, have been brought into the territory in great quantities. Our people in our community have said that this is wrong under our laws, whether a border exists or not. Their view is that those native people who abuse our right to transport such property within our territory free of taxes and duties are opportunists. They are risking injury to the rights of all our people for their own immediate profit. Neither the community nor the Iroquois Confederacy supports smuggling.

> (Exhibit D-13. Grand Chief Michael Mitchell, "An Unbroken Assertion of Sovereignty", in B. Richardson, ed., Drumbeat: Anger and Renewal in Indian Country (1989), 105, at p. 130.)

**94**    The Attorney General for New Brunswick argues that the claimed aboriginal right really amounts to no more than an aboriginal cross-border link to facilitate trade in non-aboriginal goods between non-aboriginal communities. There was, on the evidence, nothing to prevent the Tyendinaga Mohawks from re-selling the goods to non-natives. This concern was not alleviated by counsel for the Assembly of First Nations who argued that mobility rights and free movement of goods must be considered separately, because goods could pass the boundary with or without people. The use of Purolator and Federal Express to send goods back and forth across the border is rather remote from the original concept of permitting the Mohawks to live "as their forefathers had done for centuries" (Calder, supra, at p. 328, per Judson J.).

**95**    The modernization and increased economic value of a claim is not necessarily fatal to its existence. Drivers of economic value are different today than they were in the past. A "frozen rights" theory has been rejected by the courts as incompatible with the purpose of s. 35(1): Sparrow, supra, at p. 1093. Aboriginal rights are capable of growth and evolution: "s. 35(1) is a solemn commitment that must be given meaningful content" (Sparrow, supra, at p. 1108).

    4.    The Basis of the Respondent's Aboriginal Rights Claim

**96**    An aboriginal right must be derived from pre-contact activity that was an element of a practice, custom or tradition integral to the aboriginal community's distinctive culture. The first step in resolving such a claim includes an assessment of the precise nature of the claim being made, "taking into account such factors as the nature of the action said to have been taken pursuant to an aboriginal right, the government regulation argued to infringe the right, and the tradition, custom or practice relied upon to establish the right" (Van der Peet, supra, at para. 53, and N.T.C. Smokehouse Ltd., supra, at para. 16).

**97**    The Chief Justice addresses the factual evidence relevant to this analysis in her reasons. For my purposes, however, it is necessary to enlarge upon some of the matters that touch on the issue of sovereignty. The trial judge has provided a meticulous and comprehensive history of the events relevant to the appeal.

**98**    While the traditional Mohawk homelands were in the Mohawk Valley (near Albany, New York State), the Mohawk people ranged throughout a territory that reached north to the valley of the St. Lawrence River. The Chief Justice points out that "[w]e may assume they travelled with goods to sustain themselves" (para. 41), but points to the scarcity of the evidence that what they carried included goods earmarked for north-south trade (paras. 50-51). It is, however, accepted that the Mohawks travelled to the St. Lawrence River valley. The trial judge found that Akwesasne itself was probably not established as a permanent settlement until "some time between 1747 and 1755" (p. 14) apparently in conjunction with a Jesuit mission. This was about 140 years after the Mohawk's first contact with the Europeans, which the trial judge, at p. 16, held was 1609. The first contact, according to the trial judge, was a battle between the French and the Mohawks on Lake Champlain. No claim to aboriginal title is suggested by the respondent in these proceedings, and it is clear that specific aboriginal rights can exist independently of claims to aboriginal title (Van der Peet, supra, at para. 74).

(i)    Prior to Contact

**99**    Prior to European contact, the upper St. Lawrence River Valley was "a battleground" (Adams, supra, at p. 126) between the Mohawks coming up from the south and the Hurons and Algonquin-speaking peoples who had earlier established themselves in the area. The trial judge quoted at p. 21 the evidence of Dr. Alexander von Gernet, called by the Crown, who acknowledged that:

> What I can say is that in the course of their raiding expeditions along the St. Lawrence while they were engaged in warfare with their northern enemies, they would almost certainly have had occasion to travel along this route, presumably stop, victualize their armies, provide their armies with food. [Emphasis added by trial judge.]

To which the trial judge added, at p. 35:

> [W]hile one might be obliged to fish in order to victualize an army, it is difficult to see how an army would engage in trade with their enemies while in pursuit of them.

and further pointed out at p. 44:

> Whatever goods they obtained either by raiding or by hunting and fishing could be freely brought back across the [then non-existent] border.

**100**   Territorial boundaries between the warring First Nations ebbed and flowed. The trial judge stated at pp. 21-22 his general conclusion from the historical evidence as follows:

> Regardless of the conflicting characterization of the Mohawks' use and control of the territory in the St. Lawrence Valley, in my view, the Mohawks whose homelands were in the Mohawk Valley prior to the arrival of the Europeans, regularly exploited the area in the St. Lawrence Valley which is now part of Canadian territory. It is not clear from the evidence whether the Mohawks consistently used the area as a hunting and fishing territory or whether the area was mainly a battle and raiding ground with other First Nations. However, it is clear that the territory around the St. Lawrence River, in what is now Canada, was regularly travelled by the Mohawks.

**101**   The trial judge's assessment of the nature of the Mohawk's progress through the territory in pre-contact times was based in part on the evidence of the respondent's expert, Professor Charles Johnston. The trial judge reproduced the following extract from Professor Johnston's evidence (at p. 27):

> Well, let's put it this way, trading and making war came as easily to the Iroquois as living and breathing. When they weren't making war, they were usually engaged in trading.... War, of course, stemmed out of trade and trade came out of war.

**102**   It is this evidence of pre-contact activity that defines the basis of an aboriginal right. The picture that emerges is one of a militarily powerful confederacy that spread to and along the St. Lawrence River Valley displacing the earlier aboriginal inhabitants by force of arms. They traded with their friends to the east and west of the Mohawk Valley, as the Chief Justice acknowledges. They fought with their enemies to the north. The trial judge cautioned at p. 35 against "concentrat[ing] too much on ... raiding activities". The point, nevertheless, is that in the pre-contact era, the Mohawks were (and acted as) a fully autonomous people within the Iroquois Confederacy. The principle object of this litigation is to reassert that autonomy in relation to the present international border between Canada and the United States to the greatest extent permitted by law.

**103**   While none of the boundaries between First Nation Territories in pre-contact times

corresponded with the present international boundary at Akwesasne, such boundaries existed, and the trial judge found that under traditional practices and customs, they were respected by the Mohawks in times of peace.

(ii)    Evidence of Post-Contact Activity

**104**    While evidence of post-contact activity cannot enlarge the factual basis of the aboriginal right claim, it is said to be relevant in this case because of the alleged incompatibility of the respondent's claim with the later assertion of non-Mohawk sovereignty.

**105**    Professor Charles Johnston emphasized that the arrival of the Europeans created further turmoil (at p. 27):

> The French arrested the Dutch first and then the English established their control in the Hudson and Mohawk valleys and the French do the same thing on the St. Lawrence. So you have these competing systems. The point is the Mohawks are right in the middle.

**106**    The evidence showed that post-contact Mohawks from the Mohawk Valley began migrating north to establish permanent communities on the St. Lawrence River. The trial judge noted, "[t]hey massed an invasion force in the late 1640s and early 1650s which led to the dispersion of the aboriginal peoples of Ontario" (p. 35).

**107**    The Hurons and Algonquins allied themselves with the French, and most of the Iroquois with the English. The Mohawks in the St. Lawrence River Valley had divided loyalties. The communities closest to Montreal, at least, came to be allies of the French. The trial judge noted that some Mohawks "moved north because they believed that an alliance with the French was preferable to neutrality or an alliance with the English" (p. 22). While colonial law under the French regime treated aboriginal rights differently than the British regime, our Court has affirmed that "the intervention of French sovereignty [did not] negat[e] the potential existence of aboriginal rights within the former boundaries of New France under s. 35(1)": (R. v. Côté, [1996] 3 S.C.R. 139, at para. 51). The fighting between the French and the English and their respective First Nation allies continued until the fall of New France in 1759-60.

**108**    The legal effect of the resulting Treaty of Paris of 1763 was described by the Judicial Committee of the Privy Council in Attorney General for Canada v. Cain, [1906] A.C. 542, at pp. 545-46:

> In 1763 Canada and all its dependencies, with the sovereignty, property, and possession, and all other rights which had at any time been held or acquired by the Crown of France, were ceded to Great Britain: St. Catherine's Milling and Lumber Co. v. Reg. (1888), 14 App. Cas. 46, at p. 53. Upon that event the Crown of England became possessed of all legislative and executive powers within the

country so ceded to it, and, save so far as it has since parted with these powers by legislation, royal proclamation, or voluntary grant, it is still possessed of them. One of the rights possessed by the supreme power in every State is the right to refuse to permit an alien to enter that State, to annex what conditions it pleases to the permission to enter it, and to expel or deport from the State, at pleasure, even a friendly alien, especially if it considers his presence in the State opposed to its peace, order, and good government, or to its social or material interests: Vattel, Law of Nations, book 1, s. 231; book 2, s. 125.

**109**    The "aliens" in the Cain case were citizens of the United States. For our purposes, it must be kept in mind that the respondent does not assert here mobility rights granted by France, Britain or Canada. He is, of course, entitled to full rights as a Canadian citizen. But in this particular case, he is not asserting those rights. He is asserting mobility rights as a "citizen of Haudenosaunee" that are derived from Mohawk mobility that pre-dated all of those regimes.

**110**    Within two decades after the fall of New France, the American Revolution swept northwards. Troops of General George Washington on manoeuvres in New York State "destroyed the cornfields, burnt the Longhouses and basically wiped out as many of the Iroquois families that [sic] still existed", thereby reinforcing the northern migration of some of the Mohawks to British territory. The boundary that cuts through Akwesasne did not come into existence until the conclusion of the American War of Independence by a subsequent Treaty of Paris in 1783.

5.    The Sovereignty Objection

**111**    The unusual aspect of this case is that not only the value but the very purpose of the claimed trading/mobility right depends on a boundary that is itself an expression of non-aboriginal sovereignties on the North American continent.

**112**    The respondent is understandably proud of the Mohawk heritage. The Iroquois Confederacy is thought to have been formed around 1450. The evidence accepted by the trial judge at p. 26 was that at their height

> ... the Iroquois had achieved for themselves the most remarkable civil organization in the New World excepting only Mexico and Peru.

The respondent's 17th century ancestors were no doubt unaware that some of the Kings in distant Europe were laying claim to sovereignty over Mohawk territory. As Marshall C.J. of the United States Supreme Court observed in Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1832), at p. 543:

> It is difficult to comprehend the proposition, that the inhabitants of either quarter of the globe could have rightful original claims of dominion over the inhabitants of the other, or over the lands they occupied....

**113**    Nevertheless, this is what happened. From the aboriginal perspective, moreover, those early claims to European "dominion" grew to reality in the decades that followed. Counsel for the respondent does not dispute Canadian sovereignty. He seeks Mohawk autonomy within the broader framework of Canadian sovereignty.

**114**    The common law concept of aboriginal rights is built around the doctrine of sovereign succession in British colonial law. The framers of the Constitution Act, 1982 undoubtedly expected the courts to have regard in their interpretation of s. 35(1) to the common law concept. This point was made by McLachlin J. (as she then was) (dissenting in the result) in Van der Peet, supra, at paras. 227 and 262:

> The issue of what constitutes an aboriginal right must, in my view, be answered by looking at what the law has historically accepted as fundamental aboriginal rights.
>
> ...
>
> Given the complexity and sensitivity of the issue of defining hitherto undefined aboriginal rights, the pragmatic approach typically adopted by the common law - reasoning from the experience of decided cases and recognized rights - has much to recommend it. [Emphasis added.]

**115**    I agree. The Constitution Act, 1982 ushered in a new chapter but it did not start a new book. Within the framework of s. 35(1) regard is to be had to the common law ("what the law has historically accepted") to enable a court to determine what constitutes an aboriginal right.

**116**    The respondent positions his claim as follows. He makes a point of travelling back and forth across the international border producing his Haudenosaunee passport issued at the capital of the Mohawk Confederacy at Onondaga, New York State. As he explained in testimony:

> [The passport] is also to me an expression of recognition, not only by my own Iroquois Confederacy and our nation's capital, Onondaga, that I carry my own passport, but it is also [a] recognition of Canada and the United States of who my citizenship lies with.

This evidence with respect to the Haudenosaunee passport was said by respondent's counsel to go "to the issue of the basis of the rights that the [respondent] is claiming in this case".

**117**    In assessing aboriginal claims, courts are required to take into account "the perspective of the aboriginal peoples themselves" (Sparrow, supra, at p. 1112; Van der Peet, supra, at para. 49). From the respondent's perspective, the aboriginal right flows from Mohawk sovereignty. In Exhibit D-13 he writes, at p. 107:

> Akwesasne is a Mohawk community that has existed from time immemorial, with its own laws and government, and we have consistently been determined to maintain the sovereignty of our Nation.

To which he adds at p. 135:

> I think of myself as a community leader, but my national leaders are the leaders of the Mohawk Nation. I am a citizen of Haudenosaunee; and if anyone says I am also a Canadian citizen, the most I can agree is that we have certain benefits in Canada, by treaty, the same benefits as we have in the United States.

**118**    Fundamentally, the respondent views his aboriginal rights as a shield against non-aboriginal laws, including what he sees as the imposition of a border that "wasn't meant for [the] Kanienkehaka or the Mohawk Nation or any of the Six Nations". He thus testified at trial:

> Even though my grandfather didn't speak any English he was able to explain to me, as other elders have, that the promises made by the English to the Haudenosaunee that they would continue to recognize our nation as free and independent peoples. At one meeting they would recite it, what exactly were those words and the gist that we had to understand it.

> So, when our people in Akwesasne today say this border was not intended for us, they have an understanding in historical terms of the interpretation of those promises. In our language and the way it is passed down, the line of what is now known as the International Border belongs to somebody else. It wasn't meant for Kanienkehaka or the Mohawk Nation or any of the Six Nations. We understand that much.

**119**    In this testimony the respondent refers to "promises made by the English to the Haudenosaunee", but his claim to base a trading/mobility right and tax exemptions on an existing treaty right was rejected by the trial judge and has not been appealed to this Court. His contention here is that whether or not the British made a treaty promise to that effect, the Mohawks were in fact free under the Mohawk legal regime "to pass and repass ... across what is now the Canada-United States boundary" with goods for trade and this freedom should now receive s. 35 protection. The claim to trade and mobility across international boundaries as a citizen of Haudenosaunee engages the sovereignty issue.

6.    Non-Assertion of Aspects of the Respondent's Claim

**120**    The Trial Division declaration, as stated, recognized an aboriginal right "to pass and repass freely across what is now the Canada-United States boundary including the right to bring goods into Canada for personal and community use, including for trade with other First Nations, without

having to pay any duty or taxes whatsoever to any Canadian Government or authority" (p. 4 (emphasis added)). The word "including" was subsequently deleted in an effort to shrink the scope of the aboriginal right asserted in this particular proceeding and thereby to present a smaller target to the appellant's objection. The Federal Court of Appeal added site-specific limitations to the claimed right. In the end, the declaration issued by the Federal Court of Appeal read as follows (at para. 56):

> [T]he plaintiff as a Mohawk of Akwesasne resident in Canada has an existing aboriginal right which is constitutionally protected by sections 35 and 52 of the Constitution Act, 1982, when crossing the international border from New York to Ontario or Quebec, to bring with him to Canada, for personal use or consumption, or for collective use or consumption by the members of the community of Akwesasne, or for non-commercial scale trade with First Nation communities in Ontario or Quebec, goods bought in the State of New York without having to pay any duty or taxes to the government of Canada.

**121**    In his opening address at trial, counsel for the respondent also made it clear that no claim is made in this action to import prohibited or controlled goods:

> So that it will be perfectly clear from the outset of the trial, my lord, Plaintiff states immediately and unequivocally that he is not here pleading and that this case is not about any right to bring across the Canada/U.S. border any form of firearm or any form of restricted or prohibited drug, alcohol, plants or the like. Nor do the facts in this case raise the issue of importation into Canada of commercial goods for the primary purpose of competing in the commercial mainstream in Canada. Plaintiff is not, my lord, seeking any judicial determination of that issue in this case. [Emphasis added.]

**122**    When asked by the trial judge whether the claim included "commercial trade" (as defined, e.g., in Gladstone, supra, at para. 57), he said not "at this time".

**123**    The respondent takes the position that aboriginal peoples do not have to claim the full extent of their entitlement. He reiterated that the purpose of s. 35 was to bring about a reconciliation between Canadian society and its aboriginal communities (Van der Peet, supra), and characterized the respondent's willingness to exclude from his claim a right to bring across the border prohibited goods (e.g., firearms and illegal drugs) and controlled goods (e.g., alcohol, though not tobacco) as a reasonable concession in pursuit of such a reconciliation. However, in considering whether the evidence gives rise to the claimed right, it is necessary to look at all of the evidence to determine whether, in its totality, it establishes not only a pre-contact practice that was capable of being carried forward under the new European-based legal orders but a practice that is compatible with Canadian sovereignty.

**124**    The analysis of the courts below in support of the respondent's position, if accepted, would

suggest that in future cases other Mohawks would argue with some force that the historical practice of the free movement of people and goods having been established in this case, any other restrictions on the movement of goods, people and perhaps capital would have to be justified under the Sparrow doctrine.

　　　7.　　The Substance of the Claim Disclosed by the Evidence

**125**　　For the reasons already mentioned, the respondent's claim, despite the concessions made in argument, is not just about physical movement of people or goods in and about Akwesasne. It is about pushing the envelope of Mohawk autonomy within the Canadian Constitution. It is about the Mohawks' aspiration to live as if the international boundary did not exist. Whatever financial benefit accrues from the ability to move goods across the border without payment of duty is clearly incidental to this larger vision.

**126**　　It is true that in R. v. Pamajewon, [1996] 2 S.C.R. 821, the Court warned, at para. 27, against casting the Court's aboriginal rights inquiry "at a level of excessive generality". Yet when the claim, as here, can only properly be construed as an international trading and mobility right, it has to be addressed at that level.

**127**　　In the constitutional framework envisaged by the respondent, the claimed aboriginal right is simply a manifestation of the more fundamental relationship between the aboriginal and non-aboriginal people. In the Mohawk tradition this relationship is memorialized by the "two-row" wampum, referred to by the respondent in Exhibit D-13, at pp. 109-110, and in his trial evidence (trans., vol. 2, at pp. 191-92), and described in the Haudenosaunee presentation to the Parliamentary Special Committee on Indian Self-Government in 1983 as follows:

> When the Haudenosaunee first came into contact with the European nations, treaties of peace and friendship were made. Each was symbolized by the Gus-Wen-Tah or Two Row Wampum. There is a bed of white wampum which symbolizes the purity of the agreement. There are two rows of purple, and those two rows have the spirit of your ancestors and mine. There are three beads of wampum separating the two rows and they symbolize peace, friendship and respect.

> These two rows will symbolize two paths or two vessels, travelling down the same river together. One, a birch bark canoe, will be for the Indian people, their laws, their customs and their ways. The other, a ship, will be for the white people and their laws, their customs and their ways. We shall each travel the river together, side by side, but in our own boat. Neither of us will try to steer the other's vessel.

> (Indian Self-Government in Canada: Report of the Special Committee (1983), back cover)

**128**    Thus, in the "two-row" wampum there are two parallel paths. In one path travels the aboriginal canoe. In the other path travels the European ship. The two vessels co-exist but they never touch. Each is the sovereign of its own destiny.

**129**    The modern embodiment of the "two-row" wampum concept, modified to reflect some of the realities of a modern state, is the idea of a "merged" or "shared" sovereignty. "Merged sovereignty" asserts that First Nations were not wholly subordinated to non-aboriginal sovereignty but over time became merger partners. The final Report of the Royal Commission on Aboriginal Peoples, vol. 2 (Restructuring the Relationship (1996)), at p. 214, says that "Aboriginal governments give the constitution [of Canada] its deepest and most resilient roots in the Canadian soil." This updated concept of Crown sovereignty is of importance. Whereas historically the Crown may have been portrayed as an entity across the seas with which aboriginal people could scarcely be expected to identify, this was no longer the case in 1982 when the s. 35(1) reconciliation process was established. The Constitution was patriated and all aspects of our sovereignty became firmly located within our borders. If the principle of "merged sovereignty" articulated by the Royal Commission on Aboriginal Peoples is to have any true meaning, it must include at least the idea that aboriginal and non-aboriginal Canadians together form a sovereign entity with a measure of common purpose and united effort. It is this new entity, as inheritor of the historical attributes of sovereignty, with which existing aboriginal and treaty rights must be reconciled.

**130**    The final Report of the Royal Commission on Aboriginal Peoples, vol. 2, goes on to describe "shared" sovereignty at pp. 240-41 as follows:

> Shared sovereignty, in our view, is a hallmark of the Canadian federation and a central feature of the three-cornered relations that link Aboriginal governments, provincial governments and the federal government. These governments are sovereign within their respective spheres and hold their powers by virtue of their constitutional status rather than by delegation. Nevertheless, many of their powers are shared in practice and may be exercised by more than one order of government.

On this view, to return to the nautical metaphor of the "two-row" wampum, "merged" sovereignty is envisaged as a single vessel (or ship of state) composed of the historic elements of wood, iron and canvas. The vessel's components pull together as a harmonious whole, but the wood remains wood, the iron remains iron and the canvas remains canvas. Non-aboriginal leaders, including Sir Wilfrid Laurier, have used similar metaphors. It represents, in a phrase, partnership without assimilation.

**131**    The s. 35(1) issue arising out of all this is signalled in the style of cause. The respondent sued as "GRAND CHIEF MICHAEL MITCHELL also known as KANENTAKERON". He lives with a foot simultaneously in two cultural communities, each with its own framework of legal rights and

responsibilities. As Kanentakeron he describes learning from his grandfather the spiritual practices of the People of the Longhouse, whose roots in North America go back perhaps 10,000 years. Yet the name Michael Mitchell announces that he is also part of modern Canada who watches television from time to time and went to high school in Cornwall. As much as anyone else in this country, he is a part of our collective sovereignty. He writes in Exhibit D-13, at p. 135:

> If anyone thinks that Mohawks are anti-Canadian or American, then we kindly remind you that First Nations in North America, in ratio to other nationalities, sent more soldiers to the First and Second World Wars. Since we usually wound up on the front lines, many of our people didn't make it home.

**132**    The dual aspect reflected in the style of cause of the respondent's action also finds its parallel in the Court's treatment of the rights of aboriginal peoples. What is "integral to the aboriginal community's distinctive culture" (Van der Peet, at para. 55) is constitutionally protected. In other respects however, the respondent and other aboriginal people live and contribute as part of our national diversity. So too in the Court's definition of aboriginal rights. They find their source in an earlier age, but they have not been frozen in time. They are, as has been said, rights not relics. They are projected into modern Canada where they are exercised as group rights in the 21st century by modern Canadians who wish to preserve and protect their aboriginal identity.

**133**    In the earlier years of the century the federal government occasionally argued that Parliament's jurisdiction under s. 91(24) of the Constitution Act, 1867 ("Indians, and Lands reserved for the Indians") was plenary. Indians were said to be federal people whose lives were wholly subject to federal "regulation". This was rejected by the courts, which ruled that while an aboriginal person could be characterized as an Indian for some purposes including language, culture and the exercise of traditional rights, he or she does not cease thereby to be a resident of a province or territory. For other purposes he or she must be recognized and treated as an ordinary member of Canadian society. In a decision handed down soon after the coming into force of the Constitution Act, 1982, in Nowegijick v. The Queen, [1983] 1 S.C.R. 29, a tax case, Dickson J. (as he then was) wrote at p. 36, "Indians are citizens and, in affairs of life not governed by treaties or the Indian Act, they are subject to all of the responsibilities ... of other Canadian citizens". See also Natural Parents v. Superintendent of Child Welfare, [1976] 2 S.C.R. 751, at p. 763, per Laskin C.J., and Dick v. The Queen, [1985] 2 S.C.R. 309, at p. 326, per Beetz J. In Gladstone (at para. 73) and again in Delgamuukw v. British Columbia, [1997] 3 S.C.R. 1010 (at para. 165), Lamer C.J. repeats that "distinctive aboriginal societies exist within, and are a part of, a broader social, political and economic community, over which the Crown is sovereign" (emphasis added). The constitutional objective is reconciliation not mutual isolation.

**134**    The Royal Commission does not explain precisely how "shared sovereignty" is expected to work in practice, although it recognized as a critical issue how "60 to 80 historically based nations in Canada at present, comprising a thousand or so local Aboriginal communities" would "interact with the jurisdictions of the federal and provincial governments" in cases of operational conflict

(final report, vol. 2, supra, at pp. 166 and 216). It also recognized the challenge aboriginal self-government poses to the orthodox view that constitutional powers in Canada are wholly and exhaustively distributed between the federal and provincial governments: see, e.g., Attorney-General for Ontario v. Attorney-General for Canada, [1912] A.C. 571 (P.C.), at p. 581; P. W. Hogg and M. E. Turpel, "Implementing Aboriginal Self-Government: Constitutional and Jurisdictional Issues" (1995), 74 Can. Bar Rev. 187, at p. 192; this issue is presently before the courts in British Columbia in Campbell v. British Columbia (Attorney General) (2000), 79 B.C.L.R. (3d) 122, 2000 BCSC 1123. There are significant economic and funding issues. Some aboriginal people who live off reserves, particularly in urban areas, have serious concerns about how self-government would affect them, as discussed in part in Corbiere v. Canada (Minister of Indian and Northern Affairs), [1999] 2 S.C.R. 203. With these difficulties in mind perhaps, the Royal Commission considered it to be "essential that any steps toward self-government be initiated by the aboriginal group in question and "respond to needs identified by its members" (Partners in Confederation: Aboriginal Peoples, Self-Government and the Constitution (1993), at p. 41). It rejected the "one size fits all" approach to First Nations' self-governing institutions in favour of a negotiated treaty model. The objective, succinctly put, is to create sufficient "constitutional space for aboriginal peoples to be aboriginal": D. Greschner, "Aboriginal Women, the Constitution and Criminal Justice", [1992] U.B.C. L. Rev. (Sp. ed.) 338, at p. 342. See also J. Borrows, "Uncertain Citizens: Aboriginal Peoples and the Supreme Court" (2001), 80 Can. Bar Rev. 15, at p. 34. The Royal Commission Final Report, vol. 2, states at p. 214 that:

> Section 35 does not warrant a claim to unlimited governmental powers or to complete sovereignty, such as independent states are commonly thought to possess. As with the federal and provincial governments, Aboriginal governments operate within a sphere of sovereignty defined by the constitution. In short, the Aboriginal right of self-government in section 35(1) involves circumscribed rather than unlimited powers.

**135**    It is unnecessary, for present purposes, to come to any conclusion about these assertions. What is significant is that the Royal Commission itself sees aboriginal peoples as full participants with non-aboriginal peoples in a shared Canadian sovereignty. Aboriginal peoples do not stand in opposition to, nor are they subjugated by, Canadian sovereignty. They are part of it.

**136**    With this background I return to the point that the respondent does not base his mobility rights in this test case as a Canadian citizen. His counsel acknowledges that s. 35(1) itself does not purport to create rights. It affirms only existing rights. The respondent's international trading and mobility right is put forward in his evidence as a right incidental to his status as a citizen of Haudenosaunee, with its capital at Onondaga, near Syracuse, New York State. He explained in his testimony:

> Q.    You made particular reference, Chief Mitchell, to going to Onondaga. What is the significance of Onondaga?

A.      In the Iroquois world as we understand it Onondaga is the capital of the
        Confederacy, much like Ottawa is the capital of Canada, Washington is the
        capital of the United States, Onondaga is the capital of the Haudenosaunee, of the
        Six Nations.

                                        ...

Q.      Chief Mitchell, do you consider yourself a citizen of the Confederacy?
A.      I am a citizen of the Haudenosaunee, the Iroquois Confederacy.... Each of the
        member nations of the Haudenosaunee if they wish to apply for a passport they
        go to Onondaga. The passport that we use to travel, we use our own Iroquois
        Confederacy passport.

**137**    The respondent's claim thus presents two defining elements. He asserts a trading and
mobility right across the international boundary and he attaches this right to his current citizenship
not of Canada but of the Haudenosaunee Confederacy with its capital in Onondaga, New York
State.

    8.    The Legal Basis of the Respondent's Claim

**138**    The respondent initially asserted both a treaty right and an aboriginal right but the conceptual
distinction between these two sources of entitlement is important. A treaty right is an affirmative
promise by the Crown which will be interpreted generously and enforced in a way that upholds the
honour of the Crown: R. v. Taylor (1981), 62 C.C.C. (2d) 227; R. v. Badger, [1996] 1 S.C.R. 771;
R. v. Marshall, [1999] 3 S.C.R. 456.

**139**    The trial court acknowledged that if duty-free provisions had been incorporated into a treaty
with the Mohawks, the promise would be enforceable as a s. 35 treaty right. A treaty right is itself
an expression of Crown sovereignty.

**140**    In the case of aboriginal rights, there is no historical event comparable to the treaty-making
process in which the Crown negotiated the right or obligation sought to be enforced. The
respondent's claim is rooted in practices which he says long preceded the Mohawks' first contact
with Europeans in 1609.

**141**    I return to the comment of McLachlin J., dissenting in the result, in Van der Peet, supra, at
para. 227 that "[t]he issue of what constitutes an aboriginal right must, in my view, be answered by
looking at what the law has historically accepted as fundamental aboriginal rights". There was a
presumption under British colonial law that the Crown intended to respect the pre-existing customs
of the inhabitants that were not deemed to be unconscionable (e.g., Blackstone in Commentaries on
the Laws of England (4th ed. 1770), Book I, at p. 107, gave the example, now discredited, of
"infidel" laws) or incompatible with the new sovereignty: Campbell v. Hall (1774), 1 Cowp. 204, 98
E.R. 1045 (K.B.), at pp. 1047-48; Delgamuukw v. British Columbia, [1993] 5 W.W.R. 97

(B.C.C.A.), at paras. 1021-24. Professor B. Slattery formulated the traditional principle as follows:

> When the Crown gained sovereignty over an American territory, colonial law dictated that the local customs of the native peoples would presumptively continue in force and be recognizable in the courts, except insofar as they were unconscionable or incompatible with the Crown's assertion of sovereignty. [Emphasis added.]

> ("Understanding Aboriginal Rights" (1987), 66 Can. Bar Rev. 727, at p. 738)

**142**　In a more recent paper published as "Making Sense of Aboriginal and Treaty Rights" (2000), 79 Can. Bar Rev. 196, Professor Slattery, at p. 201, largely reiterates his earlier proposition although he now substitutes the phrase "Crown suzerainty" for "Crown sovereignty". The substitution signals a shift in emphasis from sovereignty over individuals to sovereignty over "autonomous" groups, which is perhaps related to arguments in support of aboriginal self-government.

**143**　Since Calder, supra, the courts have extended recognition beyond pre-existing "rights" to practices, customs or traditions integral to the aboriginal community's distinctive culture (Van der Peet, supra, at para. 53). The aboriginal rights question, as McLachlin J. put it, dissenting in the result, in Van der Peet, at para. 248, is traditionally "what laws and customs held sway before superimposition of European laws and customs [?]"

**144**　Reference has already been made to the fact that one of several sources of the concept of aboriginal rights, now significantly modified by the more generous principles of constitutional interpretation, is traditional British colonial law. Many of the cases decided by the Judicial Committee of the Privy Council were concerned with rights of property created under a former regime. In Amodu Tijani v. Southern Nigeria (Secretary), [1921] 2 A.C. 399, at p. 407, it was confirmed that "A mere change in sovereignty is not to be presumed as meant to disturb rights of private owners" (emphasis added). More recently, Lord Denning, speaking for the Privy Council in Oyekan v. Adele, [1957] 2 All E.R. 785, at p. 788, said: "In inquiring ... what rights are recognised, there is one guiding principle. It is this: The courts will assume that the British Crown intends that the rights of property of the inhabitants are to be fully respected" (emphasis added). As with the modern law of aboriginal rights, the law of sovereign succession was intended to reconcile the interests of the local inhabitants across the empire to a change in sovereignty.

**145**　The concept of a presumption was endorsed by Hall J. in Calder, supra, at p. 402:

> The appellants rely on the presumption that the British Crown intended to respect native rights; therefore, when the Nishga people came under British sovereignty ... they were entitled to assert, as a legal right, their Indian title. [Emphasis added.]

**146**    It was subsequently affirmed that aboriginal rights could exist independently of "aboriginal title" (Van der Peet, supra, at para. 74; Adams, supra, at para. 26). Further, Guerin v. The Queen, [1984] 2 S.C.R. 335, Dickson J. emphasized the "legal" character of the resulting aboriginal right: "[i]n Calder ... this Court recognized aboriginal title as a legal right derived from the Indians' historic occupation and possession of their tribal lands" (p. 376 (emphasis added)), and then went on to state the proposition that the Indians were "the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion" (p. 378 (emphasis added; emphasis in original deleted)).

**147**    The High Court of Australia has reached a similar conclusion with respect to the legal regime governing Australian aboriginal people: Mabo v. Queensland (1992), 175 C.L.R. 1, per Brennan J., for the majority, at pp. 55-57, and Toohey J., at p. 184. See also Wik Peoples v. Queensland (1996), 187 C.L.R. 1.

**148**    I am far from suggesting that the key to s. 35(1) reconciliation is to be found in the legal archives of the British Empire. The root of the respondent's argument nevertheless is that the Mohawks of Akwesasne acquired under the legal regimes of 18th century North America, a positive legal right as a group to continue to come and go across any subsequent international border dividing their traditional homelands with whatever goods they wished, just as they had in pre-contact times. In other words, Mohawk autonomy in this respect was continued but not as a mere custom or practice. It emerged in the new European-based constitutional order as a legal trading and mobility right. By s. 35(1) of the Constitution Act, 1982, it became a constitutionally protected right. That is the respondent's argument.

    9.    The Limitation of "Sovereign Incompatibility"

**149**    Care must be taken not to carry forward doctrines of British colonial law into the interpretation of s. 35(1) without careful reflection. In R. v. Eninew (1984), 12 C.C.C. (3d) 365 (Sask. C.A.), and R. v. Hare (1985), 20 C.C.C. (3d) 1 (Ont. C.A.), for example, it was held by two provincial courts of appeal that s. 35(1) "recognized and affirmed" (and thus set in constitutional concrete) the traditional frailties of common law aboriginal rights, including their vulnerability to unilateral extinguishment by governments. This was rejected in Sparrow, supra, where the Court construed s. 35(1) as affirming the promise of a new commitment by Canadians to resolve some of the ancient grievances that have exacerbated relations between aboriginal and non-aboriginal communities.

**150**    Yet the language of s. 35(1) cannot be construed as a wholesale repudiation of the common law. The subject matter of the constitutional provision is "existing" aboriginal and treaty rights and they are said to be "recognized and affirmed" not wholly cut loose from either their legal or historical origins. One of the defining characteristics of sovereign succession and therefore a limitation on the scope of aboriginal rights, as already discussed, was the notion of incompatibility with the new sovereignty. Such incompatibility seems to have been accepted, for example, as a

limitation on the powers of aboriginal self-government in the 1993 working report of the Royal Commission on Aboriginal Peoples, Partners in Confederation: Aboriginal Peoples, Self-Government and the Constitution, supra, at p. 23:

> ... Aboriginal nations did not lose their inherent rights when they entered into a confederal relationship with the Crown. Rather, they retained their ancient constitutions so far as these were not inconsistent with the new relationship. [Emphasis added.]

**151**    Prior to Calder, supra, "sovereign incompatibility" was given excessive scope. The assertion of sovereign authority was confused with doctrines of feudal title to deny aboriginal peoples any interest at all in their traditional lands or even in activities related to the use of those lands. To acknowledge that the doctrine of sovereign incompatibility was sometimes given excessive scope in the past is not to deny that it has any scope at all, but it is a doctrine that must be applied with caution.

**152**    I take an illustration from the evidence in this case. The trial judge showed that pre-contact the Mohawks, as a military force, moved under their own command through what is now parts of southern Ontario and southern Quebec. The evidence, taken as a whole, suggests that military values were "a defining feature of the Mohawk [or Iroquois] culture", to use my colleague's expression at para. 54. Indeed, the Mohawk warrior tradition has its adherents to this day. As previously noted, the trial judge at p. 35 thought the Mohawks' military activities in the St. Lawrence River Valley probably got in the way of their trading activities:

> [I]t is difficult to see how an army would engage in trade with their enemies while in pursuit of them.

**153**    However, important as they may have been to the Mohawk identity as a people, it could not be said, in my view, that pre-contact warrior activities gave rise under successor regimes to a legal right under s. 35(1) to engage in military adventures on Canadian territory. Canadian sovereign authority has, as one of its inherent characteristics, a monopoly on the lawful use of military force within its territory. I do not accept that the Mohawks could acquire under s. 35(1) a legal right to deploy a military force in what is now Canada, as and when they choose to do so, even if the warrior tradition was to be considered a defining feature of pre-contact Mohawk society. Section 35(1) should not be interpreted to throw on the Crown the burden of demonstrating subsequent extinguishment by "clear and plain" measures (Gladstone, supra, at para. 31) of a "right" to organize a private army, or a requirement to justify such a limitation after 1982 under the Sparrow standard. This example, remote as it is from the particular claim advanced in this case, usefully illustrates the principled limitation flowing from sovereign incompatibility in the s. 35(1) analysis.

**154**    In my opinion, sovereign incompatibility continues to be an element in the s. 35(1) analysis, albeit a limitation that will be sparingly applied. For the most part, the protection of practices, traditions and customs that are distinctive to aboriginal cultures in Canada does not raise legitimate

sovereignty issues at the definitional stage.

> 10.    The Alleged Incompatibility Between the Aboriginal Right Disclosed by the
> Evidence and Canadian Sovereignty

**155**    I proceed to the next step keeping in mind that the respondent's claim must respond not only to the historical requirements that have traditionally preoccupied aboriginal law but also to the reconciliation objective that lies at the heart of the purposive interpretation of s. 35(1).

**156**    The assertion of British sovereignty to the Akwesasne area was certainly no later than the Treaty of Paris of 1763. Boundaries at that time were considered to be of high importance:

> The Treaty of Paris produced the greatest rearrangement of boundaries in North America that had hitherto occurred. It is for this reason that the war that immediately preceded it is sometimes called the "War of the Boundary Lines".

> (N. L. Nicholson, The Boundaries of the Canadian Confederation (1979), at p. 19)

**157**    Prior to the American Revolution, as evidenced by the geographic scope of the Royal Proclamation of 1763 (reproduced in R.S.C. 1985, App. II, No. 1), the claim of British sovereignty continued south to Florida and westwards beyond the Great Lakes (Calder, supra, at pp. 322-23). Movement from the Mohawk Valley to Akwesasne lay wholly within the British claim and did not cross an international boundary. The present international boundary, as earlier mentioned, was not settled until after the American Revolution under the subsequent Treaty of Paris of 1783.

**158**    The question is whether the asserted legal right to the autonomous exercise of international trade and mobility was compatible with the new European (now Canadian) sovereignty and the reciprocal loss (or impairment) of Mohawk sovereignty.

**159**    In the resolution of this legal issue, as stated, we are addressing legal incompatibility as opposed to factual incompatibility. The latter emerged more slowly as assertions of sovereignty gave way to colonisation and progressive occupation of land. From the outset, however, frontiers were a fundamental expression or demarcation of sovereignty amongst First Nations as well as in the European conception (Nicholson, supra, at pp. 8-9), and indeed amongst and between Britain's North American colonies (J. Story, Commentaries on the Constitution of the United States (4th ed. 1873), vol. II, at pp. 463-64). Akwesasne is the point at which, since 1783, British (and later Canadian) sovereignty came face to face with the sovereignty of the United States.

**160**    Control over the mobility of persons and goods into one country is, and always has been, a fundamental attribute of sovereignty.

> It is commonly accepted that sovereign states have the right to control both who and what enters their boundaries. For the general welfare of the nation the state is expected to perform this role. [Emphasis added.]

> (R. v. Simmons, [1988] 2 S.C.R. 495, at p. 528, per Dickson C.J.)

See also R. v. Jacques, [1996] 3 S.C.R. 312, at paras. 15 and 18, per Gonthier J.; Almeida-Sanchez v. United States, 413 U.S. 266 (1973), at p. 279; and United States v. Ramsey, 431 U.S. 606 (1977). In other words, not only does authority over the border exist as an incident of sovereignty, the state is expected to exercise it in the public interest. The duty cannot be abdicated to the vagaries of an earlier regime whose sovereignty has been eclipsed (Cain, supra, at pp. 545-46).

**161**    The legal situation is further complicated by the fact, previously mentioned, that the respondent attributes his international trading and mobility right not to his status as a Canadian citizen but as a citizen of the Haudenosaunee (Iroquois Confederacy) based at Onondaga, New York. Border conditions in the modern era are vastly different from those in the 18th century. Nevertheless, as stated, borders existed among nations, including First Nations. They were expressions of sovereign autonomy and then, as now, compelled observance.

**162**    The courts of the United States, being in this case the country of export, also view border controls as incidental to territorial sovereignty. In Chae Chan Ping v. United States, 130 U.S. 581 (1889), it was said by Field J., for the United States Supreme Court, at pp. 603-4:

> Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens it would be to that extent subject to the control of another power.

In Ekiu v. United States, 142 U.S. 651 (1892), at p. 659, the United States Supreme Court stated:

> It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.

To the same effect is the holding of Gray J., for the court, in Fong Yue Ting v. United States, 149 U.S. 698 (1893), at p. 707.

**163**    Similar views were expressed by scholars writing before the Canada-United States border was ever established. E. de Vattel, whose treatise The Law of Nations was first published in 1758, said this:

> The sovereign may forbid the entrance of his territory either to foreigners

in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to the state. There is nothing in all this that does not flow from the rights of domain and sovereignty : every one is obliged to pay respect to the prohibition ; and whoever dares to violate it, incurs the penalty decreed to render it effectual.

(The Law of Nations (Chitty ed. 1834), Book II, at pp. 169-70)

To the same effect is Blackstone, supra, at p. 259:

Upon exactly the same reason stands the prerogative of granting safe-conducts, without which by the law of nations no member of one society has a right to intrude into another.

In my view, therefore, the international trading/mobility right claimed by the respondent as a citizen of the Haudenosaunee (Iroquois) Confederacy is incompatible with the historical attributes of Canadian sovereignty.

**164**    The question that then arises is whether this conclusion is at odds with the purpose of s. 35(1), i.e. the reconciliation of the interests of aboriginal peoples with Crown sovereignty? In addressing this question it must be remembered that aboriginal people are themselves part of Canadian sovereignty as discussed above. I agree with Borrows, supra, at p. 40, that accommodation of aboriginal rights should not be seen as "a zero-sum relationship between minority rights and citizenship; as if every gain in the direction of accommodating diversity comes at the expense of promoting citizenship" (quoting W. Kymlicka and W. Norman, eds., Citizenship in Diverse Societies (2000), at p. 39). On the other hand, the reverse is also true. Affirmation of the sovereign interest of Canadians as a whole, including aboriginal peoples, should not necessarily be seen as a loss of sufficient "constitutional space for aboriginal peoples to be aboriginal" (Greschner, supra, at p. 342). A finding of distinctiveness is a judgment that to fulfill the purpose of s. 35, a measure of constitutional space is required to accommodate particular activities (traditions, customs or practices) rooted in the aboriginal peoples' prior occupation of the land. In this case, a finding against "distinctiveness" is a conclusion that the respondent's claim does not relate to a "defining feature" that makes Mohawk "culture what it is" (Van der Peet, at paras. 59 and 71 (emphasis in original deleted); it is a conclusion that to extend constitutional protection to the respondent's claim finds no support in the pre-1982 jurisprudence and would overshoot the purpose of s. 35(1). In terms of sovereign incompatibility, it is a conclusion that the respondent's claim relates to national interests that all of us have in common rather than to distinctive interests that for some purposes differentiate an aboriginal community. In my view, reconciliation of these interests in this particular case favours an affirmation of our collective sovereignty.

    11.    Implications for Internal Aboriginal Self-Government

**165**   In reaching that conclusion, however, I do not wish to be taken as either foreclosing or endorsing any position on the compatibility or incompatibility of internal self-governing institutions of First Nations with Crown sovereignty, either past or present. I point out in this connection that the sovereign incompatibility principle has not prevented the United States (albeit with its very different constitutional framework) from continuing to recognize forms of internal aboriginal self-government which it considers to be expressions of residual aboriginal sovereignty. The concept of a "domestic dependent nation" was introduced by Marshall C.J. in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831), at p. 17, as follows:

> ... it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations.

**166**   More recently, in United States v. Wheeler, 435 U.S. 313 (1978), the United States Supreme Court, per Stewart J., described the applicable U.S. doctrine at pp. 322, 323 and 326:

> The powers of Indian tribes are, in general, "inherent powers of a limited sovereignty which has never been extinguished." ...
>
> Indian tribes are, of course, no longer "possessed of the full attributes of sovereignty." United States v. Kagama, supra, at 381. Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others.
>
> ...
>
> In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.
>
> ...
>
> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy... . They cannot enter into direct commercial or governmental relations with foreign nations... . And, as we have recently held, they cannot try nonmembers in tribal courts... .

> These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. [Underlining added.]

**167**    The U.S. doctrine of domestic dependent nation differs in material respects from the proposals of our Royal Commission on Aboriginal Peoples. The concepts of merged sovereignty and shared sovereignty, which are said to be essential to the achievement of reconciliation as well as to the maintenance of diversity, are not reflected in the American jurisprudence. Under U.S. law the powers of a tribal government (whatever its theoretical sovereignty) can be overridden by an ordinary law of Congress. Further, there is nothing that I am aware of in the U.S. doctrine that extends the concept of self-government to claims to an independent self-sustaining economic base, as contemplated by the Royal Commission on Aboriginal Peoples (final report, vol. 2, supra, at p. 2). In any event, whatever be the differences and similarities, an international trading and mobility right, which necessarily involves "external relations", would appear not to be included in the attributes of a U.S.-style "domestic dependent nation".

**168**    As to the position of Mohawks in Canada seeking to trade into the United States, see United States v. Garrow, supra, which involved "a full-blooded Indian woman of the Canadian St. Regis Tribe of Iroquois Indians" (p. 318) who resided in Canada near the international boundary line. She entered the United States at the village of Hogansburg, New York, carrying 24 baskets for sale in the United States. She was charged duty under the Tariff Act of 1930. She launched a protest, claiming that as she was an aboriginal person she could bring the baskets into the United States free of duty under Article III of the Jay Treaty. Her claim was rejected, the court stating at p. 324:

> There being neither any treaty exemption of appellee's goods from duty, nor any statutory exemption thereof, it follows that they are dutiable, as claimed by the collector.

See also Akins v. United States, 551 F.2d 1222 (C.C.P.A. 1977).

**169**    I refer to the U.S. law only to alleviate any concern that addressing aspects of the sovereignty issue in the context of a claim to an international trading and mobility right would prejudice one way or the other a resolution of the much larger and more complex claim of First Nations in Canada to internal self-governing institutions. The United States has lived with internal tribal self-government within the framework of external relations determined wholly by the United States government without doctrinal difficulties since Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543 (1823), was decided almost 170 years ago.

**170**    In this connection, the respondent also referred us to Watt v. Liebelt, [1999] 2 F.C. 455, where the Federal Court of Appeal considered the mobility right of an aboriginal person whose traditional territory also straddles the Canada-U.S. border. The claimant, who was neither a Canadian citizen nor a person registered under the Indian Act, claimed a right to come into or remain in Canada. In considering this question, the court commented at para. 15:

> The respondent contends that the existence of a sovereign state is inconsistent with any fetters on the power of that state to control which non-citizens may remain in the country. Suffice it to say that while there is ample authority in international and common law for that proposition, a sovereign state may fetter itself as to the means by which, the circumstances in which, and the agencies of government by which, such power of control may be exercised. Canada has by its Constitution limited the exercise of governmental powers which may be inherent as a sovereign state.... [S]ection 35 of the Constitution Act, 1982 now guarantees existing Aboriginal rights not previously extinguished, and this carries the corollary that no agency of the state can, after 1982, extinguish those rights.

**171**    The question under consideration here is rather different from the question discussed in that passage. It is not about post-1982 extinguishment. It is about the prior question of whether the claimed international trading and mobility right could, as a matter of law, have arisen in the first place.

**172**    It was, of course, an expression of sovereignty in 1982 to recognize existing aboriginal rights under s. 35(1) of the Constitution Act, 1982. However, if the claimed aboriginal right did not survive the transition to non-Mohawk sovereignty, there was nothing in existence in 1982 to which s. 35(1) protection of existing aboriginal rights could attach. It would have been, of course, quite within the sovereign's power to confer specific border privileges by treaty, but the respondent's claim to a treaty right was dismissed.

**173**    In my respectful view the claimed aboriginal right never came into existence and it is unnecessary to consider the Crown's argument that whatever aboriginal rights in this respect may have existed were extinguished by border controls enforced by Canada prior to April 17, 1982.

Conclusion

**174**    I would allow the appeal.

*Indexed as:*
# Mount Royal/Walsh Inc. v. Jensen Star (The) (F.C.A.)

**Between**
**Mount Royal/Walsh Inc., Plaintiff, and**
**The ship Jensen Star, Jensen Shipping Limited, and The owners**
**and all others interested in the ship Jensen Star, Defendants**

**[1989] F.C.J. No. 450**

[1989] A.C.F. No 450

[1990] 1 F.C. 199

[1990] 1 C.F. 199

99 N.R. 42

Court No. A-621-88 (T-1654-84)

Federal Court of Appeal
Montreal, Quebec

**Marceau, MacGuigan and Desjardins JJ.**

Heard: April 4, 1989
Judgment: May 23, 1989

*Maritime law -- Claims in respect of materials -- Repairs of shop -- Jurisdiction in rem.*

Gerald P. Barry, for the Appellants.
Sean J. Harrington, for the Respondent.

---

    Reasons for judgment delivered by Marceau J., allowing the appeal; concurred in by MacGuigan
and Desjardins JJ.

**MARCEAU J.**:-- This appeal is taken against a judgment of the Trial Division which has granted an action brought by a ship repairer for work done and material supplied to a ship. Originally commenced as a pure action in rem against the ship for necessaries, the proceedings were later amended to implead personally, as a party defendant, the shipping company at the behest of which the services had been rendered. The judgment under attack is thus one in personam against the shipping company as well as in rem against the ship. Only its in rem part, however, is actually disputed, which permits us to leave aside some other grounds of defence raised with respect to the action as a whole but rejected by the trial judge and accept as it is the amount of condemnation, $237,243.68, even if there are some difficulties with how the figure was reached. But even so limited, the appeal raises a very difficult question which relates to the treatment Canadian maritime law reserves to a claim for necessaries supplied to a ship and to the in rem jurisdiction of the Federal Court on its admiralty side.

The facts put in evidence before the trial judge were somewhat involved but, of course, there is no need to go over those pertaining to grounds of defence which have been finally disposed of, such as the contention by the shipping company that the charges made were excessive or the allegation that some of the amounts claimed were either not in relation to maritime services or else had already been paid. What has to be known of the factual background to be able to deal with the issue that the appeal is concerned with is relatively simple.

Mount Royal/Walsh Inc., (hereinafter Mount Royal), the respondent (plaintiff in the court below), is a company which carries on the business of marine and industrial repairs in Montreal. Over the period from August 1982 until June 1984, Mount Royal was requested by Niels Jorgensen, the president and principal shareholder of Jensen Shipping Limited, also of Montreal (hereinafter Jensen Shipping), to do approximately 25 separate jobs on five different ships operated by the company, among which was the JENSEN STAR. Seventeen of these 25 jobs, for a total amount of $264,036.66, were in respect of the JENSEN STAR, the first and last invoices for which were dated August 30, 1982 and May 21, 1984. All that time, Mount Royal was working on credit, although some partial payments were received by it on two occasions (about which I will speak later). Such an extended period of credit may appear surprising for commercial operations but in fact there was a very special association between Jorgensen and the president and principal shareholder of Mount Royal, John Hynes. Jorgensen and Hynes had been partners in a marine repair and shipping business until 1982 when, quite amicably, they had decided to go their separate ways: Hynes, in the repair business with the existing but renamed firm, Jorgensen, in the shipping business with a newly incorporated company, Jensen Shipping, to which the JENSEN STAR, the one ship that belonged to the old operation, had been transferred. The patience of Mount Royal is, in that context, understandable. It was not limitless, however, and there came a time when legal proceedings finally appeared to be required.

As mentioned at the outset, the action was commenced, on August 9, 1984, as an action in rem directed against the JENSEN STAR, the ship defendant being described in the title of the statement of claim in the manner indicated by Rule 1002 of the Rules of this Court, namely: the owners and all others interested in the ship JENSEN STAR. The action was brought under paragraphs 22(2)(m) and (n) and subsection 43(2) of the Federal Court Act, which give this Court jurisdiction to entertain a claim for materials and services supplied to a ship and provide for this jurisdiction to be exercised in rem against the ship [Footnote 1 appended to judgment]. Security was immediately given in order to avoid arrest, Jorgensen appearing in the Court's documents as the individual taking charge of the defence on behalf of the owners. On October 18, 1984, a statement of defence and counterclaim,

alleging exaggerated accounts, partial payments and amounts due othervise by plaintiff to "defend-ants", was filed in the name of the "defendants", referred to in the pleading as "Jensen". On April 29, 1985, the plaintiff sought and obtained leave to amend the statement of claim so as to implead Jensen Shipping personally as a party defendant and pray for a judgment against it in personam for the whole amount owed by it for all the jobs done, along with the condemnation in rem against the ship for those accounts directly related to it.

The amended statement of claim naturally elicited a renewed statement of defence. One was filed on July 12, 1985 by substituted counsel. It reiterated all the allegations of the original one including those relating to the counterclaim, and its prayer for relief was again a simple dismissal of the ac-tion. But there was in it an allegation completely novel. Its paragraph 4 read thus: "The beneficial ownership of Defendant vessel was sold by this Defendant (Jensen Shipping) to Jensen Marine Holdings Ltd. on 24 November 1983." Nothing else was said about this Jensen Marine Holdings Ltd., but the revelation in itself, if accurate, was no doubt of major consequence to the in rem side of the proceedings.

The allegation was accurate. It was established at trial that indeed a transfer of ownership of the vessel had taken place in 1983 as part of a refinancing scheme rendered necessary by the precarious situation of Jorgensen and his shipping operation. On November 24, 1983, by statutory bill of sale which had been regularly registered, the JENSEN STAR had been acquired by a recently formed corporation -- Jensen Marine Holdings Ltd., the shares of which were equally divided between Jorgensen and the two individuals who had accepted to inject the money needed -- which corpora-tion had immediately demise chartered it to Jensen Shipping, for twelve years, by bareboat char-terparty dated December 8, 1983.

As to the ground of defence that counsel drew from these facts, it was directly related to the limi-tation of the in rem jurisdiction of this Court in maritime matters imposed by subsection 43(3) of the Federal Court Act which reads:

> 43. (3) Notwithstanding subsection (2), the jurisdiction conferred on the Court by section 22 shall not be exercised in rem with respect to a claim mentioned in paragraph 22(2) (e), (f), (g), (h), (i), (k), (m), (n), (p) or (r) unless, at the time of the commence-ment of the action, the ship, aircraft or other property that is the subject of the action is beneficially owned by the person who was the beneficial owner at the time when the cause of action arose.

The contention was, of course, that the Court had no jurisdiction to entertain the proceedings against the ship, since there had occurred a change in the beneficial ownership of the JENSEN STAR be-tween the time the cause of action had arisen and the time the action had been commenced.

The trial judge rejected the contention and affirmed his jurisdiction on the basis of a two-tier rea-soning which he summarized in his reasons as follows:

> In my view this Court has the right to exercise in rem jurisdiction notwith-standing the transfer because, for the purpose of subsection 43(3), Jensen Ship-ping remained the beneficial owner of the ship or, in the alternative, Jensen Shipping and Jensen Holdings are estopped from claiming that Jensen Shipping was not the beneficial owner of the ship at the time this action was commenced.

The appellants submit again before this Court that the trial judge lacked jurisdiction to condemn the ship and ask that this part of the judgment be set aside.

\* \* \*

My first comments will be to express, with respect, my difficulty with the reasoning on the basis of which the trial judge has arrived at his conclusion. In fact, I do not think that either of the two propositions relied on by him is legally correct.

1. It seems to me impossible to hold that Jensen Shipping could have remained the beneficial owner of the ship for the purposes of subsection 43(3) of the Federal Court Act, unless the transfer from Jensen Shipping to Jensen Marine Holdings Ltd., on 24 November 1983, could be seen as only a sham aimed at concealing the true ownership of the vessel in order to shield it from risk of seizure as security, and the trial judge was satisfied that this was not so.

To arrive at his conclusion that Jensen Shipping had remained the beneficial owner of the ship, the trial judge accepted the view, expressed in obiter by Mr. Justice Addy in a previous case, [Footnote: Thorne Riddell Inc. v. Nicole N. Enterprises Inc., [1985] 2 F.C. 31.] that the demise charter of a vessel should be regarded as carrying with it an ownership interest sufficient to support an action in rem, a position our courts should adopt, even if it meant departing from the English decisions which had refused to accept that a demise charterer could be the beneficial owner referred to in an English statutory provision akin to subsection 43(3) of the Federal Court Act.

That the English decisions referred to should be considered with caution is obvious since they were rendered in the context of a statutory framework quite different from ours. When section 43 of the Federal Court Act was adopted, the corresponding provision conferring Admiralty jurisdiction to the High Court in England was subsection 3(4) of the Administration of Justice Act 1956 (U.K.) 1956, c. 46 [Footnote 3 appended to judgment]. This provision had been enacted in the context of Britain's ratification of the International Convention Relating to the Arrest of Sea-going Ships, Brussels, May 10, 1952; its aim was essentially to extend the in rem jurisdiction of the Court, not only to the ship in respect of which a maritime claim had arisen, but also to any sister ship, i.e. to any ship belonging to the same owner; and the reference in it was to the "beneficial owner of all the shares" in the ship. Canada has not adhered to the 1952 Brussels Convention; the in rem jurisdiction conferred by our provision is strictly limited to the ship to which the services have been rendered, and the text speaks of "beneficial owner of the ship", with no reference to shares. A passive importation of the English case law would no doubt be unwarranted. As to the preoccupations of Mr. Justice Addy and the trial judge, who would want to assure a greater protection to the supplier of necessaries when there was nothing to warn him, at the time his services were requested, that the ship was not then in the possession and control of her owners or their employees, no one could deny their legitimacy. [Footnote 4 appended to judgment]

The problem, however, is that I simply do not see how a court could suppose that Parliament may have meant to include a demise charterer in the expression "beneficial owner" as it appears in subsection 43(3). Whatever be the meaning of the qualifying term "beneficial", the word owner can only normally be used in reference to title in the res itself, a title characterized essentially by the right to dispose of the res. The French corresponding word "proprie taire" is equally clear in that regard. These words are clearly inapt to describe the possession of a demise charterer. [Footnote: See the comments of Mr. Justice Goff in the Il Congresco Del Partido, 1977 LLR 536 at 560 et seq. where he vigorously disputes the possibility to attribute to a demise charterer the characteristics of a

beneficial owner, refusing to follow in that respect the previous decision of Mr. Justice Brandon in The Andrea Ursula, [1971] 1 Lloyd's Rep. 145. See also The "Permina 3001", [1979] Lloyd's Rep. 327 (Sing. C.A.).] In my view, the expression "beneficial owner" was chosen to serve as an instruction, in a system of registration of ownership rights, to look beyond the register in searching for the relevant person. But such search cannot go so far as to encompass a demise charterer who has no equitable or proprietary interest which could burden the title of the registered owner. As I see it, the expression "beneficial owner" serves to include someone who stands behind the registered owner in situations where the latter functions merely as an intermediary, like a trustee, a legal representative or an agent. The French corresponding expression "veritable proprietaire" leaves no doubt to that effect. [Footnote 6 appended to judgment]

Only Parliament, in my view, can relax the constraints of subsection 43(3) by placing the demise charterer on the same level as a beneficial owner. This cannot be done by the courts.

2. It seems to me likewise impossible to hold that the Defendants-Appellants could be estopped from claiming that Jensen Shipping was not the beneficial owner of the ship at the time the action was commenced.

It is clear on the evidence that at no time did Jorgensen give Mount Royal notice of the transfer of ownership of the vessel, or act in such a way as to suggest that his authority to bind the ship could have changed. It is also somewhat disturbing to see that Jensen Shipping presented itself in the proceedings as the owner of the ship, up until the filing of the amended statement of defence when the transfer was revealed. But nevertheless I do not see how the doctrine of estoppel could come into play here so as to preclude any effect flowing from the fact that the vessel had become the property of Jensen Marine Holdings Ltd. and was no longer that of Jensen Shipping.

Assuming that the conditions for an estoppel could be seen to be present here, which I seriously doubt since there was no promise or assurance having induced anyone to alter his position to his detriment; and assuming further that such an estoppel could have effect against Jensen Marine Holdings Ltd., the registered owners, which appears to me difficult to accept, since it, itself, has never expressly denied its title; even so, the requirement of continuity of ownership imposed by subsection 43(3) to allow an action in rem is one that goes to the very jurisdiction of the Court, and no estoppel can give a court a jurisdiction expressly denied by statute (Halsbury Laws of England, vol. 16 no. 1515 no. 3; Snell's Principles of Equity, 27 ed. p. 563).

I therefore conclude that the reasons given by the trial judge to reject the jurisdictional argument advanced against the action in rem are not valid. Does that mean that the conclusion itself was totally unjustified? I do not think so and I will try to explain why.

* * *

It will be recalled that Mount Royal claimed in its action in rem the aggregate of the amounts due to it for seventeen different jobs done on the JENSEN STAR at different dates between August 30, 1982 and May 21, 1984. Six of these seventeen jobs predated November 24, 1983, the date of sale of the vessel by Jensen Shipping to Jensen Marine Holdings Ltd. In my view of the situation, since I reject the possibility that Jensen Shipping be seen as having remained beneficial owner of the ship after November 24, 1983, the action in rem in regard to the costs involved in these six "pre-sale jobs" cannot be entertained. There is no doubt that the requirement of continuity of ownership established by paragraph 43(3) is not met. The statutory right in rem that Mount Royal could have exercised in order to secure payment of its due for the six first jobs it did on the JENSEN STAR has

been definitely extinguished by the transfer of the vessel to new owners. The judgment in rem appealed from cannot stand with respect to those six jobs, the invoices for which amounted to the sum of $102,875.66.

I need to pause here for a moment to say a few words about an alternative ground of appeal raised by the appellants in their submissions to which I have not yet made reference. In my review of the facts at the outset, I made allusion to some partial payments that Jensen Shipping had made to Mount Royal on account of its outstanding debts for all the jobs done to the several vessels it was operating. On making those partial payments, on December 31, 1983 and April 23, 1984, Jensen Shipping did not specify which particular accounts were to be discharged thereby. On June 20, 1984, Mount Royal sent to Jensen Shipping a statement of accounts in which the invoices were listed chronologically and the partial payments were entered, on their proper dates, as reducing the total debt then due, which appeared to mean that they were being attributed on the basis of "first invoice in -- first out", but othervise no express declaration was made by either party as to how the payments were to be imputed.

Upon commencing its action in rem before the Court, however, Mount Royal purported to apply the partial payments to accounts relating to vessels other than the JENSEN STAR, which permitted it to arrest the ship for most of the invoices relating to it, regardless of their dates ($237,243.68). The defendants objected to such allocation claiming essentially that Mount Royal had already made an allocation in its June 1984 statement as a result of which the oldest accounts, including the six first relating to the JENSEN STAR, had been extinguished. The objection was denied by the trial judge on the basis that the common law principles relating to attribution of payments between debtor and creditor were applicable and that those principles had been illustrated in the judgment of the House of Lords in The Mecca, [1897] A.C. 286 where it had been decided that, in the absence of a specific appropriation by the debtor, the creditor remains free to elect at any time and may do so in bringing his action.

While the trial judge was no doubt correct in referring to the rules of common law as they are applied in Adrniralty matters (ITD - International Terminal Operators v. Miida Electronics, [1986] 1 S.C.R. 752), I am not sure that the reasoning in The Mecca would necessarily lead to the conclusion he adopted and, more particularly, that the June 20, 1984 statements are not to be seen as a plain and irrevocable expression of intention to which effect should be given. But, be that as it may, it will be seen that my conclusion as to the lack of jurisdiction to entertain the action in rem for the "pre-sale invoices" (which include all those clamed by the appellants to have been extinguished by the initial appropriation) renders the issue moot.

I now revert to my analysis.

The "post-sale accounts", for a total amount of $145,582.00, are to be completely distinguished from the "pre-sale" ones. The problem they raise has nothing to do with jurisdiction. In their case, the condition, established by subsection 43(3) of the Federal Court Act, for the exercise by this Court of its jurisdiction in rem is obviously met. The problem with them is of a totally different order.

The problem with the "post-sale accounts" relates to the required relationship between the supplier of necessaries and the owner of the vessel for the statutory right in rem to be eventually recognized and enforced. Here is what I mean.

As it is well known, the so-called statutory right in rem that the Canadian law accords to the supplier of necessaries is quite different from a maritime lien. A maritime lien is, in effect, a privilege against a ship which attaches and gains priority by pure effect of the law and travels with the ship wherever it goes and in whosever hands it comes. (See: William Tetley, Maritime Liens and Claims, 1985, ch. 1, more specially at p. 40). A statutory right in rem is merely a right to sue the ship itself to obtain payment. The action in rem, which, as noted by Noe!l J. in Coastal Equipment Agencies v. The Comer, [1970] Ex. C.R. 13, originated in England as a procedural device whose object was to grant a claimant pre judgment security and to safeguard by so doing the Admiralty Court jurisdiction against intrusions by the Courts of common law, was in due course implanted in Canada where it has become a basic feature of our maritime law.

This so far is easy enough. But a question immediately arises. Does that right to sue in rem exist by the sole fact that necessaries were supplied? The difference between a statutory right in rem and a maritime lien, entrenched by the judgments in The Henrich Bjorn, (1886) 11 App. Cas 270, and The Castlegate, [1983] A.C. 38, precludes an affirmative answer. The protection of the owners was seen to be more important than that of the suppliers. The provision of subsection 43(3) of the Federal Court Act may appear, at first, to be concerned only with the protection of a new owner, but it is clear that the theory behind it is that the owner must, in all cases, be directly involved in the creation of the cause of action. The broad answer to the question set forth is therefore that the supplier of necessaries will have the right to sue in rem if the owner of the vessel has been involved in the contract under which his services were rendered. But this answer needs to be completed, as it lacks precision as the nature and extent of the involvement required.

As I have already mentioned, the United Kingdom has adopted in 1956 a special legislation respecting the right in rem of a claimant in maritime law. According to that legislation (which is now contained in the Supreme Court Act 1981, (U.K.) 1981 Chapter 54 at section 21(4)), the action in rem is only receivable if "the owner as respects all the shares in the vessel" or (a significant amendment) its demise charterer, at the time the action is commenced "would be liable on the claim in an action in personam". In other words, whether the situation of the person at the behest of whom the services were rendered was that of owner, charterer, or mere possessor of the vessel, the action in rem lies if that person is owner or demise charterer at the time of the action. [Footnote 7 appended to judgment] The focus is there put almost exclusively on the personal liability of the owner or the demise charterer at the time of the action, which is quite understandable since, as I said, the right of the supplier to sue in rem exists, not only with respect to the ship for the benefit of which the services were rendered, but also with respect to any sister ship. So, this condition that the owner of the vessel be involved in the supplying of the necessaries for the right in rem to come into existence, is now wholly peculiar to our law, and what it involves can in no way be determined by reference to English law.

Most of the decisions of the Trial Division of this Court rendered since 1970 have taken the view that the involvement of the owner in the supplying of the necessaries has to be complete and direct enough to entail his personal liability. These decisions repeat, in effect, that an action in rem is sustainable only if the owner is personally liable for the amount claimed. (See: Westcan Stevedoring Ltd. v. The "Armar", [1973] F.C. 1232, Sabb Inc. v. Shipping Ltd., [1976] 2 F.C. 175, Waterside Ocean Navigation Co. v. International Naviagation Ltd., [1977] 2 F.C. 257, McCain Produce Co. Ltd. v. The "Rea", [1978] 1 F.C. 686, Logistec Corp. v. The "Sneland", [1979] 1 F.C. 497, Kuhr v. The "Friedrich Busse", [1982] 2 F.C. 709, Marlex Petroleum, Inc.. v. The "Har Rai", [1984] 2 F.C. 345, Thorne Riddell Inc, v. Nicolle N Enteprises Inc., [1985] 2 F.C. 31 Imperial Oil Limited v The

"Expo Sprit", (1986) T-2159-86). Some doubts have occasionally been expressed as to the validity of this view (for instance Thorne Riddell Inc. referred to above, The "Anadoluu Guney", a decision of June 17, 1988, file T-2517-87, and of course the decision under attack here), but I believe that it is basically indisputable. To contend that an action in rem could be sustained even in the absence of any personal liability on the part of the owner would go against the whole idea behind the system which is, again, the protection of the owner. A claim against a ship cannot be viewed apart from the owner; it is essentially a claim against the owner. It may be that the terms in which the principle has been put in many decisions was somewhat too broad. This personal liability of the owner could exist, I suggest, only in relation to the vessel, that is to say only to the extent to which the proceeds of sale of the vessel may be applied to the claim; in other words, a liability to be satisfied strictly out of the res (see in that respect the interesting decision of the Privy Council in Foong Tai & Co. v. Buchheister & Co., [1908] A.C. 458 (P.C.)). Is it not a fact that there are three possibilities which have to be reckoned: the owner may have contracted himself, or he may have authorized someone to contract on his personal credit, or he may have expressly or implicitly authorized a person, in possession and control of a ship, to contract on the credit of the ship (rather than on the entirety of his personal assets). But, I essentially agree that liability as a result of some personal behaviour and attitude on the part of the owner is required. Would that mean, though, that a judgment in rem cannot be rendered without being accompanied by a judgment in personam against the owner? If it were so, the whole notion of a distinct action in rem would be defeated, it seems to me, and to my knowledge no one has ever contended that such could be the case (Comp D.C. Jackson, Enforcement of Maritime Claims, 1985, at p. 59).

It is on the basis of that understanding of our law that I have come to the conclusion that, in the circumstances of this case, the action in rem must be sustained in respect of all of the "post-sale invoices". It should be recalled that Jensen Marine Holdings Ltd. was created for financing purposes only; that Jorgensen, who ran Jensen Shipping, was also president of Jensen Marine Holdings Ltd; that Jorgensen himself did not treat Jensen Shipping and Jensen Marine Holdings Ltd. as two separate entities, but on the contrary showed, by his conduct at the moment of the contracts as well as his attitude at the time of the action, that he never considered his legal authority over the ship to have changed. I have no difficulty in finding that Jensen Marine Holdings Ltd., have had, in the supplying of the services by Mount Royal, the involvement required for the validity of the action in rem involvement which consisted in acting througb its president in such a manner as to authorize tacitly Jensen Shipping to contract on the credit of the vessel and engage, to that extent, its personal liability. Whether or not the terms of the charterparty governing the contractual relations inter se between the two corporations would bear that interpretation of the situation is immaterial.

In fact, I do not even believe that Jensen Marine Holdings Ltd. can now dispute such an interpretation. It is well established that necessaries supplied to a vessel are prima facie presumed to have been supplied on the credit of the vessel and its owner. The presumption is a rebuttable one, of course, but here, not only was it not in fact rebutted, no attempt was even made to do so. It is true that the trial judge did not formally pronounce on the question of the personal liability of Jensen Marine Holdings Ltd. and rendered judgment in personam only against Jensen Shipping; but, in my view, he could not do otherwise, since, on the action as it came before him, judgment in personam could issue against the latter company only, and not the former which had never been personally impleaded.

In relation to that last statement of mine, I must say here the surprise I felt when I noticed, in the course of analyzing the file, that the style of cause on the appeal book (which had been prepared by

counsel for the appellants) was not the same as the one appearing on the Trial Division documents, including the judgment: Jensen Marine Holdings Ltd. had been added as a party defendant. Apparently the change was explalned to the registry as being based on the following passage in the judgment:

> There remains to consider the defendant's third line of defence, that the plaintiff has no claim in rem agalnst the ship because the beneficial owner of the ship at the time this action was commenced was not the beneficial owner of the ship at the time the claim arose.

> Before I deal with that submission on the part of the defendant, however, I must deal with an application made by counsel for the defendant in the course of the trial to amend the Statement of Defence to show Jensen Shipping Limited and Jensen Marine Holdings Lirnited as defendants. Counsel for the defendant claimed it was his intention, when be filed his defence in July of 1985, to file it on behalf of Jensen Holdings as well as on behalf of Jensen Shipping and that he made that fact clear in paragraph 4 of the Defence which pleaded the following:

> 4.    The beneficial ownership of Defendamt vessel was sold by this Defendant to Jensen Marine Holdings Ltd. on November 1983;

> Counsel for the plaintiff opposed the application to show Jensen Holdings as a defendant on the grounds that having previously identified Jensen Shipping as the owner of the vessel Jensen Shipping was precluded from later claiming that Jensen Holdings was the owner. Counsel for the defendant Jensen Shipping appeared to be concerned that unless Jensen Holdings was made a party to the action he, as counsel for Jensen Shipping, might not be able to argue that Jensen Holdings was the owner.

> I must confess that I did not appreciate the significance of the application by counsel for Jensen Shipping at the time nor did I appreciate the significance of the opposition to the motion by counsel for the plaintiff.

> For whatever reason counsel for Jensen Shipping sometimes filed documents as solicitor for the defendant and sometimes as solicitor for the defendants. The Defence itself was filed as the "Statement of Defence of Jensen Shipping Limited" and filed by "Solicitors for the Defendants". It appears that counsel was laying the grounds for claiming either that Jensen Holdings was or was not before the Court depending on which submission would be most advantageous at the time it had to be made.

> In view of the documents filed with the Court showing the transfer of the ship from Jensen Shipping to Jensen Holdings on November 24, 1983, the fact that

counsel claims he intended to act on behalf of Jensen Holdings as well as Jensen Shipping, and the fact that the owner is named as one of the defendants, I am satisfied that Jensen Holdings is a party to the action and is represented by Barry & Associates as its solicitors.

...

While the last words used by the trial judge were somewhat equivocal, it was nevertheless clear that what was meant was that the defendants were entitled to argue that the ship was owned by Jensen Marine Holdings Ltd. The phrase "the owners and all others interested in" the ship is, I repeat, merely the manner indicated by the rules of the Court (rule 1002) to commence an action in rem, which by itself can only lead to a judgment in rem. To implead the owner so as to obtain against him a judgment in personam, a plaintiff, it seems to me, has to amend, with leave, his statement of claim, specially the style of cause thereof and the prayer for relief. On the other hand, if it must be accepted, as it seems to be in England, that by raising a defence to the action in rem on the basis of absence of liability on his part, an owner submits himself to the jurisdiction of the Court with the result that the action continues against him as an action in personam as well as in rem (see The Banco, [1971] 1 Lloyd's Rep. 49 and The August 8 (P.C.), [1983] 2 A.C. p. 450 at p. 456), it would appear to me difficult to understand that, by simply coming before the Court to reveal his ownership, without raising the issue of his personal liability, as here, an owner would automatically become a party defendant against whom judgment in personam must be entered, failing which the judgment in rem could not stand. In any event, he who prepared the appeal book should know that a change in the style of cause requires a formal order of the Court. I repeat that, in my view, no judgment in personam could have been pronounced against Jensen Marine Holdings Ltd.

* * *

My conclusion therefore is that if the judgment in rem rendered by the trial judge is not sustainable with respect to the "pre-sale jobs", it is, on the contrary, well founded with respect to all of the "post-sales invoices". I would then vary the judgment a quo so as to limit the amount to $145,582.00. I do not think an award for costs would in the circumstances be warranted.

MARCEAU J.
 MacGUIGAN J.
 DESJARDINS J.

Footnote 1

Paragraphs 22(2)(m), 22(2)(n) and subsection 43(2) read as follows:

> 22. (2) Without limiting the generality of subsection (1), it is hereby declared for greater certainty that the Trial Division has jurisdiction with respect to any claim or question arising out of one or more of the following:
>
> ...
>
> (m)  any claim in respect of goods, materials or services wherever supplied to a ship for her operation or maintenance including, without restricting the generality of the foregoing, claims in respect of stevedoring and lighterage;

(n)    any claim arising out of a contract relating to the construction, repair or equip-
        ping of a ship;

        ...

43. (2) Subject to subsection (3), the jurisdiction conferred on the Court by section
22 may be exercised in rem against the ship, aircraft or other property that is the subject
of the action, or against any proceeds of sale thereof that have been paid into court.

Footnote 3

In read thus:

3. (4) In the case of any such claim as is mentioned in paragraph (d) to (r) of subsec-
tion (1) of section one of this Act, being a claim arising in connection with a ship,
where the person who would be liable on the claim in an action in personam was, when
the cause of action arose, the owner or charterer of, or in possession or in control of, the
ship, the Admiralty jurisdiction of the High Court ... may ... be invoked by an action in
rem against -- (a) that ship if at the time when the action is brought it is beneficially
owned as respects all the shares therein by that person; or (b) any other ship which, at
the time when the action is brought, is beneficially owned as aforesaid.

Footnote 4

Addy J. could not express his views in this regard more forcefully:

"Where an owner turns over a ship to another person under a demise bare boat
charter, knowing full well that it will be sailing to foreign ports and that it will be
obliged to take on fuel and other supplies from time to time, it would seems, at
first sight, in any event, to be impractical and unnecessarily restrictive of com-
merce and of the movement of ships to expect that the suppliers in all these cases
would be required to receive prepayment in specie or to check with the actual
registered owners at or through the port of registry in whatever corner of the
world it might be, to enquire whether proper authority had been granted before
supplying that ship with the essential requirements to enable it to continue on its
voyage. Whether it be by virtue of presumed or implied authority or otherwise,
unless the supplier is put on notice or has reason to suspect that the actual owner
has forbidden the credit of the ship to be pledged, then it would seem that an ac-
tion for such necessaries might well be maintainable in rem against the ship when
its owner pro tempore, that is, the charterer by way of demise, would be respon-
sible at law for those supplies." [1985] 2 F.C. 31 at 37.

Footnote 6

In both the Canada Business Corporations Act, R.S.C. 1985, c. C-44, section 2
and the Bank Act R.S.C. 1985, c. B-1, section 2, where the expression "beneficial

owner", again translated by "veritable proprietaire", is also to be found, it is made clear there that it is used in the sense I suggest.

Elsewhere, in that Part of the Canada Shipping Act dealing with pollution, prevention and control, when it is sought to give a name to "the person having for the time being, either by law or by contract, the rights of the owner of the ship as regards the possession and use thereof" [S.C. 1987, c. 7, section 81], a special and express definition of the word "owner" is employed, rather than the addition of the qualifying term "beneficial".

Footnote 7

I have already reproduced the text of section 3(4) of the Administration of Justice Act 1956. Here is that of section 21(4) of the Supreme Court Act 1981.

21. (4) In the case of any such claim as is mentioned in section 20(2)(e) to (r), where --

(a)    the claim arises in connection with a ship; and

(b)    the person who would be liable on the claim in an action in personam ("the relevant person") was, when the cause of action arose, the owner or charterer of, or in possession or in control of, the ship,

an action in rem may (whether or not the claim gives rise to a maritime lien or that ship) be brought in the High Court against --

(i)    that ship, if at the time when the action is brought the relevant person is either the beneficial owner of that ship as respects all the shares in it or the charterer of it under a charter by demise; or

(ii)    any other ship of which, at the time when the action is brought, the relevant person is the beneficial owner as respects all the shares in it.

*Indexed as:*

# National Bank of Greece (Canada) v. Katsikonouris

**Antonio Panzera, Giuseppe Valiante, Francesco Tatta
and Andrea Barbiero, appellants;**

**v.**

**Simcoe & Erie Insurance Company, General Accident
Insurance and Balboa Insurance Company, respondents.**

**[1990] 2 S.C.R. 1029**

[1990] S.C.J. No. 95

File No.: 21341.

Supreme Court of Canada

1990: March 20 / 1990: October 4.

**Present: La Forest, L'Heureux-Dubé, Gonthier, Cory and
McLachlin JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC (105 paras.)

*Insurance -- Fire insurance -- Nature and effect of hypothecary (mortgage) clause --
Misrepresentations by hypothecary debtor when insurance policy purchased -- Whether nullity ab
initio of insurance policy can be invoked against hypothecary creditors.*

A businessman obtained a loan from appellants and hypothecated one of his properties to secure its
repayment. The hypothecary deed of loan provided that the debtor undertook to insure the
hypothecated property in favour of appellants and in fulfilment of this obligation the debtor later
purchased a fire insurance policy from respondent insurers. This policy contained a standard
mortgage clause (or standard hypothecary clause) which provided that "this insurance ... is and shall
be in force notwithstanding any act, neglect, omission or misrepresentation attributable to the
mortgagor, owner or occupant of the property insured, including transfer of interest, any vacancy or
non-occupancy, or the occupation of the property for purposes more hazardous than specified in the
description of the risk". The debtor's property was destroyed by fire and the insurers refused to pay

appellants the indemnity, alleging that the policy was void ab initio as the result of misrepresentations by the debtor when the policy was purchased. The latter allegedly did not disclose the occurrence of criminal fires on the insured premises and the refusal by the previous insurer to continue insuring the property. Relying on the mortgage clause, appellants then brought an action against the insurers for payment of the indemnity. The Superior Court allowed the action but the Court of Appeal reversed this judgment. This appeal is to determine [page1030] whether the nullity ab initio of the insurance policy, resulting from misrepresentations by the hypothecary debtor at the time the policy was purchased, can be invoked against the hypothecary creditors.

Held (L'Heureux-Dubé and Gonthier JJ. dissenting): The appeal should be allowed.

Per La Forest, Cory and McLachlin JJ.: When insuring its own interest in the property, the hypothecary debtor also assumed a mandate to take out a separate and distinct contract of insurance to insure the hypothecary creditors' interest in the hypothecated property. The insurers cannot refuse to honour this independent contract (the standard mortgage clause) with the hypothecary creditors on discovering that their contract with the hypothecary debtor was issued on the basis of misrepresentations or omissions such that it was null ab initio. The standard mortgage clause makes no distinction between acts and neglects of the hypothecary debtor committed at the inception of the policy, and acts and neglects subsequent to its formation. The clause is written in clear and untechnical language and simply states that the insurance of the hypothecary creditors will not be invalidated by any omission or misrepresentation of the hypothecary debtor. In the face of this unequivocal representation, the courts should not import interpretive subtleties where none exist. Where the contract is unambiguous, and its meaning clear, there is no occasion for construction. The insurance of the hypothecary creditors cannot, therefore, be invalidated by any act or neglect of the hypothecary debtor, be it at the inception of the policy, or subsequent to its formation. The validity of this independent contract depends solely on the course of action between the hypothecary creditors and the insurers. To hold otherwise would distort the plain and ordinary language used in the clause.

The ejusdem generis rule finds no application in the context of the standard mortgage clause. The precondition for application of the rule is not met, for in the clause under consideration the general words precede and do not follow the specific enumeration. The rationale for applying the rule is accordingly absent. Further, while the specific examples of omissions and misrepresentations found in the policy all relate to faults which the hypothecary debtor is in a position to commit only subsequent to the formation of a valid contract, these terms are found in a clause in which the insurer is enumerating faults of the hypothecary debtor which the insurer represents that it will not rely on in order to deny coverage to the hypothecary creditor. Far from intending to represent to the hypothecary creditor that only [page1031] omissions and misrepresentations committed by the hypothecary debtor after the conclusion of a valid contract will not invalidate coverage, the insurer makes it clear that even omissions and misrepresentations of this nature will not invalidate the hypothecary creditor's coverage.

Additionally, insurance contracts must be interpreted as they would be understood by the average person applying for insurance, and not as they might be perceived by persons versed in the niceties of insurance law. If the insurer were reserving to itself the right to invalidate the coverage of the hypothecary creditor as a result of some misrepresentations and omissions of the hypothecary debtor, it was incumbent on the insurer, in drafting its insurance form, to make this known in clear, express and easily intelligible terms.

Finally, while the hypothecary debtor is acting as the mandatary of the hypothecary creditor when it insures the hypothecary creditor's interest, it does not follow that any false representations made by the hypothecary debtor in effecting its mandate should be held to be those of the hypothecary creditor. The law of mandate does not operate so as to have this effect in the context of the standard mortgage clause. This inference would run counter to what must be taken to be the understanding of the parties. When a hypothecary creditor elects to insure through the medium of the standard mortgage clause, it does so on the reasonable expectation that its interest will be protected in the same way as if it had entered into an independent contract evidenced by a separate piece of paper, and nothing in the wording of the clause supports the conclusion that the insurer is proceeding on any other understanding. To make the insurance of the hypothecary creditor dependent to a certain degree on the course of dealings between the hypothecary debtor and the insurer would strike at the very raison d'être of the standard mortgage clause.

Per L'Heureux-Dubé and Gonthier JJ. (dissenting): The insurance clause in the hypothecary loan contract is a contract of mandate, by which the hypothecary debtor undertakes to insure the hypothecated property on behalf of his hypothecary creditor. In accordance with that mandate, the hypothecary debtor purchased an insurance policy containing a standard mortgage clause. That policy thus sets out two separate insurance contracts, one between the hypothecary debtor and the insurers, and the other between the hypothecary creditors and the insurers. However, the hypothecary debtor's insurance contract is void ab initio because of the latter's misrepresentations when the policy was purchased. Since the debtor was acting in accordance with his mandate by purchasing the hypothecary creditors' [page1032] insurance contract, the misrepresentations he made at that time must be regarded, for the purposes of considering the validity of this contract, as misrepresentations made by the hypothecary creditors themselves. These misrepresentations have, as to the insurance contract between the hypothecary creditors and the insurers, consequences similar to those produced on the hypothecary debtor's personal insurance contract. They have the effect of misrepresenting the risk to the insurers and thereby of vitiating their consent to the insurance contract purchased for the hypothecary creditors, in the same way as these misrepresentations vitiated the insurers' consent to the hypothecary debtor's insurance contract. The insurance contract between the insurers and the hypothecary creditors is thus also void ab initio.

Analysis of the language of the mortgage clause and its context indicate that the nullity ab initio of the insurance contract as a consequence of misrepresentation by the hypothecary debtor when the contract is purchased can be invoked against the hypothecary creditors. The examples given in the clause are not exhaustive but clearly indicate the type of act the parties intended to include in the

expression "act, neglect, omission or misrepresentation". All these examples are a homogeneous group having as their common feature occurrence after the purchase of the policy. By application of the rule of interpretation noscitur a sociis or the ejusdem generis rule, we must therefore conclude that only misrepresentations subsequent to purchase are covered by the mortgage clause. Further, the insurance contract, like any other contract, rests on the presumed good faith of the parties. If the parties wished to cover the risk concerned here, they should have done so in clear and express language, which is not the case in the mortgage clause at issue here.

## Cases Cited

By La Forest J.

Followed:  Hastings v. Westchester Fire Insurance Co., 73 N.Y. 141 (1878); Syndicate Ins. Co. v. Bohn, 65 F. 165 (1894); Caisse populaire des Deux Rives v. Société mutuelle d'assurance contre l'incendie de la Vallée du Richelieu, [1990] 2 S.C.R. 995; not followed:  Imperial Building & Loan Ass'n v. Aetna Ins. Co., 166 S.E. 841 (1932); Hanover Fire Ins. Co. v. National Exchange Bank, 34 S.W. 333 (1896); Omnium Securities Co. v. Canada Fire and Mutual Insurance Co. (1882), 1 O.R. 494; Chenier v. Madill (1973), 2 O.R. (2d) 361; distinguished:  Liverpool and London and Globe Insurance Co. v. Agricultural Savings and Loan Co. (1903), 33 S.C.R. 94; referred to:  [page1033] London and Midland General Insurance Co. v. Bonser, [1973] S.C.R. 10; Madill v. Lirette, [1987] R.J.Q. 993; Thames and Mersey Marine Insurance Co. v. Hamilton, Fraser & Co. (1887), 12 App. Cas. 484; Renault v. Bell Asbestos Mines Ltd., [1980] C.A. 370; Scott v. Wawanesa Mutual Insurance Co., [1989] 1 S.C.R. 1445; Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888.

By L'Heureux-Dubé J. (dissenting)

Caisse populaire des Deux Rives v. Société mutuelle d'assurance contre l'incendie de la Vallée du Richelieu, [1990] 2 S.C.R. 995, aff'g [1988] R.J.Q. 2355 (C.A.); Madill v. Lirette, [1987] R.J.Q. 993 (C.A.), rev'g [1982] C.S. 49 (sub nom. Great American Insurance Co. v. Lirette); Hastings v. Westchester Fire Insurance Co., 73 N.Y. 141 (1878); Syndicate Ins. Co. v. Bohn, 65 F. 165 (1894); Reed v. Firemen's Insurance Co. of Newark, 35 L.R.A. (N.S.) 343 (1911); Federal Land Bank of Columbia v. Atlas Assur. Co., 125 S.E. 631 (1924); Collins v. Michigan Commercial Underwriters, 6 Tenn. App. 528 (1928); Fayetteville Building & Loan Ass'n v. Mutual Fire Ins. Co. of West Virginia, 141 S.E. 634 (1928); National Union Fire Ins. Co. v. Short, 32 F.2d 631 (1929); Stockton v. Atlantic Fire Ins. Co., 175 S.E. 695 (1934); National Fire Ins. Co. of Hartford, Conn. v. Dallas Joint Stock Land Bank of Dallas, 50 P.2d 326 (1935); Western Assur. Co. v. Hughes, 66 P.2d 1056 (1937); Great American Insurance Co. of New York v. Southwestern Finance Co., 297 P.2d 403 (1956); Northwestern National Insurance Co. v. Mildenberger, 359 S.W.2d 380 (1962); Equality Savings and Loan Association v. Missouri Property Insurance Placement Facility, 537 S.W.2d 440 (1976); Meade v. North Country Co-Operative Insurance Co., 487 N.Y.S.2d 983 (1985); Hanover Fire Ins. Co. v. National Exchange Bank, 34 S.W. 333 (1896); Graham v. Fireman's Insurance Co.,

87 N.Y. 69 (1881); Young Men's Lyceum of Tarrytown v. National Ben Franklin Fire Ins. Co. of Pittsburg, 163 N.Y.S. 226 (1917); Imperial Building & Loan Ass'n v. Aetna Ins. Co., 166 S.E. 841 (1932); Omnium Securities Co. v. Canada Fire and Mutual Insurance Co. (1882), 1 O.R. 494; Liverpool and London and Globe Insurance Co. v. Agricultural Savings and Loan Co. (1903), 33 S.C.R. 94; Chenier v. Madill (1973), 2 O.R. (2d) 361; Canadian Imperial Bank of Commerce v. Dominion of Canada General Insurance Co. (1987), 29 C.C.L.I. 313; Renault v. Bell Asbestos Mines Ltd., [1980] C.A. 370; Duchesneau v. Great American Insurance Co., [1955] Que. Q.B. 120; Amin v. Cie d'assurance American Home, [1989] R.R.A. 151; Veilleux v. Victoria Insurance Co., [1989] R.J.Q. 1075.


[page1034]


## Statutes and Regulations Cited

Civil Code of Lower Canada [am. 1974, c. 70, s. 2], arts. 1024, 1727, 2485 [am. 1979, c. 33, s. 44], 2486 [am. idem, s. 45], 2487, 2499, 2510 to 2515, 2566 [am. idem, s. 48], 2572, 2573.

## Authors Cited

American Jurisprudence, vol. 43, 2nd ed.  Rochester, N.Y.:  Lawyers Co-operative Publishing Co., 1982.

Bergeron, Jean-Guy.  "L'opposabilité des exceptions à différents intéressés dans un contrat d'assurance" (1987), 47 R. du B. 933.

Bouzat, Pierre.  "De la clause par laquelle une partie dans une convention s'engage à ne pas en demander la nullité" (1934), 54 Rev. crit. lég. et jur. 350.

Concise Oxford Dictionary, 7th ed.  By J. B. Sykes. Oxford:  Clarendon Press, 1982, "include".

Côté, Pierre-André.  The Interpretation of Legislation in Canada.  Cowansville:  Yvon Blais Inc., 1984.

Couch, George J.  Cyclopedia of Insurance Law, vol. 10A, 2nd ed.  By Ronald A. Anderson. Revised volume by Mark S. Rhodes.  Rochester, N.Y.:  Lawyers Co-operative Publishing Co., 1982.

Domenget, M.  Du mandat, de la commission et de la gestion d'affaires, t. 1.  Paris:  Cotillon, 1862.

Driedger, Elmer A.  Construction of Statutes, 2nd ed. Toronto:  Butterworths, 1983.

Dwyer, James R. and Carey S. Barney.  "Analysis of Standard Mortgage Clause and Selected Provisions of the New York Standard Fire Policy" (1984), 19 Forum 639.

Encyclopédie juridique Dalloz:  Répertoire de droit civil, t. 5, 2e éd.  "Mandat", par René Rodière.

Faribault, Bernard.  "Du papillon à la chrysalide ou l'étrange métamorphose de l'assurance de responsabilité" (1987), 55 Assurances 300.

Petit Robert 1.  Par Paul Robert.  Paris:  Le Robert, 1987, "notamment".

Picard, Maurice et André Besson.  Traité général des assurances terrestres en droit français, t. 2.

Paris:  L.G.D.J., 1940.

Simard Jr., François-Xavier.  "La faute intentionnelle de l'assuré et la clause de garantie hypothécaire" (1987), 21 R.J.T. 335.

Stroud's Judicial Dictionary, vol. 3, 5th ed.  By John S. James.  London:  Sweet & Maxwell, 1986, "include", "including".


APPEAL from a judgment of the Quebec Court of Appeal, [1989] R.D.I. 46, [1989] R.R.A. 145, 20 Q.A.C. 226, 36 C.C.L.I. 296, reversing a judgment of the Superior Court, [1985] C.S. 1263, 16 C.C.L.I. 126. Appeal allowed, L'Heureux-Dubé and Gonthier JJ. dissenting.


[page1035]


Jacques Fournier, for the appellants.

Émile Colas, Q.C., for the respondents.

[Quicklaw note: Please see complete list of solicitors appended at the end of the judgment.]

---

The judgment of La Forest, Cory and McLachlin JJ. was delivered by

**1**    **LA FOREST J.**:-- I have had the advantage of reading the reasons of my colleague, Justice L'Heureux-Dubé. She has fully set forth the facts and judicial history of the case, and I need not repeat them. However, I am unable, with respect, to agree with her conclusions for the reasons that follow.

**2**    In its decision in Caisse populaire des Deux Rives v. Société mutuelle d'assurance contre l'incendie de la Vallée du Richelieu, [1990] 2 S.C.R. 995 (hereinafter Caisse populaire), issued concurrently, this Court elaborated an explanation for the operation of the standard mortgage clause in light of civil law principles. For ease of reference, I set out the French and English versions of the clause as it appears in the policy issued by the respondent insurers:

IT IS HEREBY PROVIDED AND AGREED THAT:


1.    This insurance and every documented renewal thereof -- AS TO THE INTEREST OF THE MORTGAGEE ONLY THEREIN -- is and shall be in force notwithstanding any act, neglect, omission or misrepresentation

attributable to the mortgagor, owner or occupant of the property insured, including transfer of interest, any vacancy or non-occupancy, or the occupation of the property for purposes more hazardous than specified in the description of the risk.

VIOLATIONS DU CONTRAT

Ne sont pas opposables aux créanciers hypothécaires les actes, négligences ou déclarations des propriétaires, locataires ou occupants des biens assurés, notamment en ce qui concerne les transferts d'intérêts, la vacance ou l'inoccupation, ou l'affectation des lieux à des fins plus dangereuses que celles déclarées.

The clause, which with variations is used throughout North America, was obviously intended to have the same effect in both common law and civil law jurisdictions and reference will be made to cases arising under both judicial systems. To avoid terminological confusion, I have, consistently with the clause itself, used the word "mortgage" and related expressions in the English version of these [page1036] reasons to include "hypothec" and related concepts.

**3** In Caisse populaire, the Court held that the hypothecary debtor (or the mortgagor), when insuring its own interest in the property, also assumes a mandate to take out a separate and distinct contract of insurance to insure the hypothecary creditor's (or the mortgagee's) interest in the mortgaged property. This appeal now raises the important question whether the insurer can refuse to honour this independent contract with the hypothecary creditor or mortgagee on discovering that its contract with the hypothecary debtor or mortgagor was issued on the basis of misrepresentations or omissions such that it was null ab initio. Unlike my colleague, I am of the view that both the nature and the language of the standard mortgage clause, as well as compelling considerations of history and policy, militate against this conclusion.

The Nature and Interpretation of the Mortgage Clause

**4** In her reasons in Caisse populaire, at p. 1021, L'Heureux-Dubé J. has drawn attention to the fact that the civil law explanation for the operation of the standard mortgage clause harmonizes with the interpretation that has emerged in the common law jurisprudence. My colleague has pointed out that the standard mortgage clause was first used in the United States. A review of the American authorities reveals an all but universal consensus to the effect that this clause evidences an independent contract between the insurer and the mortgagee. My colleague has also noted that the "two contract" theory is now well anchored in Canadian jurisprudence. Notably, in London and Midland General Insurance Co. v. Bonser, [1973] S.C.R. 10, a common law decision, this Court expressed approval of the two contract theory, and several recent lower court decisions have also adopted this approach to the operation of the standard mortgage clause; see Caisse populaire, at p.

1019-20.

[page1037]

**5**    It should also be noted that the American jurisprudence dealing with the narrow issue raised by this appeal is all but unanimous in concluding that by virtue of the two contract theory, the insurance of the mortgagee cannot be invalidated by any act or neglect of the mortgagor, be it at the inception of the policy, or subsequent to its formation; see Couch, Couch on Insurance (2nd ed. 1982), vol. 10A, para. 42:736. Thus the overwhelming majority of the decisions are in essential agreement with an interpretation of the clause that would seem to have first emerged in the decision of the New York Court of Appeal in Hastings v. Westchester Fire Insurance Co., 73 N.Y. 141 (1878). There Rapallo J. stated the following, at p. 153:

> To hold otherwise would, I think, defeat the purpose intended, and deprive the mortgagees of the protection upon which they had a right to rely. Although the clause might be construed so as to exempt the mortgagees from the consequences only of acts of the owners done after the making of the agreement, I do not think, in view of its apparent purpose, that any such distinction was intended.

I note that my colleague who cites a plethora of decisions that have followed the lead taken in Hastings can point to no decision since Imperial Building & Loan Ass'n v. Aetna Ins. Co., 166 S.E. 841 (W. Va. 1932), rejecting that approach.

**6**    As I view the matter, the contrary interpretation, which is to the effect that the clause only protects the mortgagee or hypothecary creditor from faults of the mortgagor or hypothecary debtor after the inception of a valid contract between the mortgagor and the insurer distorts the plain and ordinary language used in the standard clause.

**7**    In Syndicate Ins. Co. v. Bohn, 65 F. 165 (1894), the Eighth Circuit of the United States Court of Appeal was called on to interpret a standard mortgage clause that read "this insurance, as to the interests of the ... mortgagee ... only, shall not be invalidated by any act or neglect of the mortgagor or owner of the property insured", a text which is [page1038] essentially of the same character as that in issue here. I find myself in full agreement with the analysis of Sanborn Cir. J. who concluded, at pp. 176-77:

> Was it that contract that the indemnity of the mortgagee should not be protected against any prior act or negligence of the mortgagors? There is no such restriction in the contract. It provides that the mortgagee's interest shall not be invalidated by any act or neglect of the mortgagors, by any occupancy or vacancy, or by any change of title or possession of the premises, provided that

> the mortgagee shall notify the insurance company of any change of ownership or
> increase of hazard that may come to its knowledge, shall have permission
> therefor indorsed on the policy, and shall pay for it... . What apter terms could be
> chosen to effect a separate insurance on the interest of the mortgagee, to free that
> insurance from any possible influence of any act or neglect of the mortgagors,
> and to make it dependent solely on the course of action of the mortgagee and the
> insurance company? None occur to us. [Emphasis added.]

**8**    These comments remind one that it is important in interpreting a contract of insurance to give
words their ordinary meanings. In the version of the standard mortgage clause under consideration
here, no distinction is made between the "act", "neglect", "omission" or "misrepresentation" that a
mortgagor might commit. The clause merely states, in simple and untechnical language, that the
insurance, as to the interest of the mortgagee, is and shall be in force notwithstanding any act,
neglect, omission or misrepresentation committed by the mortgagor. Given this unequivocal
representation, it is unclear to me on what grounds one may seek to limit the application of the word
"any", which, of course, is commonly understood as meaning "no matter which". I respectfully
share the conclusion of the trial judge, Lamb J., who stated:

> The express renunciation of the insurers must therefore be read as intending to
> refer to absolute as well as [page1039] relative nullity, in the absence of any
> words imposing a restrictive distinction between the two.

> ([1985] C.S. 1263, at p. 1269.)

**9**    The Court of Appeal, [1989] R.D.I. 46, relying in great part on its earlier decision in Madill v.
Lirette, [1987] R.J.Q. 993, downplayed the fact that the clause does not expressly distinguish
between the "act", "neglect", "omission" or "misrepresentation". It accorded great importance to the
fact that the omissions and misrepresentations specifically mentioned in the clause all relate to acts
which the mortgagor is only in a position to commit following the inception of a valid contract. As
put by Desmeules J. (ad hoc), at p. 50:

> [TRANSLATION] The wording of the present hypothecary (mortgage)
> clause, in effect since 1972, refers to certain situations such as transfers of
> interest, vacancy or non-occupancy or the occupation of the property for
> purposes more hazardous than those specified, and it subjects creditors to an
> obligation to inform the insurer as soon as they are aware of such situations.

> These events are subsequent to the issuing of the insurance policy, and this
> leads me to conclude that it is such situations that the insurers sought to provide
> for in their hypothecary (mortgage) clause.

In his concurring judgment, Beauregard J.A. added, at p. 47:

> [TRANSLATION] Despite the use of the adverb "including", by application of the "rule" of interpretation noscitur a sociis or the ejusdem generis rule, we must conclude that "any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured" is an "act, neglect, omission or misrepresentation" which took place or was made after the policy was issued, just as "transfer of interest, vacancy or non-occupancy or the occupation of the property for purposes more hazardous than those specified".

**10**    I am unable to agree with the Court of Appeal's view that it is clear, by application of the ejusdem generis rule, that the reference in the clause to "omission[s] or misrepresentation[s]" is to be taken as limited to omissions and misrepresentations subsequent to the inception of the policy. I am of the view that this rule of construction finds [page1040] no application in the context of the standard mortgage clause.

**11**    At page 111 of his book Construction of Statutes (2nd ed. 1983), Professor Driedger points to the definition of the rule given by Lord Halsbury L.C. in Thames and Mersey Marine Insurance Co. v. Hamilton, Fraser & Co. (1887), 12 App. Cas. 484, at p. 490. Lord Halsbury L.C. observes that the rule is predicated on the notion that "general words may be restricted to the same genus as the specific words that precede them". I would also cite from an illustration of the working of the rule provided by Professor Côté in The Interpretation of Legislation in Canada (1984), at p. 243. Professor Côté quotes from the observations of Turgeon J.A. in Renault v. Bell Asbestos Mines Ltd., [1980] C.A. 370, at p. 372. The remarks are to the same effect as those of Lord Halsbury L.C., though I would draw attention to Turgeon J.A.'s important observation:

> [TRANSLATION] In other words, for the rule to apply it is absolutely necessary that there be a class or category preceding the general terms, if the intent is to limit them to that class or category. [Emphasis added.]

**12**    Here, of course, this precondition for application of the rule is not met, for in the clause under consideration the general words precede and do not follow the specific enumeration. The clause states that coverage as to the interest of the mortgagee is valid notwithstanding "omission[s] or misrepresentation[s]", and then provides illustrative examples of such omissions and misrepresentations. The rationale for applying the ejusdem generis rule is accordingly absent. Whatever the particular document one is construing, when one finds a clause that sets out a list of specific words followed by a general term, it will normally be appropriate to limit the general term to the genus of the narrow enumeration that precedes it. But it would be illogical to proceed in the same manner when a general term precedes an enumeration of specific examples. In this situation, it is logical to infer that the purpose of providing specific examples from within a broad general category is to remove any ambiguity as to whether those [page1041] examples are in fact included

in the category. It would defeat the intention of the person drafting the document if one were to view the specific illustrations as an exhaustive definition of the larger category of which they form a part.

**13**    Moreover, in this instance, the very language used to introduce the list of omissions and misrepresentations confirms that it would be erroneous to view them as exhaustive. In the English version of the clause, the term "including" precedes the list of examples of omissions and misrepresentations, while the term "notamment" is used in the French text. I note that the Concise Oxford Dictionary (7th ed. 1982) defines "include" as "comprise or embrace (thing etc.) as part of a whole", while the Petit Robert 1 (1987) says of "notamment" that it "sert le plus souvent à attirer l'attention sur un ou plusieurs objets particuliers faisant partie d'un ensemble précédemment désigné ou sous-entendu". This meaning finds confirmation in legal lexicons as well: the entries under "include" and "including" in Stroud's Judicial Dictionary (5th ed. 1986) to take but one example, again make it clear that these words are terms of extension, designed to enlarge the meaning of preceding words, and, not, to limit them.

**14**    As I have noted, the natural inference is that the drafter will provide a specific illustration of a subset of a given category of things in order to make it clear that that category extends to things that might otherwise be expected to fall outside it. As I see it, it is precisely this reasoning which explains the reference to specific omissions and misrepresentations in the standard mortgage clause. The Court of Appeal was correct in pointing out that the specific examples of omissions and misrepresentations found in the policy all relate to faults which the mortgagor is in a position to commit only subsequent to the formation of a valid contract. It is important to bear in mind, however, that these terms are found in a clause in which the insurer is enumerating faults of the mortgagor which the insurer represents that it will not rely on in order to deny coverage to the mortgagee. When due account is taken of this fact, it becomes apparent that the insurer, far from intending to [page1042] represent to the mortgagee that only omissions and misrepresentations committed by the mortgagor after the conclusion of a valid contract will not invalidate coverage, is, instead, at pains to make it clear that even omissions and misrepresentations of this nature will not invalidate the mortgagee's coverage. For from the perspective of the insurer by far the greater risk is posed precisely by omissions and misrepresentations the mortgagor may commit after a validly formed contract is entered into. In his article "L'opposabilité des exceptions à différents intéressés dans un contrat d'assurance" (1987), 47 R. du B. 933, Professor Bergeron puts the matter convincingly when he argues, at p. 988:

> [TRANSLATION] When one reflects carefully about it, one realizes that there is in this list one exception, the transfer of interest, which is of much greater concern to the insurer than nullity for misrepresentation. In the first case the assignee is a new insured, unknown to the insurer, about whom he has been unable to make any inquiries in order to determine the risk. It is thus all the more reasonable that misrepresentations by an insured from whom the insurer has had an opportunity of obtaining all relevant information cannot be pleaded.

[Emphasis in original.]

**15**     The same could, of course, be said with respect to the occupation of the property for purposes more hazardous than specified in the description of the risk. If the mortgagor concludes a valid contract and then, unbeknownst to the insurer, transforms the property into a depository for flammable liquids, an omission to convey this change in the vocation of the property may be infinitely more prejudicial to the insurer than a simple misrepresentation at the time of concluding the contract.

**16**     In the result, considerations of a practical commercial nature militate strongly against the interpretation advanced by the Court of Appeal. It defies rational explanation to suppose that the insurer would agree not to invalidate coverage of the mortgagee with respect to the very omissions and misrepresentations of the mortgagor that stand to affect most radically the risk it has agreed to assume, while at the same time reserving to itself the right to invalidate coverage in respect of the omissions and misrepresentations it had a [page1043] reasonable opportunity to investigate before agreeing to issue a policy.

**17**     I respectfully conclude therefore that the Court of Appeal has misconstrued the reference to specific omissions and misrepresentations in the standard mortgage clause. The interpretation of the Court of Appeal ignores commercial practicalities, and gives a strained and unnatural meaning to the language used.

**18**     Additionally, I am of the view that to adopt the interpretation of the Court of Appeal would be to ignore the well-recognized principle that it is necessary to interpret insurance contracts as they would be understood by the average person applying for insurance, and not as they might be perceived by persons versed in the niceties of insurance law. I have elaborated (in dissent) on this principle in Scott v. Wawanesa Mutual Insurance Co., [1989] 1 S.C.R. 1445, at pp. 1454-55. Here, in the absence of clear and explicit language pointing to a different meaning in the policy itself, I am at a loss to see how mortgagee purchasers of fire insurance, on reading that their coverage will not be denied for "any" misrepresentations or omissions of their mortgagor, could be expected to do other than take this statement at face value. If, in fact, the insurer were reserving to itself the right to invalidate the coverage of the mortgagee as a result of some misrepresentations and omissions of the mortgagor (i.e., those made at the inception of the contract between the insurer and the mortgagor), I would hold that it was incumbent on the insurer, in drafting its insurance form, to make this known in clear, express and easily intelligible terms. It can hardly be expected that a mortgagee deduce, on the basis of the type of subtle analysis engaged in by the Court of Appeal, that the insurer, despite expressly saying that coverage will not be denied for "any" omissions and misrepresentations of the mortgagor, has, in fact, meant to say that coverage will not be denied for "some" omissions and misrepresentations.

**19**     In short, there is little mystery to me why the overwhelming majority of the American decisions [page1044] reject the notion that the standard mortgage clause makes a distinction

between acts and neglects of the mortgagor committed at the inception of the policy, and acts and neglects subsequent to its formation. The standard mortgage clause is written in clear and untechnical language and simply states that the insurance of the mortgagee will not be invalidated because of anything the mortgagor might do. As I see it, in the face of this unequivocal representation, the courts have shied from importing interpretive subtleties where none exist. In a word, the American courts have applied the principle that where the contract is unambiguous, and its meaning clear, there is no occasion for construction; see 43 Am. Jur. 2d Insurance para. 271 (1982).

**20**    It is true that the clause under consideration here differs somewhat from that which was the object of consideration in the American decisions. But when one looks to the substance of the differences, I conclude that they, if anything, only reinforce the case for adopting the interpretation of the standard mortgage clause advanced in the overwhelming majority of the American decisions.

**21**    For ease of comparison, I set out first the relevant portion of the American clause:

> ... and this insurance shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property ...

and, once again, its counterpart in use in Canada:

> IT IS HEREBY PROVIDED AND AGREED THAT:

> 1.    This insurance and every documented renewal thereof -- AS TO THE INTEREST OF THE MORTGAGEE ONLY THEREIN -- is and shall be in force notwithstanding any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured, including transfer of interest, any vacancy or non-occupancy, or the occupation of the property for purposes more hazardous than specified in the description of the risk.

> VIOLATIONS DU CONTRAT

> Ne sont pas opposables aux créanciers hypothécaires les actes, négligences ou déclarations des propriétaires, locataires ou occupants des biens assurés, notamment en ce qui concerne les transferts d'intérêts, la vacance ou [page1045] l'inoccupation, ou l'affectation des lieux à des fins plus dangereuses que celles déclarées.

**22**    It is clear that the substance of the difference between the Canadian and American versions of

the clause lies in the fact that the text used in Canada incorporates a distinct and pointed reference to "omission" and "misrepresentation" of the mortgagor, over and above the mention of "act" and "neglect".

**23**    I have already drawn attention to the fact that there is today all but unanimous agreement in the American decisions that a mortgagee insuring its interest through the medium of the standard mortgage clause will not be denied coverage because of anything that its mortgagor may do, be it at the inception of the contract or subsequent to its formation. It is clear, therefore, that the American courts have proceeded on the basis that the terms "act" and "neglect" in the clause include breaches of warranty or fraudulent concealments mortgagors may commit on taking out their policy. I am firmly of the view that that particular interpretation is sound given the wide sweep of the words used in the clause. It is difficult to understand on what basis one could argue that an omission or misrepresentation is not included within the meaning of the open-ended terms "act" and "neglect". But whatever view one might hold on the matter, the effect of the additions in the clause in question here make the issue moot, for in that clause the insurer has expressly undertaken not to refuse coverage on the basis of any omission or misrepresentation of the mortgagor. In effect, the additions in the Canadian version of the clause make all the more compelling the case for following the lead of the American courts and concluding that by virtue of the standard mortgage clause the insurer is representing to the mortgagee that the contract between them is meant to be unaffected by anything the mortgagor might do before or after the inception of the policies. It would be paradoxical indeed if one were to compare the Canadian and American versions of the clause and then conclude that, here, the insurer is in fact cutting down on the scope of the protection afforded the mortgagee because it has added terms that explicitly expand [page1046] on the list of actions of the mortgagor that will not invalidate the insurance of the mortgagee.

**24**    In summary, when the standard mortgage clause is interpreted in the light of the settled principles that govern the construction of insurance contracts, there can be no doubt that the insurer, by virtue of this clause, is representing to the mortgagee that a separate and distinct contract exists between them, and that the validity of this independent contract depends solely on the course of action between the mortgagee and the insurer. Moreover, even if the language of the clause was ambiguous, art. 2499 C.C.L.C. reminds us that it would be necessary to resolve this ambiguity against the insurer. No mortgagee would wish that the validity of its "separate and distinct" contract with the insurer rest on the question whether its mortgagor dealt in good faith in effecting coverage on its (the mortgagor's) insurable interest. From the perspective of the mortgagee, this would stand to defeat the very purpose of relying on the standard mortgage clause in the first place.

**25**    I therefore conclude that to adopt the interpretation of the standard mortgage clause proposed by the Court of Appeal would turn the clause into a sort of trap for the mortgagee. By ostensibly holding out to the mortgagee that the validity of its insurance contract was unaffected by the course of action between the mortgagor and the insurer, the clause would induce the mortgagee to rely on the standard mortgage clause, only to belie this expectation if a loss occurred and the insurer discovered that the mortgagor had, in fact, made a misrepresentation when effecting its policy. I

alluded in Scott v. Wawanesa Mutual Insurance Co., supra, at p. 1459, to the burden that rests on an insurer when it is offering insurance on terms that can reasonably be supposed to defeat the very objective of the coverage sought by the purchaser of insurance. By application of this principle it is clear that the insurer has, in this instance, failed to use the requisite degree of clarity if it has indeed [page1047] wished to represent to the mortgagees who choose to rely on the standard mortgage clause that their coverage was in fact subject to defeat, in certain circumstances, solely because of the acts of the mortgagor.

The Historical Record

**26**     I turn next to a consideration of other factors that militate against the conclusion that the insurer may deny recovery to a mortgagee who has insured his interest through the medium of the standard mortgage clause solely because of the course of action of the mortgagor. I begin with a brief historical overview of the development of the standard mortgage clause, and a consideration of early judicial reaction to it.

**27**     As my colleague has noted, insurance companies would seem to have first incorporated the standard mortgage clause into their policies in the State of New York in the 1860s. Since that time, the clause has become, as its name reflects, the standard vehicle by which mortgagees insure their interest in encumbered property. However, it is important for present purposes to bear in mind that the standard mortgage clause, in gaining this ascendancy, eclipsed the use of what is known as the "loss payable" or "open mortgage" clause. As explained in Couch, op. cit., para. 42:702, by the terms of the latter clause, no privity of contract exists between the insurer and the mortgagee: the mortgagee is simply designated as the person who is to be paid in the case of a loss. In the result, there is an almost universal consensus in the authorities that the mortgagee, as a simple beneficiary, can recover solely on the same terms as the mortgagor. Accordingly, if the mortgagor is precluded from recovering on the policy by reason of a breach of its conditions, this breach will also preclude recovery on the part of the mortgagee.

[page1048]

**28**     It is precisely this feature of the "loss payable" or "open mortgage" clause that determined its fall into desuetude. As explained by Dwyer and Barney in their study entitled "Analysis of Standard Mortgage Clause and Selected Provisions of the New York Standard Fire Policy" (1984), 19 Forum 639, at p. 640:

> Because the loss payable clause did not adequately protect the mortgagee's interest in insured property, use of the standard or union mortgage clause became more prevalent over time. In contrast to the simple loss payable clause, the standard mortgage clause generally has been construed by the courts as a separate insurance contract between the insurer and mortgagee. The most

important consequence of interpreting the standard mortgage clause as independent insurance of the mortgagee's interest is that a mortgagee protected by this clause, in contrast to a mortgagee named in a loss payable clause, will not be denied recovery under a fire insurance policy solely because of the acts of the mortgagor.

29    The two clauses are clearly creatures of a different stripe, and it was only to be expected that a period of transition would be required before it was universally appreciated that under the new clause the mortgagee could no longer be equated to a simple beneficiary of the mortgagor. A reading of early judicial reaction to the clause confirms this. Hanover Fire Ins. Co. v. National Exchange Bank, 34 S.W. 333 (Tex. Civ. App. 1896), the decision which may be regarded as the fountainhead of the meagre line of authority rejecting the view advanced in Hastings, supra, provides a convenient example of the difficulties encountered by the courts in their efforts to come to terms with the purpose of the standard mortgage clause, and to appreciate the salient difference between it and the "loss payable" clause. The following excerpts from the decision leaves no doubt that the court essentially viewed the standard mortgage clause in the same manner as a "loss payable" clause, and was unwilling to accept that the standard mortgage clause is itself a vehicle by which the mortgagee obtains a separate and distinct contract of [page1049] insurance with the insurer. Thus, at p. 334, Lightfoot C.J. says:

> The doctrine is well established in this state that A., for a consideration paid by him, may make a contract with B., for the benefit of C., and the latter will have a right of action to enforce it. [...] But, if the contract was obtained by a fraudulent device of A., the person for whose benefit he fraudulently obtained it can gain no higher right than A. held, and, if the contract is void as to him, it is void as to his beneficiary.

30    At page 335, Lightfoot C.J. goes on to make this revealing concession:

> We can readily see that a difference might arise in a case where the mortgage company, on its own behalf and for a separate consideration, procures a policy of insurance for its own benefit, unaffected by any act or concealment on the part of the owner of the property.

31    An examination of the early Canadian decisions also reveals that the courts remained fettered by the traditional view of the mortgagee as beneficiary of the mortgagor. Thus in one of the earliest Canadian decisions dealing with the problem of the nullity ab initio of the mortgagor's contract, Omnium Securities Co. v. Canada Fire and Mutual Insurance Co. (1882), 1 O.R. 494, the Ontario Court of Queen's Bench expressly repudiated the two contract theory as an explanation for the working of the standard mortgage clause, and again chose to view the mortgagee as a beneficiary of the mortgagor. Thus, at p. 496, Hagarty C.J. said:

> It remains to consider the very serious question whether the defendants

have the right to prove that the policy was obtained by fraud on [the mortgagor's] part. I must consider it as his insurance of his own interest, and although he makes the loss payable to the mortgagees, it does not thereby become the insurance of a mere mortgage interest.

Plaintiffs contend that the effect of the agreement between the parties by this subrogation clause, to which [the mortgagor] was no party, was in effect a new [page1050] insurance as between them and the underwriters, and that the latter conclusively adopt and confirm it as such, irrespective of any fraud committed by [the mortgagor]. I do not think that the subsequent clause strengthens that view.

Without entering into that not very clear subject of "subrogation," we may treat it on the intelligible ground of a special bargain made, after [the mortgagor] had insured his premises, with his mortgagees, to whom he had made the loss payable.

**32**    In Liverpool and London and Globe Insurance Co. v. Agricultural Savings and Loan Co. (1903), 33 S.C.R. 94, this Court was called on to deal with another instance where, as in this appeal, the contract with the mortgagor was found to be void ab initio. As pointed out by my colleague at p. 1018-19 of her reasons in Caisse populaire, although the Court of Appeal had affirmed that the standard mortgage clause evidenced a separate contract between the insurer and the mortgagee, this Court evinced a reluctance to enter into a detailed examination of the workings of the clause. This is particularly clear in the following obiter remarks of Davies J., at p. 110:

I have already stated that it is not necessary on this appeal for us to determine, and we do not determine, whether such a mortgage clause as was inserted in this policy gave the mortgagees such a beneficial right and interest or constituted such a direct contract between the mortgagees and the insurance company as would enable the former to sue in their own name alone and irrespective of [the mortgagor]. But we are all of the opinion that whether there was or was not such a direct contract, it did not cover or relate to the statements or omissions made by the applicant, [the mortgagor], in his application for insurance ... .

**33**    Given that the Court decided the matter before it on other grounds, and expressly declined to consider the implications that flow from viewing the mortgage clause as providing for a separate and distinct contract between the mortgagee and the insurer, as opposed to making the mortgagee a simple beneficiary of the mortgagor, this decision becomes essentially irrelevant for present purposes. This Court first in London and Midland General Insurance Co. v. Bonser, supra,

[page1051] and then in Caisse populaire has expressed approval of the two contract theory as an explanation for the operation of the standard mortgage clause. Faced now with the problem of sounding out the consequences that flow from its adoption of that viewpoint, the Court is accordingly called on to deal with the very question it declined to consider in Liverpool and London, supra.

**34**    Turning from this consideration of the conceptual difficulties encountered by the courts in early attempts to understand the nature of the standard mortgage clause, I would observe that a historical overview of the introduction of the standard mortgage clause makes it clear that it became an all but universal feature of fire insurance policies precisely because it was perceived as providing for the creation of a separate and independent contract of insurance between the mortgagee and the insurer. To borrow the formulation of Sanborn Cir. J. in Syndicate Insurance Co. v. Bohn, supra, at p. 178, mortgagees renounced the use of the "loss payable" clause and elected to rely on the standard mortgage clause because that clause was perceived as constituting a representation by the insurer to the mortgagee that its interests were insured in a separate contract from those of the mortgagor, that the mortgagee's insurance was dependent for its validity solely upon the course of action of the insurance company and the mortgagee, and thus unaffected by any act or neglect of the mortgagor of which the mortgagee is ignorant.

The Advantages to the Use of the Standard Mortgage Clause

**35**    The advantages to all parties in insuring through the medium of the standard mortgage clause are obvious. First, it saves time and hence money. The underwriter need not issue two separate policies: by the simple expedient of the standard mortgage clause the insurer represents to the mortgagee that [page1052] the one policy it issues in favour of the mortgagor in fact evidences two separate contracts, that between the mortgagee and the insurer being "engrafted" on that between the mortgagor and the insurer, to borrow the apt term found in Couch, op. cit., para. 42:728. Moreover, as explained by Professor Bergeron, op. cit., at p. 975, there are other advantages for the insurer:

> [TRANSLATION] The insurer probably has most to benefit from proceeding through the debtor. It is in its interest to determine the risk as accurately as possible by dealing with the person directly associated with the property to be insured: that person is the owner, the hypothecary debtor. Otherwise there will be a great number of persons with whom the insurer must check, increasing both his expense and the delay.

**36**    It is, of course, at the instance of the insurer that mortgagees effect their coverage through the standard mortgage clause, and I share the conclusions of Professor Bergeron as to the advantages to the insurer in proceeding in this way. It would seem to be a commercial strategy well calculated to permit insurance companies to draw, in the most effective and economical manner possible, on their vast expertise in the assessment of the risk posed by a given application for insurance.

**37**    The expertise of lenders lies elsewhere: they are concerned with assessing the solvency of their borrowers, not their assurability. That being the case, I can, with respect, see little merit to the suggestion that mortgagees, on granting a mortgage, should bear the burden of guaranteeing the assurability of their mortgagors and that, as a result, the insurer should be entitled to hold up against the mortgagee any omissions or misrepresentations made by the mortgagor at the moment of effecting its own separate contract of insurance; see the observations of Bisson J.A. in Madill v. Lirette, supra, at p. 1002. In my respectful view, this would be an unfair delegation of responsibility on the part of insurers, all the more so since it is the insurer who represents to the mortgagee that it wishes to effect the insurance of both mortgagee [page1053] and mortgagor through the agency of the mortgagor. I share the reservations expressed by Professor Bergeron, op. cit., at p. 988, to the effect that:

> [TRANSLATION] We admit our surprise and it will be shared by the business community, including the risk industry. It is surprising to see given to the solvency specialists, if we may use the expression, a task which naturally belongs to risk specialists.

**38**    The standard mortgage clause has stood the test of time, and I am left with no doubt that it represents the most economical, rational, and fair procedure for effecting insurance on the interest of mortgagees. Its all but universal presence in fire insurance policies also attests to the fact that its use does not cut down in an unfair manner on the profits insurers recoup from the sale of fire insurance. Moreover, the American experience confirms that this is no less true if one proceeds on the assumption that the standard mortgage clause constitutes a representation by the insurer to the mortgagee that the validity of its policy is unaffected by the acts, neglects, omissions, and misrepresentations that the mortgagor may commit, whether they be committed by the mortgagor at the inception of its separate contract, or subsequent to its formation. In a word, once it is accepted that by the medium of the standard mortgage clause two separate and distinct contracts are issued in the one policy, it follows that any alternative to the use of the clause would seem guaranteed merely to arrive at the same end result (i.e., a separate contract for the mortgagee, and another for the mortgagor), but at the cost of generating needless delays, a flurry of paper, and a goodly amount of ultimately unproductive activity.

**39**    On this point, it is worth noting that the decisions that decline to follow Hastings, supra, and thus reject the thesis that the standard mortgage clause is designed to extend protection to the mortgagee in respect of omissions and misrepresentations made by the mortgagor at the inception of the contract, are all but unanimous in recommending that the mortgagee, when insuring its interest, adopt this alternative course of action and effect a separate policy on a separate piece of [page1054] paper. Thus Galligan J. in Chenier v. Madill (1973), 2 O.R. (2d) 361 (H.C.), notes, at p. 365:

> ... it is to be observed that there is nothing which prevents a mortgagee from obtaining his own insurance to protect his security. If a mortgagee relies upon the insurance obtained by the mortgagor, he subjects himself to the risk that such a

policy may be voidable if the mortgagor has violated stat. con. 1 of the policy.

As we have already seen, Lightfoot C.J. in Hanover, supra, at p. 335, also observes that the situation would be an entirely different one if the mortgagee had effected a separate and independent policy of insurance to protect his own interest. To the same effect is the following suggestion made by Bisson J.A. in Madill v. Lirette, supra, at p. 1002:

> [TRANSLATION] If the hypothecary creditor does not have faith in the actions and the words of his insured before the policy is issued, all he has to do is take out a separate policy in his own name.

**40**    Academic literature also provides an echo of this line of reasoning. In his article "La faute intentionnelle de l'assuré et la clause de garantie hypothécaire" (1987), 21 R.J.T. 335, Simard explicitly endorses the view expressed by Bisson J.A.

**41**    However, in my respectful view, this notion that mortgagees who declined to rely on the standard mortgage clause and insured their interest by means of a separate policy would gain a measure of protection over and above the protection afforded by the standard mortgage clause cannot fail but be otiose once it is concluded that this clause itself evidences two separate and distinct contracts of insurance, one between the mortgagor and the insurer and a second (engrafted on the first contract) between the mortgagee and the insurer. In the final analysis, the authorities I have just reviewed reject the view espoused in Hastings because they, again, have chosen to view the mortgagee whose interest is insured through the standard mortgage clause on the same terms as a simple beneficiary of the mortgagor. (I note that Galligan J. in Chenier v. Madill, supra, relies on [page1055] Omnium Securities, supra, which, as we have seen, did not adopt the two contract theory.) Once that view is put aside, and it is recognized that the mortgagee whose interest is insured by the standard mortgage clause is, in fact, a party to a separate and distinct contract with the insurer, the question of how the mortgagee effects that separate and distinct contract must, in my view, become one of form, and not of substance.

**42**    This is the view L'Heureux-Dubé J. expresses at p. 1027 of her reasons in Caisse populaire. There she observes:

> There would not seem to be any valid reason for distinguishing between a policy taken out by the hypothecary creditor personally and one taken out by the latter through a mandatary, in the person of the hypothecary debtor. They are both separate insurance contracts in which the insured is the hypothecary creditor.

The Mortgagor as Mandator of the Mortgagee

**43**    I noted earlier that by the terms of the standard mortgage clause the mortgagor, when insuring its own interest in the property, assumes a mandate to take out a separate contract of insurance to insure the mortgagee's interest. This raises the question whether it could be argued that because the

mortgagor is acting as the mandatary of the mortgagee when it insures the mortgagee's interest, it therefore follows that any false representations made by the mortgagor in effecting its mandate should be held to be those of the mortgagee. On this logic, the invalidity of the mortgagor's contract would entrain the invalidity of the mortgagee's contract as well.

**44**    I do not see how one can reasonably infer that the law of mandate operates so as to have this effect in the context of the standard mortgage clause. This inference would run counter to what must be taken to be the understanding of the [page1056] parties when agreeing to insure through the medium of the standard mortgage clause, for, as was explained above, it was precisely because the standard mortgage clause held out the promise of making the mortgagee's insurance dependent solely on the course of action between the mortgagee and the insurance company that it supplanted the use of the "open mortgage" clause in the insurance industry. As put by Miller J. in Hastings, supra, at p. 150:

> The mortgage clause was agreed upon for this very purpose, and created an independent and a new contract, which removes the mortgagees beyond the control or the effect of any act or neglect of the owner of the property, and renders such mortgagees parties who have a distinct interest separate from the owner, embraced in another and a different contract.

**45**    Accordingly, to hold that the law of mandate would have the result mentioned above would defeat the very purpose of the clause by again making the right of the mortgagee to recover on its policy derivative of the right of the mortgagor, provided only that the insurer could establish that the mortgagor had made any omissions or misrepresentations on taking out coverage to insure its (the mortgagor's) separate interest.

**46**    In discussing the principles governing the construction of contracts of insurance in Scott v. Wawanesa Mutual Insurance Co., supra, at p. 1454, I adverted to the approach set out by this Court in Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888. There it was made clear that in the construction of a contract of insurance a court must seek the interpretation which most fairly reflects what can reasonably be supposed to have been the intention of the parties when entering into the contract. Applying these principles here, I can only conclude that the notion that the insurer should be free to deny coverage to the mortgagee on the basis of a misrepresentation made by the mortgagor when insuring its interest would fly in the face of the mortgagee's reasonable [page1057] perception of the very purpose of the standard mortgage clause.

**47**    As intimated above, it is only a matter of common sense that mortgagees will wish to effect insurance on their insurable interest so as to ensure that the validity of their contract with the insurer does not stand to be affected by anything the mortgagor might do, and as we have seen, clearly one option for the mortgagee who wishes to effect such coverage is to take out a separate policy on a separate piece of paper. It is, of course, at the instance of the insurer that mortgagees do not, in fact,

make this trip to their insurer's office to effect independent policies on separate pieces of paper. In effect, the insurer represents to mortgagees that they can save themselves the trouble since the insurer will "engraft" this separate and distinct contract on the policy of the mortgagor. Given this representation on the part of the insurer, it is only fair to conclude that mortgagees will assume that insuring by means of the standard mortgage clause offers all the advantages of a separate and distinct contract evidenced by a separate piece of paper (the separate and distinct contract all the cases rejecting Hastings counsel mortgagees to obtain) but without any of its disadvantages, i.e, the trouble of having to obtain and deal with that separate piece of paper.

**48**    As noted by Professor Bergeron, op. cit., at p. 974, it cannot be the case that mortgagees accept to insure by means of the standard mortgage clause because they wish [TRANSLATION] "in so doing to protect their interest less". That conclusion would be to take mortgagees for fools; it would be tantamount to proceeding on the basis that mortgagees, in accepting to insure by means of the standard mortgage clause, were somehow resigned to settling for second rate coverage, i.e., coverage that did not offer the same protection as the separate and distinct contract they could effect without relying on the standard mortgage clause. It is, of course, the converse that must be true, for, clearly, if mortgagees elect to insure through the [page1058] medium of the standard mortgage clause, they can only be doing so on the reasonable expectation that their interests will be protected in the same way as if they had entered into an independent contract evidenced by a separate piece of paper.

**49**    Moreover, as already demonstrated, nothing in the wording of the standard mortgage clause supports the conclusion that the insurer is proceeding on any other understanding. There is no language such as would indicate an unequivocal and manifest intention on the part of the insurer to offer insurance on the understanding that the coverage of the mortgagee was in any way dependent on the course of action between the insurer and the mortgagor. Rather, the language is to the opposite effect: it states in simple and unambiguous terms that the mortgagee's insurance will not be invalidated by any fault of the mortgagor. The terms used in making this representation are so clear, in my view, that there is no need to invoke the principle that is necessary to resolve any ambiguity on this point in favour of the insured. I have already drawn attention to the fact that insurers cannot rely on anything short of the clearest language when offering coverage on terms that would go to frustrating the legitimate expectations as to coverage of those purchasing the policy.

**50**    I conclude that by the terms of the standard mortgage clause the insurer has represented to the mortgagee that it will decline to set up as against the mortgagee any omissions and misrepresentations made by the mortgagor in effecting coverage for the mortgagee and which, by the ordinary application of the law of mandate, might otherwise be imputable to the mortgagee. Any other interpretation would, in my view, fail to concord with the reasonable expectations of the parties as to the coverage offered by the standard mortgage clause, and, indeed, by making the insurance of the mortgagee derivative to a certain degree on the course of dealings between the mortgagor and the insurer, would strike at the very raison d'être of the standard mortgage clause.

[page1059]

Disposition

**51**    For these reasons, I would allow the appeal with costs throughout, reverse the judgment of the Court of Appeal, and restore judgment of the trial judge.

English version of the reasons of L'Heureux-Dubé and Gonthier JJ. delivered by

**52**    L'HEUREUX-DUBÉ J. (dissenting):-- This appeal was heard at the same time as Caisse populaire des Deux Rives v. Société mutuelle d'assurance contre l'incendie de la Vallée du Richelieu, [1990] 2 S.C.R. 995 (hereinafter referred to as "Caisse populaire"), judgment rendered concurrently. In Caisse populaire, the issue concerned the legal relationship between an insurer and a hypothecary creditor where the debtor of the hypothecary creditor purchased an insurance contract containing a hypothecary (mortgage) clause and committed an intentional fault. In the present appeal, the issue is whether the nullity ab initio of an insurance policy, resulting from misrepresentations by the hypothecary debtor at the time the policy was bought, can be invoked against the hypothecary creditor.

Facts

**53**    In 1977 one Dimitrios (Jimmy) Katsikonouris borrowed $80,000 from the National Bank of Greece (Canada) and $21,800 from the appellants, who were doing business in partnership under the name Tava Enregistré. As security for these loans, Katsikonouris granted a first hypothec to the National Bank of Greece (Canada) and a second hypothec to the appellants, on properties owned by him at 2100-2102-2104 rue Bélanger est, in Montréal.

**54**    In the succeeding years six fires of varying size occurred in the buildings subject to the hypothecs. Those buildings were covered by an insurance policy issued by previous insurers. On January 24, 1983, following notice that his policy had been cancelled, Katsikonouris purchased a fire insurance policy from the respondents. At the time this policy was taken out, the broker acting for [page1060] Katsikonouris answered "no" to the following three questions:

1.    Does the applicant have other insurance?
2.    Have there been losses in the last three years?
3.    Has an insurer refused or cancelled a policy in the last three years?

The insurance policy issued by the respondents, providing coverage of $350,000, contained a hypothecary (mortgage) clause approved by the Insurance Bureau of Canada and used in fire insurance policies issued in Quebec and in the rest of Canada.

**55**    After the properties in question were completely destroyed by arson on June 25, 1983, the respondents refused to pay the indemnity to the hypothecary creditors, alleging that the policy was void ab initio because of the misrepresentations by Katsikonouris at the time the policy was purchased. The appellants and the National Bank of Greece (Canada) brought actions against Katsikonouris's insurers to claim the indemnity.

**56**    In a judgment on the actions brought by the hypothecary creditors, which actions were joined for hearing, the trial judge held, on the evidence presented to him, that the policy issued by the respondents was void ab initio as a consequence of the misrepresentations and omissions by the insured or his representative. He concluded, however, that the hypothecary (mortgage) clause prevented the respondents from relying on this nullity ab initio against the hypothecary creditors, and therefore that the latter were entitled to payment of the insurance indemnity. He accordingly allowed their action. The Court of Appeal allowed the appeal, reversed the Superior Court judgment and dismissed the actions of the hypothecary creditors, the appellants in this Court (the National Bank of Greece (Canada), plaintiff in the Superior Court, is not a party to the appeal in this Court).


[page1061]


Judgments

Superior Court, [1985] C.S. 1263 (Lamb J.)

**57**    The trial judge first noted that, through his broker, the hypothecary debtor had made numerous misrepresentations to the respondents so as to conceal from them the cancellation of an earlier insurance policy and the occurence of several fires of criminal origin on the insured property. He was of the view that these misrepresentations were such as to entail the nullity ab initio of the insurance contract between the hypothecary debtor and the respondents.

**58**    Proceeding to consider the argument of the insurance companies, which sought to invoke the nullity of the policy against the hypothecary creditors, the judge wrote (at pp. 1268-69):

> The wording of paragraph 1 of the mortgage clause which reads


> This insurance and every documented renewal thereof -- AS TO THE INTEREST OF THE MORTGAGEE ONLY THEREIN -- is and shall be in force notwithstanding any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured,


> is so broad that it can only be interpreted as a clear and unqualified renunciation

by the insurers of their right to raise against the mortgage creditors a defence of nullity resulting from any act or neglect of the insured, whether the result of that act or neglect is a nullity ab initio or a nullity resulting from a cause arising after the policy had validly attached. Nothing in the clause purports specifically to limit or restrict the application of the word "any". The express renunciation of the insurers must therefore be read as intending to refer to absolute as well as relative nullity, in the absence of any words imposing a restrictive distinction between the two.

The meaning of the mortgage clause is unambiguous, but if any further evidence is needed as to the insurers' intent to renounce their rights to invoke as against the mortgagees both absolute as well as relative nullity, such evidence can be found in the inclusion in the clause of the words "omission or misrepresentation", words clearly contemplating nullity ab initio as well as relative. [Emphasis in original.]

As to the nature of the contractual relationship between the insurers and the hypothecary creditors, he added (at p. 1269):

[page1062]

Furthermore the language of the mortgage clause is such that it can only be regarded as a separate contract between the insurers and the mortgate [sic] creditors, wholly unaffected, as indeed its terms make clear, by the absolute or relative nullity of the policy vis-à-vis the insured.

This was the conclusion reached by Laflamme J. in the case of Lirette c. Great American Insurance Co., [1982] C.S. 49, and by Biron J. in the case of Caisse populaire des deux rives c. Société mutuelle d'assurance contre l'incendie de la Vallée du Richelieu, [1984] C.S. 1180. Both were carefully reasoned decisions with which this Court agrees. While they concern the effect to be given to the second paragraph of 2563 C.C. and thus do not involve the question of nullity ab initio, the principle of the separate contract which these decisions endorse is nevertheless applicable to this case.

He therefore concluded that the insurers were liable to the hypothecary creditors and allowed the actions by the appellants and the National Bank of Greece (Canada).

Court of Appeal, [1989] R.D.I. 46 (Monet and Beauregard JJ.A. and Desmeules J. (ad hoc))

Desmeules J. (ad hoc)

**59**    Desmeules J., with his two colleagues concurring, noted that the trial judge had relied inter alia on the Superior Court's decision in Lirette v. Great American Insurance Co., [1982] C.S. 49, reversed by the Court of Appeal since the judgment a quo was rendered, [1987] R.J.Q. 993 (sub nom. Madill v. Lirette). As the wording of the hypothecary (mortgage) clause considered by the Court of Appeal in Madill was the same as that which is at issue before this Court, Desmeules J. relied on that decision, from which he quoted at length. In that case, Bisson J.A. held for the majority that the nullity ab initio of the policy obtained by the insured carried with it the termination of the benefits conferred on the hypothecary creditor (at p. 49):

> [TRANSLATION] I consider that a hypothecary (mortgage) clause, like the one appearing in policy P-4, only protects the creditor once the contract has come into being, and from that time, for subsequent acts, neglect, [page1063] omissions or misrepresentations by the owners of the insured property.

Desmeules J. noted that Bisson J.A. would have come to the same conclusion even had he recognized the existence of two separate contracts in an insurance policy containing a hypothecary (mortgage) clause. He further cited the Quebec Court of Appeal's decision in Vallée du Richelieu, Compagnie mutuelle d'assurance de dommages v. Caisse populaire des Deux Rives, [1988] R.J.Q. 2355, where Gendreau J.A., who had taken part in the Madill judgment, restated the Court of Appeal's position (at p. 50):

> [TRANSLATION] ... that is why we held that the hypothecary creditor's protection existed only if the insurance contract had actually and really been formed between the insured who had in fact requested it and the insurer who was preparing to undertake it. In deciding that there was no completed contract, that it was void ab initio, we rejected the recognition of the guarantee conferred by the hypothecary (mortgage) clause.

**60**    The conclusion of Desmeules J. conforms in all aspects to this jurisprudence of the Court of Appeal (at pp. 50-51):

> [TRANSLATION] The wording of the present hypothecary (mortgage) clause, in effect since 1972, refers to certain situations such as transfers of interest, vacancy or non-occupancy or the occupation of the property for purposes more hazardous than those specified, and it subjects creditors to an obligation to inform the insurer as soon as they are aware of such situations.
>
> These events are subsequent to the issuing of the insurance policy, and this

leads me to conclude that it is such situations that the insurers sought to provide for in their hypothecary (mortgage) clause.

With respect, I consider that the nullity ab initio of the insurance policy issued by [the respondents] has the effect of invalidating the hypothecary (mortgage) clause contained in that policy as well, and that there is no reason to depart from the existing precedents.

**61**   He accordingly allowed the appeal and denied the appellants and the National Bank of Greece (Canada) the right to the insurance indemnity.

Beauregard J.A.

**62**   Beauregard J.A. was also of the view that the appeals should be allowed. The gist of his brief reasons reads as follows (at p. 47):

[page1064]

[TRANSLATION] Despite the use of the adverb "including", by application of the "rule" of interpretation noscitur a sociis or the ejusdem generis rule, we must conclude that "any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured" is an "act, neglect, omission or misrepresentation" which took place or was made after the policy was issued, just as "transfer of interest, vacancy or non-occupancy or the occupation of the property for purposes more hazardous than those specified".

Analysis

**63**   As in the Caisse populaire appeal, supra, the present case concerns an insurance contract purchased by the hypothecary debtor, pursuant to an undertaking made in hypothecary loan contracts to keep the hypothecated property insured for the benefit of the hypothecary creditors. The insurance policy purchased from the respondents contains the standard hypothecary (mortgage) clause approved by the Insurance Bureau of Canada. I have set out the clause below.

**64**   The judgment of this Court in Caisse populaire is to the effect that the insurance clause in a hypothecary loan contract is a contract of mandate, by which the hypothecary debtor undertakes to insure the hypothecated property on behalf of his hypothecary creditor. The insurance policy taken out in accordance with this mandate contains a standard hypothecary (mortgage) clause which thus

sets out two separate insurance contracts, one between the insurer and the hypothecary debtor and the other between the insurer and the hypothecary creditor. I refer to the reasons I gave in Caisse populaire in this regard and adopt them for these purposes.

**65**    Given these premises, this appeal must deal with the consequences of the alleged misrepresentations by the hypothecary debtor, first on his own insurance contract and then on the insurance contract between the hypothecary creditors and the insurers, in light of the existence of a standard hypothecary (mortgage) clause in the contract.

[page1065]

1.    Nullity ab initio of the Hypothecary Debtor's Insurance Contract

**66**    Under arts. 2485 and 2486 C.C.L.C., the holder of an insurance policy must disclose to the insurer, in the utmost good faith, all the circumstances relevant to determining the risk, otherwise the contract may be cancelled at the insurer's request under art. 2487 C.C.L.C.:

> 2485. The policyholder, and the insured if the insurer requires it, is bound to represent all the facts known to him which are likely to influence a reasonable insurer materially in the setting of the premium, the appraisal of the risk or the decision to cover it.

> 2486. The obligation respecting representations is deemed met if the facts are substantially as represented and there is no material concealment.

> There is no obligation to represent the facts known to the insurer or which from their notoriety he is presumed to know, except in answer to inquiries.

> Misrepresentation or deceitful concealment by the insurer is in all cases a cause of nullity of the contract that the party acting in good faith may invoke.

> 2487. Subject to articles 2510 to 2515, misrepresentation or concealment by either the policyholder or the insured, in regard to the facts contemplated in articles 2485 and 2486, nullifies the contract at the instance of the insurer, even for losses not connected with the risks so misrepresented.

(Articles 2510 to 2515 C.C.L.C., mentioned in art. 2487 C.C.L.C., being concerned exclusively with life insurance, are not relevant here.)

**67**   According to the evidence, the hypothecary debtor or his representative did not disclose to the insurers various facts of importance in the insurers' determination of the risk, concerning inter alia previous insurance coverage, the occurrences of criminal fires on the insured premises and the refusal by the previous insurers to continue insuring the property. This non-disclosure surely constitutes misrepresentation, as the trial judge found (at p. 1268):

> The existence of the Pelletier, Symons policy, the decision of that insurer to cancel that policy, and the [page1066] previous fires, all of criminal origin, which occurred in the building housing the insured's restaurant Athens by Night and in the Bélanger St. building, were facts known to Katsikonouris and which were material to the risk. Hofman's [Katsikonouris's broker's] failure to disclose these facts therefore nullifies the contract ab initio between the insured Katsikonouris and the Defendant Insurers. [Emphasis added.]

The Superior Court judge's conclusion in this regard and the resulting nullity of the insurance contract between the hypothecary debtor and the insurers were not disputed in the Quebec Court of Appeal and were not the subject of argument in this Court.

**68**   It thus seems clear that the hypothecary debtor's insurance contract is void ab initio because of the latter's misrepresentations when the policy was purchased.

2.   Nullity of the Hypothecary Creditors' Insurance Contract

**69**   The hypothecary creditors purchased their insurance contract from the insurers through their mandatary, the hypothecary debtor. The mandate, set out in the insurance clause of the hypothecary loan contracts, provides that the hypothecary debtor must keep the hypothecated property insured for the lenders' benefit. Accordingly, by purchasing the insurance contract, the hypothecary debtor performed his mandate in accordance with his undertaking.

**70**   Under art. 1727 C.C.L.C. mandators, in this case the lenders, are bound by the acts of their mandatary in the performance of the mandate:

> 1727. The mandator is bound in favour of third persons for all the acts of his mandatary, done in execution and within the powers of the mandate, except in the case provided for in article 1738 of this title, and the cases wherein by agreement or the usage of trade the latter alone is bound.

> The mandator is also answerable for acts which exceed such power, if he have ratified them either expressly or tacitly. [Emphasis added.]

As Rodière puts it, [TRANSLATION] "a mandatary [cannot] be regarded as a third party vis-à-vis the [page1067] mandator" (Encyclopédie juridique Dalloz: Répertoire de droit civil, vol. 5, 2nd ed., "Mandat", at p. 26, No. 337). Domenget (Du mandat, de la commission et de la gestion d'affaires, vol. 1, Du mandat (1862)) specifically mentions the case of bad faith by the mandatary, stating that it cannot be invoked against third parties (at p. 257, No. 405):

> [TRANSLATION] Bad faith by the mandatary could not even be invoked against third parties by the mandator, if indeed those third parties were not in bad faith, in accordance with the rule qui mandavit ipse fecisse videtur.

Since the hypothecary debtor was acting in accordance with his mandate by purchasing the hypothecary creditors' insurance contract, the misrepresentations he made at that time must therefore be regarded, for the purposes of considering the validity of this contract, as misrepresentations made by the hypothecary creditors themselves.

**71**    These misrepresentations by the broker will have, as to the insurance contract between the hypothecary creditors and the insurers, consequences similar to those produced on the hypothecary debtor's personal insurance contract. Thus, the misrepresentations of the hypothecary debtor, acting as mandatary of the hypothecary creditors, had the effect of misrepresenting the risk to the insurers and thereby vitiating their consent to the insurance contract purchased for the hypothecary creditors, in the same way as these misrepresentations vitiated the insurers' consent to the hypothecary debtor's insurance contract. The insurance contract between the insurers and the hypothecary creditors is thus also void ab initio.

> 3.    Whether the Nullity ab initio Can Be Invoked Against the Hypothecary Creditors

**72**    The appellants argue, however, that the nullity of the hypothecary creditors' insurance contract, whether ab initio or otherwise, cannot be invoked against them on account of the undertakings made by the insurers and set forth in the hypothecary (mortgage) clause of this insurance contract. The content of this clause, which reads as follows, must therefore be considered:

[page1068]

<div align="center">

(For use with Quebec Policy Forms only)

STANDARD MORTGAGE CLAUSE
(approved by the Insurance Bureau of Canada)

IT IS HEREBY PROVIDED AND AGREED THAT:

BREACH OF CONDITIONS BY MORTGAGOR, OWNER OR OCCUPANT

</div>

This insurance and every documented renewal thereof -- AS TO THE INTEREST OF THE MORTGAGEE ONLY THEREIN -- is and shall be in force notwithstanding any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured, including transfer of interest, any vacancy or non-occupancy, or the occupation of the property for purposes more hazardous than specified in the description of the risk.

PROVIDED ALWAYS that the Mortgagee shall notify forthwith the Insurer (if known) of any vacancy or non-occupancy extending beyond thirty (30) consecutive days, or of any transfer of interest or increased hazard THAT SHALL COME TO HIS KNOWLEDGE, and that every increase of hazard (not permitted by the policy) shall be paid for by the Mortgagee -- on reasonable demand -- from the date such hazard existed, according to the established scale of rates for the acceptance of such increased hazard, during the continuance of this insurance.

RIGHT OF SUBROGATION

Whenever the Insurer pays the Mortgagee any loss award under this policy and claims that -- as to the Mortgagor or Owner -- no liability therefor existed, it shall be legally subrogated to all rights of the Mortgagee against the Insured, but any subrogation shall be limited to the amount of such loss payment and shall be subordinate and subject to the basic right of the Mortgagee to recover the full amount of its mortgage equity in priority to the Insurer, or the Insurer may at its option pay the Mortgagee all amounts due or to become due under the mortgage or on the security thereof, and shall thereupon receive a full assignment and transfer of the mortgage together with all securities held as collateral to the mortgage debt.

OTHER INSURANCE

If there be other valid and collectible insurance upon the property with loss payable to the Mortgagee -- at law or in equity -- then any amount payable thereunder shall be taken into account in determining the amount payable to the Mortgagee.

[page1069]

WHO MAY GIVE PROOF OF LOSS

In the absence of the Insured, or the inability, refusal or neglect of the Insured to give notice of loss or deliver the required Proof of Loss under the policy, then the Mortgagee may give the notice upon becoming aware of the loss and deliver as soon as practicable the Proof of Loss.

TERMINATION

The term of this Mortgage Clause coincides with the term of the policy;

PROVIDED ALWAYS that the Insurer reserves the right to cancel the policy as provided by Articles 2567 and 2568 of the Civil Code of the Province of Quebec, but agrees that the insurer will neither terminate nor alter the policy to the prejudice of the Mortgagee without 15 days' notice to the Mortgagee by registered letter.

FORECLOSURE

Should title or ownership to said property become vested in the Mortgagee and/or assigns as owner or purchaser under foreclosure or otherwise, this insurance shall continue until expiry or cancellation for the benefit of the said Mortgagee and/or assigns.

SUBJECT TO THE TERMS OF THIS MORTGAGE CLAUSE (and these shall supersede any policy provisions in conflict therewith BUT ONLY AS TO THE INTEREST OF THE MORTGAGEE), loss under this policy is made payable to the Mortgagee. [Emphasis added.]

The wording of this clause is very similar to the one considered in Caisse populaire, supra.

**73**    Before proceeding with the analysis of this clause as such, however, it may be worth taking a

comparative look at the interpretation in other jurisdictions of clauses similarly worded to see whether the nullity ab initio of the insurance contract, as a consequence of misrepresentations by the hypothecary debtor, can be invoked against the hypothecary creditor.

A.    Comparative Analysis

**74**    The hypothecary (mortgage) clause at issue here is in fact derived from clauses of the same type developed in the State of New York in the 1860s. This clause became widely used over the years throughout the United States and in Canada. Although known in France, it is seldom used there.


[page1070]


(i)    France

**75**    The writers Picard and Besson in their classic treatise give an example of a hypothecary (mortgage) clause under which, according to them, the nullity ab initio of the insurance contract as a consequence of misrepresentation by the hypothecary debtor could not be invoked against the hypothecary creditor:

> [TRANSLATION] This clause -- known as the standard hypothecary or mortgage clause -- has been in widespread use in America since the late 19th century. It is however quite rare in French practice. The guarantee it provides creditors of course varies according to the policy. The following is an example of the standard hypothecary clause:

>> "At the request of the insured, the Company agrees not to take advantage of (but only as to hypothecary creditors registered against the immovable pursuant to a deed recorded by Mr. X, a notary) the failure to make the declarations prescribed by the general conditions of the policy, but only to the extent that their debts fall in the correct order on the indemnity to which the insured would have been entitled if his position had been in order ... ."

> With a clause of this kind, hypothecary creditors whose names are given to the insurer cannot be affected by nullities or disqualifications incurred by the insured, in particular as the result of an incorrect declaration of risk, even if they knew of such irregularities before the loss. [Emphasis added.]

> (Traité général des assurances terrestres en droit français, vol. 2, Assurances de
> dommages -- Règles générales (1940), at pp. 471-73.)

This clause is clearly specific and provides that an inaccurate initial statement of risk will not invalidate the hypothecary creditor's right to indemnification. It is interesting to note that it was thought necessary to use a very specific formula so as to cover nullity of the contract resulting from the absence of consent by one of the parties. The hypothecary (mortgage) clause at issue here is different and contains no specific mention of an "incorrect declaration of risk".

(ii)   United States

**76**   The mortgage clause used in insurance policies in the United States usually reads as follows, with [page1071] regard to waiver of the right to raise the mortgagor's actions against the mortgagee:

> It is hereby specially agreed that this insurance, as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the property insured, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy. [Emphasis added.]

**77**   Unlike the case of the existence of a second separate contract in the same policy containing a hypothecary (mortgage) clause, discussed in Caisse populaire, the specific question of whether the nullity ab initio of an insurance contract because of the mortgagor's misrepresentations can be invoked against the mortgagee has not been dealt with by the U.S. Supreme Court. The plethora of judgments in various states on this point does however disclose two trends: the majority of the decisions hold that such nullity cannot be invoked against the mortgagee, and the minority hold that it can.

**78**   The first judgment of the majority view is probably the decision by the New York Court of Appeal in Hastings v. Westchester Fire Insurance Co., 73 N.Y. 141 (1878). In that case, the mortgagor had bought such insurance. One of the conditions was that any other insurance was to be disclosed to the insurer. The mortgagor, however did not reveal that he had other insurance. The mortgagor's wrongful act thus occurred at the very time the policy was bought. The New York Court of Appeal found this policy to be null and void with respect to the mortgagor, but rejected the insurer's defence that this nullity extended to the mortgage clause. In his judgment Rapallo J. found that there were two separate insurance contracts in the policy and went on to say (at p. 153):

> To hold otherwise would, I think, defeat the purpose intended, and deprive the mortgagees of the protection upon which they had a right to rely. Although the clause might be construed so as to exempt the mortgagees from the consequences only of acts of the owners done after the making of the agreement,

> I do not think, in view of [page1072] its apparent purpose, that any such
> distinction was intended. [Emphasis added.]

This case was followed by a long line of decisions by other courts, in which the refusal to allow the
nullity ab initio of the insurance contract to be invoked against the mortgagee was justified either by
referring to the intent of the parties or by interpreting the mortgage clause as a sufficiently express
waiver by the insurer of its right to invoke the nullity: Syndicate Ins. Co. v. Bohn, 65 F. 165 (8th
Cir. 1894); Reed v. Firemen's Insurance Co. of Newark, 35 L.R.A. (N.S.) 343 (N.J. 1911); Federal
Land Bank of Columbia v. Atlas Assur. Co., 125 S.E. 631 (N.C. 1924); Collins v. Michigan
Commercial Underwriters, 6 Tenn. App. 528 (1928); Fayetteville Building & Loan Ass'n v. Mutual
Fire Ins. Co. of West Virginia, 141 S.E. 634 (W. Va. 1928); National Union Fire Ins. Co. v. Short,
32 F.2d 631 (6th Cir. 1929); Stockton v. Atlantic Fire Ins. Co., 175 S.E. 695 (N.C. 1934); National
Fire Ins. Co. of Hartford, Conn. v. Dallas Joint Stock Land Bank of Dallas, 50 P.2d 326 (Okla.
1935); Western Assur. Co. v. Hughes, 66 P.2d 1056 (Okla. 1937); Great American Insurance Co. of
New York v. Southwestern Finance Co., 297 P.2d 403 (Okla. 1956); Northwestern National
Insurance Co. v. Mildenberger, 359 S.W.2d 380 (Mo. Ct. App. 1962); Equality Savings and Loan
Association v. Missouri Property Insurance Placement Facility, 537 S.W.2d 440 (Mo. Ct. App.
1976); Meade v. North County Co-Operative Insurance Co., 487 N.Y.S.2d 983 (Sup. Ct. 1985).

**79**    Despite these precedents, another line of authority, though less weighty, has taken the contrary
view and denied the mortgagee the right to be indemnified where there have been
misrepresentations by the mortgagor prior to or at the time the policy was bought. A specific
example of this approach is found in Hanover Fire Ins. Co. v. National Exchange Bank, 34 S.W.
333 (Tex. Civ. App. 1896). In that case the insurance policy was vitiated ab initio because of a fraud
committed when it was purchased. The trial court, in conformity with Hastings, held that the
mortgagee had the right to be indemnified [page1073] under the "standard" mortgage clause. In
allowing the appeal the Court of Appeal said (Lightfoot C.J. for the court, at p. 334):

> The fraudulent concealment of a fact so material to the risk itself, which fact was
> expressly provided against on the face of the policy, and a knowledge of which
> would have stopped the issuance of the policy, prevented it from becoming a
> valid contract in favor of the assured, or the party for whose security it provided.
> The doctrine is well established in this state that A., for a consideration paid by
> him, may make a contract with B., for the benefit of C., and the latter will have a
> right of action to enforce it ... . But, if the contract was obtained by a fraudulent
> device of A., the person for whose benefit he fraudulently obtained it can gain no
> higher right than A. held, and, if the contract is void as to him, it is void as to his
> beneficiary. [Emphasis added.]

The court thus interpreted the formation of the second contract as the performance of a contract of
agency between the mortgagee and the mortgagor. It went on to expressly reject the applicability of
Hastings, concluding that the mortgagee could not validly claim both the benefits of the agency and

immunity from its disadvantages. The court accordingly concluded that, in a case of fraud at the very time the policy is purchased (at p. 335): "The contract, as a whole, in such a case, must stand or fall" (see to the same effect, Graham v. Fireman's Insurance Co., 87 N.Y. 69 (1881); Young Men's Lyceum of Tarrytown v. National Ben Franklin Fire Ins. Co. of Pittsburgh, 163 N.Y.S. 226 (Sup. Ct., App. Div. 1917); Imperial Building and Loan Ass'n v. Aetna Ins. Co., 166 S.E. 841 (W. Va. 1932).)

**80**　Since the case law is thus divided and there is no ruling by the U.S. Supreme Court on the point, and as the wording of the clause in question differs from that at issue in the present appeal in a crucial respect, the U.S. precedents are of limited assistance.

　　　(iii)　Canada (common law)

**81**　The courts in the common law jurisdictions of Canada, including this Court, have on various [page1074] occasions considered the question of whether the nullity ab initio of an insurance contract as the result of misrepresentations by the mortgagor when the contract was purchased can be invoked against the mortgagee.

**82**　In Omnium Securities Co. v. Canada Fire and Mutual Insurance Co. (1882), 1 O.R. 494, the Ontario Court of Queen's Bench rejected the solution put forward in the United States in Hastings four years earlier. Hagarty C.J. wrote (at pp. 496-97):

> It seems to me that this provision only points to the future, and that insurers are not thereby debarred from setting up that the insurance had been effected by fraud.
>
> ...
>
> I do not think they [the insurers] thereby guarantee to him [the mortgagee] that his mortgagor has committed no such fraud upon them in effecting the insurance -- they do not warrant it to be an indisputable risk.
>
> ...
>
> I repeat, I do not see how the insurers can be held to condone undiscovered fraud, or warrant the policy to be conclusively binding at the time of this bargain, any more than they could insist that the mortgagees warranted the validity of the mortgage as to title, value, &c., &c. [Emphasis added.]

The mortgage clause at issue in that case was similar in all respects to that used in the U.S. at the time. The judge accordingly rejected both the argument based on the apparent intent of the parties and the argument holding that, by giving the mortgagee the insurance contract found in the mortgage clause, the insurer had undertaken to guarantee the validity of the policy purchased by the

mortgagor.

**83**    The same clause was involved in the judgment of this Court in Liverpool and London and Globe Insurance Co. v. Agricultural Savings and Loan Co. (1903), 33 S.C.R. 94. The policy was found to be void ab initio, and the Court held per Davis J., with whom the majority concurred, that this invalidity could be invoked against the mortgagee (at p. 110):

[page1075]

> I have already stated that it is not necessary on this appeal for us to determine, and we do not determine, whether such a mortgage clause as was inserted in this policy gave the mortgagees such a beneficial right and interest or constituted such a direct contract between the mortgagees and the insurance company as would enable the former to sue in their own name alone and irrespective of [the mortgagor]. But we are all of the opinion that whether there was or was not such a direct contract, it did not cover or relate to the statements or omissions made by the applicant [the mortgagor], in his application for insurance and which were expressly made

> > the basis of the liability of the company, and a part and a condition of the insurance contract.

> > In our opinion the provision in the mortgage clause already quoted in words by me to the effect that

> > the insurance should not be invalidated by any act or neglect of the mortgagor or owner of the property insured, etc.

> had reference to the subsequent acts or neglects of the mortgagor and did not apply to his application for insurance or his statements or omissions therein. [Emphasis added.]

**84**    This interpretation was again recently adopted by the Ontario High Court in Chenier v. Madill (1973), 2 O.R. (2d) 361, where Galligan J., citing Omnium Securities, supra, noted (at p. 365):

> > It is clear that the mortgage clause provides only against future acts by the

> insured. It has no relation to misrepresentation or fraudulent omissions by the
> insured affecting the validity of the contract of insurance ... . Accordingly, if
> either of the defences of misrepresentation or fraudulent omission to disclose
> circumstances material to the risk succeed, the defendant [the insurer] would be
> justified in denying liability to the mortgagees. [Emphasis added.]

**85**    The judgment of the British Columbia Supreme Court in Canadian Imperial Bank of
Commerce v. Dominion of Canada General Insurance Co. (1987), 29 C.C.L.I. 313, is to the
contrary. In a short oral decision on a motion, Huddart J. held that the fact the policy was void ab
initio could not be invoked against the mortgagee (at p. 316):

[page1076]

> In my view, the only reasonable interpretation of the mortgage clause is
> that Mr. Dley suggests. By it the insurers are in effect entering into a separate
> contract with the mortgagee as an insured, a contract whose validity is
> independent of the acts or omissions of the owner.

**86**    Like the American precedents, most of the Canadian decisions on this point deal with
hypothecary (mortgage) clauses whose wording is not in all respects identical to the one at issue
here. In particular, they do not contain the words "omission or misrepresentation", which are present
in the clause we are concerned with here. It is nonetheless interesting to note that these decisions
almost unanimously hold that nullity ab initio resulting from misrepresentations by the hypothecary
debtor at the time the insurance contract is purchased can be invoked against the [page1077]
hypothecary creditor.

**87**    This background does not dispense with the necessity of considering the wording of the
hypothecary (mortgage) clause at issue in the present appeal so as to determine its true scope.

> B.    Analysis of the Words "Omission or Misrepresentation" in the
>       Hypothecary (Mortgage) Clause: Wording and Context

**88**    The hypothecary (mortgage) clause in the insurance contract between the insurers and the
hypothecary creditors is, as I have already mentioned, the standard formula approved by the
Insurance Bureau of Canada, and is found in a great many insurance contracts throughout the
country. The contract indeed contains both a French and an English version of this clause.

**89**    The crux of the problem is to define the exact meaning of the words "omission or [page1078]
misrepresentation" in subclause one of the hypothecary (mortgage) clause, by analysing first the
words themselves and then their context.

(i)    Wording

**90**    The appellants relied in particular on subclause one of the hypothecary (mortgage) clause, which states that "omission or misrepresentation" ("déclarations" in the French version) by the owner of the insured property cannot be invoked against the hypothecary creditors. For the sake of convenience, I shall set out the French and English texts of the first paragraph of subclause one of the hypothecary (mortgage) clause:

VIOLATIONS DU CONTRAT

Ne sont pas opposables aux créanciers hypothécaires les actes, négligences ou déclarations des propriétaires, locataires ou occupants des biens assurés, notamment en ce qui concerne les transferts d'intérêts, la vacance ou l'inoccupation, ou l'affectation des lieux à des fins plus dangereuses que celles déclarées.

BREACH OF CONDITIONS BY MORTGAGOR, OWNER OR OCCUPANT

This insurance and every documented renewal thereof -- AS TO THE INTEREST OF THE MORTGAGEE ONLY THEREIN -- is and shall be in force notwithstanding any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured, including transfer of interest, any vacancy or non-occupancy, or the occupation of the property for purposes more hazardous than specified in the description of the risk. [Emphasis added.]

**91**    The appellants first contended that the term "omission or misrepresentation" can only apply to omissions or misrepresentations by the policyholder at the time the policy is purchased. With respect, it is not clear that this term has such a wide meaning here. If this term can in fact be applied to the initial declaration of the risk (arts. 2485 and 2486 C.C.L.C. and condition one of the insurance contract), it can equally apply to other situations: the owner (or tenant or occupant) of the insured property has an obligation to notify the insurer of any aggravation of risk (art. 2566 C.C.L.C.), as well as any loss affecting that property (arts. 2572 and 2573 C.C.L.C.). In particular, that part of the Civil Code of Lower Canada dealing with notification of loss is titled "Of the notification of loss". Further, the clause does not mention the concept of "concealment", the word used in art. 2487 C.C.L.C. in connection with the concealment of information at the time of purchase, which is one of the actions alleged against the hypothecary debtor in the present case. Accordingly, the words "omission or misrepresentation" by themselves are ambiguous. In view of this vague wording, it is necessary to examine the context in which the words "omission or misrepresentation" occur, so as to determine the meaning by an analysis of the other provisions of

the insurance contract.

(ii)   Context

**92**    The appellants base an argument on the use, in the English text of the hypothecary (mortgage) clause, of the present and future tenses of the verb "to be" ("is and shall be in force"), and conclude that the insurance contract is stated to be valid at the time it is purchased. In the appellants' submission, this immediate validation, concurrent with the formation of the insurance contract, is specifically designed to cover any misrepresentation by the policyholder. This argument is somewhat circular, however, since the policy could only be confirmed if it already exists. Thus, the present tense in the contract would apply to actions occurring at the time of formation, which are therefore subsequent to the purchase, preceding formation of the contract. This argument therefore does not appear to have the weight given to it by the appellants.

**93**    The wording of the first paragraph of the hypothecary (mortgage) clause contains a list of acts that will not affect the rights of hypothecary creditors. While this list is not in any way exhaustive, as indicated by the adverb "including", it indicates the type of acts the parties intended to include in the expression "act, neglect, omission or misrepresentation". All the items contained in this list ("transfer of interest, any vacancy or non-occupancy, or the occupation of the property for purposes more hazardous than specified in the description of the risk") can only take place after the policy has been purchased. As we know, in accordance with the rule of interpretation noscitur a sociis and its particular application, the ejusdem generis rule, the generality of a term can be limited by a series of more specific terms which precede or follow it. Professor Côté writes in this regard (The Interpretation of Legislation in Canada (1984), at p. 242):

> Noscitur a sociis helpfully draws attention to the fact that a statute's context can indicate a meaning far more restrictive than that found in the dictionary.

[page1079]

Professor Côté further cites the following passage from Renault v. Bell Asbestos Mines Ltd., [1980] C.A. 370, concerning the ejusdem generis rule (at p. 372 of that judgment, per Turgeon J.A. for the court):

> [TRANSLATION] The ejusdem generis rule means that a generic or collective term that completes an enumeration of terms should be restricted to the same genus as those words, even though the generic or collective term may ordinarily have a much broader meaning.

He added the following caveat, however (at pp. 244-45):

Certain conditions must be satisfied for ejusdem generis to apply. According to some cases, the general expression must be preceded by several specific terms; otherwise there would be no genus permitting its restriction. But this condition is not universally respected, and its [sic] does not seem unreasonable to restrict the meaning of a broad expression even if it is preceded by only one specific term. Instead of ejusdem generis, the rule of noscitur a sociis could be invoked. Sometimes the courts have refused to apply ejusdem generis when a general term is preceded by only one specific term. However, such decisions have been based on ordinary principles of interpretation, and not simply on the fact that a single specific term preceded a general one.

A second condition for application of the rule, according to some authorities, is that the general term follow rather than precede the specific ones. But these cases do not eliminate the possibility of attenuating the meaning of generic terms with less general terms which follow. Even if strictly speaking ejusdem generis doesn't apply, the principle of contextual interpretation set forth by noscitur a sociis holds in any case.

As a third condition, the specific terms must have a significant common denominator to be considered within one given category. If this is lacking, ejusdem generis doesn't apply. [References omitted. Emphasis added.]

[page 1080]

The acts listed in the present case, as mentioned above, are a homogeneous group having as their common feature occurrence after the purchase of the contract. I adopt in this regard the reasoning of Beauregard J.A. in the Court of Appeal when he wrote (at p. 47):

[TRANSLATION] Despite the use of the adverb "including", by application of the "rule" of interpretation noscitur a sociis or the ejusdem generis rule, we must conclude that "any act, neglect, omission or misrepresentation attributable to the mortgagor, owner or occupant of the property insured" is an "act, neglect, omission or misrepresentation" which took place or was made after the policy was issued, just as "transfer of interest, any vacancy or non-occupancy or the occupation of the property for purposes more hazardous than specified".

According to this interpretation, the words "omission or misrepresentation" would thus apply only to omissions or misrepresentations subsequent to the formation of a valid insurance contract between the hypothecary creditor and the insurer.

**94**    This interpretation in my opinion is confirmed by the wording of the second paragraph of subclause one of the hypothecary (mortgage) clause, which provides that the hypothecary creditor shall be liable for increased premiums resulting from increases in the risk. In this connection one must differentiate between an increase in the risk and a different risk resulting from misrepresentations by the holder of the insurance. In the case of misrepresentations when the risk was initially declared, there is not necessarily an increase in the risk since the insurer may simply refuse to insure the risk. Additionally, when these misrepresentations that aggravate the risk are subsequently discovered, an additional premium may be due the insurer to reflect the risk actually insured. Coverage of a different risk, on the other hand, is not a situation contemplated by the second paragraph of subclause one of the hypothecary (mortgage) clause, which makes the hypothecary creditor liable for additional premiums that may be due on account of an increase in the risk, but which could not apply to a different risk. This is a further indication supporting the conclusion that only omissions or misrepresentations subsequent to [page1081] purchase are covered by the hypothecary (mortgage) clause.

**95**    The apparent generality of the words "omission or misrepresentation" is thus actually limited by what follows the first paragraph of subclause one of the hypothecary (mortgage) clause. This seems to indicate that the parties did not intend to cover the insurer's defect of consent resulting from misrepresentations by the hypothecary debtor when the insurance contract was taken out on behalf of the hypothecary creditors.

**96**    The word "any" in the English text, on which the trial judge relied, only qualifies the words "act, neglect" and it will differ in scope depending on the definition and scope of the words "act, neglect" in the English text, or "déclarations" in the French text, so that no conclusion can be drawn from this. If the "déclarations" or "act[s], neglect[s]" apply only to "déclarations" or "act[s]" subsequent to a valid contract, the word "any" cannot have the meaning given to it by the trial judge. Similarly, the words "is and shall be" seem to me to seal the fate of the meaning of the hypothecary (mortgage) clause only if it is assumed that the parties intended to guarantee insurance that is void ab initio, an intention which I do not impute to the parties.

**97**    The intent of the parties as indicated by the wording and context of the hypothecary (mortgage) clause seems to me to be all the clearer as the logic of the system requires that the mandator be bound by the misrepresentations of his mandatary, who himself has taken out a separate insurance policy with the insurers on behalf of the hypothecary creditors. In such a case, the second insurance contract thus entered into is in principle void ab initio. If that is the case, it seems to me that much more specific language than that in the hypothecary (mortgage) clause at issue would be needed to conclude that the parties intended to cover this nullity ab initio, as is the case in France for example.

**98**    Additionally, bearing in mind that Quebec insurance law is based on the [TRANSLATION] "genius of the French language" and [TRANSLATION] [page1082] "North American practice" (Faribault, "Du papillon à la chrysalide ou l'étrange métamorphose de l'assurance de responsabilité"

(1987), 55 Assurances 300, at p. 308) in accordance with the opinion of the codifiers (see Caisse populaire), it would be surprising if the standard hypothecary (mortgage) clause at issue here were to be given a different interpretation here, as it is purely a question of the application of the rules of interpretation of contracts in either system, rules which are very similar. A clause to the same effect, though worded differently, is in use throughout Canada and has been interpreted on numerous occasions in the common law provinces as denying mortgagees the protection of an insurance contract that is void ab initio. If the parties intended to circumvent these precedents, which are not recent, they could easily have adopted a wording specifically designed to do so. In this connection the simple addition of the words "déclarations" in French and "omission or misrepresentation" in English, without further qualification, was not intended in my opinion to make it impossible to invoke against the hypothecary creditor "déclarations" or "omission[s] or misrepresentation[s]" made when the policy was purchased. I would instead interpret this addition as being intended solely to cover a possible lacuna in the earlier hypothecary (mortgage) clause, the language of which might suggest that the hypothecary debtor's "omission[s] or misrepresentation[s]" during the life of the contract could be invoked against the hypothecary creditor. It must be remembered that in our legal system it is the intent of the parties that governs and it was thus open to the contracting parties to indicate clearly their common intention to cover nullity ab initio of the insurance contract toward the hypothecary creditor if they could legally do so. In view of the wording and context of the hypothecary (mortgage) clause, in my opinion, such an intent has not been established.

**99**    This result is also consistent with the unanimous jurisprudence of the Quebec Court of Appeal: Duchesneau v. Great American Insurance Co., [1955] Que. Q.B. 120; Madill v. Lirette, supra; Amin v. Cie d'assurance American Home, [1989] R.R.A. 151; Veilleux v. Victoria Insurance Co., [1989] R.J.Q. 1075. This result is also in accord [page1083] with the presumption of good faith implicit in any contract (art. 1024 C.C.L.C.), according to which the insurance contract, like any other contract, was concluded. Assuming, as it was entitled to do, the good faith of its insured when the insurance contract was formed, the insurer could not have had any reservations regarding the second contract attached to it in favour of the insured's hypothecary creditor. It has to be asked whether, in the absence of such good faith on the part of the insured, the insurer would have assumed the risk towards the hypothecary creditor, a risk which it agreed to run precisely because of the assumed good faith of its insured. In other words, in practical terms I find it hard to understand how an insurer, knowing before issuing the policy of the facts not declared or misrepresented here by the insured, would have concluded an insurance contract with that insured. Moreover, this contract has been declared void ab initio for this reason. The second contract, attached to the one concluded between the hypothecary debtor and the insurer under the mandate conferred by the hypothecary creditor, would thus not have been made in those circumstances. The position of the hypothecary creditor is accordingly no different here from what it would have been there.

**100**    If the parties did intend the hypothecary creditor to benefit from the policy's protection, even in a case where the insurer would have refused to issue a policy to the hypothecary debtor, they were obviously free to agree to this, subject of course to the validity of such an agreement. However, it seems to me that such an agreement, the effect of which would be to negate, with

respect to the hypothecary creditor, the provisions in the policy (and the provisions of the law) regarding the initial misrepresentations of the insured hypothecary debtor, must be written in clear and express language. In my opinion, the hypothecary (mortgage) clause at issue here does not meet these requirements.

**101**    Additionally, the obvious advantage for the insurer and insured as well as for the hypothecary creditor in covering the insured risk in a single policy instead of using two separate contracts does not seem to me to be threatened by the conclusions [page1084] at which I arrive. First, there is nothing to indicate that a second contract between the hypothecary creditor and the insurer could not have included restrictions regarding the initial statements by the insured so as to make the policy void ab initio with respect to protection of the hypothecary creditor. Second, the hypothecary (mortgage) clause attached to the policy issued to the hypothecary debtor retains its full value without any need to resort to the procedure of a second contract, so long as the parties expressly indicate the extent of the risk which the hypothecary (mortgage) clause is to cover.

**102**    Having found that the meaning of the hypothecary (mortgage) clause is free of ambiguity, it is not necessary to refer to the rule of interpretation contained in art. 2499 C.C.L.C.

Conclusion

**103**    I therefore conclude that the nullity ab initio of the insurance contract entered into by the appellants and the respondents, as a consequence of misrepresentations by the hypothecary debtor when this contract was purchased, is not covered by the wording of this clause. This conclusion, based on an analysis of the clause itself and its context, is in keeping with the majority interpretations given to various versions of the hypothecary (mortgage) clause by decisions of this Court and the Quebec Court of Appeal.

**104**    If, however, one had to conclude that the parties intended in the hypothecary (mortgage) clause that the insurers would waive their right to have the insurance contract invalidated ab initio, it would then be necessary to consider the validity of such a waiver (in this regard reference can be made, in particular, to Bouzat, "De la clause par laquelle une partie dans une convention s'engage à ne pas en demander la nullité" (1934), 54 Rev. crit. lég. et jur. 350). However, in view of the conclusion at which I have arrived it is not necessary to discuss this question here.

**105**    Accordingly, for all these reasons I would affirm the judgment of the Quebec Court of Appeal and dismiss the appeal, with costs throughout.

[page1085]

Solicitors for the appellants: Mondor, Fournier, Montréal.
Solicitors for the respondents: Colas & Associés, Montréal.

*Indexed as:*

# Oceanic Exploration Co. v. Denison Mines Ltd.

**Between**
**Oceanic Exploration Company, plaintiff (respondent), and**
**Denison Mines Limited, defendant (appellant)**

[1999] O.J. No. 4813

127 O.A.C. 224

93 A.C.W.S. (3d) 468

Docket No. C26405

Ontario Court of Appeal
Toronto, Ontario

**McMurtry C.J.O., Laskin and Goudge JJ.A.**

Heard: June 15 and 16, 1999.
Judgment: December 16, 1999.

(46 paras.)

*Contracts -- Interpretation -- Intention of parties (incl. reasonable expectations).*

Appeal by the defendant Denison from a decision that favoured the plaintiff Oceanic. In 1975, a consortium in which Oceanic was the major stakeholder struck an agreement with Greece for the development of oil production in the Aegean Sea, the E & D Agreement. In 1976 Oceanic sold its rights under the E & D Agreement to Denison through the NEI Agreement for $25,000,000 plus 15 per cent of the consortium's net annual earning as calculated pursuant to the E & D Agreement. Paragraph 3 of the NEI Agreement referred to net earnings interest that was payable to Oceanic as long as there was production under the E & D Agreement but only in connection with its production of oil, gas and hydrocarbons pursuant to the said Agreement. After 1976, the production costs of the venture far exceeded anticipation and by 1990 the consortium had very significant unrecovered production costs. In 1993, the consortium and Greece amended the E & D Agreement to provide for a different method of calculating the net earnings of the consortium that would reduce significantly

Oceanic's share of net earnings. This was the Second Amendment Agreement. It was made without the participation of Oceanic. The trial judge determined that Oceanic and Denison had agreed to the method of calculation provided in the original E & D Agreement. The judge relied on the subsequent conduct of the parties and the doctrines of commercial reasonableness and fairness. Denison took issue with the main conclusions of the trial judge and the applicability of the doctrine of good faith to this case.

HELD: Appeal dismissed. The language of the NEI Agreement and the party's objective made it clear that their shared intention was to incorporate into paragraph 3 the formula for Oceanic's Retained Net Share found in the E & D Agreement as it existed in 1975. Paragraph 3 of the NEI Agreement referenced the original E & D agreement. The condition for the payment of the 15 per cent was intended to continue as long as there could be said to be production under the original E & D Agreement. The condition was met. The Second Amendment Agreement did not touch the terms relating to production and the payments by Denison to Oceanic were still required. It was not necessary to deal with the implications of the good faith principle.

**Appeal from:**

On appeal from a judgment of Feldman J. dated December 13, 1996.

**Counsel:**

Robert P. Armstrong, Q.C., and Jane S. Bailey, for the appellant.
Joseph M. Steiner and Donald D. Hanna, for the respondent.

---

The judgment of the Court was delivered by

**1    GOUDGE J.A.**:-- In 1975, a consortium in which Oceanic Exploration Company was the major stakeholder struck an agreement with Greece for the development of oil production in the Aegean Sea. This agreement was known as the Exploration and Development Agreement, or in short form, the E & D Agreement.

**2**    In 1976 Oceanic sold its rights under this Agreement to Denison Mines Limited for $25 million, plus 15% of the consortium's annual net earnings as calculated pursuant to the E & D Agreement.

**3**    In 1993 the consortium and Greece amended the E & D Agreement to provide a different method of calculating the net earnings of the consortium. If that method of calculation was used as the basis to determine Oceanic's 15% share of net earnings, the annual amount it was to receive would be significantly reduced.

**4**    The question in this litigation is whether the 1976 contract between Oceanic and Denison references the calculation of net earnings only to the original E & D Agreement or to the E & D Agreement as amended in 1993.

**5**    At trial, Feldman J. determined that Oceanic and Denison had agreed to the method of calculation provided in the original E & D Agreement. For the reasons that follow I agree, although I reach that conclusion by a somewhat different route.

THE FACTS

**6**    As the trial judge indicated, in large measure the relevant facts are not in dispute.

**7**    The E & D Agreement was entered into on June 14, 1975, and was thereafter ratified in law by the Parliament of Greece. Its purpose was to permit the consortium, in which Oceanic had a 68.75% interest, to proceed to develop oil production from certain offshore areas in the Aegean Sea. The concept behind the agreement was that the consortium would pay for the project and the Greek State would share in the resulting revenue rather than receiving a royalty.

**8**    The method of calculating the net revenue of the consortium set out in the original E & D Agreement of 1975 required several steps.

**9**    First, from the gross revenue of the project were subtracted the production costs for the year. These were capped after the first five years at 40% of gross revenue. This yielded the net revenue of the project.

**10**    The Greek State then took its share which was 30% of the net revenue.

**11**    Then the consortium paid Greek income tax at a 50% rate leaving the balance of 35% of the net revenue as the net earnings of the consortium. This was called the "Contractor's Retained Net Share".

**12**    The 1975 E & D Agreement had two other provisions of importance in this litigation. The first is found in the Definitions provision at the beginning of the contract. It reads as follows:

> The following underlined words and terms shall have the following meaning unless the context of the Agreement otherwise specifies:

> Agreement: means the present document and its Schedules, as well as any extension, renewal, substitution or amendment thereof; ...

**13**    The second is Article 30.3 which is as follows:

> 30.3. The Parties hereto further agree that during the entire validity of this

Agreement, no provisions hereof shall be amended, supplemented or replaced, except by mutual agreement between them, confirmed in writing and signed by their lawful representatives.

**14**    Oceanic's business was to do the preliminary work on ventures such as this and then transfer its interest to an operator who was technically and financially able to carry it out. It therefore entered into a Memorandum of Agreement on June 30, 1976 (which was subsequently amended on August 27, 1976) to sell its interest in the E & D Agreement to Denison. The purchase price was U.S. $25 million together with an annual amount equivalent to 15% of the Contractor's Retained Net Share for that year as determined under the E & D Agreement.

**15**    Then on August 30, 1976, in an agreement in which Denison and Oceanic expressly set out their desire to define the terms and conditions upon which payments between them would be made, the final form of the amount due each year to Oceanic was fixed. This agreement was known as the Oil Payment and Net Earnings Interest Agreement (the "NEI Agreement").

**16**    For the purposes of this litigation there are several critical provisions of the NEI Agreement. Recitals A and B read as follows:

>    A. Pursuant to the Memorandum of Agreement of June 30, 1976 between Denison and Oceanic, as amended, (such agreement and all amendments thereto collectively referred to as the "Agreement"), Denison has agreed to acquire all of the interests of Oceanic in and to that certain Exploration and Development Agreement of June 14, 1975 by and between the Greek State and Oceanic Exploration Co. of Greece, et al., (the "Exploration and Development Agreement") and in the areas subject thereto.

>    B. The Agreement further provides that Denison will make certain payments to Oceanic, referred to as the "Oil Payment" or "First Oil Payment" and as the "15% Net Earnings Interest," and that under certain circumstances Oceanic may make certain payments to Denison, referred to as the "Second Oil Payment." Denison and Oceanic hereby desire to define the terms and conditions upon which such payments shall be made to Oceanic and to Denison.

**17**    Paragraph 3 provides for the 15% payment:

>    3.    Net Earnings Interest. Denison hereby grants to Oceanic a 15% net earnings interest (the "Net Earnings Interest") which shall be payable by Denison to Oceanic as long as there is production under the Exploration and Development Agreement, but (a) only in connection with its production of oil, gas and hydrocarbons pursuant to the Exploration and Development Agreement, if any, (except as otherwise provided below in this Paragraph 3); (b) only upon

completion of all payments pursuant to the First Oil Payment and the Second Oil Payment, if any; and (c) only upon the following terms:

(a)     there shall be determined in respect of each calendar year, from and including the year in respect of which the final portion of the First Oil Payment, or Second Oil Payment, if any, is payable, the amount of the Contractor's retained net share for such year from each Development area under the Exploration and Development Agreement, after deduction of Petroleum Costs recovered under the Exploration and Development Agreement, and the Greek State's Percentage Participation Share, but before deducting Greek income tax, but excluding earnings in respect of which the final portion of the First Oil Payment or Second Oil Payment, if applicable, is payable (the expressions used in this clause (a) to have the same meanings as in the Exploration and Development Agreement).

(b)     there shall then be determined the amount which is 15% of the amount determined under clause (a) above; and

(c)     the amount determined under clause (b) above shall be the Net Earnings Interest payable to Oceanic; Denison shall withhold from each payment to Oceanic of its Net Earnings Interest the proportionate amount of Greek taxes paid by the Contractor attributable to the net earnings payable to Oceanic and shall promptly, after receipt by Denison, deliver to Oceanic certified copies of receipts issued by the Greek Revenue authorities for the payment of such income taxes, such delivery shall constitute a full accounting by and acquitance [sic] of Denison for such withheld amounts.

**18**    In the years following 1976, the production costs of the venture far exceeded anticipation. Given the cap on their recovery contained in the formula in the E & D Agreement, by the early 1990s the consortium had very significant unrecovered production costs. As a result, even though there were still oil reserves, it was clear that the project was going to become uneconomic for the consortium if it could not strike a new revenue sharing agreement with Greece.

**19**    By the end of November 1992 such an agreement had been reached. It was formally signed on February 23, 1993, and was subsequently ratified in law by the Greek Parliament. It was effective as of January 1, 1993.

**20**    This agreement was known as the Second Amendment Agreement. It significantly altered the method of determining the Contractor's Retained Net Share. The most important change was that the cap for recovery of production costs was put on a sliding scale and could go as high as 90% of gross revenue. In addition, the share taken by the Greek State was reduced to 5% and the income tax rate was reduced from 50% to 40%.

**21**    The Second Amendment Agreement concluded with Article 10 which provides that the terms of the original E & D Agreement not amended by this amending agreement remain in full force and effect.

**22**    The Second Amendment Agreement was made without any participation by Oceanic. Indeed, Denison acknowledged that it took no account of Oceanic's interest in its negotiations with Greece. Oceanic had been paid since 1976 on the basis of the method contained in the original E & D Agreement. Largely because of the rise in the cap on production cost recovery and based on the production levels actually attained between 1993 and the date of trial, the new formula yielded a much lower return to Oceanic than would have resulted from the original method in the 1975 E & D Agreement.

**23**    Thus the issue was joined, with Oceanic taking the position that the payment called for by the NEI Agreement should be determined by taking 15% of the Contractor's Retained Net Share calculated according to the original E & D Agreement and Denison asserting that the calculation should reflect the amendments contained in the Second Amendment Agreement of 1993.

**24**    Against this backdrop Feldman J. concluded that the payment referred to in paragraph 3 of the NEI Agreement was to be calculated using the formula in the original E & D Agreement and not that in the 1993 Amendment. She based this conclusion on the plain meaning of the language coupled with the rules of contractual interpretation regarding incorporation into contracts of foreign statutes, regulations and standard foreign contracts.

**25**    She also found support for this conclusion because if an ambiguity could be said to exist here, both the subsequent conduct of the parties and the most commercially reasonable meaning of this agreement pointed in her view to the same conclusion.

**26**    Secondly, Feldman J. concluded that in the circumstances of this case it was not necessary that the phrase "Exploration and Development Agreement" as used in paragraph 3 of the NEI Agreement always mean the original E & D Agreement. In particular, she found that phrase to mean the E & D Agreement as amended where paragraph 3 refers to the payment obligation existing only "as long as there is production under the Exploration and Development Agreement". In finding that the circumstances pointed away from giving the same meaning to this term throughout the NEI Agreement she relied primarily on the subsequent conduct of the parties and the doctrines of commercial reasonableness and fairness.

**27**    Finally, she offered in obiter that while the obligation of good faith owed by one contracting party to another did not squarely bind Denison in negotiating amendments to the original E & D Agreement that would adversely affect Oceanic, fair dealing might require that a term be implied in the NEI Agreement to limit any resulting adverse impact on Oceanic.

**28**    On this appeal the appellant takes issue with both main conclusions of the trial judge and with the applicability of the doctrine of good faith to this case.

ANALYSIS

**29**    In my opinion, the outcome of this appeal depends upon the proper interpretation of paragraph 3 of the NEI Agreement. In the oft repeated phrase of Estey J. the task of the court is "... to search for an interpretation which from the whole of the contract would appear to promote or advance the true intent of the parties at the time of entry into the contract."[1] It is a task which is anchored in the language used by the parties in drafting the document. When these words are clear and there is no ambiguity there is no need to go outside the Agreement for assistance in the interpretive exercise.[2]

**30**    The question here is whether in drafting the NEI Agreement the parties intended the calculation of the required payment to Oceanic to be based on the formula in the original E & D Agreement or that provided in the Agreement as amended. To answer that question it is useful to repeat the language in the NEI Agreement that must be scrutinized.

> Recital A:
>
> Pursuant to the Memorandum of Agreement of June 30, 1976 between Denison and Oceanic, as amended, (such agreement and all amendments thereto collectively referred to as the "Agreement"), Denison has agreed to acquire all of the interests of Oceanic in and *to that certain Exploration and Development Agreement of June 14, 1975* by and between the Greek State and Oceanic Exploration Co. of Greece, et al., (the "Exploration and Development Agreement") and in the areas subject thereto. [Emphasis added.] ...
>
> 3.    <u>Net Earnings Interest</u>. Denison hereby grants to Oceanic a 15% net earnings interest (the "Net Earnings Interest") which shall be payable by Denison to Oceanic as long as there is production under the Exploration and Development Agreement, but (a) only in connection with its production of oil, gas and hydrocarbons pursuant to the Exploration and Development Agreement, if any, (except as otherwise provided below in this Paragraph 3); (b) only upon completion of all payments pursuant to the First Oil Payment and the Second Oil Payment, if any; and (c) only upon the following terms:
>
> (a)    there shall be determined in respect of each calendar year, from and including the year in respect of which the final portion of the First Oil Payment, or Second Oil Payment, if any, is payable, the amount of the Contractor's retained net share for such year from each Development area under the Exploration and Development Agreement, after deduction of Petroleum Costs recovered under the Exploration and Development Agreement, and the Greek State's Percentage Participation Share, but

before deducting Greek income tax, but excluding earnings in respect of which the final portion of the First Oil Payment or Second Oil Payment, if applicable, is payable *(the expressions used in this clause (a) to have the same meanings as in the Exploration and Development Agreement)*. [Emphasis added.]

**31**    As Recital B in the NEI Agreement makes clear, the parties were seeking to give definition to the terms and conditions upon which payments would be made to Oceanic. They were striving for certainty and clarity. Against that backdrop they provided in paragraph 3(a) for the method of calculating the annual amount owing to Oceanic, explicitly stating that the expressions used have the same meaning as in the Exploration and Development Agreement. Recital A makes this a defined term namely, "that certain Exploration and Development Agreement of June 14, 1975".

**32**    This language together with the party's objective of certainty make clear that the shared intention of the parties was to incorporate into paragraphs 3(a) of the NEI Agreement the formula for Contractor's Retained Net Share found in the E & D Agreement as it existed on June 14, 1975. They did not intend to incorporate whatever formula might emerge from amendments that might be made at some future date.

**33**    This meaning would seem to accord with the underlying reality of the transaction between Denison and Oceanic in 1976, namely that Denison was acquiring the right to develop oil production in the designated offshore areas of the Aegean Sea in return for providing Oceanic with $25 million together with a steady future income stream calculated according to paragraph 3 of the NEI Agreement.

**34**    The alternative interpretation urged by Denison simply does not square with the language used by the parties in the NEI Agreement. Denison says that because the E & D Agreement defines "Agreement" to mean "the present document ... as well as any ... amendment thereof", and because paragraph 3(a) of the NEI Agreement provides that expressions used in that clause have the same meaning as in the E & D Agreement, it follows that the NEI Agreement incorporates the definition of the E & D Agreement set out in the latter Agreement, which specifically includes amendments to it.

**35**    On the contrary, in Recital A the parties to the NEI Agreement explicitly defined what they meant by "the Exploration and Development Agreement." They meant "that certain Exploration and Development Agreement of June 14, 1975" not "the Exploration and Development Agreement as amended."

**36**    Moreover, "the Exploration and Development Agreement" is not a defined term in the E & D Agreement. Rather, the defined term is "Agreement". It is clear that the parties to the NEI Agreement did not intend to incorporate the definition of "Agreement" found in the E & D Agreement because they expressly defined "Agreement" in Recital A of the NEI Agreement to mean something quite different - namely, the Memorandum of Agreement of June 30, 1976, as

amended.

**37**    The position advanced by Denison is that the formula referenced by paragraph 3 of the NEI Agreement is the one set out in the E & D Agreement as it might be amended in future from time to time. This would mean that Oceanic would have placed its ongoing economic interest in this contract entirely in the hands of Denison and Greece. In my view, if this were the shared intention of the parties, it would have been clearly expressed.

**38**    Commercial contracts are normally designed, at least in part, to maximize certainty. In Spooner Oils Limited v. Turner Valley Conservation Board, [1933] S.C.R. 629 Duff C.J. addressed this principle. That case involved a contract between the federal government and a private lessor. Although he was speaking of the incorporation into a contract of future government regulations (rather than other contracts which might be amended) his words are apposite. At pp. 641-42 he said this:

> The view suggested involves the result that the terms of the contract may in every respect be altered (as regards rental, as regards royalties, as regards the obligations of the lessee in respect to the working of the mine); and by one party to the lease acting alone, without consultation with the other; and with the result (a result which, as we have seen, actually follows in this case from the acceptance of the respondent's contention) that a contract radically new, in its essential terms, may be substituted for that explicitly set forth in the document executed by the parties and the specific regulations that it incorporates.

> ... But to us it seems clear that, if it had been intended to incorporate, as one of the terms of the lease, a stipulation that all future regulations touching the working of the property should become part of the lease as contractual stipulations, that intention would have been expressed, not inferentially, but in plain language.

**39**    I would, therefore, conclude, as did Feldman J., that paragraph 3 of the NEI Agreement references the original E & D Agreement, not the E & D Agreement as amended in 1993.

**40**    The opening paragraph of paragraph 3 requires that this 15% payment by Denison continue "as long as there is production under the Exploration and Development Agreement". As I have said, Feldman J. interpreted this reference to the E & D Agreement to mean "as amended", contrary to her finding that the parties intended the same reference in the payment calculation to refer only to the original 1975 Agreement.

**41**    I do not agree with this differentiation. I see no basis here to depart from basic principles of interpretation to read this phrase differently in different parts of paragraph 3 of the NEI Agreement. For the reasons I have outlined, I think that throughout paragraph 3 the parties intended to reference

the original E & D Agreement. The 15% payment was intended to continue as long as there could be said to be production under that original E & D Agreement.

**42**    That condition is clearly met here. The original E & D Agreement provisions which permit oil production are Articles 1.1 and 7.4. They read as follows:

> 1.2 Contractor is granted hereby the exclusive right and license to perform, manage and carry out under the terms and conditions set out hereunder, all Petroleum Operations related to Hydrocarbons in the Contract Area.
>
> ...
>
> 7.4 During the entire term of validity of each Development License Contractor shall have the exclusive right to keep, use, operate and maintain each Development Area for the purpose of carrying out the Petroleum Operations therein.

**43**    These provisions were untouched by the 1993 Amendment and remained operative. Article 10 of the Second Amendment Agreement expressly provides that all terms of the original E & D Agreement that were not amended remain in full force and effect.

**44**    The Second Amendment Agreement focussed on amending the terms of the E & D Agreement relating to the allocation of the proceeds of production. It did not touch the terms relating to production. That production continued under the terms of the original E & D Agreement. Hence the payments by Denison to Oceanic were still required.

**45**    I therefore conclude that the references to the Exploration and Development Agreement in paragraph 3 of the NEI Agreement are to the original E & D Agreement not the E & D Agreement as amended in 1993. I have reached this conclusion based on the plain meaning of the contractual language. I do not find any ambiguity in the wording and hence would not resort to the extrinsic evidence about the subsequent conduct of the parties or the commercial reasonableness of the outcome. Indeed, the conclusions to be drawn from that evidence seem open to considerable debate. Nor is it necessary to deal with the implications of the good faith principle for this contractual relationship.

**46**    For these reasons I would dismiss the appeal with costs.

GOUDGE J.A.
 McMURTRY C.J.O. -- I agree.
 LASKIN J.A. -- I agree.

cp/e/nc/qlbbd/qlkra/qlmjb/qlbxm

1 Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888 at 901.

2 Glimmer Resources Inc. v. Exall Resources Ltd., [1999] O.J. No. 1357 (C.A.) per Doherty J.A. at paragraph 16.

*Indexed as:*

# Paxton v. Canada

**IN THE MATTER OF the Income Tax Act**
**Between**
**Her Majesty the Queen, appellant, and**
**Jerrold D. Paxton, respondent**

**[1996] F.C.J. No. 1634**

[1996] A.C.F. no 1634

206 N.R. 241

97 D.T.C. 5012

67 A.C.W.S. (3d) 1225

Court File No. A-513-94

Federal Court of Appeal
Toronto, Ontario

**Strayer, Robertson and McDonald JJ.**

Heard: October 8, 1996
Judgment: December 12, 1996

(26 pp.)

*Income tax -- Persons liable -- Transfers of property from taxpayer -- Capital gains and losses -- Capital gains -- Sale of shares -- Computation of income -- Non-arm's length transactions -- Transfer, what constitutes.*

Appeal by the Queen from a decision of the Tax Court pursuant to section 73(5) of the Income Tax Act. The section permitted the deferral of capital gains upon a transfer of shares of a small business corporation from parent to child. The Tax Court judge had allowed the tax benefit. The appeal depended on the meaning of "transferred" in the Act. The taxpayer had transferred his shares in his business to his children, who then transferred their shares for a greater amount of money to a corporate purchaser of the business pursuant to a sale agreement. Each child received $10,000 and the

balance of the sale proceeds flowed to the taxpayer. The taxpayer argued that he had made a prior agreement with his children to sell the shares to them and had acted as their agent in selling the shares to the purchaser. The agreement with the purchaser stated that the taxpayer was the legal owner of the shares.

HELD: Appeal allowed. The taxpayer's agency argument directly contradicted the documentary evidence. The facts revealed an incomplete or ineffective tax planning scheme which could be traced to the failure to properly document the sale of the shares to the children prior to the execution of the agreement with the corporate purchaser.

**Statutes, Regulations and Rules Cited:**

Income Tax Act, ss. 70(9), 73(3), 73(4), 73(5).

**Avocats:**

Harry Erlichman and Elizabeth Chasson, for the appellant.
Maralynne Monteith, for the respondent.

---

Reasons for judgment by: Robertson J. Concurred in by: Strayer J. Dissenting reasons by: McDonald J.

**1    ROBERTSON J.**:-- This is an appeal from a reported decision of the Tax Court of Canada, [1995] 1 C.T.C. 2229, involving the application of subsection 73(5) of the Income Tax Act (the "Act"). That provision, now repealed, sought to facilitate the inter-generational roll-over of small business corporations by permitting the deferral of capital gains upon a transfer from parent to child. The learned Tax Court Judge concluded that the respondent taxpayer is entitled to that tax benefit. I respectfully disagree.

**2**    At the outset I wish to make clear that I am acutely aware of the prohibition against employing the purposive approach in the context of statutory language which admits of no ambiguity and where the legal and practical effect of a transaction is undisputed: see Canada v. Antosko, [1994] 2 S.C.R. 312 at 326-27, per Iacobucci J. But, in my view, this is not an Antosko-type case. Rather, the outcome of this appeal hinges initially on the meaning or scope of the word "transferred" as employed in subsection 73(5) of the Act. Once that meaning has been identified then it is my opinion that the facts of this case clearly reveal an ineffective or incomplete tax planning scheme arising from the failure to comply with legal formalities. My analysis begins with subsection 73(5) which at the relevant time read as follows:

> 73(5) For the purposes of this Part, where at any particular time a taxpayer has transferred property to his child who was resident in Canada immediately before the transfer and the property was, immediately before the transfer, a share of the capital stock of a small business corporation, except where the rules in subsection 74(2) require any taxable capital gain from the disposition by the taxpayer of that property to be included in the income of a person other than the taxpayer, the following rules apply... [Underlining added]

**3**    It is to the facts that I now turn. In 1986, the taxpayer decided to retire and sell his 50 percent interest in a small business corporation, Ronlar Investments Ltd. ("Ronlar"). He testified that he wished to transfer his Ronlar shares to his three children and daughter-in-law (hereinafter the "children"), but they were not interested in carrying on the business. The taxpayer then sought out a purchaser with the assistance of "advisors". The taxpayer also testified that while his counsel was negotiating with a purchaser, Tandet Management Inc. ("Tandet"), he agreed to sell and the children agreed to purchase the shares in question. Prior to documenting these agreements the taxpayer agreed to sell the shares to Tandet pursuant to an agreement executed on November 6, 1986 (the "Tandet Agreement"). The children were not parties to that agreement which had a closing date of November 28, 1986.

**4**    Pursuant to Article 3.3 of the Tandet Agreement, the taxpayer had the right, exercisable in writing at any time prior to two business days before the closing date of the transaction, to elect to make an "interim transfer" of his Ronlar shares to members of his family. The right to elect, however, was subject to the restriction that any transfer to family members would be valid only if the family members completed the sale and transferred the shares to Tandet in accordance with the terms of the Tandet Agreement.

**5**    Article 4.1(5) of the Tandet Agreement provided that the taxpayer warranted that he was the owner of the Ronlar shares as of the date of that agreement and that the shares would be owned by him or his family members on the date of closing. Article 4.1(7) provided that the taxpayer warranted that no person or corporation had or would have at the date of closing any agreement capable of being enforced as a contract or option for the purchase from the taxpayer or his family members of any of the shares.

**6**    On November 24, 1986, the taxpayer notified Tandet that he wished to exercise his right to transfer the shares to his family pursuant to Article 3.3 of the Tandet Agreement. On November 27, 1986, the taxpayer and the children entered into agreements of purchase and sale for the Ronlar shares. In those agreements the taxpayer warranted that he was the owner of the shares and that no outstanding agreement for the sale of the shares existed. On the same date, the shares were duly transferred to the children for less money than Tandet had agreed to pay. On November 28, 1986, the children transferred their shares to Tandet. As a result of that transaction, each child received $10,000. Ultimately, the balance of the sale proceeds flowed to the taxpayer. Within this factual context the Tax Court Judge concluded as follows (at 2243-44):

> The Court, after reviewing the evidence, written and oral, and after consideration of Counsels' submissions, finds that the Tandet Agreement did not effect a transfer of the Ronlar shares. It clearly obliged the Appellant to effect a transfer on the closing date, or as anticipated in Article 3.3, to cause a transfer to be made. Moreover the incidents of title, possession, use and risk did not pass to Tandet until the closing. It is true that the children were not parties to the Tandet Agreement. However this is not sufficient to justify a conclusion that the Tandet Agreement must be considered as effecting a transfer. Tandet obviously wanted the covenants from the two persons who had run the corporation and its subsidiaries over the years. Tandet also recognized that the Appellant was free, prior to closing, to structure the transaction in the best possible fiscal manner and that is what he did. He took advantage of the benefits which the Act provided with respect to transfers of shares of a small business corporation and with respect to

> deferring recognition of a capital gain. Again it is true that the transfers to the children were only valid if they subsequently sold to Tandet. However they did so and consequently the transfers to them were valid.

**7**      One need not be a tax professional to recognize that the purpose of the sale of the Ronlar shares to the taxpayer's children was to enable him to defer the payment of capital gains arising on the sale to Tandet. Subsection 73(5) of the Act provides for such. The parties obviously tried to structure a transaction which satisfies that provision by relying on a tax strategy premised on the legal principle established in Orr v. M.N.R., [1989] 2 C.T.C. 2348, 89 DTC 557 (T.C.C.). Therein, it was held that subsection 73(5) does not require that shares transferred by a parent to a child be held for a minimum period prior to a transfer to a third party. It follows from that decision that even though the taxpayer's children had no intention of operating the business, the tax advantage remains available provided that there was a transfer of the Ronlar shares to the children prior to the transfer to Tandet. For purposes of deciding this appeal, however, it is unnecessary to consider the correctness of Orr, for in my opinion there was never a valid or effective transfer of the Ronlar shares to the children within the meaning of subsection 73(5).

**8**      In my view, the nub of this case comes down to the proper meaning to be ascribed to the word "transferred", as used in subsection 73(5) of the Act. Specifically, it must be determined whether the transfer of the Ronlar shares to the taxpayer's children constituted a transfer within the meaning of that subsection. Before turning to that issue, however, it is necessary to consider whether the Tandet Agreement of November 7, 1986 effected a transfer of the Ronlar shares. The Tax Court Judge concluded that it did not. I respectfully disagree. To some, this question might seem to be trite or pedantic, but I think it is necessary to understand that there are other forms of transfer recognized at law aside from an actual transfer of shares. In the circumstances I feel compelled to deal with this latter issue first.

**9**      It is not entirely clear how the Tax Court Judge reached the conclusion that the Tandet Agreement did not effect a transfer of the Ronlar shares. There are, however, at least two arguments which could be advanced in support thereof. First, it could be argued that the Tandet Agreement was not a binding or enforceable contract and, therefore, could not be deemed to have effected a valid transfer of the Ronlar shares. Pursuant to this argument the actual transfer to the children occurred on November 27, 1986 and preceded the actual transfer to Tandet on November 28, 1986. Second, the word "transferred" employed in subsection 73(5) of the Act, and applicable in relation to the Tandet Agreement as well, could be interpreted narrowly as meaning an "actual transfer" such as occurs when shares are registered in the name of a new owner. In my opinion, both arguments must be rejected.

**10**      With respect to the possible argument that the Tandet Agreement was not binding or enforceable, I note that in the court below the taxpayer argued that "no property in the shares of a private company can pass" until such time as the restrictions pertaining to share transfer are satisfied (Appeal Book, Appendix I, at 79). I presume that the share restrictions being referred to embrace shareholder or director approval of any transfer of the Ronlar shares. In any event, the argument is without legal foundation. An executory contract which is subject, for example, to third party approval is nonetheless binding. [I am ignoring the fact that in this case third party approval was to come from the taxpayer himself]. The condition precedent is said to go to "performance" and not "obligation": see generally Barnett v. Harrison, [1976] 2 S.C.R. 531. Furthermore, a purchaser under an executory contract for the sale of shares has, as a general rule, a right to specific performance

of the contract: see R.J. Sharpe, Injunctions and Specific Performance, 2d ed. (Aurora: Canada Law Book Inc., 1995) at 8-26. To maintain that a purchaser such as Tandet had no proprietary interest in the shares pending the actual closing of the transaction and transfer of the shares would, in my view, fly in the face of accepted principles of law.

**11**     I pause here to note that it is unnecessary to determine the exact nature of the proprietary interest which a purchaser receives under an executory contract for the sale of shares. This is not a case where the competing interests of vendor and purchaser of shares are at issue. Accordingly, nothing is to be gained here by attempting to extract from the extant law rigid theories of ownership when one is construing the meaning of a word, such as "transferred", in the context of a taxing statute. It is sufficient for purposes of this appeal to speak of a purchaser of shares under an executory contract as the equitable or beneficial owner of such. The vendor may properly be described as the legal or nominal owner.

**12**     As noted above, the second argument that could be advanced for holding that the Tandet Agreement did not effect a transfer of the Ronlar shares embraces the understanding that the word transferred means "actual transfer" as happens when shares are registered in the name of the new owners. If that understanding is accepted then it is irrelevant whether a purchaser of shares under an executory contract is deemed, for example, to be the equitable or beneficial owner of such. In my view, this is the position adopted by the Tax Court Judge. I say this because he rests his conclusion that the Tandet Agreement did not effect a transfer of the Ronlar shares on the basis that the incidents of title, possession, use and risk did not pass to Tandet until closing. At the same time, the Tax Court Judge recognizes that the Tandet Agreement is a binding one (he accepts that the transfers to the children were only valid if they subsequently sold to Tandet), but apparently that is not for him a sufficient basis on which to conclude that there was indeed a transfer to Tandet. Respectfully, I cannot accept this analysis.

**13**     By excluding executory contracts from the ambit of the word transferred, the interpretation placed on that word by the Tax Court Judge is far too narrow and certainly not in harmony with the jurisprudence. As early as 1948 the Exchequer Court held that the word "transfer" is not a term of art, nor is it necessary to effect a transfer of property that it be made in any particular form: see David Fasken Estate v. Minister of National Revenue, [1948] Ex. C.R. 580; Dunkelman v. M.N.R., 59 DTC 1242 (Ex. Ct.); and German v. M.N.R., 57 DTC 1216 (Ex. Ct.).

**14**     I should also point out that if I were to accede to the narrow meaning being attributed to the word transferred in subsection 73(5) then the meaning that has been ascribed to that word in the context of other roll-over provisions found within the Act (e.g. subsections 73(3),(4) and 70(9) regarding farm property) would have to be re-evaluated: see, for example, Boger Estate v. M.N.R., [1993] F.C.J. No. 545 (F.C.A.). In that case, decided under Alberta law, it was held that a formal conveyance was not necessary to transfer farm lands to children pursuant to a father's will upon the latter's death. For tax purposes, too, the complete administration of the estate was held to be unnecessary. It follows that this Court is not preoccupied with the form of transfers in the context of the roll-over provisions of the Act. Otherwise, cases like Boger might have been decided differently.

**15**     Having regard to the extant law, I am of the view that on November 6, 1986, the Ronlar shares were effectively transferred by the taxpayer to Tandet, which transfer was perfected by the actual transfer which occurred on November 28, 1986. I turn now to a more detailed investigation of the difficult question of whether the transfer of the Ronlar shares from the taxpayer to his children constituted a transfer within the meaning of subsection 73(5) of the Act.

**16**     One cannot help but be tempted to rely on the legal maxim nemo dat quod non habet for the proposition that the children could not become the owners of the Ronlar shares following their sale to Tandet. But aside from the fact that Latin maxims are today unfashionable, that quoted is not applicable for reasons which I need not address. What is relevant is the legal basis for rejecting the proposition that the actual transfer of the Ronlar shares to the children, effected on November 27, 1986, did not satisfy subsection 73(5) of the Act.

**17**     It seems to me that the type of transfer embraced by subsection 73(5) of the Act is, at a minimum, one which enables the purchaser to exercise the degree of control necessary to determine the ultimate fate of the family business. That is what the subsection is all about. That criterion has not been satisfied in the instant case. This is so because the sale and transfer to the children was conditioned on an immediate transfer to Tandet. It is true that the children did hold the shares for one day, but that fact cannot be determinative of the issue. In my view, what is of fundamental significance is the fact that the Tandet Agreement deprived the children of the right to decide whether the business would be sold or held, be it for a year or even a millisecond. They had no right to the use or enjoyment of the shares other than to transfer them within one day to Tandet and to retain a small portion of the sale proceeds. That limited right and the legal inability to decide whether the family business should be continued are, in my opinion, sufficient grounds to hold that a transfer within the meaning of subsection 73(5) did not occur on November 27, 1986. I might add that nothing I have said contradicts or undermines the ruling in Orr, discussed earlier.

**18**     The above reasoning and conclusion leaves open the possibility that the taxpayer entered into a binding contract of sale with his children prior to the Tandet Agreement being signed. Indeed, this is the very argument advanced by counsel for the taxpayer in the Tax Court and before this Court in both written and oral argument. The essence of that argument is that the taxpayer agreed to sell the shares to his children, who then instructed him to act as their agent in finding a buyer for the Ronlar shares. In this regard, it is argued that the Tandet Agreement was not signed until the children's approval had been obtained: see Respondent's Memorandum of Fact and Law at paragraphs 4 and 5. It follows that the written contracts entered into by the taxpayer and his children on November 27, 1986 were merely confirmatory of the earlier oral contracts.

**19**     As is discussed below, I am unable to accept the so-called agency argument for two reasons. First, the evidence does not support the existence of an oral contract for the sale of the Ronlar shares to the children and, second, the argument gives rise to the vexing allegation of "sham". I shall deal with each of these points in turn.

**20**     If the taxpayer's agency argument is to succeed, then it is because an enforceable contract of sale for the Ronlar shares had been entered into by the taxpayer and his children prior to the execution of the Tandet Agreement. While a contract for the sale of shares may be enforceable even though not in writing, the oral evidence in this case must establish a binding contract as alleged. [I note that the Tax Court Judge made no express finding on this point]. During oral argument counsel for the taxpayer was asked to direct this Court to all of the viva voce evidence which supports the existence of an enforceable oral contract. We were referred specifically to the following extracts:

> Appeal Book, Appendix I, at 16-17, Evidence-in-chief of
> taxpayer
> Q. When you talked to your children, did you indicate
> to them that you were going to sell the shares directly?

A.      No. I had always promised the business to -- not so much the daughters as to son, Darryl, who I expected would take it over and I guess I felt like I was -- I still felt like I was selling out from under them. But we discussed it and basically I was acting as an agent for the children as far as I was concerned at that stage.

Q.      So Mr. Larmer wanted to sell the business as well.

A.      Yes, he did.

Q.      Who was to negotiate the transaction?

A.      I had always done all the negotiations for that type of thing in the business and Ron had always left me to do that, so that I was the one that did all the negotiations for the sale of the business...

[At 18-20]:

Q.      Did the children approve? Did you talk to the children about the Tandet transaction, the deal?

A.      They were aware of the amount of money that was involved. They were aware -- basically the situation was that they could come out of this at this time with some cash in their jeans, rather than owning the business, and they were aware of -- they weren't aware of the nitty-gritty little things, neither was Ron Larmer, actually, at the outset. So they knew everything that Ron knew, yes.

Q.      I'd like to draw your attention to the agreement of purchase and sale with Tandet which appears at Tab 5 of the book of authorities, and in particular clause 3.3 which appears at page 7 of that document.

A.      Yes.

Q.      That clause reads: [3.3] That article, why was that clause in the agreement?

A.      This clause was here because the family had decided to sell the business and this clause had to be here as I was negotiating the deal. This clause had to be here to allow me to put the shares into the children's names before they sold to Tandet.

Q.      Why didn't the children sign the agreement?

A.      The children really-I'm their dad, I was the one they looked up to to negotiate. I guess it's the same as when I bought my first trucking business, my father did all the negotiations for me and I trusted him to do that.

[I have also carefully examined the taxpayer's evidence at 14 (lines 3-25), 15(lines 1-7), 24 (lines 12 and 19), 25 (lines 3-4), 35 (lines 5-7) and 39 (lines 7-16). In addition, I have reviewed Darryl Paxton's evidence in-chief at 52 (lines 5-17) and 63 (lines 6-10), all of which is referred to in the Respondent's Memorandum of Fact and Law. None of this evidence, in my opinion, supports the taxpayer's argument more effectively than the foregoing excerpts.]

**21**      The above evidence, in my opinion, does not establish an enforceable contract between taxpayer and children prior to the execution of the Tandet Agreement. According to the transcript evidence, they had not even agreed on the price to be paid by the children to the taxpayer for the Ronlar shares. If the taxpayer did not want to sell out from under his children, why is it that they only received a fraction of the sale proceeds? In fact, each child made $10,000 on the sale to Tandet. The taxpayer would receive in excess of $1 million. At best, the evidence supports the finding that the

taxpayer had entered into an informal and non-binding agreement to permit the children to share in the proceeds received from Tandet.

**22**    There is in my view another fundamental problem with the agency argument. It gives rise to an allegation of sham, an argument which was pursued below and before this Court. The principal position of the taxpayer is that since the doctrine was not pleaded it could not be raised.

**23**    The classic definition of sham is found in Lord Diplock's reasons in Snook v. London & West Riding Investments, Ltd., [1967] 1 All E.R. 518 at 528:

> I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. One thing I think, however, is clear in legal principle, morality and the authorities..., that for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived.

That definition was adopted by the Supreme Court of Canada in M.N.R. v. Cameron, [1974] S.C.R. 1062 at 1068, per Martland J. It was reaffirmed by that Court in Stubart Investments Limited v. The Queen, [1984] 1 S.C.R. 536 at 545-46. As Professor Krishna has written, the definition of sham implies that the parties to a transaction have deliberately set out to misrepresent the actual state of affairs. In other words, deceit is the cornerstone of the sham doctrine: see V. Krishna, The Fundamentals of Canadian Income Tax, 5th ed. (Scarborough: Carswell, 1995) at 1371-72.

**24**    On the facts of this case it is evident that the parties to the transaction, that is the taxpayer and Tandet, did not have a common intention to deceive the Minister by executing a contract which established legal rights and obligations different from those which the parties intended to create. Moreover, I do not think the agreements with the children entered into on November 27, 1986 can reasonably be viewed as an attempt to deceive the Minister. However, the facts do give rise to what I shall label, for lack of a better expression, an "inverse sham" which falls outside the ambit of the conventional sham doctrine. Before explaining this novel proposition, I hasten to acknowledge that I am cognizant of the legal fact that there is a difference between the sham doctrine and the theory of incomplete transactions. It just happens that in this case the two seem to blur.

**25**    This is not a case where the Minister is arguing that the documentary evidence does not reflect the realities of the transaction. Rather, this is a case in which the taxpayer is arguing that things are not what they appear to be. For example, in the Tandet Agreement the taxpayer warrants that he is the owner of the shares. Yet he maintains that this is not the true state of affairs as he was in fact acting as agent for his children, who must, in turn, be deemed to be undisclosed principals. The problem, of course, is that this legal position gives rise to several unanswered questions. Why wasn't the transaction structured to reflect the alleged state of affairs? Why was it imperative that Tandet be kept in the dark as to the true owner of the Ronlar shares?

26      In short, it appears that it is Tandet and not the Minister who has been misled: see Joel A. Nitikman, "Current Cases of Interest" in Report of Proceedings of the Forty-Sixth Tax Conference (Canadian Tax Foundation, 1995) 12:1 at 12:12. Moreover, it is not the documentary evidence which gives rise to an allegation of deception or sham, but rather the taxpayer's agency argument which stands in contradiction to the documentary evidence. In the final analysis, tax professionals must be cautious when raising legal arguments which represent a threat to the veracity of documentary evidence which they have drafted. While an allegation of inverse sham need not be pleaded and does not give rise to an estoppel, it places the onus on the taxpayer to explain why it is that things are not as they are represented on the face of such evidence. Enough said of the inverse sham. I return to the simple proposition that the facts of this case reveal an incomplete or ineffective tax planning scheme.

27      I cannot ignore the fact that the Supreme Court of Canada has affirmed the rule that no tax planning transaction will be recognized for tax purposes unless that transaction has been validly established under the rules of the general law: see Stubart, supra at 579. A tax advantage can be lost should a transaction be found to be incomplete or ineffective because of a failure to comply with indispensable legal formalities. In this regard the caution of Urie J. in Atinco Paper Products Limited v. The Queen, [1978] C.T.C. 566 at 577-78 (F.C.A.) (leave to appeal to S.C.C. refused (1979) 25 N.R. 603n) dictates that tax planners must ensure that tax driven transactions are fully implemented and carefully documented:

> Nonetheless, it is the duty of the Court to carefully scrutinize everything that a taxpayer has done to ensure that everything which appears to have been done, in fact, has been done in accordance with applicable law. It is not sufficient to employ devices to achieve a desired result without ensuring that those devices are not simply cosmetically correct, that is, correct in form, but, in fact, are in all respects legally correct, real transactions. If this Court, or any other Court, were to fail to carry out its elementary duty to examine with care all aspects of the transactions in issue, it would not only be derelict in carrying out its judicial duties, but in its duty to the public at large. It is for this reason that I cannot accede to the suggestion, sometimes expressed, that there can be a strict or liberal view taken of a transaction, or series of transactions which it is hoped by the taxpayer will result in a minimization of tax. The only course for the Court to take is to apply the law as the Court sees it to the facts as found in the particular transaction. If the transaction can withstand that scrutiny, then it will, of course, be supported. If it cannot, it will fall. That is what happened here.

28      Having regard to the jurisprudence and the facts of this case, I am compelled to find against the taxpayer. In my opinion, when this case is viewed in its most positive light it serves as an example of an ineffective or incomplete transaction, which can be traced to the failure to properly document the sale of the Ronlar shares to the children prior to the execution of the Tandet Agreement.

29      Having concluded that this case is an example of a tax planning strategy which failed to meet a threshold requirement, it is unnecessary to deal with the other issues raised on appeal. In conclusion, I would allow the appeal with costs here and below, set aside the judgment of the Tax Court of Canada dated August 24, 1994 and affirm the Minister's Notice of Confirmation dated January 16, 1992.

ROBERTSON J.

**30**    McDONALD J. (dissenting):-- This is an appeal from the Tax Court of Canada. The issue in this appeal is whether the taxpayer made appropriate use of what was then subsection 73(5) of the Income Tax Act.

**31**    Having read the reasons of my colleague Robertson J.A., I find I am unable to agree with the conclusion he has reached. The Respondent, Jerrold D. Paxton, was the owner of 50% of Ronlar, a small business enterprise involved in trucking. In 1986, an offer was made by Tandet, a Canadian resident company, to purchase all shares of Ronlar for $2.4 million. An agreement was reached to sell Ronlar which contained a provision that allowed Mr. Paxton to sell his shares of Ronlar to his children, who would then sell the shares to Tandet. The relevant provisions of the agreement read as follows:

> 3.3 Each of the Vendors shall have the right exerciseable by written notice to the Purchaser at any time prior to two business days before the Closing Date to elect to make an interim transfer of all or part of the Purchased Common Shares to other family members of the Vendors (the "Subsequent Vendors") provided that such transfers are only valid if the Subsequent Vendors complete the sale and transfer of the Purchased Common Shares to the Purchaser in accordance with the terms of this agreement. Each of the Vendors undertakes that in the event of any such election the Vendors shall take all such steps as are necessary to cause and require the Subsequent Vendors to complete all the transactions contemplated by this Agreement and each of the Vendors warrants to the Purchaser that all such transactions will be so completed.

> 4.1 Each of the Vendors jointly and severally convenants, represents and warrants as follows and acknowledges that the Purchaser is relying upon such covenants, representations and warranties in connection with the purchase herein:

> (5)    all of the Purchased Common Shares are now owned by the Vendors and will be owned at the Closing date by the Vendors or the Subsequent Vendors as the beneficial owners of record, with good and marketable title thereto, free and clear of all mortgages, liens, charges, security interests, adverse claims, pledges, encumbrances and demands whatsoever;

> . . .

> (7)    no person, firm or corporation has or will have at the Closing Date any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase from the Vendors or the Subsequent Vendors of any of the Purchased Common Shares or any of the Special Shares (except the Purchaser pursuant to the Put Agreement), or the purchase from Ronlar of any shares in the capital of the Corporations;

**32**    Before the sale to Tandet was completed, 120,000 shares of Ronlar were transferred to Mr. Paxton's three children and his daughter-in-law. Each of the four bought 5,000 shares for $40,000. One of the children bought an additional 100,000 shares at a cost of $1,000,000[1]. Each of the four

paid for the purchase with non-interest bearing promissory notes and presumably repaid the debt with the money realized upon the sale to Tandet. At the completion of the transaction, the children had each realized a profit of $10,000.

**33**    It was asserted by the appellant both in this appeal and before the Tax Court Judge that the transfer of shares to Tandet was effected once Mr. Paxton and Tandet signed the Share Purchase Agreement. The Tax Court Judge found in favour of Mr. Paxton, holding that the agreement between Tandet and Mr. Paxton did not effect a transfer of Ronlar shares. In the view of the Tax Court Judge, incidents of title, possession, use and risk did not pass to Tandet until the closing of the transaction. He found that the transfer of shares to the four children took place before the transaction closed. The Crown appeals to this Court on the basis that the transfer of the shares to the children was one step in the overall transfer of shares from Mr. Paxton to Tandet, and the transaction should be caught by either subsection 56(2) or subsection 55(1) of the Income Tax Act.

ANALYSIS

**34**    The Respondent was taking advantage of an inter-generational rollover provision in the Income Tax Act. (The section has since been repealed.) At that time a rollover of capital gains was permitted under subsection 73(5) when a parent transferred shares in a small business corporation to a child. The relevant portions of the provision read:

> 73(5) For the purposes of this Part, where at any particular time a taxpayer has transferred property to his child who was resident in Canada immediately before the transfer and the property was, immediately before the transfer, a share of the capital stock of a small business corporation, ... the following rules apply:
>
> (a)    the taxpayer shall be deemed to have disposed of the share at the time of the transfer and to have received proceeds of disposition therefor equal to the amount, if any, by which
>
> > (i)     the fair market value of the share at that time exceeds the lesser of
> > (ii)    the taxpayer's capital gain otherwise determined from the disposition of the share, and
> > (iii)   the amount of the taxpayer's cumulative small business gains account immediately before the transfer or such lesser amount as the taxpayer specifies in respect of the transfer of the share;
>
> (b)    the child shall be deemed to have acquired the share at a cost equal to the proceeds of disposition deemed to have been received by the taxpayer under paragraph (a); and ...

**35**    In assessing whether the Respondent has made proper use of s.73(5), we must first look to the plain meaning of the section. The Supreme Court of Canada has held that the clear meaning of the section will prevail unless the transaction is a sham. In the words of Iacobucci, J. in Canada v. Antosko, [1994] 2 S.C.R. 312 at 326:

> While it is true that the courts must view discrete provisions of the Income Tax Act in light of the other provisions of the Act and of the purpose of the leg-

islation, and that they must analyze a given transaction in the context of economic and commercial reality, such techniques cannot alter the result where the words of the statute are clear and plain and where the legal and practical effect of the transaction is undisputed.

**36**     This position was affirmed and strengthened in Friesen v. The Queen, [1995] 3 S.C.R. 103 when Major, J., writing for the majority, adopted the words of Peter Hogg's Notes on Income Tax (3rd ed. 1994) at 22:12:

> It would introduce intolerable uncertainty into the Income Tax Act if clear language in a detailed provision of the Act were to be qualified by unexpressed exceptions derived from a court's view of the object and purpose of the provision.

Plain meaning of Subsection 73(5)

**37**     Subsection 73(5) applies when a taxpayer "has transferred property to a child." The question in this case is whether the Respondent effected a complete and legal transfer of shares to his children. The Crown asserts that because the transfer to the children was contingent upon the children transferring the shares to Tandet, the original transfer to the children was but an intermediary step in the transfer between the Respondent and Tandet.

**38**     In an effort to determine whether there was a fully effective and complete transfer to the children, it is helpful to establish who had beneficial ownership of the shares at the time of the transfer to Tandet. As held by Stone, J.A. for this Court in Canada v. LeBlanc (1991) 124 N.R. 321 at 328,

> At common law, the notion of beneficial entitlement seems to have acquired a fairly well-understood meaning. In MacKeen Estate v. Nova Scotia, [1978] CTC 557 (C.A.), MacKiegan C.J.N.S. wrote of the modern sense of the phrase "beneficially entitled" in the following terms:
>
>> "In the modern sense of the phrase, a person is 'beneficially entitled' to property if he is the real of beneficial owner of it, even though it is in someone else's name as beneficial owner. The nominal owner of the property ... has legal title to it. The real owner, the person 'beneficially entitled' to it, can require the nominal owner to let him use or have possession of the property, or to give him income from it, or otherwise to let him have the benefit and enjoyment of it."

**39**     In Mount Royal/Walsh Inc. v. Ship "Jensen Star" et al., (1989) 99 N.R. 42 at 47, Marceau, J.A. also spoke to the concept of beneficial ownership. He held,

> As I see it , the expression "beneficial owner" serves to include someone who stands behind the registered owner in situations where the latter functions merely as an intermediary, like a trustee, a legal representative, or an agent.

**40**     Counsel for the Respondent took the position that Mr. Paxton was acting as an agent for the children when he negotiated the sale to Tandet. Inherent in this proposition is the notion that the

children were the beneficial owners of the shares, while Mr. Paxton was but a nominal owner. The evidence discloses that an offer had been made to purchase Ronlar in the past, but Mr. Paxton declined to sell, as he did not wish to sell the business "out from under" the children.

**41**     I make no finding as to whether Mr. Paxton was acting as agent for the children when he negotiated the deal with Tandet. Such a finding is not necessary in this case, as the evidence also discloses that the Paxton children were the only parties entitled to the proceeds of the sale to Tandet. Mr. Paxton himself had no claim on the profits realized on the sale to Tandet. He transferred his shares to his children before the transaction's closing date. When the transaction closed, Mr. Paxton's only claim on the monies received from Tandet was an indirect claim: through payment by his children of the amount owed on the promissory notes. Further, the children were solely entitled to the amount paid by Tandet that was in excess of the amount owed on the non-interest bearing promissory notes. I find that the children were the beneficial owners of the shares when the sale to Tandet was completed.

**42**     Having established that the children were the beneficial owners at the time of sale, the only question which remains is whether the children were the nominal owners of the shares at the time of transfer to Tandet. While the Share Transfer Agreement was being negotiated with Tandet, Mr. Paxton was at least the nominal owner of the shares. After the sale agreement with Tandet was negotiated he transferred nominal ownership to the children. That nominal ownership transfer was made fully effective and complete when the children fulfilled their agreement and transferred their shares to Tandet.

**43**     The Crown posited that because the children were not parties to the agreement with Tandet, the Agreement was really a transfer from Mr. Paxton to Tandet. On this issue, the Tax Court Judge stated:

> It is true the children were not parties to the Tandet Agreement. However this is not sufficient to justify a conclusion that the Tandet Agreement must be considered as effecting a transfer.... [I]t is true that the transfers to the children were only valid if they subsequently sold to Tandet. However they did so and consequently the transfers were valid.

I adopt this finding.

**44**     Given that both nominal and **beneficial ownership** was vested in the children at the moment of sale to Tandet, I find that the transfer from Mr. Paxton to his children was fully effective and legal.

No Sham

**45**     There is no foundation for an allegation of sham in this case. In Snook v. London & West Riding Investments, [1967] 2 Q.B. 786 at 802 (C.A.), a "sham" was defined as:

> "... acts done ... which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intended to create."

**46**    This definition was adopted by the Supreme Court of Canada in Stubart Investments v. The Queen [1984] 1 S.C.R. 536. It is clear from this definition that a sham must involve some element of deceit. There is no evidence of deceit in this case.

**47**    It was advanced to this court that although there is no sham, the Court should apply the reasoning in Continental Bank Leasing [1996] F.C.J. No. 710 (Q.L.) to find against the taxpayer. With respect, I do not find Continental Bank Leasing to be applicable to the case at bar. In Continental Bank Leasing, this Court found that the elements necessary for there to be a valid partnership were not made out. In this case, however, I have concluded that the necessary elements for an effective transfer of shares, that is, a transfer of nominal and beneficial ownership before the sale to Tandet, were made out.

Does the transaction violate the object and spirit of s. 73(5) of the Act?

**48**    It is a deeply entrenched principle of our law that all taxpayers are free to arrange their affairs so as to minimize their tax liability. This is the underlying principle laid down by Lord Tomlin in IRC v. Westminister, [1936] A.C. 1. Nevertheless, such an arrangement must not be repugnant to the object and purpose of the Income Tax Act.

**49**    The object and purpose of subsection 73(5) is apparent upon a plain reading of the section. In this case, Parliament's intention was to introduce a deferral of capital gains for certain types of small business owners. This was to encourage the development of small business and to enable business owners to pass the family business on to the next generation.[2] Parliament specifically limited the rollover provision to certain types of businesses so that the provision would not be abused.[3] The Respondent's small business enterprise fell within the Act's provisions.

**50**    In this case, Parliament's intention was not violated by the Respondent's use of subsection 73(5). When drafting the legislation, Parliament did not require that the transferred shares be retained by the children for any specific length of time. It was within Parliament's purview to impose such a restriction, but Parliament chose not to. In this situation, the words of Brule J. in Orr v. M.N.R. 89 D.T.C. 557 are applicable:

> In the present case there is no clear statutory prohibition to what the Appellant did. Parliament intended the shares be transferred to the family. This was done. Subsection 73(5) does not specify a time limit in which shares must be held as is found, for example, in dealing with another matter in subsection 7(1.1) of the Income Tax Act. There could have been a time period placed in subsection 73(5) during which the shares had to be held by the recipients.

**51**    I adopt those words, and find that as there is no clear statutory prohibition against the Respondents use of the provision, Parliament's stated intention has not been violated, nor has the object and purpose of the Act.

**52**    In my view, even where the sole purpose of a transaction is to minimize tax, where the result is not inconsistent or repugnant with the Act as a whole nor with Parliament's intent, the transaction is valid: Mara Properties Ltd. v. Canada, [1996] 2 S.C.R. 161, rev'g [1995] 2 F.C. 433. In this case, the transaction was legally effective and complete, and does not violate the provisions of the Act. Mr. Paxton made use of the subsection while it existed. Parliament has since repealed the section, indicating that such transactions will not be available to taxpayers in the future.

**53**     Having found that the transaction was within the plain meaning of subsection 73(5), I agree with the Tax Court Judge that subsections 56(2) and 55(1) are now of no effect in this case. With respect to subsection 56(2), I have found that the share transfer to the children was a separate and distinct transaction. Mr. Paxton was not entitled to the proceeds of the transaction when the children sold their shares to Tandet. As for the application of subsection 55(1), the taxpayer made a valid application of a provision of the Income Tax Act, thus there has been no "artificial reduction" in Mr. Paxton's tax liability.

**54**     I would dismiss the appeal with costs.

McDONALD J.

qp/d/hbb/mjb/DRS

1 his additional purchase of shares was not at issue in this appeal.

2 Commons Debates, June 29, 1978, p. 6871.

3 Commons Debates, June 29, 1978, p. 6982.

** Preliminary Version **

*Case Name:*

# R. v. Roy

**Randy Leigh Roy, Appellant;**
**v.**
**Her Majesty The Queen, Respondent**

[2012] S.C.J. No. 26

[2012] A.C.S. no 26

2012 SCC 26

[2012] 2 S.C.R. 60

[2012] 2 R.C.S. 60

259 C.R.R. (2d) 361

430 N.R. 201

2012EXP-2100

J.E. 2012-1099

321 B.C.A.C. 112

281 C.C.C. (3d) 433

345 D.L.R. (4th) 193

100 W.C.B. (2d) 695

28 M.V.R. (6th) 1

93 C.R. (6th) 1

2012 CarswellBC 1573

File No.: 33699.

Supreme Court of Canada

Heard: November 9, 2011;
Judgment: June 1, 2012.

**Present: McLachlin C.J. and LeBel, Deschamps, Fish, Abella,
Rothstein and Cromwell JJ.**

(56 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Criminal law -- Criminal Code offences -- Offences against person and reputation -- Motor vehicles -- Dangerous operation of motor vehicle -- Causing death -- Appeal by Roy from judgment of British Columbia Court of Appeal affirming his conviction on a count of dangerous driving causing death allowed, conviction set aside and acquittal entered -- Roy pulled motor home out from stop sign onto highway and into the path of oncoming tractor-trailer -- Collision resulted and Roy's passenger was killed -- Trial judge made a serious legal error in relation to the fault element: he simply inferred from the fact that Roy had committed a dangerous act while driving that his conduct displayed a marked departure from the standard of care expected of a reasonable person in the circumstances.*

Appeal by Roy from a judgment of the British Columbia Court of Appeal affirming his conviction on a count of dangerous driving causing death. Roy pulled his motor home out from a stop sign onto a highway and into the path of an oncoming tractor-trailer. In the collision that resulted, Roy's passenger was killed. Roy was convicted of dangerous driving causing death and his appeal to the Court of Appeal was dismissed. The trial judge considered that, in order to convict Roy, he had to be satisfied beyond a reasonable doubt that Roy was driving in a manner that was dangerous to the public. Further, given that no explanation was provided for Roy's conduct ù due in great part to his loss of memory ù there was no evidence that could raise a reasonable doubt that a reasonable person would not have been aware of the risks related to his behaviour in the present case. The Court of Appeal held that the trial judge erred in his legal analysis because he had equated the mens rea inquiry with the question of whether there was an explanation for Roy's conduct. However, it was of the view that the error was harmless as it occasioned no substantial wrong or miscarriage of justice.

HELD: Appeal allowed. The focus of the analysis in relation to the actus reus of the offence was the manner of operation of the motor vehicle. The trier of fact could not simply leap from the consequences of the driving to a conclusion about dangerousness. There had to be a meaningful inquiry into the manner of driving. Proof of the actus reus of the offence, without more, did not support a reasonable inference that the required fault element was present. Only driving that constituted a marked departure from the norm could reasonably support that inference. The trial judge made a serious legal error in relation to the fault element: he simply inferred from the fact that Roy had committed a dangerous act while driving that his conduct displayed a marked departure from the standard of care expected of a reasonable person in the circumstances. This error was not one that could be dismissed as harmless. The evidence in the record did not support a reasonable inference that Roy exhibited a marked departure from the standard of care that a reasonable person would have exhibited in the circumstances. The Court allowed the appeal, set aside Roy's conviction and entered an acquittal.

**Statutes, Regulations and Rules Cited:**

Criminal Code, R.S.C. 1985, c.áC46, s. 249(1)(a), s. 249(4), s. 259(4), s. 686(1)(a)(ii), s. 686(1)(b)(iii)

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Criminal law -- Dangerous operation of motor vehicle -- Elements of offence -- Mens rea -- Whether proof of actus reus without more can support inference that required fault element is present -- Whether accused's conduct displayed a marked departure from standard of care -- Criminal Code, R.S.C. 1985, c. C-46, s. 249.*

*Criminal law -- Appeals -- Whether trial judge applied incorrect legal principles in addressing fault component of offence -- If so, whether error was harmless -- If appeal allowed, whether Court should order new trial or direct an acquittal -- Criminal Code, R.S.C. 1985, c. C-46, ss. 686(1)(a)(ii), 686(1)(b)(iii).*

**Court Summary:**

On an afternoon in late November 2004, R was driving home from work with a passenger. Visibility was limited due to fog and the unpaved back road they were on was relatively steep, snow-covered, and slippery. The driver of an oncoming tractor-trailer testified that R stopped before proceeding onto the highway, then drove onto the highway and into the tractor-trailer's path. In the

resulting collision, R's passenger was killed. R survived, but the collision left him with no memory of either its circumstances or of the surrounding events. R was convicted of dangerous driving causing death and his appeal to the Court of Appeal was dismissed.

In a decision released shortly before *R. v. Beatty*, 2008 SCC 5, [2008] 1 S.C.R. 49, the trial judge concluded that R's conduct was objectively dangerous. He then immediately concluded that R's driving had constituted a marked departure from the standard of care a reasonable person would observe in the circumstances. Since no explanation was provided for R's conduct -- due in great part to his loss of memory -- there was no evidence that could raise a reasonable doubt that a reasonable person would not have been aware of the risks in the circumstances. The appellant's appeal to the Court of Appeal was dismissed. Although the Court concluded that the trial judge had made a legal error, it was of the view that the error was harmless as it occasioned no substantial wrong or miscarriage of justice.

*Held*: The appeal should be allowed, the conviction set aside and an acquittal entered.

Dangerous driving causing death, a serious criminal offence punishable by up to 14 years in prison, consists of two components: prohibited conduct -- operating a motor vehicle in a dangerous manner resulting in death -- and a required degree of fault -- a marked departure from the standard of care that a reasonable person would observe in all the circumstances. However, because driving is an inherently dangerous activity, the trier of fact must not infer simply from the fact that the driving was, objectively viewed, dangerous, that the accused's level of care was a marked departure from that expected of a reasonable person in the same circumstances. The fault component ensures that criminal punishment is only imposed on those deserving the stigma of a criminal conviction. Determining whether the fault component is present may in turn be done by asking two questions. First, in light of all of the relevant evidence, would a reasonable person have foreseen the risk and taken steps to avoid it if possible? Second, was the accused's failure to foresee the risk and take steps to avoid it, if possible, a marked departure from the standard of care expected of a reasonable person in the accused's circumstances? The distinction between a *mere* departure, which may support civil liability, and the *marked* departure required for criminal fault, is a matter of degree, but the trier of fact must identify how and in what way the driver went markedly beyond mere carelessness. This will generally be done by drawing inferences from all of the circumstances. Furthermore, in answering these questions, personal attributes will only be relevant if they go to capacity to appreciate or to avoid the risk. Of course, proof of deliberately dangerous driving would support a conviction for dangerous driving, but it is not required.

In this case, the trial judge erred in law erred by equating fault with the failure to explain the conduct, but also by failing to conduct any meaningful inquiry into whether R had displayed a marked departure from the standard of care to be expected of a reasonable person in the same circumstances. He simply inferred from the fact that R had committed a dangerous act while driving that his conduct displayed a marked departure from the standard of care expected of a reasonable person in the circumstances.

The Court of Appeal erred in finding that this error was not a substantial wrong or a miscarriage of justice. There was no evidence to support the finding that R was aware of the risk he was creating and deliberately chose to run that risk, and fault could not be inferred from the fact that the driving was, objectively viewed, dangerous. The record here discloses a single and momentary error in judgment with tragic consequences. Since the record did not provide evidence on which a properly instructed trier of fact, acting reasonably, could have concluded that R's standard of care was a marked departure from that expected of a reasonable person in the circumstances, entering an acquittal is the appropriate course.

### Cases Cited

**Applied:** *R. v. Beatty*, 2008 SCC 5, [2008] 1 S.C.R. 49, rev'g 2006 BCCA 229, 225 B.C.A.C. 154; **referred to:** *R. v. Hundal*, [1993] 1 S.C.R. 867; *American Automobile Insurance Co. v. Dickson*, [1943] S.C.R. 143; *O'Grady v. Sparling*, [1960] S.C.R. 804; *Mann v. The Queen*, [1966] S.C.R. 238; *R. v. Khan*, 2001 SCC 86, [2001] 3 S.C.R. 823; *R. v. MacNeil*, 2009 NSCA 46, 277 N.S.R. (2d) 22; *R. v. D.C.S.*, 2000 NSCA 61, 184 N.S.R. (2d) 299.

### Statutes and Regulations Cited

*Canadian Charter of Rights and Freedoms*.

*Criminal Code*, R.S.C. 1985, c. C-46, ss. 249(1)(*a*), 249(4), 259(4), 686(1)(*b*)(iii).

### History and Disposition:

APPEAL from a judgment of the British Columbia Court of Appeal (Levine, Neilson and Garson JJ.A.), 2010 BCCA 130, 285 B.C.A.C. 57, 482 W.A.C. 57, 92 M.V.R. (5) 28, [2010] B.C.J. No. 437 (QL), 2010 CarswellBC 583, affirming the convictions entered by Blair J., 2006 BCSC 2107 (CanLII), [2006] B.C.J. No. 3660 (QL), 2006 CarswellBC 3851. Appeal allowed.

### Counsel:

*Christopher J. Nowlin*, for the appellant.

*Michael J. Brundrett*, for the respondent.

---

The judgment of the Court was delivered by

**CROMWELL J.**:--

I.    <u>Overview</u>

**1**    Dangerous driving causing death is a serious criminal offence punishable by up to 14 years in prison. Like all criminal offences, it consists of two components: prohibited conduct -- operating a motor vehicle in a dangerous manner resulting in death -- and a required degree of fault -- a marked departure from the standard of care that a reasonable person would observe in all the circumstances. The fault component is critical, as it ensures that criminal punishment is only imposed on those deserving the stigma of a criminal conviction. While a mere departure from the standard of care justifies imposing civil liability, only a marked departure justifies the fault requirement for this serious criminal offence.

**2**    Defining and applying this fault element is important, but also challenging, given the inherently dangerous nature of driving. Even simple carelessness may result in tragic consequences which may tempt judges and juries to unduly extend the reach of the criminal law to those responsible. Yet, as the Court put in *R. v. Beatty*, 2008 SCC 5, [2008] 1 S.C.R. 49, at para. 34, "If every departure from the civil norm is to be criminalized, regardless of the degree, we risk casting the net too widely and branding as criminals persons who are in reality not morally blameworthy." Giving careful attention to the fault element of the offence is essential if we are to avoid making criminals out of the merely careless.

**3**    The fault requirement for dangerous driving is at the centre of this appeal, which raises three issues:

> 1.    Did the trial judge apply incorrect legal principles when he addressed the fault component of the offence?
> 2.    If he applied incorrect legal principles, was his error harmless in the circumstances?
> 3.    If the judge erred and the error was not harmless so that the appeal must be allowed, should the Court order a new trial or direct an acquittal?

**4**    In my view, the trial judge made a serious legal error in relation to the fault element: he simply inferred from the fact that the appellant had committed a dangerous act while driving that his conduct displayed a marked departure from the standard of care expected of a reasonable person in the circumstances. This error is not one that may be dismissed as harmless. I would allow the appeal and set aside the appellant's conviction for dangerous driving. As in my view the evidence in the record does not support a reasonable inference that the appellant exhibited a marked departure from the standard of care that a reasonable person would have exhibited in the circumstances, I would allow the appeal and enter an acquittal.

II.    <u>Facts and Proceedings</u>

A. *Overview of the Facts*

**5**    The appellant pulled his motor home out from a stop sign onto a highway and into the path of an oncoming tractor-trailer. In the collision that resulted, the appellant's passenger was killed. The appellant was convicted of dangerous driving causing death and his appeal to the Court of Appeal was dismissed. The facts are as simple as they are tragic.

**6**    On an afternoon in late November 2004, the appellant and Mark Anthony Harrington decided to return home after work at a sawmill near Vavenby, a town north of Kamloops, British Columbia. They left work together in the appellant's motor home to head back to a trailer park where they lived. They took a shortcut via the Harmon Road to reach Highway 5, the Southern Yellowhead Highway, and then planned to head south on the highway to the trailer park.[1] The Harmon Road is an unpaved back road which becomes relatively steep as it approaches the intersection with the highway. The appellant knew the Harmon Road well, having driven it to and from Highway 5 about 500 times before.

**7**    The Harmon Road intersects with Highway 5 in such a way that vehicles intending to turn from the road onto the highway to head south, as the appellant did to return to the trailer park, usually first veer towards the north in order to come squarely to the intersection. This enables them to better see the oncoming northbound traffic and better determine when it is safe to turn left, and cross the northbound lanes to head south. Constable Campbell testified that to turn onto the highway, he has "to turn towards the right so I can come square at the intersection so I can see both ways" (A.R., vol. II, at p. 167). That afternoon, visibility was limited due to fog and the Harmon Road was snow-covered and slippery.

**8**    On the afternoon of the accident, Michael McGinnis, accompanied by his daughter Darlene, was driving a tractor-trailer northbound on the highway. As he was approaching the Harmon Road intersection at about 3:00 p.m., the fog was thickening and the visibility was poor. The trial judge accepted Mr. McGinnis's evidence that the weather conditions led him to decrease his speed to between 75 and 80 kilometres per hour. That was the speed he was driving when, from a distance, he noticed the headlights of what we now know to have been the appellant's vehicle pointing towards him from what Mr. McGinnis assumed was the shoulder of the highway or the top of the side road. Although the trial judge did not make a specific finding on the point, both Mr. McGinnis and his passenger thought that the appellant's vehicle had stopped before proceeding onto the highway, although his passenger was not sure. Mr. McGinnis also testified that when he first saw the lights of the appellant's vehicle, he guessed that it was about 300-400 feet away but that it could have been as little as 100 feet.

**9**    When Mr. McGinnis saw the headlights, he took his foot off the accelerator. When he then realized that the appellant's vehicle was proceeding onto the highway, he applied his brakes, but it was too late. His truck violently collided with the appellant's vehicle, killing Mr. Harrington. The appellant survived, but the collision left him with no memory of either its circumstances or of the surrounding events.

**10**    The appellant was charged with and convicted of dangerous driving causing the death of Mr. Harrington, contrary to s. 249(4) of the *Criminal Code*, R.S.C. 1985, c. C-46. The relevant provisions read as follows:

> **249.** (1) <u>Every one commits an offence who operates</u>
>
>> (*a*) <u>a motor vehicle in a manner that is dangerous to the public, having</u> <u>regard to all the circumstances</u>, including the nature, condition and use of the place at which the motor vehicle is being operated and the amount of traffic that at the time is or might reasonably be expected to be at that place;
>>
>> ...
>>
>> (4) Every one who commits an offence under subsection (1) and thereby causes the death of any other person is guilty of an indictable offence and liable to imprisonment for a term not exceeding fourteen years.

**11**    The appellant was also convicted under s. 259(4) of the *Criminal Code* of operating a motor vehicle while disqualified from doing so by reason of an order issued under the *Criminal Code*. The driving while disqualified charge is not in issue here.

B. *Proceedings*

> (1)    <u>Supreme Court of British Columbia (Blair J.), 2006 BCSC 2107 (CanLII)</u>

**12**    As noted, the appellant was convicted at trial of dangerous driving causing death. At the time of trial, the Court had not yet rendered its decision in *Beatty*. The trial judge therefore relied on the law as set out in *R. v. Hundal*, [1993] 1 S.C.R. 867, and in the British Columbia Court of Appeal's judgment in *R. v. Beatty*, 2006 BCCA 229, 225 B.C.A.C. 154, a decision which this Court subsequently reversed.

**13**    The trial judge considered that, in order to convict the appellant, he had to be satisfied beyond a reasonable doubt that the appellant was driving in a manner that was dangerous to the public. In making this assessment, he had to satisfy himself that the conduct of the appellant amounted to a marked departure from the standard of care that a reasonable person would observe in the accused's situation. If the appellant offered an explanation for his conduct, such as a sudden and unexpected onset of illness, then he had to be convinced that a reasonable person in similar circumstances ought to have been aware of the risk and of the danger involved in the conduct he manifested.

**14**    Turning to the facts of this case, the trial judge noted that vehicles entering Highway 5 from Harmon Road had to comply with a stop sign which gave highway traffic the right of way. He

accepted that, at the relevant time, the surface of right of way Harmon Road was slippery and that its steepness would have slowed the progress of a motor home attempting to proceed through the northbound traffic on to the southbound lanes on Highway 5. He was of the view that the fog on Highway 5 would have "obscured [the appellant's] ability to ascertain the presence of other traffic" on it (para. 25). Finally, the evidence, the trial judge held, entitled him to infer that the appellant was well aware that Highway 5 "is a major traffic conduit between British Columbia and the Prairies and as such it attracts a considerable amount of traffic, including tractor trailer units at all times" (para. 26).

**15**    The trial judge concluded that the appellant's conduct in proceeding "from the stop sign onto Highway 5 from [Harmon] Road, with visibility diminished by fog, into the path of oncoming traffic, specifically Mr. [McGinnis's] tractor trailer unit" was objectively dangerous (para. 27) and then immediately concluded that the appellant's driving had constituted a marked departure from the standard of care a reasonable person would observe in the circumstances. Further, given that no explanation was provided for the appellant's conduct -- due in great part to his loss of memory -- there was no evidence that could raise a reasonable doubt that a reasonable person would not have been aware of the risks related to his behaviour in the present case.

**16**    The critical part of the judge's analysis is as follows:

> The question is whether Mr. Roy's conduct in proceeding from the stop sign onto Highway 5 from [Harmon] Road, with visibility diminished by fog, into the path of oncoming traffic, specifically Mr. [McGinnis's] tractor trailer unit, was objectively dangerous.

> I conclude that given the test as expressed in *Hundal* and as further by the B.C. Court of Appeal in [*Beatty* ], that the question must be answered in the affirmative. I find that Mr. Roy's driving constitutes a marked departure from the standard of care a reasonable person would observe in the accused's situation.

> The second part of the test in *Hundal* is found in para38 and 43 and that is whether, even though the driving is objectively dangerous, there was an explanation for the accused's conduct that would raise a reasonable doubt that a reasonable person would have been aware of the reasonable risks in the accused's conduct.

> There is no explanation for Mr. Roy's conduct. He recalls nothing of the events surrounding the collision and therefore there is no evidence to consider that might raise a reasonable doubt that a reasonable person would have been aware of the risks in the accused's conduct. [Emphasis added; paras. 27-30.]

<div style="text-align:center">

(2)    Court of Appeal for British Columbia (Garson J.A., Levine and Neilson JJ.A.
       concurring), 2010 BCCA 130, 285 B.C.A.C. 57

</div>

**17**    The appellant's appeal to the Court of Appeal was dismissed. Although the Court concluded that the trial judge had made a legal error, it was of the view that the error was harmless as it occasioned no substantial wrong or miscarriage of justice.

**18**    The appellant argued that the trial judge had erred in law at para. 28 of his reasons by equating the *actus reus* of the offence -- that is, driving which viewed objectively was dangerous -- with the *mens rea* requirement -- that is, that the appellant's level of care was a marked departure from the standard expected of a reasonable person in the same circumstances. The Court of Appeal noted that the trial judge's reasons had to be reviewed in light of this Court's decision in *Beatty*.

**19**    The Court of Appeal held that the trial judge erred in his legal analysis because he had equated the fault ("*mens rea*") inquiry "with the question of whether there was an explanation for the accused's conduct" (para. 21). Had the trial judge applied the test set out in *Beatty*, "his analysis would have reflected two enquiries. First, ... was his driving objectively dangerous? Second, was it a marked departure from the standard of care that a reasonable person would observe in the accused's circumstances?" (para. 23). His failure to specifically address both questions opened his verdict to appellate review.

**20**    Notwithstanding the trial judge's error, the Court of Appeal dismissed the appeal. It applied the proviso set out in s. 686(1)(*b*)(iii) of the *Criminal Code*, because in its view the error had not occasioned any substantial wrong or miscarriage of justice. Although the trial judge had not specifically addressed the second step of the dangerous driving inquiry as articulated in *Beatty*, it could "easily be inferred from his reasons that the [appellant] had the necessary intent" (para. 31). Indeed, this case was not one where the appellant's negligence was inadvertent. "Rather, the driving that resulted in the collision entailed a deliberate act of driving onto a busy highway, in fog, in the face of oncoming traffic" (para. 31). Further, "[t]he evidence at trial did not reveal any explanation as to why he left the stop sign without first ascertaining that it was safe to do so" (para. 1). In light of these considerations, the trial judge was correct, in the court's view, to hold that the appellant's driving constituted a marked departure from the standard of care expected of a reasonable person in his circumstances. This satisfied the fault requirement of dangerous driving and therefore no substantial wrong or miscarriage of justice resulted from the trial judge's failure to inquire separately into the appellant's state of mind.

**21**    The appeal was dismissed.

   III.    Issues

**22**    As noted, the appeal to this Court raises three issues:

1.  Did the trial judge apply incorrect legal principles when he addressed the fault component of the offence?
2.  If he applied incorrect legal principles, was his error harmless in the circumstances?
3.  If the judge erred and the error was not harmless so that the appeal must be allowed, should the Court order a new trial or direct an acquittal?

**23**  I will address these issues in turn.

IV.  Analysis

A. *First Issue: The Fault Element of Dangerous Driving*

**24**  The respondent defends the appeal to this Court by submitting that, contrary to the finding of the Court of Appeal, the trial judge did not err in his consideration of the fault component of the offence. I do not agree. In brief, my view is that the trial judge did exactly what the Court unanimously said in *Beatty* must not be done: without further analysis of the fault component of the offence, he inferred simply from the fact of driving that was, objectively viewed, dangerous, that the appellant's level of care was a marked departure from that expected of a reasonable person in the same circumstances.

**25**  To explain my conclusion, it will be helpful first to review the main principles established by the Court in *Beatty* and then to set out how in my respectful view the trial judge failed to apply them in substance in this case.

(1)  *Beatty* in Overview

**26**  In *Beatty*, the Court undertook an in-depth analysis of the elements of dangerous driving. Although three opinions were delivered, the Court unanimously upheld the trial judge's finding that Mr. Beatty's momentary lapse of attention did not constitute a marked departure from the standard of care of a prudent driver even though it had tragic consequences.

**27**  *Beatty* addressed concern that the Court's reasons in *Hundal* did not sufficiently emphasize the importance of giving careful attention to the fault requirement of dangerous driving. *Hundal* did not expressly differentiate between the two elements of the offence -- the prohibited conduct and the required fault. There was concern that judges and juries might infer the existence of the fault element too quickly and without sufficient analysis, simply from the fact that a motor vehicle had been operated in a dangerous manner. (This, I add parenthetically, is, in my view precisely what happened in this case.) The Court in *Beatty* sought to ensure that a meaningful analysis of *both* elements would be performed in every case and it did this by defining and separating the conduct and mental elements of the offence.

**28**  In *Beatty*, the majority of the Court spoke through the reasons of Charron J. which of course

are the authoritative statement of the relevant principles. In brief, the Court decided as follows. The *actus reus* of the offence is driving in a manner dangerous to the public, having regard to all the circumstances, including the nature, condition and use of the place at which the motor vehicle was being operated and the amount of traffic that at the time was or might reasonably have been expected to be at that place (s. 249(1)(*a*) of the *Criminal Code*). The *mens rea* is that the degree of care exercised by the accused's was a *marked* departure from the standard of care that a reasonable person would observe in the accused's circumstances (*Beatty*, at para. 43). The care exhibited by the accused is assessed against the standard of care expected of a reasonably prudent driver in the circumstances. The offence will only be made out if the care exhibited by the accused constitutes a *marked* departure from that norm. While the distinction between a mere departure from the standard of care, which would justify civil liability, and a *marked* departure justifying criminal punishment is a matter of degree, the lack of care must be serious enough to merit punishment (para. 48).

**29**     It will be helpful to reiterate the main elements of the majority reasons in *Beatty*.

### (2)     The Importance of the Fault Requirement for Dangerous Driving

**30**     A fundamental point in *Beatty* is that dangerous driving is a serious criminal offence. It is, therefore, critically important to ensure that the fault requirement for dangerous driving has been established. Failing to do so unduly extends the reach of the criminal law and wrongly brands as criminals those who are not morally blameworthy. The distinction between a *mere* departure, which may support civil liability, and the *marked* departure required for criminal fault is a matter of degree. The trier of fact must identify how and in what way the departure from the standard goes *markedly* beyond mere carelessness.

**31**     From at least the 1940s, the Court has distinguished between, on the one hand, simple negligence that is required to establish civil liability or guilt of provincial careless driving offences and, on the other hand, the significantly greater fault required for the criminal offence of dangerous driving (*American Automobile Ins. Co. v. Dickson*, [1943] S.C.R. 143). This distinction took on added importance for constitutional purposes. It became the basis for differentiating, for division of powers purposes, between the permissible scope of provincial and federal legislative competence as well as meeting the minimum fault requirements for crimes under the *Canadian Charter of Rights and Freedoms* (*O'Grady v. Sparling*, [1960] S.C.R. 804; *Mann v. The Queen*, [1966] S.C.R. 238; *Hundal*). Thus, the "marked departure" standard underlines the seriousness of the criminal offence of dangerous driving, separates federal criminal law from provincial regulatory law and ensures that there is an appropriate fault requirement for *Charter* purposes.

**32**     *Beatty* consolidated and clarified this line of jurisprudence. The Court was unanimous with respect to the importance of insisting on a significant fault element in order to distinguish between negligence for the purposes of imposing civil liability and that necessary for the imposition of criminal punishment. As Charron J. put it on behalf of the majority, at paras. 34-35:

> If every departure from the civil norm is to be criminalized, regardless of the

degree, we risk casting the net too widely and branding as criminals persons who are in reality not morally blameworthy. Such an approach risks violating the principle of fundamental justice that the morally innocent not be deprived of liberty.

In a civil setting, it does not matter how far the driver fell short of the standard of reasonable care required by law. The extent of the driver's liability depends not on the degree of negligence, but on the amount of damage done. Also, the mental state (or lack thereof) of the tortfeasor is immaterial, except in respect of punitive damages. In a criminal setting, the driver's mental state does matter because the punishment of an innocent person is contrary to fundamental principles of criminal justice. The degree of negligence is the determinative question because criminal fault must be based on conduct that merits punishment. [Emphasis added.]

> (3)    The *Actus Reus*

**33**    *Beatty* held that the *actus reus* for dangerous driving is as set out in s. 249(1)(*a*) of the *Code*, that is, driving "in a manner that was dangerous to the public, having regard to all the circumstances, including the nature, condition and use of the place at which the motor vehicle is being operated and the amount of traffic that at the time is or might reasonably be expected to be at that place" (para. 43).

**34**    In considering whether the *actus reus* has been established, the question is whether the driving, viewed objectively, was dangerous to the public in all of the circumstances. The focus of this inquiry must be on the risks created by the accused's manner of driving, not the consequences, such as an accident in which he or she was involved. As Charron J. put it, at para. 46 of *Beatty*, "The court must not leap to its conclusion about the manner of driving based on the consequence. There must be a meaningful inquiry into the manner of driving" (emphasis added). A manner of driving can rightly be qualified as dangerous when it endangers the public. It is the risk of damage or injury created by the manner of driving that is relevant, not the consequences of a subsequent accident. In conducting this inquiry into the manner of driving, it must be borne in mind that driving is an inherently dangerous activity, but one that is both legal and of social value (*Beatty*, at paras. 31 and 34). Accidents caused by these inherent risks materializing should generally not result in criminal convictions.

**35**    To summarize, the focus of the analysis in relation to the *actus reus* of the offence is the manner of operation of the motor vehicle. The trier of fact must not simply leap from the consequences of the driving to a conclusion about dangerousness. There must be a meaningful inquiry into the manner of driving.

(4)    The *Mens Rea*

**36**    The focus of the *mens rea* analysis is on whether the dangerous manner of driving was the result of a marked departure from the standard of care which a reasonable person would have exercised in the same circumstances (*Beatty*, at para. 48). It is helpful to approach the issue by asking two questions. The first is whether, in light of all of the relevant evidence, a reasonable person would have foreseen the risk and taken steps to avoid it if possible. If so, the second question is whether the accused's failure to foresee the risk and take steps to avoid it, if possible, was a *marked departure* from the standard of care expected of a reasonable person in the accused's circumstances.

**37**    Simple carelessness, to which even the most prudent drivers may occasionally succumb, is generally not criminal. As noted earlier, Charron J., for the majority in *Beatty*, put it this way: "If every departure from the civil norm is to be criminalized, regardless of the degree, we risk casting the net too widely and branding as criminals persons who are in reality not morally blameworthy" (para. 34). The Chief Justice expressed a similar view: "Even good drivers are occasionally subject to momentary lapses of attention. These may, depending on the circumstances, give rise to civil liability, or to a conviction for careless driving. But they generally will not rise to the level of a marked departure required for a conviction for dangerous driving" (para. 71).

**38**    The marked departure from the standard expected of a reasonable person in the same circumstances -- a modified objective standard -- is the minimum fault requirement. The modified objective standard means that, while the reasonable person is placed in the accused's circumstances, evidence of the accused's personal attributes (such as age, experience and education) is irrelevant unless it goes to the accused's incapacity to appreciate or to avoid the risk (para. 40). Of course, proof of subjective *mens rea* -- that is, deliberately dangerous driving -- would support a conviction for dangerous driving, but proof of that is not required (Charron J., at para. 47; see also McLachlin C.J., at paras. 74-75, and Fish J., at para. 86).

(5) Proof of the "Marked Departure" Fault Element

**39**    Determining whether the required objective fault element has been proved will generally be a matter of drawing inferences from all of the circumstances. As Charron J. put it, the trier of fact must examine all of the evidence, including any evidence about the accused's actual state of mind (para. 43).

**40**    Generally, the existence of the required objective *mens rea* may be inferred from the fact that the accused drove in a manner that constituted a *marked departure* from the norm. However, even where the manner of driving is a marked departure from normal driving, the trier of fact must examine all of the circumstances to determine whether it is appropriate to draw the inference of fault from the manner of driving. The evidence may raise a doubt about whether, in the particular case, it is appropriate to draw the inference of a marked departure from the standard of care from the manner of driving. The underlying premise for finding fault based on objectively dangerous

conduct that constitutes a marked departure from the norm is that a reasonable person in the position of the accused would have been aware of the risk posed by the manner of driving and would not have undertaken the activity: *Beatty*, at para. 37.

**41**    In other words, the question is whether the manner of driving which is a marked departure from the norm viewed in all of the circumstances, supports the inference that the driving was the result of a marked departure from the standard of care that a reasonable person in the same circumstances would have exhibited.

**42**    Driving which, objectively viewed, is simply dangerous, will not on its own support the inference that the accused departed markedly from the standard of care of a reasonable person in the circumstances (Charron J., at para. 49; see also McLachlin C.J., at para. 66, and Fish J., at para. 88). In other words, proof of the *actus reus* of the offence, without more, does not support a reasonable inference that the required fault element was present. Only driving that constitutes a marked departure from the norm may reasonably support that inference.

**43**    I now turn to the question of whether the trial judge committed reversible error in this case.

(6)    Did the Trial Judge Err With Respect to the Fault Element?

**44**    The Court of Appeal found that the trial judge erred by equating the fault component of the offence with the question of whether there was an explanation for the accused's conduct (para. 21). I agree. But I also agree with the appellant that the trial judge's error goes beyond that. In my respectful view, the trial judge erred in law by failing to conduct any meaningful inquiry into whether the appellant displayed a marked departure from the standard of care to be expected of a reasonable person in the same circumstances. Specifically, he inferred the marked departure simply from the fact that the driving was, objectively viewed, dangerous: trial judge's reasons, at paras. 27-28. This is precisely what all of the members of the Court held in *Beatty* must not be done. Of course, the trial judge did not have the Court's decision in *Beatty*.

**45**    The respondent argues that the trial judge did not err and that the Court of Appeal was wrong to find that he had. It is submitted that the Court's decision in *Beatty* only reformulated, not substantively modified, the test in *Hundal*. It follows, the respondent says, that by faithfully following the test established in *Hundal* the trial judge did not make any legal error. The respondent points out that the Court did not suggest in *Beatty* that verdicts rendered under the *Hundal* analysis were automatically subject to appellate intervention. That being the case, the respondent submits, it was not open to the Court of Appeal to intervene simply because the trial judge had used the *Hundal* test to reach his verdict.

**46**    I agree that, if the trial judge had correctly applied the law in substance, it would not have been an error simply to fail to carry out his analysis using the *Beatty* framework, which of course he could not have known of at the time of his decision. However, my view is that the trial judge erred in substance and not merely in form. As explained above, the trial judge inferred the necessary fault

element simply from the fact of dangerous driving. As *Beatty* makes clear, this is an error of law.

**47**    The next question is therefore whether the trial judge's error was harmless because it resulted in no substantial wrong or miscarriage of justice.

B. *Second Issue: Was the Error Harmless?*

**48**    Section 686(1)(*b*)(iii) of the *Criminal Code* permits an appellate court to dismiss an appeal from conviction despite a trial judge's legal error where the Crown satisfies the court that no "substantial wrong or miscarriage of justice has occurred". The Crown may do this either by showing that (1) the error was trivial or could have had only minor effect on the verdict, or (2) that it is clear that the evidence pointing to the guilt of the accused is so overwhelming that conviction was inevitable (*R. v. Khan*, 2001 SCC 86, [2001] 3 S.C.R. 823, at paras. 30-31).

**49**    The appellant argues that the Court of Appeal's reasoning on this issue is flawed and I respectfully agree. I note that the respondent's primary position is that there was no error and very little argument was directed to upholding the Court of Appeal's decision to apply the proviso.

**50**    I do not understand the Court of Appeal to have applied the proviso on the basis that the Crown's case was overwhelming. In any event, that is clearly not the case here. Rather, the Court of Appeal held that the trial judge's reasons show that the legal error had no significant effect. The court relied on two points to reach this conclusion: first, that this was a case of advertent rather than inadvertent negligence and second, that the trial judge's finding of fact that the driving constituted a marked departure from the standard of care made it clear that he had found the fault element to have been established. I set out the operative part of the Court of Appeal's judgment:

> The trial judge did not ... specifically address the second step as it is now articulated in *Beatty* [i.e., the fault element], but it may easily be inferred from his reasons that the accused had the necessary intent. This was not a case in which the negligence was inadvertent. Rather, the driving that resulted in the collision entailed a deliberate act of driving onto a busy highway, in fog, in the face of oncoming traffic. The trial judge correctly concluded that the appellant's driving did constitute a marked departure from the standard of care of a reasonable person in the circumstances of the appellant, thus satisfying the test for mens rea. [para. 31]

**51**    I respectfully cannot agree with either of these reasons. With respect to the first, there was no evidence to support the Court of Appeal's conclusion that this was "advertent" negligence. Advertent negligence refers to subjective *mens rea* and applies when an accused actually foresees the risk and decides to take it. While the appellant's act of driving out from the stop sign was apparently a voluntary act, there was no evidence to support the conclusion that the appellant was in fact aware of the risk he was creating in doing so and deliberately chose to run that risk. In my respectful view, the Court of Appeal erred in finding that subjective *mens rea* had been established

on this record. Of course, subjective *mens rea* is not required, but it certainly was not established on this record.

**52**    As to the judge's finding of a marked departure, my view is, as noted earlier, that the judge reached this conclusion solely by inferring it from the fact that the appellant's driving had been, objectively viewed, dangerous. That erroneous inference cannot provide justification for dismissing that error as harmless.

C. *Third Issue: New Trial or Acquittal?*

**53**    The appellant asks the Court to allow the appeal, set aside his conviction and enter an acquittal. The Crown's position is that if the appeal is to be allowed, a new trial should be ordered. The decision as to what order to make turns on whether there is any evidence upon which a properly instructed trier of fact could have convicted. If there is not, then generally entering an acquittal is the appropriate course (see *R. v. MacNeil*, 2009 NSCA 46, 277 N.S.R. (2d) 22, at paras. 16-18; *R. v. D.C.S.*, 2000 NSCA 61, 184 N.S.R. (2d) 299, at paras. 46-50). In my view, that is the appropriate course in this case.

**54**    In my view, the record does not provide evidence on which a properly instructed trier of fact, acting reasonably, could conclude that the appellant's standard of care was a marked departure from that expected of a reasonable person in the circumstances. I accept that the driving, objectively viewed, was dangerous. But it must be noted that there was no evidence that the driving leading up to pulling into the path of oncoming traffic was other than normal and prudent driving. The focus, therefore, is on the momentary decision to pull onto the highway when it was not safe to do so. I do not think that the manner of driving, on its own, supports a reasonable inference that the appellant's standard of care was a marked departure from that expected of a reasonable driver in the same circumstances.

**55**    Taking the Crown's case at its highest, the appellant pulled out from a stop sign at a difficult intersection and in poor visibility when it was not safe to do so. Although the trial judge did not make a specific finding on the point, Mr. McGinnis (the driver of the tractor-trailer) thought that the appellant's vehicle had stopped before proceeding onto the highway. Mr. McGinnis also testified that when he first saw the lights of the appellant's vehicle, he guessed that it was about 300-400 feet away but that it could have been as little as 100 feet. It is, of course, reasonable to assume that the appellant could have seen the McGinnis vehicle at least as soon as Mr. McGinnis was able to see the appellant's vehicle. Given the lighting on the tractor-trailer, it might be concluded that the tractor-trailer may have been visible somewhat sooner. However, on any realistic scenario consistent with the evidence, the time between visibility and impact would be only a few seconds. In my view, the appellant's decision to pull onto the highway is consistent with simple misjudgment of speed and distance in difficult conditions and poor visibility. The record here discloses a single and momentary error in judgment with tragic consequences. It does not support a reasonable inference that the appellant displayed a marked departure from the standard of care expected of a

reasonable person in the same circumstances so as to justify conviction for the serious criminal offence of dangerous driving causing death.

V.    <u>Disposition</u>

**56**    I would allow the appeal, set aside the appellant's conviction and enter an acquittal.

*Appeal allowed.*

**Solicitors:**

*Solicitor for the appellant: Christopher J. Nowlin, Vancouver.*

*Solicitor for the respondent: Attorney General of British Columbia, Vancouver.*

1 Highway 5 runs predominantly north-south, but, in the area of the collision, it runs east-west. As the witnesses most often referred to east and west as north and south, "north" and "south" are used in these reasons.

*Indexed as:*
## Canada 3000 Inc. (Re)

**NAV Canada, Greater Toronto Airports Authority, Winnipeg
Airports Authority Inc., Halifax International Airport
Authority, Edmonton Regional Airports Authority, Calgary
Airport Authority, Aéroports de Montréal, Ottawa
Macdonald-Cartier International Airport Authority,
Vancouver International Airport Authority and St. John's
International Airport Authority, Appellants/Respondents
on cross-appeals
v.
International Lease Finance Corporation, Hyr Här I
Sverige Kommanditbolag, IAI X, Inc., Triton Aviation
International LLC, Sierra Leasing Limited, ACG
Acquisition XXV LLC, ILFC International Lease Finance
Canada Ltd., U.S. Airways Inc., G.E. Capital Aviation
Services Inc., as Agent and Manager for Polaris Holding
Company and AFT Trust-Sub I, Pegasus Aviation Inc., PALS
I, Inc., Ansett Worldwide Aviation, U.S.A., MSA V, RRPF
Engine Leasing Limited, Canadian Imperial Bank of
Commerce, Flight Logistics Inc., C.I.T. Leasing
Corporation, NBB-Royal Lease Partnership One and GATX/CL
Air Leasing Cooperative Association,
Respondents/Appellants on cross-appeals
And between
NAV Canada, Appellant
v.
Wilmington Trust Company and Wilmington Trust
Corporation, Respondents
[page866]
And between
NAV Canada, Appellant
v.
G.I.E. Avions de transport régional, ATR Marketing Inc.,
Heather Leasing Corporation, Renaissance Leasing
Corporation, Inter-Canadian (1991) Inc. and Ernst &
Young Inc., in its capacity as trustee for the**

bankruptcy of Inter-Canadian (1991) Inc., Respondents
And between
NAV Canada, Appellant
v. Inter-Canadian (1991) Inc., Wilmington Trust Company,
Wilmington Trust Corporation, Aéroports de Montréal,
Greater Toronto Airports Authority, Ottawa
Macdonald-Cartier International Airport Authority and
Ernst & Young Inc., in its capacity as trustee for the
bankruptcy of Inter-Canadian (1991) Inc., Respondents,
and
Aéroports de Montréal, Appellant
v.
Wilmington Trust Company, Wilmington Trust Corporation,
NAV Canada, Greater Toronto Airports Authority, Ottawa
Macdonald-Cartier International Airport Authority and
Ernst & Young Inc., in its capacity as trustee for the
bankruptcy of Inter-Canadian (1991) Inc., Respondents,
and
Greater Toronto Airports Authority, Appellant
v.
[page867]
Ottawa Macdonald-Cartier International Airport
Authority, Wilmington Trust Company, Wilmington Trust
Corporation, Aéroports de Montréal, NAV Canada, Ernst &
Young Inc., in its capacity as trustee for the
bankruptcy of Inter-Canadian (1991) Inc. and
Inter-Canadian (1991) Inc., Respondents, and
Ottawa Macdonald-Cartier International Airport
Authority, Appellant
v.
Wilmington Trust Company, Wilmington Trust Corporation
and Ernst & Young Inc., in its capacity as trustee for
the bankruptcy of Inter-Canadian (1991) Inc.,
Respondents
And between
NAV Canada, Appellant
v.
Inter-Canadian (1991) Inc., Renaissance Leasing
Corporation, Heather Leasing Corporation, G.I.E. Avions
de transport régional, ATR Marketing Inc., Ernst & Young
Inc., in its capacity as trustee for the bankruptcy of

Inter-Canadian (1991) Inc., Aéroports de Montréal,
Greater Toronto Airports Authority and Ottawa
Macdonald-Cartier International Airport Authority,
Respondents, and
Aéroports de Montréal, Appellant
v.
Renaissance Leasing Corporation, Heather Leasing
Corporation, G.I.E. Avions
[page868]
de transport régional, ATR Marketing Inc., Ernst & Young
Inc., in its capacity as trustee for the bankruptcy of
Inter-Canadian (1991) Inc., NAV Canada, Greater Toronto
Airports Authority and Ottawa Macdonald-Cartier
International Airport Authority, Respondents, and
Greater Toronto Airports Authority, Appellant
v.
Ottawa Macdonald-Cartier International Airport
Authority, Renaissance Leasing Corporation, Heather
Leasing Corporation, G.I.E. Avions de transport
régional, ATR Marketing Inc., Aéroports de Montréal, NAV
Canada, Ernst & Young Inc., in its capacity as trustee
for the bankruptcy of Inter-Canadian (1991) Inc. and
Inter-Canadian (1991) Inc., Respondents, and
Ottawa Macdonald-Cartier International Airport
Authority, Appellant
v.
Renaissance Leasing Corporation, Heather Leasing
Corporation, G.I.E. Avions de transport régional, ATR
Marketing Inc. and Ernst & Young Inc., in its capacity
as trustee for the bankruptcy of Inter-Canadian (1991)
Inc., Respondents
And between
Aéroports de Montréal, Appellant
v.
[page869]
Wilmington Trust Company, Wilmington Trust Corporation
and Ernst & Young Inc., in its capacity as trustee for
the bankruptcy of Inter-Canadian (1991) Inc.,
Respondents
And between
Aéroports de Montréal, Appellant

v.
**Newcourt Credit Group (Alberta) Inc., Canada Life
Assurance Company, Ernst & Young Inc., in its capacity
as trustee for the bankruptcy of Inter-Canadian (1991)
Inc. and Renaissance Leasing Corporation, Respondents
And between
Aéroports de Montréal, Appellant**
v.
**Newcourt Credit Group (Alberta) Inc., Canada Life
Assurance Company, CCG Trust Corporation, Greater London
International Airport Authority, Greater Toronto
Airports Authority, Saint John Airport Inc., St. John's
International Airport Authority, Charlottetown Airport
Authority Inc., Renaissance Leasing Corporation, Heather
Leasing Corporation and Ernst & Young Inc., in its
capacity as trustee for the bankruptcy of Inter-Canadian
(1991) Inc., Respondents, and
St. John's International Airport Authority and
Charlottetown Airport Authority Inc., Appellants**
v.
**Newcourt Credit Group (Alberta) Inc.,**
[page870]
**Canada Life Assurance Company, CCG Trust Corporation,
Renaissance Leasing Corporation, Heather Leasing
Corporation, Canadian Regional Airlines Ltd., Canadian
Regional (1998) Ltd. and Ernst & Young Inc., in its
capacity as trustee for the bankruptcy of Inter-Canadian
(1991) Inc., Respondents, and
Greater Toronto Airports Authority, Appellant**
v.
**Greater London International Airport Authority, Saint
John Airport Inc., St. John's International Airport
Authority, Charlottetown Airport Authority Inc.,
Newcourt Credit Group (Alberta) Inc., Canada Life
Assurance Company, CCG Trust Corporation, Aéroports de
Montréal, Renaissance Leasing Corporation, Heather
Leasing Corporation, Canadian Regional Airlines Ltd.,
Canadian Regional (1998) Ltd. and Ernst & Young Inc., in
its capacity as trustee for the bankruptcy of
Inter-Canadian (1991) Inc., Respondents
And between**

**Greater Toronto Airports Authority, Appellant**

v.

**Renaissance Leasing Corporation, Inter-Canadian (1991) Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Respondents**

[page871]

**Greater Toronto Airports Authority, Appellant**

v.

**Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company, CCG Trust Corporation, Inter-Canadian (1991) Inc., Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. and Renaissance Leasing Corporation, Respondents**

And between

**Ottawa Macdonald-Cartier International Airport Authority, Appellant**

v.

**Wilmington Trust Company and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Respondents**

And between

**St. John's International Airport Authority, Appellant**

v.

**Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company, CCG Trust Corporation, Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. and Renaissance Leasing Corporation, Respondents**

And between

**Charlottetown Airport Authority Inc., Appellant**

v.

**CCG Trust Corporation and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Respondents**

[page872]

**[2006] 1 S.C.R. 865**

[2006] S.C.J. No. 24

2006 SCC 24

File Nos.: 30214, 30729, 30730, 30731, 30732, 30738,

30740, 30742, 30743, 30745, 30749, 30750, 30751.

Supreme Court of Canada

Heard: January 16, 17, 2006;
Judgment: June 9, 2006.

**Present: McLachlin C.J. and Bastarache, Binnie, LeBel,
Deschamps, Fish and Charron JJ.**

(98 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

**Catchwords:**

 *Transportation law -- Airports -- Seizure and detention of aircraft -- Airlines operating fleets of aircraft under leasing agreements with legal titleholders -- Airlines, registered owners of aircraft, incurring charges for civil air navigation and airport services -- Service providers applying to superior court judge for authorization, pursuant to s. 9 of Airport Transfer (Miscellaneous Matters) Act and s. 56 of Civil Air Navigation Services Commercialization Act, to seize and detain aircraft operated by airlines for unpaid charges incurred prior to airlines' bankruptcies -- Whether titleholders' right to repossess leased aircraft should take priority over service providers' seize and detain orders - - Whether titleholders liable to service providers for unpaid charges -- Whether seize and detain orders can be exercised against security posted by titleholders in substitution for aircraft -- Whether lessors of engines attached to detained aircraft entitled to repossess engines -- Airport Transfer (Miscellaneous Matters) Act, S.C. 1992, c. 5, s. 9 -- Civil Air Navigation Services Commercialization Act, S.C. 1996, c. 20, ss. 55, 56.*

 *Legislation -- Interpretation -- Contextual interpretation -- Owner of aircraft -- Whether word "owner" in s. 55 of Civil Air Navigation Services Commercialization Act includes legal titleholders of aircraft -- Civil Air [page873] Navigation Services Commercialization Act, S.C. 1996, c. 20, s. 55.*

**Summary:**

An airline in the modern era may consist of little more than a name, with its aircraft leased, its

suppliers on week to week contracts and even its reservation and yield management systems outsourced to one of the global service providers such as Sabre or Galileo. Start-ups are relatively easy, balance sheets are often thin, and failure can be quick and (to outsiders) unexpected. Yet privatized Canadian airports and NAV Canada (the privatized civil air navigation service) are obliged by statute to provide service even to financially troubled airline operators. When an operator collapses leaving unpaid bills for airport charges and air navigation services, the question becomes: who takes the financial loss, the people who ultimately own the leased aircraft or the people who were obliged to (and did) provide the airport and navigation services?

Before going bankrupt, the airline companies Canada 3000 and Inter-Canadian operated their fleets of aircraft under leasing agreements with the respondent legal titleholders and were the registered owners of the aircraft under the *Aeronautics Act*. These airlines incurred approximately $33.75 million in charges for civil air navigation and airport services provided by NAV Canada and the airport authorities pursuant to the *Airport Transfer (Miscellaneous Matters) Act* ("*Airports Act*") and the *Civil Air Navigation Services Commercialization Act* ("*CANSCA*").

*The Collapse of Canada 3000*

In November 2001, Canada 3000 applied for protection under the *Companies' Creditors Arrangement Act* ("*CCAA*"). NAV Canada and the airport authorities applied to a judge of the Ontario Superior Court of Justice, under s. 56 of *CANSCA* and s. 9 of the *Airports Act*, for authorization to seize and detain certain aircraft operated by the airline. The judge released the aircraft on the posting of security by the legal titleholders and later dismissed the seizure and detention motions, holding that the provisions in question of *CANSCA* and the *Airports Act* did not give the authorities priority over the rights of the legal titleholders to repossess the aircraft. He also held that the titleholders were not jointly and severally liable for the charges owed to NAV Canada under s. 55 of *CANSCA*, since they were not [page874] "owners" within the meaning of the Act. The majority of the Court of Appeal upheld the motions judge's decision.

*The Collapse of Inter-Canadian*

In December 1999, the airport authorities and NAV Canada obtained, pursuant to s. 56 of *CANSCA* and s. 9 of the *Airports Act*, an order of the Quebec Superior Court to seize and detain a number of aircraft operated by Inter-Canadian. The airline was subsequently deemed to have made an assignment in bankruptcy. Faced with the legal titleholders' claims that they were entitled to repossess the aircraft, the trustee in bankruptcy applied to the Superior Court for directions. The judge allowed a motion to release the aircraft in exchange for security. He later held that the legal titleholders were jointly and severally liable for the amounts owing. The majority of the Court of Appeal overturned the motions judge's ruling, concluding that the lessors' right to repossession took priority and that the legal titleholders were entitled to the return of their aircraft free and clear of the unpaid charges.

*Held*: The appeals and cross-appeals should be allowed in part.

This case is from first to last an exercise in statutory interpretation, and the issues of interpretation are closely tied to context. Prior to *CANSCA* and the *Airports Act*, civil air navigation and airport services were provided by the federal government. Under the current legislative scheme, the privatized NAV Canada and airport authorities operate as self-funded corporations that provide services on the basis of a cost-based tariff fixed by government regulation. They cannot withhold airport or navigation services even from an obviously failing airline. At the time the measures in question here were enacted, airline insolvencies and bankruptcies had become a fact of life throughout the airline industry. The legislative scheme shows that Parliament fully appreciated that in dealing with aircraft flown in and out of jurisdictions under complex leasing arrangements, the only effective collection scheme would be to render the aircraft themselves available for seizure, and thereafter to let those interested in them resolve their dispute about where the money should come from to pay the debts due to the service providers. [paras.36-39]


[page875]

*No Joint and Several Liability for Charges for Air Navigation Services*

The appeals are dismissed with respect to NAV Canada's claim that the legal titleholders are jointly and severally liable for outstanding civil air navigation charges incurred by the registered owners and operators of the failed airlines, since the legal titleholders are not "owners" within the meaning of s. 55 of *CANSCA*. It is clear from the statutory scheme and the legislative record that Parliament intended to create a "user-pay" system for civil air navigation services, and that the only "users" of those services within the contemplation of the Act are the airlines. While in some contexts the meaning of "owner" could include legal titleholders, a purposive interpretation of s. 55 excludes them. The definition of "owner" in s. 55(2) lists only persons in possession or legal custody and control of the aircraft. Section 55(1) should be similarly construed. Interpreting the list in s. 55(2) as exhaustive of ownership for the purposes of s. 55(1) is consistent with the rest of the statutory scheme governing aeronautics, the legislative history, and conforms with common sense. If NAV Canada's interpretation of s. 55 were correct, it would mean that a seizure and detention order issued in respect of Canada 3000's unpaid user charges could in theory attach not only to a legal titleholder's aircraft leased to Canada 3000, but also to any other aircraft to which that lessor holds title, including aircraft leased to other airlines. Moreover, to interpret "owner" as argued by NAV Canada would give preference to the ambiguous English text of s. 55 over the relatively clear French provision. A restrictive interpretation of "owner" is consistent with the policy and practice throughout the federal aeronautics scheme where the term "owner" is used to refer to the person in legal custody and control of the aircraft, not the legal titleholder. In enacting *CANSCA*, Parliament intended not to replace or override the existing regulatory framework but rather to fit cohesively within it. [paras.41-61]

*The Seizure and Detention Remedy*

Although the legal titleholders are not directly liable for the charges due to the service providers, NAV Canada and the airport authorities were entitled to orders seizing and detaining the aircraft pursuant to s. 56 of *CANSCA* and s. 9 of the *Airports Act*, and are [page876] entitled now to have their claims (as assessed by the motions judges) satisfied out of the security posted in substitution for the aircraft. Whereas s. 55 of *CANSCA* identifies a group of persons who are made legally liable for the amounts owing, the detention remedy set out in s. 9 of the *Airports Act* and s. 56 of *CANSCA* has a different focus. This court-granted remedy entitles the authorities to possess the aircraft until the debt is paid or security furnished. It does not confer any interest in the beneficial ownership of the aircraft, and it cannot be circumvented by a leasing arrangement made between an airline and an aircraft lessor. Since ss. 9(1) and 56(1) do not distinguish between the unpaid charges accumulated by specific aircraft operated by a defaulting owner or operator, the amount in respect of which the seizure of each aircraft is made is the entire amount owed by that registered owner or operator. There is no limitation of debts on an aircraft by aircraft basis. [paras.9-10] [paras.62-75] [paras.85-86]

Much of the potential unfairness complained of by the legal titleholders in the operation of the detention remedy can adequately be addressed by the motions judge. The right to seize and detain is not automatic. It requires a prior court authorization which may be subject to such terms as the court considers necessary. The court also has a discretion to limit the duration of the remedy by requiring the applicable authority to release a detained aircraft from detention prior to payment of the amount with respect to which the seizure was made. In any event, an authority that obtains an order is required to release a detained aircraft upon payment of the outstanding charges, or upon the provision of acceptable security therefor. Parliament has thus left the door open for the motions judge to work out an arrangement that is fair and reasonable to all concerned provided that the object and purpose of the remedy (to ensure the unpaid user fees are paid) is fulfilled. [para.73] [para.92]

The legal titleholders are sophisticated corporate players and are well versed in the industry in which they have chosen to invest. Since they can select which airlines they are prepared to deal with and negotiate appropriate security arrangements as part of their lease transactions, they are in a better position to protect themselves against this type of loss than are the airport authorities and NAV Canada. [paras.71-72]

The intervention of bankruptcy proceedings in both Quebec and Ontario created procedural complications. In the case of Inter-Canadian, the detention remedies [page877] were applied for well before the assignment in bankruptcy. In the case of Canada 3000, the detention remedies were applied for while the *CCAA* stay was in effect and Canada 3000 remained the registered owner of the aircraft in question. In neither case did the aircraft become part of the bankrupt estate (because ultimate ownership was in the legal titleholder). The aircraft were legitimate targets of the detention remedies as they were still sitting on a Canadian airport tarmac and were still "owned or operated" (within the meaning of the relevant statutes) by the airlines at the relevant date. Given the authority to charge interest, the interest continues to run to the first of the date of payment, the posting of

security or the bankruptcy. [para.77] [para.96]

In the proceedings involving Inter-Canadian it was not necessary for the Quebec Superior Court judge to resort to provincial law or, more specifically, to the *Civil Code of Québec*. The *Aeronautics Act*, the *Airports Act*, and *CANSCA* are federal statutes that create a unified aeronautics regime. Parliament endeavoured to create a comprehensive remedy that would be applicable across the country and would not vary from one province to another. This uniformity is especially vital since aircraft are highly mobile and move easily across jurisdictions. [paras.78-79]

Two of the respondents leased to Canada 3000 the engines attached to two of the aircraft which, when seized, were airworthy. For the present purposes, the engines are part of the aircraft in respect of which charges were incurred and that are the subject of the detention. The *Aeronautics Act* does not envisage the dismantling of the aircraft (and thus of its value as security) on the tarmac. [paras. 87-89]

**Cases Cited**

**Applied:** *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42; **distinguished:** *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411; **referred to:** *Pan American World Airways Inc. v. The Queen*, [1981] 2 S.C.R. 565; *Heydon's Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637; *Grand Trunk Railway Co. of Canada v. Hepworth Silica Pressed Brick Co.* (1915), 51 S.C.R. 81; *Bristol-Myers Squibb Co. v. Canada (Attorney General)*, [2005] 1 S.C.R. 533, 2005 SCC 26; *Dilworth v. Commissioner of Stamps*, [1899] A.C. 99; *R. v. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] S.C.R. 138; [page878] *Slaight Communications Inc. v. Davidson*, [1989] 1 S.C.R. 1038; *Schreiber v. Canada (Attorney General)*, [2002] 3 S.C.R. 269, 2002 SCC 62; *R. v. Dubois*, [1935] S.C.R. 378; *R. v. Ulybel Enterprises Ltd.*, [2001] 2 S.C.R. 867, 2001 SCC 56; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27; *R. v. Morgentaler*, [1993] 3 S.C.R. 463; *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2; *The Emilie Millon*, [1905] 2 K.B. 817; *Channel Airways Ltd. v. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456; *Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461, 2004 SCC 68; *Firestone Tire & Rubber Co. of Canada v. Industrial Acceptance Corp.*, [1971] S.C.R. 357; *Bank of America Canada v. Mutual Trust Co.*, [2002] 2 S.C.R. 601, 2002 SCC 43.

**Statutes and Regulations Cited**

*Aeronautics Act*, R.S.C. 1985, c. A-2, ss. 3(1) "aeronautical product", "registered owner", 4.4(5), 4.5.

*Airport Transfer (Miscellaneous Matters) Act*, S.C. 1992, c. 5, ss. 9, 10.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, ss. 121, 122.

*Canadian Aviation Regulations*, SOR/96-433, ss. 101.01(1) "operator", "owner", 202.15 to 202.17.

*Civil Air Navigation Services Commercialization Act*, S.C. 1996, c. 20, ss. 2(1) "user", (2), 7, 8, 9, Part III, 32 to 35, 36(3)(*a*)(i), 37(4), 44, 55, 56, 57(1).

*Civil Code of Québec*, S.Q. 1991, c. 64, arts. 1592, 1593.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, s. 11.31.

*Interpretation Act*, R.S.C. 1985, c. I-21, ss. 8.1, 8.2, 12.

**Treaties and Other International Instruments**

*Air Transport Agreement Between the Government of Canada and the Government of the United States of America* (1995), Annex I, s. 1.

*Convention on International Civil Aviation*, Can. T.S. 1944 No. 36, art. 19.

**Authors Cited**

Bunker, Donald H. *Canadian Aviation Finance Legislation*. Montreal: Institute and Centre of Air and Space Law, McGill University, 1989.

Canada. House of Commons. *House of Commons Debates*, vol. IV, 1st Sess., 33rd Parl., June 20, 1985, pp. 6065-66.


[page879]

Canada. House of Commons. *House of Commons Debates*, vol. 133, 2nd Sess., 35th Parl., March 25, 1996, pp. 1152-54.

Canada. House of Commons. *House of Commons Debates*, vol. 134, 2nd Sess., 35th Parl., May 15, 1996, pp. 2821, 2834, May 29, 1996, p. 3144, June 4, 1996, pp. 3394, 3410.

Canada. Senate. *Debates of the Senate*, vol. 135, 2nd Sess., 35th Parl., June 10, 1996, pp. 588-89.

"Clause by Clause Analysis for the *Civil Air Navigation Services Commercialization Act*", as presented to the Senate Committee on Transport and Communications.

Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto: Butterworths, 1983.

Sullivan, Ruth. *Sullivan and Driedger on the Construction of Statutes*, 4th ed. Toronto: Butterworths, 2002.

Uniform Law Conference of Canada. *Drafting Conventions for the Uniform Law Conference of Canada*, s. 21(4) (online: http://www.ulcc.ca/en/us/index.cfm?sec=5).

**History and Disposition:**

APPEALS and CROSS-APPEALS from a judgment of the Ontario Court of Appeal (Abella and Cronk JJ.A. and Juriansz J. (*ad hoc*)) (2004), 69 O.R. (3d) 1, 235 D.L.R. (4th) 618, 183 O.A.C. 201, 3 C.B.R. (5th) 207, [2004] O.J. No. 141 (QL), affirming in part a decision of Ground J. (2002), 33 C.B.R. (4th) 184, 5 P.P.S.A.C. (3d) 272, [2002] O.J. No. 1775 (QL). Appeals and cross-appeals allowed in part.

[page880]

 APPEALS from judgments of the Quebec Court of Appeal (Nuss, Pelletier and Morissette JJ.A.), [2004] R.J.Q. 2966, 247 D.L.R. (4th) 503, [2004] Q.J. No. 11921 (QL), [2004] Q.J. No. 11922 (QL), [2004] Q.J. No. 11923 (QL), [2004] Q.J. No. 11924 (QL), [2004] Q.J. No. 11925 (QL), [2004] Q.J. No. 11926 (QL), [2004] Q.J. No. 11927 (QL), [2004] Q.J. No. 11928 (QL), [2004] Q.J. No. 11930 (QL), [2004] Q.J. No. 11932 (QL), [2004] Q.J. No. 11933 (QL), [2004] Q.J. No. 11961 (QL), reversing, in whole or in part, decisions of Tremblay J., [2000] R.J.Q. 2935, [2000] Q.J. No. 7330 (QL), [2000] Q.J. No. 4959 (QL), [2000] Q.J. No. 4996 (QL), [2000] Q.J. No. 5004 (QL), [2000] Q.J. No. 5005 (QL), [2000] Q.J. No. 5007 (QL), [2000] Q.J. No. 5009 (QL). Appeals allowed in part.

**Counsel:**

Clifton P. Prophet and Eric Wredenhagen, for NAV Canada (30214).

Lyndon A. J. Barnes and Jean-Marc Leclerc, for Greater Toronto Airports Authority (30214).

John T. Porter and Alan B. Merskey, for Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority and St. John's International Airport [page881] Authority (30214).

Richard A. Conway, David P. Chernos, Linda M. Plumpton and Jana N. Stettner, for International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. and U.S. Airways Inc. (30214).

Christopher W. Besant and Joseph J. Bellissimo, for G.E. Capital Aviation Services Inc., as Agent and Manager for Polaris Holding Company and AFT Trust-Sub I, Pegasus Aviation Inc., and PALS I, Inc. (30214).

Barbara L. Grossman and Christopher D. Woodbury, for Ansett Worldwide Aviation, U.S.A., and MSA V (30214).

Kenneth D. Kraft, for RRPF Engine Leasing Limited and Flight Logistics Inc. (30214).

Pamela L. J. Huff and Jill Lawrie, for C.I.T. Leasing Corporation and NBB-Royal Lease Partnership One (30214).

Written submissions only by Craig J. Hill and Roger Jaipargas, for GATX/CL Air Leasing Cooperative Association (30214).

Michel G. Ménard, for NAV Canada (30729, 30730, 30731, 30732).

Richard L. Desgagnés and Véronique E. Marquis, for Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport Authority and Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751).

Gerald N. Apostolatos, for Aéroports de Montréal (30731, 30732, 30738, 30740, 30742).

Sandra Abitan, David Tardif-Latourelle and Allon Pollack, for Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745).

Bertrand Giroux, Markus Koehnen, Jeff Gollob, Jason Murphy, Jean-Yves Fortin and Geneviève Bergeron, for Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional and ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750).

Pierre Bourque and Eugene Czolij, for Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company and CCG Trust Corporation (30740, 30742, 30745, 30750, 30751).

No one appeared for Canadian Imperial Bank of Commerce, Inter-Canadian (1991) Inc., Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Greater London International Airport Authority, Saint John Airport Inc., Canadian Regional Airlines Ltd. and Canadian Regional (1998) Ltd.

---

The judgment of the Court was delivered by

**1**    **BINNIE J.**:-- When an airline collapses leaving unpaid bills for airport charges and air navigation services, the question becomes who takes the financial loss (or, as it is sometimes said, "the haircut"), the people who ultimately own the aircraft or the people who were obliged to (and did) provide the airport and navigation services?

**2**    The question lands before the Court because of the collapse of "Inter-Canadian (1991) Inc.

Airline" in 1999 and, in 2001, of Canada 3000 Airlines Ltd. and Royal Aviation Inc. (collectively "Canada [page882] 3000"). The answer depends on the statutory interpretation to be given to provisions of the *Airport Transfer (Miscellaneous Matters) Act*, S.C. 1992, c. 5 ("*Airports Act*"), and the *Civil Air Navigation Services Commercialization Act*, S.C. 1996, c. 20 ("*CANSCA*"). The important context for this interpretation is the unusual nature of the modern airline business.

**3**    After decades of financial turbulence, an airline in the modern era may consist of little more than a name, with its aircraft leased, its suppliers on week to week contracts and even its reservation and yield management systems outsourced to one of the global service providers such as Sabre or Galileo. Start-ups are relatively easy, balance sheets are often thin, and failure can be quick and (to outsiders) unexpected, as the history of Canada 3000 illustrates. When a financial collapse occurs (and these have been frequent in Canada and elsewhere in the past decade), there is little meat on the corporate bones for unsecured creditors. Doing business with such airline operators carries significant financial risks, yet the appellant Canadian airports operating under government supervision are obliged by statute to allow financially troubled airlines to make use of their services (and sometimes the airport will not know if an airline is in financial trouble or not). Airport costs are largely recovered through landing fees. If these and other fees go unpaid, the airport is out of pocket for the cost of the service it was obliged by law to provide.

**4**    "NAV Canada", the privatized successor to the former government-run civil air navigation system, is also obliged to offer its services to any aircraft flying through Canadian airspace on a cost-recovery basis. Its business is even riskier than that of the airports because quite often these aircraft do not even land in Canada, as in the case of transatlantic traffic flying the great circle route to and from the eastern seaboard of the United States: [page883] *Pan American World Airways Inc. v. The Queen*, [1981] 2 S.C.R. 565.

**5**    When Parliament adopted its policy of privatizing major airports and navigation services in the early 1990s putting such services on a commercial footing, potential investors were expected to insist on some assurance that they would in fact be financially viable serving the chronically unstable aviation business. Thus, Parliament decided to extend to the private operators of airport and navigation services a statutory power to apply to a superior court judge for an order to seize and detain aircraft until outstanding charges are paid, similar to the power Parliament had earlier conferred on the Crown in pre-privatization days under the *Aeronautics Act*, R.S.C. 1985, c. A-2, s. 4.5.

**6**    It is worth emphasizing that no power to seize and detain as such is conferred. A superior court judge is interposed between the aircraft sought to be seized and the airports or NAV Canada. As discussed below, the role of the judge is crucial to an understanding of the statutory detention remedy.

**7**    The respondents are primarily entities with the ultimate ownership of the aircraft in respect of which the charges in issue were incurred ("the legal titleholders"). Their position is that under the

terms of their various leases with the defaulting airlines, they did not operate the aircraft, nor did they make use of the services for which charges were levied, nor did they derive benefit therefrom. They say that they are investors, and that when the lessees failed they were entitled to repossess their aircraft free of the charges which the defaulting airlines - not the legal titleholders - incurred. They consider it unjust that they were required in these cases to post security as a condition of removing "their" aircraft from the airports in question. The appellant airport authorities and NAV Canada, on the other hand, argue that the failure of Canada 3000 and Inter-Canadian reflects the sort of air carrier instability that Parliament rightly anticipated and in light of [page884] which it created the statutory remedies in question. Parliament must be taken to appreciate, they say, that an airline may be only a corporate shell but an aircraft under detention is a good, solid and enduring hostage for payment.

**8**    I agree with the courts below that the respondent legal titleholders are not subject to personal or corporate liability to pay the unpaid charges under s. 55 of *CANSCA*. But that is not to say that the aircraft are similarly unburdened.

**9**    In my view, the appellants are entitled to obtain judicially authorized seize and detain orders (hereinafter sometimes collectively referred to as the detention remedy) to be exercised against the security posted in substitution for the aircraft. The matters should be remitted to the motions judges to work out the details of the orders. Considered in the context in which the detention remedy was intended by Parliament to operate, the detention remedy cannot be circumvented as suggested by the respondents by the expedient of leasing arrangements made between the airlines and the aircraft lessors. The detention remedy is purely statutory and Parliament's intention to create an effective collection mechanism against *the aircraft* itself owned or operated by the person liable to pay the amount or charge must be given full effect.

**10**    On the other hand, the appellants' remedy, if an order is granted, is limited to possession. Simple possession under the statutes does not confer any interest in the beneficial ownership of the aircraft. I do not think the appellants' further claim to the airborne equivalent of a maritime lien is well founded, nor do they have any "implied" power to sell the aircraft once detained. They get what the statute says they get - a right to apply for a judicial order to seize and detain the aircraft until payment - no more, and no less.

[page885]

**11**    For the reasons that follow, I would allow the appeals and the cross-appeals in part, and return the seizure and detention applications to the respective motions judges to be dealt with in accordance with this judgment.

    I.    <u>Facts</u>

**12**    In 1992, the *Airports Act* privatized airports formerly owned and operated by the federal government. In 1996, *CANSCA* implemented the same objective in relation to Canada's civil air navigation services. Thus NAV Canada was incorporated as a non-profit corporation for the purpose of developing, operating and maintaining the civil air navigation system; see *House of Commons Debates*, vol. 133, 2nd Sess., 35th Parl., March 25, 1996, at p. 1153. *CANSCA* implemented the transfer of what was Transport Canada's civil air navigation services to NAV Canada and established the commercial and economic regulatory arrangements for the continued operation of those services; see *House of Commons Debates*, vol. 134, 2nd Sess., 35th Parl., May 15, 1996, at p. 2821.

A. *Canada 3000*

**13**    On November 8, 2001, Canada 3000 applied for protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). The effect of an initial court order made on the same day stayed all proceedings by creditors pending the filing of a plan of arrangement. Although the stay contemplated the continuation of operations, some five hours later the airlines' management issued a press release declaring that the airlines had ceased operations. The next day, November 9, a further order was issued grounding the fleet and providing for the return of aircraft operated by the airlines to Canada.

**14**    On November 9, 2001, NAV Canada applied to the Ontario Superior Court of Justice under s. 56(1) of *CANSCA* for an authorization to seize and detain certain aircraft operated by Canada 3000. [page886] The Greater Toronto Airport Authority ("GTAA") applied for relief against Canada 3000 but did not at that time seek leave of the court to seize and detain any aircraft.

**15**    On November 10, 2001, the directors and officers of Canada 3000 resigned. The next day the Canada 3000 companies were put into bankruptcy. At that time, the Canada 3000 companies owed approximately $7.4 million to NAV Canada, $13 million to the GTAA, and $8.35 million to the other Canadian airport authorities. On November 12, the GTAA moved to seize and detain aircraft under s. 9 of the *Airports Act* and on November 23, the other airport authorities applied for similar relief.

**16**    The detention remedy sought by the authorities was in relation to 38 aircraft operated by the Canada 3000 companies and collectively worth approximately US $1.1 billion. Despite the existence of the legal titleholders, all of the aircraft were registered in the name of Canada 3000 as owner under the *Aeronautics Act*. Canada 3000 held leases with the various respondents in respect of 36 aircraft. The lessors retained legal title to the aircraft. At the time of the *CCAA* application, rental payments under the leases were significantly in arrears.

**17**    The termination provisions varied somewhat from lease to lease. Under some, the leases came to an end and the lessors became entitled to repossession upon the granting of the *CCAA* order, under others by the cessation of operations, and under the rest by the assignment in bankruptcy. The *CCAA* stay operated, in effect, as an interim bar to repossession (see s. 11.31 *CCAA*). At the time

the detention remedy was sought, the aircraft sought to be seized were grounded at the Canadian airports listed in the style of cause of the various proceedings.

**18**    On December 3, 2001, after the aircraft had been grounded for close to a month, the motions judge [page887] approved the terms of their release on the posting of security for 110 percent of the amounts alleged to be owed. The motions judge then heard the seizure and detention motions through December and into January 2002, and dismissed them on May 7, 2002. The airport authorities and NAV Canada appealed and on January 20, 2004, the Ontario Court of Appeal dismissed their appeal.

B. *Inter-Canadian*

**19**    Inter-Canadian operated its fleet of aircraft under leasing agreements with the legal titleholders but it too was the registered owner under the *Aeronautics Act*. On November 27, 1999, Inter-Canadian ceased operations and laid off 90 percent of its employees. At that point, it had accumulated unpaid charges totalling approximately $5 million owing to NAV Canada and to the airport authorities.

**20**    Through early December 1999 the airport authorities and NAV Canada moved to seize and detain a number of the aircraft. This was authorized by four orders made by the Quebec Superior Court between December 8 and 17. Before the seizure motions were launched, however, one of the respondents, Renaissance Leasing Corporation, had purported to terminate its lease with Inter-Canadian. The aircraft nevertheless remained on the tarmac at Dorval airport.

**21**    On January 5, 2000, Inter-Canadian filed a notice of intention to make a proposal to its creditors pursuant to the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. The airline's creditors rejected its proposal in March and the company was deemed retroactively to have made an assignment in bankruptcy as of January 5. Faced with the legal titleholders' claims that they were entitled to repossession of the aircraft, the trustee in bankruptcy applied to the Superior Court for directions.

**22**    On July 7, 2000, the Superior Court allowed a motion to release the aircraft in exchange for security set at 150 percent of the claims of the [page888] airport authorities and NAV Canada. On November 9, 2000, Tremblay J., having heard the application on its merits, confirmed the validity of the detention and also held the legal titleholders liable for the amounts owing. His ruling was overturned by a majority decision of the Quebec Court of Appeal, which held that the lessors' right to repossession took priority and that the legal titleholders were entitled to the return of their aircraft free and clear of the unpaid charges.

II.    Judicial History

A. *Canada 3000*

(1)     Ontario Superior Court of Justice (Ground J.)

**23**     The motions judge concluded that the legal titleholders were not jointly and severally liable for the charges owed to NAV Canada under s. 55 of *CANSCA*. They were not "owners" within the meaning of the Act because none of the aircraft were registered in their name. Nor were any of the titleholders in possession of the aircraft when the charges were incurred. In his view, "the word 'owner' in [*CANSCA*] should not be interpreted to include persons who do not have custody or control of the aircraft, do not operate the aircraft, and do not make use of the air navigation services in respect of which the navigation charges are levied": (2002), 33 C.B.R. (4th) 184, at para. 52.

**24**     Further, the motions judge concluded that the seizure and detention remedies found in *CANSCA* and the *Airports Act* did not create a lien or security interest that ranked in priority to the ownership or perfected security rights of third parties. He preferred the analogy of a *Mareva* injunction:

> I am not persuaded, however, that the legislation granting such detention rights should be interpreted as creating rights against third parties having ownership or perfected security interests in the aircraft such that they, in effect, become liable for the debts of third parties and must extinguish those debts before they can [page889] enforce their contractual rights to repossess the aircraft or enter into possession of the aircraft to realize on their security. [para. 43]

**25**     Accordingly, he dismissed the claims of NAV Canada and the airport authorities.

(2) Ontario Court of Appeal

(a)     *Cronk J.A., for the Majority*

**26**     Cronk J.A. agreed with the motions judge that the titleholders were not jointly and severally liable under s. 55 of *CANSCA*. A restrictive definition of "owner" excluding legal titleholders was consistent with the user-pay model established by *CANSCA*, the broader regulatory system and the relevant legislative history, all of which demonstrated Parliament's intent to limit liability to "persons having legal custody and control and persons otherwise in possession of aircraft": (2004), 69 O.R. (3d) 1, at para. 118.

**27**     Cronk J.A. also agreed that the seizure and detention provisions in *CANSCA* and the *Airports Act* do not give the authorities priority over the rights of the titleholders to repossess the aircraft:

> I conclude that the remedies under the Detention Provisions, if granted, do not create rights in the Aircraft that rank in priority to the interests in the Aircraft of the Lessors, the legal titleholders to the Aircraft, in the face of a claim for repossession and recovery of the Aircraft by the Lessors... . The Detention Provisions are intended to apply to aircraft of persons having legal custody and

control or who are otherwise in possession of the aircraft. [para. 190]

**28**    In the view of the majority, even if the aircraft had been properly detained, the engines attached to the aircraft and leased to Canada 3000 by two of the respondents could be removed by their respective owners. The appeal of the various authorities was dismissed.


[page890]



(b)    *Juriansz J. (ad hoc), Dissenting in Part*

**29**    Juriansz J. (*ad hoc*, now J.A.) would have allowed the appeal in respect of the detention remedies. In his view, these remedies focus on the aircraft and not the persons liable to pay. As long as the aircraft is owned or operated by a person liable to pay then it may be the subject of an application to seize and detain it. The fact that other persons may have property interests in the aircraft is of no consequence:

> The remedy is "in addition to any other remedy available for the collection" of the outstanding charges. The remedy is not confined to collection of outstanding charges from persons liable for the charges. The remedy is not directed to persons at all, but rather to "aircraft", and permits the Authorities, under court supervision, to seize, to detain and to refuse to release the aircraft until somebody has satisfied the outstanding charges. [para. 255]

Juriansz J. also held that the detention provisions apply to the leased engines since they were affixed to the aircraft that were subject to the detention remedy.

B. *Inter-Canadian*

(1)    Quebec Superior Court (Tremblay J.)

**30**    The motions judge held the titleholders to be jointly and severally liable for the unpaid charges due to NAV Canada under s. 55 of *CANSCA*. *CANSCA* and the *Airports Act* provide for a right to retain the aircraft operated by a party that has not paid its charges. The motions judge relied on arts. 1592 and 1593 of the *Civil Code of Québec*, S.Q. 1991, c. 64, and determined that the authorities' right of retention of the aircraft took priority over the lessors' interests: [2000] R.J.Q. 2935.

**31**    Accordingly, by order dated November 9, 2000, the motions judge confirmed the validity of the [page891] seizures, and declared the respondents liable to pay the overdue charges.

(2) Quebec Court of Appeal

(a)    *Pelletier and Morissette JJ.A., for the Majority*

**32**    Pelletier and Morissette JJ.A. reversed the motions judge's decision and absolved the legal titleholders from liability for unpaid service charges to NAV Canada under s. 55 of *CANSCA*. In their view, limiting the definition of "owner" to the enumerated categories in s. 55(2) was the only interpretation consistent with both the English and French versions of the statute and the statutory context. They noted that NAV Canada's interaction is primarily with the user of the aircraft, not the legal titleholders. They concluded, at (2004), 247 D.L.R. (4th) 503, para. 106, that

> [translation] these aircraft are in no way liable for the debts of Inter-Canadian for the simple reason that they do not belong to this debtor.

**33**    Moreover, in their view, neither the airport authorities nor NAV Canada had any right to an order to seize and detain the aircraft in priority to the rights of the legal titleholders. They rejected the motions judge's resort to the *Civil Code*.

(b)    *Nuss J.A., Dissenting*

**34**    Nuss J.A. concluded that the intention and purpose of the statutory provisions would be defeated if the legal titleholders could obtain release of the aircraft without payment of the charges. However, he limited the liability of a legal titleholder to an obligation to pay the charges incurred in the operation of aircraft of which it is the titleholder:

> ... the titleholder, to obtain release of its seized aircraft must only pay all the charges, in the use of the airport, incurred (and unpaid) by the operator in the operation of any aircraft owned by the <u>same</u> titleholder. [Emphasis added; para. 145.]

[page892]

III.    <u>Statutory Provisions</u>

**35**    The statutory provisions are reproduced in the relevant paragraphs of the reasons.

IV.    <u>Analysis</u>

**36**    This case is from first to last an exercise in statutory interpretation, and the issues of interpretation are, as always, closely tied to context. The notion that a statute is to be interpreted in light of the problem it was intended to address is as old at least as the 16th century; see *Heydon's*

*Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637. In a more modern and elaborate formulation, it is said that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament" (E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87).

**37**    As this Court noted in 1915, part of the context is "the condition of things existent at the time of the enactment": *Grand Trunk Railway Co. of Canada v. Hepworth Silica Pressed Brick Co.* (1915), 51 S.C.R. 81, at p. 88. At the time the measures in question here were enacted, airline insolvencies and bankruptcies had become a fact of life throughout the airline industry. Many of the planes flown in and out of and across Canada were leased to, and flown by, airlines in, or close to, bankruptcy protection. Under the interpretation offered by the respondents and the majority decisions of the Courts of Appeal, the detention remedy would be opposable to everybody but the titleholder, whose aircraft is often the only asset to survive the financial wreckage. Parliament would be taken to have intended a remedy that is least effective when it is most needed. It is more likely that Parliament fully appreciated that in dealing with aircraft flown in and out of jurisdictions under complex leasing arrangements, the only effective collection scheme is to render the aircraft themselves available for seizure, and thereafter to let those interested in them, including legal titleholders, registered owners, sublessors and operators, [page893] resolve their dispute about where the money is to come from to pay the debts due to the service providers. I should add that I agree with Juriansz J. that the legal titleholders are not without benefit from the services provided, although the benefit is indirect. Without the day to day flight operations the legal titleholders would have no business. They lease the aircraft intending them to be used in the very activities for which the services are provided. By and large, the legal titleholders are sophisticated corporations. They are knowledgeable about the ways of the industry in which they have chosen to participate.

**38**    Part of the important context is the commercial reality of the marketplace where a statute is intended to function. Here the privatized appellants provide services on the basis of a cost-based tariff fixed by regulation. Prior to *CANSCA* and the *Airports Act*, civil air navigation and airport services were provided by the federal government. Central to the statutory scheme is the fact that these service providers are self-funded and intended to be financially viable and independent; see *CANSCA*, ss. 7 and 8; *House of Commons Debates*, March 25, 1996, at pp. 1152-54. The privatized service providers do not possess the financial resources of the Crown. The statutory remedies are clearly intended to promote financial viability within a risky business environment and to make privatization attractive and practicable to potential investors.

**39**    Another important commercial fact is that not only are NAV Canada and the airport authorities required to provide services according to a cost-based tariff, but they cannot withhold services from even an obviously failing airline. Pursuant to the lease agreement between Transport Canada and [page894] the Airport Authorities, the airports cannot limit the access of aircraft to their facilities except in cases of bad weather or emergency conditions; see *Ottawa Macdonald-Cartier International Airport Ground Lease*, s. 8.10.02. Similarly, NAV Canada is obligated under s. 9 of *CANSCA* to provide all users with its civil air navigation services. This reflects the obligation

undertaken by Canada under international agreements; see, e.g., *Air Transport Agreement Between the Government of Canada and the Government of the United States of America*, February 24, 1995 ("*USA-Canada Open-Skies Agreement*"), Annex I, s. 1.

**40**    With these preliminary comments on context (and in particular the vitally important commercial context in which these statutes were designed to operate), I turn to the two major questions raised by the appeals. Firstly are the *legal titleholders* liable for the debt incurred by the registered owners and operators of the failed airlines to the service providers? Secondly, even if they are not so liable, are *the aircraft* to which they hold title subject on the facts of this case to judicially issued seizure and detention orders to answer for the unpaid user charges incurred by Canada 3000 and Inter-Canadian?

A. *Are the Legal Titleholders Jointly and Severally Liable to NAV Canada Under Section 55 of CANSCA for Outstanding Civil Air Navigation Charges?*

**41**    In my view, on a purposeful interpretation of s. 55, the answer is no. I agree with Ground J. and with the unanimous view of both Courts of Appeal that the legal titleholders are not personally liable for the unpaid charges. Section 55 provides:

> **55.** (1) [Joint and several liability] The owner and operator of an aircraft are jointly and severally liable [page895] for the payment of any charge for air navigation services imposed by the Corporation in respect of the aircraft.

> (2) [Meaning of "owner"] In subsection (1), "owner", in respect of an aircraft, includes

> (*a*) the person in whose name the aircraft is registered;

> (*b*) a person in possession of an aircraft as purchaser under a conditional sale or hire-purchase agreement that reserves to the vendor the title to the aircraft until payment of the purchase price or the performance of certain conditions;

> (*c*) a person in possession of the aircraft as chattel mortgagor under a chattel mortgage; and

> (*d*) a person in possession of the aircraft under a bona fide lease or agreement of hire.

**42**    The appellants contend that the word "owner" in s. 55(1) should be given its ordinary meaning to include the legal titleholders. Who, more than they, should be considered an "owner"? The legal titleholders respond that it would be absurd to make them jointly and severally liable for civil air navigation charges related to air operations in which they did not participate, any more than the owner of a rented car should be liable for charges incurred by a renter in using a toll bridge. They point out that the practical effect of NAV Canada's argument would be mischievous. In this case, for example, Canada 3000 leased a number of aircraft from International Lease Finance Corporation ("ILFC") based in California, one of the largest aircraft leasing companies in the world. If NAV Canada's interpretation of s. 55 is correct, it would mean that a seizure and detention order issued in respect of Canada 3000's unpaid user charges could in theory attach not only to the ILFC aircraft leased to Canada 3000, but also to any other aircraft to which ILFC holds title, including aircraft leased to other airlines (e.g. Lufthansa, British Airways or United Airlines). Thus the wreckage created by Canada 3000's collapse could spread disruption widely and [page896] perhaps unjustifiably trigger a further crisis in other airlines.

**43**    It seems clear from the statutes and the legislative record that Parliament intended to create a "user-pay" scheme for civil air navigation services, and that the only "users" of the civil air navigation services within the contemplation of the Act are the airlines, not the legal titleholders.

>    (1)    The Meaning of "Owner"

**44**    If s. 55(1) were read in isolation, the ordinary and grammatical meaning of "owner" would include the legal titleholder. However, this Court held, in *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, that

>>        one must consider the "entire context" of a provision <u>before</u> one can determine if it is reasonably capable of multiple interpretations... .

>>        ... It is necessary, in every case, for the court charged with interpreting a provision to undertake the contextual and purposive approach set out by Driedger, and *thereafter* to determine if "the words are ambiguous ...". [Underlining added; paras. 29-30.]

**45**    Accordingly, to paraphrase the Court's decision in *Bristol-Myers Squibb Co. v. Canada (Attorney General)*, [2005] 1 S.C.R. 533, 2005 SCC 26, it is necessary to suspend judgment on the precise scope of the word "owner" in s. 55(1) and first to examine the "contextual" elements of the Driedger approach.

>    (2)    Statutory Context of Section 55

**46**    Understandably, the appellants lay great emphasis on the fact that s. 55(2) is introduced by the words

[page897]

> In subsection (1), "owner", in respect of an aircraft, <u>includes</u> ... .

followed by a list of four subsections. In the French text, on the other hand, the introductory words are

> *Pour l'application du paragraphe (1), "propriétaire", relativement à un aéronef, <u>s'entend</u>* ... .

There was, as might be expected, much argument over the words "includes" and "*s'entend*" in s. 55(2). NAV Canada argues that "includes" expands the definition of owner beyond the enumerated groups and that its ordinary meaning encompasses titleholders. The legal titleholders respond that the sense of "*s'entend*" in the French text is usually conveyed by the English word "means", which generally precedes a definition to be construed as exhaustive, and which would therefore exclude them from personal liability.

**47**    The English word "includes" may also, depending on the context, precede a list that exhausts the definition; see, e.g., *Dilworth v. Commissioner of Stamps*, [1899] A.C. 99 (P.C.), at pp. 105-6; *R. v. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] S.C.R. 138.

**48**    In this case, in my view there are three significant reasons for adopting a restrictive interpretation of the word "includes" in s. 55(2), and thereby excluding the legal titleholders from liability under s. 55(1).

**49**    Firstly, it *is* significant that the French version signals a closed list; see Uniform Law Conference of Canada, *Drafting Conventions for the Uniform Law Conference of Canada* (online), s. 21(4) . The shared meaning is not conclusive when such an interpretation would be contrary to the purpose and intent of the statute, but it is preferred; see *Slaight Communications Inc. v. Davidson*, [1989] 1 S.C.R. 1038, at pp. 1070-72; *Schreiber v. Canada (Attorney General)*, [2002] 3 S.C.R. 269, 2002 SCC 62, at para. 56; and R. Sullivan, *Sullivan and Driedger on the Construction of Statutes* (4th ed. 2002), at pp. 79-90. Further, where one of the linguistic versions is broader than the other, the common meaning favours the more restricted or limited meaning; [page898] see *Schreiber*; *R. v. Dubois*, [1935] S.C.R. 378. As the English version is ambiguous, indicating that the list could be exhaustive or expansive depending on the context, the fact that the relatively clear French version signals that "owner" is restricted to the persons listed in s. 55(2) is a factor weighing against NAV Canada's expansive interpretation.

**50**    Secondly, I conclude (as did the Courts of Appeal) that interpreting the list enumerated in s. 55(2) as exhaustive of ownership for the purposes of s. 55(1) is consistent with the regulatory

scheme as a whole and its legislative history, outlined below. In restricting "owner" to those in possession and legal custody and control of the aircraft, s. 55(2) is brought into conformity with the meaning that the word "owner" carries throughout the interlocking statutes that regulate aeronautics. For example, under the *Canadian Aviation Regulations*, SOR/96-433 ("*CARs*"), only a person who has legal custody and control may be a registered owner. Sections 55(2)(*b*) to (*d*) all explicitly state that the "owner" must be in possession of the aircraft. Also of significance is s. 55(2)(*d*), which includes as owner someone "in possession of the aircraft under a bona fide lease". No reference is made therein to the lessor. Parliament put its mind to aircraft leasing agreements and decided that the person in possession of the aircraft is the owner for the purposes of user charges.

**51**    Thirdly, exclusion of legal titleholders is consistent with Parliament's manifest intent to limit the scope of liability to "users" of NAV Canada's civil air navigation services. Section 32 of *CANSCA* authorizes NAV Canada to impose charges only on a "user", which s. 2(1) of the Act defines as "an aircraft operator." Part III of *CANSCA* lays out detailed mechanisms through which NAV Canada may impose fees. All of its provisions contemplate that it is the user who will be charged. Section 36(3)(*a*)(i) states that notice of changes to existing [page899] charges and notice of new charges must be sent to representative user organizations. Section 37(4) states that NAV Canada must advise representative user organizations once a new charge has been approved. Section 44 limits the right to appeal charges to "any user, group of users or representative organization of users".

**52**    In contrast, titleholders are not provided with notice of rates or accounts of the charges that their aircraft accumulate. In this case, the respondents in the Canada 3000 case were only notified of the $7.4 million owing to NAV Canada the day before the airline filed for protection under the *CCAA*. Thus Cronk J.A. observed that

> the charges scheme of the *CANSCA* does not protect aircraft lessors and secured creditors from the possible imposition by NAV Canada of improper or arbitrary navigation charges precisely because it is not envisaged that such persons will have any liability for such charges. [para. 101]

**53**    In summary, in my view, the statutory context supports the exclusion of the legal titleholders from the definition of owner under s. 55 of *CANSCA*.

### (3)    The Broader Legislative Framework

**54**    As stated, aeronautics in Canada is governed by a complex web of statutes, regulations and international conventions. *CANSCA* and the *Airports Act* are part of this broader legislative framework. In *R. v. Ulybel Enterprises Ltd.*, [2001] 2 S.C.R. 867, 2001 SCC 56, the Court emphasized, at para. 52, "the principle of interpretation that presumes a harmony, coherence, and consistency between statutes dealing with the same subject matter". See also *Bell ExpressVu*, at para. 27.

**55**    The policy and practice throughout the federal regulatory scheme is to use the term "owner" to refer to the person in legal custody and control of [page900] the aircraft, not the legal titleholder. The *CARs*, for example, define owner as "the person who has legal custody and control of the aircraft" (s. 101.01(1)). The *Aeronautics Act* refers only to "registered owners" and, under s. 4.4(5), only the operator or *registered* owner may face liability for charges imposed under that Act. Section 3(1) defines a registered owner as the person to whom a certificate of registration has been issued and the *CARs* make clear that an aircraft may only be registered by an owner who, again, must have legal custody and control of the aircraft; see ss. 202.15 to 202.17. Section 2(2) of *CANSCA* itself states that "[u]nless a contrary intention appears, words and expressions used in this Act have the same meaning as in subsection 3(1) of the *Aeronautics Act*." I appreciate that arguments are available to counter these points but in my view the legal titleholders have the better side of the debate.

**56**    Internationally, the *Convention on International Civil Aviation*, December 7, 1944, Can. T.S. 1944 No. 36 (the "Chicago Convention"), does not require legal title to correspond with registered ownership. Article 19 states that registration shall be in accordance with the laws of the contracting State. It is common ground that, by virtue of ss. 202.15, 202.16 and 202.17 of the *CARs*, an aircraft may only be registered in the Canadian Civil Aircraft Register by the "owner" of the aircraft as that term is defined under s. 101.01(1) of the *CARs*, and that that person is the entity having legal custody and control of the aircraft. Thus an airline operating aircraft in Canada under a long-term lease is named on the Certificate of Registration as "owner" of the aircraft, notwithstanding that title is actually held by the lessor; see D. H. Bunker, *Canadian Aviation Finance Legislation* (1989), at p. 764. We have been given no reason why the privatization legislation should be held to depart so strikingly from Canadian regulatory practice.

[page901]

(4)    Legislative History

**57**    Though of limited weight, Hansard evidence can assist in determining the background and purpose of legislation; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27, at para. 35; *R. v. Morgentaler*, [1993] 3 S.C.R. 463, at p. 484. In this case, it confirms Parliament's apparent intent to exclude legal titleholders from personal liability for air navigation charges. The legislative history and the statute itself make it clear that Parliament did not intend *CANSCA* to replace or override the existing regulatory framework but rather to fit cohesively within it. In introducing *CANSCA*, the Minister of Transport stated that the *Aeronautics Act*, which establishes the essential regulatory framework to maintain safety in the aviation industry, "will always take precedence over the commercialization legislation" (*House of Commons Debates*, March 25, 1996, at p. 1154). In the Ontario Court of Appeal, Cronk J.A. highlighted a number of other instances where government

spokespersons emphasized to Members of Parliament that *CANSCA* was to fit within the existing regulatory framework which generally favours the narrow meaning of "owner"; see, e.g., *House of Commons Debates*, May 15, 1996, at p. 2834; May 29, 1996, at p. 3144; June 4, 1996, at pp. 3394 and 3410; and *Debates of the Senate*, vol. 135, 2nd Sess., 35th Parl., June 10, 1996, at pp. 588-89.

**58**    In 1985, during passage of the *Aeronautics Act*, a concern was raised in Parliament that liability under s. 4.4(5) (that Act's liability provision) could extend to legal titleholders. In response, the Government inserted the term "registered owner". The Parliamentary Secretary to the Minister of Transport specifically stated that the change was made to ensure that liability did not extend to those who had a security or other financial interest in the aircraft; *House of Commons Debates*, vol. IV, 1st Sess., 33rd Parl., June 20, 1985, at pp. 6065-66.

**59**    In 1996, the Government considered Bill C-20 (which became *CANSCA*) as it transferred the [page902] operation of the civil navigation system from Transport Canada to NAV Canada. The Clause by Clause Analysis brief presented to the Senate Committee explained that s. 55 is based on the wording of the equivalent section of the *Aeronautics Act* which, as stated, restricts "owner" to *registered* owner; see "Clause by Clause Analysis for the *Civil Air Navigation Services Commercialization Act*", as presented to the Senate Committee on Transport and Communications, at pp. 51-52. However, the textual discrepancy noted above was not addressed.

(5)    Conclusion on the Section 55 Issue

**60**    A purposive interpretation of s. 55 that takes into account the foregoing considerations compels rejection of the position urged by NAV Canada. Moreover, and importantly, the narrow interpretation of "owner" in s. 55(1) conforms with common sense. It would be a severe disruption to the functioning of the airline industry if, as a result of Canada 3000's failure to pay its charges, NAV Canada could seize and detain an aircraft operated by, for example, Air Canada. There is no reason to think Parliament intended to let the damage caused by a failed airline expand beyond that airline's fleet of aircraft.

**61**    Accordingly, applying Driedger's contextual approach to s. 55(1) of *CANSCA*, I agree with the Courts of Appeal that the titleholders of the aircraft are *not* jointly and severally liable for the charges due to NAV Canada. They are not "owners" within the meaning of that section.

B.    *The Detention Remedy*

**62**    If the legal titleholders are not directly liable for the charges due to the service providers, they argue that it would be unfair and contradictory to hold their aircraft hostage for the payment. Section 56 of *CANSCA* and s. 9 of the *Airports Act* should be [page903] interpreted consistently with s. 55(1) of *CANSCA*, the legal titleholders argue, and their right to repossess the aircraft on termination of the lease should take priority over the statutory remedy.

**63**    On the other hand, Nuss J.A., dissenting in the Quebec Court of Appeal, put the contrary

position:

>If the titleholder could obtain release of the seized aircraft without the payment of the outstanding charges or providing security, the intention and purpose of the Detention Provisions enacted by Parliament would be defeated. This is so because the debt is constituted of charges incurred by the operator of the aircraft (who is often, as in this case, the registered owner) and not by the titleholder. Thus, if the contention of [the titleholders] were to prevail, the titleholder, who is neither the operator nor the "owner" within the meaning of the statutes, could always obtain release of the aircraft and the charges would not be paid. The recourse provided by Parliament would, inevitably, be of no avail. [para. 126]

I believe that Nuss J.A. is correct on this point.

**64**    The relevant provisions, which authorize applications to a superior court judge of the province in which any aircraft owned or operated by the person liable to pay the charge or amount is situated, are expressed in the two statutes in similar terms.

**65**    Section 56 of *CANSCA* provides:

>**56.** (1) [Seizure and detention of aircraft] <u>In addition to any other remedy available</u> for the collection of an unpaid and overdue charge imposed by the Corporation for air navigation services, and <u>whether or not a judgment for the collection of the charge has been obtained</u>, the Corporation may apply to the superior court of the province in which any aircraft owned or operated by the person liable to pay the charge is situated for an order, issued on such terms as the court considers appropriate, <u>authorizing the Corporation to seize and detain any such aircraft until the charge is paid</u> or a bond or other security for the unpaid and overdue amount in a form satisfactory to the Corporation is deposited with the Corporation.

>(2) [Application may be *ex parte*] An application for an order referred to in subsection (1) may be made [page904] *ex parte* if the Corporation has reason to believe that the person liable to pay the charge is about to leave Canada or take from Canada any aircraft owned or operated by the person.

>(3) [Release] <u>The Corporation shall release</u> from detention an aircraft seized under this section if

> (*a*)    the amount in respect of which the seizure was made is paid;
>
> (*b*) a bond or other security in a form satisfactory to the Corporation for the amount in respect of which the seizure was made is deposited with the Corporation; or
>
> (*c*)    an order of a court directs the Corporation to do so.

**66**    Section 9 of the *Airports Act*, under which the airport authorities bring their seizure and detention applications, is to the same effect.

> **9.** (1) [Seizure and detention for fees and charges] Where the amount of any landing fees, general terminal fees or other charges related to the use of an airport, and interest thereon, set by a designated airport authority in respect of an airport operated by the authority has not been paid, the authority may, in addition to any other remedy available for the collection of the amount and whether or not a judgment for the collection of the amount has been obtained, on application to the superior court of the province in which any aircraft owned or operated by the person liable to pay the amount is situated, obtain an order of the court, issued on such terms as the court considers necessary, authorizing the authority to seize and detain aircraft.
>
> (2) [Idem ] Where the amount of any fees, charges and interest referred to in subsection (1) has not been paid and the designated airport authority has reason to believe that the person liable to pay the amount is about to leave Canada or take from Canada any aircraft owned or operated by the person, the authority may, in addition to any other remedy available for the collection of the amount and whether or not a judgment for the collection of the amount has been obtained, on *ex parte* application to the superior court of the province in which any aircraft owned or operated by the person is situated, obtain an order of the court, issued on such terms as the court considers necessary, authorizing the authority to seize and detain aircraft.
>
> (3) [Release on payment] Subject to subsection (4), except where otherwise directed by an order of a court, [page905] a designated airport authority is not required to release from detention an aircraft seized under subsection (1) or (2) unless the amount in respect of which the seizure was made is paid.

(4) [Release on security] A designated airport authority shall release from detention an aircraft seized under subsection (1) or (2) if a bond, suretyship or other security in a form satisfactory to the authority for the amount in respect of which the aircraft was seized is deposited with the authority.

(5) [Same meaning] Words and expressions used in this section and section 10 have the same meaning as in the *Aeronautics Act*.

**67**    According to these provisions, the airport authorities or NAV Canada (upon obtaining a court order) may take possession of an aircraft and detain it. The aircraft must be either "owned" or "operated" by a person who is liable to pay. Either is a sufficient basis for an application.

**68**    The key difference between the joint and several liability provisions in s. 55 of *CANSCA* and the detention remedy provided for in s. 56 of *CANSCA* and s. 9 of the *Airports Act* is that the seizure and detention remedy lies against the aircraft. Whereas s. 55 identifies a group of *persons* who are made legally liable for the amounts owing, the detention remedy has a different focus. It provides for a right to possess *aircraft* until the debt is paid or security provided.

**69**    The legal titleholders argue that the claim of NAV Canada and the airport authorities to detain the aircraft must yield to their right under their respective leases to repossession. They liken the seizure and detention remedies to a *Mareva* injunction, in which the assets are frozen while various parties work out their respective entitlements; see *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2. However, in my view, there is no need to resort to analogies, especially loose analogies (e.g. *Mareva* injunctions are interlocutory, whereas the detention remedy is available whether or not a judgment for the collection of the charge or amount has been obtained. Moreover, *Mareva* injunctions are directed at persons (*Aetna Financial Services*, [page906] at pp. 25-26), whereas the seizure and detention remedy targets the aircraft itself).

**70**    The *CARs*, adopted pursuant to the *Aeronautics Act*, provide that an "operator" in respect of an aircraft "means the person that has possession of the aircraft as owner, lessee or otherwise" (s. 101.01(1)). At the dates of the applications for seizure and detention orders, Canada 3000 and Inter-Canadian were still the *registered* owners of the aircraft. Accordingly, if the Court is to read the words of the detention remedy in the context of the realities of this industry previously discussed, it seems to me that those remedies must be available against the aircraft of Canada 3000 (except any aircraft already repossessed by the titleholder prior to the *CCAA* application on November 8, 2001) and Inter-Canadian. (Once a titleholder reclaims possession, it becomes an operator in possession within s. 55(1) of *CANSCA*. However, as its possession post-dates the charges, no personal liability is incurred on that account.)

**71**    It is difficult to endorse the indignation of the legal titleholders with respect to detention of their aircraft until payment is made for debts due to the service providers. They are sophisticated corporate players well versed in the industry in which they have chosen to invest. The detention

remedies do not affect their ultimate title. Investors who have done their due diligence will recognize that detention remedies have deep roots in the transport business. In *The Emilie Millon*, [1905] 2 K.B. 817 ("*Mersey Docks*"), for example, the English Court of Appeal examined a statute that stipulated that the Mersey Docks and Harbour Board could cause a ship to be detained until all harbour and tonnage payments had been made despite the fact that the ownership of the ship did not correspond to the debtor who had incurred the charges. The ruling in that case reflects the traditional scope of this type of remedy (at p. 821):

[page907]

> The Mersey Docks and Harbour Board have a right by statute to detain the vessel until the dock tonnage rates and harbour rates are paid. That is an express statutory right, and the board have nothing to do with any sale of the vessel to a purchaser. That is a matter which only concerns those who are interested in the vessel. It does not concern the board. The board are entitled to detain the vessel, whoever is the owner, until the rates are paid. The order appealed against deprives them of that right, and without their consent purports to give them an option to try and make some claim to a lien upon or right against the fund in priority to other claimants. The board have no such lien or right. If this vessel had been allowed to leave the dock, the board would have been left to make a futile claim against the fund in court. [Emphasis added.]

This type of provision is not uncommon in the airline business, see, e.g., decisions under a differently worded U.K. Act such as *Channel Airways Ltd. v. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456 (Q.B.), at p. 461, in which it was held that the *Manchester Corporation Act* "mean[t] what it sa[id]", and that the city could detain aircraft in respect of which charges had been incurred until those charges had been paid. The legal titleholders face this problem on the other side of the Atlantic. It is a risk they manage there. No reason was given as to why they cannot manage it here.

**72**     The legal titleholders are in a better position to protect themselves against this type of loss than are the airport authorities and NAV Canada. The legal titleholders can select which airlines they are prepared to deal with and negotiate appropriate security arrangements as part of their lease transactions with the airlines. In the case of the aircraft at issue in these appeals, many if not all of the leases provided for substantial security deposits. For example, the total amount posted by Canada 3000 to the ILFC as security deposits for airport fees and charges was approximately $15,305,500. It is unnecessary to catalogue all of the possible security arrangements, but these deposits demonstrate a legal titleholder's ability to negotiate protection at a time when the airline is solvent to cover the amounts in overdue charges that the airline may [page908] eventually be required to pay to the statutory service providers.

**73**    I agree with Cronk J.A. (at para. 133) that the detention remedy under the statutes is subject to several constraints: (i) the remedy is not automatic and requires prior court authorization; (ii) the remedy is discretionary and may be subject to such terms as the court considers necessary; (iii) under s. 9(3) of the *Airports Act* and s. 56(3)(*c*) of *CANSCA*, the court also has a discretion to limit the duration of the remedy by requiring the applicable authority to release a detained aircraft from detention prior to payment of the amount with respect to which the seizure was made; (iv) in any event, an authority that obtains an order under the detention provisions is required to release a detained aircraft upon payment of the outstanding amount or charges in respect of which the seizure was made or upon the provision of acceptable security therefor (ss. 9(3) and 9(4) of the *Airports Act* and ss. 56(1) and 56(3) of *CANSCA*); and (v) an order is not available under the detention provisions if the aircraft in respect of which the order is sought is exempt from seizure and detention under provincial law (s. 10(1) of the *Airports Act* and s. 57(1) of *CANSCA*) or, in the case of the *Airports Act*, under a regulation made by the Governor in Council (s. 10(2)).

**74**    On the other hand, the conclusion of Juriansz J., dissenting in part, was correct that "the wording of the Detention Provisions makes apparent that aircraft may be seized and detained without regard to the property interests of persons who are neither the registered owners nor the operators of the aircraft under the legislation. As long as the aircraft is owned or operated by a person liable to pay the outstanding charges, it may be the subject of an application to seize and detain it. The fact that there may be other persons, who are not liable to pay the outstanding charges but have property interests in the aircraft, is of no consequence" (para. 239).

[page909]

**75**    I turn, then, to a number of additional arguments raised on both sides which, in my view, with respect, unnecessarily complicate a straightforward task of statutory interpretation.

### (1)    Whether or Not a Lien Existed

**76**    In the Ontario case, there was considerable debate about whether the detention remedy created a lien. However, as the English Court of Appeal commented in *Mersey Docks*, there was no need for the port authority "to ... make some claim to a lien" (p. 821). Nor is it necessary here. In this case, as in *Mersey Docks*, the remedy is purely a creature of statute. Whether or not a lien could be said to arise by operation of law is perhaps of theoretical interest but it has no practical bearing on the result in these appeals.

### (2)    Effect of the Bankruptcy Proceedings

**77**    The intervention of bankruptcy proceedings in both Quebec and Ontario created procedural complications. For present purposes, it is sufficient to note that the detention remedies in Quebec were applied for well before the assignment in bankruptcy. In Ontario, the detention remedies were

applied for while the *CCAA* stay was in effect and Canada 3000 remained the registered owner of the aircraft in question. In neither case did the aircraft become part of the bankrupt estate (because ultimate ownership was in the legal titleholder). The aircraft were nevertheless legitimate targets of the detention remedies as they were still sitting on a Canadian airport tarmac and were still "owned or operated" (within the meaning of the relevant statutes) by the airlines at the relevant date.

(3)    Resort to the *Civil Code of Québec*

**78**    In the Quebec Superior Court, Tremblay J. held that the seizure and detention provisions create a right similar to that found in arts. 1592 and 1593 of [page910] the *Civil Code of Québec*. However, with respect, there is no need to make reference to provincial law or, more specifically, to the *Civil Code*, and to do so here is inappropriate. Section 56 of *CANSCA* and s. 9 of the *Airports Act* specifically state that the remedy is to be "in addition to any other remedy", which includes remedies under provincial law.

**79**    The *Aeronautics Act*, the *Airports Act* and *CANSCA* are federal statutes that create a unified aeronautics regime. Parliament endeavoured to create a comprehensive code applicable across the country and not to vary from one province to another. This uniformity is especially vital since aircraft are highly mobile and move easily across jurisdictions.

**80**    NAV Canada also relied on ss. 8.1 and 8.2 of the *Interpretation Act*, R.S.C. 1985, c. I-21, to urge that s. 56 of *CANSCA* provides for a *civiliste* right of retention . However, neither section applies in this case. Section 8.1 states that

> if in interpreting an enactment <u>it is necessary</u> to refer to a province's rules, principles or concepts forming part of the law of property and civil rights, reference must be made to the rules, principles and concepts in force in the province at the time the enactment is being applied

If it were *necessary* to resort to provincial law, then the provincial law to be used is that of the province in which the provision is being applied: *Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461, 2004 SCC 68. Here, for reasons stated, resort to provincial law is not necessary.

**81**    Section 8.2 of the *Interpretation Act* states that

> when an enactment contains both civil law and common law terminology, or terminology that has a different meaning in the civil law and the common [page911] law, the civil law terminology or meaning is to be adopted in the Province of Quebec and the common law terminology or meaning is to be adopted in the other provinces.

**82**    The issue here is not one of conflicting terminology. The language used in relation to the

detention remedy is perfectly apt to make Parliament's intention clear bilingually and bijuridically. In short, resort to the *Civil Code* was neither necessary nor appropriate.

(4)    Existence of a Power of Sale

**83**    The appellants argue that the existence of a seizure and detention implies (in their favour) a power of sale. No such power is contained in *CANSCA* or the *Airports Act*. Nor is it necessarily implied in the creation of a power to seize and detain. The only claim that the authorities have under federal aeronautics law is the claim to possession of the aircraft until their user charges are paid.

(5)    Presumption Against Interference With Private Rights

**84**    The Ontario motions judge applied a narrow approach to the Detention Remedy on the basis that it invades what would otherwise be the proprietary rights of the legal titleholders. Reference was made to *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, where it was held that the legislation at issue in that case did not impose a charge in the nature of a lien because of the absence of clear and unambiguous language. However, only if a provision is ambiguous (in that after full consideration of the context, multiple interpretations of the words arise that are equally consistent with Parliamentary intent), is it permissible to resort to interpretive presumptions such as "strict construction". The applicable principle is not "strict construction" but s. 12 of the *Interpretation Act*, which provides that every enactment "is deemed remedial, and shall be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects"; see *Bell ExpressVu*, at para. 28:

[page912]

Other principles of interpretation - such as the strict construction of penal statutes and the "*Charter* values" presumption - only receive application where there is ambiguity as to the meaning of a provision. (On strict construction, see: *Marcotte v. Deputy Attorney General for Canada*, [1976] 1 S.C.R. 108, at p. 115, *per* Dickson J. (as he then was); *R. v. Goulis* (1981), 33 O.R. (2d) 55 (C.A.), at pp. 59-60; *R. v. Hasselwander*, [1993] 2 S.C.R. 398, at p. 413; *R. v. Russell*, [2001] 2 S.C.R. 804, 2001 SCC 53, at para. 46... .)

In my view, there is no ambiguity in the statutory language creating the detention remedy and thus resort to "strict construction" is not called for.

(6)    Limitation of Debts on an Aircraft by Aircraft Basis

**85**    The titleholders argue that it would be extremely unfair that one titleholder's aircraft, however

recently leased, may ultimately be held hostage for all of the unpaid user charges of the airline that flew it. They contend that if (which they deny) the titleholders must pay charges in order to recover an aircraft, they should only be required to pay the charges incurred by the individual aircraft sought to be released, as opposed to the charges outstanding in relation to the whole fleet of the defaulting airline.

**86**    However, the statute says that an aircraft operated by the person liable to pay the amount can be seized and, absent further court order, need not be released until the entire amount owed by that *operator* has been paid. This point is made clearly by the release provisions in s. 9(3) of the *Airports Act* and s. 56(3) of *CANSCA*. The authorities must only release the aircraft if "the amount in respect of which the seizure was made is paid". Since s. 9(1) and s. 56(1) do not distinguish between the amounts accumulated by specific aircraft operated by a defaulting owner or operator, it seems clear that the amount in respect of which the seizure was made is the entire amount owed by that registered owner or operator.

[page913]

### (7)    Limitation of Seizure to Exclude Engines

**87**    Two of the respondents, RRPF Engine Leasing Ltd. and Flight Logistics Inc. (the "engine lessors"), leased to Canada 3000 the engines attached to two of the aircraft which, when seized, were airworthy. The engine lessors argue that they should be entitled to repossess their engines because seizure of the aircraft is not seizure of the engines. They cite Laskin J. (as he then was) in *Firestone Tire & Rubber Co. of Canada v. Industrial Acceptance Corp.*, [1971] S.C.R. 357, for the proposition that the doctrine of accession does not apply to a removable and identifiable object such as the engines.

**88**    In my view, the engines are part of the aircraft for present purposes. Engines and equipment such as onboard computers fall under the definition of "aeronautical product" in the *Aeronautics Act* (s. 3(1)). If the engines could be removed, third-party lessors could cannibalize any "aircraft propeller or aircraft appliance or part or the component parts of any of those things, including any computer system and software"; see *Aeronautics Act*, s. 3(1).

**89**    *Firestone Tire* is not of assistance here. In that case, a truck was repossessed under a conditional sales contract. The vendor in possession of the seized truck sought to retain the tires mounted on the truck as against the claim of the unpaid conditional seller of the tires. Laskin J. was concerned about the windfall one creditor might receive when repossessing the property of another unpaid creditor for which he "has given no value" (p. 359). Here, no beneficial interest is implicated. The engines are attached to the aircraft in respect of which charges were incurred and that are the subject of the detention. The Act does not envisage the dismantling of the aircraft (and

thus of its value as a security) on the tarmac.

[page914]

(8)   Effect of Sub-Leases

**90**   The respondents Ansett Worldwide Aviation, U.S.A. and MSA V leased three aircraft to Canada 3000, two of which, in turn, had been leased by those respondents from other persons under head leases. These sub-lessors stand in no better position than the legal titleholders, and the aircraft in which they have a leasehold interest were subject to seizure.

C.   *The Important Role of the Motions Judge*

**91**   The detention remedy does not create any rights unless, and until, a court order is made authorizing the seizure and detention of an aircraft. Instead, the provisions create potential remedies, available at the discretion of the court and subject to such conditions as the court considers necessary, as Cronk J.A. noted, at para. 134.

**92**   Much of the potential unfairness which the titleholders envisage in the operation of the detention remedy can be addressed by the motions judge. Section 56(3)(*c*) of *CANSCA* states that NAV Canada must release the aircraft "if ... an order of a court directs the Corporation to do so". Similarly, s. 9(3) of the *Airports Act* states that an airport authority need not release the aircraft until the charges are paid, "except where otherwise directed by an order of a court". Parliament has left the door open for the motions judge to work out an arrangement that is fair and reasonable to all concerned, provided that the object and purpose of the remedy (to ensure the unpaid user fees are paid) is fulfilled. It would be open to a judge on a detention remedy hearing to determine an allocation amongst the titleholders that reflected such factors as the number of seized aircraft, the amount of charges in relation to a particular aircraft or the short duration of an aircraft's life spent in the doomed fleet. The judge need not make each aircraft hostage for the full amount of the unpaid charges, provided the result is that the authority is paid in full. In this way, what may otherwise be portrayed as a draconian [page915] remedy can be reduced to a fair and proportionate judicial response to the airline collapse.

D.   *Interest*

**93**   The *Airports Act* explicitly authorizes the airport authorities to charge interest on the overdue amounts. Section 9(1) defines the amount on account of which the seizure was made as the "amount of any landing fees, general terminal fees or other charges related to the use of an airport, and underline interest thereon". While *CANSCA* makes no explicit mention of interest, ss. 32 to 35 lay out a broad authority for NAV Canada to set and charge its fees. A procedure has been established under s.

35(1)(*a*), whereby the Minister of Transport approves the charges imposed by NAV Canada. The Minister has approved a regulation imposing interest. Notice was provided to airline operators (although not the legal titleholders) and no judicial review of this regulation was sought.

**94**    The time value of money is universally accepted in ordinary commercial practice; see *Bank of America Canada v. Mutual Trust Co.*, [2002] 2 S.C.R. 601, 2002 SCC 43. There is no reason for this principle to be excluded in the case of privatized aeronautics services, and it is not surprising that NAV Canada has been permitted to incorporate interest on unpaid charges into its charging scheme.

**95**    The question then turns to how long the interest can run. The airport authorities and NAV Canada have possession of the aircraft until the charge or amount in respect of which the seizure was made is paid. It seems to me that this debt must be understood in real terms and must include the time value of money.

**96**    Given the authority to charge interest, my view is that interest continues to run to the first of the [page916] date of payment, the posting of security or bankruptcy. If interest were to stop accruing before payment has been made, then the airport authorities and NAV Canada would not recover the full amount owed to them in real terms. Once the owner, operator or titleholder has provided security, the interest stops accruing. The legal titleholder is then incurring the cost of the security and losing the time value of money. It should not have to pay twice. While a *CCAA* filing does not stop the accrual of interest, the unpaid charges remain an unsecured claim provable against the bankrupt airline. The claim does not accrue interest after the bankruptcy: ss. 121 and 122 of the *Bankruptcy and Insolvency Act*.

**97**    A particular issue is raised in the Quebec appeals regarding proper notice of the interest charges. This is an issue to be dealt with by the motions judge when these matters are returned for further consideration and disposition.

V. Disposition *

> \*    The amendments to para.98, issued on August 16, 2006, are included in these reasons.

**98**    For these reasons, I would allow the appeals and cross-appeals in part, as follows:

> 1.    I would dismiss the appeals of NAV Canada seeking to hold the respondents liable in their personal/corporate capacity;
> 2.    I would allow the appeals of NAV Canada and the airport authorities of the dismissal of their seizure and detention applications and remit those applications to the respective motions judges to be dealt with in accordance with these reasons;
> 3.    I would set aside the orders requiring NAV Canada and the airport

authorities to reimburse [page917] the respondents for the aircraft detention costs;

4.    I would allow the appeals of NAV Canada and the GTAA of the ruling that the engine lessors are entitled to repossess the leased engines;

5.    Interest on overdue charges continues to run to the first of the date of payment, the posting of security or bankruptcy.

In other respects, the appeals and cross-appeals will be dismissed. Aéroports de Montréal, St. John's International Airport Authority Inc. and Charlottetown Airport Authority Inc. are entitled to their costs in the Quebec appeals. All other parties shall bear their own costs.

*Appeals and cross-appeals allowed in part.*

**Solicitors:**

Solicitors for NAV Canada (30214): Gowling Lafleur Henderson, Toronto.

Solicitors for Greater Toronto Airports Authority (30214): Osler Hoskin & Harcourt, Toronto.

Solicitors for Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority and St. John's International Airport Authority (30214): Ogilvy Renault, Toronto.

Solicitors for International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. and U.S. Airways Inc. (30214): Torys, Toronto.

Solicitors for G.E. Capital Aviation Services Inc., as Agent and Manager for Polaris Holding [page918] Company and AFT Trust-Sub I, Pegasus Aviation Inc., and PALS I, Inc. (30214): Cassels Brock & Blackwell, Toronto.

Solicitors for Ansett Worldwide Aviation, U.S.A., and MSA V (30214): Fraser Milner Casgrain, Toronto.

Solicitors for RRPF Engine Leasing Limited (30214): Heenan Blaikie, Toronto.

Solicitors for Flight Logistics Inc. (30214): Morrison Brown Sosnovitch, Toronto.

Solicitors for C.I.T. Leasing Corporation and NBB-Royal Lease Partnership One (30214): Blake Cassels & Graydon, Toronto.

Solicitors for GATX/CL Air Leasing Cooperative Association (30214): Borden Ladner Gervais, Toronto.

Solicitors for NAV Canada (30729, 30730, 30731, 30732): Lapointe Rosenstein, Montréal.

Solicitors for Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport Authority and Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751): Ogilvy Renault, Montréal.

Solicitors for Aéroports de Montréal (30731, 30732, 30738, 30740, 30742): Langlois Kronström Desjardins, Montréal.

Solicitors for Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745): Osler Hoskin & Harcourt, Montréal.

Solicitors for Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional and ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750): Brouillette Charpentier Fortin, Montréal.

Solicitors for Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company and CCG Trust Corporation (30740, 30742, 30745, 30750, [page919] 30751): Desjardins Ducharme Stein Monast, Montréal.

Solicitors for Canadian Imperial Bank of Commerce (30214): Blake Cassels & Graydon, Toronto.

Solicitors for Inter-Canadian (1991) Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. (30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750, 30751): Kugler Kandestin, Montréal.

Solicitors for Greater London International Airport Authority and Saint John Airport Inc. (30742): Ogilvy Renault, Montréal.

Solicitors for Canadian Regional Airlines Ltd. and Canadian Regional (1998) Ltd. (30742): Fraser Milner Casgrain, Montréal.

*Case Name:*

# Shelanu Inc. v. Print Three Franchising Corp.

**Between**
**Shelanu Inc., plaintiff (respondent), and**
**Print Three Franchising Corporation, defendant (appellant)**
**And between**
**Print Three Franchising Corporation, plaintiff by counterclaim**
**(appellant), and**
**Shelanu Inc., Brian Deslauriers and Mary Deslauriers,**
**defendants by counterclaim (respondents)**

**[2003] O.J. No. 1919**

64 O.R. (3d) 533

226 D.L.R. (4th) 577

172 O.A.C. 78

38 B.L.R. (3d) 42

2003 CanLII 52151

123 A.C.W.S. (3d) 267

2003 CarswellOnt 2038

Docket No. C35392

Ontario Court of Appeal
Toronto, Ontario

**Weiler, Austin and Laskin JJ.A.**

Heard: August 26, 2002.
Judgment: May 20, 2003.

(140 paras.)

*Franchises -- Franchise agreement -- Breach of agreement -- What constitutes -- Damages --*
*Duties of franchisor -- Duty of good faith -- Withdrawal from -- Notice requirements -- Royalties.*

Appeal by the defendant Print Three Franchising Corporation and cross-appeal by the plaintiff
Shelanu Inc. from a decision awarding Shelanu damages for breach of contract. BCD Print Inc. was
a company that was owned by a husband and wife who also owned Shelanu. BCD had one Print
Three franchise and Shelanu had two Print Three franchises. The owners decided to surrender the
BCD franchise and to operate the two Shelanu franchises as a single entity, which affected the
calculation of their royalty rebate. Subsequently, Print Three withheld some of the monthly royalty
rebates and purported to deny the request to terminate one of the franchises and consolidate the
others. In 1997, Shelanu brought an action to recover unpaid royalty rebates. Although Shelanu
considered the franchise agreement terminated due to a number of breaches, Shelanu continued to
remit royalty payments and continued to use the Print Three name on its store until October 1999.
The franchise agreement provided for an expiry date of December 1999. Print Three denied any
breach of obligation and counterclaimed for damages. The trial judge found that there was an
enforceable oral agreement by Print Three to cancel the BCD franchise and allow BCD to combine
its production operations with the retail operations of Shelanu. The trial judge also found that Print
Three breached its duty of good faith toward Shelanu by attempting to rescind the oral agreement,
by breaching representations with respect to promotional programs, by failing to make prompt
payment of royalty rebates, and by establishing a separate, competing franchise operation. The
judge awarded damages for breach of contract, but did not award separate damages for breach of
duty of good faith. The counterclaim was dismissed but there was an assessment of damages on the
basis of lost royalties and advertising fees for the 10-year life of a franchise agreement. On appeal,
Print Three submitted that oral agreement was contrary to the terms of the written franchise
agreement which stated that delay in exercising a right or breach of default was not a waiver of
right, that no waiver, amendment or change of any terms was valid unless signed by all parties, and
that the written agreement constituted the entire agreement.

HELD: Appeal and cross-appeal allowed in part. The wording of the clauses in the written
agreement relied upon by Print Three did not conflict with the subsequent tripartite oral agreement.
Print Three breached its obligation to pay Shelanu the royalty rebates in accordance with the oral
agreement, such that Shelanu was entitled to damages as found by the trial judge. It was open to the
trial judge to find that Print Three acted arbitrarily and unreasonably with respect to the promotional
programs. However, the separate franchise operation established by Print Three was a different
business that did not contribute to any losses by Shelanu, and its establishment did not constitute a
breach of the duty of good faith. Furthermore, none of the breaches amounted to a fundamental
breach which would have excused Shelanu from future performance, especially since Shelanu
continued to use the Print Three name for more than two years after the notice of termination was
issued. Accordingly, Shelanu was not entitled to recover any royalties paid to Print Three, but was
entitled to receive credit for royalty rebates withheld by Print Three. The award of damages for the
counterclaim was adjusted to account for the failure of the trial judge failed to consider the one-year

non-competition clause in the agreement.

**Statutes, Regulations and Rules Cited:**

Arthur Wishart Act (Franchise Disclosure) 2000, S.O.  2000, c. 3.
Patent Act, R.S.C.  1985, c. P.4.
Statute of Frauds.

**Appeal From:**

On appeal from the order of Justice Ian V.B. Nordheimer of the Superior Court of Justice dated October 31, 2000.

**Counsel:**

Benjamin Zarnett and Elliot S. Birnboim, for the appellant.
F. Scott Turton, for the respondents.

---

[Quicklaw note: A corrigendum was released by the Court August 5, 2003. The changes have been made to the text and the corrigendum is appended to this document.]

The judgment of the Court was delivered by

WEILER J.A.:--

I.    INTRODUCTION

**1**    Print Three is a franchisor of copying and print stores. Shelanu was a Print Three franchisee owned by Brian Deslauriers and his wife Mary. Shelanu alleged that Print Three breached its obligations as a franchisor and, in addition to claiming damages, alleged that it was entitled to be released from further performance of its obligations as a franchisee from the date it gave notice of termination of the franchise agreement (the "agreement"). Print Three denied any breach of its obligations and counterclaimed for damages. Nordheimer J. held in favour of Shelanu with respect to both damages and fundamental breach and dismissed Print Three's counterclaim. Despite this finding, he assessed the damages under the counterclaim.

II.    OVERVIEW

**2**    Print Three's appeal raises three main issues. The first issue is whether the trial judge erred in holding that Print Three breached any of its obligations to Shelanu. In connection with this issue, Print Three alleges that the trial judge erred in holding that it breached an oral agreement entered into after the written franchise agreement. The effect of the oral agreement was to entitle Shelanu to

a greater royalty rebate under the agreement. Print Three submits that the oral agreement is unenforceable due to the existence of an entire agreement clause and other clauses excluding oral amendments and waivers not in writing in the agreement (collectively referred to, for ease of reference, as the exclusion clauses) and due to lack of consideration. The second issue is whether the trial judge erred in holding that the parties owed each other a duty of good faith and that Print Three breached that duty by allowing for the establishment of a Le Print Express franchise. If Print Three did breach its obligations to Shelanu, the third issue is whether the breach was so fundamental that Shelanu was released from further performance of the agreement from the date it gave notice of termination of the agreement.

**3**    In the event that Shelanu was not released from further performance of its obligations as a franchisee, I must consider Shelanu's cross-appeal of the trial judge's assessment of damages under Print Three's counterclaim.

**4**    With respect to the first issue, based on the twofold approach I adopt, I would hold that the subsequent oral agreement is enforceable despite the existence of the exclusion clauses. First, I determine whether these clauses apply to the subsequent oral agreement and I conclude that they do not. I would also uphold the trial judge's finding that there was consideration for the oral agreement. Second, because the appellant has not appealed the trial judge's finding that the oral agreement exists and there is no dispute as to its terms, I find that the subsequent oral agreement represents the intentions and legitimate expectations of the parties and, in these circumstances, should prevail.

**5**    With respect to the second issue, the trial judge recognized a common law and statutory duty of good faith between Print Three and Shelanu. I would hold that the trial judge did not err in recognizing the existence of a duty of good faith at common law. For reasons I will specify later, the circumstances giving rise to the duty of good faith that the Supreme Court recognized in the employment context in Wallace v. United Grain Growers Ltd. (c.o.b. Public Press), [1997] 3 S.C.R. 701 are equally present in the franchisor franchisee relationship here. Print Three had a duty of good faith in the sense that it had an obligation to have regard to Shelanu's legitimate interests and to deal promptly, honestly, fairly and reasonably with Shelanu. I would also hold that the trial judge did not impose a higher, fiduciary duty on Print Three.

**6**    Given my conclusion, it is unnecessary to decide whether the Arthur Wishart Act, (Franchise Disclosure), S.O. 2000 c. 3, which applies to existing franchises, is applicable in this case where the acts in issue took place prior to the coming into force of the Act.

**7**    I agree with the trial judge that Print Three breached its obligations to Shelanu with respect to payment of royalty rebates and its advertising program. I disagree, however, with the trial judge's conclusion that the establishment of the Le Print Express business was a breach of Print Three's duty of good faith towards Shelanu. The trial judge committed a palpable and overriding error in coming to that conclusion.

**8**    With respect to the third issue, fundamental breach, having regard to my conclusion that the

establishment of the Le Print Express franchise was not a breach of Print Three's obligations towards Shelanu and to the fact that Shelanu continued to derive the benefit of the use of Print Three's name and an exclusive territory after it purported to terminate the agreement, I would hold that the trial judge erred in excusing Shelanu from further performance under the agreement.

**9**    In relation to the cross-appeal respecting damages though I have concluded that Shelanu was not excused from further performance under the agreement, I would hold that the trial judge committed an error in principle in holding Shelanu liable for damages over a period of 10 years, or the life of a franchise agreement. Instead, based on Shelanu's breach of its one-year non-competition clause, I would hold Shelanu liable for damages for one year. I would agree with the trial judge that Shelanu is liable to pay Print Three an amount equal to the loss of one franchise fee - namely $64,500 - for failing to surrender its customer list, telephone and fax numbers at the end of the agreement. In accordance with the figures used by the trial judge, I would assess the damages to Print Three for loss of revenue and loss of advertising fees for one year at $29,700 in addition to the franchise fee of $64,500 for a total of $94,200. My reasons follow.

III.    LEGAL ISSUES

**10**    The decision of the trial judge is reported at [2000] O.J. No. 4129 and, therefore, a brief outline of the facts relating to the alleged breaches will suffice to appreciate the legal arguments and these reasons.

1.    Enforceability of the Oral Agreement

A.    Facts

**11**    In 1987, BCD Print Inc., a company owned by Brian Deslauriers, purchased a Print Three franchise for a location at 239 Bloor Street East in Toronto. BCD is not a party to this action although it is a party to the oral agreement.

**12**    Two years later, Brian Deslauriers and his wife Mary purchased the shares of Shelanu Inc., which had two Print Three franchises at 60 and 200 Bloor Street West. They entered into two new franchise agreements with Print Three for each of these locations and gave a personal guarantee of the debts of Shelanu. In September 1991, there was a downturn in the economy and, with the oral agreement of Jack Banks, the principal behind Print Three, Shelanu closed the operation at 200 Bloor Street West. Paragraph 26 of the franchise agreement required that any change to the terms or covenants of the agreement be in writing. No such documentation was ever requested or required by Print Three when the 200 Bloor Street West location was closed.

**13**    Over the next few years, the Deslauriers continued to struggle with their businesses and eventually BCD closed the 239 Bloor Street East location and moved it to 80 Bloor Street West. Pursuant to the written franchise agreement, Print Three was to lease the space but was not

interested in doing so. BCD leased the space directly at 80 Bloor Street West and used it as a
production facility for Shelanu's business. Print Three did not object. Instead, Banks orally offered
to let the Deslauriers surrender BCD's franchise but said that, if they did, he would feel free to put a
new franchise in at 239 Bloor Street East. Afraid of the competition, the Deslauriers declined
Banks' offer at this time.

**14**    On January 13, 1995, two years after the closure of the 239 Bloor Street East outlet, the
Deslauriers met with Banks and asked him if they could surrender the BCD franchise. (By this time
BCD had moved into space at 60 Bloor Street West, above the premises occupied by Shelanu). He
agreed but asked that they confirm this agreement with his legal counsel. Three days later, Mary
Deslauriers wrote a letter on BCD letterhead as follows:

> This is to confirm our discussion of Friday, January 13, 1995, with Jack Banks,
> that we would like to operate our business as one franchise, that being the
> franchise located at 60 Bloor St. W. Therefore, we are hereby cancelling our
> licensing agreement for the franchise formerly located at 239 Bloor Street East
> (location #73). We will then submit royalties for all revenues on one report. If
> possible, we would like this change to be effective January 1, 1995.

**15**    The reference to submitting royalties is a reference to Shelanu's obligation to pay Print Three a
monthly royalty of 6% of gross sales pursuant to paragraph 3 of the franchise agreement.

**16**    The franchise agreement provided that a percentage of the royalties paid was to be remitted to
the franchisee based on the franchisee's aggregate sales each quarter. As certain gross sales levels
were met, the percentage of royalties rebated increased. As two franchises, the sales were split
between BCD and Shelanu with the result that gross sales levels would be lower for both franchises
and, consequently, the percentage royalty rebate owed by Print Three would be lower. Conversely,
if Shelanu reported all sales, gross sales levels would be higher and the royalty rebate would be at a
higher percentage.

**17**    In early February 1995, the Deslauriers reported as one franchise, Shelanu, and sent the
royalty statement based on sales for the month of January. Charlotte Krebs, a Print Three employee,
called Mary Deslauriers and told her that one franchise report was missing. Mary Deslauriers told
her of the agreement reached with Banks. Subsequently, Krebs called Mary Deslauriers again and
said that Banks might require a new franchise agreement to be signed. Mary Deslauriers was
surprised at this and said she would speak to Banks. Although Mary Deslauriers called and left
messages for Banks asking why a new agreement would be necessary, he never returned her call,
and the question of a new franchise agreement was not raised again.

**18**    On April 6, 1995 Mary Deslauriers sent a letter to Krebs enclosing Shelanu's royalty cheque
for March as one franchise. The letter stated in part:

> Since your inquiry, we have left several messages for Jack to see if he has any

concerns about this. We have not heard back from him, so we assume that we are and have been since January, one franchise. We are therefore looking forward to a Royalty Rebate for this quarter accordingly.

**19**    Around this time a dispute arose between Print Three and many of the franchisees regarding advertising. This dispute is the subject of an issue called the Air Miles program that I will discuss later. The fact that the Deslauriers sided with the other franchisees on this issue angered Banks. On May 8, 1995, Banks expressed some of this anger during a telephone conversation with Mary Deslauriers. According to Mary Deslaurier's note, he stated, among other things, "Every franchise that did not pay the 3% for April [for the Air Miles advertising program], Jack [Banks] is going to go after, and he's going to close them down. And he's going to write a letter to us saying that he will never help us out again ..." Following this conversation, Banks wrote a letter to the Deslauriers purporting to deny the "request to terminate one of your franchise agreements and to consolidate your two centres".

**20**    The quarter following the phone call (July to September 1995) was the first time the royalty rebate was withheld. Print Three also withheld the royalty rebate for the fourth quarter (October to December 1995).

**21**    The royalty rebates remained an outstanding problem. Print Three also withheld royalty rebates for the second quarter of 1996 without explanation. On October 3, 1996, a meeting took place between Bob Davis, a former franchisee who had become president of Print Three, and the Deslauriers to deal with the issue of royalty rebates. Davis asked to see the production facility now located on the twelfth floor of 60 Bloor Street West and Brian Deslauriers refused to show it to him. He wanted to discuss the unpaid rebates. Towards the end of the meeting, Davis handed over a royalty rebate cheque for the royalty rebates due for the second quarter of 1996 apparently on the basis of there being two franchises. On October 7, 1996, the royalty rebates for the third and fourth quarters of 1995 were also paid on the basis that there were two franchises. On October 8, at Davis' request, Brian Deslauriers sent a letter to Davis again outlining the 1995 agreement he had with Banks. The next day Davis replied, stating they were in breach of the franchise agreement for refusing to allow him to see the production facility, and, as a result, were not entitled to any royalty rebate. The amount of this rebate was $2,241 or $8,947, depending upon whether the January 13, 1995 agreement was enforceable (i.e. depending on whether they were reporting as one or two franchises). Brian Deslauriers wrote back saying Davis could see the production facility any time it was convenient for him. This visit took place on January 16, 1996 and lasted only a few minutes. On January 24, 1996, Davis sent a letter to Brian Deslauriers indicating that he had decided he would continue to treat their operation as two stores for rebate purposes.

**22**    On May 2, 1997, Shelanu wrote a letter alleging a number of breaches of the franchise agreement and purporting to terminate the franchise agreement with Print Three. In August 1997, Shelanu commenced an action against Print Three for royalty rebates it claimed were owing. Despite the litigation, Shelanu continued to remit royalty payments on the basis of one franchise.

Shelanu also continued to use the name Print Three on its store until October 16, 1999. The franchise agreement expired naturally in December 1999.

**23**    Neither Banks nor Krebs testified at trial.

B.    The Findings of the Trial Judge

**24**    Since neither Banks nor Krebs testified, the trial judge inferred that their evidence would not have supported the defence position respecting the lack of any oral agreement. From this inference, and the evidence as a whole, the trial judge found that an oral agreement was reached in January 1995 in which Print Three agreed to cancel BCD's franchise for the 239 Bloor Street East location and to allow BCD to combine its production operations with the retail operations of Shelanu. Because an oral agreement had been reached in January 1995, Banks' letter of May 1995 and Davis' letter in January 1996, unilaterally refusing to treat the production facility and the store at 60 Bloor Street West as one location, had no effect.

**25**    The trial judge rejected the appellant's argument that the agreement was unenforceable. He found that the defendant did not require any formal written documentation when Shelanu terminated the franchise at the 200 Bloor Street West location or when BCD closed the 239 Bloor Street East location and moved it to 80 Bloor Street West and, consequently, it was not now open to Print Three to insist on strict compliance with its rights under the written agreement.

**26**    With respect to the issue of consideration, the trial judge found that this was a three-party agreement and that there was consideration flowing to Print Three from both BCD and Shelanu. From BCD, Print Three obtained the release of the territory related to the 239 Bloor Street East location that it could then sell to a new franchisee. From Shelanu, Print Three received the benefit of Shelanu's improved financial situation. Presumably, the trial judge meant that Print Three received the benefit of increased royalties from Shelanu resulting from its increased sales which, in turn, were derived from the synergies of combining BCD's and Print Three's operations into one. On the issue of privity, the trial judge found that the representatives of both BCD and Shelanu, the Deslauriers, were present with Print Three's representative, Banks, at the meeting where the agreement was reached. He saw no reason why Shelanu - one of the parties to the agreement and its principal beneficiary - could not enforce it.

**27**    The evidence respecting the making of the oral agreement and its existence were explored extensively at trial. On appeal, the appellant accepts the finding of the trial judge that there was an oral agreement in January 1995, but submits that the trial judge erred in law in holding that this oral agreement was enforceable.

**28**    The paragraphs in the written franchise agreement which the appellant submits are contrary to the oral agreement are paragraph 20 (delay in exercising a right or breach of default is not waiver of right), paragraph 26 (no waiver, amendment or change of any terms unless signed by all parties) and paragraph 27 (this [written] agreement constitutes the entire agreement between the parties with

respect to all matters herein).

**29**    Simply put, the appellant's position is that the parties' bargain is to be equated with the document they have signed.

      C.     Analysis

          i.)     Exclusion Clauses: Interpretive Approach

**30**    Before deciding not to enforce the exclusion clauses, the trial judge did not specifically consider whether they applied to the oral agreement. This seems to me to be a necessary first step. Once a determination has been made that the exclusion clauses apply, the court can then consider whether they should be enforced.

**31**    Paragraphs 20, 26, and 27 are not limitation or exclusion clauses in the traditional sense that they limit or exclude liability for damages for breach of contract or for a tort connected to the contract. Their purpose is, rather, to limit the parties' duties to each other to what has been reduced to writing and, as a corollary, to exclude any other duties. More specifically, an entire agreement clause seeks to exclude liability for statements other than those set out in the written contract and is sometimes referred to as an exclusion clause. See H.G. Beale et al., eds. Chitty on Contracts, 28th ed. (London: Sweet & Maxwell, 1999), vol. 1 at 12-102; Kenyon, Son & Craven Ltd. v. Baxter Hoare & Co. Ltd., [1971] 1 W.L.R. 519 (Q.B.) at 522; Betker v. Williams (1991), 86 D.L.R. (4th) 395 ( B.C.C.A.); Zippy Print Enterprises Ltd. v. Pawliuk (1994), 100 B.C.L.R. (2d) 55 (C.A.). Further, in construing an entire agreement clause, in Beer v. Townsgate I Ltd. (1997), 36 O.R. (3d) 136 at 147 (C.A.) this court resorted to the reasoning typically associated with an exclusion clause that limits liability for damages.

**32**    The approach that I am adopting here is consistent with the approach to construing and enforcing exclusion or limitation clauses relating to damages as stated in Hunter Engineering Co. v. Syncrude Canada Ltd., [1989] 1 S.C.R. 426. Dickson C.J., with whom La Forest J. concurred, held that exclusion clauses are not inherently unreasonable. In construing an exclusion clause, the issue to be addressed is whether, as a matter of construction, the exclusion clause covers the alleged occurrence or breach in question. Exclusion clauses are to be approached with the aid of the cardinal rules of contractual construction: they must be read contra proferentem and clear words are necessary for the exclusion clause to apply. See Photo Production Ltd. v. Securicor Transport Ltd., [1980] A.C. 827 (H.L.) per Lord Wilberforce at 846, cited by Dickson C.J. at 458-459 of his judgment.

**33**    When the exclusion clause covers the alleged occurrence or breach, the question is whether to enforce the exclusion clause. Where the court is of the opinion extreme unfairness would result from the enforcement of an exclusion clause, such as, for example, where there was inequality of bargaining power, this concern should be addressed directly through the doctrine of

unconscionability. Dickson C.J. held that courts should no longer use the term fundamental breach to avoid the operation of an exclusion clause as this term is confusing. The approach of directly addressing the concerns respecting enforcement of the exclusion clause would allow the courts to focus expressly on the real grounds for refusing to enforce a contractual term agreed to by the parties.

**34**    The other major opinion in Hunter Engineering, supra, is that of Wilson J. with whom L'Heureux-Dubé J. concurred. Wilson J. held that the court's responsibility did not end with construing the contract to ascertain the bargain that the parties had made. She was of the opinion that the court had a responsibility to assess the reasonableness of enforcing the exclusion clause in the contract in light of subsequent events. The doctrine of unconscionability did not suffice to relieve a party from the effect of an exclusion clause that operated unfairly because it was traditionally restricted to inequality of bargaining power and the circumstances existing at the time the contract was made: See Hunter Engineering, supra, at pp. 511-518. See also N. Rafferty, "Developments in Contract and Tort Law: The 1999-2000 Term" (2000) 13 S.C.L.R. (2d) 125 at 141-143.

**35**    In Guarantee Co. of North America v. Gordon Capital Corp., [1999] 3 S.C.R. 423, the Supreme Court of Canada "... interpreted Hunter Engineering in such a way as to indicate that there was little distinction between the approaches of Dickson C.J. and Wilson J." respecting the enforceability of exclusion clauses: Rafferty, supra, at 143. I agree. At paragraph 52 of the reasons in Gordon Capital, supra, Iacobucci and Bastarache JJ. stated:

> The only limitation placed upon enforcing the contract as written .... would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or unfair, unreasonable or otherwise contrary to public policy, according to Wilson J.

**36**    With this framework for contractual interpretation in mind, I will now turn to the agreements in issue with a view to determining whether the paragraphs in issue apply to the oral agreement.

> ii.)    Does the Tripartite Oral Agreement Conflict with the Wording of the Exclusion Clauses in the Franchise Agreement?

**37**    Paragraph 3B of the agreement requires the franchise owner to pay a continuing royalty - amounting to six percent of all monthly gross sales - for the use of the franchisor's on-going assistance, trademarks and know-how. Regardless of whether Shelanu operated as one franchise or as two, it had to pay Print Three six percent of all monthly gross sales. It was in relation to the royalty rebate provided for in the agreement that the dispute arose. In this regard the wording of the agreement is again instructive. Paragraph 3C states that the rebate on quarterly gross sales from $81,501 to 135,850 is 33 and 1/3%. On sales between $135,851 and $190,190, the rebate is 66 and 2/3%, and on sales over $190,191 it is 100%. The next relevant sentence is:

> The foregoing royalty rebate calculation assumes Franchise Owner has just one (1) <u>location</u>.

> If the franchisee has two locations, gross sales must attain $163,001 before the rebate of 33 1/3% of gross sales is payable [emphasis added].

**38**    Paragraph 5 requires the franchise owner to operate only at the location specified in the agreement. The address indicated for Shelanu's approved location is 60 Bloor Street West, Toronto, Ontario. With respect to Shelanu's franchise agreement, nothing changed in January 1995; it was operating as a single franchise out of a single location, namely 60 Bloor Street West. Consistent with the oral agreement reached with Jack Banks on January 13, 1995, BCD had cancelled its franchise with Print Three. BCD effectively merged with Shelanu; however, Shelanu's franchise did not change. It continued to operate as a single franchise under the terms of the franchise agreement. The oral agreement reached was not inconsistent with paragraph 5.

**39**    I will now consider whether the paragraphs in issue are inconsistent with the alleged oral agreement.

**40**    Paragraph 20 states:

> No delay or omission to exercise a right, power or remedy accruing to one party on any breach or default of this Agreement shall be construed as a waiver of such right, power or remedy of said party nor will it prevent Franchisor from thereafter enforcing strict compliance with any and all of the terms and conditions herein set forth.

**41**    The words "right, power or remedy" are not used in a vacuum but relate to "any breach or default of this Agreement". Paragraph 20 has no application because Shelanu was not in breach of its agreement and because paragraph 20 does not apply to the three party oral agreement that was reached. It applies only to "this Agreement", that is, the written franchise agreement between Print Three and Shelanu.

**42**    The appellant also relies on paragraphs 26 and 27 of the franchise agreement between Shelanu and Print Three. Paragraph 26 is as follows:

> No waiver, amendment or change of any of the terms or covenants of this Agreement or non-compliance therewith, shall be binding or effective unless effected by a notice signed by any and all parties hereto. The Franchise Owner shall execute such further and other documents, including, without limitation a registered user agreement in respect of the Mark, as may be required from time to time, by the franchisor, to carry out the full intent and purpose of this Agreement.

**43**    Again the words, "waiver amendment or change" are not used in a vacuum. They are tied to "any of the terms or covenants of this Agreement". Shelanu owned one franchise and there was no change in its obligations relating to the terms or covenants of that agreement. This is indirectly acknowledged in paragraph 36 of the appellant's factum which states, "Nothing about Print Three observing or not observing the January 13, 1995 Agreement could be a breach of Shelanu's Franchise Agreement".

**44**    The oral agreement would only be enforceable if it was valid and binding on all three parties, including BCD. BCD's written franchise agreement with Print Three contained the same wording as Shelanu's. In considering the enforceability of the tri-partite agreement I will also therefore consider whether the exclusion paragraphs applied to BCD. Paragraph 20 of the written agreement between BCD and Print Three also applies only to the two parties and would not apply to the three party oral agreement that was reached. I turn now to consider whether, as against BCD, the words, "waiver, amendment or change" in paragraph 26 would apply. The surrender of the franchise was not a waiver or amendment to BCD's franchise agreement as both these words envisage the continuation of some aspect of the franchise agreement and not, as is the case here, its surrender and termination by agreement of the parties. As Cory J. held in Schmidt v. Air Products of Canada Ltd., [1994] 2 S.C.R. 611 at para. 66 in concluding that a power to amend a trust did not include the power to revoke it, "... amendment means change not cancellation which the word revocation connotes." Similarly, in this case, we are dealing with a revocation of a franchise licence, not an amendment or change to the licence. Further, in interpreting the Patent Act, R.S.C. 1985, c. P.4, in Harvard College v. Canada (Commissioner of Patents), [2002] S.C.J. No. 77, at para. 161, McLachlin C.J.C. on behalf of the majority, stated:

> It is a well-known principle of statutory interpretation that the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of the words or phrases associated with them (P.-A. Côté, The Interpretation of Legislation in Canada (3rd ed. 2000), at pp. 313-14). Also, a collective term that completes an enumeration is often restricted to the same genus as those words, even though the collective term may ordinarily have a much broader meaning (at p. 315).

**45**    The principles which govern the interpretation of contracts are essentially the same as for statutory interpretation: River Wear Commissioners v. Adamson (1877), 2 App. Cos. 743 (H.L.) at 763-765 adopted by L'Heureux-Dubé J. in dissent but not on this point in Manulife Bank of Canada v. Conlin, [1996] 3 S.C.R. 415 at para. 40 and also Manitoba (Hydro-Electric Board) v. John Ziglio Co., [1999] M.J. No. 506 (C.A.). Applying these principles of interpretation to the phrase, "waiver, amendment or change" in this case, the word change would be construed as including a change that would nevertheless result in the continuation of the agreement not, as here, its revocation and termination. The paragraph does not contemplate what occurred pursuant to the oral agreement, namely, a surrender and revocation of the franchise for 239 Bloor Street East by mutual agreement. Paragraph 26 in BCD's agreement does not conflict with the oral agreement.

**46**    Paragraph 27 of the agreement reads as follows:

> This agreement constitutes the entire Agreement between the parties with respect
> to all of the matters herein and its execution has not been induced by, nor do any
> of the parties hereto rely upon or regard as material, any representation or right
> not incorporated herein. Any representations, inducements, promises, and
> agreements, oral or otherwise not contained herein shall have no force or effect
> in the construction of the rights and obligations of the parties created by this
> Agreement.

**47**    Paragraph 27 deals "with ... all of the matters herein" and states that any oral or other
representations have no force or effect in the "construction of the rights and obligations of the
parties created by this Agreement". The rights and obligations of the parties to the oral agreement,
namely, BCD, Shelanu and Print Three are, as I have said, not "matters herein" and were not
"created" by the franchise agreement between Shelanu and Print Three or, for that matter, BCD and
Print Three.

**48**    Further, the ordinary meaning of the language used in paragraph 27 is that the written
agreement represented the entire agreement between the parties at the time it was signed. J.
Beatson, in Anson's Law of Contract, 27th ed. (Oxford: Oxford University Press, 1998) at 494-95
states:

> A simple contract, ... whether in writing or not, may be varied by a subsequent
> agreement either written or oral. This in no way conflicts with the rule that
> extrinsic evidence is not admissible to vary or add to the contents of the written
> document, for that principle merely refers to the ascertainment of the *original*
> intention of the parties [emphasis added].

**49**    Indeed, an exception to the parol evidence rule is the existence of any subsequent oral
agreement to rescind or modify a written contract provided that the agreement is not invalid under
the Statute of Frauds: Ellis v. Abell, [1884] O.J. No. 70, 10 O.A.R. 226 at para. 85.

**50**    Clauses such as the entire agreement clause in issue here are normally used to try to exclude
representations made prior to the signing of the written agreement. See P.M. Perell, "A Riddle
Inside an Enigma: The Entire Agreement Clause" (1998) The Advocates' Q. 287. Nothing in
paragraph 27 suggests that an oral agreement to surrender the franchise several years later would be
of no effect. It cannot be said the entire agreement clause was clearly intended to cover any and all
future contractual relations between Shelanu and Print Three. See Turner v. Visscher Holdings,
[1996] B.C.J. No. 998 (B.C.C.A.). The fact that Print Three and Shelanu entered into and acted
upon an oral agreement respecting the surrender of the franchise at 200 Bloor Street West indicates
this was not the case. Indeed, J.M. Perillo, ed., Corbin on Contracts (St. Paul, MN: Western
Publishing Co., 1993) states at para. 1295 that an express provision in a written contract forbidding
oral variation of the terms of a contract or its discharge is generally unsuccessful with respect to

subsequent agreements. The reason he gives is that:

> Two contractors cannot by mutual agreement limit their power to control their legal relations by future mutual agreement. Nor can they in this manner prescribe new rules of evidence and procedure in the proof of facts and events.

**51**    Paragraph 27 has no application either.

**52**    The wording of the exclusion paragraphs does not conflict with the subsequent tri-partite oral agreement of January 13, 1995 and does not prevent effect being given to this oral agreement.

> (iii)    Discretion not to enforce the exclusion clauses

**53**    In view of my conclusion above it is not strictly necessary for me to address the enforceability of the exclusion clauses. However, given the trial judge's conclusion and the extent of argument on the question of whether he erred in refusing to give effect to the clauses, I will consider this issue.

**54**    At the trial, the existence of the oral agreement and thus the intention of the parties was in issue. The trial judge relied on the parties' subsequent course of conduct to infer that they did not intend to continue to be bound by the exclusion clauses in the agreement. The trial judge found that Print Three had orally agreed to the surrender of a franchise by Shelanu on a previous occasion, and had allowed Shelanu to change locations and to lease space directly without anything being in writing. Where the parties have, by their subsequent course of conduct, amended the written agreement so that it no longer represents the intention of the parties, the court will refuse to enforce the written agreement. This is so even in the face of a clause requiring changes to the agreement to be in writing. See Colautti Construction Ltd. v. City of Ottawa (1984), 9 D.L.R. (4th) 265 (Ont. C.A.), per Cory J.A.

**55**    On appeal, the appellant has conceded the existence of the oral agreement and its terms but asks this court to enforce the written agreement instead. That submission, in effect, asks this court not to give effect to the intention of the parties. Such a submission is contrary to the classical theory of contract interpretation which emphasizes that courts should ascertain and give effect to the intention of the parties: R. Sullivan, "Contract Interpretation in Practice and Theory" (2000), 13 S.C.L.R. (2d) 369.

**56**    Sullivan states, at 378, that, "if a conflict arises between the intention of the parties as inferred from the totality of the evidence on the one hand and the meaning of the text on the other, intention should win." Professor Waddams has also argued that if a party knows or has reason to know that a written contract on which that party relies does not represent the intention of the other party, it should not be enforced. See S.M. Waddams, The Law of Contracts, 3rd ed. (Toronto: Canada Law Book, 1993) at paras. 328-329.

**57**    The rationale of Sullivan and Waddams is similar, namely, that in addition to certainty, legal

values such as fairness, equity and justice underlie contractual interpretation and enforcement. Before the court allows the coercive power of the state to be used to serve the private interests of a party to a contract, the court will want to ensure that the contract does not offend these legal values.

**58**    I would also note that the agreement that we are dealing with is a franchise agreement. A franchise agreement is a type of contract of adhesion, that is, a type of contract whose main provisions are presented on a "take it or leave it basis". In such situations, the case for holding that an exclusion clause represents the intention of the signer and that the signer should be bound by it is weaker because there is usually an inherent inequality of bargaining power between the parties. See Waddams, supra, at para. 342. Examples of cases involving contracts of adhesion where this Court has refused to apply an exclusion clause because it did not accord with the intention or reasonable expectations of the parties include: Beer v. Townsgate I, supra, Solway v. Davis Moving & Storage Inc. (c.o.b. Kennedy Moving Systems), [2002] O.J. No. 4760 (C.A.) at para. 21 and Zurich Insurance Company v. 686234 Ontario Ltd., [2002] O.J. No. 4496 (C.A.). See also Mellco Developments Ltd. v. Portage la Prairie (City), [2002] M.J. No. 381 (C.A.).

**59**    Enforcing an exclusion clause that is contrary to the reasonable expectation and understanding of the parties in these circumstances would not be fair or reasonable and would also come within the exception enunciated in Gordon Capital, supra.

**60**    I would hold that even if the exclusion clauses applied, the trial judge was entitled to refuse to enforce paragraphs 20, 26, and 27 of the agreement.

> (iv)    Consideration

**61**    I also agree with the trial judge's conclusion that there was consideration for the oral agreement. BCD provided consideration by giving up its territory. Shelanu provided consideration by promising to report the joint earnings of itself and BCD, thereby agreeing to pay the six per cent royalty on higher sales. Rather than having two franchises that were in financial difficulty, Print Three gained the benefit of one healthy franchise and the peace of mind and greater financial certainty of royalties in difficult economic times that brought. The consideration from Print Three was its promise to allow Shelanu to merge BCD's sales with its sales and to report them as one.

**62**    For these reasons, I would hold that the trial judge did not err in finding that Shelanu was entitled to enforce the three-party oral agreement against Print Three. Print Three breached its obligation to pay Shelanu the royalty rebate in accordance with the oral agreement and, therefore, is liable for damages as found by the trial judge.

> 2.    The Duty of Good Faith and Fiduciary Duty

**63**    The trial judge found that the appellant owed the respondent a duty of good faith either under The Arthur Wishart Act, supra, or at common law. Having regard to my conclusions regarding good faith, set out below, it is unnecessary to decide whether the Arthur Wishart Act, which applies to

existing franchises, is applicable in this case where the acts in issue took place prior to the coming into force of the Act.

### A.    Circumstances Giving Rise to a Duty of Good Faith

**64**    In Wallace v. United Grain Growers Ltd. (c.o.b. Public Press), [1997] 3 S.C.R. 701, the majority of the Supreme Court was prepared to recognize a good faith obligation in employment contracts. Indeed, at paras. 91-95, Iacobucci J. held that contracts of employment have unique characteristics that set them apart from ordinary commercial contracts. He described three special characteristics of employment contracts: 1) the formation of the contract is not the result of the exercise of bargaining power between two equals; 2) the person in the weaker position is unable to achieve more favourable contractual terms because of, for example, that person's inability to access information; 3) the power imbalance continues to affect other facets of the relationship after the contract has been entered into.

**65**    In some instances a duty of good faith may arise ordinarily out of the nature of the relationship, or the circumstances created by the other party: see 978011 Ontario Ltd. v. Cornell Engineering Co. (2001), 53 O.R. (3d) 783 (C.A.) at para. 35.

**66**    The relative position of the parties as outlined by Iacobucci J. in Wallace also exists in the typical franchisor-franchisee relationship. First, it is unusual for a franchisee to be in the position of being equal in bargaining power to the franchisor: See Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc. (1998), 114 O.A.C. 357 (C.A.), per Goudge J.A. at para 16; Machias v. Mr. Submarine Ltd., [2002] O.J. No. 1261 (S.C.J.) at para. 109. The second characteristic, inability to negotiate more favourable terms, is met by the fact that a franchise agreement is a contract of adhesion. As I have indicated, a contract of adhesion is a contract in which the essential clauses were not freely negotiated but were drawn up by one of the parties on its behalf and imposed on the other. Further, insofar as access to information is concerned, the franchisee is dependent on the franchisor for information about the franchise, its location and projected cash flow, and is typically required to take a training program devised by the franchisor. The third characteristic, namely that the relationship continues to be affected by the power imbalance, is also met by the fact the franchisee is required to submit to inspections of its premises and audits of its books on demand, to comply with operation bulletins, and, often is dependent on, or required to buy, equipment or product from the franchisor. It is hardly surprising, therefore, that a number of courts, including the Manitoba Court of Appeal in Imasco Retail Inc. (c.o.b. Shoppers Drug Mart) v. Blanaru, [1995] 9 W.W.R. 44 (Man. Q.B.), aff'd, [1997] 2 W.W.R. 295 (C.A.) have recognized that a duty of good faith exists at common law in the context of a franchisor-franchisee relationship.

### B.    Whether the trial judge held Print Three to a fiduciary duty

**67**    The appellant submits that the trial judge held Print Three to a higher standard than that imposed by the duty of good faith, namely, the duty of a fiduciary. The appellant's submission that

the trial judge applied a fiduciary standard to Print Three rests on the trial judge's comment that the relationship of franchisor to franchisee is akin to a partnership. The appellant states partners owe each other a fiduciary duty and that this is the standard that he applied to Print Three's relationship with Shelanu.

**68**    The imposition of a duty of good faith and a fiduciary duty are closely related. As stated in Cornell, supra at para. 33 they, along with the standard of unconscionability:

> [a]re points on a continuum in which the law acknowledges a limitation on the principle of self-reliance and imposes an obligation to respect the interests of the other. They are defined by P. Finn, "The Fiduciary Principle" in T. Youdan, ed., Equity, Fiduciaries and Trusts, (1989), 1 at 4 as follows:

>> "Unconscionability" accepts that one party is entitled as of course to act self-interestedly in his actions towards the other. Yet in deference to that other's interests, it then proscribes excessively self-interested or exploitative conduct. "Good faith," while permitting a party to act self-interestedly, nonetheless qualifies this by positively requiring that party, in his decision and action, to have regard to the legitimate interests therein of the other. The "fiduciary" standard for its part enjoins one party to act in the interests of the other -- to act selflessly and with undivided loyalty. There is, in other words, a progression from the first to the third: from selfish behaviour to selfless behaviour. Much the most contentious of the trio is the second, "good faith." It often goes unacknowledged. It does embody characteristics to be found in the other two [footnotes omitted].

**69**    There is at least one important difference between the duty of good faith and a fiduciary duty. If, for example, A owes a fiduciary duty to B, A must act only in accordance with B's interests when A exercises its powers or exercises a discretion arising out of the relationship: see York Condominium Corp. No. 167 et al. v. Newrey Holdings Ltd. et al. (1981), 122 D.L.R. (3d) 280 (Ont. C.A.) at 289, leave to appeal to the Supreme Court of Canada refused [1981] 1 S.C.R. xi; Hodgkinson v. Simms, [1994] 3 S.C.R. 377. If, on the other hand, A owes a duty of good faith to B, A must give consideration to B's interests as well as to its own interests before exercising its power. Thus, if A owes a duty of good faith to B, so long as A deals honestly and reasonably with B, B's interests are not necessarily paramount: see for example Mason v. Freedman, [1958] S.C.R. 483.

**70**    The trial judge recognized that the relationship between a franchisor and a franchisee would not normally be characterized as a fiduciary one in accordance with Jirna Ltd. v. Mister Donut of Canada Ltd., [1972] 1 O.R. 251 (C.A.), aff'd, [1975] 1 S.C.R. 2. I do not agree that it logically follows from the trial judge's reference to partners that he applied the fiduciary standard in this case. At a later point in his reasons, the trial judge reiterated that a franchise relationship was akin to that

of a partnership and, accordingly, like a partnership required mutual respect. He quoted from the decision of Kelly J. in Gateway Realty Ltd. v. Arton Holdings Ltd. (1991), 106 N.S.R. (2d) 180 (Sup. Ct.) at 191-192, aff'd (1992), 112 N.S.R. (2d) 180 (C.A.), to the effect that parties to a contract are required to exercise their rights under that agreement honestly, fairly, and in good faith, and that, when a party acts contrary to community standards of honesty and reasonableness or fairness, he acts in bad faith. The trial judge well knew the distinction between a duty of good faith and a fiduciary duty and did not hold Print Three to a fiduciary duty.

**71**    Moreover, the fact that contractual terms are ultimately complied with, does not mean that there has been no breach of the duty of good faith.

C.    Breaches of Print Three's obligations as found by the trial judge

**72**    The trial judge found that Print Three breached its duty of good faith towards Shelanu in four respects. The specific breaches found by the trial judge are:

*    Print Three's attempts to rescind the May 1995 agreement were not only a breach of that agreement but, in the circumstances, evinced a lack of good faith dealing by the franchisor;
*    Print Three unilaterally changed the terms and conditions upon which the franchisees agreed to participate in the Air Miles program, and in so doing, breached the representations made and acted upon by Shelanu;
*    Print Three failed to make prompt payment of several royalty rebates and its refusal to pay a royalty rebate for the fourth quarter of 1996; and
*    Print Three's establishment of the Le Print Express system, "not only would but did take work and customers from existing Print Three franchises." As a consequence he held that, "... the establishment of such an enterprise by the very person who owned and controlled the defendant was fundamentally at odds with the defendant's obligations, including the obligation to deal in good faith, to its franchisees."

**73**    In relation to the first three breaches, the trial judge awarded damages for breach of contract. He did not award separate damages for breach of the duty of good faith. No damages were awarded for the establishment of the Le Print Express franchise. The breaches, including his finding respecting the establishment of the Le Print Express franchise, led the trial judge to conclude that Print Three did not intend to honour or be bound by the commitments it had made to its franchisees and that, as a result, Shelanu should be discharged from any further obligation under the contract.

**74**    Whether or not a party under a duty of good faith has breached that duty will depend on all the circumstances of the case, including whether the party subject to a duty of good faith conducted itself fairly throughout the process. See by analogy: 702535 Ontario Inc. v. Lloyd's London, Non-Marine Underwriters (2000), 184 D.L.R. (4th) 687 (Ont. C.A.), per O'Connor J.A., at paras. 28-37 leave to appeal to Supreme Court of Canada dismissed, [2000] S.C.C.A No. 258. See also the

decision of Laskin J.A. in the Court of Appeal in Whiten v. Pilot Insurance Co. (1999), 170 D.L.R. (4th) 280 in dissent, aff'd, [2002] S.C.J. No. 19.

3. Breaches of Print Three's Obligations to Shelanu

A. Royalty Rebates

i.) Refusal to recognize the 1995 oral agreement

**75**    I have already dealt with the facts and findings of the trial judge in relation to the 1995 oral agreement and have held that Print Three breached that agreement.

**76**    Where a duty of good faith exists, not every breach of contract will be a breach of the duty of good faith. An honest disagreement concerning the interpretation of a franchise agreement ultimately decided in favour of the franchisee could be a breach of contract but need not be a breach of the duty of good faith owed by the franchisor. Denial of payment under an agreement should not, however, be made in order to gain leverage or bargaining advantage in a dispute with the other party or out of vindictiveness. In this case the evidence indicates that Print Three's refusal to pay Shelanu the royalty rebate pursuant to the oral agreement was linked to Banks' anger concerning Shelanu's position respecting the Air Miles advertising program. There was evidence upon which the trial judge could hold that the refusal to recognize the 1995 oral agreement was also a breach of the duty of good faith.

ii.) Delay in payment of undisputed royalty rebates

**77**    Print Three withheld all royalty rebates payable to Shelanu for the third and fourth quarters of 1995 (July to September 1995 and October to December 1995). All royalty rebates for April to June 1996 were also withheld but that portion about which there was no dispute was paid when Bob Davis met with Shelanu in October 1996. Similarly, the rebates for 1995 were paid in September. No explanation was given for the delay in paying that portion of the royalty rebate about which there was no dispute. The trial judge found Print Three acted arbitrarily in withholding payment of the royalty rebates. I agree Print Three had no reasonable basis for refusing to pay the royalty rebates that were not in dispute.

**78**    The fact that the royalty rebates were ultimately paid does not mean that Print Three did not breach its obligations towards Shelanu. The duty of good faith comprises a time component. That time component requires the party under a duty of good faith to respond promptly to a request from the other party and to make a decision within a reasonable time of receiving that request. Parties under a duty of good faith also have an obligation to make payment of any amounts that are clearly owed to the other party in a timely manner: 702535 Ontario Inc. v. Lloyd's London, supra.

iii.)    Disputed royalty rebate because of refusal to allow inspection

**79**    Print Three submits that the royalty rebate for the fourth quarter of 1996 was never paid because the Deslauriers refused to allow Davis to inspect the production facility at 60 Bloor Street West. Brian Deslauriers testified that he did not take Davis' request seriously because the stated purpose of the meeting on October 3, 1996 was to discuss the 1995 agreement and he wished to get on with that discussion. The royalty rebate for the fourth quarter of 1996 remained outstanding at the commencement of trial.

**80**    The trial judge found that, on a strict reading of the franchise agreement, Davis was entitled to conduct an inspection but that, in view of Print Three's past practice of not enforcing the strict terms of the franchise agreement, Shelanu was entitled to some form of notification that Print Three intended to strictly enforce its rights under the agreement and that, in any event, Print Three could not withhold the royalty rebate once Shelanu made it clear Davis could inspect the production facility. The respondent submits that the trial judge erred in ordering that a royalty rebate be paid for this period. I would uphold the trial judge's conclusion that the rebate is payable based on a different analysis of the franchise agreement.

**81**    A franchisee is only entitled to receive a royalty rebate according to paragraph 3C of the franchise agreement: "if he or she has fully complied with all the terms and conditions of this agreement during the pertinent time period."

**82**    Paragraph 3C defines what constitutes full compliance with the agreement It stipulates that "[i]n addition to other provisions of this agreement", "full compliance means timely submission of provincial sales tax returns, timely payment of advertising fees, royalties, other amounts owing to the franchisor or amounts guaranteed by the franchisor to third parties." The phrase, "other provisions of this agreement" is vague and ambiguous. The terms specified all have a financial component. It makes commercial sense that Print Three would not grant Shelanu a rebate if Shelanu were in default of money owing to it for which it could be responsible to pay; this is the main thrust of the provision.

**83**    Paragraph 5G of the franchise agreement states that the Franchisee shall permit the franchisor to enter on the premises to conduct:

> [a] compliance audit to determine whether Franchise Owner is abiding by the terms of this Agreement and conforming to standards of operation as may have been otherwise detailed in the Operations Manuals, Technical Bulletins or other publications supplied by Franchisor. Franchisor may advise Franchise Owner in writing regarding any deficiencies in Franchise Owner's compliance with Franchisor's standards. Franchise Owner shall have thirty (30) days to cure such deficiencies from the date such written notice is received by Franchise Owner.

**84**    On the other hand, paragraph 7B states that the franchisee shall permit the franchisor to enter

the premises:

> [i]n order to inspect and audit all aspects of Franchise Owner's business including, but not limited to: books, records, facilities, business equipment, materials and any other matters relating to Franchise Owner's obligations set out in this Agreement.

**85**    Thus the right to inspect is contained in both paragraph 5G and 7B. Paragraph 5G envisages a compliance audit with respect to standards of operation and gives a franchisee 30 days in which to cure a "deficiency". The term "breach" is not used. The word "deficient" is defined in Webster's Dictionary, 1989 ed., as "inadequate". A franchisee could be in compliance with its franchise agreement but still have inadequacies in its operation that the franchisor wanted corrected. Provided the deficiency was corrected within 30 days the franchisee would be in compliance with the agreement. Paragraph 7B contains similar wording but envisages a financial audit and contains no time component.

**86**    There is no evidence to suggest that Davis wished to conduct a financial audit or, indeed, an audit of any kind. He simply stated he wished to inspect the premises. In any event, upon receiving written notice from Print Three, Shelanu promptly offered to remedy the situation. The inspection had no financial impact and none of the specific requirements defined as "full compliance" was breached. In these circumstances, Shelanu's refusal did not affect its right to a royalty rebate and Print Three could not refuse to pay it.

**87**    I would not have considered the dispute with respect to this single payment to be a breach of Print Three's duty of good faith, in and of itself.

**88**    Shelanu is entitled to the payment of the disputed royalty rebates.

> B.    Air Miles

> i.)    Facts and finding of the trial judge

**89**    The franchise agreement provided that franchisees were to pay an annual three per cent advertising fee to Print Three. The relevant portion of paragraph 9 respecting advertising states:

> Due to the inherent importance and value of advertising and the need for standardization and promotion of the Print Three public image and program, the Franchise Owner agrees to pay to Franchisor an advertising fee of THREE PERCENT (3%) of each month's gross sales. Such payment is due by the tenth (10th) day of the month following the month for which the gross sales were made. The advertising fees paid directly to the Franchisor are intended to reasonably compensate Franchisor for the actual cost of advertising and

> promotional campaigns; provide reasonable and adequate compensation for
> Franchisor's personnel engaged in the preparation, purchase and arrangement of
> advertising activities; and to reimburse Franchisor for any fees paid to
> advertising and other organizations. Franchisor shall have complete discretion to
> use such advertising funds in such ways as it feels will best promote the products
> and services offered by the franchise system.

**90**    Following a vote by the franchisees, the advertising fee was suspended between 1991 and 1994, primarily because of the recession. In November 1994, at the franchisees' convention, a vote was held on whether to reintroduce the fee and whether to enter into the Air Miles program. The trial judge found that, without the vote, the franchisees could be obligated to pay the fee and the vote was really about whether to embark on the Air Miles program or some other advertising program. Print Three represented that, "the entire three percent advertising fee had to go to the Air Miles program in order for Print Three to qualify to be part of that program". Based on the documents presented in evidence, the trial judge found that that representation was false. The misrepresentation was important because one of the reasons the franchisees were reluctant to participate in the program was that it would consume all of the advertising fees.

**91**    A second reason that some franchisees, including the Deslauriers, were opposed to participating in the Air Miles program was because it was apparent to them that, although all of the advertising fees went into the program, not all of the benefits of that program would be capable of being used for the franchisees' business. The trial judge found that in order to get over the franchisees' opposition to the Air Miles program, Print Three represented to the franchisees that any air miles purchased under the program, and not distributed by the franchisees to their customers, could be used by the franchisees for their own purposes including personal travel. Both Print Three's letter dated May 2, 1995 and the operations manual for the program support the trial judge's finding in this regard.

**92**    Shortly after the Air Miles program began, however, Print Three changed these arrangements and directed that all undistributed Air Miles for each outlet could only be used with its approval. The unused Air Miles were placed in accounts in the personal names of certain of its employees. The trial judge found that this unilateral change was a clear breach of the representations made to the franchisees. He held that Shelanu was entitled to damages equivalent to the value of the undistributed Air Miles earned by its franchise to the end of the program.

> ii.)    Argument and analysis

**93**    The appellant submits that any representations respecting unused Air Miles were not in writing and signed by the parties and, therefore, cannot be enforced because they amounted to an amendment of the franchise agreement that was not in writing and signed by the parties as required by that agreement. Further, Print Three submits that it had an absolute discretion respecting the use of the advertising funds and any use of unused Air Miles and thus, the fact it did not abide by its

representations is of no consequence. Finally, the appellant also asserts that the representations were "gratuitous offers to Shelanu regarding advertising which were more advantageous than the terms of the Franchise Agreement".

**94**    I have already indicated that parties to a written agreement may subsequently enter into a new oral agreement. I have also indicated that courts will refuse to enforce a written agreement requiring that amendments be in writing where that clause no longer represents the intention of the parties. (See paras. 54 and following). With respect to the Air Miles program, the parties agreed to an oral amendment of the agreement respecting advertising fees and their subsequent conduct is indicative that the oral agreement was performed in part. The trial judge clearly found that not all of the money collected was used for the Air Miles program - the only advertising undertaken - and this finding is supported by the evidence.

**95**    The appellant's submission that Print Three possessed an absolute discretion with respect to the use of advertising funds ignores paragraph 9 of the franchise agreement which stipulates that the three percent advertising fee is to compensate Print Three "for the *actual cost* of advertising and promotional campaigns" [emphasis added], to provide reasonable compensation to its employees in preparing and purchasing advertising activities, and to reimburse the franchisor for advertising fees paid. Furthermore, nothing in paragraph 9 gives Print Three the right to use Shelanu's three percent advertising fees for non-advertising related or personal purposes as happened here. Paragraph 26 of the agreement respecting amendments being in writing has nothing to do with excusing breaches of the agreement.

**96**    Even if paragraph 9 is only a statement of intent and Print Three had an absolute discretion with respect to the use of the Air Miles, Print Three could not exercise that discretion without regard to Shelanu's interests; it was obliged to exercise the discretion in a reasonable manner. See J.D. McCamus, "The Duty of Good Faith Contractual Performance" (N.J.I.: Civil Law Seminar, Contract Law: From Form to Remedies, Osgoode Hall Law School, 17 May 2000). Professor McCamus is of the opinion that under ordinary contract principles, a party has an obligation to act reasonably in exercising a discretionary power. Applying this principle, he says the same result could have been reached in cases recognizing the existence of a duty of good faith in the execution of a contract such as Mason v. Freedman, [1958] S.C.R. 483 at 486; Greenberg v. Meffert (1985), 18 D.L.R. (4th) 548 (Ont. C.A.), leave to appeal to the Supreme Court of Canada dismissed (1985), 30 D.L.R. (4th) 768; Le Mesurier et al. v. Andrus (1986), 25 D.L.R. (4th) 424 (Ont. C.A.); and Gateway Realty Ltd. v. Arton Holdings Ltd., supra. In Greenberg v. Meffert et al., supra, where a breach of a duty of good faith was found, this court held that the words "at the sole discretion", in relation to payment of commission by a real estate company to its real estate agent after termination of the relationship meant that the company, "must act reasonably in exercising its discretion, and also honestly and in good faith." Those standards not having been attained, the agent was entitled to his commission. Here, the trial judge found Print Three acted arbitrarily and unreasonably and not in conformity with the standards for exercising a discretion. On the evidence, it was open to him to make this finding.

**97**    Lastly, the misrepresentations were not a gratuitous offer. The consideration for the agreement to credit unused air miles was that Shelanu entered into the Air Miles program as opposed to some other advertising program.

**98**    As found by the trial judge, Shelanu is entitled to the cash value of the unused Air Miles.

      C.    Le Print Express

      i.)    Facts and finding of the trial judge

**99**    Around October 1990, the appellant set up a business initially known as Print Three Express that subsequently became known as Le Print Express. The trial judge found that these outlets were to be smaller than Print Three franchises in order to target individuals and small businesses. The cost to purchase these franchises was lower than the cost to purchase a Print Three franchise and some financing was also offered to potential Le Print Express franchisees. Shelanu complained that the establishment of the Le Print Express concept involved the franchisor in a business that competed with existing Print Three franchises. Brian Deslauriers testified that Le Print Express offered the same kinds of products and services that were, to a large extent, offered by Print Three. In support of his evidence he produced a flyer from the Le Print Express at the Eaton Centre that had been faxed to Shelanu. He further testified that contrary to his understanding that the Le Print Express operations were to be small, occupying 200 square feet, the Eaton operation was three to four times this size and had the same kind of equipment and capabilities as Shelanu. The same personnel and staff who operated and marketed Print Three franchises also handled the requirements of the new franchise. The trial judge held:

> It seems to me to be intrinsically troublesome for a franchisor to develop a concept for a new franchise operation that will operate in competition with its existing franchise operation. Even though Le Print Express franchisees were directed at a specific segment of the industry, I am satisfied that they not only would, but did, take work and customers from existing Print Three franchisees. As a consequence, in my view, the establishment of such an enterprise by the very person who owned and controlled the defendant was fundamentally at odds with the defendant's obligations, including the obligation to deal in good faith, to its franchisees. The defendant could not properly and fairly institute this new concept without at least obtaining the agreement of the existing Print Three franchisees to this crucial change to their contractual relationship which, of course, the defendant made no attempt to do. The establishment of the Le Print Express franchises fundamentally altered the nature of the Print Three franchise network and impacted directly on the business environment in which the Print Three franchisees operated.

ii.)    Argument and analysis

**100**    The appellant challenges the trial judge's finding of fact that Le Print Express competed with Shelanu's business as well as his conclusion that the establishment of this business took work and customers from Print Three franchisees and Shelanu in particular. The appellant emphasizes that, while there may have been some overlap of services, Le Print Express was in a different business sector than Print Three.

**101**    In Housen v. Nikolaisen, [2002] S.C.J. No. 31, the Supreme Court held, at para. 10, that "[t]he standard of review for findings of fact is that such findings are not to be reversed unless it can be established that the trial judge made a palpable and overriding error'" [citations omitted]. This deferential standard is also applicable to appellate review of inferences of fact: see Housen, supra at para. 25.

**102**    The franchise agreement is silent as to whether the franchisor can engage in a similar business during the term of the agreement.[1] Print Three did, however, agree not to take any action that would be likely to injure the goodwill or reputation associated with the Print Three trademark, logo or mark.

**103**    Print Three targeted corporate accounts, whereas Le Print Express did small copying jobs for individuals and small businesses. None of the Le Print Express franchises was established within Shelanu's exclusive territory; the three Le Print Express locations were the Eaton Centre, Union Station, and Scotia Bank Plaza. Shelanu did not complain about Le Print Express for almost seven years after it was established and Shelanu presented no evidence that it lost income as a result of competition from Le Print Express. The trial judge's reasons do not address these considerations.

**104**    The trial judge also rejected a number of Shelanu's submissions that would have affected its claim respecting Le Print Express. Shelanu's statement of claim claimed damages for misrepresentation on the basis that the franchise agreement contained representations that Print Three was an expanding organization; it had a commitment to continue to introduce leading edge technologies and systems in document reproduction technology; it would continue to develop the credibility and presence of the Print Three name and logo; and it would continue to improve and modify the know-how it had developed. The trial judge held that the failure of these representations to materialize were not breaches of the franchise agreement but goals that had not been achieved. In other words, they were not representations of fact.

**105**    On the issue of technology, the trial judge described the contribution of Print Three as the bare minimum a franchisee ought to expect in return for royalty payments and held that "... in the end result, I am not satisfied on the evidence that the failures of the defendant [Print Three] on this issue were so great as to constitute a breach of its obligations under the franchise agreement." The trial judge noted that the evidence in this case was like that in Khagen Investments Ltd. v. 710497 Ontario Ltd., [1999] O.J. No. 2152 (S.C.J.), in that there was no evidence as to the standard of service given to other franchisees or whether provision of the same level of service to other

franchisees resulted in their failure. He held that these issues could not justify Shelanu's position that it was entitled to treat the franchise agreement at an end as of May 8, 1997.

**106**     Brian Deslauriers testified that the number of Print Three franchises declined after Le Print Express was created. The trial judge held that, on balance, the reduction in the number of Print Three franchises was largely the result of prevailing economic conditions. By implication, therefore, the establishment of Le Print Express did not contribute to the decline in the number of Print Three franchises.

**107**     I would, therefore, hold that the appellant has met the high standard required to overturn a trial judge's finding of fact that Le Print Express competed with Shelanu and took business from it. My reasons for doing so may be summarized as follows: 1) the different nature of the business engaged in by Le Print Express; 2) Shelanu's delay in complaining about the establishment of that business; 3) the lack of evidence before the trial judge as to Shelanu's consequential loss of income; 4) the trial judge's findings that there had been no misrepresentation concerning what Print Three was to provide in exchange for royalty payments and that Print Three had done the minimum required to discharge those obligations; and 5) the trial judge's finding that the decline in Print Three franchises was primarily due to prevailing economic conditions. The finding that Print Three breached "reasonable commercial standards" must also fail for the same reasons.

**108**     Inasmuch as I have not upheld the trial judge's finding of fact in respect of Le Print Express, I would not uphold his conclusion that the establishment of Le Print Express was a breach of Print Three's duty of good faith.

    4.    Fundamental Breach

    A.    The findings of the trial judge

**109**     The trial judge concluded that the various failings and breaches of the franchise agreement by Print Three constituted a fundamental breach of the franchise agreement. The trial judge further held Shelanu was entitled to terminate the franchise agreement because the breaches

> [a]lso reveal an attitude of the defendant generally toward this franchisee, at least, and toward its obligations under the franchise agreement which demonstrates an intention by the defendant that it was not going to be bound by, nor honour, its obligations under the franchise agreement unless it suited its purpose to do so.

    B.    The standard of review and analysis

**110**     A trial judge's finding of fundamental breach is a matter of mixed fact and law. This is

because it is a question "about whether the facts satisfy the legal tests": Housen, supra, at para. 26 citing Canada (Director of Investigation and Research) v. Southam Inc., [1997] 1 S.C.R. 748 at para. 55. The appropriate standard of review is dependent on where the error lies. As stated by Iacobucci and Major JJ. at para. 36:

> Matters of mixed fact and law lie along a spectrum. Where, for instance, an error with respect to a finding of negligence can be attributed to the application of an incorrect standard, a failure to consider a required element of a legal test, or similar error in principle, such an error can be characterized as an error in law, subject to a standard of correctness. Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" and is subject to a more stringent standard. The general rule, as stated in Jaegli Enterprises, supra, is that, where the issue on appeal involves the trial judge's interpretation of the evidence as a whole, it should not be overturned absent palpable and overriding error.

Thus, as stated by Rosenberg J.A. in Algoma Steel Inc. v. Union Gas Ltd., [2003] O.J. No. 71 (C.A.) at para. 19, "where the issue concerns application of a legal standard to a set of facts the question is one of mixed fact and law and a somewhat less deferential standard may be appropriate, although not the standard of correctness required for questions of law."

**111**    In order to conclude that Print Three had committed a fundamental breach of its obligations to Shelanu, the trial judge relied on the evidence as a whole, requiring the application of the more stringent standard of review. At the same time, it must be borne in mind that I have not upheld the trial judge's finding that Print Three breached its duty of good faith to Shelanu by establishing the Le Print Express franchise. It is therefore necessary to consider whether the remaining breaches can support the trial judge's conclusion that there was a fundamental breach of the agreement. I am of the opinion that they cannot. As of the date Shelanu gave notice of termination of its obligations to Print Three, Print Three had abused its discretion respecting Air Miles, failed to make payment of the full royalty rebate based on there being a single franchise, delayed in making payment of royalty rebates admittedly due on three occasions, and refused to pay one royalty rebate allegedly based on Shelanu's breach of the franchise agreement for refusing to allow Davis to inspect its premises. The breaches respecting the Air Miles program and non-payment of royalty rebate were the subject of damages awarded by the trial judge.

**112**    It is also necessary to consider what appears to me to be a further palpable and overriding error on the part of the trial judge. This is the trial judge's failure to consider the fact that although Shelanu gave notice of termination of the agreement on May 8, 1997, it continued to use the name Print Three for a further two and a half years and continued to have an exclusive territory. Shelanu

was therefore able to carry on the commercial purpose of the agreement.

113    In Majdpour v. M & B Acquisition Corp (2001), 56 O.R. (3d) 481 (C.A.), the event alleged to have triggered a fundamental breach of the franchise agreement by the franchisor was a bankruptcy. Because the franchisee was able to carry on the commercial purpose of the agreement intact after the bankruptcy, MacPherson J.A. dismissed the franchisee's claim it was discharged from further performance. That reasoning is equally applicable in this case.

114    In dismissing the claim for fundamental breach, MacPherson J.A. noted that the test was a restrictive one, namely, whether the conduct of one party deprived the other party of substantially the whole benefit' of the contract' as stated by Wilson J. in Hunter Engineering, supra.[2] This is the classic formulation of the test as set out by Diplock L.J. in Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd., [1962] 2 Q.B. 26 (C.A.) at 66:

> [d]oes the occurrence of the event deprive the party who has further undertakings still to perform of substantially the benefit which it was the intention of the parties as expressed in the contract that he should obtain in consideration for performing those undertakings.

115    Print Three submits that, because the trial judge relied on the words of Gonthier J. at para. 33 of his reasons in Farber v. Royal Trust Co., [1997] 1 S.C.R. 846, namely that, "where one party to a contract demonstrates an intention no longer to be bound by it, that party is committing a fundamental breach of the contract that results in its termination," the trial judge applied the wrong legal test for fundamental breach. The appellant submits that this phraseology is only appropriate for employment law contracts and that the only correct phraseology for fundamental breach is whether the failure of one party to perform its contractual obligations had the effect of depriving the other of "substantially the whole benefit" of the contract.

116    I do not agree that the phraseology used by Gonthier J. in Farber, supra, is restricted to the employment law context. Indeed this is precisely the phraseology used by G.C. Cheshire and C.H.S. Fifoot to describe the circumstances in which a breach of contract will excuse further performance in their text The Law of Contract, 5th ed. (London: Butterworths, 1960) at 488:

> A breach of contract is a cause of discharge only if its effect is to render it purposeless for the innocent to proceed further with performance. Further performance is rendered purposeless if one party either shows an intention no longer to be bound by the contract or breaks a stipulation of major importance to the contract.

117    I agree, however, that the deprivation of "substantially the whole benefit of the contract" is the phraseology adopted by this court to describe the test for fundamental breach in Robson v. Thorne, Ernst & Whinney (1999), 127 O.A.C. 215, at para. 18 (C.A.) and Bayer v. Aktiengesellschaft et al. v. Apotex (1998), 113 O.A.C. 1 at para. 34 (C.A.) as well as Majdpour,

supra. In the circumstances of this case, the phraseology chosen by the trial judge to describe the test for fundamental breach may not have been the most appropriate one to define the sort of breach that would excuse Shelanu from further performance of its obligations.

**118**    Professor Waddams addresses the variety of expressions that have been used to define the sort of breach that will excuse a party from further performance under a contract in his text: Waddams, supra at para. 583. Waddams says that behind all of these expressions lies a single notion, that of substantial failure of performance. Irrespective of the expression used, he proposes five factors derived from the jurisprudence to measure whether future performance under a contract should be excused at para. 587. In 968703 Ontario Ltd. v. Vernon (2002), 58 O.R. (3d) 215 (C.A.) this court, after referring to the decisions in Robson, supra, and Bayer, supra, adopted and applied the factors suggested by Waddams to measure whether future performance should be excused. They are: (a) the ratio of the party's obligation not performed to the obligation as a whole; (b) the seriousness of the breach to the innocent party; (c) the likelihood of repetition of such breach; (d) the seriousness of the consequences of the breach; and (e) the relationship of the part of the obligation performed to the whole obligation. Applying those factors to the breaches by Print Three in this case would not lead to the conclusion that Shelanu should be excused from further performance of its obligations.

**119**    Applying Waddams' guidelines in this case would not lead to the conclusion that Shelanu should be excused from future performance. The first and fifth factors appear to be aimed at helping a court to ascertain whether the contract was substantially performed. See Fairbanks Soap Co. v. Sheppard, [1953] 2 D.L.R. 193 (S.C.C.). The crux of the agreement between Print Three and Shelanu was the licence to use Print Three's name and trademark in exchange for royalty payments and its exclusive territory. Print Three did not revoke or undermine Shelanu's licence to use Print Three's name and trademark and Shelanu continued to use them. In return, Shelanu was obligated to make royalty payments which it did. Over the ten years of the franchise agreement, Print Three also paid Shelanu the majority of its royalty rebates. I would also disagree that Print Three evinced an intention to no longer be bound by the agreement as a whole although it certainly refused to be bound by parts of it. Print Three did not place another franchisee in Shelanu's territory until after Shelanu's franchise agreement had expired. Shelanu was not deprived of substantially the whole of the benefit of its agreement with Print Three.

**120**    The second and fourth factors are aimed at measuring the effect of the breach on the innocent party while the third factor, the likelihood of repetition of the breach, is aimed specifically at whether the aggrieved party should be released because continued performance would be intolerable due to repetition of the breaches. To a small business like Shelanu, the delay in payment of royalty rebates on three occasions, the failure to pay the rebate based on there being a single franchise and the abuse of discretion respecting the advertising program were undoubtedly serious but they do not appear to have made it intolerable for Shelanu to continue to operate the franchise because that is what it continued to do.

**121**    Consequently, Shelanu is not entitled to recover the royalties paid by it since May 8, 1997 which the trial judge assessed at $199,622 nor the $59,870. in advertising fees paid by it after that date. (The latter amount would be subject to any credit for unused Air Miles until that program was discontinued.)

**122**    Lastly, I would point out that in Hunter Engineering, supra, the court was concerned with the delivery of damaged equipment. The court was not dealing with a contractual relationship that required the parties to continue to interact with each other on an ongoing basis. The same is also true of the situation in Hongkong Fir Shipping, supra. In the context of a franchise agreement, which, as I have noted bears certain similarities to the employment law situation, there is an ongoing, interactive relationship. I note that, following Farber, supra, this court has held that a party may be excused from further performance of an employment contract and the employer held in constructive breach of the agreement where the employer's treatment of the employee makes continued employment intolerable: Shah v. Xerox Canada Ltd., [2000] O.J. No. 849 (C.A.). See also Whiting v. Winnipeg River Brokenhead Community Futures Development Corp. (1998), 159 D.L.R. (4th) 18 (Man. C.A.).

**123**    Having regard to the current jurisprudence, the trial judge might have chosen more apt phraseology to describe the test for fundamental breach but I would not hold that the trial judge erred in law in using the phraseology that he did. Rather, as I have indicated, it is in the application of the test for fundamental breach that he erred.

<div align="center">C.    Amounts owing because there was no fundamental breach</div>

**124**    Because Shelanu is not excused from its obligations under the franchise agreement, Shelanu is not entitled to recover the royalties it paid to Print Three, which the trial judge assessed at $199,622.

**125**    Against the amount of $199,622, I would hold, however, that Shelanu is entitled to receive credit for royalty rebates withheld by Print Three.

**126**    Shelanu's notice of termination would not, of itself, disentitle Shelanu to the royalty rebate provided that it continued to be in compliance with its obligations under the agreement. Because the agreement did not expire until December 1999 and Shelanu continued to pay royalties that Print Three accepted until October of that year, it was not in breach of the one-year non-competition clause contained in the agreement while it paid royalties. The trial judge held that an error Print Three made with respect to a Yellow Pages advertisement was not a breach of the agreement and I would agree with his conclusion in that regard.

**127**    Shelanu is entitled to a royalty rebate credit during the period it paid royalties.

**128**    Print Three is entitled to the $59,870 in advertising fees paid by Shelanu after it gave notice of termination. The latter amount would be subject to any credit for unused Air Miles until that

program was discontinued, or to the advertising rebate otherwise payable under the agreement.

**129**    Having found that the trial judge erred in holding that Print Three had fundamentally breached the franchise agreement I now turn to Print Three's appeal from the trial judge's dismissal of its counterclaim and Shelanu's cross-appeal on damages.

    5.    The Counterclaim and Cross-Appeal

**130**    I approach my review of the damages assessed bearing in mind that a trial judge's assessment of damages is ordinarily entitled to great deference. As stated by the Supreme Court of Canada in Naylor Group v. Ellis-Don Construction, [2001] 2 S.C.R. 943 at 977-78:

> It is common ground that the Court of Appeal was not entitled to substitute its own view of a proper award unless it could be shown that the trial judge had made an error of principle of law, or misapprehended the evidence, or it could be shown there was no evidence on which the trial judge could have reached his or her conclusion, or the trial judge failed to consider relevant factors in the assessment of damages, or considered irrelevant factors, or otherwise, in the result, made "a palpably incorrect" of "wholly erroneous" assessment of the damages. Where one or more of these conditions are met, however, the appellate court is obliged to interfere.

**131**    The trial judge held that, in the event he was wrong in concluding there had been a fundamental breach of the agreement, Print Three was entitled to damages that he assessed at $465,500 over a ten-year period. The award has three components: $64,500 for the waiver of a franchise fee; $225,000 for lost royalties and $176,000 for lost advertising fees, both calculated over a 10-year period.

**132**    The trial judge dismissed the following claims by Print Three, because there was no evidence to support those assessments:

    *    A claim for $750,000 for Shelanu's business, as a turn-key operation, on the basis that "[a]ll of the assets of that business would be the property of the plaintiff with the exception of the name and the telephone number."
    *    A complaint that Shelanu did not assign the lease in accordance with paragraph 15F of the franchise agreement. Print Three took no steps to negotiate a lease so Shelanu could stay in its location when the existing lease expired during the currency of the franchise agreement and Print Three was subject to a number of judgments from creditors. The trial judge held the only commercially reasonable thing for Shelanu to do was to negotiate the lease in its own name.
    *    A claim for $180,000 for the cost of equivalent signage. While the trial judge accepted that the loss of the Print Three name in a well-travelled

shopping concourse area in a busy section of Toronto could result in damages, he dismissed that claim because there was no evidence before him sufficient to establish an actual loss or the amount of such a loss.

\* The claim for one new or renewed franchise in Shelanu's territory on the basis that Mr. Davis' evidence that another franchisee would be unwilling to locate in the territory was nothing more than sheer speculation.

**133** Only the finding respecting the lease requires further comment. Under clause 19 of the franchise agreement, Print Three had agreed to give Shelanu an exclusive territory at 60 Bloor Street West until the expiry of the franchise in 1999. In failing to renegotiate the terms of the lease or, if that was not possible, offering to relocate Shelanu at Print Three's expense within the territory, Print Three breached this provision. Once Shelanu had renegotiated the lease in its own name, Print Three did not execute a sublease with Shelanu and reimburse it for any rental deposit as required by the franchise agreement. Given the lapse of time of about three years with neither party complaining about the state of the lease this appears to be yet another instance of the parties amending the agreement by their conduct about which Print Three cannot now complain. In any event, having failed to fulfill its obligations under the franchise agreement, Print Three cannot benefit from its breaches by asserting the right to have the lease assigned to it at the end of the franchise agreement.

**134** I must now deal with the claims the trial judge did allow. The waiver of the franchise fee arose when Paul Kim, an existing franchisee, approached Print Three about putting a franchise in Shelanu's territory about six months prior to the expiry of Shelanu's franchise. Print Three gave Mr. Kim a franchise just north of Shelanu's territory. The Kim franchise was required to operate in direct competition with Shelanu, which continued to operate at the Bloor Location, and, since Print Three could not deliver either the Bloor Location, the customer list, the telephone or fax numbers to the Kim Franchise, Print Three waived its usual franchise fee of $64,500 in order to secure the Kim Franchise without this. The trial judge found that in order for Print Three to mitigate its damages it was necessary for Print Three to waive its franchise fee in granting Mr. Kim a franchise. Having regard to the evidence, there is no basis on which to interfere with the trial judge's finding in this regard.

**135** The trial judge's award of damages for lost royalties and advertising fees over a period of 10 years is problematic. The underpinning for his conclusion appears to be in paragraph 81 of his reasons wherein he stated:

> The loss of the 6% royalty and the loss of the advertising fees for ten years assumes that the plaintiff would have continued to be a franchisee or that another franchisee would have been found for the plaintiff's location. *While that assumption is fair enough,* the claim must be subject to a duty to mitigate, that is, the defendant had an obligation to mitigate its damages by locating another franchisee in the same territory where the plaintiff was continuing to operate. Indeed, the defendant did exactly that when it sold a franchise to Mr. Kim, an

existing franchisee, to operate a franchise outlet on Cumberland Street which is just north of the plaintiff's location [emphasis added].

I am of the opinion that the trial judge erred in assessing damages based on this assumption.

**136**    In assessing damages the onus is on Print Three to prove its damages on a reasonable preponderance of credible evidence. The trial judge was required to put Print Three in the same position it would have been in had the agreement been performed, that is, had Shelanu not competed for one year in a defined geographic area. Having regard to the trial judge's finding that Print Three was not entitled to Shelanu's business or lease once the franchise agreement ended, which I have upheld, another franchisee could not have been placed in Shelanu's location. The trial judge was not entitled to base his award of damages on an assumption that did not accord with the specific facts of this case. Print Three would not have had a franchisee in Shelanu's location. It would only have had, as it did, a franchisee located just north of Bloor and Cumberland.

**137**    The trial judge erred in principle in concluding that Print Three was entitled to damages based on the projected revenue stream from Shelanu's franchise less Mr. Kim's projected revenue over a ten-year period, the entire life of a franchise agreement. If Shelanu had observed the one-year non-competition clause in the franchise agreement, there is no evidence to suggest that all of Shelanu's customers would have become customers of the new franchisee. The Shelanu Print Three franchise was not the only copying business in the geographic area. The geographic restrictions contained in the one-year non-competition clause were five miles from one specific franchisee and seven miles from another. If Shelanu had moved its business just outside the geographic area, there is no evidence to suggest it would have lost all its customers or personal goodwill. As noted earlier, the evidence indicates that Shelanu targeted corporate and business accounts, not walk-in trade. After one year, Shelanu was entitled to compete again with Print Three within the same geographic area. There is no evidence that, after one year, Shelanu's goodwill would have been so impaired that many of its customers would not have returned to it.

**138**    Based on Shelanu's breach of the non-competition clause some damages must also be assessed for loss of revenue to Mr. Kim over one year. The figures for all forty-two Print Three franchisees for the five years prior to October 1999, disclosed that the average franchisee paid approximately $25,000 annually in royalties and $4,700 annually in advertising fees. This figure was about one-half the annual royalties and advertising fees paid by Shelanu. The trial judge chose to adopt this average figure as the basis for his calculation and Print Three does not challenge it as being too low. By taking the average yearly sales of the average franchisee as his basis for awarding damages for loss of royalties and advertising fees the trial judge effectively took account of the complex contingencies that Shelanu's personal goodwill may not have been transferred to another franchisee and that Mr. Kim may not have been as competent as Shelanu in operating its franchise. In Martin v. Goldfarb (1998), 41 O.R. (3d) 161 (C.A.) at 187, Finlayson J.A. held that a defendant is not entitled to have damages assessed by guesswork when the party bearing the burden of adducing the evidence has failed to do so. However, where there are complex contingencies,

incapable of proof, a court must then do its best to assess the quantum of damages.

**139**    Having regard to these considerations, in addition to the franchise fee of $64,500, I would substitute an award of damages for one year's loss of revenue and advertising fees which, in accordance with the trial judge's figure for one year, I would fix at $29,700 for a total of $94,200.

IV.    Disposition

**140**    For the reasons given, I would allow both the appeal and cross-appeal as indicated. In view of the divided success on this appeal I would order that the parties bear their own costs.

WEILER J.A.
 AUSTIN J.A. -- I agree.
 LASKIN J.A. -- I agree.

* * * * *

Corrigendum
Released: August 5, 2003

Paragraph 62 now reads, "Print Three breached its obligation to pay Shelanu the royalty rebate in accordance with the oral agreement and, therefore, is liable for damages as found by the trial judge."

Paragraph 72, bullet #1, now reads, "Print Three's attempts to rescind the May 1995 agreement were not only a breach of that agreement but, in the circumstances, evinced a lack of good faith dealing by the franchisor;"

Paragraph 85 now reads, "The term "breach" is not used. The word "deficient" is defined in Webster's Dictionary, 1989 ed., as "inadequate"."

1 The present regulations to the franchise legislation in Ontario now require that the franchise agreement contain a statement of the franchisor's policy respecting setting up a competing business by it. The regulations also require that the franchisee be provided with a description of the franchisor's policy, if any, respecting the proximity between an existing franchise and another franchise granted by the franchisor that distributes similar products or services under a different trade-mark, trade name or logo. In the absence of such disclosure, ".... there is an expectation on the part of the franchisee that the franchisor will not establish a corporate or franchise location (or another business or channel of distribution) within such proximity or in

such a manner that would negatively effect the franchisee's business." See J.P. Hoffman, "Statutory Obligations of Fair Dealing and Good Faith in Canada" (2nd Annual Franchise Law Conference: A New Act, A New Era of Disclosure - One Year Later, Ontario Bar Association C.L.E., 22 February, 2002) [unpublished], at 22. Among the cases discussed are Supermarché A.R.G. Inc. v. Provigo Distribution Inc., [1997] A.Q. No. 3710 (C.A.), which held that Provigo owed the supermarkets bearing its name a duty to provide assistance and to support the franchise system and not to compete with it, particularly in the area of pricing. Provigo had breached its statutory duty of good faith under the Civil Code. Kelsey Group Inc. v. 75766 Ontario Ltd., [1990] O.J. No. 598 (H.C.J.) where notices of termination delivered by the franchisor to its franchisee were held to be a smoke screen to enable it to establish another franchise in the franchisee's territory; and Metro- Pacific Cellular Inc. v. Rogers Cantel Inc. et al. (1994), 57 C.P.R. (3d) 538 (B.C. Sup. Ct.), where the court held that Cantel could not compete directly with its non-exclusive dealer in downtown Vancouver.

Presumably one factor that would be a consideration as to whether the franchisor can set up a competing business is whether the franchisee has an exclusive territory.

2 In Hunter Engineering, supra, at para. 137ff. Dickson C.J. restricted his comments to the use of fundamental breach in the context of enforcing exclusion clauses in a contract and did not express an opinion on the other meaning of fundamental breach which he termed "substantial failure of performance" to relieve a party from future obligations under a contract.

*Case Name:*

# Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic

### RE: Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi, and
### Kyrgyz Republic and Kyrgyzaltyn JSC

[2014] O.J. No. 1815

2014 ONSC 2407

Court File No. CV-11-9419-00CL

Ontario Superior Court of Justice
Commercial List

**J.A. Thorburn J.**

Heard: December 17 and 18, 2013.
Judgment: April 15, 2014.

(73 paras.)

**Counsel:**

*G. Pollack* and *S. Frankel*, for the moving parties.

*B. Casey* and *C. Doria*, for the responding parties.

---

## ENDORSEMENT

J.A. THORBURN J.:--

*Relief Sought by Sistem*

**1**      Sistem seeks a declaration that the Kyrgyz Republic (the Republic) owns or has an equitable or other right, property or interest in Centerra shares registered in Kyrgyzaltyn JSC's name.

**2**      Sistem also seeks an Order permitting the Sheriff to seize enough of the Centerra shares (or dividend monies paid on those shares) in Kyrgyzaltyn JSC's name to satisfy Sistem's arbitral award.

*History of this Proceeding*

**3**      In 1992, Sistem entered into a joint venture with a Kyrgyz company to build the Hotel Pinara in Bishkek, the capital of the Republic. The Kyrgyz company went bankrupt and Sistem purchased its interest in the project. Sistem became the sole owner of the project in 1999. In 2005, Sistem was evicted from the Hotel Pinara at gunpoint and the property was expropriated.

**4**      Sistem commenced arbitration proceedings against the Republic pursuant to a bilateral investment treaty between Turkey and the Republic. An arbitral tribunal was constituted pursuant to the International Center for Settlement of Investment Disputes, an organ of the World Bank.

**5**      On September 9, 2009, the arbitral tribunal held that the Republic was legally responsible for the illegal expropriation of the Hotel Pinara and was ordered to pay to Sistem $8.5 million US plus interest and costs of over $600,000. The arbitral award is final and binding.

**6**      Sistem has tried to enforce the award without success.

**7**      On October 10, 2010 Sistem filed an Application in the Ontario Superior Court for an order recognizing the Award and rendering it enforceable in Ontario. The Republic was served but filed no responding materials.

**8**      On January 5, 2011 Echlin J. granted an Order recognizing and enforcing the award in Ontario and ordering the Republic to pay Sistem in accordance with the arbitration award.

**9**      In August 2011, Sistem brought a motion to add Kyrgyzaltyn as a party to this proceeding and to seek declaratory relief to permit the seizure of enough of the Centerra shares to satisfy the award. Both the Republic and Kyrgyzaltyn were served and neither filed responding materials. Cumming J. allowed Sistem's motion and found that "given the evidentiary record, Sistem has an arguable case that the subject shares in Centerra are properly subject to attachment in satisfaction of the Award." The Amended Notice of Application was issued and served on both the Republic and Kyrgyzaltyn.

**10**      In July 2012, Brown J. dismissed Kyrgyzaltyn's motion to set aside the Recognition Order. He also ordered that if the Republic intended to participate in this proceeding, it would have to file an appearance by September 1, 2012. It did not do so. That time was later extended to March 2013 but the Republic still did not participate.

**11**      On August 17, 2012, [2012] O.J. No. 3980, Strathy J. (as he then was) granted an *ex parte* motion for a Mareva injunction to prevent Kyrgyzaltyn's disposition of the Centerra shares or dividends declared on those shares. He found that "there is evidence to support Sistem's position that Kyrgyzaltyn holds the shares for the Republic" and "there are reasonable grounds to believe that there are assets of the Republic, or assets held for its benefit, in this jurisdiction." The Mareva injunction was extended by Newbould J.

**12**      Pursuant to the Mareva injunction, 4,000,000 Centerra shares registered in Kyrgyzaltyn's name remain frozen and more than $11.2 million in dividend monies are being held in trust to the credit of these proceedings.

*The Issues*

**13**     The key issue to be determined is whether the Republic owns the Centerra shares in the name of Kyrgyzaltyn JSC or has an equitable or other right, property or interest in those shares within the meaning of section 18(1) of the *Execution Act*. R.S.O. 1990 C.E-24 such that the Sheriff should be ordered to seize and sell them to satisfy the arbitration award against the Republic. The issue is not (as Kyrgyzaltyn suggests) whether Kyrgyzaltyn and the Republic are one and the same.

**14**     If the Republic has an interest in the Centerra shares, the Respondent Kyrgyzaltyn claims the Order should not be granted as the Republic was not properly served with this Application.

**15**     If the Republic does not have a right or other property interest in the Centerra shares. Kyrgyzaltyn seeks to lift the Mareva injunction so that it can dispose of the Centerra shares.

### The Circumstances Surrounding Kyrgyzaltyn's Acquisition of the Centerra Shares

**16**     Centerra is a publicly traded Canadian mining company that has extensive operations. Through its subsidiaries, Centerra operated the Kumtor gold mine in the Republic. Centerra's head office is in Toronto and its shares are traded over the Toronto Stock Exchange.

**17**     The Kumtor project is of great importance to the economy of the Kyrgyz Republic.

**18**     Originally, Kyrgyzaltyn JSC was a State Concern with no separate corporate existence. Under a plan of denationalization in 1999, Kyrgyzaltyn was created as an open Joint Stock Company wholly owned by the Republic through the State Property Fund. All assets previously owned by the State Concern were transferred to this new Corporation.

**19**     Kyrgyzaltyn owns 77,401,766 shares of Centerra. The Republic is Kyrgyzaltyn's only shareholder.

**20**     On December 31, 2003 the share ownership of the Kumtor mine was restructured. Centerra became the sole shareholder of Kumtor. Kyrgyzaltyn represented to Centerra that it was the "sole beneficial owner of and ... has all necessary legal ability and authority to sell and deliver the Kumtor stock."

**21**     In September 2004, the Republic passed a resolution directing the State Committee for Property Administration (as a shareholder of Kyrgyzaltyn), to pass a shareholder's resolution authorizing dividend funds from the sale of 7.5 million C shares to be given to the Republic.

**22**     In April 2009, Centerra, the Republic, Kyrgyzaltyn and others entered into an Agreement on New Terms.

**23**     The Agreement on New Terms was part of the settlement of a dispute between the Republic and Centerra concerning the Kumtor gold mine. The Agreement on New Terms provides for the issuance or transfer of more than 43 million Centerra shares to be registered in Kyrgyzaltyn's name. All of the consideration for these new shares was given by the Republic. In exchange for the issuance and transfer of these shares, the Republic expanded the Kumtor mining concession and implemented a more favourable tax regime for one of Centerra's subsidiaries. This was recorded in the Restated Concession Agreement to which Kyrgyzaltyn was not a party.

**24**     The Agreement on New Terms is governed by New York law.

**25**     Section 2.2 of the Agreement provides that the treasury shares would be issued to Kyrgyzaltyn so that "Kyrgyzaltyn will beneficially own" such shares and be "entitled to all the benefits arising from such shares". Other provisions in the agreement indicate that Kyrgyzaltyn holds the

shares of Centerra "on behalf of the Government". (The Government is referred to in these reasons as the Republic.)

### Positions of the Parties

#### A. Sistem's Position

**26**    Sistem claims the Republic owns or has a beneficial interest in the Centerra shares.

**27**    Sistem claims that as a matter of fact, the Republic owns or has an interest in the Centerra shares. The Agreement on New Terms expressly provides that the Republic has an interest in the shares of Centerra. Moreover, the Republic gave consideration for the Centerra shares issued pursuant to the Agreement on New Terms and the Republic approved the decisions concerning the disposition of the Centerra shares. The Republic's understanding that it owned the shares is evident from the public statements made by the Republic and others.

**28**    Sistem further claims that as a matter of Kyrgyz law, the Republic owns the Centerra shares. The Kyrgyz *Civil Code* permits the Republic to own property and the Republic purchased Centerra shares using Kyrgyszaltyn JSC as its vehicle. A special set of rules were enacted to control the Centerra shares. Moreover, Sistem claims the Republic exceeded its authority as a 100% shareholder of Kyrgyzaltyn.

**29**    Thirdly, Sistem contends that Kyrgyzaltyn does not and cannot own the Centerra shares. According to article 222 of the Kyrgyz *Civil Code*, in order to own shares, a party must have the right to possess, enjoy and dispose of property. Sistem claims Kyrgyzaltyn does not have the right to enjoy or dispose of the shares without the approval of the Republic.

**30**    In her affidavit, Ms. Smanalieva, Sistem's expert on the law of the Republic concludes that the Republic is the true owner of the shares and that Kyrgyzaltyn holds the Centerra shares on behalf of the Republic. She, unlike the Respondent's expert Ms. Molodanova, reviewed the Agreement on New Terms before providing her opinion.

**31**    The court should therefore find that the Republic has an interest in the shares within the meaning of section 18 of the *Execution Act* and the Sheriff should be ordered to seize enough of those shares to satisfy Sistem's arbitration award against the Republic because they are either held by or for the Republic.

### B. Kyrgyzaltyn JSC's Position

**32**    Kyrgyzaltyn JSC claims the Republic has no ownership or beneficial interest in the Centerra shares.

**33**    As a matter of fact, Kyrgyzaltyn keeps its own accounts, shares are registered in its name and dividends are paid to it. Kyrgyzaltyn is a large company specializing in the development of gold deposits. It participates in other ventures for the development of gold deposits. The terms of the Agreement on New Terms make it clear that Kyrgyzaltyn (not the Republic) is the owner of the Centerra shares:

>    (a)    the Agreement on New Terms provides for the issuance or transfer of more than 43 million Centerra shares to be registered in Kyrgyzaltyn's name;
>    (b)    Article 2.1(a) of the Agreement on New Terms provides that the Centerra shares are to be held, "for the benefit of and on behalf of Kyrgyzaltyn ...";

(c)    Section 2.2(a) provides that the Centerra shares "shall be issued by Centerra to Kyrgyzaltyn so that Kyrgyzaltyn will beneficially own and be entitled to all the benefits arising from (including the exercise of all rights attaching to) such shares, subject only to the terms of this Agreement on New Terms and the Restated Shareholders Agreement ..."; and

(d)    and resolutions enacted by the Republic direct its State Committee to call shareholder meetings as a shareholder of Kyrgyzaltyn not as an owner of the Centerra shares.

**34**    Although the Republic directed the State Committee to bring shareholder meetings and shareholder resolutions to transfer funds from Kyrgyzaltyn to the Republic, this was done in the Republic's capacity as sole shareholder of Kyrgyzaltyn.

**35**    Kyrgyzaltyn takes the position that the talk of share ownership on the part of the Republic and others is of no legal significance.

**36**    Kyrgyzaltyn submits that as a matter of law, there is nothing expropriating the shares from Kyrgyzaltyn nor does the Agreement on New Terms contain a provision that Kyrgyzaltyn is a trustee or agent of the Republic.

**37**    Ms. Molodanova, an expert in Kyrgyz law, states that the Republic, as 100% owner of the shares, had the legal right to make decisions regarding the disposition of those shares.

**38**    Frank Hebert, general counsel for Centerra, states in his affidavit that he is "aware that Kyrgyzaltyn was intended to be, and is, the beneficial owner and not merely the nominal owner of the shares of Centerra". He claims that although securities law disclosure recognizes that the Republic owns 100% of the shares in Centerra through its 100% control of Kyrgyzaltyn, this is not intended to change legal ownership.

**39**    Kyrgyzaltyn takes the position that even if the court determines that the Republic has an interest in the Centerra shares, the Sheriff should not be directed to seize them as the Republic was not properly served with this Application record and the affidavits and other evidence in support thereof.

**40**    If the Court finds the Republic does not have an interest in the Centerra shares, the injunction preventing Kyrgyzaltyn from enjoying or disposing of the shares should be lifted.

***The Law***

### A. How to Approach the Main Issue

**41**    The court must review the evidence, read the underlying Kyrgyz law, determine credibility and come to its own conclusion as to the "right, property or interest" in the Centerra shares within the meaning of the *Execution Act*. (*Ferranti-Packard Ltd. v. Cushman Rentals Ltd.* (1981), 30 O.R. (2d) 194 (Div. Ct.) aff'd (1981), 31 O.R. (2d) 799 (C.A.) at para 5, *Canada Life Assurance Co. v. Canadian Imperial Bank of Commerce* (1977), 14 O.R. (2d) 777) and *Lister v. McAnulty*, [1944] S.C.R. 317 at 5).

**42**    The Agreement on New Terms is governed by the laws of New York. Kyrgyzaltyn accepts that, for the purpose of this Application, New York law is the same as Ontario law. It is also agreed that the basic Canadian notions of corporate law apply in Kyrgyzstan.

***B. Kyrgyz Law***

**43**     Article 169 of the Kyrgyz *Civil Code* provides that, "bodies of state authority ... may ... acquire and exercise property and individual non-property rights and obligations. ... Other legal entities or citizens may act on behalf of the state."

**44**     Article 222 of the Kyrgyz *Civil Code* provides that there are three essential elements of ownership: the right to possess, enjoy and dispose of property. The right to enjoy is defined as the "right to use natural qualities of the property and to gain profit out of it." The right to dispose is defined as taking actions regarding the property "at his own discretion ... including the right to alienate his own property to the ownership of other persons and to pledge his property and encumber it".

**45**     Decree Number 1141-IV of the Kyrgyz Parliament dated April 30, 2009 provides that the Centerra shares transferred to Kygyzaltyn pursuant to the Agreement on New Terms are for "the benefit of the Kyrgyz Republic".

**46**     Article 38 of the Kyrgyz law on Joint Stock Companies (such as Kyrgyzaltyn) provides that decisions about the execution of major transactions, the size and procedure for payment of dividends, and the use of company funds are reserved exclusively for the general meeting of shareholders.

### C. Section 18 of the Execution Act

**47**     Section 18 of Ontario's *Execution Act* enables the sheriff to "seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property". Section 14 of the *Act* provides that every seizure and sale of an interest in security "shall include all dividends, distributions, interest and other rights to payment."

**48**     The wording of section 18 is broad. If the Republic has "any" equitable or other interest in the Centerra shares, Sistem can seize that right, property or interest.

**49**     The word "interest" in section 18 includes a beneficial interest. In *Banglar Progoti Ltd. v. Ranka Enterprises Inc.*, [2009] O.J. No. 1470 at paras 8 and 27-29 (Ont. S.C.) the court granted a declaration that the debtor had a 100% beneficial interest in real property that could be seized pursuant to a writ of seizure and sale.

**50**     In *Nishi v. Rascal Trucking Ltd.*, 2013 SCC 33, Rothstein J. on behalf of the Court, held that, "A purchase money resulting trust arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended that the person who advanced the funds would hold a beneficial interest in the property in proportion to that person's contribution."

**51**     Similarly, in *Hamilton v. Hamilton*, [1996] 92 O.A.C. 103 at para. 39, the court held that where there is a direct financial contribution to the acquisition of a property, there is a resulting trust in favour of the party that advanced the funds.

**52**     In *1454495 Ontario Inc. v. J=Systems Inc*. [2002] O.J. No. 486 at paras. 3 to 4 and 23 to 25, the court held that the debtor's rights in certain shares constitute an interest that can be seized and sold pursuant to section 18(1) of the *Execution Act*, notwithstanding that another party also has significant rights in the shares. The court held that, "there are residual rights remaining [in the shares] which are subject to seizure and sale under the *Execution Act*."

### D. Analysis and Conclusion

**53**     The question to be determined is whether the Republic has legal right to or beneficial interest in the Centerra shares such that they can be seized to satisfy an award payable by the Republic.

*As a Matter of Fact, the Republic has an Interest in the Centerra Shares*

**54**     As a matter of fact, the Centerra shares issued pursuant to the Agreement on New Terms are controlled by the Republic as:

> (a)    although the Centerra shares in the Kumtor mine were put in the name of Kyrgyzaltyn JSC pursuant to the Agreement on New Terms, all of the consideration for those shares was provided by the Republic. (The Republic expanded the Kumtor mining concession and implemented a more favourable tax regime for one of Centerra's operating subsidiaries);
>
> (b)    Kyrgyzaltyn's management cannot make any decision concerning the Centerra shares without the Republic's approval. The Republic appoints the Board of Directors, the Audit Committee and management of Kyrgyzaltyn;
>
> (c)    substantially all proceeds from the sale of the shares and payment of dividends are deposited to the Republic. They are included in revenues of the State, not as dividends from corporate net profits; and
>
> (d)    the Republic is able to use the shares as collateral. (Although Kyrgyzaltyn claims it can use the shares as collateral, it has refused to substantiate this claim.).

**55**     The parties intended that the Republic would have an interest in the Centerra shares. In the Agreement on New Terms, the preamble provides that Kyrgyzaltyn, "holds shares in Centerra on behalf of the Government. Kyrgyzaltyn, together with the Government, (the "Kyrgyz Side") are the largest shareholders of Centerra".

**56**     I disagree with the position taken by Kyrgyzaltyn that the statement in the preamble that Kyrgyzaltyn, "holds shares in Centerra on behalf of the Government" has no operative effect. On the contrary, it is clear from the decision in *Disera v. Liberty Development Corp.* [2008] 63 R.P.R. (4th) 197 (O.C.A.) at para. 20, that the recital was considered in arriving at the interpretation of the intentions of the parties to that Agreement.

**57**     The "Kyrgyz Side" is defined in the agreement as "the Government of the Republic together with Kyrgyzaltyn". The "Kyrgyz Side" is referred to often in the Agreement:

> (a)    the ninth recital provides that "Centerra and its shareholders, including ... the Kyrgyz Side, have a vested interest in seeing the price of Centerra's shares increase";
>
> (b)    Section 2.4(d) refers to "Centerra shares held by the "Kyrgyz Side";
>
> (c)    Section 2.5(c) provides that the "Kyrgyz Side" shall have no restrictions on the transfer or encumbrance of any common shares it holds ...'; and
>
> (d)    Section 2.5(d) provides that, "Any common shares held by the Kyrgyz Side shall be subject to the provision of section 3.8 of the 2004 Shareholders Agreement ..."

**58**     Members of the Republic, Centerra and others stated that the Republic was the owner of the Centerra shares held by Kyrgyzaltyn:

(a)   in a press release dated April 22, 2011, the Prime Minister of the Republic stated that "we have a 33% stake in Centerra";

(b)   in a memorandum submitted to the International Monetary Fund on June 2013, the Republic described Kyrgyzaltyn as part of its public sector;

(c)   in a central Asia newswire of May 2, 2011, there is reference to a Bishkek news agency reporting that the Deputy Prime Minister stated that the Kyrgyz government is looking to expand its stake in Centerra;

(d)   news reports from the Republic on August 14, 2012 provide that it had received or should shortly receive certificates;

(e)   in the Management's Discussion and Analysis (MD&A) section of the 2009 annual report of Centerra, it refers to the transfer by Cameco of 25.3 million common shares "to Kyrgyzaltyn", "to the Government" and "to the Kyrgyz Government"; and

(f)   in the MD&A in the 2010 annual statement of Centerra, there is reference to "the issuance of common shares to the Government". In an April 24, 2009 press release of Centerra, there is reference to an agreement to issue 18,232,615 common shares of Centerra to the Government and to the agreement of Cameco to transfer 23.5 million shares to the Government.

**59**    These statements are evidence that the Republic and Centerra believed the Republic had an interest in the shares.

*Kyrgyz Law Provides that the Republic has an Interest in the Centerra Shares*

**60**    Secondly, the Republic chose to enact special Kyrgyz laws and other rules to confirm the Republic's interest in the Centerra shares and control their use. For example,

(a)   Law number 142 incorporates the Agreement on New Terms into Kyrgyz law. It provides that if there is a conflict between the Agreement on New Terms and other legislation, the Agreement prevails;

(b)   Resolution 253 authorizes Kyrgyzaltyn "to receive and hold shares in the company Centerra Gold Inc., which are owned by the Government of the Kyrgyz Republic";

(c)   Decree Number 1141-IV provides that the 43 million Centerra shares transferred pursuant to the Agreement on New Terms are for "the benefit of the Kyrgyz Republic";

(d)   Order Number 495-R, establishes a commission to "develop proposals for the effective use of the shares of the Kyrgyz side in the company Centerra Gold Inc." The Deputy Minister of State Property was a member of the commission; and

(e)   the Republic directed the State Property Fund to prohibit the sale of Centerra shares without an appropriate government resolution and ordered that proceeds from the sale of Centerra shares be used in the manner determined by the Republic. According to its enabling legislation, the State Property Fund "represents the interests of the state as owner of state property."

**61**　In 2006 and 2011 the Republic convened working groups to advise the Republic as to how shares could be effectively used. This occurred outside the framework of the shareholders meeting and outside the scope of powers given to Joint Stock Companies as set out in Article 38 of the *Civil Code*. Moreover the funds were assigned to the Republic's revenues as "future dividends" to be declared by Kyrgyzaltyn, a move that is not permitted under Kyrgyz law.

*The Republic has an Interest in the Centerra Shares*

**62**　I accept Kyrgyzaltyn's position that it is a large company with other interests. However, insofar as the Centerra shares issued pursuant to the Agreement on New Terms are concerned, Kyrgyzaltyn acted in accordance with instructions of the Republic and had no real control over the use or disposition of those shares independent of the Republic.

**63**　However, one party may have a beneficial interest even where another party also has an interest in the property. (See *Nishi v. Rascal Trucking Ltd.*, and *1454495 Ontario Inc. v. J=Systems Inc.* cited above.)

*The Republic Had the Opportunity to Participate in this Application*

**64**　The Republic was party to the arbitration proceeding brought by Sistem. It refused to pay the arbitration award. Thereafter the award was recognized by the Ontario court. Kyrgyzaltyn was added as a party to the Application to enforce the award. This Application is in furtherance of the payment of the arbitration award as in this Application, Sistem seeks to effect seizure of the Centerra shares registered in the name of Kyrgyzaltyn in order to satisfy the arbitration award against the Republic.

**65**　In two separate sets of reasons, Brown J. directed that if the Republic intended to participate in this application it would have to file an appearance. The Republic chose not to deliver any responding materials. This Court and the Court of Appeal have both dismissed requests by Kyrgyzaltyn to dismiss proceedings because the Republic had not been properly served. The Republic had ample notice of Sistem's request for relief and the opportunity to respond.

*Summary of Conclusions*

**66**　I find that the shares of Centerra held in the name of Kyrgyzaltyn pursuant to the Agreement on New Terms may be seized to satisfy the arbitration award against the Republic.

**67**　The Republic owns all of the shares in Kyrgyzaltyn and Kyrgyzaltyn owns the Centerra shares in question.

**68**　The Republic has a beneficial interest in the shares because it gave all of the consideration for the issuance of these shares, the terms of the Agreement refer to the "Kyrgyz Side" (which is defined to include the Republic and Kyrgyzaltyn), and the Republic has actual control over the Centerra shares. Special laws were enacted to effect that control pursuant to Kyrgyz law.

**69**　Kyrgyzaltyn has the right to manage the asset at the direction of the Republic.

**70**　The fact that Kyrgyzaltyn may be a large company with other interests is of no consequence as the question is not whether Kyrgyzaltyn has other interests separate and apart from those of the Republic, but rather whether these Centerra shares in the name of Kyrgyzaltyn can be seized to satisfy the arbitration award.

**71**     A declaration is granted that the Kyrgyz Republic has an equitable interest in the Centerra shares issued in the name of Kyrgyzaltyn pursuant to the Agreement on New Terms.

**72**     Moreover, in accordance with Section 18 of the *Execution Act*, the Sheriff shall seize the Centerra shares as the Republic has "an equitable or other interest" in them. In accordance with Section 14 of the Act, that interest includes "all dividends, distributions, interest and other rights to payment."

**73**     The Application is granted. The Applicant is entitled to its party and party costs. If the parties cannot agree on the quantum of costs payable, they may provide me with brief written submissions and a Bill of Costs within 14 days.

J.A. THORBURN J.

*Case Name:*

# Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic

### RE: Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi, Applicant, and Kyrgyz Republic and Kyrgyzaltyn JSC, Respondents

[2012] O.J. No. 4105

### 2012 ONSC 4983

Court File No. CV-11-9419-00CL

Ontario Superior Court of Justice
Commercial List

### F.J.C. Newbould J.

Heard: August 27, 2012.
Judgment: September 4, 2012.

(42 paras.)

*Civil litigation -- Civil procedure -- Injunctions -- Ex-parte injunctions -- Extension of injunctions -- Preservation of property -- Mareva injunctions -- Application by Sistem to extend a Mareva injunction to freeze common shares in Centerra Gold nominally held by respondent Kyrgyzaltyn and to prevent Kyrgyzaltyn from removing share certificates from Ontario and to freeze dividends payable allowed -- Applicant sought to enforce arbitration award obtained against respondent Republic -- Republic wholly owned shares of Kyrgyzaltyn -- Sistem had established strong prima facie case that the shares held by Kyrgyzaltyn ware held for benefit of Republic -- Real risk that the shares would be removed and a real risk that the dividends, if paid to Kyrgyzaltyn, would be removed.*

Application by Sistem to extend an August 2012 Mareva injunction. Sistem sought to freeze 4,000,000 common shares in Centerra Gold nominally held by the respondent Kyrgyzaltyn JSC and to prevent Kyrgyzaltyn from removing from Ontario share certificates evidencing those shares. Sistem also sought an order requiring Centerra to hold $3,080,000 in trust to the credit of this

proceeding, being an amount equal to a dividend payment that Centerra would otherwise make to Kyrgyzaltyn. A 2009 arbitration order required the respondent Kyrgyz Republic to pay to Sistem US $8.5 million for the illegal expropriation of a hotel owned by Sistem in the Republic. The Republic refused to pay the award. The Republic wholly owned the shares of Kyrgyzaltyn. Sistem argued Kyrgyzaltyn held the Centerra shares in trust for the Republic. Sistem had obtained an order recognizing and enforcing the arbitration award in Ontario. Sistem now sought to enforce the award against the Centerra shares. Kyrgyzaltyn's primary contention was that there was no evidence that Kyrgyzaltyn held the Centerra shares for the Republic. Sistem was concerned that if the share certificates for the shares were physically transferred to the Republic they would not be capable of being seized by the sheriff to satisfy the award and Sistem's efforts to enforce the award would be frustrated.

HELD: Application allowed. Sistem had established a strong prima facie case that the shares of Centerra held by Kyrgyzaltyn ware held for the benefit of the Republic. An agreement amongst the Republic, Kyrgyzaltyn and others under which Cameco, a large shareholder of Centerra, agreed to exit Centerra and transfer its shares to Kyrgyzaltyn provided evidence that indicated that Kyrgyzaltyn held the shares of Centerra for the benefit of the Republic. Press release statements also indicated that the shares of Centerra held by Kyrgyzaltyn were held for the Republic. While the evidence was limited concerning efforts to remove the shares from this jurisdiction, it was consistent with the course of conduct of the respondents in taking every possible measure to avoid payment of the award. There was a real risk that the share certificates would, if not already removed from Canada, be removed and a real risk that the dividends, if paid to Kyrgyzaltyn, would be removed.

**Statutes, Regulations and Rules Cited:**

Securities Act, R.S.O. 1990, c. S.5,

**Counsel:**

Steven G. Frankel, for the Applicant.

J. Brian Casey and Christina Doria, for the Respondents.

John A.M. Judge, for Centerra Gold Inc.

---

## ENDORSEMENT

**1    F.J.C. NEWBOULD J.**:-- This is a motion by Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi ("Sistem") to extend the order of Justice Strathy dated August 17, 2012, which

granted relief in the nature of a Mareva injunction. In essence, Sistem seeks to freeze 4,000,000 common shares in Centerra Gold Inc. ("Centerra") nominally held by Kyrgyzaltyn JSC ("Kyrgyzaltyn"), and to prevent Kyrgyzaltyn from removing from Ontario share certificates evidencing those shares. Sistem also seeks an order requiring Centerra to hold $3,080,000 in trust to the credit of this proceeding, being an amount equal to a dividend payment that Centerra will otherwise make to Kyrgyzaltyn on August 30, 2012.[1]

**2**    On September 9, 2009, an arbitration panel constituted pursuant to the International Center for Settlement of Investment Disputes ("ICSID") Additional Facility Rules ordered the Kyrgyz Republic (the "Republic") pay to Sistem US $8.5 million, plus certain costs and interest (the "Award"). The arbitration concerned the illegal expropriation of the Hotel Pinara, a hotel in Bishkek, the capital of Kyrgyzstan, owned by Sistem. The arbitration panel found that the Republic was responsible for the expropriation.

**3**    Despite retaining counsel and actively participating in the arbitration, the Republic has refused to pay the Award. It has also rejected the validity of judgments recognizing the Award in France and Switzerland.

**4**    On October 8, 2010, Sistem commenced an application in this Court for an order recognizing and enforcing the Award. Despite being given notice of the application, the Republic did not file material or appear. On January 5, 2011, Echlin J. made an order recognizing the Award as an award of this Court.

**5**    Centerra is a publicly-traded Canadian mining company that has extensive operations in Asia and, though subsidiaries, operates the Kumtor gold mine in the Republic, one of the largest gold mines in the world. Centerra's head office is in Toronto, it is a reporting issuer under the *Securities Act,* R.S.O. 1990, c. S.5 and its shares are traded over the Toronto Stock Exchange.

**6**    Kyrgyzaltyn, a state-owned enterprise wholly-owned by the Republic, nominally holds 77,401,766 Centerra shares. Sistem maintains that the true owner of the shares is the Republic. Sistem is seeking to enforce the award against those shares, and has therefore sought declaratory relief from this Court that, if granted, would permit the seizure of enough of those shares to satisfy the award.

**7**    Having obtained the order from Echlin J., Sistem sought to enforce the Award. On February 11, 2011, the Registrar of this Court issued a Writ of Seizure and Sale directing the Sheriff of the City of Toronto to seize and sell the real and personal property of the Republic sufficient to satisfy the Republic's judgment debt to Sistem. Sistem asked the sheriff to enforce the Writ by seizing the Republic's beneficial interest in the Centerra shares. Ultimately, however, the sheriff was unwilling to do so.

**8**    Sistem also caused the Registrar to issue a Notice of Garnishment against Centerra in respect of existing or future debts owed by Centerra to the Republic. Centerra has denied that any such debt

exists, and has not paid any money to the Sheriff pursuant to the Notice of Garnishment.

**9**    On May 3, 2011, Sistem brought a motion for a declaration that (i) the Republic beneficially owns the Centerra shares and (ii) the Sheriff may seize those shares pursuant to the Writ. Neither the Republic nor Kyrgyzaltyn responded to the motion. Centerra, however, did oppose the motion, which was adjourned sine die on June 8, 2011.

**10**    On August 22, 2011, Sistem brought a motion to add Kyrgyzaltyn as a party to the Application. The Republic and Kyrgyzaltyn were provided with notice of the motion, but again did not appear. As before, Centerra opposed the motion.

**11**    The motion was heard by Cumming J. on September 29, 2011, after the matter was transferred to the Commercial List. On September 30, 2011, Justice Cumming delivered reasons allowing Sistem's motion. Among other things, Justice Cumming found that Centerra had no standing.

**12**    After the Amended Notice of Application was issued and served, Kyrgyzaltyn filed an appearance and then brought two motions. The first was to set aside the order of Echlin J. on the basis that the Court had no jurisdiction. The second was to stay any determination of the share ownership issue in favour of the Courts of the Republic on the basis of *forum non conveniens*. Centerra supported Kyrgyzaltyn's jurisdiction motion.

**13**    On July 25, 2012, Mr. Brown J. dismissed Kyrgyzaltyn's motions. He directed the parties to attend at a 9:30 a.m. chambers appointment before him in order to present a timetable and plan for the adjudication of the remainder of the Application, that is, the share ownership issue. Further, he directed the Republic to file an appearance by September 1, 2012 and be present at the chambers appointment, if it wanted to participate in the proceedings at all.

**14**    On August 14, 2012, Sistem became aware through news reports from the Republic that Kyrgyzaltyn either has received or will shortly receive certificates in respect of 74,551,766 of the 77,401,766 shares. The reports further indicate that the certificates have been or will soon be moved out of Ontario and to the Republic. One report quotes the Prime Minister of the Republic as calling this event "historical". The remaining 2,850,000 shares nominally held by Kyrgyzaltyn are pledged to Centerra.

**15**    On August 17, 2012, Sistem brought an *ex parte* motion for relief in the nature of a Mareva injunction. Strathy J. granted the motion. See *Sistem v. Krygyz Republic*, 2012 ONSC 4751 (CanLII). His order provided that it would expire in 10 days unless Sistem applied to extend it. Sistem now applies to extend his order for a further 90 days.

**16**    Sistem's evidence is that the shares of Centerra had a market price on August 15, 2012 of $6.67 per share. At this price, the Award could be satisfied by the seizure and sale of less than 2,000,000 shares. There has, however, been considerable volatility in Centerra's share price, which has had a 52 week high of $23.69. There could be further volatility in the share price. In the

circumstances, Sistem asked for an order freezing 4,000,000 shares, which Strathy J. granted.

**17** Centerra announced that in August 30, 2012 it will pay a dividend of $0.04 per share to shareholders of record as of August 17, 2012. This will entitle Kyrgyzaltyn to a payment of $3,080,000. Sistem asked for an order that such amount and any further dividends to be paid to Kyrgyzaltyn be held in trust by Centerra to the credit of this proceeding, which Strathy J. ordered.

**18** The Republic has not appeared to defend this motion by Sistem to extend the Mareva injunction ordered by Strathy J. Kyrgyzaltyn has appeared and opposes the motion. It has not filed any evidence. Thus the evidence on this motion is the evidence that was before Strathy J.

**19** Centerra has appeared only for the limited purpose of seeking consent amendments to the order of Strathy J. to deal with what are said to be ambiguities in the order.

**20** The tests for granting a Mareva injunction are well known and need not be repeated here. See *Chitel v. Rothbart* (1983), 39 O.R. (2d) 513. One requirement is that the moving party must establish a strong *prima facie* case.

**21** Kyrgyzaltyn primary contention is that Sistem has not established any case, let alone a strong *prima facie* case, as there is no evidence that Kyrgyzaltyn holds the Centerra shares for the Republic. I do not agree, and essentially agree with the reasons of Strathy J. in granting the Mareva injunction in the first place.

**22** Kyrgyzaltyn asserts, and I agree, that the fact that shares are held by a subsidiary does not in itself mean that they are the asset of the parent. Kyrgyzaltyn asserts that there is no evidence that the shares of Centerra held by Kyrgyzaltyn are held on any basis on behalf of the Republic that wholly owns the shares of Kyrgyzaltyn. I do not accept that assertion.

**23** Kyrgyzaltyn relies on an agreement amongst the Republic, Kyrgyzaltyn, Cameco, Centerra and Kumtor under which Cameco, which was a large shareholder of Centerra, agreed to exit Centerra and transfer its shares to Kyrgyzaltyn. The agreement provided that approximately 25.3 million shares of Centerra owned by Cameco would be transferred to Kyrgyzaltyn and that an additional approximately 18.2 million shares would issued by Centerra from treasury to Kyrgyzaltyn. The agreement provided expressly in section 2.2 that the treasury shares would be issued to Kyrgyzaltyn so that "Kyrgyzaltyn will beneficially own" such shares and be "entitled to all the benefits arising from such shares". Kyrgyzaltyn asserts that that is the end of the matter and that it is Kyrgyzaltyn and not the Republic that beneficially owns the shares of Centerra.

**24** I note that section 2.2 does not deal with the 25.3 million shares of Centerra to be transferred under the agreement by Cameco. It may be that section 2.2 was intended to mean that so far as Centerra was concerned, it was Kyrgyzaltyn that was entitled to act as beneficial owner of those treasury shares issued to Kyrgyzaltyn. But there are other provisions in the agreement that indicate that Kyrgyzaltyn holds the shares of Centerra for the benefit of the Republic.

**25**    The preamble to the agreement provided-

> Whereas Cameco... and Kyrgyzaltyn, which holds shares in Centerra on behalf of the Government (Kyrgyzaltyn, together with the Government, the "Kyrgyz Side") are the largest shareholder of Centerra;

**26**    This is a clear statement that Kyrgyzaltyn holds its shares of Centerra on behalf of the Republic. Moreover, section 2.5(c) provided that the "Kyrgyz Side [meaning the Republic and Kyrgyzaltyn] shall have no restrictions on the transfer or encumbrance of any common shares it holds..." (Underlining added) and section 2.5 (d) provided that "Any common shares held by the Kyrgyz Side shall be subject to the provision of section 3.8 of the 2004 Shareholders Agreement..." These provisions indicate a clear intention that the Republic is a shareholder in Centerra.

**27**    There are other indications that the shares of Centerra held by Kyrgyzaltyn are held for the Republic. In a press release of April 22, 2011, the Prime Minister of the Republic was quoted as saying that "we have a 33% stake in Centerra". In a central Asia newswire of May 2, 2011 there is reference to a Bishkek (the capital of Kyrgyzstan) news agency 24.kg reporting that the Deputy Prime Minister made the statement that the Kyrgyz government is looking to expand its stake in Centerra.

**28**    There are statements from Centerra that indicate that so far as Centerra is concerned, the holding of its shares by Kyrgyzaltyn is a holding by the Republic. While these statements are not directly by Kyrgyzaltyn or the Republic, they are statements of Centerra management about a very important shareholder. In the Management's Discussion and Analysis (MD&A) section of the 2009 annual report of Centerra, it refers to the transfer by Cameco of 25.3 million common shares "to Kyrgyzaltyn", "to the Government" and "to the Kyrgyz Government". In the MD&A in the 2010 annual statement of Centerra, there is reference to "the issuance of common shares to the Government". In an April 24, 2009 press release of Centerra, there is reference to an agreement to issue 18,232,615 common shares of Centerra to the Government and to the agreement of Cameco to transfer 23.5 million shares to the Government.

**29**    Sistem has filed expert evidence of Ms. Mirgul Smanalieva, an expert in Kyrgyz law, to the effect that under the law of the Republic, the Republic is the owner of the Centerra shares and that Kyrgyzaltyn holds the Centerra shares on behalf of the Republic. She further opines that the shares and any dividends are the property of the Republic and may be seized in satisfaction of the arbitration Award. This report was known to Kyrgyzaltyn at the time of the hearing before Brown J., although not relevant then as the issue was *forum non conveniens*, but to date no opposing expert opinion has been produced.

**30**    Kyrgyzaltyn points to the affidavit of Mr. Frank Hebert, the general counsel and corporate counsel of Centerra. He states in his affidavit that it is made in support of Centerra's interest in the motion. I fail to see any interest Centerra has in the motion, as it involves a question which should be irrelevant to Centerra. Whatever the court decides will be binding on Centerra, which should

have no interest in who between Sistem or Kyrgyzaltyn is right. The fact that Centerra has in prior motions sought to intervene to support the position of Kyrgyzaltyn and the Republic is an indication that Centerra is not being entirely neutral in this matter.

**31**    Mr. Hebert states in his affidavit that he is "aware that Kyrgyzaltyn was intended to be, and is, the beneficial owner and not merely the nominal owner of the shares of Centerra". He says this is set out in section 2.2 of the agreement I have referred to. He says that Centerra has always observed this provision and has paid dividends directly to Kyrgyzaltyn. I can understand that as between Centerra and Kyrgyzaltyn, Centerra deals with Kyrgyzaltyn as the holder of the shares. But that does not deal directly with the question of who between the Republic and Kyrgyzaltyn is the beneficial owner of the Centerra shares. His statements are contradictory to the position of Centerra in its MD&A statements and press releases. I see the statement of Mr. Hebert as mainly argument.

**32**    In my view, Sistem has established a strong *prima facie* case that the shares of Centerra held by Kyrgyzaltyn are held for the benefit of the Republic. This of course does not mean that Sistem will necessarily succeed on this point at the trial of the action, if it proceeds that far, but I am satisfied, as was Strathy J., that the case of Sistem is sufficiently strong to say that a strong *prima facie* case has been established.

**33**    Kyrgyzaltyn also contends that there is no evidence of a risk that there will be a dissipation of assets. In answer to a question from the bench, Mr. Casey said that Kyrgyzaltyn would make no undertaking to retain the dividends it will receive from Centerra, and no undertaking regarding the shares except in the alternative. That is a clear indication that any dividends it obtains will be given to the Republic, which is consistent with the evidence that the Republic intends to cause the dividends to be transferred to the Republic.

**34**    A judgment creditor need not invariably provide direct evidence that there is a risk of removal or dissipation of assets. Rather, such a risk can, in an appropriate case, be inferred from the circumstances. See *Sibley & Associates LP v. Ross*, 2011 ONSC 2951 at para. 63.

**35**    Sistem is concerned that if the share certificates for the shares are physically transferred to the Republic they will not be capable of being seized by the sheriff to satisfy the Award and Sistem's efforts to enforce the Award will be frustrated. Sistem believes that this activity is designed to put the Shares beyond the reach of this court and to avoid the enforcement of the judgment in favour of Sistem. Under the *Securities Transfer Act* S.O. 2006, c. 8, an interest in a certificated security may only be seized by seizing the actual certificates (subject to limited exceptions that do not apply). Thus, if the certificates are moved to the Republic, the sheriff will be unable to seize them and the Republic will have made itself judgment-proof with respect to the shares.

**36**    Mr. Casey stated in argument that the share certificates of Centerra have already been moved to the Republic. This is consistent with press reports emanating from Kyrgyzstan that the certificates have or will shortly be received by Kyrgyzaltyn and that the Prime Minister of Kyrgyzstan had described this event as historical. Mr. Casey asserts that where the certificates are

located is not important as the share register of Centerra is in Canada and the court can make whatever order regarding the shares that it deems appropriate. Sistem points out that it is by no means certain that if a Canadian court ordered the share certificates to be returned that Kyrgyzaltyn would obey the order. The Republic has made it clear that it will do everything in its power to avoid paying Sistem the amount of the Award, and there is no reason to think that it would not direct Kyrgyzaltyn to ignore an order of this court.

**37**   Kyrgyzaltyn also contends that it is overkill to tie up both 4 million common shares of Centerra and the dividends of $3,080,000. It contends that the shares are more than enough. However, taken the attempts by both the Republic and Kyrgyzaltyn to prevent recognition and payment of the Award and to spirit away the share certificates, I think it appropriate that the dividends to be tied up.

**38**   I agree with Strathy J. in his conclusion that while the evidence is limited concerning efforts to remove the shares from this jurisdiction, it is consistent with the course of conduct of the respondents in taking every possible measure to avoid payment of the Award and the coincidence of this action being taken within a few weeks of the order of Brown J. cannot be overlooked. In my view there is a real risk that the share certificates will, if not already removed from Canada, be removed and a real risk that the dividends if paid to Kyrgyzaltyn will be removed.

**39**   It was not argued that the balance of convenience favours Kyrgyzaltyn. However, I agree with Strathy J. for the reasons given by him that the balance of convenience favours the granting of the relief sought.

**40**   Kyrgyzaltyn also contends that there is no evidence that Sistem has any assets in Canada and that a letter of credit should be posted in support of its undertaking as to damages in an amount equivalent to the number of shares frozen at today's price. Whether an undertaking as to damages or security for it is required is a discretionary matter. In this case, I see no purpose in requiring a letter of credit for the value of the shares being tied up. The shares exist somewhere and will not be dissipated unless Kyrgyzaltyn or the Republic takes some steps to sell them. Mr. Casey says there is no intent to do that. The dividends will presumably remain in an interest bearing account.

**41**   Strathy J. held that he did not propose to order security for the undertaking in light of the substantial judgment Sistem has. I am of the same view.

**42**   In the circumstances the motion to extend the order of Strathy J. for 90 days is granted. With respect to the proposed changes to the order of Strathy J., Mr. Casey had not had a chance to review the proposed changes. If the parties cannot agree on the changes, the matter can be taken up with me.

F.J.C. NEWBOULD J.

cp/e/qlmdl/qlpmg/qlced

1 It was agreed that no interim order was required tying up the assets pending my decision on this motion, as under the language of the order of Strathy J., Sistem was required to apply for an extension of the order within 10 days, which it did, failing which the order would terminate.

*Indexed as:*

# Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

**Between
The Toronto-Dominion Bank, plaintiff, and
Peat Marwick Thorne Inc. in its capacity as Trustee of the
Estate of Leigh Instruments Limited, a Bankrupt: The Plessey
Company plc; GEC Siemens plc: and the General Electric
Company plc, defendants**

[1998] O.J. No. 2637

63 O.T.C. 1

40 B.L.R. (2d) 1

1998 CanLII 14806

81 A.C.W.S. (3d) 117

Court File No. 51353/90 and Commercial List Court File No.

B195/94

Ontario Court of Justice (General Division)
Commercial List

**Winkler J.**

Heard: January 13, 1997 to May 1, 1998.
Judgment: June 24, 1998.

(277 pp.)

*Banks and banking -- Letters of comfort -- Validity -- Contracts -- Formation of contract --
Intention -- Terms -- Representations -- Representation v. warranty -- Interpretation -- Ambiguity --
Contra proferentum rule -- Mistake -- Relief -- Rectification -- Fraud and misrepresentation --
Fraud and misrepresentation -- Negligent misrepresentation -- Elements of actionable
misrepresentation -- Reliance -- Fraudulent misrepresentation (deceit) -- What constitutes fraud.*

Action by Toronto-Dominion Bank against Plessey Company and GEC for damages for breach of contract and negligent misrepresentation. The action resulted from a letter provided by Plessey to the Bank on behalf of its subsidiary, Leigh Instruments. Leigh was a high-tech company that was involved in the defence industry. Plessey was a large British company that acquired Leigh in April 1988. Leigh had borrowed funds from the Bank prior to Plessey's acquisition. The Bank financed the takeover of Leigh. It could not obtain a guarantee from Plessey. It agreed to accept a comfort letter in order to obtain more business from Plessey. The letter stated that Plessey would not change its ownership position in Leigh until it provided prior notice to the Bank. It contained a policy statement that Leigh would be managed in a manner that would enable it to meet its financial obligations. As Leigh borrowed more money, new comfort letters were provided that replaced their predecessors. The Bank was consulted for the wording of some of the letters. It was given the opportunity to make modifications. The indebtedness started at $10 million and increased to $38 million because of Leigh's financial problems. In September 1989, GEC Siemens, a joint venture of General Electric and Siemens, completed a hostile takeover of Plessey. The joint venture conducted a review and division of the Plessey subsidiaries. In the interim, Leigh required more funds. The Bank agreed to increase the loan to $45 million, provided that it received a new comfort letter. The new letter, dated December 15, 1989, stated that it was not a legally binding commitment. It was accepted by the Bank. The Bank called Leigh's loan after the joint venture refused to guarantee it. Leigh made an assignment in bankruptcy on April 11, 1990. The Bank did not rely on Leigh's financial state. It knew that Leigh could not repay the loan without assistance. It submitted that Plessey had breached its promise to ensure that Leigh would meet its financial obligations. The Bank claimed that it was entitled to rectification to eliminate the statement that the letter was not a legally binding commitment. The Bank also submitted that the letter contained material misrepresentations, as Plessey was not involved in the management of Leigh, and it had no policy regarding its subsidiaries.

HELD: Action dismissed. The final comfort letter applied. It superseded the previous letters. It was accepted by the Bank. The defendants were not liable in contract because it was not a legally binding commitment. The letter was a representation and not a warranty. It did not contain a legally enforceable promise. It was merely a statement of present policy. The letter was not ambiguous. Rectification was not available because the Bank reviewed the letter and accepted it. The claims in tort also failed. The policy statement did not mislead the Bank. Statements made by Plessey and GEC personnel did not support the claim of misrepresentation. The statements were not made, did not mislead the Bank or were not relied upon by the Bank. The evidence did not support the fraud claim. Letters of comfort were not guarantees or formal security, and were not enforceable as such. They were moral obligations. They were only effective if the giver could be swayed by the negative effect non-compliance would have on its creditworthiness and reputation in the marketplace.

[Ed. note: Supplementary reasons for judgment released October 26, 1998. See [1998] O.J. No. 4221.

A Corrigendum was released by the Court September 3, 1998 and the corrections have been made to the text.]

**Counsel:**

John A. Campion, Peter Downard and Paul F. Monahan, for the plaintiff.
Earl A. Cherniak, Q.C., Robert J. Morris, Susan B. Wortzman and Lisa C. Munro, for the defendant the Plessey Company plc.
Peter F.C. Howard, Johanna Superina and Adrian C. Lang, for the defendant the General Electric Company plc.

---

**WINKLER J.**:--

Table of Contents

PART    I

INTRODUCTION
OVERVIEW
THE TRIAL
DISPOSITION
The Claim in Contract
The Claim in Tort


PART    II

THE EVIDENCE
The Bank and Leigh prior to April 1988
Spring 1988 - The Takeover by Plessey,
First Comfort Letter and
Amalgamation
The Second Comfort Letter
The Multi-Option Facility
September 1988 to April 1989 -
The Third Comfort Letter
The Fourth Comfort Letter and the Bulge
The GEC Siemens Takeover
Fall 1989 and the Fifth Comfort Letter
Winter - Spring 1990 - The Bankruptcy
of Leigh

The Parties' Understanding of Comfort
Letters
THE WITNESSES
The Bank Witnesses
The Plessey Witnesses
The GEC Witnesses
The Leigh Witness
The Expert Banking Witness


PAR
T

III

ISSUES AND LAW
OVERVIEW
The Claims in Contract
The Claims in Tort
Conduct outside the Comfort Letters
THE CLAIMS IN CONTRACT
PRINCIPLES OF CONTRACTUAL INTERPRETATION
Factual Matrix
Ambiguity
APPLICATION TO THE CIRCUMSTANCES OF
THIS CASE
Interpretation of the comfort Letter on
its Face
The Statement of Policy in the Third
Paragraph
The Factual Matrix
Ambiguity
Circumstances Leading up to the First
Comfort Letter
Evidence Regarding the Subsequent Comfort
Letters
Evidence of Subsequent Conduct
Contra Proferentem
Rectification
NEGLIGENT AND FRAUDULENT MISREPRESENTATION
THE LAW

Negligent Misrepresentation
1. There must be a Duty of Care based
on a "Special Relationship"
2. The Representation in Question
must be Untrue, Inaccurate
or Misleading
3. The Representor must have acted
Negligently in Making
the Misrepresentation
4. The Representee must have Relied,
in a Reasonable Manner, on the
Negligent
Fraudulent Misrepresentation
APPLICATION TO THE FACTS OF THIS CASE
Misrepresentation in the First Four
Comfort Letters
Existence of a "Special Relationship"
The Representation Must be Untrue,
Inaccurate or Misleading
The Plaintiffs Interpretation of the
Comfort Letter
Untrue, Inaccurate or Misleading
Fraud and Negligent Misrepresentation in
the Fifth Comfort Letter
Conduct Outside the Letters
Tantamount to a Guarantee
The Justice Statements
The Anderson Statement
The February 26 Memo


PART    IV

DAMAGES
The Claim in Contract
The Claim in Misrepresentation based on
the Comfort Letters
Conduct Outside the Letters

INTEREST


PAR  V
T
          CONCLUSION

APPENDIX A - Dramatis Personae

APPENDIX B - Corporate Structure

APPENDIX C - Leigh Loan Balances

**1**    This is an action on a comfort letter brought by The Toronto-Dominion Bank against The Plessey Company plc., the U.K. parent of a Canadian company Leigh Instruments Ltd., and one of Plessey's shareholders General Electric Company plc. The claim is for damages for breach of contract and in the alternative damages for the tort of negligent misrepresentation. The bank alleges fraud.

PART I

INTRODUCTION

**2**    The short unhappy life of Leigh Instruments Ltd. provides the centre-piece for this action. Leigh was a high-tech company on the leading edge of the Canadian defence industry. The events described here occurred during the brief period of two years from April 1988 to April 1990.

**3**    In April 1988, Leigh was acquired as the result of a successful takeover bid by The Plessey Company plc., a large U.K. company with a focus on electronics and defence products. A year and a half later, in September 1989, GEC Siemens plc, a joint venture consisting of General Electric Company plc. and Siemens A.G., completed a hostile takeover of Plessey. GEC has been described as the largest industrial enterprise in the U.K. Siemens is a vast German multinational company. Both companies are heavily into the electronics and defence businesses.

**4**    The Toronto-Dominion Bank is one of Canada's five main chartered banks with operations world wide. TD is the plaintiff in this action and was banker to Leigh. Over the two-year period in question Leigh's borrowing increased from nil at the time of the take-over by Plessey in April 1988, to $40.5 million in April 1990 when Leigh went into bankruptcy.

**5**    Although the Banks line of credit to Leigh was unsecured and the parent company had not formally guaranteed the loan, the Bank did have a letter of comfort issued in its favour by Plessey in respect of the Leigh loan.

**6**    In this proceeding, TD seeks to recover from Plessey and GEC the amount advanced by it to

Leigh. It bases its claim on the letter of comfort and alleges breach of contract and negligent misrepresentation. The bank also alleges fraud. My overview of the facts, key findings and points of argument follow.

OVERVIEW

**7**    Leigh's banking relationship with TD dated back to 1982. At that time Leigh was a public company with operations at Kanata, Ontario. In 1983 the bank had been concerned about Leigh's financial condition and the reliability of its security for the borrowing, to the extent that it considered forcing Leigh into bankruptcy or ridding itself of Leigh as a customer. With the assistance of a bank work-out specialist and the bank's co-operation, Leigh survived this crisis.

**8**    The relationship continued and on March 1, 1988, Leigh and TD entered into a facility agreement pursuant to which Leigh had a $5.4 million loan facility, secured by a floating charge debenture and an assignment of book debts. Leigh however, did not draw down on the facility and had approximately $10 million in its treasury. At the same time, Leigh had entered into a number of long-term, fixed-price contracts with the Canadian government to design and build defence products. Two of the largest programs were the Ship Interior Communications System Program (SHINCOM) and Tactical Air Navigational System Program (TACAN). All of this must have seemed attractive because at least two takeover bids for Leigh were mounted in the early spring of 1988.

**9**    The bid by the Plessey Company plc. through its acquisition vehicle Plessey Canada (1988) Inc. was successful and Leigh was acquired for $104 million in April 1988.

**10**    In order partially to assist with the financing of the acquisition, TD made available to Plessey Canada a $10 million uncommitted loan facility. This was a short-term acquisition loan, unsecured and payable on demand. It was understood that this facility would be re-paid from the $10 million in the Leigh treasury once Plessey had complete ownership of Leigh, expected to occur about three months later.

**11**    The loan was based on the creditworthiness of the parent company, since there were no financial statements for the acquisition vehicle, Plessey Canada. Operating in the mistaken belief, at least initially, that Plessey did not provide guarantees for loans to its subsidiaries but more pointedly because a guarantee from the parent company was not on offer, TD proposed that Plessey supply it with a letter of comfort, which Plessey agreed to provide. TD noted that a "strong letter of comfort" would be obtained by TD in London and forwarded to the bank in Toronto. The first comfort letter dated April 20, 1988 was sent to TD on April 27, two to three weeks after the funds were drain down.

**12**    The internal structure of the bank was such that Corporate Banking Division was responsible for direct customer contact, monitoring accounts, preparation of credit applications and documentation. Credit Division, on the other hand, was charged with reviewing credit risks to the

bank and approving loans subject to whatever terms it felt appropriate.

**13**    TD's willingness to accommodate Plessey, as demonstrated above, was it seems motivated to no small extent by its desire to retain the Leigh business in Canada, since it had no prior relationship with Plessey. TD also hoped to use this as a bridgehead for development of business with Plessey itself in Canada and abroad. Therefore, although the line with Plessey Canada was clearly a short-term bridge loan, TD put it through as an operating line. The facility contained no financial reporting provision.

**14**    Letters of comfort are at the heart of this proceeding. A letter of comfort is an improvisation of the banking industry which grew out of the increased competitiveness between banks, making it more difficult for banks to obtain parent company guarantees for loans to subsidiaries. A comfort letter may be described as a letter provided by a parent company to a bank concerning the borrowings of a subsidiary intended to give to the bank a degree of comfort about the transaction but also intended to fall short of a guarantee to repay the debts of the subsidiary. Comfort letters generally are not legally binding in terms of imposing an obligation to repay the debt of the subsidiary, and are perceived in the business world as moral agreements.

**15**    Typically a comfort letter may contain statements or obligations such as an acknowledgment of awareness of the debt facility, an obligation to maintain ownership of the subsidiary or to provide notice of any change in such ownership. It may contain a statement of general corporate policy.

**16**    Those commercial considerations which might impact on a bank's decision to accept a comfort letter as opposed to insisting on a formal and legally enforceable guarantee could include the overall relationship of the bank with the corporate group involved, its general reputation, the volume of business and profit margins that the bank enjoyed from them as well as the degree of risk inherent in the instant transaction. In short, the terms which comprise a letter of comfort will likely be negotiated individually, address some or all of the above issues and be somewhat idiosyncratic reflecting the respective bargaining power of the parties.

**17**    Moving from the general to the particular, the Plessey letter of comfort referenced the loan to Plessey Canada. It stated that Plessey would not change its ownership position in the subsidiary without providing prior notice to TD. Finally, it contained a policy paragraph which stated:

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc., be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts owing under the above facility.

Two points were clear. The Plessey letter of comfort was not formal security and it was not a formal guarantee. Nonetheless, Plessey included it in its guarantee register for convenience.

**18**    On June 30, 1988, Plessey Canada was amalgamated with Leigh; the new entity was known as

of July 1, 1988 as Leigh Instruments Limited. When it came time, however, to pay down the Plessey Canada loan from the funds in the Leigh treasury, as had been the plan, it was determined that the cash had been depleted. As a consequence, the loan was rolled over, with Plessey acknowledging on August 1, 1988, that the comfort letter applied to what was now a loan to Leigh. This became known as the second comfort letter.

**19**    The financial structure of Leigh was settled by Plessey and Leigh, largely in accordance with the initial plan, with approximately $25 million in equity and $69 million in inter-company debt owed to Plessey, plus the $10 million loan from TD. As a result of acquisition accounting adjustments made to bring Leigh's accounting policies into line with those of Plessey, the book value of the assets of Leigh was devalued from $51 million to $13 million. All of this was known to TD.

**20**    Deloitte, Haskins and Sells, Plessey's auditors, had prepared a due diligence report for Plessey prior to the acquisition of Leigh, in March, 1988. The report stated that Plessey's policies regarding valuation of inventory and revenue recognition were more conservative than those of Leigh. It noted also that there were missed milestones and projected margins regarding certain of Leigh's major contracts. It drew attention to liquidated damages consequences in certain of the contracts for delays. These prognostications boded ill for the future, for in the summer and fall of 1988 the bank loan began an upward climb due to these very problems, culminating ultimately in the bankruptcy of Leigh on April 12, 1990.

**21**    Although the bank was aware of all of this, it is clear to me that the preoccupation of the bank throughout this period was with its relationship with Plessey and business development. At the same time, the bank's credit division was concerned about the need for financial information from Leigh. The corporate banking division was less than diligent in obtaining such information for them.

**22**    In September 1988, it became apparent to Leigh and Plessey that Leigh would require an increase in its borrowing limit to $30 million to the end of December, due to slippage in production in the two major contracts, SHINCOM and TACAN. Notwithstanding that an existing facility letter between Leigh and the bank provided security for the demand loan in the form of a floating charge debenture and an assignment of book debts, and notwithstanding the existence of Plessey comfort letter number two, the bank extended the line of $15.4 million on a temporary basis only to October 31, 1988, due to the absence of audited financial statements, and in order to obtain fresh documentation and a new letter of comfort.

**23**    On October 6, 1988, Jonathan Exton manager of corporate finance at the bank's office in London, together with a Toronto-based vice-president of the bank, made a courtesy call on Ian Musgrave, group treasurer of Plessey. Leigh was discussed only briefly, the conversation centering on the banks 5 million pound participation in a Plessey 200 million pound Multi-Option Facility.

**24**    By the beginning of November, what had begun as a short-term bridge loan of $10 million to assist Plessey with the Leigh acquisition had been transformed in a little more than seven months

into an operating line of about $17 million to Leigh. The bank continued to be driven by a desire to retain the Leigh business, obtain the Plessey business in Canada from the Bank of Montreal, and to position itself to obtain $2 billion of business which it projected Plessey would generate in Canada over the next ten years. This hope had been expanded by TD's participation in the Multi-Option Facility. However, Leigh had not repaid the $ 10 million acquisition loan as planned, the acquisition accounting would significantly affect Leigh's balance sheet and income statement negatively, and Leigh's financial situation was deteriorating, as evidenced by the increasing bank loan. Although the bank's motivation had not changed, the underlying purpose and circumstances relating to the loan had shifted dramatically, without, it seems, the bank's Corporate Banking Division adjusting its approach to reflect this reality. Credit Division, mindful of the problem flew storm warnings throughout the bank saying that the facility should be regularized, and the bank should avoid being dragged along.

**25**    In the fall of 1988, Plessey requested that the bank release the Leigh Security. A further temporary increase or "bulge" to $20 million in the bank line was required in November, and it was expected that Leigh might need a further extension to $30 million. In this period Leigh went into an overdraft position several times. On December 16 Credit Division approved an increase to $25 million to regularize the exposure of more than $24 million, pending fresh documentation.

**26**    The bank, appeared to concede internally that the comfort letter did not amount to a formal guarantee, noting "we are confident Plessey will support Leigh as required". The concern was expressed that the parent might not honour the comfort letter in the event of a hostile takeover. In the context of commenting on the Jack of reliable financials for Leigh, the comfort letter was characterized by a Senior Vice-President Credit Division in a November note as "support, albeit informal" from Plessey. More conclusively, in the Corporate Credit Reviews of Leigh prepared by Corporate Banking Division and sent to Credit Division for processing, the bank consistently rated the risk of Leigh as opposed to that of Plessey thus making it clear that they did not hold the belief that the comfort letter was in the nature of a guarantee or that it constituted a legally binding obligation to pay.

**27**    In November, 1988, GEC Siemens launched a hostile takeover bid for Plessey, an earlier bid by GEC having failed in 1985. The bid was referred to the U.K. Mergers and Monopolies Commission in January, 1989. Jonathan Exton of the bank's London office met with a Plessey representative the day after the bid was announced and offered the bank's support in resisting the hostile takeover bid. Also around this time, the bank's account manager for Leigh, Greg Young expressed a concern in an internal memorandum that the comfort letter for Leigh might not be honoured in the event of a successful hostile takeover.

**28**    Leigh's borrowing came up for annual review by the bank in January 1989. Credit Division reviewed the request for an increase in the bank line to $35 million, and approved the requested release of security contingent upon a postponement of the inter-company debt of $69 million. This would subordinate the inter-company debt to the bank in which would now be unsecured. Also

required was a "strong" comfort letter in the same form as the second letter. The audited financial statements for Leigh as at June 30, 1988 and an unaudited balance sheet at September 30, 1988 were provided to the bank at this time.

**29**    As background, at the time of the January review, both Corporate Banking and the Credit Division were aware that: Leigh faced cash and working capital deterioration; Leigh had problems with major contracts; and that in light of the known details of the financial structure, debt and tax considerations of Leigh, Leigh could not support the debt on its own. The bank noted that the relationship with Plessey was growing, but remained cognizant of the outstanding hostile takeover bid.

**30**    Ultimately, over the next three months, the Corporate Banking Division took it upon itself to waive the Credit Division's condition that the inter-company debt be postponed and agreed to release its security over the assets of Leigh. Meanwhile however, because of its effect on the Leigh balance sheet and tax considerations, reasons entirely unrelated to the banking issues, Plessey decided to convert the Leigh intercompany debt to equity, capitalizing the debt as preferred shares, and thereby rendering the postponement of debt problem moot, effective April 1, 1989. The bank did not agree to remove its security over the assets of Leigh based on anything that Plessey said or did but rather for its own purposes.

**31**    On March 29, 1989. TD revised the $35 million facility, deleting reference to the inter-company debt. Security was to be released upon receipt of a revised comfort letter. On April 4 and 10, the form of the third comfort letter was approved by Plessey and TD respectively. On April 20, 1989 an executed comfort letter dated March 31, 1989 was delivered to the bank. The third comfort letter by its terms replaced the prior two. The $34 million facility letter was executed by Leigh on June 27, 1989, and an executed copy was received by the bank on July 21, accompanied by Leigh's year-end and quarterly financials. With this process completed Leigh had fulfilled the conditions set out in the April 7 letter from the bank for release of the security over its assets.

**32**    In the months that followed, attention within Plessey began to focus on defending against the hostile GEC Siemens bid. At Leigh the cash problems continued with a request of TD for a $4 million bulge from $34 to $38 million.

**33**    The negotiation and delivery of the new facility between Leigh and TD and third comfort letter between TD and Plessey took place over a period of some six months in early 1989. While this was happening two events of note occurred. The first was the launching of the GEC Siemens takeover bid of which mention has been made. The second was a decision of the English Court of Appeal, released February 2, 1989, which has a direct bearing in several ways on the instant case. Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd, [1989] 1 All E.R. 785 (C.A.) (Leave to appeal to the House of Lords refused) involved the enforceability of a letter of comfort and overturned the trial decision which had held that the comfort letter was enforceable. This was a landmark decision in the world of banking and commerce, not because of the result, which seems

not to have been unexpected, but rather due to the dearth of court authority on the subject. All parties to this proceeding were aware generally of both the trial and appeal decisions in Kleinwort Benson. The timing of the decision as it pertains to the case at bar is striking especially in light of the banks decision some six weeks later in March of 1989 to rest its exposure with Leigh solely on the comfort letter from Plessey.

**34**    In the summer of 1989, Leigh requested and received approval for a further temporary $4 million bulge from the bank, necessary due to delays in the SHINCOM and TACAN contracts. Plessey did not provide another comfort letter to secure the additional borrowing, although it undertook to do so if the funds were required beyond the end of August. Although TD made no request for delivery of the further comfort letter, Plessey nevertheless on September 7, forwarded a fourth comfort letter dated August 31, 1989 revised to cover the full amount of the Leigh borrowings. The letter was sent, in part, as a consequence of the impending hostile takeover. This letter was the same as the prior one except for the amount and by its terms replaced the earlier letters. Approval of the comfort letter was one of the last acts performed by Plessey group treasurer Ian Musgrave, before leaving the company on August 31, 1989.

**35**    During this period, Leigh also underwent personnel changes at the executive level. On August 8, 1989 Frank Driscoll took over as president of Leigh from Barry Flower who had departed Leigh for Plessey in June. At the very outset of his tenure, Driscoll began a review of progress on all major outstanding Leigh contracts. This revealed that the estimates to completion for both the SHINCOM and TACAN contracts were woefully inaccurate.

**36**    Slightly more than one week later, on August 17, 1989, GEC Siemens submitted its final offer for Plessey. The bid was successful on September 8, 1989, and GEC Siemens took over Plessey in late September.

**37**    Somewhat obliquely, the TD account manager Greg Young reported to Credit Division at TD on August 30, 1989 that the bank has enjoyed a long relationship with Leigh and a good relationship with Plessey. He commented mistakenly that the GEC Siemens takeover was unlikely to succeed before October 31st. He reported as well that he had met the new president of Leigh. He concluded with reference to goodwill generation and potential new business. He characterized the comfort letter as "quite strong" and his superiors concurred that the letter was "strong".

**38**    Shortly after the takeover, Young referred in a corporate credit review of Leigh to the hostile takeover, stated he was comfortable with the quality of GEC Siemens' credit, and expressed the hope of developing a relationship with GEC. On the other hand he identified a "significant weakness" in terms of the uncertain fate of Leigh as a result of the takeover. Canadian Marconi, a GEC subsidiary and client of the Royal Bank of Canada, might be merged with Leigh. Young noted ID had been unable to establish a relationship with GEC in London, despite several attempts. As of October 2, 1989, the Leigh loan was about $36 million.

**39**    September was a long month at GEC Siemens. Plessey was not a single business enterprise. It

consisted. between 1988 and 1989 of between 80 and 100 companies located in 43 different countries around the world. The strategy of the joint venture was a matter of public record. In the bid document made public in August 1989, the proposal was to disband Plessey and divide the spoils between GEC and Siemens 50-50; certain of its businesses were intended to be transferred 100 per cent to GEC; others 100 per cent to Siemens, with the remainder to remain within Plessey, where they would be operated jointly until such time as they were sold or otherwise disposed of.

**40**    The bid package revealed that Leigh was intended to be owned 100 per cent by GEC. Also noteworthy was the fact that Leigh was but a tiny piece of the Plessey pie. To put this in perspective, Leigh had comprised two per cent of the group sales of Plessey and three and a half per cent of its group assets. Plessey was a 1.5 billion pounds to 1.8 billion pounds company. The significance of Leigh paled even further in the context of GEC Siemens. GEC alone was a 6.5 billion pound company, and held over 100 companies world-wide prior to the Plessey acquisition. Both Plessey and GEC were holding companies with small, central staffs. Plessey was headquartered at Ilford, England. GEC maintained its head office at Stanhope Gate, in London. Plessey had arranged that the MOF would fund its acquisitions. GEC, on the other hand, was cash rich and referred to as a cash mountain with over 1 billion pounds in cash reserves on its balance sheet. Thus, in either case, Leigh and its borrowings did not make a significant impact within the framework of Plessey or GEC Siemens.

**41**    It was understood in a firm sense between GEC Siemens and the UK regulatory agencies that the Plessey companies would be divided or "hived-up" between the two parent companies by March 8, 1990. Additionally, there were constraints as to which company could acquire certain parts of Plessey. Indeed, it was a requirement of the bid approval by the Mergers and Monopolies Commission that Siemens, as a German company, was not permitted to own certain of the defence industry businesses. As a consequence, GEC and Siemens had to decide the ultimate destinations, and transfer ownership of all the Plessey companies by this deadline. As part of this process. GEC and Siemens had to agree on valuations for all the Plessey companies, since the division was to be approximately 50-50. The purchase price of Plessey was 2.2 billion pounds. Since the takeover was a hostile one, the new parents had very little information about the financial situation of the Plessey businesses. In essence, they walked into Plessey "blind". In addition, shortly after the takeover most of those Plessey executives who had not already resigned were terminated by the new owners. The departure of these executives signalled the departure of valuable information about the operation of the Plessey empire, and created hurdles for the new owners both in terms of valuing the companies and also their ongoing administration.

**42**    To fill this vacuum, each shareholder appointed a point person to act in concert as managing directors of Plessey. GEC's representative was Simon Weinstock, a GEC executive and manager and son of the GEC managing director Lord Weinstock. Siemens appointed Dr. Philip Gerdine, an experienced mergers and acquisitions accountant from its U.S. operation. Those companies slated to be transferred 100 per cent to either GEC or Siemens were to be supervised directly by the intended parent until the transfer was completed, while the companies to be held jointly within Plessey were

supervised through it.

**43**    Leigh was earmarked in the bid document to go to GEC. GEC in turn was considering a possible merger of Leigh with one of its Canadian subsidiaries, Canadian Marconi where there would be obvious synergies. Jonathan Exton learned of this possibility for Leigh on a goodwill call to David Newlands, finance director at GEC on October 3, 1989, although it was clear a final decision on the merger was not expected until mid-1990. The bank was made aware of GEC Siemens plan for Plessey when it received a refinancing package from the joint venture, GEC Siemens plan containing a copy of the bid document. As a consequence of the takeover, it was necessary to refinance Plessey, and on October 30, 1989, the joint venture company and Plessey invited some 40 banks on the open market to provide quotes for the refinancing. One of these was ID.

**44**    Due to the possible merger of Leigh with CMC, it was natural that GEC Marconi, also a GEC subsidiary would provide technical and finance people to assume responsibility for evaluating Leigh. To this end, David Newlands, GEC finance director, and David Rickard, finance director for GEC Marconi, visited Leigh on October, 20, 1989, to appraise Leigh. Newlands had in hand a briefing document from Colin Justice at Plessey who was assigned to Leigh, in which Justice alerted Newlands to the fact that the technical baseline at Leigh was sufficiently insecure that the financial results of the company could not be relied upon. Newlands was quick to identify problems at Leigh. He was critical of management, in particular David Dean, the vice-president of finance. Newlands concluded that Plessey's budgets for Leigh were hopelessly optimistic. Included in the material presented to Newlands and Rickard were the draft six-month financial results for the period ended September 30, 1989, which showed a cumulative loss of $2.858 million to the end of September and the bank line outstanding at approximately $36 million. Leigh was trading at a loss, absorbing cash, and there was no indication it would improve.

**45**    Plessey described Leigh internally in the August 1989 as a "major loss maker". Between the October 20 meeting at Kanata with Newlands and Rickard, and the end of November, Frank Driscoll provided numerous reports and financial information to GEC and GEC Marconi, as well as to Lord Weinstock personally. These included a President's report for October and revised half-yearly reports to September 30, 1989 with forecasts to the end of the financial year in March 1990. The seriousness of the problems at Leigh was apparent to Driscoll and the recipients of his reports, and were underscored by the variances from previous budgets and forecasts. Leigh was pursuing explanations for the variances from budget and gas seeking cost-cutting solutions. As of mid-November 1989 there was a variance from budgeted profit of negative $19 million.

**46**    Back at the bank, on October 3, 1989 account manager Greg Young sent to Leigh the facility letter for $38 million, which was to become the last facility agreement entered into by the bank and Leigh. Young stated that the facility was contingent upon the year-end financials at July 31, 1990 and referenced the fourth comfort letter. This was accepted by Leigh on October 26, 1989. The following day Dean returned the facility to Young, referred to problems with SHINCOM and

enclosed cash flow forecasts. There seems to have been no suggestion from anyone at TD that they seek to obtain a new comfort letter from GEC or Siemens.

**47**    Jonathan Exton, in England, was pursuing larger fish, and met with David Newlands on October 3 at Stanhope Gate to discuss possible new business with GEC, in his words, "to further our marketing relationship with GEC". They discussed the plan to dismantle Plessey and also Leigh's tax position and low profits.

**48**    As noted earlier, GEC, Siemens and Plessey on October 30, 1989 wrote to some 40 banks including TD with a view to replacing the Plessey MOF, which was to be cancelled on November 23. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a 50 million pound facility for Plessey to Ross Anderson, group treasurer for GEC. Plessey never drew down on the facility.

**49**    On October 31, 1989, Greg Young, the account manager for Leigh, left the bank's employ. He was replaced by Rob Wilson. Wilson was given the sparest of briefing by Young on his hand over, but was left on his own to review the files. Young and Wilson met once with Dean at Leigh. Wilson's supervisor at TD, Wendy Leaney also gave him little help in familiarizing himself with his accounts, which included the troubled Leigh. Wilson did not see or review the comfort letter.

**50**    Upon Ian Musgrave's departure from the position of finance director at Plessey on August 31, 1989, his duties had been assumed by his former assistant, Denise Beard. On November 3, 1989, Denise Beard also left Plessey. Beard had been deeply involved in Leigh's affair, particularly the first comfort letter and the details surrounding the lifting of security on the Leigh assets at the time of the negotiation of the facility agreement and the third comfort letter in early 1989. The exit of Musgrave, Young and Beard from the scene all at about the same time did not enhance the ability of TD and Plessey to adapt to the GEC Siemens takeover. To make matters worse, all Plessey's senior management left following the takeover, including managing director Stephen Walls, signatory, to the first four comfort letters. As replacement TD account manager Rob Wilson observed in a memorandum to file in late November 1989, Leigh's numbers were getting worse and the comfort letter was from the old Plessey management.

**51**    The unaudited quarterly financial statements of Leigh were due to be provided to the bank by Leigh, according to the terms of the facility agreement, by the end of October for the quarter ending September 30, 1989. These were not sent. On November 8, 1989, in a meeting with Young and Wilson, David Dean advised them the financial statements were unavailable due to the implementation of the purchase accounting adjustments necessitated by the GEC Siemens takeover. The bankers did not ask for any alternative financial information. Colin Justice of Plessey assisting at Leigh gave this identical explanation to the bank on December 21, 1989. Dean left Leigh on December 18, 1989, as part of a cost-cutting general layoff. Dean was replaced by his assistant,

Patrick Smith. Frank Driscoll, president of Leigh, was personally unaware of this reporting obligation to the bank. The bank was not provided with financial statements until March 21, 1990.

**52**    The figures reported by Leigh in October and November indicate the state of disarray of Leigh. At the October 20 meeting with Newlands and Rickard, Leigh reported a cumulative loss to September 30 of $2.85 million and the bank line at $36.081 million. Six days later in the Presidents Report for September, Driscoll reported a revised loss, to date, of $15.634 million and a bank loan of $37.17 million. Financial results for that period were due to the bank four days later. On November 17 in the Presidents Report for October, he reported a loss for the seven months to October 27 of $16.677 million and the loan at $38.534 million. At the end of November, at the six-month review at Stanmore, he reported a cumulative loss to September 30 of $18.850 million and a bank line of $38.745 as at November 24.

**53**    Leigh was in breach of the facility agreement by not providing to TD the unaudited quarterly financial statements, given that there were in fact some statements in existence, albeit not in the form that Leigh wished to provide. However, up until his departure in December, Dean spoke by telephone with Wilson, and conveyed to him some details of Leigh's cash flow position and the contract overruns. Although the messages were at best mixed, they were such that they ought to have given rise to questions which inexplicably were never put by the bank to Leigh.

**54**    The half-year review for Leigh was to take place at Stanmore in the U.K., the home of GEC Marconi, on November 28 and 29, 1989. In attendance were representatives of Leigh, GEC Marconi and GEC. Although Driscoll's approach was seen as positive, two serious problems were presented. To begin with, Leigh predicted a $19.6 million loss for the year. As a cost-cutting measure they proposed a staff reduction of 250 persons. Also, Leigh was preparing a plan for sale of its components division. Problems with the SHINCOM and TACAN contracts were reported in detail. Leigh was asked to re-attend later to deal with the operational problems.

**55**    To make matters worse however, Leigh was anticipating a problem meeting its payroll, and submitted a proposal for approval of an increase in its bank line from $38 million to $45 million. An increase to the borrowing limit of Leigh required prior approval of Plessey and GEC, in order for Leigh to make a request to the bank. David Newlands and Simon Weinstock considered the request and Newlands "reluctantly" approved the increase in the Leigh bank line, on the basis that any drawdown over $41 million had to be approved specifically by Anderson or someone else with similar authority. Leigh was given the go-ahead to request the increase from the bank.

**56**    Wilson at TD meanwhile, produced a detailed corporate credit review of Leigh on December 6, 1989, in which he referred to the proposed layoffs, an $8.4 million contract payment due to Leigh in early January, 1990, the support by Plessey in converting the intercompany debt to equity, and the possible sale to or merger with Canadian Marconi. As negatives, he referred to the dynamic of the defence industry, delay's and slow payments, and uncertainty about Leigh ultimate ownership. His recommendation of approval for the request for an increase to $45 million was accepted by

Credit Division on the condition that the fifth comfort letter be delivered by Plessey in the same form and substance as the fourth letter of August 31, 1989, especially the third paragraph, the policy paragraph noted above. These conditions were never communicated to Leigh, Plessey or GEC by anyone at TD. Wilson included reference in the CCR to TD's intention to bid on providing a fairness opinion in the event that the CMC purchase of Leigh proceeded, and reference to the London offices continued attempts to build a relationship with GEC.

**57**   At GEC, Ross Anderson was advised that David Newlands had approved the increase to Leigh's bank line. Anderson was charged with preparing the fifth comfort letter. Working on his prior experience, he revised the existing comfort letter, adding among other things an additional phrase which stated that the letter "... does not constitute a legally binding commitment". The police paragraph was unchanged. This letter, as had its predecessors, by its terms replaced the prior letters. Anderson ran the draft of the revised letter past David Newlands, who approved the wording, in a brief meeting in the corridor outside his office. Anderson then forwarded the letter to Plessey company secretary Bernard Huntbatch for his review and processing. Copies were sent to a number of GEC and Siemens executives, including the Siemens treasury person Andy Hafner and Dr. Gerdine. There were no representations to TD by anyone on behalf of Plessey that the letter would be in the same form as the prior letters. Nor were the conditions stipulated by Noonan regarding the comfort letter communicated by Wilson or anyone else to Plessey or to Anderson. The signed letter became the fifth comfort letter in the piece, dated December 15, 1989, received by the bank's London office on December 27. TD filed the letter without commenting on the changes to either Leigh, Plessey, GEC or Siemens. No one at TD acknowledges having read the comfort letter until sometime in April 1990. I find, however, that Wendy Leaney received, read and accepted the letter on behalf of the bank in January 1990.

**58**   The Leigh Presidents Report for November, dated December 14, 1989, recorded a loss of $18.6 million, $21.4 million below budget. The report was not sent to the bank.

**59**   On January 8 and 9, 1990 representatives of Leigh re-attended in London for budget meetings and to review Leigh's status. Leigh management were dispatched at the conclusion of this meeting to review five options available to the company. At the same time, GEC and Siemens were engaged in valuing the Plessey companies. On January 8, Exton and Wilson called Anderson at GEC from Canada to advise of Leigh's loan balance and to introduce Wilson. On January 11, Newlands wrote to Dr. Mackenrodt Vice President at Siemens, describing Leigh's situation as "very serious". Appended to the letter was a proposal showing Leigh in the Plessey rump of jointly-held companies rather than going to GEC.

**60**   In late January, representatives of Leigh and GEC Marconi were debating the intended future of Leigh, which had been expressed as a series of options at the meetings in early January. These options included shut down or wind down of Leigh, sale to a third party, or fold in to Canadian Marconi, the original plan. One of the options considered was to re-negotiate the TACAN and SHINCOM contracts with the Canadian Government. Newlands and Gerdine based on their

experience still thought this was a possibility. An $8.4 million payment was received from Paramax in mid-January, with a corresponding effect on the bank loan. One executive noted 'so far so good'. On February 1 and 2, 1990 representatives of Leigh and GEC Marconi met again to discuss Leigh's analysis of the five options.

**61**    Bill Alexander of GEC Marconi met Canadian government officials in Ottawa on January 22 and 23, 1990, in an attempt to negotiate some relief from the provisions of the government contracts. The government was advised of the "desperate situation" at Leigh, heavy losses on SHINCOM and acute cash problems. He reported back that there was some sympathy and that he was less pessimistic than previously. Simon Weinstock, appearing to be losing patience, contacted Shearson, Lehmann, an American investment banking firm, seeking an evaluation of Leigh. Copying Gerdine, Weinstock described the viability of the company as being in question. Other at GEC and Siemens disagreed. The prospect of Leigh going to CMC was still being debated.

**62**    On February 8, 1990, GEC and Siemens met to finalize the valuations and disposition of the Plessey companies. It was agreed that Leigh would be placed in the Plessey rump, to be held 50-50 until sold. Leading up to this, Dr. Gerdine had become involved with Leigh at the end of January 1990, at the insistence of Dr. Mackenrodt of Siemens. Shortly thereafter at the instance of Simon Weinstock, he met with Shearson Lehmann, the investment banking firm, to canvas the possibility of selling the three Plessey companies in North America, including Leigh, together as a package. By late January it is clear that GEC had decided not to take 100 per cent ownership of Leigh. Dr. Gerdine knew this around this same time, at least by February 8, 1990.

**63**    Newlands, since his visit to Leigh on October 20, 1989 had seen Leigh's long-term, fixed price contracts with the Canadian government as a problem. Dr. Gerdine was of the same view after becoming involved with Leigh in late January. Both were highly experienced in the defence industry and felt relief through contract re-negotiations was possible. It was commonplace in the industry for the customer to agree to re-negotiation, so why not here? This had been broached at meetings held with the Canadian government on January 22 and 23, 1990. Further such meetings, attended by Dr. Gerdine, took place on March 27.

**64**    A more serious problem however, was the technical problem with the contracts, in particular SHINCOM, and the issue of whether they could be performed by Leigh at all. As a consequence, the GEC Marconi technical review of Leigh was pivotal in the decision as to what was to be done with Leigh. The technical team assigned this task was dubbed the Red Team and their report was expected in early April, 1990. On February 28, Dr. Gerdine visited Leigh on behalf of Siemens, and was shocked by the projected year-end loss of $68.3 million. If this was accurate, he felt bankruptcy for Leigh was not out of the question. On March 6, Shearson Lehmann concluded Leigh was unsaleable to a third party, a view with which Simon Weinstock and Dr. Gerdine reluctantly agreed.

**65**    Frank Driscoll inadvertently brought the matter to a head. On February 26 he had become aware for the first time of the reporting obligation of Leigh contained in the facility letter with the

Bank. For some unexplained reason, he felt he needed the direction of GEC and Siemens before complying with this obligation. Despite repeated requests for such a direction, none was forthcoming, although Dr. Gerdine is adamant that he advised Driscoll orally to do so on at least two occasion, at the February 28 meeting and again on March 15. Finally, on March 21, 1990, not having heard from GEC, Driscoll instructed Pat Smith to send the financials to the bank.

**66**    In fact, the six-month results forwarded were outdated numbers which had been presented Newlands when he visited Leigh on October 20, 1989. However, the financial statements provided to TD also included the nine-month results to the end of December, 1989, which showed a loss of $21.3 million. Even this information was not sufficient to prod TD into action. It was not until Dr. Gerdine telephoned Wendy Leaney and Rob Wilson at the bank on March 26th or 27th, to inquire whether they knew what was going on at Leigh financially that they reacted to the data. As a consequence, the bank line was frozen on March 27, 1990 following Gerdine's indication that GEC and Siemens might not commit to the Plessey comfort letter.

**67**    GEC Siemens did not give up on Leigh without further effort. On April 9, 1990, Dr. Gerdine and others met again with Government officials in Ottawa, in the hope of negotiating contract relief, but to no avail. By this time, on April 3, the GEC Marconi technical RED Team had completed its review of SHINCOM, confirming that Leigh had serious technical problems and casting doubt on its ability to complete the contracts, absent new personnel and funding. When GEC and Siemens refused to guarantee the Leigh loan, the bank called the loan on April 11, 1990. The next day, on April 12, Leigh made an assignment in bankruptcy. Thus ended ignominiously the short, unhappy life of Leigh instruments and set the stage for this lawsuit.

**68**    This concludes the basic chronology. The following observations emerge.

**69**    The transitional effect of the movement of personnel on and off of the scene was highly disruptive to all parties. Frank Driscoll arrived as president of Leigh on August 8, 1989. One month later to the day the hostile takeover occurred. Ian Musgrave left Plessey at the end of August after approving the fourth comfort letter. Almost all of the senior management at Plessey departed at this time. GEC and Siemens people were required to assist. The account manager at TD, Greg Young left at the end of October. The treasury person at Plessey, Denise Beard, left on November 3. All of these people filled critical roles at a material time in the life of Leigh. However, the most significant change from the standpoint of the fifth, operative comfort letter, was the change in the management group at Plessey, as noted by Rob Wilson in late November 1989.

**70**    The bank at the same time as it was advancing funds to Leigh was preoccupied with the parent companies' business potential and appeared heedless of its exposure at Leigh. The bank paid scant attention to detail at Leigh and reaped the consequences.

**71**    From the time of the third comfort letter in April, 1989 and the decision of the bank to remove its security over Leigh's assets, the bank rested its risk solely on the comfort letter. Although at first glance it might appear from the bank's lack of diligence in monitoring the financial situation at

Leigh, that Wilson and Leaney were not acting as prudent bankers, rather, the approach by TD toward Leigh makes it plain and obvious that TD was not relying upon the financial condition of Leigh or any representations in that regard, since it knew Leigh was not capable of repaying the loan without assistance. The bank assumed this assistance would come from Leigh's parents, and to that end, relied upon the moral obligation they believed the comfort letter to contain. The final proof of this lies in the fact that TD did not cap the loan until it was advised by Dr. Gerdine in March, 1990 that Plessey might not honour the comfort letter.

**72**    There were many victims of the disaster which befell Leigh. One such victim was certainly the TD bank. But also victims of almost equal proportion were Plessey and ultimately GEC Siemens which lost their total investment. On a personal level, Frank Driscoll and the other employees of Leigh were casualties. The Government of Canada likewise suffered losses at the hands of Leigh.

**73**    The question in this proceeding is, simply put, whether Plessey and GEC are responsible to TD for the losses of the bank.

THE TRIAL

**74**    This trial commenced January 13, 1997 and concluded on May 1, 1998. There are more than 15,000 pages of trial transcript, and thousands of pages of exhibits some lengthy and many detailed. The parties submitted extensive written argument consisting of more than 1200 pages, followed by oral submissions.

**75**    During the openings by counsel it was stated that the amended statement of claim contained more than one hundred and fifty alleged causes of action. During the trial the issues were not narrowed. even though the court urged the plaintiff to do so. This did not occur until the time of filing of written submissions. Any alleged causes of action not pursued in argument are abandoned.

DISPOSITION

The Claim in Contract

**76**    I have concluded that Wendy Leaney received, read and accepted on behalf of the bank the fifth comfort letter dated December 15, 1989 in January 1990. This letter by its terms supersedes all prior comfort letters. There was no representation that the fifth comfort letter would be in the same form as the prior ones. There are no collateral agreements or warranties. Hence, the operative comfort letter is the fifth comfort letter which was delivered to the bank by Plessey in December 1989.

**77**    The bank asserts that this comfort letter contains in paragraph three, the policy paragraph, a contractual commitment by Plessey to directly or indirectly pay the bank the amount of the Leigh loan. The added words in the fifth comfort letter that "The letter ... does not constitute a legally binding commitment," are a complete answer to this contention and dispose of the claim in contract.

Moreover, even disregarding those words, a literal reading of the paragraph which I find to be clear and unambiguous is to like effect. The paragraph does not contain a contractual promise enforceable in law. Rather it is a statement of present policy of Plessey. The added words do not alter that meaning. Indeed, the extrinsic evidence, if admitted, does not assist the bank. Instead it confirms two things: first, the paragraph does not contain a latent ambiguity, and second, the literal reading of the paragraph discloses its true meaning. The claim in contract fails.

The Claim in Tort

**78**    The bank asserts a number of causes of action in negligent and fraudulent misrepresentation, based on the statement of policy in the third paragraph of all of the comfort letters, and in the alternative, based solely on the policy statement in the fifth letter. For the reasons that follow, I find that the statement of policy in the comfort letters was not misleading and the claim in this respect is dismissed. The bank also claims damages for misrepresentation based on certain alleged statements made by Justice, Anderson and Musgrave to the bank. For the reasons below, I find that none of these claims have been made out, either because the statements did not take place, were not misleading, or were not relied upon by the bank.

**79**    The bank has alleged fraud against Plessey and GEC based on their conduct in failing to direct Leigh to provide the financial statements, and also based upon alleged statements by Colin Justice and Ross Anderson to the bank. There is no basis in the evidence for a finding of fraud. Accordingly, and in light of my appreciation of the totality of the evidence, I decline to make a finding of fraud against Plessey, GEC or either of Justice and Anderson. The claim in fraud is dismissed.

**80**    A review of the evidence, my findings and reasons follow.

PART II

THE EVIDENCE

The Bank and Leigh prior to April 1988.

**81**    The relationship between TD and Leigh dates back to the early 1980s, when Leigh acquired a company called Marsland Engineering Limited. At that time, Marsland had been a client of TDs for several years, however Leigh terminated the relationship with TD following the takeover. In consequence, TD solicited the business of Leigh and eventually succeeded in bringing Leigh in as a client. From the outset however, the bank had concerns about Leigh's financial performance. By July of 1983, the Leigh account had been classified by the bank as satisfactory and removed from the discretion of the branch manager. In an internal bank memo, F.G. McDowell, then vice-chairman of the banks described the Leigh account as a "persistent worry" and recommended that the bank divest itself of the relationship with Leigh.

**82**    In 1983 the bank appointed management consultants Woods Gordon to review the Leigh contracts and management. Following on recommendations of Woods Gordon, Leigh sold certain subsidiaries, raised capital and changed management. The company began to turn a profit and the bank decided to continue the banking relationship.

**83**    In March of 1984 the Leigh risk was again classed as unsatisfactory, and the bank expressed concern that the working capital of Leigh was being used to pay off secured debt, to the detriment of the banks position.

Spring 1988 - The Takeover by Plessey, First Comfort Letter and Amalgamation

**84**    Leigh Instruments was a supplier of high-technology products and systems for the defence and aerospace markets. The company's main products included secure voice communications systems, ground-based navigation systems and flight data recording systems.

**85**    The bulk of Leigh's business was composed of contracts to supply two sophisticated products, SHINCOM and TACAN. SHINCOM was a ship interior communications system program and TACAN was a tactical air navigation program. The bulk of Leigh's contracts were the Canadian Department of National Defence either directly or as subcontractor to other with companies with government contracts, and were long-term contracts for fixed prices. SHINCOM was being installed by the Canadian Navy as part of its program to refit older destroyers.

**86**    In January 1988, Leigh acquired all the shares of a Nova Scotia based company known as Micronav Ltd. for $2.8 million. Micronav had developed a microwave landing system, which was a leading-edge airport landing system. TD was the banker for Micronav both before and after the takeover, and noted in a credit review of Leigh on February 29th, 1988 that "MLS is widely recognized as the next generation of airport landing systems with a world market estimated to be several billion dollars during the next decade. For example, Transport Canada has recommended MLS for up to 40 airports in Canada."

**87**    At this time, Leigh was a publicly traded company. In late February of 1988, a Halifax based Aerospace company. IMP Group Ltd., made a public offer of $80 million for all the shares of Leigh. Leigh's board of directors rejected the bid and retained Dominion Securities and First Boston to advise it on defensive strategies.

**88**    In order to assist in the defence of the takeover bid, TD offered Leigh a $10 million operating line with a number of conditions attached. In approving the credit application on February 29, 1988 however, senior vice president James Laitner noted: "this is not the type of company that should have a lot of debt." The bank rated the risk of this borrowing at 3A and included as a condition that Leigh provide to the bank quarterly unaudited financial statements and audited year end statements. Leigh did not accept this offer, but chose instead to accept the straight renewal of its existing operating facility of $5.4 million, which to date had not been drawn upon. That facility included a requirement that Leigh provide to the bank its quarterly/annual financial statements within 30/90

days from the end of the respective financial period.

**89**    In early March, 1988, while the hostile IMP takeover bid was still outstanding, Plessey announced a friendly takeover bid for Leigh, offering $96.4 million for the outstanding shares of Leigh. When TD learned of the bid, Howard Baker of TD's London office immediately telephoned the Plessey treasury department, and then wrote to Ian Musgrave, group treasurer of Plessey, offering to provide financial assistance in connection with thee takeover. On March 24, Plessey increased its offer for Leigh to $104 million, leading IMP to drop out of the running and withdraw its offer on April 5th. The Plessey bid succeeded that same day.

**90**    In connection with the bid, Plessey retained Deloitte, Haskins & Sells to prepare a due diligence report on Leigh, which was delivered on March 6th. This report was reviewed in detail by Ian Musgrave, who was in charge of structuring Leigh's acquisition, and others at Plessey. The report noted that Leigh's major source of revenue was from government contracts associated with the TACAN, SHINCOM, and LSI programs, and that Leigh's revenue recognition policies for the contract were, from an accounting perspective, less conservative than Plessey's. Other accounting policies were also less conservative than Plessey's and the report cautioned that application of the accounting principles used by Plessey would result in a significant writedown of the value of Leigh's inventories. Deloitte's also noted that Leigh had failed to meet certain contract milestones for the TACAN program, had not yet filed its corporate tax return for 1987, and had made no payments towards its tax liabilities for the 1987 or 1988 fiscal years. The report failed to note the security held by TD over Leigh's assets.

**91**    As treasurer, Ian Musgrave was responsible for the structure of the Leigh acquisition. In evidence, he explained the structure was designed to provide the most favourable tax results for Plessey. In order to minimize the amount of profit on which Leigh would have to pay tax, Plessey imposed a capital structure on Leigh of 25 percent equity and 75 percent interest-bearing intercompany debt. The intercompany debt was payable to Plessey, with the notion that the interest payments on the debt would reduce or eliminate Leigh's taxable profits. In the final analysis, the structure consisted of $69 million intercompany debt, $25 million in equity, plus the TD loan for the total purchase price of $ 104 million. There was a $3 million acquisition cost for a total outlaw of $107 million.

**92**    In order to facilitate the transition, Plessey incorporated a holding company called Plessey Canada (1988) Inc., with the 75-25 debt to equity capital structure. This company was to be used to purchase the shares of Leigh and then the two companies were to be amalgamated, with the merged company assuming the intercompany debt held by the acquisition vehicle. At the time of the acquisition, the Leigh balance sheet showed approximately $ 10 million in cash. Accordingly, Plessey decided to borrow $10 million of the acquisition financing from the TD bank, through Plessey Canada, with the intention that this $10 million would be re-paid to the bank from Leigh's cash balances following the amalgamation.

**93** TD had approached Plessey immediately after the announcement of the takeover bid, and offered to assist with acquisition financing. Initially, TD offered Plessey a $50 million facility, with the provision that $10 million be made available to Plessey Canada (1988) Inc. directly.

**94** The procedures and responsibilities within the bank in terms of processing and approving credit applications for customers was addressed by numerous bank witnesses in the course of the trial. The Corporate Banking Division ("Corporate Banking") had responsibility for direct customer contact. It was charged with the responsibility for preparing documentation of a credit best which has then submitted to the Credit Division. Corporate Banking had no lending authority. The Credit Division's role was that of decision maker - it had no liaison with customers or documentation role after a credit was approved. Those duties were left to Corporate Banking, and included responsibility for ensuring that any condition placed on an approval of a credit by the Credit Division was implemented. There was no procedure in place within the bank by which the Credit Division could ensure that its conditions had been complied with, and the Credit Division simply relied on Corporate Banking to do so. For example, the account manager in Corporate Banking was responsible for obtaining the requisite security or other documentation for a loan, in keeping with the bank's requirements. Similarly, if a loan went into an overdraft position, it was the responsibility of the account manager to obtain approval of an increased loan limit from the Credit Division. Once that approval was obtained, the account manager was charged with obtaining a new facility agreement from the Customer reflecting the increased amount, and obtaining any other associated documentation.

**95** For the purpose of standardizing credit applications, the bank had in place a Credit Procedures Manual. This manual was described by bank witnesses as a "guideline" on how to complete a Corporate Credit Review (CCR). Although its purpose was described variously by bank witnesses as to standardize the format of submissions for ease of processing or as being "mechanical", there were aspects of it which were admitted to be requirements, as opposed to discretionary guidelines. Portions of the manual were for use by Corporate Banking and were available to every manager responsible for the Leigh account, and certainly Wendy Leaney.

**96** The manual expressly provided that a corporate guarantee be accompanied by a solicitor's opinion and a resolution of the board of directors authorizing the guarantee. No such stipulation applied to comfort letters, which the manual described as "documentation" rather than "security", unlike a guarantee. It stated that comfort letters were "not legally enforceable in the collection of our loan." In contrast, guarantees were to be in the bank's standard form. Guarantees not conforming with the standard form were to be vetted and approved by the bank's legal counsel.

**97** Within the Credit Division, each person had an authorized credit approval limit, which conferred upon them the discretion to approve any loan which fell within that limit, as long as they were satisfied with the risk. If a credit application exceeded the authorized limit, the person to whom it had been sent would review it and add whatever comments were appropriate. The application would be forwarded up the chain to someone with a higher limit, and this might happen

several times before the credit was approved by the ultimate decision maker. Each person who signed off on a credit would review it and the comments of the persons below them in the chain of approval. Persons reviewing a credit also had the authority to recommend changes in the terms and conditions of the credit, or to recommend rejection.

**98**    Once the credit was approved, the application was returned to the Corporate Banking Division, along with the comments or conditions added by the Credit Division. It fell then to the Corporate Banking people to ensure that the conditions were complied with and documentation obtained, and Wendy Leaney testified the department had its own internal procedures in this regard. If these terms and conditions were not complied with, it was the responsibility of the account manager to report this to the Credit Division.

**99**    Patrick Noonan, senior vice president, Credit Division, testified that he assumed everyone below him on a credit approval application had read all of the material he received, because any recommendation was based upon it. Since a recommendation could be approved with conditions attached, he assumed it would be read by everyone on its way back down the chain. There was no process by which Credit Division could ensure those below adhered to conditions it imposed so that the responsibility for this rested on the account manager in Corporate Banking. Hence, it was not for Credit Division to pass on a comfort letter. It was for the account manager to see to it that a comfort letter was satisfactory to the bank. Noonan testified that he had never spoken to anyone at Plessey, GEC, GEC Marconi or CMC at any time material to this proceeding.

**100**    In accordance with standard bank procedure for the approval of credit applications, a Corporate Credit Review of Plessey was prepared by the account manager, in this case Howard Baker, manager of corporate finance in the Bank's London office. The account was given a risk rating of 2, a rate which the bank reserved for corporate borrowers with strong balance sheets, strong earnings, good access to public markets and a top corporate credit. Although the CCR indicated the bank had had a relationship with Plessey since 1982, it listed facilities then available to Plessey, none of which had been drawn upon. In the section entitled purpose of review/use of credit, Baker noted "We view Plessey risk as entirely acceptable for this transaction. A successful bid will enhance our relationship with Plessey in London (which currently consists only of occasional FX business), and of course in Canada where we hope to maintain our relationship with Leigh, and further build on Plessey's growth in Canada. ... Plessey intends to use Leigh as its platform to sell communications, avionics and defence equipment in Canada, estimating that it would be able to bid for 500 million pounds of Canadian contracts over the next five years." Under pricing Baker noted "we would therefore seek your guidance on lowering the pricing ... on the basis of our relationship with Leigh in Canada and the important one-off opportunity we have been presented with." The security for the $50 million short-term, uncommitted line was listed as nil, with the explanatory note "Borrowings by Plessey Canada (1988) Inc. will not be guaranteed by the parent. Plessey & Co. plc do not provide guarantees for any subsidiaries borrowing." The CCR was sent to the bank's Credit Division in Toronto for approval.

**101**    Ian Musgrave testified that Baker's observation was incorrect, and while Plessey had a group policy of ordinarily avoiding guarantees, that Plessey did guarantee the borrowings of its subsidiaries in certain circumstances. I accept his evidence. Although Musgrave was not involved in negotiation of the terms of this facility, he was treasurer of the Company at the time. The negotiations were conducted largely by Denise Beard, who reported directly to Musgrave. No evidence was led as to the source of Baker's mistaken conclusion that Plessey did not give guarantees. This observation was critical however, in that it led Patrick Noonan, then a senior vice president in TD's Credit Division, to recommend as a condition of the credit approval, that a letter of comfort be obtained from the parent, Plessey Company plc. Musgrave did confirm in evidence that bank was correct in noting that a Plessey guarantee was not on offer for the Plessey Canada borrowing.

**102**    In recommending that the credit be approved, Noonan noted:

> Credit risk of U.K. parent acceptable. Appl'n requests Cdn $10MM to Plessey Canada (1988) Inc. which is obviously a new vehicle for this investment. It is not listed as a subsidiary of the U.K. parent in last annual report. No gtee will be provided.

> As there are no financials we should have an appropriate comfort letter from parent. Would agree on this basis in light of interim finance requested.

**103**    In this period, Noonan testified he was reviewing well over 1000 CCRs a year. Noonan explained he was not surprised to see that a guarantee was not on offer because "it was common for major companies not to guarantee borrowings of subsidiaries and I was aware that the common practice was to provide comfort letters in some cases." He testified that he specified an "appropriate comfort letter" because the bank had no financials for Plessey Canada and therefore no basis upon which to assess the company's debt service capacity, its ability to repay, nor at that time, information on how the loan was to be repaid. Hence, he explained that he wanted "a clear undertaking from the Plessey Company Plc that they would see the bank whole on any portion that may be taken by the Canadian company." Regarding his reference to an ongoing Canadian bank role, Noonan testified that since they were the sole bankers for Leigh and had no active relationship with Plessey, he hoped the bank would preserve the relationship with Leigh. He described this aspect of the credit as a marketing aspect between the corporate account manager at the bank and Plessey. He explained that each member of the bank's Credit Division had a discretionary lending limit. If the credit application was for an amount within that limit, then the person reviewing it had authority to approve the risk. If not, the application would be passed to a more senior member of the department who had a higher lending limit. Noonan testified that he reviewed the Plessey application from the perspective of acceptance of credit risk. As the $50 million limit was in excess of his discretionary lending authority, he recommended that the credit be approved, and forwarded the CCR to the senior executive.

**104**     In the case of the $50 million Plessey facility, the CCR was passed above to William T. Brock, Executive Vice President, Credit, who recommended that the application be approved and noted "this is a short term bridge loan and we are bankers to Leigh which will now be expanded by Plessey. We would not want to lose this to a Canadian competitor." The credit application was ultimately approved by the chairman of the bank himself, Richard Thomson, and the requirement that an appropriate comfort letter be obtained was left unchanged.

**105**     The credit was approved the same day as the application was made. In notifying the London office of the approval, Noonan advised:

> Insofar as CDN $10,000,000 being available under the name of Plessey Canada (1988) Inc., which is obviously a new vehicle for this investment, as there are no financials, we should have an appropriate comfort letter from the parent. We note your remarks that no guarantee would be available. However in light of short-term requested, we are agreeable on the above basis. ... We would not want to lose this financing to Canadian competitor, particularly with our long-standing account relationship in Canada where we are the sole bankers to Leigh.

**106**     Noonan explained in evidence that while it was his idea to obtain a comfort letter, he did not provide any of the language or participate in the drafting of the letter. Nor could he recall indicating what, in his view, constituted an appropriate comfort letter. He explained that according to bank procedure it was the responsibility of the account manager, in consultation with legal counsel, to obtain the appropriate documentation, including in this case, the comfort letter. While on occasion he would provide some verbal guidance to Corporate Banking officers if approached by them. Noonan said he could not recall having spoken to Baker or his assistant J.A. Read concerning the Plessey letter.

**107**     The bank learned subsequently that Plessey did not intend to use the $50 million loan facility, but did wish to draw upon the $10 million amount which had been called out for use by Plessey Canada.

**108**     Howard Baker, of TD's London office, and Greg Young, a manager of Corporate Banking in Toronto, were responsible for obtaining an "appropriate letter of comfort" from Plessey. Young had been in charge of the Leigh account in Toronto since early 1987, and was responsible for determining that the comfort letter was acceptable. Since Baker was the bank officer then in charge of the relationship with Plessey, he was charged with obtaining the letter from Plessey and forwarding it to Young for approval. Young testified it was reasonable to assume that Baker had received Noonan's comments when he contacted Plessey.

**109**     Baker had available to him a draft comfort letter, which he used as a template for drafting the Plessey letter. The template letter stated:

> We understand that Toronto-Dominion Bank has agreed to place at the disposal

of [blank] a subsidiary of [blank] banking facilities of C $3,750,000 (three million seven hundred and fifty thousand Canadian dollars).

This letter will confirm that [blank] is aware of and approves of the above-mentioned facilities. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of [blank] will be conducted on a sound basis. Furthermore, we undertake to retain control of this subsidiary company as long as any indebtedness to you may be outstanding.

It is our policy that our subsidiary companies including [blank] be managed and operated in such a way as to be always in a position to meet their financial obligations when they become due and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity.

**110**    Baker did not use the template letter verbatim, and instead sent Plessey an amended version. No evidence was led as to the reason for these changes. On April 7, 1988, Baker faxed to Ms. Beard a draft of a proposed comfort letter which stated:

We understand that the Toronto-Dominion Bank ("the bank") has in place at the disposal of Plessey Canada (1988) Inc., a wholly-owned subsidiary of The Plessey Company PLC, borrowing facilities of up to C $10,000,000 (ten million Canadian dollars).

This letter confirms that The Plessey Company Plc is aware of and approves of this facility, and undertakes to advise the Bank if any reduction in ownership of Plessey Canada (1988) Inc. is contemplated. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis.

That same day, Denise Beard responded by sending Baker the following draft comfort letter, which was in a form Plessey had used on other occasions:

This is to confirm that The Plessey Company plc has full knowledge of the facility of C $10,000,000 (ten million Canadian dollars) which has been granted by Toronto-Dominion Bank to Plessey Canada (1988) Inc.

> Plessey Canada (1988) Inc. is currently a wholly-owned subsidiary of Plessey
> Overseas Limited which is a wholly-owned subsidiary of The Plessey Company
> plc. No change in the ownership of Plessey Canada (1988) Inc. or Plessey
> Overseas Limited is contemplated and we undertake not to reduce our
> share-holding during the term of the above mentioned facility without prior
> notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada
> (1988) Inc. be managed in such a way as to be always in a position to meet their
> financial obligations, including repayment of all amounts due under the above
> facility.

**111**    In evidence, Musgrave said it was common for Plessey to negotiate the language of the
comfort letters it gave, and that quite often the bank concerned would produce a form and Plessey
would then respond with its own form of letter. He said there was some degree of negotiation in
most cases and that Plessey's comfort letters were reviewed by its in-house counsel, Tony Noon, "as
a matter of course." In respect of comfort letter number one, no party called Baker or Beard to give
evidence about the extent of the negotiations.

**112**    Upon receipt of the Plessey draft, Baker in London forwarded the letter to Young in Toronto
with a note saying that Plessey wanted the line in place by the next day. Young had previously been
involved in several other files involving comfort letters, however this was his first experience in
actually taking one. Upon receipt of the draft, Young showed it to Alex Norton, in-house counsel at
the bank. Young testified that following the brief meeting with Norton, he believed the Plessey
letter was "a strong comfort letter" and "legally binding." Neither Plessey's counsel, Tony Noon, nor
TD's counsel, Alex Norton, testified at trial.

**113**    Young did not show the draft letter to Noonan in the Credit Division, nor did Noonan see the
first comfort letter until after it had been executed. On April 7, Baker faxed a letter to Beard
confirming that TD had made available a short-term $10 million facility for use by Plessey Canada,
noting "documentation to formalize this facility will follow due course."

**114**    On April 11, 1988, Young sent a facility letter to J. Palazzi of Plessey U.S. containing the
terms of the $10 million loan facility. This term sheet described the borrower as Plessey Canada,
noted that repayment was on demand, that the loan was unsecured, and did not contain any financial
reporting requirements. It listed that documentation would include "a Comfort Letter from the
Plessey Company PLC in the form attached." The attached comfort letter was in the same form as
that which Plessey had forwarded to the bank and which Young had shown to Norton. On April 12,
prior to receipt of an executed comfort letter by the bank, Plessey Canada drew down the amount of
$10 million from the bank, which it used as part of the acquisition financing for Leigh. Plessey
group treasurer Ian Musgrave explained in evidence that from time to time the drawdown of cash

would precede completion of the formal documentation with a bank. He said that normally by that time all the terms and conditions would be pretty well agreed, and there would be no contentious items left unresolved. The documentation would amount to the completion of paperwork in the terms agreed. Plessey Canada accepted the terms as offered and signed the facility letter on April 15, 1988.

115    In connection with this facility, the bank prepared a second, separate Corporate Credit Review of Plessey Canada, on April 19, after the loan facility had been offered by the bank and accepted by Plessey Canada. The CCR was prepared by Randi Winston, of the Corporate Banking Division in Toronto. It rated the risk of the borrowing as 2 low risk, which was the same as the risk rating given to Plessey Plc in the April 5 CCR, and listed security as nil. Documentation was "to be obtained" and included "comfort letter from The Plessey Company PLC."

116    The April 19 CCR enclosed the draft Plessey comfort letter and a copy of the April 5 CCR of Plessey Plc. In the remarks section Winston noted:

> The purchase of Leigh should enable Plessey Company to bid for about $2 billion in Canadian contracts over the next 10 years. The Department of National Defence proposes to spend several billion dollars to acquire a fleet of nuclear powered submarines which should provide Plessey with an opportunity to market its sonar equipment, currently used on the British submarines.

> While Bank of Montreal is Plessey Canada's banker, the company has expressed in interest in adding another financial institution and splitting their banking business. For the time being, Plessey has indicated that Leigh's facilities with the TD bank will remain intact.

Under "Use of Credit and Repayment" the CCR noted that the loan was to assist in the purchase of Leigh and that repayment of the advances under the facility was to be derived from Leigh's cash balances. The loan was to mature in 90 days, on July 11. Winston also observed:

> Plessey Canada has advised us that this is a short-term need and have not requested a formal operating line of credit. However, having available an authorized facility would place TD in good standing in the event that Plessey decides to split its banking business. At this time we note that EMEA division was unsuccessful in winning Plessey Company PLC's $50 million deal.

The security section stated that "While there is no security per se, a strong comfort letter from the Plessey Company Plc will be obtained by EMEA division and forwarded to us shortly." Winston explained the risk assessment as follows "Given the short term nature of this facility and the comfort letter to be obtained the risk is acceptable to the bank. Given the strong financial position of the Plessey Company PLC we are recommending account rating of 2." Young also signed the CCR

which was ultimately approved by Noonan, who stipulated that the bank should obtain financials of the borrowing entity as soon as possible.

**117**    In reviewing the credit application Noonan testified that he noted the purchase of Leigh should enable Plessey to bid for Canadian contracts over the next 10 years and that while Bank of Montreal were the bankers for Plessey Canada, there might be opportunity for TD to be involved in their ongoing banking requirements. He testified that while this was a noteworthy point, it had no bearing on his risk assessment. Noonan testified that he noted the facility was for a short-term and that a formal operating line was not requested by the customer. He said other points of note were that the $10 million was to be repaid from Leigh's cash balances once Plessey had obtained the 100 percent ownership, and that while there was no security per se, a strong comfort letter would be forwarded by Plessey.

**118**    Noonan said he read the attached draft comfort letter, and in particular, paragraph 3. He said that, at the time, he took the view that the language of the comfort letter provided a commitment from Plessey to see that Plessey Canada was in funds or solvent to meet its financial obligations, including the amounts due under the TD facility. Noonan testified he formed this view based on the wording of the third paragraph and based also on the standing, strength and reputation of Plessey, which he described as "of paramount importance." In that regard, he said when a draft comfort letter was given by a company with a reputation that, enjoyed access to the public markets of the world, then he believed it was a company which valued its reputation, and that the bank in turn could believe in its word. As well, he said he took Plessey at its word, as expressed in the letter, because the comfort letter had been signed by two authorized signatories, and because he believed the people who gave the comfort letter also controlled finances and were in a position to provide the flow of funds to the appropriate subsidiaries. He said "in my view it's a quasi-solvency guarantee that they, in turn, will always meet their financial obligations." He elaborated that while he did not view the comfort letter as a guarantee per se, he viewed it as a quasi-guarantee from the point of view of ensuring that the subsidiary was in a solvent position.

**119**    Meanwhile, within Plessey, Denise Beard was arranging for formal approval of the comfort letter. While group treasurer Musgrave was not involved in negotiating the comfort letter, he testified that Beard would "almost certainly" have shown him the final draft before it was signed. Musgrave explained that Plessey controlled the borrowings of its subsidiaries and that approval of the Plessey main board was required for both a borrowing limit and a guarantee limit for each of its subsidiaries. Once approved by the board, the borrowing limit would entitle the subsidiary to borrow in amounts up to that limit, without exceeding it. The guarantee limit was Musgrave's authority to negotiate with the banks the degree of support Plessey could offer in connection with those borrowings. He said the degree of support to be offered by Plessey was within his discretion, and that he could choose to offer no support, a comfort letter, or a guarantee if one was necessary. Once a guarantee limit had been approved, it was not necessary to have the support approved by the main board, although, in light of the group policy, Musgrave testified that if a guarantee was offered, he would consult with Stephen Walls, managing director of Plessey, first. He said the main

board would not have seen the wording of the comfort letter itself.

**120**    On April 20, Denise Beard sent a memo to Stephen Walls requesting authorization of the comfort letter by him and one other board member, and the letter was in fact signed by Walls and Mayes. Musgrave explained that it was somewhat unusual to issue a comfort letter without prior main board approval of a guarantee limit, but that this happened from time to time if a transaction was taking place at high speed and there wasn't a board meeting scheduled in time. Hence on April 29, after the letter had already been issued, Musgrave placed the issue of retrospective approval of a guarantee limit for Plessey Canada on the of the next main board meeting. On May 6, 1988, the Plessey main board retrospectively approved both a borrowing limit and guarantee limit for Plessey Canada of $ 10 million.

**121**    Musgrave testified that the Plessey treasury department maintained a "guarantee register" in which it recorded all guarantees and comfort letters, including the comfort letter provided to TD. Although designated as a guarantee register, Musgrave explained in evidence that the title of the register did not mean every document recorded there was a guarantee. He said that in addition to guarantees, comfort letters were recorded there for the sake of convenience, but were separately identified. Musgrave testified that the register included documents which did not require Plessey to pay the debt of a subsidiary. I accept Musgrave's explanation, and hence his evidence on this point.

**122**    Although the TD comfort letter was recorded in the guarantee register, Musgrave stated in evidence that his personal intention at the time was that the comfort letter would not bind Plessey to repay the indebtedness of Plessey Canada. Further, he testified that while he could not recall discussing the question specifically with Stephen Walls, Walls was a highly experienced finance director and Musgrave stated he would be very surprised if Walls did not understand the difference between a comfort letter and a guarantee.

**123**    Notwithstanding this however, Musgrave testified that in his view, the comfort letter still had value for the bank. In respect of the first paragraph of the letter, Musgrave said the statement that Plessey was aware of the facility should prevent the bank from feeling vulnerable that it was advancing money to a subsidiary without knowledge of the parent. Regarding paragraph 2, Musgrave said it was his belief at the time that this statement would have significant value to the bank. He said notification of any intention of Plessey's to reduce its shareholding would give the bank the opportunity to withdraw its facility, which was a demand loan. He said the third paragraph would also have value for the bank in that Plessey was stating its policy that its subsidiaries are expected to manage their affairs so as to be always in position to meet their financial obligations. Musgrave testified that he expected the bank to take the statements into account in deciding whether to make the facility available to Plessey Canada, that he expected the bank to rely upon the statements as being factually correct, and that they were intended to give the bank a degree of comfort about the proposed facility. He said he and Plessey would have known that the bank would not advance the funds without the comfort letter.

**124**    On April 27, 1988, Plessey forwarded to the bank a comfort letter dated April 20, 1988 executed by authorized signatories Stephen Walls and Derek Mayes, which was identical to the draft previously submitted to the bank by Beard. This the first comfort letter, stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$10,000,000 (Ten million Canadian dollars) which has been granted by Toronto Dominion Bank to Plessey Canada (1988) Inc.
>
> Plessey Canada (1988) Inc is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.
>
> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

**125**    By this time, the acquisition of Leigh had been completed, and Plessey Canada held the shares of Leigh. As an acquisition vehicle, Plessey Canada simply held the shares of Leigh. It did not cam on business and was run by Plessey's lawyers in Canada acting on direction from Plessey in London. Once the transaction had been completed, Musgrave said all the cash holdings in Plessey Canada were paid out, and conceded that Plessey Canada would not have had the cash to pay the TD loan, if payment had been demanded. He said there were options available to Plessey Canada however, and at least one other bank was interested in assisting. At the time of the takeover, Leigh had available to it a $5.4 million facility from TD, although it had not drawn down upon it, and the amount outstanding was nil.

**126**    Although Plessey paid $104 million for the shares of Leigh, when the transaction was completed Plessey determined that the book value of Leigh's assets was about $50 million. Of that $104 million, $10 million was drawn down on the TD bank line. The remaining $94 million was structured as $69 million intercompany debt held by Plessey and $25 million equity. In consequence, Leigh's total debt load was within the order of $79 million.

The Second Comfort Letter

**127**    Following the acquisition, Plessey, commenced a process of purchase accounting adjustments, whereby the Leigh balance sheet was adjusted to reflect the introduction of Plessey accounting principles. Although this process was not completed until several months later, it spoke

as of the date of the takeover. Due to the fact that Plessey's accounting principles were more conservative than Leigh's, their introduction led to a $38.5 million reduction in the book value of Leigh's assets, leaving Leigh with a book value, on paper, of $13.1 million.

**128** On June 30, 1988, Leigh and Plessey Canada were amalgamated under the name Leigh Instruments Limited. Thus, Leigh became responsible for the $10 million acquisition loan from TD held by Plessey Canada. Around this time, Musgrave spoke to Greg Young, the account manager for Leigh at TD's Corporate Banking Division in Toronto, and assured him the bank needn't worry about the amalgamation and that "as far as we were concerned, the letter of comfort still stood."

**129** Following the amalgamation, Plessey determined that, in fact, Leigh did not have the anticipated $10 million in cash on its books. At the same time, Leigh advised Plessey it required an additional $2 million working capital. As a result, Leigh was unable to repay the $10 million facility to TD on its maturity date of July 11. On July 4, Musgrave sent a memo to Stephen Walls, apprising him of the situation and proposing that the $10 million facility be rolled over. As well, he requested permission from Walls to advance the additional $2 million to Leigh. Walls approved both requests.

**130** Musgrave then requested an explanation for the Leigh shortfall from Andrew Akerman the financial analyst at PESL, the group to which Leigh belonged. Akerman reported that most of the shortfall was due to adverse phasing variances on the TACAN contract. In evidence, Musgrave explained this sort of shortfall was fairly common within Plessey. He said most of Plessey's business consisted of long-term advanced technology contracts, and that it would not be unusual at any point in time for several of these contracts to experience difficulties on a technical level. He said such technical difficulties resulted in cash flow variances, since often the customer would only make progress payments on the contract once specific technical milestones had been met. If there was a delay in meeting these milestones, it would affect the company's cash flow. Musgrave testified that while Leigh did not have sufficient rash to repay the loan at this point, it did have other options available to it. He said if TD had called the loan, Leigh could have sold some of its assets or perhaps approached the Bank of Montreal, which he said was keen to get involved.

**131** In a July 11 memo to Noonan at TD Credit Division, Young reported the conversation with Musgrave about the comfort letter and that he had confirmed with the bank's legal department that the comfort letter would continue to apply. He also noted that contrary to prior expectation, Leigh did not have the $10 million to repay the outstanding loan, and that Leigh's cash balances had declined due to a temporary delay on a major contract. Young requested that the existing loan be rolled over for a further 90 days and continued in the name of Leigh, concluding "We are satisfied that the risk is still acceptable based on the comfort letter".

**132** Plessey delivered written confirmation to the bank in a letter dated August 1, 1988, that the comfort letter applied to Leigh. This letter was vetted by Plessey in-house counsel before being sent, and was signed by Walls and Huntbatch. This second comfort letter stated: "We confirm that the comfort letter dated April 20, 1988 remains valid and now applies to Leigh Instruments

Limited."

The Multi-Option Facility

**133**    In August 1988, Jonathan Exton of the Bank's London office received an invitation from Plessey to submit a bid to participate in a 250 million pound multi-option facility, which Exton explained was a "facility which permitted the borrower to draw down in different currencies of its choice". Due to the size of the facility, this invitation had been extended to a number of banks. Exton testified that when he received the invitation, he prepared a Corporate Credit Review of Plessey, which he sent to the Credit Division in Toronto. The CCR, dated August 24, described its purpose as a request for approval to underwrite 5 million pounds of the 200/250 million pound five-year multi-option facility, arranged for Plessey by Barclays de Zoete Wedd Limited. The CCR gave Plessey a risk rating of 2 (unchanged). Under documentation, Exton noted that the MOF agreement included standard events of default, including a material adverse change clause and a negative pledge.

**134**    In the section pertaining to use of credit, Exton noted that TD had been invited to participate due to its "close relationship in Canada as the principal beer of its subsidiary Leigh Instruments of Canada ... since the acquisition TD has also taken the banking business of Plessey Canada, who were formerly with the bank of Montreal." Exton went on to state that the pricing on the MOF would not provide much profit for the bank. Nevertheless, he was seeking approval to participate for "relationship reasons and the opportunity to gain future business," and added that the bank had recently offered Plessey a 20 million pound uncommitted short-term facility which had been fully drawn down. In his financial summary of Plessey, Exton observed that the company's turnover had fallen by 9 percent as senior management had devoted resources to fighting off a recent hostile takeover bid by GEC. Also, Plessey's net worth had been reduced by 335 million pounds from 623 million pounds as a result of a write-off of goodwill associated with a series of recent acquisitions, one of which was Leigh. Despite this, Exton described the company as "financially strong". The CCR was also signed by Hugh Rising, vice president of corporate finance for the EMEA division, who added: "We are proposing to participate in this facility at the minimum level for existing relationship reasons, feeling as well opportunities will be presented going forth. This will assure our prominent position as bankers to the Canadian operations and afford us with opportunities in the US and specifically the UK relative to FX and Capital Market products." The application was approved by McDowell, who noted that the bank should obtain a capital adequacy clause. In evidence, McDowell said concern about losing the Plessey business to a competitor would not have affected his decision, but agreed that building up the relationship with Plessey was an important consideration for the bank. The MOE was signed on September 20, 1988.

September 1988 to April 1989 - The Third Comfort Letter

**135**    Plessey completed the purchase accounting adjustments for Leigh by early September 1988. The opening balance sheet showed Leigh's assets were valued at $51.66 million on March 31, 1988.

This figure was arrived at using Leigh's accounting principles. Once the asset value had been calculated using Plessey's more conservative accounting principles, Leigh's assets were reduced to $13.16 million as at April 5, 1988. Musgrave explained in evidence that Plessey took a more conservative view than Leigh on the valuation of contracts in progress. He explained that Leigh and Plessey were both involved in large long-term contracts, and with such contracts it was necessary to book profit on the contract as it progressed. He said if the contract ran over a period of several years, profit would accrue over the life of the contract and there was a certain amount of discretion as to how and when the profit was booked or recognized on the balance sheet. Plessey was more conservative than Leigh in recognizing profit, so when Leigh's balance sheet was adjusted according to Plessey principles, it resulted in the write-down to $13.16 million.

**136**    In late September 1988, only five months after the Leigh acquisition, Leigh advised that it would have a total borrowing requirement for the quarter ended December 1988, of $30 million. Leigh's cash requirements included $3.55 million for the payment to Plessey of interest on the $69 million intercompany debt which had been imposed following the acquisition.

**137**    Although the interest payment on the intercompany debt was payable on September 15, Leigh did not make this payment. Plessey was not pleased at this turf events. In a memo to file in late October. Musgrave recorded that he had been informed by David Dean, the vice president, finance at Leigh, that the loan interest payments to Plessey might have to be further deferred due to contract slippages. Musgrave noted "we cannot allow trading cash flow slippages to be accommodated by the deferral of loan obligations."

**138**    In late September, Andrew Akerman, financial analyst at PESL, advised Musgrave that Leigh required increased working capital due to delays in start-up of the TACAN program, and due to technical problems plaguing the SHINCOM program. However, Leigh was forecasting that its bank borrowings would decrease from $30 million at the end of December, to $19.89 million by the end of March 1989.

**139**    Based on the information from Akerman, Musgrave drafted a submission to Plessey's main board, requesting an increase in Leigh's borrowing and guarantee limit to $30 million. Board approval was granted on September 30, 1988.

**140**    On September 26, Greg Young at TD prepared a Corporate Credit Review of Leigh for the purpose of renewing the outstanding facilities, and placing the $10 million acquisition facility in Leigh's name, since it had previously been in the name of Plessey Canada. The total of Leigh's outstanding borrowings at the date of the review was $13.782 million.

**141**    In the CCR, the Leigh account was given the risk rating of 3A for all the facilities which, Noonan explained, denoted a normal banking risk, with the A indicating an improving trend. It is significant that this was the same risk rating which had been applied by the bank to the Leigh operating line prior to the acquisition. The $10 million acquisition facility had been given a lower risk rating of 2 when it was held by Plessey Canada, 2 being the same rating as the parent. Plessey

Plc. In evidence, Noonan testified that the $10 million acquisition facility, as secured by the comfort letter, was still rated at 2, but that the practice and policy of the bank was that if a portion of the credit facilities of the borrower had a more adverse rating than any other, then the total account rating for the borrower would receive the higher risk.

**142**    Notwithstanding Noonan's evidence, it is clear that the risk rating applied by the bank to all the facilities was that of Leigh and not Plessey. Plessey Canada was merely a shell company incorporated for the sole purpose of the Leigh acquisition. Since it was not an operating company, there was no basis for a risk rating other than the risk of the parent. Once the acquisition loan had been placed in Leigh's name following the amalgamation, the risk was rated as that of Leigh rather than Plessey. This conclusion is further reinforced by the risk rating given by the bank subsequently in the January 10, 1989 CCR. As is set out in more detail below, in that CCR the bank merged all the Leigh facilities into one operating line, released all its formal security and rested its exposure solely on the comfort letter. The risk rating of the account remained that of Leigh however. This risk rating is inconsistent with the bank's subsequently professed view that the comfort letter contained an obligation to pay or was in the nature of a guarantee.

**143**    Security was listed in the September 26 CCR as a registered general assignment of book debts and documentation for the $5.4 million operating line was listed as a loan agreement containing normal representations, warranties and covenants. For the second line of credit, documentation was described as a letter agreement and the comfort letter from Plessey. Repayment was "As funds permit/on demand (subject to contract maturities)."

**144**    In the remarks section, Young noted that Leigh's financing requirements had increased substantially due to the acquisition and subsequent amalgamation, and that Leigh had advised they would request an increased operating facility of $25 million. Young reported that the introduction of Plessey accounting principles had altered Leigh's balance sheet significantly, but recommended the risk as acceptable, despite the deterioration in Leigh's financial position. He made his recommendation, in part, on the basis that the lines were payable on demand and fully secured by receivables, and because "facility No. 2 is backed by a strong comfort letter from Plessey and we are confident that Plessey will support Leigh as required". The review concluded that the low pricing on the $10 million facility had been recommended by Credit Division to ensure that the bank kept the Leigh relationship.

**145**    Although this CCR was intended to serve as Leigh's annual review, Noonan refused to approve it on that basis. He renewed Leigh's facilities only until October 31 and noted that based on a review of Leigh's balance sheet, outside security such as a comfort letter would be required for the expected loan increase.

**146**    Noonan testified that he limited the renewal period of the facilities to Oct. 31 because the bank had only the draft accounts, and he wanted to see a full set of audited financials for the company. Noonan said he specified a new comfort letter because the amount of the anticipated

increase would exceed the value of the receivables over which the bank held a charge.

**147**    A subsequent Credit for Executive Circulation dated September 30, 1988, reviewed the Leigh facilities and concluded "our lines are fully secured by the assets of the company and supported by comfort letter from Plessey. We are confident that Plessey will support Leigh as required." This document was initialled by Brock, McDowell, and Noonan.

**148**    That same day, Young sent Noonan a memo requesting a temporary increase or bulge in Leigh's operating line of $1 million, until the company could provide the amalgamated financials. Young reported that the Leigh borrowings were at $15.8 million (an increase of $2 million over the past four days), some $400,000 in excess of the authorized limit. In recommending approval of the bulge, Wendy Leaney, general manager, Corporate Banking Division and Young's immediate superior, described Plessey as a "valued connection." The request was approved, and initialled by both Noonan and McDowell.

**149**    On October 6, 1988, Brock, who was visiting the U.K., attended a meeting with Musgrave at Plessey, accompanied by Jonathan Exton, manager, corporate finance in the bank's London office. Musgrave explained that this sort of visit happened quite frequently. He said someone senior would visit from overseas and would be taken around to meet major customers or potential customers of the bank. In fact, requests for appointments like this were so common, Musgrave had instructed his secretary to limit them to two per week.

**150**    In his reporting memo following the meeting. Exton commented that the bank's last visit to Plessey had been more than two and half years earlier. Plessey had not been prepared to accept visits, despite repeated attempts, and so he was pleased to be able to make this call. Exton did not record any discussion about Leigh, but did note that Plessey intended to drawdown on the MOE sometime in the next month.

**151**    By the first of November, Leigh again requested a temporary increase in its loan facility, this time of $4 million. In a memorandum to Noonan on that date, Young stated the bank was still awaiting a copy of the amalgamated financial statements, which they expected to receive by mid-November. The total outstandings to Leigh at this point were $16.851 million. No explanation was provided in the memo regarding the need for an increase, however Young did point out that the London office felt the Leigh relationship had assisted in the efforts with Plessey, and that Brock had recently called on the company. As well, he reported that Plessey's board had approved Leigh's request for an increased operating line of $30 million. Included in the description of security was the comfort letter.

**152**    In recommending the increase, Young's supervisor Wendy Leaney, noted that while the Leigh relationship was thing a long time to "regularize", this was the bank's only relationship with Plessey, although this latter observation was in error. Leaney explained in evidence that she did not object to the inclusion of the comfort letter under security, because she considered it part of the security package.

**153**    This particular credit did not go to Noonan, who was away from the office. Instead, it was reviewed by Sid Owen, senior vice president, Credit Division. Owen approved the requested increase until months end, but commented that the lack of presentation of reasonable figures was difficult to understand, and that they must be tabled if the bank was to consider restructuring the loan. He concluded cautiously "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by Nov 30/88. We must resist being dragged along."

**154**    When asked in evidence about the reference to informal support, Noonan said that, although he had not seen the note at that time, the comfort letter in his view amounted to a quasi-guarantee. He explained that while a comfort letter might not be supported by a formal resolution and all the protective clauses that accompany a guarantee, he believed it could convey a quasi-guarantee to perform certain functions.

**155**    Meanwhile, on November 16, GEC announced a second hostile takeover bid for Plessey, this time in partnership with Siemens, a German company. The two companies formed GEC Siemens plc as a vehicle for the joint venture. As Musgrave explained, this was the second such hostile bid from GEC, and it was most certainly not welcomed by Plessey, which wished to remain independent. Also, Musgrave said there had been a long-standing adversarial relationship between the chairman of Plessey and the chairman of GEC. Exton she bank's London office wasted no time in offering the bank's support to Plessey. He met with Denise Beard of Plessey's Treasury Department on Nov. 17. In evidence, Exton explained the purpose of the call was to develop further business opportunities with Plessey. In his report of the meeting, Exton described the purpose of the call as, among other things, to advise of the bank's willingness to support Plessey in any defence strategy against the hostile bid, and to follow up on amendments to credit facilities for Leigh. Exton reported that Plessey would put a freeze on meeting other bankers while the bid was on, and that they were Plessey's last visitors for the time being. He noted that the bank's pledge of support was greatly appreciated by Plessey, and that Plessey's main need was credit facilities.

**156**    Also in this meeting, Beard requested that the bank release its formal security over the assets of Leigh. Exton testified that he understood the request for release of security was related to the terms of the MOF, which restricted negative pledges on the assets of Plessey. He said it was his understanding that Plessey was concerned about its level of encumbrances, which was approaching the percentage allowable under the MOF, and consequently it wished to reduce them.

**157**    This contrasts with the evidence of Musgrave, who indicated it was merely Plessey's preference not to have security over the assets of its subsidiaries, as it restricted Plessey's ability to deal with these assets, and because if security was granted to one bank, others might wish to follow suit. He explained that the Deloitte's due diligence report on Leigh had omitted any reference to the security TD held over Leigh's assets. Plessey only discovered the security when preparing for the MOF, since as an appendix to the MOF, Plessey had to list all the secured assets in the group at the time of signing. He said the MOF was signed with the Leigh security in place and listed in the

appendix. As well, he testified that Plessey was well within the allowable limit in secured assets contained in the MOF. As such, the terms of the MOF did not require that the security be released. However, when Musgrave became aware of the security, he asked Beard to try and have it removed. He said it was simply a matter of good housekeeping that the security be released.

**158**    To the extent that Musgrave's evidence conflicts with that of Exton regarding the reason for the requested release of security, I prefer the evidence of Musgrave. He was intimately acquainted with Plessey's policy on secured assets as group treasurer. Moreover, although Ms. Beard did not testify, she would have been aware that TD was a signatory to the MOE, and thus would have a copy of the MOF agreement. Accordingly, I conclude that Plessey requested the security be released simply because it preferred not to grant security over assets of the group, and not because it was required to do so by the MOF.

**159**    Leigh continued to experience cash flow problems and on November 18, Dean at Leigh advised A.G. Finnis, group taxation manager at Plessey, that the $3.5 million in interest owing on the intercompany debt, which had been due September 15, would not be paid before January. Leigh also advised that it would require a further increase in its borrowing limit. Musgrave responded to Finnis in a memo dated November 28 that a request would be submitted to the Plessey main board for an increase in the borrowing limit, in part to enable Leigh to pay the interest on the intercompany debt. In evidence however, Musgrave explained that payment of the interest had always been factored into Leigh's financing requirements, and that the need for an increased borrowing limit stemmed from cash flow problems related to Leigh's contracts.

**160**    By November 28, Leigh was in an "out of order" position on its TD facility. This probed Leaney to write to the senior vice president advising that Leigh's credit had been renewed to November 30, with an operating line increased to $10 million in addition to the $10 million acquisition loan. On November 29, Young advised Leigh's local account manager in Ottawa that a credit exposure for Leigh of $21 million had been verbally approved by the bank and was not to be exceeded.

**161**    In his record of the conversation, the account manager noted "the bank is concerned that the letter of comfort provided by Leigh Instruments' parent company (Plessey) will not be honoured in the event of a successful hostile takeover from G.E. and Simmons [sic] group."

**162**    The credit authorization was followed by a memo from Leaney and Young to the Ottawa account manager on November 30, authorizing a temporary renewal of the Leigh facilities, with the operating line at $11 million for total of $21 million. The memo observed that the bank was still awaiting updated financial information, expected on December 5, before proceeding with Leigh's request for lines totalling $30 million. Leaney added a handwritten note that "in the interim, no security is to be released."

**163**    Leigh's cash flow difficulties did not abate however, and by December 12th Leigh was again in an out of order position, with a credit exposure of over $22 million. The branch manager in

Ottawa called Leaney concerning this, and Leaney authorized the branch to manage the account over the $21 million which had been authorized. At the same time, she stipulated the Leigh position be reported to Corporate Banking Division on a daily basis. In evidence, Leaney said his was a judgment call she made, knowing Plessey had approved a $30 million limit, and that she knew it was only a matter of time before the bank received an increased comfort letter. Leaney conceded that it was beyond her authority to grant approval to manage the account above the authorized limit, and that she should have obtained approval from Credit Division. She said it was a judgment call she made, given that she had been delegated responsibility to manage the relationship, and she took it upon herself to give the approval. Leaney said she wasn't concerned about the account in view of the security package the bank had, but was annoyed at the way the account was being managed.

**164**    By December 16, the Leigh outstandings had risen to $24 million, and accordingly, Young and Leaney met with Noonan on that date and sought from him an exceptional approval of an increase in the Leigh limit to $25 million, to regularize the company's position on the books. Leaney advised Noonan that Plessey had approved a borrowing limit of $30 million, and that a credit review of Leigh was underway. Noonan approved the increase, on the basis that the credit review would be received in the week of December 19. Leaney and Young failed to provide the credit review within the stipulated time.

**165**    At Plessey, Musgrave was taking steps to have the Leigh borrowing limit increased even further, to $34 million, following a request from Dean on December 12. In his record of the conversation with Dean, Musgrave noted that the bank was "getting a little uneasy about the security for the local borrowings, in light of the GEC bid for Plessey," despite the $10 million letter of comfort and floating charge on inventory, and receivables. Musgrave told Dean he would prefer to secure the bank's position by an increased letter of comfort, "matched at the same time by an elimination of the bank's security on the inventory, and receivables."

**166**    Musgrave prepared a main board submission in the name of Walls, requesting that the Leigh borrowing and guarantee limits be increased from $30 million to $34 million. The need for the increase was attributed to delivery slippages and higher costs on the TACAN and SHINCOM programs. The submission noted that technical problems plaguing SHINCOM had been resolved and borrowing levels were expected to fall to $29 million by March 1989. The increase was approved by Plessey's executive committee on December 21.

**167**    Meanwhile, at Leigh, steps were being taken to find a new president of the company. To that end, Barry Flower and John Shepherd, president and chairman of the board of Leigh, respectively, met with Frank Driscoll, an engineer with an army background and long experience working for the military and later in the defence industry. Driscoll ultimately was to become president of Leigh in August, 1989. In that initial meeting however, both Flower and Shepherd expressed concern to Driscoll about the performance of David Dean. Driscoll testified that they expressed reservations to him about Dean's ability to perform in his role as vice president of finance, in view of the growth they had planned for Leigh.

**168**     On January 10, 1989, Leaney and Young finally submitted the credit review Noonan had expected in the week of December 19. By this time, Leigh had again exceeded its authorized credit of $25 million and had outstanding $25.552 million. The purpose of the review was to cancel the separate operating line and $10 million acquisition facility, and replace them with a single operating line of $35 million. The credit was ultimately approved by McDowell upon Noonan's recommendation, however both imposed changes and conditions in the proposal as submitted by Young. Young and Leaney had proposed that the account risk rating remain at 3 A, however Noonan changed the rating to 3 B, denoting a stable rather than improving trend. I note at this stage that the prior $10 million acquisition facility was given a risk rating of 2 by the bank, based on the comfort letter. However this new facility, which was also to be supported by a comfort letter, was given a much lower risk rating though still normal. This reinforces my conclusion above that the risk rating applied by the bank was clearly that of Leigh rather than that of Plessey. As such, the risk rating was inconsistent with any belief on the part of the bank that the comfort letter contained an obligation to pay Leigh's debts or amounted to a guarantee.

**169**     Security was listed in the credit review as the general assignment of book debts and floating charge debenture. Leaney had handwritten next to the description of security that it was to be released, however Noonan struck out her note and substituted "No! See below," in reference to his lengthy typewritten additional recommendations, set out below.

**170**     Under documentation, Young had listed the letter and loan agreements and comfort letter from Plessey Company. Beside the reference to the loan agreements for the cancelled facilities, Leaney had handwritten "to be released," to which Noonan added "only when new security package is in place." To the reference to the comfort letter, Noonan added the handwritten notations: "for $35 million and in the same form, wording and sign off as existing letter, including final paragraph," and "with negative pledge by Leigh Instruments Limited." Noonan explained in evidence his reason for adding this condition was to ensure, if the bank gave up its security on these assets, that Leigh would not be in a position to place security on them in favour of another party.

**171**     In the conditions section, Young included a requirement that Plessey maintain a majority interest in the voting stock of Leigh. In evidence, Young explained that he included this condition in view of the GEC/Siemens takeover bid and the uncertainty surrounding the ownership of Leigh. Even though the comfort letter contained an ownership clause, he explained that he wished to be able to trigger the loan agreement in the event that Leigh was no longer a subsidiary of Plessey. Young also included a condition that the intercompany debt be postponed in priority to the TD debt, to which Noonan added the word "formally." Attached as enclosures to the review were Leigh's audited financial statements for the period ending June 30, 1988, draft financials as at September 30 and a copy of the existing comfort letter.

**172**     Under use of credit and repayment, Young noted that while Leigh's balance sheet indicated some of Leigh's debt should be "termed out" they were prepared to increase Leigh's operating line based on the comfort letter from Plessey, noting as well that the facility was payable on demand. In

the security section, Young commented that Plessey had requested that the security be released, since it was Plessey's policy that all its debt and that of its subsidiaries be unsecured. He recommended acceding to this request in return for the comfort letter. In fact, Young's observation on this point was in error, as Musgrave testified. I accept Musgrave's evidence that Plessey did, on occasion, provide guarantees and other security where circumstances warranted. In support of this finding, I note that in April 1989, Musgrave issued a memo permitting a creditor of Micronav to maintain security over Micronav's assets in the amount of $700,000. Musgrave explained in evidence that there were good commercial reasons in that instance to leave the Micronav security in place.

**173**    In the section on risk assessment, Young observed that the six month delay in the TACAN project had adversely affected Leigh's cash flow and earnings to tune of about $5 million per month. He stated that the acquisition by Plessey and related financing has had a "major negative impact on Leigh's financial position" and that of the $81 million in debt carried by Leigh, $71 million of it was intercompany debt. "Clearly Leigh cannot support this level of debt on its own and consequently this credit depends on the support of Plessey," Young stated, noting that Plessey was prepared to provide a "strong" comfort letter similar to the one attached, and that the risk rating for Plessey itself was 2-low risk. He added that the bank's relationship with Plessey was growing and the Leigh account must be considered in that context, noting again that Plessey was the target of hostile takeover bid.

**174**    Leaney recommended the credit be approved, although she observed that "there is no question that the Plessey support is required here and on that basis, credit is recommended."

**175**    Noonan appended lengthy comments to the credit review and was clearly cautious about the risk. In respect of the request to release the security, he noted that the existing security predated the negative pledge in the MOE and should not be released until acceptable security package was in place. Noonan also observed that the existing comfort letter was "indeed strong," but stipulated that Corporate Banking Division request subordination of the intercompany debt to the TD facility. He recommended the credit on the basis, among other things, that the comfort letter be in the "same form, wording and sign-off as the existing letter, particularly paragraph 3". In cross-examination, Noonan said that although the facility was for an increased amount, and although it was now an operating line, rather than a short-term acquisition loan, he did not see any need to change the wording of the comfort letter, which was substantially the same as comfort letter number one.

**176**    Noonan also noted in the credit review that if a negative pledge was obtained from Leigh he would be flexible on the debt subordination. He retracted this suggestion in handwriting however, in light of the comments of McDowell, who ultimately approved the credit. Noonan testified that he added his own written retraction because he wanted to be absolutely sure the account manager realized that McDowell had overruled and wanted a full Subordination of the intercompany debt.

**177**    McDowell noted "it is preferable to have full subordination of the inter-company loan cause

Leigh will be in no position to repay for some time and in the absence of a call on assets, subordination adheres to spirit of the comfort letter." McDowell testified that it was not his practice to review the documentation accompanying a credit review, and that responsibility rested with the senior vice president who recommended the credit, in this case Noonan. McDowell said he had tremendous respect for Noonan and trusted him implicitly. In the board sheet remarks relating to the CCR, it was noted in reference to the comfort letter: "We are confident that Plessey will support Leigh as required."

**178**     In evidence, Noonan testified he felt the comfort letter was strong, in part because it was signed by people with authority to commit the company, and because in his view the third paragraph, coming from a company with the stature to fulfil its obligations, was a clear commitment to the bank that they would see that Leigh was in funds to repay the amounts due under the loan facility. He said the reputation of Plessey was significant to him, and that with its standing the bank could believe in what Plessey said.

**179**     Accordingly, the bank agreed to release its security and rest its risk on the comfort letter, without stipulating any changes to the wording of the comfort letter, notwithstanding that the form and substance of the letter had been initially approved in the context of a short-term acquisition facility. I must infer from all of this evidence that the bank made this decision based on a desire to foster its relationship with Plessey, as noted in the CCR.

**180**     On February 2 1989, less than a month after the credit was approved, and before a new facility agreement was in place, the English Court of Appeal released its decision in Kleinwort Benson Ltd. v. Malaysia Mining Corp., [1989] 1 All E.R. 785 (C.A) (leave to appeal to the House of Lords refused), overturning the trial decision and refusing to enforce payment on a letter of comfort. Noonan testified that he was aware of both the trial and appeal decisions, but that the appeal decision did not change his approach to comfort letters, as he had always practiced a policy of handling comfort letters with caution.

**181**     At this point, TD did not have an updated facility agreement to cover the outstanding Leigh borrowings. Indeed, the bank had not obtained a facility agreement with Leigh since its amalgamation with Plessey Canada following the acquisition, and the most recent facility agreement had been executed by Plessey Canada the previous April regarding the acquisition loan. The other facility agreement outstanding was for the $5.4 million Leigh operating line, which was dated March 1, 1988, and also predated the acquisition. On February 9, Dean forwarded to Beard at Plessey a proposed facility letter received from TD, which contained a clause requiring the subordination of the intercompany debt and attached a draft resolution to that end. Plessey did not wish to enter into this agreement. Musgrave explained in evidence that Plessey did not wish to subordinate the debt for reasons similar to their reluctance to grant security, and that if subordination had been agreed to, it would restrict Plessey's ability to deal as it liked with the capital structure of the group.

**182**    On the January 10 CCR, Young made a handwritten note on the last page, which he dated March 6, 1989, and which read: "Plessey has refused to provide postponement of the intercompany loan as they view comfort letter as tantamount to a guarantee, which it is. In consultation with WAL, we have agreed to waive that condition." In the body of the CCR, beside the reference to the request for postponement. Young wrote "Plessey has refused, since comfort letter is very strong. We waived postponement."

**183**    In evidence, Mr. Young testified that he wrote this note following a telephone conversation with Ian Musgrave, and that someone from the bank's London office was also on the line, although he could not recall who. Young said Musgrave told him the bank did not need the postponement, that Plessey viewed the comfort letter as tantamount to a guarantee, and that Musgrave's words were exactly as he had recorded them. He said the words "which it is" reflected his own view, arrived at after consultation with the bank's in-house counsel, Norton. This was the extent of Mr. Young's recollection.

**184**    Ms. Leaney testified that Young told her about this conversation immediately after it took place. She said that she and Young had discussed the question of the postponement, and that she had approved the decision to waive that requirement. I note that this was despite McDowell's condition that subordination be obtained.

**185**    This conversation, alleged to have taken place between Young and Musgrave, was a contentious issue in this trial, particularly the statement attributed to Musgrave that the comfort letter was "tantamount to a guarantee". Mr. Musgrave testified that he had no recollection of any conversation with the bank, apart from the call in spring of 1988, when he advised that the first comfort letter would continue to apply following the amalgamation. He said specifically he could not recall ever discussing the meaning and intent of the comfort letter with the bank, and that he did not hold the views expressed in the note. Musgrave conceded on cross-examination a that it was possible he spoke to Young and told him there would be no postponement of the intercompany loan, although he could not recall doing so.

**186**    Musgrave said that comfort letters and guarantees were quite different, and that he would be "amazed" if anyone at Plessey had said that a comfort letter was "tantamount to a guarantee". He elaborated that he and Beard had developed a standard response to the question of what a comfort letter meant, which was to tell anyone who asked that, as a matter of fact, in the entire time he had been at Plessey, the main board had never walked away from a comfort letter. He said the statement was intended to give the banks a degree of comfort, but at the same time they would make it quite clear as part of the response that the board saw comfort letters and guarantees as something quite different. Musgrave said he "certainly" didn't believe that the Leigh comfort letter was tantamount to a guarantee. In cross-examination, he had to concede that since he had no recollection of such a conversation, it was possible the conversation took place, however he thought it was highly unlikely.

**187**    I have considered the evidence of both Mr. Young and Mr. Musgrave on this point, and I prefer the evidence of Mr. Musgrave. Mr. Musgrave was group treasurer of Plessey, and used to dealing with banks and bank security on a daily basis. He was intimately acquainted with Plessey's policy and views regarding comfort letters. He had no recollection of saying a comfort letter was tantamount to a guarantee and thought it was highly unlikely that he had done so. Such a statement was contrary to his set response. Further, he testified that it was his practice, when he had dealings on a file in which someone else was involved, to dictate a note concerning the conversation. Musgrave said he had no recollection of making such a note, nor was he aware of the existence of one.

**188**    There is no reference in Young's note to Musgrave, nor indeed to a telephone call. Jonathan Exton, formerly of the bank's London office, gave evidence in this trial. He was the contact person for Plessey, and Young testified it was "a reasonable assumption" that Exton was the other person on the call. Yet Exton testified he could not recall any telephone conversation with Musgrave up to March 6, 1989, nor could he recall any conversation jointly with Musgrave and Young. No one else was ever identified as being the person from the bank's London office on the line.

**189**    Mr. Young himself, had very little recollection of this conversation, apart from the note. He conceded in cross-examination that the note was not contemporaneous with the phone call, but was made on March 6, 1989, following a conversation with Ms. Leaney. He could not recall how much time had elapsed between the phone call and when he wrote the note. The plaintiff did not produce any contemporaneous note of the phone call. Further, the note was made to record the decision which Young and Leaney had taken it upon themselves to make, to waive the requirement that Plessey postpone the intercompany debt, despite the strong comments from McDowell.

**190**    Finally, Young never again referred to the phone call, or to Plessey's alleged description of the comfort letter as tantamount to a guarantee, in any subsequent bank documentation. Nor did he refer to it in any other communication, written or oral, with Plessey. This description, as attributed to Plessey would have been significant, and would certainly have been recorded in internal bank documents or raised by the bank upon renewal of the comfort letter. However, there is no evidence that the bank ever made any further reference to the alleged statement, although it would have been in the bank's interest to have done so, had the statement actually been made. Since it is improbable that such a key statement, if made, would not have been referred to again in some fashion, the allegation lacks any ring of credibility. I conclude that the conversation between Young and Musgrave and the unnamed third person, did not take place, and that Musgrave did not state to Young that the comfort letter was tantamount to a guarantee. I find that TD did not give up its security, nor did it make any further advances to Leigh after this date, on the basis that such a statement had been made or was purported to have been made by Musgrave.

**191**    In the meantime, unbeknownst to the bank, Plessey was considering an alteration to Leigh's capital structure. In a February 16 memo to Musgrave, Alan Jones the managing director of PESL, expressed concern about the capital structure of Leigh and the high level of interest-bearing debt

which had been imposed upon Leigh for tax reasons. He informed Musgrave the government, as Leigh's main customer had expressed concerns about Leigh's long-term viability in the context of the debt load. At this point in time, Leigh had still not paid any of the interest owing on the intercompany debt from September 15, 1988, despite the increases in its bank line. Musgrave testified that in this period, Plessey began to realize that the financial structure of Leigh was not appropriate. He said that at some point in February or March, Plessey decided to waive any further payments of the interest owing on the debt, and on April 1, converted the intercompany debt into preference shares. He explained the debt had been put in place initially, to offset taxation of Leigh's profits, however Leigh was not generating enough profit to cover the expense. Conversion of the debt to equity removed the burden of the interest expense from Leigh.

**192**    This conversion essentially supplied the bank with the subordination they had requested, since the conversion of debt to equity removed the threat to priority of the bank's loan posed by the intercompany, debt. Musgrave testified, however, that the decision was taken purely for tax reasons, and not in response to the bank's request for subordination.

**193**    At the same time, TD was continuing its efforts to generate business with Plessey on other fronts. On March 16, Exton met again with Musgrave and Beard, and presented them with a revised facility letter for a short-term loan to Plessey of 20 million pounds. At this meeting, Exton also tried to interest Plessey in participating in a Canadian commercial paper program in connection with Leigh. Exton noted Plessey was interested in such a program, but wished to wait until the GEC/Siemens bid situation was over. Exton discussed the bid with Beard and Musgrave and noted that "the tables may be turning in favour of Plessey." They also discussed the Leigh account briefly. Leigh and TD had not yet agreed upon terms for the new facility agreement and Plessey requested a revised copy of the facility be sent to them.

**194**    On March 29, Young forwarded a fresh proposed facility to Exton, who in turn sent it to Beard the following day. By this point the Leigh borrowings were about $29 million and the bank still did not have a facility in place. Moreover, Young conceded on cross-examination that Leigh was well in excess of its authorized credit. Although the January 10 CCR had been approved, the conditions in it had not yet been fulfilled and Young agreed the approval was not operative. The prior authorization was only for $25 million, some $4 million less than the amount outstanding.

**195**    The revised facility letter did not contain a subordination clause. It provided an operating line of $35 million, payable on demand, and noted that the existing security was to be released upon receipt of a new comfort letter. The facility contained a negative pledge against Leigh's assets and requirement that Plessey maintain a majority interest in the voting stock of Leigh. The facility agreement also contained a reporting clause, requiring Leigh to provide the bank with audited financial statements within 90 days of Leigh's fiscal year end unaudited financial statements within 30 days of the end of each quarter.

**196**    On April 4, Beard responded by sending Exton a proposed draft of the comfort letter, asking

him to confirm that its content was acceptable, and that the security held by TD would be released as of March 31, 1989 (Plessey's year end and the date proposed for the comfort letter). Exton wrote Beard on April 10, enclosing a copy of a letter from Young confirming that the draft comfort letter was acceptable to the bank and that the bank would treat the Leigh facility as unsecured as of March 31, provided that Leigh accepted the proposed credit facility and that the letter of comfort was dated the 31st March.

**197**    On April 20, Beard sent Exton an executed copy of the letter of comfort, signed by Walls and Huntbatch and dated March 31. This, the third letter, stated:

> To this is to confirm that The Plessey Company plc has full knowledge of the facility of C $34,000,000 (Thirty four million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

> This letter replaces our letters of 20th April 1988 and 1st August 1988.

**198**    Exton testified that when he received the letter, he simply checked to ensure the letter was for the right amount, and then forwarded it to Young in Toronto. He said he took no steps to determine whether the letter was acceptable to the bank, because this was the responsibility of the account manager. This proposed facility letter was never executed by Leigh.

**199**    Four days later, on April 24, Leigh received its audited financial statements for the year ending March 31, 1989, which showed a profit for the year, before taxes and one extraordinary item, of $4.659 million. The net income for the period was the same figure.

**200**    Meanwhile, the GEC/Siemens bid for Plessey was proceeding apace. Plessey had obtained an injunction to prevent GEC and Siemens for making the offer to its shareholders in December, however the injunction was overturned and GEC/Siemens issued the offer in late December. The

GEC/Siemens bid document indicated that the existing Plessey businesses were intended to be divided between GEC and Siemens and that GEC intended to take a majority interest in Plessey's North American defence electronics industries. The offer was referred to the British Monopolies and Mergers Commission in January, and in April the commission ruled the bid could proceed. The Commission stipulated, however, that certain of the Plessey businesses could not go to Siemens, a German company, for security reasons. Similarly, UK monopoly restrictions prevented certain of the businesses from going to GEC.

**201**    In response, Plessey continue to resist the bid. In a May 2 memo to all Plessey's businesses, managing director Stephen Walls stated:

> As part of our defence we will almost certainly be publishing a profit forecast to demonstrate the financial benefits starting to flow from strategies we have adopted.

> The provisional budget does not yet represent a sufficiently strong performance to fully achieve our objectives. The timing of our forecast requirements is as yet unclear but it is vital that we use forecast to be submitted with April results as the first opportunity to add profit improvement plans onto the budget to create a better platform for our bid defence. Would you please ensure, therefore that profit forecasts and improvements are closely scrutinized to enable us to maximize [sic] performance.

Musgrave said that while he did not recall seeing this memo at the time, he would expect it to be sent to stand alone subsidiaries like Leigh.

The Fourth Comfort Letter and the Bulge

**202**    By the 13th of June, Leigh was again experiencing financial difficulties. Dean contacted Musgrave and requested authorization for a further $4 million bulge in the bank line. That same day, Musgrave sent a memo to Walls asking for approval of "an emergency increase in the borrowing limit". Musgrave explained in evidence that although he could not recall the precise reason for the urgency, the request had to be turned around very quickly. He said Dean would have needed the money fairly rapidly, and could not wait until the next scheduled board meeting for approval of the increase. Walls approved the request, and Beard informed Dean on June 15 that the borrowing and guarantee limits bad been increased by $4 million to $38 million. The increase was approved to the end of August only, at which time it would revert back to $34 million.

**203**    Having received Plessey approval, Dean then wrote to Young at TD and requested the $4 million bulge, leading Young to prepare a CCR of Leigh dated June 15. Young described the submission as urgent and requested a decision as soon as possible. The purpose of the CCR was to lower the amount of the operating line from $35 million to $34 million, which was the amount

supported by the third comfort letter, and to obtain approval for a temporary $4 million line until a August 31st. The risk rating remained unchanged at 3B (normal risk). In the remarks section, Young noted that Leigh had missed milestones on both the TACAN and SHINCOM contracts, with a consequent impact on cash flow leading to the bulge request. Young pointed out that the bulge had been approved by Plessey, but that Plessey was reluctant to amend the comfort letter for such a short period. However, "Plessey has agreed to provide a new comfort letter if outstandings are not back in order by August 31/89." Young then observed that the general assignment of book debts and floating charge debenture over Leigh's assets had not yet been released, despite the fact the bank had received the new third comfort letter from Plessey, and that the security would not be released until the outstandings were back in order. He noted that TD London confirmed Plessey's account rating of 2 - low risk - and concluded "believe the risk is acceptable." Leaney recommended approval of the credit, which was then forwarded to James Laitner, senior vice president, Credit Division. Although he recommended approval as well, he stipulated that the security was not to be released until the bulge was repaid or a new comfort letter received for the increased amount. The credit was ultimately approved by William Brock, the executive vice president, Credit Division, without comment.

**204**    On June 26, Young sent Noonan a memo updating him on Leigh's credit situation and the condition that security not be released. He reported that in-house counsel had advised TD would be in a conflict of interest if it retained the security, given that TD had signed the MOF containing a negative pledge, and given the agreement in writing to release the security. Noting that Plessey had agreed to provide a new comfort letter if the bulge was required beyond the end of August, he stated "We have a good relationship with Plessey and believe the risk is acceptable. Although the hostile takeover bid by Siemens and GEC is a concern, it will likely take beyond Aug. 31/89 to complete or resolve. We request that the condition for the approval of the bulge, that our security not be released, be waived."

**205**    Leaney agreed, although she observed "clearly a higher comfort letter is the best solution but for relationship reasons would go along." Noonan added his own comments: "The new comfort letter is certainly strong & I am told by CBD actually boarded by Plessey Co PLC." He added that the bulge was clearly to the end of August only, but pointed out that the MOF did permit encumbrance of 10 percent of Plessey's group assets and that the bank security predated the MOF in any event. He concluded that he would agree to release the security "if it is the Co request to do so." The decision to release the security was alternately taken by Brock: "We have agreed to release the security and would proceed to do so, resting the exposure on the comfort letter." An executive review sheet regarding the release of security was initialled by Noonan, Brock, McDowell, bank president Robin Korthalls and Thomson, the chairman and CEO of the bank. It noted the risk rating of Leigh at 3B (unchanged) and specified the audited year-end financials be obtained prior to Leigh's annual review date of September 30, 1989. I note that Young's letter sent to Beard on April 10 stated the security would be released when the comfort letter was delivered and the credit facility accepted by Leigh. This latter condition had not yet been met.

**206**     On June 27, Young sent a new facility letter to Leigh. At this point, the most recent executed facilities remained that accepted by Plessey Canada in April, 1988 and the Leigh facility executed March 1, 1988. The facility offered an operating line of $34 million, was payable on demand, and listed security as nil, with a note that the existing security was to be released. The facility contained the same terms and conditions regarding Plessey majority interest in Leigh's voting stock and Leigh's financial reporting requirements as had been contained in the last proposed letter. In a separate letter, Young offered the $4 million temporary bulge, on the understanding that Plessey would provide a further comfort letter if the funds were required past the end of August. Both facility letters were accepted by Leigh the same day.

**207**     In London, Exton wrote to Beard on June 29, enclosing a draft letter of undertaking for Plessey to sign regarding the possible extension of the comfort letter at the end of August. Musgrave executed the letter without any change to the draft:

> We are writing to confirm our agreement with Mr. Michael Walzak on the telephone last week with respect to the temporary increase in the operating facilities for Leigh. We are aware that Leigh requires its operating line to be increased from C $34 million to C $38 million for a period of two months. Since at this time this is only a temporary requirement we will not revise the Letter of Comfort (dated 31st March 1989) to reflect the increased amount. However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the Letter of Comfort accordingly.

Exton forwarded the letter to Young on June 30th. The $34 million guarantee limit and $38 million borrowing limit for Leigh received retrospective approval of the Plessey main board on July 28.

**208**     On July 8, Leigh received its unaudited first-quarter financial statements for the quarter ending June 30. These financials showed net earnings for the quarter of $131,000 before deductions for taxes and an internal Plessey Group payment. After deductions, the financials showed a loss of $181,000 the financial statements included a quarterly forecast to the end of the fiscal year, projecting net earnings as at March 31, 1990 of $8.379 million. The information contained in these financial statements was sent to the bank pursuant to Leigh's reporting obligations, by letter of July 21, 1989, together with the executed facilities for the $34 million operating line and the $4 million bulge.

**209**     By the end of July however, Leigh was showing an increased loss. In the Plessey corporate finance report for the month of August, Leigh was listed under the heading "major loss makers". Leigh had budgeted a profit of 1.246 million pounds for the period to the end of July, but in fact reported a loss of 326,000 pounds. Hence Leigh reported a negative variance from its budget of 1.572 million pounds. The Plessey corporate finance reports were produced monthly by the Plessey treasury department. In evidence, Binnie Sammon, group chief accountant at Plessey, testified that

the corporate finance reports were distributed to a restricted list of recipients, including Walls, Musgrave and Huntbatch. Musgrave testified that while Leigh was showing a loss in that period, there were other subsidiaries with worse numbers, and there was nothing in the report which would have caused him to get "too excited".

**210**    On August 17, GEC and Siemens released their proposals for the Plessey businesses in the event that the takeover was successful. David Newlands, the GEC finance director, explained in evidence that there were two components of the Plessey businesses which particularly interested GEC and Siemens; the telecommunications aspect of the business and the defence electronics aspect. He said the original plan had been for GEC and Siemens to operate the Plessey businesses in partnership, however the Monopolies and Mergers Commission in Britain refused to permit Siemens to participate in certain defence businesses and refuse to allow GEC takeover other of the Plessey businesses for monopoly reasons. The conditions imposed by the commission led to the GEC/Siemens final offer document on August 17. In that document, GEC and Siemens set out their plans for restructuring Plessey and indicated that Leigh was intended to be wholly-owned by GEC if the bid was successful.

**211**    In TD's annual Corporate Credit Review of Plessey, dated August 25, the bank noted that a 20 million pound facility and the MOF were still in place, but had not been drawn upon. The CCR of Plessey also contained an update on the status of the takeover bid, however Brock noted "financial covenants protect if there were a takeover and restructuring."

**212**    Frank Driscoll had assumed his new role as president of Leigh on Aug. 8, and on August 23 had a short meeting with Young and Leaney, although he described it as a social, get acquainted meeting rather then a business meeting.

**213**    On August 29, Pat Smith of the Leigh finance department contacted Beard at Plessey and requested that the $4 million bulge be extended past the end of August to the end of November. The Leigh outstandings at that date were $34.8 million. The next day, Young relayed to Noonan a request for extension of the bulge to the end of October.

**214**    Young recommended approval of the request provided Leigh supply their written acknowledgment, and added that he did not believe it was necessary to obtain a new undertaking from Plessey. He based this recommendation on the fact that Leigh's balance sheet had improved dramatically with the conversion of intercompany debt, and noted that he and Leaney had met with Driscoll and believed this gesture would demonstrate the bank's support, thus generating goodwill and new business. Although he referred to the hostile takeover bid, he erroneously stated that it was unlikely to be completed before October 31st. Young noted in conclusion that the potential market for Leigh's MLS program was $300 million in Canada and $4 billion worldwide. The request was reviewed by Owen, who recommended the bulge be extended as long as Plessey was notified of the extension and Leigh formally requested it. Brock approved the extension without comment.

**215**    Meanwhile, several weeks earlier Musgrave had informed Walls he was leaving Plessey at

the end of August. Notwithstanding that the bank had not requested a further comfort letter relating to the bulge extension, Plessey nevertheless prepared one on its own initiative, in substantially the same form as the earlier letters. One of Musgrave's last acts before leaving the company was to review a draft of this letter. The comfort letter was executed by Walls and Huntbatch on behalf of Plessey and sent to Exton, who faxed it on to Young on September 7, with the explanation that "Plessey appreciated that the Bank was not requesting a revised Letter of Comfort, but as they had promised one, if the facility was required beyond August, and in view of GEC/Siemens bid, it was considered appropriate to do so." Exton testified he simply checked the amount and that the document was a comfort letter before forwarding it to Young. The fourth comfort letter stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C $38,000,000 (Thirty-eight million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

> This letter replaces our letters of 31st March 1989 and 30th June 1989.

The GEC Siemens Takeover

**216**    On September 8, 1989 the GEC/Siemens offer to purchase the shares of Plessey was accepted by more than 50 percent of Plessey's shareholders, and the hostile takeover of Plessey succeeded. GEC and Siemens ultimately paid 2.2 billion pounds for Plessey shares. On September 22nd the new owners held a Plessey board meeting, at which they elected a new Board of Directors composed of representatives of GEC and Siemens, including GEC finance director David Newlands. Shortly following the takeover a great many of the Plessey senior management left the company, either having resigned or having been terminated by the new owners. Stephen Walls left on October 6th and Denise Beard left on November 3rd.

**217**    On September 28, each of GEC and Siemens put forward a candidate for managing director

of Plessey. The two nominees were to work together to manage Plessey from that date forward. Simon Weinstock was appointed by GEC and Phillip Gerdine by Siemens. Gerdine testified that from the outset he and Weinstock proceeded with several goals in mind. He said they intended to separate the Plessey businesses into units to be acquired by GEC and by Siemens. Those businesses remaining in the Plessey "rump" following this "hive-up" of the Plessey companies were to be liquidated. Gerdine explained that GEC and Siemens had purchased Plessey for about $4.5 billion U.S. and held the interest roughly 50-50. He stated that the hive-up exercise was a two-step process. The first step was that GEC and Siemens had to decide what companies would go where and then, how much the companies were valued at. He said allocation of the companies fell into two categories; those mandated by the U.K. government and those which were discretionary. Because it was a hostile takeover, the discretionary companies had been allocated preliminarily on the basis of very little information. Gerdine said GEC and Siemens put in place teams of people to determine the fair value of Plessey's assets, and each of the subsidiaries was subject to a review based on revenue earnings and net book value. Those values then had to be reconciled within the $4.5 billion purchase price.

**218**    Gerdine testified GEC and Siemens each took responsibility at the outset for the companies intended ultimately to be held solely by them. He said he took responsibility for the Sirens companies, Simon Weinstock for the GEC companies, and companies remaining in the rump were administered jointly. At the time of the takeover, Plessey had in place a set of rules and procedures governing financial reporting of the subsidiaries to the parent, and the new owners left those in place for the purpose of public filing of Plessey's financial reports. Each of GEC and Siemens applied additional internal financial reporting requirements in accordance with their respective practice.

**219**    News of the takeover was greeted by Exton as a further opportunity to develop business. He forwarded the original of the fourth comfort letter to Young in mid-September with the note: "As you know the GEC/Siemens bid for Plessey has been successful, and we now hope to develop our relationship with GEC. Hugh Rising and I will be visiting David Newlands, Finance Director, on 3rd October, 1989 and if you have any items for discussion, please advise me."

**220**    Almost immediately, the bank began to consider the effect of the takeover on Leigh. Ernest Mercier, executive vice president of the Corporate Banking Division contacted the bank's Montreal office which in turn contacted Canadian Marconi, which was owned 51 percent by GEC. A Montreal based vice-president of Corporate Banking wry to Mercier on September 13, noting that CMC had accepted in principal the notion of a merger with Leigh, in view of the similarity in their product lines.

**221**    On September 19, Mercier had an executive luncheon with Leigh president Frank Driscoll, the purpose of which was to solicit any business opportunities arising out of the takeover. In a briefing memo prepared in advance of the luncheon, Young advised Mercier of Leigh's contract related cash flow problems and of the Plessey comfort letters. Young pointed out the possibilities

for merger with CMC, and repeated the market estimates for the MLS system. He reminded Mercier that TD was Leigh's only banker, and that CMC did all its banking with the Royal Bank. He concluded that the London office had been unable to establish a meaningful relationship with GEC and "In addition to identifying opportunities arising out of the Plessey acquisition (e.g. fairness opinion on Leigh), we have a substantial interest to protect." Driscoll testified that when he met with Mercier, the discussion focused on the prospects for Micronav, and on the future of Leigh's banking relationship with TD in light of the possible CMC merger. The comfort letter was not discussed.

**222**    Driscoll testified that Leigh was aware it was intended to be wholly-owned by GEC fairly shortly after the takeover, if not earlier. He said that Dean attended a briefing on GEC accounting policies in England in late September or the first week of October.

**223**    The day after Driscoll's lunch with Mercier, on September 20, 1989, Young prepared a new CCR of Leigh in order to renew the existing facilities on the same terms, and to downgrade Leigh's risk rating from 3B to 4. In the remarks section, Young noted the recent acquisition of Plessey by GE Siemens and that Leigh was slated to go to GEC. "Although we were aware of the hostile takeover bid by GEC/Siemens, we are comfortable with the quality of their credit and hope to use our positions with Leigh/Plessey to develop a relationship with GEC." Young describe the uncertainty about Leigh's ownership and possible merger with CMC as a weakness however, leading to the revised risk rating of 4.

**224**    This CCR also mentioned the contract delays and missed milestones on SHINCOM and TACAN, observing that "A restructuring of the company's debt is clearly required". Young speculated that in view of GEC's cash resources and Leigh's tax position, it was likely that Leigh would receive an equity injection to pay out the bank. Young elaborated in evidence that Leigh had a number of research and development tax credits and carryforwards and that they were not taxable as a result. In that situation, he said it made sense for a parent with taxable cash to put in into the nontaxable subsidiary. He testified he vaguely recalled discussing this issue with Dean. The CCR concluded that TD Montreal would solicit opportunities arising out of the Plessey acquisition, including the possibility of providing a fairness opinion to CMC. Young explained in evidence that given 49 percent of CMC was publicly held, a fairness opinion on any acquisition or merger with Leigh would be required.

**225**    Leaney reviewed the CCR and recommended renewal of the facility but suggested, while the risk was increasing, that a rating of 3C was more appropriate, and Young agreed. Noonan in turn recommended the rating remain at 3 B in light of the "strong and renewed comfort letter" and the intercompany debt conversion. He testified that he reviewed the attached comfort letter at this time. McDowell agreed and authorized the credit.

**226**    An October 2 Credit for Executive Circulation distributed to senior bank executives regarding the Leigh credit misstated the terms of a comfort letter, describing it as at commitment "to

maintain ownership and to manage Leigh Instruments in such a way as to be always in a position to meet their financial obligations."

**227**    Just two weeks after the new Plessey board was in place, on October 3, Exton and Rising met with Newlands and reported GEC's intention to integrate Plessey's operating subsidiaries into its own businesses. Exton pointed out the bank's relationship with Leigh and observed that Newlands was familiar with Leigh's tax position and low profits, however Newlands advised refinancing of Leigh was premature. Exton noted GEC had not yet decided whether to sell Leigh 100 to CMC but that Newlands noted the bank's interest in providing a fairness opinion. As follow-up, Exton advised that the bank should maintain close contact with Leigh and CMC in Canada, and attempt to develop a relationship with GEC Treasury Department in the U.K. Newlands testified they did not discuss the Leigh comfort letter.

Fall 1989 and the Fifth Comfort Letter

**228**    Back at Leigh, by mid-October Driscoll had received some financial results for the month of September, which revealed a further deterioration. In September, shortly after arriving at Leigh, Driscoll had initiated an ETC review of all Leigh's SHINCOM and TACAN contracts in progress to estimate the cost of completing the contracts. The review involved the calculation of the ETC or estimate of the cost of completing the contract. That figure, combined with the actual cost incurred to date, would generate an estimated cost at completion of the contract of EAC. The EAC would then be compared to the contract price to measure the financial success of the contract. Driscoll testified that to the extent that a business had a fixed price contract, periodic calculation of EAC's was an important indicator of performance.

**229**    Driscoll explained that he attended reviews of Leigh's programs in August and became aware that the actual cost spent on SHINCOM had already exceeded the most recent EAC for that project, and there were several months left before completion of the contracts. He said this information, combined with the fact that there had not been a rigorous ETC review since early in the year, led him to implement the review. He said quarterly ETC reviews were ordinarily standard on larger contracts. When he arrived at Leigh, he said the company had about 20 major contracts and that the SHINCOM and TACAN programs comprised the larger part of the business.

**230**    David Newlands, finance director of GEC, visited Leigh in person on October 20, 1989, accompanied by David Rickard, finance director at GEC Marconi to learn more about the new acquisition. In preparation for the meeting, Newlands received a briefing memorandum on Leigh prepared by Colin Justice, divisional finance director at PESL, who was at Leigh participating the fair value exercise for the GEC Siemens hive up of Plessey. In addition, on October 2nd, very shortly after the takeover, Newlands had reviewed the opening balance sheet for Leigh incorporating the purchase accounting adjustments implemented by Plessey as of April 5.

**231**    Justice's briefing memo to Newlands noted the difficulties with SHINCOM and expressed the concern that Leigh's performance might not be technically adequate. He pointed out SHINCOM

had failed to meet some technical tests in the contract, giving rise to a need for additional program management and engineering expense. Justice observed that this was an area where they should be highly conservative in the fair value exercise. Newlands explained in evidence that accounting provision should be made for the contract risks in the context of the fair value exercise.

**232**    The Justice memo pointed out that there had been major program deterioration for both TACAN and SHINCOM and that the EAC's had worsened substantially. Regarding SHINCOM, Justice wrote that the product was not "technically secure and underwritten". Newlands testified that this statement put him on notice that all the financial information about the project was open to "extreme doubt." He said if the program was not technically secure, it could not produce a reliable EAC. The memo showed a forecast loss for the year ending March 1990, of $2.316 million.

**233**    The Newlands and Rickard visit took place in Leigh's Kanata, Ontario offices on Oct. 20. Leigh prepared a presentation for Newlands and Rickard on the company's programs and financial condition, including the ongoing ETC review and fair value exercise. The transition to GEC accounting principles was also discussed and Newlands instructed the company to take care to distinguish between operational issues, such as the ETC results, and adjustments to the balance sheet resulting from the fair value exercise.

**234**    Included in the material presented to Newlands and Rickard at the meeting were second-quarter financial statements, in Leigh accounting format, to the end of September. These results showed an actual loss to the end of September of $2.85 million and a forecast loss of $1.5 million to the end of the fiscal year. Newlands was also given a preliminary draft of the purchase accounting adjustments following the GEC takeover, and a copy of Leigh's cash requirements forecast. The forecast showed the bank line outstanding at $36.081 million as at October 16, with a forecast overdraft of $35.774 million at the year-end on March 31st 1990.

**235**    Newlands drafted a memo to file following his visit to Leigh in which he recorded his view that the business was in poor shape and, using GEC accounting principles, trading at a loss and absorbing cash. He noted that "The businesses have prepared September management accounts in GEC format but do not reflect current contract cost to complete reviews and changes to GEC accounting policies. As a result of the half year reviews, adoption of GEC accounting principles and purchase accounting, there will be significant changes to the results to 30 September, and the Balance Sheet will have to be restated in the October management accounts." Newlands added that these changes would leave Leigh showing a "significant loss."

**236**    He observed that, in his view, the Plessey budgets for the business were "hopelessly optimistic and should be disregarded," and that support from Marconi would be required to turn the business around. Newlands noted that Driscoll was "showing the right attitude," but that Dean was under pressure and in Newlands view not up to the job.

**237**    Six days later on Oct. 26, Leigh produced a revised half year forecast, which showed an actual loss of $15.634 million to Sept. 30 and forecast a loss for the year of $12.813 million.

Driscoll testified that these figures reflected an incorporation of some of the ETC results, including a loss on the SHINCOM program of $6.88 million. The report noted that the results would likely require further re-statement to reflect purchase accounting adjustments, and that a number of unquantifiable risks regarding SHINCOM and TACAN had not been provided for. This report was forwarded to Rickard, Justice, Flower and Shepherd.

**238**    Pursuant to the financial reporting obligations contained in Leigh's facility agreement, Leigh was obliged to provide TD with unaudited quarterly financial statements within 30 days of the end of the quarter. Thus, the quarterly statements for the period ending September 30 were due on October 30, four days alter Driscoll's six-month results were prepared. Driscoll conceded in cross-examination that the six-month results did constitute an unaudited interim quarterly report.

**239**    Also on October 26, Young wrote to Dean, to confirm that the bank had agreed to discharge its security and would do so forthwith. The next day Dean wrote to Young and requested a further extension of the $4 million bulge to July 31, 1990, due to persisting problems with the SHINCOM program. Dean attached a copy of the cash flow forecast which had been presented to Newlands on Oct. 20 and which showed an estimate of the bank line at $35.57 million as at the end of December, and $35.774 million as at March 31, 1990. He enclosed an executed facility agreement renewing the operating line on the same terms and conditions, and a facility executed September 18 regarding extension of the bulge. The bulge facility offered an extension only until October 31st however, and the offer to extend had expired on September 15. The package sent to Young did not include the October 26 half year results, with their actual and forecast losses.

**240**    In a letter dated October 30, and sent to Exton along with about 40 other banks, GEC, Siemens and Plessey invited TD to provide Plessey with an uncommitted bank facility. The invitation was signed by Anderson, Huntbatch and Gerdine. Anderson testified that following the takeover, GEC and Siemens decide to cancel Plessey's MOE and instead borrow from one of a number of available bank facilities, depending on terms offered on any particular day. The package included a copy of the GEC Siemens final offer for Plessey with details of the proposed restructuring of Plessey. The letter noted "Siemens and GEC are prepared to guarantee, on a 50/50 several basis, such new borrowings. Therefore the terms of these new borrowing facilities should be based on the creditworthiness of Siemens and GEC." The letter added that in view of the security offered and the reduction in treasury staff at Plessey, preference would be given to those banks who accept the shortest, simplest, standard documentation. A committee of the GEC board passed a resolution prior to the issuance of this letter, authoring Anderson to sign, on behalf of the company, this letter which included a commitment to provide a several guarantee.

**241**    Several of the key players in the piece changed at the end of October. On November 3, Denise Beard, who had been assistant treasurer, left Plessey. On the same day, Greg Young, who had been in charge of the Leigh account since 1987, left TD and was replaced by Rob Wilson. His evidence was that there was a two or three week period when he overlapped with Young. During that period, he said he shadowed Young day-to-day to "assimilate" the relationships he would be

taking over. Wilson said he familiarized himself with Leigh account by discussing it with Young and reviewing the file. He said he did not discuss the Leigh file with his supervisor Leaney, nor did he review the comfort letters. Also during this period, GEC treasurer Ross Anderson began to receive weekly cash reports from Plessey.

**242**    On November 8, Young and Wilson met with David Dean at Leigh. In the meeting, Dean advised the bankers that Leigh's numbers were getting worse, and told them there were legal disputes with some of the contractors involved in the SHINCOM program. Wilson said Dean told them he could live with a $38 million operating line, but if there was no change, Leigh might require further funds from TD or GEC. In his notes of the meeting, Wilson jotted "new forecast forthcoming". In evidence, he said at this point in the meeting he asked Dean for financial statements. He said Dean told him there would be a new forecast forthcoming but that the financial statements were not available because the acquisition accounting issues had not been resolved. Wilson also noted "fold in or fund $10 million or more". He said Dean told him Leigh a couple of options available to it. One was an acquisition by CMC, or in the alternative they would need further funding of $10 million. Wilson testified Dean told them if other money was required from TD another comfort letter could be provided: "Q. From Whom? A. He said GEC, once they took it over, but I understood at this time that it would be a Plessey comfort letter consistent with the previous ones." Young testified he had no recollection of this meeting.

**243**    On November 15, Exton and three other managers of Corporate Banking produced a CCR of Plessey in relation to the invitation of Oct. 30 to provide Plessey with an uncommitted facility. The risk rating was 1 and was described as that of the parents, and the proposal was to increase the 20 million pound facility already available to Plessey to 50 million pounds. Under security, they noted that GEC and Siemens were offering unconditional and irrevocable 50-50 several guarantees. Documentation referred to a facility agreement containing a material adverse change clause. In the remarks section they noted that despite the fine pricing, TD had enjoyed a strong relationship with Plessey but had not had a relationship with GEC, and they hoped to forge such a relationship through Plessey. They noted other opportunities with CMC and Leigh merited this business for relationship reasons. Senior vice president, credit division, Sid Owen recommended the credit on the basis that the guarantees be supported by a directors' resolution and solicitors' letters of opinion. Brock also recommend the credit, which was ultimately approved by McDowell who reduced the risk rating to 2 on the basis that 1 was reserved for governments.

**244**    In mid-November, the corporate finance report for October showed a cumulative Leigh loss of $15.6 million to the end of October, and a forecast loss to year end of 8.45 million pounds. On Nov. 17, Driscoll forwarded a copy of the October President's Report to Lord Weinstock, managing director of GEC, directly. The financial results to October 27, which were attached, showed a cumulative loss to October 27 of $16.677 million, and the Leigh loan outstanding at $38.5 million, some $500,000 in excess of the authorized credit.

**245**    In the week of November 20, Leigh completed the ETC review process and Justice reed to

Leigh to assist in preparation for the half-year review meetings to be held at GEC's Marconi's offices in Stanmore, U.K. the following week. Wilson testified he had a conversation with Dean on November 23rd, in which Dean indicated his concern that Leigh might go into overdraft the next day. He said Dean also advised that Paramax, the major contractor in connection with SHINCOM, wished to withhold a $5 million payment due to Leigh until early in the new year. As a consequence, Dean asked for a further $5 million from the bank. Wilson said he wasn't concerned as Dean advised they would be invoicing Paramax about $10 million in December. Wilson's note of the call stated: "full comfort from Plessey, even GEC." He said Dean told him any additional borrowings would have full comfort from Plessey, and even GEC. Wilson said he did not ask about the overdue financial statements. It is clear to me, and I so find, that the term "full comfort" refers to the full amount of the authorized line of credit.

**246**    In late November, Dean called Wilson. Justice was on the call and since Wilson and Justice had not met previously, Dean introduced him to Wilson as the PESL divisional finance director. There was discussion concerning additional short term borrowing up to $41 million. Justice raised the possibility of a floating letter of comfort, but Wilson rejected this concept. Wilson testified that either Dean or Justice confirmed that the Paramax payments would be coming in January. Wilson was advised that Leigh planned to reduce its work force in the near future, possibly in March, but perhaps earlier, with consequent severance obligations. Wilson did not commit to the increased borrowings. He took the lay-off as "somewhat positive". There was no discussion of Leigh's financial statements.

**247**    Wilson stated in cross-examination that Justice had "indicated" to him during this conversation that "We'd get the same comfort letter." He conceded when pressed that Justice did not "expressly say that." "He did not say those words" but he said "we'd get full comfort" and "I clearly understood that we were getting the same comfort letter." Wilson said it was clear to him what Justice meant, and he took it the letter would be in the same form. He conceded further that Justice did not say the comfort letter would be in the same form. His note was silent on this point.

**248**    I am not satisfied that there was any discussion during this telephone conversation in late November concerning the form of the comfort letter or that it would be in the same form as the previous letters, and I find that Justice made no such statements, or representations to this effect to Wilson.

**249**    On November 28 and 29 Driscoll, Dean and Justice attended a series of meetings at GEC Marconi offices in Stanmore. The purpose of these meetings was the GEC half-year review. The first day, Driscoll testified they met with representatives of GEC Marconi and the second meeting was attended as well by Simon Weinstock and David Newlands. He said they presented a package of financial material on the first day and essentially responded to questions. The material had been prepared in Canada with the assistance of Justice and then finally revised the day before the meetings in England.

**250**    The financial information presented at the meeting disclosed a forecast loss to year end of $19.608 million. Driscoll said this increase in the projected loss from the October estimates was due in large part to the ETC review. The revised six-month figures to the end of September, also included in the package, showed an actual loss of $18.85 million.

**251**    Driscoll testified that the meeting on November 28 was largely a fact-finding meeting and that the GEC Marconi representatives commented from time to time but gave no broad reaction to the size of the losses, nor did they comment on any options for Leigh for the future. On the second day, the meeting was attended by Simon Weinstock and David Newlands. Driscoll said this meeting was much shorter and that Newlands zeroed in on SHINCOM and TACAN which Driscoll said were the largest components of the losses. He said again there was no comment on any future options for Leigh, but that Leigh's position in the GEC group could be characterized at this time as uncertain.

**252**    Driscoll testified that at the conclusion of the second day, he with the assistance of Justice, presented a written request for an increase in the bank line. He said some combination of Justice, Newlands, and Rickard said they would take care of the request, and that Justice and Rickard were charged with doing further work on the issue.

**253**    In cross-examination, Driscoll was asked whether Newlands was left in charge of the issue and he answered that he was not sure Newlands was. This is consistent with the evidence of Newlands, who testified that he probably led the discussion, and that Leigh and Marconi management were then charged with producing more support for the request. He said the request would have come back to him because he had led the discussion, but that treasury actually reported to Simon Weinstock. Newlands also testified that he had no recollection of any mention in the meeting that Leigh ought to be allowed to go bankrupt. Following the meetings Leigh was instructed to provide a weekly cash report to GEC, which Newlands explained was an attempt put pressure on the business to utilize its cash resources as sparingly as possible.

**254**    Driscoll testified that following these meetings he was of the opinion that Leigh was terminal, absent a significant change in its capital structure or relief from contractual requirements. There was no evidence that he expressed this view to anyone at Plessey or GEC at the time. In cross-examination, Newlands disagreed with Driscoll's assessment that the company was terminal on the basis that the technical baseline was not secure and hence, Driscoll didn't necessarily have all the information he needed to reach such a conclusion. However, I do note that a concerted effort to negotiate contract relief with the Canadian government was commenced by Leigh in early January, with the assistance of GEC and Plessey. These efforts continued right up until Leigh's bankruptcy.

**255**    Rickard wrote to Newlands on December 1 that Leigh had now demonstrated a need for essential payments, particularly payroll. He noted Justice would visit Leigh the following week to review the cash requirement in depth, and report back to him. In the meantime, he wrote that it would be sensible to extend the limit to $41 million and monitor it weekly. He closed by noting that

this would require an uplift in the comfort letter.

**256**    On November 30, Derek Thorn, Plessey finance director, group services, faxed GEC treasurer Ross Anderson, with information on Leigh's line of credit and cash forecast, and a copy of the fourth comfort letter. Anderson and Hafner had been made available to assist the Plessey treasury department on an as-needed basis in view of the depletion of their personnel following the takeover. Regarding the proposed increase in the bank line, Thorn noted that Leigh had asked for an increase to $45 million but Justice had recommended it only be increased to $41 million. Thorn suggested that if Simon Weinstock and David Newlands approved the increase to $45 million, the company be instructed not to exceed $41 million without a specific approval from the U.K. In conclusion, Thorn asked Anderson to notify him when the increase had been approved, and "can we then discuss the mechanics, particularly the form of comfort letter that may be required."

**257**    Anderson said when he received the memo he probably looked at the attached cash forecast but it did not indicate anything of significance to him. He said he could not recall discussing the increase with Newlands or Simon Weinstock but that he must have done to get their approval. Newlands reluctantly approved the requested increase, and Justice, who was at Leigh, was informed of the approval on Dec. 6.

**258**    Upon receiving the package from Thorn, Anderson said he reviewed the copy of the fourth comfort letter which was included and made some changes to it. He explained in evidence that he did this in order to make the letter as accurate and as clear as he could. Anderson did two different markups on the comfort letter. He testified he would have done the first one at the same time or immediately after receiving the comfort letter and a second, more detailed markup a few days later. Anderson added to the third paragraph of the letter the words: "and does not constitute a legally binding commitment."

**259**    Anderson testified that he did not make any inquiries into the terms of the Leigh facility, the history of the loan, or how the comfort letter had been arrived at. He did not view the comfort letter as a legally binding commitment, but testified that he added the words "does not constitute a legally binding commitment" to eliminate any doubt or uncertainty. He said he did not consider it to be a change of any substance, but he felt that with the added words, it was 100 percent certain that the letter was not binding, and without them it was slightly less certain. David Newlands testified that Anderson stopped him in the hall and showed him the comfort letter with the handwritten changes. He said Anderson asked him to read and "bless" it, which he did.

**260**    Exton testified that Anderson called him on December 6 or 7 and advised that permission had been granted to increase the loan facility to $45 million but that the borrowings were not to go above $41 million without Anderson's explicit approval. Exton said this struck him as being an unusual request as Anderson was taking direct control of the advances to be made to a subsidiary of a joint venture involving GEC, and that he had never received such a request in his banking career.

**261**    Exton testified that he and Anderson also discussed the possibility of TD providing a fairness

opinion on the possible Leigh CMC merger. As well, he said Anderson told him he would forward to Exton a revised comfort letter for $45 million, and that this would be done with the full knowledge and approval of GEC and Siemens. Exton passed this information on to Wilson.

**262**    Anderson testified in relation to this conversation that he might well have told Exton he would forward a new comfort letter. Although he could not recall the conversation, he did not believe he would have told Exton the comfort letter would be revised with respect to the amount of the facility alone, because he had already started to amend the comfort letter by this time. He said he did not discuss the changes in the comfort letter with Exton, nor did he tell him about the added words "does not constitute a legally binding commitment." Anderson testified that if he had felt he was making changes of substance, he likely would have told Exton. He said he had expected the bank to read the letter, which was only a one page document, and said if the bank had not agreed to any of the language of the comfort letter, he had expected they would indicate this upon receipt of it. I accept Anderson's evidence. He was a credible and forthright witness.

**263**    Wilson at TD prepared a CCR of Leigh dated December 6, to formally cancel the $4 million bulge and authorize an increased operating line of $45 million. The risk rating remained at 3B and security was listed as nil. Documentation was described as a $45 million comfort letter and letter agreement. The terms and conditions remained the same as the prior facility.

**264**    In the remarks section, Wilson noted that the funding was necessary due to the delays in receiving cash payments from Paramax, the main contractor on the SHINCOM contracts. He observed that:

> Any additional borrowings will be fully supported by a Plessey letter of comfort. Jonathan Exton of TD-London has been in contact with Ross Anderson, Group Treasurer of GEC regarding this. Anderson is providing a letter of comfort from Plessey with the full knowledge and approval of GEC and Siemens to cover Leigh borrowings up to $45.0 million. Internally, Plessey will cap Leigh's borrowings on a weekly basis at levels below the $45.0 MM to keep pressure on Leigh to manage its cash flow; consequently, while we will have authorized availability of $45.0 MM, Anderson will personally approve any excess borrowing requirements above $41.0 MM and he does not plan to disclose to Leigh the full extent of Plessey's letter of comfort support.

**265**    In the next paragraph, Wilson referred to Leigh's revised cash flow forecasts projecting peak borrowings of $43.3 million in December, and expected to fall below $36 million upon receipt of the Paramax payments in January.

**266**    Wilson noted as well that TD intended to bid on a fairness opinion for CMC regarding its potential acquisition of Leigh, and that the bank had recently offered Plessey a 50 million pound uncommitted facility. Under strengths, Wilson observed that the revised comfort letter covered borrowings of Leigh, and that Plessey was ultimately owned by GEC and had access to significant

parent company resources. He listed Leigh's weaknesses as delayed contract payments which had impacted cash flow and dependence on defence industry expenditures which had suffered cutbacks. Finally, he noted: "There is still continued uncertainty over Leigh's ultimate ownership; however, we believe that this does not represent a significant credit risk in view of strong existing parent company support." Leaney concurred and recommended approval with the note "the support letter justifies."

**267**    Noonan reviewed the application on December 8th and recommended the credit on condition that the comfort letter was in the same form and substance as the Aug. 31/89 letter attached to the review, "particularly to include para. 3", and that no borrowings be extended beyond $41 million without the prior approval of GEC's group treasurer. These conditions were never communicated to Leigh. McDowell approved the credit on the assumption the bank was satisfied with the financial condition of Paramax and its ability to pay the amounts owing to Leigh.

**268**    Noonan testified it was incumbent on the Corporate Banking Division personnel to obtain a new facility agreement as condition of the credit, and that he received no request from corporate Banking Division that this requirement be waived. He said he also expected Corporate Banking to read both the Aug. 31 comfort letter and the one received in connection with the credit. McDowell testified that he agreed with Noonan's expectation of the Corporate Banking department. McDowell said he expected they would read and compare the comfort letters, and if the new document was in a different form than that stipulated, Corporate Banking would have to seek authorization from the Credit Division before accepting it. Noonan testified he received no such request.

**269**    Wilson sent a letter to Leigh's Ottawa branch advising of the approval on December 8 and cautioned that the $45 million limit was not to be disclosed to Leigh, "as it is an internal matter how GEC/Plessey manages a subsidiary's borrowings. Therefore, Leigh should be informed that availability only totals $41.0 MM."

**270**    On December 13, a Credit for Executive Circulation relating to the Leigh line was circulated among the bank's senior executive. The document referred to the GEC takeover and contained the same erroneous description of the comfort letter as had been included in the earlier Credit for Executive Circulation. The document was initialled by Noonan, McDowell, president Robin Korthalls, and the chairman and CEO of the bank, Richard Thomson.

**271**    Driscoll had completed the Presidents Report for the month of November by December 14. This report, which was forwarded to GEC, disclosed an actual loss as at November 24 of $20.301 million with an outstanding bank line of $38.745 million. Driscoll attributed these figures to the results of the ETC review and SHINCOM and TACAN contract delays.

**272**    On approximately the 14th of December, in the course of revising the comfort letter, Anderson called Dean at Leigh to ascertain whether there was a holding company in the corporate structure between Leigh and Plessey. Anderson testified he did not discuss Leigh's financial condition with Dean.

**273**    Anderson sent the revised comfort letter to Bernard Huntbatch at Plessey on December 15, with a copy to Andy Hafner, treasurer at Siemens' offices in London, Rickard, Justice, Simon Weinstock and Newlands. Anderson testified he sent the letter to everyone who had an interest in it, to give them an opportunity to comment. Mr. Huntbatch, who is now deceased, was Plessey's Company Secretary, a solicitor, and one of the few remaining members of the Plessey old guard. He had signed the second, third and fourth comfort letters as well. Anderson said in evidence that Huntbatch did not call him to comment on the letter or query it. Anderson said he would expect Huntbatch to review the letter and if he had any comments, to make them or to change the letter if necessary.

**274**    The other signatory to the letter was Brendan Sammon, group chief accountant at Plessey. Sammon testified that he knew the final paragraph constituted a change from the fourth letter and discussed this with Huntbatch. He said they concluded Plessey had never considered comfort letters to be binding, that this was simply GEC's "belt and braces", and hence they signed the letter. The letter was not forwarded to TD's London office until December 27. The fifth comfort letter stated:

> This is to confirm that The Plessey plc has full knowledge of the facility of C $45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

**275**    On December 18, Leigh laid off 80 people, including David Dean, the vice-president of finance and the bank's main contact person. Pat Smith took over his role. Driscoll testified the layoff was due in part to a decline in manufacturing, which meant Leigh had excess staff for its needs. He said it was also due in part to Leigh's losses.

**276**    Colin Justice had been travelling back and forth between Britain and Canada throughout the fall and was back at Leigh during this period. On December 21 Justice called Wilson at the bank to

advise him of the staff layoff and that Dean was no longer with the company. Justice attributed the layoff to difficult market conditions and told Wilson a second wave of layoffs might be forthcoming. In a memo to file following phone call, which he copied to Leaney and others, Wilson reported details of the call, including the staff layoff and the termination of Dean. Wilson noted that Justice would continue to be actively involved in the affairs of Leigh, having spent four of the past seven weeks in Canada, that he expected to be in Canada regularly, and would be returning for budget meetings in January. Wilson noted he took the opportunity to discuss with Justice the possibility of a Leigh merger with CMC in some detail, indicating TD would be "very interested" in providing a fairness opinion. Justice told him the question of the CMC acquisition of Leigh would be reviewed early in the new year. Wilson recorded in detail the aspects of the conversation dealing with the layoff and the fairness opinion.

**277**    In evidence, Wilson testified that although he had not recorded this in his memo, he had asked Justice in this conversation for Leigh's financial statements. He said Justice told him the financial statements were not ready due to the acquisition accounting issues related to the GEC/Siemens takeover. Wilson said he did not ask him about the accounting issues because this was consistent with what he had been told by Dean. This conversation is admitted by the defendant Plessey, who did not call Justice as a witness.

**278**    Also on December 21, Driscoll forwarded a draft budget for Leigh to Bill Alexander, managing director at GEC Marconi, in which Driscoll commented that "cash flow is awful" and that dramatic improvement would likely come only from a politically directed renegotiation of the TACAN and SHINCOM contracts, or a radical restructuring of their operations. The draft budget projected a worsening overdraft of $39 million in March of 1990 and $62 million by March of 1991. It estimated the bank line would be at $41.576 million by December 31st of the current year.

**279**    Justice had requested authorization from Newlands on December 19 to increase Leigh's line to $42.5 million, and on December 22, Anderson called Exton to tell him the increase had been approved. Exton did not receive the fifth comfort letter however, until December 27, at which point he sent it on to Wilson. Exton testified that when he received the letter he checked to see the amount was correct and that was the extent of his review of the comfort letter. He did not notice the added line that the comfort letter did not constitute a legally binding commitment. Exton said that his role regarding the letter was merely to pass it on to the account manager and no more. I accept his evidence on this point.

**280**    Wilson's evidence was that when he received the comfort letter, he advised his supervisor Leaney of its arrival and sent her a copy for her information, but did not discuss it with her any further.

**281**    Wilson testified that following the December 6 conversation with Anderson, Exton advised him that Anderson had said the new comfort letter would be the same form and substance as the prior letters, revised only as to amount. Wilson said that as a consequence, when he received the

fifth comfort letter, he simply checked to see the amount was accurate and instructed his secretary to file it. He said he felt he had fulfilled his responsibilities by doing this. Although he had never read the prior comfort letters, he did not compare the wording of the 4th and fifth comfort letters, nor did he notice the changed wording. Wilson said he felt Anderson made a verbal commitment that the letter would be changed only in amount, and so that was the only part of the letter he checked. He said he felt Noonan's condition that the comfort letter be in the same form and substance was satisfied based on his confirmation of the amount. He conceded in cross-examination he had not advised anyone at Leigh or Plessey about Noonan's condition.

**282**    I am unable to accept his explanation for this. Wilson did not record this alleged representation by Anderson in any note, credit review, or other document. Wilson was not party to the conversation between Anderson and Exton. None of the exhibits corroborates Wilson's evidence. Jonathan Exton was a witness at this trial and gave evidence about the conversation with Anderson. He did not testify that Anderson had said the letter would be in the same form and substance. Anderson also testified at trial and said he did not believe he would have said such a thing, as he had already changed the language of the letter by the time he spoke to Exton.

**283**    I accept the evidence of Anderson and Exton and I find as a fact that Anderson did not represent or state to Exton that the letter would be the same form and substance as the previous comfort letter. Hence, any failure on Wilson's part to read the fifth comfort letter was not due to the representation Wilson attributed to Anderson. I accept Wilson's statement that he had not read the prior letters before receiving comfort letter number five. Hence, either Wilson read the letter and did not realize the letter had been changed, or he did not read the letter at all. Even if he had read the letter, not having read the fourth comfort letter, he had no basis for comparison, and likely would not have noticed the alteration. In my view, however, responsibility for this oversight lies squarely on the shoulders of Wendy Leaney.

**284**    Leaney was general manager, Corporate Banking and Wilson's direct supervisor. She knew he had only been in his position for two months. She testified in another context that responsibility for managing the relationship had been delegated to her. She was aware of Leigh's climbing bank line, contracts difficulties, and of the recent hostile takeover, with the consequent changes in management personnel at Plessey. Wilson told her the letter had arrived and sent her a copy to review. She, at least, was familiar with the language of the prior letters, and knew of Noonan's condition that the fifth letter be of the same form and substance. She received the letter and placed her initials on the covering memo from Wilson to which the comfort letter was attached.

**285**    Leaney's evidence is that she did not read the comfort letter on or about December 28 when it was transmitted by Exton in London to Wilson in Toronto. She stated the covering memo from Wilson with the executed comfort letter attached Gas passed up to her "... in January 1990 when I returned from Christmas vacation, and it was just -- it was passed to me by Rob [Wilson]." She stated that she did not read it. "I expected that he would have read it and I -- I didn't read it myself."

**286**    She said she first heard about the words "does not constitute a legally binding obligation" the day she went on vacation on March 29, 1900, from Ernest Mercier, who had been in touch with the bank's office in London. She testified she was concerned about the words. She had not seen the letter, had not been "apprised" by Plessey "that there was going to be any change, that we assumed the letter was the same as we'd had before."

**287**    Leaney's evidence on discovery was that she had been told by Wilson in December that the bank had received the comfort letter, but in January she did not "look at it." Leaney testified at trial that she subsequently realized she did see the memo, but did not read the comfort letter. She conceded on cross-examination that her evidence on discovery had been mistaken. The covering memo has "Wendy FYI" handwritten on it in red ink, and the initials "W.L." in her handwriting in blue ink. She acknowledged on cross-examination she had only discovered the memo several months prior to trial, and then realized that she must have looked at the covering memo.

**288**    In cross-examination when asked to explain her initials on the covering memorandum she stated: "I didn't read the comfort letter for certain, and the covering memo I don't recall specifically reading. Obviously I saw it because my initials are there. But it was one of many pieces of paper that came across my desk, especially after coming back from vacation." "It was a piece of paper ... that was it. It was just information only."

**289**    Other exhibits in this trial contain Leaney's handwritten initials, which she testified meant she had read the document in question. Of all the 20 documents initialled by Leaney and made exhibits at this trial, neither she nor her counsel could point to one other she had initialled but not reviewed. The bank's outstanding exposure for some $40 million rested solely on the comfort letter and she conceded that she knew the letter was an important document. Nevertheless, Ms. Leaney maintained that when she received the fifth comfort letter, she merely glanced at it, and did not review it in depth because it had been sent to her for information purposes.

**290**    In the CCR of March 28, internal memos, and conversations with Anderson and Gerdine subsequently, no bank official ever raised the issue of the added sentence in comfort letter number five. Leaney had no explanation for this, nor could she explain the reference by Wilson to "the integrity of both GEC and Siemens, consistently demonstrated to us" in an April 5 letter to Newlands and Gerdine.

**291**    I find that Ms. Leaney read and accepted the fifth comfort letter dated December 15, 1989, when she received the letter and covering memo and initialled it in January, 1990. She could point to no other document she had initialled without reading it. Her explanation of relying on Wilson to read it is not credible. He was new on the job and had no involvement with the previous comfort letters. This was a large loan and the line was increasing steadily. The bank was resting its position entirely on the comfort letter and knew Leigh could not pay the debt itself.

**292**    The issue of the form and content of the comfort letter was never raised prior to the bankruptcy of Leigh on April 12, 1990. It was not referred to in any internal bank document,

including the March 28 CCR. Nor was it raised in the subsequent conversations with GEC and Siemens concerning Leigh. The reference in Wilson's April 5 letter to the integrity of GEC and Siemens is not consistent with the behaviour of a party upon whom a fraud has just been perpetrated. All of these facts are consistent however, with Leaney having read and accepted the comfort letter when she received it in January.

**293**    Leaney was disciplined by Ernest Mercier in June, 1990, and did not receive the bonus part of her compensation package that year, on the basis that she had accepted the fifth comfort letter. Mercier wrote to Leaney on June 25:

Re:    Credit Portfolio Management

Referring to your memorandum of May 22nd, 1990, and our discussions with regard to the captioned situation.

Upon review of your memorandum as well as the events surrounding the four accounts mentioned in said correspondence, we acknowledge that your actions on these accounts have generally demonstrated a positive commitment towards exercising appropriate credit judgment. The one situation which falls short of this standard is in the case of Leigh Instruments, and the acceptance of the Comfort Letter in December 1989 that was deficient in form from previous Comfort Letters we had received as a Bank. This was a serious oversight. Thin matter and its severity is accentuated by the significant exposure which the Bank has in regard to this credit facility.

Given the serious nature of this situation it has been decided that no Incentive Compensation Award will be granted to you this year.

A review of future Long Term Incentive Plan Awards will be considered at the appropriate time.

This letter will be placed in your Human Resource file and we ask that you acknowledge receipt by signing below. [Emphasis added]

**294**    This reprimand letter supports my conclusion that Ms. Leaney read and accepted the fifth comfort letter when it was received by TD, and that the bank shared this view.

Winter - Spring 1990 - The Bankruptcy of Leigh

**295**    GEC and Siemens were continuing the hive-up process and the valuation of the Plessey businesses. By January 8, a further valuation proposal exchanged between Siemens and GEC showed Leigh in the category of businesses to be held 50-50 or to be sold, and not in the list of businesses to go to GEC. In that document, GEC did not place a value on Leigh, but inserted a question mark rather than a number. Siemens, who had had little direct involvement with Leigh to that point, had assigned it a value of 70 million pounds.

**296**    GEC Marconi budget meetings were held annually within the first three or four months of the calendar year. Driscoll and Smith attended meetings at GEC Marconi's Stanmore offices in England on January 8 and 9, including a meeting January 9 chaired by Dr. Ian McBean, managing director of GEC Marconi, to discuss the preliminary Leigh budget for 1991. Following this review, at the end of the meeting, future options for Leigh were discussed very briefly. McBean instructed Driscoll and Smith to return to Canada and develop a series of options for Leigh, to be reviewed later in the month. Most of the options were identified in a brief discussion at the meeting, and included a restructuring of Leigh, integration with CMC, sale of Leigh to a third party, controlled shutdown and windup of the business, and immediate closing. Driscoll testified these were intended to cover the range of available options.

**297**    By January 11, Newlands' evidence was that he was of the view that the Leigh situation was serious. He said his initial impression from his visit in the fall was that the North American businesses were in poor shape and the monthly management accounts had not shown the position to be improving. He explained that GEC Marconi were analyzing the position and that McBean would have to determine whether the management of Leigh and personnel were capable of completing their contracts in a sensible time, or at all. He said no conclusion regarding the future of Leigh had been reached by this time in January, however he conceded that GEC was uncertain by this time whether they wanted to take Leigh, and in a further valuation proposal had listed it under 50-50 or to be sold.

**298**    Meanwhile, Leigh's financial position was still grim. The Plessey finance reports for December, available mid-January, showed a cumulative loss for Leigh to the end of December of 10.721 million pounds or roughly $20 million. By the 16th of January however, Leigh had received the expected Paramax payments and applied them to its overdraft, thus reducing the bank line to $31.646 million.

**299**    Driscoll and Shepherd had written several letters to the Canadian government in early January, outlining Leigh's financial situation, in the hope that relief could be negotiated on the TACAN and SHINCOM contracts. To that end, Driscoll, Shepherd, and Alexander attended a series of meetings with various Canadian government officials from Investment Canada, The Department of Industry, Trade and Technology and the Department of National Defence on January 22 and 23. At these meetings, Driscoll advised that there was a serious threat to the viability of Leigh and that

one of the options under consideration was the closure of Leigh. Driscoll also presented financial information on Leigh's situation giving a clear indication of the gravity of the situation. At the conclusion of the meeting with the Department of National Defence, Driscoll and Alexander were advised that the government would deal with the Leigh issues on an urgent basis.

**300**    On January 25th, Driscoll forwarded to GEC his presidents report for December, which showed a cumulative loss to the end of that month of $21.387 million.

**301**    Driscoll, Smith and Justice re-attended at Stanmore February 1 and 2 to review the list of options for Leigh, which they had prepared pursuant to McBean's direction in early January. Also present at the meeting were Rickard, McBean and Alexander. The options tabled for discussion included a restructuring of Leigh with a recapitalization to eliminate the bank debt; an integration with Canadian Marconi; sale of the company to a third party; a controlled shutdown and windup of the business; and immediate closure. Payment of the bank debt was listed as one of the steps to be taken pursuant to the last option and Driscoll testified it was discussed briefly. No decision was arrived at concerning what, if any option would be chosen for Leigh, and GEC Marconi took the matter under advisement.

**302**    Rickard wrote to Justice on February 6 as a follow-up to the options meeting held at Stanmore earlier in the week, and advised that the financial data presented at that meeting represented an "unacceptable deterioration over what appeared to have been a firmly established position on January 9th." He asked Driscoll to respond to McBean's requirement for a concise explanation for each item of deterioration.

**303**    On February 1, Gerdine was contacted by Simon Weinstock, who expressed concern that Leigh was losing a lot of money. Shortly after that he received a copy of Alexander's memorandum concerning the Ottawa meetings with government in which Alexander observed that Leigh was "running out of money" and "could be insolvent." On February 2nd, Rickard sent Simon Weinstock a copy of the preliminary purchase accounting adjustments for Leigh, which showed a writedown in Leigh's assets of $33 million.

**304**    Driscoll's evidence was that during this period he felt the likely outcome would be consolidation with CMC. However, on or about February 2, 1990, G. Stuurop, treasurer of CMC and Anderson met. Stuurop told Anderson that upon seeing the comfort letter, CMC seriously considered advising Plessey to walk away. Anderson had no recollection of this but testified he thought it meant that CMC no longer wanted to buy Leigh.

**305**    On February 8, GEC and Siemens formally decided to place Leigh in the Plessey rump, pending sale, closure or other solution. As a result, Philip Gerdine, the Siemens representative who was co-managing director of Plessey, became more involved with Leigh. Gerdine testified that prior to this time he did not pay much attention to Leigh.

**306**    Gerdine also testified that by early February, Siemens and GEC were considering selling

three of Plessey's North American companies, including Leigh, to a third party. To that end, Simon Weinstock wrote to investment bankers Shearson Lehman in New York, to arrange assistance in the sale of the companies. Gerdine had had previous dealings with the Shearson bankers and thus was asked to attend two meetings with them in early February, to discuss due diligence on the companies and preparation of a sales package.

**307**    Meanwhile, on other fronts the negotiations with the Canadian government were continuing. The government had not responded directly to the earlier approaches by Leigh, and on February 13, Driscoll and others again met with officials in the Department of National Defence in the hope of negotiating some contract relief. Driscoll presented the government with a detailed package of financial material, including analysis of the five options being considered for Leigh's future, and a revised a six-month balance sheet showing a loss as at September 30 1989, of $63.628 million. The projected loss to March 31st, 1990 was $67.7 million. Driscoll testified that these figures included adjustments reflecting both the ETC reviews, which were operational losses, and GEC fair value adjustments. On Feb. 14 Driscoll reported to Alexander on the outcome of the meeting and noted that "some assurance will be required from GEC before the government will proceed in any significant contractual areas."

**308**    Gerdine met with Justice the next day, on Feb. 15, to be briefed on the Leigh situation. Justice informed him of the projected $68 million loss, leading Gerdine to write to Simon Weinstock "we are appalled at the projected losses and bankruptcy is not out of the question if much of this is true." He questioned in the letter whether the sale of Leigh would even be possible. Weinstock had written on Feb. 5 to Shearson Lehman, copying Gerdine, stating that there were "major problems in the business" and noting that the future viability of the company was in question.

**309**    Wilson at TD telephoned Smith at Leigh on February 21, to get an update on the company's progress, find out more information about Leigh's contracts, and ask about the financial statements. In a memorandum of the conversation made the same day, Wilson noted that Smith told him there was some difficulty with the SHINCOM qualification testing, and that this might have an impact on the profitability of Leigh's fixed-price contracts if costs escalate, but that Leigh was negotiating with the Department of National Defence in this regard.

**310**    Wilson recorded that Smith had told him the budget for the fiscal year ending March 31, 1991 had not yet been finalized, but that Smith was predicting the sales for the year would be relatively flat, with a modest profit pre-debt service. Wilson testified that this meant a modest profit prior to interest payment on the outstanding debt. Wilson testified that he asked Smith for updated financial statements and Smith told him that the current year's results were difficult to forecast in view of the GEC Siemens takeover, but that he believed GEC would adopt conservative accounting, requiring Leigh to take up-front provisions for projects such as SHINCOM on Leigh's opening balance sheet. Wilson noted that "this is still under active discussion and results are therefore difficult to predict." Wilson testified this did not concern him as there had also been a delay in

producing financial statements following the Plessey takeover of Leigh.

**311**    Smith told Wilson that a merger with CMC was not imminent, given that GEC and Siemens had not yet decided how to divide Leigh's assets, and that Colin Justice was no longer actively involved with Leigh, as he was concentrating on the hive-up and valuation of Plessey's assets. Wilson noted that Siemens was scheduled to visit Leigh the following week. Wilson concluded the memo, referring to the current fiscal year: "In summary, Smith will therefore be closely managing his cash position, but acknowledged that it will be a "tight" year for Leigh. ... Smith expects to operate within his budget but is concerned with the high level of debt and related servicing burden. I confirmed that we are comfortable with the support provided by Plessey for Leigh's borrowings." Wilson testified that he took the reference to "tight" to mean modest profit to break even, although he conceded that Smith had not said that. Wilson noted as follow-up to keep Anderson informed, through Exton, which he testified referred to the Leigh borrowing levels. As follow up Wilson also listed a reminder to schedule a visit to Leigh in mid-March, although he testified that this visit never took place, but he could not recall why. Wilson testified that following this conversation he still had the same view that Leigh was performing satisfactorily, and that Smith did not tell him anything which would lead him to think otherwise. At the bottom of the memo, Wilson noted that a copy was to go to Exton.

**312**    In London, Exton met with Anderson in person on February 22 for the first time. He testified that he advised Anderson of the amount outstanding on the Leigh loan and discussed the bank generally. No evidence was led at trial that Anderson and Exton discussed the conversation between Smith and Wilson which had taken place the previous day. Nor did Anderson tell Exton of Leigh's financial condition, although he knew of the deterioration. Anderson testified that he asked Exton for a 50 million pound facility for GEC at this meeting.

**313**    Driscoll learned for the first time on February 23 that Leigh had a financial reporting requirement in its facility with the bank, and that Leigh was in violation of this term of the facility. He also discovered that the most recent financial information the bank had was the quarterly financial statements to the end of June 1989 and the 1989 year-end financials, which showed Leigh trading at a modest profit.

**314**    This discovery prompted Driscoll to write to Alexander on February 26, informing him that Leigh had not fulfilled its reporting requirements for the September and December quarters and noting that, although the bank had not requested the financial statements, he expected a request in light of the continually rising bank line. He asked Alexander for direction as to what information should be provided to the bank in terms of weigh's current financial position and projected cash flow. He sent a copy of the letter to Justice and Rickard, and Rickard noted in handwriting on the side of his copy of the memo "must tell if they ask". All parties agreed on this transcription of Rickard's note, although he was not called to give evidence about it. Driscoll testified that he expected some guidance from Alexander, but that he never received any response to the letter.

**315**     Also on February 26, Exton wrote Anderson at GEC, thanking him for the recent meeting and undertaking to keep him advised of Leigh outstanding levels of borrowing.

**316**     Two days later, Gerdine visited Leigh with Shearson Lehman as part of the due diligence process for the potential sale of Leigh through the investment bankers. This was his first visit to the company. Driscoll and Smith presented him with a detailed financial package similar to the material presented to the Department of National Defence earlier in the month. Gerdine became aware for the first time in this meeting of the depth and seriousness of the problems facing Leigh, including the TACAN and SHINCOM delays and technical problems. Gerdine testified that they advised him Leigh was in violation of its reporting requirements to the bank and Gerdine stated in evidence that he suggested forcibly to them that they send the financial information to the bank. In contrast, Driscoll's evidence was that while he did discuss reporting requirements with Gerdine, Gerdine gave him no direction he could recall. If he had received direction, he testified that he thought he would have acted upon it. Driscoll's version of events is supported by the memo he wrote to both Gerdine and Alexander on March 1, reiterating his request for guidance on the question of the information to be provided to the bank. Driscoll testified he could not recall receiving any guidance in response to the memo. Although I do not prefer his version of events to that of Gerdine, it is clear that if Driscoll thought any guidance was required, he thought it was required from both GEC and Siemens. Given Siemens' relatively recent involvement with Leigh, it seems unlikely that Driscoll would have acted on Gerdine's direction alone.

**317**     Also in this meeting, Gerdine became aware of the comfort letter in connection with the $37 million TD loan. Although he had seen the draft comfort letter in December, he testified he had not connected it with the Leigh loan.

**318**     Gerdine concluded following the meeting that, based on Leigh's losses, the company was technically insolvent and its future uncertain, although its ultimate viability was still unclear. Also uncertain was whether Leigh could pay its debts on a stand alone basis without some form of financial assistance. Gerdine had not, by this point, given up on Leigh as a going concern, and felt that Driscoll and Shepherd were taking positive steps regarding Leigh's future.

**319**     On March 5, following his visit, Gerdine reported to Simon Weinstock that he had found Leigh to be out of financial control, and confirmed that Shearson had informed him that morning Leigh was "unsaleable at this time". He noted however that shutting Leigh down "might hurt us all" in light of Leigh's close ties to the Canadian government.

**320**     The process of valuing and allocating the Plessey businesses was continuing, and by Feb. 22, GEC and Siemens had finalized division of the companies between GEC and Siemens, and determined which companies would remain in the Plessey "rump" ultimately to be liquidated or sold. The destination of each company was a matter of negotiation between the parties, with a view to the value allocated to each company and the overall acquisition cost of Plessey. Leigh was relegated to the Plessey "rump". As the companies in the "rump" were assigned one, lump sum

value, the parties never agreed on a specific valuation for Leigh. The hive-up transaction closed on March 8.

**321**     Driscoll flew to New York to meet with Gerdine, who was there on other business, on March 12. Driscoll testified he once again raised the issue of the financial reporting to the bank with Gerdine but received no direction he could recall. Gerdine testified to the contrary, that he instructed Driscoll again to send the statements, although his note of the meeting does not record such an instruction. It is apparent that Driscoll received no direction from GEC, but I am not prepared to find that Gerdine did not so direct.

**322**     On March 15 Driscoll wrote to Gerdine, Alexander, and Rickard, regarding guidance about the reporting requirements and noting "I propose to provide a copy of our September and December results and discuss our present cash flow position with the bank unless you advise otherwise." Driscoll testified he again received no response and on March 21st, acting on his own initiative, he instructed Smith to forward the financial statements to the bank. In view of Driscoll's repeated requests in writing, his evidence that if he had received instruction to provide the statements to the bank he likely would have done so, and in view of the fact that he did ultimately provide the statements to the bank on his own initiative, I accept his evidence that he received no response to his requests for guidance from GEC. That said, the obligation to provide the financial statements to the bank was the of Leigh and not the parent companies. Driscoll was the president of Leigh and thus ultimately responsible for delivering the statements to the bank. I must infer that his repeated requests for direction from GEC and Siemens were an attempt to transfer responsibility to them for his oversight in not knowing of the obligation to provide the statements to the bank, and for Leigh's failure to comply with the reporting requirements in the facility. GEC's failure to respond is understandable in this light. This inference is supported by the fact that Driscoll ultimately did provide the statements to the bank without any direction to do so from GEC.

**323**     On March 21, at Driscoll's direction, Smith sent a package of financial data to Wilson at the bank. The documents sent by Smith included financial information for the quarters ending September 30 and the end of December, 1989, and cash flow forecasts. Unfortunately, the financial statements that Smith sent to the bank were inaccurate. The six-month results to the end of September only reflected the Leigh financial position as it was known in October, and did not reflect the magnitude of the losses as they were known on March 21st. Indeed, the six-month results were the same figures as had been presented to David Newlands on October 20, 1989, when he visited Leigh, and showed an actual loss, as at September 30, 1989 of $2.858 million. The third-quarter results were more up-to-date, and included the president's report for the month of December. The consolidated management report for the quarter, included in the package, disclosed an actual loss to December 29, 1989 of $21.387 million. The cash flow forecast projected an overdraft of $40.976 million at the end of March 1990. All the financial statements were, according to Driscoll, prepared in Plessey format, and not using GEC accounting principles.

**324**     Driscoll conceded on cross-examination that the information provided to the bank did not

reflect all the information Leigh knew at the time, and did not include the revised loss figure of $63.628 which had been disclosed by that time to GEC, Siemens, Plessey, and the Government of Canada. Driscoll testified that he did not review the financial statements before they were sent to the bank, but simply instructed Smith to send them. The president's report prepared only two days previously showed an operational loss to the end of February of $24.402 million, although this data was not sent to the bank.

325    Wilson's evidence was that he received the financial information on or about March 22, and reviewed the financial statements and enclosures, particularly the profit and loss statements. He testified that he had not been aware of the technical and manufacturing problems associated with SHINCOM and TACAN, although I note that he had referred to contract delays in prior CCRs.

326    Gerdine attended a board meeting at Leigh on March 26, 1990, at which a number of proposals regarding the future of Leigh were discussed, including a five-year plan for the company. The issue of the reporting requirement to the bank was also placed on the agenda. Following the meeting, Gerdine testified that he telephoned the bank, and spoke to Wilson and Leaney. Gerdine asked Leaney if she was aware of the serious financial situation at Leigh, and that she sounded surprised that anything was wrong. He said it seemed evident to him that she had not seen the financial package which had been sent to the bank. He said she then brought up the subject of the letter of comfort and asked if GEC and Siemens would countersign it. Gerdine testified that he did not know what the legal effect of that would be, but that it seemed to be a "quick fix" to a lot of the problems. He testified that Leaney pointed out Leigh was near its authorized credit limit, and indicated that the bank would be willing to increase the line to $50 million if GEC and Siemens signed the comfort letter. Gerdine testified that he told Leaney he would look into the question of whether the comfort letter would be signed by the parents. Gerdine said he suggested that the bank arrange for the assistance of a work-out specialist for Leigh, and that Leaney was receptive to the idea, suggesting the see specialist who had worked with Leigh in the early 1980s. He said the conversation concluded that he would speak to the treasury department at Siemens and the bank would look into arranging a work-out specialist.

327    Gerdine testified that the next day, he again spoke with Leaney and Wilson and that the tone of the conversation "suddenly changed about 180 degrees." Leaney advised Gerdine she was freezing the loan, and Gerdine said the potential to involve a work-out specialist seemed to evaporate at that point. Gerdine ultimately told Leaney that a letter of comfort was "just that" and that parent company signatures on the letter of comfort were not "going to be forthcoming" in his estimation.

328    Leaney testified that she felt Gerdine was "back-pedalling" from association with Leigh. She testified regarding this conversation:

> Well, I brought the comfort letter up because I felt that at this point, given the serious situation at Leigh and the fact that Dr. Gerdine seemed to be

back-pedalling from the association with Leigh, I -- I can't put specific words in his mouth, but he -- the impression I got was they were not -- Siemens was not fully in support of the comfort letter that we had, uhm, from Plessey and, uhm, we -- we said, you know, the only reason we were lending was because we had the comfort letter, and he said Well, a comfort letter was just that, and, uhm, - but he did agree that he would review -

**329** Later that day, Gerdine attended a meeting with the Canadian government, which he described as more positive than he would have expected. He said he proposed a "save Leigh" program which would require participation from all the various parties, and that he thought at this time there was still a chance that Leigh could be saved. He said the government indicated it would want parent company guarantees. On the 29th of March, Gerdine composed a list of possible options for Leigh, which he forwarded to Driscoll.

**330** Following the conversations with Gerdine, Wilson at the bank prepared a memo to Noonan, in which he summarized the discussion with Gerdine. Apart from a number of minor discrepancies and the fact that the memo appears to collapse the two conversations into one, Gerdine confirmed in evidence that the memo accurately reflected the conversations. Wilson noted in the memo, which was incorporated into a CCR of Leigh dated March 28, that Gerdine had indicated Siemens felt there were two potential alternatives in dealing with Leigh; to do nothing and go away, or to inject capital and turn the company around. The CCR recommended that the risk rating for Leigh be reclassified at 5, and that Leigh be placed on the "watch list". The CCR was reviewed by Yovhan Burega, vice president of corporate banking, who noted "GEC and Siemens will have to provide us with a very strong letter of comfort. They do not have an option to do nothing. If that was the case we should immediately call the loan; also, we will not provide any concessions and GEC/Siemens must honour all of Plessey's commitments." Pierre Boulanger, senior vice president in the Credit Division, noted that "The situation is of concern and a firm stance is needed. We agree that we should make it very clear to Siemens that we do not view the "do nothing" option as a viable alternative for the company and we agree with Mr. Burega's position that unless we can shore-up our position we should immediately call the loan in order to force their hand." He concluded that the bank should not advance further funds to help the company pay interest when it was operating at a loss. The CCR was initialled by Brock and Thomson. Wilson confirmed in evidence that the bank decided in this period it would not offer Leigh any concessions, nor would it intercede with the Canadian government to seek concessions on behalf of Leigh.

**331** Wilson sent Exton a copy of the memo regarding the conversation with Gerdine, and indicated he would be interested to hear the views expressed by GEC. In consequence, Exton called Anderson on March 29th, and advised him of the bank's concern following the conversation with Gerdine. He said Anderson told him Gerdine did not have authority to speak for the joint venture, and that "the original intention for GEC is not abandoned, but has not happened," which Exton interpreted as Anderson telling him GEC still intended to take over Leigh. After speaking to Anderson, Exton called Wilson, who told him the line had been capped at $41 million. Exton then

called Anderson back the same day to advise him of this development. He said Anderson was "upset and disappointed" that the bank had decided not to stand by their arrangement. Exton testified that he told Anderson the bank definitely wanted the Plessey comfort letter to be acknowledged by GEC and Siemens, and that Anderson told him this was unlikely. Exton told Anderson someone from the bank in Toronto would call him.

**332**    Wendy Leaney did call Anderson shortly thereafter, and gave the following evidence regarding the call:

> I talked to him about the situation at Leigh and the fact that we capped the line of credit, and we had a conversation. He said that GEC had never reneged on any of its obligations and a number of other things, such as commenting about social life, that he and his wife would not be invited anywhere if they did renege on any of their obligations, and we just left it at that.

**333**    Anderson testified that while he did have a conversation with Leaney, he would not have made the remarks attributed to him, particularly since his wife had died of brain cancer five years earlier. His evidence in this regard was as follows:

> Q.    ... Mr. Anderson, it is alleged by the bank that during a phone call with Ms. Leaney on or about March 29 you said to her that you and your wife could not show up at social functions if such a letter of comfort was not honoured. Do you have any recollection of making that statement to her?
>
> A.    No recollection of saying that.
>
> Q.    Do you have any belief as to whether it is possible you said that?
>
> A.    Well, I think now that its inconceivable I could have said that.
>
> Q.    Why do you say that, sir?
>
> A.    Well, this is what date, March, 1990. My wife had died five years before then and it was not a very nice death and I haven't gone to a social function with ladies since then so I just feel that I couldn't have said such a thing.

**334**    Although Ms. Leaney was told of the death of Mrs. Anderson, in cross-examination she insisted that Mr. Anderson had made the statements in question:

> Q.    Ms. Leaney, have you become aware since the date of that conversation that Mr. Anderson was, at the time, widowed and his wife had died of brain cancer?
>
> A.    No.
>
> Q.    I suggest to you that -- is it possible your memory in that regard is mistaken?
>
> A.    Absolutely not. He talked about his -- he and his wife had been -- they were guests all the time at functions, and business -- corporate functions, if they did not honour their obligations, they wouldn't be invited. It was a bizarre statement. That's why I'm so strongly -
>
> Q.    You agree especially bizarre for a man who was a widower whose wife had died

of brain cancer?
> A.    Maybe he was talking in the past. I don't know. He might well have been.

**335**    In my view, Ms. Leaney's evidence on this point's incapable of belief. I observed the demeanour of Mr. Anderson when questioned on this point. He was visibly upset by the line of questioning. Although Mr. Anderson had no recollection of the substance of the conversation, I prefer his evidence. Moreover, he testified in a different context that he did not view comfort letters as binding obligations. Accordingly I find as a fact that he did not make the statements attributed to him by Ms. Leaney, and in particular those concerning the comfort letter.

**336**    Ms. Leaney testified that following the conversation with Anderson, she met with Ernest Mercier, to update him on the situation. She said Mercier told her of the added line in the comfort letter, which she said was the first indication she had that the letter had been amended. In light of my finding above that she had read and accepted the letter when it was received, I do not accept her evidence on this point. She testified she told Mercier they had not been advised of the change by Plessey and she had assumed the letter would be the same as the prior letters. Leaney left on vacation following the conversation with Mercier and did not return until April 16, by which time Leigh had made an assignment in bankruptcy.

**337**    Meanwhile, on April 3, the Red Team delivered its report on Leigh, at a meeting attended by Simon Weinstock and Gerdine, among others. The Red Team was composed of technical people from GEC Marconi who had been hand-picked by MacBean and put in place in mid-February to review the technical assumptions underlying the Leigh contracts and the cost estimates of completing the SHINCOM contracts. Driscoll testified that this was a technical review rather than financial, and that it validated his belief about the state of the contracts. The report concluded that there were numerous engineering problems in relation to the contracts that would require significant investment, and that without changes in both investment and personnel, Leigh would not be able to deliver the product. David Newlands testified that he concluded from the review that Leigh had terminal problems unless Leigh could negotiate some relief from its customer, the Canadian government.

**338**    Also on April 3, Exton testified that he called Anderson concerning a shareholders meeting. Exton reported the call to Wilson by facsimile, stating that "given Leigh's financial performance and position, a joint guarantee would obviously be preferable, but I doubt whether this would be forthcoming." Exton explained himself in his testimony, stating "... I was aware that Toronto was very concerned about the letter of comfort that they had and whether or not it would be good security ..."

**339**    Wilson drafted a new comfort letter in consultation with Norton, the bank's in-house counsel, and sent it to Newlands and Gerdine on April 5, 1990. In his covering letter, he requested that the letter be executed by both GEC and Siemens, noting: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." Wilson made no

mention of the added wording in the fifth comfort letter, nor that Musgrave had allegedly told Young the comfort letter was tantamount to a guarantee, explaining in evidence that they were trying to be conciliatory and co-operative. The proposed letter stated:

> This is to confirm that we have full knowledge of the facility of C $45 million (Forty Five million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh Instruments Limited ("Leigh").

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc which is a wholly owned subsidiary of Plessey Overseas Limited which is in turn a wholly owned subsidiary of The Plessey Company plc which is owned jointly by GEC plc and Siemens AG. We undertake not to reduce out respective share-holdings in Leigh or its holding companies without your prior consent.

> We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates.

**340**    On cross-examination, Wilson conceded there was no reference in the letter to the added language of the fifth comfort letter, namely that it did not constitute a legally binding obligation. Given that he testified that he felt "shock and dismay" when he read the fifth letter, his explanation of the reference to the integrity of GEC and Siemens is not believable. He was hard pressed to explain this apparent inconsistency, saying only that the reference to the parents' integrity was "somewhat of an overstatement on my part".

**341**    In late March or early April, TD decided that it would not offer concessions as part of an overall solution for Leigh. Wilson testified that the bank had indicated it would not provide any concessions and would not approach the government with the shareholders to seek concessions.

**342**    On April 6, Wilson and Anderson spoke. Wilson testified that Anderson told him "the news was not good" and that it was possible that neither GEC or Siemens would take Leigh. During the conversation, Wilson did not complain about the added words in the fifth comfort letter. His explanation for not doing so was that it should have been clear to Anderson by the deletion of the words from the proposed letter. Wilson makes no reference to this issue in his note of the call. I find his explanation unconvincing and that no complaint was registered concerning the added words.

**343**    On April 9, Gerdine and Alexander came to Canada to meet with members of the Canadian government. Gerdine testified that the government officials refused any assistance, following which he concluded the only alternative was bankruptcy for Leigh. He said the group who he said was insistent that the parent companies sign "some kind of an instrument" regarding the Leigh

borrowings and Gerdine told him that they might not be able to do it. He said he told Burega "we will all have to do what we have to do" which ended the call. He said that since it was manifest that the shareholders were not going to put any cash into Leigh, following the call bankruptcy was the only alternative. During these final calls no mention was made of the wording of the fifth comfort letter by anyone at the bank. On April 10 Hugh Rising of the bank's London office called David Newlands. Newlands testified that Rising was seeking comfort that GEC would stand behind the Leigh loan. Newlands did not give him the comfort he was seeking.

**344**    On April 11, 1990, Exton, in a memorandum recording discussions between himself, Rising, Walzak, Burega and Wilson, concerning events between April 5 and April 11, outlined "key strategic areas identified by Rob Wilson." These included, "GEC & Siemens worldwide reputation - negative publicity, if the companies do not stand behind the Comfort Letter," government pressure, and poor relations with the Canadian government. Also a possible injunction which could "cause costly delays and be a major nuisance factor." In a separate memorandum of the same date, Wilson adverted to the these factors and added "Need to give GEC/Siemens lessons on doing business in Canada ... moreover, they are reneging on a commitment to a major Canadian bank, with public sympathy clearing [sic] falling on the side of TD rather than 2 European multinationals."

**345**    On April 11 and 12, abortive discussions were held between the government and Leigh in a last attempt to save Leigh. When these failed, Leigh applied for bankruptcy protection on April 12, 1990.

**346**    Newlands took part in GEC's decision not to pay TD. He could not recall who was in attendance at the meeting, but he believes it took place in Lord Weinstock's office. He testified they had a brief discussion and concluded that there was no reason why GEC should pay. Newlands participated in the a similar discussion regarding whether Plessey should pay TD and the same conclusion was reached.

**347**    The process followed by both the Plessey board and GEC accords with Musgrave's view of what a company issuing a letter of comfort ought to do when demand is made. Musgrave testified that, while he never saw a legal obligation for Plessey to pay under a comfort letter of this kind, he personally felt that the board of directors of the issuer had a moral obligation at least to consider a bank's request for payment. If the directors reviewed the matter but decided not to pay the borrower's outstanding loan, then they had, in his view, discharged that obligation.

The Parties' Understanding of Comfort Letters.

**348**    At the outset, I note that where the views of the witnesses constitute legal conclusions on issues before this court, I place no weight on their evidence.

**349**    The bank and Plessey were both large and sophisticated business organizations. Their states of mind was placed squarely in issue in this trial. Their knowledge of the use of comfort letters in the marketplace in which they both operated was the subject of considerable evidence.

**350**    Dealing first with the bank, Noonan testified that he used comfort letters with caution. It was he who first proposed that a comfort letter be obtained from Plessey, given that a guarantee was not on offer. The bank characterized the Plessey comfort letter as "strong" throughout, and knew that comfort letters varied in strength, according to their wording.

**351**    F.G. McDowell, vice chairman of the Credit Division and the most senior credit person involved with the Leigh facility (other than the chairman of the bank), testified that the bank was aware of the distinction between a comfort letter binding a parent to pay a subsidiary's debt and one that did not, even though he did not review the specific comfort letters accepted by the bank.

**352**    TD's Legal department was mindful of concerns about the enforceability of comfort letters. In a memo and dated September 8, 1982, as senior member TD's legal department, T.G. O'Connor identified a series of weaknesses and legal technicalities which accompanied comfort letters and concluded that "comfort letters are only of use where political assurances are better than legal assurances (which is seldom the case) or where a shadow of a guarantee is better than nothing at all. They are inappropriate for lenders who require a serious legal claim."

**353**    Neither Noonan nor McDowell had seen this memorandum but McDowell was aware that the TD legal department had "reservations" about comfort letters. Young did not know of the memorandum either but was aware of the "uncertainty of enforceability" of comfort letters.

**354**    On September 16, 1988 a "head office circular" emanated from the bank's general counsel and secretary, R.G. Bumstead, dealing with the use of comfort letters. Bumstead stated that comfort letters "invariably" fall short of a guarantee, are not a suitable substitute for a standard form of guarantee, and should not "normally" be used unless the bank is "otherwise well protected or secured." Where a comfort letter is all that is on offer and the bank is prepared to lend on that basis, he advised as to procedures to be followed. McDowell testified that this permanent circular reflected the legal department's opinion of comfort letters, he would have seen it and it would have been circulated to staff, including to the corporate bank banking department, and retained by them. He added that it was*merely an opinion however, and not binding. Evaluating credits was a matter of personal judgment, he stated, but the circular should have been read and considered.

**355**    McDowell stated that he did not agree with everything in the legal department memos, although he did not see them at the time. Noonan's evidence was substantially in line with that of McDowell. Leaney testified that she was not aware of the circular or the views expressed in it, either through the circular or other sources. Exton, Young and Wilson all testified that they also had not seen the circular. Leaney Young and Wilson differed somewhat as to what effect knowledge of the memo would have had on their.actions, but all agreed they would have had to at least consider it.

**356**    In a memorandum dated March 16, 1989 the bank's legal department reported on the decision of the English Court of Appeal in Kleinwort Benson, stating that "the enforceability of comfort letters is limited." The memorandum concluded:

> If a fully protected legal obligation is sought, a standard guarantee, resolution
> and solicitor's letter of opinion should be obtained. The Bank cannot rely on
> comfort letters to do more than state a fact, which may or may not change in the
> future. If there is misrepresentation in the letter, the Bank may have an action
> against the signatory for misrepresentation but not in contract. A comfort letter is
> cold comfort for the Bank.

**357**   This document was addressed to the Credit Division, Corporate Banking Division, and senior vice presidents of the Line Division, and bore the handwritten notation "Sent-Mar 28" with the names of McDowell and Mercier, and "all Division SVPs".

**358**   McDowell and Noonan both testified they could not recall having received this memo. Noonan would have felt obliged to follow it he said, but not necessarily where existing customers or comfort letters were involved. McDowell would have expected persons required to deal with comfort letters to receive it, however, Leaney apparently did not. Exton, Young and Wilson had not seen the memo either. Exton and Young knew of Kleinwort Benson independently of the memo, but Wilson did not know of the case.

**359**   Noonan testified that he was aware of the trial decision in Kleinwort Benson and had, indeed drawn to the attention of Bumstead a financial Times of London clipping dealing with Kleinwort Benson in January, 1988. Noonan and Young were both involved in the first four Plessey comfort letters. Both testified that they were aware of the trial decision in Kleinwort Benson, and also of the subsequent Court of Appeal decision, reversing it. Young had consulted with a lawyer in the bank's legal department, Alex Norton, when he learned of the appellate decision. Leaney testified she never learned of the Kleinwort Benson decision at any time. Young however, said he thought it "likely" he would have discussed the case with her. Young recalled that at least one source of his knowledge of Kleinwort Benson was from a law firm circular, and any information circulated to him would have gone to Leaney as well.

**360**   TD had used comfort letters in other facilities and examples were introduced in evidence. McDowell stated that he expected the legal department to keep on top of developments in commercial law, including comfort letters, and advise the lending and credit officers of developments to the extent they felt appropriate. Non-lawyers were not expected to keep abreast of developments in the law on their own.

**361**   McDowell and Noonan agreed the bank would be or ought to be aware of major developments affecting the usefulness and enforceability of comfort letters, to the extent this received attention in the marketplace. There was evidence of a plethora of law firm circulars, articles, and other documents dealing with comfort letters, over and above those generated within the bank.

**362**   Noonan and Young had a general working familiarity with comfort letters based on their experience, but no formal education regarding them.

**363**    Noonan testified that his characterization of the comfort letter as strong was based on the language in the letter, the fact that two authorized persons signed it, and the company's reputation and ability pay. He testified he believed Plessey would do what it had said in the letter, although, as he stated, he never spoke to anyone at any of the corporate defendants. He stated that of paramount importance was the reputation of the giver of the letter, whether it had access to world markets, valued its reputation, and whether the bank could believe their word. He felt Plessey met all the above criteria; it was a "major world corporation" with the resources to flow money to the subsidiary to see the commitment fulfilled. Noonan said he thought the language of the comfort letter was appropriate and Plessey's reputation was such that the bank could take it at its word. He said he thought the same was true after the GEC siemens takeover.

**364**    McDowell testified that he knew Plessey as a very respectable U.K. corporation. Sir Alastair Frame was a director of both Plessey and the bank. The bank was soliciting an opportunity to do business with Plessey. McDowell noted, on a September, 1988 Group Credit for Board Presentation for the Plessey group including Leigh, that Plessey was "a leading U.K. high tech company and the parent of Leigh Instruments Ltd. in Canada. Well capitalized, profitable, and considered responsible. Loans to Leigh are supported by comfort letter."

**365**    McDowell's personal view was that a well-written comfort letter was one which was from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfil it." McDowell did not see any of the Plessey comfort letters, and thus these views were of comfort letters generally and not a construction of any particular letter.

**366**    I turn next to Plessey, and its knowledge of and experience with comfort letters.

**367**    Musgrave was head of Plessey's Treasury Department. He was responsible for all comfort letters issued by Plessey. Since becoming group treasurer in 1982, he had acquired knowledge of comfort letters from varied sources ranging from professional organizations such as the Association of Corporate Treasurers, discussions with Plessey in-house counsel, a review of all of the Plessey comfort letters on file, and by following the literature on the subject. He learned of the Kleinwort Benson decisions through this professional literature, but testified that the decisions and subsequent comment upon them did not lead him to alter his views on comfort letters.

**368**    Musgrave testified that he knew the essential nature of a guarantee, which he described as a direct obligation to pay someone else's debt. Conversely, a comfort letter in most cases was intended to provide, in his view, "a degree of comfort" to the bank about a transaction, while falling short of the guarantee to repay the debt of a subsidiary. There was, he said, a "clear distinction between a comfort letter and a guarantee". He was aware of the range of language used in comfort letters, from mere awareness of a facility to "just short of a guarantee". He said comfort letters could

include legal or moral obligations.

**369**    Musgrave stated comfort letters were a means of avoiding giving a guarantee, and that Plessey did not like to give guarantees, except where necessary, such as for a large contract or at government insistence. His and Plessey's view was that a comfort letter did not impose an obligation to repay a subsidiary's debt. Lenders, he testified, accepted such letters based on commercial considerations such as the overall relationship with the lending group, the amount of business from the group, and an overall assessment of the risk in the transaction. He expected that a bank would look at the particular comfort letter and the overall relationship with the group in arriving at its decision.

**370**    Musgrave testified that during the period of his involvement from 1982 to 1989, it was a buyers market, and since Plessey was credit worthy, many banks wished to do business with it. He testified that comfort letters would be negotiated between the bank and Plessey in any given transaction. Since Plessey was reluctant to give guarantees, comfort letters were sought from time to time, as a lesser form of support for the facility sought by the subsidiary. Plessey produced several comfort letters it had used over the years, and Musgrave testified about two examples where Plessey had paid on a non-binding comfort letter. He said on one of those occasions, Plessey paid for relationship reasons, because public knowledge they had walked away could make future dealings with banks difficult. He stated that he would be "embarrassed" if Plessey signed a comfort letter and decided not to pay the debt associated with it, without first giving a request for payment reasonable consideration, because Plessey would have failed to live up to the spirit of the letter. He said he viewed comfort letters as imparting a moral obligation to consider whether or not to pay the debt of the subsidiary, and that as long as Plessey gave the comfort letter that consideration, that was all that was required. He said once Plessey had given that consideration, a decision not to pay would not embarrass him.

**371**    The evidence of Musgrave, Noonan and McDowell was not inconsistent in substance. Each of them essentially viewed comfort letters as gentlemen's agreements, and placed emphasis on considerations of reputation in the business community and ability to pay, when assessing a comfort letter.

THE WITNESSES

**372**    In light of my evidentiary findings, it is perhaps useful to share my impressions of the witnesses called by the three parties to the action.

**373**    This is a fact driven case, however there was no significant controversy about much of the evidence, with the exception of the evidence of the three witnesses to whom I now turn. It is necessary to make adverse credibility findings in respect of these three witnesses only.

The Bank Witnesses

**374**    I must comment generally on the evidence of the three bank witnesses from the Corporate Banking Division; Mr. Young, Mr. Wilson, and their supervisor, Ms. Leaney. Ms. Leaney graduated from the University of Toronto with a B.A. (Hons.) and immediately thereafter joined the TD Bank. After a brief training period she became a senior accounting officer at a branch and then moved up the ranks into middle management. She held a series of positions and gained experience in lending, credit and marketing. She had been involved with Leigh in 1983, in the period when it had experienced financial difficulties, resolved with the help of a work-out specialist. After a period in Corporate Finance, she returned to the Corporate Banking Division in 1988 as a general manager. The account manager responsible for the Leigh account, Young, and then Wilson, reported to her. She herself reported to Ernest Mercier, executive vice president of Corporate Banking. In 1990 she moved to the Corporate and Investment Banking Group as a vice president, and then into TD Securities Inc., from which she retired in 1996. I found Ms. Leaney to be alternatively aggressive, argumentative and defensive when giving evidence. Her evidence at trial contained a plethora of inconsistencies and contradictions with the evidence she gave on discovery.

**375**    Greg Young also has an MBA and worked as a chartered accountant at Clarkson Gordon until 1980. From 1981 until 1987 when he joined TD he held a series of positions at the Bank of Montreal, Citibank Canada and Royal Trust. He remained in TD's Corporate Banking Department until November, 1989, when he was replaced by Rob Wilson. He is presently self-employed as a management consultant.

**376**    Rob Wilson obtained a B.A. from University of Toronto in 1978 and an M.B.A. in 1980. He joined the Continental Illinois Bank following graduation and stayed there until the fall of 1983, when he entered a forestry program at the University of Toronto. Upon obtaining his diploma in resource management from the Department of Forestry, he attempted unsuccessfully to obtain employment in the forestry industry, and then joined the Bank of Nova Scotia in 1984. In 1985 he rejoined the Corporate Banking department of the Continental Illinois Bank, where he remained until 1987 when he again moved, this time to a merchant bank called Canadian Corporate Funding Limited. He left that position and joined TD in October, 1989. He is presently a vice president of TD Securities, where he has been since 1994.

**377**    These three members of the Corporate Banking Department were involved in management of the Leigh account during the period of time material to this proceeding. During that interval their handling of the account for the bank left much to be desired. In December, 1988 Leaney and Young extended credit to Leigh with Noonan's authorization, on condition that a revised credit review was received the following week. The credit review was not prepared until almost one month later.

**378**    On the occasion of the taking of the third comfort letter, Young and Leaney acted contrary to the specific direction of the Credit Division in waiving the requirement that the intercompany debt be postponed of their own volition, and releasing the security notwithstanding that the debt had not been postponed. Upon the assumption of Young's responsibilities by Wilson, the degree of supervision provided by Leaney to ensure continuity was unsatisfactory. From time to time the

account was out of order, facility letters were not updated and fresh documentation not obtained as directed by Credit Division, and good banking practice not always followed. Ms. Leaney authorized an extension of the authorized credit for Leigh when Leigh was in an overdraft position without consulting the Credit Division, and even though, as she conceded, she did not have the authority to do so. Mr. Wilson did not read the fourth comfort letter when he took over responsibility for the Leigh account, nor did he do so upon receipt of the fifth comfort letter. Thus, while he failed to read the fifth comfort letter, he would not, in any event, have been able to draw an informed comparison if he had done so. Ms. Leaney claims not to have read the comfort letter, which was the only support for a loan of over $40 million, even though her initials appear on the covering memorandum, and she was responsible for the account. When the Leigh situation came to a head, with Leigh on the brink of bankruptcy and the parent companies "back-pedalling" from the association with Leigh, Leaney left for a two-week vacation without, she maintains, having bothered to read the fifth comfort letter.

**379**    Throughout, the monitoring of the Leigh account was less than diligent, although it is apparent all three knew a good deal more about Leigh than they admitted to. There was a pre-occupation with maintaining existing business and generating new business which pervaded their approach and clouded their judgment. These three bank witnesses were the persons directly responsible for supervision and control of the Leigh account. All of this resulted, to varying degrees, in a retrospective reconstruction of events by each of these three witnesses in testimony, perhaps inadvertently, in an attempt to explain or minimize their errors and oversights and to cover their mistakes.

**380**    For all of these reasons, I must conclude that, where the evidence of these three witnesses conflicts with that of any other witness, I cannot rely on the evidence of the Corporate Banking witnesses, and I prefer the evidence of the others. These observations have no bearing, however, upon my perception of the evidence of the witnesses from the bank's Credit Division or that of Mr. Exton.

**381**    The other bank witnesses were Patrick Noonan and Ted McDowell. McDowell joined the bank out of high school in 1947 and rose through the ranks by dint of hard work. He was the senior credit officer for the bank, a post he had held from 1972 until his retirement in 1990. He was appointed vice-chair of the bank in 1981, and reported directly to the chairman and chief executive officer of the bank. He remained on the board of directors of the bank until 1995. Patrick Noonan began his banking career in 1948 with the Canadian Imperial Bank of Commerce, and joined TD in 1968. He held numerous senior positions in the bank, and was posted in the U.K. and Singapore, as well as Canada. He was appointed senior vice president, credit, in 1982, a position he held until his retirement in 1991. In 1986 he became one of only four senior vice presidents responsible for all credit, globally. Both these witnesses were seasoned professional bankers, who conducted themselves with integrity, and I found them to be knowledgeable and credible.

**382**    Jonathan Exton is a graduate of the City of London Business school, and received his MBA

from the University of British Columbia in Canada. He held positions with Canadian Pacific and the Bank of Montreal, before joining TD's London office in 1988 as manager of corporate finance. He subsequently was promoted to the position of director of corporate finance, a position he held until he left TD in 1994. He is presently the head of the European multi-nationals group for the Industrial Bank of Japan. I found him to be an honest, credible and forthright witness.

The Plessey Witnesses

**383**    Ian Musgrave is a chartered accountant, and joined Plessey in 1978. He became group finance director seven months later and group treasurer in 1982, a post he held until August, 1989, when he resigned shortly before the hostile takeover succeeded. He was an informed and experienced businessman, who gave his evidence in a responsive, forthright and credible manner. The word which comes to mind in connection with his evidence and his demeanour is honourable.

**384**    Brendon Sammon was Plessey group chief accountant from 1972 until he left in September, 1990. His, experience, duties and responsibilities at Plessey were in the accounting area and not general management. He executed the fifth comfort letter, not because it fell naturally within his purview, but more because the senior management of Plessey was depleted following the GEC Siemens takeover. He was a forthright witness, but I gave little, if any, weight to his evidence where it went beyond his area of experience and responsibility, for instance in the area of the general enforceability of comfort letters.

**385**    Dr. Philip Gerdine is a vice president of Siemens in New York, seconded to Siemens in Munich, in the mergers and acquisitions department. Dr. Gerdine has both an MBA and a Ph.D. and is a certified public accountant. Prior to joining Siemens, he served for about five years as manager in charge of acquisitions services for Price Waterhouse. Following the GEC Siemens acquisition of Plessey in September, 1990, he became the co-managing director of Plessey, along with Simon Weinstock. I found him to be a candid, forthright and credible witness, with a high degree of business acumen and sophistication.

The GEC Witnesses

**386**    David Newlands was finance director and a director of GEC plc until his retirement last year. He and Gerdine were both highly involved in the integration of the Plessey businesses into GEC and Siemens. This was a gargantuan task, especially given the lack of prior knowledge of Plessey due to the information constraints associated with a hostile takeover. Leigh was a minute portion of the Plessey whole, and more so in context of the size of the two parents, GEC and Siemens. The GEC group comprised some 145,000 employees, and the group sales in the 1989-90 fiscal year were 6.5 billion pounds, with a profit of 797 million pounds. GEC had cash reserves at the time of about 1 billion pounds and no borrowings. Newlands testified that a "miniscule" amount of his time, less than one per cent of it, was taken up with Leigh matters. I found his evidence to be straightforward, informed, and credible.

**387**    Ross Anderson joined GEC in London as deputy treasurer in 1975, and was promoted to treasurer in 1979. He has an M.A. from Oxford in jurisprudence and is a chartered accountant. His principal duty as treasurer was the regular, almost daily, investment of GEC's sizable resources. I found him to be a responsive, ingenuous witness who was believable in his testimony.

**388**    Simon Weinstock, who is now deceased, was a manager and executive director of GEC in the period of time material to this action, and reported directly to Lord Weinstock, the managing director of GEC and his father. He was the GEC appointee to act as co-managing director of Plessey following the hostile takeover and was intimately involved in the GEC Siemens hive-up of Plessey. Simon Weinstock was originally named as a defendant to this action and was examined for discovery prior to his death. At trial, the plaintiff vigorously cross-examined David Newlands on a number of areas touching upon the conduct of Simon Weinstock as a directing mind of Plessey. As a consequence, GEC moved to introduce the discovery transcript of Simon Weinstock, which I allowed. I have placed little weight on this discovery evidence however, in view of the fact that I did not have an opportunity to observe his viva voce evidence, and because the cross-examination of Simon Weinstock on discovery was likely less extensive than would have been the case at trial.

The Leigh Witness

**389**    Frank Driscoll became president and CEO of Leigh on August 8, 1989. His background was in the technical area with little, if any, experience in finance. At or about the time of the Stanmore meetings on Nov. 28 and 29, 1989, Driscoll became aware that the past president of Leigh, Barry Flower, who was then working with Plessey, was attempting to place blame for Leigh's contractual and other difficulties on Driscoll. Driscoll was of the view that these difficulties had their genesis prior to his arrival at Leigh, during Flower's watch. It is apparent that he felt taken advantage of and vulnerable, and felt in retrospect he had been deceived about the condition of Leigh when he was hired. Prior to the collapse of Leigh he asked for and was given an indemnity agreement by GEC and Siemens. Driscoll was originally named as a defendant in this action. When he was called by the bank to testify, the bank stated that though it had discontinued the action against him, it reserved the right to reinstate or recommence those claims at the end of trial. Prior to testifying, Driscoll invoked the protection of s. 9 of the Canada Evidence Act and s. 5 of the Ontario Evidence Act. His evidence must be considered in the light of all of these circumstances, and I have apportioned weight to it accordingly.

The Expert Banking Witness

**390**    The defendants proffered as expert banking evidence the report and testimony of Robert Wickham. He is a retired banker who spent 25 years with the Royal Bank of Scotland, based in London, until his retirement in 1993. This court ruled he was qualified as an expert in the area of banking, and particularly corporate lending in England, subject to later argument on admissibility.

**391**    Wickham's expert evidence related to banking practices generally and the use of comfort letters during the period of time material to this action. His evidence also describes the commercial context in which the Plessey letters were delivered to the bank. TD, through its bank witnesses, continually characterised the Plessey letters as strong. TD has pleaded and argued in the alternative that the comfort letters are ambiguous. Wickham's evidence was intended to counter these characterizations. In my opinion, Wickham's evidence meets the test of relevance necessary to assist the trier of fact, and is not subject to an exclusionary rule. It is given by a properly qualified expert. See: R. v. Mohan, [1994] 2 S.C.R. 9 at 20 per Sopinka J. It is accordingly admissible. Wickham's evidence was useful in respect of the commercial context in which the comfort letters were exchanged and buttressed other evidence in that regard, but was not essential to any findings. Where his evidence overlapped with issues which were to be decided by this Court, it was given no weight.

PART III

ISSUES AND LAW

OVERVIEW

**392**    The plaintiff submits that several causes of action arise from Leigh and Plessey's failure to pay the TD loan and Leigh' assignment in bankruptcy, and has advanced claims against the defendants in both contract and tort. In the statement of claim, the plaintiff asserted approximately 150 causes of action against the defendants, however in argument many of these claims were abandoned. As set out below, the plaintiffs claims against Plessey in contract and tort remain outstanding, as do the claims against GEC in tort. All claims of the plaintiff other than those dealt with below have been abandoned.

The Claims in Contract

**393**    The bank claims as against Plessey for breach of contract, and submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Leigh to be managed so as to be always in a position to meet its financial obligations, including all amounts owed to the bank pursuant to the bank's loan to Leigh. The plaintiff asserts that Plessey is in breach of this contractual promise to cause Leigh to be so managed, and is therefore liable to the bank in contract. The bank also seeks an order that the fifth comfort letter be rectified to conform with the agreement between the parties, or that it be set aside.

The Claims in Tort

**394**    The plaintiff submits that Plessey is liable to the bank in misrepresentation on the basis that the third paragraph of the Plessey comfort letters misrepresented the Plessey policy regarding management of its wholly-owned subsidiaries. Specifically, the plaintiff claims that the letters misrepresented the policy because the letters did not disclose the following: that the policy was regarding the management of the subsidiaries by their own management rather than by Plessey; that

the policy in the third paragraph did not require Plessey to do anything so that the subsidiaries would always be in a position to pay their debts; that the letters were only a statement of Plessey's policy as at the date of the letter; and that the letter was so "commercially hollow" Leigh could go bankrupt and the bank would receive nothing under its loan facility. In the alternative, the plaintiff claims the third paragraph of each letter was a material misrepresentation because Plessey had adopted no policy regarding the management of its subsidiaries.

395    The bank claims in the alternative that if the policy did exist, it had ceased to exist or was subject to material qualifications by or after December 27, 1989. The plaintiff submits that GEC and Plessey knew the policy statement in the fourth comfort letter had been made and "knew, recklessly disregarded or should have known" of these material qualifications, and should not have made the statement of policy in the third comfort letter, or should have disclosed the material qualifications. The plaintiff submits the defendants' actions in this regard amount to fraud or negligent misrepresentation.

Conduct outside the Comfort Letters

396    In the further alternative, the plaintiff claims the defendant are liable in contract and tort for conduct separate and apart from the comfort letters. In particular, the bank submits that the alleged statement of Ian Musgrave, Plessey group treasurer, that the comfort letters were "tantamount to a guarantee" amounted to a misrepresentation upon which the bank relied to its detriment. Further, the plaintiff claims that certain statements of Colin Justice, made to the bank in November and December 1989, regarding the Leigh financial statements, were negligently or fraudulently made. In addition, the bank claims that certain statements allegedly made by Ross Anderson to Exton constituted negligent misrepresentations.

397    Finally, the bank claims that from no later than February 26, 1990, Plessey and GEC were aware that Leigh was knowingly withholding its unaudited financial statements from the bank, in breach of its express contractual requirements to deliver them. The plaintiff submits that Leigh's conduct in knowingly withholding the statements while continuing to take further funds constituted a deceit upon the bank, and that Plessey and GEC were parties to this deceit through their silence.

THE CLAIMS IN CONTACT

398    The plaintiff submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Plessey Canada and Leigh to be managed so as to be always in a position to meet their financial obligations, including all amounts due pursuant to the banks loan to Leigh. The bank claims that Plessey is in breach of that contractual promise to cause Leigh to be so managed and is liable to the bank for the amount of the bank's advances to Leigh.

399    In addition, the bank submits it is entitled to rectification of the fifth comfort letter to eliminate the words "and does not constitute a legally binding commitment" on the basis that it does

not reflect the agreement of the parties. In the alternative, the plaintiff seeks an order that the defendants cannot rely upon those words, or that the fifth comfort letter be set aside in its entirety.

**400**    In response, Plessey submits that the operative document is the fifth comfort letter, and asserts that the letter creates no legally binding obligation upon Plessey to directly or indirectly make good the indebtedness of Leigh to TD, regardless of the concluding words which, it submits, simply reinforce the plain meaning of the document.

**401**    Regarding the bank's assertions as to the contractual promises contained in the comfort letters, Plessey argues that such an interpretation would require the court to insert words into the third paragraph which are not there, and which would, if added, convert a statement of policy or representation into a promise amounting to a guarantee.

**402**    Plessey resists the request for rectification on the basis that the fifth comfort letter accurately records the understanding between Plessey and TD that the comfort letter did not create a binding legal obligation to pay Leigh's debt to the bank.

PRINCIPLES OF CONTRACTUAL INTERPRETATION

**403**    The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand. See: Chitty on Contracts Volume 1, General Principles, 27th ed. (1994) at 580.

**404**    Where the agreement has been reduced to writing, the parol evidence rule operates to prohibit the introduction of extrinsic evidence to vary the written contract. This rule of interpretation is enunciated in G.H.L. Fridman, The Law of Contract in Canada, 3rd ed. (Toronto: Carswell, 1994) at pp. 455-456:

> The fundamental rule is that if the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary, or interpret in any way the words used in the writing.

See also: Hawrish v. Bank of Montreal, [1969] S.C.R. 515 per Judson J.

**405**    This is consistent with the principle that where a document purports on its face to be the final and conclusive expression of the parties' agreement, the document will be taken to be a reliable record of the parties' latest agreement, and evidence of the negotiations leading up to it will not be admissible. See: S.M. Waddams, The Law of Contracts (3rd ed.) (Toronto: Canada Law Book, 1993) at 210. This principle was articulated by Lord Wilberforce in Prenn v. Simmonds, [1971] 1 W.L.R. 1381 (H.L.) at 1384-1385:

> The reason for not admitting evidence of these exchanges is not a technical one

> or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to.

**406** These principles were adopted by the Court of Appeal for Ontario in Craighampton Investments Ltd. v. Ayerswood Developments Ltd. et al., (1984), 4 O.A.C. 124 (C.A.) at 126:

> This case obviously demonstrates the practical sense of the parol evidence rule. When equals negotiate at length and arrive at a written agreement which can be interpreted by itself or by reference to matters which must be taken to have been known to both of them and which show the sense or meaning that the words must be taken to have had when the agreement was made, it verges on idle activity for a court to rehash the negotiations, activities and conduct of the parties and hear their now professed expression of what their intentions were at an earlier time.

Factual Matrix

**407** The court need not be confined to a strict, literal interpretation of the language of the document however, and may admit evidence of the "factual matrix" or circumstances surrounding the conclusion of the agreement as an aid in interpretation. Lord Wilberforce stated in Prenn v. Simmonds, supra at 1383-4:

> In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ... We must ... inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 ... it has been clear enough that evidence of mutually known facts may be admitted to identify the meaning of a descriptive term.

He rejected the notion, however, that evidence of the parties' subjective intentions ought to be admissible, at 1385:

And if it can be shown that one interpretation completely frustrates that object, to
the extent of rendering the contract futile, that may be a strong argument for an
alternative interpretation, if that can reasonably be found. But beyond that it may
be difficult to go: it may be a matter of degree, or of judgment, how far one
interpretation, or another, gives effect to a common intention: the parties, indeed,
may be pursuing that intention with differing emphasis, and hoping to achieve it
to an extent which may differ, and in different ways. The words used may, and
often do, represent a formula which means different things teach side, yet may be
accepted because that is the only way to get "agreement" and in the hope that
disputes will not arise. The only course then can be to try to ascertain the
"natural" meaning. Far more, and indeed totally, dangerous is it to admit
evidence of one party's objective -- even if this is known to the other party.
However strongly pursued this may be, the other party may only be willing to
give it partial recognition, and in a world of give and take, men often have to be
satisfied with less than they want. So, again, it would be a matter of speculation
how far the common intention was that the particular objective should be realised
...

In my opinion, then, evidence of negotiations, or of the parties' intentions, and a
fortiori of Dr. Simmonds' intentions, ought not to be received, and evidence
should be restricted to evidence of the factual background known to the parties at
or before the date of the contract, including evidence of the "genesis" and
objectively the "aim" of the transaction. [Emphasis added]

Lord Wilberforce returned to this theme and elaborated upon the notion that evidence of the factual
matrix may be admitted to construe a term in Reardon Smith Line Ltd. v. Hansen-Tangen et al.,
[1976] 3 All E.R. 570 (H.L.), at 574-575:

When it comes to ascertaining whether particular words apply to a factual
situation or, if one prefers, whether a factual situation comes within particular
words, it is undoubtedly proper, and necessary, to take evidence as to the factual
situation.

\*\*\*

It is less easy to define what evidence may be used in order to enable a term to be
construed. ... [I]t does not follow that ... one must be confined within the four
comers of the document. No contracts are made in a vacuum: there is always a
setting in which they have to be placed. The nature of what is legitimate to have

regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

\*\*\*

It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that judges are found using words like 'knew or must be taken to have known' ....

\*\*\*

I think that all of their Lordships are saying, in different words, the same thing - what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognize that, in the search for the relevant background, there may be facts, which form part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts, so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed.

**408**    The Supreme Court of Canada has adopted the notion that a court may look at evidence of the surrounding circumstances when construing a document. In Hill v. Nova Scotia (Attorney General), [1997] 1 S.C.R. 69, the court cited with approval the dicta of LaForest J. (as he then was), in White, Fluhman and Eddy v. Central Trust Co. and Smith Estate (1984), 54 N.B.R. (2d) 293 at

310-311:

> What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about.

**409**   From these authorities can be gleaned certain principles which should guide the court in interpreting an agreement. The document should be looked at as a whole, with each contractual term considered in the context of the entire document. See: G.H.L. Fridman, The Law of Contract in Canada, 3rd ed. (Toronto: Carswell, 1994) at 469. The court should make every effort to construe the document on its face, without regard to extrinsic evidence.

**410**   Where an agreement is clear and unambiguous on its face, the parol evidence rule operates to prohibit admission of evidence to alter or vary the written terms of the contract. However, the court may admit evidence of the surrounding circumstances, including evidence of the commercial purpose of the contract, the genesis of the transaction, the background, the context, and the market in which the parties were operating. In this regard, evidence to be admitted must be objective in the sense of what reasonable persons in the position of the parties would have had in mind, rather than subjective evidence of the parties' actual intentions.

Ambiguity

**411**   A contract which appears clear and unambiguous on its face may, nevertheless, contain a latent ambiguity. Such an ambiguity may only become apparent when the court seeks to apply the language of the agreement to the facts. Extrinsic evidence of the factual matrix of the agreement may also disclose such an ambiguity, by revealing a meaning attributable to the language of the document apparent only in light of evidence of the commercial context. Where the court determines that a document contains a latent ambiguity, further extrinsic evidence is admissible to clear up the ambiguity. See: Leitch Gold Mines v. Texas Gulf Sulphur Co., [1969] 1 O.R. 469 (N.C.). The role of the court in interpreting an ambiguous commercial contract was stated by Estey J. in Consolidated-Bathurst Export Limited v. Mutual Boiler & Machinery Insurance Company, [1980] 1 S.C.R. 888, at 901:

> [T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must

certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

**412**    The nature of the evidence to be admitted as an aid to interpretation was considered by the Court of Appeal for Ontario in the seminal case of Alampi v. Swartz, [1964] 1 O.R. 488 (C.A.). In that case, McGillivray J.A. for the court held that extrinsic evidence was not admissible to vary the terms of a written contract, but could be admitted to explain the document and to prove the facts upon which interpretation of the document depends, including the validity of the document, the identity of the parties and to explain technical terms or commercial usage. Justice McGillivray held that such evidence may not contradict a term of the contract, but is adduced to relate the terms of the contract to the proper subject matter or to assign to the terms a definite meaning. Once such evidence is admitted, it may disclose that a term of the contract is ambiguous and capable of more than one meaning. In that case, he noted at p. 493, "Such an ambiguity, a "latent ambiguity", because not apparent on the face of the writing, demands evidence of intention to establish whether there was an agreement at all, or if the parties intended a particular one of alternate meanings to prevail." Evidence of intention may only be admitted however, once the latent ambiguity has been established.

**413**    This issue was later considered by Cory J.A. (as he then was), in TransCanada Pipelines Ltd. v. Northern and Central Gas Corp. Ltd. (1983), 41 O.R. (2d) 447 (C.A.), who noted that every effort should be made to construe the contract based on the wording. Where, however, a doubt arises as to the true sense and meaning of the words or there is difficulty in their application to the circumstances, resort may be had to extrinsic evidence. Mr. Justice Cory held that once the court is of the opinion the contract is difficult to interpret, extrinsic evidence may be admitted to determine whether, in fact, the agreement contains a latent defect, and noted that if, at a later stage, another court was able to interpret the document without regard to that evidence, no harm would result from its admission. At p. 452 Cory J.A. adopted and paraphrased the reasoning of Gale C.J.O. in Leitch Gold Mines v. Texas Gulf Sulphur Co., supra:

(1)    The extrinsic evidence admitted may establish that there is no latent ambiguity in the written document relevant to the issue in dispute. In such a case obviously the written document governs.

(2)    The extrinsic evidence may demonstrate that there is latent ambiguity in the terms of the written document which are in dispute. Nonetheless, upon a consideration of all the surrounding circumstances, it requires the choice to be made in favour of the meaning of the agreement which would appear from a reading of the whole document without any extrinsic evidence to show ambiguity.

(3)    The extrinsic evidence establishes that there is a latent ambiguity. However, a

consideration of the surrounding circumstances requires the choice of a meaning consistent with the words of the document but different from their patent meaning. The party contending that there is a latent ambiguity must not only establish that there is such an ambiguity but also resolve that ambiguity by evidence from which the court can find what agreement was made and what the choice of alternative meanings should be. The party contending for the latent ambiguity must show that the extrinsic evidence dictates the selection of a meaning which is generally consistent with the wording of the written document but different from its patent meaning.

(4)    The extrinsic evidence indicates that there is a latent ambiguity of such an extent that the true agreement between the parties is different from the agreement expressed in the written document. That is, the extrinsic evidence established that there is a case of mistake.

(5)    The extrinsic evidence establishes that there is a latent ambiguity and goes further and demonstrates that the minds of the parties never really met upon the subject matter concerning which there is an agreement. In other words, there is in fact no agreement upon the terms which would decided the issue between the parties. The court then cannot, on the balance of probabilities, make the necessary finding of consensus ad idem.

Similarly in Arthur Andersen Inc. v. Toronto-Dominion Bank et al (1994), 17 O.R. (3d) 363 (C.A.), Grange and McKinlay JJ.A. stated at 372:

First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and evidence of subsequent conduct of the parties to the agreement.

**414**    Accordingly, where there is some doubt as to the meaning of language used in the contract, or the court has difficulty in applying it to the facts, the court should, in light of the factual matrix, search for an interpretation which would appear to advance the true intent of the parties. The more reasonable construction of the words, which produces a fair result consistent with the commercial atmosphere, is the interpretation which the court should adopt.

**415**    The court may have regard to extrinsic evidence in order to resolve the ambiguity, and no harm will come from its admission, however extrinsic evidence of facts leading up to the making of the agreement, circumstances existing at the time of the agreement and subsequent conduct of the parties may only be considered once an ambiguity has been found. Extrinsic evidence demonstrating the intention of the parties is only admissible however, once an ambiguity has been found, and in my view, should be objective, rather than subjective evidence of the parties'

intentions.

APPLICATION TO THE CIRCUMSTANCES OF THIS CASE

Interpretation of the Comfort Letter on its Face

**416**    The starting point of any analysis must be identification of the document to be construed. In the present case, the operative document is clearly the fifth comfort letter, dated December 15, 1989 and delivered to the bank on December 27, 1989. This was the last comfort letter delivered to TD prior to the bankruptcy of Leigh in April, 1990. Moreover, the letter states on its face "This letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 ...." Applying the principles enunciated by Professor Waddams, supra, the fifth comfort letter purports on its face to be the most recent iteration of the parties' agreement. Subject to the plaintiffs submission that the letter should be rectified or set aside, the fifth letter is the document to be construed by the court in the context of the claim in contract.

**417**    Applying the principles of contractual interpretation set out above, the first step in any analysis must be an attempt on the part of the court to construe the document according to the language on its face, without reference to extrinsic evidence of any sort. The fifth comfort letter states, in its entirety:

> This is to confirm that The Plessey plc has full knowledge of the facility of C $45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

**418**    The last line of the letter is, in my view, dispositive of the plaintiffs contract argument. Having regard to the principle that contracting parties are presumed to intend what they say, the

fifth comfort letter states on its face that it replaces all prior comfort letters, and must therefore be taken to be a reliable record of the parties' latest agreement. Moreover, the letter states that it does not constitute a legally binding agreement and must be taken as conclusive of Plessey's intention that it not be so bound. This is a full and complete answer to the plaintiffs claim in contract.

The Statement of Policy in the Third Paragraph

**419**    The plaintiff submits that the statement of policy in the this paragraph of the comfort letter amounts to a contractual promise by Plessey that it had and would have a policy, as long as the bank's loans were outstanding, to cause Leigh to be managed in such a way that it could pay the bank when called upon to do so. Hence, the plaintiff asserts that the added words in the last line of the document operate to eliminate the contractual promise contained in the third paragraph.

**420**    In response, Plessey asserts that, notwithstanding the added words in the last line, the statement in the third paragraph is merely a representation as to its policy speaking as at the date of the letter, and not a binding contractual promise. As such, the added words in the last line do not change the effect or alter the meaning of the third paragraph. Plessey argues that the interpretation urged by the plaintiff amounts to a contractual promise that Plessey would see to it that the bank be paid, either directly or indirectly, and that in order to arrive at such an interpretation, the court would have to read into the comfort letter words that are not there.

**421**    The difference between a contractual promise and a representation was articulated by Professor Fridman in The Law Of Contract in Canada, supra, at 3-4 as follows:

> Promises are fundamental to the idea of contract. A promise is an undertaking as to the future conduct of the party promising, the promisor, with respect to the party to whom the promise is given, the promisee. ... It is the idea of promise which distinguishes contract from representation. A representation is not an undertaking, although, sometimes, it may resemble a promise in its form, for example, where a seller of goods states that the goods in question are "top quality". Representations are statements as to an existing or past fact, not promises as to future events or states of affairs. Although representations can have legal consequences, if made falsely or negligently, or, on occasion, without either fraud or negligence on the part of the representor, such consequences are non-contractual in their nature. They stem from the misleading nature of a statement, not from any promissory character. [Emphasis added]

**422**    The leading case on the interpretation of comfort letters in the decision of the English court of appeal in Kleinwort Benson Ltd. v. Malaysia Mining Corp., [1989] 1 All E.R. 785 (C.A.) (leave to appeal to the House of Lords refused). In that case, Ralph Gibson L.J. held that a comfort letter given in support of a subsidiaries borrowing did not have contractual effect.

**423**    The plaintiffs seek to rely upon the decision of Rogers C.J. in Banque Brussels Lambert SA

v. Australian National Industries Ltd. (1989), 21 NSWLR 502, in which the Supreme Court of New South Wales held that a comfort letter was a legally enforceable obligation. In my view that case can have no application to the facts before me. In this regard I adopt the reasoning of Chadwick J. in Re Atlantic Computers plc, [1995] B.C.C. 696 (Ch.D - Companies Court) at 699:

> I was referred also, understandably, to the decision of Rogers C.J. in the Supreme Court of New South Wales in the case of Banque Brussels Lambert SA v. Australian National Industries Ltd. (1989), 21 NSWLR 502. It is clear from remarks on p. 523 that the Chief Justice found the approach of the Court of Appeal in Kleinwort Benson somewhat unreal. He took the view that the construction reached by the Court of Appeal rendered the document in that case nothing but a scrap of paper.

> It would not be open to me to follow the Chief Justice's decision, even if I were to accept his criticism of the Court of Appeal's approach; but I draw attention to the fact that, as he acknowledged, the test prescribed by the law of Australia to determine whether a statement is promissory or only representational is different from that in England (see p. 524A). In my view, the law of England is clear. A document in the terms of these two letters of comfort does not impose a contractual promise as to future conduct.

**424**    In Kleinwort Benson, as in the present case, the paragraph in issue was the third paragraph containing a statement of policy of the parent company that: "It is our policy to ensure that the business of MMC Metals Limited is at all times in a position to meet its liabilities to you un r the above arrangements." I note in passing that the language used in that comfort letter, including the word "ensure" is arguably stronger than that used in the comfort letter before me.

**425**    The question before the court in Kleinwort Benson was whether the paragraph was a contractual promise as to the parent company's future conduct, or, whether it was simply a statement of present fact regarding the company's intentions. Although the wording and factual matrix of that comfort letter differ from those in the case at bar, nevertheless I find the reasoning to be instructive. In holding that the paragraph was a representation, the court stated at 792:

> In my judgment the defendants made a statement as to what their policy was, and did not in para 3 of the comfort letter expressly promise that such policy would be continued in future. It is impossible to make up for the lack of express promise by implying such a promise, and indeed, no such implied promise is pleaded. My conclusion rests on what, in my judgment, is the proper effect and meaning which, on the evidence, is to be given to para 3 of the comfort letters.

**426**    In my view, the statement in the third paragraph of the comfort letter is, on its face, a representation and not a contractual promise or warranty. The paragraph does not use promissory

language or language of undertaking. It simply contains a statement or representation as to Plessey policy at the time the letter was executed, and does not coin a contractual promise that it will cause Leigh to be so managed nor a promise that the bank will be paid. Moreover, the paragraph must be construed in the context of the document as a whole. A comparison of the wording in the second and third paragraphs is instructive in this regard. The second paragraph states: "We undertake not to reduce our share-holding in Leigh ..." The use of words of promise or undertaking stands in sharp contrast to the wording of paragraph three: "It is our policy ...".

**427**    In order to arrive at the construction urged by the plaintiff, if would be necessary to add or imply the words "It is Plessey's policy to cause Leigh to be managed in such a way ..." or "Plessey undertakes to ensure that Leigh be managed ..." or other, similar language. The word policy itself, given its common usage, means a guideline or principle, and does not amount to a promise to do anything or a requirement that the terms of the policy be adhered to. A consideration of the policy statement, placed in the context of the letter as a whole, supports this construction of the word, for the reasons set out below. Further, the words "it is our policy" are, in my view, a representation of present policy and not a contractual undertaking to have the policy in the future. The paragraph does not say "it is and will be our policy", and in order to construe the statement of policy as a statement of future intention, it would again be necessary to imply into it words which are not there. The word "always" in the third paragraph has the effect of making the representation as to policy a continuing representation, although subject to change. Absent the word "always", the policy statement could be taken as speaking only as at the date of the letter. The word "always" does not have the effect of elevating the policy statement to the level of a contractual promise to have the policy in the future.

**428**    If the construction urged by the plaintiff is adopted, namely that Plessey promises to have the policy as long as the loan is outstanding and that Plessey will cause Leigh to be managed in accordance with the policy, the effect is to emasculate the preceding two paragraphs of the comfort letter. In this regard, the reasoning in Kleinwort Benson at 795-796 is apposite:

> Next, the first draft of the comfort letter was produced by the plaintiffs. Paragraph 1 contained confirmation that the defendants knew of and approved of the granting of the facilities in question by the plaintiffs to Metals, and para 2 contained the express confirmation that the defendants would not reduce their current financial interest in Metals until (in effect) facilities had been paid or the defendants consented. Both are relevant to the present and future moral responsibility of the defendants. If the words of para 3 are to be treated as intended to express a contractual promise by the defendants as to their future policy, which Hirst J. held the words to contain, then the recitation of the plaintiffs' approval and the promise not to reduce their current financial interest in Metals would be of no significance. If the defendants have promised that at all times in the future it will be the defendants' policy to ensure that Metals is in a position to meet its liabilities to the plaintiffs under the facility it would not matter whether they had approved or disapproved, or whether they had disposed

of their shares in Metals. Contracts may, of course, contain statements or promises which are caused to be of no separate commercial importance by the width of a later promise in the same document. Where, however, the court is examining a statement which is by its express words no more than a representation of fact, in order to consider whether it is shown to have been intended to be of the nature of a contractual promise or warranty, it seems to me to be a fact suggesting at least the absence of such intention if, as in this case, to read the statement as a contractual promise is to reduce to no significance two paragraphs included in the plaintiff's draft, both of which have significance if the statement is read as a representation of fact only. [Emphasis added]

**429**    Similarly, in the case at bar, the first paragraph of the comfort letter contains a statement of Plessey's awareness of the facility extended by TD to Leigh, and the second paragraph contains an undertaking on the part of Plessey not to reduce its shareholding without prior notification to the bank. If the third paragraph is read as a contractual obligation that Plessey will continue to have the policy while the facility is outstanding, and that it will cause Leigh to be managed so that it can meet its obligations under the facility, the preceding two paragraphs would become irrelevant. To paraphrase Ralph Gibson L.J., there would be no reason to waste ink or paper on the first two paragraphs.

**430**    Finally, in interpreting the document as a whole, the third paragraph must also be construed in light of the last line, stating that the comfort letter (and thus the third paragraph) does not constitute a legally binding commitment. Hence, the fifth comfort letter is clear and unambiguous on its face, does not contain any contractual promise, and the bank's claim in contract must fail.

The Factual Matrix

**431**    A consideration of the comfort letter in its factual matrix does not alter this conclusion. Plessey and TD have both made submissions as to the appropriate evidence of the surrounding circumstances which the court ought to consider. I have reviewed the evidence carefully, and having regard to the principles outlined above, in my view the following evidence is admissible to place the comfort letter in its factual matrix. Plessey was a large, multinational corporation with subsidiaries in 43 countries. TD is a Canadian Bank with branches throughout the world. Both are large, sophisticated parties, and both were intimately familiar with commercial lending transactions and the various forms of security used in such transactions, including loan guarantees. Prior to the delivery of the Leigh comfort letters, both parties had been involved in other transactions involving comfort letters. Both parties knew that there was no single "standard form" of comfort letter in use in the financial marketplace, and both knew that the legal effect of a comfort letter depended on the wording of the letter. Plessey and the Bank were both aware that in the commercial context in which they were operating, a confirmation by a parent company that it was aware of the borrowings of its subsidiary was considered to have some significance, as was an undertaking to notify the bank of any reduction by the parent in its shareholding in the subsidiary. It would also have been known

to both parties that banks competed for the business of companies of the size and prominence of Plessey and actively solicited them to develop business opportunities. TD had solicited Plessey for business unsuccessfully in the past. The aim of the transaction was to arrange bank financing for Leigh on terms that were acceptable to both parties.

**432**    Regarding the specific transaction in issue and its genesis, as is outlined above the bank approached Plessey when the Leigh takeover bid was announced, and offered to assist in financing the purchase of Leigh. Plessey ultimately availed itself of a $10 million short-term acquisition loan, to be used by the acquisition vehicle, Plessey Canada (1988) Inc. Plessey also provided a letter of comfort to the bank, in a form which was agreed upon following negotiation, and which the bank accepted. The first comfort letter was in substantially the same form as the fifth letter, absent the last sentence.

**433**    The factual matrix surrounding the comfort letter does not alter my conclusion that the comfort letter is clear and unambiguous. The parties were sophisticated and accustomed to operating in international financial markets. The comfort letter contained statements of commercial significance to the bank. The first paragraph contained a representation that Plessey was aware of the facility which had been granted to Leigh by, the bank. The second paragraph contained an undertaking, using express contractual language, that Plessey would not reduce its shareholding in Leigh without prior notification to the bank. Such notification would provide the bank with an opportunity to call the loan or take whatever steps it deemed necessary.

**434**    The third paragraph contained a representation as to the policy of Plessey. The paragraph does not contain express promissory language, in direct contrast with the contractual undertaking given in the second paragraph. This contrast is significant given that both parties were sophisticated and used to negotiating the terms of security. Both parties also knew what a guarantee was and the appropriate language of guarantee. The comfort letter was arrived at in a commercial marketplace in which banks, including TD, solicited large companies like Plessey for business, and competed with other banks for that business. In that context, to construe the third paragraph as a promise to do anything, including a promise to pay the bank, in the absence of express language to that effect, defies both legal and commercial sense.

**435**    The plaintiff asserts that to construe the third paragraph as a representation makes no commercial sense, in that the bank would be no better off than it would have been with a letter from Leigh itself, saying that it intended to manage its own affairs in such a way as to be always in a position to meet its financial obligations. I do not agree with this submission. While Plessey is not obliged to pay the bank, nor to have the policy stated, the letter nevertheless has commercial value. Delivery of the letter provides the bank with a recourse it would not otherwise have had, namely, to approach the parent company and ask it to pay. The possibility that the parent will consider paying must give the bank more comfort than such a letter from Leigh standing alone, without potential recourse to a parent. Moreover, to interpret the third paragraph as a representation rather than a contractual promise is not to render it commercially hollow or devoid of meaning. An interpretation

of the paragraph as not obliging Plessey to do anything to have or enforce such a policy does not mean that, in fact, Plessey did not take such steps. A comfort letter containing a representation as to policy must, in my view, have more commercial value than a letter which did not contain such a statement.

**436**    The third paragraph does not amount to a contractual promise by Plessey to have the policy described, either at the date of the letter or in the future. Nor is it a promise by Plessey to cause Leigh to be managed in accordance with the policy, or that Plessey would cause the bank to be paid. In order to reach such conclusions, it would be necessary to read into the paragraph words which are not there, and there is no basis in the evidence for the implication of such terms. See: C.P. Hotels v. Bank of Montreal, [1987] 1 S.C.R. 711; Charles P. Rowan & Associates Inc. v. Ciba-Geigy Canada (1994), 19 O.R. (3d) 205 (C.A.). My conclusion is reinforced when the paragraph is viewed in the context of the entire letter, including the final sentence disavowing any binding legal obligation.

Ambiguity

**437**    Both the bank and Plessey assert that the comfort letter is not ambiguous, although each urges the court to adopt a different construction of the third paragraph, based upon the same wording. The bank asserts that the third paragraph amounts to an ongoing contractual promise to have the policy set out in the paragraph for as long as the loan was outstanding, and a contractual promise that Plessey would cause Leigh to be managed so that it could pay the bank. Plessey, on the other hand, submits that the paragraph contains no contractual obligation, and is simply a statement of present intention. In their submission, the paragraph is merely a representation that on the date of the comfort letter Plessey had the policy described, and that a policy, as opposed to a obligation of some kind, merely speaks to Plessey's expectation as to the management of Leigh, and not to any requirement that it be so managed.

**438**    As was noted by Cory J.A. (as he then was) in TransCanada Pipelines Lid. v. Northern and Central Gas Corp. Ltd., supra, a document which appears clear on its face, may nevertheless disclose an ambiguity if a doubt arises as to the true meaning of the words, or if the court has difficulty in applying the language to the facts. I agree with the submissions of both parties that the letter is not ambiguous on its face and, for the reasons outlined above, a consideration of the letter in its factual matrix does not disclose any ambiguity, nor any reason to depart from a construction of the document based upon its express wording. I find the document contains no latent ambiguity. However, even had I found there was such an ambiguity, the extrinsic evidence which would then be admissible does not assist the plaintiff. Although it is not necessary that I review it, the extrinsic evidence supports the conclusion that there is no latent ambiguity and defeats the construction urged by the plaintiff. The salient details of this extrinsic evidence are outlined below.

Circumstances Leading up to the First Comfort Letter

**439**    The starting point must be that the bank knew from the outset that a guarantee was not on

offer by Plessey. When Plessey announced its friendly takeover bid for Leigh, the bank approached Plessey and offered to assist with funding for the acquisition. Although the bank had made loan facilities available to Plessey prior to this, none had been drawn upon, and Baker referred to the possibilities for developing business opportunities with Plessey in his CCR recommending that the loan be approved. Baker also noted in the CCR that a guarantee was not on offer for the borrowing, which would be unsecured. Indeed, it was this notation which led Noonan in the Credit Division to stipulate that an appropriate comfort letter be obtained from Plessey, instead.

**440**    The form of comfort letter which was ultimately delivered to the bank was the subject of negotiation between the bank and Plessey. Drafts were exchanged. Howard Baker sent an initial draft to Plessey, based on a template comfort letter. The template Baker was working from included a line which contained language which, in my view, amounted to a contractual promise: "and in this particular instance, we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Baker deleted this line from the proposed draft which he sent to Plessey. Baker's draft concluded "We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis." Plessey responded with its own draft, which was accepted by the bank without amendment.

**441**    I can only conclude from the foregoing that the bank was aware Plessey was not prepared to provide a guarantee for the borrowings of Plessey Canada, that the bank agreed to accept a comfort letter rather than a guarantee in order to develop the business relationship with Plessey, and that the bank was consulted as to the terms of the comfort letter to be provided. In this regard, it is significant that in October 1989, the bank was invited to (and did) tender a bid to provide Plessey with an uncommitted facility, security for which was offered as the unconditional and irrevocable 50-50 several guarantees of GEC and Siemens. In my opinion, none of this evidence supports a finding that the comfort letter contains a latent ambiguity, nor that the third paragraph of the letter contains any contractual promise.

Evidence Regarding the Subsequent Comfort Letters.

**442**    The corporate credit reviews of the Leigh account are replete with references to the bank's relationship with Plessey and later GEC, and to the bank's desire to generate further business with these companies. Throughout, the comfort letter is listed as documentation rather than security, in accordance with the bank's Credit Procedures Manual. At the same time, from the time of delivery of the third comfort letter, the risk rating in these credit reviews is clearly that of Leigh, and not that of the parent companies. The risk rating deteriorates as the Leigh bank line grows, a fact which is inconsistent with an understanding on the part of the bank that they had a guarantee or enforceable contractual commitment from Plessey that they would be paid. Indeed, the bank explicitly recognized that the support from Plessey was informal. In his comment on the Nov. 1, 1988 request that the Leigh line be extended by $4 million, Sid Owen noted: "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to

regularize this company's facilities by November 30, 1988. We must resist being dragged along." This observation is, in my view, completely inconsistent with the notion that the bank thought it had a contractual promise from Plessey that it be paid.

**443**    In the fall of 1988, Plessey discovered that the bank held security over the assets of Leigh in the form of a general assignment of book debts and a floating charge debenture. Plessey requested that the bank release this security and the bank agreed. The Credit Division required as a term of this agreement that Plessey subordinate its intercompany debt in priority to the debt of the bank. Plessey refused to do this, and the Corporate Banking Division agreed to waive that condition, and also agreed to release its security over Leigh's assets. At no time did the bank suggest that the wording of the comfort letter be altered or amended in any way, notwithstanding that the line of credit was now an operating loan rather than a short-term acquisition loan, and that the amount of the loan had increased substantially. This is so even though Plessey forwarded a draft of the third comfort letter to the bank and requested confirmation that its terms were acceptable, thus providing TD with an opportunity to suggest changes in the wording. It is noteworthy that the loan was repayable on demand, and thus could have been called by the bank at any time.

**444**    Prior to delivery of the fourth comfort letter, the bank agreed to extend credit to Leigh in excess of the amount referred to in the comfort letter. Plessey executed a letter to this effect which had been provided in draft form by the bank, without amending its terms, which stated: "However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the letter of comfort accordingly." This document contains words which amount to a contractual promise to provide a further comfort letter if one gas needed, in language which was supplied by the bank. Plessey complied with the terms of this undertaking, and forwarded the fourth comfort letter to the bank, despite the fact the bank had not requested it. This is significant, both because the bank clearly was familiar with promissory language and requested it when it felt such language was appropriate, and also because having given an enforceable undertaking, Plessey honoured it.

**445**    In the fall of 1989, Plessey was the subject of a successful hostile takeover. The bank was aware of this and noted the GEC Siemens plan to divide up the assets of Plessey in the September 20, 1989 CCR. Almost all of the senior personnel at Plessey left shortly after the takeover, and were replaced by representatives of GEC and Siemens. The bank viewed this as an opportunity to develop a business relationship with GEC, and made no effort to renegotiate the terms of the comfort letter or call the loan.

**446**    Finally, as I have found above, the bank read and accepted the fifth comfort letter, including the last line which stated that the comfort letter did not constitute a legally binding obligation.

**447**    All of this extrinsic evidence displays a clear focus on the part of the bank on generation of further business with Plessey and GEC, and, in a competitive marketplace, indicates to me that the bank was prepared to assume risks and make concessions in order to further that goal. Moreover, all

of this evidence, including Plessey's refusal to provide a guarantee at the outset; the descriptions of the support from Plessey as informal; the fact that the relevant risk rating was that of Leigh rather than Plessey; the parties' use of contractual language prior to delivery of the fourth comfort letter; and the offer of joint and several guarantees in the October 1989 Plessey uncommitted facility; all of this is inconsistent with an understanding on the part of the bank that they had obtained a contractual promise in the comfort letter that they would be paid directly or indirectly' by' Plessey. It is also inconsistent with a belief by the bank that it had obtained a promise that Leigh would remain solvent.

Evidence of Subsequent Conduct.

**448**    The bank read and accepted the fifth comfort letter. At no time up until the bankruptcy of Leigh on April 12, 1990, did anyone from the bank comment or complain to any of the defendants regarding the additional wording in the last line, let alone ask that the language be deleted. In conversations with Gerdine and Anderson, the bank requested that GEC and Siemens formally acknowledge the existing Plessey comfort letter. On April 5, 1990, the bank sent both GEC and Siemens a letter enclosing a draft comfort letter which it requested that they execute. The covering letter stated: "Our comfort and support for high has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." The bank's reference to its reliance on the integrity of the parent companies is, in my view, inconsistent with an understanding on their part that they were in possession of a binding contract in the comfort letter. Further, the accompanying comfort letter contained no reference to Plessey's policy, but did contain express promissory language which might well have amounted to a contractual obligation, had the letter been executed: "We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates."

**449**    The subsequent conduct of the bank is consistent with an understanding on its part that it did not have a binding contract with Plessey. It is also consistent with an understanding that the third paragraph did not contain a promise that the bank would be paid, nor a promise that Plessey would cause Leigh to be managed in accordance with the policy. In light of all of my findings above, there is no basis in the evidence for a finding of any collateral contract or collateral warranty. See: Hawrish v. Bank of Montreal supra, and Esso Petroleum Co. Ltd. v. Mardon, [1997] 2 All E.R. 5 (C.A.). For all of the foregoing reasons, I conclude that the comfort letter is clear and unambiguous, and the construction of the comfort letter urged by the plaintiff is not supported either by the wording of the document or the evidence.

Contra Proferentem

**450**    TD seeks to rely upon the doctrine of contra proferentem and argues that any ambiguity in the comfort letters should be resolved in favour of the bank. In my view, even had I found an ambiguity in the comfort letter, the doctrine of contra proferentum would have no application on

these facts.

**451**    Only where the court finds an ambiguity and the other rules of construction fail to resolve that ambiguity may the court invoke the contra proferentem doctrine and interpret the document strictly against its drafter. Contra proferentem is a principle of last resort. See Hillis Oil and Sales Limited v. Wynn's Canada Limited, [1986] 1 S.C.R. 57 at 68-69; Consolidated-Bathurst Export Limited v Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888 at 900-901; and Alex Duff Realty Limited v. Eaglecrest Holdings Limited, [1983] 5 W.W.R. 61 (Alta. C.A.). In Hillis Oil and Sales v. Wynn's Canada, supra, at p. 69, Le Dain J. speaking for the court, quoted from Anson's Law of Contract, 25th ed., (1979) at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing, more to his advantage.

**452**    Le Dain J., in Hillis Oil, also made it clear that, as a general principle relevant to the construction of all contracts, contra proferentem may only be applied where there has been no opportunity for the other side to review and modify the disputed or ambiguous terms. He said (at p. 68):

> [T]he rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording.

**453**    Even if I had found the comfort letter to be ambiguous, which I have not, TD cannot rely upon the doctrine of contra proferentem on the facts of this case. The bank was consulted on the wording of the first and third comfort letters, and given an opportunity to modify the language used. The bank agreed to the language contained in the third paragraph, and accepted the comfort letters as drafted. The bank read and accepted the fifth comfort letter. If it was dissatisfied with the language used, it could have requested a revision, refused to advance further funds until the revision was obtained, or indeed, it could have called the loan, which was repayable on demand. It did none of these things. Accordingly, in my view, the comfort letter is not ambiguous and in any event, the plaintiff had a full opportunity to modify its wording. The doctrine of contra proferentum has no application.

Rectification

**454**    The plaintiff requests an order of this court that the fifth comfort letter be rectified to conform with the agreement between the parties by striking out the last line, or in the alternative,

seeks an order that the fifth comfort letter be set aside in its entirety. It is not necessary to deal with these arguments in depth, in light of my finding above, that the bank, and specifically Wendy Leaney, read and accepted the fifth comfort letter upon its receipt. In light of the bank's failure to make any comment or complaint regarding the last line of the letter at the time of its delivery or at any time up to the bankruptcy of Leigh on April 12, 1990, it was reasonable for Plessey to conclude that the bank had accepted the revised comfort letter, including the final sentence. It is not now open to the bank to claim rectification.

**455**    In any event in view of my conclusions above regarding the interpretation of the third paragraph of the comfort letter, the orders sought by the plaintiff would be of no effect. All parties concede that the fourth comfort letter is substantially the same as the fifth, but for the last line, and I agree. While an order granting rectification might have some effect on the promissory wording contained in the second paragraph, that paragraph is not in issue, and in my view the third paragraph does not contain any contractual promise. Hence, rectification would be of no assistance to the plaintiff.

NEGLIGENT AND FRAUDULENT MISREPRESENTATION

**456**    In the alternative to its claim in contract, the plaintiff has advanced a number of causes of action in negligent and fraudulent misrepresentation. The bank claims that the statement in paragraph three of all five of the comfort letters amounted to a material misrepresentation because, it submits, the paragraph failed to disclose the following: that the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility.

**457**    In the alternative, TD claims that the third paragraph of each of the letters of comfort was a material misrepresentation because Plessey had, in fact, adopted no policy regarding any of its subsidiaries, including Leigh. In support of this allegation, the bank asserts that nowhere in any of Plessey's internal documentation is it demonstrated that the Board of Plessey actually adopted the policy described in the letters.

**458**    In the further alternative, TD claims that even if Plessey had a policy which was accurately described in the letters of comfort, that policy ceased to exist or became subject to material qualifications prior to receipt by the bank of the fifth comfort letter on December 27, 1989. In the alternative, the bank pleads that the policy ceased to exist or became subject to material qualifications between receipt by the bank and the bankruptcy of Leigh on April 12, 1990. The bank submits that Plessey and GEC knew, recklessly disregarded or should have known of these material

qualifications to the statement of policy in the August 31, 1989 letter, and had an obligation to disclose them to the bank. The bank alleges that GEC and Plessey's conduct in this regard amounts to fraudulent misrepresentation or negligent misrepresentation.

**459**    In addition to claims arising out of the comfort letters, the plaintiff alleges certain representations made by representatives of GEC and Plessey amount to fraudulent or negligent misrepresentation.

THE LAW

Negligent Misrepresentation

**460**    The law of negligent misrepresentation in Canada was set out by the Supreme Court of Canada in the seminal case of Queen v. Cognos Inc., [1993] 1 S.C.R. 87. In that case, Iacobucci J., speaking for the court, stated the five elements of a claim in negligent misrepresentation at 110:

> The required elements for a successful Hedley Byrne claim have been stated in many authorities, sometimes in varying forms. The decisions of this court cited above suggest five general requirements:
>
> (1)    There must be a duty of care based on a "special relationship" between the representor and the representee;
> (2)    The representation in question must be untrue, inaccurate or misleading;
> (3)    The representor must have acted negligently in making said misrepresentation;
> (4)    The representee must have relied, in a reasonable manner, on said negligent misrepresentation; and
> (5)    The reliance must have been detrimental to the representee in the sense that damages resulted.

**461**    Each of these elements must be made out in order for the plaintiff to be successful in its claim of negligent misrepresentation.

> 1.    There must be a Duty of Care based on a "Special Relationship"

**462**    In Queen, supra, Iacobucci J. considered the nature of the special relationship that must exist between the parties before a duty of care will arise, and applied the approach adopted by the House of Lords in Caparo Industries plc v. Dickman, [1990] 1 All E.R. 568 (H.L.), in which their Lordships held that three criteria determine the imposition of a duty of care, and hence, the existence of a "special relationship": foreseeability of damage, proximity of relationship and the reasonableness of imposing a duty. In so doing, he noted at p. 117-118 that the duty of care is no longer restricted to situations of reliance on professional advice:

In my opinion, confining this duty of care to "professionals" who are in the business of providing information and advice, such as doctors, lawyers, bankers, architects and engineers, reflects an overly simplistic view of the analysis required in cases such as the present one. The question of whether a duty of care with respect to representations exists depends on a number of considerations including, but not limited to, the representor's profession. While this factor may provide a good indication as to whether a "special relationship" exists between the parties, it should not be treated in all cases as a threshold requirement. There may be situations where the surrounding circumstances provide sufficient indicia of a duty of care, notwithstanding the representor's profession.

**463**    The Supreme Court revisited and refined the criteria for establishment of a "special relationship" in the recent case Hercules Managements Lid. v. Ernst & Young, [1997] 2 S.C.R. 165. In that case, LaForest J. held for the court that there ought not, in principle, to be any difference between the criteria used to establish a duty of care in negligent misrepresentation and the criteria applied in any other negligence case, and adapted the two-part test first described in Anns v. Merton London Borough Council, [1978] A.C. 728 (H.L.). The Anns test mandates that where there is a sufficient relationship of proximity between the parties such that carelessness on the part of one may be likely to cause damage to the other, it will give rise to a prima facie duty of care. Once the court has found that such a duty of care exists, it is then necessary to consider whether there are any considerations which ought to limit the scope of the duty or the class of persons to whom it is owed.

**464**    In adapting the notion of proximity to cases of negligent misrepresentation, LaForest J. stated at 188:

> In cases of negligent misrepresentation, the relationship between the plaintiff and defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representations and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable. To use the term employed by my colleague, Iacobucci J., in Cognos, ... the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere. [Emphasis added]

**465**    Regarding the second limb of the Anns test, Mr. Justice LaForest held at p. 197 that the court, in a claim of negligent misrepresentation, may look to such factors as "knowledge of the

plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared", in order to determine whether there are any policy considerations which should limit the scope of the duty, such as the potential for indeterminate liability on the part of the defendants.

> 2.    The Representation in Question must be Untrue, Inaccurate or Misleading

**466**    In order to satisfy the second requirement of a claim in misrepresentation, the plaintiff must establish that the statement relied upon was untrue, inaccurate or misleading. In this regard, Iacobucci J. held in Cognos, supra, at p. 653 that failure to divulge highly pertinent information may, in some circumstances, amount to a negligent misrepresentation.

**467**    In addition, the court held at p. 658-659 that in some circumstances, an implied representation, as opposed to an actual representation, may give rise to actionable negligence:

> In my view, there is no compelling reason in principle, authority or policy for the proposition that, as a general rule, an implied representation cannot under any circumstances give rise to actionable negligence. ... On the other hand, there is considerable authority for the more flexible view that, in appropriate circumstances, implied representations can and often do, give rise to actionable negligence.

> In my opinion, a flexible approach to this issue is preferable. It is arbitrary and premature to declare as a general rule that nothing less than express or direct representations can succeed under the Hedley Byrne doctrine. ... It is unnecessary for me to set out in detail the circumstances in which so-called implied representations can be enough to sustain an action in tort for negligent misrepresentation. I prefer to leave this task to trial judges dealing with specific factual situations. [Emphasis in original]

**468**    This reasoning was followed by Mr. Justice Linden in Spinks v. Canada (1996), 134 D.L.R. (4th) 223 (Fed. C.A.) who noted that silence as to a fact may give rise to an implied representation. He stated at 236:

> A person may be "misled" by a failure to divulge as much as by advice that is inaccurate or untrue. In the same way that absent information can be "erroneous", as discussed above, missing information can be misleading. ... Consequently, the duty may be breached not only by positive misstatements but also my omissions, for they may be just as misleading.

**469**    In Cognos, it was argued that only representations of existing facts, and not those relating to future occurrences, can give rise to actionable negligence. Mr. Justice Iacobucci noted that there

were a number of authorities cited in support of this proposition, and proceeded on the assumption that these authorities were correct, without deciding the point, on the basis that the representations at the heart of the case before him concerned representations of existing fact.

**470**    The question of when a representation will amount to a material misrepresentation was considered by the British Columbia Court of Appeal in Kripps v. Touche Ross & Co. (1997), 35 C.C.L.T. (2d) 60 (B.C.C.A.) (Leave to appeal to the Supreme Court of Canada refused, [1997] S.C.C.A. No. 380, Nov. 7, 1997). Following a review of the case law, Finch J.A. stated at 85:

> From these submissions it would appear that there are two or three different tests for materiality. The first test is whether a representation might possibly affect a decision [made by a representee]; the second is whether a representation is capable of affecting a decision; and the third is whether a representation would probably affect a decision. I think that the first two tests are the same, and that the real distinction is between a representation that might possibly affect a decision and one that would probably affect a decision. [Emphasis in original]

**471**    The court did not decided which of these two tests was applicable, as on the facts before it, Finch J.A. was of the view that even the higher standard was met. In either case, the test is an objective one of the effect that the statement would have had on a reasonable person in the circumstances of the representee.

3.    The Representor must have acted Negligently in Making the Misrepresentation

**472**    The standard of care to be exercised by the representor is the same standard as is applied in other negligence cases, that of the reasonable person. This standard of care is an objective one, namely, what a reasonable person would do in the circumstances. The duty requires not only that the representor be honest and truthful, but that the representor exercise such reasonable care as the circumstances of the case dictate, to ensure that representations made are accurate and not misleading. See: Queen v. Cognos, supra. At p. 651-652 Iacobucci J. cited with approval the following passage from L.N. Klar, Tort Law (Toronto: Thomson Professional Publishing Canada, 1991) at 160:

> An advisor does not guarantee the accuracy of the statements made, but is only required to exercise reasonable care with respect to it. As with the issue of standard of care in negligence in general, this is a question of fact which must be determined in the circumstances of the case. Taking into account the nature of the occasion, the purpose for which the statement was made, the foreseeable use of the statement, the probable damage which will result from an inaccurate statement, the status of the advisor and the level of competence generally observed by others similarly placed, the trier of fact will determine whether the advisor was negligent.

Iacobucci J. elaborated upon the requirements of the duty, noting that it was not a duty of full disclosure, but rather a duty to take reasonable care. He added at p. 654 that the representor's belief in the truth of his representations is not relevant to a determination of whether the duty has been breached:

> Although the representor's subjective belief in the accuracy of the representations and his moral blameworthiness, or lack thereof, is highly relevant when considering whether or not a misrepresentation was fraudulently made, it serves little, if any, purpose in an inquiry into negligence. As noted above, the applicable standard of care is that of the objective reasonable person. The representor's belief in the truth of his or her representations is irrelevant to that standard of care. The position adopted by the Court of Appeal seems to absolve those who make negligent misrepresentations from liability if they believe that their representations are true. Such a position would virtually eliminate liability for negligent misrepresentation as liability would result only where there is actual knowledge that the representation made is not true; the basis of fraudulent misrepresentation. [Emphasis in original]

4.    The Representee must have Relied, in a Reasonable Manner, on the Negligent Misrepresentation

**473**    The fourth element of the tort is that the plaintiff must reasonably have relied upon the representation made by the defendant. As Mr. Justice Linden observed in Spinks v. Canada, supra, at p. 239, this is simply the universal requirement of proof of causation, necessary in all negligence cases in order to found liability.

**474**    In Kripps, supra, the British Columbia Court of Appeal considered the nature of reasonable reliance in a negligent misrepresentation case, and concluded that in some circumstances, reliance may be inferred by the court. However, the circumstances in that case were unusual, in that the trial judge had heard no oral evidence but proceeded on the basis of affidavits and transcripts of cross-examinations. As well, the trial judge had made no findings on the reliance issue, having previously found there was no misrepresentation. In addition, the plaintiffs claims of presumed or deemed reliance had been struck at the pleadings stage of the action, leaving only the claims of actual reliance. Hence, the court of appeal held it was in as good a position to draw these inferences as the trial judge had been. Finch J.A. stated at 89-90:

> Whether a representation was made negligently or fraudulently, reliance upon that representation is an issue of fact as to the representee's state of mind. There are cases where the representee may be able to give direct evidence as to what, in fact, induced him to act as he did. Where such evidence is available, its weight is a question for the trier of fact. In many cases however, as the authorities point

out, it would be reasonable to expect such evidence to be given, and if it were it might well be suspect as self-serving. This is such a case.

The distinction between cases of negligent and fraudulent misrepresentation is that proof of a dishonest or fraudulent frame of mind on the defendant's part is required in actions of deceit. That, too, is an issue of fact and one which may also, of necessity, fall to be resolved by way of inference. There is, however, nothing in that which touches on the issue of the plaintiffs reliance. I can see no reason why the burden of proving reliance by the plaintiff, and the drawing of inferences with respect to the plaintiffs state of mind, should be any different in cases of negligent misrepresentation than it is in cases of fraud.

**475**    The court concluded that it was sufficient, in a negligent misrepresentation action, for the plaintiff to prove that the misrepresentation was at least one factor which induced the plaintiff to act to his or her detriment. Where the misrepresentation was one which was calculated to induce the plaintiff to act or one which would naturally induce the plaintiff to act, the court held that reliance may be inferred. The inference of reliance may be rebutted by the representor.

**476**    Proof of the element of reliance on a misrepresentation involves a two step test. The first is a factual test, namely, whether the plaintiff relied upon the representation in fact. The second limb of the test requires a determination by the court, on an objective basis, as to whether the reliance was reasonable. This second requirement was described in Allen M. Linden, Canadian Tort Law, 6th ed (Butterworths: Toronto, 1997) at 445-446:

Reliance not only must be proven in fact but also must be demonstrated to be reasonable. The second part of the fourth requirement, therefore, means that only those injuries resulting from reliance reasonably placed on a defendant will be compensable. It follows that, to the extent injuries were sustained as a result of unreasonable reliance, recovery may be barred. In most cases, however, a plaintiff will be barred from recovery only to the extent the reliance was unreasonable. The notion of unreasonableness here simply suggests a limit on the degree of reliance a given factual scenario may bear. It does not suggest that, if a plaintiff steps beyond that limit, all recovery must be lost.

Nevertheless, where the facts suggest that any reliance whatsoever is unreasonable, recovery is rightly barred.

Fraudulent Misrepresentation

**477**    Fraud is the most serious civil tort which can be alleged, and must be both strictly pleaded and strictly proved. The main distinction between the elements of fraudulent misrepresentation and

negligent misrepresentation has been touched upon above, namely the dishonest state of mind of the representor. The state of mind was described in the seminal case Derry v. Peek (1889), 14 App. Cas. 337 (H.L.) which held fraud is proved where it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. The intention to deceive or reckless disregard for the truth is critical.

**478**    Where fraudulent misrepresentation is alleged against a corporation, the intention to deceive must still be strictly proved. Further, in order to attach liability to a corporation for fraud, the fraudulent intent must have been held by an individual person who is either a directing mind of the corporation, or who is acting in the course of their employment through the principle of respondeat superior or vicarious liability. In B.G. Checo v. B.C. Hydro (1990), 4 C.C.L.T. (2d) 161 at 223 (Aff'd, [1993] 1 S.C.R. 12), Hinkson J.A., writing for the majority, traced the jurisprudence on corporate responsibility in the context of a claim in fraudulent misrepresentation at 222-223:

> Subsequently, in H.L. Bolton (Engineering) Co. v. T.J Graham & Sons Ltd., [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (C.A.), Denning L.J. said at p. 172:

> \*\*\*

> > "A company may in many ways be likened to a human body. It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre. Some of the people in the company are mere servants and agents who are nothing more than hands to do the work and cannot be said to represent the mind or will. Others are directors and managers who represent the directing mind and will of the company, and control what it does. The state of mind of these managers is the state of mind of the company and is treated by the law as such. So you will find that in cases where the law requires personal fault as a condition of liability in tort, the fault of the manager will be the personal fault of the company. That is made clear by Lord Haldane's speech in Leonard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd."

> > \*\*\*

> > In the field of criminal law, corporate responsibility has its roots in civil law. In Canadian Dredge & Dock Co. v. R., [1985] 1 S.C.R. 662 ... Estey J., speaking for the Supreme Court of Canada, discussed the directing mind or identification theory and the respondeat superior approaches to corporate liability in a criminal context.

In tracing the development of the law, Estey J. referred to the decision of the Lord Chancellor, Viscount Haldane in Lennard's Carrying Co. v. Asiatic Petroleum Co., supra. He also made reference to the decision in Tesco Supermarkets Ltd. v. Nattrass, supra. After analyzing the previous decisions in this field of the law, Estey J. said at p. 311 [of C.R., p. 691 of S.C.R.]:

> "In summary, therefore, the courts in this country can be said to this date to have declined generally to apply the principle of respondeat superior in the determination of corporate criminal responsibility. Criminal responsibility in our courts thus far has been achieved in the mens rea offences by the attribution to the corporation of the acts of its employees and agents on the more limited basis of the doctrine of the directing mind or identification. Corporate responsibility in both strict and absolute liability offences has been found to arise on the direct imposition of a primary duty in the corporation in the stature in question, as construed by the court. By what appears to be the same purely pragmatic reasoning, the courts of the United Kingdom find criminal liability in a corporation only by the attribution to it of the conduct of its employees and agents where those natural persons represent the core mind and spirit of the corporation. The United States federal courts are inclined, as we have seen, to find criminal liability in the corporation by vicarious liability where any employee-agent commits in the course of his employment, the criminal act."

\*\*\*

It is apparent that the law in Canada dealing with the responsibility of a corporation for the tort of deceit is still evolving. In view of the English decisions and the decision of the Supreme Court of Canada in the Dredging case, supra, it would appear that the concept of vicarious responsibility based upon respondeat superior is too narrow a basis to determine the liability of a corporation. The structure and operations of corporations are becoming more complex. However, the fundamental proposition that the plaintiff must establish an intention to deceive on the part of the defendant still applies.

See also: Standard Investments Ltd. et al. v. Canadian Imperial Bank of Commerce (1985), 52 O.R. (2d) 473 (C.A.) (Leave to appeal to Supreme Court of Canada refused Feb. 3, 1986).

**479**    In the case of fraudulent misrepresentation, there are circumstances where silence may attract

liability. If a material fact which was true at the time a contract was executed becomes false while the contract remains executory, or if a statement believed to be true at the time it was made is discovered to be false, then the representor has a duty to disclose the change in circumstances. The failure to do so may amount to a fraudulent misrepresentation. See: P. Perell, "False Statements" (1996), 18 Advocates' Quarterly 232 at 242.

**480**    In Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co. (1988), 54 D.L.R. (4th) 43 (B.C.C.A.) (Aff'd on other grounds [1991] 3 S.C.R. 3), the British Columbia Court of Appeal overturned the trial judge's finding of fraud through non-disclosure on the basis that the defendant did not remain silent as to the changed fact but was simply slow to respond to the change and could only be criticized for its "communications arrangements". In so doing, the court adopted the approach to fraud through silence established by the House of Lords in Brownlie v. Campbell, (1880), 5 App. Cas. 925 at 950. Esson J.A. stated at 67-68:

> There is much emphasis in the plaintiffs submissions and in the reasons of the trial judge on the circumstance that this is not a case of fraud "of the usual kind" involving positive representations of fact but is, rather, one concerned only with non-disclosure by a party which has become aware of an altered set of circumstances. It is, I think, potentially misleading to regard these as different categories of fraud rather than as a different factual basis for a finding of fraud. Where the fraud is alleged to arise from failure to disclose, the plaintiff remains subject to all of the stringent requirements which the law imposes upon those who allege fraud. The authority relied upon by the trial judge was the speech of Lord Blackburn in Brownlie v. Campbell. ... The trial judge quoted this excerpt:

>> ... when a statement or representation has been made in the bona fide belief that it is true, and the party who has made it afterwards comes to find out that it is untrue, and discovers what he should have said, he can no longer honestly keep up that silence on the subject after that has come to his knowledge, thereby allowing the other party to go on, and still more, inducing him to go on, upon a statement which was honestly made at the time at which it was made, but which he has not now retracted when he has become aware that it can be no long honestly perservered [sic] in.

> The relationship between the two bases for fraud appears clearly enough if one reads that passage in the context of the passage which immediately precedes it:

>> I quite agree in this, that whenever a man in order to induce a contract says that which is in his knowledge untrue with the intention to mislead the

other side, and induce them to enter into the contract, that is downright fraud; in plain English, and Scotch also, it is a downright lie told to induce the other party to act upon it, and it should of course be treated as such. I further agree in this: that when a statement or representation ...

**481**    Fraud through "active non-disclosure" was considered by the Court of Appeal for Ontario in Abel v. McDonald, [1964] 2 O.R. 256 (C.A.) in which the court held at 259: "By active non-disclosure is meant that the defendants, with knowledge that the damage to the premises had occurred actively prevented as far as they could that knowledge from coming to the notice of the appellants."

APPLICATION TO THE FACTS OF THIS CASE

Misrepresentation in the First Four Comfort Letters

**482**    The plaintiff asserts a cause of action in negligent misrepresentation against Plessey based on the wording of the third paragraph of the first four comfort letters. In particular, the bank claims that the paragraph did not disclose that the policy referred to the management of Plessey Canada and Leigh by their own management, rather than by Plessey; that the policy did not require Plessey to do anything so that its subsidiaries would be in a position to pay their debts; that the letters were only statements of policy as at the date of the letters, and could not be taken to be statements of Plessey's policy as at the date of receipt of the letters by the bank, when the policy "might or might not" be that stated in the letter; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank receive nothing. In the alternative, the bank pleads that the third paragraph was a material misrepresentation because Plessey had, in fact, adopted no policy regarding Leigh, and asserts that there was no direct evidence led at trial that the board of Plessey had adopted the policy. I propose to deal with the latter submission first.

Existence of a "Special Relationship"

**483**    Plessey concedes that there exists a special relationship between it and the bank regarding the text of the comfort letters, and I agree. Applying the principles set out in Hercules Management, supra, it is reasonably foreseeable that the bank would rely on the statements in the comfort letter and reliance upon those statements, in the circumstances, would be reasonable. There are no policy considerations, such as indeterminate liability of the defendant, to preclude a finding that Plessey owed TD a duty of care.

The Representation Must be Untrue, Inaccurate or Misleading

The Plaintiffs Interpretation of the Comfort Letter.

**484**    The plaintiff submits that the third paragraph of the letters is materially misleading because Plessey had, in fact, adopted no policy with respect to any of its subsidiaries, including Leigh. TD's

misrepresentation argument is premised on the same interpretation of the comfort letter as was advanced above in the contract argument, namely that the bank understood the policy paragraph to mean that Plessey would manage its subsidiaries, including Leigh so that the subsidiaries would always be in a position to meet their financial obligations, and that Plessey had not adopted this policy. Hence, they assert that the policy paragraph was misleading. I have rejected this construction of the comfort letter above, in the contract portion of these reasons, and I adopt and reiterate that reasoning here. The interpretation urged by the plaintiff requires that words be implied into the third paragraph which are not there. In my view there is no basis in the evidence to find such an implied representation.

**485**    The bank's interpretation of the comfort letter is based upon the testimony of Patrick Noonan that this was his subjective understanding of the policy paragraph. The proper test however, is not what the plaintiff subjectively thought of the representation, but what a reasonable person, in all of the circumstances of the plaintiff, would have thought. See: Cognos, supra, at 131-132. In my view, the bank's interpretation of the comfort letter is not reasonable in the circumstances, nor is it supported by the totality of the evidence of Noonan and McDowell.

**486**    Noonan testified that he read the letter with a high regard for Plessey's standing, strength and reputation, and financial capacity to give effect to the stated policy. This is consistent with McDowell's evidence as to what constituted a strong comfort letter. McDowell testified that a well-written comfort letter was one from a responsible corporation and signed by its authorized officers. Which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfil it." These criteria are consistent with a perception of comfort letters as moral, rather than legal obligations.

**487**    Noonan testified that he was not involved in the negotiation or drafting of the first comfort letter, he never discussed the wording of the letter with anyone at Leigh, Plessey or GEC, nor did he direct the terms to be used in it. It was not his practice to discuss the wording of comfort letters with bank counsel, nor did he do so regarding the Leigh letter. He did not discuss the letter with Baker, who negotiated the letter from the bank's London office. In fact, it was never the responsibility of Noonan or anyone else in the Credit Division to negotiate the terms of documents like comfort letters. That responsibility rested with the account manager in the Corporate Banking Division.

**488**    Further, Howard Baker, who did negotiate the wording of the first letter, worked from a template comfort letter, which contained in the policy paragraph the additional words: "and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Those words were deleted by Baker from the draft comfort letter he sent to Plessey and were never included in the Leigh letters.

**489**    Finally, a Plessey guarantee was not on offer for the Leigh loan, and the bank knew this prior

to negotiating the first comfort letter. I am of the view that the interpretation urged by the bank, based on the evidence of Patrick Noonan's subjective view of the letter, is not one which would be held by a reasonable person in all the circumstances. The evidence does not support a finding that Plessey impliedly represented that it would cause Leigh to be managed in accordance with the policy. Such an interpretation amounts to a promise that directly or indirectly, the bank would be paid, and both parties knew a guarantee was not on offer.

Untrue, Inaccurate or Misleading

**490**    The plaintiff submits that the statement of policy in the third paragraph of the comfort letters was materially misleading because Plessey had adopted no policy at all with respect to Leigh. In this regard, the plaintiff asserts that nowhere in the internal Plessey documentation produced was there any evidence that the Plessey board had adopted a formal policy regarding management of its subsidiaries. The bank argues that if Plessey had such a company-wide policy, it would have to have been in writing and published throughout the company so that everyone required to know about the policy would be aware of it and understand it. I do not accept this submission, and the evidence is to the contrary.

**491**    I find as a fact that Plessey did have the policy stated in the third paragraph of the comfort letter. Indeed, such a policy is virtually axiomatic from a business management perspective. While the Plessey board may not have published a company-wide policy statement to the effect of paragraph three, Musgrave prepared a submission for the Plessey main board regarding each of the comfort letters, and the board did formally approve the issuance of each. The Plessey board did authorize the signatories to sign the comfort letters on behalf of the company, and this, in my view, is sufficient formal confirmation that Plessey had the policy.

**492**    It was the evidence of Ian Musgrave, which I accept, that Plessey did have the policy set out in the third paragraph, regarding both Plessey Canada and later Leigh, for the duration of his tenure at Plessey. Musgrave gave the following evidence regarding board's adoption of the policy:

> Q.    So just to be absolutely certain, the general instructions in writing dealt with the company policy that the wholly-owned subsidiaries of Plessey Company plc would be managed in such a way as to always be in a - or to be - such as to always be in a position to pay or to meet their financial obligations.
>
> A.    That's my understanding. Yes.
>
> Q.    Now, we - where is that written general instruction?
>
> A.    The section I'd always read as covering this is actually in general instruction number 215, which is at tab "C" in 227. ... It reads:
>
> > This instruction supersedes all current General Instructions in matters relating to levels of delegated authority where in conflict. However, it must be noted that it does not remove any statutory,

> legal or contractual obligations of the directors or employees of The
> Plessey Company or any of its subsidiaries.

> Certainly in the context of U.K. company law, it was a statutory, legal obligation
> of the directors of U.K. subsidiaries to manage the affairs of the company
> concerned so that they could meet all their obligations as they fell due. If they
> didn't, I think they were trading illegally, going under U.K. company law, and
> they should legally stop trading. So that's the section I had always looked at on
> that point. There is another section in the finance manual itself. Let me just find
> this, if I might. Yes. If you look at Exhibit 227, 1C. ... This section is headed
> "Policies Financial Accounting Balance Sheet". ... And then on the third page
> there's a paragraph at the top headed "Creditors":

>> It is company policy to pay suppliers in accordance with the agreed credit
>> terms. It is not permitted to take excessive credit, which may damage the
>> Group's reputation or result in difficulty in obtaining supplies or services.
>> Creditors and liabilities are recorded by reference to goods delivered and
>> services received ...

> Now, I fully expect that was written with trade creditors in mind, but I think the
> principle equally applies to any supply of services, which would include supply
> of credit.

> So those are the bits I looked at to, if you like, to back up the claim that the
> company had a policy in that area. It's not something that I'm looking at post the
> event. These are sections which I looked at at the time to justify that type of
> statement.

Musgrave was pressed on the point and said:

> A.    The policy is not defined precisely in the general instruction, nor anywhere else,
> as far as I can see, in precisely the same words that were used in Paragraph 3 of
> the comfort letter. However, my view at the time was that the second paragraph
> of the introduction section to GIP.215 set out a policy which had the same
> meaning, did not use the same words, or it didn't get there in quite the same way,
> but the meaning is the same. I don't think there was any particular need in the
> comfort letter to use precisely the same words as might have appeared in an
> internal company document.

**493**    In addition, Musgrave testified as to the application of the policy to the Plessey group:

> A.    Yes. I do. This was a policy that Plessey applied to the whole group, to all its subsidiaries and to joint venture companies where it was able to apply it. Essentially, the policy was that the management of the company concerned should manage the business of that company in such a way as to be always in a position, etc., etc.
>
> Q.    What role did the Plessey plc management have in that policy?
>
> A.    Well, they laid down the policy in the first place and I think if it came to their attention that the policy was not being applied by the management of any particular subsidiary, they would clearly, at least in the first instance, remind the management of the policy. That would hopefully be enough to ensure policy was applied by the management.
>
> Q.    During your time, and did that policy predate this day, December 22nd, 1988?
>
> A.    I'm certain it did.
>
> Q.    And in your time at Plessey till you left Plessey at the end of August, 1989, did that policy ever change?
>
> A.    No.

Musgrave elaborated on the meaning of the policy under cross-examination:

> THE WITNESS: Excuse me, your Honour. There's actually something I'd like to say just before we start. There was an answer I gave to Mr. Campion on Thursday afternoon which, at the time, I wasn't comfortable with. I've reflected quite a lot on the weekend and I think - I gave him the wrong answer. It concerns the area of participation in a company's management. I think Mr. Campion suggested that a parent company, by setting down through policies, procedures, levels of delegated authority, but the parent company was actually participating in the management of the subsidiary -- concerned. I agreed with that. I was uncomfortable with it at the time. I have reflected on it. I don't now agree with the suggestion. It seems to me that the legal responsibility for managing the affairs of a subsidiary lies with the board of the subsidiaries concerned. That is certainly the case in English law, and I expect it is in Canadian law, as well. And nobody can take that await from them.
>
> Now, having said that, the management has to manage the affairs of the company, manage the business within a whole series of constraints. They might be constraints laid down by the government in the form of law environmental laws, labour laws, customer protection laws. The management has to have regard to all of those. The management may have to regard - have regard to policies laid down by a regulator, if it's operating a regulated industry. The management

might have to have regard to policies and procedures laid down by some professional body, if that's relevant. In the case of a company which is a subsidiary within a group, almost certainly it will have to have regard to the policies and procedures laid down by the parent company of the group. But I don't see any difference with any of that - I don't think any of those situations involve the person who is setting out the policies, procedures, laws, regulations, whatever, participating in the management of the group. I think the management of the subsidiary have to manage the affairs of the company concerned within those policies and procedures.

So, on reflection, I disagree with Mr. Campion's suggestion. I think you can actually take it a stage further. As I said earlier, certainly in the U.K. it is the board of a company who are responsible for the management of that company. And they can't give away that responsibility. If they allowed someone else who wasn't a member of that board or didn't report to that board to participate in the management of the company, I think they would be in a very shaky legal position, and I'm certain that Plessey did not structure its delegated authorities to put the members of all its subsidiaries' boards in that sort of position. So I'm afraid I have got to change my mind on that one. [Emphasis added]

**494**    In addition to the evidence of Musgrave, I note that shortly following its takeover of Leigh, Plessey implemented a series of financial controls, in order to monitor Leigh's performance. These included a requirement that Leigh provide Plessey with key financial data on a monthly, basis, including external sales, operating profit, profit before tax and cash flow. Binnie Sammon testified that Plessey would have begun receiving this information from Leigh by July 1988. In addition, Plessey controlled the borrowing and guarantee limits of Leigh, which were set by the Plessey main board. Leigh could not exceed these limits without main board approval. Leigh, along with the other Plessey subsidiaries, was required to produce an annual budget, for approval by Plessey. This requirement was continued by GEC following the takeover of Plessey. When it became apparent, in the spring of 1989, that Leigh could not support the interest payments associated with the intercompany debt, Plessey converted the debt to preference shares, thus increasing the equity capital on Leigh's books and eliminating the interest payments. Finally, throughout the period of the first four comfort letters, Leigh did meet its financial obligations, and no evidence has been led to the contrary. All of this evidence supports the finding that Plessey did have the policy as stated on the face of the comfort letters, and acted in accordance with it, even though it had no legal obligation to do so. Accordingly, I find that the comfort letter was not misleading in this respect, and the bank's claim in this regard must fail.

**495**    In the alternative, the bank claims that the comfort letter was materially misleading because the policy paragraph did not disclose that: 1. the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed

by their own management; 2. that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; 3. that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and 4. that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility. These submissions are premised upon an acceptance by the bank of the evidence of Ian Musgrave as to the interpretation of the comfort letters and an assertion that this evidence is inconsistent with the bank's interpretation of the comfort letters. I have rejected the bank's interpretation for the reasons set out above.

**496**    Ian Musgrave left Plessey in 1989 prior to the hostile takeover by GEC Siemens, and prior to Leigh's demise. He was approached by National Power plc in 1989 and accepted an offer from them. For the past three years he has been employed as group cash manager for a Norwegian company called Kvaerner, which has between 400 and 500 subsidiaries worldwide. In that position, Musgrave is responsible for setting up the group banking systems globally and controlling the day to day liquidity of the entire group. Borrowings for the group are in the range of 1.5 billion pounds, and Musgrave testified that he deals with banks on a daily basis. I accept Musgrave's evidence, which in my view is in accord with a reasonable, objective interpretation of the comfort letter. In addition, I note that Musgrave's evidence was consistent with that of Robert Wicknam, the expert banking witness.

**497**    The first of the bank's assertions is that the policy statement was misleading because it did not disclose that Leigh was to be managed by its own officers and directors. I cannot accede to this submission. In my view, it is self evident, and would be to any reasonable person in the circumstances of the bank, that Leigh was to be managed by its own management. In this regard, I note the evidence of Musgrave, above, that it would be an improper delegation of authority of the board of directors of Leigh to permit the company to be managed by a party other than an office holder of the company. I agree. A bank is a commercially sophisticated plaintiff, and a reasonable party in the position of the bank would have been aware of this provision of company law.

**498**    The second assertion of the bank is that the paragraph was misleading in that it did not disclose that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay the bank. On the contrary, I am of the view that this is exactly what the policy paragraph says, clearly and on its face. I have set out the reasons for this conclusion in the section on contract, and need not repeat them again here. Similarly, the comfort letter does carry a degree of value in the commercial context, and for the reasons outlined above, is not commercially hollow.

**499**    Regarding the third assertion, while I found above that the wording of the third paragraph does not contain a contractual promise by Plessey to have the policy into the future, I am of the view that the comfort letter does contain a continuing representation as to Plessey policy. The letter is not misleading in this respect, as this is consistent with the bank's reading of the letter and also

with Musgrave's evidence:

> Q.   I take it that it was your understanding that this was a statement of continuing policy.
>
> A.   I think, as the word stands, it's a statement of our policy at that point in time. It is our policy. We don't say our policy will continue to be. But I think, if the policy changed, if it had changed at any point in time, I would, I think almost certainly, have gone back to the bank, this bank and any other bank who had a similar comfort letter, and say; Look, our policy has changed.
>
> Q.   I see. So you'd feel obliged to go to the bank, policy changed?
>
> A.   Yes. I don't think we were obliged in the legal sense, because it's simply a statement of policy at the time saying it doesn't commit us to notify the bank of a change of policy. But as a matter of good practice, I think I would have gone back and informed the banks, not just Toronto-Dominion but any bank, if policy in this area had changed.
>
> Q.   But you weren't legally obliged here?
>
> A.   I don't think we were.

Hence, for all of the above reasons, I find that the first four comfort letters are neither untrue, inaccurate, nor misleading, and the bank's claim in negligent misrepresentation must fail.

Fraud and Negligent Misrepresentation in the Fifth Comfort Letter

**500**    In the alternative, the bank claims that even if Plessey had a policy which was accurately described in the first four comfort letters, that policy ceased to exist or became subject to "material qualifications" prior to the bank's receipt of the fifth letter. In the further alternative, the bank asserts that the policy changed at some time following receipt of the letter on December 27, 1989 and the bankruptcy of Leigh on April 12, 1990. The bank claims that Plessey and GEC knew, recklessly disregarded, or should have known of the "material qualifications" to the policy, and had an obligation to disclose them to TD. Their failure to do so, the bank asserts, amounts to fraudulent or negligent misrepresentation.

**501**    The bank submits, as the basis for this claim, that GEC, knowing of Leigh's financial results following the Stanmore meetings in late November, had not adopted any settled policy with respect to Leigh. I cannot accede to these submissions. While GEC, in the months following the Stanmore meetings, may have had reservations as to whether it wanted to become 100 per cent owner of Leigh, these reservations and the uncertainty as to Leigh's ultimate ownership, were unrelated to the management policy for Leigh as stated in the fifth comfort letter, and the letter is not misleading in this respect.

**502**    The bank also asserts, as the basis for this claim, that Plessey, GEC and Siemens did not have a common understanding of what their policy was for Leigh and that GEC and Siemens never discussed or came to a specific agreement as to what Plessey's policy for Leigh was to be. I

disagree. Anderson testified that following his revisions to the comfort letter, he sent a copy of it to everyone at GEC, Siemens and Plessey who had an interest in the letter, in order that they might comment upon it. Both Andy Hafner and Philip Gerdine received a copy of the letter, and neither commented upon it to Anderson, who interpreted this as approval from Siemens. Moreover, I find that the evidence of Gerdine and Newlands is consistent as to the application and substance of the policy.

**503**    The policy stated in the third paragraph was a policy as to Leigh's management, and I find as a fact, based on a consideration of all the evidence, that policy remained in place throughout the material period of time, right up until immediately before the bankruptcy of Leigh.

**504**    Both David Newlands and Philip Gerdine gave evidence in this trial, and both testified that Plessey continued to have the policy stated in the third paragraph of the comfort letter following the takeover. Gerdine, who was the co-managing director of Plessey following the takeover, stated in evidence:

> Q.    I'm suggesting to you that in April, 1990, as you look back on the period September '89 to April '90, you must have concluded that Plessey never had the policy referred to in the third paragraph of the letter we have just referred to during that period, namely September '89 to April '90. Do you agree with me?
>
> A.    I don't agree for this reason: That I think that with respect to worldwide operations, Plessey had this policy, which is a very simple policy, which says that we are going to supply the direction on the resources so that - and delegate to the 178 affiliates of Plessey so that they would be in a position to be managed in this way to meet financial obligations, because there are just so many alternatives available. The opposite one is simply unacceptable, that they would be unable to meet any financial obligations. So that would not be acceptable. There's another one which is Plessey's policy to run each of these subsidiaries, and it certainly didn't do that, it delegated. And I thought about this at some length about what this policy meant. It had to be in place during the entire period, and then come shortly before all the facts were in, that there was something terribly wrong here, that policy would change with respect to Leigh on that day. And that was a unique event. But frankly, even today, Plessey's policy is as stated here, in my opinion.

Gerdine also testified as to the substance of the policy:

> Q.    Do I take it that what you're saying is, is that Plessey had a policy that - Plessey would see that Leigh would be managed in such a way as to always be in a position to meet its financial obligations?
>
> A.    Well, yes, again, it's just slightly different from that. It's that Plessey would provide the resources in management, in financial instruction, in various things

> that would permit Leigh to run its business in a position to meet its financial obligations. And there is an important distinction there of what Plessey was doing, because there is a policy at Plessey on delegation which is important, that these people operate their own businesses, and Plessey sets the guidelines.

Q.   As I understand your answer, as part of that, Plessey would supply resources, management, and financial instructions and various things to Leigh as part of that policy.

A.   Yes.

Q.   And when you use the term "resources", that would include the financial support from Plessey.

A.   It would include basic investment, because the way Plessey or any parent would manage a subsidiary, at least in my view, is, it provides the management and the basic financial resource to carry on its business. And it - then the business itself does the business itself.

Q.   And when you say that, it would, in this resources, provide financial support if needed.

A.   I'm not sure you can say that. It might or it might not, depending on the circumstances.

Q.   And I take it, then, having regard to those answers, that I'm correct in saying that you read this policy as saying - read this paragraph as saying that as long as the policy was in place, Leigh would be able to pay The Toronto-Dominion Bank.

A.   I'm not sure if that follows. I mean, the policy warn place for the fundamental input, but I'm not sure that the last part of that sentence would apply necessarily. We would hope it would apply, but what Plessey did was provide this fundamental policy guidance and support by, making the investment and putting the management, and that was Plessey's policy. What they do with it is their business. That's how I understood it.

**505**    David Newlands was the finance director of GEC and the person who "blessed" Anderson's revisions of the comfort letter prior to its signature and delivery. His evidence was, in substance, the same as that of Gerdine:

> A.   Thirdly, that it was Plessey's policy that Leigh be managed so that it could pay its bills as they fell due.

Q.   Yes.

A.   And fourthly, the letter replaced earlier letters and did not constitute a legally binding commitment.

Q.   And again, I want you to focus on what you thought at the time. Do you recall anything further as to why you thought it was fine?

A.   I thought all those statements were explicit and statements that Plessey could properly make. This was from a common sense point of view.

\*\*\*

Q.    I take it that except by agreement during the period takeover date to the corridor conversation date, this policy, as stated in the latter August 31, 1989 found at tab 21, was not in place.

A.    I wouldn't take that at all. I can't envisage how, when a company has a policy, that its subsidiaries be managed in such a way that they meet their bills as and when they fall due can ever be a policy that wouldn't exist. It would be a very odd company that didn't have such a policy. Any company - I mean, it's almost a statement of the obvious, that you would seek to have your subsidiaries run in such - in that sort of way, which is why I didn't have any problem with the policy in the 31st of August letter, and I don't believe that Ross's changes actually changed the meaning of that statement, either. So it seemed to me - I don't mean to put it the wrong way, but a motherhood statement, it seems a sensible policy for any company to have.

\*\*\*

Q.    Now, obviously in the letter, in the third paragraph, there is the Plessey policy statement.

A.    Yes.

Q.    Or statement about the Plessey policy. I take it that the policy, as far as you understood, was in place certainly when the letter was sent and was true when the letter was sent.

A.    Yes.

**506**    In addition to the evidence of Newlands and Gerdine, I find that Plessey and GEC acted in accordance with the policy throughout the material time. Colin Justice, divisional finance director of PESL was dispatched to Leigh to assist with the transition to GEC accounting principles and to assist the Plessey management with the ETC reviews, which were ongoing. Justice visited Leigh periodically through the fall of 1989 and assisted in the preparation of financial data presented at the Nov. 28 and 29 meetings at Stanmore, and at the meetings with Dr. MacBean in early January, 1990. At these January meetings, MacBean, who by then was aware of the increasingly bleak financial picture at Leigh, tasked Driscoll with preparation of a feasibility analysis of the various options available to Leigh. While these options did include closure of the business, other options contemplated the continued viability of Leigh, including restructuring, integration with Canadian Marconi, and sale to a third party. Justice assisted in the analysis. It is clear that Plessey and GEC were still trying to find solutions which would enable Leigh to continue as a viable entity. In this period, Driscoll, along with various representatives of Plessey and GEC Marconi met repeatedly

with the Canadian government. The government was Leigh's main customer, and the purpose of the meetings was to negotiate some contractual relief for Leigh.

**507**    In the same period, the Red Team review was initiated to investigate the technical situation at Leigh and to ascertain the source of Leigh's contractual difficulties. Throughout this period, Leigh continued to meet its obligations as they became due.

**508**    Once Plessey co-managing director Philip Gerdine became involved with Leigh, he too made vigorous efforts on Leigh's behalf, attending a number of meetings with the Canadian government, and meeting with Leigh management. Even after the bank had frozen the loan, Gerdine prepared a "save Leigh" proposal. In early April, the Red Team had reported that Leigh had numerous serious engineering problems in relation to the SHINCOM contracts, and that Leigh was incapable of performing its contracts from a technological perspective. Nevertheless, Gerdine and others continued their efforts on Leigh's behalf and made further attempts to negotiate relief from the Canadian government. It was not until the government finally indicated on April 9 that no relief would be forthcoming, that the decision was taken to place Leigh into bankruptcy. Throughout this period, Leigh continued to meet its obligations as they became due.

**509**    Accordingly, if Plessey did change its stated policy regarding the management of Leigh, I find that such change did not take place until the decision was taken that Leigh was terminal and bankruptcy was the only option. Only then did the policy of Plessey, as stated in the third paragraph of the comfort letter, become misleading. Up until that point, Plessey had actively supervised the management of Leigh and endeavoured to solve its problems. By the time the decision was made to abandon Leigh, the bank had already frozen the loan, no further funds had been advanced, and no damages incurred by the bank. Hence, there is no basis for a finding of negligent or fraudulent misrepresentation in the fifth comfort letter.

**510**    Even if I had found that the statement of policy in the fifth comfort letter was materially misleading, I am of the view that any reliance placed upon, the statement of policy by the bank was not reasonable, having regard to all the evidence.

**511**    Plessey became the target of a hostile takeover bid by GEC and Siemens in November, 1988. The bank was aware of this from the time the hostile bid was announced, and was also aware that GEC and Siemens intended to dismantle Plessey and divide up its assets between them. One of Musgrave's last acts at Plessey was to review the fourth comfort letter, which Plessey sent to the bank even though the bank had not asked for it. When Exton forwarded the letter to Young, he noted that Plessey felt it was "appropriate" to send the letter, due in part to the hostile takeover bid.

**512**    Following the success of the hostile takeover bid in September 1989, the Plessey management was decimated. Virtually all of the prior Plessey executive and managers either resigned or were terminated by the new owners. These were the people with whom the bank had been dealing regarding Leigh. The new owners, and particularly GEC, were large companies with whom TD had no existing relationship, despite repeated attempts to develop one over the years.

**513**    Plessey was a borrower of funds from banks, while GEC was referred to as a "cash mountain" with over 1 billion pounds in cash reserves, over and above its other assets. One of Anderson's main responsibilities was the daily investment of this surplus on the most favourable terms possible. Rather than being dependant on banks and their goodwill for funding, GEC dealt with banks as a depositor of huge sums of money. Banks eagerly vied for GEC's business, including TD.

**514**    Throughout the piece, both before and after the hostile takeover, Leigh kept the bank informed of its contract difficulties, including delays and missed milestones, all of which had a negative impact on Leigh's cash flow. The bank knew that the Leigh loan was continually climbing. On several occasions Leigh exceeded its authorized credit and went into an overdraft position. Leigh provided cash flow forecasts to the bank, including a forecast in late November projecting a peak of borrowings in December of $43.3 million. In December, the bank was informed that Leigh had laid off 80 people, and that a second tranche of layoffs was anticipated early in the new year.

**515**    Finally, Leaney read and accepted the fifth comfort letter, which included the added language in the last paragraph that the letter did not constitute a legally binding commitment. This was the first comfort letter received from Plessey since the hostile takeover, and the change from the wording of the four prior letters should have signalled a warning to the bank.

**516**    In all of these circumstances, I find that any reliance placed upon the policy paragraph by the bank was not reasonable, and hence the claim in misrepresentation must be dismissed.

Conduct Outside the Letters

**517**    In addition to the causes of action arising out of delivery of the comfort letters, the bank asserts a number of causes of action in negligent or fraudulent misrepresentation arising out of the conduct of several individuals.

Tantamount to a Guarantee

**518**    In particular, the bank asserts that Plessey is liable in negligent misrepresentation for the alleged statement by Ian Musgrave to Greg Young at TD that the Plessey comfort letter was "tantamount to a guarantee". Following a careful consideration of all the evidence, and for reasons which are set out above in my recounting of the evidence I have found as a fact, on a balance of probabilities, that Musgrave did not make this statement to Wilson. Consequently, the bank's claim in this regard must fail.

The Justice Statements

**519**    In addition, the bank claims that statements made by Colin Justice in two telephone conversations with Wilson of the bank constituted fraudulent or negligent misrepresentations. Regarding both conversations, the evidence is uncontroverted. TD urges the Court to draw an

adverse inference from the fact that Plessey chose not to call Justice as a witness, though the nature of the inference to be drawn is not particularized. I decline to draw an adverse inference, on the basis that the statements attributed to Justice were admitted by the defendant, and his evidence was not necessary. I observe that the plaintiff did not call Smith or Dean from Leigh's finance department to testify.

**520**    The bank alleges that in the first conversation, which took place in late November, Justice and Dean were both on the call. Either Justice or Dean discussed the financial condition of Leigh and advised Wilson that Leigh would be receiving payments totalling $11.4 million in January. The bank alleges that Justice was aware at the time of the call that Leigh was reporting a loss to the end of September, 1989 of $18.85 million, and knew of the ETC results regarding Leigh's contracts. The bank asserts that "Justice was conveying to the bank that the Bank could increase line to Leigh because Leigh was merely suffering cash flow problems" and that Justices statements amount to negligent misrepresentations.

**521**    I am unable to accede to this submission. This conversation must be placed in context. The late November conversation was the first of only two occasions on which Justice ever spoke to the bank. On November 8, Wilson met with Dean at Leigh's offices, and Dean informed him that "Leigh's numbers are getting worse" that there were legal disputes with some of the SHINCOM contractors, and that Leigh might require a further $10 million from the bank. On November 23, Wilson had a conversation with Dean alone, in which Dean requested a further $5 million from the bank, as Paramax was withholding payments owed to Leigh. In that conversation, Dean informed Wilson that Leigh would invoice Paramax for about $10 million in December, which they expected to receive in January.

**522**    Regarding the conversation in which Justice participated, this was the first time Justice had had any contact with anyone at TD. Wilson was unable to recall who had said Leigh would receive Paramax payments in January, Justice or Dean. On this basis alone, I am not prepared to find that Justice made a negligent misrepresentation to TD. Moreover, regardless of who made the statement, it was true. Leigh did expect to receive the payments, did in fact receive them in early January, and applied them to pay down the TD operating line. Finally, I am not persuaded that even if Justice had said the payments were due in January, that Wilson would have relied upon the statement from Justice. Wilson had never spoken to Justice before. He knew that Dean was the vice president of finance at Leigh and had spoken to him on several occasions. Dean was the person who had previously broached the subject of the extended line of credit and the expected payments in January. If Wilson did rely on these representations, it is more probable that he relied on the statements made by Dean, and I so find.

**523**    The second conversation between Justice and Wilson took place on December 21. In that conversation. Wilson asked Justice for financial statements for Leigh, and Justice responded that the statements were "not available", "due to the takeover with acquisition accounting issues". The fact that Justice made these statements is admitted by Plessey. The bank asserts that to Justice's

knowledge, some financial statements for Leigh were available and that this statement by Justice was intentionally false, or made so recklessly as to amount to fraud. In the alternative, the bank asserts that the statement amounted to a negligent misrepresentation.

**524**    In my view, the explanation given by Justice to Wilson, that the financial statements were not ready due to the acquisition accounting issues, was misleading. Although the explanation was accurate as far as it went, in that the adjusted financial statements were not available (and indeed were never finalized prior to Leigh's bankruptcy), the statement was misleading in what it failed to disclose. By the time Justice made this statement to Wilson, he had assisted in the preparation of the financial information presented at the Stanmore meetings on November 28 and 29. He had attended those meetings with Dean and Driscoll, and knew that Leigh had some financial data available, even though the reports were not finalized using GEC format. He also knew that by this time, Leigh was reporting a loss to the end of September 1989 of more than $16 million, and that it was the quarterly financial statements for this same period, to the end of September, which had been due to the bank almost two months earlier. In these circumstances, it was misleading of once to simply tell Wilson that the statements were not available due to the purchase accounting issues, and to omit any reference to the financial results Leigh did have.

**525**    However, while the statement made by Justice was misleading, I am not prepared, on the evidence before me, to find that the bank relied upon it. Again, the December conversation must be placed in context. At the November 8 meeting at Leigh, Dean was asked for the financial statements for the third quarter and he responded that they were not available "due to the acquisition accounting issues had not been resolved." As noted above, Dean told Wilson at this meeting that Leigh's numbers were getting worse, that there were difficulties with the SHINCOM program, and that Leigh might require an increase in its bank line. Dean also said that a new cash flow forecast would be forthcoming, and subsequently sent the bank a revised forecast projecting peak borrowings of $43.3 million in December.

**526**    In the late November phone call, Justice was introduced to Wilson as the Plessey Divisional Finance Director. His explanation of his role was that he was "assisting GEC with respect to Leigh," without further elaboration. In this phone call, Wilson was advised of the intended layoff at Leigh, which he considered somewhat positive. He did not ask about the overdue financial statements. By December 6, Wilson had received the revised cash flow forecast from Leigh, and also knew that Ross Anderson at GEC was personally monitoring the Leigh borrowings weekly, and that Plessey had authorized availability of $45 million but had only advised Leigh of a $41 million limit in order to "keep pressure on Leigh to manage its cash flow".

**527**    The conversation on December 21 was initiated by Justice to tell Wilson of the lay-off at Leigh and to advise him that Dean had been terminated and replaced by Pat Smith. This was the second and final conversation Justice had with the bank. Wilson noted in his memo of the call that he took the opportunity to discuss with Justice "in some detail" the possibility of TD providing a fairness opinion in connection with the potential merger with Canadian Marconi, and that he told

Justice TD "would be very interested" in providing the opinion. In his detailed record of the call, Wilson devoted half of his memo to discussion of the layoff at Leigh, and the other half to the fairness opinion issue. Wilson made no reference whatever in his memo to the request for financial statements or Justice's reply that they were not ready due to the acquisition accounting issues. Nor did he ask Justice any questions about the accounting issues in the phone call, or if there were any financial statements available in some other format.

**528**    Justice told Wilson that he would return to Canada in January to assist with Leigh's budget meetings. Implicit in the notion of budget meetings is that there is a budget to be discussed, yet Wilson never followed up on this. He neither asked for the results of the budget meetings in January, nor did he ask for a copy of the budget or any underlying documentation. Indeed, he did not contact Leigh to ask about the financial statements again until February 21, two months later.

**529**    Finally, when the bank did receive the financial statements in March, 1990, they did not react to them. It was not until Gerdine called the bank himself, several days after the statements had been delivered, that anyone from the bank made any comment upon them. Even then it was Gerdine's evidence that Leaney sounded surprised that anything was wrong, and he testified that it was evident to him she had not seen the financial package. In all of these circumstances, and particularly in light of the scant contact between Justice and the bank; the fact that Wilson failed to record any reference to the statement by Justice in his detailed memo of the call; the fact that the responsibility for providing the statements lay with Leigh and not Justice; the fact that the bank did not know the extent of Justice's involvement with Leigh's finances; the fact that Dean had made the same statement to the bank himself two months earlier; and in light of the bank's failure to react to the statements until contacted by Gerdine, I am unable to find that the bank relied or acted upon the statement made by Justice. Hence, one of the essential elements of negligent and fraudulent misrepresentation has not been made out. Further, the Justice statement was not a representation of a continuing nature and, as is set out below, the plaintiff has suffered no damages. The claims in negligent and fraudulent misrepresentation are dismissed.

**530**    I note in passing that the question of any liability which may attach to Leigh for misrepresentation or fraud is not before this court, and thus I make no comment upon it.

**531**    Even if I had found that the remarks made by Justice amounted to a negligent misrepresentation, I would not have found the statement to be fraudulent. I am mindful of the requirement that fraud must be strictly pleaded and strictly proved. In order to prove fraud, the dishonest mind must be established. The statements made by Justice were, strictly speaking, true. Leigh never produced a finalized set of financial statements adjusted for purchase accounting issues prior to the bankruptcy. In addition, Newlands testified that Justice had provided him with a memo in October, 1989 indicating the technical baseline at Leigh was insecure, thus casting doubt on the accuracy of all the numbers Leigh produced. For these reasons, and given the paucity of evidence, I am not prepared, on a balance of probabilities, to draw the inference that Justice acted deliberately or recklessly in making the statement to Wilson.

**532**    Moreover, applying the principles set out in Canadian Dredge & Dock Co., and supra, B.G. Checo, supra, I am not persuaded, on the basis of the evidence before me, that Justice was a directing mind of either GEC or Plessey, such that the corporations should be liable in fraud. Justice was not directly employed by GEC. He was the divisional finance director for PESL, however, no evidence was led as to the nature or scope of his responsibilities in that position. I am unable to conclude that he represented a directing mind of either GEC or Plessey, nor that he was acting within the scope of his authority as an employee when he discussed the financial statements of Leigh with the bank. For this reason as well, the claim in fraud must fail.

The Anderson Statement

**533**    On February 22, 1990, at a meeting in London, Anderson told Exton that the possibilities for Leigh "include Marconi acquisition or Siemens acquisition but the main problem is valuation of Leigh's worth to GEC or Siemens." The bank asserts that prior to this conversation, on February 2, Anderson had been told by the treasurer of CMC, Gerry Stuurop, that "Leigh will owe banks $50 to $60 million soon and is worth about negative C $30 million versus cost $110 million" and that Stuurop had told him, as he recorded in a note: "CMC very seriously considered advising Plessey to walk away, when they saw "my" letter of support to Toronto Dominion." The bank had asserted a cause of action against GEC in fraud based upon these statements, however, the fraud allegation was abandoned by the plaintiff in argument. In any event, I find that there is absolutely no evidence to support such an allegation.

**534**    The bank submits that Anderson did not convey this information to Exton and that as a consequence, GEC is liable in negligent misrepresentation. I am not persuaded by this submission. Mr. Anderson had virtually no recollection of either the meeting with Stuurop or the meeting with Exton, and his evidence regarding both was purely reconstructed. He said under cross-examination that he did not recall receiving the information from Stuurop on Feb. 2, but that it was possible. He gave this evidence based on an entry in his diary, and because his notes of the information from Stuurop were written on the face of a memo dated December 21. The next document on top of this in his file was a letter from Wilson dated Feb. 21. Anderson testified his practice was to make notes on the top memo in his file until the document was superceded by a new addition to the file, although he also testified that the documents were sometimes out of order, as they were simply placed loosely in a plastic file and were not held together in order by any kind of document clip.

**535**    Further, the meeting must be placed in context. Mr. Exton was not responsible for the Leigh account. Anderson was the treasurer of a huge multinational corporation, with whom the bank, and particularly Mr. Exton, had been attempting to develop a direct business relationship for some time. Leigh was a minuscule part of the GEC group. Leigh was purchased by Plessey for $107 million cdn. Plessey was itself purchased by GEC and Siemens for $4.5 billion U.S., and GEC alone was worth 6.5 billion pounds. The purpose of the meeting was not to discuss Leigh and find that Leigh was discussed in the meeting only in passing. Exton used the Leigh relationship only as a door-opener with GEC, in order to develop business opportunities with the company. Indeed,

Anderson asked Exton for a separate 50 million pound loan facility in the meeting.

**536**    In these circumstances, I cannot find that Anderson owed Exton a duty of care. In my view, it was not reasonably foreseeable that Exton or the bank would rely on the statement about the valuation of Leigh, or any omission from that statement, to its detriment. This claim in negligent misrepresentation is dismissed.

The February 26 Memo

**537**    The bank asserts that GEC and Plessey are liable in fraud for their failure to direct Driscoll to deliver the financial statements due to the bank, following his February 26 memo asking for direction in this regard. The bank argues that Leigh's behaviour in knowingly failing to produce the financial statements amounts to fraud and deceit, and that Plessey and GEC were parties to this deception, as "Plessey and GEC must be taken to have known that Leigh was not going to deliver the financial statements to the bank without their direction." I cannot accede to this submission.

**538**    In the first instance, I note that TD raised this allegation of fraud for the very first time in its written argument submitted at the conclusion of trial. It was not pleaded in the statement of claim, although the claim has been amended twice, most recently in April, 1996 when several new claims were added. The parties spent over six years in pre-trial preparation. The statement of claim does refer to Driscoll's February 26 memo, and hence, the bank could have pleaded the fraud allegation, since it was aware of the document upon which it is based.

**539**    The defendants were denied the opportunity to respond to this very serious allegation through cross-examining witnesses or calling witnesses of their own in order to refute it. The prejudice to the defendants in this regard is considerable.

**540**    Moreover, the bank has not identified any specific person at GEC or Siemens who is alleged to have had the dishonest mind which is an integral part of any fraud claim. In order to attach liability to a corporation for fraud, as noted above, the fraudulent intent must be established on the part of a natural person. I reiterate that fraud must be strictly pleaded and strictly proved.

**541**    Notwithstanding that the defendants have not had an opportunity to properly meet this allegation, in my view the plaintiff has failed to establish a case for fraud. The contractual obligation to provide the financial statements was that of Leigh and not of either GEC or Plessey. The memo was sent by Driscoll to Rickard and Alexander, both of GEC Marconi, and to Justice. None of these people gave evidence at this trial, nor was detailed evidence led about the nature or scope of their duties and responsibilities. No evidence was led as to their reaction, if any, to the memo. The only evidence of any, response to Driscoll's memo is a copy of the memo, produced by GEC, with the handwritten notation "must tell if they ask". This notation is admitted by GEC to be in the handwriting of David Rickard. Rickard and Alexander were not employed by GEC, but by GEC Marconi, a GEC subsidiary which is not a party to this action. The plaintiff has failed to establish a dishonest intent on the part of any person sufficient to attach liability to either GEC or

Plessey. I am not prepared to draw an inference of dishonest intent in these circumstances, and this claim in fraud must fail. In this respect, the observation of Essen J.A. in Rainbow Industrial, supra at p. 69 is apt:

> It seems, most regrettably, to have become fashionable to allege fraud in commercial cases without much regard for the fundamental rule that fraud must be strictly pleaded and strictly proven. To some extent, this may be an off-shoot of the mistaken notion, to which I referred earlier, that those stringent requirements do not apply to fraud by non-disclosure.

PART IV

DAMAGES

**542**    I have not found either GEC or Plessey liable in either contract or tort under any of the causes of action asserted. However, if I had done so, I would have assessed the damages in the following amounts.

**543**    The applicable principles concerning the measure of damages in contract and for the tort of negligent misrepresentation are set out by the majority of the Supreme Court of Canada in B.G. Checo, supra at 37:

> The measure of damages in contract and for the tort of negligent misrepresentation are:

> Contract: The plaintiff is to be put in the position it would have been in had the contract been performed as agreed.

> Tort: The plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

See also MacGregor on Damages, 15th ed. (London: Sweet & Maxwell, 1997) at pp. 9-11.

**544**    I assess the damages in respect of each of the plaintiffs claims as follows:

The Claim in Contract

**545**    I have held that the comfort letter does not contain a contractual obligation on Plessey to pay the bank nor to have the policy referenced in the third paragraph. I have also found that there was no breach of the policy paragraph. If there was a contract which was breached, the plaintiff should be placed in the same position as it would have been had the contract been performed. I assess the damages flowing from a breach of that contract as follows. The amount of the Leigh loan

outstanding at the time of the bankruptcy was $40,489,427.09. Leigh had in its account a positive cash balance of $1 million, which the bank seized and applied to the outstanding loan. Accordingly, the damages must be reduced by this amount. As well, the bank recovered $398,710.87 in an action against Leigh's auditors Deloitte, Haskins & Sells regarding the Leigh loan. The damages should be reduced by this amount as well. Accordingly, I assess damages for breach of contract at $39,090,716.22.

**546**    I am not prepared to reduce the damages by the amount of any taxation provision taken by the bank on account of the loss. The evidence does not establish with certainty what the bank's tax treatment of the Leigh loan was, nor the amount of any tax saving which may have accrued to the bank. In the event that damages were awarded the bank, any recapture of this provision could be adjusted for in future tax returns.

The Claim in Misrepresentation based on the Comfort Letters

**547**    I have held that the comfort letters did not contain a misrepresentation from their inception in April 1988 forward. If I had held Plessey liable in misrepresentation from the date of the first comfort letter, I would assess the damages in the same amount as in the contract claim above, that is $39,090,716.22.

**548**    I have held that the fifth comfort letter dated December 15, 1989 and delivered on December 27, 1989 did not amount to a negligent or fraudulent misrepresentation and could not be reasonably relied upon by the bank. Had I held otherwise, I would assess the damages so as to put the plaintiff in the same position it would have been in if the misrepresentation had not been made. Given that this representation was a continuing representation, in my view the plaintiff would be entitled to recovery of all amounts advanced in reliance on the representation. In this case, Leigh received payments which reduced its loan balance in January, however further amounts were advanced by the bank thereafter. In fact, the full amount of funds advanced following the reduction in the Leigh loan and prior to the bankruptcy was $8,843,140.04, although the loan balance was actually slightly higher at the date of delivery of the comfort letter than it was at the date of the bankruptcy. Accordingly, I would assess damages at $8,843,140.04, less the plaintiffs recovery of $1 million from the Leigh bank account and $398,710.87 from the Deloitte's settlement for a total of $7,444,429.17.

Conduct Outside the Letters

**549**    I have found that the bank did not give up its security at the time of delivery of the third comfort letter in April 1989 nor did it make advances thereafter based on the alleged statements by Musgrave that the letter was tantamount to a guarantee. I have found such statement was not made by him. The bank did not give up its security or make further advances based on anything Plessey said or did at that time. Had I found liability on the basis of the alleged statement by Musgrave, I would assess damages flowing from such a claim as follows. The value of TD's security over Leigh's assets was $14,300,000.00. Assuming that the bank would have called the Leigh loan as at

the date of the representation by Musgrave, from March 6, 1989 to the date of bankruptcy, the bank advanced to Leigh the sum of $12,279,290.03, for a total of $26,579,290.03. I would subtract the sums recovered from the Deloitte's settlement and the Leigh bank account above, for a total damages award of $25,180,579.16.

**550**    Had I found liability on the basis of the statements made by Colin Justice to the bank in late November, 1989 and on December 21, 1989, I would have assessed damages as at November 30 at $919,698.09, being the difference between the loan balance on that date of $38,171,018.13 and at the date of bankruptcy, less the recovery above. Applying the same calculation to December 21, I would assess the damages at that date as ($330,052.04). Hence, the plaintiff would have suffered no damages.

**551**    Regarding the Anderson meeting with Exton, applying the same calculation to the loan balance outstanding on February 22 of $36,482,251.92, I would assess damages at $2,608,464.30.

**552**    TD claims damages in respect of Plessey's and GEC failure to direct Leigh to provide to the bank the financial information which Leigh was required to provide pursuant to the terms of the facility letter reporting provisions. I would assess any damages flowing therefrom if liability had been found, at $2,544,543.81, based on a loan balance of $36,546,172.41 on February 26, 1990, and applying the calculation above.

**553**    The bank has pleaded fraud against GEC and Plessey. I have found that there is a total absence of any evidence of fraud and I have rejected this assertion by TD. Nevertheless, the measure of damages would be the same as for negligent misrepresentation. See Smith v. Scrimgeour Vickers, [1996] 4 All E.R. 769 (H.L.) at 792 and S.M. Waddams, The Law of Damages, 2nd ed. (Toronto: Canada Law Book, 1993 ) at 5-19.

INTEREST

**554**    During the period up to the freezing of the line by the bank interest was either included in the amount of the loan or paid. Accordingly, I would assess pre-judgment interest from March 30, 1990. I would assess both pre-judgment and post-judgment interest in accordance with the Courts of Justice Act.

PART V

CONCLUSION

**555**    Letters of comfort are just that, comfort. They are not guarantees or formal security nor are they enforceable as such. They are gentlemen's agreements and moral obligations. This is common knowledge in the business community. The bank recognized this fact of life in its credit manual and in its references to comfort letters in its CCRs and other internal documents.

**556**    Mr. McDowell, one of the most senior officers of the bank, stated that he expected the bank's legal department to follow and provide updates on issues such as comfort letters to those persons at the bank making and approving loans. Noonan, Leaney, Young and Wilson acknowledged that this would be important to them although they either could not recall or denied receiving information from the legal department. If those opinions were not circulated, or if circulated not paid due attention, this is sparse consolation. The opinions of the bank's highly qualified legal department accurately reflected the quality, in law, of comfort letters.

**557**    One might rightfully ask why it is that parties exchange language such as that in the policy paragraph of the Plessey comfort letter. More so, when the language conspicuously lacks words of promise or contract, and where there has been no attempt to provide otherwise. In such circumstances one may only conclude that it was not intended that such words be enforceable as a contract. These were both, after all, large commercially sophisticated parties.

**558**    The defendants criticize the bank for its characterization of the comfort letters as "strong". It seems to me that this censure is unfair. To begin with, the bank did not state the letters to be strong in law. This would have been wrong, both in the face of the bank's legal advice and in general principle. A comfort letter may nevertheless be strong, even though not legally strong because its essence is that of a gentleman's agreement or moral obligation. Hence the test of the true strength of such a document is whether it will be honoured and paid on when presented for payment. Musgrave testified that Plessey, had paid pursuant to two comfort letters which were not legally enforceable. Whether Plessey, prior to the GEC-Siemens hostile takeover, would have paid on their letter to TD is a matter for speculation.

**559**    As Musgrave, and the expert banker Wickham testified, companies may pay on non-binding comfort letters based on commercial considerations, such as corporate reputation and concern that a refusal to honour a comfort letter may undercut the company's relationship with the affected bank or become public knowledge and make future dealings with other banks difficult. Plessey paid on one comfort letter for these exact reasons, although this was not known to TD. Based on such considerations of which McDowell and Noonan were certainly mindful, TD was perhaps justified in regarding the Plessey comfort letter as "strong" given the reputation of Plessey in the marketplace, up to the time of the hostile takeover in September 1989.

**560**    The takeover is a clear break point in this chronology. Although not a factor in anything that followed, TD had backed Plessey in its losing gamut to fend off the GEC-Siemens bid. It had no prior relationship with the new Plessey shareholders. It also knew that the takeover proposal was to dismantle Plessey and distribute the Plessey companies between GEC and Siemens. The Plessey management with whom TD had been dealing, as is to be expected in such circumstances, was decimated after the takeover. TD, lacking any relationship with the GEC and Siemens personnel, attempted to use the Plessey situation as a beachhead to develop a relationship and generate new business with GEC. In this environment, however, for the bank to rest its risk on a comfort letter which in turn depends for its integrity on relationship, was not only decidedly unwise, it was

foolhardy. It is not as though TD was without options. Its facility with Leigh was payable on demand. As such it could have called the loan prior to the takeover. Or, it could have renegotiated the arrangement with Plessey immediately afterwards by broaching the subject directly.

**561**    The leverage available to the lender in enforcing a comfort letter is that stated above - a possible impairment, in the event of refusal to honour the letter, of the creditworthiness of the giver of the letter in the marketplace. In short, the reputation of the giver is on the line should it fail to honour a moral commitment, notwithstanding it is unenforceable at law. Plessey, pre takeover, was a user of credit. GEC, on the other hand, was variously described as a cash mountain, debt free, and one of the richest companies in the U.K. The GEC treasurer Ross Anderson had as one of his main duties the almost daily investment of the company's cash surplus measured in billions of pounds. Such a company was not dependent on the banking industry for its goodwill. It was a lender not a borrower. Thus leverage of reputation among and access to the banking industry was not a factor in the case of GEC. TD overlooked this critical distinction.

**562**    Nevertheless, when TD asked Plessey to pay on the comfort letter and was met with a refusal, it sought to fall back on the traditional strategy in such a situation, marketplace pressure and the threat of its consequences, only to learn to its chagrin that Plessey with its new shareholders was immune to such tactics. This trial appears to be the last move by TD in its execution of this strategy.

**563**    At the beginning of these reasons I said that this case had at the centre Leigh Instruments and TD, a bank and its customer. It also involves TD and, like itself, Plessey another large multinational company, not in a banker-customer relationship and an effort by one to recover on a moral commitment, unsuccessfully.

**564**    It is not the role of the courts to re-write bargains, to substitute a better bargain than the one that the parties made for themselves or to enforce moral obligations and gentlemen's agreements. McDowell stated that, in his world, his word was his bond and if he made a commitment he expected to fulfil it. Unfortunately, the converse of that proposition is that if one accepts another person's word instead of taking their bond, one does so at their own peril. This does not however, condone the actions of a large multinational company with over a billion pounds sterling in cash reserves in walking away from a gentleman's business agreement to support its subsidiary.

**565**    I may be spoken to regarding costs.

WINKLER J.

* * * * *

APPENDIX A

DRAMATIS PERSONAE

## THE TORONTO-DOMINION BANK

Baker, Howard M.

Manager, Corporate Finance, London, England

Boulanger, Pierre de G.      Senior Vice-President, Credit Division (from September 1988)

Brock, William T.

Executive Vice-President, Credit

Bumstead, R. Glenn

Senior Vice-President & General Counsel and Secretary

Burega, Yovhan M.      Vice-President, Corporate Banking Division

Exton, Jonathan      Manager, Corporate Finance, London, England (from May 1988 to end of 1989)
Director, Corporate Finance, London, England (from end of 1989)

Klingenstierna, Goran G. Manager, Corporate Banking Division

Kriss, Merle

Assistant General Manager, Corporate Banking Division

Laitner, James      Senior Vice-President, Credit Division

Leaney, Wendy A.      General Manager, Corporate Banking Division

Mercier, Ernest C.      Executive Vice-President, Corporate Banking Division

McDowell, F.G. (Ted)

Vice-Chairman, Credit Division

Noonan, Patrick C.

Senior Vice-President, Credit Division

Norton, Alec I.

Assistant General Counsel

Owen, Sidney C.

Senior Vice-President, Credit Division

Read, J.A.                          Assistant General Manager, London, England

Rising, Hugh                        Vice-President, Corporate Finance, London, England

Thomson, Richard

Chairman and CEO

Walzak, Mike

Assistant General Manager, Credit, London, England

Wilson, Robert                      Manager, Corporate Banking (as of October 31, 1989)

Winston, Randi                      Assistant Manager, Corporate Banking Division

Young, Gregory G.

Manager, Corporate Banking Division

LEIGH INSTRUMENTS LIMITED

Dean, David

Vice-President, Finance (laid off on December 20, 1989)

Driscoll, Frank                     President and CEO (from August 8, 1989)

Flower, Barry

President and CEO (to June, 1989)

Plumley, Kent                       Secretary

Shepherd, John                      Chairman/Director

Smith, Pat                          Finance Director (replaced Dean)

THE PLESSEY DEFENDANTS

The Plessey Company plc:

Beard, Denise

Treasury Department:
Group Banking Manager (to August 31,
1989); Assistant Treasurer (Sept. 1,
1989); (left Plessey November 3,
1989)

Finnis, A.G.

Group Taxation Manager

Dr. Gerdine, Philip V.

(a director, as of February, 1990); Co-managing Director of Plessey
(Siemens representative) after GEC/Siemens takeover of Plessey

Huntbatch, Kenneth
Bernard

Company Secretary and Director of
Administration (to Jan. 3, 1989);
Director of Administration (from Jan.
3, 1989) (Company Secretary until his
resignation on June 29, 1990)
(died in latter part of 1990)
(a director)

Musgrave, Ian C.

Group Treasurer (previously Group Finance Director) resigned as
Group Treasurer on August 31, 1989

Noon, Anothony J.

Director of Legal and Contract Services

Sammon, Brendon P. (Binny)

Group Chief Accountant (to September 1990)

Thorn, Derek G.

Finance Director, Group Services (deceased - December, 1989)

Walls, Stephen R.

Managing Director (a director) (promoted from Finance Director in
1988) (resigned October 6, 1989)

Plessey Incorporated, White Plains, New York

Palazzi, J.L.

Finance Director

Plessey Electronic Systems Limited ("PESL")

Akerman, Andrew C.

Financial Analyst (to February, 1989)

Flower, Barry

Managing Director - International Defense (from July 1, 1989)

Justice, Colin J.

Finance Director (from Aug. 1, 1988)

THE GEC DEFENDANTS

The General Electric Company plc

Anderson, Ross K.

Treasurer

Bates, Malcolm                    Deputy Managing Director/Director

MacBean, Ian                      Director

Newlands, David

Finance Director/Director (from September 1989)

Robinson, Tony

Assistance Finance Director

Weinstock, Lord                   Managing Director/Director

Weinstock, Simon                  Commercial Director/Director

GEC Marconi

Alexander, Bill

Managing Director, GEC Avionics

MacBean, Ian                     Managing Director, GEC Marconi

Rickard, David                   Finance Director, GEC Marconi

Canadian Marconi


Simons, John
                                 President

Stuurop, G.                      Treasurer

SIEMENS AKTIENGESELLSCHAFT


Baumann, Dr. Karl
                                 Executive Vice-President, Finance

Gerdine, Dr. Philip              Executive Director

Hafner, Andreas                  Treasurer


Mackenrodt, Dr. Jochen
                                 Vice-President, Central Finance, Foreign Affiliates

[Editor's note: Appendix B could not be reproduced online.]

APPENDIX C

Leigh Loan Balances

May 17, 1990

LEIGH BORROWINGS:


| MONTH | B/A's | OVERDRAFT | TOTAL |
|---|---|---|---|
| January 1989 | | | |
| 1 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |

| 2 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| 3 | 10,600,000 | 12,176,688.72 | 22,776,688.72 |
| 4 | 10,600,000 | 12,214,143.35 | 22,814,143.35 |
| 5 | 10,600,000 | 12,333,052.16 | 22,933,052.16 |
| 6 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 7 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 8 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 9 | 10,600,000 | 13,146,357.80 | 23,746,357.80 |
| 10 | 10,600,000 | 13,255,838.06 | 23,855,838,06 |
| R/O 11 | 20,000,000 | 4,200,956.94 | 24,200,956.94 |
| 12 | 20,000,000 | 4,274,752.88 | 24,274,752.88 |
| 13 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 14 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 15 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 16 | 20,000,000 | 4,513,489.16 | 24,513,489.16 |
| 17 | 20,000,000 | 4,805,016.65 | 24,805,016.65 |
| 18 | 20,000,000 | 4,955,113.19 | 24,955,113.19 |
| 19 | 20,000,000 | 4,920,040.60 | 24,920,040.60 |
| 20 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 21 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 22 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 23 | 20,000,000 | 5,892,985.50 | 25,892,985.50 |
| 24 | 20,000,000 | 5,989,040.15 | 25,989,040.15 |
| 25 | 20,000,000 | 6,282,432.32 | 26,282,432.32 |
| 26 | 20,000,000 | 6,878,134.17 | 26,878,134.17 |
| 27 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 28 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 29 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 30 | 20,000,000 | 6,898,160.20 | 26,898,160.20 |
| 31 | 20,000,000 | 7,021,523.63 | 27,021,523.63 |

February 1989

| 1 | 20,000,000 | 7,126,693.17 | 27,126,693.17 |
| 2 | 20,000,000 | 7,413,772.56 | 27,413,772.56 |
| 3 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| 4 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |

| | | | |
|---|---|---|---|
| 5 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| 6 | 20,000,000 | 8,290,740.86 | 28,290,740.86 |
| 7 | 20,000,000 | 8,328,058.19 | 28,328,058.19 |
| 8 | 20,000,000 | 8,289,384.74 | 28,289,384.74 |
| 9 | 20,000,000 | 8,426,878.83 | 28,426,878.83 |
| 10 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 11 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 12 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 13 | 20,000,000 | 9,421,372.38 | 29,421,372.38 |
| 14 | 20,000,000 | 9,666,167.87 | 29,666,167.87 |
| R/O 15 | 25,200,000 | 3,529,973.98 | 28,729,973.98 |
| 16 | 25,200,000 | 3,627,371.49 | 28,827,371.46 |
| 17 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 18 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 19 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 20 | 25,200,000 | 3,797,809.52 | 28,997,809.52 |
| 21 | 25,200,000 | 3,971,011.86 | 29,171,011.66 |
| 22 | 25,200,000 | 3,978,941.88 | 29,178,941.88 |
| 23 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 24 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 25 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 26 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 27 | 25,200,000 | 4,479,813.36 | 29,679,813.36 |
| 28 | 25,200,000 | 2,645,394.72 | 27,845,394.72 |

March 1989

| | | | |
|---|---|---|---|
| 1 | 25,200,000 | 2,778,153.15 | 27,978,153.15 |
| 2 | 25,200,000 | 2,347,556.87 | 27,547,556.87 |
| 3 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 4 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 5 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 6 | 25,200,000 | 3,010,137.06 | 28,210,137.06 |
| 7 | 25,200,000 | 2,942,566.24 | 28,142,566.24 |
| 8 | 25,200,000 | 875,753.18 | 26,075,753.18 |
| 9 | 25,200,000 | 613,084.43 | 25,813,084.43 |
| 10 | 25,200,000 | 960,205.40 | 26,160,205.40 |

| | | | |
|------|------------|--------------|---------------|
| 11 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 12 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 13 | 25,200,000 | 967,037.38 | 26,167,037.38 |
| 14 | 25,200,000 | 1,019,345.36 | 26,219,345.36 |
| 15 | 25,200,000 | 1,385,809.09 | 26,585,809.09 |
| 16 | 25,200,000 | 1,393,298.34 | 26,593,298.34 |
| 17 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 18 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 19 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 20 | 25,200,000 | 2,185,732.95 | 27,385,732.95 |
| R/O 21 | 25,300,000 | 2,459,049.45 | 27,759,049.45 |
| 22 | 25,300,000 | 1,654,251.16 | 26,954,251.16 |
| 23 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 24 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 25 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 26 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 27 | 25,300,000 | 2,147,265.85 | 27,447,265.85 |
| 28 | 25,300,000 | 2,106,861.67 | 27,406,861.67 |
| 29 | 25,300,000 | 2,113,873.01 | 27,413,873.01 |
| 30 | 25,300,000 | 1,881,398.58 | 27,181,398.58 |
| 31 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |

April 1989

| | | | |
|------|------------|--------------|---------------|
| 1 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 2 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 3 | 25,300,000 | 2,442,323.39 | 27,742,323.39 |
| 4 | 25,300,000 | 2,536,700.93 | 27,836,700.93 |
| 5 | 25,300,000 | 2,296,313.54 | 27,596,313.54 |
| 6 | 25,300,000 | 2,384,335.89 | 27,684,335.89 |
| 7 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 8 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 9 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 10 | 25,300,000 | 3,512,317.61 | 28,812,317.61 |
| 11 | 25,300,000 | 3,732,516.46 | 29,032,516.46 |
| 12 | 25,300,000 | 3,761,812.59 | 29,061,812.59 |
| 13 | 25,300,000 | 3,773,262.71 | 29,073,262.71 |

| 14 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 15 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 16 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 17 | 25,300,000 | 4,685,046.55 | 29,985,046.55 |
| 18 | 25,300,000 | 4,729,857.98 | 30,029,857.98 |
| 19 | 25,300,000 | 4,828,939.81 | 30,128,939.81 |
| 20 | 25,300,000 | 2,782,380.50 | 28,082,380.50 |
| 21 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 22 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 23 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 24 | 25,300,000 | 2,914,336.09 | 28,214,336.09 |
| R/O 25 | 30,000,000 | 615,774.45 | 30,615,774.45 |
| 26 | 30,000,000 | 595,369.26 | 30,595,369.26 |
| 27 | 30,000,000 | 1,611,577.04 | 31,611,577.04 |
| 28 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 29 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 30 | 30,000,000 | 930,467.56 | 30,930,467.56 |

May 1989

| 1 | 30,000,000 | 572,124.83 | 30,572,124.83 |
| 2 | 30,000,000 | 312,673.05 | 30,312,673,05 |
| 3 | 30,000,000 | 332,028.81 | 30,332,028.81 |
| 4 | 30,000,000 | 316,847.53 | 30,316,847.53 |
| 5 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 6 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 7 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 8 | 30,000,000 | 446,373.25 | 30,446,373.25 |
| 9 | 30,000,000 | 330,426.43 | 30,330,426.43 |
| 10 | 30,000,000 | 3,369.55 | 30,003,369.55 |
| 11 | 30,000,000 | 165,814.06 | 30,165,814.06 |
| 12 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 13 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 14 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 15 | 30,000,000 | 1,314,848.53 | 31,314,848.53 |
| 16 | 30,000,000 | 1,464,716.98 | 31,464,716.98 |
| 17 | 30,000,000 | 1,631,817.02 | 31,631,817.02 |

| 18 | 30,000,000 | 1,221,046.01 | 31,221,046.01 |
| 19 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 20 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 21 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 22 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 23 | 30,000,000 | 1,862,398.81 | 31,862,398.81 |
| 24 | 30,000,000 | 1,984,855.44 | 31,984,855.44 |
| 25 | 30,000,000 | 2,450,199.76 | 32,450,199.76 |
| 26 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 27 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 28 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 29 | 30,000,000 | 3,169,024.65 | 33,169,024.65 |
| 30 | 30,000,000 | 3,272,847.14 | 33,272,847.14 |
| 31 | 30,000,000 | 3,421,007.24 | 33,421,007.24 |

June 1989

| 1  | 30,000,000 | 3,807,906.22 | 33,807,906.22 |
| 2  | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 3  | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 4  | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 5  | 30,000,000 | 4,183,246.54 | 34,183,246.54 |
| 6  | 30,000,000 | 4,221,107.60 | 34,221,107.60 |
| 7  | 30,000,000 | 4,286,095.12 | 34,286,095.12 |
| 8  | 30,000,000 | 4,276,486.77 | 34,276,486.77 |
| 9  | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 10 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 11 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 12 | 30,000,000 | 3,869,384.91 | 33,869,384.91 |
| 13 | 30,000,000 | 3,870,629.94 | 33,870,629.94 |
| 14 | 30,000,000 | 3,906,792.83 | 33,906,792.83 |
| 15 | 30,000,000 | 3,901,483.73 | 33,901,483.73 |
| 16 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 17 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 18 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 19 | 30,000,000 | 1,326,243.09 | 31,326,243.09 |
| 20 | 30,000,000 | 1,792,483.59 | 31,792,483.59 |
| 21 | 30,000,000 | 1,940,661.74 | 31,940,661.74 |

| | | | |
|---|---|---|---|
| 22 | 30,000,000 | 114,015.07 | 30,114,015.07 |
| 23 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 24 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 25 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 26 | 30,000,000 | 1,699,284.94 | 31,699,284.94 |
| 27 | 30,000,000 | 1,740,425.93 | 31,740,425.93 |
| 28 | 30,000,000 | 1,619,155.96 | 31,619,155.96 |
| 29 | 30,000,000 | 1,645,231.57 | 31,645,231.56 |
| R/O 30 | 30,000,000 | 1,659,173.91 | 31,659,173.91 |

July 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 2 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 3 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 4 | 30,700,000 | 904,935.09 | 31,604,935.09 |
| 5 | 30,700,000 | 1,132,744.32 | 31,832,744.32 |
| 6 | 30,700,000 | 1,933,687.99 | 32,633,687.99 |
| 7 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 8 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 9 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 10 | 30,700,000 | 3,362,740.73 | 34,062,740.73 |
| 11 | 30,700,000 | 3,219,776.51 | 33,919,776.51 |
| 12 | 30,700,000 | 3,210,332.88 | 33,910,332.88 |
| 13 | 30,700,000 | 3,481,122.61 | 34,181,122.61 |
| 14 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 15 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 16 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 17 | 30,700,000 | 2,887,189.99 | 33,587,189.99 |
| 18 | 30,700,000 | 2,920,771.73 | 33,620,771.73 |
| 19 | 30,700,000 | 3,013,625.52 | 33,713,625.52 |
| 20 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 21 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 22 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 23 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 24 | 30,700,000 | 4,588,772.15 | 35,288,772.15 |
| 25 | 30,700,000 | 5,023,958.06 | 35,723,958.06 |

| 26 | 30,700,000 | 4,762,514.74 | 35,462,514.74 |
| 27 | 30,700,000 | 4,828,507.48 | 35,528,507.48 |
| 28 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 29 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 30 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 31 | 30,700,000 | 4,280,482.57 | 34,980,482.57 |

August 1989

| 1 | 30,700,000 | 6,059,098.65 | 36,759,098.65 |
| R/O 2 | 30,700,000 | 6,004,154.56 | 36,704,154.56 |
| 3 | 30,700,000 | 2,375,802.44 | 33,075,802.44 |
| 4 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 5 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 6 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 7 | 30,700,000 | 3,104,314.68 | 33,804,314.68 |
| 8 | 30,700,000 | 3,164,896.67 | 33,864,896.67 |
| 9 | 30,700,000 | 3,000,534.07 | 33,700,534.07 |
| 10 | 30,700,000 | 3,365,019.83 | 34,065,019.83 |
| 11 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 12 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 13 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 14 | 30,700,000 | 3,474,923.56 | 34,174,923.56 |
| 15 | 30,700,000 | 3,561,681.48 | 34,261,681.48 |
| 16 | 30,700,000 | 3,751,602.27 | 34,451,602.27 |
| 17 | 30,700,000 | 3,780,700.45 | 34,480,700.45 |
| 18 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 19 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 20 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 21 | 30,700,000 | 4,392,378.08 | 35,092,378.08 |
| 22 | 30,700,000 | 4,904,112.81 | 35,604,112.81 |
| 23 | 30,700,000 | 5,006,737.32 | 35,706,737.32 |
| 24 | 30,700,000 | 5,308,323.67 | 36,008,323.67 |
| 25 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 26 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 27 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 28 | 30,700,000 | 4,364,417.93 | 35,064,417.93 |
| 29 | 30,700,000 | 4,228,592.01 | 34,928,592.01 |

| | | | |
|---|---|---|---|
| 30 | 30,700,000 | 4,306,706.93 | 35,006,706.93 |
| 31 | 30,700,000 | 3,184,769.20 | 33,884,768.20 |

September 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |
| 2 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 3 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 4 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| R/O 5 | 30,700,000 | 4,210,666.17 | 34,910,666.17 |
| 6 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| R/O 7 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| 8 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 9 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 10 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 11 | 30,700,000 | 3,735,418.60 | 34,435,418.60 |
| R/O 12 | 30,700,000 | 3,841,093.34 | 34,541,093.34 |
| 13 | 30,700,000 | 4,418,509.99 | 35,118,509.99 |
| R/O 14 | 30,700,000 | 4,478,971.44 | 35,178,971.44 |
| 15 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 16 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 17 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 18 | 30,700,000 | 5,515,347.94 | 36,215,347.94 |
| R/O 19 | 30,700,000 | 4,152,908.82 | 34,852,908.82 |
| 20 | 30,700,000 | 4,307,175.52 | 35,007,175.52 |
| R/O 21 | 31,000,000 | 4,023,254.92 | 35,023,254.92 |
| 22 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 23 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 24 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 25 | 31,000,000 | 5,139,590.56 | 36,139,590.56 |
| 26 | 31,000,000 | 5,170,884.55 | 36,170,884.55 |
| 27 | 31,000,000 | 5,265,858.00 | 36,265,858.00 |
| 28 | 31,000,000 | 5,109,688.79 | 36,109,688.79 |
| R/O 29 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |

| 30 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |

October 1989

| 1 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| 2 | 31,000,000 | 5,005,795.86 | 36,005,795.86 |
| 3 | 31,000,000 | 5,064,463.04 | 36,064,463.04 |
| 4 | 31,000,000 | 5,108,529.51 | 36,108,529.51 |
| 5 | 31,000,000 | 3,147,895.01 | 34,147,895.01 |
| R/O 6 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 7 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 8 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 9 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 10 | 30,000,000 | 5,071,186.84 | 35,071,186.84 |
| 11 | 30,000,000 | 5,032,946.25 | 35,032,946.25 |
| 12 | 30,000,000 | 5,025,761.02 | 35,025,761.02 |
| 13 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 14 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 15 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 16 | 30,000,000 | 6,148,109.84 | 36,148,109.84 |
| 17 | 30,000,000 | 6,272,575.37 | 36,727,575.37 |
| 18 | 30,000,000 | 6,475,771.31 | 36,475,771.31 |
| 19 | 30,000,000 | 6,520,320.96 | 36,520,320.96 |
| R/O 20 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 21 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 22 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 23 | 30,000,000 | 6,937,449.81 | 36,937,449.81 |
| 24 | 30,000,000 | 6,756,758.68 | 36,756,758.68 |
| 25 | 30,000,000 | 7,246,658.57 | 37,246,658.57 |
| 26 | 30,000,000 | 7,177,329.10 | 37,177,329.10 |
| R/O 27 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 28 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 29 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 30 | 30,000,000 | 9,192,083.03 | 39,192,083.03 |
| 31 | 30,000,000 | 9,111,727.71 | 39,111,727.71 |

November 1989

| 1 | 30,000,000 | 9,177,322.75 | 39,177,322.75 |
| 2 | 30,000,000 | 9,093,386.46 | 39,093,386.46 |
| 3 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 4 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 5 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 6 | 30,000,000 | 6,770,013.70 | 36,770,013.70 |
| 7 | 30,000,000 | 6,794,751.71 | 36,794,751.71 |
| 8 | 30,000,000 | 6,910,148.70 | 36,910,148.70 |
| 9 | 30,000,000 | 6,983,774.72 | 36,983,774.72 |
| 10 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 11 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 12 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 13 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 14 | 30,000,000 | 7,357,647.97 | 37,357,647.97 |
| 15 | 30,000,000 | 7,532,161.84 | 37,532,161.84 |
| 16 | 30,000,000 | 7,554,032.80 | 37,554,032.80 |
| 17 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 18 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 19 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 20 | 30,000,000 | 7,808,426.72 | 37,808,426.72 |
| 21 | 30,000,000 | 7,757,066.84 | 37,757,066.84 |
| 22 | 30,000,000 | 7,915,046.19 | 37,915,046.19 |
| 23 | 30,000,000 | 7,940,170.04 | 37,940,170.04 |
| 24 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 25 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 26 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 27 | 30,000,000 | 8,087,463.15 | 38,087,463.15 |
| 28 | 30,000,000 | 8,071,525.94 | 38,071,525.94 |
| 29 | 30,000,000 | 8,192,922.73 | 38,192,922.73 |
| 30 | 30,000,000 | 8,171,018.13 | 38,171,018.13 |

December 1989

| 1 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 2 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |

| 3 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 4 | 30,000,000 | 8,317,144.93 | 38,317,144.93 |
| 5 | 30,000,000 | 8,398,592.62 | 38,398,592.62 |
| 6 | 30,000,000 | 8,482,020.38 | 38,482,020.38 |
| 7 | 30,000,000 | 8,501,066.61 | 38,501,066.61 |
| 8 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 9 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 10 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 11 | 30,000,000 | 9,419,747.97 | 39,491,747.97 |
| 12 | 30,000,000 | 9,353,653.80 | 39,353,653,80 |
| 13 | 30,000,000 | 9,401,980.70 | 39,401,980.70 |
| 14 | 30,000,000 | 9,482,030.69 | 39,482,030.69 |
| 15 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 16 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 17 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 18 | 30,000,000 | 9,399,857.48 | 39,399,857.48 |
| 19 | 30,000,000 | 9,527,175.77 | 39,527,175.77 |
| 20 | 30,000,000 | 9,552,579.42 | 39,552,579.42 |
| 21 | 30,000,000 | 9,420,768.26 | 39,420,768.26 |
| 22 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 23 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 24 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 25 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 26 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 27 | 30,000,000 | 10,635,970.30 | 40,635,970.30 |
| 28 | 30,000,000 | 10,697,291.73 | 40,697,291.73 |
| 29 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 30 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 31 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |

January 1990

| 1 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 2 | 30,000,000 | 10,754,186.13 | 40,754,186.13 |
| 3 | 30,000,000 | 11,481,214.94 | 41,481,214.94 |
| 4 | 30,000,000 | 9,818,104.83 | 39,818,104.83 |
| 5 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 6 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |

| 7 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 8 | 30,000,000 | 8,519,719.51 | 38,519,719.51 |
| 9 | 30,000,000 | 8,793,567.82 | 38,793,567.82 |
| 10 | 30,000,000 | 9,391,486.94 | 39,391,486.94 |
| 11 | 30,000,000 | 4,519,480.39 | 34,519,480.36 |
| 12 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 13 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 14 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 15 | 30,000,000 | 4,859,292.27 | 34,859,292.27 |
| 16 | 30,000,000 | 1,646,287.05 | 31,646,287.05 |
| 17 | 30,000,000 | 1,760,211.90 | 31,760,211.90 |
| 18 | 30,000,000 | 1,787,825.23 | 31,787,828.23 |
| 19 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 20 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 21 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 22 | 30,000,000 | 2,934,734.46 | 32,934,734.46 |
| 23 | 30,000,000 | 3,207,365.71 | 33,207,365.71 |
| 24 | 30,000,000 | 3,906,014.36 | 33,906,014.36 |
| 25 | 30,000,000 | 3,976,907.17 | 33,976,907.17 |
| 26 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| 27 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| 28 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| R/O 29 | 30,000,000 | 3,377,469.60 | 33,337,469.60 |
| 30 | 30,000,000 | 3,487,811.03 | 33,487,811.03 |
| 31 | 30,000,000 | 3,604,761.96 | 33,604,761.96 |

February 1990

| 1 | 30,000,000 | 3,783,285.08 | 33,783,285.08 |
| 2 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 3 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 4 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 5 | 30,000,000 | 4,494,132.41 | 34,494,132.41 |
| 6 | 30,000,000 | 4,132,872.96 | 34,132,872.96 |
| 7 | 30,000,000 | 4,507,118.28 | 34,507,118.28 |
| 8 | 30,000,000 | 4,608,245.77 | 34,608,245.77 |
| 9 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |

| 10 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 11 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 12 | 30,000,000 | 4,781,593.95 | 34,781,593.95 |
| 13 | 30,000,000 | 4,774,292.88 | 34,774,292.88 |
| 14 | 30,000,000 | 4,775,563.95 | 34,775,563.95 |
| 15 | 30,000,000 | 4,907,788.81 | 34,907,788.81 |
| 16 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 17 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 18 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 19 | 30,000,000 | 5,821,451.91 | 35,821,451.91 |
| 20 | 30,000,000 | 5,982,391.96 | 35,982,391.96 |
| 21 | 30,000,000 | 6,430,392.55 | 36,430,392.55 |
| 22 | 30,000,000 | 6,482,251.92 | 36,482,251.92 |
| 23 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 24 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 25 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 26 | 30,000,000 | 6,546,172.41 | 36,546,172.41 |
| 27 | 30,000,000 | 7,070,969.01 | 37,070,969.01 |
| 28 | 30,000,000 | 7,179,650.03 | 37,179,650.03 |

March 1990

| 1 | 30,000,000 | 7,161,620.64 | 37,161,620.64 |
| 2 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 3 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 4 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| R/O 5 | 30,000,000 | 7,822,176.33 | 37,822,176.33 |
| 6 | 30,000,000 | 7,941,922.94 | 37,941,922.94 |
| 7 | 30,000,000 | 8,286,889.99 | 38,286,889.99 |
| 8 | 30,000,000 | 8,480,590.42 | 38,480,590.42 |
| 9 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 10 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 11 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 12 | 30,000,000 | 8,709,952.06 | 38,709,952.06 |
| 13 | 30,000,000 | 8,537,558.70 | 38,537,558.70 |
| 14 | 30,000,000 | 8,712,265.42 | 38,712,265.42 |
| 15 | 30,000,000 | 8,542,273.30 | 38,542,273.30 |
| 16 | 30,000,000 | 9,374,689.38 | 39,374,689.38 |

| | | | |
|----|-----------|--------------|---------------|
| 17 | 30,000,000 | 9,374,689.38  | 39,374,689.38 |
| 18 | 30,000,000 | 9,374,689.38  | 39,374,689.38 |
| 19 | 30,000,000 | 9,443,816.07  | 39,443,816.07 |
| 20 | 30,000,000 | 9,565,672.22  | 39,565,672.22 |
| 21 | 30,000,000 | 9,926,127.87  | 39,926,127.87 |
| 22 | 30,000,000 | 10,210,851.53 | 40,210,851.53 |
| 23 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 24 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 25 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 26 | 30,000,000 | 10,216,162.75 | 40,216,162.75 |
| 27 | 30,000,000 | 10,425,698.00 | 40,425,698.00 |
| 28 | 30,000,000 | 10,409,060.50 | 40,409,060.50 |
| 29 | 30,000,000 | 10,482,581.14 | 40,482,581.14 |
| 30 | 30,000,000 | 10,489,427.09 | 40,489,427.09 |

*Indexed as:*

# Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

**Between**
**The Toronto-Dominion Bank, plaintiff/appellant, and**
**Peat Marwick Thorne Inc., in its capacity as trustee of the**
**Estate of Leigh Instruments Limited, a bankrupt, The Plessey**
**Company plc, GEC Siemens plc and the General Electric Company**
**plc, defendants/respondents**

[1999] O.J. No. 3290

45 O.R. (3d) 417

178 D.L.R. (4th) 634

124 O.A.C. 87

50 B.L.R. (2d) 64

1999 CanLII 3778

91 A.C.W.S. (3d) 125

Docket No. C30288

Ontario Court of Appeal
Toronto, Ontario

**Doherty, Austin and Sharpe JJ.A.**

Heard: August 30-31, 1999.
Judgment: September 13, 1999.

(36 paras.)

On appeal from the judgment of the Honourable Mr. Justice Winkler dated June 24, 1998.

**Counsel:**

Bryan Finlay, Q.C., John A. Campion, Peter A. Downard and Paul F. Monahan, for the appellant.

Earl A. Cherniak, Q.C., Robert J. Morris, Susan B. Wortzman and Lisa C. Munro, for the respondents, Plessey.
Peter F.C. Howard and Adrian C. Lang, for the respondents, GEC.

---

The following judgment was delivered by

**1**    THE COURT:-- This is an appeal from the judgment of Winkler J. dismissing all of the appellant's claims. Those claims were based on five letters of comfort provided to the appellant (the Bank) by the Plessey Company plc (Plessey) in connection with a series of loans made at the time of and following Plessey's take-over of Leigh Instruments Limited (Leigh). The respondent, General Electric Company plc (GEC) was in effective control of Plessey when the fifth letter of comfort was provided (December 19, 1989) and the claims against it arise out of that letter.

**2**    The court dismissed the appeal at the conclusion of oral argument with reasons to follow. These are the reasons.

**3**    Justice Winkler's reasons are reported at (1999), 40 B.L.R. (2d) 1. His detailed and careful review of the evidence and analysis of the issues have proved most helpful on the hearing of this appeal. The factual background necessary to an understanding of these reasons can be found in the reasons of Winkler J.

**4**    The trial took over a year. The wide ranging attack launched by the Bank at trial has been replaced on appeal by a focussed challenge to the trial judge's finding that the appellant had failed to establish negligent misrepresentation by Plessey in respect of any of the five letters of comfort or by GEC in respect of the fifth letter of comfort.

The Main Appeal

**5**    Mr. Finlay, with his usual consummate skill, advanced five grounds of appeal on behalf of the Bank. Four require him to convince us that the trial judge erred in his interpretation of the meaning of paragraph 3 of the letters of comfort provided by Plessey. Paragraph 3 reads:

> It is our policy that our wholly owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations including repayment of all amounts due under the above facility.

**6**    "The above facility" refers to the line of credit made available by the Bank to Leigh. That amount varied and reached $45 million when the fifth comfort letter was provided by Plessey in December 1989.

**7**    Throughout his submissions, Mr. Finlay stressed the differences between the contract claim advanced by the Bank and the tort claim in so far as they related to paragraph 3 of the comfort letters. He did not take issue with the trial judge's analysis of the contract claim, but submitted that the trial judge erroneously applied the same analysis when interpreting paragraph 3 for the purposes of the negligent misrepresentation claim.

**8**    No doubt there are important differences between the two claims, however, the task of determining the meaning to be given to the words in paragraph 3 was common to both. Before considering the legal effect of those words, the trial judge had to determine what they meant. The same words in the same document cannot have one meaning in the context of a contract claim and a different meaning in the context of a tort claim. Once the meaning of the words is fixed, the legal effect of those words must be considered. It is at this stage of the interpretative process that distinctions between contract and tort claims can become important.

**9**    The process of determining the meaning to be given to words in a document is governed by the same principles regardless of whether the process is engaged in the context of a contract claim or a tort claim. Those principles are

identified by the trial judge at pp. 105-111 and recently reviewed by the Supreme Court of Canada in Eli Lily and Co. v. Novapharm Ltd., [1998] 2 S.C.R. 129 at 166-167. Essentially, the process is captured in the following question:

> Bearing in mind the relevant background, the purpose of the document, and considering the entirety of the document, what would the parties to the document reasonably have understood the contested words to mean?

**10**    The Bank contends, and the respondents agree, that paragraph 3 contained a representation by Plessey to the Bank as to its policy with respect to the business affairs of Leigh. It is also common ground that the representation was a continuing one. The dispute centres on what the policy was represented to be. The Bank reads paragraph 3 as a representation by Plessey that it would manage Leigh's affairs in such a way that Leigh would always be in a position to meet its obligations to the Bank. The Bank contends that it was entitled to rely on this representation as to Plessey's policy unless and until given notice of a change in that policy.

**11**    The respondents, emphasizing the words "be managed" in paragraph 3, submit that the paragraph was not a representation that Plessey would manage the affairs of Leigh, but rather a representation that it was Plessey's policy that its subsidiaries, including Leigh, should manage their own affairs in such a way as to be able to meet their financial obligations. The respondents rely not only on the language of paragraph 3, but on basic corporate law principles which they submit fixed the responsibility of management with the properly appointed officers of Leigh even though ultimate control of the company rested with the sole shareholder, Plessey.

**12**    Winkler J. accepted the respondents' interpretation of paragraph 3. In reaching that conclusion, he emphasized the language of paragraph 3 considered in the context of the entire letter (pp. 111-16). He further held that his conclusion as to the meaning of the words in paragraph 3 was fortified by a consideration of the relevant background facts (pp. 116-18).

**13**    Winkler J. construed paragraph 3 in the course of his consideration of the contract claim and applied that construction to both the contract claim and the tort claim. For the reasons set out above, we think this was a proper approach.

**14**    There is some uncertainty as to the standard of review to be applied when addressing the appellant's submission that the trial judge misconstrued paragraph 3 of the comfort letters. We will assume that no deference is due to the trial judge's conclusion and that a correctness standard of review should be applied.

**15**    After giving careful consideration to Mr. Finlay's submissions, we come to the same conclusion as the trial judge. We agree with the trial judge's observation, at p. 141, that the appellant's interpretation is inconsistent with the words "be managed" and would require that additional words be inserted in paragraph 3. The parties chose not to insert any such language. The phrase "be managed" does not suggest that Plessey itself would manage the affairs of Leigh.

**16**    Whatever doubt might exist if only the words of paragraph 3 are considered is dispelled by a consideration of the relevant factual background. The Bank and Plessey were sophisticated commercial entities. Both were familiar with letters of comfort. The Bank knew full well that the letter of comfort was not security in the traditional sense and that its commercial value depended very much on the relationship which existed between the lender and the provider of the letter of comfort. The Bank was very anxious to establish an ongoing relationship with Plessey, a very large multinational corporation. It was well known that Plessey would not provide any guarantee on loans made to Leigh by the Bank. The letter was crafted to avoid any suggestion that Plessey had any legal responsibility for the loans. The interpretation of paragraph 3 now advanced by the Bank would effectively put Plessey in the position of a guarantor subject to Plessey's ability, on notice to the Bank, to change its "policy." The interpretation urged by the Bank would give it almost exactly the security which it knew full well was not available to it when it chose to proceed with the loan in the hopes of doing more business with Plessey and its many subsidiaries.

**17**    It was argued before Winkler J. and here that the respondents' interpretation of paragraph 3 meant that it amounted

to no more than a "motherhood" statement having no real commercial purpose or value to the Bank. The trial judge, at pp. 116-18, considered and rejected this argument. He observed that other paragraphs in the letters contained valuable representations and undertakings by Plessey and that the third paragraph gave the Bank a basis, albeit not a legal one, upon which to request that Plessey stand behind the commercial activities of Leigh and honour Leigh's debts. That request, while not based on any legal obligation, had substance and value in the commercial world revealed by the extensive evidence heard by the trial judge.

**18**    The trial judge, drawing on the language used by the English Court of Appeal in Kleinwort Benson v. Malaysia Mining, [1989] 1 All E.R. 785, referred to paragraph 3 of the letter as imposing a "moral obligation" on Plessey or as constituting a "gentleman's agreement" between the Bank and Plessey. We prefer the description of the commercial value of comfort letters in general and this one in particular provided in the factum of the respondent GEC. Counsel wrote:

> ... In this marketplace, both parties have experience in situations where a parent, for reasons it deems appropriate, refuses to give a legally binding assurance and a bank, for reasons it similarly considers appropriate agrees to accept something less, perhaps believing that when, and if, "push comes to shove", the parent would pay for any or all of the "non-legal" commercial considerations of reputation, fear of adverse publicity, higher future borrowing costs and a myriad other reasons and possibilities depending on the circumstances.

**19**    The interpretation given to paragraph 3 by the trial judge did not render the letters of comfort valueless and it cannot be said that his interpretation yields a commercial absurdity. The Bank's primary submission must be rejected. The trial judge correctly construed paragraph 3 of the letters of comfort.

**20**    The second ground of appeal assumes that the Bank's interpretation of paragraph 3 of the comfort letters is correct and goes on to contend that as Plessey had no such policy, paragraph 3 contained a misrepresentation. Obviously, the accuracy of the representation in paragraph 3 must be considered in the light of the meaning given to that paragraph by Winkler J. and affirmed by this court. The trial judge considered whether Plessey had a policy as he had found it described in paragraph 3. After an extensive review of the evidence (pp. 136-42), he concluded that Plessey had such a policy and that it remained in operation throughout the relevant time. This finding is clearly one of fact to which deference is due. There was ample evidence to support the finding.

**21**    The Bank's third submission relates only to the fifth letter of comfort. The trial judge found that the fifth letter, like the first four, did not contain a material misrepresentation. He further held, at p. 146, that in the circumstances existing when the fifth letter was provided, the Bank could not reasonably have relied on any representation in the letter. In coming to that conclusion, the trial judge placed considerable emphasis on the concluding language of the fifth letter. In that letter Plessey indicated that the letter "does not constitute a legally binding commitment." That language did not appear in the earlier letters.

**22**    As we are satisfied that the fifth letter contained no misrepresentation, it is not necessary to address the reliance argument. We will do so for the sake of completeness. The trial judge was entitled on all of the evidence to come to the conclusion that he did. His finding was reached not only on the basis of the closing language in the letter, but on all of the circumstances existing as of December 1989 when the fifth letter was provided. By that date, Plessey had been the subject of a hostile takeover and was controlled by commercial entities, one of which was the respondent, GEC, which had no ongoing working relationship with the Bank and no apparent need to look to the Bank for financing in the future. The commercial considerations which may have prompted Plessey to respond favourably to the Bank's request that Plessey honour these debts were not operative after Plessey itself was acquired by GEC and another corporate entity.

**23**    The fourth submission made by the Bank is directed at GEC. The Bank seeks to hold GEC jointly liable with Plessey, the author of the letter, for negligent misrepresentation. This ground of appeal must fail as we are satisfied that the fifth letter did not contain any misrepresentation, and in any event any representation in that letter could not

reasonably be relied on by the Bank.

**24**    The Bank's fifth submission is somewhat different. For the purpose of this submission, the Bank accepts the interpretation of paragraph 3 given by the trial judge and adopted by this court. Counsel submits that even on that interpretation, the representation became untrue or at least misleading by January or February 1990 when Plessey realized that Leigh's continued fiscal viability was uncertain. Counsel submits that the continuing nature of the representation in paragraph 3 of the letters required Plessey to put the Bank on notice when it became clear to Plessey that Leigh might not be able to manage itself so as to meet its obligations to the Bank. If this submission is accepted, the Bank is entitled to recover the advances made to Leigh after Plessey knew that Leigh's prospects were not good.

**25**    We cannot accept this submission. There is nothing inconsistent with the continued existence of a policy that Leigh should manage its affairs so as to be able to meet its financial obligations and the existence of circumstances which imperiled Leigh's ability to conduct its affairs in accordance with that policy. The policy may remain extant even if circumstances make compliance difficult or doubtful.

**26**    The trial judge conducted an extensive review of the evidence surrounding Leigh's slide into insolvency in late 1989 and early 1990. He reviewed the extensive efforts made by Plessey and its owners to salvage Leigh's business. He concluded, at p. 142, that the policy referred to in paragraph 3 of the letters remained in place throughout the material period of time right up until immediately before the bankruptcy of Leigh. We see no basis for interfering with that finding.

**27**    There is a second reason why this submission must fail. It is premised on the representations made in the fifth letter of comfort. As indicated above, we agree with the trial judge's conclusion that the Bank could not reasonably rely on any representation in that letter. Consequently, even if we accepted the Bank's argument that the representations in paragraph 3 became misleading some time in January or February 1990, the Bank could still not establish the requisite reliance on the representations.

**28**    We affirm the order of Winkler J. dismissing the Bank's action.

The Costs Appeal

**29**    The Bank also seeks leave to appeal the costs order made by Winkler J. He ordered that the respondents should have their costs on a solicitor-and-client scale. The Bank submits that the trial judge should have awarded costs on a party-and-party basis.

**30**    The determination of an appropriate costs order is within the discretion of the trial judge. This court will only interfere with the exercise of that discretion if it is satisfied that the order is unreasonable or premised on some error in principle.

**31**    The trial judge referred to the appropriate statutory authorities and instructed himself that an order of costs on a solicitor-and-client level should be made only in "exceptional" and "rare" cases.

**32**    In holding that this was a case for costs, the trial judge said:

> In my view, this is one of the "rare" and "exceptional" cases where an award of solicitor and client costs is warranted. The plaintiff advanced numerous allegations of fraud and deceit on the part of the defendants. These allegations included: allegations that Colin Justice intentionally make false and misleading statements to the bank regarding Leigh financial statements; that Justice intentionally misrepresented Leigh's financial condition to the bank; that Plessey, GEC and GEC Siemens plc intentionally misrepresented the affairs of Leigh to the Bank in order to induce the bank to lend money to Leigh; and that the fifth and last comfort letter was delivered to the bank fraudulently, and that this fraud was perpetrated, in part, by Ross Anderson. These

allegations were pursued unrelentingly through to the conclusion of trial. Indeed, the plaintiff raised a novel allegation of fraud concerning Mr. Anderson in its written argument, despite the fact that it had not been pleaded and the defendants had no opportunity to lead evidence to refute it. All of these allegations of fraud and deceit were held to be wholly unsupported by the evidence.

**33**    The above-quoted observations of the trial judge are fully supported in the record and, in our view, provide ample reason for the costs order made by the trial judge.

**34**    Mr. Finlay submitted that the trial judge erroneously accepted the respondents' submission that their offer to settle the action by the payment of $15 million made in 1996 was evidence that they did not simply "walk away" from their "moral obligation" under the comfort letters. We agree that the offer of payment made some 6 years after the litigation commenced says little about the respondents' sense of their "moral obligations." We do not think, however, that this mischaracterization of the motivation for the settlement offer warrants interference with the costs order made by the trial judge. That order was fully justified in the light of the unfounded allegations made by the Bank and the conduct of the trial by the Bank.

**35**    We would grant leave to appeal the costs order, but dismiss that appeal.

**36**    The respondents are entitled to their costs on the appeal on a party-and-party basis.

2000 CarswellOnt 2983, 2000 CarswellOnt 2984, 139 O.A.C. 399 (note)...

2000 CarswellOnt 2983
Supreme Court of Canada

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

2000 CarswellOnt 2983, 2000 CarswellOnt 2984, 139 O.A.C. 399 (note), 260 N.R. 394 (note)

# The Toronto-Dominion Bank v. The Plessey Company

Arbour J., Binnie J., Gonthier J.

Judgment: August 3, 2000
Docket: 27570

Proceedings: Leave to appeal refused 1999 CarswellOnt 2812, (sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt)) 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64 (Ont. C.A.); Affirmed 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637 (Ont. Gen. Div. [Commercial List]); Affirmed 1998 CarswellOnt 4099, [1998] O.J. No. 4221 (Ont. Gen. Div. [Commercial List]); Additional reasons 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637 (Ont. Gen. Div. [Commercial List])

Counsel: None given.

Subject: Contracts; Torts; Corporate and Commercial; Civil Practice and Procedure

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**
   **Banking and banks**

   **Fraud and misrepresentation**

   **Practice**

***Arbour J., Binnie J., Gonthier J.***:

1    The application for leave to appeal is dismissed with costs.

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# WATERS' LAW OF TRUSTS IN CANADA

## Fourth Edition

By

### Editor-in-Chief
### Donovan W.M. Waters, Q.C.

M.A., D.C.L. (Oxon.), Ph. D. (London), LL.D. (Hons.) Victoria, McGill, F.R.S.C.
Emeritus Professor, University of Victoria, B.C., of Lincoln's Inn, Barrister at
Law, Counsel, Horne Coupar, Barristers & Solicitors, Victoria, B.C.

### Contributing Editors
### Mark R. Gillen

B.Comm. (Toronto), M.B.A. (York), LL.B. (Osgoode), LL.M. (Toronto),
Faculty of Law, University of Victoria

### Lionel D. Smith

B.Sc., LL.M. (Cantab.), D. Phil., M.A. (Oxon.),
James McGill Professor of Law, McGill University,
of the Bar of Alberta

## CARSWELL®

DAVIES WARD PHILLIPS

NOV - 2 2012

& VINEBERG LLP

© 2012 Thomson Reuters Canada Limited

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein. No one involved in this publication is attempting herein to render legal, accounting, or other professional advice.

**Library and Archives Canada Cataloguing in Publication**

Waters' law of trusts in Canada / editor-in-chief, Donovan W.M.
Waters; contributing editors, Lionel D. Smith, Mark R. Gillen.—4th ed.

Previously published under title: Law of trusts in Canada / by D.W.M. Waters
Includes bibliographical references and index.
ISBN 978-0-7798-5165-2 (bound).—ISBN 978-0-7798-5166-9 (pbk.)

1. Trusts and trustees—Canada.   I. Waters, D. W. M.   II. Smith, Lionel D.   III. Gillen, Mark R., 1957-   IV. Waters, D. W. M. Law of trusts in Canada.

KE787.W38 2005 346.7105'9
C2005-901583-7
KF730.W38 2005

Composition: Computer Composition of Canada Inc.

**Printed in the United States by Thomson Reuters**

 **THOMSON REUTERS**

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

One Corporate Plaza, 2075 Kennedy Road, Toronto, Ontario M1T 3V4
**Customer Relations:**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5162
Fax 1-416-298-5094

## B. Purchase in the Name of Another, or in the Names of the Purchaser and Another

The principle has been established since the early eighteenth century that if one person buys property, but has it conveyed into another's name, or into the joint names of himself and another, that other becomes a resulting trustee for the purchaser of all the interest taken by that other, *unless* it be proved that the buyer intended to make a gift of the property. The best-known statement of the principle, cited and quoted in many Canadian cases, is that of Chief Baron Eyre in *Dyer v. Dyer*:

> The clear result of all the cases, without a single exception, is that the trust of a legal estate, whether freehold, copyhold, or leasehold; whether taken in the names of the purchasers and others jointly, or in the names of others without that of the purchaser; whether in one name or several; whether jointly or successive, results to the man who advances the purchase-money.[29]

*Dyer v. Dyer* concerned land, but the principle is clearly applicable to all forms of property, and there has never been any question of its general application.[30]

## 1. Purchase or Loan

In order to take advantage of the principle, the claimant must first show that it was he who advanced the purchase money.[31] Because the resulting trust is excepted from the *Statute of Frauds*, parol evidence is admissible for this purpose, even if the property purchased is land. Circumstantial evidence is also admissible. In *Vaselenak v. Vaselenak*[32] the impecuniosity of the transferee of title proved the major factor in establishing the claimant's case. This apparent facility of the claimant to introduce such informal evidence is not enough, however, to prevent many such claimants from failing at this stage. Where the claimant and the transferee are members of a

---

[29] (1788), 2 Cox Eq. Cas. 92, 30 E.R. 42 (Exch.) at 43 [E.R.].

[30] *Hudson's Bay Co. v. Hosie*, [1926] 2 W.W.R. 730, [1926] 4 D.L.R. 489 (Sask. C.A.) (shares); *Boulos v. Boulos* (1986), 57 Nfld. & P.E.I.R. 181, 24 E.T.R. 56 (Nfld. T.D.) (debt obligations); *Fancy v. Quilty* (1998), 161 Nfld. & P.E.I.R. 296, 37 R.F.L. (4th) 409 (Nfld. T.D.) (truck). Glanville Williams argued that in a situation where A contracts with B to confer a benefit upon C, no resulting trust should arise in favour of A over any property acquired by C from B: "Contracts for the Benefit of Third Parties" (1944), 7 M.L.R. 123 at 126-7. He suggested that should there be such a trust arising, legislative change would be in order. We cannot see the force of this argument if it does not attack all resulting trusts, which is a more defensible argument. Surely if a contract intends "to confer a benefit" upon C, the evidence demonstrating that intent will rebut the presumption of resulting trust. The law governing privity of contract has been amended in New Brunswick (*Law Reform Act*, R.S.N.B. 2011, c. 184, s. 4) and in England and Wales (*Contracts (Rights of Third Parties) Act*, 1999 (Eng.)), and note *Fraser River Pile & Dredge Ltd. v. Can-Dive Services Ltd.*, [1999] 3 S.C.R. 108, 176 D.L.R. (4th) 257 (S.C.C.).

[31] Purchase means the payment of money for the acquisition of a capital asset; it does not include the payment of rent for the use of property: *Savage v. Dunningham* (1973), [1974] Ch. 181, [1973] 3 All E.R. 429.

[32] [1921] 1 W.W.R. 889, 57 D.L.R. 370 (Alta. C.A.).

common household, as is so often the case, the source of the purchase moneys can easily remain in doubt, though it be established that the moneys were handed to the vendor by the claimant.

Though the claimant can establish that he owned and paid over the purchase money, he must also prove that he acted throughout as a purchaser. If in fact he was lending the money to the transferee, then his relationship with the transferee is that of a creditor with a debtor.[33] It is not open to him to argue that he advanced the money which facilitated the purchase of the property, advantageous though such a position might be to the claimant in the event of the transferee's bankruptcy. *Clark v. MacInnis*[34] provides the object lesson. The claimant merely asserted that he was entitled to a reconveyance of a certain house from the defendant, and was prepared to prove that he had made the down payment. His statement of claim was struck out with costs. He had not shown an express trust, nor any other basis upon which the transferee was to hold the house, and as there was not even a statement that he had made the down payment as a purchaser, there could be no resulting trust. Nor was the court prepared to accept an allegation that because the claimant had agreed to sell the house to the transferee, a resulting trust was established in the claimant's favour.

If the claimant is lending money and takes title in the transferee's name, then he is merely acting as an agent for the transferee.[35] A person is also acting as an agent if, on another's behalf, he uses his own money to buy property, and takes title in his own name. In those circumstances the payor has lent the purchase money to another, possibly holding the property as security. Such a person is a resulting trustee of the benefit of the property for the other. If, however, the payor had bought the property for himself, and had agreed with another that on the other paying him the price, he would transfer to the other, the payor is not a resulting trustee. The relationship between the payor and the other is purely contractual; the property may have been bought by the payor with the idea of fulfilling the agreement to sell after

---

[33] *Caruk v. Ludyk* (1987), 59 Sask. R. 155 (Sask. C.A.); *Hollett v. Hollett* (1993), 106 Nfld. & P.E.I.R. 271, 334 A.P.R. 271 (Nfld. T.D.); *Vancouver Trade Mart Inc. (Trustee of) v. Creative Prosperity Capital Corp.* (1998), 50 B.C.L.R. (3d) 155 (B.C. S.C.), additional reasons at (1998), 7 C.B.R. (4th) 3 (B.C. S.C.); *Carpe Investments Corp. v. Creative Prosperity Capital Corp.* (1998), 6 C.B.R. (4th) 230 (B.C. C.A.).

[34] [1953] O.W.N. 551 (Ont. H.C.). In *McKenzie v. Ross* (1900), 33 N.S.R. 252 (N.S. C.A.), it was particularly difficult to determine whether the transferee bought in his own name with moneys loaned to him by the claimant (whose trustee in bankruptcy was not suing) or whether he had bought as an agent of the bankrupt. The transferee had entered the bankrupt's business, many years before the bankruptcy, as an employee and son-in-law. As the bankrupt's health deteriorated, the transferee came to be the controller of the business. The land purchases were made with moneys coming from the business, but with the bankrupt's consent. Both trial judge and appeal court found that the moneys were in fact loaned to the transferee for him to buy in his own name, though the purchased lands were later mortgaged and the proceeds of the mortgage paid into the business. Consequently no resulting trust arose in favour of the bankrupt's creditors. A crucial point was that the *transferee* negotiated the purchases, the bankrupt on one occasion even refusing to be a purchaser.

[35] It involves a nice point where the claimant alleges that money the transferee acquired from a third party, so that the purchase might be made, was acquired by the transferee as an agent for the claimant: see *Henry v. Vukasha* (1957), 21 W.W.R. 409 (Sask. Q.B.).

he himself had bought, but the property was not bought on behalf of the other. This distinction is well brought out in *Brown v. Storoschuk*.[36]

Again, if A agrees with B to purchase land for B, paying the price with B's money, but enters into a binding contract with a vendor in his own name, A thereupon becomes a resulting trustee of the chose in action for B. Stuart J. came somewhat reluctantly to this conclusion in *Vaselenak v. Vaselenak*;[37] he preferred to see B seek a declaration of agency. In *Boulter-Waugh & Co. v. Phillips*, Lamont J.A. said:

> The same result, in my opinion, follows where a person takes title in his own name to land which he agreed to purchase, but which, prior to obtaining title, he had assigned to another.[38]

That is to say, the assignor becomes a resulting trustee for the assignee.

## 2. Multiple Contributors

What is the position if two persons advance the money for the purchase of certain property, which is taken in the name of one of them? If the amount subscribed by each is determinable, it is clear that the transferee holds on a proportionate resulting trust. But what if it proves impossible to determine how much was subscribed by each? Suppose the parties have kept their savings in a shared strong box, and from those savings a house is bought, in the name, as it happens, of one of the parties. In *Wilde v. Wilde*[39] it was said by Strong V.C. that in those circumstances no resulting trust could arise. This result seems obviously unsatisfactory, although it is clear that the resulting trust can only benefit the deprived party to the extent of his contribution. In *Szczepkowski v. Eppler*[40] it was pointed out that Strong V.C.'s words could conflict with *Lupton v. White*.[41] The latter case established that, if A undertakes to keep the property of B distinct, but mixes it with his own, the whole must be taken to be the property of B.[42] This situation would occur, for example, where B requests A to keep

---

[36] [1946] 3 W.W.R. 641 (B.C. C.A.). That which rests in contract cannot give rise to a resulting trust. If A agrees to sell land to B for a certain sum, and transfers title to B before he has been paid, A retains an equitable lien against the land, but, if B fails to pay, A cannot assert that B is a resulting trustee of the land: *Taylor v. Taylor* (1879), (sub nom. *Taylor v. Wallbridge*) 2 S.C.R. 616 (S.C.C.) at 674. On agreement by one person to purchase as agent for another, see also *Chupak v. Cirka* (1982), 11 E.T.R. 262, 132 D.L.R. (3d) 251 (Ont. H.C.), and *infra*, note 191.

[37] *Supra*, note 32.

[38] [1918] 3 W.W.R. 27, 42 D.L.R. 548 (Sask. C.A.) at 33 [W.W.R.], additional reasons at [1918] 3 W.W.R. 196 (Sask. C.A.), reversed on other grounds 58 S.C.R. 385, (sub nom. *Union Bank v. Boulter-Waugh Ltd.*) [1919] 1 W.W.R. 1046 (S.C.C.).

[39] See also *Taylor v. Taylor, supra*, note 36, at 683 *per* Henry J.

[40] [1945] O.R. 149, [1945] 1 D.L.R. 657 (Ont. H.C.), reversed on other grounds [1945] O.R. 540, [1945] 4 D.L.R. 104 (Ont. C.A.). Trial decision restored, [1946] 3 D.L.R. 641 (S.C.C.).

[41] (1808), 15 Ves. Jun. 432, 33 E.R. 817.

[42] This proposition has been refined in further cases, both in equity and at common law. It is not so much a rule of forfeiture, but a rule of evidence: if a person, by a wrongful act, creates an evidentiary difficulty, that difficulty will be resolved against him; but only to the extent of the uncertainty. The principle has been applied to difficulties of accounting, physical confusions of goods, mixtures of

a record of B's savings handed to A, but consents to the savings of both parties being kept in the same strong box. A does not keep a record of B's money. Alternatively, A may have kept the savings distinct, but have drawn indiscriminately and without record from the box when the parties needed money.[43]

Most cases of this kind, where it is impossible to determine how much each party contributed to a purchase taken in the name of one of them, will occur where there has been some pooling of resources, and in *S. v. S.*,[44] in Manitoba, Campbell J. refused to follow the statement of Strong V.C. in *Wilde v. Wilde*. He preferred to follow the English authority of *Jones v. Maynard*[45] and to hold that the transferee held the property jointly for himself and the other. An equal division is at least more equitable, if arbitrary. *S. v. S.* was in fact a case of husband and wife, as was *Jones v. Maynard*, and here the English authorities have found it easier to justify such a division. As we shall see,[46] there has been a more recent turning away from the post-World War II English authorities on this point, and *S. v. S.* may not now represent the Canadian solution.

Care should be taken to see what is meant when property is purchased in the "joint names" of two parties, or where, as in *S. v. S.*, property is deemed to be held by the title holder for himself and another "jointly". When property is bought by one person and title taken in joint names, a joint tenancy will arise which confers upon each party an equal entitlement to the property, which includes a so-called right of survivorship. This right, which is not a separate right but merely an incident of joint tenancy, will cause the whole property to vest in the survivor. The reason is that in a joint tenancy, if one joint tenant dies, his interest simply disappears and nothing passes to his estate. The result is that the interest of the surviving joint tenant is effectively converted into sole ownership. It is this effect which is often described as a right of survivorship. If A supplies the purchase money and conveyance is taken in the joint names of A and B, B during the joint lives will hold his interest for A;[47]

---

money in bank accounts, and difficulties of determining the value of things. For full citations, see *Smith*, at 77-79.

[43] B cannot "trace" his savings because, where no record has been kept, he cannot quantify how much is his own, and, where the savings have been kept distinct, he cannot show that withdrawals from his savings were either quantified or not used for his own benefit. In view of *Lupton v. White*, could B trace the whole fund as his own?

[44] (1952), 5 W.W.R. (N.S.) 523 (Man. Q.B.): Campbell J. said (at 527) that *Wilde v. Wilde* had "no application to the instant case", and he refused to follow *Dudgeon v. Dudgeon* (1907), 6 W.L.R. 346, 13 B.C.R. 179 (B.C. S.C.), in which there is a favourable reference to *Wilde v. Wilde*. One important point in favour of this view is that the principle that evidentiary difficulties shall be resolved against the wrongdoer (*supra*, note 42) operates only where the creation of the evidentiary difficulty is, itself, a wrongful act, such as a breach of trust. This was not the case in *S. v. S.*, where the mixing was part of the everyday life of the parties. It was noted by the Manitoba Court of Appeal that Campbell J. was affirmed on appeal in an unreported decision: this is stated in an unrelated case, also confusingly called *S. v. S.*, [1954] 2 D.L.R. 765 (Man. C.A.) (which itself was reversed: [1955] S.C.R. 658, [1955] 4 D.L.R. 6). See also *Barleben v. Barleben* (1964), 44 D.L.R. (2d) 332, 46 W.W.R. 683 (Alta. C.A.).

[45] [1951] Ch. 572, [1951] 1 All E.R. 802 (Eng. Ch. Div.). Campbell J. thought the facts of the instant case more compelling than *Jones v. Maynard*, in that a joint interest was intended.

[46] *Infra*, Part II G 4.

[47] Or, if both parties contributed unequally, the beneficial interests in the property will reflect the proportions of the contributions: *Miles v. Conkin* (1996), 24 R.F.L. (4th) 211 (B.C. C.A.).

B will also hold his right of survivorship – again by way of a resulting trust – for A's estate, because that right is merely one aspect of B's interest. In other words, the starting point is that B holds all of his interest on resulting trust for A, or A's estate. However, evidence may show that, while A intended B to hold his interest for A during the joint lives, it was also A's intention that, should he (A) predecease, B should take the benefit of the property. The presumption of resulting trust would then be partially rebutted, in relation to the situation that has arisen, so that B would not hold his interest (now a sole interest and not a joint tenancy) on resulting trust. He would hold it for his own benefit.

However, A may supply the purchase money and title taken in the names of A and B as tenants in common. In this case, A and B each has an inheritable undivided half-interest, but B will hold his interest on resulting trust for A.[48] All B's interest is then subject to this one resulting trust.[49] Where, however, both parties contribute to the purchase money, and title is taken in the name of one party, the other party is entitled to a resulting trust order in his favour proportionate to the amount he contributed. The result will be secured by declaring that the title holder holds on resulting trust for both parties in proportionate shares as equitable tenants in common.[50] This would be an appropriate result where one partner has used partnership moneys and taken title in his own name or in the name of a volunteer third party. A resulting trust in favour of all the partners in equal proportionate shares as equitable tenants in common would then come into existence.[51]

## C. Voluntary Transfer into the Name of Another, or into the Joint Names of the Transferor and Another

### 1. Introduction

Where a person transfers his property into another's name, or into the names of himself and another, and does so gratuitously, the principle underlying *Dyer v. Dyer*[52]

---

[48] In a tenancy in common, the legal interests need not be 50% each, but can be in any shares. The equitable interests, however, presumably follow the contributions of the purchase price.

[49] *Ballard v. Stover* (1887), 14 O.R. 153 (Ont. C.A.) at 156, *per* Armour J. A joint tenancy can be severed, turning it into a tenancy in common. This must necessarily be during the joint lives, because the interest of a joint tenant disappears on his death. If a joint tenancy were severed, A and B would be entitled thereafter as tenants in common and, subject to any agreement, B – as here explained – would hold his entire interest for A.

[50] *Nasmith v. Nasmith* (1919), 16 O.W.N. 298, where title to a house was taken in the wife's name, but, since both husband and wife had contributed to the purchase money, and the presumption of advancement was rebutted, the wife held on resulting trust for her husband and herself in equal shares as equitable tenants in common.

[51] *McNeil v. Sharpe* (1913), 47 N.S.R. 406, 15 D.L.R. 73 (N.S. S.C.), affirmed 62 S.C.R. 504, 70 D.L.R. 740 (S.C.C.); *McFadgen v. Stewart* (1865), 11 Gr. 272 (U.C. Ch.); *Wright v. Kyle*, [1939] O.W.N. 464 (Ont. H.C.).

[52] *Supra*, note 39. See also Spence J. in *Goodfriend v. Goodfriend* (1971), [1972] S.C.R. 640, 22 D.L.R. (3d) 699 (S.C.C.) at 646 [S.C.R.].

98 A.F.T.R.2d 2006-5264, 2006-2 USTC P 50,395, Med & Med GD (CCH) P 301,862

456 F.3d 444
United States Court of Appeals,
Fifth Circuit.

Michael T. CARACCI, et al., Petitioners,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

Sta-Home Health Agency of Carthage, Inc.; Sta-
Home Health Agency of Greenwood, Inc.; Michael
Caracci; Victor Caracci; Christina C. Mcquillen;
Joyce P. Caracci; Vincent Caracci; Sta-Home Health
Agency of Jackson, Inc., Petitioners-Appellants,

v.

Commissioner of Internal
Revenue, Respondent-Appellee.

No. 02-60912.    |    July 11, 2006.

**Synopsis**

**Background:** Taxpayers, home-healthcare agencies, brought
action against Commissioner of Internal Revenue challenging
deficiency notices requiring taxpayers to pay over $250
million in excise taxes. The United States Tax Court, Laro, J.,
118 T.C. 379, affirmed. Taxpayers appealed.

**Holdings:** The Court of Appeals held that:

[1] Commissioner of Internal Revenue failed to meet its
burden of proof;

[2] tax court erred in using modified market value of invested
capital (MVIC) method in valuing home healthcare agencies;

[3] tax court's finding that agencies had potential for making
profit was clearly erroneous; and

[4] nothing supported tax court's assignment of $5 million
value to agencies' intangible assets.

Reversed.

**Attorneys and Law Firms**

**\*446** David D. Aughtry (argued), Charles Edward Hodges,
Chamberlain, Hrdlicka, White, Williams & Martin, Atlanta,
GA, for Petitioner-Appellant.

Michael J. Haungs, Kenneth L. Greene, Tax Div., Eileen
J. O'Connor, Asst. Atty. Gen., U.S. Dept. of Justice,
Washington, DC, for Respondent-Appellee.

Appeals from the Decision of the United States Tax Court.

Before JOLLY and WIENER, Circuit Judges, and
ROSENTHAL, District **\*447** Judge. [*]

**Opinion**

PER CURIAM:

The Commissioner of Internal Revenue issued deficiency
notices requiring the taxpayers, three privately held home-
healthcare agencies and the family that owns and operates
them, to pay over $250 million in excise taxes under 26
U.S.C. § 4958. The Commissioner based the deficiency
notices on an internal valuation of assets and liabilities
transferred when the agencies converted from exempt to
nonexempt status, finding that the taxpayers received a
"net excess benefit" in the amount of $18.5 million. The
taxpayers challenged the deficiency notices in the Tax Court.
During a two-year audit and nearly two years of litigation,
the Commissioner insisted that the deficiency notices and
underlying valuations were correct. At the trial before the
Tax Court, the Commissioner for the first time conceded that
the deficiency notices were both excessive and erroneous.
The Tax Court recognized that the Commissioner's deficiency
notices were wrong. The Tax Court also found that the
valuation expert the Commissioner presented at trial-the only
support the Commissioner presented for imposing excise
taxes-also committed significant errors in his analysis. The
Tax Court nonetheless affirmed the Commissioner's decision
to impose excise taxes, finding that the fair market value
of the assets transferred from the exempt entities to the
newly created nonexempt entities exceeded the value of the
liabilities and debts assumed as consideration by over $5
million.

In this appeal, the Commissioner does not dispute that the
deficiency notices were erroneous. The Commissioner also
concedes that the Tax Court made a $1.78 million mistake in
its valuation analysis. The Commissioner nonetheless insists

that the Tax Court correctly found that the taxpayers received a "net excess benefit" of over $5 million in the conversion from exempt to nonexempt status and collectively owed $69,702,390 in excise taxes under I.R.C. § 4958(a) and (b). [1]

The taxpayers contend that the Tax Court made numerous factual and legal errors in valuing the assets transferred in the conversion from exempt to nonexempt status. We agree. As explained below, the Tax Court erred as a matter of law in affirming the Commissioner's decision to impose excise taxes after the Commissioner failed to meet his burden of proving that the taxes were correctly assessed; erred as a matter of law in selecting the method to value the assets and liabilities transferred; and made clearly erroneous fact findings in applying that valuation method. We reverse and render because the record establishes as a matter of law that the taxpayers did not receive any "net excess benefit" and therefore are not liable for the excise taxes assessed.

### I. Background

In 1976, Joyce Caracci, an experienced nurse, her husband, Victor Caracci, and a third person started the Sta-Home Health Agency, Inc. to provide home health care in a geographically large and primarily rural part of Mississippi. A year later, Joyce and Victor Caracci and the third individual formed two other Sta-Home agencies, Sta-Home Health Agency, Inc., of Forest, Mississippi and Sta-Home Health Agency, Inc., of Grenada, Mississippi. The shareholders, directors, and officers of the Sta-Home entities were Caracci **\*448** family members who also worked for the agencies.

The three Sta-Home entities were nonstock, tax-exempt corporations formed under Mississippi law. To comply with the Medicare regulations in place when the Caraccis began their business, the agencies had to be tax-exempt under the Internal Revenue Code § 501(c)(3) (26 U.S.C. § 501(c)(3)). In the 1980s, the law changed to permit agencies such as Sta-Home to be formed as nonexempt corporations.

The Sta-Home agencies served the rural poor in a large area in northeast Mississippi. The agencies were intended to provide home healthcare as an alternative to what Joyce Caracci believed from her long professional experience was unacceptable institutional care available from nursing homes and other facilities in the region. A large majority of the patients Sta-Home served depended on Medicare and Medicaid. It is undisputed that between 95 and 97 percent

of Sta-Home's income consisted of Medicare and Medicaid reimbursements.

In 1995, Medicare reimbursed home-healthcare providers the lesser of the actual reasonable cost or the customary charge, up to a maximum per-visit "cost cap." Medicare paid retrospectively, sending a "periodic interim payment"-known as a PIP-every two weeks. Home-healthcare agencies also submitted quarterly and annual cost reports, which Medicare used to adjust disparities between interim payments made and actual costs reported by reimbursing the provider for any underpayment or requiring the provider to remit any overpayment. Under the Medicare reimbursement system, home-healthcare agencies like Sta-Home effectively had no ability to realize profits. Medicare did not even reimburse all of the costs expended, but only costs it deemed "allowable." If Sta-Home submitted a claim for reimbursement that Medicare denied, the result for Sta-Home was a negative cash outflow. On average, Medicare disallowed .7 percent of Sta-Home's submitted annual costs. As a result, the greater the volume of Sta-Home's business-the more care Sta-Home provided patients and the more revenue it received-the more money it lost.

Sta-Home generated increased revenue and commensurately increased losses from 1992 through 1995. Financial statements revealed that the Sta-Home corporations' expenses exceeded its revenues every year. Not only did Sta-Home sustain repeated net operating losses, its capital deficit increased every year from 1991 through 1995. At the end of fiscal year 1995, the combined assets and stated liabilities of the three Sta-Home exempt agencies was a negative $1.4 million. [2]

To ease this precarious financial situation, Sta-Home required its newly hired employees to forgo pay for the first month of employment. Sta-Home paid this amount only when employees left the company. Sta-Home also underpaid salaries and wages during the year, using year-end "bonuses" to make up unpaid compensation amounts. Sta-Home also deferred or accrued contributions to employee benefit plans. These efforts to ease cash-flow difficulties affected all Sta-Home's employees, including the Caracci family members.

During this period, Mississippi was the highest-ranking state in the country in **\*449** payments per Medicare recipient. As noted, during 1995, over 95 percent of the services Sta-Home provided went to Medicare beneficiaries. State law required home-healthcare agencies in Mississippi to operate

under a Certificate of Need (CON). In 1983, Mississippi imposed a moratorium on the issuance of new CONs, which prevented new competitors from entering the industry unless they purchased an existing CON. The combined Sta-Home entities had CONs in nineteen Mississippi counties. The Sta-Home corporations ranked first or second in market share in 14 of the 19 rural Mississippi counties they served. "Sta-Home" was a recognized name in home healthcare in Mississippi and enjoyed a strong reputation among the state's elderly. In 1993, Sta-Home was the first freestanding agency to be accredited by the Joint Commission on Accreditation of Healthcare Organizations, which required achieving or exceeding certain regulatory standards, including standards regulating the quality of patient care.

During 1994 and 1995, a change in the Medicare regulations was proposed, under which certain healthcare entities accepting Medicare payments would change from the retrospective PIP system to a prospective payment system to be known as "PPS." Under PPS, healthcare providers would file a claim for each service rendered and then wait for it to be processed and paid. [3] Concerned about the impact of this system on Sta-Home's already fragile cash flow, the Caraccis consulted an attorney, Thomas Kirkland. He recommended converting Sta-Home into for-profit corporations, which Medicare regulations had permitted since the 1980s. The conversion to nonexempt status would allow Sta-Home to borrow money that lenders were unwilling to provide to exempt entities. Kirkland's law firm had represented many home-healthcare agencies in Mississippi, and Kirkland was a recognized expert in the legal issues relating to such agencies. He advised all his tax-exempt healthcare-agency clients to convert to nonexempt status. Most of Kirkland's clients followed his advice. The primary form of conversion used was a transfer of assets from the old exempt corporations to the newly formed nonexempt subchapter-S corporations, in exchange for assuming the debts and liabilities of the exempt corporations.

Sta-Home took a careful and conscientious approach to the conversion. Not only did Sta-Home consult with an attorney knowledgeable in the area, it also retained a tax attorney whose accounting firm obtained two contemporaneous appraisals of Sta-Home's assets and liabilities. These appraisals showed that Sta-Home's liabilities exceeded the value of its tangible and intangible assets. The appraisals specifically showed that the value of the intangible assets—including the CONs—would not result in a positive fair market value because the assets had been consistently

unprofitable. These appraisals were consistent with the Caraccis' conclusion that unless they did something to provide more cash and capital, they would likely not be able to continue to operate.

Before Sta-Home changed from tax-exempt to nonexempt status, it investigated other alternatives to meet its need for improved cash flow and access to capital in light of the anticipated change from a PIP to a PPS Medicare reimbursement system. Sta-Home looked for a hospital in its service area that could purchase the agencies, to provide capital and additional patient **450** referrals. The search proved fruitless. Sta-Home discovered that the potential purchasers were uninterested; the most likely candidate had acquired a home-healthcare agency the prior year. With no prospective or potential buyer, Sta-Home decided to convert to nonexempt status.

On July 11, 1995, Sta-Home's board of directors authorized the conversion of the tax-exempt entities into nonexempt subchapter-S corporations. Sta-Home Health Agency, Inc. was converted to Sta-Home Health Agency of Jackson, Inc.; Sta-Home Health Agency, Inc., of Forrest, Mississippi was converted to Sta-Home Health Agency of Carthage, Inc.; and Sta-Home Health Agency, Inc., of Grenada, Mississippi was converted to Sta-Home Health Agency of Greenwood, Inc. The exempt corporations transferred their tangible and intangible assets to the for-profit corporations in exchange for the assumption of, and indemnification against, liabilities. The contemporaneous appraisals performed in support of the conversion showed that the consideration for the assets-the agreement to assume the debts and liabilities-exceeded the value of the assets, which had been unprofitable for the previous five years. It is undisputed that after the conversion, the Sta-Home entities continued to operate as before, providing the same services to the same patients in the same manner, subject to the same Medicare limits on profit.

In 1999, after an extended audit period, the Commissioner issued deficiency notices to the Caracci family and the Sta-Home agencies. The Commissioner determined that the value of the assets transferred to the nonexempt Sta-Home corporations exceeded the value of the liabilities and debts assumed by approximately $18.5 million. Based solely on that valuation analysis, the Commissioner concluded that the transfer provided an "excess benefit" to the newly created nonexempt corporations and the Caracci family, in violation of I.R.C. § 4958, which imposes a 25 percent and a 200 percent penalty in the form of excise taxes on "excess

98 A.F.T.R.2d 2006-5264, 2006-2 USTC P 50,395, Med & Med GD (CCH) P 301,862

benefit transactions." The deficiency notices asserted that the taxpayers owed excise taxes totaling $256,114,435.

The Commissioner based the deficiency notices on a brief internal memorandum. This memorandum stated: "This intermediate determination of value should not be considered final until issuance of the final economic report." The deficiency notices were not based on a final economic report, instead using the figures from the "intermediate determination of value" in stating that the conversion from exempt to nonexempt status resulted in a net excess benefit of $18,543,694 and triggered excise taxes and penalties of over $250 million. Sta-Home and the Caracci family filed timely petitions in the United States Tax Court challenging the determination of their tax liabilities.

In the Tax Court, the taxpayers pointed out that one problem with the deficiency notices was that the valuations made no adjustment for the liabilities that the nonexempt corporations assumed as consideration for acquiring the assets from the exempt corporations. The taxpayers moved for partial summary judgment based on this problem in the deficiency notices. The Commissioner responded that the notices were correct, filing affidavits in opposition to the partial summary judgment motion swearing to the validity of the deficiency amounts and the consequent excise tax amounts. It was not until the trial before the Tax Court that the Commissioner acknowledged that the deficiency notices were wrong. On cross-examination, the Commissioner's own expert witness admitted that the notices were "excessive," "incorrect," and "erroneous."

 **\*451**  On May 22, 2002, the Tax Court affirmed the finding that the conversion resulted in a "net excess benefit" triggering excise taxes and penalties, but reduced the amount of the benefit and the resulting amounts that Sta-Home and the Caracci family owed. The Tax Court found that the value of the exempt former Sta-Home entities' debts and liabilities that the newly formed nonexempt Sta-Home entities assumed was $13.5 million. The parties do not challenge this valuation on appeal. The Tax Court found that the newly formed nonexempt Sta-Home entities received assets from the exempt former entities worth $20.8 million, exceeding the value of the assumed liabilities by $5.1 million. In so finding, the Tax Court rejected both the $20 million figure the Commissioner had asserted as the amount of the net excess benefit in its deficiency notices and also rejected the amount that the Commissioner's expert presented.

Both Sta-Home and the Commissioner presented detailed expert testimony on the fair market value of Sta-Home's tangible and intangible assets at the time of the conversion from nonexempt to exempt status. The expert witnesses for both the taxpayers and the Commissioner agreed that traditional valuation methodology uses three approaches: (1) income; (2) cost; and (3) market. An income approach assigns value based on determining how much money an owner will derive from the business in the future. A cost approach values a business by determining how much it would cost to replace the entity's tangible and intangible assets. [4] A market approach tries to establish the market value of a company, usually by comparing sales or transfers of similar companies. The experts disagreed on how to value Sta-Home's assets and what assumptions should be used. The Tax Court agreed with neither expert, instead selecting aspects from the Commissioner's expert to piece together its own valuation result.

Sta-Home's expert, Allen D. Hahn, is a director at Pricewaterhouse Coopers Northeast Region Corporation Valuation Consulting Group. He has written extensively on valuing home-healthcare agencies. The Commissioner unsuccessfully attempted to hire Hahn for this case, recognizing his expertise. To prepare his analysis of the Sta-Home conversion, Hahn spent eight weeks in Mississippi, studying the assets and liabilities transferred in the conversion and analyzing the home-healthcare industry in the area.

The Commissioner, unable to retain Hahn, hired Charles Wilhoite. Although Wilhoite is a certified public accountant and codirector of the Portland, Oregon office of Willamette Management Associates, a business valuation firm, he had no prior experience with the home-healthcare industry. Wilhoite spent only two days in Mississippi to study the Sta-Home entities in order to value their assets and liabilities and spent one of those days in a hotel room tracking down lost luggage. Lacking detailed or thorough knowledge about the home-healthcare industry in general or in the part of Mississippi where Sta-Home operated, and about Sta-Home itself, Wilhoite instead relied on his general valuation knowledge and experience and the information learned in the single day he  **\*452**  spent interviewing Sta-Home's chief financial officer. In short, neither the Commissioner nor his expert witness did the work necessary to perform an asset-valuation analysis of the Sta-Home entities throughout the extended audit period or during the Tax Court litigation. [5]

Hahn's analysis carefully took into account the economic realities of home-healthcare agencies that depended almost entirely on Medicare reimbursements rather than on private payers, lost an average of .7 percent annually on their operating costs, did not offer specialized services that could generate profits, and had a capital deficit. Hahn used an "adjusted balance sheet" method to value the Sta-Home assets, adjusting the values identified on the companies' balance sheet to their fair market value equivalent.[6] Hahn prepared both a "base case" and a "best case" scenario, developing a range of fair market values for Sta-Home's assets ranging between $10.5 million and $11.5 million. Hahn specifically valued Sta-Home's intangible assets, attributing between $2.1 million and $3.4 million to the CONs and the workforce. Hahn found that the Sta-Home entities' total liabilities ranged between $12 million and $12.5 million, concluding that these liabilities exceeded the value of Sta-Home assets by $.5 million to $2 million.

To check this asset valuation, Hahn also used a market approach, comparing the Sta-Home transactions to thirteen private transactions involving home-healthcare agencies engaged in by publicly traded companies. Hahn cautioned that the market approach was only a secondary indication of value because transactions involving other home-healthcare providers were too dissimilar to the Sta-Home transactions used to effect the conversion from exempt to nonexempt entities to serve as the basis for a stand-alone valuation. Hahn noted that although Sta-Home provided only traditional home healthcare, publicly traded companies often used home-healthcare agencies as part of a broader mix of healthcare businesses. Sta-Home's heavy dependence on Medicare reimbursements also made it difficult to compare with publicly traded companies offering services to a mix that included a much larger number of private payers and far fewer Medicare patients than Sta-Home. The Commissioner's expert conceded that home-healthcare agencies serving private-pay patients can make a profit on those services if they are run well; by contrast, healthcare agencies cannot make a profit on serving Medicare patients. Hahn also noted that sales of home-healthcare agencies that provided sophisticated treatments could not be included as comparables because these treatments attracted higher payments and reimbursements than the services provided by Sta-Home.

Based on the adjusted balance sheet method and the corroboration provided by the comparable market approach, Hahn concluded that the liabilities the Sta-Home nonexempt entities agreed to assume from the nonexempt entities exceeded the value of the assets received by $600,000 to **\*453** $2,350,000, resulting in no net excess benefit and therefore no excise tax liability. Hahn reached this result without applying a minority stock discount, reasoning that the shares represented interests in a loss corporation,[7] and without a discount for lack of marketability,[8] concluding that the unattractive healthcare market in Mississippi was already incorporated into his adjusted balance sheet valuation.

The Commissioner's expert, Wilhoite, lacked the specific information about the Sta-Home entities necessary to value their assets, particularly the intangible assets. Wilhoite assumed that those intangible assets had significant value to potential purchasers, despite Sta-Home's history of losses, because several home-healthcare agencies acquired in recent transactions incurred losses just before those agencies were purchased for large amounts.[9] Wilhoite used market-based and income-based approaches to assign values to all Sta-Home's assets in general, without valuing any of Sta-Home's assets in particular.

For both the market and income approaches, Wilhoite determined the "market value of invested capital" (MVIC), which represents the market value of ownership equity plus debt invested in a company. The MVIC is commonly used in valuing private companies because it minimizes differences in capital structure between private and public corporations.[10] Wilhoite assumed that this method could be applied to value the Sta-Home entities' assets, despite the fact that method is designed to value a company's invested capital, not its assets, and the Sta-Home agencies did not have invested capital.

Wilhoite calculated the MVIC for the Sta-Home entities by extracting a "revenue pricing multiple" (RPM), a percentage that when multiplied by a company's annual revenues yield's that company's MVIC. To derive the RPM, Wilhoite identified two categories of "comparable" entities, one made up of publicly traded companies and one made up of merged or acquired entities. Wilhoite found the median RPM of publicly traded companies operating home-healthcare agencies to be .61. Because Sta-Home had been nonprofit, Wilhoite reduced that RPM by 50 percent to reflect a lower return on invested capital. When multiplied by Sta-Home's 1995 revenues, this RPM led to an MVIC of $13,563,000. Wilhoite ran the same analysis comparing merged and

acquired companies and arrived at an RPM of .25 and an MVIC of $11,302,000.

Wilhoite's income approach calculated the value to a potential buyer that Wilhoite assumed would result from the buyer's ability to use a "cost-shifting" strategy. [11]  **\*454** Wilhoite determined that the annual value of cost-shifting, based on a historical "cost-cap gap" [12] of .5 percent, was $1,408,168. Wilhoite applied a capitalization rate of 12.8 percent and calculated $11,001,000 as the present value of Sta-Home to a potential buyer.

Wilhoite also assigned a weighted percentage to each of the three values he derived. He assigned the largest weight to the income approach, followed by the publicly traded comparables market approach, followed by the merged or acquired comparables market approach, yielding a weighted-average MVIC of $11,604,000. Wilhoite then subtracted the amount of deficit that a buyer of the Sta-Home companies would have to pay for current liabilities and added the value of those current liabilities. Based on the accounting rule that the asset side and liability side of a company's balance sheet must be equal, Wilhoite reasoned that Sta-Home's MVIC (long-term liabilities and owners' equity) plus current liabilities would be equivalent to the value of the assets. Wilhoite valued Sta-Home's 1995 assets transferred from the nonexempt to the exempt entities at $20,858,000, over $7 million more than the $13,511,000 of liabilities assumed by the nonexempt entities.

The Tax Court rejected Wilhoite's income method-the method that Wilhoite viewed as deserving the greatest weight-stating that the value of the cost-shifting strategy included "too many imponderables." [13]  The Commissioner does not challenge this rejection of its expert's method. The Tax Court adopted only one part of one of Wilhoite's market-value approaches, making adjustments and filling in gaps to reach its own conclusion as to value.

The Tax Court adopted the part of the MVIC-Revenue approach that used publicly traded companies as comparables. In so doing, however, the Tax Court recognized that even the publicly traded companies Wilhoite used as "comparables" were in fact not comparable to the Sta-Home entities. Sta-Home operated in a much less advantageous market than many of the publicly traded companies, was much more heavily dependent on Medicare reimbursements than these companies, and did not offer the sophisticated and profitable therapies that many of these companies did. [14]

Elsewhere in the opinion, the Tax Court recognized these important aspects of Sta-Home's operations and finances that distinguished it from the publicly traded companies Wilhoite used as comparables. For example, the Tax Court recognized Sta-Home's dependency on Medicare reimbursements for over 95 percent of its revenues and the fact that Medicare disallowed .7 percent of Sta-Home's costs annually. But the Tax Court did not discuss these aspects in analyzing whether the publicly traded healthcare companies were sufficiently similar to Sta-Home to be "comparables," as Wilhoite's MVIC-Revenue valuation method required. Instead, although the Tax Court recognized that the publicly traded companies Wilhoite selected as comparables were different from Sta-Home in critical aspects, the Tax Court accounted for the differences by simply reducing the multiplier from .3 to .25 percent. The Tax Court did not explain the basis for reducing the multiplier by the amount it selected or why that  **\*455** reduction accounted for the differences between the publicly held companies and the Sta-Home agencies.

The Tax Court rejected Hahn's primary adjusted balance sheet valuation analysis and his secondary market-value analysis. In rejecting Hahn's secondary analysis, the Tax Court failed to recognize that Hahn used it only to confirm his primary valuation method, because Hahn himself recognized that the publicly traded healthcare companies were not sufficiently similar to the Sta-Home entities to serve as comparables in a stand-alone valuation analysis. The Tax Court also rejected Hahn's adjusted balance sheet approach, believing that it undervalued Sta-Home's intangible assets. The Tax Court justified its reliance on part of Wilhoite's analysis and its rejection of all of Hahn's analysis and conclusion-despite the fact that only Hahn had detailed information about how Sta-Home's operations and finances worked under the complex Medicare regulations-by its belief that Sta-Home had "the potential to generate income and thus demonstrate a substantial fair market value." [15]  The primary reason the Tax Court gave for this belief was that in 1995, the Sta-Home entities had generated nearly $45 million in revenues but had reported an operating loss that year, in part because the entities deducted depreciation for their automobile fleet and in part because they had declared employee bonuses, without which they would have reported "nontaxable income of approximately $1,785,000, or, in other words, more than enough to eliminate the accumulated deficit in net asset value." [16]  On appeal, the Commissioner concedes that the Tax Court was simply wrong in this statement, but insists that the error is harmless.

Having rejected most of Wilhoite's analysis and all of Hahn's, the Tax Court put together its own valuation analysis with the little that remained of Wilhoite's methodology. Using an RPM of .25-its own modification of Wilhoite's RPM of .3-the Tax Court calculated an MVIC of $11.3 million. The court then adjusted that amount by excluding four weeks of employees' deferred compensation from the current liabilities that Wilhoite had added to the MVIC and increasing current liabilities to reflect a reserve for disallowed Medicare claims. [17] Adding current liabilities to the adjusted MVIC, the Tax Court arrived at a fair market value of $18,675,000 for the tangible and intangible assets that the new nonexempt Sta-Home entities received from the old exempt Sta-Home entities. The court subtracted the liabilities the old exempt Sta-Home companies transferred to the newly created nonexempt entities-$13,511,000-from the fair market value of the assets, leaving an excess of $5,164,000. Because Sta-Home's transferred assets "far exceeded" the consideration paid by the Sta-Home nonexempt corporations-the assumed debts and liabilities-the Tax Court found a violation of I.R.C. § 4958 and ordered the taxpayers to pay $69,702,390 in excise taxes. This appeal followed.

## II. Discussion

### A. The Legal Standards

Section 4958 of the Internal Revenue Code prohibits certain acts of self-dealing between private foundations and company **\*456** insiders. The statute imposes a 25 percent tax on "excess benefit transactions," defined as follows:

> "[E]xcess benefit transaction" means any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit.

I.R.C. § 4958(c)(1)(A). "Disqualified persons" include any person in a position to exert "substantial influence" over the organization's affairs before the transaction, or any member of such person's family. Id. at § 4958(f)(1)(A)-(B). [18] If taxes imposed under the statute are not corrected within the taxable period, an additional tax equal to 200 percent of the excess benefit is assessed. Id. at § 4958(b).

**[1]** **[2]** Whether the transfer of Sta-Home's assets qualifies as an "economic benefit" depends on the fair market value of the companies' assets and liabilities. Fair market value is the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all relevant facts and neither being under any compulsion to buy or sell. United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); Dunn v. Comm'r, 301 F.3d 339 (5th Cir.2002). The willing buyer and seller are hypothetical persons rather than specific individuals or entities, and their characteristics are not necessarily shared by the actual seller or particular buyer. Estate of Bright v. United States, 658 F.2d 999, 1005-06 (5th Cir.1981). At the same time, the valuation method must take into account, and correspond to, the attributes of the entity whose assets are being valued. Dunn, 301 F.3d at 356-57.

**[3]** **[4]** **[5]** The Tax Court's factual determinations are reviewed for clear error and its conclusions of law are reviewed de novo. Dunn, 301 F.3d at 348. The determination of fair market value is a mixed question of fact and law; "the factual premises [are] subject to review on a clearly erroneous standard, and the legal conclusion[s are] subject to de novo review." Id. (quoting In re T-H New Orleans, Ltd. P'ship, 116 F.3d 790, 799 (5th Cir.1997)). Although the mathematical computation of fair market value is an issue of fact, the determination of the appropriate valuation method is an issue of law. Dunn, 301 F.3d at 348 (citing Powers v. Comm'r, 312 U.S. 259, 260, 61 S.Ct. 509, 85 L.Ed. 817 (1941)).

### B. Analysis

The conclusion is inescapable from the description of the background of this case. There are so many legal and factual errors-many of which the Commissioner acknowledges-infecting this case from the outset that reversal must result.

**[6]** The Commissioner began the cascade of errors by issuing deficiency notices based on a brief, intermediate internal analysis. That analysis stated on its face that it was intermediate and that a final economic study had to be performed. Ignoring this disclaimer, the Commissioner issued valuation-based deficiency notices asserting § 4958 excise tax penalties against the Sta-Home entities and the Caracci family totaling $250,729,866 (plus interest) and income tax deficiencies and penalties totaling $8,330,064 (plus interest), and retroactively revoking the exempt status **\*457** of the Sta-Home exempt agencies. Internal IRS documents reveal that the IRS issued the notices on the

98 A.F.T.R.2d 2006-5264, 2006-2 USTC P 50,395, Med & Med GD (CCH) P 301,862

basis of an intermediate rather than final economic study to prevent the Caraccis from correcting what the IRS viewed as prohibited transactions, which would have reduced the § 4958 "intermediate sanction" penalties. The second reason the IRS issued these premature notices was its concern over the statute of limitations. The IRS blamed the taxpayers for that problem. One of the IRS employees working on this case stated in an affidavit that the agency asked the taxpayers to consent to extend the limitations period and "informed [the taxpayers] that if the statute was not extended, statutory notices would be issued based on the best available information that [the IRS] had at that point," despite the fact that the IRS economist needed more time to analyze the case. Even more disturbing, the record reveals that despite recognizing the tentative and incomplete nature of the analysis used as the basis for the deficiency notices, the Commissioner defended the correctness of those notices for several years into this litigation and only conceded that the notices overstated the Commissioner's tax claim when the trial began in the Tax Court. In issuing the deficiency notices, the Commissioner did not adjust the analysis by the amount of liabilities the taxpayers assumed. As a result, the 1999 deficiency notices greatly overstated the excise tax liability. Despite this error, the Commissioner insisted throughout a two-year audit and nearly two years of litigation that the deficiency notices were correct. It was not until March 5, 2001, in the opening statement before the Tax Court and in the cross-examination of the Commissioner's sole expert witness, that the Commissioner acknowledged that the 1999 deficiency notices were excessive and erroneous. This court has recognized that when, as here, the Commissioner persists in taking a position in litigation that is

> so incongruous as to call his motivation into question, ... [i]t can only be seen as one aimed at achieving maximum revenue at any cost, ... seeking to gain leverage against the taxpayer in the hope of garnering a split-the-difference settlement-or, failing that, then a compromise judgment-somewhere between the value returned by the taxpayer ... and the unsupportedly excessive value eventually proposed by the Commissioner.

*Dunn*, 301 F.3d at 349. In *Dunn*, the result that the Commissioner obtained in the Tax Court was rejected. As in *Dunn*, the result in this case cannot stand.

**[7]** **[8]** The legal effect of the Commissioner's concession of error in the Tax Court is clear. "In a Tax Court deficiency proceeding, once the taxpayer has established that the assessment is arbitrary and erroneous, the burden shifts to the government to prove the correct amount of any taxes owed." *Portillo v. Comm'r,* 932 F.2d 1128, 1133 (5th Cir.1991). The Tax Court, however, did not place the burden of proof on the Commissioner. Instead, the Tax Court stated that while the parties disputed who bore the burden of proving "the central issue in this case; namely, the value of the transferred assets, ... [w]e do not decide this dispute." [19] Instead, the Tax Court rejected most of the only support the Commissioner provided for the net excess benefit finding, the testimony of the Commissioner's valuation expert. At that point, the Commissioner failed to meet his burden of proof. At that point, the Tax Court should have found in the **\*458** taxpayers' favor. Its failure to do so was error, as a matter of law.

**[9]** In rejecting most, but not all, of the Commissioner's valuation expert's opinions, the Tax Court made a number of errors in the valuation method it selected and in the facts it found in selecting and applying that method. The Tax Court's use of Wilhoite's modified MVIC-Revenue method for valuing Sta-Home's assets, particularly its intangible assets, is wrong as a matter of law. Wilhoite had no experience in appraising healthcare companies and knew very little about the Sta-Home entities or their assets and liabilities. Wilhoite did not value Sta-Home's specific assets, but instead used a variation on an invested-capital valuation method to do a general and indirect valuation of Sta-Home's assets. The Tax Court adopted a modified version of Wilhoite's valuation approach, which is designed to value invested capital-not assets-to value the assets of a company that had no capital. The Tax Court did so with no legal support for the use of such a method to value the assets of these agencies, over the recognition of both Wilhoite and Hahn that this method was inferior to, and less rigorous than, an asset-valuation method. The Tax Court then compounded this error by deriving the invested-capital multiple it applied to the Sta-Home entities using the seven public companies Wilhoite selected as "comparables." Put simply, they were not.

The Tax Court considered the Commissioner's expert testimony against a record of stipulated or undisputed facts. Those facts included that between 95 and 97 percent of Sta-Home's revenues came from Medicare, compared to a national average of 38 percent, and that Medicare only

reimbursed up to actual costs and disallowed .7 percent of Sta-Home's annual costs, thereby ensuring that the Sta-Home entities would continue to build liabilities, not assets, and could not profit. The more patient care the Sta-Home entities provided, the more revenues they generated, and the more their losses grew. The parties did not dispute that the liabilities of the Sta-Home exempt entities exceeded assets for every year from 1987 through 1995. The parties did not dispute that the Sta-Home exempt agencies had $13.5 million in debts and liabilities that the newly created nonexempt entities assumed. The parties did not dispute that the Sta-Home exempt entities had sustained progressively larger net operating losses and capital deficits for the previous five years. The parties did not dispute that there was no likely potential buyer for Sta-Home. Despite these undisputed facts, the Tax Court's valuation method used an invested-capital valuation method that compared the Sta-Home entities with solvent, publicly traded companies with significant equity and a present ability to generate profits. This aspect of Wilhoite's analysis, accepted by the Tax Court, excluded distressed companies from the "comparables." Six of the seven "comparable" companies were generating profits at the time of Wilhoite's comparison and the seventh had substantial equity. Sta-Home had neither equity nor a record of profits. The Commissioner's expert erred when he stated to the Tax Court that two of the "comparable" public companies had operating losses; in fact, one of those companies was Sta-Home. The Commissioner's expert also erred in telling the Tax Court that one of the public "comparables" had negative stockholder's equity; the only negative equity entry was Sta-Home. On cross-examination, the Commissioner's expert conceded that some of the "comparables" provided infusion services, which are fee-based and thus capable of turning a profit, and that some "comparables" provided respiratory services, which are also fee based. The Commissioner's **\*459** expert further conceded that other "comparables" that provided residential medical services, pediatric care, adult day care, and companion care services either were fee-based or may have been; he did not know. The Commissioner's expert also admitted that many of the "comparables" were far less Medicare-dependent than Sta-Home.

[10] A "comparable" must be substantially similar to the entity or asset that is at issue. *Van Zelst v. Comm'r,* 100 F.3d 1259, 1263 (7th Cir.1996); *Estate of Palmer v. Comm'r,* 839 F.2d 420, 423 (8th Cir.1988). As noted, none of the publicly traded entities Wilhoite chose were similar to Sta-Home. They were publicly traded. *See Dunn,* 301 F.3d at 350 (recognizing that public companies generally cannot be compared with private companies). They had capital. They were profitable. They were not limited to offering basic, and unprofitable, therapies. Most important, they did not depend on Medicare for over 95 percent of their revenues, were not limited to recovery of actual costs, and did not have a portion of their actual costs disallowed every year. For these publicly traded "comparables," added revenue would logically create added value. For Sta-Home, the overwhelming dependence on Medicare reimbursements meant that added revenue meant added unreimbursed costs, which in turn generated greater losses. The Tax Court recognized some of these differences, but assumed-without explanation-that the publicly traded entities could still be used as "comparables" as long as the amount of the multiple derived was adjusted. The Tax Court did not explain how it arrived at the amount of the adjustment or how that amount transformed fundamentally different financial entities into "comparables."

[11] Using an adjusted version of the Wilhoite MVIC-Revenue invested capital method, the Tax Court concluded that the value of the assets the nonexempt Sta-Home entities received exceeded the value of the $13.5 million in liabilities and debts they assumed by $5.1 million. As the taxpayers point out, the Tax Court concluded that a willing buyer would assume $13.5 million in liabilities and pay $5.1 million to acquire the right to lose money on an ongoing basis. The Tax Court explained why it believed this apparently illogical conclusion made sense: it found that Sta-Home had the potential to make a profit, which demonstrated that its assets had substantial fair market value. This finding was clearly erroneous.

The Tax Court based its finding that the Sta-Home entities had the potential to make a profit on the finding that if Sta-Home had not paid a year-end bonus to its staff in 1995, it would have reported nontaxable income of approximately $1.78 million, "more than enough to eliminate the accumulated deficit in net asset value." [20] The Commissioner concedes that this statement is simply error. The statement ignores the fact that under the Medicare system that accounted for between 95 and 97 percent of Sta-Home's revenues, there is no reimbursement unless there is an actual expense incurred. If Sta-Home had not paid the bonuses, the Medicare reimbursements it received would have been reduced by an equal amount, leaving the same level of company losses. The Tax Court did not take into account this effect of the Medicare reimbursement system on the Sta-Home entities, despite acknowledging it earlier in the opinion. The Tax Court also overlooked the reason for

the bonuses and what they revealed about the Sta-Home entities' finances. These **\*460** "bonuses" were unpaid, deferred employee pay, rather than discretionary bonuses. The deferred wages for existing employees, along with deferred first-month wages for newly hired employees, were mechanisms the taxpayers used to continue to operate despite their perennial cash-flow problems, their lack of profitability, their increasing operating losses, and their increasing deficits. The Commissioner acknowledged before the Tax Court that the salaries and bonuses were neither excessive nor unreasonable. Moreover, the Caracci family members withheld their own compensation in the same manner as compensation for the other employees. In short, these "bonuses" evidenced the unprofitable nature of the Sta-Home entities, not the potential for profitability, as the Tax Court erroneously stated.

The Tax Court also criticized Sta-Home-in the same section of the opinion that discussed its profit potential-for taking a large motor-vehicle depreciation deduction. The Tax Court ignored the fact that a home-healthcare agency providing services to a predominately rural population dispersed over a geographically large area necessarily has a heavily used fleet of vehicles. The Tax Court's suggestion that the taxpayers were improperly exploiting the depreciation ignored the fact that it represented a very real cost that could not be annually expensed because of the Tax Code's specifications for the depreciable life of such personal property. *See generally* I.R.C. § 168. Indeed, stipulated facts in the record make it clear that far from exploiting the tax consequences of their corporate form, the Caracci family had been unable to take advantage of the income tax exemption the agencies "enjoyed" before 1995, because the agencies had consistently incurred net operating losses.

The Tax Court stated that the Sta-Home agencies had not profited from their business because of the entities' previous "tax-exempt" status. [21] This statement further reflects a misunderstanding of Sta-Home's business and the regulatory regime under which it operated. The Sta-Home exempt agencies did not profit because they were virtually entirely dependent on Medicare reimbursements and the Medicare reimbursement system prohibits profit-taking, regardless of an agency's tax status. As the Tax Court recognized elsewhere in its opinion, the Sta-Home entities continued to operate in the same manner-at a loss-after converting to nonexempt status.

The Commissioner concedes that the Tax Court's statement that the Sta-Home entities could have reported nontaxable income of $1.78 million had it not declared a bonus in 1995 was wrong. Yet the Commissioner insists on this appeal that the error was harmless. The Tax Court opinion itself defeats this argument. The Tax Court reasoned from the mistaken assumption that the Sta-Home agencies could have generated positive net income by eliminating the 1995 employee "bonus" to the mistaken finding that the agencies had demonstrated a "substantial fair market value." [22] This mistaken statement was immediately followed by the Tax Court's decision to use an invested-capital method to value Sta-Home's assets and to use profitable public companies as "comparables" to derive the MVIC multiple as part of that method. If the Tax Court had not found that the Sta-Home entities had the potential to generate a positive net income and "thus demonstrate substantial fair market value," the Tax Court's decisions to **\*461** use an invested-capital method for valuing assets and to use profitable public companies as comparables for unprofitable privately held agencies, would be not only erroneous but illogical. The Tax Court's $1.78 million error was anything but harmless.

The Tax Court's erroneous finding that the Sta-Home entities had shown a potential for profitability and thus demonstrated that their assets had "substantial fair market value" is also the only apparent explanation for the decision to discredit the opinions provided by the taxpayers' expert witness, Hahn. As noted, in marked contrast to Wilhoite, Hahn had spent months in Mississippi analyzing the Sta-Home agencies and was a recognized authority on the home-healthcare industry. In marked contrast to Wilhoite, Hahn did the work to value the actual assets of the Sta-Home entities. Hahn used the valuation method that both he and Wilhoite agreed was the preferred and more rigorous approach to value assets. Neither the Tax Court nor the Commissioner disputed Hahn's tangible asset valuations, which attributed values between $8.4 and $8.7 million. The Tax Court rejected Hahn's intangible asset valuations, which attributed approximately $2.7 million to the workforce, including the certificates and licenses, because Hahn's conclusion that the value of the assets the nonexempt entities received from the exempt entities was less than the $13.5 million in liabilities they assumed was inconsistent with the Tax Court's (erroneous) finding that the Sta-Home entities had "demonstrated substantial fair market value."

**[12]** **[13]** The Tax Court's mistaken belief that Sta-Home's intangible assets had substantial fair market value led it to ignore its own long-recognized position that unprofitable

intangible assets do not contribute to fair market value unless those assets produce net income or earnings. Revenue Rule 59-60 requires the IRS to assign zero value to unprofitable intangible assets. *See* Rev. Rul. 59-60, 1959-1 C.B. 237 ("The presence of goodwill and its value, therefore, rests upon the excess of net earnings over and above a fair return on the net tangible assets."). The Tax Court (and reviewing courts) have recognized this. *See Fox River Paper Corp. v. United States,* 65 F.Supp. 605, 607 (E.D.Wis.1946), aff'd 165 F.2d 639 (7th Cir.1948); *Rosen v. Comm'r,* 62 T.C. 11, 1974 WL 2732 (1974), aff'd 515 F.2d 507 (3d Cir.1975). The Tax Court clearly erred and violated its own prior rulings in failing to recognize that the Sta-Home exempt agencies' unprofitable intangible assets-including the workforce, the licenses, the CONs, the Medicare-dependent client base, and the aging and largely uncollectible accounts receivable-had little or negative market value.

Hahn established the value of the Sta-Home exempt agencies' tangible assets at a range between $8,421,977 and $8,787,492. Neither the Commissioner nor the Tax Court challenged this figure. The parties agreed that the for-profit entities assumed roughly $13.5 million in liabilities. The Tax Court concluded that the Sta-Home exempt agencies' total asset value was $18,675,000, meaning that the agencies' intangible asset value had to be approximately $10,000,000. The parties agree that the Tax Court clearly erred in including the $1.78 million in "bonus" money as an intangible asset. Setting this error aside, there is no basis to assign over $8 million to the Sta-Home exempt agencies' remaining intangible assets, the largest of which-its patients-would only enable the agencies to *lose* money for the indefinite future. The CON was similarly of little or no value as an intangible asset because it provided Sta-Home access to the same **\*462** Medicare-dependent group of patients; neither Sta-Home (or another buyer) could raise prices on the services provided to these patients to generate revenue because Medicare precluded profit. Even if the Tax Court assigned a significant value to the Sta-Home exempt agencies' other intangible assets, such as its trained workforce (which would need to be paid, representing further liabilities as well as future profits), and goodwill, the Tax Court would have had to find these remaining intangible assets were worth approximately $5 million to conclude that the taxpayers realized any net excess benefit from the transaction, assuming that the Sta-Home nonexempt agencies assumed $13.5 million in liabilities from the exempt entities and that the exempt entities assumed approximately $8.5 million in tangible assets from the exempt

agencies. There is no legal or factual basis for assigning a $5 million value to these intangible assets.

This case began and ends with the Commissioner's refusal to recognize the legal effect of its own errors. The Commissioner issued erroneous and excessive deficiency notices, yet persisted in defending them for nearly two years of litigation before the Tax Court. After the Commissioner admitted his erroneous deficiency notices, he failed to meet his burden of proving that the excise taxes he sought to collect were correct. The Commissioner presented an expert who used an inappropriate valuation method and lacked basic factual information essential to the asset valuation he was called on to provide. The Tax Court erred as a matter of law when it failed to find for the taxpayers after it rejected much of the Commissioner's expert's opinion and instead proceeded to use bits and pieces from that opinion to value the Sta-Home assets transferred to the newly created nonexempt entities. The Tax Court erred as a matter of law in the valuation method it selected. In the process of arriving at and applying that method, and in struggling to make that method make sense, the Tax Court made a number of clearly erroneous factual findings. These errors led the Tax Court to reject the taxpayers' expert, whose adjusted balance sheet valuation method provided the only rational and justifiable valuation available in the record, and to find that a willing buyer would have paid $18.6 million for the Sta-Home exempt agencies despite their unprofitability. These errors require this court to reverse and render.

### III. Conclusion

The Commissioner failed to perform a legitimate asset valuation analysis throughout the audit, discovery, and litigation of this case. The Tax Court erred as a matter of law in failing to hold the Commissioner to his burden of proof and in selecting an inappropriate and incorrect method to value the assets of the Sta-Home entities and made clearly erroneous factual findings in applying this valuation method. The Tax Court's errors do not require remand because the record makes it clear that the Commissioner cannot meet his burden of proof under 26 U.S.C. § 6213, *Portillo,* and *Dunn.* The Tax Court's decision is reversed and judgment is rendered in favor of the taxpayers.

REVERSED AND RENDERED.

## Parallel Citations

98 A.F.T.R.2d 2006-5264, 2006-2 USTC P 50,395, Med &
Med GD (CCH) P 301,862

## Footnotes

*     District Judge for the Southern District of Texas, sitting by designation.

1     The Tax Court entered separate orders as to each taxpayer; these cases were consolidated in the Tax Court and remain so in this court.

2     The net income for each respective year from 1991 to 1995 was:
  -$63,660; $27,757; -$45,554; -$258,729; and -$433,390. The total deficit Sta-Home ran for the same period was: $583,526; $555,771; $729,145; $901,535; and $1,408,248.

3     Congress ultimately passed the system in 1997. Medicare fully implemented the PPS system in 2001.

4     Assets in accounting are items of worth to a company, categorized as tangible (for example, property) and intangible (for example, community goodwill). A company's assets are equal to its liabilities and ownership equity combined. Margaret A. Gibson, *The Intractable Debt/Equity Problem: A New Structure for Analyzing Shareholder Advances,* 81 NW. U.L. REV. 452, 482 n.216 (1987). Liabilities (debt) and equity are the principal methods of financing a company. *Id.* at 456-57. Under debt financing, a corporation borrows funds; while under equity financing, a corporation raises funds by issuing stock. *Id.*

5     The Commissioner faults Sta-Home for failing to provide access to more information about the corporations, but this argument ignores the discovery tools that the Commissioner had available and ignores the fact that it is the Commissioner's burden to show that the tax it imposed was correct, not the taxpayers' burden to show that the Commissioner was wrong.

6     A company's balance sheet documents the historical cost of its assets, liabilities, and ownership equity. Shannon P. Pratt *et al., Valuing Small Businesses and Professional Practices* 366 (3d ed.1998).

7     When an individual has less than 50 percent ownership interest in a company, it is deemed a "minority" ownership interest and discounted to reflect the holder's lack of control of the business. Pratt, *Valuing Small Businesses* at 426-30.

8     "Marketability" is the ability to convert property to cash quickly. When companies are not traded on the public market, they are less marketable and therefore valued less. Pratt, *Valuing Small Businesses* at 446-48.

9     As discussed below, this assumption violated the Commissioner's own valuation rules.

10     Public companies tend to have greater equity than do private companies, which are often owned by small groups. *See Hollis v. Hill,* 232 F.3d 460, 467 (5th Cir.2000) (outlining the differences in equity ownership between public and private companies).

11     This attribute of Medicare business enables a buyer to shift some of its overhead costs to Medicare's cost reimbursement system. If a home-healthcare agency sought less than the maximum reimbursement allowed by Medicare, a buyer could shift its overhead costs to the agency and Medicare would reimburse it to the extent there was room under the cost cap.

12     The "cost-cap gap" is the difference between the reimbursement amount sought by a home-healthcare provider and the maximum amount of reimbursement permitted by Medicare.

13     *Caracci v. Comm'r,* 118 T.C. 379, 406 (2002).

14     *Id.* at 405-06.

15     *Id.* at 405.

16     *Id.*

17     The court reasoned that these four weeks of deferred payment were in fact long-term loans to the company for the duration of the employees' employment. The court classified the deferred salary as part of Sta-Home's invested capital (specifically as long-term liabilities). *Id.* at 407.

18     The parties do not dispute that the Sta-Home for-profit entities and the Caracci family are "disqualified persons."

19     *Caracci,* 118 T.C. at 382 n. 4.

20     *Caracci,* 118 T.C. at 405.

21     *Caracci,* 118 T.C. at 385-86.

22     *Id.* at 405.

---

**End of Document**           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

77 F.3d 1381
United States Court of Appeals,
Federal Circuit.

CYRIX CORPORATION, Plaintiff–Appellee,
and

SGS–Thomson Microelectronics,
Inc., Plaintiff–Appellee,
and

International Business Machines
Corporation, Plaintiff–Appellee,

v.

INTEL CORPORATION, Defendant–Appellant.

No. 95–1246.    |    March 5, 1996.
|   Rehearing Denied April 26, 1996.

Company which designed and sold microprocessors brought action against patentee seeking declaratory judgment that company did not infringe patents for computer technology, which patentee licensed to licensees who, in turn, made products for company. Licensees intervened. The United States District Court for the Eastern District of Texas, Paul N. Brown, J., granted judgment for company and licensees, 879 F.Supp. 672, and patentee appealed. The Court of Appeals, Lourie, Circuit Judge, held that: (1) first licensee's making of products for company was within scope of license agreement with patentee, and (2) second licensee acted within scope of its "have made" rights under licensing agreement by having foreign affiliate make products which licensee then sold to company.

Affirmed.

*1382 Appealed from United States District Court Eastern District of Texas, Brown, Judge.

**Attorneys and Law Firms**

Albert E. Fey, Fish & Neave, New York City, argued, for plaintiff-appellee Cyrix Corporation. With him on the brief were Laurence S. Rogers, Kelsey I. Nix and Elaine A. Drager.

Stephen E. Stein, SGS–Thomson Microelectronics, Inc., Carrollton, Texas, argued, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Frank Finn, Bruce S. Sostek, Jane Politz Brandt and Beverly Ray Burlingame, Thompson & Knight, Dallas, Texas, were on the brief, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Richard W. Clary, Cravath, Swaine & Moore, New York City, argued for plaintiff-appellee Intern. Business Machines Corp. With him on the brief were Evan R. Chesler and Robert H. Baron.

James J. Elacqua, Arnold, White & Durkee, Houston, Texas, argued, for defendant-appellant. With him on the brief were Thomas A. Miller, Richard L. Stanley and Amber L. Hatfield (Peter N. Detkin, Intel Corporation, Santa Clara, California, of counsel).

Before MICHEL, Circuit Judge, NIES, Senior Circuit Judge, and LOURIE, Circuit Judge.

**Opinion**

LOURIE, Circuit Judge.

Intel Corporation appeals from the decision of the United States District Court for the Eastern District of Texas entering judgment in favor of Cyrix Corporation, SGS–Thomson Microelectronics, Inc. (ST), and International Business Machines Corporation (IBM), and holding that IBM and ST acted *1383 within the scope of their respective patent license agreements with Intel when IBM made, and ST had made, products for Cyrix. Cyrix Corp. v. Intel Corp., 879 F.Supp. 672 (E.D.Tex.1995). Because the district court correctly interpreted the IBM–Intel and ST–Intel agreements and hence did not err in rendering a declaratory judgment of noninfringement in favor of Cyrix, ST, and IBM, we affirm.

## BACKGROUND

Cyrix designed and sold microprocessors. Since it did not have its own facility for manufacturing the microprocessors it designed, it contracted with other companies to act as its foundries. Under such an arrangement, Cyrix provided the foundries with its microprocessor designs, and the foundries manufactured integrated circuit chips containing those microprocessors and sold them to Cyrix. Cyrix then sold the microprocessors in the marketplace under its own brand name.

It was Cyrix's practice to use manufacturing facilities of companies that were licensed under Intel's patents. IBM was such a company; it had obtained a license to Intel's patents in a patent license agreement dated October 1, 1989. [*] The granting clause of the IBM–Intel agreement provided as follows:

2.2 Subject to the provisions of Sections 2.7 and 3.3, INTEL, on behalf of itself and its Subsidiaries, hereby grants to IBM a worldwide, royalty-free, nonexclusive license under the INTEL Licensed Patents:

2.2.1 to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method or process involved in the manufacture or use thereof;

2.2.2 to have made and/or have designed Semiconductor Apparatus;

2.2.3 to have made IBM Licensed Products (other than Semiconductor Apparatus) by another manufacturer for the use, lease, sale or other transfer by IBM....

The agreement defined "IBM Licensed Products" as follows:

1.23 "IBM Licensed Products" shall mean IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times.

Cyrix also used ST as a foundry. Initially, ST manufactured the chips, but when ST was unable to meet Cyrix's demand, ST requested its affiliate in Italy, SGS–Thomson Microelectronics S.r.l. (ST–Italy), to manufacture the needed chips, which ST then sold to Cyrix.

ST was operating under a license agreement between Mostek and Intel, which ST acquired by assignment. The agreement contains the following granting clause:

INTEL grants and agrees to grant to MOSTEK non-exclusive, non-transferrable, world-wide licenses under INTEL PATENTS and INTEL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS.

The agreement defined "LICENSED PRODUCTS" as follows:

"LICENSED PRODUCTS" shall mean any product manufactured, used or sold by either party covered by patents of the other party.

It is undisputed that ST–Italy is legally not a "subsidiary" of ST and is thus not licensed under the ST–Intel agreement. ST therefore relied upon its "have made" rights to obtain products from ST–Italy, which it then sold to Cyrix to fulfill its contractual obligation.

Cyrix filed a declaratory judgment action against Intel, alleging a "reasonable apprehension" that it would be sued for patent infringement. Cyrix sought a declaration that it did not infringe the Intel patents, **\*1384** claiming immunity on the ground that IBM and ST were both licensed under the patents. Cyrix's view was that because IBM and ST acted within the scope of their respective licenses from Intel, its sales of microprocessors were shielded from any holding of infringement, the microprocessors having been obtained from authorized licensees. See *Unidisco, Inc. v. Schattner,* 824 F.2d 965, 968, 3 USPQ2d 1439, 1441 (Fed.Cir.1987) ("Resale of the product by Unidisco could not infringe the patent if Unidisco purchased the product from an authorized seller."), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988).

IBM and ST intervened, seeking an adjudication of their rights under their respective agreements with Intel. On motions for summary judgment by Intel, IBM, and ST, the district court granted summary judgment for IBM and ST, and denied summary judgment for Intel. The district court also entered judgment for Cyrix.

The district court held that IBM had a right to act as a foundry in supplying microprocessors to Cyrix. It found that the definition of "IBM Licensed Products" in the IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM. The district court

distinguished *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 828, 20 USPQ2d 1161, 1167–68 (Fed.Cir.1991) ("*Atmel* ") (construing the term "Sanyo ... products" in a license agreement as limiting the grant of rights to Sanyo-designed and Sanyo-manufactured products). The district court concluded that, unlike the situation in *Atmel,* an internal conflict in the IBM–Intel agreement was not created by construing the license grant to cover products other than IBM–designed products. The court considered the facts to be more analogous to those in *ULSI, see infra,* rather than to those in *Atmel. See Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 27 USPQ2d 1136 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

The district court also held that ST had the right to have microprocessors made for it by any third party, including ST–Italy, and the right to sell those microprocessors to Cyrix. The district court found that the microprocessors were made for ST, not Cyrix, and that the supply agreement between ST and ST–Italy was not a sublicense that exceeded ST's rights under the ST–Intel agreement. The district court thus distinguished the case that Intel cited in support of its position, *E.I. du Pont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108, 1114–15, 227 USPQ 233, 237 (Del.1985) (holding that a third-party's manufacturing of a product for itself under a licensee's "have made" rights was a prohibited sublicense). This appeal followed.

## DISCUSSION

 **[1]** **[2]** Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir.1989). We review *de novo* a district court's grant of summary judgment. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Interpretation of a contract is a question of law that we also review *de novo. ULSI,* 995 F.2d at 1569, 27 USPQ2d at 1138; *see also Hoskins Lumber Co. v. United States,* 20 F.3d 1144, 1147 (Fed.Cir.1994).

It is accepted by all the parties that there are no issues of fact before us. The question is solely whether IBM's and ST's agreements with Intel entitled them to make or have made the microprocessor products in question and sell them

to Cyrix. Intel states that the ST appeal raises an issue of first impression.

### A. *IBM–Intel Agreement*

Intel argues that the IBM–Intel agreement does not support a grant of foundry rights. Intel relies upon the word "IBM" as modifying the term "licensed products" in arguing that this modifier is a so-called "Sanyo limitation," limiting the scope of the products licensed and indicating that the parties did not intend to provide foundry rights. *See Atmel,* 946 F.2d at 828, 20 USPQ2d at 1167–68 (discussing the limitation "Sanyo ... **\*1385** products" in a patent license agreement). Intel also asserts that the "have designed" provision in the license does not provide IBM with the right to act as a foundry in manufacturing products designed by Cyrix.

Cyrix and IBM argue that the plain language of the IBM–Intel agreement grants to IBM the right to make and sell to Cyrix microprocessors that Cyrix designed. They argue that the "IBM" modifier in section 2.2.1 of the agreement was intended to distinguish "IBM Licensed Products" from "Intel Licensed Products," and that "IBM Licensed Products" as defined in the agreement are not limited to those products specifically designed by IBM and made for itself. They argue that the term "IBM" used in the term "IBM Licensed Products" is not a "Sanyo limitation." *See id.* at 826 n. 9, 828, 20 USPQ2d at 1166 n. 9, 1167–68.

 **[3]** We agree with the district court that IBM acted within the scope of the IBM–Intel agreement when it made and sold to Cyrix products designed by Cyrix. The agreement granted IBM the right to make and sell "IBM Licensed Products," which are defined elsewhere in the agreement and are not limited to products designed by IBM. Sections 2.2.1, which grants a license to sell "IBM Licensed Products," and 1.23, which defines "IBM Licensed Products," must be read together. When this is done, the granting provision essentially reads as follows:

> 2.2.1 to make, use, lease, sell and otherwise transfer *IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus* and to practice any method or process involved in the manufacture or use thereof;

The products so defined are not limited to IBM-designed products. They include categories of products defined without the IBM prefix. The agreement defined these items as follows:

1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

1.2 "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; *provided, however,* that a Manufacturing Apparatus shall not be considered to be an IHS Product.

1.3 "IHS Program" shall mean a plurality of instructions capable of being executed by an IHS Product or Complex, whether or not such instructions are in a machine-readable form.

1.4 "Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and adapted to be effectively consumed in the course of operation of an IHS Product licensed herein to that party.

...

1.22 "Semiconductor Apparatus" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Memory and/or Integrated Circuit.

Accordingly, we conclude that the district court correctly held that "IBM Licensed Products" are not limited to products designed by IBM.

We also do not agree with Intel that the "IBM" modifier is analogous to the "Sanyo limitation" in *Atmel.* The agreement in *Atmel* contained the following provision:

Intel hereby grants and will grant to Sanyo an [sic] non-exclusive, world-wide royalty-free license without the right to sublicense except to its Subsidiaries, under Intel Patents which read on any *Sanyo* Semiconductor Material, Semiconductor Device, Magnetic Bubble Memory Device, Integrated Circuit and Electronic Circuit products, for the lives of such patents, to make, use and sell *such products.*

*Atmel,* 946 F.2d at 826 n. 9, 20 USPQ2d at 1166 n. 9 (emphasis in original). We construed the term "Sanyo" to limit the products listed after that term. Such a construction was required because it gave meaning to the **\*1386** term "Sanyo" which was consistent with other provisions of the contract. *Id.* at 827–28, 20 USPQ2d at 1167–68. Otherwise, the term "Sanyo" would have lacked meaning, and a contract must be construed if possible to give meaning to all its provisions. In contrast, the term "IBM Licensed Products" is thoroughly defined in the IBM–Intel agreement to provide no Sanyo-type limitation. *See ULSI,* 995 F.2d at 1570, 27 USPQ2d at 1140 (distinguishing the "Sanyo ... products" limitation in *Atmel* because the agreement in *ULSI* contained no similar qualification to the product definition). Moreover, as argued by IBM, the "IBM" modifier is readily explained by its being distinguished from "Intel Licensed Products."

This case is more analogous to *ULSI* than *Atmel.* In *ULSI,* Hewlett–Packard Company (HP) acted as a foundry to make and sell math coprocessor chips to ULSI. HP obtained a license to Intel's patents under an agreement in which "each granted to the other an 'irrevocable, retroactive, nonexclusive, world-wide, royalty-free license[.]' " *Id.* at 1567, 27 USPQ2d at 1137. ULSI sought to be shielded from infringement of Intel's patents by purchasing the math coprocessor chips from HP, which was acting as an authorized seller. In concluding that HP's agreement with Intel provided HP with the right to act as a foundry for ULSI, we stated that, in contrast to the "Sanyo limitation" discussed in *Atmel,* "the licensing agreement between Intel and HP here contains no restriction on HP's right to sell or serve as a foundry." *Id.* at 1570, 27 USPQ2d at 1140. There was no "Sanyo limitation" in *ULSI.* The products that were licensed were defined broadly. Notwithstanding the presence of the modifier "IBM," the same is true here.

[4] Intel also argues that the "have designed" provision of section 2.2.2 limits the products IBM is entitled to make to those designed for IBM, presumably meaning for IBM's sole use. We find no such limitation in the agreement. Section 2.2.2 by its plain terms granted IBM the right "to have made and/or have designed Semiconductor Apparatus[,]" defined in the agreement as "any Semiconductor Material,

Semiconductor Device, Semiconductor Memory and/or Integrated Circuit." The microprocessors in question surely meet the definition of "Semiconductor Apparatus." This provision contains no limitation to the designs of any particular entity. Therefore, the right to have designed, make, and sell Semiconductor Apparatus clearly entitled IBM to act as a foundry for Cyrix by making a product designed by Cyrix.

 [5]   Intel also argues that section 2.2.3, providing a right to "have made" products only when the designs are furnished by IBM, limits IBM's right to have products designed by Cyrix. IBM did not have the products made for it, and thus this provision does not limit its rights to make and have designed the products it sold to Cyrix. Moreover, 2.2.3 relates to products "other than Semiconductor Apparatus." We do not accept Intel's argument that section 2.2.3's limitations with respect to other products somehow cut back on unambiguous rights granted in sections 2.2.1 and 2.2.2 regarding the products in question. In summary, IBM properly made and sold microprocessors under section 2.2.1; IBM properly had microprocessors designed under section 2.2.2; and IBM did not "have made" microprocessors under the more limited section 2.2.3. Thus, IBM did not act outside the terms of the Intel agreement. The district court accordingly did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and IBM.

 [6]   Intel also makes a policy argument premised on a preamble clause in its agreement with IBM in which the parties stated that "each expects to continue a research and development effort which will produce further patents and each may require a nonexclusive license under such patents of the other." Intel argues that interpreting the agreement in favor of IBM would discourage the research the agreement was intended to foster. That argument totally misses the mark. The meaning of that clause is simply that the parties were entering into the agreement to facilitate their future research, *i.e.,* to provide themselves with patent freedom for the future. Even if Intel never intended IBM to act as a foundry, this vague preamble cannot be interpreted to give effect to that intention if doing so would override clear  **\*1387**  operative language in the agreement. This agreement clearly gave IBM the right to make and sell to Cyrix microprocessors designed by Cyrix.

## B. *ST–Intel Agreement*

 [7]   Intel argues that the arrangement between ST and ST–Italy is in effect a sublicense, which it is clear is not

permissible under the ST–Intel agreement. In particular, it argues that under ST's "have made" rights, ST is only permitted to have products made for itself. Intel posits that the arrangement among ST, ST–Italy, and Cyrix was a mere paper transaction, *i.e.,* a "sham." *See E.I. du Pont,* 498 A.2d at 1116, 227 USPQ at 238 (holding that a third party made a product for itself, not for a licensee, when it made a product and sold it to the licensee, who simultaneously sold it back to the third party).

ST and Cyrix argue that ST was acting within the scope of its "have made" rights. ST denies that its arrangement with ST–Italy was a "sham" and claims that it was using ST–Italy to manufacture products for it in order to meet its obligation to supply microprocessors to Cyrix. They distinguish *du Pont* on its facts, noting that in *du Pont* the party manufacturing under the "have made" right was also using the product itself, whereas here the product made under the "have made" right was sent to and eventually sold by the licensee.

We start with the clear proposition that, under its agreement, ST had the right to have the product made for it and to sell that product to third parties. It relied upon that right to have the product made by ST–Italy and to sell it to Cyrix. The district court found that the arrangement was distinguishable from that in *du Pont.* In *du Pont,* Carbide sought a license under du Pont's patent to manufacture a product known as methomyl, but du Pont refused to grant Carbide a license. *Id.* at 1111, 227 USPQ at 234. Carbide then entered into an agreement with Shell, du Pont's licensee, whereby Carbide would manufacture methomyl for Shell under Shell's "have made" rights and Shell would sell it back to Carbide. *Id.* Carbide would then use it (or sell it) as it wished. The Supreme Court of Delaware, whose law governed that agreement, concluded that the two agreements, one to enable Carbide to manufacture methomyl for Shell and the other whereby Shell sold it back to Carbide, were two halves of a single business transaction. The net result was that they enabled Carbide to make and use the patented product. The court held that that was in effect a sublicense, which was prohibited under the Shell-du Pont agreement. *Id.* at 1115, 1117, 227 USPQ at 237–38.

The district court identified several important differences between the situation in *du Pont* and the arrangement among ST, ST–Italy, and Cyrix, and concluded in its Memorandum Opinion and Order as follows:

> The substance of the arrangement between Cyrix and ST and ST and

ST–Italy is that when Cyrix needs wafers, it issues a purchase order to ST. ST then either manufactures the wafers itself at its Carrollton, Texas, facility or arranges for ST–Italy to manufacture the wafers at its Italian facility. ST is selling wafers. It is not selling or receiving payment for the use of its license from Intel. It has not authorized St–Italy to make the wafers for or sell them to anyone other than ST. The production of the wafers is for the use of ST, the original licensee, and not for the use of ST–Italy. This is a valid exercise of the have-made rights granted under the License Agreement and does not constitute a sublicense.

*Cyrix Corp. v. Intel Corp.,* 879 F.Supp. 666, 671 (E.D.Tex.1995).

We agree with the district court that the facts here are thoroughly distinguishable from those in *du Pont.* In *du Pont,* the arrangement was a sham. The third-party (Carbide) acting under Shell's "have made" rights was manufacturing and selling the product to Shell and then buying it back in what was only a set of paper transactions. *E.I. du Pont,* 498 A.2d at 1111, 227 USPQ at 234. Here, however, the third-party (ST–Italy) properly manufactured microprocessors under ST's "have made" rights, and ST then properly sold the products to a different entity, Cyrix. The two agreements, one permitting ST–Italy to manufacture microprocessors **\*1388** for ST and the other providing for ST's sale of microprocessors to Cyrix, were separate business transactions. As the district court found, ST was using both its own facility and ST–Italy's to satisfy its obligation to provide microprocessors to

Cyrix. The products manufactured by ST–Italy were made for ST. If the facts in this case had been that Cyrix made the product for ST under ST's "have made" rights and then ST sold the product back to Cyrix, then they would have been analogous to those in *du Pont,* but those are not our facts. We accordingly conclude that the district court did not err in holding that the arrangements among ST, ST–Italy, and Cyrix were a valid exercise of ST's "have made" rights under its agreement with Intel. The district court thus did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and ST.

We have considered the other arguments raised by Intel and conclude that they do not compel reversal of the district court's judgment.

## CONCLUSION

Judgment was properly entered in favor of Cyrix, IBM, and ST on their respective complaints. In particular, the district court did not err in concluding that the IBM–Intel agreement provided IBM with the right to make microprocessors designed by Cyrix and sell those microprocessors to Cyrix. The district court also did not err in concluding that ST acted within the scope of its "have made" right under the ST–Intel agreement when it had ST–Italy make the microprocessors and then sold them to Cyrix.

*AFFIRMED.*

### Parallel Citations

37 U.S.P.Q.2d 1884

Footnotes

\*    The agreement was amended on January 1, 1994, but this amendment did not change the scope of the license granted in the original agreement.

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

624 F.3d 575
United States Court of Appeals,
Third Circuit.

FEDERAL TRADE COMMISSION, Appellant

v.

LANE LABS–USA, INC; Cartilage Consultants,
Inc.; I. William Lane; Andrew J. Lane.

No. 09–3909.    |    Argued Sept.
14, 2010.    |    Filed: Oct. 26, 2010.

**Synopsis**
**Background:** Federal Trade Commission (FTC) filed motion
to hold manufacturer of calcium supplement and male fertility
product in contempt for violation of consent judgments
requiring that it refrain from making claims about its
products without possessing competent and reliable scientific
evidence that substantiated the claims and prohibiting
misrepresentations regarding tests, studies or research. The
United States District Court for the District of New Jersey,
Dennis M. Cavanaugh, J., 2009 WL 2496532, denied motion.
FTC appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held
that:

[1] manufacturer's claim that only its calcium supplement
could increase bone density in women was in contempt;

[2] manufacturer's claim that supplement had been shown in
clinical tests to increase bone density in the hip was not in
contempt;

[3] district court's finding that manufacturer's claim that its
product was three to four times more absorbable than other
calcium supplements was not in contempt was inadequate;

[4] manufacturer's claim that its product was comparable or
superior to prescription osteoporosis drugs was in contempt;

[5] manufacturer's claim that its male fertility product could
cause sperm count to "skyrocket" in as little as one month was
not in contempt;

[6] district court failed to provide reasoned basis for
concluding that manufacturer was not in contempt of

prohibition against misrepresentations regarding tests, studies
or research;

[7] as matter of first impression, party charged with contempt
may avail itself of defense of substantial compliance; but

[8] district court did not make necessary findings for that
defense.

Vacated and remanded.

**Attorneys and Law Firms**

*577 Theodora T. McCormick, Jack Wenik (argued), Sills,
Cummis & Gross, Newark, NJ, for Appellee Lane Labs–
USA, Inc. and Andrew J. Lane.

Paul F. Carvelli (argued), McCusker, Anselmi, Rosen &
Carvelli, Florham Park, NJ, for Appellee I. William Lane.

Michele Arington (argued), John F. Daly, Federal Trade
Commission, Elsie B. Kappler, Constance M. Vecellio,
Federal Trade Commission, Amanda C. Basta, Kirkland &
Ellis, Washington, DC, Susan J. Steele, Office of United
States Attorney, Newark, NJ, for Appellant.

Before: SLOVITER, BARRY, and SMITH, Circuit Judges.

**OPINION**

SMITH, Circuit Judge.

The Federal Trade Commission ("FTC") appeals from an
order of the United States District Court for the District of
New Jersey denying its motion to hold Lane Labs–USA,
Inc., I. William Lane, and Andrew J. Lane in contempt for
violation of consent judgments entered by the District Court
on July 6, 2000 and September 26, 2000. For the reasons set
forth below, we conclude that the District Court committed
clear error. Accordingly, we will vacate the order of the
District Court and remand for further proceedings.

**I.**

Lane Labs–USA, Inc. ("Lane Labs") is a manufacturing
distributor of specialty dietary *578 supplements and
cosmetic products.[1] The company was founded in 1994 by
its current president and sole shareholder, Andrew J. Lane

("Lane"). Lane's father, I. William Lane, is not an employee of Lane Labs, but has served as a consultant to the company since its founding. [2]

In June of 2000, the FTC charged the Lane defendants with deceptive acts in violation of § 5 of the Federal Trade Commission Act ("FTC Act"). [3] The FTC's complaint focused upon unsubstantiated representations pertaining to two products: BeneFin, a dietary supplement, and SkinAnswer, a cosmetic cream. [4] Shortly after the litigation was commenced, however, each of the Lane defendants reached a settlement with the FTC and agreed to the terms of a consent decree. The District Court entered the decree as a stipulated final order for permanent injunction (hereinafter, the "Final Order"), [5] and adjudged Lane Labs liable for the sum of $1 million.

Two provisions of the Final Order are pertinent to this appeal. In Section III, the Lane defendants agreed that "in connection with the manufacturing, labeling, advertising, promotion, offering for sale, or distribution of any food, dietary supplement, or drug," they would refrain from

> mak[ing] any representation, in any manner, ... expressly or by implication, about the effect of [a] product on any disease or disorder, or the effect of such product on the structure or function of the human body, or about any other health benefits of such product, unless, at the time the representation is made, [they] possess[ed] and rel[ied] upon competent and reliable scientific evidence that substantiates the representation.

"Competent and reliable scientific evidence" was defined as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." Section IV of the Final Order forbade express or implied misrepresentations regarding "the existence, contents, validity, results, **\*579** conclusions, or interpretations of any test, study or research" in connection with "the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any food, dietary

supplement, or drug." Two other provisos, Sections IX and XIV, imposed record keeping and periodic reporting requirements, respectively.

Two products are at issue: AdvaCal, a calcium supplement, and Fertil Male, which, as the name suggests, purports to improve male fertility. We shall briefly consider the development and marketing of both products before turning to the proceedings that occasioned the instant appeal.

## A. AdvaCal

AdvaCal was developed by a renowned Japanese scientist named Takuo Fujita. The product primarily consists of calcium hydroxide derived from oyster shells smelted at extremely high temperatures. Once the smelting process is complete, the calcium component is combined with a heated algae ingredient ("HAI") extracted from Hijiki seaweed. This combination of active ingredients purportedly yields a calcium hydroxide product that is significantly more absorbable by the human body than competing calcium supplements.

Lane Labs began marketing AdvaCal in 2000 as a means to increase bone strength and combat osteoporosis. Over the next several years, the company utilized an array of print, television, and online media to promote its product. Each of these advertisements contained numerous representations regarding AdvaCal's efficacy, and many compared AdvaCal to competing calcium supplements. Typical among the claims appearing in AdvaCal marketing materials were assertions that the supplement (1) was unique in its ability to increase bone mineral density, (2) was clinically proven to be more absorbable than other calcium supplements, and (3) was clinically shown to increase bone density in the hip. In addition, Lane Labs distributed literature promoting AdvaCal as comparable or superior to prescription osteoporosis medicine, and Lane told at least one prospective retail purchaser that the calcium supplement was "on par with" prescription pharmaceuticals.

Consistent with its obligations under the Final Order, Lane Labs provided the FTC with compliance reports pertaining to AdvaCal in 2001, 2004, and 2006. Each report attached print copies of AdvaCal-specific advertisements, as well as the scientific research upon which Lane Labs relied for its representations. The parties do not dispute that many of the marketing claims at issue in this matter were disclosed to the FTC in the 2001 compliance report.

**B. Fertil Male**

Fertil Male is derived from a Peruvian plant known as "maca." After it is gelatinised and heated, the plant is combined with HAI. This combination allegedly enhances the human body's capacity to absorb maca, which purportedly improves male fertility parameters such as sperm production and sperm motility. [6] In October 2003, Lane Labs began marketing Fertil Male. One advertisement featured a customer who proclaimed that Fertil Male caused his sperm count to "skyrocket" within one month. Just as it had with AdvaCal, Lane Labs submitted an FTC compliance report disclosing its Fertil Male advertisements in 2006.

**\*580  C. The Contempt Proceeding**

On July 12, 2006, the FTC notified Lane Labs that certain Fertil Male advertisements contained misrepresentations which amounted to violations of the Final Order. One month later, the FTC provided Lane Labs with a similar notice concerning the marketing of AdvaCal. Both notices threatened litigation absent the negotiation of an appropriate settlement agreement. The parties did not reach a settlement. Thus, on January 12, 2007, the FTC filed a motion with the District Court to hold the Lane defendants in contempt for violating Sections III and IV of the Final Order. To remedy these purported violations, the FTC requested $24 million in monetary damages.

The District Court held a five-day evidentiary hearing on the motion beginning on April 20, 2009. Two expert witnesses testified on behalf of the FTC: Robert Heaney, a physician and researcher at Creighton University, offered testimony concerning AdvaCal, while Craig Niederberger, a urologist at the University of Illinois at Chicago, addressed matters pertaining to Fertil Male. The Lane defendants presented the testimony of two opposing experts. Boston University physician Michael Holick discussed Lane Labs' marketing of AdvaCal, and University of Massachusetts professor Machelle Seibel testified as an expert in reproductive medicine. Each of these witnesses discussed scientific studies relied upon by Lane Labs to support its marketing claims. The FTC experts generally opined that the claims in question were not substantiated by competent or reliable scientific research; not surprisingly, experts for the Lane defendants contradicted this viewpoint.

In addition to these dueling experts, the Court heard testimony from, among others, Lane and Jennifer Morganti, a naturopathic doctor employed by Lane Labs from 2001 to 2004. Lane testified that he took the Final Order "extremely serious[ly]," and he spoke at length about the measures the company pursued to comply with the decree. Lane explained that: the Final Order was distributed to all senior management personnel; copies were sent to Lane Labs' customers; an outside company was retained to compile existing research and to monitor research updates; and Lane hired Morganti to serve as manager of nutritional research. Morganti testified that her primary responsibility was to scrutinize Lane Labs' marketing claims to ensure that each representation was supported by scientific research. [7] In all circumstances, however, the ultimate decision to utilize a particular claim was Lane's alone.

By order dated August 10, 2009, the District Court denied the FTC's motion for contempt. The Court explained that it reached its decision after "carefully considering the complete record" and weighing the testimony of each party's witnesses. In the Court's view, "[a]ll four expert witnesses were credible and knowledgeable in their respective fields of expertise," but those testifying on behalf of the Lane defendants were more impressive "because their testimony and approach to the subject matter seemed more reasonable and in accordance with the [Final] Order[ ]." The Court also characterized Lane's testimony in a favorable fashion, stating that it "found Mr. Lane to be forthcoming and credible, and consider[ed] his testimony to be evidence of the efforts undertaken by **\*581** Defendants to comply with the [Final Order]."

Against this backdrop, the Court ultimately found that the Lane defendants' marketing claims were supported by competent and reliable scientific evidence. Absent from the decision, however, was any detailed examination of the particular representations challenged by the FTC. Rather, the Court simply set forth, in a series of bullet points, a "representative selection" of the challenged assertions, [8] eschewing an analysis of whether each claim found support in the record. It emphasized that AdvaCal was generally recognized as "a good source of calcium," and that there was little to no evidence that either AdvaCal or Fertil Male was ineffective or potentially dangerous. The Court went on to summarize the evidence as follows: "Lane Labs found a product and obtained scientific evidence that the product is efficacious. Lane Labs then consulted experts who opined that the research supporting the product and the product itself were good. Lane Labs acted in accordance with the spirit of the [the Final] Order[ ]." For the District Court, then, this matter was no more than a dispute over "good" products about which there was a "difference of opinion." The Court

found the opinions proffered by the Lane defendants more persuasive and, consequently, determined that they had not disobeyed the Final Order.

The Court further concluded that even if the Lane defendants violated the Final Order, they were entitled to a defense of substantial compliance. According to the Court, the Lane defendants undertook "considerable effort[s] to comply with the [Final] Order[ ]," even if "the materials relied upon by Defendants are in hindsight not perfect." These efforts were frustrated by the FTC, which failed for several years to notify Lane Labs of potential Final Order violations. The Court explained that such governmental foot dragging "raise[s] a significant issue of fundamental fairness." In other words, the Lane defendants attempted to comply with the Final Order, believed in good faith that they were successful in doing so, and received no indication from the government that their efforts were misguided. Under these circumstances, the Court found that "Defendants took all reasonable steps to substantially comply with the [Final] Order[ ]." The motion for contempt was accordingly denied.

The FTC timely appealed. [9]

## II.

[1]  [2]  [3]  We review the denial of a contempt motion for abuse of discretion. *See* **\*582** *Marshak v. Treadwell,* 595 F.3d 478, 485 (3d Cir.2009). "Reversal is appropriate 'only where the denial is based on an error of law or a finding of fact that is clearly erroneous.' " *Roe v. Operation Rescue,* 54 F.3d 133, 137 (3d Cir.1995) (quoting *Harley–Davidson, Inc. v. Morris,* 19 F.3d 142, 145 (3d Cir.1994)). A factual finding is clearly erroneous if it is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 399 F.3d 248, 254 (3d Cir.2005) (internal quotations omitted); *see also Giles v. Kearney,* 571 F.3d 318, 322 (3d Cir.2009) (explaining that "[c]lear error review is deferential" and that the district court's factual findings should be upheld when they are "plausible in light of the record viewed in its entirety" (internal quotations omitted)). Where factual findings are based upon the testimony of live witnesses, the deference due the district court is even more considerable. *See Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *United States v. Igbonwa,* 120 F.3d 437, 441 (3d Cir.1997) (stating that "when the district court's decision is based on testimony that is coherent and

plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error"). However, "a court may not insulate its findings from review by 'denominating them credibility determinations, [because] factors other than demeanor ... go into the decision whether or not to believe a witness.' " *Giles,* 571 F.3d at 322 (alteration in original) (quoting *Anderson,* 470 U.S. at 575, 105 S.Ct. 1504). With these principles in mind, we turn our attention to the contempt proceedings conducted by the District Court.

## III.

[4]  [5]  Proof of contempt requires a movant to demonstrate "(1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." *Marshak,* 595 F.3d at 485 (internal quotations omitted); *Roe,* 919 F.2d at 871. These elements "must be proven by 'clear and convincing' evidence, and ambiguities must be resolved in favor of the party charged with contempt." *John T. v. Del. Cnty. Intermediate Unit,* 318 F.3d 545, 552 (3d Cir.2003). Although courts should hesitate to adjudge a defendant in contempt when " 'there is ground to doubt the wrongfulness of the conduct,' " *Robin Woods Inc. v. Woods,* 28 F.3d 396, 399 (3d Cir.1994) (quoting *Quinter v. Volkswagen of Am.,* 676 F.2d 969, 974 (3d Cir.1982)), an alleged contemnor's behavior need not be willful in order to contravene the applicable decree, *John T.,* 318 F.3d at 552; *Harley–Davidson,* 19 F.3d at 148–49. In other words, "good faith is not a defense to civil contempt." *Robin Woods,* 28 F.3d at 399.

The first two elements of contempt are not in dispute. Both parties agree that the Final Order constitutes a valid court order and that the Lane defendants were well aware of its existence and prohibitions. Thus, it is only the final element of contempt—disobedience of a valid court order—about which the parties quarrel. The FTC argues that the Lane defendants disobeyed Sections III and IV of the Final Order, and that the District Court erred in holding otherwise. Section III requires that each of Lane Labs' marketing claims find substantiation in competent or reliable scientific research. According to the FTC, the District Court failed to consider the specific marketing claims challenged during the contempt proceeding. The FTC challenges four claims pertaining to AdvaCal:

A. Only AdvaCal can increase bone density.

**\*583**  B. AdvaCal has been shown in clinical tests to increase bone density in the hip.

C. AdvaCal is three to four times more absorbable than other calcium supplements.

D. AdvaCal is comparable or superior to prescription osteoporosis drugs.

The FTC also challenges the assertion that Fertil Male can cause sperm count to "skyrocket" in as little as one month. Finally, the government argues that it proved Lane Labs violated Section IV of the Final Order by distorting research regarding AdvaCal and other forms of calcium. We will address each of these contentions in turn.

### A. Only AdvaCal Can Increase Bone Density

[6]  In various marketing fora, the Lane defendants claimed that AdvaCal was unique in its ability to increase bone density. One full-page print advertisement proclaimed, "Clinical studies show that AdvaCal does what no other calcium does: actually increases bone density in women." A direct mail circular asserted, "Other calcium supplements cannot increase bone mass. AdvaCal can." Yet another print publication explains,

> When LaneLabs introduced AdvaCal and AdvaCal Ultra in the mid 1990s, the scientific view of calcium changed forever. Up until then, calcium supplements, at best, could only PREVENT bone loss. AdvaCal was different. AdvaCal demonstrated in multiple clinical studies that it could actually BUILD bone density quickly, naturally and safely.

In a 2003 infomercial, William Lane described AdvaCal as "the only calcium that I know of where you can actually increase bone density." Finally, on two occasions in 2005, Lane wrote to a book publisher to promote AdvaCal. In a February 9, 2005 email, Lane portrayed AdvaCal as "the one calcium clinically shown to build bone density in multiple human clinical studies. No other calcium can make that claim." Lane followed this electronic correspondence with a March 2005 letter stating, "AdvaCal offers the following benefits versus other calciums: Actually builds bone density. That's something no calcium has demonstrated consistently

in clinical research." Although each of these marketing claims were admitted into the record, none was substantively discussed in the District Court's order.

The FTC presented evidence demonstrating that these claims of uniqueness were unsupported by competent and reliable scientific research. According to its expert, Dr. Heaney, nearly all calcium supplements "produce a measurable increase in bone density." He characterized this effect of calcium intake as "common," and reinforced his opinion by pointing to his own research and the results of at least two other peer-reviewed calcium studies. Both studies showed increases in bone density when human subjects were provided with calcium supplements other than AdvaCal. Dr. Morganti, Lane Labs' former manager of nutritional research, bolstered Dr. Heaney's opinion, explaining that "there's a general consensus that calcium can build bone density." She also remarked, "[t]o say that no other calciums can build bone is probably not true."

The record is devoid of credible evidence to contradict the government's proffer. Dr. Holick did not even address AdvaCal's purported uniqueness, much less dispute Dr. Heaney's interpretation of research indicating that most calcium supplements increase bone density. In fact, Lane was the sole witness who testified in defense of this claim, but his effort was without scientific support. Lane stated that clinical research on other forms of calcium had not produced results demonstrating an increase in bone density above baseline value; the peer-reviewed studies discussed **\*584** and introduced into evidence by Dr. Heaney show otherwise. While Lane disputed the findings of these studies, his lay speculation does not constitute credible evidence sufficient to refute the expert testimony and evidence entered into the record through Dr. Heaney. [10]

On the basis of Lane's lay speculation, and in spite of expert testimony to the contrary, the District Court ruled that the Lane defendants "offered support and substantiation" for the claim that AdvaCal was unique in its ability to increase human bone density. The Court's finding is not plausible in view of the entire record. The Lane defendants were not merely asserting that AdvaCal produced beneficial bone-building results or outcomes that were superior to other calcium supplements; rather, the claims indicated that other supplements did not build bone at all. Dr. Heaney showed that such an assertion was untrue, and Dr. Holick offered no testimony to contradict him. We are thus left with the

F.T.C. v. Lane Labs USA, Inc., 624 F.3d 575 (2010)

2010-2 Trade Cases P 77,204

definite conviction that the District Court's finding is clearly erroneous and must be reversed.

## B. AdvaCal Has Been Shown in Clinical Tests to Increase Bone Density in the Hip

[7]    The FTC moved into evidence two print documents—one a direct mailing, the other a two-page advertisement—in which Lane Labs touts clinical research exhibiting AdvaCal's ability to increase bone density in the hip. It is undisputed that no such clinical research exists,[11] a fact that the District Court did not address in its memorandum. In spite of this omission, our review of the record leaves us satisfied that the Court did not clearly err by finding that these representations were in accord with Section III of the Final Order.

Dr. Holick pointed to two clinical studies supportive of Lane Labs' claims. Both appeared in peer-reviewed journals, and both showed that calcium increased bone density in the human hip. Although neither study administered AdvaCal to its subjects, Dr. Holick explained that the results were applicable to AdvaCal because "[o]nce the calcium is in your bloodstream, it doesn't make any difference what it was associated with before."[12] Thus, one could "extrapolate" the data generated in these generic calcium trials and apply the conclusions drawn therefrom to the likely effect of taking AdvaCal. In Dr. Holick's opinion, competent and reliable clinical research therefore showed that AdvaCal increases bone density in the human hip.[13] The District Court was entitled to rely upon this testimony, to credit Dr. Holick's reliance on data "extrapolated" from generic **\*585** calcium studies, and to find that the Lane defendants did not violate the Final Order by making the claims in question. Accordingly, we will affirm the District Court's finding.

## C. AdvaCal is Three to Four Times More Absorbable Than Other Calcium Supplements

[8]    In direct mailers, print advertisements, and in an infomercial, the Lane defendants represented that AdvaCal was three to four times more absorbable than other calcium supplements. One assertion characteristic of these claims appeared in a direct mail article distributed to Lane Labs' customers. In it, AdvaCal was described as "an extremely high-potency calcium supplement that is absorbed *four times better* than typical calcium-carbonate supplements."

Dr. Heaney characterized such a contention as "not physically possible." He explained that the typical calcium carbonate supplement is absorbed at a rate of 30–35%; were AdvaCal capable of performing at the advertised rate, its absorption value would rise to 120%. Dr. Heaney testified that this is physiologically—and mathematically—unattainable. In fact, Dr. Heaney stated, "No adult that I've ever measured under any circumstance would ever have an absorption value above, say, 60 percent, and that's highly unusual."

The Lane defendants argue that AdvaCal was not marketed to the average individual, but rather to elderly females, a substantial number of whom suffer from conditions of achlorhydria and osteoporosis. Achlorhydric individuals cannot produce stomach acid and, as a result, absorb calcium at a rate significantly below average. In some patients, this rate is as low as 4%. Dr. Holick explained that it would not be unusual for an achlorhydric individual, whose calcium absorption rate is far below 30–35%, to absorb AdvaCal three to four times more effectively than calcium carbonate. In such circumstances, Dr. Heaney's criticism is inapplicable, for an achlorhydric patient may absorb AdvaCal three to four times more effectively and still not attain the average absorption rate of 30–35%.

The problem with this argument is its failure to account for the actual language of the challenged representations. Lane Labs' marketing did not include phraseology limiting its claims to elderly females suffering conditions of achlorhydria. A 2003 infomercial was typical: "Osteoporosis now strikes women and men of all ages, races and nationalities. But osteoporosis can be prevented. A key is taking the right calcium and the right calcium supplement is AdvaCal.... AdvaCal has been clinically shown to be three times more absorbable than other calciums."[14] Thus, **\*586** although AdvaCal may in fact have been targeted at a particular population segment, the challenged representations do not, on their face, limit their claims to any particular target group.

The District Court did not address the incongruity between the Lane defendants' argument and the actual language of the marketing claims identified by the FTC. We consider this omission problematic, for the record contains some evidence that AdvaCal was, as a matter of fact, marketed toward individuals at risk of, or suffering from, achlorhydria. Lane testified that the company targeted "[o]lder women, [or] postmenopausal women," and much of its advertising generally appears to focus upon this segment of the

population. In addition, Dr. Holick's testimony indicates that among this population segment, AdvaCal *could* be three to four times more absorbable than calcium carbonate. The District Court credited the testimony of both Lane and Dr. Holick, but it did not indicate whether AdvaCal was, as a matter of fact, marketed to elderly females at risk of, or suffering from, achlorhyrdria.

Clearly, AdvaCal does not produce ideal outcomes in every patient, but the question is whether Lane Labs' claims promised results that were unattainable for large segments of its audience. The District Court implicitly found that they did not. Were we sitting as the finder of fact, we likely would reach the opposite result. We are not, of course, sitting as a court of first impression; rather, our role is to review the District Court's factual findings. Unfortunately, our attempt to do so is frustrated by the absence of a detailed discussion of whether Lane Labs over-promised on results that could not be attained. In fact, we are unable to say with certainty that the District Court implicitly addressed these claims because the opinion fails to discuss the AdvaCal target market, and gives no indication that the Court considered—and disposed of— this factual dispute. We therefore consider it appropriate to remand so that the District Court may address these particular claims more exhaustively.

### D. AdvaCal is Comparable or Superior to Prescription Osteoporosis Medicine

[9]    In 1999, Lane sent a "pitch letter" to Monica Reinagel, who was then the editor of the Health Sciences Institute ("HSI") newsletter. In this correspondence, Lane lauded AdvaCal's potential, describing it as "a revolutionary calcium supplement ... that has been clinically shown to actually build postmenopausal bone density, without the side effects of hormonal drugs or supplements." HSI published an article praising AdvaCal shortly thereafter. The article proclaimed, *inter alia,* that AdvaCal "works as well or better than [leading prescription drugs], and without the substantial side effects and risks."

AdvaCal has never undergone scientific testing for comparison with any prescription drug, and Dr. Heaney opined that the above-described claim of comparability/ superiority was without competent or reliable substantiation. Notably, the Lane defendants made no attempt to dispute Dr. Heaney's opinion, and our review of the record has revealed no evidence supportive of this particular marketing

claim. However, the Lane defendants argued before the District Court that the representation was not their own, and that they had no control over the content appearing in **\*587** HSI's newsletter. This assertion was, quite simply, more than a stretch. And, surprisingly, the Lane defendants persist in pressing the argument on appeal. Lane himself acknowledged that Lane Labs paid for the right to distribute the article, and then did so "extensively." It was distributed to past and current customers in direct mailing packets and featured in retail store displays. In short, the Lane defendants adopted HSI's characterization by aggressively promoting the newsletter's content. [15] They cannot run from the representation now that its veracity has been subjected to the spotlight.

The District Court did not address Lane Labs' comparability/ superiority claim or its use of the HSI article to promote AdvaCal. It is therefore unclear whether the Court found substantiation for the claim or whether it accepted Lane Labs' attempt to absolve itself from propagating the representation. In either event, the District Court's finding was clearly erroneous; there is no dispute that the comparability/ superiority claim was unsupported by competent or reliable scientific evidence and, by their own admission, the Lane defendants used this claim to market AdvaCal. Thus, this claim violates Section III of the Final Order and the District Court's holding to the contrary is clear error.

### E. Fertil Male Can Cause Sperm Count to "Skyrocket" in as Little as One Month

[10]    Lane Labs published an advertisement for Fertil Male which claims, *inter alia,* that the supplement caused a male customer's sperm count to "skyrocket" after one month's use. This is the sole Fertil Male representation challenged by the FTC on appeal. Although the District Court did not discuss this specific representation, it expressly credited the testimony of Dr. Seibel, who stated that there was competent or reliable scientific evidence suggesting that Fertil Male improves male fertility parameters such as sperm count, sperm motility, and sperm production.

The FTC attempts to overcome Dr. Seibel's testimony by focusing on the one-month time span identified in Lane Labs' advertisement. According to the FTC, it is impossible for a fertility supplement to increase sperm count in such a short time. The government did not challenge this specific aspect of the Fertil Male claim during the contempt hearing,

however, and thus there is little testimony which addresses the contention directly. Dr. Seibel explained that the process of spermatogenesis requires at least three months, [16] but he did not explicate the precise manner in which spermatogenesis is related to changes in sperm count. Moreover, when the FTC confronted Dr. Seibel with the print advertisement in question, the following exchange transpired:

Q: Let's look at the next paragraph: "The results were dramatic. In the first month Joe's sperm count skyrocketed."

Now, Doctor, in a month, Fertil Male could not have caused the sperm count to skyrocket because the sperm wouldn't have been created yet[?] ...

**\*588** A: Well, the entire impact would require a longer time.

Q: But particularly, sperm count, you told us that sperm takes three months to go from inception to emission; correct?

A: To see an absolute effect, yes.

The Court then attempted to clarify whether it was possible for male sperm count to increase over the course of one month's time.

THE COURT: Could a male's sperm count increase in the first month, or is that something that just couldn't happen?

THE WITNESS: It could have happened as part of the regression to the mean. It could have happened because the sperm—the maca had some effect inside the testes in a way I don't understand.

But in general, it's a—it's a three-month window.

Neither party pursued this line of questioning any further after this exchange.

Dr. Seibel testified unequivocally that there was competent or reliable scientific research to substantiate the claim that Fertil Male increased sperm count. In the excerpt above, he indicates that the "absolute effect" of an increase requires a period of three months, but appears to imply that some positive change also occurs within the first month. The FTC declined to delve further into this inquiry when it had the opportunity, but now asks that we set aside the District Court's factual findings on the basis of testimony that is ambiguous

at best. We decline this invitation. The finding of the District Court with respect to this marketing claim will stand.

### F. Distortion of Research

**[11]**    According to the FTC, the District Court committed error by finding that Lane Labs did not violate Section IV of the Final Order. Section IV forbids express or implied misrepresentations regarding "the existence, contents, validity, results, conclusions, or interpretations of any test, study or research" pertaining to "the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any food, dietary supplement, or drug." The District Court's Section IV analysis is brief. It began by acknowledging that "some of the statements contained in the advertising claims made by [the Lane defendants] were incorrect," and that "errors were made over a number of years." These misstatements and errors are nowhere identified. Instead, the Court focused upon AdvaCal's general efficacy, noting that the supplement was considered to be "a good source of calcium" and "will most likely help the people who take [it]." The Court then concluded that the evidence was insufficient to show that the representations in question created a "false impression" in violation of Section IV.

The District Court's analysis is problematic. Section IV of the Final Order prohibits the Lane defendants from misrepresenting the results of research and data; it is simply unconcerned with a product's overall salutary effects. That AdvaCal is efficacious in delivering calcium to the body does not, *ipso facto*, preclude the Lane defendants from misrepresenting scientific research. Nor did the District Court's characterization of AdvaCal as a "good product [ ]" relieve it of the duty to make particularized findings of fact germane to the purported misrepresentations challenged by the FTC. Rather, it was incumbent upon the Court to examine the alleged misrepresentations in detail and to explicitly find whether each transgressed the proscriptions of Section IV.

**\*589**   The District Court's failure to provide us with a reasoned basis for concluding that Lane Labs did not violate Section IV prevents us from exercising meaningful review. Many of the challenged representations appear misleading on their face, and the District Court provides no rationale for its conclusion that they are not. For example, a direct mailing advertisement asserted, "In clinical tests [AdvaCal] has been shown to actually increase bone density—even in the critical hip bones...." It was not disputed, however,

that the Lane defendants lacked such clinical research. Even Lane conceded, "There are no clinical studies on AdvaCal in the hip.... [W]e can't verify that statement." Without any explanation from the District Court, we are unable to determine if this claim was even considered in its Section IV analysis. And, if it was, it is difficult to comprehend how the representation did not "create[ ] a false impression in violation of Section IV."

Other challenged representations appear equally misleading. Rather than speculate as to the factual basis underlying the District Court's ultimate conclusions, we will return this matter to the District Court so that it may make findings that are more specific than those presently before us. Some of the representations are unlikely to survive careful factual scrutiny, but we leave the initial resolution of each issue to the District Court. The findings pertaining to the Lane defendants' alleged violation of Section IV will therefore be vacated.

## IV.

The District Court held that even if the Lane defendants violated Sections III and IV of the Final Order, they were entitled to a defense of substantial compliance. We have never explicitly recognized the validity of the substantial compliance defense, *see Robin Woods,* 28 F.3d at 399, but we note that several of our sister circuits have done so, *see Morales–Feliciano v. Parole Bd. of P.R.,* 887 F.2d 1, 4–5 (1st Cir.1989); *Gen. Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986); *see also Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL–CIO–CLC,* 103 F.3d 1007, 1017 (D.C.Cir.1997) (assuming substantial compliance defense "survives" in the D.C. Circuit). Neither party has objected to the District Court's application of the defense, and, in fact, both appear to proceed under the assumption that the defense is cognizable under this Court's jurisprudence.

In *Robin Woods,* we favorably referenced a decision of the Court of Appeals for the Ninth Circuit and set forth the two-part substantial compliance defense adopted therein. The rule permits a party cited for contempt to assert the defense if it (1) has taken all reasonable steps to comply with the court order at issue, and (2) has violated the order in a manner that is merely " 'technical' " or " 'inadvertent.' " *See* 28 F.3d at 399 (quoting *Gen. Signal Corp.,* 787 F.2d at 1379). Other courts apply a variation on this rule. The District of Columbia Circuit has stated the defense this way:

"In order to prove good faith substantial compliance, a party must demonstrate that it 'took all reasonable steps within [its] power to comply with the court's order.' " *Food Lion,* 103 F.3d at 1017 (quoting *Glover v. Johnson,* 934 F.2d 703, 708 (6th Cir.1991)); *see also Salazar v. District of Columbia,* 602 F.3d 431, 441 (D.C.Cir.2010)). In the First Circuit, the rule is even less definitive: "substantiality," like reasonableness, "depend[s] on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin v.* **\*590** *Comm'r of Mass. Dep't of Pub. Welfare,* 692 F.2d 790, 795 (1st Cir.1982).

The Lane defendants cite to our decision in *Harris v. City of Philadelphia,* 47 F.3d 1311 (3d Cir.1995), and urge us to adopt a substantial compliance test akin to that which is applied in the District of Columbia Circuit. In other words, they argue that " 'a defendant may not be held in contempt as long as it took all reasonable steps to comply.' " Appellee's Br. at 42 (quoting *Harris,* 47 F.3d at 1324). In *Harris,* we were concerned not with substantial compliance, but the defense of impossibility. The City of Philadelphia was under court order to improve conditions in its prisons; it failed to fulfill the terms of the order and contempt sanctions were pursued. On appeal, we recognized that "the City would have a valid defense were it able to show physical impossibility" to comply with the court order. *Id.* at 1324. We then cited authority recognizing the impossibility defense and holding that such a position is available only to those defendants that show they have made "in good faith all reasonable efforts to comply." *Id.* (internal quotations omitted).

The impossibility defense necessarily requires the defending party to assert a present inability to comply with the relevant court order. *See Hicks v. Feiock,* 485 U.S. 624, 638 n. 9, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). It "refers to physical impossibility beyond the control of the alleged contemnor." [17] *Inmates of Allegheny County v. Wecht,* 874 F.2d 147, 152 (3d Cir.1989) (citing *United States v. Bryan,* 339 U.S. 323, 330–31, 70 S.Ct. 724, 94 L.Ed. 884 (1950)), *vacated on other grounds,* 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989). Such an assertion will naturally precipitate judicial inquiry into the feasibility of the defendant's compliance. *See, e.g., Spallone v. United States,* 487 U.S. 1251, 1256, 1258, 109 S.Ct. 14, 101 L.Ed.2d 964 (1988) (rejecting impossibility defense when city had not attempted certain extreme measures to obtain city council compliance with court order); *Harris,* 47

F.3d at 1330–32 (rejecting impossibility defense when city underfunded and understaffed court-ordered rehabilitation center, thereby leading to its failure to comport with required standards); *Wecht,* 874 F.2d at 152 (rejecting impossibility defense when government officials took insufficient steps to enable prison warden to comply with court order). Thus, a tribunal that concludes that contempt is excused on grounds of impossibility is essentially declaring that the defendant was incapable of compliance in spite of his or her best efforts. Substantial compliance evokes a standard somewhat less demanding. A party substantially complies when it takes all reasonable steps to do so, but nonetheless contravenes the court order by good faith mistake or excusable oversight. [18] **\*591** The distinction is important, for a party that substantially complies is physically capable of doing so; it has simply erred in a manner for which it would be inequitable to impose contempt sanctions.

[12]  [13]  [14]  Recognizing that we did not formally adopt the defense of substantial compliance in *Robin Woods,* we do so here. In order to avail oneself of the defense, a party must show that it (1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely "technical" or "inadvertent." The District Court's application of the appropriate test for substantial compliance is a legal issue to be reviewed de novo. *See Anderson v. City of Phila.,* 845 F.2d 1216, 1220 (3d Cir.1988). Whether the alleged contemnors took all reasonable steps to comply with the court order, and the extent to which contumacious conduct constitutes a "technical" or "inadvertent" violation, are factual questions subject to review for clear error. Resolution of these questions will naturally depend upon the unique facts of each case, the nature of the conduct precluded, and the capabilities of the parties subject to the order.

[15]  In the instant matter, the District Court set forth the correct standard for substantial compliance, explaining that "[i]f a respondent has made in good faith all reasonable efforts to comply with a court order, technical or inadvertent violations of the order will not support a finding of contempt." The Court then applied this rule to the facts, emphasizing the Lane defendants' considerable efforts to comply with the Final Order. In particular, the Lane defendants submitted timely compliance reports disclosing the representations in question; the FTC did not respond to these disclosures and, as the Court explained, "to tell Defendants that their efforts were not good enough years after not advising them of any compliance issues is disingenuous and is highly

relevant to the inquiry into whether Defendants should have done something different in the first instance." The Court concluded by recognizing "that the materials relied upon by Defendants are in hindsight not perfect," but that "Defendants took all reasonable steps to substantially comply with the [Final Order]." It did not explicitly address the extent to which violations of the Final Order were "technical" or "inadvertent."

The FTC assails this omission, arguing that the District Court's opinion contains no findings addressing the second step of the substantial compliance inquiry. We are hard-pressed to disagree. The entirety of the Court's substantial compliance analysis is focused upon the reasonableness of the Lane defendants' actions. The Court underscores Lane Labs' submission of compliance reports; its retention of additional compliance personnel; and the government's delay in commencing an enforcement proceeding. [19] Each of these **\*592** considerations inherently impacts the reasonableness inquiry, but does little to illuminate the justification for violating the Final Order. Moreover, although the Court implicitly recognized that some violations occurred, it neither identified this misconduct nor explained why the conduct qualified as a "technical" or "inadvertent" violation of the Final Order. Absent specific findings addressing this second step of the substantial compliance test, we are reduced to guesswork: speculating at that which the District Court considered contumacious conduct; speculating whether it found that such conduct technically violated the court order, or did so inadvertently; and speculating whether the District Court overlooked this necessary second step and neglected to consider the nature of the violations at all. In short, we are unable to conduct meaningful appellate review.

Accordingly, we will vacate the District Court's finding that the Lane defendants substantially complied with the Final Order, and will remand for reconsideration consistent with the discussion set forth above.

### V.

The District Court examined the record in its entirety and concluded that the Lane defendants complied with "the spirit" of the Final Order. This was insufficient. The District Court was not petitioned for an assessment of the general efficacy of AdvaCal and Fertil Male. Rather, the FTC contended that specific marketing claims were violations of two previously-entered consent decrees. Unfortunately, the able District

Judge did not provide sufficiently detailed findings or sufficient rationale to allow us to perform effective appellate review. For the reasons set forth above, we will remand this matter to the District Court for further proceedings consistent with this opinion.

**Parallel Citations**

2010-2 Trade Cases P 77,204

Footnotes

1   Although Lane Labs is considered a "products manufacturer" under the Standard Industrial Classification Code, it outsources all manufacturing work for offsite production. The company's in-house staff is primarily concerned with distributing and marketing its products.

2   For ease of reference, we collectively refer to Lane Labs, Andrew J. Lane, and I. William Lane as "the Lane defendants."

3   Section 5 of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

4   In a related action, the Food and Drug Administration ("FDA") filed a complaint against Lane Labs and Lane on December 10, 1999, alleging violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* Specifically, the government accused both defendants of misbranding and falsely advertising three products: BeneFin, SkinAnswer, and MGN–3. The United States District Court for the District of New Jersey agreed with the FDA, permanently enjoined the offensive conduct, and ordered payment of restitution to consumers who purchased these products. *United States v. Lane Labs–USA, Inc.,* 324 F.Supp.2d 547 (D.N.J.2004). We affirmed the District Court's decision the following year. *United States v. Lane Labs–USA, Inc.,* 427 F.3d 219 (3d Cir.2005).

5   The District Court actually entered two stipulated final orders for permanent injunction, one against William Lane on July 6, 2000, and the other against Lane Labs and Lane on September 26, 2000. Both orders are identical in all material respects, except that monetary penalties were imposed against Lane Labs.

6   The FTC's expert, Dr. Craig Niederberger, described sperm motility as "the wiggling of the sperm as if they were ... going towards an egg."

7   Lane also testified that marketing claims were vetted by Lane Labs' marketing department and its outside counsel.

8   According to the District Court, the following claims comprised a "representative selection" of the AdvaCal-specific claims challenged by the FTC: (1) AdvaCal has been "clinically shown to be three times more absorbable than other calciums"; (2) AdvaCal is "absorbed three times better than typical calcium carbonate/coral calcium supplements"; (3) AdvaCal is the "only" calcium that can increase bone mineral density; (4) AdvaCal produced a 3 percent per year increase in bone density "over a period of years"; (5) results from a "group" study demonstrate that AdvaCal caused a 13.5% increase in bone density over two years; (6) AdvaCal has been shown in clinical tests to increase bone density in the hip; and (7) a testimonial from a twenty-five-year-old woman who claimed that after taking AdvaCal, her bone density increased by 50% in six months. With respect to Fertil Male, the Court simply stated that "the FTC challenges Defendants' general claim that Fertil Male has been 'clinically-shown' to increase sperm production, sperm motility, and semen production."

9   The District Court had subject matter jurisdiction pursuant to 15 U.S.C. § 45 and 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

10   Lane questioned the results of one study after "reading the abstract very quickly" on the stand. As a witness with no medical or scientific expertise, Lane was unequipped to credibly refute the government's expert after "quickly" skimming a research abstract during cross examination. What is more, the Lane defendants' own expert, Dr. Holick, undermined Lane's lay opinion, explaining that the analysis appearing in an abstract does not typically represent competent or reliable scientific evidence sufficient to support a given proposition.

11   A clinical study is one performed upon human subjects. The studies relied upon by the Lane defendants, however, were animal studies.

12   We note that the logic of Dr. Holick's opinion serves to undermine Lane Labs' uniqueness claim, addressed *supra.*

13   Although Dr. Heaney disagreed with Dr. Holick's ultimate opinion concerning these particular marketing claims, he did not dispute Dr. Holick's statement concerning the extent to which one could "extrapolate" data from one clinical trial and apply it to a similar product. For example, when Dr. Heaney was presented with one of the two reports cited by Dr. Holick in support of Lane Labs' claims, he testified as follows:

Q: My question, Doctor, was, could one rely on this study for the proposition that AdvaCal reduces the risk of fracture in the hip?
A: One can—one can rely upon it for a statement that calcium reduces the risk of fracture at the hip.
Q: And therefore, AdvaCal does.
A: And therefore, presumably, AdvaCal does.

14    The record contains several additional advertisements whose focus is not limited to elderly females suffering conditions of achlorhydria. For example, the Lane defendants' AdvaCal infomercial warned that an individual's long-term health would be impacted by "decisions that you make as early as your thirties." Another promotional document states in bold letters, "It's never too early to act," and describes AdvaCal as "an excellent supplement for women of all ages [and] ... an excellent supplement for men." Yet another advertisement notes that "while most of us still think of osteoporosis as something that strikes women aged 60–plus, its precursor, osteopenia, is beginning to appear in women of 30 or even younger. And increasing numbers of men are also being diagnosed with this potentially debilitating condition.... [T]he good news is that there is a calcium supplement [AdvaCal] available right now that is clinically proven to fight osteoporosis."

15    The Final Order requires that the use of third party publications in advertising and promotion not be "false, deceptive, or misleading" under § 5 of the FTC Act, and precludes the Lane defendants from disseminating to "any distributor any material containing any representation prohibited by [the Final] Order." During cross examination, Lane acknowledged that the HSI article constituted a third party publication.

16    Dr. Seibel defined spermatogenesis as "the evolution of the sperm into a mature sperm."

17    An alleged contemnor may also argue that a change in the law has rendered compliance illegal, even if it is physically possible. *See, e.g., Halderman v. Pennhurst State Sch. & Hosp., 673 F.2d 628, 638–39 (3d Cir.1981).* This defense is not implicated in the present matter.

18    According to the FTC, the Lane defendants' good faith efforts to comply with the Final Order are irrelevant and should have no bearing on the substantial compliance inquiry. This argument is based upon a misreading of our jurisprudence. As we explained in *Robin Woods,* an alleged contemnor may not invoke its good faith efforts as a *defense on the elements* of civil contempt. *See Robin Woods,* 28 F.3d at 399 (stating that "willfulness is not a necessary element of civil contempt," and that "good faith does not bar the conclusion ... that [the defendant] acted in contempt" (alterations in original) (internal quotations omitted)). When assessing the *affirmative defense* of substantial compliance, however, good faith efforts inherently factor into the inquiry. *See id.* (considering contemnor's good faith efforts but nevertheless concluding that violations were neither technical nor inadvertent); *see also Food Lion,* 103 F.3d at 1017 (explaining that good faith is relevant when assessing substantial compliance). Indeed, an "inadvertent" error is one that is, by its very nature, made in good faith. This is not to say that a party's good faith efforts necessarily convert its contumacious conduct into inadvertent violations; rather, good faith is relevant to the substantial compliance inquiry, no more, no less.

19    The FTC mistakenly accuses the District Court of applying a laches defense in favor of the Lane defendants. Although the laches defense was briefed by the parties before the District Court, that Court correctly characterized it as a "mis-conceptualiz[ation]" of the issue. We are satisfied that the Court considered the FTC's prolonged delay in initiating contempt proceedings only insofar as it reflected upon the reasonableness of the Lane defendants' conduct. Such consideration is eminently appropriate. In fact, we share the District Court's concerns. In 2007, the FTC accused the Lane defendants of numerous misrepresentations, many of which were disclosed in compliance reports as early as 2001. After providing the government with its advertising and the research relevant thereto, the Lane defendants heard nothing for a period of years. To construe the FTC's silence as approval was technically mistaken, but it was not unreasonable. We are, of course, sympathetic to the FTC's significant regulatory and enforcement responsibilities, but delays of this extraordinary length are inordinate. In sum, it was proper for the District Court to consider these facts in its reasonableness assessment.

---

End of Document                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

32 Bankr.Ct.Dec. 354, 34 UCC Rep.Serv.2d 891

139 F.3d 154
United States Court of Appeals,
Third Circuit.

In re VARSITY SODDING SERVICE, Debtor.
PNC BANK, National Association f/
k/a First Eastern Bank, N.A.; John
J. Thomas, Judge; Gregory R. Lyons,
v.
VARSITY SODDING SERVICE,
PNC Bank, National Association, s/b/
m/t First Eastern Bank, N.A., Appellant.

No. 96-7643.   |   Argued June 23,
1997.   |   Decided March 13, 1998.

Bank claiming security interest in Chapter 11 debtor's landscaping equipment sought relief from automatic stay. Debtor's chief officer and trustee intervened to oppose bank's claim. The Bankruptcy Court, John J. Thomas, J., 191 B.R. 306, ruled that bank had lost its perfected security interest in equipment. Bank appealed. The United States District Court for the Middle District of Pennsylvania, James F. McClure, J., affirmed. Bank appealed. The Court of Appeals, Wellford, Senior Circuit Judge, sitting by designation, held that debtor's landscaping equipment and machinery fell within definition of "mobile goods" under Pennsylvania's version of the Uniform Commercial Code.

Reversed.

## Attorneys and Law Firms

**\*155** Richard K. Hodges (argued), O'Malley & Harris, P.C., Scranton, PA, for Appellant.

Eugene C. Kelley (argued), Hoegen, Hoegen & Kelley, Wilkes-Barre, PA, for Debtor.

Before: GREENBERG, McKEE, and WELLFORD, [*] Circuit Judges.

## OPINION OF THE COURT

WELLFORD, Senior Circuit Judge.

Varsity Sodding Service, Inc. ("Varsity"), incorporated in 1978, was engaged in the landscaping and nursery businesses.

In 1990, First Eastern Bank, N.A. ("the Bank"), [1] in Wilkes-Barre, Pennsylvania, financed the purchase of various pieces of landscaping equipment by Varsity, the now bankrupt debtor, for some $450,000. Varsity agreed to keep its records with regard to the loan at its principal office in Swoyersville, Pennsylvania. In connection with the loan, Varsity executed financing statements and granted the Bank a lien on "inventory machinery and equipment and furniture and fixtures." [2] The security agreement was to be construed under Pennsylvania law, and it provided that Varsity would promptly notify the Bank of a change in the location of the subject collateral. The financing statements were continued in force through 1993 by filing in Luzerne County, Pennsylvania, and in the office of the Secretary of State of Pennsylvania.

The machinery and equipment purchased by Varsity included backhoes, loaders, a mulch spreader, a trencher, landscape rakes, a vibrator plow, and hydro-seeders. The total financing arrangement between the parties involved notes totaling in excess of $500,000. The machinery and equipment are the only collateral at issue in this proceeding, and the parties have stipulated that it is worth only $82,600. *See In re: Varsity Sodding Service, Inc., 191 B.R. 306 (Bankr.M.D.Pa.1996).*

After 1990, Varsity transported the equipment to Maryland and then to New Jersey. On December 1, 1993, Varsity filed for bankruptcy protection under Chapter 11, at a time when the equipment was still in New Jersey. Varsity never filed financing statements in New Jersey.

In the bankruptcy proceeding, the Bank filed a proof of claim as a secured creditor in an amount exceeding $500,000, and also filed a motion for a stay with respect to its claimed security interests. The chief officer of Varsity, John Yarosz, intervened opposing the Bank's claim, as did the bankruptcy trustee. The bankruptcy court held that, because the Bank failed to file the required financing statements in New Jersey, it "lost its perfected security interest in equipment and in the proceeds therefrom." The Bank appealed that ruling to the district court, because it stood to receive nothing from the sale or value of the equipment. In an order dated August 30, 1996, the district court denied the Bank relief and affirmed the bankruptcy court's decision. The Bank filed a timely appeal to this court.

The district court below determined that the singular issue before it "was whether certain earth-moving equipment constitutes 'mobile goods' for filing purposes under the

32 Bankr.Ct.Dec. 354, 34 UCC Rep.Serv.2d 891

[applicable provision of the] Uniform Commercial Code." If the collateral were deemed to be "mobile," then the transporting of the collateral to another state would have no **\*156** effect on the Bank's perfected security interest in Pennsylvania under U.C.C. § 9-103(3). The district court agreed with the bankruptcy court that the equipment in question was not "mobile goods:"

> The equipment consists of various items identified in Yarosz' Exhibit No. 1. They are generally described as items used in the landscaping business including backhoes, loaders, mulch spreader, trencher, landscape rakes, vibrator plow, hydro-seeders, etc. None of these items could be used over the roads. All of them would have to be "trailered" or chained onto a flat-bed trailer for movement from one area to another. While the equipment is used to move earth in landscaping operations, none of it is of a large-scale nature such as what exists with regard to excavation equipment.

The district court added:

> [L]andscaping is not an activity that takes place over such a large area that the equipment would be expected to be in more than one state during the course of a week.

[1]    Perfection of a security interest ordinarily requires filing in a location in which the secured collateral is located. Pennsylvania law, however, provides for a four month period of protection for a security holder after a change in location from one county to another.

> (c) Effect of change in location of debtor or collateral.- A filing which is made in the proper county continues effective for four months after a change to another county of residence of the debtor or place of business or the location of the collateral, whichever controlled the original filing. It becomes ineffective thereafter unless a copy of the financing statement signed by the

secured party is filed in the new county within said period. The security interest may also be perfected in the new county after the expiration of the four month period; in such case, perfection dates from the time of perfection in the new county. A change in the use of the collateral does not impair the effectiveness of the original filing.

13 PA. CONS. STAT. ANN. § 9401(c). The purpose of this provision "is to put future creditors and subsequent purchasers of the collateral on notice of the lien." *General Elec. Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184, 190 (3d Cir.1988) (citing *Industrial Packaging Prods. Co. v. Fort Pitt Packaging Int'l,* 399 Pa. 643, 648, 161 A.2d 19, 21(1960)), and *Casterline v. Gen. Motors Accept. Corp.,* 195 Pa.Super. Ct. 344, 351, 171 A.2d 813, 814 (1961).

[2]    Both the bankruptcy court and the district court relied upon *In the Matter of Dennis Mitchell Industries,* 419 F.2d 349 (3d Cir.1969), for its holding that the chattels and equipment involved were not "mobile" goods within the meaning of § 9-103(2) of the U.C.C. (13 PA. CONS. STAT. ANN. § 9103(b)). We note first several distinguishing characteristics of *Dennis Mitchell* from the facts of this case:

1. In *Dennis Mitchell* the debtor filed the requisite financing statements in Pennsylvania, but the collateral was *never* located in that state.

2. The collateral bought in New York was taken directly to debtor's plant in New Jersey, and remained at this location despite debtor's agreement to send and keep it in Pennsylvania.

3. The receiver in bankruptcy sought to sell this equipment to another secured creditor; the lienholder in Pennsylvania asserted priority.

4. The collateral involved was industrial (plant) equipment.

The court stated in *Dennis Mitchell:*

> Had the machinery been taken to Mitchell's Philadelphia plant within 30 days after the security interest had attached, it is clear that Pennsylvania law would control, and Schwabe's Pennsylvania filing would have

perfected its security interest as the parties intended the property be kept in Pennsylvania (see § 9-103(3) ... ).

*Dennis Mitchell,* 419 F.2d at 357 (footnote omitted). The court went further, however, to hold that the secured creditor's interest was imperfected after the secured property had been in New Jersey more than four months, even though the creditor had no **\*157** knowledge that the property was not in Pennsylvania. [3] *Id.* at 358. As a consequence, the court in *Dennis Mitchell* concluded that the creditor's interest was subordinate to the rights of the bankruptcy trustee under the circumstances unless the machinery was of the type described in § 9-103(2). *Id.*

The court then addressed whether the collateral constituted "goods of a type which are normally used in more than one jurisdiction," *i.e.,* "mobile goods," under section, § 9-103(2). The court reasoned that the enumeration of certain types of goods was not intended to be all inclusive, and that the *type* of goods involved, not their actual use, is the key to resolving the issue. *Id.* The fact that "the goods may be and are easily transported from state to state" is not dispositive. *Id.* The court concluded, without elaboration, that "the *industrial equipment* [plant machinery] of the type involved here may not be characterized as mobile goods within the meaning of that section." *Id.* (emphasis added).

In footnote 31, the *Dennis Mitchell* court cited to a comment following U.C.C. § 9-103(2), which emphasizes that the rule applicable to mobile goods may apply "whether the particular collateral in question is in fact mobile or not;" the real question is "whether the collateral is of a *type* normally used in more than one jurisdiction." *Id.* at 358, n. 31 (quoting U.C.C. § 9-103(2), Comment 3). In the instant case, the bankruptcy court conceded, we believe correctly, that inherent characteristics of landscaping equipment suggest that its usefulness would be quite limited if it could not be relocated from site to site. [4] *Varsity Sodding,* 191 B.R. at 308. The bankruptcy court added, moreover, that "the language of the UCC quite naturally lends itself to defining the normal use as focusing '... on the inherent qualities of the collateral and the uses to which such collateral would normally be put.' " *Id.* (quoting *Konkel v. Golden Plains Credit Union,* 778 P.2d 660, 663 (Colo.1989)(*en banc* )). Thus, the precedent relied upon by the district and bankruptcy courts leads us to a conclusion different than that of those courts with respect to whether the

collateral in question constitutes "mobile goods" within the meaning of the U.C.C. as adopted in Pennsylvania.

The district court, however, analyzed another portion of the bankruptcy court decision. The bankruptcy court found Varsity to be "engaged in a residential landscaping business [and] engaged in projects that were outside ... Pennsylvania." Varsity was clearly a large-scale commercial and multiple residency project landscaping operation, and it utilized very substantial, expensive equipment as it moved regularly from one site to another. [5] The machinery and equipment in question were admittedly readily "moveable" by means of a tractor-trailer. Yarosz described one "Skitsgear loader," as machinery which moved "topsoil" and grades land. He described the "trenching equipment" as that which installs "irrigation systems" and trenches for pipe connection (with four wheels and a "long boom off the back," a kind of "tractor"). This equipment would be like a backhoe. [6] The equipment generally was capable of operation on a highway but was hauled instead. The "grader" equipment was similar to the kind used to "grade a street." We find such machinery and equipment to be substantial construction-type equipment akin to "road building and construction machinery" specifically set out as examples in 13 PA. CONS. STAT. ANN. § 9103(c)(1).

**\*158** The remaining equipment at issue was lighter, more easily moved, and all of the equipment was normally used in different jobs, at different projects, in various states during the period of the security agreement. According to Yarosz's testimony, Varsity utilized the equipment in question on large commercial and residential housing project landscaping jobs. The machinery remained on sites outside of Pennsylvania for more than a year. This equipment, according to the debtor's brief, "had to be dragged or hauled from site to site." We conclude from these undisputed facts that the "normal" use of such machinery would take it from state to state. In light of this fact, the bankruptcy court erred in finding that the " 'normal use' of this equipment [would not] take it from state to state." [7]

We find that the Varsity operations, including earth moving, were sufficiently "large-scale" in nature and akin to road grading, digging, and general excavation work that the equipment used meets the requirements and is characteristic of the mobile goods described in 13 P A. CONS. STAT. ANN. § 9103(c)(1). *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d 1167, 1168 (10th Cir.1985)(golf course landscaping equipment, which was adaptable to land mining operations,

was considered to be "mobile goods" under the U.C.C.). It was clear that Yarosz headed a landscaping company that became much more than a local residential concern. At least one of its projects involved $1,000,000. Therefore, the bankruptcy court was clearly erroneous in finding that "[w]hile the equipment is used to move earth in landscaping operations, *none of it is of a large-scale nature such as what exists with regard to excavation equipment.*" It is immaterial that, generally speaking, "[l]andscaping is not an activity that takes place over such a large area that the equipment would be expected to be in more than one state during the course of a week." As is explained above, *Dennis Mitchell,* relied upon by the district and bankruptcy courts, actually supports our decision.

In summary, we conclude that the equipment and machinery at issue constitute "mobile goods," given the nature of Varsity's landscaping business. The Bank's financing statements were properly filed in Pennsylvania. The Bank perfected its security interest and is entitled to priority status over that of the bankruptcy trustee and Yarosz personally. The equipment is of the type and inherent quality that its "normal use" would be reasonably expected to take it from state to state in the business conducted by Varsity.

We, accordingly, **REVERSE** the judgment of the district court and award priority to the Bank in the equipment and machinery at issue.

**Parallel Citations**

32 Bankr.Ct.Dec. 354, 34 UCC Rep.Serv.2d 891

---

Footnotes

*   Honorable Harry W. Wellford, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1   PNC Bank is the successor by merger to First Eastern Bank.

2   Other collateral for the loan consisted of accounts receivable and assignment of life insurance. The later modification agreement added as collateral a mortgage on real estate in Carbon and Luzerne Counties, Pennsylvania.

3   The court cited no Pennsylvania law for this proposition, but mentioned the decision of a referee in *In re Welker,* 2 U.C.C. Reporting Serv. 169, 1964 WL 8629 (Bankr.W.D.Pa.1964).

4   *Golden Plains Credit Union v. Konkel,* 759 P.2d 788, 5 UCC Rep.Serv.2d 1196 (Colo.Ct.App.1988), discussed the meaning of § 9-103(2) more fully and was affirmed on this point by the Colorado Supreme Court, 778 P.2d 660, 663 (Colo.1989)(*en banc* ). The appellate court cited cases holding that this section included such items as (1) farm tractors, (2) heavy construction equipment, (3) excavation machinery, and (4) large earth moving equipment as "mobile goods" or equipment.

5   Varsity's principal officer testified that it "did large landscaping projects and large trac[t] housing projects."

6   The "vibrator plow" is the same type as the trencher-it "vibrate[s] the pipe in instead of trenching."

7   Our holding is consistent with the bankruptcy court's statement that the investment in this equipment "would require its use over a large regional area including from one state to another." *Varsity Sodding,* 191 B.R. at 308.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

496 Fed.Appx. 238 (Table)
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA3 RULE 28.0 and CTA3 APP I, IOP 5.2 regarding the publication and citation of unpublished opinions.)
United States Court of Appeals,
Third Circuit.

UPPER FREEHOLD REGIONAL
BOARD OF EDUCATION
v.
* T.W.; M.W., o/b/o T.W., Appellants.
* Dismissed pursuant to Clerk's
order of December 22, 2011.

No. 11–2151.    |    Argued May 22,
2012.    |    Opinion Filed: Sept. 7, 2012.

**Synopsis**

**Background:** In parents' suit against school district for tuition reimbursement under Individuals with Disabilities Education Act (IDEA), the United States District Court for the District of New Jersey, 2011 WL 1322222, Joel A. Pisano, J., reversed administrative law judge's (ALJ) award to parents. Parents appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit Judge, held that:

[1] district court was required to first determine whether proposed individual education plan (IEP) provided a free appropriate public education (FAPE) before considering whether parents' conduct in removing child from school created an impasse, and

[2] district court's finding that parents had frustrated IEP process was not based on administrative record.

Judgment vacated and case remanded.

Hardiman, Circuit Judge, dissented with opinion.

*239  Appeal from the United States District Court for the District of New Jersey (D.C. Civil No. 3–09–cv–01847), District Judge: Honorable Joel A. Pisano.

**Attorneys and Law Firms**

Pedro De Oliveira Esq., [Argued] Mark W. Friedman, Esq., Debevoise & Plimpton, New York, NY, Denise Lanchantin Dwyer Esq., Princeton Junction, NJ, for Appellants.

Cherie L. Adams Esq., [Argued] Adams, Stern, Gutierrez & Lattiboudere, Newark, NJ, Paul C. Kalac, Esq., Parker McCay, Lawrenceville, NJ, for Appellee.

Before: RENDELL, FUENTES and HARDIMAN, Circuit Judges.

Dissenting opinion filed by Circuit Judge HARDIMAN.

**OPINION OF THE COURT**

RENDELL, Circuit Judge.

This is an appeal from the District Court's reversal of a state administrative law judge's (ALJ) award of tuition reimbursement for plaintiffs in an Individuals with Disabilities in Education Act ("IDEA") case. We will vacate the judgment below and remand.

**\*240  I. Background**

T.W. is a child with learning disabilities. His parents, along with the school district of Upper Freehold (the "District"), developed an individualized education plan ("IEP") for the 2006–07 school year that called for T.W. to split his school days between the District's preschool and the "Project Child" preschool in the Mercer County Special Services School District. Although T.W. turned four early in the 2006–07 school year, he was placed in a classroom at Project Child with three-year olds who would turn four in the calendar year 2007. T.W.'s birthday is in September 2002, shortly before the October 1st date that the District uses as a cut-off for class years. Therefore, if T.W. was placed in a classroom based on his date of birth, he would be one of the youngest students. In his Project Child classroom, by contrast, he was one of the oldest students.

The current dispute relates to a disagreement between T.W.'s parents and the District about T.W.'s education for the 2007–08 school year. Prior to a June 15, 2007 meeting of T.W.'s IEP team, the District provided T.W.'s parents with a draft IEP, proposing that T.W. be placed in kindergarten the following fall and receive certain additional services and therapies. At the June 15 meeting, the parents urged that T.W. be placed in preschool for another year. The meeting adjourned without agreement on an IEP. Another meeting was scheduled for June 29, 2007, but never took place. The District asserts that T.W.'s parents cancelled the meeting, whereas the parents contend that they merely requested a postponement to give a psychologist working with T.W. time to complete her full report.

By letter dated June 29, 2007, the District sent T.W.'s parents an amended IEP for the 2007–08 school year, again calling for T.W.'s placement in kindergarten but adding additional supports and services recommended by a team of Yale researchers that analyzed T.W. at his parents' behest. The cover letter enclosing the amended IEP stated "[y]ou have 15 days to respond." (A2109.)

T.W.'s parents responded by letter dated July 3, 2007, stating that "the document purporting to be an IEP was generated without our participation" and that, because the parties had not discussed their "unresolved issues" at an IEP meeting, "the document [the parents] received could not constitute the district's formal proposal." (A2110.) The letter concluded by stating, "[w]e look forward to your response." (A2110.)

On July 12, 2007, T.W.'s parents filed a request for mediation and a due process hearing. They claim they filed their petition when they did because they believed that, under New Jersey law, the District's June 29 IEP placing T.W. in kindergarten would have gone into effect unless they requested mediation or a due process hearing within 15 days of the IEP proposal. *See* N.J.A.C. § 6A:14–2.3(h)(3).

The parties met again in August 2007 to try to resolve their dispute. At that meeting, the parents presented the district with a letter from T.W.'s developmental pediatrician, Dr. Anna Baumgaertel, explaining that she recommended another year of preschool for T.W. so that he could "work on his significant social deficits." (A2124.) The meeting concluded without an agreement.

In September 2007, T.W.'s parents unilaterally placed him as a regular student in the Project Child preschool program.

On September 11, 2007, they advised the District by letter that they would be making the placement immediately and that they were "unable to wait ten business days to make the placement [pursuant to *241 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) ] because to do so would cause [T.W.] to suffer severe harm." (A2125.)

In the beginning of the 2007–08 school year, T.W. did not receive one-on-one services and therapies at Project Child. However, on November 19, 2007, T.W.'s parents and Project Child agreed on an educational plan for T.W. that called for him to receive additional services and be in a smaller classroom setting. The District did not participate in the making of this plan.

An ALJ hearing was conducted over eleven days in 2008 and early 2009. The ALJ thoroughly described the evidence presented in a 54–page opinion. He found both the District's witnesses and T.W.'s expert witnesses credible. He found that "[i]f placed in kindergarten in the 2007–08 school year, T.W. would do 'fine academically,' but it could increase his social awkwardness and withdrawal.... [F]or the 2007–08 school year placement in *kindergarten* pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE." (A58 (emphasis added).) The ALJ noted that when T.W. was placed in Project Child's full-day preschool program for the 2007–08 school year, he "did not receive the therapies and/or related services that the [District] would have provided pursuant to the draft IEP and I find that this placement in Project Child did not provide T.W. with a FAPE." (A58.) However, the ALJ found that "[o]n November 19, 2007, without inviting the [District] educators to participate in an IEP meeting [T.W.'s parents] and Project Child agreed to an IEP for T.W." (A59.)

The District argued that it offered an IEP for the 2007–08 school year that would have provided a FAPE and that T.W.'s parents refused and/or failed to participate meaningfully in the IEP-development process, so their claim for reimbursement should therefore be dismissed. The ALJ's complete response follows:

> [D]uring the summer of 2007 the parties had reached an impasse: the petitioners would not agree to an IEP that provided for placement in kindergarten for the 2007–08 school year and, consistent with the findings of fact, placement in kindergarten would not have provided a FAPE.

On the other hand, the placement of T.W., a disabled child, in Project Child as a regular student and without an IEP also did not provide him with a FAPE. T.W. did not have an IEP until after November 19, 2007, and the unilateral placement did not provide a FAPE until after November 19, 2007. Consequently, the [District] cannot be ordered to reimburse [T.W.'s parents] for the unilateral placement before that time. However, the [District] is responsible for the reimbursement for the unilateral placement for the period after November 19, 2007, until the end of the 2007–08 school year.

(A63.) The ALJ made no specific finding as to whether the District's draft amended IEP offered a FAPE or whether the IEP provided sufficient "supports and services" to make the placement in kindergarten a FAPE. (*See* A58 (ALJ opinion) ("[F]or the 2007–08 school year placement in kindergarten pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE.").)

The parties appealed to the District Court for the District of New Jersey and submitted cross-motions for judgment on the record. Relying on our decision in *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59 (3d Cir.2010), the District Court held that the parents were not entitled to reimbursement. The District Court concluded that the parents' actions "deprive the Court of the ability to determine whether the District proposed an appropriate IEP." **\*242** (A8.) Furthermore, the District Court denied reimbursement on "equitable grounds, as provided for in 20 U.S.C. § 1412(a)(10)(C)(iii)," saying that the parents "did not provide adequate notice to the District of their unilateral withdrawal of T.W. from the public placement," and that their "conduct in delaying, cancelling, or refusing to set up additional meetings with the IEP team substantially precluded any possibility that the District could timely develop an appropriate IEP for T.W." (A9.)

## II. Standard of Review

On appeal from an ALJ's determination in an IDEA case, the district court is to "give due weight and deference" to the ALJ's findings and consider the ALJ's factual findings to be prima facie correct. *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 564 (3d Cir.2010); *see also Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("[D]ue weight shall be given to [state administrative] proceedings."). According "due weight" to the ALJ's findings means that the district court has an obligation "to consider—although not necessarily to accept—the administrative fact findings." *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995) (citing *Oberti ex rel. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.,* 995 F.2d 1204, 1219 (3d Cir.1993)). The district court "must *independently* review the evidence adduced at the administrative proceedings and can receive new evidence." *Oberti,* 995 F.2d at 1219. Ultimately, the district court must " 'make an independent determination based on a preponderance of the evidence.' " *Id.* (quoting *Geis v. Bd. of Educ.,* 774 F.2d 575, 583 (3d Cir.1985)). A district court "should defer to the hearing officer's findings based on credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle,* 62 F.3d at 529.

We review a district court's findings of fact for clear error and exercise plenary review over the legal standards the district court applies and the legal conclusions it reaches. *Bayonne Bd. of Educ.,* 602 F.3d at 564. Under a clear error standard of review, "we accept the District Court's ultimate factual determinations unless 'that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.' " *N.J. Retail Merchants Ass'n v. Sidamon–Eristoff,* 669 F.3d 374, 390 (3d Cir.2012) (quoting *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972)). Where parents allege that "the district court failed to observe its own proper scope of review, we must determine whether the district court erred in its interpretation or application of the law governing the administrative review process, a question over which we exercise plenary review." *Carlisle,* 62 F.3d at 526 (citing *Louis W. Epstein Family P'ship v. Kmart Corp.,* 13 F.3d 762, 765–66 (3d Cir.1994)).

## III. Discussion

**[1]**    The IDEA authorizes tuition reimbursement for parents who unilaterally decide to place their child in an out-of-district school if the IEP proposed by the school district failed to offer the child a FAPE and the placement the parents chose

was proper under the IDEA. *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Florence Cty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). The District Court failed to analyze these issues and instead relied on *Cape Henlopen* as the basis for **\*243** denying tuition reimbursement to T.W.'s parents. This was error. [1] *Cape Henlopen* presented a very unique situation, and the holding in that case simply cannot be applied once the parties have been working toward formulating an IEP, and then reach an impasse. In *Cape Henlopen,* the petitioners alleged that the school district committed a *procedural* violation of the IDEA when it failed to have an IEP in place for their child on the first day of school. 606 F.3d at 68–69. We noted that this failure was a result of the parents' decision to delay an IEP team meeting until after classes had begun. *Id.* at 69. We therefore "decline[d] to hold that a school district is liable for procedural violations that are thrust upon it by uncooperative parents." *Id.* Here, in contrast, the parents do not complain that the school district failed to timely implement an IEP. Rather they complain that the *substance* of the proposed IEP, which was developed after meetings and correspondence between the parties, did not provide a FAPE because it called for T.W. to attend kindergarten, not preschool, for 2007–08. The alleged problem with the IEP was not that it could not be developed due to "uncooperative parents." *Id.* Rather, the problem was that the IEP offered would place T.W. in kindergarten for the school year 2007–08. [2] The parents' disagreed with that proposal, resulting in what the ALJ characterized as an "impasse." (A63.) To say that *Cape Henlopen* would apply to totally bar parents from reimbursement after negotiations reached an impasse is to fault them for failing to agree to whatever the school district presents, whether justified or not. [3] Here, the District Court erred when it abbreviated its analysis based on the parents' conduct and failed to determine **\*244** whether the District's proposed IEP was appropriate. It should have considered the substance of the District's most recent proposed IEP and determined if it met the IDEA'S substantive requirements. *See Rowley,* 458 U.S. at 203, 102 S.Ct. 3034 (holding that a state satisfies the IDEA's requirement to offer FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction"); *Bayonne Bd. of Educ.,* 602 F.3d at 556 ("Although a state is not required to supply an education to a handicapped child that maximizes the child's potential, it must confer an education providing 'significant learning' and 'meaningful benefit' to the child." (quoting *Ridgewood Bd.*

*of Educ. v. N.E.,* 172 F.3d 238, 247 (3d Cir.1999))). We will remand for the District Court to address that issue.

[2]    Additionally, we find error in the District Court's denial of reimbursement on equitable grounds based on the parents' conduct. Again, the District Court's reliance on *Cape Henlopen* was misplaced. The ALJ had not considered the parents to be unreasonable or to have refused to work with the District to develop an IEP. Instead, the ALJ recounted all of the meetings and correspondence between the parties and then characterized the situation as an "impasse." (A63.) This clearly connotes an inability of both sides to agree, not the arbitrary refusal of one side to come to the table. We agree. Our review of the record leads us to conclude that the District Court's finding "that the Parents' conduct in delaying, cancelling, or refusing to set up additional meetings with the IEP team substantially precluded any possibility that the District could timely develop an appropriate IEP for T.W. and provide the necessary services to him" was clearly erroneous. (A9.) Unlike the parents in *Cape Henlopen,* T.W.'s parents did not "disregard[ ] their obligation to cooperate and assist in the formulation of an IEP." 606 F.3d at 72. The record clearly indicates that the parents participated in the IEP development process and tried to work with the District to develop an IEP. However, the parties reached an impasse based on the parents' insistence on preschool and the District's insistence on kindergarten. Denial of reimbursement based on this aspect of the parents' conduct was improper.

In discussing its alternative holding to deny reimbursement on equitable grounds, the District Court noted that T.W.'s parents did not provide adequate notice to the District, pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii), of their intent to withdraw T.W. from the District's school. The IDEA states that failure to give the statutorily required notice can justify the "reduc[tion] or deni[al]" of a reimbursement award. 20 U.S.C. § 1412(a)(10)(C)(iii)(I). However, it is unclear to us whether the District Court's equitable reduction was tainted by its erroneous determination that T.W.'s parents acted unreasonably in the IEP development process. Therefore, on remand, after the District Court determines whether T.W.'s parents are eligible for tuition reimbursement, it may examine to what extent any reimbursement award may be equitably reduced based on § 1412(a)(10)(C)(iii)(I). If the District Court reaches this issue on remand, it should consider the equities, including the parents' argument that delay in placing T.W. in Project Child would have caused him severe harm and the extent to which the District was prejudiced by receiving late notice of the parents' decision. The District Court may, of course, take

additional evidence on this issue or remand the case to the ALJ for further fact-finding.

In sum, the District Court erroneously short-circuited the required analysis by applying **\*245** our ruling in *Cape Henlopen* to deny T.W.'s parents tuition reimbursement. In so doing, the District Court did not reach the real issue before it: whether the IEP proposed by the District offered T.W. a FAPE, and, if not, whether the placement at Project Child was proper under the IDEA.[4] *Burlington,* 471 U.S. at 370, 105 S.Ct. 1996; *Florence,* 510 U.S. at 15, 114 S.Ct. 361. The District Court must engage in this analysis on remand.

We note that there is a paucity of reasoning in the ALJ's opinion regarding these crucial analytical issues. The ALJ's opinion states that "placement in *kindergarten* pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE," but does not explain why kindergarten placement with the support services provided for in the revised IEP—including all of the recommendations proposed by the Yale researchers—was insufficient to provide a FAPE. (A58 (emphasis added).)[5] The ALJ embraces the opinion of Dr. Baumgaertel (who never saw the District's proposed IEP), yet never indicates why the opinions of the District's experts (whom he credited) were rejected. If the District Court so desires, it may request a remand to the ALJ so that this aspect of its opinion can be expanded.

Accordingly, we will vacate the judgment below and remand for further proceedings consistent with this opinion.

HARDIMAN, Circuit Judge, dissenting.

My disagreement with the majority's effort to distinguish controlling precedent necessitates this respectful dissent.

**I**

In *Cape Henlopen,* the disabled child attended private school for the 2005–06 school year, and under a settlement agreement the school district reimbursed the parents for most of the cost of that schooling. 606 F.3d at 63. During that year, the mother and the school district met to develop an individualized education program (IEP) under which the child would return to the public school the following year. *Id.* The meeting was cut short due to a scheduling conflict and, after the mother indicated she was unavailable for several weeks, the school district offered **\*246** to continue the meeting

approximately three weeks later, which was five days into the school year. *Id.* The mother noted a conflict but tentatively agreed to that date. *Id.*

On the first day of school, before the scheduled date for the continued meeting, the parents "unilaterally chose[ ] to have [the child] begin classes at" private school. *Id.* at 64. The next day, the parents filed a due-process request and thereafter refused to attend the scheduled meeting. *Id.* The state hearing panel and the district court both found against the parents because the school district did not deny the child a free appropriate public education (FAPE) and because the parents had unduly inhibited the school district from providing an IEP. *Id.* at 64–65. We affirmed, stating:

> Although the IEP was not completed in the first meeting, it was the Parents and not the District who delayed the continuation of that meeting until after the start of classes, and ultimately terminated the process by filing a due process request. Like the court in [*MM ex rel. DM & EM v. School District of Greenville County,* 303 F.3d 523 (4th Cir.2002) ], we decline to hold that a school district is liable for procedural violations that are thrust upon it by uncooperative parents.

*Id.* at 69. As the child never enrolled in the public school, there was no "specific evidence of an educational deprivation." *Id.* In other words, the parents' decision to remove their child from the school before a final IEP had been offered deprived this Court of the opportunity to evaluate whether the school district would have provided a FAPE. *See id.* at 69–70.

The application of *Cape Henlopen* to the parents' conduct in this case is straightforward. In both cases, the parents participated in a preliminary IEP meeting regarding the upcoming school year. They also left that initial meeting without resolution or a final IEP proposal, thwarted the district's attempt to hold an additional meeting,[1] and then turned to litigation.[2]

The majority distinguishes *Cape Henlopen,* correctly identifying that the parents there alleged a procedural violation of the IDEA, whereas here a substantive claim has been brought. In my view, that is a distinction without a difference. To obtain reimbursement, a plaintiff alleging a

procedural violation still must show that the school district's "violation can meaningfully be said to have '[i]mpeded the child's right to a FAPE' or 'caused a deprivation of [an] **\*247** educational benefit.' " [3] *Id.* at 66–68 (alterations in original) (quoting 34 C.F.R. § 300.513(a)(2)). Put more simply, even procedural claims that seek compensatory relief require proof of a substantive violation of the IDEA.

Consequently, it makes little sense to limit *Cape Henlopen's* rule to procedural claims. The *Cape Henlopen* principle—that parents may not recover compensatory education or tuition reimbursement under the IDEA where they have short-circuited the IEP-development process—applies with equal force to procedural and substantive IDEA lawsuits. [4]

The majority's disagreement arises from its misreading of *Cape Henlopen,* from which it incorrectly concludes that the parents there impeded the school district from initiating the IEP-development process. In defending its procedure-versus-substance distinction, the majority writes that in *Cape Henlopen,* "the parents refused to attend meetings or permit [the] testing required" for IEP development. Maj. Typescript at 243 n. 2. In fact, the requisite educational evaluation occurred and the mother attended an initial IEP meeting. 606 F.3d at 63. In addition, the majority asserts that in that case "[n]o mention is made ... of any proposed" IEP or the specifics of the parents' requested educational supports. Maj. Typescript at 243 n. 2. This reasoning seeks to distinguish *Cape Henlopen* by assuming the nonexistence of certain facts regarding the details of the IEP-development process simply because they were not included in the opinion. But even in this attempt, the majority misinterprets the case. We noted in *Cape Henlopen* that the IEP meeting the parents attended "concluded before C.H.'s IEP was finalized." 606 F.3d at 63. The use of the word "finalized" implies that there was a draft proposal. We can likewise infer that, because the mother

attended the IEP meeting but placed her child in private school, the family and the school district failed to reach an agreement regarding the child's education. In sum, the facts in *Cape Henlopen* mirror the facts of this case.

Accordingly, I would hold that the District Court properly applied *Cape Henlopen.*

## II

A second ground for affirmance exists in this case. The majority interprets the equitable-reduction provision of the IDEA to not allow a denial of the ALJ's award as applied to the parental conduct at issue here. I see it differently. The IDEA allows a district court to reduce or deny any award, *id.* at 71, if: (1) the parents failed to reject the school district's placement and indicate their intent to make a private placement "at the most recent IEP meeting that the parents attended"; (2) they did not provide written notice of their intent to remove the child ten days prior to **\*248** the removal; or (3) there is a "judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a) (10)(C)(iii)(I), (III). There is no question that the parents left the first and only IEP meeting without rejecting the placement. Nor is there any doubt that the parents did not provide the requisite notice. Thus, the denial of the ALJ's award, like the District Court's "judicial finding of unreasonableness," was not an abuse of discretion.

For these reasons, I respectfully dissent.

## Parallel Citations

2012 WL 3871724 (C.A.3 (N.J.)), 290 Ed. Law Rep. 23

---

Footnotes

1   We note that the ALJ did not have the benefit of our decision in *Cape Henlopen,* which was issued after his decision in this case. Even so, we do not believe that affects our analysis. As explained below, we believe that the behavior of T.W.'s parents was quite different from the conduct of the parents in *Cape Henlopen.*

2   While the dissent believes that the procedural versus substantive distinction makes little difference, we disagree. The reason the parents in *Cape Henlopen* complained of a procedural violation—the failure of the school district to have an IEP in place on the first day of school—was that there was no IEP offered, because the parents refused to attend meetings or permit testing required in order for an IEP to be prepared. *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 64 (3d Cir.2010) ("[T]he Parents refused to give the District permission to conduct a speech and language evaluation of C.H., which was necessary in order to develop his IEP."). No mention is made in *Cape Henlopen* of any proposed program, or the parents' wishes, if any, regarding schooling. We correctly held that where the parents essentially prevented the formulation of the IEP, the school district could not be held responsible for the procedural violation.

3      The dissent suggests that so long as a school district presents its proposed IEP as a "draft" rather than "final proposal," a parent who unilaterally places her child in private school has "short-circuited the IEP-development process" and can be barred from tuition reimbursement based on *Cape Henlopen.* (Dissenting op. at 247 & n. 4.) This cannot be. Under the dissent's proposal, school districts could force parents into perpetual negotiations and effectively gut a parents' right to tuition reimbursement for a unilateral placement. The IDEA does not permit school districts to hold parents hostage merely by styling an IEP as a "draft" subject to the possibility of revision, however remote. Parents who make unilateral placements for their children surely take a risk that they will later be found to have pulled out of negotiations prematurely. *Cf. Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (noting that parents who make unilateral placements "do so at their own financial risk"). However, we disagree with our dissenting colleague that school districts can unilaterally dictate how long negotiations must continue by deciding when to call their proposals "final."

4      The District Court stated that "[b]ecause the November [19, 2007] plan [drawn up by T.W.'s parents and Project Child] was developed in the absence of the District, it was legal error for the ALJ to conclude that it was an IEP" and that "[t]herefore, the ALJ could not find that T.W.'s placement at the outside program was proper." (A6–7.) While it is true that the educational plan was not technically an IEP, this fact alone does not prevent the parents from receiving tuition reimbursement. The IDEA allows parents of disabled children to be reimbursed for expenditures on private special education if (1) the IEP calling for placement in a public school was inappropriate and (2) the private placement desired by the parents was proper under the Act. *Florence,* 510 U.S. at 15, 114 S.Ct. 361. To satisfy the second step of this test, parents seeking reimbursement for the unilateral placement of their child in an out-of-district school need not show that the out-of-district school provided their child with an IEP; they need only show that the alternative placement was "proper." *Id.* This does not require that the out-of-district placement conform to the statutory requirements of an IEP. *Id.* at 13, 114 S.Ct. 361 (noting that the requirement that an IEP must be designed by a representative of the local educational agency "do[es] not make sense in the context of a parental placement").

5      At oral argument in this case, counsel for the parents suggested that the use of the word "kindergarten" in the above-quoted language was a typographical error. This argument was not made in appellants' briefs and we are reluctant to infer that a key portion of the ALJ's opinion—the only portion discussing what would be required in 2007–08 to give T.W. a FAPE—was a mere typographical error.

1      The parents in this appeal claim that the District never sought another meeting, (Reply Br. 4–5), but the record indicates otherwise. The District wrote to the parents: "It is [the District's] firm and consistent desire that we reach agreement on a least restrictive, free appropriate public education for [T.W.] Please contact [the District] so that we may continue to move forward in developing an Individualized Education Plan for [T.W.]." (**App.2111.**)

2      The parents also contend that they filed the due-process petition in order to protect their rights under New Jersey law. Specifically, they claim that under N.J. Admin. Code § 6A:14–2.3(h), the District's June 29 letter triggered a fifteen-day window after which the District could have implemented the IEP if they had not filed a request for mediation or a due-process hearing. I am unconvinced that New Jersey law allows an IEP to be unilaterally implemented in this way. *See* N.J. Admin. Code § 6A:14–2.3(a)(2), (c) (mandating parental consent prior to finalization and adoption of an IEP). But even if it does, *Cape Henlopen* requires parents to continue the IEP-development process even after availing themselves of procedural safeguards. *See Cape Henlopen,* 606 F.3d at 72 ("The stay-put provision [in 20 U.S.C. § 1415(j) ] does not ... excuse the Parents, who based their complaint on the absence of an IEP, from continuing to meet with the District to rectify the perceived wrong.").

3      If the plaintiff chooses not to prove substantive harm, he "may only seek injunctive relief for prospective compliance." *Cape Henlopen,* 606 F.3d at 66 (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.,* 585 F.3d 727, 738 (3d Cir.2009)).

4      This principle is useful only where the parents terminate the interactive process while the IEP is in "draft" form, as was the case here and in *Cape Henlopen.* If the District had set forth a final proposal, or if the District's own obstinacy had caused a break-down in communication, the parents would have been under no continuing obligation to schedule or attend further meetings. *See Cape Henlopen,* 606 F.3d at 69 (distinguishing *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755 (6th Cir.2001)). Thus, I do not advocate, as the majority suggests I do, that "school districts [can] force parents into perpetual negotiations." Maj. Typescript at 243 n. 3.

---

**End of Document**                                                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

266

[1999]

[HOUSE OF LORDS]                                      A

BEAUFORT DEVELOPMENTS (N.I.) LTD.    .    .    .  APPELLANTS

AND

GILBERT-ASH N.I. LTD.    .    .    .    .    .    .  RESPONDENTS

1998  Feb. 25, 26;        Lord Goff of Chieveley, Lord Lloyd of Berwick,    B
      May 20                      Lord Nolan, Lord Hoffmann and
                                         Lord Hope of Craighead

> *Building—Contract—Arbitration—Contractors claiming payment for work*
> *certified by architects—Employers alleging negligence and breach*
> *of contract by contractors and architects—Contractors seeking*
> *appointment of arbitrator in accordance with contract—Employers*  C
> *commencing High Court action—Contractors' application to stay*
> *action—Whether arbitrator's power to open up, review and*
> *revise architects' certificates exclusive—Standard Form of Building*
> *Contract, Private Edition without Quantities, 1980 ed., cl. 41.4*

The employers entered into an agreement with the contractors in
the J.C.T. standard form of building contract, 1980 ed., for the
construction of an office block in Belfast. By a separate agreement    D
the employers appointed architects for the project. The contract,
by clause 41.4,[1] provided for arbitration of disputes, and gave the
arbitrator power to open up, review and revise any certificate.
Following disputes over the progress of the work, the contractors
commenced High Court litigation against the employers claiming
payment for work in respect of which architects' interim certificates
had been issued. By their defence the employers denied liability    E
and alleged that they were entitled to set off an amount in excess
of that claimed by the contractors. The contractors then served a
notice to refer and concur in the appointment of an arbitrator
pursuant to the arbitration clause. The employers issued a writ
against both the contractors and the architects claiming damages
for negligence and breach of contract. The contractors applied,
pursuant to section 4 of the Arbitration Act (Northern Ireland)    F
1937, for an order staying all further proceedings in the employers'
action. The master granted the order. The judge and the Court of
Appeal in Northern Ireland dismissed appeals by the employers
and upheld the master's order on the ground that the court did
not have the power conferred upon an arbitrator by the arbitration
clause to open up, review and revise certificates issued by the
architect.

On the employers' appeal:—                                          G

*Held*, allowing the appeal, that the arbitration clause was
intended to confer on the arbitrator the plenitude of powers
possessed by the court to determine the rights of the parties; that
it was necessary to spell out those powers in the case of the
arbitrator but not in the case of the court since his powers were
derived from the contract under which he was appointed, whereas
the court's jurisdiction was unlimited; that, therefore, the fact that
power to open up, review and revise was expressly conferred upon    H
the arbitrator but not upon the court could not be construed as
removing the court's power; and that, accordingly, in the

---

[1] J.C.T. Standard Form, 1980 ed., cl. 41.4: see post, p. 272D–E.

A    circumstances, there would be no injustice to the contractors in
refusing a stay (post, pp. 269B–C, 271A–C, F–272B, 276F–G, 278A,
280G–281A, 282A–B, 283C, 285D–F, 286A–D, 292A–E).
  *Robins v. Goddard* [1905] 1 K.B. 294, C.A. approved.
  *Northern Regional Health Authority v. Derek Crouch Construc-
tion Co. Ltd* [1984] Q.B. 644, C.A. overruled.
  Decision of the Court of Appeal in Northern Ireland reversed.

B
  The following cases are referred to in their Lordships' opinions:

  *Balfour Beatty Civil Engineering Ltd. v. Docklands Light Railway Ltd.* (1996)
   78 B.L.R. 42, C.A.
  *Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R. 115, C.A.
  *Brodie v. Cardiff Corporation* [1919] A.C. 337, H.L.(E.)
  *Dawnays Ltd. v. F.G Minter Ltd. and Trollope and Colls Ltd.* [1971] 1 W.L.R.
C   1205; [1971] 2 All E.R. 1389, C.A.
  *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406; [1965]
   3 W.L.R. 1096; [1965] 3 All E.R. 619, H.L.(E.)
  *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146; [1972]
   1 All E.R. 121, H.L.(E.)
  *Minster Trust Ltd. v. Traps Tractors Ltd.* [1954] 1 W.L.R. 963; [1954] 3 All
   E.R. 136
D  *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* (1973)
   71 L.G.R. 162, C.A.; [1974] A.C. 689; [1973] 3 W.L.R. 421; [1973] 3 All
   E.R. 195, H.L.(E.)
  *National Coal Board v. William Neill & Son (St. Helens) Ltd.* [1985] Q.B. 300;
   [1984] 3 W.L.R. 1135; [1984] 1 All E.R. 555
  *Neale v. Richardson* [1938] 1 All E.R. 753, C.A.
  *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.*
   [1984] Q.B. 644; [1984] 2 W.L.R. 676; [1984] 2 All E.R. 175, C.A.
E  *Robins v. Goddard* [1905] 1 K.B. 294, C.A.
  *Taunton-Collins v. Cromie* [1964] 1 W.L.R. 633; [1964] 2 All E.R. 332, C.A.


  The following additional cases were cited in argument:

  *Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488; [1988]
   3 W.L.R. 867; [1988] 2 All E.R. 577, C.A.
F  *Chrisphine Othieno v. Cooper* (1991) 57 B.L.R. 128
  *Partington & Son (Builders) Ltd. v. Tameside Metropolitan Borough Council*
   (1985) 32 B.L.R. 150
  *Tubeworkers Ltd. v. Tilbury Construction Ltd.* (1985) 30 B.L.R. 67, C.A.
  *University of Reading v. Miller Construction Ltd.* (1994) 75 B.L.R. 91


  APPEAL from the Court of Appeal in Northern Ireland.
G  This was an appeal by the plaintiff employers, Beaufort Developments
(N.I.) Ltd., from a decision dated 21 April 1997 of the Court of Appeal in
Northern Ireland (Carswell L.C.J., MacDermott and Nicholson L.JJ.)
dismissing the employers' appeal from a decision of Pringle J. sitting in the
High Court of Justice in Northern Ireland on 24 May 1996 when he
affirmed an order granted on 18 April 1996 by Master Wilson staying all
further proceedings in the employers' action commenced by writ issued on
H 5 December 1995 against the first respondent contractors, Gilbert-Ash N.I.
Ltd., and the second respondents, T. H. Philip Parker and George
W. S. Scott, practising as Parker & Scott, architects, claiming damages for
negligence and breach of contract. On 28 April 1997 the Court of Appeal

268

Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))    [1999]

in Northern Ireland granted the employers' application for leave to appeal    A
to the House of Lords.

The facts are stated in the opinions of Lord Hoffmann and Lord Hope
of Craighead.

*Declan Morgan Q.C* and *Gavin Bonnar* (both of the Northern Ireland    B
Bar) for the employers. In order to construe a contract it is necessary to
look at it as a whole. The disputes arising from the contract in the present
case are in respect of matters that are appropriate for resolution by a
court.

The interpretation of the contract in *Northern Regional Health Authority
v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 was erroneous. That
interpretation has now been elevated to a principle of law that the words
"open up, review and revise" oust the jurisdiction of the courts. The    C
decision in the *Crouch* case was based on a wrong proposition of law and
has been followed in subsequent cases. [Reference was made to *Robins v.
Goddard* [1905] K.B. 294; *Neale v. Richardson* [1938] 1 All E.R. 753;
*Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974]
A.C. 689; *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R.
146; *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406;
*Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488 and    D
*Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R. 115.]

*Donnell Deeny Q.C.* and *Mark Horner Q.C.* (both of the Northern
Ireland Bar) for the contractors. The parties here, as in *Northern Regional
Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644,
agreed to arbitrate in binding and clear terms and should be held to their
agreement. This was a commercial contract and where parties agree a    E
machinery for resolving disputes they should not substitute other
machinery. That view is in accordance with Scottish law and with the
provisions of the Arbitration Act 1996.

Here, as in the *Crouch* case, the arbitrator was given wide power to
"open up, review and revise any certificate, opinion, decision . . ." of the
architect. The arbitrator would be technically qualified and therefore well
armed to review the architect's decision ab initio. The court would not    F
approach the matter in the same way but would tend to defer to the
decisions of the architect as a professional man adjudicating between
contractor and the client in the course of the contract.

Therefore the *Crouch* case was right in principle and on the merits. The
powers of the court in this context derive from this contract between the
parties. The *Crouch* case has been followed without dissent by a series of    G
appellate courts in England. [Reference was made to *Tube Workers Ltd. v.
Tilbury Construction Ltd.* (1985) 30 B.L.R. 67; *Balfour Beatty Civil
Engineering Ltd. v. Docklands Light Railway Ltd.* (1996) 78 B.L.R. 42;
*University of Reading v. Miller Construction Ltd.* (1994) 75 B.L.R. 91;
*Partington & Son (Builders) Ltd. v. Tameside Metropolitan Borough Council*
(1985) 32 B.L.R. 150 and *Chrisphine Othieno v. Cooper* (1991) 57 B.L.R.
128.]    H

*John Thompson Q.C.* and *Desmond Marrinan* (both of the Northern
Ireland Bar) for the architects, adopting the submission of the contractors.
If the employers are successful, the architects will be in the invidious

1 A.C.          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))

A   position of being witnesses in one set of proceedings and being obliged to defend themselves in another set of proceedings. All the issues would not be resolved in one set of proceedings and there would be a risk of inconsistent findings in the two sets of proceedings, giving rise to the prospect of injustice and increased costs.

     *Morgan Q.C.* replied.

B

     Their Lordships took time for consideration.

     20 May.  Lord Goff of Chieveley.  My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Hoffmann. I find myself to be in complete agreement with his

C   reasoning and his conclusion; and I, too, am satisfied that, with all respect to the distinguished members of the Court of Appeal who decided the case, *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 was wrongly decided and must be overruled. I, too, would therefore allow the appeal a conclusion which, I have no doubt, will be welcomed by the courts in Northern Ireland who would, if they had been free to do so, have wished to follow the same course. Like

D   my noble and learned friend, I gladly acknowledge my debt to the writings of Mr. I. N. Duncan Wallace Q.C. on the subject.

     Lord Lloyd of Berwick.  My Lords, standard forms of building contract have often been criticised by the courts for being unnecessarily obscure and verbose. But in fairness one should add that it is sometimes

E   the courts themselves who have added to the difficulty by treating building contracts as if they were subject to special rules of their own.

     Two recent examples illustrate the point. In *Dawnays Ltd. v. F. G. Minter Ltd. and Trollope and Colls Ltd.* [1971] 1 W.L.R. 1205 the Court of Appeal held that when a sum is certified by an architect as due under a building contract (in that case the R.I.B.A. form) the employer has no right of set-off. The justification for this decision was said to be

F   that cash flow is the life blood of the building trade: see *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* (1973) 71 L.G.R. 162, *per* Lord Denning M.R., at p. 167. The decision came as something of a surprise in the official referees' corridor. It was overruled a few years later when the *Modern Engineering* case reached the House: [1974] A.C. 689. "It is not to be supposed" Lord Diplock said, at p. 718:

G       "that so an elementary an economic proposition as the need for cash flow in business enterprises escaped the attention of judges throughout the 130 years which had lapsed between *Mondel v. Steel* (1841) 8 M. & W. 858 and *Dawnays'* case in 1971 ..."

     And so the House held, restoring the decision of Judge Edgar Fay Q.C., that the ordinary common law right of set-off, whereby a breach of

H   warranty may be set up in diminution of the price, applies as much to building contracts as to contracts for the sale of goods.

     In the meantime *Dawnays'* case had been followed in five other cases in the Court of Appeal. This is not surprising when one considers the

270

pressure of litigation in this field. One erroneous decision of the Court of    A
Appeal is bound to lead to others.

The same applies to the second example, although the intervening
period has been somewhat longer. The arbitration clause in *Northern
Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984]
Q.B. 644 gave the arbitrator the power to "open up, review and revise any
certificate" of the architect, as does the arbitration clause in the present    B
case. The Court of Appeal held this special power was confined to the
arbitrator, on whom it had been conferred by the arbitration clause. It
could not be exercised by the courts. Since it would have been unjust to
the contractors to deprive them of the opportunity of challenging the
architect's certificates in that case, the Court of Appeal held that the
arbitrations (there were two of them) should go ahead.

As in *Dawnays'* case, it appears that the decision in the *Crouch* case    C
came as a surprise. Official referees had been opening up and revising
certificates as a matter of course for many years without any objection
from the parties.

It is clear from Pringle J.'s judgment in the present case, that but for
the decision in the *Crouch* case, he would not have granted the defendant
a stay of the plaintiffs' action under section 4 of the Arbitration Act
(Northern Ireland) 1937, and the Court of Appeal would have upheld his    D
decision. In my view they would have been right. So the question is
whether the *Crouch* case was correctly decided.

In the present case we are concerned with clauses 30.9, 30.10 and 41.4.
Clause 30.9 provides that the *final* certificate is to be conclusive evidence
of the matter certified in accordance with the elaborate provisions set out
in that clause. Clause 41.4, the arbitration clause, provides, as one would    E
expect, that the arbitrator's powers to open up and revise certificates are
subject to clause 30.9. So the arbitrator has no power to open up and
revise the final certificate, save as provided by clause 30.9, and in particular
by clause 30.9.3. But we are not here concerned with the final certificate.
It has not yet been issued.

Nothing in clause 30.9 affects any certificate other than the final
certificate. Indeed clause 30.10 specifically provides:    F

> "Save as aforesaid no certificate of the architect shall of itself be
> conclusive evidence that any works, materials or goods to which it
> relates are in accordance with this contract."

Interim certificates granted by the architect in the course of a building
contract are an important part of the contractual machinery. But there is    G
nothing in the present contract to make interim certificates conclusive; nor
was there in the *Crouch* case. So there is no need for the contract to confer
on the courts the power to open up and revise interim certificates. The
power already exists, as part of the court's ordinary power to enforce the
contract in accordance with its terms.

Then can it be said that the jurisdiction of the courts to open up and
revise interim certificates is impliedly excluded by the terms of the    H
arbitration clause? I do not pause to consider whether such an ouster of
the court's powers would be effective in law; on any view it would require
the clearest of language. I can find no such language in clause 41.4. Since

A    an arbitrator's powers, unlike the powers of the court, are derived ultimately from the contract under which he is appointed, it is by no means unusual to find his powers spelt out in longhand. Thus under the old law (until changed by section 30 of the Arbitration Act 1996) an arbitrator had no power to rule on his own jurisdiction. Since he could not pull himself up by his own boot straps, he could not decide whether a valid arbitration agreement had ever come into existence. But the High

B    Court can rule on its own jurisdiction. Similarly an arbitrator could not rule on a question whether the contract ought to be rectified. So it is not surprising to find the parties conferring on the arbitrator an express power to rectify the contract. But it would be hopeless to argue that because the parties had by clause 41.4 conferred on the arbitrator an express power to rectify the contact, they had by implication curtailed the power of the

C    court to rectify the contract. By the same token, the court's power to open up and revise interim certificates is not excluded by the express power to open up and revise certificates conferred on the arbitrator.

   For these reasons, and those given by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I agree, I would hold that the *Crouch* case was wrongly decided, and, like them, would allow the appeal.

D

   LORD NOLAN. My Lords, I confess to much sympathy with the very distinguished and experienced judges who have expressed or assented to the view that a clause such as clause 41.4 of the building contract giving the arbitrator power to "open up, review and revise any certificate, opinion, decision ... requirement or notice ..." confers upon him a discretion wider

E    than that available to a court. The language used is not that of *The Supreme Court Practice*. It seems to suggest an informal and constructive approach to the resolution of problems occurring in the course of the building work, an approach appropriate to the work of an arbitrator who is chosen because he is an architect rather than a judge.

   I am, however, persuaded by the arguments of Mr. Declan Morgan, and by the opinions of your Lordships whose speeches I have had the

F    opportunity of reading in draft, that the Court of Appeal in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 placed a weight on clause 41.4 greater than it will bear. I am persuaded in particular that clause 41.4, read in the context of the contract as a whole, cannot properly be construed as giving an interim certificate (as distinct from a final certificate) any conclusive effect in litigation

G    between the parties. Further, I am satisfied that the clause cannot be regarded as conferring upon the arbitrator the power to modify the contract. I find it difficult to conceive of a contract properly so called which conferred upon a third party the power to modify its terms.

   The decision in the *Crouch* case has stood unchallenged, although not uncriticised, for 14 years. It has now been virtually superseded by section 9(4) of the Arbitration Act 1996, unless and until (if ever) section

H    86 of that Act is brought into operation. Yet on the view of the law which has prevailed in your Lordships' House the relevant dicta in the *Crouch* case must clearly be overruled, in justice to the appellants. Pringle J. and the Court of Appeal in Northern Ireland would plainly have refused a stay

272

to the respondents, on the compelling ground that to grant it would lead  A
to duplication of proceedings, had it not been for their reluctant acceptance
of what was said in the *Crouch* case. The same objection to a stay did not,
as it happens, arise in the *Crouch* case itself because all three of the parties
concerned submitted to arbitration by the same arbitrator. Mr. Donnell
Deeny, for the first named respondent, persuasively invited your Lordships
to assume that the same consequence would follow if the stay were upheld
in the present case, but the assumption was not one which Mr. Morgan  B
was prepared to support.

I, too, would therefore allow the appeal.


Lord Hoffmann.   My Lords, the question before your Lordships is
whether an arbitrator appointed to decide a dispute arising under a
building contract in the J.C.T. Standard Form has a power to review  C
decisions and certificates of the architect which is not available to a court.
The English Court of Appeal so held in *Northern Regional Health
Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 but your
Lordships are invited to say that they were wrong.

The clause which is said to give the arbitrator these exceptional powers
is 41.4, of which the relevant parts are as follows:  D

> "the arbitrator shall, without prejudice to the generality of his powers,
> have power to rectify the contract so that it accurately reflects the true
> agreement made by the employer and the contractor, to direct such
> measurements and/or valuations as may in his opinion be desirable in
> order to determine the rights of the parties and to ascertain and
> award any sum which ought to have been the subject of or included
> in any certificate and to open up, review and revise any certificate,  E
> opinion, decision ... requirement or notice and to determine all
> matters in dispute which shall be to him in the same manner as if no
> such certificate, opinion, decision, requirement or notice had been
> given."

The words particularly relied upon are those which confer a power "to  F
open up, review and revise any certificate, opinion, decision ... requirement
or notice" and determine matters in dispute as if they had not been
given. The Court of Appeal in the *Crouch* case said that these were
special powers conferred exclusively upon the arbitrator. Browne-
Wilkinson L.J. said, at p. 667 that in an action "questioning the validity of
an architect's certificate or opinion," the jurisdiction of the court would be
limited to deciding whether or not the certificate or opinion was invalid  G
for bad faith or excess of power. It could not revise the certificate on the
ground that the court thought it was wrong. A clause such as 41.4, on the
other hand, gave the arbitrator "power not only to enforce the contractual
obligations but to modify them." Sir John Donaldson M.R. also said that
the arbitrator could vary the certificates to create new rights and
obligations which would not otherwise arise from the contract. Dunn L.J.
said that one could not imply a term that if the dispute was litigated  H
instead of arbitrated, the court should have a similar power.

My Lords, I have no doubt that it is open to the parties to enter into
an agreement of the kind described by the Court of Appeal in the *Crouch*

1 A.C.        Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.L.))  Lord Hoffmann

A    case. I put aside the purely theoretical question of whether it is right to speak of the architect or arbitrator having power to modify the contractual obligations of the parties. I find this a strange concept. The powers of the architect or arbitrator, whatever they may be, are conferred by the contract. It seems to me more accurate to say that the parties have agreed that their contractual obligations are to be whatever the architect or arbitrator interprets them to be. In such a case, the opinion of the court or anyone

B    else as to what the contract requires is simply irrelevant. To enforce such an interpretation of the contract would be something different from what the parties had agreed. Provisions of this kind are common in contracts for the sale of property at a valuation or goods which comply with a specified description. The contract may say that the value of the property or the question of whether the goods comply with the description shall be

C    determined by a named person as an expert. In such a case, the agreement is to sell at what the expert considers to be the value or to buy goods which the expert considers to be in accordance with the description. The court's view on these questions is irrelevant.

It is less usual, though certainly theoretically possible, to add a second tier to arrangements of this kind, and to provide that a party who is dissatisfied with the view of one expert shall be entitled to call for the

D    opinion of another, which shall then be final and binding. From the point of view of the court, the final outcome is no different from that in the case of a single expert. The contractual obligations of the parties depend upon the opinion of the one expert or the other and not upon its own view of the matter.

It is this two-tier arrangement which the Court of Appeal in the *Crouch*

E    case considered that the J.C.T. contract had created; what Sir John Donaldson M.R. afterwards called, cryptically but vividly, an "internal arbitration:" see *Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R. 115, 118. It is internal in the sense that it does not adjudicate upon the rights and duties of the parties but is part of the machinery for determining what they are. The court appears to have considered that in the absence of a second-tier power of the arbitrator to open up, review and revise the

F    architect's certificates, they would (if given in good faith and within the ambit of the relevant contractual provisions) be binding upon the parties. So the critical question is whether, upon the true construction of the contract, such certificates are binding. Unless they are, there is no need for any special second-tier arrangement. They will be open to review by any tribunal called upon to determine the rights of the parties, whether arbitral

G    or judicial.

The judgments of the Court of Appeal contain no very detailed analysis of the provisions of the contract which are said to confer upon the architect this power to issue binding certificates. Although none of the judges say so expressly, there is an implied suggestion that one can infer such a power from the very fact that the arbitrator is given a power to "open up, review and revise." This is the argument from redundancy; the

H    parties are presumed not to say anything unnecessarily and unless the decisions of the architect were binding, there would be no need to confer upon the arbitrator an express power open up, review and revise them. The later judgment of Sir John Donaldson M.R. in *Benstrete Construction*

*Ltd. v. Angus Hill,* 38 B.L.R. 115, in which he distinguished the *Crouch*   A
case on the ground that the contract in the latter case did not have a
similar arbitration clause, tends to support the view that he had adopted
this form of reasoning.

I think, my Lords, that the argument from redundancy is seldom an
entirely secure one. The fact is that even in legal documents (or, some
might say, especially in legal documents) people often use superfluous   B
words. Sometimes the draftsmanship is clumsy; more often the cause is a
lawyer's desire to be certain that every conceivable point has been covered.
One has only to read the covenants in a traditional lease to realise that
draftsmen lack inhibition about using too many words. I have no wish to
add to the anthology of adverse comments on the drafting of the J.C.T.
Standard Form Contract. In the case of a contract which has been
periodically renegotiated, amended and added to over many years, it is   C
unreasonable to expect that there will be no redundancies or loose ends. It
is therefore necessary to make a careful examination of the contract as a
whole in order to discover whether upon its true construction it does
confer binding power upon the decisions of the architect or whether there
is some other explanation for the "open up, review and revise" power in
clause 41.4. It is also important to have regard to the course of earlier
judicial authority and practice on the construction of similar contracts.   D
The evolution of standard forms is often the result of interaction between
the draftsmen and the courts and the efforts of the draftsman cannot be
properly understood without reference to the meaning which the judges
have given to the language used by his predecessors.

The substantive provisions of the agreement state the principal
obligations of the parties in clear and objective terms. The contractor is   E
obliged by condition 2.1 to "carry out and complete the works in
accordance with the contract documents, using materials and workmanship
of the quality and standards therein specified." In this particular contract,
the preliminary articles defined the "works" as the construction of a nine-
storey office block as described in the contract documents. Condition 8.1.3
provides that all work is to be carried out in a proper and workmanlike
manner and by condition 23.1.1 the contractor is to proceed "regularly   F
and diligently" with the works and complete them on or before the
completion date. The contract specified 14 January 1995 as the completion
date and said that the contract price was to be £1,700,000.

This framework of carefully defined contractual obligation is not easily
reconcilable with a broad discretion, said to be conferred in the first
instance upon the architect and subject to review by an arbitrator, to vary   G
or modify the rights of the parties or to have them conclusively determined
by the judgment of one or the other. The parties have agreed that a
particular building is to be constructed out of specified materials in a
workmanlike manner and that the work should proceed regularly and
diligently to completion by a specified date. No doubt within this
framework there is room for judgment about what amounts to proper
workmanship and diligent progress. But one would not ordinarily describe   H
the exercise of such judgment as a power to modify the contractual rights.
These are questions which require the application of objective standards
and with which the courts are routinely familiar.

1 A.C.          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))   Lord Hoffmann

A    The contract provides for the issue by the architect of certificates or statements in writing as to his opinion on various matters. For present purposes, these documents may be treated as similar. As Devlin J. said in *Minster Trust Ltd. v. Traps Tractors Ltd.* [1954] 1 W.L.R. 963, 973: "The mere use of the word 'certificate' is not decisive." In the absence of express words, the parties are highly unlikely to have intended that some of these statements of opinion should be binding and others not. I shall give a few

B    examples. Clause 30 provides for the issue of interim certificates of the value of the work for which the contractor is from time to time entitled to payment. Clause 30.1.1 provides that the contractor is entitled to payment within 14 days after the issue of the certificate. Clause 25, which deals with extension of time, lists a number of "relevant events" such as force majeure or failure to provide instructions or information which the parties accept

C    as capable of delaying completion beyond the completion date without breach of the contractor's primary obligation to proceed diligently with the works. By clause 25.3, if the architect is of opinion that a relevant event is likely to delay completion beyond the completion date, he must give the contractor an appropriate extension of time by a written notice fixing a new completion date. Clause 26 deals with claims for loss and expense caused by deferment of giving possession of the site or various

D    matters such as provision of information for which the employer or architect is responsible. Here again, the architect is required to state his opinion that loss or expense has been caused, or is likely to be caused, by one of the specified matters, whereupon the amount is ascertained by the quantity surveyor and added to the contract price. Finally, clause 30.8 provides for the issue of a final certificate stating the balance due from

E    employer to contractor or vice versa.

    Clause 30.9 expressly makes the final certificate conclusive evidence as to various matters. But there is no other express provision which says that any certificate or expression of opinion is to be binding upon the parties in the same way as the determination of an expert. Clause 30.10, immediately after the provisions dealing with the final certificate, says:

F    "Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works, materials or goods to which it relates are in accordance with this contract."

    This clause has itself been the subject of refined arguments of the inclusio unius, exclusio alterius variety. The clause refers to certificates, therefore it must have been intended that other statements of opinion by the architect

G    should be conclusive. The clause refers only to works, materials and goods being in accordance with the contract, therefore it must have been intended that certificates as to other matters such as extensions of time should be conclusive. In a contract such as this, such arguments are just as dangerous as the argument from redundancy, of which they are in truth merely a variety. If arguments of this kind are to be pursued, what seems to me

H    much more compelling is that the contract contains express and elaborate terms which provide for conclusiveness as to various matters for one certificate and one only, namely the final certificate.

    If the certificates are not conclusive, what purpose do they serve? If one considers the practicalities of the construction of a building or other

276

Lord Hoffmann   Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))      [1999]

works, it seems to me that parties could reasonably have intended that    A
they should have what might be called a provisional validity. Construction
contracts may involve substantial work and expenditure over a lengthy
period. It is important to have machinery by which the rights and duties
of the parties at any given moment can be at least provisionally determined
with some precision. This machinery is provided by architect's certificates.
If they are not challenged as inconsistent with the contractual terms which    B
the parties have agreed, they will determine such matters as when interim
payments are due or completion must take place. This is something which
the parties need to know. No doubt in most cases there will be no
challenge.

On the other hand, to make the certificate conclusive could easily cause
injustice. It may have been given when the knowledge of the architect
about the state of the work or the effect of external causes was incomplete.    C
Furthermore, the architect is the agent of the employer. He is a professional
man but can hardly be called independent. One would not readily assume
that the contractor would submit himself to be bound by his decisions,
subject only to a challenge on the grounds of bad faith or excess of power.
It must be said that there are instances in the 19th century and the early
part of this one in which contracts were construed as doing precisely this.
There are also contracts which provided that in case of dispute, the    D
architect was to be arbitrator. But the notion of what amounted to a
conflict of interest was not then as well understood as it is now. And of
course the inclusion of such clauses is a matter for negotiation between
the parties or, in a standard form, the two sides of the industry, so that
what is acceptable will to some extent depend upon the bargaining strength
of one side or the other. At all events, I think that today one should    E
require very clear words before construing a contract as giving an architect
such powers.

The language and practical background of the J.C.T. contract does not
therefore suggest that any certificates other than the final certificate were
intended to have conclusive effect. I return, therefore, to clause 41.4, from
which the Court of Appeal in the *Crouch* case [1984] Q.B. 644 drew the
opposite conclusion. It is worth noticing in passing that, in addition to the    F
power to "open up, review and revise," it also confers express powers to
rectify the contract and to direct measurements and valuations. It seems
plain that the reason for the inclusion of these powers in clause 41.4 is to
confer upon the arbitrator the plenitude of power to "determine the rights
of the parties" which would be possessed by a court. If the power to
"open up, review and revise" was intended to be peculiar to the arbitrator,    G
it would at any rate be different in its purpose from the other powers.

At this stage, however, I wish to refer to an important authority on a
clause in similar language which may be taken to have formed part of the
background to the inclusion of clause 41.4 in the J.C.T. Standard Form
Contract, 1980 ed., which was used in this case. It is *Robins v. Goddard*
[1905] 1 K.B. 294. This concerned an R.I.B.A. form of contract, of which    H
clause 17 dealt with defects "arising in the opinion of the architect from
materials or workmanship not in accordance with the drawings or
specification." It provided that the contractor should make good such
defects at his own cost "unless the architect should decide that the

A   contractor ought to be paid for the same." The contract also included an arbitration clause which conferred power to "open up, review and revise" any certificate, opinion etc. of the architect. The contractor sued upon unpaid architect's certificates and the employer counterclaimed on the ground that the work done and materials supplied were not in accordance with the terms of the contract. Farwell J. held that the fact that the architect had not expressed an opinion in accordance with clause 17 that

B   the work and materials were not in accordance with the contract was conclusive and that the court therefore had no jurisdiction to entertain the counterclaim.

    Mr. Duke K.C. argued for the contractor that the contract meant that "the certificate of the architect is to be final unless and until it is appealed under the arbitration clause." He mentioned one express exception in the

C   contract but said that "in all other cases the certificates are final so long as the only mode of reviewing them by means of the arbitration clause is not adopted." In other words, he was contending for precisely the two-tier system of conclusive determination which the Court of Appeal adopted in the *Crouch* case.

    The Court of Appeal unanimously rejected this argument. In fact, they stood it on its head. Sir Richard Henn Collins M.R. said that the

D   arbitrator's power to open up, review and revise showed that the architect's certificates were not intended to be conclusive at all. And if they were not conclusive, they were no more conclusive in litigation than in arbitration. The power to open up and review, said Collins M.R., at p. 301:

      "negatives the contention that the defendant is debarred by the certificates of the architect from setting up bad workmanship on the

E       building and the introduction of improper materials."

  It followed that he could challenge them in an arbitration or, if there was no arbitration, before the court. Stirling L.J. said, at p. 303, that, rather as I have suggested to your Lordships is the case with the J.C.T. contract in this case, the language of the rest of the R.I.B.A. contract did not support the view that certificates were intended to be conclusive. But, he added:

F   "When we come to the arbitration clause the matter is free from doubt." The effect of the power to open up and revise was that:

      "These certificates, therefore, were not intended to be absolutely binding and conclusive. No doubt on an application made at the proper time the dispute might have been referred to arbitration; but it has not been referred, and the matter remained open for decision

G       under the ordinary jurisdiction of the courts, and the defendant was entitled to his ordinary legal remedies and to have his case heard."

  I have said, my Lords, that *Robins v. Goddard* [1905] 1 K.B. 294 is an important case. This is not because it lays down any proposition of law but because it tells us what the Court of Appeal, nearly a century ago, when the "open up, review and revise" formula seems to have been

H   relatively new, thought that it was intended to do. Not, as the Court of Appeal said in the *Crouch* case, to enable certificates otherwise conclusive to be revised by an arbitrator and no one else, but to make it clear that such certificates were not conclusive at all. The court clearly took the view

278

Lord Hoffmann  Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))          [1999]

that the draftsman had seen no need to confer an express power on the      A
court in the same terms as the arbitration clause. The court's jurisdiction
was unlimited. It was the arbitrator's powers which need to be spelt out.
On this view, the power to open up, review and revise falls into place
alongside the other powers conferred by clause 41.4 as a power which a
court would in any event possess.

During the 80 years between *Robins v. Goddard* and the *Crouch* case      B
[1984] Q.B. 644, I can find no authority in which a construction
inconsistent with the earlier case was adopted. In *Neale v. Richardson*
[1938] 1 All E.R. 753 similar reasoning was used in a case in which the
question was whether the contractor could sue without a certificate which
the architect had refused to issue. The arbitration clause empowered the
arbitrator to decide all disputes, which, on the authority of *Brodie v.
Cardiff Corporation* [1919] A.C. 337, the court construed to include        C
disputes as to whether or not a certificate should have been issued. There
had been no arbitration because the arbitrator (who was also the architect)
refused to act, but the court decided in general terms that the non-issue of
the certificate was not conclusive and therefore if the arbitrator had power
to decide that the money was owing, the court must have it also. Scott L.J.
said, at p. 758:                                                            D

"If ... the parties did not choose to enforce the domestic tribunal, or
were prevented by the action of the agreed tribunal from doing so, the
King's courts regained their full jurisdiction, and then the county
court judge was entitled to decide the issue as to the certificate which
the architect would have decided as arbitrator, had he acted as such."

It is true that *Robins v. Goddard* seems to have been a cause of perplexity    E
to some members of your Lordships' House in *East Ham Corporation v.
Bernard Sunley & Sons Ltd.* [1966] A.C. 406. Lord Upjohn in particular
said, at p. 441, that he found it a "rather difficult case" and that while not
doubting the actual decision, he did not find it easy to follow some of the
observations in the judgments. Lord Pearson also said, at p. 447, that the
effect of the case was not clear. I venture to suggest that the problem lay
not so much in what *Robins v. Goddard* [1905] 1 K.B. 294 decided but the    F
extraordinary proposition for which counsel was seeking to rely upon it in
the *East Ham* case [1966] A.C. 407. He appears to have submitted that
even if the contract expressly made a certificate conclusive (as did the
contract in the *East Ham* case) but conferred upon an arbitrator a special
power to revise it, the court would automatically acquire a similar power
if the matter was litigated. In other words, a two-tier structure of conclusive
certificates could not be created even by express language. Viscount        G
Dilhorne dealt with the matter accurately and concisely when he said, at
p. 424:

"it appears to be thought in some quarters that, if special powers are
given to an arbitrator, they devolve on the court should there be
litigation. I do not regard the decision in *Robins v. Goddard* as
establishing or, indeed, supporting such a proposition. In that case, as
I understand it, the Court of Appeal held that the arbitration clause,     H
which gave power to an arbitrator to open up, review and revise a
certificate, showed beyond doubt that the certificates in that case were

A       not conclusive and, the certificates not being conclusive, the court was
not obliged to treat them as if they were."

*Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146,
another decision of this House, also concerned a final certificate expressly
declared by the contract to be conclusive. The arbitration clause
(clause 35) gave the arbitrator power to decide any dispute including "any

B       matter or thing left by this contract to the discretion of the architect" but
there had been no request for arbitration. The House held that a final
certificate was conclusive not only in relation to any later litigation but
also in relation to litigation already commenced. Your Lordships are not
concerned with this aspect of the decision, but Lord Wilberforce said near
the end of his speech, at p. 158:

C
"Had the matter gone to arbitration the position would no doubt
have been different: this is because clause 35 of the contract confers
very wide powers upon arbitrators to open up and review certificates
which a court would not have."

D       I understand Lord Wilberforce to have meant that the contract in
question, which expressly declared final certificates to be conclusive but
gave an arbitrator a special power to revise them, had successfully created
a two-tier structure of binding certificates. There is nothing to support the
view that certificates which are not said to be conclusive or binding can be
assumed to have such effect merely because the arbitrator is given an
express power to open up and revise them.

E       In *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.*
[1974] A.C. 689 the issue was whether a contractor, sued by a sub-
contractor on interim certificates, could set off an unliquidated claim for
damages for late and defective work. The Court of Appeal had held in a
number of decisions that there was a strong presumption (amounting, as
Lord Diplock said, at p. 717, virtually to a rule of law) that the contract

F       excluded the right of set-off. The House overruled these cases, Lord
Diplock saying, at p. 717, that so far from there being a presumption that
set-off was excluded:

"one starts with the presumption that neither party intends to
abandon any remedies for its breach arising by operation of law, and
clear express words must be used in order to rebut this presumption."

G       It was submitted to your Lordships that this presumption supports an
argument that the contract should be construed so as to preserve the
common law remedies of the parties for breach of contract rather than
making their rights subject to the binding decision of the architect. But
I think that such an argument may be circular: if the decision of the
architect is as conclusive as that of an expert, subject only to second-tier

H       revision by an arbitrator, then the rights of the parties are defined by
reference to the opinions of the architect or arbitrator and there is no
question of any independent breach of contract. More to the point,
however, is a later passage in Lord Diplock's speech, in which he referred

280
Lord Hoffmann  Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))         [1999]

to the power of an arbitrator to open up, review and revise any certificate    A
and went on to say, at p. 720:

> "Counsel for the respondent felt compelled to concede, in my view
> rightly, that the employer if sued in an action for the amount stated
> as due in an interim certificate would be entitled to challenge the
> certificate on the ground that the work included in the calculation of
> that amount was not properly executed; though counsel contended    B
> that in order to resist payment on this ground the employer would
> have to have already submitted to arbitration the dispute as to whether
> or not the certificate was in accordance with the conditions of the
> contract and then to apply for a stay of action under section 4 of the
> Arbitration Act 1950. The arbitration clause, however, does not make
> an award a condition precedent to a right of action, let alone a
> condition precedent to a right of defence; and I see no grounds in law    C
> to prevent the employer from defending the action by setting up the
> contractor's breach of warranty in doing defective work even though
> this involves challenging the architect's certificate that the work had
> been properly executed."

This passage seems to me a clear and explicit statement that in the case
of a certificate expressly stated (by the equivalent of clause 30.10 of the    D
J.C.T. contract) not to be conclusive, the court has exactly the same right
to interpret the contractual obligations of the parties as an arbitrator
would have had.

This was the state of the authorities at the time when the *Crouch* case
[1984] Q.B. 644 came before the Court of Appeal. Dunn L.J. introduced
his discussion of this question by saying, at p. 663: "Perhaps surprisingly    E
there is no direct authority on the point which is binding on us." He made
no reference to *Robins v. Goddard* [1905] 1 K.B. 294 and appears to have
regarded the issue as being, not whether the certificates were conclusive in
the first place, but whether (assuming them to be conclusive) one could
imply into the contract a term that the court was to have the same power
to revise them as the arbitrator. Not surprisingly, he rejected the implication
of such a term. Browne-Wilkinson L.J. also made no reference to *Robins*    F
*v. Goddard*, agreed that there was no authority directly in point and said,
at p. 668, that his view was supported by the "weight of judicial dicta."
Sir John Donaldson M.R. did refer to *Robins v. Goddard*, but only in
relation to the comments upon that case in *East Ham Corporation v.
Bernard Sunley & Sons Ltd.* [1966] A.C. 406. He mentioned the comment
of Viscount Dilhorne as to the proposition which *Robins v. Goddard* did    G
not support but made no reference to his summary of what the case
actually decided. It was the latter which was, in my opinion, binding upon
the Court of Appeal in the *Crouch* case and should have been determinative
on the question before them. None of the judges made reference to what
Lord Diplock had said in *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash
(Northern) Ltd.* [1974] A.C. 689, although it appears from the report (at
p. 649) that counsel drew attention to the passage and submitted (in my    H
view rightly) that it supported the proposition that

> "where a dispute as to the quality of work is litigated as opposed to
> arbitrated the court would be entitled to consider the matter on the

1 A.C.        Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.,(N.l.))   Lord Hoffmann

A        basis of the evidence adduced and so would not be bound by the architect's certificate."

In my opinion, therefore, the dicta on this point in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 were both obiter and wrong. Since then, however, 14 years have passed and the building industry has lived with the *Crouch* construction of the standard building contracts. There have also been legislative changes. Section 43A of the Supreme Court Act 1981, inserted by section 100 of the Courts and Legal Services Act 1990, provides that if all parties agree, the High Court may exercise any specific powers which the contract confers upon an arbitrator. The discretion of the court to refuse a stay on the grounds of an arbitration clause has been abolished by section 9(4) of the Arbitration Act 1996, which provides that "a stay must be granted unless the arbitration agreement is null and void, inoperative, or incapable of being performed." This provision is subject to section 86, which excludes its operation in domestic operations and retains the court's discretion. Section 86 has not however been brought into force and it is not clear whether it will be. For the moment, the mandatory stay required by section 9(4) appears to be of general application. So the possibility of litigating contracts containing an arbitration clause except by the consent of all parties has been much reduced.

Nevertheless, it seems to me that cases since *Crouch* show that the decision has caused such uncertainty and even injustice that its dicta should be disapproved. I refer in particular to the recent decision of the Court of Appeal in *Balfour Beatty Civil Engineering Ltd. v. Docklands Light Railway Ltd.* (1996) 78 B.L.R. 42. It was a claim for extension of time and loss and expense under the I.C.E. Conditions of Contract, which had been amended, first, by substituting the employer's representative for the engineer and secondly, by deleting the arbitration clause. The contract provided for the employer to certify extensions of time and loss and expense claims. But there was no provision that they were to be binding or conclusive. Nevertheless, the court held that there was no power to "open up, review or revise" them such as an arbitrator might have had if there was an arbitration clause in the usual form and that, as a matter of construction, "the contractor's entitlement was to depend on the employer's judgment:" *per* Sir Thomas Bingham M.R., at p. 57. Your Lordships will remember that in *Benstrete Construction Ltd. v. Angus Hill,* 38 B.L.R. 115, 118 Sir John Donaldson M.R. appeared to be saying that the *Crouch* construction of the certification clauses as conclusive in litigation was based upon the fact that the contract created an "internal arbitration." But in the *Balfour Beatty* case the contractors were held, even in the absence of an arbitration clause or any express language as to the certificates being conclusive, to have subjected themselves to the judgment of the employer. It is true, as Sir Thomas Bingham M.R. remarked, at p. 57:

"It is not for the court to decide whether the contractor made a good bargain or a bad one; it can only give fair effect to what the parties agreed."

A.C. 1999—11

282
Lord Hoffmann  Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))    [1999]

On the other hand, in deciding exactly what the parties did agree, it seems    A
to me that in the absence of express language, one should not assume so
uncommercial a bargain. I do not think that the *Balfour Beatty* case would
have been decided as it was if not for the shadow of the *Crouch* decision
that certificates, even if not declared to be conclusive, can be questioned
only for bad faith or excess of power. I do not think that anyone in the
industry can be said to have acted in reliance on the *Crouch* case        B
and I would therefore overrule it. I must acknowledge the assistance
which I have had in reaching this conclusion from the writings of
Mr. I. N. Duncan Wallace Q.C.

The significance of doing so in the present case can be briefly stated.
Beaufort Developments (N.I.) Ltd. ("the employer") entered into a contract
dated 3 May 1994 with Gilbert-Ash N.I. Ltd. ("the contractor") for the
construction of a nine-storey office block in Belfast. The contract was in    C
the standard J.C.T. form, 1980 ed., Private without Quantities. By a
separate contract it employed the firm of Parker & Scott ("the architects")
as architects. The works were not completed on time; an outcome for
which the contractor blamed the architects and the employer blamed them
both. For example, some work had to be done over again and there are
disputes over whether this was on account of the contractor's bad
workmanship or use of wrong materials or the architects' failure to provide    D
adequate drawings and information. There is also a dispute over whether
this and other matters actually caused the delay in completion. The
contractor claimed that it was entitled to payment from the employer, both
under certificates issued by the architects for work done under the contract
and by way of payment for extra work. The employer claimed that it was
entitled to damages against contractor and architects for breach of        E
contract.

Litigation commenced on 31 August 1995 when the contractor issued
a writ claiming about £230,000 and interest due under six architects'
certificates. On 9 October 1995 the employer served an unilluminating
defence, denying liability and alleging that it was entitled to set off a cross-
claim in a larger amount. On 15 November 1995 the contractor served a
notice to refer and concur in the appointment of an arbitrator pursuant to    F
the arbitration clause in the contract. It referred in general terms to the
areas of dispute such as the responsibility for delay and the contractor's
claims to payment for extra work. On 5 December 1995 the employer
issued a writ which named both the contractor and the architects as
defendants. It claimed damages for negligence and breach of contract. On
7 February 1996 the contractor issued a summons for a stay of the        G
employer's action pursuant to section 4 of the Arbitration Act (Northern
Ireland) 1937. The agreement between the employer and the architects also
contained an arbitration clause but the architects did not make a similar
application.

Master Wilson granted the stay and on appeal his decision was affirmed
by Pringle J. He did so with reluctance because he said that the architects
could not be required to take part in the arbitration between the employer    H
and the contractor and there was a very real risk of conflicting decisions
in the arbitration and the litigation against the architects. But he considered
that he was bound by the *Crouch* case [1984] Q.B. 644 to hold that an

A  arbitrator would have the power to "open up, review and revise" certificates or opinions of the architect which the court did not possess. If a stay was refused, the contractor would therefore be at a "grave disadvantage in that it will be faced with architect's certificates which the court will not be able to review." In the Court of Appeal, Carswell L.C.J. prefaced his judgment by saying:

B       "In the hearing of this appeal counsel for the contractor did not seek to challenge the correctness of the judge's view that if it were not for the effect of the *Crouch* decision a stay should not be granted in the present case. Nor did counsel for the employer or counsel for the architects challenge his conclusion that if the *Crouch* decision is to be followed in this jurisdiction it' would be unjust to the contractor to refuse a stay. The argument before us turned on the correctness of the
C       *Crouch* decision and whether this court should follow it."

        As in my opinion the *Crouch* case was wrongly decided, I think that the discretion should have been exercised as Pringle J. would have done if he felt free to do so. I would therefore allow the appeal.

D       LORD HOPE OF CRAIGHEAD.   My Lords, the application by Gilbert-Ash N.I. Ltd. ("the contractor") for a stay of the action by Beaufort Developments (N.I.) Ltd. ("the employer") was made under section 4 of the Arbitration Act (Northern Ireland) 1937. The grant of a stay under that section is discretionary. It is plain from the reasons which Pringle J. gave for affirming the master's decision to grant the stay that he would have refused the application had it not been for the decision of the Court
E   of Appeal in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644. As he pointed out, the circumstances in the present case are very similar to those in *Taunton-Collins v. Cromie* [1964] 1 W.L.R. 633.
        In that case, as here, the contract between the employer and the contractor contained an arbitration clause. The architect, in response to the employer's claim against him, put part of the blame for the
F   unsatisfactory building on the contractor. The employer then joined the contractor as a defendant to his action against the architect. The contractor's application for a stay in reliance on the arbitration clause was refused by the official referee, and an appeal against his decision was dismissed. This was because to grant a stay would have resulted in two sets of proceedings. There would have been an arbitration as against the
G   contractor and an action as against the architect. There would have been a substantial risk of different decisions on the same question and on the same facts. Pearson L.J. said, at p. 638, that there were very strong reasons based on the principle of avoiding a multiplicity of proceedings for permitting the action to continue as an action by the employer against both defendants.
        Pringle J. noted that there were many issues of fact to be determined
H   in the present case. They included the reasons for the delay which had occurred in the completion of the works by the contractor, the standard of workmanship and materials and the question whether acceleration of the works had given rise to additional costs. He said that he could foresee very

Lord Hope
of Craighead       Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))          [1999]

considerable difficulties in dealing with these issues, and that in his opinion    A
the risk of conflicting decisions was a very real one. Nevertheless he felt
obliged to uphold the stay in view of the consequences to the contractor
of the decision in the *Crouch* case if the dispute between it and the
employer were not to be dealt with by an arbitrator. The Court of Appeal
decided, with some hesitation, to follow the decision in the *Crouch* case. a
But Carswell L.C.J. made it clear in the course of his judgment that the
court had considerable reservations about the soundness of that decision.    B
He said that, if the matter were res integra, he would have been attracted
to an interpretation of the contract which would have avoided the need to
go to arbitration to avoid injustice to the contractor.

The situation in this case has therefore brought out into the open
difficulties created by the decision of the Court of Appeal in the *Crouch*
case which have been lying not far below the surface since it was made.    C
The fundamental question is whether the court has been deprived, by the
power which the parties have given to their arbitrator to open up, review
and revise certificates, opinions and decisions of the architect, of its
ordinary power to determine the rights and obligations of the parties and
to provide them with the usual remedies. In the *Crouch* case [1984] Q.B.
644, 667 Browne-Wilkinson L.J. said:                                            D

> "In no circumstances would the court have power to revise such
> certificate or opinion solely on the ground that the court would have
> reached a different conclusion since so to do would be to interfere
> with the agreement of the parties."

I shall return to this passage later when I come to examine that case in
more detail. For the time being it is sufficient to notice that the basis for    E
this view is the difference which was said to exist between the powers of
the court and those conferred by the agreement of the parties on the
arbitrator. The power of the court, it was said, was to enforce the contract,
while the arbitrator had been given the power, which the court does not
possess, to modify it. This proposition has come to be applied generally to
all cases where the arbitrator has been given power to open up, review and
revise certificates.                                                            F

The contract in the present case was entered into under the
J.C.T Standard Form of Building Contract, 1980 ed., Private without
Quantities. It incorporated amendments numbers 1 to 12 together with the
adaptation schedule for Northern Ireland and the Contractor's Designed
Portion Supplement. By article 5 of the articles of agreement the parties
agreed to refer their disputes to arbitration in accordance with clause 41    G
of the conditions. Clause 41.4 of the conditions, so far as relevant to this
case, provides:

> "the arbitrator shall, without prejudice to the generality of his powers,
> have power to rectify the contract so that it accurately reflects the true
> agreement made by the employer and the contractor, to direct such
> measurements and/or valuations as may in his opinion be desirable in
> order to determine the rights of the parties and to ascertain and    H
> award any sum which ought to have been the subject of or included
> in any certificate and to open up, review and revise any certificate,
> opinion, decision ... requirement or notice and to determine all

1 A.C.          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))          Lord Hope
of Craighead

A     matters in dispute which shall be submitted to him in the same manner as if no such certificate, opinion, decision, requirement or notice had been given."

Clause 41.5 provides that, subject to clause 41.6 which enables either party to appeal to the High Court on any question of law, the award of such arbitrator shall be final and binding on the parties. Clause 30 deals

B     with certificates and payments to the contractor. Clause 30.9 makes provision as to the effect of the final certificate, while clause 30.10 makes provision as to the effect of certificates other than the final certificate. Clause 30.9 provides that, except in certain circumstances, the final certificate shall be conclusive evidence "in any proceedings arising out of or in connection with the contract (whether by arbitration under article 5 or otherwise)" as to various matters about which decisions have had to be

C     made by the architect under the contract. Clause 30.10 provides:

"Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works, materials or goods to which it relates are in accordance with this contract."

Had it not been for the weight of contrary authority I would not have found much difficulty in reaching the following conclusions about the effect

D     of these provisions relating to the powers of the arbitrator and the finality to be given to certificates. In the first place, the function of clause 41.4 is to define the powers which are to be given to the arbitrator. An arbitrator has no jurisdiction except that which the parties choose to confer upon him by their agreement to refer their disputes to an arbitrator. The whole question as to the extent of his powers rests upon contract. So

E     it is necessary that the agreement should set out all the powers which he is to have in order that he may determine all the matters which are in dispute. But it is not to be thought that by conferring powers on the arbitrator the parties are limiting the ordinary powers of the court to determine their rights and obligations under the contract. In the present case, for example, clause 41.4 gives power to the arbitrator to rectify the contract. The court already has that power, but it might well have been in

F     doubt as to whether the power of the court could be exercised by the arbitrator. There is nothing in clause 41.4 to suggest that, by conferring this power on the arbitrator, the parties intended to remove this power from the court.

Then there are the provisions about the certificates. In the present case the contractor seeks payment of the sums certified as due for payment

G     under six interim certificates. It appears that it will also seek to maintain a claim against the employer for additional costs which are not the subject of any certificate by the architect. The employer for its part claims, by way of set off against any sums due to the contractor, amounts in respect of delay in completion of the construction and fitting out works and damages for breach of its obligation to provide materials and workmanship to the standard which the contract required. These are matters about which

H     the contract provides for decisions to be taken or opinions to be given by the architect. But there is no express contractual provision to which one can point which has the effect of giving finality to the various decisions and opinions which he has made. We are not concerned in this case with any

Lord Hope
of Craighead        Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))        [1999]

question as to the conclusive effect of the final certificate because, although        A
a certificate of practical completion was issued in June 1996, the final
certificate has not yet been issued. It is made quite clear by clause 30.10
that the interim certificates which the architect has issued are not of
themselves to be conclusive evidence.

On this approach, if there is no stay, the court will be able to exercise
all its ordinary powers to decide the issues of fact and law which may be
brought before it and to give effect to the rights and obligations of the        B
parties in the usual way. It will have all the powers which it needs to
determine the extent to which, if at all, either party was in breach of the
contract and to determine what sums, if any, are due to be paid by one
party to the other whether by way of set-off or in addition to those sums
which have been certified by the architect. It will not be necessary for it to
exercise the powers which the parties have conferred upon the architect in        C
order to provide the machinery for working out their contract. Nor will it
be necessary for it to exercise the power which clause 41.4 confers on the
arbitrator to revise certificates. This is because the court does not need to
make use of the machinery under the contract to provide the parties with
the appropriate remedies. The ordinary powers of the court in regard to
the examination of the facts and the awarding of sums found due to or by        D
either party are all that is required. There would be no risk of any injustice
to the contractor.

In *Taunton-Collins v. Cromie* [1964] 1 W.L.R. 633, 636 Pearson L.J. said
that in that case there was a conflict between two well established
principles. One was that parties should normally be held to their
contractual agreements. Where the parties have agreed that any dispute or
difference between them should be referred to arbitration the court should        E
be willing to say by its decision what the parties have already said by their
contract. The other principle was that a multiplicity of proceedings was
highly undesirable. In that case it was the principle of avoiding a
multiplicity of proceedings which prevailed. The effect of the decision of
the Court of Appeal in the *Crouch* case has been to reverse the result of
balancing these two principles. But that case also, it may be said, involved
the application of two well established principles. The first is that which        F
was expressed in these terms by Browne-Wilkinson L.J. [1984] Q.B. 644,
667:

"In principle, in an action based on contract the court can only
enforce the agreement between the parties: it has no power to modify
that agreement in any way."

G
The second, which was not referred to at all in the judgments in that
case, is that which was described by Lord Diplock in *Modern Engineering
(Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689, 718:

"So when one is concerned with a building contract one starts
with the presumption that each party is to be entitled to all those
remedies for its breach as would arise by operation of law, including
the remedy of setting up a breach of warranty in diminution or        H
extinction of the price of material supplied or work executed under
the contract. To rebut that presumption one must be able to find in
the contract clear unequivocal words in which the parties have

A    expressed their agreement that this remedy shall not be available in respect of breaches of that particular contract."

The facts in the *Crouch* case [1984] Q.B. 644 can be stated quite shortly. There had been delays in the completion of the work under the main contract and by a nominated subcontractor. An arbitrator had been appointed on a reference under the main contract between the contractor

B    and the authority. The same arbitrator had been appointed in a reference under the subcontract in which the nominated subcontractor was proceeding in the contractor's name in its arbitration with the authority. The arbitrator was empowered under clause 35(3) of the conditions under the main contract to open up, review and revise the architect's certificates, opinions, decisions, requirements or notices. There had been no final certificate. The question was whether the arbitration proceedings should be

C    stayed. One of the issues raised in the case—although it was not necessary to decide this issue in order to dispose of the appeal—was whether the official referee in the High Court had the power to open up, review and revise the certificates, opinions, decisions, requirements or notices of the architect which had been given to the arbitrator by clause 35(3) of the main contract.

D    Dunn L.J. said, at p. 663F, that the court had been told that it was common practice for the official referee to open up and review certificates and other decisions of the architect and he observed that there were decisions of high authority either way as to whether this was competent. In his summary of the competing arguments he said that the authority had relied on obiter dicta of Lord Wilberforce in *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146, 158 and of Viscount Dilhorne

E    and Lord Cohen in *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406, 424 and 432. The other side had contended that in order to give business efficacy to the contract there must be an implied term that if the parties were to litigate rather than arbitrate the court was to have the same powers as the arbitrator. He went on [1984] Q.B. 644, 664:

F    "In my judgment it is not necessary to imply the term suggested in clause 35. The contract gives the architect wide discretionary powers as to the supervision, evaluation and progress of the works. The parties have agreed that disputes as to anything left to the discretion of the architect should be referred to arbitration, and clause 35 gives wide powers to the arbitrator to review the exercise of the architect's discretion and to substitute his own views for those of

G    the architect. Where parties have agreed on machinery of that kind for the resolution of disputes, it is not for the court to intervene and replace its own process for the contractual machinery agreed by the parties."

Browne-Wilkinson L.J. began his discussion of this point, at p. 667B, with the statement of principle that the court had power only to enforce the contract, not to modify it in any way. He went on to say that, if the

H    parties have agreed on a specified machinery for establishing their obligations, the court cannot substitute a different machinery. He then distinguished the powers of the court from those of the arbitrator. The parties had agreed that certain rights were to be determined by the

certificate or opinion of the architect. In no circumstances would the court    A
have power to revise such certificate or opinion solely on the ground that
it would have reached a different conclusion, as to do so would be to
interfere with that agreement. But the powers conferred on the arbitrator
were different. He had been given power to modify the contractual rights
by varying the architect's certificates and opinions if he disagreed with
them and to substitute his own discretion for that of the architect. He
summed the matter up with these words, at pp. 667–668:    B

> "Therefore as a matter of principle I reach the conclusion that if
> this matter were to be litigated in the High Court (whether before the
> official referee or a judge) the court would not have power to open
> up, review and revise certificates or opinions as it thought fit since so
> to do would be to modify the contractual obligations of the parties.
> The limit of the court's jurisdiction would be to declare inoperative    C
> any certificate or opinion given by the architect if the architect had
> no power to give such certificate or opinion or had otherwise erred in
> law in giving it. The court could not (as an arbitrator could) substitute
> its own discretion for that of the architect."

    Sir John Donaldson M.R., at pp. 671–673, also drew a distinction    D
between the power of the court and those which had been conferred on
the arbitrator. He said that the powers conferred on the arbitrator seemed
to him to involve the exercise of a completely novel jurisdiction which was
quite different from the function of the court. He described the court's
function as being to determine facts and to enforce the contractual rights
of the parties. The arbitrator had that function also, but he also had the
right and duty which the court did not possess to review the architect's    E
decisions and, if appropriate, to substitute his own. He also found support
for his opinion that the court would not be able to exercise the power to
open up and review which clause 35 of the J.C.T. contract had given to
the arbitrator in the dicta to which Dunn L.J. had referred in the *East
Ham* case [1966] A.C. 406 and in what Lord Wilberforce had said, in the
*Hosier & Dickinson Ltd.* case [1972] 1 W.L.R. 146, 158.
    The statement of principle with which Browne-Wilkinson L.J. began    F
his discussion of this point seems to me, with respect, to be both relevant
and accurate. I do not think that it can be doubted that in a case which
has been based on contract the court's function is to enforce the agreement
of the parties, not to modify their agreement in any way. But I have the
impression that in the discussion which follows, and in the remarks which
were made by the other judges, two other important points were overlooked    G
and that the description of the arbitrator's powers as including a power to
modify the contract, for what it is worth, is less than accurate.
    The first point is that there is a difference between an agreement that
machinery is to be used to implement or to give effect to the contract and
an agreement that the parties' rights are to be determined solely by means
of that machinery. An agreement which falls into the first category will be    H
needed in almost every building or engineering contract. Some method has
to be laid down for dealing with such matters as variations to the contract
works and the making of interim payments to the contractor as the work
proceeds. But an agreement of that kind does not imply any limitation on

A  the ordinary powers of the court. Nor does it confer any powers on the architect or engineer, or in his turn on the arbitrator, which restrict the power of the court, in the event of litigation, to conduct its own inquiry into the facts. Its purpose is simply to enable the contract to be worked out upon the agreed terms to achieve the result to which it was directed. The purpose of an agreement which falls into the second category, on the other hand, is to exclude the point at issue from being determined by the

B  court. If the parties have agreed that a dispute between them is to be determined conclusively by the architect or engineer, or in the event of dispute by an arbitrator, the sole function of the court is to give effect to the agreement which they have made. Its jurisdiction is to enforce the contract. Its duty is to ensure that the decision of the architect or the engineer or, in his turn, of the arbitrator is given the conclusive effect

C  which has been agreed. But none of the judges in the *Crouch* case addressed the question whether the certificates or opinions of the architect which the arbitrator had power to open up, review and revise were agreed by the parties to the contract to have effect as conclusive evidence.

The second point is this. The powers which the court ordinarily has to determine and give effect to the rights and obligations of the parties to a contract differ from the additional powers which, in the typical building or

D  engineering contract, are given to the architect or the engineer and, in the event of any dispute about their exercise, to the arbitrator. The purpose of these additional powers is not to deprive the court of its ordinary powers to determine their rights and obligations under the contract. Their purpose is to enable the architect or engineer, and in the event of a dispute about their exercise the arbitrator, to do things in the course of the execution of

E  the contract which the court could not do. This point was well expressed by Piers Ashworth Q.C., sitting as a deputy High Court judge, in *National Coal Board v. William Neill & Son (St. Helens) Ltd.* [1985] Q.B. 300, 309, where he said:

"I have heard much argument on the effect of arbitration clauses. I cannot help feeling that a certain unjustified mystique has been

F  attributed to them. In general an arbitration clause does no more than provide an alternative method of resolving disputes. It is hoped that it is simpler, quicker and cheaper than resorting to a court of law. In building contracts an arbitrator is frequently given additional powers which would not otherwise be open to him and are not open to a judge to exercise. For example, by clause 15 of this contract the contractor is required to proceed with the work in accordance with

G  the instructions of the engineer. By sub-clause (b) he is entitled to dispute any such instruction and to refer to arbitration. Were it not for this sub-clause, clearly the contractor would have no right to dispute or litigate about any such instruction and, even within sub-clause (b), he cannot dispute such an instruction before a court. In this respect, it is right to say the arbitrator has additional powers to a

H  court. But in general, as I have said, arbitration is simply an alternative way of resolving disputes."

So there is this difference between the provision of an agreed machinery for giving effect to the contract and the taking of decisions or the

290

expressions of opinion which may be necessary from time to time to its      A
exercise. Where the parties have conferred additional powers on the
architect, the engineer or the arbitrator, the function of the court is to give
effect to the agreement of the parties as to the use of that machinery. The
court cannot give the instructions or issue the certificates. But the fact that
decisions are taken or opinions are expressed in the course of the working
out of that machinery does not, of itself, affect the ordinary powers of the
court if litigation becomes necessary. That would only be so if the parties      B
had agreed that those decisions or opinions were to receive effect as
conclusive evidence.

Then there is the question whether it was accurate for the court in the
*Crouch* case to describe the power which was given by the conditions in
the J.C.T. contract to the arbitrator to open up, review and revise
certificates and opinions of the architect as a power to modify the contract.      C
It was primarily on this ground that the distinction was drawn between
the powers of the arbitrator and those of the court. In my opinion the
correct analysis is that the power which is given to the arbitrator in the
event of a dispute about the exercise of his powers by the architect is a
power to give effect to the contract, not to modify it.

In *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.*      D
[1974] A.C. L 689, 717B Lord Diplock said that a building contract is an
entire contract for the sale of goods and work and labour for a lump sum
price payable by instalments as the goods are delivered and the work is
done. Decisions have to be taken from time to time about such essential
matters as the making of variation orders, the expenditure of provisional
and prime cost sums and the extension of time for carrying out the works
under the contract. Decisions also have to be taken from time to time as      E
to the adjustments which may have to be made to the contract sum on
account of these matters and on the amounts to be paid to the contractor
by way of instalments towards a final settlement of the sums to which he
is entitled under the contract. But in taking their decisions on all these
matters the duty of the architect or the arbitrator is to give effect to the
contract, not to alter or modify it. Variations can only be made to the      F
contract within the limits which the parties themselves have agreed. From
time to time in order to exercise these functions the architect or the
arbitrator must apply the provisions of the contract to the facts. But in
this regard their position in the resolution of disputes between the parties
is no different from that enjoyed in the exercise of its ordinary powers by
the court.      G

For these reasons I consider that the Court of Appeal in *Crouch*,
having started from the correct principle, fell into error in its application
to the facts. Unlike both *East Ham Corporation v. Bernard Sunley & Sons
Ltd.* [1966] A.C. 406 and *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.*
[1972] 1 W.L.R. 146 it was not a case in which there had been a final
certificate. There was no issue between the parties as to whether any of the
certificates which had been issued had been agreed to be conclusive      H
evidence of the facts stated in them. In *East Ham* it was held that the
effect of the relevant provisions of the building contract was that the final
certificate was conclusive evidence and that it could not be reopened even

A  by the arbitrator. In the *Hosier & Dickinson* case Lord Morris of Borth-y-Gest explained, at p. 153B–C, that the fact that the parties had agreed to the conclusiveness of a certificate as a matter of evidence did not involve any ouster of the jurisdiction of the court. Lord Wilberforce said, at p. 157D, that to describe it as doing so would be to misdescribe the effect attributed to it by the contract. There was no discussion of any of these points in the *Crouch* case. But the effect of the decision was to confer a

B  similar status on the certificates and opinions of the architect, subject only to their review by an arbitrator, without having identified any provision in the contract which removed these matters from the ordinary jurisdiction of the court.

    In the *Crouch* case [1984] Q.B. 644 both Dunn L.J. and Sir John Donaldson M.R., at pp. 663H and 673C, relied on the dictum of Lord

C  Wilberforce in *Hosier & Dickinson Ltd v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146, 158:

> "Had the matter gone to arbitration the position would no doubt have been different: this is because clause 35 of the contract confers very wide powers upon arbitrators to open up and review certificates which a court would not have."

D  I agree that, at first sight, this dictum may be taken to suggest that the court can never open up and review certificates where such wide powers in that regard are given to the arbitrator. But I think that to read the dictum in this way would be to take it out of its context. The context is to be found in what Lord Wilberforce said, at p. 157, about the provisions of the contract which dealt with the effect of the final certificate. He said that

E  the court proceedings had raised the question whether the work done and the materials used were such as should have been done and used under the contract, and that an essential question was what standard was to be set for this. It was in that context that he examined the provisions about the final certificate. He concluded that there could be no objection to a clause which provided that it was the architect's standard which was to be relevant and that his final certificate was to be conclusive evidence. The

F  only circumstances in which, by clause 30(7) of the conditions in that contract, the final certificate was not to be conclusive evidence were where there had been a written request by either party, within certain time limits, to concur in the appointment of an arbitrator.

    It seems to me that the discussion in the *Hosier & Dickinson* case put the matter on the correct basis. On the one hand there is the principle

G  which was expressed by Lord Diplock in *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689, by which clear unequivocal words must be used to deprive a party to a contract of recourse to the court for the ordinary exercise of its powers and the granting of the ordinary remedies. On the other there is the principle that the court must give effect to the contract which the parties have made for themselves. If the contract provides that the sole means of establishing the

H  facts is the expression of opinion in an architect's certificate, that provision must be given effect to by the court. But in all other respects, where a party comes to the court in the search of an ordinary remedy under the contract or for a remedy in respect of an alleged breach of it, the court is

292

A

entitled to examine the facts and to form its own opinion upon them in the light of the evidence. The fact that the architect has formed an opinion on the matter will be part of the evidence. But, as it will not be conclusive evidence, the court can disregard his opinion if it does not agree with it.

For these reasons I agree with my noble and learned friend, Lord Hoffmann, that the *Crouch* case was wrongly decided and should be overruled. I, also, consider that the answers which the Court of Appeal gave to the questions which were before it in *Balfour Beatty Civil Engineering Ltd. v. Docklands Light Railway Ltd.*, 78 B.L.R. 42 were the wrong answers. That was a case in which there was no arbitration clause, but there was no provision in the contract agreeing that the opinion of the employer's representative was to be conclusive evidence in the event of a dispute. The fact that the contract did not provide an agreed means of challenging the judgment of the employer's representative did not affect the power of the court to examine the issue and to form its own judgment in the light of the evidence.

B

C

I can return now to the facts of this case. There has been no final certificate. No certificates or opinion have been issued or given which the parties have agreed shall be taken to provide conclusive evidence as to the matters which are in dispute. The court is thus in no different position in regard to such expressions of opinion as have been given as would be an arbitrator. It does not have the additional power which an arbitrator has under this contract to issue fresh certificates in place of those already issued by the architect. But it does not need that power in order to resolve the disputes which have arisen in this case. In these circumstances there would be no injustice to the contractor in refusing a stay. To grant a stay would be to risk conflicting decisions in the separate proceedings which would be needed to determine the respective responsibilities to the employer of the contractor and of the architect. I would therefore allow the appeal and refuse a stay of the proceedings in the High Court.

D

E

*Appeal allowed with costs in House of Lords and below.*

F

*Solicitors; Crawford & Lockhart, Belfast; L'Estrange & Brett, Belfast; McCloskey & Co., Belfast.*

[Reported by SHIRANIKHA HERBERT, Barrister]

G

H