Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**BOOK OF AUTHORITIES**
**OF THE MONITOR AND CANADIAN DEBTORS**
**(POST-TRIAL BRIEF – ALLOCATION)**
**VOLUME 1 OF 3**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661

*Lawyers for the Canadian Debtors*

September 10, 2014

- 2 -

| | |
|---|---|
| **BUCHANAN INGERSOLL & ROONEY PC** | **ALLEN & OVERY LLP** |
| 919 North Market Street, Suite 1500 | 1221 Avenue of the Americas |
| Wilmington, Delaware  19801 | New York, NY  10020 |

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware  19801

**Mary F. Caloway**  (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy**  (No. 5215)
kathleen.murphy@bipc.com
Tel:    (302) 552-4200
Fax:    (302) 552-4295

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Paul B. Keller**
paul.keller@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
david.guyder@allenovery.com
Tel:    (212) 610-6300
Fax:    (212) 610-6399

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

TO:    THE CORE PARTIES SERVICE LIST

---

[1]    The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9630), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226)

# LIST OF AUTHORITIES

| TAB | |
|---|---|
| **VOLUME 1: CASES** | |
| 1. | *1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003] O.J. No. 1468 (S.C.J., Commercial List) [Initial Brief] |
| 2. | *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2010 ONSC 1587 (S.C.J.) [Rebuttal Brief] |
| 3. | *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2011 ONCA 442 [Rebuttal Brief] |
| 4. | *Adam v. Campbell* [1950] S.C.J. No. 51 [Rebuttal Brief] |
| 5. | *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 [Initial Brief] |
| 6. | *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] S.C.J. No. 78 [Rebuttal Brief] |
| 7. | *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907 [Initial Brief] |
| 8. | *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 [Initial Brief] |
| 9. | *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*, [1999] A.C. 266 [Initial Brief] |
| 10. | *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195 (3rd Cir. 2006) [Initial Brief] |
| 11. | *Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 98 USPQ (2d) 1761 (2011) [Rebuttal Brief] |
| 12. | *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624 (7th Cir. 2010) [Initial Brief] |
| 13. | *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351 (N.Y. 1978) [Initial Brief] |
| 14. | *Canadian National Railway Company v. Volker Stevin Contracting Ltd.,* 1991 CarswellAlta 8 (C.A.) [Initial Brief] |
| 15. | *CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549 (Supr. Ct., N.Y. Cnty. 2005) [Rebuttal Brief] |
| 16. | *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 [Rebuttal Brief] |
| 17. | *Continental Bank Leasing Corp. v. Canada,* [1998] S.C.J. No. 63 [Rebuttal Brief] |

| TAB | |
|---|---|
| 18. | *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) [Initial Brief] |
| 19. | *Dinney v. Great-West Life Assurance Co.*, [2009] S.C.C.A. 257 [Initial Brief] |
| 20. | *Dinney v. Great-West Life Assurance Co.*, 2009 MBCA 29 [Initial Brief] |
| 21. | *Doherty v. Home Insurance Co.,* 1986 CarswellOnt 741 (Ont. Div. Ct.) [Rebuttal Brief] |
| 22. | *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 [Initial Brief] |
| 23. | *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581 [Initial Brief] |
| 24. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 [Initial and Rebuttal Brief] |
| 25. | *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 [Initial Brief] |
| 26. | *Georgia Construction Co. v. Pacific Great Eastern Railway Co.*, [1929] S.C.R. 630 [Rebuttal Brief] |
| 27. | *Gilchrist v. Western Star Trucks Inc.*, 2000 BCCA 70 [Initial Brief] |
| 28. | *Gioris v. Ontario (Director of Income Maintenance, Ministry of Community & Social Services)*, 1999 CarswellOnt 3716 (Div. Ct.) [Rebuttal Brief] |
| 29. | *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (N.Y. 2002) [Initial Brief] |
| 30. | *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 [Initial Brief] |
| 31. | *Heap v Hartley*, (1889) 42 Ch.D. 461 (UK Ch) [Initial Brief] |
| 32. | *Hilgraeve Corp v Symantec Corp*. 265 F.3d 1336 (Fed. Cir. 2001) [Initial Brief] |
| 33. | *Hodge v. Bluebeard's Castle, Inc.*, 392 Fed. Appx. 965 (3d Cir. 2010) [Initial Brief] |
| 34. | *In re Gravure paper & Board Corp.*, 234 F.2d 928 (3d Cir. 1956) [Initial Brief] |
| 35. | *In re Kane*, 628 F.3d 631 (3d Cir. 2010) [Initial Brief] |
| 36. | *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) [Initial Brief] |
| 37. | *In re RFE Industries, Inc.*, 283 F.3d 159 (3d Cir. 2002) [Initial Brief] |
| 38. | *Institute For Disabilities Research and Training, Inc. v. Wal-Mart Stores, Inc.,* No. 5 |

- 3 -

| TAB | |
|---|---|
| | Civ. 176 (D. Del. 2007) [Rebuttal Brief] |
| 39. | *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, 2007 SCC 55 [Initial and Rebuttal Brief] |
| 40. | *Keefer Laundry Ltd. v. Pellerin Milnor Corp.*, 2009 BCCA 273 [Initial Brief] |
| 41. | *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 1998 CarswellOnt 4170 (C.A.) [Rebuttal Brief] |
| **VOLUME 2: CASES CONTINUED** | |
| 42. | *Kerr* v. *Baranow* 2011 SCC 10 [Rebuttal Brief] |
| 43. | *Kraft Canada Inc. v. Euro Excellence Inc.*, 2007 SCC 37 [Initial Brief] |
| 44. | *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, (3d Cir. 2003) [Initial Brief] |
| 45. | *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 [Initial Brief] |
| 46. | *Lease Corp. of Am., Inc. v. Resnick*, 288 A.D.2d 533, 732 N.Y.S.2d 266 (N.Y. App. Div. 3rd Dep't 2001) [Initial Brief] |
| 47. | *Long v Delta Catalytic Industrial Services Inc.*, [1998] 6 W.W.R. 792 (ABQB) [Initial Brief] |
| 48. | *Marquete Co. v. Norcem, Inc.*, 114 A.D.2d 738, 494 N.Y.S.2d 511 (3d Dep't 1985) [Rebuttal Brief] |
| 49. | *Massey-Ferguson Ltd. v. R.*, [1976] F.C.J. No. 196 (C.A.) [Rebuttal Brief] |
| 50. | *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 (FC) [Initial Brief] |
| 51. | *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001) [Initial Brief] |
| 52. | *Nishi v. Rascal Trucking Ltd.* 2013 SCC 33 [Rebuttal Brief] |
| 53. | *Nortel Networks Corp., Re*, 2011 ONSC 3805 (S.C.J.) [Initial Brief] |
| 54. | *Nortel Networks Corp., Re*, 2011 ONSC 4012 (S.C.J.) [Initial Brief] |
| 55. | *Nortel Networks Corporation (Re)*, 2013 ONSC 1757 (S.C.J.) [Initial Brief] |
| 56. | *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988) [Initial Brief] |

- 4 -

| TAB | |
|-----|---|
| 57. | *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75 [Initial Brief] |
| 58. | *Paddon Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 [Initial and Rebuttal Brief] |
| 59. | *Paddon-Hughes Development Co. v. Pancontinental Oil Ltd.*, [1998] S.C.C.A No. 600 [Rebuttal Brief] |
| 60. | *Pecore v. Pecore* 2007 SCC 17 [Rebuttal Brief] |
| 61. | *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352 (D. Del. 1993) [Initial Brief] |
| 62. | *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 [Initial and Rebuttal Brief] |
| 63. | *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 [Initial Brief] |
| 64. | *R. v. Mohan*, [1994] S.C.R. 9 [Initial Brief] |
| 65. | *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.) [Initial Brief] |
| 66. | *Re: Axelrod*, [1994] O.J. No. 2277 (C.A.) [Initial Brief] |
| 67. | *Ryan v. Moore*, 2005 SCC 38 [Rebuttal Brief] |
| 68. | *Sable Offshore Energy Inc. v. Ameron International Corp.*, 2013 SCC 37 [Initial Brief] |
| **VOLUME 3: CASES CONTINUED** | |
| 69. | *Safeway, Inc. v. Sugarload Partnership, LLC*, 423 F. Supp. 2d 531 (D. Md. 2006) [Initial Brief] |
| 70. | *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 [Initial and Rebuttal Brief] |
| 71. | *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 (S.C.J.) [Initial and Rebuttal Brief] |
| 72. | *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, 1998 CarswellOnt 2565 (Gen. Div. – Commercial List) [Rebuttal Brief] |
| 73. | *Thorn EMI North America, Inc. v. Hyundai Electronics Industries Co., Ltd.*, No. Civ. 332 (D. Del. 1996) [Rebuttal Brief] |

- 5 -

| TAB | |
|---|---|
| 74. | *U.S. v. Bennett*, 161 F.3d 171 (3rd Cir. 1998) [Initial Brief] |
| 75. | *United Rentals, Inc. v. RAM Holdings, Inc.,* 2007 Del. Ch. LEXIS 179 (Del. Ch. December 13,2007) [Initial Brief] |
| 76. | *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933) [Rebuttal Brief] |
| 77. | *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L. (2d) 230 (Ont. S.C., Gen. Div.) [Initial Brief] |
| 78. | *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 [Initial and Rebuttal Brief] |
| 79. | *Weatherford Canada Ltd. v. Corlac Inc.*, 2010 FC 602 [Rebuttal Brief] |
| 80. | *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 (H.L.) [Rebuttal Brief] |
| 81. | *Yetter v. Wise Power Systems, Inc.*, 929 F.Supp.2d 329 (D. Del. 2013) [Initial Brief] |
| 82. | *York Bremner Development Ltd. v. FHR Properties Inc.*, [2007] O.J. No. 3484 (S.C.J.) [Initial Brief] |
| 83. | *Young & Rubicam L.P. v. Gramercy Court Associates,* 190 A.D.2d 518, 593 N.Y.S.2d 20 (1st Dep't 1993) [Rebuttal Brief] |
| 84. | *Zaccardelli v. Kraus*, [2003] A.J. No. 442 (Q.B.) [Initial and Rebuttal Brief] |
| **VOLUME 3: OTHER** | |
| 85. | Alan W. Bryant, Sidney N. Lederman & Michelle K. Fuerst, *Sopinka, Lederman & Bryant: The Law of Evidence in Canada,* 3rd ed. (Markham, Ontario: LexisNexis Canada, 2009) [Initial Brief] |
| 86. | Bruce Ziff, *Principles of Property Law*, 5th ed.(Toronto: Thomson Reuters Canada, 2010) [Initial Brief] |
| 87. | Bryan A. Garner, ed., *Black's Law Dictionary*, 10th ed. (St. Paul: Thomson West, 2014) [Initial Brief] |
| 88. | D.W.M. Waters, M.R. Gillen and LD. Smith, eds. *Waters' Law of Trusts in Canada*, 3rd ed. (Toronto: Thomson/Carswell, 2005) [Rebuttal Brief] |
| 89. | David Vaver, *Intellectual Property Law* (Toronto: Irwin Law, 2011) [Initial Brief] |
| 90. | Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in* |

- 6 -

| TAB | |
|-----|---|
| | *Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) [Initial Brief] |
| 91. | U.S. Federal Rules of Evidence 408(a) [Initial Brief] |
| 92. | Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham, Ontario: LexisNexis, 2012) [Initial and Rebuttal Brief] |
| 93. | Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (1969) [Initial Brief] |
| 94. | *Internal Revenue Services*, 26 C.F.R. §1.482-4(f)(2)(ii)(A), 4(b) (2013) [Rebuttal Brief] |
| 95. | Janet Walker, *Canadian Conflicts of Laws, Vol. 2*, 6th ed. loose-leaf (Markham: LexisNexis, 2005) [Initial Brief] |
| 96. | Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) [Rebuttal Brief] |

| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.* | Court File No.:09-CL-7950 |
|---|---|
| In re: Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |

|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** | **IN THE UNITED STATES**<br>**BANKRUPTCY COURT FOR**<br>**THE DISTRICT OF DELAWARE** |
|---|---|---|

**BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS (POST-TRIAL BRIEF – ALLOCATION) VOLUME 3 OF 3**

| | |
|---|---|
| **GOODMANS LLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br>**Jay A. Carfagnini**  LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br>**Benjamin Zarnett** LSUC#: 17247M<br>bzarnett@goodmans.ca<br>**Peter Ruby** LSUC#: 38439P<br>pruby@goodmans.ca<br>**Joseph Pasquariello** LSUC#: 38390C<br>jpasquariello@goodmans.ca<br>Tel:       (416) 979-2211<br>Fax:      (416) 979-1234<br>*Lawyers for the Monitor*<br><br>**GOWLING LAFLEUR HENDERSON LLP**<br>Barristers & Solicitors<br>1 First Canadian Place,<br>100 King Street West, Suite 1600<br>Toronto ON M5X 1G5<br>**Derrick Tay** LSUC#: 21152A<br>derrick.tay@gowlings.com<br>**Jennifer Stam** LSUC#: 46735J<br>Jennifer.stam@gowlings.com<br>Tel:       (416) 862-5697<br>Fax:      (416) 862-7661<br>*Lawyers for the Canadian Debtors* | **BUCHANAN INGERSOLL & ROONEY PC**<br>Mary F. Caloway (No. 3059)<br>Kathleen A. Murphy (No. 5215)<br>919 North Market Street, Suite 1500<br>Wilmington, Delaware 19801<br>(302) 552-4200 (telephone)<br>(302) 552-4295 (facsimile)<br>mary.caloway@bipc.com<br>kathleen.murphy@bipc.com<br><br>**ALLEN & OVERY LLP**<br>Jacob S. Pultman<br>Paul B. Keller<br>Laura R. Hall<br>Ken Coleman<br>Daniel Guyder<br>1221 Avenue of the Americas<br>New York, NY  10020<br>(212) 610-6300 (telephone)<br>(212) 610-6399 (facsimile)<br>jacob.pultman@allenovery.com<br>paul.keller@allenovery.com<br>laura.hall@allenovery.com<br>ken.coleman@allenovery.com<br>daniel.guyder@allenovery.com<br><br>*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors* |

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

2003 CarswellOnt 1474
Ontario Superior Court of Justice [Commercial List]

1124980 Ontario Inc. v. Liberty Mutual Insurance Co.

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468, 33 B.L.R. (3d) 206

# 1124980 Ontario Inc., carrying on business as "Health-Care Pharmacy" (Applicant) and Liberty Mutual Insurance Company and Inco Ltd. (Respondents)

Epstein J.

Heard: December 17, 2002
Judgment: April 22, 2003
Docket: 02-CL-4735

Counsel: Charles Scott, David E. Gruber for Applicant
Larry P. Lowenstein, Mahmud Jamal for Respondents

Subject: Corporate and Commercial; Contracts; Insurance

## Headnote

### Choses in action --- Legality of assignments

Pharmacy refused to enter into letter of understanding with company under which company proposed that pharmacy would limit dispensing fee charged to customers covered under employee benefit plans — Company instructed insurer which administered plans to refuse to recognize assignments of benefits made in favour of pharmacy by individuals covered under plans — Pharmacy would have to obtain payment from covered person directly — Pharmacy brought application for declaration that it was entitled to receive assignments from individuals covered under group benefit plans of their right to be reimbursed for covered prescription drug charges — Application dismissed — Right of covered employees to be reimbursed for cost of prescription drugs constitutes chose in action which is capable of being assigned — Right of assignment may be negated by contract — Company and insurer had entered into contracts (Group Benefits Agreements and Administrative Services Only Agreement) which expressly restricted right of assignment by limiting right of covered person to give assignment and by limiting right of non-participating pharmacy to receive assignment — Through contractual relationships established in agreements among parties, company and insurer reserved right to limit right of covered persons to assign reimbursement of benefits — Pharmacy had no right to receive assignment that its customer was not legally able to give — Otherwise-valid assignments under Conveyancing and Law of Property Act were legitimately limited by contract in this case.

### Choses in action --- Assignability — Miscellaneous issues

Pharmacy refused to enter into letter of understanding with company under which company proposed that pharmacy would limit dispensing fee charged to customers covered under employee benefit plans — Company instructed insurer which administered plans to refuse to recognize assignments of benefits made in favour of pharmacy by individuals covered under plans — Pharmacy would have to obtain payment from covered person directly — Pharmacy brought application for declaration that it was entitled to receive assignments from individuals covered under group benefit plans of their right to be reimbursed for covered prescription drug charges — Application dismissed — Right of covered employees to be reimbursed for cost of prescription drugs constitutes chose in action which is capable of being assigned

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

— Right of assignment may be negated by contract.

**Table of Authorities**

**Cases considered by *Epstein J.*:**

*Al-Qahtani-Shaw-Leonard Ltd. v. Crossworld Freight Ltd.*, 28 C.C.L.I. 60, 60 O.R. (2d) 565, 40 D.L.R. (4th) 656, 1987 CarswellOnt 738 (Ont. H.C.) — referred to

*Al-Qahtani-Shaw-Leonard Ltd. v. Crossworld Freight Ltd.* (1988), 34 C.C.L.I. xix, 66 O.R. (2d) 256, 54 D.L.R. (4th) 192 (Ont. C.A.) — referred to

*Canada (Attorney General) v. 3068529 Manitoba Ltd.*, 2000 MBQB 24, 2000 CarswellMan 261, 19 C.C.L.I. (3d) 285, 22 Admin. L.R. (3d) 106, 7 B.L.R. (3d) 140, 146 Man. R. (2d) 55 (Man. Q.B.) — distinguished

*Canada (Attorney General) v. 3068529 Manitoba Ltd.*, 2000 MBCA 111, 2000 CarswellMan 504, 9 B.L.R. (3d) 159, 150 Man. R. (2d) 287, 230 W.A.C. 287, [2001] 3 W.W.R. 266, 24 C.C.L.I. (3d) 287 (Man. C.A.) — referred to

*Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417, *(sub nom. St. Martin's Property Corp. v. Sir Robert McAlpine Ltd.)* [1994] 1 A.C. 85 (U.K. H.L.) — referred to

*Moore, Re* (1878), 8 Ch. D. 519 (Eng. C.A.) — referred to

*Rodaro v. Royal Bank*, 2002 CarswellOnt 1047, 22 B.L.R. (3d) 274, 157 O.A.C. 203, 49 R.P.R. (3d) 227, 59 O.R. (3d) 74 (Ont. C.A.) — considered

**Statutes considered:**

*Conveyancing and Law of Property Act*, R.S.O. 1990, c. C.34
    Generally — referred to

    s. 53(1) — considered

*Ontario Drug Benefit Act*, R.S.O. 1990, c. O.10
    Generally — referred to

APPLICATION by pharmacy for declaration that it was entitled to receive assignments from individuals covered under group benefit plans of their right to be reimbursed for covered prescription drug charges.

*Epstein J.*:

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

1    At issue in this case is the applicant's right to receive an assignment of drug benefits under a series of group benefit plans for employees of Inco Ltd. Under these group benefit plans, Inco's employees, retirees and their eligible dependants are covered for prescription drugs, plus the pharmacist's customary dispensing fee, less a $0.35 deductible for each prescription. The respondent, Liberty Mutual Insurance Company, administers these plans.

2    The applicant, 1124980 Ontario Inc., carrying on business as Health Care Pharmacy, is a company that owns and operates a pharmacy in the Sudbury area. It seeks a declaration that it is entitled to receive assignments from those individuals covered under the various group benefit plans (the "Inco benefit plans") of their right to be reimbursed for covered prescription drug charges.

**General Background**

3    The applicant refused to enter into a letter of understanding with Inco Ltd. ("Inco") under which Inco proposed that the applicant would limit its dispensing fee charged to customers covered under the Inco benefit plans to $6.47. This is the amount charged to the government for social assistance prescription drug benefits under the *Ontario Drug Benefit Act*, R.S.O. 1990, c. O.10. In response to the applicant's decision not to enter into the letter of understanding, Inco instructed the Liberty Mutual Insurance Company ("Liberty Health"), to refuse to recognize assignments of benefits made by individuals covered under the plans in favour of the applicant. Inco acknowledges the obligation to pay the cost of prescriptions and the dispensing fee the applicant and other pharmacies charge to those entitled to benefits, but it refuses to allow the right of assignment to be exercised in favour of the applicant to enable direct payment to the pharmacy.

**The Facts**

4    In setting out the facts, I have borrowed heavily from the detailed facta prepared by counsel for both parties.

*A. — The Agreements*

5    A number of agreements are relevant to the issues raised in this proceeding.

*(i) — The Collective Agreements*

6    Inco has approximately 4,500 active employees (3,300 of whom are unionized) and approximately 14,000 retirees in the Sudbury area. Its unionized and non-unionized employees and retirees are entitled to health care benefits, including prescription drug benefits, under their collective agreements or other employment or retirement arrangements.

7    The majority of Inco's unionized employees receive health care benefits pursuant to the terms of a collective agreement made between Inco and the United Steelworkers of America, Local 6500 dated June 1, 2000. Article 24 of that collective agreement provides:

    24.01 The employees covered by this Agreement shall receive the benefits of . . . a Group Plan for Prescription Drugs

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

(providing coverage equivalent to the Liberty Health plan for prescript drugs - Formulary 2 - $0.35 deductible), . . . all Plans are subject to and in accordance with the terms and conditions as set out in this Article and in the Plans, all of which . . . form part of this Agreement.

8    A minority of Inco's unionized employees in Sudbury are covered under another collective agreement between Inco and the United Steelworkers of America, Local 6600, dated April 1, 2001. Article 20.01 of that collective agreement provides that Inco will pay the premiums for a Prescription Drugs Plan for eligible employees.

*(ii) — The Inco Sudbury Group Benefit Agreements (between Inco and Liberty Health)*

9    In order to provide prescription drug benefits to each of its employees and retirees (hereinafter referred to as the "Covered Persons") in the Sudbury area, Inco entered into a variety of Group Benefit Plan Agreements (collectively the "Inco Sudbury Group Benefit Agreements") with Ontario Blue Cross, whose business was acquired in 1995 by Liberty Health.

10    These agreements set out the benefits Liberty Health provides on Inco's behalf. Each of the Inco Sudbury Group Benefit Agreements provides, in part, as follows:

11. A Covered Person may obtain services or supplies for which coverage is available under this agreement from any . . . provider of his or her choice.

12. Payments will be made for charges eligible as benefits for . . . services or supplies upon presentation of written proof of claim satisfactory to [Liberty Health] subject to the terms and conditions of this agreement, provided that:

(a) all or a portion of any eligible charges shall be paid directly to the provider of the . . . service or supply which has an agreement with [Liberty Health], or

(b) in the absence of an agreement with [Liberty Health], all or a portion of any eligible charges shall be paid to the provider upon the written direction of the Covered Person who is the principal certificate holder, or

(c) payment of eligible charges other than as described in (a) and (b) above, shall be made to the Covered Person who is the principal certificate holder.

11    In September 1995, Liberty Health amended all its group benefit plans, including the Inco Sudbury Group Benefit Agreements. In a letter sent to all Covered Persons, Liberty advised as follows:

To reflect our current claims practices regarding assignment, we are also adding the following clause to your contract(s):

ASSIGNMENT

Liberty Mutual allows the Covered Person who is the principal certificate holder to assign the payment of eligible expense to the provider of the care, service or supply, which has an agreement with Liberty Mutual, unless otherwise stated in the provision entitled "Payment".

However, Liberty Mutual reserves the right to cancel the above right, which subsequently may be reinstated at any

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

time.

Please retain this letter with your other group insurance documents because it serves as your notice of this contract amendment.

12    The applicant notes that there is no provision entitled "Payment" in the contract. In my opinion, this does not affect the arguments or the outcome in this case in any way.

*(iii) — The Administrative Services Only Agreement (between Inco and Liberty Health)*

13    Inco and Liberty Health are also parties to an Administrative Services Only (ASO) Agreement, dated August 2002 (the "ASO Agreement"). The ASO Agreement records the financial arrangements between Liberty Health and Inco with respect to prescription drug, semi-private hospital, vision care and dental care benefits provided under the terms of, *inter alia*, the Inco Sudbury Group Benefit Agreements. The ASO Agreement is stated to define Inco's liability, the method of accounting for deposits, claims, expenses, taxes, interest allowances and treatment of plan surplus and deficit.

14    Significantly, the ASO Agreement states that if there exists a conflict between its terms and those of the Inco Sudbury Group Benefit Agreements, the terms of the ASO Agreement govern.

15    With regard to the services provided under the ASO Agreement, Article 4.0 states as follows:

Liberty Health agrees to provide the services as outlined in Appendix "A" under this agreement.

16    Appendix "A" to the ASO Agreement provides, in relevant part, as follows:

Liberty Health agrees to provide the following services:

. . .

<u>Claims Administration</u>

- validate claimant eligibility

- adjudicate and pay claims as per Group Contracts, including cost containment cheques (DRUGCHECK) and Coordination of Benefit Provision

- conduct appropriate claims investigations

- review claims, as necessary, with providers of health services

- attempt to recover any benefit payments, incorrectly paid

- provide medical and dental consultants

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

• maintain claim files for the Contractholder [Inco]

• any other claim matters to which the Contractholder and Liberty Health may agree from time to time

*(iv) — The Liberty Health Provider Agreement (between Liberty Health and Health-Care Pharmacy)*

17    In order to administer the Inco Benefit Plans that Liberty Health administers for various plan sponsors such as Inco, Liberty Health enters into direct contractual agreements with pharmacies, such as the applicant, regarding reimbursement of drug benefits provided by the pharmacies to plan members.

18    Liberty Health and the applicant have entered into an agreement referred to as the Liberty Health Provider Agreement (the "Provider Agreement"), under which Liberty Health permits the applicant to receive an assignment of eligible reimbursement from plan members under the various group plans that Liberty Health administers (the "assignment"). This agreement is not specific to Inco's plans, but rather covers the many group plans Liberty Health administers on behalf of many plan sponsors. In other words, this is an umbrella agreement.

19    The applicant acquired the pharmacy in issue in October of 1995. Because of the change in store ownership, Liberty Health required a new Provider Agreement to be executed. Accordingly in December 1995 the applicant and Liberty Health entered into Liberty Health Provider Agreement No. 161187, Zone 041, in the standard form provided by Liberty Health.

20    The Provider Agreement between the applicant and Liberty Health states:

WHEREAS Liberty Health has entered into agreements to pay for eligible PRESCRIPTION DRUGS or medicines purchased by subscribers and eligible dependants of subscribers, in accordance with the terms and conditions more particularly set forth in the said agreements which detail such benefits.

AND WHEREAS the Pharmacy has requested Liberty Health to make payments for the said prescription drugs or medicines directly to it on the consents of the Liberty Health subscribers and their eligible dependants.

NOW THEREFORE THIS AGREEMENT WITNESSETH, in consideration of the premises and in accordance with the terms and conditions set out on the reverse side, that Liberty Health will make the aforesaid payments to the Pharmacy and the Pharmacy agrees to abide by and perform each and every of the said terms and conditions, and as a specific condition of receiving any payment to indemnify and hold harmless Liberty Health from any claims for the said payments by its subscribers and their eligible dependants or other parties with which Liberty Health has agreed.

AND THAT this agreement is subject to cancellation by Liberty Health without notice and by the Pharmacy on one month's written notice addressed to Liberty Health, 150 Ferrand Drive, Don Mills, Ontario, M3C 1H6 and sent by prepaid registered post.

21    The terms and conditions on the reverse side of the Provider Agreement deal with practical matters pertaining to the financial dealings between the applicant and Liberty Health, such as the manner in which the applicant is to submit claims to Liberty Health, the method and timing of payment, the cost of the product and responsibility for the deductible amounts. No reference is made to any of the contractual arrangements between Inco and Liberty Health.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

*B. — Inco's Actions*

22    Inco's drug plans are entirely self-funded or self-insured. Inco pays the annual drug costs directly out of its revenues. As an indication of the magnitude of these costs, for the year 2001 Inco paid $29.4 million in health care coverage under its various plans.

23    Inco participated in a survey in 2001 about health care costs. The results suggested that Inco's drug costs were significantly higher than comparable organizations. Given this result, and the projected increase in prescription drug costs, Inco studied ways of reducing expenses related to health benefits. To that end, in September 2001, Inco issued an "Inco Benefits Initiative Prescription Drugs Update". This document explained to the Covered Persons some of the challenges Inco faced in terms of health care costs. The document advised the recipients that Sudbury area pharmacies charged varying dispensing fees and recommended that Covered Persons use pharmacies with lower dispensing fees. The document also identified a number of Sudbury-area pharmacies with lower dispensing fees (the "preferred providers") that would be permitted to display a sign "Inco Prescription Drug Provider", but noted that plan members were not required to use any of these pharmacies.

24    A few months later, in April 2002, Inco sent another letter to the Covered Persons announcing that as of May 13, 2002, Liberty Health would no longer reimburse non-preferred providers directly, but would instead only reimburse the Covered Person. The exception to this new policy is where payment would still be allowed to be made directly from Liberty Health to a non-preferred provider in cases where the nearest preferred provider is located more than two kilometres from the pharmacy the Covered Person would otherwise use.

25    On April 16, 2002, Inco sent a letter to Sudbury-area pharmacies, including the applicant, attaching the April 2000 newsletter and a proposed letter of understanding the pharmacies were to execute if they wished to become preferred providers. The applicant did not execute such a letter of understanding.

26    On May 3, 2002, Inco wrote another letter to all Sudbury-area pharmacies, including the applicant, in which it set out its view that it was entitled to prevent redirection of reimbursement for goods or services billed to Liberty Health on an Inco benefit plan.

27    On May 5, 2002, Inco wrote to the applicant, reminding that the last date to submit letters of understanding was May 8, 2002. Then on May 10, 2002, Inco wrote the applicant and other area pharmacies that had chosen not to sign Inco's proposed letter of understanding, indicating that Inco had instructed Liberty Health no longer to recognize assignments of benefits from these non-participating pharmacies billed to any of the relevant Inco Sudbury Group Benefit Agreements.

28    In response to Liberty Health's refusal to recognize assignments of benefits, the applicant and other non-participating pharmacies began submitting claims manually by correspondence, rather than electronically as had been the common practice. Included with claims submitted manually were copies of an assignment of benefits form as executed by Covered Persons or their agents. Notwithstanding the Covered Persons' execution of assignment of benefits forms, Liberty Health has been issuing payment to the Covered Person instead of to the applicant directly.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

29    The application record contained examples of claims submitted by the applicant for which payment was made to the Covered Person notwithstanding the assignment of benefits to the applicant. In all cases, whether the claim was submitted electronically or by regular mail, Liberty has reimbursed the Covered Person directly by cheque, rather than reimbursing the applicant.

30    On May 29, 2002, the applicant wrote to Liberty Health to demand payment in respect of all the claims that the applicant had sent for processing. On June 21, 2002, Liberty Health replied to the applicant refusing to make payment, regardless of whether executed assignment of benefit forms had been obtained and submitted.

31    Against this background, the practical issue that has motivated these proceedings can be summarized as follows. Inco and Liberty Health say that as a result of the contractual relationships that govern the parties and the steps they have taken in accordance with the terms of those relationships, non-participating pharmacies, such as the applicant, are free to continue charging their usual dispensing fee and Inco will pay that fee. Non-participating pharmacies can also continue to use Liberty Health's on-line adjudication system to determine whether certain drugs are eligible under the respective plans, and they can also continue to submit claims electronically to Liberty Health on behalf of the Covered Person. However, non-participating pharmacies are required to obtain payment from the Covered Person directly, and the Covered Person must then seek reimbursement from Liberty Health. Liberty Health, on Inco's behalf, will then reimburse the Covered Person directly for the cost of the drugs and the dispensing fee.

32    The applicant contends that it is entitled to receive the Covered Person's assignment of the debt owed by Inco. It has entered into no agreement with Inco that limits its right to receive any such assignment. The applicant argues that rather than restricting the right to receive the assignments, the Provider Agreement between it and Liberty Health specifically provides that the applicant is entitled to be paid directly for prescription drugs and the dispensing fee.

**The Issues**

33    The following issues have been raised for determination:

1. Is this an appropriate case to consider granting declaratory relief?

2. Have the Covered Persons under the Inco Sudbury Group Health Agreements executed legal assignment of their entitlement to be reimbursed prescription drug costs and dispensing fees?

3. Has the right of the Covered Persons to assign their entitlement been limited by the contractual arrangements between Inco and Liberty Health? If so, does this limitation affect the applicant's right to receive payment under such assignments?

**Analysis**

*1. — Declaratory Relief*

34    The resolution of the issues raised in this proceeding primarily involves a determination of the parties' rights pursuant to the various agreements set out above. The applicant is seeking a declaration that it is the legal and absolute assignee of the

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

claims of Covered Persons for prescriptions it filled. The decision to grant declaratory relief is within the Court's discretion. The question is whether this is an appropriate case for declaratory relief to be granted if the applicant shows it is legally entitled to the assignments.

35    Inco and Liberty Health have described what they refer to as the "self-help" remedies the applicant has taken since Inco altered the right of assignment, such as providing customers with charge accounts and allowing them to use credit cards, and requiring the customer to settle the account with the pharmacy once he or she receives reimbursement from Liberty Health. Mr. Beradi, the principal of the applicant pharmacy, admitted on cross-examination that as of December 2, 2002 the applicant was owed only $5,000 in respect of the assignment of benefit forms Inco and Liberty Health had declared invalid. Inco and Liberty Health submit that the issues raised in this proceeding are either *de minimis* or are matters properly brought before the Small Claims Court. For the reasons that follow, in dealing with whether this is a proper case for declaratory relief, I do not accept the proposition that this application raises issues of such little moment.

36    As noted above, the decision to grant declaratory relief is within the court's discretion. The principal criterion to which courts refer in the exercise of that discretion is whether there is a practical purpose to the declaration sought. If the declaration sought can be of some use, it will generally be granted, provided that there is a genuine dispute between the parties, the dispute arises from specific facts that are already in existence, and the dispute is still alive. If these considerations are satisfied, a declaration will generally issue, unless it is shown that the utility of granting the declaration is outweighed by inconvenience or embarrassment to the respondent. Such a situation rarely arises in practice because unlike injunctive relief, a declaration generally does not cause any inconvenience since it establishes the rights of the parties and resolves uncertainties.

37    To meet the criterion of showing a practical purpose, the applicant does not have to be in a position to demonstrate that a material tangible benefit will be derived from the relief sought. Rather, the requirement of utility is satisfied if the declaration would solve a real difficulty with which the applicant is faced. See Zamir & Woolf, *The Declaratory Judgment* (London: Sweet & Maxwell, 2002) at paras. 4.092, 4.119-4.120.

38    In this proceeding the dispute between the parties is a live one that arises from facts already in existence. Further, it is clear that a material, tangible benefit would be derived from the declaration. The resolution of the dispute over the ability of the applicant to take assignments by way of a declaration would be of practical benefit to the applicant and to others similarly situated.

39    The applicant continues to be out of pocket by about $5,000 on assignments taken in respect of pharmacy services rendered in May 2002, that Liberty Health has refused to recognise or pay. More importantly, owing to the position Inco and Liberty Health have taken, the applicant has been compelled to change the manner in which it does business with its customers. Established customers covered under the Inco Sudbury Group Benefit Agreements have been provided with charge accounts that they can use to pay for prescriptions dispensed to them, with their agreement to reimburse the pharmacy when they receive payment from Liberty Health. New Inco customers of the pharmacy are not afforded credit, and must pay for all their prescriptions in cash. Many of the customers of the pharmacy are elderly, and the customers have apparently expressed displeasure at these new arrangements.

40    While Inco and Liberty Health have suggested that the applicant could deal with the inconvenience to its customers by encouraging them to use credit cards, to do so would cause the applicant to incur credit card fees that it would not have to pay if the assignments were recognized. If I were to grant the declaration sought, the applicant could go back to the practice of

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

taking assignments from Covered Persons, thereby avoiding the cost and inconvenience of other credit arrangements, and avoiding the reduced volume of customers Inco clearly intends to effect by way of its instruction to Liberty Health to refuse to accept such assignments. These are real, practical benefits to the applicant.

41    I conclude that this is an appropriate case to consider whether, on the merits of the case, the Court ought to exercise its discretion to grant the declaratory relief sought.

### 2. — Legal Validity of the Assignments

42    The right in question in this case is the right to assign. Against that background the applicant's argument started with the legal validity of the assignment itself.

43    The applicable legislation is the *Conveyancing and Law of Property Act,* R.S.O. 1990, c. C.34 ("CLPA"). Section 53(1) of the CLPA provides:

> Any absolute assignment made on or after the 31st day of December, 1897, by writing under the hand of the assignor, not purporting to be by way of charge only, of any debt or other legal chose in action of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor would have been entitled to receive or claim such debt or chose in action is effectual in law, subject to all equities that would have been entitled to priority over the right of the assignee if this section had not been enacted, to pass and transfer the legal right to such debt or chose in action from the date of such notice, and all legal and other remedies for the same, and the power to give a good discharge for the same without the concurrence of the assignor.

44    Accordingly, for there to be a valid legal assignment under section 53(1) of the *CLPA*, four requirements must be met:

a) there must be debt or chose in action;

b) the assignment must be absolute;

c) the assignment must be written; and

d) written notice of the assignment must be given to the debtor.

45    It is clear from the authorities that these principles apply to assignments of proceeds payable under a policy of insurance: see *Al-Qahtani-Shaw-Leonard Ltd. v. Crossworld Freight Ltd.* (1987), 60 O.R. (2d) 565 (Ont. H.C.), at 581; varied (1988), 66 O.R. (2d) 256 (Ont. C.A.); *Moore, Re* (1878), 8 Ch. D. 519 (Eng. C.A.). Where an insurer receives notice of an assignment of proceeds payable under an insurance policy, the insurer is obliged to pay the proceeds to the assignee and, although this may be pursuant to the contract with the assignor, the insurer pays out the assignor at its peril.

46    The evidence from both Inco and Liberty Health is that the Covered Persons are entitled to be reimbursed for the cost of prescription drugs covered under Liberty Health's formulary 2 plus the pharmacy's usual and customary dispensing fee, less a $0.35 deductible. This right to receive an indemnity under an insurance contract is a chose in action and is capable of

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

being assigned.

47    The assignment of benefits form created by Liberty Health, which was used by the applicant and executed by the applicant's customers covered under the Inco Sudbury Group Health Agreements, states: "I hereby assign my benefits payable from this claim to the named provider and authorize payment directly to him/her." There is no language in the form that imposes any condition to the assignment. It is absolute.

48    The applicant's customers have executed the assignment of the Liberty Health benefits form and Liberty Health has received the executed forms.

49    Based on this analysis alone, the answer to the first question would be in the affirmative. All four requirements for a valid assignment were met. The Covered Persons did execute legal assignment to the applicant of a chose in action, namely their entitlement to be reimbursed for prescription drug costs and dispensing fees.

50    However, for the reasons that follow, because of Inco's actions culminating in the May 13, 2002 letter to the Covered Persons and to the Sudbury pharmacies, this previously assignable chose in action is no longer available for assignment to the applicant, except under limited circumstances.

### 3. — Effect of the Contractual Arrangements on the Right of Assignment

51    As I have said, the key to resolving this dispute involves a determination of the effect of the contractual arrangements between Inco and Liberty Health on the Covered Persons' right to assign, and on the applicant's right to receive, payment from Liberty Health for services and products rendered to Covered Persons.

52    First, it is clear that whatever right a party has to assign under a contract may be negated by contract. *Halsbury's Laws of England* (4th ed. Reissue, 1991, vol. 6) notes at p. 58 that "[i]f there is a provision in a contract prohibiting the assignment of rights thereunder, it appears that any purported assignment will be invalid as regards to the other party to the contract." Further, the Ontario Court of Appeal in *Rodaro v. Royal Bank* (2002), 59 O.R. (3d) 74 (Ont. C.A.) recently confirmed the right to limit assignment by contract. Doherty J.A. makes this clear at para. 33 when he says that "aside from limitations imposed by statute, public policy or the terms of a specific contract, a party to an agreement may assign its rights, but not its obligations under that agreement, to a third party without the consent of the other party to the contract" [emphasis added]. See also *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.* (1993), [1994] 1 A.C. 85 (U.K. H.L.).

53    Inco and Liberty Health submit that through their contractual relationships, namely the Inco Sudbury Group Benefit Agreements, as amended in September 1995, and the ASO Agreement, they have expressly restricted the right of assignment by limiting the right of a Covered Person to give an assignment and by limiting the right of a non-participating pharmacy to receive an assignment. Inco and Liberty Health further argue that these agreements are part of the Provider Agreement, since the Provider Agreement incorporated the ASO Agreement and the Inco Sudbury Group Benefit Agreements by reference through the wording in the recitals.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

54    The position of Inco and Liberty Health on this pivotal point can be broken down into two independent questions: (a) are the agreements between Liberty Health and Inco incorporated into the Provider Agreement by the recitals contained in that agreement?; and (b) if so, do the provisions of the contractual relationships between Inco and Liberty Health allow Liberty Health to modify the right to give and receive assignments?

*(a) — The Provider Agreement and the Recitals*

55    The position advanced by Inco and Liberty Health is that the Provider Agreement specifically states in its opening recitals that Liberty Health has entered into contracts, in particular the Inco Sudbury Group Benefit Agreements and the ASO Agreement, and that by virtue of these recitals these agreements are an integral part of the Provider Agreement. Thus, when Inco and Liberty Health change "claim matters", as they are permitted to do by the ASO Agreement, or change rights of assignment under the 1995 amendment to all of Liberty Health's group plans, these changes bind the pharmacies. In other words, Inco argues that the ASO Agreement and the group plans (in particular the Inco benefit plans) are incorporated by reference into the Provider Agreement, and that the applicant can have no greater rights regarding assignment than the customers whose rights of assignment are dealt with in the various group plans and administered by the ASO Agreement.

56    The applicant counters with the submission that nothing turns on the recitals in the Provider Agreement. The applicant submits that in law a recital to a written instrument will not create a covenant where the operative part of the instrument contains an express covenant dealing with the same subject matter.

57    From *Halsbury's Laws of England* (4th ed. Reissue, 1991, vol. 12) at paras. 1509-1511 and 1515, it is settled law that recitals do not control the operative part of an instrument. Where the operative part is clear, it is treated as expressing the intention of the parties, and it prevails over any suggestion of a contrary intention afforded by the recitals. There are exceptions to this proposition, the most notable being where there is an ambiguity in the operative part.

58    I digress for a moment to consider Inco and Liberty Health's second argument on this point. In addition to pointing to the recitals, counsel for Inco and Liberty Health rely heavily on the decision in *Canada (Attorney General) v. 3068529 Manitoba Ltd.* (2000), 7 B.L.R. (3d) 140 (Man. Q.B.); appeal dismissed (2000), 9 B.L.R. (3d) 159 (Man. C.A.) (the "*Manitoba* case") in support of this part of their argument. Inco and Liberty Health seek to rely on the *Manitoba* case for the proposition that the terms of specific group plans and other agreements relating to the administration of benefits are incorporated by reference into the umbrella pharmacy agreements. They also argue that the *Manitoba* case stands for the proposition that pharmacies are bound by the terms of each of the group plans when they dispense prescription drugs to plan members.

59    In my view, the *Manitoba* case is distinguishable and provides little, if any, assistance in my determination of the issues raised in this application, because of the importance of the specific wording of the contracts in issue.

60    The facts in the *Manitoba* case were as follows. The Medical Services Branch of Health Canada provided health benefits, including prescription drugs and other non-prescription products, free of charge to First Nations and Inuit clients (the "Aboriginal Covered Persons") who did not otherwise have insurance coverage. The program was referred to as the "non-insured health benefits program" or "NIHB". An Aboriginal Covered Person provided a valid prescription at a "participating pharmacy" and the pharmacy dispensed the prescription without charge to the Aboriginal Covered Person. If no other program covered the prescription, the pharmacy then submitted a claim for payment to the NIHB program.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

61    The Medical Services Branch of Health Canada did not process the claims from pharmacies directly, but instead contracted with claims processors who processed claims on its behalf. At all relevant times, Liberty Health was the payor and collector of information under the NIHB, having taken over the contractual relationship with Health Canada in 1995.

62    In Manitoba, those pharmacies wishing to act as providers in the NIHB were required to sign written "pharmacy agreements", which established the terms and conditions of the program and provided the mechanism by which drug claims were to be submitted for processing and payment. The report of the case suggests, without necessarily making it clear, that these pharmacy agreements were general umbrella agreements and were not specific to the NIHB, and were therefore similar to the Provider Agreement the applicant and Liberty Health entered into in the instant case.

63    Upon execution of a pharmacy agreement and registration in the NIHB program, each provider pharmacy was then provided with a Pharmacy Information Kit ("PIK"), a comprehensive document setting out the conditions to be met for a given benefit to be payable by Health Canada, similar to the Inco benefit plans in issue in this proceeding. The contracting pharmacy was entitled to submit claims to Liberty Health, but only pursuant to the terms and conditions set out in the PIK.

The Manitoba Court of Queen's Bench held at para. 13 that the terms and conditions of the PIK formed an "integral part" of the pharmacy agreement, even though they were provided to the pharmacy after the pharmacy agreement was executed, because the pharmacy agreement indicated that Blue Cross (later Liberty Health) had "entered into agreements to pay for certain prescription drugs purchased by subscribers in accordance with the terms and conditions more particularly set forth in the said agreements which detailed such benefits". The Court held that this statement incorporated by reference the terms of each of the group plans administered by Liberty Health.

64    The issue in the *Manitoba* case was whether Health Canada had a right to audit the books of participating pharmacies after the pharmacy agreements had been terminated. The audit right was contained in the pharmacy agreement, as well as in the PIK. A number of pharmacies had allegedly engaged in fraudulent practices with respect to the NIHB program, and Health Canada wanted to audit the books of participating pharmacies. The pharmacy agreements with two pharmacies alleged to have engaged in fraudulent practices were terminated by Liberty Health in a letter to those pharmacies, in which Liberty Health said that it was "terminating the right of assignment of claims" under the NIHB. The Court of Queen's Bench described this communication as follows:

On July 16, 1998, a letter was sent by Liberty Health to Arbor Drugs and Wellness Pharmacy terminating the right of assignment of claims as of the close of business on July 17, 1998. The letter from Liberty Health stated:

As the administrator of Health Canada [sic] health information and claims processing system for the non-insured benefits program, we wish to advise you that Liberty Health is terminating your right of assignment of claims. Effective at the close of business July 17, 1998, Liberty Health will no longer accept any claims submitted from your location on behalf of clients covered under the non-insured health benefits program.

65    The Court described the termination of assignment under this program as having the legal effect of terminating the pharmacy agreement. According to the Court, the letter cancelling assignment resulted in "termination of the contract between the parties" in respect of the NIHB program.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    13

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

66     On appeal, the Manitoba Court of Appeal confirmed that the legal effect of this letter cancelling assignment was to terminate the contract between participating pharmacies and Liberty Health in respect of the NIHB program. The Court of Appeal also held that the letter from Liberty Health had the effect of Health Canada terminating the contract. Consistent with this conclusion, the Court of Queen's Bench and the Court of Appeal found that the legal relationship between Health Canada and Liberty Health was one of agency, with Liberty Health acting as agent administering the NIHB on behalf of Health Canada. This is why Liberty Health's letter of termination stated that it was terminating the right of assignment of claims "as administrator of Health Canada", and only in respect of the NIHB program, and why the Court of Appeal held that this resulted in Health Canada terminating the contract.

67     To summarize, in the *Manitoba* case, Liberty Health sent a letter to the pharmacies terminating their right to receive assignment of benefits, and the Court held that the termination of assignment under the program had the effect of terminating the pharmacy agreement in respect of that program.

68     While the *Manitoba* case can be distinguished on a number of bases, the key distinction lies in the applicable contractual arrangements. As previously described, in the scheme the Manitoba court was considering, upon the execution of the pharmacy agreement, the pharmacy received an information package. The PIK was not an agreement involving a third party; it related directly to the relationship between the pharmacy and Liberty Health and not the relationship between Health Canada and the Aboriginal Covered Persons, nor the relationship between Liberty Health and Health Canada.

69     The importance of this factual distinction is that the Manitoba court was prepared to incorporate terms of the PIK, an instrument that related directly to the relationship between the pharmacy and Liberty Health, into the provider agreement. The position Inco and Liberty Health are trying to advance in the instant case is quite different. They are advancing the proposition that the terms of agreements between the two of them, agreements to which the applicant is not privy, are incorporated into the Provider Agreement.

70     The *Manitoba* case looks similar to the instant case. Indeed, it involves pharmacies, Liberty Health, a benefits program, covered persons, and sets of contracts among all the players. However, it is not the structure of relationships among the players that can make the *Manitoba* case similar or dissimilar to the case at bar. Rather, the wording and interpretation of the contracts must prevail. The reported version of the *Manitoba* case does not refer specifically to the wording of the contracts at issue, only describing at para. 11 that the pharmacy agreement in that case "established the terms and conditions between the parties and provided for the mechanism by which prescription drug plan claims" were to be submitted. Therefore, the *Manitoba* case does not shed any particular light on the dispute in the instant case.

71     I return therefore to an examination of the Provider Agreement in light of the legal principles expressed above concerning recitals. The parties do not appear to take issue with the statement of law that a recital will not create a covenant where the operative part of the agreement contains an express covenant dealing with the same subject matter. The dispute on this point is whether the recital upon which Inco and Liberty Health rely deals with the same subject matter as the operative part of the Provider Agreement.

72     I repeat the terms of the recitals for ease of reference:

WHEREAS Liberty Health has entered into agreements to pay for eligible PRESCRIPTION DRUGS or medicines purchased by subscribers and eligible dependants of subscribers, in accordance with the terms and conditions more

**WestlawNext® CANADA** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

particularly set forth in the said agreements which detail such benefits.

AND WHEREAS the Pharmacy has requested Liberty Health to make payments for the said prescription drugs or medicines directly to it on the consents of the Liberty Health subscribers and their eligible dependants.

NOW THEREFORE THIS AGREEMENT WITNESSETH, in consideration of the premises and in accordance with the terms and conditions set out on the reverse side, that Liberty Health will make the aforesaid payments to the Pharmacy and the Pharmacy agrees to abide by and perform each and every of the said terms and conditions, and as a specific condition of receiving any payment to indemnify and hold harmless Liberty Health from any claims for the said payments by its subscribers and their eligible dependants or other parties with which Liberty Health has agreed.

AND THAT this agreement is subject to cancellation by Liberty Health without notice and by the Pharmacy on one month's written notice addressed to Liberty Health, 150 Ferrand Drive, Don Mills, Ontario, M3C 1H6 and sent by prepaid registered post.

73      A close reading of the operative part of the Provider Agreement establishes that although there are allusions to the subject matter of the recitals, there is no express covenant clearly dealing with this same subject.

74      For example, various clauses in the operative part of the Provider Agreement refer to the pharmacy providing "eligible prescription drugs" to "Liberty Health subscribers" under "Liberty Health agreements", and refraining from filling prescriptions for "excluded benefits". However, there is no description in the operative part of the Provider Agreement concerning who is a subscriber under what agreements, what drugs are eligible, or what benefits are excluded. This must mean that the Provider Agreement contemplates including the provisions of the various benefit plans which set out in great detail who is eligible, what portion of what drugs and services are covered, and what benefits are excluded. In other words, absent the incorporation of the benefit plans and the ASO Agreement, the rights and obligations of the parties to the Provider Agreement would be incomplete.

75      In my opinion, the operative part of the Provider Agreement must be read together with the recitals in order to give meaning to the instrument. Liberty Health's obligation to make payments to the applicant depends on the terms and conditions of the agreements entered into between Inco and Liberty Health that are referred to in the first recital This explains why the Provider Agreement contains a statement that Liberty Health has entered into such agreements, and why I find them to be an integral part of the Provider Agreement.

76      I also note that the operative paragraph in the Provider Agreement states that the agreement is being signed "in consideration of the premises", including the premise that "Liberty Health has entered into agreements to pay for eligible prescription drugs . . . in accordance with the terms and conditions more particularly set forth in the said agreements that detail the benefits."

77      I therefore find that the applicant is bound by the terms, conditions and rules agreed upon between Inco and Liberty Health.

78      In this case, the Inco Sudbury Group Benefit Agreements (including the 1995 amendment) and the ASO Agreement were in place before the applicant entered into the Provider Agreement in December 1995. While the applicant argued that there is no evidence that these agreements were "brought to the table" before it signed the Provider Agreement, there is also

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

no evidence that the applicant took any steps at that time to obtain copies of the instruments to which reference is made in the recitals in order to be informed of the contractual rights between Inco and Liberty Health.

79      Moreover, I note that Inco and Liberty Health are not attempting to incorporate by reference any terms of the Inco Sudbury Group Benefit Agreements or the ASO Agreement that may have changed *after* the Provider Agreement was entered into. The validity of incorporating terms that might have changed after the Provider Agreement was signed is therefore not at issue in the instant case.

*(b) — Inco and Liberty's entitlements to alter the assignment rights of covered persons*

80      There are two elements to the question of whether Inco and Liberty Health properly altered the assignment rights in issue. The first is whether Inco and Liberty Health acted within their proper authority in purporting to limit the right of a Covered Person to assign the debt. The second issue is whether Inco and Liberty Health's actions restricted the applicant's right to receive an assignment. I will address each of these in turn.

**(i) — 1995 Amendment to Group Benefit Plans**

81      Inco and Liberty Health submit first that the 1995 amendment to the Inco Sudbury Group Benefit Agreement provided them with the power to act as they did. For the reasons that follow, this argument is not tenable.

82      The Inco Sudbury Group Benefit Agreement, including the 1995 amendment, would not on its own allow Inco to achieve its desired outcome. The clear terms of the 1995 amendment give Inco, through its agent Liberty Health, the ability to cancel the assignment right in its entirety. The clause does not entitle Inco and Liberty Health to limit the right to assign to individual suppliers selectively identified by Inco or Liberty Health.

83      Support for this conclusion can be found in the wording of the 1995 amendment. For ease of reference, I repeat the wording of the amendment:

ASSIGNMENT

Liberty Mutual allows the Covered Persons who is the principal certificate holder to assign the payment of eligible expense to the provider of the care, service or supply, which has an agreement with Liberty Mutual, unless otherwise stated in the provision entitled "Payment".

However, Liberty Mutual reserves the right to cancel the above right, which subsequently may be reinstated at any time.

84      The right with which this clause deals is the right of the Covered Person to assign payment owed to him or her by Inco. Based on the wording of this clause, the Covered Person either has the right to assign, or he or she does not. There is no in between. This amendment provides Liberty Health, as Inco's agent, with the right to cancel the Covered Persons' right to assign. But the clause affords no other right to Inco and Liberty Health. On a plain reading of the clause, Inco, through its agent Liberty Health, has no ability to limit the Covered Person's right of assignment in respect only of certain specific care providers such as the applicant.

1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

**(ii) — ASO Agreement**

85    Inco and Liberty Health also submit, however, that they cancelled the right of Covered Persons to assign payment for eligible expenses to a non-participating pharmacy such as the applicant by agreeing to do so under the ASO Agreement. As noted above, this agreement expressly provides that Inco and Liberty Health can agree upon "any other claim matters". The only restriction is that Inco and Liberty Health must agree on these claim matters. It is plain that the parties' intention was to be able to alter their arrangements from time to time if those changes were mutually agreeable.

86    Inco and Liberty Health argue that under the ASO Agreement they agreed that after May 13, 2002 Covered Persons were no longer permitted to assign the payment of eligible expenses to non-participating pharmacies, and that they advised Covered Persons and all Sudbury area pharmacies of their agreement.

87    The applicant, in response, points out that the reference to "other claim matters" to which Inco and Liberty Health may agree from time to time is the last bullet of eight bullets in Appendix "A" to the ASO Agreement, the second of which includes Liberty Health's obligation to adjudicate and pay claims as per the various group plans. The applicant submits that a contextual interpretation of Appendix "A" to the ASO Agreement indicates that the "other claim matters" referred to in the last bullet refers to matters other than those set out in the preceding seven bullets. Accordingly, the applicant submits that "other claim matters" must refer to matters *other than* Liberty Health's obligation to adjudicate and pay claims submitted on behalf of Covered Persons.

88    I agree. However, I am also of the view that the right of the Covered Persons to assign their entitlement to receive payment for their expenditure for prescription drugs is a matter that is separate and distinct from Liberty Health's obligation under the second bullet point to adjudicate and pay claims as per the various group plans.

89    There is no evidence in the record of what types of decisions have been contemplated under the provision "any other claim matters" in the eighth bullet point of Appendix "A". Nor, for that matter, is there any evidence about what is meant by "adjudicate and pay claims" in the second bullet point. However, as I shall explain, "adjudicate and pay claims" is something separate and distinct from any assignment rights that might exist under the contract or at large.

90    As the situation presently stands, as a non-participating pharmacy, the applicant is entitled to use Liberty Health's on-line claim evaluation system, which is referred to as the on-line adjudication system. Currently, any pharmacy -- whether a participating pharmacy or a non-participating pharmacy such as the applicant -- has the right to use the on-line adjudication method when a Covered Person wishes to have his or her health insurance pay for the cost of a pharmacy good or service. The pharmacist enters the claim into the on-line adjudication system and receives an on-line response indicating whether (or to what extent) the particular good or service is covered by the Covered Person's health insurance plan. Any pharmacist, and presumably any service provider, is entitled to have a claim relating to his or her goods or services evaluated by Liberty Health as to coverage. This is the "adjudication" phase of the "adjudicate and pay claims" obligation under Appendix "A" of the ASO Agreement.

91    Once the claim has been adjudicated, Liberty Health fulfils its obligation to "pay" the claim under Appendix "A" by

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

sending a cheque either to the Covered Person directly, or, if the Covered Person is entitled to assign his or her debt, to the care provider - the "pay" phase.

92      This set of transactions is what I take to be referred to by the obligation in the ASO Agreement to "adjudicate and pay claims". The reference to "Group Contracts" within this bullet point only modifies adjudication and payment. This is necessarily the case, since without the Group Contracts, Liberty Health would have nothing to administer on Inco's behalf.

93      It follows that any questions about the ability to assign the debt do not fall under this second bullet point from Appendix "A". Nor is it explicitly dealt with under the any other bullet point. Assignability, therefore, must be covered under the final catch-all bullet point, which entitles the parties to the ASO Agreement (Inco and Liberty Health) to decide on "any other claim matters to which [Inco] and Liberty Health may agree from time to time". There is no indication that assignment rights would *not* fall under "any other claim matters".

94      I conclude that Inco and Liberty Health, under the ASO Agreement, are entitled to set out more specifically the circumstances governing Covered Persons' rights of assignment.

95      The second element of this question is whether Inco and Liberty Health restricted contractually the applicant's ability to receive the assignment.

96      Inco and Liberty Health contend that Liberty Health advised the applicant that the right to receive an assignment under the Provider Agreement was terminated effective May 13, 2002. They argue that this had the effect of terminating the Provider Agreement in respect of the Inco benefit plans. They refer again to the *Manitoba* case, in which it was held that the plan administrator's termination of a pharmacy's right to receive an assignment had the legal effect of terminating the pharmacy agreement in respect of the particular insurance plan at issue, in that case the NIHB program.

97      I do not agree that the same situation exists in the instant case. There is no evidence that Liberty Health intended to cancel the Provider Agreement. Rather, the evidence supports the proposition that Liberty attempted to modify or amend the Provider Agreement unilaterally. This is clear from the fact that Liberty Health purported to allow the Covered Persons to give (and therefore Liberty Health to receive) an assignment if the Covered Person lived more than two kilometres from a participating pharmacy.

98      In any case, the right of the applicant to receive assignments is a separate and distinct question from whether the assignments from the Covered Persons were valid in the first place. If the Covered Person had no valid assignment to give, then nobody -- neither a participating pharmacy, nor a non-participating pharmacy -- could receive the assignment. Indeed, in signing the Provider Agreement, the applicant specifically "undertakes and agrees that it has in its possession valid and effective assignments of benefits" before submitting any claims to Liberty Health.

99      For these reasons, I conclude that Inco and Liberty Health were entitled, pursuant to the terms of the ASO Agreement, to alter the circumstances under which the Covered Persons were entitled to give an assignment. The otherwise valid assignment under the *CLPA* was legitimately limited by contract. The limitation prevents Covered Persons from assigning to the applicant, except in cases where the Covered Person lives more than 2 kilometres from a participating pharmacy. The

**1124980 Ontario Inc. v. Liberty Mutual Insurance Co., 2003 CarswellOnt 1474**

2003 CarswellOnt 1474, 2003 C.E.B. & P.G.R. 8499 (note), [2003] O.J. No. 1468...

applicant has no right to receive an assignment that its customer is not legally able to give.

100    Although Inco tried to impress upon me that its actions were motivated by a desire to reduce health care costs, I find that the intention behind the actions that brought about this proceeding was to reduce the costs of Inco's employee health care benefits and thereby increase its profits. Whatever Inco's true purpose was, the bottom line is that through the contractual relationships established in the agreements among the parties, Inco and Liberty Health reserved the right to limit the right of Covered Persons to assign reimbursement of benefits.

**Conclusion**

101    For these reasons, the application is dismissed.

102    Inco and Liberty Health are entitled to their costs of this proceeding. If the parties are not able to resolve the issue of costs, they may make written submissions within 30 days of the date of the receipt of these reasons.

*Application dismissed.*

End of Document    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587

Ontario Superior Court of Justice

1230995 Ontario Inc. v. Badger Daylighting Inc.

2010 CarswellOnt 3454, 2010 ONSC 1587, 189 A.C.W.S. (3d) 364

# 1230995 Ontario Inc. (Plaintiff) and Badger Daylighting Inc. (Defendant)

W.A. Jenkins J.

Heard: December 1-4,7-11, 2009; January 12-15,18-21, 2010

Judgment: May 25, 2010

Docket: 49635

Counsel: Thomas J. Corbett for Plaintiff
Irving Marks, Shawn Pulver for Defendant

Subject: Contracts; Civil Practice and Procedure

## Headnote

### Contracts --- Franchising contracts — Statutory rights and obligations

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees over territory of two cities — Plaintiff and defendant entered into work zone agreement to amend franchise agreement, granting plaintiff right to work in areas outside his territory and recognizing this zone of nine counties could be reassigned by defendant — Plaintiff and defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff brought action against defendant for breach of contract; defendant counterclaimed — Action allowed; counterclaim dismissed — Defendant did not comply with disclosure requirements of Arthur Wishart Act (Franchise Disclosure) as work zone agreement or territory description was not attached to 2003 agreement — Defendant also failed to include performance levels required for plaintiff to continue to have exclusive territory — Defendant did not deal fairly with plaintiff.

### Contracts --- Franchising contracts — Construction and interpretation — Entire agreement clause

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees over territory of two cities — Plaintiff and defendant entered into work zone agreement to amend franchise agreement, granting plaintiff right to work in areas outside his territory and recognizing this zone of nine counties could be reassigned by defendant — Plaintiff and defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff brought action against defendant for breach of contract; defendant counterclaimed — Action allowed; counterclaim dismissed — 2003 agreement defined plaintiff's territory as city and work zones, but also defined work zones as areas which had not been assigned as territory — 2003 agreement was ambiguous and confusing — Evidence did not establish mutual assumption by parties that work zone agreement continued to apply, contrary to clause that 2003 agreement was entire agreement — Plaintiff believed that it had exclusive right to operate in nine counties of work zones and did nothing to lead defendant to believe that it could place new franchisee in zones at its sole discretion — Only agreement in force was 2003 agreement.

### Contracts --- Franchising contracts — Construction and interpretation — Miscellaneous

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees, over territory of two cities — Plaintiff and defendant entered into work zone agreement to amend franchise agreement, granting plaintiff right to work in areas outside his territory and recognizing this zone of nine counties could be reassigned by defendant — Plaintiff and

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff brought action against defendant for breach of contract; defendant counterclaimed — Action allowed; counterclaim dismissed — 2003 agreement defined plaintiff's territory as city and work zones, but also defined work zones as areas which had not been assigned as territory — 2003 agreement was ambiguous and confusing — Defendant claimed inclusion of work zones in definition of territory was mistake, but contra proferentum rule of interpretation prevented phrase from being removed — Work zones were part of plaintiff's territory.

**Contracts --- Franchising contracts — Performance or breach — Duty of franchisees — Operation in accordance with franchise agreement**

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees — Plaintiff and defendant entered into work zone agreement, granting plaintiff right to work in areas outside his territory but recognizing defendant could reassign this zone of nine counties — Plaintiff and defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff brought action against defendant for breach of contract; defendant counterclaimed — Action allowed; counterclaim dismissed — Work zones were part of plaintiff's territory — Agreement required plaintiff to aggressively and fully develop market — Plaintiff did not generate as much business in area as defendant demanded, but did aggressively seek to exploit market — Given market conditions, plaintiff fully developed market to extent possible and so did not breach agreement — Plaintiff suffered pre-trial loss of gross profits in amount of $64,861 and, given that his services would occasionally still be required in four counties, future loss of income assessed at $497,516 — Plaintiff's claim for expenses incurred in 2005 that defendant refused to pay would be allowed, as fact that claim might have been submitted late was of no consequence — There was no separate action or reprehensible conduct worthy of punishment so as to warrant punitive damages — It would be premature to issue injunction restraining defendant from interfering with plaintiff's ability to do business in five counties, as defendant was satisfied with plaintiff's performance in those counties.

**Table of Authorities**

**Cases considered by *W.A. Jenkins J.*:**

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — considered

*Qureshi v. Gooch* (2005), 2005 BCSC 1584, 2005 CarswellBC 2707, 37 R.P.R. (4th) 262 (B.C. S.C.) — followed

*Ryan v. Moore* (2005), 254 D.L.R. (4th) 1, 334 N.R. 355, [2005] 2 S.C.R. 53, 2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, 247 Nfld. & P.E.I.R. 286, 735 A.P.R. 286, 25 C.C.L.I. (4th) 1, 32 C.C.L.T. (3d) 1, [2005] R.R.A. 694, 18 E.T.R. (3d) 163 (S.C.C.) — followed

*Whiten v. Pilot Insurance Co.* (2002), 156 O.A.C. 201, 35 C.C.L.I. (3d) 1, [2002] 1 S.C.R. 595, 2002 SCC 18, 2002 CarswellOnt 537, 2002 CarswellOnt 538, 283 N.R. 1, 20 B.L.R. (3d) 165, [2002] I.L.R. I-4048, 209 D.L.R. (4th) 257 (S.C.C.) — referred to

*6792341 Canada Inc. v. Dollar It Ltd.* (2009), 95 O.R. (3d) 291, 2009 CarswellOnt 2514, 2009 ONCA 385, 250 O.A.C. 280, 310 D.L.R. (4th) 683, 60 B.L.R. (4th) 1 (Ont. C.A.) — referred to

**Statutes considered:**

*Arthur Wishart Act (Franchise Disclosure), 2000*, S.O. 2000, c. 3
    Generally — referred to

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

**Regulations considered:**

*Arthur Wishart Act (Franchise Disclosure), 2000*, S.O. 2000, c. 3
    *General*, O. Reg. 581/00

    Generally — referred to

ACTION by plaintiff against defendant for breach of franchise agreement; COUNTERCLAIM by defendant.

*W.A. Jenkins J.*:

1      The plaintiff 1230995 Ontario Inc., hereinafter referred to as "123 Inc.," sues the defendant Badger Daylighting Inc., hereinafter referred to as "Badger," for damages for breach of its franchise agreement, for a declaration as to its territory under the franchise agreement, for an injunction restraining Badger from removing parts of its territory and for punitive damages. The defendant Badger counterclaims against the plaintiff for damages for breach of contract by the plaintiff in failing to fully develop the market for the defendant's services in the London area.

**Facts**

2      The defendant Badger is a publicly traded corporation and its head office is in the Province of Alberta. It manufactures Badger vehicles which are specialized trucks used to dig holes and uncover underground utilities, using pressurized water and a vacuum system to remove the soil.

3      Badger has six franchisees in Ontario and two corporate operations. Badger leases its trucks to its franchisees for a lump sum payment plus a monthly administrative fee. Under the franchise agreements, the revenues from the Badger vehicles are shared between Badger (42.5%) and the franchisees (57.5%).

4      The plaintiff 123 Inc. is a company incorporated in Ontario. Its president, sole director and sole shareholder is Greg Potter who has operated a Badger franchise in southwestern Ontario since 1998. He carried on business in the nine counties of Lambton, Essex, Chatham-Kent, Huron, Bruce, Elgin, Oxford, Middlesex and Perth. In 1998, his company had revenues of $330,000.00 and in 2008, the company's revenues had risen to $4.326 million. By 2009 he was operating 10 Badger trucks.

5      When Potter first became a Badger franchisee, he entered into a franchise agreement dated February 17, 1998. That agreement designated Potter's Territory as the City of Sarnia, in the County of Lambton. Later, Badger assigned the City of London, in the County of Middlesex, to Potter as an operating center.

6      On February 26, 2002, Badger and Potter entered into a Work Zone Amendment agreement that purported to amend the 1998 franchise agreement. The Work Zone Amendment agreement granted Potter the right to work in areas which were not "Territory" and which could be reassigned by Badger at its sole discretion.

7      On the same date, Badger issued a letter of understanding to Potter assigning the nine counties in Southwestern Ontario to Potter as Work Zones. That letter said that the Work Zones could be added to Potter's Territory if he was successful in meeting Badger's key objectives. It also recognized the fact that Potter was working in all nine counties.

8    In 2003, Badger and Potter's Company 123 Inc. entered into a new franchise agreement referred to as a Marketing Agreement with a term of 10 years. Although the agreement is dated February 18, 2003, it was not signed by Potter until June of 2003. The Marketing Agreement of February 18, 2003 was in effect in the fall of 2005 when Badger informed Potter that it intended to look for a new franchisee for the London area. Then, on December 19, 2005, Badger wrote to 123 Ontario Inc. and advised it that the Counties of Middlesex, Oxford, Elgin and Perth had been taken away from it.

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14394   Filed 09/10/14   Page 32 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

9     The plaintiff objected to the removal of those counties on the grounds that the 2003 franchise agreement granted 123 Inc. the exclusive right to operate its business in the "Territory" as defined in the agreement. "Territory" is defined in the agreement as the area specified in the map attached as Schedule "B" and the Work Zones. No map was attached to Schedule "B" however, "Territory" is referred to in Schedule "B" as the City of Sarnia.

10     The 2003 Marketing Agreement provides in para. 10.11 that it is the entire agreement between the parties and that it supercedes all previous agreements. The plaintiff therefore contends that the 1998 franchise agreement, as well as the 2002 Work Zone Amendment, were replaced by the 2003 Marketing Agreement.

11     Since the 2003 Marketing Agreement defines "Territory" as including the City of Sarnia and 123 Inc.'s Work Zones, the plaintiff alleges that it had the exclusive right to provide Badger services within the nine counties of Southwestern Ontario.

12     Further, the plaintiff 123 Inc. alleges that the four counties that were taken away by Badger were part of the territory granted to it under the 2003 Marketing Agreement and the defendant breached that agreement when it took away those counties. As a result, the plaintiff alleges that it suffered a pre-trial loss of profit up to December 31, 2009 of $64,861.00 and a future loss of gross profit for the period from January 1, 2010 to December 31, 2036, when Potter will retire at age 65, in the range o/ f $450,298.00 to $705,472.00. The plaintiff also claims expenses in the amount of $17,644.11 owing since 2005.

13     The defendant alleges that none of the nine counties in 123 Inc's Work Zone's were granted to 123 Inc. in the 2003 Marketing Agreement or assigned to 123 Inc. as "Territory". It points out that the 2003 Marketing Agreement defines Work Zone's as areas that have not been assigned as "Territory" and consequently the nine counties were not "Territory".

14     The defendant alleges that, since no new Work Zone Agreement was signed, the Work Zone Amendment Agreement and the Letter of Understanding continued in effect following execution by the parties of the 2003 Marketing Agreement. Badger therefore contends that it had the right to reassign the plaintiff's Work Zone counties at its sole discretion. It denies that it breached the 2003 Marketing Agreement or that it is liable to the plaintiff for damages

15     In addition, the defendant alleges that the plaintiff failed to fully develop the market for Badger's services in the Work Zones in accordance with para. 4.7(2) of the Marketing Agreement and consequently it was in breach of that agreement. The defendant, therefore, counterclaims from the plaintiff for damages it alleges it suffered as a result of the plaintiff's failure to develop the four counties in the plaintiff's Work Zones. The defendant's counterclaim is for loss of profits totalling $1,292,000.00.

**The Plaintiff's Evidence**

16     Greg Potter testified that his company continues to operate a Badger franchise in Sarnia and the counties of Lambton, Essex, Chatham-Kent, Huron and Bruce. He said that he has approximately 20 employees and 10 Badger trucks. When he started in 1998 he had one truck, one labourer and a part-time girl answering the telephone.

17     Potter said that, when he started, his home base was in Sarnia but he worked all over the province. Although the 1998 Franchise Agreement described his territory as the City of Sarnia, most of his work was in the County of Lambton and other areas. During the period 1998 to 2000, he operated mostly between Kitchener and Sarnia.

18     He said that, since London was one of his operating centres, he obtained a place to park a Badger truck at the Western Star Truck Dealership in London and he got a London telephone number. He also put an advertisement in the London Yellow Pages and he parked a Badger truck in London as required.

19     In 2001 and 2002, Badger expected him to generate a revenue of at least $24,500.00 per truck. He met those targets in both years and in 2002, he generated revenue of $26,749.00 per truck. $24,500.00 pre truck was the only measurable goal that Badger gave him for those years. He said that he was never given a target or objective on a per county or per city basis.

20     On July 26, 2002, Mark Lyle, the Badger operations manager for Eastern Canada, wrote to Potter and said as follows: "Congratulations on your strong start to 2002. This is great for both of us." Then on December 13, 2002, Lyle wrote to Potter

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 33 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

and said as follows: "Congratulations. You had a great year in terms of revenue. I look forward to 2003 and hope you can surpass 2002."

21      On February 3, 2003, Lyle advised Potter that Badger would be sending him a new franchise agreement for his review. Potter said that he received the Franchise Disclosure Document on February 10, 2003. He also got an updated version of the Ontario Marketing Agreement and the Equipment Lease Agreement.

22      He was told that a map outlining his "Territory" would be attached to the executed copy of the Marketing Agreement. It was not enclosed with the Marketing Agreement or the Equipment Lease. As well, there was no Work Zone Amendment Agreement included in the material sent to him.

23      On April 15, 2003, Badger sent Potter an e-mail advising him that cl. 4.7 of the Marketing Agreement sent to him was incorrect and the last three sentences of the clause should be removed. Badger said that the clause should read as follows:

> The agent agrees that it will achieve gross sales of at least $10,000.00 per month for each Badger leased to by the agent within the first six months of the delivery of the Badger and thereafter will maintain gross sales of at least $45,000.00 per billing period on average for each Badger operated by the agent.

24      Potter testified that he was concerned about the new Marketing Agreement and he wanted to change a couple of items. He said that he went to Calgary to talk to Badger about those changes which related to equipment charges and fees. He said he met with Tor Wilson, the President of Badger, and Greg Kelly, the Vice President of Finance, and they refused to make any changes to the agreement.

25      Potter testified that he signed the agreement on June 24, 2003 and left. He said that, after he signed the agreement, he continued to operate in the nine counties and no one from Badger ever told him that the nine counties were not his exclusive area.

26      In the summer of 2003, Potter was trying to get a bank loan to develop a depot in the Windsor area. As a result, he asked Bryan Jones, the marketing manager for Badger, to help him with a business plan for the bank. In that business plan which Jones helped to prepare, para. 2 states as follows:

> Mr. Greg Potter is the sole owner/operator of the enterprise and owns the exclusive rights to the branding technology and marketing of the specialized equipment in the territory of Southwestern Ontario. Together, all of these attributes solidify the commercial benefit, uniqueness and control of the marketplace in this discipline.

27      At about the same time, Potter was seeking to hire a sales person for the nine counties. He asked Jones to tell him what would be required to properly equip such a person. In his email of July 31, 2003 to Potter, Jones said the following:

> Okay. I will try to lay out what it will take to properly equip a person to effectively develop new opportunities for you in Southwestern Ontario.

A few months later, Potter hired Richard Greatrex, a marketing specialist who was recommended by Jones.

28      On January 14, 2004, Potter met with Wilson in London. At that meeting, Wilson discussed with Potter how he thought the London market should be developed. There was no suggestion at that time that Badger was considering taking the four counties away from 123 Inc.

29      Potter testified that he met with Jon Babulic, the Badger Regional Manager for Eastern Canada in February, 2004. He said they went over the truck revenue targets for 2004 and discussed his marketing plan and the fact that he had hired Greatrex to help market his services. He said that he planned to base Greatrex in London.

30      Greatrex began work in May, 2004, and he met with customers, made sales presentations and followed up on business opportunities. Potter said he was convinced that hiring Greatrex was the right thing to do as business was slow in 2004 and he needed help with marketing his services.

31    Potter testified that he met with Wilson on November 17, 2004. Wilson told him that he thought 123 Inc. was operating on too many fronts. Potter said he asked Wilson if he wanted to visit his London shop and Wilson declined as he thought the London market was distracting Potter's efforts in other areas.

32    In 2005, Greatrex told Potter that he had some family issues and planned to leave 123 Inc. to return to Ottawa. Potter asked him to put together a plan for the coming year. As a result, Greatrex prepared a Sales and Marketing Business Expansion Plan for the nine counties.

33    Potter testified that 2005 turned out to be a good year for his company and he said the marketing plan was beneficial. He said he still uses it to this day. He said that he added four trucks in 2005.

34    Potter said that he met with Wilson on April 12, 2005, to discuss the London market. Wilson told him that he thought another agent should be located in London. Potter said he told Wilson that, under his marketing agreement, London was part of his territory. It was left that he would think about it and they would discuss it again.

35    On May 18, 2005, Potter said he met with Jon Babulic in Goderich. At that time, Babulic told him that Badger was going to start looking for a new franchisee for London. Potter told Babulic that he objected to that and he was going to put one of his employees and a truck in London.

36    On June 20, 2005, Jones told Potter that he wanted to talk to him about developing more business in the London area. As a result, Potter went ahead and sent out a notice to his London customers about locating a new truck in the London area. By that time, he had leased a new depot on Exeter Road in London.

37    In September, 2005, Potter said Babulic told him that he did not know why he was opening a shop in London as Badger was looking for someone else to take over London. Potter said he objected to Badger taking over London and he told Babulic that he was not happy about that.

38    On September 15, he sent Babulic an email with a copy to Wilson. In that email he said that Badger's proposal to take over the London area was unacceptable. He said that he had a solid plan for developing business in the area.

39    By that time Potter said that he had two trucks operating in the London area. He said his sales as of the end of the third quarter of 2005 were up 42%.

40    On December 19, 2005, Kelly, the Vice President of Finance for Badger, wrote to Potter and said as follows:

Your current Work Zones as outlined in the February 26, 2002, Work Zone Agreement (copy attached) are as follows:

Lambton, Essex, Chatham-Kent, Elgin, Oxford, Middlesex, Perth, Huron, Bruce.

Based on discussions with Jon Babulic your new Work Zones are as follows:

Lambton, Essex, Chatham-Kent, Huron and Bruce.

41    Potter said that early in January, 2006, he told Babulic that he objected to Badger's actions and Babulic replied that it did not matter as it was done. As a result, Potter consulted his solicitors who wrote to Badger and objected to its actions in taking away the four counties and asked it to reverse its position and acknowledge that the four counties were part of the plaintiff's "Territory". Since the plaintiff did not receive a response to this letter, this action was commenced in February, 2006.

42    Badger continued to ignore Potter's complaints and appointed new franchisees for the four counties. It also refused to pay 123 Inc. for any work that it did in those counties unless the new franchisees agreed.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

43    On cross-examination, Potter admitted that he did not open an office in London in 1999. He said he continued to develop the London area from his office in Sarnia. Although no trucks were located in London, he said he had an address and a telephone number.

44    Potter also admitted that the fall of 2002 was the only period when he maintained a truck in London prior to September of 2005. Other than that, he only had a mailing address and telephone number for London.

45    Potter also admitted that, when Work Zones were first introduced in 2002, he knew that they were not part of his territory. That continued to be his understanding until he received the new Marketing Agreement and Equipment Lease in February, 2003.

46    Potter agreed on cross-examination that Badger expected him to develop the nine counties and that one of the best ways of doing that was to have a local presence in the market. He also agreed that, under the new agreement if he did not develop the nine counties, Badger could reassign them. He said, however, that he understood he had the exclusive right to the nine counties.

47    Potter also agreed that he knew it was important to Badger to have a local presence in London. He knew that because they had discussed the need for a local presence on several occasions.

48    When asked about the Disclosure Documents sent to him by Badger in 2003 Potter said he did not know whether he received a Work Zone Amendment Agreement. He said that no new Work Zone Agreement was ever signed by him.

49    Potter also agreed that he did not look at the definitions of Territory or Work Zones in the new agreement and he did not consult a lawyer. He said that, after he signed the new Marketing Agreement, he believed he had the nine counties as his exclusive area although he did not have any discussions with Badger about the assignment of Work Zones.

50    Potter admitted that, at the meeting in January of 2004, Wilson expressed concern that he was not adequately developing the London area. Potter said that he met again with Wilson on April 12, 2005, and they discussed the London area. He said that Wilson was still not happy because there was no local presence in London. Potter said that Wilson told him it had to be run as though there was a local agent.

51    Potter agreed that he met with Babulic on May 18, 2005 who told him that he was going to put an advertisement in the newspaper for a franchisee for the London area. He agreed that he knew then that Badger was planning to take London away from him.

52    In spite of that, he said he went ahead and rented premises in London where he could park two Badger trucks. He sent notices of this to his potential customers and continued to work in the London area.

53    Potter agreed that he received an email from Wilson on September 15, 2005, in which Wilson said that Badger wanted to find a dedicated person for London who could grow the business. He said that he would leave the issue with he and Babulic.

54    Potter said that, while he was told that Badger was going to look for another franchisee, he was not told definitively that they were taking London away until September 16, 2005, when he received an email from Babulic indicating that the London area would be reassigned. Potter said he called Babulic and objected.

55    After he got the December 19, 2005, letter from Badger telling him that the four counties would be reassigned, he spoke to Babulic who told him that Middlesex, Oxford and Elgin were going to a franchisee by the name of Webb. Later he learned that Perth went to a franchisee by the name of Ertl.

56    Potter agreed that, between 2001 and 2005, his revenue from the four counties only increased from $225,000 to $255,000. So the growth during that period was less than 10%. He agreed that, after he lost the four counties in December of 2005, his total revenue from the remaining five counties continued to increase and he did better than when he had the nine counties.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 36 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

57    Potter also admitted that, between 2001 and 2005, his annual revenue from the four counties did not meet the annual target for one truck which was $294,000. So the revenue from the four counties was always a small percentage of his total revenue. It was probably in the range of 7 to 10% and less than the minimum target for one out of his ten truck fleet.

**The Defence**

58    Tor Wilson, the President of Badger, testified that he has a Masters of Business Administration degree and, prior to joining Badger in June of 2000, he worked for Timberjack. He said that he is located at Badger's head office in Calgary and that Badger is a public company traded on the Toronto Stock Exchange. He described Badger as being in the Hydrovac business and said that the company designs and manufactures its own vehicles. The Badger vehicles provide non-destructive excavation and are worth approximately $350,000.

59    Each Badger truck has a fresh water tank and a debris tank with a high powered suction system. The water is used to break up the ground through the use of a wand held by the operator. There is a powerful suction tube that sucks the debris into a tank on the truck. These trucks are pieces of safety equipment that prevent accidents when digging around utilities such as gas lines and other underground services.

60    Wilson said that Badger has 75 locations across North America. Sixty of the locations are operated by independent franchisees. The others are corporate operations. He said they have a total of 413 trucks.

61    Wilson testified that the Badger franchisees all have agreements with Badger that give them the right to use Badger vehicles and to provide hydrovac services in certain areas. In return, the franchisee has to pay a one-time fee for use of the truck together with a rental fee. As well, the revenue from work done for customers is split 57.5% for the franchisee and 42.5% for Badger.

62    Wilson said that, when he joined the company in 2000, there were only six agents in Ontario. Each of those agents had a city as a territory and the rest of the province was open area. He said the open area provided room for the appointment for more franchisees.

63    After he joined the company, he said he met with the Ontario franchisees. They all wanted to expand their territories. They did not, however, want to pay for more territory. Consequently, Badger decided that it would allow the franchisees to have more exclusive area in return for a commitment to develop the expanded area. Badger reserved the right to take an area away if the franchisee did not develop it.

64    Wilson said that several different concepts were discussed over several months and proposed agreements were sent to the franchisees. Because they could not reach any consensus on expanding the franchisee's territories, the issue was dropped in late 2001.

65    In February, 2002, the issue arose again. This time, the concept of "Work Zones" was discussed. Wilson said the Work Zone proposal was attractive because it did not interfere with existing territories. The proposal was that franchisee would be assigned a Work Zone to develop and if they were successful the Work Zone could be added to their Territory. If they were not successful, it would be taken away and given to another franchisee.

66    On February 26, 2002, Badger sent Potter a Work Zone Amendment Agreement and a Letter of Understanding granting him the nine counties as his Work Zones. The Letter of Understanding set out three primary objectives which were: to increase revenue, increase the number of customers and provide ongoing marketing. The Work Zone Amendment Agreement provided that Badger would reassign the Work Zones if the franchisee did not fully develop them.

67    Wilson testified that by 2003 the 1998 Franchise Agreements were expiring. As a result, new franchise agreements had to be entered into by the company and the franchisees. He said that Disclosure Documents were required under the Ontario franchise legislation and this information was sent out in February, 2003. It provided that the franchisees would be required to sign new Marketing Agreements and Equipment Leases as well as a Work Zone Agreement.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

68      No Work Zone Agreement was signed by Potter and Wilson agreed that there was nothing in the other documents that specified his Work Zones. He pointed out that the definition of a Work Zone indicates that it is an area that has not been assigned as Territory.

69      Wilson said that the franchisees were expected to meet certain minimum targets for each Badger truck. He said that the trucks were worth approximately $350,000 and, if they were not generating enough revenue, it was very difficult for Badger to pay for the unit.

70      Wilson said that, in January 2004, he and Babulic met with Potter for lunch. He said they talked about developing more business in London and Windsor. Wilson said he stressed that they needed a local presence in London. He said he wanted to take London away from Potter but Potter convinced him that he should be given another chance to develop London. Potter said he would locate a truck in London.

71      Wilson said he met with Potter again on April 29, 2004 in Sarnia. He said that Babulic was present at the meeting and they talked about the fact that Potter had hired a marketing person for London.

72      Wilson said he told Potter he did not think that was a good idea. He said it would be better to put a truck and operator in London. Wilson said that Potter told him that he wanted to run his business this way.

73      On November 17, 2004, Wilson said he met with Potter in London. Wilson said he told Potter he had too many fronts open and he should concentrate on Sarnia and Windsor.

74      Wilson said he met with Potter again on April 12, 2005, in Sarnia. He said that Potter had a number of financial issues and he was worried about him. He said he told him that London was no longer his area of responsibility and that Badger was going to get a new franchisee. He said Potter brought up the issue of his contract with Badger and Wilson said he told him that his contract did not include London as part of his Territory. It was left that Babulic would talk to Potter about covering London until another franchisee was found.

75      Wilson said that, on September 15, 2005, he received a copy of Potter's e-mail to Babulic. In that e-mail Potter accused Babulic of being uncooperative and he said that Badger's decision concerning reassignment of the London area was unacceptable. He said that he had a solid plan in place for developing the London area and he planned to continue with implementation of that plan.

76      Wilson said he responded to Potter's e-mail on the same day and insisted that he had given Potter years to do something about locating an agent in the London and that had not happened. He said he wanted to find a dedicated person for the London area.

77      Wilson testified that even though he did not agree with Potter's decision to hire Greatrex he had instructed Babulic and Jones to support Greatrex and do everything they could to assist him. He did not believe that effort had worked out.

78      Eventually Webb was appointed to the London Territory with Middlesex, Oxford and Elgin as his Work Zones. Wilson said that Webb was not successful in developing the London area because he had to compete with Benko Sewer Services which was a well established Hydrovac operator. As well, he had to compete against Potter who was still doing some work in the area.

79      Wilson said that Badger solved the problem by purchasing Benko for $4 million dollars in April 2007. Thereafter, Benko became part of Badger and serviced London and the three counties.

80      Wilson said they purchased Benko because it had done roughly $1.5 million dollars in Hydrovac business in 2006. Sixty percent of that amount was done in the London area. At the present time, Badger is operating Benko in London and the counties of Middlesex, Elgin and Oxford as a corporate franchise. Ertl is operating in Perth County.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

81    On cross-examination, Wilson agreed that prior to the introduction of the Work Zones in February 2002 Potter had the exclusive right to operate in Sarnia and London. He insisted, however that London was not part of Potter's territory, even though he had the exclusive right to work in that area.

82    Wilson also agreed that prior to February 2002 when the Work Zone Amendment Agreement came into force there was an arrangement between Badger and Potter allowing Potter to expand into the London area. He also agreed that on February 20, 2002 Mark Lyle sent an e-mail to head office proposing that Potter's Territory be Sarnia and London including Lambton and Middlesex regions. A copy of that e-mail was sent to Wilson.

83    Wilson also agreed that in 2003 Jones, the marketing manager for Badger sent a notice to Badger customers in Southwestern Ontario indicating that Potter was the sole owner and operator of Badger Enterprises in the Territory of Southwestern Ontario.

84    Wilson conceded that Potter's new Marketing Agreement indicates that a map outlining his Territory is attached to the executed copy. He said the map was never attached because Potter's Territory was limited to the City of Sarnia.

85    Although Potter signed a new Marketing Agreement, Wilson agreed that he never signed a new Work Zone Amendment Agreement. He also conceded that neither Ertl nor Webb signed Work Zone Amendment Agreements.

86    Wilson conceded on cross-examination that Brian Jones, the marketing manager, agreed with Potter that hiring Greatrex to help develop the London area was a good idea. He insisted, however, that he wanted a truck placed in London and he did not agree with hiring Greatrex.

87    Wilson agreed on cross-examination that he first learned of Benko being a major competitor in 2004. He conceded that Benko was active not only in London, but in Brantford, Hamilton, Markham, Windsor and Kitchener-Waterloo.

88    Mark Lyle, the present regional manager for Western Canada, testified on behalf of Badger. He became involved with the Ontario franchisees in 1998.

89    He said that, by the summer of 2000, they were experiencing difficulties with agents competing with each other in open areas. As a result, they wanted to enlarge the areas where franchisees had exclusive rights.

90    He said there was a franchisee meeting on September 30 2000 to discuss the matter. Lyle said that since the franchisees did not want to pay for additional Territory, Badger offered to expand their areas of exclusivity if they agreed to meet certain goals and objectives.

91    He said they discussed adding additional Territory by amendment to the current Marketing Agreements. Those discussions did not result in any changes to the existing Territories.

92    By February 2002, Lyle said the concept of Work Zones was being discussed. That concept was incorporated into a draft agreement that was circulated among the Ontario franchisees. In his e-mail of February 20, 2002 to the Toronto, Sarnia and Hamilton franchisees, Lyle said as follows:

"[W]e would like to come a general consensus regarding the assignment of Territories and Work Zones this week. We would then want to formalize it in an amendment to the existing agent agreements similar to the one for forwarded to you earlier today as soon as possible."

Toronto Proposed Initial Territory

Existing - Toronto

Add - Vaughn, Richmond Hill and Markham

Proposed Regional Work Zones

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 39 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

York, Durham, Victoria, Peterborough, Northumberland, Lennox and Addington regions

Sarnia Proposed Initial Territory

Existing - Sarnia and London

Add - expand to include Lambton and Middlesex Regions

Proposed Regional Work Zones

Elgin, Oxford, Perth, Huron and Bruce regions

Hamilton Proposed Initial Territory

Existing - Stoney Creek, Hamilton, Burlington, Cambridge, Kitchener/Waterloo

Add - Oakville, Milton and Mississauga

Proposed Regional Work Zones

Haldimand-Norfolk, Brant, Niagara, Flamborough, Waterloo, Halton, Peel, Wellington, Grey, Simcoe and Muskoka Regions.

I would suggest that once an agreement is reached then we would respect these new territories and work zones for all clients within 30 days.

93    Lyle, who was by then the Operations Manager for Eastern Canada, said this was his attempt to summarize the Work Zone concept. He said the e-mail included a poor choice of words as he regarded London as an operating centre for Potter and not his Territory.

94    Lyle said that on February 26, 2002 he sent Potter a letter enclosing four copies of the Work Zone Amendment and two copies of a letter of understanding. He said the Letter of Understanding made it clear that Potter's Work Zones included Lambton, Essex, Chatham-Kent, Elgin, Oxford, Middlesex, Perth, Huron and Bruce and that they were not part of his Territory.

95    He said if the franchisees developed their Work Zones they could be added to their Territory. He said Potter signed both the Work Zone Amendment and the Letter of Understanding.

96    On cross-examination Lyle agreed that in late 1998 or early 1999 the concept of a London operating centre was discussed. He said Potter made a bid for that operating centre so he could expand his business. He said that London was awarded to Potter on April 14, 1999.

97    Lyle agreed that he wrote to Potter on July 26, 2002 and indicated that there were two areas that needed his attention. Those areas were customer relations and administrative reorganization. Neither of those areas related to the three objectives set out in the February 26, 2002 Letter of Understanding. Those objectives were increase in revenue, increase in number of clients and substantial ongoing marketing.

98    He wrote to Potter again on December 13, 2002 and expressed concern about his safety program. Once again, he did not refer to the objectives set out in the Letter of Understanding. Lyle admitted that the semi-annual reviews of the objectives referred to in the Letter of Understanding were not carried out.

99    Lyle said that in 2003 a new Marketing Agreement had to be signed as the 1998 agreement expired. He said he sent Potter an e-mail on June 6, 2003 insisting that he sign the new agreement by July 1.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

100     Jon Babulic testified that he took over from Lyle as Operations Manager for Eastern Canada on July 1, 2003. He said he met with Potter in August 2003 and they discussed the state of his business and his future plans.

101     In the fall of 2003, Babulic said he reported to Wilson that there was a need for a local operator in both London and Windsor within the next three years. He pointed out that there was lots of potential in the London market but little penetration.

102     On January 14, 2004, Babulic said he and Wilson met with Potter to discuss his business. Wilson told Potter that he had to develop the London market and he discussed how that should be done. Wilson told Potter that he should put a truck in both London and Windsor.

103     In February 2004, Babulic said that Potter lost the bid for the London Hydro contract. He said Benko was awarded the contract based on a lower price.

104     On February 11, 2004, Babulic said he met with Potter and talked about the need for a local representative in London. He said they discussed the potential of the natural markets in Potter's Work Zones and they developed a three-year projection for the Work Zones.

105     Babulic said that the projected revenue for the five counties surrounding London was $325,000.00 for 2004 and Potter only achieved $170,000.00 in Hydrovac business. He said Potter did not put any trucks in London in 2004.

106     Babulic said Potter had a marketing plan for his Territory and Work Zones. He planned to hire Greatrex as a marketing manager starting on May 1 2004. Babulic said he opposed the plan and thought that putting a truck in London would be more effective.

107     As of May 2004, Babulic said Potter was only doing $13,000.00 a month per truck and the target was $24,500.00 per month per truck. He said Potter was concerned about the state of his business and believed a marketing manager would generate more work.

108     On April 29, 2004, Babulic said he and Wilson met with Potter. At that meeting they expressed their concerns about Potter's lack of sales in London.

109     Babulic said he met with Potter on November 5 2004 because Potter was having cash flow problems. He said Badger set up accounts for Potter at his suppliers to help solve his cash flow problem. He said this was a special arrangement for Potter.

110     Babulic said he and Wilson met with Potter on November 17, 2004. He said Potter was in financial trouble and Wilson told him that he was operating on too many fronts and that he had lost his focus. Wilson told him to focus on his core business in Sarnia and Windsor.

111     On March 4, 2005, Babulic said he met with Wilson and Wilson talked about finding another agent for London. He said they decided that they had given Potter more than a year to show improvement in the London area and he had not based a truck in London or developed the market.

112     Babulic said that he met with Wilson again on April 14, 2005 and Wilson told him that he had to tell Potter that they were taking London away and he had to start looking for a new franchisee. Babulic said he told Potter on April 21 that they were looking for someone else for London. Potter's response was that he might place a truck in London when work slowed down. Babulic said he told him he had to address the problem now.

113     Babulic said he met with Potter again on May 18, 2005 and told him that Badger was actively looking for a new London franchisee. He told Potter that his lack of activity in the London area had allowed Benko to grow. Potter said it was unfair of them to take London away and it was left that Potter would do the work in London until they found a new franchisee.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

114    On September 13, 2005, Babulic said he found out that Potter had rented premises in London. When Wilson heard that he told him to send Potter an e-mail formally taking London away.

115    Babulic said he talked to Potter on the telephone on September 14, 2005 and confirmed that they were taking London away. He said he received an e-mail from Potter on September 15 expressing concern and surprise.

116    The e-mail from Potter said as follows:

I am extremely concerned and surprised with the information you discussed with me on the phone yesterday. Obviously there has been a major lack of communication on your behalf with respect to 1230995 Ontario Inc. Your indications regarding the London area are not only unacceptable to us but they are also punitive and completely uncooperative.

The facts in this matter are as follows:

After two meetings with Tor we have been following his advice on the ongoing development of the area. Arrangements had been made in May to dedicate Unit 403 to the London market and have it and its crew in the city. Due to a catastrophic mechanical problem, Unit 403 was not functional for over one and a half months and therefore not available to be positioned. Arrangements were made September 1st to lease a shop in London. Unit 403 with staff will be moving in this weekend. Growth in the London and surrounding market has been on course and it's expected to exceed double digits this year. This meets Tor's expectations that were stated in the September, 2004 agent's meeting. We have not received any correspondence from you or your office as to specific targets, expectations, requirements or conditions with regards to the London market. That would have communicated appropriately that your intent was take any part of the Work Zone which is defined in our agreement.

I am very disappointed in the lack of open and honest up-front communication in this matter. As Tor stated in our last meeting, the bottom line was "We need a truck in the London market". We have fulfilled that expectation and we have a solid plan for developing that business. Your statement of "I am going to try and find a new op" is not specific. In the meantime, I have made a commitment to develop this Work Zone and that is still our intent.

We would kindly request that you support 1230995 Ontario Inc. to help grow this business. The current trend of inaction is not helping. We have a plan and that plan is in motion.

Respectfully,

Greg Potter 1230995 Ontario Inc. Agent for Badger Daylighting

117    In response to the e-mail Babulic said the following in an e-mail of September 16, 2005:

Greg,

I hope this e-mail will clarify our intentions.

You have been a successful Badger agent and have done a great job cultivating work and growing your business consummate to the opportunity in Lambton, Chatham-Kent, Huron, Bruce, and more recently Essex. However, London and the surrounding communities have not experienced the same growth relative to the opportunity.

The objectives of each Work Zone per the agreement is increase revenue, increase the number of regular clients and provide substantial and ongoing marketing. These objectives have not been met in London relative to the growth experience in areas with dedicated operating partners.

Greg, we have discussed Badger's weak revenue in London market on several occasions prior to you hiring a sales manager for the area. Although not agreeing with your decision to hire a sale manager for the London last year we did support it by providing substantial ongoing training & support to this employee throughout his tenure time with your organization.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

After the meeting with Tor, you and I met privately in Goderich. I made it very clear at this time that I would be actively pursuing an Operating Partner for the London market. At no time since until this week did you make me aware of your intentions to place a unit in London or rent a shop.

We have an obligation to make decisions that we feel are in the best interests of Badger and all of the Operating partners. A strong London OP would undoubtedly benefit both you and adjacent OP's. Conversely the lack of a substantial local present in London will hurt adjacent OP's by fueling competition and reducing the availability of units for overflow work. The decision to reassign this area is was not an easy one because you have been so successful in markets adjacent to the London area. However, we feel it is in the best interest of Badger and the OP's to develop this market independent of yours. As UI said in our meeting in Godrich [sic] in the spring this area is yours to service until such time as we can place an appropriate OP.

Thank you

Jon Babulic

118    Babulic confirmed that they hired George Webb as the new franchisee in the London area in the fall of 2005.

119    As a result, Potter was informed on December 19, 2005 by Badger's head office that his new Work Zones were Lambton, Essex, Chatham-Kent, Huron and Bruce. On January 16, 2006, Potter's lawyer wrote to Badger asking it to reverse its position on the Work Zones and Babulic said he was told not to respond to the letter.

120    Potter's lawyer's letter of January 16, read as follows:

Our client's position is straightforward; section 2.2 of the franchise agreement provides that our client has a right to operate the business in its territory during the term of the franchise agreement and renewals. The territory is defined in the agreement. At the time of the agreement, the territory included all of the counties described in your December 19, 2005 letter, including the four counties purportedly withdrawn.

121    Since Potter continued to work in the four counties that were withdrawn by Badger, Babulic wrote him on February 15, 2006 and told him that he would not be paid for that work. Then on November 6, 2006, Badger sent Potter a Notice of Default under the Marketing Agreement because he was operating outside of his territory and new Work Zones. That dispute was ultimately resolved and Potter was paid.

122    Babulic said that between 2002 and 2005, when Potter had the four counties as part of his Work Zones, his growth was 3.2% per annum. Badger's overall growth in Ontario was approximately 15% per annum during the same time.

123    On cross-examination, Babulic admitted that he did not know Potter had put operators in London in 2001 and 2002. He also said that he was at the January 14, 2004 meeting with Wilson and Potter. He did not recall Wilson telling Potter that he had one year to fix the problem in London. Babulic agreed that, in the fall of 2003, he and Potter discussed a three-year projection for Potter's business.

124    Babulic admitted that he and Potter discussed the natural markets in Potter's Work Zones in February 2004 and the need for each market to have local representation. His notes do not reflect any comment by him that there had to be a truck at each location within Potter's Work Zones.

125    By April 21, 2005, Babulic said he knew that Greatrex was leaving Potter to go back to Ottawa. He admitted that he and Potter discussed Potter's future plans for developing London. Further, he admitted that Potter told him on May 18, 2005 that he was going to put a truck in London. Unfortunately, the truck broke down and it took some time to repair it.

126    Bryan Jones testified that, starting in 1998, he was the Marketing Manager for Badger in Eastern Canada. He agreed that he introduced Greatrex to Potter and he thought it was a good idea for Potter to hire Greatrex. He said he helped Greatex develop business in Potter's Work Zones as much as possible.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 43 of 485
**1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...**

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

127    On cross-examination, he agreed that Benko was using cut rate pricing in the London area in 2004. He said Benko's prices and his relationship with the customers in London gave him a big advantage.

128    He also admitted on cross-examination that, when he referred to Southwestern Ontario as Potter's territory in his e-mail of July 21, 2003, he did not know that that was incorrect. As a result, he did not tell Potter that that reference in his email was wrong.

129    Greg Kelly, the Vice President of Finance for Badger, testified that he, Wilson and Lyle developed the Work Zone concept so that franchisees could not work in other franchisees' Work Zones without permission. As a result, each franchisee was asked to sign a Marketing Agreement, a Work Zone Agreement and a Letter of Understanding.

130    In 2003, the original Marketing Agreement expired and new franchise agreements were required. As a result, the franchisees were sent Disclosure Documents including a new Marketing Agreement and Equipment Lease. He said a new Work Zone Agreement was drafted but he is not sure whether it was sent to the franchisees. He said Potter had previously signed a Work Zone Amendment Agreement.

131    There was no change in the Work Zones allocated to Potter so he did not believe a new Work Zone Agreement was necessary. He agreed that a Work Zone Agreement was not attached to the Disclosure Documents and that none of the Ontario franchisees signed a new Work Zone Agreement.

132    On November 14, 2004, Kelly said he attended a meeting with Wilson, Potter and Babulic in Sarnia. He said Wilson told Potter at that meeting that he needed to be more focused in his approach and that London needed a local presence.

133    He agreed that on December 19, 2005, he wrote to Potter confirming that four of the counties in his Work Zone had been reassigned. That, of course, led to this lawsuit.

134    John Benko, who now works for Badger, testified that he started his sewer flushing company in 1994. About 2000 he said he began using his sewer flushing equipment to do hydrovac jobs. He said most of his work was in London and Windsor.

135    Benko said that he got most of the hydrovac work in the London area because the contracts were with the same people he had done sewer flushing for. He said he was already doing work for all of the big contractors in the London area.

136    By 2003, 30 to 40% of his work was hydrovac work and by that time he had two hydrovac trucks. By 2006, he said he needed another truck as he had expanded into Kitchener, Hamilton, Markham and Sarnia.

137    In 2007, he was approached by two companies who wanted to buy him out. One of those companies was Badger and it eventually submitted the highest bid which Benko accepted. As part of the deal Benko agreed to stay on and he is still working for the defendant.

138    Benko said that they refer work from the Sarnia area to the plaintiff and if they had overflow work in their area they would give some of it to Potter. He said he expects to provide the plaintiff with overflow work in the future.

**Liability**

139    The issues relating to liability are:

(1) Were London and the counties of Middlesex, Elgin, Oxford and Perth part of the plaintiff's "Territory'?

(2) Did Badger have the right to reassign London and the four counties at its sole discretion or did it require a breach of the Marketing Agreement?

(3) Did the plaintiff breach the Marketing Agreement by failing to develop London and the four counties?

**Analysis**

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

140    Potter contends that his company's Territory was comprised of Sarnia, London and the nine Counties of Lambton, Essex, Chatham/Kent, Huron Bruce, Elgin, Oxford, Middlesex and Perth. As a result, he alleges that the defendant Badger breached the Marketing Agreement when it took London and the Counties of Middlesex, Elgin, Oxford and Perth and gave them to other franchisees.

141    The defendant Badger contends that both parties intended that the Work Zone Amendment and Letter of Understanding which were signed by Potter on or about February 28, 2002, would continue in force in conjunction with the new Marketing Agreement. As a result, the London area Work Zones were not part of the plaintiff's Territory and could be reassigned by Badger at its sole discretion. Further, Badger alleges that even if the Work Zone Amendment is not in force, it had the right under the new Marketing Agreement to reassign the four counties due to the breach by the plaintiff of s. 4.7(2) of the Marketing Agreement.

*Arthur Wishart Act*

142    One of the factors that distinguishes this dispute from the usual contract dispute is the fact that the contract in issue is a franchise agreement. As a result, the *Arthur Wishart Act (Franchise Disclosure)*, S.O. 2000, Chapter 3, applies. That legislation is remedial and is designed to address the inequality in bargaining power between franchisor and franchisee.

143    Franchisees are often small business people lacking in commercial experience and that is the case here. Potter is a highschool graduate with very little formal business training. Badger, on the other hand, is a public company carrying on business in both Canada and the United States.

144    Since the focus of the *Arthur Wishart Act* is the protection of franchisees' interest, it imposes a duty on both franchisors and franchisees of fair dealing in the performance and enforcement of the franchise agreement. That duty of fair dealing includes a duty to act in good faith and in accordance with reasonable, commercial standards.

145    The Act also imposes an obligation of disclosure. The franchisor must give the franchisee a disclosure document which contains copies of all proposed franchise agreements and other agreements to be signed by the franchisee. All of the documents must be included in one disclosure document.

146    The disclosure document must include a description of any exclusive territory and a statement as to whether continuation of the exclusive right to the territory depends on the franchisee achieving certain performance levels. (See Regulation 581/00)

147    In this case Badger did not comply with the disclosure requirements of the Act. A Work Zone Agreement was not attached to the disclosure document and the only description of the franchisee's territory was in the Marketing Agreement which was not attached to the disclosure document. It is not enough to send separate documents at the same time as the disclosure document. (See *6792341 Canada Inc. v. Dollar It Ltd.*, 2009 ONCA 385 (Ont. C.A.)at para. 16)

148    In addition, the disclosure document did not include the performance levels required to continue the franchisee's exclusive territory. By failing to comply with the requirements of the Act, Badger did not deal fairly with the plaintiff. This affects both the interpretation of the agreements between the parties and the performance requirements the defendant sought to impose on the plaintiff in order to maintain its Territory.

**The Agreements**

149    The original 1998 Franchise Agreement granted Potter the City of Sarnia as his Territory. Then on April 14, 1999, Potter was given London as an operating centre (Exhibit 1, p. 84). On February 20, 2002, immediately prior to the Work Zone Amendment, the defendant told the plaintiff his existing Territory included both Sarnia and London. (Exhibit 1, p. 227)

150    The Work Zone Amendment of February 26, 2002, provided that Potter would be assigned a Work Zone that was not Territory. The accompanying Letter of Understanding provided that Potter's Work Zone was the nine counties and they could be reassigned by Badger at its sole discretion. As a result, when the 1998 Franchise Agreement expired in 2003, the plaintiff had two operating centres, Sarnia and London, and a Work Zone of nine counties.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

151    The 2003 Marketing Agreement granted the plaintiff the exclusive right, license and privilege to operate its business in the Territory for a term of ten years. It defined the Territory as the area specified in the map attached to Schedule B as well as the Work Zones.

152    No map was ever attached to Schedule B, however, Schedule B said that the plaintiff's Territory was the City of Sarnia. So the agreement defined the plaintiff's Territory as Sarnia (the area specified in Schedule B) and the Work Zones. However, it also defined Work Zones as areas which had not been assigned as Territory by Badger. As a result, the 2003 Marketing Agreement was both ambiguous and confusing.

153    Badger, however, alleges that its dealings with the plaintiff were based on a shared assumption of fact or law established by statement or conduct that created a mutual understanding. Badger contends that it would be unjust and unfair to permit the plaintiff to resile from that mutual assumption and it states that both parties assumed that the Work Zone Amendment and the Letter of Understanding of February 2002 continued in force in conjunction with the 2003 Marketing Agreement.

154    Badger alleges that both parties should be estopped from relying on cl. 10.11 of the Marketing Agreement which provides that the Marketing Agreement and the Equipment Lease constitute the entire agreement between the parties and supersede all previous agreements and understandings including any representations, inducements, warranties or provisions made by the corporation, whether collateral, oral or otherwise. As a result, Badger contends that the four counties were not part of the plaintiff's Territory and they could be reassigned at its sole discretion or in the alternative, if not fully developed by the plaintiff, as required by para. 4.7 (2) of the Marketing Agreement.

155    On the other hand, the plaintiff contends that the 2003 Marketing Agreement must be interpreted in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective. It contends that the intention of the parties must be determined in accordance with the written document based on the presumption that the parties intended what they wrote.

156    Since the provisions of the Marketing Agreement are subject to the overriding provisions of the *Arthur Wishart Act*, the agreement must be interpreted in the context of fair dealing. Also, since the franchise agreement is a contract of adhesion because it was presented on a take it or leave it basis, it must be interpreted *contra proferentum*. The defendant drew up the agreement and the plaintiff contends that it is not open to the defendant to say that what it drafted is not what it intended.

157    In *Dumbrell v. Regional Group of Cos.*, 2007 ONCA 59 (Ont. C.A.), Doherty J.A. said at para. 50:

In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem.

158    In this case, para. 10.11 of the Marketing Agreement provides that the Marketing Agreement and the Lease Agreement constitute the entire agreement between the parties and supersede all previous agreements. Those are the written words of the parties and since there is no evidence of any subsequent agreement entered into by the parties, I accept that as expressing their intentions.

159    Badger urges me to find that the plaintiff is estopped from relying on that clause because of a mutual assumption that the Work Zone Amendment and Letter of Understanding continued in force. I am not convinced that, even if I found there was a mutual assumption, it would be fair to prohibit the plaintiff from relying on the entire agreement clause.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

160      In any event, the evidence does not establish such a mutual assumption. Potter's evidence is that he met with Wilson on April 12, 2005 and, when Wilson suggested that he wanted to put another franchisee in London, Potter told him that London was part of his Territory. Both Wilson and Potter agree that there was no discussion about Territory or Work Zones when they met on June 24, 2003, to discuss the new Marketing Agreement.

161      In order to rely on the doctrine of Estoppel by Convention, Badger must establish the following three criteria referred to by Bastarach J. in *Ryan v. Moore*, 2005 SCC 38 (S.C.C.) at para. 59:

> (1) The parties' dealings must have been based on a shared assumption of fact or law: estoppel requires manifest representation by statement or conduct creating a mutual assumption. Nevertheless, estoppel can arise out of *silence* (impliedly).

> (2) A party must have conducted itself, i.e. acted, in reliance on such shared assumption, its actions resulting in a change of its legal position.

> (3) It must also be unjust or unfair to allow one of the parties to resile or depart from the common assumption. The party seeking to establish estoppel therefore has to prove that detriment will be suffered if the other party is allowed to resile from the assumption since there has been a change from the presumed position.

162      I am satisfied that Badger has failed to satisfy these criteria. The plaintiff believed that it had the exclusive right to operate in the nine counties and it did nothing to lead Badger to believe that it could place a new franchisee in any of those nine counties at its sole discretion.

163      I therefore find that at the time Badger took the four counties from the plaintiff, the only agreements between the parties were the 2003 Marketing Agreement and the Lease Agreements. Badger must therefore justify the taking of the four counties pursuant to the 2003 Marketing Agreement.

**The Territory**

164      As I have previously said, the 2003 Marketing Agreement is a contract of adhesion which was prepared by Badger and presented to the plaintiff on a take it or leave it basis. That fact is highlighted by the position taken by Wilson at his meeting with Potter on June 24, 2003, when he refused to discuss any changes to the agreement.

165      Since the Marketing Agreement is a contract of adhesion, it is not open to Badger to say that what it drafted was not what it intended. The agreement must be interpreted *contra proferentum*. As a result, any confusion or ambiguity in the terms of the agreement must be resolved in favour of the plaintiff.

166      In this case, as I have previously found, there is both confusion and ambiguity in the description of the plaintiff's Territory. The definition of Territory in the agreement states:

> Territory means the area specified in the map attached to Schedule B hereto as well as Work Zones;

Schedule B does not have a map but instead states that the Territory is the City of Sarnia. Based on the definition and Schedule B, I find that the plaintiff's Territory was the City of Sarnia and its Work Zones.

167      In case there is any doubt about what the plaintiff's Work Zones were, Badger acknowledged in Kelly's letter of December 19, 2005, that its current Work Zones were Lambton, Essex, Chatham-Kent, Elgin, Oxford, Middlesex, Perth, Huron and Bruce. In that same letter Kelly indicated to the plaintiff that its Work Zones would be reduced to Lambton, Essex, Chatham-Kent, Huron and Bruce. (See Exhibit 1, p. 525)

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

168    Badger says the inclusion of "Work Zones" in the definition of Territory was a mistake. It wants me to remove that phrase and find that the plaintiff's Territory was the City of Sarnia. I am satisfied that it would not be fair to the plaintiff if I did that and, in any event, the *contra proferentum* rule of interpretation prevents me from doing so.

169    The Marketing Agreement provides in Article 2.1 (1) as follows:

> (1) The Corporation grants to the Agent and the Agent accepts, subject to the provisions in this Article 2, the right, license and privilege to:
>
> > a) establish and operate the Business pursuant to the provisions of this Agreement in the Territory;
> >
> > b) use the System in the Business and offer and sell to the public Services in the Territory;
> >
> > c) use the Trade Marks and Trade Names solely with the operation of the Business in the Territory;
> >
> > d) enter into Leases for Badgers for operation in the Territory.

170    Then in Article 2.2 under the heading Territory the agreement provides:

> The parties hereto confirm and agree that so long as the Agent complies in all respects with the terms of this Agreement, the Corporation shall not locate any other Agent or operate the Business in the Territory during the Term of License without the consent of the Agent. The Agent confirms and agrees not to operate the Business or the System or to offer Services anywhere but in the Territory without the prior consent of the Corporation.

171    In accordance with the foregoing provisions of the Marketing Agreement, I find that London and the Counties of Middlesex, Oxford, Elgin and Perth were part of the plaintiff's Territory and that Badger did not have the right to reassign London and the four counties at its sole discretion.

**Did the plaintiff breach the Marketing Agreement?**

172    Para. 4.7 of the Marketing Agreement provides as follows:

> **4.7 Performance and Market Development**
>
> (1) The Agent agrees that it will achieve Gross Sales of at least $10,000 per month for each Badger leased by the Agent within the first six (6) months of the delivery of that Badger and thereafter will maintain gross sales of at least $45,000 per Billing Period on average for each Badger operated by the Agent.
>
> (2) The Agent further agrees that it will aggressively and fully develop and exploit the market for the Services and diligently solicit orders in the Territory.

173    Article 9.1(1)(c) provides that the agent will be in default under the agreement if:

> (c) The Agent fails to perform or performs in a materially deficient, defective or continually delinquent manner, any other terms, conditions or provisions of this Agreement or the Lease, or any direction given by the Corporation to the Agent pursuant to this Agreement or the Lease, or obstructs or prevents the Corporation, after reasonable notice by the Corporation, from exercising any of its rights pursuant to this Agreement or the Lease;

174    Subpara. (2) provides in part as follows:

> Upon an event of default and material failure of the Agent to perform this Agreement as set out in Section 9.1(1)(a) through 9.1(1)(h), 9.1(1)(k)...written notice from the Corporation describing the default, or where such default cannot be cured within 30 days of receipt of notice of default for reasons beyond the control of the Agent or upon the Agent failing within

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 48 of 485
**1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...**

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

such 30 day period to take all necessary steps to commence to cure and minimize such default, the Corporation may at its option and without prejudice to any and all remedies which it may otherwise have upon written notice to the Agent, terminate this Agreement and the rights, licenses and privileges granted to the Agent, or suspend its obligations and the rights, licenses and privileges of the Agent under this Agreement, and upon receipt by the Agent of such notice from the Corporation this Agreement shall be terminated without further act by either party.

175    Badger contends that Potter admitted on cross-examination that failure to fully develop and exploit the Territory as required by Article 4.7(2) was an act of default. Since Badger was not required to give any prior written notice, reassigning the London area Work Zones upon default, Badger contends that its letter of December 19, 2005, reassigning the four counties was sufficient notice under the Marketing Agreement.

176    The plaintiff denies that it breached Article 4.7(2) of the Marketing Agreement and it alleges that the defendant did not, in any event, purport to act under the default provisions of the agreement when it reassigned the four counties to other franchisees. The plaintiff also contends that the Article 9.1(3) does not authorize a partial taking of Territory under the default provisions and that, in any event, it would be entitled to relief from forfeiture.

177    Badger does not seek to rely on para. 4.7(1) of the Marketing Agreement. Instead it relies on subparagraph 2 and it contends that the plaintiff breached that subparagraph by failing to develop London and the four counties. Subparagraph 2 purports to require the plaintiff to aggressively develop the market, fully develop the market, exploit the market and diligently solicit orders in the Territory which I have found included London and the four counties.

178    In an effort to aggressively develop the market, the evidence is that the plaintiff established a base or bases in London at various times including a depot, personnel, equipment and a telephone listing. It hired a marketing and sales representative to develop business in the area, it made a truck and operator available as needed and Potter met with potential customers. He also submitted bids on work in the London area.

179    Badger complains that Potter was told on numerous occasions to locate a truck and operator in the London area on a permanent basis and he did not do that. Although he occasionally placed a truck in the London area, he had to locate his equipment in areas where he was most successful in order to maximize his revenue. In spite of his efforts, he did not generate as much business in the London area as Badger demanded. I am satisfied, however, that he aggressively sought to exploit the market.

180    By hiring a sales and marketing person, submitting bids to customers such as London Hydro and calling on contractors in the London area, I find that Potter and his company diligently solicited orders. He was also required to fully develop and exploit the market. Badger contends that the annual growth he achieved in the London area was not adequate when compared with the growth in other areas.

181    The reason for the lower growth figures in London is that John Benko had most of the hydrovac business in the London area. The plaintiff had trouble competing with Benko because it was unionized and Benko was not. As a result, Benko could offer his services at lower prices. Further, Benko had a long and established history with London and area contractors.

182    At the trial, Benko testified that he started in the hydrovac business in 2000. Most of his business was in the London area as he got hydrovac work from the contractors he had been doing sewer work for since 1994. They were his client base and, as he said, it was easy to get their hydrovac work as he already knew them. He said all the big contractors in London were already his clients.

183    In addition, Benko testified that, because he was not unionized, he enjoyed a price advantage over the plaintiff. He said his biggest advantage, however, was the personal relationships he had with the customers making it hard for anyone else to get their business.

184    As a result of the intense competition from Benko, I am satisfied that it was difficult for the plaintiff to develop the London area to the extent required by Badger. Indeed, after Badger took the London area away from the plaintiff, they gave

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

it to a new franchisee by the name of Webb. Webb was unsuccessful in developing the London area and eventually Badger bought out Benko and took over his business. Benko remained with Badger and continued to be successful in the London area.

185    The requirement in para. 4.7 (2) to fully develop and exploit the market is, of course, subject to any interpretation Badger wished to impose. It is Badger's wording and it is not specific. As a result, any franchisee would have difficulty knowing whether he had complied with that requirement.

186    In this case, the competition in the London area from Benko was very intense. If Badger was serious about making inroads in the London market, it needed to provide the plaintiff with more support. It needed to subsidize the plaintiff with funds, men and equipment in order to compete with Benko and make inroads in the London market. Semi-annual visits by Wilson to exhort the plaintiff to do better were not enough.

187    Given the market conditions, I am satisfied that the plaintiff fully developed the London market to the extent possible. I therefore find that the plaintiff complied with para. 4.7 (2) of the Marketing Agreement and that there was no breach of that agreement by the plaintiff.

188    In view of the foregoing, I find that the plaintiff was not in default under the Marketing Agreement. Further, I find that Badger breached the Marketing Agreement by assigning the four counties to other franchisees and that the plaintiff is entitled to recover any damages it suffered as a result of that breach.

**Damages**

189    The plaintiff hired Thomas Mitchell, a partner in PricewaterhouseCoopers LLP to calculate the damages it suffered as a result of the loss of the four counties to the date of the trial being December 31, 2009, and its future loss to December 31, 2036, which is the date of Potter's retirement. The defendant retained Farley J. Cohen of Navigant Consulting to make the same calculations and to comment on the report prepared by Mitchell.

190    Both experts used the same methodology in calculating the plaintiff's past and future loss. The difference in their reports lies in their assumptions. The methodology adopted by both experts involved measuring revenue lost due to the loss of the four counties and the variable expenses for the period prior to the trial to arrive at the plaintiff's past loss of gross profit. They then calculated the present value of the company's future loss of gross profit from January 1, 2010, to December 31, 2036.

191    The plaintiff's expert, Mitchell, calculated the company's past loss of gross profits, at $64,861. He calculated the company's future loss of gross profit at $640,611 under Scenario A, $497,516 under Scenario B, and $385,437 under Scenario C.

192    Scenario A is based on the assumption that the company will not generate any revenue from the four counties beyond 2009. Scenario B is based on the assumption that the plaintiff will generate revenue similar to the mid-point between the revenue generated under Scenario A and the revenue generated under Scenario C. Scenario C is based on the assumption the plaintiff will generate revenue similar to the average revenue generated in the four counties in 2008 and 2009.

193    The defendant's expert, Cohen, estimated the plaintiff's past loss of gross profit to December 31, 2009, at $12,000 and the present value of its future loss of gross profit to December 31, 2036, at $58,000.

194    Both Mitchell and Cohen are highly qualified accountants and business valuators who are senior members of their respective firms. They both testified in a straight forward manner and did their best to assist the court.

195    After weighing the evidence of the two experts, I have decided to accept the evidence of Mitchell because I prefer his approach to the assessment of the plaintiff's damages as opposed to Cohen's approach which was based on faulty assumptions and which adopted a business valuation model as opposed to a traditional assessment of damages.

196    Assessing the damages in this case is difficult because the experts were attempting to predict what will happen in the future. The court must, however, do its best on the evidence to assess the damages the plaintiff will suffer as a result of the loss of the four counties.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 50 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

**Past Loss**

197     In calculating the past loss, Mitchell averaged the plaintiff's revenue from the four counties in the London area for the years 2001 to 2005 and came up with a gross revenue total. He then assumed that the plaintiff would have maintained that level of business and increase its gross revenues by 9% per annum. He based the increase on the fact that the plaintiff experienced 15.3% per annum growth in the other counties.

198     Mitchell said the plaintiff would experience 9% per annum growth in the London area as opposed to the historical 3.870 because it rented a depot and was going to place a truck and operator in London on a permanent basis. In his view, that would enable the plaintiff to increase its business in the area.

199     Cohen used a growth rate of 3.8% per annum and said that any additional growth would be offset by additional costs the plaintiff incurred in establishing a depot in London. He pointed out that the rent owed for the depot was $12,000.00 per annum.

200     While Mitchell used a profit margin of 15.4%, Cohen reduced that to 11.1% due to additional expenses not accounted for by Mitchell. Cohen also assumed that the billing rates in the London area were lower than in the other counties due to the competition from Benko which reduced the profit margin.

201     Mitchell's position was that the extra expenses were offset by the fact the plaintiff did not have to pay travelling costs from Sarnia to London in order to service the area. As well, Mitchell said that Cohen's calculation of the billing rates is flawed because he used 2008 revenue numbers which were low and not reflective of the business done by the plaintiff over the four years prior to trial.

202     I am satisfied that if Badger had not taken the four counties from the plaintiff, the plaintiff would have increased its sales in the London area and with a permanent presence in the City of London, it would have increased its revenue. Cohen has understated the past loss by failing to account for the reduction in travel expenses and by inadvertently distorting the billing rates by using the 2008 revenue figures.

203     In view of the foregoing, I accept the evidence of Mitchell and find that the plaintiff suffered a pretrial loss of gross profits to December 31, 2009 in the amount of $64,861.

**Future Loss**

204     In calculating the future losses in the four counties, both experts made different assumptions. The important differences are:

  a) They used different approaches to calculate the amount of work the plaintiff will continue to get in the London area in the future.

  b) Mitchell used a 19.1% profit margin for Hydrovac work and Cohen used an 11.1% profit margin which he calculated by reference to billing rates.

  c) Mitchell used progressive discount rates which were effectively 9.279% and Cohen used a discount rate of 22%.

205     The work the plaintiff will continue to get from the London area is an issue because it affects the amount of its future loss. In calculating the amount of work the plaintiff will continue to get, Cohen annualized the revenue the plaintiff got from the four counties to December, 2009, by grossing up the 2009 revenue from the four counties to August by over 40%. Cohen distorted the allowance for work the plaintiff will get in the future as in fact, after August of 2009, the plaintiff got very little work from the London area.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

206    By basing his assessment of the future work the plaintiff will receive from the London area on the 2008/2009 annualized revenues, Cohen significantly reduced the amount of the plaintiff's future loss of revenue resulting from the taking of the London area by the defendant.

207    In arriving at an 11.1% profit margin on gross revenues, Cohen based his calculation on average billing rates in the London area. The problem with Cohen's calculation of the plaintiff's billing rates is that the hours of work were not accurately recorded so that the results in the London area in 2008 were distorted as the per hour expenses were overstated. In addition, during that time there was a lot of high hourly rate work in the five counties outside the London area and next to none in the London area. As a result, the hourly rate arrived at by Cohen was skewed.

208    By using faulty data to calculate the plaintiff's profit margin on hydrovac work in the London area, Cohen mistakenly reduced the plaintiff's future loss.

209    There is a wide divergence between the discount rates used by the experts in calculating the plaintiff's future loss. Mitchell's rate is effectively 9.279% and Cohen's is 22%. Cohen's discount rate is inappropriate because it is based on a rate associated with the purchase of Benko by the defendant and it is derived from a risk adjusted build up. The Benko transaction was the purchase of an entire company two-thirds of which was a different business from the plaintiff's and a business highly dependent on Benko's personal relationships with the customers.

210    The risk inherent in the Benko purchase was much higher than the risk involved in the assessment of future loss. Two-thirds of Benko's business was unfamiliar to the defendant as it had no experience in the sewer flushing business and it was not acquainted with most of the customers. Although Benko agreed to stay on, there was no guarantee that that arrangement would work out.

211    In addition, the risk adjusted build up approach is not appropriate for the calculation of a future loss of gross profit. As a result of the foregoing, I am satisfied that Mitchell's approach to the calculation of the plaintiff's future loss is more reliable than Cohen's.

212    The plaintiff urges me to accept Mitchell's Scenario A which assumes that the plaintiff will not generate any revenue in the London area counties beyond 2009. That, in my view, is unrealistic. Certainly the defendant will not be inclined to do the plaintiff any favours in the future, however, it is in the business of making money. It gets a percentage of every dollar earned by the plaintiff no matter where the work is done. I am confident that there will continue to be some occasions when the plaintiff's services are required in the four counties in the London area.

213    After the plaintiff commenced this action, relations between Potter and the defendant were strained. No doubt they will deteriorate further in the immediate future and it would be unrealistic to expect that the plaintiff will receive the same volume of referred work as it did in 2008 and 2009. I therefore find that Scenario B is the appropriate approach to the plaintiff's claim for damages for future loss of income.

214    I assess the future loss of income claim at $497,516 which assumes that company will generate revenue similar to the midpoint between the revenue generated under Scenario A and the revenue generated under Scenario B.

**2005 Expenses**

215    The plaintiff claims damages of $17,644.11 for expenses that it incurred during the year 2005. The defendant has refused to pay those expenses as it alleges that they were submitted late and could not be included in its financial statements.

216    Potter testified that he submitted the accounts in early January, 2006, and Babulic acknowledged by email dated Wednesday, April 5, 2006, that he had received the original invoices and approved them. He asked Potter to send him copies. At trial Babulic said the email was wrong and he no longer recalled receiving the original invoices.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

217    I did not believe Babulic and I do not accept his evidence concerning the expenses. The fact that they may have been submitted after Badger closed its books is of no consequence. They could of course be included in the financial results for the year in which they were paid. I therefore allow the plaintiff's claim for expenses in the amount of $17,664.11.

**Punitive Damages**

218    In order to justify an award of punitive damages, the plaintiff must demonstrate that the defendant has committed an independent or separate action causing it to suffer damages. In addition, the defendant's conduct must be sufficiently harsh, vindictive, reprehensible, oppressive and high handed that it offends the court's sense of decency (See *Whiten v. Pilot Insurance Co.*, [2002] 1 S.C.R. 595 (S.C.C.)).

219    In this case, the defendant breached its contractual obligations especially in the absence of any Work Zone Agreement; it refused to respond to correspondence from the plaintiff's solicitors and it issued a veiled threat when it asked Potter whether he wished to continue to work with Badger. Further, the plaintiff alleges that the defendant engaged in reprehensible conduct by refusing to pay Potter for work done in the Woodstock and Perth areas, for refusing to pay his 2005 expenses and by sending default notices threatening immediate termination of his Marketing Agreement.

220    The plaintiff also contends that the defendant threatened to sue it for the $4,000,000 it spent to purchase Benko due to his failure to develop the London area. The defendant did in fact commence a counterclaim against the plaintiff which has no merit.

221    This is not however a case for punitive damages. Although the relations between the plaintiff and the defendant are strained, they have continued their business relationship and the defendant has continued to support the plaintiff's efforts to increase its business. While they have been involved in a hard fought lawsuit over a contractual dispute, both sides have acted in a responsible manner.

222    There is no separate action or reprehensible conduct here that is worthy of punishment. The plaintiff's claim for punitive damages is therefore dismissed.

**Injunctive Relief**

223    The plaintiff seeks a permanent injunction restraining the defendant from interfering with its ability to do business in the Counties of Lambton, Essex, Chatham-Kent, Huron and Bruce. It is concerned that the defendant will refuse to pay it for work done in those areas in the future or that it will appoint other franchisees in those areas. A test for a permanent injunction based on fear of a future contractual breach was addressed in *Qureshi v. Gooch*, [2005] B.C.J. No. 2469 (B.C. S.C.) at para. 29. In that case, which was heard in the British Columbia Supreme Court, Gerow J. said at para. 36:

> The test for an injunction on the basis that a breach may occur in the future is a high one. Various courts have described the test as requiring proof of imminent danger or that that apprehended danger will, if it occurs be very substantial and it would be impossible for the plaintiff to protect himself without an injunction: R.J. Sharpe, Injunctions and Specific Performance, (loose-leaf) Aurora Ont.: Canada Law Book 2002 at paras. 1.700 to 1.730.

224    In this case, there is no threat by the defendant to reassign any further counties to other franchisees. The defendant's representatives testified at the trial that they were satisfied with the plaintiff's performance in the five counties.

225    In view of the foregoing, I am satisfied that an injunction would be premature in the circumstances of this case. The plaintiff's claim for an injunction will therefore be dismissed.

**Counterclaim**

226    The defendant has counterclaimed against the plaintiff for damages resulting from the plaintiff's alleged breach of the Marketing Agreement by failing to develop the four counties in the London area. Cohen assessed the defendant's counterclaim

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 53 of 485

1230995 Ontario Inc. v. Badger Daylighting Inc., 2010 ONSC 1587, 2010 CarswellOnt...

2010 ONSC 1587, 2010 CarswellOnt 3454, 189 A.C.W.S. (3d) 364

at $1,292,000 (See Exhibit 19). Since I have found that the plaintiff did not breach the Marketing Agreement, the defendant's counterclaim cannot succeed.

**Judgment**

227    In view of the foregoing there will be judgment for the plaintiff in the amount of $64,861.00 for past loss and $17,644.11 for 2005 expenses and $497,516.00 for future loss of income. There will be a declaration that the Counties of Lambton, Essex, Chatham-Kent, Huron and Bruce are part of the plaintiff's Territory as defined in the 2003 Marketing Agreement. The plaintiff's claim for punitive damages will be dismissed as will its claim for an injunction. The defendant's counterclaim will also be dismissed.

228    If necessary, the parties may make an appointment with the trial coordinator to make submissions concerning pre-judgment interest and costs.

*Action allowed; counterclaim dismissed.*

---

End of Document Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2011 ONCA 442
Ontario Court of Appeal

1230995 Ontario Inc. v. Badger Daylighting Inc.

2011 CarswellOnt 4321, 2011 ONCA 442, 204 A.C.W.S. (3d) 64

# 1230995 Ontario Inc., Plaintiff (Respondent) and
# Badger Daylighting Inc., Defendant (Appellant)

John Laskin J.A., Karakatsanis J.A., S.T. Goudge J.A.

Heard: June 1, 2011
Judgment: June 1, 2011
Docket: CA C52312

Proceedings: affirming *1230995 Ontario Inc. v. Badger Daylighting Inc.* (2010), 2010 ONSC 1587, 2010 CarswellOnt 3454 (Ont. S.C.J.)

Counsel: Irving Marks, Shawn Pulver, for Defendant / Appellant
Thomas J. Corbett, for Plaintiff / Respondent

Subject: Contracts; Civil Practice and Procedure

### Headnote
#### Contracts --- Franchising contracts — Construction and interpretation — Miscellaneous

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees, over territory of two cities — Plaintiff and defendant entered into work zone agreement to amend franchise agreement, granting plaintiff right to work in areas outside his territory and recognizing this zone of nine counties could be reassigned by defendant — Plaintiff and defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff successfully brought action against defendant for breach of contract — Defendant counterclaimed, but counterclaim was dismissed — Defendant appealed — Appeal dismissed — Defendant was ordered to pay costs of $16,000 to plaintiff — Judge did not err in finding that plaintiff had complied with its obligation to develop and exploit market in four counties, as this finding was well supported by evidence at trial — As plaintiff's territory included work zones, judge was entitled to consider extrinsic evidence to identify what those work zones were.

#### Contracts --- Franchising contracts — Construction and interpretation — Entire agreement clause

Defendant manufactured specialized vehicles — Plaintiff was one of defendant's franchisees, over territory of two cities — Plaintiff and defendant entered into work zone agreement to amend franchise agreement, granting plaintiff right to work in areas outside his territory and recognizing this zone of nine counties could be reassigned by defendant — Plaintiff and defendant entered into new franchise agreement in 2003 — In 2005, defendant advised plaintiff that it would be looking for new franchisee in area, and then assigned four counties away from plaintiff's work zones — Plaintiff successfully brought action against defendant for breach of contract — Defendant counterclaimed, but counterclaim was dismissed — Defendant appealed — Appeal dismissed — Defendant was ordered to pay costs of $16,000 to plaintiff — Judge did not err in enforcing entire agreement clause — Definition of territory included work zones — To extent that agreement was ambiguous, judge correctly noted that this was contract of adhesion to be interpreted contra proferentum — Judge implicitly concluded that his interpretation of agreement gave effect to parties' reasonable expectations.

2011 ONCA 442, 2011 CarswellOnt 4321, 204 A.C.W.S. (3d) 64

APPEAL by defendant from judgment reported at *1230995 Ontario Inc. v. Badger Daylighting Inc.* (2010), 2010 ONSC 1587, 2010 CarswellOnt 3454 (Ont. S.C.J.), respecting finding of breach of contract.

**Per curiam:**

1    The appellant Badger argues three points on appeal:

  1) The trial judge erred in finding that the respondent had complied with its obligation under s. 4.7(2) of the 2003 Marketing Agreement to "aggressively and fully develop and exploit the market for the Services and diligently solicit orders" in the four counties;

  2) the trial judge erred by enforcing the entire agreement clause section 10.11, instead of giving effect to the common understanding and reasonable expectations of the parties that the nine counties were work zones and continued to be governed by the 2002 Work Zone Amendment and the letter of understanding and;

  3) the trial judge erred in finding that the nine counties had been assigned to the respondent as work zones under the 2003 Marketing Agreement.

We do not accept any of these arguments.

2    Badger's first argument fails for two reasons. First, it runs up against the trial judge's finding of fact in para. 187 of his reasons "Given the market conditions, I am satisfied that the plaintiff fully developed the London market to the extent possible. I therefore find that the plaintiff complied with para. 4.7 (2) of the Marketing Agreement and that there was no breach of that agreement by the plaintiff." This finding is well supported by the evidence at trial.

3    The trial judge's reference to the potential for increased revenues by putting a truck in the London area is not inconsistent with this finding. The trial judge's finding under s. 4.7(2) is that the respondent has complied to date. His finding on damages recognizes that the respondent could grow the market in the future.

4    Additionally, the trial judge's use of the phrase "to the extent possible" does not amount to a misinterpretation of s. 4.7(2). It simply reflects the commercial reality that Benko had a strong presence in the London market.

5    Second, in taking the four counties away from the respondent, Badger did not rely on s. 4.7(2). Nor did it exercise the right in s. 9.1(3) to terminate the marketing agreement for breach of s. 4.7(2). Rather, Badger exercised what it thought, mistakenly, was its unilateral right to reassign the four counties. For these reasons, we reject Badger's first argument.

6    The trial judge rejected Badger's second argument, and in our view, he was fully justified in doing so in the light of the entire agreement clause and the definition of Territory, which included the work zones. To the extent that the 2003 Marketing Agreement was ambiguous, the trial judge correctly noted that this was a contract of adhesion to be interpreted *contra proferentum.*

7    Part of Badger's argument on this point is that the trial judge improperly curtailed cross-examination that was designed to elicit support for applying the principle of estoppel by representation or convention.

8    We think that the trial judge's ruling was correct. He upheld an objection to a question that asked for Mr. Potter's subjective understanding of the Agreement. That question was irrelevant to the interpretation of the contract. It was also irrelevant to estoppel by convention, which requires shared assumptions based on representations by statements or conduct.

9    Further, although the trial judge did not expressly address the parties' reasonable expectations, implicitly he concluded that his interpretation of the Marketing Agreement gave effect to their reasonable expectations. Accordingly, Badger's second argument fails.

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2011 ONCA 442, 2011 CarswellOnt 4321, 204 A.C.W.S. (3d) 64

10    Finally, we reject Badger's third argument. Having found that the respondent's territory included work zones, the trial judge was entitled to consider extrinsic evidence to identify what those work zones were. And on the evidence, there was no doubt whatsoever that the work zones referred to the nine counties.

11    Accordingly, the appeal is dismissed with costs to the respondent fixed in the amount of $ 16,000 inclusive of disbursements and applicable taxes.

*Appeal dismissed.*

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Case Name:*

# Adam v. Campbell

[1950] S.C.J. No. 51

[1950] 3 D.L.R. 449

Supreme Court of Canada

**Kerwin, Rand, Kellock, Cartwright, Fauteux JJ.**

Judgment: June 6, 1950.

(47 paras.)

**Counsel:**

*B.J. Spencer Pitt*, for appellant.

*Edson L. Haines*, K.C., for respondent.

---

1    **KERWIN J.** (dissenting):-- The facts in this case appear elsewhere and need not be repeated. With respect, in my view the evidence of the experts, Hastings and Pollard, was admissible although that of the latter was given, it is true, in cross-examination upon a point that had not been opened by counsel for the plaintiffs whose witness he was. These witnesses were giving their opinion upon a matter to which the jury was entitled to the benefit of their experience and views: Wigmore on Evidence, 3rd ed., vol. 7, p. 18.

2    In Professor Thayer's famous Preliminary Treatise on the Law of Evidence, at p. 525, it is stated that without acceding quite literally to a judicial statement that "there is, in truth, no general rule requiring the rejection of opinions as evidence", there is ground for saying that, in the main, any rule excluding opinion evidence is limited to cases where, in the judgment of the Court, it will not be helpful to the jury. This is borne out by the notes to *Carter v. Boehm* (1766), 3 Burr. 1905, 97 E.R. 1162, in the 13th edition of Smith's Leading Cases, vol. I, at p. 561, where the authors state: "The difference of opinion that formerly existed arose perhaps less upon any point of law than on

the application of a settled law to certain states of facts; for, on the one hand, it appears to have been admitted that the opinion of witnesses possessing peculiar skill is admissible whenever the subject-matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance, in other words, when it so far partakes of the nature of a science as to require a course of previous habit, or study, in order to the attainment of a knowledge of it."

**3**    In *Kelliher v. Smith*, [1931], 4 D.L.R. 102, S.C.R. 672, the majority of the Court decided that the trial Judge had rightly ruled out certain evidence but applied the rule set forth in Smith's Leading Cases. In my opinion it would be too restrictive of the rule to hold that the evidence referred to should not have been admitted, particularly where the trial Judge must have considered that it would be useful to the jury. This is not to say that the trial Judge's discretion in such a matter will never be interfered with but it is, I think, an additional element in considering any particular circumstances.

**4**    Upon a review of the charge of the trial Judge, I am unable to say that he misdirected the jury. All the questions raised on the argument as to where the respondent's car was when the respondent first saw the deceased--as to the time that elapsed between the using of the foot-brakes and the hitting of the deceased, as to what might, or might not, have been done during that very short period--were all questions for the jury. Their finding that the injuries to the deceased did not arise through the negligence or improper conduct of the respondent was justified on the evidence and it cannot be said that no twelve reasonable men doing their duty could not have come to the conclusion they did.

**5**    The appeal should be dismissed with costs.

**6**    The judgment of RAND, KELLOCK, CARTWRIGHT and FAUTEUX JJ. were delivered by

**7**    CARTWRIGHT J.:--In this case there is little, if any, dispute as to the relevant facts.

**8**    On the morning of December 2, 1947, John Adam the son of the plaintiffs was walking easterly on the southerly portion of the sidewalk on the south side of St. Clair Ave. a short distance west of Old Weston Rd. in the City of Toronto, when he was struck from behind by a motor car owned and driven by the respondent. He suffered injuries from which he died a few days later.

**9**    The respondent was driving his automobile, which was a 1940 Chevrolet, easterly on St. Clair Ave. The weather was fine and the pavement clear and dry. He had driven that morning from a point near Brantford, Ontario, a distance of some 60 miles, and throughout the trip his service brake was working perfectly. As he was approaching the intersection of Old Weston Rd. and St. Clair Ave. he was following a truck, driven by his son-in-law, at a distance of about 55 ft. His speed was between 15 and 25 m.p.h. The intersection of St. Clair Ave. and Old Weston Rd. is equipped with traffic signal lights and the respondent observed that as the truck was approaching Old Weston Rd. it was slowing down, the traffic signal being against east and westbound traffic.

**10**    The respondent proceeded to apply his service brake with the intention of coming to a gradual stop behind the truck. To his surprise the brake pedal went right to the floor of the car and he realized that his service brake was useless.

**11**    There was no evidence to suggest that the sudden failure of the service brake was attributable to any negligence on the part of the respondent. It had failed owing to an entirely unusual and unanticipated break in the mechanism which permitted the fluid in the master cylinder to escape.

**12**    On realizing that his service brake was useless, the respondent, with his left hand, applied his emergency brake, keeping his right hand on the steering wheel. The evidence of his daughter who was sitting beside him would indicate that the respondent looked down while he was applying the emergency brake. The respondent himself was not certain whether he looked down or whether he "automatically reached for it".

**13**    The respondent stated expressly that he did not intentionally turn his car, but in fact, his car turned somewhat to the south, proceeded up on to the sidewalk and continued easterly along the sidewalk striking John Adam, dragging him a short distance and causing him fatal injuries.

**14**    The respondent's own evidence as to what occurred following the failure of the service brake may be briefly summarized as follows. When the pedal went to the floor he realized that the service brake was useless. His speed was between 15 and 25 m.p.h. It seemed to him that there was a time during which he does not know what happened. The next thing he remembers was reaching for his emergency brake. He can't say whether he looked for the emergency brake or automatically reached for it. "When things came normal again" his car was up on the sidewalk. He saw John Adam who was walking ahead of him at a fair pace. He kept his eyes on him. He could not say exactly how far ahead of him Adam was when he first observed him but estimates the distance at 20 ft. He expressly states that he did nothing to avoid striking Adam except to apply his emergency brake. He says he could have turned his car but that the thought of doing so did not occur to him.

**15**    It should be explained that at the place of the accident there was to the south of the sidewalk a large open space paved with asphalt used as part of a gasoline service station. No evidence was given to suggest that there was anything to prevent the respondent turning either to the right or the left so as to avoid striking Adam.

**16**    The defence pleaded was a denial of negligence and a plea of unavoidable accident put in the following words: "The Defendant says that the accident complained of was caused by the hydraulic braking system on the Defendant's motor vehicle suddenly and without any warning whatsoever failing and thereby depriving the Defendant of any opportunity of stopping his motor vehicle before striking the late John George Adam. The Defendant says that by reason of the sudden, unexpected and unanticipated failure of the braking system, the Plaintiff's damages, if any, were the result of an unavoidable or'pure' accident and that the Defendant is therefore not in law liable to the Plaintiffs or to either of them."

**17**    In answer to questions submitted to them, the jury found that the respondent had satisfied them that the injuries to the deceased did not arise through the negligence or improper conduct of the respondent, and the action was accordingly dismissed with costs.

**18**    The learned trial Judge had directed the jury to assess the damages regardless of their finding as to liability and the damages were assessed at $2,850.

**19**    The appellants appealed to the Court of Appeal for Ontario. The grounds of appeal are expressed in different words in the several paragraphs of the notice but amount to the submission that no jury acting reasonably could, on the evidence, properly find that the respondent had discharged the onus of disproving negligence.

**20**    The Court of Appeal for Ontario dismissed the appeal without delivering written reasons.

**21**    The rule which must guide an Appellate Court in such a case is well settled. In *McCannell v. McLean*, [1937] 2 D.L.R. 639 at p. 644, [1938] O.R. 37 at p. 41, Masten J.A. stated it in the following words: "The well settled rule is that a finding of fact by a jury properly instructed will not be set aside by the Court of Appeal if there is any evidence on which an honest jury acting reasonably could make it. But the application of this recognized rule to particular cases leaves open to the judicial discretion of the Appellate Court an extensive field when determining whether there is any evidence adequate to support the jury's finding."

**22**    At p. 643 D.L.R., p. 41 O.R., the same learned Judge points out that: "An Appellate Court cannot divest itself of its proper function by saying that the jury is infallible."

**23**    This judgment was affirmed by the Supreme Court of Canada, [1937], 2 D.L.R. 639, S.C.R. 341. At p. 649 D.L.R., p. 343 S.C.R., Duff C.J.C. expressed the rule as follows: "The principle has been laid down in many judgments of this Court to this effect, that the verdict of a jury will not be set aside as against the weight of evidence unless it is so plainly unreasonable and unjust as to satisfy the Court that no jury reviewing the evidence as a whole and acting judicially could have reached it."

**24**    The judgment of Duff C.J.C. concludes with the following paragraph: "It is, perhaps, advisable to observe that what has been said above does not contemplate cases in which there is some valid objection to directions given by the Court to the jury in respect either of insufficiency or impropriety, or where the Court may have to consider some circumstance connected with the conduct of the proceedings at the trial as having a bearing upon the question whether, consistently with justice, the verdict can be allowed to stand."

**25**    In the case at bar it is my view that inadmissible evidence, put in on behalf of the respondent, was received. It was, I think, likely to have weight with the jury. I think further that a portion of the charge of the learned trial Judge would tend to cause the jury to give added weight and significance to this inadmissible evidence.

**26**    The evidence to which I refer is found in the examination-in-chief of Mr. Clarence Hastings, called on behalf of the respondent, and in the cross-examination of Mr. Harold Pollard called on behalf of the appellants.

**27**    The record indicates that Mr. Hastings is an automotive engineer of high qualifications and great experience who has investigated very many accidents, and who was undoubtedly qualified as an expert in engineering matters. In his examination-in-chief, Mr. Hastings gave evidence that as the result of a number of tests which he had carried out he had calculated that there is an interval of time required by a person who is driving a motor ear to react to any perceived danger. He stated that there is a noticeable difference in different individuals, the reaction time varying from two-fifths of a second to four-fifths of a second. He went on to testify that, in his opinion, the average "reaction time" would be three-quarters of a second and that this standard has been accepted by the highway authorities in this country and in other countries. The witness' evidence up to this point was based on tests carried out by him personally and it would appear to be unobjectionable.

**28**    In arriving at the three-quarters of a second reaction time, the suggested danger with which the hypothetical motorist was to be confronted was that of a child running out suddenly on to the highway or a car pulling out suddenly from the side of the road. Counsel for the respondent then asked the witness to contrast the above suggested situations with that where the motorist's brakes suddenly fail and asked the witness whether there would be a difference in the "reaction time" of the average man. The witness replied that in the last-mentioned situation "one's reaction time is far greater than it is otherwise, the reason being is that your first thought is you wonder what has happened and secondly what you will do about it. The situation there is quite different than when you are confronted with an ordinary traffic hazard."

**29**    Counsel then put to Mr. Hastings the suggested case of a sudden failure of the braking system and proceeded as follows:

> "Q.    In such a case as that can you assist the jury as to what time reaction there might be from the time you see danger, when it makes itself apparent to you, until you are able to do something about it? A. I have never been able to conduct any tests of that, but all I can tell you is that the ordinary time applicable to traffic hazards is 3/4's of a second, and the reaction time of an unusual occurrence such as the type we have discussed may be a matter of 2 or 3 seconds. It would depend on the individual. After all a second is a very short interval of time--if you look at a watch you will realize that. Q. And if that occurs when a motorist is running at a speed of 20 m.p.h. he runs something like 90 ft. in 3 seconds before he can do anything? A. Yes. Q. Will you tell me whether or not during this reaction period the motorist is able to do anything? A. No, he can't do anything during the reaction period because that is the time it takes him to function and do whatever he is going to do."

**30**   The witness Harold Pollard, who is also a consulting engineer specializing in the investigation of accidents, was called on behalf of the appellants. He was not questioned when examined in chief as to the reaction time referred to above, but in his cross-examination, the following questions and answers are found:

> "Q.   Am I correct in saying that to an ordinary motorist, the ordinary experienced motorist, the contingency of a brake line suddenly going is a very unnerving experience?
>
> A.   t is to anybody. Q. For a moment he may be paralysed and dumbfounded? A. It is a very weird experience. Q. And comes as a distinct shock and a surprise? A. Definitely.
>
> Q.   m I correct in saying the ordinary well-trained motorist or reasonably well trained motorist as he drives along the highway in respect to highway hazards such as cars moving into his path, he acts quickly and almost automatically? A. Yes, the reaction time of a person controlling a car has been accepted as between four-fifths and two-thirds of a second. The usually accepted reaction time is three-quarters of a second. Q. I' was referring to the conditions a motorist meets as he drives along? A. I interpreted your question of reaction to refer to somebody reacting to an emergency. Q. Let us say you are driving along and you come suddenly to apply your brakes, not to make a normal application of the brakes, and you are shocked or surprised or dumfounded because you have no brake, am I not correct in saying your reaction period because of surprise and shock and being dumfounded has to be extended? A. Oh, definitely."

**31**   It appears to me that the jury may well have been influenced by this evidence. There was no suggestion of any negligence on the part of the deceased John Adam, and, of course, no suggestion that the respondent had any right to drive his motor vehicle on the sidewalk. The whole defence was that the sudden and unexpected failure of the service brake excused all the following actions and omissions of the respondent which resulted in the death of John Adam, although such actions and omissions would clearly have been negligent and unlawful unless they were excused by the sudden failure of the brake.

**32**   In dealing with this branch of the matter, the learned trial Judge said in part: "Now, for how long an interval is a man entitled to lose his head in a case of sudden emergency? You must remember the time would be very short, if you compare the distance that he went with his probable speed of 20 to 25 m.p.h. The time interval must have been very short, it must have been seconds, so you have to value it in that light. Nevertheless, even though he was placed in that sudden emergency, in what he did was there any carelessness or negligence as I have explained those words to you? If you find there was then the plaintiffs are entitled to recover. If you decide there was no negligence or carelessness in what he did after the failure of the brakes then the cause of the accident was the failure of the brakes because he did not contribute to it in any way. If he did contribute to it in any way then I would suggest to you that the defence of an inevitable accident

fails and you must then value his conduct as to whether there was negligence or not and there is an onus of proof on him to satisfy you that such loss or damage did not arise through his negligence or improper conduct and he must satisfy that burden to your satisfaction looking at all the evidence."

**33**    In my view, the evidence which I regard as inadmissible and the portion of the charge quoted above would, or at all events might, have the following effect upon the jury. They would understand from what the learned trial Judge had said to them that there is an interval of time following an emergency in which the driver of a motor car is as a matter of law "entitled to lose his head" in the sense that he will not during such interval be legally responsible for what would otherwise be negligent actions and omissions on his part. When they came to consider what that interval was, in the case at bar, they would no doubt have in their minds the evidence of Mr. Hastings quoted above, that such interval could be as much as three seconds. They would not, I think, be assisted in coming to a right conclusion by the use of the adjectives employed by counsel for the respondent -- "paralysed" and "dumbfounded" which were not in terms rejected by the witness Pollard and which the jury may well have understood him to accept.

**34**    In my view the evidence quoted above was inadmissible on two grounds. The first is that neither witness had conducted any tests or laid any other foundation to indicate that he had any qualification to express an opinion on such a matter as the "reaction time" upon encountering an "unusual" as opposed to an "ordinary" traffic hazard. The second is stated in the following words in Phipson on Evidence, 8th ed., p. 385: "Neither experts nor ordinary witnesses may give their opinions upon *matters of legal or moral obligation*, or *general human nature, or the manner in which other persons would probably act or be influenced*."

**35**    As was said by Farwell J. in *Bourne v. Swan & Edgar Ltd.*, [1903] 1 Ch. 211 at p. 224: "It appears to me that there is also another reason against the admissibility, and that is that I do not see how you can call any individual to give what is in truth expert evidence as to human nature, because what they are asked in this form of question is, not what would happen to them individually, but what they think the rest of the world would be likely to suppose or believe. They are not experts in human nature, nor can they be called to give such evidence, and, apart from admissibility, one cannot help feeling that there is a certain proneness in the human mind to think that other people are perhaps more foolish than they really are. I do not think that Carlyle is alone in his estimate of the intelligence of the majority of the inhabitants of these islands."

**36**    I have not overlooked the fact that no objection was taken by counsel for the appellants to the evidence which I have concluded was inadmissible. It is unnecessary to state that failure to object to its reception cannot render admissible evidence which is legally inadmissible.

**37**    I do not think it necessary to decide whether, had there been other evidence in the record on which the verdict could reasonably be supported, the Court should set aside the verdict and grant a new trial by reason of the admission of this evidence, in view of the fact that its reception was neither objected to at the trial nor made a ground of appeal to the Court of Appeal. I have come to

the conclusion that there is no evidence on which the jury acting reasonably could have found that the respondent had satisfied the onus which rested upon him.

**38**    The only way in which the respondent sought to satisfy that onus was by relying upon the defence of inevitable accident. The "inevitable accident" put forward was the unexpected failure of the service brake. Undoubtedly that failure was inevitable in the sense that it was unavoidable by the respondent. But that is not enough. The respondent to succeed had to go further and show that the killing of Adam was the inevitable result of the unexpected failure of the brake. In my opinion no such causal connection between the two events was established by the evidence. I think that the evidence not only failed to show that there was no negligence on the part of the respondent subsequent to the brake failure but rather established the existence of such negligence.

**39**    The duty which the respondent, while driving his motor car on the highway, owed to pedestrians on the sidewalk, and therefore to the late John Adam, was in my respectful opinion correctly stated by Duff J., as he then was, in his dissenting judgment in *Carter v. Van Camp*, [1929] 4 D.L.R. 625 at p. 632, [1930] S.C.R. 156 at p. 167, in the following words: "So to conduct himself as not to expose them to unnecessary risk of harm by default in the management of his car in respect of reasonable care, reasonable skill or reasonable self-possession, whether in emergencies or in ordinary circumstances."

**40**    No doubt, as stated in 23 Hals., 2nd ed., p. 719: "It is a defence to an action for negligence that the defendant did the act complained of in an emergency, in response to his instinct for self-preservation, provided that his action was what a reasonable man might well have done in the circumstances."

**41**    It is also settled that a defendant may be excused if in the agony of an imminent collision, not brought about by his own antecedent negligence, he fails to take some step which might have prevented a collision, unless the step is one which a reasonably careful man would fairly be expected to take in the circumstances.

**42**    Making all due allowance for the fact that the respondent had no reason to expect the sudden failure of the brake, I can find no evidence to support the finding that a reasonably careful, skilful and self-possessed driver would by reason thereof have been unable to prevent his automobile striking Adam.

**43**    The respondent was required to know the law including the rule laid down in s. 11 of the *Highway Traffic Act*, R.S.O. 1937, c. 288, which required his motor vehicle to be equipped with brakes adequate to stop and hold such vehicle, having two separate means of application each of which should suffice to stop the vehicle within a proper distance and to be so constructed that the cutting in two of any one element of the operating mechanism should not leave the motor vehicle without brakes effective on at least two wheels.

**44**    The respondent had complied with this section. It was proved at the trial that his emergency

brake was in good condition and conformed with the regulations made under the *Highway Traffic Act*. It was his duty to know, and he did in fact know, that when his foot-brake failed he had his emergency brake available for the purpose of stopping his car. There was no evidence to suggest that he was going at an excessive rate of speed. He explicitly states that the steering apparatus on his car was and continued to be in perfect working order. All that was required of him was to apply the emergency brake and continue to steer his car until it came to a stop.

**45**    It is hard to find any causal connection between the failure of the foot-brake and the turning of the car on to the sidewalk. The respondent expressly rejects the suggestion that he swerved, voluntarily or involuntarily, for the purpose of avoiding the truck. His daughter, an experienced driver, who was sitting beside him, also repudiates the suggestion that after the brake failed she was worried about striking the truck. There is no suggestion that there was any other traffic which in any way presented any danger of collision. There was nothing in the circumstances disclosed in the evidence to explain or excuse the driving of the car on to the sidewalk at all.

**46**    The respondent says that he first saw the deceased when he was 20 ft. away from him. I cannot find in the evidence any excuse for his failure to observe him sooner, but, on his own evidence, even at that point he had an opportunity of avoiding him by turning his car either to the right or the left.

**47**    In my view there was no evidence upon which a jury acting reasonably could have found that the respondent had satisfied the onus which rested upon him. I would allow the appeal with costs throughout and direct that judgment be entered for the plaintiffs in the sum of $2,850, the amount of damages assessed by the jury.

qllaz/qlpxm

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

2011 SCC 24
Supreme Court of Canada

Elder Advocates of Alberta Society v. Alberta

2011 CarswellAlta 763, 2011 CarswellAlta 764, 2011 SCC 24, [2011] 2 S.C.R. 261, [2011] 6 W.W.R. 191, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2197, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2206, [2011] A.C.S. No. 24, [2011] S.C.J. No. 24, 201 A.C.W.S. (3d) 344, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 41 Alta. L.R. (5th) 1, 499 A.R. 345, 514 W.A.C. 345, 81 C.C.L.T. (3d) 1, J.E. 2011-868, EYB 2011-190431

**Her Majesty The Queen in Right of Alberta (Appellant) and Elder Advocates of Alberta Society and James O. Darwish, Personal Representative of the Estate of Johanna H. Darwish, deceased (Respondents) and Attorney General of Canada and Attorney General of British Columbia (Interveners)**

McLachlin C.J.C., Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell JJ.

Heard: January 27, 2011
Judgment: May 12, 2011
Docket: 33551

Proceedings: reversing in part *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197, Carole Conrad J.A., Patricia Rowbotham J.A., Ronald Berger J.A. (Alta. C.A.); reversing in part *Elder Advocates of Alberta Society v. Alberta* (2008), 2008 CarswellAlta 1104, 2008 ABQB 490, 59 C.C.L.T. (3d) 23, 59 C.P.C. (6th) 243, [2008] 11 W.W.R. 70, 453 A.R. 1, 94 Alta. L.R. (4th) 10, S.J. Greckol J. (Alta. Q.B.)

Counsel: G. Alan Meikle, Q.C., Ward K. Branch, Michael Sobkin, for Appellant
Allan A. Garber, Nathan J. Whitling, for Respondents
Christine Mohr, for Intervener, Attorney General of Canada
Anthony Fraser, for Intervener, Attorney General of British Columbia

Subject: Public; Torts; Estates and Trusts; Restitution; Civil Practice and Procedure; Contracts; Constitutional

**Headnote**

**Health law --- Regional matters — Other health facilities — Nursing homes and homes for the aged**

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

### Torts --- Negligence — Duty and standard of care — Fiduciary duty

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action — Class members' vulnerability alone was insufficient to ground fiduciary obligation, as their state of vulnerability did not arise from their relationship with province — Plaintiffs could not point to anything in legislation, or in factual relationship pleaded, that supported undertaking by province to act with undivided loyalty toward class members in setting, receipt and administration of accommodation charges — It was not clear that pleadings alleged that Crown, as distinguished from individual actors, was under fiduciary duty — Legal or substantial practical interests alleged in pleadings to be affected by Crown's exercise of authority were insufficient to attract fiduciary duty — Specific fiduciary duty that plaintiffs sought to establish related primarily to setting accommodation charges by regulation, and where government acts in exercise of its legislative functions, courts have consistently held that fiduciary duty does not arise.

### Torts --- Negligence — Duty and standard of care — Duty of care

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action — Negligence claim was bound to fail at first step of Anns/Cooper inquiry — Legislative scheme did not impose duty of care on province — Legislative scheme did not impose duty on Crown to act in relation to class members with respect to accommodation charges — Plaintiffs failed to point to any duty to audit, supervise, monitor or administer funds related to accommodation charges in provisions — Simple fact of bad faith was not independently actionable — Misfeasance in public office was not raised before courts below.

### Restitution and unjust enrichment --- General principles — When remedy available

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Trial judge correctly concluded that cause of action based on unjust enrichment with remedy of restitution was not hopeless, but rather analytically defensible — Whatever its chances of ultimate success, it was not plain and obvious that claim did not disclose cause of action, and it should be allowed to proceed to trial — Claim for unjust enrichment stood on different legal footing than claims for breach of fiduciary duty or negligence.

**Civil practice and procedure --- Parties — Representative or class proceedings under class proceedings legislation — Certification — Plaintiff's class proceeding — Pleadings disclose cause of action**

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

**Civil practice and procedure --- Parties — Representative or class proceedings under class proceedings legislation — Certification — Plaintiff's class proceeding — Preferable procedure**

**Droit de la santé --- Questions régionales — Autres établissements de santé — Centres d'hébergement et résidences pour personnes âgées**

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

### Délits civils --- Négligence — Devoir et norme de diligence — Devoir fiduciaire

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action — Vulnérabilité des membres du groupe à elle seule ne suffisait pas pour établir une obligation fiduciaire, puisque cette vulnérabilité ne résultait pas de leur relation avec la province — Partie demanderesse ne renvoyait pas à une disposition législative, ni à quoi que ce soit dans les rapports de fait invoqués, qui étayait un engagement de la province de faire preuve, envers les membres du groupe, d'une loyauté exclusive pour ce qui était de la fixation, de la perception et de l'administration des frais d'hébergement — Allégations n'indiquaient pas clairement que l'État, par opposition à une personne physique, avait une obligation fiduciaire — Intérêt juridique ou l'intérêt pratique essentiel que la partie demanderesse décrivait dans ses actes de procédures comme étant touché par l'exercice du pouvoir de l'État n'était pas suffisant pour faire naître une obligation fiduciaire — Obligation fiduciaire précise que la partie demanderesse cherchait à établir se rapportait principalement à la fixation par règlement des frais d'hébergement, et lorsque le gouvernement agit dans l'exercice de ses fonctions législatives, les tribunaux ont systématiquement conclu que cela ne donne lieu à aucune obligation fiduciaire.

### Délits civils --- Négligence — Devoir et norme de diligence — Devoir de diligence

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action — Allégation de négligence était vouée à l'échec à la première étape du critère retenu dans les arrêts Anns et Cooper — Régime législatif n'imposait pas d'obligation de diligence à la province — Régime législatif n'imposait pas à l'État l'obligation d'agir pour le bénéfice des membres du groupe à l'égard des frais d'hébergement — Partie demanderesse n'a pu établir, dans les dispositions législatives, l'existence d'une obligation de vérifier, de superviser, de contrôler ou de gérer les fonds associés aux frais d'hébergement — Simple fait d'avoir agi de mauvaise foi ne donnait pas lui-même ouverture à un droit d'action — Il n'a pas été question de faute dans l'exercice d'une charge publique devant les tribunaux inférieurs.

### Restitution et enrichissement injustifié --- Principes généraux — Lorsqu'un recours est disponible

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — C'était à bon droit que la juge de première instance a conclu que la cause d'action fondée sur l'enrichissement injustifié ainsi que la demande de restitution n'étaient pas vouées à l'échec mais qu'elles étaient plutôt analytiquement défendables — Peu importe si la demande avait des chances d'être accueillie ou non, il n'était pas clair et évident qu'elle ne révélait aucune cause d'action, et il faudrait permettre qu'elle soit instruite — Allégation d'enrichissement injustifié reposait sur un fondement juridique différent des allégations de manquement à l'obligation fiduciaire ou de négligence.

### Procédure civile --- Parties — Recours collectifs intentés en vertu d'une loi relative aux recours collectifs — Autorisation — Recours collectif du demandeur — Procédures écrites révèlent une cause d'action

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

**Procédure civile --- Parties — Recours collectifs intentés en vertu d'une loi relative aux recours collectifs — Autorisation — Recours collectif du demandeur — Procédure préférable**

Long-term care facilities were funded in part by provincial funds and in part by a charge levied on residents. In principle, the government was responsible for costs of the residents' medical care, but residents could be asked to contribute to costs of their housing and meals through the payment of accommodation charges. The plaintiff advocacy group and individual plaintiff alleged that the government artificially elevated the required resident contributions to subsidize the medical expenses that were properly the responsibility of the government. The plaintiffs sought the return of monies or damages equivalent to the amount of any over-payment of permitted accommodation charges.

The plaintiffs' application to certify the action as a class proceeding was granted. The certification judge concluded the action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on the claim under the Canadian Charter of Rights and Freedoms. The certification judge struck out the action in breach of fiduciary duty, negligence in directing that facilities charge the maximum accommodation charge, and ultra vires indirect taxation. The province's appeal was dismissed, and the plaintiffs' cross-appeal was allowed in part. The common issues regarding breach of fiduciary duties owed to class members were reinstated. The Crown appealed.

**Held:** The appeal was allowed in part.

Per McLachlin C.J.C. (Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell JJ. concurring): The certification of the class was upheld. It was ordered that the unjust enrichment claim and the claim for discrimination under s. 15(1) of the Charter proceed to trial. The pleas of breach of fiduciary duty, negligence and bad faith were struck. The pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

The class members' vulnerability alone was insufficient to ground a fiduciary obligation, as their state of vulnerability did not arise from their relationship with the province. The class members would generally still be competent to manage their own affairs, or would be beneficiaries of duties owed by their own guardians and trustees, and therefore the province was not responsible for them. The class members were not being denied care and though their financial situation may have been affected by the levy of accommodation charges, that alone was not enough to warrant a fiduciary duty. The plaintiffs could not point to anything in the legislation, or in the factual relationship pleaded, that supported an undertaking by the province to act with an undivided loyalty toward the class members in the setting, receipt and administration of the accommodation charges. It was not clear that the pleadings alleged that the Crown, as distinguished from individual actors, was under a fiduciary duty. The legal or substantial practical interests alleged in the pleadings to be affected by the Crown's exercise of authority were insufficient to attract a fiduciary duty. The specific fiduciary duty that the plaintiffs sought to establish related primarily to the setting of accommodation charges by regulation, and where government acts in exercise of its legislative functions, courts have consistently held that fiduciary duty does not arise.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

The negligence claim was bound to fail at the first step of the Anns/Cooper inquiry. The legislative scheme did not impose a duty of care on the province. The legislative scheme did not impose a duty on the Crown to act in relation to the class members with respect to the accommodation charges. The plaintiffs failed to point to any duty to audit, supervise, monitor or administer the funds related to the accommodation charges in the provisions.

The simple fact of bad faith was not independently actionable. Misfeasance in public office was not raised before the courts below.

The trial judge correctly concluded that the cause of action based on unjust enrichment with the remedy of restitution was not hopeless, but rather analytically defensible. Whatever its chances of ultimate success, it was not plain and obvious that the claim did not disclose a cause of action, and it should be allowed to proceed to trial. The claim for unjust enrichment stood on a different legal footing than the claims for breach of fiduciary duty or negligence.

Des établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires. En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas. La partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement. La partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes.

La requête de la partie demanderesse en autorisation d'un recours collectif a été accordée. La juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites. La juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires. L'appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie. Une série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies. L'État a formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli en partie.

McLachlin, J.C.C. (Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell, JJ. souscrivant à son opinion) : L'autorisation d'intenter le recours collectif a été confirmée. L'autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée. Les allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées. Les allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

La vulnérabilité des membres du groupe à elle seule ne suffisait pas pour établir une obligation fiduciaire, puisque cette vulnérabilité ne résultait pas de leur relation avec la province. Les membres du groupe seraient généralement encore capables de gérer leurs propres affaires ou seraient bénéficiaires des obligations de leurs propres tuteurs et fiduciaires; par conséquent, la province n'était pas responsable d'eux. Les soins n'étaient pas refusés aux membres du groupe et bien que leur situation financière pouvait être touchée par l'imposition des frais d'hébergement, ce facteur, à lui seul, ne suffisait pas pour justifier une obligation fiduciaire. La partie demanderesse ne renvoyait pas à une disposition législative, ni à quoi que ce soit dans les rapports de fait invoqués, qui étayait un engagement de la province de faire preuve, envers les membres du groupe, d'une loyauté exclusive pour ce qui était de la fixation, de la perception et de l'administration des frais d'hébergement. Les allégations n'indiquaient pas clairement que l'État, par opposition à une personne physique, avait une obligation fiduciaire. L'intérêt juridique ou l'intérêt pratique essentiel que la partie demanderesse décrivait dans les actes de procédures comme étant touché par l'exercice du pouvoir de l'État n'était pas

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

suffisant pour faire naître une obligation fiduciaire. L'obligation fiduciaire précise que la partie demanderesse cherchait à établir se rapportait principalement à la fixation par règlement des frais d'hébergement, et lorsque le gouvernement agit dans l'exercice de ses fonctions législatives, les tribunaux ont systématiquement conclu que cela ne donne lieu à aucune obligation fiduciaire.

L'allégation de négligence était vouée à l'échec à la première étape du critère retenu dans les arrêts Anns et Cooper. Le régime législatif n'imposait pas d'obligation de diligence à la province. Le régime législatif n'imposait pas à l'État l'obligation d'agir pour le bénéfice des membres du groupe à l'égard des frais d'hébergement. La partie demanderesse n'a pu établir, dans les dispositions législatives, l'existence d'une obligation de vérifier, de superviser, de contrôler ou de gérer les fonds associés aux frais d'hébergement.

Le simple fait d'avoir agi de mauvaise foi ne donnait pas lui-même ouverture à un droit d'action. Il n'a pas été question de faute dans l'exercice d'une charge publique devant les tribunaux inférieurs.

C'était à bon droit que la juge de première instance a conclu que la cause d'action fondée sur l'enrichissement injustifié ainsi que la demande de restitution n'étaient pas vouées à l'échec mais qu'elles étaient plutôt analytiquement défendables. Peu importe si la demande avait des chances d'être accueillie ou non, il n'était pas clair et évident qu'elle ne révélait aucune cause d'action, et il faudrait permettre qu'elle soit instruite. L'allégation d'enrichissement injustifié reposait sur un fondement juridique différent des allégations de manquement à l'obligation fiduciaire ou de négligence.

**Table of Authorities**

**Cases considered by *McLachlin C.J.C.*:**

*Air Canada v. British Columbia* (1989), 1989 CarswellBC 706, [1989] 4 W.W.R. 97, [1989] 1 S.C.R. 1161, 59 D.L.R. (4th) 161, 95 N.R. 1, 36 B.C.L.R. (2d) 145, 41 C.R.R. 308, 2 T.C.T. 4178, [1989] 1 T.S.T. 2126, 1989 CarswellBC 67 (S.C.C.) — followed

*Anns v. Merton London Borough Council* (1977), *(sub nom. Anns v. London Borough of Merton)* [1977] 2 All E.R. 492, [1978] A.C. 728, [1977] 2 W.L.R. 1024, 121 S.J. 377, [1977] UKHL 4 (U.K. H.L.) — considered

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2000), 2000 CarswellOnt 3707, *(sub nom. Authorson v. Canada (Attorney General))* 53 O.R. (3d) 221, *(sub nom. Authorson v. Canada (Attorney General))* 84 C.R.R. (2d) 211 (Ont. S.C.J.) — followed

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2002), *(sub nom. Authorson v. Canada (Attorney General))* 157 O.A.C. 278, 58 O.R. (3d) 417, 2002 C.E.B. & P.G.R. 8448 (note), 2002 CarswellOnt 815, 33 C.C.P.B. 1, 215 D.L.R. (4th) 496, *(sub nom. Authorson v. Canada (Attorney General))* 92 C.R.R. (2d) 224 (Ont. C.A.) — referred to

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2003), *(sub nom. Authorson v. Canada (Attorney General))* 2003 C.E.B. & P.G.R. 8051, *(sub nom. Authorson v. Canada (Attorney General))* 227 D.L.R. (4th) 385, *(sub nom. Authorson v. Canada (Attorney General))* 109 C.R.R. (2d) 220, *(sub nom. Authorson v. Canada (Attorney General))* 306 N.R. 335, *(sub nom. Authorson v. Canada (Attorney General))* 66 O.R. (3d) 734 (note), *(sub nom. Authorson v. Canada (Attorney General))* [2003] 2 S.C.R. 40, 2003 CarswellOnt 2773, 2003 CarswellOnt 2774, 2003 SCC 39, 36 C.C.P.B. 29, *(sub nom. Authorson v. Canada (Attorney General))* 175 O.A.C. 363, 4 Admin. L.R. (4th) 167 (S.C.C.) — referred to

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

*B. (K.L.) v. British Columbia* (2003), 2003 CarswellBC 2405, 2003 CarswellBC 2406, 2003 SCC 51, 309 N.R. 306, [2003] 2 S.C.R. 403, 18 B.C.L.R. (4th) 1, 44 R.F.L. (5th) 245, 187 B.C.A.C. 42, 307 W.A.C. 42, 38 C.P.C. (5th) 199, [2003] R.R.A. 1065, 230 D.L.R. (4th) 513, [2003] 11 W.W.R. 203, 19 C.C.L.T. (3d) 66, 2004 C.L.L.C. 210-014 (S.C.C.) — followed

*Bennett v. British Columbia* (2009), 77 C.C.P.B. 56, 2009 BCSC 1358, 2009 CarswellBC 2635, 2009 C.E.B. & P.G.R. 8363 (B.C. S.C.) — referred to

*Brewer Brothers v. Canada (Attorney General)* (1991), 1991 CarswellNat 796, 8 C.C.L.T. (2d) 45, 129 N.R. 3, [1992] 1 F.C. 25, 80 D.L.R. (4th) 321, 1991 CarswellNat 170, 45 F.T.R. 325 (note) (Fed. C.A.) — distinguished

*Broome v. Prince Edward Island* (2010), 918 A.P.R. 24, 297 Nfld. & P.E.I.R. 24, [2010] 1 S.C.R. 360, 400 N.R. 148, 317 D.L.R. (4th) 218, 73 C.C.L.T. (3d) 1, 2010 CarswellPEI 20, 2010 CarswellPEI 21, 2010 SCC 11 (S.C.C.) — followed

*Childs v. Desormeaux* (2006), 30 M.V.R. (5th) 1, 80 O.R. (3d) 558 (note), 210 O.A.C. 315, 2006 CarswellOnt 2710, 2006 CarswellOnt 2711, 2006 SCC 18, 347 N.R. 328, 266 D.L.R. (4th) 257, 39 C.C.L.T. (3d) 163, [2006] 1 S.C.R. 643, [2006] R.R.A. 245 (S.C.C.) — followed

*Cooper v. Hobart* (2001), [2002] 1 W.W.R. 221, 2001 CarswellBC 2502, 2001 CarswellBC 2503, 2001 SCC 79, 8 C.C.L.T. (3d) 26, 206 D.L.R. (4th) 193, 96 B.C.L.R. (3d) 36, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 277 N.R. 113, [2001] 3 S.C.R. 537, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 160 B.C.A.C. 268, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 261 W.A.C. 268 (S.C.C.) — followed

*D. (B.) v. Children's Aid Society of Halton (Region)* (2007), 39 R.F.L. (6th) 245, 49 C.C.L.T. (3d) 1, 284 D.L.R. (4th) 682, 2007 CarswellOnt 4789, 2007 CarswellOnt 4790, 2007 SCC 38, 365 N.R. 302, 227 O.A.C. 161, *(sub nom. Syl Apps Secure Treatment Centre v. D. (B.))* [2007] 3 S.C.R. 83, 86 O.R. (3d) 720 (note) (S.C.C.) — followed

*Design Services Ltd. v. R.* (2008), 69 C.L.R. (3d) 1, 55 C.C.L.T. (3d) 1, *(sub nom. Design Services Ltd. v. Canada)* 293 D.L.R. (4th) 437, *(sub nom. Design Services Ltd. v. Canada)* 374 N.R. 77, 64 C.C.L.I. (4th) 159, 2008 SCC 22, 2008 CarswellNat 1298, 2008 CarswellNat 1299, *(sub nom. Design Services Ltd. v. Canada)* [2008] 1 S.C.R. 737 (S.C.C.) — followed

*Drady v. Canada (Minister of Health)* (2007), 2007 CarswellOnt 4631 (Ont. S.C.J.) — referred to

*Drady v. Canada (Minister of Health)* (2008), 270 O.A.C. 1, 300 D.L.R. (4th) 443, 68 C.P.C. (6th) 306, 2008 CarswellOnt 5662, 2008 ONCA 659 (Ont. C.A.) — referred to

*Drady v. Canada (Minister of Health)* (2009), 260 O.A.C. 399 (note), 2009 CarswellOnt 2345, 2009 CarswellOnt 2346, [2009] 1 S.C.R. viii (note), 396 N.R. 396 (note) (S.C.C.) — referred to

*Eurig Estate, Re* (1998), *(sub nom. Eurig Estate v. Ontario Court (General Division), Registrar)* 114 O.A.C. 55, 1998 CarswellOnt 3950, 1998 CarswellOnt 3951, 40 O.R. (3d) 160 (headnote only), [2000] 1 C.T.C. 284, 165 D.L.R. (4th) 1, *(sub nom. Eurig Estate v. Ontario Court (General Division), Registrar)* 231 N.R. 55, 23 E.T.R. (2d) 1, [1998] 2 S.C.R. 565 (S.C.C.) — followed

*Frame v. Smith* (1987), 1987 CarswellOnt 969, 78 N.R. 40, [1987] 2 S.C.R. 99, 42 D.L.R. (4th) 81, 23 O.A.C. 84, 42 C.C.L.T. 1, [1988] 1 C.N.L.R. 152, 9 R.F.L. (3d) 225, 1987 CarswellOnt 347 (S.C.C.) — considered

*Garland v. Consumers' Gas Co.* (2004), 2004 CarswellOnt 1558, 2004 CarswellOnt 1559, 2004 SCC 25, 72 O.R.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

(3d) 80 (note), 237 D.L.R. (4th) 385, 319 N.R. 38, 43 B.L.R. (3d) 163, 9 E.T.R. (3d) 163, 42 Alta. L. Rev. 399, 186 O.A.C. 128, [2004] 1 S.C.R. 629 (S.C.C.) — followed

*Gorecki v. Canada (Attorney General)* (2006), 2006 CarswellOnt 1745, 265 D.L.R. (4th) 206, 208 O.A.C. 368, 2006 C.E.B. & P.G.R. 8191 (Ont. C.A.) — considered

*Guerin v. R.* (1984), 59 B.C.L.R. 301, 1984 CarswellNat 693, 1984 CarswellNat 813, [1984] 6 W.W.R. 481, *(sub nom. Guerin v. Canada)* [1984] 2 S.C.R. 335, 13 D.L.R. (4th) 321, *(sub nom. Guerin v. Canada)* 55 N.R. 161, [1985] 1 C.N.L.R. 120, 20 E.T.R. 6, 36 R.P.R. 1 (S.C.C.) — followed

*Harris v. R.* (2001), 2001 FCT 1408, 2001 CarswellNat 2887, 2001 CarswellNat 2888, *(sub nom. Harris v. Minister of National Revenue)* 214 F.T.R. 1, [2002] 1 C.T.C. 243, *(sub nom. Harris v. Canada)* [2002] 2 F.C. 484 (Fed. T.D.) — considered

*Hodgkinson v. Simms* (1994), 57 C.P.R. (3d) 1, 5 E.T.R. (2d) 1, [1994] 3 S.C.R. 377, 95 D.T.C. 5135, 97 B.C.L.R. (2d) 1, 117 D.L.R. (4th) 161, 171 N.R. 245, 1994 CarswellBC 438, 1994 CarswellBC 1245, [1994] 9 W.W.R. 609, 49 B.C.A.C. 1, 80 W.A.C. 1, 22 C.C.L.T. (2d) 1, 16 B.L.R. (2d) 1, 6 C.C.L.S. 1 (S.C.C.) — followed

*Hogan v. Newfoundland (Attorney General)* (2000), 2000 NFCA 12, 189 Nfld. & P.E.I.R. 183, 571 A.P.R. 183, 183 D.L.R. (4th) 225, 2000 CarswellNfld 47, 72 C.R.R. (2d) 1 (Nfld. C.A.) — considered

*Hollick v. Metropolitan Toronto (Municipality)* (2001), *(sub nom. Hollick v. Toronto (City))* 56 O.R. (3d) 214 (headnote only), *(sub nom. Hollick v. Toronto (City))* 205 D.L.R. (4th) 19, *(sub nom. Hollick v. Toronto (City))* [2001] 3 S.C.R. 158, *(sub nom. Hollick v. Toronto (City))* 2001 SCC 68, 2001 CarswellOnt 3577, 2001 CarswellOnt 3578, 24 M.P.L.R. (3d) 9, 13 C.P.C. (5th) 1, 277 N.R. 51, 42 C.E.L.R. (N.S.) 26, 153 O.A.C. 279 (S.C.C.) — followed

*Hunt v. T & N plc* (1990), 1990 CarswellBC 216, 43 C.P.C. (2d) 105, 117 N.R. 321, 4 C.O.H.S.C. 173 (headnote only), *(sub nom. Hunt v. Carey Canada Inc.)* [1990] 6 W.W.R. 385, 49 B.C.L.R. (2d) 273, *(sub nom. Hunt v. Carey Canada Inc.)* 74 D.L.R. (4th) 321, [1990] 2 S.C.R. 959, 1990 CarswellBC 759, 4 C.C.L.T. (2d) 1 (S.C.C.) — followed

*International Corona Resources Ltd. v. LAC Minerals Ltd.* (1989), 44 B.L.R. 1, 35 E.T.R. 1, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 69 O.R. (2d) 287, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* [1989] 2 S.C.R. 574, 6 R.P.R. (2d) 1, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 26 C.P.R. (3d) 97, 1989 CarswellOnt 126, 1989 CarswellOnt 965 (S.C.C.) — considered

*Kingstreet Investments Ltd. v. New Brunswick (Department of Finance)* (2007), 2007 CarswellNB 6, 2007 CarswellNB 7, 2007 SCC 1, 355 N.R. 336, 25 B.L.R. (4th) 1, 51 Admin. L.R. (4th) 184, *(sub nom. Kingstreet Investments Ltd. v. New Brunswick)* [2007] 1 S.C.R. 3, 2007 D.T.C. 5041 (Fr.), 2007 D.T.C. 5029 (Eng.), 276 D.L.R. (4th) 342, 309 N.B.R. (2d) 255, 799 A.P.R. 255 (S.C.C.) — considered

*Nielsen v. Kamloops (City)* (1984), [1984] 5 W.W.R. 1, 1984 CarswellBC 476, 66 B.C.L.R. 273, [1984] 2 S.C.R. 2, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1, 29 C.C.L.T. 97, 8 C.L.R. 1, 26 M.P.L.R. 81, 1984 CarswellBC 821 (S.C.C.) — considered

*Odhavji Estate v. Woodhouse* (2003), 19 C.C.L.T. (3d) 163, [2004] R.R.A. 1, 233 D.L.R. (4th) 193, 11 Admin. L.R. (4th) 45, [2003] 3 S.C.R. 263, 70 O.R. (3d) 253 (note), 2003 SCC 69, 2003 CarswellOnt 4851, 2003 CarswellOnt 4852, 312 N.R. 305, 180 O.A.C. 201 (S.C.C.) — referred to

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

*Pacific National Investments Ltd. v. Victoria (City)* (2004), 34 B.C.L.R. (4th) 1, 327 N.R. 100, [2004] 3 S.C.R. 575, 206 B.C.A.C. 99, 338 W.A.C. 99, 42 C.L.R. (3d) 76, [2005] 3 W.W.R. 1, 3 M.P.L.R. (4th) 1, 2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, 245 D.L.R. (4th) 211 (S.C.C.) — considered

*Peel (Regional Municipality) v. Canada* (1992), *(*sub nom. *Peel (Regional Municipality) v. Ontario)* 144 N.R. 1, 1992 CarswellNat 15, 55 F.T.R. 277 (note), 12 M.P.L.R. (2d) 229, 98 D.L.R. (4th) 140, [1992] 3 S.C.R. 762, 59 O.A.C. 81, 1992 CarswellNat 659 (S.C.C.) — considered

*Perez v. Galambos* (2009), 97 B.C.L.R. (4th) 1, [2009] 12 W.W.R. 193, *(*sub nom. *Galambos v. Perez)* [2009] 3 S.C.R. 247, 394 N.R. 209, 70 C.C.L.T. (3d) 167, 312 D.L.R. (4th) 220, 276 B.C.A.C. 272, 468 W.A.C. 272, 2009 CarswellBC 2787, 2009 CarswellBC 2788, 2009 SCC 48 (S.C.C.) — followed

*R. v. Sparrow* (1990), 1990 CarswellBC 105, 1990 CarswellBC 756, 70 D.L.R. (4th) 385, 111 N.R. 241, [1990] 1 S.C.R. 1075, [1990] 3 C.N.L.R. 160, 46 B.C.L.R. (2d) 1, 56 C.C.C. (3d) 263, [1990] 4 W.W.R. 410 (S.C.C.) — considered

*Roberts v. R.* (2002), 2002 CarswellNat 3438, 2002 CarswellNat 3439, *(*sub nom. *Wewaykum Indian Band v. Canada)* 2002 SCC 79, *(*sub nom. *Wewaykum Indian Band v. Canada)* [2003] 1 C.N.L.R. 341, *(*sub nom. *Wewaykum Indian Band v. Canada)* 220 D.L.R. (4th) 1, *(*sub nom. *Wewaykum Indian Band v. Canada)* 297 N.R. 1, *(*sub nom. *Wewaykum Indian Band v. Canada)* [2002] 4 S.C.R. 245, *(*sub nom. *Wewaykum Indian Band v. Canada)* 236 F.T.R. 147 (note) (S.C.C.) — followed

*Sagharian (Guardian ad litem of) v. Ontario (Minister of Education)* (2008), *(*sub nom. *Sagharian (Litigation Guardian of) v. Ontario (Minister of Education))* 172 C.R.R. (2d) 105, 2008 ONCA 411, 2008 CarswellOnt 2888 (Ont. C.A.) — considered

*Ultramares Corp. v. Touche* (1931), 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (U.S. N.Y. Ct. App.) — considered

*Welbridge Holdings Ltd. v. Greater Winnipeg (Municipality)* (1970), [1971] S.C.R. 957, 22 D.L.R. (3d) 470, [1972] 3 W.W.R. 433, 1970 CarswellMan 33, 1970 CarswellMan 83 (S.C.C.) — considered

*620 Connaught Ltd. v. Canada (Attorney General)* (2008), 2008 SCC 7, 290 D.L.R. (4th) 385, 371 N.R. 200, 2008 G.T.C. 1194 (Eng.), [2008] 1 S.C.R. 131, 74 Admin. L.R. (4th) 1, 2008 CarswellNat 399, 2008 CarswellNat 400 (S.C.C.) — considered

**Statutes considered:**

*Alberta Health Care Insurance Act*, R.S.A. 2000, c. A-20
    Generally — referred to

    s. 3 — considered

    s. 4 — considered

    s. 4(1) — considered

*Canada Health Act*, R.S.C. 1985, c. C-6
    Generally — referred to

    s. 2 "hospital services" — considered

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

s. 19(2) — considered

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11
    Generally — referred to

s. 1 — considered

s. 15 — pursuant to

s. 15(1) — pursuant to

s. 24(1) — considered

*Class Proceedings Act*, S.A. 2003, c. C-16.5
    Generally — referred to

ss. 30-33 — referred to

*Constitution Act, 1982*, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11, reprinted R.S.C. 1985, App. II, No. 44
    Generally — referred to

s. 52 — considered

*Hospitals Act*, R.S.A. 2000, c. H-12
    Generally — referred to

s. 1(c) "auxiliary hospital" — referred to

ss. 25-27 — referred to

s. 28(2) — referred to

s. 29 — referred to

s. 37 — referred to

s. 38(1) — referred to

s. 41 — referred to

s. 43(l) — referred to

*Indian Act*, R.S.C. 1952, c. 149
    s. 18(1) — referred to

*Nursing Homes Act*, R.S.A. 2000, c. N-7
    Generally — referred to

s. 1(a) "accommodation charge" — considered

s. 8 — considered

s. 8(1) — referred to

s. 8(2) — considered

s. 10(2) — considered

s. 12 — referred to

s. 19 — referred to

s. 24 — considered

*Pension Act*, R.S.C. 1927, c. 157
Generally — referred to

*Pension Act*, R.S.C. 1970, c. P-7
Generally — referred to

*Protection of Children Act*, R.S.B.C. 1960, c. 303
Generally — referred to

*Regional Health Authorities Act*, R.S.A. 2000, c. R-10
s. 5 — referred to

s. 9 — referred to

s. 13 — referred to

s. 14 — referred to

s. 21 — referred to

*Royal Proclamation*, 1763 (U.K.), reprinted R.S.C. 1985, App. II, No. 1
Generally — referred to

*War Veterans Allowance Act*, R.S.C. 1985, c. W-3
s. 15(2) — referred to

**Regulations considered:**

*Hospitals Act*, R.S.A. 2000, c. H-12
    *Hospitalization Benefits Regulation*, Alta. Reg. 244/90

s. 5(1)(d) — referred to

s. 5(8) — considered

*Nursing Homes Act*, R.S.A. 2000, c. N-7
    *Nursing Homes General Regulation*, Alta. Reg. 232/85

Generally — referred to

s. 4 — referred to

    *Nursing Homes Operation Regulation*, Alta. Reg. 258/85

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    13

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

Generally — referred to

s. 3(1) — considered

s. 8 — referred to

s. 9 — referred to

APPEAL from judgment reported at *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197 (Alta. C.A.).

POURVOI formé à l'encontre d'un jugement publié à *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197 (Alta. C.A.).

*McLachlin C.J.C.*:

1    It is a sad reality of life that as people age they may become unable to care for themselves and be obliged to live in special facilities providing greater or lesser degrees of assistance and medical care. In Alberta, chronic care for the elderly is provided through nursing homes and auxiliary hospitals. In principle, the government of Alberta is responsible for the costs of residents' medical care, but residents may be asked to contribute to the costs of their housing and meals through the payment of accommodation charges. In this case, 12,500 residents of Alberta's long-term care facilities ("LTCFs") sue as a class, alleging that the government artificially elevated the required resident contributions to subsidize medical expenses that are properly the responsibility of government.

2    The class has filed a statement of claim in which it alleges that the government's conduct constitutes a breach of fiduciary duty, negligence, bad faith in the exercise of discretion and/or unjust enrichment. The class seeks the return of monies or damages equivalent to the amount of any over-payment of the permitted accommodation charges. It is on the basis of these allegations that the action was certified. The class also brings an equality claim under s. 15 of the *Canadian Charter of Rights and Freedoms*, which Alberta does not seek to have struck but argues should not proceed by way of class action.

3    At certification, the Province of Alberta challenged the claims of fiduciary duty, negligence, and bad faith in the exercise of discretion. The certification judge struck out the plea of breach of fiduciary duty and partially limited the duty of care alleged in negligence (2008 ABQB 490, 94 Alta. L.R. (4th) 10 (Alta. Q.B.)). The Court of Appeal upheld the entitlement of the plaintiff class to pursue all three causes of action (2009 ABCA 403, 16 Alta. L.R. (5th) 1 (Alta. C.A.)). The Crown in Right of Alberta now appeals to this Court, contending that all the claims should be struck out and the action decertified.

4    This is not a decision on the merits of the action, but on whether the causes of action pleaded are supportable at law. The question is whether the pleadings, assuming the facts pleaded to be true, disclose a supportable cause of action. If it is plain and obvious that the claim cannot succeed, it should be struck out.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

5     I conclude that the pleas of fiduciary duty, negligence and bad faith in the exercise of discretion disclose no cause of action and should be struck out in their entirety, but that the claim of unjust enrichment should survive. It follows that the certification of the class is upheld, and the unjust enrichment claim may proceed to trial, together with the claim for discrimination under s. 15(1) of the *Charter*.


# I. Background


6     Since this action is at a preliminary stage and the facts as pleaded are assumed true for our purposes, it is unnecessary to exhaustively review the factual and statutory background. Nevertheless, a brief overview is helpful to understand the context of the claims made.


7     When this action was commenced, the Province of Alberta and nine Regional Health Authorities ("RHAs") administered and operated Alberta's health care regime under a number of interlocking statutes and regulations, including the *Alberta Health Care Insurance Act*, R.S.A. 2000, c. A-20, the *Nursing Homes Act*, R.S.A. 2000, c. N-7, and the *Hospitals Act*, R.S.A. 2000, c. H-12. The RHAs received block-funding from the Province to deliver health care services, and the RHAs were responsible for managing the provision of health services: *Regional Health Authorities Act*, R.S.A. 2000, c. R-10, s. 5. Alberta Health Services is the successor to the nine former RHAs. Although this action was brought against the RHAs as well as the Crown in Right of Alberta, the RHAs took no part in this appeal, and an action remains pending against them. The relief sought in this Court relates only to the Crown in Right of Alberta.


8     Under the *Canada Health Act*, R.S.C. 1985, c. C-6, a province does not qualify for contribution from the federal government for health care expenditures if the province permits user charges under its health care insurance plan, with certain exceptions. For example, user charges for "accommodation or meals provided to an in-patient who ... requires chronic care and is more or less permanently resident in a hospital or other institution" are allowed: *Canada Health Act*, s. 19(2). As a condition of funding, chronic care must be provided as an insured hospital service: *Canada Health Act*, s. 2.


9     In Alberta, the Province must pay for "benefits in respect of health services provided to residents [of the province]", unless exempted by statute or regulation: *Alberta Health Care Insurance Act*, s. 4(1). Generally, persons attending hospitals in Alberta are not liable for services insured under the *Canada Health Act*. User charges are permitted for accommodation and meals: *Hospitals Act*, ss. 38(1) and 43(*l*).


10     Nursing homes, or LTCFs, are regulated by the *Nursing Homes Act* and receive funding from both the Alberta government, by way of the RHAs, and the nursing home residents themselves. Nursing home operations — which are run by either private operators or the RHAs, not by the Province — may impose on residents an accommodation charge for housing and meals, not to exceed a maximum daily amount prescribed by regulation: *Nursing Homes Act*, ss. 8 and 24; *Nursing Homes Operation Regulation*, Alta. Reg. 258/85, s. 3(1). An "accommodation charge" is a "charge in respect of nursing home care payable by a resident for accommodation and meals in a nursing home or an approved [hospital that provides nursing home care]": *Nursing Homes Act*, ss. 1(a) and 10(2). "Basic care" costs remain the fiscal responsibility of the Province: *Alberta Health Care Insurance Act*, ss. 3 and 4.


11     Auxiliary hospitals, which also provide for the care of long-term or chronic patients, are funded and operated in the same way: *Hospitals Act*, ss. 1(c), 28(2) and 37, and *Ministerial Order* 1/2006. The accommodation charges paid by residents of auxiliary hospitals are governed by the *Hospitals Act*, s. 41, and the *Hospitalization Benefits Regulation*, Alta. Reg.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

244/90, s. 5(1)(d).

12      Collectively, these accommodation charges are the subject of the present action.

13      The representative plaintiffs are James Darwish, in his capacity as the personal representative of the estate of his mother, Johanna Darwish, and the Elder Advocates of Alberta Society, a non-profit group. Mr. Darwish was his mother's guardian and trustee when she lived in an LTCF; he is now her executor. When preparing her estate tax returns, he was advised by the local RHA that approximately two-thirds of the monthly accommodation charge his mother had been paying was for a "care component". He concluded that the remaining one-third had been allotted to accommodation and meals. Mr. Darwish contends that the allocation for accommodation and meals that residents must pay is more than required, and in effect requires residents to subsidize medical care costs that are entirely the responsibility of the Province, and for which Alberta is not entitled to charge residents under the legislative scheme. Together with the Elder Advocates, he commenced an action to recover the amount of the overpayment.

14      On August 1, 2003, Alberta's Minister of Health and Wellness promulgated the *Nursing Homes Operation Amendment Regulation*, Alta. Reg. 260/2003, s. 2, which raised the maximum accommodation charge payable by residents of the province's nursing homes and auxiliary hospitals. The plaintiffs' contention is that the Minister increased the permissible charge even though he was aware of a "past practice" on the part of LTCFs to apply the accommodation fees "to subsidize health care and off set care funding", and that, despite this knowledge, the Province instructed operators to charge the maximum allowable.

15      The representative plaintiffs sought to certify a class action under the *Class Proceedings Act*, S.A. 2003, c. C-16.5, maintaining that the Crown and the RHAs have failed to ensure that the monies paid by the residents of LTCFs for "accommodation and meals" are used exclusively for that purpose. The pleadings allege that the Province is only allowed to charge for the *actual* cost of accommodation and meals, and not to use funds collected at the maximum level to subsidize basic care costs. They claim the residents of Alberta's chronic care facilities have been overcharged and seek return of the overpayment or damages.

## II. The Decisions of the Alberta Courts

16      The class consists of about 12,500 residents who are institutionalized in LTCFs in Alberta. More than half are 85 years of age or older, and all have some form of chronic disability or incapacity. They are not capable of living on their own and require varying degrees of care, including help with feeding, toileting and other fundamental aspects of daily life.

17      The representative plaintiffs pleaded numerous causes of action: (i) breach of fiduciary duty; (ii) breach of duty of care; (iii) breach of contract; (iv) unjust enrichment; (v) *ultra vires* action; (vi) *ultra vires* tax; and (vii) breach of s. 15(1) of the *Charter*. "Bad faith in the exercise of discretion" was also pleaded. I refer throughout to the pleas contained in the plaintiffs' Fresh Statement of Claim No. 2, issued March 1, 2010.

18      The certification judge approved the class definition and 67 common questions (2008 ABQB 490, 94 Alta. L.R. (4th) 10 (Alta. Q.B.)). In deciding to certify those questions, Justice Greckol declined to certify others based on fiduciary duty and

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

*ultra vires* tax, striking them from the claim as they were bound to fail. She also struck a claim for a duty of care with respect to *setting* the accommodation charges, but permitted the plea of negligence in monitoring the collection and management of accommodation charges to stand. Finding that the requirements of certification were made out, Greckol J. concluded that a class action was the preferable procedure.

19     The Court of Appeal dismissed an appeal by the Province and permitted a cross-appeal by the representative plaintiffs (2009 ABCA 403, 16 Alta. L.R. (5th) 1 (Alta. C.A.)). In unanimous reasons, the court reinstated the plaintiffs' claim that Alberta owed and had breached a fiduciary duty to the class. The Province now appeals to this Court.

## III. Analysis

20     The test for striking out pleadings is not in dispute. The question at issue is whether the disputed claims disclose a cause of action, assuming the facts pleaded to be true. If it is plain and obvious that a claim cannot succeed, then it should be struck out: See *Hollick v. Metropolitan Toronto (Municipality)*, 2001 SCC 68, [2001] 3 S.C.R. 158 (S.C.C.), at para. 25; *Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.), at p. 980.

21     The issue we must decide on each of the disputed claims is whether this test is met and, separately, whether the class action should be decertified.

### A. The Claim for Breach of Fiduciary Duty

22     The question is whether the pleading of breach of fiduciary duty discloses a supportable cause of action, taking all the facts pleaded as true: *Hollick*, at para. 25; *Hunt*, at p. 991. Fiduciary duty is a doctrine originating in trust. It requires that one party, the fiduciary, act with absolute loyalty toward another party, the beneficiary or *cestui que trust*, in managing the latter's affairs.

23     The plaintiff class argues that the categories of fiduciary duty are not closed and that basic principle supports their claim. The representative plaintiffs contend that they have pleaded sufficient facts to make it at least arguable that such a duty is owed to the vulnerable members of the class. In their view, fiduciary duty is a flexible principle aimed at protecting the vulnerable from abuses of power and should not be burdened by high hurdles or confined to limited categories.

24     Alberta, by contrast, argues that it does not owe the plaintiff class a fiduciary duty on the facts pleaded. In its view, the doctrine that permits imposition of a fiduciary duty on a government is narrowly confined, and does not extend to a claim such as this. Together with the intervening Attorneys General of Canada and British Columbia, Alberta asks the Court to clarify the approach to identifying fiduciary duties owed by the government to its citizens and to hold that no duty lies in the circumstances before us.

25     This case thus raises the question of when governments, as opposed to individuals, may be bound by a fiduciary duty. Fiduciary duty originated as a private law doctrine. In the past, state actors have been held to be under a fiduciary duty in limited circumstances, namely, in discharging the Crown's special responsibilities towards Aboriginal peoples and where the Crown is acting in a private capacity, as in its role as the public guardian and trustee. This claim does not fall within either of

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

these situations.

26      In my view, the same broad principles apply to private actors and governments, though they may play out differently where the alleged fiduciary is a public authority. I will therefore proceed by examining the requirements of imposing fiduciary duty generally, and then turn to examine how those requirements apply in the governmental context.

*(1) The General Requirements for Imposition of a Fiduciary Duty*

27      The plaintiff class argues that, in addition to traditionally recognized categories like trustee or solicitor-client relationships, a fiduciary duty more broadly may arise whenever one person exercises power over another "vulnerable" person. They rely on *Frame v. Smith*, [1987] 2 S.C.R. 99 (S.C.C.), where Wilson J., in dissenting reasons later adopted and applied in *International Corona Resources Ltd. v. LAC Minerals Ltd.*, [1989] 2 S.C.R. 574 (S.C.C.), outlined the hallmarks of a fiduciary duty:

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:
>
> > (1) The fiduciary has scope for the exercise of some discretion or power.
> >
> > (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
> >
> > (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power. [p. 136]

28      It is now clear that vulnerability alone is insufficient to support a fiduciary claim. As Cromwell J. explained in *Perez v. Galambos*, 2009 SCC 48, [2009] 3 S.C.R. 247 (S.C.C.), at para. 67:

> An important focus of fiduciary law is the protection of one party against abuse of power by another in certain types of relationships or in particular circumstances. However, to assert that the protection of the vulnerable is the role of fiduciary law puts the matter too broadly. The law seeks to protect the vulnerable in many contexts and through many different doctrines.

Cromwell J. concluded, at para. 68, that:

> [68] ... while vulnerability in the broad sense resulting from factors external to the relationship is a relevant consideration, a more important one is the extent to which vulnerability arises from the relationship: *Hodgkinson*, at p. 406.
>
> [Emphasis added.]

29      As useful as the three "hallmarks" referred to in *Frame* are in explaining the source fiduciary duties, they are not a complete code for identifying fiduciary duties. It is now clear from the foundational principles outlined in *Guerin v. R.*, [1984] 2 S.C.R. 335 (S.C.C.), *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377 (S.C.C.), and *Galambos* that the elements outlined

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

in the paragraphs that follow are those which identify the existence of a fiduciary duty in cases not covered by an existing category in which fiduciary duties have been recognized.

30    First, the evidence must show that the alleged fiduciary gave an undertaking of responsibility to act in the best interests of a beneficiary: *Galambos*, at paras. 66, 71 and 77-78; and *Hodgkinson*, *per* La Forest J., at pp. 409-10. As Cromwell J. wrote in *Galambos*, at para. 75: "what is required in all cases is an undertaking by the fiduciary, express or implied, to act in accordance with the duty of loyalty reposed on him or her."

31    The existence and character of the undertaking is informed by the norms relating to the particular relationship: *Galambos*, at para. 77. The party asserting the duty must be able to point to a forsaking by the alleged fiduciary of the interests of all others in favour of those of the beneficiary, in relation to the specific legal interest at stake.

32    The undertaking may be found in the relationship between the parties, in an imposition of responsibility by statute, or under an express agreement to act as trustee of the beneficiary's interests. As stated in *Galambos*, at para. 77:

> The fiduciary's undertaking may be the result of the exercise of statutory powers, the express or implied terms of an agreement or, perhaps, simply an undertaking to act in this way. In cases of *per se* fiduciary relationships, this undertaking will be found in the nature of the category of relationship in issue. <u>The critical point is that in both *per se* and ad hoc fiduciary relationships, there will be some undertaking on the part of the fiduciary to act with loyalty</u>.

> [Emphasis added.]

33    Second, the duty must be owed to a defined person or class of persons who must be vulnerable to the fiduciary in the sense that the fiduciary has a discretionary power over them. Fiduciary duties do not exist at large; they are confined to specific relationships between particular parties. *Per se*, historically recognized, fiduciary relationships exist as a matter of course within the traditional categories of trustee-*cestui qui trust*, executor-beneficiary, solicitor-client, agent-principal, director-corporation and guardian-ward or parent-child. By contrast, *ad hoc* fiduciary relationships must be established on a case-by-case basis.

34    Finally, to establish a fiduciary duty, the claimant must show that the alleged fiduciary's power may affect the legal or substantial practical interests of the beneficiary: *Frame*, *per* Wilson J., at p. 142.

35    In the traditional categories of fiduciary relationship, the nature of the relationship itself defines the interest at stake. However, a party seeking to establish an *ad hoc* duty must be able to point to an identifiable legal or vital practical interest that is at stake. The most obvious example is an interest in property, although other interests recognized by law may also be protected.

36    In summary, for an *ad hoc* fiduciary duty to arise, the claimant must show, in addition to the vulnerability arising from the relationship as described by Wilson J. in *Frame*; (1) an undertaking by the alleged fiduciary to act in the best interests of the alleged beneficiary or beneficiaries; (2) a defined person or class of persons vulnerable to a fiduciary's control (the beneficiary or beneficiaries); and (3) a legal or substantial practical interest of the beneficiary or beneficiaries that stands to be adversely affected by the alleged fiduciary's exercise of discretion or control.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

*(2) Fiduciary Duties in the Governmental Context*

37      The general principles discussed above apply not only to relationships between private actors, but also to cases where it is alleged that the government owes a fiduciary duty to an individual or class of individuals. However, the special characteristics of governmental responsibilities and functions mean that governments will owe fiduciary duties only in limited and special circumstances. As Dickson J., as he then was, wrote for the majority in *Guerin*, at p. 385:

> It should be noted that fiduciary duties generally arise only with regard to obligations originating in a private law context. <u>Public law duties, the performance of which requires the exercise of discretion, do not typically give rise to a fiduciary relationship.</u> As the "political trust" cases indicate, the Crown is not normally viewed as a fiduciary in the exercise of its legislative or administrative function.

> [Emphasis added.]

38      Binnie J., for the Court, made the same point in *Roberts v. R.*, *(sub nom. Wewaykum Indian Band v. Canada)* 2002 SCC 79, [2002] 4 S.C.R. 245 (S.C.C.) [hereinafter *Wewaykum*], at para. 96: "The Crown can be no ordinary fiduciary; it wears many hats and represents many interests, some of which cannot help but be conflicting". *Guerin* exceptionally recognized that the Crown was under a fiduciary duty in the management of Indian lands for their benefit. But the Court there noted, at p. 385, that the fiduciary duty owed to the Aboriginal peoples of Canada is unique and grounded in analogy to private law:

> The mere fact, however, that it is the Crown which is obligated to act on the Indians' behalf does not of itself remove the Crown's obligation from the scope of the fiduciary principle. As was pointed out earlier, the Indians' interest in land is an independent legal interest. It is not a creation of either the legislative or executive branches of government. <u>The Crown's obligation to the Indians with respect to that interest is therefore not a public law duty. While it is not a private law duty in the strict sense either, it is nonetheless in the nature of a private law duty. Therefore, in this *sui generis* relationship, it is not improper to regard the Crown as a fiduciary.</u>

> [Emphasis added.]

Noting the unique nature of the fiduciary duty owed by the Crown in the Aboriginal context, courts have suggested that this duty must be distinguished from other relationships: *Hogan v. Newfoundland (Attorney General)* (2000), 183 D.L.R. (4th) 225 (Nfld. C.A.), at paras. 66-67.

39      In *R. v. Sparrow*, [1990] 1 S.C.R. 1075 (S.C.C.), the Court confirmed that the fiduciary duty owed by the Crown to Aboriginal peoples with respect to their lands is *sui generis*, at p. 1108:

> <u>The *sui generis* nature of Indian title, and the historic powers and responsibility assumed by the Crown constituted the source of such a fiduciary obligation.</u> In our opinion, *Guerin*, together with *R. v. Taylor and Williams* (1981), 34 O.R. (2d) 360, ground a general guiding principle for s. 35(1). That is, the Government has the responsibility to act in a fiduciary capacity with respect to aboriginal peoples. The relationship between the Government and aboriginals is trust-like, rather than adversarial, and contemporary recognition and affirmation of aboriginal rights must be defined in light of this historic relationship.

> [Emphasis added.]

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

Similarly, in *Wewaykum*, Binnie J. suggested that the fiduciary duty owed by the Crown to Aboriginal peoples is not restricted to instances where the facts raise "considerations 'in the nature of a private law duty'" (para. 74).

40      The unique and historic nature of Crown-Aboriginal relations described in these cases negates the plaintiff class' assertion that they serve as a template for the duty of the government to citizens in other contexts. The same applies to the only other situation where a Crown fiduciary duty has been recognized — such as where the Crown acts as the public guardian and trustee.

41      The special nature of the governmental context impacts on the requirements of a fiduciary relationship just discussed.

42      First, the requirement of an undertaking to act in the alleged beneficiary's interest will typically be lacking where what is at issue is the exercise of a government power or discretion.

43      The duty is one of utmost loyalty to the beneficiary. As Finn states, the fiduciary principle's function "*is not to mediate between interests*. It is to secure the paramountcy of *one side's* interests ... The beneficiary's interests are to be protected. This is achieved through a regime designed to secure loyal service of those interests" (P. D. Finn, "The Fiduciary Principle" in T. G. Youdon (ed.), *Equity, Fiduciaries and Trusts* (1989), at p. 27 (underlining added). See also *Hodgkinson*, *per* Sopinka J. and McLachlin J., as she then was, dissenting, at p. 468.

44      Compelling a fiduciary to put the best interests of the beneficiary before their own is thus essential to the relationship. Imposing such a burden on the Crown is inherently at odds with its duty to act in the best interests of society as a whole, and its obligation to spread limited resources among competing groups with equally valid claims to its assistance: *Sagharian (Guardian ad litem of) v. Ontario (Minister of Education)*, 2008 ONCA 411, 172 C.R.R. (2d) 105 (Ont. C.A.), at paras. 47-49. The circumstances in which this will occur are few. The Crown's broad responsibility to act in the public interest means that situations where it is shown to owe a duty of loyalty to a particular person or group will be rare: see *Harris v. R.*, 2001 FCT 1408, [2002] 2 F.C. 484 (Fed. T.D.), at para. 178.

45      If the undertaking is alleged to flow from a statute, the language in the legislation must clearly support it: *B. (K.L.) v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403 (S.C.C.), at para. 40; *Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2000), 53 O.R. (3d) 221 (Ont. S.C.J.), at para. 28, aff'd (2002), 58 O.R. (3d) 417 (Ont. C.A.), at para. 73, rev'd on other grounds, 2003 SCC 39, [2003] 2 S.C.R. 40 (S.C.C.). The mere grant to a public authority of discretionary power to affect a person's interest does not suffice. A thorough examination of the provisions in issue is mandatory: *Guerin* addressed the *Indian Act*, R.S.C. 1952, c. 149, s. 18(1) (which confirms the Crown's duty to manage Indian lands for their use and benefit); *Authorson* dealt with the *Pension Act*, R.S.C. 1970, c. P-7, the *War Veterans Allowance Act*, R.S.C. 1985, c. W-3, s. 15(2), and the *Pension Act*, R.S.C. 1927, c. 157 (which set out the obligation of the government to hold and administer funds on behalf and for the benefit of incapable veterans and their dependants); and *B. (K.L.)* found that the language in the *Protection of Children Act*, R.S.B.C. 1960, c. 303, did not encompass the duty asserted.

46      If the alleged undertaking arises by implication from the relationship between the parties, the content of the obligation owed by the government will vary depending on the nature of the relationship, and should be determined by focussing on analogous cases: *B. (K.L.)*, at para. 41.

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

47     Generally speaking, a strong correspondence with one of the traditional categories of fiduciary relationship — trustee-*cestui qui trust*, executor-beneficiary, solicitor-client, agent-principal, director-corporation, and guardian-ward or parent-child — is a precondition to finding an implied fiduciary duty on the government.

48     In sum, while it is not impossible to meet the requirement of an undertaking by a government actor, it will be rare. The necessary undertaking is met with respect to Aboriginal peoples by clear government commitments from the *Royal Proclamation* of 1763 to the *Constitution Act, 1982* and considerations akin to those found in the private sphere. It may also be met where the relationship is akin to one where a fiduciary duty has been recognized on private actors. But a general obligation to the public or sectors of the public cannot meet the requirement of an undertaking.

49     For similar reasons, where the alleged fiduciary is the government, it may be difficult to establish the second requirement of a defined person or class of persons vulnerable to the fiduciary's exercise of discretionary power. The government, as a general rule, must act in the interest of all citizens: *Bennett v. British Columbia*, 2009 BCSC 1358 (B.C. S.C.), at paras. 61 and 71; and *Drady v. Canada (Minister of Health)* [2007 CarswellOnt 4631 (Ont. S.C.J.)], 2007 CanLII 27970, at para. 28, aff'd 2008 ONCA 659, 300 D.L.R. (4th) 443 (Ont. C.A.), leave to appeal ref'd [2009] 1 S.C.R. viii (note) (S.C.C.). It is entitled to make distinctions between different groups in the imposition of burdens or provision of benefits, subject to s. 15 of the *Charter*, which forbids discrimination. As stated in *Galambos*, the claimant must point to a deliberate forsaking of the interests of all others in favour of himself or his class. In the Aboriginal context, an exclusive duty in relation to Aboriginal lands is established by the special Crown responsibilities owed to this sector of the population and none other. Similarly, where the government duty is in effect a private duty being carried out by government, this requirement may be established. Outside such cases, a specific class of persons to whom the government owes an exclusive duty of loyalty is difficult to posit.

50     No fiduciary duty is owed to the public as a whole, and generally an individual determination is required to establish that the fiduciary duty is owed to a particular person or group. A fiduciary duty can exist toward a class — for example, adults in need of a guardian or trustee, or children in need of a guardian — but for a declaration that an individual is owed a duty, a person must bring himself within the class on the basis of his unique situation. Group duties have not often been found; thus far, only the Crown's duty toward Aboriginal peoples in respect of lands held in trust for them has been recognized on a collective basis.

51     Finally, it may be difficult to establish the requirement that the government power attacked affects a legal or significant practical interest, where the alleged fiduciary is the government. It is not enough that the alleged fiduciary's acts impact generally on a person's well-being, property or security. The interest affected must be a specific *private law* interest to which the person has a pre-existing distinct and complete legal entitlement. Examples of sufficient interests include property rights, interests akin to property rights, and the type of fundamental human or personal interest that is implicated when the state assumes guardianship of a child or incompetent person. The entitlement must not be contingent on future government action. For example, in *Authorson*, the right to the funds had already fully vested in the veterans' hands *before* the Crown took on the responsibility for administration: *Authorson* (C.A.), at paras. 60, 73(b) and 73(h); in the Aboriginal context, see *Guerin*, at p. 385. In other circumstances, a statute that creates a complete legal entitlement might also give rise to a fiduciary duty on the part of government in relation to administering the interest.

52     Access to a benefit scheme without more will not constitute an interest capable of attracting a fiduciary duty. Although the receipt of a statutory benefit may affect a person's financial welfare, absent evidence that the legislature intended otherwise, the entitlement is a creation of public law and is subject to the government's public law obligations in the administration of the scheme.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    22

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

53    Moreover, the degree of control exerted by the government over the interest in question must be equivalent or analogous to direct administration of that interest before a fiduciary relationship can be said to arise. The type of legal control over an interest that arises from the ordinary exercise of statutory powers does not suffice. Otherwise, fiduciary obligations would arise in most day to day government functions making general action for the public good difficult or almost impossible.

54    It thus emerges that a rigorous application of the general requirements for fiduciary duty will of necessity limit the range of cases in which a fiduciary duty on the government is found. Claims against the government that fail to satisfy the legal requirements of a fiduciary duty should not be allowed to proceed in the speculative hope that they may ultimately succeed. The truism that the categories of fiduciary duty are not closed (as Dickson J. noted in *Guerin*, at p. 384) does not justify allowing hopeless claims to proceed to trial: see M. V. Ellis, *Fiduciary Duties in Canada* (loose-leaf), at pp. 19-3 and 19-24.10. Plaintiffs suing for breach of fiduciary duty must be prepared to have their claims tested at the pleadings stage, as for any cause of action.

*(3) Application to this Case*

55    I turn now to the application of these principles to the appeal before us. The core of the plaintiffs' pleading of fiduciary duty is found at para. 40 of the Fresh Statement of Claim No. 2:

> The Crown owed the <u>fiduciary duty to the Class members with respect to the implementation and administration of the</u> <u>Accommodation Charge to ensure that the Accommodation Fee was fair, reasonable and justifiable, that the</u> <u>Accommodation Fee reflects the cost of accommodation and meals, that the Accommodation Fee was</u> in their best interests, and that moneys paid pursuant to the Accommodation Charge would not be used to subsidize Health Care costs.
>
> [Emphasis added.]

See also paras. 32-42.

56    The plaintiffs' pleadings emphasize the vulnerability of the class members:

> 34. The Class members are frail, elderly, and have chronic disabilities. They are incapable of caring for themselves or living on their own. They are among the most vulnerable members of our society. A physician has determined that each Class member requires long-term care.

57    However, vulnerability alone is insufficient to ground a fiduciary obligation, as discussed earlier. In this case, their state of vulnerability does not arise from their relationship with Alberta: *Galambos*, at paras. 67-68. Moreover, as Alberta points out, class members will generally still be competent to manage their own affairs, or will be beneficiaries of duties owed by their own guardians and trustees; the Province is not responsible for them. They are not being denied care and though their financial situation may be affected by the levy of accommodation charges, that alone is not enough to warrant a fiduciary duty.

58    The plaintiffs do not point to anything in the legislation, or in the factual relationship pleaded, that supports an

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

undertaking by Alberta to act with undivided loyalty toward the claimant class members, in the setting, receipt and administration of the accommodation charges. The *Alberta Health Care Insurance Act* imposes an obligation on the Province to provide medical care, including chronic care, but provides no direction amounting to a statutory undertaking to act in the best interests of residents of Alberta generally, or in the best interests of residents residing in LTCFs in particular. Nor does the statute impose any obligation on the government to take into account anyone's interests in determining the contribution that may be sought from residents. There may be a trust relationship between *operators* and residents with respect to residents' property, but no similar trust relationship is established between the *Province* and residents: *Nursing Homes Act*, s. 8(1); *Nursing Homes General Regulation*, s. 4; *Nursing Homes Operation Regulation*, ss. 8-9.


59    Nor have the plaintiffs pleaded facts sufficient to establish an implied undertaking on the part of Alberta to act with undivided loyalty to the residents of LTCFs. They point to no analogous duty in private law. The facts pleaded do not assert any undertaking or any basis upon which such an undertaking could be posited.


60    Indeed, it is not clear that the pleadings allege that the Crown, as distinguished from individual actors, is under a fiduciary duty. Although the action was brought against Her Majesty the Queen in Right of Alberta, the allegations in the pleadings are against the Minister of Seniors and Community Supports and the Department of Alberta Health and Wellness. This makes it difficult to determine the second and third requirements of an undertaking to a defined group in relation to any legal or vital practical interests. The separate pleas against the RHAs may support a cause of action for breach of fiduciary duty, a matter not before us, but the pleas against the Crown do not. Absent pleadings fixing a specific undertaking on the Crown, how can we know to whom such a duty would be owed or indeed what duty is owed? Put simply, the pleadings against the Crown are too vague to permit the inference of a fiduciary duty on the Crown toward the plaintiff class.


61    Apart from these difficulties, the legal or substantial practical interests alleged in the pleadings to be affected by the Crown's exercise of authority is insufficient to attract a fiduciary duty. The pleadings speak of the right to chronic care and the right to be assessed a reasonable fee for the receipt of care. The entitlement to chronic care flows exclusively from statute, and no one contests that Alberta continues to provide such care. The allegation, at base, is that the plaintiffs are paying more than their meal and accommodation cost, with the result that the Province is offsetting its obligation to meet medical costs and thus pocketing money it is not entitled to pocket. The situation is not unlike that in *Gorecki v. Canada (Attorney General)* (2006), 208 O.A.C. 368 (Ont. C.A.), where Sharpe J.A. wrote, at para. 6:

> I agree with the motion judge's conclusion that it is plain and obvious that the action cannot succeed on the allegations of breach of fiduciary duty. The relationship between the Crown and the appellant flows entirely from the terms of the [Canada Pension Plan] and the statutory definition of that relationship bears none of the hallmarks of a fiduciary duty. The CPP confers no discretion on the Crown to act for the benefit of the appellant. The Crown does not undertake to administer CPP funds for the appellant's benefit. The only duty that the CPP imposes on the Crown or that the Crown assumes is the public law duty to fulfill the statutory terms of the CPP. This cannot be the source of a fiduciary duty owed to the appellant.


62    Finally, I note that the specific fiduciary duty that the plaintiffs seek to establish relates primarily to *setting* the accommodation charges by regulation. This is a *legislative* function of government. Where the government acts in the exercise of its legislative functions, courts have consistently held that a fiduciary duty does not arise: *Guerin*, at p. 385; *Wewaykum*, at para. 74. Deciding how to fund and implement insured health care services requires constant balancing of competing interests between all segments of the population, since everyone receives health care. The Crown would be unable to meet its obligations to the public at large if we were to hold it to a fiduciary standard of conduct for one group among so many others. This aspect of the claim is doomed to fail.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

63      In my view, the facts as pleaded, which are accepted as true for the purpose of the instant motion, do not establish a fiduciary duty on the Crown. Accordingly, I would strike the plea of breach of fiduciary duty.


### B. The Negligence Claim


64      The plaintiff class pleads that Alberta is in breach of a duty of care to its members to act with due care, i.e. without negligence. It pleads:

> 43. The Defendants owed the Class members a duty to exercise all reasonable care, skill, and diligence with respect to auditing, supervising, monitoring and administering (i) the Health Care benefits paid by the Crown to the Health Authorities, (ii) the Health Care benefits provided by the Health Authorities to Long Term Care Facilities and (iii) the Accommodation Fee paid by the Class members, to ensure that the Accommodation Fee was fair, just, and reasonable, to ensure that the Accommodation Fee reflected the actual cost of accommodation and meals, and that Accommodation Fees paid pursuant to the Accommodation Charge would not be used to subsidize Health Care costs.

> [Emphasis added.]


65      I note at the outset that the claim of negligence sits uncomfortably with the general thrust of the plaintiff class' grievance. That grievance, viewed broadly, appears mainly concerned with deliberate legislative and policy decisions. Hints of this remain in the way the negligence claim is cast: the duty is said to be "to ensure" rather than merely to take reasonable care. That said, the pleadings arguably evoke negligence in "auditing, supervising, monitoring and administering the health care benefit". The duty of care asserted with respect to setting the accommodation fees has been struck and is not appealed. It is therefore unnecessary to consider whether this pleading raises a triable cause of action in negligence.


66      The first and central question is whether the pleadings, assuming the facts alleged to be true, support a duty of care on Alberta to members of the plaintiff class. This requires us to determine first whether Alberta and the class members were in a relationship that gave rise to a *prima facie* duty of care, based on foreseeability and proximity. If a *prima facie* duty of care is established, the second step is to ask whether it is negated by policy considerations: See *Anns v. Merton London Borough Council (1977)*, [1978] A.C. 728 (U.K. H.L.); *Nielsen v. Kamloops (City)*, [1984] 2 S.C.R. 2 (S.C.C.); *Cooper v. Hobart*, 2001 SCC 79, [2001] 3 S.C.R. 537 (S.C.C.), at para. 30; and *Broome v. Prince Edward Island*, 2010 SCC 11, [2010] 1 S.C.R. 360 (S.C.C.), at para. 14.


67      The claim raised in this case has not been previously recognized as giving rise to a duty of care. Therefore, we must examine whether it meets the foregoing requirements for imposing a duty of care in negligence: *Childs v. Desormeaux*, 2006 SCC 18, [2006] 1 S.C.R. 643 (S.C.C.), at para. 15.


68      In this case, as in *Broome*, the plaintiff class relies on provincial statutory obligations as the source of a private duty of care. The allegation, in essence, is that statutory and regulatory duties brought Alberta into a relationship of proximity with members of the class, whom it was reasonably foreseeable would be affected by failure to discharge these duties in a non-negligent manner. The *Cooper* analysis applies to claims grounded in statutory duties. As the Court, *per* Cromwell J., stated in *Broome*, at para. 13:

> [13] [The *Anns/Kamloops*] test is the appropriate one even though the appellants mainly rely on statutory duties. Such duties do not generally, in and of themselves, give rise to private law duties of care. The *Anns/Kamloops* test determines

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

whether public as well as private actors owe a private law duty of care to individuals enabling them to sue the public actors in a civil suit.

69     Determining whether a duty of care lies on the government proceeds by "review of the relevant powers and duties of the [government body] under the Act": *Cooper*, at para. 45. See also *Broome*, at para. 20; *D. (B.) v. Children's Aid Society of Halton (Region)*, 2007 SCC 38, [2007] 3 S.C.R. 83 (S.C.C.), at para. 27.

70     In this case, the legislative scheme does not impose a duty on the Crown to act in relation to the class members with respect to the accommodation charges. A review of the relevant provisions discloses a general duty on the Minister to provide insured health care services: *Alberta Health Care Insurance Act*, s. 3. However, the plaintiffs have failed to point to any duty to audit, supervise, monitor or administer the funds related to the accommodation charges in the provisions. The *Nursing Homes Act* imposes no positive duty on the Crown, but grants only permissive monitoring powers. Reporting requirements are discretionary (i.e. at the demand of the Minister). While they flow up the chain of command (i.e. the RHA or operator must report to the Minister), the *Minister* need not respond: *Nursing Homes Act*, ss. 12 and 19. The same is true of the Act's regulations (*Nursing Homes General Regulation* and *Nursing Homes Operation Regulation*) and the *Regional Health Authorities Act*, ss. 9, 13, 14 and 21, and accompanying regulations; as in the *Hospitals Act*, ss. 25-27 and 29, and its regulations. This case is distinguishable from *Brewer Brothers v. Canada (Attorney General)* (1991), [1992] 1 F.C. 25 (Fed. C.A.), relied on by the plaintiffs, where the statute in question imposed on the public authority a *positive duty to act*.

71     For these reasons, I conclude that the legislative scheme does not impose a duty of care on Alberta. However, the claimant class also argues that Alberta's conduct established a relationship of a sufficient proximity to support a duty of care. They rely generally on the fact that Alberta supervised, monitored and administered the accommodation fees. More particularly, they emphasize that Alberta directed the health authorities to charge the class members the maximum accommodation charge, without regard to the actual cost of accommodation and meals, and that information about the rates was communicated by the health authorities directly to the class members at the direction of Alberta. This, they argue, is sufficient to create a relationship of proximity.

72     In the absence of a statutory duty, the fact that Alberta may have audited, supervised, monitored and generally administered the accommodation fees objected to does not create sufficient proximity to impose a *prima facie* duty of care. As stated in *Broome*, at para. 40:

>     Even if the statute ought to be interpreted so that there was a duty to inspect the Home, on the record before me, <u>the statute gives no direction as to the purpose or scope of such inspections, imposes no standards to be applied and requires no action to be taken as a result of an inspection. No authority is cited for the proposition that such a bare duty of inspection would be sufficient to support a finding of proximity</u> between the Director and the children.

>     [Emphasis added.]

The specific acts alleged — that Alberta directed the charges and that the health authorities communicated them to members of the claimant class — fall under the rubric of administration of the scheme. As in *Broome*, the mere supplying of a service is insufficient, without more, to establish a relationship of proximity between the government and the claimants.

73     I therefore conclude that, assuming the facts pleaded to be true, the negligence claim is bound to fail at the first step of the *Anns/Cooper* inquiry. Absent a statutory obligation to do the things that the plaintiffs claim were done negligently, the

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

necessary relationship of proximity between Alberta and the claimants cannot be made out.

74    Were the pleadings to satisfy the first step of the *Anns/Cooper* test, they would fail at the second step, which asks whether the *prima facie* duty of care is negated by policy considerations. Where the defendant is a public body, inferring a private duty of care from statutory duties may be difficult, and must respect the particular constitutional role of those institutions: *Welbridge Holdings Ltd. v. Greater Winnipeg (Municipality)* (1970), [1971] S.C.R. 957 (S.C.C.), *per* Laskin J., as he then was, for the Court. Related to this concern is the fear of virtually unlimited exposure of the government to private claims, which may tax public resources and chill government intervention. It is arguable that to impose a duty of care on the plaintiff class on the facts pleaded would open the door to a claim in negligence by *any* patient in the healthcare system with an entitlement to receive funding for health services, whether primary or extended. This raises the spectre of unlimited liability to an unlimited class, decried by Cardozo Ch.J. in *Ultramares Corp. v. Touche*, 174 N.E. 441 (U.S. N.Y. Ct. App. 1931), at p. 444: see *Design Services Ltd. v. R.*, 2008 SCC 22, [2008] 1 S.C.R. 737 (S.C.C.), at paras. 59-66.

75    For these reasons, I would find that the pleadings do not disclose a duty of care and that the cause of action as pleaded is bound to fail. I would therefore strike the plea of negligence in its entirety.

### C. The Bad Faith Claim

76    The plaintiff class pleads that the instruction by the Minister of Health and Wellness to the LTCF operators to charge the maximum fee allowable under the regulations for accommodation and meals is a bad faith exercise of discretion. The plaintiffs say the Minister gave his instructions knowing full well of the past practice of certain LTCF operators of using surplus accommodation charges to subsidize basic care and operating costs properly the responsibility of the operator and the Province. This recklessness and breakdown of the orderly exercise of authority, they say, is sufficient to establish a distinct cause of action for bad faith.

77    I agree with the Province's submissions that the allegation of bad faith, as pleaded, is bootstrapped to the duty of care claim, and cannot survive on its own when the plea of negligence is struck. The pleadings disclose the explicit link between bad faith and negligence:

### Negligence: Breach of Duty of Care and Bad Faith

. . . . .

44.  In breach of their duty of care, the Defendants, acting recklessly, arbitrarily, and in bad faith, failed to exercise any, or any sufficient, care, skill, and diligence with respect to auditing, supervising, monitoring and administering (i) the Health Care benefits paid by the Crown to the Health Authorities, (ii) the Health Care benefits provided by the Health Authorities to Long Term Care Facilities and (iii) the Accommodation Fees paid by the Class members. In particular, the Defendants, acting recklessly, arbitrarily and in bad faith:

> a) Had no rational basis for determining what accommodation and meals consist of;

> b) Had no rational basis for calculating the actual cost of accommodation and meals or the Accommodation Fee;

> c) Had no rational basis for separating or distinguishing Health Care costs, which are the responsibility of the Defendants, from Accommodation Fees, which are the responsibility of the Class members;

> d) Failed to conduct any analysis to determine the actual cost of accommodation and meals and levied, either

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

directly or through their agents, the maximum Accommodation Charge across the Province of Alberta (save for a very few exceptions[)];

e) Failed to account or require an accounting to be provided to the Class members with respect to the disposition of monies paid by the Class members as Accommodation Fees;

f) Failed to put in place any, or any proper, reporting, accounting and financial records and systems;

g) Permitted or alternatively failed to prevent the Class members from being charged for Health Care costs which are the responsibility of the Defendants including but not limited to [a detailed list follows]; and

h) By letter dated August 1, 2003, the Crown, by its Minister of Seniors and Community Supports, did unlawfully [list of particular actions omitted].

**Policy Decisions: Breach of Duty of Care and Bad Faith**

· · · · ·

49. In breach of its duty of care and acting recklessly, arbitrarily and in bad faith, the Crown, pursuant to the Letters, did unlawfully and improperly direct and instruct the Predecessor Health Authorities and their agents to charge the maximum Accommodation Charge, notwithstanding the permissive and discretionary language of s. 3(1) of the *Nursing Homes Operation Regulation* and s. 8(2) of the *Nursing Homes Act*, as a result of which the Class members, save for a limited number of exceptions, were charged the maximum Accommodation Charge without regard to the actual cost of accommodation and meals.

50. In further breach of its duty of care and acting recklessly, arbitrarily and in bad faith, the Crown, pursuant to the Letters, unlawfully and improperly directed and instructed the Predecessor Health Authorities and their agents to charge the Class members for Health Care costs set out in paragraph 44(g) herein in circumstances where:

a) Such costs are Health Care costs pursuant to the *Nursing Homes Act* and regulations, the *Hospitals Act* and regulations, and Ministerial Directive D-317;

b) The Crown understood and has since acknowledged that such costs and services were the responsibility of the Defendants; and

c) The Crown understood and has since acknowledged that such costs were included as part of the block funding for Health Care provided by the Crown to the Health Authorities.

51. As a result of the negligent, *ultra vires* and bad faith actions of the Defendants:

a) There was no reasonable nexus between the Accommodation Fee and the cost of accommodation and meals;

b) The Class members paid an Accommodation Fee that was contrary to the *Hospitals Act* and the *Nursing Homes Act*;

c) The Class members' right and entitlement to publicly funded Health Care services and benefits was violated; [and]

d) Under the guise of the Accommodation Charge, the Class members paid an Accommodation Fee that included the cost of Health Care services and benefits the Class members were entitled to receive at no cost as described in paragraph 41(i) herein.

52. As a result of the negligent and bad faith actions of the Defendants, the Class members have suffered damage and loss.

[Emphasis added.]

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

78      The law does not recognize a stand-alone action for bad faith. As the certification judge noted, at para. 408, the bad faith exercise of discretion by a government authority is properly a ground for judicial review of administrative action. In tort, it is an element of misfeasance in public office and, in employment law, relevant to the manner of dismissal. The simple fact of bad faith is not independently actionable.

79      At the hearing, counsel for the plaintiffs sought to argue that we should read the plea of bad faith as disclosing the tort of misfeasance in public office: *Odhavji Estate v. Woodhouse*, 2003 SCC 69, [2003] 3 S.C.R. 263 (S.C.C.). Notwithstanding the difficulty of raising this interpretation of the pleadings for the first time in response during oral hearing, I do not see how this claim is sustainable at law: The facts necessary to support such an allegation cannot be extricated from the pleas of negligence and fiduciary duty, and a court is not obliged to divine causes of action apart from those deliberately pleaded and argued by a party. Misfeasance in a public office was not raised before the courts below, and I would not now accede to this submission.

80      For these reasons, the plea of bad faith should be struck.

### D. The Unjust Enrichment Claim

81      The representative plaintiffs advanced a claim in restitution. Essentially, they plead that by overcharging them for accommodation and food, the government used their money to partially offset its obligations under the scheme, without being entitled to do so. The government, they plead, was thus unjustly enriched, and should be ordered to return the excess money thus obtained. They pleaded the following with respect to unjust enrichment:

**Restitution**

. . . . .

54. The Class members, with very limited exceptions, paid the maximum rates permitted by s. 3(1) of the *Nursing Homes Operation Regulation*, A.R. 258/85 as amended, such that the Class members experienced a deprivation equal to the amount of the Accommodation Fees.

55. The payment of the Accommodation Fees constituted a corresponding benefit to the Defendants in that the payments relieved the Defendants from inevitable expenses they were required to incur pursuant to the *Hospitals Act*, the *Nursing Homes Act*, and *Ministerial Directive D-317*.

56. There exists no juristic reason for the Class members' deprivation and the Defendants' corresponding benefit because:

a) Section 19(2) of the *Canada Health Act*, R.S. 1985, c. C-6, s. 3(1) of the *Nursing Homes Operation Regulation* as amended, s. 8(2) of the *Nursing Homes Act*, ss. 5(1)(d) and 5(8) of the *Hospitalization Benefits Regulation*, and the Letters, are of no force or effect in that they violate s. 15 of the *Canadian Charter of Rights and Freedoms* (the "*Charter*") in that they authorize the imposition of Accommodation Charges upon the Class members which may not be imposed upon other patients solely on the basis of the Class members' age and/or mental and/or physical disabilities, are not justified under s. 1 of the *Charter*, and are of no force or effect by operation of s. 52 of the *Constitution Act, 1982*;

b) Section 3(1) of the *Nursing Homes Operation Regulation* as amended, ss. 5(1)(d) and 5(8) of the *Hospitalization*

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

*Benefits Regulation*, and the Letters are *ultra vires* and inoperative in that contrary to the *Nursing Homes Act*, and the *Hospitals Act*, they purport to authorize the imposition of charges or fees against the Class members for goods and services other than accommodation and meals, including but not limited to [list of specific goods and services omitted], all of which are the financial responsibility of the Defendants;

c) The Letters are *ultra vires* and inoperative in that there was in fact no obligation on the part of the Long Term Care Facilities to impose the maximum Accommodation Charges, [and] there was no obligation on the part of the Class members to pay them;

d) The Crown's Minister of Seniors and Community Supports had no lawful authority in August of 2003 with respect to setting and monitoring the Accommodation Charge; ...

[Emphasis added.]

82      These pleadings mirror the test for unjust enrichment set out in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629 (S.C.C.), at para. 30:

As a general matter, the test for unjust enrichment is well established in Canada. The cause of action has three elements: (1) an enrichment of the defendant; (2) a corresponding deprivation of the plaintiff; and (3) an absence of juristic reason for the enrichment ...

The savings of an inevitable expense can constitute an enrichment of the defendant: *Garland*, at para. 31.

83      The thrust of Alberta's argument on this point is that the claim of unjust enrichment is bound to fail because the doctrine does not apply to a public authority in a case such as this. Governments enact laws and regulations that require citizens to pay monies to government in a variety of situations, and as a general rule, the citizen should have no right to recover such payments. It argues that this position is justified in terms of public policy; governments should not be required to endlessly defend levies made under valid statutes and regulations.

84      In reality, the situation is not so simple. As one writer delicately puts it, the application of restitutionary principles to public authorities in Canada "is a matter of some subtlety": P. D. Maddaugh and J. D. McCamus, *The Law of Restitution* (loose-leaf), at pp. 22-1. Under the traditional common law doctrine, recovery from public authorities was recognized only on the grounds of *colore officii* (demands for unlawful payment from citizens by government officials for the receipt of benefits to which the citizen had a lawful entitlement) or duress (actual or implied). Payments made pursuant to *intra vires* statutory schemes were potentially recoverable; those made pursuant to *ultra vires* legislation were not necessarily so.

85      The traditional doctrine, though workable in some circumstances, has been criticized on the ground that it produced inconsistent and inequitable results. A series of judicial decisions, responding to these concerns, has narrowed the ambit of the doctrine.

86      It has been held that benefits received by the government because of a mistake of law may be recovered, so long as the mistake caused the payment in question: *Air Canada v. British Columbia*, [1989] 1 S.C.R. 1161 (S.C.C.), at pp. 1200-01, *per* La Forest J., for three of the six members of the Court, in *obiter*. Thus, where payments are made to a government under an *intra vires* law pursuant to an unlawful demand for payment which was based on a misinterpretation of the governing legislation, the payments may be subject to restitution.

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

87     It has also been held that benefits received by the government pursuant to *ultra vires* legislation may be recoverable where the payment is made under practical compulsion or actual duress: *Eurig Estate, Re,* [1998] 2 S.C.R. 565 (S.C.C.), at p. 587, *per* Major J., for the majority. In that decision, the Court left open the question of the recoverability of payments made under *ultra vires* legislation *in the absence of compulsion*: *Eurig Estate*.

88     Again, courts have held that benefits conferred under an *agreement* with a public authority that is beyond the power of the state actor to make are recoverable in a restitutionary claim: *Pacific National Investments Ltd. v. Victoria (City),* 2004 SCC 75, [2004] 3 S.C.R. 575 (S.C.C.).

89     Most recently, this Court in *Kingstreet Investments Ltd. v. New Brunswick (Department of Finance),* 2007 SCC 1, [2007] 1 S.C.R. 3 (S.C.C.), *per* Bastarache J., held that taxes collected by public authorities on the basis of an *ultra vires* statute are recoverable where the law is found to be unconstitutional. Restitution is generally "available for the recovery of monies collected under legislation that is subsequently declared to be *ultra vires*": at para. 12. Bastarache J. suggested that where the claim is for unconstitutional taxes, the claim should be brought under public law principles, and not the private law rules of unjust enrichment. However, he added that "[c]laims of unjust enrichment against the government may still be appropriate in certain circumstances": at para. 34. Although the Court rejected Justice La Forest's *obiter* proposal in *Air Canada*, at pp. 1203-04, that recovery of payments made under *ultra vires* legislation should never be possible, Bastarache J. did not go so far as to embrace Justice Wilson's dissent on this point (at pp. 1214-15), which would have permitted recovery in cases where unjust enrichment is applied.

90     Alberta argues that *Kingstreet* stands for the proposition that an action for unjust enrichment cannot be brought against the government. The only recourse, it argues, is under public law principles, such as a claim for misfeasance in public office. The plaintiff class, in response, argues that Alberta interprets *Kingstreet* too narrowly. It fastens on Bastarache J.'s statement that "[c]laims of unjust enrichment against the government may still be appropriate in certain circumstances".

91     In my view, *Kingstreet* stands for the proposition that public law remedies, rather than unjust enrichment, are the proper route for claims relating restitution of taxes levied under an *ultra vires* statute, on the ground that the framework of unjust enrichment is ill-suited to dealing with issues raised by a claim that a measure is *ultra vires*. However, *Kingstreet* leaves open the possibility of suing for unjust enrichment in other circumstances. The claim pleaded in this case is not for taxes paid under an *ultra vires* statute. It is not therefore precluded by this Court's decisions in *Kingstreet*. The pleading should be allowed to go to trial, at which point the propriety of the claim for unjust enrichment may be explored more fully in the context of the evidence adduced.

92     With respect to whether or not a juristic reason exists, Alberta argues that the regulation setting the maximum allowable accommodation charge is a complete answer to any claim in restitution. However, the claim that the regulation is itself invalid is a *Charter* claim, subject to *Charter* remedies.

93     Alberta argues that the cause of action for unjust enrichment must fail because there is a nexus between the levy and the cost of making the service or benefit available, and therefore that the applicable regulations are not *ultra vires*. However, the sufficiency of the nexus is a matter of reasonableness: see *620 Connaught Ltd. v. Canada (Attorney General),* 2008 SCC 7, [2008] 1 S.C.R. 131 (S.C.C.), at para. 19, *per* Rothstein J., for the Court. It is better explored at trial than on a motion to

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

strike.

94     Finally, Alberta argues that the claim for unjust enrichment is simply another way of asserting breach of fiduciary duty and negligence, and therefore should be struck. I cannot accept this argument. The claim for unjust enrichment stands on different legal footing than the claims for breach of fiduciary duty or negligence. On the law just reviewed, it should be allowed to proceed. I further note that the restrictions set out in *Welbridge* on suing governments (as opposed to government actors) in tort do not apply to actions for restitution: *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 (S.C.C.).

95     In summary, the plaintiffs plead the three elements of unjust enrichment — benefit, deprivation, and absence of juristic reason for the deprivation. Whatever its chances of ultimate success, it is not plain and obvious that the claim does not disclose a cause of action, and it should be allowed to proceed to trial. As the trial judge correctly observed, at para. 443:

> I am satisfied that the cause of action based on unjust enrichment with the remedy of restitution is not hopeless, but rather analytically defensible, *albeit* novel, even dubious. I cannot say that it is "plain and obvious" that no claim exists; nor that the pleadings do not disclose a cause of action based on unjust enrichment with any hope of success.

96     I would permit the plea of unjust enrichment to proceed.

### E. The Section 15(1) Claim of Discrimination

97     The plaintiffs plead that the imposition on the class members of an obligation to pay health care costs violates s. 15(1) of the *Charter*. They say the charges were imposed solely on the basis of the class members' age, mental disability, physical disability, or some combination thereof, and the consequent infringement of their equality rights is not demonstrably justified under s. 1 of the *Charter*. They seek restoration of the accommodation charges and damages under s. 24(1) of the *Charter*, and a declaration that the listed provisions are of no force or effect to the extent of their inconsistency with s. 15(1).

98     My understanding is that the plea for relief under s. 15(1) is not directly challenged by the Province. Although the Province argues that a class action is not the preferable procedure for the *Charter* claim or its remedy, the Crown does not seek to strike the plea of discrimination itself; instead, it asks that we order it to proceed in another form. In light of my other conclusions, especially the survival of the plea of unjust enrichment, and without commenting on its merits, I would permit the s. 15 claim to proceed as part of the class action.

### F. Whether the Claim Should be Decertified

99     Although the claims for unjust enrichment and breach of s. 15(1) of the *Charter* survive, Alberta nevertheless argues that the action should be decertified because a class proceeding is not the preferable procedure. Alberta submits that an individualized cost review would have to be conducted for each proposed class member, to determine whether particular charges for individual residents of specific LTCFs did not reflect the actual cost of accommodation and meals. Alberta argues that the charges will vary by time, regions, operator and resident, and — on the plaintiffs' theory — there is no wrong done unless it can be shown that the costs of accommodation and meals for a particular resident did not reflect the actual costs of providing those services.

**Elder Advocates of Alberta Society v. Alberta, 2011 SCC 24, 2011 CarswellAlta 763**

2011 SCC 24, 2011 CarswellAlta 763, 2011 CarswellAlta 764, [2011] 2 S.C.R. 261...

100      I would reject Alberta's argument: The common questions certified by the judge at first instance ask whether the accommodation charges, *as a practice carried out on a class-wide basis*, resulted in unjust enrichment. The claim as pleaded does not require an individual assessment of the nexus between *specific* accommodation and meal charges in order to ground any potential liability to the class. The *Class Proceedings Act* provides sufficient remedial flexibility — by means of the aggregate assessment of damages (ss. 30-33) — to address any potential difficulties in assessing, awarding, and distributing damages.

101      For these reasons, I find that a class proceeding remains the preferable procedure and I decline to decertify the action.

**Conclusion**

102      Based on the foregoing, I would allow the appeal in part and strike the pleas of breach of fiduciary duty, negligence and bad faith. Without endorsing them, I would leave untouched the claim of discrimination under s. 15(1) of the *Charter* and the plea of unjust enrichment, along with any other pleas which survived in the lower courts and were not appealed to this Court. Certification of the class and the unaffected common questions will remain, since the action, in truncated form, survives.

103      Costs will be in the cause.

*Appeal allowed in part.*

*Pourvoi accueilli en partie.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 99 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

2002 SCC 77
Supreme Court of Canada

Apotex Inc. v. Wellcome Foundation Ltd.

2002 CarswellNat 3436, 2002 CarswellNat 3437, 2002 SCC 77, [2002] 4 S.C.R. 153, [2002] S.C.J. No. 78, 219 D.L.R. (4th) 660, 21 C.P.R. (4th) 499, 235 F.T.R. 204 (note), 296 N.R. 130, J.E. 2003-26, REJB 2002-35974

## Apotex Inc. and Novopharm Ltd., Appellants v. Wellcome Foundation Limited, Glaxo Wellcome Inc., Interpharm Inc. and Allen Barry Shechtman, Respondents

Arbour J., Bastarache J., Binnie J., Gonthier J., Iacobucci J., L'Heureux-Dubé J., LeBel J., Major J., McLachlin C.J.C

Judgment: December 5, 2002
Heard: February 14, 2002
Docket: 28287

Proceedings: affirming (2000), 2000 CarswellNat 2643, [2000] F.C.J. No. 1770, 10 C.P.R. (4th) 65, 262 N.R. 137, 186 F.T.R. 274 (note), 195 D.L.R. (4th) 641, [2001] 1 F.C. 495, 2000 CarswellNat 3414 (Fed. C.A.); reversing in part (1998), 1998 CarswellNat 458, 79 C.P.R. (3d) 193, 145 F.T.R. 161 (Fed. T.D.)

Counsel: *Harry B. Radomski*, *Richard Naiberg*, *David M. Scrimger*, for Appellant, Apotex Inc.
*Carol Hitchman*, *Warren Sprigings*, *Paula Bremner*, for Appellant, Novopharm Ltd.
*Patrick Kierans*, *Kenneth E. Sharpe*, *Peter J. Stanford*, *Brian R. Daley*, for Respondents, Wellcome Foundation Ltd., Glaxo Wellcome Inc.

Subject: Intellectual Property; Property; Civil Practice and Procedure

### Headnote

#### Intellectual property --- Patents — Validity of patent — Utility — General

Results pharmaceutical company received from U.S. National Institutes of Health scientist taken together with own data on AZT provided factual foundation — Knowledge of mechanism by which retrovirus reproduced and "chain terminator effect" of AZT as disclosed in patent, provided line of reasoning by which utility could be established by date of U.K. patent application — HIV incubation period was targeted by "chain termination" effect known and disclosed at time of patent application, and which afforded basis for prediction that AZT had prophylactic properties — A Inc. and N Ltd. did not discharge onus of showing that patent was invalid — Patent Act, R.S.C. 1985, c. P-4.

#### Intellectual property --- Patents — Validity of patent — Invention — General

U.S. National Institutes of Health (NIH) scientists were instrumental in providing crucial evidence on which sound prediction of AZT's utility depended — NIH scientists were not responsible for inventive concept — Blind test of chemical compound whose existence they had not identified did not require them to be listed as co-inventors — Patent Act, R.S.C. 1985, c. P-4.

#### Propriété intellectuelle --- Brevets — Validité du brevet — Utilité — En général

Réunion des résultats transmis à la compagnie pharmaceutique par un scientifique du U.S. National Institutes of Health et des propres données de la compagnie sur l'AZT fournissait un fondement factuel — Connaissance du mécanisme de reproduction du rétrovirus et de l'« effet bloquant [de l'AZT] sur l'élongation de la chaîne », divulgués dans le brevet, fournissait le raisonnement nécessaire pour établir l'utilité de l'invention à la date de la demande de brevet britannique

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

— Période d'incubation du VIH était ciblée par l'effet « bloquant sur l'élongation de la chaîne », qui était connu et divulgué au moment de la demande de brevet, ce qui a servi de fondement à la prédiction que l'AZT aurait des propriétés prophylactiques — A inc. et N ltée ne se sont pas acquittées de leur fardeau de prouver que le brevet était invalide — Loi sur les brevets, L.R.C. 1985, c. P-4.

**Propriété intellectuelle --- Brevets — Validité du brevet — Invention — En général**

Scientifiques du U.S. National Institutes of Health (NIH) ont joué un rôle clé en fournissant de la preuve cruciale dont dépendait la « prédiction valable » de l'utilité de l'AZT — Scientifiques du NIH n'étaient pas les auteurs de l'idée originale — Fait qu'ils avaient effectué des tests en aveugle sur un composé chimique qu'ils n'avaient pas découvert, n'exigeait pas qu'ils soient désignés comme étant des coïnventeurs. — Loi sur les brevets, L.R.C. 1985, c. P-4.


In early 1984, scientists at the pharmaceutical company G/W began to screen various compounds in search of an anti-AIDS drug. One of the compounds screened eventually became known as AZT. This known compound was originally synthesized, tested and eventually abandoned as a cancer treatment drug in 1964. Critical testing of the compound was done by two scientists at the U.S. National Institutes of Health (NIH). By February 6, 1985, G/W had prepared a draft patent application. In February 1985, the NIH scientists reported to G/W findings that AZT inhibited HIV replication. On March 16, 1985, G/W filed in the United Kingdom the patent application from which the Canadian patent claimed priority. A patent was issued in 1988.


In 1990, generic drug manufacturers N Ltd. and A Inc. challenged the validity of the patent. In 1991, W Ltd. and G/W brought an action against A Inc., I Inc. and an individual alleging that their products infringed various claims of the patent. The trial judge adjudged several of the claims invalid but that the remaining claims were infringed by the manufacture and sale of the generic version by N Ltd. and A Inc.. N Ltd. and A Inc. appealed and the trial decision was reversed in part. A Inc. and N Ltd. appealed.


**Held:** The appeal was dismissed.


Where the new use is the gravamen of the invention, the utility required for patentability must, as of the priority date, either be demonstrated or be a sound prediction based on the information and expertise then available. The doctrine of sound prediction consists of the following components: there must be a factual basis for the prediction; the inventor must have at the date of the patent an articulable and sound line of reasoning from which the desired result could be inferred from the factual basis; and there must be proper disclosure. The results G/W received from the NIH taken together with G/W's own data on AZT provided a factual foundation. G/W's knowledge of the mechanism by which a retrovirus reproduced, and the "chain terminator effect" of AZT as disclosed in the patent, was found by the trial judge to provide a line of reasoning by which utility could be established by the date of the U.K. patent application, which was also the priority date by which the invention must be evaluated for purposes of the Canadian patent. HIV offers an incubation period in which the virus is present but vulnerable to attack. It is this specific feature that was targeted by the "chain termination" effect known and disclosed by G/W at the time of the patent application, and which afforded the basis for its prediction that AZT had prophylactic properties. No palpable and overriding error with respect to this finding by the trial judge had been demonstrated. G/W's prediction that the "chain terminator effect" disclosed in the patent specification had prophylactic as well as post-infection treatment application was sound. A Inc. and N Ltd. did not discharge the onus of showing that the patent was invalid.


Inventorship is not defined in the Patent Act, and must be inferred from various sections. In the steps leading from conception to patentability, the inventor(s) may utilize the services of others, but those others will not be co-inventors unless they participated in the conception as opposed to its verification. The NIH scientists were instrumental in providing crucial evidence on which the sound prediction of AZT's utility depended, but they were not responsible for the inventive concept. Their blind test of a chemical compound whose existence they had not identified, and with which they apparently had no prior experience, did not require them to be listed as co-inventors.

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

Au début de 1984, les scientifiques employés par la compagnie pharmaceutique G/W ont commencé à tester différents composés dans le but de trouver un médicament contre le SIDA. Un des composés testés a par la suite été connu sous le nom de AZT. Ce composé connu avait été initialement synthétisé, testé et par la suite abandonné, en 1964, comme médicament pour traiter le cancer. Deux scientifiques du U.S. National Institutes of Health (NIH) ont fait des tests critiques sur le composé. Au 6 février 1985, G/W avait préparé la première version d'une demande de brevet. En février 1985, les scientifiques du NIH ont transmis à G/W des résultats démontrant que l'AZT freinait la reproduction du VIH. G/W a déposé au Royaume-Uni une demande de brevet le 16 mars 1985, qui était la date de priorité sur laquelle se fondait le brevet canadien. Le brevet a été émis en 1988.

Les fabricants de médicaments génériques N ltée et A inc. ont contesté la validité du brevet en 1990. W ltée et G/W ont intenté une action, en 1991, contre A inc., I inc. et un individu, soutenant que les produits de ces derniers violaient différentes revendications du brevet. Le juge de première instance a jugé que plusieurs revendications du brevet étaient invalides, mais que celles qui demeuraient étaient violées par la fabrication et la vente des versions génériques par N ltée et A inc. Ces dernières ont interjeté appel; la décision de première instance a été infirmée en partie. A inc. et N ltée ont interjeté appel.

**Arrêt:** Le pourvoi a été rejeté.

Lorsque la nouvelle utilisation constitue le fondement de l'invention, l'utilité nécessaire à la brevetabilité doit, à la date de priorité, avoir été démontrée ou être une prédiction valable fondée sur les renseignements et expertises disponibles à ce moment-là. La théorie de la prédiction valable est constituée des éléments suivants: la prédiction doit avoir un fondement factuel; l'inventeur doit avoir, à la date du brevet, un raisonnement clair et valable, qui permet d'inférer le résultat désiré du fondement factuel; et il doit y avoir une divulgation suffisante. La réunion des résultats obtenus par G/W du NIH et des propres données de G/W sur l'AZT fournissait un fondement factuel. Le juge de première instance a conclu que la connaissance qu'avait G/W du mécanisme de reproduction d'un rétrovirus ainsi que l'« effet bloquant [de l'AZT] sur l'élongation de la chaîne », divulgués dans le brevet, fournissaient le raisonnement nécessaire pour établir l'utilité de l'invention à la date de la demande de brevet britannique, laquelle date constituait aussi la date de priorité pour l'évaluation de l'invention aux fins du brevet canadien. Le VIH a une période d'incubation pendant laquelle le virus est présent dans l'organisme mais vulnérable à une attaque. C'était justement cette caractéristique qui était ciblée par l'effet « bloquant sur l'élongation de la chaîne », qui était connu et divulgué par G/W au moment de la demande de brevet, ce qui a servi de fondement à la prédiction que l'AZT aurait des propriétés prophylactiques. On n'a pas réussi à démontrer que le juge de première instance avait commis une erreur manifeste et déterminante en tirant cette conclusion. La prédiction de G/W selon laquelle l'« effet bloquant sur l'élongation de la chaîne », divulgué dans le mémoire descriptif du brevet, aurait une application en matière de prophylaxie et de traitement de l'infection contractée était valable. A inc. et N ltée n'ont pas réussi à s'acquitter de leur fardeau de prouver que le brevet était invalide.

Puisque la Loi sur les brevets ne définit pas l'expression « paternité de l'invention », la définition de celle-ci doit être inférée de divers articles. Au cours des étapes entre la conception et la brevetabilité, le ou les inventeur(s) peuvent utiliser les services d'autres personnes, mais ces dernières ne peuvent être des coïnventeurs à moins d'avoir participé à la conception, et non à la vérification. Les scientifiques du NIH ont joué un rôle clé en fournissant de la preuve cruciale dont dépendait la « prédiction valable » de l'utilité de l'AZT, mais ce n'était pas eux qui avaient inventé ce concept. Le fait qu'ils avaient effectué des tests en aveugle sur un composé chimique qu'ils n'avaient pas découvert et qu'ils n'avaient apparemment jamais expérimenté, n'exigeait pas qu'ils soient désignés comme étant des coïnventeurs.

**Table of Authorities**

**Cases considered by _Binnie J._:**

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

*Beecham Group v. Bristol Laboratories Ltd.*, [1978] R.P.C. 153 (U.K. H.L.) — considered

*Biogen Inc. v. Medeva PLC*, [1997] R.P.C. 1 (Eng. H.L.) — referred to

*Burroughs Wellcome Co. v. Barr Laboratories Inc.* (1994), 40 F. Supp. 1208, 32 U.S.P.Q.2d 1915 (U.S. Fed. Cir.) — considered

*Burton Parsons Chemicals Inc. v. Hewlett-Packard (Canada) Ltd.* (1974), [1976] 1 S.C.R. 555, 1 N.R. 553, 17 C.P.R. (2d) 97, 54 D.L.R. (3d) 711, 1974 CarswellNat 378, 1974 CarswellNat 378F (S.C.C.) — considered

*Canada (Director of Investigation & Research) v. Southam Inc.*, 144 D.L.R. (4th) 1, 71 C.P.R. (3d) 417, [1997] 1 S.C.R. 748, 209 N.R. 20, 50 Admin. L.R. (2d) 199, 1997 CarswellNat 368, 1997 CarswellNat 369 (S.C.C.) — referred to

*Canadian General Electric Co. v. Fada Radio Ltd.* (1929), [1930] A.C. 97, 47 R.P.C. 69, [1930] 1 D.L.R. 449 (Canada P.C.) — distinguished

*Ciba-Geigy v. Canada (Commissioner of Patents)*, 42 N.R. 587, 65 C.P.R. (2d) 73, 1982 CarswellNat 460 (Fed. C.A.) — not followed

*Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504, 56 C.P.R. (2d) 145, 35 N.R. 390, 122 D.L.R. (3d) 203, 1981 CarswellNat 582F, 1981 CarswellNat 582 (S.C.C.) — considered

*Ernest Scragg & Sons Ltd. v. Leesona Corp.*, [1964] Ex. C.R. 649, 45 C.P.R. 1, 26 Fox Pat. C. 1, 1964 CarswellNat 18 (Can. Ex. Ct.) — distinguished

*Free World Trust c. Électro Santé Inc.*, 2000 SCC 66, 2000 CarswellQue 2728, 2000 CarswellQue 2731, (sub nom. *Free World Trust v. Électro Santé Inc.)* 194 D.L.R. (4th) 232, (sub nom. *Free World Trust v. Électro Santé Inc.)* 263 N.R. 150, [2000] 2 S.C.R. 1024, (sub nom. *Free World Trust v. Électro Santé Inc.)* 9 C.P.R. (4th) 168 (S.C.C.) — considered

*Genentech Inc.'s Patent*, [1989] R.P.C. 147 (Eng. C.A.) — considered

*Gerrard Wire Tying Machines Co. v. Cary Manufacturing Co.*, [1926] Ex. C.R. 170, [1926] 3 D.L.R. 374, 1926 CarswellNat 22 (Can. Ex. Ct.) — referred to

*Harvard College v. Canada (Commissioner of Patents)*, 2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435 (S.C.C.) — distinguished

*Henry Bros. (Magherafelt) Ltd. v. Ministry of Defence and the Northern Ireland Office*, [1997] R.P.C. 693 (Eng. Ch. Div.) — considered

*I.G. Farbenindustrie A.G.'s Patents, Re* (1930), 47 R.P.C. 289 (Eng. Ch. Div.) — referred to

*Jules R. Gilbert Ltd. v. Sandoz Patents Ltd.* (1970), 64 C.P.R. 14 (Can. Ex. Ct.) — considered

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 103 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

*Kellogg Co. v. Kellogg*, [1942] Ex. C.R. 87, 2 Fox Pat. C. 164, 2 C.P.R. 131, [1942] 4 D.L.R. 737, 1942 CarswellNat 3 (Can. Ex. Ct.) — referred to

*May & Baker Ltd. & Ciba Ltd.'s Letters Patent, Re* (1948), 65 R.P.C. 255 — considered

*May & Baker Ltd. & Ciba Ltd.'s Letters Patent, Re* (1950), 67 R.P.C. 23, 94 Sol. Jo. 112 (U.K. H.L.) — considered

*Monsanto Co. v. Canada (Commissioner of Patents)*, 28 N.R. 181, 42 C.P.R. (2d) 161, [1979] 2 S.C.R. 1108, 100 D.L.R. (3d) 385, 1979 CarswellNat 637, 1979 CarswellNat 637F (S.C.C.) — followed

*Mullard Radio Valve Co. v. Philco Radio & T.V. Corp. of Great Britain*, [1936] 2 All E.R. 920, 53 R.P.C. 323 (U.K. H.L.) — referred to

*Olin Mathieson Chemical Corp. v. Biorex Laboratories Ltd.*, [1970] R.P.C. 157 (Eng. Ch. Div.) — followed

*Owens-Illinois Inc. v. Keohring Waterous Ltd.* (1980), 33 N.R. 597, 52 C.P.R. (2d) 1 (Fed. C.A.) — distinguished

*Owens-Illinois Inc. v. Keohring Waterous Ltd.* (1980), 35 N.R. 625n (S.C.C.) — referred to

*Permutit Co. v. Borrowman*, [1926] 4 D.L.R. 285, 43 R.P.C. 356 (Canada P.C.) — distinguished

*Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1978), 39 C.P.R. (2d) 145 (Fed. T.D.) — considered

*Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1979), 42 C.P.R. (2d) 33, 28 N.R. 273 (Fed. C.A.) — considered

*Rice v. Christiani & Nielsen*, [1930] S.C.R. 443, [1930] 4 D.L.R. 401, 1930 CarswellNat 36 (S.C.C.) — considered

*Rubbermaid (Canada) Ltd. v. Tucker Plastic Products Ltd.* (1972), 8 C.P.R. (2d) 6 (Fed. T.D.) — considered

*Sandoz Patents Ltd. v. Gilcross Ltd.* (1972), [1974] S.C.R. 1336, 1972 CarswellNat 438, 1972 CarswellNat 438F, 8 C.P.R. (2d) 210 (S.C.C.) — referred to

*Shell Oil Co. v. Canada (Patent Commissioner)*, [1982] 2 S.C.R. 536, 67 C.P.R. (2d) 1, 142 D.L.R. (3d) 117, 44 N.R. 541, 1982 CarswellNat 487, 1982 CarswellNat 487F (S.C.C.) — considered

*Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.*, [1968] S.C.R. 950, 55 C.P.R. 207, 38 Fox Pat. C. 203, 69 D.L.R. (2d) 353, 1968 CarswellNat 33 (S.C.C.) — considered

*Tavis v. Baker* (1943), 137 F.2d 109 (U.S. Ct. of Cust. & Patent App.) — considered

*Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111, 33 D.L.R. (3d) 459, 8 C.P.R. (2d) 202, 1972 CarswellNat 423, 1972 CarswellNat 423F (S.C.C.) — referred to

**Statutes considered:**

*Patent Act*, R.S.C. 1985, c. P-4
        Generally — considered

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

s. 2 "invention" — considered

s. 27 — considered

s. 27(3) — considered

s. 34(1)(a) — considered

s. 34(1)(b) — considered

s. 34(1)(d) — considered

s. 34(1)(e) — considered

s. 40 — considered

s. 41 — referred to

s. 42 — considered

s. 45 — considered

s. 53 — considered

s. 53(1) — considered

s. 53(2) — considered

*Patents Act*, 1949 (12, 13 & 14 Geo. 6), c. 87
s. 4(3) — referred to

s. 32(1)(i) — referred to

**Regulations considered:**

*Food and Drugs Act*, R.S.C. 1985, c. F-27
*Food and Drug Regulations*, C.R.C. 1978, c. 870

s. C.08.002(2) [am. SOR/95-411]

**Words and phrases considered**

**virus**

A virus is a type of subcellular parasite which is dependent on a cellular host to provide the machinery for its reproduction.

**patent**

A patent . . . is a method by which inventive solutions to practical problems are coaxed into the public domain by the promise of a limited monopoly for a limited time.

**Termes et locutions cités**

**virus**

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    6

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

Un virus est un type de parasite infracellulaire qui dépend de l'appareil de la cellule hôte pour se reproduire.

**brevet**

C'est un moyen d'encourager les gens à rendre publiques les solutions ingénieuses apportées à des problèmes concrets, en promettant de leur accorder un monopole limité d'une durée limitée.

APPEAL by generic drug companies from judgment reported at (2000), 2000 CarswellNat 2643, [2000] F.C.J. No. 1770, 2000 CarswellNat 3414, 10 C.P.R. (4th) 65, 262 N.R. 137, 186 F.T.R. 274 (note), 195 D.L.R. (4th) 641, [2001] 1 F.C. 495 (Fed. C.A.) which reversed in part judgment adjudging several valid claims to have been infringed by generic drug companies' manufacture and sale of generic version of drug compound.

POURVOI des compagnies pharmaceutiques génériques à l'encontre de l'arrêt publié à (2000), 2000 CarswellNat 2643, [2000] F.C.J. No. 1770, 2000 CarswellNat 3414, 10 C.P.R. (4th) 65, 262 N.R. 137, 186 F.T.R. 274 (note), 195 D.L.R. (4th) 641, [2001] 1 F.C. 495 (C.A. Féd.), qui a infirmé en partie le jugement déterminant que plusieurs revendications valides avaient été violées par la fabrication et la vente par les compagnies pharmaceutiques génériques de la version générique d'un composé pharmaceutique.

*Binnie J.*:

1     AIDS is one of the great health scourges of the modern world. AZT was one of the earliest and is still one of the most effective drugs for its treatment. The patent on the use of AZT for HIV/AIDS treatment and prophylaxis is held by the respondents, but the appellants, Apotex and Novopharm, two "generic" drug manufacturers, say that in fact the respondents (collectively referred to as "Glaxo/Wellcome") did not invent anything. In the alternative, if Glaxo/Wellcome can be said to have invented something, the appellants say it did so in collaboration with others whose work Glaxo/Wellcome wrongly appropriated for its own financial benefit. Moreover, there was no basis at all disclosed in the patent to claim a "prophylactic" as well as a "treatment" benefit. On any or all of these grounds, they say the patent should be declared invalid.

2     The appeals therefore require us to consider the statutory requirement for an invention in the context of a new use for an old chemical compound, and the related questions of who ought to have been included as inventors, and what is the appropriate remedy if someone who ought to have been included in the patent is left out.

3     In my view, for the reasons which follow, the inventive use of AZT was made by the five Glaxo/Wellcome scientists named in the patent on or before March 16, 1985, the priority date of the patent. It was sufficient that at that time the Glaxo/Wellcome scientists disclosed in the patent a rational basis for making a sound prediction that AZT would prove useful in the treatment and prophylaxis of AIDS, which it did. For the Commissioner of Patents to have allowed Glaxo/Wellcome a patent based on speculation would have been unfair to the public. For him to have required Glaxo/Wellcome to demonstrate AZT's efficacy through the clinical tests required by the Minister of Health for approval of a new drug for medical prescription would have been unfair to Glaxo/Wellcome. The disclosure made in the patent was and is of real use and benefit to millions of HIV and AIDS sufferers around the world (irrespective of Glaxo/Wellcome's pricing policy for AZT, which it must be acknowledged has generated serious controversy in some countries, particularly in the developing world). The fact remains that Glaxo/Wellcome, by making the disclosure, has fulfilled its side of the bargain with the public, and is by law entitled to legal protection for what it has disclosed.

4     The claims that have survived the rigours of administrative and judicial scrutiny to date (19 out of 78 claims) do not overreach the invention disclosed. The appellants had the onus of demonstrating the invalidity of the patent and their attack on the factual underpinnings of the trial judgment revealed no palpable and overriding error. The legal outcome was correct. I would affirm the validity of the patent and dismiss the appeals.

**I. Facts**

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

5    During the early 1980s, a deadly disease, now known as AIDS, was identified. It appeared to suppress the immune systems of those who became infected. AIDS (Acquired Immune Deficiency Syndrome) was shown to be caused, in turn, by a retrovirus, now known as the human immunodeficiency virus ("HIV"), which was first isolated at the Institut Pasteur in 1983. A virus is a type of subcellular parasite which is dependent on a cellular host to provide the machinery for its reproduction. HIV infects T-cells, which play an important part in human immune response, hijacking the T-cells to produce copies of itself, eventually destroying the T-cell and degrading the body's immune response. At that point, HIV renders the body prone to infection, ultimately fatally, by opportunistic diseases that the diminished immune system is unable to combat. The trial judge commented that AIDS quickly became "a world-wide health crisis referred to by many as an epidemic": (1998), 145 F.T.R. 161 (Fed. T.D.), at para. 8.

6    Glaxo/Wellcome had considerable experience in researching retroviruses, and in late 1983 assembled a working group to harness that expertise to the search for an anti-AIDS drug. The group included Dr. David Barry, head of the Department of Virology at Glaxo/Wellcome, Dr. Janet Rideout, who had been coordinating the various investigations involving the compound 509U81 (AZT) and the one who suggested that AZT be tested in the screens, Dr. Philip Furman, a research scientist with a Ph.D. in virology who had previously worked with anti-viral drugs, Dr. Sandra Nusinoff Lehrman, a physician with expertise in the areas of infectious disease and pediatrics, and Martha St. Clair, a virologist who worked with Dr. Furman and who had experience with retroviruses.

7    The fact that HIV attacks the T-cells, which are crucial to the functioning of the human immune system, was known in 1984. It was also known that HIV infects the T-cell by insinuating and integrating a DNA copy of its RNA genome into the genome of the T-cell using reverse transcriptase, an enzyme common to all retroviruses. As the host cell, with the viral DNA integrated into its own DNA, divides, it replicates and thereby provides a template for the further propagation of the virus.

8    The Glaxo/Wellcome scientists believed that the reverse transcription stage, unique to retroviruses, offered the best target for a drug. The growing DNA chain could be terminated by adding on a "false" nucleoside, one of the chemical building blocks of DNA. The nucleoside is said to be "false" because, while it appears to others in the chain to be a regular nucleoside, it lacks the OH group for coupling with the incoming nucleoside, which finds it has nothing to hook onto. There being no hook, the chain terminates, thereby arresting the propagation of HIV.

9    The Glaxo/Wellcome scientists, in the spring of 1984, began to screen various compounds which, they believed, based on their chemical structure, might serve as chain terminators. One of the hundreds of compounds screened eventually became known as AZT.

10    It is important to note that the respondents did not "invent" AZT. It was a known compound, synthesized and tested by Dr. Jerome Horwitz at the Detroit Institute of Cancer Research in 1964 as part of a project to find a cancer treatment for humans. That project was abandoned. Glaxo/Wellcome had more recently been researching the drug for use as an anti-bacterial treatment, though this was not its original purpose.

11    Once the Glaxo/Wellcome team had identified suitable compounds, its in-house screening methods were relatively simple. Coating the bottom of a petri dish with murine (mouse) T-cells, the laboratory technician would introduce a retrovirus. Glaxo/Wellcome used two retrovires found in mice (not humans) because they were readily reproducible, predictable, reliable and easy to use. Using staining techniques, the laboratory technician could see if the virus spread, destroying the mouse T-cells. If the technician were then to add the candidate "remedial" compound, he or she could see whether the virus triumphed by continuing to kill the T-cells, or the compound triumphed by preserving the T-cells. In November 1984, during Glaxo/Wellcome's multiple tests of known compounds, the AZT compound produced surprisingly good results, appearing to eradicate completely the retrovirus in the mouse T-cells. It proved more potent than any other compound tested. In argument in this Court, counsel for Glaxo/Wellcome called this a "eureka moment", but this seems to be something of an exaggeration. There had been no testing in a human cell line (*in vitro*) or in humans (*in vivo*). The object of the exercise was to eradicate HIV in humans, not a mouse virus in a petri dish.

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

12    It seems clear, and was found as a fact by the trial judge, that scientists at Glaxo/Wellcome and elsewhere recognized that the immune systems of humans and mice are sufficiently different that it is not possible to predict from studies in mouse cells how a drug would work, if at all, in humans. Senior members of the Glaxo/Wellcome team readily acknowledged the problem of predictability:

**Dr. David Barry:**

... we [do not] wish to indicate that sensitivity testing in [murine retrovirus] is in any way predictive of sensitivity of the human AIDS virus. We have generated a considerable amount of data to show that it is extremely unpredictive.

**Dr. Sandra Nusinoff Lehrman:**

Recent data would indicate that human retroviruses are sufficiently different from the [murine retroviruses]. ... [T]he use of this compound for AIDS could not be predicted.

13    However, some of the Glaxo/Wellcome scientists testified that they *believed* as early as November 1984 that AZT would work in humans against the HIV retrovirus. On December 5, 1984, Dr. Jane Rideout, the team member who had recommended testing AZT, sent a note to the Glaxo/Wellcome patent group stating: "Ethically the MD's at BW [Glaxo/Wellcome] cannot suppress the activity of such a compound for very long". By that, she meant that HIV/AIDS sufferers should not be deprived of potential relief through unnecessary delay, scientific timidity, or corporate dithering. Work on a patent application began soon afterwards.

14    Dr. Rideout shared the view that further work was essential. She added, in her note to the Glaxo/Wellcome patent group, that a patent should only be pursued "*if* [AZT is] active against HIV" and "*if* all this holds up [i.e., *if* activity is shown against HIV]" (emphasis added).

15    Glaxo/Wellcome was not equipped to undertake the more sophisticated testing required, and, given the lethal nature of HIV/AIDS, may not have been anxious to do so. It turned to a number of outside laboratories for screening compounds. These included Duke University and the Sloan-Kettering Institute whose work Glaxo/Wellcome partly funded. Testing of Glaxo/Wellcome candidate compounds was also done by the U.S. Food and Drug Administration and the National Cancer Institute of the U.S. National Institutes of Health (NIH). It should be emphasized that both of these U.S. government funded agencies were working for the benefit of the public, not Glaxo/Wellcome, in the search for a drug to combat what was emerging as a national health crisis.

16    The critical testing of the AZT compound was done by Drs. Samuel Broder and Hiroaki Mitsuya, both of the NIH, who were in the forefront of efforts to find medicines that could be used as treatments for AIDS. Their mandate was to use the public funds of the NIH to make AIDS therapies available to the public on an emergency basis. As Glaxo/Wellcome was using the NIH to test AZT, so NIH was using Glaxo/Wellcome and other pharmaceutical companies as suppliers of potentially useful compounds to be tested in the NIH program. Although NIH signed confidentiality agreements with Glaxo/Wellcome, as had other outside laboratories, the NIH did not, as had the private institutions, make an assignment to Glaxo/Wellcome of any intellectual property rights generated by work on Glaxo/Wellcome-supplied compounds.

17    The NIH screening was very sophisticated. Drs. Broder and Mitsuya had developed a *human* cell line (ATH8) that could propagate *in vitro*, be infected with HIV *in vitro*, and provide information relevant to the ability of candidate compounds to inhibit the replication of HIV in the T-cells of living patients. At the time, normal human T-cells were very difficult to grow *in vitro*. This work itself required exceptional inventive ingenuity and was eventually patented by the NIH under U.S. patent number 4,704,357.

18    By February 6, 1985, Glaxo/Wellcome had prepared a draft patent application. At that point, however, AZT had not been tested against HIV *in vitro* (i.e., in a petri dish), let alone administered to a human being in the context of the AIDS research.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

19    In mid-February 1985, Drs. Broder and Mitsuya found that AZT did indeed inhibit HIV replication in their *in vitro* HIV assay system, thus vindicating Glaxo/Wellcome's confidence (justified or not at the earlier date) in the potential benefits of AZT. This result was reported to Glaxo/Wellcome on February 21, 1985. At Dr. Broder's request, the identity of the compound was disclosed to the NIH about March 1, 1985. He was surprised. He suspected the mystery compound was probably suramin, with which he was familiar.

20    On March 16, 1985, Glaxo/Wellcome filed in the United Kingdom the patent application from which the Canadian patent claims priority. The appellants contend that because AZT had not, at that time, been administered to patients with HIV or AIDS, crucial information regarding its bioavailability, pharmacokinetics, metabolic characteristics, activity and toxicity was not known. Before it could be known whether AZT could be used as a treatment for HIV in humans, the appellants say, Glaxo/Wellcome needed to know if AZT would be absorbed into the human blood stream, make its way to the T-cells infected with HIV, enter the T-cells and inhibit the reproduction of the HIV infection without proving toxic to other cells, and demonstrate clinical improvement in the patient.

21    The argument in support of the patent's validity is that at least by March 1, 1985, when Glaxo-Wellcome received the results from the NIH showing AZT activity *in vitro* against HIV-infected human T-cells, it had a sound basis to predict all of these matters, and did so predict, and has been proven correct in that prediction by subsequent clinical experience. To have withheld disclosure of this new and very important use in a gathering international health crisis would have been, as Dr. Rideout noted back in December 1984, little short of irresponsible.

## II. Relevant Statutory Provisions

22    *Patent Act*, R.S.C. 1985, c. P-4:

**Interpretation**

"invention" means any new and useful art, process, machine, manufacture or composition of matter, or any new and useful improvement in any art, process, machine, manufacture or composition of matter;

**Application for Patents**

**27.** (1) Subject to this section, any inventor or legal representative of an inventor of an invention that was

(*a*) not known or used by any other person before he invented it,

(*b*) not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and

(*c*) not in public use or on sale in Canada for more than two years prior to his application in Canada,

may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

**Specifications and Claims**

**34.** (1) An applicant shall in the specification of his invention

(*a*) correctly and fully describe the invention and its operation or use as contemplated by the inventor;

(*b*) set out clearly the various steps in a process, or the method of constructing, making, compounding or using a machine, manufacture or composition of matter, in such full, clear, concise and exact terms as to enable any person

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 109 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

skilled in the art or science to which it appertains, or with which it is most closely connected, to make, construct, compound or use it;

. . . . .

(*d*) in the case of a process, explain the necessary sequence, if any, of the various steps, so as to distinguish the invention from other inventions; and

(*e*) particularly indicate and distinctly claim the part, improvement or combination that he claims as his invention.

**Refusal of Patents**

**40.** Whenever the Commissioner is satisfied that an applicant is not by law entitled to be granted a patent, he shall refuse the application and, by registered letter addressed to the applicant or his registered agent, notify the applicant of the refusal and of the ground or reason therefor.

**Form and Term of Patents**

**45.** Every patent granted under this Act shall be issued under the signature of the Commissioner and the seal of the Patent Office, shall bear on its face the date on which it is granted and issued and shall thereafter, in the absence of any evidence to the contrary, be valid and avail the grantee and his legal representatives for the term mentioned therein.

**Legal Proceedings in Respect of Patents**

**53.** (1) A patent is void if any material allegation in the petition of the applicant in respect of the patent is untrue, or if the specification and drawings contain more or less than is necessary for obtaining the end for which they purport to be made, and the omission or addition is wilfully made for the purpose of misleading.

(2) Where it appears to a court that the omission or addition referred to in subsection (1) was an involuntary error and it is proved that the patentee is entitled to the remainder of his patent, the court shall render a judgment in accordance with the facts, and shall determine the costs, and the patent shall be held valid for that part of the invention described to which the patentee is so found to be entitled.

**Définitions**

« invention » Toute réalisation, tout procédé, toute machine, fabrication ou composition de matières, ainsi que tout perfectionnement de l'un d'eux, présentant le caractère de la nouveauté et de l'utilité.

**Demandes de brevets**

**27.** (1) Sous réserve des autres dispositions du présent article, l'auteur de toute invention ou le représentant légal de l'auteur d'une invention peut, sur présentation au commissaire d'une pétition exposant les faits, appelée dans la présente loi le « dépôt de la demande », et en se conformant à toutes les autres prescriptions de la présente loi, obtenir un brevet qui lui accorde l'exclusive propriété d'une invention qui n'était pas :

*a*) connue ou utilisée par une autre personne avant que lui-même l'ait faite;

*b*) décrite dans un brevet ou dans une publication imprimée au Canada ou dans tout autre pays plus de deux ans avant la présentation de la pétition ci-après mentionnée;

*c*) en usage public ou en vente au Canada plus de deux ans avant le dépôt de sa demande au Canada.

**Mémoires descriptifs et revendications**

**34.** (1) Dans le mémoire descriptif, le demandeur :

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

*a*) décrit d'une façon exacte et complète l'invention et son application ou exploitation, telles que les a conçues l'inventeur;

*b*) expose clairement les diverses phases d'un procédé, ou le mode de construction, de confection, de composition ou d'utilisation d'une machine, d'un objet manufacturé ou d'un composé de matières, dans des termes complets, clairs, concis et exacts qui permettent à toute personne versée dans l'art ou la science dont relève l'invention, ou dans l'art ou la science qui s'en rapproche le plus, de confectionner, construire, composer ou utiliser l'objet de l'invention;

. . . . .

*d*) s'il s'agit d'un procédé, explique la suite nécessaire, le cas échéant, des diverses phases du procédé, de façon à distinguer l'invention d'autres inventions;

*e*) indique particuliérement et revendique distinctement la partie, le perfectionnement ou la combinaison qu'il réclame comme son invention.

**Rejet des demandes de brevets**

**40.** Chaque fois que le commissaire s'est assuré que le demandeur n'est pas fondé en droit à obtenir la concession d'un brevet, il rejette la demande et, par courrier recommandé adressé au demandeur ou à son agent enregistré, notifie à ce demandeur le rejet de la demande, ainsi que les motifs ou raisons du rejet.

**Forme et durée des brevets**

**45.** Tout brevet accordé en vertu de la présente loi est délivré sous la signature du commissaire et le sceau du Bureau des brevets. Le brevet porte à sa face la date à laquelle il a été accordé et délivré, et il est par la suite, sauf preuve contraire, valide et acquis au titulaire et à ses représentants légaux pour la période y mentionnée.

**Procédures judiciaires relatives aux brevets**

**53.** (1) Le brevet est nul si la pétition du demandeur, relative à ce brevet, contient quelque allégation importante qui n'est pas conforme à la vérité, ou si le mémoire descriptif et les dessins contiennent plus ou moins qu'il n'est nécessaire pour démontrer ce qu'ils sont censés démontrer, et si l'omission ou l'addition est volontairement faite pour induire en erreur.

(2) S'il apparaît au tribunal que pareille omission ou addition est le résultat d'une erreur involontaire, et s'il est prouvé que le breveté a droit au reste de son brevet, le tribunal rend jugement selon les faits et statue sur les frais. Le brevet est réputé valide quant à la partie de l'invention décrite à laquelle le breveté est reconnu avoir droit.

## III. Case History

### A. Federal Court, Trial Division **(1998), 145 F.T.R. 161** (Fed. T.D.)

23    Wetston J., in a detailed, comprehensive and thoughtful judgment, following 60 days of trial, began with the proposition that a patent is available for a new use for a known compound: *Shell Oil Co. v. Canada (Patent Commissioner)*, [1982] 2 S.C.R. 536 (S.C.C.). Moreover, the patent in this case does not make a claim to a method of medical treatment, which would be invalid: *Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111 (S.C.C.). With respect to inventorship, Wetston J. considered the degree and type of testing required to establish utility. The "act of inventing may be different in different circumstances. The range of expertise required in the pharmaceutical field, the nuances between theoretical and clinical proof, and the underlying public policy concerns of the safe and effective development of medicines, all serve to make utility in the pharmaceutical area highly complex" (para. 84).

24    Wetston J. found the insistence of Apotex and Novopharm on regulatory levels of safety to be "excessive" and "too high a standard" (para. 105). On the other hand, he rejected the applicability of the doctrine of sound prediction, which he

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

considered was limited to the situation where inventors claim a number of untested compounds based on the proven utility of one or more compounds.

25    He concluded that utility was *not* shown as of the February 6, 1985 draft application date. At that time there was no more than a belief that AZT "might be useful" to treat AIDS, and the claims at that date exceeded the invention. By March 16, 1985, however, the patent met the s. 2 requirements and did not exceed the invention claimed. The Glaxo/Wellcome researchers had received the initial NIH data showing that AZT was active in arresting the HIV retrovirus in human cells.

26    On the co-inventorship issue, Wetston J. cited *Burroughs Wellcome Co. v. Barr Laboratories Inc.*, 32 U.S.P.Q.2d 1915 (U.S. Fed. Cir. 1994), where it was observed that Drs. Broder and Mitsuya of the NIH were not a mere "pair of hands". They exercised "considerable skill" and were "uniquely qualified". They were given little instruction by Glaxo/Wellcome. In fact, Glaxo/Wellcome did not have the expertise to be able to instruct the NIH researchers in this regard. Wetston J. concluded that although all the 5 named Glaxo/Wellcome inventors were properly included, the NIH researchers were highly skilled "collaborators" and co-inventors on the utility aspect and should not have been omitted from the application: "the utility as claimed was not established without the extensive and direct involvement of the NIH .... [para. 224] In my opinion, the work of the NIH was not ancillary to the invention and this invention would not have been complete without their investigation, skill and research [para. 226]". Nevertheless, the failure to name co-inventors in this case was not "material" under s. 53(1) of the *Patent Act*, and the omission therefore did not render the patent invalid.

27    As to the claim for prophylaxis (as opposed to treatment), Wetston J. concluded that the claims were not broader than the invention or the disclosure, although the claim "for the treatment or prophylaxis of *all* human retroviral infections [was] overbroad" and speculative (para. 303, emphasis added). Wetston J. adjudged several of the claims to be invalid, but the remaining valid claims were infringed by the appellants' manufacture and sale of the generic version of AZT (para. 377).

**B. Federal Court of Appeal, (2000), [2001] 1 F.C. 495 (Fed. C.A.), (Rothstein, Sexton and Malone JJ.A. each writing part of a unitary set of reasons - October 26, 2000)**

*1. Sexton J.A.*

*(a) Co-Inventorship and Section 53 on Material Misrepresentation*

28    Sexton J.A. reversed the trial judge's conclusion on NIH co-inventorship and found that the facts demonstrated that Drs. Broder and Mitsuya do not satisfy the legal definition of inventorship. The subject matter of the invention was conceived without their assistance. They agreed only to test an unknown substance on Glaxo/Wellcome's behalf. That people other than the inventors perform the tests does not make them "inventors".

29    Sexton J.A. concluded that February 6, 1985 may be the relevant date of invention, since by that point the draft patent application had been distinctly formulated; however, he declined to choose between February 6, 1985 (draft application) or March 16, 1985 (priority date) because in either event the patent was valid.

30    Although he did not find it necessary to address s. 53 given the conclusions on co-inventorship, Sexton J.A. agreed that failure to name an inventor is not a violation of s. 53.

*(b) Utility and Date of Completion of Invention*

31    Sexton J.A. was of the view that the date of invention can, in effect, be backdated where speculation at the time of invention is subsequently confirmed by the time the patent is attacked. Sexton J.A. offers an analogy with the Wright brothers, suggesting that it would be "illogical" if a hypothetical patent for a heavier-than-air flying machine, considered by critics at the time to be based on an unsound prediction, could not be upheld on the basis of post-patent evidence that the invention actually works. Any other approach would require a court to close its eyes as to "continuing scientific advancements" (para. 52). The attack on the validity of the patent on this ground, too, should be rejected.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 112 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

### 2. Malone J.A.

32     Malone J.A. upheld the trial judge on obviousness, novelty, ambiguity, and sufficiency of disclosure.

### 3. Rothstein J.A.

33     Rothstein J.A. agreed with the trial judge that the invention here is a new use for a known compound and not a method of medical treatment. However, only those claims relating to the *use* of the known compound are patentable and not those which purport to include the compound formulation itself. Accordingly, claim no. 1 and those dependent on it were struck down.

34     With respect to prophylaxis, Rothstein J.A. held that there was evidence that AZT could prevent fetal transmission of HIV from pregnant women and arrest infections received by health care workers and others stuck with contaminated needles. This, in his view, demonstrated some prophylactic properties and the fact the information was not available until years after the patent was not relevant. "[T]he time at which usefulness is to be established is when required by the Commissioner of Patents or in court proceedings when the validity of the patent is challenged on that ground. There was such evidence before Wetston J..." (para. 93). Rothstein J.A. thus concluded that the claims for the prophylactic use of AZT against AIDS are valid.

## IV. Analysis

35     AZT has earned for the respondents hundreds of millions of dollars in worldwide sales since its usefulness was discovered for the treatment of HIV and AIDS. In the United States alone, it is estimated that AZT earned for the patent owner a profit of $592 million between 1987 and 1993: J. Yardley, "Industry Giant Owns Right to AIDS Drug? N.C. Trial to Decide", *Atlanta Constitution*, June 27, 1993 at p. 14, quoted in "Case Comment: *Burroughs Wellcome Co. v. Barr Laboratories Inc.* 108 Harv. L. Rev. 2053, at note 17.

36     It is not surprising that the appellants, being generic drug manufacturers, would like to obtain at least a percentage of the AZT market in Canada. To do so they must somehow have the patent declared invalid. Yet their challenge, understandably motivated by the hope of private profit, raises broader issues of public interest.

37     A patent, as has been said many times, is not intended as an accolade or civic award for ingenuity. It is a method by which inventive solutions to practical problems are coaxed into the public domain by the promise of a limited monopoly for a limited time. Disclosure is the *quid pro quo* for valuable proprietary rights to exclusivity which are entirely the statutory creature of the *Patent Act*. Monopolies are associated in the public mind with higher prices. The public should not be expected to pay an elevated price in exchange for speculation, or for the statement of "any mere scientific principle or abstract theorem" (s. 27(3)), or for the "discovery" of things that already exist, or are obvious. The patent monopoly should be purchased with the hard coinage of new, ingenious, useful and unobvious disclosures. The appellants' argument here is that the identification in March of 1985 of AZT as a treatment and prophylaxis for HIV/AIDS was a shot in the dark, a speculation based on inadequate information and testing, a lottery ticket for which the public in general and HIV and AIDS sufferers in particular have paid an exorbitant price. AZT works, but for reasons both unknown and unknowable by Glaxo/Wellcome at the time it filed its patent application, the appellants argue. A lucky guess is not, they say, patentable.

38     Furthermore, if credit is to be given, the appellants argue, it should go to Drs. Broder and Mitsuya at the NIH who actually established the utility of AZT in human T-cells. If the patent on AZT was owned by the NIH or even by a co-ownership of Glaxo/Wellcome and the NIH, they say, the commercial history of AZT would have been vastly more oriented to the public interest.

39     The public interest arguments were not advanced in the U.S. just by advocates of rights for AIDS patients. The NIH itself in 1991 granted a non-exclusive licence to Barr Laboratories "to exploit any patent rights" the NIH "might have" in Glaxo/Wellcome's AZT patents. See Case Comment, *supra*, at p. 2054. See also "Agency Wants to End AIDS Drug Monopoly", *The New York Times*, May 29, 1991, p. A24. However, the U.S. patent owner successfully defeated this challenge in *Burroughs Wellcome Co. v. Barr Laboratories Inc.*, *supra*, and see Case Comment, *supra*.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 113 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

40    Under United States law, the Court of Appeals for the Federal Circuit said, it was irrelevant that Glaxo/Wellcome had no evidence of AZT's effectiveness against the HIV/AIDS virus in humans and no reasonable basis for believing that the invention would work (*Burroughs Wellcome Co. v. Barr Laboratories Inc.* , *supra*, at p. 1921) until it subsequently received the NIH results. It was sufficient that on February 6, 1985, Glaxo/Wellcome scientists had a concept that was "definite and permanent" which could be applied by a person skilled in the art "without extensive research or experimentation" (p. 1919). In order for there to be an invention in the United States, U.S. law requires "reduction to practice". "Constructive reduction to practice" may occur when a patent application is filed in which an untested invention is adequately disclosed: *Tavis v. Baker*, 137 F.2d 109 (U.S. Ct. of Cust. & Patent App. 1943), at p. 111. This seems to have some affinity with our doctrine of "sound prediction" discussed below. However, given the differences in our respective patent laws, the outcome of the U.S. litigation on this patent is of limited interest here.

## A. The Standard of Review

41    The Commissioner of Patents in this case allowed 78 claims. His decision in this respect is entitled to limited deference. In fact, the courts below have struck out 59 of the 78 claims allowed by the Commissioner, and no cross-appeal has been taken against these rulings.

42    Unlike the *Harvard Mouse* case (*Harvard College v. Canada (Commissioner of Patents)*, 2002 SCC 76 (S.C.C.) ), released concurrently, these appeals are not limited to a question of law (i.e., the statutory limits of patentable subject matter). On that issue, the standard is correctness. The issue here is one of mixed fact and law, namely, was the Commissioner properly satisfied the claimed invention met the statutory test of utility? Fact finding generally commands deference, but here Parliament has provided an unfettered right of appeal to the Federal Court (*Patent Act*, s. 42).

43    There is no privative clause and the statutory presumption of the patent's validity in s. 45 of the *Patent Act* is rather weakly worded. It provides that after issuance a patent "in the absence of any evidence to the contrary" is presumed to be valid. As Pratte J. (as he then was) said in *Rubbermaid (Canada) Ltd. v. Tucker Plastic Products Ltd.* (1972), 8 C.P.R. (2d) 6 (Fed. T.D.), at p. 14:

> ... once the party attacking the patent has introduced evidence, the Court, in considering this evidence and in determining whether it establishes the invalidity of the patent, must not take the presumption into account. It cannot be said that the presumption created by [now s. 45] is, as a rule, either easy or difficult to overcome; in some cases, the circumstances may be such that the presumption will be easily rebutted, while, in other cases the same result may be very difficult or even impossible to obtain.

In other words, the statutory "presumption" adds little to the onus already resting, in the usual way, on the attacking party. The Commissioner and his staff have considerable expertise in these matters but the trial judge heard 60 days of expert evidence and legal submissions that post-dated their review of the patent application.

44    In the circumstances, I think the appropriate standard of review of these issues, which largely raise mixed questions of law and fact, is reasonableness *simpliciter*, i.e., that the Commissioner's decision must withstand a somewhat probing examination: (*Canada (Director of Investigation & Research) v. Southam Inc.*, [1997] 1 S.C.R. 748 (S.C.C.), at para. 56).

## B. Inventorship

45    The role of the Commissioner in scrutinizing patent applications is extremely important. The grant of a patent monopoly for 17 years (20 years after October 1, 1989) creates, and is intended to create, serious anti-competitive effects. Once the subject matter of the patent is fenced in by the claims, others trespass (advertently or inadvertently) on the forbidden territory at their peril. The boundary is defended by a considerable arsenal of remedies conferred by the *Patent Act*, including an accounting of the infringer's profits in an appropriate case. Patent litigation is usually protracted and costly. (The present litigation commenced in 1990 and took 12 years to get here.) There is in the meantime a chilling effect on other researchers. They will tend to invest their talents in less litigious areas. Parliament considered this chilling effect to be a worthwhile price for the disclosure of a

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

"new and useful" invention, bringing into the public domain information that might otherwise remain a trade secret, but there is nothing in the Act to suggest that Parliament was prepared to accept the chilling effect in exchange for nothing but speculation.

46      Glaxo/Wellcome argues that where the subject matter of the patent is a new use for an old chemical compound, it is enough that the invention is reduced to a definite and practical shape "by the formulation of a written or oral description". This cannot be correct. The concept might be beautifully described but at the same time be quite wrong and misleading to people who consult it. In such a case, the public would be spending its monopoly rights for *mis*information, and in the process litter the patent registry with useless patents that might impede others in their search for a real solution to the same problem. Nor, in my view, is it enough for a patent owner to be able to buttress speculation with post-patent proof, and thereby to turn dross into gold. Utility is an essential part of the definition of an invention (*Patent Act*, s. 2). A policy of patent first and litigate later unfairly puts the onus of proof on the attackers to prove *invalidity*, without the patent owner's ever being put in a position to establish validity. Unless the inventor is in a position to establish utility as of the time the patent is applied for, on the basis of either demonstration or sound prediction, the Commissioner "by law" is required to refuse the patent (*Patent Act*, s. 40).

47      I propose now to deal with these propositions in more detail.

*1. Patentable Subject Matter*

48      There is no serious challenge in this case to subject matter patentability. "[H]itherto unrecognized properties" can constitute a patentable new use for an old substance: *Shell Oil, supra, per* Wilson J. at p. 549. In that case, it was disclosed in the patent that known chemical compounds revealed a previously unrecognized use as plant growth regulators.

49      At trial, the present appellants argued that the patent was invalid as seeking to monopolize a method of medical treatment contrary to *Tennessee Eastman Co. v. Commissioner of Patents*, *supra*, but this was rightly rejected. *Tennessee Eastman* was concerned with the patentability of a surgical method for joining incisions or wounds by applying certain compounds. The decision was based on the former s. 41 of the *Patent Act*, now repealed. The Court concluded that the method (apart from the compounds) was not patentable. The policy rationale, as explained by Wilson J. in *Shell Oil, supra*, at p. 554, was that the unpatentable claim was

> ... essentially non-economic and unrelated to trade, industry, or commerce. It was related rather to the area of professional skills.

50      The AZT patent does not seek to "fence in" an area of medical treatment. It seeks the exclusive right to provide AZT as a commercial offering. How and when, if at all, AZT is employed is left to the professional skill and judgment of the medical profession.

*2. Proof of utility*

51      The *Patent Act* defines an "invention" as, amongst other criteria, "new and useful" (s. 2). If it is not useful, it is not an invention within the meaning of the Act.

52      It is important to reiterate that the *only* contribution made by Glaxo/Wellcome in the case of AZT was to identify a new *use*. The compound itself was not novel. Its chemical composition had been described 20 years earlier by Dr. Jerome Horwitz. Glaxo/Wellcome claimed a hitherto unrecognized *utility* but if it had not established such utility by tests or sound prediction at the time it applied for its patent, then it was offering nothing to the public but wishful thinking in exchange for locking up potentially valuable research turf for (then) 17 years. As Jackett C.J. observed in *Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1979), 42 C.P.R. (2d) 33 (Fed. C.A.), at p. 39:

> By definition an "invention" includes a "new and useful process". A "new" process is not an invention unless it is "useful" in some practical sense. Knowing a new process without knowing its utility is not in my view knowledge of an "invention".

53      Glaxo-Wellcome says the invention was complete when the draft patent application was circulated internally on February 6, 1985. Its argument here, as in the United States, was that the written description identified the drug and its new use sufficiently

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

to give the invention "definite and practical shape". It taught persons skilled in the art how the invention could be practised. This, however, misses the point. The question on February 6, 1985 was not whether or how the invention could be practised. The question was whether AZT did the job against HIV that was claimed; in other words, whether on February 6, 1985 there was *any* invention at all within the meaning of s. 2 of the *Patent Act*.

54      Canadian case law dealing with inventorship has to be read keeping the particular factual context in mind. In *Rice v. Christiani & Nielsen*, [1930] S.C.R. 443 (S.C.C.), this Court held, *per* Rinfret J. (as he then was), at p. 454:

> ... for the purpose of section 7 [now s. 27] "it is not enough for a man to say that an idea floated through his brain; he must at least have reduced it to a definite and practical shape before he can be said to have invented a process". [Emphasis added.]

The claimed invention in that case was a process for manufacturing porous cement. The utility of porous cement was not in dispute. The question was how to make it, and who was the first to invent the process. In this case, Dr. Horwitz taught everyone how to make AZT. The question was what could usefully be done with it. In *Ernest Scragg & Sons Ltd. v. Leesona Corp.*, [1964] Ex. C.R. 649 (Can. Ex. Ct.), Thorson P. held that if the invention related to an apparatus or process, it was sufficient if the apparatus had actually been built or the process used. The invention in that case was for "Thermoplastic Yarns and Methods of Processing Them" (p. 659). AZT had been compounded and used in 1964, but not by Glaxo/Wellcome, and not in relation to HIV/AIDS. The invention claimed here related entirely to the new and hitherto unexpected use. Glaxo/Wellcome also cites *Owens-Illinois Inc. v. Keohring Waterous Ltd.* (1980), 52 C.P.R. (2d) 1 (Fed. C.A.), (leave to the Supreme Court of Canada refused December 18, 1980, (1980), [1980] 2 S.C.R. ix (S.C.C.)), which dealt with an invention to harvest and process trees in the middle of a forest. The utility was obvious. The invention lay in the machine and its operation. Glaxo/Wellcome also relied upon two Canadian appeals to the Privy Council for the proposition that "proof of utility is not required for there to be an invention" (factum para. 45): *Permutit Co. v. Borrowman*, [1926] 4 D.L.R. 285 (Canada P.C.), and *Canadian General Electric Co. v. Fada Radio Ltd.* (1929), [1930] 1 D.L.R. 449 (Canada P.C.). In neither case was utility in doubt. *Permutit* dealt with a process for softening water and *Fada Radio* dealt with a radio tuning device. There may in such cases be some doubt about the commercial success of the invention, but utility in this context means useful for the purpose claimed, not commercial acceptance.

55      In the present case, by contrast, if the utility of AZT for the treatment of HIV/AIDS was unpredictable at the time of the patent application, then the inventors had not made an invention and had offered nothing to the public in exchange for a 17-year monopoly except wishful thinking.

56      Where the new use is the *gravamen* of the invention, the utility required for patentability (s. 2) must, as of the priority date, either be demonstrated or be a sound prediction based on the information and expertise then available. If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, *per* Pigeon J. in *Monsanto Co. v. Canada (Commissioner of Patents)*, [1979] 2 S.C.R. 1108 (S.C.C.), at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

*3. The limits of sound prediction*

57      The evidence accepted by the trial judge showed that by March 16, 1985 Glaxo/Wellcome had sufficient information about AZT and its activity against HIV in human cells to make a sound prediction that AZT would be useful in the treatment and prophylaxis of HIV/AIDS in human beings. To the extent its claims went beyond the limits within which the prediction remained sound (e.g., in claiming treatment for human retroviruses other than HIV), the Federal Court properly struck them out.

58      Although the trial judge did not consider the doctrine of "sound prediction" to be applicable in this sort of case, he seems to have applied it nevertheless when he decided that the claims did not exceed the invention, starting at para. 108. He also seems to have applied it when he upheld the patent claims for prophylaxis as well as treatment. At para. 292 he pointed out, in that connection, that "*demonstrated* utility or reduction to practice is *not* a requirement under Canadian patent law" (emphasis added). Lack of *demonstrated* utility does not obviate the need for sound prediction.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

59    The doctrine of sound prediction seems to have had its genesis in a comment by Lord MacDermott in *May & Baker Ltd. & Ciba Ltd.'s Letters Patent, Re* (1950), 67 R.P.C. 23 (U.K. H.L.), at p. 50 (where, however, he rejected its application on the facts). It was connected to the requirement that the claims be "fairly based" on the patent disclosure: *I.G. Farbenindustrie A.G.'s Patents, Re* (1930), 47 R.P.C. 289 (Eng. Ch. Div.), at pp. 322-23. The principle of "fair basis" was later explicitly incorporated into the British *Patents Act, 1949*, 1949 (U.K.), c. 87, ss. 4(3) and 32(1)(*i*). While these specific provisions were repealed in 1977, the "fair basis" doctrine seems still to be a force in British patent law; see Lord Hoffman in *Biogen Inc. v. Medeva PLC*, [1997] R.P.C. 1 (Eng. H.L.).

60    The doctrine of "sound prediction" was given serious shape and substance by Graham J. in *Olin Mathieson Chemical Corp. v. Biorex Laboratories Ltd.*, [1970] R.P.C. 157 (Eng. Ch. Div.). In that case the proposition was framed as follows, at p. 182:

>    If it is really possible, according to the evidence, to make a sound prediction about a certain area, then prima facie it would be reasonable that the patentee should have a claim accordingly....

61    The doctrine was explicitly received into our law in *Monsanto, supra*. In that case, the Court was confronted with a patent that included claims to numerous chemical compounds to inhibit premature vulcanization of rubber, but only three of the claimed compounds had actually been prepared and tested before the date the application was filed. The examiner rejected the claims to the untested compounds, holding that "'broad product claims must be adequately supported by a sufficient number of [tested] examples'" (p. 1111). The rejection was upheld by the Patent Appeal Board and the Federal Court, but this Court reversed on the basis that the "architecture of chemical compounds" was no longer a mystery but, within limits, soundly predictable. Pigeon J. thus wrote, at pp. 1118-19:

>    Although the report of the Board is quite lengthy, in the end with respect to claim 9 all it says after stating the principle with which I agree, is that a claim has to be restricted to the area of <u>sound prediction</u> and "we are not satisfied that three specific examples are adequate". As to why three is not enough nothing is said. In my view this is to give no reason at all in a matter which is not of speculation but of exact science. We are no longer in the days when the architecture of chemical compounds was a mystery. By means of modern techniques, chemists are now able to map out in detail the exact disposition of every atom in very complex molecules. It, therefore, becomes possible to ascertain, as was done in *Olin Mathieson*, [*infra*], the exact position of a given radical and also to relate this position to a specific activity. It thus becomes possible to predict the utility of a substance including such radical. [Emphasis added.]

62    Pigeon J. found persuasive a line of British patent cases including the decisions of the House of Lords in *May & Baker Ltd. & Ciba Ltd.'s Letters Patent* , *supra*, and *Mullard Radio Valve Co. v. Philco Radio & T.V. Corp. of Great Britain* (1936), 53 R.P.C. 323 (U.K. H.L.), as well as the Chancery Division judgment in *Olin Mathieson, supra*. Pigeon J. adopted a number of propositions stated by Graham J. in *Olin Mathieson*, a case dealing with claims to certain chemical derivatives for pharmaceutical use as tranquillizers, in their entirety, at pp. 1116-17:

>    Where, then, is the line to be drawn between a claim which goes beyond the consideration and one which equiparates with it? In my judgment this line was drawn properly by Sir Lionel when he very helpfully stated in the words quoted above that it depended upon whether or not it was possible to make a <u>sound prediction</u>. If it is possible for the patentee to make a <u>sound prediction</u> and to frame a claim which does not go beyond the limits within which the prediction remains sound, then he is entitled to do so. Of course, in so doing he takes the risk that a defendant may be able to show that his prediction is unsound or that some bodies falling within the words he has used have no utility or are old or obvious or that some promise he has made in his specification is false in a material respect; but if, when attacked, he survives this risk successfully, then his claim does not go beyond the consideration given by his disclosure, his claim is fairly based on such disclosure in these respects, and is valid. [Emphasis added.]

Adopting this admirably concise formulation, Pigeon J. drew the following conclusion at p. 1117:

>    I have quoted again the passage quoted by the [Patent Appeal] Board because I consider the last sentence of the paragraph of some importance as it does clearly indicate what is meant by a "sound prediction". <u>It cannot mean a certainty</u> since

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

it does not exclude all risk that some of the area covered may prove devoid of utility. It thus appears to me that the test formulated by Graham J. involves just two possible reasons for rejecting claims such as those in issue.

1. There is evidence of lack of utility in respect of some of the area covered; [or]

2. It is not a sound prediction. [Emphasis added.]

63    Our Federal Court of Appeal subsequently applied the doctrine of "sound prediction" in the context of a patent for a pharmaceutical product in *Ciba-Geigy v. Canada (Commissioner of Patents)* (1982), 65 C.P.R. (2d) 73 (Fed. C.A.). In that case, Thurlow C.J. upheld product and process claims in relation to certain "new amines" useful in cardiac treatment, but added the qualification that what is predictable chemically may not be predictable pharmacologically, at p. 77:

The predictability of a particular result seems to me to be essentially a question of fact, though in some situations it may be a matter of common knowledge. With respect to chemical reactions it is apparent from the foregoing that knowledge in the chemical art as to the predictability of chemical reactions has advanced considerably in the 50 years since *Chipman Chemicals Ltd. v. Fairview Chemical Co. Ltd.*, [1932] Ex. C.R. 107, was decided. The predictability of chemical reactions should not, however, be confused with predictability of the pharmacological effects and thus of the pharmacological utility of new substances. [Emphasis added.]

64    Thurlow C.J. was not laying down as a matter of law that pharmacological utility cannot be predicted because, as he said, predictability is "essentially a question of fact". It will depend on the evidence. In *Beecham Group v. Bristol Laboratories Ltd.*, [1978] R.P.C. 153 (U.K. H.L.), for example, claims in respect of a semi-synthetic penicillin were invalidated as being little more than an announcement of a research project (p. 570). In that case, on the facts, Lord Diplock stated at p. 579:

The evidence in the instant case is overwhelming that it is not yet possible to predict in advance what, if any, special therapeutic advantages will be possessed by a penicillin made to a particular formula. The only way to find out is to make it and discover what its therapeutic characteristics are by conducting extensive tests upon it *in vitro* and *in vivo*.

65    However, where, as here, the trial judge accepts on the evidence that the inventors *could* in fact make a sound prediction that an old compound (AZT) offers a hitherto unexpected utility in the treatment and prophylaxis of HIV/AIDS, then (and only then) does their disclosure of "the invention" offer real consideration for the monopoly benefits they seek.

66    The doctrine of "sound prediction" balances the public interest in early disclosure of new and useful inventions, even before their utility has been verified by tests (which in the case of pharmaceutical products may take years) and the public interest in avoiding cluttering the public domain with useless patents, and granting monopoly rights in exchange for misinformation.

*4. The trial judge's rejection of "sound prediction" in this case*

67    The trial judge concluded that the doctrine of sound prediction did not apply here because in his view the doctrine addresses the issue of *testing* rather than *utility*. Thus the absence of tests confirming the suitability of certain compounds was held not to be fatal (because the results were soundly predictable) in *Monsanto* itself, and in *Burton Parsons Chemicals Inc. v. Hewlett-Packard (Canada) Ltd.* (1974), [1976] 1 S.C.R. 555 (S.C.C.). The doctrine was used in those cases to permit the inventors to extrapolate from the utility of a proven invention to the utility of equivalent chemical compounds. "Accordingly", the trial judge concluded at para. 99, "it would be inappropriate to rely on the doctrine of sound prediction where the true cause of invalidity is not inutility but insufficient testing".

68    The Court of Appeal, on the other hand, considered the doctrine of sound prediction to be unnecessarily strict. Sexton J.A., with whom Rothstein J.A. specifically agreed on this point, stated at para. 50:

In my view, this Court's decision in *Ciba-Geigy* stands for the proposition that even where an invention constitutes a speculation as of the priority date claimed in the patent, the patent will not be invalid if it turns out that the speculation is valid at the time the patent is attacked.

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

69    With respect, I think Parliament intended to get something more than speculation in exchange for the grant of a patent monopoly (a point which is further discussed below). On the other hand, I do not think, with respect, that the doctrine of sound prediction is limited to the narrow ambit ascribed to it by the trial judge. Once it is accepted that in appropriate circumstances utility can be predicted in advance of complete testing (whether of untested chemical compounds or otherwise), there seems no reason in principle why the doctrine should not be applied more generally, depending, of course, on the expert evidence. There is no doubt that care must be taken that the doctrine is not abused, and that sound prediction is not diluted to include a lucky guess or mere speculation. The public is entitled to obtain a solid teaching in exchange for the patent rights.

*5. The requirements of the doctrine of "sound prediction"*

70    The doctrine of sound prediction has three components. Firstly, as here, there must be a factual basis for the prediction. In *Monsanto* and *Burton Parsons*, the factual basis was supplied by the tested compounds, but other factual underpinnings, depending on the nature of the invention, may suffice. Secondly, the inventor must have at the date of the patent application an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis. In *Monsanto* and *Burton Parsons*, the line of reasoning was grounded in the known "architecture of chemical compounds" (*Monsanto*, at p. 1119), but other lines of reasoning, again depending on the subject matter, may be legitimate. Thirdly, there must be proper disclosure. Normally, it is sufficient if the specification provides a full, clear and exact description of the nature of the invention and the manner in which it can be practised: H. G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), at p. 167. It is generally not necessary for an inventor to provide a theory of *why* the invention works. Practical readers merely want to know that it does work and how to work it. In this sort of case, however, the sound prediction is to some extent the *quid pro quo* the applicant offers in exchange for the patent monopoly. Precise disclosure requirements in this regard do not arise for decision in this case because both the underlying facts (the test data) and the line of reasoning (the chain terminator effect) were in fact disclosed, and disclosure in this respect did not become an issue between the parties. I therefore say no more about it.

71    It bears repetition that the soundness (or otherwise) of the prediction is a question of fact. Evidence must be led about what was known or not known at the priority date, as was done here. Each case will turn on the particularities of the discipline to which it relates. In this case, the findings of fact necessary for the application of "sound prediction" were made and the appellants have not, in my view, demonstrated any overriding or palpable error.

72    On March 1, 1985, Glaxo/Wellcome received from the NIH the key results of the *in vitro* test of AZT against the HIV in a human cell line. This, taken together with Glaxo/Wellcome's own data on AZT, including the mouse tests, provided a factual foundation. Glaxo/Wellcome's knowledge of the mechanism by which a retrovirus reproduces, and the "chain terminator effect" of AZT, as disclosed in the patent, was found by the trial judge to provide a line of reasoning by which utility could be established as of the date of the U.K. patent application, March 16, 1985, which is also the priority date by which the invention must be evaluated for purposes of the Canadian patent. Although "sound prediction" was not the precise approach followed by the trial judge, his reasoning as well as his ultimate ruling is entirely consistent with its application.

*6. The Trial Judge's Key Findings*

73    The trial judge upheld the claim in suit on the following bases:

(i) Glaxo/Wellcome had information regarding toxicity, pharmacokinetics and the pharmacology of AZT in an internal document called the "Wise-Burchall report" dated December 12, 1984 (paras. 116 and 177), as well as some preliminary testing on HeLa Alpha-DNA polymerase (para. 118).

(ii) Glaxo/Wellcome's experience with other nucleoside analogues suggested that it was likely that AZT would be absorbed by oral administration making it potentially suitable for prolonged therapy (para. 177).

(iii) It was known by Glaxo-Wellcome in 1984 that:

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 119 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

1) Compounds of the class of nucleoside analogues could act as chain terminators in reactions involving DNA polymerase;

2) The inhibition of HIV-I reverse transcriptase would prevent the reverse transcription of the viral genome from RNA into DNA and would thus prevent integration of the viral genome into the genome of the host;

3) Both MLV and HIV were retroviruses; and

4) Glaxo knew that AZT would inhibit the replication of [two strains of retrovirus in mouse cells] in November-December 1984 (para. 249).

(iv) On receipt of the *in vitro* data from the NIH in February 1985, Glaxo/Wellcome knew that AZT inhibits the replication of HIV in a human cell line, albeit through *in vitro* rather than through *in vivo* testing. The trial judge found that "'in vitro' tests may be adequate when the art would accept this as appropriately correlated with 'in vivo' utility in humans. As such, 'in vitro' tests involving human cells may be sufficient if coupled with other evidence, for example, success with other nucleoside analogues, studies or assays that allowed one to determine whether the drug produces little or no toxicity even in relatively high doses" (para. 179).

(v) In the trial judge's view, "these results, considered cumulatively, in conjunction with all of the evidence adduced and considered in this trial, moves the invention out of the sphere of belief and into the realm of the inventors having deduced the complete invention" (para. 185).

74    At para. 186 of his judgment, the trial judge said that "[a]ccordingly, as of March 16, 1985, I find that the patent satisfied, subject to obviousness, the requirements of s. 2 of the Act and does not exceed the invention claimed. The idea, hypothesis or theory had, at this time, been reduced to a definite and practical shape".

75    These conclusions support a finding of sound prediction. The trial judge has found that the inventors possessed and disclosed in the patent both the factual data on which to base a prediction, and a line of reasoning (chain terminator effect) to enable them to make a sound prediction at the time they applied for the patent.

76    Not all predictions, even sound ones, turn out to be correct. If the Glaxo/Wellcome prediction had subsequently been shown to be wrong, the patent would have been invalidated for want of utility. But, as Pigeon J. remarked in *Monsanto, supra*, at p. 1116, commenting on *Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.*, [1968] S.C.R. 950 (S.C.C.), "while the substances without utility had not been tested, the true cause of the invalidity was the fact that they were without utility, not that they had not been tested before the patent was applied for".

77    The appellants take issue with the trial judge's conclusion. In their factum (though not in oral argument), they argue that utility must be demonstrated by prior human clinical trials establishing toxicity, metabolic features, bioavailability and other factors. These factors track the requirements of the Minister of Health when dealing with a new drug submission to assess its "safety" and "effectiveness". See now: *Food and Drug Regulations*, C.R.C., c. 870, s. C.08.002.(2) as amended by SOR/95-411, s. 4, which provides in part:

A new drug submission shall contain sufficient information and material to enable the Minister to assess the safety and effectiveness of the new drug. ...

The prerequisites of proof for a manufacturer who wishes to market a new drug are directed to a different purpose than patent law. The former deals with safety and effectiveness. The latter looks at utility, but in the context of inventiveness. The doctrine of sound prediction, in its nature, presupposes that further work remains to be done.

*C. Glaxo/Wellcome's After-the-Fact Validation Theory*

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

78    Glaxo/Wellcome contends that because AZT turned out to have both treatment and (limited) prophylactic properties, its prediction must necessarily have been sound, and the patent upheld on that basis. This argument presupposes that the critical date to establish utility is the state of knowledge when the patent is attacked, even though the attack may come years after its issuance, rather than as of the date the patent application is filed. The patent in this case was applied for in 1986, and issued in 1988. The trial did not occur until 1997, almost a decade after the grant of the AZT patent in Canada.

79    The "after-the-fact" validation theory was accepted by the Federal Court of Appeal, at para. 51:

In other words, so long as an inventor can demonstrate utility or a sound prediction at the time a patent is attacked, the patent will not fail for lack of utility. The time at which usefulness is to be established is when required by the Commissioner of Patents or in court proceedings when the validity of the patent is challenged on that ground.

80    In my view, with respect, Glaxo/Wellcome's proposition is consistent neither with the Act (which does not postpone the requirement of utility to the vagaries of when such proof might actually be demanded) nor with patent policy (which does not encourage the stockpiling of useless or misleading patent disclosures). Were the law to be otherwise, major pharmaceutical corporations could (subject to cost considerations) patent whole stables of chemical compounds for all sorts of desirable but unrealized purposes in a shot-gun approach hoping that, as in a lottery, a certain percentage of compounds will serendipitously turn out to be useful for the purposes claimed. Such a patent system would reward deep pockets and the ingenuity of patent agents rather than the ingenuity of true inventors.

81    The Federal Court of Appeal was concerned that patents based on "instinct and intuition (and) gut reaction" might be invalidated in a case where the ignorance that passed at the time for "sound prediction" turned out to be wrong and the inventor eventually vindicated. An example was given of a hypothetical patent on the Wright brothers' airplane. Perhaps all the "experts" thought it would not fly, but it did. Would it not be illogical, it was asked, to invalidate a hypothetical patent on a heavier-than-air flying machine because scientific opinion in the pre-flight era was wrong?

82    The hypothetical Wright brothers patent relates to a new and useful product, rather than (as here) to a new *use* for an old product, but all the same it illustrates, I think, the flaw in the Glaxo/Wellcome argument. The mere idea of a "heavier-than-air flying machine" is no more patentable than would be "*anything* that grows hair on bald men" (emphasis in original): *Free World Trust c. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66 (S.C.C.)), at para. 32. The patent (even in this improbable scenario) would have to teach precisely *how* the machine could be made to fly. Section 34(1)(*b*) requires the applicant to set out in the specification "the method of constructing, making ... or using a machine ... in such full, clear, concise and exact terms as to enable any person skilled in the art ... to make, construct ... or use it". This means the Wright brothers' hypothetical patent would have to describe, amongst other things, how to design an air foil that creates "lift" by reducing the air pressure on the upper surface of the wing as the air rushes over it, as well as a suitable airborne method of forward locomotion. If the essentials of the heavier-than-air flying machine were set out with sufficient precision to allow the reader actually to make a flying machine that flies, it is hard to accept the "hypothetical" that experts would continue to insist, after it had flown, that the prediction was unsound. (Of course, if the prediction turned out to be wrong, the patent would be struck down for inutility. Leonardo da Vinci's elegant drawings showed exactly how to make a "bird man" machine but it never could, would or did sustain a person in flight.)

83    On the other hand, if the patent failed to disclose the essentials of a heavier-than-air flying machine, such that no one could "soundly predict" whether or not the ill-defined thing could get off the ground, then the patent would be rightly invalidated, even though the inventors had eventually flown some sort of machine in the meantime. It goes back to the same point. The public is entitled to accurate and meaningful teaching in exchange for suffering the patent monopoly. The patent claims must be supported by the disclosure. Speculation, even if it afterwards proves justified, does not provide valid consideration. As Lord Mustill pointed out in *Genetech Inc.'s Patent*, [1989] R.P.C. 147 (Eng. C.A.), at p. 275:

Many years ago, an inventor could not have patented a heavier-than-air flying machine simply by writing down the concept, but equally the fact that the concept was capable of being written down in advance could not, in itself, exclude the rights of a person who had actually made one fly.

84    The Federal Court of Appeal claimed support for its position in a statement by Thurlow C.J. in *Ciba-Geigy*, *supra*, at p. 77:

> ... if indeed what is in the patent specification was mere speculation or prediction, the speculation or prediction having turned out to be true, ought to be considered to have been well founded at the time it was made. Even at the time it was made it is not improbable that it would have been considered well founded.

It is unfortunate that Thurlow C.J. speaks of "speculation or prediction" in the same breath without distinguishing between the two concepts. The two sentences, standing alone, give some support to the position taken in this case by the Federal Court of Appeal. However, the two sentences do not stand alone. Thurlow C.J. purported to be applying *Monsanto, supra*, and in the passage from *Monsanto* that he quotes Pigeon J. says it is central to the analysis that he is dealing with

> ... a matter which is not of speculation but of exact science. We are no longer in the days when the architecture of chemical compounds was a mystery. [Emphasis added.]

The point of Pigeon J.'s reasons is that a wide gulf separates speculation from "exact science" and it is the latter that may (or may not, depending on the expert evidence) permit sound prediction. Moreover, on the facts of *Ciba-Geigy* itself, Thurlow C.J. says, as quoted above, that "[e]ven at the time it was made it is not improbable [i.e., it is probable] that it [the invention] would have been considered well founded [i.e., a sound prediction]". In the broader context of the *Patent Act*, as well, there is good reason to reject the proposition that bare speculation, even if it afterwards turns out to be correct, is sufficient. An applicant does not merit a patent on an almost-invention, where the public receives only a promise that a hypothesis might later prove useful; this would permit, and encourage, applicants to put placeholders on intriguing ideas to wait for the science to catch up and make it so. The patentee would enjoy the property right of excluding others from making, selling, using or improving that idea without the public's having derived anything useful in return.

85    Accordingly, to the extent *Ciba-Geigy* stands for a contrary position, I do not think it should be followed.

### D. Did Glaxo/Wellcome Claim More Than It Had Invented?

86    The appellants argue that even if Glaxo/Wellcome can squeeze over the inventorship hurdle with respect to the *treatment* properties of AZT, there is nothing in the record on which to base a prediction, sound or otherwise, that AZT possessed *prophylactic* properties. The appellants point out that, generally speaking, treatment deals with an infection already acquired, whereas prophylaxis refers to prevention of getting the disease in the first instance.

87    Glaxo/Wellcome claims that not only was its prediction sound at the time it was made, but also that it has since been demonstrated in practice. Specifically, as stated, it was established some years after issuance of the patent that AZT can be effective in preventing the transmission of HIV from a pregnant woman to her foetus (and is thus arguably prophylactic for the foetus), and that health care workers who have been pricked by infected needles ("needle-stick") acquire a measure of protection against HIV infection. These particular applications were not disclosed in the patent and were, it appears, unknown to Glaxo/Wellcome on March 16, 1985. (The appellants deny that these are instances of "prophylaxis". They say these are both instances of post-infection treatment.) Interestingly, while the U.K. patent for AZT claimed both treatment and prophylactic properties, the U.S. AZT patent, which was the focus of the U.S. litigation on which Glaxo/Wellcome relies to support the validity of its patent, refers only to treatment.

88    While the appellants' argument has some linguistic attraction, it puts too much weight on a supposed "bright line" distinction between treatment and prophylaxis. Dictionaries tend to include prophylaxis as an aspect of treatment:

*Oxford English Dictionary* [www.oed.com]

*Med.* The preventive treatment of disease. ...

*Black's Medical Dictionary* (39th ed. 1999), at p. 446

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 122 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

Treatment or action adopted with the view of warding off disease.

In *Butterworths Medical Dictionary* (2nd ed. 1978), at p. 1385, the following definitions (amongst others) are given:

**Clinical prophylaxis**. The prevention of the development of signs and symptoms of the disease without necessarily eradicating the causal factor, e.g. in malaria, by schizonticidal drugs.

**Drug prophylaxis**. The administration of drugs as protection against infection, in particular malarial infection.

**Gametocidal prophylaxis**. The administration of drugs in order to kill malarial gametocytes in individuals.

See also *Dorland's Illustrated Medical Dictionary*, (27th ed. 1988), at p. 1365.

89    If "prophylactic" treatment of malaria may post-date the initial infection, it would seem appropriate that prophylaxis can also include "prevention of the development of signs and symptoms of the disease [AIDS] without necessarily eradicating the causal factor [HIV]".

90    The patent itself includes some information described as "Preventing Infection by AIDV", which refers to an experiment which showed "decreased infection" of cells in the presence of AZT. The patent then discloses (as earlier mentioned) the mechanism by which AZT prevents "the development of signs and symptoms" of AIDS (and is thus prophylactic to AIDS), namely as a "chain terminator" which inhibits HIV reverse transcriptase:

... it is the triphosphate form of 3'-azido-3'deoxythymidine which is believed to be <u>the effective chain terminator</u> in the reverse transcription of AIDV, as evidence by its effect on avian myeloblastosis virus and Moloney murine leukaemia virus. This form also inhibits AIDV reverse transcriptase *in vitro* whilst having a negligible effect on human DNA polymerase activity. [Emphasis added.]

91    HIV offers an incubation period in which the virus is present but vulnerable to attack. It is this specific feature that was targeted by the "chain termination" effect known and disclosed by Glaxo/Wellcome at the time of the patent application, and which afforded the basis for its prediction that AZT had prophylactic properties. In these circumstances, I do not think the appellants have demonstrated any palpable and overriding error with respect to this finding by the trial judge.

92    There is another reason why I think we should not be too quick to overrule the conclusion that prophylactic benefits were soundly predicted. The appellants seek to place Glaxo/Wellcome in a "catch-22" situation. If Glaxo/Wellcome had not specifically claimed prophylactic properties, the appellants could have sought to obtain their own patent on the basis of claiming "hitherto unrecognized [prophylactic] properties" (relying on *Shell Oil, supra*), thereby undercutting Glaxo/Wellcome's market for treatment, and leaving Glaxo/Wellcome to try to salvage their patent position by arguing that the prophylactic properties were already implicit (or "obvious") in their own patent as aspects of treatment. If the appellants could lawfully get their AZT to market allegedly for prophylaxis, with or without their own patent, the generic version of AZT would likely be used by cost-conscious health providers in place of the more expensive Glaxo/Wellcome AZT for all aspects of HIV/AIDS treatment at all stages, thus undercutting the commercial value of the Glaxo/Wellcome patent. On the other hand, Glaxo/Wellcome having sought to protect itself from this scenario by claiming prophylactic benefits, the appellants now adopt the opposite strategy and seek to invalidate the entire patent on the ground that the claim to prophylaxis is invalid because it exceeds the invention, and its "covetousness" wipes out all of the combined "treatment and prophylaxis" claims, thereby wiping out the commercial value of the patent. As long ago as *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504 (S.C.C.), Dickson J. (as he then was) subscribed to the view, at p. 521, that a "patent should be approached 'with a judicial anxiety to support a really useful invention'".

93    In the particular circumstances of this case, I think Glaxo/Wellcome's prediction that the "chain terminator" effect disclosed in the patent specification had prophylactic as well as post-infection treatment application was sound. The Commissioner so ruled, and his decision to allow both treatment and prophylaxis was upheld in the courts below. The onus was on the appellants

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

to show that the patent is invalid, not on Glaxo/Wellcome to show that it is valid. I agree with the trial judge and the Federal Court of Appeal that the appellants have not discharged this onus.

### E. Did Glaxo/Wellcome Wrongly Exclude the NIH from Co-inventorship?

94    The appellants contend that Drs. Broder and Mitsuya were "co-inventors" and ought to have been so identified in the patent. For this argument to benefit the appellants (as opposed to Drs. Broder and Mitsuya), the appellants must further establish that this omission was a "material" misstatement that was "wilfully made for the purpose of misleading". If so, the patent would be void pursuant to s. 53(1) of the *Patent Act*.

95    Inventors come in all shapes and sizes. As long ago as 1831, the *London Journal of Arts and Sciences* commented (with gender assumptions no doubt common at the time):

> Useful inventors are of three classes; the first are men of genius, capable of producing important inventions that involve the entire projecting of new machines, or remodelling of existing ones, and the organization of new or complicated processes and systems of working. These are very few.

> The second are men who have not so extensive a scope of imagination and intellect as to project new systems or great changes, and to organize the means of effecting them, but who are capable of making marked improvements upon existing systems and machinery, or partial changes in them. This class is considerable.

> The third class is made up of men of small imagination, who are not capable of any great originality of thought, but who have a certain ingenuity which they can apply to the things that come within the range of their observation, and possess a tact for correctly and accurately executing that which they conceive.

> ... Happily this class is immense, being spread thickly over the whole body of mechanics, from the manufacturer and engineer down to the lowest workman. Such men constitute expert mechanicians, who are never at a loss for expedients for overcoming the practical difficulties of detail that occur in their business, and are perpetually making trifling inventions which they require for immediate application.

> (Quoted in *Godson on Patents* (2nd ed. 1851), at pp. 33-34.)

96    Inventorship is not defined in the Act, and it must therefore be inferred from various sections. From the definition of "invention" in s. 2, for example, we infer that the inventor is the person or persons who conceived of the "new and useful" art, process, machine, manufacture or composition of matter, or any "new and useful" improvement thereto. The ultimate question must therefore be: who is responsible for the inventive concept?

97    Section 34(1) requires that at least at the time the patent application is filed, the specification "correctly and fully describe the invention ... to enable any person skilled in the art or science to which it pertains ... to ... use it". It is therefore not enough to have a good idea (or, as was said in *Christiani, supra*, at p. 454, "for a man to say that an idea floated through his brain"); the ingenious idea must be "reduced to a definite and practical shape" (*ibid.*). Of course, in the steps leading from conception to patentability, the inventor(s) may utilize the services of others, who may be highly skilled, but those others will not be co-inventors unless they participated in the conception as opposed to its verification. As Jenkins J. notes in *May & Baker Ltd. & Ciba Ltd.'s Letters Patent, Re* (1948), 65 R.P.C. 255, at p. 281, the requisite "useful qualities" of an invention, "must be the inventor's own discovery as opposed to mere verification by him of previous predictions".

98    More recently, in *Henry Bros. (Magherafelt) Ltd. v. Ministry of Defence and the Northern Ireland Office*, [1997] R.P.C. 693 (Eng. Ch. Div.), in response to a submission that an invention could be divided into contributed elements and patents awarded accordingly, Jacob J. stated, at p. 706:

> I do not think it is right to divide up the claim for an invention which consists of a combination of elements and then to seek to identify who contributed which element. I think the inquiry is more fundamental than that. One must seek to

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

identify who in substance made the combination. Who was responsible for the inventive concept, namely the combination? [Emphasis added.]

99    The distinction between conception and verification is consistent with the Canadian authorities, including Fox, *The Canadian Law and Practice relating to Letters Patent for Inventions, supra*, at p. 225; *Kellogg Co. v. Kellogg*, [1942] Ex. C.R. 87 (Can. Ex. Ct.), at p. 97; *Ernest Scragg & Sons Ltd., supra*, at pp. 676-77; H. Fisher and R. Smart, *Canadian Patent Law and Practice* (1914), at pp. 27-29. The line is perhaps blurred in *Gerrard Wire Tying Machines Co. v. Cary Manufacturing Co.*, [1926] Ex. C.R. 170 (Can. Ex. Ct.), where the U.S. text *Walker on Patents* is quoted at p. 186:

> Nor is a patent to joint inventors invalidated by the fact that one of them only first perceived the crude form of the elements and the possibility of their adaptation to complete the result desired. In fact the conception of the entire device may be attributed to one, but if the other makes suggestions of practical value, which assist in working out the main idea and making it operative, or contributes an independent part of the entire invention which helps to create the whole, he is a joint inventor even though his contribution be of minor importance.

To the extent this suggests that an individual who contributes to the inventive concept may be a co-inventor without being the prime originator, I agree with it. To the extent, however, that it can be read to include as inventors those who help the invention to completion, but whose ingenuity is directed to verification rather than the original inventive concept, I respectfully, for the reasons already given, disagree.

100    Wetston J. concluded at para. 224 that "the utility as claimed was not established without the extensive and direct involvement of the NIH...." This is true, but it is not, with respect, the test. If Glaxo/Wellcome had soundly predicted that AZT could cure nausea in the weightlessness of space, it might require NASA and all its rocket ship expertise to "establish" the utility, but NASA would not on that account become a co-inventor.

101    It is clear that Drs. Broder and Mitsuya at the NIH were instrumental in providing crucial evidence on which the "sound prediction" of AZT's utility depended, but they were not responsible for the inventive concept. They carried out their investigation using extraordinary skill and expertise but, in my view, their blind test of a chemical compound whose existence they had not identified, and with which (unlike Glaxo/Wellcome) they apparently had no prior experience, did not require them to be listed as co-inventors.

102    There is no question that the ATH8 cell line developed by Drs. Broder and Mitsuya at NIH was original and offered a testing environment that Glaxo/Wellcome could not duplicate in-house. For this achievement they obtained a patent, as mentioned earlier. But the patentees of an invention for testing do not, by virtue of executing tests using that invention, become co-inventors of every sound idea that is so tested.

103    Drs. Broder and Mitsuya did not conceive of the utility of AZT for the treatment and prophylaxis of HIV, although they were engaged in a massive search for such a drug. As stated earlier, they initially thought that the coded drug sent by Glaxo/ Wellcome was suramin, a compound of longstanding interest to the NIH in its HIV research, but a drug that performed poorly in humans. The trial judge said that "[t]he work that Dr. Broder and Dr. Mitsuya were doing with suramin, at the NIH, situated them uniquely to this research" (para. 202), but that, it seems to me, shows the weakness of their claim. The NIH had one of the best testing facilities in the world but they had not been able, to that point, to identify an effective chemical compound to counter HIV. Their five-star candidate, suramin, turned out to be a disappointment.

104    The Court of Appeal referred specifically to Dr. Mitsuya's testimony that in 1984 and 1985, he thought that dideoxynucleosides, of which AZT is a member, "was likely to be harmful to human cells" (note 33) and thus "too toxic to be used in the treatment of human diseases" (para. 38). The success of AZT, accordingly, must have come as a surprise.

105    It is easy to sympathize with the frustration felt by Drs. Broder and Mitsuya, who felt it necessary, together with NIH colleagues, to send a rather bitter letter to *The New York Times* on September 20, 1989 complaining about what they took to be Glaxo/Wellcome's ingratitude for the immense NIH contribution:

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 125 of 485

Apotex Inc. v. Wellcome Foundation Ltd., 2002 SCC 77, 2002 CarswellNat 3436

2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437, [2002] 4 S.C.R. 153...

In a number of specific ways, government scientists made it possible to take a drug already in the public domain with no medical use and make it a practical reality as a new therapy for AIDS. It is unlikely that any drug company could have found a better partner than the government in the development of a new product. We believe that the development of this drug in the record time of two years, start to finish, would have been impossible without the substantive commitment of government scientists and government technology.

106    In the circumstances, however, I agree with the Federal Court of Appeal that great though the contribution of Drs. Broder and Mitsuya was to the advancement of science, they were not co-inventors of the patent-in-suit.

### F. Materiality of Co-inventorship

107    The trial judge concluded that Drs. Broder and Mitsuya were co-inventors, but that failure to include them in the patent was not a material misrepresentation that would invalidate the patent. In reaching this conclusion, he referred to the observation of Addy J. in *Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1978), 39 C.P.R. (2d) 145 (Fed. T.D.) at p. 157 that "it is really immaterial to the public whether the applicant is the inventor or one of two joint inventors as this does not got [*sic*] to the term or to the substance of the invention nor even to the entitlement" (aff'd (1979), 42 C.P.R. (2d) 33 (Fed. C.A.)). At an earlier date, Thurlow J. had suggested in *Jules R. Gilbert Ltd. v. Sandoz Patents Ltd.* (1970), 64 C.P.R. 14 (Can. Ex. Ct.), at p. 74, rev'd (on other grounds) *Sandoz Patents Ltd. v. Gilcross Ltd.* (1972), [1974] S.C.R. 1336 (S.C.C.), that "allegations in the petition respecting anything other than the subject-matter of the claims in the patent are granted are not material".

108    The appellants argue that, while as Addy J. says, it may be that the identity of the inventor is immaterial to the public in most instances, this is not necessarily true in all cases. Here, for example, the issue of "entitlement" to the rewards of the AZT patent has created a significant public controversy. There were arguably important public policy ramifications to the issue of co-inventorship because of the contrasting mandates, objectives and funding sources of the institutions involved, in particular the NIH and the Glaxo/Wellcome corporate group. If indeed the NIH researchers had been "co-inventors", and the NIH or the U.S. government had therefore held an ownership interest in the patent, there potentially could have been a significant effect on both the access to and the cost of the drug AZT across the world.

109    There is no need to consider the issue of materiality further in this case however, not only because of the conclusion that Drs. Broder and Mitsuya were not in fact co-inventors in this case, but also because there is no evidence whatsoever that the omission to name them was "wilfully made for the purpose of misleading", as required by the concluding words of s. 53(1).

### V. Conclusion

110    I would dismiss the appeals with one set of costs to the respondents on a party and party basis, payable jointly and severally by the appellants.

*Appeals dismissed.*

*Pourvois rejetés.*

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

1982 CarswellNat 482
Supreme Court of Canada

Armstrong Cork Canada Ltd. v. Domco Industries Ltd.

1982 CarswellNat 482F, 1982 CarswellNat 482, [1982] 1 S.C.R. 907, 136 D.L.R. (3d) 595, 42 N.R. 254, 66 C.P.R. (2d) 46, J.E. 82-674

# Armstrong Cork Canada Ltd. et al. v. Domco Industries Ltd. et al.

Armstrong Cork Canada Limited, Armstrong Cork Company, Armstrong Cork Industries Limited and Armstrong Cork Inter-Americas Inc., (Defendants) (Appellants) Appellants and Domco Industries Limited, (Plaintiff) (Respondent) Respondent and Congoleum-Nairn Inc., Congoleum Industries, Inc. and Congoleum Corporation, (Defendants) (Respondents) Respondents

Laskin C.J.C., Martland, Ritchie, Dickson and Beetz JJ.

Judgment: June 23, 1982
Docket: 16437

Proceedings: Affirmed, 22 C.P.C. 276, 56 C.P.R. (2d) 198, 1981 CarswellNat 9, [1982] 1 F.C. 522, 1981 CarswellNat 103F (Fed. T.D.)

Counsel: Gordon F. Henderson, Q.C., David Watson, Q.C., for appellants
Donald F. Sim, Q.C., Colleen E. R. Spring, for respondent, Domco Industries Ltd.
Donald J. Wright, Q.C., Donald H. MacOdrum, for respondents, Congoleum-Nairn Inc., Congoleum Industries, Inc. and Congoleum Corporation

Subject: Intellectual Property; Property; Civil Practice and Procedure

**Headnote**

**Patents --- Actions for infringement — Remedies — Damages**

Non-exclusive licensee — Patent Act, R.S.C. 1970, c. P-4, s. 57(1).

Plaintiffs C. and D. commencing infringement actions against defendant -- Plaintiff C. and defendant reaching settlement -- Plaintiff D. as non-exclusive licensee continuing action for damages -- Federal Court holding plaintiff D. entitled to continue action -- Defendant's appeal dismissed -- Statutory right to damages rendering infringer of patent liable for all damages sustained by reason of infringement by patentee or person claiming under patentee -- Non-exclusive licensee included in persons claiming under patentee within s. 57(1) -- Settlement between other parties to action not extinguishing plaintiff D.'s right of action and entitlement to damages.

**Patents --- Actions for infringement — Practice and procedure — Parties — Standing — Licensee**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

*Martland J.*:


1    The appellants (hereinafter jointly referred to as "Armstrong") appeal from two judgments of the Federal Court of Appeal which dismissed appeals by Armstrong from the judgments of Mahoney J. at trial. Two actions were originally commenced against Armstrong by the respondent Domco Industries Limited (hereinafter referred to as "Domco") and by the other respondents (hereinafter jointly referred to as "Congoleum"). The duplication was because of a title dispute, which is no longer material. The issues at trial were identical and the cases were heard together. The appeals to the Federal Court of Appeal were also heard together. The judgments in that court differ only in relation to the disposition of costs. Similarly, the appeals to this court were argued as one appeal.


2    The actions were tried upon an agreed statement of facts and issues and no oral evidence was given. The facts disclose that Congoleum is the holder of Canadian patent No. 764,004 issued on July 25, 1967, relating to a type of chemically embossed floor covering. By an agreement dated July 8, 1966, Congoleum granted to Domco a restricted non-exclusive right and licence to make, use and sell the products covered by the patent in Canada. The relevant portions of this agreement are as follows:

### Grant

2(a) LICENSOR hereby grants to LICENSEE under the PATENT RIGHTS, subject to the terms, conditions, and limitations hereof, a restricted nonexclusive right and license to make, use and sell said LICENSED PRODUCTS in Canada;

### Exclusive Period

8. LICENSOR agrees that during the first five-year period from the date of this agreement, it will not grant to any third party a license under said PATENT RIGHTS to manufacture floor, or felt-backed or paper-backed wall covering in Canada. LICENSOR also agrees that during the first three-year period of this agreement, it will not manufacture floor coverings in Canada under said PATENT RIGHTS.


3    Armstrong, at the time the patent issued, was already selling in Canada products manufactured in the United States. On April 26, 1968, it commenced to manufacture such products in Canada. It continued to sell in Canada products manufactured in the United States. During the period of time relevant to this action only the infringer, Armstrong, and the licensee, Domco, were manufacturing the products covered by the patent in Canada.


4    In consequence of Armstrong's activities, which were carried on without any licence from Congoleum, the actions referred to above were commenced by Congoleum and Domco as plaintiffs alleging that Armstrong had infringed Congoleum's patent.


5    On March 9, 1976, Congoleum and Armstrong agreed to a settlement of the above litigation, as well as litigation between them in the United States. Armstrong paid to Congoleum the sum of $35,000,000 in full satisfaction of Congoleum's claims. Armstrong was given a licence for the period from the date of settlement to the end of 1976 to enable it to effect an orderly termination of the manufacture and sale of the products.

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

6    The memorandum of understanding contained the following provision:

> 4. The parties to T-476-71 and T-1209-71 will enter into minutes of consent in the form attached. Congoleum undertakes to obtain such action by its subsidiaries and affiliates and by Domco Industries, Ltd. Armstrong undertakes to obtain such action by its subsidiaries and affiliates and represents that it is authorized to take such action on behalf of Trimont Building Supplies, Ltd.

7    The references to T-476-71 and T-1209-71 are to the numbers of the two actions in the Federal Court. Domco did not agree to the release, with the result that Congoleum proceeded with the settlement as far as it could. The pleadings in the actions were amended so that Congoleum ceased to be a plaintiff and was named as a defendant. As a consequence, while Congoleum appears as a respondent in the appeal to this court, it supported the position of Armstrong. This is understandable since Congoleum, when Domco refused to be a party to the settlement, undertook to indemnify Armstrong from any claim which Domco might have in the action.

8    There is now no issue as to the validity of the Congoleum patent, nor as to the fact that Armstrong had infringed it. The real issue is as to whether Domco, as the holder of a licence to make, use and sell in Canada the products covered by the patent, can claim damages from Armstrong arising out of its infringement of that patent. This involves the interpretation and application of s. 57 of the *Patent Act*, R.S.C. 1970, c. P-4, which provides as follows:

> 57(1) Any person who infringes a patent is liable to the patentee and to all persons claiming under him for all damages sustained by the patentee or by any such person, by reason of such infringement.
>
> (2) Unless otherwise expressly provided, the patentee shall be or be made a party to any action for the recovery of such damages.

9    The position taken by Armstrong is that Domco as the holder of a non-exclusive licence was not entitled to invoke s-s. 57(1) because:

> (a) Domco had no claim to qualify it as a person "claiming under" the patentee;
>
> (b) Domco did not have any right which could be infringed; and
>
> (c) Domco could not sustain "damages" by reason of the patent infringement.

10    Domco contends that the Federal Court of Appeal correctly construed s-s. 57(1) and was right in holding that a licensee is a person claiming under the patentee, who has a remedy for all damages sustained by it by reason of the infringement of the patent.

11    Section 57 of the *Patent Act* first appeared as s. 55 of the *Patent Act*, 1935 (Can.), c. 32. It was in the same terms as the present section. Section 55 was a part of a new statute which repealed the earlier Act and which was enacted following representations to and hearings by a Senate committee. In determining its meaning, it is helpful to consider the state of the law prior to its enactment.

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

12    The predecessor of s. 57 was s. 32 of the *Patent Act*, R.S.C. 1927, c. 150. It provided as follows:

> 32. Every person who, without the consent in writing of the patentee, makes, constructs or puts in practice any invention for which a patent has been obtained under this Act or any previous Act, or who procures such invention from any person not authorized by the patentee or his legal representatives to make or use it, and who uses it, shall be liable to the patentee or his legal representatives in an action of damages for so doing; and the judgment shall be enforced, and the damages and costs that are adjudged shall be recoverable, in like manner as in other cases in the court in which the action is brought.

13    "Legal representatives" was defined in s. 2(*c*):

> (c) "legal representatives" includes heirs, executors, administrators, guardians, curators, tutors, assigns or other legal representatives;

14    In *Electric Chain Co. v. Art Metal Works Inc. et al.*, [1933] 4 D.L.R. 240, [1933] S.C.R. 581, this court was called upon to consider the ambit of s. 32. The respondent, Dominion Art Metal Works Limited, was the Canadian subsidiary of the respondent, Art Metal Works Inc. of New Jersey, the patentee. Electric Chain Company was the infringer of the patent. Evidence disclosed that it was the Canadian company which had suffered damage by the infringement. The interest held by the Canadian company was characterized to be that of a licensee. Hughes J., who delivered the judgment of the court, approved of the decision in *Heap v. Hartley* (1889), 42 Ch.D. 461, a judgment of the Court of Appeal in England, and concluded that Dominion Art Metal Works Limited had no cause of action against the infringer.

15    The question in issue in *Heap v. Hartley* was as to whether the holder of an exclusive licence had title to sue in his own name, without joining the patentee, for infringement of the patent to which his licence related. It was held that he could not. Fry L.J., at p. 470, said:

> I am of the same opinion. The Plaintiff in this case sues under an exclusive license to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his license. Now he puts his case in a two-fold manner. He says: "In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing. A license may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the license pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

16    The issue as to the right of a licensee to sue an infringer in the light of the enactment of s. 55 of the 1935 Act was considered by this court and, on appeal, by the Privy Council in *Spun Rock Wools Ltd. v. Fiberglas Canada Ltd. et al.*, [1943] 4 D.L.R. 289, 3 C.P.R. 87, [1943] S.C.R. 547; reversed [1947] 2 D.L.R. 465, 6 C.P.R. 57, [1947] A.C. 313. The action was

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

for infringement of a patent for alleged new and useful improvements in the production of fibres or threads from glass, slag and like meltable materials. The action failed in this court, Rand J. dissenting, on the ground that there was not invention in the claim sued upon. This decision was reversed in the Privy Council.

17    However, the claim was also opposed on the basis that the plaintiff did not have the right to maintain the action. The plaintiff had an exclusive licence to use the patent. Three of the members of the court, Davis, Taschereau and Kerwin JJ., held that the plaintiff had a right to claim damages under s. 55. Hudson J. expressed no opinion on this issue. Rand J. did not deal with it specifically but, as he decided in favour of the plaintiff, it is clear that he held the view that a claim was available under s. 55. Kerwin J. referred to the fact that the plaintiff claimed as an exclusive licensee, but no point is made of this in the judgment of Davis J., concurred in by Taschereau J.

18    The decision of this court as to the effect of s. 55 was upheld in the Privy Council. The judgment was delivered by Lord Simonds, who said at pp. 472-3 D.L.R., pp. 65-6 C.P.R., pp. 320-1 A.C.:

> Here the question is, whether a licensee is a person claiming under the patentee. Upon this question, even if it was argued before him, the learned trial Judge can have had no doubt; for he makes no mention of it in his judgment. In the Supreme Court Davis J. (with whom Taschereau J. concurred) held that a licensee is for the purposes of the section a person claiming under the patentee. Kerwin J. came to the same conclusion, pointing out that in the 1935 Act the relevant provision was recast, the words "the patentee and all persons claiming under him" taking the place of the words "the patentee or his legal representatives", which occurred in the earlier Patent Act of 1923 and were not apt to include a licensee. Upon this question neither Hudson J. nor Rand J. expressed an opinion, but the latter Judge, who was in favour of dismissing the appeal, can have had no doubt upon the matter.

> In the face of this consensus of opinion upon a Canadian statute their Lordships would in any case hesitate to express a contrary view. But it appears to them that the statutory amendment of 1935 following upon the decision of *Electric Chain Co. v. Art Metal Works Inc.*, [1933], 4 D.L.R. 240, S.C.R. 581 points irresistibly to the conclusion that licensees are persons claiming under the patentee within the meaning of the section. The patentee by definition means the person for the time being entitled to the benefit of a patent. Section 55(1) contemplates an action not only by the person for the time being entitled to the benefit of a patent but also by any person claiming under that person. Upon the plain language of the section a licensee answers that description.

> The appellants as licensees were therefore entitled to sue for damages under s. 55.

19    No differentiation was made in these reasons as between an exclusive and a non-exclusive licence.

20    The Federal Court of Appeal considered the position of a non-exclusive licence in the case of *American Cyanamid Co. v. Novopharm Ltd.* (1972), 7 C.P.R. (2d) 61, [1972] F.C. 739. The plaintiff had a non-exclusive licence from the patentee to manufacture, have manufactured for it, use and sell certain products manufactured by the patented processes. It sued an alleged infringer of the patent. The defendant moved to strike out the statement of claim as disclosing no cause of action because the plaintiff was not a person claiming under the patentee within the meaning of s-s. 57(1).

21    All of the three members of the court were of the view that the judgment of the Privy Council in the *Fiberglas* case, *supra*, had decided that a person who is a licensee under a patent is a person claiming under the patentee within the meaning of s-s. 57(1). However, Chief Justice Jackett, dissenting on this point, was of the opinion that since a non-exclusive licence merely entitled the licensee to use the patented invention, and as this right of use is not affected by the infringement of the

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

patent, the licensee suffered no damage from the infringement and therefore the statement of claim disclosed no cause of action.

22      The other two members of the court did not share this view. Bastin D.J. said at pp. 83-4 C.P.R., p. 764 F.C.:

It can hardly be questioned that the diminution in the volume of his sales due to sales by an infringer can result in a loss to a non-exclusive licensee. It might be argued that Parliament never contemplated compelling an infringer to compensate a non-exclusive licensee for such *de facto* damages but intended to restrict damages for which an infringer is liable to those of a person whose rights were directly infringed by the particular act of infringement. On this reasoning, a bare licensee has merely permission to make use of the patent and, unless his freedom to exercise this permission is interfered with, he cannot complain. On the other hand, an exclusive licensee has been granted a monopoly and an infringement of the patent directly affects this legal right. This may appear a logical argument but the answer is that the right of any licensee to collect damages is purely statutory and, if Parliament had intended to distinguish between an exclusive and a non-exclusive licence, it would have made this clear. Since Parliament has made no such distinction, it follows that all licensees should be treated alike.

Sweet D.J. said at pp. 86-7 C.P.R., pp. 767-8 F.C.:

It would seem logical for Parliament to decide to correct the situation wherein the licensee, under such circumstances, had no protection from and no recourse against the infringer and, in enacting s. 57(1) in its present form, to create, by statute, a right in the licensee against the infringer and to provide a means of enforcing that right. Certainly the change was not necessary for the protection of the patentee or the assignee of the patent. They were already protected.

An analysis of s. 57(1) of the *Patent Act* reveals, I think, Parliament's intention to create such a right and to provide the accompanying remedy and that it has implemented that intention and accomplished its purpose. In this connection, the following are noted:

1. The expressed liability of the person who infringes both to the patentee and to all persons claiming under him is set out in the same subsection and in the same terms.

2. The words "any person who infringes a patent is liable to" relate both to the patentee and to persons claiming under him.

3. The words "for all damages sustained" relate both to the patentee and to persons claiming under him.

4. There is no differentiation between the liability of the infringer to the patentee and to persons claiming under him nor is there any differentiation between the nature of the rights the patentee and the persons claiming under him have against the person infringing.

It seems to me to be made manifest by the legislation that what the patentee is entitled to and what the persons claiming under him are entitled to are basically the same, namely, "all damages sustained" by them respectively by reason of the infringement. It would, of course, be inconceivable that the patentee with a valid patent would not be entitled, from the person who infringes, to damages in compensation for his loss by reason of the infringement. Having regard to the structure of s. 57(1), I am of opinion that all persons claiming under the patentee, who would include non-exclusive licensees, now have the same basic right, as has the patentee, namely, to recover from the person who infringes, damages in compensation for their losses by reason of the infringement.

23      A similar application to strike out a statement of claim as disclosing no cause of action, because the plaintiff who was a non-exclusive licensee in respect of the use of a patent, was seeking damages as a result of the infringement of the patent,

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

was seeking damages as a result of the infringement of the patent, was made unsuccessfully in *Flake Board Co. Ltd. v. Ciba-Geigy Corp. et al.* (1974), 15 C.P.R. (2d) 33. Chief Justice Jackett, who presided, said (at p. 35):

> Counsel for the appellant conceded that, in so far as the application to strike out Cyanamid of Canada as a plaintiff is concerned, the appeal to this Court must be dismissed having regard to the decision of this Court in *American Cyanamid Co. v. Novopharm Ltd.* (1972), 7 C.P.R. (2d) 61, [1972] F.C. 739.

24    The appellant, who was obviously seeking a decision on the point by this court, then applied for leave to appeal to this court contending that the appeal raised a question of law as to whether the plaintiff, being merely a non-exclusive licensee, had the status to be a plaintiff, *i.e.*, whether the plaintiff was a person claiming under the patentee within the meaning of s-s. 57(1) of the *Patent Act*. Leave to appeal was refused by this court.

25    Counsel for Armstrong recognizes that both this court and the Privy Council considered that the enactment of s. 55 (now s. 57) of the *Patent Act* was as a consequence of the decision of this court in *Electric Chain Co. v. Art Metal Works Inc.* to which reference has already been made. The reference in the Privy Council, at pp. 472-3 D.L.R., p. 66 C.P.R., p. 320 A.C., already quoted, is in these terms:

> But it appears to them that the statutory amendment of 1935 following upon the decision of *Electric Chain Co. v. Art Metal Works Inc.* points irresistibly to the conclusion that licensees are persons claiming under the patentee within the meaning of the section.

26    However, he contends that s-s. 57(1) was only intended to change the law so as to provide a remedy to someone who by contract had been granted exclusive rights under a patent, *i.e.*, the holder of an exclusive licence. He also contends that the judgments in *Fiberglas* in this court and in the Privy Council go no further than that.

27    While it is true that the licensee actually under consideration in the *Fiberglas* case was said to be "the exclusive sublicensee" (or "exclusive licensee") under the patent, no information is given in any of the judgments as to the precise nature of the licence, and nothing in the reasons for judgment on this point turned on the distinction between an exclusive licensee and a non-exclusive licensee or a bare licensee. Both Mr. Justice Davis in this court delivering his and Mr. Justice Taschereau's judgment and Lord Simonds in the Judicial Committee used the general word "licensee" in delivering their judgments. It cannot be supposed that they did so intending that only an exclusive licensee was being considered, particularly when Lord Simonds defined the issue of law as being: "Here the question is, whether a licensee is a person claiming under the patentee."

28    Armstrong sought to distinguish an exclusive licence from a non-exclusive licence on the basis that the former was a grant of a part of the monopoly and that such a licensee was practically an assignee of the patent for the term of the licence with all the beneficial rights of the patentee. It is difficult to reconcile this reasoning with what was said in *Heap v. Hartley, supra* (applied by this court in the *Electric Chain Co.* case), in the passage which I have already quoted. I repeat from that passage the following portion which is apt in relation to Armstrong's submission:

> Now he puts his case in a two-fold manner. He says: "In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive

Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing.

29      In my opinion, the reasons which led this court and the Privy Council to the conclusions reached in the *Fiberglas* case are as applicable to a non-exclusive licensee as to an exclusive licensee. If an exclusive licensee is a person claiming under the patentee within s-s. 57(1), and the *Fiberglas* case so holds, there is no valid basis, under the wording of the subsection, to exclude its application to a non-exclusive licensee, and there is no valid basis for interpreting the *Fiberglas* case as holding otherwise.

30      It was also contended on behalf of Armstrong that a non-exclusive licensee has no rights which can be infringed and therefore has no claim against the infringer of a patent. This was the view of Jackett C.J. in the *American Cyanamid* case. He was of the opinion that the non-exclusive licensee had only a right to use the patent, which right was not affected by its infringement.

31      This was the legal position, even in respect of an exclusive licensee, prior to the enactment of s. 55 of the 1935 Act. Section 55 was enacted to meet this difficulty and, in my opinion, it has overcome the problem. Subsection 55(1), by its terms, imposes a liability upon the infringer of a patent to the patentee and also to all persons claiming under him for all damages sustained by the patentee or any such person by reason of such infringement. It is the infringement of the patent which gives rise to a liability. If that infringement causes damage to the patentee or to any person claiming under him, the infringer must compensate for the damage sustained by reason of the infringement of the patent. A licensee relying on this subsection is not claiming against the infringer for infringement of his rights under the licence, he is claiming for the damage he has sustained in consequence of the infringement of the patent.

32      On this point, I adopt the reasons of Sweet D.J. in the *American Cyanamid* case which have already been quoted.

33      Armstrong contended that the meaning of the word "damages" in s-s. 57(1) meant loss resulting from interference with the legal rights of the claimant. "Damages", it was said, refers to pecuniary recompense given by process of law to a person for an actionable wrong that another has done to him.

34      The meaning of the word "damages" must be ascertained in respect of its use in this specific statutory provision. In s-s. 57(1) it is provided in terms that an infringer of a patent is liable for all damages sustained by reason of his infringement by a patentee or by any person claiming under him. This is a statutory obligation to pay damages and it applies in favour of any person who comes within the provisions of the subsection. In my opinion, Domco does come within the terms of the subsection.

35      Finally, Armstrong contended that the settlement made between Armstrong and Congoleum meant that there was no longer any infringement of the patent and, that, therefore, there could not be any remaining claim by the licensee, Domco, for damages for infringement.

36      The terms of settlement did not purport to say that there had been no infringement by Armstrong of Congoleum's patent. The settlement provided for the payment by Armstrong to Congoleum of $35,000,000 "in full satisfaction of

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    8

**Armstrong Cork Canada Ltd. v. Domco Industries Ltd., 1982 CarswellNat 482**

1982 CarswellNat 482, 1982 CarswellNat 482F, [1982] 1 S.C.R. 907...

Congoleum's claims". Congoleum accepted this sum in satisfaction of its claims for damages for infringement.

37      Domco since the commencement of the proceedings has sought damages on the basis of its being a licensee. It was not a party to nor did it have any part in the settlement between Armstrong and Congoleum. It was a term of the settlement that Congoleum would obtain the release and consent from Domco in respect of its claim. When Domco would not sign the release and consent unless it received a portion of the settlement moneys, Congoleum undertook to indemnify Armstrong from any claim that Domco might have in the action.

38      Subsection 57(1) gave to Domco a statutory right of action and an entitlement to damages which Congoleum could not independently extinguish by virtue of its settlement with Armstrong.

39      For these reasons I would dismiss the appeals with costs to the respondent, Domco, against the appellant, Armstrong, and the respondent, Congoleum. As the two appeals were identical, there should be only one set of costs.

40      *Appeal dismissed.*

*Appeals dismissed with costs.*

Solicitors of record:
Solicitors for the appellants: *Gowling & Henderson*, Ottawa.
Solicitor for the respondent Domco Industries Limited: *Donald F. Sim*, Toronto.
Solicitors for the respondents Congoleum-Nairm Inc. et al.: *Hayhurst, Dale & Deeth*, Toronto.

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

1980 CarswellOnt 141
Supreme Court of Canada

Bauer v. Bank of Montreal

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46, 10 B.L.R. 209, 110 D.L.R. (3d) 424, 2 A.C.W.S. (2d) 450, 32 N.R. 191, 33 C.B.R. (N.S.) 291, J.E. 80-543

# BAUER v. BANK OF MONTREAL

Ritchie, Dickson, Estey, McIntyre and Chouinard JJ.

Heard: February 14, 1980
Judgment: April 22, 1980

Counsel: *B. P. Bellmore*, for appellant.
*J. L. McDougall*, for respondent.

Subject: Corporate and Commercial; Insolvency

Headnote

**Guarantee and Indemnity --- Guarantee — Grounds for termination of guarantee — Conduct of creditor — Dealings with debtor's security — Failure to perfect security**

Creditors — Secured creditors — Position of guarantor — Secured creditor not preserving security — Assignment of book debts not registered in proper office — Primary debtor bankrupt — Trustee obtaining order that security invalid as against trustee — Bank proceeding against customer (guarantor).

For the facts see headnotes of the judgments below, from which the guarantor appealed.

**Held:**

Appeal dismissed.

The creditor, in the absence of an agreement to the contrary with the debtor or surety, must protect and preserve the security and be in a position, unless excused by other agreement, to return or reassign the security to the debtor or surety on repayment of the debt. Despite this rule, it is open to the parties to make their own arrangements, and a surety is competent to contract himself out of the protection of the equitable rule requiring preservation of his security.

The clause whereby it was agreed that the bank "may take securities from and give the same and any or all existing securities up to, may abstain from taking securities from, or from perfecting securities of, ... the customer" was not an exemption clause. It was no more than a provision which varied the ordinary terms of a guarantee and which gave the bank the right to deal with security provided by the debtor with greater freedom than would be otherwise permissitle. This was a provision by which the guarantor had contracted himself out of the equitable right he would have possessed in the absence of this term and he had, as a term of the contract between the bank and himself, given the bank

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

affirmative rights in this regard. The guarantor in this position was fully competent to so dispose of his affairs.

**Annotation**

This case illustrates how a choice made by a Court between possible rules of construction for a contract can effectively determine the judgment reached. The Court accepts as a correct statement of the law, the categories of exemption clauses set forth in Chitty on Contracts (24th ed., 1977), vol. 1, at p. 362. The first category includes "clauses which purport to exempt one party from a substantive obligation to which he would otherwise be subject under the contract, for example by excluding express or implied terms". The Court also reviewed and approved various authorities stating the common law obligation of a creditor to be, in the absence of any agreement to the contrary with the debtor or surety, to protect and preserve any security of the debtor taken in addition to the guarantee and to reassign such security to the debtor or the surety on repayment of the debt.

Chitty on Contracts at p. 363 provides that exemption clauses are subject to the following rules of construction:

1. Exemption clauses must be expressed clearly and without ambiguity and must clearly express what the intention is;

2. Each clause must be considered according to its actual wording but it must clearly extend to the exact contingency which has occurred if it is to protect the party relying on it;

3. The contra proferentem rule may be applied in cases of ambiguity or where other rules of construction fail.

These rules could have been very helpful to the guarantor in this case in his argument that the exemption clause in the guarantee extended only to situations where the bank abstained from perfecting the security rather than those where its negligent registration resulted in non-perfection.

However, the Court came to the conclusion that the clause was not an exemption clause and accordingly the foregoing rules of construction were not applicable. It is difficult to understand this reasoning. The Court may have concluded that the guarantee itself, as opposed to the common law, contained no express or implied term providing a positive obligation on the bank under the guarantee to preserve the security and accordingly, that there was no obligation for the clause to exempt. If this were so, it would mean that a clause exempting a party from common law contractual obligations not express or implied in the contract would not be an exemption clause subject to the special rules of construction. It would be unfortunate if the Court intended to limit exemption clauses in this way.

The Court held the clause to be simply one that permitted the bank greater freedom to deal with the security than it would have otherwise had without the clause. If the reasoning of the Court was not as set forth above, it is difficult to understand how the Court came to the conclusion that the clause did not fall into Category 1 of the exemption clauses set forth in Chitty.

**WestlawNext**₆ CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Bauer v. Bank of Montreal, 1980 CarswellOnt 141

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

**Table of Authorities**

**Cases considered:**

*Bryans v. Peterson* (1920), 47 O.L.R. 298, 53 D.L.R. 429 (C.A.) — *referred to*

*Firestone Tyre and Rubber Co. Ltd. v. Vokins & Co. Ltd.*, [1951] 1 Lloyd's Rep. 32 (K.B.) — *distinguished*

*Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 66 W.W.R. 673, 2 D.L.R. (3d) 600 — *followed*

*Household Finance Corpn. v. Foster*, [1949] O.R. 123, [1949] 1 D.L.R. 840 (C.A.) — *applied*

*Jamesway Ltd. v. Krug* (1932), 41 O.W.N. 146 (H.C.) — *referred to*

*Jaques v. George (Lloyd D.) & Partners Ltd.*, [1968] 1 W.L.R. 625, [1968] 2 All E.R. 187 (C.A.) — *distinguished*

*Mendelssohn v. Normand Ltd.*, [1970] 1 Q.B. 177, [1969] 2 All E.R. 1215 (C.A.) — *distinguished*

*Okanagan Mainline Real Estate Bd. v. Can. Indemnity Co.*, [1971] S.C.R. 493, [1971] 1 W.W.R. 289, [1970] I.L.R. 1-383, 16 D.L.R. (3d) 715 — *distinguished*

*Perry v. Nat. Prov. Bank of England*, [1910] 1 Ch. 464 (C.A.) — *applied*

*Rose v. Aftenberger*, [1970] 1 O.R. 547, 9 D.L.R. (3d) 42 (C.A.) — *applied*

*Traders Finance Corpn. v. Halverson* (1968), 2 D.L.R. (3d) 666 (B.C.C.A.) — *applied*

**Authorities considered:**

Holden, Securities for Bankers' Advances, 2nd ed., pp. 197 et seq.

Chitty on Contracts, 24th ed. (1977), vol. 1, p. 362, para. 813.

28 Hals. (4th) 152, paras. 280 et seq.

Snell's Principles of Equity, 27th ed. (1973), pp. 462-63.

Appeal from a judgment of the Ontario Court of Appeal (sub nom. Bank of Montreal v. Bauer) 19 O.R. (2d) 425, 28 C.B.R. (N.S.) 207, 3 B.L.R. 324, 85 D.L.R. (3d) 752, reversing a judgment of Galligan J., 15 O.R. (2d) 746, 25 C.B.R. (N.S.) 193, 1 B.L.R. 165, 76 D.L.R. (3d) 636, dismissing action on guarantee.

**The judgment of the court was delivered by *McIntyre J.*:**

1    This appeal [from 19 O.R. (2d) 425, 28 C.B.R. (N.S.) 207, 3 B.L.R. 324, 85 D.L.R. (3d) 752] raises the question of the effect upon the liability of a guarantor to the creditor when the creditor, by reason of its dealing with security for the debt, has

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

rendered it impossible to deliver the security to the guarantor upon the guarantor paying the debt.

2      Bauer, defendant at trial and appellant in this court, hereinafter referred to as the "guarantor," was in March 1971 the principal officer and major shareholder of a company known as Grey Electronics Supply Limited, hereinafter referred to as the "company". The company was a customer of the respondent bank. The bank was prepared to advance to or to continue to allow the company an operating credit of up to $50,000 upon receiving an assignment of the company's book accounts and the guarantee of the indebtedness by the guarantor. The guarantee was signed on the bank's standard form on 29th March 1971, and the assignment of book accounts was executed later on 7th April 1971. Despite the difference in date, it is common ground that the two dispositions formed part of the same transaction. In December 1971 the guarantor sold his interest in the company to one David Walling. The bank would not, however, release him from his liability under the guarantee, and it remained in effect. The company ran into serious difficulty, and in August 1974 it went into bankruptcy. The amount then owing by the company to the bank came to $36,165.73. In the bankruptcy proceedings the bank claimed preference, relying upon its assignment of book accounts. The trustee, however, contested this claim successfully (see *Re Grey Electronic Supply Ltd.* (1974), 6 O.R. (2d) 308, 20 C.B.R. (N.S.) 88, 52 D.L.R. (3d) 532 (S.C.)) on the basis that the assignment had not been registered by the bank. The bank had attempted to register and in fact had done so but in the wrong county. The result of this failure, which was entirely the responsibility of the bank, was that the assignment was held to be void against the trustee. The assigned accounts, for whatever value they possessed, became available to general creditors and were of little if any value to the guarantor in reducing his obligation or recouping his loss under the guarantee. At trial before Galligan J. [15 O.R. (2d) 746, 25 C.B.R. (N.S.) 193, 1 B.L.R. 165, 76 D.L.R. (3d) 636] the bank's action was dismissed. The trial judge held [p. 195] that a creditor was under an obligation to "Keep the security given to him in the same condition as when the guarantee was given, and if registration is necessary to make the security valid and effective then the creditor must properly register the security". He went on to hold that where a creditor fails to preserve the security and it therefore becomes unavailable for delivery to the guarantor upon payment of the debt, the guarantor would be relieved wholly or partially from his liability depending on the extent of the injury suffered. He held as well that since the bank had not met the onus of showing to what extent the guarantor was prejudiced by the loss of the accounts, the guarantor was entitled to be fully discharged. On appeal by the bank, the Court of Appeal, per Arnup J.A., agreed with the trial judge upon his disposition of the case as it was presented to him but allowed the appeal on a new point not raised or argued at trial.

3      As has been stated earlier, the guarantee was on the bank's standard form which is used regularly for this purpose. It provided for a continuing guarantee by the guarantor of all indebtedness of the company to the bank from time to time owing up to $50,000 and provided as well:

It is further agreed that said bank, without exonerating in whole or in part the undersigned, or any of them (if more than one), may grant time, renewals, extensions, indulgences, releases and discharges to, may take securities from and give the same and any or all existing securities up to, may abstain from taking securities from, or from perfecting securities of, ... the customer.

4      The inclusion of this provision in the guarantee raised the only point considered of significance in the Court of Appeal, and Arnup J.A. for the court dealt with it in these words [p. 210]:

In the circumstances of this case, the words 'perfecting securities' in the guarantee included registration of the assignment of book debts in the right place. The guarantee contains in express terms an agreement by the signatory with the bank that the bank may abstain from perfecting securities without exonerating in whole or in part the guarantor. In our view, this language precisely covers the situation that arose, and accordingly it was not open to the defendant to assert, by way of defence, the alleged negligent dealing with the securities by the bank.

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

5     The duty of a creditor holding security for the performance of the obligations of a debtor or a surety is clearly established. The creditor, in the absence of agreement to the contrary with the debtor or the surety, must protect and preserve the security and be in a position, unless excused by other agreement, to return or reassign the security to the debtor or surety on repayment of the debt. The principle was aptly stated in *Traders Finance Corpn. v. Halverson* (1968), 2 D.L.R. (3d) 666 (B.C.C.A.), by Bull J.A. at p. 672, where he collected various authorities on the point. As well Robertson C.J.O. in *Household Finance Corpn. v. Foster*, [1949] O.R. 123, [1949] 1 D.L.R. 840 (C.A.), reviewed several authorities on the point at pp. 132-33, after having said at p. 131, regarding the position of an endorser of a note who had no contract with the payee:

> There was no contractual relationship between them with respect to the mortgage security given the appellant by the Fosters, the principal debtors. Such right or interest as the respondents had in that security rested, not upon contract, but upon the rule of equity by which, upon payment of the debt, the surety is entitled to benefit of every security held by the creditor, even though neither contracted for by the surety, nor known to him, and even though not existing until after the surety became bound.

6     There are other authorities and writings to the same effect: see *Jamesway Ltd. v. Krug* (1932), 41 O.W.N. 146 (H.C.); *Bryans v. Peterson* (1920), 47 O.L.R. 298, 53 D.L.R. 429 (C.A.), as well as 28 Hals. (4th) 152, paras. 280 et seq., and Snell's Principles of Equity, 27th ed. (1973), pp. 462-63. It was upon a recognition of this principle, and without having the clause above quoted referred to him, that Galligan J. exonerated the guarantor at trial.

7     Despite this rule, it is open to the parties to make their own arrangements, and a surety is competent to contract himself out of the protection of the equitable rule requiring preservation of his security. If authority is needed for such a proposition, it may be found in *Rose v. Aftenberger*, [1970] 1 O.R. 547 at 552, 9 D.L.R. (3d) 42, where Laskin J.A., as he then was, speaking for the Ontario Court of Appeal said:

> The law is that sureties are entitled to the benefits of any security taken by a creditor who has their promise to pay the debt of the principal obligor, unless the sureties have contracted themselves out of this right or are estopped from asserting it. In this connection, it is immaterial when the security was taken or whether the guarantor knew of it at the time.

8     See as well Holden, Securities for Bankers' Advances, 2nd ed., pp. 197 et seq., where the question is discussed and reference is made to *Perry v. Nat. Prov. Bank of England*, [1910] 1 Ch. 464 (C.A.). It was upon this basis that the Court of Appeal allowed the appeal and imposed liability on the guarantor.

9     In this court, the appellant argued several points. In summary, his argument embraced four principal propositions. He contended in the first place that the clause in the guarantee relied upon by the Court of Appeal was an exemption or exclusion clause and that as such it should be construed contra proferentem, that is, against the bank, whose standard printed form embodied the guarantee. He then contended that the bank could not rely on the clause because it was unusual, onerous, and unreasonable. Further, it was said that the execution of the guarantee was procured by a misrepresentation of its nature and effect by the bank and that it should be set aside. Finally it was argued that it had been specifically agreed in a collateral agreement that the assigned accounts would be preserved for reassignment to the guarantor upon payment of the debt.

10     I turn now to the exemption clause argument. It was argued that the provision giving the bank wide freedom in its dealing with security furnished by the company fell into the classification of an exclusion clause and that it was therefore subject to special rules of construction. There have been various attempts to define and to categorize exemption clauses,

**Bauer v. Bank of Montreal, 1980 CarswellOnt 141**

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

which generally have the effect of excluding or limiting the liability of one party to a contract and which generally, but not always, appear in standard form contracts widely used in commercial matters. While they have been variously described, I find that the categorization in Chitty on Contracts, 24th ed. (1977), vol. 1, p. 362, para. 813, is particularly helpful where it is said:

> Exemption clauses may broadly be divided into three categories. First, there are clauses which purport to exempt one party from a substantive obligation to which he would otherwise be subject under the contract, for example, by excluding express or implied terms, by limiting liability to cases of wilful neglect or default, or by binding a buyer of land or goods to accept the property sold subject to 'faults', 'defects' or 'errors of description'. Secondly, there are clauses which purport to relieve a party in default from the sanctions which would otherwise attach to his breach of contract, such as the liability to be sued for breach or to be liable in damages, or which take way from the other party the right to repudiate or rescind the agreement. Thirdly, there are clauses which purport to qualify the duty of the party in default to indemnify the other party, for example, by limiting the amount of damages recoverable against him, or by providing a time-limit within which claims must be made.

11     Contracts falling within these categories are said to be subject to special rules of construction. In construing such a clause, the court will see that the clause is expressed clearly and that it is limited in its effect to the narrow meaning of the words employed, and it must clearly cover the exact circumstances which have arisen in order to afford protection to the party claiming benefit. It is generally to be construed against the party benefiting from the exemption, and this is particularly true where the clause is found in a standard printed form of contract, frequently termed a contract of adhesion, which is presented by one party to the other as the basis of their transaction. No argument was raised by the bank against the general propositions advanced above, but it was contended that this clause was not an exemption clause and did not become subject to any special rules of construction. I accept the basic argument of the bank on this point. The clause in question is not an exemption clause in my opinion. It is no more than a provision which varies the ordinary terms of a guarantee and which gives the bank the right to deal with security provided by the debtor with greater freedom than would be otherwise permissible. This is a provision by which the guarantor has contracted himself out of the equitable right he would have possessed in the absence of this term, and he has, as a term of the contract between the bank and himself, given the bank affirmative rights in this regard. That a guarantor in this situation is fully competent to so dispose of his affairs is beyond question (see the words of Laskin J.A., as he then was, in *Rose v. Aftenberger*, supra, quoted above and *Perry v. Nat. Prov. Bank of England*, supra, particularly the words of Cozens-Hardy M.R. at p. 471). The clause in question here is just such a provision as that referred to in the *Perry* case. It must be construed according to the general rules of construction and the appellant may not, in my view, call in aid any special rules applicable in an approach to an exemption clause.

12     When the whole guarantee is examined, it becomes clear at once that the consideration for the guarantee was the bank's continuation of the line of credit it had advanced to the company. As part of the transaction, the company had agreed to give and had given the assignment of book debts. The clause in question gave the bank powers which it could exercise or not as it chose in dealing with that security. The principal bone of contention here turned on the words permitting the bank to abstain from perfecting or registering securities. "Abstain" meant, it was said, to voluntarily or knowingly refrain from registration. The bank had then not abstained from registration, for it had tried unsuccessfully to do so and had negligently failed. Therefore, it was said, upon a strict construction of the clause in question it had not brought itself within its terms and the guarantee should be void. I am not able to accept this argument. I do not consider that the reason or motive for the bank's non-registration alters the case. The bank was under a duty not to damage the position of the guarantor or act to his prejudice beyond the terms of the agreement, but the clause is clear in that it provides that a failure to perfect security or to register will not impair the bank's position. This ground of appeal must fail.

13     To the argument that the clause was onerous and unreasonable and that the bank could not rely upon it, various arguments were advanced. It was stressed that the guarantee was on a standard bank form, that it was drawn by a party seeking to rely upon the clause, that there was inequality between the parties, and that the clause was unusual in nature. I can find no merit in this position. While it is, of course, true that the guarantee was on the bank's standard form, it is difficult to

Bauer v. Bank of Montreal, 1980 CarswellOnt 141

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

say that the clause was unusual. It was the one the bank always used and the guarantor, an experienced businessman, admitted that he had signed three previous guarantees to the bank on the same form and that he knew the general scope and purpose of the guarantee and what it would require of him. The guarantor was a customer of the bank; he had been for some years. While I suppose it could be said that there is always a degree of inequality between borrower and lender, banker and guarantor, there was no such inequality here that would void the arrangements. Nor, in my opinion, can it be said that there was any unreasonableness in the arrangement. This contract concluded between the bank and the guarantor was an ordinary commercial transaction carried out between the bank and an experienced businessman in the same manner and upon the same terms as are employed daily in such matters. The contract created no unusual or onerous burden in ordinary commercial terms. I can find no merit in this argument.

14      The third argument involves the assertion that the execution of the guarantee was procured by misrepresentation of its full nature and effect by the bank or, alternatively, that there was a failure to explain its nature and effect. The misrepresentation alleged is that the bank manager told the guarantor that upon his paying the amount secured under the guarantee, the book debts would be reassigned to him. This representation was false for the reason that it contradicted the bank's own document. It was contended that the guarantee would not have been executed in its absence. Various authorities were cited for the proposition that a contract induced by misrepresentation or by an oral representation, inconsistent with the form of the written contract, would not stand and could not bind the party to whom the representation had been made. These authorities included *Okanagan Mainline Real Estate Bd. v. Can. Indemnity Co.*, [1971] S.C.R. 493, [1971] 1 W.W.R. 289, [1970] I.L.R. 1-383, 16 D.L.R. (3d) 715, per Judson J. at p. 500; *Jaques v. Lloyd D. George & Partners Ltd.*, [1968] 1 W.L.R. 625, [1968] 2 All E.R. 187 (C.A.), per Lord Denning at pp. 630-631; *Firestone Tyre and Rubber Co. Ltd. v. Vokins & Co. Ltd.*, [1951] 1 Lloyd's Rep. 32 (K.B.), per Devlin J. at p. 39; and *Mendelssohn v. Normand Ltd.*, [1970] 1 Q.B. 177, [1969] 2 All E.R. 1215 (C.A.).

15      No quarrel can be made with the general proposition advanced on this point by the appellant. To succeed, however, this argument must rest upon a finding of some misrepresentation by the bank, innocent or not, or on some oral representation inconsistent with the written document which caused a misimpression in the guarantor's mind, or upon some omission on the part of the bank manager to explain the contents of the document which induced the guarantor to enter into the guarantee upon a misunderstanding as to its nature. For reasons which will appear later in that part of this judgment dealing with the collateral contract argument, I am of the view that there is no evidence which would support any such finding against the bank. The cases referred to above support the general proposition advanced but rest upon a factual basis providing support for the argument. In each case there is a clear finding of a specific misrepresentation which led to the formation of the contract in question, a circumstance not to be found here. This argument must fail as well.

16      Finally, it was the contention of the guarantor that the bank could not rely on the above quoted provision in the facts of this case because it was an express condition of the giving of the guarantee that the accounts be preserved for the benefit of the guarantor and reassigned to him on payment of the company's indebtedness. The bank was, therefore, in breach of its undertaking in this regard and was not entitled to take advantage of the provision. The argument had not been raised at trial, presumably because no reliance had been placed upon the relieving provision above quoted.

17      I have examined the evidence with care and find it difficult to discover any very clear support for the existence of any such collateral or qualifying agreement. However, Galligan J. considered that there was such an agreement, for he said [p. 194]:

Not only is it the law that a surety upon payment of the debt is entitled to the benefit of the security held by the creditor (see *Household Finance Corpn. v. Foster* [supra]), in this case I am satisfied that it was understood between the plaintiffs branch manager and the defendant that if defendant paid the indebtedness of Grey Electronic to the plaintiff the plaintiff would deliver to him the book debts of Grey Electronic, the assignment of which was held by it.

**Westlaw**Next CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Bauer v. Bank of Montreal, 1980 CarswellOnt 141

1980 CarswellOnt 141, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, [1980] S.C.J. No. 46...

18      To make such a finding, he would necessarily have had to rely on evidence. The only evidence I can find in the record of such an arrangement is a statement by the bank manager that the bank would have reassigned the accounts on payment by the guarantor as normal practice, and the assertion by the guarantor that he had been told by the bank manager that if he made good on his guarantee the accounts would be reassigned to him. He said as well that he would not have given his guarantee otherwise. There was then some evidence for the finding of the trial judge, and its sufficiency is not for this court to judge. However, it seems clear to me that this evidence would go towards imposing a limit on the bank's rights with respect to the security given by the debtor. This would clearly contradict the terms of the guarantee which, as has been pointed out, gave the bank the right to abstain from registration and perfection of security. On this basis, it would be inadmissible under the parol evidence rule, and any collateral agreement rounded upon it could not stand. I can see no distinction between the case at bar and that of *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 66 W.W.R. 673, 2 D.L.R. (3d) 600, where in almost identical circumstances Judson J., speaking for this court, said at pp. 678-79:

Bearing in mind these remarks to the effect that there must be a clear intention to create a binding agreement, I am not convinced that the evidence in this case indicates clearly the existence of such intention. Indeed, I am disposed to agree with what the court of appeal [61 W.W.R. 16] said on this point. However, this is not in issue in this appeal. My opinion is that the appellant's argument fails on the ground that the collateral agreement allowing for the discharge of the appellant cannot stand as it clearly contradicts the terms of the guarantee bond which state that it is a continuing guarantee.

The appellant has relied upon *Byers v. McMillan* (1887), 15 S.C.R. 194. But upon my interpretation that the terms of the two contracts conflict, this case is really against him as it is there stated by Strong J. that a collateral agreement cannot be established where it is inconsistent with or contradicts the written agreement. To the same effect is the unanimous judgment of the High Court of Australia in *Hoyt's Proprietary Ltd. v. Spencer* (1919), 27 C.L.R. 133, which rejected the argument that a collateral contract which contradicted the written agreement could stand with it. Knox, C.J., said at p. 139:

A distinct collateral agreement, whether oral or in writing, and whether prior to or contemporaneous with the main agreement, is valid and enforceable even though the main agreement be in writing, provided the two may consistently stand together so that the provisions of the main agreement remain in full force and effect notwithstanding the collateral agreement. This proposition is illustrated by the decisions in *Lindley v. Lacey* (1864), 17 C.B.N.S. 578, 144 E.R. 232, *Erskine v. Adeane* (1873), 8 Ch. App. 756, *DeLassalle v. Guildford*, [1901] 2 K.B. 215, and other cases.

19      Any such collateral oral agreement as contended for by the apellant therefore may not stand in the face of the written guarantee. It follows that an additional argument raised by the guarantor relating to a claim that the collateral contract had been fundamentally breached will not require to be dealt with. I would dismiss the appeal. In all circumstances of this case, I would not award costs to the respondent in any of the courts.

*Appeal dismissed.*

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

266

[1999]

[HOUSE OF LORDS]

A

BEAUFORT DEVELOPMENTS (N.I.) LTD.   .    .    .   APPELLANTS

AND

GILBERT-ASH N.I. LTD.    .    .    .    .    .    .   RESPONDENTS

1998   Feb. 25, 26;              Lord Goff of Chieveley, Lord Lloyd of Berwick,    B
       May 20                                 Lord Nolan, Lord Hoffmann and
                                                 Lord Hope of Craighead

> *Building—Contract—Arbitration—Contractors claiming payment for work*
> *certified by architects—Employers alleging negligence and breach*
> *of contract by contractors and architects—Contractors seeking*
> *appointment of arbitrator in accordance with contract—Employers*    C
> *commencing High Court action—Contractors' application to stay*
> *action—Whether arbitrator's power to open up, review and*
> *revise architects' certificates exclusive—Standard Form of Building*
> *Contract, Private Edition without Quantities, 1980 ed., cl. 41.4*

The employers entered into an agreement with the contractors in
the J.C.T. standard form of building contract, 1980 ed., for the
construction of an office block in Belfast. By a separate agreement    D
the employers appointed architects for the project. The contract,
by clause 41.4,[1] provided for arbitration of disputes, and gave the
arbitrator power to open up, review and revise any certificate.
Following disputes over the progress of the work, the contractors
commenced High Court litigation against the employers claiming
payment for work in respect of which architects' interim certificates
had been issued. By their defence the employers denied liability    E
and alleged that they were entitled to set off an amount in excess
of that claimed by the contractors. The contractors then served a
notice to refer and concur in the appointment of an arbitrator
pursuant to the arbitration clause. The employers issued a writ
against both the contractors and the architects claiming damages
for negligence and breach of contract. The contractors applied,
pursuant to section 4 of the Arbitration Act (Northern Ireland)
1937, for an order staying all further proceedings in the employers'    F
action. The master granted the order. The judge and the Court of
Appeal in Northern Ireland dismissed appeals by the employers
and upheld the master's order on the ground that the court did
not have the power conferred upon an arbitrator by the arbitration
clause to open up, review and revise certificates issued by the
architect.

On the employers' appeal:—

*Held*, allowing the appeal, that the arbitration clause was    G
intended to confer on the arbitrator the plenitude of powers
possessed by the court to determine the rights of the parties; that
it was necessary to spell out those powers in the case of the
arbitrator but not in the case of the court since his powers were
derived from the contract under which he was appointed, whereas
the court's jurisdiction was unlimited; that, therefore, the fact that
power to open up, review and revise was expressly conferred upon    H
the arbitrator but not upon the court could not be construed as
removing the court's power; and that, accordingly, in the

---

[1] J.C.T. Standard Form, 1980 ed., cl. 41.4: see post, p. 272D–E.

1 A.C.                Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))

A    circumstances, there would be no injustice to the contractors in
refusing a stay (post, pp. 269B–C, 271A–C, F–272B, 276F–G, 278A,
280G–281A, 282A–B, 283C, 285D–F, 286A–D, 292A–E).
        *Robins v. Goddard* [1905] 1 K.B. 294, C.A. approved.
        *Northern Regional Health Authority v. Derek Crouch Construc-*
*tion Co. Ltd.* [1984] Q.B. 644, C.A. overruled.
        Decision of the Court of Appeal in Northern Ireland reversed.

B
        The following cases are referred to in their Lordships' opinions:
        *Balfour Beatty Civil Engineering Ltd. v. Docklands Light Railway Ltd.* (1996)
                78 B.L.R. 42, C.A.
        *Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R. 115, C.A.
        *Brodie v. Cardiff Corporation* [1919] A.C. 337, H.L.(E.)
        *Dawnays Ltd. v. F. G. Minter Ltd. and Trollope and Colls Ltd.* [1971] 1 W.L.R.
C                1205; [1971] 2 All E.R. 1389, C.A.
        *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406; [1965]
                3 W.L.R. 1096; [1965] 3 All E.R. 619, H.L.(E.)
        *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146; [1972]
                1 All E.R. 121, H.L.(E.)
        *Minster Trust Ltd. v. Traps Tractors Ltd.* [1954] 1 W.L.R. 963; [1954] 3 All
                E.R. 136
        *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* (1973)
D                71 L.G.R. 162, C.A.; [1974] A.C. 689; [1973] 3 W.L.R. 421; [1973] 3 All
                E.R. 195, H.L.(E.)
        *National Coal Board v. William Neill & Son (St. Helens) Ltd.* [1985] Q.B. 300;
                [1984] 3 W.L.R. 1135; [1984] 1 All E.R. 555
        *Neale v. Richardson* [1938] 1 All E.R. 753, C.A.
        *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.*
                [1984] Q.B. 644; [1984] 2 W.L.R. 676; [1984] 2 All E.R. 175, C.A.
E        *Robins v. Goddard* [1905] 1 K.B. 294, C.A.
        *Taunton-Collins v. Cromie* [1964] 1 W.L.R. 633; [1964] 2 All E.R. 332, C.A.

        The following additional cases were cited in argument:
        *Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488; [1988]
                3 W.L.R. 867; [1988] 2 All E.R. 577, C.A.
F        *Chrisphine Othieno v. Cooper* (1991) 57 B.L.R. 128
        *Partington & Son (Builders) Ltd. v. Tameside Metropolitan Borough Council*
                (1985) 32 B.L.R. 150
        *Tubeworkers Ltd. v. Tilbury Construction Ltd.* (1985) 30 B.L.R. 67, C.A.
        *University of Reading v. Miller Construction Ltd.* (1994) 75 B.L.R. 91

        APPEAL from the Court of Appeal in Northern Ireland.
G        This was an appeal by the plaintiff employers, Beaufort Developments
(N.I.) Ltd., from a decision dated 21 April 1997 of the Court of Appeal in
Northern Ireland (Carswell L.C.J., MacDermott and Nicholson L.JJ.)
dismissing the employers' appeal from a decision of Pringle J. sitting in the
High Court of Justice in Northern Ireland on 24 May 1996 when he
affirmed an order granted on 18 April 1996 by Master Wilson staying all
further proceedings in the employers' action commenced by writ issued on
H    5 December 1995 against the first respondent contractors, Gilbert-Ash N.I.
Ltd., and the second respondents, T. H. Philip Parker and George
W. S. Scott, practising as Parker & Scott, architects, claiming damages for
negligence and breach of contract. On 28 April 1997 the Court of Appeal

in Northern Ireland granted the employers' application for leave to appeal    A
to the House of Lords.

The facts are stated in the opinions of Lord Hoffmann and Lord Hope
of Craighead.

*Declan Morgan Q.C.* and *Gavin Bonnar* (both of the Northern Ireland
Bar) for the employers. In order to construe a contract it is necessary to    B
look at it as a whole. The disputes arising from the contract in the present
case are in respect of matters that are appropriate for resolution by a
court.

The interpretation of the contract in *Northern Regional Health Authority
v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 was erroneous. That
interpretation has now been elevated to a principle of law that the words
"open up, review and revise" oust the jurisdiction of the courts. The    C
decision in the *Crouch* case was based on a wrong proposition of law and
has been followed in subsequent cases. [Reference was made to *Robins v.
Goddard* [1905] K.B. 294; *Neale v. Richardson* [1938] 1 All E.R. 753;
*Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974]
A.C. 689; *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R.
146; *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406;    D
*Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488 and
*Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R. 115.]

*Donnell Deeny Q.C.* and *Mark Horner Q.C.* (both of the Northern
Ireland Bar) for the contractors. The parties here, as in *Northern Regional
Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644,
agreed to arbitrate in binding and clear terms and should be held to their
agreement. This was a commercial contract and where parties agree a    E
machinery for resolving disputes they should not substitute other
machinery. That view is in accordance with Scottish law and with the
provisions of the Arbitration Act 1996.

Here, as in the *Crouch* case, the arbitrator was given wide power to
"open up, review and revise any certificate, opinion, decision . . ." of the
architect. The arbitrator was technically qualified and therefore well
armed to review the architect's decision ab initio. The court would not    F
approach the matter in the same way but would tend to defer to the
decisions of the architect as a professional man adjudicating between
contractor and the client in the course of the contract.

Therefore the *Crouch* case was right in principle and on the merits. The
powers of the court in this context derive from the contract between the
parties. The *Crouch* case has been followed without dissent by a series of    G
appellate courts in England. [Reference was made to *Tube Workers Ltd. v.
Tilbury Construction Ltd.* (1985) 30 B.L.R. 67; *Balfour Beatty Civil
Engineering Ltd. v. Docklands Light Railway Ltd.* (1996) 78 B.L.R. 42;
*University of Reading v. Miller Construction Ltd.* (1994) 75 B.L.R. 91;
*Partington & Son (Builders) Ltd. v. Tameside Metropolitan Borough Council*
(1985) 32 B.L.R. 150 and *Chrisphine Othieno v. Cooper* (1991) 57 B.L.R.
128.]    H

*John Thompson Q.C.* and *Desmond Marrinan* (both of the Northern
Ireland Bar) for the architects, adopting the submission of the contractors.
If the employers are successful, the architects will be in the invidious

A   position of being witnesses in one set of proceedings and being obliged to defend themselves in another set of proceedings. All the issues would not be resolved in one set of proceedings and there would be a risk of inconsistent findings in the two sets of proceedings, giving rise to the prospect of injustice and increased costs.

*Morgan Q.C.* replied.

B

Their Lordships took time for consideration.

20 May. LORD GOFF OF CHIEVELEY. My Lords, I have the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Hoffmann. I find myself to be in complete agreement with his reasoning and his conclusion; and I, too, am satisfied that, with all respect

C   to the distinguished members of the Court of Appeal who decided the case, *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 was wrongly decided and must be overruled. I, too, would therefore allow the appeal a conclusion which, I have no doubt, will be welcomed by the courts in Northern Ireland who would, if they had been free to do so, have wished to follow the same course. Like

D   my noble and learned friend, I gladly acknowledge my debt to the writings of Mr. I. N. Duncan Wallace Q.C. on the subject.

LORD LLOYD OF BERWICK. My Lords, standard forms of building contract have often been criticised by the courts for being unnecessarily obscure and verbose. But in fairness one should add that it is sometimes

E   the courts themselves who have added to the difficulty by treating building contracts as if they were subject to special rules of their own.

Two recent examples illustrate the point. In *Dawnays Ltd. v. F. G. Minter Ltd. and Trollope and Colls Ltd.* [1971] 1 W.L.R. 1205 the Court of Appeal held that when a sum is certified by an architect as due under a building contract (in that case the R.I.B.A. form) the employer has no right of set-off. The justification for this decision was said to be

F   that cash flow is the life blood of the building trade: see *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* (1973) 71 L.G.R. 162, *per* Lord Denning M.R., at p. 167. The decision came as something of a surprise in the official referees' corridor. It was overruled a few years later when the *Modern Engineering* case reached the House: [1974] A.C. 689. "It is not to be supposed" Lord Diplock said, at p. 718:

G      "that so an elementary an economic proposition as the need for cash flow in business enterprises escaped the attention of judges throughout the 130 years which had lapsed between *Mondel v. Steel* (1841) 8 M. & W. 858 and *Dawnays'* case in 1971 ..."

And so the House held, restoring the decision of Judge Edgar Fay Q.C., that the ordinary common law right of set-off, whereby a breach of

H   warranty may be set up in diminution of the price, applies as much to building contracts as to contracts for the sale of goods.

In the meantime *Dawnays'* case had been followed in five other cases in the Court of Appeal. This is not surprising when one considers the

270

pressure of litigation in this field. One erroneous decision of the Court of      A
Appeal is bound to lead to others.

The same applies to the second example, although the intervening
period has been somewhat longer. The arbitration clause in *Northern
Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984]
Q.B. 644 gave the arbitrator the power to "open up, review and revise any
certificate" of the architect, as does the arbitration clause in the present
case. The Court of Appeal held this special power was confined to the      B
arbitrator, on whom it had been conferred by the arbitration clause. It
could not be exercised by the courts. Since it would have been unjust to
the contractors to deprive them of the opportunity of challenging the
architect's certificates in that case, the Court of Appeal held that the
arbitrations (there were two of them) should go ahead.

As in *Dawnays'* case, it appears that the decision in the *Crouch* case      C
came as a surprise. Official referees had been opening up and revising
certificates as a matter of course for many years without any objection
from the parties.

It is clear from Pringle J.'s judgment in the present case, that but for
the decision in the *Crouch* case, he would not have granted the defendant
a stay of the plaintiffs' action under section 4 of the Arbitration Act
(Northern Ireland) 1937, and the Court of Appeal would have upheld his      D
decision. In my view they would have been right. So the question is
whether the *Crouch* case was correctly decided.

In the present case we are concerned with clauses 30.9, 30.10 and 41.4.
Clause 30.9 provides that the *final* certificate is to be conclusive evidence
of the matter certified in accordance with the elaborate provisions set out
in that clause. Clause 41.4, the arbitration clause, provides, as one would      E
expect, that the arbitrator's powers to open up and revise certificates are
subject to clause 30.9. So the arbitrator has no power to open up and
revise the final certificate, save as provided by clause 30.9, and in particular
by clause 30.9.3. But we are not here concerned with the final certificate.
It has not yet been issued.

Nothing in clause 30.9 affects any certificate other than the final
certificate. Indeed clause 30.10 specifically provides:      F

"Save as aforesaid no certificate of the architect shall of itself be
conclusive evidence that any works, materials or goods to which it
relates are in accordance with this contract."

Interim certificates granted by the architect in the course of a building
contract are an important part of the contractual machinery. But there is      G
nothing in the present contract to make interim certificates conclusive; nor
was there in the *Crouch* case. So there is no need for the contract to confer
on the courts the power to open up and revise interim certificates. The
power already exists, as part of the court's ordinary power to enforce the
contract in accordance with its terms.

Then can it be said that the jurisdiction of the courts to open up and
revise interim certificates is impliedly excluded by the terms of the      H
arbitration clause? I do not pause to consider whether such an ouster of
the court's powers would be effective in law; on any view it would require
the clearest of language. I can find no such language in clause 41.4. Since

A   an arbitrator's powers, unlike the powers of the court, are derived ultimately from the contract under which he is appointed, it is by no means unusual to find his powers spelt out in longhand. Thus under the old law (until changed by section 30 of the Arbitration Act 1996) an arbitrator had no power to rule on his own jurisdiction. Since he could not pull himself up by his own boot straps, he could not decide whether a valid arbitration agreement had ever come into existence. But the High
B   Court can rule on its own jurisdiction. Similarly an arbitrator could not rule on a question whether the contract ought to be rectified. So it is not surprising to find the parties conferring on the arbitrator an express power to rectify the contract. But it would be hopeless to argue that because the parties had by clause 41.4 conferred on the arbitrator an express power to rectify the contact, they had by implication curtailed the power of the
C   court to rectify the contract. By the same token, the court's power to open up and revise interim certificates is not excluded by the express power to open up and revise certificates conferred on the arbitrator.

For these reasons, and those given by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I agree, I would hold that the *Crouch* case was wrongly decided, and, like them, would allow the appeal.

D

E   LORD NOLAN. My Lords, I confess to much sympathy with the very distinguished and experienced judges who have expressed or assented to the view that a clause such as clause 41.4 of the building contract giving the arbitrator power to "open up, review and revise any certificate, opinion, decision ... requirement or notice ..." confers upon him a discretion wider than that available to a court. The language used is not that of *The Supreme Court Practice.* It seems to suggest an informal and constructive approach to the resolution of problems occurring in the course of the building work, an approach appropriate to the work of an arbitrator who is chosen because he is an architect rather than a judge.

F   I am, however, persuaded by the arguments of Mr. Declan Morgan, and by the opinions of your Lordships whose speeches I have had the opportunity of reading in draft, that the Court of Appeal in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 placed a weight on clause 41.4 greater than it will bear. I am persuaded in particular that clause 41.4, read in the context of the contract as a whole, cannot properly be construed as giving an interim certificate (as distinct from a final certificate) any conclusive effect in litigation
G   between the parties. Further, I am satisfied that the clause cannot be regarded as conferring upon the arbitrator the power to modify the contract. I find it difficult to conceive of a contract properly so called which conferred upon a third party the power to modify its terms.

The decision in the *Crouch* case has stood unchallenged, although not uncriticised, for 14 years. It has now been virtually superseded by section 9(4) of the Arbitration Act 1996, unless and until (if ever) section
H   86 of that Act is brought into operation. Yet on the view of the law which has prevailed in your Lordships' House the relevant dicta in the *Crouch* case must clearly be overruled, in justice to the appellants. Pringle J. and the Court of Appeal in Northern Ireland would plainly have refused a stay

272

**Lord Nolan**      Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))      **[1999]**

to the respondents, on the compelling ground that to grant it would lead    A
to duplication of proceedings, had it not been for their reluctant acceptance
of what was said in the *Crouch* case. The same objection to a stay did not,
as it happens, arise in the *Crouch* case itself because all three of the parties
concerned submitted to arbitration by the same arbitrator. Mr. Donnell
Deeny, for the first named respondent, persuasively invited your Lordships
to assume that the same consequence would follow if the stay were upheld
in the present case, but the assumption was not one which Mr. Morgan    B
was prepared to support.

I, too, would therefore allow the appeal.


LORD HOFFMANN.   My Lords, the question before your Lordships is
whether an arbitrator appointed to decide a dispute arising under a
building contract in the J.C.T. Standard Form has a power to review    C
decisions and certificates of the architect which is not available to a court.
The English Court of Appeal so held in *Northern Regional Health
Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 but your
Lordships are invited to say that they were wrong.

The clause which is said to give the arbitrator these exceptional powers
is 41.4, of which the relevant parts are as follows:    D

"the arbitrator shall, without prejudice to the generality of his powers,
have power to rectify the contract so that it accurately reflects the true
agreement made by the employer and the contractor, to direct such
measurements and/or valuations as may in his opinion be desirable in
order to determine the rights of the parties and to ascertain and
award any sum which ought to have been the subject of or included
in any certificate and to open up, review and revise any certificate,    E
opinion, decision ... requirement or notice and to determine all
matters in dispute which shall be to him in the same manner as if no
such certificate, opinion, decision, requirement or notice had been
given."

The words particularly relied upon are those which confer a power "to
open up, review and revise any certificate, opinion, decision ... requirement    F
or notice" and determine matters in dispute as if they had not been
given. The Court of Appeal in the *Crouch* case said that these were
special powers conferred exclusively upon the arbitrator. Browne-
Wilkinson L.J. said, at p. 667 that in an action "questioning the validity of
an architect's certificate or opinion," the jurisdiction of the court would be
limited to deciding whether or not the certificate or opinion was invalid    G
for bad faith or excess of power. It could not revise the certificate on the
ground that the court thought it was wrong. A clause such as 41.4, on the
other hand, gave the arbitrator "power not only to enforce the contractual
obligations but to modify them." Sir John Donaldson M.R. also said that
the arbitrator could vary the certificates to create new rights and
obligations which would not otherwise arise from the contract. Dunn L.J.
said that one could not imply a term that if the dispute was litigated    H
instead of arbitrated, the court should have a similar power.

My Lords, I have no doubt that it is open to the parties to enter into
an agreement of the kind described by the Court of Appeal in the *Crouch*

A    case. I put aside the purely theoretical question of whether it is right to
speak of the architect or arbitrator having power to modify the contractual
obligations of the parties. I find this a strange concept. The powers of the
architect or arbitrator, whatever they may be, are conferred by the contract.
It seems to me more accurate to say that the parties have agreed that their
contractual obligations are to be whatever the architect or arbitrator
interprets them to be. In such a case, the opinion of the court or anyone

B    else as to what the contract requires is simply irrelevant. To enforce such
an interpretation of the contract would be something different from what
the parties had agreed. Provisions of this kind are common in contracts
for the sale of property at a valuation or goods which comply with a
specified description. The contract may say that the value of the property
or the question of whether the goods comply with the description shall be

C    determined by a named person as an expert. In such a case, the agreement
is to sell at what the expert considers to be the value or to buy goods
which the expert considers to be in accordance with the description. The
court's view on these questions is irrelevant.

      It is less usual, though certainly theoretically possible, to add a second
tier to arrangements of this kind, and to provide that a party who is
dissatisfied with the view of one expert shall be entitled to call for the

D    opinion of another, which shall then be final and binding. From the point
of view of the court, the final outcome is no different from that in the case
of a single expert. The contractual obligations of the parties depend upon
the opinion of the one expert or the other and not upon its own view of
the matter.

      It is this two-tier arrangement which the Court of Appeal in the *Crouch*

E    case considered that the J.C.T. contract had created; what Sir John
Donaldson M.R. afterwards called, cryptically but vividly, an "internal
arbitration:" see *Benstrete Construction Ltd. v. Angus Hill* (1987) 38 B.L.R.
115, 118. It is internal in the sense that it does not adjudicate upon the
rights and duties of the parties but is part of the machinery for determining
what they are. The court appears to have considered that in the absence of
a second-tier power of the arbitrator to open up, review and revise the

F    architect's certificates, they would (if given in good faith and within the
ambit of the relevant contractual provisions) be binding upon the parties.
So the critical question is whether, upon the true construction of the
contract, such certificates are binding. Unless they are, there is no need for
any special second-tier arrangement. They will be open to review by any
tribunal called upon to determine the rights of the parties, whether arbitral

G    or judicial.

      The judgments of the Court of Appeal contain no very detailed analysis
of the provisions of the contract which are said to confer upon the
architect this power to issue binding certificates. Although none of the
judges say so expressly, there is an implied suggestion that one can infer
such a power from the very fact that the arbitrator is given a power to
"open up, review and revise." This is the argument from redundancy; the

H    parties are presumed not to say anything unnecessarily and unless the
decisions of the architect were binding, there would be no need to confer
upon the arbitrator an express power open up, review and revise them.
The later judgment of Sir John Donaldson M.R. in *Benstrete Construction*

274

**Lord Hoffmann   Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))**                    **[1999]**

*Ltd. v. Angus Hill,* 38 B.L.R. 115, in which he distinguished the *Crouch*       A
case on the ground that the contract in the latter case did not have a
similar arbitration clause, tends to support the view that he had adopted
this form of reasoning.

I think, my Lords, that the argument from redundancy is seldom an
entirely secure one. The fact is that even in legal documents (or, some
might say, especially in legal documents) people often use superfluous
words. Sometimes the draftsmanship is clumsy; more often the cause is a       B
lawyer's desire to be certain that every conceivable point has been covered.
One has only to read the covenants in a traditional lease to realise that
draftsmen lack inhibition about using too many words. I have no wish to
add to the anthology of adverse comments on the drafting of the J.C.T.
Standard Form Contract. In the case of a contract which has been
periodically renegotiated, amended and added to over many years, it is       C
unreasonable to expect that there will be no redundancies or loose ends. It
is therefore necessary to make a careful examination of the contract as a
whole in order to discover whether upon its true construction it does
confer binding power upon the decisions of the architect or whether there
is some other explanation for the "open up, review and revise" power in
clause 41.4. It is also important to have regard to the course of earlier
judicial authority and practice on the construction of similar contracts.       D
The evolution of standard forms is often the result of interaction between
the draftsmen and the courts and the efforts of the draftsman cannot be
properly understood without reference to the meaning which the judges
have given to the language used by his predecessors.

The substantive provisions of the agreement state the principal
obligations of the parties in clear and objective terms. The contractor is       E
obliged by condition 2.1 to "carry out and complete the works in
accordance with the contract documents, using materials and workmanship
of the quality and standards therein specified." In this particular contract,
the preliminary articles defined the "works" as the construction of a nine-
storey office block as described in the contract documents. Condition 8.1.3
provides that all work is to be carried out in a proper and workmanlike
manner and by condition 23.1.1 the contractor is to proceed "regularly       F
and diligently" with the works and complete them on or before the
completion date. The contract specified 14 January 1995 as the completion
date and said that the contract price was to be £1,700,000.

This framework of carefully defined contractual obligation is not easily
reconcilable with a broad discretion, said to be conferred in the first
instance upon the architect and subject to review by an arbitrator, to vary       G
or modify the rights of the parties or to have them conclusively determined
by the judgment of one or the other. The parties have agreed that a
particular building is to be constructed out of specified materials in a
workmanlike manner and that the work should proceed regularly and
diligently to completion by a specified date. No doubt within this
framework there is room for judgment about what amounts to proper
workmanship and diligent progress. But one would not ordinarily describe       H
the exercise of such judgment as a power to modify the contractual rights.
These are questions which require the application of objective standards
and with which the courts are routinely familiar.

**1 A.C.**          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))   Lord Hoffmann

A          The contract provides for the issue by the architect of certificates or statements in writing as to his opinion on various matters. For present purposes, these documents may be treated as similar. As Devlin J. said in *Minster Trust Ltd. v. Traps Tractors Ltd.* [1954] 1 W.L.R. 963, 973: "The mere use of the word 'certificate' is not decisive." In the absence of express words, the parties are highly unlikely to have intended that some of these statements of opinion should be binding and others not. I shall give a few

B     examples. Clause 30 provides for the issue of interim certificates of the value of the work for which the contractor is from time to time entitled to payment. Clause 30.1.1 provides that the contractor is entitled to payment within 14 days after the issue of the certificate. Clause 25, which deals with extension of time, lists a number of "relevant events" such as force majeure or failure to provide instructions or information which the parties accept

C     as capable of delaying completion beyond the completion date without breach of the contractor's primary obligation to proceed diligently with the works. By clause 25.3, if the architect is of opinion that a relevant event is likely to delay completion beyond the completion date, he must give the contractor an appropriate extension of time by a written notice fixing a new completion date. Clause 26 deals with claims for loss and expense caused by deferment of giving possession of the site or various

D     matters such as provision of information for which the employer or architect is responsible. Here again, the architect is required to state his opinion that loss or expense has been caused, or is likely to be caused, by one of the specified matters, whereupon the amount is ascertained by the quantity surveyor and added to the contract price. Finally, clause 30.8 provides for the issue of a final certificate stating the balance due from

E     employer to contractor or vice versa.
          Clause 30.9 expressly makes the final certificate conclusive evidence as to various matters. But there is no other express provision which says that any certificate or expression of opinion is to be binding upon the parties in the same way as the determination of an expert. Clause 30.10, immediately after the provisions dealing with the final certificate, says:

F          "Save as aforesaid no certificate of the architect shall of itself be conclusive evidence that any works, materials or goods to which it relates are in accordance with this contract."

          This clause has itself been the subject of refined arguments of the inclusio unius, exclusio alterius variety. The clause refers to certificates, therefore it must have been intended that other statements of opinion by the architect

G     should be conclusive. The clause refers only to works, materials and goods being in accordance with the contract, therefore it must have been intended that certificates as to other matters such as extensions of time should be conclusive. In a contract such as this, such arguments are just as dangerous as the argument from redundancy, of which they are in truth merely a variety. If arguments of this kind are to be pursued, what seems to me much more compelling is that the contract contains express and elaborate

H     terms which provide for conclusiveness as to various matters for one certificate and one only, namely the final certificate.
          If the certificates are not conclusive, what purpose do they serve? If one considers the practicalities of the construction of a building or other

276

**Lord Hoffmann   Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))**            [1999]

works, it seems to me that parties could reasonably have intended that    A
they should have what might be called a provisional validity. Construction
contracts may involve substantial work and expenditure over a lengthy
period. It is important to have machinery by which the rights and duties
of the parties at any given moment can be at least provisionally determined
with some precision. This machinery is provided by architect's certificates.
If they are not challenged as inconsistent with the contractual terms which    B
the parties have agreed, they will determine such matters as when interim
payments are due or completion must take place. This is something which
the parties need to know. No doubt in most cases there will be no
challenge.

On the other hand, to make the certificate conclusive could easily cause
injustice. It may have been given when the knowledge of the architect
about the state of the work or the effect of external causes was incomplete.    C
Furthermore, the architect is the agent of the employer. He is a professional
man but can hardly be called independent. One would not readily assume
that the contractor would submit himself to be bound by his decisions,
subject only to a challenge on the grounds of bad faith or excess of power.
It must be said that there are instances in the 19th century and the early
part of this one in which contracts were construed as doing precisely this.
There are also contracts which provided that in case of dispute, the    D
architect was to be arbitrator. But the notion of what amounted to a
conflict of interest was not then as well understood as it is now. And of
course the inclusion of such clauses is a matter for negotiation between
the parties or, in a standard form, the two sides of the industry, so that
what is acceptable will to some extent depend upon the bargaining strength
of one side or the other. At all events, I think that today one should    E
require very clear words before construing a contract as giving an architect
such powers.

The language and practical background of the J.C.T. contract does not
therefore suggest that any certificates other than the final certificate were
intended to have conclusive effect. I return, therefore, to clause 41.4, from
which the Court of Appeal in the *Crouch* case [1984] Q.B. 644 drew the
opposite conclusion. It is worth noticing in passing that, in addition to the    F
power to "open up, review and revise," it also confers express powers to
rectify the contract and to direct measurements and valuations. It seems
plain that the reason for the inclusion of these powers in clause 41.4 is to
confer upon the arbitrator the plenitude of power to "determine the rights
of the parties" which would be possessed by a court. If the power to
"open up, review and revise" was intended to be peculiar to the arbitrator,    G
it would at any rate be different in its purpose from the other powers.

At this stage, however, I wish to refer to an important authority on a
clause in similar language which may be taken to have formed part of the
background to the inclusion of clause 41.4 in the J.C.T. Standard Form
Contract, 1980 ed., which was used in this case. It is *Robins v. Goddard*
[1905] 1 K.B. 294. This concerned an R.I.B.A. form of contract, of which
clause 17 dealt with defects "arising in the opinion of the architect from    H
materials or workmanship not in accordance with the drawings or
specification." It provided that the contractor should make good such
defects at his own cost "unless the architect should decide that the

A    contractor ought to be paid for the same." The contract also included an
arbitration clause which conferred power to "open up, review and revise"
any certificate, opinion etc. of the architect. The contractor sued upon
unpaid architect's certificates and the employer counterclaimed on the
ground that the work done and materials supplied were not in accordance
with the terms of the contract. Farwell J. held that the fact that the
architect had not expressed an opinion in accordance with clause 17 that
B    the work and materials were not in accordance with the contract was
conclusive and that the court therefore had no jurisdiction to entertain the
counterclaim.

Mr. Duke K.C. argued for the contractor that the contract meant that
"the certificate of the architect is to be final unless and until it is appealed
under the arbitration clause." He mentioned one express exception in the
C    contract but said that "in all other cases the certificates are final so long
as the only mode of reviewing them by means of the arbitration clause
is not adopted." In other words, he was contending for precisely the two-tier
system of conclusive determination which the Court of Appeal adopted in
the *Crouch* case.

The Court of Appeal unanimously rejected this argument. In fact, they
stood it on its head. Sir Richard Henn Collins M.R. said that the
D    arbitrator's power to open up, review and revise showed that the architect's
certificates were not intended to be conclusive at all. And if they were not
conclusive, they were no more conclusive in litigation than in arbitration.
The power to open up and review, said Collins M.R., at p. 301:

"negatives the contention that the defendant is debarred by the
certificates of the architect from setting up bad workmanship on the
E        building and the introduction of improper materials."

It followed that he could challenge them in an arbitration or, if there was
no arbitration, before the court. Stirling L.J. said, at p. 303, that, rather as
I have suggested to your Lordships is the case with the J.C.T. contract in
this case, the language of the rest of the R.I.B.A. contract did not support
the view that certificates were intended to be conclusive. But, he added:
F    "When we come to the arbitration clause the matter is free from doubt."
The effect of the power to open up and revise was that:

"These certificates, therefore, were not intended to be absolutely
binding and conclusive. No doubt on an application made at the
proper time the dispute might have been referred to arbitration; but it
has not been referred, and the matter remained open for decision
G        under the ordinary jurisdiction of the courts, and the defendant was
entitled to his ordinary legal remedies and to have his case heard."

I have said, my Lords, that *Robins v. Goddard* [1905] 1 K.B. 294 is an
important case. This is not because it lays down any proposition of law
but because it tells us what the Court of Appeal, nearly a century ago,
when the "open up, review and revise" formula seems to have been
H    relatively new, thought that it was intended to do. Not, as the Court of
Appeal said in the *Crouch* case, to enable certificates otherwise conclusive
to be revised by an arbitrator and no one else, but to make it clear that
such certificates were not conclusive at all. The court clearly took the view

278

Lord Hoffmann  Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))                    [1999]

that the draftsman had seen no need to confer an express power on the     A
court in the same terms as the arbitration clause. The court's jurisdiction
was unlimited. It was the arbitrator's powers which need to be spelt out.
On this view, the power to open up, review and revise falls into place
alongside the other powers conferred by clause 41.4 as a power which a
court would in any event possess.

During the 80 years between *Robins v. Goddard* and the *Crouch* case
[1984] Q.B. 644, I can find no authority in which a construction     B
inconsistent with the earlier case was adopted. In *Neale v. Richardson*
[1938] 1 All E.R. 753 similar reasoning was used in a case in which the
question was whether the contractor could sue without a certificate which
the architect had refused to issue. The arbitration clause empowered the
arbitrator to decide all disputes, which, on the authority of *Brodie v.
Cardiff Corporation* [1919] A.C. 337, the court construed to include     C
disputes as to whether or not a certificate should have been issued. There
had been no arbitration because the arbitrator (who was also the architect)
refused to act, but the court decided in general terms that the non-issue of
the certificate was not conclusive and therefore if the arbitrator had power
to decide that the money was owing, the court must have it also. Scott L.J.
said, at p. 758:     D

"If ... the parties did not choose to enforce the domestic tribunal, or
were prevented by the action of the agreed tribunal from doing so, the
King's courts regained their full jurisdiction, and then the county
court judge was entitled to decide the issue as to the certificate which
the architect would have decided as arbitrator, had he acted as such."

It is true that *Robins v. Goddard* seems to have been a cause of perplexity     E
to some members of your Lordships' House in *East Ham Corporation v.
Bernard Sunley & Sons Ltd.* [1966] A.C. 406. Lord Upjohn in particular
said, at p. 441, that he found it a "rather difficult case" and that while not
doubting the actual decision, he did not find it easy to follow some of the
observations in the judgments. Lord Pearson also said, at p. 447, that the
effect of the case was not clear. I venture to suggest that the problem lay
not so much in what *Robins v. Goddard* [1905] 1 K.B. 294 decided but the     F
extraordinary proposition for which counsel was seeking to rely upon it in
the *East Ham* case [1966] A.C. 407. He appears to have submitted that
even if the contract expressly made a certificate conclusive (as did the
contract in the *East Ham* case) but conferred upon an arbitrator a special
power to revise it, the court would automatically acquire a similar power
if the matter was litigated. In other words, a two-tier structure of conclusive     G
certificates could not be created even by express language. Viscount
Dilhorne dealt with the matter accurately and concisely when he said, at
p. 424:

"it appears to be thought in some quarters that, if special powers are
given to an arbitrator, they devolve on the court should there be
litigation. I do not regard the decision in *Robins v. Goddard* as
establishing or, indeed, supporting such a proposition. In that case, as     H
I understand it, the Court of Appeal held that the arbitration clause,
which gave power to an arbitrator to open up, review and revise a
certificate, showed beyond doubt that the certificates in that case were

A      not conclusive and, the certificates not being conclusive, the court was
not obliged to treat them as if they were."

*Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146,
another decision of this House, also concerned a final certificate expressly
declared by the contract to be conclusive. The arbitration clause
(clause 35) gave the arbitrator power to decide any dispute including "any
B      matter or thing left by this contract to the discretion of the architect" but
there had been no request for arbitration. The House held that a final
certificate was conclusive not only in relation to any later litigation but
also in relation to litigation already commenced. Your Lordships are not
concerned with this aspect of the decision, but Lord Wilberforce said near
the end of his speech, at p. 158:

C          "Had the matter gone to arbitration the position would no doubt
have been different: this is because clause 35 of the contract confers
very wide powers upon arbitrators to open up and review certificates
which a court would not have."

I understand Lord Wilberforce to have meant that the contract in
D      question, which expressly declared final certificates to be conclusive but
gave an arbitrator a special power to revise them, had successfully created
a two-tier structure of binding certificates. There is nothing to support the
view that certificates which are not said to be conclusive or binding can be
assumed to have such effect merely because the arbitrator is given an
express power to open up and revise them.

E          In *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.*
[1974] A.C. 689 the issue was whether a contractor, sued by a sub-
contractor on interim certificates, could set off an unliquidated claim for
damages for late and defective work. The Court of Appeal had held in a
number of decisions that there was a strong presumption (amounting, as
Lord Diplock said, at p. 717, virtually to a rule of law) that the contract
excluded the right of set-off. The House overruled these cases, Lord
F      Diplock saying, at p. 717, that so far from there being a presumption that
set-off was excluded:

          "one starts with the presumption that neither party intends to
abandon any remedies for its breach arising by operation of law, and
clear express words must be used in order to rebut this presumption."

G
It was submitted to your Lordships that this presumption supports an
argument that the contract should be construed so as to preserve the
common law remedies of the parties for breach of contract rather than
making their rights subject to the binding decision of the architect. But
I think that such an argument may be circular: if the decision of the
architect is as conclusive as that of an expert, subject only to second-tier
H      revision by an arbitrator, then the rights of the parties are defined by
reference to the opinions of the architect or arbitrator and there is no
question of any independent breach of contract. More to the point,
however, is a later passage in Lord Diplock's speech, in which he referred

to the power of an arbitrator to open up, review and revise any certificate    A
and went on to say, at p. 720:

> "Counsel for the respondent felt compelled to concede, in my view
> rightly, that the employer if sued in an action for the amount stated
> as due in an interim certificate would be entitled to challenge the
> certificate on the ground that the work included in the calculation of
> that amount was not properly executed; though counsel contended    B
> that in order to resist payment on this ground the employer would
> have to have already submitted to arbitration the dispute as to whether
> or not the certificate was in accordance with the conditions of the
> contract and then to apply for a stay of action under section 4 of the
> Arbitration Act 1950. The arbitration clause, however, does not make
> an award a condition precedent to a right of action, let alone a
> condition precedent to a right of defence; and I see no grounds in law    C
> to prevent the employer from defending the action by setting up the
> contractor's breach of warranty in doing defective work even though
> this involves challenging the architect's certificate that the work had
> been properly executed."

This passage seems to me a clear and explicit statement that in the case
of a certificate expressly stated (by the equivalent of clause 30.10 of the    D
J.C.T. contract) not to be conclusive, the court has exactly the same right
to interpret the contractual obligations of the parties as an arbitrator
would have had.

This was the state of the authorities at the time when the *Crouch* case
[1984] Q.B. 644 came before the Court of Appeal. Dunn L.J. introduced
his discussion of this question by saying, at p. 663: "Perhaps surprisingly    E
there is no direct authority on the point which is binding on us." He made
no reference to *Robins v. Goddard* [1905] 1 K.B. 294 and appears to have
regarded the issue as being, not whether the certificates were conclusive in
the first place, but whether (assuming them to be conclusive) one could
imply into the contract a term that the court was to have the same power
to revise them as the arbitrator. Not surprisingly, he rejected the implication
of such a term. Browne-Wilkinson L.J. also made no reference to *Robins*    F
*v. Goddard*, agreed that there was no authority directly in point and said,
at p. 668, that his view was supported by the "weight of judicial dicta."
Sir John Donaldson M.R. did refer to *Robins v. Goddard*, but only in
relation to the comments upon that case in *East Ham Corporation v.*
*Bernard Sunley & Sons Ltd.* [1966] A.C. 406. He mentioned the comment
of Viscount Dilhorne as to the proposition which *Robins v. Goddard* did    G
not support but made no reference to his summary of what the case
actually decided. It was the latter which was, in my opinion, binding upon
the Court of Appeal in the *Crouch* case and should have been determinative
on the question before them. None of the judges made reference to what
Lord Diplock had said in *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash*
*(Northern) Ltd.* [1974] A.C. 689, although it appears from the report (at
p. 649) that counsel drew attention to the passage and submitted (in my    H
view rightly) that it supported the proposition that

> "where a dispute as to the quality of work is litigated as opposed to
> arbitrated the court would be entitled to consider the matter on the

A      basis of the evidence adduced and so would not be bound by the
architect's certificate."

In my opinion, therefore, the dicta on this point in *Northern Regional
Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644
were both obiter and wrong. Since then, however, 14 years have passed
and the building industry has lived with the *Crouch* construction of the
B      standard building contracts. There have also been legislative changes.
Section 43A of the Supreme Court Act 1981, inserted by section 100 of
the Courts and Legal Services Act 1990, provides that if all parties agree,
the High Court may exercise any specific powers which the contract
confers upon an arbitrator. The discretion of the court to refuse a stay on
the grounds of an arbitration clause has been abolished by section 9(4) of
C      the Arbitration Act 1996, which provides that "a stay must be granted
unless the arbitration agreement is null and void, inoperative, or incapable
of being performed." This provision is subject to section 86, which excludes
its operation in domestic operations and retains the court's discretion.
Section 86 has not however been brought into force and it is not clear
whether it will be. For the moment, the mandatory stay required by
D      section 9(4) appears to be of general application. So the possibility of
litigating contracts containing an arbitration clause except by the consent
of all parties has been much reduced.

Nevertheless, it seems to me that cases since *Crouch* show that the
decision has caused such uncertainty and even injustice that its dicta
should be disapproved. I refer in particular to the recent decision of the
Court of Appeal in *Balfour Beatty Civil Engineering Ltd. v. Docklands
E      Light Railway Ltd.* (1996) 78 B.L.R. 42. It was a claim for extension of
time and loss and expense under the I.C.E. Conditions of Contract, which
had been amended, first, by substituting the employer's representative for
the engineer and secondly, by deleting the arbitration clause. The contract
provided for the employer to certify extensions of time and loss and
expense claims. But there was no provision that they were to be binding or
F      conclusive. Nevertheless, the court held that there was no power to "open
up, review or revise" them such as an arbitrator might have had if there
was an arbitration clause in the usual form and that, as a matter of
construction, "the contractor's entitlement was to depend on the
employer's judgment:" *per* Sir Thomas Bingham M.R., at p. 57. Your
Lordships will remember that in *Benstrete Construction Ltd. v. Angus Hill,*
G      38 B.L.R. 115, 118 Sir John Donaldson M.R. appeared to be saying that
the *Crouch* construction of the certification clauses as conclusive in
litigation was based upon the fact that the contract created an "internal
arbitration." But in the *Balfour Beatty* case the contractors were held, even
in the absence of an arbitration clause or any express language as to the
certificates being conclusive, to have subjected themselves to the judgment
of the employer. It is true, as Sir Thomas Bingham M.R. remarked, at
H      p. 57:

"It is not for the court to decide whether the contractor made a good
bargain or a bad one; it can only give fair effect to what the parties
agreed."

On the other hand, in deciding exactly what the parties did agree, it seems    A
to me that in the absence of express language, one should not assume so
uncommercial a bargain. I do not think that the *Balfour Beatty* case would
have been decided as it was if not for the shadow of the *Crouch* decision
that certificates, even if not declared to be conclusive, can be questioned
only for bad faith or excess of power. I do not think that anyone in the
industry can be said to have acted in reliance on the *Crouch* case
and I would therefore overrule it. I must acknowledge the assistance    B
which I have had in reaching this conclusion from the writings of
Mr. I. N. Duncan Wallace Q.C.

The significance of doing so in the present case can be briefly stated.
Beaufort Developments (N.I.) Ltd. ("the employer") entered into a contract
dated 3 May 1994 with Gilbert-Ash N.I. Ltd. ("the contractor") for the
construction of a nine-storey office block in Belfast. The contract was in    C
the standard J.C.T. form, 1980 ed., Private without Quantities. By a
separate contract it employed the firm of Parker & Scott ("the architects")
as architects. The works were not completed on time; an outcome for
which the contractor blamed the architects and the employer blamed them
both. For example, some work had to be done over again and there are
disputes over whether this was on account of the contractor's bad
workmanship or use of wrong materials or the architects' failure to provide    D
adequate drawings and information. There is also a dispute over whether
this and other matters actually caused the delay in completion. The
contractor claimed that it was entitled to payment from the employer, both
under certificates issued by the architects for work done under the contract
and by way of payment for extra work. The employer claimed that it was
entitled to damages against contractor and architects for breach of    E
contract.

Litigation commenced on 31 August 1995 when the contractor issued
a writ claiming about £230,000 and interest due under six architects'
certificates. On 9 October 1995 the employer served an unilluminating
defence, denying liability and alleging that it was entitled to set off a cross-
claim in a larger amount. On 15 November 1995 the contractor served a
notice to refer and concur in the appointment of an arbitrator pursuant to    F
the arbitration clause in the contract. It referred in general terms to the
areas of dispute such as the responsibility for delay and the contractor's
claims to payment for extra work. On 5 December 1995 the employer
issued a writ which named both the contractor and the architects as
defendants. It claimed damages for negligence and breach of contract. On
7 February 1996 the contractor issued a summons for a stay of the    G
employer's action pursuant to section 4 of the Arbitration Act (Northern
Ireland) 1937. The agreement between the employer and the architects also
contained an arbitration clause but the architects did not make a similar
application.

Master Wilson granted the stay and on appeal his decision was affirmed
by Pringle J. He did so with reluctance because he said that the architects
could not be required to take part in the arbitration between the employer    H
and the contractor and there was a very real risk of conflicting decisions
in the arbitration and the litigation against the architects. But he considered
that he was bound by the *Crouch* case [1984] Q.B. 644 to hold that an

A    arbitrator would have the power to "open up, review and revise" certificates
or opinions of the architect which the court did not possess. If a stay was
refused, the contractor would therefore be at a "grave disadvantage in that
it will be faced with architect's certificates which the court will not be able
to review." In the Court of Appeal, Carswell L.C.J. prefaced his judgment
by saying:

B        "In the hearing of this appeal counsel for the contractor did not seek
        to challenge the correctness of the judge's view that if it were not for
        the effect of the *Crouch* decision a stay should not be granted in the
        present case. Nor did counsel for the employer or counsel for the
        architects challenge his conclusion that if the *Crouch* decision is to be
        followed in this jurisdiction it' would be unjust to the contractor to
        refuse a stay. The argument before us turned on the correctness of the
C        *Crouch* decision and whether this court should follow it."

    As in my opinion the *Crouch* case was wrongly decided, I think that
the discretion should have been exercised as Pringle J. would have done if
he felt free to do so. I would therefore allow the appeal.


D        LORD HOPE OF CRAIGHEAD.    My Lords, the application by Gilbert-Ash
    N.I. Ltd. ("the contractor") for a stay of the action by Beaufort
    Developments (N.I.) Ltd. ("the employer") was made under section 4 of
    the Arbitration Act (Northern Ireland) 1937. The grant of a stay under
    that section is discretionary. It is plain from the reasons which Pringle J.
    gave for affirming the master's decision to grant the stay that he would
    have refused the application had it not been for the decision of the Court
E    of Appeal in *Northern Regional Health Authority v. Derek Crouch
    Construction Co. Ltd.* [1984] Q.B. 644. As he pointed out, the circumstances
    in the present case are very similar to those in *Taunton-Collins v. Cromie*
    [1964] 1 W.L.R. 633.
        In that case, as here, the contract between the employer and the
    contractor contained an arbitration clause. The architect, in response to
    the employer's claim against him, put part of the blame for the
F    unsatisfactory building on the contractor. The employer then joined
    the contractor as a defendant to his action against the architect. The
    contractor's application for a stay in reliance on the arbitration clause was
    refused by the official referee, and an appeal against his decision was
    dismissed. This was because to grant a stay would have resulted in two
    sets of proceedings. There would have been an arbitration as against the
G    contractor and an action as against the architect. There would have been
    a substantial risk of different decisions on the same question and on the
    same facts. Pearson L.J. said, at p. 638, that there were very strong reasons
    based on the principle of avoiding a multiplicity of proceedings for
    permitting the action to continue as an action by the employer against
    both defendants.
H        Pringle J. noted that there were many issues of fact to be determined
    in the present case. They included the reasons for the delay which had
    occurred in the completion of the works by the contractor, the standard of
    workmanship and materials and the question whether acceleration of the
    works had given rise to additional costs. He said that he could foresee very

**Lord Hope
of Craighead**    Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))        [1999]

considerable difficulties in dealing with these issues, and that in his opinion    A
the risk of conflicting decisions was a very real one. Nevertheless he felt
obliged to uphold the stay in view of the consequences to the contractor
of the decision in the *Crouch* case if the dispute between it and the
employer were not to be dealt with by an arbitrator. The Court of Appeal
decided, with some hesitation, to follow the decision in the *Crouch* case.    a
But Carswell L.C.J. made it clear in the course of his judgment that the
court had considerable reservations about the soundness of that decision.    B
He said that, if the matter were res integra, he would have been attracted
to an interpretation of the contract which would have avoided the need to
go to arbitration to avoid injustice to the contractor.

The situation in this case has therefore brought out into the open
difficulties created by the decision of the Court of Appeal in the *Crouch*
case which have been lying not far below the surface since it was made.    C
The fundamental question is whether the court has been deprived, by the
power which the parties have given to their arbitrator to open up, review
and revise certificates, opinions and decisions of the architect, of its
ordinary power to determine the rights and obligations of the parties and
to provide them with the usual remedies. In the *Crouch* case [1984] Q.B.
644, 667 Browne-Wilkinson L.J. said:
                                                                          D
"In no circumstances would the court have power to revise such
certificate or opinion solely on the ground that the court would have
reached a different conclusion since so to do would be to interfere
with the agreement of the parties."

I shall return to this passage later when I come to examine that case in
more detail. For the time being it is sufficient to notice that the basis for    E
this view is the difference which was said to exist between the powers of
the court and those conferred by the agreement of the parties on the
arbitrator. The power of the court, it was said, was to enforce the contract,
while the arbitrator had been given the power, which the court does not
possess, to modify it. This proposition has come to be applied generally to
all cases where the arbitrator has been given power to open up, review and
revise certificates.                                                      F
The contract in the present case was entered into under the
J.C.T. Standard Form of Building Contract, 1980 ed., Private without
Quantities. It incorporated amendments numbers 1 to 12 together with the
adaptation schedule for Northern Ireland and the Contractor's Designed
Portion Supplement. By article 5 of the articles of agreement the parties
agreed to refer their disputes to arbitration in accordance with clause 41    G
of the conditions. Clause 41.4 of the conditions, so far as relevant to this
case, provides:

"the arbitrator shall, without prejudice to the generality of his powers,
have power to rectify the contract so that it accurately reflects the true
agreement made by the employer and the contractor, to direct such
measurements and/or valuations as may in his opinion be desirable in
order to determine the rights of the parties and to ascertain and    H
award any sum which ought to have been the subject of or included
in any certificate and to open up, review and revise any certificate,
opinion, decision ... requirement or notice and to determine all

1 A.C.          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))          Lord Hope
of Craighead

A     matters in dispute which shall be submitted to him in the same
manner as if no such certificate, opinion, decision, requirement or
notice had been given."

Clause 41.5 provides that, subject to clause 41.6 which enables either
party to appeal to the High Court on any question of law, the award of
such arbitrator shall be final and binding on the parties. Clause 30 deals
B     with certificates and payments to the contractor. Clause 30.9 makes
provision as to the effect of the final certificate, while clause 30.10 makes
provision as to the effect of certificates other than the final certificate.
Clause 30.9 provides that, except in certain circumstances, the final
certificate shall be conclusive evidence "in any proceedings arising out of
or in connection with the contract (whether by arbitration under article 5
or otherwise)" as to various matters about which decisions have had to be
C     made by the architect under the contract. Clause 30.10 provides:

"Save as aforesaid no certificate of the architect shall of itself be
conclusive evidence that any works, materials or goods to which it
relates are in accordance with this contract."

Had it not been for the weight of contrary authority I would not have
D     found much difficulty in reaching the following conclusions about the effect
of these provisions relating to the powers of the arbitrator and the finality
to be given to certificates. In the first place, the function of
clause 41.4 is to define the powers which are to be given to the arbitrator.
An arbitrator has no jurisdiction except that which the parties choose to
confer upon him by their agreement to refer their disputes to an arbitrator.
The whole question as to the extent of his powers rests upon contract. So
E     it is necessary that the agreement should set out all the powers which he is
to have in order that he may determine all the matters which are in
dispute. But it is not to be thought that by conferring powers on the
arbitrator the parties are limiting the ordinary powers of the court to
determine their rights and obligations under the contract. In the present
case, for example, clause 41.4 gives power to the arbitrator to rectify the
F     contract. The court already has that power, but it might well have been in
doubt as to whether the power of the court could be exercised by the
arbitrator. There is nothing in clause 41.4 to suggest that, by conferring
this power on the arbitrator, the parties intended to remove this power
from the court.

Then there are the provisions about the certificates. In the present case
the contractor seeks payment of the sums certified as due for payment
G     under six interim certificates. It appears that it will also seek to maintain a
claim against the employer for additional costs which are not the subject
of any certificate by the architect. The employer for its part claims, by way
of set off against any sums due to the contractor, amounts in respect of
delay in completion of the construction and fitting out works and damages
for breach of its obligation to provide materials and workmanship to the
standard which the contract required. These are matters about which
H     the contract provides for decisions to be taken or opinions to be given by the
architect. But there is no express contractual provision to which one can
point which has the effect of giving finality to the various decisions and
opinions which he has made. We are not concerned in this case with any

286

Lord Hope
of Craighead        Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))        [1999]

question as to the conclusive effect of the final certificate because, although    A
a certificate of practical completion was issued in June 1996, the final
certificate has not yet been issued. It is made quite clear by clause 30.10
that the interim certificates which the architect has issued are not of
themselves to be conclusive evidence.

On this approach, if there is no stay, the court will be able to exercise
all its ordinary powers to decide the issues of fact and law which may be
brought before it and to give effect to the rights and obligations of the    B
parties in the usual way. It will have all the powers which it needs to
determine the extent to which, if at all, either party was in breach of the
contract and to determine what sums, if any, are due to be paid by one
party to the other whether by way of set-off or in addition to those sums
which have been certified by the architect. It will not be necessary for it to
exercise the powers which the parties have conferred upon the architect in    C
order to provide the machinery for working out their contract. Nor will it
be necessary for it to exercise the power which clause 41.4 confers on the
arbitrator to revise certificates. This is because the court does not need to
make use of the machinery under the contract to provide the parties with
the appropriate remedies. The ordinary powers of the court in regard to
the examination of the facts and the awarding of sums found due to or by
either party are all that is required. There would be no risk of any injustice    D
to the contractor.

In *Taunton-Collins v. Cromie* [1964] 1 W.L.R. 633, 636 Pearson L.J. said
that in that case there was a conflict between two well established
principles. One was that parties should normally be held to their
contractual agreements. Where the parties have agreed that any dispute or
difference between them should be referred to arbitration the court should    E
be willing to say by its decision what the parties have already said by their
contract. The other principle was that a multiplicity of proceedings was
highly undesirable. In that case it was the principle of avoiding a
multiplicity of proceedings which prevailed. The effect of the decision of
the Court of Appeal in the *Crouch* case has been to reverse the result of
balancing these two principles. But that case also, it may be said, involved
the application of two well established principles. The first is that which    F
was expressed in these terms by Browne-Wilkinson L.J. [1984] Q.B. 644,
667:

"In principle, in an action based on contract the court can only
enforce the agreement between the parties: it has no power to modify
that agreement in any way."

G
The second, which was not referred to at all in the judgments in that
case, is that which was described by Lord Diplock in *Modern Engineering
(Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689, 718:

"So when one is concerned with a building contract one starts
with the presumption that each party is to be entitled to all those
remedies for its breach as would arise by operation of law, including
the remedy of setting up a breach of warranty in diminution or    H
extinction of the price of material supplied or work executed under
the contract. To rebut that presumption one must be able to find in
the contract clear unequivocal words in which the parties have

A    expressed their agreement that this remedy shall not be available in respect of breaches of that particular contract."

The facts in the *Crouch* case [1984] Q.B. 644 can be stated quite shortly. There had been delays in the completion of the work under the main contract and by a nominated subcontractor. An arbitrator had been appointed on a reference under the main contract between the contractor

B    and the authority. The same arbitrator had been appointed in a reference under the subcontract in which the nominated subcontractor was proceeding in the contractor's name in its arbitration with the authority. The arbitrator was empowered under clause 35(3) of the conditions under the main contract to open up, review and revise the architect's certificates, opinions, decisions, requirements or notices. There had been no final certificate. The question was whether the arbitration proceedings should be

C    stayed. One of the issues raised in the case—although it was not necessary to decide this issue in order to dispose of the appeal—was whether the official referee in the High Court had the power to open up, review and revise the certificates, opinions, decisions, requirements or notices of the architect which had been given to the arbitrator by clause 35(3) of the main contract.

D    Dunn L.J. said, at p. 663F, that the court had been told that it was common practice for the official referee to open up and review certificates and other decisions of the architect and he observed that there were decisions of high authority either way as to whether this was competent. In his summary of the competing arguments he said that the authority had relied on obiter dicta of Lord Wilberforce in *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146, 158 and of Viscount Dilhorne

E    and Lord Cohen in *East Ham Corporation v. Bernard Sunley & Sons Ltd.* [1966] A.C. 406, 424 and 432. The other side had contended that in order to give business efficacy to the contract there must be an implied term that if the parties were to litigate rather than arbitrate the court was to have the same powers as the arbitrator. He went on [1984] Q.B. 644, 664:

"In my judgment it is not necessary to imply the term suggested
F    in clause 35. The contract gives the architect wide discretionary powers as to the supervision, evaluation and progress of the works. The parties have agreed that disputes as to anything left to the discretion of the architect should be referred to arbitration, and clause 35 gives wide powers to the arbitrator to review the exercise of the architect's discretion and to substitute his own views for those of the architect. Where parties have agreed on machinery of that kind
G    for the resolution of disputes, it is not for the court to intervene and replace its own process for the contractual machinery agreed by the parties."

Browne-Wilkinson L.J. began his discussion of this point, at p. 667B, with the statement of principle that the court had power only to enforce the contract, not to modify it in any way. He went on to say that, if the

H    parties have agreed on a specified machinery for establishing their obligations, the court cannot substitute a different machinery. He then distinguished the powers of the court from those of the arbitrator. The parties had agreed that certain rights were to be determined by the

288

Lord Hope
of Craighead        **Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))**                    [1999]

certificate or opinion of the architect. In no circumstances would the court          A
have power to revise such certificate or opinion solely on the ground that
it would have reached a different conclusion, as to do so would be to
interfere with that agreement. But the powers conferred on the arbitrator
were different. He had been given power to modify the contractual rights
by varying the architect's certificates and opinions if he disagreed with
them and to substitute his own discretion for that of the architect. He
summed the matter up with these words, at pp. 667–668:                                 B

> "Therefore as a matter of principle I reach the conclusion that if
> this matter were to be litigated in the High Court (whether before the
> official referee or a judge) the court would not have power to open
> up, review and revise certificates or opinions as it thought fit since so
> to do would be to modify the contractual obligations of the parties.
> The limit of the court's jurisdiction would be to declare inoperative      C
> any certificate or opinion given by the architect if the architect had
> no power to give such certificate or opinion or had otherwise erred in
> law in giving it. The court could not (as an arbitrator could) substitute
> its own discretion for that of the architect."

Sir John Donaldson M.R., at pp. 671–673, also drew a distinction          D
between the power of the court and those which had been conferred on
the arbitrator. He said that the powers conferred on the arbitrator seemed
to him to involve the exercise of a completely novel jurisdiction which was
quite different from the function of the court. He described the court's
function as being to determine facts and to enforce the contractual rights
of the parties. The arbitrator had that function also, but he also had the
right and duty which the court did not possess to review the architect's          E
decisions and, if appropriate, to substitute his own. He also found support
for his opinion that the court would not be able to exercise the power to
open up and review which clause 35 of the J.C.T. contract had given to
the arbitrator in the dicta to which Dunn L.J. had referred in the *East
Ham* case [1966] A.C. 406 and in what Lord Wilberforce had said, in the
*Hosier & Dickinson Ltd.* case [1972] 1 W.L.R. 146, 158.
The statement of principle with which Browne-Wilkinson L.J. began          F
his discussion of this point seems to me, with respect, to be both relevant
and accurate. I do not think that it can be doubted that in a case which
has been based on contract the court's function is to enforce the agreement
of the parties, not to modify their agreement in any way. But I have the
impression that in the discussion which follows, and in the remarks which
were made by the other judges, two other important points were overlooked          G
and that the description of the arbitrator's powers as including a power to
modify the contract, for what it is worth, is less than accurate.
The first point is that there is a difference between an agreement that
machinery is to be used to implement or to give effect to the contract and
an agreement that the parties' rights are to be determined solely by means
of that machinery. An agreement which falls into the first category will be
needed in almost every building or engineering contract. Some method has          H
to be laid down for dealing with such matters as variations to the contract
works and the making of interim payments to the contractor as the work
proceeds. But an agreement of that kind does not imply any limitation on

1 A.C.          Beaufort Developments Ltd. v. Gilbert-Ash Ltd. (H.L.(N.I.))          Lord Hope
                                                                                    of Craighead

A     the ordinary powers of the court. Nor does it confer any powers on the architect or engineer, or in his turn on the arbitrator, which restrict the power of the court, in the event of litigation, to conduct its own inquiry into the facts. Its purpose is simply to enable the contract to be worked out upon the agreed terms to achieve the result to which it was directed. The purpose of an agreement which falls into the second category, on the other hand, is to exclude the point at issue from being determined by the

B     court. If the parties have agreed that a dispute between them is to be determined conclusively by the architect or engineer, or in the event of dispute by an arbitrator, the sole function of the court is to give effect to the agreement which they have made. Its jurisdiction is to enforce the contract. Its duty is to ensure that the decision of the architect or the engineer or, in his turn, of the arbitrator is given the conclusive effect

C     which has been agreed. But none of the judges in the *Crouch* case addressed the question whether the certificates or opinions of the architect which the arbitrator had power to open up, review and revise were agreed by the parties to the contract to have effect as conclusive evidence.

     The second point is this. The powers which the court ordinarily has to determine and give effect to the rights and obligations of the parties to a contract differ from the additional powers which, in the typical building or

D     engineering contract, are given to the architect or the engineer and, in the event of any dispute about their exercise, to the arbitrator. The purpose of these additional powers is not to deprive the court of its ordinary powers to determine their rights and obligations under the contract. Their purpose is to enable the architect or engineer, and in the event of a dispute about their exercise the arbitrator, to do things in the course of the execution of

E     the contract which the court could not do. This point was well expressed by Piers Ashworth Q.C., sitting as a deputy High Court judge, in *National Coal Board v. William Neill & Son (St. Helens) Ltd.* [1985] Q.B. 300, 309, where he said:

     "I have heard much argument on the effect of arbitration clauses. I cannot help feeling that a certain unjustified mystique has been

F     attributed to them. In general an arbitration clause does no more than provide an alternative method of resolving disputes. It is hoped that it is simpler, quicker and cheaper than resorting to a court of law. In building contracts an arbitrator is frequently given additional powers which would not otherwise be open to him and are not open to a judge to exercise. For example, by clause 15 of this contract the contractor is required to proceed with the work in accordance with

G     the instructions of the engineer. By sub-clause (b) he is entitled to dispute any such instruction and to refer to arbitration. Were it not for this sub-clause, clearly the contractor would have no right to dispute or litigate about any such instruction and, even within sub-clause (b), he cannot dispute such an instruction before a court. In this respect, it is right to say the arbitrator has additional powers to a

H     court. But in general, as I have said, arbitration is simply an alternative way of resolving disputes."

     So there is this difference between the provision of an agreed machinery for giving effect to the contract and the taking of decisions or the

expressions of opinion which may be necessary from time to time to its          A
exercise. Where the parties have conferred additional powers on the
architect, the engineer or the arbitrator, the function of the court is to give
effect to the agreement of the parties as to the use of that machinery. The
court cannot give the instructions or issue the certificates. But the fact that
decisions are taken or opinions are expressed in the course of the working
out of that machinery does not, of itself, affect the ordinary powers of the
court if litigation becomes necessary. That would only be so if the parties          B
had agreed that those decisions or opinions were to receive effect as
conclusive evidence.

     Then there is the question whether it was accurate for the court in the
*Crouch* case to describe the power which was given by the conditions in
the J.C.T. contract to the arbitrator to open up, review and revise
certificates and opinions of the architect as a power to modify the contract.          C
It was primarily on this ground that the distinction was drawn between
the powers of the arbitrator and those of the court. In my opinion the
correct analysis is that the power which is given to the arbitrator in the
event of a dispute about the exercise of his powers by the architect is a
power to give effect to the contract, not to modify it.

     In *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.*          D
[1974] A.C. L 689, 717B Lord Diplock said that a building contract is an
entire contract for the sale of goods and work and labour for a lump sum
price payable by instalments as the goods are delivered and the work is
done. Decisions have to be taken from time to time about such essential
matters as the making of variation orders, the expenditure of provisional
and prime cost sums and the extension of time for carrying out the works
under the contract. Decisions also have to be taken from time to time as          E
to the adjustments which may have to be made to the contract sum on
account of these matters and on the amounts to be paid to the contractor
by way of instalments towards a final settlement of the sums to which he
is entitled under the contract. But in taking their decisions on all these
matters the duty of the architect or the arbitrator is to give effect to the
contract, not to alter or modify it. Variations can only be made to the          F
contract within the limits which the parties themselves have agreed. From
time to time in order to exercise these functions the architect or the
arbitrator must apply the provisions of the contract to the facts. But in
this regard their position in the resolution of disputes between the parties
is no different from that enjoyed in the exercise of its ordinary powers by
the court.          G

     For these reasons I consider that the Court of Appeal in *Crouch,*
having started from the correct principle, fell into error in its application
to the facts. Unlike both *East Ham Corporation v. Bernard Sunley & Sons
Ltd.* [1966] A.C. 406 and *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.*
[1972] 1 W.L.R. 146 it was not a case in which there had been a final
certificate. There was no issue between the parties as to whether any of the
certificates which had been issued had been agreed to be conclusive          H
evidence of the facts stated in them. In *East Ham* it was held that the
effect of the relevant provisions of the building contract was that the final
certificate was conclusive evidence and that it could not be reopened even

A     by the arbitrator. In the *Hosier & Dickinson* case Lord Morris of Borth-y-Gest explained, at p. 153B–C, that the fact that the parties had agreed to the conclusiveness of a certificate as a matter of evidence did not involve any ouster of the jurisdiction of the court. Lord Wilberforce said, at p. 157D, that to describe it as doing so would be to misdescribe the effect attributed to it by the contract. There was no discussion of any of these points in the *Crouch* case. But the effect of the decision was to confer a

B     similar status on the certificates and opinions of the architect, subject only to their review by an arbitrator, without having identified any provision in the contract which removed these matters from the ordinary jurisdiction of the court.

    In the *Crouch* case [1984] Q.B. 644 both Dunn L.J. and Sir John Donaldson M.R., at pp. 663H and 673C, relied on the dictum of Lord

C     Wilberforce in *Hosier & Dickinson Ltd. v. P. & M. Kaye Ltd.* [1972] 1 W.L.R. 146, 158:

> "Had the matter gone to arbitration the position would no doubt have been different: this is because clause 35 of the contract confers very wide powers upon arbitrators to open up and review certificates which a court would not have."

D     I agree that, at first sight, this dictum may be taken to suggest that the court can never open up and review certificates where such wide powers in that regard are given to the arbitrator. But I think that to read the dictum in this way would be to take it out of its context. The context is to be found in what Lord Wilberforce said, at p. 157, about the provisions of the contract which dealt with the effect of the final certificate. He said that

E     the court proceedings had raised the question whether the work done and the materials used were such as should have been done and used under the contract, and that an essential question was what standard was to be set for this. It was in that context that he examined the provisions about the final certificate. He concluded that there could be no objection to a clause which provided that it was the architect's standard which was to be relevant and that his final certificate was to be conclusive evidence. The

F     only circumstances in which, by clause 30(7) of the conditions in that contract, the final certificate was not to be conclusive evidence were where there had been a written request by either party, within certain time limits, to concur in the appointment of an arbitrator.

    It seems to me that the discussion in the *Hosier & Dickinson* case put the matter on the correct basis. On the one hand there is the principle which was expressed by Lord Diplock in *Modern Engineering (Bristol)*

G     *Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689, by which clear unequivocal words must be used to deprive a party to a contract of recourse to the court for the ordinary exercise of its powers and the granting of the ordinary remedies. On the other there is the principle that the court must give effect to the contract which the parties have made for themselves. If the contract provides that the sole means of establishing the

H     facts is the expression of opinion in an architect's certificate, that provision must be given effect to by the court. But in all other respects, where a party comes to the court in the search of an ordinary remedy under the contract or for a remedy in respect of an alleged breach of it, the court is

292

entitled to examine the facts and to form its own opinion upon them in    A
the light of the evidence. The fact that the architect has formed an opinion
on the matter will be part of the evidence. But, as it will not be conclusive
evidence, the court can disregard his opinion if it does not agree with it.

For these reasons I agree with my noble and learned friend, Lord
Hoffmann, that the *Crouch* case was wrongly decided and should be
overruled. I, also, consider that the answers which the Court of Appeal
gave to the questions which were before it in *Balfour Beatty Civil*    B
*Engineering Ltd. v. Docklands Light Railway Ltd.*, 78 B.L.R. 42 were the
wrong answers. That was a case in which there was no arbitration clause,
but there was no provision in the contract agreeing that the opinion of
the employer's representative was to be conclusive evidence in the event
of a dispute. The fact that the contract did not provide an agreed
means of challenging the judgment of the employer's representative did not    C
affect the power of the court to examine the issue and to form its own
judgment in the light of the evidence.

I can return now to the facts of this case. There has been no final
certificate. No certificates or opinion have been issued or given which the
parties have agreed shall be taken to provide conclusive evidence as to the
matters which are in dispute. The court is thus in no different position in
regard to such expressions of opinion as have been given as would be an    D
arbitrator. It does not have the additional power which an arbitrator has
under this contract to issue fresh certificates in place of those already
issued by the architect. But it does not need that power in order to resolve
the disputes which have arisen in this case. In these circumstances there
would be no injustice to the contractor in refusing a stay. To grant a stay
would be to risk conflicting decisions in the separate proceedings    E
which would be needed to determine the respective responsibilities to the
employer of the contractor and of the architect. I would therefore allow
the appeal and refuse a stay of the proceedings in the High Court.

*Appeal allowed with costs in House of*
*Lords and below.*

F

*Solicitors: Crawford & Lockhart, Belfast; L'Estrange & Brett, Belfast;*
*McCloskey & Co., Belfast.*

[Reported by SHIRANIKHA HERBERT, Barrister]

G

——————

H



**BERCKELEY INVESTMENT GROUP, LTD. v. DOUGLAS COLKITT; SHORELINE PACIFIC INSTITUTIONAL FINANCE, THE INSTITUTIONAL DIVISION OF FINANCE WEST GROUP; NATIONAL MEDICAL FINANCIAL SERVICES CORPORATION, Douglas R. Colkitt, Appellant**

**No. 04-3844**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*455 F.3d 195*; *2006 U.S. App. LEXIS 18584*; *Fed. Sec. L. Rep. (CCH) P93,904*

**February 21, 2006, Argued**
**July 25, 2006), Filed**

**PRIOR HISTORY:** [**1] On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. No. 97-cv-01242). District Judge: Honorable James F. McClure, Jr.
*Berckeley Inv. Group, Ltd. v. Colkitt, 259 F.3d 135, 2001 U.S. App. LEXIS 16801 (3d Cir. Pa., 2001)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After remand for failure to properly certify a summary judgment order as final, the United States District Court for the Middle District of Pennsylvania certified its order in favor of plaintiff Bahamian financing entity and against defendant doctor on the parties' breach of contract claims and the doctor's claims of securities laws violations under *15 U.S.C.S. §§ 77d(1), 77e, 78j(b), 78cc(b)*. The doctor appealed.

**OVERVIEW:** The doctor's *15 U.S.C.S. § 78cc(b)* recission claim pursuant to *15 U.S.C.S. § 77e* failed because the entity's obligation to loan funds to the doctor and the doctor's obligation to provide convertible debentures could have been lawfully performed when the agreement was signed. The entity's downstream sales were tangential to those obligations. Under the agreement, all later sales of converted shares were to comply with the Securities Act of 1933's registration requirements. The entity admitted it had intended to

exercise its conversion rights as quickly as possible, and no viable offshore market for the shares was shown. *17 C.F.R. § 230.144's* safe harbor provisions were not available because the entity sold the unregistered shares within a year. There was no evidence the shares were to be sold solely to sophisticated investors. Thus, the entity had not shown entitlement to *15 U.S.C.S. 77d(1)'s* exemption. While the *15 U.S.C.S. § 78j(b)* claim could form the basis of a recission claim under *15 U.S.C.S. § 78cc(b)*, there was no connection between the shares' price decrease and the entity's unrelated alleged misrepresentation of its intent to comply with offshore registration requirements.

**OUTCOME:** Summary judgment in favor of the entity was affirmed on the doctor's recission claim based on a violation of the Securities Act of 1933's registration requirements, and on the fraud claim under the Securities Exchange Act of 1934. Summary judgment to the entity as to the fraud claim, and the issues of intent to sell the converted debentures' shares without registration, as a basis for a recission claim, was reversed. The case was remanded.

**LexisNexis(R) Headnotes**

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court exercises plenary review over the district court's entry of summary judgment.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
[HN2] Under the summary judgment standard of *Fed. R. Civ. P. 56(c)*, an appellate court will affirm the judgment of the district court if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN3] In deciding the motion for summary judgment, the court's job is to ascertain solely whether there is a dispute of material fact: the court is not permitted to make factual findings, which remains the province of the jury. When determining whether there are any genuine issues of material fact, the court draws all inferences in favor of the non-moving party. Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the non-moving party must point to some evidence in the record that creates a genuine issue of material fact. In this respect, summary judgment is essentially "put up or shut up" time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument. In addition, if the non-moving party has the burden of proof at trial, that party must set forth facts sufficient to establish the existence of an element essential to that party's case.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
[HN4] *Fed. R. Civ. P. 54(b)* governs the certification of final decisions in multiple-claim actions.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
[HN5] See *Fed. R. Civ. P. 54(b)*.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
[HN6] *Fed. R. Civ. P. 54(b)* was designed in an attempt to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
[HN7] A decision to certify a final decision under *Fed. R. Civ. P. 54(b)* involves two separate findings: (1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there is "no just reason for delay."

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN8] The United States Supreme Court has analogized the function of district courts under *Fed. R. Civ. P. 54(b)* as akin to a "dispatcher": district courts are to consider judicial administrative interests, as well as the equities involved in the case, in order to determine whether discrete final decisions in multiple-claim actions are ready for appeal. Recognizing that the district court is most likely to be familiar with the case and with any justifiable reason for delay, an appellate court applies an abuse of discretion standard of review to the district court's determination that there is no just cause for delay. The appellate court applies as a benchmark against the district court's exercise of discretion whether that discretion was applied in the interest of sound judicial administration. The appellate court's proper role in this regard is not to reweigh the equities or reassess the facts but to make sure that the conclusions derived from those weighings and assessments are juridically sound and supported by the record. As a result, the appellate court should disturb the trial court's assessment of the equities only if it can say that the judge's conclusion was clearly unreasonable.

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN9] An appellate court subjects questions of law concerning the interpretation of the requirements of *Fed. R. Civ. P. 54(b)* to plenary review.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN10] Where there is a concurrent failure to make an express determination of no just cause for delay, an appellate court cannot reasonably conclude that the district court intended to enter a partial final judgment pursuant to *Fed. R. Civ. P. 54(b)*.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN11] There are several factors that courts should consider when assessing that there is a "just reason for delay" under *Fed. R. Civ. P. 54(b)*: (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like. The factors are not jurisdictional prerequisites -- but instead constitute a prophylactic means of enabling the appellate court to ensure that immediate appeal will advance the purpose of the rule.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of Contracts > Void & Voidable Contracts*
[HN12] See *15 U.S.C.S. § 78cc(b)*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of*

*Contracts > Void & Voidable Contracts*
[HN13] Section 29(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78cc(b)*, itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions. Although the word "void" is contained in the statute, the United States Supreme Court has read *§ 78cc(b)* to be merely voidable at the option of the innocent party.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of Contracts > Void & Voidable Contracts*
[HN14] In order to void an agreement under § 29(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78cc(b)*, a party must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with the other party; and (3) he is in the class of persons that the securities acts were designed to protect. He must demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be inseparable from the performance of the contract rather than collateral or tangential to the contract.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of Contracts > Void & Voidable Contracts*
[HN15] The United States Court of Appeals for the Third Circuit has taken a narrow view of the phrases "made in violation of" and "the performance of which involves the violation of" contained in § 29(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78cc(b)*. The test is whether the securities violations are inseparable from the underlying agreement between the parties. If an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under *§ 78cc(b)*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of Contracts > Void & Voidable Contracts*
[HN16] Unlawful transactions made pursuant to lawful contracts do not fall within the ambit of § 29(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78cc(b)*.

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > U.S. Securities & Exchange Commission > Rulemaking*
[HN17] Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, makes it unlawful for any person to employ manipulative or deceptive conduct in connection with the purchase or sale of any security. When the Exchange Act was passed in 1934, Congress granted the Securities and Exchange Commission the authority in *§ 78j(b)* to develop rules and regulations to prevent such conduct as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *15 U.S.C.S. § 78j(b)*. The Commission responded in 1948 by promulgating *17 C.F.R. § 240.10b-5*, which establishes that manipulative or deceptive conduct includes, inter alia, making an untrue statement of material fact or omitting to state a material fact in connection with the purchase or sale of securities.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN18] See *17 C.F.R. § 240.10b-5*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Validity of Contracts > Rescission*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
[HN19] A private party plaintiff must establish each of the following elements to prove that a defendant violated § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and *17 C.F.R. § 240.10b-5*: (1) the defendant made a misstatement of material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that the plaintiff's reliance was the proximate cause of his injury. A § 29(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78cc(b)*, rescission claim premised on a *15 U.S.C.S. § 78j(b)* violation, however, differs from a private damages action brought under *§ 78j(b)*. In the *15 U.S.C.S. § 78cc(b)* context, a plaintiff seeking rescission does not have to establish reliance and causation.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN20] Under the Private Securities Litigation Reform Act of 1995, Congress codified the common law loss causation requirement as a statutory element of a § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, private cause of action. *15 U.S.C.S. § 78u-4(b)(4)*.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN21] See *15 U.S.C.S. § 78u-4(b)(4)*.

*Evidence > Judicial Admissions > Effects*
*Evidence > Judicial Admissions > Pleadings*
[HN22] Judicial admissions are concessions in pleadings or briefs that bind the party who makes them.

*Securities Law > Exemptions From Registration > Exempt Transactions > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN23] In order to establish a § 5 of the Securities Act of 1933 violation, *15 U.S.C.S. § 77e*, the plaintiff must point to evidence that: (1) no registration statement was in effect as to the securities; (2) the defendant sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Securities Law > Exemptions From Registration > Burdens of Proof*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Defenses > General Overview*
[HN24] The burden of proving entitlement to an

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

exemption under § 4(1) of the Securities Act of 1933, *15 U.S.C.S. § 77d(1)*, rests with the party claiming the entitlement.

***Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview***
***Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Defenses > General Overview***
[HN25] Section 4(1) of the Securities Act of 1933, *15 U.S.C.S. § 77d(1)*, exempts from the registration requirements under § 5 of the Securities Act of 1933, *15 U.S.C.S. § 77e*, transactions by any person other than issuer, underwriter, or dealer.

***Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview***
***Securities Law > Liability > Securities Act of 1933 Actions > Definitions***
[HN26] Section 2(a)(11) of the Securities Act of 1933 defines the term "underwriter," in part, as any person who has purchased from an issuer with a view to the distribution of any security. *15 U.S.C.S. § 77b(a)(11)*.

***Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters***
***Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rule 144***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview***
***Securities Law > Liability > Securities Act of 1933 Actions > Definitions***
[HN27] Because it is difficult to discern a party's intent at the time of purchase with respect to downstream sales of unregistered shares in connection with determining if that party is an underwriter under § 2(a)(11) of the Securities Act of 1933, *15 U.S.C.S. § 77b(a)(11)*, courts and commentators have typically focused on the amount of time a security holder holds on to shares prior to reselling them. Over time, courts have developed the general

presumption that a two-year holding period is sufficient to negate the inference that the security holder did not take the securities with a "view to distribute."

***Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters***
***Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rule 144***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview***
***Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview***
[HN28] Seizing upon the difficulty of determining a party's subjective intent at the time of purchase, the Securities and Exchange Commission (SEC) adopted *17 C.F.R. § 230.144*, which creates an objective safe harbor to allow non-affiliate sellers to comply with the § 4(1) of the Securities Act of 1933, *15 U.S.C.S. § 77d(1)*, exemption. A non-affiliate seller may fall within the *17 C.F.R. § 230.144* safe harbor, and not be deemed an "underwriter," under two sets of circumstances. First, the SEC has generally removed all restrictions from the sale of securities by a non-affiliate who has held onto the securities for a period of at least two years from the date the securities were acquired from the issuer or an affiliate of the issuer. *17 C.F.R. § 230.144(k)*.

***Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters***
***Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rule 144***
***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview***
***Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview***
[HN29] If the non-affiliate seller has not held the securities for a period of at least two years, the seller may fall within the *17 C.F.R. § 230.144* safe harbor if it complies with the following five criteria: (1) adequate current public information about the securities is available, i.e., the company must have complied with the reporting requirements of the Securities Exchange Act of 1934 or with S.E.C. Rule 15c2-11; (2) at least one year has lapsed between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

issuer, and any resale of such securities; (3) the amount of securities sold may not exceed the greater of (a) one percent of the outstanding class, or, (b) if traded on a national exchange, the average weekly volume of trading in the securities over the past four weeks preceding the filing of notice as required under *17 C.F.R. § 230.144(h)*; (4) the securities must be sold in "brokers' transactions" or in transactions with a "market maker," and the seller is prohibited from soliciting or arranging for solicitation orders to buy securities in anticipation or in connection with such transaction; and (5) if the seller is going to sell more than 500 shares, or the aggregate sale price is greater than $ 10,000, the seller must file a notice of the sale with the Securities and Exchange Commission.

*Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters*
*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rule 144*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN30] The seller must comply with each of the elements in order to gain the benefit of the safe harbor provisions of *17 C.F.R. § 230.144*. *17 C.F.R. § 230.144(b)*.

*Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters*
*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rule 144*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
[HN31] Each safe harbor set forth under *17 C.F.R. § 230.144*, requires the seller to have held on to the unregistered shares for a specified time period, either one or two years.

*Securities Law > Exemptions From Registration > Exempt Transactions > Dealers, Issuers & Underwriters*
*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rules 146 & 506*

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*
[HN32] The focus of the term "underwriter" as defined under 2(a)(11) of the Securities Act of 1933, *15 U.S.C.S. § 77b(a)(11)*, is on the concept of "distribution."

*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rules 146 & 506*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*
[HN33] Courts interpreting the § 4(1) of the Securities Act of 1933, *15 U.S.C.S. § 77d(1)*, exemption have uniformly concluded that the term "distribution" is synonymous with "public offering" as set forth under § 4(2) of the Securities Act of 1933. The United States Court of Appeals for the Third Circuit agrees with the rationale of those courts and similarly holds that the term "distribution" in *15 U.S.C.S. § 77d(1)* is synonymous with "public offering."

*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rules 146 & 506*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*
[HN34] Whether an issuance of stock is a "public offering" turns on the need of the offerees for the protections of the securities laws. Since exempt transactions are those as to which there is no practical need for the Securities Act of 1933's application, the applicability of the § 4(2) of the Securities Act of 1933, *15 U.S.C.S. § 77d(2)*, private placement exemption should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering.

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rules 146 & 506*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*

[HN35] The percentage of outstanding shares distributed to the public is not determinative as to whether an issuance of stock is a "public offering," as the application of the § 4(1) of the Securities Act of 1933, *15 U.S.C.S. § 77d(1)*, exemption does not turn on the percentage of the shares sold, even where the resales constitute extremely small percentages of the outstanding stock. Rather, the key inquiry for the court is whether the security holder can demonstrate that the sales were made to individuals or entities that did not require the registration protections of the Securities Act.

*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*

[HN36] A sell order given to a stock exchange broker results in an offer to the highest bidder in the world, which is certainly a "public offering" within the meaning of § 4(2) of the Securities Act of 1933, *15 U.S.C.S. § 77d(2)*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*

[HN37] A plaintiff can plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. Recklessness can be shown by a statement or action involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers of securities that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
*Evidence > Testimony > Experts > Ultimate Issue*

[HN38] The district court has discretion to determine whether expert testimony will help the trier of fact. In utilizing that discretion, however, the district court must ensure that an expert does not testify as to the governing law of the case. Although *Fed. R. Evid. 704* permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion. Such testimony is prohibited because it would usurp the district court's pivotal role in explaining the law to the jury.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
*Evidence > Testimony > Experts > General Overview*

[HN39] An appellate court reviews the district court's decision to admit expert testimony for abuse of discretion.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Ultimate Issue*

[HN40] *Fed. R. Evid. 704*, advisory committee's notes explain that, although a witness may give an opinion as to an ultimate issue, *Fed. R. Evid. 701*, *702*, *403*, stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

*Evidence > Testimony > Experts > Ultimate Issue*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*

[HN41] An expert's testimony regarding securities industry practice and custom is not determinative as to a party's state of mind. Even a universal industry practice may still be fraudulent, and ultimate responsibility for construction and enforcement of the securities laws must rest with the court.

*Securities Law > Exemptions From Registration > Exempt Transactions > U.S. Securities & Exchange Commission Rules 146 & 506*
*Securities Law > Initial Public Offerings & the*

*Securities Act of 1933 > Definitions > General Overview*
*Securities Law > Initial Public Offerings & the*
*Securities Act of 1933 > Registration of Securities >*
*General Overview*

[HN42] *17 C.F.R. § 230.901* was enacted in 1990 to provide generally that an offer or sale of a security that occurs outside the United States is not subject to the registration requirements under § 5 of the Securities Act of 1933, *15 U.S.C.S. § 77e. 17 C.F.R. §§ 230.901 - 230.905*. Under that regulation, securities acquired overseas, whether or not pursuant to *17 C.F.R. § 230.901*, may be resold in the United States only if they are registered under the Act or an exemption from registration is available. *17 C.F.R. § 230.904*, preliminary note 6. *17 C.F.R. § 230.901* contains two non-exclusive safe harbor provisions, *17 C.F.R. §§ 230.903, -.904*. Under *17 C.F.R. §§ 230.903, -.904*, an offer or sale of securities is deemed to occur outside the United States if: (1) the offer or sale is made in an offshore transaction; (2) no directed selling efforts are made in the United States; and (3) additional considerations listed in *17 C.F.R. § 230.903(b)* and/or *17 C.F.R. § 230.904(b)* are satisfied. *17 C.F.R. §§ 230.903 - .904*. Both safe-harbor rules contain a 40-day "distribution compliance period" under which resales of unregistered shares may not be made in any event. *17 C.F.R. §§ 230.903, -.904*.

*Securities Law > Exemptions From Registration >*
*Exempt Transactions > Dealers, Issuers & Underwriters*
*Securities Law > Exemptions From Registration >*
*Exempt Transactions > U.S. Securities & Exchange*
*Commission Rule 144*
*Securities Law > Initial Public Offerings & the*
*Securities Act of 1933 > Registration of Securities >*
*General Overview*

[HN43] The safe harbors under *17 C.F.R. §§ 230.903, -.904*, are not available for a transaction or series of transactions that, although in technical compliance with *17 C.F.R. § 230.901*, is part of a plan or scheme to evade the registration requirements of the Securities Act of 1933. The 40-day restricted period cannot be used for to "wash off" resale restrictions such as the 2-year holding requirement under *17 C.F.R. § 230.144*. Any distributions by a statutory "underwriter" must be registered pursuant to § 5 of the Securities Act of 1933, *15 U.S.C.S. § 77e*, unless subject to a statutory exemption.

*Administrative Law > Agency Rulemaking > Rule*

*Application & Interpretation > Binding Effect*
[HN44] An interpretive rule is one issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers. An interpretive rule is not binding upon a court. Indeed, no-action and interpretive responses by the agency's staff are subject to reconsideration and should not be regarded as precedents binding on the agency.

*Evidence > Privileges > Attorney-Client Privilege >*
*Exceptions*
*Legal Ethics > Client Relations > Confidentiality of*
*Information*
*Securities Law > Liability > Securities Exchange Act of*
*1934 Actions > Implied Private Rights of Action >*
*Elements of Proof > Scienter > General Overview*
[HN45] The attorney-client privilege cannot be used as both a "shield" and a "sword." A securities litigation party cannot rely upon the legal advice it received for the purpose of negating its scienter without permitting the other party the opportunity to probe the surrounding circumstances and substance of that advice.

*Securities Law > Liability > Securities Exchange Act of*
*1934 Actions > Implied Private Rights of Action >*
*Elements of Proof > Causation*
[HN46] Causation in the securities context is strikingly similar to the familiar standard in the torts context, but with different labels. In the securities realm, "but for" causation is referred to as "reliance, or transaction causation," and "proximate cause" is known as "loss causation."

*Securities Law > Liability > Securities Exchange Act of*
*1934 Actions > Implied Private Rights of Action >*
*Elements of Proof > Causation*
*Securities Law > Liability > Securities Exchange Act of*
*1934 Actions > Implied Private Rights of Action >*
*Elements of Proof > Reliance > General Overview*
[HN47] In order to establish reliance, or transaction causation, a § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, plaintiff must prove that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security. Stated differently, the plaintiff must prove that but for the wrongful conduct, the transaction would not have gone through, at least in the form that it eventually took.

455 F.3d 195, *; 2006 U.S. App. LEXIS 18584, **1;
Fed. Sec. L. Rep. (CCH) P93,904

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*

[HN48] To prove loss causation under *15 U.S.C.S. § 78j(b)*, the plaintiff must demonstrate that the fraudulent misrepresentation actually caused the loss suffered. Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff. Thus, the loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*

[HN49] The loss causation element under *15 U.S.C.S. § 78j(b)* requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries. In the typical *§ 78j(b)* case, a party can meet this burden by showing that the price of a security was inflated due to a fraudulent misrepresentation. In such a case, there is a direct causal nexus between the misrepresentation and the plaintiff's economic loss. Similarly, the loss causation element is satisfied where a fraudulent misrepresentation or omission induces the plaintiff to enter into the challenged transaction. In contrast, a plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation. In that situation, it cannot be said that the alleged misrepresentation proximately caused the decline in the security's value to satisfy the element of loss causation.

**COUNSEL:** Peter Konolige, Andrew J. Kennedy (Argued), Marcy L. Colkitt & Associates, Indiana, PA, for Appellant.

Joel Magolnick (Argued), Moscowitz, Moscowitz & Magolnick, Miami, FL, for Appellee Berckeley Investment Group, Ltd.

Michael J. Lawson (Argued), Morgan, Lewis & Bockius, San Francisco, CA, for Appellee Shoreline Pacific Institutional Finance.

**JUDGES:** Before: McKEE, FISHER and ROTH, * Circuit Judges.

\* The Honorable Jane R. Roth assumed senior status on May 31, 2006.

**OPINION BY:** FISHER

**OPINION**

[*197] FISHER, *Circuit Judge*.

In May 1996, Appellant Douglas Colkitt, M.D., entered into an "Offshore Convertible Securities Purchase Agreement" (the "Agreement") with Appellee Berckeley Investment Group, Ltd., an offshore financing entity based in the Bahamas. The Agreement provided that Colkitt would receive $ 2,000,000 from Berckeley in exchange for 40 convertible debentures, which Berckeley could convert after a specified time period into unregistered shares of stock held by Colkitt. The number of shares to be converted [**2] was controlled by a formula based on the current market value of the shares less a 17% discount for Berckeley.

The relationship between the parties quickly deteriorated, as Colkitt accused Berckeley of "short selling" in order to deflate the market price of the stock and thereby obtain more shares upon conversion. When the time came for Colkitt to convert the unregistered shares to repay his debt to Berckeley, he balked and ended up converting only a small percentage of the shares that Berckeley requested. Thereafter, each party filed suit against the other. There is no dispute that Colkitt breached his end of the bargain. Colkitt, however, asserts that he was justified in [*198] not complying with the Agreement because Berckeley made material misrepresentations in the Agreement that violated federal securities laws and constituted common law fraud.

Following seven years of protracted litigation, including a previous appeal to this Court, *Berckeley Inv. Group, Ltd. v. Colkitt, 259 F.3d 135, 137 (3d Cir. 2001)* ("*Berckeley I*"), the District Court found in favor of Berckeley on the parties' cross-motions for summary judgment. The District Court awarded damages to Berckeley [**3] in the amount of $ 2,611,075.52. Colkitt appeals that decision on a number of grounds, primarily relating to the District Court's analysis of federal securities laws. For the reasons set forth herein, we will affirm in part, reverse in part, and remand the case to the District Court for further proceedings.

**I. BACKGROUND**

Douglas Colkitt, M.D., is the Chairman of the Board and principal shareholder of National Medical Financial Services Corporation ("NMFS"), a corporation whose shares were traded on the NASDAQ stock exchange. Looking to obtain financing for an unrelated business venture, Colkitt sought out lenders who would be willing to lend him money in exchange for the right to convert his unregistered shares of NMFS stock. *See, e.g., GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 194-95 (3d Cir. 2001).*

In the spring of 1996, Colkitt entered into negotiations with Berckeley Investment Group, Ltd., a Bahamian corporation headquartered in Nassau, Bahamas. On May 30, 1996, the negotiations culminated in the Agreement between the parties. [1] Under the Agreement, Berckeley purchased 40 convertible debentures from Colkitt at $ 50,000 per debenture, [**4] for a total of $ 2,000,000. [2] Each debenture represented an unsecured loan for a one-year term, which also obligated Colkitt to pay to Berckeley six percent interest on a quarterly basis. In lieu of receiving repayment in cash per these terms, however, Berckeley was entitled under the Agreement to convert its debentures into NMFS shares. The Agreement provided that, upon demand by Berckeley, Colkitt would issue unregistered shares of NMFS at a 17% discount off the then-prevailing market price of the stock. [3] Berckeley was entitled to convert up to one-half of the principal amount into unregistered NMFS shares one hundred (100) days after the closing of the Agreement, and the remaining principal amount one hundred twenty (120) days after the closing date.

1    Defendant-Appellant Shoreline Pacific Institutional Finance ("Shoreline") brokered the Agreement between Colkitt and Berckeley. *Berckeley I, 259 F.3d at 137.*
2    A debenture is a debt secured only by the debtor's earning power, not by a lien on any specific asset. A convertible debenture is one that the holder may change into some other security, such as stock. *See* Black's Law Dictionary 430 (8th ed. 2004).

[**5]

3    For example, suppose that Berckeley wanted to convert $ 1,000,000 of the debentures into NMFS shares, and that the current market price for NMFS stock was $ 25 per share. The conversion price would be $ 20.75 per share ($ 25 per share *

0.83). At a rate of $ 20.75 per share, Berckeley would be entitled under the Agreement to 48,192.77 shares of NMFS stock.

The 17% discount received by Berckeley represented, in part, the fact that "the National Medical shares held by Colkitt for the transaction were not registered with the Securities and Exchange Commission, as would be required for sales of those shares within the United States by *Section 5 of the Securities Act of 1933.*" *See Berckeley I, 259 F.3d at 137* (internal citation omitted).

Several of the contractual provisions in the Agreement are key to an understanding [*199] of the dispute between the parties. The parties acknowledged that the Agreement was entered into pursuant to Regulation S of the Securities Act of 1933, *17 C.F.R. §§ 230.901-.04,* and that it would be "governed by and interpreted according [**6] to the law of the State of New York." In paragraph 2.5 of the Agreement, Berckeley warranted that all subsequent offers or sales of the debentures or shares would be undertaken in accordance with the registration requirements of the 1933 Securities Act:

All subsequent offers and sales of the Debentures or the Shares will be made (a) outside the United States in compliance with *Rule 903* or *904* of Regulation S, (b) pursuant to registration of the Debentures or the Shares, respectively, under the Securities Act, or (c) pursuant to an exemption from such registration. Buyer understands the conditions of the exemption from registration afforded by *Section 4(1) of the Securities Act* and acknowledges that there can be no assurance that it will be able to rely on such exemption. In any case, Buyer will not resell the Debentures or the Shares to U.S. Persons or within the United States until after the end of the forty (40) day period commencing on the date of completion of the Offering (the "Restricted Period").

Berckeley further represented that it was aware that Colkitt was relying upon the accuracy of its

455 F.3d 195, *199; 2006 U.S. App. LEXIS 18584, **6;
Fed. Sec. L. Rep. (CCH) P93,904

representations regarding federal and state securities laws, and that [**7] its "purchase of the Debenture or the Shares pursuant to this Agreement is not part of a plan or scheme to evade the registration provisions of the Securities Act." For his part, Colkitt represented that he would "take no action, including but not limited to the further sale of securities pursuant to Regulation S of [NMFS] that are held by [Colkitt], that will affect in any way the running of the Restricted Period or the ability of Buyer to freely resell the debentures or the Shares in accordance with applicable securities laws and this Agreement." In addition, Colkitt agreed to place 300,000 shares of NMFS stock in escrow to cover the $ 2,000,000 aggregate amount of the debentures. He further agreed that "[i]f the price has decreased so that the shares in escrow are insufficient for the conversion of all outstanding Debentures, [Colkitt] agrees to place in escrow additional shares representing that number of shares necessary for the conversion of all outstanding Debentures plus an additional 100,000 shares."

Berckeley upheld its end of the Agreement when it

wired $ 2 million via Shoreline to Colkitt. Colkitt, however, did not. Following the expiration of the one hundred day [**8] period, Berckeley began making demands on Colkitt to convert the debentures into NMFS stock. Berckeley made five such demands on Colkitt during September 1996 to convert $ 300,000 worth of the debentures into 40,133 shares of stock. [4] On each occasion, Colkitt failed to comply with the conversion demands. Following repeated requests for conversion, Colkitt finally converted 18,230 shares on November 5, 1996. [5] Colkitt, however, refused to [*200] convert any additional shares, including $ 160,000 worth of the debentures demanded by Berckeley on November 6, 1996. [6] Colkitt further refused to make required quarterly interest payments that were due on the debentures under the Agreement, and to repay the balance due on the Debentures at the end of the term.

4    Berckeley specifically made the following demands on the following dates in September 1996:

| Date | Face Value | Conversion Price | Shares Due (truncated) |
|---|---|---|---|
| 9/13/96 | $ 80,000 | 7.6152 | 10,505 |
| 9/16/96 | $ 60,000 | 7.6775 | 7,815 |
| 9/19/96 | $ 90,000 | 7.5115 | 11,981 |
| 9/26/96 | $ 20,000 | 7.1795 | 2,786 |
| 9/26/96 | $ 50,000 | 7.0965 | 7,046 |
| | $ 300,000 | | 40,133 |

[**9]
5    That figure represented Berckeley's conversion demands made on September 13, 1996, and September 16, 1996.
6    The conversion price for the $ 160,000 demand made on November 6, 1996, does not appear in the record.

## II. PROCEDURAL HISTORY

Berckeley filed suit in the District Court on August 13, 1997, alleging that Colkitt breached the Agreement by failing to convert the debentures. [7] After the District Court made several procedural rulings, [8] Colkitt filed a

second amended counterclaim complaint containing five counts against Berckeley for violations of federal securities laws and the Pennsylvania Securities Act, common law fraud, and breach of contract. Following discovery, both parties filed cross-motions for summary judgment. In a decision dated December 7, 1999, the District Court granted Berckeley's motion and denied Colkitt's motion. The District Court recognized in the order that there were three remaining issues for its consideration: (1) the amount of damages to which Berckeley was entitled on its breach of contract claim against Colkitt; (2) Berckeley's breach of contract [**10] and breach of fiduciary claims against Shoreline; and (3)

Shoreline's cross-claims against Colkitt for breach of contract and contractual indemnity. The District Court stated that it would defer the entry of a final judgment pending disposition of the remaining claims, and it requested the parties to file a statement "suggesting how the court shall proceed with the remaining claims/issues."

> 7    Berckeley also sued NMFS for breach of contract, and Shoreline for breach of contract and breach of fiduciary duty. The District Court dismissed NMFS as a party to the action, and the merits of Berckeley's claims against Shoreline are not at issue on appeal.
>
> 8    The lengthy procedural history in the District Court is summarized in our decision in *Berckeley I, 259 F.3d at 138.*

Berckeley and Shoreline suggested that Berckeley be permitted to file a motion for entry of final judgment against Colkitt, thus staying proceedings involving Shoreline for one year, because satisfaction of Berckeley's judgment [**11] against Colkitt would dispose of any remaining claims by or against Shoreline. In contrast, Colkitt stated his intention to seek leave for immediate appeal of the District Court's summary judgment decision pursuant to *Fed. R. Civ. P. 54(b)* and/or *28 U.S.C. § 1292(b).* The District Court sided with Berckeley, which subsequently filed a motion for entry of final judgment against Colkitt. Berckeley and Shoreline then moved to stay Berckeley's claims against Shoreline and Shoreline's claims against Colkitt. On March 30, 2000, the District Court granted Berckeley's and Shoreline's motions and entered judgment in the amount of $ 2,611,075.52 against Colkitt.

Colkitt appealed the decision of the District Court. On appeal, however, Colkitt argued that we lacked appellate jurisdiction because the District Court had failed to comply with *Rule 54(b)* and indicate expressly that there was no "just reason" for delaying Colkitt's appellate rights. On July 26, 2001, we issued an opinion agreeing with Colkitt that we lacked appellate jurisdiction, and we remanded the matter back to the District Court. *See Berckeley I, 259 F.3d at 146.* [**12] On August 23, 2001, Berckeley filed with the District Court a motion to amend the judgment so that it comported with the requirements of *Rule 54(b).* [*201] Colkitt opposed the motion. On September 8, 2004, the District Court granted Berckeley's motion and entered an order certifying the judgment as final. [9] This appeal

followed.

> 9    The record is unclear as to why there was a thirty-eight month delay between the date of our opinion remanding the case back to the District Court and the District Court's subsequent order.

## III. STANDARD OF REVIEW

We have jurisdiction over Colkitt's appeal from the order of the District Court pursuant to *28 U.S.C. § 1291.* [HN1] We exercise plenary review over the District Court's entry of summary judgment in favor of Berckeley. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir. 2003).* We therefore apply the summary judgment standard set forth in *Federal Rule of Civil Procedure 56(c).* [HN2] Under [**13] that standard, we will affirm the judgment of the District Court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

[HN3] In deciding the motion for summary judgment, our job is to ascertain solely whether there is a dispute of material fact: we are not permitted to make factual findings, which remains the province of the jury. *See Bragen v. Hudson County News Co., 278 F.2d 615, 618 (3d Cir. 1960).* When determining whether there are any genuine issues of material fact, we draw all inferences in favor of the non-moving party. *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005)* (citations omitted). Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the non-moving party must point to some evidence in the record that creates a genuine issue of material fact. *Id.* (citing [**14] *Fed. R. Civ. P. 56(e)).* In this respect, summary judgment is essentially "put up or shut up" time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument. *See Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109-10 (3d Cir. 1985).* In addition, if the non-moving party has the burden of proof at trial, that party must set forth facts "sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

## IV. DISCUSSION

### A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE ORDER AGAINST COLKITT AS A PARTIAL FINAL JUDGMENT PURSUANT TO *RULE 54(b)*

The threshold issue confronting the Court is whether the District Court abused its discretion in certifying the order against Colkitt as a partial final judgment pursuant to *Rule 54(b)*. [HN4] *Rule 54(b)*, which governs the certification of final decisions in multiple-claim actions, provides:

> [HN5] When more than one claim [**15] for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties *only upon an express determination* [*202] *that there is no just reason for delay* and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

*Fed. R. Civ. P. 54(b)* (emphasis added). We have explained that [HN6] the rule was designed in an attempt "to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis-Chalmers Corp. v. Philadelphia Elec. Co., 521 F.2d 360, 363 (3d Cir. 1975)* [**16] (citations omitted).

[HN7] A decision to certify a final decision under *Rule 54(b)* involves two separate findings: (1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there

is "no just reason for delay." *Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7-8, 100 S. Ct. 1460, 64 L. Ed. 2d 1 (1980)*. The parties do not dispute that the District Court's decision entering summary judgment in favor of Berckeley on all claims against Colkitt constituted a final judgment. The dispute lies over whether the District Court abused its discretion in certifying that judgment for immediate appeal under *Rule 54(b)* on the basis that there was "no just reason for delay."

[HN8] The Supreme Court has analogized the function of district courts under *Rule 54(b)* as akin to a "dispatcher": district courts are to consider judicial administrative interests, as well as the equities involved in the case, in order to determine whether discrete final decisions in multiple-claim actions are ready for appeal. *Curtiss-Wright Corp., 446 U.S. at 8*. Recognizing that the District Court is "most likely to be familiar with the case and with [**17] any justifiable reason for appeal," we apply an abuse of discretion standard of review to the District Court's determination that there is no just cause for delay. *Berckeley I, 259 F.3d at 140 n.4, 145.* [10] We apply as a benchmark against the District Court's exercise of discretion whether that discretion was applied in the "interest of sound judicial administration." *Curtiss-Wright Corp., 446 U.S. at 10*. Our proper role in this regard "is not to reweigh the equities or reassess the facts but to make sure that the conclusions derived from those weighings and assessments are juridically sound and supported by the record." *Id.* As a result, we "should disturb the trial court's assessment of the equities only if we can say that the judge's conclusion was clearly unreasonable." *Id.*

> 10    [HN9] We subject questions of law concerning the interpretation of the requirements of *Rule 54(b)* to plenary review. *Berckeley I, 259 F.3d at 140 n.4.*

Our decision in *Berckeley* [**18] *I* is illustrative of this general principle. In *Berckeley I*, we determined that there were three principal defects in the District Court's original order entering judgment in favor of Berckeley. First, contrary to the explicit requirement of *Rule 54(b)*, the District Court's opinion did not contain an express determination that there was "no just reason for delay." *Berckeley I, 259 F.3d at 141*. We concluded that such an express determination was a jurisdictional prerequisite required by *Rule 54(b)*, and thus declined to adopt

Berckeley's position that "general references to the necessity of [*203] expedition" were sufficient. *Id.* (citation omitted).

Second, the District Court's original order stated only that it was granting "final judgment" with respect to the claims between Berckeley and Colkitt; it did not cite, or even discuss, *Rule 54(b)*. Thus, it was unclear whether the District Court intended to enter a partial final judgment in accordance with *Rule 54(b)*. Although stopping short of holding that citing to *Rule 54(b)* is a jurisdictional prerequisite, we concluded that [HN10] "where there is a concurrent failure to make an express determination of no just cause for [**19] delay, we cannot reasonably conclude that the District Court intended to enter a partial final judgment pursuant to that Rule." *Id. at 144.*

Finally, we noted that the District Court did not discuss in its opinion any factors relevant to whether there was a just reason for delay. We have set forth [HN11] several factors that courts should consider when assessing that there is a "just reason for delay" under *Rule 54(b)*:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Allis-Chalmers Corp., 521 F.2d at 364.* Although the factors set forth in *Allis-Chalmers* are not jurisdictional prerequisites -- but instead [**20] constitute "a prophylactic means of enabling the appellate court to ensure that immediate appeal will advance the purpose of the rule," *Carter v. City of Philadelphia, 181 F.3d 339, 345 (3d Cir. 1999)* -- the District Court's original order did not contain any statement of reasons as to why there was no just cause for delay. *Berckeley I, 259 F.3d at 145.*

We held that this omission, when combined with the other two omissions in the order and our inability to ascertain the propriety of the certification from the record, precluded us from exercising appellate jurisdiction over the merits of Colkitt's appeal. We thus dismissed the appeal for lack of jurisdiction and remanded the case to the District Court. *Id.* at 146.

On remand, the District Court addressed each of the *Allis-Chalmer Corp.* factors to determine whether to enter a final judgment with respect to all claims between Berckeley and Colkitt. First, the District Court concluded that the adjudicated claims between Berckeley and Colkitt and the outstanding unadjudicated claims did not conflict because "the other pending claims may easily be resolved upon execution of the order [**21] of final judgment against Colkitt." (App. VI at 5.) Second, the court stressed that the procedural posture of this case presented the possibility that immediate appellate review might actually moot the remaining proceedings in front of the District Court, which were wholly derivative of the claims on appeal. (*Id.*) Whether Shoreline will owe damages to Berckeley and whether Colkitt will be required to indemnify Shoreline depends upon Colkitt's underlying liability to Berckeley and Colkitt's ability, if applicable, to satisfy the judgment. Third, the District Court stated that it was unlikely that the remaining claims between Berckeley and Colkitt could be revisited a second time on appellate review because the remaining claims did not involve [*204] Berckeley and Colkitt. (*Id.* at 6.) Finally, the District Court mentioned two judicial economy considerations weighing in favor of certification: (1) depending upon the result on appeal, immediate appellate review could shorten the time for trial or eliminate the need for a trial altogether; and (2) any further delay in the lengthy proceedings could prejudice Berckeley's ability to execute the judgment. (*Id.*)

Colkitt has once again [**22] appealed the District Court's certification decision on the basis that we lack appellate jurisdiction. Colkitt's primary argument is that the District Court abused its discretion in certifying the judgment under *Rule 54(b)* because the adjudicated claims are factually and legally intertwined with the non-adjudicated claims. A close review of the District Court's September 2004 order, however, reveals that all of the defects in the original order certifying judgment have been remedied. The District Court's decision rested upon pragmatic considerations, particularly the fact that a

final appellate determination could moot the remaining derivative claims existing between the parties. Although the *Allis-Chalmers Corp.* analysis was framed by the converse scenario, i.e., in which appellate review might be mooted by further developments in the district court, the District Court's evaluation of the procedural posture of this case was reasonable. The remaining claims in this case are wholly derivative of the claims between Berckeley and Colkitt, arising from separate agreements entered into between each of those parties and Shoreline. Practically, however, if the summary judgment decision [**23] of the District Court is upheld and Berckeley is able to execute on the full amount of the judgment, Shoreline's indemnity claim against Colkitt would become moot and Berckeley would no longer be compelled to continue its claims against Shoreline.

These considerations are amplified when we take into account the miscellaneous factors addressed by the District Court. This case has been litigated by the parties for nearly ten years, and it has been approximately six years since the District Court entered its summary judgment order. In addition, Colkitt's shares of NMFS stock have experienced a steep decline over the past decade, to the point that they are practically worthless. Under these circumstances, it was reasonable for the District Court to take into consideration the possibility that any further delays might impact Berckeley's ability to execute on the judgment. *See Curtiss-Wright Corp., 446 U.S. at 11-12* (finding that the difference between statutory and market interest rates, combined with the reality that the prevailing party would not be able to execute the judgment for many years due to the complexity of the litigation and the other party's declining financial [**24] position, was an appropriate basis to certify the judgment under *Rule 54(b)*); *see also Allis-Chalmers Corp., 521 F.2d at 367* (Gibbons, J., dissenting) (referencing as a factor the "ingenuity of debtors in devising reasons for not paying liquidated indebtedness").

Taking all of these factors into consideration -- the possibility that our determination on appeal might moot the remaining claims, the derivative nature of the remaining claims, the length of the litigation, and the possibility that further delays might impair Berckeley's ability to execute the judgment -- we find that the decision of the District Court to certify the order as a partial final judgment was not "clearly unreasonable." *Curtiss-Wright Corp., 446 U.S. at 10*. As a result, we

conclude that we have appellate jurisdiction over the present appeal and proceed to address the merits of the dispute.

[*205]  **B. SECTION 29(b) OF THE SECURITIES ACT OF 1934**

Colkitt contends that he is entitled to rescind the Agreement under *Section 29(b) of the Securities Exchange Act of 1934* (the "Exchange Act"). *Section 29(b)* provides in pertinent part that:

> [HN12] Every contract made in violation of [**25] any provision of this chapter or of any rule or regulation thereunder, . . . [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

*15 U.S.C. § 78cc(b)*. [HN13] *Section 29(b)* itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions. *See National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 206 n.4 (2d Cir. 1989)*. Although the word "void" is contained in the statute, the Supreme Court has read *Section 29(b)* to be "merely voidable at the option of the innocent party." *Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 387-88, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970)*.

[HN14] In order to void the Agreement under *Section 29(b)*, Colkitt must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with Berckeley; and (3) Colkitt is in the class of persons that the securities acts were designed to protect. [**26] *Regional Properties, Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552, 559 (5th Cir. 1982)*. *See also Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc., 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992)*. Colkitt must demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be "inseparable from the performance of the contract" rather than "collateral or tangential to the contract." *GFL Advantage Fund, Ltd., 272 F.3d at 201*.

In this case, Colkitt asserts that the Agreement was made "in violation of" *Section 10(b)* and *Rule 10b-5 of*

*the Exchange Act*, and that the "performance" of the contract violated *Section 10(b)*, *Rule 10b-5*, and *Section 5 of the Securities Act of 1933* (the "Securities Act") because Berckeley perpetuated securities fraud in violation of the statutes. We consider each of these arguments below.

### 1. Colkitt cannot advance a *Section 29(b)* rescission claim pursuant to *Section 5 of the 1933 Securities Act*

Colkitt asserts that he is entitled to rescind the Agreement under *Section 29(b) of the Exchange Act* based upon a violation [**27] of *Section 5 of the Securities Act*. The District Court determined that Colkitt could not rescind the Agreement under *Section 29(b)* because the contract did not involve a prohibited transaction. According to the District Court, Colkitt's *Section 5* claim asserted that a subsequent transaction was unlawful, and "*Section 29(b)* does not reach into the future to void a subsequent contract."

We recently addressed the scope of *Section 29(b)* regarding downstream securities transactions in *GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001).* In that case, we considered a virtually identical financing transaction that Colkitt entered into with GFL. Colkitt argued that he was entitled to rescind the agreement between the parties because subsequent short sales made by GFL following the agreement violated *Section 10(b)*. Before concluding that the short sales did not constitute market manipulation in violation of *Section 10(b)*, we addressed first whether Colkitt could even maintain a *Section 29(b)* [*206] rescission claim based upon the subsequent short sales. Surveying the applicable case law on the subject, [HN15] we took a narrow view of the phrases "made in violation of" and "the [**28] performance" of which involves the violation of" contained in *Section 29(b)*. The test, as we applied it in *GFL Advantage Fund*, is whether the securities violations are inseparable from the underlying agreement between the parties. *Id. at 201.* If an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under *Section 29(b). Id. at 202.* Thus, we held that:

> Despite the theory of Colkitt's case, however, GFL's short sales are completely independent of the parties' respective

obligations under the terms of the notes -- namely, GFL's obligation to lend Colkitt a total of $ 13,000,000, and Colkitt's obligation to repay the loans at GFL's option with shares of National Medical and EquiMed stock. In the end, GFL's alleged unlawful activity (*i.e.*, its short sales) is too attenuated from the parties" valid, lawful contracts (*i.e.*, the National Medical and EquiMed notes) or GFL's performance thereunder. Therefore, we conclude that the notes were neither made nor performed in violation of any federal securities laws as is required for rescission under Section 29(b).

*Id.*

Two cases [**29] we discussed in *GFL Advantage Fund* and relied upon by Colkitt in the instant appeal confirm that Colkitt's *Section 5* claim cannot proceed under *Section 29(b)*. In *Grove v. First National Bank of Herminie, 489 F.2d 512 (3d Cir. 1974)*, a debtor obtained a series of loans from a bank to purchase registered securities. Regulation U, promulgated under the Exchange Act, provided that such loans were limited to set percentages of the value of the stock to be purchased. The bank, however, failed to inform Grove of the Regulation U margin requirements and loaned him the money. We held that *Section 29(b)* precluded the bank from recovering a loan deficiency because the loans were made in direct violation of Regulation U. Similarly, in *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, a securities broker entered into an agreement with the principals of several limited partnerships to market the limited partnerships for a fee. *678 F.2d 552 (5th Cir. 1982).* It turned out that the broker, a former New York lawyer who had been disbarred, failed to register as a broker dealer as required by *Section 15(a)(1)* of the Exchange Act. The Fifth Circuit [**30] determined that the broker's performance of the agreement was a prohibited transaction under *Section 29(b)* because the agreement, although lawful on its face, could not have been performed by the unregistered broker without violating the securities laws.

As we explained in *GFL Advantage Fund*, the key in both of those cases was that neither agreement could be performed without violating the securities laws. *272 F.3d at 202.* In contrast, in *GFL Advantage Fund* the

downstream short sales were neither connected to nor "inseparable" from the agreement between the parties. Thus, we determined that the transactions at issue in that case could not support a claim under *Section 29(b)*, regardless of whether they violated *Section 10(b)*. *Id.*

In this case, although the Agreement contains references to *Section 5* that allegedly induced Colkitt to enter into the Agreement, Berckeley's downstream sales were tangential to the parties' basic obligations under the Agreement: Berckeley's [*207] obligation to loan Colkitt $ 2,000,000 and Colkitt's obligation to provide Berckeley with convertible debentures. [11] At the time the parties entered into the Agreement, the Agreement could be [**31] performed without violating provisions of the securities laws. *Id.* As we observed in *GFL*, [HN16] "unlawful transactions made pursuant to lawful contracts" do not fall within the ambit of *Section 29(b)*. *Id. at 200* (quoting *Slomiak v. Bear Stearns & Co., 597 F. Supp. 676, 682 (S.D.N.Y. 1984))*. Thus, to the extent that a trier of fact determines that Berckeley's downstream sales of unregistered NMFS shares violated *Section 5*, those sales are too attenuated to establish a claim under *Section 29(b)*. *See id. at 202.* [12]

> [11] The distinction between this claim and the *Section 29(b)* claim premised on a violation of *Section 10(b)* is readily apparent. The *Section 10(b)* claim alleges that Berckeley made material misrepresentations that induced Colkitt to enter into the Agreement. If Colkitt is able to prove that claim, then the Agreement was "made in violation of" *Section 10(b)*. The misrepresentations that induced Colkitt to enter into the Agreement would be "inseparable from the underlying agreement between the parties." *GFL Advantage Fund, 272 F.3d at 202*.

[**32]

> [12] We agree with the District Court that the SEC's administrative decision in *In re GFL Fund Ltd.*, 64 S.E.C. Docket 1958, 1997 WL 330419 (June 18, 1997), does not compel a different conclusion. In that case, the SEC brought administrative proceedings against GFL for reselling unregistered securities back into the United States. The SEC's administrative ruling was concerned solely with GFL's resale of the unregistered shares, not with any contracts GFL had entered into with other parties. In fact, the SEC did not even mention *Section 29(b)* in the

administrative ruling. Thus, there was no finding that the underlying contracts that enabled GFL to obtain the unregistered shares violated *Section 29(b)*. As such, we do not find *In re GFL Fund Ltd.* helpful to our disposition of the present case.

For these reasons, we will uphold the District Court's decision to grant summary judgment in favor of Berckeley as to Colkitt's *Section 29(b)* claim premised on a violation of *Section 5* of the Securities Act. [13]

> [13] We therefore need not determine whether *Section 29(b)* can ever support a rescission claim founded on a violation of the 1933 Securities Act.

[**33]

## 2. The District Court erred in dismissing Colkitt's *Section 29(b)* claim premised on a violation of *Section 10(b)*

[HN17] Section 10(b) of the Exchange Act, *15 U.S.C. § 78j(b)*, makes it unlawful for any person to employ "manipulative or deceptive" conduct "in connection with the purchase or sale of any security." *In re Phillips Petroleum Sec. Lit., 881 F.2d 1236, 1243 (3d Cir. 1989)*. When the Exchange Act was passed in 1934, Congress granted the Securities and Exchange Commission the authority in *Section 10(b)* to develop rules and regulations to prevent such conduct "as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 77b*. The Commission responded in 1948 by promulgating *Rule 10b-5*, which establishes that manipulative or deceptive conduct includes, *inter alia*, making an untrue statement of material fact or omitting to state a material fact in connection with the purchase or sale of securities. [14]

> [14] *Employment of Manipulative and Deceptive Devices, 13 Fed. Reg. 8183 (Dec. 22, 1948)*, amended by 16 Fed. Reg. 7928 (Aug. 11, 1951). The full text of *Rule 10b-5* provides:
>
>> [HN18] It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national

securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statements of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.*

[**34] [HN19] [*208] As a private party, Colkitt must establish each of the following elements to prove that Berckeley violated *Section 10(b)* and *Rule 10b-5*: (1) Berckeley made a misstatement of material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which Colkitt reasonably relied, and (5) that Colkitt's reliance was the proximate cause of his injury. *In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002).* [15] A *Section 29(b)* rescission claim premised on a *Section 10(b)* violation, however, differs from a private damages action brought under *Section 10(b).* In the *Section 29(b)* context, a plaintiff seeking rescission does not have to establish reliance and causation. *See GFL Advantage Fund, 272 F.3d at 206 n.6.* [16] Because Colkitt's *Section 29(b)* and stand-alone *Section 10(b)* claims overlap, we will consider the initial three *Section 10(b)* elements in our disposition of his *Section 29(b)* claim.

15    [HN20] Under the Private Securities Litigation Reform Act of 1995, Congress codified the common law loss causation requirement as a statutory element of a *Section 10(b)* private cause of action. *See 15 U.S.C. § 78u-4(b)(4)* (stating that [HN21] "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages").

[**35]

16    Similarly, the SEC does not have to establish those elements in an enforcement proceeding. *See Graham v. SEC, 343 U.S. App. D.C. 57, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000).*

Colkitt's case does not present the "typical" fact pattern seen in securities violations brought under *Section 10(b).* As we have noted, the customary *Section 10(b)* claim concerns "fraudulent material misrepresentation[s] or omission[s] that affect[] a security's value." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 173 (3d Cir. 2001)* ("*Newton II*") (collecting cases). In this case, Colkitt's theory of liability is not based upon an alleged material misrepresentation relating to the value of NMFS stock, but rather a misrepresentation regarding Berckeley's intent to comply downstream with the registration requirements contained in the Securities Act. Colkitt's argument in favor of establishing Berckeley's liability proceeds as follows:

. *Section 5 of the Securities Act of 1933* requires a registration statement to be in effect as to a security in [**36] order to (1) sell the security in interstate commerce; or (2) cause to be carried through interstate commerce any such security for the purpose or sale or for delivery after sale, unless the security is exempt from registration. [17]

. Berckeley represented in Paragraph 2.5 of the Agreement that all subsequent sales of converted shares would be made in accordance with the registration requirements of the Securities Act of 1933.

. Berckeley's later-acknowledged sale of 18,320 unregistered NMFS shares violated *Section 5* and, therefore, the Agreement because the shares were not registered and Berckeley was an "underwriter" not entitled to an exemption under *Section 4(1).* Because Berckeley was not exempt under *Section 4(1),* it knowingly engaged in a scheme and artifice to defraud *at the time it entered into the agreement.*

. Colkitt relied upon Berckeley's

representation to enter into the Agreement, [*209] which resulted in Berckeley receiving 18,320 unregistered shares of NMFS at a 17% discount.

. Colkitt suffered the following damages that were proximately caused by Berckeley's material misrepresentation:

(1) he sold shares to Berckeley at a 17 % discount from their [**37] market value; (2) he became liable under the Agreement to pay interest and penalties; and (3) his NMFS share holdings, placed in escrow, lost value and became practically worthless.

There is no dispute between the parties that the Agreement was made "in connection" with the purchase or sale of a security, and Berckeley's argument that Colkitt suffered no reliance damages essentially addresses whether Colkitt's reliance was the proximate cause of his injury. Thus, the misrepresentation, scienter, and causation prongs of the *Rule 10b-5* case are in dispute between the parties. [18]

17  *See 15 U.S.C. § 77e(a)*.
18  We will examine the misrepresentation and scienter issues as part of our resolution of the *Section 29(b)* claim, and we will consider separately the causation prong in part IV.C, *infra*.

### a. Material issues of fact exist regarding Berckeley's intent to resell unregistered shares and its status as an underwriter

At the outset, we examine whether [**38] there is sufficient evidence in the record to create a material issue of fact that Berckeley made a misrepresentation in paragraph 2.5 of the Agreement. Colkitt bases his *Section 10(b)* claim on the argument that Berckeley intentionally misrepresented in Paragraph 2.5 of the Agreement that all subsequent sales of converted shares would be made in accordance with the registration requirements of the Securities Act of 1933. [19] To ultimately prove a misrepresentation, Colkitt must demonstrate that, at the time Berckeley entered into the Agreement, it intended to violate federal securities laws by reselling unregistered shares of NMFS stock back into the United States without entitlement to an exemption. Colkitt's theory breaks down into two discrete subissues as to which he must point to a dispute of material fact: (1) that there is evidence in the record that Berckeley intended at the time the Agreement [*210] was executed to sell shares back into the United States without registering them, and (2) Berckeley was aware at the time of the Agreement that it would be reselling the shares as an "underwriter," i.e., the company knew that it was not entitled to an exemption from the registration requirement [**39] under *Section 4(1) of the Securities Act of 1933* .

19  In the District Court, the primary argument advanced by Colkitt to establish that Berckeley violated *Section 10(b)* was that Berckeley had engaged in short selling in violation of the Agreement. The District Court determined that Berckeley did not engage in short selling, and Colkitt has not advanced this issue on appeal.

We note that our recent decision in *GFL Advantage Fund, 272 F.3d at 202*, addressed the effect of short sales in a nearly identical financing transaction that Colkitt entered into with GFL. We held that GFL's short selling did not support Colkitt's *Section 10(b)* claim. In rejecting Colkitt's argument that the short selling constituted market manipulation, we stated that "[t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed artificially." *Id. at 207*. We concluded that "short selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation." *Id. at 209*. We further explained: "That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are natural consequences of a lawful and carefully regulated trading practice." *Id. at 209-10*. Rather, short selling could only form a basis for a *Section 10(b)* claim if done "in conjunction with some other deceptive practice that either injected inaccurate information into the market or otherwise artificially affected the price of the stock." *Id. at*

455 F.3d 195, *210; 2006 U.S. App. LEXIS 18584, **39;
Fed. Sec. L. Rep. (CCH) P93,904

*207.*

[**40]

### (1) There is sufficient evidence that Berckeley intended to resell NMSF shares back into the United States without registering them

We first examine whether there is evidence in the record that Berckeley intended at the time it entered into the Agreement with Colkitt to resell unregistered NMSF shares back into the United States. On the basis of three affidavits, two judicial admissions, and the structure of the deal itself, we conclude that there is sufficient evidence to create a material issue of fact that Berckeley intended to resell NMSF shares back into the United States without registering them.

The first affidavit was submitted by Martin Douglas Ho, Berckeley's Connecticut-based investment advisor. Ho participated in negotiating and closing the transaction between Berckeley and Colkitt, and he also was involved in the delayed conversion and attempted conversions of the debentures. (App. at 1173.) Ho stated in his supplemental affidavit that he sought legal advice and provided investment advice in connection with the transaction. Regarding the advice he provided to Berckeley, Ho stated the following:

> After thoroughly investigating the appropriateness [**41] and legality of the transaction, I advised Berckeley that, pursuant to the terms of the Agreement and subject Debentures, and applicable federal securities laws, including Regulation S promulgated under the Securities Act of 1933, and exemptions therefrom, after the expiration of 40 days and certainly after the expiration of 100 days -- the initial restricted period -- Berckeley was *permitted to sell the common stock of National Medical in the United States that was to be delivered by Colkitt.*
>
> I, on behalf of Berckeley, sought and obtained legal advice which confirmed my understanding of Regulation S and related exemptions and my advice to Berckeley

> regarding the transaction *and its ability to resell the converted shares in the United States after the expiration of 40 days or, in this case, commencing after the initial restricted period under the Agreement.*

(App. at 1175 (emphasis added).) Specifically referencing Paragraph 2.5 of the Agreement, which is at the crux of the dispute between the parties, Ho stated the following:

> All of the representations contained in Paragraph 2.5 were true and correct at the time that they were made by Berckeley and continue [**42] to be true and correct in that, among other things, *Berckeley intended to sell the converted shares pursuant to an exemption from registration and, in good faith, believed that it could do so based upon the advice it obtained from me as well as its counsel.* No shares were sold prior to the Restricted Period. The only shares of Colkitt's that were ever sold were the approximately 18,320 shares he converted in November 1996. No securities violation can be alleged as to this sale.

(App. at 1176-77 (emphasis added).)

Berckeley directors Milton Morales and Carlos Mijares also submitted supplemental affidavits. Those affidavits, which were identical, provided the following pertinent averments:

> Prior to executing the Agreement, Berckeley was advised by Mr. Ho that [*211] he conducted a complete investigation as to the appropriateness and legality of the transaction, that, pursuant to the terms of the Agreement and Debentures, and applicable federal securities laws, including Regulations promulgated under the Securities Act of 1933, and exemptions therefrom, the transactions did not violate any laws and, that *after the expiration of 100 days -- the initial restricted period* [**43] *-- Berckeley was permitted to sell the common stock of National Medical in the United States that was to be delivered by Colkitt.*

****

Berckeley merely intended to convert the Debentures into National Medical Shares after 100-120 days and slowly sell the stock thereafter . . . .

****

All of the representations contained in paragraph 2.5 were true and correct at the time that they were made by Berckeley and continue to be true and correct in that, among other things, *Berckeley intended to sell the converted shares pursuant to an exemption from registration* and, in good faith, believed that it could do so based upon the advice that it obtained from Mr. Ho, as well as its counsel. No shares were sold prior to the Restricted Period. The only shares of Colkitt's that were ever sold were the approximately 18,320 shares he converted in November 1996.

(App. at 1181-83; 1187-89 (emphasis added).)

In addition to these affidavits, Berckeley made two binding judicial admissions in its complaint and in its brief on appeal. [20] Berckeley stated unequivocally in its complaint that "[i]t was always Berckeley's intent to exercise its conversion rights as to all of the debentures [**44] as quickly as possible, selling the National Medical stock in the market as quickly as reasonably possible, and thereby maximizing its return." Furthermore, Berckeley stated in its brief on appeal to us that its "intention was . . . to convert the Debentures into shares of National Medical stock after a period of 100-120 days and then proceed slowly to sell the stock in a reasonable manner as an investment objective." (Appellee's Br. at 31.)

20  [HN22] Judicial admissions are concessions in pleadings or briefs that bind the party who makes them. *See Parilla v. IAP Worldwide Servs. VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004)* (finding that the plaintiff was bound because she "expressly conceded those facts in her complaint.") (citing, *inter alia, Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997)* (noting the "well-settled rule that a party is bound by what it states in its

pleadings"); *Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972)* (noting that unequivocal "judicial admissions are binding for the purpose of the case in which the admissions are made[,] including appeals")). *See also Karkoukli's, Inc. v. Dohany, 409 F.3d 279, 283 (6th Cir. 2005)* (finding that the plaintiff's "admissions of statutory compliance by defendants in its briefs" constituted "'judicial admissions' that estop [plaintiff] from raising a statutory non-compliance argument in this appeal.") (citation omitted); *Gospel Missions of America v. City of Los Angeles, 328 F.3d 548, 557 (9th Cir. 2003)* (stating that court of appeals has discretion whether to treat a concession in a pleading or brief as a binding judicial admission).

[**45] Finally, the structure of the deal, as well as a lack of evidence of any viable offshore market for the shares, *see infra,* raises an inference that Berckeley intended to resell the converted shares back into the United States. The deal provided Berckeley with the unilateral option to convert one-half of the debentures into NMFS shares 100 days from closing and the remaining debentures 120 days from closing. In addition, the Agreement provided [*212] that any unredeemed debentures would be automatically converted into NMFS shares within one year. Thus, in all likelihood Berckely knew that it would be holding a large number of unregistered shares within one year of the Agreement. These timetables built into the Agreement are even more important when we consider that, for all practical purposes, Berckeley could only receive the maximum return on its investment (the 17% premium it received from Colkitt as part of the deal) if it resold the unregistered NMFS shares back into the United States. The affidavits and the admissions referenced above confirm that it was Berckeley's intent from the outset to resell at least a portion of the unregistered NMFS shares "as quickly as reasonably possible [**46] . . . thereby maximizing its return." As discussed more fully below, Berckeley has not shown that there was any real marketplace for the unregistered NMFS shares other than in the United States, thus adding to the inference at this stage of the litigation that Berckeley intended to resell unregistered shares back into the United States.

For these reasons, we find that there is sufficient evidence at this stage of the proceedings to create a material issue of fact that Berckeley intended, at the time

of the Agreement, to resell the converted shares back into the United States following the Restricted Period set forth in the Agreement.

**(2) Material issues of fact exist as to whether Berckeley was aware it was not entitled to an exemption under *Section 4(1)***

[HN23] In order to establish a *Section 5* violation, Colkitt must point to evidence that: (1) no registration statement was in effect as to the securities; (2) Berckeley sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce. *See Hill York Corp. v. American Int'l Franchises, Inc., 448 F.2d 680, 686 (5th Cir. 1971), distinguished on other grounds by Pinter v. Dahl, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988).* [**47] It is undisputed that there are sufficient facts in the record for Colkitt to establish the first two elements, and our finding above that there is a factual dispute as to whether Berckeley intended at the time of the Agreement to resell the securities back into the United States is sufficient at this stage to satisfy the third element. As a result, our next step is to determine whether there are facts in dispute as to whether Berckeley was aware it was not entitled to an exemption from the registration requirement under *Section 4(1)* of the Securities Act.

[HN24] The burden of proving entitlement to an exemption rests with the party claiming the entitlement. *SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S. Ct. 981, 97 L. Ed. 1494 (1953).* The District Court did not address whether Berckeley satisfied the definition of a "statutory underwriter," and there is no indication that the parties or the District Court were aware that the burden of demonstrating an entitlement to the exemption rested with Berckeley. Instead, the District Court determined that Berckeley did not make a misrepresentation because, based upon uncertainties in the securities industry as to the applicability of the exemption [**48] in 1996, "the illegality of the transaction simply was not apparent." (App. at 43.)

[HN25] *Section 4(1)* exempts from the registration requirements under *Section 5* "transactions by any person other than issuer, underwriter, or dealer." *15 U.S.C. § 77d(1).* At issue here is whether Berckeley was an "underwriter," as there is no dispute that Colkitt was an "issuer" and that Berckeley purchased unregistered [*213] securities from Colkitt. [HN26] *Section 2(a)(11)* of the Securities Act defines the term "underwriter" in pertinent part as "any person who has purchased from an issuer with a view to . . . the distribution of any security. . . ." *15 U.S.C. § 77b(a)(11).* Because the burden of proving entitlement to the exemption rests with Berckeley, it can establish that it is entitled to the exemption if it proves that: (1) the acquisition of the unregistered shares through conversion was not made "with a view to" distribution; or (2) the sale of the 18,320 shares was not made in connection with a "distribution." *See Ackerberg v. Johnson, 892 F.2d 1328, 1336 (8th Cir. 1989).*

Whether Berckeley's acquisition of the unregistered shares was made "with a [**49] view to" distribution focuses on Berckeley's investment intent at the time of the conversion. *See* 1 Thomas Lee Hazen, *The Law of Securities Regulation* 482 (5th ed. 2005) (collecting cases). [HN27] Because it is difficult to discern a party's intent at the time of purchase with respect to downstream sales of unregistered shares, courts and commentators have typically focused on the amount of time a security holder holds on to shares prior to reselling them. *Id.*; *see Ackerberg, 892 F.2d at 1336* (stating that "the courts look to whether the security holder has held the securities long enough to negate any inference that his intention at the time of acquisition was to distribute them to the public"). Over time, courts have developed the general presumption that a two-year holding period is sufficient to negate the inference that the security holder did not take the securities with a "view to distribute." *Ackerberg, 892 F.2d at 1336.*

[HN28] Seizing upon the difficulty of determining a party's subjective intent at the time of purchase, the SEC adopted *Rule 144*, which creates an objective safe harbor to allow non-affiliate sellers to comply with the Section [**50] *4(1)* exemption. A non-affiliate seller may fall within the *Rule 144* safe harbor, and not be deemed an "underwriter," under two sets of circumstances. First, the SEC has generally removed all restrictions from the sale of securities by a non-affiliate who has held onto the securities for a period of at least two years from the date the securities were acquired from the issuer or an affiliate of the issuer. *17 C.F.R. § 230.144(k).* [HN29] If the non-affiliate seller has not held the securities for a period of at least two years, the seller may fall within the *Rule 144* safe harbor if it complies with the following five

criteria:

(1) adequate current public information about the securities is available, i.e., the company must have complied with the reporting requirements of the Exchange Act or with Exchange Act *Rule 15c2-11*(2) at least one year has lapsed "between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the issuer, and any resale of such securities";

(3) the amount of securities sold may not exceed the greater of (a) one percent of the outstanding class, or, (b) if traded on a national exchange, [**51] the average weekly volume of trading in the securities over the past four weeks preceding the filing of notice as required *Rule 144(h)*(4) the securities must be sold in "brokers' transactions" or in transactions with a "market maker," and the seller is prohibited from soliciting or arranging for solicitation orders to buy securities in anticipation or in connection with such transaction; and

(5) if the seller is going to sell more than 500 shares, or the aggregate sale price is greater than $ 10,000, the seller must file a notice of the sale with the SEC.

[*214] *17 C.F.R. § 230.144(c)-(h).* [HN30] The seller must comply with each of the elements in order to gain the benefit of the safe harbor. *Id. § 230.144(b).*

[HN31] Each safe harbor set forth under *Rule 144* requires the seller to have held on to the unregistered shares for a specified time period, either one or two years. Because it is undisputed that Berckeley sold the unregistered shares in this case before even one year had elapsed, Berckeley cannot take advantage of the *Rule 144* safe harbor. In addition, Berckeley's quick turnaround sale of the converted shares at least creates an issue of fact [**52] as to whether Berckeley acquired the shares with a "view to distribution" under the statutory exemption as well. *See Gilligan, Will & Co. v. Securities and Exchange Comm'n, 267 F.2d 461, 467-68 (2d Cir. 1959)* (finding that ten-month holding period was

sufficient to support SEC finding that security holder bought shares "with a view to distribution"). [21]

21   In the initial years following the passage of the Securities Act, resellers of unregistered securities frequently made the argument that they were not underwriters because "although they had the requisite investment intent at the time of purchase, subsequent changes in their personal situations necessitated the resale of securities." *See* 1 Hazen, *The Law of Securities Regulation* 484. This highly fact-specific inquiry became known as the "change in circumstances" exception. *See generally Vohs v. Dickson, 495 F.2d 607, 620-21 (5th Cir. 1974); see also Neuwirth Inv. Fund, Ltd. v. Swanton, 422 F. Supp. 1187, 1197 (S.D.N.Y. 1975)* (finding that change in circumstances exception applied and that security holder did not take stock with a view to distribution where fifteen months passed between purchase and resale and where stock was sold only after security holder was forced into liquidation).

Although the SEC has taken the position that the "change in circumstances" exception is no longer applicable after the passage of *Rule 144*, commentators have expressed doubt that the exception can be read out of the definition of an "underwriter" under *§ 2(a)(11)*. *See* 1 Hazen, *The Law of Securities Regulation* 485 ("To the extent that the change in circumstances defense is a valid interpretation in terms of the *section 2(a)(11)* statutory definition of one who purchases with an intent to redistribute, the SEC cannot by administrative fiat change the meaning of the statute."); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 325 n.241 (5th ed. 2004) (noting that, although the "law largely has made a transition from the subjectivity of the statutory standard to more objective rule enforcement, . . . the statutes still exist and it still can be argued . . . that the wording of *§ 2(a)(11)* compels some sort of change in circumstances doctrine."). In addition, *Rule 144* is generally considered to be non-exclusive, and sellers such as Berckeley may still seek to invoke the statutory *Section 4(1)* exemption. *See* 1 Hazen, *The Law of Securities Regulation* 490; Loss and Seligman, *Fundamentals of Securities Regulation* 325 n.241;

Marc I. Steinberg, *Understanding Securities Law* 139 (3d ed 2001); II Louis Loss and Joel Seligman, *Securities Regulation* 1138.47 n.580 (2d ed. 1999).

Because the parties have not addressed the application of the "change in circumstances" exception to this case, however, we need not decide whether that exception remains a viable method of refuting "underwriter" status under *§ 2(a)(11)*.

[**53] Berckeley, however, can still demonstrate that it did not act as an "underwriter" if the sale of the 18,320 shares was not made in connection with a "distribution." The registration requirements of the 1933 Securities Act are "design[ed] . . . to protect investors by promoting full disclosure of information thought necessary to [make] informed investment decisions." *Ralston Purina, 346 U.S. at 124.* The legislative history of the term "underwriter" reveals "that the congressional intent was to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public." 1 Hazen, *The Law of Securities Regulation* 476; *see Van Dyke v. Coburn Enter., Inc., 873 F.2d 1094, 1097 (8th Cir. 1989)* (stating [*215] that "[t]he design of the Act is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions"). As a result, [HN32] the focus of the term "underwriter" is on the concept of "distribution." *Ackerberg, 892 F.2d at 1337.*

Although we have not yet had the occasion to interpret the *Section 4(1)* statutory exemption, those [HN33] courts [**54] interpreting the exemption have uniformly concluded that the term "distribution" is synonymous with "public offering" as set forth under *Section 4(2). See Geiger v. SEC, 361 U.S. App. D.C. 45, 363 F.3d 481, 484 (D.C. Cir. 2004); Ackerberg, 892 F.2d at 1337; SEC v. Dolnick, 501 F.2d 1279, 1282 (7th Cir. 1974); Quinn & Co. v. SEC, 452 F.2d 943, 946 (10th Cir. 1971); Gilligan, Will & Co., 267 F.2d at 466; Neuwirth Inv. Fund, Ltd. v. Swanton, 422 F. Supp. 1187, 1194-96 (S.D.N.Y. 1975); see also* II Louis Loss and Joel Seligman, *Securities Regulation* 1138.47 n.580 (2d ed. 1999) (collecting authorities). We agree with the rationale of those courts and similarly hold that the term "distribution" in *§ 2(a)(11)* is synonymous with "public offering."

In the landmark decision of *SEC v. Ralston Purina*, the United States Supreme Court explained that [HN34] whether an issuance of stock is a "public offering" turns on the need of the offerees for the protections of the securities laws:

Since exempt transactions are those as to which "there is no practical need for the (the bill's) application, [**55] " the applicability of [the *Section 4(2)* private placement exemption] should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering.

*346 U.S. at 125* (internal punctuation omitted). *See also Van Dyke, 873 F.2d at 1098; Sorrell v. SEC, 679 F.2d 1323, 1326 (9th Cir. 1982)* (stating that the "offeree's access to financial information about the investment, similar to what would be found in a registration statement, is crucial"); *Neuwirth Inv. Fund, 422 F. Supp. at 1198.* [HN35] The percentage of outstanding shares distributed to the public is not determinative, as the application of the *Section 4(1)* exemption does not turn on the percentage of the shares sold, even where the resales constitute extremely small percentages of the outstanding stock. *Geiger, 363 F.3d at 484.* Rather, the key inquiry for the court is whether the security holder can demonstrate that the sales were made to individuals or entities that did not require the registration protections [**56] of the Securities Act. *Id.*

For example, in *Geiger* the United States Court of Appeals for the District of Columbia determined that the resale of unregistered shares comprising only 0.50% of all outstanding shares constituted a "distribution" because the shares made their way into the hands of the investing public. *363 F.3d at 484.* There, the D.C. Circuit was guided by an earlier decision of the Ninth Circuit which upheld the SEC's finding that the sale of 0.25% of shares of unregistered stock violated *Section 5* of the Securities Act. *See Pennaluna & Co. v. SEC, 410 F.2d 861, 865 (9th Cir. 1969).* In contrast, in *Ackerberg* the Eighth Circuit determined that the sale of 12,500 shares of unregistered stock did not constitute a "distribution" because the shares were sold to a single sophisticated investor who had received detailed information about the company prior to purchasing the securities. *Ackerberg,*

*892 F.2d at 1329, 1336-37*. Similarly, the United States District Court for the District of New York concluded in *Neuwirth Inv. Fund, Ltd.* that the sale of 18,000 unregistered shares was not a "distribution" because the unregistered [**57] stock was sold to [*216] two identifiable purchasers who were sophisticated and experienced investors and who had asked for and received information from the corporation prior to purchasing the shares. *422 F. Supp. at 1199*.

On the basis of the record we have before us, Berckeley has not adduced any evidence to meet its burden that it is entitled to an exemption under *§ 4(1)*. The record is clear that Berckeley intended to resell a quantity of the shares within two years. As stated in Beckeley's complaint, "[i]t was always Berckeley's intent to exercise its conversion rights as to all of the debentures as quickly as possible, selling the National Medical stock in the market as quickly as possible." Berckeley has not advanced any evidence that there was any "market" for NMFS shares outside the United States, particularly considering that Berckeley placed the 18,320 shares for sale with a United States broker. Inferring from these facts that the only market for NMFS shares was in the United States, Berckeley did not bring forward any evidence that the NMFS shares would be sold *solely* to sophisticated investors who do not need the protections of the registration requirements [**58] of the securities laws. To the contrary, placing the 18,320 shares with a broker suggests that those shares would be sold to the highest bidder without regard to the bidder's level of investing acumen. *See* Loss and Seligman, *Fundamentals of Securities Regulation* 327 (noting that [HN36] "a sell order given to a stock exchange broker results in an offer to the highest bidder in the world, which is certainly a 'public offering'"). For these reasons, we find that Berckeley failed to meet its burden to show it was entitled to an exemption under *Section 4(1)*.

Accordingly, we conclude that the record contains sufficient evidence that Berckeley made a misrepresentation of material fact regarding its intent to resell and its status as an underwriter in a resale.

**b. Material issues of fact exist regarding whether Berckeley was reckless in its belief that it would be entitled to the Section 4(1) exemption**

Because that there is a factual dispute regarding whether Berckeley intended at the time of the agreement to resell illegally the converted shares back into the United States, we must next determine whether Colkitt can point to sufficient evidence that Berckeley had [**59] the requisite scienter to violate the *Section 5* registration requirement at the time it entered into the Agreement.

[HN37] A plaintiff can "plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999)* (quoting *Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997)*) (additional citation omitted). Recklessness can be shown by a statement or action "'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id. at 535* (quoting *McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)*).

In concluding that Colkitt failed to produce sufficient evidence to demonstrate Berckeley's scienter, the District Court relied upon an affidavit from Nancy Van Sant, a former SEC lawyer reputed to have experience with offshore [**60] transactions and the availability of exemptions in connection with those transactions as of May [*217] 1996. Based on assumed facts concerning Berckeley's conduct, Van Sant drew multiple legal conclusions. Particularly relevant here was her conclusion that it was reasonable for Berckeley to have believed at the time of the Agreement that it would be entitled to the *Section 4(1)* exemption if and when it sold any shares. Van Sant reached this conclusion after a fairly substantial legal analysis of the *Section 4(1)* exemption as applied to the facts she assumed:

> In my experience as a securities litigator, and as an attorney giving securities advice, in 1996, Regulation S shares were routinely purchased offshore, held for the restricted forty day period and then resold in the United States pursuant to the *Section 4(1)* exemption. This was common and accepted practice in the securities industry in 1996. Given the common practice and the confusion generated by

455 F.3d 195, *217; 2006 U.S. App. LEXIS 18584, **60;
Fed. Sec. L. Rep. (CCH) P93,904

the SEC's adoption of the Regulation S forty day restricted period, it would not have been unreasonable for persons acquiring shares in offshore transactions exempt under Regulation S, or specifically the shareholders of Berckeley, [**61] to believe that their resale of Regulation S shares into the United States marketplace upon the expiration of the Regulation S restricted period (which was considerably shorter than the contractual provisions restricting the timing of the conversion of the shares); in brokers transactions; and, in small amounts that would not adversely affect the National Medical trading market, was in compliance with applicable securities law.

(App. at 1436-37.) The District Court explained that the above paragraph (paragraph 18) was the "operative portion" of the affidavit, and that the "remainder of the affidavit simply explain[ed] the development of the law and why it was reasonable to rely on the exemption under § 4(1)." (App. at 43.)

[HN38] The District Court has discretion to determine whether expert testimony will help the trier of fact. *United States v. Agnes, 753 F.2d 293, 303 (3d Cir. 1985), abrogated on other grounds by Smith v. Borough of Wilkinsburg, 147 F.3d 272 (3d Cir. 1998).* [22] In utilizing that discretion, however, the District Court must ensure that an expert does not testify as to the governing law of the case. Although *Federal Rule of Evidence 704* [**62] permits an expert witness to give expert testimony that "embraces an ultimate issue to be decided by the trier of fact," an expert witness is prohibited from rendering a legal opinion. *United States v. Leo, 941 F.2d 181, 195-96 (3d Cir. 1991).* [23] Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury. *First National State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981)* (per curiam).

22    [HN39] We review the District Court's decision to admit expert testimony for abuse of discretion. *In re Unisys Savings Plan Litig., 173 F.3d 145, 163 (3d Cir. 1999).*

23    [HN40] The Advisory Committee Notes to *Rule 704* explain that, although a witness may give an opinion as to an ultimate issue, *Rules 701,*

*702,* and *403* "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria." As the committee notes further explain:

> [T]he question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural object of his bounty and to formulate a rational scheme of distribution?" would be allowed.

*See Fed. R. Evid. 704*, advisory committee notes.

[**63] [*218] Notwithstanding this admonition, the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties. Two of our decisions in this area provide guidance. In *First National State Bank*, the district court permitted an expert on the Uniform Commercial Code to testify as to the established custom in the banking industry and to provide background information to help the jury determine whether the bank's conduct warranted status akin to a holder in due course. *Id. at 731.* The district court did not, however, permit the expert to "give his opinion as to the legal duties arising" from the industry custom as to whether the bank "lacked good faith and/or had notice of claims, thereby denying it holder-in-due course status." *Id.* On appeal, we rejected the bank's argument that the expert testified to a legal conclusion, and we agreed with the district court that the expert's testimony was admissible.

Similarly in *Leo*, we held that the district court did not abuse its discretion in permitting an expert [**64] in the field of governmental contracting to testify as to the custom and practices of the defense industry regarding the Armed Services Procurement Act in a criminal fraud prosecution. *941 F.2d at 196-97.* We stated that the expert's testimony was admissible because it was limited to an explanation of business custom, i.e., that defense contractors generally provided updated cost and pricing data to the government during contract negotiations. *Id.* Key to our determination was that the expert did not give his opinion as to what was required under the law, or whether the defendant complied with the Act. Rather, the

testimony was permissible because the expert "testified, based upon his experience in the defense industry, as to how firms such as [the defendant's] operated when performing contracts governed by the Act." *Id. at 197.*

This is a case in which we find that Van Sant's background testimony could be helpful to the jury. She is an experienced former counsel for the SEC with expertise in offshore securities transactions. The customs and business practices in the securities industry at the time the parties entered into the Agreement provides an [**65] important context which will aid the jury in determining whether Berckeley had the requisite scienter at the time to evade the registration requirements.

In accordance with *First National State Bank* and *Leo*, however, Van Sant cannot testify as to whether Berckeley complied with legal duties that arose under the federal securities laws. Thus, Van Sant's testimony that Berckeley's sales of NMFS stock were exempt from registration requirements, and any testimony as to the legal effect of the various SEC pronouncements regarding *Rule 144* and Regulation S, are inadmissible as improper legal opinions. Similarly, the portion of paragraph 18 of the affidavit, opining that in light of the apparent routine industry practice it was reasonable for Berckeley to have believed that it was entitled to the *Section 4(1)* exemption, is inadmissible because it concerns Berckeley's legal duties resulting from the various SEC pronouncements. *Leo, 941 F.2d at 197.* As to the remainder of the testimony considered by the District Court, we conclude that the District Court did not abuse its discretion in admitting Van Sant's testimony regarding securities industry custom with respect [**66] to the *Section 4(1)* exemption.

Based solely on Van Sant's opinion regarding industry practices, the District Court concluded that, given the state of affairs in the securities industry in May [*219] 1996, "the illegality of the transaction simply was not apparent." (App. at 43.) [HN41] Van Sant's testimony regarding industry practice and custom, however, is not determinative as to Berckely's state of mind. Such an inference would run counter to our determination in *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, 135 F.3d 266 (3d Cir. 1998)* ("*Newton I*"). In that case, the defendants submitted multiple affidavits from investment brokers explaining that the brokers followed the same allegedly fraudulent investment practices as the defendants. The defendants argued that the universal

industry custom established as a matter of law that the defendants did not have the requisite scienter to violate *Section 10(b)*. We rejected the defendants's claim that evidence of a "widely, if not almost universally followed" practice in the securities industry was determinative as to their state of mind. We explained that "[e]ven a universal industry practice may still be fraudulent[,]" and [**67] that "ultimate responsibility for construction and enforcement of the securities laws must rest with the court." *Id. at 274* (citations omitted).

The touchstone of our decision in *Newton I* was that universal industry practices are not "outcome determinative." *Id. at 273.* In the present case, we read the District Court's opinion as finding that the Van Sant affidavit on industry custom was "outcome determinative" as to Berckeley's state of mind regarding its qualification for the *Section 4(1)* exemption.

Under *Newton I,* that conclusion cannot stand. Our decision in *Newton I*, however, did not preclude the defendants from introducing the proffered evidence of industry custom and practice to demonstrate that they had not acted with the requisite scienter. *See id.* (stating that "any evidence, derived from knowledge of industry practice or elsewhere, that the plaintiffs were generally aware of the defendants' exclusive reliance on the [allegedly fraudulent practices] would, of course, be quite probative of whether the plaintiffs had the expectations they claim"). Similarly in this case, Van Sant's testimony regarding securities industry [**68] practices in May 1996 will be probative of Berckeley's scienter at the time of the Agreement, but not determinative.

Because the Van Sandt affidavit, standing alone, is insufficient to establish that Berckeley did not have the requisite scienter, we must examine the record to determine whether there is any other evidence regarding Berckeley's state of mind concerning its qualification for the *Section 4(1)* exemption at the time it entered into the Agreement. In order to defeat summary judgment, Colkitt must point to evidence in the record creating an issue of fact regarding whether Berckeley was reckless in its belief that it would be entitled to an exemption under *Section 4(1)* of the Securities Act of 1933. Colkitt relies on several Rules, Regulations, and Interpretive Guidances issued by the SEC to argue that the law in 1996 was clear that no exception to the *Section 5* registration requirement existed under *Section 4(1)* for unregistered securities acquired in offshore transactions. (Appellant's Br. at 42.)

We agree that the authorities cited by Colkitt create an issue of fact as to whether Berckeley's belief that it could freely resell the securities after the holding period in the [**69] Agreement without otherwise complying with *Section 4(1)* was reckless.

Important to our conclusion is an understanding of the interrelationship among *Rule 144*, which gives guidance on "underwriter" status under *Section 4(1)*; Regulation S, which was adopted in 1990 to clarify the extraterritorial application of the 1933 Act; and an interpretive release issued by the SEC on June 10, 1995, entitled "Problematic Practices Under Regulation S." We examined the *Rule 144* safe harbor in [*220] detail, *supra*, and concluded that Berckeley could not fall under the safe harbor because it resold the securities back into the United States within one year of converting the debentures. *See 17 C.F.R. § 230.144*.

[HN42] Regulation S was enacted in 1990 to provide generally that an offer or sale of a security that occurs outside the United States is not subject to the registration requirements under *Section 5* of the Securities Act. *See 17 C.F.R. §§ 230.901-.05*. Under that regulation, "[s]ecurities acquired overseas, whether or not pursuant to Regulation S, may be resin in the United States only if they are registered under the Act or an exemption from [**70] registration is available." *Offshore Offers and Sales, 55 Fed. Reg. 18306, 18322 (May 2, 1990). 17 C.F.R. § 230.904*, preliminary note 6. Regulation S contains two non-exclusive safe harbor provisions, *Rule 903* and *Rule 904*. Under *Rules 903* and *904*, an offer or sale of securities is deemed to occur outside the United States if: (1) the offer or sale is made in an offshore transaction; (2) no directed selling efforts are made in the United States; and (3) additional considerations listed in *Rule 903(b)* and/or *904(b)* are satisfied. *See 17 C.F.R. §§ 230.903 - .04*. Both safe-harbor rules contain a 40-day "distribution compliance period" under which resales of unregistered shares may not be made in any event. *See id.* The SEC interpretive release issued in connection with Regulation S explained that Regulation S did not alter the availability of the *Section 4(1)* exemption for the resale of securities. Notice of Adoption of *Rule 144*, SEC. Release No. 5223, *55 Fed. Reg. 18319 (January 11, 1972)*. The interpretive release further stated that Regulation S did not apply to "any transaction or series of transactions [**71] that, although in technical compliance with the rules, is part of a plan or scheme to evade the registration provisions of the Securities Act." *55 Fed. Reg. at 18320*.

In June 1995, in response to "a number of problematic practices [that] . . . developed involving unregistered sales of equity securities of domestic reporting companies purportedly in reliance upon Regulation S," the SEC published an interpretive release entitled "Problematic Practices Under Regulation S." *See* Problematic Practices Under Regulation S, SEC Release No. 33-7190, *60 Fed. Reg. 35663 (July 10, 1995)*. That publication stated that [HN43] the safe harbors under *Rules 903* and *904* were not available "for a transaction or series of transactions that, although in technical compliance with the regulation, is part of a plan or scheme to evade the registration requirements of the Securities Act." *Id.* The publication was concerned primarily with so-called "parking transactions," under which domestic issuers or distributors sold securities to offshore shell entities to hold for the forty-day restricted period, after which such securities were sold back into the United States. In the end, proceeds [**72] from the sales would make their way, directly or indirectly, back to the domestic issuer or distributer. *Id. at 35664*. The SEC made clear in the release that the forty-day restricted period could not be used for this purpose, i.e., to "wash off" resale restrictions such as the 2-year holding requirement under *Rule 144*. The release concluded by stating that "any distributions by a statutory 'underwriter' must be registered pursuant to *Section 5*" unless subject to a statutory exemption. *Id.*

The net effect of all of these Rules and interpretive releases is to create an issue of fact as to whether it would have been reckless for Berckeley to rely *solely* on the forty-day restricted period to foreclose any possibility that it was an "underwriter" at the time it entered into the Agreement [*221] with Colkitt. Berckeley argues that it was not reckless as a matter of law because the 1995 interpretive release only solicited comments as to whether Regulation S should be amended, and that it was not until February 1997 -- almost one year after the parties' transaction -- that the SEC formally proposed changes to Regulation S in order to stop certain abusive practices. *See* [**73] Offshore Offers and Sales, SEC Release No. 33-7392, *62 Fed. Reg. 9258 (Feb. 28, 1997)*. We view Berckeley's argument as a distinction without a difference. Although the SEC did not propose formal Regulation S rule changes until February 1997, the 1995 interpretive release was clearly directed to stop abusive practices relating to the sale of unregistered securities. When the SEC finally adopted amendments to Regulation S in February 1998, the Commission explained that it

first "acted to stem abuses of Regulation S" in the June 1995 interpretive release. Offshore Offers and Sales, SEC Release No. 33-7505, *63 Fed. Reg. 9362 (Feb. 25, 1998).* The SEC further referenced eight enforcement proceedings it had instituted against participants in abusive Regulation S transactions between June 5, 1992, and May 6, 1996, each of which took place prior to the date of the Agreement on May 30, 1996.

Based upon all the information available to Berckeley at the time it entered into the Agreement, we conclude that there is an issue of fact as to whether Berckeley was reckless in its belief that the resale of securities back into the United States would not violate *Section 5* [**74] of the Securities Act. [24] This issue must be resolved by the trier of fact, which may or may not accept Berckeley's explanation that the law was so unclear at the time to dispel [*222] Colkitt's contention that it acted with scienter. Accordingly, we will reverse the District Court's grant of summary judgment on Colkitt's *Section 29(b)* claim premised on a violation of *Section 10(b)* and remand the case for a trial on the merits.

24  We note that we are *not* determining that the failure to follow an SEC interpretive release is *per se* reckless for purposes of finding liability under the securities laws. [HN44] An interpretive rule is "one issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979)* (citation omitted). An interpretive rule is not binding upon a court. *Dismas Charities, Inc. v. United States Dept. of Justice, 401 F.3d 666, 681 (6th Cir. 2004).* Indeed, the SEC itself has recognized that "no-action and interpretive responses by the staff are subject to reconsideration and should not be regarded as precedents binding on the Commission." *See* SEC Release No. 33-5089, 1970 WL 10582 (Oct. 29, 1970). Our decision in this case does not elevate SEC interpretive releases to the force of law; rather our focus is on Berckeley's state of mind when it entered into the Agreement. The sheer weight of the interpretive releases and the eight enforcement proceedings instituted by the SEC against participants in abusive Regulation S transactions between June 5, 1992, and May 6, 1996, creates an issue of fact that Berckeley

intended to undertake an unlawful course of conduct.

[**75] **C. COLKITT'S *SECTION 10(b)* CLAIM**

Berckeley has evidence at its disposal to counter the interpretive releases, including the Van Sant testimony and evidence that it sought out the advice of counsel prior to entering into the Agreement. On the latter piece of evidence, we realize that the record is sparse as to the nature of the advice Berckeley received from its counsel. (App. at 1175-77, 1187-89.) For purposes of the remand to the District Court, we remind the parties that [HN45] the attorney-client privilege cannot be used as both a "shield" and a "sword": Berckeley cannot rely upon the legal advice it received for the purpose of negating its scienter without permitting Colkitt the opportunity to probe the surrounding circumstances and substance of that advice. See *Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir. 1996)* ("The attorney client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that: (a) the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.") (quoting *Restatement of the Law Governing Lawyers* [**76] *§ 130(1) (Final Draft No.1, 1996)*).

As we explained, *supra*, a party proceeding under a *Section 29(b)* rescission claim has a lesser burden because it is not necessary in that context to establish reliance and causation. *See GFL Advantage Fund, 272 F.3d at 206 n.6.* In this case, however, Colkitt has also alleged a stand-alone claim under *Section 10(b).* The remaining issue for our consideration under that claim is whether Colkitt has produced sufficient evidence to create an issue of fact that Berckeley's alleged misrepresentation caused his injury.

[HN46] Causation in the securities context is strikingly similar to the familiar standard in the torts context, but with different labels. In the securities realm, "but for" causation is referred to as "reliance, or transaction causation," and "proximate cause" is known as "loss causation." *See Newton II, 259 F.3d at 172-73; see also Bastian v. Petren Resources Corp., 892 F.2d 680, 683 (7th Cir. 1990)* (stating that "what securities lawyers call 'loss causation' *is* the standard common law fraud rule . . . merely borrowed for use in federal securities law cases") (emphasis in original); [**77] 3 Hazen, *The Law of Securities Regulation,* § 12.11[1].

[HN47] In order to establish reliance, or transaction causation, a *Section 10(b)* plaintiff must prove that "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Newton II, 259 F.3d at 172.* Stated differently, the plaintiff must prove that "but for the wrongful conduct, the transaction would not have gone through, at least in the form that it eventually took." 3 Thomas Lee Hazen, *The Law of Securities Regulation*, § 12.11[2] (5th ed. 2005); *see also Suez Equity Investors, L.P., Sei Assocs. v. Toronto Dominion Bank, 250 F.3d 87, 95-96 (3d Cir. 2001)* ("Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.").

Loss causation is a more exacting standard for a *Section 10(b)* plaintiff to meet. [HN48] To prove loss causation, the plaintiff must demonstrate "that the fraudulent misrepresentation actually caused the loss suffered." *Newton II, 259 F.3d at 173.* Similar to the concept [**78] of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff. *Suez Equity Investors, 250 F.3d at 96.* Thus, "[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Id.* The United States Court of Appeals for the Seventh Circuit has succinctly explained that [HN49] the loss causation element requires the plaintiff to prove "that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997)* (citing *LHLC Corp. v. Cluett, Peabody & Co., 842 F.2d 928, 931 (7th Cir. 1988)).* In the typical *Section 10(b)* case, a party can meet this burden by showing that the price of a security was inflated due to a fraudulent misrepresentation. *Semerenko v. Cendant Corp., 223 F.3d 165, 184 (3d Cir. 2000); Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992); Scattergood v. Perelman, 945 F.2d 618, 624 [*223] (3d Cir. 1991).* [**79] In such a case, there is a direct causal nexus between the misrepresentation and the plaintiff's economic loss. *Semerenko, 223 F.3d at 184.* Similarly, the loss causation element is satisfied where a fraudulent misrepresentation or omission induces the plaintiff to enter into the challenged transaction. *See Hatrock v. Edward D. Jones & Co., 750 F.2d 767, 773 (9th Cir. 1984)* (stating that "[t]he plaintiff . . . should not have to

prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security"), *as cited in* 3 Hazen, The Law of Securities Regulation, § 12.11[3]. In contrast, a plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation. *Semerenko, 223 F.3d at 185; Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1446-49 (11th Cir. 1997).* In that situation, it cannot be said "that the alleged misrepresentation proximately caused the decline in the security's value to satisfy the element of loss causation." *Id.*

[**80] Colkitt's complaint asserts that his NMFS share holdings lost value as a proximate cause of Berckeley's alleged misrepresentation. [25] (App. at 955.) We disagree. Based on the record before us, there is absolutely no connection between the price decrease in NMFS shares and Berckeley's unrelated alleged misrepresentation as to its intent to comply with offshore registration requirements. In fact, Colkitt himself has attributed the drop in the price of NMFS shares solely to repercussions resulting from Berckeley's short sales of NMFS stock, a practice that the District Court determined did not violate *Section 10(b)* or *Rule 10b-5.* [26] For example, the following exchange took place during Colkitt's deposition regarding the reasons why he never repaid the loan amount to Berckeley:

> Q. Is the only reason that you did not repay Berckeley in one form or another these allegations that have been made in this lawsuit that you believe that Berckeley was involved in the short-selling of National Medical Stock?
>
> A. Yes.
>
> Q. There is no other reason that you have for not repaying the loan made by Berckeley?
>
> A. *Well, obviously, the short-selling helped collapse totally the* [**81] *price of the stock, which obviously made my liquidity -- inability to pay, it was a downward cycle, made it much more difficult.*
>
> ****

Q. You don't have any other reason for failing to repay this loan from Berckeley other than the allegations that you have made in this case that Berckeley was somehow involved in short-selling National Medical stock [*224] and the repercussions of those allegations; is that correct?

A. Yeah, and the repercussions, that's correct.

Q. Okay. Included in those repercussions is your contention that there's now some issue of inability to repay?

A. Correct.

Q. Okay. Is there any other reason that you have for not repaying this loan?

A. No.

(App. at 1018-19 (emphasis added).)

25  Colkitt also alleges that he suffered two other categories of damages as a direct and proximate cause of Berckeley's alleged misrepresentation: (1) the sale of NMFS shares to Berckeley at a 17% discount from their market value, and (2) the possible requirement to pay interest and penalties on the outstanding debentures under the Agreement. The current record, as we have examined it, is unclear as to whether these expenses would have been part of the cost of *any* deal Colkitt could have made to obtain the financing in light of NMFS's precarious financial position at the time it entered into the deal. *See Berckeley I, 259 F.3d at 137 & supra* note 3. We invite the District Court upon remand to determine in the first instance the nature of these expenses and their relationship, if any, to the alleged misrepresentation.

[**82]

26  Colkitt has not appealed that ruling and is thus bound by it.

Once we strip away the short selling allegations, the alleged misrepresentations in this case have no connection to the decrease in the value of NMFS shares

in the open market. That misrepresentation simply did not affect the value of NMFS stock. Accordingly, Colkitt cannot recover damages for the decrease in value of his stock that was held in escrow because that decrease was not proximately caused by Berckeley's alleged misrepresentation.

In summary, we will reverse the decision of the District Court with respect to Colkitt's *Section 10(b)* claim on limited grounds. We hold that Colkitt failed to set forth sufficient facts that the precipitous loss in value in his NMFS share holdings was proximately caused by Berckeley's alleged misrepresentation. There is no evidence in the record that the decline in the price per share of NMFS stock was connected in any manner to alleged misrepresentations regarding Berckeley's intent to evade *Section 5* registration requirements, and we will affirm the decision of the District Court relating [**83] to this category of damages. 27 For these reasons, we will reverse in part, affirm in part, and remand Colkitt's remaining *Section 10(b)* claim to the District Court for trial. 28

27  In this respect, our decision represents only a Pyrrhic victory for Colkitt, who will not be able to recover his largest category of damages from Berckeley, which is the drop in stock prices connected to NMFS stock held in escrow. We note for the record that Colkitt recognized the inherent possibility that market forces might cause the share price of NMFS stock to decrease when he agreed, in the Agreement, to place additional shares of NMFS stock into escrow if the stock price decreased.

28  As a result, to the extent we have determined that Colkitt has stated a claim under *Section 10(b)*, we will also reinstate Colkitt's claim that Berckeley's conduct committed common law fraud under New York law. We conclude that the Agreement, which contains a choice of law clause in Paragraph 6.1, is governed solely by New York law. *See Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52, 56 (3d Cir. 1994)* (stating that the parties freely bargained for a choice of law provision and that Pennsylvania courts "will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests"). As Colkitt fails to set forth any public policy interest to invalidate the choice of law provision entered into between two parties that

freely bargained for the terms of the Agreement, we find that the choice of law provision bars Colkitt from proceeding under the Pennsylvania Securities Act and Pennsylvania common law fraud. Accordingly, Colkitt will have to prove that Berckeley's conduct constituted fraud under New York law. *See Computerized Radiological Services v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986)* (stating that under New York law, a plaintiff must prove the following elements of fraud: "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury") (citation omitted)).

## [**84] D. CALCULATION OF DAMAGES

Having determined that Colkitt has adduced sufficient facts to survive summary judgment on his *Section 29* rescission [*225] claim premised on a violation of *Section 10(b)*, we must necessarily vacate the District Court's damages award in favor of Berckeley. Colkitt will have the opportunity at trial to prove that he is entitled to rescind the Agreement. [29]

> 29  We note that the record is unclear as to what damages Berckeley would be entitled to for its "buy-in loss" should it ultimately be successful at trial. Those damages represent the losses that Berckeley allegedly suffered when it was forced

to buy NMFS shares on the open market to cover for existing delivery obligations after Colkitt failed to follow through on his duty to convert shares under the Agreement. As set forth in note 4, *supra*, Berckeley made conversion demands on five occasions in September 1996. Colkitt honored only two of the conversion demands and converted 18,320 shares. At around the same time in September 1996, Berckeley entered into sales agreements to sell 10,680 NMFS shares. Berckeley then purchased 10,680 shares on the open market in February 1997 to cover for its existing delivery obligations from September. What is unclear to us from the existing record is why Berckeley would have had to purchase the shares on the open market when it already held 18,320 shares that would have covered the outstanding delivery obligations. The answer may be that Berckeley sold a certain number of shares, and that the 10,680 outstanding shares represent the remaining shares upon which Berckeley still owed delivery obligations. The parties' current submissions, however, are far from clear on this issue, and the parties should address this unanswered question on remand.

## [**85] V. CONCLUSION

Based upon the foregoing reasons, we will affirm in part, reverse in part, and remand the case to the District Court for further proceedings consistent with this opinion.



**BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,
Petitioner v. ROCHE MOLECULAR SYSTEMS, INC., et al.**

**No. 09-1159**

**SUPREME COURT OF THE UNITED STATES**

*131 S. Ct. 2188; 180 L. Ed. 2d 1; 2011 U.S. LEXIS 4183; 79 U.S.L.W. 4407; 98
U.S.P.Q.2D (BNA) 1761; 68 A.L.R. Fed. 2d 617; 22 Fla. L. Weekly Fed. S 1069*

**February 28, 2011, Argued
June 6, 2011, Decided**

**NOTICE:**

    The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:**  [***1]
    ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT.
*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., 583 F.3d 832, 2009 U.S. App. LEXIS 21465 (Fed. Cir., 2009)*

**DISPOSITION:**    *583 F.3d 832*, affirmed.

**DECISION:**

    [**1]  Bayh-Dole Act provisions (*35 U.S.C.S §§201(e), (c), 202(a)*) allocating rights in federally funded inventions between Federal Government and federal contractors held not to (1) automatically vest title to such inventions in federal contractors; or (2) authorize contractors to unilaterally take title to such inventions.

**SUMMARY:**

    **Procedural posture:** Petitioner university sued respondent research company (RC). The RC argued it co-owned a patent based on a professor inventor's assignment, so the university lacked standing. A district court held the professor had no rights to assign, as the university's research was federally funded, giving it superior rights under the Bayh-Dole Act. The U.S. Court of Appeals for the Federal Circuit remanded for dismissal. Certiorari was granted.

    **Overview:** The Bayh-Dole Act did not displace the norm that rights in an invention belonged to the inventor. It did not automatically vest title to federally funded inventions in federal contractors. In *35 U.S.C.S. § 202(a)*, the Act provided that contractors could "elect to retain title to any subject invention." *35 U.S.C.S. § 201(e)* defined "subject invention" as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. Construing "invention of the contractor" to those owned by or belonging to the contractor made the phrase meaningful. And "invention owned by the contractor" or "invention belonging to the contractor" were natural readings of the phrase "invention of the contractor." The use of the word "of" denoted ownership. An "invention of the contractor" did not automatically include inventions made by the contractor's employees. *35 U.S.C.S. § 202(a)*, stating that contractors could "elect to retain title" confirmed that the Act did not vest title. Only when an invention belonged to the contractor did the Act come into play. The RC's ownership in the patent was not automatically extinguished by the Act.

**Outcome:** The judgment of the United States Court of Appeals for the Federal Circuit, holding that the research company possessed an ownership interest in the patents that was not extinguished by the Bayh-Dole Act and that the university was deprived of standing, was affirmed. 7-2 Decision; 1 Concurrence; 1 Dissent.

## LAWYERS' EDITION HEADNOTES:

[**2]

PATENTS §87;

FEDERALLY SUPPORTED INVENTIONS -- ALLOCATION OF RIGHTS ;

Headnote:[1]

In 1980, Congress passed the Bayh-Dole Act to promote the utilization of inventions arising from federally supported research, promote collaboration between commercial concerns and nonprofit organizations, and ensure that the Government obtains sufficient rights in federally supported inventions. *35 U.S.C.S. § 200.* To achieve these aims, the Act allocates rights in federally funded "subject inventions" between the Federal Government and federal contractors (any person, small business firm, or nonprofit organization that is a party to a funding agreement). *35 U.S.C.S. §§201(e), (c), 202(a).* The Act defines "subject invention" as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. *35 U.S.C.S. § 201(e).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

FEDERALLY FUNDED INVENTION -- TITLE ;

Headnote:[2]

The Bayh-Dole Act provides that Federal Government contractors may elect to retain title to any subject invention. *35 U.S.C.S. § 202(a).* To be able to retain title, a contractor must fulfill a number of obligations imposed by the statute. The contractor must disclose each subject invention to the relevant Federal agency within a reasonable time; it must make a written election within two years after disclosure stating that the contractor opts to retain title to the invention; and the

contractor must file a patent application prior to any statutory bar date. *35 U.S.C.S. § 202(c)(1)-(3).* The Federal Government may receive title to a subject invention if a contractor fails to comply with any of these obligations. *35 U.S.C.S. § 202(c)(1)-(3).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §88;

FEDERALLY FUNDED INVENTIONS -- GOVERNMENT RIGHTS -- INVENTOR'S RIGHTS ;

Headnote:[3]

The Government has several rights in federally funded subject inventions under the Bayh-Dole Act. The agency that granted the federal funds receives from the contractor a nonexclusive, nontransferrable, irrevocable, paid-up license to practice the subject invention. *35 U.S.C.S. § 202(c)(4).* The agency also possesses "march-in rights," which permit the agency to grant a license to a responsible third party under certain circumstances, such as when the contractor fails to take effective steps to achieve practical application of the invention. *35 U.S.C.S. § 203.* The Act further provides that when the contractor does not elect to retain title to a subject invention, the Government may consider and after consultation with the contractor grant requests for retention of rights by the inventor. *35 U.S.C.S. § 202(d).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**3]

PATENTS §2;

POWER OF CONGRESS ;

Headnote:[4]

Congress has the authority to promote the progress of science and useful arts, by securing to authors and inventors the exclusive right to their respective writings and discoveries. *U.S. Const art. I, § 8, cl. 8.* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

ENTITLEMENT ;

Headnote:[5]

See *35 U.S.C.S. § 101*, which provides in part: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefor . . . ." (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §100 ;PATENTS §210;

OATH -- ENTITLEMENT -- INVENTOR -- ASSIGNEE ;

Headnote:[6]

An inventor must attest that he believes himself to be the original and first inventor of the invention for which he solicits a patent. *35 U.S.C.S. § 115*. In most cases, a patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is assignable in law by an instrument in writing--an inventor's assignee. *35 U.S.C.S. §§151, 152, 261*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §210;

INVENTOR -- ASSIGNMENT TO THIRD PARTY ;

Headnote:[7]

United States Supreme Court precedents confirm the general rule that rights in an invention belong to the inventor. It is equally well established that an inventor can assign his rights in an invention to a third party. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §90;

ENTITLEMENT -- EMPLOYER -- EMPLOYEE ;

Headnote:[8]

Unless there is an agreement to the contrary, an employer does not have rights in an invention which is

the original conception of the employee alone. Such an invention remains the property of him who conceived it. In most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

GOVERNMENT CONTRACTORS -- INTEREST IN INVENTION -- FEDERAL FUNDING ;

Headnote:[9]

Nowhere in the Bayh-Dole Act is title expressly vested in Federal Government contractors or anyone else; nowhere in the Act are inventors expressly deprived of their interest in federally funded inventions. Instead, the Act provides that contractors may elect to retain title to any subject invention. *35 U.S.C.S. § 202(a)*. A "subject invention" is defined as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. *§ 201(e)*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

STATUTES §110;

SURPLUSAGE ;

Headnote:[10]

Courts have a general reluctance to treat statutory terms as surplusage. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**4]

PATENTS §89 ;PATENTS §90;

GOVERNMENT EMPLOYEES -- EMPLOYEES OF FEDERAL CONTRACTORS ;

Headnote:[11]

Exec. Order No. 10096 governs Federal Government employee-to-employer patent right assignments. Lest there be any doubt, employees of nonfederal entities that have federal funding contracts are not federal employees. And there is no equivalent executive order governing

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **4;
2011 U.S. LEXIS 4183, ***1; 79 U.S.L.W. 4407

invention rights with respect to federally funded research; that issue is of course addressed by the Bayh-Dole Act. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

TITLE TO FEDERALLY FUNDED INVENTIONS -- GOVERNMENT CONTRACTORS ;

Headnote:[12]

The Bayh-Dole Act's provision stating that contractors may "elect to retain title" confirms that the Act does not vest title. *35 U.S.C.S. § 202(a).* "Retain" means to hold or continue to hold in possession or use. One cannot retain something unless he already has it. The Bayh-Dole Act does not confer title to federally funded inventions on contractors or authorize contractors to unilaterally take title to those inventions; it simply assures contractors that they may keep title to whatever it is they already have. Such a provision makes sense in a statute specifying the respective rights and responsibilities of federal contractors and the Government. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

INVENTOR'S TITLE -- GOVERNMENT CONTRACTOR'S TITLE ;

Headnote:[13]

The Bayh-Dole Act states that it takes precedence over any other Act which would require a disposition of rights in subject inventions that is inconsistent with the Act. *35 U.S.C.S. § 210(a).* Because the Bayh-Dole Act, including *§ 210(a),* applies only to "subject inventions"--"inventions of the contractor"--it does not displace an inventor's antecedent title to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights--like much of the rest of the Bayh-Dole Act--serves to clarify the order of priority of rights between the Federal Government and a federal contractor in a federally funded invention that already belongs to the contractor. Nothing more. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

OWNERSHIP -- DIVISION BETWEEN GOVERNMENT AND CONTRACTOR ;

Headnote:[14]

Far from superseding the Patent Act's basic principle that an inventor owns the rights to his invention, it is clear that *35 U.S.C.S. § 210(a)*'s concern is far narrower. That provision specifies 21 different statutory provisions that the Bayh-Dole Act takes precedence over, the vast majority of which deal with the division of ownership in certain inventions between a contractor and the Government. *35 U.S.C.S. § 210(a)(1)-(21).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**5]

PATENTS §87;

INVENTOR -- RETENTION OF RIGHTS -- GOVERNMENT CONTRACTOR ;

Headnote:[15]

Under the Bayh-Dole Act, a federal agency may grant requests for retention of rights by the inventor if a contractor does not elect to retain title to a subject invention. *35 U.S.C.S. § 202(d).* If an employee inventor never had title to his invention because title vested in the contractor by operation of law, it would be odd to allow the Government to grant requests for retention of rights by the inventor. By using the word "retention," *§ 202(d)* assumes that the inventor had rights in the subject invention at some point, undermining the notion that the Act automatically vests title to federally funded inventions in federal contractors. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §98;

PROCEDURES -- INVENTOR AND THIRD-PARTY RIGHTS ;

Headnote:[16]

The Bayh-Dole Act expressly confers on contractors the right to challenge a Government-imposed impediment

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **;
2011 U.S. LEXIS 4183, ***1; 79 U.S.L.W. 4407

to retaining title to a subject invention. *35 U.S.C.S. § 202(b)(4)*. However, the Act contains not a single procedural protection for third parties that have neither sought nor received federal funds, such as cooperating private research institutions. Nor does the Bayh-Dole Act allow inventors employed by federal contractors to contest their employer's claim to a subject invention. The lack of procedures protecting inventor and third-party rights makes perfect sense if the Act applies only when a federal contractor has already acquired title to an inventor's interest. In that case, there is no need to protect inventor or third-party rights, because the only rights at issue are those of the contractor and the Government. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

INVENTIONS -- FEDERAL FUNDING ;

Headnote:[17]

The Bayh-Dole Act applies to subject inventions conceived or first actually reduced to practice in the performance of work funded in whole or in part by the Federal Government. *35 U.S.C.S. § 201(e), (b)*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

## SYLLABUS

[**6] [*2189] In 1985, a small California research company called Cetus began to develop methods for quantifying blood-borne levels of human immunodeficiency virus (HIV), the virus that causes AIDS. A Nobel Prize winning technique developed at Cetus known as PCR was an integral part of these efforts.

In 1988, Cetus began to collaborate with scientists at Stanford University's Department of Infectious Diseases to test the efficacy of new AIDS drugs. Dr. Holodniy joined Stanford as a research fellow in the department around that time. When he did so, he signed an agreement stating that he "agree[d] to assign" to Stanford his "right, title and interest in" inventions resulting from his employment there. Holodniy's supervisor arranged for him to conduct research at Cetus to learn about PCR. As a condition of gaining access to Cetus, Holodniy was required to sign an agreement stating that he "will assign and do[es] hereby assign" to Cetus his "right, title and

interest in . . . the ideas, inventions, and improvements" made "as a consequence of [his] access" to Cetus. Working with Cetus employees, [***2] Holodniy devised a PCR-based procedure for measuring the amount of HIV in a patient's blood. Upon returning to Stanford, he and other Stanford employees tested the procedure. Stanford secured three patents to the measurement process.

Roche Molecular Systems acquired Cetus's PCR-related assets. After conducting clinical trials on the HIV quantification method developed at Cetus, Roche commercialized the procedure. Today, its HIV test kits are used worldwide.

The University and Small Business Patent Procedures Act of 1980 (Bayh-Dole Act or Act) allocates rights in federally funded "subject invention[s]" between the Federal Government and federal contractors. *35 U.S.C. §§ 201(e)*, *(c)*, *202(a)*. The Act defines "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement," *§ 201(e)*, and provides that contractors may "elect to retain title to any subject invention," *§ 202(a)*. Because some of Stanford's research on the HIV measurement technique was funded by the National Institutes of Health (NIH), the Bayh-Dole Act applied. In accordance with the Act's requirements, Stanford notified NIH that it [***3] was electing to retain title to the invention and conferred on the Government a license to use the patented procedure.

[**7] Petitioner, the Board of Trustees of Stanford University, filed suit against respondents (Roche), claiming that their HIV test kits infringed Stanford's patents. Roche responded that Holodniy's agreement with Cetus gave it co-ownership of the procedure, and thus Stanford lacked standing to sue it for patent infringement. Stanford countered that Holodniy had no rights to assign because the University had superior rights under the Bayh-Dole Act. The District Court agreed with Stanford and held that under the Bayh-Dole Act, Holodniy had no rights to assign to Cetus. The Court of Appeals for the Federal Circuit disagreed, concluding that Holodniy's agreement with Cetus assigned his rights to Cetus, and thus to Roche. It also found that the Bayh-Dole Act did not automatically void an inventor's rights in federally funded inventions. Thus, the Act did not extinguish Roche's ownership interest

[*2190] in the invention, and Stanford was deprived of standing.

*Held:* The Bayh-Dole Act does not automatically vest title to federally funded inventions in federal contractors or authorize contractors [***4] to unilaterally take title to such inventions. Pp. ___ - ___, *180 L. Ed. 2d, at 11-17.*

(a) Since 1790, patent law has operated on the premise that rights in an invention belong to the inventor. See, *e.g., Gayler v. Wilder, 51 U.S. 477, 10 How. 477, 493, 13 L. Ed. 504.* In most cases, a patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is assignable in law by an instrument in writing--an inventor's assignee. See *United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574.* Absent an agreement to the contrary, an employer does not have rights in an invention "which is the original conception of the employee alone," *id., at 189, 53 S. Ct. 554, 77 L. Ed. 1114;* an inventor must expressly grant those rights to his employer, see *id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114.* Pp. ___ - ___, *180 L. Ed. 2d, at 11-13.*

(b) Stanford and *amicus* United States contend that, when an invention is conceived or first reduced to practice with the support of federal funds, the Bayh-Dole Act vests title to those inventions in the inventor's employer--the federal contractor. Congress has in the past divested inventors of their rights in inventions by providing unambiguously that inventions created pursuant to certain specified federal contracts become the Government's property. Such unambiguous language [***5] is notably absent from the Bayh-Dole Act. Instead, the Act provides that contractors may "elect to retain title to any subject invention," *§ 202(a),* defining a "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement," *§*

*201(e).*

Stanford contends that "invention of the contractor" means all inventions that a contractor's employees make with the aid of federal funds. That reading assumes that Congress subtly set aside two centuries of patent law in a statutory definition. This Court has rejected the idea that mere employment is sufficient to vest title to an employee's invention in the employer. Stanford's reading also renders the phrase "of the contractor" superfluous since the definition already covers inventions made under a funding agreement. Construing the phrase to refer instead to a particular category of inventions conceived or [**8] reduced to practice under a funding agreement--inventions "of the contractor," that is, those owned by or belonging to the contractor--makes the phrase meaningful in the statutory definition. And "invention owned by the contractor" or "invention belonging [***6] to the contractor" are natural readings of the phrase "invention of the contractor."

*Section 202(a),* which states that contractors may "elect to retain title," confirms that the Act does not *vest* title. Stanford reaches the opposite conclusion, but only because it reads "retain" to mean "acquire" and "receive." That is certainly not the common meaning of "retain," which is "to hold or continue to hold in possession or use." You cannot retain something unless you already have it. And *§ 210(a)*--which provides that the Act "take[s] precedence over any other Act which would require a disposition of rights in subject inventions . . . that is inconsistent with" the Act--does not displace the basic principle that an inventor owns the rights to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights does nothing more than clarify the order of priority of rights between the Federal Government and a federal contractor in a federally

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **8;
2011 U.S. LEXIS 4183, ***6; 79 U.S.L.W. 4407

[*2191] funded invention that already belongs to the contractor.

The Act's isolated provisions dealing with inventors' rights in subject inventions are consistent with the Court's construction [***7] of the Act. See *§ 202(d)*. That construction is also bolstered by the Act's limited procedural protections, which expressly give contractors the right to challenge a Government-imposed impediment to retaining title to a subject invention, *§ 202(b)(4)*, but do not provide similar protection for inventor and third-party rights.

Stanford's contrary construction would permit title to an employee's inventions to vest in the University even if the invention was conceived before the inventor became an employee, so long as the invention's reduction to practice was supported by federal funding. It also suggests that the school would obtain title were even one dollar of federal funding applied toward an invention's conception or reduction to practice. It would be noteworthy enough for Congress to supplant one of the fundamental precepts of patent law and deprive inventors of rights in their own inventions. To do so under such unusual terms would be truly surprising. Had Congress intended such a sea change in intellectual property rights it would have said so clearly--not obliquely through an ambiguous definition of "subject invention" and an idiosyncratic use of the word "retain."

The Court's [***8] construction of the Act is also reflected in the common practice of contractors, who generally obtain assignments from their employees, and of agencies that fund federal contractors, who typically expect those contractors to obtain assignments. With effective assignments, federally funded inventions become "subject inventions" and the Act as a practical matter works pretty much the way Stanford says it should. The only significant difference is that it does so without violence to the basic patent law principle that inventors own their inventions. Pp. ___ - ___, *180 L. Ed. 2d, at 13-17*.

*583 F.3d 832*, affirmed.

**COUNSEL: Donald B. Ayer** argued the cause for petitioner.

**Malcolm L. Stewart** argued the cause for the United States, as amicus curiae, by special leave of court.

**Mark C. Fleming** argued the cause for respondents.

**JUDGES:** Roberts, C. J., delivered the opinion of the Court, in which Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ., joined. Sotomayor, J., filed a concurring opinion. Breyer, J., filed a dissenting opinion, in which Ginsburg, J., joined.

**OPINION BY:** Roberts

131 S. Ct. 2188, *2191; 180 L. Ed. 2d 1, **;
2011 U.S. LEXIS 4183, ***8; 79 U.S.L.W. 4407

**OPINION**

[*2192] [**9]   Chief Justice **Roberts** delivered the opinion of the Court.

Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor. The question here is whether the University and Small Business Patent Procedures Act of 1980--commonly referred to as the Bayh-Dole Act--displaces that norm and automatically vests title to federally [***9] funded inventions in federal contractors. We hold that it does not.

I

A

In 1985, a small California research company called Cetus began to develop methods for quantifying blood-borne levels of human immunodeficiency virus (HIV), the virus that causes AIDS. A Nobel Prize winning technique developed at Cetus--polymerase chain reaction, or PCR--was an integral part of these efforts. PCR allows billions of copies of DNA sequences to be made from a small initial blood sample.

In 1988, Cetus began to collaborate with scientists at Stanford University's Department of Infectious Diseases to test the efficacy of new AIDS drugs. Dr. Mark Holodniy joined Stanford as a research fellow in the department around that time. When he did so, he signed a Copyright and Patent Agreement (CPA) stating that he "agree[d] to assign" to Stanford his "right, title and interest in" inventions resulting from his employment at the University. App. to Pet. for Cert. 118a-119a.

At Stanford Holodniy undertook to develop an improved method for quantifying HIV levels in patient blood samples, using PCR. Because Holodniy was largely unfamiliar with PCR, his supervisor arranged for him to conduct research at Cetus. As [***10] a condition of gaining access to Cetus, Holodniy signed a Visitor's Confidentiality Agreement (VCA). That agreement stated that Holodniy "will assign and do[es] hereby assign" to Cetus his "right, title and interest in each of the ideas, inventions and improvements" made "as a consequence of [his] access" to Cetus. *Id.,* at 122a-124a.

For the next nine months, Holodniy conducted research at Cetus. Working with Cetus employees, Holodniy devised a PCR-based procedure for calculating the amount of HIV in a patient's blood. That technique allowed doctors to determine whether a patient was benefiting from HIV therapy.

Holodniy then returned to Stanford where he and other University employees tested the HIV measurement technique. Over the next few years, Stanford obtained written assignments of rights from the Stanford employees involved in refinement of the technique, including Holodniy, and filed several patent applications related to the procedure. Stanford secured three patents to the HIV measurement process.

In 1991, Roche Molecular Systems, a company that specializes in diagnostic blood screening, acquired Cetus's PCR-related assets, including all rights Cetus had obtained through [**10] agreements [***11] like the VCA signed by Holodniy. After conducting clinical trials on the HIV quantification method developed at Cetus, Roche commercialized the procedure. Today, Roche's HIV test "kits are used in hospitals and AIDS clinics worldwide." Brief for Respondents 10-11.

B

[**LEdHR1] [1] In 1980, Congress passed the Bayh-Dole Act to "promote the utilization of inventions arising from federally supported research," "promote collaboration between commercial concerns and nonprofit organizations,"

[*2193] and "ensure that the Government obtains sufficient rights in federally supported inventions." *35 U.S.C. § 200*. To achieve these aims, the Act allocates rights in federally funded "subject invention[s]" between the Federal Government and federal contractors ("any person, small business firm, or nonprofit organization that is a party to a funding agreement"). *§§ 201(e), (c), 202(a)*. The Act defines "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)*.

[**LEdHR2] [2] The Bayh-Dole Act provides that contractors may "elect to retain title to any subject invention." *§ 202(a)*. To be able to retain title, a contractor must fulfill [***12] a number of obligations imposed by the statute. The contractor must "disclose each subject invention to the [relevant] Federal agency within a reasonable time"; it must "make a written election within two years after disclosure" stating that the contractor opts to retain title to the invention; and the contractor must "file a patent application prior to any statutory bar date." *§§ 202(c)(1)-(3)*. The "Federal Government may receive title" to a subject invention if a contractor fails to comply with any of these obligations. *Ibid*.

[**LEdHR3] [3] The Government has several rights in federally funded subject inventions under the Bayh-Dole Act. The agency that granted the federal funds receives from the contractor "a nonexclusive, nontransferrable, irrevocable, paid-up license to practice . . . [the] subject invention." *§ 202(c)(4)*. The agency also possesses "[m]arch-in rights," which permit the agency to grant a license to a responsible third party under certain circumstances, such as when the contractor fails to take "effective steps to achieve practical application" of the invention. *§ 203*. The Act further provides that when the contractor does not elect to retain title to a subject invention, the Government [***13] "may consider and

after consultation with the contractor grant requests for retention of rights by the inventor." *§ 202(d)*.

Some of Stanford's research related to the HIV measurement technique was funded by the National Institutes of Health (NIH), thereby subjecting the invention to the Bayh-Dole Act. Accordingly, Stanford disclosed the invention, conferred on the Government a nonexclusive, nontransferable, paid-up license to use the patented procedure, and formally notified NIH that it elected to retain title to the invention.

C

In 2005, the Board of Trustees of Stanford University filed suit against Roche Molecular Systems, Inc., Roche Diagnostics Corporation, and Roche Diagnostics Operations, Inc. (collectively Roche), contending that Roche's HIV test kits infringed Stanford's patents. As relevant here, Roche responded by asserting that it was a [**11] co-owner of the HIV quantification procedure, based on Holodniy's assignment of his rights in the Visitor's Confidentiality Agreement. As a result, Roche argued, Stanford lacked standing to sue it for patent infringement. *487 F. Supp. 2d 1099, 1111, 1115 (ND Cal. 2007)*. Stanford claimed that Holodniy had no rights to assign because the University's [***14] HIV research was federally funded, giving the school superior rights in the invention under the Bayh-Dole Act. *Ibid*.[1]

1    Roche submitted a host of other claims to the District Court, including that it had "shop rights" to the patents and was entitled to a license to use the patents. See *583 F.3d 832, 838 (CA Fed. 2009)*. None of those claims is now before us; we deal only with Roche's claim to co-ownership to rebut Stanford's standing to bring an infringement action.

[*2194] The District Court held that the "VCA effectively assigned any rights that Holodniy had in the patented invention to Cetus," and thus to Roche. *Id., at 1117.* But because of the operation of the Bayh-Dole Act, "Holodniy had no interest to assign." *Id., at 1117, 1119.* The court concluded that the Bayh-Dole Act "provides that the individual inventor may obtain title" to a federally funded invention "only after the government and the contracting party have declined to do so." *Id., at 1118.*

The Court of Appeals for the Federal Circuit disagreed. First, the court concluded that Holodniy's initial agreement with Stanford in the Copyright and Patent Agreement constituted a mere promise to assign rights in the future, unlike Holodniy's [***15] agreement with Cetus in the Visitor's Confidentiality Agreement, which itself assigned Holodniy's rights in the invention to Cetus. See *583 F.3d 832, 841-842 (2009).* Therefore, as a matter of contract law, Cetus obtained Holodniy's rights in the HIV quantification technique through the VCA.[2] Next, the court explained that the Bayh-Dole Act "does not automatically void ab initio the inventors' rights in government-funded inventions" and that the "statutory scheme did not automatically void the patent rights that Cetus received from Holodniy." *Id., at 844-845.* The court held that "Roche possesse[d] an ownership interest in the patents-in-suit" that was not extinguished by the Bayh-Dole Act, "depriv[ing] Stanford of standing." *Id., at 836-837.* The Court of Appeals then remanded the case with instructions to dismiss Stanford's infringement claim. *Id., at 849.*

> 2    Because the Federal Circuit's interpretation of the relevant assignment agreements is not an issue on which we granted certiorari, we have no occasion to pass on the validity of the lower court's construction of those agreements.

We granted certiorari. *562 U.S. ___, 131 S. Ct. 502, 178 L. Ed. 2d 368 (2010).*

II

A

[**LEdHR4] [4] Congress has the authority "[t]o promote the Progress of [***16] Science and useful Arts, by securing . . . to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *U.S. Const. Art. I, § 8, cl. 8.* The first Congress put that power to use by enacting the Patent Act of 1790. That Act provided "[t]hat upon the petition of any person or persons . . . setting forth, that he, she, or they, hath or have invented or discovered" an invention, a patent could be granted to "such petitioner or petitioners" or "their heirs, administrators [**12] or assigns." Act of Apr. 10, 1790, § 1, 1 Stat. 109-110. Under that law, the first patent was granted in 1790 to Samuel Hopkins, who had devised an improved method for making potash, America's first industrial chemical. *U.S. Patent No. 1* (issued July 31, 1790).[3]

> 3    The patent was signed by President George Washington, Secretary of State Thomas Jefferson, and Attorney General Edmund Randolph. See Maxey, Samuel Hopkins, The Holder of the First U. S. Patent: A Study of Failure, 122 Pa. Magazine of Hist. and Biography 6 (1998).

Although much in intellectual property law has changed in the 220 years since the first Patent Act, the basic idea that inventors have the right to patent their inventions [***17] has not. Under the law in its current form, " [**LEdHR5] [5] [w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefor." *35 U.S.C. § 101.* [**LEdHR6] [6] The inventor must attest that "he believes himself to be the original and first inventor of the [invention] for which he solicits a patent." *§ 115.* In most cases, a

[*2195] patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is "assignable in law by an instrument in writing"--an inventor's assignee. *§§ 151, 152, 261*.

[**LEdHR7] [7] Our precedents confirm the general rule that rights in an invention belong to the inventor. See, *e.g.,Gayler v. Wilder, 51 U.S. 477, 10 How. 477, 493, 13 L. Ed. 504 (1851)* ("the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires"); *Solomons v. United States, 137 U.S. 342, 346, 11 S. Ct. 88, 34 L. Ed. 667, 26 Ct. Cl. 620, 1891 Dec. Comm'r Pat. 267 (1890)* ("whatever invention [an inventor] may thus conceive and perfect is his individual property"); *United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574 (1933)* (an inventor owns "the product of [his] original thought"). The treatises [***18] are to the same effect. See, *e.g.,* 8 *Chisum on Patents §* *22.01,* p. 22-2 (2011) ("The presumptive owner of the property right in a patentable invention is the single human inventor").

It is equally well established that an inventor can assign his rights in an invention to a third party. See *Dubilier Condenser Corp., supra, at 187, 53 S. Ct. 554, 77 L. Ed. 1114* ("A patent is property and title to it can pass only by assignment"); 8 *Chisum on Patents, supra, § 22.01,* at 22-2 ("The inventor . . . [may] transfer ownership interests by written assignment to anyone"). Thus, although others may acquire an interest in an invention, any such interest--as a general rule--must trace back to the inventor.

In accordance with these principles, we have recognized that [**LEdHR8] [8] unless there is an agreement to the contrary, an employer does not have rights in an invention "which is the original conception of the employee alone." *Dubilier Condenser Corp., 289 U.S. at 189, 53 S. Ct. 554, 77 L. Ed. 1114.* Such an invention "remains the property of him who conceived it." *Ibid.* In most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights. See *id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114* ("The respective rights and obligations [***19] of employer and employee, touching an invention conceived by the latter, spring from the contract of employment").

[**13] B

Stanford and the United States as *amicus curiae* contend that the Bayh-Dole Act reorders the normal priority of rights in an invention when the invention is conceived or first reduced to practice with the support of federal funds. In their view, the Act moves inventors from the front of the line to the back by vesting title to federally funded inventions in the inventor's employer--the federal contractor. See Brief for Petitioner 26-27; Brief for United States as *Amicus Curiae* 6.

Congress has in the past divested inventors of their rights in inventions by providing unambiguously that inventions created pursuant to specified federal contracts become the property of the United States. For example, with respect to certain contracts dealing with nuclear material and atomic energy, Congress provided that title to such inventions "shall be vested in, and be the property of, the [Atomic Energy] Commission." *42 U.S.C. § 2182.* Congress has also enacted laws requiring that title to certain inventions made pursuant to contracts with the National Aeronautics and Space Administration [***20] "shall be the exclusive property of the United States," Pub. L. 111-314, § 3, 124 Stat. 3339, *51 U.S.C. § 20135(b)(1),* and that title to certain inventions under contracts with the Department of Energy "shall vest in the United States." *42 U.S.C. § 5908.*

[*2196] Such language is notably absent from the Bayh-Dole Act. [**LEdHR9] [9] Nowhere in the Act is title expressly vested in contractors or anyone else; nowhere in the Act are inventors expressly deprived of their interest in federally funded inventions. Instead, the Act provides that contractors may "elect to retain title to any subject invention." *35 U.S.C. § 202(a)*. A "subject invention" is defined as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)*.

Stanford asserts that the phrase "invention of the contractor" in this provision "is naturally read to include all inventions made by the contractor's employees with the aid of federal funding." Brief for Petitioner 32 (footnote omitted). That reading assumes that Congress subtly set aside two centuries of patent law in a statutory definition. It also renders the phrase "of the contractor" superfluous. If the phrase [***21] "of the contractor" were deleted from the definition of "subject invention," the definition would cover "any invention . . . conceived or first actually reduced to practice in the performance of work under a funding agreement." Reading "of the contractor" to mean "all inventions made by the contractor's employees with the aid of federal funding," as Stanford would, adds nothing that is not already in the definition, since the definition already covers inventions made under the funding agreement. That is contrary to our [**LEdHR10] [10] general "reluctan[ce] to treat statutory terms as surplusage." *Duncan v. Walker, 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)* (internal quotation marks omitted).

Construing the phrase to refer instead to a particular category of inventions conceived or reduced to practice under a funding agreement--inventions "of the contractor," that is, those owned by or belonging to the contractor--makes the phrase meaningful in the statutory definition. And "invention owned by the contractor" or "invention belonging to the contractor" are natural readings of the [**14] phrase "invention of the contractor." As we have explained, "[t]he use of the word 'of' denotes ownership." *Poe v. Seaborn, 282 U.S. 101, 109, 51 S. Ct. 58, 75 L. Ed. 239, 1930-2 C.B. 202 (1930)*; [***22] see *Flores-Figueroa v. United States, 556 U.S. 646, ___, ___, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009)* (treating the phrase "identification [papers] of another person" as meaning such items belonging to another person (internal quotation marks omitted)); *Ellis v. United States, 206 U.S. 246, 259, 27 S. Ct. 600, 51 L. Ed. 1047, 5 Ohio L. Rep. 427 (1907)* (interpreting the phrase "works of the United States" to mean "works belonging to the United States" (internal quotation marks omitted)).

That reading follows from a common definition of the word "of." See Webster's Third New International Dictionary 1565 (2002) ("of" can be "used as a function word indicating a possessive relationship"); New Oxford American Dictionary 1180 (2d ed. 2005) (defining "of" as "indicating an association between two entities, typically one of belonging"); Webster's New Twentieth Century Dictionary 1241 (2d ed. 1979) (defining "of" as "belonging to").

Stanford's reading of the phrase "invention of the contractor" to mean "all inventions made by the contractor's employees" is plausible enough in the abstract; it is often the case that whatever an employee produces in the course of his employment belongs to his employer. No one would claim that an autoworker who builds a car [***23] while working in a factory owns that car. But, as noted, patent law has always been different: We have rejected the idea that mere employment is sufficient to vest title to an employee's invention in the employer. Against this background, a contractor's invention--an "invention of the contractor"--does

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 214 of 485

Page 13

131 S. Ct. 2188, *2197; 180 L. Ed. 2d 1, **14;
2011 U.S. LEXIS 4183, ***23; 79 U.S.L.W. 4407

[*2197]  not automatically include inventions made by the contractor's employees.[4]

4   The dissent suggests that "we could interpret the Bayh-Dole Act as ordinarily assuming, and thereby ordinarily requiring, an assignment of patent rights by the federally funded employee to the federally funded employer." *Post, at ___, 180 L. Ed. 2d, at 21.* That suggestion is based in large part on [**LEdHR11] [11] Executive Order 10096, which "governs Federal Government employee-to-employer patent right assignments." *Post, at ___, 180 L. Ed. 2d, at 22.* Lest there be any doubt, employees of nonfederal entities that have federal funding contracts--like Holodniy--are *not* federal employees. And there is no equivalent executive order governing invention rights with respect to federally funded research; that issue is of course addressed by the Bayh-Dole Act.

[**LEdHR12] [12] The Bayh-Dole Act's provision stating that contractors may "elect to *retain* title" confirms that the Act does not *vest* [***24] title. *35 U.S.C. § 202(a)* (emphasis added). Stanford reaches the opposite conclusion, but only because it reads "retain" to mean "acquire" and "receive." Brief for Petitioner 36 (internal quotation marks omitted). That is certainly not the common meaning of "retain." "[R]etain" means "to hold or continue to hold in possession or use." Webster's Third, *supra*, at 1938; see Webster's New Collegiate Dictionary 980 (1980) ("to keep in possession or use"); American Heritage Dictionary 1109 (1969) ("[t]o keep or hold in one's possession"). You cannot retain something unless you already have it. See *Alaska v. United States, 545 U.S. 75, 104, 125 S. Ct. 2137, 162 L. Ed. 2d 57 (2005)* (interpreting the phrase "the United States shall retain title to all property" to mean that "[t]he United States . . . retained title to *its* property located within Alaska's borders") (emphasis added). The Bayh-Dole Act does not confer title to federally funded inventions on contractors or authorize contractors [**15] to unilaterally take title to those inventions; it simply assures contractors

that they may keep title to whatever it is they already have. Such a provision makes sense in a statute specifying the respective rights and responsibilities of [***25] federal contractors and the Government.

[**LEdHR13] [13] The Bayh-Dole Act states that it "take[s] precedence over any other Act which would require a disposition of rights in subject inventions . . . that is inconsistent with" the Act. *35 U.S.C. § 210(a).* The United States as *amicus curiae* argues that this provision operates to displace the basic principle, codified in the Patent Act, that an inventor owns the rights to his invention. See Brief for United States 21. But because the Bayh-Dole Act, including *§ 210(a)*, applies only to "subject inventions"--"inventions of the contractor"--it does not displace an inventor's antecedent title to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights--like much of the rest of the Bayh-Dole Act--serves to clarify the order of priority of rights between the Federal Government and a federal contractor in a federally funded invention that already belongs to the contractor. Nothing more.[5]

5   [**LEdHR14] [14] Far from superseding the Patent Act in such a backhanded way, it is clear that *§ 210(a)*'s concern is far narrower. That provision specifies 21 different statutory provisions that the Bayh-Dole [***26] Act "take[s] precedence over," the vast majority of which deal with the division of ownership in certain inventions between a contractor and the Government. *35 U.S.C. §§ 210(a)(1)-(21)*; see, *e.g., §§ 210(a)(19)-(20)* (the Bayh-Dole Act takes precedence over "*section 6(b)* of the Solar Photovoltaic Energy Research Development and Demonstration Act" and "*section 12* of the Native Latex Commercialization and Economic Development Act").

The isolated provisions of the Bayh-Dole Act dealing with inventors' rights in

[*2198] subject inventions are consistent with our construction of the Act. [**LEdHR15] [15] Under the Act, a federal agency may "grant requests for retention of rights by the inventor . . . [i]f a contractor does not elect to retain title to a subject invention." § 202(d). If an employee inventor never had title to his invention because title vested in the contractor by operation of law--as Stanford submits--it would be odd to allow the Government to grant "requests for retention of rights by the inventor." By using the word "retention," § 202(d) assumes that the inventor had rights in the subject invention at some point, undermining the notion that the Act automatically vests title to federally funded [***27] inventions in federal contractors.[6]

> 6    Stanford contends that it cannot be the case "that the contractor can only 'retain title' to an invention that it already owns, while an inventor may be considered for 'retention' of title only when he has assigned title away." Reply Brief for Petitioner 8. That argument has some force. But there may be situations where an inventor, by the terms of an assignment, has subsidiary rights in an invention to which a contractor has title, as § 202(d) suggests. Compare § 202(d) ("retention of *rights*") with § 202(a) ("retain *title*") (emphasis added). And at the end of the day, it is Stanford's contention that "retain" must be "read as a synonym for 'acquire' or 'receive' " that dooms its argument on this point. Brief for Petitioner 37.

The limited scope of the Act's procedural protections also bolsters our conclusion. [**LEdHR16] [16] The Bayh-Dole Act expressly confers on contractors the right to challenge a Government-imposed impediment to retaining title to a subject invention. § 202(b)(4). As [**16] Roche correctly notes, however, "the Act contains not a single procedural protection for third parties that have neither sought nor received federal funds," such as cooperating [***28] private research

institutions. Brief for Respondents 29. Nor does the Bayh-Dole Act allow inventors employed by federal contractors to contest their employer's claim to a subject invention. The Act, for example, does not expressly permit an interested third party or an inventor to challenge a claim that a particular invention was supported by federal funding. In a world in which there is frequent collaboration between private entities, inventors, and federal contractors, see Brief for Pharmaceutical Research and Manufacturers of America as *Amicus Curiae* 22-23, that absence would be deeply troubling. But the lack of procedures protecting inventor and third-party rights makes perfect sense if the Act applies only when a federal contractor has already acquired title to an inventor's interest. In that case, there is no need to protect inventor or third-party rights, because the only rights at issue are those of the contractor and the Government.

 [**LEdHR17] [17] The Bayh-Dole Act applies to subject inventions "conceived *or* first actually reduced to practice in the performance of work" "funded in whole *or in part* by the Federal Government." *35 U.S.C. §§ 201(e), 201(b)* (emphasis added). Under Stanford's construction [***29] of the Act, title to one of its employee's inventions could vest in the University even if the invention was conceived before the inventor became a University employee, so long as the invention's reduction to practice was supported by federal funding. What is more, Stanford's reading suggests that the school would obtain title to one of its employee's inventions even if only one dollar of federal funding was applied toward the invention's conception or reduction to practice.

It would be noteworthy enough for Congress to supplant one of the fundamental precepts of patent law and deprive inventors of rights in their own inventions. To do so under such unusual terms would be truly surprising. We are confident that if

131 S. Ct. 2188, *2199; 180 L. Ed. 2d 1, **LEdHR17;
2011 U.S. LEXIS 4183, ***29; 79 U.S.L.W. 4407

[*2199] Congress had intended such a sea change in intellectual property rights it would have said so clearly--not obliquely through an ambiguous definition of "subject invention" and an idiosyncratic use of the word "retain." Cf. *Whitman v. American Trucking Assns., Inc., 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001)* ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions").

Though unnecessary to our conclusion, it is worth noting that our [***30] construction of the Bayh-Dole Act is reflected in the common practice among parties operating under the Act. Contractors generally institute policies to obtain assignments from their employees. See Brief for Respondents 34; Brief for Pharmaceutical Research and Manufacturers of America as *Amicus Curiae* 13-18. Agencies that grant funds to federal contractors typically expect those contractors to obtain assignments. So it is with NIH, the agency that granted the federal funds at issue in this case. In guidance documents made available to contractors, NIH has made clear that "[b]y law, an inventor has initial ownership of an invention " and that contractors should therefore "have in place employee agreements requiring an inventor to 'assign' or give ownership of an invention to the organization [**17] upon acceptance of Federal funds." NIH Policies, Procedures, and Forms, A "20-20" View of Invention Reporting to the National Institutes of Health (Sept. 22, 1995). Such guidance would be unnecessary if Stanford's reading of the statute were correct.

Stanford contends that reading the Bayh-Dole Act as not vesting title to federally funded inventions in federal contractors "fundamentally undermin[es]" [***31] the Act's framework and severely threatens its continued "successful application." Brief for Petitioner 45. We do not agree. As just noted, universities typically enter into agreements with their employees requiring the assignment to the university of rights in inventions. With an effective assignment, those inventions--if federally funded--become "subject inventions" under the Act, and the statute as a practical matter works pretty much the way Stanford says it should. The only significant difference is that it does so without violence to the basic principle of patent law that inventors own their inventions.

The judgment of the Court of Appeals for the Federal Circuit is affirmed.

It is so ordered.

**CONCUR BY:** Sotomayor

## CONCUR

Justice **Sotomayor**, concurring.

I agree with the Court's resolution of this case and with its reasoning. I write separately to note that I share Justice Breyer's concerns as to the principles adopted by the Court of Appeals for the Federal Circuit in *FilmTec Corp. v. Allied-Signal, Inc., 939 F.2d 1568 (1991)*, and the application of those principles to agreements that implicate the Bayh-Dole Act. See *post, at ___ - ___, 180 L. Ed. 2d, at 20-22* (dissenting opinion). Because Stanford failed to challenge the decision [***32] below on these grounds, I agree that the appropriate disposition is to affirm. Like the dissent, however, I understand the majority opinion to permit consideration of these arguments in a future case. See *ante, at ___, n. 2, 180 L. Ed. 2d, at 11*.

**DISSENT BY:** Breyer; Ginsburg

## DISSENT

Justice **Breyer**, with whom Justice **Ginsburg** joins, dissenting.

The question presented in this case is:

"Whether a federal contractor university's statutory right under the Bayh-Dole Act, *35 U.S.C. §§ 200-212*, in inventions arising from federally funded research can be terminated unilaterally by an individual inventor through a separate agreement purporting to assign [*2200] the inventor's rights to a third party." Brief for Petitioner i.

In my view, the answer to this question is likely no. But because that answer turns on matters that have not been fully briefed (and are not resolved by the opinion of the Court), I would return this case to the Federal Circuit for further argument.

I

The Bayh-Dole Act creates a three-tier system for patent rights ownership applicable to federally funded research conducted by nonprofit organizations, such as universities, and small businesses. It sets forth conditions that mean (1) the funded firm; (2) failing that, the United States Government; [***33] and (3) failing that, the employee who made the invention, will likely obtain (or retain) any resulting [**18] patent rights (normally in that just-listed order). *35 U.S.C. §§ 202-203.* The statute applies to "subject invention[s]" defined as "any *invention of the contractor* conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)* (emphasis added). Since the "contractor" (*e.g.*, a university or small business) is unlikely to "conceiv[e]" of an idea or "reduc[e]" it "to practice" *other than* through its employees, the term "invention of the contractor" must refer to the work and ideas of those employees. We all agree that the term covers those employee inventions that the employee properly assigns to the contractor, *i.e.*, his or her employer. But does the term "subject invention" also include inventions that the employee fails to assign properly?

II

Congress enacted this statute against a background norm that often, but not always, denies individual inventors patent rights growing out of research for which the public has already paid. This legal norm reflects the fact that patents themselves have both benefits and costs. Patents, for example, [***34] help to elicit useful inventions and research and to assure public disclosure of technological advances. See, *e.g., Mazer v. Stein, 347 U.S. 201, 219, 74 S. Ct. 460, 98 L. Ed. 630, 1954 Dec. Comm'r Pat. 308 (1954)*; *Bilski v. Kappos, 561 U.S. ___, ___, 130 S. Ct. 3218, 177 L. Ed. 2d 792 (2010)*; *id., at ___, 130 S. Ct. 3218, 177 L. Ed. 2d 792* (Stevens, J., concurring in judgment). But patents sometimes mean unnecessarily high prices or restricted dissemination; and they sometimes discourage further innovation and competition by requiring costly searches for earlier, related patents or by tying up ideas, which, were they free, would more effectively spur research and development. See, *e.g., Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 548 U.S. 124, 128, 126 S. Ct. 2921, 165 L. Ed. 2d 399 (2006)* (Breyer, J., dissenting from dismissal of certiorari as

improvidently granted); Heller & Eisenberg, Can Patents Deter Innovation? The Anticommons in Biomedical Research, 280 Science 698 (1998).

Thus, Thomas Jefferson wrote of "the difficulty of drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not." Letter to Isaac McPherson (Aug. 13, 1813), in 6 Writings of Thomas Jefferson 181 (H. Washington ed. 1854). And James Madison [***35] favored the patent monopoly because it amounted to "compensation for" a community "benefit." Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments., in J. Madison, Writings 756 (J. Rakove ed. 1999).

The importance of assuring this community "benefit" is reflected in legal rules that may deny or limit the award of patent rights where the public has already paid to produce an invention, lest the public bear the potential costs of patent protection [*2201] where there is no offsetting need for such protection to elicit that invention. Why should the public have to pay twice for the same invention?

Legal rules of this kind include an Executive Order that ordinarily gives to the Government "the entire right, title and interest" to inventions made by Government employees who "conduct or perform research, development work, or both." *37 CFR § 501.6 (2010)* (codifying, as amended, Exec. Order 10096, 3 CFR 292 (1949-1953 Comp.)). See also *Heinemann v.* [**19] *United States, 796 F.2d 451, 455-456 (CA Fed. 1986)* (holding Executive Order constitutional and finding "no 'taking' because the invention was not the property of Heinemann"). They also include statutes, which, in specific research areas, give [***36] the Government title to inventions made pursuant to Government contracts. See Atomic Energy Act of 1954, § 152, 68 Stat. 944 (codified as amended at *42 U.S.C. § 2182*); National Aeronautics and Space Act of 1958, § 305, 72 Stat. 435 (codified at *42 U.S.C. § 2457*), repealed by § 6, 124 Stat. 3444; Federal Nonnuclear Energy Research and Development Act of 1974, § 9, 88 Stat. 1887 (codified as amended at *42 U.S.C. § 5908(a)*). And they have included Government regulations, established prior to the Bayh-Dole Act's enactment, that work in roughly similar ways. See, *e.g., 45 CFR § 650.4(b) (1977)* (National Science Foundation regulations providing that Foundation would "determine the disposition of the invention [made under the grant] and title to and rights

under any patent application"); §§ 8.1(a), 8.2(d) (Department of Health, Education, and Welfare regulations providing that inventions made under department grants "shall be subject to determination" by the agency and that the department may "require that all domestic rights in the invention shall be assigned to the United States").

These legal rules provide the basic background against which Congress passed the Bayh-Dole Act. And the Act's [***37] provisions reflect a related effort to assure that rights to inventions arising out of research for which the public has paid are distributed and used in ways that further specific important public interests. I agree with the majority that the Act does not simply take the individual inventors' rights and grant them to the Government. Rather, it assumes that the federal funds' recipient, say a university or small business, will possess those rights. The Act leaves those rights in the hands of that recipient, not because it seeks to make the public pay twice for the same invention, but for a special public policy reason. In doing so, it seeks to encourage those institutions *to commercialize* inventions that otherwise might not realize their potentially beneficial public use. *35 U.S.C. § 200.* The Act helps assure that commercialization (while "promot[ing] free competition" and "protect[ing] the public," *ibid.*) by imposing a set of conditions upon the federal funds recipient, by providing that sometimes the Government will take direct control of the patent rights, and by adding that on occasion the Government will permit the individual inventor to retain those rights. *§§ 202-203.*

Given this [***38] basic statutory objective, I cannot so easily accept the majority's conclusion--that the individual inventor can lawfully assign an invention (produced by public funds) to a third party, thereby taking that invention out from under the Bayh-Dole Act's restrictions, conditions, and allocation rules. That conclusion, in my view, is inconsistent with the Act's basic purposes. It may significantly undercut the Act's ability to achieve its objectives. It allows individual inventors, for whose invention the public has paid, to avoid the Act's corresponding restrictions and conditions. And it makes the commercialization [*2202] and marketing of such an invention more difficult: A potential purchaser of rights from the contractor, say a university, will not know if the university itself possesses the patent right in [**20] question or whether, as here, the individual, inadvertently or deliberately, has previously assigned the title to a third party.

Moreover, I do not agree that the language to which the majority points--the words "invention of the contractor" and "retain"--requires its result. As the majority concedes, Stanford's alternative reading of the phrase " 'invention of the contractor' " is [***39] "plausible enough in the abstract." *Ante, at ___, 180 L. Ed. 2d, at 14.* Nor do I agree that the Act's lack of an explicit provision for "an interested third party" to claim that an invention was not the result of federal funding "bolsters" the majority's interpretation. *Ante, at ___, 180 L. Ed. 2d, at 15.* In any event, universities and businesses have worked out ways to protect the various participants to research. See Brief for Association of American Universities et al. as *Amici Curiae* 22-24 (hereinafter AAU Brief); App. 118-124 (Materials Transfer Agreement between Cetus and Stanford University).

Ultimately, the majority rejects Stanford's reading (and the Government's reading) of the Act because it believes that it is inconsistent with certain background norms of patent law, norms that ordinarily provide an individual inventor with full patent rights. *Ante, at ___, 180 L. Ed. 2d, at 14.* But in my view, the competing norms governing rights in inventions for which the public has already paid, along with the Bayh-Dole Act's objectives, suggest a different result.

III

There are two different legal routes to what I consider an interpretation more consistent with the statute's objectives. First, we could set aside the Federal Circuit's interpretation of [***40] the licensing agreements and its related licensing doctrine. That doctrine governs interpretation of licensing agreements made *before* an invention is conceived or reduced to practice. Here, there are two such agreements. In the earlier agreement--that between Dr. Holodniy and Stanford University--Dr. Holodniy said, "I *agree to assign* . . . to Stanford . . . that right, title and interest in and to . . . such inventions as required by Contracts and Grants." App. to Pet. for Cert. 119a (emphasis added). In the later agreement--that between Dr. Holodniy and the private research firm Cetus--Dr. Holodniy said, "I will assign and *do hereby assign* to Cetus, my right, title, and interest in" here relevant "ideas" and "inventions." *Id.,* at 123a (emphasis added; capitalization omitted).

The Federal Circuit held that the earlier Stanford

agreement's use of the words "agree to assign," when compared with the later Cetus agreement's use of the words "do hereby assign," made all the difference. It concluded that, once the invention came into existence, the latter words meant that the Cetus agreement trumped the earlier, Stanford agreement. *583 F.3d 832, 841-842 (CA Fed. 2009)*. That, in the [***41] Circuit's view, is because the latter words operated upon the invention automatically, while the former did not. Quoting its 1991 opinion in *FilmTec Corp. v. Allied-Signal, Inc., 939 F.2d 1568, 1572*, the Circuit declared that " '[o]nce the invention is made and [the] application for [a] patent is filed, . . . legal title to the rights accruing thereunder would be in the assignee [*i.e.*, Cetus] . . . , and the assignor-inventor would have nothing remaining to assign.' *583 F.3d, at 842*.

[**21] Given what seem only slight linguistic differences in the contractual language, this reasoning seems to make too much of [*2203] too little. Dr. Holodniy executed his agreement with Stanford in 1988. At that time, patent law appears to have long specified that a present assignment of future inventions (as in both contracts here) conveyed equitable, but not legal, title. See, *e.g.*, G. Curtis, A Treatise on the Law of Patents for Useful Inventions § 170, p. 155 (3d ed. 1867) ("A contract to convey a future invention . . . cannot alone authorize a patent to be taken by the party in whose favor such a contract was intended to operate"); Comment, Contract Rights as Commercial Security: Present and Future Intangibles, 67 Yale L. J. 847, 854, n. 27 (1958) [***42] ("The rule generally applicable grants equitable enforcement to an assignment of an expectancy but demands a further act, either reduction to possession or further assignment of the right when it comes into existence").

Under this rule, both the initial Stanford and later Cetus agreements would have given rise only to equitable interests in Dr. Holodniy's invention. And as between these two claims in equity, the facts that Stanford's contract came first and that Stanford subsequently obtained a postinvention assignment as well should have meant that Stanford, not Cetus, would receive the rights its contract conveyed.

In 1991, however, the Federal Circuit, in *FilmTec*, adopted the new rule quoted above--a rule that distinguishes between these equitable claims and, in effect, says that Cetus must win. The Federal Circuit

provided no explanation for what seems a significant change in the law. See *939 F.2d, at 1572*. Nor did it give any explanation for that change in its opinion in this case. See *583 F.3d, at 841-842*. The Federal Circuit's *FilmTec* rule undercuts the objectives of the Bayh-Dole Act. While the cognoscenti may be able to meet the *FilmTec* rule in future contracts simply by copying [***43] the precise words blessed by the Federal Circuit, the rule nonetheless remains a technical drafting trap for the unwary. See AAU Brief 35-36. But cf. *ante, at ___, 180 L. Ed. 2d, at 17* (assuming ease of obtaining effective assignments). It is unclear to me why, where the Bayh-Dole Act is at issue, we should prefer the Federal Circuit's *FilmTec* rule to the rule, of apparently much longer vintage, that would treat both agreements in this case as creating merely equitable rights.

At the same time, the Federal Circuit's reasoning brings about an interpretation contrary to the intention of the parties to the earlier, Stanford, contract. See App. to Pet. for Cert. 120a (provision in Stanford contract promising that Dr. Holodniy "will not enter into any agreement creating copyright or patent obligations in conflict with this agreement"). And it runs counter to what may well have been the drafters' reasonable expectations of how courts would interpret the relevant language.

Second, we could interpret the Bayh-Dole Act as ordinarily assuming, and thereby ordinarily requiring, an assignment of patent rights by the federally funded employee to the federally funded employer. I concede that this interpretation would treat [***44] federally funded employees of contractors (subject to the Act) differently than the law ordinarily treats private sector employees. The Court long ago described the latter, private sector principles. In *United States v. Dubilier* [**22] *Condenser Corp., 289 U.S. 178, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574 (1933)*, the Court explained that a "patent is property, and title to it can pass only by assignment." *Id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114*. It then described two categories of private sector employee-to-employer assignments as follows: First, a person who is

"employed to make an invention, who succeeds, during his term of service, in [*2204] accomplishing that task, is bound

to assign to his employer any patent obtained." *Ibid.*

But, second,

"if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent." *Ibid.*

The Court added that, because of "the peculiar nature of the act of invention," courts are "reluctan[t] . . . to imply or infer an agreement by the employee to assign his patent." *Id., at 188, 53 S. Ct. 554, 77 L. Ed. 1114.* And it applied these same principles governing assignment to inventions made [***45] by employees of the United States. *Id., at 189-190, 53 S. Ct. 554, 77 L. Ed. 1114.*

Subsequently, however, the President promulgated Executive Order 10096. Courts have since found that this Executive Order, not *Dubilier*, governs Federal Government employee-to-employer patent right assignments. See, *e.g., Kaplan v. Corcoran, 545 F.2d 1073, 1076-1077 (CA7 1976); Heinemann, 796 F.2d, at 455-456; Wright v. United States, 164 F.3d 267, 269 (CA5 1999); Halas v. United States, 28 Fed. Cl. 354, 364 (1993).* The Bayh-Dole Act seeks objectives roughly analogous to the objectives of the Executive Order. At least one agency has promulgated regulations that require Bayh-Dole contractors to insist upon similar assignments. See NIH Policies, Procedures, and Forms, A "20-20" View of Invention Reporting to the National Institutes of Health (Sept. 22, 1995) (available in the Clerk of Court's case file) (requiring a Government contractor, such as Stanford University, to "have in place employee agreements requiring an inventor to 'assign' or give ownership of an invention to the organization upon acceptance of Federal funds," as the Bayh-Dole Act "require[s]"). And an *amicus* brief, filed by major associations of universities, scientists, [***46] medical researchers, and others, argues that we should interpret the rules governing assignments of the employees at issue here (and consequently the Act's reference to "inventions of the contractor") in a similar way. AAU Brief 5-14.

The District Court in this case adopted roughly this approach. *487 F. Supp. 2d 1099, 1118 (ND Cal. 2007)* ("[A]lthough title still vests in the named inventor, the inventor remains under a legal obligation to assign his interest either to the government or the nonprofit contractor unless the inventor acts within the statutory framework to retain title"). And since a university often enters into a grant agreement with the Government for a researcher's benefit and at his request, see J. Hall, Grant Management 205 (2010), implying such a presumption in favor of compliance with the grant agreement, and thus with the Bayh-Dole Act, would ordinarily be equitable.

IV

As I have suggested, these views are [**23] tentative. That is because the parties have not fully argued these matters (though one *amicus* brief raises the license interpretation question, see Brief for Alexander M. Shukh as *Amicus Curiae* 18-24, and at least one other can be read as supporting something like [***47] the equitable presumption I have described, see AAU Brief 5-14). Cf. *ante, at ___, n. 2, 180 L. Ed. 2d, at 11.* While I do not understand the majority to have foreclosed a similarly situated party from raising these matters in a future case, see *ibid.,* I believe them relevant to our efforts to answer the question presented here. Consequently, I would vacate the judgment of the Federal Circuit and remand this case to provide the parties with an [*2205] opportunity to argue these, or related, matters more fully.

Because the Court decides otherwise, with respect, I dissent.

REFERENCES

*35 U.S.C.S. §§201, 202*

8 *Chisum on Patents §§22.02, 22.03* (Matthew Bender)

L Ed Digest, Patents § 87

L Ed Index, Patents

Patent infringement under *35 U.S.C.S. § 271*--Supreme Court cases. *162 L. Ed. 2d 977.*

Supreme Court's construction and application of provision in Federal Constitution's Art. I, § 8, cl. 3, authorizing Congress to provide "for limited Times" copyright and patent protection. *154 L. Ed. 2d 1185.*

131 S. Ct. 2188, *2205; 180 L. Ed. 2d 1, **23;
2011 U.S. LEXIS 4183, ***47; 79 U.S.L.W. 4407

Supreme Court's views as to what is patentable subject      *1197.*
matter under federal law as "process," "machine,"
"manufacture," or "composition of matter." *65 L. Ed. 2d*



**BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, Petitioner v. ROCHE MOLECULAR SYSTEMS, INC., et al.**

**No. 09-1159**

**SUPREME COURT OF THE UNITED STATES**

*131 S. Ct. 2188; 180 L. Ed. 2d 1; 2011 U.S. LEXIS 4183; 79 U.S.L.W. 4407; 98 U.S.P.Q.2D (BNA) 1761; 68 A.L.R. Fed. 2d 617; 22 Fla. L. Weekly Fed. S 1069*

**February 28, 2011, Argued**
**June 6, 2011, Decided**

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:**  [***1]
ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT.
*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., 583 F.3d 832, 2009 U.S. App. LEXIS 21465 (Fed. Cir., 2009)*

**DISPOSITION:**   *583 F.3d 832*, affirmed.

**DECISION:**

[**1] Bayh-Dole Act provisions (*35 U.S.C.S §§201(e), (c), 202(a)*) allocating rights in federally funded inventions between Federal Government and federal contractors held not to (1) automatically vest title to such inventions in federal contractors; or (2) authorize contractors to unilaterally take title to such inventions.

**SUMMARY:**

**Procedural posture:** Petitioner university sued respondent research company (RC). The RC argued it co-owned a patent based on a professor inventor's assignment, so the university lacked standing. A district court held the professor had no rights to assign, as the university's research was federally funded, giving it superior rights under the Bayh-Dole Act. The U.S. Court of Appeals for the Federal Circuit remanded for dismissal. Certiorari was granted.

**Overview:** The Bayh-Dole Act did not displace the norm that rights in an invention belonged to the inventor. It did not automatically vest title to federally funded inventions in federal contractors. In *35 U.S.C.S. § 202(a)*, the Act provided that contractors could "elect to retain title to any subject invention." *35 U.S.C.S. § 201(e)* defined "subject invention" as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. Construing "invention of the contractor" to those owned by or belonging to the contractor made the phrase meaningful. And "invention owned by the contractor" or "invention belonging to the contractor" were natural readings of the phrase "invention of the contractor." The use of the word "of" denoted ownership. An "invention of the contractor" did not automatically include inventions made by the contractor's employees. *35 U.S.C.S. § 202(a)*, stating that contractors could "elect to retain title" confirmed that the Act did not vest title. Only when an invention belonged to the contractor did the Act come into play. The RC's ownership in the patent was not automatically extinguished by the Act.

**Outcome:** The judgment of the United States Court of Appeals for the Federal Circuit, holding that the research company possessed an ownership interest in the patents that was not extinguished by the Bayh-Dole Act and that the university was deprived of standing, was affirmed. 7-2 Decision; 1 Concurrence; 1 Dissent.

**LAWYERS' EDITION HEADNOTES:**

[**2]

PATENTS §87;

FEDERALLY SUPPORTED INVENTIONS -- ALLOCATION OF RIGHTS ;

Headnote:[1]

In 1980, Congress passed the Bayh-Dole Act to promote the utilization of inventions arising from federally supported research, promote collaboration between commercial concerns and nonprofit organizations, and ensure that the Government obtains sufficient rights in federally supported inventions. *35 U.S.C.S. § 200.* To achieve these aims, the Act allocates rights in federally funded "subject inventions" between the Federal Government and federal contractors (any person, small business firm, or nonprofit organization that is a party to a funding agreement). *35 U.S.C.S. §§201(e), (c), 202(a).* The Act defines "subject invention" as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. *35 U.S.C.S. § 201(e).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

FEDERALLY FUNDED INVENTION -- TITLE ;

Headnote:[2]

The Bayh-Dole Act provides that Federal Government contractors may elect to retain title to any subject invention. *35 U.S.C.S. § 202(a).* To be able to retain title, a contractor must fulfill a number of obligations imposed by the statute. The contractor must disclose each subject invention to the relevant Federal agency within a reasonable time; it must make a written election within two years after disclosure stating that the contractor opts to retain title to the invention; and the

contractor must file a patent application prior to any statutory bar date. *35 U.S.C.S. § 202(c)(1)-(3).* The Federal Government may receive title to a subject invention if a contractor fails to comply with any of these obligations. *35 U.S.C.S. § 202(c)(1)-(3).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §88;

FEDERALLY FUNDED INVENTIONS -- GOVERNMENT RIGHTS -- INVENTOR'S RIGHTS ;

Headnote:[3]

The Government has several rights in federally funded subject inventions under the Bayh-Dole Act. The agency that granted the federal funds receives from the contractor a nonexclusive, nontransferrable, irrevocable, paid-up license to practice the subject invention. *35 U.S.C.S. § 202(c)(4).* The agency also possesses "march-in rights," which permit the agency to grant a license to a responsible third party under certain circumstances, such as when the contractor fails to take effective steps to achieve practical application of the invention. *35 U.S.C.S. § 203.* The Act further provides that when the contractor does not elect to retain title to a subject invention, the Government may consider and after consultation with the contractor grant requests for retention of rights by the inventor. *35 U.S.C.S. § 202(d).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**3]

PATENTS §2;

POWER OF CONGRESS ;

Headnote:[4]

Congress has the authority to promote the progress of science and useful arts, by securing to authors and inventors the exclusive right to their respective writings and discoveries. *U.S. Const art. I, § 8, cl. 8.* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **3;
2011 U.S. LEXIS 4183, ***1; 79 U.S.L.W. 4407

ENTITLEMENT ;

Headnote:[5]

See *35 U.S.C.S. § 101*, which provides in part: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefor . . . ." (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §100 ;PATENTS §210;

OATH -- ENTITLEMENT -- INVENTOR -- ASSIGNEE ;

Headnote:[6]

An inventor must attest that he believes himself to be the original and first inventor of the invention for which he solicits a patent. *35 U.S.C.S. § 115*. In most cases, a patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is assignable in law by an instrument in writing--an inventor's assignee. *35 U.S.C.S. §§151, 152, 261*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87 ;PATENTS §210;

INVENTOR -- ASSIGNMENT TO THIRD PARTY ;

Headnote:[7]

United States Supreme Court precedents confirm the general rule that rights in an invention belong to the inventor. It is equally well established that an inventor can assign his rights in an invention to a third party. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §90;

ENTITLEMENT -- EMPLOYER -- EMPLOYEE ;

Headnote:[8]

Unless there is an agreement to the contrary, an employer does not have rights in an invention which is

the original conception of the employee alone. Such an invention remains the property of him who conceived it. In most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

GOVERNMENT CONTRACTORS -- INTEREST IN INVENTION -- FEDERAL FUNDING ;

Headnote:[9]

Nowhere in the Bayh-Dole Act is title expressly vested in Federal Government contractors or anyone else; nowhere in the Act are inventors expressly deprived of their interest in federally funded inventions. Instead, the Act provides that contractors may elect to retain title to any subject invention. *35 U.S.C.S. § 202(a)*. A "subject invention" is defined as any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement. *§ 201(e)*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

STATUTES §110;

SURPLUSAGE ;

Headnote:[10]

Courts have a general reluctance to treat statutory terms as surplusage. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**4]

PATENTS §89 ;PATENTS §90;

GOVERNMENT EMPLOYEES -- EMPLOYEES OF FEDERAL CONTRACTORS ;

Headnote:[11]

Exec. Order No. 10096 governs Federal Government employee-to-employer patent right assignments. Lest there be any doubt, employees of nonfederal entities that have federal funding contracts are not federal employees. And there is no equivalent executive order governing

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **4;
2011 U.S. LEXIS 4183, ***1; 79 U.S.L.W. 4407

invention rights with respect to federally funded research; that issue is of course addressed by the Bayh-Dole Act. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

TITLE TO FEDERALLY FUNDED INVENTIONS -- GOVERNMENT CONTRACTORS ;

Headnote:[12]

The Bayh-Dole Act's provision stating that contractors may "elect to retain title" confirms that the Act does not vest title. *35 U.S.C.S. § 202(a).* "Retain" means to hold or continue to hold in possession or use. One cannot retain something unless he already has it. The Bayh-Dole Act does not confer title to federally funded inventions on contractors or authorize contractors to unilaterally take title to those inventions; it simply assures contractors that they may keep title to whatever it is they already have. Such a provision makes sense in a statute specifying the respective rights and responsibilities of federal contractors and the Government. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

INVENTOR'S TITLE -- GOVERNMENT CONTRACTOR'S TITLE ;

Headnote:[13]

The Bayh-Dole Act states that it takes precedence over any other Act which would require a disposition of rights in subject inventions that is inconsistent with the Act. *35 U.S.C.S. § 210(a).* Because the Bayh-Dole Act, including *§ 210(a),* applies only to "subject inventions"--"inventions of the contractor"--it does not displace an inventor's antecedent title to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights--like much of the rest of the Bayh-Dole Act--serves to clarify the order of priority of rights between the Federal Government and a federal contractor in a federally funded invention that already belongs to the contractor. Nothing more. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

OWNERSHIP -- DIVISION BETWEEN GOVERNMENT AND CONTRACTOR ;

Headnote:[14]

Far from superseding the Patent Act's basic principle that an inventor owns the rights to his invention, it is clear that *35 U.S.C.S. § 210(a)*'s concern is far narrower. That provision specifies 21 different statutory provisions that the Bayh-Dole Act takes precedence over, the vast majority of which deal with the division of ownership in certain inventions between a contractor and the Government. *35 U.S.C.S. § 210(a)(1)-(21).* (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

[**5]

PATENTS §87;

INVENTOR -- RETENTION OF RIGHTS -- GOVERNMENT CONTRACTOR ;

Headnote:[15]

Under the Bayh-Dole Act, a federal agency may grant requests for retention of rights by the inventor if a contractor does not elect to retain title to a subject invention. *35 U.S.C.S. § 202(d).* If an employee inventor never had title to his invention because title vested in the contractor by operation of law, it would be odd to allow the Government to grant requests for retention of rights by the inventor. By using the word "retention," *§ 202(d)* assumes that the inventor had rights in the subject invention at some point, undermining the notion that the Act automatically vests title to federally funded inventions in federal contractors. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §98;

PROCEDURES -- INVENTOR AND THIRD-PARTY RIGHTS ;

Headnote:[16]

The Bayh-Dole Act expressly confers on contractors the right to challenge a Government-imposed impediment

to retaining title to a subject invention. *35 U.S.C.S. § 202(b)(4)*. However, the Act contains not a single procedural protection for third parties that have neither sought nor received federal funds, such as cooperating private research institutions. Nor does the Bayh-Dole Act allow inventors employed by federal contractors to contest their employer's claim to a subject invention. The lack of procedures protecting inventor and third-party rights makes perfect sense if the Act applies only when a federal contractor has already acquired title to an inventor's interest. In that case, there is no need to protect inventor and third-party rights, because the only rights at issue are those of the contractor and the Government. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

PATENTS §87;

INVENTIONS -- FEDERAL FUNDING ;

Headnote:[17]

The Bayh-Dole Act applies to subject inventions conceived or first actually reduced to practice in the performance of work funded in whole or in part by the Federal Government. *35 U.S.C.S. § 201(e), (b)*. (Roberts, Ch. J., joined by Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ.)

**SYLLABUS**

[**6] [*2189] In 1985, a small California research company called Cetus began to develop methods for quantifying blood-borne levels of human immunodeficiency virus (HIV), the virus that causes AIDS. A Nobel Prize winning technique developed at Cetus known as PCR was an integral part of these efforts.

In 1988, Cetus began to collaborate with scientists at Stanford University's Department of Infectious Diseases to test the efficacy of new AIDS drugs. Dr. Holodniy joined Stanford as a research fellow in the department around that time. When he did so, he signed an agreement stating that he "agree[d] to assign" to Stanford his "right, title and interest in" inventions resulting from his employment there. Holodniy's supervisor arranged for him to conduct research at Cetus to learn about PCR. As a condition of gaining access to Cetus, Holodniy was required to sign an agreement stating that he "will assign and do[es] hereby assign" to Cetus his "right, title and

interest in . . . the ideas, inventions, and improvements" made "as a consequence of [his] access" to Cetus. Working with Cetus employees, [***2] Holodniy devised a PCR-based procedure for measuring the amount of HIV in a patient's blood. Upon returning to Stanford, he and other Stanford employees tested the procedure. Stanford secured three patents to the measurement process.

Roche Molecular Systems acquired Cetus's PCR-related assets. After conducting clinical trials on the HIV quantification method developed at Cetus, Roche commercialized the procedure. Today, its HIV test kits are used worldwide.

The University and Small Business Patent Procedures Act of 1980 (Bayh-Dole Act or Act) allocates rights in federally funded "subject invention[s]" between the Federal Government and federal contractors. *35 U.S.C. §§ 201(e)*, *(c)*, *202(a)*. The Act defines "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement," *§ 201(e)*, and provides that contractors may "elect to retain title to any subject invention," *§ 202(a)*. Because some of Stanford's research on the HIV measurement technique was funded by the National Institutes of Health (NIH), the Bayh-Dole Act applied. In accordance with the Act's requirements, Stanford notified NIH that it [***3] was electing to retain title to the invention and conferred on the Government a license to use the patented procedure.

[**7] Petitioner, the Board of Trustees of Stanford University, filed suit against respondents (Roche), claiming that their HIV test kits infringed Stanford's patents. Roche responded that Holodniy's agreement with Cetus gave it co-ownership of the procedure, and thus Stanford lacked standing to sue it for patent infringement. Stanford countered that Holodniy had no rights to assign because the University had superior rights under the Bayh-Dole Act. The District Court agreed with Stanford and held that under the Bayh-Dole Act, Holodniy had no rights to assign to Cetus. The Court of Appeals for the Federal Circuit disagreed, concluding that Holodniy's agreement with Cetus assigned his rights to Cetus, and thus to Roche. It also found that the Bayh-Dole Act did not automatically void an inventor's rights in federally funded inventions. Thus, the Act did not extinguish Roche's ownership interest

131 S. Ct. 2188, *2190; 180 L. Ed. 2d 1, **7;
2011 U.S. LEXIS 4183, ***3; 79 U.S.L.W. 4407

[*2190] in the invention, and Stanford was deprived of standing.

*Held:* The Bayh-Dole Act does not automatically vest title to federally funded inventions in federal contractors or authorize contractors [***4] to unilaterally take title to such inventions. Pp. ___ - ___, *180 L. Ed. 2d, at 11-17.*

(a) Since 1790, patent law has operated on the premise that rights in an invention belong to the inventor. See, *e.g., Gayler v. Wilder, 51 U.S. 477, 10 How. 477, 493, 13 L. Ed. 504.* In most cases, a patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is assignable in law by an instrument in writing--an inventor's assignee. See *United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574.* Absent an agreement to the contrary, an employer does not have rights in an invention "which is the original conception of the employee alone," *id., at 189, 53 S. Ct. 554, 77 L. Ed. 1114;* an inventor must expressly grant those rights to his employer, see *id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114.* Pp. ___ - ___, *180 L. Ed. 2d, at 11-13.*

(b) Stanford and *amicus* United States contend that, when an invention is conceived or first reduced to practice with the support of federal funds, the Bayh-Dole Act vests title to those inventions in the inventor's employer--the federal contractor. Congress has in the past divested inventors of their rights in inventions by providing unambiguously that inventions created pursuant to certain specified federal contracts become the Government's property. Such unambiguous language [***5] is notably absent from the Bayh-Dole Act. Instead, the Act provides that contractors may "elect to retain title to any subject invention," *§ 202(a),* defining a "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement," *§*

*201(e).*

Stanford contends that "invention of the contractor" means all inventions that a contractor's employees make with the aid of federal funds. That reading assumes that Congress subtly set aside two centuries of patent law in a statutory definition. This Court has rejected the idea that mere employment is sufficient to vest title to an employee's invention in the employer. Stanford's reading also renders the phrase "of the contractor" superfluous since the definition already covers inventions made under a funding agreement. Construing the phrase to refer instead to a particular category of inventions conceived or [**8] reduced to practice under a funding agreement--inventions "of the contractor," that is, those owned by or belonging to the contractor--makes the phrase meaningful in the statutory definition. And "invention owned by the contractor" or "invention belonging [***6] to the contractor" are natural readings of the phrase "invention of the contractor."

*Section 202(a),* which states that contractors may "elect to retain title," confirms that the Act does not *vest* title. Stanford reaches the opposite conclusion, but only because it reads "retain" to mean "acquire" and "receive." That is certainly not the common meaning of "retain," which is "to hold or continue to hold in possession or use." You cannot retain something unless you already have it. And *§ 210(a)*--which provides that the Act "take[s] precedence over any other Act which would require a disposition of rights in subject inventions . . . that is inconsistent with" the Act--does not displace the basic principle that an inventor owns the rights to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights does nothing more than clarify the order of priority of rights between the Federal Government and a federal contractor in a federally

131 S. Ct. 2188, *; 180 L. Ed. 2d 1, **8;
2011 U.S. LEXIS 4183, ***6; 79 U.S.L.W. 4407

[*2191] funded invention that already belongs to the contractor.

The Act's isolated provisions dealing with inventors' rights in subject inventions are consistent with the Court's construction [***7] of the Act. See *§ 202(d)*. That construction is also bolstered by the Act's limited procedural protections, which expressly give contractors the right to challenge a Government-imposed impediment to retaining title to a subject invention, *§ 202(b)(4)*, but do not provide similar protection for inventor and third-party rights.

Stanford's contrary construction would permit title to an employee's inventions to vest in the University even if the invention was conceived before the inventor became an employee, so long as the invention's reduction to practice was supported by federal funding. It also suggests that the school would obtain title were even one dollar of federal funding applied toward an invention's conception or reduction to practice. It would be noteworthy enough for Congress to supplant one of the fundamental precepts of patent law and deprive inventors of rights in their own inventions. To do so under such unusual terms would be truly surprising. Had Congress intended such a sea change in intellectual property rights it would have said so clearly--not obliquely through an ambiguous definition of "subject invention" and an idiosyncratic use of the word "retain."

The Court's [***8] construction of the Act is also reflected in the common practice of contractors, who generally obtain assignments from their employees, and of agencies that fund federal contractors, who typically expect those contractors to obtain assignments. With effective assignments, federally funded inventions become "subject inventions" and the Act as a practical matter works pretty much the way Stanford says it should. The only significant difference is that it does so without violence to the basic patent law principle that inventors own their inventions. Pp. ___ - ___, *180 L. Ed. 2d, at 13-17.*

*583 F.3d 832*, affirmed.

**COUNSEL: Donald B. Ayer** argued the cause for petitioner.

**Malcolm L. Stewart** argued the cause for the United States, as amicus curiae, by special leave of court.

**Mark C. Fleming** argued the cause for respondents.

**JUDGES:** Roberts, C. J., delivered the opinion of the Court, in which Scalia, Kennedy, Thomas, Alito, Sotomayor, and Kagan, JJ., joined. Sotomayor, J., filed a concurring opinion. Breyer, J., filed a dissenting opinion, in which Ginsburg, J., joined.

**OPINION BY:** Roberts

131 S. Ct. 2188, *2191; 180 L. Ed. 2d 1, **;
2011 U.S. LEXIS 4183, ***8; 79 U.S.L.W. 4407

## OPINION

[*2192] [**9]  Chief Justice **Roberts** delivered the opinion of the Court.

Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor. The question here is whether the University and Small Business Patent Procedures Act of 1980--commonly referred to as the Bayh-Dole Act--displaces that norm and automatically vests title to federally [***9] funded inventions in federal contractors. We hold that it does not.

I

A

In 1985, a small California research company called Cetus began to develop methods for quantifying blood-borne levels of human immunodeficiency virus (HIV), the virus that causes AIDS. A Nobel Prize winning technique developed at Cetus--polymerase chain reaction, or PCR--was an integral part of these efforts. PCR allows billions of copies of DNA sequences to be made from a small initial blood sample.

In 1988, Cetus began to collaborate with scientists at Stanford University's Department of Infectious Diseases to test the efficacy of new AIDS drugs. Dr. Mark Holodniy joined Stanford as a research fellow in the department around that time. When he did so, he signed a Copyright and Patent Agreement (CPA) stating that he "agree[d] to assign" to Stanford his "right, title and interest in" inventions resulting from his employment at the University. App. to Pet. for Cert. 118a-119a.

At Stanford Holodniy undertook to develop an improved method for quantifying HIV levels in patient blood samples, using PCR. Because Holodniy was largely unfamiliar with PCR, his supervisor arranged for him to conduct research at Cetus. As [***10] a condition

of gaining access to Cetus, Holodniy signed a Visitor's Confidentiality Agreement (VCA). That agreement stated that Holodniy "will assign and do[es] hereby assign" to Cetus his "right, title and interest in each of the ideas, inventions and improvements" made "as a consequence of [his] access" to Cetus. *Id.*, at 122a-124a.

For the next nine months, Holodniy conducted research at Cetus. Working with Cetus employees, Holodniy devised a PCR-based procedure for calculating the amount of HIV in a patient's blood. That technique allowed doctors to determine whether a patient was benefiting from HIV therapy.

Holodniy then returned to Stanford where he and other University employees tested the HIV measurement technique. Over the next few years, Stanford obtained written assignments of rights from the Stanford employees involved in refinement of the technique, including Holodniy, and filed several patent applications related to the procedure. Stanford secured three patents to the HIV measurement process.

In 1991, Roche Molecular Systems, a company that specializes in diagnostic blood screening, acquired Cetus's PCR-related assets, including all rights Cetus had obtained through [**10] agreements [***11] like the VCA signed by Holodniy. After conducting clinical trials on the HIV quantification method developed at Cetus, Roche commercialized the procedure. Today, Roche's HIV test "kits are used in hospitals and AIDS clinics worldwide." Brief for Respondents 10-11.

B

[**LEdHR1] [1] In 1980, Congress passed the Bayh-Dole Act to "promote the utilization of inventions arising from federally supported research," "promote collaboration between commercial concerns and nonprofit organizations,"

[*2193] and "ensure that the Government obtains sufficient rights in federally supported inventions." *35 U.S.C. § 200*. To achieve these aims, the Act allocates rights in federally funded "subject invention[s]" between the Federal Government and federal contractors ("any person, small business firm, or nonprofit organization that is a party to a funding agreement"). *§§ 201(e), (c), 202(a)*. The Act defines "subject invention" as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)*.

[**LEdHR2] [2] The Bayh-Dole Act provides that contractors may "elect to retain title to any subject invention." *§ 202(a)*. To be able to retain title, a contractor must fulfill [***12] a number of obligations imposed by the statute. The contractor must "disclose each subject invention to the [relevant] Federal agency within a reasonable time"; it must "make a written election within two years after disclosure" stating that the contractor opts to retain title to the invention; and the contractor must "file a patent application prior to any statutory bar date." *§§ 202(c)(1)-(3)*. The "Federal Government may receive title" to a subject invention if a contractor fails to comply with any of these obligations. *Ibid.*

[**LEdHR3] [3] The Government has several rights in federally funded subject inventions under the Bayh-Dole Act. The agency that granted the federal funds receives from the contractor "a nonexclusive, nontransferrable, irrevocable, paid-up license to practice . . . [the] subject invention." *§ 202(c)(4)*. The agency also possesses "[m]arch-in rights," which permit the agency to grant a license to a responsible third party under certain circumstances, such as when the contractor fails to take "effective steps to achieve practical application" of the invention. *§ 203*. The Act further provides that when the contractor does not elect to retain title to a subject invention, the Government [***13] "may consider and

after consultation with the contractor grant requests for retention of rights by the inventor." *§ 202(d)*.

Some of Stanford's research related to the HIV measurement technique was funded by the National Institutes of Health (NIH), thereby subjecting the invention to the Bayh-Dole Act. Accordingly, Stanford disclosed the invention, conferred on the Government a nonexclusive, nontransferable, paid-up license to use the patented procedure, and formally notified NIH that it elected to retain title to the invention.

C

In 2005, the Board of Trustees of Stanford University filed suit against Roche Molecular Systems, Inc., Roche Diagnostics Corporation, and Roche Diagnostics Operations, Inc. (collectively Roche), contending that Roche's HIV test kits infringed Stanford's patents. As relevant here, Roche responded by asserting that it was a [**11] co-owner of the HIV quantification procedure, based on Holodniy's assignment of his rights in the Visitor's Confidentiality Agreement. As a result, Roche argued, Stanford lacked standing to sue it for patent infringement. *487 F. Supp. 2d 1099, 1111, 1115 (ND Cal. 2007)*. Stanford claimed that Holodniy had no rights to assign because the University's [***14] HIV research was federally funded, giving the school superior rights in the invention under the Bayh-Dole Act. *Ibid.*[1]

1    Roche submitted a host of other claims to the District Court, including that it had "shop rights" to the patents and was entitled to a license to use the patents. See *583 F.3d 832, 838 (CA Fed. 2009)*. None of those claims is now before us; we deal only with Roche's claim to co-ownership to rebut Stanford's standing to bring an infringement action.

[*2194] The District Court held that the "VCA effectively assigned any rights that Holodniy had in the patented invention to Cetus," and thus to Roche. *Id., at 1117.* But because of the operation of the Bayh-Dole Act, "Holodniy had no interest to assign." *Id., at 1117, 1119.* The court concluded that the Bayh-Dole Act "provides that the individual inventor may obtain title" to a federally funded invention "only after the government and the contracting party have declined to do so." *Id., at 1118.*

The Court of Appeals for the Federal Circuit disagreed. First, the court concluded that Holodniy's initial agreement with Stanford in the Copyright and Patent Agreement constituted a mere promise to assign rights in the future, unlike Holodniy's [***15] agreement with Cetus in the Visitor's Confidentiality Agreement, which itself assigned Holodniy's rights in the invention to Cetus. See *583 F.3d 832, 841-842 (2009).* Therefore, as a matter of contract law, Cetus obtained Holodniy's rights in the HIV quantification technique through the VCA.[2] Next, the court explained that the Bayh-Dole Act "does not automatically void ab initio the inventors' rights in government-funded inventions" and that the "statutory scheme did not automatically void the patent rights that Cetus received from Holodniy." *Id., at 844-845.* The court held that "Roche possesse[d] an ownership interest in the patents-in-suit" that was not extinguished by the Bayh-Dole Act, "depriv[ing] Stanford of standing." *Id., at 836-837.* The Court of Appeals then remanded the case with instructions to dismiss Stanford's infringement claim. *Id., at 849.*

2   Because the Federal Circuit's interpretation of the relevant assignment agreements is not an issue on which we granted certiorari, we have no occasion to pass on the validity of the lower court's construction of those agreements.

We granted certiorari. *562 U.S. ___, 131 S. Ct. 502, 178 L. Ed. 2d 368 (2010).*

II

A

[**LEdHR4] [4] Congress has the authority "[t]o promote the Progress of [***16] Science and useful Arts, by securing . . . to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *U.S. Const. Art. I, § 8, cl. 8.* The first Congress put that power to use by enacting the Patent Act of 1790. That Act provided "[t]hat upon the petition of any person or persons . . . setting forth, that he, she, or they, hath or have invented or discovered" an invention, a patent could be granted to "such petitioner or petitioners" or "their heirs, administrators [**12] or assigns." Act of Apr. 10, 1790, § 1, 1 Stat. 109-110. Under that law, the first patent was granted in 1790 to Samuel Hopkins, who had devised an improved method for making potash, America's first industrial chemical. *U.S. Patent No. 1* (issued July 31, 1790).[3]

3   The patent was signed by President George Washington, Secretary of State Thomas Jefferson, and Attorney General Edmund Randolph. See Maxey, Samuel Hopkins, The Holder of the First U. S. Patent: A Study of Failure, 122 Pa. Magazine of Hist. and Biography 6 (1998).

Although much in intellectual property law has changed in the 220 years since the first Patent Act, the basic idea that inventors have the right to patent their inventions [***17] has not. Under the law in its current form, " [**LEdHR5] [5] [w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefor." *35 U.S.C. § 101.* [**LEdHR6] [6] The inventor must attest that "he believes himself to be the original and first inventor of the [invention] for which he solicits a patent." *§ 115.* In most cases, a

131 S. Ct. 2188, *2195; 180 L. Ed. 2d 1, **LEdHR6;
2011 U.S. LEXIS 4183, ***17; 79 U.S.L.W. 4407

[*2195] patent may be issued only to an applying inventor, or--because an inventor's interest in his invention is "assignable in law by an instrument in writing"--an inventor's assignee. *§§ 151, 152, 261.*

[**LEdHR7] [7] Our precedents confirm the general rule that rights in an invention belong to the inventor. See, *e.g.,Gayler v. Wilder, 51 U.S. 477, 10 How. 477, 493, 13 L. Ed. 504 (1851)* ("the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires"); *Solomons v. United States, 137 U.S. 342, 346, 11 S. Ct. 88, 34 L. Ed. 667, 26 Ct. Cl. 620, 1891 Dec. Comm'r Pat. 267 (1890)* ("whatever invention [an inventor] may thus conceive and perfect is his individual property"); *United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574 (1933)* (an inventor owns "the product of [his] original thought"). The treatises [***18] are to the same effect. See, *e.g.,* 8 *Chisum on Patents §* 22.01, p. 22-2 (2011) ("The presumptive owner of the property right in a patentable invention is the single human inventor").

It is equally well established that an inventor can assign his rights in an invention to a third party. See *Dubilier Condenser Corp., supra, at 187, 53 S. Ct. 554, 77 L. Ed. 1114* ("A patent is property and title to it can pass only by assignment"); 8 *Chisum on Patents, supra, § 22.01, at 22-2* ("The inventor . . . [may] transfer ownership interests by written assignment to anyone"). Thus, although others may acquire an interest in an invention, any such interest--as a general rule--must trace back to the inventor.

In accordance with these principles, we have recognized that [**LEdHR8] [8] unless there is an agreement to the contrary, an employer does not have rights in an invention "which is the original conception of the employee alone." *Dubilier Condenser Corp., 289 U.S. at 189, 53 S. Ct. 554, 77 L. Ed. 1114.* Such an invention "remains the property of him who conceived it." *Ibid.* In most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights. See *id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114* ("The respective rights and obligations [***19] of employer and employee, touching an invention conceived by the latter, spring from the contract of employment").

[**13] B

Stanford and the United States as *amicus curiae* contend that the Bayh-Dole Act reorders the normal priority of rights in an invention when the invention is conceived or first reduced to practice with the support of federal funds. In their view, the Act moves inventors from the front of the line to the back by vesting title to federally funded inventions in the inventor's employer--the federal contractor. See Brief for Petitioner 26-27; Brief for United States as *Amicus Curiae* 6.

Congress has in the past divested inventors of their rights in inventions by providing unambiguously that inventions created pursuant to specified federal contracts become the property of the United States. For example, with respect to certain contracts dealing with nuclear material and atomic energy, Congress provided that title to such inventions "shall be vested in, and be the property of, the [Atomic Energy] Commission." *42 U.S.C. § 2182.* Congress has also enacted laws requiring that title to certain inventions made pursuant to contracts with the National Aeronautics and Space Administration [***20] "shall be the exclusive property of the United States," Pub. L. 111-314, § 3, 124 Stat. 3339, *51 U.S.C. § 20135(b)(1),* and that title to certain inventions under contracts with the Department of Energy "shall vest in the United States." *42 U.S.C. § 5908.*

[*2196] Such language is notably absent from the Bayh-Dole Act. [**LEdHR9] [9] Nowhere in the Act is title expressly vested in contractors or anyone else; nowhere in the Act are inventors expressly deprived of their interest in federally funded inventions. Instead, the Act provides that contractors may "elect to retain title to any subject invention." *35 U.S.C. § 202(a)*. A "subject invention" is defined as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)*.

Stanford asserts that the phrase "invention of the contractor" in this provision "is naturally read to include all inventions made by the contractor's employees with the aid of federal funding." Brief for Petitioner 32 (footnote omitted). That reading assumes that Congress subtly set aside two centuries of patent law in a statutory definition. It also renders the phrase "of the contractor" superfluous. If the phrase [***21] "of the contractor" were deleted from the definition of "subject invention," the definition would cover "any invention . . . conceived or first actually reduced to practice in the performance of work under a funding agreement." Reading "of the contractor" to mean "all inventions made by the contractor's employees with the aid of federal funding," as Stanford would, adds nothing that is not already in the definition, since the definition already covers inventions made under the funding agreement. That is contrary to our [**LEdHR10] [10] general "reluctan[ce] to treat statutory terms as surplusage." *Duncan v. Walker, 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)* (internal quotation marks omitted).

Construing the phrase to refer instead to a particular category of inventions conceived or reduced to practice under a funding agreement--inventions "of the contractor," that is, those owned by or belonging to the contractor--makes the phrase meaningful in the statutory definition. And "invention owned by the contractor" or

"invention belonging to the contractor" are natural readings of the [**14] phrase "invention of the contractor." As we have explained, "[t]he use of the word 'of' denotes ownership." *Poe v. Seaborn, 282 U.S. 101, 109, 51 S. Ct. 58, 75 L. Ed. 239, 1930-2 C.B. 202 (1930)*; [***22] see *Flores-Figueroa v. United States, 556 U.S. 646, ___, ___, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009)* (treating the phrase "identification [papers] of another person" as meaning such items belonging to another person (internal quotation marks omitted)); *Ellis v. United States, 206 U.S. 246, 259, 27 S. Ct. 600, 51 L. Ed. 1047, 5 Ohio L. Rep. 427 (1907)* (interpreting the phrase "works of the United States" to mean "works belonging to the United States" (internal quotation marks omitted)).

That reading follows from a common definition of the word "of." See Webster's Third New International Dictionary 1565 (2002) ("of" can be "used as a function word indicating a possessive relationship"); New Oxford American Dictionary 1180 (2d ed. 2005) (defining "of" as "indicating an association between two entities, typically one of belonging"); Webster's New Twentieth Century Dictionary 1241 (2d ed. 1979) (defining "of" as "belonging to").

Stanford's reading of the phrase "invention of the contractor" to mean "all inventions made by the contractor's employees" is plausible enough in the abstract; it is often the case that whatever an employee produces in the course of his employment belongs to his employer. No one would claim that an autoworker who builds a car [***23] while working in a factory owns that car. But, as noted, patent law has always been different: We have rejected the idea that mere employment is sufficient to vest title to an employee's invention in the employer. Against this background, a contractor's invention--an "invention of the contractor"--does

[*2197] not automatically include inventions made by the contractor's employees.[4]

> 4   The dissent suggests that "we could interpret the Bayh-Dole Act as ordinarily assuming, and thereby ordinarily requiring, an assignment of patent rights by the federally funded employee to the federally funded employer." *Post, at ___, 180 L. Ed. 2d, at 21.* That suggestion is based in large part on [**LEdHR11] [11] Executive Order 10096, which "governs Federal Government employee-to-employer patent right assignments." *Post, at ___, 180 L. Ed. 2d, at 22.* Lest there be any doubt, employees of nonfederal entities that have federal funding contracts--like Holodniy--are *not* federal employees. And there is no equivalent executive order governing invention rights with respect to federally funded research; that issue is of course addressed by the Bayh-Dole Act.

[**LEdHR12] [12] The Bayh-Dole Act's provision stating that contractors may "elect to *retain* title" confirms that the Act does not *vest* [***24] title. *35 U.S.C. § 202(a)* (emphasis added). Stanford reaches the opposite conclusion, but only because it reads "retain" to mean "acquire" and "receive." Brief for Petitioner 36 (internal quotation marks omitted). That is certainly not the common meaning of "retain." "[R]etain" means "to hold or continue to hold in possession or use." Webster's Third, *supra*, at 1938; see Webster's New Collegiate Dictionary 980 (1980) ("to keep in possession or use"); American Heritage Dictionary 1109 (1969) ("[t]o keep or hold in one's possession"). You cannot retain something unless you already have it. See *Alaska v. United States, 545 U.S. 75, 104, 125 S. Ct. 2137, 162 L. Ed. 2d 57 (2005)* (interpreting the phrase "the United States shall retain title to all property" to mean that "[t]he United States . . . retained title to *its* property located within Alaska's borders") (emphasis added). The Bayh-Dole Act does not confer title to federally funded inventions on contractors or authorize contractors [**15] to unilaterally take title to those inventions; it simply assures contractors

that they may keep title to whatever it is they already have. Such a provision makes sense in a statute specifying the respective rights and responsibilities of [***25] federal contractors and the Government.

[**LEdHR13] [13] The Bayh-Dole Act states that it "take[s] precedence over any other Act which would require a disposition of rights in subject inventions . . . that is inconsistent with" the Act. *35 U.S.C. § 210(a).* The United States as *amicus curiae* argues that this provision operates to displace the basic principle, codified in the Patent Act, that an inventor owns the rights to his invention. See Brief for United States 21. But because the Bayh-Dole Act, including *§ 210(a)*, applies only to "subject inventions"--"inventions of the contractor"--it does not displace an inventor's antecedent title to his invention. Only when an invention belongs to the contractor does the Bayh-Dole Act come into play. The Act's disposition of rights--like much of the rest of the Bayh-Dole Act--serves to clarify the order of priority of rights between the Federal Government and a federal contractor in a federally funded invention that already belongs to the contractor. Nothing more.[5]

> 5   [**LEdHR14] [14] Far from superseding the Patent Act in such a backhanded way, it is clear that *§ 210(a)*'s concern is far narrower. That provision specifies 21 different statutory provisions that the Bayh-Dole [***26] Act "take[s] precedence over," the vast majority of which deal with the division of ownership in certain inventions between a contractor and the Government. *35 U.S.C. §§ 210(a)(1)-(21)*; see, *e.g., §§ 210(a)(19)-(20)* (the Bayh-Dole Act takes precedence over "*section 6(b)* of the Solar Photovoltaic Energy Research Development and Demonstration Act" and "*section 12* of the Native Latex Commercialization and Economic Development Act").

The isolated provisions of the Bayh-Dole Act dealing with inventors' rights in

[*2198] subject inventions are consistent with our construction of the Act. [**LEdHR15] [15] Under the Act, a federal agency may "grant requests for retention of rights by the inventor . . . [i]f a contractor does not elect to retain title to a subject invention." § 202(d). If an employee inventor never had title to his invention because title vested in the contractor by operation of law--as Stanford submits--it would be odd to allow the Government to grant "requests for retention of rights by the inventor." By using the word "retention," § 202(d) assumes that the inventor had rights in the subject invention at some point, undermining the notion that the Act automatically vests title to federally funded [***27] inventions in federal contractors.[6]

> 6   Stanford contends that it cannot be the case "that the contractor can only 'retain title' to an invention that it already owns, while an inventor may be considered for 'retention' of title only when he has assigned title away." Reply Brief for Petitioner 8. That argument has some force. But there may be situations where an inventor, by the terms of an assignment, has subsidiary rights in an invention to which a contractor has title, as § 202(d) suggests. Compare § 202(d) ("retention of *rights*") with § 202(a) ("retain *title*") (emphasis added). And at the end of the day, it is Stanford's contention that "retain" must be "read as a synonym for 'acquire' or 'receive' " that dooms its argument on this point. Brief for Petitioner 37.

The limited scope of the Act's procedural protections also bolsters our conclusion. [**LEdHR16] [16] The Bayh-Dole Act expressly confers on contractors the right to challenge a Government-imposed impediment to retaining title to a subject invention. § 202(b)(4). As [**16] Roche correctly notes, however, "the Act contains not a single procedural protection for third parties that have neither sought nor received federal funds," such as cooperating [***28] private research

institutions. Brief for Respondents 29. Nor does the Bayh-Dole Act allow inventors employed by federal contractors to contest their employer's claim to a subject invention. The Act, for example, does not expressly permit an interested third party or an inventor to challenge a claim that a particular invention was supported by federal funding. In a world in which there is frequent collaboration between private entities, inventors, and federal contractors, see Brief for Pharmaceutical Research and Manufacturers of America as *Amicus Curiae* 22-23, that absence would be deeply troubling. But the lack of procedures protecting inventor and third-party rights makes perfect sense if the Act applies only when a federal contractor has already acquired title to an inventor's interest. In that case, there is no need to protect inventor or third-party rights, because the only rights at issue are those of the contractor and the Government.

[**LEdHR17] [17] The Bayh-Dole Act applies to subject inventions "conceived *or* first actually reduced to practice in the performance of work" "funded in whole *or in part* by the Federal Government." *35 U.S.C. §§ 201(e), 201(b)* (emphasis added). Under Stanford's construction [***29] of the Act, title to one of its employee's inventions could vest in the University even if the invention was conceived before the inventor became a University employee, so long as the invention's reduction to practice was supported by federal funding. What is more, Stanford's reading suggests that the school would obtain title to one of its employee's inventions even if only one dollar of federal funding was applied toward the invention's conception or reduction to practice.

It would be noteworthy enough for Congress to supplant one of the fundamental precepts of patent law and deprive inventors of rights in their own inventions. To do so under such unusual terms would be truly surprising. We are confident that if

131 S. Ct. 2188, *2199; 180 L. Ed. 2d 1, **LEdHR17;
2011 U.S. LEXIS 4183, ***29; 79 U.S.L.W. 4407

[*2199] Congress had intended such a sea change in intellectual property rights it would have said so clearly--not obliquely through an ambiguous definition of "subject invention" and an idiosyncratic use of the word "retain." Cf. *Whitman v. American Trucking Assns., Inc., 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001)* ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions").

Though unnecessary to our conclusion, it is worth noting that our [***30] construction of the Bayh-Dole Act is reflected in the common practice among parties operating under the Act. Contractors generally institute policies to obtain assignments from their employees. See Brief for Respondents 34; Brief for Pharmaceutical Research and Manufacturers of America as *Amicus Curiae* 13-18. Agencies that grant funds to federal contractors typically expect those contractors to obtain assignments. So it is with NIH, the agency that granted the federal funds at issue in this case. In guidance documents made available to contractors, NIH has made clear that "[b]y law, an inventor has initial ownership of an invention " and that contractors should therefore "have in place employee agreements requiring an inventor to 'assign' or give ownership of an invention to the organization [**17] upon acceptance of Federal funds." NIH Policies, Procedures, and Forms, A "20-20" View of Invention Reporting to the National Institutes of Health (Sept. 22, 1995). Such guidance would be unnecessary if Stanford's reading of the statute were correct.

Stanford contends that reading the Bayh-Dole Act as not vesting title to federally funded inventions in federal contractors "fundamentally undermin[es]" [***31] the Act's framework and severely threatens its continued "successful application." Brief for Petitioner 45. We do not agree. As just noted, universities typically enter into agreements with their employees requiring the assignment to the university of rights in inventions. With an effective assignment, those inventions--if federally funded--become "subject inventions" under the Act, and the statute as a practical matter works pretty much the way Stanford says it should. The only significant difference is that it does so without violence to the basic principle of patent law that inventors own their inventions.

The judgment of the Court of Appeals for the Federal Circuit is affirmed.

It is so ordered.

**CONCUR BY:** Sotomayor

**CONCUR**

Justice **Sotomayor**, concurring.

I agree with the Court's resolution of this case and with its reasoning. I write separately to note that I share Justice Breyer's concerns as to the principles adopted by the Court of Appeals for the Federal Circuit in *FilmTec Corp. v. Allied-Signal, Inc., 939 F.2d 1568 (1991)*, and the application of those principles to agreements that implicate the Bayh-Dole Act. See *post,* at ___ - ___, *180 L. Ed. 2d,* at 20-22 (dissenting opinion). Because Stanford failed to challenge the decision [***32] below on these grounds, I agree that the appropriate disposition is to affirm. Like the dissent, however, I understand the majority opinion to permit consideration of these arguments in a future case. See *ante,* at ___, n. 2, *180 L. Ed. 2d,* at 11.

**DISSENT BY:** Breyer; Ginsburg

**DISSENT**

Justice **Breyer**, with whom Justice **Ginsburg** joins, dissenting.

The question presented in this case is:

> "Whether a federal contractor university's statutory right under the Bayh-Dole Act, *35 U.S.C. §§ 200-212,* in inventions arising from federally funded research can be terminated unilaterally by an individual inventor through a separate agreement purporting to assign [*2200] the inventor's rights to a third party." Brief for Petitioner i.

In my view, the answer to this question is likely no. But because that answer turns on matters that have not been fully briefed (and are not resolved by the opinion of the Court), I would return this case to the Federal Circuit for further argument.

I

The Bayh-Dole Act creates a three-tier system for patent rights ownership applicable to federally funded research conducted by nonprofit organizations, such as universities, and small businesses. It sets forth conditions that mean (1) the funded firm; (2) failing that, the United States Government; [***33] and (3) failing that, the employee who made the invention, will likely obtain (or retain) any resulting [**18] patent rights (normally in that just-listed order). *35 U.S.C. §§ 202-203*. The statute applies to "subject invention[s]" defined as "any *invention of the contractor* conceived or first actually reduced to practice in the performance of work under a funding agreement." *§ 201(e)* (emphasis added). Since the "contractor" (*e.g.*, a university or small business) is unlikely to "conceiv[e]" of an idea or "reduc[e]" it "to practice" *other than* through its employees, the term "invention of the contractor" must refer to the work and ideas of those employees. We all agree that the term covers those employee inventions that the employee properly assigns to the contractor, *i.e.*, his or her employer. But does the term "subject invention" also include inventions that the employee fails to assign properly?

II

Congress enacted this statute against a background norm that often, but not always, denies individual inventors patent rights growing out of research for which the public has already paid. This legal norm reflects the fact that patents themselves have both benefits and costs. Patents, for example, [***34] help to elicit useful inventions and research and to assure public disclosure of technological advances. See, *e.g.*, *Mazer v. Stein, 347 U.S. 201, 219, 74 S. Ct. 460, 98 L. Ed. 630, 1954 Dec. Comm'r Pat. 308 (1954)*; *Bilski v. Kappos, 561 U.S. ___, ___, 130 S. Ct. 3218, 177 L. Ed. 2d 792 (2010)*; *id., at ___, 130 S. Ct. 3218, 177 L. Ed. 2d 792* (Stevens, J., concurring in judgment). But patents sometimes mean unnecessarily high prices or restricted dissemination; and they sometimes discourage further innovation and competition by requiring costly searches for earlier, related patents or by tying up ideas, which, were they free, would more effectively spur research and development. See, *e.g.*, *Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 548 U.S. 124, 128, 126 S. Ct. 2921, 165 L. Ed. 2d 399 (2006)* (Breyer, J., dissenting from dismissal of certiorari as improvidently granted); Heller & Eisenberg, Can Patents Deter Innovation? The Anticommons in Biomedical Research, 280 Science 698 (1998).

Thus, Thomas Jefferson wrote of "the difficulty of drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not." Letter to Isaac McPherson (Aug. 13, 1813), in 6 Writings of Thomas Jefferson 181 (H. Washington ed. 1854). And James Madison [***35] favored the patent monopoly because it amounted to "compensation for" a community "benefit." Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments., in J. Madison, Writings 756 (J. Rakove ed. 1999).

The importance of assuring this community "benefit" is reflected in legal rules that may deny or limit the award of patent rights where the public has already paid to produce an invention, lest the public bear the potential costs of patent protection [*2201] where there is no offsetting need for such protection to elicit that invention. Why should the public have to pay twice for the same invention?

Legal rules of this kind include an Executive Order that ordinarily gives to the Government "the entire right, title and interest" to inventions made by Government employees who "conduct or perform research, development work, or both." *37 CFR § 501.6 (2010)* (codifying, as amended, Exec. Order 10096, 3 CFR 292 (1949-1953 Comp.)). See also *Heinemann v.* [**19] *United States, 796 F.2d 451, 455-456 (CA Fed. 1986)* (holding Executive Order constitutional and finding "no 'taking' because the invention was not the property of Heinemann"). They also include statutes, which, in specific research areas, give [***36] the Government title to inventions made pursuant to Government contracts. See Atomic Energy Act of 1954, § 152, 68 Stat. 944 (codified as amended at *42 U.S.C. § 2182*); National Aeronautics and Space Act of 1958, § 305, 72 Stat. 435 (codified at *42 U.S.C. § 2457*), repealed by § 6, 124 Stat. 3444; Federal Nonnuclear Energy Research and Development Act of 1974, § 9, 88 Stat. 1887 (codified as amended at *42 U.S.C. § 5908(a)*). And they have included Government regulations, established prior to the Bayh-Dole Act's enactment, that work in roughly similar ways. See, *e.g.*, *45 CFR § 650.4(b) (1977)* (National Science Foundation regulations providing that Foundation would "determine the disposition of the invention [made under the grant] and title to and rights

under any patent application"); §§ 8.1(a), 8.2(d) (Department of Health, Education, and Welfare regulations providing that inventions made under department grants "shall be subject to determination" by the agency and that the department may "require that all domestic rights in the invention shall be assigned to the United States").

These legal rules provide the basic background against which Congress passed the Bayh-Dole Act. And the Act's [***37] provisions reflect a related effort to assure that rights to inventions arising out of research for which the public has paid are distributed and used in ways that further specific important public interests. I agree with the majority that the Act does not simply take the individual inventors' rights and grant them to the Government. Rather, it assumes that the federal funds' recipient, say a university or small business, will possess those rights. The Act leaves those rights in the hands of that recipient, not because it seeks to make the public pay twice for the same invention, but for a special public policy reason. In doing so, it seeks to encourage those institutions *to commercialize* inventions that otherwise might not realize their potentially beneficial public use. *35 U.S.C. § 200*. The Act helps assure that commercialization (while "promot[ing] free competition" and "protect[ing] the public," *ibid.*) by imposing a set of conditions upon the federal funds recipient, by providing that sometimes the Government will take direct control of the patent rights, and by adding that on occasion the Government will permit the individual inventor to retain those rights. *§§ 202-203*.

Given this [***38] basic statutory objective, I cannot so easily accept the majority's conclusion--that the individual inventor can lawfully assign an invention (produced by public funds) to a third party, thereby taking that invention out from under the Bayh-Dole Act's restrictions, conditions, and allocation rules. That conclusion, in my view, is inconsistent with the Act's basic purposes. It may significantly undercut the Act's ability to achieve its objectives. It allows individual inventors, for whose invention the public has paid, to avoid the Act's corresponding restrictions and conditions. And it makes the commercialization [*2202] and marketing of such an invention more difficult: A potential purchaser of rights from the contractor, say a university, will not know if the university itself possesses the patent right in [**20] question or whether, as here, the individual, inadvertently or deliberately, has previously assigned the title to a third party.

Moreover, I do not agree that the language to which the majority points--the words "invention of the contractor" and "retain"--requires its result. As the majority concedes, Stanford's alternative reading of the phrase " 'invention of the contractor' " is [***39] "plausible enough in the abstract." *Ante, at ___, 180 L. Ed. 2d, at 14*. Nor do I agree that the Act's lack of an explicit provision for "an interested third party" to claim that an invention was not the result of federal funding "bolsters" the majority's interpretation. *Ante, at ___, 180 L. Ed. 2d, at 15*. In any event, universities and businesses have worked out ways to protect the various participants to research. See Brief for Association of American Universities et al. as *Amici Curiae* 22-24 (hereinafter AAU Brief); App. 118-124 (Materials Transfer Agreement between Cetus and Stanford University).

Ultimately, the majority rejects Stanford's reading (and the Government's reading) of the Act because it believes that it is inconsistent with certain background norms of patent law, norms that ordinarily provide an individual inventor with full patent rights. *Ante, at ___, 180 L. Ed. 2d, at 14*. But in my view, the competing norms governing rights in inventions for which the public has already paid, along with the Bayh-Dole Act's objectives, suggest a different result.

### III

There are two different legal routes to what I consider an interpretation more consistent with the statute's objectives. First, we could set aside the Federal Circuit's interpretation of [***40] the licensing agreements and its related licensing doctrine. That doctrine governs interpretation of licensing agreements made *before* an invention is conceived or reduced to practice. Here, there are two such agreements. In the earlier agreement--that between Dr. Holodniy and Stanford University--Dr. Holodniy said, "I *agree to assign* . . . to Stanford . . . that right, title and interest in and to . . . such inventions as required by Contracts and Grants." App. to Pet. for Cert. 119a (emphasis added). In the later agreement--that between Dr. Holodniy and the private research firm Cetus--Dr. Holodniy said, "I will assign and *do hereby assign* to Cetus, my right, title, and interest in" here relevant "ideas" and "inventions." *Id.,* at 123a (emphasis added; capitalization omitted).

The Federal Circuit held that the earlier Stanford

agreement's use of the words "agree to assign," when compared with the later Cetus agreement's use of the words "do hereby assign," made all the difference. It concluded that, once the invention came into existence, the latter words meant that the Cetus agreement trumped the earlier, Stanford agreement. *583 F.3d 832, 841-842 (CA Fed. 2009)*. That, in the [***41] Circuit's view, is because the latter words operated upon the invention automatically, while the former did not. Quoting its 1991 opinion in *FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1572, the Circuit declared that " '[o]nce the invention is made and [the] application for [a] patent is filed, . . . legal title to the rights accruing thereunder would be in the assignee [*i.e.*, Cetus] . . . , and the assignor-inventor would have nothing remaining to assign.' *583 F.3d, at 842*.

[**21] Given what seem only slight linguistic differences in the contractual language, this reasoning seems to make too much of [*2203] too little. Dr. Holodniy executed his agreement with Stanford in 1988. At that time, patent law appears to have long specified that a present assignment of future inventions (as in both contracts here) conveyed equitable, but not legal, title. See, *e.g.*, G. Curtis, A Treatise on the Law of Patents for Useful Inventions § 170, p. 155 (3d ed. 1867) ("A contract to convey a future invention . . . cannot alone authorize a patent to be taken by the party in whose favor such a contract was intended to operate"); Comment, Contract Rights as Commercial Security: Present and Future Intangibles, 67 Yale L. J. 847, 854, n. 27 (1958) [***42] ("The rule generally applicable grants equitable enforcement to an assignment of an expectancy but demands a further act, either reduction to possession or further assignment of the right when it comes into existence").

Under this rule, both the initial Stanford and later Cetus agreements would have given rise only to equitable interests in Dr. Holodniy's invention. And as between these two claims in equity, the facts that Stanford's contract came first and that Stanford subsequently obtained a postinvention assignment as well should have meant that Stanford, not Cetus, would receive the rights its contract conveyed.

In 1991, however, the Federal Circuit, in *FilmTec*, adopted the new rule quoted above--a rule that distinguishes between these equitable claims and, in effect, says that Cetus must win. The Federal Circuit

provided no explanation for what seems a significant change in the law. See *939 F.2d, at 1572*. Nor did it give any explanation for that change in its opinion in this case. See *583 F.3d, at 841-842*. The Federal Circuit's *FilmTec* rule undercuts the objectives of the Bayh-Dole Act. While the cognoscenti may be able to meet the *FilmTec* rule in future contracts simply by copying [***43] the precise words blessed by the Federal Circuit, the rule nonetheless remains a technical drafting trap for the unwary. See AAU Brief 35-36. But cf. *ante, at ___, 180 L. Ed. 2d, at 17* (assuming ease of obtaining effective assignments). It is unclear to me why, where the Bayh-Dole Act is at issue, we should prefer the Federal Circuit's *FilmTec* rule to the rule, of apparently much longer vintage, that would treat both agreements in this case as creating merely equitable rights.

At the same time, the Federal Circuit's reasoning brings about an interpretation contrary to the intention of the parties to the earlier, Stanford, contract. See App. to Pet. for Cert. 120a (provision in Stanford contract promising that Dr. Holodniy "will not enter into any agreement creating copyright or patent obligations in conflict with this agreement"). And it runs counter to what may well have been the drafters' reasonable expectations of how courts would interpret the relevant language.

Second, we could interpret the Bayh-Dole Act as ordinarily assuming, and thereby ordinarily requiring, an assignment of patent rights by the federally funded employee to the federally funded employer. I concede that this interpretation would treat [***44] federally funded employees of contractors (subject to the Act) differently than the law ordinarily treats private sector employees. The Court long ago described the latter, private sector principles. In *United States v. Dubilier* [**22] *Condenser Corp., 289 U.S. 178, 53 S. Ct. 554, 77 L. Ed. 1114, 1933 Dec. Comm'r Pat. 574 (1933)*, the Court explained that a "patent is property, and title to it can pass only by assignment." *Id., at 187, 53 S. Ct. 554, 77 L. Ed. 1114*. It then described two categories of private sector employee-to-employer assignments as follows: First, a person who is

"employed to make an invention, who succeeds, during his term of service, in [*2204] accomplishing that task, is bound

to assign to his employer any patent obtained." *Ibid.*

But, second,

"if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent." *Ibid.*

The Court added that, because of "the peculiar nature of the act of invention," courts are "reluctan[t] . . . to imply or infer an agreement by the employee to assign his patent." *Id., at 188, 53 S. Ct. 554, 77 L. Ed. 1114.* And it applied these same principles governing assignment to inventions made [***45] by employees of the United States. *Id., at 189-190, 53 S. Ct. 554, 77 L. Ed. 1114.*

Subsequently, however, the President promulgated Executive Order 10096. Courts have since found that this Executive Order, not *Dubilier,* governs Federal Government employee-to-employer patent right assignments. See, *e.g., Kaplan v. Corcoran, 545 F.2d 1073, 1076-1077 (CA7 1976); Heinemann, 796 F.2d, at 455-456; Wright v. United States, 164 F.3d 267, 269 (CA5 1999); Halas v. United States, 28 Fed. Cl. 354, 364 (1993).* The Bayh-Dole Act seeks objectives roughly analogous to the objectives of the Executive Order. At least one agency has promulgated regulations that require Bayh-Dole contractors to insist upon similar assignments. See NIH Policies, Procedures, and Forms, A "20-20" View of Invention Reporting to the National Institutes of Health (Sept. 22, 1995) (available in the Clerk of Court's case file) (requiring a Government contractor, such as Stanford University, to "have in place employee agreements requiring an inventor to 'assign' or give ownership of an invention to the organization upon acceptance of Federal funds," as the Bayh-Dole Act "require[s]"). And an *amicus* brief, filed by major associations of universities, scientists, [***46] medical researchers, and others, argues that we should interpret the rules governing assignments of the employees at issue here (and consequently the Act's reference to "inventions of the contractor") in a similar way. AAU Brief 5-14.

The District Court in this case adopted roughly this approach. *487 F. Supp. 2d 1099, 1118 (ND Cal. 2007)* ("[A]lthough title still vests in the named inventor, the inventor remains under a legal obligation to assign his interest either to the government or the nonprofit contractor unless the inventor acts within the statutory framework to retain title"). And since a university often enters into a grant agreement with the Government for a researcher's benefit and at his request, see J. Hall, Grant Management 205 (2010), implying such a presumption in favor of compliance with the grant agreement, and thus with the Bayh-Dole Act, would ordinarily be equitable.

IV

As I have suggested, these views are [**23] tentative. That is because the parties have not fully argued these matters (though one *amicus* brief raises the license interpretation question, see Brief for Alexander M. Shukh as *Amicus Curiae* 18-24, and at least one other can be read as supporting something like [***47] the equitable presumption I have described, see AAU Brief 5-14). Cf. *ante, at ___, n. 2, 180 L. Ed. 2d, at 11.* While I do not understand the majority to have foreclosed a similarly situated party from raising these matters in a future case, see *ibid.,* I believe them relevant to our efforts to answer the question presented here. Consequently, I would vacate the judgment of the Federal Circuit and remand this case to provide the parties with an [*2205] opportunity to argue these, or related, matters more fully.

Because the Court decides otherwise, with respect, I dissent.

## REFERENCES

*35 U.S.C.S. §§201, 202*

8 *Chisum on Patents §§22.02, 22.03* (Matthew Bender)

L Ed Digest, Patents § 87

L Ed Index, Patents

Patent infringement under *35 U.S.C.S. § 271*--Supreme Court cases. *162 L. Ed. 2d 977.*

Supreme Court's construction and application of provision in Federal Constitution's Art. I, § 8, cl. 3, authorizing Congress to provide "for limited Times" copyright and patent protection. *154 L. Ed. 2d 1185.*

131 S. Ct. 2188, *2205; 180 L. Ed. 2d 1, **23;
2011 U.S. LEXIS 4183, ***47; 79 U.S.L.W. 4407

Supreme Court's views as to what is patentable subject matter under federal law as "process," "machine," "manufacture," or "composition of matter." *65 L. Ed. 2d 1197.*



**BODUM USA, INC., Plaintiff-Appellant, v. LA CAFETIERE, INC.,
Defendant-Appellee.**

**No. 09-1892**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*621 F.3d 624; 2010 U.S. App. LEXIS 18374; 96 U.S.P.Q.2D (BNA) 1689*

**September 11, 2009, Argued
September 2, 2010, Decided**

**PRIOR HISTORY:** [**1]
    Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 07 C 6302--Matthew F. Kennelly, Judge.
*Bodum United States, Inc. v. La Cafetiere, Inc., 2009 U.S. Dist. LEXIS 25555 (N.D. Ill., Mar. 24, 2009)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed an action contending that the sale of any coffee maker similar to a design violated plaintiff's common-law trade dress. Defendant contended that an agreement permitted it to sell the design anywhere in the world, except France, provided that it did not use certain marks. The United States District Court for the Northern District of Illinois, Eastern Division, granted summary judgment in defendant's favor. Plaintiff appealed.

**OVERVIEW:** Plaintiff contended that, under French law, the parties' intent prevailed over the written word. Because objective, English-language descriptions of French law were readily available, the court preferred them to the parties' declarations, under *Fed. R. Civ. P. 44.1*. The value of the dispute between plaintiff and defendant exceeded 5,000 francs, so what the negotiators said to each other was irrelevant under Code civil [C. civ.] art. 1156 (Fr.). The court found that the final version of the agreement allowed defendant to sell the design anywhere except France--provided that it did not use the

marks and did not use certain supply channels for four years. The agreement was clear and precise as it stood, and the negotiating history showed that it meant what it said. Plaintiff insisted that, if the agreement meant what the court concluded it meant, then the agreement was invalid as a "naked license" of a trademark. But plaintiff did not sell a naked trademark to defendant. People were free to use contracts to allocate rights to products' designs.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Interpretation > Intent*
[HN1] Code civil [C. civ.] art. 1156 (Fr.) provides: One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms.

*Evidence > Judicial Notice > Laws of Foreign States*
*Evidence > Testimony > Experts > General Overview*
[HN2] Although *Fed. R. Civ. P. 44.1* provides that courts may consider expert testimony when deciding questions of foreign law, it does not compel them to do so--for the Rule says that judges "may" rather than "must" receive expert testimony and adds that courts may consider any

621 F.3d 624, *; 2010 U.S. App. LEXIS 18374, **1;
96 U.S.P.Q.2D (BNA) 1689

relevant material or source. Judges should use the best of the available sources. A court may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail. Sometimes federal courts must interpret foreign statutes or decisions that have not been translated into English or glossed in treatises or other sources. Then experts' declarations and testimony may be essential. But French law, and the law of most other nations that engage in extensive international commerce, is widely available in English. Judges can use not only accepted (sometimes official) translations of statutes and decisions but also ample secondary literature, such as treatises and scholarly commentary.

*Contracts Law > Contract Interpretation > Intent*
[HN3] Code civil [C. civ.] art. 1156 (Fr.) says that courts must seek the parties' common intention--which means their joint intent, not one side's unilateral version.

*Contracts Law > Contract Interpretation > Intent*
[HN4] French law takes a contract's negotiating history to be a more reliable indicator of intent than the litigants' self-serving declarations.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
[HN5] Code civil [C. civ.] art. 1341 (Fr.) forbids evidence about what negotiators said to one another--often called parol evidence in the United States--when the value of the dispute exceeds 5,000 francs (roughly 800 euros). This constraint illustrates the proposition that although as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to add to, vary or contradict a deed or other written instrument. On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially right outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors. Extrinsic evidence can,

however, be used for the purposes of interpreting a written document that contains internal contradictions or is otherwise unclear--something true of American law as well.

*Contracts Law > Contract Interpretation > Intent*
[HN6] The Cour de Cassation (France's highest civil court) has concluded that a clear and precise contract must not be denatured by resort to one party's declaration of intent.

*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
*Contracts Law > Contract Interpretation > General Overview*
[HN7] When the facts are undisputed, interpretation of contractual language is a question of law for a judge.

*Contracts Law > Contract Interpretation > Intent*
[HN8] In the United States, contractual interpretation seeks to find the parties' shared intent. And in the United States, as in France, this is done by objective means (through devices such as the negotiating history) rather than attempting to read the parties' minds.

*Trademark Law > Conveyances > General Overview*
[HN9] People are free to use contracts to allocate rights to products' designs.

**COUNSEL:** For BODUM USA, INCORPORATED, Plaintiff - Appellant: David E. Bennett, Attorney, VEDDER PRICE KAUFMAN & KAMMHOLZ, Chicago, IL.

For LA CAFETIERE, INCORPORATED, Defendant - Appelee: Thomas G. Pasternak, Attorney, STEPTOE & JOHNSON, Chicago, IL.

**JUDGES:** Before EASTERBROOK, Chief Judge, and POSNER and WOOD, Circuit Judges.

**OPINION BY:** EASTERBROOK

**OPINION**

[*625]  EASTERBROOK, *Chief Judge*. From the mid-1950s through 1991, Societe des Anciens Etablissements Martin S.A. ("Martin") distributed a

successful French-press coffee maker known as the Chambord. A French-press coffee maker (called a cafetiere a piston in France) is a carafe in which hot water is mixed with coffee grounds. When the brewing is complete, a mesh screen attached to a rod drives the grounds to the bottom of the carafe. Clear coffee then can be poured from the top. In 1991 Bodum Holding purchased all of Martin's stock. Today subsidiaries of Bodum Holding sell throughout the world coffee makers that use the Chambord design and name.

Martin's principal investor and manager was Louis-James de Viel Castel, who had other businesses. [**2] One of these, the British firm Household Articles Ltd., sold a French-press coffee maker that it called La Cafetiere, which closely resembles the Chambord design. Viel Castel wanted to continue Household's business after Bodum bought Martin. So Viel Castel and Jorgen Jepsen Bodum, the main investor in Bodum Holding, negotiated. An early draft agreement provided that Household could sell the Chambord design in the United Kingdom, but nowhere else. After several rounds of revisions, however, the agreement provided that Household would never sell a French-press coffee maker in France, that it would not use the trade names Chambord or Melior, and that for four years it would not distribute through the importers, distributors, or agents that Martin employed during 1990-91. The agreement was signed, and Bodum Holding acquired Martin.

La Cafetiere, Inc., was incorporated in Illinois in 2006 to serve as the distributor of Household's products in the United States. One of these is the La Cafetiere model, which carries the name "Classic" in this country. To avoid confusion between the corporation (which since 2008 has been one of Household's subsidiaries) and the product, we refer to the distributor [**3] as "Household." Household has itself been renamed The Greenfield Group, but we stick with the original name for simplicity. Bodum Holding's US distributor (Bodum USA, Inc.) filed this suit under federal and state law, contending that the sale of any coffee maker similar to [*626] the Chambord design violates Bodum's common-law trade dress. Trade dress, a distinctive appearance that enables consumers to identify a product's maker, is a form of trademark. See *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)*. The Chambord design is not registered as Bodum's trademark, but common-law marks may be enforced under both *15 U.S.C. § 1125(a)*, a part of the Lanham Act, and *815*

*ILCS 510/2(a)*. Household contends that the 1991 agreement permits it to sell the La Cafetiere design anywhere in the world, except France, provided that it does not use the words Chambord or Melior--and Household has never used either of those marks. The district court agreed with this contention and granted summary judgment in Household's favor. *2009 U.S. Dist. LEXIS 25555 (N.D. Ill. Mar. 24, 2009)*.

The Chambord design and the La Cafetiere design are indeed similar, and although they are not identical a casual coffee [**4] drinker (or purchaser) would have trouble telling them apart. Here are pictures:





[*627] The right-hand version of the La Cafetiere design looks closer to the Chambord design because of the domed lid and the ball on the piston. Household calls one design the Classic and the other the Optima; the parties do not make anything of the difference.

Bodum assumes that the proprietor of any distinctive design has an intellectual-property right in this design, which it alone can sell. That assumption is unwarranted. The Chambord design is distinctive--so much so that Martin received a design patent for it--but the patent expired many years ago. After a patent expires, other firms are free to copy the design to the last detail in order to increase competition and drive down the price that consumers pay. See, e.g., *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S. Ct. 784, 11 L. Ed. 2d 661, 1964 Dec. Comm'r Pat. 425 (1964). See also *Jay Franco & Sons, Inc. v. Franek*, No. 09-2155, 615 F.3d 855, 2010 U.S. App. LEXIS 17019 (7th Cir. Aug. 11, 2010); *Specialized Seating, Inc. v. Greenwich Industries, L.P.*, No. 07-1435, 616 F.3d 722, 2010 U.S. App. LEXIS 17015 (7th Cir. Aug. 11, 2010). [**5] A distinctive design may be protected as a trademark only if it has acquired secondary meaning--that is, if consumers associate the design with a particular manufacturer--and the design's identifying aspects are not functional. See *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000). Bodum has not produced evidence that the Chambord design has secondary meaning, so that purchasers of a La Cafetiere coffee maker think that they are getting one of Bodum's products. But because Household has not asked us to affirm the district court on this ground, we move on to the contract.

Here is the critical language, from Article 4 of the contract:

In consideration of the compensation paid to Stockholder [Viel Castel] for the stocks of [Martin], Stockholder guarantees, limited to the agreed compensation, see Article 2, that he shall not--for a period of four (4) years--be engaged directly or indirectly in any commercial business related to manufacturing or distributing [Martin's] products . . . .

[*628] Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder through Household . . . can manufacture and distribute any products similar to [Martin's] products [**6] outside of France. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to any such activity in France, and that Household [ ] furthermore is not entitled, directly or indirectly, globally to manufacture and/or distribute coffeepots under the trade marks and/or brand names of "Melior" and "Chambord," held by [Martin]. Stockholder agrees that Household [ ] is not entitled to use for a period of four (4) years the importers, distributors, and agents which [Martin] uses and/or has used the last year. Any violation of these obligations will constitute a breach of Stockholder's obligation according to Article 4.

The parties agree that this is an accurate translation of the French original, and that French substantive law governs its interpretation. The district judge thought that the contract is clear and that Household can sell its La Cafetiere outside of France, if it does not use the Chambord or Melior names. Even if the La Cafetiere or Classic model is identical to the Chambord model (which it is not, as a glance at the illustrations shows), a thing identical to something else also is "similar" to it.

Bodum contends that, under French law, the parties' [**7] intent prevails over the written word. [HN1] Article 1156 of the French Civil Code provides: "One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms." (Again this is an agreed translation, as are all other translations in this opinion.) Jorgen Bodum has submitted an affidavit declaring that he understood the contract to limit Household's sales of the La Cafetiere model to the United Kingdom and Australia. This means, Bodum Holding insists, that there must be a trial to determine the parties' intent. It supports this position with the declaration of Pierre-Yves Gautier, a Professor of Law at Universite Pantheon-Assas Paris II, who Bodum tenders as an expert on French law. Household has replied with declarations from two experts of its own.

[HN2] Although *Fed. R. Civ. P. 44.1* provides that courts may consider expert testimony when deciding questions of foreign law, it does not compel them to do so--for the Rule says that judges "may" rather than "must" receive expert testimony and adds that courts may

consider "any relevant material or source". Judges should use the best of the available sources. The Committee [**8] Note in 1966, when *Rule 44.1* was adopted, explains that a court "may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail."

Sometimes federal courts must interpret foreign statutes or decisions that have not been translated into English or glossed in treatises or other sources. Then experts' declarations and testimony may be essential. But French law, and the law of most other nations that engage in extensive international commerce, is widely available in English. Judges can use not only accepted (sometimes official) translations of statutes and decisions but also ample secondary literature, such as treatises and scholarly commentary. It is no more necessary to resort to expert declarations about the law of France than about the law of Louisiana, which had its origins in the French civil code, or the law [*629] of Puerto Rico, whose origins are in the Spanish civil code. No federal judge would admit "expert" declarations about the meaning of Louisiana law [**9] in a commercial case.

==Trying to establish foreign law through experts' declarations not only is expensive (experts must be located and paid) but also adds an adversary's spin, which the court then must discount.== Published sources such as treatises do not have the slant that characterizes the warring declarations presented in this case. Because objective, English-language descriptions of French law are readily available, we prefer them to the parties' declarations. See *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495-96 (7th Cir. 2009); *Abad v. Bayer Corp.*, 563 F.3d 663, 670-71 (7th Cir. 2009).

[HN3] Article 1156 says that courts must seek the parties' "common intention"--which means their *joint* intent, not one side's unilateral version. Jorgen Bodum tells us what he understood by the contract, but Bodum Holding does not offer any evidence of statements by Viel Castel that would tend to demonstrate that this view is mutual. For its part, Household offers the contract's negotiating history, [HN4] which French law takes to be a more reliable indicator of intent than the litigants' self-serving declarations. See Alberto Luis Zuppi, *The Parol Evidence Rule: A Comparative Study of the*

*Common Law*, [**10] *the Civil Law Tradition, and Lex Mercatoria*, 35 Ga. J. Int'l & Comp. L. 233, 258-60 (2007).

[HN5] Article 1341 of the Civil Code forbids evidence about what negotiators said to one another--often called parol evidence in the United States--when the value of the dispute exceeds 5,000 francs (roughly 800 euros). The value of the dispute between Bodum and Household exceeds 5,000 francs, so what the negotiators said to each other is irrelevant under Art. 1341. This constraint illustrates the proposition that although "as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation . . . this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to 'add to, vary or contradict a deed or other written instrument.' On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially 'right' outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors . . . . Extrinsic [**11] evidence can, however, be used for the purposes of interpreting a written document that contains internal contradictions or is otherwise unclear"--something true of American law as well. Stefan Vogenauer, "Interpretation of Contracts: Concluding Comparative Observations," in *Contract Terms* 123, 135-36 (Andrew Burrows & Edwin Peel eds. 2007).

Article 110-3 of the Commercial Code is more tolerant of oral parol evidence, but it is not clear whether the Commercial Code governs the sale to Bodum Holding of Viel Castel's stock in Martin. The Commercial Code applies to "all obligations between dealers, merchants, and bankers". Art. 110-2. The contract by which Viel Castel sold his stock was a hybrid, affecting the business of Household as a merchant at the same time as it affected Viel Castel as an investor. It is unnecessary to decide whether Art. 110-3 applies, however, because Bodum Holding does not offer any parol evidence that would tend to show Viel Castel's oral agreement with Jorgen Bodum's beliefs. This leaves the written record.

[*630] The negotiating history is straightforward. Bodum's lawyers submitted an initial draft for Viel Castel's consideration. The relevant provision said this:

In [**12] consideration of the compensation paid to Stockholder [Viel Castel] for the stock of [Martin,] Stockholder guarantees that he shall not--for an indefinite period of time--be engaged directly or indirectly in any commercial business related to manufacturing and/or distributing [Martin's] products . . . .

Notwithstanding article 4 [Bodum Holding] agrees that Stockholder through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to distribute products outside the United Kingdom.

Viel Castel rejected this proposal and negotiated to allow Household the right to sell the La Cafetiere design outside the United Kingdom. The next draft said this:

Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder [Viel Castel] through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, globally to manufacture and/or distribute coffee-pots under the trade marks and/or brand names of "Melior" and "Chambord". [Bodum Holding] agrees that Household [ ] with the [**13] limitation mentioned in the previous sentence outside of the United Kingdom on markets where Household [ ] prior to signing of this Agreement has proved to [Bodum Holding] that he is already manufacturing/distributing products can manufacture and distribute products which, directly or indirectly, do not compete with the business of the Company as run today.

This, too, was unacceptable to Viel Castel. Eventually the parties signed the final version that we quoted several pages ago. The lesson is easy to grasp. The initial draft placed on Household the sort of restriction that Jorgen Bodum imputes to the final version. But the final version allows Household to sell the La Cafetiere design anywhere except France--provided that it does not use the Chambord or Melior names (which Household has never done) and does not use Martin's supply channels for four years (a promise Household kept).

[HN6] The Cour de Cassation (France's highest civil court) has concluded that a clear and precise contract must not be "denatured" by resort to one party's declaration of intent. See Jacques H. Herbots, "Interpretation of Contracts" in *The Elgar Encyclopedia of Comparative Law* 334-35 (2006); Cass. 2e civ., March [**14] 8, 2006, Bull. Civ. II, No. 66. Article 4 of this contract is clear and precise as it stands; the negotiating history shows that it means what it says. And we are not the first court to reach this conclusion. Bodum and another of Household's subsidiaries litigated in Denmark. Relying heavily on the negotiating history, the Court of Randers concluded, in a judgment dated February 8, 2008 (Case FS 40-6066/2007), that Article 4 means exactly what the district judge held in this litigation. The Court of Randers reached its judgment under French law (which a choice-of-law clause in the contract requires). The judgment was affirmed by the Western Danish High Court on May 12, 2009 (Appeal No. V.L. B-0329-08, Ref. No. 138212). It would not be sensible to create an international conflict about the interpretation of this contract. Denmark is a civil-law nation, and a Danish court's understanding and application of the civil-law tradition is more likely to [*631] be accurate than are the warring declarations of the paid experts in this litigation.

[HN7] When the facts are undisputed, interpretation of contractual language is a question of law for the judge. See *PSI Energy, Inc. v. Exxon Coal USA, Inc., 17 F.3d 969, 971 (7th Cir. 1994)*. [**15] Bodum contends that the French preference for intent over text means that interpretation must be a question of fact. But [HN8] in the United States, too, contractual interpretation seeks to find the parties' shared intent. And in the United States, as in France, this is done by objective means (through devices such as the negotiating history) rather than attempting to read the parties' minds. See *Skycom Corp. v. Telstar Corp., 813 F.2d 810 (7th Cir. 1987)*.

If this dispute were proceeding in France, it would not be submitted to lay jurors (which France does not use) or even to a judge. It would be submitted to an arbitral panel of business executives, the International

Court of Commerce in Paris, as Article 18 of the contract provides. Bodum has not asked that this dispute be arbitrated, in Chicago or Paris, although that might have been preferable. That the suit depends on a mixture of U.S. trademark law and French contract law would not prevent arbitration. See *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)*; *Omron Healthcare, Inc. v. Maclaren Exports Ltd., 28 F.3d 600 (7th Cir. 1994)*; *Baxter International, Inc. v. Abbott Laboratories, 315 F.3d 829 (7th Cir. 2003)*. [**16] Having chosen to litigate in Chicago rather than arbitrate in Paris, however, Bodum must abide by the forum's procedural doctrines, such as the allocation of tasks between judge and jury. See *Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir. 1994)*.

Bodum insists that, if the 1991 contract means what we have concluded it means, the agreement is invalid as a "naked license" of a trademark. American law forbids "naked" transfers of trademarks. *TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876 (7th Cir. 1997)*. A business cannot sell a name divorced from a product, because a trademark is significant only to the extent it helps consumers associate a product with a producer. But Bodum did not sell a naked trademark to Household. Before 1991, Martin and Household had allocated rights to the Chambord design: Martin sold coffee makers embodying this design in some nations, Household in others. The 1991 contract continued that division. The names Chambord and Melior went to Bodum; the design stayed where it was, and Household promised not to sell it in France, where in 1991 Martin did about 70% of its business. No transfer of any rights *to* Household occurred; the transfer was from Martin [**17] to Bodum, with a reservation of some existing rights in Household. [HN9] People are free to use contracts to allocate rights to products' designs. See *Aronson v. Quick Point Pencil Co., 440 U.S. 257, 99 S. Ct. 1096, 59 L. Ed. 2d 296 (1979)*.

None of the other arguments requires discussion. The judgment is affirmed.

**CONCUR BY:** POSNER; WOOD

**CONCUR**

POSNER, *Circuit Judge*, concurring. I join the majority opinion, and write separately merely to express emphatic support for, and modestly to amplify, the court's criticism of a common and authorized but unsound judicial practice. That is the practice of trying to establish the meaning of a law of a foreign country by testimony or affidavits of expert witnesses, usually lawyers or law professors, often from the country in question. For earlier criticism, see *Sunstar, Inc. v. Alberto-Culver Co., 586 F.3d 487, 495-96 (7th Cir. 2009)*.

[*632] The contract in this case is in writing and unambiguously entitles the defendant to continue to sell its "Classic" coffee maker in the United States, because, although it is a product "similar" to the plaintiff's coffee maker, only in France is the defendant forbidden to sell products "similar" to the plaintiff's products. The plaintiff argues that nevertheless it is entitled [**18] to a trial at which Jorgen Bodum, its principal, would testify that part of the deal the parties *thought* they were making, although it is not reflected in the written contract, was that the defendant would be barred from selling its "Classic" coffee maker in the United States because it is identical rather than merely "similar" to the plaintiff's "Chambord" coffee maker. (Yet the plaintiff concedes in its reply brief that "it may certainly be true that all identical products are similar.") The issue of contractual interpretation is governed by French law.

*Rule 44.1 of the Federal Rules of Civil Procedure* provides that a federal court, "in determining foreign law, . . . may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." The committee note explains that the court "may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail." Thus the court doesn't *have* [**19] to rely on testimony; and in only a few cases, I believe, is it justified in doing so. This case is not one of them.

The only evidence of the meaning of French law that was presented to the district court or is found in the appellate record is an English translation of brief excerpts from the French Civil Code and affidavits by three French law professors (Pierre-Yves Gautier for the plaintiff and Christophe Caron and Jerome Huet for the defendant, with Huet's affidavit adding little to Caron's). The district court did no research of its own, but relied on the parties' submissions.

When a court in one state applies the law of another, or when a federal court applies state law (or a state court federal law), the court does not permit expert testimony on the meaning of the "foreign" law that it has to apply. *Sunstar, Inc. v. Alberto-Culver Co., supra, 586 F.3d at 495*; *Nationwide Transport Finance v. Cass Information Systems, Inc., 523 F.3d 1051, 1058-59 (9th Cir. 2008)*; *Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 (11th Cir. 1990)*; *Magee v. Huppin-Fleck, 279 Ill. App. 3d 81, 664 N.E.2d 246, 249, 215 Ill. Dec. 849 (Ill. App. 1996)*. This is true even when it's the law of Louisiana, see, e.g., *Executors of McDonogh v. Murdoch, 56 U.S. (15 How.) 367, 405-06, 14 L. Ed. 732 (1853)*; [**20] *Central States, Southeast & Southwest Areas Pension Fund v. Creative Development Co., 232 F.3d 406, 417-18 (5th Cir. 2000)*, which is based to a significant degree on the *Code Napoleon* (curiously, adopted by Louisiana after the United States acquired Louisiana from France). *Id.; Maher v. City of New Orleans, 371 F. Supp. 653, 657-61 (E.D. La. 1974)*; Rodolfo Batiza, "The *Louisiana Civil Code of 1808*: Its Actual Sources and Present Relevance," *46 Tulane L. Rev. 4, 11-12 (1971)*; Vernon Valentine Palmer, "The French Connection and the Spanish Perception: Historical Debates and Contemporary Evaluation of French Influence on Louisiana Civil Law," *63 La. L. Rev. 1067, 1072-77 (2003)*.

Yet if the law to be applied is the law of a foreign country, even a country such as the United Kingdom, Canada, or Australia [*633] in which the official language is English and the legal system derives from the same source as ours, namely the English common law, our courts routinely rely on lawyers' testimony about the meaning of the foreign law. See, e.g., *Schexnider v. McDermott Int'l, Inc., 868 F.2d 717, 719 n. 2 (5th Cir. 1989)* (per curiam); *Sphere Drake Ins. Ltd. v. All American Life Ins. Co., 221 F. Supp. 2d 874, 884-86 (N.D. Ill. 2002)*; [**21] *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc., 198 F. Supp. 2d 598, 622-23 (E.D. Pa. 2002)*. Not only rely but sometimes suggest, incorrectly in light of *Rule 44.1*, that testimony is *required* for establishing foreign law. E.g., *Interpane Coatings, Inc. v. Australia & New Zealand Banking Group Ltd., 732 F. Supp. 909, 917 (N.D. Ill. 1990)*.

Lawyers who testify to the meaning of foreign law, whether they are practitioners or professors, are paid for their testimony and selected on the basis of the convergence of their views with the litigating position of the client, or their willingness to fall in with the views urged upon them by the client. These are the banes of expert testimony. When the testimony concerns a scientific or other technical issue, it may be unreasonable to expect a judge to resolve the issue without the aid of such testimony. But judges are experts on law, and there is an abundance of published materials, in the form of treatises, law review articles, statutes, and cases, all in English (if English is the foreign country's official language), to provide neutral illumination of issues of foreign law. I cannot fathom why in dealing with the meaning of laws [**22] of English-speaking countries that share our legal origins judges should prefer paid affidavits and testimony to published materials.

It is only a little less perverse for judges to rely on testimony to ascertain the law of a country whose official language is not English, at least if is a major country and has a modern legal system. Although most Americans are monolingual, including most judges, there are both official translations of French statutes into English, Legifrance, "Codes and Texts," http://195.83.177.9/code/index.phtml?lang=uk (visited Aug. 4, 2010), and abundant secondary material on French law, including French contract and procedural law, published in English. Barry Nicholas, *The French Law of Contract* (2d ed. 1992); Denis Tallon, "Contract Law," in *Introduction to French Law* 205 (George A. Bermann & Etienne Picard eds. 2008); Loic Cadiet & Soraya Amrani-Mekki, "Civil Procedure," in *Introduction to French Law, supra*, at 307; Stefan Vogenauer, "Interpretation of Contracts: Concluding Comparative Observations," in *Contract Terms* 123 (Andrew Burrows & Edwin Peel eds. 2007); Daniel Soulez Lariviere, "Overview of the Problems of French Civil Procedure," *45 Am. J. Comp. L. 737, 743-44 (1997)*; [**23] James Beardsley, "Proof of Fact in French Civil Procedure," *34 Am. J. Comp. L. 459 (1986)*. Neither party cited *any* such material, except translations of statutory provisions; beyond that they relied on the affidavits of their expert witnesses.

Because English has become the international *lingua franca*, it is unsurprising that most Americans, even when otherwise educated, make little investment in acquiring even a reading knowledge of a foreign language. But our linguistic provincialism does not excuse intellectual provincialism. It does not justify our judges in relying on paid witnesses to spoon feed them foreign law that can be found well explained in English-language treatises and articles. I do not criticize the district judge in this case,

because he was following the common practice. But it is a bad practice, followed like so many legal practices out of habit rather than reflection. It is excusable only when the foreign law is the law of [*634] a country with such an obscure or poorly developed legal system that there are no secondary materials to which the judge could turn. The French legal system is obviously not of that character. The district court could --as this court did in *Abad v. Bayer Corp., 563 F.3d 663, 670-71 (7th Cir. 2009)*, [**24] with respect to the law of Argentina--have based his interpretation of French contract law on published writings as distinct from paid testimony.

Of course often the most authoritative literature will be in the language of the foreign country. But often too there will be official, or reputable unofficial, translations and when there are not the parties can have the relevant portions translated into English. Translations figure prominently in a variety of cases tried in American courts, such as drug-trafficking and immigration cases; why not in cases involving foreign law?

Article 1156 of the French Civil Code--the provision that the briefs principally discuss--states in its entirety: "*On doit dans les conventions rechercher quelle a ete la commune intention des parties contractantes, plutot que de s'arreter au sens litteral des termes.*" In idiomatic English (the official English version is stilted), this means that in interpreting a contract one should search for what the parties' joint intention was, rather than stopping with the literal meaning of the contract's terms. The plaintiff argues that this means that no matter how clear the contract appears to be, a party is entitled to present [**25] evidence at trial that the parties intended something else. "French law," according to the plaintiff's opening brief, "clearly provides that an assessment of the parties' rights and obligations under the [contract] must be evaluated in light of the parties' mutual intent, regardless of whether the contract is deemed unambiguous."

What is true and worth noting is that the civil law--the law of Continental Europe, as distinct from Anglo-American law--of contracts places an emphasis on fault that is not found in the common law. As Holmes remarked, the common law conceives of contracts as options--when you sign a contract in which you promise a specified performance you buy an option to either perform as promised or pay damages, Oliver Wendell Holmes, "The Path of the Law," 10 *Harv. L. Rev.* 457,

462 (1897), unless damages are not an adequate remedy in the particular case. Whether you were at fault in deciding not to perform--you could have done so but preferred to pay damages because someone offered you a higher price for the goods that you'd promised to the other party to your contract--is therefore irrelevant.

In the civil law, in contrast, a party is in breach of his contract and therefore [**26] subject to a legal sanction only if he "could reasonably have been expected to behave in a different way," that is, only if he was at fault in failing to perform. Jurgen Basedow, "Towards a Universal Doctrine of Breach of Contract: The Impact of the CISG," 25 *Int'l Rev. L. & Econ.* 487, 496 (2005) ("the fault principle is often considered to be an indispensable part of the law of obligations in civil law countries"); see also Nicholas, *supra*, at 200-01; Tallon, *supra*, at 224-25, 230-31; Richard Hyland, "*Pacta Sunt Servanda*: A Meditation," *34 Va. J. Int'l L. 405, 429-30 (1994)*; John Y. Gotanda, "Recovering Lost Profits in International Disputes," *36 Georgetown J. Int'l L. 61, 76-77 (2004)*. The civil law embraces the slogan *pacta sunt servanda--promises* are to be obeyed, not commuted to a price believed to approximate their value. That is why in the civil law the default remedy for breach of contract is (though more in principle than in practice) specific performance rather than damages. Nicholas, *supra*, at 211-12; [*635] Ronald J. Scalise, Jr., "Why No 'Efficient Breach' in the Civil Law?: A Comparative Assessment of the Doctrine of Efficient Breach of Contract," *55 Am. J. Comp. L. 721, 726-27 (2007)*; [**27] see Tallon, *supra*, at 233-34; John P. Dawson, "Specific Performance in France and Germany," 57 *Mich. L. Rev.* 495, 524-25 (1959). You *should* have performed your promise, so the court will *order* you to do so.

The common law of contracts evolved from the law merchant, the civil law of contracts from canon law. Joseph M. Perillo, "UNIDROIT Principles of International Commercial Contracts: The Black Letter Text and a Review," *63 Fordham L. Rev. 281, 308 n. 190 (1994)*. Priests do not take promise breaking quite as lightly as businessmen, but on the other hand are not attuned to commercial usages, such as options. Yet despite the difference in origins, differences in outcome under the two legal regimes are small and shrinking. E.g., Stefan Grundmann, "The Fault Principle as the Chameleon of Contract Law: A Market Function Approach," *107 Mich. L. Rev. 1583, 1586-91 (2009)*; Vogenauer, *supra*, at 149-50; Wayne R. Barnes,

"Contemplating a Civil Law Paradigm for a Future International Commercial Code," *65 La. L. Rev. 677, 751-52 (2005)*; *Gotanda, supra, at 63-64*; Patricia Pattison & Daniel Herron, "The Mountains Are High and the Emperor Is Far Away: Sanctity of Contract in China," *40 Am. Bus. L.J. 459, 475 (2003)*. [**28] A difference at least in tone remains, however, and enables one to see why French law might, as the plaintiff contends, be more concerned to determine the parties' intentions than American law would be. For if an intention is innocent--a party never intended the promise that he is now accused of having broken--ascribing fault to him, viewed as a precondition to finding him guilty of a breach of contract, is a graver step. Conversely, if the party did intend the promise but somehow it failed to get written down intelligibly, he should not be permitted to break it by pointing to a writing. Hence the greater "readiness [of French courts] to have recourse to previous negotiations and subsequent conduct of the parties" in interpreting a contract, Vogenauer, *supra*, at 150--to conduct a deeper search into subjective understandings.

The civil-law culture is the basis for the plaintiff's claim to be entitled to a trial at which to present evidence that its contract with the defendant was intended to mean something different from what it says. This claim cannot be derived from Article 1156, which, as the majority opinion in this case points out, just tells the court to search for what the parties' [**29] joint intention was rather than stopping with the literal meaning of the contract's terms. That is no different from warnings in American contract law to be wary of literal interpretations of contracts because such interpretations often are mistaken. *Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir. 2002)*; *Rhode Island Charities Trust v. Engelhard Corp., 267 F.3d 3, 6-7 (1st Cir. 2001)*; *Outlet Embroidery Co. v. Derwent Mills, 254 N.Y. 179, 172 N.E. 462, 463 (N.Y. 1930)* (Cardozo, C.J.). It is based rather on the greater willingness (in principle--which will turn out to be an essential qualification) of a French court than of an American one to dig deeply for reassurance that it is not distorting the parties' intentions by blinding itself to everything that is not text.

The argument may seem to be supported by the fact that French law does not have a parol evidence rule applicable to commercial cases. See French Commercial Code, Art. 110-3; CISG-AC [Advisory Council of the Convention of International Sale of Goods], Opinion No.

3, "Parol Evidence Rule, Plain Meaning Rule, Contractual Merger Clause and the [*636] CISG," P 1.2.8 (Oct. 23, 2004), www.cisg.law.pace.edu/cisg/CISG-AC-op3.h tml [**30] (visited Aug. 6, 2010); Alberto Luis Zuppi, "The Parol Evidence Rule: A Comparative Study of the Common Law, the Civil Law Tradition, and *Lex Mercatoria*," *35 Ga. J. Int'l & Comp. L. 233, 258-60 (2007)*; Arthur T. von Mehren, "Civil-Law Analogues to Consideration: An Exercise in Comparative Analysis," *72 Harv. L. Rev.* 1009, 1013 and n. 15 (1959). An approximation to that rule, and to the related "four corners" rule, *Bank v. Truck Ins. Exchange, 51 F.3d 736, 737-38 (7th Cir. 1995)*; E. Allan Farnsworth, *Contracts* § 7.12, p. 464 (4th ed. 2004), which forbids using extrinsic evidence to contradict an unambiguous written contract, is found in Article 1341 of the French Civil Code for ordinary contracts unless very small. (Neither rule is limited to oral evidence, despite the word "parol," which is derived from the French word for "word"; the parol evidence rule merely excludes extrinsic evidence concerning precontractual negotiations if the written contract was intended to be the parties' complete agreement, *Utica Mutual Ins. Co. v. Vigo Coal Co., 393 F.3d 707, 713-14 (7th Cir. 2004)*; see also *Patton v. Mid-Continent Systems, Inc., 841 F.2d 742, 745-46 (7th Cir. 1988)*; Farnsworth, *supra*, § 7.2, [**31] pp. 414-16).) Article 1341 bars "proof by witnesses" that is inconsistent with the written contract unless there is a "commencement of proof in writing"--a writing originating with the defendant that makes it probable that an alleged fact about the parties' deal is true. Vogenauer, *supra*, at 135-37; Jacques H. Herbots, "Interpretation of Contracts," in Jan M. Smits, *The Elgar Encyclopedia of Comparative Law* 325, 337 (2006).

But the limitations on extrinsic evidence in Article 1341 do not apply to commercial contracts, a possible characterization of the contract at issue in this case, though not an inevitable characterization for reasons explained in the majority opinion. Article 110-3 of the French Commercial Code provides that "with regard to traders, commercial instruments may be proven by any means unless the law specifies otherwise" (footnote omitted). And CISG-AC Opinion No. 3, *supra*, states that "though the French Civil Code . . . incorporates a version of the Parol Evidence Rule for ordinary contracts, all forms of proof are generally available against merchants." See also United Nations Convention on Contracts for the International Sale of Goods, art. 11, 52

Fed. Reg. 6262, [**32] 6265 (Mar. 2, 1987); Louis F. Del Duca, "Implementation of Contract Formation Statute of Frauds, Parol Evidence, and Battle of Forms CISG Provisions in Civil and Common Law Countries," 38 *UCC L.J.* 55, 56-57 and n. 3 (2005).

This gap in French commercial law has little practical significance, however, because it mainly reflects the fact that civil law systems do not use juries in civil cases. As a result, their rules on admissibility of evidence are notably looser than in common law jurisdictions. Frederick Schauer, "On the Supposed Jury-Dependence of Evidence Law," *155 U. Pa. L. Rev. 165, 174-75 (2006)*; Kenneth Williams, "Do We Really Need the Federal Rules of Evidence?," *74 N. Dak. L. Rev. 1, 21-22 (1998)*; Konstantinos D. Kerameus, "A Civilian Lawyer Looks at Common Law Procedure," *47 La. L. Rev. 493, 499-503 (1987)*. Although technically the parol evidence and four-corners rules are rules of contract law rather of evidence, *Rossetto v. Pabst Brewing Co., 217 F.3d 539, 546 (7th Cir. 2000)*; Farnsworth, *supra*, § 7.2, p. 416, they are strongly influenced by concern lest trial by jury upset the expectations of contracting parties as embodied in written contracts. *AM Int'l Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 576 (7th Cir. 1995)*; [**33] *Olympia Hotels* [*637] *Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1373 (7th Cir. 1990)*; Charles T. McCormick, "The Parol Evidence Rule as a Procedural Device for Control of the Jury," 41 *Yale L.J.* 365 (1932).

Unburdened by juries and tight rules of evidence, French courts could range further afield than American courts in search of subjective contractual intentions. Could--but don't. As explained in Vogenauer, *supra*, at 135-36, while "as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation . . . this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to 'add to, vary or contradict a deed or other written instrument.' On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially 'right' outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, *they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors*. . . . Extrinsic evidence can, however, be used for the purposes of interpreting a written [**34] document that contains internal contradictions or is

otherwise unclear" (emphasis added, footnote omitted)--which is also true of American law, but irrelevant to this case.

Unlike American courts, moreover, "French commercial courts are staffed by members of the business community, who serve part-time as judges. There is no requirement that they have legal training. Hearings before French commercial courts typically last less than an hour. Witnesses are virtually never heard by the court. In any case, a French rule of evidence makes evidence originating from any of the parties inadmissible, which means that no employee of any of the two companies may validly testify." Gilles Cuniberti, "Beyond Contract--The Case for Default Arbitration in International Commercial Disputes," *32 Fordham Int'l L.J. 417, 431-32 (2009)* (footnote omitted). "The past continues to shape the present. This is especially true with respect to one particularity of the French judicial system which is rarely evoked--the absence of a jury in civil court proceedings, and the consequences this has on procedure, which remains 98% written, with no witnesses, no investigations ordered by the judge, and no cross-examination. [**35] The hearing is a sort of ritual, a rigid, immutable show in which the silent judge, flanked--for the moment at least-- by two colleagues, listens to the 'pleadings': an exercise in solitary eloquence, a lengthy monologue by a lawyer who blindly and desperately attempts to breathe life into documents, or even affidavits, which are inert, consigned to paper, embedded in ritual phraseology, and accompanied by a document proving identity. It is the absence of any jury which has dictated the entire concept of what a civil court hearing should be." *Lariviere, supra, at 743-44*. "[T]he tendency [in French civil litigation is] to prefer written proof of ultimate fact--evidence that can be analyzed on the basis of a writing even though its origins may be in oral testimony or other more difficult-to-appreciate forms of proof." Beardsley, *supra*, at 470.

The plaintiff in our case wants to marry French substantive doctrine that might appear to permit a more far-ranging evidentiary exploration in a contract case to American trial procedure, which permits a far-ranging evidentiary exploration in many types of case but not in cases charging a breach of a clear written contract. The marriage has produced [**36] an ungainly hybrid that corresponds neither to French law nor to American law. It is true that [*638] some foreign legal systems heavily influenced by the civil codes do use common law

procedure--as does Louisiana. Stephen Goldstein, "The Odd Couple: Common Law Procedure and Civilian Substantive Law," *78 Tul. L. Rev. 291 (2003)*. These typically are former code jurisdictions that were conquered, or in the case of Louisiana bought, by a common law nation such as Britain or the United States. But they do not do it on an ad hoc basis, as proposed by our plaintiff; and, so far as I can discover, they do not, by doing so, deny contracting parties the protection of a clearly written contract.

It is at least as difficult to persuade a French court (because of its composition and usages) to admit extrinsic evidence in a contract case as it is to persuade an American court to do so. See *Cuniberti, supra, at 431-32*; *Lariviere, supra, at 743-44*; Beardsley, *supra*, at 469-70. The happenstance that this case has been brought in an American court must not be allowed to produce a misfit between substantive and procedural law.

Curiously, one of the defendant's experts, Professor Caron, not only cites Article [**37] 1156 but asserts that in interpreting the "common intention of the parties . . . reference to the negotiations that may have taken place between the parties should be required." I don't think he means that there *is* a legal requirement; there isn't. I think he means it would be helpful to refer to the previous negotiations in this case because they support the defendant's position. Yet in its brief the defendant goes further and says that "Article 1156 simply *requires* that a court look beyond the literal meaning of the terms of an agreement, even where--as here--the terms of the agreement are plain and unambiguous" (emphasis added). This is not a correct interpretation of French law, or even one helpful to the defendant, since the contract unambiguously supports its position. The defendant acknowledges, on the basis of what appears to be its expert's misunderstanding or misstatement of French law, that it is not enough that the contract be unambiguous; the evidence of subjective intention must also be. Among other things this ignores the following exception, which is not inapplicable to commercial contracts, to the principle that "judicial interpretation of contracts is considered to [**38] entail questions of fact and therefore be subject to the discretion of the lower courts": in "cases in which there has been a distortion (*une denaturation*) of the clear and precise terms of the contract . . ., the court is deemed to be faced not merely with a question of the interpretation of a contract, but rather a refusal to apply it." Tallon, *supra*, at 225; see

also Herbots, *supra*, at 334. It must not refuse to apply it.

The parties' reliance on affidavits to establish the standard for interpreting their contract has produced only confusion. They should have relied on published analyses of French commercial law.

WOOD, *Circuit Judge*, concurring. While I endorse without reservation the majority's reading of the 1991 contract that is at the heart of this case, I write separately to note my disagreement with the discussion of *FED. R. CIV. P. 44.1* in both the majority opinion, *ante* at 6-7, and in Judge Posner's concurring opinion. *Rule 44.1* itself establishes no hierarchy for sources of foreign law, and I am unpersuaded by my colleagues' assertion that expert testimony is categorically inferior to published, English-language materials. Exercises in comparative law are notoriously difficult, [**39] because the U.S. reader is likely to miss nuances in the foreign law, to fail to appreciate the way in which one branch of the other country's law interacts [*639] with another, or to assume erroneously that the foreign law mirrors U.S. law when it does not. As the French might put it more generally, apparently similar phrases might be *faux amis*. A simple example illustrates why two words might be "false friends." A speaker of American English will be familiar with the word "actual," which is defined in Webster's Third New International Dictionary as "existing in act, . . . existing in fact or reality: really acted or acting or carried out--contrasted with *ideal* and *hypothetical* . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (1993). So, one might say, "This is the actual chair used by George Washington." But the word "actuel" in French means "present" or right now. LE ROBERT & COLLINS COMPACT PLUS DICTIONNAIRE 7 (5th ed. 2003). A French person would thus use the term "les evenements actuels" or "actualite" to refer to current events, not to describe something that really happened either now or in the past.

There will be many times when testimony from an acknowledged expert in foreign [**40] law will be helpful, or even necessary, to ensure that the U.S. judge is not confronted with a "false friend" or that the U.S. judge understands the full context of the foreign provision. Some published articles or treatises, written particularly for a U.S. audience, might perform the same service, but many will not, even if they are written in English, and especially if they are translated into English from another language. It will often be most efficient and useful for the

judge to have before her an expert who can provide the needed precision on the spot, rather than have the judge wade through a number of secondary sources. In practice, the experts produced by the parties are often the authors of the leading treatises and scholarly articles in the foreign country anyway. In those cases, it is hard to see why the person's views cannot be tested in court, to guard against the possibility that he or she is just a mouthpiece for one party. Prominent lawyers from the country in question also sometimes serve as experts. That too is perfectly acceptable in principle, especially if the question requires an understanding of court procedure in the foreign country. In many places, the academic [**41] branch of the legal profession is entirely separate from the bar. Academic writings in such places tend to be highly theoretical and removed from the day-to-day realities of the practice of law.

To be clear, I have no objection to the use of written sources of foreign law. *Rule 44.1* permits the court to consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." The written sources cited by both of my colleagues throw useful light on the problem before us in this case, and both were well within their rights to conduct independent research and to rely on those sources. There is no need, however, to disparage oral testimony from experts in the foreign law. That kind of testimony has been used by responsible lawyers for years, and there will be many instances in which it is adequate by itself or it provides a helpful gloss on the literature. The tried and true methods set forth in *FED. R. EVID. 702* for testing the depth of the witness's expertise, the facts and other relevant information on which the witness has relied, and the quality of the witness's application of those principles to the problem [**42] at hand, suffice to protect the court against self-serving experts in foreign law, just as they suffice to protect the process for any other kind of expert.

Finally, my colleagues see no material difference between a judge's ability to research the laws of Louisiana or Puerto Rico and her ability to research the laws of [*640] France, Australia, or Indonesia. With respect, I cannot agree with them. Like the laws of the other 49 states, the law of Louisiana is based on many sources. One important such source is the Code Napoleon, but it is not the only source. Louisiana has legislation on the usual topics, it is part of the federal system, and its courts function much like the courts of

other states. See, *e.g.*, Kensie Kim, *Mixed Systems in Legal Origins Analysis*, 83 S. CAL. L. REV. 693, 720 n.123 (2010) (noting that, though its civil procedure is in the civil law form, Louisiana's criminal procedure has adopted a U.S. common-law form); William R. Forrester, Jr., *New Technology & The 2007 Amendments to the Code of Civil Procedure*, 55 LA. BAR J. 236 (2008) (noting that the 2007 amendments to Louisiana's civil procedure rules adopt most of the provisions in the Federal Rules of Civil Procedure [**43] for electronically stored information); Harry J. Haynsworth, *The Unified Business Organizations Code*, 29 DEL. J. CORP. L. 83, 101 n.110 (2004) (noting that Louisiana has adopted several provisions of the Uniform Commercial Code); William R. Forrester, Jr., *Recent Changes to the Code of Civil Procedure*, 51 LA. BAR J. 342 (2004) (discussing amendments to Louisiana's civil procedure rules governing expert discovery); David W. Robertson, *Summary Judgment and Burden of Proof*, 45 LA. BAR J. 331 (1997) (discussing the new Louisiana rule on summary judgment and noting that it was derived directly from the U.S. Supreme Court's decision in *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*).

Puerto Rico's system is somewhat less accessible for non-Spanish-speaking Americans. Interestingly, one finds Puerto Rican materials under the "International/Worldwide Materials" database in Westlaw (R), not under the U.S. States database. This is so even though Congress has expressly defined Puerto Rico as a "state" for purposes of the diversity jurisdiction statute. See *28 U.S.C. § 1332(e) (2010)*. There is no denying the fact, however, that Puerto Rico is far more integrated into the U.S. legal system than any [**44] foreign country is. Since Puerto Rico falls within the jurisdiction of the First Circuit, see *28 U.S.C. § 41 (2010)*, the judges of that court regularly hear cases implicating Puerto Rican law. Furthermore, American law has greatly influenced the Puerto Rican legal system. See, *e.g.*, Harry J. Haynsworth, *The Unified Business Organizations Code*, 29 DEL. J. CORP. L. 83, 86 n.32, 87 (2004) (stating that Puerto Rico has adopted the Delaware General Corporation Law and the Revised Uniform Partnership Act); Symeon C. Symeonides, *Choice of Law in the American Courts in 1998: Twelfth Annual Survey*, 47 AM. J. COMP. L. 327, 354 (1999) (noting that Puerto Rican choice-of-law jurisprudence was influenced by the Second Restatement); Luis E. Rodriguez-Rivera, *Genesis of Puerto Rico's Environmental Law*, 67 REVISTA

JURIDICA UNIVERSIDAD DE PUERTO RICO 201, 209-11 (1998) (discussing the impact of the American legal tradition on Puerto Rican law, especially environmental law). As a practical matter, therefore, the Supreme Court was on firm ground when it assumed, in the text of *Rule 44.1*, that only the law of a "foreign country" would be subject to the rule's procedures, not the law of a U.S. state, territory, [**45] or commonwealth.

For these reasons, although I join the majority's reasoning in all other respects, I do not share their views about the use of expert testimony to prove foreign law. I therefore concur in the judgment to that extent.



**Henry E. Breed et al., Respondents, v. Insurance Company of North America, Appellant**

**[NO NUMBER IN ORIGINAL]**

**Court of Appeals of New York**

**46 N.Y.2d 351; 385 N.E.2d 1280; 413 N.Y.S.2d 352; 1978 N.Y. LEXIS 2424; 4 A.L.R.4th 1246**

**November 28, 1978, Argued
December 27, 1978, Decided**

**PRIOR HISTORY:**    Appeal from a judgment of the Supreme Court, entered January 25, 1978 in Rensselaer County, bringing up for review an order of the Appellate Division of the Supreme Court in the Third Judicial Department, entered April 26, 1977, which (1) reversed an order of the Supreme Court at Special Term (Edward S. Conway, J.), entered July 8, 1976 in Rensselaer County, granting defendant's motion for summary judgment dismissing plaintiffs' complaint, and denying a cross motion by the plaintiffs for summary judgment, (2) granted summary judgment in favor of plaintiffs on the issue of liability only, and (3) remitted the matter to the Supreme Court for an assessment of damanges.

The Insurance Company of North America had issued to plaintiffs a homeowners policy which excluded from coverage theft of property by any tenant of the described premises.  Various articles of personal property were stolen from the plaintiffs' dwelling on their premises which were described in the policy.  The theft was committed by a tenant who rented an apartment in a carriage house located on the described premises.  The action was instituted to recover the value of the personal property taken.

The Court of Appeals reversed the judgment of the Supreme Court appealed from and the order of the Appellate Division brought up for review, and reinstated the order of Special Term granting summary judgment to defendant, holding, in an opinion by Judge Cooke, that the policy was clear and unambiguous, and that plaintiffs could not recover the value of the stolen property, since the "described premises", as outlined in the policy, equal the entire property of plaintiffs at the locations listed and consequently, inasmuch as the theft was committed by a

tenant residing on plaintiffs' property, the theft was not covered.

*Breed v Insurance Co. of North Amer.*, 57 AD2d 31. Breed v Insurance Co. of North Amer., 46 NY2d  .

**DISPOSITION:**    Judgment appealed from and the order of the Appellate Division brought up for review reversed, etc.

**LexisNexis(R) Headnotes**

*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms > Construction Against Insurers*
*Insurance Law > Claims & Contracts > Policy Interpretation > Exclusions*
*Insurance Law > General Liability Insurance > Exclusions > General Overview*
[HN1] Ambiguities in an insurance policy are to be construed against the insurer, particularly when found in an exclusionary clause.

*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms > General Overview*
[HN2] It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed. Before the rules governing the construction of ambiguous contracts are triggered, the court must first find ambiguity in the policy. There is no ambiguity when the words in the

46 N.Y.2d 351, *; 385 N.E.2d 1280, **;
413 N.Y.S.2d 352, ***; 1978 N.Y. LEXIS 2424

paragraphs of the policy under examination have a definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion.

## HEADNOTES

**Insurance -- Construction of Ambiguities in Policy**

1. Ambiguities in an insurance policy are to be construed against the insurer, particularly when found in an exclusionary clause.

**Insurance -- Homeowners Insurance -- Theft by Tenant**

2. An insurance policy which excludes from its coverage theft "of property * * * by any tenant of the described premises" is clear and unambiguous; accordingly, plaintiffs may not recover the value of personal property taken from their dwelling by their tenant who rented an apartment in a carriage house located on their parcel, some 80 feet from the dwelling, since the "described premises", as outlined in the policy, equal the entire property of plaintiffs at the locations listed and consequently, inasmuch as the theft was committed by a tenant residing on plaintiffs' property, the theft is not covered.

**Contracts -- Construction**

3. A contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.

**COUNSEL:** *John R. Casey* for appellant. The policy exclusion for theft by a tenant of the described premises is clear and unambiguous. ( *Trimble-Waterman Assoc. v Certain Underwriters at Lloyd's*, 41 NY2d 934; *McLeod & Henry Co. v Employers' Fire Ins. Co.*, 46 AD2d 242.)

*F. Richard Decatur, Jr.*, for respondents. The policy provisions are ambiguous and must be construed against the insurance company. ( *Sperling v Great Amer. Ind. Co.*, 7 NY2d 442; *Lachs v Fidelity & Cas. Co.*, 306 NY 357; *Eagle Star Ins. Co. v International Proteins Corp.*, 45 AD2d 637, 38 NY2d 861; *Greaves v Public Serv. Mut. Ins. Co.*, 5 NY2d 120; *Thomas J. Lipton, Inc. v Liberty Mut. Ins. Co.*, 34 NY2d 356.)

**JUDGES:** Judges Gabrielli, Jones and Fuchsberg concur with Judge Cooke; Judge Wachtler dissents and votes to affirm in a separate opinion in which Chief Judge Breitel and Judge Jasen concur.

**OPINION BY:** COOKE

## OPINION

[*352] [**1281] [***354] **OPINION OF THE COURT**

The basic issue here is whether an insurance policy, which excludes from its coverage theft "of property * * * by any tenant of the described premises", is clear and unambiguous.

Defendant insurer, through an agent related to plaintiffs, issued to the latter a homeowners policy for a continuous period commencing October 11, 1972. It contained section one relating to "Dwelling and Personal Property", section two in respect to "Comprehensive Personal Liability", a number of [*353] provisos applicable to the entire policy, a face sheet and three endorsement pages. Part I of section one, dealing with "Coverages", listed four categories of protection: "A, Dwelling", "B, Private Structure", "C, Unscheduled Personal Property", and "D, Additional Living Expense (Expenses Occasioned by Loss)." Thereafter it was provided that "[theft]" of property described under "Coverage C" was one of the perils insured against, subject to exclusions contained in the policy (section one, part II, item 8). In this respect, the policy read:

"This policy does not insure against loss or damage:

"A. caused by theft:

* * *

"2. of property by any relative of the Insured or by any tenant of the *described premises*". (Emphasis supplied.)

In turn, the face sheet stated: "The *described premises* are located at the above address [R. D. No. 3, Box 245, Troy, New York], and legally described unless otherwise stated herein. Tamarac Road, Town of Brunswick, Rensselaer County, New York". (Emphasis supplied.)

On January 26, 1973 a sizable number of articles of personal property belonging to plaintiffs were stolen from their dwelling on their said premises in the Town of Brunswick. There is no dispute but that the theft was committed by a tenant, Anthony Matarazzo, who at the time was renting an apartment in the carriage house, located on the parcel, some 80 feet distant from the dwelling. This action was instituted to recover the value of the personal property taken. Special Term granted summary judgment to defendant, and the Appellate Division, by a divided court, reversed, granted summary judgment to plaintiffs and remitted to Special Term for assessment of damages. Defendant now appeals, pursuant to CPLR 5601 (subd [d]), from the final judgment of Supreme Court, Rensselaer County, in favor of plaintiffs and

against defendant in a stated sum, bringing up for review the interlocutory order of the Appellate Division.

[**1282]  Well recognized is the general rule that [HN1] ambiguities in an insurance policy are to be construed against the insurer, particularly when found in an exclusionary clause (see *Thomas J. Lipton, Inc. v Liberty Mut. Ins. Co*., 34 NY2d 356, 361). But, in attempting to reach a conclusion embracing recovery under this policy, plaintiffs would have this court find as a minor premise that there is actually such an ambiguity [*354]  here. The obvious flaw in such reasoning is that there is no uncertainty in the germane terms of the policy.  Rather, if a tenant of the "described premises" steals property, the loss is not covered; the "described premises", as outlined in the policy, equal the entire property of plaintiffs at the location listed; and, therefore, since the theft at issue was committed by a tenant residing on plaintiffs' property, the theft is not covered.

[***355]  The majority at the Appellate Division conceded that "it is clear that the general provisions of section I of the policy covers all structures on the 'described premises' (coverage A and B of section one)" ' (57 AD2d, p 33). This being so and without more, the theft is excluded from the policy coverage under the express language of paragraph A (2) of part IV of section one: "This policy does not insure against loss or damage: A. caused by theft: * * * 2. of property by any relative of the Insured or by any tenant of the described premises." Since Matarazzo, who pleaded guilty to the crime, was a tenant of the apartment in the carriage house, a structure on the described premises, the theft is excluded and plaintiffs may not recover.

   *  Paragraph A of section "ONE" of the policy in pertinent part reads: "A. Coverage A, Dwelling. Coverage A insures, subject to the Exclusions and limitations stated herein, the described residence owned and occupied by the Insured exclusively for residential purposes."

      Paragraph B of said section reads: "B. Coverage B, Private Structure.  Coverage B insures, subject to the Exclusions stated herein, appurtenant structures owned by the Insured and which are located on the described premises or within five hundred feet thereof and not used for business, professional or farming purposes."

Plaintiffs urge, however, that it is unclear whether said exclusionary language of the policy exempts from coverage a theft by a tenant of the residence only or a tenant of either the residence or an appurtenant structure on the described premises.  It is argued that the doubt is caused by the policy definition of "residence premises", which includes appurtenant structures, and the claimed

absence of any policy definition of described premises. The simple answer is that the term "residence premises" does not appear in the exclusion, and that therefore the phrase bears no relevance to our inquiry.  The definition would be applicable to other policy provisions where the expression appears, which provisions, incidentally, do not call for exclusion (see, e.g., section one, part I, par C [12]; section one, part VIII, par A [4], [a], [a], [b], [c], [d]).  Furthermore, the "described premises", although not appearing under [*355]  a definitional heading, are in reality and for all purposes defined by the characterization and demarcation contained on the face sheet.

[HN2] "It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed" ( *Morlee Sales Corp. v Manufacturers Trust Co*., 9 NY2d 16, 19). Obviously, before the rules governing the construction of ambiguous contracts are triggered, the court must first find ambiguity in the policy ( *Hartigan v Casualty Co. of Amer*., 227 NY 175, 180). But here there is no ambiguity since the words in the paragraphs of the policy under examination have a definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion (see *Loch Sheldrake Assoc. v Evans*, 306 NY 297, 305; *Midkiff v Castle & Cooke*, 45 Hawaii 409; *London & [**1283] Lancashire Ind. Co. of Amer. v Barron Fuel Co*., 31 F Supp 599, 600; see, also, 30 Am Jur 2d, Evidence, § 1069).  This court may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation, since "[equitable] considerations will not allow an extension of the coverage beyond its fair intent and meaning in order to do raw equity and to obviate objections which might have been foreseen and guarded against" *(Weinberg  & Holman v Providence Washington Ins. Co*., 254 NY 387, 391; see 1 Couch, Insurance [1929], § 184, p 376).

Lastly, plaintiffs point to the "split" in Judges and in courts and even to the combined experience and legal experience of those who have reviewed this matter and arrived at different results.  They conclude  [***356] from these statistics that the instant exclusionary clause must perforce be ambiguous. Such an approach was rejected long ago in *Hartigan v Casualty Co. of Amer*. (227 NY 175, *supra*) wherein this court observed at pages 179-180: "The fact that the courts below have read the policy otherwise and found it susceptible of another meaning is urged as establishing the fact that reasonable and intelligent men may honestly differ as to its meaning and that it must, therefore, be construed against the insurer. It is, however, for this court to say, as matter of law, whether reasonable men may reasonably differ as to such meaning, or whether the indulgence of the lower

46 N.Y.2d 351, *; 385 N.E.2d 1280, **;
413 N.Y.S.2d 352, ***; 1978 N.Y. LEXIS 2424

courts has not written a new contract for the parties and extended the defendant's liability beyond the plain and unambiguous language of the policy."

[*356] Accordingly, the judgment of Supreme Court appealed from and the order of the Appellate Division brought up for review should be reversed, with costs, and the order of Special Term granting summary judgment to defendant reinstated.

## DISSENT BY: WACHTLER

## DISSENT

Wachtler, J. (dissenting). I cannot agree with the majority that the term "described premises" is unambiguous as it appears in the policy provision in question.

The property owner, whose home was looted, seeks to recover from his insurance carrier. The insurance company claims that since the culprit was a tenant of the carriage house located on the insured's property, coverage is excluded under the policy. The exclusion clause relied on by the carrier reads:

"This policy does not insure against loss or damage:

"A. caused by theft:

* * *

"2. of property by any relative of the Insured or by any tenant of the described premises." (Section one, part IV, par A [2].)

The question presented is whether this clause is free from ambiguity. Surely the phrase "described premises", without express definition, does not import a clear meaning. Concededly it could mean the entire premises, including the main dwelling and the carriage house as the insurance company argues. However, it could just as easily be construed to refer only to the main dwelling. One cannot be sure. Yet, although numerous other terms are clarified such as "insured premises" and "residence premises" in the policy's definitional section (section one, part VIII, par A [2], [3]), inexplicably no definition is provided for "described premises".

A reading of the entire insurance policy, rather than supporting the insurance company's construction of the term, engenders additional confusion. Notably the policy defines "residence premises" as "a one or two family dwelling building, appurtenant structures, grounds and private approaches thereto". Thus "residence premises" means exactly what the carrier contends "described premises" should mean. It is puzzling why the carrier neglected to use the unambiguous term "residence premises" if that is what it meant to express.

Another provision of the policy which casts doubt upon the insurance company's position, Coverage B, insures "appurtenant [**1284] structures owned by the Insured and which are located on the described premises" (section one, part I, par B). For [*357] purposes of this provision, appurtenant structures are not subsumed by the term "described premises", but are rather located on and distinct from the "described premises". It would be unreasonable to conclude, absent any contextual difference, that the same term has a more inclusive meaning as it appears in the provision in question.

Attempting to clarify the ambiguity, the majority relies most heavily on the face sheet of the policy which states: "The described premises are located at the above address [R. D. No. 3, Box 245, Troy, New [***357] York], and legally described unless otherwise stated herein, Tamarac Road, Town of Brunswick, Rensselaer County, New York." This statement, however, does little to dispel the ambiguity indicating merely where the "described premises" are located, without defining whether that term embraces appurtenant structures.

Ambiguities in an insurance policy must be construed in favor of the insured ( *Sperling v Great Amer. Ind. Co*., 7 NY2d 442, 450; *Greaves v Public Serv. Mut. Ins. Co*., 5 NY2d 120, 125). This rule is especially applicable where, as here, the ambiguity appears in a clause excluding coverage ( *Thomas J. Lipton, Inc. v Liberty Mut. Ins. Co*., 34 NY2d 356; *Sincoff    v Liberty Mut. Fire Ins. Co*., 11 NY2d 386, 390-391). Since the policy was drafted by the insurer it would be unfair to deprive an insured of coverage which in view of the language of the policy was reasonably anticipated.

It should be noted also that of the 13 Judges who have grappled with this issue, six, including three from this court, have found ambiguity. Although *Hartigan v Casualty Co. of Amer*. (227 NY 175, 179-180), instructs that a finding of ambiguity by the lower courts does not necessitate that this court reach a similar result, one must wonder how a layman will comprehend the terms of an insurance policy, when the purportedly clear meaning has eluded so many Judges.

The order of the Appellate Division granting summary judgment to the insured property owner should be affirmed.

Case 09-10138-MFW   Doc 14394   Filed 09/10/14   Page 260 of 485

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

1991 CarswellAlta 8
Alberta Court of Appeal

Canadian National Railway v. Volker Stevin Contracting Ltd.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167, 30 A.C.W.S. (3d) 346, 8 W.A.C. 39

# CANADIAN NATIONAL RAILWAY COMPANY v. VOLKER STEVIN CONTRACTING LTD. and CANADIAN INDEMNITY COMPANY; TED SIMON, STEVENSON WILLS MATTHEWS, BENJAMIN VAUGHN YALLOP and WILLIAM E. JUBIEN (Third Parties)

Harradence, Stratton and Côté JJ.A.

Heard: November 12, 1991
Judgment: November 25, 1991
Docket: Doc. Edmonton Appeal 9103-0076-AC

Counsel: *C.P. Clarke, Q.C.*, and *G.A. Harding*, for appellant.
*M.J. Bondar*, for respondents.

Subject: Contracts

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**
 **Construction Law --- Building contract — Terms of contract — Express terms — General**

Evidence (civil) — Opinion evidence — Expert witnesses — General — Scientific and engineering witnesses testifying at trial on interpretation of construction contract — Contract containing little jargon or technical language — Interpretation of contract being matter of law rather than subject for evidence — Scientist or engineer improperly testifying on meaning of ordinary English.

Contracts — Interpretation — General — Construction contract requiring contractor to install new culvert by tunnelling through embankment — Contract leaving aspects of construction method to determination of contractor but requiring contractor to maintain structural integrity of soil — Contract putting risk of unforeseen conditions at site on contractor and precluding reliance on information supplied by railway — Railway failing to pass along report on unstable soil conditions at site — Attempt at conventional tunnelling unsuccessful due to unstable soil conditions — Railway terminating contract and retaining another construction company — Tunnel successfully completed using chemical grouting to maintain soil stability — Railway unsuccessfully suing to recover additional cost of that method — Trial judge allowing counterclaim by contractor for damages for breach of contract — In case of doubt, court adopting sensible interpretation advancing objects of contract — Contract not requiring use of conventional tunnelling methods — Use of chemical grouting not violating covenant to maintain structural integrity of soil — Failure to pass on site report not actionable under contract — Appeal allowed.

Construction law — Interpretation of contract — Construction contract requiring contractor to install new culvert by tunnelling through embankment — Contract leaving aspects of construction method to determination of contractor but requiring contractor to maintain structural integrity of soil — Contract putting risk of unforeseen conditions at site on

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

contractor and precluding reliance on information supplied by railway — Railway failing to pass along report on unstable soil conditions at site — Attempt at conventional tunnelling unsuccessful due to unstable soil conditions — Railway terminating contract and retaining another construction company — Tunnel successfully completed using chemical grouting to maintain soil stability — Railway unsuccessfully suing to recover additional cost of that method — Trial judge allowing counterclaim by contractor for damages for breach of contract — In case of doubt, court adopting sensible interpretation advancing objects of contract — Contract not requiring use of conventional tunnelling methods — Use of chemical grouting not violating covenant to maintain structural integrity of soil — Failure to pass on site report not actionable under contract — Appeal allowed.

The plaintiff railway decided to have a new culvert installed by tunnelling through an embankment of fill beneath a trestle. The tenders specified tunnelling without interrupting rail service, with other aspects of the construction method left to the contractor. The contract documents said that the contractor had to make its own assessment of conditions and not rely on the plaintiff's information, and that the contractor was to bear all risk from unforeseen site conditions. The documents also said the contractor was to maintain the structural integrity of the soil.

The defendant obtained the contract, and subcontracted the tunnelling. When the subcontractor's method failed, the defendant terminated the subcontract and the plaintiff terminated the main contract. The plaintiff then hired another contractor, which did the job by a different method, chemical grouting, at a cost higher than the original contracted amount. The plaintiff sued for the difference, and the defendant counterclaimed for breach of contract.

At trial, some of the scientific and engineering witnesses gave opinions on the nature and types of construction contracts, and on how to interpret certain clauses in the contract.

The trial judge dismissed the claim and awarded the defendant damages under the counterclaim on the grounds that the contract called for "conventional" tunnelling methods and forbade a change in the character of the soil, and that "conventional" tunnelling methods would not work, so the tunnel ultimately built was not that originally contracted for. The plaintiff appealed.

**Held:**

Appeal allowed.

It is for the court to interpret a contract, which is a legal matter. It is not a subject for evidence. The contract here contained very little jargon or technical matters, and a scientist or engineer should not have testified about the meaning of ordinary English.

The contract did not call for conventional tunnelling methods; the tunnelling methods were to be proposed by the builder. Moreover, the contract encouraged the use of chemical grouting or similar methods. If there is any doubt in construing a contract, one should prefer the interpretation that makes sense and advances the objects of the contract.

Maintaining the structural integrity of the soil meant its shape and maybe its cohesion, not its chemical or geological nature. No one would want to preserve the nature of unstable soil. Neither does the word "maintain" mean to avoid all change.

Ordinary law restricts the conditions under which one may imply a term in a contract, and forbids implying a term contrary to express terms. It is doubtful that a construction contract implies a warranty by the owner that the work can be carried out or the work achieved. Here, the contract expressly excluded implying any obligation on the plaintiff's part not expressly imposed by the contract. The law of torts should not impose between contracting parties a duty opposite to that imposed by their contract. As the contract said the defendant was to inspect and bear all risk, the plaintiff's failure to pass along

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14394   Filed 09/10/14   Page 262 of 485

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8
1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

a site report regarding the unstable soils problem was not actionable. Moreover, the report did not contain any unusual knowledge that was crying out to be revealed.

**Table of Authorities**

**Cases considered:**

*Catre Industries Ltd. v. Alberta* (1989), 36 C.L.R. 169, 63 D.L.R. (4th) 74, 99 A.R. 321 (C.A.) [leave to appeal to S.C.C. refused (1990), 105 A.R. 254, 108 N.R. 170] — *referred to*

*Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.*, [1991] 4 W.W.R. 251, 53 B.C.L.R. (2d) 180, 44 C.L.R. 88, 7 C.C.L.T. (2d) 177, 1 B.L.R. (2d) 188 (C.A.) — *considered*

*Gorgichuk Estate v. American Home Assurance Co.* (1985), 5 C.P.C. (2d) 166, 14 C.C.L.I. 32, [1985] I.L.R. 1-1984, varied on other grounds [1988] I.L.R. 1-2283, 30 C.C.L.I. 51, 27 O.A.C. 157 (C.A.) — *referred to*

*Green Elm Holdings v. J.H. Hogg & Associates Ltd.* (1983), 31 Alta. L.R. (2d) 88, 7 C.L.R. 159 (C.A.) — *distinguished*

*Moncton (City) v. Aprile Contracting Ltd.* (1980), 29 N.B.R. (2d) 631, 66 A.P.R. 631 (C.A.) — *referred to*

*R. v. Walter Cabott Construction Ltd.* (1975), 44 D.L.R. (3d) 82, varied (1975), 69 D.L.R. (3d) 542, *(sub nom. Walter Cabott Construction Ltd. v. Canada)* 12 N.R. 285 (Fed. C.A.) — *considered*

*Temar Construction Ltd. v. West Hill Redevelopment Co.* (1986), 21 C.L.R. 156 (Ont. H.C.)*referred to*

*Warden Construction Co. v. Grimsby (Town)* (1983), 2 C.L.R. 69 at 93 (Ont. C.A.) — *distinguished*

Appeal from judgment of Matheson J., (1990), 42 C.L.R. 150, 111 A.R. 116, dismissing action and allowing counterclaim.

**Per curiam (Written memorandum of judgment):**

One C.N. rail line links part of the Northwest Territories to the rest of Canada. At one point just inside Alberta, the rail line originally crossed a small valley on a timber trestle. Then later the C.N. put large metal culverts near the bottom, and dumped fill, mostly sand, on top. They covered the old trestle, so that the rail line now runs on an artificial embankment, mostly of sand. After some years the culverts became squashed so they would not carry sufficient water, threatening a washout. They were big enough that a person could walk inside and observe their deformation and consequent closure. The C.N. decided to have one culvert rebuilt, and the other one abandoned and replaced by a new culvert nearby. The C.N. bought and supplied the disassembled pieces of metal culvert. The C.N. called for tenders and specified that the new culvert had to be installed by tunnelling through the embankment without interruption of rail service above, and had to be completed by the end of winter. The C.N. expressly left other aspects of method of construction to the contractor [appeal from (1990), 42 C.L.R. 150, 111 A.R. 116].

Neither the C.N. nor Volker Stevin had any tunnelling experience. But a tunnelling company which could not secure a bond big enough for this job persuaded Volker Stevin to bid on this job and to subcontract all the tunnelling out to the tunnelling company. Volker Stevin did bid and got the job, and signed the contract with the C.N. The tunnelling company elected to use the shield method of tunnelling, but that did not work, and very little was done to build the new culvert. Volker Stevin terminated the subcontract, and the C.N. terminated the main contract. C.N. hired a different tunnelling company, Janod, which later successfully completed the job. It used chemical grouting to firm up the soil, and poling plates instead of portions of a shield. Volker Stevin's expert testified, and the trial judgment seems to find, that that was an excellent solution to the problem.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

The new job cost more that the old contract amount, so the C.N. sued Volker Stevin, which defended and counterclaimed, and third partied some C.N. officials.

The trial judgment dismissed C.N.'s suit, awarded Volker Stevin damages under its counterclaim, and dismissed Volker Stevin's third party claim. C.N. was ordered to pay costs of Volker Stevin and the third parties. C.N. appeals.

The reasons for judgment of the trial court are lengthy, but these appear to be their essential steps in reasoning:

(a) the contract called for "conventional" tunnelling methods, and forbade a change in the character of the soil;

(b) the contract excluded the possibility of problems in the embankment, other than the old wooden trestle, and said that the soil's structural integrity was basically adequate;

(c) "conventional" tunnelling methods would not work, because they would allow too much deflection, and chemical grouting was not a "conventional" tunnelling method, so the tunnel ultimately built was not that originally contracted for;

(d) the law excuses a builder under the present circumstances as the work called for by the contract is impossible or very difficult, or would not last long.

It is curious that some of the scientific and engineering witnesses gave opinions on the nature and types of construction contracts, and on how to interpret certain clauses in this contract. The trial judgment quotes some of that evidence, and seems to rely upon it. But these are legal matters which must be submitted to the court as argument. It is not a subject for evidence, or weighing of the qualifications of the person who submits it. The contract here contains very little jargon or technical matters, and is composed almost entirely of ordinary English. It is for the court itself to interpret that; even a professor of English should not testify on that point: *Gorgichuk Estate v. American Home Assurance Co.* (1985), 5 C.P.C. (2d) 166, 14 C.C.L.I. 32, [1985] I.L.R. 1-1984 (at pp. 7619, 7620), varied on other grounds [1988] I.L.R. 1-2283, 30 C.C.L.I. 51, 27 O.A.C. 157 (C.A.). Therefore, still less can a scientist or engineer testify about the meaning of ordinary English.

We have considerable doubts whether proposition (d) above, or any part of it, is correct in law. But our views respecting steps (a) to (c), set out below, make that academic. No more need be said about (d).

We attach as an appendix [post, p. 177] a number of the most relevant portions of the building contract between C.N. and Volker Stevin. It appears to us impossible to say that the contract called for "conventional" tunnelling methods, and forbade chemical grouting. The contract says many times that tunnelling methods are to be proposed by the builder: see supplementary general conditions 1.14(d), 1.26, 2.9(b); general conditions 3, 19, 44; instructions to bidders, paras. 8 and 9. Indeed Volker Stevin first told C.N. that it would investigate soil conditions further with a pilot hole and then tunnel using either the advancing shield method, or chemical freezing. (Its officer testified at trial that the word "chemical" was an error, but the author of that letter did not testify.) Later Volker Stevin elected the shield method. Besides the need to install the metal lining provided by the C.N., we see no restriction in the contract on method of tunnelling. No one showed us any evidence that Volker Stevin in fact interpreted the contract as calling for "conventional" tunnelling methods. No one from the tunnelling subcontractor testified. Therefore, even if *Warden Construction Co. v. Grimsby (Town)* (1983), 2 C.L.R. 69 at 93 (Ont. C.A.), is correctly decided, it is irrelevant.

What is more, we read supplementary general condition 2.9(k) as encouraging the use of chemical grouting or other similar methods, whether or not they may be considered "conventional." It says to combat any unstable soil, the contractor is to "employ sheathing; timbering; shoring, poling plates, spiling, grouting or other means necessary to maintain the structural integrity of the soil." It is common ground that the whole problem here was "unstable soil conditions." The second contractor, Janod, later successfully used poling plates and chemical grouting. It is suggested that "grouting" in para. (k) just means filling in the gap around the metal liner, and does not mean the extensive chemical process ultimately used by Janod. As paras. (m) and (n) unconditionally call for grouting, irrespective of the presence of unstable soil, we doubt that interpretation. But in any event, cl. (k) specifically calls for "other means necessary," so plainly the items enumerated in (k) are but examples, and the opposite of exclusive.

During the appeal, Volker Stevin suggested that para. (k) was confined to temporary methods during construction. We see nothing there to limit it that way. Some of the examples given sound neither temporary nor readily removable. Nor is there any need to remove them. Nor does the contract guarantee that the metal liner alone will support unstable soil.

It is suggested that when Janod injected large quantities of chemicals into the soil to harden it around the tunnel, they destroyed the soil's character, so that it became a kind of concrete, and so was no longer soil. And in turn it is suggested that that contradicted the original contract, and so both showed that the original contract was impossible, and that what C.N. now sues for is a different job entirely. We disagree. Paragraph (k) does not speak of preserving the soil, still less preserving its chemical or geological nature. Why one would want to preserve the nature of unstable soil we cannot fathom. If there is any doubt in construing a contract, one should prefer the interpretation which makes sense and advances the objects of the contract. What para. (k) expressly says to "maintain" is the "structural integrity of the soil." The "structural integrity" means its shape and maybe its cohesion. Patently that is what timbering would preserve. And obviously slumping or flow or fall of unstable soil is the evil a tunneller must guard against.

Nor does the word "maintain" mean to avoid all change. The new *Oxford English Dictionary* includes among the definitions of "maintain" these:

4. a. To keep up, preserve, cause to continue in being (a state of things, a condition or activity, etc.); to keep vigorous, effective, or unimpaired; to guard from loss or derogation ...

5. a. To cause to continue in a specified state, relation, or position ...

11. To back up, stand, give one's support to, defend, uphold (a cause, something established, one's side or interest, etc. ...)

13. To hold, keep, defend (a place, position, possession) against hostility or attack, actual or threatened ... 1660 F. Brooke tr. *LeBlanc's Trav.* 15 There are four avenues cut through the Mountain, easie to be maintained.

It is also relevant to note one of its definitions of "maintenance":

3. The action of keeping in effective condition, in working order, in repair, etc.; the keeping up of (a building, light, institution, body of troops, etc.) by the supply of funds or needful provision; the state or fact of being so kept up; means or provision for keeping up.

Instructions to "maintain the structural integrity" of a fire department or police force would not forbid replacement of any officers. On the contrary, the instructions plainly imply that any officers killed or disabled or retired are to be replaced at once. Instructions to maintain the structural integrity of a bridge plainly imply that corroded or cracked beams are to be replaced at once with new strong ones, not kept in place until the bridge falls down. That is so even if a number of the beams are already corroded or cracked at the time that the instruction is given.

The reasons for judgment say (with apparent approval) that one of the expert witnesses referred to supplementary general condition 2.9(c) and "was of the view that the absence of clear indications of problems related to any other aspects of tunnelling or methods excludes the possibility of other problems." That flies in the face of the clear words of para. (k), just discussed at length. What is more, everyone knew that the embankment was artificial, and had been built by piling sand and other fill over the old culverts and old trestle. And everyone knew that the new construction was to repair one old culvert and totally replace the other, because they had deformed and become squashed shut.

The contract documents repeatedly call on the builder to attend at the scene and thoroughly acquaint itself with subsurface and other conditions: see supplementary general condition 1.13, general condition 44, form of tender, and annex B to tender. Volker Stevin argued that their inspection was for site access and cost assessment, not for problem diagnosis, but we can read no such limitations into those clauses: see especially supplementary general condition 2.9(d). The tender certifies that Volker Stevin had inspected, and its counsel told us that its tunnelling subcontractor had also inspected conditions onsite before Volker Stevin bid. Volker Stevin's senior vice-president testified that Volker Stevin left it to its proposed tunnelling subcontractor to study

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 265 of 485

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8
1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

the plans and specifications with care. What is more, the old culverts were taller than a person, and one could enter them and view their deformation, cracking, and squashed ends. Volker Stevin argued that their assumption of risk in general condition 44 arose only if they did not inspect. But in fact it arose if they did not inspect everything: the clause is clear.

In oral argument before us, counsel for Volker Stevin repeatedly abandoned any claim for misrepresentation by C.N. (as distinguished from non-disclosure). Given supplementary general condition 1.13 and general condition 44, that abandonment is not surprising.

The reasons for judgment point out that supplementary general condition para. 2.9(k) begins "If areas of unstable soil conditions are encountered ..." The reasons say that "that would infer that the structural integrity of the soil was basically adequate," and that only some areas might not be. For the reasons just given, we reject that suggestion. Nor does it flow in English grammar or logic.

It will be seen that the reasons for judgment imply a number of terms which are nowhere in the express words of the contract documents, and indeed contradict the express words in varying degrees. This contract expressly excludes implying any obligation on C.N.'s part which is not expressly imposed by the contract: general condition 4. Even if the contract did not say that, the ordinary law restricts when one may imply a term in a contract, and forbids implying a term contrary to express terms: *Catre Industries Ltd. v. Alberta* (1989), 36 C.L.R. 169, 63 D.L.R. (4th) 74, 99 A.R. 321 (C.A.), especially at pp. 84-86, 88 [D.L.R.]. It is doubtful that a construction contract implies a warranty by the owner that the work can be carried out or the result achieved: see *Temar Construction Ltd. v. West Hill Redevelopment Co.* (1986), 21 C.L.R. 156 (Ont. H.C.), at pp. 168-69, and cases cited, and *Moncton (City) v. Aprile Contracting Ltd.* (1980), 29 N.B.R. (2d) 631, 66 A.P.R. 631 (C.A.), at p. 667.

Volker Stevin puts a great deal of emphasis upon supposed design defects here. But if there is no implied warranty by the owner that the design will work, then the significance of such defects either disappears or reverses itself. And when the contract leaves construction method up to the builder, then he in effect becomes one of the designers.

In our view, the contract was clear, and put on Volker Stevin the problem of how to bore and maintain a tunnel, and all risk that that might prove expensive or difficult. Volker Stevin and its tunnelling subcontractor inspected the scene at C.N.'s express demand, and C.N. were not tunnelling experts, so we cannot even see any unfairness, were that relevant. Volker Stevin did not have to bid. If they did bid, they could choose any price which they wanted, and allow in it for any contingencies which they wished. They chose to gamble that they could put in the low bid and still make money, and they lost: see the *Catre* case, at p. 91, and cases there cited.

During the second day of the appeal, Volker Stevin raised another argument. They suggested that C.N. was wrong not to pass on to prospective bidders a site report which C.N had obtained about the problem from the manufacturer of the metal tunnel lining. They framed that claim in tort, not contract. We see a number of obstacles to that claim:

(a) It is not pleaded in the statement of defence, or counterclaim, or particulars; the only thing at all close is a brief plea of misrepresentation, abandoned before us.

(b) It seems contrary to common sense that the law of torts should impose between contracting parties (or their employees) a duty the very opposite of that which they have imposed between themselves by their contract. The contract here says ad nauseam that the builder must make his own assessment of conditions, not rely on C.N.'s information, and must bear all risk of difficulties or cost overruns from unforeseen conditions on the site: see supplementary general conditions 1.10, 1.13.

(c) The authority cited to us is a lone sentence in *R. v. Walter Cabott Construction Ltd.* (1975), 44 D.L.R. (3d) 82 at 98 (Fed. T.D.). The facts there were rather unusual. Mahoney J. cited no authority for that legal proposition. As the law already has categories of contracts where disclosure is and is not required between parties negotiating a contract, the best which can be said of the sentence relied on is that it is far too broad. The Federal Court of Appeal reversed that part of the decision of Mahoney J. Without setting out a general rule, Pratte J. held that there was no duty in tort there beyond the duties in contract, and the rest of the court concurred on that point: (1975), 69 D.L.R. (3d) 542, *(sub nom. Walter Cabott Construction Ltd. v. Canada)* 12 N.R. 285, at pp. 545-46, 549 [D.L.R.].

Case 09-10138-MFW   Doc 14394   Filed 09/10/14   Page 266 of 485

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

(d) Volker Stevin relies upon *Green Elm Holdings v. J.H. Hogg & Associates Ltd.* (1983), 31 Alta. L.R. (2d) 88, 7 C.L.R. 159 (C.A.). That was a suit by an *owner* against the subdesigner to whom the designer hired by the plaintiff owner had delegated part of the design. The design could be built and was built, but did not suffice for the plaintiff owner's purposes. That case has nothing to do with the present situation, and no general statements of law are found there. There is apparently no authority at the appellate level in the Commonwealth making an owner's designers liable in tort to the *builder*, and in one case the British Columbia Court of Appeal would not find such a duty of care: *Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.*, [1991] 4 W.W.R. 251, 53 B.C.L.R. (2d) 180, 44 C.L.R. 88, 7 C.C.L.T. (2d) 177, 1 B.L.R. (2d) 188.

(e) The manufacturer's report not given to Volker Stevin was not a scientific analysis of geological or subsoil conditions. It did not analyze instability of the soil itself. (That was in other material which C.N. did give Volker Stevin.) Instead portions of the manufacturer's report on which Volker Stevin relied on appeal covered three things:

(i) a description of what was evident to the naked eye of anyone who entered the two old culverts;

(ii) a discussion in common-sense terms (with no evidence of advanced technical knowledge) of what could and could not have caused the culvert's obvious deformation;

(iii) an educated guess that compacting or backfilling during the original entombment of the old trestle played a role in the deformation.

We cannot see that C.N. had any unusual or peculiar knowledge which cried out to be revealed, especially to Volker Stevin, who knew the basic facts anyway, or to its tunnelling subcontractor which had more tunnelling knowledge than did C.N.

Therefore, we need not consider whether C.N.'s employees could take advantage of an exculpatory clause in C.N.'s contract had they themselves been guilty of misrepresentation or actionable non-disclosure.

There was a great deal of evidence on a number of points which appear to us irrelevant, and we will not recite that evidence.

We heard no dispute about the amounts involved in the suit. When counsel for the plaintiff C.N. was leading Mr. Yallop's evidence at trial on amount, counsel for the defendant Volker Stevin said that quantum was not in issue, and C.N.'s counsel dropped that line of evidence. On appeal Volker Stevin's counsel raised the question of quantum, but desisted when reminded of this. He conceded that C.N.'s computations are right. Nor did we hear any suggestions that the defendant bonding company was in any different legal position than the defendant Volker Stevin. They appear here, and appeared at trial, by the same counsel. At the end of oral argument we announced that the appeal would be allowed. We promised reasons to follow, which are found above. We allow the main suit for the amounts suggested by C.N. at trial, and dismiss the counterclaim. The third party notice becomes academic.

After we announced that the appeal was allowed, we heard argument on costs. Counsel for Volker Stevin said that when he had won at trial, he had got costs on double col. 6 up to the date of the losing party's offer of settlement, and at four times col. 6 thereafter. He suggested that turnabout would be fair play, and counsel for C.N. did not object. Nor did C.N. object to his reminder that Volker Stevin was to get costs in any event of an earlier procedural appeal, to be set off against the main costs. We adopt that suggestion for costs in Queen's Bench and on appeal. C.N. should recover costs of second counsel, and no limiting rule should apply. If any more details need to be worked out, or directions are useful, any member of the panel may give them before or after entry of formal judgment.

### APPENDIX — Supplementary General Conditions #1

#### 1.4 Work included

The work included in the contract consists of furnishing all equipment, tools, and labour necessary for sorting, loading, hauling and installation of tunnel liner and multiplate culverts, disposal of excavated material, channel relocation, backfill of existing

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

culvert, supply and install shoring as required, end treatment hold down devices, and any and all work ordered by the Engineer necessary to complete this work as shown on the drawings and specified herein.

## 1.7 Procedure of construction

The Contractor shall study all drawings, so as to become familiar with the conditions under which the Contract will have to be carried out.

The Contractor shall carry out all work in such a way and sequence that all work covered under the Contract shall be completed by the completion date specified. The site shall be left in a neat and tidy condition.

## 1.8 Basis of tendering (Cont'd.)

Unless otherwise stated in this specification, the unit prices above referred to shall include all labour, scaffolding, tools, implements, machinery, service and materials constructed in place and shall include all overhead, profit and supervision and the entire cost of all permits, certificates, Sales Tax, Provincial Sales Tax, Provincial Labour Taxes, Workers' Compensation, Public Liability and Property Damage, Surety Bond, Royalties, and any and all other costs of a like nature to which the work is liable.

## 1.10 Allowance for working conditions

The Contractor shall take into consideration all of the precautions, conditions and limitations of every kind which may affect the work or his operations, and he must allow for same in the various Unit Prices or lump sums submitted.

## 1.12 Contractor to show ability to do work

Before the award of the contract, any tenderer may be required to show to the satisfaction of the Engineer that he has, or can obtain, the necessary and proper equipment, tools, facilities and means, and that he has the experience, ability and financial resources to perform the work within the time specified and in a satisfactory or workmanlike manner.

## 1.13 Visiting the site

The Contractor shall visit the site before submitting his tender in order to thoroughly acquaint himself with all local conditions under which he will be called upon to carry out the work coming under his contract.

The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labour, water, electric power, roads and uncertainties of weather, or similar physical conditions at the site, the conformation and con ditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work or the cost thereof under this Contract.

The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of any and all surface and subsurface materials, including streams and ground water, to be encountered. The Contractor has considered all exploratory work done by or for the Railway, as well as information presented by the Drawings and Specifications made a part of this Contract. Any failure of the Contractor, to acquaint himself with all the available information will not relieve him from responsibility for performing the work. Representations made but not so expressly stated and for which liability is not expressly assumed by the Railway in the Contract and for information on or opinions concerning soils and subsurface conditions or other matters furnished by or for the Railway or for any understanding, opinions, or representations made or so expressed by any of its officers or agents during or prior to the execution of this Contract, shall be deemed only for the information of the Contractor and the Contractor shall have no claim against the Railway resulting from such information.

## 1.14 Work schedule

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

The Contractor shall submit, with his tender documents, a schedule or diagram showing the dates on which all activities will be commenced and finished and to which the Contractor is prepared to work and stand by bearing in mind that the completion date must not be altered. The Contractor shall indicate, in his schedule, his expected progress in increments of not more than one week.

Within 14 days after the award of the contract, the contractor shall submit to the Engineer for approval a detailed work schedule in increments of not more than one week.

The detailed work schedule shall:

(d) Clearly indicate the construction periods and sequences of operations of each item of work in sufficient detail so the Engineer can determine the feasibility of the program.

Approval by the Engineer of the Contractor's detailed construction program shall in no way be construed to relieve the Contractor of any of his duties or responsibilities under this contract.

**1.24 Intent of plans and specifications (Cont'd.)**

If the Contractor, in the course of the work, finds any discrepancy between the specifications, the plans and the physical conditions of the locality, or any errors or omissions in the plans, it shall be his duty to immediately inform the Engineer in writing, and the Engineer shall promptly verify the same. Any work done after such discovery, until authorized, will be done at the Contractor's risk.

Specifications shall take precedence over the drawings. Figures on the drawings shall take precedence over scaled measurements; details shall take precedence over drawings made to a smaller scale.

**1.26 Construction methods and prosecution of work**

As far as it is consistent with the nature of the work and the results to be attained, the order and methods of prosecuting the work will be left to the discretion of the Contractor, with whom the responsibility for such order and methods shall rest; provided, however, that the Engineer shall have the right at all times to prescribe and control such order and methods with a view to the safety and to the rapid and economical construction of the work.

If the Contractor fails, in the opinion of the Engineer, to carry on the work with sufficient diligence and skill, or his delegated representative having jurisdiction fails to co-operate with all trades and the Engineer, as aforementioned to ensure completion in accordance with the Contract, the Engineer may take whatever steps he considers necessary under Clauses 22 and Page A5, of Annex "A", General Conditions attached.

**1.27 Maintenance and guarantee**

The Contractor will be held absolutely responsible for the care of the work and whatever appertains thereto from commencement of same to its final completion and acceptance.

All work performed under this contract, unless otherwise specified, shall be guaranteed by the Contractor for a period of one year from the date of final acceptance of work by the Railway, during which period of one year the Contractor shall, immediately on receipt of notice in writing from the Railway, and at his own expense, make good all defects of whatever nature which may develop during that period.

In the event of the Contractor refusing or neglecting to do so, the Railway may employ some other person or persons to make good any such defects, loss or damage, and the expense of employing such person or persons to make good any such defects, loss, or damage, shall be charged to and paid by the Contractor.

**1.62 Addenda to specification**

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

Should any bidder find discrepancies in or omissions from the contract drawings or specifications, or be in doubt as to their meaning, he shall notify the Engineer who will forthwith interpret the true intent and if necessary issue addenda to specifications stating the true intent and purpose of the contract drawings or specifications relative thereto. Upon award of contract, said addenda shall become an integral part of the contract.

**Supplementary General Conditions — #2**

**2.2 Work included**

The work consists of furnishing all plant, labour and equipment to install structural plate corrugated steel pipe, tunnel liner plate, anchoring and stiffening systems, excavation and disposal, backfill existing culvert and install end treatment.

All work shall be carried out by personnel skilled in this type of installation.

**2.3 Scope of the work**

The scope of the works is as follows:

(b) Under the closure of the railway traffic for a continuous period of ten days excavate for, install and backfill grade for the 2450 mm. Structural plate corrugated steel pipe including the installation of the adapter to provide connection to the proposed 2400 mm tunnel liner plate installation; and the removal of the existing damaged culvert section now in place.

(c) With the rail traffic in continuous service install 2400 mm tunnel liner plate through an existing structural plate corrugated steel pipe to connect onto the installation described in paragraph (b).

(d) Install a new tunnel liner plate installation of 4200 mm diameter.

**2.4 Material (Cont'd.)**

(c) All other materials including anchors, grout, sand bags and miscellaneous iron will be supplied by the contractor.

**2.9 Installation of 4200 mm tunnel liner plate**

(a) A new 4200 mm diameter tunnel liner plate is required to be installed through the railway grade as shown on the drawings.

(b) The Contractor shall submit with his form of tender the construction method and procedures he intends to use to accomplish this installation.

(c) The Contractor is to be aware of the existence of an old timber trestle within the limits of his installation. Piling and timber will be encountered during the tunnelling operation.

(d) The soil information contained on the contract drawing was obtained by the railway in June of 1985. It is the responsibility of the contractor in using this information to ensure that it is suitable for their purposes and to supplement it as they consider necessary.

(e) The Contractor is to pay particular attention to the fact that his tunnelling operation will be carried out during the operation of the railway. The Contractor is to ensure that his operations do not jeopardize the structural integrity of the railway grade and track.

(f) The tunnel liner plate culvert shall be assembled and installed according to the ring makeup drawing and manufacturers recommendations.

(g) Tunnel liner plates are to be installed in such a manner as to have the grout holes located every third ring at the two, four, six, eight, and ten o'clock positions.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

(i) Installation shall begin at the outlet end of the structure and shall proceed continuous to the inlet end.

(j) Excavation shall be kept to a minimum. It shall be advanced ahead of the tunnel liner installation in relationship to the structural makeup of the soil encountered and at no time shall it exceed 600 mm.

(k) If areas of unstable soil conditions are encountered the contractor shall employ sheathing; timbering; shoring, poling plates, spiling, grouting or other means necessary to maintain the structural integrity of the soil.

(l) Excavation material gained by the tunnelling operation may be disposed of on railway property at a site approved by the Engineer.

(m) Grouting shall be carried out via each grout hole provided and shall be carried out immediately after each ring sectionals installed not exceeding 4 hours after installation or as directed by the Engineer.

(n) Grouting shall be done to ensure that all voids are filled taking care that no shifting or deformation occurs to the liner during this operation due to excessive pressure.

**2.10 Basis of payment (4200 mm Tunnel Liner Plate)**

The Unit Prices shall also include the cost of all pumping, bailing, shoring, etc. and the furnishing of all necessary pumps, tools and equipment required to keep the work area dry.

***CN Contract***

*Work to be done.*

*Time for completion.*

III. The Contractor shall forthwith commence the work provided for by the said Contract, shall diligently execute the respective portions thereof according to the Contract and on or before the following dates, namely:

> February 23, 1986

shall deliver the same to the Railway completed in every particular to the satisfaction of the Engineer.

*Payments.*

IV. (1) The Railway covenants with the Contractor, that the Contractor having in all respects complied with the provisions of the Contract, will be paid for and in respect of the work the price or the various prices set out in the schedule of prices embodied in the said accepted tender, (Annex "B"), and any other sums of money properly payable under the terms of the Contract.

*Interpretation of the Contract.*

VII. (a) If there is any discrepancy or conflict between the provisions of this Agreement and the General Conditions (Annex "A"), this Agreement shall govern.

(b) If there is any discrepancy or conflict between the General Conditions (Annex "A") and Annexes "B" and "C", the provisions of the General Conditions (Annex "A") shall govern.

***General Conditions***

*Interpretation.*

1. In the Contract:

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

(a) "work" or "works" shall, unless the context otherwise requires, mean the whole of the work and materials, matters and things required to be done furnished and performed by the Contractor in or under this Contract;

*Included and incidental works*

3. The price or each respective price and amount of money stipulated in the schedule of prices embodied in the accepted tender (Annex "B") and in any Engineer's certificate issued pursuant to Clause 13 or 14 of these General Conditions includes and determines the full compensation to the Contractor for not only the particular description of work and materials mentioned therein but also all and every kind of planning, labour, supervision, materials, machinery, plant, equipment, civil and other works and things of whatsoever nature required for the full execution, completion and delivery, in accordance with the Contract, of the work. All of such incidental facilities and services shall be provided by the Contractor without further expense to the Railway. In case of any dispute as to what work, materials and/or incidental facilities or services are included in the work contracted for, or in the said schedule and certificates, or any item thereof, the decision of the Engineer shall be final and conclusive.

*Implied contracts negatived.*

4. No implied obligation of any kind whatsoever, by or on behalf of the Railway shall arise or be implied from anything in the Contract contained, nor from any position or situation of the parties at any time, it being clearly understood that the express covenants and agreements herein contained made by the Railway, shall be the only covenants and agreements upon which any rights against the Railway may be founded.

*Quality.*

8. The works shall be constructed of the best materials of their several kinds, and carried on and completed in the best and most workmanlike manner, and in the manner required by, and in strict conformity with, the Contract, as defined in Article II of the Agreement, all to the complete satisfaction of the Engineer.

*Extra work.*

14. (1) The Engineer may from time to time, before the final acceptance of the works, order in writing extra work to be done. The price for such work shall be determined by the Engineer who may either fix a unit price or a lump sum price, or may, if he so elects, provide that the price shall be determined by the actual cost, which will include additional costs for Surety Bond, Public Liability and Property Damage Insurance, Workmen's Compensation Insurance, Provincial Labour Tax, Provincial Sales Tax, and other costs of a like nature that may be imposed upon the Contractor by Federal or Provincial laws, to which shall be added ten per cent to cover general expense and superintendence, profits, contingencies, use of tools (other than Contractor's plant), Contractor's risk and liability. If the Contractor shall perform any work or furnish any material which is not provided for in the Contract, or which was not authorized in writing by the Engineer, the Contractor shall receive no compensation for such work or material so furnished, and does hereby release and discharge the Railway from any liability therefor.

*Covenants herein apply to Extra Work.*

16. All alterations, changes or extra work so ordered, shall, except as otherwise expressly provided, fall within and be governed by the terms and conditions of this Contract, in like manner and to the same extent as the works originally contracted for.

*Delays.*

19. The Contractor shall not be entitled to make any claim or demand, nor bring any action or suit against the Railway for any damage which he may sustain by reason of any delay in the progress of the work.

*Defective work or material.*

*May require removal or re-execution.*

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

*Non-compliance by Contractor.*

20. Should the Contractor use or employ, or intend to use or employ, in or about the works, any tools, plant, materials, equipment, or things which, in the opinion of the Engineer, are not in accordance with the provisions of the Contract or are for any reason unsuitable for the works, or should the Engineer consider that any work is for any reason improperly, defectively, or insufficiently executed or performed, the Engineer may order the Contractor to remove the same and to use and employ proper tools, plant, materials, equipment, or things, or to properly re-execute and perform such work, as the case may be; should the Contractor not commence within twenty-four hours to carry out and comply with the said order or orders with all due diligence, the Engineer may at any time thereafter execute, or cause to be executed, the orders so given by him, and the Contractor shall, on demand, pay to the Railway all costs, damages, and expenses incurred by the Engineer in respect thereof, or occasioned to the Railway by reason of non-compliance by the Contractor with any such orders, or the Railway may retain and deduct the amount of such costs, damages and expenses from any amounts then or thereafter payable to the Contractor.

*Insufficient workmen, plant, etc.*

*Work not proceeding with due diligence.*

*Engineer may provide additional at Contractor's expense.*

*Repayment by Contractor.*

22. If the Engineer shall at any time consider the number of workmen, quantity of machinery, tools, plant, equipment, or of proper materials or things, respectively employed or provided by the Contractor on or for the said works, to be insufficient for the advancement of such works, or any part thereof, toward the completion within the time limited in respect thereof, or that the works are, or some part thereof is, not being carried on with due diligence, the Engineer may, in writing, order the Contractor to employ or provide such additional workmen, machinery, tools, plant, equipment, materials or things as he may think necessary, and in case the Contractor shall not, within three days, or such other longer period as may be fixed by any such order, in all respects comply therewith, the Engineer may provide and employ such additional workmen, machinery, tools, plant, equipment, material and things respectively or employ a sub-contractor, or sub-contractors as he may think proper, and may pay in respect of such additional workmen such wages, Workmen's Compensation assessments, fringe benefits and all other things and benefits of a similar nature, as may be applicable, and for such additional machinery, tools, plant, equipment, materials and things respectively and to such sub-contractor or sub-contractors such prices as he may think proper, and all such amounts so paid shall be repaid on demand by the Contractor, or the same may be retained and deducted out of any sum that may then or thereafter be due from the Railway to the Contractor. The Contractor shall employ the additional sub-contractor, or sub-contractors, workmen, machinery, tools, plant, equipment, materials and things so provided and employed by the Engineer, in the diligent advancement of the works; the workmen so provided being thereafter exempt from discharge or removal by the Contractor without the consent and approval of the Engineer. In the event that the Engineer provides and employs additional workmen or employs a sub-contractor or sub-contractors, such shall thereupon be deemed to be the workmen of the Contractor or sub-contractors of the Contractor for the purposes of this Contract.

*Default or delay by Contractor.*

*May take work out of the Contractor's hands.*

*Materials, etc. subject to lien.*

*Power of sale.*

*Set off against damages.*

23. In case the Contractor makes default in the prompt commencement or in the diligent prosecution of any of the works or parts or portions thereof to be performed or that may be ordered, under the Contract, to the satisfaction of the Engineer, the

Case 09-10138-MFW   Doc 14394   Filed 09/10/14   Page 273 of 485

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

Engineer may give a general notice in writing to the Contractor that he, the Contractor, has made such default. Should the Contractor during six (6) days (excluding Sundays) from the giving of such notice fail to remedy such default or delay to the satisfaction of the Engineer, or should the Contractor make default in completion of the works, or any portion thereof, within the time limited with respect thereto, in or under the Contract, or should the Contractor become insolvent or bankrupt, or aban don the work or any part thereof, or otherwise should he fail to observe and perform any of the provisions of this Contract then, and in any of such cases, the Engineer may forthwith within such further time as he deems reasonable and without prior notice or other proceedings whatsoever take all the work, or any portion or portions thereof, out of the Contractor's hands, and may employ such means as he may see fit to complete the works, or any such portion or portions thereof so taken over, or to partly complete or advance the same, and in such case the Contractor shall be chargeable with, and remain liable for, all loss and damages which may be suffered by the Railway by reason of such default, or the non-completion by the Contractor of the works, and shall also be liable to the Railway for the cost of doing any such work over and above the contract price therefor, and no objection or claim shall be made by the Contractor on account of the ultimate cost of the work so taken for any reason proving greater than, in the opinion of the Contractor, it should have been. All or any part of such loss and damages may be chargeable by the Railway against any monies that may be deducted from any monies accruing or owing to the Contractor from time to time and any remainder thereof shall be recoverable from the Contractor. All materials and things whatsoever, and all machinery, tools, plant and equipment and all licenses, powers and privileges, acquired, possessed or provided by the Contractor for the purposes of the works, or by the Engineer under the provisions of the Contract, shall be subject to a lien or pledge in favor of the Railway for all purposes incidental to the completion of the works; and the Railway may use, exercise and employ the same in such completion, and may sell, or otherwise dispose of, the whole or any portion of such materials and things, machinery, tools, plant and equipment at forced sale prices, and may retain the proceeds of such sale or disposition and all other amounts then or thereafter payable by the Railway to the Contractor under the Contract, on account of or in part satisfaction of any loss or damage which it may sustain or may have sustained by reason aforesaid.

*Waiver negatived.*

43. No condoning, excusing, or overlooking by the Railway, or by any person acting on its behalf, on previous occasions, of breaches or defaults similar to that for which any action is taken, or power exercised, or forfeiture is claimed or enforced against the Contractor, shall be taken to operate as a waiver of any provisions of the Contract, nor to defeat, affect or prejudice in any particular the rights of the Railway hereunder.

*Contractor's information.*

*Contractor's investigation of every condition of work before execution of Contract.*

44. The Contractor declares that in tendering for the works and in entering into the Contract he has either investigated for himself the character of the work and all local conditions that might affect his tender or his acceptance of the work, or that not having so investigated, he is willing to assume and does hereby assume all risk of conditions arising or developing in the course of the work which might or could make the work, or any items thereof, more expensive in character, or more onerous to fulfil, than was contemplated or known when the tender was made or the Contract signed. The Contractor also declares that he did not and does not rely upon information furnished by any method, whatsoever, by the Railway or its officers or employees, being aware that any information from such sources was and is approximate and speculative only, and was not in any manner warranted or guaranteed by the Railway.

**Instructions to Bidders — Paras. 8 and 9**

The tenderer shall submit with his tender a construction schedule and method of operation to install the 2450 mm structural plate corrugated steel pipe and a construction method and procedure to install the 4200 mm tunnel liner plate as called for in the specifications.

This document must not be detached from the "Form of Tender" as it constitutes a part of the contract.

**Form of Tender — Paras. 1 and 2**

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

```
                                             Annex "B"
                                             ---------
                                    FT3425-256.8-1.2
              Canadian National Railway Company
                      form of tender
          for the installation of tunnel liner plate
            culverts at lutose creek -- km 413.36
            (mile 256.85) meander river subdivision
                    near steen river, alberta
```

VOLKER STEVIN CONTRACTING LTD., the undersigned, hereby offer and agree to furnish all and every kind of labour, scaffolding, tools, implements, machinery, plant, services and materials that may be required to execute and complete, in a satisfactory and workmanlike manner, all the work required to complete the above project in accordance with Plans and Specifications attached hereto and exhibited, and such further details as may be furnished from time to time during progress of the work.

*Volker Stevin Contracting Ltd.*, have examined the Plans, Specifications, Instructions to Bidders, the Site and Existing Conditions, and have ascertained all necessary particulars with regard to the work and upon acceptance of this tender _____ prepared to enter into a contract in the form exhibited with the said Specifications, for the performance of the work for the Unit Prices given below:

*[Graphic not reproduced].*

*Appeal allowed*.

---

**End of Document**     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



**CanWest Global Communications Corp., Petitioner, v Mirkaei Tikshoret Limited, Doing Business as Mirkaei Tikshoret Group, Respondent.**

**600245-05**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*9 Misc. 3d 845*; *804 N.Y.S.2d 549*; *2005 N.Y. Misc. LEXIS 1727*; *2005 NY Slip Op 25337*; *234 N.Y.L.J. 39*

**April 1, 2005, Decided**

**SUBSEQUENT HISTORY:**    [***1]
Related proceeding at *Canwest Global Communs. v. Mirkaei Tikshoret Ltd., 2006 U.S. Dist. LEXIS 63835 (S.D.N.Y., Sept. 6, 2006)*

**HEADNOTES**

    **Arbitration -- Foreign Arbitral Agreements -- Application of United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards -- Right to Prearbitration Injunctive Relief**

    The parties' written agreement to arbitrate in New York any disputes involving their proposed joint venture to acquire the assets of an Israeli newspaper was governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (UN Convention) (21 UST 2517). The Convention applies to written agreements involving commercial matters between international traders providing for arbitration in the territory of a signatory to the Convention. Furthermore, the applicability of the Convention was not a bar to petitioner's application for prearbitration injunctive relief pursuant to *CPLR 7502 (c)*. The bar to provisional remedies is limited to international arbitrations governed by the UN Convention, and did not extend in this case to a "domestic" arbitration where the parties expressly adopted a New York choice of law provision (*see*

*General Obligations Law § 5-1402*) that allowed either party to apply to a court for prearbitration injunctive relief. The contractually agreed upon injunctive relief carve-out did not frustrate the purpose of the UN Convention, but rather supported the goal of minimizing the uncertainty of enforcing arbitration agreements and avoiding the vagaries of foreign law for international traders.

**COUNSEL:** *Kaye Scholer LLP*, New York City (*John J.P. Howley* of counsel), for petitioner. *Skadden, Arps, Slate, Meagher & Flom LLP*, New York City (*Henry P. Wasserstein* of counsel), for respondent.

**JUDGES:** Carol Edmead, J.S.C.

**OPINION BY:** Carol Edmead

**OPINION**

    [*846]  [**552]  Carol Edmead, J.

    I. Procedural History

    This proceeding for injunctive relief arises from an alleged breach of agreement between petitioner CanWest Global Communications Corp. and respondent Mirkaei Tikshoret Limited, doing business as Mirkaei Tikshoret Group (MTG), in which the parties agreed to, inter alia, (1) jointly acquire assets of the JPost Group (including

9 Misc. 3d 845, *846; 804 N.Y.S.2d 549, **552;
2005 N.Y. Misc. LEXIS 1727, ***1; 2005 NY Slip Op 25337

without limitation the Palestine Post Limited [PPL] and Jerusalem Post Publications Limited [collectively the JPost Group]) from Hollinger International Inc., (2) transfer such assets to an entity jointly owned by the parties, and (3) permit CanWest to control the board of such entity and establish editorial policy (the agreement).

A. The June Letter Agreement

By letter agreement dated June 11, 2004, the parties expressed the following:

> "This letter ['LOI'] is intended to summarize the principal terms of a proposal being considered by [CanWest] [***2] and [MTG] regarding the Parties' . . . acquisition ['Possible Acquisition'] of either all of the shares of those corporations operating or owning, or all of the assets comprising [the JPost Group] . . .
>
> "[T]he entity to be established by the parties as the vehicle to acquire the [JPost Group] is sometimes called the 'Company' . . .
>
> "[W]e envisage the Parties being equal 50/50 shareholders in the newly-formed Company . . . We will jointly work towards establishing a viable business plan for [the JPost Group] that will provide us with the assurance that any Bid (defined below) we submit will lead to a successful re-establishment of a profitable Jerusalem Post and Jerusalem Report . . . [W]e have outlined . . . the process we suggest be adopted in developing the business plan and finalizing a mutually acceptable Bid and, in Schedule A attached hereto, the terms of a shareholders agreement that would be acceptable once the Bid is submitted to and accepted by [Hollinger]. The process

9 Misc. 3d 845, *847; 804 N.Y.S.2d 549, **552;
2005 N.Y. Misc. LEXIS 1727, ***2; 2005 NY Slip Op 25337

[*847] we suggest be adopted is as follows:

"1 . . . Until the Termination Date (defined below), the Parties will deal with each other only on an exclusive basis [***3] in [**553] connection with the Possible Acquisition and, accordingly, subject to paragraph 7 hereof, until the Termination Date, the Parties will not . . . solicit or entertain any arrangement whereby such Party will . . . consider proceeding with, or entertaining any proposal of, any third party relating to the Possible Acquisition . . .

"4. The Company will be established by the Parties for the purposes of . . . submitting an offer for the [JPost Group] and/or all of its assets, and thereby completing the Possible Acquisition.

"5 . . . the completion and submission of the Bid shall be subject to the following conditions precedent in favour of each Party . . .

"(b) Development and acceptance of the initial twelve (12) months business plan in respect of the [JPost Group]; . . .

"(d) Successful negotiation and execution of a definitive shareholders agreement in respect of the Company and the [JPost Group] incorporating the provisions of this LOI and Schedule A . . . ; and

"(e) Approval by each Party's board of directors of the final terms of the Bid . . .

"7. Either party has the right (a) at any time, to withdraw from submitting the Bid [***4] if it determines in its absolute discretion that, in its judgment, the conditions precedent in paragraph 5 hereof will not be capable of being fulfilled to its satisfaction . . . [T]he party that has provided notice of [withdrawal or decision not to proceed] shall not, directly or indirectly, solicit or entertain any arrangement whereby such Party will, either alone or in conjunction with a third party, submit a bid or offer to acquire the [JPost Group] for a period of twelve (12) months following the [withdrawal or decision not to proceed]."

According to CanWest, between June 11 and August 9, 2004, the parties conducted due diligence on the businesses to be acquired, and held discussions of how best to structure their joint bid. CanWest contends that MTG suggested that it was in a better position to "strong-arm" the JPost Group's creditors if

9 Misc. 3d 845, *848; 804 N.Y.S.2d 549, **553;
2005 N.Y. Misc. LEXIS 1727, ***4; 2005 NY Slip Op 25337

[*848] it alone was seen to be owner and operator of the JPost Group shares. For this and other reasons, the parties agreed to a purchase of all the shares and securities by MTG pursuant to a jointly developed bid, followed by a sale of all the assets to a new, jointly owned entity.

B. The November Letter Agreement

Subsequently, by letter [***5] dated November 10, 2004, the parties entered into a further agreement, in which the parties "confirmed that MTG, with the concurrence of CanWest has today submitted to Hollinger . . . an offer to purchase the Shares of the PPL . . . in favour of MTG (in either case 'SPA')." The letter further provides:

"In the event that the SPA is accepted by Hollinger . . . then the following shall occur:

"1. MTG and CanWest shall negotiate in good faith to finalize, on or before the closing of the transaction described in the SPA, the terms by which MTG shall [sell] . . . the assets comprising PPL and its subsidiaries, to a joint venture, limited partnership or similar entity ('Partnership') which will be owned and funded by MTG and CanWest equally (50% each) on the basis that MTG will indemni[f]y and save

harmless the Partnership in respect of certain liabilities of, and claim against, PPL and it subsidiaries.

[**554] "2. MTG and CanWest shall negotiate in good faith to finalize the terms of, and complete those agreements and conditions precedent referred to [in] paragraph 5 of the LOI [agreement], on or before the closing of the transaction described in the SPA . . .

"In [***6] the event that the parties are unable to satisfy to their mutual satisfaction, the provisions of paragraph 1 and 2 of this letter agreement, and MTG nevertheless completes the purchase of the PPL in accordance with the SPA . . . then (a) CanWest shall have no obligation to participate in the SPA or purchase of the PPL in any manner, and (b) the provisions of paragraph 3 of the LOI shall be deemed to be amended such that each of MTG and CanWest shall be [responsible] for their own costs and expenses incurred at any time in connection with the purchase or attempted purchase of the PPL."

9 Misc. 3d 845, *848; 804 N.Y.S.2d 549, **554;
2005 N.Y. Misc. LEXIS 1727, ***6; 2005 NY Slip Op 25337

[*849]  On November 15, 2004, the offer was submitted and accepted by Hollinger, who, according to CanWest, set the closing date of no earlier than December 23, 2004.

CanWest contends that with the first step of the acquisition underway, it proposed, again, that the parties form an Israeli limited partnership to acquire the JPost Group assets, with 99% of the limited partnership owned on a 50/50 basis by corporations owned by CanWest and MTG, and the other 1% held by a general partner also owned 50/50 by CanWest and MTG. MTG endorsed this concept and on November 22, 2004 provided a draft asset purchase [***7] agreement (APA), wherein JPost Group assets were to be purchased by the limited partnership.

On November 28, 2004, CanWest made certain comments concerning the draft APA, and MTG suggested that CanWest take over responsibility for producing the next draft.

On December 9, 2004, CanWest urged MTG to have Hollinger consider setting the closing for December 31, 2004 and resolve accounting and other issues before the closing. CanWest also proposed a date of December 14, 2004 for MTG and CanWest to review the draft agreements and work through their own internal checklist for closing.

On December 10, 2004, MTG indicated that "[w]ith respect to the date of closing, it seems it is now more in the hands of Hollinger than in our hands." In response, CanWest reiterated the reasons for closing on December 31, 2004.

On December 15, 2004, MTG and Hollinger closed on the transaction, without notice to CanWest, and notwithstanding the fact that the parties had not yet established the new entity nor agreed upon the final documents. On the same day, CanWest wrote to MTG expressing their desire to "focus on the next phase, i.e. the establishment of the partnership and the acquisition of the assets [***8] and to have this phase completed by December 31st, to have a clear month-end cut-off and get the assets to their ultimate owners ASAP." In response, MTG advised CanWest that, as

> "discussed earlier tonight, we should focus on two issues . . . The main issue for us now is to concentrate on the APA between us. Given the fact that we didn't have the chance to go over it yet, we would prefer to read it over the weekend, . . . I do agree that we should target to the end of the year, and I think we would still have enough time."

On December 20, 2004, MTG advised CanWest of its availability for a conference call on December 22nd, and requested a

9 Misc. 3d 845, *850; 804 N.Y.S.2d 549, **554;
2005 N.Y. Misc. LEXIS 1727, ***8; 2005 NY Slip Op 25337

 [*850] "step memo" that was prepared to "describe the structure of the deal[.] Until we know exactly what is the plan I am not sure that we can be very productive." In [**555] response, CanWest confirmed the meeting and provided the "step memo."

On December 22, 2004, CanWest wrote to MTG requesting, inter alia, that they discuss the mechanics of the asset purchase, partnership and general partnership agreements.

On December 27, 2004, CanWest advised MTG, inter alia, that "without [a final agreement] there is no partnership and we are increasingly [***9] frustrated . . . that you are not moving this along."

By e-mail dated December 31, 2004, CanWest accused MTG of not returning calls, to which MTG responded on the same day that MTG was still interested in bridging the existing "gaps" between the parties to "get the agreement signed."

On January 3, 2005, CanWest advised MTG that it appeared that the parties had reached a "crisis stage" and that MTG was "clearly moving without us notwithstanding our agreement" and that if it did not hear from MTG by the following day, it "will assume [MTG does] not intend to honour our partnership, that [MTG] intend[s] to own and operate the Jerusalem Post without

[CanWest]."

The next series of e-mails between the parties reflect CanWest's lack of interest "in changing the deal, to 51-49 in favour of MTG." CanWest contends that at the meetings in Tel Aviv on January 6th and 7th, MTG demanded that the share ownership of the new entity would be weighed in favor of MTG 75%-25% or 51%-49%. Alternatively, MTG insisted that it would accept 50/50 ownership only if substantial terms of the June agreement were changed in its favor. Further, MTG demanded that, instead of establishing a board of directors [***10] comprising seven directors, with four, including the chairman, appointed by CanWest, the agreement had to be changed to eliminate CanWest's right to appoint a fourth director. All of the alternatives proposed by CanWest were flatly rejected.

Finally, by letter dated January 10, 2005, CanWest stated that based on MTG's failure to discuss and complete the APA and shareholders agreements, and Mr. Azour's rejection of the terms of the June agreement, MTG repudiated such agreement. CanWest expressed its willingness to proceed under the June agreement, and demanded that MTG confirm its willingness to proceed with the transaction as contemplated by the June agreement.

9 Misc. 3d 845, *851; 804 N.Y.S.2d 549, **555;
2005 N.Y. Misc. LEXIS 1727, ***10; 2005 NY Slip Op 25337

[*851] In response, MTG stated that the demand was unreasonable and made in bad faith, and deemed CanWest's letter "as a clear repudiation and bad faith breach of the agreements between the parties, and as a notice of termination of the parties' negotiations and relationship." CanWest thereafter advised MTG of its continued willingness to "honor the[] Agreement." However, MTG stated outright that it was not willing to give any such assurances.

C. Initial Order to Show Cause and Temporary Restraining Order

Upon application [***11] by CanWest, the court temporarily enjoined MTG from taking certain actions with respect to the JPost Group (the first TRO). The TRO was subsequently lifted since service of the order to show cause (OSC) had not been completed pursuant to the Hague Convention.

II. Instant Order to Show Cause and Application for Temporary Restraining Order

Having effected proper service upon MTG, CanWest now moves by OSC for a TRO, enjoining MTG and its officers, including Eli Azour, and all persons acting [**556] on behalf of MTG, from taking certain actions with respect to the JPost Group. [1]

> 1 Specifically, CanWest seeks to enjoin MTG from, inter alia: (1) entering into any merger,

consolidation, joint venture or adopting or effecting any reorganization of any kind involving the JPost Group, (2) taking any steps to terminate the corporate existence of any entity comprising the JPost Group, (3) selling, transferring, or encumbering any of the shares or other securities, or JPost Group assets acquired by MTG, (4) repaying to MTG any indebtedness, (5) changing the employment status of any executives of any entity comprising the JPost Group, and (6) terminating or entering into any contracts or business relationships.

[***12] In support, CanWest contends that it has continued to suffer irreparable harm. According to CanWest, at the time the initial TRO was sought, MTG had already fired senior management executives at the Jerusalem Post, hired a new CEO and CFO, and appointed a new executive to manage the North American components of the JPost business. Further, MTG caused agreements instrumental to the operation of the publication to be amended.

CanWest claims that it recently learned that MTG purports to have transferred its shares in PPL to Eli Azour, the president and principal shareholder of MTG on December 15, 2004. At the same time, Mr. Azour claims to have purchased the Jerusalem Report Publications Limited from PPL. CanWest also

9 Misc. 3d 845, *852; 804 N.Y.S.2d 549, **556;
2005 N.Y. Misc. LEXIS 1727, ***12; 2005 NY Slip Op 25337

[*852] discovered that there has been a treasury issue of 12% of the PPL shares to Y.B. Etgarim Ltd. (YEL), a company solely owned by Jacob Bardugo, who was recently appointed as manager of PPL. It is argued that the irreparable injury CanWest has already suffered will only continue.

CanWest further avers that as the president and principal shareholder of MTG who signed the agreement on behalf of MTG, Mr. Azour had actual knowledge of paragraph 9 of the agreement, which [***13] provides for binding arbitration in New York of any dispute arising from or relating to the agreement. [2] Further, the arbitration commenced by CanWest and related proceedings in New York State court were widely publicized in the Israeli press, and CanWest's assertion of its agreement with MTG and CanWest's ownership rights were described in this press coverage. Additional press coverage of the agreement occurred as a result of a lawsuit commenced in Israel by Mr. Azour, in which he acknowledges both the existence of the agreement and CanWest's assertion of ownership rights. Similarly, it is argued, Mr. Bardugo had actual knowledge of the agreement; the Israeli proceedings commenced by Mr. Azour put Mr. Bardugo on notice and created a duty to inquire before he proceeded with his purported acquisition of shares.

   [2]   CanWest contends that the agreement further

provides that either party "may apply to any court in the State of New York to seek injunctive relief to maintain the *status quo* until the arbitration award is rendered or the controversy is otherwise resolved." Pursuant to these provisions, CanWest commenced an arbitration with the American Arbitration Association in New York.

[***14] CanWest also contends that it is likely to succeed on the merits of its claim that MTG breached the agreements. In support, CanWest argues that up to the time of MTG's acquisition of the JPost Group on December 15, 2004, the parties were proceeding consistent with the intent of the parties' agreements, and in anticipation that MTG would consummate the agreements by, inter alia, transferring the JPost Group assets to an entity jointly owned by both parties.

CanWest avers that the November agreement does not give MTG any right to withdraw, other than on the basis of the [**557] June agreement, in which event, MTG would be prohibited from seeking ownership of the JPost Group for a period of 12 months. By repudiating the June agreement, MTG breached the parties' agreement and unilaterally took over exclusive control, management and ownership of PPL and the JPost Group to the total exclusion of CanWest.

9 Misc. 3d 845, *852; 804 N.Y.S.2d 549, **557;
2005 N.Y. Misc. LEXIS 1727, ***14; 2005 NY Slip Op 25337

[*853] Further, MTG's offer to transfer the assets on the condition that CanWest give up its rights under the June 11 agreement "was not good faith negotiation" but extortion in order to seize the JPost Group for itself.

MTG's Opposition and Cross Motion to Vacate the TRO

MTG opposes [***15] injunctive relief, and cross-moves to vacate the TRO, arguing that the court lacks jurisdiction to issue injunctive relief against MTG and that CanWest failed to meet its burden to justify such relief.

MTG argues that the pending arbitration between CanWest and MTG is an "international arbitration" governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the UN Convention) which restricts prearbitration judicial action to determinations as to whether an arbitration should be compelled. Relying on *Cooper v Ateliers de la Motobecane (57 NY2d 408, 442 NE2d 1239, 456 NYS2d 728 [1982])* and its progeny, MTG argues that the UN Convention restricts prearbitration judicial action to determinations as to whether an arbitration should be compelled, and as such, this court lacks jurisdiction to entertain the instant application for injunctive relief.

Furthermore, it is argued that since case law holds that parties by consent cannot confer on federal courts subject matter jurisdiction beyond the limitations imposed by the United States Constitution, the limitation by a treaty herein on the court's jurisdiction similarly cannot be undone by the [***16] parties.

In any event, MTG asserts, CanWest failed to make a clear showing of its entitlement to injunctive relief. MTG contends that at the time CanWest brought the instant application, it was advised that MTG transferred its interest in PPL to its principal shareholder, Mr. Azour, in December 2004. Therefore, any injunction to bar CanWest's alleged joint venture partner, MTG, which owns neither the shares of PPL nor its underlying assets, is pointless and futile. It is equally ineffective to seek an injunction prohibiting MTG from directing the affairs of PPL.

Further, the TRO is overreaching as to any party other than MTG. CanWest's attempt to add the three additional parties to the arbitration demand is "purely cosmetic," as none of these individuals have signed an arbitration agreement, and nothing in the *Federal Arbitration Act (FAA)* requires them to do so. MTG adds that the UN Convention, which applies here, requires an "agreement in writing" between the parties to an international

9 Misc. 3d 845, *854; 804 N.Y.S.2d 549, **557;
2005 N.Y. Misc. LEXIS 1727, ***16; 2005 NY Slip Op 25337

[*854] arbitration, which does not exist in respect to any of these parties. Since PPL has not entered into any agreement to arbitrate, there is no "arbitrable controversy" between CanWest and PPL, and, [***17] as such, no basis for seeking to extend the TRO to PPL, the "Jerusalem Post," or any other "affiliates" of MTG. Noting that the TRO is addressed to MTG's directors and officers, including Mr. Azour, MTG also contends that neither YEL nor Bardugo are parties to any "arbitrable controversy." Mr. Azour was not a signatory to any arbitration agreement. And, CanWest's assertion that Mr. Azour had notice of the arbitration agreement is insufficient to overcome the FAA's proscription that the court cannot compel arbitration by any [**558] parties that are not already covered in an agreement.

Likewise, CanWest has no prospect of piercing the corporate veil in order to hold Mr. Azour personally responsible under the arbitration clause of the June agreement. It is argued that MTG has a separate corporate existence, is duly incorporated, and in good standing under the laws of Israel. Further, MTG conducts business in its own name and on its own behalf, holds property in its own name, and has corporate representatives other than Mr. Azour, including Eyal Golan. MTG also points out that CanWest repeatedly recognized MTG, not Mr. Azour, as its potential business partner, and never required Mr. [***18] Azour be made a party to the agreements or personally guaranty MTG's performance.

The transfer of shares to Mr. Azour was properly documented and reflected in the tax structure of the acquisition. Further, there was a bona fide commercial rationale for the transfer, the transfer was not prohibited by the November agreement, which does not address postacquisition ownership of PPL shares, and the transfer was made known to CanWest immediately thereafter. [3]

> 3  MTG asserts that, prior to the closing, it kept CanWest apprised of PPL's serious financial condition, and that, based on CanWest's reactions, MTG became concerned with its ability to respond to such problems. Mr. Azour took "quick action to stop the bleeding" and appointed a new CEO and CFO to take over management. At the time of these hiring and firing decisions, Mr. Azour held close to 100% of PPL's share capital, having financed the PPL acquisition out of his own personal credit and was therefore not required to gain CanWest's consent. The appointment of the CFO and the firings of the head of marketing and the publisher were approved by CanWest.

[***19]  In addition, CanWest has not identified any irreparable harm warranting injunctive relief. Since the profitability of PPL and the Jerusalem Post was impaired by the first and current TRO, such injunction is actually destructive of the asset CanWest

9 Misc. 3d 845, *855; 804 N.Y.S.2d 549, **558;
2005 N.Y. Misc. LEXIS 1727, ***19; 2005 NY Slip Op 25337

[*855] seeks to covet. And, CanWest fails to explain what purpose is served by blocking PPL from becoming more profitable by disposing of redundant assets or restructuring its work force. Moreover, as PPL has already been sold by MTG, the sole remedy available to CanWest is damages, which negates any suggestion of immediate or irreparable harm. MTG also claims that, as an additional remedy, CanWest can litigate its right to any PPL stock in Mr. Azour's proceeding to clear title to the shares in Jerusalem Post, pending in Israel.

MTG further contends that CanWest cannot establish the likelihood of success on the merits. At the outset, MTG maintains that CanWest's contention that the June agreement gives it the right to maintain the status quo is without merit, given that the provision at issue merely gives the parties the ability to seek such relief in New York state court, and does not obviate the burden imposed by the CPLR to establish entitlement [***20] to injunctive relief.

Also, since the parties failed to agree upon the terms of a common venture to own the "Jerusalem Post," CanWest cannot establish that MTG breached the agreements. The June agreement merely creates a framework to agree upon a joint bid, and does not obligate either party to make a joint bid for the "Jerusalem Post" or PPL; rather, it refers to a "Possible Acquisition" and requires that any "Bid," once negotiated, be "subject to the unanimous decision of the Parties." MTG points out that the completion and submission of the bid was subject to the five "conditions precedent" and that none of these conditions were ever satisfied. Further, although CanWest repeatedly cites to [**559] the draft "Shareholders Agreement" attached as schedule A to the June agreement, MTG and CanWest never actually entered into any such agreement and schedule A was superceded by the November 10 agreement.

According to MTG, after the June agreement was executed, it soon emerged that CanWest would not participate in any bid for PPL because it was unwilling to assume the liabilities of PPL and Hollinger was unwilling to enter into any representations or indemnities to cover those losses. [***21] CanWest agreed to permit MTG to bid alone for PPL, and that MTG and CanWest subsequently agreed to attempt to negotiate a joint venture structure to hold PPL's assets, including the Jerusalem Post on the condition that (1) CanWest would only contribute to such venture once it was insulated from risks associated with PPL's liabilities, and (2) unless and until a revised venture structure

9 Misc. 3d 845, *856; 804 N.Y.S.2d 549, **559;
2005 N.Y. Misc. LEXIS 1727, ***21; 2005 NY Slip Op 25337

[*856] was agreed upon, CanWest would not be financially liable to contribute to the acquisition of PPL. Therefore, the November agreement was entered into to supply even more opportunities for CanWest to retreat from a future deal.

In this regard, the November agreement evinces that the parties contemplated to "negotiate in good faith" to try to reach a mutually satisfactory agreement for a joint venture to own certain of PPL's assets. The critical terms of the November 10 agreement, i.e., the nature and extent of "certain liabilities" to be assumed by MTG, were completely a matter for future negotiation. Thus, the November 10 agreement contained, at most, an obligation to negotiate until December 15 to form a future possible venture to own some of the assets of PPL, whose structure, liabilities, assets [***22] and other critical features were never actually agreed upon prior to the collapse of talks in January 2005.

Nevertheless, MTG still expected to agree on these matters with CanWest and therefore engaged in further discussions, from December 2004 through mid-January 2005, in an effort to reach agreement. But, the parties remained divided on many key issues. MTG points out that on December 27, 2004, CanWest acknowledged that unless the parties reached an agreement on the form and structure of the future venture to own the "Jerusalem Post" no such venture could or would be established. Although the negotiations occurred, they failed to result in any agreement. Therefore, CanWest has no partnership or any other ownership rights in MTG.

According to MTG, after Hollinger and MTG signed the purchase agreement obligating MTG to close the deal by December 23, 2004, MTG tried, but failed to negotiate with CanWest to finalize a venture structure, partnership and asset purchase agreement and to fulfill the other conditions precedent set forth in the November 10 agreement. MTG asserts that it notified CanWest that the closing was set for December 15, 2004. Although CanWest expressed reservations [***23] about an early closing, it accepted that a quick transition was necessary since PPL was losing money. In view of CanWest's refusal to participate in the financing of the deal, MTG was forced to pay Hollinger the balance of the sum to which it had committed. Therefore, it is argued, the evidence shows that MTG did participate in negotiations up to the closing of the PPL acquisition, and that CanWest kept refusing to commit to or finance a deal, leaving MTG alone to purchase PPL. Since any obligation to

9 Misc. 3d 845, *857; 804 N.Y.S.2d 549, **559;
2005 N.Y. Misc. LEXIS 1727, ***23; 2005 NY Slip Op 25337

[*857] negotiate was fully discharged by MTG, CanWest still has no cognizable proprietary interest in PPL or the Jerusalem Post.

[**560] At the closing, MTG acquired, inter alia, all but one of the shares of PPL. Also on December 15, 2004, MTG transferred all of its PPL shares to Mr. Azour personally. Mr. Azour's acquisition of PPL, and his direct acquisition from PPL of Jerusalem Report Publications Limited, reflected the tax structure of the acquisition and the fact that he had drawn on his own credit to finance the purchase of PPL. MTG communicated the transfer to Mr. Azour to CanWest, which did not object.

According to MTG, during negotiations in Tel Aviv on January 6 and 7, 2005, [***24] it seemed the parties had reached an agreement on a venture structure: (1) PPL's core business assets would be transferred to a MTG/CanWest joint venture vehicle, (2) MTG (or Mr. Azour) would retain PPL's redundant assets and assume certain categories of outstanding PPL liabilities, and (3) the price to CanWest for its investment would be adjusted to United States $ 5 million for 50% of the business to reflect the netting of assets being retained and liabilities being assumed by MTG or Mr. Azour. However, CanWest then vetoed this agreement in favor of a "take it or leave it" proposal, accompanied by threats that

CanWest would create a "black hole" litigation for MTG in New York, and establish a rival to drive the Jerusalem Post out of business. CanWest insisted on (1) a 3-3 board, with a neutral chair, (2) that it have editorial control over the Jerusalem Post, and (3) that all assets and liabilities of PPL be assigned to the new venture and shared on a 50-50 basis by both parties. MTG took issue with CanWest's proposal because CanWest sought the right (in consultation with MTG) to control the method of operation of the editorial board and not the right to determine editorial content as [***25] provided in the shareholders agreement. MTG believed that CanWest would then turn the Jerusalem Post into an extreme right-wing newspaper. When MTG proposed that discussions resume after the approaching Sabbath, CanWest allegedly left the country.

On the following Sunday, MTG attempted to contact CanWest to resume discussion. However, on the following Monday, CanWest retreated to a new proposal different from either of those discussed on January 7; CanWest abandoned negotiations, and insisted that the parties immediately establish a jointly-held company pursuant to the "long-defunct" skeletal draft shareholders agreement, ignoring the conditions precedent to the June and November agreements, and requiring MTG to forego

9 Misc. 3d 845, *858; 804 N.Y.S.2d 549, **560;
2005 N.Y. Misc. LEXIS 1727, ***25; 2005 NY Slip Op 25337

[*858] its right to withhold acceptance of proposals with which it agreed. On February 15, 2005, PPL finalized agreements with YEL in order for PPL for financing to meet its cash flow needs; YEL subscribed for 137 newly-created shares in PPL and PPL received a loan of $ 1.6 million.

According to MTG, it negotiated in good faith at all times and only ceased negotiations with CanWest once it became evident that no agreement would ever be reached.

In further opposition to [***26] injunctive relief, MTG argues that the balance of equities militates against the continuance of a TRO. The first TRO already caused significant harm to MTG and PPL in lost business, lost advertising, workplace disruption and loss of the ability to raise bank finance, and the requested relief would severely jeopardize the Jerusalem Post.

It is further argued that CanWest's application is barred by the doctrine of laches and unclean hands. CanWest allegedly failed to address its knowledge of the transfer to Mr. Azour in its earlier OSC papers. And, even accepting CanWest's assertion that it recently learned of such transfer on February 11, 2005, CanWest [**561] did not bring this application until 24 days thereafter.

MTG also claims that the potential hardship to MTG

tips the scale against injunctive relief. Any bar on MTG from entering into any contracts effectively puts MTG out of business altogether, and causes reputational damage to MTG and Mr. Azour. MTG states that any TRO will prevent the sale of loss factors within PPL, i.e., the printing press, and harm PPL's goodwill and workplace relations. Also, the TRO presents a direct challenge to the competence of the Jerusalem District Court [***27] to hear and determine claims involving Mr. Azour, CanWest, and PPL because the relief contained in the TRO implicates issues before that court.

In response to MTG's cross motion to vacate the TRO, CanWest asserts that the parties chose a New York court, not arbitration, as the forum for preliminary injunctive relief. The UN Convention does not apply to every dispute involving foreigners in New York, but only disputes that the parties have agreed to submit to arbitration and then only to the extent the dispute is within the scope of the arbitration agreement. Here, the parties did not agree to arbitration as the forum for preliminary injunctive relief; instead, they agreed that the claim for injunctive relief may be heard in a New York court.

CanWest also asserts that *Cooper* requires enforcement of the parties' agreements, including the provision authorizing injunctive

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 289 of 485

Page 15

9 Misc. 3d 845, *859; 804 N.Y.S.2d 549, **561;
2005 N.Y. Misc. LEXIS 1727, ***27; 2005 NY Slip Op 25337

[*859] relief from a New York court. Further, this court has jurisdiction to issue injunctive relief because the parties' choice of New York courts as the forum for same is enforceable under *General Obligations Law § 5-1402*. It is clear that, as a matter of law, respondents [***28] have submitted to the jurisdiction of New York courts by agreeing that applications for injunctive relief may be made to a New York court.

Additionally, CanWest has demonstrated a strong likelihood of success on the merits that MTG has breached the agreements and that the TRO properly applies to Mr. Azour. MTG completed the acquisition on its own, thereby breaching paragraph 7 of the June agreement, and in January, refused to negotiate in good faith by insisting on an entirely different deal. CanWest also argues that MTG's assertion that it notified CanWest of the transfer to Mr. Azour, which CanWest expressly denies, is unsupported by any documentary evidence. CanWest contends that the documents concerning this purported transfer demonstrate that MTG's transfer of the shares to Mr. Azour before the closing of the transaction with Hollinger was done when respondents were supposed to be negotiating in good faith with CanWest. The minutes of a Mirkaei Tikshoret Limited (MTL) board meeting six days before the closing with Hollinger

purportedly approving the sale of all shares to Mr. Azour personally contain only Mr. Azour's name and confirm that the purported transfer was not an "arm's length transaction" but a mere [***29] shifting of the names from MTG to Azour.

CanWest also asserts that MTG is not listed in Israel's Company Registry, and as such, it is not a legal entity incorporated in Israel. Thus, there is no legal distinction between Mr. Azour and MTG. Since an individual is personally bound when he purports to sign on behalf of any entity that does not have a separate legal existence, and Mr. Azour is bound by the obligation to arbitrate and defend against an application for injunctive relief. CanWest also notes that it is puzzling how MTG could have continued to negotiate with CanWest after the shares of PPL had already been transferred to Mr. Azour. Further, where the parties agreed to arbitration, the issue of whether the agreement [**562] applied to a nonsignatory is to be determined by the arbitrator.

Furthermore, CanWest has demonstrated that severe irreparable harm and the balance of equities are in favor of injunctive relief. The loss of key employees constitutes irreparable harm as a matter of law. Also, respondents are engaged in self-dealing

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 290 of 485

Page 16

9 Misc. 3d 845, *860; 804 N.Y.S.2d 549, **562;
2005 N.Y. Misc. LEXIS 1727, ***29; 2005 NY Slip Op 25337

[*860] and a fundamental restructuring of business relationships with irreversible consequences, including shutting down the printing plant and transferring [***30] the printing business to a company owned by Azour. Independent advertising has declined, and much of the advertising in the Jerusalem Post now promotes business run by Azour. The resulting erosion of the newspaper's goodwill and reputation also constitutes irreparable harm as a matter of law. Every day that CanWest is denied its right to participate in the ownership and management of the newspaper also constitutes irreparable harm.

III. Analysis

A. United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards

The underlying arbitration agreement implicates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The UN Convention was drafted in New York in 1958 in order to ease "the difficulty in enforcing international arbitration agreements by minimizing uncertainties and shifting the burden of proof to the party opposing enforcement" of such agreements (*Cooper v Ateliers de la Motobecane, 57 NY2d 408, 412, 442 NE2d 1239, 456 NYS2d 728 [1982]*). As such, the UN Convention provides that when an action is brought in court and a party asserts the arbitration agreement, the [***31] court "shall . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed" (Foreign Arbitral Awards Convention, 21 UST 2517, TIAS No. 6997, art II, § 3). [4]

4   Article II provides:

"1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration . . .

"3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."

The UN Convention sets forth basic requirements for enforcement of arbitration [***32] agreements under the Convention: (1) there is a written agreement (Convention, art II [1], [2]), (2) the agreement provides for arbitration in the territory of a signatory to

9 Misc. 3d 845, *861; 804 N.Y.S.2d 549, **562;
2005 N.Y. Misc. LEXIS 1727, ***32; 2005 NY Slip Op 25337

[*861] the UN Convention (Convention, art I, §§ 1, 3), and (3) the subject matter is commercial (Convention, art I, § 3; *Burnham v Ruebsamen, 139 AD2d 323, 531 NYS2d 547 [1st Dept 1988]; see Smith/Enron Cogeneration Ltd. Partnership, Inc. v Smith Cogeneration Intl., Inc., 198 F3d 88, 92 [2d Cir 1999]*, citing *Ledee v Ceramiche Ragno, 684 F2d 184, 186-187 [1st Cir 1982]).* [5]

5   *Smith and Ledee*, to which the court in *Smith* cites, adds an additional requirement: that the agreement is not entirely domestic in scope. While citing to the UN Convention in support of the three aforementioned criteria, the *Ledee* court cites solely to the Federal Arbitration Act (*9 USC § 202*) in support of the fourth requirement. *9 USC § 201* provides that the UN Convention "shall be enforced in United States courts in accordance with this chapter." *USC § 202* defines the type of "Agreement or award falling under the Convention":

> "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement . . . An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property

located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."

[***33] [**563] In the instant matter, the underlying arbitration agreement meets all of the above requirements. The underlying arbitration involves parties from Canada and Israel and pertains to an agreement to purchase assets in Israel. Furthermore, the agreement to arbitrate provides for arbitration in New York, New York (June agreement para 9) and the United States is a signatory to the UN Convention. There is no question that the underlying transaction for the purchase of and subsequent transfer of shares in, inter alia, PPL is commercial. Therefore, the agreements at issue between CanWest and MTG satisfy these requirements and are subject to the UN Convention enforcement rules.

B. *Cooper* and Its Progeny

MTG argues that the Court of Appeals decision in *Cooper v Ateliers de la Motobecane (57 NY2d 408, 442 NE2d 1239, 456 NYS2d 728 [1982])* proscribes prearbitration injunctive relief in matters governed by the UN Convention. In *Cooper*, the Court of Appeals opined that the purpose of the UN Convention to "minimize the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders" would be defeated if, "contrary to contract," parties [***34] were permitted to petition a court for

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 292 of 485

Page 18

9 Misc. 3d 845, *862; 804 N.Y.S.2d 549, **563;
2005 N.Y. Misc. LEXIS 1727, ***34; 2005 NY Slip Op 25337

[*862] prearbitration injunctive relief (*Cooper, 57 NY2d at 410*). Therefore, since the underlying dispute between the parties involved their obligations under an agreement which provided that disputes were to be resolved by arbitration in Switzerland, the order of attachment was improper.

After the Court of Appeals decision in *Cooper*, the Legislature enacted *CPLR 7502 (c)* to address prearbitration injunctive remedies. *CPLR 7502 (c)* confers authority upon New York State courts to "entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy." Although the language of *CPLR 7502 (c)* appears to eviscerate *Cooper*, the First Department relied favorably on *Cooper* when it denied attachment pursuant to *CPLR 7502* in connection with an arbitration within the purview of the UN Convention in *Drexel Burnham Lambert Inc. v Ruebsamen (139 AD2d 323, 531 NYS2d 547 [1st Dept 1988])*.

In *Drexel*, the petitioner sought a prearbitration order of attachment pursuant to *CPLR 7502 (c)*. [***35] The parties agreed that the dispute between them would be resolved in arbitration. Further, the agreement to arbitrate provided for arbitration in either West Germany, Belgium or the United States. The First Department reaffirmed its previously held position that

"in instances in which the UN Convention is applicable, the 'arbitration is governed by the UN Convention, and pursuant to the terms thereof, . . . prejudgment attachment is prohibited. It was the intention of the UN Convention that there should be no significant judicial intervention until *after* an arbitration award is made' " [**564] (*Drexel, 139 AD2d at 330*, citing *Shah v Eastern Silk Indus., 112 AD2d 870, 871, 493 NYS2d 150 [1985]* [holding that since the parties selected arbitration in India as the forum in which to resolve "any dispute of claims arising out of" their agreements, the UN Convention applied so as to preclude prejudgment attachment]).

The Court concluded that each of the three requirements for activating the UN Convention were present. Therefore, notwithstanding petitioners' showing of entitlement to an order of attachment under *CPLR 7502 (c)* [***36] , the Court held that *Cooper* rendered prearbitration attachment unavailable to the petitioners therein.

Similarly, in *ContiChem LPG v Parsons Shipping Co. (229 F3d 426 [2d Cir 2000])*, the Second Circuit Court of Appeals also limited prearbitration attachment under *CPLR 7502* to domestic

9 Misc. 3d 845, *863; 804 N.Y.S.2d 549, **564;
2005 N.Y. Misc. LEXIS 1727, ***36; 2005 NY Slip Op 25337

[*863] arbitrations. ContiChem attempted to obtain security in New York for damages resulting from a breach of a "charter party." The issue before the court was whether ContiChem could avail itself of *CPLR 7502* when no arbitration was pending in New York where the parties expressly agreed to arbitration in London. The court examined the Advisory Committee's comment on *CPLR 7502 (c)* which states that:

"[T]here is no inconsistency between the proposed amendment [*7502 (c)*] and the decision of the Court of Appeals in *Cooper v At[e]liers De La Motobecane, S.A., 57 NY2d 408, 456 NYS2d 728, 442 NE2d 1239 (1982)*, where a pre-arbitration attachment was disallowed in a matter involving international litigants governed by the [UN Convention]. The amendment would not affect proceedings governed [***37] by such international agreements [i.e., the Convention]." (*ContiChem, 229 F3d at 432*, quoting 1985 Report of Advisory Comm on Civ Prac, reprinted in 1985 McKinney's Session Laws of NY, at 3432.)

The *ContiChem* court also noted that the Advisory Committee explicitly contemplated that *CPLR 7502 (c)*

was "designed to make the *domestic arbitration* remedy more efficacious" (*id. at 432* [emphasis added]). Therefore, it held that although the matter involved maritime attachment, and *Cooper* was not necessarily a bar to relief, ContiChem nevertheless was not entitled to provisional remedies under *CPLR 7502 (c)* "because this [was] not a domestic arbitration" (*id. at 433*). Continuing, the court stated (*at 433*): "The charter party in this case specifically provided for arbitration of disputes in London, and *Rule 7502* by its terms applies only to domestic arbitrations." Therefore, the court refused to expand the scope of *CPLR 7502* beyond the limits of its language. The court also noted (*at 433*) that having determined that ContiChem could not bring an application under [***38] *CPLR 7502* "because it agreed to arbitration in London," it cannot seek attachment under *CPLR 6210*, [6] "because the court cannot entertain" the *CPLR 7502* application. In other words, since *CPLR 7502* is limited to domestic arbitrations, and the parties in *ContiChem* explicitly agreed to arbitration in London, *CPLR 7502*'s provisional remedies were not available.

6  *CPLR 6201* permits the court, upon motion on notice, to grant a temporary restraining order prohibiting the transfer of assets by a garnishee as provided in *CPLR 6214 (b)*. A garnishee is defined in *CPLR 105 (i)* as "a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest."

[*864]  C. Classification as a Domestic or International Arbitration

The court notes that in *ContiChem*, the [***39] Second Circuit equated a foreign situs of arbitration with a nondomestic arbitration, and outside the scope of [**565] *CPLR 7502* relief. However, the court therein also stated (*229 F3d at 432*): "[I]f this case involved a domestic arbitration, not governed by the Convention, we would have little trouble concluding that *Rule 7502 (c)* was available to ContiChem . . . ." It is unclear whether the court, by this latter statement, equated domestic arbitrations to one not subject to the UN Convention. However, the case law does support the conclusion that a foreign arbitration for purposes of invoking *CPLR 7502* relief is one whose situs is expressly selected as a country outside of the United States (*see Smith/Enron Cogeneration Ltd. Partnership, Inc., 198 F3d 88, 94 [2d Cir 1999]* [the "focus of . . . the Convention is not on the nationality of the party seeking to enforce an award but on the situs of the arbitration"]). In this regard, the agreements to arbitrate found in *Cooper*, *Shah* and *ContiChem* expressly provided for arbitrations in Switzerland, India and London, respectively. Similarly, the arbitration in *Drexel* was scheduled to be [***40] held in Germany, pursuant to the parties' agreement to hold arbitrations in either West Germany, Belgium or the United States. Given that the parties herein expressly agreed to hold the arbitration solely in New York, the underlying domestic arbitration renders the instant matter materially distinguishable from *Cooper* and its progeny.

MTG confuses an international "agreement" with an international "arbitration." While the agreements between the parties are undoubtedly international in nature, the terms of their agreements provide for a domestic arbitration. In paragraph 9 of the June agreement, the parties agree to a New York choice of law provision, arbitration in New York to be administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules, and to designate a member of the New York bar as the arbitrator. All of these factors are indicia of the intent of the parties to conduct a New York "domestic" arbitration. Accordingly, and contrary to MTG's contention, that the agreements at issue satisfy the three requirements so as to implicate the UN Convention enforcement rules (*supra* at 860-861), *Cooper* and its progeny [***41] are no bar to the preinjunctive relief sought herein.

Moreover, unlike the facts in *Cooper* and its progeny, the parties herein specifically agreed to permit an application "to any

9 Misc. 3d 845, *865; 804 N.Y.S.2d 549, **565;
2005 N.Y. Misc. LEXIS 1727, ***41; 2005 NY Slip Op 25337

[*865] court in the State of New York to seek injunctive relief to maintain the status quo until the arbitration award is rendered or the controversy is otherwise resolved" (June agreement para 9). CanWest and MTG clearly anticipated the possibility of prearbitration applications for injunctive relief in the event of a dispute, and unambiguously agreed to permit prearbitration judicial intervention for the purposes of obtaining such relief.

Before a party can be forced to forgo its rights to judicial review and submit its disputes to arbitration, there must be evidence that the parties intended to submit the relevant dispute to arbitration (*see Matter of Writers Guild of Am. E. [Prockter Prods.], 1 NY2d 305, 135 NE2d 204, 152 NYS2d 466 [1956]; Bowmer v Bowmer, 50 NY2d 288, 406 NE2d 760, 428 NYS2d 902 [1980]; Matter of Helmsley [Wien], 173 AD2d 280, 569 NYS2d 672 [1st Dept 1991]; see also* 21 UST 2517, art II, para 1). In [***42] *HSBC Bank USA v National Equity Corp. (279 AD2d 251, 252, 719 NYS2d 20 [1st Dept 2001]* [although not involving the UN Convention]), the parties' agreement gave the lender, HSBC, the right, "at any time prior to the commencement of a judicial proceeding, to submit any disputes to arbitration, but by so electing the lender is not thereby required to submit all disputes to [**566] arbitration." The agreement further provided that "no provision, nor exercise of rights under, . . . shall limit the right of any party . . . to obtain from a court . . .

provisional . . . remedies . . . ." In response to HSBC's request for an order of seizure, the defendant argued that the agreement could not confer such a provisional remedy by right since it was not authorized by statute, namely, *CPLR 7502 (c)*, which only provided for an injunction or an order of attachment. The First Department rejected defendant's contention, and held (*at 254*) that HSBC was free, "under the contract, and within the statute" to seek judicial relief while, simultaneously, seeking arbitration of the underlying dispute. Here, the parties specifically excluded any application for injunctive relief from the arbitration, and agreed to submit such applications to a New York court. [***43] The parties did not thereby attempt to contract out of the UN Convention; rather, they intentionally excluded injunctive relief from their arbitration agreement. Therefore, CanWest is similarly free under its contract to seek the injunctive relief herein.

This conclusion is not inconsistent with the UN Convention. The UN Convention recognizes that parties have the right to agree to resolve certain disputes outside of arbitration. Indeed, article V of the UN Convention provides bases on which a signatory may refuse to recognize or enforce an arbitral award. Subparagraph (c) of paragraph (1) permits refusal if:

[*866] "The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced." (21 UST 2517, art V, para [1] [c].)

Such a provision would be unnecessary if all agreements to submit disputes to arbitration required [***44] that any dispute between the parties be so submitted. This provision clearly recognizes that disputes may fall outside the scope of the agreement to arbitrate.

Furthermore, as noted in the Court of Appeals decision in *Cooper*, the UN Convention's purpose is to provide parties with certainty when entering into an international contract (*Cooper, 57 NY2d 408, 442 NE2d 1239, 456 NYS2d 728 [1982]*). When, as here, parties agree to permit application to a court for prearbitration injunctive relief, it would be consistent with the letter and spirit of *Cooper* and its progeny to enforce that agreement. Additionally, the provision in the June

agreement which permits applications to New York courts for injunctive relief is separate and distinct from the provision in the June agreement which permits arbitration, and therefore does not fall within the purview of, and is not inconsistent with, the UN Convention. Therefore, there is no basis to preclude parties to an international agreement from enforcing an agreement to seek the same remedies that *CPLR 7502 (c)* provides to domestic arbitrations. The injunctive relief carve-out, contractually agreed upon by the parties herein, does not [***45] frustrate the purpose of the UN Convention, but supports the goal of "minimiz[ing] the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders." (*Cooper, 57 NY2d at 410.*) The "international traders" herein avoided any uncertainty in the enforcement of arbitral awards arising from their agreement by expressly providing a mechanism to seek injunctive relief in connection with any arbitration. It cannot be said that the purpose of the UN Convention is defeated, because the application [**567] herein for injunctive relief is not "contrary to contract."

The court also notes that since the parties' agreement provides that an application for injunctive relief may be made in any New York court, *General Obligations Law § 5-1402* further

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 297 of 485

Page 23

9 Misc. 3d 845, *867; 804 N.Y.S.2d 549, **567;
2005 N.Y. Misc. LEXIS 1727, ***45; 2005 NY Slip Op 25337

[*867]  supports the enforcement of such an agreement. *General Obligations Law § 5-1402* provides, in part:

> "1. Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, . . . any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or [***46] relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state."

In the instant case, since the June agreement includes a choice of New York law and the parties' submission to the jurisdiction of New York courts for injunctive relief, and relates to an obligation of more than $ 1 million, New York is the proper forum as a matter of law to entertain the injunctive application (*CPLR 327 [b]*; *General Obligations Law § 5-1402*; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Worley, 257 AD2d 228, 230-231, 690 NYS2d 57 [1st Dept 1999]*).

Accordingly, based on the terms of the June agreement between CanWest and MTG, this court concludes that CanWest's application for injunctive [***47] relief pursuant to *CPLR 7502 (c)* in connection with the underlying arbitration is not barred by either the UN Convention or *Cooper* or its progeny. And, *General Obligations Law § 5-1402* permits CanWest to seek such relief.

D. Injunctive Relief

While ordinarily the function of a preliminary injunction is to preserve the status quo until a final determination upon the merits can be made, "[t]here is no question that in a proper case the Supreme Court has power as a court of equity to grant a temporary injunction which mandates specific conduct" (*McCain v Koch, 70 NY2d 109, 116, 511 NE2d 62, 517 NYS2d 918 [1987]*; *see also, State of New York v Solil Mgt. Corp., 128 Misc 2d 767, 491 NYS2d 243 [Sup Ct, NY County 1985]* [an injunction may be used to either restrain or compel performance of an act]). The decision whether to grant a motion for preliminary relief is committed to the sound discretion of

9 Misc. 3d 845, *868; 804 N.Y.S.2d 549, **567;
2005 N.Y. Misc. LEXIS 1727, ***47; 2005 NY Slip Op 25337

[*868] the trial court (*see*, *Doe v Axelrod, 73 NY2d 748, 750, 532 NE2d 1272, 536 NYS2d 44 [1988]*; *Jiggetts v Perales, 202 AD2d 341, 342, 609 NYS2d 222 [1st Dept 1994]*).

In order for [***48] a preliminary injunction or temporary restraining order to be issued pursuant to *CPLR 7502 (c)*, the petitioner must demonstrate (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; (3) a balancing of the equities which favors the issuance of injunctive relief; and (4) that "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief" (*50-09 2nd St. LLC v Ianvil Assoc., Inc., 2002 NY Slip Op 50292[U], *4, 2002 NY Misc LEXIS 912 [Sup Ct, NY County 2002]*; *St. Paul Fire & Mar. Ins. Co. v York Claims Serv., 308 AD2d 347, 765 NYS2d 573 [1st Dept [**568] 2003]*; *New York City Off-Track Betting Corp. v New York Racing Assn., 250 AD2d 437, 673 NYS2d 387 [1st Dept 1998]*; *Grumet v Cuomo, 162 Misc 2d 913, 617 NYS2d 620 [Sup Ct, NY County 1994]*). Preliminary injunctive relief is a drastic remedy, which will only be granted if it is established that there is a clear right to the relief under the law and the facts (*Koultukis v Phillips, 285 AD2d 433, 728 NYS2d 440 [1st Dept 2001]*).

In addition, where as here the injunctive relief would upset [***49] the status quo and grant some form of the ultimate relief requested, the movant has the heightened burden of showing that extraordinary circumstances warrant the relief (*see Rosa Hair Stylists v Jaber Food Corp., 218 AD2d 793, 794, 631 NYS2d 167 [2d Dept 1995]*).

Notwithstanding, *CPLR 6314* permits the court to vacate or modify a temporary restraining order or preliminary injunction where such injunctive relief would not serve any of the objectives the remedy is designed to achieve, where the party in support is not in danger of suffering any irreparable injury during the pendency of the suit or an alternative legal remedy is adequate to protect the interests of the party in support of injunctive relief. Further, a temporary restraining order or preliminary injunction may be vacated due to the lack of jurisdiction over the person to be retrained.

1. Likelihood of Success on the Merits

CanWest has demonstrated a strong likelihood of success on the merits of its claim that MTG breached the June and November agreements. The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' [***50] intent (*see Slatt v Slatt, 64 NY2d 966, 967, 477 NE2d 1099, 488 NYS2d 645 [1985], rearg denied 65 NY2d 785, 482 NE2d 568, 492 NYS2d 1026 [1985]*). "The best evidence of what parties to a written agreement intend is what they say

[*869] in their writing" (*Slamow v Del Col, 79 NY2d 1016, 1018, 594 NE2d 918, 584 NYS2d 424 [1992]*). Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms (*see e.g. R/S Assoc. v New York Job Dev. Auth., 98 NY2d 29, 32, 771 NE2d 240, 744 NYS2d 358 [2002], rearg denied 98 NY2d 693, 775 NE2d 1291, 747 NYS2d 411 [2002]*; *W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162, 566 NE2d 639, 565 NYS2d 440 [1990]*).

The June agreement was expressly intended to be a legally enforceable agreement between CanWest and MTG. By its terms, the June agreement was a proposal to establish, upon agreed material terms, a newly formed entity or partnership, which would acquire the assets of JPost Group from Hollinger. Such agreements to negotiate in good faith in an effort to reach a final agreement within a certain scope of terms are enforceable (*see* [***51] *Teachers Ins. & Annuity Assn. of Am. v Tribune Co., 670 F Supp 491 [SD NY 1987]*). The parties expressly indicated that they would be "equal 50/50" shareholders in this newly formed entity. CanWest and MTG also agreed to develop a business plan and finalize a bid to be accepted by Hollinger. The submission of the bid was subject to certain conditions precedent, including completing the final structure of the newly formed entity and successfully executing a shareholders agreement

pursuant to Schedule A of the agreement. The June agreement also permitted either party to withdraw from submitting the bid or, if permitted by the bid, to determine not to proceed with the purchase of the JPost Group assets, if such party determined in its own judgment that [**569] the conditions precedent will not be capable of being fulfilled to its satisfaction. Under such circumstance, the party that withdrew from submitting the bid or proceeding with the acquisition was expressly prohibited from proceeding alone or with any third party relating to the acquisition for a period of 12 months after withdrawal.

However, the June agreement was modified in part by the November agreement. The November agreement expressly acknowledged MTG's submission to Hollinger of the offer to purchase [***52] the JPost Group assets, and that such submission was with the concurrence of CanWest. More importantly, the November agreement bound the parties to negotiate in good faith to finalize, before the closing of the Hollinger transaction, the terms under which MTG shall sell the assets of PPL and its subsidiaries to the newly formed entity, which will be owned and funded by CanWest and MTG equally (50%), and on the basis that MTG will indemnify and hold the newly formed entity harmless in respect to certain liabilities of the PPL. The

9 Misc. 3d 845, *870; 804 N.Y.S.2d 549, **569;
2005 N.Y. Misc. LEXIS 1727, ***52; 2005 NY Slip Op 25337

[*870] November agreement also obligated MTG and CanWest to negotiate in good faith to finalize, before the closing of the Hollinger transaction, the terms of the agreements and conditions precedent outlined in the June agreement, recognizing that the parties have outlined the terms of the shareholders agreement to be applicable to the newly formed entity to be jointly owned by them. More importantly, the November agreement provided that in the event the parties are unable to negotiate in good faith toward finalizing the terms by which MTG shall sell the JPost Groups assets to a newly formed entity, or complete the conditions precedent outlined in the [***53] June agreement, CanWest would have no further obligation to participate in the purchase of the PPL.

In essence, the June and November agreements clearly represent an agreement between CanWest and MTG to submit a joint bid for the purchase of the JPost Group's assets from Hollinger, and to work together in creating the newly formed company, to which the assets of the JPost Group would be transferred after the closing of the purchase from Hollinger. The parties agreed to work toward creating the newly formed entity before the closing of the Hollinger transaction, but in the event the newly formed entity was not created by such time and MTG nevertheless completed the transaction, CanWest was no longer obligated to participate in the formation of the newly formed entity or purchase of the PPL in any manner.

Omitted from the November agreement is any reference to *MTG*'s obligation in the event MTG completed the Hollinger transaction, and the newly formed entity was not created by the time of the closing of the Hollinger transaction. However, it appears that from a fair reading of the November agreement, together with the June agreement, MTG had a continuing obligation to negotiate [***54] toward structuring the newly formed entity to receive the shares of PPL and to finalize the terms of the relevant agreements *until either party served notice of its decision to withdraw from purchasing the JPost Group*, since, pursuant to the November agreement, "all other respects" of the June agreement "continued in force and effect."

Contrary to MTG's contention, the obligation to negotiate in good faith to finalize, "on or before the closing date," served as a goal to work toward structuring and finalizing the limited partnership to which MTG was to transfer the shares of PPL, and does not express the moment at which the parties' obligation to negotiate in good faith ended.

9 Misc. 3d 845, *870; 804 N.Y.S.2d 549, **569;
2005 N.Y. Misc. LEXIS 1727, ***54; 2005 NY Slip Op 25337

[*871]   [**570] The submissions herein sufficiently demonstrate, for purposes of injunctive relief inquiry, that MTG breached its duty to negotiate in good faith by drastically altering the terms of the June and November agreements. The submissions indicate that MTG insisted on terms, i.e., 75%-25% in favor of MTG, that were in direct conflict with those contained in the June and November agreements. The obligation of good faith requires parties to refrain bars a party from insisting on terms that do not conform to [***55] the preliminary agreement (*Teachers, supra*; *Liberty Envtl. Sys., Inc. v County of Westchester, 2000 WL 1752927, at *4, 2000 US Dist LEXIS 17095, *12 [SD NY 2000]*). Notably, the record indicates that as of December 15, 2004, MTG negotiated with what it knew to be assets owned by Mr. Azour, who, according to MTG, is not subject to either agreement and, thus, not within this court's jurisdiction. Any measure of good faith with which MTG purports to have negotiated is undermined by the position taken by MTG that Mr. Azour was not obligated to abide by the June agreement. Therefore, assuming the veracity of MTG's position, that Mr. Azour is not a party to the June agreement, MTG could not have been in a position to negotiate toward the sale of "Mr. Azour's" assets to a newly formed corporation pursuant to the terms of the June and November agreements.

CanWest argues that it is likely to succeed on the merits against Mr. Azour in an individual capacity because MTG does not have a separate legal existence. Since Mr. Azour signed the June and November agreements on behalf of MTG, an entity without a separate legal existence, CanWest claims that Mr. Azour is personally bound.

An action [***56] may be maintained against the president of an unincorporated corporation in his individual capacity. Defendant in *Refined Sugars Inc. v Hazou (1987 WL 19024, 1987 US Dist LEXIS 9662 [SD NY 1987]*) contracted with plaintiff under the name of an unincorporated entity named American Sahara General Trading Company (GTC). Defendant, Hazou, sought to dismiss the breach of contract claims against him in an individual capacity claiming that he conducted business with plaintiff as president of American Sahara, Inc. However, plaintiffs presented a contract which Hazou signed as president on behalf of GTC. The court denied defendant's motion to dismiss, stating that "[t]he fact that he signed it 'Elias Hazou, President' does not by itself transform the General Trading Company into a corporation" (*1987 WL 19024, *3, 1987 US Dist LEXIS 9662, *9*).

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 302 of 485

Page 28
9 Misc. 3d 845, *871; 804 N.Y.S.2d 549, **570;
2005 N.Y. Misc. LEXIS 1727, ***56; 2005 NY Slip Op 25337

[*872] Similarly, MTG has established its likelihood of success on the merits of its breach of agreement claim against Mr. Azour. In the instant case, Mr. Azour signed the June agreement on behalf of MTG. CanWest contends that MTG is a nonexistent entity. Although MTG now claims that it was and is the trade name for MTL, there is no indication in the June or November agreement that MTG was [***57] doing business as MTL. Furthermore, the June agreement fails to even mention that MTL has any interest in the subject matter. Since Mr. Azour signed the June agreement on behalf of MTG, a nonexistent entity, this court finds that CanWest has demonstrated its likelihood of success on the merits of asserting it breach of contract claims as against Mr. Azour individually.

2. Irreparable Harm

CanWest has also established a sufficient basis for finding irreparable harm in the event that the relief is not granted. Since the closing with Hollinger, MTG and/or Azour have (1) fired key executives and employees, (2) moved printing operations, (3) reduced advertising, and (4) changed printing suppliers, resulting in the [**571] loss of customers, revenue and an erosion of its reputation. Furthermore, CanWest has lost the right to participate in the management of the Jerusalem Post. These factors necessitate a finding of irreparable harm (see *Urban Archaeology Ltd. v Dencorp Invs., Inc., 12 AD3d 96, 783 NYS2d 330 [1st Dept 2004]* [finding the loss of important employees to be irreparable injury]; [***58] *Register.Com, Inc. v Verio, Inc., 356 F3d 393 [2d Cir 2004]* [holding that the loss of reputation, goodwill and business opportunities constitutes irreparable harm]; *Willis of N.Y. v DeFelice, 299 AD2d 240, 750 NYS2d 39 [1st Dept 2002]* [finding that the loss of business was irreparable damage]; *Wisdom Import Sales Co., L.L.C. v Labatt Brewing Co., Ltd., 339 F3d 101 [2d Cir 2003]* [holding that the loss of the right to participate in management constituted irreparable harm where such right was essential to preserving an agreed-upon balance of power in management]).

3. Balance of the Equities

Furthermore, since CanWest merely seeks to maintain the status quo, the balance of equities tilt in its favor. Absent a TRO, MTG will be free to take additional actions which may cause CanWest further irreparable injury (see *Gramercy Co. v Benenson, 223 AD2d 497, 637 NYS2d 383 [1st Dept 1996]* [finding that the balance of equities tilted in favor of plaintiffs who merely sought to maintain the status quo where denial of injunctive relief would have rendered the final judgment ineffectual]).

9 Misc. 3d 845, *872; 804 N.Y.S.2d 549, **571;
2005 N.Y. Misc. LEXIS 1727, ***58; 2005 NY Slip Op 25337

[*873] 4. Award Rendered Ineffectual

Finally, absent a temporary restraining [***59] order, MTG and/or Mr. Azour will be able to transfer the shares of PPL prior to the hearing on the preliminary injunction. Such a transfer would render a preliminary injunction ineffectual since it would only constrain MTG and not the new owners of PPL.

IV. Conclusion

Based on the foregoing, it is hereby ordered that CanWest's order to show cause for a temporary restraining order, pending a hearing of CanWest's petition for a preliminary injunction, enjoining MTG and its subsidiaries, affiliates, and officers, including Eli Azour, and all persons acting on behalf of MTG from taking certain actions with respect to the JPost Group is granted; and it is further ordered that the cross motion by MTG to vacate the temporary restraining order is denied.

[PORTIONS OF OPINION OMITTED FOR PURPOSES OF PUBLICATION.]

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 304 of 485

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

1979 CarswellQue 157

Supreme Court of Canada

Consolidated Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.

1979 CarswellQue 157F, 1979 CarswellQue 157, [1979] S.C.J. No. 133, [1980] 1 S.C.R. 888,
[1980] I.L.R. 1-1176, 112 D.L.R. (3d) 49, 1 A.C.W.S. (2d) 169, 32 N.R. 488, REJB 1979-109268

# Consolidated-Bathurst Export Limited, (Plaintiff) Appellant and Mutual Boiler and Machinery Insurance Company, (Defendant) Respondent

Martland, Ritchie, Pigeon, Dickson, Beetz, Estey, and McIntyre JJ.

Judgment: March 13, 1979
Judgment: December 21, 1979

Proceedings: affirmed *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* ((4 octobre 1977)), no C.A. Montréal 500-09-000267-757 ((Que. C.A.))

Counsel: *Guy Desjardins, Q.C.*, for the appellant.
*Marcel Cinq-Mars, Q.C.*, for the respondent.

Subject: Insurance; Family

**Headnote**
**Insurance --- Principles of interpretation and construction — Contra proferentem rule**

Products of factory damaged following corrosion of machinery -- Insurer having right to inspect and terminate contract -- Exclusion clause in policy excluding liability for damages directly caused by corrosion -- Other exclusion clauses excluding liability for damages caused directly or indirectly -- Insurer liable under contra proferentem doctrine in not employing less ambiguous language to exclude liability for corrosion -- Liability also being imposed using normal rules of construction to discern intent of parties.

**The reasons of Martland, Ritchie and McIntyre JJ. were delivered by** *Ritchie J.* (*dissenting*):

1     This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

2     By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

3     I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 305 of 485

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

4     The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

. . . . .

1. ...To pay the Insured for loss or damage to property of the Insured directly caused by such Accident *to an Object*, or if the Company so elects, to repair or replace such damaged property; ...

(The italics are my own.)

5     The objects covered by the policy are defined in the 1st Schedule thereof as follows:

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

6     What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

C. Definition of Accident — As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material*, (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

(The italics are my own.)

7     Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

8     It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured *directly* caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for *consequential* damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage

to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of ... material".

9     It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts when it is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

10     In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company* [1] where he said at p. 953:

> The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

11     My brother Estey has, however, adopted the view that in construing the policy and particularly the definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service* [2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

12     The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

> Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold — a circumstance to be avoided, so far as the language used will permit.

13     I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

14     For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

**The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by *Estey J.*:**

15     The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 307 of 485

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

[TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.

Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of $^5/_8$ inch and a metal casing measuring $^1/_{16}$ inch, or .065 inch.

Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.

Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.

Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.

Each exchanger is sealed at each end by a lid.

As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.

The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a breakdown and considerable damage.

16      Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

**INSURING AGREEMENT**

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

**COVERAGE A — PROPERTY OF THE INSURED**

1. ACTUAL CASH VALUE — To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 308 of 485

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

17      The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

18      The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,

(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

19      The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

20      The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was cross-examined, he admitted that he could not provide any direct evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

21      The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

22      In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and strip ping out the words not here relevant, the definition reads as follows:

Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion...

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

23    Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

**EXCLUSIONS**

This policy does not apply to

1. *WAR DAMAGE* — Loss from an Accident *caused directly or indirectly* by

(a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

• 

. . . . .

2. *NUCLEAR HAZARDS* — Loss, *whether it be direct or indirect, proximate or remote,*

(a) From an Accident *caused directly or indirectly* by nuclear reaction...

(b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, *caused directly or indirectly by, contributed to or aggravated by an Accident*;

• 

. . . . .

3. *MISCELLANEOUS PERILS* — Loss under Coverages A and B from

• 

. . . . .

(b) An Accident *caused directly or indirectly by fire* or from the use of water or other means to extinguish fire;

• 

. . . . .

(d) Flood *unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident*;

• 

. . . . .

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had this technique been adopted in the primary coverage provisions excerpted above, it would have read;

Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

24    At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

25    Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern Life Assurance Co.* [3] at p. 137:

> There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers, and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

> (Adopted in this Court in 1908 [4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

> If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service* [5] where at pp. 179-180 it was stated:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:

>> I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company* [6] at p. 953:

> The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 311 of 485

Consolidated Bathurst Export Ltd. c. Mutual Boiler &..., 1979 CarswellQue 157

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.

*Cornish v. Accident Insurance Company* [7] , at p. 456.

26    Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.

27    The *Cornish* case, *supra*, illustrates a course generally taken when such contracts reach the courts. There the court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury". Lindley L.J., in the course of judgment, stated:

The words are "exposure of the insured to obvious risk of injury." These words suggest the following questions: Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself. Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America v. Excel Cleaning Service, supra*, where, at pp. 177-8, it was concluded:

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold — a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection of the machinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk

1979 CarswellQue 157, 1979 CarswellQue 157F, [1979] S.C.J. No. 133...

pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

28    It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

29    I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs, Martland, Ritchie and McIntyre JJ. dissenting.*

Solicitors of record:

Solicitors for the appellant: *Desjardins, Ducharme*, Desjardins & Bourque, Montreal.

Solicitors for the respondent: *Martineau, Walker, Allison, Beaulieu, MacKell* & *Clermont*, Montreal.

Footnotes

1    [1956] S.C.R. 936.
2    [1954] S.C.R. 169.
3    (1907), 15 O.L.R. 131 (Ont. C.A.).
4    (1908), 42 S.C.R. 246.
5    [1954] S.C.R. 169.
6    [1956] S.C.R. 936.
7    (1889), 23 Q.B. 453 (C.A.).

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 313 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

1998 CarswellNat 1496

Supreme Court of Canada

Continental Bank of Canada v. R.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298, [1998] 4 C.T.C. 119,
[1998] S.C.J. No. 63, 163 D.L.R. (4th) 385, 229 N.R. 58, 82 A.C.W.S. (3d) 196, 98 D.T.C. 6505

# Continental Bank Leasing Corporation, Appellant v. Her Majesty The Queen, Respondent and The Canadian Bankers' Association, Intervener

L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major, Bastarache JJ.

Judgment: September 3, 1998

Docket: 25532

Proceedings: reversing [1997] 1 C.T.C. 13 (Fed. C.A.); reversing [1995] 1 C.T.C. 2135 (T.C.C.); additional reasons at (October 4, 1994), Doc. 91-683(IT)G, 91-684(IT)G (T.C.C.)

Counsel: *H. Lorne Morphy* and *Kent E. Thomson*, for the appellant.
*Larry R. Olsson*, Q.C., and *S. Patricia Lee*, for the respondent.
*Harry Underwood* and *Ira Nishisato*, for the intervener.

Subject: Corporate and Commercial; Civil Practice and Procedure; Income Tax (Federal)

**Headnote**

**Income tax --- Partnerships — Transfer of property to**

**Income tax --- Partnerships — Existence of**

**Banking and banks --- Powers and capacities of banks**

Bank sold assets of subsidiary leasing company — Partnership formed between leasing company and purchasers — Leasing company transferred assets to partnership under s. 97(2) of Income Tax Act — Leasing company sold partnership interest to bank which sold interest to purchasers — Bank violated s. 174(2)(i) of Bank Act but partnership not void — Bank Act, R.S.C. 1985, c. B-1, ss. 20(1), 174(2)(i) — Income Tax Act, S.C. 1970-71-72, c. 63, s. 97(2) — Partnerships Act, R.S.O. 1980, c. 370, s. 34.

**Droit bancaire et banques --- Pouvoirs et capacité des banques**

Banque a vendu des éléments d'actif de sa filiale, une compagnie exerçant des activités de crédit-bail — Société en nom collectif a été formée entre la compagnie de crédit-bail et les acheteurs — Compagnie de crédit-bail a transféré ses éléments d'actif à la société en nom collectif en effectuant le choix prévu à l'art. 97(2) de la Loi de l'impôt sur le revenu — Compagnie de crédit-bail a vendu sa participation dans la société en nom collectif à la banque qui l'a vendue aux acheteurs — Banque a violé l'art. 174(2)(i) de la Loi sur les banques, mais la société en nom collectif n'est pas nulle — Loi sur les banques, L.R.C. 1985, ch. B-1, art. 20(1), 174(2)(i) — Loi de l'impôt sur le revenu, L.C. 1970-71-72, ch. 63, art. 97(2) — Loi sur les sociétés en nom collectif, R.S.O. 1980, ch. 370, art. 34.

**Income tax --- Partnerships — Rollover involving partnership**

Bank sold assets of subsidiary leasing company — Partnership formed between leasing company and purchasers — Leasing company transferred assets to partnership under s. 97(2) of Income Tax Act — Leasing company sold partnership interest

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

to bank which sold interest to purchasers — Leasing company entitled to s. 97(2) election — Bank Act, R.S.C. 1985, c. B-1, s. 174(2)(i) — Income Tax Act, S.C. 1970-71-72, c. 63, s. 97(2) — Partnerships Act, R.S.O. 1980, c. 370, s. 34.

### Impôt sur le revenu --- Sociétés en nom collectif — Transfert impliquant la société en nom collectif

Banque a vendu des éléments d'actif de sa filiale, une compagnie exerçant des activités de crédit-bail — Société en nom collectif a été formée entre la compagnie de crédit-bail et les acheteurs — Compagnie de crédit-bail a transféré ses éléments d'actif à la société en nom collectif en effectuant le choix prévu à l'art. 97(2) de la Loi de l'impôt sur le revenu — Compagnie de crédit-bail a vendu sa participation dans la société en nom collectif à la banque qui l'a vendue aux acheteurs — Compagnie de crédit-bail avait le droit d'effectuer le choix prévu à l'art. 97(2) — Loi sur les banques, L.R.C. 1985, ch. B-1, art. 20(1), 174(2)i) — <u>Loi de l'impôt sur le revenu, L.C. 1970-71-72</u>, c. 63, art. 97(2) — Loi sur les sociétés en nom collectif, R.S.O. 1980, ch. 370, art. 34.

### Partnership --- Nature of partnership — Evidence of partnership — Intention of parties

Bank sold assets of subsidiary leasing company — Partnership formed between leasing company and purchasers — Leasing company transferred assets to partnership under s. 97(2) of Income Tax Act — Leasing company sold partnership interest to bank which sold interest to purchasers — Partnership was valid — Leasing company entitled to s. 97(2) election — Income Tax Act, S.C. 1970-71-72, c. 63, s. 97(2) — Partnerships Act, R.S.O. 1980, c. 370, s. 2.

### Sociétés en nom collectif --- Nature de la société en nom collectif — Preuve de la société en nom collectif — Intention des parties

Banque a vendu des éléments d'actif de sa filiale, une compagnie exerçant des activités de crédit-bail — Société en nom collectif a été formée entre la compagnie de crédit-bail et les acheteurs — Compagnie de crédit-bail a transféré ses éléments d'actif à la société en nom collectif en effectuant le choix prévu à l'art. 97(2) de la Loi de l'impôt sur le revenu — Compagnie de crédit-bail a vendu sa participation dans la société en nom collectif à la banque qui l'a vendue aux acheteurs — Société en nom collectif était valide — Compagnie de crédit-bail avait le droit d'effectuer le choix prévu à l'art. 97(2) — <u>Loi de l'impôt sur le revenu, L.C. 1970-71-72</u>, c. 63, art. 97(2) — Loi sur les sociétés en nom collectif, R.S.O. 1980, ch. 370, art. 2.

A bank negotiated with C Corp. to sell its wholly-owned subsidiary, the appellant taxpayer leasing company. A partnership was formed on December 24, 1986 between the leasing company and C Corp.'s subsidiaries to carry on the leasing company's business. The leasing company transferred its assets to the partnership, tax free, pursuant to s. 97(2) of the *Income Tax Act*. On December 27, 1986 the leasing company transferred its partnership interest to the bank and was dissolved. The bank sold its partnership interest to C Corp.'s subsidiaries. Under subsec. 174(2) of the *Bank Act* ["the Act"], a bank may not, directly or indirectly, participate in a partnership. Subsection 20(1) of the Act provides that no act of a bank is invalid by reason only that it contravenes the Act. Section 34 of the *Partnerships Act* provides that a partnership is dissolved by any event that makes it unlawful for business to be carried on or for the members to carry it on in partnership. The respondent Minister reassessed the leasing company on the basis that the true nature of the transaction was the disposition of assets to C Corp., making the subsec. 97(2) election invalid and giving rise to recaptured capital cost allowance in the hands of the leasing company. The leasing company successfully appealed. The Minister's appeal was allowed. The leasing company appealed.

**Held:** The appeal was allowed.

*Per McLachlin J. (Gonthier, Cory, Iacobucci and Major JJ. concurring)*: While the other aspects of Bastarache J.'s reasons were agreed with, s. 34 of the *Partnerships Act* did not render the partnership void. The partnership's business was not rendered illegal merely because the bank held shares in the leasing company when subsec. 174(2) said that it should not. A partnership must be distinguished from those who may invest in or support the partners that make it up. Prior to December 27, the bank was not a partner. It merely held shares in one of the partners which was separate and legally distinct. Section 174 did not make it unlawful for the partnership to carry on its business or for the leasing company to be a partner. As such, the partnership was not dissolved by s. 34.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

The leasing company's participation in the partnership was not unlawful within the meaning of s. 34 by reason of the public policy component of the doctrine of illegality. The finding that the participation in the partnership should be void or unenforceable for public policy reasons did not necessarily mean that its participation was illegal or unlawful. As such, s. 34 was not attracted.

Public policy required that breaches of the Act should not lead to the invalidation of contracts and other transactions. The partnership was valid between December 24 and 27. The leasing company was entitled to the s. 97(2) election.

*Per Bastarache J. (dissenting in part) (L'Heureux-Dube concurring)*: The leasing company was a member of a valid partnership within the meaning of s. 2 of the *Partnerships Act*. On the face of the agreements, the parties created a valid partnership, acted upon those agreements and were governed by them. The partners carried on an equipment leasing business in common with a view to profit. While there was no active business activity from December 24 to 27, there was no termination of leasing contracts which continued throughout. The parties held themselves out as partners and conducted themselves as such. The distribution of profits was provided by the partnership agreement. While the ultimate objective was to dispose of assets, this did not negate the ancillary profit-making and sharing purpose. The duration of the partnership was not relevant. There was no minimum period of time required for a partnership to exist.

While the bank contravened para. 174(2)(i) of the Act, the partnership was not ultra vires the bank, by reason of subsec. 20(1). The doctrine of ultra vires no longer applied to banks since they now had the capacity of a natural person under subsec. 18(1) of the Act.

While subsec. 20(1) did not eliminate the doctrine of illegality, the doctrine did not apply in the case at hand. While the bank deliberately contravened the Act, a finding of invalidity on this basis would deprive subsec. 20(1) of any effect and amounted to a finding of invalidity by reason only of a breach of the statute.

Subsection 20(1) of the Act and s. 34 of the *Partnerships Act* were not in conflict. The stipulation in subsec. 20(1) was of no consequence; the act was not invalid by reason only of the prohibition in para. 174(2)(i), but rather by reason of a contravention under the *Partnerships Act*. Payment of the penalties set out in subsec. 174(16) of the Act did not render lawful what the Act prohibits. The indirect participation by the bank through the leasing company made the carrying on of business in the partnership "unlawful" within the meaning of s. 34. The leasing company's participation in the partnership was also "unlawful" by reason of public policy. It was contrary to public policy to allow the parties to benefit from their deliberate breach of the Act's prohibitions.

As such, the leasing company was not a member of a valid partnership, could not take advantage of subsec. 97(2) and was liable for recapture of capital cost allowance.

Une banque a négocié avec C Corp. dans le but de vendre sa filiale en propriété exclusive, la compagnie de crédit-bail appelante. Une société en nom collectif a été formée le 24 décembre 1986 entre la compagnie de crédit-bail et les filiales de C Corp. pour poursuivre les activités de la compagnie de crédit-bail. Cette dernière a transféré ses éléments d'actif à la société en nom collectif, libres d'impôt, conformément à l'article 97(2) de la *Loi de l'impôt sur le revenu*. Le 27 décembre 1986, la compagnie de crédit-bail a transféré à la banque sa participation dans la société en nom collectif et a été dissoute. La banque a vendu sa participation dans la société en nom collectif à des filiales de C Corp. Aux termes de l'art. 174(2) de la *Loi sur les banques* [« la Loi »], une banque ne peut pas, directement ou indirectement, participer à une société en nom collectif. L'article 20(1) de la Loi prévoit qu'aucun acte d'une banque n'est nul du seul fait qu'il est contraire à la Loi. L'article 34 de la *Loi sur les sociétés en nom collectif* prévoit qu'une société en nom collectif est dissoute dès lors qu'il se produit un événement qui rend illégale soit l'exploitation de l'entreprise, soit son exploitation par les membres de la firme dans le cadre d'une société en nom collectif. Le ministre intimé a transmis un nouvel avis de cotisation à la compagnie de crédit-bail au motif que le véritable objet de la transaction était la disposition des éléments d'actifs en faveur de C

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Corp., rendant invalide le choix fait en application de l'art. 97(2) et donnant lieu à la récupération de la déduction pour amortissement dans les mains de la compagnie de crédit-bail. L'appel formé par la compagnie de crédit-bail a été accueilli. L'appel du ministre a été accueilli. La compagnie de crédit-bail a formé un pourvoi à l'encontre de cette décision.

**Arrêt:** Le pourvoi a été accueilli.

Par McLachlin J. (Gonthier, Cory, Iacobucci et Major JJ., souscrivant): Bien qu'il y ait accord avec les autres aspects des motifs du juge Bastarache, l'art. 34 de *Loi sur les sociétés en nom collectif* n'a pas eu pour effet de frapper de nullité la société en nom collectif. L'exploitation de l'entreprise de la société en nom collectif n'a pas été rendue illégale simplement parce que la banque détenait des actions dans la compagnie de crédit-bail en contravention de l'art. 174(2). Une distinction doit être faite entre la société en nom collectif et ceux qui peuvent y investir ou qui appuient les associés la composant. Avant le 27 décembre, la banque n'était pas un associé. Elle détenait simplement des actions de l'un des associés, qui était une personne morale distincte sur le plan juridique. L'art. 174 ne rendait donc pas illégale l'exploitation par la société en nom collectif de son entreprise ou la participation de la compagnie de crédit-bail en tant qu'associé. Par conséquent, la société en nom collectif n'a pas été dissoute par l'effet de l'art. 34.

La participation de la compagnie de crédit-bail dans la société en nom collectif n'était pas illégale au sens de l'art. 34 en raison du volet ordre public de la doctrine de l'illégalité en common law. La conclusion voulant que la participation dans la société en nom collectif devrait être nulle ou inexécutable pour des raisons d'ordre public ne signifie pas nécessairement que la participation était « illegal » ou « unlawful » au sens courant de ces mots. Par conséquent, l'art. 34 ne s'appliquait pas.

L'ordre public fait en sorte que les contraventions à la Loi n'entraînent pas l'invalidation de contrats et autres opérations. La société en nom collectif était valide entre le 24 et le 27 décembre. La compagnie de crédit-bail avait le droit d'effectuer le choix prévu à l'art. 97(2).

Par Bastarache J. (dissident en partie) (L'Heureux-Dubé J., souscrivant) : La compagnie de crédit-bail faisait partie d'une société en nom collectif valide au sens de l'art. 2 de la *Loi sur les sociétés en nom collectif*. À la lecture des conventions, les parties ont créé une société en nom collectif valide, ont appliqué ces conventions et ont été régies par celles-ci. Les associés ont exploité en commun une entreprise de location de matériel en vue de réaliser un bénéfice. Quoiqu'il n'y ait eu aucune nouvelle activité commerciale du 24 au 27 décembre, il n'y a pas eu de résiliation des contrats de location, lesquels ont continué de s'appliquer. Les parties se sont présentées comme des associés et se sont comportées comme tels. Le partage des bénéfices était prévu par le contrat de société en nom collectif. Bien que l'objectif principal était de se départir des éléments d'actif, cela n'empêchait pas que la réalisation et le partage d'un bénéfice constituaient un but accessoire. La durée de la société en nom collectif n'était pas pertinente. Il n'y avait aucune durée minimale requise pour qu'une société en nom collectif existe.

Bien que la banque ait contrevenu à l'art. 174(2)i) de la Loi, sa participation à la société en nom collectif n'était pas *ultra vires*, en raison de l'art. 20(1). La théorie de l'*ultra vires* ne s'applique plus aux banques depuis qu'elles possèdent la capacité juridique d'une personne physique aux termes de l'art. 18(1) de la Loi.

Même si l'art. 20(1) n'a pas éliminé la théorie de l'illégalité, la théorie ne s'appliquait pas aux circonstances de la présente affaire. Même si la banque a délibérément contrevenu à la Loi, une conclusion de nullité sur cette base priverait l'art. 20(1) de tout effet et résulterait en une conclusion de nullité du seul fait d'un acte contraire à la Loi.

L'art. 20(1) de la Loi et l'art. 34 de la *Loi sur les sociétés en nom collectif* n'étaient pas incompatibles. Le passage de l'art. 20(1) était sans conséquence; l'acte n'était pas du seul fait qu'il était interdit à l'art. 174(2)i), mais plutôt en raison de la contravention au regard de la *Loi sur les sociétés en nom collectif*. Le paiement des amendes prévues à l'art. 174(16) de la Loi n'a pas rendu légal l'acte que cette Loi interdit. La participation indirecte de la banque, par l'entremise de la compagnie de crédit-bail, a rendu l'exploitation de l'entreprise dans le cadre de la société en nom collectif « illégale » au sens de l'art.

**WestlawNext.** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 317 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496
1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

34. La participation de la compagnie de crédit-bail dans la société en nom collectif était également « illégale » en raison de l'intérêt public. Il était contraire à l'intérêt public de permettre aux parties de profiter de leur violation délibérée des interdictions prévues par la Loi.

Par conséquent, la compagnie de crédit-bail ne faisait pas partie d'une société en nom collectif valide, ne pouvait pas tirer avantage de l'art. 97(2) et était assujettie à la récupération de la déduction pour amortissement.

**Table of Authorities**

**Cases considered by/Jurisprudence cité par *Bastarache J.*:**

*Antosko v. Minister of National Revenue*, (sub nom. *Antosko v. R.*) 94 D.T.C. 6314, 168 N.R. 16, 80 F.T.R. 320 (note), (sub nom. *Antosko v. R.*) [1994] 2 C.T.C. 25, (sub nom. *Canada v. Antosko*) [1994] 2 S.C.R. 312 (S.C.C.) — applied

*Ashbury Railway Carriage & Iron Co. v. Riche* (1875), L.R. 7 H.L. 653, 44 L.J. Exch. 185 (U.K. H.L.) — referred to

*Communities Economic Development Fund v. Canadian Pickles Corp.* (1991), [1992] 1 W.W.R. 193, [1991] 3 S.C.R. 388, 85 D.L.R. (4th) 88, 76 Man. R. (2d) 1, 131 N.R. 81, 10 W.A.C. 1, 8 C.B.R. (3d) 121 (S.C.C.) — referred to

*Continental Bank of Canada v. R.* (1998), (sub nom. *R. v. Continental Bank of Canada*) 98 D.T.C. 6501 (S.C.C.) — referred to

*Cope v. Rowlands* (1836), 150 E.R. 707, 2 M. & W. 149 (Eng. Exch.) — referred to

*Hickman Motors Ltd. v. R.*, (sub nom. *Hickman Motors Ltd. v. Canada*) 148 D.L.R. (4th) 1, (sub nom. *Hickman Motors Ltd. v. Minister of National Revenue*) 213 N.R. 81, [1997] 2 S.C.R. 336, (sub nom. *Hickman Motors Ltd. v. Minister of National Revenue*) 131 F.T.R. 317 (note), [1998] 1 C.T.C. 213 (S.C.C.) — applied

*Holman v. Johnson* (1775), 98 E.R. 1120, 1 Cowp. 341 (Eng. K.B.) — considered

*Hudgell Yeates & Co. v. Watson*, [1978] 2 All E.R. 363 (Eng. C.A.) — applied

*Mahon v. Minister of National Revenue*, [1991] 1 C.T.C. 2543, 91 D.T.C. 878 (T.C.C.) — referred to

*Menard v. Genereux* (1982), 39 O.R. (2d) 55, 138 D.L.R. (3d) 273 (Ont. H.C.) — considered

*Neider v. Carda of Peace River District Ltd.*, [1972] 4 W.W.R. 513, [1972] S.C.R. 678, 25 D.L.R. (3d) 363 (S.C.C.) — referred to

*Orion Finance Ltd. v. Crown Financial Management Ltd.*, [1996] 2 B.C.L.C. 78 (Eng.. C.A.) — applied

*Royal Bank v. Grobman* (1977), 18 O.R. (2d) 636, 2 R.P.R. 101, 2 B.L.R. 145, 83 D.L.R. (3d) 415, 25 C.B.R. (N.S.) 132 (Ont. H.C.) — referred to

*Sidmay Ltd. v. Wehttam Investments Ltd.*, [1967] 1 O.R. 508, 61 D.L.R. (2d) 358 (Ont. C.A.) — considered

*Sidmay Ltd. v. Wehttam Investments Ltd.*, [1968] S.C.R. 828, 69 D.L.R. (2d) 336 (S.C.C.) — referred to

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

*Still v. Minister of National Revenue* (1997), 221 N.R. 127, (sub nom. *Still v. M.N.R.*) 154 D.L.R. (4th) 229, 98 C.L.L.C. 240-001, [1998] 1 F.C. 549 (Fed. C.A.) — considered

*Stubart Investments Ltd. v. R.*, [1984] C.T.C. 294, 84 D.T.C. 6305, [1984] 1 S.C.R. 536, 10 D.L.R. (4th) 1, 53 N.R. 241 (S.C.C.) — considered

**Cases considered by/Jurisprudence cité par *McLachlin J.*:**

*Salomon v. A. Salomon & Co.*, [1897] A.C. 22, 45 W.R. 193, [1895-99] All E.R. Rep. 33 (U.K. H.L.) — referred to

**Statutes considered by / Législation citée par *Bastarache J.*:**

*Bank Act/Banques, Loi sur les*, R.S.C./L.R.C. 1970, c. B-1
    Generally/en général — referred to

*Bank Act/Banques, Loi sur les*, R.S.C./L.R.C. 1985, c. B-1
    s. 18(1) — considered

    s. 20(1) — considered

    s. 174 — considered

    s. 174(2) — considered

    s. 174(2)(i) — considered

    s. 174(16) — considered

    s. 246 — referred to

*Canada Business Corporations Act/Corporations commerciales canadiennes, Loi sur les*, S.C./L.C. 1974-75-76, c. 33
    s. 15(1) — referred to

    s. 16(3) — referred to

*Companies Act*, 1862 (25 & 26 Vict.), c. 89
    Generally — referred to

*Income Tax Act/Impôt sur le revenu, Loi de l'*, S.C./L.C. 1970-71-72, c. 63
    s. 13 [am./mod. 1980-81-82-83, c. 48, s. 5] — considered

    s. 56(4) — referred to

    s. 85 [am./mod. 1985, c. 45, s. 41(1)] — referred to

    s. 85(1) [am./mod. 1985, c. 45, s. 41(1)] — referred to

    s. 85(1)(a) [am./mod. 1985, c. 45, s. 41(1)] — referred to

    s. 88 [am./mod. 1980-81-82-83, c. 48, s. 48(1)] — referred to

    s. 88(1) [am./mod. 1980-81-82-83, c. 48, s. 48(1)] — referred to

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

    s. 88(1)(a)(iii) — considered

    s. 88(1)(f) — considered

    s. 97 [am./mod. 1980-81-82-83, c. 140, s. 58(1); am./mod. 1985, c. 45, s. 49(1)] — referred to

    s. 97(2) [rep. & sub./abr. & rempl. 1980-81-82-83, c. 140, s. 58(1); am./mod. 1985, c. 45, s. 49(1)] — considered

*Partnership Act*, 1890 (53 & 54 Vict.), c. 39
    s. 34 — referred to

*Partnerships Act/Sociétés en nom collectif, Loi sur les*, R.S.O./L.R.O. 1980, c. 370
    s. 1(1)(a) "business" — considered

    s. 1(1)(a) "entreprise" — considered

    s. 2 — considered

    s. 15 — referred to

    s. 34 — considered

**Statutes considered by / Législation citée par *McLachlin J.*:**

*Bank Act/Banques, Loi sur les*, R.S.C./L.R.C. 1985, c. B-1
    s. 20(1) — considered

    s. 174 — considered

    s. 174(2) — considered

    s. 174(2)(i) — considered

*Income Tax Act/Impôt sur le revenu, Loi de l'*, S.C./L.C. 1970-71-72, c. 63
    s. 97(2) [rep. & sub./abr. & rempl. 1980-81-82-83, c. 140, s. 58(1); am./mod. 1985, c. 45, s. 49(1)] — considered

*Partnerships Act/Sociétés en nom collectif, Loi sur les*, R.S.O./L.R.O. 1980, c. 370
    s. 34 — considered

APPEAL by leasing company from judgment reported at [1997] 1 C.T.C. 13 (Fed. C.A.) allowing Minister's appeal of [1995] 1 C.T.C. 2135 (T.C.C.) additional reasons at (October 4, 1994), Doc. 91-683(IT)G, 91-684(IT)G (T.C.C.) allowing leasing company's appeal of Minister's tax assessment refusing election under s. 97(2) of Income Tax Act.

POURVOI de la compagnie de crédit-bail d'un jugement publié à [1997] 1 C.T.C. 13 (Fed. C.A.) accueillant l'appel du ministre contre un jugement publié à [1995] 1 C.T.C. 2135 (T.C.C.) motifs additionnels publiés à (4 octobre 1994), Doc. 91-683(IT)G, 91-684(IT)G (T.C.C.) accueillant l'appel formé par la compagnie de crédit-bail contre le nouvel avis de cotisation du ministre refusant le choix effectué en vertu de l'art. 97(2) de la Loi de l'impôt sur le revenu.

*Bastarache J.*:

**I. Introduction**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 320 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

1    This appeal and a related appeal (*Continental Bank of Canada v. R.* September 3, 1998, No. 25521 [reported (1998), 98 D.T.C. 6501 (S.C.C.)], released concurrently) concern events arising out of the winding-up of Continental Bank of Canada (the "Bank") and its subsidiary, Continental Bank Leasing Corporation ("Leasing"). The broad issue is the validity of a transaction by which Central Capital Leasing ("Central") ultimately became the owner of leasing assets formerly held by the Bank and Leasing. The transaction involved the formation of a partnership into which Leasing transferred its leasing assets in return for a 99 percent interest in a partnership. Leasing transferred that partnership interest to the Bank, which subsequently sold it to Central's subsidiaries. These transactions ultimately permitted Leasing to file an election pursuant to s. 97(2) of the *Income Tax Act*, R.S.C. 1952, c. 148, as amended; this election was rejected by the Minister of National Revenue.

## II. Factual Background

2    The Bank was incorporated by an Act of Parliament in 1977 and commenced operations in 1979. In October 1981, the Bank amalgamated with IAC Limited ("IAC") and became the successor corporation to IAC. Prior to the amalgamation, IAC carried on a sales finance and leasing business which involved, among other things, the purchase of depreciable assets by IAC, including heavy equipment and aircraft, which were then leased for a term of years to corporations that required the use of the assets in their businesses. In 1981, Leasing was incorporated as a subsidiary of the Bank pursuant to amendments to the *Bank Act* in 1980 which permitted chartered banks to carry on leasing businesses through wholly owned subsidiaries. In 1986, the Bank, no longer being viable, made a decision to wind up its affairs. On October 31, 1986, the Bank entered into an asset purchase agreement with Lloyds Bank plc of London ("Lloyds") whereby Lloyds agreed to purchase all of the Bank's assets except the shares of Leasing, the remaining leases still held directly by the Bank and its international loan portfolio. The Bank invited offers for the purchase of either the assets of Leasing or its shares.

3    Pursuant to an agreement accepted by the Bank on October 15, 1986, Central agreed to purchase the shares of Leasing from the Bank. The October 15th agreement was made on the understanding that any leasing assets held directly by the Bank would be transferred to Leasing prior to the completion of the sale of the shares of Leasing. The October 15th agreement was conditional on certain due diligence to be conducted by Central.

4    On November 1, 1986, the Bank transferred the leasing assets held directly by it to Leasing, in contemplation of the share sale. The share sale transaction, however, was never completed. After conducting due diligence in respect of the October 15th agreement, Central expressed concern with regard to certain tax liabilities of Leasing and the creditworthiness of seven lessees. Given that the Bank was in the process of winding-up, it was not prepared to assume the contingent tax liabilities and the parties were at an impasse.

5    In December 1986, Central proposed an alternative transaction which was structured to replicate the economic consequences of the October 15th agreement, but would exclude the seven leases about which Central had expressed concern and would avoid the contingent tax liabilities. This transaction is the one giving rise to this appeal. In essence, Central proposed that Leasing form a partnership with several Central subsidiaries to carry on the same business as Leasing, transfer its assets into the partnership using an election under s. 97(2) of the *Income Tax Act*, distribute its partnership interest to the Bank at its cost base pursuant to s. 88 of the Income Tax Act, and then have the Bank sell its interest to Central or its subsidiaries.

6    The transaction was governed by the provisions of a Master Agreement that was signed on December 23, 1986 by the Bank, Leasing, Central, Central Capital Management Inc. ("CCMI"), 693396 Ontario Limited ("693396"), 693397 Ontario Limited ("693397") and 153587 Canada Limited ("153587"). CCMI, 693396 and 693397 were wholly owned subsidiaries of Central. 153587 was a shelf company. The Master Agreement set out the following steps that were executed by the parties:

(a) On December 23, 1986, Leasing acquired certain additional leasing assets that were to be included at the request of Central in the agreement.

(b) On December 24, 1986, Leasing and 153587 amalgamated and continued as one corporation under the name Continental Bank Leasing Corporation ("Leasing"). The Bank was the sole shareholder of the corporation. This created a new year end for Leasing on December 23, 1986.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 321 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

(c) On December 24, 1986, Leasing formed a partnership, known as Central Capital Leasing (the "Partnership"), with 693396 and CCMI. Leasing contributed its leasing business to the Partnership in return for a 99 percent interest in the Partnership, and filed an election pursuant to s. 97(2) of the *Income Tax Act*. 693396 and CCMI each contributed $656,929 to the Partnership and each received one-half of a 1 percent interest. Under the Partnership Agreement, 693396 and CCMI gave representations and warranties that they were and would remain duly registered and qualified to carry on the business of the Partnership and enable it to own or lease property, that they could fulfill their partnership obligations without violating the terms of their constating documents or other agreements, and that their forming the Partnership would not result in the breach of any law or agreement. Leasing declined to give such representations.

(d) The first fiscal period for the Partnership ended on December 27, 1986.

(e) On December 27, 1986, as part of its winding-up, Leasing and the Bank signed an indenture providing for the transfer of Leasing's 99 percent partnership interest to the Bank pursuant to s. 88 of the *Income Tax Act*.

(f) On December 29, 1986, the Bank purchased secured notes and subordinated convertible debentures of Central for a total amount of $130,071,985. This amount was credited to Central on the books of the Bank.

(g) On December 29, 1986, the Bank sold the interest in the Partnership to 693396 and 693397 for a total purchase price of $130,071,985. Pursuant to the Partnership Interest Purchase Agreement and Assignment Agreement, 693396 purchased $1/11$ of the partnership interest and 693397 purchased $10/11$ of the partnership interest. The agreements were signed on December 24, 1986 and were effective December 29, 1986.

7    On February 4, 1987, 693397 sent a cheque to Leasing from the Partnership in the amount of $130,726 in respect of Leasing's net earnings as the 99 percent partner of Central Leasing for the fiscal year December 24 to 27, 1986.

8    Leasing filed its income tax return for 1987 on the basis that pursuant to s. 97(2) of the *Income Tax Act*, it transferred all of its leasing assets, with the exception of the seven excluded leases, to the Partnership on December 24, 1986 in return for its interest in the Partnership and that it transferred its interest in the Partnership to the Bank as part of its winding-up pursuant to s. 88(1) of the *Income Tax Act*.

9    On October 12, 1989, the Minister of National Revenue issued a Notice of Reassessment for the 1987 taxation year. Revenue Canada reassessed Leasing on the basis that the partnership transaction was invalid and that the true nature of the transaction was a disposition by Leasing of its leasing assets to Central, making the s. 97(2) election invalid and giving rise to recaptured capital cost allowance in the hands of Leasing.

**III. Relevant Statutory Provisions**

10    The following statutory provisions are relevant to this appeal:

Bank Act, R.S.C., 1985, c. B-1

**18.**(1) A bank has the capacity and, subject to this Act, the rights, powers and privileges of a natural person.

**20.**(1) No act of a bank, including any transfer of property to or by a bank, is invalid by reason only that the act or transfer is contrary to this Act.

**174.** ...

(2) Except as authorized by or under this Act and in accordance with such terms and conditions, if any, as are prescribed by the regulations, a bank shall not, directly or indirectly,

. . . . .

(*i*) acquire or hold an interest in Canada in, or otherwise invest or participate in Canada in, a partnership or a limited partnership

. . . . .

(16) A bank that contravenes any of paragraphs (2)(*a*), (*c*), (*f*), (*h*), (*i*) or (*j*) is guilty of an offence and liable on summary conviction to a fine not exceeding five hundred dollars in respect of each contravention.

Partnerships Act, R.S.O. 1980, c. 370

**2.** Partnership is the relation that subsists between persons carrying on a business in common with a view to profit....

**34.** A partnership is in every case dissolved by the happening of any event that makes it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership.

Income Tax Act, R.S.C. 1952, c. 148, as amended

**85.** (1) Where a taxpayer has after May 6, 1974 disposed of any of his property that was a capital property (other than real property, an interest therein or an option in respect thereof, owned by a non-resident person), a Canadian resource property, a foreign resource property, an eligible capital property or an inventory (other than real property) to a taxable Canadian corporation for consideration that includes shares of the capital stock of the corporation, if the taxpayer and the corporation have jointly so elected in prescribed form and within the time referred to in subsection (6), the following rules apply:

(*a*) the amount that the taxpayer and the corporation have agreed upon in their election in respect of the property shall be deemed to be the taxpayer's proceeds of disposition of the property and the corporation's cost of the property;

**88.** (1) Where a taxable Canadian corporation (in this subsection referred to as the "subsidiary") has been wound up after May 6, 1974 and not less than 90% of the issued shares of each class of the capital stock of the subsidiary were, immediately before the winding-up, owned by another taxable Canadian corporation (in this subsection referred to as the "parent") and all of the shares of the subsidiary that were not owned by the parent immediately before the winding-up were owned at that time by persons with whom the parent was dealing at arm's length, the following rules apply:

(*a*) ...each property of the subsidiary that was distributed to the parent on the winding-up shall be deemed to have been disposed of by the subsidiary for proceeds equal to,

. . . . .

(ii) in the case of any other property, the cost amount to the subsidiary of the property immediately before the winding-up;

(*f*) where property that was depreciable property of a prescribed class of the subsidiary has been distributed to the parent on the winding-up and the capital cost to the subsidiary of the property exceeds the amount deemed by paragraph (*a*) to be the subsidiary's proceeds of disposition thereof, for the purposes of sections 13 and 20 and any regulations made under paragraph 20(1)(*a*),

(i) notwithstanding paragraph (*c*) the capital cost to the parent of the property shall be deemed to be the amount that was the capital cost thereof to the subsidiary, and

(ii) the excess shall be deemed to have been allowed to the parent in respect of the property under regulations made under paragraph 20(1)(*a*) in computing income for taxation years before the acquisition by the parent of the property.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

**97.** (1) Where at any time after 1971 a partnership has acquired property from a taxpayer who was, immediately after that time, a member of the partnership, the partnership shall be deemed to have acquired the property at an amount equal to its fair market value at that time and the taxpayer shall be deemed to have disposed of the property for proceeds equal to that fair market value.

(2) Notwithstanding any other provision of this Act, other than subsection 85(5.1), where at any time after November 12, 1981 a taxpayer has disposed of any capital property, a Canadian resource property, a foreign resource property, an eligible capital property or an inventory to a partnership that immediately after that time was a Canadian partnership of which the taxpayer was a member, if the taxpayer and all the other members of the partnership have jointly so elected in prescribed form and within the time referred to in subsection 96(4), the following rules apply:

(*a*) the provisions of paragraphs 85(1)(*a*) to (*f*) apply to the disposition as if

(i) the reference therein to "corporation's cost" were read as a reference to "partnership's cost",

(ii) the references therein to "other than any shares of the capital stock of the corporation or a right to receive any such shares" and to "other than shares of the capital stock of the corporation or a right to receive any such shares" were read as references to "other than an interest in the partnership",

(iii) the references therein to "shareholder of the corporation" were read as references to "member of the partnership",

(iv) the references therein "to the corporation" were read as references to "all the other members of the partnership", and

(v) the references therein to "to the corporation" were read as references to "to the partnership";

(*b*) n computing, at any time after the disposition, the adjusted cost base to the taxpayer of his interest in the partnership immediately after the disposition,

(i) there shall be added the amount, if any, by which the taxpayer's proceeds of disposition of the property exceed the fair market value, at the time of the disposition, of the consideration (other than an interest in the partnership) received by the taxpayer for the property, and

(ii) there shall be deducted the amount, if any, by which the fair market value, at the time of the disposition, of the consideration (other than an interest in the partnership) received by the taxpayer for the property so disposed of by him exceeds the fair market value of the property at the time of the disposition; and

(*c*) where the property so disposed of by the taxpayer to the partnership is taxable Canadian property of the taxpayer, the interest in the partnership received by him as consideration therefor shall be deemed to be taxable Canadian property of the taxpayer.

## IV. Judicial History

### *Tax Court of Canada, (1994), [1995] 1 C.T.C. 2135 (T.C.C.)*

11    Bowman J.T.C.C. allowed Leasing's appeal of the reassessment. Dealing first with illegality under s. 174(2)(*i*) of the *Bank Act*, Bowman J.T.C.C. recognized that Leasing's entering into the Partnership was a breach of the *Bank Act*, given that this resulted in indirect participation of the Bank in a partnership. Bowman J.T.C.C. held, however, that the breach of the *Bank Act* was not sufficient to invalidate the scheme because the *Bank Act* provides a penalty for the breach and because s. 20(1) preserves the validity of the impugned act.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

12      Bowman J.T.C.C. concluded that the scheme, in substance, was a single transaction designed to sell Leasing's assets and that the Partnership was merely a means to an end. He held that neither the Bank nor Leasing had intended to enter into a long-term partnership with Central. In his opinion, the scheme had been designed to enable the Bank to divest the leasing assets at a tax cost roughly equivalent to the cost of a share transaction. However, in his opinion, the scheme was not a sham. He held that the Bank and Central had been at arm's length and that their legal relationships had been real and binding. He held that the parties would not have been able to tell a third party that they were not partners and had not disguised another type of legal relationship. In his opinion, a sham requires a different, real, legal relationship behind a legal facade. Bowman J.T.C.C. concluded that the legal reality was the same as the apparent legal relationships; therefore, there had been no sham.

13      Bowman J.T.C.C. held that the requirement to consider "substance over form" in income tax law does not mean that the legal effect of a transaction is irrelevant, nor does it mean that one is entitled to treat substance as synonymous with economic effect. He held that he could not ignore the form of the legally binding relations in this case because the essential nature of a transaction cannot be altered for income tax purposes by nomenclature. Bowman J.T.C.C. concluded that the ultimate purpose of the transactions did not warrant a disregard of the legal relations created by the scheme; therefore, the parties had formed a valid partnership.

14      With respect to the sale of the partnership interest in the final step of the scheme, Bowman J.T.C.C. held that the Bank had not traded its partnership interest in the same way that a speculator or trader would trade land or securities. He held that the Bank's partnership interest had been a capital asset and that any characterization of the disposition of the partnership interest had to consider the context in which the transaction had occurred. The reasons for disposing of the partnership interest, in the context of a composite transaction forming an integral part of the winding up of Leasing, were sufficient to dispel any inference that the Bank had been engaged in a profit-making scheme. He noted that when subsidiaries are wound up, their assets are often transferred at cost to their parents to be immediately resold. He also noted that under s. 85 of the *Income Tax Act*, assets that are not inventory may be rolled into a corporation at their cost amount and immediately resold by the corporation at a profit without becoming inventory, because of the rapidity of the resale. Bowman J. rejected the Crown's argument that the Bank's gain on the sale of its partnership interest was income from an adventure in the nature of trade.

15      Bowman J. rejected the Crown's argument that the transactions violated the object and spirit of s. 97(2) of the *Income Tax Act*. He held that the words of a statute are of primary importance when determining the statute's "object and spirit", but that any interpretation of a provision inconsistent with the obvious purpose of the provision should be avoided. He held that s. 97(2) is intended to defer tax by permitting an asset transfer without triggering an immediate tax result when the transfer is to a partnership. He held that the premise underlying s. 97(2) is that a taxpayer's real economic position is not enhanced because the assets are merely being held in a different vehicle. He held that a taxpayer does not contravene s. 97(2) by taking advantage of it.

***Federal Court of Appeal, [1996] 3 F.C. 713 (Fed. C.A.)***

16      The Court of Appeal rendered two separate judgments. The judgment relevant to this appeal is that dealing with the liability of Leasing for the recapture of the capital cost allowance. In this judgment, Linden J.A. for the court concluded that no valid partnership had been created or, if one had been created, that it was void or *ultr`a vires* the Bank. Linden J.A. held that Leasing had sold its assets to Central and had recaptured capital cost allowance; therefore, it had to pay tax on the recapture.

17      Linden J.A. agreed that the transaction had not been a sham because no element of deceit had been involved and because the scheme had formed legally binding relationships. However, he held that to achieve the desired tax results the substance of the tax transaction must be considered, the partnership scheme must be real, and its form must not be fanciful. Linden J.A. reviewed the evidence and held that the parties had not intended to carry on business with a view to profit; therefore, s. 97(2) could not be relied upon by the parties.

18      Linden J.A. held that any involvement by the Bank in a partnership through Leasing would have been legally invalid, void and illegal because it would have contravened s. 174(2)(*i*) of the *Bank Act*, which prohibits banks from indirectly participating in partnerships through subsidiaries. He also held that s. 34 of the *Partnerships Act* would have dissolved any partnership that

might have been established because a violation of s. 174(2)(*i*) of the *Bank Act* would be illegal and criminal within the meaning of s. 34. He also held that a partnership was *ultra vires* the bank. He rejected arguments that ss. 18(1) and 20(1) of the *Bank Act* offset the *ultra vires* doctrine. He held that the parties had been advised by counsel that signing the partnership agreement was a violation of the *Bank Act*, that flagrant violations of the *Bank Act* will not be ignored and that this is not a circumstance for which the Court of Appeal should grant relief under s. 20(1). He held the Court of Appeal was obliged to apply the doctrine of *ultra vires* and to view the scheme as invalid.

## V. Issues

19    The following issues must be addressed to determine this appeal.

> 1. Was Leasing a member of a valid partnership with the subsidiaries of Central in December 1986 within the meaning of s. 2 of the *Partnerships Act?*

> 2. If Leasing was a member of a valid partnership within the meaning of s. 2 of the *Partnerships Act*, was the partnership rendered invalid by s. 174(2)(*i*) of the *Bank Act*, by s. 34 of the *Partnerships Act*, or by the common law doctrines of illegality or *ultra vires?*

> 3. If the partnership was invalid, was Leasing liable for recapture under s. 13 of the *Income Tax Act* as the person that disposed of its depreciable assets to the Central subsidiary?

## VI. Analysis

### 1. Was Leasing a member of a valid partnership with the subsidiaries of Central in December 1986 within the meaning of s. 2 of the Partnerships Act?

20    In order to answer this question, it is necessary to consider the various legal requirements for the proper characterization of the transactions entered into by Leasing. The sham doctrine will not be applied unless there is an element of deceit in the way a transaction was either constructed or conducted. This requirement was outlined by Estey J. as follows in *Stubart Investments Ltd. v. R.*, [1984] 1 S.C.R. 536 (S.C.C.), at p. 545:

> A sham transaction: This expression comes to us from decisions in the United Kingdom, and it has been generally taken to mean (but not without ambiguity) a transaction conducted with an element of deceit so as to create an illusion calculated to lead the tax collector away from the taxpayer or the true nature of the transaction; or, simple deception whereby the taxpayer creates a facade of reality quite different from the disguised reality.

Both the trial judge and the Court of Appeal correctly held that the transactions entered into by the parties did not amount to a sham and the sham issue was not argued in this Court. However, the Court of Appeal, after holding that the transaction did not amount to a sham, stated that the present case is an example of a transaction "[w]here legal reality is found to be lacking" (p. 726). The Court of Appeal found that the trial judge erred in law by relying exclusively on documents and forms and did not give proper consideration to the reality of the situation.

21    After it has been found that the sham doctrine does not apply, it is necessary to examine the documents outlining the transaction to determine whether the parties have satisfied the requirements of creating the legal entity that it sought to create. The proper approach is that outlined in *Orion Finance Ltd. v. Crown Financial Management Ltd.*, [1996] 2 B.C.L.C. 78 (Eng. C.A.), at p. 84:

> The first task is to determine whether the documents are a sham intended to mask the true agreement between the parties. If so, the court must disregard the deceptive language by which the parties have attempted to conceal the true nature of the transaction into which they have entered and must attempt by extrinsic evidence to discover what the real transaction was. There is no suggestion in the present case that any of the documents was a sham. Nor is it suggested that the parties

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 326 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

departed from what they had agreed in the documents, so that they should be treated as having by their conduct replaced it by some other agreement.

Once the documents are accepted as genuinely representing the transaction into which the parties have entered, its proper legal categorisation is a matter of construction of the documents. This does not mean that the terms which the parties have adopted are necessarily determinative. The substance of the parties' agreement must be found in the language they have used; but the categorisation of a document is determined by the legal effect which it is intended to have, and if when properly construed the effect of the document as a whole is inconsistent with the terminology which the parties have used, then their ill-chosen language must yield to the substance.

22    Section 2 of the *Partnerships Act* defines partnership as "the relation that subsists between persons carrying on a business in common with a view to profit". This wording, which is common to the majority of partnership statutes in the common law world, discloses three essential ingredients: (1) a business, (2) carried on in common, (3) with a view to profit. I will examine each of the ingredients in turn.

23    The existence of a partnership is dependent on the facts and circumstances of each particular case. It is also determined by what the parties actually intended. As stated in *Lindley & Banks on Partnership* (17th ed. 1995), at p. 73: "in determining the existence of a partnership ... regard must be paid to the true contract and intention of the parties as appearing from the whole facts of the case".

24    The *Partnerships Act* does not set out the criteria for determining when a partnership exists. But since most of the case law dealing with partnerships results from disputes where one of the parties claims that a partnership does not exist, a number of criteria that indicate the existence of a partnership have been judicially recognized. The indicia of a partnership include the contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking, a joint property interest in the subject-matter of the adventure, the sharing of profits and losses, a mutual right of control or management of the enterprise, the filing of income tax returns as a partnership and joint bank accounts. (See A. R. Manzer, *A Practical Guide to Canadian Partnership Law* (1994 (loose-leaf)), at pp. 2-4 *et seq.* and the cases cited therein.)

25    In cases such as this, where the parties have entered into a formal written agreement to govern their relationship and hold themselves out as partners, the courts should determine whether the agreement contains the type of provisions typically found in a partnership agreement, whether the agreement was acted upon and whether it actually governed the affairs of the parties (*Mahon v. Minister of National Revenue* (1991), 91 D.T.C. 878 (T.C.C.). On the face of the agreements entered into by the parties, I have found that the parties created a valid partnership within the meaning of s. 2 of the *Partnerships Act*. I have also found that the parties acted upon the agreements and that the agreements governed their affairs.

26    It should be noted that Leasing is the company whose tax liability is the subject of this appeal. In determining the proper effect to be given to the Partnership, the concern is whether Leasing was a partner in a valid partnership between December 24, 1986 and December 26, 1986. The main dispute between the parties concerns whether Leasing intended to carry on business in common with Central's subsidiaries with a view to profit. In order for Leasing to take advantage of the rollover provisions in s. 97(2) of the *Income Tax Act*, it had to be a valid member of a partnership when it transferred its assets. The dispute does not surround the validity of the partnership with respect to Central's subsidiaries who entered the Partnership on December 24, 1986 and continued to operate that Partnership long after Leasing and the Bank were no longer members.

27    The Partnership Agreement contains most of the standard provisions that appear in partnership agreements. The agreement provides for the carrying on of "leasing services and such other businesses as the Managing Partner may from time to time determine" (Art. 2.01); it also provides for the distribution of income or loss to "those Persons who are Partners on the last day of the fiscal year of the Partnership" (Art. 5.09) and sets out the liability of the partners (Art. 3.02). The agreement further provides for the Management of the Partnership (Art. IV), Accounts and Allocations (Art. V), Dissolution (Art. VIII) and other provisions common to partnership agreements. It is not surprising that the Partnership contains all of the provisions required to form a valid partnership. The parties intended to set up a partnership that would comply with s. 2 of the *Partnerships Act* and they succeeded.

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

*(a) Was There a Business?*

28    By s. 1(1)(*a*) of the *Partnerships Act*, "business" includes "every trade, occupation and profession". There is no doubt that equipment leasing constitutes a business within the meaning of the *Partnerships Act*. The activities carried on by Leasing that were subsequently transferred to the Partnership included sales financing and leasing, which involved, among other things, the purchase of depreciable assets including heavy equipment and aircraft, which were then leased for a term to corporations that required the use of the assets in their business.

*(b) Was the Business Carried On in Common?*

29    If a partnership is to exist, it must be shown that two or more people carried on the business. It is also fundamental that the business is carried on in common (*Lindley & Banks on Partnership, supra*, at pp. 9-10). The respondent argues that no active business activity was conducted between December 24 and December 29, the period in which Leasing and subsequently the Bank were members of the Partnership. Therefore, according to the respondent, the Partnership did not carry on business within the meaning of s. 2 of the *Partnerships Act*. Further, s. A.9(a) of the Master Agreement set out that new transactions were prohibited between December 24 and December 29 without unanimous consent. Moreover, the three days over the 1986 Christmas holiday that were chosen for the purported involvement of Leasing in the partnership ensured that no business would be conducted.

30    The issue of whether an equipment leasing operation constitutes a business for the purposes of the *Income Tax Act* was before this Court in *Hickman Motors Ltd. v. R.*, [1997] 2 S.C.R. 336 (S.C.C.). In that case, L'Heureux-Dubé J., with whom the majority agreed on that point, found that a leasing business was in fact carried on by a company to which a subsidiary transferred its leasing assets, in circumstances where the parent's sole business activity was the passive receipt of rent. At p. 359, she held:

> Where machinery is rented out, the essential core operations may at times be limited to accepting rental revenue and assuming the business risk and other obligations. At any time during that period, any client could demand the execution of any of the contractual obligations, such as fixing an engine, for example. Where, because a rental business is fortunate enough to experience no mechanical breakdowns or accidents during a period of time, it "passively" accepts rental revenue and assumes business risk and obligations, it does not necessarily follow that it is not carrying on a business during that period. Holding otherwise would imply that rental businesses are "intermittent" that is, that they carry on a business only when something goes wrong in the operations. Such a proposition is unacceptable.

31    In the present instance, it is true that between December 24 and December 27, 1986, no meetings were held, no new transactions were entered into by the parties and no decisions were made. However, that is not determinative of the fact that no business was carried on by the Partnership. Prior to its entering the Partnership, Leasing carried on business. This business and its assets were transferred to the Partnership on December 24, 1986. There was no termination of Leasing's contracts with its customers and the contracts continued during the period of December 24 to December 27.

32    Evidence that the business previously carried on by Leasing was carried on by the Partnership is contained in a letter dated December 24, 1986 from Air Canada, one of the Bank's customers. In the letter, Air Canada acknowledges that "[Leasing] intends to sell and assign its interest in the Purchase Agreements, the Aircraft and the Leases to an Ontario partnership ...". Air Canada consented to the "sale and assignment of the Purchase Agreements, the Aircraft and the Leases" from the Bank to Leasing and consented "to the sale and assignment of the Purchase Agreements, the Aircraft and the Leases by [Leasing] to the Partnership".

33    The fact that no new business was created during the period of Leasing and the Bank's involvement in the Partnership does not negate the effect of the existing business that was continued during this time. The existence of a valid partnership does not depend on the creation of a new business. It is common that partnerships are formed when two parties agree to carry on the existing business of one of them, while the other contributes capital.

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

34      In addition, I am satisfied that the business that was carried on was carried on by the partners in common. Under the Partnership Agreement, the Partners "delegate to the Managing Partner full power and authority to manage, control, administer and operate the business and affairs of the Partnership and to represent and enter into transactions which bind the Partnership" (Art. 4.01). The fact that the management of the Partnership was given to the Managing Partner does not mandate a conclusion that the business was not carried on in common. Nor does the fact that Central, acting alone, was negotiating transactions relating to the lease portfolios prior to December 29, 1986. The respondent argues that the exclusion of Leasing and the Bank from any of those activities negates any claim that the Central entities and the Continental entities were actually carrying on business in common during that period. As *Lindley & Banks on Partnership, supra*, point out, at p. 9, one or more parties may in fact run the business on behalf of themselves and the others without jeopardizing the legal status of the arrangement.

35      If any of the negotiations that Central was involved in had resulted in a decision by Central's subsidiaries who were members of the Partnership during the relevant period to follow through with the transaction, under the Partnership agreement, the Partnership would have been bound by these agreements. By entering the Partnership Agreement, Leasing and the Bank recognized that any partner had the authority to bind the firm.

36      It is also relevant that during the brief term that Leasing and the Bank were parties to the Partnership Agreement, they held themselves out as partners. Various supporting documents, including correspondence with third parties, tax returns, financial statements and assignments of leases effected during this period, are consistent with the carrying on of a business in common. While this alone would not have the effect of validating the partnership, because holding out affects liability as against third parties and not the essential validity of the arrangement (s. 15, *Partnerships Act*), it is nonetheless evidence of the parties' intention to carry on business in common under the Partnership.

37      Bowman J.T.C.C. was correct in emphasizing that the members of the Partnership could not hold themselves out to third parties as not being partners. In the partnership agreement, art. 3.02 sets out the liability of the partners. It provides in part: "Subject to Article XI, the Partners shall, as between themselves, be liable for the obligations, liabilities and losses of the Partnership in the same proportion as their respective Interests." The Partnership was involved in the leasing of aircraft. If, during the period in which Leasing and the Bank were members of the Partnership, liability of the lessor was engaged because of an event involving a leased aircraft, Leasing and the Bank could not have denied that they were members of the partnership and, according to article 3.02, would have been liable for 99 percent of the loss incurred by the lessee.

38      The Bank and Leasing conducted themselves as partners for the duration of their memberships in the Partnership. Throughout that period, they were subject to all of the rights and obligations of partners and carried on the business of leasing in common with the other partners. There is no evidence to show that the leasing business carried on as defined in *Hickman, supra*, was not carried on by Leasing and the Central subsidiaries.

*(c) Was the Business Carried On in Common with a View to Profit?*

39      The Court of Appeal held that the parties intended to conduct a sale of assets through a device they chose to call a partnership. This intention did not include a view to profit and in fact "the idea to share profits was an afterthought when the parties originally put the deal together". This characterization by the Court of Appeal ignores the fact that the Partnership Agreement provided for the distribution of the profits from the leasing business being operated by the Partnership and that the Partnership continued to carry on the business operated for profit by Leasing. There is no evidence of any expectation other than that profits would continue to be generated during the predetermined term of Leasing's involvement in the Partnership. The Court of Appeal also relied heavily on the fact that Leasing was not legally entitled to a share of the profits of the first fiscal year because its partnership interest had already been transferred to the Bank by the time the year end was triggered on December 27, 1986. This, however, is irrelevant to the determination of the issue.

40      To determine whether the business was carried on with a view to profit, it is necessary to look to the provisions of the Partnership Agreement governing the distribution of profits.

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

5 06 *Allocation of Net Income or Loss*. The net income or loss for each fiscal year of the Partnership shall be allocated to the current accounts of the Partners in proportion to their respective average capital accounts for the period for which the allocation was made.

5 09 *Allocation of Income and Loss for Tax Purposes*. The income or loss of the Partnership for the whole of a fiscal year for the purposes of the *Income Tax Act* shall be allocated to those Persons who are Partners on the last day of the fiscal year of the Partnership in the proportions set out in section 5.06. The income or loss of the Partnership which is allocated to those Partners shall be allocated among those Partners as of the time and in the proportions set out in this article.

41    These provisions clearly contemplate the distribution of profits in accordance with a partner's interest in the Partnership. Profit was accumulated by the Partnership during the period of Leasing's membership in that partnership and that profit was distributed. Leasing received a cheque dated February 4, 1987 for $130,726 that was described in a financial statement dated January 11, 1988 as a 99 percent share of partnership income for the period December 24 to December 27, 1986. Because Leasing had already transferred its partnership interest to the Bank by December 27, 1986, it was not entitled to receive the partnership income under the Partnership Agreement as it was no longer a partner at year end. This however, does not change the fact that a generation of profit and profit sharing was contemplated and effected under the Partnership Agreement. Whether the entitlement belonged to Leasing or to the Bank at the end of the year is of no consequence. The important consideration is that the 99 percent partnership interest owned initially by Leasing and then the Bank carried with it a right to share in the profits of business carried on by the Partnership.

42    It is not disputed that the ultimate objective of the series of transactions entered into by the parties and in particular the Partnership was to duplicate the tax consequences of the original share transaction with Central. The Bank's main intention and by extension, Leasing's main intention was to get rid of its leasing assets for the purpose of winding up. As Bowman J.T.C.C. held, at p. 2151:

One thing is clear. Notwithstanding the pious assertions of a number of witnesses that they intended to enter into a partnership with the other parties, [the Bank's] and [Leasing's] intention was patently not to go into the leasing business in partnership with [Central] . ... . The whole object of the exercise was precisely the opposite -- to get out of that business. The partnership was merely a means to that end.

43    Simply because the parties had the overriding intention of creating a partnership for one purpose does not, however, negate the fact that profit-making and profit-sharing was an ancillary purpose. This is sufficient to satisfy the definition in s. 2 of the *Partnerships Act* in the circumstances of this case. At pp. 10-11, *Lindley & Banks on Partnership* makes the following observation:

... if a partnership is formed with some other predominant motive [other than the acquisition of profit], *e.g.*, tax avoidance, but there is also a real, albeit ancillary, profit element, it may be permissible to infer that the business is being carried on "with a view of profit." If, however, it could be shown that the sole reason for the creation of a partnership was to give a particular partner the "benefit" of, say, a tax loss, when there was no contemplation in the parties' minds that a profit... would be derived from carrying on the relevant business, the partnership could not in any real sense be said to have been formed "with a view of profit".

44    This is not a case where the disentitlement of one partner to a share of the profits was agreed to by the parties; nor is it a case where no profits were anticipated during the term of a partner's involvement. During the period in which Leasing and the Bank were partners in the business, the partnership earned a profit from its leasing operations and that profit was distributed at year end.

45    The respondent argues that intending to constitute a valid partnership is not the same thing as intending to carry on business in common with a view to profit. I agree. The parties in the present case, however, set up a valid partnership within the meaning of s. 2 of the *Partnerships Act*. They had the intention to and did carry on business in common with a view to profit.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

This conclusion is not based simply on the parties' subjective statements as to intention. It is based on the objective evidence derived from the partnership agreement entered into by the parties. As Millett L.J. held in *Orion Finance, supra*, at p. 85:

> The question is not what the transaction is but whether it is in truth what it purports to be. Unless the documents taken as a whole compel a different conclusion, the transaction which they embody should be categorised in conformity with the intention which the parties have expressed in them.

46    I do not see anything in the documentation that is inconsistent with the intention of the parties to create a partnership within the meaning of the *Partnerships Act*.

*(d) Duration of the Partnership*

47    In the present case, the Partnership Agreement provided for a fixed term of membership for Leasing and the Bank in the Partnership. It also provided that the Partnership would continue indefinitely after Leasing and the Bank were no longer members (Article XI, Initial Transactions). There is no authority for the proposition that a valid partnership cannot be formed for fixed or relatively short and predetermined periods, nor is there authority for the proposition that a person cannot be a member of a partnership for a single transaction. The respondent recognized that there is no set minimum period of time required for a partnership to exist and accepted that a partnership may be formed for a predetermined period. The respondent argues, however, that a partnership, being a relationship that "subsists" and that pertains to the "carrying on" of a business in common with others, has a temporal quality. In the present case, the respondent argues, no business was carried on between December 24, 1986 and December 26, 1986, the period that Leasing was a member of the Partnership.

48    The duration of Leasing's membership in the Partnership is not relevant in this case. I found above that business was carried on in common with a view to profit through the leasing activities of the Partnership between December 24 and December 27. This satisfies the definition of Partnership under the *Partnerships Act*. It is not necessary for Leasing to show that it carried on business over a long period of time in the Partnership. The *Partnerships Act* does not limit the ability of a person to enter into a partnership for a single transaction. As long as the parties do not create what amounts to an empty shell that does not in fact carry on business, the fact that the partnership was created for a single transaction is of no consequence.

49    Section 85(1) of the *Income Tax Act* is a rollover provision for corporations similar to the provision for partnerships contained in s. 97(2) Corporations are frequently created for the single purpose of deferring tax liability by using s. 85(1) of the *Income Tax Act*. As long as the corporation is validly formed, there is no requirement that the taxpayer demonstrate that the corporation was formed for anything other than the single purpose of deferring tax liability. Similarly, as long as the definition in s. 2 of the *Partnerships Act* is satisfied, a person is permitted to create a partnership for the purpose of using s. 97(2) of the *Income Tax Act*. It is recognized that the definition of a partnership requires that business actually be carried on and that there is no such requirement for a corporation. However, that does not detract from the principle that a person should be permitted to create a partnership for a single transaction.

50    The Court of Appeal held, in effect, that because the ultimate objective of the Bank in proceeding with the partnership transaction was to effect a sale of its leasing business to Central, neither Leasing nor the Bank could have had the requisite intention to form a valid partnership. The result of this reasoning is that unless the only motive underlying the formation of a partnership is to carry on business in common with a view to profit, a valid partnership cannot be formed. The underlying premise of this reasoning is also that a transaction that is motivated by the securing of tax benefits is not a valid transaction. This reasoning cannot be supported.

51    A taxpayer who fully complies with the provisions of the *Income Tax Act* ought not to be denied the benefit of such provisions simply because the transaction was motivated for tax planning purposes. In *Stubart Investments, supra*, this Court unanimously rejected the "business purpose test" and affirmed the proposition that it is permissible for a taxpayer to take advantage of the terms of the *Income Tax Act* by structuring a transaction that is solely motivated by the desire to minimize taxation. Similarly, in *Antosko v. Minister of National Revenue*, [1994] 2 S.C.R. 312 (S.C.C.), Iacobucci J., for a unanimous Court, found, at p. 328.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

In this appeal, despite conceding that these factual elements are present, the respondent is asking the Court to examine and evaluate the transaction in and of itself and to conclude that the transaction is somehow outside the scope of the section in issue. In the absence of evidence that the transaction was a sham or an abuse of the provisions of the Act, it is not the role of the court to determine whether the transaction in question is one which renders the taxpayer deserving of a deduction. If the terms of the section are met, the taxpayer may rely on it, and it is the option of Parliament specifically to preclude further reliance in such situations.

Iacobucci J. went on to say, at p. 330:

This transaction was obviously not a sham. The terms of the section were met in a manner that was not artificial. Where the words of the section are not ambiguous, it is not for this Court to find that the appellants should be disentitled to a deduction because they do not deserve a "windfall", as the respondent contends. In the absence of a situation of ambiguity, such that the Court must look to the results of a transaction to assist in ascertaining the intent of Parliament, a normative assessment of the consequences of the application of a given provision is within the ambit of the legislature, not the courts.

52    Having found that the transaction was not a sham, the Court of Appeal should not have found that the parties lacked the requisite intention to form a valid partnership simply because the transaction was motivated by a resulting tax benefit. The Court of Appeal proceeded on the basis that the predominance of fiscal motives or the absence of a concurrent business purpose justifies or compels the court to disregard the legal form of the transaction which the parties intended.

53    The legal and commercial reality in the present case is that Leasing intended to and did enter into a partnership with Central within the meaning of s. 2 of the *Partnerships Act*. The Court of Appeal erred by ignoring the substance of a legally effective transaction.

**2. If Leasing was a member of a valid partnership within the meaning of s. 2 of the Partnerships Act, was the partnership rendered invalid by s. 174(2)(i) of the Bank Act, by s. 34 of the Partnerships Act, or by the common law doctrines of illegality or ultra vires?**

54    Section 174(2)(*i*) of the *Bank Act* states that a bank "shall not, directly or indirectly ... acquire or hold an interest in Canada in, or otherwise invest or participate in Canada in, a partnership". There is no dispute that the entry into a partnership constitutes a breach by the Bank of s. 174(2)(*i*) of the *Bank Act*. The Bank therefore contravened the *Bank Act* by indirectly investing or participating in a partnership. The dispute concerns the effect of ss. 18(1) and 20(1) of the *Bank Act*, the applicability of the *ultra vires* doctrine, the effect of the doctrine of illegality and the effect of s. 34 of the *Partnerships Act*.

*a) Ultra Vires*

55    The *ultra vires* doctrine was developed by the courts in the mid-19th century to restrict the legal capacity of corporations created under the Companies Act, 1862 and its successor statutes. The doctrine provided that a corporation had the legal capacity to perform only those acts authorized by its articles. Any acts not authorized by the articles were void for want of legal capacity (*Ashbury Railway Carriage & Iron Co. v. Riche* (1875), L.R. 7 H.L. 653 (U.K. H.L.)).

56    The doctrine was meant to limit the scope of activities of a corporation in order to protect the interests of its creditors and shareholders. It came to be recognized that the doctrine produced inconvenience and occasional hardship for the public who were expected to take notice of all limitations on the corporation's capacity as revealed through public documents. The doctrine was characterized by Iacobucci J. in *Communities Economic Development Fund v. Canadian Pickles Corp.*, [1991] 3 S.C.R. 388 (S.C.C.), at p. 406, as "a protection to no one and a trap for the unwary".

57    In 1974, the *Canada Business Corporations Act*, S.C. 1974-75-76, c. 33 ("CBCA"), abolished the *ultra vires* doctrine in the context of Canadian corporations by attributing to corporations the capacity of a natural person. Section 15(1) of the CBCA provided that "a corporation has the capacity and, subject to this Act, the rights, powers and privileges of a natural person".

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 332 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

The CBCA also provides at s. 16(3) that "[n]o act of a corporation, including any transfer of property to or by a corporation, is invalid by reason only that the act or transfer is contrary to its articles or this Act".

58    In 1980, the *Bank Act* was amended to provide, in s. 18(1), that "[a] bank has the capacity and, subject to this Act, the rights, powers and privileges of a natural person". Section 20(1) states that "[n]o act of a bank, including any transfer of property to or by a bank, is invalid by reason only that the act or transfer is contrary to this Act". These amendments parallel the amendments to corporations Acts and their aim is also to abolish the *ultra vires* doctrine. As a result of s. 18(1), banks were given the legal capacity to perform any act, even if it would constitute an offence under the *Bank Act*. M. H. Ogilvie, *Canadian Banking Law* (1991), states, at p. 35:

> When a bank engages in any conduct — including the transfer of property to or by a bank — which is contrary to the *Bank Act*, the conduct is not invalid, rather merely contrary to the Act. At common law, when a company had been found to have engaged in an *ultra vires* transaction, the legal effect was to render that transaction void and unenforceable. Since 1980, that is no longer the case in relation to transactions with banking corporations. Legal rights and duties created in transactions prohibited to banks by the Act and conferred on third parties are valid and no longer subject to disturbance by judicial avoidance of the original prohibited transaction. Rather, the bank is subject to the penalties set out in the *Bank Act*, and probably also those existing in the general law, for engaging in prohibited actions.

59    *Crawford and Falconbridge, Banking and Bills of Exchange* (8th ed. 1986) states a similar principle, at p. 94:

> It will be noted that the *Bank Act* bestows on the banks the capacity of a natural person, without limitation or qualification. The reference to the other provisions of the Act qualifies only the rights, powers and privileges of the banks. In other words, the banks now have the legal capacity to perform any act, even though it may constitute an offence under the *Bank Act* or some other law. Like man, in Milton's view, they have been created capable of standing, but free to fall. A good illustration of this is provided by sub-s. 174(2), which prohibits the banks from engaging in the activities therein described. A violation of one of those prohibitions by a bank would not result in the transaction involved being void -- or even necessarily voidable... It would, however, subject the bank, and possibly also the directors, to the penalties set out in sub-ss. 174(17) to (20) and sub-s. 54(2) respectively.

60    The doctrine of *ultra vires* has been abolished with respect to banks. Banks now have the capacity of a natural person. The Court of Appeal came to the wrong conclusion in this regard because it misapplied the *Canadian Pickles* case by relying on it to hold that the *ultra vires* doctrine is not abolished, but merely curtailed by s. 18(1) of the *Bank Act*. The Court of Appeal erred by failing to recognize the distinction between the statutory provisions in *Canadian Pickles* and the relevant provisions of the *Bank Act*.

61    In *Canadian Pickles, supra*, this Court held that the doctrine of *ultra vires* has been abolished for corporations incorporated under most business corporations legislation. The Court held, however, that the doctrine was still alive with respect to the Communities Economic Development Fund of Manitoba. The Court stated that the doctrine continues to apply to corporations created by special Act for public purposes. At pp. 406-7, Iacobucci J. held:

> However, in spite of the general trend towards abolition of the doctrine of *ultra vires*, the limited aspects of the doctrine, as seen from the above review, may be present with respect to corporations created by special act for public purposes. Not only is there a long line of cases supporting the principle, but one may argue that this protects the public interest because a company created for a specific purpose by an act of a legislature ought not to have the power to do things not in furtherance of that purpose. Of course, it is open to the legislature to rebut this presumption because, for example, the legislature may provide for other remedies short of invalidity for acts contrary to the statute.

62    Banks are not analogous to the Economic Fund described in the *Canadian Pickles* case. The Bank was not created by a special Act for public purposes. It was incorporated under a general Act of Parliament to engage in the ordinary commercial business of banking. Parliament has provided for other remedies short of invalidity for acts of banks that are contrary to the statute. The *Bank Act* contains penalties for breaches and, pursuant to s. 246 of the Act, the Inspector General of Banks is

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

empowered to "take charge on the premises of the assets of the bank or any portion thereof, if the need should arise, for the purposes of satisfying himself that the provisions of this Act ... are being duly observed".

63     The Bank, by virtue of its capacity, rights, powers and privileges, had the capacity to participate in a partnership. The prohibition in s. 174(2)(*i*) of the *Bank Act* does not make partnerships *ultra vires* the Bank. The questions remain, however, whether the Bank's participation in the partnership is void on the basis of the doctrine of illegality or by virtue of s. 34 of the *Partnerships Act*.

*(b) The Doctrine of Illegality*

64     Under the doctrine of illegality, a contract prohibited by statute or for an illegal purpose will be declared void even it conforms to all other requirements of a valid transaction. A classic case concerning statutory illegality is *Cope v. Rowlands* (1836), 2 M. & W. 149, 150 E.R. 707 (Eng. Exch.), where Parke B. held (at p. 710):

> ...where the contract which the plaintiff seeks to enforce, be it express or implied, is expressly or by implication forbidden by the common or statute law, no court will lend its assistance to give it effect. It is equally clear that a contract is void if prohibited by a statute, though the statute inflicts a penalty only, because such a penalty implies a prohibition.

65     It should follow, therefore, that the absolute prohibition of a contract by a statute renders the contract void and of no effect. However, as G.H.L. Fridman points out in *The Law of Contract in Canada* (3rd ed. 1994), at p. 348:

> It might be thought ... that the doctrine was clear and uncomplicated, that whenever a statute prohibited a certain course of conduct, or required a particular course of conduct, the failure to observe which resulted in a penalty of some kind, a contract which infringed the statutory prohibition or requirement would be illegal and therefore void. This situation is not as straightforward as that ... in some instances a statute while involving illegality, in the sense of prescribing penalties for certain conduct, will not have the effect of rendering void a contract entered into in breach of the statute.

66     In fact, the rigidity of the doctrine of illegality first gave rise to exceptions which dealt with the return of property transferred under an illegal contract (Fridman, *supra*, at p. 424). This development was nevertheless considered insufficient. In *Sidmay Ltd. v. Wehttam Investments Ltd.* (1967), 61 D.L.R. (2d) 358 (Ont. C.A.), aff'd on other grounds, [1968] S.C.R. 828 (S.C.C.), Laskin J.A. (as he then was) held that the court must take into account the harmful effect on the parties for whose protection the law making the bargain illegal exists before deciding to enforce or rescind the bargain. This approach was also adopted by Krever J. (as he then was) in *Royal Bank v. Grobman* (1977), 18 O.R. (2d) 636 (Ont. H.C.), at pp. 652-53.

67     The doctrine of illegality was recently examined by the Federal Court of Appeal in *Still v. Minister of National Revenue* (1997), 221 N.R. 127 (Fed. C.A.). Robertson J.A. noted at the outset that the doctrine of illegality is divided into two categories: common law illegality and statutory illegality. With regard to statutory illegality, he noted that the classic approach affirmed in *Neider v. Carda of Peace River District Ltd.*, [1972] S.C.R. 678 (S.C.C.), had given rise to many avoidance techniques in the courts, particularly where the illegality resulted from the performance of the contract rather than its formation. On the issue of formation, Robertson J.A. was prepared to expand the modern approach to illegality further, stating, at p. 139, that "a finding of illegality is dependent, not only on the purpose underlying the statutory prohibition, but also on the remedy being sought and the consequences which flow from a finding that a contract is unenforceable".

68     The Court of Appeal held that not all findings of invalidity are prohibited by s. 20(1) of the *Bank Act*. This approach is supported by Crawford and Falconbridge, *supra*, and Ogilvie, *supra*. Crawford and Falconbridge state, at p. 97:

> But it should be noted that s. 20 refers to invalidity "by reason only" of acts in contravention. That leaves open the possibility that vestiges of the common law sanctions upon unlawful conduct might still apply. For example, the modern approach of the courts could not be relied upon to validate or enforce an agreement consciously and deliberately entered into in violation of the *Bank Act*...

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

69    The appellant's position is that s. 20(1) of the *Bank Act* has the effect of eliminating the continued application of the doctrine of illegality. A construction of s. 20(1) that completely ousts the Court's jurisdiction to find an act of the bank invalid would impose a requirement that a court recognize all acts as valid, no matter how egregious the illegality. The respondent argues that to find that no act done by a bank that is contrary to the *Bank Act* is invalid is to render the prohibitions set out in s. 174(2) of the Act meaningless. In answer to this, the appellant submits that the proper effect to be given to the prohibitions in the *Bank Act* is that the penalties set out in the *Bank Act* amount to a mere licence fee for doing what the *Bank Act* prohibits.

70    The consequence of prohibiting certain transactions under the *Bank Act* can be disastrous for third parties who may be unaware of the limitations on a bank's rights. The consequences are the same as those identified by courts and Law Reform Commissions which criticized the rigid application of a declaration of invalidity under the doctrine of illegality as it relates to statutory prohibitions. I agree with the Court of Appeal, however, that s. 20(1) on its face does not limit all findings of invalidity. Section 20(1) states that no act of a bank is invalid by *reason only* that the act is contrary to the Act. This section serves, in particular, to relieve the hardship for unsuspecting third parties of the effects of a rigid application of the doctrine of illegality but does not eliminate the doctrine entirely. A. R. Manzer, in an annotation to this section in *The Bank Act Annotated* (1993), at p. 29, states:

> This provision is for the benefit of third parties dealing with a bank by preventing actions of the bank from being declared null and void and consequently of no effect, only because they are contrary to the bank's incorporating instrument or the *Bank Act*.

71    There is no conflict between the doctrine of *ultra vires* and a finding that s. 20(1) does not eliminate all findings of illegality. The apparent conflict between the doctrine of illegality and the doctrine of *ultra vires* must be addressed by referring to the foundations of those doctrines. It is not the capacity of the bank to enter into a partnership that is limited by a finding of invalidity. Rather, it is the right of the bank to participate in certain activities that may be limited. The distinction between capacity under the *ultra vires* doctrine and illegality was explained by F. W. Wegenast in *The Law of Canadian Companies* (1979), at pp. 136-37, where he stated:

> It must be borne in mind also that the entire absence of the *ultra vires* rule would not mean that there were no limitations on the legal rights of a corporation. Just as a natural person is capable of doing things that are unlawful, so the capacity of a corporation may be broader than its rights. It has been said that "*ultra vires* and illegality represent totally different ideas," although a prohibition may be in such form that it renders the prohibited act both illegal and *ultra vires*. But an act which is *ultra vires* is not necessarily either *malum in se* or *malum prohibitum*. On the other hand, although it may be true, generally speaking, that a corporate act expressly forbidden by statute is *ultra vires*, it is also clear that an act may be illegal without being *ultra vires*, and remedies are available to enforce the legal limitations of corporations without invoking the plea of *ultra vires*. In many cases, indeed, it would be quite immaterial whether the question were raised as one of right or of capacity. Thus in the case of a shareholder seeking an injunction to restrain the company from any particular act it would be a sufficient ground to say that the company had not the *right* to do the act, without saying that it was not capable. The same could be said as regards action on behalf of the Crown by way of *scire facias* or otherwise. [Emphasis in original.]

72    Section 20(1) is a saving provision. It is not a provision allowing a bank to do what it is prohibited from doing. Since it is a saving provision, the same principles that guide the modern doctrine of illegality should guide a finding of invalidity under the *Bank Act*. In the present case, a declaration that the bank's participation in the partnership is prohibited does not harm any third party. The bank deliberately contravened the *Bank Act* and it appears from the evidence that it did so with the knowledge of the other partners. However, a finding of invalidity on the basis of illegality in the present case would deprive s. 20(1) of any effect. The doctrine of illegality would be triggered by the prohibition set out in s. 174(2)(*i*) of the *Bank Act*. To find that the Partnership is invalid on this basis alone amounts to a finding on invalidity *by reason only* of an act in contravention of the statute.

73    It does not follow, however, as the appellant argued, that the prohibitions set out in the *Bank Act* amount to a licensing scheme. These are clear restrictions on the Bank's right to enter into transactions. Section 20(1), in this context, precludes a finding of invalidity that is based only on a breach of the statute. There are other remedies, in the *Bank Act* in particular, to

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

enforce the prohibitions set out in the *Bank Act*. For example, pursuant to s. 246 of the *Bank Act*, the Inspector General of Banks is empowered to "take charge on the premises of the assets of a bank or any portion thereof, if the need should arise, for the purposes of satisfying himself that the provisions of this Act ... are being duly observed".

74     Although I accept that s. 20(1) is not a complete bar to the application of the doctrine of illegality in the appropriate case, I do not think that it applies in the present circumstances. I will now examine the application of s. 34 of the *Partnerships Act* on the validity of the partnership created on December 24, 1986.

*(c) The Partnerships Act*

75     The Court of Appeal held that s. 34 of the *Partnerships Act* expressly dissolved any partnership that may have been created in the present case because s. 174(2)(*i*) of the *Bank Act* made it unlawful within the meaning of s. 34 for members of the firm to carry on the Partnership. Section 34 provides:

**34.** A partnership is in every case dissolved by the happening of any event that makes it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership.

76     The appellant argues that the Court of Appeal erred because the penalty imposed by s. 174(16) of the *Bank Act* represents what has been described as "the price of a licence for doing what the statute apparently forbids". Therefore, it does not compel the conclusion that either the Bank or Leasing was incapable of becoming a member of a valid partnership or that the Partnership was automatically dissolved after its formation on the basis of unlawfulness, pursuant to s. 34.

77     Both the Court of Appeal and the appellant rely on *Lindley* & *Banks on Partnership, supra*, at p. 135, where it states:

...although a statute may appear to prohibit certain activities and impose a penalty for failure to observe its provisions, it does not follow that conduct which would attract the penalty is necessarily illegal. If the statute can genuinely be classed as prohibitory, as will be the case if the penalty is imposed for the protection of the public, then such conduct will be illegal. *Per contra* if, on a true construction of the statute, the penalty merely represents, as Lord Lindley put it, "the price of a licence for doing what the statute apparently forbids".

78     The penalty provision in the *Bank Act* dealing with the participation in a Canadian partnership contrary to s. 174(2)(*i*) is contained in s. 174(16). It reads as follows:

**174.** ...

(16) A bank that contravenes any of paragraphs (2)(*a*), (*c*), (*f*), (*h*), (*i*) or (*j*) is guilty of an offence and liable on summary conviction to a fine not exceeding five hundred dollars in respect of each contravention.

79     It is argued that s. 34 of the *Partnerships Act* and s. 20(1) of the *Bank Act* are in conflict because s. 20(1) ensures that all acts done contrary to the *Bank Act* are not invalid by reason only of a contravention of the statute. The effect of s. 20(1), it is argued, is that no acts done contrary to the *Bank Act* are unlawful. By paying the "licence fee" set out in s. 174(2) of the *Bank Act*, a bank is permitted to enter into a partnership. For s. 34 of the *Partnerships Act* to then render the participation of a bank in a partnership unlawful is contrary to the *Bank Act* as it prohibits what the *Bank Act* allows. What is argued, in effect, is that the *Bank Act*, as a federal statute, must prevail over the *Partnerships Act*, which is a provincial statute.

80     The wording of the penalty provision contained in s. 174(16) makes it clear that the prohibitions contained in s. 174(2) do not amount to a regulatory scheme providing that licence fees be paid for what the *Bank Act* prohibits. To interpret the section in this manner ignores the clear wording of the *Bank Act*. Section 174 (16) labels a contravention of the Act an "offence" subject to "summary conviction" and sets out what amounts to a fine. Moreover, even if the combination of ss. 18(1) and 20(1) serves to preserve the validity of the transaction that is prohibited by the Act, the action is no less "unlawful" within the meaning of s. 34 of the *Partnerships Act* because it is an action that is contrary to the clear wording of the *Bank Act*.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

81      As I do not accept that the penalties outlined in s. 174(16) represent a licence fee for doing what the *Bank Act* clearly prohibits in s. 174(2), I do not find that s. 20(1) of the *Bank Act* and s. 34 of the *Partnerships Act* are in conflict. The effect of s. 34 of the *Partnerships Act* is clear: the unlawfully formed partnership is dissolved *ab initio*. The stipulation in s. 20(1) of the *Bank Act*, that no act of a bank is invalid by reason only of a contravention of that Act, is of no consequence; the act is not invalid by reason *only* of the prohibition in s. 174(2)(*i*), but rather by reason of the effect of the contravention on the validity of the partnership under another statute, the *Partnerships Act*. Payment of the penalties set out in s. 174(16) of the *Bank Act* does not render lawful what the *Bank Act* prohibits.

82      The respondent submits that s. 34 of the *Partnerships Act* should be construed to render invalid any partnership entered into by the Bank or its subsidiary. It can be argued, however, that the effect of dissolving the Partnership under s. 34 of the *Partnerships Act*, when Leasing became a partner, is to make Leasing subject to the prohibitions in the *Bank Act*. If Leasing were subject to the prohibitions in the *Bank Act*, it would be unlawful for it, as a partner, to carry on the business of the Partnership and would therefore be contrary to s. 34 of the *Partnerships Act*. The argument is that the Bank is subject to the prohibitions and penalties set out in the *Bank Act*, but that Leasing's activities are not made unlawful because of the Bank's breach of the statute. To hold otherwise would amount to lifting the corporate veil to determine who are the investors who hold shares in a corporate partner and to determine if the investor has been involved in any unlawful activity.

83      I do not accept that a finding that the Partnership is unlawful under s. 34 necessitates a finding that Leasing is subject to the prohibitions in the *Bank Act*. Section 34 of the *Partnerships Act* states that a partnership is dissolved upon the happening of an event that makes it unlawful "for the business of the firm to be carried on *or* for the members of the firm to carry it on in partnership" (emphasis added). The prohibitions in the *Bank Act* clearly make it unlawful for a bank to "indirectly" participate in a partnership. Any indirect participation by a bank, i.e., participation through a subsidiary company, makes the carrying on of business in the partnership "unlawful" within the meaning of s. 34 of the *Partnerships Act*.

84      With regard to the second part of s. 34, under the reasoning that it cannot be unlawful for Leasing to be a member of the Partnership because it is not subject to the prohibitions of the *Bank Act*, the unlawful event must have occurred when the Bank, which is clearly subject to the *Bank Act*, became a partner on December 27, 1986. The Partnership would therefore have been dissolved on December 27, 1986. I do not accept, however, that the "unlawful" event under s. 34 of the *Partnerships Act* occurred only when the Bank directly became involved in the Partnership on December 27, 1986. In my view, Leasing's participation in the Partnership on December 24, 1986 can still be considered "unlawful" within the meaning of s. 34 of the *Partnerships Act* by reason of the public policy component of the common law doctrine of illegality.

85      The public policy component of the common law doctrine of illegality was not specifically pleaded in the present case; however, the respondent did plead that the Partnership was rendered invalid by s. 34 of the *Partnerships Act* because of the Bank's *or Leasing's* involvement in the Partnership. Moreover, as Krever J. (as he then was) set out in *Menard v. Genereux* (1982), 39 O.R. (2d) 55 (Ont. H.C.), at p. 64:

> It is, however, well established that whether or not they are pleaded, if facts are shown in the course of a trial which may render an agreement unenforceable by reason of illegality or public policy, a court must take these facts into consideration and, depending on the circumstances, act upon them if necessary by refusing to lend its assistance to a party seeking to enforce his or her rights by relying on the agreement.

86      I have discussed the doctrine of illegality as applied to contracts prohibited by statute. The common law doctrine of illegality and its effect on the validity of a contract must also be considered with regard to acts contrary to public policy. The development of the law in this area can be traced to *Holman v. Johnson* (1775), 1 Cowp. 341, 98 E.R. 1120 (Eng. K.B.), where Lord Mansfield stated, at p. 1121:

> The principle of public policy is this: ex dolo malo non oritur actio. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the Court says he has no right

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

to be assisted. It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.

87    Since *Holman*, the courts have examined many transactions which involve what the courts considered to be immoral or illegal acts. The public policy in the present case is similar to the public policy recognized in the case law where the courts have refused to uphold a contract to commit a crime. To enforce a contract of this type is to recognize that it is valid to agree to circumvent the law for economic gain. As *Cheshire, Fifoot and Furmston's Law of Contract* (13th ed. 1996), explains, at p. 375: "An allied rule of public policy is that no person shall be allowed to benefit from his own crime."

88    While it may not be strictly contrary to the *Bank Act* for Leasing to enter into a partnership, the parties to the agreements are, in effect, asking that they be permitted to benefit from a deliberate breach of the provisions of the *Bank Act*. In this case, it is clear that, by virtue of s. 174 of the *Bank Act*, the Bank is prohibited from directly or *indirectly* participating in a partnership. The parties to the Master Agreement and the Partnership Agreement were aware of this prohibition, but proceeded to enter into the Partnership with this knowledge. It is worth reiterating that Leasing declined to give the representations and warranties regarding qualification to carry on the business of the Partnership that had been requested of all proposed members.

89    The Bank negotiated the terms of the Master Agreement and set up a transaction that it hoped would allow it to circumvent the terms of the *Bank Act* and avoid the consequences of the dissolution section in s. 34 of the *Partnerships Act*. To find that the Partnership is dissolved when the Bank directly becomes involved on December 27, 1986 but not when Leasing, acting for the Bank, became involved in the Partnership on December 24, 1986 is to give effect to a transaction that offends public policy. To sanction the participation of Leasing in the Partnership is to sanction the agreement to circumvent the provisions and penalties of the *Bank Act* and the *Partnerships Act*.

90    Is the finding that the transaction offends public policy sufficient to label the transaction illegal? As noted earlier, *Still*, *supra*, sets out the modern approach to this area of the law. At p. 138, Robertson J.A. explains the differences between the classical model of illegality and the modern approach. He states that the modern approach to illegality recognizes that a contract will not be considered void *ab initio* simply because it is prohibited. Under the modern approach, the contract can be declared illegal, and relief may be granted as an exception, or the contract can be held not to be illegal, and therefore enforceable. Enforceability of a contract depends upon an assessment of the purpose and objects of the prohibition, in the context of the case.

91    Similarly, C. Boyle and D. R. Percy in *Contracts: Cases and Commentaries* (5th ed. 1994), state, at p. 719:

> One way of conceptualizing this area might be to focus on the instances where public or communitarian concerns override the contracting parties' interests in ordering their private affairs as they choose. ...This approach is well-expressed in the early case of *Maddox v. Fuller* (1937), 173 So. 12 at 16: "The true test ... is whether the public interest is injuriously affected in such a substantial manner that private rights and interests should yield to those of the public."

92    Boyle and Percy go on to state that "[o]n the other hand, it is possible to see the enforcement of certain contracts as reflecting public policy concerns just as much as the non-enforcement of other contracts". The proper question therefore, in my view, is whether it is in the interests of public policy to recognize the validity of the Partnership or whether it is in the interests of public policy to refuse to give effect to the transaction. In all of the circumstances, I conclude that it is contrary to public policy to allow the parties to the transaction to benefit from their deliberate breach of the prohibitions set out in the *Bank Act*. No third party will be harmed by the refusal to give effect to the transaction. All of the parties to the Master Agreement and the Partnership Agreement were aware that they were assisting the Bank in breaching the statute. The only hardship that may result from a finding that the formation of the Partnership on December 24, 1986 is illegal at common law on the grounds of public policy is that Leasing will not benefit from the deferred tax payment under s. 97(2) of the *Income Tax Act*.

93    Even though I have found that Leasing's participation in the Partnership is illegal on the ground of public policy, it is not necessary in this case to consider the effect of a finding of illegality at common law and the possible remedies set out in G. H. Treital, *The Law of Contract* (9th ed. 1995), at pp. 438-66; *Cheshire, Fifoot and Furmston's Law of Contract, supra*, at pp.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

385-406. The result of a finding that Leasing's participation in the Partnership is contrary to public policy is that it is "unlawful" within the meaning of s. 34 of the *Partnerships Act* and that the Partnership is dissolved.

94    In closing on this issue, I wish to add that a finding that the Bank was prohibited from participating in the Partnership, directly or indirectly, therefore rendering the transaction invalid, does not render invalid the participation of the other parties in the Partnership. The other two subsidiaries of Central (693396 and CCMI) were valid participants in the Partnership and in my view created a valid partnership at law between themselves on December 24, 1986. After Leasing and subsequently the Bank are removed from the Partnership, it continued as a valid entity. This proposition is supported by *Hudgell Yeates & Co. v. Watson*, [1978] 2 All E.R. 363 (Eng. C.A.). In that case, a partnership was dissolved by operation of s. 34 of the *Partnership Act 1890*, the same provision as that contained in the Ontario *Partnerships Act*, because one member of a law firm's practising certificate lapsed without the knowledge of the other partners. The partnership, however, was reconstituted as a partnership between the remaining partners.

### 3. Was Leasing liable for recapture under s. 13 of the Income Tax Act as the person that disposed of its depreciable assets to the Central subsidiary?

95    Having found that Leasing was not a member of a valid partnership and could not take advantage of s. 97(2) of the *Income Tax Act*, I must determine whether Leasing is liable for recapture of capital cost allowance as the vendor of the leasing assets. Since the transaction entered into by the parties did not involve the transfer of a partnership interest, it follows that what was transferred from the Continental group to the Central group was leasing assets. Leasing claims that a finding that the property that was transferred to Central was leasing assets, rather than an interest in a partnership, does not make Leasing the vendor of those assets and, therefore, liable for the recapture of capital cost allowance. The Court of Appeal, after finding that no valid partnership existed, did not make an express finding that Leasing sold the leasing assets to Central. It simply attributed the recapture to Leasing and upheld the Crown's reassessment. Bowman J.T.C.C. did not make a finding on this issue because once he found that a valid partnership had been formed, it was not necessary to determine who would have disposed of the assets if no partnership had been formed.

96    Leasing argues that it was the Bank that disposed of the leasing assets and on that basis, it is not liable for the recapture of capital cost allowance. Leasing stressed that the original transaction with Central was to be a sale of the shares in Leasing and that the Bank would have been the vendor, given that it was the sole shareholder in the company. While this may be true, I do not think that it follows that the Bank was the vendor of the leasing assets.

97    Having found that the substance of the transaction was a sale of assets, the conveyance of those assets occurred when Leasing signed the Master Agreement on December 23, 1986. The s. 97(2) election showed all three of the Central subsidiaries as transferees under the conveyance of assets, not just the two subsidiaries that signed the December 24, 1986 Partnership Agreement. The three Central subsidiaries appeared to have a *bona fide* intention to carry on business in common with each other and there was no legal prohibition to prevent them from forming a partnership between themselves under the name Central Capital Leasing. The failure of Leasing ever to be a member of a valid partnership with any of them did not prevent the assets from being acquired by the Central subsidiaries and being held by them under the name Central Capital Leasing. Once the partnership scheme is collapsed *vis-à-vis* Leasing, what is left is a sale of Leasing's assets to Central's subsidiaries on December 24, 1986.

98    Leasing argues that the sale of the assets effectively took place on December 29, 1986, two days after the purported transfer of the 99 percent partnership interest from Leasing to the Bank. In other words, it is argued that the transfer from Leasing to the Bank on December 27, 1986 would in reality have been a transfer of the leasing assets if the partnership was invalid and would have made the Bank the owner of the assets on the date they were transferred to Central.

99    Section 13 of the *Income Tax Act* imposes the tax liability for recapture of capital cost allowance on the person who owned depreciable assets and disposed of those assets. The only person that can be liable for the recapture is Leasing because, as owner of the assets on December 24, 1986, Leasing transferred those assets to what it hoped to be a valid partnership. The Bank was not a party to the transfer.

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

100    What the appellant seeks to do is to characterize the Bank as having acquired Leasing's assets when the 99 percent partnership interest was transferred to it on December 27, 1986. This would make the Bank the vendor of the assets which disposed of them to Central on December 29, 1986. To adopt this approach would require the invalid partnership interest that was transferred to the Bank by Leasing to be converted to a transfer of assets. This approach is flawed because, by December 29, 1986, Leasing was no longer the owner of the assets. The fact that the Partnership was not a valid one *vis-à-vis* Leasing and that consequently the s. 97(2) rollover was ineffective does not negate the consequence that the assets were transferred on December 24, 1986.

101    The proceeds of the sale of the assets were paid to the Bank on December 29, 1986 in the form of notes and debentures from Central. This, however, does not change the fact that Leasing was the vendor of those assets on December 24, 1986 and was entitled to the proceeds of the disposition. Income tax principles require that taxpayers be taxed on amounts that are receivable. The transfer of the "partnership interest" from Leasing to the Bank could arguably be characterized as a transfer of the proceeds that Leasing was to receive from the sale of its assets to Central subsidiaries. However, even characterized in this way, Leasing is liable for the recapture of capital cost allowance as the vendor of the assets. Subsection 56(4) of the *Income Tax Act* requires that where a taxpayer transfers rights to income that should have been included as income for the taxation year because the amount would have been receivable in that year, the taxpayer will be taxed on that income.

## VII. Conclusion

102    Although the parties in this case set up a valid partnership within the meaning of s. 2 of the *Partnerships Act*, the participation of Leasing in that partnership was void by virtue of s. 34 of the *Partnerships Act*. The collapse of the partnership scheme *vis-à-vis* Leasing, however, does not change the fact that Leasing's assets were transferred to Central's subsidiaries on December 24, 1986. Because these assets were not transferred to a partnership pursuant to s. 97(2) of the *Income Tax Act*, Leasing cannot take advantage of that provision and is therefore liable for the recapture of capital cost allowance on its depreciable assets pursuant to s. 13 of the *Income Tax Act*. I would dismiss the appeal with costs.

### *McLachlin J.*:

103    My colleague Justice Bastarache concludes that the Continental Bank Leasing Corporation ("Leasing") cannot take advantage of s. 97(2) of the *Income Tax Act*, R.S.C. 1952, c. 148, as amended, because its participation in the partnership was void by virtue of the *Partnerships Act*, R.S.O. 1980, c. 370. While I agree with all other aspects of his reasons, I respectfully differ on this point and consequently on the disposition of this appeal.

104    The partnership in question was formed between Leasing and two wholly owned subsidiaries of Central Capital Leasing, 693396 Ontario Limited ("693396") and Central Capital Management Inc. ("CCMI"), on December 24, 1986. The trial judge found that it was a real and binding partnership. The partners would not have been able to tell a third party that they were not partners. On this basis, he found the arrangements set up to reduce tax were valid and held that Leasing was entitled to take advantage of s. 97(2) of the *Income Tax Act*.

105    The respondent on appeal argued that the partnership was not valid by reason of the combined operation of s. 174(2) of the *Bank Act*, R.S.C., 1985, c. B-1, and s. 34 of the Ontario *Partnerships Act*. The *Bank Act* states:

**174.** ...

(2) Except as authorized by or under this Act and in accordance with such terms and conditions, if any, as are prescribed by the regulations, a bank shall not, directly or indirectly,

(*i*) acquire or hold an interest in Canada in, or otherwise invest or participate in Canada in, a partnership or a limited partnership.

The *Partnerships Act* states:

Case 09-10138-MFW Doc 14394 Filed 09/10/14 Page 340 of 485

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

**34.** A partnership is in every case dissolved by the happening of any event that makes it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership.

106    The reasoning underlying the respondent's argument appears to be as follows:

1 Section 174 of the federal *Bank Act* prohibits the Continental Bank of Canada (the "Bank") from acquiring or holding an interest, or otherwise investing or participating in, a partnership or limited partnership in Canada.

2 The Bank violated this provision when its wholly owned subsidiary, Leasing, entered into a partnership with 693396 and CCMI.

3 . Section 34 of the Ontario *Partnerships Act* provides that a partnership is "dissolved" by the happening of any event that makes it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership.

4 The partnership formed initially by Leasing and the two other corporations was dissolved under s. 34 because of the operation of s. 174 of the *Bank Act* either (a) because s. 174 made the partnership's business unlawful; or (b) because s. 174 made it unlawful for the members of the firm to carry it on in partnership.

5 This effect prevails despite s. 20(1) of the *Bank Act*, which provides that "[n]o act of a bank, including any transfer of property to or by a bank, is invalid by reason only that the act or transfer is contrary to this Act".

107    In my view, steps 4 and 5 of the argument are not made out.

108    The first question is whether s. 34 of the *Partnerships Act* is attracted because the Bank's investment in a partner (Leasing) makes it unlawful for the business of the partnership to be carried on. If an investor holds shares in a corporate partner in a partnership when the law says it should not, is the business of the partnership thereby rendered illegal? I think not. The partnership must be distinguished from those who may invest in or support the partners that make it up. The investors are behind the scenes. They do not incur liability for partnership obligations. The law looks only to the partners to satisfy any liability that the partnership may incur. An investor may supply money to a partner which the partner then uses to carry on lawful business. The fact that the law says that the investor should not have supplied the money does not render the partnership business unlawful.

109    This is precisely the situation in the case at bar. Prior to December 27, 1986, the Bank was not a partner. It merely held shares in one of the partners, Leasing, which was a separate and legally distinct corporation. The *Bank Act* says that the Bank should not have held shares in Leasing if Leasing was a partner in a partnership. But this does not render illegal the business that Leasing carried on in the partnership. Leasing was a distinct and separate entity from the Bank, as was the partnership it entered into. The fallacy in the argument of the respondent is that it treats the Bank as if it were a partner in the partnership. But, prior to December 27th, it was not a partner. Leasing was the partner. And Leasing did not violate s. 174 of the *Bank Act*. Indeed, Leasing could not violate s. 174 of the *Bank Act*, because it was not a bank.

110    The next question is whether s. 34 of the *Partnerships Act* is attracted because s. 174 of the *Bank Act* made it unlawful for Leasing to be a partner in the firm. The same point disposes of this question. Leasing was a separate corporation from the Bank. It had its own identity. It was not a bank. So s. 174 does not touch it. There is nothing in s. 174 of the *Bank Act* that made it unlawful for Leasing to be a member of the partnership.

111    If these observations are correct, then, prior to December 27th, s. 174 did not make it unlawful for the partnership to carry on its business, or for Leasing to be a partner. It made it unlawful for the Bank to invest in Leasing, but that is an entirely different thing. It does not affect the legality of the partnership's business or of Leasing's participation in the partnership.

112    It follows that the partnership was not dissolved under s. 34 of the *Partnerships Act* because the Bank should not have held shares in one of the partners. To suggest that partnerships could be dissolved simply because a behind-the-scenes investor or supporter of one of the partners was legally prohibited from investing in the partnership is to assert a proposition novel to the law. In determining who may be partners and what the lawful business of the partnership is, the law looks to the partnership

Continental Bank of Canada v. R., 1998 CarswellNat 1496

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

and the partners, not those who invest or hold shares in the partners. Where the partner is a corporation, as here, the general rule that the law does not pierce the corporate veil reinforces this conclusion: *Salomon v. A. Salomon & Co.*, [1897] A.C. 22 (U.K. H.L.). Were it otherwise, one would never know whether a partnership is valid without investigating all those who may own shares or financially support the partners. This would make it difficult if not impossible to do business with partnerships with any sense of security. In the case at bar, the consequence of holding the partnership void is to defeat a transaction aimed at minimizing tax. However, in other cases it might affect innocent third parties relying on the partnership.

113    A further consequence of holding that an unlawful investment voids a partnership entered into by an investee is that the legal status of partnerships would vary with the shareholders in corporate partners. If a bank holds shares in a corporate partner, the partnership would be void. But if the bank sells those shares to a non-bank (and who is to know?) is the partnership reconstituted? The only sensible rule is what I apprehend to be the legal rule -- that the validity of a partnership depends on its members, not on who may hold shares in them.

114    This brings me to Bastarache J.'s argument that Leasing's participation in the partnership on December 24, 1986 can be considered unlawful within the meaning of s. 34 of the *Partnerships Act* by reason of the public policy component of the common law doctrine of illegality. This argument posits that, despite the fact that Leasing's participation in the partnership does not contravene the provisions of the *Bank Act*, it should be considered illegal for public policy reasons, namely because "[t]o sanction the participation of Leasing in the Partnership is to sanction the agreement to circumvent the provisions and penalties of the *Bank Act* and the *Partnerships Act*" (para. 89). In essence, Bastarache J. equates his conclusion that Leasing's participation in the partnership is "illegal" under the doctrine of illegality with a finding that that participation is also "unlawful" under s. 34 of the *Partnerships Act*. In my view, the equation is not warranted.

115     I will not repeat the historical foundations for the doctrine of illegality, which have been ably summarized by my colleague, Bastarache J. I simply note that the meaning of the term "illegal" within the context of the doctrine of illegality does not always mean "unlawful" in the traditional sense of being "contrary to, prohibited, or unauthorized by law" (*Black's Law Dictionary* (6th ed. 1990)). The need to exercise caution in the use of the term "illegal" in this area was underlined by C. Boyle and D. R. Percy in *Contracts: Cases and Commentaries* (5th ed. 1994), at p. 721:

> A word of warning is necessary with respect to terminology. It will be evident already that the expressions "illegal" and "contrary to public policy" are used somewhat loosely and interchangeably. The approach of the British Columbia Law Reform Commission may be helpful. After recognizing that *the word "illegal" is not always entirely appropriate*, the Commission stated in its *Report on Illegal Transactions* (1983), at 2:
>
>> The term "illegal" is used as a convenient shorthand expression, signifying that the transaction so designated is one which a court will decline to enforce on the ground that it infringes some public policy, or the terms or object of an enactment. [Emphasis added.]

116    The fact that the court determines that a contract is void or unenforceable for public policy reasons under the doctrine of illegality does not render either the contract itself or the subject of the contract unlawful. As noted by G. H. Treitel in *The Law of Contract* (9th ed. 1995), at p. 399: "Such contracts are often called 'illegal.' It is sometimes said that they are only 'void' or 'unenforceable'; but these statements only emphasize that *no specific legal wrong is involved*. So long as this point is borne in mind, no harm is done by using the traditional terminology in which these contracts are 'illegal.'" (Emphasis added.)

117    It follows that a finding that Leasing's participation in the partnership should be void or unenforceable for public policy reasons under the doctrine of illegality does *not* necessarily mean that its participation was illegal or unlawful in the traditional sense of either term. As a result, s. 34 of the *Partnerships Act* is not attracted.

118    This is sufficient to dispose of the argument that s. 34 of the Ontario *Partnerships Act* rendered the partnership between Leasing and its partners void. However, the question remains whether Leasing's participation in the partnership should be deemed unenforceable as a result of the application of public policy principles under the doctrine of illegality, quite apart from s. 34 of the *Partnerships Act*. In my opinion, this question must be determined in the negative. Contrary to my colleague, I find

1998 CarswellNat 1496, 1998 CarswellNat 1497, [1998] 2 S.C.R. 298...

that public policy requires that breaches of the Bank Act should *not* lead to the invalidation of contracts and other transactions. There is a good reason for this; to unravel commercial transactions on the basis that a corporate actor breached a statute is to introduce uncertainty into the affairs of individuals and businesses. This is especially true where the transactions at issue involve a subsidiary of the corporate actor.

119    More importantly, s. 20(1) of the *Bank Act* clearly states that "[n]o act of a bank ... is invalid by reason only that the act or transfer is contrary to this Act". Section 20(1) thus supports the view that Parliament never intended breaches of the *Bank Act* to render bank transactions, including investments in other corporations, like Leasing, null and void. This supports the argument that Parliament intended to create an offence punishable by fines, not to invalidate otherwise lawful transactions and that the doctrine of illegality should have no application in the case at bar.

120    I conclude that the partnership between Leasing, 693396 and CCMI was valid between December 24th and December 27th. It follows that the election under s. 97(2) of the *Income Tax Act* was also valid. It is not necessary, for the purposes of this first appeal, to consider the transfer of Leasing's partnership interest to the Bank. That transfer and the subsequent transfer of the Bank's partnership interest to 693396 and 693397 Ontario Ltd. are the subjects of the second appeal. I would allow this appeal with costs and refer the assessment back to the Minister of National Revenue for reconsideration and reassessment in accordance with these reasons.

*Appeal allowed.*

*Pourvoi accueilli.*

---

End of Document        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



**WILLIAM DAUBERT, ET UX., ETC., ET AL., PETITIONERS V. MERRELL
DOW PHARMACEUTICALS, INC.**

**No. 92-102**

**SUPREME COURT OF THE UNITED STATES**

*509 U.S. 579; 113 S. Ct. 2786; 125 L. Ed. 2d 469; 1993 U.S. LEXIS 4408; 61 U.S.L.W.
4805; 27 U.S.P.Q.2D (BNA) 1200; CCH Prod. Liab. Rep. P13,494; 93 Cal. Daily Op.
Service 4825; 93 Daily Journal DAR 8148; 23 ELR 20979; 7 Fla. L. Weekly Fed. S 632*

**March 30, 1993, Argued
June 28, 1993, Decided**

**PRIOR HISTORY:** ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT.

**DISPOSITION:** *951 F.2d 1128*, vacated and
remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioners appealed an
order from the United States Court of Appeals for the
Ninth Circuit, which affirmed the trial court's grant of
summary judgment for respondent drug company.
Petitioners challenged the finding that its experts'
opinions were inadmissible as unreliable where opinions
were based on recalculations of study data and such
recalculations had not been subjected to peer review or
published.

**OVERVIEW:** The summary judgment was reversed
where expert opinions were admissible to show
respondent's drug caused birth defects despite the fact
that the experts' analysis had not been published or
subject to peer review. Petitioners were children with
serious birth defects. Their parents alleged that the
mothers' ingestion of respondent's drug caused defects.
Respondent brought a motion for summary judgment,
supported by proof that the drug did not cause defects.

Petitioners responded with expert opinions that the drug
did cause defects. The opinions were based on a
reanalysis of previously published studies stating the drug
did not cause defects. The trial court granted respondent's
motion, holding petitioners' scientific evidence was
inadmissible because the reanalyzed studies were not
reliable where they had not been published. Petitioners
appealed. The Court vacated and remanded, holding that
a technique upon which an expert opinion was based did
not have to be generally accepted as reliable as a
precondition to the opinion's admission as long as the
standards of reliability and relevance under the federal
evidence rules were met.

**OUTCOME:** The Court vacated and reversed the
appellate court's affirmance of a judgment granting
respondent summary judgment. Where petitioners' expert
evidence was reliable under federal rules, the evidence
was admissible. The common law standard for
determining reliability of scientific evidence was
inapplicable where federal evidence rules superceded the
common law. Publication or peer review of the experts'
recalculation was thus unnecessary.

**LexisNexis(R) Headnotes**

509 U.S. 579, *; 113 S. Ct. 2786, **;
125 L. Ed. 2d 469, ***; 1993 U.S. LEXIS 4408

*Evidence > Procedural Considerations > Rule Application & Interpretation*
[HN1] The court must interpret the legislatively enacted Federal Rules of Evidence as it would any statute.

*Evidence > Relevance > Relevant Evidence*
[HN2] See *Fed. R. Evid. 402*.

*Evidence > Relevance > Relevant Evidence*
[HN3] "Relevant evidence" is defined as that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Fed. R. Evid. 401*. The Rules' basic standard of relevance thus is a liberal one.

*Evidence > Testimony > Experts > General Overview*
[HN4] See *Fed. R. Evid. 702*.

*Evidence > Scientific Evidence > General Overview*
*Evidence > Testimony > Experts > General Overview*
[HN5] Nothing in the text of *Fed. R. Evid. 702* establishes "general acceptance" as an absolute prerequisite to admissibility of scientific evidence.

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Evidence > Relevance > Relevant Evidence*
*Evidence > Scientific Evidence > Daubert Standard*
[HN6] Under the Federal Rules of Evidence, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

*Evidence > Relevance > Relevant Evidence*
*Evidence > Testimony > Experts > General Overview*
[HN7] The requirement that an expert's testimony pertain to scientific knowledge establishes a standard of evidentiary reliability.

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Evidence > Procedural Considerations > Preliminary Questions > General Overview*
*Evidence > Testimony > Experts > Helpfulness*
[HN8] Faced with a proffer of expert scientific testimony, the trial judge must determine at the outset, pursuant to

*Fed. R. Evid. 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Evidence > Testimony > Experts > General Overview*
[HN9] Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge under *Fed. R. Evid. 702* that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry. Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected.

*Evidence > Testimony > Experts > General Overview*
[HN10] For purposes of determining whether a theory or technique is scientific knowledge under *Fed. R. Evid. 702*, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation. Finally, "general acceptance" can yet have a bearing on the inquiry. A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community. Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community, may properly be viewed with skepticism. The inquiry envisioned by *Rule 702* is a flexible one. Its overarching subject is the scientific validity -- and thus the evidentiary

relevance and reliability -- of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

**Evidence > Relevance > Relevant Evidence**
**Evidence > Testimony > Examination > General Overview**
[HN11] Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

**Civil Procedure > Summary Judgment > Standards > General Overview**
**Civil Procedure > Trials > Judgment as Matter of Law > General Overview**
**Evidence > Scientific Evidence > General Overview**
[HN12] In the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, *Fed. R. Civ. P. 50(a)*, and likewise to grant summary judgment, *Fed. R. Civ. P. 56*.

**Evidence > Scientific Evidence > General Overview**
**Evidence > Testimony > Experts > Admissibility**
[HN13] "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence, *Fed. R. Evid. 702*, do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

**DECISION:**

"General acceptance" of principle underlying scientific evidence held not to be necessary precondition to admissibility of such evidence under Federal Rules of Evidence.

**SUMMARY:**

A minor child and his parents, together with another minor child and his mother, brought suit in a California state court against a drug company which had marketed the prescription drug Bendectin. The plaintiffs alleged

that the children's birth defects had been caused by the mothers' ingestion of Bendectin during pregnancy. The suit was removed, on diversity grounds, to the United States District Court for the Southern District of California. The company moved for summary judgment and submitted, in support of the motion, the affidavit of an epidemiologist to the effect that no published epidemiological (human statistical) study had demonstrated a statistically significant association between Bendectin and birth defects. In response, the plaintiffs offered expert opinion testimony based on (1) test-tube and live-animal studies that had allegedly found a link between Bendectin and birth defects; (2) pharmacological studies that allegedly showed similarities between the chemical structure of Bendectin and that of substances known to cause birth defects; and (3) the reanalysis, or recalculation, of previously published epidemiological studies. The District Court, granting summary judgment in favor of the company, expressed the view that (1) scientific evidence is admissible under the Federal Rules of Evidence only if the principle on which such evidence is based is sufficiently established to have general acceptance in the field to which it belongs; (2) epidemiological studies were the most reliable evidence of causation of birth defects; (3) the testimony based on test-tube, live-animal, and pharmacological studies was inadmissible because such testimony was not based on epidemiological evidence; and (4) the testimony based on reanalyses was inadmissible because the reanalyses (a) apparently had never been published or subjected to peer review, and (b) failed to show a statistically significant association between Bendectin and birth defects (*727 F Supp 570*). The United States Court of Appeals for the Ninth Circuit, affirming on appeal, expressed the view that (1) expert opinion based on a scientific technique is inadmissible if the technique is not generally accepted as reliable in the relevant scientific community; and (2) under the general acceptance standard, the plaintiffs' evidence provided an insufficient foundation to allow admission of expert testimony that Bendectin caused birth defects (*951 F2d 1128*).

On certiorari, the United States Supreme Court vacated the Court of Appeals' judgment and remanded the case for further proceedings. In an opinion by Blackmun, J., expressing the unanimous view of the court as to holding 1 below, and joined by White, O'Connor, Scalia, Kennedy, Souter, and Thomas, JJ., as to holdings 2 and 3 below, it was held that (1) the "general

acceptance" test of *Frye v United States (1923) 54 App DC 46, 293 F 1013, 34 ALR 145*, was superseded by the Federal Rules of Evidence (FRE), and thus general acceptance is not a necessary precondition to the admissibility of scientific evidence under the FRE, given that (a) nothing in the text of *Rule 702 of the FRE*, governing expert testimony, establishes general acceptance as an absolute prerequisite to admissibility, and (b) there is no indication that *Rule 702* or the FRE as a whole were intended to incorporate a general acceptance standard; (2) under the FRE, a federal trial judge must insure that any and all scientific testimony or evidence is not only relevant but reliable; and (3) in a federal case involving scientific evidence, evidentiary reliability is based on scientific validity.

Rehnquist, Ch. J., joined by Stevens, J., concurring in part and dissenting in part, (1) agreed that (a) the Frye "general acceptance" rule did not survive the enactment of the FRE, and (b) *Rule 702 of the FRE* confides to the trial judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony; but (2) expressed the view that the Supreme Court should have left the further development of the area of the law in question to future cases.

## LAWYERS' EDITION HEADNOTES:

EVIDENCE §641;

expert scientific testimony -- admissibility -- general acceptance standard -- ;

Headnote:[1A][1B][1C][1D][1E]

A standard under which the exclusive test for admitting expert scientific testimony is whether the principle on which such testimony is based has general acceptance in the field to which it belongs is not to be applied in federal trials; the "general acceptance" test of *Frye v United States (1923) 54 App DC 46, 293 F 1013, 34 ALR 145*, is superseded by the Federal Rules of Evidence (FRE), and thus general acceptance is not a necessary precondition to the admissibility of scientific evidence under the FRE, given that (1) nothing in the text of *Rule 702 of the FRE*, governing expert testimony, establishes general acceptance as an absolute prerequisite to admissibility; and (2) there is no indication that *Rule 702* or the FRE as a whole are intended to incorporate a general acceptance standard, as (a) the drafting history

makes no mention of the Frye decision, and (b) a rigid general acceptance requirement would be at odds with the liberal thrust of the FRE and their general approach of relaxing the traditional barriers to opinion testimony.

COURTS §538.11;

construction of rules -- ;

Headnote:[2]

A court properly interprets the legislatively enacted Federal Rules of Evidence as the court would interpret any statute.

EVIDENCE §641;

expert scientific testimony -- reliability -- ;

Headnote:[3A][3B][3C]

Under the Federal Rules of Evidence (FRE), a federal trial judge is not disabled from screening purportedly scientific evidence; rather, the trial judge must insure that any and all scientific testimony or evidence admitted is not only relevant but reliable; the primary locus of this obligation is *Rule 702 of the FRE*, which governs expert testimony as to scientific knowledge; for purposes of *Rule 702*, "scientific" implies a grounding in the methods and procedure of science, and "knowledge" connotes more than subjective belief or unsupported speculation; although it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty, *Rule 702* requires that proposed scientific testimony be supported by appropriate validation--that is, good grounds--based on what is known; *Rule 702*'s requirement that an expert's scientific testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability, that is, trustworthiness; in a federal case involving scientific evidence, evidentiary reliability is based on scientific validity. (Rehnquist, Ch. J., and Stevens, J., dissented in part from this holding.)

EVIDENCE §641;

expert scientific testimony -- relevance -- ;

Headnote:[4A][4B]

509 U.S. 579, *; 113 S. Ct. 2786, **;
125 L. Ed. 2d 469, ***; 1993 U.S. LEXIS 4408

The "helpfulness" standard of *Rule 702 of the Federal Rules of Evidence (FRE)*, which requires that scientific evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue--a condition that goes primarily to relevance--requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility; for purposes of *Rule 702*, expert testimony which does not relate to any issue in the case at hand is not relevant and thus is nonhelpful.

EVIDENCE §641;

expert witnesses -- ;

Headnote:[5]

Unlike an ordinary witness, an expert witness is permitted wide latitude, under the Federal Rules of Evidence, to offer opinions, including those that are not based on firsthand knowledge or observation.

EVIDENCE §641;

expert scientific testimony -- ;

Headnote:[6]

Pursuant to *Rule 104(a) of the Federal Rules of Evidence*, governing preliminary questions concerning the admissibility of evidence, a federal trial judge who is faced with a proffer of expert scientific testimony must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue; this determination entails a preliminary assessment of (1) whether the reasoning or methodology underlying the testimony is scientifically valid, and (2) whether that reasoning or methodology properly can be applied to the facts in issue. (Rehnquist, Ch. J., and Stevens, J., dissented in part from this holding.)

EVIDENCE §383;

burden of proof -- ;

Headnote:[7A][7B]

Matters to be determined by a federal trial court pursuant to *Rule 104(a) of the Federal Rules of Evidence--that* is, preliminary questions concerning the

qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence--are to be established by a preponderance of proof.

EVIDENCE §67;

science -- admissibility -- judicial notice -- ;

Headnote:[8A][8B]

The requirements of *Rule 702 of the Federal Rules of Evidence (FRE)* for the admissibility of expert scientific evidence do not apply specially or exclusively to unconventional evidence; however, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under *Rule 201 of the FRE*.

EVIDENCE §641;

expert scientific testimony -- admissibility -- ;

Headnote:[9]

In determining whether a theory or technique is scientific knowledge that will assist the trier of fact, so as to be the basis of admissible evidence under *Rule 702 of the Federal Rules of Evidence*, (1) a key question to be answered is, ordinarily, whether the theory or technique can be and has been tested; (2) a pertinent consideration is whether the theory or technique has been subjected to peer review and publication, although the fact of publication, or lack thereof, in a peer-reviewed journal is not a dispositive consideration; (3) the court should ordinarily consider the known or potential rate of error of a particular scientific technique; (4) the assessment of reliability permits, but does not require, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance of the theory or technique within that community, as (a) widespread acceptance can be an important factor in ruling particular evidence admissible, and (b) a known technique that has been able to attract only minimal support within the scientific community may properly be viewed with skepticism; and (5) the inquiry is a flexible one, and the focus must be solely on principles and methodology, not on the conclusions that such principles and methodology generate. (Rehnquist, Ch. J., and Stevens, J., dissented in part from this

holding.)

TRIAL §15;

witnesses -- control -- ;

Headnote:[10]

Since expert evidence can be both powerful and misleading because of the difficulty in evaluating such evidence, a federal trial judge--in weighing, under *Rule 403 of the Federal Rules of Evidence*, the possible danger of unfair prejudice resulting from such evidence against the evidence's probative force--exercises more control over experts than over lay witnesses.

EVIDENCE §641

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §1

TRIAL §199

WITNESSES §59;

scientific testimony -- attack -- ;

Headnote:[11]

In federal cases, the appropriate means of attacking scientific testimony, where the basis of such testimony meets the admissibility standards of *Rule 702 of the Federal Rules of Evidence*, are (1) vigorous cross-examination, (2) presentation of contrary evidence, and (3) careful instruction on the burden of proof; additionally, in the event that the trial court concludes that a scintilla of such evidence presented to support a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment under *Rule 50(a) of the Federal Rules of Civil Procedure (FRCP)* and to grant summary judgment under Rule 56 of the FRCP.

APPEAL §1692.3;

remand -- misconception of law -- ;

Headnote:[12]

On certiorari to review a United States Court of Appeals judgment which upheld a United States District Court's ruling that proffered scientific evidence as to the alleged causation of birth defects was inadmissible, the United States Supreme Court will vacate the Court of Appeals' judgment and remand the case for further proceedings, where (1) the inquiries of the District Court and the Court of Appeals as to the admissibility of the evidence focused almost exclusively on whether the principle on which the evidence was based had gained "general acceptance," as gauged by publication and the decisions of other courts; and (2) the Supreme Court holds that general acceptance is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence.

**SYLLABUS**

Petitioners, two minor children and their parents, alleged in their suit against respondent that the children's serious birth defects had been caused by the mothers' prenatal ingestion of Bendectin, a prescription drug marketed by respondent. The District Court granted respondent summary judgment based on a well-credentialed expert's affidavit concluding, upon reviewing the extensive published scientific literature on the subject, that maternal use of Bendectin has not been shown to be a risk factor for human birth defects. Although petitioners had responded with the testimony of eight other well-credentialed experts, who based their conclusion that Bendectin can cause birth defects on animal studies, chemical structure analyses, and the unpublished "reanalysis" of previously published human statistical studies, the court determined that this evidence did not meet the applicable "general acceptance" standard for the admission of expert testimony. The Court of Appeals agreed and affirmed, citing *Frye v. United States, 54 App. D.C. 46, 47, 293 F. 1013, 1014*, for the rule that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community.

*Held:* The Federal Rules of Evidence, not *Frye*, provide the standard for admitting expert scientific testimony in a federal trial. Pp. 585-597.

(a) *Frye*'s "general acceptance" test was superseded by the Rules' adoption. The Rules occupy the field, *United States v. Abel, 469 U.S. 45, 49, 83 L. Ed. 2d 450, 105 S. Ct. 465*, and, although the common law of evidence may serve as an aid to their application, *id., at*

*51-52*, respondent's assertion that they some-how assimilated *Frye* is unconvincing. Nothing in the Rules as a whole or in the text and drafting history of *Rule 702*, which specifically governs expert testimony, gives any indication that "general acceptance" is a necessary precondition to the admissibility of scientific evidence. Moreover, such a rigid standard would be at odds with the Rules' liberal thrust and their general approach of relaxing the traditional barriers to "opinion" testimony. Pp. 585-589.

(b) The Rules -- especially *Rule 702* -- place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The reliability standard is established by *Rule 702*'s requirement that an expert's testimony pertain to "scientific . . . knowledge," since the adjective "scientific" implies a grounding in science's methods and procedures, while the word "knowledge" connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds. The Rule's requirement that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Pp. 589-592.

(c) Faced with a proffer of expert scientific testimony under *Rule 702*, the trial judge, pursuant to *Rule 104(a)*, must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue. Many considerations will bear on the inquiry, including whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate. Throughout, the judge should also be mindful of other applicable Rules. Pp. 592-595.

(d) Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion under an uncompromising "general acceptance" standard, is the appropriate means by which evidence based on valid principles may be challenged. That even limited screening by the trial judge, on occasion, will prevent the jury from hearing of authentic scientific breakthroughs is simply a consequence of the fact that the Rules are not designed to seek cosmic understanding but, rather, to resolve legal disputes. Pp. 595-597.

**COUNSEL:** Michael H. Gottesman argued the cause for petitioners. With him on the briefs were Kenneth J. Chesebro, Barry J. Nace, David L. Shapiro, and Mary G. Gillick.

Charles Fried argued the cause for respondent. With him on the brief were Charles R. Nesson, Joel I. Klein, Richard G. Taranto, Hall R. Marston, George E. Berry, Edward H. Stratemeier, and W. Glenn Forrester. [*]

    [*] Briefs of amici curiae urging reversal were filed for the State of Texas et al. by Dan Morales, Attorney General of Texas, Mark Barnett, Attorney General of South Dakota, Marc Racicot, Attorney General of Montana, Larry EchoHawk, Attorney General of Idaho, and Brian Stuart Koukoutchos; for the American Society of Law, Medicine and Ethics et al. by Joan E. Bertin, Marsha S. Berzon, and Albert H. Meyerhoff; for the Association of Trial Lawyers of America by Jeffrey Robert White and Roxanne Barton Conlin; for Ronald Bayer et al. by Brian Stuart Koukoutchos, Priscilla Budeiri, Arthur Bryant, and George W. Conk; and for Daryl E. Chubin et al. by Ron Simon and Nicole Schultheis.

    Briefs of amici curiae urging affirmance were filed for the United States by Acting Solicitor General Wallace, Assistant Attorney General Gerson, Miguel A. Estrada, Michael Jay Singer, and John P. Schnitker; for the American Insurance Association by William J. Kilberg, Paul Blankenstein, Bradford R. Clark, and Craig A. Berrington; for the American Medical Association et al. by Carter G. Phillips, Mark D. Hopson, and Jack R. Bierig; for the American Tort Reform Association by John G. Kester and John W. Vardaman, Jr.; for the Chamber of Commerce of the United States by Timothy B. Dyk, Stephen A. Bokat, and Robin S. Conrad; for the Pharmaceutical Manufacturers Association by

509 U.S. 579, *; 113 S. Ct. 2786, **;
125 L. Ed. 2d 469, ***; 1993 U.S. LEXIS 4408

Louis R. Cohen and Daniel Marcus; for the Product Liability Advisory Council, Inc., et al. by Victor E. Schwartz, Robert P. Charrow, and Paul F. Rothstein; for the Washington Legal Foundation by Scott G. Campbell, Daniel J. Popeo, and Richard A. Samp; and for Nicolaas Bloembergen et al. by Martin S. Kaufman.

Briefs of amici curiae were filed for the American Association for the Advancement of Science et al. by Richard A. Meserve and Bert Black; for the American College of Legal Medicine by Miles J. Zaremski; for the Carnegie Commission on Science, Technology, and Government by Steven G. Gallagher, Elizabeth H. Esty, and Margaret A. Berger; for the Defense Research Institute, Inc., by Joseph A. Sherman, E. Wayne Taff, and Harvey L. Kaplan; for the New England Journal of Medicine et al. by Michael Malina and Jeffrey I. D. Lewis; for A Group of American Law Professors by Donald N. Bersoff; for Alvan R. Feinstein by Don M. Kennedy, Loretta M. Smith, and Richard A. Oetheimer; and for Kenneth Rothman et al. by Neil B. Cohen.

**JUDGES:** BLACKMUN, J., delivered the opinion for a unanimous Court with respect to Parts I and II-A, and the opinion of the Court with respect to Parts II-B, II-C, III, and IV, in which WHITE, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, post, p. 598.

**OPINION BY:** BLACKMUN

**OPINION**

[*582] [***476] [**2791] JUSTICE BLACKMUN delivered the opinion of the Court.

[***LEdHR1A] [1A]In this case we are called upon to determine the standard for admitting expert scientific testimony in a federal trial.

I

Petitioners Jason Daubert and Eric Schuller are minor children born with serious birth defects. They and

their parents sued respondent in California state court, alleging that the birth defects had been caused by the mothers' ingestion of Bendectin, a prescription antinausea drug marketed by respondent. Respondent removed the suits to federal court on diversity grounds.

After extensive discovery, respondent moved for summary judgment, contending that Bendectin does not cause birth defects in humans and that petitioners would be unable to come forward with any admissible evidence that it does. In support of its motion, respondent submitted an affidavit of Steven H. Lamm, physician and epidemiologist, who is a well-credentialed expert on the risks from exposure to various chemical substances. [1] Doctor Lamm stated that he had reviewed all the literature on Bendectin and human birth defects -- more than 30 published studies involving over 130,000 patients. No study had found Bendectin to be a human teratogen (i.e., a substance capable of causing malformations in fetuses). On the basis of this review, Doctor Lamm concluded that maternal use of Bendectin during the first trimester of pregnancy has not been shown to be a risk factor for human birth defects.

1    Doctor Lamm received his master's and doctor of medicine degrees from the University of Southern California. He has served as a consultant in birth-defect epidemiology for the National Center for Health Statistics and has published numerous articles on the magnitude of risk from exposure to various chemical and biological substances. App. 34-44.

[*583] Petitioners did not (and do not) contest this characterization of the published record regarding Bendectin. Instead, they responded to respondent's motion with the testimony of eight experts of their own, each of whom also possessed impressive credentials. [2] These experts had concluded that Bendectin can cause birth defects. Their conclusions were based upon "in vitro" (test tube) and "in vivo" (live) animal studies that [***477] found a link between Bendectin and malformations; pharmacological studies of the chemical structure of Bendectin that purported to show similarities between the structure of the drug and that of other substances known to cause birth defects; and the "reanalysis" of previously [**2792] published epidemiological (human statistical) studies.

2    For example, Shanna Helen Swan, who received a master's degree in biostatistics from

Columbia University and a doctorate in statistics from the University of California at Berkeley, is chief of the section of the California Department of Health and Services that determines causes of birth defects and has served as a consultant to the World Health Organization, the Food and Drug Administration, and the National Institutes of Health. *Id., at 113-114, 131-132*. Stuart A. Newman, who received his bachelor's degree in chemistry from Columbia University and his master's and doctorate in chemistry from the University of Chicago, is a professor at New York Medical College and has spent over a decade studying the effect of chemicals on limb development. *Id., at 54-56*. The credentials of the others are similarly impressive. See *id., at 61-66, 73-80, 148-153, 187-192*, and Attachments 12, 20, 21, 26, 31, and 32 to Petitioners' Opposition to Summary Judgment in No. 84-2013-G(I) (SD Cal.).

The District Court granted respondent's motion for summary judgment. The court stated that scientific evidence is admissible only if the principle upon which it is based is "'sufficiently established to have general acceptance in the field to which it belongs.'" *727 F. Supp. 570, 572 (SD Cal. 1989)*, quoting *United States v. Kilgus, 571 F.2d 508, 510 (CA9 1978)*. The court concluded that petitioners' evidence did not meet this standard. Given the vast body of epidemiological data concerning Bendectin, the court held, expert opinion which is not based on epidemiological evidence [*584] is not admissible to establish causation. *727 F. Supp. at 575*. Thus, the animal-cell studies, live-animal studies, and chemical-structure analyses on which petitioners had relied could not raise by themselves a reasonably disputable jury issue regarding causation. *Ibid*. Petitioners' epidemiological analyses, based as they were on recalculations of data in previously published studies that had found no causal link between the drug and birth defects, were ruled to be inadmissible because they had not been published or subjected to peer review. *Ibid*.

The United States Court of Appeals for the Ninth Circuit affirmed. *951 F.2d 1128 (1991)*. Citing *Frye v. United States, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923)*, the court stated that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community. *951 F.2d at 1129-1130*. The court

declared that expert opinion based on a methodology that diverges "significantly from the procedures accepted by recognized authorities in the field . . . cannot be shown to be 'generally accepted as a reliable technique.'" *Id., at 1130*, quoting *United States v. Solomon, 753 F.2d 1522, 1526 (CA9 1985)*.

The court emphasized that other Courts of Appeals considering the risks of Bendectin had refused to admit reanalyses of epidemiological studies that had been neither published nor subjected to peer review. *951 F.2d at 1130-1131*. Those courts had found unpublished reanalyses "particularly problematic in light of the massive weight of the original published studies supporting [respondent's] position, all of which had undergone full scrutiny from the scientific community." *Id., at 1130*. Contending that reanalysis is generally accepted by the scientific community only when it is subjected to verification and scrutiny by others in the field, the Court of Appeals rejected petitioners' reanalyses as "unpublished, not subjected to the normal peer review process and generated solely for use in litigation." *Id., at 1131*. The [*585] court concluded that petitioners' evidence provided an insufficient foundation to allow admission of expert testimony that Bendectin caused their injuries and, accordingly, that petitioners could not satisfy their burden of proving causation at trial.

We granted certiorari, *506 U.S. 914* [***478] *(1992)*, in light of sharp divisions among the courts regarding the proper standard for the admission of expert testimony. Compare, *e.g.*, *United States v. Shorter, 257 U.S. App. D.C. 358, 363-364, 809 F.2d 54, 59-60* (applying the "general acceptance" standard), cert. denied, *484 U.S. 817, 98 L. Ed. 2d 35, 108 S. Ct. 71 (1987)*, with *DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 955 (CA3 1990)* (rejecting the "general acceptance" standard).

## II

### A

In the 70 years since its formulation in the *Frye* case, the "general acceptance" test has been the dominant standard for determining the admissibility of novel scientific evidence at trial. See E. Green & C. Nesson, Problems, Cases, and Materials on Evidence 649 (1983). Although under increasing attack of late, the rule continues to be followed by a [**2793] majority of courts, including the Ninth Circuit. [3]

3   For a catalog of the many cases on either side of this controversy, see P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 1-5, pp. 10-14 (1986 and Supp. 1991).

The *Frye* test has its origin in a short and citation-free 1923 decision concerning the admissibility of evidence derived from a systolic blood pressure deception test, a crude precursor to the polygraph machine. In what has become a famous (perhaps infamous) passage, the then Court of Appeals for the District of Columbia described the device and its operation and declared:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages [*586] is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*" *54 App. D.C. at 47, 293 F. at 1014* (emphasis added).

Because the deception test had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made," evidence of its results was ruled inadmissible. *Ibid.*

[***LEdHR1A] [1B]The merits of the *Frye* test have been much debated, and scholarship on its proper scope and application is legion. 4 [*587] Petitioners' primary [***479] attack, however, is not on the content but on the continuing authority of the rule. They contend that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence. 5 We agree.

4    See, *e.g.*, Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of *Agent Orange* and Bendectin Litigation, *86 Nw. U. L. Rev. 643 (1992)* (hereinafter Green); Becker & Orenstein,

The Federal Rules of Evidence After Sixteen Years -- The Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of Evidence, and Suggestions for Selective Revision of the Rules, *60 Geo. Wash. L. Rev. 857, 876-885 (1992)*; Hanson, James Alphonzo Frye is Sixty-Five Years Old; Should He Retire?, 16 West. St. U. L. Rev. 357 (1989); Black, A Unified Theory of Scientific Evidence, *56 Ford. L. Rev. 595 (1988)*; Imwinkelried, The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony, *67 N. C. L. Rev. 1 (1988)*; Proposals for a Model Rule on the Admissibility of Scientific Evidence, 26 Jurimetrics J. 235 (1986); Giannelli, The Admissibility of Novel Scientific Evidence: *Frye* v. *United States*, a Half-Century Later, 80 Colum. L. Rev. 1197 (1980); The Supreme Court, 1986 Term, *101 Harv. L. Rev. 7, 119, 125-127 (1987).*

Indeed, the debates over *Frye* are such a well-established part of the academic landscape that a distinct term -- "*Frye*-ologist" -- has been advanced to describe those who take part. See Behringer, Introduction, Proposals for a Model Rule on the Admissibility of Scientific Evidence, 26 Jurimetrics J. 237, 239 (1986), quoting Lacey, Scientific Evidence, 24 Jurimetrics J. 254, 264 (1984).

5   Like the question of *Frye*'s merit, the dispute over its survival has divided courts and commentators. Compare, *e.g., United States v. Williams, 583 F.2d 1194 (CA2 1978)* (*Frye* is superseded by the Rules of Evidence), cert. denied, *439 U.S. 1117, 59 L. Ed. 2d 77, 99 S. Ct. 1025 (1979)*, with *Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1111, 1115-1116 (CA5 1991)* (en banc) (*Frye* and the Rules coexist), cert. denied, *503 U.S. 912, 117 L. Ed. 2d 506, 112 S. Ct. 1280 (1992)*, 3 J. Weinstein & M. Berger, Weinstein's Evidence P702[03], pp. 702-36 to 702-37 (1988) (hereinafter Weinstein & Berger) (*Frye* is dead), and M. Graham, Handbook of Federal Evidence § 703.2 (3d ed. 1991) (*Frye* lives). See generally P. Giannelli & E. Imwinkelried, Scientific Evidence § 1-5, at 28-29 (citing authorities).

[***LEdHR2] [2]We [HN1] interpret the legislatively enacted Federal Rules of Evidence as we would any statute. *Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 163, 102 L. Ed. 2d 445, 109 S. Ct. 439 (1988).* Rule 402 provides the baseline:

> [HN2] "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, [**2794] by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

[HN3] "Relevant evidence" is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Rule 401.* The Rules' basic standard of relevance thus is a liberal one.

*Frye,* of course, predated the Rules by half a century. In *United States v. Abel, 469 U.S. 45, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984),* we considered the pertinence of background common law in interpreting the Rules of Evidence. We noted that the Rules occupy the field, *id., at 49,* but, quoting Professor Cleary, the Reporter, [*588] explained that the common law nevertheless could serve as an aid to their application:

> "'In principle, under the Federal Rules no common law of evidence remains. "All relevant evidence is admissible, except as otherwise provided . . . ." In reality, of course, the body of common law knowledge continues to exist, though in the somewhat altered form of a source of guidance in the exercise of delegated powers.'" *Id., at 51-52.*

We found the common-law precept at issue in the *Abel* case entirely consistent with *Rule 402's* general requirement of admissibility, and considered it unlikely that the drafters had intended to change the rule. *Id., at 50-51.* In *Bourjaily v. United States, 483 U.S. 171, 97 L. Ed. 2d 144, 107 S.* [***480] *Ct. 2775 (1987),* on the other hand, the Court was unable to find a particular common-law doctrine in the Rules, and so held it superseded.

[***LEdHR1A] [1C] Here there is a specific Rule that speaks to the contested issue. *Rule 702,* governing expert testimony, provides:

> [HN4] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[HN5] Nothing in the text of this Rule establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that *Rule 702* or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye,* and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Beech Aircraft Corp. v. Rainey, 488 U.S. at 169* (citing Rules 701 to 705). See also Weinstein, *Rule 702 of the Federal Rules of Evidence* is [*589] Sound; *It Should Not Be Amended, 138 F.R.D. 631 (1991)* ("The Rules were designed to depend primarily upon lawyer-adversaries and sensible triers of fact to evaluate conflicts"). Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "general acceptance," the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials. [6]

[***LEdHR1A] [1D]

> 6    Because we hold that *Frye* has been superseded and base the discussion that follows on the content of the congressionally enacted Federal Rules of Evidence, we do not address petitioners' argument that application of the *Frye* rule in this diversity case, as the application of a judgemade rule affecting substantive rights, would violate the doctrine of *Erie R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938).*

B

[***LEdHR3A] [3A]That the *Frye* test was displaced by the Rules of Evidence does not mean, [**2795] however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. [7] Nor is the trial judge disabled from screening such evidence. To the contrary, [HN6] under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

7   THE CHIEF JUSTICE "do[es] not doubt that *Rule 702* confides to the judge some gatekeeping responsibility," *post*, at 600, but would neither say how it does so nor explain what that role entails. We believe the better course is to note the nature and source of the duty.

The primary locus of this obligation is *Rule 702*, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto*." (Emphasis added.) The subject of an expert's testimony must [*590] be "scientific . . . [***481] knowledge." [8] The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. See, *e.g.*, Brief for Nicolaas Bloembergen et al. as *Amici Curiae* 9 ("Indeed, scientists do not assert that they know what is immutably 'true' -- they are committed to searching for new, temporary, theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7-8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- *i.e.*, "good grounds," based on what is known. In short, [HN7] the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. [9]

8   *Rule 702* also applies to "technical, or other specialized knowledge." Our discussion is limited to the scientific context because that is the nature of the expertise offered here.

[***LEdHR3A] [3B]

9   We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?). See Black, *56 Ford. L. Rev., at 599*. Although "the difference between accuracy, validity, and reliability may be such that each is distinct from the other by no more than a hen's kick," Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend *Federal Evidence Rule 702*, 26 Jurimetrics J. 249, 256 (1986), our reference here is to *evidentiary* reliability -- that is, trustworthiness. Cf., *e.g.*, Advisory Committee's Notes on *Fed. Rule Evid. 602*, 28 U.S.C. App., p. 755 (""The rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact' is a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information'" (citation omitted)); Advisory Committee's Notes on Art. VIII of Rules of Evidence, 28 U.S.C. App., p. 770 (hearsay exceptions will be recognized only "under circumstances supposed to furnish guarantees of trustworthiness"). In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*.

[*591]   [***LEdHR4A] [4A]*Rule 702* further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger P702[02], p. 702-18. See also *United States v.*

*Downing, 753 F.2d 1224, 1242 (CA3 1985)* ("An additional consideration [**2796] under *Rule 702* -- and another aspect of relevancy -- is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit." *Ibid.* "Fit" is not always obvious, [***482] and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. See Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend *Federal Evidence Rule 702*, 26 Jurimetrics J. 249, 258 (1986). The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. *Rule 702*'s "helpfulness" [*592] standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

[***LEdHR5] [5]That these requirements are embodied in *Rule 702* is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See *Rules 702* and *703*. Presumably, this relaxation of the usual requirement of firsthand knowledge -- a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,'" Advisory Committee's Notes on *Fed. Rule Evid. 602*, 28 U.S.C. App., p. 755 (citation omitted) -- is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

C

[***LEdHR6] [6] [***LEdHR7A] [7A] [***LEdHR8A] [8A][HN8] Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to *Rule 104(a)*, 10 whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. 11 This entails a preliminary assessment of whether the reasoning or methodology [*593] underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

[***LEdHR7A] [7B]

10 *Rule 104(a)* provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges." These matters should be established by a preponderance of proof. See *Bourjaily v. United States, 483 U.S. 171, 175-176, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987).*

[***LEdHR8A] [8B]

11 Although the *Frye* decision itself focused exclusively on "novel" scientific techniques, we do not read the requirements of *Rule 702* to apply specially or exclusively to unconventional evidence. Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended. Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under *Federal Rule of Evidence 201*.

[***LEdHR9] [9][HN9] Ordinarily, a key question to be answered in determining whether [***483] a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green 645. See also C. Hempel, Philosophy of

Natural Science 49 (1966) [**2797] ("The statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability") (emphasis deleted).

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, The Fifth Branch: Science Advisors as Policymakers 61-76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical Basis of Peer Review and the Suppression of Innovation, 263 JAMA 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Ziman, Reliable Knowledge: An Exploration [*594] of the Grounds for Belief in Science 130-133 (1978); Relman & Angell, How Good Is Peer Review?, 321 New Eng. J. Med. 827 (1989). The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Additionally, [HN10] in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, see, *e.g., United States v. Smith, 869 F.2d 348, 353-354 (CA7 1989)* (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation, see *United States v. Williams, 583 F.2d 1194, 1198 (CA2 1978)* (noting professional organization's standard governing spectrographic analysis), cert. denied, *439 U.S. 1117, 59 L. Ed. 2d 77, 99 S. Ct. 1025 (1979)*.

Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within

that community." *United States v. Downing, 753 F.2d at 1238.* See also 3 Weinstein & Berger P702[03], pp. 702-41 to 702-42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," *Downing, 753 F.2d at 1238*, may properly be viewed with skepticism.

The inquiry envisioned by *Rule* [***484] *702* is, we emphasize, a flexible one. [12] Its overarching subject is the scientific validity [*595] -- and thus the evidentiary relevance and reliability -- of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

[12]    A number of authorities have presented variations on the reliability approach, each with its own slightly different set of factors. See, *e.g., Downing, 753 F.2d at 1238-1239* (on which our discussion draws in part); 3 Weinstein & Berger P702[03], pp. 702-41 to 702-42 (on which the *Downing* court in turn partially relied); McCormick, Scientific Evidence: Defining a New Approach to Admissibility, 67 Iowa L. Rev. 879, 911-912 (1982); and *Symposium on Science and the Rules of Evidence, 99 F.R.D. 187, 231 (1983)* (statement by Margaret Berger). To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, all these versions may well have merit, although we express no opinion regarding any of their particular details.

[***LEdHR10] [10]Throughout, a judge assessing a proffer of expert scientific testimony under *Rule 702* should also be mindful of other applicable rules. *Rule 703* provides that expert opinions based on otherwise inadmissible [**2798] hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing. Finally, *Rule 403* permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in

evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under *Rule 403* of the present rules exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632.

### III

[***LEdHR11] [11] We conclude by briefly addressing what appear to be two underlying concerns of the parties and *amici* in this case. Respondent expresses apprehension that abandonment of "general acceptance" as the exclusive requirement for admission will result in a "free-for-all" in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions. [*596] In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. [HN11] Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. See *Rock v. Arkansas, 483 U.S. 44, 61, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987)*. Additionally, [HN12] in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, *Fed. Rule Civ. Proc. 50(a)*, and likewise to grant summary judgment, *Fed. Rule Civ. Proc. 56*. Cf., *e.g.*, *Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349* (CA6) (holding that scientific evidence that provided foundation for expert testimony, viewed in the light most favorable to plaintiffs, was not sufficient to allow a jury to find it more probable than not that defendant [***485] caused plaintiff's injury), cert. denied, *506 U.S. 826, 121 L. Ed. 2d 47, 113 S. Ct. 84 (1992)*; *Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307 (CA5 1989)* (reversing judgment entered on jury verdict for plaintiffs because evidence regarding causation was insufficient), modified, *884 F.2d 166 (CA5 1989)*, cert. denied, *494 U.S. 1046 (1990)*; Green 680-681. These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of *Rule 702*.

Petitioners and, to a greater extent, their *amici* exhibit a different concern. They suggest that recognition of a screening role for the judge that allows for the exclusion of "invalid" evidence will sanction a stifling

and repressive scientific orthodoxy and will be inimical to the search for truth. See, *e.g.*, Brief for Ronald Bayer et al. as *Amici Curiae*. It is true that open debate is an essential part of both legal and scientific analyses. Yet there are important differences between the quest for truth in the courtroom and the quest [*597] for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment -- often of great consequence -- about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic [**2799] insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes. [13]

13   This is not to say that judicial interpretation, as opposed to adjudicative factfinding, does not share basic characteristics of the scientific endeavor: "The work of a judge is in one sense enduring and in another ephemeral. . . . In the endless process of testing and retesting, there is a constant rejection of the dross and a constant retention of whatever is pure and sound and fine." B. Cardozo, The Nature of the Judicial Process 178-179 (1921).

### IV

[***LEdHR1A] [1E] [***LEdHR3A] [3C] [***LEdHR4A] [4B]To summarize: [HN13] "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence -- especially *Rule 702* -- do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

[***LEdHR12] [12]The inquiries of the District Court and the Court of Appeals focused almost exclusively on "general acceptance," as gauged by

publication and the decisions of other courts. Accordingly, [*598] the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**CONCUR BY:** REHNQUIST (In Part)

**DISSENT BY:** REHNQUIST (In Part)

**DISSENT**

[***486] CHIEF JUSTICE REHNQUIST, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

The petition for certiorari in this case presents two questions: first, whether the rule of *Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923)*, remains good law after the enactment of the Federal Rules of Evidence; and second, if *Frye* remains valid, whether it requires expert scientific testimony to have been subjected to a peer review process in order to be admissible. The Court concludes, correctly in my view, that the *Frye* rule did not survive the enactment of the Federal Rules of Evidence, and I therefore join Parts I and II-A of its opinion. The second question presented in the petition for certiorari necessarily is mooted by this holding, but the Court nonetheless proceeds to construe *Rules 702* and *703* very much in the abstract, and then offers some "general observations." *Ante*, at 593.

"General observations" by this Court customarily carry great weight with lower federal courts, but the ones offered here suffer from the flaw common to most such observations -- they are not applied to deciding whether particular testimony was or was not admissible, and therefore they tend to be not only general, but vague and abstract. This is particularly unfortunate in a case such as this, where the ultimate legal question depends on an appreciation of one or more bodies of knowledge not judicially noticeable, and subject to different interpretations in the briefs of the parties and their *amici*. Twenty-two *amicus* briefs have been filed in the case, and indeed the Court's opinion contains no fewer than 37 citations to *amicus* briefs and other secondary sources.

[*599] The various briefs filed in this case are markedly different from typical briefs, in that large parts of them do not deal with decided cases or statutory

language -- the sort of material we customarily interpret. Instead, they deal with definitions of scientific knowledge, scientific method, scientific validity, and peer review -- in short, matters far afield from the expertise of judges. This is not to say that such materials are not useful or even necessary in deciding how *Rule 702* should be applied; but it is to say that the unusual subject matter should cause us to proceed with great caution in deciding more than we have to, because our reach can so easily exceed our grasp.

But even if it were desirable to make "general observations" not necessary to decide [**2800] the questions presented, I cannot subscribe to some of the observations made by the Court. In Part II-B, the Court concludes that reliability and relevancy are the touchstones of the admissibility of expert testimony. *Ante*, at 590-592. *Federal Rule of Evidence 402* provides, as the Court points out, that "evidence which is not relevant is not admissible." But there is no similar reference in the Rule to "reliability." The Court constructs its argument by parsing the language "if scientific, technical, or other specialized [***487] knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, . . . an expert . . . may testify thereto . . . ." *Fed. Rule Evid. 702*. It stresses that the subject of the expert's testimony must be "scientific . . . knowledge," and points out that "scientific" "implies a grounding in the methods and procedures of science" and that the word "knowledge" "connotes more than subjective belief or unsupported speculation." *Ante*, at 590. From this it concludes that "scientific knowledge" must be "derived by the scientific method." *Ibid.* Proposed testimony, we are told, must be supported by "appropriate validation." *Ibid.* Indeed, in footnote 9, the Court decides that "in a case involving scientific evidence, *evidentiary* [*600] *reliability* will be based upon *scientific validity." Ante*, at 591, n. 9 (emphasis in original).

Questions arise simply from reading this part of the Court's opinion, and countless more questions will surely arise when hundreds of district judges try to apply its teaching to particular offers of expert testimony. Does all of this *dicta* apply to an expert seeking to testify on the basis of "technical or other specialized knowledge" -- the other types of expert knowledge to which *Rule 702* applies -- or are the "general observations" limited only to "scientific knowledge"? What is the difference between scientific knowledge and technical knowledge;

does *Rule 702* actually contemplate that the phrase "scientific, technical, or other specialized knowledge" be broken down into numerous subspecies of expertise, or did its authors simply pick general descriptive language covering the sort of expert testimony which courts have customarily received? The Court speaks of its confidence that federal judges can make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Ante*, at 592-593. The Court then states that a "key question" to be answered in deciding whether something is "scientific knowledge" "will be whether it can be (and has been) tested." *Ante*, at 593. Following this sentence are three quotations from treatises, which not only speak of empirical testing, but one of which states that the "'criterion of the scientific status of a theory is its falsifiability, or refutability, or testability.'" *Ibid.*

I defer to no one in my confidence in federal judges; but I am at a loss to know what is meant when it is said that the scientific status of a theory depends on its "falsifiability," and I suspect some of them will be, too.

I do not doubt that *Rule 702* confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think [*601] it imposes on them either the obligation or the authority to become amateur scientists in order to perform that role. I think the Court would be far better advised in this case to decide only the questions presented, and to leave the further development of this important area of the law to future cases.

**REFERENCES**

32B Am Jur 2d, Federal Rules of Evidence 435

12 Federal Procedure, L Ed, Evidence 33:131; 33 Federal Procedure, L Ed, Witnesses 80: 133

2 Am Jur Trials 585, Selecting and Preparing Expert Witness; 3 Am Jur Trials 427, Preparing and Using Experimental Evidence

28 USCS Appx, *Federal Rules of Evidence, Rule 702*

Am Law Prod Liab 3d 54:70, 54:71, 89:38

Ausman & Snyder's Medical Library, L Ed, Pediatrics 5:102

L Ed Digest, Evidence 641

L Ed Index, Experiments or Tests; Expert and Opinion Evidence; Rules of Evidence

ALR Index, Evidence Rules; Experiments and Tests; Expert and Opinion Evidence; Frye Test; Science and Scientific Matters

Annotation References:

Reliability of scientific technique and its acceptance within scientific community as affecting admissibility, at federal trial, of expert testimony as to result of test or study based on such technique--modern cases. *105 ALR Fed 299.*

When will expert testimony "assist trier of fact" so as to be admissible at federal trial under *Rule 702 of Federal Rules of Evidence. 75 ALR Fed 461.*

*Case Name:*

# Dinney v. Great-West Life Assurance Co.

## George R. Dinney on his own behalf and on behalf of certain former employees of the Great-West Life Assurance Company v. Great-West Life Assurance Company, Trustees, from time to time, of the pension fund established under part A of the Great-West Life Assurance Company system of insurance and pensions for certain employees and agents

**[2009] S.C.C.A. No. 257**

[2009] C.S.C.R. no 257

File No.: 33222

Supreme Court of Canada

Record created: June 19, 2009.
Record updated: December 17, 2009.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR MANITOBA

**Status:**

Application for leave to appeal dismissed with costs (without reasons) December 17, 2009.

**Catchwords:**

 *Pensions -- Whether setting index is an administrative function related to the calculation and payment of pension indexing under the plan -- Whether the sponsor owes beneficiaries a fiduciary duty when performing that function -- Whether sponsor can reserve itself a discretion in relation to the calculation of pension indexing increments that are payable out of pension funds which have been transferred to a group of trustees for administration -- Whether, in a bifurcated trial, it is open to a provincial appeal court to make inconsistent rulings on appeals from the separate components of the trial -- If so, whether procedural fairness requires prior notice to the parties and a five-person panel of the court -- Whether a provincial appeal court can override the parties' agreement regarding the issues to be submitted to the trial court for decision -- Whether misquoting the reasons of the trial judge on a material issue is a reviewable error.*

**Case Summary:**

The Applicant was a beneficiary of a pension plan sponsored, trusteed and administered by the Respondents. In 1990, the plan was amended so that increments were no longer tied to its fund's performance, and, in 1993, the increments

were tied to the Consumer Price Index. The Retirees sued. In the first part of a bifurcated trial, the trial judge held that the Respondents had violated the retirees' vested right that the increments be tied to the investment performance of the fund. An appeal and cross-appeal were both dismissed. In the second part of the trial, the trial judge approved the Respondent's proposed formula for determining the index to be used in calculating increases, but ordered that a previous method be used to calculate the past increments. The Court of Appeal found that he had thereby usurped the sponsor's discretion and allowed the appeal, ordering the sponsor be permitted to calculate the past increments using the proposed formula.

**Counsel:**

Robert L. Tapper (Tapper Cuddy), for the motion.

Cy M. Fien (Fillmore Riley LLP), contra.

---

**Chronology:**

1.    Application for leave to appeal:

> FILED: June 19, 2009. S.C.C. Bulletin, 2009, p. 955.
> SUBMITTED TO THE COURT: November 16, 2009. S.C.C.
> Bulletin, 2009, p. 1597.
> DISMISSED WITH COSTS: December 17, 2009 (without
> reasons). S.C.C. Bulletin, 2009, p. 1748.
> Before: Binnie, Fish and Charron JJ.

**Procedural History:**

Judgment at first instance: Applicant and class had vested
interest in the indexing provisions; method used to
calculate pension increments inappropriate; limitation
period set; applicable law is that of Manitoba;
extra-provincial employees who retired within class
period included in class.
Court of Queen's Bench of Manitoba, Jewers J., November
19, 2002.
Neutral citation: 2002 MBQB 277.

Judgment on appeal: Appeal and cross-appeal dismissed. Manitoba Court of Appeal, Scott C.J.M. and Philp and
Monnin JJ.A., March 23, 2004.
Neutral citation: 2005 MBCA 36.

Judgment at first instance: Methods for calculating past-due
and future annual pension increments set; aggravated,
punitive and exemplary damages and disgorgement of
profits denied.
Court of Queen's Bench of Manitoba, Jewers J., October
26, 2006.
Neutral citation: 2006 MBQB 247.

Judgment at first instance: Rate of prejudgment interest set; costs and disbursements set at $350,000. Court of
Queen's Bench of Manitoba, Jewers J., March 9, 2007.
Neutral citation: 2007 MBQB 76.

Judgment at first instance: Limitation period to run from
September 12, 1990; new formula to apply as of April 1,
2006; negative adjustment not to be carried forward; rate

of investment return set for original formula and new
formula.
Court of Queen's Bench of Manitoba, Jewers J., May 22,
2007.
Neutral citation: 2007 MBQB 120.

      Judgment on appeal: Appeal allowed; cross-appeal dismissed. Court of Appeal of Manitoba, Scott C.J.M. and
Steel and MacInnes JJ.A., April 21, 2009.
 Neutral citation: 2009 MBCA 29; [2009] M.J. No. 116.

e/qlhbb

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 363 of 485
Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

2009 MBCA 29
Manitoba Court of Appeal

Dinney v. Great-West Life Assurance Co.

2009 CarswellMan 149, 2009 MBCA 29, 2009 C.E.B. & P.G.R. 8338, [2009] 8 W.W.R. 30, [2009]
M.J. No. 116, 176 A.C.W.S. (3d) 1162, 236 Man. R. (2d) 299, 448 W.A.C. 299, 74 C.C.P.B. 161

# GEORGE R. DINNEY on his own behalf and ON BEHALF OF CERTAIN FORMER EMPLOYEES OF THE GREAT-WEST LIFE ASSURANCE COMPANY (Plaintiff / Respondent) and THE GREAT-WEST LIFE ASSURANCE COMPANY and THE TRUSTEES, FROM TIME TO TIME, OF THE PENSION FUND ESTABLISHED UNDER PART A OF THE GREAT-WEST LIFE ASSURANCE COMPANY SYSTEM OF INSURANCE AND PENSIONS FOR CERTAIN EMPLOYEES AND AGENTS (Defendants / Appellants)

R.J. Scott C.J.M., F.M. Steel, A.D. MacInnes JJ.A.

Heard: April 23-24, 2008
Judgment: April 21, 2009
Docket: AI 07-30-06764

Proceedings: reversed in part *Dinney v. Great-West Life Assurance Co.* ((2006)), 2006 CarswellMan 376, 56 C.C.P.B. 266, 210 Man. R. (2d) 61, 2006 C.E.B. & P.G.R. 8223, 2006 MBQB 247 ((Man. Q.B.)); affirming *Dinney v. Great-West Life Assurance Co.* (2007), 2007 MBQB 120, 2007 CarswellMan 413, 217 Man. R. (2d) 46, 64 C.C.P.B. 104, Jewers J. (Man. Q.B.); and reversing *Dinney v. Great-West Life Assurance Co.* (2006), 56 C.C.P.B. 266, 210 Man. R. (2d) 61, 2006 C.E.B. & P.G.R. 8223, 2006 CarswellMan 376, 2006 MBQB 247, Jewers J. (Man. Q.B.)

Counsel: C.M. Fien, E.B. Eva, D.A. Simpson for Appellants
R.L. Tapper, Q.C., R.M. Swystun for Respondent

Subject: Corporate and Commercial; Civil Practice and Procedure; Contracts

Table of Authorities

Cases considered by *A.D. MacInnes J.A.*:

*Armitage v. Staveley Industries Plc* (July 1, 2005), Arden L.J., Keene L.J., Sir Andrew Morritt V.C. (Eng. C.A.) — considered

*Bank of New Zealand v. Bank of New Zealand Officers Provident Assoc.* (2003), [2003] UKPC 58 (New Zealand P.C.) — considered

*Bell Mobility Inc. v. MTS Allstream Inc.* (2009), 2009 MBCA 28, 2009 CarswellMan 80 (Man. C.A.) — considered

*Courage Group's Pension Schemes, Re* (1986), [1987] 1 W.L.R. 495, [1987] 1 All E.R. 528 (Eng. Ch. Div.) — considered

*Dinney v. Great-West Life Assurance Co.* (2000), 152 Man. R. (2d) 88, [2001] 3 W.W.R. 339, 2000 CarswellMan 631, 2000 MBQB 209, 6 C.C.E.L. (3d) 306, 25 C.C.P.B. 245 (Man. Q.B.) — referred to

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 364 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

*Dinney v. Great-West Life Assurance Co.* (2005), 2005 C.E.B. & P.G.R. 8144, 252 D.L.R. (4th) 660, 192 Man. R. (2d) 229, 340 W.A.C. 229, [2005] 10 W.W.R. 401, 2005 MBCA 36, 2005 CarswellMan 78, 16 E.T.R. (3d) 206, 45 C.C.P.B. 222 (Man. C.A.) — referred to

*Edge v. Pensions Ombudsman* (1997), [1998] Ch. 512, [1998] 3 W.L.R. 466, [1998] 2 All E.R. 547 (Eng. Ch. Div.) — considered

*Edge v. Pensions Ombudsman* (1999), [2000] 3 W.L.R. 79, [1999] 4 All E.R. 546, [2000] I.C.R. 748, [2000] Ch. 602 (Eng. C.A.) — referred to

*Fidler v. Sun Life Assurance Co. of Canada* (2006), 2006 SCC 30, 2006 CarswellBC 1596, 2006 CarswellBC 1597, *(sub nom. Sun Life Assurance Co. of Canada v. Fidler)* [2006] I.L.R. 1-4521, [2006] 2 S.C.R. 3, 350 N.R. 40, 227 B.C.A.C. 39, 374 W.A.C. 39, 39 C.C.L.I. (4th) 1, *(sub nom. Sun Life Assurance Company of Canada v. Fidler)* 2007 C.L.L.C. 210-015, [2006] 8 W.W.R. 1, 2006 C.E.B. & P.G.R. 8202, 57 B.C.L.R. (4th) 1, 53 C.C.E.L. (3d) 1, *(sub nom. Sun Life Assurance Co. of Canada v. Fidler)* 271 D.L.R. (4th) 1, [2006] R.R.A. 525 (S.C.C.) — considered

*Firestone Tire and Rubber Co. v. Bruch* (1989), 489 U.S. 101 (U.S. Sup. Ct.) — considered

*Huang v. Telus Corp. Pension Plan (Trustees of)* (2005), 2005 CarswellAlta 93, 41 Alta. L.R. (4th) 107, *(sub nom. Huang v. Drinkwater)* 372 A.R. 336, [2005] 9 W.W.R. 51, 2005 ABQB 40, 44 C.C.P.B. 100, 13 E.T.R. (3d) 233, 2005 C.E.B. & P.G.R. 8147 (Alta. Q.B.) — considered

*Hurd v. Illinois Bell Telephone Co.* (1955), 136 F. Supp. 125, 37 L.R.R.M. 2143 (U.S. Dist. Ct. N.D. Ill.) — considered

*Locker's Settlement Trusts, Re* (1978), [1978] 1 All E.R. 216 (Eng. Ch. Div.) — considered

*MacDougall v. MacDougall* (2005), 2005 CarswellOnt 7257, 205 O.A.C. 216, 262 D.L.R. (4th) 120 (Ont. C.A.) — considered

*National Grid Co. Plc v. Mayes* (2001), [2001] UKHL 20, [2001] 2 All E.R. 417 (U.K. H.L.) — considered

*Neville v. U.A., Local 170 Pension Plan (Trustees of)* (2005), *(sub nom. Neville v. Wynne)* 2005 C.E.B. & P.G.R. 8143, 46 C.C.P.B. 80, 2005 CarswellBC 753, 2005 BCSC 483, 16 E.T.R. (3d) 307 (B.C. S.C.) — referred to

*Neville v. U.A., Local 170 Pension Plan (Trustees of)* (2006), 2006 CarswellBC 2604, 2006 BCCA 460, 27 E.T.R. (3d) 1, 57 B.C.L.R. (4th) 199, 55 C.C.P.B. 157, *(sub nom. Neville v. Wynne)* 231 B.C.A.C. 121, *(sub nom. Neville v. Wynne)* 381 W.A.C. 121 (B.C. C.A.) — considered

*Prairie Petroleum Products Ltd. v. Husky Oil Ltd.* (2008), 2008 MBCA 87, [2008] 9 W.W.R. 249, 2008 CarswellMan 358, 46 B.L.R. (4th) 174, 295 D.L.R. (4th) 146, 231 Man. R. (2d) 1, 437 W.A.C. 1 (Man. C.A.) — considered

*Stevens v. Bell* (May 20, 2002), Arden L.J., Auld L.J., Waller L.J. (Eng. C.A.) — considered

**Statutes considered:**

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
       Generally — referred to

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 365 of 485
Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

*Limitation of Actions Act*, R.S.M. 1987, c. L150
Generally — referred to

APPEAL by defendants and CROSS-APPEAL by plaintiffs from judgments reported at *Dinney v. Great-West Life Assurance Co.* (2007), 2007 MBQB 120, 2007 CarswellMan 413, 217 Man. R. (2d) 46, 64 C.C.P.B. 104 (Man. Q.B.) and *Dinney v. Great-West Life Assurance Co.* (2006), 56 C.C.P.B. 266, 210 Man. R. (2d) 61, 2006 C.E.B. & P.G.R. 8223, 2006 CarswellMan 376, 2006 MBQB 247 (Man. Q.B.), regarding remedy for breach of pension plan.

**A.D. MacInnes J.A.:**

1    George R. Dinney, on his own behalf and on behalf of others, all former employees of the defendant The Great-West Life Assurance Company (GWL) who retired between January 1, 1982, and October 22, 1990 (collectively the plaintiff), sued GWL and the Trustees from time to time of the pension fund (the Trustees) (collectively the defendants) in respect of their entitlement to annual increments to their pensions under The Great-West Life Assurance Company Canadian Employees' Pension Plan (the plan).

2    There was an initial trial of issues which proceeded in October 2000, resulting in reasons for judgment delivered November 30, 2000 (the first trial), and a formal judgment therefrom entered September 10, 2003 (the first judgment). An appeal and cross-appeal of the first judgment was made to this court, which issued reasons for judgment on March 23, 2005, dismissing both.

3    A second trial was heard in June 2006, leading to reasons for judgment on October 26, 2006. There were two subsequent motions arising from the reasons for judgment which were heard and decided in early 2007 (all three called the second trial). The formal judgment in respect of the second trial was filed August 15, 2007 (the second judgment). The defendants appeal and the plaintiff cross-appeals the second judgment.

**Background**

4    GWL established the plan sometime prior to 1943. The plan has been amended many times since. The plan is a defined benefit plan which guarantees a specific or defined benefit upon retirement.

5    Initially, GWL administered the plan, including the plan assets, but as of July 1, 1971, a trust deed was entered into between GWL and certain named trustees whereby the plan assets previously administered by GWL were transferred to The Great-West Life Assurance Company Canadian Employees' Pension Fund (the fund), a trust to be administered by the Trustees. Essentially, this arrangement has continued to the present.

6    In April 1973, GWL passed a resolution effective January 1, 1972, which amended the rules of the plan in several significant ways. These changes occurred following an internal study which highlighted among other things the desirability of increasing the plan benefits following retirement to take into account the "complex situation that faces us today," including the rising impact of inflation on the pension benefits of retirees.

7    Two provisions of the amended plan are of particular importance to this litigation, namely, s. 29, which concerns amendments to the plan, and s. 30, which made provision for the newly created pension indexing. The relevant parts of these provisions are as follows:

**Section 29. Amendment or Repeal**

The foregoing rules, regulations and provisions shall be subject always to such repeal, amendment or substitution, including but without limiting the generality of the foregoing discontinuance under this Part of the granting or receiving of further contributions or other payments, all as the Board of Directors of the Company may from time to time determine, but such repeal, amendment or substitution shall not reduce any benefits accrued to the credit of an employee to the date of such repeal, amendment, substitution or discontinuance.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 366 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

**Section 30. Pension Indexing**

Subsequent to the date at which annuity payments commence, increments in such payments in the form of annuity elected will be granted not more frequently than annually. For payments which commenced prior to January 1, 1973, the aforesaid increments will be effective with the first payment in 1973 and every April thereafter. For payments commencing after December 31, 1972 such increments will commence with the first payment received subsequent to the 12th month of retirement and will be effective yearly thereafter.

<u>The amount of the aforesaid increments shall be as the Company may from time to time determine and will be related to the investment performance of the Great-West Life Assurance Company Canadian Employees' Pension Fund.</u>

. . . . .

[emphasis added]

8    In essence, s. 30 entitled retired employees of GWL to receive increases or increments to the defined benefits otherwise payable under the plan, which were to be "related to" the fund's investment performance. In various memoranda and documents contemporaneous with the 1973 amendment to the plan and thereafter, GWL advised staff that the purpose of s. 30 was to create a "contractual form of indexing" which would be "automatic" so as to replace the "previous discretionary increases" which had occurred when GWL in its discretion had "topped up" retirees' pensions on an *ad hoc* basis.

9    During the early years following creation of the fund and the "trusteed" operation, the Trustees themselves determined the amount of the pension increment granted each year based on advice from the plan's actuary. The increments tracked the earnings performance of a substantial portion of the fund invested in what were called Calendar Year Funds (CYFs) (and starting in 1981 the earnings performance of "notional" or "hypothetical" CYFs) less five per cent as advised by the actuary (the actuarial reserve). As well, there were additional modest *ad hoc* "top ups" beyond the investment performance of the fund in 1972, 1975 and 1982 to take account of the significant increase in the cost of living during those years.

10    Until in or about 1983 the amount of the increment generated pursuant to the formula being used pursuant to s. 30 was less than the annual cost of living in the given year. Starting about 1984 and repeating for several years thereafter, an event occurred described as an "inversion," namely, the investment returns in the fund, even after the deduction of the five per cent actuarial reserve, exceeded the cost of living and in some years by a very substantial amount.

11    As a result, in 1985 GWL began to consider whether changes should be made to the plan. In May 1987, the Trustees who had customarily set the rate for pension indexing were advised by GWL that the indexing was being fixed for the 1986 year at four per cent (as opposed to what would have been 6.8 per cent pursuant to the past formula) since the actual investment performance was higher than both the rate of inflation and staff salary increases. Thereafter, GWL, not the Trustees, determined the rate for pension indexing purposes.

12    In October 1990, GWL amended the plan to enable it to exercise complete control respecting calculation of pension indexing. The reference to increments being related to the investment performance of the fund was eliminated.

13    There was a further amendment in 1993 which provided that the maximum allowable pension increment for any year was to be tied to the Consumer Price Index (CPI) for such year. This situation continued through the litigation. In the result, the increments granted since 1990 were significantly less than they would have been if the increments were calculated based upon the past formula tied to the fund's investment performance. It appears that for some of the years since 1990 GWL enjoyed pension contribution holidays by reason of the surplus investment income in the fund.

**Judicial History**

14    In the first trial, the trial judge was asked to decide four issues and determined that:

(1) the indexing provision in the plan created a vested right in favour of former employees;

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 367 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

(2) the indexing was to be related to the investment performance of the fund;

(3) GWL breached its obligations under the provision in that increments were not related to the investment performance; and

(4) the rights of the plaintiff were limited by application of the provisions of *The Limitation of Actions Act*, C.C.S.M., c. L150 (the *Act*), and in particular that its claim could not go back so far as the date GWL breached its obligations under the pension indexing provision (s. 30), but could only go back for six years from September 12, 1996 (the date the plaintiff sued), that is, until September 12, 1990.

15    Pursuant to the first judgment, the court ordered and declared "that, in 1982 and subsequent years, Great-West Life and the Defendant Trustees were obliged, and are now obliged, to grant and calculate pension increments for the Plaintiff ... in a manner that is related to the investment performance of the Great-West Life Employees Pension Plan fund, whether it be by Formula, Modified Formula or otherwise."

16    As I have stated, an appeal and cross-appeal followed, leading to this court's reasons for judgment of March 23, 2005, about which more will be written later in these reasons.

17    The second trial was heard by the same judge who heard and decided the first trial. The second judgment described the purpose of the second trial as being "to determine the appropriate method to be used for the determination of the annual pension increments payable to the Plaintiff and the represented class members ... and to determine the damages, if any, payable to the Plaintiff and the represented class members, ...."

18    In his reasons for judgment following the second trial, the judge decided that GWL was given a very broad discretion to determine the annual increment though it was not wholly unfettered; but must be "'related to' the investment performance of the fund" (MBQB 247, 210 Man.R. (2d) 61 (Man. Q.B.) at para. 9). He heard evidence from GWL's actuarial expert, who testified as to the proposed new formula developed by GWL pursuant to the direction of the court in the first judgment, and which GWL was proposing for use to grant and calculate the plaintiff's pension increments.

19    The trial judge found the new proposal to be consistent with s. 30 and he accepted the new formula for use by GWL for that purpose, but only commencing April 1, 2006. He concluded that the plaintiff was entitled to be reimbursed in accordance with what he called the original formula, without regard to CPI limits, for the period up to and including March 31, 2006. He held that the plaintiff was entitled to be compensated for the increments which should have been received but were not received commencing September 12, 1990, and that the plaintiff was entitled to prejudgment interest. He denied any award to the plaintiff for aggravated, punitive or exemplary damages, and he awarded the plaintiff costs of $350,000, including disbursements, plus applicable taxes for the entirety of the litigation.

20    The present appeal and cross-appeal arise from the second judgment.

21    The issues raised by the parties on this appeal and cross-appeal are as follows:

• By the Defendants on Appeal

(1) Whether the trial judge erred in law and exceeded his jurisdiction by substituting his own decision for GWL's discretionary decision to use the new formula to calculate the increments for the plaintiff for all years, and by ordering instead that GWL shall use the Dinney Formula (described by the trial judge as the original formula) for the period September 12, 1990, to March 31, 2006.

(2) Whether the trial judge erred in law by making a decision as to the method to be used by GWL to calculate increments that was based on an approach not pleaded, argued or otherwise advanced at trial.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 368 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

(3) Whether the trial judge erred in law and exceeded his jurisdiction by considering whether a CPI cap must be applied to the pension increments and by substituting his own decision for GWL's discretionary decision to apply a CPI cap.

(4) In the alternative, if it was open to the trial judge to decide how GWL would have exercised its discretion in 1986, whether he erred by applying the wrong legal principles and by deciding that GWL would have used the Dinney Formula indefinitely.

(5) Whether the trial judge erred in law by failing to find that the plaintiff's claim is statute-barred in respect of the determination of the annual increment granted as of April 1, 1990.

(6) If the court upholds the order that GWL must use the Dinney Formula for any years, whether the trial judge erred in law by failing to order that the "net internal rate of return" on the fund be used and by ordering instead that the gross actual rate be used with a deduction of 0.45 per cent for expenses.

(7) If this court upholds the order that GWL must use the Dinney Formula for any years, whether the trial judge erred by failing to order that GWL may carry forward investment losses and gains.

(8) Whether the trial judge erred in law in his approach to fixing costs and by awarding an excessive quantum of costs.

• By the Plaintiff on Cross-Appeal

(1) Whether the trial judge erred in ruling that the defendants have a broad, or any, discretion under s. 30 of the plan and in ruling that, on and after April 1, 2006, the defendants may utilize their new formula or any other formula consistent with s. 30 of the plan to calculate the annual pension increments payable to the plaintiff.

(2) Whether the trial judge erred in holding that the pension increments calculated under the formula applicable to the period commencing on April 1, 2006, shall be subject to the legitimate CPI requirements actually imposed by Canada Revenue Agency (CRA) and/or in directing that the fiscal requirements of CRA shall in any way impact upon the amount of the increments payable to the plaintiff under the plan.

(3) Whether the trial judge erred in declining to award punitive, aggravated and exemplary damages and a disgorgement of any profits made by GWL to the plaintiff.

## Decision

22    The principal ground upon which the plaintiff advances its cross-appeal is that the trial judge erred in finding that GWL had any discretion under s. 30 of the plan to change the formula for determining the amount of the annual pension increments from that which it had used from inception until the date of the breach.

23    The defendants on the other hand assert that the trial judge was correct in concluding that GWL had a broad discretion to establish and amend the formula and that he was correct in approving the new formula as he did. Their principal ground of appeal, however, is that having so decided and having approved the new formula, the trial judge erred in not then referring the matter back to GWL for the purpose of properly carrying out its discretion under s. 30 pursuant to the approved new formula.

24    I will deal with each of these principal issues, but propose to deal firstly with Issue No. 1 of the plaintiff in its cross-appeal and thereafter with Issue No. 1 of the defendants on their appeal.

### Standard of Review

Case 09-10138-MEW Doc 14394 Filed 09/10/14 Page 369 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

25     The plaintiff asserts that the standard of review in respect of this issue is that of correctness. In support of that proposition, it cites *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120 (Ont. C.A.), wherein the Ontario Court of Appeal commented as to the task of interpreting a contract (at para. 30):

> To begin with, the trial judge must apply the proper principles of contract interpretation, including consideration of the clause in the context of the entirety of the contract. A failure to follow the proper principles, including a failure to apply a fundamental principle of interpretation, would be an error of law attracting review on the standard of correctness.

26     The defendants, however, assert that the standard of review on this issue is that of palpable and overriding error, arguing that the question is not a pure question of law, but one of mixed fact and law. They too refer to *MacDougall* in support. Following immediately upon the quotation relied upon by the plaintiff, the defendants refer to paras. 31 and 32 as follows:

> To the extent that this task of interpretation includes consideration of extrinsic evidence, or a determination of the factual matrix, the trial judge is involved in making a finding of fact, or drawing inferences from a finding of fact. Further, the trial judge's "interpretation of the evidence as a whole" is one involving factual or inferential determinations. .... Such questions of fact are entitled to deference and are not to be overturned except in the case of palpable or overriding error, or its "functional equivalents": "clearly wrong", "unreasonable", and "not reasonably supported by the evidence". See *H.L. v. Canada*, [2005] 1 S.C.R. 401, 251 D.L.R. (4[th]) 604, at para. 110.

> In interpreting the contract, the trial judge also applies the legal principles to the language of the contract in the context of the relevant facts and inferences. This requires the application of law to fact. This has been said to be a question of mixed fact and law. ....

27     This court's most recent pronouncement on standard of review for contractual interpretation is that in *Bell Mobility Inc. v. MTS Allstream Inc.*, 2009 MBCA 28 (Man. C.A.). Within *Bell Mobility Inc.*, the court referred to *Prairie Petroleum Products Ltd. v. Husky Oil Ltd.*, 2008 MBCA 87, 231 Man. R. (2d) 1 (Man. C.A.), wherein Steel J.A. wrote (at para. 36):

> The proper interpretation and application of the principles of contractual interpretation is a question of law. A trial judge's determination of the factual matrix, consideration of extrinsic evidence and consideration of the evidence as a whole is a question of fact. Finally, the application of the legal principles to the language of the contract in the context of the relevant facts, or a question involving an intertwining of fact and law, is a question of mixed fact and law. See **MacDougall v. MacDougall** [citation omitted]; **Kary Investment Corp. v. Tremblay** (2005), 371 A.R. 339, 354 W.A.C. 339, 8 B.L.R. (4[th]) 40, 2005 ABCA 273, and **Hall**, [Geoff R. Hall, *Canadian Contractual Interpretation Law* (Markham: LexisNexis Canada Inc., 2007)] at pp. 106-107. See also, **QK Investments Inc. v. Crocus Investment Fund et al.** (2008), 225 Man.R. (2d) 176, 419 W.A.C. 176, 2008 MBCA 21, at para. 26, and **Barcode Systems Inc. v. Symbol Technologies Canada Inc. et al.** (2008), 225 Man.R. (2d) 312, 419 W.A.C. 312, 2008 MBCA 47, at paras. 1-2.

28     In addition to the case law cited in the above quotation, Steel J.A. also relied upon Geoff R. Hall, *Canadian Contractual Interpretation Law* (Markham: LexisNexis Canada Inc., 2007), in which he writes (at pp. 106-7):

> Until very recently, interpretation of a contract was considered a question of law reviewable by an appellate court on a standard of correctness. However, this approach was based on historical considerations quite divorced from the modern approach to contractual interpretation, in which questions of fact (the factual matrix) play a significant role in all cases. As a result, courts have recently concluded that contractual interpretation involves questions of law, questions of fact, and (most commonly) questions of mixed fact and law. ....

> .... Interpretation involves a complex interplay between the words of a contract and the context in which they arise. Consideration of the context involves questions of fact which require a trial judge to hear evidence, and consideration of the words cannot be cleanly separated from consideration of the context. ....

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 370 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

29      In respect of this issue, the plaintiff argues that the trial judge erred in considering s. 30 in isolation without reference to other provisions of the plan or trust deed, without consideration of extrinsic documentary evidence, of which it gives many examples in its factum, and without consideration of the subsequent conduct of the parties.

30      In my view, the issue raised and argued by the plaintiff is not one which calls for a pure, contractual interpretation, but rather is one which requires a consideration of facts based upon evidence adduced at trial in interpreting the contract to decide the issue.

31      This issue, as argued by the plaintiff, thus raises a question of mixed fact and law. Accordingly, the standard of review is that of palpable and overriding error except if there is an extricable question of law, in which case the standard of review on that question is correctness.

*Arguments*

32      The plaintiff argues that the trial judge erred in law by failing to consider and apply the fundamental rules of contractual interpretation, an error it asserts that is fully reviewable by this court.

33      The plaintiff submits that a proper consideration and application of the rules of contractual interpretation will lead this court to conclude that GWL did not have any discretion in relation to the determination of the annual indexing increments, but rather was contractually bound to grant such increments in accordance with what the trial judge called the "original formula."

34      The errors asserted by the plaintiff consist of:

(1) The trial judge reached his conclusion that GWL had a considerable discretion in relation to the determination of indexing by considering the wording of s. 30 in isolation. The plaintiff says that the trial judge made no mention of having considered any other provisions contained in the rules of the plan or the trust deed.

(2) The trial judge simply reiterated in essence his conclusion as to the discretion of GWL which he reached in the first trial when the issue was not then before him and was clearly *obiter dicta*.

(3) The trial judge made no mention of and gave no consideration to the extrinsic documentary evidence as an interpretation tool in reaching his conclusion that GWL had a considerable discretion in relation to the granting of indexing, but did so only in the context of addressing the question whether the initial indexing formula could be changed.

The plaintiff refers in its factum to many examples of extrinsic evidence in support of its position, which it argues points clearly to the conclusion that the determination of the annual indexing under s. 30 was not one where GWL was to have considerable or any discretion, but rather was to be carried out in a mathematical way as a calculation with the original formula forming an integral part of the plan.

(4) He failed to consider subsequent conduct of the parties or the *contra proferentem* rule as a tool to interpret what the plaintiff asserts was ambiguity in s. 30.

35      Overall, the plaintiff says that the trial judge erred in his interpretation of the language in s. 30. In particular the plaintiff argues that:

(1) the word "determine" found in the second paragraph of s. 30 must be interpreted as meaning "calculate" or "ascertain by calculation" rather than as implying any sort of discretion;

(2) based upon a review of the first paragraph of s. 30, the words "from time to time" in the second paragraph must be interpreted to mean "annually" and in sufficient time for the increments to become effective in April of each year;

(3) the word "may" in the second paragraph must be interpreted not to connote a discretion, but rather to convey the concept that the amount of the increment is not a fixed amount but such as may arise from the calculation done each year; and

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 371 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

(4) the words "will be related to" in the second paragraph of s. 30 are not intended to connote a loose flexible connection, but rather a close harmonic and ultimately formulaic connection.

36    In short, the plaintiff asserts that relying upon the rules of contractual interpretation, the second paragraph of s. 30 can and should be read as follows:

> The amount of the aforesaid increments shall be as the Company may annually ascertain by calculation and will be related to the investment performance of the Great-West Life Assurance Company Canadian Employees' Pension Fund.

This the plaintiff says is the proper interpretation to be placed upon the said paragraph. It deprives GWL of any discretion to change the formula from that which was originally utilized and remains forever by contract the formula which must be used by GWL for the determination or calculation of the annual increment.

37    The defendants acknowledge that the rights of the plaintiff in relation to pension indexing under s. 30 are contractual.

38    They assert that in deciding that GWL has discretion under s. 30, the trial judge correctly identified and applied the relevant principles of contractual interpretation and found s. 30 to be clear and unambiguous. They say the plaintiff's proposed interpretation of s. 30, namely that it confers no discretion and mandates the use of the first formula developed in 1972 forever, does violence to the plain language of the provision and is inconsistent with other provisions of the plan and all of the extrinsic evidence.

39    The defendants argue that the plaintiff's position on this issue is not based on the well established and fundamental principles of contractual interpretation. The golden rule is that the words used by the parties are to be given their plain, ordinary and literal meaning, unless to do so would result in an absurdity. The paramount test of the meaning of words is the intention of the parties, which is to be determined in the operative sense by a reference to the surrounding circumstances when the contract was made. The court should give effect to the reasonable expectations of the parties without reading in windfalls in favour of either of them.

40    The defendants say that extrinsic parol evidence is not admissible if the language in the written contract is clear and unambiguous. Where there is an ambiguity, extrinsic evidence may be admitted to aid in resolving the ambiguity, but the court should not strain to create an ambiguity that does not exist. They argue that if all of the rules of construction fail to enable the court to ascertain the meaning of the contract, only then should the court resort to the *contra proferentem* rule, and that that rule should be applied to resolve an ambiguity, not to create & magnify one, and may only be applied where two or more reasonable interpretations of a provision are possible.

41    As well, while acknowledging that pension plans are governed by ordinary rules of contractual interpretation, the defendants say that much judicial authority has decided that there are some special principles of interpretation that should also be applied. Some of these, they assert, are particularly applicable to the issue here, namely:

(1) The provisions of a pension plan should, wherever possible, be construed to give reasonable and practical effect to the scheme, bearing in mind it has to be operated over a long duration and against a constantly changing commercial background.

(2) The approach to construction should be practical and purposive, not detached and literal. The court should interpret the plan as a whole, giving reasonable, lawful and effective meaning to all manifestations of intention. The court may consider evidence of what the plan sponsor meant by the terms.

(3) The plan is to be construed in light of the surrounding circumstances when the plan was created or when an amendment was adopted, including common practice from time to time in the field of pension schemes generally, based on the evidence of actuaries and textbooks written by practitioners.

(4) If there is a choice of possible constructions, they must be tested against the consequences they produce in practice.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 372 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

(5) Where the plan gives the employer the authority to interpret the plan provisions, the *contra proferentem* rule does not apply and the court is required to adopt the employer's interpretation if reasonable and even if a member proposes another reasonable interpretation. Where it applies, the *contra proferentem* doctrine is a secondary rule of interpretation, or a "last resort" to be invoked when ordinary interpretation guides have been exhausted and two or more reasonable interpretations remain.

42      The defendants assert that in interpreting a contract, the first step is to construe the written terms in the context of the contract as a whole and the surrounding circumstances. They say that the plaintiff does not provide any analysis of the words in s. 30 in the context of the plan as a whole, but rather proceeds to advance an argument based on extrinsic evidence without identifying any specific ambiguity in the provision when read in the context of the plan as a whole.

43      The defendants submit that the words "may" and "from time to time" as they appear in the phrase "may from time to time determine" found in s. 30 have been judicially considered. They say that where a term provides that a person "may" do something, a discretionary power is generally intended. It has also been interpreted to be permissive rather than mandatory.

44      The words "from time to time" have been interpreted as providing temporal flexibility.

45      The defendants argue that the same language used in s. 30 appears in numerous sections of the plan and when considered in the context of other terms of the plan it becomes absolutely clear that the intention was for GWL to have discretion to determine a wide variety of matters, including the indexing amounts from time to time.

46      The defendants assert that the result of applying the plaintiff's interpretation would defeat the intention of GWL and the purpose of the indexing. It would produce the absurd result of providing substantial windfall benefits to the plaintiff at the expense of the other members of the plan.

47      The defendants submit that in this case, the trial judge, after applying the basic principles of contractual interpretation, concluded that there was no ambiguity in the language of s. 30 of the plan. He then went on, they say, to assume an ambiguity and, in so doing, considered extrinsic evidence and the possible application of the *contra proferentem* rule. This did not alter his conclusion, which was to reject the plaintiff's assertion that GWL did not have discretion in respect of s. 30 and that the original formula had to be used throughout and without any ability for GWL to amend it. The defendants assert that the trial judge was correct in so doing.

*Analysis*

48      As I have already stated, the trial judge on the second trial was the same judge as on the first trial. As appears from his reasons for judgment following the first trial, both the plaintiff and the defendants argued the issue of discretion. The issue was not strictly before him on the first trial. Thus, his conclusory findings on the issue of GWL's discretion were *obiter dicta*. Those findings were set out, in part, in his reasons (2000 MBQB 209, 152 Man. R. (2d) 88 (Man. Q.B.) at paras. 25-26, 37):

The first part stipulates that the amount of the increments shall be as the company may from time to time determine. This clearly gives to the company a considerable discretion in making the determination. If the intention had been to require the company to follow a specific formula then no discretion would have been given and the formula would have been enunciated in the provision. This was not the approach taken and, in my view, the intention was to give the company considerable leeway in deciding upon the amount of the annual increment.

But the discretion is not wholly unfettered: it must be "related to" the investment performance of the fund.

The Great-West Life could use any method it wished to determine the amount of the increment whether it be by formula, modified formula or otherwise, so long as they maintained some reasonable material connection between the increments and the investment performance of the fund such that the performance had an effect on the amounts of the increments. It is really not possible to say any more than that. No doubt a logical and easy way to make the connection would be to do what the company had done initially, namely to directly relate the amount of the increment to the investment return of the

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 373 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

fund in the previous year. But the company was and is not restricted to that method and are at liberty to adopt any other method just so long as it maintains some reasonable relationship to the investment performance.

49    On appeal, this court described the comments made by the trial judge in para. 37 as being *obiter dicta*. This court also referred to an ambiguity in the language of s. 30, essentially as to the meaning of the phrase "related to the investment performance of [the fund]," and mentioned the various tools of interpretation available in respect of an ambiguity. It also made clear that the *obiter* language was not binding on the judge who presided at the second trial, but that it was for that judge to make use of such interpretative tools to the extent they might assist in interpreting the second paragraph of s. 30.

50    However, this court clearly did not, nor did it intend to, bind the hands of the judge in the second trial or require that judge to make use of these various interpretative tools. The language and the court's intention clearly was that it was for that judge to interpret s. 30 and to decide the question whether or not a discretion existed, using, if the judge considered it necessary in respect of an ambiguity, the appropriate available tools for interpretation.

51    In his judgment following the second trial, the judge concluded, as he was entitled to do (at para. 9):

I see no reason to depart from the analysis which I made in my original reasons for judgment with respect to clause #30 which was in part as follows: ....

He then quoted paras. 22 to 26 and para. 37 of his original judgment.

52    And he continued in his judgment following the second trial to write (at para. 10):

I might have added that the relevant clause states that the increments "shall be as the company may from time to time determine ..." and that the use of the words "from time to time" import a certain degree of flexibility. ....

53    The trial judge then concluded that the method of indexing could change as time progressed and new conditions dictated and that the formula selected by GWL at the beginning could be changed to another formula if, as and when it thought it appropriate to do so, with nothing in s. 30 precluding that.

54    He disagreed with the plaintiff's suggested interpretation of the meaning of the word "determine" and concluded that he could not accept that GWL intended to so absolutely restrict itself. He asked what if conditions and actuarial advice suggested a different formula was preferable. He said that if GWL's intention had been to restrict itself to the original formula, then surely it would have spelled out that formula in the provision itself. And after assuming a possible ambiguity and considering the argument as to the use of subsequent conduct of GWL to interpret the provision, his conclusion was unchanged.

55    Pension rights are in the nature of contractual rights. Hence, the use of contractual principles and the rules of interpretation of contractual documents are resorted to for the purpose of determining what rights exist under a pension plan. In this case, as in many, a trust deed is involved. Nevertheless, the pension plan document is the paramount or dominant legal document and the trust deed is secondary. As Scott C.J.M. wrote in the appeal to this court following the first judgment (2005 MBCA 36, 192 Man. R. (2d) 229 (Man. C.A.) at para. 48):

Of particular significance, Dean Gillese in the same article ["Pension Plans and The Law of Trusts" (1996) 75 Can. Bar Rev. 221] commented on the relationship between the contractual provisions of the pension plan and an underlying trust agreement or deed which often accompanies (as in this case) such a plan. In her opinion, with which I agree, the pension plan text is the (at p. 236):

... dominant legal document. The trust instrument is secondary; it is merely a tool used to ensure that the promises made in the plan text are kept. The paramountcy of contract law is based on the intention of the parties.

56    In this case, in my view, it is clear from a reading of the plan and the trust deed that the assets of the plan were transferred to the trust and that the Trustees were afforded the power to administer the assets pursuant to the terms of the trust deed. However, GWL retained its authority and discretion under the plan as regards s. 30.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 374 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

57     In addition, while the plaintiff clearly was the beneficiary of vested rights under the plan, which vested rights could not be amended as regards the plaintiff after retirement without the plaintiff's consent, such rights were only those as defined by the plan which created them. Thus, the vested right here was the right to payment of an annual increment to be determined by GWL pursuant to s. 30.

58     A fundamental rule for interpreting contracts is that the contract is to be construed as a whole, and the words of a contract, being the words used by the parties, are to be given their plain, ordinary and literal meaning so as to determine the objective intent of the parties at the time of execution of the contract. Resort is made to the entire document so as to ensure that the interpretation of a particular term is contextual.

59     Extrinsic evidence is not admissible if the language of the written contract is clear and unambiguous. If an ambiguity is found to exist, extrinsic evidence may be admitted and the subsequent conduct of the parties may be referred to as aids in resolving the ambiguity.

60     As a last resort, the *contra proferentem* rule may be resorted to, but only after the ordinary interpretative guides have been exhausted and if there remain two or more reasonable interpretations of the language in question (*Hurd v. Illinois Bell Telephone Co.*, 136 F. Supp. 125 (U.S. Dist. Ct. N.D. Ill. 1955) at 134).

61     In addition to the ordinary rules of contractual interpretation there is indeed judicial authority for the proposition that certain principles of interpretation should also be applied when interpreting pension plans. These include that:

(1) the provisions of a pension plan should wherever possible be construed to give reasonable and practical effect to the scheme, mindful that it will operate over a lengthy period of time and against a constantly changing commercial background;

(2) the approach to construction should be practical and purposive, not detached and literal;

(3) the plan is to be construed in light of the surrounding circumstances when it was created or when an amendment was adopted;

(4) if there is a choice of possible constructions, they must be tested against the consequences they produce in practice; and

(5) a pension scheme should be interpreted as a whole. The meaning of a particular clause should be considered in conjunction with other relevant clauses.

See: *Courage Group's Pension Schemes, Re* (1986), [1987] 1 All E.R. 528 (Eng. Ch. Div.), at 537; *Stevens v. Bell* (Eng. C.A.) at paras. 26-34; *Bank of New Zealand v. Bank of New Zealand Officers Provident Assoc.*, [2003] UKPC 58 (New Zealand P.C.) at para. 19; and *Armitage v. Staveley Industries Plc* (Eng. C.A.) at para. 29.

62     In addition, a court, in interpreting the language of a pension plan, must be mindful that the plan is being operated for the benefit of all retired employees and that an interpretation which would provide a windfall for some might affect the financial interests of others.

63     The law is clear that the sponsor of a pension plan does not stand in a fiduciary relationship to the beneficiaries thereunder and is entitled to consider its own interests in the decision which it makes concerning the management and administration of the plan and pension fund. The sponsor does, however, owe a duty of good faith to the beneficiaries in its management and administration of the plan. See *National Grid Co. Plc v. Mayes*, [2001] UKHL 20, [2001] 2 All E.R. 417 (U.K. H.L.).

64     It is clear from the reasons for judgment that the trial judge concluded that there was no ambiguity in the language of s. 30 relative to the meaning of the words or phrase "may from time to time determine," that they could not and did not bear the meaning argued by the plaintiff and that in light of his conclusion as to their meaning, GWL was given a broad discretion to determine from time to time the amount of the annual increments.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 375 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

65    The plan provides numerous examples of the language found in s. 30 (or very similar language) which the trial judge found created a discretion in GWL. Such language may be found in s. 3 (eligibility); s. 5 (amount and form of basic pension); s. 7 (total disability benefits); s. 8 (death benefit prior to retirement); s. 10A (funding of benefits); s. 11 (optional forms of pension); s. 12 (optional retirement date); s. 13 (benefit on termination of service other than on the normal retirement date of the employee or by disability or death); s. 15 (additional interest); s. 16 (voluntary additional contributions of employees); s. 17 (minimum pension or annuity payment); and s. 29 (amendment or repeal).

66    To accept the plaintiff's argument that "determine" in s. 30 means "ascertain by calculation" and the words "may" and "from time to time" mean "shall" and "annually" would require the court to apply radically different meanings to those words found in s. 30 as compared with the same or very similar wording found in other sections of the plan.

67    What the plaintiff has done here is as was described in *Hurd* (at p. 134):

.... Rather, they have isolated certain words or phrases and assigned to them a precise meaning which was designed to create ambiguity and then resolved the resulting ambiguity in their own favor. Such a course would not lead to a proper interpretation of the contract. ....

68    While it would have been preferable, in my view, if his explanation for the conclusion which he reached was more detailed, it is not error for a trial judge to fail to record in his reasons a consideration of all of the evidence so long as it is apparent from his reasons as a whole that he did consider in its totality the evidence which he was entitled to consider in arriving at his decision.

69    Nor is it error for a trial judge to fail to specifically address in his reasons all of the issues argued by a party where it is clear that he was alive to all of the issues. That was surely the case here, where the trial judge had heard two trials in the litigation and the records from both, as well as the submissions made by very competent counsel, were complete and thorough.

70    I am not persuaded by plaintiff's argument that the trial judge committed palpable and overriding error in his conclusion that GWL had a discretion in respect of the determination of the amount of the annual pension increment.

71    In my view, when one reads s. 30 in the context of the entire contractual document, it is clear that the trial judge was correct in concluding that s. 30 gave GWL a considerable discretion as to the method it would use to determine the amount of the increment so long as that method was related to the investment performance of the fund, and further that GWL was not restricted to any one method or formula, but was at liberty to adopt any other method or formula so long as it maintained some reasonable relationship to the investment performance of the fund.

72    I would therefore dismiss Issue No. 1 of the plaintiff's cross-appeal.


*Standard of Review*

73    The defendants argue that having found that the development of the new formula was a proper exercise of GWL's discretion and was consistent with s. 30 of the plan, the trial judge erred in law by substituting his own discretion for that of GWL and ordering that GWL use what the trial judge described as the original formula to calculate the increments for the period September 12, 1990, to March 31, 2006, rather than referring the matter back to GWL to exercise its discretion to calculate the increments in question pursuant to the new formula.

74    As the defendants assert this to be an error of law and an excess of jurisdiction, they argue that the standard of review is correctness. The plaintiff argues that the standard of review is that of correctness as to the discretion principles, but palpable and overriding error as to assessment of damages by way of the original formula.

75    For purposes of this issue as raised and argued by the defendants, namely that the trial judge erred in law by substituting his discretion for that of GWL, and without regard to the calculation of damages, I agree with the defendants and with what

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

I understand to be the position of the plaintiff on this issue (with the restricted understanding I have expressed) and conclude that the standard of review is that of correctness.

### Arguments

76      The defendants argue that in light of the trial judge's findings that GWL was given considerable discretion under s. 30 as to the formula to be used to determine the annual increments (provided that they be related to the investment performance of the fund) and that the new formula which GWL developed in response to the direction in the first judgment was acceptable, the trial judge ought then to have referred the matter back to GWL for the proper exercise of its discretion in determining the annual increments. Instead, they say, he erred by usurping the discretion given GWL under the plan and by substituting his own discretion, deciding that GWL should determine the increment using what he described as the "original formula."

77      As well, in response to the plaintiff's argument that the trial judge was justified in directing that the original formula be used to calculate the increments for the period in question, the defendants say, firstly, that his decision was based upon a speculative conclusion as to what GWL would have done, secondly, that it directed the use for that purpose of a formula which was not the formula originally used nor a formula which had ever been used, and thirdly, that to refer the matter back to GWL would not have permitted GWL a "do over" or "mulligan" as argued by the plaintiff, but rather would have permitted GWL to exercise its discretion as it should have.

78      The plaintiff argues that the trial judge did not err in law as argued by the defendants.

79      It says that the trial judge did not substitute his own discretion for that of GWL to use and apply the new formula, but merely endorsed and left in place the discretionary decision that GWL had made in 1972 to establish the "original formula" for the calculation of the increments payable to the plaintiff.

80      The plaintiff also argues that pursuant to the issues put before the trial judge at the second trial, one of which was to determine the damages, if any, payable to the plaintiff, the trial judge was obliged to assess damages as he did and on the basis of the evidence before him.

81      The plaintiff says that GWL developed the new formula only a short time before commencement of the second trial and accordingly the trial judge quite properly rejected its use prior to March 31, 2006, and ordered the use of the original formula which the plaintiff asserts GWL in its discretion had chosen to use when s. 30 was originally added to the plan.

82      Lastly, the plaintiff argues that the trial judge was justified in ordering the use of the original formula rather than referring the matter back to GWL for determination of the increment based upon the new formula for to do otherwise would have unfairly permitted GWL a "do over" or "mulligan" in determining the annual increments using the new formula, which would produce a lesser increment than would be payable using the original formula.

### Analysis

83      In the first trial, the judge did not find an absence of discretion on the part of GWL under s. 30 of the plan. He found simply that GWL had exercised its discretion thereunder improperly because the method or formula which it began to use in or about 1986 was not related to the investment performance of the fund as required by s. 30.

84      As I have already stated, in the second trial, the judge found clearly that GWL had the discretion, indeed a considerable discretion, to determine from time to time the amount of the annual increment and to establish the formula which would be utilized for that purpose. He also found that GWL could change the formula and adopt any other method or formula with which to determine the amount of the increment so long as it maintained some reasonable relationship to the investment performance. And he found that the new formula proposed by GWL at the second trial was one which fell within the parameters of s. 30.

85      Courts may have a supervisory role to play in appropriate cases in respect of the exercise of discretion by an employer or trustee under a pension plan or trust deed respecting a pension fund. Indeed, that is what the trial judge in both trials did

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 377 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

here. In trial one, he determined that GWL had exceeded its jurisdiction or authority or erred in the exercise of its discretion by determining increments that were not related to the investment performance of the fund and he directed that GWL proceed to grant and calculate pension increments that were so related.

86    In trial two, he determined that GWL enjoyed a very broad discretion in determining the annual increment, though not a wholly unfettered one in that the increment had to be related to the investment performance of the fund. As well, he accepted the expert actuarial evidence presented by GWL, including the new formula offered for the determination of the annual increment which he approved for use under s. 30.

87    All of the foregoing was of a permitted supervisory nature. However, the trial judge went further and in so doing, in my view, erred. He failed regrettably to follow his own direction, that is, that GWL proceed to grant and calculate the requisite pension increments and instead, as I will explain, usurped GWL's discretion and did so himself.

88    The law is clear that, having fulfilled a supervisory role, he ought then to have referred the matter back to GWL, with whom the discretion reposed, to use the new formula which the court had approved and determine the increment which ought to have been determined originally.

89    It is not for a judge, except in certain limited circumstances, none of which exist here, to effectively intercede in or interfere with the exercise of the discretion given to a party under the constating document in question, which in this case was the plan and in particular s. 30 thereof as regards the determination of the annual increments.

90    *Edge v. Pensions Ombudsman* (1997), [1998] 2 All E.R. 547 (Eng. Ch. Div.), aff'd [1999] 4 All E.R. 546 (Eng. C.A.), was a decision of the Court of Appeal of England and Wales. The circumstances were that a decision had been made by trustees to reduce the surplus in a pension fund in a particular way. A contributor who was about to retire complained. The trustees maintained their decision. The contributor complained to the Pensions Ombudsman, who denied the complaint, deferring to the trustees' decision. Shortly thereafter, a new Ombudsman was appointed and he interfered with the trustees' decision. The trustees appealed to the Chancery Division, which reversed the decision of the Pensions Ombudsman. The matter was then appealed to the Court of Appeal. In his reasons for judgment in the Court of Appeal, Chadwick L.J. made reference to the decision of the trial judge, the Vice-Chancellor, as follows (at p. 559):

.... The trustees are entitled to be partial. They are entitled to exclude some beneficiaries from particular benefits and to prefer others. If what is meant by "undue partiality" is that the trustees have taken into account irrelevant or improper or irrational factors, their exercise of discretion may well be flawed. But it is not flawed simply because someone else, whether or not a judge, regards their partiality as "undue". It is the trustees' discretion that is to be exercised. Except in a case in which the discretion has been surrendered to the court, it is not for the judge to exercise the discretion. The judge may disagree with the manner in which the trustees have exercised their discretion but, unless they can be seen to have taken into account irrelevant, improper or irrational factors, or unless their decision can be said to be one that no reasonable body of trustees properly directing themselves could have reached, the judge cannot interfere. ....

Sir Richard Scott V-C found support for that approach in a well-known passage in the judgment of Salmon L.J. in *Re Londonderry's Settlement, Peat v. Walsh*, [1964] 3 All E.R. 855 at 862, [1965] Ch. 918 at 936:

Whether or not the court, if it knew all the facts known to the trustees, would have acted as they did, again I do not know - nor is it material. The settlement gave the absolute discretion to appoint to the trustees and not to the courts. So long as the trustees exercise this power ... and exercise it bona fide with no improper motive, their exercise of this power cannot be challenged in the courts ...

[emphasis added]

91    As well, in *Neville v. U.A., Local 170 Pension Plan (Trustees of)*, 2006 BCCA 460, 55 C.C.P.B. 157 (B.C. C.A.), the British Columbia Court of Appeal upheld the trial decision of Preston J. (2005 BCSC 483, 46 C.C.P.B. 80 (B.C. S.C.)), where he wrote (at para. 39):

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 378 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

In *Edell v. Sitzer* (2001), 55 O.R. (3d) 198 (Ont. S.C.J.), affirmed (2004), 187 O.A.C. 189 (Ont. C.A.), the Ontario Superior Court of Justice considered the discretionary powers of a trustee to vary the terms of a trust in an estate planning context. The court refused to interfere with the trustee's discretion. At ¶ 159, Cullity J. dealt with the discretionary powers of trustees as follows:

The grounds on which the court will strike down an attempt by a trustee to exercise discretionary powers - even where, as here, the discretion is intended [to] be as unfettered as possible - have been described in different terms over the years. The old approach that limited the court's intervention to cases of "*mala fides*" has been reformulated in the more recent cases in terms of a concept of abuse of discretion that is similar to the criteria applied in other areas of the law concerning the exercise of discretionary powers by administrative bodies and officials - including judges. Non-interference is still the general rule. The court is not to substitute an exercise of its discretion for that of the trustee; ....

92    In *Huang v. Telus Corp. Pension Plan (Trustees of)*, 2005 ABQB 40, 44 C.C.P.B. 100 (Alta. Q.B.), Moreau J. quoted from D.W.M. Waters, *Law of Trusts in Canada*, 2d ed. (Toronto: Carswell, 1984) at 758-59, when she wrote (at para. 90):

D.W.M. Waters commented on the proper role of the Court in supervising the exercise of discretionary powers by trustees at pp. 758-59:

... all trustee discretions involve the question of how far the courts are thereby excluded

... The creator of the trust ... does not intend the courts to make discretionary decisions.

93    And in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (U.S. Sup. Ct. 1989), the United States Supreme Court wrote (at p. 111):

Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers. See Restatement (Second) of Trusts § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion"). See also G. Bogert & G. Bogert, Law of Trusts and Trustees § 560, pp. 193-208 (2d rev. ed. 1980). A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable. *Id.*, § 559, at 169-171. Whether "the exercise of a power is permissive or mandatory depends upon the terms of the trust." 3 W. Fratcher, Scott on Trusts § 187, p. 14 (4 $^{th}$ ed. 1988). Hence, over a century ago we remarked that "[w]hen trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the exercise of a *discretion vested in them by the instrument* under which they act." ....

94    Lastly, in *Locker's Settlement Trusts, Re*, [1978] 1 All E.R. 216 (Eng. Ch. Div.), Goulding J. wrote (at p. 219):

.... In a case such as the present, where the trustees desire to repair their breach of duty, and to make restitution by doing late what they ought to have done early, and where they are in no way disabled from doing so, the court should in my judgment, permit and encourage them to take that course. A tardy distribution at the discretion of the trustees is, after all, nearer to prompt distribution at the discretion of the trustees, which is what the settlor intended, than tardy distribution by the trustees at the discretion of someone else. There are, no doubt, cases where a manifestation of obstinacy or bias on the part of the trustees, or of hostility and suspicion (even unjustified hostility and suspicion) on the part of the potential cestuis que trust, or some other circumstance, must make such a solution of the problem inadvisable. The court may readily listen to the misgivings of potential beneficiaries who have been unable to get the trustees to exercise their discretion after repeated requests and are hoping themselves, if they have the locus standi to do so, to invoke the court's jurisdiction. The other solutions recommended by Lord Wilberforce are then available to the court. <u>There is however no evidence of any disqualifying circumstances ... before me today, and it is not suggested that the trustees, if permitted to do so, will exercise anything other than a proper discretion.</u> ....

[emphasis added]

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 379 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

95    Here the trial judge's reasons for judgment make clear that there was no evidence before him of any circumstances which would disqualify GWL from the fulfillment of its discretion.

96    It is true that GWL developed the new formula only a short time before the commencement of the second trial, but that was clearly due to the fact that until the court so found in trial one, GWL was not aware that its manner of determining the annual increment was in breach of the plan.

97    The trial judge made a clear finding that GWL was not guilty of bad faith and that the litigation was the result of an honest dispute between the parties as to the interpretation of s. 30. In my view, the fact that GWL had only recently developed the new formula was not in these circumstances a basis for refusing to allow it to make use of the new formula. Furthermore, in so doing, the judge, by his own acknowledgment, resorted to speculation as to what GWL would have done in 1986 and he relied upon such speculation in directing that GWL should instead use what he called the original formula.

98    As well, to allow GWL to make use of the new formula for the purpose of calculating the increment due under s. 30 of the plan would not be to permit it a "do over" or "mulligan" as the plaintiff argues, but simply to allow the party vested with the discretion under the plan to exercise its discretion within the parameters set out in the court's decision.

99    While it is true that one of the issues before the court for determination was the damages, if any, payable to the plaintiff, the trial judge was not obliged to calculate, determine or assess same unless the law permitted him to do so, which in the circumstances here, in my view, it did not.

100    Instead of referring the matter back to GWL as he ought to have done, the trial judge usurped the discretion of GWL and ordered it to use what he described as the original formula, speculating, as he acknowledged, that that is what GWL would have done in 1986. In addition, in directing the use of the original formula, he effectively speculated as to the reaction of the CRA and its possible deregistration of the plan under the *Income Tax Act* by reason of the amount of the increments that would result from the use of the original formula relative to the CPI.

101    These two conclusions were not the result of findings of fact or properly drawn inferences, but were the product of speculation as the trial judge himself stated and thus also amounted to error.

102    In addition, though I need not decide the question, there is strong evidence that what the trial judge described as the original formula which he directed that GWL use in the calculation of the increment was not the original formula and indeed was a formula that had never been used by GWL under the plan.

103    In the circumstances here present, it is my view that the matter should have been referred back to GWL to permit it to exercise the discretion afforded it by s. 30 of the plan, using the new formula, which the trial judge found complied with s. 30, to determine the annual increment which it ought to have paid to the plaintiff.

104    I would therefore allow the defendants' appeal on this issue.

105    In light of my conclusions with respect to the two issues now addressed, I need not deal with Issues No. 2, 3, 4, 6 and 7 of the defendants' appeal or Issue No. 2 of the plaintiff's cross-appeal.


*Standard of Review*

106    The defendants argue that the question here is one of law and the standard of review correctness. The plaintiff does not address the standard of review, but argues the issue on the basis that it is one of law, namely an interpretation and application of the provisions of the *Act*. I agree that the question here is one of law. Hence, the standard of review is correctness.

*Arguments*

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 380 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

107    The defendants argue that the plaintiff's claim, which was filed September 12, 1996, is statute-barred with respect to the determination of the annual increment granted as of April 1, 1990.

108    They assert that the trial judge erred in finding that although the annual increment which ought to have been determined and granted April 1, 1990 (a date outside the limitation period) and was not, the plaintiff was nevertheless entitled to be paid one-twelfth of such increment, prorated for September 1990 commencing September 12, 1990, and on a monthly basis thereafter.

109    The defendants' position is that the trial judge applied wrong legal principles in deciding that the payment of each monthly instalment of the April 1, 1990 increment gave rise to a fresh cause of action. They assert that the cause of action with respect to the annual increment or any part of it arose each year as of April 1st, when the amount of the annual increment was determined. Thus, they argue that the plaintiff's claim, which is legally enforceable only commencing September 12, 1990, is not able to capture the amount of the annual increment determined and granted as of April 1, 1990, and that the first annual increment recoverable by the plaintiff in this litigation would be that determined and granted as of April 1, 1991.

110    In short, the defendants say there should be no proration of the monthly payment of the April 1, 1990 increment commencing September 12, 1990, nor recovery of any portion of the April 1, 1990 annual increment whatsoever.

111    The plaintiff argues that the trial judge did not err in his application of the provisions of the *Act*, that he quite properly considered the fact that the pension payments, although calculated annually, are payable monthly and that he properly based his decision on the periodic nature of the monthly payments. Thus, argues the plaintiff, the trial judge correctly concluded that it had successive monthly causes of action from April 1990 to April 1991 and the right to sue for a failure to make any such monthly payment after September 12, 1990.

*Analysis*

112    H. G. Beale, ed., *Chitty on Contracts: Volume 1: General Principles*, 30th ed., (London: Sweet & Maxwell: Thomson Reuters, 2008) states the following (at para. 28-032):

> **General rule in contract.**
>
> The general rule in contract is that the cause of action accrues, not when the damage is suffered, but when the breach takes place: ....
>
> The gist of an action for breach of contract is the breach, and not any resulting damage which may be occasioned thereby. Consequently, the Act runs from the time when the contract is broken, and not from the time at which any damage resulting therefrom is sustained by the claimant. Therefore, although such damage may occur within six years before the action is brought, the action will be barred if the contract was broken before that period. ....

113    It is in reliance upon this statement that the defendants say that though the plaintiff may have suffered damage commencing September 12, 1990, and monthly thereafter, the breach giving rise to that damage occurred on or about April 1, 1990, a date outside the limitation period; hence such damage is not recoverable in this action.

114    While I do not question the principle as enunciated in *Chitty on Contracts*, the real question is the meaning of the contract which grounds the dispute.

115    In this case, s. 5 of the plan as it existed when s. 30 was first made part of the plan provided that upon retirement the employee "will thereupon become entitled to a yearly basic pension," that "[p]ayments under any pension herein provided for shall be made monthly" and that "[t]he amount of each monthly pension payment shall be one-twelfth of the yearly pension." That provision continued, exactly or in essence, to and including 1990. The indexing under s. 30 was such that once granted, it formed an integral part of a retiree's pension, such that the pension payment and annual increments accumulated over time.

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 381 of 485

Dinney v. Great-West Life Assurance Co., 2009 MBCA 29, 2009 CarswellMan 149

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

116    In the circumstances, it is my view that there was in the plan a contractual obligation to determine and grant an increment on an annual basis as of April 1 $^{st}$ each year and, in addition, a contractual obligation to pay monthly one-twelfth of the retiree's annual pension, which by the terms of the plan included the annual increment(s).

117    In the result, although the application of the *Act* in the circumstances here would preclude the plaintiff from suing for breach by reason of the failure to determine and grant the April 1, 1990 increment pursuant to the terms of the contract, there was a separate cause of action permitting the plaintiff to sue for the breach of contract in failing to pay monthly one-twelfth of the pension, which would include, as it did, both the base pension and the annual increment. Thus, the plaintiff was entitled to sue as of September 12, 1990, for GWL's breach of contract in failing to make the monthly pension payment due on a prorated basis for the month of September 1990 and for each month thereafter.

118    Accordingly, I conclude that the trial judge was correct in deciding that damages were recoverable by reason of this breach commencing September 12, 1990.

119    I would therefore dismiss the defendants' appeal on this issue.


### Standard of Review

120    Both the plaintiff and the defendants assert that the standard of review as regards this issue is palpable and overriding error. I agree.

### Arguments

121    The plaintiff argues that the trial judge committed palpable and overriding error in failing to award punitive damages and/or any of the other types of enhanced damages mentioned in this issue.

122    The plaintiff asserts that GWL stood in a fiduciary relationship to it *vis-à-vis* the granting of increments and that its conduct overall in respect of that entitles the plaintiff to aggravated, exemplary and punitive damages. In addition, the plaintiff argues that GWL should be compelled to disgorge the profits which it reaped from the plan at the expense of the pensioners by failing to grant the proper increments pursuant to the original formula.

123    The defendants assert that no palpable and overriding error was made by the trial judge on this issue and that the plaintiff's appeal from his discretionary conclusion is entirely without merit.

124    The defendants refer to *Fidler v. Sun Life Assurance Co. of Canada*, 2006 SCC 30, [2006] 2 S.C.R. 3 (S.C.C.), and the court's description as to the nature of a contract breach that might attract punitive damages. The court wrote (at para. 62):

> By their nature, contract breaches will sometimes give rise to censure. But to attract punitive damages, the impugned conduct must depart markedly from ordinary standards of decency - the exceptional case that can be described as malicious, oppressive or high-handed and that offends the court's sense of decency: .... The misconduct must be of a nature as to take it beyond the usual opprobrium that surrounds breaking a contract. .... It is important that punitive damages be resorted to only in exceptional cases, and with restraint.

125    The defendants argue that none of this kind of conduct existed here. Indeed, the trial judge found that GWL acted in good faith at all times.

126    The defendants also assert that GWL did not owe a fiduciary duty to the plaintiff in making a decision as to the amount of increments, but was entitled to consider its own interests as well as those of the members. They acknowledge that in making a decision respecting the determination and granting of indexing, GWL clearly owed a duty of good faith to members of the plan, including the plaintiff.

2009 MBCA 29, 2009 CarswellMan 149, 2009 C.E.B. & P.G.R. 8338...

*Analysis*

127      In his judgment, the trial judge found that GWL had acted in good faith. He found that its conduct did not depart to such a marked degree from ordinary standards of decent behaviour as to require a penalty in addition to actual damages. In fact, he went on to find that s. 30 was not precisely drawn, was open to interpretation, and that this litigation was an honest dispute about how the provision should be interpreted. He held that the abandonment in 1986 of the excess interest formula was carried out in good faith as GWL's president believed that it was not a satisfactory way to alleviate inflation and that the CPI approach would be a more stable and better way to go.

128      Clearly, there was evidence to support the trial judge's findings. He was fully entitled to make such findings and there was no palpable and overriding error in his conclusion that there would be no award for aggravated, punitive or exemplary damages. Though he did not specifically deny the claim for a disgorgement of profits, such a denial would follow in light of his findings and conclusions not to award aggravated, punitive or exemplary damages.

129      Thus, I would dismiss the plaintiff's appeal on this issue.

**Conclusion**

130      I would allow the defendants' appeal and order that the judgment be varied to provide that the new formula approved by the trial judge be used by GWL to calculate and pay the pension increments of the plaintiff commencing September 12, 1990, and that the matter be referred back to GWL for that purpose.

131      I would dismiss the defendants' appeal from the trial judge's order as to the commencement date for the payment of increments, namely, September 12, 1990.

132      I would dismiss the plaintiff's cross-appeal asserting no discretion on the part of GWL in respect of the determination and granting of annual increments and its cross-appeal in respect of the denial of an award of punitive, exemplary or aggravated damages or a disgorgement of profits.

133      In light of this decision, I would set aside the order of costs made by the trial judge. I point out that the costs award which he made in favour of the plaintiff was to cover the entirety of the action. The result of this decision is that there has now been mixed success in the litigation and I would leave the parties to settle the matter of costs. If they are unable to do so, costs may be spoken to.

*Appeal allowed in part; cross-appeal dismissed.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1986 CarswellOnt 741, [1986] I.L.R. 1-2120, 18 O.A.C. 85, 19 C.C.L.I. 314

1986 CarswellOnt 741

Ontario Divisional Court

Doherty v. Home Insurance Co.

1986 CarswellOnt 741, [1986] I.L.R. 1-2120, 18 O.A.C. 85, 19 C.C.L.I. 314

# DOHERTY et al. v. HOME INSURANCE CO. et al.

Saunders, O'Brien and Fitzpatrick JJ.

Heard: September 3, 1986
Judgment: November 10, 1986
Docket: File No. 1017/85

Counsel: *A.T. Keller*, for plaintiffs.
*W.L. McCormick*, for Home Insurance Co.
*J. White*, for Conestoga Insurance Brokers Ltd.

Subject: Insurance

**Headnote**

**Insurance --- Disclosure of risk — Duty to disclose material change in risk — Fire insurance — Change in use or occupation**

Fire insurance — Risk — Material change in risk — Property rented — Rental of property not constituting material change in risk.

The insureds, who were contemplating marriage, purchased a house in their joint names. They applied for insurance on the house through an insurance agency. The agency had also arranged insurance on separate property owned by the male plaintiff. The insurer issued a policy covering the house. The female plaintiff lived in the house until the plaintiffs' marriage. Subsequently, the house was rented and during that time it was damaged by fire. The insurer denied liability on the ground that the insureds failed to disclose a material change in the risk. The insureds claimed indemnity from the insurer and also claimed in negligence against the agency and the insurer. The insureds' action was dismissed and they appealed.

**Held:**

The insureds' appeal against the insurer was allowed.

There was no evidence, statistical or otherwise, to support the conclusion that there was a material change in the risk when the property was rented and the tenants moved in. In addition, the insurer did not prove that there was a material change within the knowledge of the insured.

In view of the Court's conclusion in the appeal involving the insurer, it was unnecessary to deal with the insureds' claim against the insurance agency.

**Table of Authorities**

**Cases considered:**

Case 09-10138-MEW    Doc 14394    Filed 09/10/14    Page 384 of 485

Doherty v. Home Insurance Co., 1986 CarswellOnt 741
1986 CarswellOnt 741, [1986] I.L.R. 1-2120, 18 O.A.C. 85, 19 C.C.L.I. 314

*Adam v. Campbell*, [1950] 3 D.L.R. 449 (S.C.C.) — *referred to*

*Johnson v. British Cdn. Ins. Co.*, [1932] S.C.R. 680, [1932] 4 D.L.R. 281 (S.C.C.) — *referred to*

*Lewandowski v. Waterloo Mutual Ins. Co.; Lewandowski v. J.P. Mulvihill & Son Ltd.*, 12 C.C.L.I. 288, [1985] I.L.R. 1-1933 (Ont. H.C.) — *applied*

*London & Western Trusts Co. v. Cdn. Fire Ins. Co.* (1908), 16 O.L.R. 217 (Ont. C.A.) — *considered*

**Statutes considered:**

Insurance Act, R.S.O. 1980, c. 218 —

s. 125 statutory condition 4

**Authorities considered:**

Baer, Marvin G., Annotation to Doherty v. Home Ins. Co., 14 C.C.L.I. 106,

Couch on Insurance (2nd rev. ed., 1982), para. 37A:317.

25 Hals. (4th ed.), p. 252, para. 457.

Ivamy, Fire and Motor Insurance (2nd ed., 1973), pp. 112-13.

APPEAL from a decision, reported at 14 C.C.L.I. 104, [1986] I.L.R. 1-2007 (Ont. Dist. Ct.), which dismissed an action by insureds against an insurer for breach of an insurance contract and against an insurance agency and the insurer for negligence.

**The judgment of the Court was delivered by *O'Brien J.*:**

1     This is an appeal from the decision of the Honourable J.D. Scott [reported at 14 C.C.L.I. 104, [1986] I.L.R. 1-2007 (Ont. Dist. Ct.)] which dismissed the plaintiffs' claims against their insurer (the Home) and their insurance agent (Conestoga). The insurer, Home, denied coverage following a fire loss to a residential property in Kitchener owned by the plaintiffs. The Home denied coverage on the basis that the plaintiffs failed to advise of a material change in risk when the property was leased.

2     The appeal raised issues, involving the Home, of whether there was material change in risk, and, as against Conestoga, of whether the agency was in breach of contract, or was negligent in failing to obtain insurance or advising of problems with insurance coverage. The appeal also involved damages.

3     During argument on appeal, the Home abandoned its claim against Conestoga for contribution and indemnity. For that reason, as well as my conclusions in the appeal against the Home, it is unnecessary to deal at any length with the plaintiffs' appeal against the Conestoga.

4     In 1980 the plaintiff Doherty, then a widower, arranged to insure a home he owned on Briar Knoll Avenue in Kitchener through Conestoga. Conestoga placed that insurance with another insurer, Mayplex. In April of 1982 Doherty and Gladys Plebon, now his wife, then his girlfriend, purchased another house on Rothsay Avenue in Kitchener. That purchase was in joint tenancy and Conestoga was asked to arrange insurance. Conestoga placed that insurance with the Home. It is that policy which gives rise to this litigation.

5    When he arranged for the insurance on Rothsay, Doherty claimed that he spoke to Conestoga's owner, Mr. Durocher, and said Gladys Plebon might live at Rothsay for awhile, but they planned to be married and then she would live at Briar Knoll and they might rent Rothsay. Doherty claimed Durocher said there was "no problem". Plebon lived at Rothsay for a few months in the summer of 1982. The couple married in November 1982. She moved to Briar Hill with Doherty. The plaintiffs did some renovations to Rothsay and then rented that house to a family named Day. Mr. and Mrs. Day and their two children lived in the house from March 1983 until a fire occurred on June 30, 1983. The fire was a result of spontaneous combustion of a snowmobile.

6    The Home renewed its policy on Rothsay using a "direct billing" method, that is, Home, not Conestoga, sent the renewal notice. The plaintiffs paid Home directly.

7    The plaintiffs did not advise the Home or Conestoga that Plebon had moved out or that the property was rented to the Days.

8    Judge Scott found there was a material change in the risk and a violation of statutory condition 4 in the policy. She rejected Doherty's evidence that he told Durocher he might rent Rothsay. The relevant statutory condition, No. 4, is as follows:

MATERIAL CHANGE 4. Any change material to the risk and within the control and knowledge of the insured avoids the contract as to the part affected thereby, unless the change is promptly notified in writing to the insurer or its local agent, and the insurer when so notified may return the unearned portion, if any, of the premium paid and cancel the contract, or may notify the insured in writing that, if he desires the contract to continue in force, he must, within fifteen days of the receipt of the notice, pay to the insurer an additional premium, and in default of such payment the contract is no longer in force and the insurer shall return the unearned portion, if any, of the premium paid.

9    With great respect to the learned trial Judge it is my conclusion that she erred dismissing the action against Home. She concluded it was "contrary to reason" to say there was no material change in the risk when the property was rented and tenants moved in. In reaching this conclusion she appears to have relied on the evidence of a Mr. Fox, the Home's underwriting manager. Fox testified Home would not insure rented premises unless the owner also insured his principal residence with Home.

10    The evidence of Fox was the only evidence on that point. He had been with Home's underwriting department only since 1982. Judge Scott apparently accepted his statement that the philosophy behind the decision was that tenants had no pride of ownership; [they had] no financial interest and were likely to take less care of the premises than owners. I must reject this conclusion. There was no evidence, statistical or otherwise, to support this conclusion. There was no evidence that this was a view generally (or reasonably) held in the insurance industry. On Fox's own evidence, Home's refusal was not an absolute one, they *would* insure rental property *if* the principal residence were also insured with them. This would appear to be a marketing rather than an underwriting decision.

11    The question of insurance risk and change in occupancy of insured property is considered in Ivamy, Fire and Motor Insurance (2nd ed., 1973), pp. 112-13, as follows:

The policy may contain a condition providing that the policy is to be avoided in the event of any change in the occupancy or tenancy of the building insured or containing the property insured. Any such change is not an alteration in the use for which a building may be occupied; nor is it of itself an increase of risk. It does not therefore avoid the policy in the absence of an express condition to that effect.

12    There is early Ontario case law to support the conclusion that in the absence of clear and specific policy provisions, a mere change in the persons occupying an insured house is not a change that will avoid the policy: *London & Western Trusts Co. v. Cdn. Fire Ins. Co.* (1908), 16 O.L.R. 217 (Ont. C.A.). That case involved a dwelling house that was subsequently leased to a tenant. The tenant, without the insurer's knowledge or consent, carried on business as a merchant from the property. It was held in that case that there had been a breach of the statutory condition because of the change in use. However, the Court also concluded that the mere leasing of the premises in the condition in which they were, and for the same purposes for which they were used at the time the insurance was effected, was *not* a breach of the statutory condition.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1986 CarswellOnt 741, [1986] I.L.R. 1-2120, 18 O.A.C. 85, 19 C.C.L.I. 314

13    It seems clear there is always a burden on an insurer to prove an alteration has taken place which had increased the risk: see 25 Hals. (4th ed.), p. 252, para. 457:

Where there has been an alteration of the risk, the scope and ambit of the relevant condition must be examined because there can only be a breach of the condition if the alteration falls within its terms.

14    It is certainly within the power of an insurer to insert separate clauses clearly stating that change in occupancy will constitute a policy breach. Such conditions are not uncommon. For example, the description "while occupied by owner and not otherwise as a dwelling" would affect a continuing warranty of occupancy by the insured such that a change to occupancy by a tenant might avoid the policy. As stated in Couch on Insurance (2nd rev. ed., 1982) at para. 37A:317:

Generally a provision as to use and occupancy is interpreted without regard to the character or identity of the occupant. That is, it is generally immaterial whether the occupant of the premises is the insured, a tenant of the insured, or a purchaser of the property.

15    The burden of proof is on the insurer to show a change has been material to the risk, see *Johnson v. British Cdn. Ins. Co.*, [1932] S.C.R. 680 at 686, [1932] 4 D.L.R. 281 (S.C.C.). Whether a change is material to the risk is a question of fact in each case. I share the view of Callaghan A.C.J.H.C. in his decision of *Lewandowski v. Waterloo Mutual Ins. Co.*; Lewandowski v. J.P. Mulvihill & Son Ltd., 12 C.C.L.I. 288, [1985] I.L.R. 1-1933 at 5 (Ont. H.C.):

Whether a change is material to the risk is a question of fact in each case. The question is: if the change had been disclosed would it have influenced a reasonable insurer to either decline to continue the insurance or to have stipulated for a higher premium?

16    In addition, it appears to me the learned trial Judge assumed the Rothsay rental was a material change in the risk within the knowledge of the insured and thus within the statutory condition 4 to which I have referred.

17    Professor Baer deals with this point in his annotation to the report of this decision, see 14 C.C.L.I. 104 at 106:

Fourth, we cannot safely assume that members of the insuring public share Home's belief that tenants are a higher risk than owners. Moreover, even if they are particularly knowledgeable about the insurance industry, they will not know how important the information about occupancy was to Home or, more significantly, a reasonable insurer. After all, members of the insuring public may plausibly believe that lots of factors affect the risk, e.g., whether they smoke, whether they work, whether they leave the insured premises on weekends, etc. However, it is very unlikely that they know which of these circumstances are considered critical to a reasonable or prudent insurer. Their ignorance will be compounded if materiality includes marketing factors as well as matters which affect the risk.

18    I agree with this view.

19    I conclude Home did not satisfy the onus of proving the rental was a material change in the risk or that it was such a change within the knowledge of the insured. The appeal as against Home should therefore be allowed.

20    This being the case, there is no significant loss established as against Conestoga. The only claim which fails as against Home is for $900 for loss of 2 months' rental. There was no evidence that the plaintiffs wanted or were willing to pay for insurance against loss of that kind or that a policy to provide coverage for loss of rental income was available. The learned trial Judge found Conestoga guilty of bad business practice but not negligent. I have some reservations on that point but in view of my conclusions in the appeal involving Home it is unnecessary to deal with that point other than on the question, perhaps, of costs.

21    On the question of damages, unfortunately the evidence is unsatisfactory. The learned trial Judge assessed damages in the amount of $18,585, relying on a written estimate of Service Master, a company from Kitchener-Waterloo, apparently engaged in making insurance repairs. The plaintiffs obtained a written estimate from that company but did not authorize those repairs. The plaintiffs unfortunately had little money and did most of the repairs themselves with the help of friends.

22    In my view, the estimate was not properly proved. It consisted of a two-paragraph unitemized letter. There was no objection at trial to the letter being filed as an exhibit, but there were no admissions on damages. The failure to object does not render inadmissible evidence admissible: see *Adam v. Campbell*, [1950] 3 D.L.R. 449 and 458 (S.C.C.). While there was no suggestion plaintiffs' counsel was misled by lack of objection in the sense that he failed to call witnesses he would otherwise have done to prove damages, I still conclude the estimate should not have been accepted by the learned trial Judge on damages.

23    Doing the best I can with the evidence available (I do not think this is a case where a new trial on damages would be desirable), there was evidence plaintiffs actually spent the $4,739 for materials, that they paid $2,150 for painting, that they paid $495 for masonary work, and that there was a claim for anticipated material purchases of $4,000. In my view there was evidence to support an allowance for materials and work actually done in the amount of $11,834. In addition there was a claim for 2,000 hours of labour on behalf of the plaintiffs and their friends. The amounts claimed as an hourly rate ranged from $17 per hour to $12. There was evidence from another insurance estimator, Mr. Sinclair, at the time of the loss, that hourly rates for carpenters were approximately $10 to $11 per hour, and labourers $5 to $6 per hour. Sinclair's evidence on that point in my view should have been accepted. The learned trial Judge rejected Sinclair's evidence that the total cost of repairs would have been $6,757 for repairs plus $1,351 for overhead and profit. On the basis of Sinclair's cross-examination I agree that his estimate overlooked many matters and was incomplete on others and that his estimated repair cost was properly rejected by the learned trial Judge. Judge Scott did conclude that the plaintiffs' claim for rates was exaggerated. On the available evidence I conclude an allowance of 1,200 hours at $9 per hour, which is $9,600, rounded to $10,000, is supported by the evidence. This would result in a total damage assessment of $21,834 and I allow the plaintiff's appeal on damages to that amount.

24    Counsel did not make submissions on prejudgment interest and costs and were not asked to. I ask counsel to make written submissions on these two points within two weeks.

*Appeal allowed.*

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

2007 ONCA 59
Ontario Court of Appeal

Dumbrell v. Regional Group of Cos.

2007 CarswellOnt 407, 2007 ONCA 59, [2007] O.J. No. 298, 220 O.A.C. 64, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 55 C.C.E.L. (3d) 155, 85 O.R. (3d) 616

## J. MICHAEL B. DUMBRELL (Plaintiff / Respondent) and THE REGIONAL GROUP OF COMPANIES INC. and STEVEN H. GORDON (Defendants / Appellants)

Doherty, M.J. Moldaver, R.J. Sharpe JJ.A.

Heard: October 23, 2006
Judgment: January 31, 2007
Docket: CA C43885

Proceedings: reversing in part *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.)

Counsel: Benjamin Zarnett, Alexa Abiscott for Appellants
R.G. Slaght, Q.C. for Respondent

Subject: Employment; Public; Corporate and Commercial; Intellectual Property; Estates and Trusts; Contracts; Civil Practice and Procedure

## Headnote

### Labour and employment law --- Employment law — Interpretation of employment contract — Performance or breach

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    1

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out in contract — Trial judge reached proper conclusion regarding entitlement to payment — Trial judge erred in awarding damages based on profits owed to third party investors — Third party investors were bona fide investors and not merely relatives of defendant's director.

**Business associations --- Nature of business associations — Nature of corporation — Distinct existence — From owner — Lifting the corporate veil**

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out in contract — Trial judge erred in finding director of defendant personally liable — Plaintiff did not claim liability against director — Director did not commit fraud — Trial judge ordered liability against director and corporation, which is not consistent with piercing corporate veil.

**Table of Authorities**

**Cases considered by *Doherty J.A.*:**

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321, 1994 CarswellOnt 234 (Ont. C.A.) — considered

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — considered

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — considered

*Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98, [1998] 1 W.L.R. 896 (U.K. H.L.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — referred to

*Kepic v. Tecumseh Road Builders* (1987), *(sub nom. Kepic v Tecumseh Road Builders, division of Countryside Farms Ltd.)* 18 C.C.E.L. 218, 1987 CarswellOnt 917, *(sub nom. Kepic v Tecumseh Road Builders, division of Countryside Farms Ltd.)* 23 O.A.C. 72 (Ont. C.A.) — referred to

*Leading Investments Ltd. v. New Forest Investments Ltd.* (1986), *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* [1986] 1 S.C.R. 70, 65 N.R. 209, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 38 R.P.R. 201, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 14 O.A.C. 159, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 25 D.L.R. (4th) 161, 1986 CarswellOnt 671, 1986 CarswellOnt 1000 (S.C.C.) — referred to

*Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 129 D.L.R. (4th) 711, 9 C.C.L.S. 97, 23 B.L.R. (2d) 165, 87 O.A.C. 129, 1995 CarswellOnt 1203, *(sub nom. ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.)* 26 O.R. (3d) 481 (Ont. C.A.) — referred to

*Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.* (2001), [2001] NZCA 372 (New Zealand C.A.) — referred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1986] 2 Lloyd's Rep. 646, [1987] 1 All E.R. 81 (Eng. Q.B.) — referred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1987), [1987] 3 All E.R. 565 (Eng. C.A.) — referred to

*Prenn v. Simmonds* (1971), [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — referred to

*Said v. Butt* (1920), [1920] All E.R. Rep. 232, 90 L.J.K.B. 239, 124 L.T. 413, [1920] 3 K.B. 497 (Eng. K.B.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Truckers Garage Inc. v. Krell* (1993), 3 C.C.E.L. (2d) 157, 68 O.A.C. 106, 1993 CarswellOnt 875 (Ont. C.A.) — referred to

APPEAL by defendant from judgment reported at *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.), allowing plaintiff's action for breach of contract.

*Doherty J.A.*:

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

**I Overview**

1      The respondent, J. Michael B. Dumbrell ("Dumbrell"), was employed by the appellant, the Regional Group of Companies Inc. ("Regional"), for about one year beginning in November 1998. The appellant, Steven H. Gordon ("Gordon"), was the president, CEO, and directing mind of Regional.

2      Dumbrell left Regional's employment in November 1999. He subsequently sued Regional and Gordon claiming he was owed fifty percent of the profit earned on a commercial real estate transaction referred to as the "Queen Street project". The trial judge found that Dumbrell was entitled, under the terms of his employment contract, to fifty percent of the $1,000,000 profit earned on the Queen Street project.

3      Regional and Gordon appeal. Counsel raises three issues:

   • Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit earned on the Queen Street project even though that profit was earned long after the termination of his employment contract?

   • Even if Dumbrell was entitled to the profits under the terms of the employment contract, did the trial judge err in awarding him fifty percent of the profit earned by entities other than Regional or Gordon?[1]

   • Did the trial judge err in holding Gordon personally liable?

4      I would allow Regional's appeal in part. I would hold Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. I would not hold Regional liable for commission on profits earned by other investors brought into the project by Gordon.

5      I would allow Gordon's appeal. Dumbrell alleged various causes of action against Regional and Gordon at trial. The trial judge found a breach of contract, but rejected the other claims made by Dumbrell. Dumbrell's contract was with Regional and only Regional. He could have no reasonable expectation of recovery upon breach of the contract from any entity other than Regional. I see no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional. Nor can Gordon be liable for inducing Regional's breach of contract. Dumbrell did not plead that cause of action and did not adduce evidence capable of establishing that Gordon induced a breach of contract.

**II The Facts**

6      The trial lasted two weeks. The trial judge heard different versions of many events, some of which are not relevant to this appeal. I will summarize only those facts germane to the issues raised on appeal. My summary also reflects the trial judge's findings of fact and her credibility assessments. Neither are challenged on appeal. The trial judge preferred Dumbrell's version of events over Gordon's whose evidence she found to be unworthy of belief in many respects.

*(a) Dumbrell's Employment with Regional*

**Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407**

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

7    In the summer of 1998, Dumbrell was living in British Colombia. He had spent most of his working life in the real estate development business and was looking for an opportunity to get back into that business in Ottawa where he had previously worked for many years.

8    Regional operated a large, well established real estate business in the Ottawa area. Gordon had been Regional's CEO since 1984. He held all the voting shares. Regional provided a variety of services, including property management, property appraisals, land acquisitions, land development, and consulting.

9    Regional would sometimes put together groups of investors or syndicates to purchase and develop properties. The properties would be located by Regional and purchased in trust by a shell company for the investors. Regional would earn various fees for arranging the purchase, syndication, management, and development of the property. Investors in the syndicate often were officers or employees of Regional or relatives of Gordon. Gordon sometimes took an equity position in these developments through Regional or various other corporate entities he controlled.

10    Gordon had the final say in respect of all facets of Regional's operation. He decided which projects in which Regional would become involved, the fees Regional would charge, which corporate entities would be used, the roles those entities would play in a transaction, and which investors would be invited to join which syndicates.

11    Dumbrell met with an employee of Regional in the summer of 1998 to discuss the possibility of Dumbrell working with Regional. Dumbrell met with Gordon either at the same meeting or in a subsequent meeting shortly afterward. Dumbrell had considerable expertise in the commercial real estate field, an area in which Gordon wanted Regional to become more involved.

12    Gordon and Dumbrell agreed that Dumbrell would work for Regional and would have the title Vice-President, Commercial Development. Dumbrell understood that he would find commercial real estate projects, bring them to Regional and that Regional would then become involved in the purchase and development of those properties. Dumbrell would be paid a commission on the profits earned from the projects that he brought to Regional.

13    On Gordon's instructions, Regional's lawyer drafted an employment contract between Dumbrell and Regional. Three drafts were prepared and reviewed by Dumbrell, Gordon, and their respective lawyers. There were several changes made in the various drafts of the contract. Almost all of these changes reflected Gordon's and not Dumbrell's preferences. Eventually, in November 1998, they agreed on the terms and both signed the agreement. Gordon signed as president of Regional.

14    Some of the contract terms are set out in full below. Generally speaking, the contract provided that Dumbrell would be compensated exclusively on a commission basis. His commission would be calculated as a percentage of the profit generated from projects that he brought to Regional.

*(b) The Queen Street Property*

15    Like most people familiar with the Ottawa real estate market, Dumbrell knew of the Queen Street property in

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

November 1998. The property was owned by Canadian Real Estate Investment Trust ("CREIT"). It occupied a full downtown city block in Ottawa and in late 1998 was being used as a parking lot. It was zoned for use as office space. Dumbrell believed that the price of the property would increase dramatically in the immediate future as the need for office space increased in Ottawa. He also believed that the property was ripe for development in late 1998. The property was not on the market, but Dumbrell mentioned it to Gordon as a potential project for development by Regional. Gordon encouraged him to look into the possibility of acquiring the Queen Street property.

16    In early 1999, Dumbrell began to assemble a file on the Queen Street property. He received information from an employee of CREIT pertaining to possible development plans for the property and certain rent schedules. CREIT gave the information to Dumbrell on the undertaking that it would be kept confidential.

17    Shortly after Dumbrell acquired information from CREIT, he contacted an architect who had worked on development plans for that property some years earlier. Dumbrell and the architect spoke at length and the architect gave Dumbrell a great deal of background information pertaining to the property. Based on the information he had accumulated, Dumbrell concluded that the Queen Street property was under priced and presented an excellent opportunity for a profitable development as an office tower. Regional decided to proceed with efforts to acquire the Queen Street property.

18    In February 1999, on Gordon's instructions, Dumbrell prepared and submitted an offer to purchase the Queen Street property for $7,745,000. That offer was in the name of Canadian Gateway, a consortium of five companies, including Regional, that had been assembled by Gordon. CREIT was not interested in selling the property on the terms of the offer.

19    Gordon instructed Dumbrell to submit a second offer in February 1999. This offer, also in the name of Canadian Gateway in the amount of $9,000,000, was rejected by CREIT. In March 1999, a third offer, also at $9,000,000, but providing for a shorter due diligence period, was submitted by Dumbrell on Gordon's instructions. This offer was also rejected.

20    The trial judge described, at para. 35, Dumbrell's role in these three offers as follows:

Mr. Dumbrell was the point man in these negotiations, drafting these offers at Mr. Gordon's direction and reporting back the reactions of Mr. Dansereau [the vendors' representative] who communicated only with Mr. Dumbrell.

21    Some time after the third offer was rejected, some of the partners in Canadian Gateway decided they were no longer interested in purchasing the Queen Street property. In July 1999, Dumbrell, on Gordon's direction, prepared a fourth offer. This offer showed Regional as the purchaser at a purchase price of $9.3 million. It also provided for a $300,000 commission payable to Regional on closing by CREIT. The corporate identity of the purchaser was irrelevant to Dumbrell. As far as he was concerned, he was working on a "Regional" project and it was up to Gordon to decide what corporate entities would be used to effect the transactions and subsequent development of the property.

22    CREIT knew that Regional would not be the ultimate purchaser and developer of its property. It, therefore, wanted to know the identity of Regional's investors. Negotiations broke down when Regional could not or would not identify its investors. The July offer was rejected in August 1999.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

23    In August, Gordon told Dumbrell that he was no longer interested in the Queen Street property. Dumbrell had spent most of his time since he commenced employment with Regional in November 1998 working on the Queen Street property. His interest in the property continued even after Gordon told him that he was no longer interested in the property.

24    In October 1999, Gordon spoke with a government official who told him that there would be a significant increase in the demand for downtown office space in Ottawa in the immediate future. This information made the Queen Street property more attractive.

25    In late October 1999, Mr. Samuel Grosz, a friend of Gordon's and a real estate developer whose Ottawa properties were managed by Regional, visited Ottawa primarily to look at his properties. Gordon showed Mr. Grosz the Queen Street property and gave him all of the information that Dumbrell had assembled, including the confidential information that had been provided to him by CREIT in January 1999. Mr. Grosz soon became interested in the Queen Street property.

26    Shortly after Gordon alerted Mr. Grosz to the possibility of purchasing the Queen Street property, Mr. Grosz learned that Philip Reichman and his company, O. & Y. Properties Inc. ("O. & Y."), were about to make an offer to purchase the Queen Street property. Mr. Grosz and Mr. Reichman knew each other well and decided to proceed by way of a joint venture with each holding a fifty percent interest in the Queen Street property if they were able to purchase it from CREIT.

27    By early November 1999, it was clear that the working relationship between Gordon and Dumbrell was not going to last. None of the projects that Dumbrell had worked on had produced any profit for Regional. Dumbrell had not received any remuneration in the year he had been at Regional. Gordon had refused Dumbrell's request for an advance on his commissions. Gordon was also systematically excluding Dumbrell from meetings and the decision-making process at Regional. On November 4, 1999, Dumbrell resigned effective November 22, 1999. He had decided to go into business for himself.

28    On November 19, 1999, after Dumbrell had tendered his resignation from Regional, but while he was still employed there, Mr. Grosz told Gordon that Mr. Grosz and O. & Y. were considering making an offer on the Queen Street property. Mr. Grosz asked Gordon to determine the status of the property. He also told Gordon that because Gordon had brought the property to his attention, he was prepared to allow Gordon to participate with he and O. & Y. in the joint venture. Mr. Grosz indicated that Gordon could purchase one-half of Mr. Grosz's fifty percent interest in the joint venture. This would mean that Gordon would have a twenty-five percent interest in the Queen Street property if the joint venture could acquire it.

29    Mr. Grosz and O. & Y. were respected and high profile participants in the Ottawa commercial real estate market. They did not need Regional's participation to complete the purchase. Gordon wanted to be involved in a joint venture with them. At Mr. Grosz's suggestion, Gordon prepared an offer to purchase the Queen Street property in the name of Regional. When he did so, he anticipated that Regional would purchase the property in trust for Mr. Grosz (twenty-five percent), Gordon or his corporate nominee (twenty-five percent), and O. & Y. (fifty percent).

30    The offer to purchase the Queen Street property prepared by Gordon in November 1999 was very similar to the offer prepared by Dumbrell in July 1999. Both offers provided for a purchase price of $9.3 million with a commission of $300,000 payable to Regional. The only significant difference between the two offers was that the July offer identified Dumbrell as the contact person at Regional and the November offer identified Gordon as the contact person.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

31    The asking price for the Queen Street property had dropped by about $1 million since July when Regional had submitted its offer at $9.3 million. Unlike Dumbrell, Gordon was not familiar with the commercial real estate market in Ottawa and was unaware that the asking price for the property had gone down. Gordon did not speak to Dumbrell before preparing this offer. The offer prepared by Gordon was reviewed by his putative partners. Mr. Reichman of O. & Y. learned that the offer prepared by Gordon was about one million dollars more than the current asking price for the Queen Street property. He decided that he would take over any negotiations to purchase the Queen Street property. He submitted an offer in the name of O. & Y. at $8,000,000. That offer did not provide for any commissions payable to Regional.

32    The offer submitted by O. & Y. was accepted by CREIT on or about November 25, 1999. The transaction was completed on December 2, 1999and closed on January 24, 2000. The Queen Street property was purchased in trust by a numbered company. The numbered company was owned fifty percent by O. & Y., and fifty percent by a numbered company owned equally by Mr. Grosz and a company controlled by Gordon. Gordon's company held its twenty-five percent interest in the property in trust for a syndicate assembled by Gordon. The syndicate consisted of Gordon, his wife and children, several cousins, and his lawyer. Gordon, his wife and his children owned 73.33 percent of the syndicate. In total, the syndicate advanced about $1,200,000 toward the project. Some of the payments went through Regional.

33    Gordon acknowledged in cross-examination that this was not a typical syndication for which Regional would charge a fee for bringing the investors together. Regional did all of the work that had to be done for the syndicate on the project, but did not charge any fees until it submitted an invoice in late May 2002 after the interest in the property was sold. The trial judge was dubious as to the *bona fides* of that invoice.

34    Early in 2000, Dumbrell learned through a contact at O. & Y., that O. & Y. had agreed to purchase the Queen Street property. Dumbrell spoke with Gordon and asked him about his or Regional's involvement in that purchase. Gordon lied to Dumbrell. He told him that he was unaware of the proposed purchase of the Queen Street property by O. & Y. and that neither Regional nor Gordon had anything to do with the purchase. Dumbrell subsequently learned of Gordon's involvement and commenced this lawsuit in October 2000. At that time, the syndicate put together by Gordon still held a twenty-five percent interest in the Queen Street property.

35    Under the terms of the agreement between O. & Y., Mr. Grosz and Gordon's syndicate, O. & Y. had an option to purchase the interests held by the other partners. In May 2002, O. & Y. exercised its option and bought out Gordon's syndicate. The syndicate's twenty-five percent interest was sold at a profit of slightly more than $1,000,000. Dumbrell amended his statement of claim and alleged that he was entitled to fifty percent of that profit.

### III Issue #1 — Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit under the terms of the employment contract?

#### (a) The trial judge's analysis

36    The trial judge found that the potential value of the Queen Street property as a development was made known to Gordon and Regional through Dumbrell's efforts. She further held that it was through those efforts that Regional established contacts with CREIT, assembled a file containing a great deal of information on the property, and was in a position to

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

provide that information to Mr. Grosz when he expressed an interest in the property in October 1999. Mr. Grosz in turn offered Regional/Gordon a twenty-five percent interest in the property because of the information he had received from Gordon.

37    On the trial judge's findings, Dumbrell was directly responsible for the syndicate, under Gordon's direction and control, obtaining a twenty-five percent interest in the Queen Street property. The syndicate ultimately made a one million dollar profit from its involvement in the transaction.

38    The trial judge rejected Gordon's evidence that he and Dumbrell had agreed that the Queen Street project would not be covered by the terms of Dumbrell's employment contract. She noted that it made no sense that Dumbrell would spend the vast majority of his time over several months trying to secure a property that was excluded from the terms of his employment contract. She then turned to the terms of that agreement.

39    The contract was between Regional and Dumbrell. It described Dumbrell as "an employee". The services to be provided to Regional by Dumbrell were described in Schedule "A" to the agreement:

> The Corporation and the Employee agree that the Employee will be charged with the responsibility <u>to provide the Corporation with Development, Acquisitions, Financing and Syndications and Consulting Services. Employee to research, investigate, report and recommend real property capital asset purchases suitable for development or syndication.</u> Employee shall not bind the Corporation to any contract or legal commitment without the prior written authority of the Corporation. [Emphasis added.]

40    The contract was for a term of six months with an expiry date of May 1, 1999 and provided for renewal for an additional term of six months on mutual agreement of the parties. Although the contract was not formally renewed, the parties agreed that it was renewed and was in effect when Dumbrell resigned in November 1999.

41    The agreement provided for termination "at the end of the Term hereof", and further provided that neither party could commence an action under the contract more than one year after the expiration of the term of the contract. Dumbrell commenced this action in October 2000, less than one year after he quit. This initial claim eventually developed into one for commission on a profit realized more than two years after the contract was terminated.

42    The provision of the contract governing Dumbrell's compensation is found under the heading "Employee Earnings":

1. <u>EMPLOYEE EARNINGS</u>

The Corporation shall pay to the Employee the sum of [<u>as per the commissions payable as set out in Schedule "B" attached].</u> The Corporation is responsible for making source deductions, including payments on account of Canada Pension Plan and Employment Insurance. Employee shall be entitled to participate in Corporation's Health Benefit Package as exists as of the date hereof and as amended from time to time. [Emphasis in original.]

43    Schedule "B" referred to in the above clause reads as follows:

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

SCHEDULE "B"

DESCRIPTION OF REMUNERATION PACKAGE TO EMPLOYEE

1(1)[*] The remuneration package for the Employee will be based on performance of the Employee payable as follows:

    (a) For each project, *profits* to be split 50% to the Employee and 50% to the Corporation.

1(2) For purposes of this Agreement, "*profit*" shall include monies earned and actually received by the Corporation as completed Acquisition Fees, Development Fees and Syndication Fees earned as a result of the Employee's direct involvement for completed and closed projects in accordance with standard operating policy of the Corporation on the following business activities:

    (a) Development projects;

    (b) Syndication projects:

    (c) Special consulting and brokerage fees payable to the Division.

1(3) "*Profit*" shall be defined as the Gross Revenues received for a particular Project less expenses directly related to the negotiation, acquisition, development and sale of the project. All such expenses shall be deducted from Gross Revenues as would a prudent accountant applying generally accepted accounting principles. Expenses shall include, but not limited to:

    (a) Acquisition cost of the property;

    (a) Governmental and development fees;

    (a) Professional advice (accountants, engineers, lawyers, third party consultants);

    (a) Financing fees, brokers fees, interest and carrying charges;

    (a) Fees paid to investors for the project;

    (a) Costs and disbursements paid pursuant to any syndication agreement;

    (a) Realtor's fees; and

    (a) Construction costs and related site improvements.

    [Emphasis added.]

44    The trial judge did not find that the contract of employment provided for payment of commission to Dumbrell on profits earned after the termination of the employment agreement. Rather, she equated the relationship between Regional and Dumbrell with a principal-agent relationship. Relying on *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.), the trial judge held that since Regional accepted the benefit of the work done by Dumbrell regarding the Queen Street property, Regional was obligated to pay for that work in the absence of an agreement to the contrary. Next, she examined the language of the employment contract and concluded at para. 131:

    The fact that crystallization of the deal [the sale of the syndicate's interest in the Queen Street property], and the culminating events occurred after the employee left his employment, is not, in my view, relevant. ... The contract did not deal with this situation and therefore the entitlement is as set out in *Charles P. Rowen & Associates Inc. et al. v.*

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

_Ciba-Geigy Canada Inc., supra._ [Emphasis added.]

45    I agree with the trial judge's conclusion that Dumbrell was entitled to compensation for profits earned after the termination of the agreement, but my analysis is somewhat different than hers. I do not regard _Charles P. Rowen_, _supra_, as controlling. In _Charles P. Rowen_, the court was faced with a true principal-agent relationship, the terms of which had not been reduced to writing by the parties. The reasoning of the majority blends notions of _quantum meruit_ and implied terms of a contract to resolve a problem that the parties had not addressed when establishing their relationship.

46    In the present case, the parties did consider the nature of their working relationship. After considerable negotiation and legal assistance, they entered into an employment contract which described Dumbrell as an "employee" and addressed the nature of his compensation. In my view, the question of whether Dumbrell was entitled to commission on the profits earned on the Queen Street project depends on an interpretation of the language used in the contract. If he is entitled to commission on the profits from the Queen Street property, that entitlement must be found in the language of the agreement he entered into with Regional.

### (b) Contractual interpretation

47    Judges spend most of their working time deciphering the meaning of various kinds of legal documents, including written contracts: see e.g. Lord Justice Johan Steyn, "The Intractable Problem of the Interpretation of Legal Texts" (2003) 25 Sydney L. Rev. 5; Sir Christopher Staughton, "How Do the Courts Interpret Commercial Contracts?" (1998) 58 Cambridge L.J. 303. Most Canadian judges faced with interpreting a written commercial contract, cite either or both of _Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co._ (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901, and _Eli Lilly & Co. v. Novopharm Ltd._, [1998] 2 S.C.R. 129 (S.C.C.) at paras. 52-56. Professor Ruth Sullivan has observed that these two authorities can be read as advancing different notions of contractual intent. She observes that _Consolidated-Bathurst_, _supra_, arguably looks to the subjective intention of the contracting parties at the time the contract was made, while _Eli Lilly_, _supra_, looks to the intent as discerned from the words used in the written contract. Professor Sullivan refers to the former approach as the intentionalist approach, and the latter as the textualist approach: see Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 Sup. Ct. L. Rev. (2d) 369 at 375-86, 392.

48    In _Eli Lilly_, _supra_, at paras. 52-54, Iacobucci J. refers to _Consolidated-Bathurst_, _supra_, with approval. He clarifies, at para. 54, what is meant in _Consolidated-Bathurst_ by "the true intent of the parties" for contractual purposes:

> The trial judge appeared to take _Consolidated-Bathurst_ to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

49    On the approach taken in _Eli Lilly_, _supra_, the focus is on the meaning of the words used in the contract. Evidence of the subjective intention of the parties has "no independent place" in the interpretative process: _Eli Lilly_, at para. 54; see also Staughton, "How Do the Courts Interpret Commercial Contracts?", _supra_, at 304-306; _Investors Compensation Scheme Ltd. v. West Bromwich Building Society_ (1997), [1998] 1 All E.R. 98 (U.K. H.L.) at 114-15.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

50    In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3d ed. (London: Sweet & Maxwell, 2004) at 18-31.

51    *Eli Lilly, supra*, instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties. In this sense, my approach is textualist. However, the meaning of the written agreement must be distinguished from the dictionary and syntactical meaning of the words used in the agreement. Lord Hoffmann observed in *Investors Compensation Scheme Ltd.*, supra, at 115:

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.

52    No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

53    The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.), at 23-24; *Leading Investments Ltd. v. New Forest Investments Ltd.*, [1986] 1 S.C.R. 70 (S.C.C.), at 80-81, La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 (U.K. H.L.), at 1383-84; Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-308.

54    A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

WESTLAWNEXT CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

55    There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20. Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at 363.

56    I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intracticable Problem of the Interpretation of Legal Texts", *supra*, at 8:

> In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.[2] [Emphasis added.]

### (c) The interpretation of this contract

57    The context in which the written words used in this agreement must be understood begins with the parties who negotiated the agreement. Both were sophisticated, experienced, successful businessmen who could reasonably be expected to negotiate a commercially sensible and workable agreement. When they agreed to work together, it was anticipated that Dumbrell, whose expertise lay in finding commercial real estate projects, would investigate and, where appropriate, bring potentially profitable large-scale commercial developments to Regional. Regional had the ability to finance and develop these projects. It did so in various ways using whatever corporate vehicle Gordon deemed appropriate.

58    The agreement reached by the parties contemplated a relatively short working relationship of between six months and one year. It also contemplated that Dumbrell would receive nothing unless he brought projects to Regional which earned profits for Regional. If he did that, his compensation would be significant (fifty percent of the profits). In tying Dumbrell's compensation to profits as opposed to, for example, fees earned by Regional, the parties anticipated that Dumbrell's entitlement to commissions would not be known until a project was complete and Regional's net profit on the project could be determined.

59    Given Regional's business history, it could reasonably be anticipated when the employment agreement was made that when projects were brought to it by Dumbrell, Regional would be involved in various ways and that its involvement could yield profits through a variety of methods at different stages of Regional's involvement in any given project. On the findings made by the trial judge, Dumbrell was not taking employment with a company whose sole source of profits came through various forms of fees, but was taking employment with a company whose profits could come through various kinds of involvement in different projects.

60    I turn from the context in which the employment agreement was made to the words used in the agreement and in particular the words used in Schedule "B". Schedule "B" begins by stating that Dumbrell's remuneration will be based on his performance. He must produce to be paid. Schedule "B" then describes his remuneration as fifty percent of "profits" for each project. "Profits" are described in paras. 1(2) and 1(3).

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

61      Paragraph 1(2) makes it clear that profits must be earned as a result of Dumbrell's direct involvement in the project. In addition, the project must be "completed and closed ... in accordance with standard operating policy of the Corporation". The reference to "standard operating policy" is of no assistance as it is common ground that there was no such thing.

62      Paragraph 1(2) sets out certain kinds of fees that are included in the meaning of profits, such as acquisition fees, development fees, and syndication fees. The fees described in para. 1(2) are not an exhaustive list of the kinds of payments to Regional that can constitute profits. Lastly, para. 1(2) refers to business activities which constitute projects for the purpose of the calculation of profits, including "Syndication projects".

63      Paragraph 1(3) sets out a formula by which profits are to be determined by deducting certain expenses from "Gross Revenues". The reference in para. 1(3) to "Gross Revenues" and the types of expenses identified in that paragraph indicates two things. First, the question of whether Regional earned any profit and, if so, the amount of that profit may well not be determined until the end of Regional's involvement in a particular project. Second, Regional's involvement in projects could take forms other than a fee for service basis. The reference to "Gross Revenues" and many of the expenses described in para. 1(3) are consistent with Regional taking equity positions in a project and realizing a profit upon a sale of that equity position.

64      On my reading of Schedule "B", Dumbrell was entitled to a fifty percent commission on profits if:

   • he was directly responsible for the project in that it was secured for Regional through his efforts;

   • Regional had earned and actually received monies on the project;

   • the project was "completed and closed", that is Regional's involvement was completed; and

   • using the method described in para. 1(3), Regional had earned a profit.

65      Nothing in the language of Schedule "B" limits Dumbrell's potential remuneration to projects that are completed and closed as of the date of termination of his employment contract. The context in which the contract was made contraindicates imposing any such limitation on profits. Reasonable people in the position of Dumbrell and Gordon would have appreciated that Regional's involvement in the kind of complex large scale commercial projects that it was anticipated Dumbrell would bring to it may well not be completed within the relatively short time span contemplated by the employment contract. Similarly, the method used for calculating Dumbrell's compensation by reference to profit as calculated in para. 1(3) contemplates that the projects could well extend over a considerable period of time with the ultimate determination of whether any profit was made and, therefore, any remuneration owed to Dumbrell being based on events that occurred well after the relatively brief period of employment contemplated by the agreement. On my reading of Schedule "B", Dumbrell was entitled to fifty percent of Regional's profits even if the profits were made after the employment contract was terminated.

66      The appellants rely on the termination provision:

   1.1 This contract shall terminate:

   1.1.1 at the end of the Term hereof.

   1.1 Upon termination or other expiration of this contract the Employee shall forthwith return to the Corporation all papers, materials, equipment and other properties of the Corporation held for the purpose of execution of the contract. In

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

addition, each party will assist the other party in the orderly termination of the contract and the transfer of all aspects hereof, tangible and intangible, as may be necessary for the orderly, non-disrupted business continuation of the Corporation.

1.1 Neither party may commence an action under this contract more than one (1) year after the expiration of its term, or, in the event of default, more than one (1) year after the occurrence of said default. [Emphasis added.]

67      The termination provision does not assist in defining profits for the purpose of calculating Dumbrell's compensation. The first part of the termination clause speaks to the point at which the contractual relationship ends. It does not purport to terminate obligations that existed under the contract when the contract came to an end. If, as I would hold, profits as defined in Schedule "B" include profits earned and calculated after the termination of the contract, the obligation to pay those profits, when and if they arise, is an obligation that exists under the contract as of the date of termination albeit in an inchoate form.

68      The last paragraph in the termination clause is also a relevant consideration. That paragraph answers one of the arguments relied on by the appellants. They submitted that a definition of profits that included profits made after the termination date of the contract would create indefinite and potentially open-ended liability by Regional to Dumbrell for profits earned on projects many years down the road. The limitation provision in the termination clause excludes any claim by Dumbrell that is not advanced within one year of the termination of the contract. This provision effectively places limits on Regional's potential liability to Dumbrell. As it happens, the limitation clause does not assist Regional here because Dumbrell had commenced his action within the one year period.

69      In summary, like the trial judge, I conclude that Dumbrell was entitled to fifty percent of the profits earned by Regional on the Queen Street project. I reach that conclusion through a reading of Schedule "B" of the agreement in the context of the circumstances in which the agreement was made. I do not read the termination clause as modifying the meaning of profits in the agreement.

**IV Issue #2 — Was Dumbrell entitled to fifty percent of the profits earned by entities other than Regional/Gordon?**

70      As outlined above, through Dumbrell's efforts, and at Mr. Grosz's invitation, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property early in 2000.

71      At Gordon's direction, the twenty-five percent interest in the Queen Street property was held by one of his companies in trust for a syndicate of investors. Another Gordon company (LPH), his wife and his children held 73.33 percent of the syndicate. Several of Gordon's cousins and his lawyer, who practised with one of the cousins, held the other 26.67 percent of the syndicate.

72      The accounting breakdown on the syndicate's investment in the Queen Street property, prepared at Gordon's request, but accepted by Dumbrell at trial, showed that the syndicate advanced about $1,200,000 on the Queen Street project and received about $2,200,000 on that project resulting in a profit of just over $1,000,000. The accounting records indicate that the funds were distributed in accordance with the percentage of ownership in the syndicate. Gordon and his immediate family received about $732,000 of the $1,000,000 profit earned by the syndicate.

**Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407**

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

73      In oral argument, Mr. Zarnett acknowledged that if Dumbrell was entitled to compensation on the Queen Street project under the terms of the employment contract, no distinction could be drawn between profits earned directly by Regional and profits earned by other corporate entities used by Gordon to generate the profit. I would extend the same reasoning to cover profits earned by Gordon's wife and children. On this approach, Dumbrell was entitled to fifty percent of the profits earned by LPH, Gordon's wife and Gordon's children.

74      Counsel submits, however, that profits earned by other investors in the syndicate cannot be treated as the same as Regional's profits. The accounting records demonstrate that profits were paid out to the other investors when the syndicate sold its twenty-five percent interest in the Queen Street property to O. & Y.

75      In her reasons, the trial judge accepted, at para. 158, that there were "third parties investing and risking money". I take this to mean that the trial judge accepted that Gordon's cousins and his lawyer were *bona fides* investors who helped finance the twenty-five percent interest in the Queen Street property. She went on to hold, however, that Gordon's resort to other investors could not affect the compensation owed to Dumbrell. She said, at paras. 159-60:

> In calculating damages, there is no evidentiary foundation of any kind on which to assess legitimate costs which might have been set off against this profit.

> Without a scintilla of such evidence, the court is unable to do other than order damages of $500,000, pursuant to the first part of the paragraph in the employment contract dealing with employee remuneration.

76      I cannot agree with this analysis. To the extent that the syndicate was owned by third parties who genuinely invested funds in the project, I do not see how profits payable to those investors can become the profits of Regional for the purposes of calculating Dumbrell's compensation. The accounting records do provide evidence that 26.67 percent of the profit realized on the sale of the twenty-five percent interest in the Queen Street project was paid to third party investors and not to Regional, Gordon, his companies, or his immediate family. The calculation of Dumbrell's compensation on the Queen Street project should not have extended to a percentage of the profits earned by third party investors. If my arithmetic is correct, Dumbrell should have received fifty percent of the profits realized by a 73.33 percent interest in the syndicate.

**V Issue #3 — Did the trial judge err in holding Gordon personally liable for breach of contract?**

77      In his statement of claim, Dumbrell alleged several causes of action against Regional and Gordon. At trial, he succeeded only on the breach of contract claim. In the statement of claim, Dumbrell alleged a breach of contract against only Regional. In her initial reasons for judgment, the trial judge found both Regional and Gordon liable for breaching the contract. She did not separately address Gordon's personal liability for breaching a contract to which he did not appear to be a party. Gordon's liability for breach of contract as distinct from Regional's liability was not addressed by counsel in closing argument.

78      After the trial judge released her initial reasons, and at the request of counsel for Regional and Gordon, she heard further argument on Gordon's personal liability for breach of contract. The trial judge gave additional reasons in which she confirmed her initial finding that Regional and Gordon were both liable for the breach of contract.

79      I have difficulty understanding the basis upon which the trial judge found Gordon liable for breach of contract. She

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

spoke of "piercing the corporate veil" and described Regional as Gordon's agent for the purposes of the contract. However, she found both Regional and Gordon liable for breaching the contract. I agree with Mr. Zarnett's submission that if Regional acted as Gordon's agent for the purposes of the contract, only Gordon could be liable for breaching that contract. The trial judge's finding that Regional was liable along with Gordon for breaching the contract was also inconsistent with the trial judge's conclusion, at para. 187, that she should "pierce the corporate veil" and hold Gordon liable. Either Regional had a separate legal persona for the purposes of the contract or it did not.

80     The concepts of piercing the corporate veil and holding that a corporation acts as an agent for the individual who controls that corporation achieve the same result in that they both impose personal liability for what appear to be corporate actions. They achieve that result, however, in different ways. The agency relationship assumes that the corporation and the controlling mind are distinct, but that on the relevant facts the former acted as agent for the latter. Piercing the corporate veil ignores the legal persona of the corporation: Bruce L. Welling, *Corporate Law in Canada: The Governing Principles*, 2d ed. (Markham, Ont.: Butterworths, 1991) at 122-36.

81     There is no basis in this record for describing Regional as Gordon's agent for the purpose of entering into the employment contract with Dumbrell. Dumbrell did not plead that Regional acted as Gordon's agent. The terms of the contract offer no suggestion that Regional was acting in an agency capacity. Finally, Dumbrell's evidence does not suggest that he regarded Regional as Gordon's agent for the purposes of the contract.

82     Nor is any case made out for ignoring Regional's separate legal persona. There can be no doubt that Dumbrell contracted with Regional and only Regional in November 1998. The employment contract clearly describes Dumbrell as Regional's employee. Dumbrell's pleadings and his evidence do not suggest otherwise. Gordon's total ownership and control of Regional and the fact that he made all decisions on behalf of Regional in respect of its dealings with Dumbrell does not detract from Regional's standing as a separate and distinct legal entity. Corporations must necessarily act at the instance and under the direction of those fixed with the responsibility and authority to direct the affairs of the corporation: see *Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 26 O.R. (3d) 481 (Ont. C.A.) at 492.

83     The separate identity of a corporation can be ignored where the corporation is inserted into a transaction for a fraudulent or dishonest purpose. Corporations used in that way often have no assets, no corporate history, and no reason for existence other than facilitating a particular transaction. None of those indicia apply to Regional. Regional cannot be described as a shell or corporation of convenience put in place by Gordon for the purpose of entering into the contract with Dumbrell. As of November 1998, Regional had been a thriving well established corporate entity for many years. It participated in many different real estate transactions and employed many people. Dumbrell chose to become one of those employees. There is no suggestion in the evidence that the creation of the employer/employee relationship between Regional and Dumbrell was tainted by fraud or dishonesty on the part of Gordon. There is simply nothing to suggest that Gordon set out to deceive or trick Dumbrell when he and Dumbrell negotiated the employment contract which created the contractual relationship between Dumbrell and Regional, and not between Dumbrell and Gordon. Dumbrell knew full well he was contracting with Regional. He could only reasonably expect to look to Regional for compensation in the event of a breach of the terms of the contract.

84     The trial judge's reasons also suggest a second basis for holding Gordon liable. She referred to authorities that hold a directing mind of a company liable for inducing a breach of contract by that company: see e.g. *Said v. Butt*, [1920] 3 K.B. 497 (Eng. K.B.), at 504-506; *Truckers Garage Inc. v. Krell* (1993), 68 O.A.C. 106 (Ont. C.A.), at 114-15; *Kepic v. Tecumseh Road Builders* (1987), 23 O.A.C. 72 (Ont. C.A.) at 74.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

85     Cases where an individual has been held liable for inducing a corporation's breach of contract have nothing to do with piercing the corporate veil or the concept of agency. These cases acknowledge the separate legal identity of the corporation and its directing mind. They hold the directing mind liable for the discrete tort of inducing the breach of contract and not for breach of contract itself. The measure of damages for inducing the breach of contract may or may not be the same as would apply to the breach of contract.

86     Gordon cannot be liable for inducing a breach of the contract between Regional and Dumbrell. That cause of action was not pleaded. Nor do I understand counsel at trial or on appeal to have argued that Gordon's liability could be based on the separate tort of inducing a breach of contract. An allegation of inducing a breach of contract is very different from a claim that a person is liable for breaching the contract. In the absence of any pleading which expressly or impliedly alleges the tort of inducing a breach of contract, I do not think the principles underlying that tort can be relied on to render Gordon liable for the breached contract.

87     The difficulties inherent in transforming an allegation of a breach of contract into a finding of inducing a breach of that contract are apparent in the trial judge's reasons. To establish the tort of inducing a breach of contract by the directing mind of the contracting party, it must be shown, among other things, that the conduct of the directing mind was not *bona fides* in the best interest of the corporation. In the addendum to her reasons, the trial judge indicates that Gordon's conduct caused Regional to lose certain fees on the Queen Street property. She states, at para. 173:

> His [Gordon's] secretive and misleading conduct eventually caused a serious loss to his company when the company became unable to make the offer which would have resulted in another $300,000. - $400,000. fee.

88     I cannot agree that anything Gordon did caused Regional to act to its detriment in respect of the Queen Street property. The trial judge found that as a result of Dumbrell's efforts, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property. That is the only interest that was available to Gordon in the joint venture that ultimately purchased the property. As the trial judge found, the calculation of Regional's profits and, therefore, Dumbrell's commission, did not depend on what part of the profits Regional described as fees. Had Gordon chosen to describe some of the profits generated for the syndicate from the sale of its interests as fees payable to Regional, it would not have increased the overall profit earned by the syndicate and would have had no effect on the quantification of Dumbrell's compensation. There is no evidentiary basis to hold that Gordon's conduct in respect of the Queen Street property cost Regional anything. On my reading of Gordon's cross-examination, it was not suggested to him that his conduct had somehow deprived Regional of profits that it would otherwise have earned. A finding that Gordon acted against Regional's best interests in connection with the profit earned on the Queen Street property has no foundation in either the pleadings or the evidence.

**VI Conclusion**

89     I would allow Gordon's appeal, set aside the trial judge's finding regarding Gordon's personal liability, and dismiss the action against Gordon. I would allow Regional's appeal in part and vary the trial order to provide that Dumbrell is entitled to fifty percent of the profit from the Queen Street project earned by LPH, Gordon's wife and Gordon's two daughters.

90     Counsel should make written submissions (no more than ten pages each) as to costs both at the trial and on appeal.

*M.J. Moldaver J.A.*:

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407**

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

I agree.


**R.J. Sharpe J.A.:**


I agree.

*Appeal allowed in part.*

Footnotes

1     In their factum, the appellants argued that under the terms of the employment contract, Dumbrell was entitled only to fifty percent of Regional's profits and that none of the profit from the Queen Street project was earned by Regional. In oral argument, counsel accepted that the terms of the employment contract would reach profits earned by Regional or other entities controlled by Gordon.

*     In the contract, all of the paragraphs in Schedule "B" are numbered "1". For ease of reference, I have added the numbers in parentheses.

2     Lord Steyn has taken the same approach in his judgments: see *Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1987] 1 All E.R. 81 (Eng. Q.B.), Steyn J., aff'd [1987] 3 All E.R. 565 (Eng. C.A.). See also *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 178 D.L.R. (4th) 634 (Ont. C.A.), at 639; Lewison, *The Interpretation of Contracts, supra*, at 5, 22-24; *Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.*, [2001] NZCA 372 (New Zealand C.A.) at para. 38.

---

**End of Document**            Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1933 CarswellNat 46
The Supreme Court of Canada

Electric Chain Co. v. Art Metal Works Inc.

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

# Electric Chain Company of Canada Limited (Defendant), Appellant and Art Metal Works Inc. and Dominion Art Metal Works, Limited (Plaintiffs), Respondents

Rinfret, Smith, Cannon, Crocket and Hughes JJ.

Judgment: June 8, 1933
Judgment: June 9, 1933
Judgment: June 28, 1933

Proceedings: On Appeal from the Exchequer Court of Canada

Counsel: *R.C.H. Cassels K.C.* for the appellant.
*O.M. Biggar K.C., R.S. Smart K.C.* and *M.B. Gordon* for the respondents.

Subject: Intellectual Property; Property; Civil Practice and Procedure

**Headnote**

**Patents --- Actions for infringement — Remedies — Damages**

Patent owned by company — Articles manufactured by subsidiary joined as plaintiff — Right of action.

A. Co., one of plaintiffs, sued for infringement, which defendant company admitted, while denying that A. Co. had suffered damages. In 1932 plaintiff company obtained judgment, and damages were assessed, being reduced in amount by the Exchequer Court, which confirmed the referee's report in other respects. It appeared that the patented articles were made and sold by the D.A. Co., the other plaintiff, added as such after the referee's report, whose shares were practically all owned by the A. Co. That company's profits from the D.A. Co.'s operations were only through dividends on such shares. The special damages awarded were based on the profit which would have been made by the D.A. Co. on articles sold by defendant company, which the referee found would otherwise have been sold by the D.A. Co. Held, the D.A. Co. was only allowed by the A. Co. to make and sell the articles. Therefore, A. Co. only, and not its subsidiary, had a cause of action within the pleadings. The D.A. Co., not being the patentee, or the legal representative of the patentee, had no right, at any rate after the judgment of 1932, to be a party to the action. The A. Co. was not entitled to damages on the basis which had been adopted. There was no evidence to show that the dividends on the stock of the D.A. Co. were in fact affected by the infringement, or that the value of its shares, owned by the A. Co., were injuriously injured by the infringement. A. Co. was, however, entitled to substantial damages for infringement.

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

**The judgment of the court was delivered by *Hughes, J.*:**

1     This action was brought in the Exchequer Court of Canada by Art Metal Works Incorporated, a New Jersey corporation, against the appellant for infringement of letters patent No. 288148 and for an injunction and other relief. The prayer when the statement of claim was filed on the 24th day of September, 1931, read in part as follows:

The plaintiff therefore claims:

(*c*) $1,000 damages or alternatively an account of profits as the plaintiff may elect.

2     On the 23rd day of November, 1931, the appellant delivered its statement of defence consisting of four paragraphs, denying that the plaintiff was the owner of the patent, denying the infringement and impeaching the patent.

3     On the 30th day of May, 1932, the appellant served a notice of motion for an order amending its statement of defence by striking out the whole four paragraphs above mentioned and substituting therefor the following single paragraph:

The defendant admits the truth of the facts set forth in the plaintiff's statement of claim herein, but denies that the plaintiff has suffered any damages or that the defendant has made any profits from the alleged infringement.

4     On Tuesday, the 31st day of May, 1932, an order was made in the Exchequer Court of Canada as follows:

UPON the application of the defendant for an order permitting it to amend its statement of defence in this action by substituting for paragraphs 1 to 4 thereof the following paragraph, namely,

"The defendant admits the truth of the facts set forth in the plaintiff's statement of claim herein but denies that the plaintiff has suffered any damages or that the defendant has made any profits from the alleged infringement," upon reading the affidavit of Birger Elias Ekblad filed and the pleadings herein, and upon hearing what was alleged by counsel for both parties, This Court was pleased to order that the statement of defence be amended as prayed, counsel for defendant consenting that judgment be rendered upon the pleadings as amended, and upon reading the pleadings as so amended;

THIS COURT DOTH ORDER AND ADJUDGE that as between the plaintiff and the defendant the Letters Patent of the plaintiff, No. 288,148 bearing date the 26th day of March, 1929, for Improvements in Cigar Lighters, are valid, and infringed by the defendant.

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant, its officers, servants, workmen and agents be and they are restrained from infringing said Letters Patent owned by the plaintiff and No. 288,148, and from making, constructing, using and vending to others to be used in the Dominion of Canada the said invention as described in the specification attached to the said Letters Patent during the continuance of the said Letters Patent:

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do forthwith deliver up to the plaintiff all products or articles in the possession or control of the defendant which infringe the said Letters Patent;

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do pay to the plaintiff such damages as it may have suffered or be entitled to by reason of the infringements complained of, and doth direct that there be a reference to the Registrar of this Court to enquire into and report as to the amount of such damages, if any;

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do pay to the plaintiff its costs of this action forthwith after taxation thereof, and that the costs of the reference, if any, be reserved.


By the Court,

(Sgd.) "ARNOLD W. DUCLOS,"

Registrar.


5    The parties duly appeared before the Registrar and on the 15th day of August, 1932, the Registrar issued his report in which he found special damages of $10,013.17 and general damages of $1,000, making a total sum of $11,013.17.


6    On the 18th day of November, 1932, the learned President of the Exchequer Court of Canada heard a motion to confirm the report of the Registrar and also a motion of the appellant to vary or set aside the report. On this motion, the learned President gave leave to the New Jersey corporation to amend its statement of claim so as not to restrict its claim for damages to $1,000. The learned President also gave leave to the New Jersey corporation to move to add a Canadian corporation known as Dominion Art Metal Works Limited as a party plaintiff, it appearing according to counsel for the appellant, that the evidence before the Registrar was to the effect that the New Jersey corporation did not carry on business in Canada and that it was the Canadian company, if any, that had suffered damage by the infringement.


7    The New Jersey corporation thereupon applied for, and on the 16th day of December, 1932, obtained, an order for the joinder of the Canadian company as a co-plaintiff.


8    On the 6th day of February, 1933, the learned President gave judgment in favour of the respondents, reciting the two amendments above mentioned and reducing the damages to $8,663.14 plus interest and costs.


9    It was argued before us by the appellant that the Exchequer Court of Canada should not have permitted an increase in the amount of the claim for damages of the New Jersey corporation, and should not have permitted the joinder of another plaintiff in view of the fact, as the appellant's counsel alleged, that the judgment of the 31st day of May, 1932, was tantamount to a consent judgment.


10    On the other hand, counsel for the respondents contended that the two orders permitting the amendments, respectively above mentioned, were interlocutory orders of the Exchequer Court of Canada and that no appeal lay to the Supreme Court of Canada; that, even if they were final orders, they could not then be appealed as the thirty days referred to in section 82 of the *Exchequer Court Act* had long since expired, and lastly, that the appellant had appealed only against the final judgment of the 6th day of February, 1933.


11    It is not necessary to consider all of these arguments, and they are recited merely in order that the history of the proceedings may be clear.

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

12    The statement of claim alleges, the judgment of the 31st day of May, 1932, recites, and the evidence before the Registrar shows that the New Jersey corporation was the owner of the patent in question.


13    Section 2 (*e*) of the *Patent Act*, R.S.C. 1927, Chapter 150, is as follows:

  2. (*e*) "patentee" means the person for the time being entitled to the benefit of a patent.


14    Section 32 of the *Patent Act* is as follows:

  32. Every person who, without the consent in writing of the patentee, makes, constructs or puts in practice any invention for which a patent has been obtained under this Act or any previous Act, or who procures such invention from any person not authorized by the patentee or his legal representatives to make or use it, and who uses it, shall be liable to the patentee or his legal representatives in an action of damages for so doing; and the judgment shall be enforced, and the damages and costs that are adjudged shall be recoverable, in like manner as in other cases in the court in which the action is brought. 1923, c. 23, s. 32.


15    Section 2 (*c*) of the *Patent Act* is as follows:

  "Legal representatives" includes heirs, executors, administrators, guardians, curators, tutors, assigns or other legal representatives;


16    Section 30, subsection 1, of the *Patent Act* is as follows:

  Every patent issued for an invention shall be assignable in law, either as to the whole interest or as to any part thereof, by any instrument in writing.


17    It was not suggested that the patent had been assigned either as to the whole interest or any part thereof to the Canadian corporation.


18    Subsection 2 of section 30 reads:

  2. Such assignment, and every grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented, within and throughout Canada or any part thereof, shall be registered in the Patent Office in the manner from time to time prescribed by the Commissioner for such registration.


19    Subsection 3 provides that every assignment shall be null and void against any subsequent assignee unless duly registered.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

20     The section does not say that every grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented within and throughout Canada or any part thereof must be in writing and the statute is silent as to the effect of non-registration. *Dalgleish v. Conboy*[1].

21     On the relationship existing between the New Jersey corporation and the Canadian corporation, the following questions and answers in the cross-examination of Alexander Harris, secretary-treasurer of the New Jersey corporation, are relevant:

> Q. Have you any agreement between the Art Metal Works Incorporated and the Dominion Art Metal Works Limited which gives them the right to manufacture under the patent of Art Metal Works Incorporated? — A. I do not believe any specific agreement exists in view of the fact that the Canadian company is wholly owned by the United States company.
>
> Q. Just an implied agreement? — A. Yes, I think so.
>
> Q. I suppose the Dominion Art Metal Works Limited does not pay any royalty to Art Metal Works Incorporated? — A. No, sir, it does not.
>
> Q. The profit of Art Metal Works Incorporated is through dividends on shares of Dominion Art Metal Works Limited? — A. Yes.

22     This is not evidence of a "grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented within and throughout Canada or any part thereof."

23     It is rather evidence of a licence.

24     In *Hussey v. Whitely*[2], referred to in *Dalgleish v. Conboy, supra*, at page 261, the complainant had by a writen instrument granted the exclusive right to make and sell the subject of his invention, during the continuance of his patent, in twenty-three counties of Ohio, including that in which the defendants' factory was carried on, but the patentee expressly reserved to himself the right of sending machines of his own manufacture into the territory embraced in the contract. This was held to be a mere licence.

25     In *Heap v. Hartley*[3], the court considered the words which in section 2 (*e*) of our Act constitute the definition of a patentee, namely, "the person for the time being entitled to the benefit of a patent," 46-47 Victoria, chap. 57, sec. 46. In that case a patentee of machinery, by deed, granted to the plaintiff the full and exclusive licence to use and exercise the patented invention within a specified district for a limited period, and covenanted during that period not to sell or to grant any licence to exercise or use the invention to any other person in the same district; and in case the patent should be infringed, he covenanted to take all necessary proceedings for defending the same, and that in default of his so doing, it should be lawful for the plaintiff to take such proceedings in his (the patentee's) name.

26     The defendants had bought two of the patented machines from some person other than the plaintiff and were using them within the district.

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

27    An action was brought by the plaintiff in his own name and without joining the patentee against the defendants and was dismissed.

28    Counsel for the appellant unsuccessfully contended, page 465, that since a patentee was according to section 46 of the Patents Act, 46-47 Victoria, chapter 57, "the person for the time being entitled to the benefit of a patent," an exclusive licensee for a particular district was *quâ* that district, and during the term of the licence, in the position of a person to whom the patentee had given his monopoly and all his beneficial rights, that he was practically an assignee *pro tanto* of the patent, and was entitled to maintain an action for infringement of his rights within the district in his own name, and without joining the patentee.

29    The distinctions between a grant of an interest and a licence are discussed fully in the judgments of Cotton L.J., and Fry L.J. The latter said at page 470:

The plaintiff in this case sues under an exclusive licence to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his licence. * * * He says: "* * * as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a licence. An exclusive licence is only a licence in one sense; that is to say, the true nature of an exclusive licence is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other licence, no interest or property in the thing. A licence may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the licence pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

30    It appears, therefore, that only the New Jersey corporation had a cause of action within the pleadings against the appellant; and that the Canadian corporation, Dominion Art Metal Works, had no cause of action within the pleadings against the appellant.

31    It must follow that the Canadian corporation, not being the patentee or the legal representative of the patentee, had no right, at any rate after the judgment of the 31st day of May, 1932, to be a party to the action in the Exchequer Court of Canada at all.

32    It was not contended before us by the respondents that it was not open to the appellant after the judgment of the 31st day of May, 1932, to deny the right of the New Jersey corporation to the damages sustained either by it or by the Canadian company. This point was mentioned in the report of the Registrar, but possibly was abandoned when on the 16th day of December, 1932, the New Jersey corporation secured from the Exchequer Court of Canada an order adding the Canadian corporation as a party plaintiff.

33    The learned President in his preliminary reasons for judgment dated November 18, 1932, made the following among other findings:

The Canadian business of the plaintiff is carried on by a Canadian corporation, known as The Dominion Art Metal

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

Works Ltd., with headquarters at Toronto, and this company manufactures and sells in Canada the lighter which is the subject matter of the plaintiff's patent. No formal licence apparently issued from the plaintiff to the Canadian company, but the latter was impliedly licensed to manufacture and sell in Canada, the invention covered by the plaintiff's patent. The plaintiff company own all the shares in the Canadian company, and the officers of both companies appear to be the same. No royalty was paid by the Canadian company to the plaintiff company for the use of the plaintiff's invention, and the only profit accruing to the plaintiff from the Canadian company was in the way of dividends upon the shares it held in that company. At the time material here the major portion of the business of the Canadian company consisted in the manufacture and sale of lighters.

The registrar has reported, awarding damages to the plaintiff in the sum of $11,013.17. This amount was ascertained by taking the number of lighters admittedly sold by the defendant, viz., 5,553, and multiplying that by the profit which the Canadian company ordinarily made on each lighter sold by it in Canada, viz., $1.84, which would amount to $10,217.32; the Registrar allowed an additional sum of $1,000 in the nature of general damages for injury to the business, apparently, of the Canadian company.

* * * I do not think any injustice will be done the defendant if I allow the plaintiff to amend its statement of claim in such a way as will not restrict its claim for damages to $1,000, and this I do. * * *

The most serious point raised by the defendant's counsel was that the plaintiff could not recover damages, other than nominal damages, because it was the Canadian company that suffered damage, if any damage was caused by the defendant's infringement. And this point was raised by defendant's counsel before the Registrar. All the evidence given before the Registrar was apparently directed towards showing loss of profits or damages suffered by the Canadian company. Now it would seem to me to be unfortunate, there being some damages in the offing for some one, if the issue as to the amount of damages and to whom they should go, could not be concluded in this proceeding and without further litigation, particularly as infringement has been admitted. It seems to me therefore that the question as to whether or not the Canadian company should be added as a party to the cause should be determined before I proceed further.

34    On the 6th day of February, 1933, the learned President in his reasons for final judgment referred to the assessment of damages by the learned Registrar as follows:

The Registrar assessed the damages under two heads. First, he allowed $10,217.52, that amount being reached by multiplying the number of lighters sold by the defendant by $1.84, the amount of profit the Canadian company claimed to make on each lighter which it manufactured and sold, but from this amount he made a deduction of 2 per cent, representing sales which the defendant made but which the plaintiff might not have made; and he allowed $1,000 in addition to cover damages generally for loss of profits, and for disruption of business, suffered by the plaintiffs, owing to the sale of the infringing article.

35    Counsel for respondent contended at bar that the New Jersey corporation owned all the shares or nearly all the shares of the Canadian corporation, and that it was therefore entitled to the damages which were awarded by the learned President as owner of all, or nearly all, the shares of the Canadian corporation, and therefore as recipient of all, or nearly all, the dividends paid by the Canadian corporation.

36    Counsel for the respondent also contended that the case came within the decision of this Court in *Palmolive Manufacturing Co. (Ontario) Ltd. v. The King*[4].

37    There was, however, no evidence adduced before the learned Registrar to shew that the dividends on the stock of the Canadian company, if they went to the New Jersey corporation, were in fact affected by the infringement or that the value of

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

the shares of the Canadian corporation, owned by the New Jersey corporation, were injuriously affected in any way by the infringement.


38     Counsel for the respondent also contended that the New Jersey corporation owned all the assets of the Canadian corporation and that through this conection the former was entitled to the damages awarded by the learned President. This contention, however, cannot be well founded in the light of the evidence of Alexander Harris above set out.


39     As Lord Buckmaster said in *Rainham Chemical Works Ltd. v. Belvedere Fish Guano Co. Ltd.*[5]:

> It not infrequently happens in the course of legal proceedings that parties who find they have a limited company as debtor with all its paid-up capital issued in the form of fully-paid shares and no free capital for working suggest that the company is nothing but an alter ego for the people by whose hand it has been incorporated, and by whose action it is controlled. But in truth the Companies Acts expressly contemplate that people may substitute the limited liability of a company for the unlimited liability of the individual, with the object that by this means enterprise and adventure may be encouraged. A company, therefore, which is duly incorporated, cannot be disregarded on the ground that it is a sham, although it may be established by evidence that in its operations it does not act on its own behalf as an independent trading unit, but simply for and on behalf of the people by whom it has been called into existence.


40     Moreover, in *Collette v. Lasnier*[6], this Court held that in the circumstances of that case the profits made by the defendants were not a proper measure of damages; that the evidence furnished no means of accurately measuring the damages, but that substantial justice would be done by awarding $100.


41     But the New Jersey corporation is undoubtedly entitled to substantial damages for infringement. In *Meters Ltd. v. Metropolitan Gas Meters Ltd.*[7], Fletcher Moulton L.J., at page 163, said:

> The defendants seek to diminish the damages by a variety of affidavits intended to show that the particular purchasers for whom they manufactured these infringements were customers who would not have purchased from the plaintiffs if they had not purchased from them. I am not for a moment going to say that evidence of that kind may not be relevant, but the argument based upon it was, that where a plaintiff proves the sale of infringing instruments by the defendants he does not establish any right to damages unless he shows how many of those particular instruments would have been purchased from him if the defendant had not sold them; and the counsel for the defendants were bold enough to say that in this case of infringement on a large scale there ought to be only nominal damages.

And at page 164:

> In the assessment of damages every instrument that is manufactured or sold, which infringes the rights of the patentee, is a wrong to him, and I do not think that there is any case, nor do I think that there is any rule of law which says that the patentee is not entitled to recover in respect of each one of those wrongs.


42     And in *Watson, Laidlaw & Company, Limited v. Pott, Cassels & Williamson*[8], Lord Shaw of Dunfermline said at page 31:

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

The argument is — for indeed this instance covers sufficiently the whole ground — the argument is: Here it is demonstrated that the patentees have lost no trade which they could have obtained. And under the cover of certain judicial dicta the infringers are entitled to say that the entire measure of the patentees' damage is exhausted when restoration of the *status quo ante* has been obtained.

And at page 32:

But in addition there remains that class of business which the respondents would not have done; and in such cases it appears to me that the correct and full measure is only reached by adding that a patentee is also entitled, on the principle of price or hire, to a royalty for the unauthorized sale or use of every one of the infringing machines in a market which the patentee if left to himself, might not have reached. Otherwise that property which consists in the monopoly of the patented articles granted to the patentee has been invaded, and indeed abstracted, and the law, when appealed to, would be standing by and allowing the invader or abstracter to go free. In such cases a royalty is an excellent key to unlock the difficulty, and I am in entire accord with the principle laid down by Lord Moulton in *Meters, Limited*[9]. Each of the infringements was an actionable wrong, and although they may have been committed in a range of business or of territory which the patentee might not have reached, he is entitled to hire or royalty in respect of each unauthorized use of his property. Otherwise the remedy might fall unjustly short of the wrong.

43     The result is that the judgment of the 6th day of February, 1933, and the report of the Registrar dated the 15th day of August, 1932, will be vacated and set aside and in lieu thereof the New Jersey corporation will have judgment against the appellant for damages which we fix at $750 with the costs of the action down to and including the judgment of the 31st day of May, 1932, only, and the appellants will have the costs of this appeal.

*Judgment accordingly.*

Solicitors of record:
Solicitor for the appellant: *G.E. Maybee.*
Solicitors for the respondents: *Smart & Biggar.*

Footnotes

1      (1876) 26 U.C.C.P. 254.

2      (1860) 2 Fish. Pat. Cas. 120.

3      (1889) 42 Ch. D. 461.

4      [1933] Can. S.C.R. 131.

5      [1921] 2 A.C. 465 at 475.

6      (1885) 13 Can. S.C.R., 563.

7      (1911) 28 R.P.C. 157.

8      Session Cases (1913-1914) 18.

9      (1911) 28 R.P.C. 157, at 163.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Electric Chain Co. v. Art Metal Works Inc., 1933 CarswellNat 46**

1933 CarswellNat 46, [1933] 4 D.L.R. 240, [1933] S.C.R. 581

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061
Supreme Court of Canada

Eli Lilly & Co. v. Novopharm Ltd.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129, [1998] S.C.J. No. 59, 152 F.T.R. 160 (note),
161 D.L.R. (4th) 1, 227 N.R. 201, 80 C.P.R. (3d) 321

# Novopharm Limited, Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc., Respondents and The Minister of National Health and Welfare, Respondent

## Apotex Inc., Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc., Respondents and The Minister of National Health and Welfare, Respondent

### L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major, Bastarache JJ.

#### Judgment: July 9, 1998
#### Docket: 25402, 25348

Proceedings: reversing (1996), 197 N.R. 291 (Fed. C.A.); reversing (1995), 60 C.P.R. (3d) 181 (Fed. T.D.); and reversing (1996), 195 N.R. 378 (Fed. C.A.); affirming (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)

Counsel: *Harry B. Radomsky*, *Richard Naiberg* and *David Scrimger*, for the appellant Apotex Inc.
*Donald N. Plumley, Q.C.*,*Mark Mitchell* and *Stephanie Chong*, for the appellant Novopharm Limited.
*Anthony G. Creber* and *David Watson, Q.C.*, for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Subject: Intellectual Property; Property; Family; Civil Practice and Procedure

## Headnote

### Patents --- Transfer of interest — Licence — General

Sublicence versus supply agreement — What constitutes sublicence — N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N — N and A, respectively, appealed from decisions which found that supply agreement conferred sublicence — Appeals were allowed — For N to have granted sublicence to A, it must have granted, expressly or impliedly, right to do something which A would otherwise be prohibited from doing, and which N was permitted to do only by virtue of its compulsory licence — Essence of sublicence is that unlicensed party is permitted to exercise licensed rights independently of licensed party — Regardless of level of control that might be exercised by A over arranging and facilitating acquisition of licensed materials for its own benefit, no actual acquisition would be possible without N's involvement — Fact that agreement required licensed party to comply with terms of its licence suggested that parties did not intend to grant sublicences — Agreement did not on its face or in its actual legal effect amount to sublicence.

### Brevets --- Cession — Licence — En général

Sous-licence par opposition à accord d'approvisionnement — Ce qui constitue une sous-licence — N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    1

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

— E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de conformité à A et N — N et A, respectivement, se sont pourvues à l'encontre de ces décisions qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Pour que N ait accordé une sous-licence à A, elle doit avoir, expressément ou implicitement, accordé à A le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire, et que N n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire — Essence de la sous-licence est que la partie non titulaire d'une licence a le droit d'exercer les droits conférés par la licence indépendamment de la partie qui en est titulaire — Peu importe l'importance du contrôle que A pourrait exercer sur les mesures prises pour organiser et faciliter l'acquisition à son propre profit des substances brevetées, aucune acquisition réelle n'est possible sans la participation de N — Fait que l'accord d'approvisionnement exige que la partie titulaire d'une licence se conforme aux conditions de sa licence suggère que les parties n'avaient pas l'intention d'accorder des sous-licences — Accord ne constituait une sous-licence ni à première vue ni en vertu de son effet juridique réel.

## Patents --- Transfer of interest — Licence — Compulsory licence — Practice and procedure — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N, and purported to exercise its option to terminate N's compulsory licence on basis that N breached terms of its licence by granting sublicence to A — N and A appealed respective decisions which found that supply agreement conferred sublicence — Appeals were allowed — Appropriate date for assessing notice of allegation where prohibition order is sought by patentee is date of hearing and not date on which notice was issued — As of date of hearing, seven years had expired since first notice of compliance was issued to E so pursuant to s. 39.14, N was entitled to use patented invention for production of medicine and therefore had a valid non-infringing way to obtain bulk nizatidine — As of hearing date, N's notice of allegation was not premature — Since supply agreement was not sublicence, E was not justified in terminating N's compulsory licence — N's request for declaratory relief was denied — Given nature of inquiry on these judicial review proceedings, it was not appropriate for court to make binding declaration, for purposes other than appeal on hand, that agreement did not constitute sublicence or transfer of compulsory licence from N to A — Patent Act, R.S.C. 1985, c. P-4, s. 39.14.

## Brevets --- Cession — Licence — Licence obligatoire — Pratique et procédure — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de conformité à A et N, et a voulu exercer sa faculté d'annuler la licence obligatoire de N pour le motif que N avait violé les conditions de sa licence en accordant une sous-licence à A — N et A se sont pourvues à l'encontre des décisions respectives qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Date appropriée pour évaluer un avis d'allégation lorsqu'une ordonnance d'interdiction est demandée par le breveté est celle de l'audition et non celle du dépôt de l'avis — À la date de l'audition, sept années s'étaient écoulées depuis la délivrance du premier avis de conformité à E et, en vertu de l'art. 39.14, N avait le droit de fabriquer le médicament elle-même et disposait en conséquence d'un moyen valide n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac — À la date de l'audition, l'avis d'allégation de N n'était pas prématuré — Comme l'accord d'approvisionnement ne constituait pas une sous-licence, E n'était pas fondée d'annuler la licence obligatoire de N — Demande de jugement déclaratoire présentée par N a été rejetée — En raison de la nature limitée des présentes procédures de contrôle judiciaire, il ne convenait pas que la Cour déclare péremptoirement, et à des fins autres que celles des présents pourvois, que l'accord d'approvisionnement ne constituait ni une sous-licence ni une cession de la licence obligatoire de N à A — Loi sur les brevets, L.R.C. 1985, c. P-4, art. 39.14.

## Patents --- Actions for infringement — When infringement arises — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for infringement would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe E's patent — A's appeal against prohibition was dismissed — A appealed dismissal — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit,

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

### Patents --- Transfer of interest — Licence — Compulsory licence — Food and medicine — Medicine

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for nizatidine would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe E's patent — A's appeal against prohibition was dismissed — A appealed dismissal — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit, so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

**Table of Authorities**

**Cases considered by/Jurisprudence citée par *Iacobucci J.*:**

*Badische Anilin und Soda Fabrik v. Isler,* [1906] 1 Ch. 605, 75 L.J. Ch. 411, 94 L.T. 367, 22 T.L.R. 326 (Eng. Ch. Div.) — applied

*Betts v. Willmott* (1871), 6 Ch. App. 239, 25 L.T. 188, 19 W.R. 367 (Eng. C.A.) — referred to

*Carey v. United States* (1964), 164 Ct. Cl. 304, 326 F.2d 975 (U.S. Cl. Ct.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(*sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Cyrix Corp. v. Intel Corp.* (1996), 77 F.3d 1381, 37 U.S.P.Q.2d 1884 (U.S. Fed. Cir.) — considered

*E.I. Du Pont de Nemours & Co. v. Shell Oil Co.* (1985), 498 A.2d 1108, 227 U.S.P.Q. 233 (U.S. Del.) — distinguished

*Eli Lilly & Co. v. Apotex Inc.* (1996), 195 N.R. 378, 66 C.P.R. (3d) 329, 111 F.T.R. 80 (note) (Fed. C.A.) — referred to

*Gillette v. Rea* (1910), 15 O.W.R. 345, 1 O.W.N. 448 (Ont. Ch.) — referred to

*Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129, 134 F.T.R. 220 (Fed. T.D.) — considered

*Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519, 40 Sol. Jo. 32, 12 T.L.R. 28 (Eng. Ch. Div.) — referred to

*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.) — referred to

*Intel Corp. v. ULSI System Technology Inc.* (1993), 27 U.S.P.Q.2d 1136, 995 F.2d 1566 (U.S. Fed. Cir.) — considered

*Joy Oil Co. v. R.*, [1951] S.C.R. 624, [1951] 3 D.L.R. 582 (S.C.C.) — considered

*Lampson v. Quebec (City)* (1920), 28 R.L. 6, [1921] 1 A.C. 294, 54 D.L.R. 344 (Quebec P.C.) — applied

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.* (1968), [1969] 1 Ex. C.R. 529, [1969] 1 C.L.R. 440, 40 Fox Pat. C. 149, 57 C.P.R. 155 (Can. Ex. Ct.) — referred to

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.*, [1970] S.C.R. 833, 62 C.P.R. 223, 14 D.L.R. (3d) 210 (S.C.C.) — referred to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, 88 F.T.R. 260 (Fed. T.D.) — referred to

*Merck & Co. v. Apotex Inc.*, 60 C.P.R. (3d) 356, 180 N.R. 373, [1995] 2 F.C. 723, 95 F.T.R. 160 (note) (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302, 169 N.R. 342 (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), 25419 (S.C.C.) — applied

*National Phonograph Co. of Australia v. Menck*, [1911] A.C. 336 (Australia P.C.) — applied

*Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), 58 C.P.R. (3d) 209, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* 176 N.R. 48, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* [1995] 1 F.C. 588, [1995] 1 C.F. 588 (Fed. C.A.) — referred to

*Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 6 C.I.P.R. 137, 7 C.P.R. (3d) 294 (Fed. T.D.) — referred to

**Statutes considered by / Législation citée par *Iacobucci J.*:**

*Patent Act/Loi sur les brevets*, R.S.C./L.R.C. 1985, c. P-4
    Generally/en général — referred to

s. 39 — considered

s. 39(4) — considered

s. 39.11 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

s. 39.11(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

s. 39.11(2)(c) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

s. 39.14 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — considered

s. 39.14(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

s. 56 — referred to

*Patent Act Amendment Act, 1992/Loi sur les brevets, Loi de 1992 modifiant la* , S.C./L.C. 1993, c. 2
    Generally/en général — considered

s. 11(1) — referred to

**Regulations considered by/Règlements cités par *Iacobucci J.*:**

*Food and Drugs Act*, R.S.C./L.R.C. 1985, c. F-27
    *Food and Drug Regulations*, C.R.C. 1978, c. 870

s. C.08.004

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Patent Act*, R.S.C./L.R.C. 1985, c. P-4
   *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

   Generally/en général

   s. 3

   s. 4

   s. 4(1)

   s. 5

   s. 5(3)

   s. 5(3)(b)

   s. 6

   s. 6(1)

   s. 6(2)

   s. 7

   s. 7(2)(b)

**Words and phrases considered**

**Contra proferentum**

*Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471

**Termes et locutions considerés**

**Contra proferentem**

Cette règle [contra proferentem] a pour effet de protéger une partie à un contrat contre les conditions ambiguës ou déroutantes introduites d'une façon détournée par l'autre partie, en privilégiant une interprétation de l'ambiguïté au détriment de la partie qui les a rédigées. Toutefois, lorsque les deux parties s'entendent sur la façon d'interpréter le contrat, il n'est pas loisible à un tiers d'affirmer que la règle *contra proferentem* devrait être appliquée pour interpréter le contrat au détriment des *deux* parties contractantes. En fait, un tiers n'a aucune raison d'invoquer la règle *contra proferentem* : voir G.H.L. Fridman, *The law of Contract in Canada* (3e éd. 1994), à la p. 471.

APPEAL by appellant from judgment reported at (1996), 197 N.R. 291 (Fed. C.A.), allowing appeal from (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) dismissing application for prohibition order; APPEAL by appellant from judgment reported at (1996), 195 N.R. 378 (Fed. C.A.) dismissing appeal from (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) prohibiting issuance of notice of compliance.

POURVOI de l'appelante à l'encontre du jugement publié à (1996), 197 N.R. 291 (Fed. C.A.), accueillant l'appel du

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

jugement publié à (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) lequel a rejeté la demande d'une ordonnance d'interdiction; POURVOI de l'appelante à l'encontre du jugement publié à (1996), 195 N.R. 378 (Fed. C.A.) qui a rejeté l'appel du jugement publié à (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) interdisant la délivrance d'un avis de conformité.

*Iacobucci J.*:

1    A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "*Novopharm*" and "*Apotex #1*", reasons in *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), Doc. 25419 (S.C.C.) ("*Apotex #2*") are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

2    Owing to the intertwining nature of the lower court decisions in *Novopharm* and *Apotex #1*, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

## I. Background

### A. The patents and the compulsory licence

3    Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the *Patents Act*, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> **39**....
>
> (4)...
>
>> (*a*) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or
>>
>> (*b*) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of the medicine...

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

4      These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the *Food and Drug Regulations*, C.R.C., c. 870, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

5      On January 17, 1990, Novopharm applied under s. 39(4) of the *Patent Act* for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final dosage form is fixed at 6% of the selling price. Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence."

6      Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final dosage form, and any subsequent non-arm's length purchasers from the latter.

7      Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence."

*B. The supply agreement between Novopharm and Apotex*

8      On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the *Patent Act*, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2. In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3. In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4. In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5. In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6. The licensed party shall comply with the terms of the licence.

7. The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence had remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8. For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessibility [*sic*] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licences [*sic*] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994 advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

9    On February 15, 1993, most of the provisions of the *Patent Act Amendment Act, 1992*, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the *Patented Medicines* (*Notice of Compliance*) *Regulations*, SOR/93-133, (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in *Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129 (Fed. T.D.) at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the *Food and Drug Regulations*, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the *Patent Act Amendment Act, 1992*, ... (the "*Patent Act*") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the *Regulations*.

. . . . .

In effect, under Subsection 5(3) of the *Regulations*, in a "Notice of Allegation", the generic drug manufacturer, the "second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the *Regulations*, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the *Regulations*, the Minister compiles the patent lists into a public document called the "Patent Register".

10    As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

11    Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(*b*) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

12    The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

13    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in *Apotex #1*, upon which I shall elaborate shortly.

14    On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

*C. The Novopharm proceeding*

15    On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court-Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

16    Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court-Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

17    On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

18    Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the *Patent Act* which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

19    McGillis J. of the Federal Court-Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in *Apotex #1, infra*, held that a sublicence had in fact been conferred by virtue of the supply agreement.

### D. The Apotex #1 proceeding

20    In cross-examination on the hearing of the application for a prohibition order in *Apotex #1*, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

21    Relying on her analysis in *Novopharm*, McGillis J. of the Federal Court-Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

22    The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final dosage form would not have infringed the patents.

## II. Relevant statutory provisions

23    *Patent Act*, R.S.C., 1985, c. P-4

**39.11** (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

(*a*) where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

(*b*) where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

(2) The prohibition under subsection (1) expires in respect of a medicine
. . . . .

(*c*) ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

**39.14** (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, or

(*b*) where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

**Patented Medicines (Notice of Compliance) Regulations, SOR/93-133**

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

(*a*) state that the person accepts that the notice of compliance will not issue until the patent expires; or

(*b*) allege that

(i) the statement made by the first person pursuant to paragraph 4(2)(*b*) is false,

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(ii) the patent has expired,

(iii) the patent is not valid, or

(iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(*b*) or subsection (2) the person shall

(*a*) provide a detailed statement of the legal and factual basis for the allegation; and

(*b*) serve a notice of the allegation on the first person and proof of such service on the Minister.

6.(1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(*b*), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2)The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(*a*)the expiration of 30 days after the coming into force of these Regulations,

(*b*)the day on which the second person complies with section 5,

(*c*)subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(*d*)subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(*e*)subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(*f*)the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(*e*) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(*a*)the patent has expired; or

(*b*)the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(3) Paragraphs (1)(*c*), (*d*) and (*e*) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(*e*) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(*e*) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

# V. Judicial history

## A. Novopharm Ltd. v. Eli Lilly and Co.

### (1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 181 (Fed. T.D.)

24    As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the *Regulations* is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to *Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), [1995] 1 F.C. 588 (Fed. C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

25    Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novophar's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

26    Relying on the decision of this Court in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract." She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted was inadmissible on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex." In her view, at p. 199, the true nature of the agreement was that of "'a supply agreement dressed up to look like a sublicence'". In other words, despite the presence in the supply agreement of wording which might tend to suggest

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28      In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicenced to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

29      Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on *Consolidated-Bathurst, supra*. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

30      As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in *Pharmacia Inc., supra*, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

*(2) Federal Court of Appeal (1996), 67 C.P.R. (3d) 377 (Fed. C.A.)*

31      In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in *Apotex #1, infra*, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

32      The court held that, while the previous decision was not *res judicata*, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in *Apotex #1* was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in *Apotex #1* could therefore be applied

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

to *Novopharm*. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

### B. Apotex Inc. v. Eli Lilly and Co

#### (1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)

33      In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

34      In concluding in *Novopharm, supra*, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in *Novopharm* that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in *Novopharm* applied equally to the case at bar.

35      Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (Fed. T.D.) and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier."

36      Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

#### (2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329 (Fed. C.A.)

#### (a) MacGuigan J.A. (Robertson J.A. concurring)

37      In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

38    MacGuigan J.A. noted that the conclusion of McGillis J. in *Novopharm* as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: *see Consolidated-Bathurst, supra*.

39    MacGuigan J.A. relied on the decision of the Delaware Supreme Court in *E.I. Du Pont de Nemours & Co. v. Shell Oil Co.*, 227 U.S.P.Q. 233 (U.S. Del.1985) ("*Du Pont*"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on *Carey v. United States* 326 F.2d 975 (U.S. Cl. Ct. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

40    In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement." While he recognized that the *subjective* intention of the parties was to avoid creating a sublicence, he found that this was at odds with the *objective* intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

41    MacGuigan J.A. also found that, in accordance with his reading of *Consolidated-Bathurst, supra*, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the *contra proferentum* doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

42    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

*(b) Pratte J.A., dissenting*

43    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement." In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

44      Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it." He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV. Issues

45      As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

46      Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

## V. Analysis

### A. The agreement between Apotex and Novopharm

47      The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*(1) The nature of a sublicence*

48      Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing* (3rd ed. 1997), at §3.18.

49      To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

50      Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, *Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519 (Eng. Ch. Div.), at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

51      For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

*(2) Contractual interpretation and the intentions of the parties*

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

52    In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In *Consolidated-Bathurst, supra,* at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

53    From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of *contra proferentem*. *Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

54    ==The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.==

55    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. Quebec (City)* (1920), 54 D.L.R. 344 (Quebec P.C.):

> ...the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses...."

56    When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in *Joy Oil Co. v. R.*, [1951] S.C.R. 624 (S.C.C.):

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

...in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

57    In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the *Patent Act*, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

58    More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see *Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-503.

59    Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

60    Therefore, I am of the opinion that the trial judge erred, in the *Novopharm* proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in *Apotex #1*, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

61    Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to *act* pursuant to the licence.

62    Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: 4% of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

63    It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention *not* to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... *on the grounds that there is doubt as to whether or not the licence ... permits the requested acts* ..." (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party *to enable the unlicensed party to enjoy the use of the licence* to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only *indirect* enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

66    In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

*3. The legal effect of the supply agreement*

67    Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

*(i) Sublicence versus purchase and sale*

68    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the *Patent Act*, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

69    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605 (Eng. Ch. Div.), at p. 610; see also *Gillette v. Rea* (1910), 1 O.W.N. 448 (Ont. Ch.); *Betts v. Willmott* (1871), 6 Ch. App. 239 (Eng. C.A.), at 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

70    But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see *Intel Corp. v. ULSI System Technology Inc.* 995 F.2d 1566 (U.S. Fed. Cir. 1993).

71    Thus, practically speaking, the rights of use and alienation can only be *determinative* of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

72      In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73      A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in *Intel, supra*, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

74      In the instant appeals, the Federal Court of Appeal relied on *Du Pont, supra*, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view *Du Pont* as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In *Du Pont*, it was more significant that the unlicensed party actually *manufactured* the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

75      But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal *personnae*, and legitimate transfers of property do, in fact, take place. In *Cyrix Corp. v. Intel Corp.* 77 F.3d 1381 (U.S. Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished *du Pont, supra*, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

76      In my view, *Cyrix* is much more closely analogous than *Du Pont* to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Apotex. The only real difference is that, where in *Cyrix* the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed 4% royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77     Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in *Du Pont*. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, *inter alia*, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

78     Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and *de facto* transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would *necessarily* render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

79     As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

*(4) The agency argument*

80     In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

81     To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

*(5) Conclusion as to the nature of the supply agreement*

82     The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

83     That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in *Du Pont, supra*. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the *Patent Act* or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

84     Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

**B. Other issues in the Novopharm appeal**

*(1) Did the Federal Court of Appeal err in applying its decision in Apotex #1 to its decision in Novopharm?*

85     Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the *Novopharm* appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in *Apotex #1* may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Apotex #1* if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in *Novopharm* and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

86     It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as *res judicata* or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

*(2) Was Novopharm's notice of allegation premature and therefore not justified?*

87     Even the unequivocal conclusion as to the character of the supply agreement does not put the *Novopharm* matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

88     Pursuant to s. 39.11(2)(c) of the *Patent Act*, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the *Patent Act Amendment Act, 1992*, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

89     A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

90     However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the *Patent Act*. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

91     Pursuant to s. 39.14 of the *Patent Act*, Novopharm was entitled to use the patented invention for the preparation or

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

92    In *Apotex #2*, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the *Patent Act* by obtaining the medicine either from a Canadian supplier or not at all.

*(3) Jurisdiction to grant declaratory relief*

93    The final issue to be determined with respect to the *Novopharm* appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

94    In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

95    As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302 (Fed. C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

In this connection, it may be noted that, while s. 7(2)(*b*) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

96    This point was reinforced more recently by Strayer J.A. in *Pharmacia Inc., supra*, at p. 600:

If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

97    While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the *Novopharm* appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

*C. Other issues in the Apotex #1 appeal*

*(1) Would the reformulation of nizatidine by Apotex into final-dosage form infringe the patent held by Eli Lilly?*

98    Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

99    In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

100     Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler, supra*. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see *National Phonograph Co. of Australia v. Menck*, [1911] A.C. 336 (Australai P.C.)

101     Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

102     No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in *Merck & Co. v. Apotex Inc., supra*, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the *Patent Act*, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

103     However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723 (Fed. C.A.). At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: *any form* of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in *Libbey-Owens-Ford Glass Co. v. Ford Motor Co.*, [1970] S.C.R. 833 (S.C.C.), at p. 839, affirming the

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

judgment of Thurlow J. (as he then was) in the court below (reported at (1968), [1969] 1 Ex. C.R. 529 (Can. Ex. Ct.)):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that <u>in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] *if the owner could not put it to the only use for which it is usable without being liable for infringement*</u>. [Emphasis added.]

104    Accordingly, MacGuigan J.A. concluded, at p. 741, that

> The use and sale of the product of a machine, <u>particularly if production is the only possible use of the machine</u>, is accorded protection under s. 56 as a use of the machine itself... <u>In my view, use must be given the same sense in the case of a chemical invention</u>. [Emphasis added.]

105    The *Merck v. Apotex* decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

106    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

108      I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, *Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (Fed. T.D.) Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

109      In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## VI. Disposition

### A. Novopharm Ltd. v. Eli Lilly and Co.

110      For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court - Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

### B. Apotex Inc. v. Eli Lilly and Co.

111      Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

*Appeals allowed.*

*Pourvois accueillis.*

**End of Document**     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Case Name:*

# Geoffrey L. Moore Realty Inc. v. Manitoba
# Motor League (c.o.b. CAA Manitoba)

**Between**
**Geoffrey L. Moore Realty Inc. (applicant) appellant,**
**and**
**The Manitoba Motor League, carrying on business under**
**the firm name and style of CAA Manitoba (respondent)**
**respondent**

[2003] M.J. No. 191

**2003 MBCA 71**

[2003] 9 W.W.R. 385

173 Man.R. (2d) 300

34 C.P.C. (5th) 21

10 R.P.R. (4th) 1

123 A.C.W.S. (3d) 569

Docket No. AI02-30-05303

Manitoba Court of Appeal

**Kroft, Steel and Hamilton JJ.A.**

Heard: March 10, 2003.
Judgment: May 29, 2003.

(52 paras.)

*Landlord and tenant -- The premises -- Use restrictions -- Shopping mall premises -- Injunctions -- Permanent injunc-*
*tions -- When granted -- Interference with easement or restrictive covenant.*

Appeal by Moore Realty from a decision granting an injunction. The dispute arose out of exclusive-use clauses in leases
regarding CAA Manitoba and another tenant, Dowling Insurance. CAA's use was restricted to carrying on the business
of a travel agency and auto club. However, it was accepted that CAA was already providing out-of-province auto and
travel insurance. Dowling's lease provided that it had the exclusive right to carry on the business of a general insurance

brokerage, including the sale of household insurance. Moore sought an injunction to prohibit CAA from selling household insurance. The judge below granted partial relief and declared that CAA had the right to sell home insurance to its members as part of its full-service operation.

HELD: Appeal allowed. The court declared that CAA was not entitled to sell home insurance from the property. A permanent injunction was granted prohibiting it from doing so as long as Dowling sold household insurance on the premises. CAA was in breach of its negative covenant not to compete with a tenant. There were no irreparable harm, and the balance of convenience favoured Dowling. There were no special circumstances for not enforcing the negative covenant.

**Statutes, Regulations and Rules Cited:**

Manitoba Motor League Incorporation Act, R.S.M. 1990, c. 99. Manitoba Rules of Court, Rule 39.01(5).

**Counsel:**

R.L. Zaparniuk, for the appellant.
C.J. Phelan, Q.C., for the respondent.

---

    The judgment of the Court was delivered by

**1**    **HAMILTON J.A.**:-- This appeal requires the interpretation of a written lease to determine whether the respondent Manitoba Motor League (MML) is entitled to sell home insurance from its location in a shopping centre on McPhillips Street in Winnipeg. The appellant landlord says MML is in breach of its lease by doing so because Dowling Insurance Ltd. (Dowling Insurance), another tenant in the shopping centre, has the exclusive right to sell this type of insurance. By application to the Court of Queen's Bench, the landlord sought a declaration to that effect and an injunction prohibiting the sale of home insurance by MML from that location.

**2**    MML is a non-share capital corporation owned by its members. It was originally incorporated by statute in 1918 and continued as a corporation under The Manitoba Motor League Incorporation Act, R.S.M 1990, c. 99 (the Act). MML and several related corporate entities carry on business under the business name "CAA Manitoba," as an auto club affiliated with the Canadian Automobile Association and the American Automobile Association. Dowling Insurance is a general insurance broker licensed to sell all types of insurance, including household insurance. MML only started selling home insurance to its members from its various Manitoba Motor League outlets in 2000 as an agent for one insurance provider.

**3**    While the motions judge did not make the specific declaration as sought by the landlord, he did order that MML was only entitled to sell home insurance from the McPhillips Street location to its members as an agent for one insurance provider.

**4**    The application before the motions judge proceeded on the basis of affidavit evidence from John Karasevich, the lawyer who represented the landlord in negotiating and drafting the lease, and Michael Mager, Vice-President of Finance and Administration of MML. Mr. Karasevich was cross-examined on his affidavit. Charles Dowling, the President of Dowling Insurance, was also cross-examined. Mr. Mager was not.

**5**    The principles of contract interpretation are essential to the analysis required by this appeal. Before I comment on these principles, it is important to know the lease provisions that are at the heart of this dispute.

**6**    The landlord and MML entered into their written lease agreement on September 28, 1993. It was renewed without amendment for five more years in 1998. On December 13, 1993, the landlord entered into a written lease agreement with Dowling Insurance. It, too, was renewed without amendment for a further five years in 1999.

**7**    The MML lease contains a "Use of Premises" clause that reads as follows (at para. 4.03):

        Use of Premises.

> (1)    The premises shall be used by the Tenant during the entire term for the purpose of providing full services of a Manitoba Motor League outlet and for no other purpose. In particular without limiting the generality of the foregoing, the Tenant covenants and agrees that it shall not use any part of the Premises for any use other than the said permitted use if any such use would be contradictory to the exclusive rights of any then existing tenant of the Shopping Centre.
>
> (2)    The Landlord covenants with the Tenant that during the entire term and any renewal thereof the Tenant shall have the exclusive right within the entire Shopping Centre to carry on the business of a Travel Agency and/or Auto Club, and the Landlord shall not allow the occupancy or use of any other space within the Shopping Centre for such purpose.

> [emphasis added]

**8**    The landlord and MML agree that the phrase "any then existing tenant" in the second sentence of subpara. 4.03(1) refers to a time frame when MML engages in activity which is outside the permitted use of providing "full services of a Manitoba Motor League outlet."

**9**    The "Use of Premises" clause in the Dowling Insurance lease reads as follows (at para. 4.03):

> (1)    The premises shall be used by the Tenant during the entire term for the purpose of operating a general Insurance Brokerage, Autopac Outlet and related financial services including the sale of Registered RSP's, RRIF, Registered Educational Funds, Tax Plans and legal assistance and for no other purpose. In particular without limiting the generality of the foregoing, the Tenant covenants and agrees that it shall not use any part of the Premises for any use other than the said permitted use if any such use would be contradictory to the exclusive rights of any then existing tenant of the Shopping Centre.
>
> (2)    The Landlord covenants with the Tenant that during the entire term and any renewal thereof the Tenant shall have the exclusive right within the entire Shopping Centre to carry on the business of a general Insurance Brokerage, Autopac Outlet and/or the sale of household insurance and the Landlord shall not allow any other party or tenant to carry on other business which shall be in direct competition with the Tenant.

**10**    As can be seen from the excerpts noted above, subpara. 4.03(2) in both leases are exclusive use provisions that protect the tenant. By subpara. 4.03(2) of the Dowling lease, Dowling Insurance has the exclusive right to sell household insurance in the shopping centre. There is no issue that the home insurance sold by MML is the same type of insurance as household insurance sold by Dowling Insurance. The issue here is whether the sale of home insurance by MML from its McPhillips Street location is permitted because it falls within the "full services of a Manitoba Motor League outlet."

Principles of Contract Interpretation

**11**    The cardinal principle of contract interpretation is that the court "should give effect to the intentions of parties as expressed in their written document." See Manulife Bank of Canada v. Conlin, [1996] 3 S.C.R. 415 at para. 79. If the contract is clear and unambiguous, the contract itself should be all that is required to determine the parties' intentions. That is, it will not be necessary to consider extrinsic evidence to assist in interpreting the contract. In Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129, Iacobucci J. wrote (at para. 55):

> Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face.

And later (at para. 57):

> [I]t cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretative aids are necessary.

**12**    There are three other well-known principles of contract interpretation that should not be overlooked when considering the text of a contract:

> 1)    all the words in the contract are to be given meaning, if possible (National Trust Co. v. Mead, [1990] 2 S.C.R. 410);

> 2)    the contract should be construed as a whole (Scanlon v. Castlepoint Development Corp.
> (1992), 11 O.R. (3d) 744 (C.A.), leave to appeal to the Supreme Court of Canada denied,
> [1993] S.C.C.A. No. 62, [1993] 2 S.C.R. x); and
>
> 3)    the absence of words may be considered (Controls & Equipment Ltd. v. Ramco Contrac-
> tors Ltd. et al. (1999), 209 N.B.R. (2d) 1 (C.A.)).

**13**    It is important to remember that the principle to exclude extrinsic evidence does not require the court to consider the text of a contract in a vacuum. The case law is clear that context, or what some call the surrounding circumstances or the factual matrix, may be considered by the court when interpreting the contract.

**14**    In Eli Lilly, Iacobucci J. observed (at para. 54):

> The contractual intent of the parties is to be determined by reference to the words they used in
> drafting the document, possibly read in light of the surrounding circumstances which were preva-
> lent at the time.

**15**    Surrounding circumstances are often important because, in the real world, the task of ascertaining contractual intention can be difficult as words do not have immutable or absolute meanings. Rather, words often take their meaning from a multitude of contextual factors including the nature of the relationship created by the agreement and the purpose of the agreement. This point is made in many appellate and Supreme Court of Canada decisions. For example, in White v. Central Trust Co. (1984), 7 D.L.R. (4th) 236 (N.B.C.A.), La Forest J.A. (as he then was), wrote (at p. 248):

> [I]n determining what was contemplated by the parties, the words used in a document need not be
> looked at in a vacuum. The specific context in which a document was executed may well assist in
> understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the
> surrounding circumstances in order to ascertain what the parties were actually contracting about.

See also Hill v. Nova Scotia (Attorney General), [1997] 1 S.C.R. 69 and Manitoba Hydro Electric v. Inglis (John) Co. et al. (1999), 142 Man.R. (2d) 1 (C.A.), where the above quote is cited with approval.

**16**    The importance of surrounding circumstances was also referred to in the often-quoted judgment of Lord Wil-berforce in Reardon Smith Line Ltd. v. Hansen-Tangen, [1976] 3 All E.R. 570 (H.L.). After indicating that particular evidence in that case concerning certain industry practices in Japan was not admissible to construe the contract, he wrote (at p. 574):

> But it does not follow that, renouncing this evidence, one must be confined within the four cor-
> ners of the document. No contracts are made in a vacuum: there is always a setting in which they
> have to be placed. The nature of what is legitimate to have regard to is usually described as "the
> surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined.
> In a commercial contract it is certainly right that the court should know the commercial purpose
> of the contract and this in turn presupposes knowledge of the genesis of the transaction, the back-
> ground, the context, the market in which the parties are operating.

**17**    As made clear by Justice Iacobucci in Eli Lilly, a court's reference to surrounding circumstances is to circum-stances at the time of execution of the contract. This point is made by G.H.L. Fridman, The Law of Contract in Canada, 4th ed. (Toronto: Carswell, 1999) at 478:

> The paramount test of the meaning of words in a contract is the intention of the parties. That is to
> be determined in the operative sense by reference to the surrounding circumstances at the time of
> signing the contract.

**18**    It is also important to remember that when determining the intention of the parties, it is in the objective sense of a reasonable person by reference to the surrounding circumstances at the time of the signing of the contract. See Rear-don Smith Line Ltd., and MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority (1992), 72 B.C.L.R. (2d) 273 (C.A.).

**19**    If evidence of surrounding circumstances is admissible, what is meant by inadmissible extrinsic evidence? Most commonly it is evidence of subjective intention or of the negotiations leading to the final contract. In Eli Lilly, the ex-

trinsic evidence in question concerned the subjective intentions of the parties' principals. See also Glimmer Resources Inc. v. Exall Resources Ltd. (1999), 119 O.A.C. 78, in which evidence of subjective intention was excluded.

**20**     In the well-known decision Prenn v. Simmonds, [1971] 3 All E.R. 237 (H.L.), Lord Wilberforce began by noting the obvious reasons why evidence of negotiations should be excluded (at p. 240):

> There were prolonged negotiations between solicitors, with exchanges of draft clauses, ultimately emerging in cl. 2 of the agreement. The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience (although the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, although converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words?

**21**     He continued by commenting on the importance of evidence of the "genesis" and "aim" of the transaction (at p. 241):

> In my opinion, then, evidence of negotiations, or of the parties' intentions, ... ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction.

**22**     The importance of the consideration of the genesis of a transaction was repeated a few years later by Lord Wilberforce in Reardon Smith Line Ltd., as seen in the quote from that judgment at para. 16 above.

**23**     More recent cases, while recognizing the basic principle that evidence of negotiations is not admissible, have considered evidence of negotiations in reference to the commercial objective and factual matrix. One illustrative example is Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd., [2000] 7 W.W.R. 46, 2000 BCCA 365, which relies on the principles articulated in Prenn v. Simmonds, McEachern C.J.B.C. opined (at para. 29):

> [I]t is important to remember that negotiations between the parties are not relevant in determining the meaning of the language used by the parties. This is because parties often change their views and positions during negotiations. The fact that the parties were in negotiations, and the reasons for these negotiations, however, including the commercial objectives of the parties is relevant as a part of the factual matrix, or factual underpinning of the agreement: Prenn v. Simmonds, ... .

**24**     When there is no ambiguity, the courts are not often called upon to consider the commercial reality of the transaction in the sense of determining a "sensible commercial result." Iacobucci J. commented on this in Eli Lilly (at para. 56):

> When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst [ [1980] 1 S.C.R. 888] that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.

**25**     When is a contract or a phrase ambiguous? Difficulty in interpreting a contract is not synonymous with ambiguity (Paddon-Hughes Development Co. v. Pancontinental Oil Ltd., [1999] 5 W.W.R. 726 (Alta. C.A.)). An ambiguous phrase has been described as one that is "reasonably susceptible of more than one meaning" (Hi-Tech Group Inc. v. Sears Canada Inc. (2001), 52 O.R. (3d) 97 at para. 18 (C.A.), and as one with a "double or devious meaning, that is to say, one word or one expression or a series of expressions capable on its face or in its application of two or more meanings" (Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town) (2000), 5 C.L.R. (3d) 55 at para. 9, 2000 NFCA 21, quoting Leitch Gold Mines Ltd. et al. v. Texas Gulf Sulphur Co. (Incorporated) et al., [1969] 1 O.R. 469 at 524 (H.C.).

This cannot be determined until the full text of the contract is considered, in light of the surrounding circumstances at the time of its execution, if necessary.

26      In brief summary then, to determine the intentions of the parties expressed in a written contract, one looks to the text of the contract as a whole. In doing so, meaning is given to all of the words in the text, if possible, and the absence of words may also be considered. If necessary, the text is considered in light of the surrounding circumstances as at the time of execution of the contract. The goal is to determine the objective intentions of the parties in the sense of a reasonable person in the context of those surrounding circumstances and not the subjective intentions of the parties. If, after that analysis, the text in question is ambiguous, extrinsic evidence may be considered.

Motions Judge's Ruling

27      The motions judge identified the issue as a narrow one, being the interpretation of clause 4.03(1) and (2) of the MML lease. He noted that "the primary source of the contract between the parties is obviously the words of the agreement." He went on to say:

> The other matters raised, such as intent, background, what the entities do at the time the contract is entered into and so on, is really a back up way of getting to the primary issue, which is the intent of the parties, as reflected in the agreement, that is, to assist in interpreting ambiguities or issues that are not clear cut in the wording.

28      With respect to the meaning of "full services," the motions judge had this to say:

> The lease also refers to providing full services. It is, I feel, quite obvious that the parties knew and understood that this is a growing and changing business. It engages in certain activities that are inherent in the nature of a Manitoba Motor League outlet. This phrase is in conjunction with sub-section (2) which talks about an exclusive right within the shopping centre to carry on the business of a travel agency and/or auto club. ... .
>
> ... I prefer to deal with the two paragraphs together and treat paragraph two as if it is almost different wording for paragraph one and tends to explain its meaning or to give it context and outline its boundaries.
>
> The question then becomes what are the full services of a Manitoba Motor League outlet; what is the business of a travel agency and/or auto club? I do not accept and I do not think that counsel was suggesting that it is the business as defined in a 1914 enabling statute. I believe that at the time the lease was signed it was understood that this is a member organization. The lease spoke about full services. They knew it was not static.
>
>                           . . . . .
>
> I have come to the conclusion that one has to read as qualifying words into that paragraph that the parties intended that these be legitimate, these full services, that they be a reasonable expansion and growth of an auto club and a Manitoba Motor League. If the issue develops in another case of what is a reasonable addendum or expansion or growth of the Manitoba Motor League well, then one will look at the various circumstances at that time.

29      The motions judge noted that MML was already selling out of province auto/travel insurance; that the insurance in issue here is "single source insurance"; and that MML is "only an agent for that insurance company" and does not act as broker for multiple insurance companies. He also noted that it was important that MML was selling the insurance to members only. He concluded that:

> [S]elling home insurance from a single source to members only is reasonably included within the notion of providing full services as a Manitoba Motor League outlet, in carrying on as a travel agency and/or auto club.

30      The motions judge then purported to grant an injunction to allow MML to sell home insurance from a single source as an agent of one insurance company and to sell it to members only. All other sales of home insurance were

prohibited. The effect of the ruling was that MML was not in breach of its lease and that it could continue selling home insurance in the manner that it had been doing.

**31**    Both counsel referred at some length to the trial and appeal decisions in London Drugs Ltd. v. Truscan Realty Ltd. et al. (1988), 3 R.P.R. (2d) 60 (B.C.S.C.), [1989] B.C.J. No. 823 (C.A.), before the motions judge and in this appeal. In London Drugs the plaintiff pharmacy, relying on a restrictive covenant in its lease, successfully objected to a food supermarket in the same shopping mall expanding to include a pharmacy to sell prescription drugs. The landlord relied on the reasoning of Legg J. in that case, which was upheld by the British Columbia Court of Appeal. To reach his conclusion, Legg J. looked at the wording of the lease and the surrounding circumstances. In doing so, he applied the basic principles outlined earlier. Of particular significance was the principle that "the meaning of a term in a written agreement is to be determined in accordance with the circumstances existing at the time of entering into the agreement" (at p. 68). At the time of the execution of the lease in question, Legg J. found the surrounding circumstances to be that supermarkets in British Columbia did not include in-store pharmacies and that the supermarket in question was not licensed to sell prescription drugs. The latter finding led to the inference that there was no intention at the time of lease execution for the supermarket to sell prescription drugs.

**32**    The Court of Appeal ruled that Legg J. appropriately considered "the factual matrix as revealed by the documentary and oral evidence, and he considered other clauses of the agreement in reaching his decision ... ." The Court of Appeal did not accept the supermarket's argument that the wording of its lease should be interpreted in a flexible manner. In doing so, the court noted that words such as "from time to time" were not included in the lease as they were, for example, in the London Drugs lease. In that lease, the "use" clause used the following words: "all other items normally carried in other London Drug[s] outlets from time to time." The Court of Appeal stated that these words:

> ... indicate in themselves a flexible interpretation so that as the lease progresses, if there is a change in the character of the business, that change in character will be permitted as a use provided it is a normal use throughout that type of business.

**33**    The motions judge determined that there was an important difference between London Drugs and the circumstances here, which he explained in this way:

> In the London Drugs case, the core nature or the fundamental nature of the entity involved was not in dispute or was not in issue. By that I mean it was a business that sells things. The only dispute was what it can sell and what it cannot sell. We are dealing here with not only a business that sells things. As we see in the wording of the lease, it talks about providing full services of a Manitoba Motor League outlet.
>
> The nature of the entity that we are dealing with here is a member organization. It is not an entity that sells to anybody that walks in through the door but only to members.

Decision

**34**    The landlord says that the interpretation given by the motions judge to subpara. 4.03(1) of the MML lease was too broad and that he erred in a number of ways:

>  1.    by distinguishing the London Drugs case from the facts here on the basis that the London Drugs case involves restrictions on sales, and here the issue relates to "full services of a Manitoba Motor League outlet";
>  2.    by finding the nature of the business of MML is not static, and this allowed MML to render services that it did not render nor contemplate at the time it entered into the MML lease;
>  3.    by making a distinction between the sale of a product or services to a "member" as opposed to the public; and
>  4.    by finding that the sale as agent for a single insurance company did not breach the restrictive covenant.

**35**    MML appropriately does not take serious issue with appeal grounds three and four. While the distinction between a member of the MML and a member of the public is obviously an important distinction for MML, it is a distinction without a difference for the issue here because of Dowling Insurance's exclusive right to sell household insurance in

the shopping centre. Neither is there a relevant distinction to be drawn between selling insurance as agent for a single insurance company and selling it as an insurance broker.

**36**    Both parties maintain that the "Use of Premises" clause in the MML lease is clear and unambiguous. MML says that the words "full services of a Manitoba Motor League outlet" are permissive in nature because member services are not static and the services that are provided from the McPhillips Street outlet are defined by the services that are provided at the other Manitoba Motor League outlets in Manitoba. In effect, MML argues that these words show the intention of the parties that MML has the flexibility to determine what "full services" are from time to time during the lease term. Therefore, from the time home insurance was sold at one of the other Manitoba Motor League outlets, it could also be sold from MML's McPhillips Street location.

**37**    MML acknowledges the restrictive covenant in the second sentence of the "Use of Premises" clause, but argues that it only restricts MML from providing a service at its McPhillips Street location that is not provided in another Manitoba Motor League outlet.

**38**    The landlord responds by saying that the intention of the parties is to be determined in accordance with the plain, ordinary and popular meaning of the words used in the lease, applying an objective meaning that is determined in accordance with the circumstances existing at the time of entering into the agreement. The landlord contends that the issue is therefore simply one of determining what were the full services of a Manitoba Motor League on September 28, 1993, the date the MML lease was executed. To answer this, the landlord relies on the following surrounding circumstances as at that time:

-    The express purpose of MML, as stated in the Act, to further "... the interests of motorists, demonstrating the need of good roads, posting signs and marking touring routes, co-operating with other associations having similar objects and promoting social intercourse among members." There is no reference to home insurance.
-    No Manitoba Motor League outlets sold home insurance.
-    The existence of the restriction on competition with "then existing tenant" contained in the second sentence of subpara. 4.03(1) of the MML lease.

**39**    The landlord also relies on the fact that the words "and its affiliated companies" were deleted from subpara. 4.03(1) of the MML lease during the course of negotiations between the submission of a letter of intent and the execution of the final lease document. It is an affiliated company that sells the home insurance.

**40**    While I agree with much of the argument of the landlord, I wish to make two comments. For the reasons that I will explain more fully in a moment, the restriction on competition contained in the second sentence of subpara. 4.03(1) of the MML lease is very important. But it is not a surrounding circumstance. It is simply a part of the text of the MML lease that must be given meaning. Secondly, unless the evidence of the deletion of the words "and its affiliated companies" can be considered as evidence of surrounding circumstances going to the "genesis" or "aim" of the transaction, this evidence is not admissible unless the words "full services of a Manitoba Motor League outlet" are ambiguous. For the reasons that follow, I conclude that they are not.

**41**    On its own, the phrase "full services" has little, if any, meaning other than it is indicative of an array of services. In that respect there is a sense of generality and flexibility. But it is not open-ended generality and flexibility as MML argues. The phrase "full services" finds its meaning in certain text of the MML lease and the surrounding circumstances as at the time of its execution.

**42**    The text analysis commences with the phrase "a Manitoba Motor League outlet." I agree with the motions judge that the words in para. 4.03(2) assist in interpreting this phrase. In this exclusive use covenant, MML's use of the premises as an auto club/travel agency is protected. While this protection is not necessarily definitive of all of the services that can be provided by a Manitoba Motor League outlet, the reference to auto club/travel agency is certainly indicative of services that are provided by a Manitoba Motor League outlet. This is particularly so when those services are consistent with the purpose of MML described in its own incorporating statute and is consistent with the core services of CAA Manitoba described in Mr. Mager's affidavit as "Emergency Road Service ... towing, starting, boosting, lock out service, extrication, fuel delivery or tire service to the member."

**43**    The covenant by MML not to compete with "any then existing tenant" is perhaps more important. By this covenant, the landlord addressed its concern that "any use other than the said permitted use" of MML might compete with a tenant in the shopping centre to whom the landlord had granted an exclusive right of use, as it did with Dowling Insur-

ance. To have meaning, these words must have a point of reference. In my view, that point of reference must be the ar-ray of services of a Manitoba Motor League outlet on September 28, 1993. The words "without limiting the generality of the foregoing" do not derogate from this interpretation, as argued by MML. Rather, they simply acknowledge that MML is entitled to provide an array of services. By the restrictive covenant, MML agreed not to change the array of services after September 28, 1993, if it would then be in competition with a tenant protected by a restrictive covenant.

**44**     Finally, it is telling that the words "from time to time," or other words denoting complete flexibility, are not used in the "Use of Premises" clause, as was the case in the London Drugs lease. Those words would have gone a long way to provide the flexibility MML argues is intended by the words "full services."

**45**     The most important surrounding circumstance is that MML did not sell home insurance on September 28, 1993. Home insurance was not part of the array of services provided at that time. The fact that MML sold various types of travel insurance in September 1993, is simply consistent with its travel agency services and nothing more, because trav-el insurance is so different from home insurance.

**46**     I pause to note that this is not a case where it is necessary to consider the commercial reality of the transaction. I say this because, while each party has something to gain by pressing for its interpretation to be accepted, both interpre-tations are consistent with the commercial purpose of the transaction which was for the landlord to rent space to MML for use as a Manitoba Motor League outlet.

**47**     The motions judge appeared to understand the importance of determining the intentions of the parties by refer-ring to the words used in the lease and to some surrounding circumstances. However, he erred when he failed to consid-er the restriction on competition in the second sentence of subpara. 4.03(1) of the MML lease and when he read into that clause a meaning of "reasonable expansion and growth of an auto club and a Manitoba Motor League" as determined by the circumstances at a particular time.

**48**     Therefore, looking at the lease as a whole, in light of the surrounding circumstances as at the date of execution, I can come to only one conclusion. "Full services of a Manitoba Motor League outlet" is not broad enough to include the sale of home insurance in light of the exclusive right of Dowling Insurance to sell household insurance. By selling home insurance, MML is in breach of its lease.

**49**     While this analysis was not free of some difficulty, after applying the principles of contract interpretation, there was no ambiguity in meaning. As a result, and notwithstanding there was no objection from MML to this evidence, I did not consider the evidence of the deletion of the words "and affiliated companies" relied upon by the landlord as an interpretative aid. Nor did I consider it as part of the surrounding circumstances pertaining to the genesis of the transac-tion. If I had done so, this evidence would have simply underscored my conclusion. In reaching my conclusion, I also did not consider certain evidence contained in para. 9 of Mr. Mager's affidavit. The landlord raised an objection to this evidence because the information contained in the paragraph is simply based on the belief of Mr. Mager, but does not state the source of that belief. The landlord argued that this offends Queen's Bench Rule 39.01(5), which stipulates that affidavits filed with respect to applications can only contain matters relating to information and belief on non-contentious issues. In that this paragraph deals specifically with the sale of home insurance by other auto clubs af-filiated with the Canadian and American Automobile Associations, it does deal with a contentious issue. But I find it unnecessary to rule on the Queen's Bench Rule objection because I agree with the landlord's other contention that what other auto clubs outside of Manitoba do is simply irrelevant to the determination of the issue before this court.

Injunctive Relief

**50**     By selling home insurance MML is in breach of its negative covenant not to compete with a tenant with an ex-clusive right to use its premises in a certain manner; in this case, Dowling Insurance's exclusive right to sell household insurance in the shopping centre. Before MML commenced to sell home insurance, the exclusive right in favour of Dowling Insurance was brought to the attention of MML by the landlord. MML chose to breach its negative covenant by ignoring the demand not to sell home insurance.

**51**     The landlord seeks an injunction prohibiting MML from selling home insurance from its McPhillips Street loca-tion. There are no special circumstances here, be it by way of evidence that the landlord will not suffer irreparable harm or that the balance of convenience favours MML, to dissuade me from the presumption that I should exercise my dis-cretion in favour of enforcing the negative covenant. See Miller v. Toews (1990), 70 Man.R. (2d) 4 (C.A.) and Krahn Enterprises Ltd. v. Big Apple Imports Ltd. (1992), 82 Man.R. (2d) 106 (Q.B.). The permanent injunction sought by the landlord is granted.

Conclusion

**52**     The appeal is allowed. There will be judgment declaring that MML is not entitled to sell home insurance from its McPhillips Street outlet and granting a permanent injunction prohibiting MML from selling home insurance from that location so long as Dowling Insurance sells household insurance from its premises in the shopping centre. The landlord is entitled to its costs on appeal and in the Court of Queen's Bench.

HAMILTON J.A.
 KROFT J.A.:-- I agree.
 STEEL J.A.:-- I agree.

1929 CarswellBC 113, [1929] 4 D.L.R. 161, [1929] S.C.R. 630, 36 C.R.C. 23

1929 CarswellBC 113
The Supreme Court of Canada

Georgia Construction Co. v. Pacific Great Eastern Railway

1929 CarswellBC 113, [1929] 4 D.L.R. 161, [1929] S.C.R. 630, 36 C.R.C. 23

# Georgia Construction Company (Plaintiff), Appellant and Pacific Great Eastern Railway Company (Defendant), Respondent

Duff, Mignault, Newcombe, Lamont and Smith JJ.

Judgment: April 23, 1929
Judgment: April 24, 1929
Judgment: April 25, 1929
Judgment: June 13, 1929

Proceedings: On Appeal from the Court of Appeal for British Columbia

Counsel: *J.W. de B. Farris K.C.* for the appellant.
*Aimé Geoffrion K.C.* and *R.W. Lane* for the respondent.

Subject: Contracts; Evidence

**Headnote**

**Construction Law --- Building contract — Terms of contract — Implied terms**

Contract for construction of railway line — Overhaul — Basis for measurement — Alleged custom.

Plaintiff company contracted to make a cutting on a railway line, and to use the material thus excavated for the purpose of making an embankment on another part of the line. Defendant company was to pay a specified price for each cubic yard of material, which price included payment for transportation, but if there was an overhaul exceeding 500' an increased price was to be paid. Plaintiff company obtained the material from a bluff so situated as to render haulage along the railway line impracticable, and the fill was brought to the site of the embankment by a circuitous route. The result was that the overhaul exceeded 500'. Plaintiff company claimed the increased price, but defendant company alleged that in accordance with the usage governing railway contracts the length of haulage was to be measured along the railway line from the point nearest the centre of the excavation to the point nearest the centre of the embankment. The evidence as to such custom or usage was, however, incomplete and contradictory. Held, the Court would not include an alleged custom or usage as a term thereof, unless such usage was reasonably certain, so notorious and so generally acquiesced in that it could be presumed to constitute a term of the contract. In the circumstances, the existence of the alleged usage had not been proved, and therefore plaintiff company was entitled to be paid in accordance with the distance actually traversed.

**Construction Law --- Payment of contractors and subcontractors — Entire contract — Conditions precedent to payment — Certificate of completion — Duty of impartiality regarding issuance**

Certificate condition precedent to payment — Engineer influenced by owner — Certificate not required.

Where the contract provided that payment was to be made upon the engineer's certificate, such a certificate was held to be a condition precedent to payment, but, where the engineer had subserviently adopted the owner's viewpoint in regard

to matters in dispute between the parties, the contractor was held thereby relieved from the necessity of obtaining such a certificate.

**Construction Law --- Payment of contractors and subcontractors — Extras — What constituting extras**

**Evidence --- Parol evidence rule — Interpretation — Usage, custom, course of dealings**

Per Duff J.: "Usage, of course, where it is established, may annex an unexpressed incident to a written contract; but it must be reasonably certain and so notorious and so generally acquiesced in that it may be presumed to form an ingredient of the contract.... The question for the learned trial Judge was whether there was evidence to satisfy him judicially that the alleged usage is, so all pervading and so reasonable and so well known that everybody doing business in railway construction must be assumed to know it, and to contract subject to it.".

**The judgment of the court was delivered by *Duff J.*:**

1    The controversies in this appeal relate to questions of fact turning to some extent upon the effect of documentary evidence, and in part upon an appreciation of the weight of oral evidence adduced at the trial; upon which the conclusions of the learned trial judge were set aside by the Court of Appeal.

2    The appellants had a contract with the respondents dated May 20, 1926, for a work on the respondents' line of railway, which work consisted of a cut and fill where the line crossed a deep ravine. The old line was carried on a trestle, and the new line was to be supported by a fill on a site adjacent to the trestle, which was to be made with earth excavated from a bluff, on the northerly side of the ravine, through which the cut was to pass.

3    The contract stipulated for unit prices including "overhaul per yard 1 cent"; and contained this clause:

> 12. The contract prices for the several classes of excavation shall be taken to include the cost of depositing the material in embankments, crib work, and all other expenses connected therewith except extra haul, which will only be paid for where it exceeds five hundred (500) feet, at so much per yard per additional one hundred feet. No allowance or compensation whatever shall be due or paid to the contractor for any temporary roads, bridges or trestles he may make to facilitate his work.

4    The appellants in excavating the cut proceeded from the foot of the northerly slope of the bluff, and by a circuitous route encircling the bluff on its westerly, southwesterly and southerly sides carried the earth to the site of the embankment. The substantive issue is whether or not the appellants are entitled to be paid for "overhaul" at the rate mentioned, that is to say, at the rate of 1 cent per cubic yard for every 100 feet of haul calculated by reference to the length of the route actually followed in excess of 500 feet.

5    The view of the contract advanced by the respondents is that the contract phrases "extra haul" and "overhaul" have, by usage, in construction contracts, or at all events in railway construction contracts, a special and specific meaning. They signify, according to this contention, to summarize it broadly, that the length of the haul in respect of which the contractor is entitled to charge for overhaul, is to be ascertained by taking the distance (measured along the centre line of the railway in process of construction) between the projections, first, of the centre of mass of the earth to be excavated in making the cut, and second, of the embankment, and deducting therefrom 500 feet; the projections being for this purpose the several points on the centre line nearest the respective centres of mass. The learned trial judge held that the usage alleged had not been established, and that the proper construction of the contract is that contended for by the appellants. The Court of Appeal disagreed with this conclusion and accepted the view advanced by the respondents.

6    If the learned trial judge was right, two further questions will require consideration. First, whether on the facts proved, the appellants have established their right to have their claim passed upon in the absence of a certificate by the engineer sanctioning

it, and second, whether, assuming that to be so, the appellants' method of proceeding was an unnecessarily expensive one, or was dictated by the physical conditions of the work and by the terms of the contract as to the time of performance.

7    I shall consider these questions in the order in which I have stated them. And first, as to the construction of the contract. Usage, of course, where it is established, may annex an unexpressed incident to a written contract; but it must be reasonably certain and so notorious and so generally acquiesced in that it may be presumed to form an ingredient of the contract, *Juggomohun Ghose v. Manickchund* [1] . In the Court of Appeal there was some disagreement with the view of the learned trial judge, that the respondents' contention as to the effect of the contract was based upon the alleged existence of usage or custom, both Martin J.A. and M.A. MacDonald J.A. expressing the opinion that they were confronted with a question of interpreta tion, merely. The respondents themselves alleged the practice they sought to prove as a custom controlling the effect of the contract; and I do not know that it is very material whether you describe the subject of inquiry as a question of the existence of a usage imparting a special meaning to particular words when employed in contracts of a given class, or as a question as to the existence of a usage annexing an incident to such contracts in virtue of the presence of such words. I am disposed to think that the latter is the more apt description of the question presented in this case.

8    In substance, the question for the learned trial judge was whether there was evidence to satisfy him judicially that the alleged usage is, to quote the language of Banks L.J., in *Laurie v. Dudin* [2] ,

so all pervading and so reasonable and so well known that everybody doing business

in railway construction "must be assumed to know" it, and to contract subject to it. I am not satisfied that the alleged usage has been established. There is no doubt that a practice widely prevails of inserting in railway construction contracts a clause providing for the computation of payment for overhaul according to the method contended for by the respondents; but in the text books, engineering manuals and writings by engineers produced, there is no basis for the view that the effect of the words used in the contract before us is, apart from such special stipulations, what is now contended. More than one of the witnesses called on behalf of the respondents admitted that he had never in his own experience encountered a case in which the earth excavated in making the cut had to be carried to the fill by a circuitous route, that is to say in which carriage along the line of railway was impracticable and the circuitous route was not adopted to serve the convenience of the contractor, where overhaul had not been calculated according to the length of the route actually traversed. Some said that they had never met a case in which carriage on that line was not practicable. Other witnesses gave instances in which overhaul had been calculated according to the rule advocated by the respondents, though a circuitous route had been followed for the con venience of the contractor, but not because a shorter route was impracticable. The engineer in charge, McMillan, admitted he had never known a case of carriage by a circuitous route being compensated for on the basis of measurement along the line of the railway. He had, he stated, adopted this course on one occasion when the earth had been taken from a borrow pit, that is to say, from an excavation entirely outside the line of the railway; in that case he had measured the distance from the point on the railway nearest the borrow pit, to the centre of mass of the fill, but he admitted that the alleged usage had no relation to such a case; and that in principle he had been wrong.

9    It was argued, that a method of computation of overhaul commonly in use, described as the method by "mass diagram," would be incapable of application to a case like the present unless the distance were measured along the centre line of the railway; and this, it is urged, is sufficient ground for treating that method of measurement as ordained by the contract. This argument involves obviously the proposition that the method of mass diagram is so essential to such computations, or at all events so universally employed as to require a direction to employ it to be implied as an incident of the contract. Taking the evidence as a whole, I do not think this has been established; but in any case there is evidence by witnesses called on behalf of the respondents which it was quite open to the learned trial judge to accept, that this method (by "mass diagram") is applicable or may be applicable for the purpose of computing compensation for overhaul where the material is taken from a place outside the line on the railway ("a borrow pit") where the distance taken is that of the actual haul; and one of the most important witnesses called on behalf of the respondents explicitly admits that such a case presents no distinction in principle from those cases where the earth is excavated on the line of the railway. Distinction in principle between the case of the "borrow pit" and the case before us is not suggested.

10    The appellants, on the other hand, called a number of engineers of long experience and high repute, who denied without qualification the existence of any usage such as that alleged. I refer particularly to the evidence of Mr. Hazen, the assistant chief engineer, of the Canadian National Railways. He stated that according to his experience, which had been chiefly in railway construction and which up to the time of the trial was of 39 years' duration, where it is impracticable to haul the excavated material from the cut to the fill along the line of the railway, and where a longer route is followed for this reason by the contractor, and not for his own convenience, the practice is to compute the compensation for overhaul by reference to the distance actually traversed, and not to the distance between the points on the centre line of the railway nearest the centres of mass measured along that line.

11    On this evidence the learned trial judge has held that the respondents failed to prove the alleged usage. I am unable myself to perceive any grounds, upon which, to quote the phrase of Scrutton L.J. in *Laurie v. Dudin* [3] , the Court of Appeal could properly

interfere with the learned judge who saw the witnesses and heard them cross-examined and heard the way in which they gave their evidence.

I may add that, with the learned trial judge, I am not satisfied by the evidence that there is any practice of measuring distance for computing overhaul in the manner contended for, so well recognized, so well known among persons engaged in railway construction, and so widely prevailing as to justify a presumption that everybody who enters into a contract for such work does so with the intention of being bound by that usage.

12    I do not doubt, I may add, that the learned trial judge, in considering whether such a widely prevailing and generally recognized usage had been established, took into account, as he was entitled to do, the fact that neither the Deputy Minister, a railroad engineer of a life time's experience, nor Mr. Randall, the company's chief engineer, was called as a witness to affirm the existence of such a usage; or that he did not fail to note the rather discreditable effort of the respondents to create the impression in Mr. Hazen's mind that he would be guilty of some impropriety in stating, as a witness on behalf of the appellants, his view that no such usage exists.

13    Second, as to the absence of an engineer's certificate recognizing the appellant's claim. The pertinent clauses of the contract may conveniently be set out together, they are these:

1.* * * The word "engineer" shall mean the chief engineer of the company (unless otherwise specified), or his duly authorized agents limited by the particular duties respectively entrusted to them. * * *

8. The engineer shall be the sole judge of work and material in respect of both quantity and quality, and his decision on all questions in dispute with regard thereto shall be final, and no work under this contract shall be deemed to have been performed, nor materials nor other things provided, so as to entitle the contractor to payment therefor, until the engineer is satisfied therewith, and has issued to the contractor his certificate in writing in respect thereof.

9. The work shall, in every particular, be under and subject to the control and supervision of the engineer; and all orders, directions or instructions, at any time given by the engineer with respect thereto, or concerning the conduct thereof, shall be by the contractor promptly and efficiently obeyed, performed and complied with to the satisfaction of the engineer. In particular, and without limiting the foregoing, the engineer shall have the right to control blasting operations, so as to protect the interests of the company, and to avoid injury or damage from excessive or improper blasting.

10. The respective descriptions of work and materials, or portions of the works referred to, in or covered by the individual items in the schedule of prices embodied in the proposal annexed to this contract, include not only the particular kinds of work or materials mentioned in the said items, but also all and every kind of work, labour, tools, plant, materials, equipment and things, whatsoever necessary for the full execution, completion and delivery, ready for use, of such descriptions of work and materials, or of such respective portions of the works, in accordance with the said drawings and specifications and to the satisfaction of the engineer. The said schedule as a whole is designed to cover not only the particular descriptions of work and materials mentioned therein, but also all and every kind of work, labour, tools, plant, material, equipment and

things whatsoever necessary for the full execution, completion and delivery, finished and ready for use, for the entire work as herein contracted for, in accordance with said drawings and specifications, and the satisfaction of the engineer; in case of dispute as to what work, labour, tools, plant, materials, equipment and things are included in the works contracted for, or in the said schedule, or any item thereof, the decision of the engineer shall be final and conclusive.

. . . . .

27. The company covenants with the contractor, that the contractor having in all respects complied with the provisions of this contract, will be paid for and in respect of the works the various prices set out in the schedule of prices embodied in the accepted proposal of the contractor hereto annexed.

. . . . .

28. Cash payments equal to about ninety per cent of the value of the work done, approximately estimated from progress measurements and computed at the applicable schedule prices, or the prices fixed with respect thereto, as the case may be, under the provisions of this contract, will be made to the contractor monthly, on the written certificate of the engineer stating that the work for, or on account of which, the certificate is granted, has been done, and stating the value of such work computed as above mentioned; and the said certificate shall be a condition precedent to the right of the contractor to be paid the said ninety per cent or any part thereof. The remaining ten per cent shall be retained until the final completion of the whole work to the satisfaction of the engineer, and will be paid within two months after such completion. The written certificate of the engineer, certifying to the final completion of the said works to his satisfaction, shall be a condition precedent to the right of the contractor to receive or to be paid the said remaining ten per cent or any part thereof.

14    The contractors appear to have commenced work under the contract in the beginning of July, 1926. A gentleman named McMillan appears to have acted from the outset as engineer in charge of this particular work, and to have been recognized as such by the directors of the respondent, although as far as we can see he was not formally appointed until December of that year. Not until much later, apparently not earlier than the end of March, 1927, was there a chief engineer of the company who intervened in the contract. The minutes of the directors show that on the 20th of July, 1926, the board decided that all progress estimates of the engineer in charge "of the diversion at Mile 13.7" should be submitted each month to the Deputy Minister of Railways for checking and for certification. There is no suggestion that the Deputy Minister of Railways, who signs as chief engineer of the railways as well as Deputy Minister, was ever appointed chief engineer of this company, and the resolution indicates that it was in his capacity as Deputy Minister that he was to check and certify the progress estimates. The engineer, for the purposes of the contract, as appears from the extracts already quoted, must be the chief engineer of the company or an agent of the chief engineer. The respondents allege in the statement of claim that McMillan was the "engineer" within the meaning and for the purposes of the contract. It is not alleged that he was chief engineer of the company, or that he was an agent of the chief engineer; admittedly he was not chief engineer and obviously he was not an agent of the chief engineer, prior at least to March, 1927, as there was no chief engineer to appoint an agent. Further, it is clear that McMillan had no authority even as agent of the company to grant progress certificates, all of which, in compliance with the resolution of the 20th July, 1926, down to the appointment of the chief engineer in 1927, are in fact the certificates of Mr. Griffith, the Deputy Minister. Authority under the contract, to give a binding decision as to the contractors' right to a certificate, McMillan had none.

15    No express authority is given to the engineer by the contract, to pass on any question as to the construction of the contract. As the engineer is to certify to the performance of the work contracted for as a condition precedent of the contractors' right to be paid, he is necessarily obliged to read the contract and understand it, but it is his duty to, and it is the right of the contractor, that he shall give effect to the provisions of the contract according to their proper legal construction; and his only authority to pass upon that construction arises from, and is incidental to his authority to grant or withhold a certificate. It may perhaps be right to observe, although it adds nothing to what has already been said, that McMillan, having no authority to grant certificates, or to decide upon the contractors' right to a certificate, was endowed with no authority, even incidentally, to bind anybody or affect anybody's rights under the contract, by his views as to its meaning.

16    The learned trial judge held that the

board of directors assumed the functions of the engineer under the contract.

1929 CarswellBC 113, [1929] 4 D.L.R. 161, [1929] S.C.R. 630, 36 C.R.C. 23

That appears to be an inference fairly warranted by the correspondence and the resolutions passed by the board of directors; especially when read in light of the fact that for nine months after the signing of the contract, no engineer was appointed. In order of date these are as follows:

July 13, 1926.

Mr. D. MCMILLAN,

Engineer,

Bridge 13.7,

Lillooet, B.C.

Referring to our conversation on Sunday last in connection with the overhaul claimed by the contractor, write me by return mail full particulars of this, together with their reason for claiming it.

T. KILPATRICK,

General Manager.

Mile 13.7, Lillooet Sub-Div.,

July 14, 1926.

T. KILPATRICK, Esq.,

General manager,

P.G.E. Railway Co.,

Vancouver, B.C.

In answer to your letter of July 13, the contractor purposes and is making preparation to take out the cut north of the fill at 13.7 by hauling out of the north end of the cut around by the P.G.E. Railway track to the fill south of the cut in question.

In a short talk with him he said he expected to be paid overhaul on this route, as it is the only way to take the cut out given as reason why he should be so paid.

He was told that overhaul is a constant, the same as the number of cubic feet in a yard and that his contention could not be supported. Not much was said but he still had his idea in mind.

The route to be used lengthens the distance over a centre line direct haul by from 3,000 to 3,500 feet.

D. MCMILLAN,

Engineer in Charge of Diversion.

17      Copy of resolutions in minute book of defendant.

July 20, 1926.

It was decided by the board that *all the progress estimates of the engineer in charge of the work of the diversion at mile 13.7 should be submitted each month to the Deputy Minister of Railways, for checking and for certification*.

Moved by Mr. W. Kitchen and seconded by Mr. C. Spencer that with reference to the question of overhaul, the engineer in charge of the work at diversion at mile 13.7 be instructed that the board cannot consider any other than the shortest haul or nearest way.

July 21, 1926.

> Mr. D. MCMILLAN,
>
> Engineer,
>
> Mile 13.7,
>
> Lillooet, B.C.

With reference to the question of overhaul, I am instructed to advise you that the board of directors cannot consider any other than the shortest haul or nearest way.

> T. KILPATRICK,
>
> General Manager.

September 10, 1926.

> T. KILPATRICK, Esq.,
>
> General manager, P.G.E. Ry.,
>
> Vancouver Block.

**Re contract overhaul.**

Your engineer Mr. McMillan informs me he has instructions to the effect that overhaul on our contract at mile 13.7 Lillooet, is not to be measured over the length of the dinky track but over a straight line from the point where the material originally lies to the fill.

You will recollect that when the writer was looking over the ground with yourself and others that I proposed the present method of doing the work and again on the day of signing the contract I was asked how I proposed to do the work, when I again proposed the present route for hauling as being the only feasible one. If it was the intention to allow overhaul by a direct line I should have been so advised at that time. I contend that the work cannot be effectively done by steam shovel in any other way and I am willing to submit the question to any practical two steam shovel men and abide by their decision.

For the above reasons I contend that overhaul must be allowed over the route the material has to be hauled and not over the direct line. If you decide otherwise, we may be compelled to close down the steam shovel part of the work. Please advise at your earliest convenience, and oblige,

> GEORGIA CONSTRUCTION CO., LTD.
>
> Per T.R. Nickson.

September 14, 1926.

A letter was read from the Georgia Construction Company Limited protesting the decision of the directors that they could not consider any other than the shortest haul or nearest way and on motion, duly seconded, it was resolved that they be

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

advised that we expect them to carry out the terms of their contract and that our interpretation of its conditions regarding overhaul is as previously advised.

September 15, 1926.

GEORGIA CONSTRUCTION CO., LTD.,

Bank of Toronto Building,

Vancouver, B.C.

I am in receipt of your letter of 10th inst. which was submitted to the board of directors at a meeting here yesterday and I am instructed to advise you that we expect you to carry out the terms of your contract and that our interpretation of its conditions regarding overhaul is as previously advised you by our Mr. D. McMillan, engineer in charge.

T. KILPATRICK,

General Manager.

November 23, 1926.

Messrs. GEORGIA CONSTRUCTION CO., LTD.,

Bank of Toronto Building,

Vancouver, B.C.

I beg to advise you that your letter of 12th instant was submitted to the board of directors at a meeting here yesterday and I was instructed to advise you that the board can see no reason for changing the decision made, which was communicated to you, at their meeting on July 20, namely, that no other than the shortest haul or nearest way would be considered.

T. KILPATRICK,

General Manager.

18      These resolutions and communications all point to the conclusion at which the learned trial judge arrived and expressed in the sentence quoted above.

19      On behalf of the respondents, it was argued that the directors did nothing more than accept the decision of McMillan. The learned trial judge, while accepting McMillan's statement in his letter, as the expression of his own opinion, did not accept the view advanced by the respondents as to the conduct of the directors; it was his view that the directors had taken the matter into their own hands, and had issued instructions to McMillan as their own agent concerning the interpretation of the contract. The oral evidence adduced by the respondents in support of their allegations that the board had treated McMillan as an independent umpire and had deferred to his decisions as such, was not regarded by the trial judge as of sufficient weight to overbear the inferences arising from the tone and substance of the documents and from the undisputed facts.

20      I am not convinced that the learned trial judge was wrong; especially in view of the fact that neither Mr. Griffith, the Deputy Minister, who for nine months certified to the progress estimates, nor Mr. Rindal, who was appointed chief engineer, apparently in March, 1927, was called as a witness, although both of them must have had not a little knowledge of the relations between the board of directors and the company's engineers.

21      But the matter does not rest there. If McMillan had possessed power to certify under the contract, it is at least questionable whether he had not already disqualified himself, before the time came to grant a progress certificate, from passing upon the construction of the clause in question. At the trial he avowed without hesitation, that from the outset he had formed an opinion

1929 CarswellBC 113, [1929] 4 D.L.R. 161, [1929] S.C.R. 630, 36 C.R.C. 23

as to the effect of the clause, an opinion based upon his own experience, which had not, it appears, embraced a similar case, that is to say, any case in which compensation for a circuitous haul had been based upon the distance measured along the centre line of the railroad. This opinion was in accordance with the respondents' contention; he declared with emphasis that he had decided the question finally, without consulting other engineers, and that his mind was not open to influence from argument upon it.

22      The following is a passage from McMillan's evidence.

Q. Let me put it to you this way: You told me in discovery — I don't want to need to refer to it — that you had never known a case of this kind before? — A. Yes.

Q. And you also told me on discovery that so far as your experience was concerned you had never known a case where material was measured any other way than the way it was actually hauled? — A. Yes.

Q. Yes, so this was the first time in all your experience where you were confronted with the problem of saying whether you should measure overhaul in a way other than it was hauled? — A. Yes.

Q. Yes, and at that time you had read no authorities on it, had you? — A. Only in so far as I have followed the method used by the railway companies I was employed with.

Q. But that didn't deal with this special case. Don't nod your head? — A. No.

Q. So that you hadn't any experience then to help you on this special case, had you? — A. No.

Q. And you at that time had no opportunity, or took occasion to read any authorities to post yourself on the question? — A. No.

Q. Nor had you sought the advice of any independent engineer to advise you in it? — A. No.

Q. No. Well now, acting as a judge between the bodies, you would, at that time, with your limited experience, be quite open to receiving further information as authority, wouldn't you? — A. No, I didn't consider my experience limited.

Q. You did not; and yet you tell me that you never have had experience to meet the case? — A. No.

Q. And you say that your mind was so settled then that if authorities had been shown you dealing with such special case that you would not have given them consideration? — A. I didn't think authorities could be shown showing anything different.

Q. I see, so your mind was settled on this thing which you have never had any experience with right from the start, you hadn't an open mind to consider any authorities if they were suggested to you? — A. My mind was settled.

Q. Your mind was settled, you were not open to any argument on the matter? — A. No.

Q. So that if the Manual of Engineering had been produced and stated contrary, it would not have had any effect on you? — A. No.

Q. If authorities like Mr. Hazen of the Canadian National Railway had been quoted to you, or if you had seen him personally and he had told you that in his experience — that he had experience in special cases of this kind — that it should be paid for, that would have had no effect on you? — A. No.

Q. So that you are prepared to say that you had decided without authority and without seeing any? — A. No, I had the authority of my experience.

Q. Well, tell me any case in your experience that touched the case? — A. I had no experience that touched the case.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Q. No, so that the authority of your experience, being none, that was sufficient for your purpose? — A. The authorities of my experience taught me that in no other way was overhaul calculated.

23      There is high authority for the proposition that an engineer or architect, who has lapsed into that attitude of mind, is disqualified from acting as umpire under such a contract as this. (Per Lindley L.J. in *Jackson v. Barry Railway Co.* [4] .)

24      At a later stage a chief engineer was appointed, Mr. Rindal, and the appellants having in April, 1927, requested that the points in difference should be submitted to arbitration, a report was made by him in which he expressed an opinion which accorded with that expressed by the board of directors in its instructions to McMillan. But the board of directors long before that had assumed the function of chief engineer; they had thereby placed themselves in a position in which they were precluded from insisting on the observance of the stipulations of the contract requiring a certificate by an engineer clothed with authority under the contract.

25      The last question to be dealt with is that which arises upon the respondents' allegation that it was quite practicable to make the cut through the bluff by proceeding from the southerly slope, and in such a manner that the material excavated could be hauled to the fill by the direct route, that is to say, along the centre line of the railway.

26      The evidence is overwhelming that Nickson, the manager of the appellants, proceeded with the cut under the belief that this course was not practicable, and that the only practicable method was that adopted by him. He says that before the execution of the contract, he informed Kilpatrick, the respondents' superintendent, of his plan, and Kilpatrick, although he says he cannot remember this communication, will not deny that it took place. It is admitted that at no time did McMillan or Kilpatrick or any other person on behalf of the respondents, suggest to the appellants that their method was an unnecessarily expensive one. Indeed, it is not open to dispute that according to the view of the officials of the respondents, the appellants were proceeding in a proper and workmanlike manner. A report by Mr. Griffith, the Deputy Minister and chief engineer of the respondents on the 23rd of July, 1927, contains this paragraph:

> In view of the knowledge we now have of the material in the bottom of the cut, we believe that the system chosen by the contractors of handling the work is the only way in which the contract could be completed anywhere near the time allotted for the work and there is no doubt that the material placed in the embankment has been placed there at a loss.

An objection was raised on the argument as to the admissibility of this report, which I shall discuss presently. In a practical sense this expression of opinion seems to be conclusive. Mr. Griffith, as already mentioned, had for nine months been responsible for progress certificates, and was no doubt fully acquainted with the work in every detail. It was the duty of the contractors to endeavour to complete the work within the time specified by the contract, and if in order to accomplish that object they adopted what they conceived to be the only practicable means of doing so, and if their view was based upon reasonable grounds and they acted in entire good faith, they are entitled to be paid for what they did according to the terms of the contract. This report seems to be conclusive upon the point that their plan was reasonable and that they were right in adopting it. Even if one were convinced by considerations *ex post facto*, that another course would have proved less expensive, that is not a ground for depriving them of the compensation, when it appears that the measures they adopted were reasonable and necessary not only in their own view, but in the view of the officials of the railway company as well.

27      As to the admissibility of the report. The document was tendered by Mr. Farris, and although no objection was taken to its admissibility, counsel for the respondents remarked that the letter was "without prejudice." The document was admitted and no exception to its admissibility was taken at any stage of the proceedings prior to the oral argument in this court. Obviously, counsel for the respondents was aware that the document could have been excluded if he had pressed an objection against it. And there appears to be not a little reason for thinking that he had his clients' interest in view in not doing so. I have already noticed the fact that the respondents called neither of the gentlemen who signed this report as a witness. Whatever be the explanation of that, no doubt the appellants had some good reason for not doing so. If the objection had been pressed, Mr. Farris would no doubt have felt obliged to call them as witnesses himself, as counsel for the respondents must have realized. He seems to have elected deliberately not to press the obvious objection to the document. In these circumstances, the objection comes, I think, too late.

1929 CarswellBC 113, [1929] 4 D.L.R. 161, [1929] S.C.R. 630, 36 C.R.C. 23

28    The appeal should be allowed and the judgment of the learned trial judge restored, with costs in all the courts.

*Appeal allowed with costs.*

Solicitors of record:
Solicitors for the appellant: *Farris, Farris, Stultz & Sloan.*
Solicitors for the respondent: *Mayers, Locke, Lane & Thomson.*


Footnotes

1      7 Moore's Indian Appeals 263, at p. 282.

2      95 L.J. K.B. 191, at 193.

3      95 L.J. K.B. 191, at p. 198.

4      (1893) 1 Ch. at 244 and 245.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights
reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 471 of 485

Gilchrist v. Western Star Trucks Inc., 2000 BCCA 70, 2000 CarswellBC 176

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

2000 BCCA 70

British Columbia Court of Appeal

Gilchrist v. Western Star Trucks Inc.

2000 CarswellBC 176, 2000 BCCA 70, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164, 133
B.C.A.C. 144, 2000 C.L.L.C. 210-030, 217 W.A.C. 144, 24 C.C.P.B. 62, 73 B.C.L.R. (3d) 102

# James Gilchrist, Plaintiff (Respondent) and Western Star Trucks Inc., Western Star Trucks Holdings Ltd., Western Star Trucks Sales Corporation, and Terrence E. Peabody, Defendants (Appellants)

McEachern C.J.B.C., Ryan, Saunders JJ.A.

Heard: September 22, 1999
Judgment: January 28, 2000
Docket: Vancouver CA025023

Proceedings: reversing (August 7, 1998), Doc. Vancouver C980867 (B.C. S.C. [In Chambers])

Counsel: *Gordon D. Phillips*, for Appellants.
*D. Murray Tevlin* and *J. Lamonte*, for Respondent.

Subject: Employment; Contracts; Public

**Table of Authorities**

**Cases considered by *Saunders J.A.* (*Ryan J.A.* concurring):**

*Baughman v. Rampart Resources Ltd.*, 4 B.C.L.R. (3d) 146, [1995] 6 W.W.R. 99, 124 D.L.R. (4th) 252, 19 B.L.R. (2d) 223, 58 B.C.A.C. 27, 96 W.A.C. 27 (B.C. C.A.) — referred to

*Bramalea Ltd. v. Vancouver School Board No. 39* (1992), 65 B.C.L.R. (2d) 334, *(*sub nom. *Bramalea Ltd. v. Board of Education No. 39)* 23 W.A.C. 229, *(*sub nom. *Bramalea Ltd. v. Board of Education No. 39)* 12 B.C.A.C. 229 (B.C. C.A.) — referred to

*Delisle v. Bulman Group Ltd.*, 54 B.C.L.R. (2d) 343, [1991] 4 W.W.R. 637 (B.C. S.C.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.*, 227 N.R. 201, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note) (S.C.C.) — referred to

*MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), 72 B.C.L.R. (2d) 273, 19 B.C.A.C. 215, 34 W.A.C. 215, 98 D.L.R. (4th) 492, [1993] 2 W.W.R. 127 (B.C. C.A.) — referred to

*Melanesian Mission Trust Board v. Australian Mutual Provident Society*, [1997] 1 N.Z.L.R. 391 (New Zealand P.C.) — referred to

*Mitsui & Co. (Canada) v. Royal Bank*, 32 C.B.R. (3d) 1, 180 N.R. 161, 123 D.L.R. (4th) 449, [1995] 2 S.C.R. 187, 142 N.S.R. (2d) 1, 407 A.P.R. 1 (S.C.C.) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 472 of 485

Gilchrist v. Western Star Trucks Inc., 2000 BCCA 70, 2000 CarswellBC 176

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — referred to

*Strata Plan No. LMS44 v. RBY Holdings Ltd.* (1993), 3 B.C.L.R. (3d) 28 (B.C. S.C.) — referred to

**Rules considered by *Saunders J.A.* (*Ryan J.A.* concurring):**

*Rules of Court, 1990*, B.C. Reg. 221/90
    R. 18A — considered

**Rules considered by *McEachern C.J.B.C.* (concurring in the result):**

*Rules of Court, 1990*, B.C. Reg. 221/90
    R. 18A — referred to

APPEAL by defendants from summary trial judgment allowing in part plaintiff's claim to damages in lieu of stock options and referring outstanding matters to trial in course of plaintiff's action for damages for wrongful dismissal.

*Saunders J.A.* (*Ryan J.A.* concurring):

1    On February 13, 1998 Western Star Trucks Inc. dismissed James Gilchrist as its Vice-President, Corporate Controller. Mr. Gilchrist sued for damages, including for sums he claimed were owing to him pursuant to an agreement concerning stock options.

2    On a summary trial under Rule 18A of the *Rules of Court* all issues were adjourned to full trial with the exception of the stock option issue. On that question the trial judge concluded that Mr. Gilchrist was entitled to two-thirds of the sum he claimed, leaving the question of his entitlement to the other one-third to the trial of the other issues in the case, which she held were unsuitable for resolution under Rule 18A. Thus Mr. Gilchrist obtained judgment against the appellants for $400,000. The appellants appeal, asking for dismissal of Mr. Gilchrist's claim for that sum.

3    On appeal, the parties raised two questions: did the option agreement require the option to be exercised before the obligation to pay Mr. Gilchrist money, and if so, did Mr. Gilchrist exercise the option? These reasons address the first issue only. The trial judge did not decide the second question. Without findings of fact from the trial court, including on the question of whether the option was issued, this Court is not able to decide whether Mr. Gilchrist exercised the option or, indeed, whether he is excused from exercising the option.

**The Circumstances**

4    Mr. Gilchrist was hired as Vice-President, Corporate Controller of Western Star Trucks Inc. after a period of secondment to the company from a large accounting firm. A written employment contract, effective May 1, 1995, set out the terms of his employment. Included in the remuneration and benefits was an option to purchase 70,000 shares of the appellant Western Star Trucks Holdings Ltd., a company listed for public trading on the Toronto Stock Exchange, at the market price as of May 1, 1995. This price turned out to be $16 1/8 per share. The parties accepted that this option was subject to the terms of a plan known as the Director and Employee Stock Option Plan, although there was no mention of the Option Plan in the employment contract. It was a term of the Option Plan that the right to exercise the option for one-third of the optioned shares vested after each of the first three completed years of employment.

5    In June 1995 the appellant Mr. Peabody, Chief Executive Officer of both Western Star Trucks Inc. and Western Star Holdings Ltd., told Mr. Gilchrist that the number of shares subject to the option (70,000) was so high as to displease other executives. Mr. Peabody asked Mr. Gilchrist to reduce the number covered by the option at that time to only 40,000 shares, and to write an agreement that he, Mr. Gilchrist, would be happy with concerning the remaining 30,000 shares.

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

6     Mr. Gilchrist drafted a letter agreement and delivered the draft to Mr. Peabody on June 6, 1995. Mr. Peabody returned it, signed as accepted, the next day. The letter agreement recited the request that Mr. Gilchrist temporarily relinquish his entitlement to the option on 30,000 of the shares on the express understanding it would be re-issued at a later date. The letter agreement provided:

> In consideration of my consent to this I request that you agree to the following:

>> 1. The 30,000 shares represented by these options will be held be held (sic) in an option pool and will not be distributed to any other employee of the Company until such time as they are released to me. In any event the options will be reissued to me within two years of the date of this agreement, or upon the change in control of the majority of the common shares in the Company.

>> 2. The exercise price of these options will be $16 1/8 as it is with the other 40,000 options granted at the date of the commencement of my employment. If the price at the date of re-issue (the "Re-issuance Price") exceeds the $16 1/8 then the amount by which the reissuance Price exceeds the Original Option Price will be paid to me by you, upon demand which shall not precede exercise of the options.

>> 3. In the event of my termination by the Company the options referenced herein will be deemed to have been issued one week prior to such termination (the "Deemed Issuance Date") at the Original Option Price and you will upon demand pay to me the amount which equals the difference between the Original Option Price and the amount at which the shares are traded publicly on the Deemed Issuance Date.

7     By June 1997 Mr. Gilchrist was entitled to exercise and had exercised his option to purchase two-thirds of the 40,000 shares still subject to option under the employment contract. Under the terms of the Option Plan, the option on the balance of the 40,000 shares could not be exercised until he had completed his third year of employment.

8     The case proceeded before the trial judge as if the option on 30,000 shares referred to in the letter agreement set out above, was re-issued on June 7, 1997. On June 7, 1997 the market price of shares in Western Star Trucks Holding Ltd. was $36 1/8, fully $20 a share higher than the initial option exercise price of $16 1/8, making the amount described in paragraph 2 of the letter agreement $20 per share.

9     On June 29, 1997 Mr. Gilchrist sent a letter to Mr. Peabody which read:

> I draw your attention to the private agreement between yourself and the writer, dated June 6, 1995.

> As I am sure you remember this agreement dealt with 30,000 common share options which were not registered at the time of my commencing employment with the Company as a result of objections raised by Gerry McParland.

> I would like to meet with you on your next visit to Kelowna to discuss the resolution of this issue in a manner satisfactory to both of us. I am open to time and place, at your convenience.

10    Mr. Peabody and Mr. Gilchrist met to discuss the matter in July 1997. At no time after June 7, 1997 did Mr. Gilchrist or the appellants suggest that the letter agreement required him to exercise his options before he was entitled to the payment described in paragraph 2 of the agreement. Discussions between the parties concerned a tax advantageous structure for the payment. By the time Mr. Gilchrist was dismissed from his employment, he neither had given formal notice of exercise of his option, nor tendered the purchase price for the shares.

11    The trial judge concluded that paragraph 2 of the letter agreement entitled Mr. Gilchrist to payment of $20 per share. However, had the original option on 70,000 shares been effective, Mr. Gilchrist would have been able to exercise the option on only two-thirds of the shares by February 1998. Accordingly the trial judge held that Mr. Gilchrist was entitled to $400,000 compensation, that is, $20 per share multiplied by two-thirds of 30,000 shares. In reaching this conclusion she said at paragraph 29 of her reasons:

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 474 of 485

Gilchrist v. Western Star Trucks Inc., 2000 BCCA 70, 2000 CarswellBC 176

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

[29] I conclude that a reasonable interpretation of the Letter Agreement entitles Mr. Gilchrist to payment in respect of 2/3 of the 30,000 stock options or $400,000 regardless of whether he was terminated for cause. The Letter Agreement provided that at the date of re-issuance, June 7, 1997, the defendants would pay the plaintiff the difference ($20 per share) between the original price ($16 1/8) and the re-issuance price ($36 1/8) "upon demand which shall not precede exercise of the options." Mr. Gilchrist effectively made his demand for payment by initiating discussions with Mr. Peabody in late June 1997. I interpret the phrase "which shall not precede exercise of the options" to refer to his entitlement to exercise his options under the Option Plan. The Letter Agreement prevented him from making a demand prior to June 7, 1997. If he had not relinquished 30,000 of his share options, he would have been able to exercise 20,000 of them under the Option Agreement by that date. That is the only rational interpretation of the wording of the Letter Agreement. If Mr. Gilchrist had not been dismissed, he would have been entitled to the $400,000 (20,000 shares X the price difference of $20) as of June 7, 1997 and the re-issuance of 20,000 stock options which he could demand when the time came to exercise the remaining 1/3 on May 1, 1998.

12      The trial judge left the issue of compensation for the option on the remaining 10,000 shares to full trial, holding that the result may turn on the issue of cause for dismissal.

13      On appeal the appellants contended that the agreement was unambiguous and the payment to Mr. Gilchrist of $20 a share was conditional on his exercise of the option to purchase shares (at $36 1/8). They say that Mr. Gilchrist never exercised the option and thus was never entitled to the sum claimed.

14      Mr. Gilchrist replied that the trial judge gave a reasonable interpretation of the contract, consistent with the factual matrix. Further, he contended that if she was wrong in her interpretation of the contract, he had effectively exercised the option on June 29, 1997, by asking Mr. Peabody to meet to discuss resolution of the matter.

**Interpretation of the Letter Agreement**

15      I turn to the interpretation issue: does the letter agreement reasonably support the interpretation given to it by the trial judge that Mr. Gilchrist is entitled to a cash payment?

16      Mr. Gilchrist refers not only to the words of the letter agreement, but also to the surrounding circumstances at the time the agreement was made including the original employment agreement, and to the events in the summer of 1997, to support the interpretation he advocates. The basic tools available to a court that is interpreting an agreement, therefore, must be kept in mind.

17      The goal in interpreting an agreement is to discover, objectively, the parties' intention at the time the contract was made. The most significant tool is the language of the agreement itself. This language must be read in the context of the surrounding circumstances prevalent at the time of contracting. Only when the words, viewed objectively, bear two or more reasonable interpretations, may the court consider other matters such as the post-contracting conduct of the parties: *Delisle v. Bulman Group Ltd.* (1991), 54 B.C.L.R. (2d) 343 (B.C. S.C.), approved by Chief Justice McEachern in *Bramalea Ltd. v. Vancouver School Board No. 39* (1992), 65 B.C.L.R. (2d) 334 (B.C. C.A.); *Prenn v. Simmonds*, [1971] 3 All E.R. 237 (U.K. H.L.); *Eli Lilly & Co. v. Novopharm Ltd.* (1998), 161 D.L.R. (4th) 1 (S.C.C.).

18      The first inquiry, then, is to determine whether there is only one reasonable meaning to the words in the contract, or more than one. In this search one must look to the surrounding circumstances and the whole of the contract. The words of the contract must be looked at in their ordinary and natural sense and cannot be distorted beyond their actual meaning: *MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), 72 B.C.L.R. (2d) 273 (B.C. C.A.); *Melanesian Mission Trust Board v. Australian Mutual Provident Society*, [1997] 1 N.Z.L.R. 391 (New Zealand P.C.).

19      The language in issue is:

2. The exercise price of these options will be $16 1/8 as it is with the other 40,000 options granted at the date of the commencement of my employment. If the price at the date of re-issue (the "Re-issuance Price") exceeds the $16 1/8

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 475 of 485

Gilchrist v. Western Star Trucks Inc., 2000 BCCA 70, 2000 CarswellBC 176

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

then the amount by which the reissuance Price exceeds the Original Option Price will be paid to me by you, upon demand <u>which shall not precede exercise of the options</u>.

(Emphasis added)

20    The trial judge concluded that paragraph 2 above did not require the optioned shares to be purchased before the obligation to pay the difference between the issuance price and the original option price crystallized. In my view this conclusion is contrary to the plain and natural meaning of the words of the agreement, in the context of the surrounding circumstances. I say this for the following reasons:

1. Both the employment contract and the letter agreement speak of options. An option is, in ordinary and legal parlance, an offer to sell something subject to the terms of the option, and is irrevocable except in accordance with its terms: *Baughman v. Rampart Resources Ltd.* (1995), 4 B.C.L.R. (3d) 146 (B.C. C.A.); *Mitsui & Co. (Canada) v. Royal Bank*, [1995] 2 S.C.R. 187 (S.C.C.). Applying this common meaning of the term option to the letter agreement reveals an agreement that Mr. Gilchrist would be provided an opportunity to purchase shares.

2. The circumstances surrounding the letter agreement include the original employment agreement. The employment agreement provided an option to Mr. Gilchrist to purchase shares and made no provision for payment only of cash. Under the employment contract Mr. Gilchrist could only realize a benefit relating to the option by purchasing the shares on the terms provided. This circumstance suggests that the letter agreement was intended to grant Mr. Gilchrist the same kind of benefit as that which was originally given when he was first employed, protecting him as to the purchase price.

3. The structure of the letter agreement supports the appellants' contention that the option must be exercised before the payment obligation was crystallized: the introductory language of the letter refers to re-issuance of the option at a later date; the opening words of paragraph 2 refer to the exercise price of the option; and the question of payment then follows to provide for the possibility that the purchase price may be higher than the price provided in the employment contract.

4. Most significantly, the clause in paragraph 2, "upon demand which shall not precede exercise of the options", is, in my view, unambiguous. This phrase establishes two conditions for crystallization of the payment obligation under the terms of the letter agreement: first, demand must have been made; and second, the option must have been exercised.

5. The interpretation advanced by Mr. Gilchrist, that the money was payable at the first date he could exercise the options, that is on the date of re-issuance, renders the phrase "on demand which shall not precede exercise of the options" surplusage. Words preceding this phrase established the amount of payment by reference to the re-issuance price, which in turn depended upon the date of re-issuance. Thus upon Mr. Gilchrist's interpretation, the first part of the paragraph would have been sufficient to determine both when the payment obligation crystallized and the amount of the obligation. There would, then, be no need for the last phrase, contrary to the norm that all language in an agreement has a purpose.

21    I am buttressed in my conclusion by the observation that had the parties simply intended the letter agreement to provide for a cash payment, they could have said so more easily and more directly than the language in the letter agreement.

22    For these reasons, I am of the view that the contract does not reasonably support the interpretation given it by the learned trial judge.

23    Mr. Gilchrist argued that this interpretation is inconsistent with the course of dealings between the parties in 1997. On the authorities above, post-contracting dealings are not admissible in the absence of ambiguity. In this I concur with Madam Justice Newbury in *Strata Plan No. LMS44 v. RBY Holdings Ltd.* (1993), 3 B.C.L.R. (3d) 28 (B.C. S.C.), that evidence of negotiations after the signing of the contract will not be admitted to create an ambiguity.

Gilchrist v. Western Star Trucks Inc., 2000 BCCA 70, 2000 CarswellBC 176

2000 BCCA 70, 2000 CarswellBC 176, [2000] B.C.W.L.D. 508, [2000] B.C.J. No. 164...

24    I find the trial judge erred in her interpretation of the contract. For these reasons I would grant the appeal, set aside the judgment below and refer the issue to full trial along with the other issues between these parties.

25    The trial judge accepted the plaintiff's interpretation of the letter agreement. Having done so, it was unnecessary for her to go on, and she did not go on, to address other issues under either its paragraph 2 or 3. There is, therefore, an insufficient factual basis for this Court to address other issues of Mr. Gilchrist's entitlement under that letter agreement. The issue of Mr. Gilchrist's entitlement under the letter agreement ought to be returned to the trial list for determination, along with the other issues still outstanding between the parties.

26    In the result, I would set aside the order of the trial judge appealed from. Given the results of this appeal and the course of proceedings, the defendants are entitled to their costs of appeal and their costs of the Rule 18A hearing.

*McEachern C.J.B.C.* **(concurring in the result):**

27    I adopt the statement of facts contained in the Reasons for Judgment of Madam Justice Saunders. As there is to be a trial, I prefer to say as little about this matter as possible.

28    Although it is not entirely clear, it appears to me that the Defendant did not re-issue the option for the additional 30,000 shares as it had agreed to do, and the plaintiff for that or other reasons did not communicate any formal exercise of the option. Whether any such exercise was possible or necessary in these circumstances must be determined at a trial before it may be determined whether the dealings between the parties could amount to an exercise of the option. A subsidiary question may then arise whether, if the option was not reissued, the Plaintiff was entitled to recover the amount in question as a debt or as damages.

29    As a result, I conclude that the requisite facts necessary for the determination of the plaintiff's entitlement were not before the learned trial judge, and it was not possible for her to determine whether the Plaintiff had sufficiently exercised the "reissued" or un-reissued option. In other words, it seems to me that the real questions in issue were not ripe for trial. That can only be corrected by a conventional trial.

30    It is accordingly necessary to set aside the trial judgment. I agree with my colleagues that this part of the case must be referred to the trial list along with the other issues already directed to be tried at a conventional trial, where all issues will be at large.

31    I regret that I cannot agree with my colleagues on the question of costs. It may be that the Defendant should have paid the Plaintiff either on the due date (June 6, 1995) or when the Plaintiff asked for payment on (June 27, 1995). For that reason, I believe the costs of the abortive Rule 18A trial and of this appeal should abide the outcome of the trial. I would leave those questions to the trial judge.

*Appeal allowed; matter referred for trial.*

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394    Filed 09/10/14    Page 477 of 485

Gioris v. Ontario (Director of Income Maintenance, Ministry..., 1999 CarswellOnt 3716
1999 CarswellOnt 3716, 131 O.A.C. 72, 92 A.C.W.S. (3d) 543

1999 CarswellOnt 3716
Ontario Superior Court of Justice (Divisional Court)

Gioris v. Ontario (Director of Income Maintenance, Ministry of Community & Social Services)

1999 CarswellOnt 3716, 131 O.A.C. 72, 92 A.C.W.S. (3d) 543

# Cosmas Gioris, Appellant and Director of Income Maintenance Branch of the Ministry of Community and Social Services, Respondent

Gillese J., O'Driscoll J., Paisley J.

Heard: October 21, 1999
Oral reasons: October 21, 1999
Docket: Toronto 174/99

Counsel: *Catherine C. Vasilaros*, for Appellant.
*Rebecca J. Givens*, for Respondent, Director.

Subject: Public

**Headnote**

   **Social assistance --- Welfare benefits — Appeals**


   **Social assistance --- Welfare benefits — Recovery of benefits — Overpayments**


**Table of Authorities**

**Cases considered by *Gillese J.*:**

   *Abrahams v. Canada (Attorney General)*, [1983] 1 S.C.R. 2, 142 D.L.R. (3d) 1, 46 N.R. 185, 83 C.L.L.C. 14,010 (S.C.C.) — applied

   *Ontario (Director of Income Maintenance, Ministry of Community & Social Services) v. Wedekind* (1994), 7 C.C.E.L. (2d) 161, *(sub nom. Wedekind v. Ontario (Ministry of Community & Social Services))* 21 O.R. (3d) 289, *(sub nom. Wedekind v. Director of Income Maintenance (Ont.))* 75 O.A.C. 358, 121 D.L.R. (4th) 1 (Ont. C.A.) — applied

   *Ontario (Director of Income Maintenance, Ministry of Community & Social Services) v. Wedekind* (1995), 13 C.C.E.L. (2d) 78 (note), 23 O.R. (3d) xvi, *(sub nom. Ontario (Ministry of Community & Social Services, Director of Income Maintenance Branch) v. Clark)* 123 D.L.R. (4th) vii, *(sub nom. Ontario (Ministry of Community & Social Services, Director of Income Maintenance Branch) v. Wedekind)* 123 D.L.R. (4th) viii, *(sub nom. Wedekind v. Director of Income Maintenance (Ont.))* 191 N.R. 397 (note), *(sub nom. Wedekind v. Director of Income Maintenance (Ont.))* 88 O.A.C. 159 (note) (S.C.C.) — referred to

**Regulations considered:**

*Family Benefits Act*, R.S.O. 1990, c. F.2
   *General Regulation*, R.R.O. 1990, Reg. 366

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

s. 13

s. 13(1)(a)

s. 13(2) ¶ 12

s. 13(2) ¶ 12(i)

APPEAL by recipient of Social Assistance Review Board's decision to uphold assessment requiring repayment of disability benefits.

*Gillese J.* (orally):

1    The Appellant appeals from the decision of the Social Assistance Review Board rendered September 18, 1998, in which the Board upheld the Director's decision to assess an overpayment to the Appellant in the amount of $1,604.33, that being the amount of his disability benefits payment for the month of September, 1997.

2    The Board held that the Appellant received income in September of 1997 that disqualified him from receiving disability benefits that month. The income he is said to have received was approximately $20,000, which the Board found he received from his brother and held in trust to be used towards the purchase of his apartment unit in October of 1997. In its decision, the Board noted the Director's submissions to the effect that the money received by the Appellant was a liquid asset in excess of the maximum permitted. The Board's decision shows that it rejected that argument:

> ...the Board finds, based on the sworn testimony of the Appellant, that this money was given to the Appellant by his brother solely for the purpose of purchasing a residence for the Appellant and his family, and that this money was transferred to the Appellant in advance of the closing of the house purchase so that the Appellant could get approval of his mortgage. In these circumstances, the Board finds that this money received by the Appellant in trust for the purpose specified by his brother, that this money did not therefore represent the Appellant's liquid assets.

The Appellant found, as well, that the money was not available for the Appellant's personal use. Nonetheless, the Board found the money to be income within the meaning of the word in section 13 of Regulation 366 to the *Family Benefits Act*, R.S.O. 1990, c. F2.

3    The issue to be determined on this appeal is whether the money sent by the Appellant's brother to the Appellant in September of 1997, to assist in the purchase of a home, was the payment of "income" within the meaning of section 13 of Regulation 366.

4    We begin by noting that the standard of review of the decisions of the Social Assistance Review Board is that of correctness. This standard was established by the Ontario Court of Appeal in the case of *Ontario (Director of Income Maintenance, Ministry of Community & Social Services) v. Wedekind* (1994), 21 O.R. (3d) 289 (Ont. C.A.); leave to appeal to the Supreme Court of Canada dismissed [reported (1995), 13 C.C.E.L. (2d) 78 (note) (S.C.C.)]).

4    We find there is ambiguity in the meaning of the word "income" in section 13, which reads, in part, as follows:

> (1) For the purposes of determining a person in need and computing the amounts of allowances, the income of an applicant or recipient shall include all payments of any nature or kind whatsoever received by or on behalf of,
>
> > (a) the applicant...

5    How do we come to the determination that there is ambiguity in the meaning of the word "income"? "Income" for the purposes of section 13 is described as including "all payments". It is not clear to us that receipt of trust funds constitutes a "payment" within the meaning of section 13. Like the Board, we find that the funds were received by the Appellant by way of trust. We make that finding on the basis that he had legal title to the money once it was deposited in his bank account, but

he did not have sole equitable beneficial interest to the money. It is clear on the evidence, and the Board so found, that if the money was not used for the purchase of the apartment that the Appellant had to return it to his brother. A trust arises where there is a split between legal and equitable title. In this case, as we have noted, the Appellant had legal title but he did not have sole equitable title. If the money was not used to purchase the apartment, the Appellant was obliged to return it to his brother. Therefore, it cannot be said that the Appellant had sole or complete beneficial title. Thus, there was a trust.

6      Ambiguity in the language of section 13 must be resolved in favour of the claimant because the legislation is remedial in nature; its purpose is to make benefits available to those in need. *Abrahams v. Canada (Attorney General)* (1983), 142 D.L.R. (3d) 1 (S.C.C.)

7      Having found that there is ambiguity in the meaning of the word "income" in section 13, it is incumbent upon us to consider the surrounding provisions to resolve that ambiguity. When we consider the surrounding provisions, we note that they demonstrate that entitlement to benefits is not to be altered simply on the basis that funds have been received, so long as the funds are used for the purchase of a home. See, for example, s.13.12 of the Regulation:

**Section 13.12**

Any payment received from the sale or other disposition of an asset, except that portion of the payment that is applied, or where the Director approves will be applied towards,

(i) the purchase by the applicant or recipient ... of a principal residence used by the applicant or recipient...

8      We ought not to construe the word "income" in a way which causes logical inconsistencies in the legislation, or that results in unfair treatment among recipients of social assistance. If we interpreted income as the Director has, we would come to the conclusion that a person who owns a home and who receives benefits is not disqualified if he or she uses the sale proceeds of the home to purchase another home but the Appellant is not permitted to use funds to purchase a home simply because the source of these funds is his brother. Surely the legislation ought not to be interpreted to treat recipients so differently.

9      In our view, the legislation does not compel us to reach such a conclusion. "Income" can be interpreted so as to not include receipt of trust funds that are directed to be used only for the purpose of purchase of a principal residence. This interpretation provides a result consonant with that in s.13.12.

10      A purposive approach to the interpretation of section 13 brings to mind the Act's intent and overall purpose, which is to make benefits available to those in need. It is social welfare legislation. We accept the admonition in *Abrahams*, *supra*, that a liberal interpretation is to be given to the provision in question as a consequence of it being social welfare legislation. Any doubt is to be resolved in favour of the claimant.

11      In conclusion, we find in these circumstances that there is ambiguity in the meaning of the word "income" because it is not clear that the word "income" encompasses the receipt of trust funds where the trust funds have been expressly stipulated to be applied towards the purchase of a principal residence.

12      The appeal is allowed. The decision is rescinded and this matter is referred back to the Director to be disposed of in accordance with the views expressed above.

13      The endorsement on the back of the Appeal Book is as follows:

This appeal is allowed for the oral reasons given for the Court by Madam Justice Gillese. The order of the Social Assistance Review Board dated September 18, 1998, (Appeal heard August 12, 1998) affirming the decision of the Director dated March 17, 1998, is set aside. $15,000.00 (U.S.) in question is declared not to be income under section 13 of Regulation 366. The matter is referred back to the Director to be disposed of in accordance with the Reasons. Counsel agree on the quantum of costs of $2,000.00. That sum shall be paid to the Appellant by the Respondent.

*Appeal allowed.*

1999 CarswellOnt 3716, 131 O.A.C. 72, 92 A.C.W.S. (3d) 543

---

**End of Document**      Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600...

1969 CarswellSask 9
Supreme Court Of Canada

Hawrish v. Bank of Montreal

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600, 66 W.W.R. 673

# Hawrish v. Bank of Montreal

Abbott, Judson, Ritchie, Hall and Spence, JJ.

Judgment: January 28, 1969

Counsel: *C. H. Locke, Q.C.*, for appellant.
*S. J. Walker, Q.C.*, for respondent.

Subject: Evidence

## Headnote

**Evidence --- Parol evidence rule — Admission of evidence in particular matters — Guaranty and suretyship**

Contracts — Guarantee of Indebtedness — Alleged Oral Agreement as Condition of Signing Guarantee — Whether Evidence of Oral Agreement Admissible.

Appeal from a judgment of the court of appeal for Saskatchewan (1967) 61 W.W.R. 16, allowing an appeal from the judgment of Davis, J. in an action upon a guarantee. Appeal dismissed.

Appellant had signed a guarantee to the respondent bank in the usual form which set out that it was to be a continuing guarantee to cover existing as well as future indebtedness of the company whose debts were being guaranteed up to the amount of $6,000. In the action on the guarantee the trial judge admitted oral evidence of an assurance which the guarantor said he had received from the assistant manager of the bank that the guarantee was to cover only existing indebtedness and that he would be released from his guarantee when the bank obtained a joint guarantee from the directors of the company; the bank did, in fact, obtain a joint guarantee but when the company became insolvent the bank brought action against the guarantor for the full amount of his guarantee. Davis, J. dismissed the bank's action and his judgment was reversed on appeal. It was *held, per curiam*, that the appeal must be dismissed. The oral agreement alleged by the appellant to have been independent of and collateral to the main contract was not independent of it in the sense in which that word has been interpreted in the authorities, namely, that it did not contradict nor was inconsistent with the written agreement; the oral agreement was, in fact, in direct contradiction to the very provisions of the written guarantee and this being so the oral evidence of the agreement ought not to have been admitted. There was no room in the case at bar for the application of the principle in *Pym v. Campbell* (1856) 6 E & B 370, 25 LJQB 277, 119 ER 903; *Lindley v. Lacey* (1864) 17 CBNS 578, 34 LJCP 17, 144 ER 232; *Morgan v. Griffith* (1871) LR 6 Exch 70, 40 LJ Ex 46; *Erskine v. Adeane* (1873) 8 Ch App 756, at 764, 42 LJ Ch 835, 849; *Byers v. McMillan* (1887) 15 S.C.R. 194, at 202, reversing 4 Man. R. 76, 7 Can Abr (2nd) 3189; *Heilbut, Symons & Co. v. Buckleton*, [1913] A.C. 30, at 47, 82 LJKB 245 applied.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600...

**The judgment of the court was delivered by *Judson, J.*:**

1    This action was brought by the Bank of Montreal against Andrew Hawrish, a solicitor in Saskatoon, on a guarantee which the solicitor had signed for the indebtedness and liability of a newly-formed company, Crescent Dairies Limited. This company had been formed for the purpose of buying the assets of Waldheim Dairies Limited, a cheese factory in which Hawrish had an interest.

2    By January, 1959, the line of credit granted by the bank to the new company was almost exhausted. The bank then asked Hawrish for a guarantee, which he signed on January 30, 1959. The guarantee was on the bank's usual form and stated that it was to be a continuing guarantee and to cover existing as well as future indebtedness of the company up to the amount of $6,000.

3    The defence was that when he signed the guarantee, Hawrish had an oral assurance from the assistant manager of the branch that the guarantee was to cover only existing indebtedness and that he would be released from his guarantee when the bank obtained a joint guarantee from the directors of the company. The bank did obtain a joint guarantee from the directors on July 22, 1959, for the sum of $10,000. Another joint guarantee for the same amount was signed by the directors on March 22, 1960. Between the dates of these two last-mentioned guarantees there had been some changes in the directorate.

4    Hawrish was never a director or officer of the new company, but at the time when the action was commenced he was a shareholder and he was interested in the vendor company. At all times the new company was indebted to the vendor company in an amount between $10,000 and $15,000. Hawrish says that he did not read the guarantee before signing. On February 20, 1961, Crescent Dairies Ltd., whose overdraft was at that time $8,000, became insolvent. The bank then brought its action against Hawrish for the full amount of his guarantee — $6,000.

5    The trial judge dismissed the bank's action. He accepted the guarantor's evidence of what was said before the guarantee was signed and held that parol evidence was admissible on the ground that it was a condition of signing the guarantee that the appellant would be released as soon as a joint guarantee was obtained from the directors. He relied upon *Standard Bank v. McCrossan,* [1920] 3 W.W.R. 846, 60 S.C.R. 655, affirming [1920] 2 W.W.R. 546, 28 B.C.R. 291. The court of appeal reversed this decision and gave judgment for the bank (1967) 61 W.W.R. 16. In their view, the parol evidence was not admissible and the problem was not the same as that in *Standard Bank v. McCrossan.* Hall, J.A. correctly stated the ratio of the *Standard Bank* case in the following paragraph of his reasons, at p. 21:

> In my opinion the learned trial judge erred in holding that the respondent was able to establish such condition by parol evidence. The condition found, if indeed it is one, was not similar to that which existed in *Standard Bank v. McCrossan, supra,* in that it did not operate merely as a suspension or delay of the written agreement. It may be permissible to prove by extraneous evidence an oral agreement which operates as a suspension only.

6    The relevant provisions of this guarantee may be summarized as follows:

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Hawrish v. Bank of Montreal, 1969 CarswellSask 9

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600...

7     (a) It guarantees the present and future debts and liabilities of the customer (Crescent Dairies Ltd.) up to the sum of $6,000.

8     (b) It is a continuing guarantee and secures the ultimate balance owing by the customer.

9     (c) The guarantor may determine at any time his further liability under the guarantee by notice in writing to the bank. The liability of the guarantor continues until determined by such notice.

10    (d) The guarantor acknowledges that no representations have been made to him on behalf of the bank; that the liability of the guarantor is embraced in the guarantee; that the guarantee has nothing to do with any other guarantee; and that the guarantor intends the guarantee to be binding whether any other guarantee or security is given to the bank or not.

11    The argument before us was confined to two submissions of error contained in the reasons of the court of appeal: (a) That the contemporaneous oral agreement found by the trial judge neither varied nor contradicted the terms of the written guarantee but simply provided by an independent agreement a manner in which the liability of the appellant would be terminated; and (b) That oral evidence proving the making of such agreement, the consideration for which was the signing of the guarantee, was admissible.

12    I cannot accept these submissions. In my opinion, there was no error in the reasons of the court of appeal. This guarantee was to be immediately effective. According to the oral evidence it was to terminate as to all liability, present or future, when the new guarantees were obtained from the directors. But the document itself states that it was to be a continuing guarantee for all present and future liabilities and could only be terminated by notice in writing, and then only as to future liabilities incurred by the customer after the giving of the notice. The oral evidence is also in plain contradiction of the terms of par. (d) of my summary above made. There is nothing in this case to permit the introduction of the principle in *Pym v. Campbell* (1856) 6 E & B 370, 25 LJQB 277, 119 ER 903, which holds that the parol evidence rule does not prevent a defendant from showing that a document formally complete and signed as a contract, was in fact only an escrow.

13    The appellant further submitted that the parol evidence was admissible on the ground that it established an oral agreement which was independent of and collateral to the main contract.

14    In the last half of the 19th century a group of English decisions, of which *Lindley v. Lacey* (1864) 17 CBNS 578, 34 LJCP 17, 144 ER 232; *Morgan v. Griffith* (1871) LR 6 Exch 70, 40 LJ Ex 46, and *Erskine v. Adeane* (1873) 8 Ch App 756, at 764, 42 LJ Ch 835, 849, are representative, established that where there was parol evidence of a distinct collateral agreement which did not contradict nor was inconsistent with the written instrument, it was admissible. These were cases between landlord and tenant in which parol evidence of stipulations as to repairs and other incidental matters and as to keeping down game and dealing with game was held to be admissible although the written leases were silent on these points. These were held to be independent agreements which were not required to be in writing and which were not in any way inconsistent with or contradictory of the written agreement.

15    The principle formulated in these cases was applied in *Byers v. McMillan* (1887) 15 S.C.R. 194, reversing 4 Man. R. 76. In this case Byers, a woodcutter, agreed in writing with one, Andrew, to cut and deliver 500 cords of wood from certain

**Hawrish v. Bank of Montreal, 1969 CarswellSask 9**

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600...

lands. The agreement contained no provision for security in the event that Byers was not paid upon making delivery. However, before he signed, it was orally agreed that Byers was to have a lien on the wood for the amount to which he would be entitled for his work and labour. Byers was not paid and eventually sold the wood. The respondents, the McMillans, in whom the contract was vested as a result of various assignments, brought an action of replevin. It was held by a majority of this court that they could not succeed on the ground that the parol evidence of the oral agreement in respect of the lien was admissible. Strong, J., with whom the other members of the majority agreed, said at p. 202:

> ... *Erskine v. Adeane* [*supra*]; *Morgan v. Griffith* [*supra*]; *Lindley v. Lacey* [*supra*], afford illustrations of the rule in question by the terms of which any agreement collateral or supplementary to the written agreement may be established by parol evidence, provided it is one which as an independent agreement could be made without writing, and that it is not in any way inconsistent with or contradictory of the written agreement.
>
> . . . . .
>
> These cases (particularly *Erskine v. Adeane* which was a judgment of the Court of Appeal) appear to be all stronger decisions than that which the appellant calls upon us to make in the present case, for it is difficult to see how an agreement, that one who in writing had undertaken by his labor to produce a chattel which is to become the property of another shall have a lien on such product for the money to be paid as the reward of his labor, in any way derogates from the contemporaneous or prior writing. By such a stipulation no term or provision of the writing is varied or in the slightest degree infringed upon; both agreements can well stand together; the writing provides for the performance of the contract, and the consideration to be paid for it, and the parol agreement merely adds something respecting security for the payment of the price to these terms.

16    In *Heilbut, Symons & Co. v. Buckleton*, [1913] A.C. 30, at 47, 82 LJKB 245, a case having to do with the existence of a warranty in a contract for the sale of shares, there is comment on the existence of the doctrine and a note of caution as to its application:

> It is evident, both on principle and on authority, that there may be a contract the consideration for which is the making of some other contract. 'If you will make such and such a contract I will give you one hundred pounds,' is in every sense of the word a complete legal contract. It is collateral to the main contract, but each has an independent existence, and they do not differ in respect of their possessing to the full the character and status of a contract. But such collateral contracts must from their very nature be rare. The effect of a collateral contract such as that which I have instanced would be to increase the consideration of the main contract by 100£, and the more natural and usual way of carrying this out would be by so modifying the main contract and not by executing a concurrent and collateral contract. Such collateral contracts, the sole effect of which is to vary or add to the terms of the principal contract, are therefore viewed with suspicion by the law. They must be proved strictly. Not only the terms of such contracts but the existence of an animus contrahendi on the part of all the parties to them must be clearly shewn. Any laxity on these points would enable parties to escape from the full performance of the obligations of contracts unquestionably entered into by them and more especially would have the effect of lessening the authority of written contracts by making it possible to vary them by suggesting the existence of verbal collateral agreements relating to the same subject-matter.

17    Bearing in mind these remarks to the effect that there must be a clear intention to create a binding agreement, I am not convinced that the evidence in this case indicates clearly the existence of such intention. Indeed, I am disposed to agree with what the court of appeal said on this point. However, this is not in issue in this appeal. My opinion is that the appellant's argument fails on the ground that the collateral agreement allowing for the discharge of the appellant cannot stand as it clearly contradicts the terms of the guarantee bond which state that it is a continuing guarantee.

18    The appellant has relied upon *Byers v. McMillan*. But upon my interpretation that the terms of the two contracts conflict, this case is really against him as it is there stated by Strong, J. that a collateral agreement cannot be established

1969 CarswellSask 9, [1969] S.C.R. 515, [1969] S.C.J. No. 17, 2 D.L.R. (3d) 600...

where it is inconsistent with or contradicts the written agreement. To the same effect is the unanimous judgment of the high court of Australia in *Hoyt's Proprietary Ltd. v. Spencer* (1919-20) 27 C.L.R. 133, which rejected the argument that a collateral contract which contradicted the written agreement could stand with it. Knox, C.J., said at p. 139:

> A distinct collateral agreement, whether oral or in writing, and whether prior to or contemporaneous with the main agreement, is valid and enforceable even though the main agreement be in writing, provided the two may consistently stand together so that the provisions of the main agreement remain in full force and effect notwithstanding the collateral agreement. This proposition is illustrated by the decisions in *Lindley v. Lacey* [*supra*], *Erskine v. Adeane* [*supra*], *De Lassalle v. Guildford*, [1901] 2 K.B. 215, 70 L.J.K.B. 533, and other cases.

19    I would dismiss the appeal with costs.

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.