C. A.
1889
GLASIER
v.
ROLLS.

Lopes, L.J.

belief. It is on this definition of fraud that the learned Judge in the Court below acted.

The House of Lords, as I read the opinions of the learned Lords, have held that the inaccuracy of a statement, however unreasonable, if honest and *bonâ fide*, will not support an action for deceit. I presume because it does not contain the necessary element of dishonesty. So that if a prospectus contains a statement which 99 persons out of 100 would understand in a sense which would make it obviously inaccurate, still, if the party making it honestly believed that it bore a meaning which would make it accurate, no action would lie, the obvious inaccuracy and unreasonable belief being evidence of dishonesty, but not of themselves ground of an action.

For the reasons given by the other members of the Court I do not think there was in this case any evidence of dishonesty within the meaning of *Peek* v. *Derry* in the House of Lords (1), the burden of proving fraud or dishonesty being on the Plaintiff. For reasons given, I also think there should not be a new trial.

Solicitors for Plaintiff: *Byrne & Lucas.*
Solicitor for Defendant: *E. T. Tadman.*

H. C. J.

---

## HEAP v. HARTLEY.

[1888 H. 5725.]

C. A.
1889
Aug. 2, 3, 5.

*Patent—Exclusive License for limited Time and Area—Right of Licensee to sue —Non-joinder of Patentee—Effect of License—Registration—Sub-Purchase —User within Area of patented Article purchased outside Area—Notice— Patents, Designs, and Trade Marks Act, 1883 (46 & 47 Vict. c. 57), ss. 23, 36, 87.*

An exclusive license is a leave to do a thing, and a contract not to allow anyone else to do the thing; but, unless coupled with a grant, it confers no more than any other license any interest or property in the thing, and the licensee has no title to sue in his own name.

A patentee of machinery, by deed duly registered under the *Patents, Designs, and Trade Marks Act,* 1883, s. 23, granted to the Plaintiff the full and exclusive license to use and exercise the patented invention within a specified district for a limited period, and covenanted during that period not to sell or to grant any license to exercise or use the invention to any

---

(1) 14 App. Cas. 337.

CHANCERY DIVISION. [VOL. XLII.

C. A.
1889
HEAP
*v.*
HARTLEY.

other person in the same district; and in case the patent should be infringed, he covenanted to take all necessary proceedings for defending the same, and that in default of his so doing it should be lawful for the Plaintiff to take such proceedings in his (the patentee's) name.

The patentee afterwards sold two of the patented machines to firms outside the specified district, and these firms sold them to the Defendants, who used them within the district; and it was in dispute whether or not the Defendants had actual notice of the exclusive license at the time of their purchase.

Upon an action brought in the County Palatine Court of *Lancaster* by the Plaintiff in his own name, and without joining the patentee, against the Defendants, it was *held* by the Vice-Chancellor, in dismissing the action, first, that registration under the *Patents, Designs, and Trade Marks Act* was not notice to all the world; secondly, that upon the evidence the Defendants had no actual notice of the exclusive license at the time of their purchase; thirdly, that the Defendants, being purchasers for value without notice, were not affected by the license; and fourthly, that it was doubtful whether an action for infringement of rights under a license could be brought by an exclusive licensee in his own name, without joining the patentee as co-Plaintiff :—

*Held*, by the Court of Appeal, in dismissing the appeal, first, that actual notice had not been proved against the Defendants; secondly, that the exclusive license, being simply an authority to do lawfully that which would otherwise have been unlawful, and not being a license coupled with or equivalent to a grant, did not entitle the licensee to sue in his own name without joining the patentee; and this being so, that it was immaterial to consider the effect of registration under the Act of 1883.

THIS was an appeal from a decision of the Vice-Chancellor of the County Palatine Court of *Lancaster* given on the 18th of July, 1888, in an action by *Charles Heap*, claiming as assignee or exclusive licensee for a particular district, of a patent, an injunction to restrain the Defendants *Israel Hartley* and *Edward Hartley* from using the invention described in the patent, or any colourable imitation thereof, within the district, or from otherwise infringing the rights of the Plaintiff in the patent, and for damages, an account, inspection and costs.

The invention was for improvements "in gig mills employed in the finishing of woven fabrics," and the letters patent for it were granted to *Charles Edward Moser* on the 30th of September, 1885, and were numbered 11,640 of 1885.

By indenture dated the 15th of November, 1886, *Moser* granted to the Plaintiff "the full and exclusive license to use and exercise the said patented invention at all places as well

within the borough of *Rochdale* as within the districts of the
local boards of *Norden, Wardle,* and *Littleborough,* and *Milnrow,*
according to the said invention, for the term of two years "; and
covenanted that, subject to a right on his part to sell the invention,
and to grant licenses to certain specified firms to use the same
for their individual use without power of resale or transfer, he,
*Moser,* would not " during the said period of two years either
sell the said patented invention or grant or give any license or
authority to exercise or use the same to any company, persons
or person carrying on or having a place of business " in the
district to which the license extended ; and further, that in case
the said letters patent or any extension or renewal thereof should
be infringed, *Moser* should forthwith, after notice of such infringe-
ment, at his own cost, take all necessary proceedings for effectually
protecting and defending the same, and in default of his so doing
it should be lawful for the Plaintiff at his own cost, but in *Moser's*
name, to take all necessary proceedings for effectually protecting
and defending the same.

   This deed was registered at the Patent Office on the 27th of
November, 1886, and the period of two years mentioned therein
was extended to four years by indenture dated the 12th of
September, 1887, which was registered at the Patent Office on
the 30th of September, 1887.

   Early in the year 1888, *Moser* sold one of the machines made
under his patent, which were known as " raising machines,"
to the *Victoria Raising Company* of *Manchester,* and another
to Messrs. *Scott & Whitworth* also of *Manchester.* These two
machines were on or before the 17th of February, 1888, bought
from the *Victoria Raising Company* and *Scott & Whitworth* by the
Defendants *Israel* and *Edward Hartley* for the purpose of a busi-
ness which they carried on, or were about to carry on, in partner-
ship at the *Victoria Mills, Littleborough,* within the district to
which the Plaintiff's license extended. And these machines were
temporarily put up by the Defendants in a room in the *Dearnley
Mills,* also within the district, where *Stephen Hartley,* a brother of
*Israel Hartley,* carried on business.

   This having come to the knowledge of the Plaintiff, his solici-
tors wrote to the Defendants on the 23rd of February, 1888, that

C. A.
1889
HEAP
*v.*
HARTLEY.

C. A.
1889
HEAP
*v.*
HARTLEY.

the purchase and user of these machines was an infringement of the Plaintiff's right as exclusive licensee within the district, and that if such user was continued proceedings would be taken against the Defendants.

The user was continued. This action was brought on the 2nd of May, 1888, and on the 10th the Plaintiff gave notice of motion for an injunction and inspection.

The evidence as to whether the Defendants before they bought the two machines had actual notice of the exclusive license granted to the Plaintiff for the district was of a conflicting character. On the part of the Plaintiff there was some evidence that at an interview between *Stephen Hartley*, *Israel Hartley*, and a workman named *Lord*, on the 29th of October, 1887, mention was made of "raising machines," and that on the same day *Stephen Hartley* wrote to *Moser* for one of his raising machines, afterwards receiving an answer from *Moser*, dated the 31st of October, 1887, that he was unable to send the machine, as he had given the Plaintiff the exclusive use of his patent for a certain time in *Stephen Hartley's* district; and further, that at another interview between *Stephen Hartley*, *Israel Hartley*, and *Lord* and his wife, in January, 1888, when mention was made of an agreement between *Moser* and the Plaintiff, one of the *Hartleys* said, "It is true enough." This was, however, denied by *Israel Hartley* in his evidence in reply, and there was no cross-examination upon the question of actual notice to the Defendants of the Plaintiff's exclusive license. This evidence is also referred to in the judgments of *Cotton* and *Fry*, L.JJ.

The motion was heard by the Vice-Chancellor of the County Palatine on the 13th of July, 1888, and having been by consent treated as the trial of the action, the Vice-Chancellor held, first, that registration, under the *Patents, &c., Act,* 1883, of an exclusive license was not in itself notice to all the world that such a license had been granted; secondly, that, upon the evidence, the Defendants had no actual notice of the exclusive license at the time of their purchase of the machines; and thirdly, that the Defendants, being purchasers for value without notice, were not affected by the prior grant of the license to the Plaintiff. And his Honour dismissed the action, and expressed a doubt

whether an action to restrain an infringement of rights under an exclusive license could be brought and maintained by the licensee in his own name without joining the patentee as a co-Plaintiff.

The Plaintiff appealed.

*Moulton*, Q.C., and *Staffurth*, for the Appellant :—

A patentee is, according to sect. 46 of the *Patents, &c., Act,* 1883, " the person for the time being entitled to the benefit of a patent." An exclusive licensee for a particular district, whose license is duly registered under sects. 23 and 87 of the same Act, is *quâ* that district, and during the term of the license, in the position of a person to whom the patentee has given his monopoly and all his beneficial rights. He is practically an assignee *pro tanto* of the patent, and is entitled to maintain an action for infringement of his rights within the district, in his own name, and without joining the patentee: *Patents, &c., Act,* 1883, s. 36 ; *Renard* v. *Levinstein* (1) ; *Newby* v. *Harrison* (2) ; *Hassall* v. *Wright* (3) ; *Derosne* v. *Fairie* (4). Again, a patent is severable, and the assignee of a severed portion of the patent may sue for an infringement affecting that part without joining one who has an interest in another part : *Dunnicliff* v. *Mallet* (5) ; *Hassall* v *Wright.*

The patentee could not give other licenses in derogation of his own exclusive grant, and would not be entitled himself to infringe his own patent within the district.

The register has given notice to all the world of the rights of the exclusive licensee, and the Defendants with such notice have infringed those rights by using the patented invention within the district without the leave of the licensee. The permission of the patentee would be of no avail, for every license he grants must be subject to the rights already on the register. If *Moser,* when he sold these machines to the Defendants, had given them an express license to use them all over the kingdom, that license would have been a nullity as to this district, for as to that district

(1) 2 H. & M. 628.          (3) Law Rep. 10 Eq. 509.
(2) 1 J. & H. 393.          (4) 1 Webs. Pat. Cas. 155.
(5) 7 C. B. (N.S.) 209.

CHANCERY DIVISION.        [VOL. XLII.

C. A.
1889
~
HEAP
*v.*
HARTLEY.

he could give no rights whatever. He, however, gave no such license or permission. The Plaintiff is the only person injured, and the only necessary Plaintiff, and the non-joinder of the patentee cannot defeat the action. If, however, there is a want of necessary parties, the objection should have been taken before. Moreover, actual notice to the Defendants is not necessary, because by the patent law the right to restrain an infringement is independent of notice, and the Defendants have infringed this patent within the district covered by the license. But upon the facts there was actual notice and knowledge of the Plaintiff's rights by the Defendants.

[They also cited *Webber* v. *Lee* (1); *Muskett* v. *Hill* (2).]

*Cozens-Hardy*, Q.C., and *Maberly*, for the Respondents:—

[COTTON, L.J.:—You may confine yourselves to the question of actual notice.]

The writ simply seeks an injunction for infringement of patent; there is no claim for conspiring with *Moser* to procure goods within the district. The original purchasers from whom we bought acquired their machines without any notice of the Appellant's rights as licensee, and no one who buys through an innocent person can be fixed with notice. There is no allegation of contrivance, collusion, or fraud, and even if the Respondents had notice, it was merely notice that the Appellant was licensed to do something within a limited area and time, which he could not have done without that license. But in fact there is no evidence of any notice sufficient to bind the conscience of the Defendants.

*Staffurth*, in reply, referred to *De Mattos* v. *Gibson* (3); *Messageries Impériales* v. *Baines* (4); *Catt* v. *Tourle* (5); *Werderman* v. *Société Générale d'Electricité* (6); *Holroyd* v. *Marshall* (7).

COTTON, L.J.:—

The last point argued by Mr. *Moulton* was that of notice, but I think it advisable to deal with that question first, because it

(1) 9 Q. B. D. 315.            (4) 11 W. R. 322.
(2) 5 Bing. N. C. 694.         (5) Law Rep. 4 Ch. 654.
(3) 4 De G. & J. 276.          (6) 19 Ch. D. 246.
                (7) 10 H. L. C. 191.

ought to be disposed of before we come to the question of whether an exclusive licensee can sue for an infringement of a patent.

The Vice-Chancellor has held that the Plaintiff has not made out that on which his title depended, viz., that the Defendants bought this machine with notice of the agreement which had been entered into between the Plaintiff and the patentee. In my opinion that is so; and it was for the Plaintiff to make that out, not as something which occurred incidentally, but as being the very foundation of his right to relief, unless he could establish that an exclusive licensee can, as such and independently of notice, sue a man for infringement of a patent. I will deal with that presently, but to my mind the title of the Plaintiff to relief depends upon notice, and therefore it was for him to make out to the satisfaction of the Court that the Defendants had notice. I agree that the case is one of some little suspicion, but that is not enough. The Plaintiff in this action did not originally raise any case of actual notice, but notice has come in incidentally, and in a rather awkward sort of way. The Plaintiff stated, and supported by affidavits, the agreement that was made between the patentee and himself. Then in answer to those affidavits the Defendant said, " I had no notice of this," but in cross-examination he said, " Oh, I do recollect something about it, which was mentioned to me by *Stephen Hartley*." What is strongest against the Defendants on this point is a joint affidavit by a workman named *Lord* and his wife. But that was answered by an affidavit of one of the Defendants, and there was no cross-examination at all as regards the matters upon which the Plaintiff might have relied in order to shew notice either as to those affidavits of the *Lords*, or as to the answer by the Defendant. To my mind this is rather a striking circumstance, and in my opinion it would be wrong merely upon that, as to which there was no cross-examination, and no opportunity therefore of the Defendants giving any explanation, to hold that they had notice of the agreement that was made between the patentee and the Plaintiff.

That being so, we come to the simple question whether an exclusive licensee for a particular district can sue in his own name a person acting in alleged violation of his rights under the license, without proving as against such person notice of those

C. A.

1889

HEAP
*v.*
HARTLEY.

Cotton, L.J.

468                   CHANCERY DIVISION.          [VOL. XLII.

C. A.

1889

HEAP
*v.*
HARTLEY.

Cotton, L.J.

rights? My opinion is that the licensee cannot so sue. It is said that this is an exclusive license, and must be construed just in the same manner as if it had been a grant of a patent right for a limited period and for a limited space. But it is a very different thing; and some of the cases that have been referred to shew clearly the distinction between licenses which amount to a grant and licenses which do not do so. One of those cases is the ice case (*Newby* v. *Harrison* (1)), and there the Vice-Chancellor shews that where there is only a license which does not entitle the licensee to take anything away, or to acquire any property, then the license simply remains a license, that is, an authority from the person who grants it to the person who receives it, enabling him to do lawfully that which without the license he could not do; and that where there is a license which not only enables the licensee to do something lawfully which otherwise he could not do, but also enables him to acquire something or to take away something, like game, or ice, in consequence of the license, then the license amounts to a grant. That is pointedly put in the judgment of Lord *Hatherley*, then Vice-Chancellor, in this way (2):—" With regard to the word 'license,' there is some little ambiguity. It is, however, well defined in the case of *Muskett* v. *Hill* (3), and I prefer stating it in the language there cited by Chief Justice *Tindal* to giving my own. It is thus stated:—'A dispensation or license properly passes no interest, but only makes an action lawful which without it had been unlawful; as a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which, without license, had been unlawful; but a license to hunt in a man's park and carry away the deer killed to his own use, to cut down a tree in a man's ground and to carry it away the next day after to his own use, are licenses as to the acts of hunting and cutting down; but as to carrying away the deer killed and the tree cut down, they are grants.' So here, a license to enter upon a canal and take the ice is a mere license; and the right of carrying it away is a grant of the ice so to be carried away." So that points out the distinction between a license and a grant, and in my opinion the license in this case, although it is an exclusive license, and for a

---

(1) 1 J. & H. 393.          (2) 1 J. & H. 398.          (3) 5 Bing. N. C. 694.

limited time, can in no way be considered as a grant of the letters patent, but is simply a license to do that which without that license would be a violation of the monopoly of the patentee.

That this exclusive license was not intended to be a grant to the licensee of any right to sue is, I think, clear from the fact that there is in it a conditional contract that if there was any infringement either within or without the district, then the patentee would allow the licensee to use his (the patentee's) name, in order to sue the infringer.  What is granted may be put thus :—" You may use this within this particular district for this particular time.  I do not give you any right which will enable you to sue, but if there is any one who is violating my patent right, and therefore infringing the right which I have given to you, or doing that even without infringing the right, because he may do it outside; having regard to the license which I have granted, I will allow you to use my name, in order to sue the person who has committed such an act."  If in this case any act had been done in violation of the agreement between the licensee and the patentee, then the licensee would have had the right to sue the patentee, but it is not alleged that there was any such violation.  All that is contended is that an exclusive license is equivalent to a grant, and that the licensee may, without the concurrence of the patentee, or without there having been any violation of the agreement between the patentee and himself, sue the person who is infringing the rights conferred by the license.  In my opinion that is wrong.  That is turning that which is merely a license into something very different, namely, a grant of the whole letters patent, and in my opinion, therefore, the Plaintiff fails.  I do not think it is necessary to go into the questions argued by Mr. *Moulton* as to the effect of the *Patent Act*, because if he cannot sue except in the name of the patentee, it is immaterial to consider whether the Act, by sect. 87, does render what these Defendants have done within the district an infringement or not, or an infringement against the patentee.  If the Plaintiff cannot sue then it is immaterial to consider the question whether this is to be considered as a right which the patentee could not grant, and therefore as an infringement against the patentee.

C. A.

1889

HEAP
*v.*
HARTLEY.

Cotton, L.J.

470                    CHANCERY DIVISION.            [VOL. XLII.

C. A.
1889
HEAP
v.
HARTLEY.

In my opinion the judgment was right, and the appeal must be dismissed.

FRY, L.J.:—

I am of the same opinion. The Plaintiff in this case sues under an exclusive license to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his license. Now he puts his case in a two-fold manner. He says: " In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense ; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing. A license may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the license pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

Then, in the second place, the Plaintiff puts his case in this way. He says: "The exclusive license implies a contract not to grant to anybody else within the district. The Defendants took these machines with notice of that contract, and it would be unconscientious to allow them to use machines in such a manner as to violate the contract of which they had notice." Had they, then, notice of the contract? In my opinion that is not proved. I agree that there are many circumstances of suspicion; many circumstances which might make an investigation of the matter reasonable; many circumstances which I think the Plaintiff, if he had been minded, might have probed into far more deeply than he has ever attempted to do in this case. But, in fact, he did not launch his case upon the ground of notice. That, I

think, is not his true cause of action as he perceived it, and
understood it at the time he began his action; and on such
ragged evidence as there is of notice he has entirely failed to
satisfy me.

Therefore I agree with the Lord Justice that this appeal fails.

C. A.
1889
HEAP
*v.*
HARTLEY.

LOPES, L.J.:—

I am of the same opinion.   I do not desire to add anything.

Solicitors: *H. G. Church*, agent for *Jacksons & Godby, Roch-
dale; Radford & Frankland*, agents for *Bowden & Walker,
Manchester*.

W. W. K.

———

## TUCK *v.* SOUTHERN COUNTIES DEPOSIT BANK.

### [1888 T. 1392.]

*Bill of Sale—Registration—Absolute Assignment—Subsequent Bill of Sale as
Security—" True Owner "—Mistake in Date of Register—" True Copy "—
Bills of Sale Act, 1878 (41 & 42 Vict. c. 31), ss. 8, 10 [Revised Ed. Statutes,
vol. xviii, p. 654]—Bills of Sale Act (1878) Amendment Act, 1882 (45 & 46
Vict. c. 43), ss. 5, 6 — Practice—Judgment—Stay of Execution—Special
Circumstances.*

C. A.
1889
KAY, J.
May 8, 17.
C. A.
July 30;
Aug. 1, 8.

———

The 10th section of the *Bills of Sale Act*, 1878, applies to absolute
assignments as well as to assignments by way of security.

The owner of certain household furniture in 1885 assigned it by a deed
of absolute gift to the Plaintiff, who was his wife, and the goods were soon
afterwards transferred to his son's house where the Plaintiff lived.   This
deed was not registered.   After the transfer the grantor executed another
bill of sale to the Defendants as security for a loan, which was registered.
After the death of the grantor the Defendants seized the goods, and the
Plaintiff brought an action to restrain them from dealing with or remaining
in possession of them :—

*Held*, by Cotton and Fry, L.JJ. (*dissentiente Lopes*, L.J.), that the first
bill of sale, although it ought to have been registered under sect. 10 of the
*Bills of Sale Act*, 1878, was not absolutely void, and, therefore, the grantor
was not the " true owner" of the goods at the time of his executing the
second bill of sale, and, consequently, the second bill of sale was made void
by the 5th section of the *Bills of Sale Act* (1878) *Amendment Act*, 1882,
against all persons except the grantor.   The Plaintiff was, therefore,
entitled to succeed in the action:

*Held*, by Lopes, L.J., dissenting, that the 5th section of the *Bills of Sale*



**HILGRAEVE CORPORATION, Plaintiff-Appellant, v. SYMANTEC CORPORATION, Defendant-Cross Appellant.**

**00-1373, 00-1374**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*265 F.3d 1336*; *2001 U.S. App. LEXIS 20496*; *60 U.S.P.Q.2D (BNA) 1291*

**September 17, 2001, Decided**

**SUBSEQUENT HISTORY:** [**1] Rehearing and Rehearing En Banc Denied November 6, 2001, Reported at: *2001 U.S. App. LEXIS 26125*. Certiorari Denied March 4, 2002, Reported at: *2002 U.S. LEXIS 1420*.
Rehearing denied by, Rehearing, en banc, denied by *Hilgraeve Corp. v. Symantec Corp., 2001 U.S. App. LEXIS 26125 (Fed. Cir., Nov. 6, 2001)*
Writ of certiorari denied *Symantec Corp. v. Hilgraeve Corp., 535 U.S. 906, 152 L. Ed. 2d 144, 122 S. Ct. 1206, 2002 U.S. LEXIS 1420 (2002)*
Motion granted by, Motion to strike denied by *Hilgraeve Corp. v. Symantec Corp., 212 F.R.D. 345, 2003 U.S. Dist. LEXIS 677 (E.D. Mich., 2003)*
On remand at, Summary judgment denied by, Summary judgment granted by *Hilgraeve, Inc. v. Symantec Corp., 2003 U.S. Dist. LEXIS 11999 (E.D. Mich., July 9, 2003)*

**PRIOR HISTORY:** Appealed from: United States District Court for the Eastern District of Michigan. Judge Paul V. Gadola.
*Hilgraeve Corp. v. Symantec Corp., 90 F. Supp. 2d 850, 2000 U.S. Dist. LEXIS 4120 (E.D. Mich., 2000)*

**DISPOSITION:** AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

**COUNSEL:** Ernie L. Brooks, Brooks & Kushman P.C., of Southfield, Michigan, argued for plaintiff-appellant. With him on the brief were Thomas A. Lewry, Robert C.J. Tuttle, John E. Nemazi, and Frank A. Angileri.

Martin C. Fliesler, Fliesler Dubb Meyer & Lovejoy LLP, of San Francisco, California, argued for defendant-cross appellant. With him on the brief were Burt Magen, and Sarah Barone Schwartz. Of counsel was Dennis J. Levasseur, Bodman Longley & Dahling LLP, of Detroit, Michigan.

**JUDGES:** Before RADER, Circuit Judge, PLAGER, Senior Circuit Judge, and DYK, Circuit Judge.

**OPINION BY:** DYK

**OPINION**

[*1338] DYK, *Circuit Judge*.

Hilgraeve Corp. ("Hilgraeve") appeals from the decision of the United States District Court for the Eastern District of Michigan granting the motion of Symantec Corp. ("Symantec") for summary judgment of non-infringement for *U.S. Patent No. 5,319,776 (" '776 patent")*. *Hilgraeve Corp. v. Symantec Corp., 90 F. Supp. 2d 850 (E.D. Mich. 2000)*. Symantec cross-appeals the district court's grant of summary judgment [**2] for Hilgraeve that Symantec is not licensed to use the invention claimed in the *'776 patent. Hilgraeve Corp. v. Symantec Corp., 1999 U.S. Dist. LEXIS 22970*, Civ. Action No. 97-40370 (E.D. Mich. Jun. 28, 1999) ("License Defense Order").

265 F.3d 1336, *1338; 2001 U.S. App. LEXIS 20496, **2;
60 U.S.P.Q.2D (BNA) 1291

We vacate the district court's grant of summary judgment of non-infringement of the *'776 patent* and generally affirm the district court's grant of summary judgment that Symantec did not license the *'776 patent*. We find that questions of material fact exist as to whether the limitations of the *'776 patent* claims are found in the methods performed by the accused products, and that Hilgraeve did not transfer any rights to practice the *'776 patent*.

BACKGROUND

Hilgraeve filed suit against Symantec in the Eastern District of Michigan for infringement of the *'776 patent* on September 15, 1997. On the same day, Hilgraeve filed a separate suit against McAfee Associates, [*1339] Inc. for infringement of the *'776 patent*, also in the Eastern District of Michigan. The cases were not consolidated. In the McAfee case, the district court's grant of summary judgment of non-infringement, *Hilgraeve Corp. v. McAfee Associates, Inc., 70 F. Supp. 2d 738 (E.D. Mich. 1999)* ("*McAfee I* [**3] "), was vacated and remanded by this court because, under the agreed claim construction, questions of material fact existed about the operation of the accused device, *224 F.3d 1349, 55 U.S.P.Q.2D (BNA) 1656 (Fed. Cir. 2000)* ("*McAfee II*").

The *'776 patent* relates to computer virus detection software. The software scans a digital data file for viruses as the file is transferred to a storage medium. If the software detects a virus prior to storing the file, it automatically blocks storage of the file. The software may be used, for example, to scan a file for viruses as the file is transferred from a floppy disk to a hard disk of a computer system, or as the file is transferred over the Internet from one computer system to a storage medium of another computer system.

The *'776 patent* contains 20 claims. Independent claims 1 and 18, which are at issue on this appeal, read as follows:

1. In a system for transferring digital data for storage in a computer storage medium, a method of screening the data *as it is being transferred* and automatically inhibiting the storage of screened data containing at least one predefined sequence, comprising the steps of:

causing a [**4] quantity of digital data resident on a source storage medium to be transferred to a computer system having a destination storage medium;

receiving and screening the transferred digital data *prior to storage on the destination storage medium* to determine if at least one of a plurality of predefined sequences are present in the digital data received; and

in response to said screening step:

(a) automatically causing the screened digital data to be stored on said destination storage medium if none of the plurality of predefined sequences are present, and

(b) automatically inhibiting the screened digital data from being stored on said destination storage medium if at least one predefined sequence is present.

18. A method of preventing the spread of computer viruses to a computer having a storage medium, comprising the steps of:

*simultaneously searching* for a plurality of virus signatures, each of which comprising an identifiable digital sequence, *while said computer is receiving a stream of digital data for storage on said storage medium*;

providing an indication of the detection of a virus from said searching step; and

automatically [**5] inhibiting the storage of

265 F.3d 1336, *1339; 2001 U.S. App. LEXIS 20496, **5;
60 U.S.P.Q.2D (BNA) 1291

said digital stream on said
storage medium if any of
said virus signatures have
been detected.

*'776 patent*, col. 17, ll. 9-29 and col. 18, ll. 45-57
(emphases added to pertinent terms).

Because these claims require the inhibition of
"storage," the district court was required to construe the
meaning of the word "storage" in the patent. The district
court construed "storage" as occurring "when the
incoming digital data is sufficiently present on the
destination storage medium so that any viruses contained
in the data can spread and infect the computer system."
*Hilgraeve, 90 F. Supp. 2d at 857.*

Hilgraeve contended that several Symantec products,
including pcANYWHERE TM and Norton Antivirus TM
("NAV"), infringe [*1340] the *'776 patent* under this
claim construction. In other words, Hilgraeve alleged that
the accused products screen incoming digital data for
viruses during transfer and before "storage" on the
destination storage medium. In contrast, Symantec
contended that its products do not infringe because they
screen for viruses only after the data have been "stored"
on the destination storage medium. Thus, the critical
issue was whether [**6] the accused products screen for
viruses before or after the data become sufficiently
present on the storage medium so that viruses contained
in the data could spread and infect the computer system.

To resolve this issue on summary judgment the
district court relied on testimony of Symantec's expert
witness about how the accused products operate and on
statements made by Hilgraeve and its expert that it agreed
with the overview offered by Symantec's expert about
how the accused products operate. *Hilgraeve, 90 F.
Supp. 2d at 858-59.* Upon accepting Symantec's view of
how the products operate, the district court found that the
accused products "first allow the incoming digital data to
be stored as a whole on the destination storage medium
before it is scanned. Virus screening is performed only
after the incoming digital data has been fully transferred
and stored." *Id. at 859.* The district court held that
"because there is no dispute about how the accused
products operate, there is no genuine issue as to any
material fact concerning whether Defendant's accused

products literally infringe the *'776 Patent*" and granted
summary judgment for Symantec. *Id.*

[**7] Before the district court, Symantec also
asserted the affirmative defense to Hilgraeve's
infringement claim that it had acquired a license to use
the patent under a complex series of transactions
involving Delrina Corp. and its subsidiaries. On June 30,
1993, Delrina Corp., Delrina (Delaware) (a subsidiary of
Delrina Corp.), and Hilgraeve executed a Technology
Transfer Agreement under which Delrina Corp. paid
Hilgraeve $ 1.45 million, and Hilgraeve transferred
certain rights to its software, allegedly including the
technology at issue in this suit, to Delrina (Delaware).
==The Technology Transfer Agreement states that it is==
==governed by the laws of the Province of Ontario, Canada.==
On the same day, Delrina (Canada) (also a subsidiary of
Delrina Corp.) and Delrina (Delaware) entered into a
Software Development and Cost Sharing Agreement (the
"SDCS Agreement") to govern the shared development
of software by the parties. In July 1995, Symantec
acquired Delrina Corp. On March 30, 1996, Delrina
(Canada) licensed its intellectual property to Symantec.
On March 2, 1999, Delrina (Delaware) entered into an
agreement with Symantec to directly transfer rights to the
technology transferred by Hilgraeve [**8] to Delrina
(Delaware) on June 30, 1993.

The district court granted Hilgraeve's motion for
summary judgment that Symantec did not have a license
to the *'776 patent* prior to March 2, 1999, because
Symantec had failed to establish that Delrina (Delaware)
transferred any rights to the *'776 patent* to Delrina
(Canada) or Delrina Corp., and Symantec therefore failed
to show that it acquired any rights to the *'776 patent*
through the 1995 acquisition of Delrina Corp. License
Defense Order, slip op. at *14. As to events after March
2, 1999, the district court denied both Hilgraeve's and
Symantec's motions for summary judgment regarding
Symantec's licensing defense, finding that the March 2,
1999, agreement raised a general issue of material fact as
to whether Symantec had acquired a license to the *'776
patent* through the March 2, 1999 agreement. *Id.* After
granting Symantec's motion for summary judgment of
non-infringement, the district court denied all [*1341]
other pending motions in the case without prejudice, and
dismissed the case. *Hilgraeve, 90 F. Supp. 2d at 859.*

DISCUSSION

I. *Jurisdiction and Standard of Review*

265 F.3d 1336, *1341; 2001 U.S. App. LEXIS 20496, **8;
60 U.S.P.Q.2D (BNA) 1291

We have jurisdiction over this appeal pursuant to *28 U.S.C. § 1295* [**9] *(a)(1)*. Summary judgment is properly granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307, 46 U.S.P.Q.2D (BNA) 1752, 1755 (Fed. Cir. 1998).* We review a district court's grant of a motion for summary judgment without deference. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1315, 47 U.S.P.Q.2D (BNA) 1272, 1275 (Fed. Cir. 1998).*

A patent infringement analysis requires two steps. *Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1476, 45 U.S.P.Q.2D (BNA) 1498, 1500 (Fed. Cir. 1998).* "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Id.* (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576, 27 U.S.P.Q.2D (BNA) 1836, 1839 (Fed. Cir. 1993)).* Claim construction is a matter of law that is reviewed without deference. *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456, 46 U.S.P.Q.2D (BNA) 1169, 1174 (Fed. Cir. 1998)* [**10] (en banc). Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353, 48 U.S.P.Q.2D (BNA) 1674, 1676 (Fed. Cir. 1998).* "Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304, 51 U.S.P.Q.2D (BNA) 1161, 1165 (Fed. Cir. 1999).*

We review the construction of a license agreement without deference and interpret the licensing agreement under the law governing the agreement, here Ontario law. *See Studiengesellschaft Kohle, m.b.H. v. Hercules, Inc., 105 F.3d 629, 632, 41 U.S.P.Q.2D (BNA) 1518, 1521 (Fed. Cir. 1997)* (citing *Cyrix Corp. v. Intel Corp., 77 F.3d 1381, 1384, 37 U.S.P.Q.2D (BNA) 1884, 1887 (Fed. Cir. 1996)).*

## II. *Claim Construction Issues*

As noted above, this is our second case involving the *'776 patent*. In *McAfee II*, we accepted the claim construction of "storage" urged by both parties and adopted by the district [**11] court in *McAfee I*. That claim construction differs slightly from the claim construction adopted below in the district court in this case in that the *McAfee II* claim construction views "storage" as occurring "when the incoming digital data is sufficiently present on the destination storage medium, *and accessible by the operating system or other programs*, so that any viruses contained in the data can spread and infect the computer system." *McAfee II, 224 F.3d at 1351* (emphasis added to differing language).

Symantec argues that "storage" should not be construed to occur when data become "accessible by the operating system or other programs," *Hilgraeve, 90 F. Supp. 2d at 857*, or when "any viruses contained in the data can spread and infect the computer system," but that "storage" should be construed to occur when the data become physically present (i.e., magnetically recorded) on the storage medium.

We need not decide here whether our claim construction of *McAfee II* is binding on us in this case as a matter of [*1342] *stare decisis*. Our decision in *McAfee II* was precedential, but it merely adopted the district court's claim construction [**12] in *McAfee I* based on the parties' agreement that the district court's claim construction was correct. We have independently considered the issues of claim construction and conclude that the construction of "storage" in *McAfee II* is indeed correct.

The *'776 patent* distinguishes prior art virus scanning programs because they "do not automatically prevent the virus from being stored on the medium in the first place, hence they cannot totally prevent the virus from attacking or spreading." *'776 patent*, col. 1, ll. 51-54. Thus, "storage" of the virus is identified with the virus's ability to spread and infect the computer system. A virus may not spread or infect the computer system, however, unless it is accessed by the operating system or other programs. Given this, we agree with the *McAfee II* court that "storage" occurs "when the incoming digital data [are] sufficiently present on the destination storage medium and accessible by the operating system or other programs so that any viruses contained in the data can spread and infect the computer system." [1] *McAfee II, 224 F.3d at 1351.*

1 The parties also dispute whether "destination storage medium" as used in claim 1 and "storage medium" as used in claim 18 mean the ultimate

265 F.3d 1336, *1342; 2001 U.S. App. LEXIS 20496, **12;
60 U.S.P.Q.2D (BNA) 1291

destination of the digital data or whether the terms may be construed to include an intermediate storage medium. In accordance with the definition of "storage" we have adopted, we conclude that "storage medium" refers to any storage medium of the computer system, if the data, when stored on the medium, are accessible to the operating system or other programs, such that viruses in the data can spread and infect the computer system.

[**13]  III. *Infringement*

Symantec contends that even under our claim construction it does not infringe. Hilgraeve argues that questions of material fact remain regarding the operation of the accused devices and hence infringement. [2] We conclude here that the conflicting affidavits of the parties' experts leave material fact questions unanswered, just as we held in a somewhat similar context in *McAfee II*.

> 2    While the parties, and the district court's decision, speak of the accused devices as infringing, more properly the allegation is that the operation of the devices directly infringes the method claims at issue, or that the sale of the devices induces customers to infringe the method claims.

The district court based its summary judgment of non-infringement on the testimony of Symantec's expert, Dr. Melvin, who opined on the operation of the accused products, and on statements made by Hilgraeve and its expert, Dr. Geske, agreeing with portions of Dr. Melvin's testimony. The experts, however, did not in fact [**14] agree.

The experts described the operation of the accused products in different ways. Symantec's expert, Dr. Melvin, described the operation of NAV as occurring in a sequence of steps. In this sequence, first (step one) a file is transferred for storage onto the destination storage medium. This transfer includes opening a new file on the storage medium and recording incoming data into the new file. Second (step two), the application causing the transfer makes a request to the operating system to close the file containing the transferred data. Third (step three), the operating system closes the file. Fourth (step four), after the file is closed, the Symantec product invokes the NAV Scan Engine to test the file for the presence of a virus. Symantec's expert alleged that after the third step and before the fourth step, the file is recorded on the

storage medium and accessible to the operating system and other programs - and therefore [*1343] "stored," and that since this occurs before the file is scanned for viruses, Symantec's products do not infringe. Hilgraeve's expert, Dr. Geske, stated that although he agreed with Dr. Melvin's "overview" of how the accused products operate, in his opinion [**15] there were critical points in Dr. Melvin's analysis that did not correspond with the behavior of the NAV as it executes. Critically, Dr. Geske interpreted the testimony of Mr. Cohen, the Chief Architect of the Symantec accused products, to mean that the accused products impose a barrier in the computer system's file system which prevents all programs and the operating system from accessing the transferred file until it is processed and screened for viruses. Thus, Dr. Geske disputed that the file becomes accessible to the operating system and other programs between steps three and four.

Symantec's expert sought to prove that a file becomes accessible to the operating system or other programs before it is scanned for viruses by the NAV Scan Engine by running four tests. Hilgraeve's expert asserted that these tests do not prove that Symantec's products do not infringe, and that even if they showed that the products do not infringe under the test circumstances, they do not prove non-infringement under normal operating conditions.

We agree that tests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis. For example, in determining whether [**16] a product claim is infringed, we have held that an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation. *See Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 832, 20 U.S.P.Q.2D (BNA) 1161, 1171 (Fed. Cir. 1991)*; *Key Pharms., Inc. v. Hercon Labs. Corp., 981 F. Supp. 299, 310 (D. Del. 1997), aff'd, 161 F.3d 709, 48 U.S.P.Q.2D (BNA) 1911 (Fed. Cir. 1998)*; *Huck Mfg. Co. v. Textron, Inc., 1975 U.S. Dist. LEXIS 12539, 187 U.S.P.Q. (BNA) 388, 408 (E.D. Mich. 1975)* ("The fact that a device may be used in a manner so as not to infringe the patent is not a defense to a claim of infringement against a manufacturer of the device if it is also reasonably capable of a use that infringes the patent."); *cf. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1556, 33 U.S.P.Q.2D (BNA) 2005, 2009 (Fed. Cir. 1995)* (finding that an accused device does not infringe if it does not

infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances). [**17] So too the sale of a device may induce infringement of a method claim, even if the accused device is capable of non-infringing modes of operation in unusual circumstances.

In the first test, Symantec's expert downloaded an infected file from a web page on the Internet to a storage disk of a computer running NAV and the Windows 95 TM operating system. After the file arrived at the computer, but before the NAV was able to scan and delete the file, he shut off power to the computer. When he turned the computer on again he was able to access the file with a utility program of Windows 95. In the second test, Dr. Melvin also downloaded an infected file from a web page to a storage disk of a computer running NAV, but he restarted the computer instead of shutting off its power, prior to scanning by NAV. When the computer restarted, he was able to access the file. Symantec alleges that these two tests show that the file is stored on the computer's storage medium prior to scanning. Even if that is true as a factual matter under the circumstances of the tests, the tests are not probative of infringement during normal operation of the accused products. Because the *'776 patent* claims require "automatically [**18] inhibiting" the storage [*1344] of the virus, as we said in *McAfee II* when considering similar tests, "a test disabling the automatic capabilities of [the accused product] is not probative of whether [the accused product] may infringe in the automatic mode." *McAfee II, 224 F.3d at 1354.*

In Dr. Melvin's third test, he downloaded an infected file to a computer running both NAV and McAfee's anti-virus screening program, VirusScan TM . VirusScan intercepted and examined the file before NAV screened it for viruses, which according to Dr. Melvin, showed that the file was accessible by other programs prior to screening by NAV. While this third test may demonstrate that the infected file is accessible to VirusScan before it is screened by NAV, it is not clear from this test that the virus can spread and infect the computer system before it is screened by NAV, especially since both NAV and VirusScan are intended to prevent the spread of viruses. Moreover, as with the first two tests, whether or not the accused products infringe when operated in conjunction with another anti-virus product - perhaps an unusually redundant mode of operation - does not answer the question whether [**19] they infringe while operating alone.

In his fourth test, Dr. Melvin loaded into memory NAV and a special program for intercepting a particular file while the file is being downloaded and redirecting the file to the computer's storage medium. When Dr. Melvin then downloaded the particular file, which contained a virus, it was intercepted and redirected to the storage medium by the special program before it could be screened by NAV for viruses. That this test may prove that the functionality of the accused products can be defeated to avoid infringement does not prove non-infringement of the products under normal operating conditions.

Thus, we find the tests inconclusive on the issue of infringement. Because the record shows the existence of genuine issues of material fact concerning the interaction of the accused devices with the operation system and other programs, the district court erred in granting summary judgment of non-infringement.

IV. *Symantec's Licensing Defense*

Symantec urges that even if we vacate the district court's grant of summary judgment of non-infringement, the judgment can be affirmed on an alternative ground, namely that Symantec was licensed to practice [**20] the patent. We cannot agree.

The district court held that Symantec had no license defense for the period prior to March 2, 1999, because the purported transfer of patent rights from Delrina (Delaware) to Delrina (Canada) under the June 30, 1993 SDCS agreement was ineffective. While the district court appears to have been correct, we believe that there is a more fundamental defect in Symantec's license defense argument - Delrina (Delaware) itself never acquired a transferable license to practice the *'776 patent*, and Delrina (Delaware) therefore could not sub-license the *'776 patent* either before March 2, 1999, or thereafter.

Unless the *'776 patent* was licensed under the June 30, 1993 Agreement, Symantec agrees that it could not acquire a license. Symantec also admits that there is no express language in the June 30, 1993 Technology Transfer Agreement licensing or transferring rights to the *'776 patent* or any other Hilgraeve patent. Instead, Symantec points to language in the paragraph 2.1 of the Agreement providing that "HILGRAEVE sells, conveys, assigns and transfers to DELRINA DELAWARE and to

HILGRAEVE, as joint tenants and not as tenants in common, all copyright rights in the Software, [**21] " and that Hilgraeve acknowledged in paragraph 9.1 that as part of the transfer "HILGRAEVE [*1345] has also agreed to transfer the necessary know-how and technical expertise to DELRINA DELAWARE with respect to the Software." On the basis of this language, Symantec urges us to find that:

> 'Software' is more than source code and object code. . . . When read in conjunction with the . . . 'know-how' and 'technical expertise' transferred to Delrina (Delaware), Delrina (Delaware) essentially acquired Hilgraeve's entire knowledge base with respect to [Hilgraeve's] products. Since the Software included in-transit anti-virus features, Delrina acquired Hilgraeve's knowledge base with respect to those in-transit anti-virus features and could use that knowledge base as it pleased."

In summary, Symantec urges us to find that "the Technology Transfer Agreement covered the technology in this case, which is allegedly covered by the '776 Patent."

Whatever the definition of "knowledge base" proposed by Symantec, we cannot conclude that rights to the '776 patent were transferred by the Technology Transfer Agreement. Under Ontario law, "effect must first be given to the intention of the parties, [**22] to be gathered from the words they have used . . . ." Consol. Bathurst Exp. Ltd. v. Mut. Boiler & Mach. Ins. Co., 1 S.C.R 888, 888 (Can. 1980). When the language of a contract is clear and unambiguous, only the contract is considered for interpretation, not extrinsic evidence. Indian Molybdenum v. The King, 3 D.L.R. 497, 502 (Can. 1951). Here, the contract provided for Hilgraeve to transfer "all copyright rights in the Software," but failed to mention the transfer of patent rights. From the terms of the contract we cannot conclude that the parties intended to transfer any patent rights. Symantec relies on Allan v. Bushnell T.V. Co., Ltd., 1 D.L.R. (3d) 534, 539 (Ont. High Ct. 1968) for the proposition that "unexpressed terms [are implied] to implement [the] parties' presumed intention." Allan, however, stated that

the presumption is against the adding to

contracts of terms which the parties have not expressed. The general presumption is that the parties have expressed every material term . . . . But . . . there may be cases where obviously some term must be implied if the intention of the parties is not to be defeated, some term [**23] of which it can be predicated that 'it goes without saying', some term not expressed but necessary to give to the transaction such business efficacy as the parties must have intended.

Id. Allan was a case involving a contract between a broadcasting company and a news service in which the unexpressed term which was implied in the contract was that the news to be supplied to the company by the service had to be "accurate." Here, we cannot say (and it does not "go without saying") that where the contract provided for the transfer of copyrights in the software, but failed to mention the transfer of patent rights, that we must imply such a term to the contract. The contract has a business efficacy without adding this unexpressed term to it.

Moreover, in the subparagraph immediately following the paragraph 2.1 pertaining to the transfer of copyrights, the contract refers to other intellectual property rights. In paragraph 2.2, the parties agreed that Hilgraeve "shall not assert against DELRINA DELAWARE, any other intellectual property right, including patent rights, it has or may have in the future, with respect to the production, copying, licensing of the Software, or the [**24] exercise by DELRINA DELAWARE of any rights transferred hereunder." Since the contract specifically mentions patent rights in paragraph 2.2, we cannot say that the omission of mention of patent rights in paragraph 2.1, which transferred rights to [*1346] copyrights in the Software, was accidental or that the transfer of patent rights is implicit anywhere the contract. Cf. State Contracting & Eng'g Corp. v. Florida, 258 F.3d 1329, 59 U.S.P.Q.2D (BNA) 1498 (Fed. Cir. 2001) (applying Florida law to construe an agreement).

Symantec also contends that the covenant not to sue for patent infringement in paragraph 2.2 is equivalent to a freely transferable license to the patent. This court has stated that "licenses are considered as nothing more than a promise by the licensor not to sue the licensee." Jim

265 F.3d 1336, *1346; 2001 U.S. App. LEXIS 20496, **24;
60 U.S.P.Q.2D (BNA) 1291

*Arnold Corp. v. Hydrotech Sys., Inc.,* 109 F.3d 1567, 1577, 42 U.S.P.Q.2D (BNA) 1119, 1127 (Fed. Cir. 1997). The covenant not to sue in paragraph 2.2 does not grant a *transferable* license to the patent.

CONCLUSION

Therefore, we vacate the district court's grant of summary judgment of non-infringement, generally affirm the district court's grant of summary judgment that Symantec [**25] did not license the *'776 patent* prior

(but without limiting our holding to the period before March 2, 1999), and remand for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

COSTS

No costs.



**LAWRENCE HODGE; MARIA HODGE, GOVERNMENT OF THE VIRGIN IS-
LANDS, Intervenor v. BLUEBEARD'S CASTLE, INC. WYNDHAM ST. THOMAS
INC, f/k/a Equivest St. Thomas, Inc., successor by merger with Bluebeard's Castle,
Inc., Appellant**

**No. 09-2274**

**United States Court of Appeals for the Third Circuit**

**392 Fed. Appx. 965; 2010 U.S. App. LEXIS 18081**

**May 4, 2010, Argued
August 27, 2010, Filed**

**NOTICE:**    NOT PRECEDENTIAL OPINION UN-
DER THIRD CIRCUIT INTERNAL OPERATING
PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT
REGARDED AS PRECEDENTS WHICH BIND THE
COURT.

   PLEASE REFER TO FEDERAL RULES OF AP-
PELLATE PROCEDURE RULE 32.1 GOVERNING
THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:**    [**1]
   On Appeal from the District Court of the Virgin Is-
lands - Appellate Division. (D.C. No. 02-cv-00154).
Chief Judge: Hon. Raymond L. Finch, District Judge:
Hon. Juan R. Sanchez, Superior Court Judge: Hon. Julio
A. Brady.
Bluebeard's Castle, Inc. v. Hodge, 2009 U.S. Dist. LEX-
IS 32521, 51 V.I. 672 (2009)

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Juris-
diction > Jurisdiction Over Actions > General Jurisdic-
tion*
[HN1] The Superior Court of the Virgin Islands has gen-
eral jurisdiction over civil matters invoking Virgin Is-
lands law. V.I. Code Ann. tit. 4, § 76(a) (the Superior
Court shall have original jurisdiction in all civil actions).

*Civil Procedure > Appeals > Appellate Jurisdiction >
General Overview*
[HN2] See 48 U.S.C.S. § 1613a(a).

*Civil Procedure > Appeals > Appellate Jurisdiction >
Final Judgment Rule*
*Civil Procedure > Appeals > Remands*
[HN3] The United States Court of Appeals for the Third
Circuit has interpreted 48 U.S.C.S. § 1613a(c) to pre-
clude its review of orders of the Superior Court of the
Virgin Islands, Appellate Division, that reverse and re-
mand a matter to the Superior Court because such orders
are not final. Remand orders are not final under §
1613a(c).

*Civil Procedure > Appeals > Appellate Jurisdiction >
General Overview*
*Civil Procedure > Appeals > Appellate Jurisdiction >
State Court Review*
[HN4] Appeals from the Superior Court of the Virgin
Islands are now taken to the Virgin Islands Supreme
Court, except for those appeals that were already pending
in the United States District Court for the Virgin Islands.
48 U.S.C.S. § 1613a(d).

*Civil Procedure > Appeals > Appellate Jurisdiction >
State Court Review*
[HN5] See V.I. Code Ann. tit. 4, § 32(a).

*Civil Procedure > Appeals > Appellate Jurisdiction >
General Overview*
*Civil Procedure > Appeals > Appellate Jurisdiction >
State Court Review*

[HN6] See 48 U.S.C.S. § 1613a(d).

*Civil Procedure > Appeals > Appellate Jurisdiction > General Overview*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
[HN7] Appeals that have already been taken to the Superior Court of the Virgin Islands, Appellate Division, proceed as they would have prior to the establishment of the Virgin Islands Supreme Court, with the opportunity for review by the United States Court of Appeals for the Third Circuit. Additionally, the Third Circuit has jurisdiction to review final decisions of the Virgin Islands Supreme Court by writ of certiorari for the first fifteen years following its creation. 48 U.S.C.S. § 1613. Otherwise, the relationship between the Supreme Court of the Virgin Islands and the federal courts is governed by the laws of the United States pertaining to the relations between the courts of the United States, including the Supreme Court of the United States, and the courts of the several states. § 1613.

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
[HN8] There is no "right" to appeal a non-final order.

*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
[HN9] The purpose of the Revised Organic Act is to encourage the development of a local Virgin Islands appellate structure with greater autonomy with respect to issues of Virgin Islands law.

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
[HN10] A final decision ends the litigation on the merits and leaves nothing to do but execute the judgment. Although 48 U.S.C.S. § 1613a(d) is silent on the question of finality, as it states only that appeals from the district court "may be reviewed in the United States Court of Appeals for the Third Circuit," in the absence of a contrary authorization allowing a court to hear an appeal from a non-final order, it applies the general finality rule.

*Civil Procedure > Justiciability > Ripeness > Rationale*
[HN11] The ripeness doctrine seeks to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements.

*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
[HN12] Pursuant to the collateral order doctrine, an appeal of a nonfinal order will lie if (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment. The collateral order doctrine is a narrow exception to the normal application of the final judgment rule. Importantly, the collateral order doctrine is narrow and limited to a small class of cases.

*Governments > Legislation > Statutes of Limitations > Judicial Review*
[HN13] Statutes of limitations are not guarantees that suit and trial will not occur on untimely claims. Thus, the interests protected by statutes of limitations, i.e., the prevention of liability based on stale evidence, are not irretrievably lost if a party must wait until after final judgment to appeal the adverse ruling and to vindicate the right to be free from liability.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case*
[HN14] Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues. The law of the case doctrine does not restrict a court's power but rather governs its exercise of discretion. Although courts are eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish. With respect to that discretion, a court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances. There are three such extraordinary circumstances in which the doctrine does not apply: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice.

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN15] Under the "merger rule," prior interlocutory orders merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order.

***Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review***
[HN16] The Virgin Islands Supreme Court was created to address matters of local law and to give the territory of the Virgin Islands more autonomy over local matters.

***Civil Procedure > Federal & State Interrelationships > General Overview***
***Governments > Legislation > Interpretation***
[HN17] The relationship between the federal courts and the territorial courts is, as it should be, largely governed by the precepts that govern the relationship between federal and state courts, 48 U.S.C.S. § 1613, and federal courts endeavor to defer to state courts' interpretations of state law. The State's highest court is the best authority on its own law.

***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***
***Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review***
[HN18] Under Virgin Islands law, upon an appeal from a judgment or an order, the Virgin Islands Supreme Court may reverse or affirm, wholly or in part, or may modify the judgment or order appealed from, and each interlocutory judgment or intermediate or other order that it is authorized to review. V.I. Code Ann. tit. 4, § 32(c).

***Civil Procedure > Appeals > Appellate Jurisdiction > General Overview***
[HN19] The Third Circuit has defined pendent appellate jurisdiction to permit review of inextricably intertwined orders or review of the nonappealable order where it is necessary to ensure meaningful review of the appealable order.

***Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders***
[HN20] 28 U.S.C.S. § 1292(a)(1) allows for jurisdiction over appeals from interlocutory orders of the district courts granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN21] Courts have an independent obligation to determine whether subject-matter jurisdiction exists.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN22] A court may address standing without ascertaining whether it possesses subject matter jurisdiction pursuant to 28 U.S.C.S. § 1292(a)(1) because jurisdiction is vital only if the court proposes to issue a judgment on the merits.

***Civil Procedure > Justiciability > Standing > General Overview***
***Civil Procedure > Appeals > General Overview***
[HN23] In order to have standing to appeal, a party must be aggrieved by the order of the district court from which it seeks to appeal. In general, if a court grants the ultimate relief a party requested, even though on grounds other than those urged by the prevailing party, that party is generally not "aggrieved" by the judgment and may not appeal. Similarly, a party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree.

***Civil Procedure > Justiciability > Standing > General Overview***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel***
***Civil Procedure > Appeals > General Overview***
[HN24] When a prevailing party is aggrieved by the collateral estoppel effect of a district court's rulings, that party has standing to pursue an appeal of those rulings.

***Civil Procedure > Justiciability > Standing > General Overview***
***Civil Procedure > Appeals > General Overview***
[HN25] The "party aggrieved" concept should be accorded a practical rather than hypertechnical meaning. Thus, a party may be aggrieved by a district court decision that adversely affects its legal rights or position vis-a-vis other parties in the case or other potential litigants, although a desire for better precedent does not by itself confer standing to appeal. In order to cabin such an approach, the order appealed from must present an actual adverse effect as opposed to a merely hypothetical possibility.

392 Fed. Appx. 965, *; 2010 U.S. App. LEXIS 18081, **

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN26] If an appellate court can dispose of a 28 U.S.C.S. § 1292(a)(1) appeal without venturing into otherwise nonreviewable matters, its jurisdiction should be limited accordingly. Ordinarily the scope of appellate review under § 1292(a)(1) is confined to the issues necessary to determine the propriety of the interlocutory order itself.

**COUNSEL:** Stefan B. Herpel, Gregory H. Hodges, Dudley, Topper & Feuerzeig, St. Thomas, USVI, *Counsel for Not-party Appellant.*

Denise M. Francois, Hodge & Francois, St. Thomas, USVI, *Counsel for Appellees.*

Denise Counts, Richard S. Davis, Douglas J. Juergens, Department of Justice, USVI, *Counsel for Intervenor Appellee.*

**JUDGES:** Before: SMITH, CHAGARES and JORDAN, *Circuit Judges.*

**OPINION BY:** JORDAN

**OPINION**

[*967] **OPINION OF THE COURT**

(August 27, 2010)

The issue in this appeal is whether we have jurisdiction over an order of the Appellate Division of the District Court of the Virgin Islands of the United States, which, in addressing a ruling by the Virgin Islands Superior Court, [1] both affirmed a denial of summary judgment and vacated a judgment providing for injunctive relief. The jurisdictional problem is somewhat peculiar due to the change in court structure and appellate review in the Virgin Islands that occurred during the course of the litigation. In particular, the creation of the Supreme Court of [**2] the Virgin Islands, which replaced the Appellate Division as the appellate tribunal for local cases in the Virgin Islands, is a complicating factor. Ultimately, we conclude that we do not have jurisdiction over this appeal under either 48 U.S.C. § 1613a or the collateral order doctrine. Furthermore, the appellant lacks appellate standing because it is insufficiently aggrieved by the portion of the order that vacates the injunction. Accordingly, we will dismiss the appeal for lack of jurisdiction and lack of appellate standing.

1    At the time, the local trial court in the Virgin Islands was known as the Territorial Court. On January 1, 2005, the name was changed to the Superior Court, and we refer to it as such throughout this opinion.

**I. Background**

This case evolved out of a long-running dispute among Bluebeard's Castle, Inc. ("BCI"), [2] Lawrence and Maria Hodge, and the Government of the Virgin Islands concerning ownership of a road (the "disputed roadway" or the "road") known as Frederiksberg Gade, which runs by the Hodges' property ("Parcel 39c") and property owned by BCI on which BCI operates a hotel and a timeshare condominium complex. Beginning in 1994, BCI erected a fence across the [**3] portion of the disputed roadway leading to Parcel 39c, which BCI kept closed between midnight and 5:00 a.m., thereby obstructing access to the Hodges' property from the west. In November 1996, BCI began keeping the gate closed and padlocked throughout the day such that the Hodges could not access their property unless they passed through BCI's parking lot and approached their parcel from the east.

2    Since the trial of this case, BCI has merged with Equivest St. Thomas, Inc., which later changed its name to Wyndham St. Thomas, Inc. For ease of reference, we will refer to the appellant as BCI.

The Hodges first objected to the fence in a letter to BCI dated December 19, 1994. It is undisputed that BCI responded to the Hodges' letter, though the response is not in the record. [3] The Hodges also sent three additional letters complaining about the fence during the two years thereafter, to which BCI did not respond. In 1997, BCI erected a chain across the eastern end of the disputed roadway, obstructing access to the Hodges' property from the east. In July 1997, the Hodges again contacted BCI about the obstruction of the road, but received no response.

3    BCI's letter was lost in 1995 as a consequence [**4] of Hurricane Marilyn. It appears from the Hodges' subsequent response to BCI's letter, however, that BCI had explained its reasons for erecting the gate.

A. *Proceedings in the Superior Court*

In November 1997, the Hodges sued BCI in the Superior Court of the Virgin Islands. Their complaint asserted several claims including: (1) claims for declaratory [*968] judgment that the Hodges are entitled to an easement by prescription or, alternatively, that the disputed roadway is public; (2) claims for damages for private and public nuisance because BCI intentionally de-

prived the Hodges of the use and enjoyment of their land; and (3) a claim for an injunction prohibiting BCI from obstructing the road. BCI brought a counterclaim seeking, among other things, a declaratory judgment that it owns the disputed roadway. In January 2002, the Government of the Virgin Islands intervened, seeking a declaration that the disputed roadway is a public road and an injunction prohibiting BCI from blocking the roadway.

BCI moved for summary judgment, arguing, among other things, that the Hodges' claims for private and public nuisance were barred by the statute of limitations. The Superior Court denied that motion in its  [**5] entirety. The Court found the applicable statute of limitations to be two years and, applying the "continuing torts doctrine," [4] concluded that the Hodges' "cause of action accrues continually." (App. at JA000060.) Accordingly, the Hodges' nuisance claims were permitted to go to trial to the extent that they were based upon BCI's acts since November 1995, two years prior to the filing of the complaint.

> 4    As described by the Superior Court:
>
> > A continuing tort is, in essence, a succession of reoccurring torts that result in damages that are recoverable *each time they occur*. In theory, each instance of damage should give rise to a new claim and, thus, a new date of accrual.
>
> (App. at JA000059 (quoting *In re Tutu Wells Contamination Litig.*, 909 F. Supp. 980, 988 (D.V.I. 1995)) (original emphasis).)

A jury trial commenced on May 28, 2002. The parties stipulated that the claims for injunctive and declaratory relief would be submitted to the jury for it to address in an advisory capacity. As to the Hodges' nuisance claims, the jury concluded that the disputed roadway was public and, accordingly, awarded the Hodges $6,000.00 in compensatory damages and $1.00 in punitive damages. Having found the  [**6] road to be public, the jury did not reach the issue of whether the Hodges possessed a prescriptive easement.

In a June 17, 2002 memorandum opinion announcing its findings of facts and conclusions of law, the Superior Court adopted the jury's advisory verdict, concluding that the disputed roadway has been public since at least 1912. The Court based its decision upon ?abundant testimonial and documentary evidence," including evidence that "shows that the road is widely regarded as a public road by the community at large," that the Hodg-

es and their predecessors used the road to access their property, and that the Government of the Virgin Islands Department of Public Works paved and maintained the road. (App. at JA000157-58.) The Court also accepted as credible the testimony of the Hodges' expert, Robert Murnan, Esquire, [5] who testified as to a "King's Road" theory. That theory draws on Denmark's colonial rule of the Virgin Islands to suggest that roads that were not conveyed to private owners by the King of Denmark were considered "the King's roads" and that those roads, including the disputed roadway, became public in 1917 when the United States purchased St. Thomas from Denmark.

> 5    BCI  [**7] had unsuccessfully moved to exclude Murnan's expert testimony prior to trial.

Turning to BCI's counterclaim seeking a declaration that it owned the disputed roadway, the Superior Court applied the doctrine of "estoppel in pais" [6] and concluded [*969]  that BCI was estopped from asserting title to the road since it "ha[d] acted affirmatively to induce the widespread belief that the disputed roadway is public," for example, by allowing the Government of the Virgin Islands Department of Public Works to pave and maintain the road. (App. at JA000161-62 (footnote omitted).) The Court further noted that BCI had never asserted its alleged title to the road when the Hodges were bidding on Parcel 39c or during the events leading up to the litigation.

> 6    The Superior Court explained that "[t]he doctrine of 'estoppel in pais' requires that one may not repudiate an act where that action works an injustice upon another who has relied thereon." (App. at JA000162 n.10.)

Based on these findings, the Court issued a declaratory judgment that the disputed roadway is public, and a permanent injunction prohibiting BCI from obstructing the Hodges' and the public's access to that roadway. The Superior Court also entered  [**8] judgment on the jury's verdict, granting the Hodges $6,000 in compensatory damages and $1.00 in punitive damages, and awarded them attorneys' fees and costs. Having concluded that substantial evidence supported the jury's verdict and having adopted that verdict, the Superior Court denied BCI's renewed motion for judgment as a matter of law.

### B. *Proceedings in the Appellate Division*

BCI timely appealed to the Appellate Division, challenging the Superior Court's judgment, its denial of BCI's motion for judgment as a matter of law, and its award of attorneys' fees and costs to the Hodges. BCI also asserted that the Hodges' nuisance claims were barred by the statute of limitations and that the Superior

Court improperly denied its motion for summary judgment on that basis.

On April 1, 2009, the Appellate Division issued an opinion vacating the Superior Court's judgment and remanding for further proceedings, but affirming the denial of BCI's motion for summary judgment. First, the Appellate Division addressed BCI's statute of limitations argument, finding that the Superior Court properly applied the continuing torts doctrine to allow the Hodges' nuisance claims to proceed. Turning next to the [**9] Superior Court's denial of BCI's motion for judgment as a matter of law, the Appellate Division found that reversal was warranted because it was not "certain that [the Hodges and the government] were held to their burden of proof." (App. at JA-C0023.) Evidently driving that conclusion was the Appellate Division's view that the trial court's opinion lacked "a clear articulation and application of the legal standard governing the establishment of a public road. The rest of the record similarly sheds no light on what standard, if any, was applied." (*Id.*)

Noting an absence of Virgin Islands law governing the establishment of a public road, the Appellate Division explained that the Superior Court "did not explicitly rely on any of the traditional ways in which a public road may be created [that have been established by case law from other jurisdictions] ... ." [7] (*Id.* at JA-C0028.) Instead, said the Appellate Division, the Superior Court appeared to rest its conclusion that the road was public on theories that lacked a basis in the law. First, the Appellate Division questioned the Superior Court's use of estoppel to find that the disputed roadway was public, explaining that, although a public [**10] road may be created by implied dedication, which is based upon principles of estoppel, "the case law suggests that estoppel in pais does not by [*970] itself create a public road." (*Id.* at JA-C0024.) The Appellate Division also "found no authority for the trial court's conclusion that the Disputed Roadway is public because of its widespread acceptance as such" or "because [the road] was public at the time of the transfer of the Virgin Islands from Denmark to the United States." (*Id.* at JA-C0028.) As to the second point, the Appellate Division found "no support" for Murnan's theory about King's Roads because "the record offers ... no basis on which to determine whether Murnan was appropriately qualified as an expert or whether the methods he used were reliable." (*Id.* at JA-C0028-29.) Accordingly, the Appellate Division reversed and remanded, stating:

> We do not mean to suggest that a new trial is necessarily warranted. We leave that determination to the sound discretion of the trial court. We do, however, note that to the extent the trial court's applica-

tion of the law governing the establishment of a public road is predicated on facts not found in the record as it now exists, additional fact-finding [**11] may be required.

(*Id.* at JA-C0031 n.15.) Consistent with its opinion, the Appellate Division, in an April 1, 2009 order, affirmed the Superior Court's denial of BCI's motion for summary judgment and vacated the Superior Court's June 17, 2002 judgment. [8]

> 7    The Appellate Division identified three such means by which a public road may be created: (1) by laying out and acceptance of a road by a town; (2) by dedication; and (3) by prescriptive use.
> 8    The order also vacated the award of attorneys' fees and costs.

### C. *BCI's Appeal*

BCI timely appealed to our court. On May 6, 2009, the clerk of court sent a notice to the parties identifying a jurisdictional problem, specifically, the question of whether the Appellate Division's vacate and remand order is final within the meaning of 48 U.S.C. § 1613a(c) and thus, whether it is appealable at this time. (App. at JA-D0001 (citing *In re Alison*, 837 F.2d 619, 620 (3d Cir. 1988)).) The parties then submitted briefs addressing both the jurisdictional issues raised by the appeal and the merits. The jurisdictional arguments are dispositive.

## II. Discussion

BCI raises three arguments in support of its assertion that we have jurisdiction. First, it contends that [**12] we have jurisdiction pursuant to 48 U.S.C. § 1613a(d), which provides that appeals taken to the Appellate Division prior to the establishment of the Virgin Islands Supreme Court shall remain in the Appellate Division, with the opportunity for review by our court. Second, it says that, pursuant to the collateral order doctrine, we have jurisdiction over the portion of the Appellate Division's order affirming the Superior Court's denial of summary judgment on BCI's statute of limitations defense. And third, it claims that we possess jurisdiction under 28 U.S.C. § 1292(a)(1), which provides for our review of interlocutory orders that dissolve injunctions. We address each of those arguments in turn.

### A. *Appellate Jurisdiction in the Virgin Islands*

#### 1. *Jurisdictional Landscape*

[HN1] The Superior Court has general jurisdiction over civil matters invoking Virgin Islands law. V.I. CODE ANN. tit. 4, § 76(a) ("[T]he Superior Court shall have original jurisdiction in all civil actions ... ."). Until recently, pursuant to the Revised Organic Act, the Appellate Division of the District Court of the Virgin Islands had jurisdiction over appeals from the Superior Court, *see* 48 U.S.C. § 1613a(a) ([HN2] "Prior to the [**13] establishment of [a local] appellate court ... , the District Court of the Virgin Islands [*971] shall have such appellate jurisdiction over the courts of the Virgin Islands established by local law ... ."), and our court had jurisdiction over "appeals from all final decisions of the district court on appeal from the [Superior Court]," [9] 48 U.S.C. § 1613a(c). [HN3] We have interpreted § 1613a(c) to preclude our review of Appellate Division orders that reverse and remand a matter to the Superior Court because such orders are not final. *See In re Alison*, 837 F.2d 619, 620 (3d Cir. 1988) ("We conclude that the order reversing and remanding is not a 'final decision,' and thus that we lack appellate jurisdiction."); *see also Gov't of the V.I. v. Hodge*, 359 F.3d 312, 318 (3d Cir. 2004) ("[R]emand orders are not final under § 1613a(c).").

> [9]  This provision is similar to the familiar 28 U.S.C. § 1291, which provides that "[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands ... ."

In 2004, [**14] in accordance with 48 U.S.C. § 1611, the Supreme Court of the Virgin Islands was established. V.I. CODE ANN. tit. 4, § 21; *see also Kendall v. Russell*, 572 F.3d 126, 132 n.5, 52 V.I. 1021 (3d Cir. 2009) ("The appellate court anticipated by the [Revised Organic Act] was formed when the Virgin Islands Legislature provided for the establishment of the Virgin Islands Supreme Court."). On January 29, 2007, the court assumed its appellate jurisdiction. *See Hypolite v. People*, 51 V.I. 97, 101 (V.I. 2009). Accordingly, [HN4] appeals from the Superior Court are now taken to the Virgin Islands Supreme Court, except for those appeals that were already pending in the District Court. *See* 48 U.S.C. § 1613a(d); *see also* V.I. CODE ANN. tit. 4, § 32(a) ([HN5] "The Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law."). Specifically, Section 1613a(d) provides that:

> [HN6] Upon the establishment of [a local] appellate court ... all appeals from

the decisions of the courts of the Virgin Islands established by local law not previously taken must be taken to that appellate court. The establishment of the appellate court [**15] shall not result in the loss of jurisdiction of the district court over any appeal then pending in it. The rulings of the district court on such appeals may be reviewed in the United States Court of Appeals for the Third Circuit ... notwithstanding the establishment of the appellate court.

48 U.S.C. § 1613a(d).

In other words, [HN7] appeals that had already been taken to the Appellate Division were to proceed as they would have prior to the establishment of the Virgin Islands Supreme Court, with the opportunity for review by our court. Additionally, we have jurisdiction to review final decisions of the Virgin Islands Supreme Court by writ of certiorari for the first fifteen years following its creation. 48 U.S.C. § 1613. Otherwise, the relationship between the Supreme Court of the Virgin Islands and the federal courts is "governed by the laws of the United States pertaining to the relations between the courts of the United States, including the Supreme Court of the United States, and the courts of the several States ... ." *Id.*; *see also In re Alison*, 837 F.2d at 621.

## 2. Section 1613a(d)

BCI contends that 48 U.S.C. § 1613a(d) should be construed to permit an immediate appeal to our court of an [**16] Appellate Division order vacating a decision and remanding a case to the Superior Court. BCI argues that [*972] *Alison*, which addressed § 1613a(c), is not applicable here because the present case is governed by § 1613a(d), now that the Supreme Court of the Virgin Islands has been established. According to BCI, "the only meaningful construction of section 1613a(d) is that a 'vacate and remand' order ... is immediately appealable. Otherwise, the right to appeal to the Third Circuit granted by section 1613a(d) will, as a practical matter, be irretrievably lost." (Appellant's Op. Br. at 2.) That is because, says BCI, after remand, any appeal from the new trial or new findings of fact and conclusions of law must be taken to the Virgin Islands Supreme Court, pursuant to § 1613a(d), with review in our court available only by writ of certiorari.

The immediate problem with BCI's argument is that [HN8] there is no "right" to appeal a non-final order, such as the one at issue here. Thus, although BCI might be correct that the last sentence of § 1613a(d) suggests

that "the parties' right to have District Court appellate decisions reviewed by the Third Circuit will not be affected as to pending appeals" (Appellant's [**17] Op. Br. at 4), there never was a right to have our court review non-final orders such as the one that BCI is now trying to appeal. *See In re Alison*, 837 F.2d at 620 (dismissing appeal for lack of jurisdiction because Appellate Division's vacate and remand order was not final and thus, not subject to review). In fact, BCI acknowledges that. [10] (Appellant's Op. Br. at 4 (acknowledging that "vacate and remand orders like the April 1[, 2009 order] are typically the kinds of orders that must await review at the conclusion of a case ... .").) Accordingly, if the purpose of § 1613a(d) is to maintain the status quo for those appeals that had already been filed under the old system, we lack jurisdiction since we would have lacked jurisdiction under § 1613a(c) prior to the establishment of the Virgin Islands Supreme Court. Furthermore, it would make no sense to construe § 1613a(d), which is triggered after the creation of a local appellate court, to authorize us to have more expansive jurisdiction than we had under § 1613a(c), when [HN9] the purpose of the Revised Organic Act is to encourage "the development of a local Virgin Islands appellate structure with greater autonomy with respect to issues [**18] of Virgin Islands law[.]" *Alison*, 837 F.2d at 622. Accordingly, we reject BCI's contention that § 1613a(d) provides for our review at this time. [11]

10   In its reply brief, BCI seems to assert that, in light of the changing appellate structure in the Virgin Islands, the Appellate Division's April 1, 2009 order is essentially a final decision and thus, subject to appellate review at this time. [HN10] A final decision "ends the litigation on the merits and leaves nothing ... to do but execute the judgment." *Hodge*, 359 F.3d at 318 (quotations omitted and alteration in original). Obviously, the Appellate Division's order to vacate and remand the case is not final because, on remand, the Superior Court will have far more to do than execute a judgment. Instead, the Superior Court will have to issue new findings of fact and conclusions of law on the record or it will have to conduct a new trial before rendering judgment. Furthermore, although § 1613a(d) is silent on the question of finality, as it states only that appeals from the district court "may be reviewed in the United States Court of Appeals for the Third Circuit," in the absence of a contrary authorization allowing us to hear an appeal from [**19] a non-final order, "we apply the general finality rule." *Gov't of the V.I. v. Rivera*, 333 F.3d 143, 148 (3d Cir. 2003).

11   BCI suggests that "another possible way out of this procedural conflict would be a construction of section 1613a(d) under which both [BCI's] appeal of any final judgment by the Superior Court on remand and its appeal of the April 1 Order would be decided by the Third Circuit, and not the Virgin Islands Supreme Court." (Appellant's Op. Br. at 6.) Even if review in our court after remand were possible, which we highly doubt, this argument is clearly not ripe for our review since the Superior Court has not yet issued any judgment on remand. *See Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 (3d Cir. 2000) ([HN11] "[T]he ripeness doctrine ... seeks to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements" (quotations omitted)).

[*973]   B. *The Collateral Order Doctrine*

BCI next argues that we have jurisdiction, pursuant to the collateral order doctrine, over the portion of the Appellate Division's order affirming the Superior Court's denial of BCI's motion for summary judgment based upon its statute of [**20] limitations defense. [HN12] Pursuant to the collateral order doctrine, announced by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949), "[a]n appeal of a nonfinal order will lie if (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment." *Hodge*, 359 F.3d at 319 (quoting *In re Ford Motor Co.*, 110 F.3d 954, 958 (3d Cir. 1997)). "The collateral order doctrine is 'a narrow exception to the normal application of the final judgment rule.'" *Rivera*, 333 F.3d at 150 n.16 (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 103 L. Ed. 2d 879 (1989)); *see also Bell Atlantic-Pa., Inc. v. Pa. Pub. Util. Comm'n*, 273 F.3d 337, 343 (3d Cir. 2001) ("Importantly, the collateral order doctrine is narrow and limited to a small class of cases.").

The parties focus their attention on whether the third *Cohen* prong is satisfied, i.e., whether the statute of limitations issue is "effectively unreviewable." BCI argues that it is because, after the Superior [*974] Court decides this [**21] matter on remand, the Virgin Islands Supreme Court will have no authority to review the Appellate Division's ruling on the statute of limitations. Appellees contend that the Appellate Division's affirmance of the Superior Court's ruling on the statute of limitations remains reviewable despite remand because,

contrary to BCI's contention, "[t]he Supreme Court, upon review of the final decision of the Superior Court, will have the full right of an appellate court to review any legal error asserted by any party, and there is neither statutory nor case law to the contrary." (Appellees' Ans. Br. at 11.)

In *Bell Atlantic-Pennsylvania*, we addressed whether a district court's denial of the defendant's motion to dismiss based upon a statute of limitations defense was appealable under the collateral order doctrine. 273 F.3d 337. We found that the denial was not immediately appealable because it did not satisfy the third prong of *Cohen*, i.e., "it is not effectively unreviewable upon appeal from final judgment." [12] *Id.* at 346. That is because [HN13] "[s]tatutes of limitations are not guarantees that suit and trial will not occur on untimely claims." *Id.* Thus, the interests protected by statutes of limitations, [**22] i.e., the prevention of liability based on stale evidence, are "not irretrievably lost if a party must wait until after final judgment to appeal the adverse ruling and to vindicate the right to be free from liability." *Id.*

> 12   In so holding, we did not address whether the district court's denial of the statute of limitations defense satisfied the first two prongs of *Cohen*.

The dispute here is somewhat different from *Bell Atlantic-Pennsylvania* because it is less clear that the Appellate Division's statute of limitations ruling is reviewable. As noted above, BCI argues that it is not reviewable because, after the Superior Court decides this matter on remand, the Virgin Islands Supreme Court will have no authority to review the Appellate Division's ruling on the statute of limitations and, thereafter, review by our court is merely discretionary. Implicit in this argument is the notion that the Virgin Islands Supreme Court would be bound by the law of the case doctrine or otherwise bound by the holdings of the Appellate Division.

[HN14] "Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the [**23] same case.'" *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988)). "This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Id.* (quotations omitted). "[T]he law of the case doctrine does not restrict a court's power but rather governs its exercise of discretion." *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *see also* 18B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE (2d ed. 2002) § 4478, p. 667 ("Although courts are eager to avoid recon-

sideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish."). We have noted, with respect to that discretion, that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances ... ." *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (quoting *Christianson*, 486 U.S. at 817) [**24] (internal quotations omitted). We have identified three such extraordinary circumstances in which the doctrine does not apply: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Id.*

If the Virgin Islands Supreme Court had not yet been created, any appeal from the Superior Court after remand would be taken to the Appellate Division. The Appellate Division would presumably abide by its prior rulings on issues it had decided in the first appeal, *see Gov't of the V.I. v. AT&T of V.I., Inc.*, 2009 WL 1097513, at *3 (D.V.I. Feb. 17, 2009) (applying law of the case in second appeal of issue addressed in prior appeal to the Appellate Division), and we would thereafter be able to consider those issues on appeal after final judgment, *see Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) ([HN15] "Under the 'merger rule,' prior interlocutory orders ... merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order." (quotations omitted)). However, because the Virgin Islands Supreme [**25] Court was created during the pendency of this appeal, any subsequent appeal from the Superior Court after remand must be taken to the Virgin Islands Supreme Court.

Although under normal circumstances the law of the case doctrine would caution against revisiting on appeal issues previously resolved by another appellate court, *see Christianson*, 486 U.S. at 816 ("[T]he doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions."), here we are confronted with a situation in which there is supervening new law. Indeed, the entire appellate structure in the Virgin Islands changed while this case was pending on appeal. [HN16] The Virgin Islands Supreme Court was [*975] created to address matters of local law and to give the territory of the Virgin Islands more autonomy over local matters. *See BA Props., Inc. v. Gov't of the V.I.*, 299 F.3d 207, 212 (3d Cir. 2002) (recognizing "the desire for an indigenous Virgin Islands jurisprudence," and noting that such an "endeavor has proved and will continue to prove very difficult to attain until the Virgin

Islands has its own appellate court composed entirely of locally appointed judges, which would essentially supplant [**26] the Third Circuit"). Thus, this case presents genuinely exceptional circumstances for disregarding the law of the case doctrine, since it would be preferable for the highest local authority to speak to the complicated issues of local property law presented by this case. In other words, as applied here, the need for local authority on local matters and respect for the autonomy of the territory outweighs the policy reasons underlying the usual application of the law of the case doctrine. [13] Given the peculiar procedural circumstances of this case, the Virgin Islands Supreme Court would not, in our view, be required to abide by the Appellate Division's ruling on the statute of limitations (or other legal issues) as law of the case.

> [13]    Although the "mandate rule," which is "a species of the law of the case doctrine, [pursuant to which] a trial court must comply strictly with the mandate directed to it by the reviewing court," *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 203 n.13 (3d Cir. 2004) (quotations omitted), would require the Superior Court to abide by the Appellate Division's rulings on remand, the Virgin Islands Supreme Court is not a lower court subject to the Appellate Division's [**27] mandate.

Furthermore, to the extent that the Appellate Division may have misconstrued local law, which is a possibility we express no opinion on at all, it would be manifestly unjust to require the parties to be bound by that ruling if the matter should come before the Virgin Islands Supreme Court. [HN17] The relationship between the federal courts and the territorial courts is, as it should be, largely governed by the precepts that govern the relationship between federal and state courts, *see* 48 U.S.C. § 1613, and, federal courts endeavor to defer to state courts' interpretations of state law, *see McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661 (3d Cir. 1980) (noting that "[t]he State's highest court is the best authority on its own law" (quotations omitted and alteration in original)).

The law of the case therefore does not pose a bar to the Virgin Islands Supreme Court's reconsideration of the Appellate Division's rulings, if the case is ultimately appealed to that territorial court. Furthermore, [HN18] under Virgin Islands law, "[u]pon an appeal from a judgment or an order, the [Virgin Islands] Supreme Court may reverse or affirm, wholly or in part, or may modify the judgment or order appealed [**28] from, *and each interlocutory judgment or intermediate or other order that it is authorized to review ...* ." V.I. CODE ANN. tit. 4, § 32(c) (emphasis added). BCI has not pointed to any

legal authority, and we have found nothing, removing the Appellate Division's order from the scope of that review.

Since the Appellate Division's statute of limitations ruling will be subject to review by the Virgin Islands Supreme Court upon appeal after remand, the matter is not "effectively unreviewable" upon final judgment. The parties' arguments will be subject to appellate review by the highest local court in the Virgin Islands and, thereafter, subject to our discretionary review. [14] Accordingly, BCI cannot satisfy [*976] the third prong of the *Cohen* test, rendering the collateral order doctrine inapplicable. [15]

> [14]    BCI analogizes to *Hodge*, 359 F.3d 312, 45 V.I. 738, but its reliance is misplaced. In that case, the Appellate Division entertained an interlocutory appeal from the Superior Court challenging the Superior Court's ruling on redactions to confessions that the government sought to use against the defendants at trial. *Id.* at 315. The Appellate Division vacated and remanded, and the defendants appealed to our court, [**29] arguing that the Appellate Division lacked jurisdiction to hear the interlocutory appeal and, alternatively, that the Appellate Division's decision was erroneous. *Id.* We first determined that, since the Appellate Division's order was not final, we did not have jurisdiction "in the usual sense." *Id.* at 318. However, we concluded that, pursuant to the collateral order doctrine, we possessed jurisdiction to consider only the issue of the Appellate Division's jurisdiction over the initial appeal. *Id.* at 321-22. We reasoned that, in light of the procedural circumstances of the case, the appeal was essentially our only opportunity to address the issue because "only in the most convoluted and improbable of hypotheticals will the jurisdictional issue presented here ever make its way to this Court on appeal from a final decision.? *Id.* at 321 (footnote omitted); *see id.* at 321-22 ("As a procedural matter, now is this Court's only opportunity to pass on the issue."). The instant case is distinguishable, however, because, as discussed above, this is not BCI's only opportunity for appellate review of the Appellate Division's opinion.

> [15]    Because BCI cannot meet *Cohen*'s third prong, we need not address [**30] whether the other two *Cohen* prongs are satisfied. Similarly, we need not address BCI's argument that, if the collateral order doctrine provides for our jurisdiction over its statute of limitations argument, we should apply the doctrine of pendent appellate jurisdiction to address the appeal in its entirety. However, we note that BCI's argument as to

392 Fed. Appx. 965, *; 2010 U.S. App. LEXIS 18081, **

pendent appellate jurisdiction is inherently incon-
sistent with its collateral order argument because,
if the statute of limitations question is "com-
pletely separate from the merits of the dispute"
for purposes of satisfying the second *Cohen*
prong, it cannot logically be inextricably inter-
twined with the remaining portions of the Appel-
late Division's order so as to render application of
pendent appellate jurisdiction appropriate. *See
E.I. DuPont de Nemours and Co. v. Rhone Pou-
lenc Fiber and Resin Intermediates, S.A.S.*, 269
F.3d 187, 203 (3d Cir. 2001) ([HN19] "[W]e
have defined pendent appellate jurisdiction to ...
[permit review of] inextricably intertwined orders
or review of the non-appealable order where it is
necessary to ensure meaningful review of the ap-
pealable order.").

C. *Section 1292(a)(1) and Appellate Standing*

Finally, BCI briefly asserts   [**31] that, because the
Appellate Division's April 1, 2009 order vacated an in-
junction, the order is reviewable pursuant to [HN20] 28
U.S.C. § 1292(a)(1), which allows for our jurisdiction
over appeals from "[i]nterlocutory orders of the district
courts ... granting, continuing, modifying, refusing or
dissolving injunctions, or refusing to dissolve or modify
injunctions ... ." [16] The appellees contend that §
1292(a)(1) is inapplicable because the issues raised by
BCI on appeal do not challenge the Appellate Division's
vacatur of the injunction. We agree with what we take to
be appellees' central point: namely, that, even if we pos-
sess jurisdiction under § 1292(a)(1), BCI lacks standing
to appeal the vacatur of the injunction against it. [17] Thus,
to the extent that appellees are asserting that   [*977]
BCI lacks standing to bring this appeal because it is not a
party aggrieved by the portion of the Appellate Divi-
sion's order vacating the injunction, their argument is
well-taken.

16    Appellees do not address this argument in
their answering brief, likely because it only ap-
pears in a footnote in BCI's brief. Accordingly,
we requested supplemental briefing from the par-
ties, asking them whether BCI had waived its
[**32] § 1292(a)(1) argument, and, if not,
whether and to what extent we possess jurisdic-
tion pursuant to that provision. We conclude that,
whether or not BCI adequately raised the §
1292(a)(1) argument, we must address it as part
of our independent obligation to assess our own
jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S.
500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097
(2006) ([HN21] "[C]ourts ... have an independent
obligation to determine whether subject-matter
jurisdiction exists ... .").

17    Appellees do not specifically mention ap-
pellate standing in their supplemental brief.
However, they assert that "a litigant that has no
objection to the district court's decision to vacate
an injunction below cannot be heard to argue that
an interlocutory appeal is somehow necessary ..
." (Appellees' Supp. Br. at 4.) What they are ef-
fectively arguing is that BCI is insufficiently ag-
grieved by the Appellate Division's order to sup-
port a right to appeal.

[HN22] We may address standing without ascer-
taining whether we possess subject matter jurisdiction
pursuant to § 1292(a)(1) because "[j]urisdiction is vital
only if [we] propose[] to issue a judgment on the merits."
*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549
U.S. 422, 431, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007)
(quotations   [**33] omitted); *see also Ruhrgas AG v.
Marathon Oil Co.*, 526 U.S. 574, 585, 119 S. Ct. 1563,
143 L. Ed. 2d 760 (1999) (indicating that federal courts
may "choose among threshold grounds for denying au-
dience to a case on the merits"). [HN23] "In order to
have standing to appeal[,] a party must be aggrieved by
the order of the district court from which it seeks to ap-
peal." *IPSCO Steel (Ala.), Inc. v. Blaine Const. Corp.*,
371 F.3d 150, 154 (3d Cir. 2004) (quotations omitted). In
general, "if a court grants the ultimate relief a party re-
quested, even though on grounds other than those urged
by the prevailing party, that party is generally not 'ag-
grieved' by the judgment and may not appeal." *Con-
cerned Citizens of Cohocton Valley, Inc. v. N.Y. State
Dep't of Envtl. Conservation*, 127 F.3d 201, 204 (2d Cir.
1997); *cf. California v. Rooney*, 483 U.S. 307, 310, 107
S. Ct. 2852, 97 L. Ed. 2d 258 (1987) ("This Court re-
views judgments, not statements in opinions." (quota-
tions omitted)); *EEOC v. Commonwealth of Pa.*, 768
F.2d 514, 516 n.1 (3d Cir. 1985) (dismissing
cross-appeal because "the cross-appeal is not from the
order of judgment, but rather from reasoning of the dis-
trict court that was not essential to the judgment"). Simi-
larly, "[a] party may not appeal from a judgment or
[**34] decree in his favor, for the purpose of obtaining a
review of findings he deems erroneous which are not
necessary to support the decree." [18] *Elec. Fittings Corp.
v. Thomas & Betts Co.*, 307 U.S. 241, 242, 59 S. Ct. 860,
83 L. Ed. 1263, 1939 Dec. Comm'r Pat. 889 (1939).

18    The corollary to that rule is that, [HN24]
"when the prevailing party is aggrieved by the
collateral estoppel effect of a district court's rul-
ings" that party has standing to pursue an appeal
of those rulings. *Dolenc v. Love*, 40 F.3d 656,
657 (3d Cir. 1994) (quotations omitted).

As one of our sister circuits has recognized, [HN25]
the "party aggrieved" concept should be accorded "a

practical rather than hypertechnical meaning." *Custer v. Sweeney*, 89 F.3d 1156, 1164 (4th Cir. 1996) (quotations omitted) (cited favorably in *Cella v. Togum Constructeur Ensemleier En Industrie Alimentaire*, 173 F.3d 909, 912 (3d Cir. 1999)). Thus, "[a] party may be aggrieved by a district court decision that adversely affects its legal rights or position vis-a-vis other parties in the case or other potential litigants, [although] a desire for better precedent does not by itself confer standing to appeal." *Id.* (quotations omitted); *see also Watson v. City of Newark*, 746 F.2d 1008, 1010-11 (3d Cir. 1984) (explaining [**35] that a prevailing party may not appeal dictum). In order to cabin such an approach, the order appealed from must present an actual adverse effect as opposed to a merely hypothetical possibility. *See Custer*, 89 F.3d at 1164; *see also* 15A FEDERAL PRACTICE AND PROCEDURE § 3902, p. 87 ("It is difficult to believe that prevailing party appeals should often be accepted on the theory that unnecessary findings may have adverse practical consequences.").

BCI contends that it is aggrieved by the Appellate Division's order because the order [*978] "arguably invites the trial court on remand to re-issue the injunction under an unpled theory [implied dedication] that is not recognized by Virgin Islands law." (Appellant's Supp. Br. at 4.) In other words, BCI successfully achieved vacatur of the injunction against it, but not for the reasons nor, perhaps, with the permanence that it wanted. BCI seems to perceive its victory as hollow because it views the Appellate Division's mandate as implicitly instructing the Superior Court to use implied dedication -- a theory that apparently was not pursued at trial -- as a means for determining whether appellees satisfied their burden that the disputed roadway is public. [**36] In other words, BCI claims to be aggrieved not by the order of the Appellate Division but by the anticipated effect, on remand, of the Appellate Division's opinion on the resolution of its case.

Although the Appellate Division's opinion, in endeavoring to explain why the theories relied upon by the Superior Court failed to support the judgment, attempted to clarify the law governing the establishment of a public road, its mention of implied dedication was not necessary to its judgment. It is possible that the Superior Court might, on remand, conclude that the road is public under an implied dedication theory, but such a result is certainly not a foregone conclusion. On remand, BCI is still free to argue that appellees waived any argument based upon the theory of implied dedication as a result of their failure to plead or pursue such a theory at trial. If the Superior Court accepts such an argument, the harm claimed by BCI will never materialize because no injunction will be imposed on that legal basis. It is also possible that, upon remand, the Superior Court will enter judgment in BCI's favor, finding that the disputed roadway is not public under any theory. Furthermore, although BCI [**37] challenges the Superior Court's description of the portion of the disputed roadway that it found to be public, the Appellate Division's vacatur of the Superior Court's judgment means that, as of now, no portion of the road has been found to be public.

Since the only apparent adverse impact that BCI might experience is hypothetical, if we were to opine on whether implied dedication is a valid means of establishing a public road under Virgin Islands law, we would run the risk of issuing nothing more than an advisory opinion. Likewise, any opinion on the proper boundaries of the disputed roadway which may be determined to be public would be inappropriate because the Superior Court may, on remand, find that appellees have failed to prove that the road is public. Or, that court might review the evidence and make a finding more favorable to BCI. Review at this point, therefore, is simply premature. *See Rooney*, 483 U.S. at 312-13 (dismissing state's appeal of denial of suppression motion as improvidently granted, despite state's argument that it would be precluded from using evidence at trial in light of lower court's analysis, because "[t]here are ... too many 'ifs' ... to make our review [**38] appropriate at this stage.").

Since BCI is insufficiently aggrieved by the Appellate Division's vacatur of the permanent injunction, it lacks standing to pursue its appeal of that portion of the April 1, 2009 order. [19] Accordingly, we must dismiss for lack of appellate standing BCI's appeal of the vacatur of the injunction.

19    Although BCI is aggrieved by the portion of the Appellate Division's order affirming the Superior Court's denial of its motion for summary judgment, there would be no basis for our jurisdiction over that portion of the order, even if we had jurisdiction under § 1292(a)(1), because our jurisdiction would be limited to those issues pertaining to the merits of the injunction. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir. 1982) (en banc) (explaining that [HN26] if "the appellate court can dispose of the section 1292(a)(1) appeal without venturing into otherwise nonreviewable matters, its jurisdiction should be limited accordingly" (footnote omitted)); *see also* 16 FEDERAL PRACTICE AND PROCEDURE § 3921.1, p. 25 ("Ordinarily the scope of appellate review under § 1292(a)(1) is [**39] confined to the issues necessary to determine the propriety of the interlocutory order itself.").

[*979]   **III. Conclusion**

392 Fed. Appx. 965, *; 2010 U.S. App. LEXIS 18081, **

We lack jurisdiction pursuant to 48 U.S.C. § 1613a(d) over the Appellate Division's order to vacate and remand because the order is not final, and we decline to construe that provision to expand our review of local appeals. Nor does the collateral order doctrine provide for our jurisdiction over the statute of limitations ques- tion because that issue is not effectively unreviewable. In addition, BCI lacks standing to appeal the portion of the Appellate Division's order that vacates the permanent injunction issued by the Superior Court. Accordingly, we will dismiss this appeal for lack of jurisdiction and lack of appellate standing.



### In The Matter of GRAVURE PAPER & BOARD CORP., Bankrupt. David J. Rosen, Appellant

### No. 11811

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### 234 F.2d 928; 1956 U.S. App. LEXIS 4410

**May 10, 1956, Argued**
**July 5, 1956, Decided**

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > Powers*
*Contracts Law > Types of Contracts > Executory Contracts*
*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
[HN1] Section 70(b) of the Bankruptcy Act, 11 U.S.C.S. § 110, provides that within 60 days after the adjudication, the trustee shall assume or reject any executory contract, including unexpired leases of real property. Any such contract or lease not assumed or rejected within such time, whether or not a trustee is appointed or is qualified, shall be deemed to be rejected.

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Evidence > Inferences & Presumptions > Presumptions > Exceptions > Statutory Presumptions*
*Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions*
[HN2] The statutory presumption of rejection by nonaction within the 60-day period is a conclusive statutory presumption. Where it is specifically held that failure of a bankruptcy trustee to take affirmative action within 60 days after the bankruptcy adjudication to adopt or reject a lease amounts to a rejection of the lease. A lease, being property cum onere, does not pass to a trustee in bankruptcy, unless he adopts it.

*Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments*
*Bankruptcy Law > Estate Property > Abandonment > Trustee Action*
*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
[HN3] When a trustee in bankruptcy abandons an asset, he is to be treated as never having title to it. The abandonment is said to relate back so that the title stands as if no assignment is made. Whatever title or inchoate interest that may have passed to the trustee is extinguished by relation as of the filing of the petition, when the trustee informs the court that the shares are burdensome assets, and is directed by the court to abandon and disclaim them. In such a case the title stands as if no assignment is made.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
[HN4] The doctrine of equitable estoppel is that he who by his language or conduct leads another to do what he would not otherwise do, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. This remedy is always so applied as to promote the ends of justice.

**COUNSEL:** [**1]  Abraham L. Shapiro, Philadelphia, Pa., for appellant.

Harry A. Margolis, Newark, N.J. (Max L. Rosenstein, Newark N.J., on the brief), for trustee-respondent.

**JUDGES:** Before MARIS, GOODRICH and KALODNER, Circuit Judges.

**OPINION BY:** KALODNER

**OPINION**

[*929] Can a trustee in bankruptcy make a valid sale of the bankrupt's interest as losses in a lease of real property which the trustee did not assume within 60 days after the adjudication as provided by Section 70, sub. b, of the Bankruptcy Act? [1]

If such a sale is invalid can the issue of invalidity be raised on appeal when it was not 'urged or argued' in the court below?

Is the appellant estopped from raising the issue of validity of the sale because he stood by when the trustee offered the lease for sale at public auction and in fact induced him to do so?

These issues are presented in this appeal from the Order of the District Court denying the application of the appellant for review of an Order of the Referee in Bankruptcy which denied appellant's petition for the return of his bid deposit and then went further and directed him to pay the balance of the bid.

We do not reach the trial issues because subsequent [**2] to the filing of this appeal the parties entered into a stipulation which provides the critical premise [*930] for the issues upon which hinge the disposition of this appeal.

In that stipulation, set forth in the margin, [2] it is disclosed that the trustee in bankruptcy '* * * did not assume the Bankrupt's lease, * * * either prior to the auction sale of the lease (June 17, 1954) or at any time thereafter'. The stipulation further provides that it '* * * may be filed and deemed a part of the record on this Appeal and in this proceeding.'

The record discloses that the adjudication in bankruptcy was filed and dated April 13, 1954 -- well over 60 days prior to the public auction on June 17, 1954, at which the appellant, David J. Rosen purchased the lease after he had requested the trustee (via the auctioneer) to offer it for sale.

As to the first issue:

Can a bankruptcy trustee make a valid sale of the bankrupt's lease which he had failed to assume within 60 days after the adjudication?

[HN1] Section 70(b) of the Bankruptcy Act provides in part:

'Within sixty days after the adjudication, the trustee shall assume or reject any executory contract, including unexpired [**3] leases of real property: * * * Any such contract or lease not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be rejected.' (Emphasis supplied.)

[HN2] The statutory presumption of rejection by nonaction within the 60 day period '* * * is a conclusive statutory presumption.' Wiemeyer v. Koch, 8 Cir., 1945, 152 F.2d 230, 234, citing Collier on Bankruptcy, 14th Ed. Sec. 70.43, p. 1230. See also Hill v. Larcon Co., D.C.W.D.Ark.1955, 131 F.Supp. 469, 474, where it was specifically held that '* * * failure of a (bankruptcy) trustee to take affirmative action within 60 days (after bankruptcy adjudication) to adopt or reject a lease amounts to a rejection of the lease.' Judge Learned Hand in Palmer v. Palmer, 2 Cir., 1939, 104 F.2d 161, 163, certiorari denied 1939, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494, put it this way: 'A lease, being property cum onere, does not pass to a trustee in bankruptcy, unless he adopts it.'

We are in entire accord with the construction given to Section 70, sub. b, in the cases cited. Indeed, its unambiguous terms permit no [**4] other view. Accordingly, we are of the opinion that since the trustee admittedly failed to assume the lease within 60 days after the adjudication its sale, subsequent to the expiration of that period, was invalid. [3]

The trustee had nothing to sell so far as the lease was concerned on June 17, 1954. The 'Order For Sale' provided he was authorized to sell his 'right, title and interest in and to the lease' but he had no 'right, title and interest in and to the lease' because of his failure to assume it within 60 days of the adjudication. On that score it is well settled that '* * * [HN3] when the trustee in bankruptcy abandons an asset, he is to be treated as having never had title to it; the abandonment is said to relate back, so that 'the title stands as if no assignment had been made." Rosenblum v. Dingfelder, 2 Cir., 1940, 111 F.2d [*931] 406, 409, citing Brown v. O'Keefe, 1937, 300 U.S. 598, 602, 57 S.Ct. 543, 546, 81 L.Ed. 827. In the latter case the trustee in bankruptcy had disclaimed and abandoned certain assets. With respect to such assets it was held: 'Whatever title or inchoate interest may have passed to the trustee was extinguished [**5] by relation as of the filing of the petition when the trustee informed the court that the shares were burdensome assets, and was directed by the court to abandon and disclaim them. * * * In such case 'the title stands as if no assignment had been made.' * * * A precise analogy is found in the law of gifts and legacies. Acceptance is presumed, but rejection leaves the title by relation as if the gift had not been made.' [4]

That brings us to the second issue:

234 F.2d 928, *; 1956 U.S. App. LEXIS 4410, **

If such a sale is invalid can the issue of invalidity be raised on appeal when it was not 'urged or argued' in the court below?

The trustee takes the position that the appellant 'neither urged nor argued below' the first issue and that he is therefore precluded from raising it on appeal. With respect to that position it must be noted that while it is true that the appellant 'neither urged nor argued' the issue to the Referee, he did, in his petition to be relieved of his bid and for the return of his deposit, raise the issue of 'a total failure of consideration' by reason of the trustee's lack of title to the lease in view of his failure to comply with the provisions of Section 70, sub. b. [5] Moreover, at the [**6] Referee's hearing on his petition he specifically called attention to what he stated in Exhibit 4 attached to his petition as set forth in Note 5, [6] and the Referee noted that 'Mr. Rosen stated that he rests on the petition.' [7] That the appellant asserted and argued additional reasons in support of his position is not controlling. What he said in his petition, and his statement at the hearing thereon that he rested on it, put the Referee and later the District Court on notice as to the existence of the specific issue of invalidity of the sale of the lease.

In our view the issue of invalidity of the sale of the lease by reason of the operation of Section 70, sub. b, was raised below and may therefore be considered in this appeal.

As to the third issue:

Is the appellant estopped from raising the issue of validity of the sale because he stood by when the trustee offered the lease for sale at public auction and in fact induced him to do so?

We need spend but little time or space on this issue.

We take a dim view of the trustee's concept of estoppel as he seeks to assert it here.

In order for him to summon the doctrine to his aid it is incumbent upon him to establish [**7] that the appellant induced him (the trustee) to his injury not to [*932] assume the lease within the 60 day period required by Section 70, sub. b, and there is not a single shred of evidence to support such a contention.

As was stated in Dickerson v. Colgrove, 1880, 100 U.S. 578, 580, 25 L.Ed. 618:

'The estoppel here relied on is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. [HN4] The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. * * * This remedy is always so applied as to promote the ends of justice.' [8]

The trustee was solely and independently responsible for the loss of title to the lease under Section 70, sub. b, by reason of his failure to assume it within 60 days of the adjudication.

Bankruptcy courts are conducted upon principles of equity and the courts have a duty to see to it that equity prevails. Here the trustee offered for sale and 'sold' a lease to which he had no 'right, title or interest.' His position is that [**8] he ought to get something (the appellant's bid price of $ 1500) for nothing. It would be inequitable to permit him to do so as was held in In re Caponigri, 2 Cir., 1914, 210 F. 897. There the trustee in bankruptcy sold his "right, title, and interest" in a lot which had been conveyed by the bankrupt prior to the bankruptcy. The district court's ruling that 'in accordance with the standard of fair dealing which a court of equity should itself exemplify' the purchaser should be relieved from his obligation to carry out his bid, was affirmed per curiam. [9]

For the reasons stated the Order of the District Court will be reversed and the cause remanded to proceed in accordance with this Opinion, each party to bear its own costs.

1.    Act of July 1, 1898, c. 541, as last amended by the Act of July 7, 1952, c. 579, Sec. 23, 66 Stat. 429, 11 U.S.C.A.  § 110.
2.    The full text of the Stipulation follows:

'Stipulation

'It is stipulated by the undersigned that the Trustee of the above named Bankrupt estate did not assume the Bankrupt's lease, as provided by Section 70(b) of the Bankruptcy Act, either prior to the auction sale of the lease (June 17, 1954) or at any time thereafter.

'This stipulation may be filed and deemed a part of the record on this Appeal and in this proceeding.

'Dated: January 20, 1956.'

[**9]

3.    The 'Order For Sale' of the bankrupt's lease (and other assets) was filed June 17, 1954 -- the day the public sale took place. At the hearing of the appeal it was suggested that this 'Order For Sale' could possibly be construed as an 'assumption' of the lease but, assuming arguendo such construction, it would be without effect in this case because at the time more than 60 days had elapsed since the bankrupt's adjudication.
4.    To the same effect see In re Kreiger, D.C.W.D.Pa.1926, 15 F.2d 90. It was there held, 15 F.2d at page 91: 'The trustee takes no title to

the lease unless he elects to accept it. The property which passes, therefore, immediately to the trustee, is not the lease itself, but the option of accepting it.' See also Schram v. Tobias, D.C.E.D.Mich.1941, 40 F.Supp. 470, 472. And see In re Malcom, D.C.E.D.Del.1943, 48 F.Supp. 675.

5.    The appellant attached to and made part of his petition a letter which he sent to the trustee on August 19, 1954 marked therein Exhibit 4. In that letter the appellant stated as follows:

'I also invoke the legal proposition that a sale by you as trustee of all of your right, title and interest presupposes that you have some right, some title, some interest, and comprehends the rights of the trustee to a lease under Section 70(b)

of the Bankruptcy Law. Those rights you have not exercised. At the time of the tender it was too late to exercise the same. As a consequence, there is a total failure of consideration.'

[**10]

6.    Page 23, N.T. Hearing, April 6, 1955.

7.    Page 25, N.T. Hearing, April 6, 1955.

8.    See also De Bobula v. Manhattan Storage & Transfer Co., 1952, 90 U.S.App.D.C. 202, 194 F.2d 885, 886; Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1952, 197 F.2d 939, 941; Gulf Oil Corporation v. Texas City Refining, Inc., 4 Cir., 1954, 218 F.2d 196, 201.

9.    See also In re Miners Mills Coal Mine Co., D.C.M.D.Pa.1939, 30 F.Supp. 597.



IN RE: THOMAS KANE; Thomas Kane, Appellant

No. 09-4254

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

628 F.3d 631; 2010 U.S. App. LEXIS 25899; Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

November 16, 2010, Submitted Under Third Circuit LAR 34.1(a)
December 21, 2010, Opinion Filed

**PRIOR HISTORY:**  [**1]
   APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY. (D.C. Civil No. 08-cv-05633). District Judge: Honorable Freda L. Wolfson.
Kane v. Kane, 2009 U.S. Dist. LEXIS 91504 (D.N.J., Sept. 30, 2009)

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN1] A district court's jurisdiction to consider an appeal from a final order of a bankruptcy court arises under 28 U.S.C.S. § 158(a)(1). A court of appeals has jurisdiction under 28 U.S.C.S. §§ 158(d)(1) and 1291.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
[HN2] A court of appeals employs the same standard of review that a district court employs in reviewing a bankruptcy court's decision. The court of appeals reviews factual findings for clear error, and the court of appeals exercises plenary review over any legal conclusions.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN3] A court of appeals reviews a district court's decision whether to invoke judicial estoppel only for abuse of discretion, asking whether its ruling is founded on an error of law or a misapplication of law to the facts.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN4] With respect to an issue of standing, a court of appeals' review is plenary.

*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN5] A court of appeals may affirm the rulings of a district court for any proper reason that appears on the record even where not relied on by it.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
[HN6] The Bankruptcy Code requires that a debtor file necessary declarations adequately, honestly, and in good faith. 11 U.S.C.S. § 521(a)(1) defines a debtor's filing duties; Fed. R. Bankr. P. 9011(b) outlines the requirements of proper purpose and evidentiary support in representations to a bankruptcy court.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*

[HN7] The Bankruptcy Code imposes on debtors an affirmative duty of full disclosure. 11 U.S.C.S. § 521 requires a debtor to file with the court a schedule of assets and liabilities and a statement of the debtor's financial affairs. The schedule must disclose, inter alia, contingent and unliquidated claims of every nature and provide an estimated value for each one. These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.

***Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles***
***Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties***
[HN8] A bankruptcy debtor's disclosure obligation extends to "contingent assets" such as causes of action pursued against another party because such disclosure allows the trustee and the creditors to determine whether to pursue these assets on the creditors' behalf. While a bankruptcy case is pending, it is the trustee, and not the debtor, who has the capacity to pursue the debtor's claims. Indeed, it would be inconsistent with the Bankruptcy Code to apply a rule requiring the debtor to have to supervise and double check the actions of the trustee, who is accountable for all property received. A debtor's burden is limited to reasonable diligence in completing schedules.

***Bankruptcy Law > Estate Property > Content***
[HN9] The Bankruptcy Code defines the property of a bankruptcy estate as including, inter alia, (1) all legal or equitable interests of the debtor in property as of the commencement of the case, 11 U.S.C.S. § 541(a)(1) (with certain exceptions), and (2) any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree. § 541(a)(5)(B).

***Bankruptcy Law > Estate Property > Abandonment > Operation of Law***
***Bankruptcy Law > Estate Property > Abandonment > Trustee Action***
[HN10] See 11 U.S.C.S. § 554.

***Bankruptcy Law > Estate Property > Abandonment > General Overview***
***Bankruptcy Law > Estate Property > Content***
[HN11] 11 U.S.C.S. § 541(a) is intended to sweep broadly to include all kinds of property, including tangible or intangible property, and causes of action, and an asset must be properly scheduled in order to pass to the debtor through abandonment under 11 U.S.C.S. § 554.

***Civil Procedure > Judicial Officers > Judges > Discretion***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN12] Courts have discretion in applying the fact-specific, equitable remedy of judicial estoppel.

***Bankruptcy Law > Discharge & Dischargeability > General Overview***
***Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction***
[HN13] Jurisdictional considerations caution a court of appeals against, if not prevent it from, essentially second-guessing the basis for a discharge in bankruptcy by a court not subject to the court of appeals' review.

***Civil Procedure > Judicial Officers > Judges > Discretion***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN14] Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion. A given set of circumstances does not necessarily compel its application.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN15] Courts have the intrinsic ability to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with the courts. The doctrine should only be applied to avoid a miscarriage of justice. Thus, the basic principle of judicial estoppel is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN16] Judicial estoppel is not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be. Certain criteria have been identified for determining when seemingly inconsistent litigation stances justify application of the doctrine. First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith--i.e., with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. Equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN17] Judicial estoppel has been described as imposing not inflexible prerequisites, but rather as encompassing additional considerations that may inform the doctrine's application in specific factual contexts. Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion. The applicability vel non of judicial estoppel is fact-specific.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN18] While judicial estoppel is fact-specific, its application is not tribunal-specific.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN19] Irreconcilable inconsistency is but the first of three prongs in a judicial estoppel analysis, and all three must be satisfied before a court opts to apply the doctrine.

*Bankruptcy Law > Estate Property > Content*
[HN20] Analysis under 11 U.S.C.S. § 541's property definition must begin by focusing directly on the specific interests claimed to constitute a debtor's property.

*Bankruptcy Law > Estate Property > Content*

*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Equitable Distribution > General Overview*
[HN21] The extent to which divorce claims are an asset of a bankruptcy estate turns on both the Bankruptcy Code and state law defining the equitable distribution of marital property.

*Bankruptcy Law > Claims > General Overview*
[HN22] "Claim" has been defined most liberally for purposes of bankruptcy law.

*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Equitable Distribution > General Overview*
[HN23] See N.J. Stat. Ann. § 2A:34-23(h).

*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Equitable Distribution > General Overview*
[HN24] By the plain terms of N.J. Stat. Ann. § 2A:34-23(h), the right to equitable distribution of marital property arises upon entry of the judgment of divorce.

*Bankruptcy Law > Estate Property > Content*
[HN25] A distinction lies between 11 U.S.C.S. § 541(a)(1), encompassing contingent property interests such as causes of action, and § 541(a)(5), encompassing, e.g., a property settlement reached during a bankruptcy proceeding, which accordingly vests property in a debtor such that, if this occurs within 180 days of filing, it becomes part of the estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
[HN26] 11 U.S.C.S. § 704 makes a bankruptcy trustee accountable for all property received. A debtor's burden is limited to reasonable diligence in completing schedules.

*Bankruptcy Law > Estate Property > Content*
*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Equitable Distribution > General Overview*
[HN27] In concurrent bankruptcy and divorce cases, courts have described spouses' interests in marital prop-

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

erty subject to equitable distribution as "inchoate" be-
cause these interests do not become property rights--i.e.,
do not vest--until entry of a judgment of divorce. New
Jersey law states that a "right" to equitable distribution
only arises upon entry of a judgment of divorce.

**COUNSEL:** Thomas Kane, Esq., Pro se, Lawrenceville,
NJ.

Shannon Kane, Pro se, Lynbrook, NY.

**JUDGES:** Before: BARRY, CHAGARES and
VANASKIE, Circuit Judges.

**OPINION BY:** BARRY

**OPINION**

[*634]  BARRY, Circuit Judge

Thomas Kane appeals the judgment of the District
Court affirming the Bankruptcy Court's decision not to
apply judicial estoppel to the entirety of a proof of claim
filed by his estranged wife in his bankruptcy proceeding,
and its conclusion that Ms. Kane has standing to pursue
equitable distribution as a post-petition claim in that
proceeding. We will affirm.

**I. Background**

Shannon and Thomas Kane were married in August
of 2004. Two years later, Ms. Kane filed for divorce in
Mercer County, New Jersey, and moved to New York. In
September of 2007, she presented her husband with a
written settlement proposal requesting, *inter alia*,  [**2]
equitable distribution, and informing him that she in-
tended to file for bankruptcy. On September 20, 2007,
she filed a Chapter 7 petition in the Eastern District of
New York. Her filing disclosed her estrangement from
Mr. Kane, and the pending divorce litigation:

> 1. Schedule A of her petition included
> details about the couple's house and spec-
> ified that "Debtor and her husband are
> separated";
>
> 2. Schedule F of her petition listed
> Mr. Kane as an unsecured creditor, speci-
> fying "[p]ossible obligations arising out of
> matrimonial proceeding" with a stated
> amount of claim listed as "unknown";
>
> 3. Ms. Kane's "Statement of Financial
> Affairs" listed the couple's divorce pro-
> ceeding by docket number, and indicated
> its status as "Pending."

On November 8, 2007, the Trustee in Ms. Kane's
bankruptcy proceeding reviewed her petition at a 341
Meeting, *see* 11 U.S.C. § 341, at which she was present
with counsel. Mr. Kane also attended in his capacity as a
creditor listed on her petition. He argued, as he argues
now, that his wife's sworn averments were "false and
misleading because [they] failed to disclose that she was
simultaneously litigating her entitlement to alimony,
equitable distribution, and attorney's  [**3] fees in an-
other court[.]" Appellant's Br. at 10. [1]  [*635]  Never-
theless, after extensive colloquy, the Trustee concluded:
"For the record, I'm satisfied that the Debtor's disclosure
was sufficient, that there are certain omissions that she
might have made, they're negligible." *Id.* at A174. The
Trustee also confirmed that a "distributive award is an
asset of the Estate[.]" *Id.* at A176. Thereafter, on No-
vember 15, 2007, Ms. Kane filed an amended petition
which disclosed a claim for alimony and a pending law-
suit that did not appear in her first petition. On Novem-
ber 20, 2007, the Trustee filed a "Trustee's Letter of As-
sets" with the Bankruptcy Court in New York, which in
early 2008 granted Ms. Kane a discharge.

1    Among the various matters that Mr. Kane al-
leges that Ms. Kane failed to disclose, or misrep-
resented, are the following:

> 1. She "falsely responded" that
> "the value of any 'alimony,
> maintenance, support, and proper-
> ty settlements' in which she 'is or
> may be entitled . . .'" was "0.00.'"
> Appellant's Reply Br. at 3 (citing
> Schedule B, Question 17 of the
> Chapter 7 petition, asking for
> "current value of debtor's interest
> in property without deducting any
> secured claim or exemption").
>
> 2. At Ms.  [**4] Kane's 341
> Meeting, "[w]ithout any further
> elaboration, she falsely respond-
> ed[] 'No'" to the question whether
> she had "'any lawsuits, insurance
> claims pending where you may
> collect some money?'" *Id.*
>
> 3. Ms. Kane's amended bank-
> ruptcy petition "once again false-
> ly" set forth the error alleged in
> number one, above. *Id.*

On April 8, 2008, Mr. Kane filed a Chapter 13
bankruptcy petition in the District of New Jersey, and his
wife filed a proof of claim in the amount of $398,950.39.

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

The Bankruptcy Court in New Jersey held a hearing on Mr. Kane's motion to expunge Ms. Kane's claim with prejudice because it was premised on claims that she failed to include in her own bankruptcy petition. The Court expunged her proof of claim without prejudice to her right to refile it. The Court concluded that such refiling would constitute a post-petition claim in Mr. Kane's bankruptcy action. And, the Court indicated that such a claim is dependent on the Mercer County Family Court entering an equitable distribution award in her favor, with that court responsible for determining its parameters. However, the Court ruled that Ms. Kane was judicially estopped from filing "claims for loans to debtor's sisters, debtor's  [**5] premarital car loan, wedding expenses and lost social security benefits ... to the extent that the matrimonial court determines such claims do not fall within the ambit of equitable distribution ... as a result of her failure to disclose such claims in her bankruptcy proceeding." *Id.* at A36. The Court then vacated the automatic stay imposed under 11 U.S.C. § 362, permitting Ms. Kane to pursue equitable distribution in the state court.

The Bankruptcy Court's decision relied on two conclusions, affirmed by the District Court, that are the crux of Mr. Kane's arguments on appeal. First, the Court concluded that, pursuant to Section 541(a)(5) of the Bankruptcy Code, entitlement to equitable distribution "is not an asset of [a bankruptcy] estate[,]" and therefore Ms. Kane had "no obligation to list the equitable distribution right as an asset in her [petition's] Schedule B[.]" *Id.* at A33. The Court thus distinguished Ms. Kane's *pursuit* of equitable distribution in state court litigation, from *entitlement* to equitable distribution arising from an award entered on her behalf within 180 days of a bankruptcy filing, concluding that only the latter becomes property of a bankruptcy estate pursuant  [**6] to 11 U.S.C. § 541(a)(5).

Second, the Bankruptcy Court concluded that because Ms. Kane's equitable distribution claim was sufficiently before the Bankruptcy Court in New York, via her 341 Meeting, she was not estopped from pursuing it in her husband's proceeding. The Court noted that the transcript from Ms. Kane's 341 Meeting addressed equitable distribution and her divorce litigation, which she had "reference[d] . . . in [her] statement of financial affairs," and concluded that "no one can suggest to this Court that the Chapter 7 trustee was not aware of the right for an equitable distribution,  [*636]  that there was litigation out there in which Shannon Kane was seeking equitable distribution[, but that the] . . . trustee made a conscious decision not to pursue it[.]" *Id.* at A33-34.

Mr. Kane appealed the Bankruptcy Court's order to the District Court, and Ms. Kane cross-appealed. The

District Court affirmed the Bankruptcy Court in all respects, and Mr. Kane now appeals.

## II. Jurisdiction and Standard of Review

[HN1] The District Court's jurisdiction to consider an appeal from a final order of the Bankruptcy Court arises under 28 U.S.C. § 158(a)(1). We have jurisdiction under 28 U.S.C. §§ 158(d)(1)  [**7] and 1291.

[HN2] We employ "the same standard of review [that] the District Court employed in reviewing the Bankruptcy Court's decision. We review factual findings for clear error, and we exercise plenary review over any legal conclusions." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 316 (3d Cir. 2003) (citation omitted). [HN3] We review a district court's decision whether to invoke judicial estoppel "only for abuse of discretion, . . . [asking whether] its ruling is founded on an error of law or a misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001) (internal quotation marks and citations omitted). [HN4] With respect to an issue of standing, our review is plenary. *Hutchins v. IRS*, 67 F.3d 40, 42 (3d Cir. 1995) (citation omitted). [HN5] "We may affirm the rulings of the District Court for any proper reason that appears on the record even where not relied on by it." *United States v. Perez*, 280 F.3d 318, 337 (3d Cir. 2002) (citation omitted).

## III. Discussion

### A. Introduction

[HN6] The Bankruptcy Code requires that a debtor file necessary declarations adequately, honestly, and in good faith. *See, e.g.*, 11 U.S.C. § 521(a)(1) (defining a debtor's filing duties); Fed. R. Bankr. P. 9011(b) (outlining requirements of proper purpose and evidentiary support in representations to bankruptcy court).

In *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, we set forth the Code's disclosure requirements, and sought to place a party's "alleged prior inconsistent statement in context." 81 F.3d 355, 362 (3d Cir. 1996). Citing 11 U.S.C. §§ 521(1) and 1125(a)-(b), as well as applicable official disclosure forms, we proceeded to note:

> [HN7] The Code imposes on debtors an affirmative duty of full disclosure. Section 521 requires the debtor to file with the court "a schedule of assets and liabilities . . . and a statement of the debtor's financial affairs." The schedule must disclose, *inter alia*, "contingent and

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

unliquidated claims of every nature" and provide an estimated value for each one.

. . .

These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.

*Id.* (internal   [**9] citations omitted).

As indicated above, [HN8] a debtor's disclosure obligation extends to "contingent assets" such as causes of action pursued against another party, *Krystal Cadillac*, 337 F.3d at 321, because such disclosure "allows the trustee and the   [*637]   creditors to determine whether" to pursue these assets "on the creditors' behalf." *In re Costello*, 255 B.R. 110, 113 (Bankr. E.D.N.Y. 2000). While a bankruptcy case is pending, "it [i]s the trustee, and not [the debtor], who ha[s] the capacity to pursue [the debtor's] claims." *Id.* (citations omitted). Indeed, it would be inconsistent with the Bankruptcy Code to apply a rule requiring "the debtor . . . [to] have to supervise and double check the actions of the trustee, . . . [who is] accountable for all property received." *Hutchins*, 67 F.3d at 44 (citing *In re R.E. Lee & Sons, Inc.*, 95 B.R. 316 (Bankr. M.D. Pa. 1989) (limiting debtor's burden to reasonable diligence in completing schedules)).

[HN9] The Bankruptcy Code defines the property of a bankruptcy estate as including, *inter alia*, (1) "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1) (with certain exceptions, inapplicable here),   [**10] and (2) "[a]ny interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date . . . as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree[.]" *Id.* § 541(a)(5)(B). Section 554 then provides:

[HN10] (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

. . .

(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

In light of the foregoing, we have emphasized that [HN11] Section 541(a) "was intended to sweep broadly to include 'all kinds of property, including tangible or   [**11] intangible property, [and] causes of action[,]'" *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)), and that "an asset must be properly scheduled in order to pass to the debtor through abandonment under 11 U.S.C. § 554." *Hutchins*, 67 F.3d at 43 (citing cases).

Mr. Kane correctly cites various of these obligations that the Bankruptcy Code and case law impose on debtors. However, his arguments that the District Court erred--(1) by refusing to apply judicial estoppel to the entirety of Ms. Kane's proof of claim, and (2) by concluding that she has standing to pursue equitable distribution--fail because he elides two other considerations that necessarily govern our decision. First, [HN12] courts have discretion in applying the fact-specific, equitable remedy of judicial estoppel. Second, [HN13] jurisdictional considerations caution us against, if not prevent us from, essentially second-guessing the basis for a discharge in bankruptcy by a court not subject to our review.

Underlying Mr. Kane's appeal is his fundamental contention that Ms. Kane's Chapter 7 proceeding worked a fraud upon the three courts   [**12] that have considered this matter and her creditors. That contention belonged, in the first instance, before the court responsible for overseeing her petition:   [*638]   the Bankruptcy Court in New York. [2] In any event, in light of the record that is before us, we conclude that the District Court, and before it the Bankruptcy Court in New Jersey, had ample reason to assume that Ms. Kane's disclosures, and Mr. Kane's own actions (as well as his opportunity to take additional action), fairly set forth before the Bankruptcy Court in New York what needed to be set forth. We address each of Mr. Kane's arguments in turn.

2   Given the facts that he alleges, one would assume that Mr. Kane would have formally objected to the Bankruptcy Court's granting of a

discharge in Ms. Kane's proceeding, as he was permitted to do pursuant to 11 U.S.C. § 727(c)(1)-(2) (outlining parties' rights to object to the granting of a discharge). The record does not indicate whether Mr. Kane did so, though Ms. Kane's counsel at the hearing on the motion to expunge her proof of claim noted that "[i]f there's a question as to whether Ms. Kane was truthful or entirely truthful in the bankruptcy court in New York, there's still an   [**13] open bankruptcy in New York within which to adjudicate that." App. at A30.

**B. Judicial Estoppel**

[HN14] Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion. Mr. Kane insufficiently accounts for this, and for the corollary that a given set of circumstances does not, as he suggests, necessarily compel its application. Accordingly, his judicial estoppel argument fails.

We summarized the doctrine of judicial estoppel, and applied it in a bankruptcy case, in *Krystal Cadillac*. Our summary bears quoting at some length:

> We first articulated the doctrine of judicial estoppel in *Scarano v. Central R. Co. of N.J.*. There, [HN15] we . . . recognized the intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with the courts.
>
> Since *Scarano*, we have consistently stated that the doctrine should only be applied to avoid a miscarriage of justice. Thus, in *Ryan Operations G.P. v. Santiam-Midwest Lumber Co*., we stated[ that t]he basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed   [**14] to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.

==[HN16] Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be.== In *Montrose Medical Group [Participating Savings Plan v. Bulger]*, we identified certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine. We concluded:

> First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent*. Second, judicial estoppel is unwarranted unless the party *changed his or her position in bad faith--i.e.*, with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

We also noted that equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position.

 [*639]  *Krystal Cadillac*, 337 F.3d at 319-20 (emphasis in original; internal quotation marks, citations, and references omitted).

More  [**15] generally, and citing various circuit court decisions, including our own in *Scarano*, [HN17] the Supreme Court has described judicial estoppel as imposing not "inflexible prerequisites[,]" but rather as encompassing "[a]dditional considerations [that] may inform the doctrine's application in specific factual contexts." *New Hampshire v. Maine*, 532 U.S. 742, 751, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (citations omitted). The Court observed that, "[b]ecause the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion[.]" *Id*. at 749 (internal quotation marks and citations omitted). As we recently observed, "[t]he applicability *vel non* of judicial estoppel is fact-specific." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237, 253 n.6 (3d Cir. 2010) (citation omitted). [3]

3    [HN18] While judicial estoppel is fact-specific, its application is not tribunal-specific. *See, e.g., Oneida Motor Freight, Inc.*

*v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (applying judicial estoppel analysis to Chapter 11 debtor pursuing claims in non-bankruptcy forum).

The crux of Mr. Kane's judicial estoppel argument is that his wife's averments and [**16] omissions in her bankruptcy proceeding were inconsistent with (if not concealed) terms of a settlement proposal in the couple's divorce proceeding, and/or claims to equitable distribution that she began litigating against him. Kane approximately one year prior to the filing of her Chapter 7 petition. These alleged misrepresentations and omissions, the argument goes, underlie her proof of claim filed in his bankruptcy proceeding.

However,[HN19] irreconcilable inconsistency is but the first of three prongs in a judicial estoppel analysis, and all three must be satisfied before a court opts to apply the doctrine. In *Ryan*, it was "undisputed" that the debtor had violated disclosure duties, but we declined to apply estoppel because the bad faith prong had not been satisfied. 81 F.3d at 362. We also noted that we have "expressly left open [whether] ... nondisclosure, standing alone, can support a finding [of irreconcilable inconsistency] ... within the meaning of the judicial-estoppel doctrine." *Id.* (citation omitted). Here, in rejecting Mr. Kane's plea to apply estoppel, the District Court relied on the fact that the Bankruptcy Court in New Jersey both noted and deferred to the New York Trustee's [**17] finding that Ms. Kane's disclosures were "sufficient" and any omissions "negligible." App. at A174. This was not error.

To be sure, there would be no issue here if Ms. Kane's Chapter 7 petition had included the specific amount that she sought in equitable distribution, rather than referencing her divorce litigation in various sections of the petition, and presumably relying on the extensive discussion of her claims at her 341 Meeting to fill in any gaps. However, her disclosures must be placed "in context." *See Ryan*, 81 F.3d at 362. That context is this: one bankruptcy court may well have examined her petition and concluded that her disclosures were insufficient because references to her marital status and pending divorce litigation on Schedules A and F and in the Statement of Financial Affairs did not excuse her from providing a specific, estimated value of equitable distribution sought on Schedule B. Or, another bankruptcy court might have concluded, as the Bankruptcy Court in New York apparently did, that her disclosures were sufficient because the [*640] Trustee, "who had the capacity to pursue her claims[,]" *see Costello*, 255 B.R. at 113, became aware of them in both fact and substance [**18] before he proclaimed them sufficient. *See Hutchins*, 67 F.3d at 44 (questioning propriety of requiring a debtor "to supervise and double check the actions

of the trustee") (citing *Lee*, 95 B.R. at 318 (debtor's burden completing schedules is one of "reasonable diligence")).

Accordingly, for purposes of the fact-specific doctrine of judicial estoppel, we have no reason to conclude that the District Court erred in finding that Ms. Kane's proof of claim in her husband's bankruptcy proceeding was not irreconcilably inconsistent with her disclosures in her bankruptcy proceeding, or a bad faith change in position manifesting an intent to play fast and loose with the courts. [4] That the Bankruptcy Court applied estoppel to claims that she had not referenced on her petition in any manner at all, reinforces this conclusion. [5]

4    There is no evidence that Ms. Kane effectively "limited the reference to . . . [her equitable distribution] claim *in order to conceal* the claim[] from creditors in the hope of retaining any recovery for [her]self." *See Krystal Cadillac*, 337 F.3d at 320 (emphasis added). That her petition disclosed divorce litigation, and was discussed at length at her 341 Meeting, also distinguishes [**19] this case from *Oneida*, where we noted Oneida's "failure to mention [its] potential claim either within the confines of its disclosure statement *or at any stage of the bankruptcy court's resolution*." 848 F.2d at 419 (emphasis added). Rather, the circumstances here seem more akin to *In re Teleglobe Communications Corp*., where an inconsistency "look[ed] more like a legitimate disagreement ... (mixed with a dose of sloppiness) than ... a bad faith attempt to mislead the courts." 493 F.3d 345, 377 (3d Cir. 2007).

5    Mr. Kane also argues that the District Court erred in holding that the informal disclosure of Ms. Kane's divorce claims to the Trustee "cured [her] omissions and misrepresentations ... and defeated judicial estoppel." Appellant's Br. at 28. While we take a somewhat different route in reaching the District Court's ultimate conclusion as to judicial estoppel, we note that the Court carefully stated that it *was not* holding that informal disclosure is sufficient. Nor, we note, do we.

## C. Standing

Mr. Kane next argues that the District Court erred when it reasoned that because equitable distribution was not part of his wife's bankruptcy estate, she has standing to pursue it as a basis [**20] of her proof of claim in his bankruptcy. Although we affirm the Court's conclusion, we do so for a somewhat different reason: Ms. Kane's equitable distribution claim was abandoned to her when

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

the Bankruptcy Court in New York granted a discharge, and it is not for us to review that court's decision.

Here the threshold questions are (1) whether Ms. Kane's equitable distribution claim was a "legal or equitable interest" pursuant to Section 541(a)(1), and (2) whether the fact that her claim was not specifically scheduled by dollar amount on her petition's Schedule B--even though her divorce action was disclosed on her financial statement and equitable distribution was discussed at length at her 341 Meeting--means that the claim was never abandoned to her and, accordingly, deprives her of standing to pursue it in her husband's bankruptcy. We answer the first question in the affirmative, and the second in the negative.

[HN20] "Analysis under § 541's property definition must begin by focusing directly on the specific interests claimed to constitute the debtor's property." *Westmoreland*, 246 F.3d at 242. [HN21] The extent to which divorce claims are an asset of a bankruptcy estate turns on both the Bankruptcy [**21] Code and New Jersey law defining the equitable distribution of marital property. [*641] *See In re Berlingeri*, 246 B.R. 196, 199 (Bankr. D.N.J. 2000) (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)). [6] Particularly pertinent here is our treatment of standing, as it relates to disclosure and scheduling of assets in bankruptcy, in *Hutchins v. IRS*, 67 F.3d at 40.

> 6  [HN22] We recently have redefined "claim" most liberally for purposes of bankruptcy law, overruling a decision on which the District Court partially relied. *See In re Grossman's*, 607 F.3d 114, 121 (3d Cir. 2010), *overruling Avellino & Bienes v. M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984).

New Jersey law provides that, [HN23] "in all actions where a judgment of divorce ... is entered the court may make such award or awards to the parties ... to effectuate an equitable distribution of [marital] property[.]" N.J.S.A. 2A:34-23(h). Accordingly, "the New Jersey Supreme Court has held that [HN24] '[b]y the plain terms of the statute,' the right to equitable distribution of marital property arises upon entry of the judgment of divorce." *Berlingeri*, 246 B.R. at 199 (quoting *Carr v. Carr*, 120 N.J. 336, 576 A.2d 872, 875 (N.J. 1990)).

The upshot of this definition is that [**22] when Ms. Kane filed for bankruptcy, she had an *interest* in an equitable distribution of marital property--namely, by virtue of being married to Mr. Kane, and by virtue of having initiated a divorce action in which she was seeking equitable distribution--but she did not have a *right* to it. Her claim qualified as a contingent, equitable interest in (marital) property that could not ripen into a vested

property interest--i.e., a tangible asset--until entry of a judgment of divorce. [7] The District Court blurred this distinction, assuming that only the latter interest is at issue in the instant case, accordingly (and erroneously) concluding that Ms. Kane had no duty to disclose her equitable distribution claim because no divorce judgment had been entered.

> 7  [HN25] Herein lies the distinction between Section 541(a)(1), encompassing contingent property interests such as causes of action, and Section 541(a)(5), encompassing, e.g., a property settlement reached during a bankruptcy proceeding, which accordingly vests property in a debtor such that, if this occurs within 180 days of filing, it becomes part of the estate.

Returning to Section 541(a)(1), Ms. Kane's bankruptcy estate included as an "equitable [**23] interest in property," the *possibility* that the Family Court would, at some point in the future, award her equitable distribution of marital assets, *or* that she and Mr. Kane would arrive at a property settlement that transferred the legal title of marital assets to her. Ms. Kane disclosed such a contingency by disclosing the divorce action, listed by docket number and described as "pending," on her financial statement. What is important for our purposes is whether this disclosure, together with the discussion of its ramifications for equitable distribution by a Trustee who found that it was sufficient and confirmed that equitable distribution is an asset of the estate--but where that cause of action was absent from Schedule B (i.e., it was both "disclosed" and "unscheduled")--means that the cause of action was never abandoned to Ms. Kane at the time of discharge.

Mr. Kane correctly notes that courts have held that where a debtor conceals an asset or fails to schedule it, the asset remains the property of the bankruptcy estate and, accordingly, the debtor can be found to lack standing to pursue its further disposition. *See, e.g., Vreugdenhill v. Navistar Int'l Transp. Corp.*, 950 F.2d 524 (8th Cir. 1991); [**24] *In re DiGeronimo*, 354 B.R. 625 (Bankr. E.D.N.Y. 2006); [*642] *Yates v. Yates*, 148 P.3d 304 (Colo. App. 2006). However, none of these cases are on all fours with the precise situation before us, nor does any one take into account principles enunciated in *Hutchins*, which provides guidance for resolution of the "disclosed but unscheduled"--i.e., not concealed and, according to the Trustee, in fact "sufficient"--quandary here.

In *Hutchins*, the debtor instituted an antitrust suit and amended his bankruptcy petition to reflect the cause of action. After his discharge in bankruptcy, a dispute arose over an IRS tax refund discrepancy. The IRS argued that because Hutchins had not scheduled the refund

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 46 of 589

Page 10

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

in his bankruptcy petition, it was never abandoned to him but rather remained part of the bankruptcy estate, and Hutchins accordingly did not have standing to pursue it. We rejected that argument, concluding rather that Hutchins had standing to pursue the claim because the refund "existed during the bankruptcy as an integral part of the antitrust claim--or if separately as a still inchoate right--[such that ]the tax claim was properly scheduled through the scheduling of the antitrust action and descended to   [**25] Hutchins through abandonment." *Hutchins*, 67 F.3d at 40, 42-43.

*Hutchins* obviously did not address the situation before us--a disclosed divorce action / unscheduled equitable distribution claim--but it helps us to resolve it. Distinguishing *Hutchins* from a "standard case" where a debtor does not schedule a tax refund to which he is legally entitled (and, thus, possesses a vested asset), we ascribed the nebulous character of Hutchins's putatively unscheduled asset--the tax refund--to "the result of action by the bankruptcy trustee[,]" who was responsible for filing the tax return (i.e., of the estate) from which the refund stemmed. *Id.* at 43. Thus, we observed,

> at the time of the bankruptcy, the crucial asset . . . was the antitrust settlement. During the bankruptcy, no "tax refund" asset existed. It was at best an inchoate right. Creating the legal fiction that this asset arose at the time of [an] erroneous filing [by the trustee] and existed independently, albeit covertly, would require every debtor to list as an additional asset a potential tax refund due to the possibly erroneous filings of the trustee. Alternatively, the debtor would have to supervise and double check the actions of the   [**26] trustee, contrary to the intention of [HN26] 11 U.S.C. § 704, which makes the bankruptcy trustee accountable for all property received. *See In re R.E. Lee & Sons, Inc.*, 95 B.R. 316 (Bankr. M.D. Pa. 1989) (limiting debtor's burden to reasonable diligence in completing schedules). There seems little to recommend either course as an innovation in bankruptcy procedure.

*Hutchins*, 67 F.3d at 44.

The facts of *Hutchins* do not map precisely onto those here, but its logic does. "At the time of [Ms. Kane's] bankruptcy, the crucial asset" was not a vested right to marital property--e.g., in the form of a property settlement that pegged the value of assets that would come to her upon entry of a judgment of divorce--but rather was her (contingent) claim to equitable distribution, on the assumption that the marriage *in fact will end* in a judgment of divorce. *See id.* "[N]o '[equitable distribution]' asset existed" as a freestanding property right; rather "[i]t was at best an inchoate right." *See id.* [8] And the Trustee,   [*643]   who was "accountable for all property received[,]" *id.*-- including the inchoate property interest that Ms. Kane had to equitable distribution--declared her disclosures concerning that property sufficient,   [**27] acknowledged that the interest was an asset of the estate, filed an asset statement with the Bankruptcy Court, and presumably, the record not manifesting anything to the contrary, allowed her case to proceed to discharge.

> 8   The fact that no property settlement had been stipulated to, and thus no *settlement* was part of Ms. Kane's bankruptcy estate, distinguishes this case from *Reid v. Reid*, 310 N.J. Super. 12, 708 A.2d 74 (N.J. Super. App. Div. 1998), on which Mr. Kane relies in arguing that New Jersey law governing equitable distribution, in tandem with bankruptcy law, directs the conclusion that his wife does not have standing to pursue equitable distribution.
>
> We also note that [HN27] in concurrent bankruptcy and divorce cases, courts have described spouses' interests in marital property subject to equitable distribution as "inchoate" because these *interests* do not become property *rights*--i.e., do not vest?until entry of a judgment of divorce. *See, e.g., DiGeronimo*, 354 B.R. at 637 (citing cases). Although *DiGeronimo* addressed New York law, New Jersey law also states that a "right" to equitable distribution only arises upon entry of a judgment of divorce.

The discharge in bankruptcy granted Ms. Kane by the Bankruptcy   [**28] Court in New York is not subject to our appellate review. However, the record before us permits the conclusion that the Trustee abandoned Ms. Kane's equitable distribution interest to her, either having determined its relative "value and benefit" to the estate, or having considered it scheduled and not otherwise administering it prior to discharge. *See* 11 U.S.C. § 554(a) and (c). To say, in the face of the Trustee's acquiescence in light of all of the facts that were presented to him, that the interest was never abandoned to Ms. Kane because she failed to assign a dollar amount to the claim on Schedule B raises the specter that we have stated would be inconsistent with the Bankruptcy Code in letter, and intolerable in practice: "the debtor would have to supervise and double check the actions of the trustee, [even though] ... the bankruptcy trustee [is] accountable for all

628 F.3d 631, *; 2010 U.S. App. LEXIS 25899, **;
Bankr. L. Rep. (CCH) P81,906; 64 Collier Bankr. Cas. 2d (MB) 1391

property received ... [and a] debtor's burden [is limited] to reasonable diligence in completing schedules[.]" *Hutchins*, 67 F.3d at 44 (internal citation omitted).

## IV. Conclusion

Having found that judicial estoppel is unwarranted in light of the totality of facts relevant to Ms. Kane's disclosures in bankruptcy, and [**29] that application of *Hutchins* to those same facts yields the conclusion that her equitable distribution claim was abandoned to her upon discharge and that, accordingly, she has standing to pursue equitable distribution according to the terms set forth in the Bankruptcy Court's order, we will affirm the judgment of the District Court. [9]

9  We reject Mr. Kane's remaining arguments without further discussion.



IN RE: MAGNETIC AUDIOTAPE ANTITRUST LITIGATION; TEXAS
INTERNATIONAL MAGNETICS, INC., f/k/a HIX RECORDING, on behalf of
itself and all others similarly situated, and CROWN MAGNETICS, INC.,
Plaintiffs-Appellants, -and- PREMIER MULTIMEDIA, INC.,
Plaintiff-Counter-Defendant-Appellant, v. AURIGA-AUREX, INC.,
Defendant-Counter-Claimant-Appellee, -and- SUNKYONG INDUSTRIES CO.,
f/k/a SUNKYONG LTD, SUNKYONG AMERICA, INC. (NEW YORK),
SUNKYONG AMERICA, INC. (LOS ANGELES), BASF MAGNETICS GMBH,
EMTEC MAGNETICS PROMEDIA, INC., f/k/a JR PRO SALES, EMTEC
MAGNETICS GMBH, KOHAP GROUP OF KOREA, KOHAP INC., EMTEC
HOLDING GMBH, AUREX S.A. DE C.V. (AURIGA), TDK CORPORATION,
TDK ELECTRONICS CORPORATION, and SKM LTD., formerly SK
MAGNETIC CO. LTD., Defendants-Appellees.

Docket No. 02-7687

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*334 F.3d 204; 2003 U.S. App. LEXIS 12534; 2003-1 Trade Cas. (CCH) P74,064; 55
Fed. R. Serv. 3d (Callaghan) 1178*

March 13, 2003, Argued and submitted
June 20, 2003, Decided

**PRIOR HISTORY:** [**1] Appeal from a judgment of the United States District Court for the Southern District of New York, Lawrence M. McKenna, Judge, dismissing defendant SKM, Ltd., from class action anti-trust suit. Class plaintiffs argue the trial court improperly denied them an opportunity for jurisdictional discovery on their alternate asserted bases for personal jurisdiction over SKM.
*In re Magnetic Audiotape Antitrust Litig., 2002 U.S. Dist. LEXIS 8362 (S.D.N.Y., May 9, 2002)*

**DISPOSITION:** Vacated and remanded. Motion to dismiss denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Class action appellants sued, among others, appellee foreign corporation,

alleging that the corporation conspired to fix prices of magnetic audiotape. Appellants sought review of the judgment of the United States District Court for the Southern District of New York which granted the corporation's motion to dismiss for lack of personal jurisdiction, and the corporation moved to dismiss the appeal based on a foreign bankruptcy.

**OVERVIEW:** Appellants contended that they were improperly denied the opportunity to conduct discovery on questions of personal jurisdiction prior to the determination of lack of personal jurisdiction over the corporation. The corporation asserted that appellants' failure to assert claims in the corporation's foreign bankruptcy barred appellants' claims under foreign law, and that the bar extended to the present proceedings. The appellate court first held that appellants were entitled to engage in limited discovery concerning personal jurisdiction over the corporation. Appellants' allegation,

334 F.3d 204, *; 2003 U.S. App. LEXIS 12534, **1;
2003-1 Trade Cas. (CCH) P74,064; 55 Fed. R. Serv. 3d (Callaghan) 1178

that an officer of the corporation attended a meeting in the foreign country at which price fixing in the United States was discussed, was arguably sufficient to show that the corporation's conduct had an antitrust effect in the United States. Further, fact questions remained concerning the extent of control the corporation exercised over its United States subsidiary. Also, the corporation's belated notice of its intended reliance on foreign law, without providing the law, precluded review of the effect of the foreign bankruptcy and barred the corporation from raising the bankruptcy as a defense.

**OUTCOME:** The judgment granting the corporation's motion to dismiss was vacated and the case was remanded. The corporation's motion to dismiss the appeal was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court reviews a district court's dismissal for want of personal jurisdiction de novo.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN2] On a *Fed. R. Civ. P. 12(b)(2)* motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of showing that the court has jurisdiction over the defendant.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN3] Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN4] Courts credit a plaintiff's averments of jurisdictional facts as true.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN5] Where plaintiff has engaged in jurisdictional

discovery, but no evidentiary hearing was conducted, the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited would suffice to establish jurisdiction over the defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Venue > Corporations*
[HN6] Under the Ninth Circuit's interpretation of *§ 12* of the Clayton Act, *15 U.S.C.S. § 22*, plaintiffs may avail themselves of *§ 22*'s worldwide service-of-process provision, which enables courts to extend personal jurisdiction over corporations to the limits permitted under the *Fifth Amendment's due process clause*, even if *§ 22*'s venue provision is not satisfied. The ensuing minimum contacts analysis looks to a corporation's contacts with the United States as a whole to determine if the federal court's exercise of personal jurisdiction comports with due process.

*Governments > Courts > Authority to Adjudicate*
[HN7] Courts are not precluded from engaging in their own information gathering with regard to issues of foreign law. *Fed. R. Civ. P. 44.1.*

*Governments > Courts > Authority to Adjudicate*
[HN8] See *Fed. R. Civ. P. 44.1.*

**COUNSEL:** Howard J. Sedran, Philadelphia, PA (Levin, Fishbein, Sedran & Berman; Eric L. Olson, Karla Gluek, Heins, Mills & Olson, P.L.C., Minneapolis, MN; Richard J. Kilsheimer, Kaplan Fox & Kilsheimer, LLP, New York, NY; and Michael J. Brickman, Richardson, Patrick, Westbrook & Brickman, LLC, Charleston, SC, of counsel), for Plaintiffs-Appellants and Plaintiff-Counter-Defendant-Appellant.

Bud G. Holman, New York, NY (Kelley, Drye & Warren, LLP, of counsel), for Defendant-Appellee SKM LTD.

**JUDGES:** Before OAKES, CABRANES and SOTOMAYOR, Circuit Judges.

334 F.3d 204, *; 2003 U.S. App. LEXIS 12534, **1;
2003-1 Trade Cas. (CCH) P74,064; 55 Fed. R. Serv. 3d (Callaghan) 1178

**OPINION**

[*205] Per Curiam:

Named plaintiffs Texas International Magnetics, Inc., Crown Magnetics, Inc., and Premier Multimedia, Inc., appeal from the dismissal of defendant SKM, Ltd., from this class action anti-trust suit based on lack of personal jurisdiction. [**2] Plaintiffs argue that the district court erroneously determined that it lacked personal jurisdiction over SKM and, alternately, that the court improperly denied them the opportunity [*206] to conduct jurisdictional discovery on questions of both specific and general personal jurisdiction prior to making its decision. Similar to our conclusion in the companion case to this matter, see *Tex. Int'l Magnetics, Inc. v. BASF Aktiengesellschaft, 31 Fed. Appx. 738 (2d Cir. 2002)*, we agree that the plaintiffs should have been afforded an opportunity to engage in jurisdictional discovery with regard to SKM prior to the court ordering dismissal. Furthermore, we deny SKM's motion to dismiss the appeal based on events in SKM's pending bankruptcy proceeding in Korea. Accordingly, we vacate the judgment and remand to the district court.

In their complaint, plaintiffs allege that SKM, a Korean corporation, along with a number of other manufacturers and distributors of magnetic audiotape, conspired to fix the price of such tape in the United States for a period of roughly eight years, in violation of the Sherman Act, *15 U.S.C. § 1 (2002)*. Specifically with regard to SKM, [**3] plaintiffs alleged that it participated directly in the conspiracy, as well as indirectly, by directing the activities of employees of its United States subsidiary, SKMA, Inc.

SKM brought a motion to dismiss under *Fed. R. Civ. P. 12(b)(2)*, arguing that the court lacked personal jurisdiction. The court granted the motion, concluding in relevant part (1) that plaintiffs had failed either to allege facts or point to facts in the record establishing that SKM was a direct participant in the price fixing activities directed at the United States such that specific personal jurisdiction extended over it; and (2) that plaintiffs had failed either to allege facts or point to facts in the record such that the continuous and systematic contacts of SKM's subsidiary, SKMA, Inc., should be imputed to it for purposes of establishing general personal jurisdiction. In dismissing SKM, however, the court failed to rule explicitly on plaintiffs' request for further discovery on the question of personal jurisdiction.

After plaintiffs filed their notice of appeal, SKM filed a motion to dismiss in this court, which we have considered along with the merits of this appeal.

A.

[HN1] We review a district court's [**4] dismissal for want of personal jurisdiction de novo. See *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002)*. [HN2] On a *Fed. R. Civ. P. 12(b)(2)* motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant. See *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)*. [HN3] Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction. Id.

[HN4] We credit a plaintiff's averments of jurisdictional facts as true. Ball v. *Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)*. [HN5] Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant." *Id.*

We note, here, that the district court analyzed the question of personal jurisdiction under § 12 of the Clayton Act, *15 U.S.C. § 22 (2002)*, adopting the Ninth [**5] Circuit's interpretation of the provision found in *Go-Video, Inc. v. Akai Elec. Co., 885 F.2d 1406 (9th Cir. 1989).* [1] Neither [*207] party contests on appeal the propriety of this decision.

> 1 As a consequence, it did not reach the alternate questions of personal jurisdiction under either New York's long-arm statute or *Fed. R. Civ. P. 4(k)(2)*.

[HN6] Under the Ninth Circuit's interpretation of *§ 12*, plaintiffs may avail themselves of *§ 12*'s worldwide service-of-process provision, which enables courts to extend personal jurisdiction over corporations to the limits permitted under the *Fifth Amendment's* due process clause, even if *§ 12*'s venue provision is not satisfied. [2] *Id. at 1408-13*; accord *Dee-K Enters. v. Heveafil Sdn. Bhd., 982 F. Supp. 1138, 1144 n.12 (E.D. Va. 1997)*; *GE v. Bucyrus-Erie Co., 550 F. Supp. 1037, 1041-42 (S.D.N.Y. 1982)*. The ensuing minimum contacts analysis

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 51 of 589

Page 4
334 F.3d 204, *207; 2003 U.S. App. LEXIS 12534, **5;
2003-1 Trade Cas. (CCH) P74,064; 55 Fed. R. Serv. 3d (Callaghan) 1178

looks to a corporation's contacts with the United States as a whole to determine [**6] if the federal court's exercise of personal jurisdiction comports with due process. *Go-Video, 885 F.2d at 1414-15; Bucyrus-Erie, 550 F. Supp. at 1043; Dee-K, 982 F. Supp. at 1145 n.15;* see also *Dardana Ltd. v. A.O. Yuganskneftegaz, 317 F.3d 202, 207 (2d Cir. 2003)* (when personal jurisdiction over foreign corporation is based on *Fed. R. Civ. P. 4(k)(2)* -- in essence the federal long-arm statute -- due process analysis involves contacts with United States as a whole); *United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 36 (1st Cir. 1999)*(same); *Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974)* (when undertaking due process analysis with respect to analogous service-of-process provision of federal *Securities Exchange Act* - - § 27 -- courts look to contacts with United States as a whole).

 2  The court held that venue could be established on some other basis such as *Title 28, section 1391(d)*, which provides that an alien may be sued in any district. *Go-Video, 885 F.2d at 4 1413.*

[**7] We will assume, without deciding, that the district court's approach to *§ 12* is correct, given that the parties do not question it on appeal. We note, however, that there is some disagreement over whether a party first must demonstrate that *§ 12*'s venue requirement -- that an antitrust suit against a corporation be brought in a district of which it is an inhabitant, in which it may be "found," or in which it transacts business - is satisfied before *§ 12*'s expansive jurisdictional provision may be invoked. Compare *Go-Video, 885 F.2d at 1408-13* (holding that venue and service-of-process provisions of *§ 12* operate independently); *Daniel v. Am. Bd. of Emergency Med., 988 F. Supp. 127, 198-201 (W.D.N.Y. 1997)* (same); *Bucyrus-Erie, 550 F. Supp. at 1041-42* (same); *Dee-K, 982 F. Supp. at 1144 n.12* (opining same), with *GTE New Media Servs. v. BellSouth Corp., 339 U.S. App. D.C. 332, 199 F.3d 1343, 1350 (D.C. Cir. 2000)* (holding venue portion of *§ 12* must be satisfied before extraterritorial service provision can confer personal jurisdiction over a corporation); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1286-87 (S.D.N.Y. 1989)* [**8] (same); *Reynolds Metals Co. v. Columbia Gas Sys., Inc., 694 F. Supp. 1248, 1251 (E.D. Va. 1988)* (opining same). See also *In re Vitamins Antitrust Litigation, 94 F. Supp. 2d 26, 27 n.3, 30 (D.D.C. 2000)* (questioning wisdom of D.C. Circuit's interpretation of *§ 12* to require that a defendant be an inhabitant of, be found in, or transact business in a forum

before being subject to worldwide service of process in a multidistrict, antitrust suit, but noting it was bound by this precedent).

With regard to the specific question in this case -- whether SKM has sufficient minimum contacts with the United States to satisfy due process -- we believe the district court improperly denied plaintiffs [*208] the opportunity to engage in limited discovery on the question prior to dismissing SKM. First, in both plaintiffs' complaint and materials submitted in opposition to dismissal, they point to minutes from a meeting showing that an executive of SKM was present at a meeting in Seoul in which price-fixing activities took place. For purposes of a motion to dismiss, this arguably would satisfy the "effects" test frequently used in the analysis of specific personal jurisdiction. [**9] See *Calder v. Jones, 465 U.S. 783, 789-90, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)* (court may exercise personal jurisdiction over defendant consistent with due process when defendant is a primary participant in intentional wrongdoing -- albeit extra- territorially -- expressly directed at forum). Indeed, SKM concedes that one of its executives was present at the meeting in question, but argues that the meeting was a "short culturally required courtesy meeting," in which no price-fixing discussion took place. This factual argument, however, is not proper for resolution in the context of a motion to dismiss.

Furthermore, it is not clear from the district court's order whether the court considered this specific allegation at all in its decision, given its very brief discussion of the effects test with respect to SKM. Rather, on the face of the order, it appears that the court may have overlooked the notes showing SKM's participation in the Seoul meeting at which price fixing appears to have been discussed. At the very least, then, plaintiffs are entitled to further development on this point prior to a conclusion that they have failed to make a prima facie showing that SKM [**10] participated directly in a conspiracy, the effects of which were purposefully directed at the United States. Remand will provide the opportunity for full consideration by the court of the meeting in Korea with regard to the question of personal jurisdiction.

Alternatively, even if plaintiffs could not satisfy the Calder "effects" test, thereby establishing specific personal jurisdiction, plaintiffs point to facts in the record in support of their claim that SKM exerted extensive control over SKMA, Inc. to the degree that SKMA's

numerous contacts with the United States should be imputed to SKM for purposes of general personal jurisdiction. As the district court acknowledged, this analysis involves a multi-factor test that is very fact-specific. Given the nature of this inquiry, it was premature to grant dismissal prior to allowing discovery on plaintiffs' insufficiently developed allegations regarding the relationship between SKM and its subsidiary.

Should the district court reach this question, it may wish to consider plaintiffs' allegations of, and development through discovery of, facts establishing that SKM has complete ownership of SKMA stock; that SKM guarantees SKMA's credit [**11] arrangements with banks in the U.S.; that SKM describes SKMA as its marketing and sales arm on its website; that SKMA was simply SKM's business office in the U.S. prior to being organized into its own corporation; that, although SKM manufactures magnetic tape in Korea, it carries out sales in the U.S. through SKMA; that SKMA's sales are comprised almost exclusively of SKM's manufactured product; that there is an overlap in executive personnel between the companies, along with a frequent exchange and rotation of personnel between parent and subsidiary; that SKMA has financial reporting requirements established by SKM; and that SKM shares resources and infrastructure with SKMA.

**B.**

SKM claims, however, that dismissal is appropriate on the alternate ground [*209] that plaintiffs' claims against it are barred under Korean law based on principles of international comity. Specifically, SKM argues in its submissions to this court that because plaintiffs failed to file a timely notice of claims against SKM in SKM's Korean bankruptcy proceedings -- initiated while the present case was pending in district court -- plaintiffs' claims are barred under Korean law and we should give effect to the [**12] bar in the present proceedings. SKM bases the entirety of its argument on two affidavits submitted by its U.S. attorney, primarily recounting the history of the present case; a three-page declaration of an attorney admitted to practice in Korea in which the attorney states his interpretation of Korean bankruptcy law with regard to the present parties' situation; and a copy of the order entered by the Korean court on which SKM relies to create the bar to plaintiffs' U.S. claims. SKM does not provide any of the relevant Korean law itself.

The dearth of evidence offered by SKM prevents this court from properly considering its request for dismissal based on an issue of foreign law. While [HN7] courts are not precluded from engaging in their own information gathering with regard to issues of foreign law, see *Fed. R. Civ. P. 44.1*, we do not believe it is appropriate for this court to do so in these circumstances.

*Rule 44.1* provides that [HN8] "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Id. (emphasis added). The bankruptcy proceedings at issue were commenced in December 2000, and SKM claims that [**13] plaintiffs' present suit became barred by operation of Korean law as of January 13, 2001. Although commencement of the Korean bankruptcy proceedings post- dated SKM's responsive pleadings in this case, the commencement pre-dated the district court's ruling on SKM's motion to dismiss by at least two months. Furthermore, nearly three months elapsed before the district court entered a final judgment dismissing SKM, which would allow for appeal, and yet another month elapsed before plaintiffs appealed to this court. In all of this intervening time, SKM failed to raise the issue in the district court, or even bring the Korean bankruptcy proceedings to its attention. Instead, it waited almost a month after plaintiffs' notice of appeal before bringing its motion to dismiss in this court. In other words, SKM elected not to take advantage of an opportunity to create a proper record for review by this court. Furthermore, SKM offers no explanation for the extensive delay in raising this issue of foreign law or for its failure to raise it in the district court proceedings. SKM has failed to demonstrate that it is entitled to dismissal based on Korean law, and we decline to allow SKM an opportunity [**14] to further develop the record because of its failure to comply with *Fed. R. Civ. P. 44.1*'s requirement of reasonable notice. We therefore hold that SKM is barred from raising the Korean proceedings as a defense.

In conclusion, the judgment of the district court dismissing SKM for lack of personal jurisdiction is vacated and the matter remanded. SKM's motion to dismiss is denied.



IN RE: RFE INDUSTRIES, INC.; FRY'S METALS, INC.; CAMERON & MIT-
TLEMAN v. JOHN J. GIBBONS, Trustee for the Estate of RFE Industries, Inc.;
ANTON NOLL, INC.; WESTBURY ALLOYS, INC.; SPARFVEN & COMPANY,
INC.; MICHAEL SPARFVEN; Fry's Metals, Inc., Appellant

No. 00-2184

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

283 F.3d 159; 2002 U.S. App. LEXIS 3676; 47 Collier Bankr. Cas. 2d (MB) 1609; 39
Bankr. Ct. Dec. 54

November 1, 2001, Argued
March 8, 2002, Filed

**SUBSEQUENT HISTORY:** Related proceeding at
Gibbons v. Anton Noll, Inc. (In re RFE Indus.), 2003
U.S. App. LEXIS 4609 (3d Cir. N.J., Mar. 14, 2003)

**PRIOR HISTORY:**       [**1]  On Appeal from the
United States District Court for the District of New Jer-
sey. (D.C. Civ. No. 00-cv-01868). District Judge: Hon.
William H. Walls.

**DISPOSITION:**      Vacated and remanded.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Appellate Jurisdiction >
Final Judgment Rule*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN1] A federal appellate court exercises plenary review
of a district court's decision in a bankruptcy matter.

*Bankruptcy Law > Case Administration > Notice*
*Bankruptcy Law > Practice & Proceedings > Adversary
Proceedings > General Overview*
[HN2] Fed. R. Bankr. P. 9019(a) provides that on motion
by the trustee and after notice and a hearing, the court
may approve a compromise or settlement.

*Bankruptcy Law > Case Administration > Examiners,
Officers & Trustees > United States Trustee*
*Bankruptcy Law > Case Administration > Notice*
*Bankruptcy Law > Practice & Proceedings > Adversary
Proceedings > General Overview*
[HN3] In order for a settlement to be approved by the
bankruptcy court, Fed. R. Bankr. P. 9019(a) provides that
notice of the settlement shall be given to creditors, the
United States trustee, the debtor, and indenture trustees
as provided in Fed. R. Bankr. P. 2002 and to any other
entity as the court may direct.

*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN4] The issues of waiver and estoppel are reviewed de
novo, although the bankruptcy court's findings of fact are
accepted unless clearly erroneous.

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers & Objections > Affirmative Defenses >
General Overview*
*Civil Procedure > Pleading & Practice > Defenses,
Demurrers & Objections > Waiver & Preservation*
[HN5] Waiver is the intentional relinquishment or aban-
donment of a known right.

*Contracts Law > Defenses > Equitable Estoppel > General Overview*

[HN6] Parties claiming equitable estoppel must establish that: (1) a representation of fact was made to them; (2) upon which they had a right to rely; and (3) the denial of the represented fact by the party making the representation would result in injury to the relying party.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*

[HN7] A bankruptcy court should examine four factors in deciding whether to approve or disapprove a settlement. These factors are: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.

**COUNSEL:** Jonathan I. Rabinowitz (ARGUED), Henry M. Karwowski, Rabinowitz, Trenk, Lubetkin & Tully, P.C., West Orange, N.J., Attorneys for Appellant, Fry's Metals, Inc.

Lawrence K. Lesnick (ARGUED), Ravin Greenberg P.C., Roseland, N.J., Attorney for Appellee, RFE Industries, Inc.

**JUDGES:** Before: SLOVITER, NYGAARD, and CUDAHY, * Circuit Judges.

    * Hon. Richard D. Cudahy, United States Court of Appeals for the Seventh Circuit, sitting by designation.

**OPINION BY:** Richard D. Cudahy

**OPINION**

    [*162]   OPINION OF THE COURT

Cudahy, Circuit Judge.

Fry's Metals, Inc. (Fry's) appeals from the judgment of the district court affirming the order of the bankruptcy court, which denied approval of a settlement between Fry's and the former Trustee of RFE. We vacate and remand.

I.

    On August 19, 1997, RFE Industries, Inc. (Debtor or RFE) voluntarily filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. On September 8, 1997, RFE received authorization to sell its MFE Division, which processes and refines metals, to Anton Noll, Inc. (Anton).   [**2]   Anton agreed to make an up-front payment of approximately $ 400,000 and to pay "royalties" to RFE for three years. RFE expected the royalty payments to be, at a minimum, about $ 360,000 per year.

    On November 10, 1997, John J. Gibbons was appointed as Chapter 11 Trustee for Debtor's estate because of allegations of "fraud or gross mismanagement of the affairs of the Debtor by current management." On February 13, 1998, Anton agreed to sell the MFE assets to Fry's and Westbury Alloys, Inc. (now Sparfven & Company, Inc. or Sparfven) for at least $ 950,000. After the sale, Anton failed to remit any royalty to RFE, so Gibbons sued Anton, Sparfven and Fry's for breach of contract and certain state torts. After discovery, Gibbons and Fry's agreed to a settlement of the estate's claims against Fry's (the Settlement). The estate's claims against Anton and Sparfven are unaffected by the Settlement.

    Meanwhile, because RFE was successful in challenging some claims by its creditors and in settling other claims, RFE was able to pay all its creditors in full. Thus, Gibbons and RFE moved to dismiss the bankruptcy case. Fry's then objected, however, that the Settlement had not yet been approved by [**3]   the bankruptcy court. To satisfy Fry's objections, the Dismissal Order stipulated that the bankruptcy court would retain limited jurisdiction to "enforce and consummate a previously agreed-upon settlement between some of the parties thereto."

    [*163]   Notice of the Settlement was then sent to all parties and a hearing date was set. At the hearing, Gibbons and Fry's moved for approval of the Settlement. RFE objected. The bankruptcy court initially approved the Settlement, holding that RFE had waived any objections to it. Later, developing some doubts about whether RFE had actually waived its right to object to the Settlement, the bankruptcy court asked the parties to file supplemental briefs on that issue. After another hearing, the bankruptcy court vacated its prior order and entered an order denying approval of the Settlement. On July 18, 2000, the district court entered an order affirming the bankruptcy court's order. Fry's appeals.

II.

    This Court has jurisdiction under 28 U.S.C. § 1291. [HN1] This Court exercises plenary review of a district court's decision in a bankruptcy matter.  In re Gi Nam, 273 F.3d 281, 285 (3d Cir. 2001).

    A.

    The Dismissal Order [**4]   of RFE's bankruptcy case provides: "Notwithstanding the entry of this order, this Court shall retain jurisdiction of the pending adversary proceeding captioned John J. Gibbons, Trustee v.

283 F.3d 159, *; 2002 U.S. App. LEXIS 3676, **;
47 Collier Bankr. Cas. 2d (MB) 1609; 39 Bankr. Ct. Dec. 54

Anton Noll, Inc., Fry's Metals, Inc. v. Sparfven & Company., Inc. et al, adversary proceeding number 99-2331 to enforce and consummate a previously agreed-upon settlement between some of the parties thereto." Fry's argues that the Dismissal Order specifically limited the jurisdiction of the bankruptcy court to the enforcement and consummation of the Settlement. Hence, Fry's argues that the bankruptcy court had no jurisdiction to review the merits of the Settlement. Here, we review whether a bankruptcy court has subject-matter jurisdiction de novo.

All parties agree that the bankruptcy court has jurisdiction over the Settlement despite the case's being dismissed. Fry's merely seeks to narrow the jurisdiction of the bankruptcy court to the enforcement and consummation of the Settlement. In this connection, [HN2] Federal Rule of Bankruptcy Procedure 9019(a) provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019 (1993) [**5] (emphasis added). We note particularly that the Bankruptcy Code uses the word "may" and not "must." Thus, the bankruptcy court's jurisdiction includes the power to disapprove a settlement. Allowing dismissal orders to narrow the authority of the bankruptcy court in the circumstances presented here would deny the bankruptcy court power to consider such matters as possible collusion between trustees and third-parties. Hence, in the interest of preserving a meaningful level of review, we hold that the bankruptcy court had power to disapprove (as well as to approve) the Settlement. The standard of review that the bankruptcy court must apply in approving or in disapproving a settlement is a matter we will discuss below.

B.

Gibbons, the Trustee, and Fry's entered into a settlement of the estate's claims against Fry's. Because RFE did not participate in the Settlement, Fry's argues that RFE had no standing to object to the Settlement. We review the issue of standing de novo.

[HN3] In order for a settlement to be approved by the bankruptcy court, Federal Rule of Bankruptcy Procedure 9019(a) provides that "notice [of the settlement] shall be given to creditors, the United [*164] States trustee, the [**6] debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019 (1993) (emphasis added). It is implicit in the debtor's being given notice in this fashion that the debtor may object to a proposed settlement. Further, in this case, the party most clearly adversely affected by the Settlement (and perhaps, since there are no creditors, the only party adversely affected by the Settlement) is RFE. Therefore, RFE has standing to object to the Settlement even though it was not a party to the Settlement.

C.

Gibbons and RFE moved to dismiss RFE's bankruptcy case because RFE's creditors had been paid in full. Due to Fry's objections, RFE included in its proposed Dismissal Order the language about the bankruptcy court's retention of jurisdiction over the Settlement. Thus, Fry's argues that RFE, by agreeing to this restrictive language, waived its right to object to the Settlement or should be equitably estopped from objecting to the Settlement. [HN4] The issues of waiver and estoppel are reviewed de novo, although the bankruptcy court's findings of fact are accepted unless clearly erroneous. See In re New Valley Corp., 89 F.3d 143, 148 (3d Cir. 1996). [**7]

[HN5] Waiver is the "intentional relinquishment or abandonment of a known right." United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 282 (3d Cir. 1999) (internal quotations and citations omitted). Fry's argues that RFE waived its rights to object to the Settlement when RFE proposed the language in the Dismissal Order that provided for the retention of what could be construed as limited jurisdiction by the bankruptcy court. However, the bankruptcy court found that RFE had not waived its rights. Because the language of the Settlement had not been disclosed to third parties, including the Debtor, RFE had no idea what the Settlement entailed. RFE therefore could not have intentionally relinquished a known right when it did not know what it was relinquishing.

Fry's also argues that RFE should be equitably estopped from objecting to the Settlement. [HN6] "Parties claiming equitable estoppel must establish that (1) a representation of fact was made to them, (2) upon which they had a right to rely, and (3) the denial of the represented fact by the party making the representation would result in injury to the relying party." Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153, 162-163 (3d Cir. 1987). [**8] Fry's claims that, when RFE proposed the language in the Dismissal Order, RFE represented that it would not object to the Settlement. If Fry's had known that RFE would object to the Settlement, Fry's now claims that it would not have agreed to the dismissal of the bankruptcy case. Thus, Fry's seek to estop RFE from objecting to the Settlement. Fry's argument is unpersuasive. First, even if the bankruptcy case had not been dismissed, RFE would still have been able to make objections at a hearing on the Settlement. More importantly, RFE could not (and likely did not) make the representation that Fry's alleges that it made. As previously noted, the Dismissal Order gave the bankruptcy court apparently limited jurisdiction to "enforce and consummate" the Settlement. But because the power of the bankruptcy court cannot be narrowed by the Dismissal Order, that

283 F.3d 159, *; 2002 U.S. App. LEXIS 3676, **;
47 Collier Bankr. Cas. 2d (MB) 1609; 39 Bankr. Ct. Dec. 54

order can only be read to permit the enforcement of a properly approved Settlement. Proper approval of a settlement requires that the Debtor have an opportunity to make any [*165] objections to the settlement. RFE had not had any opportunity to make such objections to the Settlement. Further, the language in the Dismissal Order does not plainly [**9] state that RFE was waiving any such opportunity. Therefore, RFE's proposal of the language in the Dismissal Order was not a representation by RFE that it would not object to the Settlement.

Thus, we hold that RFE had not waived its right to object to the Settlement and is not estopped from objecting to the Settlement.

D.

Turning to the merits, Fry's urges this Court to approve the Settlement in light of In re Martin, 91 F.3d 389, 393 (3d Cir. 1996), or, in the alternative, remand to the bankruptcy court for an analysis of the settlement under the Martin factors. We review de novo whether the bankruptcy court should have analyzed the Settlement under the Martin analysis.

In Martin, we held that [HN7] a bankruptcy court should examine four factors in deciding whether to approve or disapprove a settlement. See Martin, 91 F.3d at 393. These factors are: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. See id.

Here, the bankruptcy court did not make any findings [**10] of fact on these four issues. Rather, it disapproved the Settlement on the grounds that RFE had not waived its objection to it, and the bankruptcy case no longer existed. However, these grounds are insufficient under Martin and cannot support the approval or the dis-

approval of a settlement. For example, the failure to waive objections to the Settlement goes to the question of standing or the existence of affirmative defenses, not to the reasonableness of the Settlement. Similarly, the dismissal of the bankruptcy case goes to the question of the jurisdiction of the bankruptcy court, not to whether the Settlement should be approved or disapproved. We agree with Fry's that the bankruptcy court should have examined the Settlement under the Martin framework. Here, the bankruptcy court retained jurisdiction over an unresolved matter of RFE's bankruptcy case--the approval or disapproval of the Settlement. Because the bankruptcy case is still ongoing as to that matter, the bankruptcy court must examine the Settlement using the Martin analysis. Hence, we remand for an examination of the "fairness, reasonableness and adequacy" of the Settlement in light of the factors listed in Martin. In re Glickman, Berkovitz, Levinson & Weiner, P.C., 204 B.R. 450, 455 (E.D. Pa. 1997). [**11] Because the situation has changed drastically since Gibbons first negotiated the Settlement, the bankruptcy court should examine the Martin factors in light of the present circumstances. For example, since there are no creditors involved, the fourth factor in Martin test will need to be modified. Substituting the paramount interest of the shareholders of RFE for the paramount interest of the creditors appears to be consistent with the purpose of the Martin test--to maximize the recovery of those to whom the company has obligations. The judgment of the former Trustee, Gibbons, is also entitled to less deference since RFE is no longer in bankruptcy.

III.

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings.



1 of 1 DOCUMENT

**INSTITUTE FOR DISABILITIES RESEARCH AND TRAINING, INC., Plaintiff,
v. WAL-MART STORES, INC., Defendant.**

**Civil Action No. 05-176 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 70932*

**September 25, 2007, Decided
September 25, 2007, Filed**

**COUNSEL:** [*1] For Institute for Disabilities Research and Training Inc., a Maryland Corporation, Plaintiff: Patricia Rose Uhlenbrock, LEAD ATTORNEY, Morris James LLP, Wilmington, DE.

For Wal-Mart Stores Inc, a Delaware Corporation, Defendant: Gregory A. Inskip, LEAD ATTORNEY, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Institute for Disabilities Research and Training Inc., a Maryland Corporation, Counter Defendant: Patricia Rose Uhlenbrock, LEAD ATTORNEY, Morris James LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, CHIEF, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On March 22, 2006, the plaintiff, Institute for Disabilities Research and Training, Inc. ("IDRT") filed this contract action against Wal-Mart Stores, Inc. ("Wal-Mart"). On April 24, 2006, the court held a bench trial in the matter. The parties tried essentially two issues: (1) whether the term "Phases" in the contract, i.e. the Development Agreement, between the parties is ambiguous or has a plain meaning; and (2) whether certain of Wal-Mart's submissions to IDRT should be counted as modules. The court subsequently directed the parties to file proposed findings of fact and conclusions of law.

After having considered

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 58 of 589

Page 2
2007 U.S. Dist. LEXIS 70932, *2

[*2] the testimony elicited during the trial and the arguments presented in the parties' submissions on the issues, the court concludes that the term "Phases" as used in the Development Agreement has a plain meaning, namely that "Phases" are determined by the number of CBL Modules submitted by Wal-Mart. The court further concludes that Wal-Mart submitted a total of 149 modules for Phases I and II, and IDRT, therefore, is entitled to recover additional compensation for Phase II based on the "Phase Contract Price," reduced by the $ 28,292.01 credit owed by IDRT to Wal-Mart.

## II. FINDINGS OF FACT

Having considered the testimony and documentary evidence, the court makes the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)*. Prior to trial, the parties submitted an exhibit of uncontested facts in conjunction with their Pretrial Order. (D.I. 41, Ex. A.) The court takes most of its findings of fact from the parties' uncontested facts, supplemented by citation to trial testimony and exhibits that support the uncontested facts. During the bench trial, each party called one witness: IDRT called Dr. Corinne Vinopol ("Dr. Vinopol"), one of its representatives,

[*3] and Wal-Mart called Mr. Brian Poland ("Mr. Poland"), one of its representatives. Much of the testimony adduced by the parties' witnesses is extrinsic evidence. <mark>Because the court finds the contract term "Phases" unambiguous, it need not make findings of fact with respect to the extrinsic evidence adduced at trial regarding the meaning of or parties' intentions as to that term.</mark> The court, however, will make findings of fact based on the extrinsic evidence adduced regarding the "Leadership Lessons," because it finds that the Development Agreement does not define this term, and it must turn to the parties' intentions with respect to whether "Leadership Lessons" are modules.

1. IDRT is incorporated and headquartered in Maryland. IDRT is in the business of providing development, training, and technical assistance to businesses that serve or employ persons with disabilities, particularly persons who are hearing impaired. (Exhibit of Uncontested Facts ("Facts"), at 1.)

2. Wal-Mart is incorporated in Delaware and has its corporate headquarters in Arkansas. Wal-Mart operates retail stores throughout the United States and the world. Wal-Mart hires, engages, and employs thousands of employees as

[*4] part of its trade and business, who are engaged to fulfill numerous jobs, tasks, and positions with Wal-Mart's retail stores. (Id.)

3. In or about 2000 to 2001, the United States Equal Employment Opportunities Commission (the "EEOC") in Arizona filed a complaint against Wal-Mart in the United States District Court for the District of Arizona, alleging violations of the Americans With Disabilities Act (the "ADA"), *42 U.S.C. § 12101, et seq.* At issue was whether Wal-Mart's employment practices in "training" were compliant with the ADA, particularly for those persons whose ability to hear and/or speak was impaired. Wal-Mart provided in-house employee training by a

series of audio-video media presentations, on VHS tapes, CDs, DVDs, and/or digitalized computer-coded files, with the format of the media presentations evolving with technological changes. [1] Regardless of their format, an employee "played" the media presentations at his or her individual site of employment throughout the United States. (Id.)

1   During the time period relevant to this action, the media presentations were being converted to computer-coded files. (Facts, at 1.)

4. The media presentations were created in a series of

2007 U.S. Dist. LEXIS 70932, *5

[*5] subject areas relevant to Wal-Mart's practices and philosophies, for example "Leadership Training." Some subjects, including the "Leadership Training" were broad and, therefore, were broken down into various subtopics, each existing as a separate Module of Training or Computer Based Learning Module ("CBL Module"). During the time period relevant to this action, there existed approximately 260-300 separate individual CBL Modules. The number and content of these CBL Modules was not static, as Wal-Mart continuously revised and developed its in-house training. These CBL Modules became the subject of concern between the EEOC and Wal-Mart, and in turn, the Development Agreement. [2] (Id. at 2.)

2    The Development Agreement (or "Agreement") is the contract at issue in the present case. Both IDRT and Wal-Mart are signatories to the Agreement, which sets forth the parties' rights and obligations with respect to the delivery and conversion of CBL Modules. (See PX 21.)

5. IDRT was introduced to Wal-Mart as a specialist in the area of converting media presentations into a format that could be accessible to the hearing impaired and the deaf by various methods and means. One method and means that IDRT

[*6] employed was to interpret the audio feed of an audio-visual presentation into American Sign Language ("ASL"), film an interpreter "signing" the audio translation and, at the point on the audiovisual display where the respective audio is played, implant a film clip of the respective audio being "signed" as a small visual inset on the display. At Wal-Mart's request, IDRT attended an EEOC meeting in Arizona to help explain this conversion process to the EEOC. (Trial Transcript ("Tr.") at 42-43.) To demonstrate that a converted Wal-Mart CBL Module would satisfy the EEOC, IDRT was contracted through Cognitive Arts ("CA") to convert one of Wal-Mart's Modules as a "demonstration project."

The subject of this CBL Module and its title was "Hazardous Communications." (Facts, at 2; see PX 2; Tr. at 42, 86.)

6. Wal-Mart had an existing relationship with CA, in Chicago, Illinois, which included using CA to transfer Wal-Mart's CBL Modules into digitalized computer-coded files to be uploaded onto computer hard drives. In October-November 2001, CA retained and paid IDRT to complete the translation and conversion of the "Hazardous Communications" CBL Module for Wal-Mart. (See PX 2; Tr. at 42, 86.) The

2007 U.S. Dist. LEXIS 70932, *7

[*7] method and means by which the conversion was accomplished became, for the most part, the method and means for the conversion of each of Wal-Mart's Training Modules under the contract at issue. The method and means for conversion entailed the following: (1) Wal-Mart would send a CD of the CBL Module to IDRT; (2) IDRT would watch and listen to the training lesson, and make suggested changes to both video (including, in some instances, changing text, symbols, and pictorial displays that required ASL explanation or change) and audio content to make it adaptable for interpretation by ASL. (Facts, at 2-3.)

7. To make the conversion more efficient and accurate, Wal-Mart also provided IDRT with a written "script" of the Module. Using the "script" in conjunction with its view of the audiovisual play of the Module, IDRT would modify the "script" to reflect suggested changes and embed a code to reflect the point at which various video clips of signed ASL interpretations should be incorporated into the media display. The explanation, changes, and audio test were translated into ASL which, in turn, was "signed" by a certified ASL interpreter and filmed on digital video media. The "coding system"

[*8] developed by IDRT provided the means by which CA could determine exactly where on the audiovisual media the ASL interpretation was to be imbedded. To insure that the ASL translations would effectively and accurately communicate the CBL Module to a deaf employee, Wal-Mart, IDRT, and CA employed considerable coordinating efforts. (Id. at 3.)

8. IDRT and CA took about two weeks to convert and encode in digital format the "Hazardous Communication" Module. The Module was completed on or about November 13, 2001, and shown by Wal-Mart to the EEOC for its approval. The EEOC approved the conversion of CBL Modules by this process and, based on Wal-Mart's completing the conversion of all its CBL Modules in this way, Wal-Mart, IDRT, and CA began discussing resolving the EEOC complaint by Consent Order. (Id. at 3-4.)

9. The EEOC and Wal-Mart negotiations also involved concerns about deadlines or time requirements for Wal-Mart to complete the conversion process for all of its CBL Modules. (See Tr. at 44-45.) In turn, Wal-Mart developed a timeline to reflect time restrictions to meet the EEOC requirements for complete conversion. That timeline changed from time to time, as the EEOC and Wal-Mart continued

[*9] negotiations. After the EEOC and Wal-Mart completed negotiations, they entered into a Consent Order and implemented a Master ASL Timeline, which became the controlling document, and imposed time requirements to effectuate the conversion process so as to comply with the Consent Order. Ultimately, the Master ASL Timeline was attached to, and made part of, Wal-Mart and IDRT's Development Agreement. (Facts, at 4; see PX 21.)

10. In December 2001, while negotiations with the EEOC to reach the final terms of a Consent Order were still in progress, Wal-Mart requested IDRT to undertake the development of all of its CBL Modules, because it had agreed with the EEOC to begin the conversion

process immediately. (See Tr. 44-45.) Upon Wal-Mart's request, IDRT advised that, fully committed, its staff could convert seven CBL Modules per week. Wal-Mart agreed to have IDRT convert seven CBL Modules per week. (Facts, at 4.)

11. On or about December 15, 2001, Wal-Mart requested IDRT to undertake the project immediately, with the understanding that the parties subsequently would prepare and execute a contract to fully describe the terms and conditions of the undertaking. IDRT agreed. (Id. at 4-5.)

12. The

 [*10] amount of time and effort to develop each CBL Module varied, depending upon the amount of interpretation required which, in turn, was roughly dependent on the number of separate "Screens" of text and audio in each Module that required interpretation. [3] Based on the size of the task, as well as the time and speed requirements with which the conversion process was to be completed, IDRT requested and Wal-Mart agreed to advance $ 50,000. (See PX 21; Tr. at 51.) With these understandings in place, in December 2001, Wal-Mart began forwarding to IDRT various CBL Modules to be developed in accordance with the method and means established by the development of the "Hazardous Communication" Module. (Facts, at 5; Tr. at 48.)

[3]    The initial demonstration Module i.e. "Hazardous Communications" was developed for a flat contract price of $ 6,000. (Facts, at 5; Tr. at 47.)

13. The project continued from December 2001 through March 2002, without a written contract establishing the exact terms and agreements of the parties, including the terms of payment. During this time period, draft contracts were submitted and negotiations between the parties continued to reach the terms and conditions of what was to

[*11] become the final Development Agreement. (See PX 9, 15, 17-19.) The parties settled on a method of compensation that would result in IDRT receiving a payment of $ 266.50 for each "Screen" of visual or audio test on each respective CBL Module. (PX 21, at 9 P 25F(1).) Additionally, because of its substantial dedication of time and resources to the project, IDRT requested assurance of a minimum obligation on the part of Wal-Mart. In March 2002, the parties reached a compromise with respect to the scope and terms of the project. That compromise became the Development Agreement that is at issue in the case. (Facts, at 5; see PX 21.)

14. Generally described, the project was divided into four "Phases." Thirty days before the end of each Phase, Wal-Mart could opt out of the contract. For each Phase, Wal-Mart would be responsible for submitting a minimum number of CBL Modules for development. If it failed to meet the minimum number of CBL Modules per Phase, it would be responsible for the payment of the difference between a "Phase Contract Price" and the "per-Screen" development price for the CBL Modules submitted in the respective Phase when the Development Agreement ended. [4]

4   The "Phase Contract

[*12] Price" was intended, in part, "to compensate IDRT for its engagement and commitment to the development." (PX 21, at 8 P 25B.) The "Phase Contract Price" for each Phase was set as follows: Phase I - $ 1,199,250; Phase II - 799,500; Phase III - 666,250; and Phase IV - 799,500. (Id.)

15. Prior to the end of Phase II, Wal-Mart timely opted out of the Development Agreement. However, IDRT continued development for Training Modules already submitted by Wal-Mart. (Facts, at 6.)

16. On or about January 23, 2003, IDRT submitted what it termed a "Final Invoice" for $ 152,446.57 to Wal-Mart. The amount included what IDRT contended

was due for payment of development work during the Phases, and additional development work after Phase II. The "Final Invoice" was prepared by IDRT's Maryland counsel, Harvey Greenberg, Esquire ("Mr. Greenberg"). After Wal-Mart questioned various items on the "Final Invoice," Mr. Greenberg prepared a "Revised Final Invoice," in the amount of $ 174,229.57, which IDRT submitted to Wal-Mart on February 26, 2003. Wal-Mart did not pay the "Revised Final Invoice," and IDRT subsequently brought this action. (Facts, at 6.)

## II. LEGAL STANDARDS

1. The present case presents issues

[*13] of contract construction and application of the parties' contract to the facts presented. Delaware law applies to the issues presented in the present case. Under Delaware Law, the proper construction of a contract is a question of law. *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1232 (Del. 1997).*

2. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity." *ThoughtWorks, Inc. v. SV Inv. Partners, LLC, 902 A.2d 745, 752 (Del. Ch. 2006)* (quoting *Eagle Indus., 702 A.2d at 1232*)). A court may consider extrinsic or parol evidence "to determine the true meaning of the parties' intent when they entered into the contract" when a contract is ambiguous. *See Eagle Indus. 702 A.2d at 1232.* A contract is ambiguous "[w]hen the provisions in controversy are fairly

[*14] susceptible of different interpretations or may have two or more different meanings." *Id.* In other words, a contract is not ambiguous simply because the parties disagree as to its meaning. *See Harrah's Entm't, Inc. v. JCC Holding Co., 802 A.2d 294, 309 (Del. Ch. 2002).*

## III. CONCLUSIONS OF LAW

1. IDRT contends that it is entitled to more compensation than Wal-Mart has paid, because Wal-Mart delivered insufficient modules in "Phase II" of the Development Agreement. Accordingly, resolution of this dispute requires the court to construe the term "Contract Phases" in the Development Agreement.

2. With respect to the term "Contract Phases," the Development Agreement states the following:

25. Compensation for Development:

A. Contract Phases

(1) The submission of CBL Modules to IDRT as directed by the Master ASL Timeline will be in four (4) phases. The Phases will be determined by the following number of CBL Modules to be submitted to IDRT for development in accordance for the Master ASL Timeline.

| Phase I: | 90 CBL Modules |
|---|---|
| Phase II: | 60 CBL Modules |
| Phase III: | 50 CBL Modules |
| Phase IV: | 60 CBL Modules |

(2) The undertakings and payments provided for in this Agreement shall be performed in the four sequential Phases

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 71 of 589

Page 15
2007 U.S. Dist. LEXIS 70932, *15

[*15] as provided herein. Each Phase shall automatically follow the other, unless either party notifies the other in writing at least 30 days prior to the beginning of the next phase, that they will terminate the Development Agreement at the end of the Phase then in development. In that event, each party is responsible for completing the terms and conditions of this Development Agreement through the Phase during which such notice was given.

(PX 21, at 7 P 25A(1) and (2).)

3. Turning to the Development Agreement, IDRT contends that Phase I ended on March 23, 2002, regardless of how many modules Wal-Mart submitted by that date. As of March 23, 2002, Wal-Mart had submitted 93 modules, or 3 additional modules to those it was required to submit in Phase I. IDRT contends that the 3 additional modules count toward Phase I of the contract because they were submitted before Phase I closed on March 23, 2002. Put another way, IDRT contends that a "Contract Phase[]" incorporates and means the production of Modules in the time periods included in the Master ASL Timeline. Thus, according to IDRT, Phase I began with week one in the Master ASL Timeline and ended with the week ending March 22, 2002.

4. Conversely,

[*16] Wal-Mart asserts that the "Contract Phases" are number-driven, irrespective of Module submission in accordance with the dates in the Master ASL Timeline. Accordingly, Wal-Mart asserts that Phase I ended with its deliver of the 90<th> module to IDRT, during the week ending March 15, 2002. The parties' differing contentions boil down to this: IDRT counts three extra modules in Phase I that Wal-Mart would count in Phase II.

5. After having considered the language of the Development Agreement regarding "Contract Phases," the court concludes that it is unambiguous. Further, the court concludes that the term "Contract Phases" as used

in the Development Agreement means that the Phases are determined by the number of CBL Modules submitted by Wal-Mart. [5] That is, as illustrated above, the Agreement defines "Phase I," "Phase 2," "Phase 3," and "Phase 4" in terms of the number of CBL Modules Wal-Mart was to deliver to IDRT. (PX 21, at 7 P 25A.) The Development Agreement thus limits Phase I to 90 CBL modules. The Agreement further provides that "[e]ach Phase will automatically follow the other." (Id. at P 25A(2).) Thus, Phase II began after Wal-Mart delivered its 90<th> CBL Module to IDRT during

[*17] the week of March 15, 2002.

5   IDRT's Findings of Fact supports the court's conclusion that the term "Contract Phases" is based on the number of modules submitted to IDRT for development. (D.I. 49, at 21 P 81) ("The Final Agreement provided that during each Phase, WM [Wal-Mart] would submit to IDRT a designated Minimum number of Modules in each Phase."). IDRT attempts to qualify the contract language by citing to Dr. Vinopol's testimony regarding what she believed to be the parties' intentions regarding "Contract Phases." IDRT's resort to extrinsic evidence to support its position is unavailing, however, as the court has already determined that the contract is unambiguous. *Eagle Indus., 702 A.2d at 1232.*

6. The court agrees with IDRT that the Development Agreement refers to "Modules to be submitted to IDRT for development in accordance for [sic] the Master ASL Timeline." (Id. at P 25A(1).) The Agreement, however, does not define the Phases with respect to any timeline. [6] Rather, as previously stated, it plainly and unambiguously defines Phases with respect to the number of CBL Modules to be delivered. Therefore, the court concludes that the purpose of including the Master ASL Timeline

[*18] was to guarantee timely performance of the parties' obligations under the Development Agreement, in order to enable Wal-Mart to meet its time constraints in the EEOC litigation. [7]

6    Nor does the Master ASL Timeline that is attached to and incorporated into the Agreement provide a date certain for the end of one Phase and the beginning of the next Phase. In fact, nothing in the Development Agreement or Master ASL Timeline prevented Wal-Mart from delivering the 90<th> module during the week of March 15, 2002, thereby triggering the start of Phase II.

7    IDRT agrees, stating: "The Revised Master ASL Timeline reflected the time and production requirements effectuated by WM [Wal-Mart] in the ASL conversion process for compliance with its U.S. District Court Consent Order." (D.I. 49, at 19 P 68.)

7.   Both Dr. Vinopol and Poland testified that Wal-Mart was under great time pressure due to the EEOC litigation. (Tr. at 44-45) ("The consent decree placed Wal-Mart in a very difficult situation of having to get these modules rolled out very quickly. And[,] there was a very tight timeline for doing this. And[,] they had many to do. So they wanted us to begin immediately."); (id. at 118.) Further, the

[*19] Development Agreement provides that a party would be in breach if it failed "to perform its undertaking within 10 business days of the dates specified in the Timeline." (PX 21 at 10 P 25F(3).) Thus, the Master ASL Timeline was also included for the purpose of determining a breach of contract. The Development Agreement, however, provides no penalty for early performance, such as Wal-Mart's early delivery of CBL Modules to IDRT.

8. Based on the foregoing, the court concludes that "Phase I" of the Development Agreement ended when Wal-Mart delivered its 90<th> module to IDRT, and "Phase II" automatically followed. Having made its

determination with respect to construction of the Development Agreement, the issue before the court is whether Wal-Mart delivered at least 150 modules -- 90 for Phase I and 60 for Phase II -- to IDRT by the end of Phase II. If Wal-Mart failed to meet its obligations under the contract as construed by the court, IDRT is entitled to compensation based on the "Phase Contract Price" for Phase II.

9. Wal-Mart contends that it delivered a total of 160 CBL Modules to IDRT for development from the outset of the relationship through May 31, 2002. Breaking the modules down

[*20] into Phases, Wal-Mart contends that it delivered 90 CBL Modules in Phase I and 70 CBL Modules in Phase II. Conversely, IDRT contends that Wal-Mart delivered a total of 144 CBL Modules, which (according to the court's construction of the Development Agreement) would amount to 90 Modules in Phase I and 54 Modules in Phase II. Thus, IDRT contends that it is owed the difference between the Phase Contract Price and the payments for per-screen charges for the CBL Modules already submitted in Phase II, because of the six outstanding CBL Modules. There are two discrepancies in the parties' respective CBL Module counts: (1) Wal-Mart counts 6 CBL Modules that IDRT does not count, namely Hazardous Communications, Firearms Procedures (Basic), and four TAPS Modules; and (2) Wal-Mart counts 15 "Leadership Lessons" as separate CBL Modules, while IDRT counts the lessons as 3 batches of CBL Modules. The court addresses these two discrepancies in turn.

10. The court first turns to the Hazardous Communications Module that IDRT developed through a Consulting Agreement with Cognitive Arts. (PX 2.) Wal-Mart contends that the Hazardous Communications Module falls within the plain language of the contract,

[*21] which states: "This Agreement will include all work involved in the parties' undertakings that began before the date of the Agreement and was in contemplation of this Agreement." (PX 21, at 1 P 3.) The court disagrees and finds that the work relating to the Hazardous Communications module was not done in contemplation of the Agreement but, rather, to demonstrate to the EEOC that Wal-Mart could comply with the Consent Order from the district court in Arizona. The contract for developing the Hazardous Communications Module was between IDRT and Cognitive Arts. (See PX 2.) After developing the Module, IDRT sent an invoice for payment to Cognitive Arts, and Cognitive Arts paid for the services. (Id. at 3-6.) Wal-Mart then demonstrated the Hazardous Communications video to the EEOC attorney, who approved it under the consent decree. (Tr. at 43.) After the demonstration, Wal-Mart and IDRT began contract negotiations. (Id. at 43-44; PX 3.)

11. Moreover, as previously mentioned, the Development Agreement was signed by IDRT and Wal-Mart on March 24, 2002, and March 28, 2002, respectively. Prior to signing the final Development Agreement, and during the process of negotiating a final agreement,

[*22] IDRT began work to incorporate ASL into Wal-Mart's CBL Modules. By the time the parties signed the final Development agreement, Phase I had ended and Phase II had begun. Therefore, the court concludes that "in contemplation of this Agreement," as used in the introductory paragraphs of the Development Agreement, means the work initiated by IDRT after the parties had demonstrated the Hazardous Communications Module to the EEOC, but before the parties had signed the final Development Agreement. As such, the Hazardous Communications Module is not part of the Phase I or Phase II CBL Modules contemplated by the Development Agreement.

12. The court now turns to the four TAPS Modules. Wal-Mart's Record of Deliverables (DX 1) indicates that the four TAPS Module scripts were sent to IDRT in the week ending on May 31, 2002. (DX 1, at 2.) IDRT's "Revised Final Invoice" (PX 31) indicates that the scripts were received on June 1, 2002, after the closing date for Phase II. Wal-Mart points to Dr. Vinopol's testimony as support for its position that the TAPS Modules are to be included in the Phase II CBL Module calculation. Dr. Vinopol's testimony, however, is inapposite. She did not testify that she

[*23] received the CBL Module scripts on May 31, 2002. Rather, she testified "yes" in responding to this question: "Did there come a time *on or about May 31, 2002,* that you received the scripts for some modules called TAPS?" (Tr. at 75) (emphasis added). Dr. Vinopol's simple answer of "yes" to a question that did not pinpoint the exact date on which the scripts were received does not lend credence to Wal-Mart's position. Nor does Wal-Mart's assertion that it did not matter whether the scripts were delivered on May 31, 2002 or June 1, 2002, because IDRT was not inconvenienced. The court does not look to whether one party was inconvenienced when determining if contractual

obligations were met. [8]

[8]    Additionally, Wal-Mart's contention that time was not of the essence is not well-received by the court. The Development Agreement repeatedly states that the parties will comply with their undertakings in accordance with the Master ASL Timeline, which was incorporated into the Agreement. (PX 21 PP 20, 21, 23, 25F(4)). Moreover, the testimony adduced at trial, and cited by Wal-Mart in its Proposed Conclusions of Law, demonstrates that the timeline was very tight, because Wal-Mart had a limited amount

[*24] of time in which to comply with the consent decree. (See D.I. 48, at 9 P 4; Tr. at 44-45; 75; 118.) As such, the court completely discounts Wal-Mart's argument as to time constraints.

13. Here, the parties agree that the date certain for Phase II closing was May 31, 2002 -- the date by which Wal-Mart was to deliver the 60<th> CBL Module. [9] IDRT's records reflect that it did not receive the TAPS Modules until June 1, 2002. Thus, the TAPS Modules were not properly submitted by Wal-Mart before the termination of the Development Agreement at the close of Phase II. Nevertheless, the Agreement provides a 10 day grace period for Phase Module fulfillment. (PX 21, at 10 P 25F(4).) In the present case, IDRT concedes that Wal-Mart provided the four TAPS Modules by June 3, 2002. (PX 31, at 14; Tr. at 75.) Pursuant to the terms of the Development Agreement, Wal-Mart had until June 10, 2002, to fulfill its module obligations. Accordingly, the court concludes that the four TAPS Modules count toward the 60 modules that Wal-Mart had to submit before the close of Phase II.

[9]     That is not to say that Wal-Mart was prohibited from delivering its 60<th> module earlier, thereby triggering the closing of Phase

[*25] II at an earlier date.

14. The court next turns to the Firearms Procedures: Basic Module. IDRT contends that it listed "Firearms Procedures: Basic" as a "Module" only for record-keeping purposes, and that it "was not a separate module, but a component" of other CBL Modules. (PX 31, at 10 n.3.) IDRT, however, points to no contractual or factual basis for its conclusion. In fact, IDRT seems to concede this point in its Proposed Findings of Fact and Conclusions of Law. (D.I. 49, at 32 P 13) ("The 'screens' included in an item identified as 'Firearms Pro Basic' will be considered a separate Module; and that Module was submitted in Phase II, increasing the number of Modules submitted in Phase II to 52."). Seeing no disagreement between the parties as to the "Firearms Procedures: Basic" Module, the court finds that it is included in Wal-Mart's Phase II CBL Module submissions to IDRT.

15. The court has determined that the "Hazardous Communications" Module does not qualify as a CBL Module submitted by Wal-Mart pursuant to the Development Agreement. The court has also determined that the four TAPS Modules and the "Firearms Procedures: Basic" do qualify as Phase II CBL Modules. Adding the five

[*26] modules to the 144 that IDRT counts, yields a subtotal 149 modules delivered by Wal-Mart for Phases I and II. The court now addresses the parties discrepancies with respect to the "Leadership Lessons."

16. The parties views as to whether the "Leadership Lessons" count as "CBL Modules" under the Development Agreement greatly differ. Wal-Mart contends that the "Leadership Lessons" are individual CBL Modules, whereas IDRT contends that the 15 lessons count collectively as three CBL Modules or batches. (See PX 38, PX 40-42.)

17. The Development Agreement does not define or contain any reference to "Leadership Lessons." Accordingly, the court looks to the conduct of the parties to determine whether the "Leadership Lessons" should each be counted as a CBL Module, and concludes that they should be counted collectively as three CBL Modules, [10] not as individual CBL Modules. Dr. Vinopol testified that the "Leadership Lessons" were text not Modules, and that "[t]hey didn't look like anything . . . we [IDRT] had been doing." (Tr. at 64.) She further testified that she spoke with Mr. Poland, who told her that the "Leadership Lessons" were "extra materials that accompanied the Learning to [L]ead

[*27] modules." (Id. at 64, 68, 70, 114.)

> 10    The three Modules were included in IDRT's count of 93 CBL Modules for Phase I. As such, the court does not count them a second time.

18. Dr. Vinopol received three CDs containing the "Leadership Lessons" material and testified that Mr. Poland told her to break them down into three batches. (Id. at 67-68.) Further, the invoices for the completion of the three sets of "Leadership Lessons" show that IDRT identified them as three batches of five lessons each. (PX 33, at 211, 216.) Wal-Mart paid the invoice without objecting to the identification of "Leadership Lessons" as "batches." (Tr. at 73.) Finally, Dr. Vinopol testified that Scott Winn ("Mr. Winn"), a Wal-Mart representative that was working on the project, asked her to prepare a memorandum regarding the fact that the Learning to Lead Modules had never been submitted to IDRT. (Id. at 114.) Dr. Vinopol memorialized her discussion with Mr. Winn in an e-mail, which states "[d]uring the meeting, you . . . alerted . . . me to the fact that the files that were sent to IDRT for the 'Learning to Lead' CBLs were not the module scripts at all." (PX 26.) This evidence demonstrates to the court that the parties

[*28] had an understanding that the "Leadership Lessons" were extra or supplementary materials that were to be identified as three CBL Modules for purposes of the parties' undertakings. Thus, the court will not count each "Leadership Lesson" as a separate CBL Module.

## IV. CONCLUSION

1. IDRT counts 144 modules delivered by Wal-Mart in Phases I and II of the Development Agreement. The court concludes that IDRT's count incorrectly omits five modules -- Firearms Procedures: Basic and four TAPS Modules. Adding these five modules to IDRT's count yields a total of 149 modules submitted by Wal-Mart

during Phases I and II of the Development Agreement. As such, Wal-Mart did not meet its obligation under the Agreement of delivering 150 modules during Phases I and II, and the court concludes that IDRT is entitled to additional compensation for Phase II based on the "Phase Contract Price."

2. The parties have stipulated that several smaller amounts, credits, and adjustments owed by one or the other party are summed and netted out to result in a credit of $ 28,292.01 owed by IDRT to Wal-Mart. (D.I. 47.) The parties also have stipulated that the $ 28,292.01 credit shall be set off against any amount that Wal-Mart

[*29] owes to IDRT. (Id.) Accordingly, the court concludes that IDRT is entitled to recover additional compensation for Phase II based on the "Phase Contract Price," reduced by the $ 28,292.01 credit owed by IDRT to Wal-Mart.

Dated: September 25, 2007

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The clerk of court shall enter judgment in favor of the plaintiff, IDRT, and against the defendant, Wal-Mart, on IDRT's contract claim.

Dated: September 25, 2007

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

2007 SCC 55
Supreme Court of Canada

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate

2007 CarswellOnt 8195, 2007 CarswellOnt 8196, 2007 SCC 55, [2007] 3 S.C.R. 679, [2007] S.C.J. No. 55, 232 O.A.C. 385, 289 D.L.R. (4th) 385, 369 N.R. 329, 39 B.L.R. (4th) 163, 92 O.R. (3d) 798 (note), J.E. 2008-56

# Jedfro Investments (U.S.A.) Limited and Elsie Iwasykiw, in her capacity as Litigation Administrator for the estate of Morris Iwasykiw (Appellants) and Nadia Jacyk, in her capacity as Litigation Administrator for the estate of Peter Jacyk, Prombank Investment Limited, Prombank International (U.S.A.) Limited, Louis V. Matukas and Gramat Investments (U.S.A.) Limited (Respondents)

McLachlin C.J.C., Bastarache, Binnie, LeBel, Deschamps, Charron, Rothstein JJ.

Heard: October 11, 2007
Judgment: December 20, 2007
Docket: 31561

Proceedings: affirming *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2006), 18 B.L.R. (4th) 8, (sub nom. *Jedfro Investments (U.S.A.) Ltd. v. Jacyk (Litigation Administrator of)*) 80 O.R. (3d) 533, 210 O.A.C. 153, 2006 CarswellOnt 3010 (Ont. C.A.); affirming *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2005), 2005 CarswellOnt 535, 2 B.L.R. (4th) 151 (Ont. S.C.J.)

Counsel: James C. Orr, Kenneth A. Dekker for Appellants
Benjamin Zarnett, Julie Rosenthal for Respondents, Nadia Jacyk, in her capacity as Litigation Administrator for the estate of Peter Jacyk, Prombank Investment Limited, Prombank International (U.S.A.) Limited
Andrew J. Macdonald for Respondents, Louis V. Matukas, Gramat Investments (U.S.A.) Limited

Subject: Contracts

### Headnote

**Contracts --- Discharge — Cancellation — By agreement of parties**

Three investors entered into joint venture agreement to purchase, develop, and sell property in US — Investors operated through their companies, J Ltd., P Ltd., and G Ltd. — Property was purchased with cash payment and promissory note — Investors were unable to meet payment obligations and promissory note became due — As J Ltd. and G Ltd. were unable to make payments, P Ltd. arranged to pay debts of all investors by assigning note to new corporation — P Ltd. agreed to assume G Ltd.'s liability in exchange for certain terms, including foregoing 35 percent profit participation — Property was foreclosed upon, unopposed by P Ltd. and G Ltd. — Principals of P Ltd. and G Ltd. ultimately entered into new arrangement for developing land — J Ltd. lost its investment — J Ltd. and its principal commenced action against P Ltd. and G Ltd. and their principals for breach of joint venture agreement and related relief — Trial judge dismissed action, holding that none of parties had relied upon provision of joint venture agreement — Trial judge held that by failing to make deal with P Ltd., J Ltd. was author of its own misfortune since J Ltd. knew of consequences of foreclosure, but failed to take steps to preserve its interest — Trial judge found that it was not reasonable under circumstances for J Ltd. having reached no agreement with P Ltd. to think its interest in joint venture lands was protected — Appeal was dismissed on basis that none of parties had relied on joint venture agreement — Pursuing strategy of self-interest, J Ltd. failed to object to plan to foreclose — Court of appeal stated that when parties acted in way that shows that they do not intend to comply with or be bound by terms of written agreement, one party cannot later ask to have agreement enforced for its benefit — J Ltd. and principal appealed — Appeal dismissed — Joint venture agreement was not terminated and remained in force — Parties did not reach new agreement to terminate joint venture agreement — P Ltd. concluded new agreement with G

Ltd., but no new agreement was ever concluded with J Ltd. — While both trial and appeal courts referred to intention of parties not to be bound by joint venture agreement after crisis precipitated by demand on promissory note, facts did not support finding of consensus necessary for new contract — Finding of trial judge that none of parties acted as though they were bound by joint venture agreement after note became payable did not end obligations under that agreement.

## Contracts --- Discharge — Right to rescind after repudiation — What constitutes repudiation

Three investors entered into joint venture agreement to purchase, develop, and sell property in US — Investors operated through their companies, J Ltd., P Ltd., and G Ltd. — Property was purchased with cash payment and promissory note — Investors were unable to meet payment obligations and promissory note became due — As J Ltd. and G Ltd. were unable to make payments, P Ltd. arranged to pay debts of all investors by assigning note to new corporation — P Ltd. agreed to assume G Ltd.'s liability in exchange for certain terms, including foregoing 35 percent profit participation — Property was foreclosed upon, unopposed by P Ltd. and G Ltd. — Principals of P Ltd. and G Ltd. ultimately entered into new arrangement for developing land — J Ltd. lost its investment — J Ltd. and its principal commenced action against P Ltd. and G Ltd. and their principals for breach of joint venture agreement and related relief — Trial judge dismissed action, holding that none of parties had relied upon provision of joint venture agreement — Trial judge held that by failing to make deal with P Ltd., J Ltd. was author of its own misfortune — J Ltd. knew of consequences of foreclosure, but did not take steps to preserve its interest — Trial judge found that it was not reasonable under circumstances for J Ltd. having reached no agreement with P Ltd. to think its interest in joint venture lands was protected — Appeal was dismissed on basis that none of parties had relied on joint venture agreement — Pursuing strategy of self-interest, J Ltd. failed to object to plan to foreclose — Court of appeal stated that when parties acted in way that shows that they do not intend to comply with or be bound by terms of written agreement, one party cannot later ask to have agreement enforced for its benefit — J Ltd. and principal appealed — Appeal dismissed — Joint venture agreement was not terminated and remained in force — Failure to pay did not constitute repudiation — J Ltd.'s refusal to pay did not amount to an intention to no longer be bound by agreement — Although J Ltd. could not or did not wish to comply with his obligations regarding note, evidence demonstrated that it wanted to keep joint venture agreement on foot — Having "little regard" for agreement does not establish that party is repudiating agreement.

## Contracts --- Performance or breach — General principles

Three investors entered into joint venture agreement to purchase, develop, and sell property in US — Investors operated through their companies, J Ltd., P Ltd., and G Ltd. — Property was purchased with cash payment and promissory note — Investors were unable to meet payment obligations and promissory note became due — As J Ltd. and G Ltd. were unable to make payments, P Ltd. arranged to pay debts of all investors by assigning note to new corporation — P Ltd. agreed to assume G Ltd.'s liability in exchange for certain terms, including foregoing 35 percent profit participation — Property was foreclosed upon, unopposed by P Ltd. and G Ltd. — Principals of P Ltd. and G Ltd. ultimately entered into new arrangement for developing land — J Ltd. lost its investment — J Ltd. and its principal commenced action against P Ltd. and G Ltd. and their principals for breach of joint venture agreement and related relief — Trial judge dismissed action, holding that none of parties had relied upon provision of joint venture agreement — Trial judge held that by failing to make deal with P Ltd., J Ltd. was author of its own misfortune — J Ltd. knew of consequences of foreclosure, but did not take steps to preserve its interest — Trial judge found that it was not reasonable under circumstances for J Ltd. having reached no agreement with P Ltd. to think its interest in joint venture lands was protected — Appeal was dismissed on basis that none of parties had relied on joint venture agreement — Pursuing strategy of self-interest, J Ltd. failed to object to plan to foreclose — Court of appeal stated that when parties acted in way that shows that they do not intend to comply with or be bound by terms of written agreement, one party cannot later ask to have agreement enforced for its benefit — J Ltd. and principal appealed — Appeal dismissed — Joint venture agreement was not terminated and remained in force — Having put J Ltd. and G Ltd. on notice that they were in default of their obligations on note, P Ltd. was entitled as only non-defaulting member, to act unilaterally to avoid foreclosure — P Ltd.'s foreclosure did not constitute breach of joint venture agreement — P Ltd. was simply exercising its legal rights under note that had been assigned to it — J Ltd.'s failure to pay its share owing on note removed need for consent under agreement — J Ltd. and its principal were not entitled to their initial investment as these monies were forfeited by P Ltd.'s disclosure — J Ltd. and its principal gambled that P

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14394-1 Filed 09/10/14 Page 88 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195...

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

Ltd. would not foreclose and lost — There was no legal basis upon which this court could revive that interest and hold that investment must be returned.

## Contracts --- Remedies for breach — Recovery of money paid under contract

Three investors entered into joint venture agreement to purchase, develop, and sell property in US — Investors operated through their companies, J Ltd., P Ltd., and G Ltd. — Property was purchased with cash payment and promissory note — Investors were unable to meet payment obligations and promissory note became due — As J Ltd. and G Ltd. were unable to make payments, P Ltd. arranged to pay debts of all investors by assigning note to new corporation — P Ltd. agreed to assume G Ltd.'s liability in exchange for certain terms, including foregoing 35 percent profit participation — Property was foreclosed upon, unopposed by P Ltd. and G Ltd. — Principals of P Ltd. and G Ltd. ultimately entered into new arrangement for developing land — J Ltd. lost its investment — J Ltd. and its principal commenced action against P Ltd. and G Ltd. and their principals for breach of joint venture agreement and related relief — Trial judge dismissed action, holding that none of parties had relied upon provision of joint venture agreement — Trial judge held that by failing to make deal with P Ltd., J Ltd. was author of its own misfortune — J Ltd. knew of consequences of foreclosure, but did not take steps to preserve its interest — Trial judge found that it was not reasonable under circumstances for J Ltd. having reached no agreement with P Ltd. to think its interest in joint venture lands was protected — Appeal was dismissed on basis that none of parties had relied on joint venture agreement — Pursuing strategy of self-interest, J Ltd. failed to object to plan to foreclose — Court of appeal stated that when parties acted in way that shows that they do not intend to comply with or be bound by terms of written agreement, one party cannot later ask to have agreement enforced for its benefit — J Ltd. and principal appealed — Appeal dismissed — Doctrine of unjust enrichment did not apply and J Ltd. and its principal were not entitled to return of their initial investment — P Ltd. and G Ltd. enjoyed benefit of J Ltd.'s investment money and J Ltd. suffered uncompensated loss of those funds when foreclosure occurred — Foreclosure proceedings provided juristic reason for enrichment — It was operation of statutory regime surrounding foreclosures that led to J Ltd.'s "deprivation" — Foreclosure proceedings were known and procedurally fair consequence of not paying amount due — J Ltd. chose not to pay and suffered consequence — J Ltd. could not now seek return of money on basis of unjust enrichment — Parties voluntarily contracted to invest money without providing for any right to have money repaid under circumstances that eventually arose.

## Contrats --- Libération — Annulation — Par le consentement des parties

Trois investisseurs ont conclu un accord de coentreprise pour l'achat, l'aménagement et la vente d'une propriété aux États-Unis — Investisseurs ont agi par l'entremise de leurs sociétés J Ltd, P Ltd et G Ltd — Propriété a été achetée en comptant et au moyen d'un billet — Investisseurs se sont trouvés dans l'impossibilité de respecter leurs obligations de paiement et le billet est devenu exigible — Comme ni J Ltd ni G Ltd n'étaient en mesure de rassembler les fonds requis pour payer leurs parts respectives, P Ltd a offert d'avancer des fonds pour les autres investisseurs en cédant le billet à une autre société — P Ltd a accepté de prendre en charge les obligations de G Ltd sous certaines conditions, y compris l'obtention d'une participation aux profits de l'ordre de 35% — Propriété a fait l'objet d'une forclusion, sans que P Ltd ou G Ltd ne s'y opposait — Commettants de P Ltd et de G Ltd ont éventuellement conclu une nouvelle entente afin de développer les terrains — J Ltd a perdu son investissement — J Ltd et son commettant ont institué une action à l'encontre de P Ltd et G Ltd et leurs commettants respectifs pour violation de l'accord de coentreprise et ont demandé réparation — Juge de première instance a rejeté l'action, concluant qu'aucune des parties n'avait invoqué les dispositions de l'accord de coentreprise — Juge de première instance a estimé que, en omettant de s'entendre avec P Ltd, J Ltd avait été l'artisan de son propre malheur puisque J Ltd connaissait les conséquences de la forclusion mais n'a rien fait pour protéger sa participation — Selon la juge de première instance, il n'était pas raisonnable dans les circonstances que, après avoir omis de s'entendre avec P Ltd, J Ltd croie que sa participation dans les terrains de la coentreprise était protégée — Appel interjeté par J Ltd a été rejeté au motif qu'aucune des parties n'avait invoqué l'accord de coentreprise — Mû par son intérêt personnel, J Ltd ne s'est pas objecté au projet de forclusion — Cour d'appel a affirmé que, lorsque des parties adoptent un comportement démontrant qu'elles ne comptent pas se conformer ou être assujetties aux modalités de l'accord écrit, l'une d'elles ne peut pas, par la suite, demander que l'accord soit exécuté à son profit — J Ltd et son commettant ont formé un pourvoi — Pourvoi rejeté — Accord de coentreprise n'avait pas été résilié et tenait toujours — Parties n'avaient pas résilié l'accord de coentreprise

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

au nouvel nouvel accord — P Ltd a conclu un nouvel accord avec G Ltd mais aucun nouvel accord n'a jamais été conclu avec J Ltd — Bien que les tribunaux de première instance et d'appel ont touts deux évoqué l'intention des parties de ne pas être liées par l'accord de coentreprise à la suite de la crise provoquée par la demande fondée sur le billet, les faits ne permettaient pas de conclure à l'existence du consensus nécessaire à la formation d'un nouveau contrat — Conclusion de la juge de première instance voulant qu'aucune des parties ne se soit comportée comme si elle était liée par l'accord de coentreprise après la demande de remboursement du billet n'éteignait pas les obligations découlant de cet accord.

## Contrats --- Libération — Droit de résilier après répudiation — Qu'est-ce qu'une répudiation

Trois investisseurs ont conclu un accord de coentreprise pour l'achat, l'aménagement et la vente d'une propriété aux États-Unis — Investisseurs ont agi par l'entremise de leurs sociétés J Ltd, P Ltd et G Ltd — Propriété a été achetée en comptant et au moyen d'un billet — Investisseurs se sont trouvés dans l'impossibilité de respecter leurs obligations de paiement et le billet est devenu exigible — Comme ni J Ltd ni G Ltd n'étaient en mesure de rassembler les fonds requis pour payer leurs parts respectives, P Ltd a offert d'avancer des fonds pour les autres investisseurs en cédant le billet à une autre société — P Ltd a accepté de prendre en charge les obligations de G Ltd sous certaines conditions, y compris l'obtention d'une participation aux profits de l'ordre de 35% — Propriété a fait l'objet d'une forclusion, sans que P Ltd ou G Ltd ne s'y opposait — Commettants de P Ltd et de G Ltd ont éventuellement conclu une nouvelle entente afin de développer les terrains — J Ltd a perdu son investissement — J Ltd et son commettant ont institué une action à l'encontre de P Ltd et G Ltd et leurs commettants respectifs pour violation de l'accord de coentreprise et ont demandé réparation — Juge de première instance a rejeté l'action, concluant qu'aucune des parties n'avait invoqué les dispositions de l'accord de coentreprise — Juge de première instance a estimé que, en omettant de s'entendre avec P Ltd, J Ltd avait été l'artisan de son propre malheur puisque J Ltd connaissait les conséquences de la forclusion mais n'a rien fait pour protéger sa participation — Selon la juge de première instance, il n'était pas raisonnable dans les circonstances que, après avoir omis de s'entendre avec P Ltd, J Ltd croie que sa participation dans les terrains de la coentreprise était protégée — Appel interjeté par J Ltd a été rejeté au motif qu'aucune des parties n'avait invoqué l'accord de coentreprise — Mû par son intérêt personnel, J Ltd ne s'est pas objecté au projet de forclusion — Cour d'appel a affirmé que, lorsque des parties adoptent un comportement démontrant qu'elles ne comptent pas se conformer ou être assujetties aux modalités de l'accord écrit, l'une d'elles ne peut pas, par la suite, demander que l'accord soit exécuté à son profit — J Ltd et son commettant ont formé un pourvoi — Pourvoi rejeté — Accord de coentreprise n'avait pas été résilié et tenait toujours — Défaut de paiement ne constituait pas une répudiation — Refus de payer de J Ltd ne constituait pas une intention de ne plus être lié par le contrat — Même si J Ltd ne pouvait ou ne voulait pas respecter ses obligations concernant le billet, la preuve a démontré qu'il tenait quand même à ce que l'accord de coentreprise demeure en vigueur — Faire « peu de cas » d'un accord ne prouve pas qu'une partie répudie cet accord.

## Contrats --- Exécution ou violation — Principes généraux

Trois investisseurs ont conclu un accord de coentreprise pour l'achat, l'aménagement et la vente d'une propriété aux États-Unis — Investisseurs ont agi par l'entremise de leurs sociétés J Ltd, P Ltd et G Ltd — Propriété a été achetée en comptant et au moyen d'un billet — Investisseurs se sont trouvés dans l'impossibilité de respecter leurs obligations de paiement et le billet est devenu exigible — Comme ni J Ltd ni G Ltd n'étaient en mesure de rassembler les fonds requis pour payer leurs parts respectives, P Ltd a offert d'avancer des fonds pour les autres investisseurs en cédant le billet à une autre société — P Ltd a accepté de prendre en charge les obligations de G Ltd sous certaines conditions, y compris l'obtention d'une participation aux profits de l'ordre de 35% — Propriété a fait l'objet d'une forclusion, sans que P Ltd ou G Ltd ne s'y opposait — Commettants de P Ltd et de G Ltd ont éventuellement conclu une nouvelle entente afin de développer les terrains — J Ltd a perdu son investissement — J Ltd et son commettant ont institué une action à l'encontre de P Ltd et G Ltd et leurs commettants respectifs pour violation de l'accord de coentreprise et ont demandé réparation — Juge de première instance a rejeté l'action, concluant qu'aucune des parties n'avait invoqué les dispositions de l'accord de coentreprise — Juge de première instance a estimé que, en omettant de s'entendre avec P Ltd, J Ltd avait été l'artisan de son propre malheur puisque J Ltd connaissait les conséquences de la forclusion mais n'a rien fait pour protéger sa participation — Selon la juge de première instance, il n'était pas raisonnable dans les circonstances que, après avoir omis de s'entendre avec P Ltd, J Ltd croie que sa participation dans les terrains de la coentreprise était protégée — Appel interjeté par J Ltd a été rejeté au motif qu'aucune des parties n'avait invoqué l'accord de coentreprise — Mû par son intérêt personnel, J Ltd ne s'est pas

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 90 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

objecté au projet de forclusion — Cour d'appel a affirmé que, lorsque des parties adoptent un comportement démontrant qu'elles ne comptent pas se conformer ou être assujetties aux modalités de l'accord écrit, l'une d'elles ne peut pas, par la suite, demander que l'accord soit exécuté à son profit — J Ltd et son commettant ont formé un pourvoi — Pourvoi rejeté — Accord de coentreprise n'avait pas été résilié et tenait toujours — Ayant avisé J Ltd et G Ltd qu'ils manquaient à leurs obligations au titre du billet, P Ltd avait le droit, en tant que seul membre non défaillant, d'agir unilatéralement pour éviter la forclusion — Forclusion par P Ltd ne constituait pas une violation de l'accord de coentreprise — P Ltd ne faisait qu'exercer les droits que la loi lui reconnaissait au titre du billet qui lui avait été cédé — Défaut de J Ltd de verser la somme due au titre du billet avait pour effet de supprimer le besoin de consentement en vertu de l'accord — J Ltd et son commettant n'avaient pas droit au remboursement de leur investissement initial puisque cette somme avait été formellement confisquée lors de la forclusion par P Ltd — J Ltd et son commettant ont parié que P Ltd ne procéderait pas à la forclusion et ils ont perdu leur pari — Aucun fondement juridique ne permettait à la cour de rétablir cette participation et de conclure que l'investissement doive faire l'objet d'un remboursement.

**Contrats --- Réparation du défaut — Récupération de l'argent payé en vertu du contrat**

Trois investisseurs ont conclu un accord de coentreprise pour l'achat, l'aménagement et la vente d'une propriété aux États-Unis — Investisseurs ont agi par l'entremise de leurs sociétés J Ltd, P Ltd et G Ltd — Propriété a été achetée en comptant et au moyen d'un billet — Investisseurs se sont trouvés dans l'impossibilité de respecter leurs obligations de paiement et le billet est devenu exigible — Comme ni J Ltd ni G Ltd n'étaient en mesure de rassembler les fonds requis pour payer leurs parts respectives, P Ltd a offert d'avancer des fonds pour les autres investisseurs en cédant le billet à une autre société — P Ltd a accepté de prendre en charge les obligations de G Ltd sous certaines conditions, y compris l'obtention d'une participation aux profits de l'ordre de 35 % — Propriété a fait l'objet d'une forclusion, sans que P Ltd ou G Ltd ne s'y opposait — Commettants de P Ltd et de G Ltd ont éventuellement conclu une nouvelle entente afin de développer les terrains — J Ltd a perdu son investissement — J Ltd et son commettant ont institué une action à l'encontre de P Ltd et G Ltd et leurs commettants respectifs pour violation de l'accord de coentreprise et ont demandé réparation — Juge de première instance a rejeté l'action, concluant qu'aucune des parties n'avait invoqué les dispositions de l'accord de coentreprise — Juge de première instance a estimé que, en omettant de s'entendre avec P Ltd, J Ltd avait été l'artisan de son propre malheur puisque J Ltd connaissait les conséquences de la forclusion mais n'a rien fait pour protéger sa participation — Selon la juge de première instance, il n'était pas raisonnable dans les circonstances que, après avoir omis de s'entendre avec P Ltd, J Ltd croie que sa participation dans les terrains de la coentreprise était protégée — Appel interjeté par J Ltd a été rejeté au motif qu'aucune des parties n'avait invoqué l'accord de coentreprise — Mû par son intérêt personnel, J Ltd ne s'est pas objecté au projet de forclusion — Cour d'appel a affirmé que, lorsque des parties adoptent un comportement démontrant qu'elles ne comptent pas se conformer ou être assujetties aux modalités de l'accord écrit, l'une d'elles ne peut pas, par la suite, demander que l'accord soit exécuté à son profit — J Ltd et son commettant ont formé un pourvoi — Pourvoi rejeté — Principe de l'enrichissement sans cause ne s'appliquait pas et J Ltd et son commettant n'avaient pas droit au remboursement de leur investissement initial — P Ltd et G Ltd avaient bénéficié de la somme investie par J Ltd, qui a perdu cette somme, sans être indemnisée, lorsqu'il y a eu forclusion — L'action en forclusion pouvait également constituer un motif juridique d'enrichissement — C'était l'application du régime législatif encadrant les forclusions qui a entraîné l'« appauvrissement » de J Ltd — Action en forclusion était une conséquence connue et équitable sur le plan procédural du défaut de payer le montant dû — J Ltd a choisi de ne pas payer et en a subi les conséquences — Parties se sont volontairement engagées par contrat à investir de l'argent, sans prévoir aucun droit au remboursement de cet argent dans les circonstances qui sont finalement survenues.


Three investors entered into joint venture agreement to purchase, develop, and sell property in US. The investors operated through their companies, J Ltd., P Ltd., and G Ltd. The property was purchased with cash payment and a promissory note and a trust deed in favour of A Inc. The land was not as saleable as originally thought and the note was extended. Payments reducing the principal were made consistently until 1995, after which A Inc. demanded repayment, failing that it would commence proceedings to enforce its security under the trust deed. Under the terms of the joint venture agreement, each partner was required to pay its proportionate share of the sum demanded. J Ltd. and G Ltd. were not prepared to meet this demand. P Ltd. arranged to pay the debts of the other two investors by assigning the note to another corporation. P Ltd.

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 91 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

and G Ltd. came to an agreement including a 35 percent profit participation in favour of P Ltd. J Ltd. took no meaningful steps to raise money for its share. P Ltd. indicated its intention to foreclose, but J Ltd. took no steps to raise the money required. P Ltd. foreclosed and J Ltd. lost its investment. J Ltd. and its principal commenced an action against P Ltd. and G Ltd. and their respective principals for breach of the joint venture agreement and related relief. P Ltd. and G Ltd. launched counterclaims. The trial judge dismissed the action, holding that none of the parties had relied upon the provisions of the joint venture agreement. The trial judge found that by failing to make a deal with P Ltd., J Ltd. was the author of its own misfortune. J Ltd. knew the consequences of the foreclosure but did not take steps to preserve its interest despite its ability to do so. The trial judge found that it was not reasonable under the circumstances for J Ltd. having reached no agreement with P Ltd. to think its interest in the joint venture lands was protected. J Ltd.'s appeal was dismissed on the basis that none of the parties had relied on the joint venture agreement. Pursuing a strategy of self-interest, J Ltd. and its principal failed to object to the plan to foreclose on their interest. The court stated that when the parties act in a way that shows that they did not intend to comply or be bound by the terms of the written agreement, one party cannot later ask to have the agreement enforced for its benefit. J Ltd. and its principal appealed.

**Held:** The appeal was dismissed.

The joint venture agreement was not terminated and remained in force. In order to discharge the joint venture agreement, a new agreement that it be terminated must be established. The facts as found by the trial judge did not support the conclusion that the parties had reached a new agreement to terminate the joint venture agreement. There was no evidence that the parties ever arrived at a concluded agreement to end the joint venture agreement. P Ltd. bought note that precipitated the crisis and then tried to negotiate the terms under which it assumed the obligations of the others. P Ltd. concluded a new agreement with G Ltd., but no new agreement was ever concluded with J Ltd. While both the trial and appeal courts referred to the intention of the parties not to be bound by the joint venture agreement after the crisis precipitated by A Inc.'s call for payment, the facts did not support a finding of consensus necessary for a new contract. The finding of the trial judge that none of the parties acted as though they were bound by the joint venture agreement after the demand for payment did not end the obligations under the agreement.

The failure of J Ltd. to pay did not constitute repudiation. A contract is repudiated when one party acts in a way that evinces an intent to no longer to be bound by the contract. The other party may then elect to terminate the contract. J Ltd.'s refusal to pay did not amount to an intention to no longer be bound by the agreement. Although J Ltd. could not or did not wish to comply with its obligations regarding the note, the evidence demonstrated that it nevertheless wanted to keep the joint venture agreement on foot. Having "little regard" for an agreement does not establish that a party is repudiating the agreement.

While the parties ignored the joint venture agreement, the obligations under it remained in effect and were not breached. Having put J Ltd. and G Ltd. on notice that they were in default of their obligations on the note, P Ltd. was entitled, as the only non-defaulting member, to act unilaterally to avoid foreclosure. P Ltd.'s foreclosure did not constitute a breach of the joint venture agreement since P Ltd. was simply exercising his legal rights under the note that had been assigned to him. J Ltd. and its principal were not entitled to their initial investment. These monies were formally forfeited by the foreclosure of P Ltd.. J Ltd. failed to meet its liability under the note and failed to do anything after it was warned by P Ltd. of foreclosure. J Ltd.'s interest in the joint venture was terminated when the foreclosure took place. J Ltd. gambled that P Ltd. would not foreclose and lost. There was no legal basis upon which this court could revive that interest and hold that the investment must be returned.

The doctrine of unjust enrichment did not apply and J Ltd. and its principal were not entitled to the return of their initial investment. The first two requirements of unjust enrichment were present in that P Ltd. and G Ltd. enjoyed the benefit of J Ltd.'s investment money and J Ltd. suffered an uncompensated loss of those funds when the foreclosure occurred. The foreclosure proceedings provided a juristic reason for the enrichment. It was the operation of the statutory regime surrounding foreclosures that led to J Ltd.'s "deprivation". The foreclosure proceedings were a known and procedurally

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

fair consequence of not paying the amount due. J Ltd. chose not to pay and suffered the consequence the law prescribed. J Ltd. could not now seek a return of the money on the basis of unjust enrichment. The parties voluntarily contracted to invest money for the purpose of acquiring and maintaining the property, without providing for any right to have the money repaid under the circumstances that eventually arose.

Trois investisseurs ont conclu un accord de coentreprise pour l'achat, l'aménagement et la vente d'une propriété aux États-Unis. Les investisseurs ont agi par l'entremise de leurs sociétés J Ltd, P Ltd et G Ltd. La propriété a été achetée en comptant et au moyen d'un billet et d'un acte de fiducie en faveur d'A Inc. Les terrains se sont révélés plus difficiles à vendre qu'on l'avait cru au départ, et la date d'échéance du billet a été prorogée. Il y a eu remboursement systématique du capital jusqu'en 1995, à la suite de quoi A Inc. a demandé le remboursement, faute de quoi elle entamerait des procédures pour réaliser sa garantie aux termes de l'acte de fiducie. L'accord de coentreprise prévoyait que chaque associé devait payer sa part proportionnelle de la somme demandée. J Ltd et G Ltd n'étaient pas en mesure de rassembler les fonds requis pour payer leurs parts respectives. P Ltd a offert d'avancer des fonds pour les deux autres investisseurs en cédant la note à une autre société. P Ltd et G Ltd en sont arrivés à une entente selon laquelle P Ltd obtiendrait une participation aux profits de l'ordre de 35%. J Ltd n'a entrepris aucune démarche sérieuse pour recueillir les fonds nécessaires pour payer sa part. P Ltd a indiqué qu'elle comptait procéder à la forclusion mais J Ltd n'a entrepris aucune démarche pour recueillir les fonds nécessaires. P Ltd a procédé à la forclusion, de sorte que J Ltd a perdu son investissement. J Ltd et son commettant ont institué une action à l'encontre de P Ltd et G Ltd et leurs commettants respectifs pour violation de l'accord de coentreprise et ont demandé réparation. P Ltd et G Ltd ont déposé des demandes reconventionnelles. La juge de première instance a rejeté l'action, concluant qu'aucune des parties n'avait invoqué les dispositions de l'accord de coentreprise. Juge de première instance a estimé que, en omettant de s'entendre avec P Ltd, J Ltd avait été l'artisan de son propre malheur. J Ltd connaissait les conséquences de la forclusion, mais il n'a rien fait pour protéger sa participation malgré sa capacité de le faire. Selon la juge de première instance, il n'était pas raisonnable dans les circonstances que, après avoir omis de s'entendre avec P Ltd, J Ltd croie que sa participation dans les terrains de la coentreprise était protégée. L'appel interjeté par J Ltd a été rejeté au motif qu'aucune des parties n'avait invoqué l'accord de coentreprise. Mûs par leur intérêt personnel, J Ltd et son commettant ne se sont pas objectés au projet de forclusion de leur participation. La Cour a affirmé que, lorsque des parties adoptent un comportement démontrant qu'elles ne comptent pas se conformer ou être assujetties aux modalités de l'accord écrit, l'une d'elles ne peut pas, par la suite, demander que l'accord soit exécuté à son profit. J Ltd et son commettant ont formé un pourvoi.

**Arrêt:** Le pourvoi a été rejeté.

L'accord de coentreprise n'avait pas été résilié et tenait toujours. Pour mettre fin à l'accord de coentreprise, il fallait le résilier au moyen d'un nouvel accord. Les faits constatés par la juge de première instance ne permettaient pas de conclure que les parties avaient résilié l'accord de coentreprise au moyen d'un nouvel accord. Rien ne démontrait que les parties étaient parvenues à conclure un accord résiliant l'accord de coentreprise. P Ltd a acheté le billet à l'origine de la crise, pour ensuite tenter de négocier les conditions auxquelles il assumerait les obligations des autres parties. P Ltd a conclu un nouvel accord avec G Ltd mais aucun nouvel accord n'a jamais été conclu avec J Ltd. Bien que les tribunaux de prelière instance et d'appel ont touts deux évoqué l'intention des parties de ne pas être liées par l'accord de coentreprise à la suite de la crise provoquée par la demande de remboursement de prêt présentée par A Inc, les faits ne permettaient pas de conclure à l'existence du consensus nécessaire à la formation d'un nouveau contrat. La conclusion de la juge de première instance voulant qu'aucune des parties ne se soit comportée comme si elle était liée par l'accord de coentreprise après la demande de remboursement du billet n'éteignait pas les obligations découlant de cet accord.

Le défaut de paiement ne constituait pas une répudiation. Il y a répudiation d'un contrat lorsqu'une partie adopte un comportement qui traduit son intention de ne plus être liée par ce contrat. L'autre partie peut alors, à sa discrétion, choisir de résilier le contrat. Le refus de payer de J Ltd ne constituait pas une intention de ne plus être lié par le contrat. Même si J Ltd ne pouvait ou ne voulait pas respecter ses obligations concernant le billet, la preuve a démontré qu'il tenait quand

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 93 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

même à ce que l'accord de coentreprise demeure en vigueur. Le fait de faire « peu de cas » d'un accord ne prouve pas qu'une partie répudie cet accord.

Même s'il se peut que les parties n'aient pas tenu compte de l'accord de coentreprise, les obligations qui en découlait s'appliquaient toujours et n'ont fait l'objet d'aucun manquement. Ayant avisé J Ltd et G Ltd qu'ils manquaient à leurs obligations au titre du billet, P Ltd avait le droit, en tant que seul membre non défaillant, d'agir unilatéralement pour éviter la forclusion. La forclusion par P Ltd ne constituait pas une violation de l'accord de coentreprise puisque P Ltd ne faisait qu'exercer les droits que la loi lui reconnaissait au titre du billet qui lui avait été cédé. J Ltd et son commettant n'avaient pas droit au remboursement de leur investissement initial. Cette somme avait été formellement confisquée lors de la forclusion par P Ltd. J Ltd ne s'est pas acquitté de la responsabilité qui lui incombait en vertu du billet et n'a rien fait une fois avisé de la forclusion par P Ltd. Il y a eu forclusion, ce qui a mis fin à la participation de J Ltd dans la coentreprise. J Ltd a parié que P Ltd ne procéderait pas à la forclusion et il a perdu son pari. Aucun fondement juridique ne permettait à la cour de rétablir cette participation et de conclure que l'investissement doive faire l'objet d'un remboursement.

Le principe de l'enrichissement sans cause ne s'appliquait pas et J Ltd et son commettant n'avaient pas droit au remboursement de leur investissement initial. Les deux premières conditions requises pour qu'il y ait enrichissement sans cause étaient remplies en ce que P Ltd et G Ltd avaient bénéficié de la somme investie par J Ltd, qui a perdu cette somme, sans être indemnisée, lorsqu'il y a eu forclusion. L'action en forclusion pouvait également constituer un motif juridique d'enrichissement. C'était l'application du régime législatif encadrant les forclusions qui a entraîné l'« appauvrissement » de J Ltd. L'action en forclusion était une conséquence connue et équitable sur le plan procédural du défaut de payer le montant dû. J Ltd a choisi de ne pas payer et a subi les conséquences prévues par la loi. J Ltd ne pouvait pas ensuite solliciter le remboursement de cette somme en invoquant l'enrichissement sans cause. Les parties se sont volontairement engagées par contrat à investir de l'argent pour acquérir et conserver la propriété, sans prévoir aucun droit au remboursement de cet argent dans les circonstances qui sont finalement survenues.

**Table of Authorities**

**Cases considered by *McLachlin C.J.C.*:**

*Becker v. Pettkus* (1980), 1980 CarswellOnt 299, 1980 CarswellOnt 644, [1980] 2 S.C.R. 834, 117 D.L.R. (3d) 257, 34 N.R. 384, 8 E.T.R. 143, 19 R.F.L. (2d) 165 (S.C.C.) — considered

*Garland v. Consumers' Gas Co.* (2004), 2004 CarswellOnt 1558, 2004 CarswellOnt 1559, 2004 SCC 25, 72 O.R. (3d) 80 (note), 237 D.L.R. (4th) 385, 319 N.R. 38, 43 B.L.R. (3d) 163, 9 E.T.R. (3d) 163, 42 Alta. L. Rev. 399, 186 O.A.C. 128, [2004] 1 S.C.R. 629 (S.C.C.) — considered

*Paal Wilson & Co. v. Blumenthal* (1982), [1983] 1 All E.R. 34, [1983] A.C. 854 (U.K. H.L.) — considered

*Pacific National Investments Ltd. v. Victoria (City)* (2004), 34 B.C.L.R. (4th) 1, 327 N.R. 100, [2004] 3 S.C.R. 575, 206 B.C.A.C. 99, 338 W.A.C. 99, 42 C.L.R. (3d) 76, [2005] 3 W.W.R. 1, 3 M.P.L.R. (4th) 1, 2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, 245 D.L.R. (4th) 211 (S.C.C.) — considered

*Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533, 172 O.A.C. 78, 226 D.L.R. (4th) 577, 38 B.L.R. (3d) 42, 2003 CarswellOnt 2038 (Ont. C.A.) — considered

APPEAL by investors from judgment reported at *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2006), 18 B.L.R. (4th) 8, (sub nom. *Jedfro Investments (U.S.A.) Ltd. v. Jacyk (Litigation Administrator of)*) 80 O.R. (3d) 533, 210 O.A.C. 153, 2006

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195...

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

CarswellOnt 3010 (Ont. C.A.), dismissing investors' appeal from trial judge's dismissal of investors' action for damages for breach of contract.

Pourvoi des investisseurs à l'encontre d'un jugement publié à *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate* (2006), 18 B.L.R. (4th) 8, (sub nom. *Jedfro Investments (U.S.A.) Ltd. v. Jacyk (Litigation Administrator of))* 80 O.R. (3d) 533, 210 O.A.C. 153, 2006 CarswellOnt 3010 (Ont. C.A.), ayant rejeté l'appel interjeté par les investisseurs à l'encontre du rejet par le juge du procès de leur action en dommages pour bris de contrat.

*McLachlin C.J.C.*:

1     The appellants claim monies under a joint venture agreement entered into with the respondents for the purpose of holding and developing a property interest near Denver, Colorado. The respondents deny liability. The first issue on the appeal is whether the joint venture agreement is enforceable by the appellants and, if so, whether the respondents are in breach. The second issue is whether the respondents are required to reimburse the sums advanced by the appellants to acquire and maintain the property.

2     I conclude that the joint venture agreement remained in effect and was not breached by the respondents. The respondents are not liable to the appellants for the monies advanced.

**Background**

3     Morris Iwasykiw, Peter Jacyk and Louis Matukas were sophisticated businessmen who had known each other for a long time. In 1989, they registered a partnership in Colorado, Tower Centre Partners, to purchase the Denver property from Air Products and Chemicals Inc. ("Air Products"). Part of the purchase price was paid with advances made by the three partners. The balance was secured by a note and a trust deed in favour of Air Products.

4     In 1991, Iwasykiw, Jacyk and Matukas entered into a joint venture agreement to purchase, develop and sell the Denver property, holding the following interests: Jacyk 60 percent; Iwasykiw 30 percent; and Matukas 10 percent. Each of the covenantors brought a corporate party into the joint venture agreement. The Air Products note was due in June 1991. The land was not as saleable as originally thought, and the note was extended. Payments reducing the principal were made consistently until 1995. However, in 1996 Air Products demanded repayment of US$3.8 million, failing which it would commence proceedings to enforce its security under the trust deed. Under the terms of the joint venture agreement, each partner was required to pay its proportionate share of the sum demanded.

5     It emerged that only Jacyk was prepared to meet this demand. Neither Iwasykiw nor Matukas were in a position to harness the funds they needed to pay their respective shares. The parties agreed that the survival of the joint venture required the note to be paid; otherwise Air Products would foreclose and they would lose their investments. At a June 24, 1996 meeting, Jacyk offered to use one of his companies to avert the crisis precipitated by Air Products' demand. The parties contemplated that Jacyk would advance funds on behalf of the other two to pay off the entire amount of the note. The possibility that Jacyk would purchase the note was also considered, according to Iwasykiw's testimony at discovery that Jacyk was "telling us all the time that he's going to buy the note". On July 20, hearing that Jacyk had gone ahead and purchased the note, Iwasykiw, the trial judge found, recognized Jacyk's purchase of the note as a strategic move benefiting all three parties to the joint venture.

6     An unresolved issue remained as to what the defaulting parties, Iwasykiw and Matukas, would give in exchange for being bailed out of the crisis. The joint venture agreement contained default provisions, but none of the parties wished to abide by them. Iwasykiw and Matukas felt they were too onerous. Jacyk, for his part, wanted a bigger share of the profits. Matukas, in the end, agreed to Jacyk's terms, including a 35 percent profit participation in favour of Jacyk. Iwasykiw, however, did not want to forego any profits from the project. He indicated that he would find the financing to meet his obligations under the note elsewhere and made an offer, which was not accepted, to give a first mortgage over certain unrelated property and a personal guarantee to Jacyk instead of profit participation. Iwasykiw voiced no objection to Jacyk's purchase of the note. Moreover, despite knowing that foreclosure would occur if the note was not paid, Iwasykiw "took no meaningful steps to raise the money for his share through the many assets that were available to him" ((2005), 2 B.L.R. (4th) 151 (Ont. S.C.J.), at para. 30).

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 95 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

7    Jacyk's company Prombank Investments Ltd., a non-party to the joint venture agreement, now held the security interest with respect to which Tower Centre Partners was a debtor. Prombank Investments Ltd. indicated in mid-August that it intended to foreclose. When the note fell due, therefore, Iwasykiw faced Prombank foreclosing his interest in the Colorado property unless the obligations under the note were met. By this time, Jacyk had concluded its arrangement with Matukas and Matukas's company Gramat. The same terms were agreed to by Jacyk's other company — the one that was a party to the joint venture agreement. Not believing that Prombank Investments Ltd. would exercise its rights, Iwasykiw took no steps to raise the money required. In fact, Iwasykiw made no attempt to communicate with Jacyk until late September, when he requested a meeting to discuss refinancing his company's (Jedfro Investments Ltd.) obligations under the note. Jacyk refused the request. Prombank Investments Ltd. foreclosed, with the effect that Iwasykiw lost the US$1.4 million he and Jedfro Investments Ltd. had invested in the joint venture. Iwasykiw appeared at the foreclosure proceedings in Colorado but was by that point unable to prevent it from happening.

8    Iwasykiw and Jedfro Investments Ltd. sued Jacyk, Matukas and their companies for breach of the joint venture agreement and related relief. Jacyk and Matukas launched counterclaims. Jacyk and Iwasykiw both died between discovery and trial, but their estates carried on the litigation.

9    The trial judge dismissed the action, holding that none of the parties had relied upon the provisions of the joint venture agreement. In her view, by failing to make a deal with Jacyk, unlike Matukas, Iwasykiw was the author of his own misfortune. He knew the consequences of the foreclosure but did not take steps to preserve his interest despite his ability to do so. The trial judge found that it was not reasonable under the circumstances for Iwasykiw, having reached no agreement with Jacyk, to think his interest in the joint venture lands was protected.

10    The Court of Appeal for Ontario dismissed the appeal ((2006), 80 O.R. (3d) 533 (Ont. C.A.)). It agreed that none of the parties, faced with the crisis precipitated by the calling of the loan, had relied on the joint venture agreement. Pursuing a strategy of self-interest, Iwasykiw and Jedfro Investments Ltd. had failed to object to the plan to foreclose on their interest. Laskin J.A., for the court, stated that when parties act in a way that shows they do not intend to comply with or be bound by the terms of their written agreement, one party cannot later ask to have the agreement enforced for its benefit.

11    Iwasykiw's estate and Jedfro Investments Ltd. now appeal to this Court.

**Analysis**

12    Can the appellants sue on the joint venture agreement? There is no doubt that the agreement was a valid contract. The question is whether it has been discharged or, failing this, whether it is unenforceable for some other reason.

13    The appellants' position is that the joint venture agreement was never terminated and remains on foot. They submit that negotiations do not terminate an agreement, unless the negotiations result in a new agreement. In this case, they argue, the parties never got beyond the stage of attempting to negotiate a new agreement, and therefore the joint venture agreement remains in force.

14    The ways in which a contract can be discharged are well established. It may be discharged by performance, by agreement, by frustration, and by repudiatory or fundamental breach. In addition to these major categories, it is possible to end a contract by merger, alteration or cancellation of a written instrument, and in particular circumstances not relevant here, such as by the death of a party (in the case of a personal contract), bankruptcy and winding up. (See *Chitty on Contracts* (29th ed. 2004), ch. 21-25.)

15    The contract here at issue was clearly not discharged by performance. Nor was it frustrated. This leaves discharge by agreement or by repudiatory breach. Applied to the facts of this case, both these modes of discharge present problems.

16    Discharge by agreement is problematic because, as the appellants point out, the negotiations between the parties never culminated in a new agreement. In order to discharge the joint venture agreement, a new agreement that it be terminated must be established. The facts as found by the trial judge do not support the conclusion that the parties had reached a new agreement

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

to terminate the joint venture agreement. The trial judge found that both parties acted as if they were not bound by the joint venture agreement. They ignored it, or parts of it, as they saw fit. But this does not establish a new contract to terminate the old contract. To establish a new agreement it must be shown that there was an offer by one party, accepted by the other, or an exchange of promises, supported by consideration. There must be a meeting of the minds on the essential terms — in this case the ending of the joint venture agreement. There is no evidence that the parties ever arrived at a concluded agreement to end the joint venture agreement. What happened was that one party, Jacyk, bought the note that had precipitated the crisis and then tried to negotiate the terms under which he assumed the obligations of the others. He concluded a new agreement with Matukas. But no new agreement was ever concluded with Iwasykiw.

17    It is suggested that if both parties are found to have abandoned a contract, that will terminate it. However, abandonment discharges a contract only if it amounts to a new contract in which the parties agree to abandon the old one. As Lord Diplock stated in *Paal Wilson & Co. v. Blumenthal* (1982), [1983] 1 All E.R. 34 (U.K. H.L.), at pp. 48-49:

> To the formation of the contract of abandonment, the ordinary principles of the English law of contract apply. To create a contract by exchange of promises between two parties where the promise of each party constitutes the consideration for the promise of the other what is necessary is that the intention of each *as it has been communicated to and understood by the other* (even though that which has been communicated does not represent the actual state of mind of the communicator) should coincide. That is what English lawyers mean when they resort to the latin phrase consensus ad idem and the words that I have italicised are essential to the concept of consensus ad idem, the lack of which prevents the formation of a binding contract in English law.

18    While both the trial and appeal courts referred saliently to the intention of the parties not to be bound by the joint venture agreement after the crisis precipitated by Air Products' call for payment, the Court of Appeal *per* Laskin J.A. expressed the view that the principles in *Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533 (Ont. C.A.), meant the parties' obligations under the contract had come to an end.

19    The facts, however, do not support a finding of the consensus necessary for a new contract, as discussed above. Therefore the finding of the trial judge that none of the parties acted as though they were bound by the joint venture agreement after the note was called does not end the obligations under that agreement.

20    It is also difficult to see how the doctrine of repudiation assists on the facts here. A contract may be said to be repudiated when one party acts in a way that evinces an intent to no longer be bound by the contract. The other party then may, at its option, elect to terminate the contract.

21    It is submitted that Iwasykiw's failure to pay his share of the debt (US$900,000) when the note was called constituted repudiation of the contract. However, it is questionable whether this failure to pay constituted repudiation. In the context of the present case, Iwasykiw's refusal to pay does not amount to an intention to no longer be bound by the contract. Although Iwasykiw could not or did not wish to comply with his obligations regarding the note, the evidence demonstrates that he nevertheless wanted to keep the joint venture agreement on foot. The trial judge, to be sure, stated that the parties "had little regard for the terms of the [joint venture agreement]" (para. 39). However, having "little regard" for an agreement does not establish that a party is repudiating the agreement. Ordinary, non-repudiatory breach is consistent with ignoring the terms of an agreement. More is required to establish repudiation. In view of the evidence, I do not find it necessary to deal with the argument that, because the joint venture contemplated the result of non-payment, failure to pay did not constitute repudiation.

22    If one could draw from this problematic evidence the conclusion that Iwasykiw's failure to pay his share of the note constituted repudiation of the contract, it would be necessary to establish that Jacyk and Matukas elected to treat this breach as ending the joint venture agreement. This is not clear. Jacyk did not advise Iwasykiw that he was treating the joint venture agreement as at an end because of his failure to pay the US$900,000. Rather, he continued to ask for new terms to reflect the fact that he had bought the loan and saved the joint venture.

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

23     In summary, none of the ways in which a contract can be discharged is established on the facts in this case. I therefore conclude that it has not been established that the joint venture agreement came to an end. We must therefore proceed on the basis that the joint venture agreement was not terminated and remained in force.

24     This brings us to the appellants' principal contention: that the respondents, and in particular Jacyk, breached the joint venture agreement. The appellants argue that Jacyk was bound by s. 4.02(a) to advance funds on behalf of the defaulting parties and, if they failed to repay their debts, to buy out their interests pursuant to s. 7.05. However, s. 4.02(a) of the agreement provided only a right to a non-defaulting party to advance funds on behalf of a defaulting party and eventually, should the party in default fail to repay those funds, to buy out that party's interest. Section 4.02(a) did not oblige Jacyk to do anything. In fact, Jacyk did not advance funds under s. 4.02(a). He did something different — which any third party could have done — namely, to purchase Air Products' note. Therefore, it cannot be said that s. 4.02(a) was breached.

25     The appellants' argument that s. 8.03 of the agreement was breached also fails. Section 8.03 required the consent of all three members of the joint venture in order to make decisions or take actions relating to the joint venture project or affecting the joint venture lands. The appellants contend that Jacyk's purchase of Air Products' note constituted a decision or action in relation to the joint venture or affecting the joint venture lands. They further contend that in any event Jacyk's foreclosure on the joint venture property falls within this clause. On both or either of these grounds, the appellants assert that the respondents are in breach of the joint venture agreement.

26     It is questionable whether the assignment of the note or the foreclosure could constitute a breach of this provision, considering that Prombank Investments Ltd. merely assumed the position Air Products had previously occupied as a creditor to the joint venture. In any case, s. 4.02(d) of the agreement removed the s. 8.03 consent requirement under circumstances such as those arising here. Section 4.02(d) provided that when a member was in default of its obligations, the non-defaulting member would be authorized to make decisions and take actions relating to the joint venture without requiring the approval or consent of the member in default. Having put Iwasykiw and Matukas on notice that they were in default of their obligations on the note, Jacyk was entitled, as the only non-defaulting member, to act unilaterally to avoid foreclosure by Air Products.

27     For the same reasons, I cannot accept the argument that Jacyk's foreclosure constituted a breach of the joint venture agreement. Jacyk was simply exercising his legal rights under the note that had been assigned to him. In any event, the appellants' failure to pay the US$900,000 owing on the note brought s. 4.02(d) into play, removing the need for consent.

28     I conclude that while the parties may have ignored the joint venture agreement, the obligations under it remained in effect and were not breached by the respondents.

29     The appellants assert that, in any event, they should receive the return of their initial investment in the joint venture of US$1.4 million. I do not agree. These monies were formally forfeited by the foreclosure by Prombank Investments Ltd. on the note and trust deed it bought from Air Products. Air Products had the right to foreclose on the joint venture if the joint venture defaulted on the note. Prombank, having bought the note and trust deed, stood in Air Products' shoes. Iwasykiw failed to meet his liability under the note. Prombank advised it would foreclose. Iwasykiw did nothing, except belatedly ask for a meeting with Jacyk. The foreclosure took place. At this point, Iwasykiw's interest in the joint venture was terminated. Under the principles of mortgage law, he lost his investment. As the trial judge put it, he gambled that Jacyk would not foreclose, and he lost. I see no legal basis upon which this Court could revive that interest and hold that the respondents must return that investment.

30     In the alternative, the appellants submit that this money should be returned on the basis of unjust enrichment. A finding of unjust enrichment has three requirements: an enrichment, a corresponding deprivation and an absence of any juristic reason for the enrichment. The fact that a party's actions have benefited another is not enough; it must also be "evident that the retention of the benefit would be 'unjust' in the circumstances of the case": *Becker v. Pettkus*, [1980] 2 S.C.R. 834 (S.C.C.), at p. 848, *per* Dickson J. (as he then was).

31     The first two requirements of unjust enrichment are present in the case at bar. The respondents enjoyed the benefit of the appellants' investment money and the appellants suffered an uncompensated loss of those funds when the foreclosure occurred.

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 98 of 589

Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estate, 2007 SCC 55, 2007 CarswellOnt 8195

2007 SCC 55, 2007 CarswellOnt 8195, 2007 CarswellOnt 8196, [2007] 3 S.C.R. 679...

32    With respect to the third requirement, the appellants must show that the facts do not fall within one of the "established categories" of juristic reason, such as contract or "other valid common law, equitable or statutory obligations": *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629, 2004 SCC 25 (S.C.C.), at para. 44.

33    The respondent Jacyk submits that the operation of the joint venture agreement provides a juristic reason why the US $1.4 million is not repayable to the appellants. The parties voluntarily contracted to invest money for the purpose of acquiring and maintaining the property, without providing for any right to have the money repaid under the circumstances that eventually arose.

34    The respondent's position is supported by the general rule "that it is not the function of the court to rewrite a contract for the parties. Nor is it their role to relieve one of the parties against the consequences of an improvident contract": *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575, 2004 SCC 75 (S.C.C.), at para. 31.

35    The foreclosure proceedings may also provide a juristic reason for the enrichment. It was the operation of the statutory regime surrounding foreclosures that led to the appellants' "deprivation". The foreclosure proceedings were a known and procedurally fair consequence of not paying the amount due. The appellants chose not to pay and suffered the consequence the law prescribed — foreclosure of their interest. They cannot now seek a return of the money on the basis of unjust enrichment.

36    I conclude that the doctrine of unjust enrichment does not apply and that the appellants are not entitled to the return of their initial investment.

37    For these reasons, I would dismiss the appeal with costs.

*Appeal dismissed.*

*Pourvoi rejeté.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 99 of 589

Keefer Laundry Ltd. v. Pellerin Milnor Corp., 2009 BCCA 273, 2009 CarswellBC 1568
2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

2009 BCCA 273
British Columbia Court of Appeal

Keefer Laundry Ltd. v. Pellerin Milnor Corp.

2009 CarswellBC 1568, 2009 BCCA 273, [2009] B.C.W.L.D. 4729, [2009] B.C.W.L.D. 4758,
[2009] B.C.W.L.D. 4759, [2009] B.C.W.L.D. 4760, [2009] B.C.W.L.D. 4761, [2009] B.C.W.L.D.
4776, [2009] B.C.W.L.D. 4905, [2009] B.C.W.L.D. 4906, [2009] B.C.J. No. 1189, 179 A.C.W.S.
(3d) 106, 271 B.C.A.C. 307, 458 W.A.C. 307, 57 B.L.R. (4th) 161, 94 B.C.L.R. (4th) 205

# Keefer Laundry Ltd. (Appellant / Plaintiff) And
# Pellerin Milnor Corporation (Respondent / Defendant)

Finch C.J.B.C., Lowry, Neilson JJ.A.

Heard: May 14-15, 2009
Judgment: June 17, 2009
Docket: Vancouver CA036459

Proceedings: affirming *Keefer Laundry Ltd. v. Pellerin Milnor Corp.* (2008), 2008 BCSC 1119, 2008 CarswellBC 1761, 49
B.L.R. (4th) 222 (B.C. S.C.)

Counsel: D.G.S. Rae, Q.C., S.M. Brooks for Appellant
G.A. Fulton, Q.C., H.D. Craig for Respondent

Subject: Civil Practice and Procedure; Corporate and Commercial; Contracts; Torts; Property

**Table of Authorities**

**Cases considered by *Finch C.J.B.C.*:**

*Bank of British Columbia Pension Plan, Re* (2000), 137 B.C.A.C. 37, 223 W.A.C. 37, 2000 BCCA 291, 2000
CarswellBC 937, 23 C.C.P.B. 101 (B.C. C.A.) — followed

*Fotinis Restaurant Corp. v. White Spot Ltd.* (1998), 1998 CarswellBC 543, 38 B.L.R. (2d) 251 (B.C. S.C. [In
Chambers]) — referred to

*Hannan v. Methanex Corp.* (1998), 1998 CarswellBC 1041, 103 B.C.A.C. 199, 169 W.A.C. 199, 37 C.C.E.L. (2d)
228, 20 C.C.P.B. 177, 46 B.C.L.R. (3d) 230, [1998] 7 W.W.R. 619 (B.C. C.A.) — followed

*Housen v. Nikolaisen* (2002), 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, 286 N.R. 1, [2002] 7 W.W.R. 1, 2002
CarswellSask 178, 2002 CarswellSask 179, 2002 SCC 33, 30 M.P.L.R. (3d) 1, 219 Sask. R. 1, 272 W.A.C. 1, [2002]
2 S.C.R. 235 (S.C.C.) — followed

*London & South Western Railway v. Blackmore* (1870), L.R. 4 H.L. 610, 39 L.J. Ch. 713, [1861-73] All E.R. Rep.
Ext. 1694 (U.K. H.L.) — considered

*MacDougall v. MacDougall* (2005), 2005 CarswellOnt 7257, 205 O.A.C. 216, 262 D.L.R. (4th) 120 (Ont. C.A.) —
followed

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 100 of 589

Keefer Laundry Ltd. v. Pellerin Milnor Corp., 2009 BCCA 273, 2009 CarswellBC 1568

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

*Privest Properties Ltd. v. Foundation Co. of Canada Ltd.* (1997), 35 C.L.R. (2d) 120, 1997 CarswellBC 897, 34 B.L.R. (2d) 281, 145 D.L.R. (4th) 729, 91 B.C.A.C. 290, 148 W.A.C. 290, 36 B.C.L.R. (3d) 155 (B.C. C.A.) — referred to

*White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293, 1984 CarswellNB 38, 17 E.T.R. 78, 140 A.P.R. 293 (N.B. C.A.) — followed

**Statutes considered:**

*Sale of Goods Act*, R.S.B.C. 1996, c. 410
    Generally — referred to

    s. 18 — referred to

APPEAL by plaintiff from judgment reported at *Keefer Laundry Ltd. v. Pellerin Milnor Corp.* (2008), 2008 BCSC 1119, 2008 CarswellBC 1761, 49 B.L.R. (4th) 222 (B.C. S.C.), dismissing action for damages for breach of contract, negligence and breach of warranties.

*Finch C.J.B.C.*:

**I.**

1    The plaintiff appeals from the order of the Supreme Court of British Columbia pronounced 22 August 2008, and entered on 7 November 2008, dismissing its action for damages for breach of contract, negligence and breach of the warranties provided by the *Sale of Goods Act*, R.S.B.C. 1996, c. 410. The reasons for judgment at trial may be found at 2008 BCSC 1119 (B.C. S.C.).

2    The main issue on this appeal is whether the learned trial judge erred in law in his construction of a letter agreement between the parties executed by the plaintiff on or about 11 December 2000. The defendant maintains, and the trial judge held, that the letter constitutes a general release by the plaintiff of all claims it might otherwise have had against the defendant arising from alleged defects in commercial laundering equipment the plaintiff purchased from the defendant in December 1998. In particular, the judge held the letter released the defendant from any liability to the plaintiff under the provisions of a "production guarantee" the defendant provided by letter of 20 January 1999.

3    In addition, the plaintiff asserted that the defendant was in breach of a "structural guarantee" provided in a further letter from the defendant dated 21 January 1999.

4    The "release" letter of December 2000 expressly excepted the "extended warranty" on the "structural integrity" of the equipment. However, the failure alleged by the plaintiff was rust and corrosion of certain components, and the judge held that this problem was not within the ambit of the structural guarantee, nor was it a breach of s. 18 of the *Sale of Goods Act*.

5    For the reasons that follow, I have concluded that the learned trial judge did not err in his construction of the letter agreement of December 2000. Nor did he err in his interpretation of the warranty for structural integrity. I would dismiss the appeal.

**II. Facts**

6    Keefer Laundry Limited ("Keefer") provides commercial laundry services to customers such as hotels, hospitals, restaurants and airlines. It operated in Vancouver's Chinatown for about 100 years. In 1999, it expanded its operation to a new facility in Burnaby. The president of Keefer was Howard Wong.

7    Pellerin Milnor Corporation ("Milnor") is a Louisiana-based designer and manufacturer of commercial laundry equipment. Its president is James Pellerin.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14394-1   Filed 09/10/14   Page 101 of 589

Keefer Laundry Ltd. v. Pellerin Milnor Corp., 2009 BCCA 273, 2009 CarswellBC 1568

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

8    Tessler G.W. Fabcare Inc. ("Tessler") was a defendant at trial in these proceedings. It was an authorized Milnor dealer, carrying on business in British Columbia. Tessler ceased its Vancouver operations in October 2000. It took no part in this appeal.

9    In December 1998, Keefer purchased Milnor equipment from Tessler for use in its new Burnaby facility. Keefer had previously used Milnor equipment in its Chinatown plant for 16 years, including two continuous batch washers ("CBWs") or "tunnel" washers. It also used presses, dryers, and related equipment from other manufacturers.

10    The new CBWs purchased in December 1998 had some design differences from the older models Keefer had previously used. The design differences, explained below at paragraph 20, had some significance for subsequent developments. Mr. Wong said he was unaware at the time of the purchase of the design differences. Keefer also purchased Milnor presses, elevators, shuttle conveyors, dryers and a Milnor control package used to operate the system and record production data.

11    All of the equipment the plaintiff purchased was subject to Milnor's limited standard warranty that the machines would be free from defects in material and workmanship for one year. The warranty purported to exclude any liability for consequential losses or any amount in excess of the purchase price.

12    In addition to the contract between Keefer and Tessler incorporating the Milnor limited standard warranty, Milnor also provided information and assurances directly to Keefer in the form of three letters from Mr. Pellerin to Mr. Wong.

13    The defendant wrote a letter on 20 January 1999 setting out the "production guarantee". It detailed the load sizes, wash times and hourly production capacities the system was designed to meet for various kinds of goods. In material part, the production guarantee reads as follows:

In response to your request to us to define the production capabilities of the equipment we have proposed for your new washroom, we offer the following guarantee:

Pellerin Milnor Corporation guarantees that the equipment complement included in our proposal which includes (2) 12 module Milnor 76039 CBW - Continuous Batch Washers, (2) Milnor MP1602 60 kg 47 bar single stage presses and (9) 58058TG2 double batch gas dryers with associated shuttle and conveyors will meet the production capacity as defined on the attached "CBW Production Capabilities". How much less than 100% full production will be realized during day to day operation depends on many things subject to your control.... Should these production capabilities not be demonstrated to Keefer Laundry's satisfaction, Milnor will make necessary adjustments, fix any defective equipment, or replace it, so as to demonstrate them. In the event that we are unable to demonstrate them to the laundry's satisfaction, we will accept return of the equipment and return all monies paid to us.

We are confident that you will find no stronger guarantee of customer satisfaction than that which is offered above. It is made in good faith, with the absolute intention that it shall never be necessary for laundry management to invoke it, but will be in force throughout the first year after start-up. It of course presumes that everyone associated with this project will make their best good faith efforts to help the project succeed. To that end you can count on Pellerin Milnor Corporation and Tessler Fabcare to spare no effort to insure your satisfaction.

14    A letter of 21 January 1999 set out the "structural guarantee". It provided:

I respond to your request for additional assurance regarding the strength of the structural components of the Milnor CBW, press, and dryers which are included in our package for your new washroom with the following guarantee:

Pellerin Milnor Corporation guarantees that the CBW, press, and dryer structural members will be free from metal fatigue or weldment failure for a period of five (5) years, or 20,000 operating hours from date of installation, whichever is longer. Failed components will be replaced at no charge, freight charges for your account. This warranty is voided in the event of failures due to lack of maintenance, misuse, or abuse, or operation contrary to manufacturer's instructions.

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

Howard, I have the utmost confidence in the structural integrity of these items. I hope that the foregoing guarantee, with caveat, addresses your concerns. We look forward to bringing this exciting project to a successful conclusion.

15    Milnor conceded that the production guarantee and the structural guarantee were collateral warranties.

16    Milnor wrote a further letter on 25 January 1999 answering additional questions about the capability of a "shuttle conveyor" transferring goods from the two tunnel washers to the dryers. This letter is not the subject of any issue on appeal.

17    The new equipment was installed at the beginning of August 1999. Keefer began to use it in its operations in October 1999.

18    Mr. Wong began to complain about problems with the equipment almost immediately. His complaints continued for more than two years. Those complaints related to almost every aspect of the new system, and they were the subject of extensive written and oral communications between Keefer, Tessler and Milnor, and of internal communication within Milnor. In many cases, Milnor repaired, or attempted to repair, the problem. In other cases, Milnor was unable to confirm the existence of the problems of which Keefer complained. In still other cases, Milnor blamed Keefer for improper or inefficient use of the equipment.

19    A major complaint related to "fallback": the problem of some goods in one module of the CBW (tunnel washer) failing to be transferred into the next module. As a result, different customers' goods were mixed together with the potential for overwhelming and jamming the system. Each time this occurred, as it frequently did, hours were required to drain and clear the system.

20    The difference in design of the new model related to the mechanism which transferred laundry from one module to the next. Eventually, a mutual decision was made to modify this mechanism and Milnor sent welders to the Keefer plant on two occasions in late 1999 to make these changes.

21    The modifications improved operations somewhat, but the plaintiff's complaints of fallback and mixing continued. The welders returned in early 2000 and welded metal plates onto part of the transfer mechanism. This blocked some perforations and increased the amount of water that was transferred forward when the laundry went from one module to the next.

22    Another problem that arose with the new equipment was the tearing of linen. Other complaints related to the speed and efficiency of the shuttle conveyor and problems with the presses, dryers and control package.

23    On 12 December 1999, Mr. Wong said he wanted the new tunnel washers replaced with the older models. The trial judge held that this request triggered the production guarantee of 20 January 1999, which was "in force throughout the first year after start-up".

24    No one from the defendant responded to Mr. Wong's request and he did not repeat it for the next two years. However, Keefer did continue to make complaints through the first half of 2000.

25    In July 2000, Milnor's engineering manager, Mr. Ken Gaulter, visited Keefer's plant. He performed some limited tests on the system but could identify no significant fallback problem. He attributed the jamming and overloading to sources other than defective Milnor equipment.

26    Mr. Gaulter returned in September 2000 to conduct more tests. Again, he did not observe a problem of the magnitude complained of by Keefer.

27    The parties entered into discussions about possible new starting dates for the warranties on some of the equipment, and about compensation for some of the problems encountered, including damaged goods. These discussions culminated in the execution of the document relied upon by Milnor as a release.

28    The document is in the form of a letter from Milnor to Keefer Laundry, originally dated 16 October 2000, re-sent for signature on 2 December 2000, and eventually signed by Mr. Wong on or about 11 December 2000. The letter reads in full:

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 103 of 589

Keefer Laundry Ltd. v. Pellerin Milnor Corp., 2009 BCCA 273, 2009 CarswellBC 1568

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

This will confirm our conversation of Thursday, 12 October where we went over all the outstanding issues with your new installation involving either Tessler or ourselves.

As I told you, we will issue a check for US $7,900 covering all your outstanding claims against either us or Tessler including parts warranty, labor warranty (which has now expired), damaged linen, etc. (in other words, everything!) This check will be issued once we receive a copy of the check you have written to Tessler for payment in full on your account.

Once this occurs, Tessler is free of all obligations to your company and the only obligation and/or guarantees we have would be our standard parts warranty running from the following dates:

| Warranty: | Commencement date |
|---|---|
| CBW | January 1, 2000 |
| Press | April 1, 2000 |
| Dryers | April 1, 2000 |

For the sake of good order please sign a copy of this letter signifying your agreement and return it to us for our records.

29    There is a handwritten amendment to the letter inserted, and initialled, by Mr. Wong. It is opposite the line "CBW January 1, 2000" and it reads "except for extended warranty on the structural integrity of the CBW".

30    This document is at the centre of this appeal.

31    Keefer's complaints continued through 2001. In December 2001, the plaintiff identified rust in a number of locations in the tunnel washers where they had been welded, and also saw rust stains on some laundered linen. Keefer attributed this to deficient welding. Milnor initially attributed it to other factors such as excessive use of bleach, or iron entering the system through the City water supply system.

32    Meetings between Keefer and Milnor representatives in early 2002 failed to resolve the issues. In about April 2002, Keefer decided to purchase new equipment from a German manufacturer. It did so in 2002 and 2004. Eventually, Keefer removed one Milnor tunnel and three Milnor dryers, continuing to operate the other Milnor equipment.

33    Keefer commenced this action against Milnor and Tessler on 24 July 2002. It filed an amended statement of claim on 17 October 2006. Milnor filed a defence on 21 October 2002, and an amended statement of defence on 5 January 2007.

34    Tessler, as mentioned above, ceased operations in the fall of 2000 and did not defend the action. Its former president, Mr. Phillip Payne, testified at trial.

35    In its claim, Keefer sought damages totalling about $11 million on various grounds, including breach of contract, breach of the performance guarantee, breach of express or implied warranties or conditions, breach of express and implied warranties under the *Sale of Goods Act*, negligence and negligent misrepresentation.

### III. The Reasons for Judgment

36    The learned trial judge held that Milnor was in breach of the production guarantee (at paras. 74-88 of his reasons). That finding is not challenged on this appeal. He held that the plaintiff was entitled to rely on that guarantee because it was invoked within one year from the date of start-up. He said:

[89] The production guarantee was in effect for only a year. However, I find that Mr. Wong's December 1999 demand for replacement of the tunnel washers constituted a sufficient and timely triggering of Milnor's obligations to repair or replace the equipment.

37    On this appeal, Milnor does not challenge that finding either.

WestlawNext CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

38      The trial judge also held that although the production guarantee contained language showing an intention to contract out of any statutory warranty of fitness, the wording of the defendant's limited standard warranty was "... not sufficiently explicit to exclude the operation of the implied condition in the *Act"* (para. 104).

39      The learned trial judge then considered the application or effect of the "release" letter, quoted above at para. 28. He referred to the law concerning the construction of written agreements and, in particular, releases. He said:

[111] Read in isolation, the release document in this case appears very broad. It lacks the formal, sometimes convoluted and archaic language often seen in releases drafted by lawyers, but is, if anything, clearer for having been written in everyday language. It refers to "all your outstanding claims," adds the phrase "in other words, everything" and states that the "only obligation and/or guarantees we have would be our standard parts warranty." The question is whether the context of the surrounding circumstances shows that the parties intended it to have a narrower application.

40      The judge then examined the circumstances he considered relevant to the construction of the letter, and some further case law, including *Fotinis Restaurant Corp. v. White Spot Ltd.* (1998), 38 B.L.R. (2d) 251 (B.C. S.C. [In Chambers]); *Privest Properties Ltd. v. Foundation Co. of Canada Ltd.* (1997), 36 B.C.L.R. (3d) 155, 145 D.L.R. (4th) 729 (B.C. C.A.); and *White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293 (N.B. C.A.).

41      Then he said:

[123] The release document in this case refers to a discussion of October 12 where "all outstanding issues" were discussed. It could be argued that those words are the equivalent of a recital in a more formal release and the release covers only the specific matters discussed at that meeting. There is no evidence that expressly sets out, point by point, what was or was not said at that meeting. Mr. Satchwell testified that "all technical issues" were discussed and referred to jamming and leaks as specific examples.

[124] However, any uncertainty or ambiguity is removed by the subsequent statement that "the only obligations we would have" are the ones listed in the document. To use the language of Professor Fridman quoted above, I do not think it would be possible for any reasonable, objective person, knowing all the facts, to conclude that statement means anything less than what the plain, ordinary meaning of the words conveys.

[125] In this case, Keefer had complained to Milnor about defects or problems with every aspect of the system along with general failure of the system to meet the production guarantee. At the risk of being repetitive, the following is a list of the specific complaints made by Keefer on one or more occasions at some point before December 2000, when Mr. Wong signed the release: ...

42      The judge then listed twenty-four specific complaints made by Mr. Wong prior to his signing of the release. These included the fallback problem, problems at the entry chute, and excessive lint. Mr. Wong had complained that the press rusted, leaked oil, caused "hydroburst" damage, and was unable to maintain sufficient even pressure or extract water from small loads. Its rubber diaphragms had failed, as had material on the press roller. There had been problems with the elevators' gears and motors and with shuttle operation and efficiency. Mr. Wong complained, too, of excessive dry times; "pancaked", burned linens; the failure of the dryers' bearings, pilot lights and ignition systems; and the improper functioning of the dryers' automatic lint-removal systems. The judge continued:

[126] With one major exception discussed below, that list represents a fairly extensive catalogue of the specific alleged failures of the system that Keefer relied upon at trial. All of them are alleged to have contributed, to a greater or lesser degree, to the fact that Keefer could not achieve the production levels it was promised. By the time Mr. Wong signed the release on behalf of Keefer, all of them had been the subject of discussion between Keefer and Milnor. Keefer, on one occasion, had gone so far as to demand replacement of the tunnel washers. These issues were all clearly "in the contemplation" of the parties.

Keefer Laundry Ltd. v. Pellerin Milnor Corp., 2009 BCCA 273, 2009 CarswellBC 1568

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

[127] Keefer also argues that, although there were many "issues" between Milnor and Keefer at the time of the release, only some of them had resulted in "claims", in the sense of specific monetary demands, and the release refers to "outstanding claims." I cannot accept that submission because the release in fact refers first to a discussion at which it is said "we went over all outstanding issues" then refers to a cheque covering "outstanding claims." Any possible distinction between the words "issues" and "claims" is, in the context of the release and the surrounding circumstances, eliminated by what I find to be the unambiguous phrases "in other words, everything" and "the only obligation and/or guarantees we have would be our standard parts warranty."

[128] Accordingly, I find that most of the defects Keefer relies upon, most importantly the inability of the system to meet the production guarantee, existed and were in the contemplation of both parties at the time the release was signed. <u>To the extent that Keefer's claim is based upon those matters, it must fail.</u>

[Emphasis added]

43    The judge held that the release was an effective answer to the plaintiff's claims based on negligent misrepresentation and breach of the implied condition of the *Sale of Goods Act* (paras. 129-131).

44    With respect to the plaintiff's claim based on the alleged breach of the structural guarantee, the judge said the "real question" was whether the structural guarantee is properly interpreted as including a guarantee against rust and corrosion" (para. 141). After referring to the language of the letter of 21 January 1999 (para. 14 above), the judge held that the rust problem was not within the ambit of the guarantee (paras. 144-145), that the rust was not shown to have made the equipment "unfit" (para. 146) and that in and of itself it had "no noticeable impact on Keefer's ability to use the equipment" for its intended purpose (para. 148).

45    The judge further held that the plaintiff had failed to establish a claim based on negligent design, manufacture or repair (paras. 152-156), and that tort law should not interfere with the parties' contractual agreement on risk allocation (para. 157). He concluded:

[158] In summary, I find that the equipment supplied by Milnor failed to meet Keefer's production requirements and Milnor was in breach both of the express warranty it provided to Keefer and of the implied condition of fitness for purposes of s. 18 of the *Sale of Goods Act*. However, I also find that Milnor is entitled to rely on the document agreed to by Keefer in December 2000 as an effective release of Keefer's claim.

[159] I find further that rust and corrosion problems, which developed after the release was executed, did not constitute a breach of the structural guarantee that Milnor provided and did not, in and of themselves, amount to a breach of the implied statutory condition.

[160] These conclusions are based upon the law of contract and the law relating to sale of goods and Keefer cannot obtain a different or contrary result by resorting to the law of torts.

46    Accordingly, he dismissed the plaintiff's action.

## IV. The Parties' Positions

47    The plaintiff contends that the learned trial judge erred in his construction of the "release letter" of December 2000. The plaintiff says that, properly construed, the letter is a release in respect of the three matters specified in the second paragraph only, namely the parts warranty, labour warranty and the claim for damaged linen, and that the letter does not constitute a general release as the trial judge held. In particular, the plaintiff contends the letter is not a release of its claim under the production guarantee of 20 January 1999.

48    The plaintiff says the learned trial judge erred in misdirecting himself on the law with respect to the construction of written agreements, and particularly releases. The plaintiff says the reduced production problems were not within the parties'

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

contemplation when Mr. Wong signed the letter in December 2000, and that the trial judge wrongly equated the parties' knowledge of various problems with their intention to resolve the matters that were within their mutual contemplation.

49    The plaintiff says the language of the release letter must be read and understood in the context of what was in the parties' contemplation, and that the trial judge's failure to do so is an error of law that should be corrected in this Court.

50    The plaintiff points to the parties' conduct after the signing of the letter, which it says shows that neither party considered the defendant's obligations under the production guarantee to be at an end. The plaintiff says that subsequent conduct is relevant to a determination of what the parties intended by making the December 2000 agreement.

51    The plaintiff also says the trial judge erred in his construction of the structural guarantee letter of 21 January 1999, and in particular erred in holding that the rusting and corrosion of defective welds in the CBWs did not constitute a "weldment failure" within the meaning of that document.

52    The defendant supports the reasons and conclusions of the learned trial judge in all respects. It says there is no extricable error of law that would permit appellate intervention. The defendant says that interpreting the language of the release letter, and determining objectively the intention of the parties, are questions of mixed fact and law. It says the trial judge applied the correct principles for interpreting a written agreement, and that this Court should defer to his factual determination as to what was in the parties' contemplation when the agreement was made.

53    The defendant says there is no ambiguity in the language of the agreement and that accordingly the parties' subsequent conduct was not relevant to determining the meaning of the agreement.

54    The defendant also says that the trial judge properly construed the structural guarantee, and that rusting and corrosion do not amount to weldment failure within the meaning of that guarantee.

## V. The Standard of Review

55    Historically, the construction of a written contract was considered to be a question of law reviewable by an appellate court on the standard of correctness.

56    This approach is no longer accepted in Canada. In *Canadian Contractual Interpretation Law*, the learned author, Hall, says:

Interpretation involves a complex interplay between the words of a contract and the context in which they arise. Consideration of the context involves questions of fact which require a trial judge to hear evidence, and consideration of the words cannot be cleanly separated from consideration of the context. Thus, it is no longer appropriate to consider the endeavour to be a pure question of law which can be reviewed by an appellate court on a standard of correctness.

57    *Chitty on Contracts* explains:

12-046 Law and fact. The construction of written instruments is a question of mixed law and fact. The expression "construction" as applied to a document includes two things: first, the meaning of the words; and, secondly, their legal effect, or the effect which is to be given to them. Construction becomes a question of law as soon as the true meaning of the words in which an instrument has been expressed and the surrounding circumstances, if any, have been ascertained as facts. However, the meaning of an ordinary English word, of technical or commercial terms and of latent ambiguities, and the discovery on the surrounding circumstances (when they are relevant) are questions of fact.

58    In *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120 (Ont. C.A.), the Ontario Court of Appeal pointed out that the interpretation of a contract can involve questions of law, questions of fact and questions of mixed fact and law. The standard of review depends on the nature of the question.

59    Hall points out that the interpretation of a release requires the court to determine as a matter of fact what was in the parties' contemplation when the release was executed:

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

A release is a contract, and the general principles governing the interpretation of contracts apply equally to releases. However, there is also a special rule which is superadded onto the regular ones. This rule comes from *London and South Western Railway v. Blackmore*, an 1870 decision of the House of Lords. The rule in *London and South Western Railway* holds that a release is to be interpreted so that it covers only those matters which were specifically in the contemplation of the parties at the time the release was given. The rule allows the court to consider a fairly broad range of evidence of surrounding circumstances in order to ascertain what was in fact in the specific contemplation of the parties at the relevant time, and it is not uncommon for a significant amount of extrinsic evidence to be examined when the rule is applied. However, like the law of contract interpretation generally, the scope of permissible extrinsic evidence does not extend to evidence of the parties' subjective intentions; such evidence is strictly inadmissible.

60    I conclude that unless there is a clearly identifiable or "extricable" error of law apparent from the reasons of the trial judge, his conclusions should be reviewed with deference. In particular his findings of fact may only be set aside if the appellant can demonstrate palpable and overriding error: see *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 (S.C.C.).

## VI. Analysis

61    The learned trial judge adopted as applicable the principles of contractual interpretation articulated in *Bank of British Columbia Pension Plan, Re*, 2000 BCCA 291, 137 B.C.A.C. 37 (B.C. C.A.) at para. 17; *Hannan v. Methanex Corp.* (1998), 46 B.C.L.R. (3d) 230, [1998] 7 W.W.R. 619 (B.C. C.A.); and *White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293 (N.B. C.A.).

62    In the latter case, La Forest J.A. (as he then was) quoted and applied the statement of Lord Westbury in *London & South Western Railway v. Blackmore* (1870), L.R. 4 H.L. 610 (U.K. H.L.), at 623:

The general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given. [emphasis added]

63    La Forest J.A. explained:

By referring to what was in the contemplation of the parties, Lord Westbury was, of course, not opening the door to adducing evidence of what was actually going on in their minds, still less to making inferences about it. Such considerations are relevant solely to issues such as undue influence, mistake, fraud and the like which have no application here. What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about.

64    I have set out above, at paragraphs 41 and 42, the reasons of the learned trial judge at paragraphs 123 to 128, which state his findings of fact as to what the parties had in their contemplation, and which explain his application of the legal principles to the facts that he found. Critical to his reasoning is his finding of fact (para. 126) that the alleged failures catalogued in paragraph 125 were "all clearly in the contemplation of the parties" and his finding at paragraph 128 that:

... most of the defects Keefer relies upon, most importantly the inability of the system to meet the production guarantee, existed and were in the contemplation of both parties at the time the release was signed. To the extent that Keefer's claim is based upon those matters, it must fail.

65    I can see no principled basis upon which this Court could interfere with those conclusions. There is no error of law, extricable or otherwise, that would permit this Court to intervene. The trial judge's findings of fact are well supported by the evidence.

2009 BCCA 273, 2009 CarswellBC 1568, [2009] B.C.W.L.D. 4729...

66    I do not consider that the judge erred in declining to consider the parties' conduct after the release letter was signed. He held the document had only one reasonable meaning, and that absent ambiguity, subsequent conduct was not relevant. I respectfully agree.

67    Applying the same standard of review, I can see no error of law or fact in the trial judge's construction of the structural guarantee and his application of the law to the relevant facts. I would not give effect to this ground of appeal.

**VII.**

68    I would dismiss the appeal essentially for the reasons given by the learned trial judge, with which I am in general agreement.

*Lowry J.A.***:**

   I agree.

*Neilson J.A.***:**

   I agree.

*Appeal dismissed.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.          10

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

1998 CarswellOnt 4170

Ontario Court of Appeal

Kentucky Fried Chicken Canada v. Scott's Food Services Inc.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

## Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd., Plaintiff (Respondent) and Scott's Food Services Inc. and Scott's Hospitality Inc., Defendants (Appellants)

Moldaver, Goudge JJ.A., Ferrier J. (ad hoc)

Heard: May 4-5, 1998
Judgment: November 2, 1998
Docket: CA C28208

Proceedings: reversing (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.); additional reasons at (November 5, 1997), Doc. 96-CU-103096 (Ont. Gen. Div.)

Counsel: *Dennis R. O'Connor, Q.C.*, *David Stockwood, Q.C.*, *Nancy J. Spies* and *Timothy H. Mitchell*, for the appellants. *David R. Byers*, *Katherine L. Kay* and *Christopher J. Cosgriffe*, for the respondent.

Subject: Intellectual Property; Corporate and Commercial; Contracts; Torts; Property; Civil Practice and Procedure; Evidence

### Headnote

**Contracts --- Franchising contracts — Construction and interpretation — General**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Trial judge held that corporation was obligated to seek approval and consent of licensor to any sale of majority control of voting shares of corporation or licensee — Failure to obtain such approval was breach of licence agreement — Appeal by licensee allowed — Agreement did not give licensor right to approve change in controlling shareholder of licensee — Ordinary meaning of language in agreement suggested licensor had right on entering franchise agreement to know and approve shareholders of licensee — Nothing in agreement suggested right to approve change in shareholders seven years later — Throughout relationship licensee had made it clear that it would not agree to any restriction on changes of ownership of licensee — Deemed transfer provisions which gave rise to licensor's right to approve change in shareholders of other franchisees under standard franchise agreements were absent from agreement between licensee and licensor — It would lead to commercial absurdity to interpret right of approval as continuing right — Provision in agreement requiring licensee to give licensor information about shareholders of prospective purchaser would be superfluous if licensor had continuing right to approve shareholders of licensee — Given history of parties, it could not be said that it did not make good business sense to restrict right of approval to time parties entered into agreement — Strong bargaining position of licensee made generally accepted industry practice of little use in interpreting agreement — Change in shareholders of licensee did not constitute licensee dealing with its interest under license agreement — Licensor did not have right to prior written consent to corporation's sale of assets — Corporation's transaction did not give rise to right of first refusal on part of licensor as there was no offer to licensee.

**Corporations --- Nature of corporation — Distinct existence — From owner — Lifting the corporate veil**

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as alter ego, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not alter ego of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for primary purposes of licence agreement, but took no part in its daily management — Appeal by licensee allowed on other grounds.

### Agency --- General principles

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as agent, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not agent of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for purposes of licence agreement, but took no part in its daily management — Fact that parent corporation made major policy and financial decisions carried out by subsidiary not determinative — Profits of subsidiary were treated as profits of parent corporation on consolidated balance sheet only — Profits of subsidiary not directly traceable to skill and direction of parent corporation — Appeal by licensee allowed on other grounds.

### Evidence --- Parol evidence rule — Interpretation — Usage, custom, course of dealings — General

Parties entered into franchise licence agreement — Licensor brought action involving interpretation of agreements and moved to exclude extrinsic parol evidence — Motion allowed in part — Extrinsic evidence admissible to enable court to determine latent ambiguity in written agreement and to construe true intention of parties — Evidence of subjective intention with respect to agreement, and of negotiations and drafts leading to execution of agreement, was not admissible — Relationship between parties and custom in industry were part of factual matrix that must be looked at to interpret agreement — Evidence of licence agreements between licensor and other franchisees in Canada, and between licensor's associated companies and franchisees in other countries, were admissible as relevant to custom in industry — Appeal by licensee allowed on other grounds — Agreement to be interpreted objectively, in accordance with sound commercial principles and good business sense.

### Equity --- Equitable doctrines — Relief against penalty and forfeiture — General

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Transactions were in breach of licence agreement and gave licensor right to terminate agreement, subject to claim for relief from forfeiture — Licensee knowingly committed breach of licence agreement — Relief from forfeiture not insurance policy for party taking chance on interpretation of essential term of its contractual rights and losses — Conduct of licensor in vigorously opposing what it considered to be breach of licence agreement was not exceptional or unconscionable — No valid reason to grant relief from forfeiture — Appeal by licensee allowed on other grounds.

### Contracts --- Franchising contracts — Performance or breach — Duty of franchisees — General

License agreement provided licensor could require renovations and remodelling of franchise outlets to its standards — Agreement required licensee to upgrade all outlets in accordance with "world wide image" standards and obtain "outlet

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

certification agreements" for each outlet — Development agreement provided for annual enhancement program covering at least 10 per cent of outlets — Licensee upgraded more than 10 per cent of outlets each year from 1990 to 1996, except for 1991, but failed to have 10 per cent of outlets certified every year — Licensee admitted 69 outlets were not upgraded to "world wide image" standards, but were upgraded within its interpretation of agreements — At end of 1996, 28 per cent of outlets did not comply with upgrade provisions of development agreement — Trial judge held that licensee was in substantial breach of development agreement, and provided licensee with three months to remedy default — Licensee brought appeal against finding that licensee must enhance all of its outlets within three months and not just sufficient number so that failure becomes less than material and substantive — Appeal allowed — License agreement permitted licensor to terminate if licensee failed in "material and substantive manner" to meet enhancement obligations — Trial judge held that licensee was in substantial breach where more than five to ten percent of outlets fell below required standard — To correct failure, licensee was only required to ensure that no more than five percent of its outlets were substandard.

### Practice --- Costs — Jurisdiction and discretion as to costs

In written submissions at end of trial both parties referred to provision of license agreement between them and claimed full indemnity of their costs — Law was clear that contractual right should be followed by court unless there are special circumstances or where there had been inequitable conduct — In present case had been no inequitable conduct nor special circumstances relating to action — Trial judge ordered there be no costs of trial on basis of provision in license agreement — Appeal of judgment by licensee allowed — Trial judge's order as to costs affirmed — Licensee entitled to costs of appeal.

### Practice --- Judgments and orders — Amending or varying — General

From notes it could be seen that counsel had conceded that plaintiff had not called any evidence regarding monetary damages, not as mistakenly put into reasons that plaintiff had not suffered any monetary damages — Reasons for judgment were amended to take this into account — Appeal of judgment allowed on other grounds.

### Table of Authorities

**Cases considered by *Goudge J.A.*:**

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 1 O.T.C. 322, 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) — distinguished

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153 (Ont. C.A.) — applied

*Toronto (City) v. W.H. Hotel Ltd.*, [1966] S.C.R. 434, 56 D.L.R. (2d) 539 (S.C.C.) — applied

APPEAL by licensee from judgment reported at (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.), allowing licensor's action for breach of license agreement.

### The judgment of the court was delivered by *Goudge J.A.*:

1    This appeal was heard on May 4 and 5, 1998. This court's reasons for judgment were ready for release on July 9, 1998 when the parties contacted the court to request that this not be done. On the basis of the reasons given by the parties for this

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

request, the court agreed to refrain from releasing its judgment until November 1, 1998 but made clear that the judgment would then be released unless prior to October 31, 1998 both parties notified the court in writing that the matter had been fully and finally settled and that the appellant wished to withdraw the appeal. This has not happened and these reasons are therefore being released.

2    The appellant Scott's Food is the largest Kentucky Fried Chicken ("KFC") franchisee in the world. Its franchise agreement (the "license agreement") with the respondent covers some four hundred outlets, approximately half of all KFC outlets in Canada.

3    Up until 1996, Scott's Food was owned by the appellant Scott's Hospitality whose other major business was a school bus operation. At that point, as part of a transaction with Laidlaw Inc. ("Laidlaw") in which Laidlaw acquired the school bus business, the shareholders of Scott's Hospitality replaced it as the sole shareholder of the franchisee with a new company, Scott's Restaurants. As a result, these shareholders then owned Scott's Restaurants which in turn owned Scott's Food. This change was made without the respondent's consent.

4    There were two main issues at trial. The second, which the parties call the enhancement issue, was whether, apart altogether from the corporate changes entailed by the Laidlaw transaction, Scott's Food had upgraded its outlets as required by its contract. At trial, Steele J. found that it had not. I will come in due course to the limited appeal taken from the judgment below on this issue.

5    The first and indeed the fundamental issue at trial, called the transfer issue, was whether the license agreement required the appellants (to whom I will refer jointly as "Scott's") to obtain the respondent's consent to the change in ownership of the franchisee failing which the respondent could terminate the agreement. Steele J. interpreted the contract as requiring consent, thereby giving the respondent the right to terminate since no consent was obtained. For the reasons that follow, I have come to the opposite conclusion and I would therefore allow the appeal on the transfer issue.

**The Transfer Issue**

*The Relevant Facts*

6    The license agreement that is the subject of this litigation was signed on June 9, 1989, effective January 1, 1989. The respondent was the franchisor and the appellant Scott's Food the franchisee. The latter was a wholly-owned subsidiary of Scott's Hospitality which was not a party to the agreement.

7    At the time the license agreement was made, Scott's operated about one-half of all the KFC outlets in Canada and more than ten times as many as the next largest franchisee in the country. Unlike most franchisees, Scott's had very significant bargaining power in the negotiations which led up to the agreement.

8    For the purposes of the transfer issue, the critical paragraphs of the license agreement are the following:

**16. Transfer**

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

9    Paragraph 17.2(d) reads as follows:

> 17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:
>
> . . . . .
>
> (d) Licensee makes or permits a transfer contrary to the provision of Paragraph 16;

10    The history of Scott's as a KFC franchisee predates the license agreement by twenty years. It goes back to 1969 when Scott's Hospitality entered into an agreement to become a franchisee operating KFC outlets in Canada. The franchisor then was Col. Sanders Kentucky Fried Chicken Limited ("Colonel Sanders"), the owner of the KFC trademarks in Canada. This agreement was to run until January 1, 1994. It is noteworthy that it contained no clause like the current paragraph 16.1. It did not specify that the rights of Scott's Hospitality were personal to it, nor were there any provisions restricting the transfer of its shares. There was, however, a provision restricting the transfer of the license without the prior written consent of the franchisor.

11    By 1985, the franchisor had developed a standard franchise agreement ("the 1985 Agreement") containing certain restrictions on the transfer of shares in the franchisee which, at that point, were standard in all KFC franchise agreements in Canada except that with Scott's Hospitality.

12    While paragraph 16.1 of the 1985 Agreement reads identically to paragraph 16.1 in the license agreement, paragraph 16.2 of the 1985 Agreement when coupled with paragraph 16.4 contains significant differences. These two paragraphs are reproduced below, highlighting the words that do not appear in the license agreement:

> 16.2 The Franchisee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), **and shall not suffer or permit any deemed sale, transfer or assignment of this Agreement or its rights or interest hereunder (hereinafter referred to as "deemed transfer" and more particularly defined in paragraph 16.4)**, without KFC's prior written consent and **Franchisee's** compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer **or deemed transfer**, or any attempt to do so, contrary to this Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in paragraph 17.2(d).
>
> **16.4 For the purposes of this Paragraph 16, a deemed transfer of this Agreement or the rights and interest hereunder shall include**:
>
> (a) ...
>
> **(b) in the event that Franchisee is a corporation, any change (including but without limitation any issuance, sale, assignment, transfer, redemption or cancellation of, or conversion of any securities into, voting shares of the corporate Franchisee or any other corporation referred to in paragraph 16.1, or any amalgamation, merger or other reorganization of the corporate Franchisee or any such other corporation) in any of the holdings of voting shares referred to in paragraph 16.1; provided that, in the case of any such corporation the voting shares of which are listed and publicly traded on a stock exchange, no such change in any of the holdings of its voting shares shall constitute a deemed transfer unless, in the sole opinion of KFC, direct or indirect control of the corporate Franchisee would thereby be changed.**

13    In 1987, Col. Sanders sold its entire interest in the KFC trademarks in Canada to Kentucky Fried Chicken's corporation ("KFC Corp." or "KFC") which held those rights for the rest of the world.

14    Just prior to this sale, by letter agreement dated July 16, 1987, KFC Corp. agreed that when the sale from Col. Sanders was concluded, it would grant Scott's Hospitality a ten-year renewal of the 1969 agreement. This letter agreement suggested no constraint on the transfer of shares of the franchisee.

15    Pursuant to the 1987 letter agreement, negotiations ensued between KFC and Scott's Hospitality. In these negotiations, Scott's Hospitality refused to agree to terms in the language of the 1985 agreement, just as it had previously refused to do with Col. Sanders. The Scott's representative made clear to KFC that Scott's would not agree to any restrictions on changes of ownership in the licensee.

16    The relative bargaining power of Scott's and KFC in these negotiations was the subject of some considerable attention at trial. The chief KFC negotiator testified that Scott's was at least the equal of KFC in bargaining power. The leading expert for KFC testified that it was unusual for a franchisee to be in such a position.

17    Because of these unique circumstances, the trial judge concluded that the evidence of the experts as to the usual practice in the franchising industry must be applied with caution. Ultimately, he found that Scott's had sufficient bargaining power to negotiate a contract in which there would be no restriction on the transferability of shares. The question he had to decide was whether the resulting license agreement contained such a restriction.

18    The first of the two Laidlaw transactions, which triggered the need to answer this question, began in January 1996 with an unsolicited offer from Laidlaw to purchase all of the shares of Scott's Hospitality. Laidlaw's intention was that following a successful takeover, it would sell off Scott's Food and retain the school bus business operated by Scott's Hospitality. Laidlaw's offer contained a condition that it be satisfied that there was no impediment to its disposing of the shares of Scott's Food to a third party without affecting the franchisee's rights under the license agreement. KFC was not prepared to give its consent to this transaction and indeed commenced this litigation in response. As a result, this Laidlaw proposal could not be completed within its time frame and hence it did not proceed.

19    Rather, a second Laidlaw transaction was structured in which Scott's Restaurants was incorporated as a subsidiary of Scott's Hospitality. Scott's Hospitality then transferred its shares in Scott's Food to Scott's Restaurants in exchange for shares of Scott's Restaurants which were dividended out to the shareholders of Scott's Hospitality. The shareholders of Scott's Hospitality thereby became the owners of Scott's Restaurants which, in turn, became the owner of the franchisee, Scott's Food. Laidlaw then purchased the shares of Scott's Hospitality thereby acquiring the school bus business.

20    KFC was kept fully informed of this transaction but continuously opposed it. Indeed, its consent was never expressly sought. The simple question at trial was whether that consent was required.

*The Judgment Below*

21    The trial judge found that while Scott's Food as franchisee was bound by the license agreement, Scott's Hospitality was not bound by its terms. He concluded that Scott's Food was neither the alter ego nor the agent of Scott's Hospitality. The respondent does not contest this conclusion.

22    He then went on to his core finding on the transfer issue, namely, the construction of paragraph 16.1 of the license agreement. He construed that paragraph to contain a continuing obligation on the part of the franchisee to obtain approval of KFC to any transfer of the shares of either Scott's Food or its controlling shareholder. He put his findings in these terms:

> In my opinion the disclosure and approval of the directors and holders of majority control would be meaningless unless it was a continuing obligation and not merely at the time of execution. Based on good business sense section 16.1 must be construed as being a continuing obligation.
>
> . . . . .
>
> In my opinion there is nothing in section 16 that prohibits or gives the right of approval to KFC of trading of shares of Scott's Food or Hospitality provided that there is no issue of a change of control.
>
> There are no clearly expressed words requiring the approval of KFC to any transfer of the shares of Scott's Food or its controlling shareholders. However section 16.1 referring to the grant being personal and the reference to the directors and holders of majority control of the shares of Scott's Food and the broad reference to any other corporations with control

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

make it clear that any transfer of the controlling shares of Scott's Food or Hospitality are subject thereto. To interpret the section otherwise would defeat the personal aspect and not make good business sense and would be contrary to the generally accepted practice in the franchise industry.

23    He then moved directly and without elaboration to a finding that paragraph 16.2 prohibits a transfer or an attempted transfer of the license agreement without consent and since the first Laidlaw proposal was an attempted transfer and the second was an actual transfer, each breached paragraph 16.2 and gave KFC the right to terminate the license agreement pursuant to paragraph 17.2(d).

*Analysis*

24    The question to be determined on the transfer issue is one of contractual interpretation: properly construed, does either paragraph 16.1 or paragraph 16.2 of the license agreement require KFC's consent to either Laidlaw transaction? The trial judge determined that this was not a case of ambiguity and on this basis, he declined to consider evidence of the subjective intentions of the parties which were not communicated to each other. Equally he excluded the various draft documents leading up to the license agreement. He did, however, consider the relationship between the parties and the custom of the industry, including the license agreements between the respondent and other franchisees in Canada, as part of the factual matrix that must be looked at in interpreting the agreement.

25    I agree with this approach. While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989 (U.K. H.L.) at 995-96 Lord Wilberforce said this:

No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

26    The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.": *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901.

27    Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity [1]. Rather, the document should be construed in accordance with sound commercial principles and good business sense [2]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

28    With these broad principles of interpretation in mind, I turn first to the construction to be given to paragraph 16.1 of the license agreement. Properly construed, does it give KFC the right to approve a change in the controlling shareholder of the franchisee? It is the second Laidlaw transaction that requires this question to be answered. Given that the first Laidlaw transaction was not proceeded with, KFC did not argue at trial or on appeal that it breached paragraph 16.1.

29    It is helpful at this point to set out the provision again:

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee

acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

30     I have concluded that this clause does not give KFC a right to approve a change in the controlling shareholder of its franchisee Scott's Food. In other words, paragraph 16.1 does not extend to the second Laidlaw transaction. I say this for a number of reasons.

31     First, the license agreement was signed in 1989. The Laidlaw transactions occurred in 1996. The ordinary meaning of the language used in paragraph 16.1 suggests that the franchisor KFC had the right on entering the contract to know and approve the shareholders of the franchisee. There is nothing to suggest a right to approve a change in those shareholders some seven years later.

32     Second, such a right would mean a significant change from the agreement which had governed this franchise relationship since 1969 which clearly contained no such right. Moreover, Scott's had refused to enter into an agreement like the 1985 standard franchise agreement which did provide the franchisor with this right. The trial judge found that prior to executing the license agreement, KFC knew this and had been told that Scott's would not agree to any restriction on changes of ownership in the franchisee.

33     Third, the language of the 1985 standard franchise agreement is revealing. In 1989, when the license agreement was concluded, every other KFC franchise agreement in Canada expressly provided for the franchisor's right to approve a change in the shareholders of the franchisee. This was done not by means of paragraph 16.1 but rather through the "deemed transfer" language of paragraphs 16.2 and 16.4. Paragraph 16.1 in the license agreement ought not to be construed to provide the franchisor with this right where the identical language in the 1985 standard franchise agreement was clearly not intended to have that effect. The corollary to this is that the deemed transfer language which does provide this right to the franchisor in the 1985 standard franchise agreement is conspicuously absent from the license agreement.

34     Fourth, paragraph 16.1 extends the right of approval to the holders of majority control of the franchisee and any corporation which has an interest in the shares of the franchisee. If this language is read to give KFC a right to approve any subsequent change in the majority shareholder of the franchisee, it must also give KFC the right to approve a subsequent change in shareholder control of any corporation which owns any interest in the franchisee, even if it is only a single share. In argument, the respondent conceded that this would be a commercial absurdity. To find, as the trial judge did, that the franchisor's right of approval is limited to a change of control in the franchisee is, in my opinion, to read out of paragraph 16.1 the phrase "have an interest in". By contrast, to extend this right of approval to the majority shareholder and also to shareholders who have an interest in the shares of the franchisee does not create a commercial absurdity if that right applies simply at the point of entering the license agreement.

35     Fifth, paragraph 16.4 provides support for this interpretation. It requires the franchisee to seek KFC's consent to a transfer to a third party of the franchisee's interest under the license agreement. To allow an informed consent, this paragraph expressly obliges the franchisee to give KFC the same information about the shareholders of the third party that paragraph 16.1 provided concerning the franchisee. However, if paragraph 16.1 contained an ongoing right of KFC to be informed of and approve the shareholders of the party holding the franchise, paragraph 16.4 would be superfluous.

36     Finally, and with respect, it is my view that the three reasons offered by the trial judge for the opposite interpretation of paragraph 16.1 do not withstand scrutiny.

37     The first reason given by the trial judge was that the meaning I would accord to paragraph 16.1 would defeat the personal aspect of the license agreement. That paragraph certainly makes clear that the grant of the license is personal to the licensee. However, that licensee is clearly and expressly Scott's Food, not its controlling shareholder. A change in the latter leaves the licensee unchanged. Following the second Laidlaw transaction, the license is still granted personally to Scott's Food.

38     The second reason was that it would not make good business sense to read paragraph 16.1 so that it did not extend to a change in the shareholders of the franchisee. While this might not make good business sense from the perspective of the

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

franchisor, it might well make good business sense for the franchisee. In my view, neither of these is helpful in the required task of contractual interpretation. Rather, in applying objectively the interpretive principle of what accords with sound commercial principles and good business sense, the key fact is that for twenty years, from 1969 to 1989, this franchise relationship operated with apparent viability without the right of approval contended for by the respondent. In light of this history, it cannot be concluded that the meaning I give to paragraph 16.1 would not make good business sense.

39     Finally, it was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry. The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship. This franchisee appeared to have bargaining power at least equal to that of KFC and certainly sufficient power to achieve a contract with no restriction on the transferability of shares. By contrast, the trial judge found the industry standard to be that the franchisor has control over the franchisee. In these circumstances, the generally accepted industry practice is of little use in interpreting this particular license agreement.

40     Hence, I conclude that paragraph 16.1 of the license agreement cannot be construed to give KFC the right to approve a change in the shareholders of Scott's Food. This paragraph, therefore, was not breached when Scott's did not obtain KFC's approval of the second Laidlaw transaction.

41     It is next necessary to consider the proper interpretation to be given to paragraph 16.2 of the license agreement. It is helpful to reproduce this provision a second time:

16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

42     The respondent's primary argument was that the second Laidlaw transaction engaged the last sentence of this paragraph. It was said to be a transfer contrary to paragraph 16.1 which, because of paragraph 16.2, triggered the right of termination in paragraph 17.2(d). Given the conclusion I have reached concerning paragraph 16.1, this argument must fail.

43     Apart altogether from paragraph 16.1, however, the respondent also argues that for the purposes of paragraph 16.2, the first Laidlaw transaction was an attempted transfer and the second was an actual transfer and that KFC's prior written consent was therefore required.

44     In my view, this argument also must fail. On the ordinary meaning of the words used in paragraph 16.2, it is the licensee Scott's Food that is constrained from dealing with its interest under the license agreement. Once the alter ego argument is dismissed, this paragraph simply cannot reach Scott's Hospitality, the shareholder of the franchisee. Nor does it reach the shareholders of Scott's Hospitality. Neither an attempted change nor an actual change in the shareholders of the franchisee constitutes the franchisee dealing with its interest under the license agreement.

45     This conclusion is assisted by examining the language of the counterpart paragraph 16.2 in the 1985 standard franchise agreement. The two Laidlaw transactions would be encompassed by that provision only because of the inclusion of the "deemed transfer" concept. As I have said, this concept is conspicuously absent from paragraph 16.2 of this license agreement.

46     The respondent argues that its proposed reading of paragraph 16.2 is consistent with good business sense and industry practice. However, as I have indicated in connection with the argument on paragraph 16.1, in the circumstances of this case, neither of these aids to interpretation requires that paragraph 16.2 be read to give KFC the right to consent to a change in the shareholders of its franchisee.

47     Finally, the respondent relies on *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) to assert a broad meaning for the phrase "or otherwise deal with" as found in paragraph 16.2. That case is

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

different from this one in that, there, the contracting party was clearly dealing indirectly with its interest under the agreement. Here, neither Laidlaw transaction involved the franchisee dealing in any way with its interest under the license agreement.

48      I therefore find that, properly construed, paragraph 16.2 does not give KFC the right to prior written consent to either Laidlaw transaction.

49      Given my conclusions about paragraphs 16.1 and 16.2 of the license agreement, it is unnecessary to deal with the appellant's alternative arguments: that paragraph 16.1 is limited to a change in ultimate control of the franchisee; that KFC could not have reasonably refused its approval of the second Laidlaw transaction; that a breach of paragraph 16.1 entitles KFC to terminate only if it was a fundamental breach of the license agreement; but in any event, for KFC to terminate would be a breach of its good faith duty under the license agreement; and finally, that the appellants are entitled to relief from forfeiture. Nor is it necessary to deal with the respondent's alternative argument that a breach of paragraph 16.1 allows it to terminate through direct resort to paragraph 17.3 of the license agreement.

50      Before leaving the transfer issue, the remaining matter required to be dealt with arises from the finding below that pursuant to paragraph 16.3 of the license agreement, KFC had a right of first refusal in the circumstances of both Laidlaw transactions. That paragraph reads in part as follows:

    16 3 In the event that **Licensee receives** a bona fide offer, which **licensee is willing to accept**, from a third party to purchase or otherwise acquire any of the Licensee's rights and interest in this Agreement, ..., Licensee shall first offer to sell the same to KFC at the same price and on the same terms and conditions as in the third party's offer... In the event that KFC so accepts such offer to sell, a binding agreement of purchase and sale shall thereby be constituted between Licensee and KFC at the said price and upon the said terms and conditions....

    [Emphasis added.]

51      The reasons below reveal no analysis of the language in this paragraph by the trial judge in reaching his conclusion.

52      In my opinion, the ordinary meaning of the words used in the paragraph dictates the opposite conclusion -- that neither Laidlaw transaction triggered a right of first refusal. Neither an offer to purchase the shares of Scott's Hospitality nor an offer to change the controlling shareholder of Scott's Food is an offer which the franchisee receives or one which the franchisee can accept. The licensee cannot receive a takeover bid for the licensee's parent or for the licensee itself.

53      In summary, therefore, the appellant did not breach either paragraph 16.1 or paragraph 16.2 of the license agreement because of the Laidlaw transactions and KFC does not have the right to terminate the license agreement as a result. Nor did either Laidlaw transaction give KFC a right of first refusal.

54      I would accordingly allow the appeal on the transfer issue and set aside the declarations in paras. 1, 2, 3 and 4 of the judgment below. Instead, an order will go dismissing the claims for these declarations. Finally, I would set aside para. 13 of the judgment below and would grant the declaration sought therein.

**The Enhancement Issue**

55      The other major issue at trial was whether Scott's Food had failed to meet its obligations to enhance its KFC outlets. These obligations are contained in the license agreement and the addendum to it, the Master Development Agreement, signed at the same time. The trial judge's two principal findings on this issue were that Scott's Food had failed to enhance its outlets as required by paragraph 7.2 of the Master Development Agreement and, secondly, because more than five to ten per cent of the outlets had not been enhanced as required, the failure was material and substantive, thereby entitling KFC to terminate the license agreement pursuant to paragraph 17.2(e) unless Scott's Food corrects the failure within three months. The appellants appeal neither of these findings. Indeed, they raise only two grounds of appeal in connection with the enhancement issue.

56      Firstly, they appeal the declaration that KFC is also entitled to terminate the license agreement pursuant to paragraphs 17.2(e) and 17.3 because Scott's Food's enhancement failures were breaches of paragraphs 3.2, 5 and 6 of the license agreement.

While the judgment contains this declaration, the reasons for judgment do not reveal the basis upon which the declaration was made.

57    Second, they appeal the finding that to avoid KFC's right to terminate under paragraph 17.2(e), Scott's Food must, within three months, enhance all of its outlets, not just a sufficient number that the failure becomes less than material and substantive.

58    Turning to the first of these two grounds of appeal, it is helpful to set out paragraphs 17.2(e) and 17.3 of the license agreement:

> 17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:
>
> . . . . .
>
> (e) Licensee fails to satisfy, in a material and substantive manner, the requirements for enhancement and development contained in Articles 3.3, 3.4, 7.2 and 7.3 of the Addendum, provided that notice of any such failure is delivered to Licensee and Licensee shall not have corrected such failure within (3) months from the delivery of such notice.
>
> 17.3 The License will terminate on the termination date specified in any notice by KFC to Licensee (without any further notice of termination unless required by law), provided that (a) the notice is hand delivered or mailed at least thirty (30) days (or such longer period as may be required by law) in advance of the termination date, (b) the notice reasonably identifies one or more breaches or defaults in Licensee's obligations or performance hereunder, (c) the notice specifies the manner in which the breach(es) or default(s) are not fully remedied before, and as of, the termination date.

59    In my view, paragraph 17.2(e) deals explicitly and exhaustively with the enhancement obligations on the franchisee that, if not met, give KFC the right to terminate the license agreement. None of paragraphs 3.2, 5 or 6 of the license agreement is included in that list.

60    Moreover, as indicated by the trial judge, paragraph 17.3 merely sets out the procedure of formal notice. It does not accord to KFC a substantive right to terminate for any failure by Scott's Food to discharge its enhancement obligations. To so interpret paragraph 17.3 would fly in the face of paragraph 17.2 where the parties have carefully selected the enhancement obligations that, if breached, justify termination. Hence I would reverse the declaration that because the franchisee's enhancement failures breached paragraphs 3.2, 5 and 6 of the license agreement, KFC is entitled to terminate pursuant to paragraphs 17.2(e) and 17.3.

61    As to the second ground of appeal on the enhancement issue, paragraph 17.2(e) of the license agreement provides that failure *in a material and substantive manner* (my emphasis) to meet the franchisee's enhancement obligations as specified therein gives KFC the right to terminate if the failure is not corrected within three months. As I have said, the trial judge found that where more than five to ten per cent of the outlets fall below this required standard, Scott's Food was in substantial breach for the purposes of this paragraph. He went on to say this:

> ...KFC must give three months' notice from the date of this judgment to Scott's to allow it to remedy the default found in this decision on the enhancement issue. In other words, Scott's must be given three months in which to upgrade all of its remaining outlets to certification standards. If it chooses not to do so, it may close those stores under other termination procedures.

62    There is nothing in the actual judgment appealed from that requires the franchisee to enhance or close all of its remaining outlets to avoid termination. Hence, I propose to make no order on this ground of appeal.

63    However, in my opinion, if failure in a material and substantive manner to meet the enhancement requirements occurs when five to ten per cent of the outlets are below standard, correcting that failure means enhancing at least enough outlets so that there is no possibility of this line being crossed. This means that to correct that failure within three months, Scott's Food must ensure that no more than five per cent of its outlets are substandard. I would therefore not think it necessary that to correct

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

the failure, the franchisee must sufficiently upgrade all its remaining outlets. To do so would make the correction incongruent with the failure contrary to what I think is meant by the final phrase of paragraph 17.2(e).

64    The view I have expressed is also consistent with paragraph 6.3 of the Master Development Agreement. It contemplates that the franchisee could operate outlets for a limited period of time even if they had not been enhanced to the required standard. This paragraph is inconsistent with a correction requirement that would compel the franchisee to properly enhance all of its remaining outlets.

65    In summary, I would allow the appeal on the enhancement issue. I would set aside the declaration in para. 9 of the judgment below and order that the claim for this declaration be dismissed.

**Costs**

66    The trial judge ordered that there be no costs of the trial on the basis of paragraph 18.3 of the license agreement which required this result unless one party prevailed entirely, something that did not occur at this trial.

67    Before us, neither party sought to disturb this order and I do not do so. Both parties submitted that costs of the appeal should follow the result. I can see no reason why this should not happen.

68    In conclusion, I would allow the appeals with costs on the transfer issue and the enhancement issue in accordance with these reasons. The trial judgment is otherwise undisturbed.

*Appeal allowed.*

Footnotes

1    *Toronto (City) v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 (S.C.C.) at 548.

2    *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

---

End of Document Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



## SUPREME COURT OF CANADA

**CITATION:** Kerr *v.* Baranow, 2011 SCC 10       **DATE:** 20110218
           **DOCKET:** 33157, 33358

**BETWEEN:**

**Margaret Patricia Kerr**
Appellant
and
**Nelson Dennis Baranow**
Respondent

**AND BETWEEN:**

**Michele Vanasse**
Appellant
and
**David Seguin**
Respondent

**CORAM:** McLachlin C.J. and Binnie, LeBel, Abella, Charron, Rothstein and
Cromwell JJ.

**REASONS FOR JUDGMENT:**      Cromwell J. (McLachlin C.J. and Binnie, LeBel, Abella,
(paras. 1 to 221):            Charron and Rothstein JJ. concurring)

**NOTE:** This document is subject to editorial revision before its reproduction in final
form in the *Canada Supreme Court Reports*.

———————————————————

Kᴇʀʀ *v.* Bᴀʀᴀɴᴏᴡ


**Margaret Patricia Kerr**                                              *Appellant*


*v.*


**Nelson Dennis Baranow**                                          *Respondent*


- and -


**Michele Vanasse**                                                      *Appellant*


*v.*


**David Seguin**                                                       *Respondent*


**Indexed as:  Kerr *v.* Baranow**


**2011 SCC 10**


File Nos.:  33157, 33358.


2010:  April 21; 2011:  February 18.

Present:   McLachlin C.J. and Binnie, LeBel, Abella, Charron, Rothstein and
Cromwell JJ.
ON APPEAL FROM THE COURTS OF APPEAL FOR BRITISH COLUMBIA AND ONTARIO

  *Family law — Common law spouses — Property — Unjust enrichment —
Monetary remedy — Whether monetary remedy restricted to quantum meruit award
— Whether evidence of joint family venture should be considered in conferring
remedy — Whether mutual benefit conferral and reasonable expectations of parties
should be considered in assessing award.*

  *Family law — Common law spouses — Property — Resulting trust —
Whether evidence of common intention should be considered in context of resulting
trust — Whether resulting trust principles apply to property or monetary award in
resolution of domestic cases.*

  *Family law — Common law spouses — Support — Parties separating
after living together for more than 25 years — Female partner commencing
proceedings for a share of property and support — Whether support should be
payable from date of trial or date on which proceedings commenced.*

  In the *Kerr* appeal, K and B, a couple in their late sixties separated after a
common law relationship of more than 25 years.  They both had worked through
much of that time and each had contributed in various ways to their mutual welfare.

K claimed support and a share of property in B's name based on resulting trust and unjust enrichment principles. B counterclaimed that K had been unjustly enriched by his housekeeping and personal assistance services provided after K suffered a debilitating stroke. The trial judge awarded K $315,000, a third of the value of the home in B's name that they had shared, both by way of resulting trust and unjust enrichment, based on his conclusion that K had provided $60,000 worth of equity and assets at the beginning of their relationship. He also awarded K $1,739 per month in spousal support effective the date she commenced proceedings. The court of appeal concluded that K did not make a financial contribution to the acquisition or improvement of B's property that was the basis for her award at trial, and dismissed her property claims. A new trial was ordered for B's counterclaim. The court of appeal further held that the commencement date of the spousal support should be the date of trial.

In the *Vanasse* appeal, it was agreed that S was unjustly enriched by the contributions of his partner, V, during their 12 year common law relationship. For the first four years of cohabitation, both parties pursued their respective careers. In 1997, V took a leave of absence from her employment and the couple moved to Halifax so that S could pursue a business opportunity. Over the next three and a half years, their children were born and V stayed at home to care for them and performed the domestic labour. S worked long hours and travelled extensively for business. In 1998, S stepped down as CEO of the business and the family returned to Ottawa where they bought a home in joint names. In 2000, S received approximately

$11 million for his shares in the business and from that time, until their separation in 2005, he participated more with the domestic chores. The trial judge found no unjust enrichment for the first and last periods of their cohabition, but held that S had been unjustly enriched at V's expense during the period in which the children were born. V was entitled to half of the value of the wealth S accumulated during the period of unjust enrichment, less her interest in the home and RRSPs in her name. The court of appeal set aside this award and directed that the proper approach to valuation was a *quantum meruit* calculation in which the value each party received from the other was assessed and set off.

*Held*:  In *Kerr*, the appeal on the spousal support issue should be allowed and the order of the trial judge should be restored. The appeal from the order dismissing K's unjust enrichment claim should also be allowed and a new trial ordered. The appeal from the order dismissing K's claim in resulting trust should be dismissed. The order for a new hearing of B's counterclaim should be affirmed.

*Held*:  In *Vanasse*, the appeal should be allowed and the order of the trial judge restored.

These appeals require the resolution of five main issues. The first concerns the role of the "common intention" resulting trust in claims by domestic partners. The second issue is whether the monetary remedy for a successful unjust enrichment claim must always be assessed on a *quantum meruit* basis. The third area relates to mutual benefit conferral in the context of an unjust enrichment claim and

when this should be taken into account.  The fourth concerns the role the parties' reasonable expectations play in the unjust enrichment analysis.  Finally, in the Kerr appeal, this Court must also decide the effective date of the commencement of spousal support.

For unmarried persons in domestic relationships in most common law provinces, judge-made law is the only option for addressing the property consequences of the breakdown of those relationships.  The main legal mechanisms available have been the resulting trust and the action in unjust enrichment.  Resulting trusts arise from gratuitous transfers in two types of situations:  the transfer of property from one partner to the other without consideration, and the joint contribution by two partners to the acquisition of property, title to which is in the name of only one of them.  The underlying legal principle is that contributions to the acquisition of a property, which were not reflected in the legal title, might nonetheless give rise to a property interest.  In Canada, added to this underlying notion was the idea that a resulting trust could arise based solely on the "common intention" of the parties that the non-owner partner was intended to have an interest.  This theory is doctrinally unsound, however, and should have no continuing role in the resolution of domestic property disputes.  While traditional resulting trust principles may well have a role to play in the resolution of property disputes between unmarried domestic partners, parties have increasingly turned to the law of unjust enrichment and the remedial constructive trust.  Since the decision in *Pettkus v. Becker*, the law of unjust enrichment has provided a much less artificial, more comprehensive and more

principled basis to address claims for the distribution of assets on the breakdown of domestic relationships.  It permits recovery whenever the plaintiff can establish three elements:    an enrichment of the defendant by the plaintiff, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment. This Court has taken a straightforward economic approach to the elements of enrichment and corresponding deprivation.  The plaintiff must show that he or she has given a tangible benefit to the defendant that the defendant received and retained. Further, the enrichment must correspond to a deprivation that the plaintiff has suffered.  Importantly, provision of domestic services may support a claim for unjust enrichment.  The absence of a juristic reason for the enrichment means that there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff.  This third element also provides for due consideration of the autonomy of the parties, their legitimate expectations and the right to order their affairs by contract.

There are two steps to the juristic reason analysis.  First, the established categories of juristic reason must be considered, which could include benefits conferred by way of gift or pursuant to a legal obligation.   In their absence, the second step permits consideration of the reasonable expectations of the parties and public policy considerations to assess whether particular enrichments are unjust.

The object of the remedy for unjust enrichment is to require the defendant to reverse the unjustified enrichment and may attract either a "personal restitutionary

award" or a "restitutionary proprietary award".  In most cases, a monetary award will be sufficient to remedy the unjust enrichment but two issues raise difficulties in determining appropriate compensation.  Where there has been a mutual conferral of benefits, it is often difficult for the court to retroactively value every service rendered by each party to the other.  While the value of domestic services is not questioned, it would be unjust to only consider the contributions of one party.  A second difficulty is whether a monetary award must invariably be calculated on a *quantum meruit*, "value received" or "fee-for-services" basis or whether that monetary relief may be assessed more flexibly, on a "value survived basis" by reference to the overall increase in the couple's wealth during the relationship.  In some cases, a proprietary remedy may be required.  Where the plaintiff can demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed property, and that a monetary award would be insufficient, a share of the property proportionate to the claimant's contribution can be impressed with a constructive trust in his or her favour.

Three areas in the law of unjust enrichment require clarification.  Once the choice has been made to award a monetary remedy, the question is how to quantify it.  If a monetary remedy must invariably be quantified on a *quantum meruit* basis, the remedial choice in unjust enrichment cases becomes whether to impose a constructive trust or to order a monetary remedy calculated on a *quantum meruit* basis.  This dichotomy of remedial choice should be rejected, however, as the value survived measure is a perfectly plausible alternative to the constructive trust.

Restricting the money remedy to a fee-for-service calculation is inappropriate for four reasons. First, it fails to reflect the reality of the lives of many domestic partners. The basis of all domestic unjust enrichment claims do not fit into only two categories — those where the enrichment consists of the provision of unpaid services, and those where it consists of an unrecognized contribution to the acquisition, improvement, maintenance or preservation of specific property. Where the contributions of both parties over time have resulted in an accumulation of wealth, the unjust enrichment occurs when one party retains a disproportionate share of the assets that are the product of their joint efforts following the breakdown of their relationship. The required link between the contributions and a specific property may not exist but there may clearly be a link between the joint efforts of the parties and the accumulation of wealth. While the law of unjust enrichment does not mandate a presumption of equal sharing, nor does the mere fact of cohabitation entitle one party to share in the other's property, the legal consequences of the breakdown of a domestic relationship should reflect realistically the way people live their lives. Second, the remedial dichotomy is inconsistent with the inherent flexibility of unjust enrichment and with the Court's approach to equitable remedies. Moreover, the Court has recognized that, given the wide variety of circumstances addressed by the traditional categories of unjust enrichment, as well as the flexibility of the broader, principled approach, its development requires recourse to a number of different sorts of remedies depending on the circumstances. There is no reason in principle why one of the traditional categories of unjust enrichment should be used to force the monetary remedy for all present domestic unjust enrichment cases into a remedial

strait-jacket.  What is essential is that there must be a link between the contribution

and the accumulation of wealth.  Where that link exists, and a proprietary remedy is

either inappropriate or unnecessary, the monetary award should be fashioned to

reflect the true nature of the enrichment and the corresponding deprivation.  Third,

the remedial dichotomy ignores the historical basis of *quantum meruit* claims.

Finally*,* a remedial dichotomy is not mandated, as has been suggested, by the Court's

judgment in *Peter. v. Beblow.*


Where the unjust enrichment is best characterized as an unjust retention

of a disproportionate share of assets accumulated during the course of a "joint family

venture" to which both partners have contributed, the monetary remedy should be

calculated according to the share of the accumulated wealth proportionate to the

claimant's contributions.  Where the spouses are domestic and financial partners,

there is no need for "duelling *quantum meruits*".  The law of unjust enrichment,

including the remedial constructive trust, is the preferable method of responding to

the inequities brought about by the breakdown of a common law relationship, since

the remedies for unjust enrichment "are tailored to the parties' specific situation and

grievances".  To be entitled to a monetary remedy on a value-survived basis, the

claimant must show both that there was a joint family venture and a link between his

or her contributions and the accumulation of wealth.


To determine whether the parties have, in fact, been engaged in a joint

family venture, the particular circumstances of each particular relationship must be

taken into account.  This is a question of fact and must be assessed by having regard to all of the relevant circumstances, including factors relating to mutual effort, economic integration, actual intent and priority of the family.  The pooling of effort and team work, the decision to have and raise children together, and the length of the relationship may all point towards the extent to which the parties have formed a true partnership and jointly worked towards important mutual goals.  The use of parties' funds entirely for family purposes or where one spouse takes on all, or a greater proportion, of the domestic labour, freeing the other spouse from those responsibilities and enabling him or her to pursue activities in the paid workforce, may also indicate a pooling of resources.  The more extensive the integration of the couple's finances, economic interests and economic well-being, the more likely it is that they have engaged in a joint family venture.  The actual intentions of the parties, either express or inferred from their conduct, must be given considerable weight.  Their conduct may show that they intended the domestic and professional spheres of their lives to be part of a larger, common venture, but may also conversely negate the existence of a joint family venture, or support the conclusion that particular assets were to be held independently.  Another consideration is whether and to what extent the parties have given priority to the family in their decision-making, and whether there has been detrimental reliance on the relationship, by one or both of the parties, for the sake of the family.  This may occur where one party leaves the workforce for a period of time to raise children; relocates for the benefit of the other party's career; foregoes career or educational advancement for the benefit of the family or

relationship; or accepts underemployment in order to balance the financial and domestic needs of the family unit.

The unjust enrichment analysis in domestic situations is often complicated by the fact that there has been a mutual conferral of benefits. When the appropriate remedy is a money award based on a fee-for-services provided approach, the fact that the defendant has also provided services to the claimant should mainly be considered at the defence and remedy stages of the analysis but may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits constitutes relevant evidence of the existence (or non-existence) of a juristic reason for the enrichment. However, given that the purpose of the juristic reason step in the analysis is to determine whether the enrichment was just, not its extent, mutual benefit conferral should only be considered at the juristic reason stage for that limited purpose. Otherwise, the mutual exchange of benefits should be taken into account only after the three elements of an unjust enrichment claim have been established.

Claimants must show that there is no juristic reason falling within any of the established categories, such as whether the benefit was a gift or pursuant to a legal obligation. It is then open to the defendant to show that a different juristic reason for the enrichment should be recognized, having regard to the parties' reasonable expectations and public policy considerations. Mutual benefit conferral and the parties' reasonable expectations have a very limited role to play at the first step of the juristic reason analysis. In some cases, the fact that mutual benefits were conferred or

that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons is present.  The parties' reasonable or legitimate expectations have a role to play at the second step of the juristic reason analysis, where the defendant bears the burden of establishing that there is a juristic reason for retaining the benefit that does not fall within the existing categories.  The question is whether the parties' mutual expectations show that retention of the benefits is just.

In the *Vanasse* appeal, although not labelling it as such, the trial judge found that there was a joint family venture and that there was a link between V's contribution to it and the substantial accumulation of wealth that the family achieved. She made a reasonable assessment of the monetary award appropriate to reverse this unjust enrichment, taking due account of S's substantial contributions.  Her findings of fact and analysis indicate that the unjust enrichment of S at the expense of V ought to be characterized as the retention by S of a disproportionate share of the wealth generated from a joint family venture.  Several factors suggested that, throughout their relationship, the parties were working collaboratively towards common goals. They made important decisions keeping the overall welfare of the family at the forefront.  It was through their joint efforts that they were able to raise a young family and acquire wealth. S could not have made the efforts he did to build up the company but for V's assumption of the domestic responsibilities.  Notably, the period of unjust enrichment corresponds to the time during which the parties had two children together, a further indicator that they were working together to achieve common

goals.  The length of the relationship is also relevant, and their 12 year cohabitation is a significant period of time.  There was also evidence of economic integration as their house was registered jointly and they had a joint bank account.  Their words and actions indicated that there was a joint family venture, to which the couple jointly contributed for their mutual benefit and the benefit of their children.  There is a strong inference from the factual findings that, to S's knowledge, V relied on the relationship to her detriment.  She left her career, gave up her own income, and moved away from her family and friends.  V then stayed home and cared for their two small children.  During the period of the unjust enrichment, V was responsible for a disproportionate share of the domestic labour.  There was a clear link between V's contribution and the accumulation of wealth.  The trial judge took a realistic and practical view of the evidence and took into account S's non-financial contributions and periods during which V's contributions were not disproportionate to S and her judgment should be restored.

The court of appeal was right to set aside the trial judge's findings of resulting trust and unjust enrichment in *Kerr* and in ordering a new hearing on B's counterclaim.  On the basis of the unsatisfactory record at trial, which includes findings of fact tainted by clear error, K's unjust enrichment claim should not have been dismissed but a new trial ordered.  The court of appeal erred in assessing B's contributions as part of the juristic reason analysis and prematurely truncated K's *prima facie* case of unjust enrichment.  The family property approach is rejected, and for K to show an entitlement to a proportionate share of the wealth accumulated

during the relationship, she must establish that B has been unjustly enriched at her expense, that their relationship constituted a joint family venture, and that her contributions are linked to the generation of wealth during the relationship.  She would then have to show what proportion of the jointly accumulated wealth reflects her contributions.  With regard to B's counterclaim, there was evidence that he made very significant contributions to K's welfare such that his counterclaim cannot simply be dismissed.   The trial judge also referred to various other monetary and non-monetary contributions which K made to the couple's welfare and comfort, but he did not evaluate them, let alone compare them with the contributions made by B. There are few findings of fact relevant to the key question of whether the parties' relationship constituted a joint family venture.  Further, the court of appeal ought not to have set aside the trial judge's order for spousal support in favour of K effective on the date she had commenced proceedings.  It is clear that K was in need of support from B at the date she started her proceedings and remained so at the time of trial. K should not have been faulted for not bringing an interim application in seeking support for the period in question.  She suffered from a serious physical disability, and her standard of living was markedly lower than it was while she lived with B.  B had the means to provide support, had prompt notice of her claim, and there was no indication in the court of appeal's reasons that it considered the judge's award imposed on him a hardship so as to make that award inappropriate.

**Cases Cited**

**Applied:** *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762; *Peter v. Beblow*, [1993] 1 S.C.R. 980, rev'g (1990), 50 B.C.L.R. (2d) 266, rev'g [1988] B.C.J. No. 887 (QL); *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38; *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629; **considered:** *Pettkus v. Becker*, [1980] 2 S.C.R. 834; *Rathwell v. Rathwell*, [1978] 2 S.C.R. 436; *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795; *D.B.S. v. S.R.G.*, 2006 SCC 37, [2006] 2 S.C.R. 231; **referred to:** *Dyer v. Dyer* (1788), 2 Cox Eq. Cas. 92, 30 E.R. 42; *Murdoch v. Murdoch*, [1975] 1 S.C.R. 423; *Gissing v. Gissing*, [1970] 2 All E.R. 780; *Pettitt v. Pettitt*, [1970] A.C. 777; *Nova Scotia (Attorney General) v. Walsh*, 2002 SCC 83, [2002] 4 S.C.R. 325; *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574; *Bell v. Bailey* (2001), 203 D.L.R. (4th) 589; *Wilson v. Fotsch*, 2010 BCCA 226, 319 D.L.R. (4th) 26; *Pickelein v. Gillmore* (1997), 30 B.C.L.R. (3d) 44; *Harrison v. Kalinocha* (1994), 90 B.C.L.R. (2d) 273; *MacFarlane v. Smith*, 2003 NBCA 6, 256 N.B.R. (2d) 108; *Shannon v. Gidden*, 1999 BCCA 539, 71 B.C.L.R. (3d) 40; *Herman v. Smith* (1984), 42 R.F.L. (2d) 154; *Clarke v. Clarke*, [1990] 2 S.C.R. 795; *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217; *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575; *Birmingham v. Ferguson*, 2004 CanLII 4764; *McDougall v. Gesell Estate*, 2001 MBCA 3, 153 Man. R. (2d) 54; *Nasser v. Mayer-Nasser* (2000), 5 R.F.L. (5th) 100; *Panara v. Di Ascenzo*, 2005 ABCA 47, 361 A.R. 382; *Ford v. Werden* (1996), 27 B.C.L.R. (3d) 169; *Thomas v.*

*Fenton*, 2006 BCCA 299, 269 D.L.R. (4th) 376; *Giles v. McEwan* (1896), 11 Man. R. 150; *Garland v. Consumers' Gas Co.*, [1998] 3 S.C.R. 112; *Nance v. British Columbia Electric Railway Co.*, [1951] A.C. 601; *MacKinnon v. MacKinnon* (2005), 75 O.R. (3d) 175; *Reference re Goods and Services Tax*, [1992] 2 S.C.R. 445; *Mack v. Canada (Attorney General)* (2002), 60 O.R. (3d) 737; *S. (L.) v. P. (E.)* (1999), 67 B.C.L.R. (3d) 254.


**Statutes and Regulations Cited**


*Divorce Act*, R.S.C. 1985, c. 3 (2nd Supp.).

*Family Relations Act*, R.S.B.C. 1996, c. 128, s. 93(5)(d).


**Authors Cited**


Birks, Peter.  *An Introduction to the Law of Restitution*.  Oxford:  Clarendon Press, 1985.

Birks, Peter.  *Unjust Enrichment*, 2nd ed. Oxford:  Oxford University Press, 2005.

Davies, J. D.  "Duties of Confidence and Loyalty", [1990] *L.M.C.L.Q.* 4.

Fridman, G. H. L. *Restitution*, 2nd ed. Toronto:  Carswell, 1992.

Gordon, Marie L. "Blame Over:  Retroactive Child and Spousal Support in the Post-Guideline Era" (2004-2005), 23 C.F.L.Q. 243.

Lord Goff of Chieveley and Gareth Jones.  *The Law of Restitution*, 7th ed. London: Sweet & Maxwell, 2007.

Maddaugh, Peter D., and John D. McCamus.  *The Law of Restitution*.  Aurora, Ont.: Canada Law Book, 1990.

Maddaugh, Peter D., and John D. McCamus.  *The Law of Restitution*. Aurora, Ont.: Canada Law Book, 1990 (loose-leaf updated August 2010, release 6).

*Matrimonial Property Law in Canada*, vol. 1, by James G. McLeod and Alfred A. Mamo, eds. Toronto:  Carswell, 1993 (loose-leaf updated 2010, release 8).

McCamus, John D.  "Restitution on Dissolution of Marital and Other Intimate Relationships:  Constructive Trust or Quantum Meruit?", in Jason W. Neyers, Mitchell McInnes and Stephen G. A. Pitel, eds., *Understanding Unjust Enrichment*.  Portland:  Hart Publishing, 2004, 359.

Mee, John.  *The Property Rights of Cohabitees:  An Analysis of Equity's Response in Five Common Law Jurisdictions*.  Portland:  Hart Publishing, 1999.

*Oosterhoff on Trusts:  Text, Commentary and Materials*, 7th ed. by A. H. Oosterhoff et al. Toronto:  Carswell, 2009.

Parkinson, Patrick.  "Beyond *Pettkus v. Becker*:  Quantifying Relief for Unjust Enrichment" (1993), 43 *U.T.L.J.* 217.

Pettit, Philip H.  *Equity and the Law of Trusts*, 11th ed. Oxford:  Oxford University Press, 2009.

Scane, Ralph E.  "Relationships 'Tantamount to Spousal', Unjust Enrichment, and Constructive Trusts" (1991), 70 *Can. Bar Rev.* 260.

Waters, Donovan.  Comment (1975), 53 *Can. Bar Rev.* 366.

*Waters' Law of Trusts in Canada*, 3rd ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith, eds.  Toronto:  Thomson, 2005.

Youdan, Timothy G. "Resulting and Constructive Trusts", in *Special Lectures of the Law Society of Upper Canada 1993 — Family Law:  Roles, Fairness and Equality*.  Scarborough, Ont.: Carswell, 1994, 169.

APPEAL from a judgment of the British Columbia Court of Appeal (Levine, Tysoe and Smith JJ.A.), 2009 BCCA 111, 93 B.C.L.R. (4th) 201, 266 B.C.A.C. 298, [2009] 9 W.W.R. 285, 66 R.F.L. (6th) 1, [2009] B.C.J. No. 474 (QL), 2009 CarswellBC 642, reversing in part a decision of Romilly J., 2007 BCSC 1863, 47 R.F.L. (6th) 103, [2007] B.C.J. No. 2737, 2007 CarswellBC 3047.   Appeal allowed in part.

APPEAL from a judgment of the Ontario Court of Appeal (Weiler, Juriansz and Epstein JJ.A.), 2009 ONCA 595, 252 O.A.C. 218, 96 O.R. (3d) 321, [2009] O.J. No. 3211 (QL), 2009 CarswellOnt 4407, reversing a decision of Blishen J., 2008 CanLII 35922, [2008] O.J. No. 2832 (QL), 2008 CarswellOnt 4265.  Appeal allowed.

*Armand A. Petronio* and *Geoffrey B. Gomery*, for the appellant Margaret Kerr.

*Susan G. Label* and *Marie-France Major*, for the respondent Nelson Baranow.

*John E. Johnson*, for the appellant Michele Vanasse.

*H. Hunter Phillips*, for the respondent David Seguin.

The judgment of the Court was delivered by

CROMWELL J. —

I. Introduction

[1]        In a series of cases spanning 30 years, the Court has wrestled with the financial and property rights of parties on the breakdown of a marriage or domestic

relationship.  Now, for married spouses, comprehensive matrimonial property statutes enacted in the late 1970s and 1980s provide the applicable legal framework.  But for unmarried persons in domestic relationships in most common law provinces, judge-made law was and remains the only option. The main legal mechanisms available to parties and courts have been the resulting trust and the action in unjust enrichment.

[2]        In the early cases of the 1970s, the parties and the courts turned to the resulting trust. The underlying legal principle was that contributions to the acquisition of a property, which were not reflected in the legal title, could nonetheless give rise to a property interest.  Added to this underlying notion was the idea that a resulting trust could arise based on the "common intention" of the parties that the non-owner partner was intended to have an interest.  The resulting trust soon proved to be an unsatisfactory legal solution for many domestic property disputes, but claims continue to be advanced and decided on that basis.

[3]        As the doctrinal problems and practical limitations of the resulting trust became clearer, parties and courts turned increasingly to the emerging law of unjust enrichment.  As the law developed, unjust enrichment carried with it the possibility of a remedial constructive trust.  In order to successfully prove a claim for unjust enrichment, the claimant must show that the defendant has been enriched, the claimant suffered a corresponding detriment, and there is no "juristic reason" for the enrichment.  This claim has become the pre-eminent vehicle for addressing the financial consequences of the breakdown of domestic relationships.  However,

various issues continue to create controversy, and these two appeals, argued consecutively, provide the Court with the opportunity to address them.

[4]        In the *Kerr* appeal, a couple in their late-sixties separated after a common law relationship of more than 25 years. Both had worked through much of that time and each had contributed in various ways to their mutual welfare. Ms. Kerr claimed support and a share of property held in her partner's name based on resulting trust and unjust enrichment principles.  The trial judge awarded her one-third of the value of the couple's residence, grounded in both resulting trust and unjust enrichment claims (2007 BCSC 1863, 47 R.F.L. (6th) 103). He did not address, other than in passing, Mr. Baranow's counterclaim that Ms. Kerr had been unjustly enriched at his expense. The judge also ordered substantial monthly support for Ms. Kerr pursuant to statute, effective as of the date she applied to the court for relief. However, the resulting trust and unjust enrichment conclusions of the trial judge were set aside by the British Columbia Court of Appeal (2009 BCCA 111, 93 B.C.L.R. (4th) 201).  Both lower courts addressed the role of the parties' common intention and reasonable expectations. The appeal to this Court raises the questions of the role of resulting trust law in these types of disputes, as well as how an unjust enrichment analysis should take account of the mutual conferral of benefits and what role the parties' intentions and expectations play in that analysis.  This Court is also called upon to decide whether the award of spousal support should be effective as of the date of application, as found by the trial judge, the date the trial began, as ordered by the Court of Appeal, or some other date.

[5]        In the *Vanasse* appeal, the central problem is how to quantify a monetary award for unjust enrichment. It is agreed that Mr. Seguin was unjustly enriched by the contributions of his partner, Ms. Vanasse; the two lived in a common law relationship for about 12 years and had two children together during this time.  The trial judge valued the extent of the enrichment by determining what proportion of Mr. Seguin's increased wealth was due to Ms. Vanasse's efforts as an equal contributor to the family venture (2008 CanLII 35922). The Court of Appeal set aside this finding and, while ordering a new trial, directed that the proper approach to valuation was to place a monetary value on the services provided by Ms. Vanasse to the family, taking due account of Mr. Seguin's own contributions by way of set-off (2009 ONCA 595, 252 O.A.C. 218).  In short, the Court of Appeal held that Ms. Vanasse should be treated as an unpaid employee, not a co-venturer.  The appeal to this Court challenges this conclusion.

[6]        These appeals require us to resolve five main issues. The first concerns the role of the "common intention" resulting trust in claims by domestic partners.  In my view, it is time to recognize that the "common intention" approach to resulting trust has no further role to play in the resolution of property claims by domestic partners on the breakdown of their relationship.

[7]        The second issue concerns the nature of the money remedy for a successful unjust enrichment claim. Some courts take the view that if the claimant's contribution cannot be linked to specific property, a money remedy must always be

assessed on a fee-for-services basis.  Other courts have taken a more flexible approach. In my view, where both parties have worked together for the common good, with each making extensive, but different, contributions to the welfare of the other and, as a result, have accumulated assets, the money remedy for unjust enrichment should reflect that reality.  The money remedy in those circumstances should not be based on a minute totting up of the give and take of daily domestic life, but rather should treat the claimant as a co-venturer, not as the hired help.

[8]      The third area requiring clarification relates to mutual benefit conferral. Many domestic relationships involve the mutual conferral of benefits, in the sense that each contributes in various ways to the welfare of the other. The question is how and at what point in the unjust enrichment analysis should this mutual conferral of benefits be taken into account? For reasons I will develop below, this issue should, with a small exception, be addressed at the defence and remedy stage.

[9]      Fourth, there is the question of what role the parties' reasonable or legitimate expectations play in the unjust enrichment analysis.  My view is that they have a limited role, and must be considered in relation to whether there is a juristic reason for the enrichment.

[10]      Finally, there is the issue of the appropriate date for the commencement of spousal support.  In my respectful view, the Court of Appeal erred in setting aside the trial judge's selection of the date of application in the circumstances of the *Kerr* appeal.

[11]        I will first address the law of resulting trusts as it applies to the breakdown of a marriage-like relationship.  Next, I will turn to the law of unjust enrichment in this context.  Finally, I will address the specific issues raised in the two appeals.


II. Resulting Trusts

[12]        The resulting trust played an important role in the early years of the Court's jurisprudence relating to property rights following the breakdown of intimate personal relationships.  This is not surprising; it had been settled law since at least 1788 in England (and likely long before) that the trust of a legal estate, whether in the names of the purchaser or others, "results" to the person who advances the purchase money: *Dyer v. Dyer* (1788), 2 Cox Eq. Cas. 92, at p. 93, 30 E.R. 42.  The resulting trust, therefore, seemed a promising vehicle to address claims that one party's contribution to the acquisition of property was not reflected in the legal title.


[13]        The resulting trust jurisprudence in domestic property cases developed into what has been called "a purely Canadian invention", the "common intention" resulting trust: A H. Oosterhoff, et al., *Oosterhoff on Trusts: Text, Commentary and Materials* (7th ed. 2009) at p. 642.  While this vehicle has largely been eclipsed by the law of unjust enrichment since the decision of the Court in *Pettkus v. Becker,* [1980] 2 S.C.R. 834, claims based on the "common intention" resulting trust continue to be advanced.  In the *Kerr* appeal, for example, the trial judge justified the imposition of a resulting trust, in part, on the basis that the parties had a common intention that Mr. Baranow would hold title to the property by way of a resulting trust

for Ms. Kerr.  The Court of Appeal, while reversing the trial judge's finding of fact on this point, implicitly accepted the ongoing vitality of the common intention resulting trust.

[14]     However promising this common intention resulting trust approach looked at the beginning, doctrinal and practical problems soon became apparent and have been the subject of comment by the Court and scholars: see, e.g., *Pettkus*, at pp. 842-43; Oosterhoff, at pp. 641-47; D.W.M. Waters, M.R. Gillen and L.D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005) ("*Waters*") at pp. 430-35; J. Mee, *The Property Rights of Cohabitees*:  *An Analysis of Equity's Response in Five Common Law Jurisdictions* (1999), at pp. 39-43; T. G. Youdan, "Resulting and Constructive Trusts" in *Special Lectures of the Law Society of Upper Canada* 1993 – *Family Law: Roles, Fairness and Equality* (1994), 169 at pp. 172-74.

[15]     In this Court, since *Pettkus*, the common intention resulting trust remains intact but unused. While traditional resulting trust principles may well have a role to play in the resolution of property disputes between unmarried domestic partners, the time has come to acknowledge that there is no continuing role for the common intention resulting trust. To explain why, I must first put the question in the context of some basic principles about resulting trusts.

[16]     That task is not as easy as it should be; there is not much one can say about resulting trusts without a well-grounded fear of contradiction.  There is debate about how they should be classified and how they arise, let alone about many of the

finer points: see, for example, *Rathwell v. Rathwell*, [1978] 2 S.C.R. 436, at pp. 449-50; *Waters'*, at pp. 19-22; P. H. Pettit, *Equity and the Law of Trusts* (11th ed. 2009), at p. 67. However, it is widely accepted that the underlying notion of the resulting trust is that it is imposed "to return property to the person who gave it and is entitled to it beneficially, from someone else who has title to it. Thus, the beneficial interest 'results' (jumps back) to the true owner": Oosterhoff, at p. 25. There is also widespread agreement that, traditionally, resulting trusts arose where there had been a gratuitous transfer or where the purposes set out by an express or implied trust failed to exhaust the trust property: *Waters'*, at p. 21.

[17]        Resulting trusts arising from gratuitous transfers are the ones relevant to domestic situations. The traditional view was they arose in two types of situations: the gratuitous transfer of property from one partner to the other, and the joint contribution by two partners to the acquisition of property, title to which is in the name of only one of them. In either case, the transfer is gratuitous, in the first case because there was no consideration for the transfer of the property, and in the second case because there was no consideration for the contribution to the acquisition of the property.

[18]        The Court's most recent decision in relation to resulting trusts is consistent with the view that, in these gratuitous transfer situations, the actual intention of the grantor is the governing consideration: *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795, at paras. 43-44. As Rothstein J. noted at para. 44 of *Pecore*,

where a gratuitous transfer is being challenged, "[t]he trial judge will commence his or her inquiry with the applicable presumption and will weigh all of the evidence in an attempt to ascertain, on a balance of probabilities, the <u>transferor's actual intention</u>" (emphasis added).

[19]    As noted by Rothstein J. in this passage, presumptions may come into play when dealing with gratuitous transfers.  The law generally presumes that the grantor intended to create a trust, rather than to make a gift, and so the presumption of resulting trust will often operate. As Rothstein J. explained, a presumption of a resulting trust is the general rule that applies to gratuitous transfers. When such a transfer is made, the onus will be on the person receiving the transfer to demonstrate that a gift was intended. Otherwise, the transferee holds that property in trust for the transferor. This presumption rests on the principle that equity presumes bargains and not gifts (*Pecore*, at para. 24).

[20]    The presumption of resulting trust, however, is neither universal nor irrebuttable.  So, for example, in the case of transfers between persons in certain relationships (such as from a parent to a minor child), a presumption of advancement — that is, a presumption that the grantor intended to make a gift — rather than a presumption of resulting trust applies:  see *Pecore*, at paras. 27-41. The presumption of advancement traditionally applied to grants from husband to wife, but the presumption of resulting trust traditionally applied to grants from wife to husband. Whether the application of the presumption of advancement applies to unmarried

couples may be more controversial: Oosterhoff, at pp. 681-82. Although the trial judge in *Kerr* touched on this issue, neither party relies on the presumption of advancement and I need say nothing further about it.

[21]      That brings me to the "common intention" resulting trust. It figured prominently in the majority judgment in *Murdoch v. Murdoch*, [1975] 1 S.C.R. 423. Quoting from Lord Diplock's speech in *Gissing v. Gissing*, [1970] 2 All E.R. 780 (H.L.), at pp. 789 and 793, Martland J. held for the majority that, absent a financial contribution to the acquisition of the contested property, a resulting trust could only arise "where the court is satisfied by the words or conduct of the parties that it was their common intention that the beneficial interest was not to belong solely to the spouse in whom the legal estate was vested but was to be shared between them in some proportion or other": *Murdoch*, at p. 438.

[22]      This approach was repeated and followed by a majority of the Court three years later in *Rathwell*, at pp. 451-53, although the Court also unanimously found there had been a direct financial contribution by the claimant. In *Rathwell*, there is, as well, some blurring of the notions of contribution and common intention; there are references to the fact that a presumption of resulting trust is sometimes explained by saying that the fact of contribution evidences the common intention to share ownership: see p. 452, *per* Dickson J. (as he then was); p. 474, *per* Ritchie J. This blurring is also evident in the reasons of the Court of Appeal in *Kerr*, where the court said, at para. 42, that "a resulting trust is an equitable doctrine that, by operation of

law, imposes a trust on a party who holds legal title to property that was gratuitously transferred to that party by another <u>and where there is evidence of a common intention that the property was to be shared by both parties</u>" (emphasis added).

[23]      The Court's development of the common intention resulting trust ended with *Pettkus*, in which Dickson J. (as he then was) noted the "many difficulties, chronicled in the cases and in the legal literature" as well as the "artificiality of the common intention approach" to resulting trusts: at pp. 842-3. He also clearly rejected the notion that the requisite common intention could be attributed to the parties where such an intention was negated by the evidence: p. 847. The import of *Pettkus* was that the law of unjust enrichment, coupled with the remedial constructive trust, became the more flexible and appropriate lens through which to view property and financial disputes in domestic situations. As Ms. Kerr stated in her factum, the "approach enunciated in *Pettkus v. Becker* has become the dominant legal paradigm for the resolution of property disputes between common law spouses" (para. 100).

[24]      This, in my view, is as it should be, and the time has come to say that the common intention resulting trust has no further role to play in the resolution of domestic cases. I say this for four reasons.

[25]      First, as the abundant scholarly criticism demonstrates, the common intention resulting trust is doctrinally unsound. It is inconsistent with the underlying principles of resulting trust law. Where the issue of intention is relevant to the finding of resulting trust, it is the intention of the grantor or contributor alone that

counts.  As Professor Waters puts it, "In imposing a resulting trust upon the recipient, Equity is never concerned with [common] intention (*Waters'*, at p. 431)."  The underlying principles of resulting trust law also make it hard to accommodate situations in which the contribution made by the claimant was not in the form of property or closely linked to its acquisition. The point of the resulting trust is that the claimant is asking for his or her own property back, or for the recognition of his or her proportionate interest in the asset which the other has acquired with that property. This thinking extends artificially to claims that are based on contributions that are not clearly associated with the acquisition of an interest in property; in such cases there is not, in any meaningful sense, a "resulting" back of the transferred property: *Waters'*, at p. 432. It follows that a resulting trust based solely on intention without a transfer of property is, as Oosterhoff puts it, a doctrinal impossibility: ". . . a resulting trust can arise only when one person has transferred assets to, or purchased assets for, another person and did not intend to make a gift of the property": p. 642.  The final doctrinal problem is that the relevant time for ascertaining intention is the time of acquisition of the property.  As a result, it is hard to see how a resulting trust can arise from contributions made over time to the improvement of an existing asset, or contributions in kind over time for its maintenance. As Oosterhoff succinctly puts it at p. 652, a resulting trust is inappropriate in these circumstances because its imposition, in effect, forces one party to give up beneficial ownership which he or she enjoyed before the improvement or maintenance occurred.

[26]        There are problems beyond these doctrinal issues. A second difficulty with the common intention resulting trust is that the notion of common intention may be highly artificial, particularly in domestic cases.   The search for common intention may easily become "a mere vehicle or formula" for giving a share of an asset, divorced from any realistic assessment of the actual intention of the parties.  Dickson J. in *Pettkus* noted the artificiality and undue malleability of the common intention approach: at pp. 843-44.

[27]        Third, the "common intention" resulting trust in Canada evolved from a misreading of some imprecise language in early authorities from the House of Lords. While much has been written on this topic, it is sufficient for my purposes to note, as did Dickson J. in *Pettkus*, at p. 842, that the principles upon which the common intention resulting trust jurisprudence developed are found in the House of Lords decisions in *Pettitt v. Pettitt*, [1970] A.C. 777, and *Gissing*. However, no clear majority opinion emerged in those cases and four of the five Law Lords in *Gissing* spoke of "resulting, implied or constructive trusts" without distinction.  The passages that have been most influential in Canada on this point, those authored by Lord Diplock, in fact relate to constructive rather than resulting trusts: see, e.g., *Waters'*, at pp. 430-35; Oosterhoff, at pp. 642-43.  I find persuasive Professor Waters' comments, specifically approved by Dickson J. in *Pettkus*, that where the search for common intention becomes simply a vehicle for reaching what the court perceives to be a just result, "[i]t is in fact a constructive trust approach masquerading as a resulting trust approach": D. Waters, Comment (1975), 53 *Can. Bar Rev.* 366, at p. 368.

[28]      Finally, as the development of the law since *Pettkus* has shown, the principles of unjust enrichment, coupled with the possible remedy of a constructive trust, provide a much less artificial, more comprehensive and more principled basis to address the wide variety of circumstances that lead to claims arising out of domestic partnerships. There is no need for any artificial inquiry into common intent. Claims for compensation as well as for property interests may be addressed. Contributions of all kinds and made at all times may be justly considered. The equities of the particular case are considered transparently and according to principle, rather than masquerading behind often artificial attempts to find common intent to support what the court thinks for unstated reasons is a just result.

[29]      I would hold that the resulting trust arising solely from the common intention of the parties, as described by the Court in *Murdoch* and *Rathwell*, no longer has a useful role to play in resolving property and financial disputes in domestic cases. I emphasize that I am speaking here only of the common intention resulting trust. I am not addressing other aspects of the law relating to resulting trusts, nor am I suggesting that a resulting trust that would otherwise validly arise is defeated by the existence in fact of common intention.

III. Unjust Enrichment

A. *Introduction*

[30]      The law of unjust enrichment has been the primary vehicle to address claims of inequitable distribution of assets on the breakdown of a domestic relationship. In a series of decisions, the Court has developed a sturdy framework within which to address these claims.  However, a number of doctrinal and practical issues require further attention.  I will first briefly set out the existing framework, then articulate the issues that in my view require further attention, and finally propose the ways in which they should be addressed.

B.  *The Legal Framework for Unjust Enrichment Claims*

[31]      At the heart of the doctrine of unjust enrichment lies the notion of restoring a benefit which justice does not permit one to retain: *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762, at p. 788.  For recovery, something must have been given by the plaintiff and received and retained by the defendant without juristic reason. A series of categories developed in which retention of a conferred benefit was considered unjust.  These included, for example: benefits conferred under mistakes of fact or law; under compulsion; out of necessity; as a result of ineffective transactions; or at the defendant's request:  see *Peel*, at p. 789; see generally, G. H. L.  Fridman, *Restitution* (2nd ed. 1992), c. 3-5, 7, 8 and 10; and Lord Goff of Chieveley and G.  Jones, *The Law of Restitution* (7th ed., 2007), c. 4-11, 17 and 19-26).

[32]      Canadian law, however, does not limit unjust enrichment claims to these categories. It permits recovery whenever the plaintiff can establish three elements: an

enrichment of or benefit to the defendant, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment: *Pettkus*; *Peel*, at p. 784.  By retaining the existing categories, while recognizing other claims that fall within the principles underlying unjust enrichment, the law is able "to develop in a flexible way as required to meet changing perceptions of justice": *Peel*, at p. 788.

[33]      The application of unjust enrichment principles to claims by domestic partners was resisted until the Court's 1980 decision in *Pettkus*.  In applying unjust enrichment principles to domestic claims, however, the Court has been clear that there is and should be no separate line of authority for "family" cases developed within the law of unjust enrichment.  Rather, concern for clarity and doctrinal integrity mandate that "the basic principles governing the rights and remedies for unjust enrichment remain the same for all cases" (*Peter v. Beblow*, [1993] 1 S.C.R. 980, at p. 997).

[34]      Although the legal principles remain constant across subject areas, they must be applied in the particular factual and social context out of which the claim arises. The Court in *Peter* was unanimously of the view that the courts "should exercise flexibility and common sense when applying equitable principles to family law issues with due sensitivity to the special circumstances that can arise in such cases" (p. 997, *per* McLachlin J. (as she then was); see also p. 1023, *per* Cory J.). Thus, while the underlying legal principles of the law of unjust enrichment are the

same for all cases, the courts must apply those common principles in ways that respond to the particular context in which they are to operate.

[35]       It will be helpful to review, briefly, the current state of the law with respect to each of the elements of an unjust enrichment claim and note the particular issues in relation to each that arise in claims by domestic partners.

C. *The Elements of an Unjust Enrichment Claim*

(1) Enrichment and Corresponding Deprivation

[36]       The first and second steps in the unjust enrichment analysis concern first, whether the defendant has been enriched by the plaintiff and second, whether the plaintiff has suffered a corresponding deprivation.

[37]       The Court has taken a straightforward economic approach to the first two elements — enrichment and corresponding deprivation. Accordingly, other considerations, such as moral and policy questions, are appropriately dealt with at the juristic reason stage of the analysis: see *Peter*, at p. 990, referring to *Pettkus*, *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38, and *Peel*, affirmed in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629, at para. 31.

[38]       For the first requirement — enrichment — the plaintiff must show that he or she gave something to the defendant which the defendant received and retained. The benefit need not be retained permanently, but there must be a benefit which has enriched the defendant and which can be restored to the plaintiff *in specie* or by

money.  Moreover, the benefit must be tangible.  It may be positive or negative, the latter in the sense that the benefit conferred on the defendant spares him or her an expense he or she would have had to undertake (*Peel*, at pp. 788 and 790; *Garland*, at paras. 31 and 37).

[39]      Turning to the second element — a *corresponding* deprivation — the plaintiff's loss is material only if the defendant has gained a benefit or been enriched (*Peel*, at pp. 789-90).  That is why the second requirement obligates the plaintiff to establish not simply that the defendant has been enriched, but also that the enrichment corresponds to a deprivation which the plaintiff has suffered (*Pettkus*, at p. 852; *Rathwell*, at p. 455).

### (2)  Absence of Juristic Reason

[40]      The third element of an unjust enrichment claim is that the benefit and corresponding detriment must have occurred without a juristic reason. To put it simply, this means that there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff, making its retention "unjust" in the circumstances of the case: see *Pettkus*, at p. 848; *Rathwell*, at p. 456; *Sorochan*, at p. 44; *Peter*, at p. 987; *Peel*, at pp. 784 and 788; *Garland*, at para. 30.

[41]      Juristic reasons to deny recovery may be the intention to make a gift (referred to as a "donative intent"), a contract, or a disposition of law (*Peter*, at pp.990-91; *Garland*, at para. 44; *Rathwell*, at p. 455). The latter category generally includes circumstances where the enrichment of the defendant at the plaintiff's

expense is required by law, such as where a valid statute denies recovery (P.D. Maddaugh, and J. D. McCamus, *The Law of Restitution* (1990), at p. 46; *Reference re Goods and Services Tax*, [1992] 2 S.C.R. 445; *Mack v. Canada (Attorney General)* (2002), 60 O.R. (3d) 737 (C.A.)). However, just as the Court has resisted a purely categorical approach to unjust enrichment claims, it has also refused to limit juristic reasons to a closed list. This third stage of the unjust enrichment analysis provides for due consideration of the autonomy of the parties, including factors such as "the legitimate expectation of the parties, the right of parties to order their affairs by contract (*Peel*, at p. 803).

[42]        A critical early question in domestic claims was whether the provision of domestic services could support a claim for unjust enrichment. After some doubts, the matter was conclusively resolved in *Peter*, where the Court held that they could. A spouse or domestic partner generally has no duty, at common law, equity, or by statute, to perform work or services for the other. It follows, on a straightforward economic approach, that there is no reason to distinguish domestic services from other contributions (*Peter*, at pp. 991 and 993; *Sorochan*, at p. 46). They constitute an enrichment because such services are of great value to the family and to the other spouse; any other conclusion devalues contributions, mostly by women, to the family economy (*Peter*, at p. 993). The unpaid provision of services (including domestic services) or labour may also constitute a deprivation because the full-time devotion of one's labour and earnings without compensation may readily be viewed as such. The Court rejected the view that such services could not found an unjust enrichment claim

because they are performed out of "natural love and affection".  (*Peter*, at pp. 989-95, *per* McLachlin J., and pp. 1012-16, *per* Cory J.).

[43]        In *Garland*, the Court set out a two-step analysis for the absence of juristic reason.  It is important to remember that what prompted this development was to ensure that the juristic reason analysis was not "purely subjective", thereby building into the unjust enrichment analysis an unacceptable "immeasureable judicial discretion" that would permit "case by case 'palm tree' justice":  *Garland*, at para. 40. The first step of the juristic reason analysis applies  the established categories of juristic reasons; in their absence, the second step permits consideration of the reasonable expectations of the parties and public policy considerations to assess whether recovery should be denied:

> First, the plaintiff must show that no juristic reason from an established category exists to deny recovery [. . .]  The established categories that can constitute juristic reasons include a contract (*Pettkus*, *supra*), a disposition of law (*Pettkus*, *supra*), a donative intent (*Peter*, *supra*), and other valid common law, equitable or statutory obligations (*Peter*, *supra*). If there is no juristic reason from an established category, then the plaintiff has made out a *prima facie* case under the juristic reason component of the analysis.

> The *prima facie* case is rebuttable, however, where the defendant can show that there is another reason to deny recovery.  As a result, there is a *de facto* burden of proof placed on the defendant to show the reason why the enrichment should be retained.  This stage of the analysis thus provides for a category of residual defence in which courts can look to all of the circumstances of the transaction in order to determine whether there is another reason to deny recovery.

> As part of the defendant's attempt to rebut, courts should have regard to two factors: the reasonable expectations of the parties, and public policy considerations. [paras. 44-46]

[44]      Thus, at the juristic reason stage of the analysis, if the case falls outside the existing categories, the court may take into account the legitimate expectations of the parties (*Pettkus*, at p. 849) and moral and policy-based arguments about whether particular enrichments are unjust (*Peter*, at p. 990).  For example, in *Peter*, it was at this stage that the Court considered and rejected the argument that the provision of domestic and childcare services should not give rise to equitable claims against the other spouse in a marital or quasi-marital relationship (pp. 993-95).  Overall, the test for juristic reason is flexible, and the relevant factors to consider will depend on the situation before the court (*Peter*, at p. 990).

[45]      Policy arguments concerning individual autonomy may arise under the second branch of the juristic reason analysis.  In the context of claims for unjust enrichment, this has led to questions regarding how (and when) factors relating to the manner in which the parties organized their relationship should be taken into account. It has been argued, for example, that the legislative decision to exclude unmarried couples from property division legislation indicates the court should not use the equitable doctrine of unjust enrichment to address their property and asset disputes. However, the court in *Peter* rejected this argument, noting that it misapprehended the role of equity.  As McLachlin J. put it at p. 994, "It is precisely where an injustice arises without a legal remedy that equity finds a role." (See also *Nova Scotia (Attorney General) v. Walsh*, 2002 SCC 83, [2002] 4 S.C.R. 325, at para. 61.)

(3)  Remedy

[46]        Remedies for unjust enrichment are restitutionary in nature; that is, the object of the remedy is to require the defendant to repay or reverse the unjustified enrichment.  A successful claim for unjust enrichment may attract either a "personal restitutionary award" or a "restitutionary proprietary award". In other words, the plaintiff may be entitled to a monetary or a proprietary remedy (*Lac Minerals Ltd.  v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574, at p. 669, *per* La Forest J.).

(a) *Monetary Award*

[47]        The first remedy to consider is always a monetary award (*Peter,* at pp. 987 and 999).  In most cases, it will be sufficient to remedy the unjust enrichment. However, calculation of such an award is far from straightforward.   Two issues have given rise to disagreement and difficulty in domestic unjust enrichment claims.

[48]        First, the fact that many domestic claims of unjust enrichment arise out of relationships in which there has been a mutual conferral of benefits gives rise to difficulties in determining what will constitute adequate compensation.   While the value of domestic services is not questioned (*Peter*; *Sorochan*), it is unjust to pay attention only to the contributions of one party in assessing an appropriate remedy. This is not only an important issue of principle; in practice, it is enormously difficult for the parties and the court to "create, retroactively, a notional ledger to record and value every service rendered by each party to the other" (R. E. Scane, "Relationships 'Tantamount to Spousal', Unjust Enrichment, and Constructive Trusts" (1991), 70

*Can. Bar Rev.* 260, at p. 281).   This gives rise to the practical problem that one scholar has aptly referred to as "duelling *quantum meruits*" (J. D. McCamus, "Restitution on Dissolution of Marital and Other Intimate Relationships: Constructive Trust or Quantum Meruit?", in J.W. Neyers, M. McInnes and S.G.A. Pitel, eds., *Understanding Unjust Enrichment* (2004), 359, at p. 376). McLachlin J. also alluded to this practical problem in *Peter*, at p. 999.

[49]      A second difficulty arises from the fact that some courts and commentators have read *Peter* as holding that when a monetary award is appropriate, it must invariably be calculated on the basis of the monetary value of the unpaid services. This is often referred to as the *quantum meruit*, or "value received" or "fee-for-services" approach. This was followed in *Bell v. Bailey* (2001), 203 D.L.R. (4th) 589, (Ont. C.A.). Other appellate courts have held that monetary relief may be assessed more flexibly — in effect, on a value survived basis — by reference, for example, to the overall increase in the couple's wealth during the relationship: *Wilson v. Fotsch*, 2010 BCCA 226, 319 D.L.R. (4th) 26, at para. 50; *Pickelein v. Gillmore* (1997), 30 B.C.L.R. (3d) 44 (C.A.); *Harrison v. Kalinocha* (1994), 90 B.C.L.R. (2d) 273 (C.A.); *MacFarlane v. Smith*, 2003 NBCA 6, 256 N.B.R. (2d) 108, at paras. 31-34 and 41-43; *Shannon v. Gidden*, 1999 BCCA 539, 71 B.C.L.R. (3d) 40, at para. 37. With respect to inconsistencies in how *in personam* relief for unjust enrichment may be quantified, see also: *Matrimonial Property Law in Canada*, vol 1, by J.G. McLeod and A.A. Mamo, eds.(loose-leaf), at pp. 40.78-40.79.

(b)  *Proprietary Award*

[50]        The Court has recognized that, in some cases, when a monetary award is inappropriate or insufficient, a proprietary remedy may be required.  *Pettkus* is responsible for an important remedial feature of the Canadian law of unjust enrichment:  the development of the remedial constructive trust.   Imposed without reference to intention to create a trust, the constructive trust is a broad and flexible equitable tool used to determine beneficial entitlement to property (*Pettkus*, at pp. 843-44 and 847-48).  Where the plaintiff can demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed property, a share of the property proportionate to the unjust enrichment can be impressed with a constructive trust in his or her favour (*Pettkus*, at pp. 852-53; *Sorochan*, at p. 50).  *Pettkus* made clear that these principles apply equally to unmarried cohabitants, since "[t]he equitable principle on which the remedy of constructive trusts rests is broad and general; its purpose is to prevent unjust enrichment in whatever circumstances it occurs" (pp. 850-51).

[51]        As to the nature of the link required between the contribution and the property, the Court has consistently held that the plaintiff must demonstrate a "sufficiently substantial and direct" link, a "causal connection" or a "nexus" between the plaintiff's contributions and the property which is the subject matter of the trust (*Peter*, at pp. 988, 997 and 999; *Pettkus* at p. 852;  *Sorochan*, at pp. 47-50; *Rathwell*, at p. 454).   A minor or indirect contribution will not suffice (*Peter*, at p. 997). As Dickson C.J. put it in *Sorochan*, the primary focus is on whether the contributions

have a "clear proprietary relationship" (p. 50, citing Professor McLeod's annotation of *Herman v. Smith* (1984), 42 R.F.L. (2d) 154, at p. 156).   Indirect contributions of money and direct contributions of labour may suffice, provided that a connection is established between the plaintiff's deprivation and the acquisition, preservation, maintenance, or improvement of the property (*Sorochan*, at p. 50; *Pettkus*, at p. 852).

[52]      The plaintiff must also establish that a monetary award would be insufficient in the circumstances (*Peter*, at p. 999).   In this regard, the court may take into account the probability of recovery, as well as whether there is a reason to grant the plaintiff the additional rights that flow from recognition of property rights (*Lac Minerals*, at p. 678, *per* La Forest J.).

[53]      The extent of the constructive trust interest should  be proportionate to the claimant's contributions.  Where the contributions are unequal, the shares will be unequal (*Pettkus*, at pp. 852-53; *Rathwell*, at p. 448; *Peter*, at pp. 998-99).   As Dickson J. put it in *Rathwell*, "The court will assess the contributions made by each spouse and make a fair, equitable distribution having regard to the respective contributions" (p. 454).

D.  *Areas Needing Clarification*

[54]      While the law of unjust enrichment sets out a sturdy legal framework within which to address claims by domestic partners, three areas continue to generate controversy and require clarification. As mentioned earlier, these are as follows: the approach to the assessment of a monetary award for a successful unjust enrichment

claim, how and where to address the mutual benefit problem, and the role of the parties' reasonable or legitimate expectations. I will address these in turn.

E.  *Is a Monetary Award Restricted to Quantum Meruit?*

(1)  Introduction

[55]      As noted earlier, remedies for unjust enrichment may either be proprietary (normally a remedial constructive trust) or personal (normally a money remedy).   Once the choice has been made to award a monetary rather than a proprietary remedy, the question of how to quantify that monetary remedy arises. Some courts have held that monetary relief must always be calculated based on a value received or *quantum meruit* basis (*Bell*), while others have held that monetary relief may also be based on a value survived (i.e. by reference to the value of property) approach (*Wilson*; *Pickelein*; *Harrison*; *MacFarlane; Shannon*).  If, as some courts have held, a monetary remedy must invariably be quantified on a *quantum meruit* basis, the remedial choice in unjust enrichment cases becomes whether to impose a constructive trust or order a monetary remedy calculated on a *quantum meruit* basis. One scholar has referred to this approach as the false dichotomy between constructive trust and *quantum meruit* (McCamus, at pp. 375-76).   Scholars have also noted this area of uncertainty in the case law, and have suggested that an *in personam* remedy using the value survived measure is a plausible alternative to the constructive trust (McCamus, at p. 377; P. Birks, *An Introduction to the Law of Restitution* (1985), at pp. 394-95).   As I will explain below, *Peter* is said to have established this dichotomy of remedial choice.   However, in my view, the focus in

*Peter* was on the availability of the constructive trust remedy, and that case should not be taken as limiting the calculation of monetary relief for unjust enrichment to a *quantum meruit* basis. In appropriate circumstances, monetary relief may be assessed on a value survived basis.

[56]    I will first briefly describe the genesis of the purported limitation on the monetary remedy. Then I will explain why, in my view, it should be rejected. Finally, I will set out my views on how money remedies for unjust enrichment claims in domestic situations should be approached.

### (2)  The Remedial Dichotomy

[57]    As noted, there is a widespread, although not unanimous, view that there are only two choices of remedy for an unjust enrichment: a monetary award, assessed on a fee-for-services basis; or a proprietary one (generally taking the form of a remedial constructive trust), where the claimant can show that the benefit conferred contributed to the acquisition, preservation, maintenance, or improvement of specific property. Some brief comments in *Peter* seem to have spawned this idea, which is reflected in a number of appellate authorities.  For instance, in the *Vanasse* appeal, the Ontario Court of Appeal reasoned that since Ms. Vanasse could not show that her contributions were linked to specific property, her claim had to be quantified on a fee-for-services basis.  I respectfully do not agree that monetary awards for unjust enrichment must always be calculated in this way.

### (3)  Why the Remedial Dichotomy Should Be Rejected

[58]     In my view, restricting the money remedy to a fee-for-services calculation is inappropriate for four reasons.  First, it fails to reflect the reality of the lives of many domestic partners.  Second, it is inconsistent with the inherent flexibility of unjust enrichment.  Third, it ignores the historical basis of *quantum meruit* claims.  Finally, it is not mandated by the Court's judgment in *Peter*. For those reasons, this remedial dichotomy should be rejected. The discussion which follows is concerned only with the quantification of a monetary remedy for unjust enrichment; the law relating to when a proprietary remedy should be granted is well established and remains unchanged.


        (a) *Life Experience*

[59]     The remedial dichotomy would be appropriate if, in fact, the bases of all domestic unjust enrichment claims fit into only two categories — those where the enrichment consists of the provision of unpaid services, and those where it consists of an unrecognized contribution to the acquisition, improvement, maintenance or preservation of specific property.  To be sure, those two bases for unjust enrichment claims exist.  However, all unjust enrichment cases cannot be neatly divided into these two categories.


[60]     At least one other basis for an unjust enrichment claim is easy to identify. It consists of cases in which the contributions of both parties over time have resulted in an accumulation of wealth. The unjust enrichment occurs following the breakdown of their relationship when one party retains a disproportionate share of

the assets which are the product of their joint efforts.  The required link between

the contributions and a specific property may not exist, making it inappropriate to

confer a proprietary remedy.  However, there may clearly be a link between the

joint efforts of the parties and the accumulation of wealth; in other words, a link

between the "value received" and the "value surviving", as McLachlin J. put it in

*Peter*, at pp. 1000-1001. Thus, where there is a relationship that can be described

as a "joint family venture", and the joint efforts of the parties are linked to the

accumulation of wealth, the unjust enrichment should be thought of as leaving

one party with a disproportionate share of the jointly earned assets.

[61]    There is nothing new about the notion of a joint family venture in which

both parties contribute to their overall accumulation of wealth.  It was recognition

of this reality that contributed to comprehensive matrimonial property legislative

reform in the late 1970s and early 1980s.  As the Court put it in *Clarke v. Clarke*,

[1990] 2 S.C.R. 795, at p. 807 (in relation to Nova Scotia's *Matrimonial Property

Act*), ". . . the Act supports the equality of both parties to a marriage and

recognized the joint contribution of the spouses, be it financial or otherwise, to

that enterprise. . . . The Act is accordingly remedial in nature.  It was designed to

alleviate the inequities of the past when the contribution made by women to the

economic survival and growth of the family was not recognized" (emphasis

added).

[62]     Unlike much matrimonial property legislation, the law of unjust enrichment does not mandate a presumption of equal sharing.  However, the law of unjust enrichment can and should respond to the social reality identified by the legislature that many domestic relationships are more realistically viewed as a joint venture to which the parties jointly contribute.

[63]     This reality has also been recognized many times and in many contexts by the Court. For instance, in *Murdoch*, Laskin J. (as he then was), in dissent, would have imposed constructive trust relief, on the basis that the facts were "consistent with a pooling of effort by the spouses" to establish themselves in a ranch operation (p. 457), and that the spouses had worked together for fifteen years to improve "their lot in life through progressively larger acquisitions of ranch property" (p. 446).  Similarly, in *Rathwell*, a majority of the judges agreed that Mr. and Mrs. Rathwell had pooled their efforts to accumulate wealth as a team.  Dickson J. emphasized that the parties had together "decided to make farming their way of life" (p. 444), and that the acquisition of property in Mr. Rathwell's name was only made possible through their "joint effort" and "team work" (p. 461).

[64]     A similar recognition is evident in *Pettkus* and *Peter*.

[65]     In *Pettkus*, the parties developed a successful beekeeping business, the profits from which they used to acquire real property. Dickson J., writing for the majority of the Court, emphasized facts suggestive of a domestic and financial

partnership. He observed that "each started with nothing; each worked continuously, unremittingly and sedulously in the joint effort" (p. 853); that each contributed to the "good fortune of the common enterprise" (p. 838); that Wilson J.A. (as she then was) at the Court of Appeal had found the wealth they accumulated was through "joint effort" and "teamwork" (p. 849); and finally, that "[t]heir lives and their economic well-being were fully integrated" (p. 850).

[66]     I agree with Professor McCamus that the Court in *Pettkus* was "satisfied that the parties were engaged in a common venture in which they expected to share the benefits flowing from the wealth that they jointly created" (p. 367).  Put another way, Mr. Pettkus was not unjustly enriched because Ms. Becker had a precise expectation of obtaining a legal interest in certain properties, but rather because they were in reality partners in a common venture.

[67]     The significance of the fact that wealth had been acquired through joint effort was again at the forefront of the analysis in *Peter* where the parties lived together for 12 years in a common law relationship.  While Mr. Beblow generated most of the family income and also contributed to the maintenance of the property, Ms. Peter did all of the domestic work (including raising the six children of their blended family), helped with property maintenance, and was solely responsible for the property when Mr. Beblow was away.  The reality of their joint venture was acknowledged when McLachlin J. wrote that the "joint family

venture, in effect, was no different from the farm which was the subject of the trust in *Pettkus v. Becker*" (p. 1001).

[68]    The Court's recognition of the joint family venture is evident in three other places in *Peter*.  First, in reference to the appropriateness of the "value survived" measure of relief, McLachlin J. observed, "[I]t is more likely that a couple expects to share in the wealth generated from their partnership, rather than to receive compensation for the services performed during the relationship" (p. 999).  Second, and also related to valuing the extent of the unjust enrichment, McLachlin J. noted that, in a case where both parties had contributed to the "family venture", it was appropriate to look to all of the family assets, rather than simply one of them, to approximate the value of the claimant's contributions to that family venture (p. 1001). Third, the Court's justification for affirming the value of domestic services was, in part, based on reasoning that such services are often proffered in the context of a common venture (p. 993).

[69]    Relationships of this nature are common in our life experience. For many domestic relationships, the couple's venture may only sensibly be viewed as a joint one, making it highly artificial in theory and extremely difficult in practice to do a detailed accounting of the contributions made and benefits received on a fee-for-services basis.  Of course, this is a relationship-specific issue; there can be no presumption one way or the other.  However, the legal consequences of the breakdown of a domestic relationship should reflect realistically the way people

live their lives.  It should not impose on them the need to engage in an artificial

balance sheet approach which does not reflect the true nature of their relationship.

(b) *Flexibility*

[70]    Maintaining a strict remedial dichotomy is inconsistent with the Court's

approach to equitable remedies in general, and to its development of remedies for

unjust enrichment in particular.

[71]    The Court has often emphasized the flexibility of equitable remedies and

the need to fashion remedies that respond to various situations in principled and

realistic ways.  So, for example, when speaking of equitable compensation for

breach of confidence, Binnie J. affirmed that "the Court has ample jurisdiction to

fashion appropriate relief out of the full gamut of available remedies, including

appropriate financial compensation":  *Cadbury Schweppes Inc. v.  FBI Foods

Ltd*., [1999] 1 S.C.R. 142, at para. 61. At para. 24, he noted the broad approach to

equitable remedies for breach of confidence taken by the Court in *Lac Minerals*.

In doing so, he cited this statement with approval:  ". . . the remedy that follows

[once liability is established] should be the one that is most appropriate on the

facts of the case rather than one derived from history or over-categorization"

(from J. D. Davies, "Duties of Confidence and Loyalty", [1990] *Lloyds' Mar. &

Com. L.Q.* 4, at p. 5).    Similarly, in the context of the constructive trust,

McLachlin J. (as she then was) noted that "[e]quitable remedies are flexible; their

award is based on what is just in all the circumstances of the case": *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217, at para. 34.

[72]    Turning specifically to remedies for unjust enrichment,  I refer to Binnie J.'s comments in *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575 at para. 13. He noted that the doctrine of unjust enrichment, while predicated on clearly defined principles, "retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscience".   Moreover, the Court has recognized that, given the wide variety of circumstances addressed by the traditional categories of unjust enrichment, as well as the flexibility of the broader, principled approach, its development has been characterized by, and indeed requires, recourse to a number of different sorts of remedies depending on the circumstances: see *Peter*, at p. 987; *Sorochan*, at p. 47.

[73]    Thus, the remedy should mirror the flexibility inherent in the unjust enrichment principle itself, so as to allow the court to respond appropriately to the substance of the problem put before it.  This means that a monetary remedy must match, as best it can, the extent of the enrichment unjustly retained by the defendant.  There is no reason to think that the wide range of circumstances that may give rise to unjust enrichment claims will necessarily fall into one or other of the two remedial options into which some have tried to force them.

(c) *History*

[74]     Imposing a strict remedial dichotomy is also inconsistent with the historical development of the unjust enrichment principle.   Unjust enrichment developed through several particular categories of cases.   *Quantum meruit*, the origin of the fee-for-services award, was only one of them.   *Quantum meruit* originated as a common law claim for compensation for benefits conferred under an agreement which, while apparently binding, was rendered ineffective for a reason recognized at common law. The scope of the claim was expanded over time, and the measure of a *quantum meruit* award was flexible.   It might be assessed, for example, by the cost to the plaintiff of providing the service, the market value of the benefit, or even the value placed on the benefit by the recipient: P.D. Maddaugh and J.D. McCamus, *The Law of Restitution* (loose-leaf), vol. 1 at § 4:200.30.   The important point, however, is that *quantum meruit* is simply one of the established categories of unjust enrichment claims. There is no reason in principle why one of the traditional categories of unjust enrichment should be used to force the monetary remedy for all present domestic unjust enrichment cases into a remedial straitjacket.

### (d) *Peter v. Beblow*

[75]     *Peter* does not mandate strict adherence to a *quantum meruit* approach to money remedies for unjust enrichment.   One must remember that the focus of *Peter* was on whether the plaintiff's contributions entitled her to a constructive trust over the former family home.   While it was assumed by both McLachlin J. and Cory J., who wrote concurring reasons in the case, that a money award would

be fashioned on the basis of *quantum meruit*, that was not an issue, let alone a holding, in the case.

[76]     There are, in fact, only two sentences in the judgments that could be taken as supporting the view that this rule should always apply.  At p. 995, McLachlin J. said,  "Two remedies are possible: an award of money on the basis of the value of the services rendered, i.e. *quantum meruit*; and the one the trial judge awarded, title to the house based on a constructive trust"; at p. 999, she wrote that "[f]or a monetary award, the 'value received' approach is appropriate". Given that the focus of the case was deciding whether a proprietary remedy was appropriate, I would not read these two brief passages as laying down the sweeping rule that a monetary award must always be calculated on a fee-for-services basis.

[77]     Moreover, McLachlin J. noted that the doctrine of unjust enrichment applies to a variety of situations, and that successful claims have been addressed through a number of remedies, depending on the circumstances.  Only one of these remedies is a payment for services rendered on the basis of *quantum meruit*: p. 987.  There is nothing in this observation to suggest that the Court decided to opt for a one-size-fits-all monetary remedy, especially when such an approach would be contrary to the very flexibility that the Court has repeatedly affirmed with regards to the law of unjust enrichment and corresponding remedies.

[78]     This restrictive reading of *Peter* is not consistent with the underlying nature of the claim founded on the principles set out in *Pettkus*.  As Professor McCamus has suggested, cases like *Pettkus* rest on a claimant's right to share surplus wealth created by joint effort and teamwork.  It follows that a remedy based on notional fees for services is not responsive to the underlying nature of that claim: McCamus, at pp. 376-77. In my view, this reasoning is persuasive whether the joint effort has led to the accumulation of specific property, in which case a remedial constructive trust may be appropriate according to the well-settled principles in that area of trust law, or where the joint effort has led to an accumulation of assets generally. In the latter instance, when appropriate, there is no reason in principle why a monetary remedy cannot be fashioned to reflect this basis of the enrichment and corresponding deprivation.  What is essential, in my view, is that, in either type of case, there must be a link between the contribution and the accumulation of wealth, or to use the words of McLachlin J. in *Peter*, between the "value received" and the "value surviving". Where that link exists, and a proprietary remedy is either inappropriate or unnecessary, the monetary award should be fashioned to reflect the true nature of the enrichment and the corresponding deprivation.

[79]     Professor McCamus has suggested that the equitable remedy of an accounting of profits could be an appropriate remedial tool: p. 377. While I would not discount that as a possibility, I doubt that the complexity and technicality of that remedy would be well-suited to domestic situations, which are more often

than not rather straightforward. The unjust enrichment principle is inherently flexible and, in my view, the calculation of a monetary award for a successful unjust enrichment claim should be equally flexible. This is necessary to respond, to the extent money can, to the particular enrichment being addressed. To my way of thinking, Professor Fridman was right to say that "where a claim for unjust enrichment has been made out by the plaintiff, the court may award whatever form of relief is most appropriate so as to ensure that the plaintiff obtains that to which he or she is entitled, regardless of whether the situation would have been governed by common law or equitable doctrines or whether the case would formerly have been considered one for a personal or a proprietary remedy" (p. 398).

### (4) <u>The Approach to the Monetary Remedy</u>

[80]     The next step in the legal development of this area should be to move away from the false remedial dichotomy between *quantum meruit* and constructive trust, and to return to the underlying principles governing the law of unjust enrichment. These underlying principles focus on properly characterizing the nature of the unjust enrichment giving rise to the claim. As I have mentioned above, not all unjust enrichments arising between domestic partners fit comfortably into either a "fee-for-services" or "a share of specific property" mold. Where the unjust enrichment is best characterized as an unjust retention of a disproportionate share of assets accumulated during the course of what McLachlin

J. referred to in *Peter* (at p. 1001) as a "joint family venture" to which both partners have contributed, the monetary remedy should reflect that fact.

[81]    In such cases, the basis of the unjust enrichment is the retention of an inappropriately disproportionate amount of wealth by one party when the parties have been engaged in a joint family venture and there is a clear link between the claimant's contributions to the joint venture and the accumulation of wealth. Irrespective of the status of legal title to particular assets, the parties in those circumstances are realistically viewed as "creating wealth in a common enterprise that will assist in sustaining their relationship, their well-being and their family life" (McCamus, at p. 366).  The wealth created during the period of cohabitation will be treated as the fruit of their domestic and financial relationship, though not necessarily by the parties in equal measure.  Since the spouses are domestic and financial partners, there is no need for "duelling *quantum meruits*".  In such cases, the unjust enrichment is understood to arise because the party who leaves the relationship with a disproportionate share of the wealth is denying to the claimant a reasonable share of the wealth accumulated in the course of the relationship through their joint efforts. The monetary award for unjust enrichment should be assessed by determining the proportionate contribution of the claimant to the accumulation of the wealth.

[82]    This flexible approach to the money remedy in unjust enrichment cases is fully consistent with *Walsh*. While that case was focused on constitutional issues

that are not before us in this case, the majority judgment was clearly not intended to freeze the law of unjust enrichment in domestic cases; the judgment indicates that the law of unjust enrichment, including the remedial constructive trust, is the preferable method of responding to the inequities brought about by the breakdown of a common law relationship, since the remedies for unjust enrichment "are tailored to the parties' specific situation and grievances" (para. 61).  In short, while emphasizing respect for autonomy as an important value, the Court at the same time approved of the continued development of the law of unjust enrichment in order to respond to the plethora of forms and functions of common law relationships.

[83]     A similar approach was taken in *Peter*.  Mr. Beblow argued that the law of unjust enrichment should not provide a share of property to unmarried partners because the legislature had chosen to exclude them from the rights accorded to married spouses under matrimonial property legislation.  This argument was succinctly — and flatly — rejected with the remark that it is "precisely where an injustice arises without a legal remedy that equity finds a role": p. 994.

[84]     It is not the purpose of the law of unjust enrichment to replicate for unmarried partners the legislative presumption that married partners are engaged in a joint family venture. However, there is no reason in principle why remedies for unjust enrichment should fail to reflect that reality in the lives and relationships of unmarried partners.

[85]     I conclude, therefore, that the common law of unjust enrichment should recognize and respond to the reality that there are unmarried domestic arrangements that are partnerships; the remedy in such cases should address the disproportionate retention of assets acquired through joint efforts with another person. This sort of sharing, of course, should not be presumed, nor will it be presumed that wealth acquired by mutual effort  will be shared equally. Cohabitation does not, in itself, under the common law of unjust enrichment, entitle one party to a share of the other's property or any other relief. However, where wealth is accumulated as a result of joint effort, as evidenced by the nature of the parties' relationship and their dealings with each other, the law of unjust enrichment should reflect that reality.

[86]     Thus the rejection of the remedial dichotomy leads us to consider in what circumstances an unjust enrichment may be appropriately characterized as a failure to share equitably assets acquired through the parties' joint efforts. While this approach will need further refinement in future cases, I offer the following as a broad outline of when this characterization of an unjust enrichment will be appropriate.

(5) Identifying Unjust Enrichment Arising From a Joint Family Venture

[87]     My view is that when the parties have been engaged in a joint family venture, and the claimant's contributions to it are linked to the generation of wealth, a monetary award for unjust enrichment should be calculated according to

the share of the accumulated wealth proportionate to the claimant's contributions. In order to apply this approach, it is first necessary to identify whether the parties have, in fact, been engaged in a joint family venture. In the preceding section, I reviewed the many occasions on which the existence of a joint family venture has been recognized. From this rich set of factual circumstances, what emerge as the hallmarks of such a relationship?

[88]    It is critical to note that cohabiting couples are not a homogeneous group. It follows that the analysis must take into account the particular circumstances of each particular relationship. Furthermore, as previously stated, there can be no presumption of a joint family venture.  The goal is for the law of unjust enrichment to attach just consequences to the way the parties have lived their lives, not to treat them as if they ought to have lived some other way or conducted their relationship on some different basis.   A joint family venture can only be identified by the court when its existence, in fact, is well-grounded in the evidence.  The emphasis should be on how the parties actually lived their lives, not on their *ex post facto* assertions or the court's view of how they ought to have done so.

[89]    In undertaking this analysis, it may be helpful to consider the evidence under four main headings: mutual effort, economic integration, actual intent and priority of the family.  There is, of course, overlap among factors that may be relevant under these headings and there is no closed list of relevant factors. What

follows is not a checklist of conditions for finding (or not finding) that the parties were engaged in a joint family venture. These headings, and the factors grouped under them, simply provide a useful way to approach a global analysis of the evidence and some examples of the relevant factors that may be taken into account in deciding whether or not the parties were engaged in a joint family venture. The absence of the factors I have set out, and many other relevant considerations, may well negate that conclusion.

(a) *Mutual Effort*

[90]    One set of factors concerns whether the parties worked collaboratively towards common goals. Indicators such as the pooling of effort and team work, the decision to have and raise children together, and the length of the relationship may all point towards the extent, if any, to which the parties have formed a true partnership and jointly worked towards important mutual goals.

[91]    Joint contributions, or contributions to a common pool, may provide evidence of joint effort.  For instance, in *Murdoch*, central to Laskin J.'s constructive trust analysis was that the parties had pooled their efforts to establish themselves in a ranch operation.  Joint contributions were also an important aspect of the Court's analyses in *Peter*, *Sorochan*, and *Pettkus*.  Pooling of efforts and resources, whether capital or income, has also been noted in the appellate case law (see, for example, *Birmingham v. Ferguson*, 2004 CanLII 4764 (Ont. C.A.); *McDougall v. Gesell Estate*, 2001 MBCA 3, 153 Man. R. (2d) 54, at para.

14).  The use of parties' funds entirely for family purposes may be indicative of the pooling of resources: *McDougall*.  The parties may also be said to be pooling their resources where one spouse takes on all, or a greater proportion, of the domestic labour, freeing the other spouse from those responsibilities, and enabling him or her to pursue activities in the paid workforce (see *Nasser v. Mayer-Nasser* (2000), 5 R.F.L. (5th) 100 (Ont. C.A.) and *Panara v. Di Ascenzo*, 2005 ABCA 47, 361 A.R. 382, at para. 27).

(b) *Economic Integration*

[92]    Another group of factors, related to those in the first group, concerns the degree of economic interdependence and integration that characterized the parties' relationship (*Birmingham*; *Pettkus*; *Nasser*). The more extensive the integration of the couple's finances,  economic interests and economic well-being, the more likely it is that they should be considered as having been engaged in a joint family venture. For example, the existence of a joint bank account that was used as a "common purse", as well as the fact that the family farm was operated by the family unit, were key factors in Dickson J.'s analysis in *Rathwell*. The sharing of expenses and the amassing of a common pool of savings may also be relevant considerations (see *Wilson; Panara*).

[93]    The parties' conduct may further indicate a sense of collectivity, mutuality, and prioritization of the overall welfare of the family unit over the individual interests of the individual members (McCamus, at p. 366).   These and

other factors may indicate that the economic well-being and lives of the parties are largely integrated (see, for example, *Pettkus*, at p. 850).

(c)  *Actual Intent*

[94]     Underpinning the law of unjust enrichment is an appropriate concern for the autonomy of the parties, and this is a particularly important consideration in relation to domestic partnerships. While domestic partners might not marry for a host of reasons, one of them may be the deliberate choice not to have their lives economically intertwined.  Thus, in considering whether there is a joint family venture, the actual intentions of the parties must be given considerable weight. Those intentions may have been expressed by the parties or may be inferred from their conduct.  The important point, however, is that the quest is for their actual intent as expressed or inferred, not for what in the court's view "reasonable" parties *ought* to have intended in the same circumstances. Courts must be vigilant not to impose their own views, under the guise of inferred intent, in order to reach a certain result.

[95]     Courts may infer from the parties' conduct that they intended to share in the wealth they jointly created (P. Parkinson, "Beyond *Pettkus* v. *Becker*: Quantifying Relief for Unjust Enrichment" (1993), 43 U.T.L.J. 217, at p. 245). The conduct of the parties may show that they intended the domestic and professional spheres of their lives to be part of a larger, common venture (*Pettkus*; *Peter*; *Sorochan*).    In some cases, courts have explicitly labelled the relationship

as a "partnership" in the social and economic sense (*Panara*, at para. 71; *McDougall*, at para. 14).    Similarly, the intention to engage in a joint family venture may be inferred where the parties accepted that their relationship was "equivalent to marriage" (*Birmingham*, at para. 1), or where the parties held themselves out to the public as married (*Sorochan*). The stability of the relationship may be a relevant factor as may the length of cohabitation (*Nasser*; *Sorochan*; *Birmingham*). When parties have lived together in a stable relationship for a lengthy period, it may be nearly impossible to engage in a precise weighing of the benefits conferred within the relationship (*McDougall*; *Nasser*).

[96]    The title to property may also reflect an intent to share wealth, or some portion of it, equitably.  This may be the case where the parties are joint tenants of property.  Even where title is registered to one of the parties, acceptance of the view that wealth will be shared may be evident from other aspects of the parties' conduct.  For example, there may have been little concern with the details of title and accounting of monies spent for household expenses, renovations, taxes, insurance, and so on. Plans for property distribution on death, whether in a will or a verbal discussion, may also indicate that the parties saw one another as domestic and economic partners.

[97]    The parties' actual intent may also negate the existence of a joint family venture, or support the conclusion that particular assets were to be held

independently.  Once again, it is the parties' actual intent, express or inferred from the evidence, that is the relevant consideration.

(d) *Priority of the Family*

[98]    A final category of factors to consider in determining whether the parties were in fact engaged in a joint family venture is whether and to what extent they have given priority to the family in their decision making.  A relevant question is whether there has been in some sense detrimental reliance on the relationship, by one or both of the parties, for the sake of the family.  As Professor McCamus puts it, the question is whether the parties have been "[p]roceeding on the basis of understandings or assumptions about a shared future which may or may not be articulated" (p. 365). The focus is on contributions to the domestic and financial partnership, and particularly financial sacrifices made by the parties for the welfare of the collective or family unit.  Whether the roles of the parties fall into the traditional wage earner/homemaker division, or whether both parties are employed and share domestic responsibilities, it is frequently the case that one party relies on the success and stability of the relationship for future economic security, to his or her own economic detriment (Parkinson, at p. 243).   This may occur in a number of ways including: leaving the workforce for a period of time to raise children; relocating for the benefit of the other party's career (and giving up employment and employment-related networks as a result); foregoing career or educational advancement for the benefit of the family or relationship; and

accepting underemployment in order to balance the financial and domestic needs of the family unit.

[99]    As I see it, giving priority to the family is not associated exclusively with the actions of the more financially dependent spouse.  The spouse with the higher income may also make financial sacrifices (for example, foregoing a promotion for the benefit of family life), which may be indicative that the parties saw the relationship as a domestic and financial partnership.  As Professor Parkinson puts it, the joint family venture may be identified where

> [o]ne party has encouraged the other to rely to her detriment by leaving the workforce or forgoing other career opportunities for the sake of the relationship, and the breakdown of the relationship leaves her in a worse position than she would otherwise have been had she not acted in this way to her economic detriment. [p. 256].

(6)  Summary of *Quantum Meruit* Versus Constructive Trust

[100]    I conclude:

1.  The monetary remedy for unjust enrichment is not restricted to an award based on a fee-for-services approach.

2.  Where the unjust enrichment is most realistically characterized as one party retaining a disproportionate share of assets resulting from a joint family venture, and a monetary award is appropriate, it should be

calculated on the basis of the share of those assets proportionate to the claimant's contributions.

3.  To be entitled to a monetary remedy of this nature, the claimant must show both (a) that there was, in fact, a joint family venture, and (b) that there is a link between his or her contributions to it and the accumulation of assets and/or wealth.

4.  Whether there was a joint family venture is a question of fact and may be assessed by having regard to all of the relevant circumstances, including factors relating to (a) mutual effort, (b) economic integration, (c) actual intent and (d) priority of the family.

F.  *Mutual Benefit Conferral*

(1)  Introduction

[101]    As discussed earlier, the unjust enrichment analysis in domestic situations is often complicated by the fact that there has been a mutual conferral of benefits; each party in almost all cases confers benefits on the other: Parkinson, at p. 222. Of course, a claimant cannot expect both to get back something given to the defendant and retain something received from him or her: Birks, at p. 415. The unjust enrichment analysis must take account of this common sense proposition. How and where in the analysis should this be done?

[102]    The answer is fairly straightforward when the essence of the unjust enrichment claim is that one party has emerged from the relationship with a disproportionate share of assets accumulated through their joint efforts.  These are

the cases of a joint family venture in which the mutual efforts of the parties have resulted in an accumulation of wealth. The remedy is a share of that wealth proportionate to the claimant's contributions. Once the claimant has established his or her contribution to a joint family venture, and a link between that contribution and the accumulation of wealth, the respective contributions of the parties are taken into account in determining the claimant's proportionate share. While determining the proportionate contributions of the parties is not an exact science, it generally does not call for a minute examination of the give and take of daily life. It calls, rather, for the reasoned exercise of judgment in light of all of the evidence.

[103]    Mutual benefit conferral, however, gives rise to more practical problems in an unjust enrichment claim where the appropriate remedy is a money award based on a fee-for-services-provided approach. The fact that the defendant has also provided services to the claimant may be seen as a factor relevant at all stages of the unjust enrichment analysis. Some courts have considered benefits received by the claimant as part of the benefit/detriment analysis (for example, at the Court of Appeal in *Peter v. Beblow* (1990), 50 B.C.L.R. (2d) 266). Others have looked at mutual benefits as an aspect of the juristic reason inquiry (for example, *Ford v. Werden* (1996), 27 B.C.L.R. (3d) 169 (C.A.), and the Court of Appeal judgment in *Kerr*). Still others have looked at mutual benefits in relation to both juristic reason and at the remedy stage (for example, as proposed in

*Wilson*).  It is apparent that some clarity and consistency is necessary with respect to this issue.

[104]    In my view, there is much to be said about the approach to the mutual benefit analysis mapped out by Huddart J.A. in *Wilson*.  Specifically, I would adopt her conclusions that mutual enrichments should mainly be considered at the defence and remedy stages, but that they may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits constitutes relevant evidence of the existence (or non-existence) of juristic reason for the enrichment (para. 9). This approach is consistent with the authorities from this Court, and provides a straightforward and just method of ensuring that mutual benefit conferral is fully taken into account without short-circuiting the proper unjust enrichment analysis. I will briefly set out why, in my view, this approach is sound.

[105]    At the outset, however, I should say that this Court's decision in *Peter* does not mandate consideration of mutual benefits at the juristic reason stage of the analysis: see, e.g., *Ford*, at para. 14; *Thomas v. Fenton*, 2006 BCCA 299, 269 D.L.R. (4th) 376, at para. 18. Rather, *Peter* made clear that mutual benefit conferral should generally not be considered at the benefit and detriment stages; the Court also approved the trial judge's decision to take mutual benefits into account at the remedy stage of the unjust enrichment analysis.

[106]    In *Peter*, the trial judge found that all three elements of unjust enrichment had been established.  Before Ms. Peter and Mr. Beblow started living together, he had a housekeeper whom he paid $350 per month.  When Ms. Peter moved in with her children and assumed the housekeeping and child-care responsibilities, the housekeeper was no longer required. The trial judge valued Ms. Peter's contribution by starting with the amount Mr. Beblow had paid his housekeeper, but then discounting this figure by one half to reflect the benefits Ms. Peter received in return.  The trial judge then used that discounted figure to value Ms. Peter's services over the 12 years of the relationship: [1988] B.C.J. No. 887 (QL).

[107]    The Court of Appeal, at (1990), 50 B.C.L.R. (2d) 266, set aside the judge's finding on the basis that Ms. Peter had failed to establish that she had suffered a deprivation corresponding to the benefits she had conferred on Mr. Beblow.  The court reasoned that, although she had performed the services of a housekeeper and homemaker, she had received compensation because she and her children lived in Mr. Beblow's home rent free and he contributed more for groceries than she had.

[108]    This Court reversed the Court of Appeal and restored the trial judge's award.  The Court was unanimous that Ms. Peter had established all of the elements of unjust enrichment, including deprivation. Cory J. (with whom McLachlin J. agreed on this point) made short work of Mr. Beblow's submission that Ms. Peter had not shown deprivation.  He observed, "As a general rule, if it is

found that the defendant has been enriched by the efforts of the plaintiff there

will, almost as a matter of course be deprivation suffered by the plaintiff": at p.

1013.  The Court also unanimously upheld the trial judge's approach of taking

account of the benefits Ms. Peter had received at the remedy stage of his decision.

As noted, the trial judge had reduced the monthly amount used to calculate Ms.

Peter's award by 50 percent to reflect benefits she had received from Mr. Beblow.

McLachlin J. did not disagree with this approach, holding at p. 1003 that the

figure arrived at by the judge fairly reflected the value of Ms. Peter's contribution

to the family assets.  Cory J., at p. 1025, referred to the trial judge's approach as

"a fair means of calculating the amount due to the appellant".  Thus, the Court

approved the approach of taking the mutual benefit issue into account at the

remedy stage of the analysis. *Peter* therefore does not support the view that

mutual benefits should be considered at the benefit/detriment or juristic reason

stages of the analysis.


(2)  The Correct Approach

[109]    As I noted earlier, my view is that mutual benefit conferral can be taken

into account at the juristic reason stage of the analysis, but only to the extent that

it provides relevant evidence of the existence of a juristic reason for the

enrichment.  Otherwise, the mutual exchange of benefits should be taken into

account at the defence and/or remedy stage.  It is important to note that this can,

and should, take place whether or not the defendant has made a formal

counterclaim or pleaded set-off.

[110]   I turn first to why mutual benefits should not be addressed at the benefit/detriment stage of the analysis.  In my view, refusing to address mutual benefits at that point is consistent with the *quantum meruit* origins of the fee-for-services approach and, as well, with the straightforward economic approach to the benefit/detriment analysis which has been consistently followed by this Court.

[111]   An unjust enrichment claim based on a fee-for-services approach is analogous to the traditional claim for *quantum meruit*.  In *quantum meruit* claims, the fact that some benefit had flowed from the defendant to the claimant is taken into account by reducing the claimant's recovery by the amount of the countervailing benefit provided.  For example, in a *quantum meruit* claim where the plaintiff is seeking to recover money paid pursuant to an unenforceable contract, but received some benefit from the defendant already, the claim will succeed but the award will be reduced by an amount corresponding to the value of that benefit: Maddaugh and McCamus (loose-leaf), vol. 2, at § 13:200.   The authors offer as an example *Giles v. McEwan* (1896), 11 Man. R. 150 (Q.B. *en banc*). In that case, two employees recovered in *quantum meruit* for services provided to the defendant under an unenforceable agreement, but the amount of the award was reduced to reflect the value of benefits the defendant had provided to them. Thus, taking the benefits conferred by the defendant into account at the remedy stage is consistent with general principles of *quantum meruit* claims. Of course, if the defendant has pleaded a counterclaim or set-off, the mutual benefit issue must be resolved in the course of considering that defence or claim.

[112]    Refusing to take mutual benefits into account at the benefit/detriment stage is also supported by a straightforward economic approach to the benefit/detriment analysis which the Court has consistently followed. *Garland* is a good example.  The class action plaintiffs claimed in unjust enrichment to seek restitution for late payment penalties that had been imposed but that this Court (in an earlier decision) found had been charged at a criminal rate of interest: see *Garland v. Consumers' Gas Co.*, [1998] 3 S.C.R. 112. The company argued that it had not been enriched because its rates were set by a regulatory mechanism out of its control, and that the rates charged would have been even higher had the company not received the late payment penalties as part of its revenues. That argument was accepted by the Court of Appeal, but rejected on the further appeal to this Court. Iacobucci J., for the Court, held that the payment of money, under the "straightforward economic approach" adopted in *Peter*, was a benefit: para. 32. He stated at para. 36: "There simply is no doubt that Consumers' Gas received the monies represented by the [late payment penalties] and had that money available for use in the carrying on of its business. . . .We are not, at this stage, concerned with what happened to this benefit in the ongoing operation of the regulatory scheme." The Court held that the company was in fact asserting the "change of position" defence (that is, the defence that is available when "an innocent defendant demonstrates that it has materially changed its position as a result of an enrichment such that it would be inequitable to require the benefit to be returned": para. 63).  This defence is considered only after the three elements of an unjust enrichment claim have been established: para. 37. Thus the Court

declined to get into a detailed consideration at the benefit/detriment stage of the defendant's submissions that it had not benefitted because of the regulatory scheme.

[113]    While *Garland* dealt with the payment of money, my view is that the same approach should be applied where the alleged enrichment consists of services.    Provided that they confer a tangible benefit on the defendant, the services will generally constitute an enrichment and a corresponding deprivation. Whether the deprivation was counterbalanced by benefits flowing to the claimant from the defendant should not be addressed at the first two steps of the analysis. I turn now to the limited role that mutual benefit conferral may have at the juristic reason stage of the analysis.

[114]    As previously set out, juristic reason is the third of three parts to the unjust enrichment analysis. As McLachlin J. put it in *Peter*, at p. 990, "It is at this stage that the court must consider whether the enrichment and detriment, morally neutral in themselves, are 'unjust'." The juristic reason analysis is intended to reveal whether there is a reason for the defendant to retain the enrichment, not to determine its value or whether the enrichment should be set off against reciprocal benefits: *Wilson*, at para. 30. *Garland* established that claimants must show that there is no juristic reason falling within any of the established categories, such as whether the benefit was a gift or pursuant to a legal obligation. If that is established, it is open to the defendant to show that a different juristic reason for

the enrichment should be recognized, having regard to the parties' reasonable expectations and public policy considerations.

[115]    The fact that the parties have conferred benefits on each other may provide relevant evidence of their reasonable expectations, a subject that may become germane when the defendant attempts to show that those expectations support the existence of a juristic reason outside the settled categories. However, given that the purpose of the juristic reason step in the analysis is to determine whether the enrichment was just, not its extent, mutual benefit conferral should only be considered at the juristic reason stage for that limited purpose.

(3)  Summary

[116]    I conclude that mutual benefits may be considered at the juristic reason stage, but only to the extent that they provide evidence relevant to the parties' reasonable expectations.    Otherwise, mutual benefit conferrals are to be considered at the defence and/or remedy stage. I will have more to say in the next section about how mutual benefit conferral and the parties' reasonable expectations may come into play in the juristic reason analysis.

G. *Reasonable or Legitimate Expectations*

[117]    The final point that requires some clarification relates to the role of the parties' reasonable expectations in the domestic context.  My conclusion is that, while in the early domestic unjust enrichment cases the parties' reasonable

expectations played an important role in the juristic reason analysis, the development of the law, and particularly the Court's judgment in *Garland*, has led to a more limited and clearly circumscribed role for those expectations.

[118]    In the early cases of domestic unjust enrichment claims, the reasonable expectations of the claimant and the defendant's knowledge of those expectations were central to the juristic reason analysis. For example, in *Pettkus*, when Dickson J. came to the juristic reason step in the analysis, he said that "where one person in a relationship tantamount to spousal prejudices herself in the reasonable expectation of receiving an interest in property and the other person in the relationship freely accepts benefits conferred by the first person in circumstances where he knows or ought to have known of that reasonable expectation, it would be unjust to allow the recipient of the benefit to retain it" (p. 849).  Similarly, in *Sorochan*, at p. 46, precisely the same reasoning was invoked to show that there was no juristic reason for the enrichment.

[119]    In these cases, central to the Court's concern was whether it was just to require the defendant to pay — in fact to surrender an interest in property — for services not expressly requested.  The Court's answer was that it would indeed be unjust for the defendant to retain the benefits, given that he had continued to accept the services when he knew or ought to have known that the claimant was providing them with the reasonable expectation of reward.

[120]    The Court's resort to reasonable expectations and the defendant's knowledge of them in these cases is analogous to the "free acceptance" principle. The notion of free acceptance has been invoked to extend restitutionary recovery beyond the traditional sorts of *quantum meruit* claims in which services had either been requested or provided under an unenforceable agreement.    The law's traditional reluctance to provide a remedy for claims where no request was made was based on the tenet that a person should generally not be required, in effect, to pay for services that he or she did not request, and perhaps did not want. However, this concern carries much less weight when the person receiving the services knew that they were being provided, had no reasonable belief that they were a gift, and yet continued to freely accept them: see P. Birks, *Unjust Enrichment* (2nd ed. 2005), at pp. 56-57.

[121]    The need to engage in this analysis of the claimant's reasonable expectations and the defendant's knowledge thereof with respect to domestic services has, in my view, now been overtaken by developments in the law. *Garland*, as noted, mandated a two-step approach to the juristic reason analysis. The first step requires the claimant to show that the benefit was not conferred for any existing category of juristic reasons.  Significantly, the fact that the defendant also provided services to the claimant is not one of the existing categories.  Nor is the fact that the services were provided pursuant to the parties' reasonable expectations. However, the fact that the parties reasonably expected the services to be provided might afford relevant evidence in relation to whether the case falls

within one of the traditional categories, for example a contract or gift.  Other than

in that way, mutual benefit conferral and the parties' reasonable expectations have

a very limited role to play at the first step in the juristic reason analysis set out in

*Garland*.

[122]    However, different considerations arise at the second step. Following

*Peter* and *Garland*, the parties' reasonable or legitimate expectations have a

critical role to play when the defendant seeks to establish a new juristic reason,

whether case-specific or categorical.   As Iacobucci J. put it in *Garland*, this

introduces a category of residual situations in which "courts can look to all of the

circumstances of the transaction in order to determine whether there is another

reason to deny recovery" (para. 45).   Specifically, it is here that the court should

consider the parties' reasonable expectations and questions of policy.

[123]    It will be helpful in understanding how *Peter* and *Garland* fit together to

apply the *Garland* approach to an issue touched on, but not resolved, in *Peter*.  In

*Peter*, an issue was whether a claim based on the provision of domestic services

could be defeated on the basis that the services had been provided as part of the

bargain between the parties in deciding to live together.   While the Court

concluded that the claim failed on the facts, it did not hold that such a claim

would inevitably fail in all circumstances: p. 991.  It seems to me that, in light of

*Garland*, where a "bargain" which does not constitute a binding contract is

alleged, the issue will be considered at the stage when the defendant seeks to

show that there is a juristic reason for the enrichment that does not fall within any of the existing categories; the claim is that the "bargain" represents the parties' reasonable expectations, and evidence about their reasonable expectations would be relevant evidence of the existence (or not) of such a bargain.

[124]    To summarize:

1.  The parties' reasonable or legitimate expectations have little role to play in deciding whether the services were provided for a juristic reason within the existing categories.

2.  In some cases, the facts that mutual benefits were conferred or that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons is present. An example might be whether there was a contract for the provision of the benefits. However, generally the existence of mutual benefits flowing from the defendant to the claimant will not be considered at the juristic reason stage of the analysis.

3.  The parties' reasonable or legitimate expectations have a role to play at the second step of the juristic reason analysis, that is, where the defendant bears the burden of establishing that there is a juristic reason for retaining the benefit which does not fall within the existing categories. It is the mutual or legitimate expectations of both parties that must be considered, and not simply the expectations of either the claimant or the

defendant. The question is whether the parties' expectations show that retention of the benefits is just.

[125]    I will now turn to the two cases at bar.

IV. The *Vanasse* Appeal

*A.        Introduction*

[126]    In the Vanasse appeal, the main issue is how to quantify a monetary award for unjust enrichment. The trial judge awarded a share of the net increase in the family's wealth during the period of unjust enrichment. The Court of Appeal held that this was the wrong approach, finding that the trial judge ought to have performed a *quantum meruit* calculation in which the value that each party received from the other was assessed and set off. This required an evaluation of the defendant Mr. Seguin's non-financial contributions to the relationship which, in the view of the Court of Appeal, the trial judge failed to perform. As the record did not permit the court to apply the correct legal principles to the facts, it ordered a new hearing with respect to compensation and consequential changes to spousal support.

[127]    In this Court, the appellant Ms. Vanasse raises two issues:

1.      Did the Court of Appeal err by insisting on a strict *quantum meruit* (i.e. "value received") approach to quantify the monetary award for unjust enrichment?

2.      Did the Court of Appeal err in finding that the trial judge had failed to consider relevant evidence of Mr. Seguin's contributions?

[128]   In my view, the appeal should be allowed and the trial judge's order restored.   For the reasons I have developed above, my view is that money compensation for unjust enrichment need not always, as a matter of principle, be calculated on a *quantum meruit* basis.  The trial judge here, although not labelling it as such, found that there was a joint family venture and that there was a link between Ms. Vanasse's contribution to it and the substantial accumulation of wealth which the family achieved.  In my view, the trial judge made a reasonable assessment of the monetary award appropriate to reverse this unjust enrichment, taking due account of Mr. Seguin's undoubted and substantial contributions.

B.      *Brief Overview of the Facts and Proceedings*

[129]   The background facts of this case are largely undisputed. The parties lived together in a common law relationship for approximately 12 years, from 1993 until March 2005.  Together, they had two children who were aged 8 and 10 at the time of trial.

[130]    During approximately the first four years of their relationship (1993 to 1997), the parties diligently pursued their respective careers, Ms. Vanasse with the Canadian Security Intelligence Service ("CSIS") and Mr. Seguin with Fastlane Technologies Inc., marketing a network operating system he had developed.

[131]    In March of 1997, Ms. Vanasse took a leave of absence to move with Mr. Seguin to Halifax, where Fastlane had relocated for important business reasons. During the next three and one-half years, the parties had two children; Ms. Vanasse took care of the domestic labour, while Mr. Seguin devoted himself to developing Fastlane.  The family moved back to Ottawa in 1998, where Mr. Seguin purchased a home and registered it in the names of both parties as joint tenants.    In September 2000, Fastlane was sold and Mr. Seguin netted approximately $11 million. He placed the funds in a holding company, with which he continued to develop business and investment opportunities.

[132]    After the sale of Fastlane, Ms. Vanasse continued to assume most of the domestic responsibilities, although Mr. Seguin was more available to assist.  He continued to manage the finances.

[133]    The parties separated on March 27, 2005. At that time, they were in starkly contrasting financial positions:  Ms. Vanasse's net worth had gone from about $40,000 at the time she and Mr. Seguin started living together, to about $332,000 at the time of separation;  Mr. Seguin had come into the relationship

with about $94,000, and his net worth at the time of separation was about $8,450,000.

[134]    Ms. Vanasse brought proceedings in the Superior Court of Justice.  In addition to seeking orders with respect to spousal support and child custody, Ms. Vanasse claimed unjust enrichment.  She argued that Mr. Seguin had been unjustly enriched because he retained virtually all of the funds from the sale of Fastlane, even though she had contributed to their acquisition through benefits she conferred in the form of domestic and childcare services.  She alleged her contributions allowed Mr. Seguin to dedicate most of his time and energy to Fastlane. She sought relief by way of constructive trust in Mr. Seguin's remaining one half interest in the family home, and a one-half interest in the investment assets held by Mr. Seguin's holding company.

[135]    Mr. Seguin contested the unjust enrichment claim.  While conceding he had been enriched during the roughly three-year period where he was working outside the home full time and Ms. Vanasse was working at home full time (May 1997 to September 2000), he argued there was no corresponding deprivation because he had given her a one-half interest in the family home and approximately $44,000 in Registered Retirement Saving Plans ("RRSPs").  In the alternative, Mr. Seguin submitted that a constructive trust remedy was inappropriate because there was no link between Ms. Vanasse's contributions and the property of Fastlane.

[136]    The trial judge, Blishen J., concluded that the relationship of the parties could be divided into three distinct periods: (1) From the commencement of cohabitation in 1993 until March 1997 when Ms. Vanasse left her job at CSIS; (2) From March 1997 to September 2000, during which both children were born and Fastlane was sold; and (3) From September 2000 to the separation of the parties in March 2005.  She concluded that neither party had been unjustly enriched in the first or third periods; she held that their contributions to the relationship during these periods had been proportionate.  In the first period, there were no children of the relationship and both parties were focused on their careers; in the third period, both parents were home and their contributions had been proportional.

[137]    In the second period, however, the trial judge concluded that Mr. Seguin had been unjustly enriched by Ms. Vanasse. Ms. Vanasse had been in charge of the domestic side of the household, including caring for their two children.  She had not been a "nanny/housekeeper" and, as the trial judge held, throughout the relationship she had been at least "an equal contributor to the family enterprise". The trial judge concluded that Ms. Vanasse's contributions during this second period "significantly benefited Mr. Seguin and were not proportional" (para. 139).

[138]    The trial judge found as fact that Ms. Vanasse's efforts during this second period were directly linked to Mr. Seguin's business success.  She stated, at para. 91, that

Mr. Seguin was enriched by Ms. Vanasse's running of the household, providing child care for two young children and looking after all the necessary appointments and needs of the children. <u>Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities. Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane.</u> [Emphasis added.]

Again at para. 137, the trial judge found that

Mr. Seguin was unjustly enriched and Ms. Vanasse deprived for three and one-half years of their relationship, during which time Mr. Seguin often worked day and night and traveled frequently while in Halifax. <u>Mr. Seguin could not have succeeded, as he did, and built up the company, as he did, without Ms. Vanasse assuming the vast majority of childcare and household responsibilities. Mr. Seguin could not have devoted his time to Fastlane but for Ms. Vanasse's assumption of those responsibilities.</u> . . . <u>Mr. Seguin reaped the benefit of Ms. Vanasse's efforts by being able to focus all of his considerable energies and talents on making Fastlane a success.</u> [Emphasis added.]

[139]    The trial judge concluded that a monetary award in this case was appropriate, given Mr. Seguin's ability to pay, and lack of a sufficiently direct and substantial link between Ms. Vanasse's contributions and Fastlane or Mr. Seguin's holding company, as required to impose a remedial constructive trust.

[140]    With respect to quantification, Blishen J. noted that Ms. Vanasse had received a one-half interest in the family home, but concluded that this was not adequate compensation for her contributions. The trial judge compared the net worths of the parties and determined that Ms. Vanasse was entitled to a one-half interest in the prorated increase in Mr. Seguin's net worth during the period of the unjust enrichment. She reasoned that his net worth had increased by about $8.4 million dollars over the 12 years of the relationship. Although she noted that the

most significant increase took place when Fastlane was sold towards the end of the period of unjust enrichment, she nonetheless prorated the increase over the full 12 years of the relationship, yielding a figure of about $700,000 per year. Starting with the $2.45 million increase attributable to the three and one-half years of unjust enrichment, the trial judge awarded Ms. Vanasse 50 percent of that amount, less the value of her interest in the family home and her RRSPs. This produced an award of just under $1 million.

[141]    Mr. Seguin did not appeal Blishen J.'s unjust enrichment finding, and conceded unjust enrichment between 1997 and 2000 on appeal. Therefore, the trial judge's findings that there had been an unjust enrichment during that period and that there was no unjust enrichment during the other periods are not in issue. The sole issue for determination in this Court is the propriety of the trial judge's monetary award for the unjust enrichment which she found to have occurred.

C. *Analysis*

   (1) Was the Trial Judge Required to Use a Q*uantum Meruit A*pproach to
   Calculate the Monetary Award?

[142]    I agree with the appellant that a monetary award for unjust enrichment need not, as a matter of principle, always be calculated on a fee-for-services basis. As I have set out earlier, an unjust enrichment is best characterized as one party leaving the relationship with a disproportionate share of wealth that accumulated as a result of the parties' joint efforts.  This will be so when the parties were

engaged in a joint family venture and where there is a link between the contributions of the claimant and the accumulation of wealth. When this is the case, the amount of the enrichment should be assessed by determining the claimant's proportionate contribution to that accumulated wealth. As the trial judge saw it, this was exactly the situation of Ms. Vanasse and Mr. Seguin.

(2)  Existence of a Joint Family Venture

[143]    The trial judge, after a six-day trial, concluded that "Ms. Vanasse was not a nanny/housekeeper".  She found that Ms. Vanasse had been at least "an equal contributor to the family enterprise" throughout the relationship and that, during the period of unjust enrichment, her contributions "significantly benefited Mr. Seguin" (para. 139).

[144]    The trial judge, of course, did not review the evidence under the headings that I have suggested will be helpful in identifying a joint family venture, namely "mutual effort", "economic integration", "actual intent" and "priority of the family".  However, her findings of fact and analysis indicate that the unjust enrichment of Mr. Seguin at the expense of Ms. Vanasse ought to be characterized as the retention by Mr. Seguin of a disproportionate share of the wealth generated from a joint family venture.  The judge's findings fit conveniently under the headings I have suggested.

(a) *Mutual Effort*

[145]    There are several factors in this case which suggest that, throughout their relationship, the parties were working collaboratively towards common goals. First, as previously mentioned, the trial judge found that Ms. Vanasse's role was not as a "nanny/housekeeper" but rather as at least an equal contributor throughout the relationship. The parties made important decisions keeping the overall welfare of the family at the forefront: the decision to move to Halifax, the decision to move back to Ottawa, and the decision that Ms. Vanasse would not return to work after the sale of Fastlane are all clear examples.  The parties pooled their efforts for the benefit of their family unit.  As the trial judge found, during the second stage of their relationship from March 1997 to September 2000, the division of labour was such that Ms. Vanasse was almost entirely responsible for running the home and caring for the children, while Mr. Seguin worked long hours and managed the family finances. The trial judge found that it was through their joint efforts that they were able to raise a young family and acquire wealth. As she put it, "Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities" (para. 91). While Mr. Seguin's long hours and extensive travel reduced somewhat in September 1998 when the parties returned to Ottawa, the basic division of labour remained the same.

[146]    Notably, the period of unjust enrichment corresponds to the time during which the parties had two children together (in 1997 and 1999), a further indicator that they were working together to achieve common goals.   The length of the

relationship is also relevant, and their 12-year cohabitation is a significant period of time.   Finally, the trial judge described the arrangement between the parties as a "family enterprise", to which Ms. Vanasse was "at least, an equal contributor" (paras. 138-39).

### (b) *Economic Integration*

[147]   The trial judge found that "[t]his was not a situation of economic interdependence" (para. 105).   That said, there was a pooling of resources.   Ms. Vanasse was not employed and did not contribute financially to the family after the children were born, and thus was financially dependent on Mr. Seguin.   The family home was registered jointly, and the parties had a joint chequing account. As the trial judge put it, "She was 'the C.E.O. of the kids' and he was 'the C.E.O. of the finances'" (para. 105).

### (c) *Actual Intent*

[148]   The actual intent of the parties in a domestic relationship, as expressed by the parties or inferred from their conduct, must be given considerable weight in determining whether there was a joint family venture.   There are a number of findings of fact that indicate these parties considered their relationship to be a joint family venture.

[149]   While a promise to marry or the discussion of legal marriage is by no means a prerequisite for the identification of a joint family venture, in this case the parties' intentions with respect to marriage strongly suggest that they viewed

themselves as the equivalent of a married couple. Mr. Seguin proposed to Ms. Vanasse in July 1996 and they exchanged rings.  While they were "devoted to one another and still in love", a wedding date was never set (para. 14).  Mr. Seguin raised the topic of marriage again when Ms. Vanasse found out she was pregnant with their first child.  Although they never married, the trial judge found that there had been "mutual expectations [of marriage] during the first few years of their 12 year relationship" (para. 64).  Mr. Seguin continued to address Ms. Vanasse as "my future wife", and she was viewed by the outside world as such (para. 33).

[150]    The trial judge also referred to statements made by Mr. Seguin that were strongly indicative of his view that there was a joint family venture.  As the trial judge put it, at para. 28, upon the sale of Fastlane

> Mr. Seguin became a wealthy man.  He told Ms. Vanasse that they would never have to worry about finances as their parents did; their children could go to the best schools and they could live a good life without financial concerns.

Again, at para. 98:

> After the sale of the company, Mr. Seguin indicated they could retire, the children could go to the best schools and the family would be well cared for.  The family took travel vacations, enjoyed luxury cars, bought a large cabin cruiser which they used for summer vacations and purchased condominiums at Mont-Tremblant.

[151]    While the trial judge viewed Mr. Seguin's promises and reassurances as contributing to a reasonable expectation on the part of Ms. Vanasse that she was to share in the increase of his net worth during the period of unjust enrichment, in my view these comments are more appropriately characterized as a reflection of the reality that there was a joint family venture, to which the couple jointly contributed for their mutual benefit and the benefit of their children.

(d) *Priority of the Family*

[152]    There is a strong inference from the factual findings that, to Mr. Seguin's knowledge, Ms. Vanasse relied on the relationship to her detriment.  As the trial judge found, in 1997 Ms. Vanasse gave up a lucrative and exciting career with CSIS, where she was training to be an intelligence officer, to move to Halifax with Mr. Seguin.  In many ways this was a sacrifice on her part; she left her career, gave up her own income, and moved away from her family and friends. Mr. Seguin had moved to Halifax in order to relocate Fastlane for business reasons.  Ms. Vanasse then stayed home and cared for their two small children. As I have already explained, during the period of the unjust enrichment, Ms. Vanasse was responsible for a disproportionate share of the domestic labour.  It was these domestic contributions that, in part, permitted Mr. Seguin to focus on his work with Fastlane.  Later, in 2003, the "family's decision" was for Ms. Vanasse to remain home after her leave from CSIS had expired (para. 198).  Ms. Vanasse's financial position at the breakdown of the relationship indicates she relied on the relationship to her economic detriment.  This is all evidence

supporting the conclusion that the parties were, in fact, operating as a joint family venture.

[153]    As a final point, I would refer to the arguments made by Mr. Seguin, which were accepted by the Court of Appeal, that the trial judge failed to give adequate weight to sacrifices Mr. Seguin made for the benefit of the relationship. Later in my reasons, I will address the question of whether the trial judge actually failed in this regard.  However, the points raised by Mr. Seguin to support this argument actually serve to reinforce the conclusion that there was a joint family venture.  Mr. Seguin specifically notes a number of factors, including:  agreeing to step down as CEO of Fastlane in September 1997 to make himself more available to Ms. Vanasse, causing friction with his co-workers and partners, and reducing his  remuneration; agreeing to relocate to Ottawa at Ms. Vanasse's request in 1998; and making increased efforts to work at home more and travel less after moving back to Ottawa.   These facts are indicative of the sense of mutuality in the parties' social and financial relationship.  In short, they support the identification of a joint family venture.

(e) *Conclusion on Identification of the Joint Family Venture*

[154]    In my view, the trial judge's findings of fact clearly show that Ms. Vanasse and Mr. Seguin engaged in a joint family venture. The remaining question is whether there was a link between Ms. Vanasse's contributions to it and the accumulation of wealth.

(3)  Link to Accumulation of Wealth

[155]    The trial judge made a clear finding that there was a link between Ms. Vanasse's contributions and the family's accumulation of wealth.

[156]    I have referred earlier, in some detail, to the trial judge's findings in this regard.  However, to repeat, her conclusion is expressed particularly clearly at para. 91 of her reasons:

> Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these [household and child-rearing] responsibilities.  Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane.

[157]    Given that and similar findings, I conclude that not only were these parties engaged in a joint family venture, but that there was a clear link between Ms. Vanasse's contribution to it and the accumulation of wealth.  The unjust enrichment is thus best viewed as Mr. Seguin leaving the relationship with a disproportionate share of the wealth accumulated as a result of their joint efforts.

(4)  Calculation of the Award

[158]    The main focus of the appeal was on whether the award ought to have been calculated on a *quantum meruit* basis. Very little was argued before this Court regarding the way the trial judge approached her calculation of a proportionate share of the parties' accumulated wealth.  I conclude that the trial judge's approach was reasonable in the circumstances, but I stress that I do not

hold out her approach as necessarily being a template for future cases. Within the legal principles I have outlined, there may be many ways in which an award may be quantified reasonably. I prefer not to make any more general statements about the quantification process in the context of this appeal, except this. Provided that the correct legal principles are applied, and the findings of fact are not tainted by clear and determinative error, a trial judge's assessment of damages is treated with considerable deference on appeal: see, e.g., *Nance v. British Columbia Electric Railway Co.*, [1951] A.C. 601 (P.C.). A reasoned and careful exercise of judgment by the trial judge as to the appropriate monetary award to remedy an unjust enrichment should be treated with the same deference. There are two final specific points that I must address.

[159]    Mr. Seguin submits, very briefly, that a proper application of the "value survived" approach in this case would require a careful determination of the contributions by third parties to the growth of Fastlane during the period his own contributions were diminished, as a result of what counsel characterizes as Ms. Vanasse's "demands" that he reduce his hours and move back to Ottawa. This argument is premised on the notion that the money he received from the sale was not justly his to share with Ms. Vanasse. I cannot accept this premise. Unexplained is why he received more than his share when the company was sold or why, having received more than he was due, Ms. Vanasse is still not entitled to an equitable share of what he actually received.

[160]    Second, there is the finding of the Court of Appeal that the trial judge
failed to take into account evidence of Mr. Seguin's numerous and significant
non-financial contributions to the family.  I respectfully cannot accept this view.
The trial judge specifically alluded to these contributions in her reasons.
Moreover, by confining the period of unjust enrichment to the three and one-half
year period, the trial judge took into account the periods during which Ms.
Vanasse's contributions were not disproportionate to Mr. Seguin's.  In my view,
the trial judge took a realistic and practical view of the evidence before her and
gave sufficient consideration to Mr. Seguin's contributions.

D.  *Disposition*

[161]    I would allow the appeal, set aside the order of the Court of Appeal, and
restore the order of the trial judge.   The appellant should have her costs
throughout.

V.  The *Kerr* Appeal

A.  *Introduction*

[162]    When their common law relationship of more than 25 years ended, Ms.
Kerr sued her former partner, Mr. Baranow, advancing claims for unjust
enrichment, resulting trust, and spousal support.  Mr. Baranow counterclaimed
that Ms. Kerr had been unjustly enriched by his housekeeping services provided
between 1991 and 2006, and by his early retirement in order to provide her
personal assistance.  The trial judge awarded Ms. Kerr $315,000, holding that she

was entitled to this amount both by way of resulting trust (to reflect her contribution to the acquisition of property) and by way of remedial constructive trust (as a remedy for her successful claim in unjust enrichment). He also awarded Ms. Kerr $1,739 per month in spousal support effective the date she commenced proceedings. Although the trial judge rejected Mr. Baranow's assertion that Ms. Kerr had been unjustly enriched at his expense, the reasons for judgment and the order after trial do not otherwise address Mr. Baranow's counterclaim.

[163]    Mr. Baranow appealed.   The Court of Appeal allowed the appeal, concluding that Ms. Kerr's claims for a resulting trust and in unjust enrichment should be dismissed, that Mr. Baranow's claim for unjust enrichment should be remitted to the trial court for determination, and that the order for spousal support should be effective as of the first day of the trial, not as of the date proceedings were commenced.

[164]    Ms. Kerr appeals, submitting that the Court of Appeal erred by setting aside the trial judge's findings that:

> (1) a resulting trust arose in her favour;
>
> (2) she had unjustly enriched Mr. Baranow; and
>
> (3) spousal support should begin as of the date she instituted proceedings.

[165]    In my view, the Court of Appeal was right to set aside the trial judge's findings of resulting trust and unjust enrichment.  It also did not err in directing that Mr. Baranow's counterclaim be returned to the Supreme Court of British Columbia for hearing. However, my view is that Ms. Kerr's unjust enrichment claim should not have been dismissed, but rather a new trial ordered. While the trial judge's errors certainly were not harmless, it is not possible to say on this record, which includes findings of fact tainted by clear error, that her unjust enrichment claim would inevitably fail if analyzed using the clarified legal framework set out above. With respect to the commencement date of the spousal support order, I would set aside the order of the Court of Appeal and restore the trial judge's order.

B. *Overview of the Facts*

[166]    The trial judge's disposition of both the resulting trust and unjust enrichment claims turned on his conclusion that Ms. Kerr had provided $60,000 worth of equity and assets at the beginning of the relationship.  This fact, in the trial judge's view, supported awarding her one-third of the value of the home she shared with Mr. Baranow at the time of separation. According to the trial judge, this $60,000 of equity and assets consisted of three elements: her $37,000 of equity in the Coleman Street home she had shared with her former husband; the value of an automobile; and the value of furniture which she brought into her relationship with Mr. Baranow. The trial judge did not make specific findings of fact about the value of either Ms. Kerr's or Mr. Baranow's non-monetary

contributions to the relationship. As previously noted, while the judge rejected in a single sentence Mr. Baranow's contention that Ms. Kerr had been unjustly enriched at his expense, the judge did not explain the basis of that conclusion. Mr. Baranow's counterclaim was not otherwise addressed.

[167]    The trial judge's findings of fact, of course, must be accepted unless tainted with clear and determinative error.  In this case, however, the Court of Appeal's intervention on some of the judge's key findings was justified, because those findings simply were not supported by the record. I will have to delve into the facts, more than might otherwise be required, to explain why.

[168]    The parties began to live together in Mr. Baranow's home on Wall Street in Vancouver in May 1981. Shortly afterward, they moved into Ms. Kerr's former matrimonial home on Coleman Street. They had met at their mutual place of work, the Port of Vancouver, where she worked as a secretary and he as a longshoreman. Ms. Kerr was in midst of a divorce. Through her separation agreement, Ms. Kerr received her husband's interest in their former matrimonial home on Coleman Street in North Vancouver, all of the furniture in the house, and a 1979 Cadillac Eldorado. However, Ms. Kerr's ex-husband owed more than $400,000 and Ms. Kerr was guarantor of some of that debt.

[169]    In the summer of 1981, the Coleman Street property was the subject of foreclosure proceedings and, according to the evidence, was about to be foreclosed on July 29, 1981. Ms. Kerr testified at trial that, at the time, she had

two teenage children, was earning under $30,000 a year, and had no money to save the house.

[170]    Ms. Kerr instructed her lawyer to place the titles to the Coleman Street property and the vehicle into Mr. Baranow's name.  Mr. Baranow paid $33,000 in cash to secure the property against outstanding debts, and guaranteed a $100,000 mortgage at a rate of 22 percent.  He then began to make the mortgage payments and eventually refinanced the mortgage, together with that on his Wall Street property, and assumed that new mortgage himself.

[171]    The couple lived together for the next 25 years, first in the Wall Street property, then at Coleman Street, then in a temporary apartment, and finally in their "dream home" which they constructed on Mr. Baranow's Wall Street property.

[172]    While the parties lived together in the Coleman Street property (from September 1981 to December 1985), Mr. Baranow retained the $450 per month he received by renting out his Wall Street property.  The trial judge found that, although the parties kept their financial affairs separate, there was an arrangement by which Mr. Baranow would pay the property taxes and mortgage payments on both the Coleman Street and the Wall Street properties.  The mortgage on both properties was paid off before July 1985.  However, Mr. Baranow took out a $32,000 mortgage on the Wall Street property in July 1985, which was paid in full by August 1988.

[173]    The Coleman Street property was sold in August 1985 for $138,000. This sale was at a considerable loss, taking into account the real estate commission, the $33,000 in cash Mr. Baranow had contributed at the time of the transfer to him, and the mortgage payments he alone had made between the transfer in the summer of 1981 and the sale in the summer of 1985.

[174]    The parties moved into an apartment (from August 1985 until October 1986) while they constructed their "dream home" at the Wall Street location.  The existing dwelling was torn down and replaced.  Mr. Baranow spent somewhere between $97,000 and $105,000 on its construction, with additional amounts spent for materials, labour and permits.  Ms. Kerr, the trial judge found, was involved with the planning, interior decorating and cleaning.  She also planted sod, tended the flower garden, and paid for some wood paneling in the downstairs bedroom. In addition, she made contributions towards the purchase of furniture, appliances, and other chattels for the Wall Street property.  Her son paid $350 per month in rent, which Mr. Baranow retained. At one point in his reasons, the trial judge stated that Ms. Kerr paid "all of the household expenses and the insurance on the new house . . . even after the $32,000.00 mortgage was paid off by [Mr. Baranow] in August 1988" (para. 24). However, at another point, the judge noted that Ms. Kerr paid the utilities and insurance and bought "some groceries" (para. 36).  Mr. Baranow, he found, paid the property-related expenses, consisting of property taxes (less the disability benefit attributable to Ms. Kerr) and upkeep (which was minimal in the new house).   The trial judge found that the current value of the

Wall Street property was $942,500, compared with $205,000 in October of 1986. He then concluded that, given there were no mortgage payments after 1988, Ms. Kerr's share of the expenses "was probably higher" than Mr. Baranow's for approximately 18 years before they stopped living together.

[175]    In 1991, Ms. Kerr suffered a massive stroke and cardiac arrest, leaving her paralyzed on her left side and unable to return to work. Her health steadily deteriorated, and relations between the couple became increasingly strained. Mr. Baranow took an early retirement in 2002.  The trial judge acknowledged that Mr. Baranow claimed to have done this to care for Ms. Kerr, but noted that early retirement was also favourable to him. The trial judge found that Mr. Baranow started to experience "caregiver fatigue" and began exploring institutional care alternatives in June 2005.  The next summer, in August 2006, Ms. Kerr had to undergo surgery on her knee. After the surgery, Mr. Baranow made it clear to the hospital staff that he was not prepared to have her return home. Ms. Kerr was transferred to an extended care facility where she remained at the time of trial. The trial judge found that, in the last 18 months Ms. Kerr resided at the Wall Street property, Mr. Baranow did most of the housework and helped her with her bodily functions.

C.  *Analysis*

(1)  <u>The Resulting Trust Issue</u>

[176]    The trial judge found that Mr. Baranow held a one-third interest in the Wall Street property by way of resulting trust for Ms. Kerr, on three bases. The Court of Appeal found that each of these holdings was erroneous.  I respectfully agree.

(a) *Gratuitous Transfer*

[177]    The trial judge found that the transfer of the Coleman Street property to Mr. Baranow was gratuitous, therefore raising the presumption of a resulting trust in Ms. Kerr's favour.  At the time of transfer to Mr. Baranow, roughly $133,000 was required to save the property (it was subject to a first mortgage of just under $80,000, a second mortgage of just under $35,000, a judgment in favour of the Bank of Montreal of just under $12,000, and other miscellaneous debts and charges, adding up to roughly $133,000). There was also a $26,500 judgment in favour of CIBC, which was of concern to Ms. Kerr, although it is not listed in the payouts required to close the transfer.  We know that Ms. Kerr had guaranteed some of her former husband's debts, and that she declared bankruptcy in 1983 in relation to $15,000 of debt for which she had co-signed with her former husband.

[178]    The Court of Appeal reversed the trial judge's resulting trust finding, holding that the transfer was not gratuitous.  The court pointed to the contributions and liabilities undertaken by Mr. Baranow to make the transfer possible, and concluded that the trial judge's finding in this regard constituted a palpable and overriding error.

[179]    On this point, I respectfully agree with the Court of Appeal.  There is no dispute that Mr. Baranow injected roughly $33,000 in cash, and guaranteed a $100,000 mortgage, so that the property would not be lost to the bank in the foreclosure proceedings.  This constituted consideration, and the transfer therefore cannot reasonably be labelled gratuitous. The respondent would have us hold otherwise on the basis of technical arguments about the lack of a precise coincidence between the time of the transfer and payments, and the lack of payment directly to Ms. Kerr because Mr. Baranow's payments were made to her creditors.   These arguments have no merit. An important element of the trial judge's finding of a resulting trust was his conclusion that there was "no evidence" that Mr. Baranow's payment of $33,000 in cash and his guarantee of the $100,000 mortgage "were in connection with the transfer or part of an agreement between the parties so as to constitute consideration for the transfer" (para. 76).   Putting to one side for the moment whether this finding reflects a correct understanding of a gratuitous transfer, the judge clearly erred in making this statement; there was in fact much evidence to that precise effect. Mr. Baranow testified that Ms. Kerr had "tearfully asked" Mr. Baranow for help to save the property from the creditors. Ms. Kerr's solicitor recorded in his reporting letter that Ms. Kerr felt she had little choice but to convey the property to Mr. Baranow "faced with the large outstanding debts of [her] husband which include[d] a Judgment taken by C.I.B.C. for a debt outstanding in the amount of $26,500.00". At trial, Ms. Kerr was asked whether she had requested Mr. Baranow to save the house; she responded, "I guess so". Thus, contrary to the

judge's finding, there was in fact considerable evidence that Mr. Baranow's paying off of the debts and guaranteeing the mortgage were in connection with the transfer of the property to him. This evidence shows that he accepted the transfer and assumed the financial obligations at Ms. Kerr's request, and in order to further her purpose of preventing the creditors from foreclosing on the property.

[180]    The Court of Appeal was correct to intervene on this point and conclude that the transfer was not gratuitous.  The trial judge's imposition of a resulting trust on one-third of the Wall Street property on this basis accordingly cannot be sustained.

(b) *Ms. Kerr's Contributions*

[181]    The trial judge also based his finding of resulting trust on Ms. Kerr's financial and other contributions to the acquisition of the new home on the Wall Street property. He found Ms. Kerr had contributed a total of $60,000: $37,000 in equity from the transfer of the Coleman Street property to Mr. Baranow; $20,000 for the value of the Cadillac also transferred to Mr. Baranow; and $3,000 for the furniture in the Coleman Street property. In addition, the trial judge noted that, in obtaining the legal title of Coleman, Mr. Baranow was able to "re-mortgage both properties for $116,000.00 and apply the $16,000.00 toward the acquisition of the Wall Street Property" (para. 82).    Furthermore, Mr. Baranow would not have been able to pay off the mortgages with the same efficiency but for Ms. Kerr's

contributions to household expenses. However, the trial judge did not attach any value to these last two matters in his determination of the extent of the resulting trust which he imposed on the Wall Street property.

[182]    The Court of Appeal reversed this finding as not being supported by the record.  The court noted that Ms. Kerr did not have $37,000 in equity in the Coleman Street property when Mr. Baranow took title, Mr. Baranow did not receive any beneficial interest in the vehicle, and there was no evidence of the value of the furnishings.

[183]    I agree with the Court of Appeal's disposition of this issue.  As it pointed out, the evidence showed that, in addition to Mr. Baranow paying cash and guaranteeing a mortgage, he paid the monthly mortgage payments, taxes and upkeep expenses on the Coleman property until it was sold in 1985 for $138,000 (less real estate commission). Mr. Baranow received no beneficial interest in the vehicle and the judge made no finding about the value of the furnishings. There was not, in any meaningful sense of the word, any equity in the Coleman property for Ms. Kerr to contribute to the acquisition or improvement of the Wall Street property.  I would affirm the conclusion of the Court of Appeal on this point.

(c) *Common Intention Resulting Trust*

[184]    The trial judge also appears to have based his conclusions about the resulting trust on his finding of a common intention on the part of Ms. Kerr and Mr. Baranow to share in the Wall Street property.  For the reasons I have given

earlier, the "common intention" resulting trust has no further role to play in the resolution of disputes such as this one.  I would hold that a resulting trust should not have been imposed on the Wall Street property on the basis of a finding of common intention between these parties.

### (d) *Conclusion With Respect to Resulting Trust*

[185]    In my view the Court of Appeal was correct to set aside the trial judge's conclusions with respect to the resulting trust issues.

### (2) <u>Unjust Enrichment</u>

[186]    The trial judge also found that Mr. Baranow had been unjustly enriched by Ms. Kerr to the extent of $315,000, the value of the one-third interest in the Wall Street property determined during the resulting trust analysis. The judge found that Ms. Kerr had provided the following benefits to Mr. Baranow:

a.      $37,000 equity in the Coleman Street property

b.      the automobile

c.      the furnishings

d.      $16,000 in refinancing permitted by the Coleman transfer and applied to the Wall Street property

e.      $22,000 gained on the resale of the Coleman Street property

f.      household expenses and insurance paid on both properties

g.      spousal services such as housework, entertaining guests and preparing meals until Ms. Kerr's disability made it impossible to continue

h.      assistance with planning and decoration of the Wall Street house

i.      financial contributions towards the purchase of chattels for the new home

j.      a disability tax exemption

k.      approximately five years' worth of rental income from Ms. Kerr's son

[187]    Turning to the element of corresponding deprivation, the trial judge noted that it was "unlikely" that Ms. Kerr had given up any career or educational opportunities over the course of the relationship.    Furthermore, her income remained unchanged, even following her stroke, due to her receipt of disability pensions and other benefits.   The judge found that she had lived rent-free for the entire relationship. He concluded, however, that she had suffered a deprivation because, had she not contributed her equity in the Coleman Street property, it was "reasonable to infer that she would have used it to purchase an asset in her own name, invest for her own benefit, use it for some personal interest, or otherwise

avail herself of beneficial financial opportunity": para. 92.  He also concluded, without elaboration, that the benefits that she received from the relationship did not overtake her contributions.

[188]   The Court of Appeal set aside the trial judge's finding of unjust enrichment. It found that Mr. Baranow's direct and indirect contributions, by which Ms. Kerr was enriched and for which he was not compensated, constituted a juristic reason for any enrichment which he experienced at her expense.  The court found that, for reasons mentioned earlier, there was no $60,000 contribution by Ms. Kerr and therefore her claim rested on her indirect contributions.  The court also concluded that the trial judge's analysis failed to assess the extent of Mr. Baranow's direct and indirect contributions to Ms. Kerr, including: his payment of accommodation expenses for the duration of the relationship; his contribution to the purchase price of the van which Ms. Kerr still possesses; her receipt of almost half of his lifetime amount of union medical benefits, used to pay for her health care expenses; his taking early retirement with a reduced monthly pension to care for Ms. Kerr; and his provision of extensive personal caregiver and domestic services without compensation.   Moreover, in the Court of Appeal's view, the trial judge had failed to note that Mr. Baranow's payment of her living expenses permitted her to save about $272,000 over the course of the relationship.

[189]    The appellant challenges the Court of Appeal's decision on two bases. First, she argues that the court improperly interfered with the trial judge's finding of fact with respect to Ms. Kerr's $60,000 contribution to the relationship. Second, she submits that the court improperly considered the question of mutual benefits through the lens of juristic reason, and that this resulted in the court failing to consider globally who had been enriched and who deprived. Ms. Kerr's submission on this latter point is that consideration of mutual benefit conferral should occur during the first two steps of the unjust enrichment analysis: enrichment and corresponding deprivation. Once that has been established, she argues that the legitimate expectations of the parties may be considered as part of the analysis of whether there was a juristic reason for the enrichment. The main point is that, in the appellant's submission, it was open to the trial judge to conclude that the parties' legitimate expectation was that they would accumulate wealth in proportion to their respective incomes; without a share of the value of the real property acquired during the relationship, that reasonable expectation cannot be realized.

[190]    More fundamentally, the appellant urges the Court to adopt what she calls the "family property approach" to unjust enrichment. In essence, the appellant submits that her contributions gave rise to a reasonable expectation that she would have an equitable share of the assets acquired during the relationship.

[191]    I will deal with these submissions in turn.

(a) *Findings of Fact Regarding the $60,000 Contribution*

[192]    As noted earlier, the Court of Appeal was right to set aside the trial judge's conclusion that the appellant had contributed $60,000 to the couple's assets.  There was, in no realistic sense of the word, any "equity" to contribute from the Coleman Street property to acquisition of the new Wall Street "dream home".    Furthermore, the appellant retained the beneficial use of the motor vehicle, and there was no satisfactory evidence of the value of the furniture.  The judge's findings on this point were the product of clear and determinative error.

(b) *Analysis of Offsetting Enrichments*

[193]    On this issue, I cannot accept the conclusions of either the trial judge or the Court of Appeal.  As noted, in his determination of the extent of Ms. Kerr's unjust enrichment, the trial judge largely ignored Mr. Baranow's contributions.  However, for the reasons I have developed earlier, the Court of Appeal erred in assessing Mr. Baranow's contributions as part of the juristic reason analysis; this analysis prematurely truncated Ms. Kerr's *prima facie* case of unjust enrichment.  I have set out the correct approach to this issue earlier in my reasons.  As, in my view, there must be a new trial of both Ms. Kerr's unjust enrichment claim and Mr. Baranow's counterclaim, it is not necessary to say anything further.  The principles set out above must accordingly be applied at the new trial of these issues.

(c) *The "Family Property Approach"*

[194]    I turn finally to Ms. Kerr's more general point that her claim should be assessed using a "family property approach".  As set out earlier in my reasons, for Ms. Kerr to show an entitlement to a proportionate share of the wealth accumulated during the relationship, she must establish that Mr. Baranow has been unjustly enriched at her expense, that their relationship constituted a joint family venture, and that her contributions are linked to the generation of wealth during the relationship. She would then have to show what proportion of the jointly accumulated wealth reflects her contributions. Of course, this clarified template was not available to the trial judge or to the Court of Appeal.  However, these requirements are quite different than those advanced by the appellant and accordingly her "family property approach" must be rejected.

(d)  *Disposition of the Unjust Enrichment Appeal*

[195]    I conclude that the findings of the trial judge in relation to unjust enrichment cannot stand.  The next question is whether, as the Court of Appeal decided, Ms. Kerr's claim for unjust enrichment should be dismissed or whether it ought to be returned for a new trial.  With reluctance, I have concluded the latter course is the more just one in all of the circumstances.

[196]    The first consideration in support of a new trial is that the Court of Appeal directed a hearing of Mr. Baranow's counterclaim.  Given that the trial judge unfortunately did not address that claim in any meaningful way, the Court of Appeal's order that it be heard and decided is unimpeachable. There was

evidence that Mr. Baranow made very significant contributions to Ms. Kerr's welfare such that his counterclaim cannot simply be dismissed.  As I noted earlier, the trial judge also referred to various other monetary and non-monetary contributions which Ms. Kerr made to the couple's welfare and comfort, but he did not evaluate them, let alone compare them with the contributions made by Mr. Baranow.  In these circumstances, trying the counterclaim separated from Ms. Kerr's claim would be an artificial and potentially unfair way of proceeding.

[197]   More fundamentally, Ms. Kerr's claim was not presented, defended or considered by the courts below pursuant to the joint family venture analysis that I have set out.  Even assuming that Ms. Kerr made out her claim in unjust enrichment, it is not possible to fairly apply the joint family venture approach to this case on appeal, using the record available to this Court.  There are few findings of fact relevant to the key question of whether the parties' relationship constituted a joint family venture.  Moreover, even if one were persuaded that the evidence permitted resolution of the joint family venture issue, the record is unsatisfactory for deciding whether Ms. Kerr's contributions to a joint family venture were linked to the accumulation of wealth and, if so, in what proportion. The trial judge found that her payment of household expenses and insurance payments, along with the "proceeds" from the Coleman Street property, allowed Mr. Baranow to pay off the $116,000 mortgage on both properties before July 1985. There is, thus, a finding that her contributions were linked to the accumulation of wealth, given that the Wall Street property was valued at

$942,500 at the time of trial.  However, as the judge's findings with respect to Ms. Kerr's equity in the Coleman Street property cannot stand, this conclusion is considerably undermined.  For much the same reason, there is no possibility on this record of evaluating the proportionate contributions to a joint family venture. In short, to attempt to resolve Ms. Kerr's unjust enrichment claim on its merits, using the record before this Court, involves too much uncertainty and risks injustice.

[198]    In this respect, the *Kerr* appeal is in marked contrast to the *Vanasse* appeal.  There, an unjust enrichment was conceded and the trial judge's findings of fact closely correspond to the analytical approach I have proposed. In the present appeal, while the findings made do not appear to demonstrate a joint family venture or a concomitant link to accumulated wealth, it would be unfair to reach that conclusion without giving an opportunity to the parties to present their evidence and arguments in light of the approach set out in these reasons.

[199]    Reluctantly, therefore, I would order a new trial of Ms. Kerr's unjust enrichment claim, as well as affirm the Court of Appeal's order for a hearing of Mr. Baranow's counterclaim.

### (3)  Effective Date of Spousal Support

[200]    The final issue is whether, as the Court of Appeal held, the trial judge erred in making his order for spousal support in favour of Ms. Kerr effective on

the date she had commenced proceedings rather than on the first day of trial. In my respectful view, the Court of Appeal erred in its application of the relevant factors and ought not to have set aside the trial judge's order.

[201]    The trial judge found that the appellant's income in 2006 was $28,787 and the respondent's income was $70,520, on the basis of their respective income tax returns. He then applied the Spousal Support Advisory Guidelines ("SSAG") to arrive at a range of $1,304 to $1,739 per month. He settled on an amount at the higher end of that range in order to assist Ms. Kerr in pursuing a private bed while waiting for a subsidized bed in a suitable facility closer to her family.

[202]    The Court of Appeal agreed with the trial judge that Ms. Kerr was entitled to an award of spousal support given the length of the parties' relationship, her age, her fixed and limited income and her significant disability; she was entitled to a spousal support award that would permit her to live at a lifestyle that is closer to that which the parties enjoyed when they were together; and that the judge had properly determined the quantum of support. The Court of Appeal concluded, however, that the trial judge had erred in ordering support effective the date Ms. Kerr had commenced proceedings. It faulted the judge in several respects: for apparently having made the order as a matter of course rather than applying the relevant legal principles; for failing to consider that, during the interim period, Ms. Kerr had no financial needs beyond her means because she had been residing in a government- subsidized care facility and had not had to

encroach on her capital; for failing to take account of the fact she had made no demand of Mr. Baranow to contribute to her interim support and had provided no explanation for not having done so; and for ordering retroactive support where, in light of the absence of an interim application, there was no blameworthy conduct on Mr. Baranow's part.

[203]    The appellant submits that the decision to equate the principles pertaining to retroactive spousal support with those of retroactive child support has been done without any discussion or legal analysis.  Furthermore, she argues that the Court of Appeal's reasoning places an untoward and inappropriate burden on applicants, essentially mandating that they apply for interim spousal support or lose their entitlement.  Lastly, she argues that there is a legal distinction between retroactive support before and after the application is filed, and that in the latter circumstance there is less need for judicial restraint.  I agree with the second and third of these submissions.

[204]    There is no doubt that the trial judge had the discretion to award support effective the date proceedings had been commenced. This is clear from the British Columbia *Family Relations Act*, R.S.B.C. 1996, c. 128 ("*FRA*"), s. 93(5)(d):

        (5) An order under this section may also provide for one or more of the following:

. . .

(d) payment of support in respect of any period before the order is made;

[205]    The appellant requested support effective the date her writ of summons and statement of claim were issued and served.  She was and is not seeking support for the period before she commenced her proceedings, or for any period during which another court order for support was in effect.  I note that she was obliged by statute to seek support within a year of the end of cohabitation: s. 1(1), definition of "spouse" para. (b), of the *FRA*.  Ms. Kerr made her application just over a month after the parties ceased living together.

[206]    I will not venture into the semantics of the word "retroactive": see *D.B.S. v. S.R.G.*, 2006 SCC 37, [2006] 2 S.C.R. 231, at paras. 2 and 69-70; *S.(L.) v. P.(E.)* (1999), 67 B.C.L.R. (3d) 254, (C.A.), at paras. 55-57.  Rather, I prefer to follow the example of Bastarache J. in *D.B.S.* and consider the relevant factors that come into play where support is sought in relation to a period predating the order.

[207]    While *D.B.S.* was concerned with child as opposed to spousal support, I agree with the Court of Appeal that similar considerations to those set out in the context of child support are also relevant to deciding the suitability of a "retroactive" award of spousal support. Specifically, these factors are the needs of the recipient, the conduct of the payor, the reason for the delay in seeking support and any hardship the retroactive award may occasion on the payor spouse.

However, in spousal support cases, these factors must be considered and weighed in light of the different legal principles and objectives that underpin spousal as compared with child support. I will mention some of those differences briefly, although certainly not exhaustively.

[208]    Spousal support has a different legal foundation than child support.  A parent-child relationship is a fiduciary relationship of presumed dependency and the obligation of both parents to support the child arises at birth.  It that sense, the entitlement to child support is "automatic" and both parents must put their child's interests ahead of their own in negotiating and litigating child support.  Child support is the right of the child, not of the parent seeking support on the child's behalf, and the basic amount of child support under the *Divorce Act*, R.S.C. 1985, c. 3 (2nd Supp.), (as well as many provincial child support statutes) now depends on the income of the payor and not on a highly discretionary balancing of means and needs.  These aspects of child support reduce somewhat the strength of concerns about lack of notice and lack of diligence in seeking child support.  With respect to notice, the payor parent is or should be aware of the obligation to provide support commensurate with his or her income.  As for delay, the right to support is the child's and therefore it is the child's, not the other parent's position that is prejudiced by lack of diligence on the part of the parent seeking child support: see *D.B.S.*, at paras. 36-39, 47-48, 59, 80 and 100-104.  In contrast, there is no presumptive entitlement to spousal support and, unlike child support, the spouse is in general not under any legal obligation to look out for the separated

spouse's legal interests.    Thus, concerns about notice, delay and misconduct generally carry more weight in relation to claims for spousal support: see, for example, M.L. Gordon, "Blame Over: Retroactive Child and Spousal Support in the Post-Guideline Era" (2004-2005), 23 C.F.L.Q. 243, at pp.  281 and 291-92.

[209]    Where, as here, the payor's complaint is that support could have been sought earlier, but was not, there are two underlying interests at stake.  The first relates to the certainty of the payor's legal obligations; the possibility of an order that reaches back into the past makes it more difficult to plan one's affairs and a sizeable "retroactive" award for which the payor did not plan may impose financial hardship.   The second concerns placing proper incentives on the applicant to proceed with his or her claims promptly (see *D.B.S.*, at paras. 100-103).

[210]    Neither of these concerns carries much weight in this case. The order was made effective the date on which the proceedings seeking relief had been commenced, and there was no interim order for some different amount. Commencement of proceedings provided clear notice to the payor that support was being claimed and permitted some planning for the eventuality that it was ordered.   There is thus little concern about certainty of the payor's obligations. Ms. Kerr diligently pursued her claim to trial and that being the case, there is little need to provide further incentives for her or others in her position to proceed with more diligence.

[211]    In *D.B.S.*, Bastarache, J. referred to the date of effective notice as the "general rule" and "default option" for the choice of effective date of the order (paras. 118 and 121; see also para. 125).  The date of the initiation of proceedings for spousal support has been described by the Ontario Court of Appeal as the "usual commencement date", absent a reason not to make the order effective as of that date: *MacKinnon v. MacKinnon* (2005), 75 O.R. (3d) 175, at para. 24.  While in my view, the decision to order support for a period before the date of the order should be the product of the exercise of judicial discretion in light of the particular circumstances, the fact that the order is sought effective from the commencement of proceedings will often be a significant factor in how the relevant considerations are weighed.   It is important to note that, in *D.B.S.*, all four litigants were requesting that child support payments reach back to a period in time preceding their respective applications; such is not the case here.

[212]    Other relevant considerations noted in *D.B.S.* include the conduct of the payor, the circumstances of the child (or in the case of spousal support, the spouse seeking support), and any hardship occasioned by the award. The focus of concern about conduct must be on conduct broadly relevant to the support obligation, for example concealing assets or failing to make appropriate disclosure: *D.B.S.*, at para. 106. Consideration of the circumstances of the spouse seeking support, by analogy to the *D.B.S.* analysis, will relate to the needs of the spouse both at the time the support should have been paid and at present.  The comments of Bastarache J. at para. 113 of *D.B.S.* may be easily adapted to the

situation of the spouse seeking support: "A [spouse] who underwent hardship in the past may be compensated for this unfortunate circumstance through a retroactive award. On the other hand, the argument for retroactive [spousal] support will be less convincing where the [spouse] already enjoyed all the advantages (s)he would have received [from that support]". As for hardship, there is the risk that a retroactive award will not be fashioned having regard to what the payor can currently afford and may disrupt the payor's ability to manage his or her finances. However, it is also critical to note that this Court in *D.B.S.* emphasized the need for flexibility and a holistic view of each matter on its own merits; the same flexibility is appropriate when dealing with "retroactive" spousal support.

[213]    In light of these principles, my view is that the Court of Appeal made two main errors.

[214]    First, it erred by finding that the circumstances of the appellant were such that there was no need prior to the trial. The trial judge found, and the Court of Appeal did not dispute, that the appellant was entitled to non-compensatory spousal support, at the high end of the range suggested by the SSAG, for an indefinite duration. Entitlement, quantum, and the indefinite duration of the order were not appealed before this Court. It is clear that Ms. Kerr was in need of support from the respondent at the date she started her proceedings and remained so at the time of trial. The Court of Appeal rightly noted the relevant factors, such

as her age, disability, and fixed income.  However, the Court of Appeal did not describe how Ms. Kerr's circumstances had changed between the commencement of proceedings and the date of trial, nor is any such change apparent in the trial judge's findings of fact. As I understand the record, one of the objectives of the support order was to permit Ms. Kerr to have access to a private pay bed while waiting for her name to come up for a subsidized bed in a suitable facility closer to her son's residence.  From the date she commenced her proceedings until the date of trial, she resided in the Brock Fahrni Pavilion in a government-funded extended care bed in a room with three other people.  In my respectful view, her need was constant throughout the period.  If the Court of Appeal's rationale was that Ms. Kerr's need would only arise once she actually had secured the private pay bed, its decision to make the order effective the first day of trial seems inconsistent with that approach.  The Court of Appeal did not suggest that her need was any different on that day than on the day she had commenced her proceedings.  Nor did the court point to any financial hardship that the trial judge's award would have on Mr. Baranow.

[215]   Respectfully, the Court of Appeal erred in principle in setting aside the judge's order effective as of the date of commencement of proceedings on the ground that Ms. Kerr had no need during that period, while upholding the judge's findings of need in circumstances that were no different from those existing at the time proceedings were commenced.

[216]    Second, the Court of Appeal in my respectful view was wrong to fault Ms. Kerr for not bringing an interim application, in effect attributing to her unreasonable delay in seeking support for the period in question.   Ms. Kerr commenced her proceedings promptly after separation and, in light of the fact that the trial occurred only about thirteen months afterward, she apparently pursued those proceedings to trial with diligence.   There was thus clear notice to Mr. Baranow that support was being sought and he could readily take advice on the likely extent of his liability.   Given the high financial, physical, and emotional costs of interlocutory applications, especially for a party with limited means and a significant disability such as Ms. Kerr, it was in my respectful view unreasonable for the Court of Appeal to attach such serious consequences to the fact that an interim application was not pursued.   The position taken by the Court of Appeal to my way of thinking undermines the incentives which should exist on parties to seek financial disclosure, pursue their claims with due diligence, and keep interlocutory proceedings to a minimum.   Requiring interim applications risks prolonging rather than expediting proceedings. The respondent's argument based on the fact that a different legal test would have applied at the interim support stage is unconvincing.   After a full trial on the merits, the trial judge made clear and now unchallenged findings of need on the basis of circumstances that had not changed between commencement of proceedings and trial.

[217]    In short, there was virtually no delay in applying for maintenance, nor was there any inordinate delay between the date of application and the date of

trial.  Ms. Kerr was in need throughout the relevant period, she suffered from a serious physical disability, and her standard of living was markedly lower than it was while she lived with the respondent.  Mr. Baranow had the means to provide support, had prompt notice of her claim, and there was no indication in the Court of Appeal's reasons that it considered the judge's award imposed on him a hardship so as to make that award inappropriate.

[218]    While it is regrettable that the judge did not elaborate on his reasons for making the order effective as of the date proceedings had been commenced, the relevant legal principles applied to the facts as he found them support the making of that order and the Court of Appeal erred in holding otherwise.

[219]    In summary, I conclude that the Court of Appeal erred in setting aside the portion of the judge's order for support between the commencement of proceedings and the beginning of trial.  I would restore the order of the trial judge making spousal support effective September 14, 2006.

D. *Disposition*

[220]    I would allow the appeal in part. Specifically, I would:

    a. allow the appeal on the spousal support issue and restore the order of
       the trial judge with respect to support;

b. allow the appeal with respect to the Court of Appeal's decision to dismiss Ms. Kerr's unjust enrichment claim and order a new trial of that claim;

c. dismiss the appeal in relation to Ms. Kerr's claim of resulting trust and the ordering of a new hearing of Mr. Baranow's counterclaim and affirm the order of the Court of Appeal in relation to those issues.

[221]    As Ms. Kerr has been substantially successful, I would award her costs throughout.

*Appeal 33157 allowed in part with costs.*

*Appeal 33358 allowed with costs.*

*Solicitors for the appellant Margaret Kerr: Hawthorne, Piggott & Company, Burnaby.*

*Solicitor for the respondent Nelson Baranow: Susan G. Label, Vancouver.*

*Solicitors for the appellant Michele Vanasse: Nelligan O'Brien Payne,* Ottawa.

*Solicitors for the respondent David Seguin: MacKinnon & Phillips,* Ottawa.



KRYSTAL CADILLAC-OLDSMOBILE GMC TRUCK, INC., Appellants v.
GENERAL MOTORS CORPORATION AND GENERAL MOTORS AC-
CEPTANCE CORPORATION

No. 01-2952

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

337 F.3d 314; 2003 U.S. App. LEXIS 14965; Bankr. L. Rep. (CCH) P78,900; 50 Col-
lier Bankr. Cas. 2d (MB) 1211; 41 Bankr. Ct. Dec. 183

September 19, 2002, Argued
July 28, 2003, Filed

**SUBSEQUENT HISTORY:** US Supreme Court certio-
rari denied by Krystal Cadillac-Oldsmobile-Gmc v.
GMC, 2004 U.S. LEXIS 3429 (U.S., May 17, 2004)

**PRIOR HISTORY:** [**1] On Appeal from the
United States District Court for the Middle District of
Pennsylvania. District Judge: Hon. Sylvia H. Rambo.
Krystal Cadillac-Oldsmobile-Gmc Truck, Inc. v. GM
Corp., 232 B.R. 622, 1999 U.S. Dist. LEXIS 4291 (E.D.
Pa., 1999)

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN1] In reviewing the decision of the district court, the
court of appeals applies the same standard of review the
district court employed in reviewing the bankruptcy
court's decision. The court of appeals reviews factual
findings for clear error, and the court exercises plenary
review over any legal conclusions.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN2] A plaintiff, who has obtained relief from an ad-
versary by asserting and offering proof to support one
position, may not be heard later in the same court to con-

tradict himself in an effort to establish against the same
adversary a second claim inconsistent with his earlier
contention. Courts have the intrinsic ability to dismiss an
offending litigant's complaint without considering the
merits of the underlying claims when such dismissal is
necessary to prevent a litigant from playing fast and
loose with the courts. The doctrine of judicial estoppel
should only be applied to avoid a miscarriage of justice.
The basic principle of judicial estoppel is that absent any
good explanation, a party should not be allowed to gain
an advantage by litigation on one theory, and then seek
an inconsistent advantage by pursuing an incompatible
theory.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
*Civil Procedure > Sanctions > General Overview*
[HN3] Judicial estoppel is not intended to eliminate all
inconsistencies no matter how slight or inadvertent they
may be. There are certain criteria for determining when
seemingly inconsistent litigation stances justify applica-
tion of the doctrine. First, the party to be estopped must
have taken two positions that are irreconcilably incon-
sistent. Second, judicial estoppel is unwarranted unless
the party changed his or her position in bad faith --i.e.,
with intent to play fast and loose with the court. Finally,
a district court may not employ judicial estoppel unless it
is tailored to address the harm identified and no lesser
sanction would adequately remedy the damage done by
the litigant's misconduct. Equity requires that the presid-
ing court give the party to be estopped a meaningful op-
portunity to provide an explanation for its changed posi-
tion.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN4] In the context of judicial estoppel, a rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose.

*Bankruptcy Law > Debtor Benefits & Duties > General Overview*
*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
*Torts > Negligence > Duty > Affirmative Duty to Act > General Overview*
[HN5] Under 11 U.S.C.S. § 1125(b), a party seeking Chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the plan. 11 U.S.C.S. § 1125(a)(1). Debtors must therefore identify and disclose all property of the estate including all of the debtor's legal and equitable property interests.

*Bankruptcy Law > Debtor Benefits & Duties > General Overview*
*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
[HN6] A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights. Therefore, preparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor. It is the pivotal concept in reorganization of a Chapter 11 debt.

*Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview*
*Business & Corporate Law > Distributorships & Franchises > Causes of Action > Breach of Contract*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case*
[HN7] The Bankruptcy Code requires that a debtor list potential causes of action, not claims it actually intends to sue on at the time of the required disclosure. It has been held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*

[HN8] Courts do not require debtors to list hypothetical claims that are so tenuous as to be fanciful. Creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan; therefore, the importance of full and honest disclosure cannot be overstated.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
[HN9] If the debtor has enough information prior to confirmation to suggest that it may have a possible cause of action, then that is a known cause of action such that it must be disclosed.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN10] Judicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court. The doctrine is to be used sparingly and reserved for the most egregious case.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN11] The application of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court. The presence or absence of any such benefit is merely a factor in determining whether the evidence would support a conclusion of bad faith. The doctrine of judicial estoppel in the Third Circuit contains no such requirement. The critical issue is what the party contended in the underlying proceeding, rather than what the jury found. Whether the party sought to be estopped benefitted from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts. It is not, however, an independent requirement for application of the doctrine of judicial estoppel.

*Civil Procedure > Sanctions > General Overview*
[HN12] The fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN13] A district court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN14] If the pleadings show (1) the fact of non-disclosure of the asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad faith for purposes of judicial estoppel.

**COUNSEL:** GERARD J. JACKSON, ESQ. (Argued), Cherry Hill, NJ, Attorney for Appellant.

JAMES A. MOLLICA, ESQ. (Argued), TIMOTHY MURRAY, ESQ., Pittsburgh, PA, Attorneys for Appellees.

**JUDGES:** Before: SCIRICA, [*] Chief Judge, ALITO, and MCKEE, Circuit Judges.

> [*]    Judge Scirica began his term as Chief Judge on May 4, 2003.

**OPINION BY:** McKEE

**OPINION**

[*316] **OPINION OF THE COURT**

McKEE, *Circuit Judge*.

Krystal Cadillac-Oldsmobile-GMC Truck, Inc., a Chapter 11 debtor, appeals an order of the District Court affirming the Bankruptcy Court's dismissal of the suit Krystal filed against GMC for breach of contract and related causes of action. The District Court concluded that the Bankruptcy Court correctly relied upon the doctrine of judicial estoppel in dismissing all of the counts in Krystal's complaint. We agree that judicial estoppel was properly invoked by the Bankruptcy Court, and we will affirm the order of the District Court. [1]

> 1    The District Court had jurisdiction pursuant to 28 U.S.C. § 548(a). We have appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.
>
> [HN1] In reviewing the decision of the District Court, we apply the same standard of review the District Court employed in reviewing the Bankruptcy Court's decision. We review factual findings for clear error, and we exercise plenary review over any legal conclusions. *See In Re Woskob*, 305 F.3d 177 (3d Cir. 2002).

[**2]    [*317]    **I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Termination of the Franchise Agreement**

Since 1987, Krystal Cadillac has operated a General Motors automobile dealership in Gettysburg, Pennsylvania pursuant to a franchise agreement with GM. Under the terms of that agreement, Krystal maintained a line of credit from a financial institution in order to finance Krystal's purchase of new GM vehicles. [2] In October 1991, Krystal lost its "floor plan" financing with General Motors Acceptance Corporation, GM's financial arm, and Krystal was not able to secure any other financing. This constituted a default under the franchise agreement. Consequently, on July 13, 1993, GM notified Krystal that GM intended to terminate the dealer agreements. Following an extension, that termination was to become effective on August 12, 1993. However, on August 11, 1993, the day before the termination became effective, Krystal initiated a proceeding before the Pennsylvania Board of Vehicle Manufacturers, Dealers, and Salespersons ("Vehicle Board") challenging the legality of the franchise termination. [3]

> 2    Article 6.4.1 of the Dealer Agreement between Krystal and GM requires Krystal "to have a reasonable quantity and variety of . . . Motor Vehicles in inventory." Article 10 requires Krystal "to maintain a separate line of credit . . . to finance its purchase of new vehicles."

[**3]

> 3    The Board of Vehicles Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. § 818.9(c) provides, in pertinent part, the following:
>
> > Canceling of franchises.--It shall be a violation of this act for any manufacturer, distributor, officer, agent or any representative whatsoever of a vehicle manufacturer to unfairly, without due regard to the equities of said dealer and without just provocation, cancel the franchise of any vehicle dealer . . . . At any time before the effective date of such termination . . . the dealer or distributor may appeal to the board for a hearing on the merits, and following due notice to all parties concerned, such a hearing shall be promptly held. No such termination . . . shall become effective until final determination of the issue by the board. In the event of a dealer . . . appeal of the termination . . . of its franchise, the burden of proof shall be on the manufacturer or

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

importer to show that such termination . . . was based on the dealer's failure to comply substantially with the reasonable and material requirements of the franchise. The manufacturer shall not meet its burden of proof to terminate . . . the franchise if the acts of the manufacturer, in whole or in significant part, caused the dealer to be unable to comply substantially with the reasonable and material requirements of the franchise.

[**4] The Vehicle Board held a hearing on Krystal's petition on August 8, 1994, and entered an Order and Adjudication upholding GM's termination of the dealership agreements on September 27, 1994. [4] Krystal thereafter appealed that Order to the Commonwealth Court of Pennsylvania, but that court affirmed the ruling of the Vehicle Board on November 6, 1995.

4    The Board found that GM's termination of Krystal's franchise was proper because Krystal had failed to comply with the reasonable and material franchise requirements for obtaining a line of credit, and had failed to maintain an adequate inventory of new vehicles.

**B. The Proceedings in the Bankruptcy Court (Krystal I).**

On September 8, 1994, (approximately three weeks before the Vehicle Board rendered its decision), Krystal filed for Chapter 11 protection. Thereafter, on June 15, 1995, Krystal filed a Plan of Reorganization in which it provided for the sale of its GM franchise in order to raise funds to pay creditors. GM objected to the plan arguing [**5] that it had properly terminated [*318] the franchise agreement with Krystal pursuant to the terms of that agreement. The appropriate state agency had upheld the termination, and the Commonwealth Court had affirmed the agency's determination that the termination was proper. Thus, according to GM, the franchise was not an asset of the estate available for sale in the bankruptcy proceedings. On October 24, 1995, Krystal filed an Amended Reorganization Plan and an Amended Disclosure Statement. Article V of the Disclosure Statement stated:

Debtor also holds an Automobile Franchise Agreement with General Motors Corporation. However, the status of this franchise is now in litigation. General Motors terminated the franchise prior to the commencement of the case and the matter was in litigation at the time the Chapter 11 petition was filed. General Motors nevertheless proceeded with termination and the matter is now on appeal in the Commonwealth Court. Debtor takes the position, which is vigorously contested by General Motors, that this franchise agreement remains an asset of the case.

GM responded by filing a separate objection to the plan and disclosure statement based upon its continuing [**6] contention that Krystal's franchise was not an asset of the estate and could not be sold by Krystal or the Trustee to satisfy Krystal's creditors.

The Bankruptcy Court affirmed GM's objections and ruled that the franchise had been validly terminated by GM. Accordingly, the court held that the franchise could not be sold as part of the bankrupt's estate. The District Court subsequently affirmed that ruling, and Krystal then appealed to us. We reversed. We held that inasmuch as Krystal had filed for bankruptcy before GM terminated the franchise agreement, GM's termination of that agreement was a violation of the automatic stay imposed under § 362 of the Code. *See, In Re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631 (3d Cir. 1998) *("Krystal I").* [5]

5    We concluded that, under Pennsylvania law, termination of a franchise does not become effective "until final determination of the issue by the board." *Krystal Cadillac*, 142 F.3d at 636 (3d Cir. 1998). Since the Vehicle Board did not issue its final determination on Krystal's appeal of GM's purported termination until after Krystal filed for bankruptcy, the subsequent termination of the franchise was a violation of the automatic stay and therefore invalid. *Id.*

[**7] **C. Krystal II: The Instant Dispute**

On September 25, 1998, Krystal filed the instant action in the District Court for the Eastern District of Pennsylvania against GM. Krystal's claims for relief arise from GM's violation of the automatic stay by terminating Krystal's franchise agreement after Krystal filed for Chapter 11 protection. More specifically, Krystal seeks damages on each of the following seven grounds: (1) violation of the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362(h); (2) breach of contract; (3) violations of Federal Dealer's Day in Court Act, 15 U.S.C. § 1221 and of the Pennsylvania Board of Vehicles Act, 63 P.S. § 818 et seq.; (4) conspiracy; (5) conversion; (6) tortious interference with contractual

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 250 of 589

Page 5

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

relations; and (7) violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7.

The Eastern District Court referred Krystal's suit to the District Court for the Middle District of Pennsylvania because the claims were interwoven with the bankruptcy action then pending in the Bankruptcy Court for the Middle District. Although GM filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), [**8] the court never [*319] ruled on that motion. Rather, the court *sua sponte* dismissed Krystal's complaint in its entirety under the doctrine of judicial estoppel. In doing so, the court noted that Krystal's complaint could also be dismissed for (1) failure to state a claim upon which relief could be granted, and (2) expiration of the applicable statutes of limitations. As noted above, the District Court affirmed the Bankruptcy Court's application of the doctrine of judicial estoppel, and this appeal followed. [6]

6    Krystal's bankruptcy case was still pending in Bankruptcy Court when this case was argued.

## II. DISCUSSION

Krystal makes several arguments as to why judicial estoppel was improperly applied here. However, before we address any of those specific arguments, it will be helpful to first provide a brief overview of that doctrine as a framework for our analysis.

### A. Judicial Estoppel In General

We first articulated the doctrine of judicial estoppel in *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510 (3rd Cir. 1953). [**9] There, we stated that [HN2] "a plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *Id.* at 513. In doing so, we recognized the intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from "playing fast and loose with the courts." *Id.* [7] (internal quotation marks omitted).

7    *See also*, *Delgrosso v. Spang and Co.*, 903 F.2d 234 (3rd Cir. 1990) (stating that unlike the concept of equitable estoppel, which focuses on relationship between parties, judicial estoppel focuses on relationship between litigant and judicial system, and seeks to preserve integrity of system).

Since *Scarano*, we have consistently stated that the doctrine [**10] should only be applied to avoid a mis-

carriage of justice. *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3rd Cir. 2001). Thus, in *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996), we stated: "[t]he basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.*

[HN3] Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be. *See, In re Chambers Development Co., Inc.*, 148 F.3d 214 (3rd Cir. 1998). In *Montrose Medical Group*, we identified certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine. We concluded:

First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent*. Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* --i.e., with intent to play fast and loose with [**11] the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

[*320] 243 F.3d at 779-80 (emphasis added) (citations omitted). We also noted that equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position. *Id.* at 780.

With these principles in mind, we turn to Krystal's alleged inconsistent representations here.

### B. Krystal's Inconsistent Representations

As noted above, each of the claims in Krystal's seven count complaint is related to, and arises from, GM's termination of Krystal's Franchise Agreement. The primary claim is the violation of the automatic stay contained in count I. All of Krystal's other claims against GM rest upon that violation. [8]

8    For reasons best known to GM and/or its attorneys, GM spends considerable time and energy in this appeal arguing that its violation of the automatic stay was not wilful. *See* Appellee's Br. at 17-21. For example, GM argues "In [*Krystal I*], this Court held that GM had violated the automatic stay, but did *not* reach the issue of whether

GM's conduct also constituted a *willful* violation under § 362(h)." Br. at 17-8. (emphasis in original). GM obviously knows that we have already ruled that its attempt to terminate the franchise agreement was a violation of the automatic stay. We can not, and will not, revisit that issue here.

Moreover, although § 362(h) requires a "willful" violation as a condition precedent to recovering damages, we have noted that this does not mean that the creditor must intend to violate the stay. "It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *Lansdale Family Restaurants Inc. v. Weis Food Service*, 977 F.2d 826, 829 (3rd Cir. 1992) (internal citations and quotation marks omitted).

[**12] When Krystal filed its Amended Disclosure Statement, it knew about each of the claims it has now included in this action. However, as quoted above, the Amended Reorganization Plan and Amended Disclosure Statement merely referenced Krystal's position that the dealer agreements were part of the bankruptcy estate and the ongoing state proceedings wherein Krystal was attempting to undo GM's termination of them.

The Bankruptcy Court found that Krystal limited the reference to the instant claim in order to conceal the claims from creditors in the hope of retaining any recovery for itself. While Krystal concedes that the schedules and statements it initially filed with the Bankruptcy Court on October 24, 1995 "failed to specifically list as a potential asset of Debtor's estate any claims against General Motors or GMAC," Appellant's Br. at 14, and 21, it vigorously denies taking two irreconcilably inconsistent positions in this case.

Krystal argues that although it did not list the instant claim as an asset in the October 24, 1995, Amended Disclosure Statement, the language of that disclosure was nevertheless adequate to inform creditors of claims Krystal had against GM and therefore they [**13] knew of the contingent asset of a potential damage award.

Alternatively, Krystal argues that even if the disclosure was insufficient, it could amend the disclosure statement under Bankruptcy Rule 1009 and thereby cure any inadequacy because the bankruptcy case is still open. Krystal insists that it did effectively amend the disclosure as soon as the Bankruptcy Court notified Krystal of the possible application of judicial estoppel. [9] Therefore, argues Krystal, [*321] it legitimately cured "any conceivable defect in a previously filed schedule or

non-disclosure." The Bankruptcy Court was not impressed by Krystal's eleventh hour candor and neither are we.

9    Krystal thereafter added the following amendment to Schedule B which asks disclosure of contingent and unliquidated assets:

"Tort, contract and violation of automatic stay claims against General Motors Acceptance Corporation."

It also noted that it did not know the value of the claims.

As the Bankruptcy Court properly noted, the language in the [**14] Amended Disclosure Statement was "little more than boilerplate." It did not specify any of the claims contained in the instant complaint against GM, much less attempt to place any monetary value on them. We agree that such boilerplate language is simply not adequate to provide the level of notice required. The bankruptcy rules were clearly not intended to encourage this kind of inadequate and misleading disclosure by creating an escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of candor is discovered.

Allowing [Krystal] to back-up, . . . and amend [its] bankruptcy filings, only after [its] omission has been [detected], suggests that a debtor should consider disclosing potential assets only if . . . caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the Bankruptcy Court with a truthful disclosure of the debtors' assets.

*Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002).

As noted above, judicial estoppel is properly applied only when appropriate to redress the problem the doctrine was designed to remedy. Krystal argues that the doctrine [**15] of judicial estoppel is too drastic a remedy to apply here because the "[p]lan calls for a one hundred (100%) percent payment to all creditors." Appellant's Br. at 22. However, as GM is quick to point out, full payment is contingent upon Krystal's ability to sell its GM franchises for some undetermined profit. *See* App. 95, and 104, Appellee's Br. at 13. Moreover, GM represents without contradiction that Krystal still has not paid its creditors in full, and that the Amended Plan not-

ed the necessity of Krystal's owner ("Pappas") getting creditors to compromise their claims. According to GM, creditors may not have been willing to compromise their claims as much, if at all, had they known of the possible addition of damages from the instant law suit.

### C. Bad Faith

In *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416-18 (3d Cir. 1988), we concluded that [HN4] a rebutable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose. That is precisely Krystal's situation here. Accordingly, the record is sufficient to support the [**16] Bankruptcy Court's finding of bad faith.

### 1. Krystal's Knowledge of the Assets

[HN5] Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the Plan." 11 U.S.C. § 1125(a) (1). Debtors must therefore identify and disclose all "property of the estate" including all of the debtor's "legal and equitable" property interests. This includes such contingent assets as any cause of action Krystal may have against GM, and Krystal does not argue to the contrary. The nature of Krystal's purported misrepresentations [*322] here can fully be appreciated if we place them within the proper context.

[HN6] "A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights." *Oneida*, 848 F.2d at 416. Therefore, "preparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor." *Id*. at 417. [**17] It has been called by one commentator, "the pivotal concept in reorganization of a Chapter 11 debtor." *Id*.

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.

*Oneida*, 848 F.2d at 417 (internal quotation marks omitted).

Krystal relies upon the history of this dispute in arguing that it did not have any claim to disclose until we ruled in *Krystal I*, that GM's termination of the franchise agreement violated the automatic stay. Until then, argues Krystal, the appropriate state agencies had ruled that GM properly terminated the franchise agreement and there was therefore no cause of action against GM to include in the disclosure statement of October 24, 1995. Therefore, according to Krystal, when the Bankruptcy Court confirmed the Plan in October of 1997, the "law of the case" was that (1) Krystal had no ownership interest in the dealership franchise and (2) GM had not violated the automatic stay provisions of the Bankruptcy [**18] Code. Therefore, there was no cause of action to disclose. Appellant's Br. at 21.

However, Krystal was aware of every allegation currently asserted in Counts II through VII of its complaint when it filed its Statement and Plan. Each of the events alleged in those counts had already occurred when Krystal made the applicable filings under the Bankruptcy Code. Moreover, Krystal's argument that it could not know that GM violated the automatic stay as it alleges in Count I, is also unpersuasive. Krystal clearly knew of this potential claim because it vigorously argued that GM violated the automatic stay when it appeared before us in *Krystal I*.

Although it is true that the relevant state agencies had upheld GM's right to terminate the lease, the agencies were never asked to consider the issue of Krystal's alleged violation of the automatic stay, and Krystal knew this when it filed its disclosure statement in the Bankruptcy Court on October 24, 1995. The Vehicle Board's Adjudication and Order did not reach this issue, and the Commonwealth Court's November 6, 1995 decision had not yet been filed. Therefore the "law of the case" did not negate Krystal's duty to disclose its claims against [**19] GM.

Krystal's attempt to seek refuge in the law of the case doctrine ignores the scope of the disclosure requirement as well as the precise issues before the Vehicle Board and Commonwealth Court. [HN7] The Code requires that a debtor list *potential* causes of action, not claims it actually intends to sue on at the time of the required disclosure. "It has been held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context." *Oneida*, 848 F.2d at 416. Thus, Krystal's own actions belie its contention that it did not know it had a potential claim against GM. Krystal has consistently and vigorously maintained that GM's termination of the franchise agreement violated the automatic stay. That claim was not within the purview of the proceeding Krystal brought [*323] before the Vehicle Board or Commonwealth Court, and the record belies any argument that it was not then within Krystal's contemplation.

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 253 of 589

Page 8

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

To the contrary, it appears that Krystal continuously believed that GM had violated the automatic stay. Nothing here supports Krystal's current position that it had to await a court decision to disclose this potential claim. Moreover, Krystal ignores the rather [**20] damning fact that it included the franchise as an asset of the estate in its disclosure statement even though the Vehicle Board had already upheld GM's termination of it. App. at 142.

[HN8] Although we do not require debtors to list hypothetical claims that are so tenuous as to be fanciful, we do require them to advise creditors of the kind of potential claims that Krystal is asserting here. "[C]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, [therefore] the importance of full and honest disclosure cannot be overstated." *Ryan*, 81 F.3d at 362.

The Bankruptcy Court properly concluded that Krystal had enough information prior to confirmation to know it might have a claim against GM. [HN9] "'[I]f the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) *(citations omitted)*. It is difficult to understand why Krystal would list the franchise as an asset after the administrative [**21] rulings upholding GM's termination of it and yet fail to disclose a potential suit against GM for what Krystal has always argued was an improper and ineffective cancellation other than an intent to hide the claim from creditors.

## 2. Krystal's Motive to Conceal the Claims

The Bankruptcy Court found that (1) Krystal's owner ("Pappas") agreed to contribute substantial funds toward the [*324] payment of claims and expenses associated with Krystal's reorganization and (2) the owner was also engaged in negotiating unsecured claims downward to minimize the amount Pappas would have to pay. [10] Krystal therefore had every reason to minimize its assets so that creditors would conclude they had no choice but to significantly compromise their claims and approve Krystal's reorganization. Indeed, the argument that Krystal made in support of its planned reorganization confirms this. The liquidation analysis Krystal set forth in its Disclosure Statement provides as follows:

> [S]ecured and priority claims far exceed the value of the Debtor's assets. This means that in the event of a liquidation no unsecured creditor will receive any dividend. In fact, it is most likely that in the event of [**22] a Chapter 7 liquidation

secured and priority claims will not be paid in full.

> Although Debtor's proposed Plan actually amounts to a liquidation of all Debtor's assets, it is nevertheless asserted that all creditors will still be treated much better under the Plan than under a Chapter 7 liquidation. This is because the Plan provides for substantial cash payments to almost all creditors.

> The reason Debtor can propose cash payments under the Plan, and none can be expected under a Chapter 7 liquidation, is because Mr. Pappas is willing to contribute substantial cash toward the payment of claims and expenses associated with this reorganization.

App. 27. Against this background, it is undeniable that creditors should have been informed of this contingent asset.

10    GMAC's $ 114,486 claim was negotiated down to $ 23,000. App. 12.

## 3. Harm To Creditors

[HN10] Judicial estoppel is only appropriate when the inconsistent positions are "tantamount to a knowing misrepresentation to or even fraud on the court." *Total Petroleum, Inc. v. Davis*, 822 F.2d 734-38 (8th Cir. 1987). [**23] Not surprisingly, Krystal reminds us of this, as well as the fact that the doctrine is to be used sparingly and reserved for the most egregious case. According to Krystal, employing that doctrine and the sanction of dismissal here was "overkill," even if the doctrine is otherwise appropriate.

This position is based upon Krystal's assertion that under the Plan, (1) the secured creditors receive 100% payment; (2) unsecured creditors received 75% and stand to receive full payment upon the sale of the franchise; and (3) the legal claims are contingent assets of a highly speculative nature and therefore would have been valued at zero dollars even if disclosed. Krystal concludes that since the creditors experienced no financial harm, the court erred by finding that there was bad faith.

In making this argument, Krystal compares itself to the debtor in *Ryan*. There, we held that a Chapter 11 debtor-builder's failure to disclose causes of action against suppliers of allegedly defective wood trim in bankruptcy proceedings did not bar debtor from pursuing those claims outside of bankruptcy. Although the contingent assets represented by those claims were not dis-

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

closed in the bankruptcy proceedings, [**24] we re-jected the Bankruptcy Court's application of judicial estoppel because the debtor did not attempt to "play fast and loose" with the court.

We also held that [HN11] the application of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court. We concluded that the presence or absence of any such benefit is merely a factor in determining whether the evidence would support a conclusion of bad faith. After raising the issue of whether Ryan actually received a benefit from the omissions there, we stated: "We readily conclude that the doctrine of judicial estoppel in this circuit contains no such requirement." 81 F.3d at 361. We then explained:

the critical issue is what the [party] contended in the underlying proceeding, rather than what the jury found. Whether the party sought to be estopped benefitted from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts. It is not, however, an independent requirement for application of the doctrine of judicial estoppel.

*Id.* (Internal citations [**25] and quotation marks omitted).

The totality of the circumstances in *Ryan* lead us to conclude that the debtor did not omit any information in bad faith. Ryan omitted certain assets from its disclosures, but it also omitted counterbalancing liabilities. Therefore, largely the "balance of assets and liabilities . . . may have been unaffected by the failure to list [certain] claims as assets." 81 F.3d at 363. Ryan did not benefit from the omission. [11] [*325] Despite Krystal's argument to the contrary, that is not the situation here.

11    Because, as we have noted, the estopped party need not have benefitted from the misrepresentation, we note the absence of a benefit in *Ryan* only because it was relevant to an inquiry into that debtor's bad faith. For the same reason, we note that Krystal benefitted from the omission here. At the very least, the record certainly supports the Bankruptcy Court's finding that it tried to derive such a benefit.

The Bankruptcy Court could not accept Krystal's argument [**26] that its creditors were not harmed, and neither can we. The Bankruptcy Court also reasoned that the impact of this nondisclosure must be measured in more than monetary terms. Such nondisclosures affect creditors' willingness to negotiate their claims and enhance the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is. That is particularly important here because, as noted above, Krystal's owner negotiated very substantial compromises of claims against Krystal.

## 4. Lesser Sanctions

[HN12] The fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate. Applying a lesser sanction here (such as requiring Krystal to pay unsecured creditors the balance of their claims out of any damages Krystal might recover from the instant action) would reward Krystal for what appears to be duplicitous conduct in the course of its bankruptcy proceeding. Krystal would still reap the benefit of any recovery beyond the amount paid to satisfy outstanding debts. In addition, the integrity of both the bankruptcy process and the judicial process would suffer. In short, allowing Krystal the lesser sanction [**27] it advocates would send a message that "a debtor should consider disclosing potential assets only if he is caught concealing them." *Pemco*, 291 F.3d at 1288. The Bankruptcy Court was understandably reluctant to allow Krystal to use sleight of hand to show its cards to its creditors and so are we. Dismissal is necessary to prevent Krystal from profiting from its omission. It is also "required to preserve the integrity of the earlier proceedings." *Oneida*, 848 F.2d at 418.

## 5. Opportunity to Explain

Lastly, Krystal argues that the Bankruptcy Court's finding of bad faith is undermined by the absence of any testimony on this issue. It maintains that it never had an adequate opportunity to explain. However, "[w]e have held that [HN13] a District Court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes." *Montrose Medical Group*, 243. F.3d at 780 n.5.

In *Oneida*, we held that [HN14] if the pleadings show (1) the fact of non-disclosure of the asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad [**28] faith. Although the Bankruptcy Court here raised the issue of judicial estoppel *sua sponte*, the court gave Krystal the opportunity to fully brief this issue and gave both parties the opportunity for oral argument. We conclude that Krystal had a fair opportunity to argue that the doctrine did not apply and to ask the Bankruptcy Court not to dismiss its complaint. We find no error in the Bankruptcy Court's ruling, and we conclude that the District Court properly affirmed it.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

**III. CONCLUSION**

For all of the above reasons, the judgment of the District Court will be affirmed.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

1989 CarswellOnt 126
Supreme Court of Canada

International Corona Resources Ltd. v. LAC Minerals Ltd.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140, [1989] S.C.J. No. 83, 101 N.R. 239, 16 A.C.W.S. (3d) 345, 26 C.P.R. (3d) 97, 35 E.T.R. 1, 36 O.A.C. 57, 44 B.L.R. 1, 61 D.L.R. (4th) 14, 69 O.R. (2d) 287, 6 R.P.R. (2d) 1, J.E. 89-1204, EYB 1989-67469

# LAC MINERALS LTD. v. INTERNATIONAL CORONA RESOURCES LTD.

McIntyre, Lamer, Wilson, La Forest and Sopinka JJ.

Heard: October 11 and 12, 1988
Judgment: August 11, 1989

Counsel: *Earl A. Cherniak* and *J.L. McDougall*, for appellant.
*Alan L. Lenczner* and *Ronald G. Slaght*, for respondent.

Subject: Intellectual Property; Corporate and Commercial; Estates and Trusts; Property; Insolvency

**Headnote**

**Partnership --- Relationship between partners — Fiduciary obligations**

**Trusts and Trustees --- Constructive trust — Gains by fiduciaries**

Breach of confidence — Misappropriation of confidential information — Defendant learned confidential information about gold mining property during negotiations with plaintiff for joint venture exploitation — Defendant acquired property itself — Acquisition constituted breach of duty of confidence.

Fiduciary duty — Extent of duty — Fiduciary duties in commercial contexts arise only when plaintiff's legal rights are dependent upon exercise of discretion by defendant, and plaintiff cannot protect itself against abuse of that discretion — Revealing confidential information does not itself create fiduciary duty in recipient — Negotiating joint venture does not create fiduciary duty — No fiduciary duty found.

Remedies — Breach of confidence — Constructive trust — Constructive trust available as restitutionary remedy for breach of confidence where plaintiff enjoys extra rights which proprietary claim affords — Mining property unique and difficult to evaluate — Plaintiff's property but for breach of confidence by defendant.

International Corona Resources Ltd. ("Corona") explored properties which held good potential for gold mining. Corona's chief geologist thought it appropriate to acquire property (the "Williams Property") adjacent to the property already claimed. When news of Corona's exploration reached LAC Minerals Ltd. ("LAC"), LAC suggested a joint venture to develop a gold mine on the Williams Property. Although negotiations proceeded for some time, no joint venture was ever concluded. LAC, however, acquired the Williams Property itself, and proceeded to develop a gold mine on it. Corona sued LAC for breach of fiduciary duty and breach of confidence.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

At trial, the Court held that LAC had received the information about the Williams Property in confidence and that LAC had breached that confidence in acquiring the Williams Property. The Court also held that LAC had a fiduciary duty to Corona because the information in question had been revealed in the course of their well-developed joint venture discussions. Furthermore, there was a general custom in the mining industry that information revealed in confidence between potential joint ventures should not be used by one party to the detriment of the other. The trial Judge considered that in the particular circumstances of the case, the appropriate remedy was to grant Corona the Williams Property after Corona paid LAC for its expenses in developing the mine. Both the findings regarding liability and the remedy were affirmed by the Ontario Court of Appeal.

LAC appealed to the Supreme Court of Canada, alleging that there had been neither breach of confidence nor breach of fiduciary duty. LAC also appealed the remedy, alleging that even if there had been a breach, the appropriate remedy was damages, not the return of the mine. Corona cross-appealed to have the damages increased from the amount which the trial Judge had awarded in the alternative.

**Held:**

The appeal and cross-appeal were dismissed.

*Breach of Confidence*

**Per La Forest J. (Lamer and Wilson JJ. concurring)**

The requirements to establish breach of confidence were established in the English *Coco* case. First, the information must have been confidential. Second, the information must have been imparted in circumstances importing an obligation of confidence. Third, there must have been an unauthorized use of that information to the detriment of the party communicating it.

The information concerning the Williams Property was confidential, and was revealed by Corona to LAC in circumstances where it was reasonable to assume that LAC knew that the information revealed was confidential. LAC made unauthorized use of the information to the detriment of Corona when it purchased the Williams Property. LAC was not authorized to purchase the Williams Property for itself; throughout the joint venture negotiations, both parties understood that Corona would purchase the Williams Property. But for the actions of LAC, Corona would have acquired the Williams Property.

The test to determine breach was whether LAC had the express authority to use information gained from Corona to purchase the Williams Property. The evidence supported the inference that LAC could not satisfy the onus and thus demonstrate that it was so authorized.

Even if LAC was uniquely prevented from acquiring the Williams Property, LAC was not excluded from prospecting altogether. Backing LAC's ability to acquire the Williams Property would effectively still allow LAC the option of bargaining in good faith in the joint venture negotiations.

**Per Sopinka J. (McIntyre J. concurring)**

The correct test for breach of confidence was stated in the judgment of Justice La Forest.

The crucial information upon which LAC relied when it acquired the Williams Property was not public, even though a part of the information LAC relied upon was publicly known. This private information was the "springboard" which gave LAC a headstart in its efforts to acquire the Williams Property. The English *Copydex* case illustrated the principle that one party cannot make unauthorized use of private information as a springboard, even when some information available is public. In addition, the Courts below properly applied the "reasonable man" test in deciding that the private

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

information was revealed to LAC in confidence. LAC clearly made use of the private information in acquiring the Williams Property. LAC was not authorized to do so, and the acquisition amounted to a breach of confidence.

The parties had not agreed who would have owned the Williams Property if the joint venture had concluded. Nor was it certain whether Corona would have held the Williams Property for itself if LAC had not acquired the property. It was, however, certain that LAC was not authorized to acquire the Williams Property by itself.

*Breach of Fiduciary Duty*

**Per Sopinka J. (McIntyre and Lamer JJ. concurring)**

The Canadian *Frame v. Smith* case sets out the criteria for determing when fiduciary duties arise: (i) the fiduciary has power or discretion; (ii) the fiduciary can exercise that power or discretion unilaterally so as to affect the beneficiary's legal or practical interests; and (iii) the beneficiary is particularly vulnerable or dependent upon the fiduciary.

In commercial contexts, the court ought not to presume fiduciary relationships. Instead, the parties should protect themselves by contract. The drastic remedies available in equity should be reserved for special circumstances.

Fiduciary duties are an integral part of certain relationships, such as those between directors and corporations. Even within these relationships, however, all duties are not fiduciary. In other relationships, fiduciary duties may also arise. Dependency or vulnerability is, however, necessary before any fiduciary relationship can arise.

The Courts below failed to give enough weight to the requirement of dependency. It was irrelevant which party approached the other. The fact that Corona revealed information in confidence was not sufficient to establish a fiduciary duty, even if it did establish the separate cause of action for breach of confidence. Even if there were a well-recognized industry practice that information revealed in joint-venture negotiations was revealed in confidence, that practice would not here lead to a fiduciary duty falling upon the recipient. Finally, on-going negotiations could not establish a fiduciary duty, as there are on-going negotiations in any commercial matter.

Dependency could not be established in this case. Dependency arises when the beneficiary of the fiduciary duty cannot prevent injury from the exercise of discretion by the fiduciary, and the beneficiary has no practical remedy other than an action for breach of fiduciary duty. In this case, any dependency was incurred by Corona gratuitously. Corona sought no contractual protection for its information. Finally, Corona had other available remedies, including the action for breach of confidence upon which it succeeded.

**Per La Forest J.**

The basic criteria for determining when to imply fiduciary duties were stated in *Frame v. Smith*. Fiduciary duties have been found in three kinds of situations: (i) relationships which always impart fiduciary duties, such as the relationship between trustee and beneficiary, or director and corporation; (ii) relationships where the specific circumstances give rise to obligations; (iii) situations where the courts have characterized the relationship as "fiduciary" in order to invoke certain remedies. The third situation does not involve a legitimate use of the concept and should be rejected. The courts should be willing to grant appropriate remedies on a principled basis without the need for specific characterizations. The first relationship did not apply in the circumstances.

The second relationship was assessed under three criteria. First, confidence had to be established in the fiduciary, taking into account the reasonable expectations of the parties. This case concerned itself with more than a mere breach of confidence. LAC should have known that it had a duty not to act against Corona's interests, and this factor should be given significant weight. Second, industry practice was taken into account. It was reasonable that both parties would expect that LAC would not abuse Corona's trust. Corona's vulnerability was a third important factor, but it was a factor not necessary in every case of fiduciary duty. Where it would be reasonable in the circumstances to expect that the other

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

party would act or refrain from acting contrary to the interests of another, then the other party must assume a duty of a fiduciary character to live up to these expectations. Notwithstanding, once LAC knew about the Williams Property, Corona was vulnerable to LAC's misuse of that information.

**Per Wilson J.**

There are relationships which are not in their essence fiduciary, such was found in the present case. However, this does not preclude a fiduciary duty from arising out of specific conduct. The mere disclosure of confidential information made Corona vulnerable to LAC. The aforementioned disclosure placed upon LAC a fiduciary duty not to misuse the information for its own benefit. LAC breached its duty.

### *Remedy for Breach of Confidence*

**Per La Forest J. (Lamer J. concurring)**

A constructive trust over the Williams Property in favour of Corona was appropriate as a remedy. But for the acts of LAC, Corona would have held the Williams Property. That property should be restored to Corona.

Even though a restitutionary remedy is not always appropriate, it was appropriate in this case. It was appropriate to measure LAC's gain at Corona's expense rather than simply measure Corona's loss. Both the compensatory and restitutionary awards were equivalent, as Corona should have had the Williams Property all along.

The court should promote honest bargaining by having each party live up to the reasonable expectations of the other. Corona's reasonable expectations were that LAC would not misuse confidential information revealed during the negotiations. The Court could not enforce the reasonable expectations of the parties unless it deprived the offending party of all of its benefit flowing from the breach of those expectations. Damages would not properly compensate Corona for its loss, and damages would not deprive LAC of all that it gained. Restitution was the only remedy suitable in the circumstances.

A two-stage test should be satisfied before a constructive trust can be declared. First, a claim for unjust enrichment must have been established. Second, a constructive trust should be the appropriate remedy. The award of a constructive trust, however, would not depend on any special relationship between the parties, and would not be limited to circumstances in which a proprietary right had already been established. In effect, the constructive trust could both recognize and create a proprietary right. A constructive trust should be established when it would be just that the plaintiff enjoy the additional benefits flowing from the award of proprietary rights. It was difficult to value the Williams Property, and Corona would have had the property but for the infringement by LAC. Thus it was appropriate to award the Williams Property to Corona. However, on the same principles, Corona should pay LAC its development expenses.

**Per Wilson J.**

The Court should have awarded the more appropriate remedy where there were alternatives. There was unjust enrichment through the breach of confidence. A constructive trust was appropriate since the valuation of the Williams Property was uncertain.

**Per Sopinka J. (McIntyre J. concurring)**

Damages should be awarded for breach of confidence. No constructive trust should be imposed on the Williams Property.

The constructive trust should only arise when a proprietary right has been established, particularly in actions for breach of fiduciary duty. In this case, there was a breach of confidence, and a misappropriation of ideas. There was virtually no

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

support in the case law for the imposition of a constructive trust over property acquired as a result of the misuse of confidential information. Furthermore, it was not clear that Corona would have held the Williams Property but for the breach of confidence. Since LAC might have had some interest in the Williams Property under the joint venture, and since it was not clear how much LAC relied upon the confidential information or other public information when it acquired the Williams Property, LAC should not be forced to give up the Williams Property.

The appropriate remedy of breach of confidence is damages to put the plaintiff in the position he would have been in had the breach not occurred. The focus should be on the loss to the plaintiff. The parties expected joint participation in the mining venture, with both parties contributing to development expenses and both parties having an interest in the Williams Property. Damages should be assessed on this basis.

**Annotation**

*Holding in the Case*

The reasons for judgment in this case can be divided into three groups. The only issue on which all the Justices agreed was that there had been a breach of confidence for which LAC was liable. Mr. Justice La Forest and Madam Justice Wilson considered that there had also been a breach of fiduciary duty, and that the appropriate remedy for both breach of confidence and breach of fiduciary duty was a constructive trust; Mr. Justice Sopinka and Mr. Justice McIntyre disagreed on both points. This meant that Mr. Justice Lamer was the deciding vote. He agreed with Mr. Justice Sopinka that there had been no breach of fiduciary duty, and with Mr. Justice La Forest that the remedies for breach of confidence could include a constructive trust which was appropriate in the case. Thus no one Justice wrote a majority decision on all the issues.

The holdings in the case must, therefore, be gathered from several judgments. The Court found that LAC breached a duty of confidence by acquiring the Williams Property for itself. LAC did not, however, owe Corona any fiduciary duty. The appropriate remedy for breach of confidence was a constructive trust. These specific holdings suggest the following general statement of the law: fiduciary duties will rarely be found between parties to a commercial negotiation. However, when a party misuses confidential information learned during such negotiations, and acquires property on the basis of that misuse, he can be found to hold that property under a constructive trust for the discloser of the information. The Supreme Court of Canada has thereby limited the extent of fiduciary duties in commercial contexts, but it has recognized the constructive trust as an appropriate remedy in breach of confidence cases.

It is unfortunate that the entire Court did not hear this appeal, and that the Judges who heard it were divided on two of the issues in the case. As a result of this division, there will likely be further litigation on the scope of fiduciary duty, and the extent to which the constructive trust is a remedy for breach of confidence. Rather than settle the law, the Supreme Court may have simply clarified what are the competing views of the law and have provided grist for further litigation. This is especially so when the various overlapping and differing judgments may be cited as the view of the Supreme Court of Canada, whereas they more properly represent a mosaic of views. To an extent, therefore, this case should remain limited closely to its own facts.

This is unfortunate, as the case offers a clear presentation of the issues surrounding fiduciary duties in commercial contexts, and the appropriateness of the constructive trust as a remedy for breach of confidence. The longer judgments consider issues of policy, and attempt to bring the law in line with reasonable commercial expectations. If the Court was closely divided on the two key issues in the case, that fact merely suggests that there are strongly competing policies

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

upon which argument is reasonably divided.

*Breach of Confidence*

The Supreme Court has not made major changes to the law of breach of confidence. All of the Justices agreed that the traditional test for breach of confidence applied. The main point of disagreement between La Forest J. and Sopinka J. was whether there was an understanding that Corona was to own the Williams Property, and would have done so had LAC not breached its duty of confidence.

Mr. Justice La Forest however, did suggest two refinements of the law affecting breach of confidence. First, he made it clear that when information is disclosed in confidence, the disclosee is entitled to use it only for those purposes explicitly authorized. The disclosee bears the onus of showing that the use was authorized. Especially in the commercial context, this is a heavy onus.

Mr. Justice La Forest also made it clear that when the confidential information concerns unique items or opportunities, it will not be subject to the fair licence remedy set out in the *Copydex (No. 2)* ([1969] 2 All E.R. 718 (C.A.)) case. This remedy is exercised by awarding the plaintiff an amount equal to a fair fee for licensing the information appropriated. The fair licence fee is especially useful when the plaintiff ordinarily licenses the information as part of its business. However, when the information relates to a unique business opportunity, and the information would not ordinarily be the subject of a licence, the fair licence fee remedy is not appropriate.

*Breach of Fiduciary Duty*

One important contest in this case was between two views on fiduciary duties in the commercial context: the dependency theory espoused by Mr. Justice Sopinka and the reasonable expectation theory espoused by Mr. Justice La Forest. In the end, Mr. Justice Sopinka carried two other Justices, and his dependency view narrowly prevailed.

Thus, the law now seems to be that fiduciary duty will be found rarely in commercial contexts.[1] The Supreme Court has rejected the position that fiduciary duties depend upon the reasonable expectation of the parties. Instead, it has accepted that fiduciary duties only arise when one party is dependent upon the exercise of discretion by another, and has no suitable remedy if that discretion is abused.

It is interesting to note that if this test were applied rigorously to relationships which have traditionally been considered to involve fiduciary duties, it could set them outside the fiduciary ambit. Thus, a client who retains a solicitor can protect himself by contract, and by a suit for professional negligence. This is unlike the true trust, in which the beneficiary can sue the trustee for breach of trust but has no other remedy. The beneficiary has no contractual protection. The trust relationship does not arise by agreement, but because of the settlor creating the trust. Contractual protection is not, therefore, available to the beneficiary of a trust. Similarly, neither contractual protection nor a separate action in tort is available for many spouses with a claim on family assets. These are situations of true dependency on the discretion of another.

Dependency in a commercial context must be rare. In some banking relationships the customer might depend on the good faith of the bank and be unable to protect himself adequately by contract. However, dependency would be unlikely in any commercial negotiations. After all, if the parties are negotiating, they are working to create a contract between themselves, and can put into that contract whatever protections they wish.

The implications of Mr. Justice Sopinka's position are important. We assume that commercial bargaining leads to a fair

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

agreement because each party is free to represent his own interest. Eventually, the parties will compromise to achieve a working relationship. The fairness of that relationship can be distorted by imbalances in information and power; when those imbalances are gross enough, the courts will declare agreements unenforceable for fraud, misrepresentation, duress or unconscionability.

But fiduciary duty is a very broad principle for controlling fairness. If, as a general rule, a fiduciary duty were to be imposed on parties involved in commercial negotiations, the very basis for the system of negotiation would fail. Instead of aggressively pursuing his own interest, each party would have to look out for the interest of the other party over his own. Such an obligation goes beyond "Do unto others ..." into "I am my brother's keeper." As we are told, the first time this was tried, the keeper murdered the brother. It is not a good omen.

The position taken by Mr. Justice La Forest — that the Court should protect the reasonable mutual expectations of the parties — leads to particular difficulty in the commercial context. Each party becomes a fiduciary for the reasonable expectations of the other party. Once the rules of the negotiation become clear, each side has a fiduciary duty to the other side to observe those rules. In theory, this does not bias the results of the negotiations between the parties; it merely ensures that parties do not take advantage of the rules. Any act that contravenes an expectation is a breach of fiduciary duty. In practice, however, there will surely be conflicts between the self-interest of one party and its fiduciary duty to uphold the expectations of the other party. Suppose, for instance, that a purchaser knows that the vendor is in a precarious financial position. Can the purchaser use that information to drive a hard bargain as to the purchase price, or must the purchaser hold that information as a fiduciary, and not only not lower the purchase price, but actually increase it to look after the interest of the other side?

In addition, there are bound to be debates about what is a "reasonable" expectation. Without a contract to establish their mutual expectations, how can parties demonstrate after the fact what was reasonable in the circumstances? An appeal to reasonable expectations is an invitation to have the court rewrite the bargain based on what the court considers reasonable. As parties proceed down the path of negotiations and approach the creation of an enforceable contract, the courts are extremely wary of being put in the position of rewriting the parties' bargain, if the parties' mutual intention is not apparent.[2]

Furthermore, the recognition of fiduciary duties in negotiations does not necessarily protect reasonable expectations in that context. Fiduciary duties impose the extra duty of acting for the benefit of the other party at the expense of one's own interests. Generally speaking, such a requirement does not fit the model of North American business reality. It might be interesting to speculate how one could arrange commercial negotiations that way, but neither business people nor their advisors have considered the matter deeply enough to be ready to throw over the traditional forms of bargaining. With respect, the position advocated by Mr. Justice La Forest on fiduciary duty cannot stand, and the decision of Mr. Justice Sopinka is to be preferred.

In any event, the position taken by Mr. Justice La Forest is stronger than necessary to achieve the result of promoting good faith bargaining. There is no need to impose the strict standards of fiduciary duty on commercial negotiations to promote fair dealing. Instead, fair dealing can be encouraged through the choice of the appropriate remedy.

*The Constructive Trust and Good Faith Bargaining*

On the question of the remedy to be awarded for the breach of confidence, however, the position of Mr. Justice La Forest seems preferable. He recognizes that the imposition of a constructive trust has the effect of depriving the offending party of any benefit he might have taken from the transaction. If a party knows that he cannot benefit from misuse of the confidence inherent in a commercial relationship, he has a stronger incentive to bargain in good faith.

Mr. Justice Sopinka considered that compensation for breach of confidence should be based on the loss to the plaintiff.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

This position, however, has the effect of rewarding the party who breaches confidence. That party can keep all possible future gain merely at the cost of buying out the other party. Once he has found out the key information, the party in breach can assess the risk. If he thinks the transaction might be highly profitable, or if he thinks his share is inadequate, he can simply acquire the entire business opportunity himself. On the other hand, if the plaintiff sues and wins, the offending party will be forced to buy out the plaintiff at fair price, but will be able to keep the future increase in value for himself. Any well-financed party can use this technique of speculation to profit from the weaker financial position of others.

Thus, through his choice of remedy, Mr. Justice La Forest has found a way of requiring good faith bargaining without the necessity of imposing fiduciary duties. The Supreme Court has not left the parties defenceless, but has ruled that if parties fail to bargain in good faith, they will be deprived of the benefit they sought from the bargain. This seems a fairer way of regulating commercial negotiations, and more in keeping with the way such negotiations are conducted in fact.

*Conclusion*

In deciding the extent to which fiduciary duties arise in commercial negotiations, the Court had to consider two key questions: to what extent will the court intervene to rewrite the bargain between parties, and what standard of good faith is required in commercial negotiations. Mr. Justice La Forest advanced the position that the court should impose fiduciary duties, so that a higher standard of good faith would be imposed. Mr. Justice Sopinka, however, spoke for the position that courts should allow commercial parties to set their own bargaining rules, and the courts should interfere only in cases of severe abuse.

Mr. Justice Lamer created an intermediate position. By agreeing with Mr. Justice Sopinka to limit fiduciary duty, he stressed that the court should not generally intervene in commercial negotiations and "second guess" the understandings of the parties. However, by agreeing with Mr. Justice La Forest regarding the appropriate remedy for breach of confidence, Mr. Justice Lamer recognized that courts should enforce standards of bargaining in good faith.

Thus, the current position seems to be that commercial parties are free to establish by contract their own expectations to guide commercial negotiations. Courts will generally honour such agreements. If such an agreement is absent, the courts will not impose fiduciary standards on negotiating parties, but encourage them to negotiate in their own interests. However, if one party takes unfair advantage of confidential information revealed during the negotiations, the courts can award remedies which will deprive the offending party of all benefit of the unfair advantage. The courts, therefore, are encouraging commercial negotiations that are tough, but fair.

As important as the *LAC Minerals* case is, however, it touches only tangentially on the vexing question of whether there can be proprietary interests in confidential information in the non-criminal law context, a question raised, but not answered, by Lamer J. in *R. v. Stewart*, [1988] 1 S.C.R. 963, 65 O.R. (2d) 637 (note), 39 B.L.R. 198, 19 C.I.P.R. 161, 63 C.R. (3d) 305, 41 C.C.C. (3d) 481, 21 C.P.R. (3d) 289, 50 D.L.R. (4th) 1, 85 N.R. 171, 28 O.A.C. 219. In *LAC Minerals*, Mr. Justice La Forest, in reasons which formed the majority view as to the appropriate remedy, found it unnecessary to determine whether confidential information is property. On the other hand, Mr. Justice Sopinka, in reasons which formed the minority view as the appropriate remedy, commented that: "Although confidential information has some of the characteristics of property, the foothold as such is tenuous." However, given the context, neither Justice was willing to break any new ground and it can safely be said that the ground continues to lie fallow, waiting for the Court to grasp the plough and sow the seed of information-as-property.

Richard B. Potter, Q.C. and Hugh Laurence

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

**Table of Authorities**

**Cases considered per La Forest J.:**

*Air Canada v. B.C.*, [1989] 1 S.C.R. 1161, [1989] 4 W.W.R. 97, 36 B.C.L.R. (2d) 145, 95 N.R. 1, 59 D.L.R. (4th) 161, 2 T.C.T. 4178, [1989] 1 T.S.T. 2126 — *applied*

*Burns v. Kelly Peters & Associates Ltd.*, 41 C.C.L.T. 257, 16 B.C.L.R. (2d) 1, [1987] 6 W.W.R. 1, [1987] I.L.R. 1-2246, 41 D.L.R. (4th) 577 (C.A.) — *referred to*

*Central Trust v. Rafuse*, [1986] 2 S.C.R. 147, 37 C.C.L.T. 117, 42 R.P.R. 161, 34 B.L.R. 187, 31 D.L.R. (4th) 481, 75 N.S.R. (2d) 109, 186 A.P.R. 109, 69 N.R. 321, [1986] R.R.A. 527, var'd [1988] 1 S.C.R. 1206, 44 C.C.L.T. xxxiv — *referred to*

*Chase Manhattan Bank v. Israel-British Bank*, [1981] Ch. 105 — *considered*

*Coco v. A.N. Clark (Engineers) Ltd.*, [1969] R.P.C. 41 (Ch.) — *applied*

*Coomber, Re*, [1911] 1 Ch. 723 (C.A.) — *considered*

*Cunliffe-Owen v. Teather & Greenwood*, [1967] 3 All E.R. 561, [1967] 1 W.L.R. 1421 (Ch.) — *considered*

*Frame v. Smith*, [1987] 2 S.C.R. 99, 9 R.F.L. (3d) 225, 42 C.C.L.T. 1, 78 N.R. 40, 23 O.A.C. 84, 42 D.L.R. (4th) 81, [1988] 1 C.N.L.R. 152 — *applied*

*Fraser Edmunston Pty. Ltd. v. A.G.T. (Qld) Pty. Ltd.* (1986), Queensland S.C. 17 — *referred to*

*Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 (S.C.) — *considered*

*Goodbody v. Bank of Montreal* (1974), 4 O.R. (2d) 147, 47 D.L.R. (3d) 335 (H.C.) — *considered*

*Guerin v. R.*, [1984] 2 S.C.R. 335, 59 B.C.L.R. 301, 20 E.T.R. 6, 36 R.P.R. 1, [1984] 6 W.W.R. 481, [1985] 1 C.N.L.R. 120, 13 D.L.R. (4th) 321, 55 N.R. 161 — *considered*

*Hospital Products Ltd. v. United States Surgical Corp.* (1984), 55 A.L.R. 417 — *considered*

*Hunter Engineering Co. Inc. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, 35 B.C.L.R. (2d) 145, [1989] 3 W.W.R. 385, 92 N.R. 1, 57 D.L.R. (4th) 321 — *applied*

*Keech v. Sanford* (1726), Sel. Cas. T. King 61, 25 E.R. 223 — *referred to*

*Liquid Veneer Co. v. Scott* (1912), 29 R.P.C. 639 (Ch.) — *considered*

*Muschinski v. Dodds* (1985), 160 C.L.R. 583 — *referred to*

*Nelson v. Dahl* (1879), 12 Ch. D. 568, 28 W.R. 57 (C.A.), aff'd (1881), 6 App. Cas. 38, [1881-5] All E.R. Rep. 572, 29 W.R. 543 (H.L.) — *referred to*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

*Norwich Winterthur Insurance (Insurance) Ltd. v. Can. Stan. Industries of Australia Pty. Ltd.*, [1983] 1 N.S.W.C.R. 461 (C.A.) — *referred to*

*Pettkus v. Becker*, [1980] 2 S.C.R. 834, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 117 D.L.R. (3d) 257, 34 N.R. 384 — *considered*

*Pre-Cam Exploration & Development Ltd. v. McTavish*, [1966] S.C.R. 551, 56 W.W.R. 697, 50 C.P.R. 299, 57 D.L.R. (2d) 557 — *considered*

*Saltman Engineering Co. v. Campbell Engineering Co.* (1948), 65 R.P.C. 203, [1963] 3 All E.R. 413n (C.A.) — *considered*

*Seager v. Copydex Ltd. (No. 2)*, [1969] 2 All E.R. 718, [1969] 1 W.L.R. 809 (C.A.) — *considered*

*Tito v. Waddell (No. 2)*, [1977] Ch. 106, [1977] 3 All E.R. 129 — *considered*

*United Dominions Corp. v. Brian Pty. Ltd.* (1985), 60 A.L.R. 741, 59 A.L.J.R. 676  (Aus. H.C.) — *distinguished*

**Cases considered per Sopinka J.:**

*Coco v. A.N. Clark (Engineers) Ltd.*, [1969] R.P.C. 41 (Ch.) — *applied*

*Cunliffe-Owen v. Teather & Greenwood*, [1967] 3 All E.R. 561, [1967] 1 W.L.R. 1421 (Ch.) — *considered*

*Dowson & Mason Ltd. v. Potter*, [1986] 2 All E.R. 418, [1986] 1 W.L.R. 1419 (C.A.) — *applied*

*Florence Realty Co. v. R.*, [1968] S.C.R. 42, 65 D.L.R. (2d) 136 — *applied*

*Frame v. Smith*, [1987] 2 S.C.R. 99, 9 R.F.L. (3d) 225, 42 C.C.L.T. 1, 78 N.R. 40, 23 O.A.C. 84, 42 D.L.R. (4th) 81, [1988] 1 C.N.L.R. 152 — *applied*

*General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.*, [1975] 2 All E.R. 173, [1975] 1 W.L.R. 819 (H.L.) — *referred to*

*Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 (S.C.)*considered*

*Guerin v. R.*, [1984] 2 S.C.R. 335, 59 B.C.L.R. 301, 20 E.T.R. 6, 36 R.P.R. 1, [1984] 6 W.W.R. 481, [1985] 1 C.N.L.R. 120, 13 D.L.R. (4th) 321, 55 N.R. 161 — *considered*

*Hospital Products Ltd. v. United States Surgical Corp.* (1984), 55 A.L.R. 417 — *considered*

*Nicholson v. St. Denis* (1975), 8 O.R. (2d) 315, 57 D.L.R. (3d) 699 (C.A.), leave to appeal to the Supreme Court of Canada refused (1975), 8 O.R. (2d) 315n, 57 D.L.R. (3d) 699n — *considered*

*Nichrotherm Electrical Co. v. Percy*, [1957] R.P.C. 207 — *considered*

*Pettkus v. Becker*, [1980] 2 S.C.R. 834, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 117 D.L.R. (3d) 257, 34 N.R. 384 — *considered*

*Pre-Cam Exploration & Development Ltd. v. McTavish*, [1966] S.C.R. 551, 56 W.W.R. 697, 50 C.P.R. 299, 57

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

D.L.R. (2d) 557 — *considered*

*Saltman Engineering Co. v. Campbell Engineering Co.* (1948), 65 R.P.C. 203, [1963] 3 All E.R. 413n (C.A.), leave to appeal to H.L. refused 65 R.P.C. 215 — *considered*

*Seager v. Copydex Ltd.*, [1967] 2 All E.R. 415, [1967] 1 W.L.R. 923 (C.A.) — *considered*

*Talbot v. General Television Corp. Pty. Ltd.*, [1980] V.R. 224 — *considered*

*Tito v. Waddell (No. 2)*, [1977] Ch. 106, [1977] 3 All E.R. 129 — *considered*

*Unident Ltd. v. Delong* (1981), 50 N.S.R. (2d) 1, 98 A.P.R. 1, 131 D.L.R. (3d) 225 (T.D.) — *considered*

*United Dominion Corp. v. Brian Pty. Ltd.* (1985), 60 A.L.R. 741, 59 A.L.J.R. 676 (Aust. H.C.) — *distinguished*

**Statutes considered per Sopinka J.:**

Courts of Justice Act, 1984, S.O. 1984, c. 11 —

s. 138(1)(b)

s. 139

**Authorities considered per La Forest J.:**

Austin, R.P., "Commerce and Equity — Fiduciary Duty and Constructive Trust" (1986), 6 O.J.L.S. 444.

Birks, Peter, *An Introduction to the Law of Restitution* (New York: Oxford U. Press, 1985).

Birks, Peter, "Restitutionary Damages for Breach of Contract: *Snepp*, and the Fusion of Law and Equity" (1987), Lloyd's Maritime & Commercial Law Quarterly 421.

Campbell, Colin L. (Aug. 1988), Advocates, Society Journal 44.

Finn, P.D., *Fiduciary Obligations* (1977).

Finn, P.D., "The Fiduciary Principle" in Youden, T. ed., *Equity, Fiduciaries and Trusts* (Toronto: Carswell, 1989).

Frankel, T., "Fiduciary Law" (1983), 71 California Law Review 795.

Fridman & McLeod, *Restitution* (Toronto: Carswell, 1982).

Gautreau, J.R.M., "Demystifying the Fiduciary Mystique" (1989), 68 C.B.R. 1.

Goff & Jones, *The Law of Restitution*, 3rd ed. (London: Sweet & Maxwell, 1986).

Grange, "Good Faith in Commercial Transactions" (1985), L.S.U.C. Special Lectures 69.

Gurry, *Breach of Confidence* (Oxford: Clarendon Press, 1984).

12 Hals (4th) at 28, para. 445.

Klinck, D.R., "The Rise of the 'Remedial' Fiduciary Relationship: A Comment on *International Corona Resources Ltd. v. Lac Minerals Ltd.*" (1988), 33 McGill Law Journal 600.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

Lindley, C.H., *A Treatise on the American Law Relating to Mines and Mineral Lands*, 2nd ed. (Salem: Ayer Pub. Co., 1983).

Mason, Anthony, "Themes and Prospects" in P.D. Finn, *Essays in Equity* (1985).

Oxford English Dictionary (2nd ed.) vol. 19, at 786 — "vulnerable".

Shepherd, J.C., "Towards a Unified Concept of Fiduciary Relationships" (1981), 97 L.Q.R. 51.

Waters, D.W.M., *The Law of Trusts in Canada*, 2d ed. (Toronto: Carswell, 1984).

Weinrib, Ernest J., "The Fiduciary Obligation" (1975), 25 U.T.L.J. 1.

Youden, T., ed., *Equity, Fiduciaries and Trusts* (Toronto: Carswell, 1989).

**Authorities considered per Wilson J.:**

McCamus, John D., "The Role of Proprietary Relief in the Modern Law of Restitution" (1987) Cambridge Lecture 141.

**Cases considered per Sopinka J.:**

Campbell, Colin L. (Aug. 1988), Advocates' Society Journal.

Goff & Jones, *The Law of Restitution*, 3rd ed. (London: Sweet & Maxwell, 1986).

Gurry, *Breach of Confidence* (Oxford: Clarendon Press, 1984).

Kennedy J., "Equity in a Commercial Context" in P.D. Finn, ed., *Equity and Commercial Relationships* (The Law Book Co., 1987).

Ong, D.S.K., "Fiduciaries: Identification & Remedies" (1986), 8 Univ. of Tasmania Law Rev. 311.

Shepherd, J.C., *The Law of Fiduciaries* (Toronto: Carswell, 1986).

Waters, D.W.M., *The Law of Trusts in Canada*, 2d ed. (Toronto: Carswell, 1984).

Weinrib, Ernest J., "The Fiduciary Obligation" (1975), 25 U.T.L.J. 1.


APPEAL from a decision of the Ontario Court of Appeal, reported at (1987), 62 O.R. (2d) 1, 44 D.L.R. (4th) 592, affirming decision of trial Judge, reported at (1986), 53 O.R. (2d) 737, finding breach of fiduciary duties and imposing constructive trust.


*La Forest J.* (*Wilson* and *Lamer JJ.* concurring in part) :


**Introduction**


1      The short issue in this appeal is whether this Court will uphold the Ontario Court of Appeal and trial Court decisions ordering LAC to deliver up to Corona land (the Williams property) on which there is a gold mine, on being compensated for the value of improvements LAC has made to the property ($153,978,000) in developing the mine.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

2     The facts in this case are crucial. The trial lasted some 5-1/2 months, and the hearing before the Court of Appeal took 10 days. The trial Judge made extensive findings of fact, and the Court of Appeal examined the record in detail and with care. The latter Court emphatically dismissed any argument that the trial Judge had overlooked or misconstrued the evidence, failed to make any necessary findings or made any erroneous inferences. It stated ((1988), 44 D.L.R. (4th) 592 at 595):

> Certainly the establishment of the facts in this case was fundamental and vital to the determination of the issues. It is submitted that erroneous inferences were taken from the facts, that evidence was overlooked or misconstrued, and that relevant findings were not made at all.
>
> There is no obligation on a trial judge to refer to every bit of conflicting evidence to show he has taken it into consideration, nor is he required to cite all the evidence to support a particular finding. In the instant case, the trial judge made some rather terse findings of fact in his recital of the events and of the relationship between the parties in the course of his lengthy reasons. On occasion he encapsuled a great deal of evidence in short form. However, the trial was a lengthy one, his reasons for judgment were lengthy and, as stated, he was not called on to cite every piece of relevant evidence to show he had considered it.
>
> . . . . .
>
> We can say in opening that we have not been persuaded that the learned trial judge overlooked or misconstrued any important or relevant evidence. There was ample evidence to support his conclusions on the facts and there is no palpable or overriding error in his assessment of the facts.

3     In this Court, LAC disclaimed any attack on the facts as found by the trial Judge, but they argued that the Court of Appeal erred in making further findings and drawing inferences from the facts so found. I accept the facts as they are set out in the judgments below, and I would respectfully add that, in my view, the Court of Appeal in no way misconstrued the purport of what it describes as the trial Judge's necessarily "rather terse findings of fact" in the course of lengthy reasons.

4     I have had the advantage of reading the reasons of my colleague, Justice Sopinka. He has given a general statement of the facts as well as the judicial history of the case, and I shall refrain from doing so. I should immediately underline, however, that while I am content to accept this statement as a general outline, it will become obvious that I, at times, take a very different view of a number of salient facts and the interpretation that can properly be put upon them, in particular as they impinge on the nature, scope and effect of the breach of confidence alleged to have been committed by LAC against Corona.

5     It is convenient to set forth any conclusions at the outset. I agree with Sopinka J. that LAC misused confidential information confided to it by Corona in breach of a duty of confidence. With respect, however, I do not agree with him about the nature and scope of that duty. Nor do I agree that in the circumstances of this case it is appropriate for this Court to substitute an award of damages for the constructive trust imposed by the Courts below. Moreover, while it is not strictly necessary for the disposition of the case, I have a conception of fiduciary duties different from that of my colleague, and I would hold that a fiduciary duty, albeit of limited scope, arose in this case. In the result, I would dismiss the appeal.

**The Issues**

6     Three issues must be addressed:

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

7      1. What was the nature of the duty of confidence that was breached by LAC?

8      2. Does the existence of the duty of confidence, alone or in conjunction with the other facts as found below, give rise to any fiduciary obligation or relationship? If so, what is the nature of that obligation or relation?

9      3. Is a constructive trust an available remedy for a breach of confidence as well as for breach of a fiduciary duty, and if so, should this Court interfere with the lower Courts' imposition of that remedy?

**Breach of Confidence**

10      I can deal quite briefly with the breach of confidence issue. I have already indicated that LAC breached a duty of confidence owed to Corona. The test for whether there has been a breach of confidence is not seriously disputed by the parties. It consists in establishing three elements: that the information conveyed was confidential, that it was communicated in confidence, and that it was misused by the party to whom it was communicated. In *Coco v. A.N. Clark (Engineers) Ltd.*, [1969] R.P.C. 41 (Ch.), Megarry J. (as he then was) put it as follows (p. 47):

> In my judgment, three elements are normally required if, apart from contract, a case of breach of confidence is to succeed. First, the information itself, in the words of Lord Greene, M.R. in the *Saltman* case on page 215, must 'have the necessary quality of confidence about it.' Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorized use of that information to the detriment of the party communicating it.

This is the test applied by both the trial Judge and the Court of Appeal. Neither party contends that it is the wrong test. LAC, however, forcefully argued that the Courts below erred in their application of the test. LAC submitted that "the real issue is whether Corona proved that LAC received confidential information from it and [whether] it should have known such information was confidential".

11      Sopinka J. has set out the findings of the trial Judge on these issues, and I do not propose to repeat them. They are all supported by the evidence and adopted by the Court of Appeal. I would not interfere with them. Essentially, the trial Judge found that the three elements set forth above were met: (1) Corona had communicated information that was private and had not been published. (2) While there was no mention of confidence with respect to the site visit, there was a mutual understanding between the parties that they were working towards a joint venture and that valuable information was communicated to LAC under circumstances giving rise to an obligation of confidence. (3) LAC made use of the information in obtaining the Williams property and was not authorized by Corona to bid on that property. I agree with my colleague that the information provided by Corona was the springboard that led to the acquisition of the Williams property. I also agree that the trial Judge correctly applied the reasonable mean test. The trial Judge's conclusion that it was obvious to Sheehan, LAC's vice-president for exploration, that the information was being communicated in circumstances giving rise to an obligation of confidence, following as it did directly on a finding of credibility against Sheehan, is unassailable.

12      In general, then, there is no difference between my colleague and me that LAC committed a breach of confidence in the present case. Where we differ — and it is a critically important difference — is in the nature and scope of the breach. The precise extent of that difference can be seen by a closer examination of the findings and evidence on the third element of the test set forth above, and I will, therefore, set forth my views on this element at greater length.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

13      With respect to this aspect of the test, it is instructive to set out the trial Judge's finding in full. He said ((1986), 25 D.L.R. (4th) 504) at 542-543:

> *Has Corona established an unauthorized use of the information to the detriment of Corona?*
>
> Where the duty of confidence is breached, the confidee will not be allowed to use the information as a springboard for activities detrimental to the confider: see *Cranleigh Precision Engineering, Ltd. v. Bryant et al.*, [1964] 3 All E.R. 289 (Q.B.).
>
> Mr. Sheehan and Dr. Anhuesser testified that the information Lac acquired from Corona was of value in assessing the merits of the Williams property and Mr. Sheehan said that he made use of this information in making an offer to Mrs. Williams.
>
> Certainly Lac was not authorized by Corona to bid on the Williams property.
>
> I have already reviewed the evidence dealing with the acquisition of the Williams property by Lac and the efforts made by Corona through Mr. McKinnon and also directly to acquire the Williams property. *On a balance of probabilities I find that, but for the actions of Lac, Corona would have acquired the Williams property and therefore Lac acted to the detriment of Corona.*
>
> I conclude that Corona has established the three requirements necessary for recovery based on the doctrine of breach of confidence.

[Emphasis added.] Later in his reasons he reiterated (p. 546) that "but for the actions of Lac, Corona would probably have acquired the Williams property".

14      The Court of Appeal was of the same view. It held (p. 657, D.L.R.) that:

> the evidence also amply sustains the finding that the confidential information which LAC received from Corona was of material importance in its decision to acquire the Williams property. In this latter regard it may fairly be said that, but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property.

15      It was argued that this passage in the Court of Appeal's reasoning is a finding of fact that was not made by the trial Judge and that the record will not support. In my view, the Court of Appeal in no way extended the finding of the trial Judge. The portion of Holland J.'s reasons I have set out above was directed solely at the question of whether Corona had established an unauthorized use of the information to the detriment of Corona. He concluded that there had been an unauthorized use since LAC had not been authorized by Corona to bid on the Williams property. In other words, Corona did not consent to the use of the information by LAC for the purpose of acquiring the Williams land for LAC's own account, or, for that matter, for any purpose other than furthering negotiations to jointly explore and develop these properties. He also found that the information had been used to the detriment of Corona. When the sole question the learned trial Judge was addressing was whether LAC misused the confidential information Corona had provided to it and his sole conclusion was that "but for the actions of Lac, Corona would have acquired the Williams property *and therefore Lac acted to the detriment of Corona*" (emphasis added), I find the conclusion inescapable that the trial Judge found as a fact that but for the *confidential information received and misused*, Corona would have acquired the Williams property and that LAC was not authorized to obtain it.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126**

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

16    If, as we saw, each of the three elements of the above-cited test are made out, a claim for breach of confidence will succeed. The receipt of confidential information in circumstances of confidence establishes a duty not to use that information for any purpose other than that for which it was conveyed. If the information is used for such a purpose, and detriment to the confider results, the confider will be entitled to a remedy.

17    There was some suggestion that LAC was only restricted from using the information imparted by Corona to acquire the Williams property for its own account, and had LAC acquired the claims on behalf of both Corona and LAC, there would have been no breach of duty. This, as I have noted, seems to me to misconstrue the finding of the trial Judge. What is more, the evidence, in my view, does not support that position. While Sheehan's letter of May 19, relied on by my colleague, may have been unclear as to who should acquire the Williams property, the events on June 30 make clear to me that both LAC and Corona contemplated Corona's acquisition of the Williams claims. The trial Judge, again making a finding of creditibility against Sheehan and Allen (LAC's president), accepted the evidence of Corona's witnesses, Bell and Dragovan, that not only was the Williams property discussed at the meeting on this latter date, but that Corona's efforts to secure it were discussed and that Allen advised Corona that they had to be aggressive in pursuing a patent group such as this. LAC in no way indicated to Corona, at this time or any other, that they were also pursuing the property. Yet 3 days later, Sheehan spoke with Mrs. Williams about making a deal for her property, and on July 6, 1981, LAC's counsel and corporate secretary submitted a written bid for the 11 patented claims. It strains credulity to suggest that on June 30 either LAC or Corona contemplated that Corona had given LAC confidential information so that LAC could acquire the property on either its own behalf or on behalf of both parties jointly. Certainly Corona would not have allowed the use of the confidential information for LAC's acquisition of the property to Corona's exclusion. Had the joint acquisition of the property been an authorized use of the information, surely there would have been some discussion of LAC's efforts to that end at the June 30 meeting. Instead, LAC advised Corona to aggressively pursue the claims.

18    The evidence of LAC's president, Mr. Allen, and of the experts called on behalf of LAC also support the position that LAC was not entitled to bid on the property and that Corona could expect that LAC would not do so. Allen testified as follows, in a passage to which both Courts below attached central importance:

> If one geologist goes to another geologist and says, are you interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be — I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that they weren't, there was just some exchange of conversation or physical data, then I would say that *while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was exchanged.*

[Emphasis added.] All the experts called by LAC agreed with the tenor of this statement. The testimony of Dr. Derry is indicative. He testified as follows:

> Q. Ah, so now we have it this way: that if some — so I understand your evidence — if Sheehan knew, as apparently he does from the way you read the evidence, that Corona was intending to acquire the Williams property; correct?

> A. Yes

> Q. That, for at least some period of time, Lac is precluded from making an offer or outbidding Corona on that property?

> A. I would say early on, yes.

> Q. Yes. And that obligation or the rationale for that preclusion comes from the fact that it is recognized in the industry, is it not?

+

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

A. Yes.

Whether these statements amount to a legally enforceable custom or whether they create a fiduciary duty are separate questions, but at the very least, they show that LAC was aware that it owed some obligation to Corona to act in good faith, and that that obligation included the industry-recognized practice not to acquire the property which was being pursued by a party with which it was negotiating.

19    Corona's activity following LAC's acquisition of the property is also noteworthy. The Court of Appeal thus described it (pp. 633-634, D.L.R.):

Upon learning from Dragovan of the LAC offer to Mrs. Williams, Pezim immediately instructed his solicitor to act for Corona in the matter and Bell ordered LAC's crew engaged in the joint geochemical sampling programme to leave Corona's property. After Sheehan had learned of the termination of the geochemical study, he telephoned Bell on August 4th and was told by him that the reason for the termination was LAC's offer to Mrs. Williams. Sheehan said that he was still interested in a deal with Corona and Bell answered that he would have to discuss the matter with Pezim. On August 18th Sheehan and Pezim met in Vancouver to discuss the Corona property. The meeting was abortive. According to Pezim's evidence, and the trial judge so found, Pezim insisted that it was a condition of any deal that LAC 'give back' to Corona the Williams property. Subsequent negotiations between Sheehan and Donald Moore, a director of Corona, also failed to resolve the differences between LAC and Corona. After his meeting with Sheehan, Pezim, according to his testimony, instructed his solicitors to press on with the matter. This action was commenced on October 27, 1981, long before it was established that a producing gold mine on the Williams property was a probability.

This is certainly inconsistent with Corona having provided LAC the information so that LAC could acquire the property, whether alone or for their joint ownership.

20    This entire inquiry appears, however, to be misdirected. In establishing a breach of a duty of confidence, the relevant question to be asked is what is the confidee entitled to do with the information, and not to what use he is prohibited from putting it. Any use other than a permitted use is prohibited and amounts to a breach of duty. When information is provided in confidence, the obligation is on the confidee to show that the use to which he put the information is not a prohibited use. In *Coco v. A.N. Clark (Engineers) Ltd.*, supra, at 48, Megarry J. said this in regard to the burden on the confidee to repel a suggestion of confidence:

In particular, where information of commercial or industrial value is given on a business-like basis and with some avowed common object in mind, such as a joint venture or the manufacture of articles by one party for the other, I would regard the recipient as carrying a heavy burden if he seeks to repel a contention that he was bound by an obligation of confidence.

In my view, the same burden applies where it is shown that confidential information has been used and the user is called upon to show that such use was permitted. LAC has not discharged that burden in this case.

21    I am therefore of the view that LAC breached a duty owed to Corona by approaching Mrs. Williams with a view to acquiring her property, and by acquiring that property, whether or not LAC intended to invite Corona to participate in its subsequent exploration and development. Such a holding may mean that LAC is uniquely disabled from pursuing property in the area for a period of time, but such a result is not unacceptable. LAC had the option of either pursuing a relationship with Corona in which Corona would disclose confidential information to LAC so that LAC and Corona could negotiate a joint venture for the exploration and development of the area, or LAC could, on the basis of publicly available information, have

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

pursued property in the area on its own behalf. LAC, however, is not entitled to the best of both worlds.

22    In this regard, the case can be distinguished from *Coco v. A.N. Clark (Engineers) Ltd.*, in that here the confidential information led to the acquisition of a specific, unique asset. Imposing a disability on a party in possession of confidential information from participating in a market in which there is room for more than one participant may be unreasonable, such as where the information relates to a manufacturing process or a design detail. In such cases, it may be that the obligation on the confidee is not to use the confidential information in its possession without paying compensation for it or sharing the benefit derived from it. Where, however, as in the present case, there is only one property from which LAC is being excluded, and there is only one property that Corona was seeking, the duty of confidence is a duty not to use the information. The fact that LAC is precluded from pursuing the Williams property does not impose an unreasonable restriction on LAC. Rather, it does the opposite by encouraging LAC to negotiate in good faith for the joint development of the property.

**Fiduciary Obligation**

23    Having established that LAC breached a duty of confidence owed to Corona, the existence of a fiduciary relationship is only relevant if the remedies for a breach of a fiduciary obligation differ from those available for a breach of confidence. In my view, the remedies available to one head of claim are available to the other, so that provided a constructive trust is an appropriate remedy for the breach of confidence in this case, finding a fiduciary duty is not strictly necessary. In my view, regardless of the basis of liability, a constructive trust is the only just remedy in this case. Nonetheless, in light of the argument, I think it appropriate to consider whether a fiduciary relationship exists in the circumstances here.

24    There are few legal concepts more frequently invoked but less conceptually certain than that of the fiduciary relationship. In specific circumstances and in specific relationships, courts have no difficulty in imposing fiduciary obligations, but at a more fundamental level, the principle on which that obligation is based is unclear. Indeed, the term "fiduciary" has been described as "one of the most ill-defined, if not altogether misleading terms in our law"; see P.D. Finn, *Fiduciary Obligations* (1977), at 1. It has been said that the fiduciary relationship is "a concept in search of a principle"; see Sir Anthony Mason, "Themes and Prospects" in P.D. Finn, *Essays in Equity* (1985), at 246. Some have suggested that the principles governing fiduciary obligations may indeed be undefinable (D.R. Klinck, "The Rise of the 'Remedial' Fiduciary Relationship: A Comment on *International Corona Resources Ltd. v. Lac Minerals Ltd.*" (1988), 33 *McGill Law Journal* 600 at 603), while others have doubted whether there can be any "universal, all-purpose definition of the fiduciary relationship" (see *Hospital Products Ltd. v. United States Surgical Corp.* (1984), 55 A.L.R. 417, 432; R.P. Austin, "Commerce and Equity — Fiduciary Duty and Constructive Trust" (1986), 6 O.J.L.S. 444, 445-446). The challenge posed by these criticisms has been taken up by Courts and academics convinced of the view that underlying the divergent categories of fiduciary relationships and obligations lies some unifying theme; see *Frame v. Smith*, [1987] 2 S.C.R. 99 at 134, 9 R.F.L. (3d) 225, 42 C.C.L.T. 1, 78 N.R. 40, 23 O.A.C. 84, 42 D.L.R. (4th) 81, [1988] 1 C.N.L.R. 152 per Wilson J.; Ernest J. Weinrib, "The Fiduciary Obligation" (1975), 25 U.T.L.J. 1; P.D. Finn, "The Fiduciary Principle" (1988), to be published by Carswell in T. Youdan, ed., *Equity, Fiduciaries and Trusts* (1989); J.C. Shepherd, "Towards a Unified Concept of Fiduciary Relationships" (1981), 97 L.Q.R. 51; T. Frankel, "Fiduciary Law" (1983), 71 *California Law Review* 795; J.R.M. Gautreau, "Demystifying the Fiduciary Mystique" (1989), 68 C.B.R. 1. This case presents a further opportunity to consider such a principle.

25    In *Guerin v. R.*, [1984] 2 S.C.R. 335, 59 B.C.L.R. 301, 20 E.T.R. 6, 36 R.P.R. 1, [1984] 6 W.W.R. 481, [1985] 1 C.N.L.R. 120, 13 D.L.R. (4th) 321, 55 N.R. 161, Dickson J. (as he then was) discussed the nature of fiduciary obligations in the following passage, at 383-384 [S.C.R.]:

The concept of fiduciary obligation originated long ago in the notion of breach of confidence, one of the original heads of jurisdiction in Chancery.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

. . . . .

Professor Ernest Weinrib maintains in his article *The Fiduciary Obligation* (1975), 25 U.T.L.J. 1, at p. 7, that 'the hallmark of a fiduciary relation is that the relative legal positions are such that one party is at the mercy of the other's discretion.' Earlier, at p. 4, he puts the point in the following way:

> [Where there is a fiduciary obligation] there is a relation in which the principal's interests can be affected by, and are therefore dependent on, the manner in which the fiduciary uses the discretion which has been delegated to him. The fiduciary obligation is the law's blunt tool for the control of this discretion.

> *I make no comment upon whether this description is broad enough to embrace all fiduciary obligations*. I do agree, however, that where by statute, agreement, or perhaps by unilateral undertaking, one party has an obligation to act for the benefit of another, and that obligation carries with it a discretionary power, the party thus empowered becomes a fiduciary. Equity will then supervise the relationship by holding him to the fiduciary's strict standard of conduct.

> It is sometimes said that the nature of fiduciary relationships is both established and exhausted by the standard categories of agent, trustee, partner, director, and the like. I do not agree. It is the nature of the relationship, not the specific category of actor involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence, should not be considered closed.

[Emphasis added.]

26      Wilson J. had occasion to consider the extension of fiduciary obligations to new categories of relationships in *Frame v. Smith*, supra. She found (p. 136, S.C.R.) that:

> there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not *the imposition of a fiduciary obligation on a new relationship would be appropriate and consistent*.

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:

> (1) The fiduciary has scope for the exercise of some discretion or power.

> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.

> (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

[Emphasis added.]

27      It will be recalled that the issue in that case, though not originally raised by the parties but argued at the request of the Court, was whether the relationship of a custodial parent to a non-custodial parent could be considered a category to which fiduciary obligations could attach. Wilson J. would have been willing to extend the categories of fiduciary relations to include such parties. While the majority in that case did not consider it necessary to address the bases on which fiduciary obligations arise (essentially because it considered the statute there to constitute a discrete code), as will be seen from my reasons below, I find Wilson J.'s approach helpful.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

28    Much of the confusion surrounding the term "fiduciary" stems, in my view, from its undifferentiated use in at least three distinct ways. The first is as used by Wilson J. in *Frame v. Smith*, supra. There the issue was whether a certain class of relationship, custodial and non-custodial parents, were a category, analogous to directors and corporations, solicitors and clients, trustees and beneficiaries, and agents and principals, the existence of which relationship would give rise to fiduciary obligations. The focus is on the identification of relationships in which, because of their inherent purpose or their presumed factual or legal incidents, the Courts will impose a fiduciary obligation on one party to act or refrain from acting in a certain way. The obligation imposed may vary in its specific substance depending on the relationship, though compendiously it can be described as the fiduciary duty of loyalty and will most often include the avoidance of a conflict of duty and interest and a duty not to profit at the expense of the beneficiary. The presumption that a fiduciary obligation will be owed in the context of such a relationship is not irrebuttable, but a strong presumption will exist that such an obligation is present. Further, not every legal claim arising out of a relationship with fiduciary incidents will give rise to a claim for breach of fiduciary duty. This was made clear by Southin J. (as she then was) in *Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 at 362 (S.C.). She stated:

> Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word 'fiduciary' is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But 'fiduciary' comes from the Latin "fiducia' meaning 'trust'. Thus, the adjective, 'fiduciary' means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words.

It is only in relation to breaches of the specific obligations imposed because the relationship is one characterized as fiduciary that a claim for breach of fiduciary duty can be founded. In determining whether the categories of relationships which should be presumed to give rise to fiduciary obligations should be extended, the rough and ready guide adopted by Wilson J. is a useful tool for that evaluation. This class of fiduciary obligation need not be considered further, as Corona's contention is not that "parties negotiating towards a joint-venture" constitute a category of relationship, proof of which will give rise to a presumption of fiduciary obligation, but rather that a fiduciary relationship arises out of the particular circumstances of this case.

29    This brings me to the second usage of fiduciary, one I think more apt to the present case. The imposition of fiduciary obligations is not limited to those relationships in which a presumption of such an obligation arises. Rather, a fiduciary obligation can arise as a matter of fact out of the specific circumstances of a relationship. As such it can arise between parties in a relationship in which fiduciary obligations would not normally be expected. I agree with this comment of Professor Finn in "The Fiduciary Principle", supra at 64:

> What must be shown, in the writer's view, is that the actual circumstances of a relationship are such that one party is entitled to expect that the other will act in his interests and for the purposes of the relationship. Ascendancy, influence, vulnerability, trust, confidence or dependence doubtless will be of importance in making this out. But they will be important only to the extent that they evidence a relationship suggesting that entitlement. The critical matter in the end is the role that the alleged fiduciary has, or should be taken to have, in the relationship. It must so implicate that party in the other's affairs or so align him with the protection or advancement of that other's interests that foundation exists for the 'fiduciary expectation'. Such a role may generate an actual expectation that that other's interests are being served. This is commonly so with lawyers and investment advisers. But equally the expectation may be a judicially prescribed one because the law itself ordains it to be that other's entitlement. And this may be so either because that party should, given the actual circumstances of the relationship, be accorded that entitlement irrespective of whether he has adverted to the matter, or because the purpose of the relationship itself is perceived to be such that to allow disloyalty in it would be to jeopardise its perceived social utility.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

It is in this sense, then, that the existence of a fiduciary obligation can be said to be a question of fact to be determined by examining the specific facts and circumstances surrounding each relationship; see D.W.M. Waters, *The Law of Trusts in Canada*, 2d ed. (Toronto: Carswell, 1984), at 405. If the facts give rise to a fiduciary obligation, a breach of the duties thereby imposed will give rise to a claim for equitable relief.

30     The third sense in which the term "fiduciary" is used is markedly different from the two usages discussed above. It requires examination here because, as I will endeavour to explain, it gives a misleading colouration to the fiduciary concept. This third usage of "fiduciary" stems, it seems, from a perception of remedial inflexibility in equity. Courts have resorted to fiduciary language because of the view that certain remedies, deemed appropriate in the circumstances, would not be available unless a fiduciary relationship was present. In this sense, the label fiduciary imposes no obligations, but rather is merely instrumental or facilitative in achieving what appears to be the appropriate result. The clearest example of this is the judgment of Goulding J. in *Chase Manhattan Bank v. Israel-British Bank*, [1981] Ch. 105. There the plaintiffs had transferred some $2,000,000 to the defendant's account at a third bank. Due to a clerical error, a second payment in the same amount was made later that day. Instructions to stop the payment were made, but not quickly enough. The defendant bank was put into receivership shortly after the payment made in error was received, and as it was insolvent, the plaintiff could only recover the full amount of its money if it could trace it into some identifiable asset. Responding to the argument that, even if the funds could be identified, they could not have be recovered since there was no fiduciary relationship, Goulding J. made the following comments, at 118-119, which it is worth setting out extensively:

The facts and decisions in *Sinclair v. Brougham*, [1914] A.C. 398 and in *In re Diplock*, [1948] Ch. 465 are well known and I shall not take time to recite them. I summarise my view of the *Diplock* judgment as follows: (1) The Court of Appeal's interpretation of *Sinclair v. Brougham* was an essential part of their decision and is binding on me. (2) The court thought that the majority of the House of Lords in *Sinclair v. Brougham* had not accepted Lord Dunedin's opinion in that case, and themselves rejected it. (3) *The court (as stated in Snell, loc. cit.) held that an initial fiduciary relationship is a necessary foundation of the equitable right of tracing. (4) They also held that the relationship between the building society directors and depositors in Sinclair v. Brougham was a sufficient fiduciary relationship for the purpose:* [1948] Ch. 465, 529, 540. *The latter passage reads, at p. 540: 'A sufficient fiduciary relationship was found to exist between the depositors and the directors by reason of the fact that the purposes for which the depositors had handed their money to the directors were by law incapable of fulfillment.'* It is founded, I think, on the observations of Lord Parker of Waddington at [1914] A.C. 398, 441.

*This fourth point shows that the fund to be traced need not* (as was the case in *In Re Diplock* itself) *have been the subject of fiduciary obligations before it got into the wrong hands. It is enough that, as in* Sinclair v. Brougham [1914] A.C. 398, *the payment into wrong hands itself gave rise to a fiduciary relationship.* The same point also throws considerable doubt on Mr. Stubbs's submission that the necessary fiduciary relationship must originate in a consensual transaction. It was not the intention of the depositors or of the directors in *Sinclair v. Brougham* to create any relationship at all between the depositors and the directors as principals. Their object, which unfortunately disregarded the statutory limitations of the building society's powers, was to establish contractual relationships between the depositors and the society. *In the circumstances, however, the depositors retained an equitable property in the funds they parted with, and fiduciary relationships arose between them and the directors. In the same way, I would suppose a person who pays money to another under a factual mistake retains an equitable property in it and the conscience of that other is subjected to a fiduciary duty to respect his proprietary right.*

[Emphasis added.] It is clear that if a fiduciary relationship was necessary for the plaintiff to be entitled to a proprietary tracing remedy, then such a relationship would be found. It is equally clear that this relationship has nothing to do with the imposition of obligations traditionally associated with fiduciaries. For another example, see *Goodbody v. Bank of Montreal* (1974), 4 O.R. (2d) 147, 47 D.L.R. (3d) 335 at 339 (H.C.), where a thief was considered to be a fiduciary so as to ground an equitable tracing order.

31     Professor Birks has described this approach as follows (Peter Birks, "Restitutionary damages for breach of contract:

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

*Snepp* and the fusion of law and equity" (1987), *Lloyd's Maritime and Commercial Law Quarterly* 421 at p. 436):

> This approach moves the characterization of a relationship as fiduciary from the reasoning which justifies a conclusion to the conclusion itself: a relationship becomes fiduciary because a legal consequence traditionally associated with that label is generated by the facts in question.

Professor Weinrib has criticized it because ("The Fiduciary Obligation", supra, at 5):

> This definition in terms of the effect produced by the finding of a fiduciary relation begs the question in an obvious way: one cannot both define the relation by the remedy and use the relation as a triggering device for remedy.

Megarry V-C commented on this approach to identifying a fiduciary obligation in *Tito v. Waddell (No. 2)*, [1977] Ch. 106, [1977] 3 All E.R. 129. In that case, the argument made was that [at 231-232, E.R.]:

> A was in a fiduciary position towards B if he was performing a special job in relation to B which affected B's property rights, at any rate if A was self-dealing. This ... could be put in two ways. First, there was a fiduciary duty if there was a job to be performed and it was performed in a self-dealing way. Alternatively, there was a fiduciary duty if there was a job to perform, and equity then imposed a duty to perform it properly if there was any self-dealing.

He rejected this position as follows, at 232 [E.R.]:

> I cannot see why the imposition of a statutory duty to perform certain functions, or the assumption of such a duty, should as a general rule impose fiduciary obligations, or even be presumed to impose any. Of course, the duty may be of such a nature as to carry with it fiduciary obligations: impose a fiduciary duty and you impose fiduciary obligations. But apart from such cases, it would be remarkable indeed if in each of the manifold cases in which statute imposes a duty, or imposes a duty relating to property, the person on whom the duty is imposed was thereby to be put into a fiduciary relationship with those interested in the property, or towards whom the duty could be said to be owed.
>
> . . . . .
>
> Furthermore, I cannot see that coupling the job to be performed with self-dealing in the performance of it makes any difference. If there is a fiduciary duty, the equitable rules about self-dealing apply: but self-dealing does not impose the duty. Equity bases its rules about self-dealing on some pre-existing fiduciary duty: it is a disregard of this pre-existing duty that subjects the self-dealer to the consequences of the self-dealing rules. I do not think that one can take a person who is subject to no pre-existing fiduciary duty and then say that because he self-deals he is thereupon subjected to a fiduciary duty.

32    Megarry V-C held in that case that there was no fiduciary relationship and so no breach of the fiduciary obligations that would have been imposed by finding such a relationship. Self-dealing would only have been a breach of fiduciary obligation if a fiduciary obligation existed. Megarry V-C rejected the notion that one can argue from a conclusion (there has been self dealing) to a duty (therefore there is a fiduciary relationship) and then back to the conclusion (therefore there has been a breach of duty).

33    In my view, this third use of the term fiduciary, used as a conclusion to justify a result, reads equity backwards. It is a misuse of the term. It will only be eliminated, however, if the Courts give explicit recognition to the existence of a range of remedies, including the constructive trust, available on a principled basis even though outside the context of a fiduciary relationship.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

34    To recapitulate, the first class of fiduciary is not in issue in this appeal. It is not contended that all parties negotiating towards a joint venture are a class to which fiduciary obligations should presumptively attach. As will be clear from my discussion of the third usage of the term fiduciary, I am not prepared to hold that because a constructive trust is the appropriate remedy a fiduciary label therefore attaches, though I will deal later with why, even if the relationship is not fiduciary in any sense, a constructive trust may nonetheless be appropriate. The issue that remains for immediate discussion is whether the facts in this case, as found by the Courts below, support the imposition of a fiduciary obligation within the second category discussed above, and whether, acting as it did, LAC was in breach of the obligations thereby imposed.

35    In addressing this issue, some detailed consideration must be given to the analysis made by the Court of Appeal. Before that Court, LAC was attacking the trial Judge's conclusion that LAC was in breach of its fiduciary duty to act fairly and not to the detriment of Corona by acquiring the Williams property. I note that, in their discussions of this breach, neither Court below spoke of LAC's duty not to acquire the property for its own account to the exclusion of Corona, but rather spoke of a duty not to acquire the property *at all*. For the reasons I have outlined in my discussion of breach of confidence, and for reasons which I will more fully outline later, I am of the view that the Courts below were correct in their description of the duty owed.

36    The Court of Appeal agreed with the submission made by LAC that the law of fiduciary relations does not ordinarily apply to parties involved in commercial negotiations. Such negotiations are normally conducted at arm's length. They held, however, that in certain circumstances fiduciary obligations can arise, and it is a question of fact in each case whether the relationship of the parties, one to the other, is such as to create a fiduciary relationship. *United Dominions Corp. v. Brian Pty. Ltd.* (1985), 60 A.L.R. 741, 59 A.L.J.R. 676  (Aus. H.C.), was given as an example of where such an obligation might arise. In terms of the scheme I have outlined above, the Court of Appeal accepted that the first usage of "fiduciary" was not in issue, but that the second must be more closely examined.

37    Before undertaking that examination, the Court made the following comments on the relationship between fiduciary law and the law of confidential information, at 638-639 [D.L.R.]:

the trial judge found that Corona imparted confidential information to LAC during the course of their negotiations. He recognized that the law regarding obligations imposed by the delivery of confidential information is distinct from the law imposing fiduciary duties and that it does not depend upon any special relationship between the parties. In *Canadian Aero Service Ltd. v. O'Malley* ... [1974] S.C.R. 592 at p. 616, Laskin J. said for the court:

The fact that breach of confidence or violation of copyright may itself afford a ground of relief does not make either one a necessary ingredient of a successful claim for breach of fiduciary duty.

*That statement recognizes that the courts will provide relief for a breach of confidence in proper circumstances where there is no fiduciary relationship between the parties. On the other hand, a fiduciary relationship between parties may co-exist with a right of one of the parties to an obligation of confidence with respect to information of a confidential nature given by that party to the other party. It is indeed difficult to conceive of any fiduciary relationship where the right to confidentiality would not exist with respect to such information.*

In the case at bar, the trial judge concluded that the legal principles regarding the obligations imposed by the delivery of confidential information and the obligations imposed as a result of the existence of a fiduciary relationship are intertwined. We are of the opinion that he was correct in this conclusion and that the law of fiduciary relationships can apply to parties involved, at least initially, in arm's length commercial discussions.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

[Emphasis added.]

38     The Court of Appeal then discussed the several factors which in its view supported the finding of a fiduciary obligation. In doing so, they were specifically responding to LAC's submission that the correct approach is to ask "whether the relationship by law, custom or agreement is such that one party is obligated to demonstrate loyalty and avoid taking advantage for himself". In light of this submission to the Court below, I must say that it lies ill in the mouth of LAC to now assert before this Court that the custom or usage found by the Courts below cannot as a matter of law give rise to fiduciary obligations. Were I not of the view that that submission is in error, I incline to think that LAC may be estopped by its conduct below from raising it in this Court.

39     The Court of Appeal relied on four main factors in upholding the imposition of the fiduciary obligation. First, LAC was a senior mining company and Corona a junior, and LAC had sought out Corona in order to obtain information and to discuss a joint venture. Second, the parties had arrived at a mutual understanding of how each would conduct itself in the course of their negotiations, were working towards a common objective and had in fact taken preliminary steps in the contemplated joint exploration and development venture. Third, Corona disclosed confidential information to LAC and LAC expected to receive that confidential information in the course of the negotiations. Finally, there was established by LAC's own evidence a custom, practice or usage in the mining industry that parties in serious negotiation to a joint venture not act to the detriment of the other, particularly with respect to the confidential information disclosed, and the parties had reached the stage in negotiations where such an industry practice applied. In all these circumstances, the Court of Appeal found that it was just and proper that a fiduciary relationship be found, and a legal obligation not to benefit at the expense of the other from information received in negotiations imposed. By acquiring the Williams property, LAC had breached this obligation.

40     While it is almost trite to say that a fiduciary relationship does not normally arise between arm's length commercial parties, I am of the view that the Courts below correctly found a fiduciary obligation in the circumstances of this case and correctly found LAC to be in breach of it. I turn then to a consideration of the factors which in this case support the imposition of that duty. These can conveniently be grouped under three headings: (1) trust and confidence, (2) industry practice and (3) vulnerability. As will be seen these factors overlap to some extent, but considered as a whole they support the proposition that Corona could reasonably expect LAC to not act to Corona's detriment by acquiring the Williams land, and that Corona's expectation should be legally protected.

**Trust and Confidence**

41     The relationship of trust and confidence that developed between Corona and LAC is a factor worthy of significant weight in determining if a fiduciary obligation existed between the parties. The existence of such a bond plays an important role in determining whether one party could reasonably expect the other to act or refrain from acting against the interests of the former. That said, the law of confidence and the law relating to fiduciary obligations are not coextensive. They are not, however, completely distinct. Indeed, while there may be some dispute as to the jurisdictional basis of the law of confidence, it is clear that equity is one source of jurisdiction: see *Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd.* (1948), 65 R.P.C. 203, [1963] 3 All E.R. 413n (C.A.). In *Guerin v. R.*, supra, Dickson J. noted that the law of fiduciary obligations had its origin in the law of confidence. Professor Finn thought it was settled that confidential information, whether classified as property or not, will attract fiduciary law's protection provided the circumstances are such as to attract a duty of confidence: "The Fiduciary Principle", supra, at 50. I agree with the view of both Courts below that the law of confidence and the law of fiduciary obligations, while distinct, are intertwined.

42     In a claim for breach of confidence, Gurry tells us (*Breach of Confidence* (1984), at 161-162):

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

the court's concern is for the protection of a confidence which *has been created* by the disclosure of confidential information by the confider to the confidant. The court's attention is thus focused on the protection of the confidential information because it has been the medium for the creation of a relationship of confidence; its attention is *not* focused on the information as a medium by which a *pre-existing* duty is breached.

However, the facts giving rise to an obligation of confidence are also of considerable importance in the creation of a fiduciary obligation. If information is imparted in circumstances of confidence, and if the information is known to be confidential, it cannot be denied that the expectations of the parties may be affected so that one party reasonably anticipates that the other will act or refrain from acting in a certain way. A claim for breach of confidence will only be made out, however, when it is shown that the confidee has misused the information to the detriment of the confidor. Fiduciary law, being concerned with the exaction of a duty of loyalty, does not require that harm in the particular case be shown to have resulted.

43    There are other distinctions between the law of fiduciary obligations and that of confidence which need not be pursued further here, but among them I simply note that unlike fiduciary obligations, duties of confidence can arise outside a direct relationship, where for example a third party has received confidential information from a confidee in breach of the confidee's obligation to the confidor: see *Liquid Veneer Co. v. Scott* (1912), 29 R.P.C. 639 (Ch.), at 644. It would be a misuse of the term to suggest that the third party stood in a fiduciary position to the original confidor. Another difference is that breach of confidence also has a jurisdictional base at law, whereas fiduciary obligations are a solely equitable creation. Though this is becoming of less importance, these differences of origin give to the claim for breach of confidence a greater remedial flexibility than is available in fiduciary law. Remedies available from both law and equity are available in the former case, equitable remedies alone are available in the latter.

44    The Court of Appeal characterized the relationship in the present case as one of "trust and cooperation". LAC and Corona were negotiating, and on the evidence of Sheehan, negotiating in good faith, towards a joint venture or some other business relationship. It was expected during these negotiations that Corona would disclose confidential information to LAC, and Corona did so. This was in conformity with the normal and usual practice in the mining industry. The evidence accepted by both Courts below established a practice in the industry, known to LAC, that LAC would not use confidential information derived out of the negotiating relationship in a manner contrary to the interests of Corona. Holland J. found that it "must have been obvious" to Sheehan that he was receiving confidential information. In light of that finding, it should be apparent that the lowest possible significance can attach to the absence of discussions between the parties relating to confidentiality. LAC, in the view of the Court of Appeal, felt that it had some obligation to confirm areas of interest with Corona, and did so with respect to staking other property in the area. The trial Judge, noting that Corona had "agreed" to LAC staking in the area, thought that this gave rise to an "informal understanding as to how each would conduct itself in anticipation of" the conclusion of a formal business relationship. In all these circumstances, I am of the view that both parties would reasonably expect that a legal obligation would be imposed on LAC not to act in a manner contrary to Corona's interest with respect to the Williams property.

**Industry Practice**

45    Both Courts below placed considerable weight on the evidence of Allen to the effect that there was a "duty" not to act to the other party's detriment when in serious negotiations through the misuse of confidential information. For ease of reference, I set out his testimony here again:

If one geologist goes to another geologist and says, are you interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be — I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

they weren't, there was just some exchange of conversation or physical data, then I would say that while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was exchanged.

All of LAC's experts agreed with this statement. The trial Judge, in reliance on this evidence said, at 537-538:

> **The Evidence of the Experts on Liability**
>
> . . . . .
>
> *Whether the conduct of the parties, according to the experts, imposed fiduciary obligations on Lac*
>
> . . . . .
>
> I conclude, following *Cunliffe-Owen*, supra, that there is a practice in the mining industry that imposes an obligation when parties are seriously negotiating not to act to the detriment of each other.

The Court of Appeal affirmed the conclusion that Corona had established a "custom or usage" in accordance with the principle set forth in *Cunliffe-Owen v. Teather & Greenwood*, [1967] 3 All E.R. 561, [1967] 1 W.L.R. 1421 (Ch.), and that the trial Judge was correct in applying that case.

46    Undoubtedly experts on mining practice are not qualified to give evidence on whether fiduciary obligations arose between the parties, as the existence of fiduciary obligations is a question of law to be answered by the court after a consideration of all the facts and circumstances. Thus, while the term "fiduciary" was not properly used by the trial Judge in this passage, the evidence of the experts is of considerable importance in establishing standard practice in the industry from which one can determine the nature of the obligations which will be imposed by law.

47    It will be clear then, that in my view LAC's submissions relating to custom and usage were largely misdirected. The issue is not, as LAC submitted, what is "the legal effect of custom in the industry". Rather, it is what is the importance of the existence of a practice in the industry, established out of the mouth of the defendant and all its experts, in determining whether Corona could reasonably expect that LAC would act or refrain from acting against the interests of Corona. Framed thus, the evidence is of significant importance.

48    I must at this point briefly advert to the law relating to custom and usage. LAC submitted that the Court of Appeal erred in using the terms "custom" and "usage" interchangeably. "Custom" in the sense of a rule having the force of law and existing since time immemorial is not in issue in this case. Indeed, Canadian law being largely of imported origin will rarely, if ever, evince that sort of custom. Custom in Canadian law must be given a broader definition. In any event, both Courts below were not using the term in such a technical sense, as is clear from the fact that both substituted the term "practice" as a synonym. It is not necessary to decide, and I do not decide, whether a usage, properly established on the evidence, can give rise to fiduciary obligations. For these purposes I accept the definition of "usage" from *Halsbury's Laws of England*, vol. 12, 4th ed., para. 445, at 28, as follows:

> Usage may be broadly defined as a particular course of dealing or line of conduct generally adopted by persons engaged in a particular department of business life, or more fully as a particular course of dealing or line of conduct which has acquired such notoriety, that, where persons enter into contractual relationships in matters respecting the particular branch of business life where the usage is alleged to exist, those persons must be taken to have intended to follow that course of dealing or line of conduct, unless they have expressly or impliedly stipulated to the contrary.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

49    I should mention that I have the greatest hesitation in saying that the only circumstances in which a legal obligation can arise out of a notorious business practice is when a contract results. The cases cited against implying terms in a contract have no relevance to negotiating practices. When the parties have reduced their understandings to writing, it is obviously the proper course for Courts to be extremely circumspect in adding to the bargain they have set down (see, for example, *Burns v. Kelly Peters & Associates Ltd.*, 41 C.C.L.T. 257, 16 B.C.L.R. (2d) 1, [1987] 6 W.W.R. 1, [1987] I.L.R. 1-2246, 41 D.L.R. (4th) 577 (C.A.), per Lambert J.A., at 601 [D.L.R.]; *Nelson v. Dahl* (1879), 12 Ch. D. 568, 28 W.R. 57 (C.A.), aff'd (1881), 6 App. Cas. 38, [1881-85] All E.R. Rep. 572, 29 W.R. 543 (H.L.); *Norwich Winterthur Insurance (Insurance) Ltd. v. Can. Stan. Industries of Australia Pty. Ltd.*, [1983] 1 N.S.W.C.R. 461 (C.A.). In any event, it is not, in my opinion, necessary to determine if the practice established by the evidence of LAC's executives and experts amounts to a legal usage. It is clear to me that the practice in the industry is so well known that at the very least Corona could reasonably expect LAC to abide by it. There is absolutely no substance to the submission of LAC that this practice is vague or uncertain. It is premised on the disclosure of confidential information in the context of serious negotiations. I do not find it necessary to define "serious", and will not interfere with the concurrent findings of the Courts below. The industry practice therefore, while not conclusive, is entitled to significant weight in determining the reasonable expectations of Corona, and for that matter of LAC regarding how the latter should behave.

**Vulnerability**

50    As I indicated below, vulnerability is not, in my view, a necessary ingredient in every fiduciary relationship. It will of course often be present, and when it is found it is an additional circumstance that must be considered in determining if the facts give rise to a fiduciary obligation. I agree with the proposition put forward by Wilson J. that when determining if new classes of relationship should be taken to give rise to fiduciary obligations then the vulnerability of the class of beneficiaries of the obligation is a relevant consideration. Wilson J. put it as follows in *Frame v. Smith*, at 137-138 [S.C.R.]:

> The third characteristic of relationships in which a fiduciary duty has been imposed is the element of vulnerability. This vulnerability arises from the inability of the beneficiary (despite his or her best efforts) to prevent the injurious exercise of the power or discretion combined with the grave inadequacy or absence of other legal or practical remedies to redress the wrongful exercise of the discretion or power. Because of the requirement of vulnerability of the beneficiary at the hands of the fiduciary, fiduciary obligations are seldom present in the dealings of experienced businessmen of similar bargaining strength acting at arm's length: see, for example, *Jirna Ltd. v. Mister Donut of Canada Ltd.* (1971), 22 D.L.R. (3d) 639 (Ont. C.A.), aff'd [1975] 1 S.C.R. 2. The law takes the position that such individuals are perfectly capable of agreeing as to the scope of the discretion or power to be exercised, i.e., any 'vulnerability' could have been prevented through the more prudent exercise of their bargaining power and the remedies for the wrongful exercise or abuse of that discretion or power, namely damages, are adequate in such a case.

However, as I indicated, this case does not require a new class of relationships to be identified, but requires instead an examination of the specific facts of this case.

51    The Oxford English Dictionary, 2nd ed., v. XIX, at 786, defines "vulnerable" as follows:

> that may be wounded; susceptible of receiving wounds or physical injury ... open to attack or injury of a non-physical nature; esp. offering an opening to the attacks of raillery, criticism, calumny, etc.

Persons are vulnerable if they are susceptible to harm, or open to injury. They are vulnerable at the hands of a fiduciary if the fiduciary is the one who can inflict that harm. It is clear, however, that fiduciary obligations can be breached without harm being inflicted on the beneficiary. *Keech v. Sandford* (1726), Sel. Cas. T. King 61, 25 E.R. 223, is the clearest example. In that case a fiduciary duty was breached even though the beneficiary suffered no harm and indeed could not have benefitted

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

from the opportunity the fiduciary pursued. Beneficiaries of trusts, however, are a class that is susceptible to harm, and are therefore protected by the fiduciary regime. Not only is actual harm not necessary, susceptibility to harm will not be present in many cases. Each director of General Motors owes a fiduciary duty to that company, but one can seriously question whether General Motors is vulnerable to the actions of each and every director. Nonetheless, the fiduciary obligation is owed because, as a class, corporations are susceptible to harm from the actions of their directors.

52      I cannot therefore agree with my colleague, Sopinka J., that vulnerability or its absence will conclude the question of fiduciary obligation. As I indicated above, the issue should be whether, having regard to all the facts and circumstances, one party stands in relation to another such that it could reasonably be expected that that other would act or refrain from acting in a way contrary to the interests of that other. In any event, I would have thought it beyond argument that on the facts of this case Corona was vulnerable to LAC.

53      The argument to the contrary seems to be based on two propositions. First, Corona did not give up to LAC any power or discretion to affect its interests. Second, Corona could have protected itself by a confidentiality agreement, and the Court should not interfere if the parties could have, but did not in fact protect themselves. In my view there is no substance to either of these arguments.

54      The first is rebutted by the facts. LAC would not have acquired the property but for the information received from Corona. LAC in fact acquired the property. In doing so it affected Corona's interests. All power and discretion mean in this context is the ability to cause harm. Clearly that is present in this case. LAC acquired a power or ability to harm Corona by obtaining the Williams property. Corona gave it that power by giving up information about the property and about Corona's intentions. Having regard to the well-established practice in the mining industry, Corona would have had no expectation that LAC would use this information to the detriment of Corona.

55      This leads to the second point. This Court should not deny the existence of a fiduciary obligation simply because the parties could have by means of a confidentiality agreement regulated their affairs. That, it seems to me, is an unacceptable proposition, particularly on the facts of this case. The concurrent findings below are that Sheehan was aware the information he was receiving was confidential information and that it was being received in circumstances of confidence. It is clear that a claim for breach of confidence is then available if the information is misused. Why one would then go and enter into a confidentiality agreement simply confirming what each party knows escapes me. I cannot understand why a claim for breach of confidence is available absent a confidentiality agreement, but a claim for breach of fiduciary duty is not. The fact that the parties could have concluded a contract to cover the situation but did not in fact do so does not, in my opinion, determine that matter. Many claims in tort could be avoided through more prudent negotiation of a contract, but courts do not deny tort liability; see Gautreau, supra, at 11; *Central Trust v. Rafuse*, [1986] 2 S.C.R. 147, 37 C.C.L.T. 117, 42 R.P.R. 161, 34 B.L.R. 187, 31 D.L.R. (4th) 481, 75 N.S.R. (2d) 109, 186 A.P.R. 109, 69 N.R. 321, [1986] R.R.A. 527, var'd [1988] 1 S.C.R. 1206, 44 C.C.L.T. xxxiv. The existence of an alternative procedure is only relevant in my mind if the parties would realistically have been expected to contemplate it as an alternative. It is useful here to once again refer to the evidence of LAC's experts. Dr. Robertson testified as follows:

Q. Do large companies generally or typically make use of such agreements [confidentiality agreements]?

A. *They are not common*. In the last five years they have become increasingly so. Even prospectors now ask large companies for confidentiality agreements.

This whole process is data dissemination. They rarely have anything so highly confidential that a large company will trade away its right to do what it wants to do in return for, in essence, very little back.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

[Emphasis added.] Dr. Derry testified to similar effect:

> Q. In 1981, in your view, how could Corona have protected itself if it both wanted to acquire more ground and it also wanted to allow the visit by Lac Minerals?
>
> A. *It would be unusual*, but I think it would have to ask the visitor to make some assurance, probably a written assurance, that he would not acquire ground or conflict with the interest of the owning company.

[Emphasis added.] The present litigation is, according to the evidence of Corona's witness Dr. Bragg, one of the reasons that confidentiality agreements are being used with increasing frequency. Where it is not established that the entering of confidentiality agreements is a common, usual or expected course of action, this Court should not presume such a procedure, particularly when the law of fiduciary obligations can operate to protect the reasonable expectations of the parties. There is no reason to clutter normal business practice by requiring a contract.

56     In this case the vulnerability of Corona at LAC's hand is clearly demonstrated by the circumstances in which LAC acquired the Williams property. Even though the offer from Corona would have paid to Mrs. Williams $250,000 within 3 years plus a 3 per cent net smelter return, Mrs. Williams accepted the offer from LAC which paid only half that return. It is nothing short of fiction to suggest that vis-à-vis third parties or each other LAC and Corona stood on an equal footing. Corona was a junior mining company which needed to raise funds in order to finance the development of its property. This is why Corona welcomed the overture of LAC in the first place. LAC was a senior mining company that had the ability to provide those funds. Indeed LAC used this as a selling point to Mrs. Williams when it advised her that it was "an exploration and development company with four gold mines in production and had been in the mining and exploration business for decades".

57     I conclude therefore that Corona was vulnerable to LAC. The fact that these are commercial parties may be a factor in determining what the reasonable expectations of the parties are, and thus it may be a rare occasion that vulnerability is found between such parties. It is, however, shown to exist in this case and is a factor deserving of considerable weight in the identification of a fiduciary obligation.

**Conclusion on Fiduciary Obligations**

58     Taking these factors together, I am of the view that the Courts below did not err in finding that a fiduciary obligation existed and that it was breached. LAC urged this Court not to accept this finding, warning that imposing a fiduciary relationship in a case such as this would give rise to the greatest uncertainty in commercial law, and result in the determination of the rules of commercial conduct on the basis of ad hoc moral judgments rather than on the basis of established principles of commercial law.

59     I cannot accept either of these submissions. Certainty in commercial law is, no doubt, an important value, but it is not the only value. As Mr. Justice Grange has noted ("Good Faith in Commercial Transactions" (1985), *L.S.U.C. Special Lectures* 69), at 70:

> There are many limitations on the freedom of contract both in the common law and by statute. Every one of them carries within itself the seeds of debate as to its meaning or at least its applicability to a particular set of facts.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

In any event, it is difficult to see how giving legal recognition to the parties' expectations will throw commercial law into turmoil.

60      Commercial relationships will more rarely involve fiduciary obligations. That is not because they are immune from them, but because in most cases, they would not be appropriately imposed. I agree with this comment of Mason J. in *Hospital Products Ltd. v. United States Surgical Corp.*, supra, at 455:

> There has been an understandable reluctance to subject commercial transactions to the equitable doctrine of constructive trust and constructive notice. But it is altogether too simplistic, if not superficial, to suggest that commercial transactions stand outside the fiduciary regime as though in some way commercial transactions do not lend themselves to the creation of a relationship in which one person comes under an obligation to act in the interests of another. The fact that in the great majority of commercial transactions the parties stand at arms' length does not enable us to make a generalization that is universally true in relation to every commercial transaction. In truth, every such transaction must be examined on its merits with a view to ascertaining whether it manifests the characteristics of a fiduciary relationship.

61      A fiduciary relationship is not precluded by the fact that the parties were involved in pre-contractual negotiations. That was made clear in the *United Dominions Corp.* case, supra, where the majority held, at 680 [A.L.J.R.], that:

> A fiduciary relationship can arise and fiduciary duties can exist between parties who have not reached, and who may never reach, agreement upon the consensual terms which are to govern the arrangement between them.

The fact that the relationship between the parties in that case was more advanced than in the case at bar does not affect the value of the conclusion. See also *Fraser Edmunston Pty. Ltd. v. A.G.T. (Qld) Pty. Ltd.* (1986), Queensland S.C. 17. It is a question to be determined on the facts whether the parties have reached a stage in their relationship where their expectations should be protected. In this case the facts support the existence of a fiduciary obligation not to act to the detriment of Corona's interest by acquiring the Williams property by using confidential information acquired during the negotiation process.

62      The argument on morality is similarly misplaced. It is simply not the case that business and accepted morality are mutually exclusive domains. Indeed, the Court of Appeal, after holding that to find a fiduciary relationship here made no broad addition to the law, a view I take to be correct, noted that the practice established by the evidence to support the obligation was consistent with "business morality and with encouraging and enabling joint development of the natural resources of the country". This is not new. Texts from as early as 1903 refer to the obligation of "good faith by partners in their dealings with each other extend[ing] to negotiations culminating in the partnership, although in advance of its actual creation" (C.H. Lindley, *A Treatise on the American Law Relating to Mines and Mineral Lands*, 2nd ed. (Salem: Ayer Pub. Co., 1983). In my view, no distinction should be drawn here between negotiations culminating in a partnership or a joint venture.

**Remedy**

63      The appropriate remedy in this case can not be divorced from the findings of fact made by the Courts below. As I indicated earlier, there is no doubt in my mind that but for the actions of LAC in misusing confidential information and thereby acquiring the Williams property, that property would have been acquired by Corona. That finding is fundamental to the determination of the appropriate remedy. Both Courts below awarded the Williams property to Corona on payment to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

LAC of the value to Corona of the improvements LAC had made to the property. The trial Judge dealt only with the remedy available for a breach of a fiduciary duty, but the Court of Appeal would have awarded the same remedy on the claim for breach of confidence, even though it was of the view that it was artificial and difficult to consider the relief available for that claim on the hypothesis that there was no fiduciary obligation.

64      The issue then is this. If it is established that one party (here LAC) has been enriched by the acquisition of an asset, the Williams property, that would have, but for the actions of that party been acquired by the plaintiff, (here Corona), and if the acquisition of that asset amounts to a breach of duty to the plaintiff, here either a breach of fiduciary obligation or a breach of a duty of confidence, what remedy is available to the party deprived of the benefit? In my view the constructive trust is one available remedy, and in this case it is the only appropriate remedy.

65      In my view the facts present in this case make out a restitutionary claim, or what is the same thing, a claim for unjust enrichment. When one talks of restitution, one normally talks of giving back to someone something that has been taken from them (a restitutionary proprietary award), or its equivalent value (a personal restitutionary award). As the Court of Appeal noted in this case, Corona never in fact owned the Williams property, and so it cannot be "given back" to them. However, there are concurrent findings below that but for its interception by LAC, Corona would have acquired the property. In *Air Canada v. B.C.*, [1989] 1 S.C.R. 1161, [1989] 4 W.W.R. 97, 36 B.C.L.R. (2d) 145, 95 N.R. 1, 59 D.L.R. (4th) 161, 2 T.C.T. 4178, [1989] 1 T.S.T. 2126, I said that the function of the law of restitution "is to ensure that where a plaintiff has been deprived of wealth that is either in his possession *or would have accrued for his benefit*, it is restored to him. The measure of restitutionary recovery is the gain the [defendant] made at the [plaintiff's] expense." In my view the fact that Corona never owned the property should not preclude it from pursuing a restitutionary claim: see Birks, *An Introduction to the Law of Restitution* (New York: Oxford U. Press, 1985), at 133-39. LAC has therefore been enriched at the expense of Corona.

66      That enrichment is also unjust, or unjustified, so that the plaintiff is entitled to a remedy. There is, in the words of Dickson J. in *Pettkus v. Becker*, [1980] 2 S.C.R. 834 at 848, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 117 D.L.R. (3d) 257, 34 N.R. 384, "an absence of any juristic reason for the enrichment". The determination that the enrichment is "unjust" does not refer to abstract notions of morality and justice, but flows directly from the finding that there was a breach of a legally recognized duty for which the Courts will grant relief. Restitution is a distinct body of law governed by its own developing system of rules. Breaches of fiduciary duties and breaches of confidence are both wrongs for which restitutionary relief is often appropriate. It is not every case of such a breach of duty, however, that will attract recovery based on the gain of the defendant at the plaintiff's expense. Indeed this has long been recognized by the courts. In *Re Coomber*, [1911] 1 Ch. 723 at 728-29, (C.A.), Fletcher Moulton L.J. said:

> Fiduciary relations are of many different types; they extend from the relation of myself to an errand boy who is bound to bring me back my change up to the most intimate and confidential relations which can possibly exist between one party and another where the one is wholly in the hands of the other because of his infinite trust in him. All these are cases of fiduciary relations, and the Courts have again and again, in cases where there has been a fiduciary relation, interfered and set aside acts which, between persons in a wholly independent position, would have been perfectly valid. Thereupon in some minds there arises the idea that if there is any fiduciary relation whatever any of these types of interference is warranted by it. They conclude that every kind of fiduciary relation justifies every kind of interference. Of course that is absurd. The nature of the fiduciary relation must be such that it justifies the interference. *There is no class of case in which one ought more carefully to bear in mind the facts of the case, when one reads the judgment of the Court on those facts, than cases which relate to fiduciary and confidential relations and the action of the Court with regard to them*.

[Emphasis added.]

67    In breach of confidence cases as well, there is considerable flexibility in remedy. Injunctions preventing the continued use of the confidential information are commonly awarded. Obviously that remedy would be of no use in this case where the total benefit accrues to the defendant through a single misuse of information. An account of profits is also often available. Indeed in both Courts below an account of profits to the date of transfer of the mine was awarded. Usually an accounting is not a restitutionary measure of damages. Thus, while it is measured according to the defendant's gain, it is not measured by the defendant's gain at the plaintiff's expense. Occasionally, as in this case, the measures coincide. In a case quite relevant here, this Court unanimously imposed a constructive trust over property obtained from the misuse of confidential information: *Pre-Cam Exploration & Development Ltd. v. McTavish*, [1966] S.C.R. 551, 56 W.W.R 697, 50 C.P.R. 299, 57 D.L.R. (2d) 557. More recently, a compensatory remedy has been introduced into the law of confidential relations. Thus in *Seager v. Copydex Ltd.*, [1969] 2 All E.R. 718, [1969] 1 W.L.R. 809 (C.A.), an inquiry was directed concerning the market value of the information between a willing buyer and a willing seller. The defendant had unconsciously plagiarized the plaintiff's design. In those circumstances it would obviously have been unjust to exclude the defendant from the market when there was room for more than one participant.

68    I noted earlier that the jurisdictional base for the law of confidence is a matter of some dispute. In the case at bar however, it is not suggested that either the contractual or property origins of the doctrine can be used to found the remedy. Thus while there can be considerable remedial flexibility for such claims, it was not argued that the Court may not have jurisdiction to award damages as compensation and not merely in lieu of an injunction in the exercise of its equitable jurisdiction, and since I am of the view that a constructive trust is in any event the appropriate remedy, I need not consider the question of jurisdiction further.

69    In view of this remedial flexibility, detailed consideration must be given to the reasons a remedy measured by LAC's gain at Corona's expense is more appropriate than a remedy compensating the plaintiff for the loss suffered. In this case, the Court of Appeal found that if compensatory damages were to be awarded, those damages in fact equalled the value of the property. This was premised on the finding that but for LAC's breach, Corona would have acquired the property. Neither at this point nor any other did either of the Courts below find Corona would only acquire one half or less of the Williams property. While I agree that, if they could in fact be adequately assessed, compensation and restitution in this case would be equivalent measures, even if they would not, a restitutionary measure would be appropriate.

70    The essence of the imposition of fiduciary obligations is its utility in the promotion and preservation of desired social behaviour and institutions. Likewise with the protection of confidences. In the modern world the exchange of confidential information is both necessary and expected. Evidence of an accepted business morality in the mining industry was given by the defendant, and the Court of Appeal found that the practice was not only reasonable, but that it would foster the exploration and development of our natural resources. The institution of bargaining in good faith is one that is worthy of legal protection in those circumstances where that protection accords with the expectations of the parties. The approach taken by my colleague, Sopinka J., would, in my view, have the effect not of encouraging bargaining in good faith, but of encouraging the contrary. If by breaching an obligation of confidence one party is able to acquire an asset entirely for itself, at a risk of only having to compensate the other for what the other would have received if a formal relationship between them were concluded, the former would be given a strong incentive to breach the obligation and acquire the asset. In the present case, it is true that had negotiations been concluded, LAC could also have acquired an interest in the Corona land, but that is only an expectation and not a certainty. Had Corona acquired the Williams property, as they would have but for LAC's breach, it seems probable that negotiations with LAC would have resulted in a concluded agreement. However, if LAC, during the negotiations, breached a duty of confidence owed to Corona, it seems certain that Corona would have broken off negotiations and LAC would be left with nothing. In such circumstances, many business people, weighing the risks, would breach the obligation and acquire the asset. This does nothing for the preservation of the institution of good faith bargaining or relationships of trust and confidence. The imposition of a remedy which restores an asset to the party who would have acquired it but for a breach of fiduciary duties or duties of confidence acts as a deterrent to the breach of duty and strengthens the social fabric those duties are imposed to protect. The elements of a claim in unjust enrichment having been made out, I have found no reason why the imposition of a restitutionary remedy should not be granted.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

71    This Court has recently had occasion to address the circumstances in which a constructive trust will be imposed in *Hunter Engineering Co. Inc. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, 35 B.C.L.R. (2d) 145, [1989] 3 W.W.R. 385, 92 N.R. 1, 57 D.L.R. (4th) 321. There, the Chief Justice discussed the development of the constructive trust over 200 years from its original use in the context of fiduciary relationships, through to *Pettkus v. Becker*, supra, where the Court moved to the modern approach with the constructive trust as a remedy for unjust enrichment. He identified that *Pettkus v. Becker*, supra, set out a two-step approach. First, the Court determines whether a claim for unjust enrichment is established, and then, secondly, examines whether in the circumstances a constructive trust is the appropriate remedy to redress that unjust enrichment. In *Hunter v. Syncrude*, a constructive trust was refused, not on the basis that it would not have been available between the parties (though in my view it may not have been appropriate), but rather on the basis that the claim for unjust enrichment had not been made out, so no remedial question arose.

72    In the case at hand, the restitutionary claim has been made out. The Court can award either a proprietary remedy, namely that LAC hand over the Williams property, or award a personal remedy, namely a monetary award. While, as the Chief Justice observed, "the principle of unjust enrichment lies at the heart of the constructive trust": see *Pettkus v. Becker*, at 847 [S.C.R.], the converse is not true. The constructive trust does not lie at the heart of the law of restitution. It is but one remedy, and will only be imposed in appropriate circumstances. Where it could be more appropriate than in the present case, however, it is difficult to imagine.

73    The trial Judge assessed damages in this case at $700,000,000 in the event that the order that LAC deliver up the property was not upheld on appeal. In doing so he had to assess the damages in the face of evidence that the Williams property would be valued by the market at up to 1.95 billion dollars. Before us there is a cross-appeal that damages be reassessed at $1.5 billion. The trial Judge found that no one could predict future gold prices, exchange rates or inflation with any certainty, or even on the balance of probabilities. Likewise he noted that the property had not been fully explored and that further reserves may be found. The Court of Appeal made the following comment, at 651 [D.L.R.], with which I am in entire agreement:

> there is no question but that gold properties of significance are unique and rare. There are almost insurmountable difficulties in assessing the value of such a property in the open market. The actual damage which has been sustained by Corona is virtually impossible to determine with any degree of accuracy. The profitability of the mine, and accordingly its value, will depend on the ore reserves of the mine, the future price of gold from time to time, which in turn depends on the rate of exchange between the U.S. dollar and Canadian dollar, inflationary trends, together with myriad other matters, all of which are virtually impossible to predict.

To award only a monetary remedy in such circumstances when an alternative remedy is both available and appropriate would in my view be unfair and unjust.

74    There is no unanimous agreement on the circumstances in which a constructive trust will be imposed. Some guidelines can, however, be suggested. First, no special relationship between the parties is necessary. I agree with this comment of Wilson J. in *Hunter v. Syncrude*, supra, at 213 [B.C.L.R.]:

> Although both *Pettkus v. Becker* and *Sorochan v. Sorochan* were 'family' cases, unjust enrichment giving rise to a constructive trust is by no means confined to such cases: see *Deglman v. Guaranty Trust Co.*, [1954] S.C.R. 725. Indeed, to do so would be to impede the growth and impair the flexibility crucial to the development of equitable principles.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

As I noted earlier, the constructive trust was refused in *Hunter v. Syncrude*, not because the parties did not stand in any special relationship to one another, but because the claim for unjust enrichment was not made out. Similarly, in *Pre-Cam Exploration*, supra, it cannot be said that the parties stood in a "special relationship" to one another, but a constructive trust was nonetheless awarded. In *Chase Manhattan*, supra, a constructive trust was imposed, but to describe the banks as standing in a special relationship one to the other would be as much of a fiction as describing them as fiduciaries. Insistence on a special relationship would undoubtedly lead to that same sort of reasoning from conclusions. Courts, coming to the conclusion that a proprietary remedy is the only appropriate result will be forced to manufacture "special relationships" out of thin air, so as to justify their conclusions. In my view that result can and should be avoided.

75    Secondly, it is not the case that a constructive trust should be reserved for situations where a right of property is recognized. That would limit the constructive trust to its institutional function, and deny to it the status of a remedy, its more important role. Thus, it is not in all cases that a pre-existing right of property will exist when a constructive trust is ordered. The imposition of a constructive trust can both recognize and create a right of property. When a constructive trust is imposed as a result of successfully tracing a plaintiff's asset into another asset, it is indeed debatable which the Court is doing. Goff and Jones, *The Law of Restitution*, 3rd ed. (London: Sweet & Maxwell, 1986), at 78, take the position that:

> the question whether a restitutionary proprietary claim should be granted should depend on whether it is just, in the particular circumstances of the case, to impose a constructive trust on, or an equitable lien over, particular assets, or to allow subrogation to a lien over such assets.

> It is the nature of the plaintiff's claim itself which is critical in determining whether a restitutionary proprietary claim should be granted; the extent of that claim is a different matter, which should be dependent upon the defendant's knowledge of the true facts. There are certain claims which must always be personal. Such are claims for services rendered under an ineffective contract; the plaintiff is then in no different position from any unsecured creditor. In contrast there are other claims, for example, those arising from payment made under mistake, compulsion or another's wrongful act, where a restitutionary proprietary claim should presumptively be granted, although the court should always retain a discretion whether to do so or not.

76    In their view, a proprietary claim should be granted when it is just to grant the plaintiff the additional benefits that flow from the recognition of a right of property. It is not the recognition of a right of property that leads to a constructive trust. It is not necessary, therefore, to determine whether confidential information is property, though a finding that it was would only strengthen the conclusion that a constructive trust is appropriate. This is the view of Fridman and McLeod, *Restitution* (Toronto: Carswell, 1982), at 539, where they say:

> there appears to be no doubt that a fiduciary who has consciously made use of confidential information for private gain will be forced to account for the entire profits by holding such profits made from the use of the confidential information on a constructive trust for the beneficiary-estate. The proprietary remedy flows naturally from the conclusion that the information itself belonged to the beneficiary and there has been no transaction effective to divest his rights over the property.

77    I do not countenance the view that a proprietary remedy can be imposed whenever it is "just" to do so, unless further guidance can be given as to what those situations may be. To allow such a result would be to leave the determination of proprietary rights to "some mix of judicial discretion ... subjective views about which party 'ought to win' ..., and 'the formless void of individual moral opinion'", per Deane J. in *Muschinski v. Dodds* (1985), 160 C.L.R. 583 at 616. As Deane J. further noted at 616:

> Long before Lord Seldon's anachronism identifying the Chancellor's foot as the measure of Chancery relief, undefined

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

notions of 'justice' and what was 'fair' had given way in the law of equity to the rule of ordered principle which is of the essence of any coherent system of rational law. The mere fact that it would be unjust or unfair in a situation of discord for the owner of a legal estate to assert his ownership against another provides, of itself, no mandate for a judicial declaration that the ownership in whole or in part lies, in equity, in that other.

78    Much of the difficulty disappears if it is recognized that in this context the issue of the appropriate remedy only arises once a valid restitutionary claim has been made out. The constructive trust awards a right in property, but that right can only arise once a right to relief has been established. In the vast majority of cases a constructive trust will not be the appropriate remedy. Thus, in *Hunter*, supra, had the restitutionary claim been made out, there would have been no reason to award a constructive trust, as the plaintiff's claim could have been satisfied simply by a personal monetary award; a constructive trust should only be awarded if there is reason to grant to the plaintiff the additional rights that flow from recognition of a right of property. Among the most important of these will be that it is appropriate that the plaintiff receive the priority accorded to the holder of a right of property in a bankruptcy. More important in this case is the right of the property holder to have changes in value accrue to his account rather than to the account of the wrongdoer. Here as well it is justified to grant a right of property since the concurrent findings below are that the defendant intercepted the plaintiff and thereby frustrated its efforts to obtain a specific and unique property that the Courts below held would otherwise have been acquired. The recognition of a constructive trust simply redirects the title of the Williams property to its original course. The moral quality of the defendants' act may also be another consideration in determining whether a proprietary remedy is appropriate. Allowing the defendant to retain a specific asset when it was obtained through conscious wrongdoing may so offend a court that it would deny to the defendant the right to retain the property. This situation will be more rare, since the focus of the inquiry should be upon the reasons for recognizing a right of property in the plaintiff, not on the reasons for denying it to the defendant.

79    Having specific regard to the uniqueness of the Williams property, to the fact that but for LAC's breaches of duty Corona would have acquired it, and recognizing the virtual impossibility of accurately valuing the property, I am of the view that it is appropriate to award Corona a constructive trust over that land.

80    Before turning to the cross-appeal, I must make brief reference to the relevance of the fact that Corona entered an arrangement with Teck under which the latter not only obtained an interest in the Corona property, but also an interest in the result of this lawsuit. Since I view this case as one where a restitutionary claim has been made out, the position of Teck is irrelevant. The focus must be on the enrichment LAC received at Corona's expense. That enrichment was found as a fact to be the Williams property. Subsequent to acquiring it, Corona would likely have entered a joint venture agreement with LAC. LAC has no one to blame but itself for that joint venture not coming about. Only because of LAC's breach of duty did the arrangement with Teck result. The fact that it is not proved that Teck demanded a share of the litigation as the price for joining with Corona is irrelevant. It cannot be said that such an agreement was unreasonable in the circumstances. Given LAC's breach of duty to Corona, and Corona's awareness of that breach, there is no way that LAC would ever have acquired an interest in the Williams property. Corona was entitled to cease negotiating with LAC and pursue other opportunities.

81    If, however, this case is viewed as my colleague Sopinka J. views it, as a case of compensation, then the position of Teck is relevant. Corona had to enter into an agreement with someone. Corona contemplated eventually owning approximately a one-half interest in the developed properties. To award only an estimated value of a one-half interest in the property when that half will be further subdivided is, in essence, to award Corona only a one-quarter interest in the Williams property. As I am of the view that damages are not an appropriate award, I need not discuss this matter further.

**The Cross-Appeal**

82      I can deal shortly with the cross-appeal. LAC has been enriched at the expense of Corona by acquiring the Williams property. Having acquired that property in breach of a duty of confidence and in breach of a fiduciary obligation, that enrichment is unjustified. Likewise, however, Corona will receive an enrichment when LAC hands over the property, in the amount of the value of the improvement of the land to Corona. That value is equal to what would have been spent by Corona to develop both properties, less what Corona in fact spent. The trial Judge made a $50,000,000 downward adjustment to the amount LAC spent, directing a reference to determine the exact amount in the event the parties disputed the adjustment. I would affirm that award. The three elements of a claim for restitution are made out, namely there is an enrichment (the mine), that enrichment accrued to Corona at LAC's expense, and the enrichment is unjustified. The enrichment is not justified since, on the assumption that Corona had acquired the Williams property, it would of necessity have had to expend funds to develop the mine. In these circumstances, LAC is entitled to a restitutionary remedy, namely a lien on the Williams property to the extent that Corona was saved a necessary expenditure.

83      In view of this conclusion it becomes unnecessary to address the contingent cross-appeal by which Corona asked that damages be reassessed at $1.5 billion. I would dismiss the appeal with costs and dismiss the cross-appeal with costs.

**Lamer J.** (concurring in part):

84      I have read the judgments of my colleagues, La Forest J. and Sopinka J. I am in agreement with my brother Sopinka J. and for the reasons set out in his judgment that the evidence does not establish in this case the existence of a fiduciary relationship.

85      I am in agreement with both of my colleagues, and concur in their reasons in support thereof, that there was a breach of confidence on the part of LAC Minerals Ltd.

86      As regards the appropriate remedy, I am of the view that the approach taken by La Forest J. is the proper one.

87      I would accordingly dismiss the appeal with costs and dismiss the cross-appeal with costs.

**Wilson J.** (concurring in part):

88      I have had the advantage of reading the reasons of my colleagues, Mr. Justice Sopinka and Mr. Justice La Forest and I agree with my colleague, Mr. Justice La Forest, as to the appropriate remedy in this case. I propose to comment briefly on the three issues before the Court on this appeal as identified by them:

**(1) Fiduciary Duty**

89      It is my view that, while no ongoing fiduciary *relationship* arose between the parties by virtue only of their arm's length negotiations towards a mutually beneficial commercial contract for the development of the mine, a fiduciary *duty* arose in LAC when Corona made available to LAC its confidential information concerning the Williams property, thereby placing itself in a position of vulnerability to LAC's misuse of that information. At that point LAC came under a duty not to

**International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126**

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

use that information for its own exclusive benefit. LAC breached that fiduciary duty by acquiring the Williams property for itself.

90      It is, in other words, my view of the law that there are certain relationships which are almost per se fiduciary such as trustee and beneficiary, guardian and ward, principal and agent, and that where such relationships subsist they give rise to fiduciary duties. On the other hand, there are relationships which are not in their essence fiduciary, such as the relationship brought into being by the parties in the present case by virtue of their arm's length negotiations towards a joint venture agreement, but this does not preclude a fiduciary duty from arising out of specific conduct engaged in by them or either of them within the confines of the relationship. This, in my view, is what happened here when Corona disclosed to LAC confidential information concerning the Williams property. LAC became at that point subject to a fiduciary duty *with respect to that information* not to use it for its own use or benefit.

### (2) Breach of Confidence

91      I agree with my colleagues that LAC's conduct may also be characterized as a breach of confidence *at common law* with respect to the information concerning the Williams property. The breach again consisted of LAC's acquisition of the Williams property for itself, such property being the subject of the confidence.

### (3) The Remedy

92      It seems to me that when the same conduct gives rise to alternate causes of action, one at common law and the other in equity, *and the available remedies are different*, the Court should consider which will provide the more appropriate remedy to the innocent party and give the innocent party the benefit of that remedy. Since the result of LAC's breach of confidence or breach of fiduciary duty was its unjust enrichment through the acquisition of the Williams property at Corona's expense, it seems to me that the only sure way in which Corona can be fully compensated for the breach in this case is by the imposition of a constructive trust on LAC in favour of Corona with respect to the property. Full compensation may or may not be achieved through an award of common law damages depending upon the accuracy of valuation techniques. It can most surely be achieved in this case through the award of an in rem remedy. I would therefore award such a remedy. The imposition of a constructive trust also ensures, of course, that the wrongdoer does not benefit from his wrongdoing, an important consideration in equity which may not be achieved by a damage award.

93      It is, however, my view that this is not a case in which the available remedies are different. I believe that the remedy of constructive trust is available for breach of confidence as well as for breach of fiduciary duty. The distinction between the two causes of action as they arise on the facts of this case is a very fine one. Inherent in both causes of action are concepts of good conscience and vulnerability. It would be strange indeed if the law accorded them widely disparate remedies. In his article on "The Role of Proprietary Relief in the Modern Law of Restitution", John D. McCamus, Cambridge Lecture 1987, 141 at 150, Professor McCamus poses the rhetorical question:

> Would it not be anomalous to allow more sophisticated forms of relief for breach of fiduciary duty than for those forms of wrongdoing recognized by the law of torts, some of which, at least, would commonly be more offensive from the point of view of either public policy or our moral sensibilities than some breaches of fiduciary duty?

94      I believe that where the consequence of the breach of either duty is the acquisition by the wrongdoer of property which

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

rightfully belongs to the plaintiff or, as in this case, ought to belong to the plaintiff if no agreement is reached between the negotiating parties, then the in rem remedy is appropriate to either cause of action.

95    I would dismiss the appeal with costs. I would also dismiss the cross-appeal with costs.

*Sopinka J.* (dissenting — concurred in part by *McIntyre* and *Wilson JJ.*):

96    This appeal and cross-appeal raise important issues relating to fiduciary duty and breach of confidence. In particular, they require this Court to consider whether fiduciary obligations can arise in the context of abortive arm's-length negotiations between parties to a prospective commercial transaction. Also at issue are the nature of confidential information and the appropriate remedy for its misuse.

**The Facts**

97    The facts are fully developed in the reasons for judgment of the trial Judge, Holland J., (1986) 53 O.R. (2d) 737, and in the judgment of the Ontario Court of Appeal, (1987) 62 O.R. (2d) 1. My recital of them, here, will therefore be skeletal in nature. From time to time in these reasons, some of the facts relating to specific issues will be examined in greater detail.

98    The parties to these proceedings are International Corona Resources Ltd. (which I will refer to as either "Corona" or the "respondent") and LAC Minerals Ltd. (which I will refer to as either "LAC" or the "appellant"). Corona, which was incorporated in 1979, was at material times a junior mining company listed on the Vancouver Stock Exchange. LAC is a senior mining company which owns a number of operating mines and is listed on several stock exchanges. This action arises out of negotiations between Corona and LAC relating to the Corona property, the Williams property and the Hughes property, all of which are located in the Hemlo area of northern Ontario.

99    The Corona property consists of 17 claims with an area of approximately 680 acres. The Williams property consists of 11 patented claims, covering a total of about 400 acres, and is contiguous to the Corona property and to the west. The Hughes property consists of approximately 156 claims and surrounds both the Corona and Williams properties, except to the north of the Williams property. It is now in the names of Golden Sceptre Resources Ltd., Goliath Gold Mines Ltd. and Noranda Exploration Co.

100    In October 1980, Corona had retained Mr. David Bell, a geologist consultant to carry out an extensive exploration program on its property which involved extensive diamond drilling. Bell hired Mr. John Dadds, a mining technician, to assist him. The core that was obtained from the drilling was identified, logged and then stored inside a core shack built on the Corona property. Assay results were sent to Bell and to the Corona office in Vancouver. Some of the results were communicated to the Vancouver Stock Exchange in the form of news releases and assay results, and were published from time to time in the George Cross Newsletter, a daily newsletter published in Vancouver.

101    The results of this exploratory work led Bell to an interesting theory. The trial Judge describes it in some detail:

Mr. Bell testified that by February, 1981, he was sufficiently encouraged by the results of the drilling programme that he decided that it was time to acquire the Williams property and the claims to the north. Mr. Bell stated that within the first month of drilling his opinion of the geology changed from what he initially thought was a secondary intrusive model, from reading the literature of the area, to a syngenetic deposit, that is a deposit formed at the same time and by the same process as the enclosing rocks. He concluded that the mineralization and gold values were not tied into a vein but rather that the mineralization was in a zone, or beds, of megasediment that indicated a volcanic origin. In Mr. Bell's opinion, in all likelihood, the distribution of gold could be spread over quite a large area and there could be pools or puddles of ore, indicating to him that the exploration programme should be extended along the zone to adjoining properties.

102    This increased the interest in surrounding properties and Bell, on behalf of Corona, requested Mr. Donald McKinnon, a prospector who was familiar with the properties, to attempt to acquire the Williams property. Representatives of LAC read about these results in the March 20, 1981 George Cross Newsletter and arranged to visit the Corona property. This property visit took place on May 6, and Bell had arranged for Dadds to have core, assay results, sections, maps and a drill plan available at the core shack. Those present at the meeting consisted of Nell Dragovan, then president of Corona, and Messrs. Bell, Dadds, Sheehan (vice-president for exploration of LAC), and Pegg (a LAC geologist). The visitors were shown cores, sections, logs with assay results added and a map showing the staking in the area. Bell discussed progress to date, plans for the future and his theory of the geology. Sheehan and Pegg both examined the cores and, after the meeting in the core shack, which Bell said lasted about 45 minutes, they went outside. Bell took a map and explained where the earlier drilling had taken place as well as the location of future holes, and discussed the geology further. He also indicated that the formation was continuing to the west on the Williams property and that Corona wanted to continue its exploration there. Outcrops in the area were also inspected. Bell said that before he left, Sheehan told him that he "wanted me to drop into Toronto when I was there and to further the discussions of their visit and talk about possible terms". A meeting was arranged for May 8 in Toronto at LAC's head office.

103    Holland J. found as a fact that there were no discussions regarding confidentiality during the May 6 property visit except in connection with an unrelated matter.

104    Following the site visit, Sheehan and Pegg returned quickly to LAC's exploration office in Toronto and instructed LAC personnel to gather information on the Hemlo area from the LAC library of files. They then went to the assessment office of the Ontario department of mines to obtain copies of all claim maps, reports, publications and assessment work files that were available on the area. Sheehan told a LAC geologist to ascertain what claims would be necessary to cover the favourable belt to the east of the Corona property. The geologist decided that about 600 claims should be staked and immediately thereafter, on May 8, LAC began staking what are now known as the White River claims.

105    On May 8, Bell and Sheehan met and discussed the geology of the area, its similarity to the Bousquet area of Quebec, at which both Pegg and Sheehan had worked, and the possible terms of an agreement between Corona and LAC. Sheehan told Bell of LAC's staking to the east. Bell said that the two men discussed the properties around the Corona property. Corona's interest in the Williams and Hughes properties was mentioned and Sheehan gave Bell advice on how to pursue a patented claim. Bell told Sheehan that Corona had somebody doing that, without mentioning McKinnon by name. A number of avenues for progress were discussed and Sheehan said that he would send a letter outlining the terms that were discussed. Again, nothing was said regarding confidentiality.

106    On May 19, Sheehan wrote to Bell as follows:

Further to our meeting in Toronto I would like to give you this letter as further evidence of our sincerity in joining with

Corona re exploration in the Hemlo area.

As we discussed there are a number of avenues that could be explored regarding a working arrangement re the property and to that end I will list the various possibilities:

(a) Corona could have our Company do a financing and ultimately we would scale it forward so as to control Corona.

(b) We form a joint venture where Long Lac [a Lac subsidiary] spends say 1.5 to 2.0 times amount spent by Corona for a 60% interest. Beyond that point we spend on a 60-40 basis or use a dilution formula down to a minimum should one party decide to stop contributing. In addition Lac would have to spend a definite amount of money to reach a threshold before they would acquire any interest.

(c) A possible significant cash payment with a variation in interests as a result of the amount of cash payment. Followed by a Lac work proposal.

As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued. In addition we are staking ground in the area and recognizing Corona's limited ability to contribute we could work Corona into the overall picture as part of an overall exploration strategy.

I believe at some point within the next few weeks we should have an understanding that Corona and Lac should seriously examine an avenue for continual work in the area. Perhaps you could give our management a presentation of results to date i.e., sections, general geology, longitudinal presentation — location potential etc. Based on foregoing we could then arrive at a sound basis for structuring a working agreement.

107    The trial Judge found that the reference to the Hughes ground was intended to include the Williams property as well. Bell replied by letter dated May 22 as follows:

I am in receipt of your letter dated May 19, 1981 regarding the Hemlo Property.

First may I thank you for your fine hospitality during my brief visit to Toronto.

I am forwarding a copy of your proposal to Vancouver for the other directors to review. We are presently well into our Phase II, exploring and extending the previous examined parameters outlined in Phase I. Our present plans are to complete 30,000 to 35,000 feet of diamond drilling at which time a general over-all review will take place.

At this point, until I hear otherwise from the directors in Vancouver, I like your idea of Corona's contribution with Long Lac Minerals Exploration Limited as part of an overall exploration programme in the area.

In the mean time I do believe we should keep in touch and maintain the fine relationship presently established.

108    Bell wrote to Dragovan by letter dated May 23 which stated, in part, the following:

Enclosed is a copy of a letter received from Long Lac Minerals Exploration Limited, also please find a copy of my letter to Lac in reply. This letter from Lac should be discussed with all directors.

109    On May 27, Corona released to the Vancouver Stock Exchange encouraging assay results of a drill hole, which the trial Judge referred to as the "discovery hole". These results were published in the George Cross Newsletter of May 29, and further results confirming an extension of the "discovery hole" were released on June 4 and published in the George Cross Newsletter of June 8.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

110    Subsequently, the results of further drill holes that were encouraging were published by Corona. On June 8, Mr. Murray Pezim, a stock promoter from Vancouver, became a director of Corona. Pezim arranged for Bell to make a presentation in Vancouver on behalf of Corona to a large number of brokers. Some of the information developed by Bell was imparted to those present at this meeting.

111    On June 15 a meeting was also arranged for June 30 at LAC's head office in Toronto, at which Bell was to make a presentation in accordance with Sheehan's letter of May 19. Following the meeting, sections, a detailed drill plan and apparently a vertically longitudinal section were left with LAC. Mr. Peter Allen, the president of LAC, advised Bell to be aggressive in his pursuit of the Williams property and Bell responded that Corona had somebody pursuing this property on their behalf. Allen told Sheehan to get a proposal out to Corona and Sheehan indicated that he would have such a proposal out within 3 weeks.

112    According to Bell, no one from LAC ever told him that they would not acquire the Williams property and LAC was never told that the information given to it was private, privileged or confidential. Although the evidence was contradictory, the trial Judge found as a fact that the pursuit by Corona of the Williams property was mentioned at the meeting. This and other information revealed to LAC went beyond the information that had been made public. This finding was confirmed by the Court of Appeal. The trial Judge also found that it was agreed that a proposal would be sent by LAC to Corona within 3 weeks, and that the purpose of the meeting was to discuss a possible deal between Corona and LAC in order to provide Corona with the financing needed to develop a mine.

113    Meanwhile, on June 8, McKinnon had spoken to Mrs. Williams by telephone and made an oral offer for the Williams property, which was followed by a written offer prepared by solicitors. On July 3, after some searching, Sheehan located Mrs. Williams by telephone and made an oral offer to her. She asked for a written offer and by letter dated July 6, 1981, LAC's legal counsel put it in writing.

114    On July 21, McKinnon again spoke to Mrs. Williams who told him that she had another offer and that he should contact her Toronto solicitor. On July 22, McKinnon told Bell of the other offer and it was agreed by Bell and Dragovan that Corona should make an offer to Williams directly. At this time, no one from Corona knew that the other offer was from LAC. On July 23, Corona's solicitor prepared an offer, which was delivered on July 27. Also on July 23, Mrs. Williams' Toronto solicitor disclosed LAC's name to Corona's solicitor. LAC's offer was accepted on July 28 and a formal agreement was signed on August 25, 1981.

115    After hearing that the LAC offer had been accepted, Pezim turned the matter over to his solicitors. On August 18, 1981, Sheehan went to Vancouver to attempt to resume negotiations with Pezim, who asked for the return of the Williams property. No agreement was reached. Later, Mr. Donald Moore, another director of Corona attempted to revive negotiations with Sheehan, without success.

116    After the Corona — LAC relationship had come to an end, Corona concluded an agreement with Teck Corp. (hereinafter referred to as "Teck") dated December 10, 1981, which was subsequently amended by agreements dated August 13, 1982 and December 14, 1983. These agreements, while providing for a joint venture in connection with the possible development of a mine on the Corona property, also purport to give Teck a 50 per cent interest in the fruits of Corona's

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

lawsuit against LAC, with Teck agreeing to pay certain costs.

**The Judgments Below**

*Ontario High Court*

117    The trial Judge considered the liability of LAC under three heads pleaded by Corona: contract, breach of confidence and breach of fiduciary duty. Holland J. concluded that no binding contract was entered into by the parties but found LAC liable under the other two heads of liability, breach of confidence and breach of fiduciary duty. He decided that the appropriate remedy for breach of fiduciary duty was the return of the Williams property to Corona but allowed LAC's claim for a lien for the cost of improvements, and the amounts paid to Williams excluding royalty payments. The actual amount spent by LAC on developing the property was $203,978,000 but this was discounted by $50,000,000 to take into account the fact that if Corona had not been deprived of the Williams property, it would have developed the property and the Williams property as one mine, thereby achieving a saving represented by the discount. Either party was entitled to undertake a reference to determine the amount by which the Williams property was enhanced by virtue of LAC's expenditure if dissatisfied with the trial Judge's estimate of the discount of $50,000,000. LAC was ordered to transfer the property to Corona upon payment by Corona to LAC of these amounts.

118    A reference was also ordered to determine the amount of the profits obtained by LAC from the Williams property. LAC was ordered to pay the amount of such profits to Corona with interest.

119    With the agreement of counsel, damages were assessed in the event that, on appeal, a court should decide that damages were the appropriate remedy. The assessment was made on the principles applicable to breach of fiduciary duty. The amount was $700,000,000 being the value of the mine as of January 1, 1986 on the basis of a discounted cash flow approach.

*Court of Appeal*

120    The Court of Appeal affirmed the findings of the trial Judge with respect to breach of confidence and fiduciary duty. It also confirmed the remedy with the addition of its opinion that a constructive trust was an appropriate remedy for both the breach of confidence and fiduciary duty. The Court did not deal with the appellant's attack on the assessment of damages. In the result, the appeal was dismissed with costs. I will deal more fully with the reasons of both the trial Judge and the Court of Appeal when discussing the issues.

**The Issues Before This Court**

121    The issues raised in this appeal can be conveniently grouped under three headings:

*(1) Fiduciary Duty*

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

122    Did a fiduciary relationship exist between Corona and LAC which was breached by LAC's acquisition of the Williams property?

### *(2) Breach of Confidence*

123    Did LAC misuse confidential information obtained by it from Corona and thereby deprive Corona of the Williams property?

### *(3) Remedy*

124    What is the appropriate remedy if the answer to (1) or (2) is in the affirmative?

### (1) Did a Fiduciary Relationship Arise between LAC and Corona?

125    The consequences attendant on a finding of a fiduciary relationship and its breach have resulted in judicial reluctance to do so except where the application of this "blunt tool of equity" is really necessary. It is rare that it is required in the context of an arm's length commercial transaction. Kennedy J., in "Equity in a Commercial Context" in *Equity and Commercial Relationships*, ed., P.D. Finn, The Law Book Company, 1987, explains why:

> It would seem that part of the reluctance to find a fiduciary duty within an arm's length commercial transaction is due to the fact that the parties in that situation have an adequate opportunity to prescribe their own mutual obligations, and that the contractual remedies available to them to obtain compensation for any breach of those obligations should be sufficient. Although the relief granted in the case of a breach of a fiduciary duty will be moulded by the equity of the particular transaction, an offending fiduciary will still be exposed to a variety of available remedies, many of which go beyond mere compensation for the loss suffered by the person to whom the duty was owed, equity, unlike the ordinary law of contract, having [sic] regard to the gain obtained by the wrongdoer, and not simply to the need to compensate the injured party.

It was submitted that the departure of the Courts below from this salutary rule has resulted in a plethora of claims that would impose fiduciary relationships in a commercial-type setting. Writing in *The Advocates' Society Journal*, Aug. 1988, Colin L. Campbell supports this point of view. He states at 44:

> The *Lac-Corona* decision, together with the decision in *Standard Investments v. Canadian Imperial Bank of Commerce* determining that a banker could be held to a fiduciary duty when he revealed information obtained in confidence, has given rise to a plethora of claims to impose fiduciary obligations where the parties' relationship has been formalized by a contract. In addition to the above principles, such obligations have been imposed on bankers, lawyers, stockbrokers, accountants, and others.

126    In *Hospital Products Ltd. v. United States Surgical Corp.* (1984), 55 A.L.R. 417, Dawson J. continued, at 493-94:

> The undesirability of extending fiduciary duties to commercial relationships and the anomaly of imposing those duties where the parties are at arm's length from one another was referred to in *Weinberger v. Kendrick* (1892) 34 Fed Rules

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

Serv (2d) 450. And in *Barnes v. Addy* (1874) 9 Ch App 244 at 251, Lord Selborne LC said: 'It is equally important to maintain the doctrine of trusts which is established in this court, and not to strain it by unreasonable construction beyond its due and proper limits. There would be no better mode of undermining the sound doctrines of equity than to make unreasonable and inequitable applications of them.'

127    In our own Court, in *Guerin v. R.*, [1984] 2 S.C.R. 335, at 384, 59 B.C.L.R. 301, 20 E.T.R. 6, 36 R.P.R. 1, [1984] 6 W.W.R. 481, [1985] 1 C.N.L.R. 120, 13 D.L.R. (4th) 321, 55 N.R. 161 Dickson J. (as he then was) referred to a passage from Professor Weinrib's article, "The Fiduciary Obligation" (1975), 25 U.T.L.J. 1 at 4, wherein the fiduciary obligation is described as "the law's blunt tool". In my opinion, equity's blunt tool must be reserved for situations that are truly in need of the special protection that equity affords.

128    While equity has refused to tie its hands by defining with precision when a fiduciary relationship will arise, certain basic principles must be taken into account. There are some relationships which are generally recognized to give rise to fiduciary obligations: director-corporation, trustee-beneficiary, solicitor-client, partners, principal-agent, and the like. The categories of relationships giving rise to fiduciary duties are not closed nor do the traditional relationships invariably give rise to fiduciary obligation. As pointed out by Dickson J. in *Guerin v. R.*, supra, p. 384 [S.C.R.]:

It is sometimes said that the nature of fiduciary relationships is both established and exhausted by the standard categories of agent, trustee, partner, director, and the like. I do not agree. It is the nature of the relationship, not the specific category of actor involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence, should not be considered closed.

129    The nature of the relationship may be such that, notwithstanding that it is usually a fiduciary relationship, in exceptional circumstances it is not. See J.C. Shepherd, *The Law of Fiduciaries* (Toronto: Carswell, 1986), at 21-22. Furthermore, not all obligations existing between the parties to a well-recognized fiduciary relationship will be fiduciary in nature. Southin J., in *Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 (S.C.), observed that the obligation of a solicitor to use care and skill is the same obligation as that of any person who undertakes to carry out a task for reward. Failure to do so does not necessarily result in a breach of fiduciary duty but simply a breach of contract or negligence. She issued this strong caveat against the overuse of claim for breach of fiduciary duty (at 362):

Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word 'fiduciary' is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But 'fiduciary' comes from the Latin 'fiducia' meaning 'trust'. Thus, the adjective, 'fiduciary' means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words. The obligation of a solicitor of care and skill is the same obligation of any person who undertakes for reward to carry out a task. One would not assert of an engineer or physician who had given bad advice and from whom common law damages were sought that he was guilty of a breach of fiduciary duty. Why should it be said of a solicitor? I make this point because an allegation of breach of fiduciary duty carries with it the stench of dishonesty — if not of deceit, then of constructive fraud. See *Nocton v. Lord Ashburton*, [1914] A.C. 932 (H.L.). Those who draft pleadings should be careful of words that carry such a connotation.

130    When the Court is dealing with one of the traditional relationships, the characteristics or criteria for a fiduciary

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

relationship are assumed to exist. In special circumstances, if they are shown to be absent, the relationship itself will not suffice. Conversely, when confronted with a relationship that does not fall within one of the traditional categories, it is essential that the Court consider: what are the essential ingredients of a fiduciary relationship and are they present? While no ironclad formula supplies the answer to this question, certain common characteristics are so frequently present in relationships that have been held to be fiduciary that they serve as a rough and ready guide. I agree with the enumeration of these features made by Wilson J. in dissent in *Frame v. Smith*, [1987] 2 S.C.R. 99, 9 R.F.L. (3d) 225, 42 C.C.L.T. 1, 78 N.R. 40, 23 O.A.C. 84, 42 D.L.R. (4th) 81, [1988] 1 C.N.L.R. 152 . The majority, although disagreeing in the result, did not disapprove of the following statement, at 135-136:

> A few commentators have attempted to discern an underlying fiduciary principle but, given the widely divergent contexts arising from the case-law, it is understandable that they have differed in their analyses: see, for example, E. Vinter, *A Treatise on the History and Law of Fiduciary Relationships and Resulting Trusts*, (3rd ed. 1955); Ernest J. Weinrib, 'The Fiduciary Obligation' (1975), 25 U.T.L.J. 1; Gareth Jones, 'Unjust Enrichment and the Fiduciary's Duty of Loyalty' (1968), 84 *L.Q.R.* 472; George W. Keeton and L.A. Sheridan, *Equity* (1969), at pp. 336-52; Shepherd, *supra*, at p. 94. Yet there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not the imposition of a fiduciary obligation on a new relationship would be appropriate and consistent.

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:

> (1) The fiduciary has scope for the exercise of some discretion or power.

> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.

> (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

131    It is possible for a fiduciary relationship to be found although not all of these characteristics are present, nor will the presence of these ingredients invariably identify the existence of a fiduciary relationship.

132    The one feature, however, which is considered to be indispensable to the existence of the relationship, and which is most relevant in this case, is that of dependency or vulnerability. In this regard, I agree with the statement of Dawson J. in *Hospital Products v. United States Surgical Corp.*, supra, at 488, that:

> There is, however, the notion underlying all the cases of fiduciary obligation that inherent in the nature of the relationship itself is a position of disadvantage or vulnerability on the part of one of the parties which causes him to place reliance upon the other and requires the protection of equity acting upon the conscience of that other.

133    The necessity for this basic ingredient in a fiduciary relationship is underscored in Professor Weinrib's statement, quoted in *Guerin*, supra, that [at 384, S.C.R.]:

> [T]he Hallmark of a fiduciary relationship is that the relative legal positions are such that one party is at the mercy of the other's discretion.

To the same effect is the discussion by Professor D.S.K. Ong in "Fiduciaries: Identification and Remedies" (1986), 8 Univ. of Tasmania Law Rev. 311, in which he suggests that the element which gives rise to and is common to all fiduciary relationships is the "implicit dependency by the beneficiary on the fiduciary". This condition of dependency moves equity to

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

subject the fiduciary to its strict standards of conduct.


134     Two caveats must be issued. First, the presence of conduct that incurs the censure of a court of equity in the context of a fiduciary duty cannot itself create the duty. In *Tito v. Waddell (No. 2)*, [1977] Ch. 106 at 230, [1977] 3 All E.R. 129 Megarry V-C said:

> If there is a fiduciary duty, the equitable rules about self-dealing apply: but self-dealing does not impose the duty. Equity bases its rules about self-dealing upon some pre-existing fiduciary duty: it is a disregard of this pre-existing duty that subjects the self-dealer to the consequences of the self-dealing rules. I do not think that one can take a person who is subject to no pre-existing fiduciary duty and then say that because he self-deals he is thereupon subjected to a fiduciary duty.


135     Second, applying the same principle, the fact that confidential information is obtained and misused cannot itself create a fiduciary obligation. No doubt one of the possible incidents of a fiduciary relationship is the exchange of confidential information and restrictions on its use. Where, however, the essence of the complaint is misuse of confidential information, the appropriate cause of action in favour of the party aggrieved is breach of confidence and not breach of fiduciary duty.


136     In my opinion, both the trial Judge and the Court of Appeal erred in coming to the conclusion that a fiduciary relationship existed between Corona and LAC. In my respectful opinion, both the trial Judge and the Court of Appeal erred by not giving sufficient weight to the essential ingredient of dependency or vulnerability and too much weight to other factors. The latter are as follows:

> (a) that the state of the negotiations attracted the principle in *United Dominions Corp. Ltd. v. Brian Pty. Ltd.* (1985), 60 A.L.R. 741, 59 A.L.J.R. 676    (Aust. H.C.);

> (b) that LAC had sought out Corona;

> (c) that the geochemical program constituted an embarkation on a joint venture;

> (d) that Corona had divulged confidential information to LAC;

> (e) that a practice in the mining industry supported the existence of a fiduciary relationship;

> (f) that the parties were negotiating towards a common object.


***The United Dominions Case***


137     This is a decision of the High Court of Australia involving a joint venture between three parties, United Dominion Corp. (UDC), Security Projects Ltd. (SPL) and Brian Pty Ltd. (Brian). Land was purchased with money provided by the joint venture and was to be developed for a hotel and shopping centre. SPL acted as agent for the joint venturers and held moneys in trust which had been provided by the joint venture. UDC acted as principal financier of the project with the balance of the funds being provided by the other joint venturers. Prior to the alleged breach of fiduciary duty, the percentage participation of each joint venturer had been set and substantial amounts had been contributed by them. The land was mortgaged to UDC as security for borrowings by SPL which acted as agents for Brian and others in this respect. All this was consistent with the terms of a draft joint venture agreement that had been circulated among the participants and eventually was executed.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

138    The mortgage which SPL granted to UDC contained a "collateralisation clause" which had the effect of subjecting lands of the joint venture to debts incurred by SPL extraneous to the joint venture. UDC was "fully aware that the land registered in the name of SPL was held in circumstances which required SPL to account to the intended partners" (per Gibbs C.J. at 678).

139    The enforcement of the collateralisation clause by UDC resulted in the loss of Brian's investment and of course it obtained no return thereon.

140    In light of the above, the Court concluded that the parties had embarked on a joint venture which the Court found to be plainly a partnership. The Court further found that prior to the grant of the first mortgage, the "arrangements between the prospective joint venturers had passed far beyond the stage of mere negotiations" (at 680). Clearly, if the draft agreement had not been signed subsequently, an agreement substantially in accordance with its terms would have been found to exist by the Court. Prior to its execution, the relationship of UDC, SPL and Brian was that of a de facto partnership or joint venture. Furthermore, Brian entrusted SPL with its funds and its interest in the land with the full knowledge of UDC. Brian was therefore "at the mercy of their discretion". In this respect the case is clearly distinguishable from the case at bar. The trial Judge found that LAC and Corona "were clearly negotiating towards a joint venture or some other business relationship". The respondent had pleaded that a partnership agreement existed between it and the appellant but this claim was abandoned. In this respect, the trial Judge found as follows: "The most that can be said is that the parties came to an informal oral understanding as to how each would conduct itself in anticipation of a joint venture *or some other business arrangement*". [Emphasis added.]

141    The parties here had not advanced beyond the negotiation stage. Indeed, they had not as yet identified what precisely their relationship should be. Furthermore, Corona did not confer on LAC any discretionary power to acquire the Williams property. LAC proceeded unilaterally to acquire the property for itself allegedly making use of confidential information, and that essentially is the ground of Corona's complaint.

142    The Court of Appeal recognized that this case differed from the *United Dominions* case, supra, (p. 317). In its opinion, however, the other factors present in the case which I have enumerated above, (a) to (f), made up for the difference.

143    I cannot find that (b) adds very much to the case in favour of a finding that a fiduciary relationship existed. In every commercial venture, one of the parties approaches the other. Corona was seeking a senior mining company and LAC responded with an expression of interest. This is not an indicium of a fiduciary relationship. Nor can I accept that (c), the arrangement as to the geochemical program, was a step in the implementation of a joint venture. The trial Judge did not so find and the evidence is too sketchy to be able to relate this activity to any proposed agreement between the parties, the nature of which itself was undetermined. With respect to (d) as explained above, the supply of confidential information is not necessarily referable to a fiduciary relationship and is therefore at best a neutral factor. The other two factors, (e) and (f), require more extensive consideration.

*(e) The Practice in the Industry*

144    The trial Judge concluded as follows:

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

I conclude, following *Cunliffe-Owen*, supra, that there is a practice in the mining industry that imposes an obligation when parties are seriously negotiating not to act to the detriment of each other.

145    He did so on the basis of the following evidence with which all experts were in agreement:

[Mr. Allen] A. If one geologist goes to another geologist and says, are you interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be — I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that they weren't, there was just some exchange of conversation or physical data, then I would say that while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was exchanged.

. . . . .

Q. ... Does the obligation not to harm each other that you referred to, et cetera, flow from the fact that they were in negotiation or discussion about a possible deal itself so long as it's a serious matter as you said?

. . . . .

[Mr. Allen]. Yes.

No examples were apparently given illustrating the operation of this practice. *Cunliffe-Owen v. Teather & Greenwood*, [1967] 3 All E.R. 561, [1967] 1 W.L.R. 1421 (Ch.), which was referred to by the trial Judge and relied on by the Court of Appeal, is a contract case. The principle is well established in contract law. It is accurately expressed by Ungoed-Thomas J. at 1438 [W.L.R.]:

For the practice to amount to such a recognised usage, it must be certain, in the sense that the practice is clearly established; it must be notorious, in the sense that it is so well known, in the market in which it is alleged to exist, that those who conduct business in that market contract with the usage as an implied term; and it must be reasonable.

The burden lies on those alleging 'usage' to establish it.

The practice that has to be established consists of a continuity of acts, and those acts have to be established by persons familiar with them, although, as is accepted before me, they may be sufficiently established by such persons without a detailed recital of instances. Practice is not a matter of opinion, of even the most highly qualified expert, as to what it is desirable that the practice should be. However, evidence of those versed in a market — so it seems to me — may be admissible and valuable in identifying those features of any transaction that attract usage

146    It is understandable that, in a contract setting, a practice that is notorious and clearly defined and relevant to the business under discussion should be incorporated as a term. It can readily be inferred that the parties agreed to it. It is a considerable leap from this principle to erect a fiduciary relationship on the basis of such a practice. No authority was cited to the Court that this concept can simply be transplanted in this fashion. It is significant that the trial Judge did not rely on this evidence in finding that a fiduciary obligation existed (pp. 776-777). Moreover, accepting the evidence at face value, it is more consistent with the obligation of confidence. The practice relates to a duty which arises upon the exchange of confidential information. Furthermore, in the absence of any illustrations of the operation of the practice, we are left with an expert's opinion on what is essentially a question of law — the existence of a fiduciary duty. The practice among geologists to act honourably towards each other is no doubt admirable and a practice to be fostered, but it should not be used to create a fiduciary relationship where one does not exist.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

*(f) Common Object*

147    The Court of Appeal stressed that the parties were not simply negotiating an ordinary commercial contract but were negotiating in furtherance of a common object. This factor does not particularly distinguish negotiations in furtherance of any partnership or joint venture. All such negotiations seek to achieve a common object, namely the accomplishment of the business venture for which the partnership or joint venture is sought to be formed. I do not see how this factor can elevate negotiations to something more.

## (1) Dependency or Vulnerability

148    In my opinion, this vital ingredient was virtually lacking in this case. Its absence cannot be replaced by any of the factors mentioned above. The Court of Appeal dealt with it as follows:

> It was a case of negotiations between a junior mining company (Corona) whose primary activities were those of locating, staking and evaluating mining claims and a senior mining company (LAC) whose activities included all of the above together with the practice and experience of bringing into production and operating gold mining properties. It was a case of the senior company seeking out the junior company in order to obtain information with respect to mining claims already owned by the junior company and to discuss a joint business venture. Having regard to the practice found to exist in the industry with respect to the obligation not to act to the detriment of each other, particularly with respect to confidential information disclosed, it was to be expected that Corona would divulge confidential information to LAC during the course of their negotiations. In those circumstances, it is only just and proper that the court find that there exists a fiduciary relationship with its attendant responsibilities of dealing fairly including, but not limited to, the obligation not to benefit at the expense of the other from information received by one from the other.

149    This statement seems to imply that there was a kind of physical or psychological dependency here which attracted fiduciary duty. Illustrations of this type of dependency are not difficult to find. They include parent and child, priest and penitent and the like. Clearly, a dependency of this type did not exist here. While it is perhaps possible to have a dependency of this sort between corporations, that cannot be so when, as here, we are dealing with experienced mining promoters who have ready access to geologists, engineers and lawyers. The fact that they were anxious to make a deal with a senior mining company surely cannot attract the special protection of equity. If confidential information was disclosed and misused, there is a remedy which falls short of classifying the relationship as fiduciary. In *Frame*, supra, Wilson J. dealt with this indicia of fiduciary duty in the following language (at 137-138 [S.C.R.]):

> This vulnerability arises from the inability of the beneficiary (despite his or her best efforts) to prevent the injurious exercise of the power or discretion combined with the grave inadequacy or absence of other legal or practical remedies to redress the wrongful exercise of the discretion or power. Because of the requirement of vulnerability of the beneficiary at the hands of the fiduciary, fiduciary obligations are seldom present in dealings of experienced businessmen of similar bargaining strength acting at arm's length: see, for example, *Jirna Ltd. v. Mister Donut of Canada Ltd.* (1971), 22 D.L.R. (3d) 639 (Ont. C.A.); affirmed [1975] 1 S.C.R. 2. The law takes the position that such individuals are perfectly capable of agreeing as to the scope of discretion or power to be exercised, i.e., any 'vulnerability' could have been prevented through the more prudent exercise of their bargaining power and the remedies for the wrongful exercise or abuse of that discretion or power ... are adequate in such a case.

150    If Corona placed itself in a vulnerable position because LAC was given confidential information, then this dependency was gratuitously incurred. Nothing prevented Corona from exacting an undertaking from LAC that it would not

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

acquire the Williams property unilaterally. And yet the trial Judge found that while the Williams property was discussed by Bell and Sheehan, the latter did not agree *not* to acquire the Williams property. Indeed it does not appear that LAC was ever asked to refrain from so doing. In the letter dated May 19, Sheehan wrote to Bell in part as follows:

> As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued.

The reference to the Hughes ground included the Williams property. It would seem that the possibility of Corona participating could only come about if the property were acquired. This would suggest that the parties contemplated that LAC might acquire the property in which event Corona would have a possibility of participating. At the very least LAC might reasonably have considered that such a course of action was open to it. In view of the abandonment by Corona of any contractual claim, I conclude that even this limited protection was not secured by any contractual arrangement.

151    Accordingly, if Corona gave up confidential information, it did so without obtaining any contractual protection which was available to it. This and the fact that misuse of confidential information is the subject of an alternate remedy strongly militate against the application here of equity's blunt tool. I now turn to that alternate remedy, breach of confidence.

## (2) Breach of Confidence

152    Both the trial Judge and the Court of Appeal applied three criteria in determining whether a breach of confidence had been made out by the respondent. These elements are:

> (i) Confidential Information: Did Corona supply LAC with information having a quality of confidence about it?

> (ii) Communication in Confidence: Did Corona communicate this information to LAC in circumstances in which an obligation of confidence arises?

> (iii) Misuse of Information: Did LAC, by acquiring the Williams property to the exclusion of Corona, misuse or make an unauthorized use of the information?

153    The trial Judge made findings of fact in favour of the respondent with respect to each of these criteria:

### (i) Confidential Information

In the present case much of the information transmitted by Corona to Lac was private and had not been published. There is no doubt, however, that Corona wished to attract investors. Drill hole results were published on a regular basis and incorporated in George Cross Newsletters. Mr. Bell permitted himself to be quoted in the March 20 George Cross Newsletter and made a presentation to a group of stockbrokers in Vancouver.

Mr. Bell also quite freely discussed the Corona results with brokers, investors and friends. Lac, however, was told more than the general public. Mr. Sheehan was shown the core, the drill plan and sections on May 6th. He discussed the geology with Mr. Bell on May 6th, May 8th and June 30th, and a full presentation with up-to-date results was made to Lac on June 30th.

### (ii) Communication in Confidence

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

I find as a fact that on May 6, 1981, there was no mention of confidentiality with respect to the site visit, except in connection with New Cinch. I prefer the evidence of Messrs. Bell and Dadds to that of Messrs. Sheehan and Pegg. Clearly the information was confidential and this must have been obvious to Mr. Sheehan.

The information, although partly public, was, I have found, of value to Lac and was used by Lac. It was transmitted with the mutual understanding that the parties were working towards a joint venture or some other business arrangement and, in my opinion, was communicated in circumstances giving rise to an obligation of confidence.

**(iii) Misuse of Information**

Mr. Sheehan and Dr. Anhuesser testified that the information Lac acquired from Corona was of value in assessing the merits of the Williams property and Mr. Sheehan said that he made use of this information in making an offer to Mrs. Williams.

Certainly Lac was not authorized by Corona to bid on the Williams property.

154    There are concurrent findings of fact and these should not be disturbed by this Court unless we are satisfied that they are clearly wrong. The appellant did not attack either the basic criteria or these findings of fact as such, but rather "the rules by which the existence of the elements as a matter of law are to be determined".

155    With respect to the first element, the appellant submitted that although some of the information was private, much of it was public. This combination did not act as a springboard to give the appellant an advantage over others. Essentially, the appellant submitted that the desirability of acquiring the Williams property could have been deduced from information which was public and it got no head start by obtaining information from the respondent.

156    In this regard the statement of Lord Greene in *Saltman Engineering Co. v. Campbell Engineering Coy.* (1948), 65 R.P.C. 203, [1963] 3 All E.R. 413n (C.A.), (leave to appeal to House of Lords refused) at 215 [R.P.C.], which was quoted by the trial Judge, is apposite:

I think that I shall not be stating the principle wrongly if I say this with regard to the use of confidential information. The information, to be confidential, must, I apprehend, apart from contract, have the necessary quality of confidence about it, namely, it must not be something which is public property and public knowledge. On the other hand, it is perfectly possible to have a confidential document, be it a formula, a plan, a sketch, or something of that kind, which is the result of work done by the maker upon materials which may be available for the use of anybody; but what makes it confidential is the fact that the maker of the document has used his brain and thus produced a result which can only be produced by somebody who goes through the same process.

157    *Seager v. Copydex,* [1967] 2 All E.R. 415, [1967] 1 W.L.R. 923 (C.A.), cited by the appellant, provides a useful illustration of the concept of the use of added information to get a head start or to use it as a springboard. The plaintiff Seager was the inventor of a patented carpet grip. He negotiated with the defendant Copydex with a view to development of his invention. Negotiations were terminated without a contract. Copydex then proceeded to produce a competing grip. The Court found that much of the information which Seager gave to Copydex was public. But there was some private information that resulted from Seager's efforts such as the difficulties which had to be overcome in making a satisfactory grip. At 931 [W.L.R.], Lord Denning M.R. stated:

When the information is mixed, being partly public and partly private, then the recipient must take special care to use only the material which is in the public domain. He should go to the public source and get it: or, at any rate, not be in a

better position than if he had gone to the public source. He should not get a start over others by using the information which he received in confidence. At any rate, he should not get a start without paying for it.

158    Corona had conducted an extensive exploration program on its own property. The information which it obtained was pertinent in evaluating the Williams property. Its geologist, Bell, had developed a theory that the source of the zone of gold mineralization on Corona's property was volcanogenic. This meant that gold could be spread over a large area with "pools" of ore throughout. This led him to conclude that the exploration program should be extended to the neighbouring properties which included the Williams property. Bell was the geologist who first firmly believed that it was the land of Havilah and his enthusiasm spread to his principals. This information was developed from the results of the exploration program and the application of Bell's knowledge as a geologist. LAC got the benefit of this information. It had the advantage of several discussions with Bell who interpreted his findings and explained his volcanogenic theory. Bell allowed LAC's representatives to examine the drill cores and the individual assays. LAC's representatives were also advised that Corona was actively pursuing the Williams property. The trial Judge found as a result that:

> On all the evidence I conclude that the site visit and the information disclosed by Corona to Lac was of assistance to Lac not only in assessing the Corona property but also in assessing other property in the area and in making an offer to Mrs. Williams.

159    This information was the springboard which led to the acquisition of the Williams property. Sheehan admitted that the offer to Mrs. Williams was based in part on information obtained from Corona. The degree of reliance on Bell's input is graphically illustrated by the fact that after LAC had optioned the Williams property, it located its three drill holes on the Williams property in the same area in which Bell would have located his next three holes, westerly from the Corona property.

160    It was suggested in argument that although some of the information was of a private nature, it was not incremental in the sense that it did not enhance the information so as to make the Williams property more desirable. This contention is effectively refuted by the actions of LAC. Immediately after the May 6 meeting, something in that meeting triggered a frenzy of activity on the part of LAC, including a staking of 640 claims, several further meetings with Corona and the acquisition of the Williams property. I agree therefore with the conclusion of the Courts below that the information obtained from Corona by LAC went beyond what had been imparted publicly in the George Cross Newsletters or the public investors' meeting. Furthermore, it put LAC in a preferred position vis-à-vis others with respect to knowledge of the desirability of acquiring the Williams property.

161    With respect to the second element the appellant submitted that the trial Judge did not apply the reasonable man test in determining whether the information was imparted in circumstances in which an obligation of confidence arises. The trial Judge in his reasons cited with approval the reasonable man test enunciated in *Coco v. A. N. (Engineers) Ltd.*, [1969] R.P.C. 41 (Ch.). Moreover, the trial Judge referred to the passage of Megarry J. at 48 which follows the articulation of that test:

> In particular, where information of commercial or industrial value is given on a business-like basis and with some avowed common object in mind, such as a joint venture or the manufacture of articles by one party for the other, I would regard the recipient as carrying a heavy burden if he seeks to repel a contention that he was bound by an obligation of confidence.

The trial Judge found that it was obvious to Sheehan that the information was confidential and that:

> It was transmitted with the mutual understanding that the parties were working towards a joint venture or some other

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

business arrangement and, in my opinion, was communicated in circumstances giving rise to an obligation of confidence.

162      These findings were made at least in part on the basis of a preference of the evidence of Bell and Dadds to that of Sheehan and Pegg. As did the Court of Appeal, I accept them.

163      With respect to the third element, LAC submits that it did not misuse the information because it went to the public record and then started staking and making the inquiries which eventually culminated in the acquisition of the Williams property. The trial Judge has found, however, that the information obtained from Corona was of value to LAC in assessing the merits of the Williams property and LAC made use of this information to the detriment of Corona. This finding is amply supported by the evidence and should be accepted.

164      The trial Judge also found that LAC was not authorized by Corona to bid on the Williams property. I interpret this to mean that Corona did not advise LAC that it could bid on the Williams property. Furthermore, as noted above, Sheehan never expressly agreed that LAC would refrain from acquiring the Williams property. The trial Judge so found. There was an "informal oral understanding as to how each would conduct itself in anticipation of a joint venture or some other business arrangement". The terms of this informal arrangement as they relate to the acquisition of the Williams property are very sketchy. I have set out above the evidence and findings of fact that relate to this matter, including the portion of the letter of May 19, 1981 which states:

As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued.

165      As I said earlier in my reasons, that statement is neutral as to who would acquire the property. It is consistent with either Corona or LAC acquiring the property but subject to the loose oral arrangement that they were working toward a joint venture or other business arrangement which would involve participation by Corona in accordance with one of the formulae set out in the May 19 letter or an arrangement similar thereto.

166      On this basis, acquisition by LAC of the Williams property to the exclusion of Corona was not an authorized use of the confidential information which it received from Corona and which was of assistance in enabling LAC to get the property for itself.

167      In summary, the three elements of breach of confidence were made out at trial, affirmed on appeal, and notwithstanding the able submissions for the appellant, I find the decision of the trial Judge and the Court of Appeal unassailable on this branch of the case. Accordingly, with respect to liability for breach of confidence, the appeal fails.

### (3) Nature of Remedy for Breach of Confidence

168      The trial Judge dealt with remedy solely on the basis of breach of a fiduciary duty. On this basis he ordered that upon payment to LAC of the amounts referred to above, the mine be transferred to Corona.

169      The Court of Appeal affirmed the trial Judge but after expressing the view that it "is artificial and difficult to consider the question of the proper remedy for breach of the obligation of confidence on the hypothesis that there is no co-existing fiduciary obligation", it concluded that a constructive trust would in such circumstances be a possible remedy.

170      Furthermore, based on the fact that (i) but for "LAC's actions, Corona would have acquired the Williams property" and (ii) "it may fairly be said that, but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property", the Court of Appeal concluded that it was the appropriate remedy.

### Constructive Trust or Damages

171      The foundation of action for breach of confidence does not rest solely on one of the traditional jurisdictional bases for action of contract, equity or property. The action is sui generis relying on all three to enforce the policy of the law that confidences be respected. See Gurry, *Breach of Confidence*, (Oxford: Clarendon Press, 1984) at 25-26, and Goff & Jones, *The Law of Restitution*, 3rd ed., (London: Sweet & Maxwell, 1986) at 664-667.

172      This multi-faceted jurisdictional basis for the action provides the Court with considerable flexibility in fashioning a remedy. The jurisdictional basis supporting the particular claim is relevant in determining the appropriate remedy. See *Nichrotherm Electrical Co. v. Percy*, [1957] R.P.C. 207, 213-14; Gurry, supra, at 26-27; and Goff & Jones, supra, at 664-65. A constructive trust is ordinarily reserved for those situations where a right of property is recognized. As stated by the learned authors of Goff & Jones, supra, at 673:

> In restitution, a constructive trust should be imposed if it is just to grant the plaintiff the additional benefits which flow from the recognition of a right of property.

Although confidential information has some of the characteristics of property, its foothold as such is tenuous (see Goff and Jones, supra, at 665). I agree in this regard with the statement of Lord Evershed in *Nichrotherm*, supra, at 209, that:

> a man who thinks of a mechanical conception and then communicates it to others for the purpose of their working out means of carrying it into effect does not, because the idea was his (assuming that it was), get proprietary rights equivalent to those of a patentee. Apart from such rights as may flow from the fact, for example, of the idea being of a secret process communicated in confidence or from some contract of partnership or agency or the like which he may enter into with his collaborator, the originator of the idea gets no proprietary rights out of the mere circumstance that he first thought of it.

173      As a result, there is virtually no support in the cases for the imposition of a constructive trust over property acquired as a result of the use of confidential information. In stating that such a remedy is possible, the Court of Appeal referred to Goff & Jones, supra, at pp. 659-674. The discussion of proprietary claims commences at 673 with the statement which I have quoted above and thereafter all references to constructive trust pertain to an accounting of profits. No reference is made to any case in which a constructive trust is imposed on property acquired as a result of the use of confidential information.

174      In Canada as in the United Kingdom, the existence of the constructive trust outside of a fiduciary relationship has been recognized as a possible remedy against unjust enrichment. See Waters, *Law of Trusts in Canada*, 2nd ed., 1984, at 386-397.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

175    In Canada this device has been sporadically employed where the unjust enrichment occurred in the context of a pre-existing special relationship between the parties. Thus in *Pettkus v. Becker*, [1980] 2 S.C.R. 834, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 117 D.L.R. (3d) 257, 34 N.R. 384, Dickson J. (as he then was) spoke of "a relationship tantamount to spousal". In *Nicholson v. St. Denis* (1975), 8 O.R. (2d) 315, 57 D.L.R. (3d) 699 (C.A.), leave to appeal to the Supreme Court of Canada refused (1975), 8 O.R. (2d) 315n, 57 D.L.R. (3d) 699n, MacKinnon J.A. refused the remedy in the absence of "a special relationship" between the parties. In *Unident v. Delong* (1981), 50 N.S.R. (2d) 1, 98 A.P.R. 1, 131 D.L.R. (3d) 225 (T.D.), Hallett J., quoting MacKinnon J.A., refused restitution where a special relationship could not be shown.

176    In *Pre-Cam Exploration & Development Ltd. v. McTavish*, [1966] S.C.R. 551, 56 W.W.R. 697, 50 C.P.R. 299, 57 D.L.R. (2d) 557, an employee acting on information which he obtained entirely in the course of his employment, staked certain claims which would otherwise have been staked by the employer. This Court affirmed the decision of the trial Judge who held that the employee was a trustee of the claims for his employer. In his reasons for the Court, Judson J. stated, at 555, that:

> it was a term of his employment, which McTavish on the facts of this case understood, that he could not use this information for his own advantage. The use of the term 'fraud' by the learned Chief Justice at trial was fully warranted.

In these circumstances, Judson J. referred to the use of the constructive trust. I do not consider that that decision lays down any principle that makes the remedy of a constructive trust an appropriate remedy for misuse of confidential information except in very special circumstances.

177    Although unjust enrichment has been recognized as having an existence apart from contract or tort under a heading referred to as the law of restitution, a constructive trust is not the appropriate remedy in most cases. As pointed out by Professor Waters in *Law of Trusts in Canada*, supra, at 394, although unjust enrichment gives rise to a number of possible remedies:

> the best remedy in the particular circumstances is that which corrects the unjust enrichment without contravening other established legal doctrines. In most cases, as in *Deglman v. Guar. Trust Co. of Can. and Constantineau* itself, a personal action will accomplish that end, whether its source is the common law or equity, providing as it often will monetary compensation.

178    While the remedy of the constructive trust may continue to be employed in situations where other remedies would be inappropriate or injustice would result, there is no reason to extend it to this case.

179    The conventional remedies for breach of confidence are an accounting of profits or damages. An injunction may be coupled with either of these remedies in appropriate circumstances. A restitutionary remedy is appropriate in cases involving fiduciaries because they are required to disgorge any benefits derived from the breach of trust. In a breach of confidence case, the focus is on the loss to the plaintiff and, as in tort actions, the particular position of the plaintiff must be examined. The object is to restore the plaintiff monetarily to the position he would have been in if no wrong had been committed. See *Dowson & Mason Ltd. v. Potter*, [1986] 2 All E.R. 418, [1986] 1 W.L.R. 1419 (C.A.) and *Talbot v. General Television Corp. Pty. Ltd.*, [1980] V.R. 224. Accordingly, this object is generally achieved by an award of damages, and a restitutionary remedy is inappropriate.

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

180    The Williams property was acquired as a result of information which was in part public and in part private. It would be impossible to assess the role of each. The trial Judge went no further than to find that the confidential information was "of value" to LAC and

of assistance to Lac not only in assessing the Corona property but also in assessing other property in the area and in making an offer to Mrs. Williams.

181    The Court of Appeal went further and stated that "but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property". The reasons do not disclose any factual basis for extending the finding of the trial Judge and I see no basis for so doing. The best that can therefore be said is that it played a part. When the extent of the connection between the confidential information and the acquisition of the property is uncertain, it would be unjust to impress the whole of the property with a constructive trust.

182    The case has been presented on the basis that either a transfer of the property or damages is the appropriate remedy. The respondent contends that the former is appropriate and the appellant the latter. No submissions were made in oral argument for or against an accounting of profits. Moreover, damages were assessed in the alternative in the event that on appeal this was considered the appropriate remedy. In all the circumstances, therefore, I have concluded that of the two alternatives presented, damages is the proper remedy.

183    It is, therefore, necessary to determine the basis upon which damages will be assessed. The formula for the measure of damages does not appear to be seriously disputed, although the application of the formula is. In *Dowson & Mason Ltd. v. Potter*, supra, Sir Edward Eveleigh adopted the statement of Lord Wilberforce in *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.*, [1975] 2 All E.R. 173, [1975] 1 W.L.R. 819 (H.L.) in a breach of confidence action. Lord Wilberforce was dealing with the measure of damages applicable to economic torts. He stated, at 177 [E.R.]:

As in the case of any other tort (leaving aside cases where exemplary damages can be given) the object of damages is to compensate for loss or injury. The general rule at any rate in relation to 'economic' torts is that the measure of damages is to be, so far as possible, that sum of money which will put the injured party in the same position as he would have been in if he had not sustained the wrong (*Livingstone v. Rawyards Coal Co* (1880) 5 App Cas 25 at 39 per Lord Blackburn).

184    In applying this test it is necessary to consider what the wrong is and what the position of the plaintiff would have been if he had not sustained the wrong. To put it shortly, what loss was caused to the plaintiff by the defendant's wrong?

185    In my opinion, the wrong committed by LAC was the acquisition of the Williams property for itself and to the exclusion of Corona. That was contrary to the understanding found to exist by the trial Judge that the parties were working towards a joint venture or some other business arrangement.

186    This set the parameters of the permitted use of the confidential information and its use within these parameters was not a misuse of it. LAC did not agree to refrain from acquiring the property and Corona did not tell LAC not to acquire the property. This would be surprising unless the parties thought that in keeping with their efforts to conclude a joint business arrangement, either one could acquire it for that purpose. This is supported by the letter of May 19 in which Sheehan set out three alternative "possibilities" for a working arrangement with Corona. That is followed with a paragraph relating to the

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

Williams property. For ease of reference I will again reproduce the relevant correspondence:

> As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued. In addition we are staking ground in the area and recognizing Corona's limited ability to contribute we could work Corona into the overall picture as part of an overall exploration strategy.

Bell's reply states in part:

> At this point, until I hear otherwise from the directors in Vancouver, I like your idea of Corona's contribution with Long Lac Minerals Exploration Limited as part of an overall exploration programme in the area.

187    The correspondence reflected the discussion between the parties up to that point. In my view it can only be read as envisaging a participation by Corona with LAC in the Williams property. Either party could acquire it for this purpose. This is further supported by the following evidence of Sheehan which was elicited on cross-examination. This evidence was relied on by the trial Judge in concluding that a statement made by Bell at the meeting of May 8 that Corona was "happy with our land position" was made in the context of additional staking and not that it (Corona) was not interested in acquiring the Williams property:

> Q. Mr. Sheehan, on May 8th — and, my Lord, page 803, question 3971:
>
> > Q. Can you tell me now then, please, your discussion with Mr. Bell on the 8th as it concerns the Hughes property?
> >
> > A. My best recollection of that discussion was where the Hughes property was concerned was I was discussing the area in general. I believe I had indicated to Mr. Bell that we would be staking in the area.
> >
> > MR. McDOUGALL: You have given that evidence.
> >
> > THE DEPONENT: With respect to the Hughes property, I had suggested the possibilities that we pick up the Hughes property, that is to say Lac, that Corona may pick it up, that any combination of those factors could be addressed. In other words, if indeed we were going to make a deal, Lac could fund Corona since he had indicated that they were just a small company without much money.
>
> A. Yes, that's correct.
>
> Q. Were you asked those questions and did you give those answers?
>
> A. Yes.
>
> MR. LENCZNER: And we have this already in one of the tabs, my Lord, with regard to the May 19th letter, but let me just — I had better pull out the tab. It is tab 146.
>
> Q. Page 863, the answer you gave:
>
> > A. Well, I think I had discussed with Mr. Bell in that meeting and I may have referred to this in previous testimony that the patented ground as well as the Hughes ground should be picked up and that's what that is referring to there.
>
> A. Yes.
>
> Q. So that you had discussed with Bell on May 8th, picking up the Hughes ground and the patented ground?

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

A. Yes.

Q. And that Lac could pick it up, Corona could pick it up?

A. Yes.

Q. Or you would even fund Corona to pick it up?

A. Yes, we would do the funding.

Q. In addition to all of that, you said you had a staking programme going down to the east and he could participate in that if he wanted?

A. Yes, we could bring him into that.

Q. In that context, I suggest to you he said, 'We are happy with our land position'?

A. It was in that context that he said, 'No, I'm happy with my land position and we will continue drilling and doing the Phase II programme'.

188    The trial Judge is correct in his finding that Corona was interested in "the possession of either Williams or Hughes". There is no finding, however, that acquisition by LAC of the Williams property as part of the joint exploration program along with continued negotiations towards an agreement on the basis of one of the scenarios outlined in the letter of May 19 would have constituted a breach of mutual understanding under which the confidential information was supplied to LAC. Furthermore, I am satisfied that had that occurred, the most likely conclusion is that LAC and Corona would have continued to negotiate and Corona would have made a deal with LAC for their respective participation in a joint venture including the Williams property. Corona could not finance the development on its own property without the assistance of a senior mining company. Accordingly, it entered into an agreement with Teck on somewhat similar terms as those proposed by LAC. Even after it discovered that LAC had acquired the Williams property, a director, Moore, sought to continue the negotiations. His evidence in part is as follows:

Q. What is it that you were setting about doing then in your attempts to reach Mr. Sheehan?

A. Well, the stage — the stage was still set, even at that point, for — to continue with this joint venture. Lac had picked up a big piece of ground in the area, 600 claims, and Corona had a nice start, that Williams' claims were off on the side. We felt that they should be ours. But it was, uh, it was still possible in that scenario, in my opinion, to make a joint venture, even with — all the pieces were still there to make a good deal.

189    But for LAC's breach, those negotiations would likely have continued and it would have resulted in Corona acquiring an interest in the Williams property of 50 per cent or perhaps a small percentage interest. It would have also acquired a corresponding obligation to contribute on the same basis. Corona's damages should therefore be calculated on the basis of the loss of this interest.

190    In his reasons the trial Judge stated:

If Corona had obtained the Williams property, Corona may well have entered into a joint venture agreement with Lac covering the Corona and Williams properties together with the White River claims. Corona's damages would be assessed accordingly in an action for breach of contract.

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

Holland J. went on to hold that based on his finding of a fiduciary duty the appropriate remedy was a restitutionary remedy requiring the whole of the property to be returned to Corona upon payment of the added value. I have decided that there is no breach of a fiduciary duty and therefore, as in contract, account must be taken of the fact that but for the breach by LAC, a joint venture agreement would likely have resulted. Damages should be assessed accordingly.

## Assessment of Damages

191     The appellant, in its factum, para. 177, submits as follows:

If it is found that, through misuse of information relating to Corona's intentions or otherwise, the loss suffered by Corona was the loss of the opportunity to acquire and to explore the Williams property, Corona would be entitled to damages. However, its loss is not to be measured by LAC's gain. Corona is to be put in the same position it would have been if it had not sustained the wrong. In making that assessment in the case of a lost opportunity the correct approach is:

i) to determine the form of business arrangement that Corona would have been obliged to have entered into with a senior mining partner and the proportionate interest that Corona would probably have conceded to that partner. The later arrangement with Teck suggests this would be 55%. Sheehan suggested 60%;

ii) to value the property as improved by LAC. This was done by the trial judge and produced a figure of $700,000,000.00 after tax, being the value created by the size of the facilities LAC decided to put on the Williams property. LAC disputed this assessment on appeal but the Court of Appeal did not deal with this issue. LAC's submissions on the value of the property as improved by LAC are set out in Appendix 'A'. In addition, Corona may have decided or been compelled to exploit the property with a lower rate of extraction. The value of the property must be discounted to reflect that eventuality;

iii) to deduct from that discounted figure the 60% (or 55%) interest of the senior partner;

iv) to deduct from that figure a capitalized estimate of the costs Corona would have had to contribute to the exploration and exploitation of the property; and

v) to deduct a further amount to reflect Corona's own share of responsibility for its loss.

192     I agree that this approach generally gives effect to the principles which I have stated above. I would not, however, include item (v) to deduct a further amount to reflect Corona's own share of responsibility for its loss. This is essentially a plea of contributory negligence for which there is no support in the findings of fact or evidence.

## (i) The Business Arrangement

193     In determining the nature of the business arrangement that the parties would likely have concluded, the arrangement with Teck is very pertinent. This arrangement was set out in a number of agreements. For my purposes I refer primarily to an agreement dated December 10, 1981 (property agreement) with the "Joint Venture Agreement" attached as Schedule B, and the "Area of Interest Agreement" contained in a letter dated August 13, 1982 as amended by an agreement made as of December 19, 1983, particularly paras. 3.2 and 5. Under these agreements, the parties entered into the following arrangement.

194     (a) Corona Property: Teck undertook to complete exploration and development work and prepare a feasibility study

International Corona Resources Ltd. v. LAC Minerals Ltd., 1989 CarswellOnt 126

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

with respect to 17 properties. The initial costs were financed out of a fund to which both Teck and Corona contributed $1,000,000. Teck acquired a 55 per cent interest upon completion of the feasibility study and election to bring the property into production, leaving Corona with 45 per cent. Thereafter development was to be financed in accordance with the respective interests of the parties, i.e. 55 per cent by Teck and 45 per cent by Corona.

195    (b) Other Property: Any property in the area not covered by the property agreement subsequently acquired by either Teck or Corona would be shared on a 50-50 basis with contributions accordingly. This provision was expressly extended to the Williams property contingent on Corona obtaining a favourable judgment.

196    In the circumstances, I conclude that Corona would have concluded with LAC a business arrangement with respect to the Williams property substantially similar to that which it concluded with Teck: a 50-50 property interest with participation in the development costs in the same ratio. Although this is a slightly higher percentage in favour of Corona than that proposed by Sheehan and agreed upon with Teck in respect of Corona's own property, it is the figure that was applied to the Williams property in the Teck agreement. The benefit of any doubt as to whether it should be 45 per cent or 50 per cent should be given to the innocent party Corona rather than to the party in breach.

*(ii) Value of Improved Mine*

197    The trial Judge fixed the value at $700,000,000 after tax. Both parties take issue with this assessment. While there is some merit in some of the issues raised by each side, it has not been established that this is a wholly erroneous assessment and I accept it. I will deal with several of the criticisms which raise an issue of law or principle. Other objections are primarily factual and the findings of the trial Judge should be accepted.

198    First, although not directly raised in this Court, the appellant submitted below that the date for valuation was the date of breach and not the date of trial. The trial Judge chose January 1, 1986, a date during the latter period, applying equitable principles. Having regard to the flexibility possessed by the Court to do justice in an action for breach of confidence, I have no difficulty in applying those principles to this assessment to the extent of adopting the later date. To do otherwise would be to ignore the vast potential that the Williams property possessed at the time it was acquired by LAC. That potential can best be valued by determining its value as of the date fixed by the trial Judge.

199    The trial Judge elected to adopt a discounted cash flow approach to value the Williams property as opposed to a market capitalization approach. Although I recognize that each approach has its strengths and weaknesses, I am not prepared to hold that the trial Judge erred in opting for a discounted cash flow of the mine on the Williams property over the life of the mine to ascertain its present value. In my opinion, there is ample evidence to support the conclusion that this was the proper means to assess the value of the property.

200    I am also of the opinion that the trial Judge correctly applied this Court's decision in *Florence Realty Co. Ltd. v. R.*, [1968] S.C.R. 42, 65 D.L.R. (2d) 136 in deducting corporate taxes from the cash flow to determine the value of the mine.

201    Furthermore, the figure of $700,000,000 was based on the payment of a 1-1/2 per cent net smelter return to Mrs. Williams in accordance with the contract negotiated by LAC. Although Corona offered a 3 per cent net smelter return to Mrs.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

Williams, which would reduce the value of the property, I accept the figure of 1-1/2 per cent as the likely figure which would have been paid if LAC had not been in breach of confidence.

### (iii) Damages for Loss of Interest in Mine

202      Damages for loss of Corona's interest in the mine are therefore assessed at $350,000,000 which is 50 per cent of $700,000,000.

### (iv) Contribution to Development Costs

203      I agree with the appellant that Corona should not have the value by which the mine was increased by the expenditures made by LAC without contributing in accordance with its interest. LAC presented evidence that it had expended $203,978,000 in developing the Williams property. The trial Judge held that had Corona developed the two properties together then a number of savings would have been realized over the sums expended by both LAC and Corona in developing their two mines independently. The trial Judge suggested that there would have been only two shafts rather than three, only one mill and only one group of service facilities. For this reason, he estimated that LAC spent an additional $50,000,000 by virtue of its independent development of the Williams property.

204      I agree that this sum is to be deducted from the expenditures by LAC in developing the Williams property. The operative principle of damages is to place Corona in the position it would have occupied had there been no breach of confidence by LAC. If LAC had acquired the property for the benefit of both parties, the two properties would have been developed jointly rather than separately. LAC is, therefore, responsible for the extra costs incurred as a result of the inability to take advantage of any natural economies of scale.

205      Accordingly, $50,000,000 is to be deducted from the figure of $203,978,000 representing LAC's improvements to the property, for a difference of $153,978,000. One-half of this sum ($76,989,000) must be deducted from $350,000,000 for a difference of $273,011,000.

206      This does not fully dispose of the assessment of damages. Several further items having a possible bearing on the amount require consideration. In arriving at the figure of $153,978,000 the trial Judge expressed some uncertainty with respect to the quantum of the deduction of $50,000,000 from the $203,978,000 which resulted in a difference of $153,978,000. Accordingly, a reference was directed but only if either party was dissatisfied with the trial Judge's figure. The formal order expressed it as a reference concerning the amount of $153,978,000. As I read the trial Judge's reasons, the uncertainty was in the amount of the deduction and not the $203,978,000 expenditure by LAC which was based on its records. Nevertheless, I propose to direct a reference in the same terms as the trial Judge.

207      In addition, the trial Judge ordered that the amounts paid to Mrs. Williams, exclusive of royalty payments, should also be paid by Corona. This cost of the acquisition of the property would have been necessary had no breach occurred. Corona would have been obliged to pay one-half of these payments. Accordingly, one-half of the amounts paid to Mrs. Williams exclusive of royalty payments must be deducted from the award of damages of $273,011,000 or from that figure as varied by any reference undertaken as indicated above.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1989 CarswellOnt 126, 1989 CarswellOnt 965, [1989] 2 S.C.R. 574, [1989] C.L.D. 1140...

208     The trial Judge also directed that the appellant pay the respondent the profits, if any, obtained by the appellant from the operation of the Williams mine. The foundation for this order was the restitutionary remedy which I have found to be inappropriate. Accordingly, no such order is made. The respondent is, however, entitled to pre-judgment interest in accordance with s. 138(1)(b) of the *Courts of Justice Act, 1984*, S.O. 1984, c. 11. If, therefore, a notice has been served as provided by that provision, the respondent will be entitled to interest in accordance with that section. The respondent is also entitled to post-judgment interest in accordance with s. 139 of the *Courts of Justice Act*.

## Disposition

209     In the result, I would allow the appeal in part and dismiss the cross-appeal. I would set aside the judgment at trial and the order of the Court of Appeal and direct that judgment should issue as follows:

1. The plaintiff is entitled to recover from the defendant damages in the sum of $273,011,000 less one-half of all sums paid to Mrs. Williams with the exceptioon of royalties, subject to the right of either the plaintiff or defendant to undertake a reference to the Master concerning the deduction of $153,978,000.

2. The plaintiff is entitled to recover pre-judgment interest from the defendant on the sum referred to in para. 1, or as varied on a reference, in accordance with s. 138(1)(b) of the *Courts of Justice Act* from the date of service of any notice, and post-judgment interest on the said sum in accordance with s. 139 of the *Courts of Justice Act*.

3. The plaintiff's is entitled to recover from the defendant the costs of the action.

210     I would also order that the appellant recover from the respondent the costs of the appeal and cross-appeal to the Court of Appeal and the costs of the appeal and cross-appeal to this Court.

*Appeal and cross-appeal dismissed.*

Footnotes

[1]     A similar approach was taken in the British Columbia case *57134 Manitoba Ltd. v. Palmer* (1985), 30 B.L.R. 121, 65 B.C.L.R. 355, 8 C.C.E.L. 282, 7 C.P.R. (3d) 477 (S.C.), aff'd (1989), 44 B.L.R. 94, 37 B.C.L.R. (2d) 50, 26 C.P.R. (3d) 8 (C.A.).

[2]     See, for example, *Bahamaconsult Ltd. v. Kellogg Salada Can. Ltd.* (1976), 15 O.R. (2d) 276 (C.A.), leave to appeal to S.C.C. dismissed (1976), 15 O.R. (2d) at 276n (S.C.C.), and *Canada Square Corp. v. VS Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205 (C.A.).

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---



**Lease Corporation of America, Inc., Plaintiff, v. William Resnick et al., Defendants and Third-Party Plaintiffs-Appellants-Respondents.   Edward J. Acton et al., Third-Party Defendants-Respondents-Appellants.   (And a Fourth-Party Action.)**

**89359**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, THIRD DE-PARTMENT**

**288 A.D.2d 533; 732 N.Y.S.2d 266; 2001 N.Y. App. Div. LEXIS 10006**

**November 1, 2001, Decided
November 1, 2001, Entered**

**PRIOR HISTORY:**    [***1]  Cross appeals from an order of the Supreme Court (Ledina, J.), entered August 23, 2000 in Sullivan County, which, *inter alia,* granted third-party defendants' motion for summary judgment dismissing the third-party complaint and, *sua sponte,* dismissed third-party defendants' causes of action against defendants.

**DISPOSITION:**    Order affirmed.

**LexisNexis(R) Headnotes**

*Contracts Law > Breach > Nonperformance*
*Contracts Law > Defenses > Unconscionability > General Overview*
*Contracts Law > Remedies > Liquidated Damages*
[HN1] Parties to a contract may provide for anticipatory damages in the event of failure to complete performance within the time specified, as long as such agreement is neither unconscionable nor contrary to public policy. Such anticipatory or liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract.

**COUNSEL:** Orseck Law Offices (Gerald Orseck of counsel), Liberty, for defendants and third-party plain-tiffs-appellants-respondents.

Robinson, Silverman, Pearce, Aronsohn & Berman (Herbert Teitelbaum of counsel), New York City, for third-party defendants-respondents-appellants.

**JUDGES:** Before: Crew III, J.P., Spain, Mugglin, Rose and Lahtinen, JJ. Spain, Mugglin, Rose and Lahtinen, JJ., concur.

**OPINION BY:** Crew III

**OPINION**

[*533]    [**267]   Crew III, J. P.

In or about March 1995 defendants, owners of certain real property located in the Town of Fallsburg, Sullivan County, entered into an oral agreement with third-party defendants to permit the latter to construct a baseball stadium and operate a minor league baseball franchise on the subject property. Once third-party defendants fulfilled the terms of this [***2]  oral agreement, defendants were to convey the property.   After entering into this agreement, however, third-party defendants apparently experienced certain cash flow problems, prompting defendants to extend a loan of some $ 750,000.  In an effort to memorialize this arrangement, the parties executed a written agreement dated August 21, 1995, pursuant to the terms of which third-party defendants agreed to, *inter alia,* repay defendants for the sum advanced on or before October 1, 1995, together with interest. The agreement further provided  [**268] that if such repayment was not forthcoming and third-party defendants otherwise failed to perform under the terms of the written agreement, the prior oral agree-

288 A.D.2d 533, *; 732 N.Y.S.2d 266, **;
2001 N.Y. App. Div. LEXIS 10006, ***

ment would be deemed void and defendants would be relieved of their obligation to convey the subject property.

Third-party defendants thereafter failed to repay the sum advanced and defendants declined to convey the now-improved parcel. Various lawsuits ensued including, insofar as is relevant to this appeal, a third-party action by defendants seeking, *inter alia,* repayment of the money loaned. Third-party defendants, in turn, commenced an action against defendants seeking, [***3] *inter alia,* damages for breach of the oral agreement. Ultimately, third-party defendants moved for summary judgment dismissing the third-party complaint. Supreme Court granted the motion, finding that the final paragraph of the August 21, 1995 letter constituted a liquidated damages clause and, as such, defendants' remedy for third-party defendants' failure to repay the sum advanced was limited to their retention [*534] of the improved parcel of land. Supreme Court also, *sua sponte,* dismissed third-party defendants' causes of actions and/or counterclaims against defendants, finding that inasmuch as defendants were entitled to retain the land, together with the subject improvements, third-party defendants could have no claim against defendants for any sums expended in the construction or initial operation of the ballpark. These cross appeals ensued.

We affirm. The case law makes clear that "[HN1] parties to a contract may provide for anticipatory damages in the event of failure to complete performance within the time specified, as long as such agreement is neither unconscionable [***4] nor contrary to public policy" (*X.L.O. Concrete Corp. v Brady & Co.,* 104 AD2d 181, 183, *affd* 66 NY2d 970). Such anticipatory or liquidated damages " 'constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract' " (*LeRoy v Sayers,* 217 AD2d 63, 69, quoting *Wirth & Hamid Fair Booking v Wirth,* 265 NY 214, 223).

Turning to the document at issue here, the final paragraph of the August 21, 1995 letter provided as follows: "That if the payments are not made as set forth in this letter, and if [third-party defendants] do not do the other affirmative acts called for in this letter, it is agreed that any prior understanding that we may have had with regard to the turning over of the property is void." Stated another way, once third-party defendants failed to, *inter alia,* repay the sum advanced (and there is no question that they failed to do so), defendants were not only expressly relieved of their obligation to convey the parcel, but also were permitted to retain the parcel, together with

all the improvements placed there at [***5] third-party defendants' expense.

In our view, the quoted contract provision constitutes a valid liquidated damages clause--plainly delineating defendants' damages in the event that third-party defendants failed to perform. ˙ Contrary to the position taken by defendants, liquidated damages need not necessarily be monetary [**269] in nature. Additionally, the fact that the relevant portion of the August 21, 1995 letter was not expressly labeled as a "liquidated damages provision" is not dispositive (*see, Truck Rent-A-Ctr. v Puritan* [*535] *Farms 2nd,* 41 NY2d 420, 425; *Scudder v Baker,* 172 AD2d 40, 43, *lv denied* 80 NY2d 757). Nor is there sufficient proof in the record to permit us to find that the subject clause constitutes an unenforceable penalty (*see generally, X.L.O. Concrete Corp. v Brady & Co., supra,* at 183 [provision will be treated as unenforceable penalty where the stipulated damages are plainly disproportionate to the injury]). While defendants, with the benefit of hindsight, may have made a bad bargain, it is not the function of this Court to rewrite the parties' agreement.

> * If such provision was, as defendants contend, merely a restatement of the doctrine of anticipatory breach, its inclusion in the August 21, 1995 letter would be superfluous. In other words, while the relevant paragraph perhaps could have been phrased more artfully, its mere inclusion in the document lends support to the finding that it indeed was intended to be a liquidated damages provision.

[***6] Having concluded that Supreme Court properly dismissed the third-party complaint, it necessarily follows that third-party defendants' various counterclaims and causes of action were properly dismissed as well. The parties' agreement plainly provided that defendants were entitled to retain the parcel, together with the improvements placed there at third-party defendants' expense, in the event that third-party defendants failed to perform. Therefore, since there is no dispute that third-party defendants failed to repay the sum advanced by defendants, third-party defendants simply cannot maintain a claim against defendants for the costs incurred in the construction and/or initial operation of the ballpark or for any lost profits or earnings. The parties' remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Spain, Mugglin, Rose and Lahtinen, JJ., concur.

Ordered that the order is affirmed, without costs.

Long v. Delta Catalytic Industrial Services Inc., 1998 CarswellAlta 70

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

1998 CarswellAlta 70
Alberta Court of Queen's Bench

Long v. Delta Catalytic Industrial Services Inc.

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70, 58 Alta. L.R. (3d) 115

# Tom Long, Plaintiff and Delta Catalytic Industrial Services Inc., Defendant

Fruman J.

Judgment: February 3, 1998
Docket: Calgary 9401-15261

Counsel: *T. M. Lee*, for the Plaintiff.
*J. D. Vallis*, for the Defendant.

Subject: Contracts; Employment; Public

## Headnote

### Employment law --- Termination and dismissal — Notice — Effect of contractual terms regarding notice

Termination provision in employment contract specified that plaintiff employee would be entitled to compensation in accordance with defendant corporation's severance policy in effect at time of termination — Defendant unilaterally changed its severance policy over time — Plaintiff was terminated in 1993 and was offered two weeks severance for each of his 11 years of service with defendant and its predecessor, in accordance with current severance policy — Plaintiff sued for wrongful dismissal and argued that termination provisions were not binding on him — Action allowed — Severance provisions can be put into contract but must be both sufficiently clear and understood by employee to be binding upon employee — Termination provisions in contract did not clearly and expressly constitute plaintiff's agreement to have his severance unilaterally determined by defendant — Provisions also could have been binding if defendant was able to establish that its severance policy was same or better than when plaintiff signed contract, but defendant did not present evidence on this point.

### Contracts --- Construction and interpretation — Intention of parties as expressed — General

Termination provision in employment contract specified that plaintiff employee would be entitled to compensation in accordance with defendant corporation's severance policy in effect at time of termination — Defendant unilaterally changed its severance policy over time — Plaintiff was terminated in 1993 and was offered two weeks severance for each of his 11 years of service with defendant and its predecessor, in accordance with current severance policy — Plaintiff sued for wrongful dismissal and argued that termination provisions were not binding on him — Action allowed — Severance provisions can be put into contract but must be both sufficiently clear and understood by employee to be binding upon employee — Termination provisions in contract did not clearly and expressly constitute plaintiff's agreement to have his severance unilaterally determined by defendant — Provisions also could have been binding if defendant was able to establish that its severance policy was same or better than when plaintiff signed contract, but defendant did not present evidence on this point.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

**Table of Authorities**

**Cases considered by *Fruman J.*:**

*Bagby v. Gustavson International Drilling Co.* (1980), 24 A.R. 181 (Alta. C.A.) — considered

*Bienvenu v. Zellers Inc.* (1984), 5 C.C.E.L. 30, 64 N.S.R. (2d) 242, 143 A.P.R. 242, 85 C.L.L.C. 14,001 (N.S. T.D.) — considered

*Brode v. Fitzwright Co.* (1992), 41 C.C.E.L. 289 (B.C. S.C.) — considered

*Buerman v. Canada (Attorney General)* (1996), 19 C.C.E.L. (2d) 127 (Ont. Gen. Div.) — considered

*Chadburn v. Sinclair Canada Oil Co.* (1966), 57 W.W.R. 477 (Alta. S.C.) — considered

*Clark v. Optyl (Can.) Ltd.* (1985), 7 C.C.E.L. 1, 61 N.B.R. (2d) 377, 158 A.P.R. 377 (N.B. C.A.) — considered

*Jobber v. Addressograph Multigraph of Canada Ltd.* (1980), 1 C.C.E.L. 87 (Ont. C.A.) — considered

*Lyonde v. Canadian Acceptance Corp.* (1983), 3 C.C.E.L. 220 (Ont. H.C.) — considered

*Mahon v. Paul Revere Life Insurance Co.* (1982), 19 Man. R. (2d) 388 (Man. Q.B.) — considered

*Matthewson v. Aiton Power Ltd.* (1985), 8 C.C.E.L. 312, 11 O.A.C. 76 (Ont. C.A.) — considered

*Nardocchio v. Canadian Imperial Bank of Commerce* (1979), 41 N.S.R. (2d) 26, 76 A.P.R. 26 (N.S. T.D.) — considered

*Rahemtulla v. Vanfed Credit Union,* 4 C.C.E.L. 170, [1984] 3 W.W.R. 296, 51 B.C.L.R. 200, 29 C.C.L.T. 78 (B.C. S.C.) — considered

*Risi v. Benson & Hedges (Canada) Inc.* (October 21, 1986), Doc. 9782/81 (Ont. Dist. Ct.) — considered

*Toronto-Dominion Bank v. Wallace* (1983), 41 O.R. (2d) 161, 145 D.L.R. (3d) 431, 83 C.L.L.C. 14,031 (Ont. C.A.) — considered

ACTION by employee for wrongful dismissal.

***Fruman J.*:**

1    Can an employee agree to place his severance fate solely in the hands of his employer? Yes. Did Tom Long make that agreement with his employer, Delta Catalytic Industrial Services Inc.? No.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

2    Mr. Long was originally employed by Stearns Catalytic Ltd. as a maintenance superintendent at the Suncor Project in Fort McMurray, Alberta. When Delta acquired the assets of Stearns in 1987, it agreed to hire all the Stearns employees. Delta presented the employees, including Mr. Long, with an offer of employment which stated that severance would be based on Delta's severance policy in effect at the time of termination of employment. Mr. Long accepted the offer by signing it.

3    Mr. Long was an exemplary and highly respected employee. He was promoted within Delta to project superintendent, an upper-middle management position. He worked at Delta projects in various locations, including the Shell Caroline project near Rocky Mountain House, Alberta. When the contract for that project was not renewed, Mr. Long, then 55, was terminated, effective November 19, 1993. Cause was not alleged and Delta purported to rely on the offer signed by Mr. Long in 1987 in order to apply Delta's then current severance policy. Delta calculated severance pay on the basis of two weeks severance for each full year with Delta and the predecessor employer, Stearns, a total of eleven years.

4    Mr. Long sued for damages for wrongful dismissal. He claimed that the severance provision was not binding and that he was entitled to damages in accordance with the common law. The validity of the accepted offer and Delta's right to change the severance provisions unilaterally were the central issues in this litigation. As is customary in these cases, a long list of additional matters was raised, dealing with the appropriate term of notice, entitlement to various benefits, mitigation and deductibility of mitigation expenses. In an oral judgment delivered on January 23, 1998 I decided that Mr. Long was not bound by the severance provisions, set the term of notice at 14 months and dealt with each of the issues on the long list. All involved the application of a specific fact situation to established law; none raised novel legal points.

5    Although my oral reasons addressed the issue of the validity of the severance provision, with counsels' concurrence I agreed to provide more comprehensive reasons on that specific area in a written decision. For purposes of any appeal of my ruling on validity, these written reasons will govern.

**Facts**

6    Mr. Long was employed on a full time basis with Stearns from August, 1982 to April, 1987, when its assets were purchased by Delta. Sometime in February, 1987 all Stearns employees at the Fort McMurray location, including Mr. Long, received three documents. The first, a letter from Stearns dated February 11, 1987, explained the sale and an employee's choices. The relevant portion reads as follows:

> Most importantly, SCL has given a high priority to ensuring the continued employment of as many employees as possible. In your case, SCL understands that DPL is offering you employment on substantially similar terms. Should you accept employment with DPL, any layoff benefits with DPL will be based on service since your employment date with SCL. In addition, if during the first year of your employment with DPL you are laid off for lack of work, SCL will pay any difference between the DPL layoff policy and the SCL layoff policy.

> If you choose not to accept DPL's offer of employment, your employment will be continued by SCL until April 17, 1987, at which time your employment will be terminated.

7    Mr. Long also received two documents from Delta: a confidentiality agreement, which is not relevant to these discussions, and an offer of employment dated February 12, 1987, which was conditional on closing the acquisition. In the offer of employment Delta offered Mr. Long the same position, reporting relationship, salary and assignment conditions and indicated that the employee benefit programs and pension plan would be changed to Delta's plans. The offer contains the

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Long v. Delta Catalytic Industrial Services Inc., 1998 CarswellAlta 70**

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

following provision dealing with severance:

> Past service with Stearns Catalytic Ltd. will be recognized as continuous and uninterrupted for the purpose of calculating vacation and severance. Severance, however, from the date of acceptance of employment, will be based on Delta's severance policy.

> As you are aware, our industry often experiences wide fluctuations in workload and consequently our workload varies depending on the economic conditions. Should the situation occur where we are forced to terminate your employment due to a reduced workload, you will be entitled to the severance policy in effect at that time.

8    Mr. Long accepted all three agreements by signing them on February 16, 1987. It seems that one or more meetings were held around this time to explain the acquisition to the employees. No one remembered any dates or even the sequence of events. Mr. Long recalled a small Stearns meeting held at the Suncor plant. He believed he signed the contracts at that meeting. Two other former Stearns employees remembered a large meeting convened by Delta at a Fort McMurray hotel. One witness specifically recalled that Mr. Long was present and actively asked questions. I don't doubt that Delta held a meeting and that Mr. Long participated. Neither of the two former Stearns employees could recall the particulars of any discussions at the meeting, although it seems that Delta generally touched on its policies, including the termination policy. Neither could remember any specific questions about that policy.

9    Mr. Long testified that he did not receive a copy of Delta's severance policy and was told nothing about it. He had no recollection that he was told that his severance rights might be reduced. He believed there was some urgency to signing the documents. Mr. Long said that he read the offer, understood it and had an opportunity to ask questions about it before he signed it. He did not remember receiving a copy of the signed Delta agreements before the litigation started.

10    Delta provided no evidence about the timing of events, disclosures made and explanations given at the meeting, nor about its practices in delivering copies of documents to employees. In fact, no one who was employed by Delta at the time of the 1987 acquisition testified at the trial. Delta was unable to locate the severance policy as it existed in 1987. That policy was superseded by a new policy in 1988 and that too has not been found. Delta provided a 1989 policy and the 1993 policy, which was in effect when Mr. Long was terminated, and which improved the 1989 severance package.

**Validity of Contract**

11    Delta relied on the terms of the accepted offer to limit Mr. Long's notice period on termination. Mr. Long submitted that the severance provision is not binding.

12    There is an implied term in every contract of employment that an employer will provide reasonable notice of termination. Failure to provide notice is a breach of contract which entitles the employee to damages. The implied term can be negatived by a specific agreement, but clear and express language must be used by the parties: *Chadburn v. Sinclair Canada Oil Co.* (1966), 57 W.W.R. 477 (Alta. S.C.), at 483; *Bagby v. Gustavson International Drilling Co.* (1980), 24 A.R. 181 (Alta. C.A.), at 191. Courts will enforce a severance provision which defines the length of notice, provided it is expressed in clear and unambiguous language: *Jobber v. Addressograph Multigraph of Canada Ltd.* (1980), 1 C.C.E.L. 87 (Ont. C.A.), at 91; *Mahon v. Paul Revere Life Insurance Co.* (1982), 19 Man. R. (2d) 388 (Man. Q.B.), at 391; *Toronto-Dominion Bank v. Wallace* (1983), 41 O.R. (2d) 161 (Ont. C.A.), at 181; *Matthewson v. Aiton Power Ltd.* (1985), 8 C.C.E.L. 312 (Ont. C.A.), at 314.

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

13    If Delta intended to rely upon the severance provision contained in the offer, it had the onus of proving that it represented the agreement of the parties. The severance provision was somewhat unique. It referred to some future severance policy of Delta: one that would be ascertainable at the time of termination but was not ascertainable at the time of signing. Additionally, it was Delta's practice to make unilateral changes to the severance policy without Mr. Long's or any other employee's consent. It did so on three occasions.

14    Unilateral changes to employment contracts seem to be a touchy subject in our jurisprudence. Generally, a unilateral notification of a change in severance entitlement by an employer after an employee has commenced working is insufficient to bind an employee. The employer must show that the employee had "an expression of agreement, express or implied": *Brode v. Fitzwright Co.* (1992), 41 C.C.E.L. 289 (B.C. S.C.), at 295. Acceptance cannot necessarily be inferred from an employee's continuing to report to work after receipt of a new policy: *Lyonde v. Canadian Acceptance Corp.* (1983), 3 C.C.E.L. 220 (Ont. H.C.), at 224. Nor, in my view, is an employee required to object to the amended policy once he learns of it, in order not to be bound. Finally, If the new policy reduces an employee's severance rights, issues of consideration for the new contract arise: *Rahemtulla v. Vanfed Credit Union*, [1984] 3 W.W.R. 296 (B.C. S.C.), at 304.

15    The courts have developed a complex set of legal and evidentiary principles to ensure that employees are treated fairly at the time of termination. The preoccupation with fairness seems to elevate the contractual standards for provisions which limit severance, surpassing normal principles of offer and acceptance in an arms' length negotiation. The standards for severance policies that may be changed unilaterally by an employer appear to be higher still. Courts have shown some reluctance to enforce those policies: *Bienvenu v. Zellers Inc.* (1984), 5 C.C.E.L. 30 (N.S. T.D.); *Clark v. Optyl (Can.) Ltd.* (1985), 7 C.C.E.L. 1 (N.B. C.A.).

16    But what of an agreement by an employee at the commencement of employment to have his severance entitlement determined by the severance policy in effect at the time of the termination, even though that policy is unknown. And what if that policy is solely within the control and discretion of the employer.

17    I fine nothing objectionable in these concepts. A provision in a contract of employment which incorporates by reference a clear, ascertainable, albeit future policy of a company is neither uncertain nor ambiguous. And calling something a "policy" does not make it any less binding. The name given to a document does not affect its enforceability, so long as both parties are bound to comply with it. Nor does the fact that a policy may be unilaterally changed by the employer mysteriously taint it with a presumption of unenforceability. Every provision that purports to define the length of notice must be approached in the same way: examine the provision to determine whether it is clear, express and unambiguous; then decide whether the employee is bound.

18    I begin with an examination of the provision. Two considerations arise. First, while an employee is free to delegate his severance to the whim of his employer, however foolhardy that might appear to be in retrospect, it must be clear that was the nature of his agreement. In this case the wording of the offer refers to the severance policy in effect at the time of termination, but does not clarify how changes to that policy will come about, or that the company may unilaterally change it for the worse. Perhaps that was explained at the meeting, but there is no evidence. I am left to look at the words of the offer standing alone, and those words do not go far enough. They do not clearly and expressly constitute Mr. Long's agreement to have his severance unilaterally determined by the company. The implication is that changes to the severance policy must be consented to by Mr. Long in order to be effective.

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

19    Some might argue that this interpretation makes the provision redundant, for any term of any agreement may be amended with the consent of the parties and there is no need to pick out severance for special treatment. That may well be the case, but it won't be the first time that a repetitive provision has been inserted in an agreement. Redundancy alone is insufficient to support the other interpretation.

20    To uphold the contract, then, we move to the second consideration. It may not matter that the severance policy was unilaterally changed by Delta so long as since 1987 the policy was never unilaterally changed for the worse. It may not matter that Mr. Long's consent to a change was required, for if Delta improved its policy, his consent would be implied or waived. If Delta could prove the terms of the policy as it existed at the time of hire in 1987, show that those terms were explained to Mr. Long and demonstrate that the 1993 severance package was as good as or better than the 1987 package, Mr. Long would be bound by them.

21    But the evidence need not go even this far. It might be enough for Delta to show that the terms of the severance policy in place in 1987 were explained at the meeting and to demonstrate that it was Delta's continued practice over the years, when modifying its termination policy, never to reduce an employee's severance benefits. Delta has presented no evidence on any of these points. While I am sympathetic to the fact that the 1987 and 1988 severance plan documents cannot be located despite diligent efforts to find them, and while I understand that the Delta employee who convened the meeting in 1987 is no longer employed by the company, Delta is not relieved from its evidentiary burden.

22    Ironically, Mr. Long, as project superintendent on the job site, was the employee responsible for maintaining the Delta Policy and Procedure Manual. He was in charge of inserting new and amended policies into the manual, reviewing them and communicating significant changes in policies to employees at the site. While Mr. Long denied knowledge of changes in the severance policy, we can impute notice to him. He of all people should have known. Willful ignorance or a failure to perform a job responsibility hardly provides an excuse.

23    It is possible that this knowledge would demonstrate a formal understanding of a change and that his conduct, in some manner, would constitute his agreement to be bound. There is no evidentiary basis to reach that conclusion. Furthermore, without knowing the 1987 policy and tracing it through to determine whether Mr. Long's severance rights were ever reduced, I can neither consider his conduct in context nor deal with the issue of consideration.

24    I conclude that Delta has not proven, on a balance of probabilities, a clear, express and unambiguous agreement by Mr. Long to have his severance rights determined by Delta in accordance with the 1993 policy, the severance policy in place at the time of termination. Delta has not negatived the implied term in every contract of employment of reasonable notice of termination.

25    In matters of employment, economic clout most often translates into contractual control. Usually the employer can boldly dictate the terms of employment; the severance clause is not the place to become bashful. There is no inherent unfairness in the employer's strong bargaining stance, so long as the employee understands what he's getting into and what he's giving up. The employee, after all, retains the ultimate choice to decline the job offer. But if an employer wants specific termination provisions to apply, not to mention the right to change them for the worse, it has to say so in clear and express terms. Any ambiguity will almost certainly be resolved in favour of the employee.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Long v. Delta Catalytic Industrial Services Inc., 1998 CarswellAlta 70

1998 CarswellAlta 70, [1998] 6 W.W.R. 792, 215 A.R. 267, 35 C.C.E.L. (2d) 70...

26    While this case turns on an interpretation of the contract, even a clear and unambiguous provision will not necessarily limit an employee's notice on termination. A court must also find that an employee knew and understood what he was signing: *Nardocchio v. Canadian Imperial Bank of Commerce* (1979), 41 N.S.R. (2d) 26, at 41, 76 A.P.R. 26 (N.S. S.C.), at 41; *Risi v. Benson & Hedges (Canada) Inc.* (October 21, 1986), Doc. 9782/81 (Ont. Dist. Ct.); and agreed to be bound by the severance provision: *Buerman v. Canada (Attorney General)* (1996), 19 C.C.E.L. (2d) 127 (Ont. Gen. Div.), at 131. In appropriate cases a court may also consider coercion, improper influence or oppressive conduct: *Toronto-Dominion Bank* at 180.

27    Had I had sufficient evidence to find a clear, express and unambiguous contract limiting Mr. Long's severance entitlement, I would have had no hesitation determining that Mr. Long understood the provision and agreed to be bound. He read and understood the offer, had an opportunity to ask questions before he signed and had continued familiarity with the severance policy in carrying out his job responsibilities. I see no hint of coercion, duress, improper influence or oppressive conduct. Mr. Long was given a reasonable choice, in fact the only choice that can be given when one company sells its assets to another. He could accept a job with Delta, the new employer, and agree to Delta's terms or he could decline the offer and trigger his severance entitlement with his old employer, Stearns.

28    Employers bear the onus of proving a contract which limits severance entitlement. They can anticipate a stiff evidentiary battle. It is incumbent on an employer to keep detailed records of everything relevant to the formation of the contract, including timing of events, meetings and delivery of documents; copies of letters, agreements and other documents given to employees; outlines of explanations and disclosures made at meetings and interviews; recommendations made and opportunities given to employees to obtain independent advice; and particulars of delivery of signed agreements to employees. If an employer relies on its dismissed employee to supply this information, it might expect to find itself at the wrong end of a judgment more often than not.

*Action allowed.*

---

**End of Document**              Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights
reserved.



**Marquete Company, Appellant-Respondent, v. Norcem, Inc., Respondent-Appellant**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of New York, Appellate Division, Third Department**

*114 A.D.2d 738*; *494 N.Y.S.2d 511*; *1985 N.Y. App. Div. LEXIS 53383*; *42 U.C.C. Rep. Serv. (Callaghan) 79*

**October 31, 1985**

**JUDGES:** [***1] Mahoney, P. J., Weiss, Yesawich, Jr., Levine and Harvey, JJ., concur.

**OPINION**

[*738] [**512] Cross appeals from an order of the Supreme Court at Special Term (Williams, J.), entered July 2, 1984 in Greene County, which, *inter alia*, granted defendant's motion to vacate a default judgment entered against it.

In 1981, the parties entered into a contract covering a period from September 1, 1981 to March 31, 1984 during which defendant contracted to purchase cement exclusively from plaintiff. The quantity and sales price for the first two shipments of cement to defendant were set forth in the contract. With regard to the third shipment, the contract mandated that the parties were to negotiate a price not to exceed $ 38 per short ton. Plaintiff informed defendant that it was prepared to deliver the cement at $ 38 per short ton, the maximum amount allowed by the contract. When defendant notified plaintiff that it considered plaintiff's insistence on the maximum amount a refusal to negotiate in good faith, plaintiff responded by informing defendant that its refusal to purchase the cement at $ 38 per short ton was a breach of the contract.

Thereafter, plaintiff commenced the [***2] instant action for breach of contract by service upon the Secretary of State pursuant to *Business Corporation Law § 306*. The summons and complaint were forwarded to an individual who, according to the Secretary of State's current records, was the agent authorized to receive service for defendant. When the papers were returned to the Secretary of State because the authorized

[*739]  agent had moved without leaving a forwarding address, plaintiff obtained a default judgment against defendant in the amount of $ 4,547,247.  When plaintiff sought to enforce the judgment, defendant moved to vacate the default.  Special Term vacated the default but let the judgment stand as security pending the final disposition of the action.  This appeal by plaintiff and cross appeal by defendant ensued.

We reject plaintiff's contention that Special Term erred in vacating the default judgment because defendant did not demonstrate a reasonable excuse for its failure to appear and that it had a meritorious defense to the action. In *Meyer v Fisher & Sons Dental Lab. (90 AD2d 889)*, this court held that, pursuant to CPRL 317, a person served with a summons other than by personal delivery to him [***3] or to his agent for service under *CPLR 318* can be relieved of a default upon a finding of the court that he did not personally receive notice of the summons in time to defend and that he has a meritorious defense *(see, Epstein v Abalene Pest Control Serv., 98 AD2d 832; Zuppa v Bison Drywall & Insulation Co., 93 AD2d 997)*. While the failure to demonstrate a reasonable excuse for not maintaining a correct address with the Secretary of State has been held to preclude relief pursuant to *CPLR 5015 (a) (see, Cristo Bros. v M. Cristo, Inc., 91 AD2d 807, appeal dismissed 59 NY2d 760)*, it will not preclude

relief pursuant to *CPLR 317*.  Here, it is uncontroverted that defendant did not receive notice of the summons before the default judgment was entered.  Therefore, all that remains to be considered is whether defendant demonstrated a meritorious defense.

While defendant asserted five different defenses to plaintiff's action, we need to consider only the first two. Defendant's first defense, that plaintiff refused to negotiate in good faith, appears, on its face, to have merit. The contract between the parties specifically states that the parties were to negotiate the sale [***4] price of certain shipments of cement. Because every contract imposes an obligation of good faith in its performance *(see, UCC 1-203)*, plaintiff's refusal to consider any payment other than [**513] the maximum amount permitted by the contract invests some merit in the defense that plaintiff refused to negotiate in good faith. Next, while it is true that parties can conclude a sales contract even though the sales price is not settled, the parties must intend this to be the case *(see, UCC 2-305 [1]*. Whether the parties so intended is normally a question of fact. Here, a fair reading of the contract seems to indicate that the parties did intend to conclude the contract despite the fact that all sales prices were not settled.  However,

114 A.D.2d 738, *740; 494 N.Y.S.2d 511, **513;
1985 N.Y. App. Div. LEXIS 53383, ***4; 42 U.C.C. Rep. Serv. (Callaghan) 79

[*740] this question of the real intent of the parties is a question properly mandating vacatur of the default judgment so that it can be addressed by the trier of fact.

Finally, defendant, on its cross appeal, argues that Special Term erred in allowing the default judgment to stand as security. We disagree. Even where the default is unintentional, the default judgment may be permitted to stand as security pending the final disposition [***5] of the action *(see, Gables Props. v Finnmarc Corp., 49 AD2d 923;* 5 Weinstein-Korn-Miller, NY Civ Prac para. 5015.4).

Order affirmed, without costs.

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

1976 CarswellNat 374
Federal Court of Appeal

Massey-Ferguson Ltd. v. R.

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No.
196, [1977] 1 F.C. 760, [1977] C.T.C. 6, 14 N.R. 316, 77 D.T.C. 5013

# Massey-Ferguson Limited, Appellant, and Her Majesty the Queen, Respondent

Urie and LeDain, JJ and MacKay, DJ

Judgment: December 13, 1976
Docket: Court No A-280-74

Proceedings: on appeal from a judgment of the Federal Court — Trial Division, reported [1974] C.T.C. 671

Counsel: *S E Edwards*, QC and *D H Martin* for the appellant.
*N A Chalmers*, QC and *C T A McNab* for the respondent.

Subject: Income Tax (Federal)

**Headnote**

**Income tax --- Special rules — Relationships — Associated corporations**

**Income tax --- Corporations — Associated corporations**

Income tax — Federal — Income Tax Act, RSC 1952, c 148 — 19(3), 139(1)(aq) [see 17(3), 248(1) of present Act] — Loan to non-resident — Interest — Loan made to non-resident corporation through controlled corporation.

The appellant company, a Canadian resident corporation, owned all the shares of V Company, another Canadian corporation. V was in the business of holding investments in and providing funds to other subsidiary companies. V owned all the shares of P Company which was a US corporation. P required $1 million additional working capital. The appellant purported to lend this amount to V, without interest, and V loaned the same amount to P. Although the records of all three companies supported this position, the funds were in fact provided directly by the appellant to P. The Minister of National Revenue considered that the appellant had made an interest-free loan to a non-resident and added to the appellant's 1967 income an amount deemed to be interest under the Act and also considered that the exception provided in subsection 19(3) did not apply as P was not a subsidiary controlled corporation as that term is defined in the Act.

Both the Tax Review Board and the Federal Court — Trial Division considered that the substance of the transaction amounted to a loan directly from the appellant to P and that the purported involvement of V was a fiction or a sham with no legitimate business purpose.

**HELD (per curiam):**

Although the appellant admitted that the arrangement was set up so as to avoid the appellant being deemed to have received interest, the evidence disclosed that the parties intended to, and did, in fact, create first a creditor-debtor relationship between the appellant and V and secondly, a creditor-debtor relationship between V and P. There was no creditor-debtor

Case 09-10138-MFW Doc 14394-1 Filed 09/10/14 Page 331 of 589

Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

relationship between the appellant and P. The loaning of money to subsidiaries was a legitimate part of the business of V and neither its corporate existence nor its business was a sham. Appeal allowed.


**Annotation**

This is another among several recent cases involving the question as to whether or not a transaction, arranged in such a way as to avoid or lessen tax, amounted to a sham. Applying the test set forth by the House of Lords in the _Snook_ case, [1967] 1 All ER 518, which was adopted by the Supreme Court of Canada in the _J A Cameron_ case, [1972] C.T.C. 380 (both cases cited in the judgment), it was concluded that here there was not a sham as the parties actually intended that the transaction should create the legal rights and obligations which it appeared to create. In reaching this conclusion the Court reversed the trial court and distinguished the decision of the Federal Court of Appeal in the case of _A T Leon_, [1976] C.T.C. 532 (cited in the judgment). In the latter case it was held that the interposition of management companies, controlled by the persons who in fact rendered the management services, was a sham. The present case was distinguished on the grounds that Verity existed and carried on business for sound reasons. It should be noted also that Urie, J, in giving the judgment for the Court, states that he is not sure whether he agrees with the broad principles relating to a finding of sham as enunciated in the _Leon_ case. In that case, Heald, J made the statement that if a transaction lacked a bona fide business purpose it was a sham. It is possibly this principle which Urie, J questions, although he does not specifically so state.

The present decision reiterates the principle that, where there are two ways in which a transaction may be carried out, there is no reason not to adopt the method that results in the lesser tax. In two other recent cases it was also held that there were no shams although the purpose for the form transaction took was the reduction of tax: _The Queen_ v _Esskay Farms Ltd_, [1976] C.T.C. 24, and _Alberta and Southern Gas Co Ltd_ v _The Queen_, [1976] C.T.C. 639. It is understood that the latter case is presently under appeal to the Federal Court of Appeal. _Produits LDG Products Inc_ v _The Queen_, [1976] C.T.C. 591, is another decision of the Federal Court of Appeal where it was held that a pension plan established by the taxpayer company was not a sham.

Besides the cases mentioned above, the following are cases where it has been held that certain transactions were not shams: _Sazio_ v _MNR_, [1968] C.T.C. 579; _Simard-Beaudry Inc_ v _MNR_, [1974] C.T.C. 715; _Sigma Explorations Ltd_ v _The Queen_, [1975] C.T.C. 215; and _Brewster_ v _The Queen_, [1976] C.T.C. 107.

In the following cases it was held that shams were involved: _Hamilton Motor Products (1963) Ltd_ v _MNR_, [1967] C.T.C. 338; _Susan Hosiery Ltd_ v _MNR_, [1969] C.T.C. 533; _West Hill Redevelopment Co Ltd_ v _MNR_, [1969] C.T.C. 581; _Gibson Bros Industries Ltd_ v _MNR_, [1972] C.T.C. 221; and _Dominion Bridge Co Ltd_ v _The Queen_, [1975] C.T.C. 263 (presently under appeal to the Federal Court of Appeal).

See also other Editorial Notes dealing with questions of shams and artificial transactions: [1975] C.T.C. at 216 (_Sigma_ case); [1975] C.T.C. at 264 (_Dominion Bridge_ case); [1976] C.T.C. at 25 (_Esskay Farms_ case) and [1976] C.T.C. at 641 (_Alberta and Southern Gas_ case).


**Table of Authorities**

**Cases referred to:**

IRC v. Brebner, [1967] 1 All E.R. 779;

Snook v. London & West Riding Investments, Ltd, [1967] 1 All E.R. 518;

MNR v J A Cameron, [1972] C.T.C. 380, 72 D.T.C. 6325;

MNR v A T Leon, [1976] C.T.C. 532, 76 D.T.C. 6299.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved. 2

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

*Urie, J*:

1    This is an appeal from a judgment of the Trial Division dismissing with costs the appeal of the appellant from a decision of the Tax Review Board, wherein the learned trial judge dismissed the appellant's appeal from a reassessment for income tax for the appellant's 1967 taxation year. The Notice of Reassessment dated May 30, 1969 revised the appellant's income for the relevant taxation year to include therein, *inter alia*, deemed interest income in the sum of $31,956.

2    The facts leading to the revision are relatively simple and may be summarized as follows:

3    The appellant is a Canadian resident corporation which is the parent company of a multi-national group engaged primarily in the manufacture and selling of agricultural machinery, construction machinery and diesel engines. During the 1967 taxation year the appellant was the beneficial owner of all the issued shares of Verity Plow Limited (hereinafter referred to as "Verity"). Verity at all material times was one of three non- operating subsidiary Canadian corporations, its sole function being, according to the evidence, to hold investments in and assist in providing loans to other companies within the Massey-Ferguson group.

4    Verity throughout the same taxation year held all the outstanding shares of Perkins Engines Inc (hereinafter referred to as "Perkins"), a company duly incorporated pursuant to the laws of the State of Maryland in the United States of America and having its head office in Farmington, Michigan. Perkins was at all material times engaged in the business of selling and servicing diesel engines, manufactured by another subsidiary of the appellant. Verity had in 1960 acquired the shares of Perkins with funds provided by the appellant. The appellant's books of account in 1967 showed the loan to Verity for the purchase of the shares and the books of account of Verity reflected the loan from the appellant for the acquisition of the shares.

5    Perkins in 1967 found itself in need of additional working capital and it was ultimately determined by certain officers of the appellant that Perkins should be provided with the needed funds in the amount of $1,000,000 (US) interest-free by the appellant's providing the funds necessary for the loan to Verity.

6    The sole issue in the case is to determine whether or not the appellant loaned the $1,000,000 to Verity following which Verity loaned those funds to Perkins or whether the loan was made directly by the appellant to Perkins. The importance of determining how the loan was made arises by reason of subsections 19(1) and 19(3) of the *Income Tax Act* which in 1967 read as follows:

> 19. (1) Where a corporation resident in Canada has loaned money to a non-resident person and the loan has remained outstanding for one year or longer without interest at a reasonable rate having been included in computing the lender's income, interest thereon, computed at 5% per annum for the taxation year or part of the year during which the loan was outstanding, shall, for the purpose of computing the lender's income, be deemed to have been received by the lender on the last day of each taxation year during all or part of which the loan has been outstanding.

> . . . . .

> (3) Subsection (1) does not apply if the loan was made to a subsidiary controlled corporation and it is established that the money that was loaned was used in the subsidiary corporation's business for the purpose of gaining or producing income.

7    The appellant takes the position that all the evidence points to the fact that it was the appellant's intention to loan the money to Verity and to cause Verity to loan the money to Perkins, and that, in fact, that intention was carried out. The loan was not a direct one from the appellant to Perkins but was, rather, a loan by it to its wholly-owned Canadian resident subsidiary, Verity, so that subsection 19(1) limited as it is to loans by a resident Canadian corporation to a non-resident person, including, of course, a corporation, had no application to the transaction. If that is the case the inclusion of the deemed interest in the Notice of Reassessment was in error and the reassessment should be set aside. On the other hand, the respondent supports the judgment of the trial judge wherein he held that the real transaction was a loan from the appellant to Perkins which while it was a non-resident corporation, was not a subsidiary controlled corporation, within the definition of that term as set out in paragraph 139(1)(aq) of the Act, of the appellant, so that subsection 19(3) could not apply to remove the transaction from the purview of subsection 19(1). In the respondent's view, therefore, the reassessment was correct and should stand.

**Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374**

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

8     Before proceeding with consideration of the relevant facts, it should, perhaps, be pointed out that the evidence is clear that Perkins received the proceeds of the loan from the New York agency of the Canadian Imperial Bank of Commerce which had been directed by the appellant to transfer the money to Perkins, debiting the appellant's account in the City of New York. There were recorded in the appellant's accounting records on or about the time the advance was made, entries showing a loan to Verity on March 29, 1967 in the amount of $1,000,000 (US). Verity's accounts, which were approved by the directors and shareholders of Verity, showed receipt of the proceeds of the loan, a liability therefor to the appellant, and the making of a loan in the same amount to Perkins on the same date. Perkins' financial reports to the appellant show its liability to Verity for the loan. Subsequently, in 1969 when the appellant purchased from Verity all of its shares of Perkins, Perkins' indebtedness to Verity was assigned by the latter to Verity. It was conceded by the respondent that the proceeds of the loan were used by Perkins for the purpose of gaining or producing income.

9     The evidence, however, shows that Verity was not a company, actively engaged commercially or industrially, its sole function being to hold shares in and make advances to other companies in the group controlled by the appellant. Verity did not have any employees apart from those employed by the appellant. Employees of the appellant served as directors of Verity and any work necessary to carry out its functions were performed by employees of the appellant. Neither did Verity have a bank account of its own.

10     The learned trial judge reviewed the evidence and came to the following conclusion with respect to the first branch of the appellant's submissions [p 676]:

> It is well established that, in considering whether a particular transaction brings a party within the terms of the *Income Tax Act* its substance rather than its form is to be regarded, and also that the intention with which a transaction is entered into is an important matter under the Act and the whole sum of the relevant circumstances must be taken into account.

> On the whole of the relevant circumstances here present, I am satisfied that it was clearly the plaintiff's intention to lend the $1 million directly to Perkins. Verity played very little part in the transaction except in a nominal way. There was no legitimate business purpose for involving Verity. The only reason, and Mr Sherman was quite frank in admitting this, was in an attempt to keep the transaction outside subsection 19(1). I have thus concluded that the substance of subject transaction, notwithstanding the form thereof, was a loan from the plaintiff to Perkins, a non-resident corporation, so as to make applicable the provisions of subsection 19(1) of the Act.

11     There can be no doubt that the general principles applicable in determining liability for income tax under the *Income Tax Act* were correctly stated by the learned trial judge. However, in my view, in applying those principles to the facts adduced in evidence, he did not draw the proper inferences therefrom in holding, firstly, that it was the appellant's intention to lend $1,000,000, interest-free, direct to Perkins; secondly, that there was no legitimate business purpose for involving Verity, and thirdly, that notwithstanding its form the substance of the transaction was a loan from the appellant to Perkins.

12     I shall deal with the first and third of these findings together for the sake of convenience. It should first be observed, I think, that what is at issue here involves the interpretation on the one hand of an agreement to lend money and, on the other hand, an agreement to borrow that money and to repay it. Speaking generally, an agreement whether formally documented or evidenced in some other fashion, is not enforceable unless the parties evince an intention to create legal relations. [1] Where there is a formal contract, it would be unusual to find that there was no intention to create such legal relation but where, as in this case, there is no formal contract, regard must be had to all of the evidence to ascertain whether or not the parties intended such relations to be created and whether or not they were successful in doing so.

13     In this case there was no formal agreement setting forth the terms of an agreement to lend money either to Verity or to Perkins. However, the appellant adduced evidence of conversations, letters, memoranda, accounting records, financial statements and corporate minutes with a view to establishing the nature of the agreement between the parties involved. There can be no doubt that this evidence establishes that originally it was contemplated that the $1,000,000 loan was to be made by the appellant to Perkins. However, it is equally without question that the transaction as originally contemplated changed at the

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    4

Case 09-10138-MFW   Doc 14394-1   Filed 09/10/14   Page 334 of 589

**Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374**

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

moment that the appellant's general tax manager at the material time, Mr Sherman, met with its treasurer, Mr Blair and the latter's assistant, Mr Wleugel, for the purpose of advising the latter on the tax implications of the proposed loan by the appellant to Perkins. At that meeting, Mr Sherman gave the advice contained in the following excerpt from his testimony:

> Q. Mr Sherman, the second paragraph of the letter contains one sentence: "As agreed with you and Mr Sherman, we will proceed as follows." Was there a meeting prior to the sending of this memo?

> A. Yes, there was a meeting with Mr Blair and Mr Wleugel and myself and at that meeting I was asked to fulfil my responsibilities and I pointed out, as my colleagues knew, that Perkins Inc, was not a subsidiary of Limited and that, if a loan was made free of interest, as was contemplated directly by Massey-Ferguson Limited to Perkins Inc, there was some doubt about whether it would fall within the exemption provided within section 19(3) because it was a subsidiary. Consequently, I recommended to remove the doubt that loan should be made by Verity Plow and these gentlemen, who were both officers of both companies, accepted my recommendation and it was agreed and then documented by Mr Wleugel who signed this memo to the effect that the loan was to be made to Perkins by Verity or, as Massey-Ferguson shorthand has it in this memorandum, "via Verity".

14    From that moment on, it can be seen that the original proposal changed and the intention became for the appellant to loan $1,000,000 interest-free to Verity, one of its resident Canadian subsidiaries and for Verity to lend that sum to Perkins. All the documentation leads to that conclusion, commencing with the memorandum dated February 27, 1967, to which Mr Sherman referred in his testimony, the relevant part of which reads as follows:

> Agrotrac via CIBC is presently lending Perkins Engines Inc, $300,000 at 6% per annum interest. It has been decided to provide Perkins US with an additional loan of $700,000 and Perkins Canada a loan of $250,000 — both of medium term character.

> As agreed with you and Mr Sherman, we will proceed as follows:

> 1.) MF Limited will lend Perkins USA, US $1,000,000 via Verity Plow at no interest charge on March 26, 1967.
> . . . . .

> 3.) Perkins Inc will, upon receipt of the loan, repay CIBC's loan of $300,000 in full (plus accrued interest).

15    At least to some extent, the difficulty in which the appellant finds itself, which has led to these proceedings, was caused by the imprecise language used in this underlying memorandum. In particular, the phrase "via Verity" seems to indicate that Verity's role was indeed minor in the transaction and that the phrase "MF Limited will lend to Perkins ..." shows the true nature of the transaction. But, the term "via" was used, as Mr Sherman testified, as "Massey- Ferguson shorthand" to show the routing of the loans. This memorandum seems to confirm that this is so since it was used not only to indicate the way the new loan to Perkins was to be made, but also to show how an existing loan by Perkins from the Canadian Imperial Bank of Commerce had originated from Agrotrac, a Panamanian subsidiary of the appellant. The evidence discloses that the $300,000 original loan had been derived from funds "loaned" to the bank by Agrotrac and the bank had in turn loaned the same amount to Perkins. That is the loan from "Agrotrac via CIBC" as described in the memorandum. It seems to me then, that the meaning of the term is explained in the document itself and tends to support the appellant's contention that while it provided the original source of the money for the $1,000,000 loan it was not intended that it would be the lender thereof to Perkins.

16    Other letters and memoranda adduced in evidence also tend to confirm this intention. No useful purpose would be served by my detailing that evidence nor to set out in detail the accounting and other records of the appellant, of Verity and of Perkins which reflect the carrying out of this intention. Suffice it to say that a fair reading of the whole leads inevitably to the conclusion that the parties intended to create, and did, in fact, create firstly a creditor-debtor relationship between the appellant and Verity and secondly, a creditor-debtor relationship between Verity and Perkins.

17    Thus the real question requiring determination in this appeal is whether or not those relationships and the legal rights and obligations arising therefrom were adversely affected for the purpose of deciding the applicability of subsection 19(1) of

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374**

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

the *Income Tax Act*, because (a) the admitted reason for Verity making the loan was to avoid the application of subsection 19(1) to the transaction; (b) the proceeds of the loan were paid directly to the ultimate borrower, Perkins, rather than by Verity, and (c) no formal documentation, other than the aforementioned book entries, was prepared as evidence of the loan. With the greatest respect for the contrary opinion of the learned trial judge, neither the relationships nor the rights and liabilities were thus adversely affected by any of the alleged defects.

18     The whole development of commercial law over the centuries is replete with examples of the courts recognizing that businessmen do not always depend on expert documentation to prove the true characterization of their transactions. Rather, they tend to achieve their desired ends, particularly when the relationships between them are close, in informal and expeditious ways which perhaps are abhorrent to lawyers. In doing so they run the risks inherent in such a practice of determining their respective rights. Frequently no difficulties ensue, but if they do, in the absence of contracts or other documents, courts must determine the intention of the parties and the nature of the obligations imposed on them by reference to credible evidence of another kind. That is what is required of the Court in this case and the inference I draw from the facts as found by the trial judge is that enforceable legal rights and obligations were created by the advance of the money by the appellant. Where those rights and obligations lie must be ascertained from the evidence. That clearly discloses that there was imposed on Perkins the liability to repay to Verity the money it received directly from the appellant. Similarly, Verity, another separate legal entity, at some unspecified date became liable to repay the money advanced to it by the appellant, although that money never actually came into its possession. On the evidence, the appellant had no creditor-debtor relationship with Perkins and thus had no right to demand repayment of $1,000,000 from Perkins but it did have that right as against Verity. If that is the case then, it seems to me, not only is the form of the initial part of the transaction a loan by the appellant to Verity but that also is the substance of the transaction. I think, therefore, that the learned trial judge erred when he inferred from the facts as he found them that, in substance, the transaction was a loan by the appellant to Perkins.

19     In so far as the finding of the judge that there was no legitimate business purpose for involving Verity in the transaction is concerned, I must again respectfully disagree with him. Since this is an inference to be drawn from ascertained facts I think that this Court is, as is any court of appeal in such circumstances, entitled to substitute its view for that of the trial judge. I believe that for the reasons that follow, we are in a position to make such a substitution.

20     Verity had been incorporated in 1957 apparently as a successor to a long-time subsidiary of the appellant, for the purpose of holding investments in and making loans to other companies in the Massey-Ferguson group. Mr Sherman described these activities in evidence as follows:

MR McDOUGALL: Q. Can you describe the type of business carried on by Verity Plow and its predecessor since 1957?

A. Yes. I should perhaps explain that the books of the company in the early days were not easy to locate, so I was forced to have recourse to the minute book, and I had one of my colleagues prepare a brief summary for my information of the transactions referred to in the minute book and the transactions essentially involved the acquisition and disposal of investments in other Massey-Ferguson companies, the making of loans to other Massey-Ferguson companies and the repayment of loans.

Q. I show you a document entitled "Material from Minute Book". Is that [the] summary to which you referred?

A. Yes.

. . . . .

Q. Mr Sherman, I interrupted you to put that Exhibit to you, so perhaps you might continue with your description of the type of transactions carried on by Verity Plow Limited in the period to which I referred, having reference to Exhibit 3?

A. Yes. They involved, as I already mentioned, the type of transaction which is in the interests of the Massey-Ferguson group of companies. They involved the acquisition of shares, disposal of shares and making of loans and the repayment of loans. Perhaps I could mention, since loans are involved, that there is a reference to 25 million Argentine peso being loaned to an Argentine subsidiary wholly-owned by Massey-Ferguson. ...

Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

Q. Where do you see that?

A. Second item on page 2, June, 1961. I think that that really is a summary of what they have done. There is a reference in April of 1969 to Perkins Engines Inc.

Q. All right. What is the purpose, or what is Limited's purpose in having non-operating companies, as you have referred to them?

A. At the time when these companies were carrying on these transactions from 1957 to approximately 1969 or '70, they had a very necessary — they served a very necessary purpose. Massey-Ferguson Limited at that time had borrowed some money secured by an indenture and this indenture provided that, once Massey-Ferguson Limited had acquired the shares in any other company, these shares were locked in. They were owned by Limited and could not be disposed of without the prior concurrence of the bond holders. This made operating difficult, made it difficult to make business transactions without a delay while the management of the company approached the bond holders and got the necessary approvals. So, from the time that this indenture was entered into, Massey-Ferguson Limited followed the practice of having its subsidiary companies, primarily Bain Wagon and Verity Plow, acquire these subsidiary shares and hold them. This was not in any way forbidden by the terms of the trust indenture and it was in order perfectly then, if there were any need to move the ownership of these shares to another company to do so without any delay caused by having to approach the bond holders. There was a second purpose, and that is that, in many jurisdictions there has to be more than one shareholder so that when Massey-Ferguson Limited acquired effective control of the shares of a subsidiary company, this was normally handled by having all but one to five shares owned by Massey-Ferguson Limited and then the subsidiary companies would each acquire one share, so as to make them shareholders in the corporation.

21     This evidence is uncontradicted and certainly demonstrates that there were, in 1967, valid business reasons for Verity's continued existence, not the least important of which, for the purpose of deciding the issue in this case, was that of loaning money to its subsidiaries. Moreover, on the basis of other evidence, there is no question of the necessity for placing in the Perkins treasury further funds to meet its working capital requirements. It was conceded by the respondent that the borrowed money was used for that purpose.

22     Thus, the legitimacy for the existence of Verity cannot be an issue. Its holding of all of the outstanding shares of Perkins was part of the reason for its existence and the loan of money to Perkins was a legitimate part of its business of lending money to other Massey-Ferguson subsidiaries. However, the learned trial judge, despite these facts, concluded that the only purpose for interposing Verity in the transaction was "in an attempt to keep the transaction outside of subsection 19(1)". He was of the opinion, further, that the intervention of Verity was a sham.

23     I am unable, with respect, to agree with this view of the transaction. As I have said, the evidence discloses that one of the reasons that Verity was in business was to lend money to Massey-Ferguson subsidiaries and there is some evidence derived from its financial statements to show that it did so, not only in the case at bar, but also in other cases. The money for such purpose was acquired, in other cases, as well as in this, by borrowing from Verity's parent, the appellant. Neither the existence of the corporate entity, nor the business in which it was engaged was in any way a sham.

24     That being so, was something done in the case at bar which made the loan transaction a sham as the trial judge has found? In general, it may be stated that if there are two ways in which a transaction may be carried out, one of which involves a liability for the payment of tax, and the other of which results in a reduction or elimination of such a liability, then, if the transaction is otherwise a bona fide commercial one, there is no reason for not adopting the tax-saving method. That principle is stated succinctly in *Inland Revenue Commissioners v. Brebner*, [1967] 1 All E.R. 779 by Lord Upjohn at page 784, as follows:

My lords, I would conclude my judgment by saying only that, when the questions of carrying out a genuine commercial transaction, as this was, is considered, the fact that there are two ways of carrying it out, — one by paying the maximum amount of tax, the other by paying no, or much less, tax — it would be quite wrong as a *necessary* consequence to draw the inference that in adopting the latter course one of the main objects is for the purposes of the section, avoidance of

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

tax. No commercial man in his senses is going to carry out commercial transactions except on the footing of paying the smallest amount of tax involved.

25    In this case the appellant adopted a method of lending money for bona fide purposes in a manner which obviated the risk of having included in its income deemed interest on the loan, which if it had been included, would have increased its taxable income. To do so did not, in my view, make the transaction a sham. Support is found for this view, in the well-known passage from the judgment of Lord Diplock in *Snook v. London & West Riding Investments, Ltd*, [1967] 1 All E.R. 518 at 528, reading as follows:

> As regards the contention of the plaintiff that the transactions between himself, Auto-Finance, Ltd and the defendants were a "sham", it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. One thing I think, however, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co v. Maclure* [(1882), 21 Ch D 309], *Stoneleigh Finance, Ltd v. Phillips* [[1965] 1 All ER 513; [1965] 2 Q.B. 537]), that for acts or documents to be a "sham", with whatever legal consequences follow from this, *all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating.* [2]

26    The legal rights and obligations to which I have earlier referred were created in this case in the manner contemplated by all three parties. The condition necessary to find a transaction to be a sham, namely, not in fact to have created the legal rights and obligations which appear to have been created, thus was not present, with the result that the learned trial judge erred, in my view, in finding that it was a sham. The legal rights and obligations having been created and the bona fides of Perkins' need for the money advanced not having been challenged, the loan to Verity by the appellant took it outside the purview of subsection 19(1).

27    As I see it, reaching this conclusion is not inconsistent with the decision of this Court in *MNR* v *Anthony Thomas Leon*, [1976] C.T.C. 532, 76 D.T.C. 6299. In that case it was held that there was no bona fide business purpose, merely a tax purpose for the interposition of the management company whose role was at issue in that case. Moreover, it was said that in ascertaining whether or not there is a bona fide business purpose it is the particular agreement or transaction in question to which the Court must look for the answer. In the view of the Court in the *Leon* case, a company may be incorporated for legitimate business purposes but may engage in a transaction at some time thereafter which has no such purpose and which is a sham because of it. In the *Leon* case that was what the transaction there in issue was found to be.

28    I am not at all sure that I would have agreed with the broad principles relating to a finding of sham as enunciated in that case, and I think that the principle so stated should perhaps be confined to the facts of that case. In any event, for the reasons heretofore given, I do not think that there was the slightest bit of evidence upon which a finding of sham could have been made in this case.

29    Moreover, the facts in this case in other critical areas are so different from those found in *Leon* that it is, in my view, distinguishable. Verity had been incorporated and carried on business for sound reasons. For apparently quite proper purposes, Verity became the owner of all of the issued shares of Perkins. Both were part of the large group of Massey-Ferguson companies. Long afterwards, Perkins informed the appellant of its need of additional working capital and when it was satisfied that there was truly such a need, discussions ensued as to how this best could be legally accomplished. There were two ways at least in which it could be done, in one of which there was an inherent risk of attracting tax, ie by making the interest-free loan directly from the appellent to Perkins, where, if the latter were found not to be a "subsidiary wholly-owned corporation" of the appellant within the meaning of paragraph 139(1)(aq) of the Act, that risk could be transposed into an actual tax liability under subsection 19(1). The other method eliminated that risk by having Verity lend the money since Perkins was its "subsidiary wholly-owned corporation" and, the latter being a non-resident corporation, subsection 19(3) became applicable to the loan. That was the method chosen after the business decision to loan the money to Perkins had been made, following which, in due course, the debtor rights and obligations came into existence.

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14394-1   Filed 09/10/14   Page 338 of 589

Massey-Ferguson Ltd. v. R., 1976 CarswellNat 374

1976 CarswellNat 374, 1976 CarswellNat 416, [1976] F.C.J. No. 196, [1977] 1 F.C. 760...

30    If no question of tax were involved, not the slightest criticism could have been levelled against any of the parties concerned. It was simply a question of a parent company, Verity, borrowing money for the purpose of lending it to its wholly-owned subsidiary.

31    Contrast this with the factual situation in the *Leon* case. As I understand it, the sole purpose for the interposition of the management companies, as held in the concurrent findings of the trial judge and the Court of Appeal, was to reduce the personal liability for income tax of the brothers Leon, by diverting money otherwise payable directly to them for management services, through companies individually controlled by each of them. That decision was consciously made for no other purpose than avoidance of tax and differs in that way materially from this case where the decision taken was to make a necessary loan to a member of a large group of companies, followed by the decision as to which company would lend the money. The incidental effect of the choice made was to eliminate the risk of an increase in the appellant's taxable income — in my view, a sound business decision. But the important thing is that the underlying decision was not a decision taken solely for tax considerations. That business decision having been made, the method whereby it was made took advantage of the fact that Perkins belonged to Verity, that Verity, *inter alia*, loaned money to subsidiaries and that its own subsidiary was the entity which needed money. Since the result could avoid the possible application of subsection 19(1), naturally this was the method adopted.

32    For all of these reasons, therefore, I am of the opinion that the appeal should be allowed. It is thus unnecessary for me to deal with the appellant's other submissions.

33    The judgment of the Trial Division should be set aside and the reassessment should be referred back to the respondent to exclude therefrom the deemed interest income in the taxation year 1967, in the sum of $31,956. The appellant should be entitled to its costs both in this Court and the Trial Division.

**LeDain, J**:

34    I agree.

**MacKay, DJ**:

35    I agree.

Footnotes

1     *Halsbury's Laws of England*, 4th ed, vol 9, p 175.

2     Emphasis is mine. This passage was cited with apparent approval in *MNR* v *James A* <u>*Cameron*</u>, [1972] C.T.C. 380 at 384, 72 D.T.C. 6325 at 6328 (SCC).

---

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 FC 1265
Federal Court

Apotex Inc. v. Merck & Co.

2010 CarswellNat 5009, 2010 FC 1265, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731, 381 F.T.R. 162 (Eng.), 91 C.P.R. (4th) 1

# Merck & Co. Inc. and Merck Frosst Canada Ltd., Plaintiffs/Defendants by Counterclaim and Apotex Inc. and Apotex Fermentation Inc., Defendants/Plaintiffs by Counterclaim

Judith A. Snider J.

Heard: February 1 - May 21, 2010
Judgment: December 22, 2010
Docket: T-1272-97

Counsel: Andrew J. Reddon, Glynnis P. Burt, David Tait, William H. Richardson, Ariel Neuer, for Plaintiffs
Harry Radomski, Jerry Topolski, Ben Hackett, David Scrimger, for Defendant, Apotex Inc.
John A. Myers, G. Patrick S. Riley, Nicole D.S. Merrick, Rodrique C. Roy, for Defendant, Apotex Fermentation Inc.
J. Alan Aucoin, Anthony M. Prenol, Antonio Turco, Athar K. Malik, for Former Third Party, Biogal Pharmaceutical Works Ltd.

Subject: Intellectual Property; Civil Practice and Procedure

## Headnote

### Intellectual property --- Patents — Actions for infringement — General principles

Plaintiffs owned '380 patent, which was issued in January 1984 — Patent was product-by-process patent to drug L when made with micro-organism — Plaintiffs sold drug in Canada under license from parent company — In 1997, defendants began selling its brand of drug L in Canada — Plaintiffs brought infringement action — Action allowed — Plaintiffs had standing — Patent was infringed — Patent was valid.

## Table of Authorities

**Cases considered by *Judith A. Snider J.*:**

*Abbott Laboratories v. Canada (Minister of Health)* (2004), 2004 FC 1349, 2004 CarswellNat 3531, 36 C.P.R. (4th) 437, 2004 CarswellNat 5876, 2004 CF 1349, 260 F.T.R. 276 (Eng.) (F.C.) — considered

*Abbott Laboratories v. Canada (Minister of Health)* (2006), 2006 CarswellNat 2914, 2006 CAF 187, 56 C.P.R.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

(4th) 387, 350 N.R. 242, 2006 CarswellNat 1384, 2006 FCA 187 (F.C.A.) — considered

*Abbott Laboratories v. Canada (Minister of Health)* (2007), 2007 FCA 153, 2007 CarswellNat 890, 2007 CAF 153, 361 N.R. 308, 2007 CarswellNat 2377, 59 C.P.R. (4th) 30 (F.C.A.) — considered

*Abbott Laboratories v. Canada (Minister of Health)* (2008), 2008 CF 1359, 71 C.P.R. (4th) 237, 2008 CarswellNat 5397, 337 F.T.R. 17 (Eng.), [2009] 4 F.C.R. 401, 2008 FC 1359, 2008 CarswellNat 4573 (F.C.) — considered

*Abbott Laboratories v. Canada (Minister of Health)* (2009), 2009 CarswellNat 636, 2009 FCA 94, 73 C.P.R. (4th) 444, 2009 CAF 94, 387 N.R. 347, 2009 CarswellNat 2141 (F.C.A.) — referred to

*Apotex v. Tanabe Seiyaku & Nordic* (1994), 1994 CarswellOnt 180, 59 C.P.R. (3d) 38 (Ont. Gen. Div.) — considered

*Apotex Inc. v. Syntex Pharmaceuticals International Ltd.* (1999), 166 F.T.R. 161, 1999 CarswellNat 869, 1 C.P.R. (4th) 22 (Fed. T.D.) — referred to

*Apotex Inc. v. Wellcome Foundation Ltd.* (2002), 2002 CarswellNat 3436, 2002 CarswellNat 3437, 2002 SCC 77, 219 D.L.R. (4th) 660, 21 C.P.R. (4th) 499, 296 N.R. 130, [2002] 4 S.C.R. 153, 235 F.T.R. 204 (note) (S.C.C.) — followed

*Ares v. Venner* (1970), 1970 CarswellAlta 80, 1970 CarswellAlta 142, [1970] S.C.R. 608, 12 C.R.N.S. 349, 73 W.W.R. 347, 14 D.L.R. (3d) 4 (S.C.C.) — referred to

*Aventis Pharma Inc. v. Apotex Inc.* (2005), 2005 FC 1283, 2005 CarswellNat 2946, 43 C.P.R. (4th) 161, 278 F.T.R. 1 (F.C.) — referred to

*Backman v. R.* (1999), (sub nom. *Backman v. Minister of National Revenue*) 246 N.R. 309, 1999 CarswellNat 3005, (sub nom. *Backman v. Canada*) [2000] 1 F.C. 555, 46 B.L.R. (2d) 225, (sub nom. *Backman v. Canada*) 178 D.L.R. (4th) 126, 1999 CarswellNat 1563, 99 D.T.C. 5602, [1999] 4 C.T.C. 177 (Fed. C.A.) — referred to

*Baker Petrolite Corp. v. Canwell Enviro-Industries Ltd.* (2002), 17 C.P.R. (4th) 478, 211 D.L.R. (4th) 696, 2002 CarswellNat 1209, 288 N.R. 201, 2002 CAF 158, 2002 FCA 158, 2002 CarswellNat 952, [2003] 1 F.C. 49 (Fed. C.A.) — considered

*Bayer AG v. Apotex Inc.* (2001), 14 C.P.R. (4th) 263, 214 F.T.R. 160 (note), 2001 FCA 263, 2001 CarswellNat 2031, 278 N.R. 178 (Fed. C.A.) — considered

*Bell ExpressVu Ltd. Partnership v. Rex* (2002), 212 D.L.R. (4th) 1, 287 N.R. 248, [2002] 5 W.W.R. 1, 166 B.C.A.C. 1, 271 W.A.C. 1, 18 C.P.R. (4th) 289, 100 B.C.L.R. (3d) 1, 2002 SCC 42, 2002 CarswellBC 851, 2002 CarswellBC 852, 93 C.R.R. (2d) 189, [2002] 2 S.C.R. 559 (S.C.C.) — referred to

*Beloit Canada Ltée/Ltd. v. Valmet Oy* (1992), 144 N.R. 389, 1992 CarswellNat 1012, 45 C.P.R. (3d) 116 (Fed. C.A.) — considered

*Beloit Canada Ltée/Ltd. v. Valmet Oy* (1994), 1994 CarswellNat 531, 55 C.P.R. (3d) 433, 78 F.T.R. 86 (Fed. T.D.) — considered

*Beloit Canada Ltée/Ltd. v. Valmet Oy* (1995), (sub nom. *Beloit Canada Ltée v. Valmet Oy*) 61 C.P.R. (3d) 271, (sub nom. *Beloit Canada Ltd. v. Valmet Oy*) 184 N.R. 149, (sub nom. *Beloit Canada Ltd. v. Valmet Oy*) 94 F.T.R. 102

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

(note), 1995 CarswellNat 1823 (Fed. C.A.) — referred to

*Beloit Canada Ltée/Ltd. v. Valmet Oy* (1996), 64 C.P.R. (3d) vi, 1996 CarswellNat 3170 (S.C.C.) — referred to

*Biovail Pharmaceuticals Inc. v. Canada (Minister of National Health & Welfare)* (2005), 37 C.P.R. (4th) 487, 267 F.T.R. 243 (Eng.), 2005 FC 9, 2005 CarswellNat 65, 2005 CarswellNat 1993, 2005 CF 9 (F.C.) — considered

*Bristol-Myers Squibb Co. v. Apotex Inc.* (2007), 2007 CarswellNat 6393, 2007 CAF 379, 2007 CarswellNat 4217, 2007 FCA 379 (F.C.A.) — referred to

*Calgon Carbon Corp. v. North Bay (City)* (2008), 2008 FCA 81, 375 N.R. 372, 2008 CarswellNat 535, 2008 CAF 81, 2008 CarswellNat 2136, 64 C.P.R. (4th) 337 (F.C.A.) — considered

*Circle Film Enterprises Inc. v. Canadian Broadcasting Corp.* (1959), 20 D.L.R. (2d) 211, [1959] S.C.R. 602, 19 Fox Pat. C. 39, 31 C.P.R. 57, 1959 CarswellNat 27 (S.C.C.) — considered

*Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.* (1981), [1981] 1 S.C.R. 504, 56 C.P.R. (2d) 145, 35 N.R. 390, 122 D.L.R. (3d) 203, 1981 CarswellNat 582F, 1981 CarswellNat 582 (S.C.C.) — considered

*Dimplex North America Ltd. v. CFM Corp.* (2006), 2006 CF 586, 2006 CarswellNat 4718, 54 C.P.R. (4th) 435, 292 F.T.R. 38 (Eng.), 2006 CarswellNat 1365, 2006 FC 586 (F.C.) — considered

*Dimplex North America Ltd. v. CFM Corp.* (2007), 2007 FCA 278, 2007 CAF 278, 2007 CarswellNat 3089, 2007 CarswellNat 2868, 60 C.P.R. (4th) 277, 370 N.R. 316 (F.C.A.) — referred to

*Domco Industries Ltd. v. Armstrong Cork Canada Ltd.* (1982), 66 C.P.R. (2d) 46, 42 N.R. 254, [1982] 1 S.C.R. 907, *(sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.)* 136 D.L.R. (3d) 595, 1982 CarswellNat 482, 1982 CarswellNat 482F (S.C.C.) — considered

*Dukart v. Surrey (District)* (1978), 4 R.P.R. 15, 21 N.R. 471, 86 D.L.R. (3d) 609, [1978] 2 S.C.R. 1039, [1978] 4 W.W.R. 1, 1978 CarswellBC 422, 1978 CarswellBC 557 (S.C.C.) — distinguished

*Eli Lilly Canada Inc. v. Apotex Inc.* (2008), 2008 CF 142, 2008 CarswellNat 1821, 2008 CarswellNat 308, 2008 FC 142, 63 C.P.R. (4th) 406, 323 F.T.R. 56 (Eng.) (F.C.) — considered

*Eli Lilly Canada Inc. v. Apotex Inc.* (2009), 2009 FCA 97, 2009 CarswellNat 833, 2009 CarswellNat 3956, 2009 CAF 97, 392 N.R. 243, 78 C.P.R. (4th) 388 (F.C.A.) — considered

*Eli Lilly Canada Inc. v. Apotex Inc.* (2009), 2009 CarswellNat 2703 (S.C.C.) — referred to

*Eli Lilly Canada Inc. v. Apotex Inc.* (2009), 401 N.R. 400 (note), 2009 CarswellNat 3235, 2009 CarswellNat 3236 (S.C.C.) — referred to

*Eli Lilly Canada Inc. v. Novopharm Ltd.* (2007), 2007 CarswellNat 1531, 2007 CF 596, 2007 FC 596, 58 C.P.R. (4th) 214, 2007 CarswellNat 3883, [2008] 2 F.C.R. 749 (F.C.) — referred to

*Eli Lilly & Co. v. Nu-Pharm Inc.* (1994), 54 C.P.R. (3d) 145, 78 F.T.R. 27, 1994 CarswellNat 467 (Fed. T.D.) — considered

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*Guyot v. Thomson* (1894), [1894] 3 Ch. 388 (Eng. C.A.) — distinguished

*Heap v. Hartley* (1889), 42 Ch. D. 461, 58 L.J. Ch. 790, 6 R.P.C. 495 (Eng. C.A.) — referred to

*Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)* (1953), 14 Fox Pat. C. 20, [1954] Ex. C.R. 52, 19 C.P.R. 80, 1953 CarswellNat 10 (Can. Ex. Ct.) — referred to

*Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)* (1955), [1955] S.C.R. 414, 23 C.P.R. 1, 15 Fox Pat. C. 99, 1955 CarswellNat 1 (S.C.C.) — followed

*Hoffmann-La Roche Ltd. v. Canada (Minister of National Health & Welfare)* (1996), 1996 CarswellNat 1845, 205 N.R. 331, 121 F.T.R. 238 (note), 70 C.P.R. (3d) 206 (Fed. C.A.) — followed

*Janssen-Ortho Inc. v. Novopharm Ltd.* (2006), 57 C.P.R. (4th) 58, 301 F.T.R. 166 (Eng.), 2006 FC 1234, 2006 CarswellNat 3249, 2006 CF 1234, 2006 CarswellNat 4811 (F.C.) — referred to

*Janssen-Ortho Inc. v. Novopharm Ltd.* (2007), 2007 FCA 217, 2007 CarswellNat 1556, 59 C.P.R. (4th) 116, 2007 CAF 217, 2007 CarswellNat 3072, 366 N.R. 290 (F.C.A.) — referred to

*Janssen-Ortho Inc. v. Novopharm Ltd.* (2007), 383 N.R. 397 (note), [2007] 3 S.C.R. xii (note), 2007 CarswellNat 4172, 2007 CarswellNat 4173 (S.C.C.) — referred to

*Jevco Insurance Co. v. Pilot Insurance Co.* (2000), 19 C.C.L.I. (3d) 189, 49 O.R. (3d) 760, 14 M.V.R. (4th) 313, [2000] I.L.R. I-3863, 2000 CarswellOnt 2072 (Ont. S.C.J.) — referred to

*Johnson & Johnson v. William H. Rorer (Canada) Ltd.* (1980), 48 C.P.R. (2d) 58, 1980 CarswellNat 808 (Fed. T.D.) — referred to

*Laboratoires Servier v. Apotex Inc.* (2008), 2008 CarswellNat 3000, 2008 FC 825, 332 F.T.R. 193 (Eng.), 2008 CarswellNat 5245, 67 C.P.R. (4th) 241, 2008 CF 825 (F.C.) — considered

*Lay v. Lay* (2000), 2000 CarswellOnt 976, 131 O.A.C. 47, 4 R.F.L. (5th) 264, 184 D.L.R. (4th) 652, 47 O.R. (3d) 779 (Ont. C.A.) — considered

*Lay v. Lay* (2000), 264 N.R. 398 (note), 2000 CarswellOnt 4309, 2000 CarswellOnt 4310, 145 O.A.C. 399 (note) (S.C.C.) — referred to

*Levesque v. Comeau* (1970), [1970] S.C.R. 1010, 16 D.L.R. (3d) 425, 5 N.B.R. (2d) 15, 1970 CarswellNB 14, 1970 CarswellNB 14F (S.C.C.) — referred to

*Mattabi Mines Ltd. v. Ontario (Minister of Revenue)* (1988), [1988] 2 C.T.C. 294, [1988] 2 S.C.R. 175, 53 D.L.R. (4th) 656, 29 O.A.C. 268, 87 N.R. 300, 1988 CarswellOnt 921, 1988 CarswellOnt 965 (S.C.C.) — considered

*Merck & Co. v. Apotex Inc.* (2005), 2005 FC 755, 2005 CarswellNat 1523, 41 C.P.R. (4th) 35, 274 F.T.R. 113 (Eng.), 2005 CF 755, 2005 CarswellNat 7039 (F.C.) — referred to

*Merck & Co. v. Apotex Inc.* (2006), 2006 CarswellNat 1119, 2006 FC 524, 53 C.P.R. (4th) 1, 282 F.T.R. 161 (Eng.), 2006 CarswellNat 3801, 2006 CF 524 (F.C.) — referred to

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*Merck & Co. v. Apotex Inc.* (2006), [2007] 3 F.C.R. 588, 2006 FCA 323, 2006 CarswellNat 3206, 55 C.P.R. (4th) 1, 2006 CarswellNat 5302, 2006 CAF 323, 354 N.R. 51, 276 D.L.R. (4th) 686 (F.C.A.) — referred to

*Merck & Co. v. Apotex Inc.* (2007), 2007 CarswellNat 1097, 2007 CarswellNat 1098, 370 N.R. 400 (note) (S.C.C.) — referred to

*Merck & Co., Inc. v. Smith* (1958), 261 F.2d 162 (U.S. C.A. 3rd Cir.) — distinguished

*Metalliflex Ltd. v. Rodi & Wienenberger AG* (1960), [1961] S.C.R. 117, 1960 CarswellQue 303, 21 Fox Pat. C. 95, 35 C.P.R. 49 (S.C.C.) — considered

*Misik v. Minister of National Revenue* (1993), 1993 CarswellNat 889, 93 D.T.C. 172, [1993] 1 C.T.C. 2360 (T.C.C.) — referred to

*Mobil Oil Corp. v. Hercules Canada Inc.* (1995), 63 C.P.R. (3d) 473, 188 N.R. 382, 98 F.T.R. 319 (note), 1995 CarswellNat 1833 (Fed. C.A.) — referred to

*Monsanto Canada Inc. v. Schmeiser* (2004), 2004 SCC 34, 320 N.R. 201, 2004 CarswellNat 1391, 2004 CarswellNat 1392, [2004] 1 S.C.R. 902, 31 C.P.R. (4th) 161, 239 D.L.R. (4th) 271 (S.C.C.) — considered

*Peach Hill Management Ltd. v. R.* (2000), *(sub nom. Jabel Image Concepts Inc. v. R.)* 2000 G.T.C. 4116, *(sub nom. Jabel Image Concepts Inc. v. Minister of National Revenue)* 257 N.R. 193, [2000] G.S.T.C. 45, 2000 CarswellNat 1157 (Fed. C.A.) — considered

*Pfizer Canada Inc. v. Apotex Inc.* (2007), 2007 CarswellNat 43, 2007 FC 26, 59 C.P.R. (4th) 183, 2007 CF 26, 2007 CarswellNat 5012, 306 F.T.R. 254 (Eng.) (F.C.) — referred to

*Pfizer Canada Inc. v. Apotex Inc.* (2007), 367 N.R. 98, 2007 CAF 195, 60 C.P.R. (4th) 177, 2007 CarswellNat 1376, 2007 FCA 195, 2007 CarswellNat 2361 (F.C.A.) — referred to

*Pfizer Canada Inc. v. Apotex Inc.* (2007), 2007 CarswellNat 3627, 2007 CarswellNat 3628, 381 N.R. 399 (note) (S.C.C.) — referred to

*Pfizer Canada Inc. v. Canada (Minister of Health)* (2005), 2005 FC 1725, 2005 CarswellNat 4401, 46 C.P.R. (4th) 244, 285 F.T.R. 1 (Eng.) (F.C.) — referred to

*Pfizer Canada Inc. v. Canada (Minister of Health)* (2008), 2008 CAF 108, 2008 CarswellNat 2714, 2008 FCA 108, 2008 CarswellNat 788, 67 C.P.R. (4th) 23, [2009] 1 F.C.R. 253, 377 N.R. 9 (F.C.A.) — referred to

*Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1995), 60 C.P.R. (3d) 328, 1995 CarswellNat 1001, 92 F.T.R. 253, 1995 CarswellNat 1950 (Fed. T.D.) — followed

*Prima Tek II, L.L.C. v. A-Roo Co.* (2000), 222 F.3d 1372 (U.S. C.A. Fed. Cir.) — distinguished

*Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1978), 39 C.P.R. (2d) 145, 1978 CarswellNat 692 (Fed. T.D.) — referred to

*R. v. E. (T.)* (2007), 2007 ONCA 891, 2007 CarswellOnt 8206 (Ont. C.A.) — considered

WestlawNext© CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*R. c. Fontaine* (2004), 18 C.R. (6th) 203, 2004 CarswellQue 814, 2004 CarswellQue 815, 2004 SCC 27, *(sub nom. R. v. Fontaine)* 237 D.L.R. (4th) 577, 183 C.C.C. (3d) 1, 318 N.R. 371, *(sub nom. R. v. Fontaine)* [2004] 1 S.C.R. 702 (S.C.C.) — followed

*R. v. Mohan* (1994), 18 O.R. (3d) 160 (note), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 1994 CarswellOnt 1155, 1994 CarswellOnt 66 (S.C.C.) — referred to

*Rizzo & Rizzo Shoes Ltd., Re* (1998), 1998 CarswellOnt 1, 1998 CarswellOnt 2, 50 C.B.R. (3d) 163, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, *(sub nom. Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006 (S.C.C.) — followed

*Sanofi-Synthelabo Canada Inc. v. Apotex Inc.* (2008), 2008 SCC 61, 2008 CarswellNat 3844, 2008 CarswellNat 3845, *(sub nom. Apotex Inc. v. Sanofi-Synthelabo Canada Inc.)* [2008] 3 S.C.R. 265, [2009] F.S.R. 7, 69 C.P.R. (4th) 251, 381 N.R. 125, 298 D.L.R. (4th) 385 (S.C.C.) — followed

*Satiacum v. Canada (Minister of Employment & Immigration)* (1989), 99 N.R. 171, 1989 CarswellNat 906 (Fed. C.A.) — considered

*Shire Biochem Inc. v. Canada (Minister of Health)* (2008), 2008 CF 538, 2008 CarswellNat 2815, 67 C.P.R. (4th) 94, 2008 CarswellNat 1240, 2008 FC 538, 328 F.T.R. 123 (Eng.) (F.C.) — referred to

*Smith, Kline & French Inter-American Corp. v. Micro Chemicals Ltd.* (1971), 1971 CarswellNat 388F, 1971 CarswellNat 388, [1972] S.C.R. 506, 25 D.L.R. (3d) 79, 2 C.P.R. (2d) 193 (S.C.C.) — followed

*Synthon BV v. Smithkline Beecham plc* (2005), [2005] UKHL 59, [2006] 1 All E.R. 685, [2006] R.P.C. 10 (U.K. H.L.) — considered

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.* (1991), 944 F.2d 870 (U.S. C.A. Fed. Cir.) — distinguished

*Whirlpool Corp. v. Camco Inc.* (2000), 9 C.P.R. (4th) 129, [2000] 2 S.C.R. 1067, 2000 SCC 67, 2000 CarswellNat 2846, 2000 CarswellNat 2861, 194 D.L.R. (4th) 193, 263 N.R. 88, 186 F.T.R. 268 (note) (S.C.C.) — considered

**Statutes considered:**

*Canada Evidence Act*, R.S.C. 1985, c. C-5
    s. 30(1) — referred to

*Copyright Act*, R.S.C. 1927, c. 32
    s. 20(3)(b) — referred to

*Federal Courts Act*, R.S.C. 1985, c. F-7
    s. 36 — referred to

    s. 37 — referred to

*Federal Food, Drug, and Cosmetic Act*, 21 U.S.C. 9
    Generally — referred to

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    6

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*Patent Act*, R.S.C. 1970, c. P-4
    Generally — referred to

*Patent Act*, R.S.C. 1985, c. P-4
    Generally — referred to

s. 2 "invention" — referred to

s. 2 "patentee" — referred to

s. 27 — referred to

s. 27(1) — considered

s. 27(3) — referred to

s. 39(1) — referred to

s. 39(2) — considered

s. 41(1) — referred to

s. 43 — referred to

s. 43(1) — referred to

s. 43(1)(b) — considered

s. 43(2) — referred to

s. 43(2)-43(4) — referred to

s. 43(5) — considered

s. 44 — referred to

s. 45 — referred to

s. 53 — referred to

s. 55 — referred to

s. 55(1) — considered

s. 55.2(1) [en. 1993, c. 2, s. 4] — considered

s. 55.2(6) [en. 1993, c. 2, s. 4] — referred to

s. 57 — referred to

s. 59 — referred to

s. 60(1) — referred to

s. 61 — referred to

s. 61(1) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    7

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

      s. 61(1)(a) — referred to

      s. 61(1)(b) — considered

      ss. 78.1-78.2 — referred to

**Rules considered:**

*Federal Courts Rules*, SOR/98-106
      R. 107 — referred to

      R. 153 — referred to

**Regulations considered:**

*Food and Drugs Act*, R.S.C. 1985, c. F-27
      *Food and Drug Regulations*, C.R.C. 1978, c. 870

      Generally — referred to

*Patent Act*, R.S.C. 1985, c. P-4
      *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

      Generally — referred to

      s. 6(1) — referred to

      s. 6(6) — referred to

      s. 8 — referred to


ACTION by patent holder for infringement.


*Judith A. Snider J.*:


# I. Introduction


## A. Overview


1    The subject of this litigation is the drug lovastatin, sold in Canada under the trade name MEVACOR since 1988 by Merck Frosst Canada Inc. (or its successor, Merck Frosst Canada Ltd. (Merck Frosst), one of the Plaintiffs in this action). MEVACOR was the first commercialized "statin" sold in the Canadian market and is used for the treatment of elevated blood cholesterol. Until January 31, 2001, when the patent expired, MEVACOR was the subject of Canadian Patent No. 1,161,380 ('380 Patent) issued January 31, 1984 to Merck & Co., Inc. (Merck & Co.), the other Plaintiff in this action. Stated briefly, the '380 Patent is a product-by-process patent to lovastatin when made with a micro-organism known as *Aspergillus terreus* (also referred to as *A. terreus*). Merck Frosst sells MEVACOR in Canada under licence from Merck & Co. In these reasons, I will refer to Merck Frosst and Merck & Co., collectively, as "Merck" or the "Plaintiffs".

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

2    In March 1997, Apotex Inc., one of the Defendants in this action, began selling its brand of lovastatin tablets in Canada (Apo-lovastatin). The active pharmaceutical ingredient (API) that remains in dispute in this litigation was made either by Apotex Fermentation Inc. (AFI), the other Defendant in this action, in Winnipeg, Manitoba, or by Qingyuan Blue Treasure Pharmaceuticals Co. Ltd. (Blue Treasure), in China. In these reasons, I will refer to Apotex Inc. and AFI, collectively, as "Apotex" or the "Defendants".

3    Merck claims that the Defendants infringed the '380 Patent:

  • through the use of infringing API that was made in China and shipped from Blue Treasure to AFI;

  • through the "salting" of non-infringing lovastatin with infringing lovastatin;

  • through the manufacturing of one batch of infringing API (batch CR0157) in Winnipeg by AFI; and

  • with some other small amounts of infringing product made in Winnipeg by AFI.

4    The Defendants claim that there has been no infringement of the '380 Patent and that, in any event, the '380 Patent is invalid. Further, they argue that Merck & Co. has no standing to bring this action, having assigned all of its interest in the '380 Patent to an affiliate, Merck and Company, Incorporated (MACI).

5    The application leading to the '380 Patent was filed in Canada on June 11, 1980. According to s. 78.1-78.2 of the present *Patent Act*, R.S.C. 1985, c. P-4, as amended, patent applications filed before October 1, 1989, are to be dealt with under the provisions of the *Patent Act* as they read immediately before that date. Accordingly, references in these reasons to the *Patent Act* [referred to as the *Patent Act* or the *Act*], unless specifically noted otherwise, will be to the *Act* as it stood immediately prior to October 1, 1989.

*B. Summary of issues and conclusions*

6    Very briefly, although there are a myriad of subsidiary issues, the key questions to be addressed in this proceeding are as follows:

  1. Does Merck & Co. have standing to bring this action?

  2. Have the Defendants infringed the '380 Patent?

  3. Is the '380 Patent valid?

7    As explained in these reasons, I have concluded that:

  1. Merck & Co. has standing to bring this action;

  2. The '380 Patent was infringed; and

  3. The '380 Patent is valid.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    9

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

8      As a result, the claims of the Plaintiffs will be allowed, to the extent described below, and the counterclaims of the Defendants will be dismissed.


9      Finally, by way of introduction, I note that this trial is subject to a bifurcation order dated November 14, 2003 (Bifurcation Order). Accordingly, the question of damages will be considered in a subsequent proceeding.


*C. Background to this litigation*


10     For almost ten years after its introduction into the Canadian market, Merck enjoyed its patent for MEVACOR without challenge. In 1993, Apotex Inc. tried to enter the market with a generic version of lovastatin and, to that end, applied to the Minister of Health for a Notice of Compliance (NOC) pursuant to the relevant provisions of the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133, as amended by SOR/98-166 [*PMNOC Regulations* or the *Regulations*]. Apotex alleged that it would not infringe the '380 Patent, as it would not be using a process to produce lovastatin that would fall within the scope of the patent.


11     As permitted by the *Regulations*, in April 1993, Merck filed an application with this Court to prohibit the Minister from issuing an NOC to Apotex Inc. A key feature of the *PMNOC Regulations* is the imposition of a statutory stay upon the filing of an application for prohibition until a determination can be made as to whether the "second person" — in this case, Apotex Inc. — was justified in its claims that its generic drug would not infringe any existing patents. Section 6(1) of the *Regulations*, as they were at that time, automatically prohibited the Minister from issuing an NOC to Apotex Inc. for up to 30 months.


12     The statutory stay expired on December 1, 1996, without any hearing before the Court on the merits of the prohibition application. Merck Frosst Canada Inc. sought an extension of the stay. In an oral judgment dated March 26, 1997, Justice Rothstein (then a judge with the Federal Court, Trial Division) refused to extend the time period or to issue a prohibition order. An NOC was issued to Apotex Inc. on March 27, 1997.


13     Following the issuance of the NOC and a series of Court challenges, two actions were commenced:


   1. Merck commenced this action against Apotex Inc. and Apotex Fermentation Inc. (AFI) for patent infringement (Court File T-1272-97). The statement of claim was filed on June 12, 1997.

   2. By statement of claim filed June 29, 2001, Apotex Inc. seeks compensation from Merck under s. 8 of the *PMNOC Regulations* (Court File No. T-1169-01).


14     In 2001, Apotex Inc. commenced a third party claim against Biogal Pharmaceutical Works Ltd. (Biogal) in Court File No.T-1272-97. The subject matter of the third party claim was 300 kg of bulk lovastatin acquired by Apotex Inc. from Biogal pursuant to a Supply Agreement. In its third party claim, Apotex Inc. claimed that, in the event that the '380 Patent is held to be valid and infringed, Biogal was liable for any relief that may have been awarded against Apotex Inc. Biogal participated in the T-1272-97 litigation until a settlement was reached among the parties to this litigation. By Court Order dated May 28,

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

2010, the Plaintiffs' claims against Apotex Inc. and AFI in the Amended Fresh as Amended Statement of Claim and referenced in paragraphs 36 and 67-73 therein relating to lovastatin supplied by Biogal to Apotex Inc. were dismissed.

15    Both actions were heard together in a trial that commenced on February 1, 2010. These Reasons deal only with the issues in Court File No. T-1272-97 — Merck's claim of infringement and Apotex's counterclaim of patent invalidity. Separate Reasons for Judgment and Judgment have been issued contemporaneously with these Reasons in Court File No. T-1169-01.

16    During the 35-day evidentiary phase of this trial, many witnesses appeared, both as expert and fact witnesses. In Appendix A, I have set out a brief overview of the expert and fact witnesses who appeared during the trial and the areas to which they testified. For the expert witnesses, I have set out a very short description of their education and experience in the areas for which this Court found each of them to be qualified. More detailed references to the witnesses' evidence and testimony are contained in the appropriate sections of these reasons.

## II. Table of Contents

17    To assist the reader, the following sets out a Table of Contents for these Reasons with paragraph numbers for each heading

I. Introduction _____ | 1 - 16
A. Overview _____ | 1 - 5
B. Summary of issues and conclusions _____ | 6 - 9
C. Background to this litigation _____ | 10 - 16
II. Table of Contents _____ | 17
III. Background _____ | 18 - 39
A. The '380 Patent and Statins _____ | 18 - 24
B. History of AFI/Blue Treasure Production _____ | 25 - 39
IV. Standing _____ | 40 - 56
V. Claims Construction _____ | 57 - 130
A. Principles of Claims Construction _____ | 57 - 62
B. The hypothetical skilled person _____ | 63 - 67
C. The Patent Specification _____ | 68 - 81
D. The claims in issue _____ | 82 - 87
E. The meaning of "a microfungus of genus Aspergillus in Claim 1 _____ | 88 - 99
F. The meaning of "isolating the products" _____ | 100 - 109
G. Inclusion of non-producing strains _____ | 110 - 121
H. The promised use of the '380 Patent _____ | 122 - 126
I. Summary on Claims Construction _____ | 127 - 130
VI. Infringement — Background _____ | 131 - 188
A. Introduction _____ | 131 - 133
B. Burden _____ | 134 - 186
C. Summary of Merck's case on infringement _____ | 187 - 188
VII. Infringement — the Circumstantial Case _____ | 189 - 360
A. Blue Treasure "Salting" _____ | 189 - 208
B. Infringement by Blue Treasure from March 1998 _____ | 209 - 335
(1) Batch Records _____ | 211 - 249
(2) P2000 _____ | 250 - 259
(3) Fermentation Duration _____ | 260 - 270
(4) Increased Titres _____ | 271 - 294
(5) Motivation, Means and Opportunity _____ | 295 - 320
(a) Motivation _____ | 296 - 310

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

| | |
|---|---|
| (b) *Means* _____ | 311 - 316 |
| (c) *Opportunity* _____ | 317 - 320 |
| (6) Blue Treasure Conduct _____ | 321 - 335 |
| C. *Conclusion on Blue Treasure Circumstantial Evidence* _____ | 336 - 342 |
| D. *AFI Batch CRO 157* _____ | 343 - 360 |
| VIII. *Infringement — the DNA Evidence* _____ | *361 - 463* |
| A. *Introduction* _____ | 361 - 369 |
| B. *Nexus between the samples tested and the allegedly infringing lovastatin* _____ | 370 - 377 |
| C. *Reproducibility of the testing in the Davies lab* _____ | 378 - 390 |
| D. *Failure of Dr. Davies to find C. fuckelii DNA in the tablets from Batch CR0157* _____ | 391 - 395 |
| E. *DNA evidence and the Apotex Experts* _____ | 396 - 422 |
| (1) What is Ancient DNA? _____ | 402 - 404 |
| (2) Is DNA derived from a pharmaceutical product degraded or fragmented? _____ | 405 - 410 |
| (3) Can one compare how DNA derived from a pharmaceutical product is fragmented to how DNA from "ancient DNA" is degraded? _____ | 411 - 414 |
| (4) Are the opinions of the Defendants' experts relevant to fragmented DNA _____ | 415 - 422 |
| F. *Contamination* _____ | 423 - 444 |
| (1) Dr. Davies _____ | 425 - 430 |
| (2) Dr. Taylor _____ | 431 - 439 |
| (3) Dr. Gilbert _____ | 440 - 444 |
| G. *Other criticisms of Dr. Davies's opinion* _____ | 445 - 463 |
| (1) Lack of knowledge _____ | 449 - 451 |
| (2) Incomplete Report & Lack of Disclosure _____ | 452 - 457 |
| (3) Unexpected results _____ | 458 - 463 |
| IX. *Infringement — Conclusion* _____ | *464 - 466* |
| X. *Validity* _____ | *467 - 609* |
| A. *Introduction* _____ | 467 - 468 |
| B. *Overbreadth* _____ | 469 - 475 |
| C. *Utility* _____ | 476 - 532 |
| (1) General Principles _____ | 476 - 485 |
| (2) The '380 Patent _____ | 486 - 488 |
| (3) Lack of Utility _____ | 489 - 495 |
| (4) Sound Prediction _____ | 496 - 532 |
| (a) *The Factual Basis* _____ | 498 - 511 |
| (b) *Line of Reasoning* _____ | 512 - 519 |
| (c) *Disclosure* _____ | 520 - 532 |
| D. *First Inventorship/Missed Conflict* _____ | 533 - 609 |
| (1) Introduction _____ | 533 - 534 |
| (2) Legal Principles _____ | 535 - 540 |
| (3) Was there a missed conflict _____ | 541 - 558 |
| (4) Did the Endo application disclose the invention of the '380 Patent? _____ | 559 - 562 |
| (5) Red Yeast Rice/Anticipation _____ | 563 - 609 |
| (a) *Principles of Anticipation* _____ | 563 - 569 |
| (b) *Background on Red Yeast Rice* _____ | 570 - 571 |
| (c) *Legal Consequences of lovastatin in Red Yeast Rice* _____ | 572 - 583 |
| (d) *Evidence of lovastatin in Red Yeast Rice prior to the priority date* _____ | 584 - 598 |
| (e) *Disclosure of lovastatin in Red Yeast Rice* _____ | 599 - 609 |
| XI. *Conclusion* _____ | *610 - 642* |
| A. *Damages or Profits* _____ | 610 - 624 |
| B. *Exemptions from Liability* _____ | 625 - 637 |
| C. *Conclusion* _____ | 638 - 642 |
| Appendix A — List of Witnesses _____ | *A1 - A11* |
| Appendix B — Claims 1 to 8 and 13 to 15 of the '380 Patent _____ | *B1 - B4* |

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

### III. Background

#### A. The '380 Patent and Statins

18    Lovastatin, as made by the process of the '380 Patent, is an example of a medicinally-valuable drug that is produced by a process of fermentation. In very simple terms, the laboratory begins with a micro-organism - in this case, *Aspergillus terreus* — and, through increasingly larger fermentations carried out in very controlled settings, manufactures the API of interest.

19    The '380 Patent relates to "hypocholesteremic products from the cultivation of a microfungus of the species *Aspergillus*." Dr. Antonio Gotto provided very helpful background information on the role of "hypocholesteremic" medications, such as lovastatin, in the treatment of cardiovascular disease. In addition to being qualified because of his stature as a professor of medicine, Dr. Gotto's experience as a treating physician during the 1970s and 1980s was directly relevant to the matters before me.

20    Atherosclerosis is a type of cardiovascular disease that occurs when cholesterol and other substances build up in the walls of arterial blood vessels to form plaque. Over time, the build-up of plaque thickens and hardens the arterial walls restricting the flow of blood from the heart. Heart attacks and strokes may follow.

21    The build-up of plaque is promoted by low density lipoproteins (referred to as LDL or "bad" cholesterol). According to Dr. Gotto, the relationship between reducing "bad" cholesterol and reducing the risk of cardiovascular disease has been known for over 20 years. Thus, a primary goal of medicine is to lower LDL cholesterol. The class of drugs known as "statins" are of great assistance in achieving this goal.

22    In Dr. Gotto's words (Gotto Expert Report, Exhibit 2, paras. 24, 38):

It was only with the discovery of statins — starting with lovastatin (MEVACOR®) in the late 1970s — that treatment of elevated cholesterol became much more effective.

. . .

The single most significant discovery to date for the treatment of cholesterol was the discovery of lovastatin in the late 1970s.

23    Dr. Gotto described how statins work to lower cholesterol. Statins reduce the production of cholesterol by the liver. Specifically, statins block the liver enzyme known as HMG-CoA reductase (hydroxyl-methylglutaryl-coenzyme A reductase); hence, statins are known as HMG-CoA reductase inhibitors. Dr. Gotto made the general comment that "statins changed medical practice" (Gotto Expert Report, Exhibit 2, para. 50). No one disagreed with this opinion.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

24    Lovastatin, as manufactured and sold by Merck (or its predecessors in interest) under the trade name MEVACOR, was the first commercially-available statin.

## B. History of AFI/Blue Treasure Production

25    An important part of the story for this litigation is how Apotex Inc. became interested in lovastatin and how Apotex Inc., AFI and the Blue Treasure Joint Venture became involved.

26    Dr. Bernard Sherman is currently the Chairman and Chief Executive Officer of Apotex Inc., a company that he founded in 1973. During his oral testimony, Dr. Sherman described Apotex Inc. in the following terms:

It's a pharmaceutical manufacturer, the largest in Canada today. We produce primarily generic pharmaceutical products, but also some innovative products. We have huge dosage form manufacturing facilities. We are vertically integrated. We have chemical plants. We spend enormously on research and development, the largest in Canada, and we have divisions in many countries around the world and factories in many countries, including chemical plants.

27    Apotex Inc. recognized the significance of the lovastatin market. Dr. Sherman described lovastatin, in 1993, as "one of the biggest selling drugs in the country at the time, close to $100 million a year".

28    Of particular relevance to this litigation, Dr. Sherman told the Court how his company's version of lovastatin became entangled with a suddenly-changed regulatory regime in 1993. Until 1993, it was possible for a generic company to obtain a compulsory licence to allow it to produce a generic equivalent of a patented medicine. The original intent of Apotex Inc. was to obtain a compulsory licence to use *Aspergillus terreus* to make lovastatin. According to Dr. Sherman, in 1993, the licence regime and licences issued under it were cancelled. They were replaced with the *PMNOC Regulations* outlined by Dr. Sherman as follows:

In 1993, not only were the licences — the licence regime eliminated, including retroactive cancellation of some licences — one applicable to this case — but, in addition to that, a new regime was instituted, called the Patented Medicines (Notice of Compliance) Regulations, pursuant to which patentees or first persons, persons who had approval for the original brand, could list patents which they purported were relevant to a product; and, if they listed the patent, then a generic applicant, a second person, cannot get federal approval until the requirements of those regulations are satisfied, which means that the second person has to serve a notice of allegation in which it is alleged that the patent will not be infringed or is invalid. Then, within 45 days, if the patentee or first person institutes a prohibition application, which almost always happens, there is a delay in federal approval until that matter is resolved, which can take a very long time.

29    A relationship of interest to this case is that of Apotex Inc. and AFI. In the mid-1980s, Apotex Inc. contracted with ABI Biotechnology Inc. (ABI) in Winnipeg to develop and manufacture certain fermented products. Ultimately, the assets of ABI were bought by Apotex Inc. and the company was renamed as AFI. Through AFI, Apotex Inc. gained the capacity to manufacture products using fermentation processes. AFI added to the vertical integration of the Apotex family of business entities.

30    AFI was to be the source of the API lovastatin. As described in detail by Dr. Lasure, in her Expert Report (Exhibit 48),

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

and by Dr. David Cox, during his testimony, the following steps were taken by AFI:

• AFI acquired Merck's deposited strains of *Aspergillus terreus* from the American Tissue Culture Collection (ATCC), including a strain designated ATCC 20542.

• ATCC 20542 was then mutated by UV mutagenesis twice to create a mutant strain of ATCC 20542.

• AFI designated the strain as BN-2-70 and the process for manufacturing lovastatin using this strain as AFI-1.

• Between 1991 and 1995, AFI developed a commercial scale fermentation process for making lovastatin using AFI-1 — that is, using *Aspergillus terreus*.

31    In 1992, Dr. Sherman testified that, anticipating the intent of the government, Apotex began to look for a non-infringing process. Apotex "had to find a microbe that would produce lovastatin that was not *Aspergillus terreus*". In her Expert Report, Dr. Lasure summarized the context and the results of this search:

• On June 25, 1988, the Journal of Antibiotics published an article entitled "The Synthesis of Compactin (ML-236B) and Monacolin K in fungi" written by Dr. Akira Endo et al. Dr. Endo reported on fungal strains capable of producing Monacolin K (known now to be lovastatin), including *Phoma* species M4452.

• In June 1992, a sample of *Phoma* Sp. M4452 was sent to AFI by Dr. Endo.

• For the next six months or so, AFI took steps in its laboratories to confirm and develop the production of lovastatin from the Endo sample. The process was initially referred to as *Phoma* #4; later designated as "AFI-4".

• By May 1993, a sample of the AFI-4 product was confirmed to be *Coniothyrium fuckelii* (also referred to as *C. fuckelii*).

• Apotex Inc. filed a patent for the AFI-4 process — a process for making lovastatin using *Coniothyrium fuckelii* — that subsequently issued as United States Patent No. 5,409,820 on April 25, 1995.

32    As described by a number of witnesses, including Dr. Cox and Ms. Lori Christofalos, AFI's production of AFI-4 lovastatin and shipments to Apotex Inc. can be divided into three phases:

1. Phase 1 occurred between June 1996 and August 1997, during which all production was done solely at AFI facilities in Winnipeg. The finished API was shipped to Apotex Inc., beginning with the shipment of batch CR0157 on December 2, 1996.

2. In Phase 2, Blue Treasure (discussed below) manufactured approximately 70 batches of technical-grade lovastatin. The product was then shipped to AFI for processing into API and shipment to Apotex Inc. Phase 2 lasted from about mid-1997 to January 1998.

3. Phase 3 consisted of approximately 294 batches of API-grade lovastatin manufactured entirely at Blue Treasure after March 1998. The product was sent to AFI, where "some testing" was carried out, and then shipped to Apotex Inc. This phase continued until October 1999, with the last shipment received at AFI on March 2, 2000.

33    The joint venture company known as Qingyuan Blue Treasure Pharmaceuticals Co. Ltd. (Blue Treasure or Blue Treasure Joint Venture) is a critical component of this litigation. Dr. David Cox, President and Chief Executive Officer of

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

AFI from September 1994 to September 1997, provided a clear and helpful background about this joint venture. Dr. Cox was on the Board of Directors of Blue Treasure during the same period.

34    Blue Treasure was formed pursuant to a Joint Venture Contract dated January 25, 1994 among Qingyuan New North River Pharmaceutical Co. Ltd. (New North River), Zuhai Special Economic Zone Lizhu Pharmaceutical Group Co. Ltd., Sichuan Industrial Institute of Antibiotics, AFI and BIOTECS. AFI held a 42.5% share of the Blue Treasure Joint Venture. As set out in clause 4.01 of the Joint Venture Contract, the purpose of the Blue Treasure Joint Venture was as follows:

> The purpose of the Joint Venture is to renovate and operate the Factory, to purchase or otherwise obtain all necessary raw materials and equipment required for the production of the Products, and to produce, market, distribute and sell Products at a profit to customers both in China and abroad.

35    In 1994, New North River was already an operational pharmaceutical facility with capacity for carrying out fermentation processes. Under the Joint Venture Contract, New North River contributed a portion of its facilities located on its property to the Blue Treasure Joint Venture.

36    As defined in the Joint Venture Contract, "Products" meant "the drug Lovastatin as Bulk Products and Finished Products". Dr. Cox stated that the Blue Treasure Joint Venture "was set up to produce and distribute and sell Lovastatin in the Chinese domestic market". AFI's main contribution to the Blue Treasure Joint Venture was the organism that produced lovastatin. Dr. Sherman told the Court that the decision to move the production of lovastatin to Blue Treasure was made for the following reasons:

> [Blue Treasure] had capacity there, and we wanted to move the production for Canada out of Winnipeg, both to bring costs down and to free up Winnipeg to go on for other things that would be needed later.

37    In the spring of 1995, AFI transferred to Blue Treasure the information and knowledge it had developed to manufacture lovastatin made from *Aspergillus terreus*. Among the things transferred to Blue Treasure were: a document setting out the process for producing lovastatin from *Aspergillus terreus*, entitled "Scale-up Process to 15000L Fermenter"; and, 25 vials of strain BN-2-70 from seed bank A18-378, and 5 rice cultures from batch #CF0057 (shipped to Blue Treasure on May 15, 1995). Blue Treasure began producing lovastatin, using the AFI-1 process, in 1996.

38    In about April 1997, AFI determined that it would transfer the AFI-4 technology to Blue Treasure together with a guarantee that AFI would purchase the lovastatin from Blue Treasure, provided that the lovastatin was all made by the AFI-4 process and that "the Blue Treasure facility be exclusively dedicated to AFI-4". The terms of this arrangement were set out in a letter agreement dated April 16, 1997 between AFI and Blue Treasure. Dr. Cox described the impact of the AFI-4 transfer as "transformative in a positive way". The transfer of AFI-4 to Blue Treasure was made with very explicit instructions that the lovastatin purchased by Apotex was to be produced exclusively with the AFI-4 *Coniothyrium fuckelii* strain, with no possibility of contamination from *Aspergillus terreus* (see, for example, letter dated September 12, 1997 from Mr. Fowler to Mr. Zhou). Problems quickly arose. These problems are discussed later in Section VII of these reasons.

39    From 1997 to 1999, AFI imported lovastatin from Blue Treasure in accordance with the terms of the Blue Treasure Joint Venture. The lovastatin API was then sold to Apotex Inc.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

**IV. Standing**

40    The first issued raised by Apotex is the standing of Merck & Co. to bring this action.

41    The authority of a party to claim damages for patent infringement is found in s. 55(1) of the *Patent Act*.

> 55.(1) Any person who infringes a patent is liable to the patentee and to all persons claiming under him for all damages sustained by the patentee or by any person, by reason of the infringement.

> 55.(1) Quiconque viole un brevet responsable, envers le breveté et envers toute personne se réclamant du breveté, des tous dommages-intérêts que cette violation a fait subir au breveté ou à cette autre personne.

42    The term "patentee" is defined in s. 2 of the *Patent Act* to mean "the person for the time being entitled to the benefit of a patent".

43    The '380 Patent was granted to Merck & Co. In 1985, Merck & Co. entered into a License Agreement with Merck Frosst (the 1985 License Agreement), granting an non-exclusive licence to Merck Frosst. That Agreement was amended, effective January 1, 1989, to add the '380 Patent. Subsequently, as of January 1, 1992, Merck & Co. entered into an agreement (the MACI Agreement) with Merck and Company, Incorporated (MACI) pursuant to which Merck & Co., as Licensor, granted to MACI, as Licensee:

> A permanent and exclusive royalty-free license for the Intellectual Property which Licensor owns or hereinafter acquires, but for any outstanding licenses for the Intellectual Property which already granted pursuant to the License Agreement, dated January 1, 1985, and amendments thereto between Merck & Co., Inc. and Merck Frosst Canada Inc.

44    Apotex does not dispute Merck Frosst Canada Ltd.'s standing in this action, as the successor in interest to Merck Frosst Canada Inc. However, Apotex submits that Merck & Co. has no standing to bring this action, having assigned all of its interest in the '380 Patent to MACI pursuant to the MACI Agreement. Apotex asserts that, as of November 1992, MACI had the "full and unrestricted benefit of the '380 Patent". Merck & Co. lost all benefit of the patent and, as a result, the right to damages under s. 55 (1) of the *Patent Act*. Apotex argues that, although the agreement is entitled "License Agreement", a review of the words of the agreement demonstrates that the intent of the parties to the MACI Agreement was to convey the entire right, title and interest in the '380 Patent to MACI.

45    Apotex submits that agreements which take the form of a licence, but nevertheless convey all of the substantive rights in a patent, have consistently been held to constitute an effective assignment or transfer of that patent. In support of this argument, Apotex relies on a line of jurisprudence of courts in the United States and the United Kingdom (*Merck & Co., Inc. v. Smith*, 261 F.2d 162 (U.S. C.A. 3rd Cir. 1958), at 164; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (U.S. C.A. Fed. Cir. 1991); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372 (U.S. C.A. Fed. Cir. 2000); *Guyot v. Thomson* [[1894] 3 Ch. 388 (Eng. C.A.)], [1894] R.P.C. 541, at 554[*Guyot*]).

46    I do not find the authorities relied on by Apotex to be of any assistance. Except in the case of *Guyot*, above, a decision

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

of the High Court of Justice — Chancery Division, the Courts in those cases were considering the effect of agreements in the context of U.S. patent law. I do not see how they could guide this Court in determining the meaning of the terms of and, if necessary, the intent of the parties to the MACI Agreement. I did not have the benefit of an expert in U.S. law opining as to whether the MACI Agreement would constitute a transfer of all of the rights of the patent to MACI under applicable U.S. law. Moreover, the facts in *Guyot*, where an exclusive assignee was attempting to enforce the terms of an Indenture, are simply too remote from the question before me.

47      Rather, I would look at this issue in the context of the Canadian law of contracts. As I understand the state of the Canadian law of contracts, the express language of the parties to a contract is the core of their contractual obligations. Where the words of a contract are clear and unambiguous, a court need not look beyond those clear words to determine its intent and effect.

48      Apotex was unable to point me to a single Canadian case that supports its position. Nevertheless, I would agree that the title of the License Agreement would not be determinative if there is clear and persuasive evidence that Merck & Co. intended to convey all of its rights in the '380 Patent to MACI, retaining nothing to itself. Whether this is so or not will depend on an examination of the words of the MACI Agreement and the facts and circumstances surrounding the MACI Agreement.

49      In this case, the express language of clause 2 of the MACI Agreement uses the word "license". On its face, the MACI Agreement only grants a "license". The Supreme Court of Canada in *Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 (S.C.C.) at p.912, (1982), 66 C.P.R. (2d) 46 (S.C.C.), adopted the comments of Fry L.J. at p. 470, in *Heap v. Hartley* (1889), 42 Ch. D. 461 (Eng. C.A.):

An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing.

[Emphasis added.]

50      I also note the language of certain clauses in the MACI Agreement that refer to rights retained by Merck & Co. For example, clause 3 provides the Licensor with the rights to inspect the Licensee's facilities. Under clause 5.2, the Licensee is to supply the Licensor with a detailed description of any disclosure of "licensed know-how" to any governmental authority. In my view, retention of rights such as these is inconsistent with an intention to transfer all rights under the patent.

51      In support of its position, Apotex points to a recital to the MACI Agreement:

WHEREAS, the Licensor desires to grant the Licensee a permanent and exclusive license with respect to its remaining right, title and interest in and to the rights which it has acquired with respect to such intellectual property as a contribution to the capital of the Licensee.

[Emphasis added.]

Apotex relies on the Supreme Court of Canada decision in *Dukart v. Surrey (District)*, [1978] 2 S.C.R. 1039 (S.C.C.) at p.1052-53, (1978), 86 D.L.R. (3d) 609 (S.C.C.) [*Dukart* cited to S.C.R] as support for its submission that, where the words of

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

a recital manifest a clear intention, the Courts have inferred that the parties intended that these words be given effect.

52    The case of *Dukart* does not assist Apotex. *Dukart* involved the grant of an "easement" and the question of the true intentions of the parties. In that case, the body of the agreement contained no language with respect to the extent of the rights granted under the agreement. The recital clause was used by the Supreme Court to provide the necessary meaning to the agreement.

53    The case before me is different in that provisions in the body of the MACI Agreement speak to the intent of the agreement and the scope of the "transfer" from Merck & Co. to MACI. The use of a recital or preamble as an interpretative aid must always be approached with caution. As pointed out by Justice Abella (as she then was) in *Lay v. Lay* (2000), 47 O.R. (3d) 779, 184 D.L.R. (4th) 652 (Ont. C.A.) at paragraph 12, leave to appeal to SCC refused, [2000] S.C.C.A. No. 369, 264 N.R. 398 (note) (S.C.C.):

There is no doubt that an introduction or a preamble can provide interpretative assistance, but I see no basis for accepting the novel proposition that its terms can triumph over those in the body of the contract.

54    In my view, the words of the MACI Agreement establish the creation of a licence and not a conveyance of all rights in the '380 Patent. The use of the word "remaining" in the recital does not "triumph over" the words of the agreement. This is sufficient to defeat the argument of Apotex.

55    However, even if I accept that there may be ambiguity in the MACI Agreement, I am satisfied that the parties to the MACI Agreement did not intend to convey the entire right, title and interest in the '380 Patent. One indication of the intent of the parties to an agreement is the behaviour of the parties. If the MACI Agreement is not clear on its face, it is of assistance to examine the behaviour of the parties after the execution of the agreement. Was the behaviour of Merck & Co., from November 1992, consistent with a company who had given up its entire right, title, estate and interest in the '380 Patent? Clearly, the answer is "no". If there had been such intent, why would Merck & Co. commence and pursue this litigation for 13 years in its own name? Further, why would Merck & Co. remain as the named patentee on the '380 Patent?

56    I am satisfied that the MACI Agreement did not operate as a conveyance of the entire right, title and interest of Merck & Co. to MACI. Merck & Co. has standing to bring this action.

**V. Claims Construction**

*A. Principles of Claims Construction*

57    The first step in a patent suit is to construe the claims, in accordance with principles that are well-established in the jurisprudence (see, for example, *Whirlpool Corp. v. Camco Inc.*, 2000 SCC 67, [2000] 2 S.C.R. 1067 (S.C.C.) [*Whirlpool*]). This jurisprudence teaches that claims are to be interpreted in a purposive way in order "to achieve fairness and predictability and to define the limits of the monopoly" (*Dimplex North America Ltd. v. CFM Corp.*, 2006 FC 586, 292 F.T.R. 38 (Eng.) (F.C.) at para. 49 [*Dimplex*], aff'd 2007 FCA 278, 60 C.P.R. (4th) 277 (F.C.A.)).

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

58    Construction of the claims is a matter for the Court to determine. The Court is called on to determine, on an objective basis, what a hypothetical skilled person would have understood the invention to mean (*Whirlpool Corp.*, above, at paras. 45, 53). Where a patent is of a highly technical nature, the person skilled in the art will be someone possessing a high degree of expert scientific knowledge in the particular field of art to which the patent relates (*Aventis Pharma Inc. v. Apotex Inc.*, 2005 FC 1283, 278 F.T.R. 1 (F.C.) [*Ramipril I (FC)*]; *Apotex Inc. v. Syntex Pharmaceuticals International Ltd.* (1999), 166 F.T.R. 161 (Fed. T.D.) at para. 38, [1999] F.C.J. No. 548 (Fed. T.D.)).

59    Where necessary, the whole of the patent, and not only the claims, should be interpreted (*Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 (F.C.) at para. 25; *Eli Lilly Canada Inc. v. Novopharm Ltd.*, 2007 FC 596, 58 C.P.R. (4th) 214 (F.C.) at para. 103). The Court should construe the claims in light of the description in the specification, assisted by experts as to the meaning of technical terms if such terms cannot be understood by the Court from reading the specification (*Shire Biochem Inc. v. Canada (Minister of Health)*, 2008 FC 538, 328 F.T.R. 123 (Eng.) (F.C.) at para. 22 [*Shire*]; *Whirlpool*, above, at para. 45).

60    It is also important to recognize that purposive construction should be directed at the points in dispute between the parties (*Shire*, above, at para. 22).

61    Lastly, as the '380 Patent was issued under the old *Patent Act*, all claims at issue are to be construed as of the date the patent was granted and issued (*Pfizer Canada Inc. v. Canada (Minister of Health)*, 2005 FC 1725, 285 F.T.R. 1 (Eng.) (F.C.) at para. 36). For the '380 Patent, that date is January 31, 1984.

62    With these overarching principles in mind, I turn to the patent in question.

## B. The hypothetical skilled person

63    As noted, claims must be construed from the view of a hypothetical skilled person. Thus, as a preliminary matter, I must define what attributes would be held by our hypothetical skilled person.

64    In its final written argument, Apotex described the person to whom the '380 Patent is addressed as follows:

> The skilled addressee of the '380 Patent is a notional person having a thorough knowledge of cultivating fungal micro-organisms. Such a person may have an advanced degree, such as a Ph.D., in biochemistry, mycology or industrial biochemical processes and several years of related practical experience in an industrial setting. The skilled addressee would also include pharmaceutical formulators, and medical and organic chemists interested in using the compounds of the alleged invention to treat hyperlipemia and hypercholesteremia.

65    Given the nature of this product-by-process patent, I believe that experience and knowledge related to fungal micro-organisms is fundamental. This expertise would, in my view, include both academic qualifications and technical experience. Identification of microorganisms, developing, recognizing and identifying productive strains and growing cultures in appropriate media for commercialization are all aspects of the '380 Patent with which the skilled addressee must be familiar. I agree with Dr. Clardy when he states (Clardy Expert Report, Exhibit 17, para. 25):

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

... [F]ermenting fungi to obtain secondary metabolites requires experience beyond ordinary academic training and because isolating natural products from fermentations requires the interplay of chemistry, biosynthesis and biological assays beyond formal academic training.

66      Since the invention consists of processes for preparing compounds that are targeted to lower serum cholesterol, the skilled person would have sufficient knowledge of medical and organic chemistry to be able to understand cholesterol biosynthesis. This expertise could be acquired through academic training or clinical practice.

67      With these remarks on some of the skills necessary, I accept Apotex's description of the person to whom the '380 Patent is addressed.

*C. The Patent Specification*

68      I begin with a brief overview of the patent specification.

69      The '380 Patent is what is commonly described as a product-by-process patent. That is, the inventors do not make a specific (or *per se*) claim to the compound lovastatin; rather, they claim the product lovastatin and three other compounds when the compounds are made by the processes described in the patent. The '380 Patent is entitled "HYPOCHOLESTEREMIC FERMENTATION PRODUCTS AND PROCESS OF PREPARATION". As set out in the summary:

This invention relates to hypocholesteremic products from the cultivation of a microfungus of the species <u>Aspergillus</u>. More specifically, it relates to compounds of the formulae:

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...



**Graphic 1**

as well as pharmaceutically acceptable salts and lower alkyl and substituted alkyl esters of the carboxylic acids in which the possible substituent is phenyl, dimethylamino or acetylamino. The invention also relates to a process of cultivating the microfungus and isolating from the medium a hypocholesteremic compound of the above structures. These new compounds have excellent properties of inhibiting cholesterol biosynthesis and are useful against hypercholesteremia and hyperlipemia.

70      I was assisted in understanding the chemical structures of, and relationship amongst, the four compounds identified in this summary (and set out in claim 1) by Drs. Lasure, Clardy and Samson.

71      Compound I is the marketed product named lovastatin. Compound II is dihydrolovastatin. It differs from lovastatin (Compound I) only in relation to the bonds in the double ring structure. Compounds I and II are both lactones, meaning that the ring at the top right of the structure is closed. Compound III is the open acid or hydroxy acid form of Compound I and Compound IV is the open acid or hydroxy acid form of Compound II. Each of Compounds III and IV has an open ring at the top with a COOH (carboxyl) group.

72      At p. 2 of the patent description, the inventors disclose, as prior art, the work and patents of Endo and others related to the compound compactin:

Recently, Endo et al., described (U.S. 4,049,495 and 3,983,140) a fermentation product obtained by cultivation of a micro-organism of the genus Penicillium and isolation from the medium. They called it ML 236 B and determined its

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

structure together with two related compounds 236 A and 236 C. Its structure, under the name compactin, was also determined by A.G. Brown, T.C. Smale, T.J. King, J. Chem. Soc. (Perkin I) 1165 (1975). This compound has been found to be an inhibitor, in vivo, of the biosynthesis of cholesterol.

73      The inventors then distinguish their invention from that of the prior art.

We have found that unexpectedly, the cultivation of a microorganism very different from that employed by Endo, a microfungus of the genus Aspergillus, produces new substances that are also very potent inhibitors of the biosynthesis of cholesterol in mammals. We have further found that these substances comprise principally the new compounds I, II, III and IV, of the above structures, accompanied by only traces of other compounds. These new compounds are much more potent inhibitors of cholesterol synthesis in vivo than is the compound, ML236B described by Endo.

74      In short, the patent specification discloses that the inventors of this patent built on the existing work of Endo and others in relation to the anti-cholesterol properties of compactin. They discovered that the Compounds I, II, III and IV, cultivated from "a microfungus of the genus Aspergillus", rather than from the genus Penicillium, were more potent inhibitors of cholesterol synthesis in vivo than compactin.

75      At p. 3 of the patent specification, the inventors state that, "The compounds of this invention are highly useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans."

76      Beginning on p. 4, the inventors begin their more detailed description of how this invention relates to a process for producing the identified compounds. From the experts, I have learned that the method of production of the '380 Patent is described as a "fermentation". Dr. Lasure described this as follows (Lasure Expert Report, Exhibit 48, para. 20):

Unlike more traditional processes by which chemists may synthesize chemical compounds in a laboratory or a factory using controlled chemical reactions in vitro, the process disclosed in the '380 Patent is a biological process involving the use of a specific fungus that synthesizes lovastatin in vivo when that fungus is grown in or under certain conditions which the '380 Patent calls a "fermentation".

77      The inventors describe their use of two sample micro-organisms from the culture collection of Merck and Co., referred to as MF-4833 and MF-4845. These two micro-organisms were placed on deposit with the American Type Culture Collection (ATCC) and assigned accession numbers ATCC 20541 and ATCC 20542 respectively. It is clear that the inventors are not limiting their invention to the use of these two micro-organisms.

Although the use of these is described in connection with the process of this invention, other organisms of the genus Aspergillus including mutants of the above ones are also capable of producing these novel compounds and their use is contemplated in carrying out the process of this invention.

78      In the paragraph that follows, the inventors disclose that:

The morphological characteristics of the micro-organisms MF-4833 and MF-4845 have been found to be those of the

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

genus <u>Aspergillus</u>. Using the criteria specified in the standard authority ... and by comparison with known species, it has been determined that both strains are <u>Aspergillus terreus</u>.

79    Beginning at the bottom of p. 5, the process of fermentation is described, with reference to such matters as illustrative media, optimal temperature ranges and the pH of nutrient media suitable for growing the culture. More detail is provided regarding fermentation scaling, from the initial culture in small flasks to the large-scale fermentation tanks. Once the fermentation broth is made, the reader is instructed that the compounds are conveniently isolated from the fermentation broth as lactones I and II or, alternatively, as salts of Compounds III and IV. Other methods of yielding the compounds of the invention are disclosed.

80    The physico-chemical properties of the compounds are set out starting at p.8. At p. 9-10, the inventors set out their belief, "with a considerable degree of certainty", the stereo chemical structures of Compounds I and III. Similar data and stereo chemical structures of Compounds II and IV are described at p. 11-12.

81    The specification, from p. 13 to 43, illustrates the "invention" with 27 examples.

### D. The claims in issue

82    Merck, as it outlined in a response to a demand for particulars dated July 8, 1998, alleged that claims 1 to 8, 10, 11, 13 to 16, 18 and 19 of the '380 Patent were infringed by the Defendants. Merck specifically stated that it was not relying upon every claim in the '380 Patent.

83    In their Statements of Defence and Counterclaim, Apotex asserts that all of the claims of the '380 Patent are invalid. Subsequent submissions of the parties lead me to the conclusion that, at this stage, the only claims still in issue — and that require construction — are claims 1 to 8 and 13 to 15. I have set out claim 1 in full below. The remaining claims are included in Appendix B to these reasons.

    1. A process of producing the compounds of structural formulae:

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

**Graphic 2**

which compromises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products and when desired converting said products to their corresponding pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methyl-glucamine, lysine, arginine or ornithine.

84    The disagreement between the parties focuses on aspects of claim 1. The proper construction of the other claims at issue flow from a resolution of the construction of claim 1. That is, a proper construction of claim 1 will be determinative of the main points in dispute for the remainder of the claims in issue, claims 2 to 8 and 13 to 15.

85    The areas of disagreement between Apotex and Merck are the following:

   1. What is the meaning of the phrase "a micro-organism of genus *Aspergillus terreus*" in claim 1?

   2. What is the meaning of the word "isolating" in claim 1?

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

3. Does the '380 Patent promise that all strains of *Aspergillus terreus* will be capable of producing the four compounds of the invention?

4. What is the promised use of the claimed invention?

86      The final two construction issues relate to the "promise" of the '380 Patent. The question of what is promised — or not — by the '380 Patent is primarily relevant to the question of the utility of the patent. However, it is an analysis that logically forms part of the '380 Patent claims construction.

87      Generally, ascertaining the promise of a patent is an exercise that requires the assistance of expert evidence (*Bristol-Myers Squibb Co. v. Apotex Inc.*, 2007 FCA 379, [2007] F.C.J. No. 1597 (F.C.A.) at para. 27). This is because the promise should be properly defined, within the context of the patent as a whole, through the eyes of a person of skill in the art.

### E. The meaning of "a microfungus of genus Aspergillus terreus" in claim 1

88      The first construction issue raised by Apotex relates to the proper interpretation of the words "a micro-organism of the genus *Aspergillus terreus*" in claim 1.

89      Claim 1 speaks to a process for producing four compounds "which comprises fermenting a nutrient medium *with a micro-organism of the genus Aspergillus terreus* ...." Apotex argues that, on a proper interpretation of claim 1, a skilled person would read the words "genus *Aspergillus terreus*" as referring to all micro-organisms in the genus *Aspergillus*. Merck asserts that claim 1 is limited to micro-organisms of the species *Aspergillus terreus*.

90      The nomenclatures used in the '380 Patent would be understood by any high school biology student (and even this judge) as part of the binomial system of naming living organisms. All living organisms are named according to a hierarchy of classifications. The hierarchy is as follows:

(i) Kingdom

(ii) Phylum

(iii) Class

(iv) Order

(v) Family

(vi) Genus

(vii) Species

In accordance with the accepted binomial convention, living organisms are identified by using the name of the genus (capitalized) together with the name of the species within the genus (lower case).

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

91    There is no such genus as *Aspergillus terreus*. As I have learned from the experts in this case, Drs. Clardy, Lasure and Samson, the well-established rules of taxonomy dictate that *Aspergillus* is a genus and that *Aspergillus terreus* is a species within the genus *Aspergillus*. As submitted by the parties, the use of the term "genus *Aspergillus terreus*" in claim 1 can mean one of two things:

    (a) the inventors were claiming only those compounds made with microorganisms of the *species Aspergillus terreus*, and inadvertently used the term "genus" in place of "species" (Merck's position); or,

    (b) the inventors were claiming compounds produced from any microorganism falling within the *genus Aspergillus* (Apotex's position).

92    Even without expert assistance, it appears to me that the first option provides the preferable interpretation. There is no question that the skilled reader would recognize *Aspergillus terreus* as a species — that is, a subset of the genus *Aspergillus*. The skilled reader would assume that the inventors intended that claim1 include only the micro-organisms of the genus *Aspergillus* that belong to the species *terreus*. To read the phrase as including all species within the genus *Aspergillus* would ignore the plain meaning of the term *terreus*, as used in the claim.

93    Not only does my construction of the words accord with common sense, it is consistent with the opinions of Drs. Lasure and Clardy. In the view of Dr. Clardy (Clardy Expert Report, Exhibit 17, para. 33):

    ... [T]he words *Aspergillus terreus* were in January 1984 and remain today words which, by definition, mean and would be read by the skilled person to describe a subset or sub-category of *Aspergillus* that is not and cannot include the entire *Aspergillus* genus.

94    Initially, Dr. Samson expressed a different interpretation of this phrase and concludes that (Samson Expert Report, Exhibit 109, para. 37):

    ... [B]ased on the repeated references in the patent to the use of a micro-organism of the "genus *Aspergillus*" and from the balance of my review of the '380 Patent described above, it is my opinion that a person skilled in the are would have concluded that the inventors did not intend to place any limits on the micro-organisms that can be used in the process other than that they be from the genus *Aspergillus*.

95    I acknowledge that the disclosure or specification of the '380 Patent makes a number of references to the "genus *Aspergillus*". Nevertheless, the key problem with Dr. Samson's interpretation of the phrase "genus *Aspergillus terreus*" in claim 1 is that it ignores completely the word "*terreus*". If I were to accept Dr. Samson's opinion, I would be expanding the claim from "*Aspergillus terreus*" to the much broader designation of "*Aspergillus*". As Dr. Samson stated, there are over 250 species that fall within the genus *Aspergillus* (Samson Expert Report, Exhibit 109, para. 17).

96    Dr. Samson's approach to claims construction is contrary to the teachings of the Supreme Court in *Whirlpool*, above, at paragraph 52, where Justice Binnie refers to the statement of Taschereau J. in *Metalliflex Ltd. v. Rodi & Wienenberger AG (1960), [1961] S.C.R. 117* (S.C.C.), at p. 122:

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

The claims, of course, must be construed with reference to the entire specifications, and the latter may therefore be considered in order to assist in apprehending and construing a claim, but the patentee may not be allowed to expand his monopoly specifically expressed in the claims "by borrowing this or that gloss from other parts of the specifications".

[Emphasis added.]

97      During cross-examination, Dr. Samson appeared to have qualified or changed his opinion. Specifically, he agreed that "the inclusion of the word '*terreus*' in claim 1 excludes all other species of *Aspergillus* including *niger* and *nidulus* and *oryzae* and the other 246 [species]."

98      Moreover, when read in its entirety, the specification is consistent with the limitation of the invention to micro-organisms of the species *Aspergillus terreus*. For example, the inventors disclose the use of micro-organisms MF-4833 and MF-4845; these are examples of *Aspergillus terreus* and not of some other species within the genus *Aspergillus*.

99      In summary on this point, the words of claim 1 make it very clear that the patentee is not claiming compounds made with any of the 250 species of *Aspergillus*; rather, the boundary of the invention, as claimed, includes the four identified compounds when made with a single species — *Aspergillus terreus*. The use of the word "genus" before "*Aspergillus terreus*" may have been a simple inconsequential error by the drafters or the patentee may have intended the word "genus" to modify only the word "*Aspergillus*" and not the entire phrase "*Aspergillus terreus*". Regardless, given the specificity of the term "*Aspergillus terreus*", the use of the word "genus" would not change the meaning ascribed to the phrase by the skilled addressee.

*F. The meaning of "isolating the products"*

100      The second construction issue concerns that part of claim 1 which states that the process of producing the compounds "comprises fermenting a nutrient medium with a micro-organism of the genus *Aspergillus terreus* and *isolating the products* ...".

101      The parties disagree on the meaning of the phrase "isolating the products". Apotex submits that claim 1 requires the production of all four of the compounds, that claim 2 requires the production of both Compound I and II (the lactones) and that claim 5 requires the production of both Compound III and IV (the hydroxy acids). In other words, Apotex argues that, for purposes of the claims, the compounds must be separated from each other, purified and crystallized before they are "isolated". Merck submits that "isolating" simply means separating the compounds from the fermentation broth and does not require the compounds to be purified or crystallized.

102      The term "isolating" is not defined in the patent. Therefore, it is necessary to review the specification to determine what meaning was reasonably intended by the inventors.

103      Example 1 of the '380 Patent is entitled "Preparation of Compounds I and III". The inventors first set out a procedure for fermenting a particular culture of *Aspergillus terreus*. At the end of this step, the skilled person would have a fermentation broth that is "set aside for isolation of the product". After the fermentation is completed, the next step is the "Isolation of Compound I". This involves separating the broth solids from the broth liquids, extracting the liquids using a mixture of

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

solvents and extracting the solids. The resulting extracts are combined and concentrated to 15 ml of crude extract. There is no purification or crystallization described as part of the "Isolation of Compound I". Further, the next step — "Testing of Compound I" — is carried out on the crude extract. There is no further purification or crystallization carried out before the testing.

104    In reviewing the examples of the patent, I note that Examples 3, 4 and 5 all refer to isolation without any purification or crystallization.

105    From the specification, I conclude that the inventors meant the term "isolating" to simply refer to separating the compounds from the broth. This was the interpretation given to the term "isolating" by Dr. Clardy who opined that (Clardy Expert Report, Exhibit 17, para. 102):

> In the '380 Patent "isolating" does not necessarily require complete separation or purification of the active compounds. The concept of "isolating the products" of a fermentation as those words are used in the patent requires getting the products out of the fermentation broth. The products do not necessarily have to be isolated from one another nor be crystalline, nor be completely purified. All of this would be understood by the skilled person reading the patent in January 1984. I note that the "Isolation of Compound I" in Example 6 is more complex and includes the further purification and crystallization of a specific fraction containing Compound I, but example 1 makes clear that such steps are optional and not necessarily required for "isolating" as that word is used in the patent.

106    Dr. Samson provided a contrary view. In his Reply Expert Report, Dr. Samson opines as follows (Samson Reply Expert Report, Exhibit 11, para. 41):

> The '380 Patent says that the compounds are extracted or isolated from the fermentation broth as "hypocholesteremic compounds" (see page 2, lines 4 to 7). This would have been understood by a person skilled in the art to mean that the invention requires that the compounds be removed from the fermentation broth and isolated from any other compound in the broth, and then purified and crystallized so that they can be useful as "hypocholesteremic compounds".

107    I have difficulty with Dr. Samson's understanding of the term "isolating". Foremost, this interpretation ignores much of the content of the specification that describes the testing of the crude extract. During cross-examination, Dr. Samson acknowledged that, in some of the examples, there was no purification, separation or crystallization prior to testing. Nevertheless, he clung — unreasonable, in my view — to the opinion that the skilled person would presume that "isolation" or "isolating" includes the steps of extraction, crystallization and separation.

108    Beyond the disclosure of the '380 Patent, the interpretation proposed by Merck is also supported by the reading of claim 1 in the context of the other claims — in particular claim 13. The general process is set out in claim 1. Claim 13 is a claim to a compound selected from Compounds I, II, III and IV. Had the inventors intended claim 1 to require a separation of each compound from the others, they could have used similar language of selection. The use of the phrase "isolating *the products*" rather that "isolating *each product*" is a strong indication, for the skilled reader, that the inventors did not intend that each of the compounds be separated from each other, purified and crystallized.

109    In sum, I am satisfied that, on a proper claims construction, the words "isolating the products" in claim 1 do not require that the relevant compounds be separated from each other, purified or crystallized prior to testing.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

### G. Inclusion of non-producing strains

110    For the third construction question, Apotex submits that, whether the Court construes the phrase "genus *Aspergillus terreus*" in claim 1 to include all micro-organisms or fungi within the genus *Aspergillus* or just those within the species *Aspergillus terreus*, the '380 Patent promises that all such micro-organisms can be used to produce the compounds in the Patent. Merck, on the other hand, asserts that the person skilled in the art would know — and eliminate from coverage of the '380 Patent — any strain or fungus that cannot produce the claimed compounds.

111    Neither claim 1 nor the specification explicitly states that the '380 Patent excludes nonproducing strains of *Aspergillus terreus*. The question to be determined is whether the skilled addressee, in 1984, would know that the claims of the '380 Patent are limited to the producing strains of *Aspergillus terreus*.

112    An essential element of the invention embodied in the '380 Patent is the production of particular compounds through the process of fermentation or cultivation of fungi. As described by Dr. Lasure, who has extensive experience working with such micro-organisms, "a culture of *Aspergillus terreus* is a living sample of a fungus from that species" (Lasure Expert Report, Exhibit 48, para. 60). Thus, within species, there are variations.

113    Dr. Sorensen described the organic compounds that are produced by fungi as "secondary metabolites". "Secondary metabolites" are compounds produced as a result of the metabolic function of the initial fungal micro-organism during the fermentation process (Sorensen Expert Report, Exhibit 132, para. 6). While Dr. Clardy opined that "in the general case it was expected that a particular isolate from a producing species would be expected to produce a given metabolite," he cautioned that there is always a possibility of non-production, for a number of reasons, all of which would have been known in 1984 (Clardy Expert Report, Exhibit 17, paras. 39-41):

   • fungi can be intentionally mutated to disrupt the genes responsible for making a metabolite;

   • fungi can lose a producing ability over time because of subculturing, or mishandling, or reasons that are never understood;

   • some fungi in a producing species simply do not have production capability, although Dr. Clardy thought that this would be unusual except where the isolates have been maintained by serial subculturing;

   • fungi tend to change randomly, especially when stored and maintained artificially by scientists;

   • if during subculturing, a sample of a variant is taken for further growth, and especially if there is repeated subculturing, the fungus can become one in which a characteristic of the parent culture is lost; and

   • physical deterioration of the fungus will lead to loss of specific metabolic functions.

114    Dr. Clardy summed up the situation as follows (Clardy Expert Report, Exhibit 17, para. 42):

It was part of the common knowledge of the skilled person in 1984 and such a person would have known, with virtual certainty, that among the many isolates (or strains) of a given species there would inevitably be found isolates that have

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

lost the capacity to produce a particular metabolite under particular conditions, or in some rare cases, that never had an ability to produce the metabolite at all.

115    Dr. Samson did not share this opinion. In his view, the skilled person would interpret the claims as including the production by *Aspergillus* of *all* four identified compounds (Samson Expert Report, Exhibit 110, para. 52). He disagreed that the exclusion of non-producing strains was implicit. However, during cross-examination, he acknowledged that the opinions of Drs. Lasure and Clardy were "both scientific opinions that a reasonable person of ordinary skill in the art could have reached in January 1984".

116    Dr. Samson, during cross-examination, also agreed that the person of ordinary skill in 1984 would have been fully aware that not every strain in a species will make a given metabolite. Even more specifically, Dr. Samson acknowledged that, in 1984, a skilled person reading the claims of the '380 Patent would know that there are strains of *Aspergillus terreus* that would not produce lovastatin.

117    In sum, I prefer the opinions of both Drs. Lasure and Clardy to the effect that a skilled person would know, from his or her general knowledge, that:

(a) there are many variations in the micro-organisms within the species *Aspergillus terreus*, such that not every micro-organism within the species will necessarily provide the desired results and that some testing and routine experimentation will be required; and

(b) the term "nutrient medium", as used within the patent description, would include the media used in the examples and other media that, upon routine testing, would result in the desired compounds.

118    In light of this general knowledge, Drs. Clardy and Lasure were both of the opinion that the skilled person would recognize — even without an explicit limitation in the claims — that the claims of the '380 Patent exclude non-producing strains of *Aspergillus terreus*. The use of the word "producing" in claim 1 tells the skilled person that non-producing strains are excluded, even though the explicit words are not used.

119    Further support for the conclusion reached by Drs. Clardy and Lasure is contained within the disclosure. In addition to the disclosure of the structure of the compounds and the therapeutic activity of the compounds, the skilled person is provided with examples of the media and conditions that could be used.

120    Moreover, the skilled person would also bring to his or her laboratory "bench", a set of skills used routinely. In light of the nature of fungi and their use in the pharmaceutical industry, it appears logical to me that the skilled person would have extensive experience with the types of experimentation and testing that are used to identify and optimize producing micro-organisms. During cross-examination, Dr. Samson confirmed that a number of experiments, known in 1984, could have been performed simultaneously, in a short period of time, to identify the producing micro-organisms. He agreed that about 300 shake flask experiments could be run at one time. The skilled person could rapidly screen a large numbers of isolates of *Aspergillus terreus* to determine which strains are producing. Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

121    Having considered the evidence of the three experts, I am persuaded that the opinions of Drs. Lasure and Clardy on this point are to be preferred to that of Dr. Samson. An implicit requirement that non-producing strains are excluded from the coverage of claim 1 is "being neither benevolent nor harsh but rather seeking a construction which is reasonable and fair to both patentee and public" (*Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.*, [1981] 1 S.C.R. 504 (S.C.C.) at p.520, (1981), 56 C.P.R. (2d) 145 (S.C.C.) [*Consolboard* cited to S.C.R.]). I do not accept Apotex's assertion that the '380 Patent states, implies or promises that all strains of *Aspergillus terreus* will be capable of producing the four compounds of the claimed invention.

### H. The promised use of the '380 Patent

122    As a final construction issue, Apotex submits that the '380 Patent makes the explicit promise that the four compounds identified in claim 1 are "highly useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

123    The "promise" of the '380 Patent appears to be clearly set out in at least two places in the specification. In the "Summary of the Invention", at p. 2 of the patent, the patentees state that:

These new compounds have excellent properties of inhibiting cholesterol biosynthesis and are useful against hypercholesteremia and hyperlipemia.

124    A slightly more detailed promise is found at p. 3, where the patentees explain that:

The compounds of this invention are highly useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans.

125    Dr. Samson's opinion is that the detailed statement in the patent (p.3) expresses the promise of the '380 Patent (Samson Expert Report, Exhibit 110, para. 25). Although Dr. Lasure did not directly respond to the question of what was the promise of the patent, she described the uses of the '380 Patent to include the following (Lasure Expert Report, Exhibit 48, para. 21):

With respect to uses, the '380 Patent discloses that the four compounds (and salts and esters of them) can be used to inhibit cholesterol biosynthesis, can be used against hypercholesteremia (high levels of cholesterol in the blood) and hyperlipidemia (high levels of lipids in the blood) and can be used as antifungal agents (to kill or inhibit growth of fungi on plants).

Anti-fungal properties have not been referred to by Apotex in this matter. The issue for this trial is focused on the medical use.

126    Based on the words of the specification and supported by the opinions of Drs. Lasure and Samson, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

### I. Summary on Claims Construction

127      Considering the words of the claims of the '380 Patent and the specification and guided by the expert testimony, the relevant claims of the patent should be construed in the following manner:

  • Claim 1 is a claim to a process for producing the four identified compounds by a fermentation process using the range of nutrient media and conditions described in the specification (or as would be generally known to the skilled person), following which the compounds are isolated or extracted from the fermentation broth by any of the known means identified in the specification (or as would be generally known to the skilled person). Of particular relevance to this litigation:

    • the micro-organism or fungus to be used is a strain of the species *Aspergillus terreus*, excluding those strains that are unable to produce the desired compounds and excluding micro-organisms from other species within the genus *Aspergillus*; and

    • after the fermentation stages of the process, the resulting broth may contain any or all of the four compounds.

128      With this construction of claim 1, the construction of claims 2 to 8 follows. Each of these claims is a "subset" of claim 1, whereby the claim is restricted to:

  • the process of producing only Compounds I and II (claim 2) or Compounds III and IV (claim 5);

  • the process of producing the identified compounds using a particular originating micro-organism (claim 3 and 6); and

  • the process of producing the identified compounds using certain operational requirements (claims 4, 7 and 8).

129      Claim 13 claims any one of the four identified compounds (the same compounds as described in claim 1) when made by the process of claim 1 "or by an obvious chemical equivalent". Claim 14 is a similar claim to either Compound I or II when made by the process of claim 2 "or by an obvious chemical equivalent". Claim 15 claims each of Compound III and IV when made by the process of claim 5 "or by an obvious chemical equivalent".

130      Finally, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

### VI. Infringement — Background

### A. Introduction

131      Having established the proper construction of the relevant claims of the '380 Patent, I now turn to the question of

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

infringement.

132    Section 44 of the *Patent Act* confers on a patentee and his legal representatives "the exclusive right, privilege and liberty of making, constructing, using and vending to others to be used the invention" of a patent. Merck claims that the Defendants infringed their rights under the '380 Patent by the production of lovastatin using the *Aspergillus terreus* micro-organism. Specifically, Merck claims infringement in three different scenarios:

    1. infringement through the manufacture (during Phase 1 of production described above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157;

    2. infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI, when Blue Treasure was allegedly "salting" the lovastatin shipments with infringing *Aspergillus terreus* lovastatin; and

    3. infringement from March 1998, when Blue Treasure was allegedly shipping lovastatin manufactured with *Aspergillus terreus*.

133    Subject to the possible exceptions of regulatory or experimental use, the making, constructing, using or vending lovastatin using *Aspergillus terreus* would be an infringement of the '380 Patent. Thus, if Merck can satisfy the Court that certain volumes of lovastatin made from the product received from Blue Treasure were manufactured from or contained, through "salting", *Aspergillus terreus* lovastatin, infringement has been established. Similarly, if Merck can persuade the Court that batch CR0157 contained lovastatin manufactured from *Aspergillus terreus*, infringement has been proved.

### B. Burden

134    The first point to be made is that proof of infringement is subject to the civil standard of proof. Merck's burden — whatever it may be — is met if infringement can be shown on a balance of probabilities. Stated in different words, Merck will succeed if it is more likely than not that infringement occurred.

135    It is trite law that the party alleging infringement bears the burden of proving infringement (see *Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, [2004] 1 S.C.R. 902 (S.C.C.) at para. 29 [*Monsanto*]). However, consideration must be given to the scheme of the *Patent Act* and, in particular, to s. 39(2). Under the *Patent Act* applicable to this action, s. 39(1) provides that:

    39. **Naturally occurring substances intended for food or medicine** — (1) In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification shall not include claims for the resulting food or medicine itself, except when prepared or produced by or significantly derived from the methods or processes of manufacture particularly described and claimed. [1987, c. 41, s. 14]

    39. **Procédés Microbiologiques Naturels** — (1) Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

[1987, ch. 41, art. 14]

136      This provision is followed by s. 39(2) which states that:

> (2) In an action for infringement of a patent where the invention relates to the production of a new substance, any substance of the same chemical composition and constitution shall, in the absence of proof to the contrary, be deemed to have been produced by the patented process.
>
> (2) Dans une action en contrefaçon de brevet où l'invention porte sur la production d'une substance nouvelle, toute substance formée des mêmes composants et éléments chimiques est, en l'absence de preuve contraire, réputée avoir été produite par la procédé breveté.

137      On its face, s. 39(2) applies to the facts before me. In Merck's opinion, the '380 Patent is to an invention that relates to the production of lovastatin — a "new substance". The lovastatin produced in any of Phases 1, 2 or 3 of the Defendants' manufacturing is a substance with the same chemical composition and constitution as that produced by the process of the '380 Patent. As such, s. 39(2) would apply and, absent proof to the contrary, such lovastatin would be deemed to be produced by the process of the '380 Patent. With respect to lovastatin manufactured as part of Phase 1 (except for batch CR0157), Merck accepts that there is "proof to the contrary". However, Merck asserts that, for lovastatin that is contained in batch CR0157 and all production sourced from Blue Treasure, s. 39(2) applies and the production must be deemed to be made from *Aspergillus terreus*, thereby infringing the '380 Patent.

138      The dispute between the parties centres on the meaning of the words "new substance" in s. 39(2).

139      Merck argues that the substances (Compounds I-IV) claimed in the '380 Patent are new and novel and s. 39(2) is engaged. While there is no definition of "new", the word appears in s. 2 under the definition of "invention". As such, for patent purposes, "new" could mean novelty, or a product that has not been anticipated.

140      Apotex submits that the definition of newness has to be determined in light of patent legislation as a whole. Where a word has a meaning in one section, it ought to be the same in every section within a document, absent legislative intent to show that the word can have various meanings. In line with this argument, Apotex's counsel, in final argument, acknowledged that ss. 2 and 39(2) use the word "new". However, the word does not appear in provisions that deal specifically with novelty (anticipation): ss. 61, 27, 43. Thus, one cannot say that "new" equates with "anticipation".

141      According to Apotex, the interpretation of "new" must fit into the context of s. 39(2) and its commonsense purpose. In oral submissions, Apotex argued that the purpose of s. 39(2) (and its presumption of infringement) was:

> [...] to deal with the impossibility of a plaintiff, when it comes to a process in a product-by-process claiming form, not being able, absent proof from the defendant of what that process is, to challenge the infringing nature of that process.

142      In line with this purpose, once another process is disclosed for the same product, the "newness" of the substance *per se* no longer exists. Apotex also asserted that newness can be lost in a number of other ways: prior commercialization,

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

disclosure and use of the substance.


143      On the facts of this case, Apotex notes that the application that resulted in Canadian Patent No. 1,129,794 (the '794 Patent or the Endo Patent) related to the claims for lovastatin and was filed in Canada before the '380 Patent. The '794 Patent also had an earlier priority and issue date. It publicly describes an alternate process to create lovastatin. In Apotex's view, the same can be said for lovastatin created from Red Yeast Rice.


144      As argued by the parties, there is no direct case law on the interpretation of "new" in s. 39(2). It is helpful to return to first principles of statutory interpretation.


145      The starting point of my analysis is the general principle clearly stated by the Supreme Court in *Rizzo & Rizzo Shoes Ltd., Re,* [1998] 1 S.C.R. 27 (S.C.C.) at paragraph 21, 154 D.L.R. (4th) 193 (S.C.C.) (See also *Bell ExpressVu Ltd. Partnership v. Rex,* 2002 SCC 42, [2002] 2 S.C.R. 559 (S.C.C.) at para. 26, and cases cited therein):

> [...] Elmer Driedger in Construction of Statutes (2nd ed. 1983) best encapsulates the approach upon which I prefer to rely. He recognizes that statutory interpretation cannot be founded on the wording of the legislation alone. At p. 87 he states:
>
>> Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.


146      *Sullivan on the Construction of Statutes,* 5th ed. (Markham, Ont.: LexisNexis, 2008) (*Sullivan*) comments on the modern principles as articulated by Driedger (p. 3):

> The court must adopt an interpretation that is appropriate. An appropriate interpretation is one that can be justified in terms of (a) its plausibility, that is, its compliance with the legislative text; (b) its efficacy, that is, its promotion of legislative intent; and (c) its acceptability, that is, the outcome complies with accepted legal norms; it is reasonable and just.


147      Furthermore, in relation to the textual analysis of legislation, there are a number of relevant principles: (a) the presumption of consistent expression (*Sullivan,* above, pp. 214-23), and (b) the presumption of coherence (*Sullivan,* above, pp. 223-25).


148      Under the principle of consistent expression, it is presumed that the legislature uses language carefully and consistently within the same statute. As such, same words presumptively have the same meanings. On the flip side, one can infer, from the use of different words or a different form of expression, that a different meaning was intended by drafters. This principle was highlighted by the Federal Court of Appeal in *Peach Hill Management Ltd. v. R.* (2000), 257 N.R. 193 (Fed. C.A.) at paragraph 12, [2000] G.S.T.C. 45 (Fed. C.A.): "When an Act uses different words in relation to the same subject such a choice by Parliament must be considered intentional and indicative of a change in meaning or a different meaning."

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

149    According to *Sullivan* (pp. 221-22), the strength of this presumption varies. Highly technical statutes and terms that play a key role in the legislative scheme are strongly presumed to have the same meaning throughout. For example the definition of "income" in taxation legislation was considered to be a key term in *Mattabi Mines Ltd. v. Ontario (Minister of Revenue)*, [1988] 2 S.C.R. 175, 53 D.L.R. (4th) 656 (S.C.C.). The presumption of consistent expression is also strong when the repeated words contribute to a noticeable pattern.

150    This presumption, however, can be weakened when one examines the context surrounding the words: "Identical words may not have identical meanings once they are placed in different contexts and used for different purposes. This is particularly true of general or abstract words" (see *Sullivan*, p. 222; *Jevco Insurance Co. v. Pilot Insurance Co.* (2000), 49 O.R. (3d) 760, [2000] O.J. No. 2259 (Ont. S.C.J.)).

151    The other relevant principle is the presumption of coherence. Here, one presumes that provisions of the same legislation are meant to work together logically as parts of a functioning whole.

> The parts are presumed to fit together logically to form a rational, internally consistent framework; and because the framework has a purpose, the parts are also presumed to work together dynamically, each contributing something toward accomplishing the intended goal. [...] It is presumed that the body of legislation enacted by a legislature does not contain contradictions or inconsistencies, that each provision is capable of operating without coming into conflict with any other (*Sullivan*, above, p. 223).

152    In applying these principles, the question is: does "new" in s. 39(2) mean "new" in the ordinary sense, or in the sense of novelty? In other words, to displace the application of s. 39(2), does Merck have to prove that the substance of the product-by-process claim in the '380 Patent was novel, or simply that it was not known before?

153    For the reasons that follow, I interpret the word "new" to simply mean a substance that was not previously known or used, rather than novelty.

154    First, within the context of ss. 2 and 39(2), "new" has been used as an adjective. According to the *Gage Canadian Dictionary* (W.S. Avis et al. (ed) (1983), Gage Educational Publishing Co., Toronto), at p. 766, "new" is defined as "not existing before". *Black's Law Dictionary* (6th ed.) (St. Paul, Minn.: West Publishing Co, 1990), at p. 1042 describes "new" as follows:

> [...] this word may denote novelty, or the condition of being previously unknown or of recent or fresh origin, but ordinarily it is a purely relative term and is employed in contrasting the date, origin, or character of one thing with the corresponding attributes of another thing of the same kind or class.
>
> In order to be "new", as the word is used in the patent laws, the achievement must be either one that produces an unusual or improved or advanced result, which was unknown to the same prior art at the time of the claimed invention; or the achievement must be one that produced an old result in an unusual and substantially more efficient, or economical way.
>
> [Emphasis added.]

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

155    As seen above, the ordinary meaning of "new" can equate to novelty or simply a condition of being previously unknown. It is a word that is "purely relative" in nature.

156    Second, I turn to the contextual meaning of the word "new" within the *Patent Act*. While there is no dispute that patent legislation is highly technical, does the word "new" carry a specific and technical meaning? Is it used in a way that creates a noticeable pattern? Is there a presumption of consistency? My answer to these questions is "no".

157    "New" in ss. 2 and 39(2) is relative as well; in both instances, the word is used as an adjective to describe different things. Under s. 2, "new" describes how an "art" or "improvement" can rise to the level of an invention. The notion of novelty is part and parcel of this interpretation.

158    On the other hand, in s. 39(2), legislators are not describing what constitutes an invention. This provision relates solely to infringement and novelty is not directly at issue. Further, the word "new" is not employed to determine if an "art" or "improvement" constitutes an invention. It merely describes a "substance" or a "product" in a product-by-process claim. There is no requirement that the "substance" be inventive. Section 39(2) deals with the claims in a product-by-process patent. In such claims, the substance cannot be divorced from its process (see s. 39(1) of the *Patent Act*). Accordingly, in a product-by-process claim, whether the substance is novel is not determinative. It is the process of producing the substance that must be novel, new, and inventive. In the context of a product-by-process claim, "new" does not necessitate a novel (not-anticipated) substance.

159    Third, this interpretation is consistent with the rest of the legislative scheme and avoids internal inconsistencies. If "new" described a novel substance or medicine as the invention *per se*, it would contradict s. 39(1) of the *Act*.

160    Applying this to the case at hand, the claimed invention is not lovastatin, but lovastatin created through the process of fermenting the organism *Aspergillus terreus*. It is clear from s. 39(1) of the *Act* that the patentee cannot merely claim lovastatin, a medicinal substance, as the invention. Lovastatin is merely the product of the product-by-process claim in the '380 Patent.

161    Fourth, ss. 27, 43, and 61, which relate to questions of novelty, have no mention of the word new.

162    Fifth, the jurisprudence supports the interpretation of "new" which means not previously known. According to Justice Nadon, in *Eli Lilly & Co. v. Nu-Pharm Inc.* (1994), 54 C.P.R. (3d) 145 (Fed. T.D.) at para. 32, [1994] F.C.J. No. 225 (Fed. T.D.) [*.Eli Lilly and Co. v. Nu-Pharm Inc.* cited to C.P.R.], the presumption of infringement does not arise until the plaintiff has satisfied a minimum evidentiary burden that the substances in question are "new substances". This means that the initial burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances". The burden is not on Apotex to show that the substances are not new or are anticipated. Since the burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances", to equate "new" with the test of "novelty" would lead to an illogical result. Under the scheme of Canadian patent law, defendants to an infringement action have the burden to prove anticipation (a subset of invalidity). Thus, to have the patentee prove novelty under s. 39(2) would contradict fundamental principles of patent law.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

163    In sum, "new" is a highly relative term and its definition is dependent on its context. Within the context of s. 39(2) of the *Act*, "new substance" means a substance that was not previously known.

164    With respect to the '380 Patent, the question is whether Compounds I-IV were previously known, or are they simply "old" products? In other words, even if anticipation is not established by the lovastatin produced by Red Yeast Rice or by the Endo Patent, can lovastatin be said to have been sufficiently "known", and thus, successfully undermine the "newness" of the substance in the '380 Patent? The answer to these questions is found in the claims construction.

165    Claim 1 of the '380 Patent clearly states that it is "a process of producing the compounds of the structural formulae [Compounds I-IV]". While the parties acknowledge that Compound I, lovastatin, is identical to the structure in Dr. Endo's '794 Patent, claim 1 does not solely fence out Compound I, but also II, III, and IV. The Defendants presented no evidence that Dr. Endo knew of, or used, Compounds II, III, and IV. Further, there is no evidence that lovastatin produced by Red Yeast Rice contains Compounds II, III and IV.

166    Accordingly, I agree with Merck's argument that the combination of substances produced (Compounds I-IV) is new. There is no evidence that either the Endo Patent or the fermentation of traditional Red Yeast Rice would produce such a combination.

167    In light of the above, I conclude that s. 39(2) is engaged.

168    The question that follows is this: If s. 39(2) applies, what is the interpretation of "in the absence of proof to the contrary"? Does it mean that Apotex has an evidentiary burden and that, once this burden is met, the persuasive burden returns to the Plaintiffs to establish infringement? Or does it mean that the persuasive burden is established and therefore Apotex must disprove infringement?

169    Merck argues that s. 39(2) mandates that the persuasive burden of proof remains with Apotex to show non-infringement. This is supported by the language in the provision — infringement is deemed "in the absence of proof to the contrary". According to Merck, this is different from the presumption of validity, which is weakly worded as merely "in the absence of evidence to the contrary". Merck relies on *Apotex v. Tanabe Seiyaku & Nordic* (1994), 59 C.P.R. (3d) 38 (Ont. Gen. Div.) at paragraph 92, [1994] O.J. No. 2613 (Ont. Gen. Div.) [*Apotex v Tanabe* cited to C.P.R.] to interpret the language in s. 39(2) as creating an onus that it "is not simply an obligation to adduce some evidence to the contrary". Rather, "proof to the contrary" is a "much higher onus than the onus simply to adduce some evidence to the contrary" (*Apotex v. Tanabe Seiyaku & Nordic*, above, at para. 92). Thus, Merck concludes that s. 39(2) is a provision that deems, rather than presumes, infringement. Consequently, in Merck's view, the persuasive burden is on Apotex to prove noninfringement. I disagree.

170    Section 39(2) of the *Act* creates a presumption of infringement that confers on Apotex an evidentiary burden to rebut infringement. There is no support for Merck's argument that s. 39(2) deems infringement and puts the persuasive burden on Apotex.

171    *Hughes & Woodley on Patents*, 2nd ed., looseleaf (Markham, ON: LexisNexis Canada, 2005) at paragraph 45 states that s. 39(2) creates a presumption of infringement:

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

This provision creates a presumption of infringement, but, only once an applicant has satisfied a minimum evidentiary burden, establishing that the substances in question are "new" and identical. These provisions, however, may permit the Court to give a broader interpretation of the claims than a mere purposive construction. This is to be contrasted with section 45 of the Patent Act which provides for a presumption of validity in the absence of "evidence" to the contrary. Speculation, as to alternative processes that may have been used to produce the product, falls short of the required evidence to the contrary. [Emphasis added; see also *Eli Lilly and Co. v. Nu-Pharm Inc.*, above.]

172     The text notes that, compared to the validity presumption (rebuttable on an evidentiary basis), the presumption of infringement is stronger. This can be supported by Justice Campbell's decision in *Apotex v. Tanabe Seiyaku & Nordic* (above, at para. 92). While Justice Campbell held that "proof to the contrary" necessitates a higher standard than "evidence to the contrary", he does not go so far as to say that "proof to the contrary" equates to a persuasive burden to prove a fact on a balance of probabilities. As such, comparing the presumptions of validity and infringement, there is only a difference in degree rather than nature of the burden.

173     Justice Gibson, in *Abbott Laboratories v. Canada (Minister of Health)*, 2004 FC 1349, 260 F.T.R. 276 (Eng.) (F.C.) at para. 101 [.*Abbott Laboratories*], examined the words "in the absence of proof to the contrary" in s. 6(6) of the *Regulations*:

(6) For the purposes of an application referred to in subsection (1), if a second person has made an allegation under subparagraph 5(1)(b)(iv) or (2)(b)(iv) in respect of a patent and the patent was granted for the medicinal ingredient when prepared or produced by the methods or processes of manufacture particularly described and claimed in the patent, or by their obvious chemical equivalents, it shall be considered that the drug proposed to be produced by the second person is, in the absence of proof to the contrary, prepared or produced by those methods or processes.

[Emphasis added.]

174     According to Justice Gibson, this provision deals with product-by-process claims, and also creates a presumption that the patent will be infringed. Despite the strong words of "in the absence of proof to the contrary", Justice Gibson was clear that there is no shift in the persuasive burden (*Abbott Laboratories*, above, above, at para. 101).

175     The Supreme Court, in *Circle Film Enterprises Inc. v. Canadian Broadcasting Corp.*, [1959] S.C.R. 602 (S.C.C.) at p.604, (1959), 31 C.P.R. 57 (S.C.C.) [*Circle Film* cited to S.C.R], considered similar words in s. 20(3)(b) of the *Copyright Act*, R.S.C. 1927, c. 532: "The author of the work shall, *unless the contrary is proved*, be presumed to be the owner of the copyright." In seeking to characterize the words in s. 20(3)(b), Justice Judson stated (*Circle Film*, above, at p. 606):

I take the operation of a presumption of this kind to be as stated by Wigmore on Evidence, 3rd ed., s. 2491(2):

It must be kept in mind that the peculiar effect of a presumption "of law" (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule.

[Emphasis added.]

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

176    In sum, I conclude that the phrase "in the absence of proof to the contrary", in s. 39(2), amounts to an evidentiary burden to rebut the presumption of infringement.


177    Following this, a number of questions are raised: what is an evidentiary burden? Also, what do the Defendants in this case have to prove in order to meet their evidentiary burden and rebut the presumption of infringement?


178    On the definition of evidentiary burden, the Federal Court of Appeal in *Hoffmann-La Roche Ltd. v. Canada (Minister of National Health & Welfare)* (1996), 70 C.P.R. (3d) 206 (Fed. C.A.) at para. 8, (1996), 205 N.R. 331 (Fed. C.A.) [*Hoffmann-La Roche* cited to C.P.R.] stated:

> [...] the "persuasive burden" or the "legal burden", is the burden of establishing a case to the civil standard of proof. By contrast, the <u>"evidential burden" consists of the burden of putting an issue in play and means that a party has the responsibility to ensure that there is sufficient evidence of the existence or non-existence of a fact or an issue on the record to pass the threshold for that particular fact or issue</u>. Nu-Pharm, supra, per Stone J.A., at page 33.

> [Emphasis added.]


179    According to the Supreme Court of Canada in *R. c. Fontaine*, 2004 SCC 27, [2004] 1 S.C.R. 702 (S.C.C.) at paragraph 11 [*Fontaine*], the "evidentiary burden" is not a burden of proof. It is a legal question left for the judge to determine whether "there is some evidence upon which a properly instructed jury could reasonably decide the issue" (*Fontaine*, above, at para. 13). In making such a determination, "the judge does not evaluate the quality, weight or reliability of the evidence" (*Fontaine*, above, at para. 12).


180    Justice Wetston in *Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1995), 60 C.P.R. (3d) 328 (Fed. T.D.) at paragraph 28, (1995), 92 F.T.R. 253 (Fed. T.D.) [*Pharmacia* cited to C.P.R.], held that the presumption of infringement is bolstered by the common law presumption. According to *Pharmacia*, the common law presumption is (above, at para. 20):

> [...] where the subject-matter of an allegation lies particularly within the knowledge of one of the parties, that party must prove it. In this instance, the applicants submit that only the respondent knows the precise composition and process to be used in making their product.


181    The Court of Appeal in *Hoffmann-La Roche* set out the test for establishing the common law presumption: (a) the defendant asserted no facts to support allegations of non-infringement; (b) the evidence of non-infringement lay peculiarly within the knowledge of the defendant; and (c) the plaintiff had no other available means to access such evidence (above, at para. 8).


182    Combining principles of the evidentiary burden, the common law presumption and s. 39(2), I conclude that Apotex's burden is to show that it used a non-infringing process to create lovastatin, and that this process was disclosed to Merck. At this time, the Court should not assess the quality, weight or reliability of the evidence, but merely ask if there is sufficient evidence to put the issue in play.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

183      I find that Apotex, by its disclosure of the AFI-4 process (fermenting *Coniothyrium fuckelii* to produce lovastatin), has met its evidentiary burden to rebut the presumption of s. 39(2). Merck has accepted that the non-infringing AFI-4 process was used at the AFI plant in Winnipeg to produce lovastatin (except for CR0157). Because Apotex has met its evidentiary burden, the presumption of infringement has been rebutted. In the words of Wigmore, "... the presumption disappears as a rule of law and the case is in the jury's hands free from any rule" (*Circle Film*, above, at p. 606). The persuasive burden of proof is back with Merck.

184      By way of summary, the burden within s. 39(2) of the *Act* is as follows:

a) Merck has the evidentiary burden to prove its substance is "new" in order to engage s. 39(2);

b) Apotex then has the evidentiary burden to prove a viable alternative process existed to create lovastatin that does not infringe the '380 Patent — if this is done, the presumption of law is lifted; and finally,

c) Merck has the persuasive burden to prove infringement.

185      On the facts of this case, I am persuaded that the '380 Patent involves a "new substance" thereby engaging s. 39(2). Apotex has established that a viable alternative exists that does not infringe the '380 Patent. Accordingly, Merck has the persuasive burden to satisfy me, on a balance of probabilities, that Apotex's sale of lovastatin, manufactured by Blue Treasure lovastatin or out of batch CR0157, was made by a process that infringed the '380 Patent.

186      I turn now to consider whether Merck has met its burden. In my view they have, with respect to some of the lovastatin manufactured by Blue Treasure and lovastatin that originated from AFI batch CR0157.

### C. Summary of Merck's case on infringement

187      As noted above, Merck claims infringement of the '380 Patent in three different scenarios:

1. infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI, when Blue Treasure was allegedly "salting" the lovastatin shipments with infringing *Aspergillus terreus* lovastatin;

2. infringement from March 1998, when Blue Treasure was allegedly shipping lovastatin manufactured with *Aspergillus terreus*; and

3. infringement through the manufacture (during Phase 1 of production described above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157.

188      I will deal with each of these scenarios separately.

### VII. Infringement — the Circumstantial Case

### A. Blue Treasure "Salting"

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

189     Merck asserts that Blue Treasure was "salting" its earlier shipments of lovastatin with infringing AFI-1 lovastatin. In simple terms, Merck submits that Blue Treasure was "diluting" its AFI-4 lovastatin with AFI-1 lovastatin, thereby infringing the '380 Patent with each and every shipment of lovastatin to AFI.

190     On March 18, 2010, Merck received a copy of an e-mail, dated September 8, 1997 purportedly from Dr. Su to his "managers" at AFI. In the e-mail, Dr. Su wrote that "before the switchover, [Blue Treasure] ... produced 296.6 kg #1 product". This 296.6 kg product is the basis of Merck's salting argument. The Defendants have not provided evidence as to how this quantity of AFI-1 lovastatin was sold or disposed of.

191     Does the failure of Blue Treasure to account for this quantity of AFI-1 lovastatin lead to a finding, on a balance of probabilities, that this lovastatin ended up being shipped to Canada as a "salted" mixture with non-infringing AFI-4?

192     Merck argues that, absent evidence of the whereabouts of the entire 296.6 kg, the reasonable inference is that all or part of that quantity of AFI-1 lovastatin was used to "salt" the AFI-4 lovastatin. By salting the Winnipeg shipments with infringing lovastatin, Merck asserts that Blue Treasure was able to sell the more cheaply-made lovastatin where payment was priced, on a kilogram basis, on the more costly AFI-4 lovastatin. Blue Treasure was also thereby able to dispose of its aging inventory of infringing lovastatin that could not be moved on the domestic Chinese market. According to Merck, if there were an innocent explanation for Blue Treasure's disposition of the infringing lovastatin, AFI would have provided it; none has come.

193     In addition to the Defendants' failure to provide sufficient information on the disposal of 296.6 kg of AFI-1 lovastatin, Merck points to two other key factors which, in their view, support the allegation of "salting". The first point is the evidence that demonstrates the difficulty that Blue Treasure was having selling lovastatin into the Chinese or other foreign markets at a reasonable profit. (This evidence is discussed at some length in the section of these reasons dealing with "motivation".)

194     Moreover, Merck refers to AFI's concern that unusually low levels of RC-14 were found in the first two shipments of lovastatin from Blue Treasure. Merck argues that AFI had been worried enough about the possibility of "adulteration" that Dr. Su was sent to Blue Treasure to investigate and supervise the Blue Treasure lovastatin productions. No determination was ever made by Dr. Su about the reason for the unusually low levels of RC-14 in the shipments of AFI-4 lovastatin. Merck appears to argue that the RC-14 level could be explained if the shipment to AFI had been, in fact, a mixture of AFI-1 and AFI-4 lovastatin.

195     In a letter dated August 11, 1997, Dr. Cox advised Mr. Zhou that:

I was very disappointed to learn that 2 out of 3 batches of lovastatin made by the new AFI process had failed our quality control, partly because your people had unilaterally made changes to our process.

196     The most worrying problem with the lovastatin batches was the low levels of a compound known as RC-14. In a

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

letter from Mr. Alexander (Sandy) Fowler (Finance Manager at AFI) to Mr. Zhou dated September 12, 1997, Mr. Fowler described the "puzzle" as follows:

> Our scientists are very concerned in regard to the low levels of RC14 in certain of the batches produced at Blue Treasure. At [AFI], we have never produced AFI-4 lovastatin with such low RC14. In fact, in our experience, the "signature" of AFI-4 is a higher level of RC14.

197     Low levels of RC-14 were characteristic of AFI-1. Thus, it is clear that the real concern was whether the AFI-4 lovastatin was being produced using AFI-1 or was being contaminated in some way by the *Aspergillus terreus* strain. During his oral testimony, Dr. Cox was very direct in his testimony about the lack of trust between AFI and Blue Treasure. The decision was made by AFI to send Dr. Jerry Su to Blue Treasure to work with the management team (see letter dated August 18, 1997 from Dr. Cox to Mr. Zhou).

198     Dr. Jerry Su was the Group Leader of Research & Development at AFI from September 1996 to December 1998. Dr. Su arrived in China on August 28, 1997 and remained there until the end of October 1997. As set out in his "Report on the work at Blue Treasure", dated November 13, 1997, his primary task was to ensure that Blue Treasure maintained all fermentation free of contamination from the *Aspergillus terreus* strain. He investigated the low levels of RC-14 but, even after his time in China and his examination of a number of possible reasons, the cause of low RC-14 levels in two batches was still a "puzzle". Nevertheless, Dr. Su appeared to be satisfied that the runs conducted while he was at Blue Treasure would meet the quality control standards at AFI.

199     Together, Merck submits, all of this evidence is consistent with a finding that, on a balance of probabilities, Blue Treasure was mixing infringing AFI-1 lovastatin with the AFI-4 lovastatin that was being shipped to AFI from Blue Treasure.

200     In terms of the technical feasibility of salting, Merck relies on the statement of Dr. Cox who testified that there is nothing difficult about salting:

> Q. You understood, at the time, doctor, that Lovastatin made from one process could be made and mixed with Lovastatin made using another process; you understood that was a technical feasibility?
>
> A. It's very straightforward. You put them together and mix them.

201     I agree with Merck that the Defendants — in particular AFI — have presented obstacles to uncovering relevant facts related to the amount of AFI-1 lovastatin actually produced and sold by Blue Treasure. Once the e-mail of Dr. Su came to light on March 18, 2010, Merck sought and was granted, on consent, an opportunity for further discovery of Mr. Fowler. Mr. Fowler has been the Finance and Administration Manager at AFI since 1996. Questions related to this lovastatin were put to Mr. Fowler and taken under advisement by counsel for AFI. AFI refused to provide confirmation of the 296.6 kg quantity (Undertaking #2319). In Undertaking #2320, AFI was also asked, in respect of the 296.6 kg product:

> To advise full particulars, when it was made, what happened to it, who it was sold to, for how much and financial benefits to AFI and Apotex.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

202     All of this information was refused. Although Apotex refers to some evidence on the record that directionally supports legitimate sales of AFI-1 lovastatin, the information is far from complete or clear.

203     In spite of my serious concerns about the unwillingness or inability of the Defendants to provide evidence concerning the alleged 296.6 kg product, I have problems with Merck's argument on this point.

204     My first concern is that I have little evidence that Blue Treasure produced 296.6 kg of AFI-1 lovastatin. In Dr. Su's e-mail, there is the reference that, "before the switchover, [Blue Treasure] ... produced 296.6 kg #1 product". There is no indication in the e-mail of where this number came from. Contrary to the assertion by Merck, the e-mail does not "prove" the existence of 296.6 kg of infringing lovastatin.

205     The second problem is that I have no evidence, beyond the cryptic statement of Dr. Cox, as to how salting could be carried out. No expert spoke to the practice. As noted by counsel for Apotex in final argument:

> ... there was no evidence led as to how you put together AFI-1 material with AFI-4 material, whether the appearance and composition of technical grade lovastatin, colour wise, physical characteristics, crystallinity, whether that is comparable.

206     In addition, I have no confirmation from anyone that low levels of RC-14 could be explained by salting. That question could have been posed to any number of witnesses by Merck and was not. The closest discussion on the record occurred during the cross-examination of Mr. Fowler. Mr. Fowler was questioned at length about why Dr. Su was sent to China. Specifically, the concern that Blue Treasure had switched the organisms was put to Mr. Fowler. His response included a vague reference to the possibility of "contamination or mixing of product":

> The concern from my perspective was that there not be any mix-up or errors resulting in a contamination or mixing of product, that sort of thing. Certainly, in everybody's mind there was a possibility of some mix-up, and that's what we wanted to get to the bottom of.

This statement is certainly not sufficient for me to conclude that AFI believed that "salting" was going on at Blue Treasure.

207     I conclude that it is possible that Blue Treasure used some of the alleged 296.6 kg of AFI-1 lovastatin to "salt" the AFI-4 lovastatin being shipped to AFI. However, on the evidence before me, I have insufficient evidence about how that could have been done from a technical perspective. Nor do I have any evidence that AFI believed that "salting" might have been the reason for the low levels of RC-14.

208     In short, Merck has failed to persuade me, on a balance of probabilities, that any quantities of lovastatin were salted with infringing lovastatin.

**B. Infringement by Blue Treasure from March 1998**

209     As I understand Merck's argument on infringement after March 1998, the key reasons why I should find that the

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

lovastatin manufactured by Blue Treasure and sold to AFI for sale in Canada, was produced using a process that infringed the '380 Patent are as follows:

• The Batch Records (referred to below) produced by Blue Treasure to demonstrate the use of the non-infringing AFI-4 process for producing lovastatin are not genuine.

• The Defendants failed to provide evidence that Blue Treasure acquired sufficient quantities of a compound known as P2000 with which to carry out fermentations with the *Coniothyrium fuckelii* micro-organism.

• The reduction in the duration of fermentation, beginning in March 1998, is unexplained except by the use of the infringing process.

• The increase in the quantities of titres, beginning in March 1998, is unexplained except by the use of the infringing process.

• Blue Treasure had the motivation, the means and the opportunity to produce lovastatin with the less expensive, more efficient AFI-1 infringing process.

• The conduct of Blue Treasure before and during this trial is consistent with infringement.

210      In addition to the above — much of which consists of circumstantial evidence — Merck asserts that it has direct evidence of infringement through the DNA evidence put forward by Dr. Julian Davies.

*(1) Batch Records*

211      Standard pharmaceutical industry practice requires that detailed and exact records be kept of all steps in the production of pharmaceutical products. In this trial, the Defendants put forward 364 documents as true photocopies of the batch records for 364 fermentation batches of lovastatin made at Blue Treasure (the Batch Records). There is no doubt that, if the Batch Records (all of which are contained in Exhibit 149) can be believed, they are direct evidence that Blue Treasure was using the non-infringing AFI-4 process and not a process using *Aspergillus terreus*. However, the issue is whether I can believe that the Batch Records are reliable, or even truthful, in some important aspects. Quite simply, I cannot.

212      The first problem with the Batch Records is that they are not the original working records from the batches. The original Batch Records, together with every single related document and working paper, were destroyed in 2003. All that is before this Court are photocopies of what is alleged to be the original batch records.

213      The Batch Records were introduced into evidence by Mrs. Quifen Hu. Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. From 1991 to 1994, she was the Manager of the Intermediates Department at New North River in China. Since 1995, Mrs. Hu's responsibilities have mainly related to maintaining the seed bank at Blue Treasure and initializing the fermentation process for the production of lovastatin.

214      Each of the 364 Batch Records is substantially the same in format; each appears to be a pre-printed form with data and other entries written by hand. They reflect fermentations that began on May 27, 1997, with batch no. CF-403-97001, and ran until the fermentation of batch no. CF-410-99166, which began on September 29, 1999.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

215    Parts 1.1 and 1.2 are entitled "Production Record of Lovastatin Fermentation". The list of ingredients of the medium is printed on the form and the quantities used are hand written in the appropriate space. Information on the pH adjustment and the steps for inoculation of the seed flasks are documented. The final step described is the culture of a second seed flask.

216    Parts 2 to 14 of each batch record set out the scale-up of fermentation from the final step of Part 1.2 to Part 13, which is entitled the "Production Fermenter", where the final product is fermented. Along the way, increasingly larger fermenters are prepared and then inoculated with the seed media from the previous stage.

217    The only place that the initiating or seed micro-organism is described is in Parts 1.1 and 1.2. The batch no. is recorded on the cover sheet of each batch record and on most pages, and always begins with the letters "CF". Presumably, this means that the particular run is being carried out with *Coniothyrium fuckelii*. In addition, each of the 364 Batch Records is pre-printed with an entry that identifies the production strain as "*Coniothyrium fuckelii* AFI-4 85-42". For Parts 2 to 14, no strain is identified.

218    Mrs. Hu was responsible for overseeing the process to the end of Part 1.2. After that, the production steps were within the responsibility of the Fermentation Production Department, where Mr. Dingjun Luo (whose testimony is referred to later in these Reasons) worked.

219    The first point to make about the Batch Records is that they do not qualify as business records that can be accepted for the truth of their contents as an exception to the hearsay rule of evidence.

220    Since *Ares v. Venner*, [1970] S.C.R. 608 (S.C.C.) at p. 363, (1970), 12 C.R.N.S. 349 (S.C.C.), the common law in Canada has recognized that certain records:

> ... made contemporaneously by someone having personal knowledge of the matters then being recorded and under a duty to make the entry or record should be received in evidence as *prima facie* proof of the facts stated therein.

221    The common law has been codified in s. 30(1) of the *Canada Evidence Act*, R.S.C. 1985, c. C-5:

> Where oral evidence in respect of a matter would be admissible in a legal proceeding, a record made in the usual and ordinary course of business that contains information in respect of that matter is admissible in evidence under this section in the legal proceeding on production of the record.

> Lorsqu'une preuve orale concernant une chose serait admissible dans une procédure judiciaire, une pièce établie dans le cours ordinaire des affaires et qui contient des renseignements sur cette chose est, en vertu du présent article, admissible en preuve dans la procédure judiciaire sur production de la pièce

222    The evidentiary record on the Batch Records is, to put it bluntly, a mess. One thing that I can say with certainty is that the Batch Records reflected in Exhibit 149 were not made contemporaneously with the fermentations to which they ostensibly relate. I need only compare these Batch Records to those produced as part of the production runs at AFI. The AFI records contain numerous corrections and deletions. From the writing styles, it is clear that a number of persons completed

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

the documents at various stages of each fermentation. In contrast, the Batch Records do not contain a single strike-out or correction; they, as described by counsel for Merck, are "pristine". This would be unheard of in any production facility.

223     As I understand it, AFI acknowledged, late in the trial, that the staff at Blue Treasure completed unilingual Chinese work sheets on the plant floor and that, subsequently, the data collected was transposed into bilingual batch records. Other evidence, provided through an Undertaking, is that Mr. Luo confirmed that unilingual sheets "did exist and that information from those sheets ... were transferred into the bilingual batch record".

224     If these are not business records, the question becomes: how much, if any, weight should be given to the Batch Records?

225     Three witnesses provided testimony on the Batch Records — Mr. Dingjun Luo, Mrs. Hu and Dr. Jerry Su.

226     The best evidence of how the Batch Records were created, and by whom, was provided by Dr. Jerry Su. As noted earlier, from September 1996 to December 1998, Dr. Su was the Group Leader of Research & Development at AFI. He has not worked for AFI since that time. Dr. Su was quite firm in his recollection, having spent long hours at the Blue Treasure plant observing and taking notes as to the daily operations. The following flows from Dr. Su's testimony:

   • Blue Treasure maintained two sets of batch records. There were no "unilingual worksheets" for part of the process, only the original Chinese language batch records, which Dr. Su called the "first set" of batch records. These were used on the plant floor and entries were made therein by operators.

   • The first set of batch records was collected and the data therein were copied out, by hand, into a "second set" of bilingual batch records.

   • Dr. Su sat next to, and witnessed, the person copying the batch records, but did not see whether the information was accurately being copied.

   • The person who copied the data into the second set of batch records (apparently the originals of the ones before the Court) was Mr. Luo, Manager of the Production and Technology Department.

   • Dr. Su did not recall ever seeing Mrs. Hu signing any of the Batch Records.

227     I have no reason to disbelieve Dr. Su and, where there is conflicting testimony from Mrs. Hu or Mr. Luo, I prefer the testimony of Dr. Su. At present, Dr. Su has no connection with AFI or Blue Treasure and no motive to fabricate his evidence. His explanation of the transfer of data from the original working documents is logical and consistent with the form of the Batch Records that make up Exhibit 149.

228     Mr. Luo's testimony was presented by AFI in an attempt to validate the Batch Records as reliable documents. Mr. Luo is currently Deputy General Manager with Blue Treasure. He first joined Blue Treasure, as a technician, in 1995. In 1996, he described his position at Blue Treasure as Head of Production and Technology.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

229    Mr. Luo was a very difficult witness. AFI's counsel admitted, in oral final argument, that there were problems with Mr. Luo's testimony. As the evidentiary record with respect to the Chinese Journal Articles demonstrates (see para. 322 of these reasons), Mr. Luo was prepared to fabricate evidence when it served his purpose. His testimony was replete with poor memory of matters that ought to have been known to him. In spite of his senior position at Blue Treasure, he claimed to be unaware of any matter that did not fall directly under his supervision. His evidence on the subject of the Batch Records was particularly problematic.

230    When cross-examined on the question of the second set of Batch Records, Mr. Luo was unequivocal:

> Q. Thank you, sir. Did you tell the lawyers that there was a unilingual Chinese worksheet from which data were copied into a second set of batch records?
>
> A. There is no such first set and second set of records.
>
> Q. Did you tell the lawyers that a unilingual worksheet, containing the parameters mentioned in a letter from February, were prepared and that those data were copied into the second set of batch records which have been produced in the litigation? Did you tell the lawyers that?
>
> A. No.

231    The problem is that Mr. Luo provided a different and conflicting explanation about the Batch Records, recorded as a response to Undertaking # 6585:

> Mr. Luo advised that it was the operators that transferred information from the unilingual worksheets into the bilingual English/Chinese batch record. He would then check the bilingual batch record to ensure that it was accurate and that no information was missing.

232    As demonstrated by these examples and other portions of the record, the evidence of Mr. Luo with respect to the Batch Records lacks credibility.

233    Another witness who spoke about the Batch Records was Mrs. Hu. Apotex submits that I should accept Mrs. Hu as a reliable witness. I find that difficult to do.

234    Mrs. Hu was an evasive and difficult witness. Her testimony on the Batch Records was no less confusing than that of Mr. Luo. Repeatedly, she refused to acknowledge matters that should have been within her knowledge. She was lead extensively through her direct testimony. In general, her testimony in chief was a reading of the Batch Records. Mrs. Hu's recollection of making lovastatin with *Coniothyrium fuckelii* from May 1997 to October 1999 and her testimony with respect to the Batch Records were not consistent and did not stand up on cross-examination.

235    When taken to the cover page of the batch record for the first run of AFI-4, Mrs. Hu testified that she signed the original of this batch record on May 26, 1997, the date reflected on the record. Similarly, she testified that she signed each and every one of the 364 Batch Records on the date that the various operations were performed. She vehemently and — in

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

my view — illogically clung to her testimony that she herself signed the record on each and every day. Mrs. Hu also testified that there were no unilingual Chinese records and that she had never seen anyone writing numbers on a separate work sheet for copying into the batch records later. This, of course, is not what the Court was told by Dr. Su. Moreover, her testimony that there were no unilingual or working records is inconsistent with the "pristine" appearance of the Batch Records in Exhibit 149.

236    Mrs. Hu may well have signed at the appropriate spots in Parts 1.1 and 1.2 of the reconstructed Batch Records. She may well have believed that Parts 1.1 and 1.2 of the Batch Records accurately reflected what she had done at that stage of the fermentation runs. However, I find, as a matter of fact, that she did not do so contemporaneously with the fermentation runs. Rather, she signed the pages after Mr. Luo had completed the forms. It is difficult to say whether Mrs. Hu, whose testimony demonstrated no understanding of the English language, was even able to read what was printed and written on the forms or took the time to compare the information on the original operational records to the headings and data that appeared in Parts 1.1 and 1.2 of the Batch Records. The original records could have helped corroborate her testimony; sadly, they were destroyed. Most significantly, Mrs. Hu's testimony does not reliably establish which runs, if any, were made using AFI-4, in spite of the use of the identifier "*Coniothyrium fuckelii* AFI-4 85-42" on each of the Batch Records.

237    In sum, I am not persuaded that the Batch Records contain the original data from the 364 fermentations allegedly carried out by Blue Treasure; rather, they were transcribed from the originals, most likely by Mr. Luo.

238    Another area of concern regarding the Batch Records was the destruction of the original documents in January 2003. The fact that the original batch records were destroyed six years into this litigation by Blue Treasure, a joint venture in which the Defendants are partners, raises a serious concern. Were they destroyed, as asserted by Merck, to hide evidence of the actual production methods?

239    Mrs. Hu's testimony on why the original batch records were destroyed was inconsistent and illogical. According to Mrs. Hu, she was the person who authorized the destruction of the originals. She testified that she did so pursuant to a Chinese GMP policy (apparently entitled "Guidance for Industry — Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients"). However, when questioned about the policy, it was clear that she did not have even the most basic understanding of the policy. Mrs. Hu was unable to recall clearly any of the details related to the destruction. She could not remember clearly the last time she signed a request for destruction. Finally, the copy of the GMP Policy presented to the Court was apparently brought into effect in April 2003 — three months *after* the alleged destruction. I am left without any reasonable explanation as to why the original records were destroyed.

240    I find that the original batch records were destroyed for reasons that cannot be determined, thereby leaving me unable to confirm any of the information contained in the Batch Records.

241    Moreover, any further confirmation of how and when the Batch Records were actually prepared is impossible. Mr. Brian Lindblom, recognized by the Court as an expert in forensic document examination, provided helpful opinions regarding this issue. Mr. Lindblom examined the Batch Records and, in his Expert Report, provided the following list of relevant tests that he would have performed on the original documents had they been available to him (Lindblom Expert Report, Exhibit 66, para. 19):

(a) whether the paper used in the original batch record was in fact available at the time the documents were allegedly

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

made;

(b) whether all of the inks used in the original batch record were in fact available at the time the documents were allegedly made;

(c) whether the ink has been on the document for the amount of time indicated by the date of the batch record;

(d) whether a single ink had been used for a batch record supposedly completed by numerous people over many days (in which one would expect to find more that one ink type);

(e) whether and perhaps when alterations had been made to documents which might suggest some type of fabrication;

(f) whether the documents were in fact completed in the chronological fashion suggested by the time line set out in the batch records (this can be determined through examination of indentations); and

(g) whether more than one person completed the handwriting on the batch record (as one would expect for a process which occurred over many days).

242    I conclude that the Batch Records are not reliable or trustworthy evidence that the fermentation runs that took place at Blue Treasure after March1998 were using the AFI-4 process to produce lovastatin. The pre-printed forms could have easily referred to *Coniothyrium fuckelii* as the production strain, even if a strain of *Aspergillus terreus* was used. The data could readily have been changed to cover up the use of the AFI-1 infringing process. Indeed, the lack of credibility of the two Blue Treasure witnesses leads me to conclude that it is more likely than not that the Batch Records were fabricated, at least with respect to any information that could identify the strain of micro-organism used.

243    The Batch Records and the testimony of Mr. Luo and Mrs. Hu are critical underpinnings of the Defendants' defence to the allegation of infringement. In my view, the Batch Records contain data about the fermentations that are not consistent with that defence.

244    Apotex asserts that Merck's argument that the Batch Records should not be relied on is inconsistent with Merck's use of the data to highlight the problems with the titres, the use of P2000 and the reduction in fermentation duration. I do not find the position of Merck, when explained in oral argument, to be inconsistent. I believe that what Merck is saying is that the Batch Records should be completely rejected. In the absence of reliable records on the fermentations, Merck asserts that the Defendants have no defence to the allegation of infringement. However and alternatively, Merck argues, if the Batch Records are to be believed, the data demonstrates that Blue Treasure must have been using the infringing AFI-1 process after March 1998.

245    On a final note, the Defendants submit that I should exercise caution in assessing the credibility of Mrs. Hu and Mr. Luo. In particular, they point to the existence of cultural differences that could account for the behaviour or demeanour of these witnesses.

246    This concern about applying "western" standards to an assessment of credibility was considered, in a criminal context, by the Ontario Court of Appeal in the case of *R. v. E. (T.)*, 2007 ONCA 891, [2007] O.J. No. 4952 (Ont. C.A.) [*R. v E.(T.)*.]. In that case, the trial judge stated that he did not believe the accused, relying heavily on the demeanour of the accused during his testimony. The Court of Appeal at paragraph 5, in finding that the judge erred, stated as follows:

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

The appellant contends that the trial judge's references to the appellant's apparent passivity and to his failure to make eye contact with the other witnesses at the trial constitute erroneous use of demeanour evidence. We agree. As the trial judge himself observed, accused persons can react differently in a stressful criminal trial. Without explaining why, and without acknowledging the effect of cultural background on demeanour (the appellant was born and raised in Sudan), the trial judge equated passivity and an absence of eye contact with witnesses with rejection of the appellant's credibility and, ultimately, his testimonial denial of committing the offence. This equation is, in our view, a misconceived and improper linkage.

247     In the criminal context, there is a significant difference in burden and standard of proof. The Crown, in *R. v. E. (T.)*, bore the burden of proving all of the elements of the alleged offence beyond a reasonable doubt. It was open to the Crown to put forward expert evidence on cultural background; had it done so, the outcome in the Court of Appeal's decision might have differed. Further, it appears, from reading the judgment of the Court of Appeal, that the trial judge placed much of his reliance on the demeanour of the accused; as noted by the Court of Appeal, the trial judge "equated" demeanour with rejection of the accused's credibility.

248     In the case before me, Mrs. Hu and Mr. Luo are the Defendants' witnesses. They were put forward expressly to respond to the claim by Merck that Blue Treasure was, at least in part, using the infringing AFI-1 process. During their appearances, I was never alerted to the fact that any cultural background issues would alter how they presented themselves. Nor did the Defendants put forward any expert testimony on what these alleged "cultural differences" could be. In fact, beyond a general caution, the Defendants make no attempt to describe what particular attributes would affect the testimony or to describe what specific aspects of their demeanour reflect a cultural difference. In the circumstances, I can see no reason why I should not rely on demeanour (within reason and not solely) in assessing their credibility.

249     Having said this, however, I am aware that both Mrs. Hu and Mr. Luo testified through an interpreter. Even with competent translation (which we had in this trial), I can appreciate that there may be times where the witnesses could have become frustrated with the inability to testify directly. This frustration was readily apparent with Mrs. Hu — less so with Mr. Luo. In those situations, the answers may not have been as clear as they could have been. I have taken that into account.

*(2) P2000*

250     The evidence before me is that the compound known as Polyglycol P2000 (P2000) was an essential ingredient in the AFI-4 process. As I understand it, foaming created by the fermentation process negatively affects the production levels. When P2000 was added to the fermenters it acted as an anti-foaming agent and increased the titres dramatically. Without P2000, it is fair to say that the production of lovastatin using *Coniothyrium fuckelii* would not be commercially viable.

251     Dr. Connors, an expert witness who provided the Court with his understanding of the history of the AFI-4 process at AFI, spoke in superlatives about the decision to add P2000 to the process. According to Dr. Connors, the addition of P2000 to the fermentation medium in March 1995 was a key breakthrough in the development of the AFI-4 process at AFI:

This is March of 1995. This is really the big break in the project. I will take you to, under tab 63, AFI production 4-39, the very first one. This is when you are glad to be a scientist. This is when you are glad that you chose science. This, again, is culture 115 57, and this is the first data that suggests that underlying P2000 in larger amounts than what you would normally add it gives you a dramatic increase in the production of Lovastatin with this culture.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

You can see through the top row of data that day six, day seven, day eight titers, 300 mgs per litre. If you increase the P2000 up to two percent or 20 mls per litre, by day eight you have almost 1.6 grams per litre. Spectacular. I mean, this is incredible.

You can see, also, more importantly too, or just as important, that this is a dose dependant manner. As you increase the concentration of P2000 incrementally, you see a concomitant increase in the titer of Lovastatin as well. So this was a very good result. This was something that really broke the project open for them.

[Emphasis added.]

252     The increased amount of P2000 needed for the AFI-4 process as compared to the AFI-1 process is dramatic — in the order of 10 to 20 times more is required for the AFI-4 process. Mr. Scott Primrose is a senior research scientist at AFI. In 1993, he was working in the microbiology laboratory of AFI, where much of his work focussed on the development of non-infringing lovastatin — that is, the AFI-4 process. He confirmed that the AFI-1 process required about 1/20th of the amount of P2000. Dr. Sailer described the amount of P2000 used for the AFI-4 process as "very unusual":

Typically amount of anti-foam used for fermentation it's like point two percent and in this case was two percent, 10 times more.

[Emphasis added.]

253     Merck submits that Blue Treasure did not have sufficient quantities of P2000 to complete 364 runs of the AFI-4 process. Merck calculated that Blue Treasure would have needed 73,338 kg of P2000 to run 364 fermentation batches. This calculation was not disputed by the Defendants. Blue Treasure also needed P2000 for other projects, including for the production of compactin and AFI-1 lovastatin.

254     How much P2000 did Blue Treasure have? According to the evidence, between May 1, 1997 and June 9, 1998, AFI made 10 shipments of P2000 to Blue Treasure for a total of 27,784.80 kg. This would have been far short of the 73,338 kg needed to run the AFI-4 process, but certainly sufficient to supply the AFI-1 process. Approximately 5 to 10% of the amount of P2000 is needed for the AFI-1 process. How did Blue Treasure obtain the remaining P2000 that it needed? There really was no answer to that question.

255     Dr. Connors speculated as follows:

The balance of the P2000 could have come from someplace else. Might have been the amount they started with. Perhaps this was the amount of raw material that Winnipeg provided, and P2000 was sourced through some local vendor. P2000 is not an unusual chemical. It's a commodity, and could very well be available in China. I don't know for sure.

256     The Defendants assert that, after July 1998, Blue Treasure began to source its own raw materials, including P2000. Mr. Fowler, speaking to this issue during his testimony, stated that "after the fifth order [for P2000] Blue Treasure was able to purchase its own raw materials". However, Mr. Fowler provided nothing beyond speculation that Blue Treasure was accessing P2000 from other markets; he had no personal knowledge of how that might have happened or if, indeed, it did.

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

257    Beyond the speculation of Dr. Connors and Mr. Fowler, I have nothing that speaks to Blue Treasure's acquisition of the required quantities of P2000. I have seen no invoices or shipment statements to back up the Defendants' assertions in this regard.

258    The missing P2000 is extremely important. Without sufficient quantities of P2000, Blue Treasure could not have produced AFI-4 lovastatin throughout the entire 364 runs. There are obviously people associated with Blue Treasure who could have provided evidence of additional purchases of P2000, if such purchases had taken place. For example, Mr. Zhou was the Plant Manager at the relevant time. Of those who might have been able to assist the Court, only Mr. Luo was called as a witness and he was not asked about P2000. In the circumstances, I will presume that the evidence that could have been provided by the witnesses from Blue Treasure, who were not called to testify, would have adversely affect the Defendants' case (see *Levesque v. Comeau*, [1970] S.C.R. 1010, 16 D.L.R. (3d) 425 (S.C.C.)). In other words, I will assume that Blue Treasure has no further evidence that it ever purchased enough P2000 to carry out the 364 fermentations using the AFI-4 process.

259    In the absence of evidence to the contrary, it is not unreasonable to believe that Blue Treasure was not using the AFI-4 process as the Defendants claim. On the other hand, I have evidence that the Blue Treasure had sufficient P2000 - 27,784.80 kg — to carry out the fermentations using the AFI-1 infringing process. I have persuasive evidence — albeit circumstantial — that supports a conclusion that Blue Treasure was using the infringing AFI-1 process to produce lovastatin.

*(3) Fermentation Duration*

260    One of Merck's arguments focuses on the notion of "fermentation duration". As discussed in the background section of these reasons, the production of lovastatin requires fermentation over a period of time. It is self-evident to say that a manufacturer will try to produce the largest volume of final product over the least amount of time. For example, in general, producing 100 units of material over 10 days is economically more efficient than producing the same 100 units over 12 days.

261    Production of lovastatin is reported in "titres" (also "titers") — that is, the concentration of a solution as determined by titration, usually measured in units of mg/L or g/L.

262    Dr. Mila Sailer explained "fermentation duration" as the interaction of a number of factors. Dr. Sailer was a fact witness presented to the Court by AFI. Dr. Sailer worked as a natural product chemist with AFI, and was involved in the production of lovastatin in October 1996 when AFI started its first commercial production of lovastatin from *Coniothyrium fuckelii*. Dr. Sailer explained that production of a product such as lovastatin requires consideration of a number of factors:

There is a number of factor which is to be considered when you, when you want to optimize the production of the facility, fermentation facility. So, for instance, you have to look on the production curve doing the fermentation run, you have to look on a capacity of the seed train which is used for inoculation of production vessels. You have to look on the capacity of the downstream equipment. You have to look on, for instance, on impurity profile during the fermentation run, which can change. You have to look on cost of the media.

263    Under the notion of the "production curve", Dr. Sailer spoke about fermentation durations and confirmed that often there is a trade-off between titres and fermentation times. Sometimes, he said "it's not the best to ... go for maximum titres";

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

rather, "sometimes it's much better to shorten the time and do a higher number of fermentation[s]". While Dr. Sailer was not presented as an expert, his testimony codifies common sense when it comes to a general view of the factors affecting production.

264      The experience of AFI, in its Winnipeg facilities, during the period between August 1996 and August 1997, was that 76 batches of AFI-4 were run with an average fermentation duration of 11 days. In other words, the optimization spoken of by Dr. Sailer for AFI-4 was reached by an 11-day fermentation.

265      As we know, Blue Treasure began its runs of AFI-4 in June 1997. About 70 runs were made at Blue Treasure between June 1997 and October 1997. If the Batch Records are to be believed, although there is significant fluctuation, the average fermentation duration during that period was about 11 days. This was an expected result, given the experience of AFI with the AFI-4 process in Winnipeg.

266      Blue Treasure shut down its production of lovastatin from October 1997 to March 1998. Other than 17 runs that took place between December 1997 and January 1998, there was no production of lovastatin in this period. Upon resumption of production in March 1998, the fermentation duration was immediately lower and eventually stabilized at nine days.

267      These data were depicted by a graph, in Exhibit 83, prepared by Merck and presented to, and discussed by, a number of witnesses. What could account for the change in the fermentation duration?

268      Merck's explanation for the reduction in the fermentation duration after the plant shutdown is that Blue Treasure began to use the infringing AFI-1 process, instead of the AFI-4 process, to produce lovastatin.

269      The graph was first presented to Dr. Cox during cross-examination. Dr. Cox, whose testimony was very credible and trustworthy, agreed with counsel for Merck that Exhibit 83 showed that the AFI's 11-day fermentation duration for AFI-4 was roughly consistent with the fermentation duration experienced by Blue Treasure up until the plant shutdown. He also agreed that the graph in Exhibit 83 depicted an average nine-day fermentation duration after the resumption of production at Blue Treasure in March 1998. Finally, and most importantly, Dr. Cox confirmed that the AFI-1 process transferred to Blue Treasure could be run in nine days.

270      In my view, the decrease in fermentation duration after the Blue Treasure plant shutdown is more likely to have occurred with the production of AFI-1 lovastatin than with the production of AFI-4 lovastatin. Thus, even if the Batch Records are accepted as reliable evidence of the production runs, the data with respect to fermentation duration are consistent with the use of the AFI-1 process and not the non-infringing AFI-4 process.

*(4) Increased Titres*

271      Fermentation duration is not the only variable to be considered in the economics of producing lovastatin. The amount of production or titres from each fermentation batch is of equal significance. Related to this issue is the role of Amicase in the fermentation medium. The AFI-4 process transferred to Blue Treasure required the use of a compound in the medium called Amicase. As I understand it, Amicase is an enzyme that is used as a catalyst in a chemical reaction. Dr. Connors testified

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

that, "If you take out Amicase, then you get less lovastatin."


272      Amicase was an expensive ingredient and the evidence suggests that Blue Treasure was taking steps to try to avoid its use. In a memorandum dated October 23, 1997 to Dr. Xinfa Xiao and Dr. David He, both employees of AFI, Mr. Huigen Xu, of Blue Treasure, explained that, when Blue Treasure tested fermentation without Amicase, they "did not find any effect on the product quality". However, the same memorandum reports a reduction in titres of 9.75% at the 12,800 L fermentation stage. Mr. Fowler confirmed that, although a loss of productivity of 9.75% was the result of removing Amicase from the medium, Blue Treasure could achieve a cost savings of about $224.00 US per kilogram by its elimination.


273      From about January 1998, Blue Treasure produced lovastatin without using Amicase. One would logically expect that thereafter there would be a reduction in titres as reflected in the memorandum of October 23, 1997. That does not appear to have been the case.


274      In Exhibit 103, Merck's counsel attempted to pull together all of the information on titres. This exhibit was prepared from Exhibit 149 (a complete set of the Blue Treasure Batch Records), and presented in graphical format in Exhibit 83. During three periods, the average titres recorded by Blue Treasure showed the following:

| Period | Average titres (g/ml) |
| --- | --- |
| June 7, 1997 to October 27, 1997 | 2.3 (n = 53 runs) |
| December 8, 1997 to January 11, 1998 | 2.0 (n = 17 runs) |
| March 7, 1998 to October 7, 1999 | 2.2 (n = 292 runs) |


275      The chart demonstrates that there was a drop in titres of about 13% for the period December 8, 1997 to January 11, 1998. However, the titres increased, after the Blue Treasure plant shutdown, to a level approximately equal to the runs made with Amicase. The obvious question is this: in the post-March 1998 period, how could Blue Treasure have obtained production levels without Amicase consistent with those with Amicase?


276      Merck submits that the only reasonable explanation is that after March 7, 1998, Blue Treasure was using the AFI-1 process and not the AFI-4 process.


277      In final oral argument, Apotex refers to a sub-set of the Batch Records to argue that there is no evidence that the omission of Amicase resulted in a reduction in titres. For support of this statement, they refer to Table A of Exhibit 156, listing "All L4-39-581 Fermentations Pre-March 1998." Apotex points out that the average titres of the three runs with Amicase are actually lower than in the 12 runs listed in Table A that were run without Amicase:


         The point is, using the same time point from the data, when you remove Amicase at nine days, you have a significantly better titre performance. So the argument, the argument that you would expect titres to go down, because they did remove Amicase in the later runs in March and following, is not borne out by this document which my friend put forward as Exhibit 156. It shows exactly the opposite.


278      The problem with Apotex's submissions on this point is that the average of titres with Amicase highlighted by Apotex was based on an average of only three runs (September 24, 1997, September 26, 1997 and October 17, 1997). Apotex

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

then compares this extremely small sample size against another small sample of 12 runs. In my view, the averages used by Apotex are based on a sub-set of the Batch Records from which relative conclusions as to titres for the entire Batch Records cannot be made.

279    I prefer the information set out in Exhibit 103, which demonstrates an increase in titres of 13%. I accept that this is inconsistent with the omission of Amicase.

280    Even discounting the effect of the omission of Amicase, there are inexplicable changes in production levels after the plant shutdown. This change in titres can be viewed in the context of L4-39-581, one particular strain of *Coniothyrium fuckelii* allegedly used both before and after the plant shutdown. From the Blue Treasure Batch Records, we can track the runs that Blue Treasure claims it used for this particular strain. Merck counsel prepared Exhibit 156 from the Batch Records. Table A of Exhibit 156 is a summary of the Batch Records for all runs using the L4-39-581 strain prior to the plant shutdown. Between September 24, 1997 and January 11, 1998, 15 fermentations were carried out. Although these batches ran for a duration of 11 days, we can calculate the hypothetical titres at nine days from the records. If these batches had been run for nine days, the average (arithmetic mean) titre would have been 1719 mg/L. Table B of Exhibit 156 consists of information from the Blue Treasure Batch Records for the alleged runs using the L4-39-581 strain after the plant shutdown. From March 7, 1998 to April 23, 1998, 19 runs were performed with an average fermentation duration of 8.3 days and an average titre of 2109 mg/L. This shows an increase of over 20% in titres.

281    This increase is dramatic. Allegedly using the same strain of *Coniothyrium fuckelii*, L4-39-581, Blue Treasure managed to increase the productivity of the fermentation by over 20%. What explanation is there for the increase? Merck submits that the only reasonable explanation is that, for the runs after the plant shut down, Blue Treasure was not using a strain of *Coniothyrium fuckelii*, but was using a strain of *Aspergillus terreus*.

282    In support of its belief, Merck referred to the testimony of Dr. Connors who was presented with scatter graphs representing the variations in titres among the Blue Treasure runs. Dr. Connors agreed that "one possible explanation" for a variation in titres before and after the plan shut down, could be the micro-organism or fungus used, when the medium and the process are kept constant. Dr. Connors did not specify what other explanations there could have been other than to say that something had to be different:

What did you do in the middle that you didn't do on either side? I wouldn't necessarily say the culture has to be different, but something is different, obviously.

Dr. Connors provided no further assistance to the Court on what could explain the differences.

283    The data replicated in some of the exhibits produced by Merck's counsel from the Batch Records show that the variability in titres between runs diminished over time. I can accept, as a matter of common sense, the comments of Dr. Cox who explained that, "with the passage of time and the practice and the reproducibility and the adherence to the [Standard Operating Practices] and the ironing out of the problems", there would be more consistency in titres. However, this does not account for the dramatic and immediate change in titres in evidence before me.

284    The only witness presented by the Defendants who could speak to the dramatic change in titres was Mr. Luo. He was on the plant floor during the relevant times. According to the Defendants, Mr. Luo indicated that other changes to the

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

fermentation conditions could result in a change of titres. Mr. Luo spoke about possible changes to aeration, pressure, the media and agitation, and about increased familiarity with the process. However, when Mr. Luo's testimony is examined, only one explanation — increased agitation — is really offered. And, I have difficulty with that explanation.

285    Exhibit 156 was presented to Mr. Luo during cross-examination. He was asked what could have explained the increased titres after the plant shutdown. Mr. Luo testified that a 23% jump could be justified as follows:

> A 23 percent jump, it's not necessarily like by changing the [strains]. It can also be changed by optimizing the fermentation conditions of the medium.
>
> ... There is lots of factors. It is not only the strain.
>
> As the staff, the production staff, get more familiarized with the production procedure and techniques, and then they get improvement on that, it will also change.
>
> So even for the same strain and the different batches, even for the same strain, the different batches may also have a different — like, a different result in titre.

286    When questioned, Mr. Luo suggested that a change in aeration could improve production. However, he was unable to point to any change in aeration from the pre-shutdown runs to the post-shutdown runs.

287    Mr. Luo explicitly agreed that there was no change in pressure.

288    With respect to a change in medium, Mr. Luo was questioned about the removal of Amicase. His explanation was bewildering. While he acknowledged that removing Amicase would probably reduce the titres, he stated that the removal of Amicase would not necessarily reduce titres. This runs counter to other testimony on the issue and to common sense.

289    At the end of the line of cross-examination on the issue of increased titres, the only possibly concrete suggestion from Mr. Luo was that increased agitation during the fermentation could account for the 23% rise in titres.

290    Apotex argues that a change in agitation could indeed explain the change in titres. Apotex first refers to production parameters set out in Exhibit 49 where a cultivation condition of "agitation between 100 and 130 (depending on DO)" is set out for AFI-1. In contrast, Apotex notes that the agitation described in the Batch Records for AFI-4 is closer to 170. Moreover, Apotex points to Exhibit 94, an AFI comparative report where it is reported in section 5.5 that, "for most of fermentation time, less vigorous agitation is needed for AFI-1 compared to AFI-4."

291    I give no weight to the information contained in Exhibit 49 referred to by Apotex. First, the document appears to have been produced no later than spring of 1995 as part of the transfer of technology related to AFI-1 lovastatin from AFI to Blue Treasure. I have no idea of what the ultimate instructions followed were and no explanation of why an agitation of 100 to 130 should be used. I also observe that the document is made subject to the note that:

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

> This is a preliminary document and <u>many process parameters including agitation</u>, aeration, media volumes, cultivation durations, feeding amounts and frequencies etc. <u>are subject to additional adjustments during the validation runs.</u>

> [Emphasis added.]

Beyond the Batch Records, I have no information on what the actual agitation levels for AFI-1 in production were or should have been. This document does not assist me.

292    I also give no weight to the statement contained in section 5.5 of Exhibit 94. Exhibit 94 is an untitled document that was produced by AFI during the pre-trial litigation. The document appears to relate to differences between the AFI-1 and AFI-4 processes. It was referred to by counsel for Merck during cross-examination of Dr. Sailer. Dr. Sailer described the document as "some kind of R & D report possibly" and admitted that he had never seen the document. Although Dr. Sailer was questioned on some of the contents of this document, I have no idea who is the author of this document or whether section 5.5 is accurate.

293    That leaves Apotex's analysis of the Batch Records as the only support for the increased agitation argument. I acknowledge that there appears, in general, to be an increase in agitation after the plant shutdown. However, I have no reliable evidence that would support Mr. Luo's statement that an increase in agitation explains the dramatic increase in titres.

294    This leaves me with no credible explanation for the post-shutdown increase in titres other than a change in organism. Thus, even if the Batch Records are accepted as reliable evidence of the production runs, the data with respect to titres are consistent with the use of the AFI-1 process and not the non-infringing AFI-4 process. In spite of the removal of Amicase and a decrease in fermentation duration, Blue Treasure managed to obtain increased titres. The only explanation consistent with the evidence before me is that Blue Treasure was using a different micro-organism — *Aspergillus terreus*.

*(5) Motivation, Means and Opportunity*

295    Supporting the arguments above, Merck also submits that Blue Treasure had the motive, means and opportunity to make and ship infringing lovastatin to AFI.

**(a) Motivation**

296    First, Merck asserts that Blue Treasure had a significant financial motivation to make infringing lovastatin that it would then sell to AFI. A number of facts certainly appear to support this argument:

  • the financial difficulties prior to the introduction of AFI-4;

  • the problems with the production of lovastatin using AFI-4; and

  • the inability of Blue Treasure to make a profit at the Blue Treasure Joint Venture contract price.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

297    Financial problems at Blue Treasure appear to have existed even before the production of AFI-4 lovastatin. As we know, Blue Treasure was expected to sell AFI-1 lovastatin in China or other foreign markets. The Minutes of the 6th Meeting of the Board of Blue Treasure held August 26-27, 1996 described the difficult market conditions in China and indicated serious financial problems at Blue Treasure. At that time, unpaid loans and utilities bills would leave Blue Treasure with no funds to produce the planned lovastatin. Dr. Cox, during cross-examination, acknowledged that, at that time, the outlook was not "very promising".

298    A concern for Blue Treasure from early 1997 was the challenge of selling into the Chinese market. In a memorandum, dated March 7, 1997, Mr. Zhou referred to the "less than satisfactory" sales of lovastatin in China and commented as follows:

In domestic market, there is a fierce rivalry market of Bulk Lovastatin course price to decline. As far as we know, ZeJing province Hai Mei Pharm. Offered the price of Bulk Lovastatin is RMB thirty-two thousand [approximately $3,900 US as confirmed by Mr. Fowler (T4565)] for one kg. If we do that, we will difficult to subsist.

[Emphasis added.]

299    Mr. Fowler, who was responsible for financial matters at AFI during the relevant times, confirmed that RMB 32,000 would convert to approximately US $3900. In the absence of any other evidence on the pricing economics, I accept that Blue Treasure's "break even" price for the sale of lovastatin was about US $3900.

300    The financial difficulties of Blue Treasure apparently were worsened by the refusal of AFI to provide higher-yielding strains of *Aspergillus terreus*. In the same memorandum referred to above, Mr. Zhou "urgently" requested that AFI provide it with an improved strain or "super fungus". Since Mr. Zhou did not testify at the trial, I can only assume that he believed that a better strain of *Aspergillus terreus* would have helped Blue Treasure's dire financial situation. AFI did not respond to this request from Blue Treasure. Dr. Cox acknowledged the refusal:

Q. You had a contract, after having given them that strain, which obliged you to give them all of the improvements, correct?

A. Correct.

Q. You were withholding that, despite your certain knowledge of their financial situation?

A. Yes

Q. And despite the contractual obligations?

A. If they were able to sell material with the old strain we might have considered doing that. There's no point in transferring a high performing strain when they can't sell the bulk material.

301    The decision to send the AFI-4 micro-organism to Blue Treasure was made, at least in part, to allow Blue Treasure to make non-infringing lovastatin that it could sell on the Canadian market. In spite of this, the evidence before me shows that Blue Treasure had some difficulties with producing lovastatin with the strain of AFI-4 sent by AFI. The result was that the financial picture for Blue Treasure did not improve.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

302     Blue Treasure's experience with AFI-4 was troubled. Wide fluctuations in batch-to-batch titres were observed at Blue Treasure prior to March 1998. As acknowledged by Dr. Cox, running a plant economically and efficiently requires a range of variability within acceptable limits; variability outside the acceptable range would make it harder to earn a profit. A memorandum, dated August-13, 1997, from Mr. Zhou to Dr. Cox highlighted the difficulty:

> Because the fermentation viscosity of new AFI process have a <u>great fluctuation</u>, some equipment in downstream didn't suit for the new technology and brought <u>many difficult for downstream</u>.

> [Emphasis added.]

303     Blue Treasure also experienced difficulties with some of the AFI-4 strains provided by AFI. In a memorandum dated October 20, 1997, Mr. Zhou noted that a replacement strain for L4-42-581 showed only 50% of the productivity and:

> Therefore, it can't be used for production. Also the strain L4-39-581 was not satisfactory for production: titers of shake flask test and fermentation showed more than 20% productivity reduction will occur if Strain L4-39-581 is used compared to that of Strain L4-42-581. This will certainly affect margin of cost and price.

304     Mr. Zhou requested that AFI send "100 frozen vials of L4-42-581 or vials with similar productivity or higher". The request for more vials of L4-42-581 was repeated by Dr. Su in an email dated October 19, 1997. As confirmed by Mr. Primrose, a shipment of seed vials that included 10 vials of L4-42-581 was sent by AFI to Blue Treasure on August 4, 1998. I have no other evidence of any response to the request of Blue Treasure for a better AFI-4 strain.

305     Apotex asserts that the fact that Blue Treasure was requesting additional information and a better AFI-4 strain is inconsistent with Merck's hypothesis that Blue Treasure was, in fact, using the infringing process after March 1998. Given that Mr. Zhou, the author of most of the memoranda relied on by Apotex, did not testify in this trial, I have no way of determining whether Apotex's theory is believable.

306     As noted above, Blue Treasure was concerned about being able to subsist with pricing of about US $3900 per kg for *Aspergillus terreus* lovastatin. Considerable evidence was produced at trial to demonstrate that the costs of producing AFI-4 would be higher and that the profit margins even smaller.

307     As stated in a lengthy AFI Monthly Scientific Report, dated July 3, 1997, in which the AFI-1 and AFI-4 processes were compared, "The calculated cost of production of AFI-1 was significantly less than the production costs for AFI-4." The same document stated that the media ingredients were the single most significant cost factor.

308     The offer to transfer the AFI-4 process to Blue Treasure and to purchase AFI-4 lovastatin was outlined in a letter dated April 10, 1997 from Dr. Cox to Mr. Zhou. As confirmed by Dr. Cox, Blue Treasure initially asked for US $6000 per kg. AFI agreed to pay only US $4500 to US $5000, depending on the average titres. A price of US $4500 would be about $600 to $700 over Blue Treasure's "break even" price of US $3900 per kg. However, the margin would have been significantly eroded by the added costs of the AFI-4 media ingredients and by having to meet AFI's 0.2% RC-14 specification. Moreover, over the course of the batches sold to AFI, the purchase price dropped to US $3300 per kg.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

309      The result is that, if Blue Treasure had been using the AFI-4 process, it would have been losing significant amounts of money for each kilogram of product shipped to AFI. Blue Treasure could not have made a profit by selling AFI-4 lovastatin to AFI at the price AFI paid. However, the evidence of Mr. Fowler was that, once Blue Treasure began to use the AFI-4 process, they "worked their way out of the financial difficulties and became profitable". Quite simply, there is no evidence on the record that explains how Blue Treasure could have turned a profit using the AFI-4 process.

310      I conclude that Blue Treasure had financial motivation to use the AFI-1 process instead of the non-infringing — but more costly — AFI-4 process.

**(b) Means**

311      The ability or means of Blue Treasure to produce the quantities of AFI-1 lovastatin depends, at least to some extent, on the availability of the appropriate strains of AFI-1.

312      Apotex argues that it was not shown that Blue Treasure had such a strain. Apotex refers to the production master batch records provided to Blue Treasure as part of the *Aspergillus terreus* technology transfer. In production, the strain showed titres generally below the 1.5 g/L level. Not only was the titre level well below 2.0 g/L reflected in the Batch Records, but the stated fermentation time was 12 to 15 days — a longer period than reported in any of the post-March 1998 runs. Merck does not agree.

313      Merck submits that Blue Treasure was in possession of a high-producing strain of AFI-1 giving it the means to make additional AFI-1 lovastatin with the very titres reflected in the Batch Records after March 1998 when the average titres were about 2.2 g/L. The reference to this strain is contained in the Management Report for the 6th Meeting of the Board of Directors of the Blue Treasure Joint Venture held on August 26-28, 1996. In that document, at paragraph 1.3, the titres are stated to be 2300 to 2500 mg/L. Moreover, a document entitled "Historical review of Lovastatin production improvement *Aspergillus* sp. and *Conioth[y]rium fuckelii* strains in R&D Biology" states that AFI achieved up to 5100 mg/L. When Mrs. Hu was asked whether Blue Treasure had an AFI-1 strain that produced titres in the range of 2300 to 2500 mg/L, she claimed to be unable to know what the question was about. This response is surprising given Mrs. Hu's responsibilities for the security of various strains of both AFI-1 and AFI-4 and for inoculating the initial fermentations for each batch.

314      With respect to fermentation duration, the evidence of Dr. Cox was that the AFI-1 strain transferred could be run in nine days.

315      Although there appears to be some contradictory evidence, I conclude that it is more likely than not that Blue Treasure had a strain of AFI-1 that could have met the titres and fermentation durations reflected in the Batch Records after March 1998.

316      I am persuaded that Blue Treasure had the means to produce lovastatin with the infringing AFI-1 process.

**(c) Opportunity**

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

317     The final element examined by Merck is opportunity.


318     As described earlier in these reasons, Dr. Jerry Su was sent to Blue Treasure to investigate certain problems with the initial AFI-4 runs. Dr. Su arrived in China on August 25, 1997 and returned to Winnipeg on October 31, 1997. Dr. Su expressed his opinion that the runs he observed were carried out in accordance with the Standard Operating Procedure for AFI-4. However, as confirmed by Mr. Fowler, after Dr. Su's departure in October 1997, no one was ever sent from AFI to assess the production. AFI apparently assumed that Blue Treasure would follow the instructions that had been provided in spite of earlier problems.


319     AFI also missed another chance to identify the micro-organism used by Blue Treasure. As confirmed by Ms. Christofalos, with each shipment of product to AFI, Blue Treasure sent a sample consisting of a mycelial or fungal cake. Dr. Connors opined that such product could have been subjected to DNA testing for the presence of the non-infringing *Coniothyrium fuckelii*. However, the fungal cake was never tested and was, unfortunately, destroyed during the course of this litigation.


320     Blue Treasure had the opportunity to revert to manufacturing AFI-1 as soon as Dr. Su left at the end of October 1997.


*(6) Blue Treasure Conduct*


321     Merck submits that the behaviour of Blue Treasure raises serious doubts about the Defendants' allegations that there has been no infringement. One of the most serious and disturbing stories involves two articles published in the Chinese Journal of Antibiotics. Merck argues that these two articles are direct evidence that Blue Treasure used *Aspergillus terreus* to manufacture lovastatin, most likely in late 1997. Furthermore, the behaviour of Blue Treasure's employee, Mr. Luo, in association with the articles, provides evidence that Blue Treasure is prepared to go to great lengths to cover up its infringing activities.


322     In early 1999, an article entitled "Optimization of Formula for Lovastatin Fermentation Medium through Uniform Design" was published in the Chinese Journal of Antibiotics, February 1999, Vol. 24, No. 1 (referred to as Article #1). One of the authors of this article was listed as "LUO Dingjun". Mr. Luo who appeared as a witness in this trial is the same Mr. Luo who wrote this article. As set out in the abstract of Article #1, the authors were presenting a method of optimizing a fermentation medium for producing lovastatin. In summary terms, the authors conducted experiments to ascertain the effectiveness of replacing two "extremely expensive" raw materials — Peptone and Amicase — in the fermentation medium with domestically produced raw materials. One of the replacement products was a fish powder, giving rise to a reference, during this trial, to the experiments as the "fish powder experiments".


323     Article #1, in its abstract, contains the following sentence:


The company [Blue Treasure] has imported patented lovastatin production technology from Canada, with the fermentation medium formula being a United States patented (patent number 5409820) formula.


324     The reference to "patent number 5409820" is most likely a reference to United States Patent No. 5, 409, 820 issued to

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

Apotex Inc. on April 25, 1995. This patent claims a process for making lovastatin using *Coniothyrium fuckelii*. In spite of this reference at the beginning of Article #1, there is no further reference to *Coniothyrium fuckelii*. Indeed, the article explicitly states that the fish powder experiments were conducted on the "Lovastatin-producing strain *Aspergillus terreus* BN 270-001." There is no reference in Article #1 to the use of a *Coniothyrium fuckelii* strain of lovastatin. The article also describes Guangdong Blue Treasure Pharmaceutical Co. Ltd. as the company who was producing lovastatin in China and the company that was interested in the lowering of the costs of the fermentation medium for lovastatin.

325      A second article, entitled "A Study Regarding Lovastatin-Producing Strain Protoplast Mutation and Fermentation Formula Optimization," was published in the Chinese Journal of Antibiotics, October 2000, Vol. 25, No. 5 (referred to as Article #2). Mr. Luo was also one of the authors of this article. The purpose of Article #2, as reflected in the abstract, was to produce a high-yield strain of lovastatin "by mutating lovastatin-producing strain protoplasts" and optimizing the fermentation culture medium formula. Once again, the authors listed, as the strain used for their experiments, "lovastatin-producing strain *Aspergillus terreus* (BN 270-053)". In Article #2, there is no mention of the US Patent.

326      Dr. Luo testified that the shake flask experiments (referred to in Article #1 and #2) were performed at Blue Treasure's microbiology lab.

327      These articles raise a strong inference that, at the time of the experiments, Blue Treasure was producing lovastatin from *Aspergillus terreus* at its facility.

328      Mr. Luo was asked about the two journal articles during his examination-in-chief. In response to a question on the purpose of publication, Mr. Luo responded that:

Getting this paper published is mainly for the technicians being able to get certified. Basically it's a kind of when you come to a profession new to get certified, certification.

329      Mr. Luo was unable to remember clearly when the experiments were run, but he thought that they were carried out in 1997 "between summer and fall of that year". Mr Luo further testified as follows:

Q. Where was these experiments conducted?

A. These experiments are done at Blue Treasure's micro-biology laboratory.

A. Specifically what strain was used I can't remember so clearly, but looking through this article probably I used number 4 strain.

Q. Why does it say Aspergillus terreus was used?

A. Because at that time due to the confidentiality reasons I don't want to leak the secrets about AFI-4 strain.

330      I find Mr. Luo's testimony related to these two articles to be astounding. First, it is simply incomprehensible that a group of scientists would fabricate a journal article to hide the identity of the *Coniothyrium fuckelii* fungus. Beyond a bald

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

assertion, Mr. Luo presented no cogent reasons as to why the use of *Coniothyrium fuckelii* would have been confidential.

331     I also question Mr. Luo's testimony with respect to when the experiments were conducted. His lack of memory is surprising. Mr. Luo has known about the significance of these articles for some time and yet was unable to recall the dates of the experiments. He could have refreshed his memory in a number of ways before testifying. Instead, he expressed the view that the experiments were done in the period of time before the use of the AFI-4 process. His faulty memory, in my view, is consistent with fabrication, by Mr. Luo, of what organism was being used at Blue Treasure in the time leading up to the publication of the articles.

332     The two articles contain other references that discredit Mr. Luo's claims. First, the strain used for the articles was described as BN 270-053. In the opinion of Dr. Lasure, this was a reference to the 53rd isolate of *Aspergillus terreus* BN-2-70. This is the same strain obtained from AFI as AFI-1 (Lasure Expert Report, Exhibit 48, para. 242).

333     The second area of disconnection relates to the ability of the strains of *Coniothyrium fuckelii* used in AFI-4 to sporulate. The evidence of Dr. Cox was to the effect that, in his experience working at AFI, the strain of *Coniothyrium fuckelii* transferred to Blue Treasure had lost the ability to produce spores during fermentation:

> Q. All right. You know that at some point Coniothyrium fuckelii ceased sporulating at AFI?
>
> A. Yes, I believe so.
>
> Q. That makes it harder to prepare and maintain consistent seed banks from generation to generation?
>
> A. A little bit, yeah.
>
> Q. That cessation of sporulation is a property of the organism?
>
> A. Not of the organism, no, it was an effect of the mutagenic strain improvement program that AFI performed.
>
> Q. The non sporulating character became intrinsic to Coniothyrium fuckelii as a result of that program, is that fair?
>
> A. That strain of Coniothyrium fuckelii, yes.
>
> Q. Right.
>
> A. It's not an inherent characteristic of the species.
>
> Q. Got it. Never a problem that was encountered with Aspergillus terreus?
>
> A. No.

[Emphasis added.]

334     In spite of the information that the AFI-4 strain sent to Blue Treasure could not sporulate, in Article #2, at section 1.2.3, the authors explicitly report as follows:

> Investigation of strain-producing capacity: The spores on the mature PDA slants are washed, inoculated onto a rice

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

culture medium, and cultured for 7 days, yielding mature rice spores.

335    In sum, Mr. Luo's explanation about why he lied in the two articles is not believable. Mr. Luo fabricated his testimony before this Court to cover up the use of *Aspergillus terreus* at a time when Blue Treasure was supposed to have been exclusively using the AFI-4 process. The better explanation for these two articles and Mr. Luo's testimony is that the fish powder experiments were carried out on lovastatin using AFI-1. I find that, on a balance of probabilities, the experiments were carried out with the AFI-1 process (that is, with *Aspergillus terreus*). It follows that the two articles support Merck's claims that Blue Treasure was using *Aspergillus terreus* to make lovastatin and thus infringing the '380 Patent.

### *C. Conclusion on Blue Treasure Circumstantial Evidence*

336    Most of the foregoing evidence could be characterized as circumstantial evidence and requires that I draw inferences to reach the conclusion that, on a balance of probabilities, there was infringement.

337    With respect to the drawing of inferences, Apotex argues that I must avoid relying on alleged inferences that are no more than speculation. I agree.

338    Obviously, there is a difference between reasonable inference and pure conjecture. The Federal Court of Appeal provided the following comments in an appeal of an immigration judicial review, in *Satiacum v. Canada (Minister of Employment & Immigration)* (1989), 99 N.R. 171 (Fed. C.A.) at p. 179, [1989] F.C.J. No. 505 (Fed. C.A.):

> The common law has long recognized the difference between reasonable inference and pure conjecture. Lord Macmillan put the distinction this way in **Jones v. Great Western Railway Co.** (1930), 47 T.L.R. 39 at 45, 144 L.T. 194 at 202 (H.L.):
>
>> The dividing line between conjecture and inference is often a very difficult one to draw. A conjecture may be plausible but it is of no legal value, for its essence is that it is a mere guess. An inference in the legal sense, on the other hand, is a deduction from the evidence, and if it is a reasonable deduction it may have the validity of legal proof. The attribution of an occurrence to a cause is, I take it, always a matter of inference.
>
> In **R. v. Fuller** (1971), 1 N.R. 112 at 114, Hall J.A. held for the Manitoba Court of Appeal that "[t]he tribunal of fact cannot resort to speculative and conjectural conclusions." Subsequently a unanimous Supreme Court of Canada expressed itself as in complete agreement with his reasons: [1975] 2 S.C.R. 121 at 123, 1 N.R. 110 at 112.

339    In the case before me, I am satisfied that I am not relying on conjecture or mere guess; rather, the deduction from the totality of the evidence that Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process is reasonable and logical.

340    Given the extent of the evidence before me and the lack of alternative, reasonable explanations for much of that evidence, I find that Merck has satisfied its burden to show that it is more likely than not that, from March 1998, Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process. The lovastatin was then delivered to AFI for ultimate sale into the Canadian market. This constituted infringement of the '380 Patent.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

341     This conclusion stands without any reference to the DNA evidence. That is, regardless of whether the DNA evidence presented by Merck constitutes reliable evidence of direct infringement, I find that any amount of lovastatin manufactured and sold in Canada that used lovastatin produced by Blue Treasure after March 1998 infringed the '380 Patent.

342     The DNA evidence is dealt with in section VIII of the Reasons.

#### D. AFI Batch CR0157

343     Merck no longer claims that all of the lovastatin produced in Winnipeg by AFI infringed the '380 Patent. However, Merck continues to assert that one batch of lovastatin — referred to as CR0157 — contained lovastatin that was made using the process protected by the '380 Patent.

344     Batch CR0157 consisted of 12.57 kg of USP-grade lovastatin. It was manufactured at AFI in Winnipeg and sent directly to the attention of Dr. Barry Sherman at Apotex Inc. on December 2, 1996. It was the first batch of AFI-4 lovastatin shipped to Apotex Inc.

345     The batch history reflects that CR0157 was the final crystallization of CR0151 which, in turn, was a recrystallization of CR0149. CR0149 was the crystallization of three extraction batches: CR0117, CR0145 and CR0144. The "genealogy" of batch CR0157 was confirmed by Dr. Sailer, during his examination-in-chief, and is depicted in Figure 1 below.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

**Figure 1**



**Graphic 3**

346    The essence of Merck's argument is that CR0157 was a combined batch of noninfringing and infringing lovastatin. The key evidence relied on by Merck is:

(1) AQA 94 Batch Records (referred to as AQA 94) show that CR0157 was "AFI#1,4 FLAGGED contains top secret material" which would indicate it was a mixture of *Aspergillus terreus* and *Coniothyrium fuckelii* lovastatin;

(2) Some of the batches that ultimately resulted in batch CR0157 (specifically CR0151, CR0117, CR0144 and CR0149) show significant alterations that increased the weights of lovastatin from those initially recorded.

(3) The DNA testing carried out by Dr. Davies demonstrated that tablets of Apo-lovastatin tested positive for *Aspergillus terreus* and negative for *Coniothyrium fuckelii*.

347    In my view, for the reasons that follow, neither of the first two arguments is persuasive on its own. However, the

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

direct evidence of *Aspergillus terreus* in tablets made from the CR0157 batch was uncontradicted and provides direct evidence of infringement.

348      As part of the trial record, the Defendants produced AFI's batch records. These records were obviously produced contemporaneously with the fermentations to which they refer and were kept in AFI's normal course of business. In contrast to the Batch Records for Blue Treasure, the AFI batch records are acceptable as business records. In other words, the AFI batch records are *prima facie* proof of the facts stated therein.

349      However, it does not follow that every document, produced by AFI, that looks like a business record meets the strict criteria to be admitted into evidence as a business records. This is particularly true with the document referred to as AQA 94 and relied on by Merck.

350      AQA 94 is a one-page document consisting of a list of 56 batch numbers with brief notations. The entry of interest is at line 11:

    CR0157 AFI#1,4 FLAGGED contains top secret material.

351      The document was introduced to Dr. Cox who was unable to identify it or to provide any testimony that could have assisted the Court. Ms. Christofalos was asked about the document during her examination-in-chief.

> Q. Are you able to identify this document?
>
> A. This looks like one of our internal, well, it is one of our internal record-keeping documents where we just have made an index of a bunch of documents that is going into a box.
>
> Q. Do you know what purpose was made for it?
>
> A. Just for filing purposes.
>
> Q. Do you know when it was made?
>
> A. We started this exercise late 99. I would, that's my recollection, late 99.
>
> Q. Can you tell the Court who made it?
>
> A. Could have been any number of people, most likely our records clerks.

352      Although Ms. Christofalos admitted that she did not prepare the document, she expressed her view that the list was merely an identification of boxes of documents. Further, Ms Christofalos provided what, in my view, was a reasonable explanation of why there was the reference to "AFI#1,4" in the document:

> • The person making this list would have looked at the first page of the actual Interim Production Batch Record and would only have seen "Product Name: lovastatin USP" and "Product Part Number: 6000".

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

> • Part number 6000 applied to lovastatin made with either AFI-1 (*At*) or AFI-4 (*Cf*), thus leading to the entry listing both.

> • The reason why the error was never corrected was because these lists were not control documents.

353     With all respect to Merck, I fail to see how this document of dubious origin can be strong circumstantial evidence of an infringing product in a batch of lovastatin. Dr. Cox was clearly unaware of AQA 94. Ms. Christofalos's explanation was simply that this was an index of documents. She did not prepare the list and was unsure of who could have prepared it. The list of documents was only made in 1999 — more than two years after batch CR0157 was manufactured. Unlike the AFI batch records, AQA 94 does not qualify as a business record. I do not accept it for the truth of its contents — in particular, that CR0157 was a mixture of infringing and non-infringing lovastatin. In light of the lack of connection between AQA 94 and the "genealogy" of CR0157, I give no weight to this document.

354     The only remaining argument of Merck (other than the DNA evidence) relates to some apparent anomalies surrounding the weight of the three preliminary batches that ultimately became part of CR0157. In making this argument, Merck refers to the batch records for three antecedent downstream batches: CR0151, CR0117 and CR0144. In each case, a document that forms part of the batch records shows a manual change to the originally-recorded weight of the material obtained. In each case the weight was increased. In Merck's submission, the augmentation is consistent with the addition of infringing lovastatin to the batch.

355     In response, the Defendants attempted to provide an explanation for these discrepancies through the evidence of Dr. Sailer and Ms. Christofalos.

356     Dr. Sailer clarified that the antecedent weights going into CR0157 cannot simply be added up, as it is a weight loss process.

> Q. Right. Well again, I don't have any errors to complain about there either. The only point I guess I'm conceding, and I want to make sure I understand that I have it right, is that we can't simply add together these three numbers?

> A. We can because the batch 151 was generated from batch CR0149 and those two errors which we see in the material coming to batch CR0149, which you said it's plus 11.2 plus 1.2 kilograms, generated certain quantity.

> Q. Right.

> A. As a starting material for the next batch 151. During the next batch when they tried to discharge it they have to correct it because they discharge extra 3.8 kilograms, which actually doesn't matter at all because if they didn't discharge it, we will dissolve it anyway and mix it with the 11.11 kilograms to generate 14.8 kilograms of product, which was starting material for the batch 157 of the final product.

> Q. All right.

357     Further, at a later date, extra lovastatin was found that had been captured in the filter, which was not initially observed by the operators. It was subsequently recorded. Dr. Sailer points out that the crossed out weights were the result of mistakes by inexperienced technicians.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

Q. All right. So let's go to tab three, page 82. Have you got that page?

A. Yes.

Q. And I'm seeing a table one crude Lovastatin obtained, do you see that?

A. Yes, I do.

Q. And I see the first listing is CR0117?

A. I can see it.

Q. But I see the net weight is 3.8 kilograms.

A. Yes.

Q. What explanation, if any, do you have for the Court for that?

A. I have similar explanation. This is first batch which was filtered on this equipment, NF 1, and this is what they found when actually they dismantled the screen, they dropped the bottom and they found there was still product there. I know it should be recorded here but as I said it was first batch. And yeah, we didn't have really experience. We were quite new crew there, so yeah, it's missing, missing note that additional 1.2 kilogram was found on the screen.

358    Finally, I observe that the corrections to the records were made some eight days after the original entry. When asked about the delay, Dr. Sailer was unable to provide a response.

359    While the explanations given by Dr. Sailer and Ms. Christofalos *could* provide a sufficient answer for the discrepancy, they are only that - an explanation or hypothesis. Their answers do not explain why there was an eight-day delay in changing the document or provide a fulsome explanation of how the process of making lovastatin would "lose weight".

360    In sum, I am left with unanswered questions on the make-up of batch CR0157. Since the batch was never tested by Apotex, I have no direct evidence that the batch was not *Aspergillus terreus* lovastatin. However, in the submission of Merck, I do have direct evidence that tablets from the CR0157 batch were made from infringing lovastatin. Merck makes this argument based on the DNA testing results of Dr. Davies. That evidence is considered in section VIII of these Reasons.

**VIII. Infringement — the DNA Evidence**

*A. Introduction*

361    Merck's case on the direct evidence of infringement rests on the DNA testing carried out on behalf of Dr. Julian Davies in his laboratory at the University of British Columbia (referred to as the Davies Lab). Merck relies on the Expert Report and testimony of Dr. Davies to assert that there is direct evidence that lovastatin manufactured by Blue Treasure and lovastatin contained in AFI batch CR0157 contained *Aspergillus terreus*, thereby infringing the '380 Patent.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

362     Dr. Davies received and tested three samples of lovastatin, consisting of: (a) three vials of white powder and one vial of brown powder, purporting to be samples from Blue Treasure provided through the services of Mr. Ted Kavowras; and (b) Apo-lovastatin tablets made from AFI batch CR0157.

363     Two sets of experiments were carried out at the Davies Lab on the same samples — the first in 2003 and another in 2007. In 2003, the experiments were performed by Karen Lu, a senior technician for the Davies Lab. In 2007, Grace Yim, a Ph.D candidate in the Davies Lab, assisted Karen Lu in performing the experiments.

364     In 2003, the experimental procedure involved a number of steps: DNA was extracted from the samples; specific primers diagnostic of the fungi region in DNA were chosen from the published literature; the primers were used to amplify the DNA in a nested polymerase chain reaction (nested PCR); the amplified DNA was subjected to gel electrophoresis; and then the gel was stained and analyzed under ultra-violet (UV) light for the presence of DNA. The UV light analysis highlighted the presence of bands which correlated to 130 base pairs (bp). These bands were determined to be a positive "hit" for *Aspergillus terreus* DNA. The bands were extracted from the gel and sent to a lab which specializes in DNA sequencing. The Davies Lab compared the results of the DNA sequencing to the sequence for *Aspergillus terreus* DNA that is located in the database at the National Institute for Biotechnology Information. This comparison confirmed that the DNA "hit" in the lovastatin samples was, in fact, *Aspergillus terreus* DNA.

365     In 2007, the Davies Lab repeated the experiments with a modified procedure and tested for the presence of both *Aspergillus terreus* and *Coniothyrium fuckelii* DNA. Again, a positive result was only found for *Aspergillus terreus*.

366     The combination of the experiments performed in 2003 and 2007 resulted in 13 positive findings of *Aspergillus terreus* DNA, and no positive findings of *Coniothyrium fuckelii* DNA. Based on these results, Dr. Davies opined that the fungus responsible for producing the lovastatin in the samples tested by the Davies Lab was *Aspergillus terreus*.

367     The first general and critical consideration is that the burden that falls on Merck is one of a balance of probabilities. That is, Merck succeeds if I am satisfied that it is more likely than not that the samples tested contained *Aspergillus terreus* DNA.

368     A number of issues arise with respect to the DNA evidence presented through Dr. Davies:

   1. Is there a nexus between the Blue Treasure samples tested and the Blue Treasure lovastatin that is alleged to infringe the '380 Patent?

   2. Should the results of the testing in the Davies Lab be rejected because they were not reproducible by Dr. Poinar?

   3. Does the failure of Dr. Davies to find *C. fuckelii* DNA in the tablets from batch CR0157 support Apotex's position that his DNA evidence is unreliable?

   4. Is "ancient DNA" the same as, or analogous to, the DNA that would be found in the samples tested by Dr. Davies?

   5. Should the results of the testing in the Davies Lab be rejected because the *Aspergillus terreus* DNA found in the Davies Lab was the result of contamination by exogenous DNA?

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

6. Should the weight to be given to Dr. Davies's Expert Report and his opinions be reduced due to:

    a) the inability to describe elements of the experiments reported in his Expert Report;

    b) the incomplete reporting of the experiments conducted in the Davies Lab;

    c) the failure to disclose the majority of tests relied on; or

    d) the failure to use negative extraction controls?

369     To this list, I would add the issue of the weight to be given to the opinions of the experts put forward by Apotex — Drs. Gilbert, Poinar and Taylor. Should the narrow expertise of these witnesses reflect on the weight to be given to, or the relevance of, their opinions?

### B. Nexus between the samples tested and the allegedly infringing lovastatin

370     An assessment of the DNA evidence in this case necessarily begins with the source of the samples that were tested in the Davies Lab. The presence of *Aspergillus terreus* in the samples only establishes infringement if the samples were obtained: (a) from lovastatin that was manufactured by Blue Treasure during the relevant time period; or, (b) from Apo-lovastatin tablets whose source was AFI batch CR0157.

371     I begin with the three vials of white powder and one vial of brown powder allegedly obtained from Blue Treasure. In 2000, a law firm representing Merck hired Mr. Ted Kavowras to obtain samples of Blue Treasure lovastatin. Mr. Kavowras has an investigative consulting firm based in China called Panoramic Consulting. Most of his investigations are done undercover. Mr. Kavowras has considerable experience obtaining evidence used in civil litigation.

372     Mr. Kavowras testified that, using the alias of "Mr. Garcia", he approached Blue Treasure to obtain lovastatin samples. In October 2000 and January 2001, he obtained samples from an employee of Blue Treasure. Samples, from two batches, were delivered in a sealed package with a corresponding certificate of analysis for each of the two samples - recorded as batch numbers 200012016 and 200012015. During his testimony at trial, Mr. Kavowras confidently identified the exhibits produced as the samples that he obtained from Blue Treasure. The samples were transported in carry-on luggage that accompanied Mr. Kavowras and were stored in his office in a secure location.

373     Merck presented Ms. Giuliani to speak to the delivery chain from the hands of Mr. Kavowras to Dr. Davies. The samples were delivered to Ms. Giuliani who stored them in the company vault, and arranged for their delivery to Dr. Davies. Dr. Davies testified that the samples he received were in "perfect" condition.

374     The evidence presented by Merck shows that the chain of evidence was intact and that the samples delivered to Dr. Davies were in an unaltered form.

375     Apotex does not take issue with the transmittal of the samples to Dr. Davies. However, the problem is that these

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

samples were taken from Blue Treasure between 2000 and 2001. There is no clear evidence that these samples were samples of the Blue Treasure lovastatin manufactured during the relevant time period from 1997 to 1999. Merck has failed to persuade me that the samples are representative of the lovastatin made, sold and distributed by Apotex Inc. Without the link of the samples taken by Mr. Kavowras to the lovastatin produced by Blue Treasure during the 1997 to 1999 period, I am unable to conclude that any DNA evidence from Dr. Davies can establish infringement.

376 The situation with respect to the Apo-lovastatin tablets is different. There is no dispute that the source of the tablets tested was AFI batch CR0157. Thus, if I conclude, on a balance of probabilities, that the CR0157 tablets tested in the Davies Lab contained the DNA of *Aspergillus terreus* that was not the result of contamination of the samples, infringement has been demonstrated.

377 Moreover, if I am wrong in my conclusion with respect to the lack of nexus in the Blue Treasure samples, the question before me would be whether the evidence establishes that those Blue Treasure samples contained the DNA of *Aspergillus terreus* that was not, on a balance of probabilities, the result of contamination. If it does, infringement has been demonstrated.

***C. Reproducibility of the testing in the Davies Lab***

378 Apotex argues that I should reject the testing done in the Davies Lab because Dr. Poinar was unable to reproduce his results.

379 In addition to being asked to provide his opinion on Dr. Davies's work, Dr. Poinar was retained by counsel for Apotex to design and carry out experiments with the same materials that were tested in the Davies Lab. Dr. Poinar tested 12 lovastatin samples made by AFI or Blue Treasure. For control purposes, Dr. Poinar's experiments included lovastatin samples that were known to have been produced with *Aspergillus terreus*. According to Apotex, Dr. Poinar used an extraction method that was essentially the same as Dr. Davies's protocol. Dr. Poinar concluded that: "both *A. terreus* and *C. fuckelii* DNA were absent in all samples tested". By way of apparent explanation, Dr. Poinar observed that (Poinar Expert Report, Exhibit 135, p.15 "conclusion"):

> The sample processing and/or extraction steps are too lossful to permit detection of trace amounts of DNA from the source fungus (neither *A. terreus* or *C.fuckelii* was detected in samples of known origin).

380 In other words, Dr. Poinar concluded that it is impossible to obtain detectable amounts of DNA from pharmaceutical fungal products using the experimental methods employed by Dr. Davies.

381 Apotex relies on the evidence of Dr. Poinar to draw the conclusion that any positive results observed by Dr. Davies were as a result of contamination, not endogenous DNA.

382 It appears that Dr. Poinar approached his experiments with the opinion that it is unlikely that DNA would survive (Poinar Expert Report, Exhibit 135, para. 62):

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

... a careful examination of the entire procedure for the fermentation, extraction, recrystalization and purification of lovastatin makes it unlikely that DNA would survive this procedure.

During his oral testimony, he restated this view:

So it is surprising, although certainly not impossible, that DNA would actually then survive that.

383     Given Dr. Poinar's initial starting bias, is there any doubt that his experiments would fail to find DNA? It appears to me that there is a real risk that Dr. Poinar brought a confirmational bias to his laboratory work. In other words, I question whether Dr. Poinar carried out the experiments to confirm his thesis that DNA would not be present, rather than with an open, independent mind.

384     Even putting aside my concern about Dr. Poinar's approach to the experiments, I have serious problems with his experimental methods and results.

385     The first concern relates to Dr. Poinar's experiences with the *Aspergillus terreus* assay. On this issue, Dr. Gilbert, accepted as an expert in the area of microbial genetics and microbiology, was of great assistance to the Court. During cross-examination, Dr. Gilbert was shown certain of the data from Dr. Poinar's experiments. In particular, he was shown two sets of qPCR data. Without knowing (as we do now) whether the information came from the *Coniothyrium fuckelii* assay or the *Aspergillus terreus* assay, he was asked to comment on various aspects of those data. The first series of slides consisted of data from the *Coniothyrium fuckelii* assay. Dr. Gilbert described the various melting curves as "very good-looking" and "pretty nice". With respect to the *Coniothyrium fuckelii* series of slides, he agreed that the data reflected an "experiment in which the PCR reactions [are] well behaved and as expected" and that the reaction was "running well". Dr. Gilbert acknowledged that the standard curve for the *Coniothyrium fuckelii* assay was typical of "a PCR reaction that is running well and predicatively as expected". The gel samples shown to Dr. Gilbert were described as "pretty much a textbook example".

386     The situation changed dramatically when Dr. Gilbert was shown the *Aspergillus terreus* data. For example, whereas the efficiency for one of the *Coniothyrium fuckelii* slides was described as 93.5%, the efficiency of a standard curve for an *Aspergillus terreus* assay was only 70%. Dr. Gilbert opined that the experimenter was "having problems with his quantification" and that "possibly", he was having problems with the primers, reactants or inhibition, problems that were not apparent in the *Coniothyrium fuckelii* assay.

387     Overall, Dr. Gilbert agreed that, even apart from quantification, the stochasticity, randomness and unexpected results were an indication that the *A. terreus* experiment did not run as well or as smoothly as the *Coniothyrium fuckelii* assay. He also acknowledged that the data supported this conclusion.

388     The necessary corollary of Dr. Gilbert's opinion is that Dr. Poinar's results are reliable regarding the absence of *C. fuckelii* but that they cannot be used as a basis to rule out the presence of *A. terreus*.

389     The next problem with Dr. Poinar's work is that he did not employ the same methods that were carried out in the Davies Lab. Using a single round of PCR, Dr. Poinar was unable to get any hits with the *A. terreus* primers at the 0.1 copy

level. However, he was able to get a hit using Dr. Davies's nested PCR reaction. Despite the possibility that it would confirm Dr. Davies's results and despite success at the 0.1 copy level with Dr. Davies's protocol, Dr. Poinar did not attempt to reproduce or run a single sample through Dr. Davies's entire nested PCR protocol. Finally, Dr. Poinar agreed with the following premise put to him in cross-examination:

> Q. You can't, based on your experiments, rule out the possibility that if you had done his experiment, reproduced his experiment, you might have found terreus?
>
> A. No.

390 Based on the evidence before me, I cannot conclude that Dr. Davies's work is not reproducible.

***D. Failure of Dr. Davies to find C. fuckelii DNA in the tablets from batch CR0157***

391 As noted above, Dr. Davies found *A. terreus* DNA in the tablets from AFI batch CR0157 but did not find any *C. fuckelii* DNA in the tablets. On its face, this appears to be inconsistent with Merck's theory that batch CR0157 was likely a mix of *Coniothyrium fuckelii* lovastatin and *Aspergillus terreus* lovastatin. In final argument, Apotex stated that this alleged inconsistency "is fundamentally fatal to any reliance upon the Davies [Lab] testing", and described its position as follows:

> [Dr. Davies] did not find CF when he should have, but he found AT when he should not have. The AT could only, in that scenario, have been exogenous AT.
>
> . . .
>
> The other alternative on CR0157 is that it is a mixture. Some AT lovastatin was thrown into the mix, but much of it, most of it, I believe, even on that scenario, was CF lovastatin.
>
> So on that scenario, it contains both CF and AT lovastatin. Dr. Davies should have detected AT and he should have detected CF. He still didn't detect CF under that scenario, which calls into question his testing and calls into question whether the DNA survives, and indicates that the AT that he did find, again, must be exogenous DNA, because he didn't find the CF.

392 The position of Apotex is based on what I believe is an incorrect assumption. A failure to find a particular micro-organism through DNA testing is not determinative that the micro-organism is not present. On the other hand, assuming appropriate laboratory procedures and no contamination, a finding of a specific micro-organism is strong evidence that the micro-organism is present in the sample. This was acknowledged by Dr. Poinar during his cross-examination:

> Q.... If you want to say to someone, Look, in my opinion, DNA is absent from this sample, the actual — the scientifically correct proposition is, always, DNA is absent from this sample to a state of detection limit; correct?
>
> A. That's correct.
>
> Q. But the flip side of the coin for the positive finding, it is not the same in science. In science you can say, I found terreus in this sample. I don't know how much was there, but I amplified it?

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

A. Hmm hmm.

Q. So to that extent, the positive finding is different from what you need to prove the negative?

A. As long as all the proper precautions are put into place. So had all of the extraction controls and PCR controls been there, then the possibility would exist; that's correct.

393      For example, we know that Dr. Poinar did not find any *A. terreus* DNA in any of the samples that he tested. Yet, we also know that there were lovastatin samples provided to Dr. Poinar — in addition to the samples in issue — that clearly contained *Aspergillus terreus* DNA. Nevertheless, Dr. Poinar was unable to confirm the presence of this micro-organism. As discussed above, I have rejected Dr. Poinar's presumption that DNA cannot be found in such samples. It follows that his conclusion that *Aspergillus terreus* DNA was not present in the samples is incorrect; *Aspergillus terreus* DNA was present and Dr. Poinar simply did not use adequate experimental methods to find the DNA.

394      Applying this analysis to Dr. Davies, I conclude that the failure of Dr. Davies to find *Coniothyrium fuckelii*, even if it existed in batch CR0157, does not mean his finding with respect to *Aspergillus terreus* cannot be relied on. It certainly does not follow, as asserted by Apotex, that the DNA found by Dr. Davies in AFI batch CR0157 must be exogenous.

395      A large caveat must be introduced at this point. I have rejected Apotex's reliance on either Dr. Poinar's inability to find *Coniothyrium fuckelii* or *Aspergillus terreus* or Dr. Davies's failure to find *Coniothyrium fuckelii* DNA in the CR0157 tablets. However, that does not necessarily mean that I will accept Dr. Davies's conclusions. As stated by Dr. Poinar, "all the proper precautions" must be in place before one can rely on the results of the DNA testing. That brings me to the key issue with respect to the DNA evidence relied on by Merck: Is the DNA evidence reliable? Stated differently, were "proper precautions" used in the Davies Lab? Any discussion of this question must begin with the opinions of the experts put forward by the Defendants in response to Dr. Davies's DNA evidence.

*E. DNA evidence and the Apotex Experts*

396      Apotex's response to the DNA evidence rests on the criticisms of Dr. Davies's work provided by three experts — Drs. Gilbert, Poinar and Taylor.

397      Dr. Taylor was qualified to provide opinions to the Court as an expert mycologist, and microbiologist with particular expertise in fungal DNA evolution and fungal DNA PCR amplifications. Dr. Taylor opined on Dr. Davies's Expert Report and DNA testing results, particularly with respect to the possibility of contamination in the Davies Lab.

398      Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA. His expert testimony and report deal with the issue of infringement. He explains the problems with the use of ancient or degraded DNA (referred to as ancient DNA). Dr. Gilbert was asked to examine Dr. Davies's laboratory notebooks, and comment on whether the conclusions generated were justified by the methods used.

399      Dr. Poinar was qualified as an expert in the extraction and characterization of low copy and degraded DNA. Dr. Poinar reviewed the experiments performed by the Davies Lab, and (discussed above) attempted to replicate the results

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

through testing of his own. Dr. Poinar was asked to answer two general questions: first, whether or not the experimental design of Dr. Davies matched the rigour necessary for an ancient DNA or low template sample project; second, whether Dr. Davies's data support his hypothesis that *Aspergillus terreus* DNA was found in samples of lovastatin from the Defendants.

400    As a general rule of evidence, witnesses may not give opinion evidence, but may only testify as to the matters within their knowledge, observation and experience. An exception to this rule applies to expert witnesses. Experts are necessary to assist the Court in scientific matters that would not normally be within the knowledge of the judge. However, before accepting the opinion evidence, the trier of fact must determine the admissibility of the evidence in accordance with four criteria: relevance, necessity in assisting the trier of fact, the absence of an exclusionary rule and a properly qualified expert (*R. v. Mohan*, [1994] 2 S.C.R. 9, 114 D.L.R. (4th) 419 (S.C.C.)).

401    In this case, Drs. Taylor, Gilbert and Poinar appear to satisfy three of the four criteria. However, given the narrowness of their experience and the focus of their opinions on ancient DNA, I seriously question the relevance of their opinions. This is true for all three experts, although more so with respect to Dr. Poinar and Dr. Gilbert. While the level of my concern does not lead me to conclude that all of their opinion evidence is inadmissible, it does reflect on the weight that should be given to their opinions. The key problem exists with the characterization of the DNA tested by Dr. Davies as ancient DNA.

*(1) What is Ancient DNA?*

402    The first question is: what is ancient DNA? On the record before me, there is no clear definition of this term. However, each of the Defendants' experts provided insights on how to understand what ancient DNA is:

• Dr. Poinar stated that (Poinar Expert Report, Exhibit 135, para. 2):

   The study of ancient DNA is the retrieval and meticulous characterization of DNA sequences from samples which are assumed to be heavily degraded, in low copy numbers and typically stemming from forensic, fossil, sub-fossil, archeological, and palenontological remains.

• Dr. Gilbert stated that (Gilbert Expert Report, Exhibit 130, para. 8):

   I have been involved in the analysis of a range of materials that contain degraded DNA, and/or low copy number modern DNA. These include ancient bone and tooth material, often dating back tens of thousands of years in age, hair shaft and root, nail, horn, skin (both tanned into leather and dried), mummified soft tissues, feather, eggshell, ancient plant seeds and leaves, formalin and Bouin's solution fixed soft tissues, historic blood samples, feces, urine, soil, ice and honey.

• Dr. Taylor stated that (Taylor Expert Report, Exhibit 124, para. 25):

   This scarcity of DNA in the lovastatin samples makes analysis of DNA from these samples akin to analysis of DNA from archeological samples, the field of research referred to above as "ancient DNA". A key complication of ancient DNA research is the high likelihood of contamination of the sample with DNA from modern sources of by DNA that has been amplified by PCR from modern DNA, unless the necessary precautions are taken.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

403    There is a clear gap in these opinions — they fail to provide a comprehensive analysis of how DNA was degraded in the process of making a pharmaceutical product, or even how to compare the DNA in ancient DNA to DNA derived from a pharmaceutical product. Without this evidence, I am unable to compare the evidence presented on ancient DNA to evidence presented by Dr. Davies.

404    Dr. Taylor made a sweeping statement in his report that "the scarcity of DNA ... is akin to archaeological samples". In the absence of a comprehensive analysis, this is neither a convincing statement nor a scientific one. What is the basis for his knowledge that the DNA in lovastatin is scarce? Where is the evidence that shows us that these two types of DNA can be considered analogous? Without something further, I do not see how it can be logical to compare the level of DNA available from ancient bone and tooth material to DNA derived from a pharmaceutical product.

*(2) Is DNA derived from a pharmaceutical product degraded or fragmented?*

405    The next step is to consider the condition or state of DNA derived from a pharmaceutical product. During the trial, there was some controversy over the semantics of whether the DNA derived from the lovastatin samples, and tested by Dr. Davies, was "fragmented" or "degraded". Apotex argues that Dr. Davies specifically described the DNA that was the subject of his experiments as "degraded DNA". Although this is correct, Dr. Davies provided a sufficient explanation of what was meant by the use of this term in his Expert Report.

406    During his oral testimony, Dr. Davies described the process whereby the fungal DNA in lovastatin is fragmented during industrial processing. He explained that DNA is released by the cells which expose the DNA to shearing forces in the fermentation machine. This was not contested. The issue was whether these shearing forces would cause "fragmentation" or "degradation". Dr. Davies was asked about this during cross-examination:

> Q. You just told me a few moments ago that there would be fragments or, the word that you didn't like to use, degradation; would I be right that you would agree with this, that although some of the DNA survives in the pharmaceutical process involved here, there, unquestionably, would be some DNA that would be degraded during the process?
>
> A. In the case of a fermentation process, I think I mentioned this before, during fermentation and particularly at the end, cells begin to LYSE, they break and they release DNA. That DNA is going to be sheared; it's going to be exposed to shearing forces of the big stirrers that are used in the fermentation. And shearing will break DNA.

For one thing, Aspergillus DNA often has a lot of protein bound to it which might stabilize it, but we planned our experiments with the expectation that the DNA was going to be sheared. It would never shear down to almost nothing.

407    In his report, Dr. Davies uses the word "degraded" when referring to the DNA which was the subject of his experiments. However, during oral testimony, Dr. Davies clarified that he equates the word "degraded" to "fragmented" — which is the word he should have used in his Expert Report. Dr. Davies explained that fragmentation is a normal process that occurs to all DNA which is outside a cell. He did not intentionally refer to "degradation" as synonymous with the process that results in ancient DNA.

> Q. You talk about the difficulties your lab experienced, you say: "I underscored the difficulty in obtaining DNA from pharmaceutical samples." And then you should read it, but go to the sentence that begins, "although some

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

DNA survives the process."

A. Yes.

Q. It says:

> "There is unquestionably some DNA that is degraded during the process."Do you accept that as correct, that's your view?

A. I do.

THE COURT: Is that because you equate the word degraded with fragmented?

THE WITNESS: Yes. This is different.

THE COURT: Let me get here to paragraph 63. When you use the word "degraded" in paragraph 63, do you mean fragmented?

THE WITNESS: I mean a very general process.

THE COURT: Is there something beside fragmentation that you mean by the word degraded in that paragraph?

THE WITNESS: Yes, Your Honour. There are enzymes, chemicals, in the reaction in the fermenter that could chemically modify the DNA.

408    Dr. Davies goes on to opine that there is no clear evidence that the *A. terreus* DNA is "degraded" (in terms of the ancient DNA reference) during the fermentation process.

> Q. Going back to my question, do you not agree with this, that a though some DNA survives the fermentation, purification process, that there, unquestionably, would be some DNA that is degraded during the process?
>
> A. If we buy degradation, we're talking about chemical reactions, and I would say yes, it's possible.
>
> Q. Not unquestionable?
>
> A. I don't know, you see. Nobody's ever looked. You've got a fermenter with things DNA has never seen and you're stirring it up.I don't know anybody is going to look to see what the DNA would be like and how it was broken. We didn't look at the fermenter. We only looked at the powder.

409    In my view, Dr. Davies's explanation is clear as to why DNA derived from a pharmaceutical process could be considered to be "fragmented" but not "degraded".

410    So, what does this mean to me? Apotex's experts assume that the DNA tested by the Davies Lab was "degraded" in the same manner that ancient DNA is degraded. I do not agree. The only relevant evidence presented before me on this issue was that of Dr. Davies. I conclude that the DNA tested by Dr. Daves is considered to be "fragmented" but not "degraded".

*(3) Can one compare how DNA derived from a pharmaceutical product is fragmented to how DNA from "ancient DNA" is degraded?*

WestlawNext· CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

411    After considering the evidence on what is ancient DNA, I will now consider whether DNA derived from a pharmaceutical product that is "fragmented" can accurately be referred to as ancient DNA. I conclude that it cannot.

412    In my view, it does not logically flow to compare DNA from "ancient bone and tooth material, often dating back tens of thousands of years" to DNA from *Aspergillus terreus* which has been processed into a pharmaceutical product. This is true especially in light of understanding that the subject DNA is not "degraded" in the same manner.

413    Without specific expert evidence on this, it is not logical to compare the two. The Defendants' experts provide no relevant evidence on this point. However, Dr. Davies explicitly states that one cannot compare ancient DNA to DNA derived by a pharmaceutical process.

Q. Tell me what you understand the words "ancient DNA" to mean to at least those that use the expression?"

A. As I understand it, it is DNA being isolated from remnants of earlier civilization, animals, from earlier stages, things of that type, and looking for DNA from those samples and trying to identify them. So the sequencing of some old human genomes recently. I don't know if that's called ancient DNA or not.

Q. In your description of it, would I be correct that the DNA one has in the context that you've given me for in ancient DNA, is DNA that is either low copy number DNA or degraded DNA?

A. Depends how you define degraded.

Q. How would you define degraded?

A. I think there are two kinds of degradation.

Q. What are they?

A. One is that the DNA can be broken to give very low molecular weight fragments which makes it more difficult to do a PCR.

. . . . .

Q. On the last sentence, the process of cleaving that you talked about in that sentence, that causes, according to your sentence, further degradation, not a new but further suggestion that the earlier process that you described, the purification steps earlier, causes degradation, and that leads to further degradation through the cleavage from the enzymes, correct?

A. That is correct. What I should have said is that <u>the DNA is really modified and broken up in a horrible way, and there would be very little intact chromosomal DNA but there would be fragments, and some of those would not work in PCR because they'd be modified further. That's the difference between this and ancient DNA</u>, and things like that.

Q. I don't know what you mean by that. What do you mean by ancient DNA?

A. It's DNA from million year old remains and things of this type.

Q. You're suggesting that that DNA is not fragmented and not degraded and not broken up?

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

A. It's everything. It's even worse. So the techniques used for ancient DNA are really very specific, and it's not the same as this.

Q. Because it's even more extreme and ancient DNA versus what you encountered here?

A. Yes, cosmic rays have been acting on it for a long time. But as I think I mentioned right at the beginning, one of the biggest problems with what they call ancient DNA is the question of desiccation, and desiccation causes quite severe damage to DNA.

[Emphasis added.]

414    Dr. Davies provides his expert opinion that DNA that has been hit with cosmic rays for thousands of years — DNA that scientists did not think even existed until a few short years ago — cannot be compared with DNA that has been processed into a pharmaceutical product. I agree with him.

*(4) Are the opinions of the Defendants' experts relevant to fragmented DNA from pharmaceutical products?*

415    Having concluded that ancient DNA is not comparable to DNA derived from a pharmaceutical product, I turn to a consideration of whether the opinions presented by the Defendants' experts extend beyond the field of ancient DNA. In other words, can the opinions of any of the experts assist the Court in gaining a different understanding of the DNA testing from fungal pharmaceutical compounds than what was provided by Dr. Davies?

416    In my view, none of the experts has provided me with the necessary link between ancient DNA and the DNA in issue. Apotex has failed to satisfy me that the evidence of these experts is relevant to the issues before me.

417    Dr. Waldo Taylor was the only expert (other than Dr. Davies) whose expertise extended beyond the field of ancient DNA. During his examination-in-chief, he stated the following:

Q. I just want to ask you about the expression "ancient DNA". Can you describe what you understand that to mean?

A. Sure. As I mentioned, when the PCR reaction became available it was possible to examine DNA and biological specimens, or really any specimen, where DNA was wanting, where it was scarce. So that field has grown and it encompasses people who study ancient DNA, who study DNA that survives in the fossil specimens, things like Neanderthal bones or organisms in amber. It includes forensic studies where there's a little amount of DNA associated with some social interaction that you'd like to study. It includes the study that we're concerned with today, trying to identify the organism that produced a pharmaceutical compound.

[Emphasis added.]

418    However, during his cross-examination Dr. Taylor acknowledged that he was not fully aware of "the whole story" of how the lovastatin samples tested in the Davies Lab were treated or prepared.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

419     Dr. Taylor's opinions are seriously undermined by his admission that he lacks understanding of how the relevant pharmaceutical compounds have been prepared or treated. It is inadequate for an expert to explicitly state that the subject DNA is comparable to ancient DNA when he does not know the scientific basis for this comparison.

420     Neither Dr. Gilbert nor Dr. Poinar offered their opinions on how, if at all, fragmented DNA from a pharmaceutical compound could be treated as ancient DNA.

421     According to Dr. Gilbert, there are millions of scientists in the world who have access to, use or rely upon PCR data; yet, there were only a "handful of people on the earth" who are qualified to undertake the kind of ancient DNA analysis Apotex promotes. It would have been more helpful to the Court (and relevant to the issues of this case) if Apotex had presented DNA experts who operated outside this "handful of people on the earth".

422     In sum, I have difficulty with the opinions of the Apotex experts. Their opinions are based on an assumption that Dr. Davies's work and opinion could be evaluated against the same standards, protocols and norms as would be used by the "handful of people on the earth" with an expertise in ancient DNA. I am not satisfied that this assumption is correct. This problem informs my evaluation of the criticisms levelled at Dr. Davies's work. The Apotex experts are providing their opinions through a very narrow prism that is only marginally relevant — at best — to the issues before me.

### F. Contamination

423     As we know, Dr. Davies had 13 hits for *Aspergillus terreus* DNA from three different samples. In their arguments, the Defendants raise many, many problems with Dr. Davies's opinion, his testimony at the trial and the procedures and results from the Davies Lab. I have considered all of their concerns. The most serious allegation is the risk that the *Aspergillus terreus* DNA found in the samples tested was the result of contamination by exogenous *Aspergillus terreus*. In other words, the Defendants submit that the risk of contamination in the Davies Lab was so high that I cannot accept the DNA testing evidence of Dr. Davies as reliable.

424     As all of the experts would agree, contamination is always a serious risk in DNA testing. I acknowledge the risk. The question for this Court is whether the risk of contamination makes it more likely than not that Dr. Davies's *Aspergillus terreus* DNA findings are false.

### (1) Dr. Davies

425     Dr. Davies was clearly aware of the risk of contamination. Dr. Davies addressed the issue of laboratory contamination on several occasions during his testimony and in his Expert Report. Dr. Davies stated (Davies Expert Report, Exhibit 55, para. 77):

> I do not consider contamination to be a likely explanation to account for the presence of *Aspergillus terreus*. For example, if our laboratory was contaminated, I would have expected to see *Aspergillus terreus* amplicons in the negative controls. However, this was not the case.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    83

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

426    Dr. Davies cautioned that there is always a possibility of a contamination while carrying out a PCR reaction with DNA. However, during his oral testimony, he insisted that, "[the Davies Lab] took every possibility to avoid contamination. We're not forensic scientists, but we can work clean."

427    Dr. Davies likened the scenario of contamination in the subject experiments to "the chance that lightening would hit you." He explained that his two investigators, Grace Yim and Karen Lu, were extremely careful workers and precautions were taken to prevent contamination, including:

  • working in a sterilized area to kill bacteria and fungi that could be a source of contamination;

  • autoclaving the micro-pipets and tips to sterilize and prevent cross-experiment contamination;

  • operating in a UV-radiated, stainless steel biosafety hood to purify the incoming air and allow for easy cleaning of the hood; and

  • utilizing experiments with zero DNA controls, and following the protocol that the experiment would be repeated if contamination was found in the zero DNA control.

428    Dr. Davies was convinced that contamination was not responsible for the results of these experiments. He opined that the fact that the Davies Lab never found *Coniothyrium fuckelii* or any other fugus of the genus *Aspergillus* (other than *terreus*) as a contaminant, was evidence to support his assertion that contamination was not responsible. Dr. Davies observed that it was hard to believe that, if contamination had been present in the experiments, it would only be found in the form of *Aspergillus terreus*.

429    Lastly, as Dr. Davies most poignantly stated, "DNA doesn't fly" or "float around in the air".

430    Against the backdrop of Dr. Davies's expert testimony, I turn to the evidence of the experts produced by Apotex. In general, as discussed above, the Apotex experts brought a very narrow perspective to the question of contamination. All three imposed incredibly high standards on the work of DNA laboratories and began with the assumption that Dr. Davies was dealing with DNA that was akin to ancient DNA that might be found in the 1000-year old remains of extinct animals. Quite simply, these experts imposed an overall standard on the DNA testing performed by the Davies Lab that is not reasonable in the circumstances. Two experts — Dr. Taylor and Dr. Gilbert — were particularly stubborn in their opinions on contamination in the Davies Lab.

*(2) Dr. Taylor*

431    Dr. Taylor equated the analysis of the tested lovastatin to an "analysis of DNA from archaeological samples" (Taylor Expert Report, Exhibit 124, para. 25). For the reasons expressed earlier, I am of the view that this assumption is flawed, or unsupported by the record.

432    Directly following from this assumption, Dr. Taylor expressed the view that a "substantial risk of contamination" could come from two sources: (a) cultures of *Aspergillus terreus* which were used by Merck to produce lovastatin; or, (b) *Aspergillus terreus* DNA that was PCR amplified in the Davies Lab.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

433     Dr. Taylor concluded that (Taylor Expert Report, Exhibit 124, para. 28):

> If Dr. Davies did in fact detect *Aspergillus terreus* DNA, then his own laboratory practices very likely caused his samples to become contaminated with such DNA from *Aspergillus terreus* cultures or from DNA that been PCR amplified from *Aspergillus terreus* DNA.

434     During cross-examination, Dr. Taylor stated that the most likely source of contamination was *Aspergillus terreus* DNA from PCR amplifications in the Davies Lab. This theory was discussed with Dr. Gilbert during cross-examination. Dr. Gilbert explained why the amplified material posed more of a risk; it is because the "PCR part" would "be more concentrated" with DNA. However, as the evidence shows, the strains of both *Aspergillus terreus* and *Coniothyrium fuckelii* were present in the Davies Lab at the relevant time. Dr. Gilbert also confirmed that the risk of contamination from the control DNA from *Aspergillus terreus* or *Coniothyrium fuckelii* was equivalent, even though the DNA concentration would differ. Yet, Dr. Davies found *Aspergillus terreus* DNA in 13 experiments but never documented a single instance of *Coniothyrium fuckelii*. How could it be that amplified *Aspergillus terreus* DNA would cause contamination but not the *Coniothyrium fuckelii* DNA? Dr. Gilbert repeatedly refused to accept the possibility that zero findings of *Coniothyrium fuckelii* DNA should reassure the experimenter that contamination by *Aspergillus terreus* was not probable. I find his denials to be unhelpful and, frankly, illogical. Thus, Merck submits, Dr. Taylor's theory does not withstand examination. I agree. Zero findings of *Coniothyrium fuckelii* demonstrates the weakness in the theory that contamination would, more likely than not, occur from *Aspergillus terreus* DNA that was amplified by PCR in the Davies Lab.

435     Another theory of contamination presented by Dr. Taylor was the possibility of airborne spores. I do not accept this as likely in the Davies Lab. The use of a biosafety hood with purified air would dramatically reduce the possibility of such contamination. Further, Dr. Taylor acknowledged that he had never studied the ability to amplify from a single spore of *Aspergillus terreus* and admitted that it was speculative to conclude that a single spore would amplify by PCR.

436     A final concern of Dr. Taylor relates to his reading of the various "gels" that recorded the experimental results. Dr. Taylor noted a "milestone" on the gels. Dr. Taylor observed the following (Taylor Expert Report, Exhibit 124, para. 33):

> ... Dr. Davies' laboratory records from 2007 confirm that DNA was amplified from the lovastatin samples using coniothyrium fuckelii specific primers, thus indicating the presence of coniothyrium fuckelii DNA in the sample. However, Dr. Davies did not mention this in his affidavit. Accordingly, Dr. Davies' failure to acknowledge coniothyrium fuckelii as the potential source organism, based on his erroneous assertion that no coniothyrium fuckelii DNA was found, was not warranted.

437     In other words, Dr. Taylor was of the opinion that Dr. Davies had positive findings of *Coniothyrium fuckelii* that were overlooked or never reported. I agree that an unreported instance of *Coniothyrium fuckelii* would be a critical contention with respect to the possibility of contamination and also with respect to Dr. Davies's conclusion that there was no *Coniothyrium fuckelii* DNA found in any of the samples tested. However, examination of Dr. Taylor's statement and observations by Dr. Gilbert and Dr. Poinar diminish the significance of this observation.

438     During his cross-examination, Dr. Taylor acknowledged that his conclusion that this was *Coniothyrium fuckelii* was speculative; he agreed that the first amplification of DNA using a *C. fuckelii* primer may have been *Coniothyrium fuckelii*

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

DNA or "may be OJ Simpson's DNA". Dr. Poinar agreed that, based on the data, one could not conclude that the band observed by Dr. Taylor was a band of *Coniothyrium fuckelii* DNA. When Dr. Gilbert was asked about the existence of any bands that were the correct size for *Coniothyrium fuckelii* using the *Coniothyrium fuckelii* specific primers, Dr. Gilbert responded that there were "zero" such bands.

439     Viewed as a whole, I do not find that Dr. Taylor's opinions regarding contamination are supported by the record.

*(3) Dr. Gilbert*

440     Dr. Gilbert provided his expert opinion that "contamination presents a serious challenge to the data generated by Dr. Davies's team". I do not believe that anyone would disagree with this statement. However, Dr. Gilbert continues to express his view that, "as a result, his results cannot be viewed as reliable."

441     The first problem that I have with Dr. Gilbert's opinion is that it is directed to his field of specialization — the fields of ancient DNA and forensic genetics. In his Expert Report, Dr. Gilbert refers to samples that "were millions of years old". His entire opinion is premised on the assumption — unexplained, in my view — that Dr. Davies was working with degraded DNA that was comparable to ancient DNA. As discussed above, I am not persuaded that this is a meaningful comparison.

442     Moreover, the contamination theory posited by Dr. Gilbert (and Drs. Taylor and Poinar) is that exogenous *Aspergillus terreus* resulted in the positive findings by the Davies Lab. Thus, unless the experts can identify a credible source of the exogenous *Aspergillus terreus* DNA, the theory does not stand up to scrutiny. Upon cross-examination, Dr. Gilbert acknowledged that there was no evidence that contaminants, if they existed in the Davies Lab, were *Aspergillus terreus*.

443     Further, how has Dr. Gilbert measured or defined the term "reliable"? Can the possibility of contamination explain away every one of the 13 "hits"? Does the risk of contamination make it more likely than not that *Aspergillus terreus* does not exist in the samples? Or, is contamination merely a possibly?

444     In sum, I am not persuaded that the risk of contamination in the Davies Lab rises to the level where, on a balance of probabilities, I cannot rely on the results obtained and opined on by Dr. Davies.

**G. Other criticisms of Dr. Davies's opinion**

445     The Defendants levelled a number of other criticisms at the work of Dr. Davies. Specifically, the Defendants submit that the following principles must be followed to determine whether the Court should ignore the expert evidence of Dr. Davies:

• Where an expert's conclusion is not appropriately explained and supported, it may properly be given no weight by the trier of fact (*Backman v. R.* (1999), 178 D.L.R. (4th) 126 (Fed. C.A.) at para. 34, (1999), 246 N.R. 309 (Fed. C.A.)).

• Likewise, for a Court to accept an expert's opinion, the trier of fact must know the facts and/or assumptions upon

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

which the expert has based his or her opinion (*Johnson & Johnson v. William H. Rorer (Canada) Ltd.* (1980), 48 C.P.R. (2d) 58 (Fed. T.D.) at para. 7, [1980] F.C.J. No. 200 (Fed. T.D.)).

• Where those facts turn out to be inaccurate or incomplete, the weight given to an expert's opinion may be significantly reduced (*Misik v. Minister of National Revenue*, [1993] 1 C.T.C. 2360 (T.C.C.) at p. 2373, [1993] T.C.J. No. 13 (T.C.C.)).

446     In support of their position that the opinion of Dr. Davies should be rejected, the Defendants point to "spurious bands" seen on some of the "gels". These bands, in the view of the Defendants, demonstrate that Dr. Davies's opinion was inaccurate.

447     In principle, I agree with the Defendant's argument that an expert should: (1) appropriately explain their conclusions; (2) inform the Court of the underlying facts and/or assumptions; and (3) provide accurate and complete information. If unable to do so, it should be expected that the weight of their opinion will be significantly reduced.

448     However, I believe that the Defendants are misapplying these principles to the opinions given by Dr. Davies.

*(1) Lack of knowledge*

449     I agree with the Defendants that there were aspects of the experiments performed in the Davies Lab that Dr. Davies was unable to describe to the Court. However, the critical question is whether his knowledge of the technical aspects of the experiments was fundamental to his expert opinion. I do not think it was.

450     If one accepts that someone is an expert in their field (as the Defendants did in the case of Dr. Davies), the parties must provide the Court with a clear understanding of what their expertise is. A problem arose in this case because of a misunderstanding between what constitutes being an expert in the science of microbiology and an expert in performing the technical experiments of microbiology. There obviously was confusion of what was expected of Dr. Davies. Dr. Davies obtained his Ph.D in 1956, and reached professor emeritus status in 1997. He is unquestionably an expert in his field. One does not rise to that level at a Canadian university without having outstanding accomplishments in an area of expertise. However, it is not surprising that someone like Dr. Davies, who is in charge of a laboratory with many students and technicians, is not personally performing the experiments and may not be knowledgeable on all of the technical aspects of the experimental procedure. Obviously (and somewhat critically of Dr. Davies), I am of the view that Dr. Davies should have prepared better for his testimony. However, unless the lack of knowledge goes the heart and substance of Dr. Davies's opinion, I would not be persuaded to reject that opinion.

451     The Defendants agreed, after reviewing his Expert Report, and before his oral testimony, that Dr. Davies was an expert in microbiology and microbial genetics. That expertise includes the use of DNA techniques for studying microbes. That expertise — and not the minutia of laboratory procedures — was the focus of his opinion. I do not agree with the Defendants that Dr. Davies's lack of knowledge of some technical aspects of the experiments should necessarily lead this Court to the conclusion that the evidence is unreliable.

*(2) Incomplete Report & Lack of Disclosure*

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

452      The Defendants argue that Dr. Davies was incorrect and incomplete in his report of, and conclusions as to, the majority of the experiments disclosed. I agree that Dr. Davies's notebooks and conclusions were incomplete. However, the determinative question is whether the missing information is fundamental to his expert opinion. I do not believe it was.

453      The Defendants refer to the following incidents of incompleteness:

• In 2003, experiments 13, 19 and 20 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 20 or 85% of all experiments were not disclosed.

• In Karen Lu's 2007 work, experiments 7, 8, 18, 20, 22, 23 and 24 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 24 or approximately 71% of all experiments were not disclosed.

• In Grace Yim's 2007 work, experiments 32, 33, 35 and 36 are disclosed. The inference is that at least 8 other experiments are not disclosed. Thus, 8 of 12 or approximately 67% of all experiments were not disclosed.

• In total, 42 or 54 experiments, or 78% of all experiments were not disclosed.

454      The Defendants submit that Dr. Davies provided an incomplete picture of the experiments performed by only providing selected pages for litigation. The Defendants allege that Dr. Davies erred by providing only the pages that "would bear on the conclusion", and not all of the pages that were relevant. The Defendants further argue that Dr. Davies provided an erroneous explanation for withholding the notebook pages because "the non-disclosed experiments did not bear on the conclusion 'in any significant way'". I do not agree with the Defendants that this was an erroneous explanation.

455      During cross-examination, Dr. Davies testified that the reason he did not disclose all of the pages relating to all of the experiments performed in his lab was that this was not "routine" procedure for a scientist. When preparing evidence to support a publication, it is "routine" for a scientist to provide only the pages that support the conclusion that the scientist has opined. There was no malice or bad faith in Dr. Davies's lack of disclosure.

        Q. You deprived a reader of coming to a different conclusion about the sufficiency or the relevance of the experiments included and not included, correct?

        A. No, I don't think so. May I make the point that when one publishes a scientific paper, you have to publish a logical sequence of events, and you publish the results, and you then interpret the results based on the experiments? This was not a scientific paper. Things were much simpler here than that. I believe we gave you a continuum. We selected some experiments. Some of them were experiments that didn't work that well, but you got an idea as to what was going on. I don't see anything wrong with that.

456      During cross-examination, Dr. Davies was presented with a chart, prepared by counsel, representing the missing information. Throughout the cross-examination, I was unable to observe any missing notes or details that would have had a material impact on the overall opinion of Dr. Davies. When asked about the chart during cross-examination, Dr. Poinar stated that all documents need to be put forward. However, he also acknowledged that, in this case, the data depicted in the chart meant little, if anything, to the conclusions being drawn by Dr. Davies.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009
2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

457      I do not agree with the Defendants that the decision of Dr. Davies to exclude certain pages *must* result in a conclusion that his evidence is unreliable. What is important is that the opinions of the expert not be contradicted or otherwise weakened by any missing information. By not putting forward all of the notebook pages, Dr. Davies ran the risk of not being able to substantiate his opinions. However, in this case, as admitted by Dr. Poinar, the missing information is not relevant to the overall conclusion. Accordingly, while I would have preferred that Dr. Davies had provided a more complete picture of the experiments performed, I do not consider that his opinion to be fatally flawed by his failure to do so.

*(3) Unexpected results*

458      The Defendant's argue that Dr. Davies obtained unexpected results and therefore his work cannot be relied upon. At the heart of their argument is the presence of "spurious bands" that only became visible upon dramatic enlargement of a photograph of the gel that was stained and analyzed under UV light for the presence of the PCR amplified DNA

459      The Defendants argue that the experiments of Dr. Davies were flawed because, upon investigation of the laboratory notebooks, extra bands could be seen on the gel pictures. The Plaintiffs, on the other hand, argue that any evidence involving "photoshopped" gels should not be considered or given any weight by this Court. I agree with the Plaintiffs on this point.

460      When presented with the greatly enlarged photographs, Dr. Davies commented that the gel photographs were manipulated by the Defendants. Dr. Davies stated:

> Your photo shopping is up to some amazing magnification ... people do this to public papers sometimes and I think it's unrealistic. It's not what you see on the actual gel. This is not the actual gel. This is a doctored gel in my opinion ... You can find many bands on PCR gels that you would not see by eye. You would not see by other detections if you photo shopped them up in some way. I am just very concerned about this, and I find it difficult to draw what I would consider to be sound conclusions

461      I agree with Dr. Davies. The original photographs of the gels are highly technical and — frankly — confusing to this judge. How can I be certain that taking those already confusing depictions and enlarging them to this extraordinary scale does not bear a risk of introducing photographic ghosts, shadows or other images that did not originally exist? I have no evidence that such distortion of the original evidence would not introduce errors or unreliable results.

462      Even if I were to accept that there are faint bands that were not seen in the original gels or referred to by Dr. Davies, none of this evidence accounts for Dr. Davies's findings of *Aspergillus terreus* in the lovastatin samples.

463      Overall, the presence of the spurious bands, or the impact of the photoshopped pictures, does not lead me to the conclusion that the results of the experiment were flawed.

**IX. Infringement — Conclusion**

464      My overall conclusion is that Dr. Davies's testing results are reliable and credible evidence that the lovastatin

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

samples tested in his laboratory contained *Aspergillus terreus* DNA. I have rejected the contamination theory of Apotex.

465    I am satisfied that the lovastatin tablets tested originated from AFI batch CR0157. The DNA evidence satisfies me that, on a balance of probabilities, the Defendants infringed the '380 Patent with the manufacture and sale of any product from AFI batch CR0157.

466    The situation with respect to the Blue Treasure samples is different. As noted earlier in these reasons, I am not persuaded that Merck has demonstrated a nexus between the samples tested in the Davies Lab and the allegedly infringing product. Thus, I do not accept the DNA evidence as direct evidence of infringement by the lovastatin produced by Blue Treasure. Nevertheless, the remaining evidence presented by Merck with respect to the Blue Treasure lovastatin strongly supports the conclusion that there was infringement. This is discussed earlier in these reasons. If I am wrong with respect to the lack of nexus, then I would conclude that the DNA evidence is evidence of direct infringement, a conclusion that would strengthen — but not change — my earlier finding of infringement.

# X. Validity

## A. Introduction

467    Having determined the issues of claims construction and infringement, I now turn to the issue of validity. In their counterclaims, each of the Defendants assert that the '380 Patent is invalid. If they are correct, there will be no question of infringement; the Defendants cannot infringe an invalid patent.

468    In an infringement action, the patentee benefits from the presumption of validity (s. 45 of the *Patent Act* and s. 43(2) of the *Patent Act* currently in force). Thus, Apotex bears the burden of proving, on a balance of probabilities, that the '380 Patent is invalid. As of the close of argument in this trial, the following remained as Apotex's grounds of invalidity:

- All of the disputed claims, except for claims 3 and 6, are invalid because they are overly broad.

- Certain of the claims are invalid because they could not demonstrate utility. In particular:

   - claims 1, 2, 5 and 13 to 15 demonstrate a lack of utility, in that not all of the compounds included in the claims are useful in fulfilling the promise of the '380 Patent; and

   - the utility of the claimed subject matter, including pharmaceutical utility, demonstrates a lack of sound prediction, in that the inventor could not predict, as of the Canadian filing date, that the compounds claimed would fulfil the utility promised by the '380 Patent.

- Claims 13 to 15 are invalid because of prior use or anticipation by the existence of lovastatin in a traditional Asian product known as "Red Yeast Rice".

- The claims are invalid because Merck was not the first to invent lovastatin.

## B. Overbreadth

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

469     Apotex argues that the claims of the '380 Patent, other than claims 3 and 6, are "overbroad" because they claim processes that were not invented by the named inventors. In their submission, the invention, as claimed, comprises numerous strains or species which were not tested or evaluated by the inventors to determine, as of the priority date, whether they were capable of producing the compounds.

470     A patent which claims more than what has been invented can be found to be invalid as being overly broad. The concept of "overbreadth" has been referred to in a number of cases before our Court. In support of its position, Apotex relies on the case of *Biovail Pharmaceuticals Inc. v. Canada (Minister of National Health & Welfare)*, 2005 FC 9, [2005] F.C.J. No. 7 (F.C.)[*Biovail*]. In *Biovail*, above, at paragraph 61, Justice Harrington described the notion of "covetous claiming" as follows:

> If the inventor claims more than he should, he loses everything.
>
> > His fences must be clearly placed in order to give the necessary warning and he must not fence in any property that is not his own. [Thorsen P. in *Minerals Separation North American Corp. v. Noranda Mines Ltd.*, [1947] Ex. C.R. 306 at page 52, as quoted in *Free World Trust*, supra, at para. 14]

471     In *Biovail*, above, the patent in issue (a patent for a controlled-release pharmaceutical tablet) disclosed only one sustained-release mechanism, referred to as an osmotic process, using a compound known as HPMC as the carrier. The generic company was using a different mechanism and compound — a hydrogel process using a compound known as HPC as the carrier. Justice Harrington's key finding was that the patent was not infringed because the inventors only contemplated the osmotic process, and not the hydrogel process, which was a substantially different process. However, in the alternative, Justice Harrington considered that, if the claims were to be construed to include the hydrogel process, "the patent was invalid for covetous claiming" (*Biovail*, above, at para. 60).

472     *Biovail*, in my view, does not support Apotex's submission on overbreadth. Unlike the patent in *Biovail*, the '380 Patent's claims and disclosure make reference to all producing species of *Aspergillus terreus*. The question of whether the inventors could extrapolate their laboratory results from the specific samples tested is a question of sound prediction and not of overbreadth.

473     Apotex also relies on *Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 (F.C.) [*Eli Lilly Raloxifene (FC)*], aff'd 2009 FCA 97, 78 C.P.R. (4th) 388 (F.C.A.), a decision in respect of a patent that claimed the use of raloxifene in the treatment of osteoporosis and bone loss. At paragraphs 179-182, Justice Hughes discussed the assertion that the claims were overly broad. Key to his conclusion that the claims were overly broad was the "disconnect" between the disclosure and the claims in the patent. The disclosure limited the osteoporosis and bone loss to that without the adverse effects of estrogen therapy. In all but one of the claims in issue, there was no limitation to the use of the drug for bone loss due to estrogen-related causes. Thus, Justice Hughes concluded that all but one of the claims in issue were overly broad. The issue of overly broad claims was not overturned by the Court of Appeal.

474     In my view, *Eli Lilly Raloxifene*, above, does not support an argument that the claims of the '380 Patent are overly broad. In the patent before me, the disclosure is consistent with the claims in issue. Contrary to the submissions of Apotex, the disclosure of the '380 Patent is not limited to the two strains of *Aspergillus terreus* that were used in the experimentation by Merck that lead to the invention.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

475     In brief, on Apotex's claim of overbreadth, I conclude that this argument, on the facts of this case, is more properly a question of sound prediction — in particular, both the factual basis for the prediction and the sufficiency of the disclosure.

### C. Utility

*(1) General Principles*

476     Apotex submits that the '380 Patent is invalid on the grounds that:

   1. the impugned claims lack actual utility, in that certain strains of *Aspergillus terreus* have been shown to be unable to produce any of the claimed compounds; and

   2. as of the relevant date, the inventors could not soundly predict that the claimed compounds would have the utility promised by the '380 Patent.

477     Section 2 of the *Patent Act* defines an invention as something that is "new and useful". From this comes the concept of "utility".

478     A number of principles associated with the law of utility are well established in the jurisprudence. To begin, the overarching concept is that, as of the relevant date, there must have been a demonstration of utility of the invention or, lacking that, a sound prediction of utility based on the information and science available at the time of the prediction (see, for example, *Merck & Co. v. Apotex Inc.*, 2005 FC 755, 41 C.P.R. (4th) 35 (F.C.) at para. 121; *Pfizer Canada Inc. v. Apotex Inc.*, 2007 FC 26, 306 F.T.R. 254 (Eng.) (F.C.) at paras. 36-40, aff'd 2007 FCA 195, 60 C.P.R. (4th) 177 (F.C.A.), leave to appeal to SCC refused, [2007] S.C.C.A. No. 371, 381 N.R. 399 (note) (S.C.C.)).

479     Apotex bears the burden on this issue of validity. To demonstrate lack of utility, Apotex must show "that the invention will not work, either in the sense that it will not operate at all or, more broadly, that it will not do what the specification promises that it will do" (*Consolboard*, above, at p. 525).

480     For many patents in the pharmaceutical field, the inventors will not yet have demonstrated that the invention "works", as of the relevant date. In such cases, the inventors rely on the concept of "sound prediction". The doctrine of sound prediction can be relied upon by an inventor to justify patent claims whose utility has not actually been demonstrated, but can be soundly predicted based upon the information and expertise available (*Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 (S.C.C.) at para. 56 [*Wellcome AZT*]). A party challenging the utility of a patent based on sound prediction must demonstrate that the prediction was not sound or that there is evidence of a lack of utility. As stated in *Wellcome AZT*, above, at paragraph 56:

   If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, *per* Pigeon J. in *Monsanto Co. v. Canada (Commissioner of Patents)* [1979] 2 S.C.R. 1108, at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

481     The relevant date is the date of the filing of the Canadian patent application (*Ramipril I*, above, at paras. 88-96). For the '380 Patent, that date is June 11, 1980.

482     Where the specification does not promise a specific result, no particular level of utility is required - a "mere scintilla" of utility will suffice (H.G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed., 1969), at p.153). However, as stated in *Consolboard*, above, where the specification sets out an explicit "promise", utility must be measured against that promise (see, for example, *Pfizer Canada Inc. v. Canada (Minister of Health)*, 2008 FCA 108, 67 C.P.R. (4th) 23 (F.C.A.) at para. 53 [*Pfizer Atorvastatin (FCA)*]). In other words, does the invention do what the patent promises it will do? The question to consider is whether, at the date of filing, the patentee had sufficient information upon which to base the promise. If not, the patentee must have had sufficient information upon which to make a sound prediction of the promise.

483     At paragraph 70 of *Wellcome AZT*, above, the Supreme Court of Canada articulated a three-part test that must be satisfied in order to establish that a sound prediction has been made by the an inventor. The three elements of the test are:

1. there must be a factual basis for the prediction;

2. the inventor must have an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis; and

3. there must be proper disclosure.

484     To be sound, a prediction does not need to amount to certainty, as it does not exclude the risk that some compounds within the area claimed may, at some later time, prove to be devoid of utility.

485     With these principles in mind, I turn to the '380 Patent and the evidence before me.

*(2) The '380 Patent*

486     As of the relevant date of June 11, 1980 (the Canadian filing date), Merck had made, but not tested, the compounds for which the process is claimed. In other words, it was not relying on actual utility but on its prediction that the four compounds would have utility.

487     As noted, sound prediction must be measured against the promise of the patent, where one is explicitly expressed or may be implied. The promise of the '380 Patent is discussed in Section V of these Reasons. To review, I have concluded the following:

1. The '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce the four compounds of claim 1 or the compounds identified in the other disputed claims.

2. The patent does promise that the compounds produced by the fermentation process identified in the patent are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

488     I will measure the utility of the '380 Patent against these two promises.


*(3) Lack of Utility*


489     Apotex claims that it has presented empirical evidence of inutility of claims 1, 2 and 5. This assertion of inutility is founded on testing, by Drs. Sorenson and Samson, that demonstrated that not all strains of micro-organisms within the genus *Aspergillus* or — more narrowly — within the species *Aspergillus terreus* are capable of producing the claimed compounds.


490     Dr. Sorensen was asked, by counsel for AFI, to investigate the ability of different strains of *Aspergillus terreus* to produce lovastatin. He was instructed to use fermentation conditions and media contemplated or specifically taught in the '380 Patent. He designed experiments involving four different strains of *Aspergillus terreus*. Two of those strains (referred to as A18 and R99) were strains which had previously been shown to produce Compound I. The other two strains (referred to as UAMH 7844 and UAMH 9313) were obtained by Dr. Sorensen from the University of Alberta Microfungus Collection and Herbarium (UAMH). In simple terms, Dr. Sorensen's results were as follows:

   • lovastatin (Compound1) was detected in the A18, R99 and UAMH 9313 extracts;

   • lovastatin was not detected in the UAMH 7844 extract; and

   • no quantifiable quantities of dihydrolovastatin (Compound II) were detected in any of the four extracts.


491     Similar results were obtained by Dr. Samson, who also carried out testing of certain micro-organisms at the request of counsel for AFI. Dr. Samson found that:

   • A18, R99 and a strain identified as Merck ATCC 20542 produced lovastatin;

   • a strain identified as *Aspergillus terreus* IBT 20944 produced no detectable quantities of lovastatin; and

   • a strain identified as *Aspergillus alabamensis* (which, according to Dr. Samson, would have been classified as *Aspergillus terreus* in 1984) produced no detectable quantities of lovastatin.


492     Witnesses presented by Merck did not dispute the core of these findings. Dr. Alberts, one of the named inventors, acknowledged that not all *Aspergillus terreus* strains tested by Merck produced lovastatin. Dr. Lasure agreed that some strains of *Aspergillus terreus* would not produce lovastatin. In Apotex's view, the result must be that claims 1, 2 and 5, and each of the dependent product claims 13 to 15, are invalid since they include embodiments that will not achieve the promised result.


493     The problem with this argument is that Apotex relies on a construction and promise of the '380 Patent with which I do not agree. During final argument, Apotex conceded that their assertion is established assuming that "my friend's construction is not adopted".

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

494     For the reasons expressed in my analysis of proper claims construction, I have concluded that: (a) the claims only include micro-organisms that fall within the species *Aspergillus terreus*; (b) the '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce lovastatin; and, (c) none of claims 1, 2 and 5 requires that all four (or two, where applicable) compounds be produced from each fermentation. Thus, it is irrelevant that that Drs. Sorenson and Samson found strains of *Aspergillus terreus* which were incapable of producing lovastatin and that other strains could only produce lovastatin (Compound I).

495     Apotex has failed to meet its burden to demonstrate that "[t]here is evidence of lack of utility in respect of some of the area covered" (*Wellcome AZT*, above, at para. 56).

*(4) Sound Prediction*

496     As noted above, Apotex may satisfy its burden of showing a lack of utility even where it cannot demonstrate inutility. Its burden can be met by demonstrating, on a balance of probabilities, that the prediction of the inventors was not sound. I turn now to a consideration of whether the three elements of the test for sound prediction, as set out in *Wellcome AZT*, above, have been met.

497     In determining that the requirements for sound prediction had been met, the Court in *Wellcome AZT* found that the factual basis for the sound prediction of a new use compound rested upon the *in vitro* test results of AZT against the HIV in a human cell line along with Glaxo's data on AZT, including animal tests (above, para. 72). The line of reasoning was found to be Glaxo's knowledge of the mechanism for the reproduction of a retrovirus.

**(a) The Factual Basis**

498     The question of sound prediction is one of fact (*Wellcome AZT*, above, at para. 71). The inventors must be able to show that, at the relevant time, they were in possession of a factual basis upon which they could articulate the desired result. The perspective being examined at this stage is a subjective one. The knowledge, activities and endeavours of the inventors themselves must be considered.

499     In this case, Merck's key witness was Mr. Alfred W. Alberts, one of the named inventors of the '380 Patent. In credible testimony, Mr. Alberts told the "story" of the invention that became the '380 Patent.

500     The '380 Patent story began in 1975, when Mr. Alberts arrived at Merck and began working in the area that was called "basic research". He established a new department within that domain, a department that was called "biochemical regulation". The mandate of the department was to take a rational approach to the development of new drugs. Mr. Alberts described the approach as follows:

> The approach that I was brought in to do was to go and do a — go back to the beginning, find the — to break down the system, find the key targets for the disease, and then start from there with discovering — hopefully discovering compounds that affect the disease process by working at the very simple, basic level, and then moving up from there to animal studies.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

501    One area of research for the department was cholesterol biosynthesis. According to Mr. Alberts, it was well known, by 1975, that cholesterol was intimately involved with the atherosclerotic process. The pathway of cholesterol biosynthesis was understood in 1975 and was described by Mr. Alberts as follows:

> The pathway of cholesterol biosynthesis is very complex. This is just a brief summary highlighting the salient features of the process.

> It starts with a simple two carbon compound known as acetate and which is basically the salt of vinegar.

> It's activated to a compound known as acetyl coenzyme A/acetyl CoA.

> Then in a series of steps, three acetyl CoA units are joined together to form the compound known as hydroxymethylglutaryl coenzyme A/HMG-CoA, which is converted by an enzyme known as HMG CoA reductase to mevalonic acid. And I will refer — sometimes refer to it as mevalonic acid or the salt form, which is mevalonate. And this six carbon compound in a series of condensations ends up as the 30 carbon compound, squalene, which is then modified into the 27 carbon sterol lipid cholesterol.

502    The Merck scientists were the first to isolate mevalonic acid — described by Mr. Alberts as "the potential missing link in the cholesterol pathway".

503    Based on their knowledge of this pathway, the Merck scientists were looking for compounds that could break this chain. One part of the biosynthesis that was of interest was the hydroxy-methylglutaryl-coenzyme A reductase (known as HMG-CoA reductase) stage. The scientists understood that, if a compound could inhibit or blocked the synthesis of cholesterol at the HMG-CoA reductase stage, there would be no conversion of: (a) HMG CoA reductase to mevalonic acid; (b) mevalonic acid to squalene; and, (c) squalene to cholesterol.

504    The Merck scientists first became aware of compounds that inhibited HMG-CoA reductase in early 1976, when:

> We received at Merck a correspondence from a representative in Japan who came across a newly issued, newly published patent in Japan describing an inhibitor of HMG-CoA reductase known as ML-236B and also became known as Compactin.

505    A sample of compactin was received from Sankyo Company in Japan. In addition, Dr. Akira Endo of the Sankyo Company visited Merck on August 26, 1977. According to notes of the meeting, Dr. Endo presented data with respect to ML-236B (compactin). It was stated that the compound "inhibits de novo cholesterol biosynthesis and reduces serum cholesterol when administered orally [in rats]." This compound operated as an HMG-CoA reductase inhibitor.

506    The goal was clearly to develop a compound that would be as good as or better than compactin. Beginning in January 1978, the Merck scientists introduced a new *in vitro* assay, the HMG-CoA reductase assay. This allowed the measurement of the inhibition of HMG-CoA reductase by any tested micro-organism. ML-236B (compactin) was the benchmark against which the activity of organisms from the Merck chemical library were measured. Between January 1978 and November 1978, none of a large number of tested micro-organisms met the goal.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

507     As reflected in the laboratory notebooks and in Mr. Alberts's testimony, November 7, 1978 was a turning point. In the first week of November 1978, Mr. Alberts's group received samples 18 and 19 (F 4683 and F 4684), both of which demonstrated inhibitory activity in the HMG-CoA reductase assay.

508     From that point, the most important steps can be summarized as follows.

• On November 27, 1978, Mr. Alberts strongly recommended that Merck further pursue "the isolation and characterization of the inhibitory component in F 4683 for use as a potential hypocholesterolemic agent".

• In December 1978, another sample — F 4797 — was found to have inhibitory activity that was tenfold higher than the first culture, F 4683.

• On February 12, 1979, the structure of lovastatin, the lactone (L-154,803), was recorded by Dr. Albers-Schonberg; the structure was similar to compactin.

• On February 12, 1979, Dr. Otto Hensens identified and recorded the structure of the open dihydroxy acid form of lovastatin.

• On February 13, 1979, Ms. Chen assayed the two samples used to identify the structures above and confirmed that they were inhibitory.

• On February 16, 1979, Mr. Alberts signed the Merck Confidential Memorandum of Invention (referred to below).

• On August 1, 1979, the structure of the natural dihydro (Compound II of the '380 Patent) was identified and recorded by Dr. Otto Hensens, having been found active in the HMG-CoA reductase assay on July 31, 1979.

• On August 2, 1979, a hydrolyzed version of the natural dihydro, being the open hydroxyl acid (Compound IV of the '380 Patent), was assayed and also found to be active in the HMG-CoA reductase assay.

509     On February 16, 1979, Dr. Alberts completed a "Confidential Memorandum of Invention", on behalf of the inventors. This Memorandum summarizes the work of the inventors. The structure of Compound I, a "homolog" of ML-236B (compactin), "produced by an *Aspergillus*" is described. The inventors explicitly note the utility or proposed use of the invention as "hypocholesteremic, antifungal". As of the date of the Memorandum, the inventors had found that the compound had "*in vitro* potency similar to ML-236B as inhibiting HMG-CoA reductase."

510     Apotex's main criticism of Merck's work relates to what was not done by the Merck scientists. Apotex submits that, because there was no testing of the compounds on humans before the Canadian filing date, Merck was missing a critical piece of factual information. In Apotex's view, without this information, the inventors did not have an adequate factual basis for the prediction that the compounds would be "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans." However, when cross-examined on this issue, Mr. Alberts was clear as to how Merck reached its prediction, even though human trials had not taken place by the Canadian filing date.

Q. Based on the test results that you had obtained, the in vivo animal test results you'd obtained, would you not agree that you could not reliably predict that Lovastatin was going to be an effective treatment for hypercholesteremia in humans?

A. The only way I could answer that is with any drug before it's been tested in humans, whether it's Lovastatin, whether it's an antibiotic, no matter what it is, you can not reliably predict it's going to work in humans until you

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

put it into the humans, and that is irrespective of the drug.

Q. In terms of these particular models, these animal results, is it not fair to say that these animal models, as a predictor of activity in humans, could not be relied upon to make a sound an assessment of its potential effectiveness?

A. There was enough — let me go to one animal model that was a good predictor there, and that's the dog, because the dog responds very nicely to the other cholesterol lowering drug, cholestyramine; in fact, it's one of the few models that responds to cholestyramine. Humans respond to cholestyramine. Rats do not respond to cholestyramine. Dogs do. Humans do. So there was a reasonable assumption that a drug that did not lower cholesterol in the rats would conceivably work in humans and based on the biology, based on the biochemistry of the system, it was a reasonable prediction that it would work and based on our knowledge of Compactin. So we had a whole body of evidence that suggested it would work.

511    I agree with Mr. Alberts; the inventors had a whole body of evidence that suggested that the compounds would work in humans. The inventors had an adequate factual basis for their predictions.

**(b) Line of Reasoning**

512    I next consider whether Apotex has shown that there was no articulable line of reasoning from which the desired results could be inferred from the factual basis. The question is: given the experimentation and laboratory results that formed the factual basis together with information drawn from the prior art, could Merck reasonably infer that the compounds would meet the promise of being "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans"?

513    There was little expert evidence produced by either side that speaks directly to the question of sound prediction or the line of reasoning. Some assistance was provided by Dr. Gotto, who described his own observations and the findings of scientists in the mid to late 1970s which demonstrated the link between high cholesterol and atherosclerosis.

514    It was also known at the relevant time that HMG-CoA was the enzyme in the liver responsible for making cholesterol.

515    Obviously, an essential element in the chain is an understanding of cholesterol biosynthesis. No expert presented an alternative to Mr. Alberts's description of the biosynthesis pathway. It follows, from an understanding of cholesterol biosynthesis, that a compound that can prevent the completion of this pathway — at any stage — will have a good chance of preventing the formation of cholesterol. Thus, it would have been part of the line of reasoning for the development of all statins, such as lovastatin, that a compound that could inhibit HMG-CoA *in vivo* could be predicted to lower cholesterol in humans.

516    The next step in the chain of reasoning is the key element — that is, compactin. The Merck inventors knew about the behaviour of compactin. Compactin works on the cholesterol biosynthesis at the HMG CoA reductase stage; it inhibits or prevents the enzyme from producing mevalonic acid. From the disclosure contained in the Endo Patent, the Merck scientists had knowledge of the *in vivo* activity of compactin.

WestlawNext© CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

517    The inventors also knew that the structure of the compounds that they had developed from fermentation of *Aspergillus terreus* was similar to the structure of compactin. It was not unreasonable for the inventors to predict that a compound with a similar structure to compactin would have similar inhibitory properties. Strengthening this prediction, the Merck scientists also had their own *in vitro* testing data that demonstrated activity. All of this information was available to the inventors of the '380 Patent as of February 12, 1979. This reasoning was confirmed by Dr. Gotto during cross-examination:

> Q. Let me ask you this. If in 1979 a compound had been found that could inhibit HMG-CoA reductase in a cell culture in vitro, would one be able to know whether or not that compound would be effective in treating atherosclerosis, hyperlipidemia or those kinds of diseases in humans?

> A. Based on the knowledge that one had about Compactin, yes.

518    In my view, an articulable line of reasoning has been demonstrated. In other words, by February 12, 1979, the inventors of the '380 Patent could soundly predict that the compounds of the invention would provide treatment for hypercholesteremia in humans based on the known *in vivo* activity of the closely-related compound, compactin, and Merck's own *in vitro* data. In other words, there was an articulable line of reasoning from which the desired result — lowering of cholesterol in humans — could be inferred from the factual basis. This was over a year in advance of the Canadian filing date of June 11, 1980.

519    Moving forward from February 1979, the Merck scientists were able to add even more information to support the articulable line of reasoning. By July 1979, Merck had supplementary *in vivo* data that confirmed cholesterol synthesis inhibition in rats. Well in advance of the Canadian filing date, Merck had obtained positive results in dogs. This information, while not essential to the sound prediction as of the Canadian filing date, certainly provides additional support for the prediction.

**(c) Disclosure**

520    The final element of sound prediction is "disclosure". The question is: in the '380 Patent, has Merck provided disclosure of the factual basis and the line of reasoning? I believe that it has.

521    In *Eli Lilly Canada Inc. v. Apotex Inc.*, 2009 FCA 97, 78 C.P.R. (4th) 388 (F.C.A.) at para. 18, leave to appeal to SCC refused, [2009] S.C.C.A. No. 219 (S.C.C.); (2009), 401 N.R. 400 (note) (S.C.C.)) [*Eli Lilly Raloxifene (FCA)*], the Court of Appeal (referring to *Wellcome AZT*, above) stated that, "where the claimed invention had not yet actually been reduced to practice, the patent must provide a disclosure such that a person skilled in the art, given that disclosure, could have as the inventors did, soundly predicted that the invention would work once reduced to practice."

522    Apotex's argument of inadequate disclosure involves two discrete areas: the first is the adequacy of disclosure of factual underpinnings of the invention, and the second is the adequacy of disclosure of methods for producing the claimed compounds from strains of *Aspergillus*.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

523    With respect to the first argument, Apotex asserts that many of the facts that were stated by Dr. Alberts to form the basis of the inventors' prediction of utility were not disclosed in the patent. Specifically, Apotex submits as follows:

> However, the only data disclosed in the '380 Patent that could form a "factual basis" for the predicted utility of the compounds as anti-hypercholesteremic agents are the tests reported in the examples. None of these tests evaluated the capacity of a test compound to lower serum cholesterol levels in mammals or humans. None of the compounds is shown to have been tested in an animal model to determine whether it lowered serum cholesterol. There is no reference or explanation of the rate-limiting role of the HMG-CoA reductase enzyme. There is no disclosure of the knowledge that Merck acquired from its work with compactin, and no disclosure of any relationship between the compounds of the invention and cholestyramine, or why (and how) the properties of cholestyramine would inform a prediction of utility. There is also no data about the toxicology, pharmacokinetics or bioavailability of the compounds that would enable the skilled addressee to predict that the compounds could be effectively administered and tolerated by humans over the identified range of dosage strengths. Accordingly, virtually all of the "facts" Dr. Alberts stated formed the basis of the inventors' prediction of utility are not disclosed.

524    The first problem with Apotex's argument is that it is based on a requirement that the patent disclose data to support the promise. The question of whether or not a patentee has obtained enough data to substantiate its invention is an irrelevant consideration with respect to the application of subsection 27(3) of the *Act*. The Court is concerned with the sufficiency of the disclosure, not the sufficiency of the data underlying the invention (*Pfizer Atorvastatin*, above, at para. 56).

525    Apotex also refers to the animal testing carried out by Merck in 1979. Reference is made to the testimony of Mr. Alberts where he agreed that the testing of dogs led Merck to believe that lovastatin would result in cholesterol reduction in humans. The '380 Patent does not disclose this testing. Thus, Apotex submits that the failure to disclose the existence and results of such tests establishes that there is insufficient information disclosed in the '380 Patent to justify the prediction. I do not agree with either Apotex's characterization of Mr. Alberts's testimony or the inference that they draw.

526    Apotex relies on *Eli Lilly Raloxifene*, above. In that case, Justice Roger Hughes, the trial judge, found, as a matter of fact, that Merck had placed reliance on a paper published before the Canadian filing date (the Hong Kong study). Justice Hughes concluded that the requirement for disclosure had not been met; the Court of Appeal agreed in *Eli Lilly Raloxifene*, above, at paragraph 17. As noted by the Court of Appeal in *Eli Lilly Raloxifene*, at paragraph 15, "As the prediction was made sound by the Hong Kong study, this study had to be disclosed." In my view, the situation before me is distinguishable.

527    I agree that the cross-examination of Mr. Alberts resulted in a list of facts and information that the inventors of the '380 Patent knew as of the Canadian filing date. One of the areas of interest relates to the dog studies carried out in 1979. Apotex pounces on this information as something that ought to have been disclosed in the '380 Patent in order to justify the sound prediction. However, I do not understand the jurisprudence to teach that the patent specification must disclose absolutely everything that that the inventor knew up to the relevant date. In *Eli Lilly Raloxifene*, above, without disclosure of the Hong Kong study, a skilled person would not have had sufficient information to understand the justification for the prediction. We must examine the specification to determine whether, with the information disclosed (even if there was more information available and undisclosed), a skilled person could have soundly predicted that the invention would work once reduced to practice.

528    In the case of the '380 Patent, the question is whether sufficient information was disclosed to allow the skilled person to soundly predict that the compounds of the invention would be "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

529    What was disclosed in the '380 Patent? The '380 Patent contains the following disclosures:

• the association between atherosclerosis and high cholesterol (p. 2, lines 11-15);

• the utility of inhibiting cholesterol biosynthesis (p. 2, lines 14-16);

• prior art consisting of US patents for compactin, a fermentation product obtained from the genus *Penicillium*, which compound was found to be an inhibitor, *in vivo*, of the biosynthesis of cholesterol (p. 2, lines 17-26);

• the discovery by the inventors of the '380 Patent that compounds produced from *Aspergillus* are more potent inhibitors of cholesterol synthesis *in vivo* than compactin (p. 2, lines 28-33; p. 3, lines 1-5);

• the fact that HMG-CoA reductase inhibition is the relevant means of inhibiting cholesterol biosynthesis (p. 14, lines 30-35);

• the structure of lovastatin and the other compounds (p. 9, 10, 11 and 12);

• *in vitro* HMG-CoA reductase inhibition by lovastatin, (p. 14, line 30; p. 15, line 6; p. 24, lines 7-8; p. 25, lines 10-12; p. 42, lines 1-13); and

• *in vivo* inhibition of cholesterol synthesis by Compound II (p. 42, lines 15-25).

530    Taken as a whole, I am not persuaded that there was inadequate disclosure. A skilled person would conclude that the '380 Patent sufficiently discloses the factual basis and the line of reasoning to soundly predict that the claimed compounds would be useful in the treatment of high cholesterol. In other words, as required by the jurisprudence, the '380 Patent discloses the factual basis and line of reasoning for its promise. The prediction was made sound by the information disclosed; the disclosure of other information within the knowledge of the inventors was not essential to the prediction.

531    The second of Apotex's submissions is that the '380 Patent fails to disclose the methods for determining which strains of the genus *Aspergillus* will produce the desired compounds. As discussed in the section of these reasons on claims construction, I have concluded that the patent only claims compounds produced from *Aspergillus terreus* and, further, that it does not promise that lovastatin can be produced from all strains of *Aspergillus terreus*. Apotex argues that, even on this narrower construction and promise, Merck was required to disclose the methods for identifying producing strains. Apotex argues that the specification does not disclose this information and that to find the producing strains would require excessive and inventive experimentation by the skilled person.

532    The courts have recognized that "routine trials and experiments not amounting to new inventions might be required to put [an invention] into practice" (*Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1978), 39 C.P.R. (2d) 145 (Fed. T.D.) at para. 51, [1978] F.C.J. No. 812 (Fed. T.D.); see also, *Mobil Oil Corp. v. Hercules Canada Inc.* (1995), 63 C.P.R. (3d) 473, [1995] F.C.J. No. 1243 (Fed. C.A.)); *Aventis Pharma Inc. v. Apotex Inc.*, 2005 FC 1283, 43 C.P.R. (4th) 161 (F.C.) at para. 207). The evidence before me does not support Apotex's assertion that inventive experimentation would be required to find producing strains of *Aspergillus terreus*. I have already discussed this issue (see paragraphs 57 to 130) under claims construction. To repeat, I am satisfied that the skilled person could use well-known techniques to rapidly screen a large number of isolates of strains of *Aspergillus terreus* to determine which strains are producing. Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*D. First Inventorship/Missed Conflict*

*(1) Introduction*

533    Apotex submits that the Merck inventors were not the first inventors of the compound lovastatin as claimed in the '380 Patent and that, therefore, the '380 Patent should be invalidated on the basis that the "invention" of the '380 Patent was known or used as of the date of filing the patent application. In so arguing, Apotex recognizes that it must overcome the requirements of the *Patent Act*.

534    The patent application that resulted in the issuance of the '380 Patent was patent application No. 353, 777 filed with the Patent Office on June 11, 1980 (the Monaghan Application). Apotex submits that the Monaghan Application disclosed the invention of lovastatin and ought to have been placed into conflict with patent application No. 345, 983 (the Endo Application), which was filed with the Patent Office on February 19, 1980. The Endo Application ultimately resulted in the issuance of the '794 Patent.

*(2) Legal Principles*

535    Prior to 1989, the overall scheme under the *Patent Act* was one of first to invent. By contrast, the scheme under the *Patent Act* currently in force can be described as first to file. The notion of first inventorship is embodied in s. 27(1) of the *Act*:

27. (1) Subject to this section, any inventor or legal representative of an inventor of an invention that was

(a) not known or used by any other person before he invented it,

(b) not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and

(c) not in public use or on sale in Canada for more than two years prior to his application in Canada,

may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

Sous réserve des autres dispositions du présent article, l'auteur de toute invention ou le représentant légal de l'auteur d'une invention peut, sur présentation au commissaire d'une pétition exposant les faits, appelée dans la présente loi "le dépôt de la demande", et en se conformant à toutes les autres prescriptions de la présente loi, obtenir un brevet qui lui accorde l'exclusive propriété d'une invention qui n'était pas:

a) connue ou utilisée par une autre personne avant que lui-même l'ait faite;

b) décrite dans un brevet ou dans une publication imprimée au Canada ou dans tout autre pays plus de deux ans avant la présentation de la pétition ci-après mentionnée;

c) en usage public ou en vente au Canada plus de deux ans avant le dépôt de sa demande au Canada.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    102

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

536    Recognizing that more than one person might claim inventorship to similar or overlapping subject matters, Parliament provided means for identifying and resolving such a conflict. To begin, s. 43(1) of the *Act* defines when a conflict exists:

> Conflict between two or more pending applications exists
>
>> (a) when each of them contains one or more claims defining substantially the same invention; or
>>
>> (b) when one or more claims of one application describe the invention disclosed in one of the other applications
>
> Se produit un conflit entre deux ou plusieurs demandes pendantes dans les cas suivants:
>
>> a) chacune d'elles contient une ou plusieurs revendications qui définissent substantiellement la même invention;
>>
>> b) une ou plusieurs revendications d'une même demande décrivent l'invention divulguée dans l'autre ou les autres demandes

The balance of s. 43 sets out the procedures for declaring and dealing with a conflict.

537    While s. 27(1) gives the right to a patent to the first inventor, the *Act* also contemplates that legal proceedings may be brought with respect to the validity of patents (see the *Patent Act*, starting at s. 53). In particular, s. 59 of the *Act* permits a defendant (such as Apotex) in a patent infringement action to plead "any fact or default which by this *Act* or by law renders the patent void." Under s. 60(1) of the *Act*, a patent or any claim in a patent may be "declared invalid or void by the Federal Court ... at the instance of any interested person."

538    However, when the validity of a patent is being challenged on the question of inventorship, s. 61(1) is a limiting or qualifying provision. In the case before me, s. 61(1)(b) is relevant:

> No patent or claim in a patent shall be declared invalid or void on the ground that, before the invention therein defined was made by the inventor by whom the patent was applied for, it had already been known or used by some other person, unless it is established that
>
>> (b) that other person had, before the issue of the patent, made an application for patent in Canada on which conflict proceedings should have been directed;
>
> Aucun brevet ou aucune revendication dans un brevet ne peut être déclaré invalide ou nul pour la raison que l'invention qui y est décrite était déjà connue ou exploitée par une autre personne avant d'être faite par l'inventeur qui en a demandé le brevet, à moins qu'il ne soit établi que, selon le cas:
>
>> b) cette autre personne avait, avant la délivrance du brevet, fait une demande pour obtenir au Canada un brevet qui aurait dû donner lieu à des procédures en cas de conflit;

539    As stated in s. 61(1)(b), no patent will be declared invalid on the grounds of prior inventorship by some other person *unless* the challenging party can establish that the other person had, before the issue of the patentee's patent, made an application for a patent in Canada *on which conflict proceedings should have been directed.* Stated in other words, a party

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

may only successfully raise inventorship as an issue if: (a) the invention in the patent or claim had already "been known or used by some other person"; (b) the other person made a patent application for this prior invention in Canada; or (c) "conflict proceedings should have been directed". The interpretation of s. 61(1)(b) was the subject of discussion in the case of *Laboratoires Servier v. Apotex Inc.*, 2008 FC 825, 67 C.P.R. (4th) 241 (F.C.) [*Servier FC*].

540      Thus, the threshold question to be answered is whether, on the facts before me, there was a "missed conflict". In other words, should conflict proceedings have been directed between the Endo Application and the Monaghan Application? If there was no missed conflict, Apotex is precluded, by s. 61(1)(b), from challenging the validity of the '380 Patent on the grounds of prior inventorship.

*(3) Was there a missed conflict*

541      The Endo Application was filed on February 19, 1980; the Endo Patent was issued on August 17, 1982. The Monaghan Application was filed on June 11, 1980; the '380 Patent was issued on January 31, 1984. Conflict could have been declared only during the co-pendency of the two applications; that is, between June 11, 1980 and August 17, 1982.

542      A review of the case or file history for the '380 Patent provides us with the sequence of events leading to the issuance of the patent.

543      As filed, claims 1 to 7 of the Monaghan Application were claims to processes for producing certain compounds. However, claim 8 was for Compounds I and II alone and claim 9 was for Compounds III and IV alone. Claims 10 to 19 were claims to salts, esters and compounds all of which were dependent on claims 8 or 9. While claims 1 to 7, as filed, were product-by-process claims, claims 8 to 19 did not contain process restrictions; they were what is referred to as *per se* claims. The problem with *per se* claims is that they were not permissible under the *Patent Act*, as it existed at the relevant time. Specifically, s. 41(1) (later, s. 39(1)) of the *Patent Act*, as it stood in 1982) stated that:

> In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification <u>shall not include claims for the resulting food or medicine itself, except when prepared or produced by or significantly derived form the methods or processes of manufacture particularly described and claimed.</u>

> [Emphasis added.]

> Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, <u>aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués.</u>

> [Non souligné dans l'original.]

In simple terms, the inventors of the Monaghan Application could never have received a patent that included claims 8 to 19, as originally filed.

544      In a letter from the Patent Office dated November 10, 1982 (Office Action), counsel for the Monaghan Application

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

was advised of the problem:

> The claims of this application are governed by Section 41(1) of the Patent Act. In the case of a substance intended for food or medicine and prepared by a chemical process, an application must have a patentable process claim, and any product claim must be in process-dependent form and of the same scope as the process claim. Amendment or cancellation of claims 8-19 is required.

545    The response to the Office Action was received by the Patent Office on February 9, 1983. Amended claims 1 through 20 were substituted for the non-allowable claims 8 to 19. Evidently, the Commissioner of Patents agreed with the submission that the Monaghan Application now contained "claims conforming with the requirements of section 41(1)"; the '380 Patent was issued on January 31, 1984.

546    Each of Apotex and Merck put forward an expert to speak to the practices of the Patent Office at the relevant times. Both Mr. Robert Barrigar (put forward by Merck) and Mr. Robert Hirons (put forward by Apotex) have been registered patent agents in Canada for a long time. Both have extensive knowledge of Canadian patent prosecution and practice between 1980 and 1982, and are knowledgeable about practices of the Commissioner of Patents at that time. I accepted the qualifications of each to speak to these matters.

547    Both experts agreed that a declaration of conflict would not have been made between two pending applications when each application contained process-dependent claims for the same compound made using different processes. Accordingly, the question of missed conflict could only have arisen between claims 8 to 19, as originally filed, of the Monaghan Application and some or all of the claims of the Endo Application.

548    Mr. Hirons opined that the requirements of s. 43(1)(b) of the *Patent Act* were satisfied and a conflict, as defined in that provision, existed between the two applications (Hirons Expert Report, Exhibit 117, para. 13). Mr. Hirons pointed out that, during the period of co-pendency, the compound claims in the Monaghan Application were not restricted by process. Thus, in his view, a conflict between the two applications necessarily existed. In other words, one or more of claims 8 to 19 of the Monaghan Application described the invention disclosed in the Endo Application and, as a result, the Commissioner should have commenced conflict proceedings.

549    Frankly, this is, to a large degree, a legal opinion and not one for which I need the assistance of an expert. That being said, I do not disagree with Mr. Hirons's conclusion that a conflict, as defined in s. 43(1)(b), existed as between the two applications. Moreover, Mr. Hirons's description of how conflict proceedings were conducted, once directed, is not inaccurate.

550    However, Mr. Hirons fails to answer the question of whether "conflict proceedings *should* have been directed". He assumes that the existence of a conflict automatically requires the Commissioner to direct conflict proceedings. The mere existence of a conflict at the application stage does not, in my view, automatically mean that conflict proceedings should have been directed.

551    In responding to this question, I refer first to the procedures described in s. 43, in respect of the legal requirements of the *Patent Act*. Sections 43(2) to 43(4) deal with procedures to be followed *before* a conflict is declared. I accept that, when a

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

s. 43(1) conflict exists, s. 43(2) sets out a mandatory procedure to be followed.

**Procedure to be followed before conflict is declared**

(2) When the Commissioner has before him two or more applications referred to in subsection (1), he shall

    (a) notify each of the application of the apparent conflict and transmit to each of them a copy of the conflicting claims, together with a copy of this section; and

    (b) give to each applicant the opportunity of inserting the same or similar claims in his application within a specified time.

**Procédure à suivre avant déclaration de conflit**

(2) Lorsque le commissaire a devant lui deux ou plusieurs de ces demandes, il doit:

    a) notifier à chacun des demandeurs le conflit apparent, et transmettre à chacun d" eux une copie des revendications concurrentes, ainsi qu'une copie du présent article;

    b) procurer à chaque demandeur l'occasion d'insérer dans sa demande les mêmes revendications ou des revendications similaires, dans un délai spécifié.

552    In this case, assuming that claims 9 to 19 of the Monaghan Application, as originally filed, were in conflict with some or all of the claims in the Endo Application, the Commissioner was required to follow the procedure set out in s. 43(2) of the *Act*. He did not do so in this case. However, these are steps to be taken before the declaration of conflict to determine if there should be a *formal* declaration. Thus, even if the Commissioner erred by not complying with the mandatory provision, any such error would be of no moment if, at the end of the day, there was no need to make a formal declaration of conflict. The next step — the formal declaration — is set out in s. 43(5):

**Formal declaration of conflict**

(5) Where the subject matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications, the Commissioner shall require each applicant to file in the Patent Office, in a sealed envelope duly endorsed, within a time specified by him, an affidavit of the record of invention, which affidavit shall declare

    (a) the date at which the idea of the invention described in the conflicting claims was conceived;

    (b) the date on which the first drawing of the invention was made;

    (c) the date when and the mode in which the first written or oral disclosure of the invention was made; and

    (d) the dates and nature of the successive steps subsequently taken by the inventor to develop and perfect the invitation from time to time up to the date of the filing of the application for patent.

**Déclaration formelle de conflit**

(5) Si l'objet des revendications visées au paragraphe (3) est reconnu brevetable et que les revendications concurrentes sont maintenues dans les demandes, le commissaire exige de chaque demandeur le dépôt, au Bureau des brevets, dans une enveloppe scellée portant une suscription régulière, dans un délai qu'il spécifie, d'un affidavit du relevé de

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

l'invention. L'affidavit déclare:

> a) la date d laquelle a été conçue l'idée de l'invention décrite dans les revendications concurrentes;

> b) la date laquelle a été fait le premier dessin de l'invention;

> c) la date i laquelle a été faite 1a première divulgation écrite ou orale de !'invention et la manière dont elle a été faite;

> d) les dates et la nature des expériences successives que l'inventeur a pratiquées par la suite afro de développer et mettre graduellement an point cette invention jusqu'à la date du dépôt de la demande de brevet,

553    Of critical importance, this provision establishes that the conflict proceedings described in s. 43(5) and the balance of s. 43 only apply "where the subject-matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications."

554    Relating the file history to the co-pendency period between the Endo Application and the Monaghan Application, at no time between June 11, 1980 and August 17, 1982 was the Monaghan Application in a patentable form. Quite simply the potentially-conflicting *per se* claims of the Monaghan Application were not patentable; claims 8 to 19 did not contain claims that met the requirements of the *Patent Act*. The subject matter of claims 8 to 19 was *not* patentable. In short, during the co-pendency period, there was no obligation on the Commissioner to declare a conflict.

555    My understanding of s. 43 of the *Patent Act* is consistent with the practices of the Patent Office. Mr. Barrigar, using his experience and knowledge of processes in the Patent Office, provided his opinion on how, in practical terms, the Patent Office would have dealt with the two patent applications. This portion of his Expert Report and his oral testimony were very helpful. In brief, the Patent Office would not, faced with unpatentable claims, have initiated conflict proceedings. Rather, the practice of the Patent Office was as described by Mr. Barrigar (Barrigar Expert Report, Exhibit 44, para. 18):

> Based on my experience, and consistent with the provisions of the "Old Act", it was the uniform practice of the Patent Office in the period 1980 to and including 1984 to implement conflict practice in the context of the Patent Act as a whole. As discussed more fully below, this meant that only claims satisfying the other requirements of the Act and applicable Patent Rules were placed in conflict. It was the practice of the Patent Office to endeavour to dispose of all other claiming issues before declaring any conflict, so that if possible it would not be necessary to conduct conflict proceedings. Conflict proceedings constituted a drain on Patent Office resources and delayed issue of patents.

556    Thus, while the Commissioner may "technically" have been required to comply with ss. 43(2) to 43(4) of the *Act*, his failure to do so is without consequence where, as in this case, the requirements to pursue the conflict in formal proceedings, as set out in s. 43(5), were not met. Even Mr. Hirons finally agreed, on cross-examination that:

> There are very good policy reasons why the Commissioner of Patent would not want to launch or commence conflict proceedings in respect of claims that everybody knows cannot be issued in the form they are written.

557    Apotex asserts that the practice of resolving apparent conflicts, by requiring the applicant to amend all or part of the specification to remove objectionable claims, should have no bearing on the right to invoke s. 61 of the *Patent Act*. I disagree.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

Where a patent application contains claims that can never result in a patent, there is no conflict to declare.

558      In summary on this issue, I am satisfied that, on the facts of this case, there was no requirement to direct conflict proceedings between the Endo Application and the Monaghan Application. There was no missed conflict and Apotex is precluded, by s. 61(1)(b) of the *Act*, from challenging the validity of the '380 Patent on the grounds of prior inventorship.

*(4) Did the Endo application disclose the invention of the '380 Patent?*

559      If I am incorrect in my conclusion that Apotex is precluded from challenging the validity on the grounds of prior inventorship, I turn to the question of whether the Endo Application and Patent disclose the same invention as that of the '380 Patent.

560      The Endo Application and Patent clearly refer to a substance called "Monacolin K". As set out in claim 1, the Endo Patent claims:

A process for preparing Monacolin K, which process comprises cultivating a Monacolin K-producing micro-organism of the genus *Monascus* in a culture medium therefore.

561      It is accepted that Monacolin K is lovastatin. However, as discussed earlier in these Reasons, an essential feature of the claims of the '380 Patent is that the lovastatin be made using a strain of the species *Aspergillus terreus*. The invention is lovastatin when made by fermentation of *Aspergillus terreus* and does not include lovastatin made with other microorganisms. *Monascus* is a different genus from *Aspergillus*. Accordingly, the two applications that included allowable claims did not contain one or more claims defining substantially the same invention. Moreover, neither application described the invention disclosed in the other application.

562      Thus, even if I accept that there was a missed conflict, the invention of the '380 Patent is not the same as that of the Endo Application or Patent. Apotex has not persuaded me that the invention of the '380 Patent was known or used by Dr. Endo prior to the filing date of the Monaghan Application.

*(5) Red Yeast Rice/Anticipation*

563      Apotex submits that claims 13 to 15 of the '380 Patent are invalid pursuant to the principles of "anticipation by prior use". Briefly stated, Apotex's argument is that the compound lovastatin (also known as Monacolin K) was known and used in the form of traditional Red Yeast Rice long before the priority date of the '380 Patent or any earlier date of invention. Thus, Apotex alleges that the presence of lovastatin in any Red Yeast Rice product before the priority date of the '380 Patent was anticipatory of claims 13 to 15. In this section, I will use the term "Red Yeast Rice" to refer to the products, including rice, that are made with the substance known as red yeast.

**(a) Principles of Anticipation**

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

564    The concept of anticipation arises from s. 27(1) of the *Patent Act*. Subsection 27(1) permits any inventor to file an application for an invention that was "not known or used by any other person before he invented it". This requirement is echoed in s. 61(1)(a), which allows the Court to invalidate any patent or claim(s) if another person had "disclosed or used the invention in such a manner that it had become available to the public". In short, the *Patent Act* requires that the subject matter of a claim must not have been disclosed to the public before the claim date.

565    The guiding jurisprudence on the legal test of anticipation is found in the Supreme Court of Canada decision in *Sanofi-Synthelabo Canada Inc. v. Apotex Inc.*, 2008 SCC 61, [2008] 3 S.C.R. 265 (S.C.C.) [*Sanofi-Synthelabo*]. At paragraphs 23-27, the Supreme Court teaches that the issue of whether an invention is anticipated by the prior art requires that the Court have regard to two questions:

    1. Was the subject matter of the invention disclosed to the public by a single disclosure?

    2. If there has been such a clear disclosure, is the working of the invention enabled by that disclosure?

566    At the first step of the analysis, the Supreme Court provided the following guidance (*Sanofi-Synthelabo*, above, at para. 25):

    When considering the role of the person skilled in the art in respect of disclosure, the skilled person is "taken to be trying to understand what the author of the description [in the prior patent] meant" (para.32). At this stage, there is no room for trial and error or experimentation by the skilled person. He is simply reading the prior patent for the purposes of understanding it.

567    Once disclosure has been made, the question of enablement was described by the Supreme Court (*Sanofi-Synthelabo*, above, at para 27):

    Once the subject matter of the invention is disclosed by the prior patent, the person skilled in the art is assumed to be willing to make trial and error experiments to get it to work. While trial and error experimentation is permitted at the enablement stage, it is not at the disclosure stage. For purposes of enablement, the question is no longer what the skilled person would think the disclosure of the prior patent meant, but whether he or she would be able to work the invention.

568    In *Abbott Laboratories v. Canada (Minister of Health)*, 2008 FC 1359, 337 F.T.R. 17 (Eng.) (F.C.) [*Abbott Clarithromycin (FC)*], aff'd 2009 FCA 94, 387 N.R. 347 (F.C.A.), Justice Hughes undertook a helpful survey of the law of anticipation as it exists after *Sanofi-Synthelabo*, above. He summarized the legal requirements for anticipation as follows (*Abbott Clarithromycin*, above, at para. 75):

    For there to be anticipation there must be both disclosure and enablement of the claimed invention.

    1. The disclosure does not have to be an "exact description" of the claimed invention. The disclosure must be sufficient so that when read by a person skilled in the art willing to understand what is being said, it can be understood without trial and error.

    2. If there is sufficient disclosure, what is disclosed must enable a person skilled in the art to carry out what is disclosed. A certain amount of trial and error experimentation of a kind normally expected may be carried out.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

3. The disclosure when carried out may be done without a person necessarily recognizing what is present or what is happening.

4. If the claimed invention is directed to a use different from that previously disclosed and enabled then such claimed use is not anticipated. However if the claimed use is the same as the previously disclosed and enabled use, then there is anticipation.

5. The Court is required to make its determinations as to disclosure and enablement on the usual civil burden of balance and probabilities, and not to any more exacting standard such as quasi-criminal.

6. If a person carrying out the prior disclosure would infringe the claim then the claim is anticipated.

569      The date for assessment of anticipation is June 15, 1979, the priority date of the '380 Patent.

### (b) Background on Red Yeast Rice

570      It is undisputed that Red Yeast Rice (or similar products containing red yeast, such as red yeast bean curd) has been used produced and consumed in Asian countries for hundreds of years. Dr. Scott Harding, an expert witness presented by Apotex, described the uses of Red Yeast Rice in (mainly) Chinese culture as follows (Harding Expert Report, Exhibit 115, para. 15):

[Red Yeast Rice] has traditionally been used as a specialty food, as a dye or food pigment and as a natural remedy for gastrointestinal infections and diseases of the blood.

571      According to Dr. Harding, more recently, Red Yeast Rice has been marketed as a product that can lower lipid levels and reduce cardiovascular risk.

### (c) Legal Consequences of lovastatin in Red Yeast Rice

572      The expert testimony of Dr. Harding is to the effect that Red Yeast Rice is not and was not produced from *Aspergillus terreus*. Dr. Harding opined that traditional Red Yeast Rice was produced through fermentation of certain strains of species from the genus *Monascus*.

573      Since Red Yeast Rice does not involve the use of *Aspergillus terreus* in any way, it cannot have been an anticipatory disclosure of the process claims of the '380 Patent. As discussed in the section of these reasons on claims construction, claims 1 to 12 are process claims in which producing strains of *Aspergillus terreus* are fermented to produce certain compounds (including lovastatin as Compound I). Apotex does not assert the argument of anticipation against claims 1 to 12; rather it limits it argument to the product-by-process claims 13 to 15.

574      Claim 13 is a claim to any one of Compounds I to IV, when prepared by the process defined in claim 1 or by an obvious chemical equivalent. Claim 14 is a claim to one of Compound I or II, when prepared by the process defined in claim 2 or by an obvious chemical equivalent and claim 15 is a claim to one of Compound III or IV, when prepared by the process

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

defined in claim 5, or by an obvious chemical equivalent. Earlier in these reasons, I construed claims 13 to 15 to require that, as an essential element, the product (be it Compound I, II, III or IV) is produced by the process defined in the earlier claims. Specifically, the compounds of claims 13 to 15 *must* be made from the fermentation of a species of *Aspergillus terreus*.

575      For the moment, I will assume that lovastatin could be found in Red Yeast Rice as of the priority date. I accept the opinion of Dr. Harding that Red Yeast Rice is a result of the fermentation of species within the genus *Monascus*. If the allegedly anticipatory product — lovastatin found in Red Yeast Rice — is produced from something other than *Aspergillus terreus*, it cannot, in my view, meet the legal test for anticipation. Stated in terms of the test, Red Yeast Rice does not meet the first requirement that the prior invention must disclose the subject matter of claims 13 to 15.

576      Apotex responds to this analysis by asserting that a product-by-process claim is a claim to the product. In the words of Apotex:

> Where the product was previously known and a new process for making it has been discovered, the only invention that can be claimed is the process because the product is not "new". Thus, a product-by-process claim can be anticipated by prior disclosure of the product but not of the process.

Apotex relies on the Supreme Court decision in *Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)*, [1955] S.C.R. 414, 23 C.P.R. 1 (S.C.C.) [*Hoffmann-LaRoche 1955* cited to S.C.R.] for this submission.

577      I acknowledge that the *Hoffmann-LaRoche* decision does appear to support Apotex's position. *Hoffmann-LaRoche* involved an application for a patent that claimed a new process for making a known substance called aldehyde, as well as aldehyde when made by that process. The Commissioner of Patents granted the claim for the new process for making aldehyde, but not the claim for aldehyde made by that process. The inventor appealed to the Exchequer Court, without success (*Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)* (1953), [1954] Ex. C.R. 52, 19 C.P.R. 80 (Can. Ex. Ct.)), and then to the Supreme Court of Canada, again without success. In his brief reasons for dismissing the appeal, Chief Justice Cartwright, speaking on behalf of four of five of the justices, stated: "There being nothing new about the product, the appellant is not entitled to obtain a patent therefore even on the basis of a process dependent product claim" (*Hoffmann-LaRoche*, above, at p.415). Little analysis is offered in the single page of Chief Justice Cartwright's reasons.

578      I admit to having considerable difficulty in understanding how the conclusion in *Hoffmann-LaRoche* can fit with the protection offered by the *Patent Act*. It seems illogical to me that a process for making a substance can be novel and thus patentable but that a claim for the product when made by that process is automatically not patentable. I understand that situations could exist that would invalidate the product-by-process claim. For example (without limitation):

• a product-by-process claim could be challenged on the basis that the substance, *when made by the described process*, was anticipated or obvious; or

• an earlier patent or disclosure is to the product made by any means (although, of course, this could not have happened with the '380 Patent since, at that time, *per se* claims were not permitted).

However, where the substance is only claimed when made by a particular process and where the making of the product by that particular process is novel, the boundaries of the claim are well delineated. I cannot see why the claim would automatically be invalidated simply because someone else has claimed the same product made by a different process.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

579    Finally, I observe that the Supreme Court in *Hoffmann-LaRoche* implicitly accepted the validity of the claims to "a new and useful process for manufacture of an aldehyde". There is, in my view, no principled reason why, if the product-by-process claim is invalidated, the new process for making the known substance is not also invalid.

580    There has been little jurisprudence in which the principle in *Hoffmann-LaRoche*. However, what little there has been over the last 65 years does not, it seems, directly contradict the Supreme Court decision. *Hoffmann-LaRoche* was recently considered by the Federal Court of Appeal in *Abbott Laboratories v. Canada (Minister of Health)*, 2007 FCA 153, 59 C.P.R. (4th) 30 (F.C.A.) (*Abbott Clarithromycin (FCA)*), where Justice Sharlow observed at paragraph 15 that, "There is no jurisprudence that casts any doubt on the correctness of the principle stated in *Hoffmann*."

581    The Court of Appeal also had occasion to examine the applicability of *Hoffmann-LaRoche* in *Bayer AG v. Apotex Inc.*, 2001 FCA 263, 14 C.P.R. (4th) 263 (Fed. C.A.) [*Bayer Ciprofloxin*]. In that case, Apotex Inc. appealed from an order prohibiting the Minister of National Health and Welfare from issuing to it an NOC under the *Regulations*. Apotex alleged that Bayer's Canadian patents for ciprofloxacin were invalid because Bayer had already applied in another country for a patent on the same drug. The inventions were substantially the same but used a different synthesis process. Apotex Inc. relied on *Hoffmann-La Roche* for the proposition that the differences in the process for the making of the drug were not "legally relevant" (*Bayer Ciprofloxin*, above, at para. 15). In rejecting this argument, Justice Evans, speaking for the Court, commented as follows (*Bayer Ciprofloxin*, above, at para. 16):

> In our view, however, that case is readily distinguishable from the case at bar. In particular, the issue in Hoffmann-La Roche, supra, was whether the patent application satisfied the requirement in paragraph 28(1)(b) of the Patent Act that a patent may only be obtained for an invention to the extent that it contains an element of novelty. This is not the question before us. What we must decide is whether the inventions that are the subject of the Chilean and Canadian patents are the same invention. And, as counsel for Bayer points out in his memorandum, Apotex did not allege in any of its notices of allegations that the product by process patent obtained in Canada for ciprofloxacin was invalid because ciprofloxacin had already been invented, and that the use of the malonic ester synthesis process to produce an intermediate could not therefore render the invention novel.

> [Emphasis added.]

582    In summary, it appears that I must accept the holding of *Hoffmann-La Roche*. In contrast to the situation before Justice Evans in *Bayer Ciprofloxin*, Apotex has clearly argued that the product-by-process claims are invalid because the substance — lovastatin or Monacolin K — had already been invented. Paraphrasing the words of Justice Sharlow in *Abbott Clarithromycin*, above, for the purposes of applying the *Hoffmann-La Roche* principle, lovastatin is "known" as of June 15, 1979, if a hypothetical claim for its invention would fail on the ground of anticipation or lack of novelty.

583    Apotex submits that the existence of Red Yeast Rice — a substance known for centuries — would satisfy this test. The issue is whether the product lovastatin, as described in the '380 Patent, however made, was anticipated by Red Yeast Rice.

**(d) Evidence of lovastatin in Red Yeast Rice prior to the priority date**

584    The first question is whether the evidence before me establishes that Red Yeast Rice was a source of lovastatin before the priority date. If it does not, then the claim of anticipation must fail. However, if I am persuaded that, on a balance of

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

probabilities, Red Yeast Rice, prepared by traditional methods, contained lovastatin, I will continue on to consider whether there was both disclosure and enablement.

585    In Dr. Harding's opinion, there is ample scientific literature that indicates that Red Yeast Rice and similar products "produced in solid phase fermentation and using strains of *Monascus* that were traditionally employed, have appreciable levels of Monacolin K [lovastatin] and are effective in lowering blood cholesterol *in vivo*" (Harding Expert Report, Exhibit 115, para. 52). Dr. Harding concludes that, "people have consumed Monacolin K for centuries."

586    Dr. Harding stated that the amount of Monacolin K in Red Yeast Rice will vary depending on the fermentation conditions used. It follows (and Dr. Harding did not disagree) that not all Red Yeast Rice contains Monacolin K.

587    In addition to his literature search, Dr. Harding tested two different samples of Red Yeast Rice products that he bought from Asian specialty markets in Winnipeg and Toronto. His conclusion was that both samples contained low, but detectable, levels of Monacolin K.

588    I will begin with the results from Dr. Harding's tests on two commercial samples of Red Yeast Rice. Even if those samples did contain measurable quantities of lovastatin (Monacolin K) (which I am prepared to accept), these samples were produced well after the priority date of the invention of the '380 Patent. They tell us nothing about the existence of lovastatin in Red Yeast Rice at any time prior to 1979. Moreover, beyond representations on the packaging, we have no evidence as to how these commercial products were produced and whether the lovastatin found in the samples resulted from traditional methods of fermentation.

589    As described by Dr. Harding, the modern techniques of producing Red Yeast Rice would differ from traditional methods:

The modern techniques would employ things like flasks and control environments. Traditionally these things were fermented in boxes or bamboo plates, containers, in open areas, and the temperature was controlled either by fanning or ensuring no direct sunlight, these sorts of things, but also by mixing the rice to uniformly distribute the yeast to get the full colour and the final product through every kernel of rice, but it's also to reduce the temperature.

590    In his Expert Report, Dr. Harding also notes that, while traditional and modern production practices are quite similar, "modifications [have] been introduced into modern production to enhance the production of the desired metabolites" (Harding Expert Report, Exhibit 115, para. 28).

591    Dr. Havel, an expert presented to the Court by Merck, also commented that:

Samples collected in January to April 1998, 12 years after the Negishi paper, may have been produced under conditions which were not, I believe, we can consider truly traditional red yeast rice on or before 1980.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

592    In my view, Dr. Harding's opinion that the two samples he tested were prepared in accordance with traditional methods is speculative. The results of Dr. Harding's tests on two Red Yeast Rice samples cannot be used to reliably demonstrate that, before the priority date, Red Yeast Rice contained lovastatin.

593    I have similar difficulties with the literature referenced by Dr. Harding in his Expert Report. One article was cited as Negishi et al, "Productivity of Monacolin K in the genus Monascus species" (referred to as Negishi). Negishi reports having tested 124 *Monascus* strains in total. Almost all of the species were isolated from several different red yeast food products. Negishi used modern techniques to carry out the experiments, and found that 17 strains of five species were capable of producing Monacolin K. The initial problem that I have with this paper is that it post-dates, by many years, the priority date of the '380 Patent. I have no information on how the Red Yeast Rice samples were collected and whether these same products would have been available in the years before 1979.

594    Another reference by Dr. Harding was a 2001 journal article by Heber et al, entitled "An Analysis of Nine Proprietary Chinese Red Yeast Rice Dietary Supplements: Implications of Variability in Chemical Profile and Contents" (referred to as Heber). Heber purchased nine different commercially available dietary Red Yeast Rice supplements and found total Monacolin K content from 0% to 0.58%. While the paper may demonstrate that a few samples of Red Yeast Rice products collected and tested for purposes of the paper contained measurable amounts of Monacolin K, they do not establish that lovastatin existed in Red Yeast Rice prior to 1979.

595    The only possible link between testing that occurred after 1979 and the potential for the production of lovastatin from Red Yeast Rice prior to that date would be the production methods. Dr. Harding appears to base his overall opinion that traditional Red Yeast Rice has contained Monacolin K throughout the centuries on the observed similarities between traditional and modern production methods. If it can be established that the production methods used in both periods were the same, it may be possible to extrapolate post-1979 results to pre-1979 samples of Red Yeast Rice.

596    Dr. Harding testified in cross-examination that, of the seven pieces of prior art cited in his report, only two dealt with the fermentation of Red Yeast Rice prior to 1979.

597    However, upon closer examination, there were significant differences in the traditional methods of producing Red Yeast Rice and those that would produce lovastatin, including:

• traditional Red Yeast Rice was most likely be fermented at temperatures in excess of 30°C where lovastatin cannot be produced;

• there is an inverse relationship between the amount of pigment-producing ability and the amount of lovastatin-producing ability in Red Yeast Rice; and

• the modern strains of Red Yeast Rice provide no information about whether the traditional Red Yeast Rice produced lovastatin.

The evidence is strong that the production of lovastatin is very dependent on the temperature of fermentation. Although Negishi reported that 17 of 50 samples of the *Monascus* species produced Monacolin K, they also reported that Monacolin K was produced only when the fungi were grown at 25°C. As observed by Negishi, "under conditions of incubation at 30 to 37°C, those Monacolin K-producing strains lost their capability of producing Monacolin K ...". The '380 Patent teaches the reader to incubate the *A. terreus* fungus at 28°C, a temperature at which *Monascus* would likely be incapable of producing

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

lovastatin.

598    In sum, I am not persuaded that the evidence demonstrates that lovastatin was contained in Red Yeast Rice prior to the priority date. It follows that Apotex has not satisfied its burden of demonstrating that Red Yeast Rice anticipates lovastatin.

**(e) Disclosure of lovastatin in Red Yeast Rice**

599    In the event that I am wrong in this conclusion, I will assume that lovastatin was contained in at least some samples of Red Yeast Rice prior to the relevant date. The question is whether this satisfies the requirement of disclosure. In my view, as discussed in the following, Apotex has not persuaded me that the subject matter of the invention - lovastatin — was disclosed to the public by Red Yeast Rice.

600    The evidence demonstrates that, if Red Yeast Rice contained lovastatin, it did not do so under all conditions of fermentation. That is, prior to June 15, 1979, not every Red Yeast Rice product contained lovastatin. Further, it is also evident that persons who produced or used Red Yeast Rice were unaware that it contained lovastatin.

601    Apotex argues that *Calgon Carbon Corp. v. North Bay (City)*, 2008 FCA 81, 64 C.P.R. (4th) 337 (F.C.A.) at paragraph 8 and *Baker Petrolite Corp. v. Canwell Enviro-Industries Ltd.*, 2002 FCA 158, 17 C.P.R. (4th) 478 (Fed. C.A.) at paragraphs 35, 42 [*Baker Petolite*] stand for the proposition that the extent or duration of the prior use or sale is not important; that disclosure to "even one member of the public" destroys the novelty of a chemical product. Thus, Apotex submits, the existence of lovastatin, in even one sample of Red Yeast Rice, as of the priority date would be anticipatory of the compound claimed in the '380 Patent.

602    I disagree with Apotex's assertion that the existence of lovastatin in even one sample of Red Yeast Rice is sufficient to demonstrate disclosure. I think that Apotex confuses "disclosure to one member of the public" as stated in *Baker Petrolite*, above, at paragraph 42, with "one disclosure". If the prior art invariably or predictably discloses the compound, there may well be anticipation. However, where the existence of the compound alleged to be anticipatory cannot be reasonably or consistently predicted from a large universe of possibilities, I cannot see how this could possibly meet the test for disclosure. Anticipation must be more than an accidental presence of a compound.

603    Not only does Apotex's argument appear illogical to me, it is not supported by the jurisprudence. In *Abbott Clarithromycin)*, above, at paragraph 22, the Court of Appeal considered the argument of Abbott that a skilled person must have certain knowledge regarding the prior art.

> Abbott argues that a person skilled in the art who heated clarithromycin Form I by the known technique would not and could not know that clarithromycin Form II had been created, unless they also knew that the heating process had to be stopped before the substance reached its melting point at 225°C. In my view, the absence of that knowledge is legally irrelevant. The undisputed evidence is <u>that clarithromycin Form II would have been present</u> if the heating technique had been followed. There were well established analytical techniques that would have disclosed its presence if anyone had cared to look at the appropriate moment.

[Emphasis added.]

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

604      In the case before me, I have no such evidence that lovastatin *would have been present* in Red Yeast Rice. Indeed the evidence, as disclosed in the literature cited (for example, Negishi and Heber), is that lovastatin was present only in a very few samples.

605      Apotex also argues that the fact that no one, including the skilled person, ever recognized that Red Yeast Rice contained lovastatin is not relevant. Apotex submits that the Federal Court of Appeal, in *Abbott Laboratories v. Canada (Minister of Health)*, 2006 FCA 187, 56 C.P.R. (4th) 387 (F.C.A.) at paragraphs 15-23, refers to the principle, outlined by Lord Hoffmann in *Synthon BV v. Smithkline Beecham plc*, [2005] UKHL 59, [2006] 1 All E.R. 685 (U.K. H.L.) [*Synthon BV*], that a patent is disclosed even though the author or maker of the prior art was not aware that he was doing so. Apotex refers to *Synthon BV*, above, at paragraphs 22-23 for support on this point.

606      I agree with Apotex that the cited passage of the House of Lords decision in *Synthon BV*, above, does contain a reference to the fact that an awareness of infringement is not a requirement. However, an examination of the entire passage clarifies the context in which those remarks were made. As stated by Lord Hoffmann in *Synthon BV*, above, at paragraphs 22-23:

> ... the matter relied upon as prior art must disclose subject matter which, if performed, would necessarily result in an infringement of the patent.... But patent infringement does not require that one should be aware that one is infringing: "whether or not a person is working [an] ... invention is an objective fact independent of what he knows or thinks about what he is doing": *Merrell Dow Pharmaceuticals Inc v H N Norton & Co Ltd* [1996] RPC 76, 90. It follows that, whether or not it would be apparent to anyone at the time, whenever subject-matter described in the prior disclosure is capable of being performed and is such that, if performed, it must result in the patent being infringed, the disclosure condition is satisfied. The flag has been planted, even though the author or maker of the prior art was not aware that he was doing so.
>
> Thus, in *Merrell Dow*, the ingestion of terfenadine by hay-fever sufferers, which was the subject of prior disclosure, necessarily entailed the making of the patented acid metabolite in their livers. It was therefore an anticipation of the acid metabolite, even though no one was aware that it was being made or even that it existed. But the infringement must be not merely a possible or even likely consequence of performing the invention disclosed by the prior disclosure. It must be necessarily entailed. If there is more than one possible consequence, one cannot say that performing the disclosed invention will infringe. The flag has not been planted on the patented invention, although a person performing the invention disclosed by the prior art may carry it there by accident or (if he is aware of the patented invention) by design. Indeed, it may be obvious to do so. But the prior disclosure must be construed as it would have been understood by the skilled person at the date of the disclosure and not in the light of the subsequent patent. As the Technical Board of Appeal said in *T/396/89 UNION CARBIDE/high tear strength polymers* [1992] EPOR 312 at para 4.4:

>> It may be easy, given a knowledge of a later invention, to select from the general teachings of a prior art document certain conditions, and apply them to an example in that document, so as to produce an end result having all the features of the later claim. However, success in so doing does not prove that the result was *inevitable*. All that it demonstrates is that, given knowledge of the later invention, the earlier teaching is capable of being adapted to give the same result. Such an adaptation cannot be used to attack the novelty of a later patent.

607      An understanding of this passage demonstrates that Apotex has selectively read the comments of Lord Hoffmann, omitting a key consideration. I agree with Apotex that an awareness that the prior art discloses the anticipatory invention is not a requirement of disclosure. Justice Hughes made that point in *Abbott Clarithromycin*, above, at paragraph 75. However,

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

while supporting the argument of Apotex, the passage from *Synthon BV*, above, makes it very clear that the disclosure requirement is only met where infringement must occur when the prior art is practised. Paraphrasing the words of Lord Hoffmann, the flag of anticipatory disclosure is not planted on the patent in question unless the prior disclosure would necessarily result in an infringement of the patent.

608      Applied to the situation before me, Red Yeast Rice only satisfies the disclosure requirement of the test for anticipation if it can be said to necessarily produce lovastatin. As we know from the evidence, that is definitely not the case. Indeed, the evidence before me is that the existence of lovastatin in Red Yeast Rice would be a very rare event.

609      In conclusion on this issue, I do not accept Apotex's submission that lovastatin was anticipated by Red Yeast Rice.

## XI. Conclusion

610      As noted at the beginning of these reasons, this litigation was subject to the Bifurcation Order. Thus, the matter proceeded to trial without requiring the parties to adduce evidence at trial on any issue of fact pertaining to the following:

1. the extent of infringement, if any, by the Defendants of the '380 Patent;

2. the amount of damages suffered, if any, by the Plaintiffs as a result of any such infringement; or

3. the amount of profits earned by the Defendants from any such infringement.

611      According to the terms of the Bifurcation Order, the determination of whether the Plaintiffs are entitled to elect to recover profits was to be determined by the trial judge. In final arguments, Merck submitted that it wished to elect to recover profits. Apotex objected.

### A. Damages or Profits

612      Once a patentee has successfully demonstrated infringement, the Court has the discretion to grant the patentee's choice of remedies — either damages (pursuant to s. 55 of the *Patent Act*) or an accounting of profits (pursuant to s. 57 of the *Patent Act*). Merck wishes to elect an accounting of profits and asks this Court to so direct. Apotex argues that I should not exercise my discretion in this case.

613      While both damages and accounting of profits are intended to provide compensation to a wronged plaintiff, the fundamental principles underlying the two remedies and the practical considerations are substantially different.

614      The object of an award of damages is to make good any loss suffered by the plaintiff as a result of the defendant's infringement of the patent. Quantification of the award is based on the losses suffered by the plaintiff; any gains realized by the defendant because of its wrongdoing are not relevant. On the other hand, an accounting of profits is based on the premise that the defendant, by reason of its wrongful conduct, has improperly received profits which belong to the plaintiff. The objective of the award is to restore those actual profits to their rightful owner, the plaintiff, thereby eliminating whatever

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

unjust enrichment has been procured by the defendant. Calculation is based on the profits wrongfully gained by the defendant; any other losses suffered by the plaintiff are irrelevant.

615     An accounting of profits is not an easy calculation. As was stated by the late Justice Paul Rouleau, of this Court, when speaking about such an accounting in *Beloit Canada Ltée/Ltd. v. Valmet Oy* (1994), 55 C.P.R. (3d) 433 (Fed. T.D.) at para. 3, [1994] F.C.J. No. 682 (Fed. T.D.), rev'd in part (1995), 61 C.P.R. (3d) 271, [1995] F.C.J. No. 733 (Fed. C.A.), leave to appeal to S.C.C. refused, (1996), [1995] S.C.C.A. No. 388, 64 C.P.R. (3d) vi (S.C.C.):

> This was undoubtedly a most expensive, lengthy and difficult reference and one which clearly underlines the pitfalls of granting the remedy of an accounting of profits other than in exceptional and appropriate circumstances and after due deliberation by the court.

616     In spite of practical difficulties, the Federal Court of Appeal in *Beloit Canada Ltée/Ltd. v. Valmet Oy* (1992), 45 C.P.R. (3d) 116 (Fed. C.A.) at para. 10, [1992] F.C.J. No. 825 (Fed. C.A.), stated that it could:

> ...see no reason in principle why a patentee, whose property has been wrongly appropriated through infringement, should not recover all the profits, direct and indirect, derived by the infringer from his wrongful infringement.

617     It is necessary for a party seeking an equitable remedy, such as profits, to show some basis for the exercise of equity (*Janssen-Ortho Inc. v. Novopharm Ltd.*, 2006 FC 1234, 57 C.P.R. (4th) 58 (F.C.) at para. 132, aff'd 2007 FCA 217, 59 C.P.R. (4th) 116 (F.C.A.) leave to appeal to S.C.C. refused, [2007] S.C.C.A. No. 442, 383 N.R. 397 (note) (S.C.C.); *Servier*, above, at para. 507).

618     Merck submits that it can demonstrate a basis for an election of profits. Specifically, it puts forward the following factors:

• The Plaintiffs have not committed any inequitable conduct which would disentitle them to equitable relief.

• The Plaintiffs did not delay in commencing the litigation. The infringement action was commenced on June 12, 1997, within 3 months of Apotex Inc. receiving an NOC for Apo-lovastatin.

• The Defendants could not have doubted that the Plaintiffs would pursue an infringement action given the lengthy history of prior lovastatin litigation.

• The reasons why the litigation took years to prosecute are not, Merck submits, reasons to disentitle the Plaintiffs to equitable relief:

> • the long and complicated facts of the cases: we are dealing with a process patent, where the acts of infringement are conducted in secret, requiring the Plaintiffs to attempt to prove infringement through a long discovery process and repeated motions for productions;

> • AFI's history of use of *Aspergillus terreus* to make lovastatin going back to 1991 to 1999;

> • the transfer of *Aspergillus terreus* and AFI-1 technology to Blue Treasure in 1995 and its use;

**WestlawNext**® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

• the filing of a statement of claim in T-1169-01;

• Apotex Inc.'s refusal to agree to consolidate the two proceedings for discovery meaning that the Plaintiffs had to repeat to a large extent the discovery from the infringement action;

• the patent expiry on January 31, 2001, thereby capping the period of infringement as of that date; and

• two years of the delay due to the length of the trial requested.

• Delay in the action is a factor that is more related to the complicated facts of the proceeding rather than the diligence of the Plaintiffs.

619     While I agree with Merck that it has not committed any inequitable conduct that would disentitle them from the equitable remedy of profits, other factors weigh against such a remedy in this case.

620     A factor that causes me serious concern is the time that this matter took to come to trial. Merck attempts to distance itself from any decisions that resulted in the delay of this trial for almost thirteen years. I cannot accept that the Defendants and the Federal Court bear all of the responsibility for the delay. The consequence of this delay is, inevitably, that reaching back to the period between 1997 and 2001 to assess Apotex profits would be exceedingly difficult.

621     The difficulty in assessing profits is further exacerbated by the complexities of the commercial arrangements that involved not only AFI and Apotex Inc., but also Blue Treasure and Biogal. Merck consented to the settlement involving Biogal's interests on May 28, 2010.

622     An additional layer of complexity comes from the fact that Merck does not assert that all of the lovastatin that was produced during the 1997 to 2001 period infringed the '380 Patent. On the Canadian-produced material by AFI, except for the batch referred to as CR0157, there is no assertion of infringement. I have also concluded that Merck has not made out its case for infringement with respect to all of the Blue Treasure productions.

623     Dissecting Apotex's profits to account for the Biogal settlement and the non-infringing production would be a complex undertaking.

624     Balancing the factors in this case, I am not persuaded that I ought to exercise my discretion and permit the Plaintiffs to elect an accounting of profits. The Plaintiffs will be entitled to their damages. Specifically, a hearing under ss. 107 and/or 153 of the *Federal Courts Rules*, SOR/98-106 [*Federal Courts Rules*] shall be conducted to determine: the extent of infringement by the Defendants of the '380 Patent; and, the amount of damages suffered by the Plaintiffs as a result of such infringement.

### B. Exemptions from Liability

625     Related to the issue of damages is the question of whether any volumes of lovastatin produced by Apotex should be exempt from a finding of infringement. Apotex relies on s. 55.2(1) of the *Patent Act* (post October 1, 1989) to submit that it should not be held liable for any infringement relating to its experimental and regulatory uses of lovastatin.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

626    Exemptions from liability are founded in s. 55.2(1) of the *Patent Act* (post October 1, 1989). That provision states that:

> 55.2(1) It is not an infringement of a patent for any person to make, construct, use or sell the patented invention solely for uses reasonably related to the development and submission of information required under any law of Canada, a province or a country other than Canada that regulates the manufacture, construction, use or sale of any product

> 55.2(1) Il n'y a pas contrefaçon de brevet lorsque l'utilisation, la fabrication, la construction ou la vente d'une invention brevetée se justifie dans la seule mesure nécessaire à la préparation et à la production du dossier d'information qu'oblige à fournir une loi fédérale, provinciale ou étrangère réglementant la fabrication, la construction, l'utilisation ou la vente d'un produit.

627    Apotex may claim an exemption from liability for certain amounts of the infringing product, provided that it can satisfy its burden to demonstrate that the product was used for permitted purposes (such as obtaining regulatory approval or to comply with regulations) (*Merck & Co. v. Apotex Inc.*, 2006 FC 524, 53 C.P.R. (4th) 1 (F.C.), rev'd on other grounds 2006 FCA 323, 55 C.P.R. (4th) 1 (F.C.A.) leave to appeal to S.C.C. refused, *Merck & Co. v. Apotex Inc.* (2007), [2006] S.C.C.A. No. 507, 370 N.R. 400 (note) (S.C.C.)).

628    The Canadian *Food and Drug Regulations*, C.R.C. 1978, c. 869 [*Food and Drug Regulations*], and the United States *Food Drug and Cosmetic Act*, 21 U.S.C., as amended [*Food Drug and Cosmetic Act*], required Apotex Inc. to retain and test samples of lovastatin on a routine basis. Apotex submits that its testing and retention of lovastatin falls within the scope of subsection 55.2(1) of the *Patent Act* and the common law exception and is therefore exempt from infringement.

629    Apotex submits that the evidence clearly shows that, as required by the Canadian *Food and Drug Regulations*, above, and the regulations under the U.S. *Food Drug and Cosmetic Act*, above, Apotex: (i) acquired and used bulk lovastatin, and formulations incorporating bulk lovastatin, for the purpose of obtaining permission to sell lovastatin containing pharmaceutical products in Canada and the United States; (ii) carried out in process quality control sampling of lovastatin formulations; and (iii) retained samples of bulk and finished dosage forms of lovastatin.

630    Mr. Barber, the Manager of the Formulations Department at Apotex Inc., and Ms. Copsey, Manager of Packaging and Director of Commercial Lab Operations at Apotex Inc., explained in detail how Apotex Inc. used lovastatin for these purposes. The business records of Apotex Inc. adduced at trial reflect those uses. Apotex submits that its use of lovastatin for these experimental and regulatory purposes is exempt from infringement under s. 55.2(1) and (6) of the *Patent Act* (post October-1989) and the common law.

631    Mr. Fahner was the Vice-President of Finance at Apotex Inc. during the relevant times. He compiled charts identifying the quantities of lovastatin from each lot of bulk lovastatin and finished dosage batch that were used by Apotex Inc. for each of the purposes described by Mr. Barber and by Ms Copsey, namely, the research and development work in preparation of the submission batches, the retention of API samples and the process sampling and finished goods retention. Apotex Inc. submits that the evidence establishes that the following quantities of lovastatin were used by Apotex Inc. for regulatory and experimental purposes and should be exempt from any finding of infringement:

| Use of lovastatin by Apotex Inc. | Total Quantity (in kg) |
| --- | --- |
| Research and Development | 59.1111 |
| Reserve Samples (API) | 22.0986 |
| In Process Samples | 6.58078 |

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

Finished Goods Retained Samples                                          4.2654

632    I do not understand Merck to be objecting to the exemption of these Apotex Inc. volumes from a finding of infringement. I am satisfied that the volumes set out in the above table are exempt from any finding of infringement.

633    AFI also conducted research and development work involving the use of the microorganism *Aspergillus terreus* after the assets of ABI were acquired in July 1991. Initially, the work was a continuation of the work commenced by ABI in 1988 and was specifically related to obtaining a compulsory licence. Subsequently, the work involved the research and development of *Aspergillus terreus* for regulatory submissions and for eventual commercialization of *Aspergillus terreus* lovastatin. In the course of these activities, ABI, and subsequently AFI, manufactured 6.9 kg of *Aspergillus terreus* lovastatin. This was supplied to Apotex Inc. and used for research and development purposes and for regulatory submissions. AFI submits that this work is exempt from infringement. I agree.

634    In 1998 and 1999, AFI ran a few fermentations using *Aspergillus terreus* at the 14,000 litre scale for research and development purposes directed to market readiness upon expiry of the '380 Patent. A total of 13.45 kg was manufactured from these runs. The Defendants assert that this work is exempt from infringement. In June 2002, this material was supplied to Brantford Chemical Inc., a sister company to Apotex Inc., for development purposes in an effort to make simvastatin, another statin that is not the subject of this litigation. Apotex Inc. submits that there was no evidence at trial that the 13.45 kg was ever used to manufacture tablets for sale in Canada, or elsewhere. This work is exempt from infringement. I agree.

635    Merck objects to an exemption from liability for any amounts of AFI-1 lovastatin made in Winnipeg during the period 1993 to 1999. In their view, these volumes clearly infringed the '380 Patent. Moreover, through the transfer of the AFI-1 technology to Blue Treasure for commercial purposes, the infringement resulted in a loss of Merck's right to the "full enjoyment of the monopoly" (*Monsanto*, above, at para. 34). Accordingly, Merck argues, these volumes should not be the subject of any "fair dealing" exemption. In addition, Merck submits that the liability should extend to all 296.6 kg of AFI-1 lovastatin that were allegedly made by Blue Treasure.

636    I am not prepared to make this link. In light of the Supreme Court of Canada's decision in *Smith, Kline & French Inter-American Corp. v. Micro Chemicals Ltd.* (1971), [1972] S.C.R. 506, 2 C.P.R. (2d) 193 (S.C.C.) [*Micro Chemicals*], Merck's allegation is without foundation. In the case at bar, AFI was doing exactly what the defendant did in *Micro Chemicals*. AFI was carrying out research for the purposes of improving its *Aspergillus terreus* process to ensure that the process could be used on a commercial scale. This is the type of activity that the Supreme Court held was exempt from infringement. The supply of the developed technology to Blue Treasure, who was permitted to utilize the AFI-1 process to make lovastatin for sale outside Canada, was not, in the circumstances, an act of infringement.

637    In sum, I am satisfied that neither the 6.9 kg nor the 13.45 kg of *Aspergillus terreus* lovastatin referred to above should attract liability. Moreover, I am not prepared to conclude that the alleged 296.6 kg of AFI-1 lovastatin that was made using the transferred AFI-1 technology infringed the '380 Patent.

*C. Conclusion*

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

638    In conclusion, the action of the Plaintiffs will succeed, in part, and they will be entitled to an order for the recovery of damages sustained as a consequence of the Defendants' infringement of the '380 Patent by the following:

    1. all Apo-lovastatin product that was produced by AFI from AFI batch CR0157; and

    2. the 294 batches of lovastatin produced by Blue Treasure in China after March 1998 and imported into Canada.

639    Damages and the extent of infringement will be determined by way of a reference pursuant to Rule 153 of the *Federal Courts Rules* and in accordance with the Bifurcation Order dated November 14, 2003. The parties will be permitted to address the specific terms of a reference as to damages, by way of written submissions to be served and filed within 60 days of the date of the Judgment. The parties will have a further 15 days to serve and file reply submissions.

640    Merck will also be entitled to an order for prejudgment interest pursuant to ss. 36 and 37 of the *Federal Courts Act*, S.C. 2002, c. 8.

641    The counterclaims of the Defendants will be dismissed. Specifically, I conclude that the '380 Patent was valid and that Merck & Co. has standing to bring this action.

642    The question of costs was not addressed by the parties in their final submissions. Obviously, Merck, as the successful party will be entitled to costs, although the amount of those costs should reflect the specific circumstances of this trial. The parties will be given a period of time to attempt to resolve the issue of costs among themselves. I sincerely hope that the direction of this Court is not required. However, in the event that the parties cannot agree on costs, they may serve and file submissions, not to exceed ten pages in length, within 60 days of the date of the Judgment. The parties will have a further 15 days to serve a reply, any such reply not to exceed five pages.

**Postscript**

1    These Reasons for Judgment are un-redacted from confidential Reasons for Judgment which were issued on December 9, 2010 pursuant to the Direction dated December 9, 2010.

2    The Court canvassed counsel for the parties whether they had concerns if the reasons were issued to the public without redactions. On December 15, 2010 and December 17, 2010, in separate letters, the parties advised that there are no portions of the confidential Reasons for Judgment that should be redacted.

*Action allowed.*

### Appendix A — List of Witnesses

**I. List of Witnesses**

*A. Plaintiffs' Expert Witnesses*

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*(1) Dr. Jerry Lee Atwood*

Dr. Atwood is a professor and Chairman of the Department of Chemistry at the University of Missouri-Columbia. He obtained a Ph.D from the University of Illinois. Dr. Atwood has been the editor of several scientific publications and has published more than 640 articles in refereed journals. Dr. Atwood was qualified as an expert in organic chemistry.

On behalf of Merck, Dr. Atwood opined on issues of validity. He also compared the chemical characteristics of Compound I in the '380 Patent to the chemical characteristics of Monacolin K in the '794 Patent. Dr. Atwood responded to certain opinions expressed Dr. Robert McClelland in his Expert Report.

*(2) Mr. Robert Hubbell Barrigar*

Mr. Barrigar is a barrister and solicitor and a registered Canadian patent agent. He obtained an LL.M Degree from Harvard Law School. He has practised in intellectual property law for 30 years. His practice involved litigation pursuant to s. 45(8) of the "old" Patent Act, including patent applications that were the subject of conflict proceedings. Mr. Barrigar was qualified in matters of patent agency and procedures in the Canadian Patent Office, including practices of the Commissioner of Patents at the relevant time.

On behalf of Merck, Mr. Barrigar provided his opinion on whether the '380 and '794 Patents would have been placed in conflict proceedings by the Canadian Patent Office.

*(2) Dr. Jon Clardy*

Dr. Jon Clardy is a professor at the Harvard Medical School, in the Department of Biological Chemistry and Molecular Pharmacology. He has a Ph.D in Organic Chemistry. Currently, Dr. Clardy holds positions as the Co-Director, Harvard University Program in Chemical Biology; Senior Associate Member, Broad Institute of Harvard and MIT; and the Infectious Disease Initiative, Broad Institute of Harvard and MIT. Dr. Clardy was recognized as an expert in organic chemistry, medicinal chemistry, natural products chemistry, and the biosynthesis of microbial metabolites.

On behalf of Merck, Dr. Clardy opined on the construction and validity of the '380 Patent.

*(3) Dr. Julian Davies*

Dr. Davies is a professor emeritus of Microbiology and Immunology at the University of British Columbia, where he has worked since 1992. Dr. Davies obtained his Ph.D in Organic Chemistry from the University of Nottingham. He was qualified as an expert in the area of microbial genetics and microbiology.

On behalf of Merck, Dr. Davies gave opinion evidence on issues relating to infringement of the '380 Patent. In 2003 and in 2007, samples of raw and processed lovastatin were tested under his supervision for the DNA of *Aspergillus terreus* and *Coniothyrium fuckelii*.

*(4) Dr. Antonio Marion Gotto*

Dr. Gotto is a professor of Medicine at Cornell University. In addition to a Ph.D in Biochemistry from Oxford University, he earned an M.D. from Vanderbilt University. Dr. Gotto was qualified as an expert in the area of atherosclerosis, lipid

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

metabolism and cardiovascular risk protection.

On behalf of Merck, Dr. Gotto gave opinion evidence on cholesterol, cardiovascular disease and the discovery and use of lovostatin.

*(5) Dr. Richard Havel*

Dr. Richard Havel is a physician specializing in medicine, endocrinology and metabolism. Dr. Havel is a professor emeritus at the University of California, and he has served as an editor of the American Journal of Clinical Nutrition. Dr. Havel was qualified as an expert in internal medicine, clinical nutrition, endocrinology and metabolism, specifically the treatment of patients with hyperlipidemia, hypercholesterolemia and cardiovascular disease.

On behalf of Merck, Dr. Havel gave opinion evidence on the issues surrounding red yeast rice and the '380 Patent.

*(6) Dr. Linda Lee Lasure*

Dr. Lasure obtained a Ph.D in Genetics from the University of Syracuse. Dr. Lasure has worked for various pharmaceutical corporations, including as staff scientist at Pacific Northwest National Lab, where she established a new program to apply fungal biotechnology to the problem of efficient conversion of lignocellulosic biomass to commercial products. She has authored numerous papers, chapters and books relating to industrial microbiology and currently holds three patents related to fungal biotechnology. Dr. Lasure was qualified as an expert in industrial microbiology.

On behalf of Merck, Dr. Lasure opined on construction and infringement of the '380 Patent.

*(7) Mr. Brian Lindblom*

Mr. Lindblom is a forensic document examiner and the founding principal of Document Examination Consultants Inc. Mr. Lindblom was qualified as an expert in forensic document examination.

On behalf of Merck, Mr. Lindblom opined on the authenticity of the documents produced by AFI that were alleged to be Blue Treasure's Batch Records.

*(8) Dr. Bernard A. Olsen*

Dr. Olsen obtained a Ph.D in Analytical Chemistry from the University of Wisconsin, and then worked for 29 years as a senior research fellow at Eli Lilly and Company. Currently, Dr. Olsen is an independent pharmaceutical consultant. He was qualified as an expert in the area of analytical chemistry.

On behalf of Merck, Dr. Olsen analyzed 11 test samples of Red Yeast Rice using High-Performance Liquid Chromatography (HPLC). The results were compared to the HPLC results of Compounds I, II, III, and IV of the '380 Patent.

**B. Plaintiffs' Fact Witnesses**

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

*(1) Dr. Alfred Alberts*

Dr. Alberts is one of the named inventors on the '380 Patent. He testified regarding the invention of lovastatin.

*(2) Ms. Rebecca Gentile (Gilbert)*

Ms. Gentile (formerly Gilbert) is the Senior Stability Coordinator for Merck & Co. Her responsibilities include generating and compiling data for use in regulatory filings. She testified regarding the Red Yeast Rice project at Merck & Co.

*(3) Mr. Ronald Harvey*

Mr. Harvey was the Director of Marketing for Merck Frosst in 1997 (now retired). He testified regarding the marketing procedures used at Merck and the sales figures for lovastatin in 1997.

*(4) Mr. Ted Kavowras*

Mr. Kavowras is the Managing Director of Panoramic Consulting, an investigative business based in Hong Kong. Mr. Kavowras testified that he obtained lovastatin from Blue Treasure between 2000 and 2001.

*(5) Ms. Donna Kugit*

Ms. Kugit, an employee of Merck, testified regarding the samples that were packaged and shipped to Bill Richardson.

*(6) Dr. Natalie Lazarowych*

Dr. Lazarowych is the Chief Scientific Officer and Director of Research at Dalton. In 2003, Dalton did work for law firm McCarthy Tetrault LLP with respect to lovastatin. She testified regarding the preparation of lovastatin samples that were sent to the law firm at that time.

*(7) Ms. Carol Mercer*

Ms. Mercer is an administrative assistant with the IP litigation department at Merck. She testified about Merck's protocol for logging and labeling samples that are put into their database.

*(8) Mr. Robert Quesnel*

Mr. Quesnel is the Vice-President of Legal Affairs & General Counsel for Sanofi Aventis Canada, and was the Director of Legal Affairs at Merck Frosst Canada from 1995 to 2007. He spoke to the legal issues surrounding Apo-lovastatin.

*(9) Mr. James P. Richardson*

Mr. Richardson is the Director of Tax Planning for Merck Sharp and Dohme Corp., and has worked as in some capacity as an

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

accountant for them for over 25 years. He testified regarding the license agreement, dated January 1, 1985, between Merck and Co. Inc. and Merck Frosst Canada.

*(10) Ms. Elizabeth Giuliani Scott*

Ms. Scott was employed as in-house counsel for Merck and Co between 1998 to 2007. She testified that she communicated with, and received samples from, Mr. Kavowras.

**C. Defendants' Expert Witnesses**

*(1) Dr. Neal Connors*

Dr. Connors holds a Ph.D in microbiology from Ohio State University. For 17 years, Dr. Connors was an employee with Merck Research Laboratories, where he worked as a senior research biochemist and a senior investigator focusing on strain development for both fungi and bacteria. Since 2009, Dr. Connors has been the President of Phoenix BioConsulting, LLC, and provides scientific consulting services to the fermentation, industrial microbiology and biotechnology sectors. Dr. Connors was qualified as an expert in industrial microbiology.

On behalf of Apotex, Dr. Connors gave opinion evidence on the AFI-4 *Coniothyrium fuckelii* process for producing lovastatin. He responded to Dr. Lasure's opinion on the AFI-4 process for making lovastatin in commercial quantities during the period commencing April 1996.

*(2) Dr. Marcus Thomas Pius Gilbert*

Dr. Gilbert is an associate professor at the Natural History Museum of Denmark's Centre of GeoGenetics at the University of Copenhagen. He completed a D.Phil in the Department of Zoology at the University of Oxford, where his research focused on ancient DNA analysis. He has written numerous articles on analysis of ancient DNA and also teaches on the subject. Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA.

On behalf of Apotex, Dr. Gilbert opined on infringement, specifically on the issue of ancient DNA. Dr. Gilbert replied to the Expert Report of Dr. Davies and commented on Dr. Davies's experimental results.

*(3) Dr. Scott Harding*

Dr. Harding is an adjunct professor in the Department of Human Nutritional Science and a research associate at the Richardson Centre for Functional Foods and Nutraceuticals at the University of Manitoba. Dr Harding received a Ph.D from McGill University. He was qualified as an expert in human nutrition and metabolism.

On behalf of Apotex, Dr. Harding gave opinion evidence on the Monacolin K producing capabilities of traditional Chinese Red Yeast Rice. In addition, he replied to the Expert Reports of Drs. Havel, Clardy and Oslen.

*(4) Mr. Robert Hirons*

Mr. Hirons is a registered patent agent in Canada with over 40 years of experience. He has been involved in the prosecution

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

of numerous applications before the Commissioner of Patents, several of which involved conflict proceedings. Mr. Hirons was qualified as an expert in Canadian patent prosecution and practice between 1980 and 1982 and knowledgeable about the practices of the Commissioner of Patents at that time.

On behalf of Apotex, Mr. Hirons gave opinion evidence on whether the '380 Patent and the '794 patent should have been placed in conflict proceedings by the Commissioner of Patents. Mr. Hirons also replied to the Expert Report of Mr. Barrigar.

*(5) Dr. Robert Allan McClelland*

Dr. McClelland is professor emeritus in the Department of Chemistry at the University of Toronto. His research focus is biological and medicinal chemistry, and he has received numerous research awards in Canada. Dr. McClelland was qualified as an expert in organic and medicinal chemistry.

On behalf of Apotex, Dr. McClelland opined on the construction and validity of the '380 Patent. Specifically, he compared the chemical characteristics of Monacolin K ('794 Patent) and Compound I ('380 Patent). In addition, Dr. McClelland's report replied to the Expert Report of Dr. Atwood.

*(6) Dr. Hendrik Nicholas Poinar*

Dr. Poinar is an associate professor in the Department of Anthropology at McMaster University. He obtained a Ph.D in molecular evolutionary genetics and biomolecular anthropology from Lüdwici Maximillians Universität München. Dr. Poinar has worked in the field of ancient DNA for more than 15 years and has published 44 peer-reviewed articles on the subject. He is considered one of the founding members of the field of ancient DNA. Dr. Poinar was qualified as an expert in the extraction and characterization of low copy number and degraded DNA.

On behalf of Apotex, Dr. Poinar opined on infringement issues, specifically the experimental results of Dr. Davies. In addition, he was asked to replicate Dr. Davies's finding using similar methods.

*(7) Dr. Robert A. Samson*

Dr. Samson received an M.Sc and Ph.D from the University of Utrecht in the Netherlands. Dr. Samson is the head of the Department of Applied and Industrial Mycology at the CBS Fungal Biodiversity Centre in the Netherlands. His research is focused on polyphasic taxonomy of the fungal genera *Penicillium* and *Aspergillus*. He was qualified as an expert in applied and industrial mycology with specific expertise in the polyphasic taxonomy of the genus *Aspergillus*.

On behalf of Apotex, Dr. Samson opined on the construction of the '380 Patent including the classification of fungal taxonomy. He also responded to the Expert Reports of Dr. Clardy and Dr. Lasure.

*(8) Dr. John Lyle Sorensen*

Dr. Sorensen is an assistant professor in the Department of Chemistry at the University of Manitoba. He obtained a Ph.D in Chemistry from the University of Alberta, where his research focused on the biosynthesis of lovastatin and the pathway used by *Aspergillus terreus*. Dr. Sorensen was qualified as an expert in natural products chemistry.

On behalf of Apotex, Dr. Sorensen opined on construction and validity of the '380 Patent, specifically the fermentation and

**WestlawNext® CANADA** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

media conditions contemplated by the '380 Patent. He also replied to the Expert Report of Dr. Clardy.

*(9) Dr. John Waldo Taylor*

Dr. Taylor is a professor in the Department of Plant and Microbial Biology at the University of California at Berkeley. He has studied fungi for 37 years and fungal DNA for 30 years and published more than 160 articles relating to PCR amplification and fungal DNA. Dr. Taylor was qualified as an expert mycologist and microbiologist, with particular expertise in the area of fungal DNA evolution and fungal DNA PCR amplifications.

On behalf of Apotex, Dr. Taylor opined on infringement, specifically in response to the DNA evidence of Dr. Davies.

**D. Defendants' Fact Witnesses**

*(1) Mr. Donald Barber*

Mr. Barber is the Manager of the Formulations Department at Apotex Inc.. He testified regarding the general steps taken in product development at Apotex Inc. and commented on the development of Apo-lovastatin.

*(2) Ms. Lori Christofalos*

Ms. Christofalos is the Manager of Quality Assurance Regulatory Affairs at AFI. She testified about AFI's standard operating procedures for the fermentation of cultures of *Coniothyrium fuckelii*.

*(3) Ms. Elaine Copsey*

Ms. Copsey has worked for Apotex Inc. since 1999 as Manager of Packaging and Director of Commercial Lab Operations. She testified regarding the procedures for quality control testing at Apotex Inc., specifically the procedures for testing bulk and raw product.

*(4) Dr. David Cox*

Dr. Cox was the President of AFI between 1994 and 1997. On behalf of AFI, he testified about the corporate background of AFI, the *Aspergillus terreus* and *Coniothyrium fuckelii* projects and the technology transfer to Blue Treasure.

*(5) Mr. Gordon Fahner*

Mr. Fahner is the Vice President of Supply Chain and has worked at Apotex Inc. since 1989. He testified regarding the standard operating procedures for Apotex Inc. between 1997 and 2001. Specifically, he spoke about the receipt, storage and use of raw materials.

*(6) Mr. Alexander Fowler*

Mr. Fowler has been the Finance and Administration Manger at AFI since 1996. Mr. Fowler testified regarding the financial

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

matters relating to the technological transfer between AFI and Blue Treasure.

*(7) Mr. John Hems*

Mr. Hems is the Director of Regulatory Affairs at Apotex Inc., where he has worked for 30 years. In his current capacity, Mr. Hems oversees the drug approval submissions to regulatory agencies. He testified that his department was responsible for the regulatory submissions made for Apo-lovastatin in the early 1990s.

*(8) Mrs. Qifen Hu*

Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. She is responsible for receiving and testing cultures received from AFI. Mrs. Hu testified regarding the AFI-4 *Coniothyrium fuckelii* strain and the Blue Treasure batch records.

*(9) Mr. Dingjun Luo*

Mr. Luo has been the Deputy General Manager at Blue Treasure since 1995. He testified regarding the creation, completion and approval of batch records at Blue Treasure. Mr. Luo authored two articles in the Chinese Journal of Antibiotics which describe the production of lovastatin at Blue Treasure. The articles specifically referred to *Aspergillus terreus* as the fungi source.

*(10) Mr. Scott Primrose*

Mr. Primrose has been a senior research scientist with AFI since 1991. He testified regarding the AFI-4 process, specifically the preparation of *Coniothyrium fuckelii* seed banks and the protocols for shipping vials to Blue Treasure.

*(11) Dr. Mila Sailer*

Dr. Sailer has been employed at AFI since 1994 as a natural product chemist and then Director of Technology. Dr. Sailer obtained a Ph.D in experimental mycology at the Institute of Microbiology at the former Czechoslovakia Academy of Science. He was involved in developing the process to create lovastatin from *Coniothyrium fuckelii*. His testimony related to the development of the AFI-4 process, the technology transfer from AFI to Blue Treasure and the differences in optimal fermentation for *Aspergillus terreus* and *Coniothyrium fuckelii*.

*(12) Dr. Bernard Charles Sherman*

Dr. Sherman is the Founder, Executive Chairman, and Chief Executive Officer for Apotex Inc.. He has overall responsibility of the company, but focuses primarily on product development, business development and legal issues. Dr. Sherman testified regarding the formation of AFI, the development of lovastatin and the process of finding a non-infringement method to produce Apo-lovastatin. He also spoke about the joint venture with Blue Treasure.

*(13) Dr. Jerry Su*

Dr. Su worked for AFI from 1996 to 1998 as a fermentation specialist. He was the Group Leader responsible for research and

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

development and the fermentation of AFI-4. Dr. Su spoke about his personal experience visiting Blue Treasure in China and compared their procedures to the procedures at AFI.

### E. Affidavit (March 1, 2010 & April 1, 2010

#### (1) Bruce Davis

Mr. Davis is currently employed by AFI as QC Production Support Manager and swore in his affidavit that he was asked by Lori Christofalos to send samples to a warehouse in Montreal called Warnex Inc.

#### (2) Lucinda Gordon

Ms. Lucinda Gordon was employed by AFI from August 17, 1992 to September 24, 1998 as a microbiology technician. She swore in her affidavit that on November 3, 1997 she was asked to create an additional *Coniothyrium fuckelii* seed bank at AFI.

#### (3) Leeyuan Huang

Mr. Huang was employed by Merck & Co. Inc as Senior Research Scientist in 1997. He swore in his affidavit that he collected various samples and provided them to Dr. Richard Monaghan of Merck & Co. Inc.

#### (4) Emily Malcolm

Ms. Malcolm is currently a legal assistant at Goodmans LLP and swore in her affidavit that on June 9, 2009 she was given a bag labelled "Red Yeast Rice" and sent it to Taylor McCaffrey LLP in Winnipeg.

#### (5) Alexander Patrick

Mr. Patrick was employed in the summer of 2009 by Goodmans LLP and swore in his affidavit that on June 2, 2009 he purchased a bag of produced labelled "Red Yeast Rice" at Hua Sheng Supermarket located at 293 Spadina Avenue in Toronto.

#### (6) Angela Razo

Ms. Razo is employed as a law clerk by Apotex Inc. and swore in her affidavit that in October 2009 she was asked to collect and send a number of pharmaceutical samples to Dr. Hendrik Poinar at McMaster University in Hamilton.

#### (7) Heather Sheps

Ms. Sheps is currently a legal assistant employed by Taylor McCaffrey LLP and swore in her affidavit regarding the circumstances of the transfer of the Red Yeast Rice product.

#### (8) Sylvia Su

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

Ms. Su swore in her affidavit that she provided Ms. Lily Su a sample of a packet labelled "yeast" that she obtained from the Triangle Oriental Market located at 748 D East Chatham Street in Cary, North Carolina.

*(9) Lee Wen Su*

Mr. Su was employed as an associate in the law firm of Olsson, Frank and Weeda in 1997. He swore that he delivered samples to Mr. Adams on May 6, 1997.

*(10) Yoshikazu Tani (Expert Statement)*

Mr. Tani is a patent attorney and licensed patent agent with the firm of Tani & Abe, located in Tokyo and swore in his affidavit that he was asked by Apotex Inc. to review two documents issued by the Japanese Patent Office related to an invention entitled "Novel Physiologically Active Monacolin K and the Production of Same".

*(11) Xin Wang*

Ms. Wang is a research technician at the Richardson Centre for Functional Foods and Neutraceuticals and swore in her affidavit that on April 26, 2009 she purchased product labelled "Read Year Rice" at Sun Wah Herb Garden in Winnipeg.

**Appendix B — Claims 1 to 8 and 13 to 15 of the '380 Patent**

1. A process of producing the compounds of structural formulae:

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...



**Graphic 4**

which compromises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products and when desired converting said products to their corresponding pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methyl-glucamine, lysine, arginine or ornithine.

2. The process of producing the compounds of structural formulae:

Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009
2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

I                                    II

**Graphic 5**

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

3. The process of Claim 2 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

4. The process of Claim 2 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

5. The process of producing the compounds of structural formulae:

III                                   IV

**Graphic 6**

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

6. The process of Claim 5 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

7. The process of Claim 5 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...

8. The process of Claim 5, wherein compound III is reacted with ammonia to form the ammonium salt of compound III.

13. A compound selected from:



**Graphic 7**

or a pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methylglucamine, lysine, arginine or ornithine, when prepared by the process defined in Claim 1 or by an obvious chemical equivalent.

14. A compound selected from:

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Apotex Inc. v. Merck & Co., 2010 FC 1265, 2010 CarswellNat 5009**

2010 FC 1265, 2010 CarswellNat 5009, [2010] F.C.J. No. 1646, 197 A.C.W.S. (3d) 731...



**Graphic 8**

when prepared by the process defined in Claim 2 or by an obvious chemical equivalent.

15. A compound selected from:



**Graphic 9**

when prepared by the process defined in Claim 5 or by an obvious chemical equivalent.

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



MONTROSE MEDICAL GROUP PARTICIPATING SAVINGS PLAN; MONT-
ROSE GENERAL HOSPITAL, INC., Appellants v. RICHARD A. BULGER;
WALTER GARVEY; MUTUAL LIFE INSURANCE COMPANY OF NEW YORK
v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK; RICHARD A.
BULGER, Third-Party Plaintiffs v. EUDORA BENNETT; MONTROSE MEDICAL
ARTS PHARMACY, INC.; MEDICAL ARTS NURSING CENTER, INC.; MEDI-
CAL ARTS CLINIC, Third-Party Defendants

No. 00-3430

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

243 F.3d 773; 2001 U.S. App. LEXIS 4364; 25 Employee Benefits Cas. (BNA) 2702

November 30, 2000, Argued
March 22, 2001, Filed

**SUBSEQUENT HISTORY:**    [**1]  As Amended
May 16, 2001.

**PRIOR HISTORY:**    On Appeal From the United
States District Court For the Middle District of Pennsyl-
vania. (D.C. Civ. No. 94-cv-02141). District Judge:
Honorable Thomas I. Vanaskie, Chief Judge.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN1] Judicial estoppel may be imposed only if: (1) the
party to be estopped is asserting a position that is irrec-
oncilably inconsistent with one he or she asserted in a
prior proceeding; (2) the party changed his or her posi-
tion in bad faith, i.e., in a culpable manner threatening to
the court's authority or integrity; and (3) the use of judi-
cial estoppel is tailored to address the affront to the
court's authority or integrity.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN2] A party has not displayed bad faith for judicial
estoppel purposes if its initial claim was never accepted
or adopted by a court or agency.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN3] Federal courts possess inherent equitable authori-
ty to sanction malfeasance. One such sanction is judicial
estoppel.

*Administrative Law > Agency Adjudication > Decisions
> Collateral Estoppel*
*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Collateral Estoppel*
*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN4] Judicial estoppel is distinct from both equitable
and collateral estoppel. When properly invoked, judicial
estoppel bars a litigant from asserting a position that is
inconsistent with one he or she previously took before a
court or agency. Summary judgment is appropriate when
operation of judicial estoppel renders a litigant unable to
state a prima facie case.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
*Civil Procedure > Sanctions > General Overview*
[HN5] Three requirements must be met before a district
court may properly apply judicial estoppel. First, the
party to be estopped must have taken two positions that
are irreconcilably inconsistent. Second, judicial estoppel
is unwarranted unless the party changed his or her posi-
tion in bad faith--i.e., with intent to play fast and loose

with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***
[HN6] Though a district court's ultimate decision to invoke the doctrine of judicial estoppel is reviewed only for abuse of discretion, a court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN7] Inconsistencies are not sanctionable unless a litigant has taken one or both positions in bad faith--i.e., with intent to play fast and loose with the court. A finding of bad faith must be based on more than the existence of an inconsistency, indeed, a litigant has not acted in "bad faith" for judicial estoppel purposes unless two requirements are met. First, he or she must have behaved in a manner that is somehow culpable. Second, a litigant may not be estopped unless he or she has engaged in culpable behavior vis-a-vis the court.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN8] Judicial estoppel is an "extraordinary remedy" that should be employed only when a party's inconsistent behavior would otherwise result in a miscarriage of justice.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN9] Under law of the United States Court of Appeals for the Third Circuit, a district court may not invoke the doctrine of judicial estoppel unless: (1) no sanction established by the Federal Rules or a pertinent statute is up to the task of remedying the damage done by a litigant's malfeasance; and (2) the sanction of judicial estoppel is tailored to address the harm identified.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel
Civil Procedure > Sanctions > General Overview***

[HN10] The application of judicial estoppel constitutes an exercise of a court's inherent power to sanction misconduct.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN11] For purposes of judicial estoppel, where bad-faith conduct in the course of litigation can be adequately sanctioned under either the Federal Rules or a particular statute, then a court ordinarily should rely on the Rules or the statute rather than its inherent power. But, if in the informed discretion of the court these other sources of authority are not "up to the task," the court may safely rely on its inherent power.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN12] Judicial estoppel is not tailored to address the harm identified, unless, "at a minimum," the party to be estopped took inconsistent positions in bad faith--implicitly recognizing that more would sometimes be required.

***Governments > Legislation > Statutes of Limitations > Time Limitations
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Statutes of Limitations***
[HN13] See 29 U.S.C.S. § 1113.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > Tolling > Fraud
Governments > Fiduciary Responsibilities
Governments > Legislation > Statutes of Limitations > General Overview***
[HN14] 29 U.S.C.S. § 1113 applies when a lawsuit has been delayed because the defendant itself has taken steps to hide its breach of fiduciary duty, and the relevant question is not whether the complaint "sounds in concealment," but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty. It is generally accepted that there must be actual concealment,--i.e., some trick or contrivance intended to exclude suspicion and prevent injury.

**COUNSEL:** WILLIAM W. WARREN, JR., ESQUIRE (ARGUED), Saul, Ewing, Remick & Saul, LLP, Harrisburg, PA. CATHLEEN M. DEVLIN, ESQUIRE, Saul, Ewing, Remick & Saul, LLP, Philadelphia, PA, Counsel for Appellants.

243 F.3d 773, *; 2001 U.S. App. LEXIS 4364, **;
25 Employee Benefits Cas. (BNA) 2702

E. THOMAS HENEFER, ESQUIRE (ARGUED), Stevens & Lee, Reading, PA, CHARLES J. BLOOM, ESQUIRE, Stevens & Lee, Wayne, PA, Counsel for Appellee/Third-Party Plaintiff Mutual Life Insurance Co. of New York.

DANIEL MORGAN, ESQUIRE, O'Malley & Harris, Scranton, PA Counsel for Appellee/Third Party Plaintiff Richard A. Bulger.

DANIEL T. BRIER, ESQUIRE, Myers, Brier & Kelly, Scranton, PA, Counsel for Appellees/Third Party Defendants Eudora Bennett; Montrose Medical Arts Pharmacy, Inc.; Medical Arts Nursing Center, Inc.; and Medical Arts Clinic.

**JUDGES:** Before: BECKER, Chief Judge, and MAGILL, * Circuit Judge.

    * Honorable Frank J. Magill, United States Circuit Judge for the Eighth Circuit, sitting by designation. The Honorable Marjorie O. Rendell participated in this case from its inception in this Court through pre-filing circulation of the opinion to the full Court pursuant to Third Circuit Internal Operating Procedure 5.6.4. At that juncture, the routine computer recusal check made for all circulating opinions revealed, for the first time, a recusal problem in the nature of contributions to the political campaign of her husband Edward G. Rendell, former Mayor of Philadelphia. The background of the problem is encapsulated in the following notice, that is routinely sent to all parties and their counsel in all cases in this Court when the docketing notice is sent.

    UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

    ___ NOTICE ___

    TO ALL PARTIES AND THEIR COUNSEL:

    You are hereby advised that the Honorable Marjorie O. Rendell, a judge of this Court, whose spouse, Edward G. Rendell, has raised funds for his campaigns for public office, advises the parties and counsel in this case that Judge Rendell will automatically recuse in all cases where the aggregate campaign contribution to Rendell '95 by a party or law firm representing a party, from January 1, 1995 to the present, is $ 2501.00 or greater. For contributions less than $ 2501.00, Judge Rendell will not automatically recuse unless 2 the parties or counsel in the case file an

objection. * Mr. Rendell does not currently hold elective office but is chairman of the Democratic National Committee, headquartered in Washington, D.C.

    During the pendency of this appeal, Judge Rendell could be one of the judges randomly assigned to decide a motion or the merits of this case. IF YOU OBJECT TO HER DOING SO BASED ON A CONTRIBUTION(S) MADE BY A PARTY OR COUNSEL IN THE CASE, you may object to her participation by filing the enclosed CONFIDENTIAL REQUEST FOR DISQUALIFICATION within ten (10) days of the date of the docketing letter.

    IF YOU DO SO OBJECT, Judge Rendell will be automatically disqualified from participation in any aspect of this appeal; otherwise, Judge Rendell will participate if the case is assigned to her.

    IF YOU DO NOT OBJECT, you will be deemed to have waived objection to Judge Rendell's participation in any aspect of this appeal. Also, if Judge Rendell is automatically recused as set forth above, nonetheless all parties can agree to waive disqualification to her participation by filing the enclosed JOINT REQUEST FOR WAIVER. Such waiver would be made part of the public record.

    By the Court:

    /s/ Edward R. Becker

    Edward R. Becker, Chief Judge

    Date: Wednesday, June 21, 2000

    * Complete reports of contributions to Rendell '95 are available as public records from the Office of the City Commissioners, Room 130, City Hall, Philadelphia, PA 19107 (telephone: 215-686-3460); or from Commonwealth of Pennsylvania Bureau of Commissions, Elections & Legislation, 305 North Office Building, Harrisburg, PA 17120; or in the Third Circuit Clerk's Office, U.S. Courthouse, 601 Market Street, Room 21400, Philadelphia, PA 19106. This information will be updated at the Clerk's Office every 60 days, and the names of parties and counsel will be checked against contributions of record only at the issuance of the briefing order in the case.

    Since July 2000, the Court has utilized the Rendell '95 contributor data base (as updated), comparing the entries thereon with the counsel and parties in cases in this Court. In this instance,

the case was assigned to the panel prior to the time when the automated check of campaign contributions of Rendell '95 had been fully integrated into the Court's recusal system. Judge Rendell therefore had no constructive knowledge of a contribution to her husband's campaign by counsel for one of the parties to this appeal. In fact, she also had no actual knowledge of any such contribution or of any ground upon which her impartiality could reasonably be questioned.

However, once the recusal problem appeared, earlier this month upon circulation of the opinion to the full Court, she determined to recuse, in the absence of agreement of all parties that she continue, which was not forthcoming.

Chief Judge Becker and Judge Magill have conferred in the wake of this development and reaffirm their commitment to the opinion as written. Accordingly, the opinion is filed notwithstanding the recusal of Judge Rendell. See 28 U.S.C. § 46(d).

[**2]

**OPINION BY:** BECKER

**OPINION**

[*777]  OPINION OF THE COURT

BECKER, Chief Judge.

This appeal, set in the context of an ERISA breach of fiduciary duty action, largely concerns the doctrine of judicial estoppel. The District Court applied the doctrine to bar Plaintiffs Montrose General Hospital, Inc. (Hospital) and Montrose Medical Group Participating Savings Plan (Plan) from asserting that the Plan is covered by ERISA on account of representations they had made in a related prior litigation. Because this suit is based on the premise that ERISA governs the Plan, the District Court's ruling rendered the Hospital and the Plan unable to state a prima facie case. The court therefore entered summary judgment in favor of Defendants Mutual Life Insurance Company of New York (MONY), whose insurance policies funded the Plan, and Richard Bulger, an outside consultant affiliated with MONY who had brought the parties together .

[HN1] Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's [**3]  authority  [*778]  or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. Though we

agree that the inconsistency prong is satisfied in this case, the other two are not.  Guided by Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 143 L. Ed. 2d 966, 119 S. Ct. 1597 (1999), we hold that [HN2] a party has not displayed bad faith for judicial estoppel purposes if the initial claim was never accepted or adopted by a court or agency. Because the earlier statements in this case were never accepted or adopted, judicial estoppel was inappropriate.

We hold in the alternative that application of judicial estoppel was not tailored to address any harm occasioned by the change of positions. First, the only "harm" identified by the District Court was inflicted upon third parties-- fourteen plan participants who had sued the Hospital, the Plan, MONY, and Bulger in prior litigation. Judicial estoppel's sole valid use, however, is to remedy an affront to the court's integrity. Second, judicial estoppel is an inappropriate sanction here because its effects would be borne not by any wrongdoers, but by innocent third parties.

[**4]  Having determined that the District Court was wrong to invoke judicial estoppel, we turn to MONY's and Bulger's alternate grounds for affirmance. We ultimately decline to rule on most of them, concluding instead that it would be better to let the District Court pass on them in the first instance. We do, however, reach and reject MONY's and Bulger's assertion that they are entitled to summary judgment on statute of limitations grounds.

I.

In the late 1970s, the Hospital decided to create a retirement plan. It informed its accountant, Defendant Walter Garvey, of its intentions. [1]  Garvey, in turn, contacted Bulger, an outside consultant who was affiliated with MONY. Bulger proposed a plan, which the Hospital ultimately adopted. The Plan was plagued by financial troubles from the beginning, and, acting on advice from Bulger, the Hospital altered its funding mechanism on several occasions. These efforts were ultimately unsuccessful, and the Hospital ceased paying premiums in connection with the Plan in either late 1991 or early 1992.

1   Garvey never moved for summary judgment. Concluding that there was no just reason to delay this appeal and acting pursuant to the powers conferred upon it by Federal Rule of Civil Procedure 54(b), the District Court directed the clerk to enter a final judgment in favor of MONY and Bulger. The District Court had jurisdiction under 28 U.S.C. § 1331. Ours is conferred by 28 U.S.C. § 1291.

[**5]  Soon thereafter, fourteen of the sixty-seven plan participants sued the Hospital, the Plan, MONY, Bulger, and Garvey. We will refer to this suit as either the "Hickok action" or the "Hickok litigation," after its first named plaintiff, June Hickok. The Hickok plaintiffs alleged that the Plan was governed by ERISA, and charged the defendants with numerous violations of their purported fiduciary duties under that statute. In their Answer, the Hospital and the Plan raised eight defenses, two of which are pertinent here. Paragraph 7 "specifically denied that the plan was an employee pension benefit plan within the meaning of section 3 of ERISA," and Paragraph 11 averred that "the claims of the Plaintiffs [were] barred by the statute of limitations." The Hospital and the Plan repeated these claims in their Amended Answer and Pre-Trial Memorandum.

The Hickok action settled for $ 600,000 in May 1994. MONY and Bulger assumed responsibility for $ 500,000, and the Hospital and the Plan were required to pay the remaining $ 100,000. The settlement was distributed among the fourteen plan participants who were plaintiffs in Hickok; nothing was paid to the fifty-three who were not.

Following [**6]  closely on the heels of the Hickok settlement, the Hospital and the Plan brought this action against MONY, Bulger, and Garvey, seeking to press [*779]  claims on behalf of the remaining fifty-three plan participants. The claims in this case are essentially the same as those against which the Hospital and the Plan were co-defendants in Hickok. [2] The Complaint avers that "the plaintiff Plan is an employee benefit plan within the meaning of § 3(2)(A) of ERISA," and that the Hospital is bringing this suit in its capacity as fiduciary of the Plan. The Hospital and the Plan have not countered the charge that if the claims in Hickok were time-barred, then those in this case are as well.

2   The parties disagree as to whether the Settlement Agreement and Release that ended the Hickok action specifically preserved or precluded the Hospital and the Plan from later suing MONY, Bulger, and Garvey. The District Court has never definitively ruled on the question.

Discovery ensued and both MONY and Bulger eventually moved for summary [**7] judgment. In support of their motions, MONY and Bulger averred that: (1) judicial estoppel should bar the claims against them; (2) the claims were untimely; (3) they were not ERISA fiduciaries; (4) the Hospital and the Plan were not entitled to equitable relief; and (5) the Hospital's and the Plan's "prohibited transaction" claims were without merit. Ruling on the motions, the District Court invoked judicial estoppel to bar the Hospital and the Plan from repudiating their previously expressed position that

ERISA did not apply to the Plan. Because the claims pressed in this suit rest on an assertion that ERISA governs the Plan, the District Court's holding rendered the Hospital and the Plan unable to state a prima facie case, and the court entered summary judgment on behalf of MONY and Bulger. With regard to the other proffered bases for summary judgment, the court remarked that "an examination of the record reveals . .. material issues of fact that would militate against granting summary judgment. In light of the application of judicial estoppel . . ., these other issues, however, need not be addressed." This appeal followed.

II.

[HN3] Federal courts possess inherent equitable authority [**8]  to sanction malfeasance. One such sanction is judicial estoppel. See Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 109 (3d Cir. 1999). For reasons explained in the margin, [HN4] judicial estoppel is distinct from both equitable and collateral estoppel. [3] When properly invoked, judicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency. Summary judgment is appropriate when operation of judicial estoppel renders a litigant unable to state a prima facie case.

3   "Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 (3d Cir. 1988). Privity and detrimental reliance--prerequisites for the application of equitable estoppel--are not required for invocation of judicial estoppel. See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 360 (3d Cir. 1996). Collateral estoppel is used to protect the finality of judgments and to conserve judicial resources, see Dici v. Pennsylvania, 91 F.3d 542, 547 (3d Cir. 1996), whereas judicial estoppel is concerned solely with protecting the integrity of the courts, see Klein, 185 F.3d at 109. And though collateral estoppel may not be employed unless the underlying issue was actually litigated, see Witkowski v. Welch, 173 F.3d 192, 198-99 (3d Cir. 1999), there is no such requirement for the use of judicial estoppel, see Anjelino v. New York Times Co., 200 F.3d 73, 100 (3d Cir. 2000).

[**9]  [HN5]

Three requirements must be met before a district court may properly apply judicial estoppel. First, the party to be estopped must have taken two positions that

are irreconcilably inconsistent. See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996). Second, judicial estoppel is unwarranted unless the party changed his or her position "in bad faith--i.e., with intent to play fast and loose with the court." Id. Finally, a district court may not employ judicial estoppel unless it is "tailored to  [*780]  address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. Klein, 185 F.3d at 108 (quotation marks and citation omitted). [4]

> 4   We acknowledge that our cases have sometimes omitted this final inquiry and referred to Ryan Operations's "two threshold questions." Motley v. New Jersey, 196 F.3d 160, 163 (3d Cir. 1999); see also McNemar v. Disney Store, Inc., 91 F.3d 610, 618 (3d Cir. 1996). But because Klein squarely held that a district court may not invoke judicial estoppel without also conducting this inquiry, see 185 F.3d at 108-11, we conclude that it is a necessary part of the analysis.

[**10]  [HN6]

Though a district court's ultimate decision to invoke the doctrine is reviewed only for abuse of discretion, see Anjelino v. New York Times Co., 200 F.3d 73, 100 (3d Cir. 2000), a court "abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts," In re O'Brien, 188 F.3d 116, 125 (3d Cir. 1999). In this case, we agree with the District Court that the Hospital and the Plan have taken inconsistent positions. We hold, however, that the District Court's finding of bad faith was built upon an error of law, and was therefore unsound. We hold also that the District Court abused its discretion in concluding that judicial estoppel was an appropriate sanction in this case because it was not tailored to address an affront to the court's integrity and because its use would create rather than defeat a miscarriage of justice. [5]

> 5   Although both parties briefed it, the possibility of judicial estoppel was never addressed during the lengthy oral argument before the District Court. It surfaced in the court's opinion. We have held that a district court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes, see Klein, 185 F.3d at 111 n.13; Ryan Operations, 81 F.3d at 364-65, but two precepts are nevertheless clear. First, a court considering the use of judicial estoppel should ensure that the party to be estopped has been given a meaningful opportunity to provide "an explanation" for its changed position.  Cleveland v. Policy Manage-

ment Sys. Corp., 526 U.S. 795, 807, 143 L. Ed. 2d 966, 119 S. Ct. 1597 (1999). Second, though a court may sometimes "discern" bad faith without holding an evidentiary hearing, it may not do so if the ultimate finding of bad faith cannot be reached without first resolving genuine disputes as to the underlying facts. The facts of this case provide an apt illustration. The parties agree that the Hospital and the Plan changed their position regarding ERISA's applicability to the Plan following the settlement of the Hickok action, but vehemently disagree why they did so. According to MONY and Bulger, the change represented a cynical attempt to forestall future suits and to secure a hefty recovery for the Hospital's owners and other highly-paid employees. Not surprisingly, the Hospital and the Plan offer a different account, claiming that years of deception by MONY and Bulger falsely led them to believe that the Plan was not covered by ERISA until efforts by their current counsel revealed the truth. If the account offered by the Hospital and the Plan is accurate, then they may have been negligent for not realizing that MONY and Bulger were dissembling sooner, but they almost certainly did not act in bad faith vis-a-vis the court. In such a situation, it would generally be inappropriate to make a finding of bad faith without first determining which of these conflicting accounts is true--something that could not be done without an evidentiary hearing. Fortunately, as will become clear, the neglect of the judicial estoppel issue earlier in this case has not impeded our resolution of this appeal.

[**11]  A.

The Hospital and the Plan have taken inconsistent positions. Three times during the Hickok action they specifically denied that the Plan was covered by ERISA, but this suit is based on the premise that it is. Furthermore, the Hospital and the Plan do not deny that the claims they press in this suit are materially identical to the ones brought in Hickok. The Hospital and the Plan argued that the Hickok claims were time-barred, and the claims in this case were brought after those in Hickok. If the Hickok action was time-barred, then this one is as well. We therefore agree with the District Court that the inconsistency element is satisfied.

B.

[HN7] Inconsistencies are not sanctionable unless a litigant has taken one or both  [*781]  positions "in bad faith--i.e., with intent to play fast and loose with the court." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996). A finding of

243 F.3d 773, *; 2001 U.S. App. LEXIS 4364, **;
25 Employee Benefits Cas. (BNA) 2702

bad faith "must be based on more than" the existence of an inconsistency, Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 111 (3d Cir. 1999) (emphasis added); indeed, a litigant has not acted in "bad faith" for judicial estoppel purposes unless two requirements [**12] are met. First, he or she must have behaved in a manner that is somehow culpable. See Ryan Operations, 81 F.3d at 362 (stating that judicial estoppel may not be employed unless " 'intentional self contradiction is . . . used as a means of obtaining unfair advantage' " (quoting Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953) (emphasis added))); id. ("An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing ." (emphasis added)); see also In re Chambers Dev. Co. Inc., 148 F.3d 214, 229 (3d Cir. 1998) (quoting this language from Ryan Operations).

Second, a litigant may not be estopped unless he or she has engaged in culpable behavior vis-a-vis the court. As we have stressed time and time again, judicial estoppel is concerned with the relationship between litigants and the legal system, and not with the way that adversaries treat each other. See, e.g., Ryan Operations, 81 F.3d at 360 ("Judicial estoppel 'is intended to protect the courts rather than the litigants.'" (quoting Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121-22 (3d Cir. 1992))); Delgrosso v. Spang & Co., 903 F.2d 234, 241 (3d Cir. 1990) [**13] (same). Accordingly, judicial estoppel may not be employed unless a litigant's culpable conduct has assaulted the dignity or authority of the court.

To assess whether the Hospital and the Plan have engaged in wrongful conduct that may fairly be described as a threat to the integrity of the courts, we must review what they did. In the Hickok action, fourteen plan participants charged the Hospital and the Plan with violating ERISA-imposed fiduciary duties. In their Answer, Amended Answer, and Pre-Trial Memorandum, the Hospital and the Plan averred, among other defenses, that the Plan was not subject to ERISA and that the plaintiffs' claims were time-barred. Before the district court ruled on any dispositive motions and before the case went to trial, the parties settled, and the case was dismissed. Shortly thereafter, the Hospital and the Plan brought the present suit on behalf of the fifty-three plan participants who had not been plaintiffs in Hickok. In this litigation, the Hospital and the Plan assert--in direct contravention of their positions in Hickok--that the Plan is covered by ERISA and that the specific claims (which are, in all relevant respects, identical to those they argued [**14] were untimely while defending Hickok) are timely.

The important threshold question--the answer to which we find dispositive in this case--is whether a dis-

trict court may properly find the existence of bad faith if the initial inconsistent statement was never accepted or adopted by a court or agency. MONY and Bulger apparently assume that it may. Guided by the Supreme Court's recent decision in Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 143 L. Ed. 2d 966, 119 S. Ct. 1597 (1999), we disagree.

The issue in Cleveland was whether a person who sought Social Security Disability Insurance (SSDI) benefits could later be judicially estopped from claiming protected status under the Americans with Disabilities Act (ADA). In seeking SSDI benefits, the claimant certified that she was "disabled" and "unable to work," but in a later ADA suit she submitted that she could "perform the essential functions" of a job "with . . . a reasonable accommodation." See id. at 798-99. Observing "that, in context, these two seeming divergent statutory contentions are often consistent with each other," the Court held that "pursuit, and receipt, of SSDI benefits does not [**15] automatically estop [*782] the recipient from pursuing an ADA claim." Id. at 797.

Though Cleveland's earlier claim had been accepted by the administrative agency, see id. at 802 (stating that she had "both applied for, and received, SSDI benefits"), the Court laid down guidance highly pertinent to this case. Quoting Federal Rule of Civil Procedure 8(e)(2), it noted that "our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to 'set forth two or more statements of a claim or defense alternatively or hypothetically' and to 'state as many separate claims and defenses as the party has regardless of consistency.' " Id. at 805. Stressing that "if an individual has merely applied for, but had not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system," the Court opined that it did "not see why the law in respect to the assertion of SSDI and ADA claims should differ." Id.

Guided by Cleveland, we hold that it does not constitute bad faith to assert contrary positions in different proceedings when the initial [**16] claim was never accepted or adopted by a court or agency. Because the practice is specifically sanctioned by the Federal Rules, asserting inconsistent claims within a single action obviously does not constitute misconduct that threatens the court's integrity. In Cleveland, the Supreme Court drew a direct parallel between pleading inconsistently in a single case and doing so in subsequent ones, so long as the initial claim was never sustained. Moreover, the Court described the latter type of inconsistencies as "the sort normally tolerated by our legal system." Though the Court did not use the magic words--"it is not bad faith to assert inconsistent claims in separate actions so long as

the initial position was never accepted by a court or agency"-- Cleveland's import is clear.

The rule we adopt is consistent with judicial estoppel's purpose of protecting the integrity of the courts. "Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled." Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982). [**17] But if a party's initial position was never accepted by a court or agency, then it is difficult to see how a later change manifests an "intent to play fast and loose with the courts," Ryan Operations, 81 F.3d at 361 (emphasis added), any more than pleading inconsistently in a single action does. We think this insight explains why the consensus view among our sister circuits is that judicial estoppel is inappropriate unless the earlier position was accepted by a court or agency. [6] This rule also has support in our cases. See Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." (quotation marks and citation omitted) (emphasis added)).

[6] See Faigin v. Kelly, 184 F.3d 67, 82 (1st Cir. 1999); Wight v. Bankamerica Corp., 219 F.3d 79, 90-91 (2d Cir. 2000); United Mine Workers of Am. v. Marrowbone Dev. Co., 232 F.3d 383, 390 (4th Cir. 2000); Lara v. Trominski, 216 F.3d 487, 495 n.9 (5th Cir. 2000); McMeans v. Brigano, 228 F.3d 674, 686 (6th Cir. 2000); Feldman v. American Mem'l Life Ins. Co., 196 F.3d 783, 790 (7th Cir. 1999); Tuveson v. Florida Governor's Counsel on Indian Affairs, Inc., 734 F.2d 730, 735 (11th Cir. 1984) (same rule characterized as equitable estoppel).

[**18] We are unpersuaded by MONY's and Bulger's contentions that Cleveland is inapplicable here, or that stare decisis precludes adoption of the rule we announce today. Citing Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998), and Deibler v. United [*783] Food & Commercial Workers' Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992), they submit that the question whether a plan is covered by ERISA is one of fact rather than law. And because in Cleveland the Supreme Court expressly declined to disturb the law of judicial estoppel relating to "purely factual matters, such as 'The light was red/green,' or 'I can/cannot raise my arm above my head,'" 526 U.S. at 802, they suggest that Cleveland has no applicability to the issue now before us. We reject this contention for

two reasons. First, it is waived because it was raised for the first time at oral argument. See Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999). Second, we conclude that it is simply wrong on the merits. Though the question whether a particular plan is covered by ERISA may not be one of pure law, it is also not a "purely factual matter" [**19] in the sense the phrase was used in Cleveland. [7]

[7] Because Cleveland specifically declined to speak to the issue, and because there may be good reasons to apply a different rule in such cases, we intimate no view as to whether the rule we announce today should apply when the inconsistent statements involve purely factual matters.

MONY and Bulger also submit that our pre-Cleveland case law precludes us from holding that there can be no bad faith for judicial estoppel purposes if the earlier statement was never accepted by a court or agency. First, to the extent this claim is true, we note simply that we owe greater fidelity to the decisions of the Supreme Court than to our own. Second, we disagree that any of our cases have actually held that judicial estoppel may be imposed in a situation such as this one.

The only case that MONY and Bulger cite in support of their claim that judicial estoppel may lie in situations where the initial claim was never accepted or adopted by a court or agency is Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996). [**20] Their reliance is misplaced. Ryan Operations held that a party seeking estoppel need not have been a party to the earlier proceedings, see id. at 359-60, and that the party facing estoppel need not have necessarily "benefitted" from its switch in position, see id. at 361. But Ryan Operations never stated that judicial estoppel could validly be applied in a case where the initial position was never accepted by a court or agency. [8]

[8] Indeed, the inconsistent "statement" in Ryan Operations had been accepted by a court. That case involved a construction company's suit against the manufacturer and suppliers of wood trim that it had used in constructing houses. Prior to filing suit, the construction company had filed a voluntary petition under Chapter 11 of the Bankruptcy Code, which required it to disclose all assets and liabilities, including potential claims and causes of action. In violation of these requirements, the construction company's disclosure statement did not mention its claims against the manufacturer and suppliers. The reorganization plan was confirmed seven months after the construction company brought suit, and the defendants then moved for summary judgment on

243 F.3d 773, *; 2001 U.S. App. LEXIS 4364, **;
25 Employee Benefits Cas. (BNA) 2702

judicial estoppel grounds. In rejecting the district court's grant of judicial estoppel, we assumed without deciding that failure to comply with the Bankruptcy Code's disclosure obligations "can support a finding that a plaintiff has asserted inconsistent positions within the meaning of the judicial estoppel doctrine." Id. at 362. But in that case, the parties' initial inconsistent "statement"--i.e., its failure to list its claims against the manufacturer and the suppliers in its original filing --had been implicitly accepted by the bankruptcy court when it approved the plan of reorganization.

[**21] Though our holding today may appear to be in some tension with our statement in Ryan Operations that there is no "independent requirement" that a party have "benefitted from its earlier position" to be estopped from changing it later, id. at 361, this tension is more apparent than real. First, the Ryan Operations principle remains true today: so long as the initial claim was in some way accepted or adopted, no further showing is necessary that the party "benefitted" in any particular way. See, e.g., Anjelino v. New York Times Co., 200 F.3d 73, 100 (3d Cir. 2000) [*784] (upholding a district court's use of judicial estoppel where a litigant sought to withdraw its previous representation to the court that no further discovery was needed). Second, our rule is consistent with Ryan Operations's admonition that "benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts." 81 F.3d at 361. We do not hold that judicial or administrative acceptance is a prerequisite for its own sake, but rather conclude that a change of position simply cannot evidence bad faith vis-a-vis a court unless the initial statement was accepted [**22] or adopted. [9]

[9] We acknowledge that McNemar v. Disney Store, Inc., 91 F.3d 610 (3d Cir. 1996) and Lewandowski v. Amtrak, 882 F.2d 815 (3d Cir. 1989) contain language that could be read as saying that acceptance or adoption is not a prerequisite for the invocation of judicial estoppel, but we decline to so conclude. First, as noted previously, our duty to follow Cleveland supersedes the requirement that we adhere to prior Third Circuit law. Second, in both McNemar and Lewandowski, the party making the inconsistent statements had succeeded in persuading the original tribunal to adopt his position. See McNemar, 91 F.3d at 615; Lewandowski, 882 F.2d at 817. We also note that McNemar's actual holding is no longer good law after Cleveland because the two cases involved the same issue. See Klein, 185 F.3d at 108 n.6. Moreover, Lewandowski involved an appeal from a decision of a public law

board rather than a district court. We could not have set aside the board's decision unless it had "failed to comply with the provisions of the RLA[,] failed to confine itself to matters within its jurisdiction, or if there was fraud or corruption." Lewandowski, 882 F.2d at 819. Under such a high standard, we could not have granted the petition even had the board's decision failed to comport with our standards for invoking judicial estoppel.

[**23]  C.

During the course of the Hickok action, the Hospital and the Plan averred that ERISA did not apply to the Plan and that the plaintiffs' claims were barred by the statute of limitations. These claims, however, were never accepted or adopted by the district court. Accordingly, their later change in position cannot, as a matter of law, constitute bad faith. We therefore hold that the District Court abused its discretion by invoking judicial estoppel.

III.

We also hold in the alternative that the District Court abused its discretion by concluding that judicial estoppel was tailored to address any harm caused by the inconsistent statements in this case. [HN8] Judicial estoppel "is an 'extraordinary remedy' " that should be employed only " 'when a party's inconsistent behavior would otherwise result in a miscarriage of justice.' " Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996) (quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 (3d Cir. 1988) (Stapleton, J., dissenting)). Observing that judicial estoppel "is often the harshest remedy" that a court can impose for inequitable conduct, we have held that [**24] [HN9] a district court may not invoke the doctrine unless: (1) "no sanction established by the Federal Rules or a pertinent statute is up to the task of remedying the damage done by a litigant's malfeasance;" and (2) "the sanction [of judicial estoppel] is tailored to address the harm identified." Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 108, 110 (3d Cir. 1999) (internal quotation marks and citations omitted). In this case, the District Court failed to conduct the former inquiry, and we hold that its conclusion that judicial estoppel was tailored to address any harm caused by the inconsistent representations was not an exercise of sound discretion.

[HN10] The application of judicial estoppel constitutes an exercise of a court's inherent power to sanction misconduct. See id. at 109. "Because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 44, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991). In Cham-

bers, the Supreme Court held that [HN11] where "bad-faith conduct in the course of litigation can be adequately sanctioned under" either the Federal Rules or a particular statute, then [**25] a "court ordinarily [*785] should rely on" the Rules or the statute "rather than the inherent power." Id. But, said the Court, "if in the informed discretion of the court" these other sources of authority are not "up to the task, the court may safely rely on its inherent power." Id. In Klein, we interpreted Chambers to mean "that the Rules are not 'up to the task' when they would not provide a district court with the authority to sanction all of the conduct deserving of sanction." 185 F.3d at 109. But we squarely held that before utilizing its inherent powers, a district court should consider whether any Rule- or statute-based sanctions are up to the task. See id. at 110. In this case, the District Court did not consider whether any such sanctions (some of which are set forth in the margin) would have sufficed to deal with any misconduct that occurred in this case. [10] That was error.

> 10    Federal Rule of Civil Procedure 11 authorizes a court to sanction a party that files "a pleading, written motion, or other paper," if: (1) the document was "presented for an[] improper purpose;" (2) the "legal contentions" contained in it were not "warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;" (3) the document contained "allegations or [other] factual contentions" that did not have evidentiary support or denials of an opponent's "factual contention" without evidentiary support." Federal Rule of Civil Procedure 37 permits a court to sanction certain discovery-related misconduct. And 28 U.S.C. § 1927 provides that "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required . . . to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." We do not intimate that these or any other particular Rule- or statute-based sanctions would have been available or "up to the task" in this case. We hold only that the District Court erred by not considering the issue.

[**26]    Moreover, even had the District Court concluded that use of its inherent sanctioning power was necessary, we would still hold that judicial estoppel was inappropriate here. In Klein we held that judicial estoppel, like all exercises of a court's inherent sanctioning power, may not be used unless it is "tailored to address the harm." Id. at 111. And we stated that [HN12] judicial estoppel is not so tailored unless, "at a minimum," the party to be estopped took inconsistent positions in bad

faith--implicitly recognizing that more would sometimes be required. Id. (emphasis added). We noted the same possibility in Ryan Operations . See 81 F.3d at 365 ("As we have already concluded that the district court erred [in employing judicial estoppel], we need not reach Ryan's argument that [its use] under the circumstances of this case would violate principles of equity and justice. . . . However, in this case, application of judicial estoppel would be unduly harsh and inequitable. While we need not and do not decide whether we would reverse the district court's order on this ground alone, our equitable concerns lend support to our overall conclusion.").

The District [**27] Court erred in determining that judicial estoppel would be tailored to address any harm in this case for two reasons. First, judicial estoppel is not an appropriate response to the only type of harm identified by the court. In its explanation of why judicial estoppel was "appropriate relief in this case," the court faulted the Hospital and the Plan for "abandoning" the fourteen plan participants who were plaintiffs in Hickok, but now seeking to assert precisely the same claims on behalf of fifty-three other participants who were not involved in Hickok. The difficultly with the District Court's reasoning is that judicial estoppel may not be used to punish litigants for how they treat other litigants or third parties; [11] its only legitimate purpose is to remedy an affront to the court's integrity. See, e.g., Ryan Operations, 81 F.3d at 360 ("Judicial estoppel 'is intended to protect the courts rather than the litigants.' " (quoting Fleck [*786] v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121-22 (3d Cir. 1992))). Because the court's opinion contains no hint that it invoked judicial estoppel to respond to a threat to its own authority, the sanction was not tailored to [**28] address the harm in this case.

> 11    The fourteen Plan participants whom the District Court faulted the Hospital and the Plan for abandoning were other litigants in the Hickok litigation and are third parties in this case.

Perhaps more fundamentally, judicial estoppel was simply not tailored to address any malfeasance that may have occurred here. The only potential wrongdoers are the Hospital and the Plan, and the District Court's application of judicial estoppel did result in the dismissal of their claims against MONY and Bulger. The problem arises because the Hospital and the Plan do not seek personal gain in this case, but rather bring this action solely in their fiduciary capacities on behalf of fifty-three plan participants. It is those participants, not the Hospital and the Plan, that will be harmed by the District Court's dismissal. Even assuming that the Hospital and the Plan acted wrongly in "abandoning" the Hickok plaintiffs, it is difficult to see how equity would be served by punishing fifty-three [**29] other plan participants in return.

In sum, the District Court erred in not considering whether any Rule or statute was "up to the task" before deciding to utilize its inherent sanctioning power, and abused its discretion in concluding that judicial estoppel was tailored to address any harm in this case.

IV.

MONY and Bulger advance several alternate grounds for affirming the District Court's judgment. They aver that, as a matter of law: (1) the claims against them are time-barred; (2) they cannot be held liable under ERISA because they were not fiduciaries of the Plan; (3) the Hospital and the Plan are not entitled to "equitable relief "; and (4) the Hospital and the Plan cannot prevail on their "prohibited transactions" claim. MONY and Bulger raised these arguments before the District Court, which declined to reach them in light of its judicial estoppel holding. The court did comment, however, that: "An examination of the record in relation to these other grounds asserted as bases for summary judgment reveals material issues of fact that would militate against granting summary judgment."

Though we certainly could reach and rule on each of the alternate grounds, we conclude--subject [**30] to one exception-- that interests of sound judicial administration compel that we remand the case without considering them. [12] This is a complicated case with a voluminous record. The able district judge plainly pondered these issues, and at one point suggested that there were genuine issues of material fact as to at least some of them. We think it better under these circumstances to let the District Court review in the first instance the arguments that neither Bulger nor MONY were ERISA fiduciaries, that the request for equitable relief should be denied, and that the prohibited transactions claim fails as a matter of law. Because the issue is so straightforward, however, we reach and reject MONY's claim that it is entitled to summary judgment on statute of limitations grounds.

12    "When a district court has failed to reach a question below that becomes critical when reviewed on appeal, an appellate court may sometimes resolve the issue on appeal rather than remand to the district court." Hudson United Bank v. LiTenda Mortgage Corp., 142 F.3d 151, 159 (3d Cir. 1998). This practice is appropriate if: (1) "the factual record is developed;" and (2) "the issues provide purely legal questions[] upon which an appellate court exercises plenary review." Id. On the other hand, appellate courts should not step in "when the resolution of an issue requires the exercise of discretion or fact finding." Id. Hudson's requirements are met in this case. Be-

cause each party has filed a supplemental appendix, the factual record is developed. Had the District Court granted summary judgment on other grounds, our review would have been plenary. And whether a genuine issue of material fact exists presents a purely legal question that does not require or allow a district court to exercise discretion. In light of these facts, we are entitled to consider MONY's alternate grounds.

[**31]    [HN13]

[*787]    ERISA's statute of limitations for fiduciary violations expires on "the earlier of ": (1) "six years after . . . the date of the last action which constituted a part of the breach or violation;" or (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." The statute also provides, however, that "in the case of fraud or concealment," the period is extended to "six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. We have described Section 1113 as creating "a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge, and potentially extended to six years from the date of discovery in cases involving fraud or concealment." Kurz v. Philadelphia Elec. Co., 96 F.3d 1544, 1551 (3d Cir. 1996).

A.

MONY and Bulger first contend that this suit is barred by ERISA's three year limitations period, which does not begin to run until "the plaintiff has actual knowledge of the breach or violation," 29 U.S.C. § 1113. We have interpreted the actual knowledge requirement "stringently." Gluck v. Unisys Corp., 960 F.2d 1168, 1176 (3d Cir. 1992); [**32]    see also id. ("Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period."). Because other sections of ERISA demonstrate that "Congress knew how to require constructive knowledge," we have opined that "we do not think that Congress' failure to" provide such a standard "in section 1113 was accidental." Id. Accordingly, we have held that "actual knowledge . . . requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists," but we have emphasized "that our holding does not mean that the statute of limitations can never begin to run until a plaintiff first consults with a lawyer." Id. at 1177.

MONY and Bulger recite seven facts that they claim show that the Hospital and the Plan had "actual knowledge of the facts necessary to understand that some claim existed" more than three years prior to filing this suit in December 1994. They stress that:

243 F.3d 773, *; 2001 U.S. App. LEXIS 4364, **;
25 Employee Benefits Cas. (BNA) 2702

- "Bulger warned [the Hospital] in writing in 1988 about not paying premiums";

- The Hospital "knew of persistent funding problems for a ten year period";

- The Plan Administrator [**33] "knew of the financial problems by, at the latest, the late 1980s ";

- The Plan Administrator "knew [the Hospital] could not make the payments by 1987";

- The Hospital "stopped paying benefits in the summer of 1991 and disclosed the problems to the participants";

- The Hospital's Administrator "reported to the [Hospital's] Board before 1991 his conclusion that the Plan could not continue"; and

- The Hospital received a letter from Plaintiff's counsel in the Hickok action "in November 1991 outlining potential ERISA violations and claims."

These facts, MONY and Bulger contend, demonstrate that "by November 1991 (at the latest) [the Hospital and the Plan] had actual knowledge sufficient to understand that (as they allege) a fiduciary duty had been breached or ERISA provision violated."

We are unpersuaded. "Gluck . . . requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Murata Erie N. Am., 980 F.2d 889, 900 (3d Cir. 1992) [**34]  (emphasis added). Until the Hospital and the Plan had actual knowledge that the Plan might be covered by ERISA, they obviously had no [*788] reason to suspect that any actions by MONY or Bulger could support a claim for breach of fiduciary duty under that statute.

The only piece of evidence to which MONY and Bulger point that could have put the Hospital and the Plan on notice that the Plan was covered by ERISA was the letter the Hospital received in 1991 from the lawyer for the Hickok plaintiffs. Though the letter suggested that the Plan was subject to ERISA, two reasons counsel against reading this letter as establishing--as a matter of law--that the Hospital and the Plan thereafter possessed actual knowledge that they had ERISA claims against

MONY and Bulger. First, the letter came from an attorney who was threatening to sue the Hospital and the Plan for ERISA violations. Parties are not required to believe every claim hurled by their adversaries, nor are they likely to do so. Second, the letter in no way suggested that the Hospital and the Plan might have an ERISA action against MONY and Bulger. Though MONY and Bulger argue that this information was supplied by the other pieces of evidence [**35]  to which they point to establish actual knowledge, we do not believe that the evidence must, as a matter of law, be read that way. We therefore decline to affirm the District Court's judgment on this alternate ground.

B.

Nor is this suit barred as a matter of law under the six year statute of limitations. ERISA's default limitations period expires "six years after . . . the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113. "In the case of fraud or concealment," however, this period is extended to "six years after the date of discovery of such breach or violation." Id. Even assuming that this suit was not brought within the general six year limitations period, we conclude that there is at least a genuine dispute of material fact as to whether the fraud or concealment exception is applicable.

We have interpreted § 1113 "as incorporating the federal doctrine of fraudulent concealment: The statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment." Kurz v. Philadelphia Elec. Co., 96 F.3d 1544 (3d Cir. 1996). [**36] [HN14] Section 1113 applies "when a lawsuit has been delayed because the defendant itself has taken steps to hide its breach of fiduciary duty," and "the relevant question is . . . not whether the complaint 'sounds in concealment,' but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty." Id. It is generally accepted that "there must be actual concealment,--i.e., some trick or contrivance intended to exclude suspicion and prevent injury." Larson v. Northrop Corp., 305 U.S. App. D.C. 416, 21 F.3d 1164, 1173 (D.C. Cir. 1994) (quotation marks and citation omitted).

In arguing against the applicability of this exception, MONY and Bulger assert that neither of them concealed anything. But the Hospital and the Plan assert, with support in the record, that "from the time of the Plan's creation and throughout its 14-year operation, Defendants consistently deceived the Hospital by misrepresenting that the Plan was not even subject to ERISA." They also submit, with record support, that although they were "generally aware that MONY, Bulger, and other MONY

243 F.3d 773, *; 2001 U.S. App. LEXIS 4364, **;
25 Employee Benefits Cas. (BNA) 2702

representatives were replacing various life insurance policies with new [**37] policies of the same or different types[,] . . . Bulger falsely represented to Hospital representatives that they would reduce costs while substantially increasing benefits." Finally, Eudora Bennett, the Plan Administrator, claimed in an affidavit that Bulger and Garvey thwarted her efforts "to gain access to information about the operations of the Plan."

Assuming that these allegations are true, which we must for summary judgment purposes, we cannot conclude as a matter of law that no fraud or concealment [*789] occurred in this case. MONY and Bulger's (alleged) repeated denials that ERISA applied to the Plan could reasonably have hindered the Hospital's and the Plan's ability to realize that any breach of ERISA-imposed fiduciary duties had occurred.

Further, it is possible that Bulger's (alleged) misrepresentations as to the reasons for replacing the life insurance policies inhibited their capacity to discover that the Plan had been imprudently designed. Finally, the (alleged) conduct of Bulger and Garvey may have actively impeded Bennett's ability to discover facts that could have led her to conclude that fiduciary violations had taken place.

MONY and Bulger offer two responses. They [**38] aver that because " 'the problems surfaced soon after the establishment of the Plan,' " "the alleged design defects constituted information readily available to" the

Hospital and the Plan. But MONY and Bulger provide no citations to the record, and fail to explain why the mere existence of problems means that the Hospital and the Plan were on notice that ERISA applied to the Plan or that it was designed in violation of ERISA-imposed fiduciary duties. Because conclusory allegations unsupported by explanation or facts in the record do not suffice to meet a movant's burden of persuasion, see 11 James Wm. Moore et al., Moore's Federal Practice § 56.13[1] (3d ed. 2000), we conclude that MONY and Bulger cannot prevail on this point.

Finally, MONY and Bulger submit that there was no "reasonable reliance as is required to trigger the fraud or concealment exception." They contend that the Hospital and the Plan "did not delay this lawsuit because of misrepresentations; instead, they delayed as long as possible to avoid subjecting themselves to liability and filed suit only after Hickok was resolved and they could no longer hope to avoid similar claims." MONY and Bulger point to no undisputed [**39] facts that demonstrate why the Hospital and the Plan brought this case when they did, and, accordingly, MONY and Bulger are not entitled to summary judgment on this ground. We therefore hold that MONY and Bulger are not entitled to summary judgment on statute of limitations grounds.

For the foregoing reasons, the judgment of the District Court will be reversed and this case remanded for further proceedings consistent with this opinion.



## SUPREME COURT OF CANADA

**CITATION:** Nishi *v.* Rascal Trucking Ltd., 2013 SCC 33      **DATE:** 20130613
                                                                                 **DOCKET:** 34510

**BETWEEN:**

**Edward Sumio Nishi**
Appellant
and
**Rascal Trucking Ltd.**
Respondent

**CORAM:** McLachlin C.J. and LeBel, Abella, Rothstein, Cromwell, Karakatsanis and Wagner JJ.

**REASONS FOR JUDGMENT:**         Rothstein J. (McLachlin C.J. and LeBel, Abella, Cromwell, (paras. 1 to 47)                           Karakatsanis and Wagner JJ. concurring)

**NOTE:** This document is subject to editorial revision before its reproduction in final form in the *Canada Supreme Court Reports*.

———————————————

NISHI *v.* RASCAL TRUCKING LTD.


**Edward Sumio Nishi**                                                    *Appellant*


*v.*


**Rascal Trucking Ltd.**                                                  *Respondent*


**Indexed as: Nishi *v.* Rascal Trucking Ltd.**


**2013 SCC 33**


File No.: 34510.


2013: January 16; 2013: June 13.


Present:  McLachlin C.J. and LeBel, Abella, Rothstein, Cromwell, Karakatsanis and Wagner JJ.


ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA


        *Trusts — Purchase money resulting trust — Appellant using funds received from respondent to purchase property in appellant's own name — Funds representing disputed monies owed to third party — Whether purchase money resulting trust should be abolished in commercial transactions in favour of unjust enrichment principles — Whether a transfer is gratuitous when it constitutes the*

*discharge of a legal and moral obligation to a third party — Whether a proportionate interest in the property is acquired where the transferor attempted, but failed to secure the title holder's agreement to an interest in the property — Whether presumption of resulting trust was rebutted*

In 1996, Kismet Enterprises Ltd. owned approximately two acres of land in Nanaimo, British Columbia that it leased to Rascal Trucking Ltd. Rascal began operating a topsoil processing facility on the property that generated significant complaints from the neighbourhood. As a result, the City passed resolutions declaring that the facility was a nuisance. The City subsequently removed the topsoil and lodged the costs incurred of $110,679.74 against the property as tax arrears. Rascal's lease included provisions which required it to "hold harmless" Kismet for "any and all liabilities resulting from Rascal's operations on the property", but at no point did Rascal reimburse Kismet or the City for the costs of the removal of the topsoil. Kismet determined that, as a result of the tax arrears and the existing mortgage to CIBC, there was no equity left in the property. It stopped making mortgage payments. Throughout the ensuing foreclosure proceedings, Mr. Heringa, the principal of Rascal, tried in a number of ways to acquire the property, but was unsuccessful. In May 2001, the property was sold to Mr. Nishi for $237,500. Nishi was assisted in the purchase by Rascal in the amount of $110,679.74, the exact amount of the tax arrears. Heringa sent Nishi's lawyer several faxes containing offers with different terms, attempting to acquire an interest in the property. Nishi did not agree. Heringa subsequently sent a fax indicating that the monies would be advanced

"without any conditions or requirements". In November 2008 Rascal began this action claiming a one-half undivided interest in the property. The trial judge dismissed the action but this decision was overturned on appeal.

*Held:* The appeal should be allowed and the decision of the trial judge should be restored.

There is no reason to depart from the long standing doctrine of the purchase money resulting trust in favour of an approach based on unjust enrichment. While flexibility is no doubt desirable in certain areas of the law, the purchase money resulting trust provides certainty and predictability because it relies on a clear rule for determining who holds the beneficial interest in a property. When making a gratuitous transfer of property, the person who makes the transfer must have intended either to pass the beneficial interest (a gift) or retain it (a trust). A purchase money resulting trust is a species of gratuitous transfer resulting trust that arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution. This presumption can be rebutted if the recipient of the property proves, on a balance of probabilities, that at the time of the contribution, the person making the contribution intended to make a gift to the person taking title. While rebutting the presumption requires evidence of the intention of the person who

advanced the funds *at the time of the advance*, after the fact evidence can be admitted so long as the trier of fact is careful to consider the possibility of self-serving changes in intention over time.

Reviewing the trial judge's reasons in their full context confirms that he understood that Rascal's intention at the time of the advance was to contribute to the purchase price without taking a beneficial interest in the property because Rascal was motivated by recognition of the costs that it had imposed on Kismet. This intention, to make good on Rascal's obligations to Kismet by way of a payment to Mr. Nishi, is not inconsistent with a finding of a legal gift. Moreover, Rascal's stated intention was to make the advance without any conditions and its contribution towards the mortgage on the property was the amount of the tax arrears ($110,679.74) down to the penny. It was open to the trial judge to conclude that the presumption of resulting trust had been rebutted and it was well supported by the evidence.

**Cases Cited**

**Applied:** *Kerr v. Baranow*, 2011 SCC 10, [2011] 1 S.C.R. 269; *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795; **referred to:** *Nanaimo (City) v. Rascal Trucking Ltd.*, 2000 SCC 13, [2000] 1 S.C.R. 342; *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609; *Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3; *Canada v. Craig*, 2012 SCC 43, [2012] 2 S.C.R. 489; *R. v. B. (K.G.)*, [1993] 1 S.C.R. 740.

**Authors Cited**

*Oosterhoff on Trusts: Text, Commentary and Materials*, 7th ed. by A. H. Oosterhoff, et al. Toronto: Carswell, 2009.

*Snell's Equity*, 32nd ed. by John McGhee. London: Sweet & Maxwell, 2010.

*Waters' Law of Trusts in Canada*, 4th ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith. Toronto: Thomson Carswell, 2012.

APPEAL from a judgment of the British Columbia Court of Appeal (Kirkpatrick, Frankel and Smith JJ.A.), 2011 BCCA 348, 21 B.C.L.R. (5th) 330, 309 B.C.A.C. 182, 523 W.A.C. 182, 340 D.L.R. (4th) 284, [2011] B.C.J. No. 1561 (QL), 2011 CarswellBC 2154, reversing a decision of Dley J., 2010 BCSC 649, [2010] B.C.J. No. 840 (QL), 2010 CarswellBC 1454. Appeal allowed.

*D. Geoffrey G. Cowper, Q.C.,* and *Joel Payne,* for the appellant.

*Craig P. Dennis* and *Owen J. James,* for the respondent.

The judgment of the Court was delivered by

ROTHSTEIN J. —

I.      Introduction

[1]          A purchase money resulting trust arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution. This is called the presumption of resulting trust.

[2]          The presumption can be rebutted by evidence that at the time of the contribution, the person making the contribution intended to make a gift to the person taking title. While rebutting the presumption requires evidence of the intention of the person who advanced the funds *at the time of the advance*, after the fact evidence can be admitted so long as the trier of fact is careful to consider the possibility of self-serving changes in intention over time.

[3]          Edward Sumio Nishi has legal title to property. Rascal Trucking Ltd., which advanced funds to assist in the purchase of the property, claims a beneficial interest in that property. The trial judge found that the presumption of resulting trust had been rebutted. That finding was overturned on appeal.

[4]          Mr. Nishi now asks this Court to restore the decision of the trial judge by replacing the doctrine of purchase money resulting trust with the doctrine of unjust enrichment and finding that Mr. Nishi was not unjustly enriched. Alternatively, Mr.

Nishi says that the presumption of resulting trust was rebutted. I see no reason to disturb the long settled doctrine of resulting trust in favour of unjust enrichment. Rather, I would allow the appeal based on the factual findings of the trial judge that no resulting trust was created in this case.

II.    Facts

[5]    In 1996, Kismet Enterprises Ltd. owned approximately two acres of land in Nanaimo, British Columbia. In April 1996, Kismet leased the property to Rascal. Rascal began operating a topsoil processing facility on the property.

[6]    Rascal's topsoil operation generated significant complaints from the neighbourhood. As a result, the City of Nanaimo (the "City") passed resolutions, declaring that the facility was a nuisance and authorizing the City to remove the topsoil in the event that neither Kismet nor Rascal did so. The City subsequently removed the topsoil and lodged the costs incurred, amounting to $110,679.74, against the property as tax arrears. Rascal brought an action challenging the City's authority to pass these resolutions, but this Court ruled in favour of the City in 2000: *Nanaimo (City) v. Rascal Trucking Ltd.*, 2000 SCC 13, [2000] 1 S.C.R. 342.

[7]    Rascal's lease included provisions which required it to "hold harmless" Kismet for "any and all liabilities resulting from Rascal's operations on the property", but at no point did Rascal reimburse Kismet or the City for the costs of the removal of the topsoil.

[8]        Kismet determined that, as a result of the tax arrears and the existing mortgage to CIBC, there was no equity left in the property. It stopped making mortgage payments and in December 1997, CIBC began foreclosure proceedings. Throughout the foreclosure proceedings, Hans Heringa, the principal of Rascal, tried in a number of ways to acquire the property, but was rebuffed or ignored by CIBC.

[9]        Upon completion of the foreclosure proceedings, in May 2001, the property was sold to Mr. Nishi for $237,500. Before selling the property to Mr. Nishi, CIBC paid the tax arrears owing to the City.

[10]        Mr. Nishi was assisted in the purchase by Rascal who provided $85,000 in cash and assumed responsibility for paying $25,000 on the mortgage. Mr. Heringa acted as guarantor on the mortgage. Subsequent to the purchase of the property, Mr. Heringa instructed his staff that the total contribution to the mortgage should be $25,679.74. As a result, Rascal's total contribution towards the purchase of the property was $110,679.74, the exact amount of the tax arrears lodged on the property due to Rascal's topsoil activities.

[11]        With respect to this financial support, Mr. Heringa sent Mr. Nishi's lawyer several faxes containing offers with different terms. On May 25, 2001, Mr. Heringa made an offer to contribute $85,000 in cash and to assume $25,000 in mortgage payments in exchange for a second mortgage to secure Rascal's interest in the property and for the bottom half of the property. Part of the text of the May 25, 2001 fax is reproduced below:

1) To advise that $85,000.00 can be applied to a purchase of this property for $232,500.00 plus Legal and Land Title costs, to be in the name of Edward Nishi.

2) Royal Bank (Colleen Tourout) is to advance a First Mortgage. We are taking a 25 year amortization, 5 yr Term, with payments to include Taxes. H. Heringa will act as a guarantor.

3) Rascal Trucking Ltd. will be responsible for payments on $25,000.00 of the Mortgage.

4) We would like Edward Nishi to sign "Registrable Form documentation for a Second Mortgage for $110,000, no interest, to secure Rascal's interest in this land. This Second will <u>not</u> be Registered as yet, and only at some later date perhaps, with the consent of both of us.

5) There should be an Agreement that Edward Nishi will apply for, transfer & convey the bottom 1/2 of the property to Rascal Trucking Ltd., after completion of the Sale, and that it is the intent that Rascal can use, and later <u>own</u> the bottom portion of the property, commencing at the halfway point of the upper driveway, as per the attached Plan. [Emphasis in original; A.R., at pp. 113-14.]

[12]        There is no evidence that Mr. Nishi accepted this offer.

[13]        On May 28, 2001, Mr. Heringa sent a fax modifying his earlier offer and stating that "the $85,000.00 is to be applied to the purchase without any conditions or requirements, and these instructions are irrevocable" (A.R., at p. 117). He stated that the request for a second mortgage and for the bottom half of the property to be conveyed to Rascal were "just possibilities, for future reference & consideration, and that's <u>all</u>" (<u>ibid.</u> (emphasis in the original)). The text of this second fax is reproduced below:

1) So there is no confusion, Instruction #1, is a stand alone instruction, and the $85,000.00 is to be applied to the purchase without any

conditions or requirements, and these instructions are irrevocable. The sale must complete, in the name of Edward Nishi. Items 2 & 3 are only to confirm what is to occur.

2) The rest (Items 4 & 5) are just possibilities, for future reference & consideration, and that's all.

3) However, if you think that a Second Mortgage or anything else makes sense, to properly protect Nishi, Kismet & Rascal, in the future, from demands from the City or from future Nuisance charges, etc., please advise . . . . Also, Rascal doesn't want to lose its legal non-conforming status in regard to topsoil processing at this site. [Emphasis in original; A.R., at p. 117.]

[14]    In November 2008, Rascal began this action claiming a one-half undivided interest in the property.

[15]    For reasons that will become apparent, it is relevant that Mr. Heringa and Cidalia Plavetic, the principal of Kismet, had had a longstanding business and personal relationship. It is also relevant that Ms. Plavetic and Mr. Nishi are common law partners and have lived on the property since 1997.

III.    Judicial History

A.    *Supreme Court of British Columbia*

[16]    Rascal advanced three arguments before the trial judge. First, Rascal argued that there was an agreement between the parties that half of the property would belong to Rascal. The trial judge rejected this argument but noted that "[Mr.

Heringa's] intention and desire to secure an interest was obvious, but Mr. Nishi would not agree" (para. 39).

[17]      Second, Rascal argued that since it had contributed to the purchase price of the property but did not take title, a resulting trust arose such that Rascal was entitled to a share of the property in proportion to its contribution to the purchase price. The trial judge rejected this argument, finding that while there was "no issue of a gift", Mr. Nishi's evidence was that there was no intention for Rascal to have an interest in the land (paras. 42 and 47). The trial judge found that the purpose of the payment was to satisfy the debt from Rascal to Kismet as a result of the tax arrears for which Rascal acknowledged responsibility due to the "hold harmless" undertaking by Rascal in its lease with Kismet. The trial judge also relied on the fact that the amount of the contribution ($110,679.74) was equal to the tax arrears caused by Rascal.

[18]      Third, the trial judge rejected Rascal's claim for a constructive trust on the basis of unjust enrichment, finding that the purpose of the contribution was simply to place Ms. Plavetic, Mr. Nishi and Kismet in the same position as if the nuisance and resulting tax arrears had never been caused by Rascal.

B.    *Court of Appeal for British Columbia*

[19]      The Court of Appeal allowed Rascal's appeal. That court held that a presumption of resulting trust arose because of a gratuitous transfer between

unrelated parties. This presumption was not rebutted because the trial judge had found that there was "no issue of a gift". The trial judge had erred in finding that the presumption had been rebutted because that finding was based on Mr. Nishi's intention and not Rascal's intention. The Court of Appeal observed that it is the intention of the person who advances the funds and not the intention of the recipient that is relevant. The trial judge had concluded that "[Mr. Heringa's] intention and desire to secure an interest was obvious" (para. 39). The fact that Rascal had an obligation to indemnify Kismet for the tax arrears could not serve to rebut the presumption because Mr. Nishi, to whom the payment was made, was a legal stranger to Kismet.

IV.    Analysis

[20]        Mr. Nishi appealed to this Court on two grounds. First, he argued that the purchase money resulting trust doctrine should be abandoned in favour of an approach based on unjust enrichment and that no unjust enrichment occurred here. Alternatively, he argued that if the purchase money resulting trust is to be retained, it would not apply in this case. I would not give effect to the first ground of appeal. In my view, there is no reason to depart from the longstanding doctrine of the purchase money resulting trust. However, I would allow Mr. Nishi's appeal because there was no resulting trust arising on the facts as found by the trial judge.

A.    *Should the Purchase Money Resulting Trust Be Abandoned?*

[21]        The purchase money resulting trust is a species of gratuitous transfer resulting trust, where a person advances a contribution to the purchase price of property without taking legal title. Gratuitous transfer resulting trusts presumptively arise any time a person voluntarily transfers property to another unrelated person or purchases property in another person's name: D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (4th ed. 2012), at p. 397.

[22]        As Cromwell J. noted in *Kerr v. Baranow*, 2011 SCC 10, [2011] 1 S.C.R. 269, at para. 12, it has been "settled law since at least 1788 in England (and likely long before) that the trust of a legal estate, whether in the names of the purchaser or others, 'results' to the person who advances the purchase money". Despite this recent endorsement of the purchase money resulting trust, Mr. Nishi argues that it should be abandoned in favour of the doctrine of unjust enrichment. The purchase money resulting trust provides certainty and predictability. Mr. Nishi has not advanced arguments that would support overruling the Court's jurisprudence in this area.

[23]        This Court has recently considered under what circumstances it should overrule a prior decision of the Court: *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609; *Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3; *Canada v. Craig*, 2012 SCC 43, [2012] 2 S.C.R. 489. It is best not to depart from precedent unless there are compelling reasons to do so: *Henry*, at para. 44. The Court will exercise caution in overturning decisions of firm majorities, particularly when those decisions are recent: *Fraser*, at para. 57.

[24]        In this case, Mr. Nishi is asking this Court to depart from both *Kerr* and *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795, two recent appeals decided unanimously or by firm majorities. These decisions represent just the most recent endorsements of longstanding doctrine. There is no concrete evidence that the purchase money resulting trust is unworkable or has lead to untenable results: *Fraser*, at para. 83. Nor has Mr. Nishi shown that the purchase money resulting trust has been "attenuated or undermined by other decisions of this or other appellate courts" (*R. v. B. (K.G.)*, [1993] 1 S.C.R. 740, at p. 778).

[25]        Mr. Nishi advances four reasons for abandoning the purchase money resulting trust and gratuitous transfer resulting trusts more generally: overlap with the doctrine of unjust enrichment in terms of purpose; overly restrictive framework for the types of intention that motivate transactions; absence of remedial flexibility; and overall lack of flexibility in terms of what can be considered relative to unjust enrichment.

[26]        Mr. Nishi's first argument is that since the purchase money resulting trust essentially responds to unjust enrichment, it is unnecessary to retain it as a separate doctrine. Even if the purchase money resulting trust is considered to be an inherently restitutionary concept, I would still not give effect to this argument. The argument appears to have been summarily made and in the absence of harm, confusion or other disadvantage, I am not satisfied that conceptual overlap is a sufficient reason to abandon the purchase money resulting trust. This is particularly true in light of the

fact that the purchase money resulting trust has been a feature of the common law since at least 1788 and provides certainty and predictability in situations where a person has made a gratuitous advance.

[27]        Mr. Nishi's second argument — that purchase money resulting trusts provide an overly restrictive framework for the types of intention that motivate transactions — must fail because it is based on too narrow an understanding of the scope of gifts in law. The concerns that Mr. Nishi raised in how the Court of Appeal applied this test to the facts here can be resolved more appropriately by considering the legal meaning of the word gift. As will be discussed in more detail below, the legal concept of a gift is broad enough to include the type of advance made in this case. Legal gifts do not require philanthropic motivations. The trust-gift dichotomy, as Mr. Nishi describes it, is not restrictive. Rather it reflects the fact that when making a gratuitous transfer of property, the person who makes the transfer must have intended either to pass the beneficial interest (a gift) or retain it (a trust).

[28]        Mr. Nishi's third and fourth arguments can be considered together. In essence, Mr. Nishi argues that the doctrine of unjust enrichment is preferable because of its flexibility in terms of factors to be considered, overall focus on justice between the parties and broader remedial options. However, desire for flexibility does not constitute a compelling reason for departing from the unanimous decision of this Court in *Kerr*, which was issued just two years ago. While flexibility is no doubt desirable in certain areas of the law, the purchase money resulting trust provides

certainty and predictability because it relies on a clear rule for determining who holds the beneficial interest in a property. Absent strong dissenting opinions in this Court, contrary decisions in provincial appellate courts or significant negative academic commentary that would justify disturbing such a settled area of the law, there is no reason to abandon the purchase money resulting trust.

B.    *Did a Resulting Trust Arise for the Benefit of Rascal?*

[29]    Rascal's contribution to the purchase of the property was made without consideration and Rascal and Mr. Nishi are not related. Therefore, the legal presumption of resulting trust applies: *Pecore* at paras. 24 and 27. This is because in such circumstances equity presumes bargains rather than gifts: *Pecore*, at para. 24. In the context of a purchase money resulting trust, the presumption is that the person who advanced purchase money intended to assume the beneficial interest in the property in proportion to his or her contribution to the purchase price: see *Waters' Law of Trusts in Canada*, at p. 401.

[30]    However, the presumption of resulting trust can be rebutted if the recipient of the property proves, on a balance of probabilities, that the person who advanced the funds intended a gift: *Pecore*, at paras. 24 and 44. The relevant intention is the intention of the person who advanced the funds at the time of the contribution to the purchase price: *Pecore*, at para. 59. Therefore, for Mr. Nishi to rebut the presumption in this case, he must prove that Rascal intended to make a gift at the time that Rascal made a contribution to the purchase price, in May 2001.

[31]        In my view, the trial judge was correct to conclude that the presumption was rebutted in this case. In his May 28, 2001 fax, Mr. Heringa indicated that the contribution to the purchase price and his intention to pay $25,000 of the mortgage was made "without any conditions or requirements, and these instructions are irrevocable" (A.R., at p. 117). As will be discussed below, a contribution to the purchase price without any intention to impose conditions or requirements is a legal gift. While Mr. Heringa argued that there was either an agreement to transfer a portion of the land to him or an intention for him to hold a beneficial interest, the trial judge preferred the evidence of Mr. Nishi (para. 40).

[32]        The Court of Appeal held that the trial judge's findings (1) that there was no issue of a gift and (2) that Mr. Heringa's intention to obtain an interest in the property was obvious, meant that the presumption of resulting trust had not been rebutted. In my view, the Court of Appeal erred in the inferences it drew from the trial judge's reasons on these two key issues.

(1)    The Meaning of "Gift"

[33]        The trial judge found that there was "no issue of a gift" (para. 42). The Court of Appeal took this statement to mean that the presumption of resulting trust was therefore not rebutted, because to rebut it would require Mr. Nishi to prove that the contribution was a gift. In my respectful view, the Court of Appeal erred by taking this statement in isolation as conclusive of the trial judge's reasoning.

[34]        In the trial judge's reasons, immediately following his statement about there being "no issue of a gift", he states: "[t]he presumption of a resulting trust is rebuttable by the title holder showing that the payment was not intended to create a beneficial interest" (para. 42). This demonstrates that the trial judge understood the test for rebutting the presumption to be based on the absence of intention to create a beneficial interest for the transferor. There would have been no need for the trial judge to continue his analysis beyond his statement about there being no issue of a gift, if the trial judge had not been of the opinion that an intention to create a beneficial interest in the transferor was the test for determining whether the presumption of resulting trust had not been rebutted.

[35]        The conclusion of the trial judge was that Mr. Nishi had satisfied the burden on him of rebutting the presumption of resulting trust. In so concluding, the reasons of the trial judge appear to suggest that he distinguished between a gift and absence of an intention by the transferor to hold a beneficial interest after the advance. Although he made such a distinction, his conclusion that there was no intention to create a beneficial interest in the property for Rascal is legally the same as saying that there was an intention to make a gift to Nishi. The trial judge erred in distinguishing between a gift and intention to create a beneficial interest for the transferee but that error was inconsequential.

[36]        Indeed, the trial judge's error may well be explained by reference to the academic authorities as some authorities have phrased the test for rebutting the

presumption of resulting trust using language about intention not to hold the beneficial interest in the property. For example, *Snell's Equity* describes the type of evidence required to rebut the presumption as "any evidence tending to indicate that A's intention was that B should take the beneficial interest in the property acquired with A's purchase money" (J. McGhee, ed., *Snell's Equity* (32nd ed. 2010), at para. 25-012). Similarly, *Oosterhoff on Trusts* describes the presumption of resulting trust as "a presumption that the apparent donor did not intend to give the beneficial ownership of the assets to the recipient" (A. H. Oosterhoff et al., eds., *Oosterhoff on Trusts: Text, Commentary and Materials* (7th ed. 2009), at p. 640).

[37]      In my view, these formulations are simply another way of describing whether the transferor's intention was to create a legal gift. There is no second category of intention that rebuts the presumption. *Pecore* and *Kerr* did not recognize a different category of intention, other than intention to make a gift, that would rebut the presumption. This is consistent with other authorities such as *Waters' Law of Trusts* where the proof required to rebut the presumption is intention "to make a gift of the property" (p. 401; see also pp. 406 and 409). In Canada, our jurisprudence is that there is no difference between the intention to make a gift and the intention that the transferor not hold a beneficial interest. In other words, in the case of a gratuitous transfer, there is a gift at law when the evidence demonstrates that, at the time of the transfer, the transferor intended the transferee to hold the beneficial interest in the property being purchased.

[38]         Reviewing the trial judge's reasons in their full context confirms that he understood that Rascal's intention at the time of the advance was to make a legal gift — i.e. to contribute to the purchase price without taking a beneficial interest in the property. As the trial judge found, Rascal's contribution to the purchase price was motivated by recognition of the costs that it had imposed on Kismet, the company owned by Ms. Plavetic, his friend. As I will explain, this intention, to make good on Rascal's obligations to Kismet by way of a payment to Mr. Nishi, is not inconsistent with a finding of a legal gift. Moreover, as was clear from the May 28, 2001 fax, Rascal's stated intention was to make the advance without any conditions such as obtaining a beneficial interest in any portion of the land.

[39]         The trial judge's comment that the there was "no issue of a gift" was made in the context of reviewing Mr. Nishi and Ms. Plavetic's perspective on the purpose of the payment:

> In this case, there is no issue of a gift. Neither Mr. Nishi nor Ms. Plavetic considered the plaintiff's contribution to be a gift. [para. 42]

Mr. Nishi and Ms. Plavetic did not see the payment as a gift, because as the trial judge went on to describe, Rascal acknowledged its responsibility for a debt to Kismet related to the tax arrears arising from Rascal's topsoil operation. However, it made no sense for Rascal to make that payment directly to Kismet since Kismet was subject to other liabilities and was essentially defunct. If Rascal had made the payment to Kismet, it would not have assisted Mr. Heringa's friends to obtain title to

the property. Making the contribution to the purchase price, therefore, enabled Rascal to live up to its moral commitment in a way that practically benefited Mr. Heringa's friends. It also left open the possibility that in the future they might agree to a second mortgage or a transfer of a portion of the property to Rascal.

[40]     Indeed, Mr. Heringa's instructions to his staff on payment of his contribution towards the mortgage on the property refer to the amount of the tax arrears ($110,679.74) down to the penny. The necessary implication is that Mr. Heringa viewed the payments as connected with that moral obligation. If Mr. Heringa's intention at that time was for Rascal to take a beneficial interest in the property, the moral obligation would not have been fulfilled since Rascal would have used the payment to obtain a corresponding interest in the land and not to make good on its moral obligation. In other words, for these parties, one payment cannot be used both to discharge the moral obligation and to obtain a beneficial interest in the land. The two intentions are incompatible.

(2)     Evidence of Rascal's Intention

[41]     Evidence that arises subsequent to a gratuitous transfer can be admissible to show the true intention of the transferor: *Pecore*, at para. 59. However, it is the intention of the transferor *at the time of transfer* that is determinative. The difficulty with subsequent evidence is that it may well be self-serving or the product of a change in intention on the part of the transferor: *Pecore*, at para. 59.

[42]    The trial judge commented on Rascal's intention twice in his reasons. When discussing whether there was an agreement between Rascal and Mr. Nishi to convey part of the property to Rascal, the trial judge stated that "[Mr. Heringa's] intention and desire to secure an interest was obvious, but Mr. Nishi would not agree" (para. 39).   Later in his reasons, the trial judge stated that he "specifically accepted the evidence of Mr. Nishi that there was no intention to have any interest in favour of Rascal created in the land" (para. 47). In my view, neither of these statements is inconsistent with the trial judge's conclusion that the presumption of resulting trust was rebutted.

[43]    The trial judge's first statement was made in the context of discussing whether Mr. Heringa and Mr. Nishi had formed a contract that conveyed an interest in the land to Mr. Heringa.  The trial judge stated:

> His intention and desire to secure an interest was obvious, but <u>Mr. Nishi would not agree</u>. As a result, I conclude that <u>there was no agreement</u> whereby Mr. Heringa was to be given an interest or ownership position in the land. [Emphasis added; para. 39.]

Mr. Heringa's desire to obtain an agreement whereby half of the property would be conveyed to him was clear from the content of the May 25, 2001 fax in which he asked for an agreement to transfer and convey the bottom portion of the land to Rascal. However, Mr. Heringa withdrew this request in his May 28, 2001 fax by stating that there were to be no conditions or requirements attached to the financial support.

[44]        Rascal argued before this Court that the trial judge's finding that Mr. Heringa's "intention and desire to secure an interest was obvious" constitutes a finding of fact as to Rascal's intention to hold a beneficial interest in the property as a result of the advance. However, the trial judge's findings with respect to the presence of an intention and desire to enter a contract should not be applied to the issue of resulting trust, when the trial judge did not choose to do so. The trial judge obviously did not consider his finding of an intention to contract to be determinative of intention for the purpose of the resulting trust analysis. Mr. Heringa withdrew this request in his May 28, 2001 fax by stating that there were to be no conditions or requirements attached to the financial support. It was open for the trial judge to organize his factual findings in this manner.

[45]        With respect to the trial judge's second statement — that he "accepted the evidence of Mr. Nishi that there was no intention to have any interest in favour of Rascal created in the land" — the trial judge was speaking not just of Mr. Nishi's evidence as to his own intention at the time but also Mr. Nishi's evidence as to Mr. Heringa and Rascal's intention at that time. This follows from his discussion of Rascal's acknowledgement of its responsibility for the debt (para. 45).

[46]        At trial, it was Rascal's position that at the time of the contribution to the purchase price, Mr. Heringa and Rascal's intention was for Rascal to retain the beneficial interest in proportion to that contribution.    The trial judge essentially concluded that Mr. Heringa's evidence at trial about Rascal's intention at the time of

the transfer could not be relied upon. Consistent with the caution of this Court in *Pecore*, this is a quintessential example of why after-the-fact evidence should be viewed with skepticism, because it often demonstrates a change in intention, not the intention at the time of the advance. It was open to the trial judge to reach this conclusion and it was well supported by the evidence, particularly Mr. Heringa's May 28, 2001 fax. The trial judge's decision is not in error and ought to be restored.

V.    Disposition

[47]      The finding of the trial judge that the presumption of resulting trust was rebutted is sound. I would allow the appeal and restore the decision of the trial judge with costs to Mr. Nishi throughout.

*Appeal allowed with costs throughout.*

*Solicitors for the appellant:  Fasken Martineau DuMoulin, Vancouver.*

*Solicitors for the respondent:  Dentons Canada, Vancouver.*

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

**H**

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

Nortel Networks Corp., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation, Applicants

Ontario Superior Court of Justice

Morawetz J.

Heard: June 7, 2011
Judgment: June 17, 2011
Docket: 09-CL-7950

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons at *Nortel Networks Corp., Re* (2011), 2011 CarswellOnt 5740, 2011 ONSC 4012 (Ont. S.C.J.)

Counsel: Alan Mark, Derrick Tay, Alan Merskey, Jennifer Tam, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello, C. Armstrong, for Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for Former & Disabled Employees

G. Finlayson, R. Orzy, R. Swan, for Noteholder Group

Lily Harmer, Max Starnino, for Superintendent

S. Seigel, for Bank of New York Mellon

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

Alex MacFarlane, Abid Quereshi, for Official Committee of Unsecured Creditors

R. Paul Steep, Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill, S. Campbell, for Joint Administrators

Bill Burden, for U.K. Pension Trustee

Lyndon Barnes, for Board of Directors of Nortel

Andrew Gray, Scott Bomhof, for U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

Subject: Insolvency; Corporate and Commercial; International

Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Miscellaneous

Debtor groups of telecommunications companies in Canada and United States were insolvent and entered insolvency protection — Debtors divested themselves of assets raising approximately $3 billion, with more expected — Interim funding and settlement agreement was entered into by Canadian, American and other debtors — Interim sales protocol could not be arranged between debtors — Canadian debtors had creditors but no secured creditors — Canadian and United States debtors brought motion for approval of allocation protocol both in United States and in Canada — Mediator appointed — Resolution of motion could take considerable time — Parties had shown ability to co-operate and had shown ability to realize proceeds of sale of assets — Possibility existed that positive results would flow from mediation — Creditors had been waiting two years — Issue was complex and multi-jurisdictional.

**Statutes considered:**

*Bankruptcy Code*, 11 U.S.C. 1982

    Chapter 11 — referred to

MOTION by debtor companies for approval of allocation protocol.

***Morawetz J.:***

1      On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

2    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

3    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross. This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

4    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

5    Decisions in respect of both motions are currently under reserve.

6    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone. It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

7    Certain of the issues raised in the motions have been the subject of two mediation sessions. These mediation sessions were not successful. It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

8    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors. The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

9    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol. After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

10    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation. After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

11    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

12      The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

13      The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

14      In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally. However, the creation of an asset pool is not ultimate resolution of Nortel matters. These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally. These proceedings were commenced on January 14, 2009. Creditors have been waiting nearly two and one-half years for a meaningful distribution. A mediation will require that the parties continue a dialogue. It is possible that tangible, positive results will flow from such mediation.

15      In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling. I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

16      I recognize that the parties may have difficulty in reaching a consensus on a mediator. In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator. No individual has been identified. It, therefore, falls to both Judge Gross and to me to appoint a mediator.

17      The mandate of the mediator is to address issues raised in the motion. It is recognized that the boundary of this mandate is not clearly defined. It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

18      The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

19      It is my understanding that, at the mediation sessions, there were a large number of parties that participated. While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor. It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel. The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions. It is hoped that the parties will be able to work out the details respecting participation of the mediation.

20      The identity of the mediator will be provided by way of Supplementary Endorsement early next week. The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5175, 2011 ONSC 3805, 203 A.C.W.S. (3d) 465

to have the expenses of such advisors and counsel paid out of the assets of Nortel.

21      In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

22      To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.

*Order accordingly.*

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5740, 2011 ONSC 4012

**H**

2011 CarswellOnt 5740, 2011 ONSC 4012

Nortel Networks Corp., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation, Applicants

Ontario Superior Court of Justice

Morawetz J.

Judgment: June 29, 2011
Docket: 09-CL-7950

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons to *Nortel Networks Corp., Re* (2011), 2011 ONSC 3805, 2011 CarswellOnt 5175 (Ont. S.C.J.)

Counsel: Alan Mark, Derrick Tay, Alan Merskey, Jennifer Stam, for Nortel Networks Corporation et al.

F. Myers, J. Pasquariello, C. Armstrong, for Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for Former & Disabled Employees

G. Finlayson, R. Orzy, R. Swan, for Noteholder Group

Lily Harmer, Max Starnino, for Superintendent

S. Seigel, for Bank of New York Mellon

Alex MacFarlane, Abid Quereshi, for Official Committee of Unsecured Creditors

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5740, 2011 ONSC 4012


R. Paul Steep, Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M.P. Gotlieb, R. Schwill, S. Campbell, for Joint Administrators

Bill Burden, for U.K. Penson Trustee

Lyndon Barnes, for Board of Directors of Nortel

Andrew Gray, Scott Bomhof, for U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

Subject: Insolvency; Corporate and Commercial; International

Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Miscellaneous

Debtor groups of telecommunications companies in Canada and United States were insolvent and entered insolvency protection, in Canada under Companies' Creditors Arrangement Act — Debtors divested themselves of assets raising approximately $3 billion, with more expected — Interim funding and settlement agreement was entered into by Canadian, American and other debtors — Interim sales protocol could not be arranged between debtors — Canadian debtors had creditors but no secured creditors — Canadian and United States debtors brought motion for approval of allocation protocol both in United States and in Canada — Mediator appointed — Resolution of motion could take considerable time — Parties had shown ability to co-operate and had shown ability to realize proceeds of sale of assets — Possibility existed that positive results would flow from mediation — Creditors had been waiting two years — Issue was complex and multi-jurisdictional — Further endorsement issued regarding terms of mediation — Mediator appointed — Court in United States agreed that appointment of mediator could be beneficial — Mediator had authority to add other parties — Mediator had authority to determine scope of mediation — Mediation proceedings were settlement hearings and to be treated as such in later hearings — Protocol for termination of mediator set out.

**Statutes considered:**

*Bankruptcy Code*, 11 U.S.C. 1982

    Chapter 11 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

    Generally — referred to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5740, 2011 ONSC 4012


ADDITIONAL REASONS to judgment reported at *Nortel Networks Corp., Re* (2011), 2011 ONSC 3805, 2011 CarswellOnt 5175 (Ont. S.C.J.), respecting terms of mediation.

*Morawetz J.*:

1    This Endorsement relates to my Endorsement of June 17, 2011. The following directions take precedence over the directions provided on June 17, 2011.


2    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").


3    A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").


4    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross. The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.


5    Both motions had the support of all parties appearing, save for the joint administrators of NNUK.


6    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors. The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").


7    To date, the parties have been unable to resolve these allocation issues on a consensual basis. This has resulted in a most unfortunate situation.


8    Nortel's insolvency is somewhat unique. The sale of its business units has created a sizeable asset pool. With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures — some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions — now sit in escrow awaiting the resolution of allocation.


9    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom. As the Monitor

2011 CarswellOnt 5740, 2011 ONSC 4012

noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

10      The Canadian Debtors have no significant secured creditors. The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel. Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

11      There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

12      For many of these individuals, the delay in receiving a meaningful distribution can be significant. It is not just a question of calculating the time value of money. For this group of creditors, time is not on their side.

13      This issue is international in scope. It is also a public-interest issue. A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

14      In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance. The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

15      The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue. There is no simple solution to the legal predicament that faces all parties.

16      Decisions in respect of both motions are currently under reserve. The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court. Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors. Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

17      A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors. With extended delay comes uncertainty. For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.

18      Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions. The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

19      The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5740, 2011 ONSC 4012

20     The mediator is authorized to select advisors of his choosing. The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

21     The particulars of the mediation are as follows:

| | |
|---|---|
| Mediator: | The Honourable Warren K. Winkler |
| | Chief Justice of Ontario |
| | Court of Appeal for Ontario |
| | Osgoode Hall |
| | 130 Queen Street West |
| | Toronto, ON |
| | M5H 2N5 |
| Timing: | To be arranged by the mediator |

22     Participation in this mediation is mandatory. Any agreements reached as a result of mediation will be binding on the parties.

23     A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

24     The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law. The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session. Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session. In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise. Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

25     The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

26     The mediation process shall be terminated under any of the following circumstances:

   (a) by a declaration by the mediator that a settlement has been reached;

   (b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

   (c) for any other reason as determined by the mediator.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 5740, 2011 ONSC 4012

27      The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on
June 7, 2011.

*Order accordingly.*

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 1757
COURT FILE NO.: 09-CL-7950
DATE: 20130403

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

                AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:   MORAWETZ J.

COUNSEL:  D. Tay and J. Stam, for Nortel Networks Corporation

                B. Zarnett, J. Carfagnini and F. Myers, for Ernst & Young Inc., the Monitor

                M. Zigler, K. Rosenberg, A. Jacques, B. Wadsworth and E. Marques, for the Canadian Creditors Committee

                M. P. Gottlieb, J. Renihan and R. B. Schwill, for Nortel Networks UK Limited (in Administration)

                D. Ward, for the UK Pension Trustees/PPF

                A. Hirsh, for the Former Directors and Officers of Nortel Networks Corporation and Nortel Networks Limited

                A. Gray and S. Bomhof, for Nortel Networks Inc. and other U.S. Debtors

                J. Salmas, for Wilmington Trust, National Association

                S. Seigel, for the Bank of New York Mellon

                R. Swan and G. Finlayson, for the Informal Committee of Noteholders

                S. Kukulowicz, R. Jacobs, and M. Wunder, for the Unsecured Creditors' Committee

                E. Lamek, for the Law Debenture Trust Company of New York

HEARD:     March 7, 2013

ENDORSED: March 8, 2013

REASONS:  April 3, 2013

- Page 2 -

## ENDORSEMENT

Background

[1]    On June 7, 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol (the "Allocation Protocol") for the allocation of proceeds of the sale of their assets, the assets of Nortel Networks Inc. and certain of its U.S. affiliates including Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors"), and the assets of Nortel Networks U.K. Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors").

[2]    An endorsement in respect of this motion was released on June 17, 2011 (the "June 17 Endorsement").  It is attached as Schedule "A", and is incorporated by reference into this endorsement.

[3]    A further endorsement was released on June 29, 2011 (the "June 29 Endorsement").  It is attached as Schedule "B", and is incorporated by reference into this endorsement. While the mediation referenced in the June 17 Endorsement and June 29 Endorsement took place, it failed to be worthwhile and was consequently terminated by declaration of the mediator.

[4]    A further endorsement was released on March 8, 2013 (the "March 8 Endorsement").  It is attached as Schedule "C", and is incorporated by reference into this endorsement. The March 8 Endorsement approved the Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011, with reasons to follow.  These are the reasons.

[5]    The parties' inability to resolve their differences is unfortunate, as approximately $9 billion, raised from various asset sales and other realizations, awaits distribution to Nortel's global creditors, and the significant time lapse is exacerbating the negative effects of the previously identified public-interest issues (see the June 29 Endorsement). The only positive development for stakeholders since June 2011 was the sale of Nortel's patent portfolio for proceeds exceeding $4 billion (substantially surpassing the $900 million estimated amount).

[6]    The sad reality for all creditors is that four years have passed from when Nortel filed for *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") protection.

Interim Funding and Settlement Agreement

[7]    In June 2009, the Canadian Debtors, certain U.S. Debtors, and certain EMEA Debtors (collectively, the "Debtors") entered into an Interim Funding and Settlement Agreement ("IFSA"), which provided for cooperation in the global sale of Nortel's business units.

[8]    Under the IFSA, these parties agreed to "negotiate in good faith and attempt to reach agreement on a timely basis" on a protocol (the "Protocol") for resolving disputes concerning the allocation of sale proceeds ("Sale Proceeds") from sale transactions. Importantly, for the purpose of determining this motion, the parties agreed, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to the matters agreed in [IFSA]" must be commenced in the U.S. Court and the Canadian Court, in a

joint hearing of both courts under the cross-border protocol ("Cross-Border Protocol"), if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

[9]    Since the parties entered into the IFSA, they concluded several sales of global Nortel businesses and, in connection with these sales, they entered into escrow agreements ("Escrow Agreements"). These Escrow Agreements provided for the deposit of Sale Proceeds into escrow and the conditional distribution of the proceeds.

[10]    Significantly, under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court, and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreements.

The Protocol/Allocation Protocol

[11]    Failing to come to an agreement on a Protocol, after one-year of talks, prompted a suspension of negotiation between the parties.  The parties, according to the Canadian Debtors, specifically could not agree on the scope of the dispute to be determined under a Protocol and the dispute resolution process (for example, deciding whether the resolution should take the form of an arbitral award).

[12]    The parties subsequently attempted to reach a consensual resolution on these issues through mediation; however, mediation failed twice.

[13]    The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "Committee") subsequently filed this joint motion in the U.S. Court and the Canadian Court seeking orders approving the Allocation Protocol. The Canadian Debtors concurrently filed a motion seeking approval of the proposed Allocation Protocol, which they developed in conjunction with Ernst & Young Inc. (the "Monitor"), the U.S. Debtors, the Committee and others.

[14]    The Allocation Protocol proposed the following:

  (a) The Canadian Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the Sale Proceeds of the global sales to the Debtors' estates;

  (b) Creditor claims, including but not limited to intercompany claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any intercompany claim is made;

  (c) The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators (defined below) and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation.  Any other party in interest could seek to establish itself as a core party;

(d) The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA Debtors' claims against the U.S. Debtors ("EMEA U.S. Claims"). The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Debtors' claims against the Canadian Debtors ("EMEA Canadian Claims"); and

(e) The Canadian and U.S. Courts will hold, simultaneously, (i) a joint hearing regarding allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively. Each Court would then issue its respective decisions.

<u>Party Submissions</u>

[15]    The parties disagree on the following fundamental issues: whether an agreement to arbitrate was reached (and, correspondingly, whether the Canadian Court and U.S. Court should compel arbitration), whether the Canadian Court and U.S. Court have jurisdiction to approve the Allocation Protocol, and whether the parties negotiated the Protocol in good faith.

*Submissions of the Canadian Debtors and the Monitor*

[16]    The Monitor's submissions essentially corroborate, or expand on, the following submissions of the Canadian Debtors.

[17]    Because the parties were unable to successfully negotiate a Protocol, the Canadian Debtors requests that the Canadian Court exercise its discretionary power to determine allocation issues and accordingly order the parties to direct payments from the escrow funds. Pursuant to section 5 of the IFSA, Sale Proceeds of each significant global transaction may only be distributed if instructed jointly by the depositors and estate fiduciaries (very unlikely at this point) or where the parties have entered into a Protocol (as previously mentioned, the parties could not come to an agreement); however, the distribution agent is able to distribute the proceeds if there is an "any order, judgment or decree" made or entered by any court "affecting the property deposited under th[e] Agreement".

[18]    The Canadian Debtors argue that the court lacks requisite authority to compel the parties to arbitrate their disputes because there has been no agreement to arbitrate. The parties merely agreed, pursuant to section 12(c) of the IFSA, to "negotiate in good faith and <u>attempt</u> to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions". Further, section 12(b) of the IFSA does not constitute an agreement to arbitrate because it has none of the features typically found in an enforceable commercial arbitration agreement, does not provide any methodology for an arbitration and does not reference the word "arbitration". It reads as follows:

> 12(b) In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

[19]    The Canadian Debtors further argue that the parties submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian Court and U.S. Court. For example, under their many Escrow Agreements, the parties "irrevocably submit[ed] to and accept[ed] for itself and its properties, generally and unconditionally to the exclusive jurisdiction of … the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice" and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements. In addition, the parties submitted all legal proceedings seeking "any relief whatsoever" to the extent "relating to" the matters agreed in the IFSA to the exclusive joint jurisdiction of the Canadian Court and U.S. Court, pursuant to section 16(b) of the IFSA, as follows:

> 16(b) To the fullest extent permitted by applicable law, each Party…(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in … a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors …

[20]    Finally, the Canadian Debtors claim that there is nothing to substantiate allegations that any party acted in bad faith. An agreement to negotiate in good faith, and attempt to reach agreement on a Protocol, does not require any party to ultimately acquiesce to an agreement.

*Submissions of the Joint Administrators of Nortel Networks U.K. Limited*

[21]    The Joint Administrators of Nortel Networks U.K. Limited (the "Joint Administrators"), acting as the court-appointed administrators and authorized foreign representatives for the EMEA Debtors, makes four submissions for dismissing this motion.

[22]    First, section 12(b) of the IFSA (articulated above) constitutes an enforceable arbitration clause to arbitrate the allocation of Sale Proceeds because it is a written agreement evidencing the intention of the parties to submit to binding *ad hoc* arbitration.   In exchange for the arbitration provision, which was designed to provide protection to each of the many worldwide Nortel entities by ensuring that they would have input into the Protocol and the appointment of the dispute resolvers, the parties agreed to give up significant rights in businesses and assets to enable the sale of Nortel's global assets to be completed without delay.

[23]    While the parties' agreement to arbitrate is clear on the face of the IFSA, any possible ambiguity is resolved by reviewing the negotiating history, surrounding circumstances, various courts understanding of how the allocation was to be determined, public statements and positions taken in negotiating a Protocol.

[24]    Second, neither the Canadian Court nor the U.S. Court has the jurisdiction to determine how the proceeds of the sale of the global Nortel assets and businesses should be divided among the estates of the various Nortel Debtors around the world. It is neither proper nor feasible for

courts of two independent nations to reach, in effect, a joint decision for the following three reasons:

- such a process violates the Cross-Border Protocol;

- the Ontario Court does not have jurisdiction to allocate Sale Proceeds that were outside the U.S. and Canada by entities outside the U.S. and Canada; and

- there are practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sale Proceeds allocation.

[25]    Third, and in the alternative, the Ontario Court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. The proper role of the courts in their supervisory function in relation to the U.S. Debtors and Canadian Debtors is to require that the parties appoint an arbitration panel possessing the power to set a procedure for such arbitration.

[26]    Fourth, the parties to the IFSA made an enforceable promise to negotiate a Protocol for the arbitration procedures in good faith; counsel submits that there has been a *bona fide* failure in those negotiations.

[27]    In the Joint Administrators' supplementary submissions, counsel highlights practical problems invariably arising from the U.S. Court and Canadian Court trying to jointly address the division of assets among approximately 40 international entities. Counsel submits that it is unlikely that both courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward.  Counsel also anticipates that the inevitable appeal process is not governed by a uniform set of procedural or legal rules.   The result would not only be years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

<u>Analysis and Conclusion</u>

[28]    I will assess the merits of the arguments made by all parties on the fundamental issues of divergence, in turn, before rendering my determination.

*Agreement to Arbitrate*

[29]    A common theme permeating the Joint Administrators' arguments is that the parties agreed to arbitrate. As I disagree with this underlying premise, I find many of their arguments to be inherently flawed.

[30]    Simply put, the parties agreed to enter into negotiations to agree on a Protocol; the best position of the Joint Administrators is an agreement to agree, which is unenforceable. I do not find the IFSA, or any of the documents, to be ambiguous in this regard.

[31]    A detailed review of the wording used in the Joint Administrators' argument is telling. The parties struck an <u>agreement</u> embodied in the IFSA; the parties would give up their…ownership rights in the assets to be sold in return for an <u>agreement</u> that, failing an agreement by the parties, the allocation of the sale proceeds would be decided in an arbitral form

that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.

[32]    It could very well be that, from their standpoint, the asset sales were predicated on the allocation being decided by way of arbitration. However, in the IFSA, I am unable to find that the parties actually entered into an agreement to arbitrate.

[33]    Contrary to the Joint Administrators view that section 12(b) of the IFSA constitutes an enforceable arbitration clause, a plain and common-sense reading of this section leads to the conclusion that, if the objective of the provision was to create a mechanism for the distribution from the escrow account, the parties failed to achieve such objective. More particularly, section 12(b)(i) has not been met as there has been no agreement of all of the selling debtors; section 12(b)(ii) is irrelevant or inapplicable as the parties have failed to reach agreement on the terms of a Protocol.

*Court's Jurisdiction*

[34]    Conforming to the views espoused by the Canadian Debtors and the Monitor, I am satisfied that this court has discretionary authority under the CCAA to approve the Allocation Protocol. Considering, and potentially approving, the Allocation Protocol is consistent with the CCAA objectives of promoting efficiency and fairness by avoiding a multiplicity of inconsistent proceedings: *Re Muscletech Research and Development Inc.* (2006), 19 C.B.R. (5th) 54 (Ont. S.C.J.). This court's authority extends to the subject matter and the persons at issue here and this court has the authority to make the order sought approving the Allocation Protocol.

[35]    It is my view that all parties have irrevocably and unconditionally submitted to the jurisdiction of the Canadian Court and the U.S. Court. This is established as a result of the jurisdiction clause in each of the Escrow Agreements, the filing of claims by the EMEA Debtors and section 16 of the IFSA. In this respect, I accept the arguments put forth by the Canadian Debtors.

[36]    No compelling argument accompanied the Joint Administrators' assertion that this court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. While there may be a presumption in favour of international arbitration, it presupposes that the parties have agreed to arbitrate (which is not the case in the present circumstances).

[37]    The objective of these proceedings must be, at this time, to ensure that the outcome is something that will be final and binding on all parties. This can be accomplished, in my view, by a joint hearing of the matter with the Canadian Court and the U.S. Court.

[38]    I acknowledge the procedural difficulties identified by the Joint Administrators in their supplemental submissions, and I do not underestimate the challenges that lie ahead. However, all parties embraced joint or parallel hearings of the U.S. Court and the Canadian Court to bring forth a number of matters, most notably applications for approval of sales process and for approval of sales. Further, despite the different procedures in the U.S. Court and the Canadian Court, both courts have worked effectively with the result that billions of dollars are now available for distribution to the stakeholders. I maintain confidence that the U.S. Court and the

Canadian Court will ensure that matters going forward are similarly dealt with in a fair and equitable manner.

[39]    Raising potential procedural issues is not sufficient to dismiss the motion of the Canadian Debtors.  Challenges of procedure will be addressed during the proceedings in the same way as procedural issues are addressed in numerous other proceedings that are brought before the court.

*Good Faith*

[40]    With respect to the Protocol negotiations, there is no shortage of conflicting viewpoints. Nevertheless, there is an overall lack of evidence either on the record, or in the parties' oral submissions, demonstrating that any party failed to negotiate the Protocol in good faith. To the contrary, there is evidence that all parties made efforts to come to a mutually beneficial agreement; as pointed out by the Canadian Debtors, failure to come to such an agreement does not necessarily evidence a lack of good faith in negotiations.

*Order*

[41]    Amendments must be made to the Allocation Protocol before it is approved, as mentioned in the March 8 Endorsement. I have specifically rejected the suggestion that there should be specified restrictions on "core parties" in the Allocation Protocol hearing; rather, I determined that certain indenture trustees should also be "core parties", and I invited suggestions as to whether there would be other "potential core parties".

[42]    I note that the U.S. Debtors filed motions with the U.S. Court to dismiss EMEA U.S. Claims, and a decision with respect to this issue has been rendered by Chief Judge Kevin Gross. The U.S. Debtors put forward an amended version of the Allocation Protocol at the March 7, 2013 hearing.  Given that substantial argument was based on the Allocation Protocol as originally presented, it is not appropriate, in my view, to consider amendments that were brought forth at the hearing which was not intended to receive new positions but rather to provide a summary of the positions previously brought forward.  The appropriate version of the Allocation Protocol to consider is the one that was previously brought before the court on June 7, 2011.

[43]    In the result, I grant the Canadian Debtors' motion and approve an amended Allocation Protocol, which incorporates the aforementioned amendments while remaining substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011. The amended Allocation Protocol must be filed with this Court for approval by April 15, 2013.

[44]    By way of directions for scheduling, the trial for this matter is scheduled to commence on January 6, 2014. The trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. Pension matters.

[45]    The cross-motion of the Joint Administrators, requesting an order compelling and directing the parties to the IFSA to engage in arbitration regarding all disputes concerning the allocation of Sale Proceeds, is dismissed.

**Date:**    April 3, 2013

MORAWETZ J.

## SCHEDULE "A"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 3805
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110617

### SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**   MORAWETZ J.

**COUNSEL:**  Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

**HEARD:**    June 7, 2011

## ENDORSEMENT

[46]    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

[47]    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[48]    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[49]    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

[50]    Decisions in respect of both motions are currently under reserve.

[51]    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone.  It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

[52]    Certain of the issues raised in the motions have been the subject of two mediation sessions.  These mediation sessions were not successful.  It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

[53]    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[54]    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol.  After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

[55]    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation.  After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

[56]    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

[57]    The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

[58]    The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

[59]    In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters.  The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally.  However, the creation of an asset pool is not ultimate resolution of Nortel matters.  These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally.  These proceedings were commenced on January 14, 2009.  Creditors have been waiting nearly two and one-half years for a meaningful distribution.  A mediation will require that the parties continue a dialogue.  It is possible that tangible, positive results will flow from such mediation.

[60]    In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling.  I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

[61]    I recognize that the parties may have difficulty in reaching a consensus on a mediator.  In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator.  No individual has been identified.  It, therefore, falls to both Judge Gross and to me to appoint a mediator.

[62]    The mandate of the mediator is to address issues raised in the motion.  It is recognized that the boundary of this mandate is not clearly defined.  It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

[63]    The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

[64]    It is my understanding that, at the mediation sessions, there were a large number of parties that participated.  While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor.  It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel.  The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions.  It is hoped that the parties will be able to work out the details respecting participation of the mediation.

[65]    The identity of the mediator will be provided by way of Supplementary Endorsement early next week.  The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and to have the expenses of such advisors and counsel paid out of the assets of Nortel.

[66]    In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

[67]    To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.

"Morawetz J."

MORAWETZ J.

**Date:**  June 17, 2011

SCHEDULE "B"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 4012
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110629

## SUPERIOR COURT OF JUSTICE - ONTARIO

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

              AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:   MORAWETZ J.

COUNSEL:  Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

              F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

              Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

              G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

              Lily Harmer and Max Starnino, for the Superintendent

              S. Seigel, for the Bank of New York Mellon

              Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

              R. Paul Steep and Elder C. Marques, for Morneau Shepell

              Barry Wadsworth, for CAW-Canada

              M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

              Bill Burden, for the U.K. Pension Trustee

              Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

## ENDORSEMENT

[1]     This Endorsement relates to my Endorsement of June 17, 2011.  The following directions take precedence over the directions provided on June 17, 2011.

[2]     On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").

[3]     A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[4]     The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[5]     Both motions had the support of all parties appearing, save for the joint administrators of NNUK.

[6]     Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[7]     To date, the parties have been unable to resolve these allocation issues on a consensual basis.  This has resulted in a most unfortunate situation.

[8]     Nortel's insolvency is somewhat unique.  The sale of its business units has created a sizeable asset pool.  With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets.  The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions – now sit in escrow awaiting the resolution of allocation.

[9]    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom.  As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

[10]    The Canadian Debtors have no significant secured creditors.  The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel.  Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

[11]    There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

[12]    For many of these individuals, the delay in receiving a meaningful distribution can be significant.  It is not just a question of calculating the time value of money.  For this group of creditors, time is not on their side.

[13]    This issue is international in scope.  It is also a public-interest issue.  A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

[14]    In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance.  The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

[15]    The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue.  There is no simple solution to the legal predicament that faces all parties.

[16]    Decisions in respect of both motions are currently under reserve.  The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court.  Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors.  Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

[17]    A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors.  With extended delay comes uncertainty. For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.

[18]    Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions.  The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

[19]    The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

[20]    The mediator is authorized to select advisors of his choosing.  The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[21]    The particulars of the mediation are as follows:

| | |
|---|---|
| Mediator: | The Honourable Warren K. Winkler |
| | Chief Justice of Ontario |
| | Court of Appeal for Ontario |
| | Osgoode Hall |
| | 130 Queen Street West |
| | Toronto, ON |
| | M5H 2N5 |
| Timing: | To be arranged by the mediator |

[22]    Participation in this mediation is mandatory.  Any agreements reached as a result of mediation will be binding on the parties.

[23]    A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

[24]    The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.  The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session.  Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session.  In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise.  Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

[25]    The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

[26]    The mediation process shall be terminated under any of the following circumstances:

(a) by a declaration by the mediator that a settlement has been reached;

(b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

(c) for any other reason as determined by the mediator.

[27]    The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on June 7, 2011.

"Morawetz J."

_____

MORAWETZ J.

**Date:**   June 29, 2011

SCHEDULE "C"

**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 1470
**COURT FILE NO.:**  09-CL-7950
**DATE:** 20130308

## SUPERIOR COURT OF JUSTICE – ONTARIO

(COMMERCIAL LIST)

**RE:**       IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**   MORAWETZ J.

**COUNSEL:**  *Derrick Tay and Jennifer Stam*, for Nortel Networks Corporation

*Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

*Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

*Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

*David Ward* for PPF/Trustee

*Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

*Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

*John Salmas* for Wilmington Trust, National Association

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**    March 7, 2013

**DECISION:**    March 8, 2013

## E N D O R S E M E N T

[1]    For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded.  Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]    The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule.  Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]    The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]      The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.


"Morawetz J."

_____

Morawetz, J.


**DATE:**          March 8, 2013



**Oneida Motor Freight, Inc., a Corporation of the State of New York, Appellant v. United Jersey Bank, a Corporation organized under the Banking Laws of the United States of America and United Jersey Bank, a New Jersey Corporation, Defendant-Third Party Plaintiff v. Donald T. Singleton, Third Party Defendant Action for Referral to Bankruptcy Court; In re: Oneida Motor Freight, Inc., Debtor, B.C. # 85-03606(DV)**

**No. 87-5525**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**848 F.2d 414; 1988 U.S. App. LEXIS 7162; Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272**

**February 1, 1988, Argued**
**May 31, 1988, Filed**

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the District of New Jersey - Newark, D.C. Civil No. 87-1440.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
[HN1] A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
[HN2] 11 U.S.C.S. § 521(1) of the current Bankruptcy Code outlines a non-exhaustive list of the debtor's duties in a bankruptcy case. The debtor is required to file a schedule of assets and liabilities and a statement of the debtor's financial affairs.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
[HN3] An obligation imposed by 11 U.S.C.S. § 1125(b) on the debtor mandates the filing of a disclosure statement containing adequate information.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
[HN4] See 11 U.S.C.S. § 1125(a).

*Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview*
[HN5] The debtor has an absolute and unlimited right to be heard in reorganization proceedings.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
*Contracts Law > Defenses > Equitable Estoppel > General Overview*
[HN6] Adequate information will be determined by the facts and circumstances of each case. It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy contest. The result of a failure to disclose such claims triggers application of the doctrine of equitable estoppel, operating against a subsequent attempt to prosecute the actions.

*Bankruptcy Law > Case Administration > Administrative Powers > Stays*
*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > General Overview*

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*

[HN7] It is clear that while bankruptcy stay proceedings may not be proper for adjudication of a counterclaim, a party may, nevertheless, raise its counterclaim at that time.

*Bankruptcy Law > Case Administration > Administrative Powers > Stays*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Reorganizations*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*

[HN8] A preliminary hearing under 11 U.S.C.S. § 362 is not the proper time or place for a full adjudication of the trustee's claims against the creditor. However, there is a tremendous difference between adjudication of the merits and mere consideration of counterclaims and defenses.

*Bankruptcy Law > Reorganizations > Plans > Disclosure Statements*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*

[HN9] Even absent a specific mandate to file a counterclaim, complete disclosure is imperative to assist interested parties in making decisions relevant to the bankrupt estate.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
*Contracts Law > Defenses > Equitable Estoppel > General Overview*

[HN10] The doctrine of judicial estoppel, distinct from that of equitable estoppel, applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation.

**COUNSEL:** Allan H. Klinger, Esq., (argued), John A. Rizzo, Esq., Jane S. Shapiro, Esq., Klinger, Nicolette, Mavroudis & Honig, Oradell, New Jersey, Counsel for Appellant.

William S. Katchen Esq., (argued), John L. Laskey, Esq., Vincent F. Papalia, Esq., Clapp & Eisenberg, Newark, New Jersey, Counsel for Appellee.

**JUDGES:** Sloviter, Stapleton, and Mansmann, Circuit Judges.   Stapleton, Circuit Judge, dissenting.

**OPINION BY:** MANSMANN

**OPINION**

[*415]   OPINION OF THE COURT

MANSMANN, Circuit Judge.

Oneida Motor Freight, a Chapter XI debtor, appeals the dismissal of its contract and tort action against United Jersey Bank, a secured creditor. We must determine whether Oneida, seeking damages for the bank's alleged breach of certain loan agreements, is estopped from litigating this action by the preclusive effect of prior bankruptcy proceedings.

We conclude that Oneida violated both its statutory and fiduciary duty to disclose this current claim against the bank during the pendency of the bankruptcy case. By virtue of this failure to disclose, equitable and judicial estoppel [**2]  operate against further litigation by Oneida. Accordingly, we shall affirm the order of the district court.

I.

Oneida Motor Freight, engaged in the interstate and intrastate trucking industry, and United Jersey Bank have maintained a banking relationship since 1983. In the course of their business dealings, the parties entered into two lending agreements. Under the terms of a "Revolving Credit Agreement", the bank would extend up to five million dollars in credit through loans and letters of credit. The parties also negotiated an "Accounts Receivable Security Agreement", whereby the bank would lend Oneida a percentage of Oneida's accounts receivable while maintaining a security interest in Oneida's accounts, equipment and inventory. The lending limits of these agreements have never been reached or exceeded.

In February 1985, Oneida settled a dispute which arose in connection with its acquisition of another trucking company, Dorn Transportation Company. In order to satisfy its obligations under the terms of the settlement, Oneida called upon the bank to pay certain outstanding letters of credit. Rather than charging against the letters of credit, however, the bank withdrew the [**3]  necessary funds from Oneida's operating account. As a result, Oneida's account became habitually overdrawn. Nonetheless, at least for a period time, the bank honored Oneida's overdrafts.

In July 1985, the bank requested that the owner of Oneida, Donald Singleton, personally guarantee Oneida's debt. According to Oneida, when Mr. Singleton refused, the bank ceased honoring Oneida's checks. The dishonor

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

of these checks allegedly compelled Oneida, on July 10, 1985, to file a petition under Chapter XI of the Bankruptcy Code. Oneida then ceased its operations and proceeded with liquidation.

On July 11, 1985, the bank filed a motion for relief from the automatic stay entered in the bankruptcy proceeding. The application for relief further sought an order establishing the validity and extent of the bank's lien. On that same date, Oneida requested permission of the bankruptcy court for Oneida to use cash collateral of the bank, which was granted.

A series of subsequent orders was entered by the bankruptcy court in regard to matters pertaining to Oneida's and the creditors' rights, including, on September 30, 1985, a stipulation and order confirming a settlement among the bank, Oneida [**4] and the official unsecured creditors' committee. This order provided for an unconditional payment by Oneida to the bank in the amount of $ 6,650,000. Thereafter, on January 14, 1986, an order and a judgment were entered by the bankruptcy court, further detailing the extent and validity of the bank's lien. In this order, the amount due the bank by Oneida was established at $ 7,631,322.73 an amount already paid in full.

On August 14, 1986 the bankruptcy court entered an order confirming Oneida's Joint [*416] Plan of Reorganization. Nowhere in the plan or in the confirmation order is reference made to Oneida's current claim against the bank. [1]

> 1    After the present action was filed in state court, the plan was modified to order that one-third of the net recovery that Oneida might obtain against the bank in this lawsuit be paid to the creditors.

Approximately seven months later, on March 11, 1987, Oneida commenced this action against the bank in the Superior Court of New Jersey. In its complaint, Oneida [**5] alleged breaches of the credit agreements, of the parties' course of dealing and of the bank's duty of good faith. Oneida also set forth a cause of action in tort for fraudulent misrepresentation on the part of the bank and its agents. Oneida alleged that the bank's prior assurances, coupled with its dishonor of certain checks "without notice" denied Oneida an adequate opportunity to seek alternate financing to satisfy the payees of the dishonored checks. Oneida additionally asserted that the actions of the bank seriously damaged its business reputation with its customers and creditors. Oneida cited these improper activities by the bank as the catalyst for its Chapter XI filing.

The bank filed an answer and a third party complaint against Donald Singleton, Oneida's sole shareholder. [2]

The bank then removed the action to the U.S. District Court for the District of New Jersey.

> 2    By order of June 24, 1987, the district court granted Singleton's motion to dismiss the third party complaint.

On May 14, 1987 the [**6] bank moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), failure to state a claim upon which relief can be granted, and/or Rule 12(c), motion for judgment on the pleadings. The district court, after argument, dismissed the complaint. 75 Bankr. 235. The court held that since Oneida's claims against the bank arose from the same series of transactions which were the subject of the extensive prior bankruptcy proceedings, its failure to bring this particular claim to the bankruptcy court's attention violated fundamental principles of preclusion and barred Oneida from proceeding with the action.

Oneida filed a notice of appeal from this final decision of the district court. We have jurisdiction under the authority of 28 U.S.C. § 1291.

The historical facts are undisputed. It is the preclusive effect of the bankruptcy proceeding upon this current action, if any, which is contested; resolution involves interpretation of legal precepts over which we invoke our power of plenary review. [3]

> 3    The bank captioned its motion as, alternatively, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and/or Rule 12(c). The district court granted the bank's motion without comment as to which procedural rule it applied.
>
> Oneida argues that the motion should have been handled as a motion requesting summary judgment and asserts that the presence of unresolved factual matters mandate that the order entered in the bank's favor be reversed.
>
> The district court characterized this argument as "irrelevant" since its decision was based on the legal question of the preclusive effect of the bankruptcy proceeding. The court then determined that no discovery was necessary for Oneida to defend against the bank's res judicata argument.
>
> In deciding the merits of Oneida's argument, we are unable to discern which precise facts the district court relied upon, i.e., what comprised "the current record." Under either motion, however, the district court had to examine the record of the prior bankruptcy proceeding. Indeed, the district court was entitled to take judicial notice of these matters in rendering its decision, regard-

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

less of the motion employed. *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364 (7th Cir. 1983); 2A J. Moore, J. Desha Lucas and G. Grotheer, Moore's Federal Practice para. 12.15 (2d ed. 1987).

Review of the legal component for either of the motions is identical -- since the material facts here are the undisputed historical facts -- we determine, as did the district court, whether the moving party, the bank, is entitled to judgment as a matter of law.

[**7]  II.

[HN1] A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights. *In Re Hannan*, 127 F.2d 894 (7th Cir. 1942).

[*417]  Section 521 of the current Bankruptcy Code [HN2] outlines a non-exhaustive list of the debtor's duties in a bankruptcy case. Foremost for our purposes, the debtor is required to "file a . . . schedule of assets and liabilities . . . and a statement of the debtor's financial affairs. . . ." 11 U.S.C. § 521(1) (1978).

[HN3] An additional obligation is imposed by 11 U.S.C. § 1125(b) mandating the filing of a disclosure statement containing "adequate information." Section 1125(a) defines adequate information [**8]  as follows:

§ 1125.  [HN4] Postpetition disclosure and solicitation

(a) In this section--

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan

. . . .

Concomitant with these prescribed duties is [HN5] the debtor's "absolute and unlimited right to be heard in reorganization proceedings." *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 871 (5th Cir. 1984).

We regard the right-conferring language of *Southmark* as confirmation of the debtor's express obligation of candid disclosure. The preparing and filing of a dis-

closure statement is a critical step in the reorganization of a Chapter XI debtor. One commentator, citing the relevant legislative history, labeled this duty as the pivotal concept in reorganization procedure under the Code. 5 Collier on Bankruptcy para. 1125.03 [**9]  (15th ed. 1988).

The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

From the legislative history of § 1125 we discern that [HN6] adequate information will be determined by the facts and circumstances of each case. H.R. Rep. No. 595, 97th Cong., 1st Sess. 266 (1977). It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy contest. *Monroe County Oil Company v. Amoco Oil Co.*, 75 B.R. 158 (Bankr. S.D. Ind. 1987). The result of a failure to disclose such claims triggers application of the doctrine of equitable estoppel, operating against a subsequent attempt to prosecute the actions. *In Re Galerie Des Monnaies of Geneva Ltd.*, 55 B.R. 253 (Bankr. S.D. N.Y. 1985), *aff'd*, 62 B.R. 224 (Bankr. S.D. N.Y. 1986).

A strong interest to achieve finality pervades Chapter [**10]  XI arrangements. *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703 (2d Cir. 1983). This goal of finality was supported by the Supreme Court in *Stoll v. Gottlieb*, 305 U.S. 165, 83 L. Ed. 104, 59 S. Ct. 134 (1938), holding that confirmation of a plan acts to bar attempts by the parties to relitigate any of the matters that could have been raised during the bankruptcy proceedings. 5 Collier on Bankruptcy para. 1141.01[1] (15th ed. 1988). *See also, In Re Penn Central Transportation Co.*, 771 F.2d 762 (3d Cir. 1985), *cert. denied*, 474 U.S. 1033, 106 S. Ct. 596, 88 L. Ed. 2d 576 (1985).

Disclosure is important, in this case, not only to the bank as an adversary and as a creditor, but to the other creditors and to the bankruptcy court. Here, "the silence" in the Oneida bankruptcy record concerning this present claim, as they say in the vernacular, "is deafening." In Schedule A-2 of its Statement of Financial Affairs required by § 521, Oneida acknowledged its debt to the bank in the amount of approximately 7.7 million dollars, without any mention of a setoff. The debt to the bank in part represented principal [**11]  and interest due on the lending agreements, the alleged breach of which Oneida now seeks to place at issue. In the portion of the statement requiring enumeration of "contingent and unliquidated claims of every nature, *including counterclaims . . .*", Oneida listed only an unrelated accounts receivable claim  [*418]  of $ 6,827.030. (Emphasis added.) We

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 548 of 589

Page 5
848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

conclude that the reorganization plan presented by Oneida to the creditors for confirmation, lacking disclosure of the potential for recovery against the bank, was informationally deficient, and not cured by the later modification. [4] The original plan failed to alert the creditors to the possible financial benefits enuring to them upon the successful prosecution of the claim.

4    *See supra* note 1.

We can assume that revealing the potential action may also have impacted upon the bank's decision to enter into the stipulation establishing the extent and validity of its lien against Oneida and to vote for confirmation. The practical effect of a successful [**12] prosecution of Oneida's claim would be to require the bank to make restitution of the amount realized on its bankruptcy claim, since Oneida's present action calls into question the bank's right to collect its secured debt. This would also constitute a successful collateral attack on the bankruptcy court's order confirming the reorganization plan. In such circumstances, employment of equitable estoppel is required to preserve the integrity of the earlier proceedings, particularly where, as here, the creditors have reasonably acted in reliance upon the assumed finality and integrity of those adjudications. *County Fuel Company v. Equitable Bank Corporation*, 832 F.2d 290 (4th Cir. 1987).

In order to preserve the requisite reliability of disclosure statements and to provide assurances to creditors regarding the finality of plans which they have voted to approve, we hold that under the facts here present Oneida's failure to announce this claim against a creditor precludes it from litigating the cause of action at this time.

III.

Oneida asserts that it did not make known the presence of this cause of action during the course of the bankruptcy proceeding primarily [**13] because the bankruptcy matter was never in a procedural posture for a proper assertion of this claim.

Oneida argues that the bank's decision to commence a "contested matter" when requesting relief from the automatic stay rather than instituting an "adversary proceeding" foreclosed Oneida's obligation to raise this current claim. Oneida notes that Bankr. Rule 9014, governing contested matters, delineates other bankruptcy rules which can apply to contested matters. Rule 9014 does not, however, cross-reference Rule 7008, allowing for a debtor to raise affirmative defenses to a creditor's claim, or Rule 7013, allowing a debtor to assert counterclaims against a creditor.

Recognizing that Rule 9014 allows the bankruptcy court, at any stage in a particular matter, to direct that the

unenumerated rules of Chapter VII shall apply, Oneida states that it could not raise its claim because the bankruptcy court did not utilize this permissive authority. We are somewhat surprised by this argument because the bankruptcy court was totally unaware that Oneida thought it had such a claim and the bankruptcy court was, therefore, never in a position to direct application of rules which might otherwise [**14] have been applicable.

Oneida further argues that it had no obligation to raise the claim when the bank sought relief from the automatic stay. Oneida cites several cases for the proposition that a motion for relief from stay, as brought by the bank under 11 U.S.C. § 362(d), is not the proper setting for adjudication of a counterclaim. *See, e.g., In Re Lexington Racquetball Club, Inc.*, 58 B.R. 103 (Bankr. E.D.Pa. 1986); *In Re Transleisure Corp.*, 41 B.R. 201 (Bankr. E.D.N.Y. 1984). Despite these cases, [HN7] it is clear that while stay proceedings may not be proper for adjudication of a counterclaim, a party may, nevertheless, raise its counterclaim at that time. One court noted:

> The Court fully agrees that [HN8] a preliminary hearing under § 362 is not the proper time or place for a full *adjudication* of the trustee's claims against the creditor. . . . However, there is a tremendous difference between *adjudication* of the [*419] merits [**15] and mere *consideration* of counterclaims and defenses.

*In Re Tallywell Services, Inc.*, 45 B.R. 149, 151 (Bankr. E.D.Mich. 1984). S. Rep. No. 95-989, 95th Cong., 2d Sess. 66 (1978).

The next procedural event providing an opportunity to bring this present claim to the forefront in the bankruptcy proceeding occurred when a hearing was held regarding Oneida's request, opposed by the bank, for use of cash collateral. After testimony, the parties consented to a cash collateral arrangement and partial vacation of the automatic stay which were memorialized in the bankruptcy court's order of July 25, 1985. It is not unreasonable to conclude that neither the bankruptcy court, nor particularly the bank, would have agreed to allow Oneida to utilize the collateral in the hands of the bank if a question as to the bank's threshold right to the funds was put at issue.

Oneida also asserts that it had no obligation to raise the claim when the bankruptcy court entered orders confirming validity of the bank's loan. Four separate orders

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

were entered regarding the validity, priority and extent of the bank's claim against Oneida. The end result of these orders was the [**16] establishment and confirmation of the amount of the bank's claim for 7.7 million dollars. No affirmative defenses, counterclaims or objection to the claim were pleaded or raised in connection with entry of these orders. Oneida contends that these orders involve different causes of actions than those presented by the district court complaint, and thus did not provide an opportunity to raise its defense to the claim. As we discuss later, we reject this argument of Oneida's, finding instead that the two claims stem from the same transaction, *i.e.*, alleged breaches of the loan agreement present an issue of fact common to the matters before the bankruptcy court in determining the extent and validity of the bank's lien based on the loan agreement.

Although Oneida may be technically correct in its argument that it was never *procedurally* compelled to raise its claim, we are satisfied that its failure to mention this potential claim either within the confines of its disclosure statement or at any stage of the bankruptcy court's resolution precludes this later independent action. [HN9] Even absent [**17] a specific mandate to file a counterclaim, complete disclosure is imperative to assist interested parties in making decisions relevant to the bankrupt estate.

IV.

We are also mindful of the equitable concept of judicial estoppel. [HN10] This doctrine, distinct from that of equitable estoppel, applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation. *Scarano v. Central Railroad Co.*, 203 F.2d 510 (3d Cir. 1953); *USLIFE Corp. v. U.S. Life Insurance Co.*, 560 F. Supp. 1302 (N.D. Tex. 1983).

We conclude that Oneida's failure to list its claim against the bank worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect. Although we stop short of finding that, as the bank urges, Oneida's prior silence is equivalent to an acknowledgement that it did not have [**18] a claim against the bank, we agree that its current suit speaks to a position clearly contrary to its Chapter XI treatment of the bank's claim as undisputed.

Oneida argues that judicial estoppel is not applicable because the claims raised in this lawsuit are entirely different, factually and legally, from those matters addressed in the bankruptcy proceeding. [5] In light of [*420] Oneida's threshold assertion in its district court

complaint that the bank's breach of the lending agreements was the catalyst to its Chapter XI filing, we are unpersuaded by this argument. The relative rights and obligations of these parties are embodied in the lending agreements and the parties' course of dealing. To be successful in this action, Oneida must demonstrate a deviation from the contracted-for and established business relationship -- a deviation which would certainly call into question any rights which the bank could assert as a creditor of Oneida for obligations accruing under the lending agreements. Cf. *Paradise Hotel Corporation v. Bank of Nova Scotia*, 842 F.2d 47 (3d Cir. 1988) (debtor, after filing a voluntary bankruptcy petition, requested the bankruptcy court [**19] to stay a previously-filed involuntary petition; debtor's stated motivation was to preserve potential claims arising from filing of the involuntary petition to pursue these claims later).

5   This is the identical argument raised in both Oneida's contest of the district court's application of the preclusion principle of res judicata to this matter and Oneida's rationale for not raising its claim in the bankruptcy forum.

In reaching its decision to apply res judicata here, the district court indicated what we described in *United States v. Athlone Industries, Inc.*, 746 F.2d 977 (3d Cir. 1984), as, "a predisposition towards taking a broad view of what constitutes identity of causes of action -- 'an essential similarity of the underlying events giving rise to the various legal claims.'" *Id.* at 984, citing *Davis v. United States Steel Supply*, 688 F.2d 166, 1971 (3d Cir. 1982) (in banc), *cert. denied*, 460 U.S. 1014, 75 L. Ed. 2d 484, 103 S. Ct. 1256 (1983). Without further elaboration, the district court then found that the current claims for breach of contract and misrepresentation were part of the same cause of action before the bankruptcy court, thereby barring further litigation of the present suit.

Because the matter here originated as a bankruptcy petition and was adjudicated in a format peculiar to bankruptcy matters, comparison of the two actions is not susceptible to the four-step analysis outlined in *Athlone*. Rather, we scrutinize the totality of the circumstances in each action and then determine whether the primary test of *Athlone*, *i.e.*, essential similarity in the underlying events, has been satisfied. Since it is Oneida's threshold allegation that the bank's activity in connection with the lending agreements was the catalyst to Oneida's filing a Chapter XI petition, we are unpersuaded by Oneida's current position that the two actions represent unrelated

events. In any event, because the concept of equitable estoppel in relation to the debtor's duty of disclosure is dispositive in this matter, we need not further address this issue.

[**20]  V.

The district court, although focusing primarily upon basic principles of res judicata, properly stressed the debtor's special duty of candid disclosure when it granted the bank's motion to dismiss.

While the result of terminating this lawsuit may produce a harsh result to other creditors of Oneida whose claims have not been paid in full, we are mindful of our review authority here -- we have been asked to rule only on the propriety of the district court's conclusion with respect to the bank. Although we focus our decision on estoppel by reason of failure to disclose, we cannot say that the district court erred in its result. We shall affirm the order of the district court.

**DISSENT BY:** STAPLETON

**DISSENT**

STAPLETON, Circuit Judge, dissenting:

Concern for Oneida's numerous unsecured creditors compels me to dissent from the court's disposition. Those creditors, as well as Oneida, stand to lose by virtue of that disposition. If Oneida had been able to foresee this court's novel application of equitable and judicial estoppel, it would have been able to protect itself against the loss the court today imposes upon it. Oneida's unsecured creditors, however, had no way of protecting themselves [**21]  and should not be required to contribute towards a windfall for an alleged wrongdoer.

I.

The court professes to steer clear of the claim preclusion analysis that underlies the district court's decision. It does so, however, only in the wake of an analysis sounding as much in claim preclusion as in the estoppel theories it embraces, and in a fashion which reflects, at most, only minor quibbles with the district court's view. I therefore begin with a discussion of the claim preclusion issue.

In effectuating the indisputable public interest in finality in bankruptcy proceedings, courts apply ordinary rules of claim and issue preclusion in the bankruptcy context. *See e.g.    Miller v. Meinhard-Commercial* [*421]  *Corp.*, 462 F.2d 358, 360 (5th Cir. 1972); *Virgin Islands Bureau of Internal Revenue v. St. Croix Hotel Corp.*, 60 B.R. 412, 414 (D. V.I. 1986). Restatement

(Second) of Judgments § 24(1) sets forth the general rule with respect to claim preclusion, stating that:

When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . the claim extinguished includes all [**22]  rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

The court is simply mistaken, as was the district court, to the extent it suggests that this principle directs the outcome reached in this case. Section 24(1) prohibits claim-splitting, which by definition occurs when a party who has once asserted a claim attempts to reintroduce the claim in another guise thereafter. Here, Oneida asserted no claim against the bank in the bankruptcy proceedings. Having made no previous attempt to pursue a claim against the bank, Oneida cannot now be said to be prosecuting, and forcing the bank to defend, a suit for the second time.

One might argue to greater effect that Oneida's claims are precluded because Oneida did not file a counterclaim in response either to the bank's proof of claim or to its motion to lift the automatic stay and determine the extent and validity of its lien. Section 22(2) of the Restatement (Second) of Judgments states:

A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the [**23]  rendition of judgment in that action, from maintaining an action on the claim if:

(a) the counterclaim is required to be interposed by a compulsory counterclaim statute or rule of court, or

(b) the relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

For me, analysis of this case under this applicable legal principle dispels any doubt about whether it is barred by claim preclusion. As the majority acknowledges, no compulsory counterclaim statute or rule required Oneida

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 551 of 589

Page 8

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

to assert its claim in the bankruptcy proceedings. Because the bank's motion to establish the validity and extent of its lien gave rise to contested, rather than adversary proceedings, Bankruptcy Rule 9014 governed and Fed. R. Civ. P. 13(a) [1] was inapplicable absent explicit court direction to the contrary. The court issued no such direction. Similarly, while the Code calls for the disclosure of claims, as we discuss hereafter, no Code provision requires that the debtor actually litigate in the bankruptcy proceedings [**24] any claim the debtor happens to have against one of its creditors. [2] Indeed, as noted in our subsequent discussion, Oneida's reorganization plan provides by its very terms, *See* Article XII, App. at 146, [3] that all claims and causes of action of Oneida's not expressly released or terminated in accordance with the plan may be prosecuted by Oneida or the Creditor's Committee after entry of the confirmation order.

> 1  Rule 13(a) states that: "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . ."
>
> 2  The absence of such a rule is consistent with § 553, the Code's setoff provision. Section 553 permits a creditor to exercise a right of setoff, but does not require the creditor to do so. The absence of such a rule also is consistent with our recent decision in *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47 (3d Cir. 1988), where we held that a debtor who believes that an involuntary bankruptcy proceeding was filed against it in bad faith may pursue its remedies after bankruptcy, rather than relying exclusively on the relief provided by the Code in § 303(i)(2).
>
> [**25]
>
> 3  Article XII is quoted, *infra*, slip op. at 8.

Nor can it be said that Oneida's decision to prosecute its claims now, after the close of the bankruptcy proceedings, threatens to undermine a judgment of the bankruptcy [*422] court and thus that Oneida's claims should be barred on that basis. *See* Restatement (Second) of Judgments § 22(2)(b). [4] While the court suggests that such a danger is presented by the facts of this case, I fail to see the logic of its argument. The bankruptcy court entered orders reflecting the undisputed facts that the bank had loaned Oneida more than $ 7.6 million, that Oneida was indebted to the bank to that extent, and that the bank's lien on Oneida's property securing that amount was valid. Oneida had no basis for contesting its debt to the bank or the validity of the bank's lien and, accordingly, it did not contest the bank's applications to the bankruptcy court. Oneida now seeks to prosecute behav-

ior by the bank, occurring after the loaning of the $ 7.6 million, which Oneida believes was both impermissible and directly responsible for the circumstances [**26] that led to its bankruptcy. Resolution of the question of the propriety of the bank's behavior in Oneida's favor and entry of a judgment against the bank on Oneida's claims would be entirely consistent with the determinations of the bankruptcy court that Oneida had a duty to repay the $ 7.6 million loaned to it and that the bank's security interest had been perfected. [5] Accordingly, I would conclude that Oneida's failure to raise its present claim as a counterclaim in the bankruptcy proceeding did not undermine the bankruptcy court's orders.

> 4  In two cases cited by the court, *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 871 (5th Cir. 1984) and *County Fuel Co. v. Equitable Bank Corp.*, 832 F.2d 290 (4th Cir. 1987), courts of appeal held that claims were barred by claim preclusion in contexts where granting relief would have been inconsistent with findings of fact or conclusions of law supporting the judgment in a prior case or would have effectively rescinded relief granted in a prior case. Both holdings are supported by the principle set forth in § 22(2)(b). In *Southmark*, the debtor sought to collaterally attack an order authorizing and confirming a sale of property to the debtor's mortgagee. In *County Fuel Co.*, the debtor attempted to raise claims that, had they been successfully raised when the creditor moved for removal of the automatic stay, would have caused the court to reject the motion.
>
> [**27]
>
> 5  There is not even a significant overlap of the evidence crucial to the motions decided in the bankruptcy court and the evidence necessary to an analysis of Oneida's current claims. The bankruptcy court's determinations required consideration of the credit agreement, the value of the lien on Oneida's property and accounts receivable, and the question whether the bank properly perfected its liens. Oneida's current claims on the other hand, would necessitate investigation of the bank's behavior immediately prior to Oneida's filing in Chapter 11. With the exception of the credit agreement itself, the evidence adduced in the bankruptcy court would likely be irrelevant to this investigation.

Thus, I conclude that Section 22(2) of the Restatement sets forth the applicable rule of claim preclusion and that application of that rule to the facts of this case requires a conclusion that Oneida's claim is not precluded.

Case 09-10138-MFW    Doc 14394-1    Filed 09/10/14    Page 552 of 589

Page 9

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

II.

I would also reject the equitable and judicial estop-pel theories on which the court places express reliance in foreclosing Oneida's claims. The court's reasoning, in short, is [**28] that Oneida forfeited its claims when it did not list them in its disclosures pursuant to § 521, which requires every debtor to file a schedule of assets, and § 1125, which imposes a similar obligation on a debtor soliciting acceptance of a reorganization plan. In my view, the court's analysis and the remedy it endorses ignore the purposes of the Code's disclosure requirements.

The Code's disclosure requirements are intended to protect those creditors whom a debtor's failure to dis-close hidden assets would prejudice. *A fortiori*, a court's response to nondisclosure should do likewise. Not only does the court fail to safeguard the interests of Oneida's unsecured creditors, but it effectively penalizes them by foreclosing the prosecution of claims against the bank that would, if successful, result in a substantial en-hancement of the estate and in their receiving more than the approximately thirty cents on the dollar for which they have been forced to settle. The only real winner in the case as decided is the bank, whom the court has re-lieved of [*423] the responsibility of justifying its allegedly improper behavior.

The court does not explain why it finds more even-handed [**29] alternatives inadequate. I see no reason, for example, why we could not allow this suit to proceed and simply make reference to the fact that the bankruptcy court has jurisdiction to entertain motions to amend or rescind the debtor's reorganization plan if such motions are brought by unsecured creditors who feel that Oneida's nondisclosure has prejudiced them. [6] *See* § 350(b) ("A case may be reopened in the court in which such case was closed to administer assets, to accord re-lief to the debtor, or for other cause."). The availability of such a course of action would in most cases adequately deter nondisclosure. Section 1141(d)(3), which authoriz-es denial of discharge under certain conditions, provides additional deterrence, as does 18 U.S.C. § 152 which makes it a crime, among other things, to "knowingly and fraudulently [conceal] . . . any property belonging to the estate of a debtor." *See e.g. 3 Collier on Bankruptcy* para. 521.02 (15th ed. 1986) (suggesting that concealment of an asset is subject to denial of discharge or criminal sanctions pursuant to 18 U.S.C. § 152).

[6]    At oral argument, we were advised that the Creditor's Committee had concurred in Oneida's decision to pursue its claims against the bank and that an application had been made to the bank-ruptcy court for a plan amendment that would provide for creditor participation in any recovery.

[**30] Moreover, this case stands in marked con-trast to the circumstances under which estoppel has tradi-tionally been invoked. Here, Oneida never represented that it would not press a claim against the bank. On the contrary, starting with its initial disclosure statement and continuing throughout the Chapter 11 proceedings, Oneida made clear that it thought it had been mistreated by the bank. [7] Having announced its displeasure at the outset, Oneida actively preserved its right to file claims. When the bank sought a general release in connection with the order establishing the extent and validity of its lien, for instance, Oneida's counsel wrote:

While we would have no objection to an amendment of the Order to, in effect, delete the handwritten portion of the Or-der which was included per Judge DeVi-to's direction, the Order proposed by you constitutes an omnibus release pertaining to the matters far beyond the issue of ser-vice charges. Unless the Order is modified to pertain only to the issue of service charges, the matter cannot be resolved . . .

App. at 422. Oneida successfully secured exclusion of the release. Thereafter, Oneida's insistence on preserving any claims [**31] it might have never wavered, and culminated in Article XII of the reorganization plan it-self:

All claims and causes of action in fa-vor of [Oneida] not expressly released or terminated in accordance with the Plan are hereby preserved and may be prose-cuted by [Oneida] or the Creditors' Com-mittee after entry of the Confirmation Order.

App. at 146.

[7]    Oneida's disclosure statement charged the bank with:

unilaterally with [drawing] Four Hundred Fifty Thousand Dollars ($ 450,000) from the Debtor's operating account to be applied towards satisfaction of the Dorn's settlement

and claimed that

Said overdraft caused an im-mediate overdraft in the Debtor's

848 F.2d 414, *; 1988 U.S. App. LEXIS 7162, **;
Bankr. L. Rep. (CCH) P72,329; 17 Bankr. Ct. Dec. 1272

account, which became a chronic
situation until the filing of the
bankruptcy proceedings.

App. at 109.

Thus, Oneida never assumed a position which its
current actions repudiate. *Compare Scarano v. Central
R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953);
*In re Galerie Des Monnaies of Geneva Ltd.*, 55 B.R. 253
(Bankr. S.D. N.Y. 1985), [**32] *aff'd* 62 B.R. 224 (S.D.
N.Y. 1986) (debtor had affirmatively stated a belief it did
not have preference actions, and would have been the
only beneficiary of actions ultimately brought after
bankruptcy).  Nor has the bank pointed to any persua-
sive evidence that it was prejudiced by anything Oneida
did or did not do during the bankruptcy [*424]  pro-
ceeding. [8]

8   The court maintains that, had the bank known
about Oneida's claims, it might not have entered
into a stipulation as to the extent and validity of

its lien, or voted for confirmation. I find it diffi-
cult to believe the bank was prejudiced in these
respects, when undisputed evidence indicates that
the bank was essentially paid in full by Oneida's
plan. The bank's consent to the use of some of its
cash collateral came prior to the filing of Oneida's
statements of assets and liabilities and its disclo-
sure statement and could not have been influ-
enced thereby.

In sum, equitable and judicial estoppel are extraor-
dinary remedies to be [**33]  invoked when a party's
inconsistent behavior will otherwise result in a miscar-
riage of justice. Oneida's behavior was neither incon-
sistent nor inequitable. Accordingly, I believe that the
court should not have applied estoppel doctrines to this
case.

III.

For the foregoing reasons, I would reverse the
judgment of the district court.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

2004 SCC 75
Supreme Court of Canada

Pacific National Investments Ltd. v. Victoria (City)

2004 CarswellBC 2673, 2004 CarswellBC 2674, 2004 SCC 75, [2004] 3 S.C.R. 575, [2004] S.C.J. No. 72, [2005] 3 W.W.R. 1, 206 B.C.A.C. 99, 245 D.L.R. (4th) 211, 327 N.R. 100, 338 W.A.C. 99, 34 B.C.L.R. (4th) 1, 3 M.P.L.R. (4th) 1, 42 C.L.R. (3d) 76, J.E. 2004-2165, REJB 2004-80300

# Pacific National Investments Ltd., Appellant v. Corporation of the City of Victoria, Respondent

McLachlin C.J.C., Major, Bastarache, Binnie, LeBel, Deschamps, Fish JJ.

Heard: June 15, 2004
Judgment: November 19, 2004
Docket: 29759

Proceedings: reversing *Pacific National Investments Ltd. v. Victoria (City) (2003), 2003 BCCA 162, 2003 CarswellBC 535, 11 B.C.L.R. (4th) 234, 223 D.L.R. (4th) 617, 36 M.P.L.R. (3d) 222, 23 C.L.R. (3d) 181, 180 B.C.A.C. 104, 297 W.A.C. 104* (B.C. C.A.); reversing *Pacific National Investments Ltd. v. Victoria (City) (2002), 2002 BCSC 41, 2002 CarswellBC 1429* (B.C. S.C.); reversing *Pacific National Investments Ltd. v. Victoria (City) (2002), 2002 BCSC 1185, 2002 CarswellBC 1898, 217 D.L.R. (4th) 248, 32 M.P.L.R. (3d) 235, 20 C.L.R. (3d) 251* (B.C. S.C.)

Counsel: L. John Alexander for Appellant
Guy E. McDannold for Respondent

Subject: Civil Practice and Procedure; Public; Restitution; Torts; Contracts

## Headnote

### Equity --- Relief from unconscionable transactions — Unconscionable or improvident transactions — Unjust enrichment

Municipality that "down-zoned" waterfront property which real estate developer began to develop, pursuant to agreement whereby municipality would re-zone lots to permit residential and commercial use, had no right in equity to retain benefit of works and improvements carried out by developer without paying for them.

### Municipal law --- Development control — Development agreements and conditions — General

Municipality that "down-zoned" waterfront property which real estate developer began to develop, pursuant to agreement whereby municipality would re-zone lots to permit residential and commercial use, had no right in equity to retain benefit of works and improvements carried out by developer without paying for them.

### Restitution --- General principles — Bars to recovery — No deprivation corresponding to enrichment

Municipality that "down-zoned" waterfront property which real estate developer began to develop, pursuant to agreement whereby municipality would re-zone lots to permit residential and commercial use, had no right in equity to retain benefit of works and improvements carried out by developer without paying for them.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

**Restitution --- Benefits conferred under ineffective transactions — Breach, repudiation or abandonment of contract — Innocent party seeking relief**

Municipality that "down-zoned" waterfront property which real estate developer began to develop, pursuant to agreement whereby municipality would re-zone lots to permit residential and commercial use, had no right in equity to retain benefit of works and improvements carried out by developer without paying for them.

**Restitution --- Benefits conferred under mistake — Mistake of fact — General**

Municipality that "down-zoned" waterfront property which real estate developer began to develop, pursuant to agreement whereby municipality would re-zone lots to permit residential and commercial use, had no right in equity to retain benefit of works and improvements carried out by developer without paying for them.

**Equity --- Redressement à l'égard d'une transaction inique — Transactions iniques ou imprévoyantes — Enrichissement sans cause**

Municipalité ayant modifié le zonage des terrains riverains que le promoteur immobilier avait commencé à aménager conformément à une entente selon laquelle la municipalité devait modifier le zonage pour permettre des usages résidentiels et commerciaux, elle n'avait aucun droit en equity de bénéficier, sans les payer, des travaux et des améliorations effectués par le promoteur.

**Droit municipal --- Contrôle de l'aménagement — Ententes et conditions d'aménagement — En général**

Municipalité ayant modifié le zonage des terrains riverains que le promoteur immobilier avait commencé à aménager conformément à une entente selon laquelle la municipalité devait modifier le zonage pour permettre des usages résidentiels et commerciaux, elle n'avait aucun droit en equity de bénéficier sans payer des travaux et des améliorations effectués par le promoteur.

**Restitution --- Principes généraux — Obstacles au recouvrement — Absence d'appauvrissement correspondant à l'enrichissement**

Municipalité ayant modifié le zonage des terrains riverains que le promoteur immobilier avait commencé à aménager conformément à une entente selon laquelle la municipalité devait modifier le zonage pour permettre des usages résidentiels et commerciaux, elle n'avait aucun droit en equity de bénéficier sans payer des travaux et des améliorations effectués par le promoteur.

**Restitution --- Avantages conférés en vertu de transactions nulles et sans effets — Manquement, répudiation ou abandon du contrat — Partie innocente demandant réparation**

Municipalité ayant modifié le zonage des terrains riverains que le promoteur immobilier avait commencé à aménager conformément à une entente selon laquelle la municipalité devait modifier le zonage pour permettre des usages résidentiels et commerciaux, elle n'avait aucun droit en equity de bénéficier sans payer des travaux et des améliorations effectués par le promoteur.

**Restitution --- Avantages conférés à cause d'une erreur — Erreur de fait — En général**

Municipalité ayant modifié le zonage des terrains riverains que le promoteur immobilier avait commencé à aménager conformément à une entente selon laquelle la municipalité devait modifier le zonage pour permettre des usages résidentiels et commerciaux, elle n'avait aucun droit en equity de bénéficier sans payer des travaux et des améliorations effectués par le promoteur.

The plaintiff, a real estate developer, purchased approximately 200 acres of waterfront land that the defendant municipality wished to redevelop for residential and commercial uses. The plaintiff and the city entered into an agreement which provided for the plaintiff to build roads, parkland, walkways and a new seawall. The cost of the extra works and improvements was $1.08 million. It was a condition precedent to the plaintiff's obligations that the city would re-zone the two lots from the existing industrial designation to permit residential and commercial uses appropriate to carrying out the plaintiff's development plans.

By an amending by-law, the city subsequently "down-zoned" the lots to permit only one-storey commercial buildings.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

As a result, a substantial amount of approved retail, residential and commercial space on the waterfront could not be built. The plaintiff brought action against the city for breach of contract and, in the alternative, unjust enrichment. The contractual claim was ultimately rejected on the basis that the city lacked the statutory authority to make the zoning commitments it did. The matter was remitted to trial on the unjust enrichment claim. The trial judge found that the city had been unjustly enriched by the extra works and improvements and awarded the plaintiff $1.08 million. The Court of Appeal set aside the trial judge's decision on the basis that there was no deprivation and dismissed the action. The plaintiff appealed.

**Held:** The appeal was allowed.

The doctrine of unjust enrichment provides an equitable cause of action that retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscience. The test for unjust enrichment has three elements: (1) an enrichment of the defendant, (2) a corresponding deprivation of the plaintiff, and (3) an absence of juristic reason for the enrichment. In this case, the city obtained $1.08 million worth of roads, parkland and walkways and a new seawall, wholly at the plaintiff's expense. These works and improvements were in excess of what the city could lawfully demand under s. 989 of the Municipal Act. The city's present argument that the extra amenities it demanded were not an enrichment but a burden because of the cost of their upkeep was not credible. Using the straightforward economic approach, the plaintiff had suffered a corresponding deprivation of $1.08 million. It was required to spend funds to provide the amenities and to give up extra parkland out of the lots it purchased. The plaintiff was not required to subsidize municipal amenities from the profits earned elsewhere on the project in the absence of some legal requirement.

There are two stages to the juristic reason inquiry. At the first stage, a claimant must show there is no juristic reason within the established categories that would deny it recovery. On proving that none of these limited categorical reasons exist, the plaintiff will have made out a prima facie case of unjust enrichment. At the second stage, the onus shifts to the defendant to rebut the prima facie case by showing there is some other valid reason to deny recovery. In the absence of a convincing rebuttal, the transfer of wealth will be reversed. It is at this stage that the court should have regard to the reasonable expectation of the parties and public policy considerations.

The city successfully argued in the first appeal that the sale of zoning was ultra vires, and therefore incapable of giving rise to a cause of action for breach of contract. It could not now rely on the contractual arrangements, which in their relevant parts flowed from its ultra vires demand, to defeat the plaintiff's claim. The trial judge found the extra works and undertakings given in exchange for the ultra vires zoning commitment to be clearly separate and identifiable. The cost was $1.08 million. There was therefore no difficulty on the facts in distinguishing between the city's lawful entitlement and the ultra vires extras.

The city's success in the first appeal knocked out of contention the juristic reason on which it now primarily relied. First, as a matter of equity, it was not necessary for the plaintiff to try to set aside the entirety of its contractual arrangements with the city. It need only isolate the provisions relating to the ultra vires demand, and show why the city ought not to be allowed to rely on them as a defence to a claim in unjust enrichment. Secondly, the trial judge found that the ultra vires arrangements rested on a common mistake as to the city's legal authority to make zoning commitments.

Equity looks to substance rather than to form. Here, the substance of the problem to be remedied was clearly identified as $1.08 million worth of improvements, which were found to be the fruits of an ultra vires demand. The city sought to enjoy an unjustified windfall at the plaintiff's expense. The remedy sought was to reverse the wrongful transfer of wealth by ordering reimbursement of that amount to the plaintiff. The equitable doctrine has the remedial flexibility to reverse an enrichment the trial judge found to be manifestly unjust.

The trial judge found that both the city and the plaintiff assumed the city had the legal authority to provide an implied undertaking to keep the zoning in place for a reasonable time to allow completion of the plaintiff's project. As a result, the parties purported to contract for the extra works and improvements under a common mistake of law as to the enforceability of their agreement. It was clear that the plaintiff would not have undertaken the extra works and

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

improvements without the zoning assurances it thought it had contracted for. Accordingly, the plaintiff had negatived the contractual provisions as a juristic reason permitting the city to retain the extra works and improvements without paying for them.

Section 914 of the Local Government Act did not authorize the city to retain without payment the $1.08 million enrichment, since the claim was not based on "the adoption of an official community plan or [zoning] bylaw." The plaintiff's cause of action for unjust enrichment was complete when it put in place the extra works and improvements in the mistaken belief that its contract with the city was enforceable. Section 215(3) of the Land Title Act did not assist the city, either, as that would allow the city to do indirectly what would be ultra vires if done directly. The agreements could not be relied upon by the city as a juristic reason to keep the works and improvements without paying for them.

The plaintiff did not offer a "sweetener" for something it got. It offered consideration for an implied undertaking that the city was able to repudiate. Nor did the claim for unjust enrichment depend on the down-zoning. It depended on the fact that the city obtained $1.08 million worth of extra works and improvements at the plaintiff's expense to which, after securing a court order declaring that it had no power to do what it purported to undertake to do, the city had no legitimate entitlement.

The city had not discharged its onus under stage two of the "juristic reason" inquiry to show that allowing the claim of unjust enrichment would frustrate the reasonable expectation of the parties. The trial judge found that neither the city nor the plaintiff expected the extra works and improvements to be donated. The reasonable expectation was that they would be paid for out of the profits from those parts of the project that the plaintiff was prevented from building. The city now owned the works, and it was consistent with the parties' "reasonable" expectations that the plaintiff be reimbursed for their cost.

The grant of an equitable remedy in this case would not frustrate the legislative purpose in making such zoning commitments unenforceable. The redevelopment, as planned, was thought to be in the overall best interest of the municipality. It would not be good public policy to have municipalities making development commitments, then not only have them attack those commitments as illegal and beyond their own powers, but also allow them to scoop a financial windfall at the expense of those who contracted with them in good faith. The city had no right in equity to retain the benefit of the extra works and improvements carried out by the plaintiff without paying for them. The trial judgment requiring the city to pay the plaintiff $1.08 million was restored.

La demanderesse, un promoteur immobilier, a acquis environ 200 acres de terrains riverains que la municipalité défenderesse souhaitait voir réaménagés à des fins résidentielles et commerciales. La demanderesse et la Ville ont conclu une entente prévoyant que la demanderesse devait construire des routes, des parcs, des sentiers et une digue. Les travaux et les aménagements supplémentaires devaient coûter 1,08 million de dollars. Il s'agissait d'une condition préalable au respect par la Ville de ses obligations envers la demanderesse consistant à modifier le zonage industriel de deux lots pour permettre des usages résidentiels et commerciaux et la réalisation ainsi des plans d'aménagement de la demanderesse.

La Ville a subséquemment modifié le zonage des lots, ne permettant plus que la construction d'édifices commerciaux d'un étage. La demanderesse n'a donc pu construire sur les plans d'eau une grande partie des espaces résidentiels et commerciaux qui avaient été approuvés. La demanderesse a intenté une action contre la Ville pour rupture de contrat et, de façon subsidiaire, pour enrichissement sans cause. L'action fondée sur le contrat a ultimement été rejetée au motif que la Ville n'était pas habilitée par la loi à prendre de tels engagements en matière de zonage. L'affaire a été renvoyée en première instance afin que la question de l'enrichissement sans cause soit tranchée. Le juge de première instance a conclu que la Ville avait été injustement enrichie par les travaux et améliorations supplémentaires et a accordé à la demanderesse un montant de 1,08 million de dollars. La Cour d'appel a infirmé le jugement de première instance, au motif qu'il n'y avait aucun appauvrissement, et a rejeté l'action. La demanderesse a interjeté appel.

**Arrêt:** Le pourvoi a été accueilli.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

La doctrine de l'enrichissement sans cause prévoit une cause d'action en equity qui offre une grande souplesse dans les réparations susceptibles d'être accordées dans différentes circonstances selon des principes fondés sur l'équité et la bonne conscience. Le critère de l'enrichissement sans cause se divise en trois conditions: 1) l'enrichissement du défendeur; 2) l'appauvrissement correspondant du demandeur; et 3) l'absence de motif juridique expliquant l'enrichissement. Dans ce cas-ci, la Ville a obtenu des routes, des parcs, des sentiers et une nouvelle digue d'une valeur de 1,08 million de dollars, le tout entièrement aux frais de la demanderesse. Ces travaux et améliorations allaient au-delà de ce que la Ville pouvait légalement exiger en application de l'art. 989 de la Municipal Act. N'était pas crédible l'argument de la Ville que les infrastructures supplémentaires qu'elle avait demandées constituaient plutôt un fardeau qu'un enrichissement en raison de leurs coûts d'entretien. Selon une analyse économique simple, la demanderesse a subi un appauvrissement corrélatif de 1,08 million de dollars. Elle a dû contribuer financièrement à la mise en place des infrastructures et fournir les espaces verts supplémentaires à même les terres qu'elle avait acquises. En l'absence d'une quelconque obligation légale, la demanderesse n'était pas obligée de subventionner les infrastructures de la Ville à partir des profits provenant d'autres parties de son projet.

L'examen d'un motif juridique se divise en deux étapes. Lors de la première étape, le demandeur doit démontrer qu'aucun motif juridique appartenant à une catégorie établie ne justifie le refus de l'indemniser. Le demandeur aura prouvé l'enrichissement sans cause de façon prima facie dès qu'il aura démontré l'absence de motif juridique appartenant à une catégorie établie. Lors de la deuxième étape, c'est au défendeur que revient le fardeau de réfuter la preuve prima facie en démontrant l'existence d'une autre raison valable pour refuser d'indemniser. S'il ne le fait pas de manière convaincante, il y a lieu d'annuler le transfert de richesse. C'est à cette étape que le tribunal doit tenir compte des attentes raisonnables des parties et des considérations d'intérêt public.

La Ville a soutenu avec succès, lors du premier appel, que la vente de zonage ne faisait pas partie de ses pouvoirs et, donc, que cela ne pouvait donner lieu à une cause d'action pour rupture de contrat. La Ville ne pouvait pas maintenant invoquer les ententes contractuelles, dont les parties pertinentes découlaient de sa demande excessive, pour faire échec à la réclamation de la demanderesse. Le premier juge a conclu que les travaux et améliorations supplémentaires donnés en échange de l'engagement sur le zonage étaient clairement distincts et identifiables. Leur coût était de 1,08 million de dollars. Il n'était donc pas difficile de distinguer entre ce à quoi la Ville avait légitimement droit et ce qui était ultra vires.

La victoire de la Ville dans le premier appel a fait tomber le motif juridique sur lequel elle s'appuyait principalement. Premièrement, en equity, la demanderesse n'avait pas à essayer de faire écarter toutes les ententes contractuelles avec la Ville. Elle devait seulement isoler les dispositions relatives à la demande ultra vires et démontrer pourquoi la Ville ne devait pas avoir le droit de les invoquer à titre de défense à une réclamation d'enrichissement sans cause. Deuxièmement, le juge de première instance a conclu que les accords ultra vires reposaient sur une erreur commune aux deux parties quant à savoir si le Ville était légalement habilité à prendre un engagement en matière de zonage.

En equity, on examine le fond plutôt que la forme. Ici, le fond du problème à réparer était clairement identifié comme des améliorations d'une valeur de 1,08 million de dollars qui ont résulté de la demande ultra vires. La Ville cherchait à profiter d'un avantage injustifié aux dépens de la demanderesse. La réparation voulue était l'annulation du transfert de richesse erroné en ordonnant le remboursement de ce montant à la demanderesse. La doctrine en equity a une souplesse de réparation permettant d'annuler un enrichissement considéré injuste par le juge de première instance.

Le premier juge a conclu que la Ville et la demanderesse avaient toutes deux présumé que la Ville était légalement habilitée à s'engager implicitement à ne pas modifier le zonage pour une période de temps raisonnable afin de permettre à la demanderesse de compléter son projet. Par conséquent, les parties ont conclu le contrat prévoyant les travaux et améliorations supplémentaires en raison d'une erreur de droit commune quant à son caractère exécutoire. Il apparaissait clair que la demanderesse n'aurait pas accepté de faire les travaux et les améliorations supplémentaires sans l'engagement en matière de zonage qu'elle croyait avoir obtenu. Par conséquent, la demanderesse a réussi à réfuter le motif juridique invoqué par la Ville, soit les dispositions contractuelles, pour lui permettre de conserver la propriété des travaux et améliorations supplémentaires sans payer pour ceux-ci.

L'article 914 de la Local Government Act n'autorisait pas la Ville à conserver, sans le payer, ce qui constituait un

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

enrichissement de 1,08 million de dollars, étant donné que l'action n'était pas fondée sur l'adoption d'un plan officiel par la communauté ou d'un règlement de zonage. La demanderesse avait une cause d'action complète pour enrichissement sans cause dès le moment où elle a réalisé les travaux et améliorations supplémentaires, croyant à tort que le contrat conclu avec la Ville à cet égard était exécutoire. L'article 215(3) de la Land Title Act n'aidait pas non plus la Ville parce que, sinon, on lui permettrait de réaliser indirectement ce qui aurait été ultra vires si réalisé directement. Les arguments invoqués par la Ville ne pouvaient servir de motif juridique lui permettant de conserver les travaux et les améliorations sans payer pour ceux-ci.

La demanderesse n'a offert aucune « rallonge » pour obtenir une chose qu'elle avait déjà. Elle l'a fait en contrepartie d'un engagement tacite que la Ville a pu en fin de compte répudier. La réclamation d'enrichissement sans cause ne reposait pas non plus sur le changement de zonage. Elle reposait sur le fait que la Ville avait obtenu, aux frais de la demanderesse, des travaux et améliorations supplémentaires d'une valeur de 1,08 million de dollars auxquels elle n'avait pas légalement droit, étant donné qu'elle avait obtenu une ordonnance de la cour déclarant qu'elle n'avait pas le pouvoir de faire ce qu'elle s'était engagée à faire.

La Ville ne s'était pas acquittée de son fardeau de prouver, à la deuxième étape de l'examen d'un « motif juridique », que l'accueil de l'action pour enrichissement sans cause viendrait frustrer les attentes raisonnables des parties. Le premier juge a conclu que ni la Ville ni la demanderesse ne s'attendaient à ce que les travaux et les améliorations supplémentaires ne fassent l'objet d'un don. Toutes deux s'attendaient à ce que ce leur coût soient couvert par les profits résultant des parties du projet que la demanderesse n'avait pas été en mesure de construire. La Ville était maintenant propriétaire des travaux et il était compatible avec les attentes « raisonnables » des parties que le coût de ces travaux soit remboursé à la demanderesse.

En l'espèce, l'octroi d'une réparation en equity ne serait pas contraire à l'objectif législatif visant à rendre inexécutoires des engagements relatifs au zonage. Tel que prévu, le réaménagement était censé servir au mieux l'intérêt général de la municipalité. Il ne serait pas dans l'intérêt public qu'une municipalité prenne un engagement relatif à l'aménagement, puis non seulement s'y dérobe et le conteste en invoquant qu'il est illégal et outrepasse ses pouvoirs, mais profite d'un avantage financier aux dépens d'un cocontractant de bonne foi. La Ville n'avait aucun droit en equity de bénéficier des travaux et améliorations supplémentaires réalisés par la demanderesse sans assumer leur coût. Le jugement de première instance ordonnant à la Ville de payer 1,08 million de dollars était rétabli.

**Table of Authorities**

**Cases considered by *Binnie J.*:**

*Air Canada v. British Columbia* (1989), [1989] 4 W.W.R. 97, [1989] 1 S.C.R. 1161, 59 D.L.R. (4th) 161, 95 N.R. 1, 36 B.C.L.R. (2d) 145, 41 C.R.R. 308, 2 T.C.T. 4178, [1989] 1 T.S.T. 2126, 1989 CarswellBC 67, 1989 CarswellBC 706 (S.C.C.) — considered

*Becker v. Pettkus* (1980), [1980] 2 S.C.R. 834, 117 D.L.R. (3d) 257, 34 N.R. 384, 8 E.T.R. 143, 19 R.F.L. (2d) 165, 1980 CarswellOnt 299, 1980 CarswellOnt 644 (S.C.C.) — followed

*Burrow v. Scammell* (1881), 19 Ch. D. 175 (Eng. Ch. Div.) — considered

*Canadian Pacific Air Lines Ltd. v. British Columbia* (1989), *(sub nom. Canadian Pacific Airlines Ltd. v. British Columbia)* [1989] 1 S.C.R. 1133, *(sub nom. Canadian Pacific Airlines Ltd. v. British Columbia)* 2 T.C.T. 4170, [1989] 4 W.W.R. 137, *(sub nom. Canadian Pacific Airlines Ltd. v. British Columbia)* 59 D.L.R. (4th) 218, *(sub*

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

nom. *Canadian Pacific Air Lines Ltd. v. British Columbia)* 36 B.C.L.R. (2d) 185, (sub nom. *Canadian Pacific Airlines Ltd. v. British Columbia)* [1989] 1 T.S.T. 2153, (sub nom. *Canadian Pacific Airlines Ltd. v. British Columbia)* 96 N.R. 1, 1989 CarswellBC 68, 1989 CarswellBC 705 (S.C.C.) — referred to

*Garland v. Consumers' Gas Co.* (2004), 9 E.T.R. (3d) 163, [2004] 1 S.C.R. 629, 186 O.A.C. 128, 237 D.L.R. (4th) 385, 43 B.L.R. (3d) 163, 319 N.R. 38, 2004 SCC 25, 2004 CarswellOnt 1558, 2004 CarswellOnt 1559 (S.C.C.) — followed

*Pacific National Investments Ltd. v. Victoria (City)* (1996), 1996 CarswellBC 2957 (B.C. S.C.) — referred to

*Pacific National Investments Ltd. v. Victoria (City)* (2000), 2000 SCC 64, 2000 CarswellBC 2439, 2000 CarswellBC 2441, 193 D.L.R. (4th) 385, 83 B.C.L.R. (3d) 207, [2001] 3 W.W.R. 1, 263 N.R. 1, 15 M.P.L.R. (3d) 1, [2000] 2 S.C.R. 919, 144 B.C.A.C. 203, 236 W.A.C. 203 (S.C.C.) — referred to

*Peel (Regional Municipality) v. Canada* (1992), (sub nom. *Peel (Regional Municipality) v. Ontario)* 144 N.R. 1, 12 M.P.L.R. (2d) 229, 98 D.L.R. (4th) 140, [1992] 3 S.C.R. 762, 59 O.A.C. 81, 1992 CarswellNat 15, 55 F.T.R. 277 (note), 1992 CarswellNat 659 (S.C.C.) — followed

*Peter v. Beblow* (1993), [1993] 3 W.W.R. 337, 23 B.C.A.C. 81, 39 W.A.C. 81, 101 D.L.R. (4th) 621, [1993] 1 S.C.R. 980, 150 N.R. 1, 48 E.T.R. 1, 77 B.C.L.R. (2d) 1, 44 R.F.L. (3d) 329, [1993] R.D.F. 369, 1993 CarswellBC 44, 1993 CarswellBC 1258 (S.C.C.) — followed

*Rathwell v. Rathwell* (1978), [1978] 2 S.C.R. 436, [1978] 2 W.W.R. 101, 83 D.L.R. (3d) 289, 19 N.R. 91, 1 E.T.R. 307, 1 R.F.L. (2d) 1, 1978 CarswellSask 36, 1978 CarswellSask 129 (S.C.C.) — followed

*Reference re Excise Tax Act (Canada)* (1992), (sub nom. *Reference re Goods & Services Tax)* 2 Alta. L.R. (3d) 289, (sub nom. *Reference re Goods & Services Tax)* 20 W.A.C. 161, (sub nom. *Reference re Bill C-62)* [1992] G.S.T.C. 2, (sub nom. *Reference re Goods & Services Tax)* [1992] 4 W.W.R. 673, (sub nom. *Reference re Goods & Services Tax)* 138 N.R. 247, (sub nom. *Reference re Goods & Services Tax)* 127 A.R. 161, (sub nom. *Reference re Goods & Services Tax)* [1992] 2 S.C.R. 445, (sub nom. *Reference re Goods & Services Tax (Alberta))* 94 D.L.R. (4th) 51, (sub nom. *Reference re GST Implementing Legislation)* 5 T.C.T. 4165, 1992 CarswellAlta 61, 1992 CarswellAlta 469 (S.C.C.) — referred to

**Statutes considered:**

*Land Title Act*, R.S.B.C. 1979, c. 219
   s. 215(3) — considered

*Local Government Act*, R.S.B.C. 1996, c. 323
   s. 914 — considered

*Municipal Act*, R.S.B.C. 1979, c. 290
   s. 989 — considered

APPEAL from judgment reported at *Pacific National Investments Ltd. v. Victoria (City)* (2003), 36 M.P.L.R. (3d) 222, 2003 CarswellBC 535, 11 B.C.L.R. (4th) 234, 223 D.L.R. (4th) 617, 2003 BCCA 162, 23 C.L.R. (3d) 181, 180 B.C.A.C. 104, 297 W.A.C. 104 (B.C. C.A.), allowing appeal by municipality from award of $1.08 million in restitution.

POURVOI du promoteur immobilier à l'encontre de l'arrêt publié à *Pacific National Investments Ltd. v. Victoria (City)* (2003), 36 M.P.L.R. (3d) 222, 2003 CarswellBC 535, 11 B.C.L.R. (4th) 234, 223 D.L.R. (4th) 617, 2003 BCCA 162, 23

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

C.L.R. (3d) 181, 180 B.C.A.C. 104, 297 W.A.C. 104 (B.C. C.A.), qui a accueilli le pourvoi de la municipalité à l'encontre du jugement octroyant un montant de 1,08 million de dollars à titre de restitution.

*Binnie J.*:

1    This case arrives in our Court for the second time. On the first occasion, the appellant real estate developer Pacific National Investments Ltd ("PNI") sought to make the respondent municipality liable for breach of contract because it down-zoned in mid-project part of the appellant's 22-acre development on the Victoria waterfront. As a result of the down-zoning, a substantial amount of approved retail, residential and commercial space on the waterfront could not be built. The appellant sued the City on the basis that when PNI accepted an obligation to install $1.08 million in extra works and improvements, it had done so in exchange for an implied undertaking by the City to keep the zoning in place for a reasonable time to allow for completion of its project. By its down-zoning, the City had broken an implied term of the contract that went to the root of the arrangement between the parties. This Court, in a majority judgment, rejected the contractual claim on the basis that the municipality lacked the statutory authority to provide such an implied undertaking, which was *ultra vires*, and that its breach therefore could not give rise to an action for damages (see *Pacific National Investments Ltd. v. Victoria (City)*, [2000] 2 S.C.R. 919, 2000 SCC 64 (S.C.C.)). The matter was remitted to the trial court to deal with the appellant's alternative claim of unjust enrichment. This lesser claim required proof of a different set of facts and offered a much reduced level of compensation because it viewed the dispute from the perspective of the City's *gain* rather than (as in the contract claim) the appellant's *loss*. The claim for unjust enrichment was upheld by the second trial judge, Wilson J., but was reversed by the British Columbia Court of Appeal. I would allow the appeal, set aside the judgment of the Court of Appeal and restore the trial judgment. In my view, with respect, the municipality in these circumstances has no right in equity to retain the benefit of the extra works and improvements without paying for them.

## I. Facts

2    In the 1980s, the provincial government and the City of Victoria agreed on the desirability of redeveloping, for residential and commercial uses, approximately 200 acres of provincial Crown land located on Victoria's inner harbour. The area was known as the Songhees lands (named after the First Nation displaced for the railway and industry). The first trial judge, Mackenzie J., found that "[t]he City had an intense interest in planning the redevelopment of such a large, strategically located site in the harbour area close to downtown" ( (B.C. S.C.), at para. 3). Amongst other things, the City wanted to obtain additional parkland (closer to 30% of the project instead of the 5% ordinarily required), road improvements, walkways and a new seawall, which were not necessitated by the PNI project itself, but which would serve to make the whole area more efficient and attractive.

3    The province was sympathetic to the City's concerns, as was the appellant, who first became involved in the planning exercise in 1984 as a party interested in eventually undertaking Phase II of the project (22 acres) as a private development. It was the appellant's architect who contributed what became the conceptual plan for the waterfront development in 1985, long before any agreements had been signed between the City and the provincial Crown agency that owned the lands, British Columbia Enterprise Corporation ("BCEC"). The respondent argued that the appellant was a stranger to the negotiations between the City and BCEC, and that on a true interpretation of events, the Province had volunteered the extra amenities to the City and PNI had simply stepped into the shoes of BCEC. This theory was rejected by Mackenzie J., who concluded that the appellant was not a volunteer but a profit-oriented developer who had been a full participant in planning the project, including the efforts to accommodate the City's demand for extra amenities (at para. 23):

    I am satisfied that at all material times both the City and BCEC expected that BCEC would sell phase 2 to PNI, and that

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

        PNI would assume BCEC's rights and obligations with respect to phase 2 on the purchase.

4     The development of the Songhees lands proceeded in the following steps:

       1 The City and BCEC entered into the Songhees Master Agreement dated August 28, 1987. BCEC itself proceeded with Phase I of the project.

       2 A restrictive covenant was registered against title to the lands to prohibit building until appropriate servicing agreements had been entered into between the appellant and the City and subdivision plans had received City approval.

       3 The appellant purchased the Phase II lands from BCEC conditional on zoning, park dedication, a service agreement between the appellant and the City, and formal subdivision approval.

       4 The City enacted zoning bylaws to permit the appellant's plans for the whole of Phase II to be carried out, including the two water lots where three-storey structures were to be built resting on piles driven into the harbour bed, or possibly free floating, with retail and commercial use on the first floor, and residential condominiums on the upper two floors.

       5 Once BCEC's rights and obligations had been assigned to the appellant, the appellant and the City entered into the Songhees Phase II Subdivision Servicing Agreement, dated January 29, 1988 which dealt with, amongst other things, the extra works and improvements which the parties have agreed cost about $1.08 million of the $2.5 million total service costs. It was a condition precedent to the appellant's obligations that the City would re-zone the 22 acres from the existing (industrial) designation to permit residential and commercial uses appropriate to carrying out the agreed upon project.

       6 The City registered a statutory right-of-way for a public walkway around the perimeter of the structures to be built on the water lots.

5     After reviewing the evidence, Wilson J., concluded that the provision of the extra works and improvements, in the view of *all* three parties, was inextricably bound up with retention of the zoning to permit construction of the PNI project as planned ([(2002), 217 D.L.R. (4th) 248](#) (B.C. S.C.), at para. 5):

       ...the provision that the plaintiff was to supply and install certain works, commensurate with the development contemplated, was inextricably bound up with the provision that the development anticipated construction of improvements pursuant to the defining by-laws. And in this case, that meant two, three-storey improvements on the water.

6     By 1993, the condominium residences on dry land had been built, or were under development or at least in contemplation and the appellant had already earned a very substantial profit on its investment with still other lands left to sell. The new residents and others from the municipality were also pleased. They had started to enjoy their new parks, cleaned up vistas and walkways around the new seawall, which had all been put in at the appellant's expense. As Mackenzie J. observed (at para. 16):

       The City had allowed the developer to come in and provide substantial tangible benefits to the City in terms of parks and other services at the developer's cost in the expectation that the development of the water lots as then contemplated by the City, BCEC and PNI would be allowed to proceed.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

7    However, when the appellant applied for building permits to develop the two water lots, including a marina, restaurants, shops, other commercial uses, and two stories of residential condominiums on the harbour, the local community objected, and the matter became an issue in the pending municipal election. Following the election, the new City Council, with one dissent, voted to down-zone the two water lots to permit only one-storey commercial buildings, thereby eliminating the two stories of residential condominiums above. The appellant complained that the down-zoning rendered development of its water lots uneconomical.

8    In its Statement of Claim filed on October 8, 1993, the appellant alleged causes of action at common law (breach of contract) and equity (unjust enrichment). With respect to its contractual claim, the appellant alleged that the Songhees Master Agreement was subject to an implied term that the zoning permitting the contemplated development to proceed would be left in place for a reasonable period of time. The City's solicitor had expressed the view that the projet would proceed "in several stages over a period of 10 to 12 years". The common law cause of action was allowed by Mackenzie J. He therefore found it unnecessary to address the claim for unjust enrichment. His judgment in the appellant's favour was reversed by the British Columbia Court of Appeal. The reversal was affirmed as correct by a majority judgment of this Court on December 14, 2000. Under the provincial law governing municipalities at the relevant time, the City did not have the capacity to make and be bound by an implied term to keep the zoning in place for a number of years or to pay damages if it modified it. Our Court then remitted the case "to trial on any unjust enrichment argument that may exist" (para. 75).

## II. Relevant Statutory Provisions

9    *Local Government Act*, R.S.B.C. 1996, c. 323:

> 914(1) Compensation is not payable to any person for any reduction in the value of that person's interest in land, or for any loss or damages that result from the adoption of an official community plan or a bylaw under this Division or the issue of a permit under Division 9 of this Part.

> (2) Subsection (1) does not apply where the bylaw under this Division restricts the use of land to a public use.

*Land Title Act*, R.S.B.C. 1979, c. 219:

> 215(3) Where an instrument contains a covenant registrable under this section, the covenant is binding on the covenantor and his successors in title, notwithstanding that the instrument or other disposition has not been signed by the covenantee.

## III. Judicial History

### A. Supreme Court of British Columbia ((2002), 217 D.L.R. (4th) 248 (B.C. S.C.))

10    Wilson J. adopted the findings of fact from the earlier trial. Then, having regard to the outcome of the appeal to this Court, he found that the parties had proceeded on a mistaken assumption that the zoning would not change in a manner that

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

would substantially and adversely affect the development before the plaintiff developer had a reasonable opportunity to implement the whole of Phase II, and a parallel mistake of law, *i.e.* that the City had the capacity to make such a contractual commitment. The extra works and improvements carried out by the appellant were in excess of works which the respondent could lawfully have demanded. He accepted the evidence that the excess work the appellant did as a result of the mistake was worth $1.08 million.

11      Wilson J. found that the City had been enriched by the extra works and improvements which, but for the mistake, it would not have received. The appellant had suffered a corresponding deprivation. He then found there was no juristic reason for the City to retain the benefit without accounting to the appellant. He therefore gave judgment for the appellant for $1.08 million with interest at registrar's rates from time to time commencing October 1, 1993 to the date of his judgment, being May 7, 2002.

***B. Court of Appeal of British Columbia (Southin, Braidwood and Hall JJ.A.)*** *((2003), 223 D.L.R. (4th) 617 (B.C. C.A.))*

12      Southin J.A. for the court found the claim concerning unjust enrichment to be misconceived. She agreed that the criteria for a finding of unjust enrichment were the enrichment of the person claimed against, a corresponding deprivation of the claimant and the absence of any juristic reason for retaining the enrichment. Applying these criteria to the facts, Southin J.A. concluded that there was no deprivation. The extra works were "part and parcel of the consideration [the appellant] gave for the benefit which it received under the agreements. There is no true correspondence between the asserted enrichment and the asserted deprivation, that is to say, the downzoning of the two water lots" (para. 25). Not only was there no deprivation, but even if there was, "the juristic reason for what the appellant did in 1993 is that the Legislature had conferred upon it the power to do the act of downzoning. The by-law is of the same force and effect as if it had been enacted by the Legislature itself and provides a complete answer to any and all claims arising out of it" (para. 26). Accordingly, the appeal was allowed and the action was dismissed.

## IV. Analysis

13      The doctrine of unjust enrichment provides an equitable cause of action that retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscience. This is not to say that it is a form of "'palm tree' justice" (*Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 (S.C.C.), at p. 802) that varies with the temperament of the sitting judges. On the contrary, as the Court recently reaffirmed in *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629, 2004 SCC 25 (S.C.C.), a court is to follow an established approach to unjust enrichment predicated on clearly defined principles. However, their application should not be mechanical. Iacobucci J. observed that "this is an equitable remedy that will necessarily involve discretion and questions of fairness" (para. 44).

14      As accepted by the courts in British Columbia, the test for unjust enrichment has three elements: (1) an enrichment of the defendant; (2) a corresponding deprivation of the plaintiff; and (3) an absence of juristic reason for the enrichment (*Rathwell v. Rathwell*, [1978] 2 S.C.R. 436 (S.C.C.), at p. 455; *Becker v. Pettkus*, [1980] 2 S.C.R. 834 (S.C.C.), at p. 848; *Peter v. Beblow*, [1993] 1 S.C.R. 980 (S.C.C.), at p. 987; *Peel (Regional Municipality) v. Canada*, *supra*, at p. 784; and *Garland*, *supra*, at para. 30).

*A. Was There Enrichment of the City?*

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

15      The existence of an enrichment to the defendant is governed by "a straightforward economic approach" (*Peter*, *supra*, at p. 990). An enrichment may "connot[e] a tangible benefit" (*Peel, supra*, at p. 790), or it can be relief from a "negative", such as saving the defendant from an expense he or she would otherwise have been *required* to make.

16      In this case, the City obtained $1.08 million worth of roads, parkland and walkways and a new seawall, wholly at the appellant's expense. These works and improvements were in excess of what the City could lawfully demand under s. 989 of the *Municipal Act*, R.S.B.C. 1979, c. 290. Mr. Clive Timms, the principal witness on behalf of the City, acknowledged that it was "beyond the authority of the approving officer to require [the extra works] under what we have characterized as a simple subdivision."

17      The City now argues that these extra works and improvements are not really a benefit because they were built on what was then provincial Crown land, and their upkeep by the City costs about $40,000 per year. The City's portrayal of itself as a victim of the appellant's generosity is not credible. The trial judge at the original trial, Mackenzie J., found as a fact that the City had pushed hard to obtain the extra amenities whose cost of upkeep it now grumbles about. Mackenzie J. noted, at para. 20, that "[t]he City wanted planned development with services, parks and other amenities at no cost to the City taxpayers". The City insisted on a restrictive covenant that prevented any construction until the subdivision plans had been approved and servicing agreements entered into, and it was the City that required the appellant as successor in title to assume BCEC's commitments for services, works and improvements beyond those it could lawfully have demanded (para. 23, *per* Mackenzie J.). On this point the *Restatement of the Law of Restitution: Quasi Contracts and Constructive Trusts* (1937), at p. 12, makes the useful comment that "[a] person confers a benefit upon another if he ... performs services beneficial to *or at the request of the other*" (emphasis added).

18      The City argues that while the extra works and improvements "may benefit either PNI as a developer or the neighbourhood and the community, it does not benefit the *Corporation* of the City of Victoria" (emphasis in original). However, it was the City that contracted with the appellant for ownership of "the Works", wherever built, under clause 11(c) of the Songhees Phase II Subdivision Servicing Agreement, dated January 29, 1988, which provides:

> (c) Save and except those works installed for public utility companies, the Works *shall be and remain the absolute property of the City* when accepted in writing by the City Engineer. [Emphasis added.]

19      The City's present argument that the extra works and improvements it demanded are not an enrichment but something of a burden should be rejected.

#### B. Did the Appellant Suffer a Corresponding Deprivation?

20      Using the straightforward economic approach, the appellant suffered a corresponding deprivation of $1.08 million. The appellant was required to spend funds to provide the amenities and had to give up the extra parkland out of the lands they had purchased. No other person or entity contributed to the enrichment. In these circumstances, as Cory J. put it in *Peter*, *supra*, at p. 1012, "I would have thought that if there is enrichment, that it would almost invariably follow that there is a corresponding deprivation suffered by the person who provided the enrichment".

21      The City claims that the appellant had already turned a handsome profit on the project even without development of

**WestlawNext** CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   12

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

the two water lots. So it did, but that is beside the point. The question here is not whether the developer made a success of its project generally, but whether it suffered a detriment corresponding to the City's enrichment. The appellant is not required to subsidize city amenities from the profits earned elsewhere on the project in the absence of some legal requirement. The significance of the Servicing Agreement in this respect is an issue to be considered at the third stage.

### C. Is There a Juristic Reason to Deny Recovery to the Appellant?

22    This branch of the test for unjust enrichment is pivotal, for as McLachlin J. observed in *Peter*, *supra*, at p. 990:

It is at this stage that the court must consider whether the enrichment and detriment, morally neutral in themselves, are "unjust".

23    The use of the expression "juristic reason" in this connection emphasizes that "unjust" is to be addressed as a matter of law and legal reasoning rather than a free-floating conscience that may risk being overly subjective; see L. Smith, "The Mystery of 'Juristic Reason'" (2000), 12 *S.C.L.R.* (2d) 211, at p. 219. This third step has to some extent been redefined and reformulated in *Garland*, *supra*, at paras. 44-46. There are now two stages to the juristic reason inquiry. At the first stage, a claimant (here the appellant) must show that there is no juristic reason within the established categories that would deny it recovery. The established categories are the existence of a contract, disposition of law, donative intent, and "other valid common law, equitable or statutory obligatio[n]" (*Garland*, at para. 44). The categories may be added to over time (para. 46). On proving that none of these limited categorical reasons exist to deny recovery, the plaintiff (here the appellant) will have made out a *prima facie* case of unjust enrichment. It will have demonstrated "a positive reason for reversing the defendant's enrichment" (Smith, at p. 244).

24    Although this formulation requires the plaintiff to prove a negative, the task is made manageable by the limited number of categories, and it is only fair to put on the claimant the onus of proving the essential elements of its cause of action.

25    At the second stage, the onus shifts to the defendant (here the respondent City), who must rebut the *prima facie* case by showing that there is some other valid reason to deny recovery. In the absence of a convincing rebuttal, the transfer of wealth will be reversed. According to *Garland*, it is at this stage that the court should have regard to the reasonable expectation of the parties and public policy considerations. However, as Iacobucci J. added, at para. 46:

The point here is that this area is an evolving one and that further cases will add additional refinements and developments.

26    With respect to the absence of a valid juristic reason in this case, the second trial judge was emphatic (para. 17):

There is no juristic reason for the City to retain the benefits without accounting to the plaintiff. I think it would be against conscience to have that result obtain.

27    I turn then to whether the appellant has demonstrated that the established categories do not apply.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

*(1) Stage One: The Established Categories*

*(a) Contract*

28    In the usual course, the existence of a contract, such as was made by the parties to this appeal, would be a complete answer to the claim for unjust enrichment. The City relies on four contracts, namely (i) the purchase agreement between the appellant and BCEC; (ii) the subdivision servicing agreement; (iii) the assumption agreement; and (iv) the Songhees Master Agreement. There is no doubt that the parties were entitled to enter into agreements respecting the development of the 22-acre site, and that the project would not have been allowed to proceed without the appellant contributing to the City appropriate works and improvements. The problem is that the City insisted on receiving more than s. 989 of the *Municipal Act* permitted it to ask for, and in exchange, as found in the first trial, it offered an implied undertaking regarding zoning that it was not authorized to give. The development agreements therefore included a perfectly valid core, which has been carried out by all parties, but we are now required to address the *extra* works and improvements demanded by the City and given by the appellant in exchange for guaranteed zoning. The City successfully argued in the first appeal to this Court that the sale of zoning was *ultra vires* its powers, and therefore incapable of giving rise to a cause of action for breach of contract. The logical conundrum for the City at this stage is that it is the very elements of the contract the City demonstrated were *ultra vires* (extra services for guaranteed zoning) that it now argues are the juristic reason for its just retention of $1.08 million in improvements "at no cost to the City taxpayers" (Mackenzie J., at para. 20). In my opinion, it is not open to the City to rely on the contractual arrangements, which in their relevant parts flowed from the City's *ultra vires* demand, to defeat the appellant's claim on the particular facts of this case.

29    The trial judge found the "extra" works and undertakings given in exchange for the *ultra vires* zoning commitment to be clearly separate and identifiable. The cost was $1.08 million. There is therefore no difficulty on the facts in distinguishing between the City's lawful entitlement and the *ultra vires* extras.

30    The agreements have been carried into execution by the appellant, who no longer seeks to enforce the *ultra vires* provisions. The question is whether equity will take into account the *ultra vires* nature of the City's demand, which is the root of the legal difficulties that followed, in determining whether the contract of which it forms a central part is fatal to the appellant's claim in unjust enrichment.

31    The general rule, of course, is that ==it is not the function of the court to rewrite a contract for the parties. Nor is it their role to relieve one of the parties against the consequences of an improvident contract.== None of that arises in this case. The question here, more precisely, is whether the City can be permitted in the first appeal to argue that it is absolved by the doctrine of *ultra vires* from any contractual responsibility to carry out the zoning obligations (that the trial court found it had undertaken to the appellant on the basis of a common mistake) and then in this appeal, in the same litigation (albeit in relation to a different cause of action), permitted to succeed on the basis that the same contract constitutes a juristic reason to obtain the extra works and improvements without paying for them. In my view, the City's success in the 2000 appeal knocked out of contention the juristic reason (the contractual provisions) on which it primarily relies in this appeal. I say that for two reasons. First, as a matter of equity, it is not necessary for the appellant in this action to try and set aside the entirety of its contractual arrangements with the City. It need only isolate the provisions relating to the *ultra vires* demand, and show why the City ought not to be allowed to rely on them as a defence to a claim in unjust enrichment. Secondly, the trial judge found that the *ultra vires* arrangements rested on a common mistake. Both the City and the appellant assumed the City had the legal authority to make zoning commitments the City did not possess. The finding of common mistake is important to the appellant's claim to recover the cost of the extra works and improvements. If there had been just the *ultra vires* transaction without the added element of common mistake, it would have been a different case and the outcome would not necessarily be

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

the same.

*(i) The Fruit of the Ultra Vires Demand*

32      In many cases, no doubt, municipalities make demands that are not strictly authorized and developers do what they are asked to do because in the end they get the zoning they want. There is no suggestion that in the ordinary case such arrangements should be unwound on the basis of the doctrine of unjust enrichment. This case is different. As Mackenzie J. observed after the first trial (at para. 17):

> In short, everyone involved miscalculated. What are the legal consequences of this imbroglio?

To which Wilson J., presiding at the second trial, added, somewhat darkly (at para. 4):

> The plaintiff failed to adhere to the admonition, "put not your faith in princes", and must now accept the consequences.

33      Recognizing, as the trial judge did, that the source of the problem in this case is the City's *ultra vires* demand for works and improvements to which it was not entitled, one approach is to sever from the contractual arrangements the exchange of promises that flowed from that initial *ultra vires* demand.

34      It is true that these commercial agreements are, as one would expect, complex, and do not readily lend themselves to "blue-pencil" deletions. We are dealing, however, with an equitable cause of action, and equity looks to substance rather than to form. As stated earlier, a characteristic of the doctrine of unjust enrichment is the flexibility of remedies. Here the substance of the problem to be remedied is clearly identified. The respondent is sitting on $1.08 million worth of improvements which have been found to be the fruits of an *ultra vires* demand. The remedy sought is simply to reverse the wrongful transfer of wealth by ordering reimbursement of that amount to the appellant.

35      The City seeks to enjoy an unjustified windfall at the appellant's expense. The equitable doctrine would be a feeble thing if it did not possess the remedial flexibility to reverse an enrichment that has been established to the satisfaction of an experienced trial judge to be manifestly unjust. I would not give effect to a defence based on the form as opposed to the substance of the contractual documents.

*(ii) Common Mistake*

36      Wilson J. found as a fact that the City and the appellant had entered into their contractual arrangements on the basis of a common mistake as to the City's legal authority. He said (at para. 34):

> I have already found that each of these parties believed in a set of circumstances which have now been found [in the earlier appeal] not to be true.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

37      The "mistake" was the belief that the City had the authority to contract for the extra works and improvements in exchange for what was found to be an implied contractual obligation to maintain the zoning in place for a reasonable time, estimated at 10 to 12 years, to allow completion of the appellant's project. The mistake was not wholly unreasonable. The judges of this Court were divided 4 to 3 on that issue in the first PNI appeal.

38      The City now denies that it was under any such misapprehension, suggesting that it knew all along that it could not carry out what was found to be its side of the bargain, but that position was rejected on the facts by the trial judge as noted above.

39      The result, accordingly, is that the City and the appellant purported to contract with respect to the extra works and improvements under a common mistake of law as to the enforceability of their agreement. "It cannot be disputed", wrote Bacon V.C. in 1881, that "Courts of Equity have at all times relieved against honest mistakes in contracts ... where not to correct the mistake would be to give an unconscionable advantage to either party": (*Burrow v. Scammell* (1881), 19 Ch. D. 175 (Eng. Ch. Div.), at p. 182). Such a mistake undermines the juristic reason relied upon by the City, as La Forest J. pointed out in *Air Canada v. British Columbia*, [1989] 1 S.C.R. 1161 (S.C.C.), at p. 1200:

> From his analysis, Dickson J. [in *Hydro Electric Commission of Nepean v. Ontario Hydro*, [1982] 1 S.C.R. 347] concluded that the judicial development of the law of restitution or unjust (or as Dickson J. noted, "unjustified") enrichment renders otiose the distinction between mistakes of fact and mistakes of law. He would abolish the distinction, and would allow recovery in any case of enrichment at the plaintiff's expense <u>provided the enrichment was caused by the mistake</u> and the payment was not made to compromise an honest claim, subject of course to any available defences or equitable reasons for denying recovery, such as change of position or estoppel. [Emphasis added.]

See also *Canadian Pacific Air Lines Ltd. v. British Columbia*, [1989] 1 S.C.R. 1133 (S.C.C.), at p. 1157.

40      Southin J.A. in the Court of Appeal (at para. 24) accepted the existence of the Songhees Phase II Subdivision Servicing Agreement as a valid juristic reason to deny recovery because:

> ... there is nothing in any of this [evidence] from which one could conclude that the original transaction would have come to fruition had the [appellant] asserted it would do only what could lawfully be required of a landowner under s. 989 of the Act.

41      This is true, but the fact is that the City and the appellant *did* make a deal on a basis which this Court found to be *ultra vires*. The City might not have done the deal on any other basis and certainly it is clear the appellant would not have undertaken the extra works and improvements without the zoning assurances it thought it had contracted for. However, the deal was done on the basis of a common mistake of law, the extra works and improvements are in place, and the relevant question now is who is to pay for them.

42      Southin J.A. also accepted the City's argument that what the appellant "asserts to be the deprivation, that is to say, the extra works, was part and parcel of the consideration it gave for the benefit which it received under the agreements" (para. 25). On this view, "the benefit" was the acquisition of the 22 acres of land and approval of the subdivision plan. Such a view, with respect, is at odds with the findings of fact by the trial judge as to the "consideration" the City and the appellant had agreed upon, namely the maintenance of the zoning in place for a reasonable time to permit the completion of the project. As noted earlier, the "extra" works and improvements were found to be distinct from what was lawfully required.

Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

43      For these reasons, I conclude that the appellant has negatived the contractual provisions as a juristic reason permitting the City to retain the extra works and improvements without paying for them.

*(b) Disposition of Law*

44      It is evident that the appellant's claim must fail if the City's retention without payment of the $1.08 million enrichment is authorized by statute (*Peter*, *supra*, p. 1018; *Reference re Excise Tax Act (Canada)*, [1992] 2 S.C.R. 445 (S.C.C.), at p. 476).

45      The City relies on s. 914 of the *Local Government Act* which provides that no compensation is payable to anyone for any "reduction in the value of that person's interest in land, or for any loss or damages that result from the adoption of an official community plan or a bylaw under this Division or the issue of a permit under Division 9 of this Part". The City argues that the loss claimed by the appellant flows from the down-zoning, and is therefore unrecoverable by reason of the statute.

46      In my view, the claim here is not based on "the adoption of an official community plan or [zoning] bylaw". While the earlier appeal alleged that the down-zoning of the water lots breached an implied term of the contract, that claim was rejected, and the appellant's losses flowing from the down-zoning are no longer in issue. The appellant's cause of action for unjust enrichment was complete when it put in place the extra works and improvements in the mistaken belief that its contract with the City in respect thereto was enforceable. The mistake formed the basis of the City's successful appeal after the first trial.

47      The City also relies on s. 215(3) of the *Land Title Act* under which the restrictive covenant bound the appellant to do the works "notwithstanding that the instrument ... has not been signed by the covenantee". The City's argument amounts to the proposition that registration allows the City to do indirectly what would be *ultra vires* if done directly, and thereby to subvert the legislative intent to limit a municipality's authority, even as the municipality itself escapes its side of the bargain by pleading the doctrine of *ultra vires*. I would not give effect to the City's s. 215 argument. The second trial judge, Wilson J., found, at para. 5, that the appellant's obligations were "inextricably bound up" with the other provisions of the agreements including the City's *ultra vires* promise to maintain in place the requisite zoning. The appellant does not deny its obligation under the restrictive covenant or the underlying agreements. Its position is that in the circumstances, the agreements, flawed as they are, cannot be relied upon by the City as a juristic reason to keep the works and improvements without paying for them. I agree with that position.

*(c) Donative Intent*

48      The City contends that it is common for developers to offer "sweeteners" in excess of what a municipality can demand for zoning and subdivision approvals. This is true. Each side gets what it wants and moves on. However, their deal is not based on a common mistake. And here the appellant did not get what the City undertook to give it. Mackenzie J., at the initial trial, whose findings were adopted by Wilson J. at the second trial, flatly rejected any suggestion that the appellant possessed a donative intent (at para. 29):

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.                17

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

The characterization of park dedications and service cost expenditures as voluntary belies the reality. PNI was pursuing a business venture. It negotiated terms of purchase with BCEC and a services agreement with the City with a precise expectation of the lots it would acquire, the zoning for each lot and the extent of development thereby permitted. It made commitments pursuant to written agreements with mutual obligations that it considered enforceable. Its motives were commercial and not philanthropic.

49    The appellant did not offer a "sweetener" for something it got. It offered consideration for an implied undertaking it turned out the City was able to repudiate.

*(d) Other Valid Common Law, Equitable Or Statutory Obligation*

50    Southin J.A. stated, at para. 26:

In any event, the juristic reason for what the appellant did in 1993 is that the Legislature had conferred upon it the power to do the act of downzoning. The by-law is of the same force and effect as if it had been enacted by the Legislature itself and provides a complete answer to any and all claims arising out of it.

51    With respect, this argument presupposes that the claim for unjust enrichment "arose" out of the down-zoning. However, the claim for unjust enrichment does not depend on the down-zoning. It depends on the fact that the City has obtained $1.08 million worth of extra works and improvements at the appellant's expense to which, after securing a court order declaring that it had no power to do what it purported to undertake to do, the City has no legitimate entitlement.

52    The City also argues that requiring it to pay for the extra works and improvements would constitute an "indirect fetter" on the exercise of its legislative power, but this is not so. The appellant has never attacked the validity of the down-zoning. The appellant no longer seeks damages for breach of contract that included loss of profits on a project it was unable to build. We are now dealing simply with the cost of extra works and improvements. The focus is not on the appellant's loss but on the City's enrichment. The power to down-zone in the public interest does not immunize the City against claims for unjust enrichment.

*(2) Stage Two: Reasonable Expectation of the Parties and Public Policy Considerations*

53    Under stage two of the "juristic reason" inquiry, the onus falls on the City to show that to allow the claim of unjust enrichment in this case would frustrate the reasonable expectation of the parties. It has not discharged this onus. On the contrary, Wilson J. found that neither the City nor the appellant expected the extra works and improvements to be donated. The reasonable expectation was that the works and improvements would be paid for out of the profits from those parts of the Phase II project the appellant was prevented by the City from building. The City did not expect to get the extra works and improvements for nothing, but the agreed form of consideration (guaranteed zoning) turned out to be beyond its powers. The City now owns the works, and it is consistent with the parties' *reasonable* expectations that the appellant be reimbursed for their cost.

54    The City contends that the grant of an equitable remedy in this case would be bad public policy.

**Pacific National Investments Ltd. v. Victoria (City), 2004 SCC 75, 2004 CarswellBC 2673**

2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, [2004] 3 S.C.R. 575...

55     First, the grant of the equitable remedy would not frustrate the legislative purpose in making such zoning commitments unenforceable. In fact, the City *did* down-zone the lots in question and *was* held able to do so without having to pay damages for breach of contract. Whether or not it should pay the cost of benefits it actually demanded and received is a different question.

56     Second, it is not suggested that the City or the appellant made these agreements for an improper purpose. On the contrary, Mackenzie J. at the first trial considered the "interlocking agreements [to be] an innovative means of achieving the parties' differing objectives by hinging binding obligations on each piece going into place" (para. 26). He pointed out that the exchange of contractual promises ultimately found to be *ultra vires* was designed, as stated by the City's solicitor, "to facilitate an unusual rezoning of a large area of undeveloped and unsubdivided land" (para. 26). No one disputes that the redevelopment, as planned, was thought to be in the overall best interest of the municipality.

57     Third, I am not persuaded that it would be good public policy to have municipalities making development commitments, then not only have them turn around and attack those commitments as illegal and beyond their own powers, but allow them to scoop a financial windfall at the expense of those who contracted with them in good faith. This is precisely the sort of unfairness that the doctrine of unjust enrichment is intended to address.

58     The City has not pointed to any other public policy that ought to preclude recovery on the facts of this case. The City insisted on the works and improvements it now owns on the Songhees lands. It should pay for the cost of their construction. Municipalities are subject to the law of unjust enrichment in the same way as other individuals and entities.

**V. Disposition**

59     I would therefore allow the appeal, set aside the decision of the British Columbia Court of Appeal, and restore the trial judgment requiring the respondent City to pay the appellant $1.08 million. Interest will accrue on that amount at registrar's rates from time to time commencing the 1st day of October 1993 to the date of this judgment. The appellant is entitled to its costs of the trial before Wilson J., of the appeal from that judgment to the British Columbia Court of Appeal, and the costs of the present appeal in this Court.

*Appeal allowed.*

*Pourvoi accueilli.*

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Indexed as:*

# Paddon Hughes Development Co. v. Pancontinental Oil Ltd.

**Between
The Paddon Hughes Development Co. Ltd.,
appellant (plaintiff), and
Pancontinental Oil Ltd., Inverness Resources Inc. and
Inverness Energy Ltd., respondents (defendants)**

[1998] A.J. No. 1120

**1998 ABCA 333**

[1999] 5 W.W.R. 726

67 Alta. L.R. (3d) 104

223 A.R. 180

83 A.C.W.S. (3d) 386

Docket: 96-16379

Alberta Court of Appeal
Calgary, Alberta

**Côté, O'Leary and Russell JJ.A.**

Heard: January 16, 1998.
Judgment: filed October 20, 1998.

(30 pp.)

Appeal from the judgment of Chrumka J. dated the 5th day of September, 1995 and entered the 4th day of March, 1996.

*Mines and minerals -- Oil and gas -- Lease -- Termination, improper or untimely payment of delay rental.*

This was an appeal by Paddon from a determination that leases were renewed. The respondent, Inverness, leased mineral rights from four individuals. It was bound to either commence gas drilling operations on the leased lands, or to pay delay rent by the first anniversary of the lease. The terms of the leases provided for their termination in the event that Inverness took neither action. The leases permitted different means of payment of delay rent. Paddon bought the interests held by the individuals under the leases. Inverness drilled an operating gas well on land in the same section as, but not on, the leased lands. It notified Paddon that it had pooled the leased lands with its other land in the same section in

order to make up a one-section natural gas spacing unit. Inverness claimed that production from any part of the pooled lands continued the leases as if the production was from the leased lands. It mailed delay rental cheques to the individuals before Paddon bought their interests. Paddon brought an action for a declaration that the delay rental payments in respect of some of the leased land was not paid in a timely fashion, and that the leases had terminated. The action was dismissed. The trial judge found that Inverness's delay rent payments were made in a timely manner in conformity with the leases. Paddon argued that the trial judge erred in finding that Inverness's delay rental cheques were mailed before the date specified in the leases. They were not received by the individuals until after the lease termination date.

HELD: Appeal dismissed. The trial judge's finding of fact regarding the date that the cheques were mailed was valid. The cheques were mailed before the termination date in the lease, so the lease remained valid. One of the leases did not clearly specify the manner in which payment of delay rental was to be made. The trial judge properly found that payment by mail was permitted under this lease. The individual lived in the United States and, the delay rent was for a small sum. Postal delivery of the cheque conformed with commercial reality. There was a mailing address for the individual on the lease. Inverness did all it could do by posting the cheque well before the lease's termination date.

**Counsel:**

J. Ballem, Q.C., H. Locke, R.F. Smith, P. Edwards, for the appellants.
J.W. Rose, Q.C., T.J. Coates, for the respondents.

---

### REASONS FOR JUDGMENT

Reasons for judgment were delivered by O'Leary J.A., concurred in by Russell J.A. Dissenting reasons were delivered by Côté J.A. (para. 65).

**1**    O'LEARY J.A.:-- The issue in this appeal is whether the delay rental payments on two freehold petroleum and natural gas leases were made in time to preserve the leases beyond their respective first anniversary dates. If either lease is found to have terminated for late payment, both of them, as well as a third lease of an interest in the same lands, will fall. The appellant, who is successor in title to the lessors, claims the trial judge erred in finding that the delay rental payments were made within the times prescribed by the leases: (1995), 173 A.R. 254, (1995), 33 Alta. L.R. (3d) 7, [1995] 10 W.W.R. 656.

**2**    In my opinion, the appeal must be dismissed. My reasons follow.

### I.    BACKGROUND

**3**    In 1984, the respondent, Pancontinental Oil Ltd. ("Pancontinental"), leased an undivided one-third interest in the mines and minerals in the SE 1/4 of 25 - 43 - 2, W4M in the Province of Alberta ("the leased lands") from each of Edward and Audrey Bishop, Harriman Thatcher, and Margaret Stevens. The timely payment of delay rental in respect of the Bishop and Thatcher leases is in issue. The Bishop lease was effective August 17, 1984 and the Thatcher lease August 20, 1984. In 1991 Pancontinental was amalgamated into the respondent Inverness Resources Inc. and the latter was amalgamated into the respondent Inverness Energy Ltd. in 1992.

**4**    The leases are in the same printed form. Each is for a primary term of five years from its date

> ... and so long thereafter as the leased substances ... are produced from the said lands, subject to the sooner termination of the said term as hereinafter provided.

...

> PROVIDED that if operations for the drilling of a well are not commenced on the said lands within one (1) year from the date hereof, this Lease shall terminate and be at an end on the first anniversary date, unless the Lessee shall have paid or tendered to the Lessor on or before said anniversary date the sum of *fifty three and 34/100 ($53.34)* Dollars (hereinafter called the "delay rental"), which payment shall confer the privilege of deferring the commencement of drilling operations for a period of one (1) year from said anniversary date, and that, in like manner and upon

like payments or tenders, the commencement of drilling operations and the termination of this Lease shall be further deferred for like periods successively.

[handwritten words in italics]

**5**      Under this form of lease, Pancontinental was bound to either commence drilling operations on the leased lands or pay the agreed delay rental on or before the first anniversary date of the lease. If it did neither, the lease automatically terminated: East Crest Oil Co. v. Strohschein, [1952] 2 D.L.R. 432 (Alta. S.C.A.D.), Canadian Superior Oil of California Ltd. v. Kanstrup, [1965] S.C.R. 92.

**6**      Clause 21 of the Bishop lease sets out the manner in which delay rental payments were to be made:

> 21.      Manner of Payment:
>
> All payments to the Lessor provided for in this Lease shall, at the Lessee's option, <u>be paid or tendered</u> either to the Lessor or to the depository named in or pursuant to this clause, and all such payments or tenders may be made by cheque or draft of the Lessee <u>either mailed or delivered to the Lessor</u> or to said depository, which cheque or draft shall be payable in Canadian funds at par in the bank on which it is drawn. <u>In the case of payments which are mailed, such payments shall be deemed to be received by the Lessor as of the date of mailing</u> ...

[emphasis added]

**7**      In its printed form, Clause 21 of the Thatcher lease was worded the same as Clause 21 of the Bishop lease. However, before the parties executed the lease, Thatcher requested that a large part of Clause 21 be deleted and other words added. This was done by striking out the unwanted portions and inserting the additions in handwriting. The changes were initialled by the parties. As amended, the clause is as follows:

> 21.      Manner of Payment:
>
> All payments to the Lessor provided for in this Lease shall be paid to the Lessor *at the address specified in Paragraph 24.*

[handwritten words in italics]

**8**      The parties deleted the part of Clause 21 that permitted payment by cheque or draft, payable in Canadian funds, mailed to Thatcher, and that deemed payment made in that manner to have been received by Thatcher on the date of mailing. They substituted an agreement that delay rental and other payments were to be paid to Thatcher at the address specified in Clause 24 of the lease.

**9**      The relevant parts of Clause 24 of the Thatcher lease are as follows:

> 24.      Notices:
>
> All notices to be given hereunder may be given by registered letter addressed to ... the Lessor at San Francisco, California, U.S.A. *94110 507 Peralta Avenue.* or such other address as the Lessor ... may ... from time to time appoint in writing, and any such notice shall be deemed to be given to and received by the addressee seven (7) days after the mailing thereof, postage prepaid.

[handwritten words in italics]

**10**      In 1988, the appellant, Paddon Hughes Development Co. Ltd. ("Paddon Hughes"), acquired the interests of Stevens, the Bishops and Thatcher under the leases. In 1989, Pancontinental commenced drilling operations at a location in the North West 1/4 of Section 25 (not on the leased lands) resulting in a natural gas well capable of commercial production. Later in 1989, Pancontinental gave formal notice to Paddon Hughes that it had pooled the leased lands with the other lands in Section 25 in order to make up a one-section natural gas spacing unit. The notice was given pursuant to Clause 8 of the leases which gave Pancontinental the right to pool the leased lands with other lands to create a one-section natural gas spacing unit. Production from any part of the pooled lands continued the leases as if the production were from the leased lands.

**11**    If either of the Bishop or Thatcher leases is found to have terminated for late payment of delay rental in 1985, the pooling notice was ineffective to preserve the other leases beyond their primary terms.

**12**    Paddon Hughes commenced this action seeking a declaration that the delay rental payments in respect of the Bishop and Thatcher leases were not paid on or before their respective anniversary dates of August 17, 1985 and August 20, 1985, and that the leases therefore terminated on those dates by their own terms. If either lease is held to be terminated for that reason, Paddon Hughes asked for a further declaration that the other lease or leases expired since the leased lands were not effectively pooled and there were no drilling operations on or production from the leased lands prior to the end of the primary terms of any of the leases.

**13**    Paddon Hughes does not complain about the payment to Thatcher being made by cheque payable in Canadian funds although the Thatcher lease does not specifically authorize payment in that manner.

## II.    TRIAL JUDGMENT

**14**    Pancontinental's position at trial and before us was that cheques for the delay rental payments were mailed at Calgary on August 9, 1985 by ordinary mail in accordance with the leases. The cheques and transmittal letters are dated August 9, 1985. The Bishop lease assumes payment to have been received on the date of mailing. Pancontinental argues that the Thatcher lease should be construed as permitting payment in Canadian funds by cheque mailed to Thatcher at his mailing address in San Francisco set out in the lease. Moreover, a payment made in that manner should, as a matter of construction, be found to have been made when posted. Alternatively, Pancontinental submits that the payment was mailed to Thatcher 11 days before the anniversary date of the lease and there is evidence from which it can reasonably be inferred that the envelope in fact arrived at Thatcher's residence before August 20, 1985.

**15**    The primary thrust of Paddon Hughes' evidence and its argument here and below was that the payments were not mailed on the date contended by Pancontinental, but, rather, not until some time after the anniversary dates of the two leases had passed. The envelopes in which the cheques were mailed have been lost or destroyed. The transmittal letters asked the addressees to confirm receipt. The Toronto Dominion Bank in Edmonton, the Bishop's designated depository, acknowledged receipt on August 26, 1985. Thatcher acknowledged receipt on September 4, 1985. Paddon Hughes points to these dates, evidence of the normal time lapse between posting and delivery, and other evidence as demonstrating that the payments were not mailed on August 9, 1985, but on a date after the respective anniversary dates of the leases.

**16**    The trial judge found on the evidence that the payments were mailed on August 9, 1985, properly addressed in accordance with the manner of payment provisions of the leases. This was eight days before the anniversary of the Bishop lease and 11 days before the anniversary of the Thatcher lease.

**17**    The trial judge relied largely on documentary and oral evidence of Pancontinental's usual practice in requisitioning, signing, and mailing delay rental cheques. Pancontinental's cheque requisition forms and file copies of the transmittal letters were dated August 9, 1985. Thatcher died before the trial and there was no explanation for the period between the date of mailing and probable delivery and his acknowledgement of receipt. There was evidence of the internal procedures of the Toronto Dominion Bank that indicated the bank would have received the cheque on the day it acknowledged receipt or the previous day. A Canada Post official testified that the average time for a letter to travel from Calgary to Edmonton in August, 1985 was 2.5 to 3.1 days. There is no similar direct evidence about the average time between posting a letter in Calgary and its delivery in San Francisco, although there is evidence that other payments sent by Pancontinental to Thatcher by mail were delivered to his mailing address in less than 11 days.

**18**    Having found that the delay rental cheques were mailed on August 9, 1985, the trial judge concluded that the payment in respect of the Bishop lease had been made in a timely fashion. The Bishop lease provides for payment by mail and deems payment to have been received when mailed. Although the Thatcher lease does not specifically provide for payment by mail or in any other manner, the trial judge construed the Thatcher lease as contemplating and permitting payment by mail (Alta. L.R., p.37):

> Was it the intention and in the contemplation of the parties in the present proceedings that the delay rental payment be sent by mail? Harriman Thatcher lived in San Francisco, California. Pancontinental's office was located in Calgary. The amount of the delay rental was $53.34. Personal delivery, in the circumstances, made no business sense and was impractical. Harriman Thatcher prior to August, 1985 received correspondence, which concerned the lease, by mail from Pioneer. *Harriman Thatcher, in Clause 24 of the lease, provided a mailing address at which he was to be*

> *paid. This mailing address included a zip code.* I am satisfied that it can fairly be inferred, and I find, that the parties contemplated and intended that delay rental payments and any other payments to which Harriman Thatcher became entitled to pursuant to the lease, would be paid through the mails.

<div align="center">[emphasis added]</div>

**19**     The trial judge then found that the parties intended that payment by mail be considered received when posted (Alta. L.R., p.37):

> The parties having contemplated and intended that the cheques in payment of the delay rentals be mailed, then the date of mailing is the relevant date and not the date of receipt.

**20**     The trial judge further held that the onus of proving, on a balance of probabilities, that the delay rental payments were not made on a timely and proper basis within the terms of the leases was on Paddon Hughes as successor in title to the lessors and the party asserting that proposition. He concluded that both the Bishop and Thatcher leases were preserved by payment of delay rentals before their anniversary dates.

### III.    ANALYSIS

**21**     Paddon Hughes urges the Court to disagree with the trial judge's finding of fact that Pancontinental mailed the delay rental cheques on August 9, 1985 in envelopes properly addressed in accordance with the leases. I would not interfere with his conclusion. It is supported by the evidence and does not demonstrate a palpable and overriding error in the trial judge's assessment of the relevant evidence: Nova, an Alberta Corp. v. Guelph Engineering Co. (1989), 100 A.R. 241 (C.A.) at 245. McLachlin J. (for the Court), summarized the roles of trial judges and appellate courts in Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital, [1994] 1 S.C.R. 114, 110 D.L.R. (4th) 289, [1994] 2 W.W.R. 609 at 613-14:

> It is by now well established that a Court of Appeal must not interfere with a trial judge's conclusions on matters of fact unless there is palpable or overriding error. In principle, a Court of Appeal will only intervene if the judge has made a manifest error, has ignored conclusive or relevant evidence, has misunderstood the evidence, or has drawn erroneous conclusions from it .... A Court of Appeal is clearly not entitled to interfere merely because it takes a different view of the evidence. The finding of facts and the drawing of evidentiary conclusions from facts is the province of the trial judge, not the Court of Appeal.

**22**     A consideration of the validity of the Bishop and Thatcher leases must therefore be premised on the finding that the delay rental payments were mailed at Calgary by ordinary mail on August 9, 1985.

### A. The Bishop lease

**23**     Clause 21 of the Bishop lease deems payment of the delay rental to have been received by the Bishops on the date of mailing, that is, August 9, 1985. Since the rental was paid before the anniversary date in the manner contemplated by the lease, the Bishop lease did not terminate for late payment.

### B. The Thatcher lease

**24**     The Thatcher lease presents a problem of interpretation. Clause 21, as altered by the parties during negotiations, does not clearly specify how payment of delay rental is to be made, or when payment is considered to have been made. There are therefore two issues to be decided:

>     -    Does the Thatcher lease permit payment of the delay rental by mail?
>     -    If payment may be made by mail, what is the effective time of receipt of a payment made in that manner?

**25**     Before proceeding to consider these issues, it is useful to review some fundamental rules of construction that are relevant to this case.

>     (1)    Rules of Construction

26    The purpose of construing a written agreement is to discover and give effect to the real intention of the parties. Contracting parties are presumed to have intended what they have said in their agreement: Chitty on Contracts, 27th ed., vol. 1 (London: Sweet & Maxwell, 1994), at paras. 12-039 and 12-040.

27    Where the parties have reduced their agreement to writing, the parol evidence rule excludes from the court's consideration extrinsic evidence of the parties' intentions, that is, direct evidence beyond what is contained within the four corners of the written agreement. The rule is that the court may not consider extrinsic evidence that adds to, subtracts from, or varies the meaning of the written document. The parties' intentions are to be found, if possible, in the document itself.

28    Clause 21 of the Thatcher lease simply says that the delay rental "shall be paid to the Lessor at the address specified in Paragraph 24". It was argued that the lease was ambiguous regarding payment of the delay rental. Notwithstanding the parol evidence rule, where the language of the agreement is ambiguous, it is well established that a court may resort to extrinsic evidence to assist in interpreting the ambiguity.

29    Difficulty of interpretation is not, however, synonymous with ambiguity: Northwestern Mechanical Installations Ltd. v. Yukon Construction Co., [1982] 5 W.W.R. 40 (Alta. C.A.) at 48-49; St. Lawrence Petroleum Ltd. v. Bailey Selburn Oil & Gas Ltd. (1962), 41 W.W.R. 210 (Alta. S.C.A.D.) at 214, aff'd [1963] S.C.R. 482; Calvan Consolidated Oil & Gas Co. v. Manning, (1958), 25 W.W.R. 641 (Alta. S.C.A.D.) at 658, aff'd [1959] S.C.R. 253; Home Oil Co. v. Page Petroleum Ltd., [1976] 4 W.W.R. 598 (Alta. S.C.T.D.) at 604-605.

30    In my view, while the Thatcher lease presents a difficulty of interpretation, it is not so unclear as to be ambiguous. Therefore, I do not find it necessary to resort to extrinsic evidence. The intention of the parties may be found in the language they used in the context of the lease as a whole.

31    It was argued that the words deleted from the printed form of Clause 21 clearly show what the parties intended. The deleted portion of Clause 21 specifically permitted payment by mail and deemed payment made by mail to be received by the lessor on the date of mailing.

32    The effect of striking words from a printed form of agreement was at issue in Knight Sugar Co. v. Webster, [1930] 4 D.L.R. 343 (S.C.C.). Newcombe J. (for the majority) referred with approval at p. 351 to the statement of Lord Hatherley in A. & J. Inglis v. John Buttery & Co. (1878), 3 App. Cas. 552 (H.L.) at 558:

> Nor can I think, and I believe your Lordships will concur with me in this opinion, that it is legitimate to look at those words which appear upon the face of the agreement with a line drawn through them, and which are expressly, by the intention of all the parties to the agreement, deleted, that is to say, done away with, and wholly abolished. *It is not legitimate to read them and to use them as bearing upon the meaning of that which has become the real contract between the parties, namely, the final arrangement of the document which we must now proceed to construe.*

> [emphasis added]

33    This proposition was echoed in Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.) at 503, where Estey J. stated that "words deleted by the drawing of a line through them, and this deletion initialled by the parties, cannot be looked at."

34    Where, as here, there is no ambiguity justifying the admission of extrinsic evidence in aid of interpretation, it is not proper to refer to the deleted words in construing the meaning of the words actually used by the parties to express their agreement. The words deleted from the Thatcher lease are to be ignored and treated as if they never existed.

    (2)    Does the Thatcher lease permit payment of the delay rental by mail?

35    Clause 21 simply says that payments "shall be paid to the Lessor at the address specified" in Clause 24. The address set out in Clause 24 is a municipal street address with a "zip code". It is clearly a mailing address. That is the language from which the Court must ascertain the parties' intentions with respect to the manner of payment of the delay rental. The trial judge construed Clause 21 to mean that the parties contemplated and intended that delay rental payments could be made by mail. His conclusion was based on the fact that the lease provided a postal address at which Thatcher was to be paid, and on the commercial reality that a small sum of money was to be paid to an individual living hundreds of miles from the party obligated to pay.

**36**      The trial judge construed the language of the Thatcher lease in the context of commercial reality. He made no error in doing so. Although extrinsic evidence of the parties' intentions is not admissible, it is perfectly acceptable (and perhaps necessary in this case) to look at the commercial setting of the agreement to help ascertain the intention of the parties. No contracts are made in a vacuum; there is always a setting in which they have to be placed: Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen, [1976] 1 W.L.R. 989 (H.L.) at 995 (per Lord Wilberforce). In Bank of British Columbia v. Turbo Resources Ltd. (1983), 148 D.L.R. (3d) 598 (Alta. C.A.) at 608, Laycraft J.A. (for the Court) stated:

> Consideration of the commercial setting in which a contract is made is not, of course, to be confused with parol evidence of the intention of the parties. That is not admissible. But the commercial setting of the contract assists in ascertaining the intention of the parties from the language they have used.

**37**      The trial judge observed that Thatcher resided in San Francisco, California, while Pancontinental's office is located in Calgary. He noted that the amount of the annual delay rental was only $53.34. In these circumstances, he concluded that personal delivery made no business sense. I agree. To borrow a phrase from Laycraft J.A. in Turbo Resources, the "commercial reality" is that the parties must have contemplated and intended that payment of a $53.34 delay rental between Calgary and San Francisco would be by mail. When considered with the actual words used by the parties, this "reality" leads one to conclude that the parties contemplated and intended that payments could be made by mail.

**38**      Support for this approach can be found in Mitsui Construction Co. v. Hong Kong (A.G.) (1986), 71 N.R. 285 (P.C.), where Lord Bridge of Harwich stated that, where possible, a court should attribute to contracting parties a businesslike intention. His comment at p. 291 is particularly apt to the construction of Clause 21:

> It is obvious that this is a badly drafted contract. This, of course, affords no reason to depart from the fundamental rule of construction of contractual documents that the intention of the parties must be ascertained from the language they have used interpreted in light of the relevant factual situation in which the contract was made. But the poorer the quality of the drafting, the less willing any court should be to be driven by semantic niceties to attribute to the parties an improbable and unbusinesslike intention, if the language used, whatever it may lack in precision, is reasonably capable of an interpretation which attributes to the parties an intention to make provision for contingencies inherent in the work contracted for on a sensible and businesslike basis.

**39**      The general principle enunciated by the Privy Council in Mitsui Construction has been applied in 32262 B.C. Ltd. v. 271617 B.C. Ltd. (1996), 24 B.C.L.R. (3d) 21 (C.A.) at 23-24 (per Gibbs J.A.); Air Transit Ltd. v. Innotech Aviation of Newfoundland Ltd. (1989), 78 Nfld. & P.E.I.R. 24 (Nfld. S.C.T.D.) at 37; and Ivamy v. Lancaster Investment Inc. (1994), 119 Nfld. & P.E.I.R. 51 (Nfld. S.C.T.D.) at 58. The Privy Council was not stating a new principle. It was merely re-stating a well-established and fundamental rule for the construction of agreements where the language used by the parties is not clear.

**40**      The parties obviously intended that payment of delay rental be made in some fashion. An interpretation that permits payment by mail accords with the language of Clause 21, in particular the incorporation by reference of Thatcher's mailing address set out in Clause 24. Such an interpretation also conforms to accepted business practice and attributes a businesslike intention to the parties. It achieves a commercially sensible result.

**41**      Interpreting the Thatcher lease in the context of commercial reality and a presumed businesslike intention is not to be confused with implying terms in the written contract. Finding that the parties contemplated and intended that payment of the delay rental could be by mail does not amount to implying a term in the Thatcher lease. This is not a case where certain details of the contractual relationship have been left out of the written agreement, necessitating the implication of terms in the sense of adding to the written document. The Thatcher lease deals with the manner of payment. The intention of the parties could have been expressed more clearly and the difficulty of interpretation avoided. That cannot excuse the Court from the duty to construe the words actually used.

**42**      Because there is no addition to the Thatcher lease, an interpretation permitting payment by mail does not conflict with Clause 23, the "entire agreement" clause. It reads as follows:

> 23.    Entire Agreement:

The terms of this Lease express and constitute the entire agreement between the parties, and no implied covenant or liability of any kind is created or shall arise by reason of these presents or anything herein contained.

**43**    There is an affinity between so-called "entire agreement" clauses and the parol evidence rule. The parol evidence rule excludes any extrinsic evidence of the parties' intentions that adds to, subtracts from, or varies the meaning of a written document. The parallel between an entire agreement provision like Clause 23 and the more general parol evidence rule is clear. In *Hayward v. Mellick* (1984), 45 O.R. (2d) 110 (C.A.) at 120, Houlden J.A. (in a dissenting judgment) went so far as to describe the "entire agreement" clause in that case as "simply a restatement of the parol evidence rule."

**44**    In *Turner v. Visscher Holdings Inc.* (1996), 23 B.C.L.R. (3d) 303 (C.A.) at 308 and 318, it was observed that courts have generally equated entire agreement clauses with the parol evidence rule. An entire agreement clause may, however, be broader than the parol evidence rule. Otherwise the clause would be redundant. The effect of "entire agreement" clauses will necessarily depend on their precise wording: *Chitty on Contracts*, 27th ed., vol. 1 (London: Sweet & Maxwell, 1994) at para. 12-089.

**45**    The conclusion that the Thatcher lease contemplates and permits payment of the delay rental by mail is not based on extrinsic evidence of the parties' intentions, and therefore does not offend the parol evidence rule. Even if Clause 23 of the Thatcher lease is broader than the parol evidence rule, the conclusion does not amount to an "implied covenant or liability of any kind". Construing the Thatcher lease as evincing a contractual intention that Pancontinental may pay the delay rental by mail does not amount to finding a collateral agreement over and above the written lease, nor does it impose any obligations beyond those already contained in the agreement.

**46**    In my view, Clause 23 of the Thatcher lease is designed to prevent any terms being added to the lease by one party later claiming that there were additional terms agreed to but not reduced to writing. It cannot, however, prevent the court from asking what the words "paid to the Lessor at the address specified" actually mean. Here, it is simply a matter of interpreting a term that is already part of the written agreement. The court must determine the meaning of that phrase by construing the language of Clause 21 in the context of the document as a whole in its commercial setting. Concluding that Clause 21 permits payment by mail does not add a term to the lease. That term has existed and been part of the lease from inception. It is, in effect, already a part of the "entire agreement".

(3)    When is payment by mail received?

**47**    The second issue is at what point in time should payment by mail be considered received by the lessor. As with the manner of payment, determining the effective date of payment is a matter of construing the terms of the Thatcher lease to discover the real intention of the parties. Clause 21 simply says that the delay rental "shall be paid to the Lessor at the address specified in Paragraph 24". There is no specific reference to the time of receipt. When considering the meaning of the wording of Clause 21 in this context, I am mindful of my earlier discussion of "commercial reality" and "businesslike intentions".

**48**    The trial judge relied on the reasoning in authorities holding that where the lease permits payment by mail, payment is made when posted: *Gloyd v. Midwest Refining Co.*, 62 F. 2d 483 (10th Cir. 1933); *Texas Gulf Sulphur Co. v. Ballem* (1970), 72 W.W.R. 273 (Alta. S.C.A.D.), aff'd [1971] 1 W.W.R. 560 (S.C.C.); and *Paramount Petroleum & Mineral Corporation v. Imperial Oil Ltd.* (1970), 73 W.W.R. 417 (Sask. Q.B.).

**49**    The decision of the United States Circuit Court of Appeals in *Gloyd v. Midwest Refining Co.* bears some striking similarities to the case at bar. The lessor resided in Oklahoma City. The lessee had its head office in Denver. The "unless" form of freehold lease was silent with respect to the manner of making delay rental payments. Prior to the second anniversary date, the lessee mailed the delay rental payment to the lessor by ordinary post. For reasons unknown the payment was never delivered to the lessor, and he subsequently took the position that the lease terminated for late payment of the delay rental. The Court held that the lessor must have contemplated and intended that the delay rental payments would be forwarded by mail, and in those circumstances payment was made at the time of mailing (p. 487):

Gloyd requested the Midwest Company to waive its right to make the payment at the depository designated in the lease, and to make such payments directly to him. Gloyd was a resident of Oklahoma City and knew that the Midwest Company's principal office was located in Denver. He must have contemplated and intended that such payments should be forwarded to him by mail. If he impliedly authorized the Midwest Company to make such payment through the mail, the de-

positing of the check in the post office at Denver in an envelope properly addressed with postage duly prepaid on or before the due date constituted payment.

**50**     American oil and gas cases are persuasive when not in conflict with authoritative Canadian decisions: Scurry-Rainbow Oil Ltd. v. Galloway Estate (1994), 157 A.R. 65 (C.A.) at 70. Gloyd is persuasive here because of the similar wording of the payment clause, the modest amount of the annual delay rental, and the distance between the locations of the parties. Moreover, it is consistent with the judgment of this Court in Texas Gulf Sulphur Co. v. Ballem (1970), 72 W.W.R. 273 (Alta. S.C.A.D.), aff'd [1971] 1 W.W.R. 560 (S.C.C.).

**51**     In Texas Gulf this Court held that the mailing of a delay rental payment before the anniversary date constituted timely payment. The "unless" form of lease in that case provided that payment could be made by mail. It did not, however, stipulate when a payment by mail was considered received by the lessor. Since the lessee was permitted to make payment by ordinary mail, Cairns J.A. (for the Court) held at p. 283 that the lessee need only mail the payment prior to the anniversary date to prevent termination of the lease:

> [The lessee] may deliver a cheque to the lessor or to a depository or he may take the alternate procedure of mailing a cheque to the lessor or the depository. The mailing of a cheque under these circumstances is, in my opinion, equivalent to making payment direct to the lessor or to the depository, and if this is done, as it was in this case prior to the termination of the lease, it constitutes compliance with it.

**52**     In a brief oral judgment reported at [1971] 1 W.W.R. 560, the Supreme Court of Canada dismissed the lessor's appeal and agreed that the lessee in Texas Gulf made payment of the delay rental within the time required to preserve the lease:

> We are all of the opinion that the respondent complied with the requirements of the oil and gas lease in effecting payment of the delay rental in question here within the time required by such lease.

**53**     The same conclusion was reached in Paramount Petroleum & Mineral Corporation v. Imperial Oil Ltd. (1970), 73 W.W.R. 417 (Sask. Q.B.). The lease in that case provided that payment could be made by mail, but, like the lease in Texas Gulf, did not contain any provision relating to receipt or presumed receipt by the lessor of payments made by mail.

**54**     The "manner of payment" clauses in both Texas Gulf and Paramount Petroleum specified that delay rental payments were to be either "mailed or delivered" by the lessee to the lessor. The parties agreed that the delay rental could be paid by mail. It was held in both cases that, in circumstances where the lessee was entitled to mail the delay rental payment, payment was effected when the payment was posted.

**55**     Paddon Hughes argues that the delay rental payment must have been delivered to Thatcher's San Francisco residence prior to the anniversary date to preserve the lease. Counsel for Paddon Hughes conceded in oral argument that proof of personal receipt by Thatcher was unnecessary. It would have been sufficient if the payment were delivered by the postal authorities to Thatcher's San Francisco residence on or before August 20, 1985.

**56**     The argument that there must be delivery before the anniversary date is met by the judgment in Texas Gulf where Cairns J.A. observed at p. 283:

> [The appellant] had done all that it was called on to do under the lease and the letter actually "arrived" at the bank within the term of the lease as it was posted to the depository at the address mentioned in the mailing clause, as altered by the assignment. It was out of the control of the appellant and was under the control of the bank from the time of receipt by the post office.

**57**     The same can be said for Pancontinental in the case at bar. Having mailed the delay rental payment to Thatcher's San Francisco address well before the anniversary of the lease, Pancontinental had done what was required of it under Clause 21, namely pay the delay rental to Thatcher at the address specified.

**58**     The reasons given by the Saskatchewan Court of Queen's Bench in Paramount Petroleum for rejecting a similar "delivery" argument illustrate the practical necessity of attributing an intention to the parties that payment be made when mailed. Johnson J. discussed the rationale behind his decision at pp. 430-31:

It was urged by counsel for the plaintiffs that the mailing of the letter containing the cheque ought to have been done in sufficient time to allow delivery to the lessor's depository before the expiration of the relevant 12-month period. But inevitably the question arises as to how much time before expiration should this be done. One week? Two weeks? A month? Or a reasonable time? Then, of course, suppose that after such letter has been so mailed by depositing in a post office box, the highway-transport truck, the airplane or the train carrying such letter is destroyed or wrecked so that the letter is never delivered or is delivered after the expiration of the year, is the lessor entitled to say that the lease has "clicked"? If art. 22 is to be construed so as to charge the lessee with ensuring delivery or tender of the cheque before the expiration of the year, the lessee's dilemma is quite obvious. Registered mail does not assist him because such mail is exposed to the same perils in transmission as ordinary mail and a lessor anxious to frustrate a lessee can refuse to accept mail delivery or can move without leaving a forwarding address and a depository on instructions from a lessor may refuse to accept letters. *It follows, therefore, that a lessee is thrown back on personal delivery or personal tender of payment if the closing words of art. 22 mean mailed and delivered ....*

If from art. 22 of the lease it is to be taken that the mailing of the annual acreage rental cheques or drafts must be in sufficient time for delivery to be effected before the expiration of the 12-month period, there is opened up a considerable area for controversy between the parties. Suppose the lessee mails his packages in what would be considered ample time for them to be delivered to the depository or the lessor, how is he to know that delivery has taken place in time? If the lessor denies having received the mailed package before the expiration of the 12-month period, what can the lessee do? Date of delivery of any mailed package is subject to variation for many reasons *but one date can be easily and definitely established and determined, namely, the date of mailing*. The postmark on a letter shows clearly when a letter is mailed and it becomes an easy matter for a lessor to determine if a lessee has paid in time by simply examining the postmark stamped on the letter by the sending post office. Apart from the rare dating mistake made by the post office, this mark provides proof of the date of mailing and reliance on such a mark obviates any problem of determining the date of delivery and eliminates the possibility of controversies on this point.

[emphasis added]

**59**    In my view, the policy that underlies the decision in Paramount Petroleum is sound and applies to the circumstances of the case at bar.

**60**    The decision of this Court in Canadian Fina Oil Ltd. v. Paschke (1957), 21 W.W.R. 260, dealt with a situation where a lease would expire unless delay rental was paid on or before October 12. Payment by mail was allowed, and the lessee mailed a cheque on October 12. It was not received by the lessor's depository bank until October 13. The Court ruled that payment had not been made in time. While Paschke appears on its face to support Paddon Hughes' position, this Court subsequently commented in Texas Gulf that the primary ruling in Paschke was that the lease had already expired before the mailing of the cheque. In Texas Gulf, Cairns J.A. said at p. 279 that "this was the only point decided by the appellate division" in Paschke. He further found that neither the trial nor appeal judgments conclusively decided that payment by mail was ineffective unless actually received on or before the due date (p.280):

Both of these judgments on this point are clearly based on an assumption that the lease was in effect when the payment was mailed. In other words, a hypothetical set of facts was set up in both judgments and the judgments on that part of the case were definitely based on an assumed set of facts, which both courts had held to the contrary. It is therefore my opinion that the reasons of Egbert, J., as well as those of Porter, J.A., in view of the fact they could have no application to the case are obiter, and this court is not bound to follow the reasons of the appellate division on this point.

**61**    Nor are we bound by the obiter expressed in Paschke. Where the lease permits payment of the delay rental by mail, Texas Gulf says that payment is made at the moment it is mailed in an envelope addressed to the lessor at the mailing address set out in the lease. The Thatcher lease, as I have interpreted it, permits payment of the delay rental by mail and the decision of this Court in Texas Gulf directly applies. By mailing the delay rental to Thatcher at his San Francisco address, Pancontinental "paid ... the Lessor at the address specified" within the meaning of Clause 21. Under

the terms of the lease, payment was effected on the date of mailing. The lease had not then terminated. The trial judge correctly held that Thatcher was paid the 1985 delay rental payment on the day it was mailed to him, namely August 9, 1985.

**62**    In my view, this appeal fails on another ground. Pancontinental's alternative submission is that the Court can infer from the evidence that the 1985 delay rental in fact arrived or was delivered at Thatcher's residence before August 20, 1985. There is no conclusive evidence of when the payment was actually delivered to Thatcher's address in San Francisco. As I mentioned earlier, Paddon Hughes concedes that delivery of the payment at the address specified in Clause 24 was sufficient to constitute payment; it need not be shown that Thatcher personally received the payment. In its factum, Paddon Hughes refers to evidence of the number of days it took prior and subsequent mailings to reach Thatcher's address as "good evidence of a 5 to 7 day mail service to San Francisco" (para. 56). It is of passing interest to note that Clause 24 of the Thatcher lease, the notice clause, stipulates that notices are deemed received by the addressee 7 days after mailing. This 7 day period roughly corresponds to the "good evidence of a 5 to 7 day mail service to San Francisco" referred to by Paddon Hughes. Although there is no direct evidence from the postal authorities on this point, there is unchallenged evidence of other correspondence and payments mailed to Thatcher in San Francisco that justifies the 5 to 7 day transmittal time urged by Paddon Hughes. That evidence supports a reasonable inference that the payment mailed by Pancontinental on August 9 would have arrived at Thatcher's address between August 14 and August 16, well before the anniversary date of August 20, 1985. If it were necessary to do so, I would draw an inference that the delay rental payment was actually delivered before the anniversary date.

**63**    I concur with the conclusion of the trial judge that the 1985 delay rental payment was paid to Thatcher before the anniversary date and the lease did not therefore terminate for late payment as contended by Paddon Hughes.

IV.    CONCLUSION

**64**    Both the Bishop and Thatcher leases were preserved by payment of the delay rental payments before their respective 1985 anniversary dates. I would dismiss the appeal.

O'LEARY J.A.
 RUSSELL J.A.:-- I concur.

The following is the judgment of:

CÔTÉ J.A. (dissenting):--

A.    Introduction

**65**    This issue is whether mailing a cheque is payment on the date of mailing.

B.    Facts

**66**    I will extract some of the facts recited in the appellant's factum and accepted by the respondents' factum.

**67**    The appellant is the registered owner of an estate in fee simple. When the appellant acquired title to the Lands, there were caveats on title, claiming an interest in the Lands by virtue of three Petroleum and Natural Gas Leases. The three leases were pooled with other lands with the intention of forming a one-section spacing unit.

**68**    One lease was the Bishop Lease. It contains an "unless" clause which reads as follows:

> "PROVIDED that if operations for the drilling of a well are not commenced on the said lands within one (1) year from the date hereof, this Lease shall terminate and be at an end on the first anniversary date, unless the Lessee shall have paid or tendered to the Lessor on or before said anniversary date the sum of Fifty-three --- 34/xx ($53.34) Dollars (hereinafter called the "delay rental"), which payment shall confer the privilege of deferring the commencement of drilling operations for a period of one (1) year from said anniversary date, and that, in like manner and upon like payments or tenders, the commencement of drilling operations and the termination of this Lease shall be further deferred for like periods successively."

(emphasis added)

**69**     The Thatcher Lease also contains an "unless" clause which is worded identically to the "unless" clause in the Bishop Lease.

**70**     The manner in which the delay rental payments in the Bishop Lease were to be made is set out in paragraph 21 as follows:

>    "21. Manner of Payment: -
>
>    All payments to the Lessor provided for in this Lease shall, at the Lessee's option, be paid or ten-dered either to the Lessor or to the depository named in or pursuant to this clause, and all such payments or tenders may be made by cheque or draft of the Lessee either mailed or delivered to the Lessor or to said depository, which cheque or draft shall be payable in Canadian funds at par in the bank on which it is drawn. In the case of payments which are mailed, <u>such payments shall be deemed to be received by the Lessor as of the date of mailing</u> ..."

>    (emphasis added)

**71**     The form on which the Thatcher Lease was prepared was the same as the form of the Bishop Lease, but most of the manner of payment clause 21 of the Thatcher Lease was struck out at the time of execution. So Thatcher's clause read:

>    "21. Manner of Payment: -
>
>    All payments to the Lessor provided for in this Lease <u>shall be paid to the Lessor at the address specified</u> in Paragraph 24."

>    (emphasis added)

**72**     Accordingly, the provision in the Bishop Lease that payments which are mailed shall be deemed to be received as of the date of mailing, was not found in the Thatcher Lease.

**73**     Paragraph 24 of the Thatcher Lease provided that notices "might be given by registered letter addressed ... to the Lessor at San Francisco California, U.S.A. 94110 507 Peralta Avenue ..." It did not speak of payment.

**74**     After hearing evidence of Pancontinental's routine for office mailing procedures, the trial judge concluded that the delay rental payments were made timely and properly. He inferred from circumstantial evidence that they had been mailed on August 9, 1985. Mr. Thatcher did not acknowledge his until September, and the Bishops' depository got their cheque August 26. Both those dates were well after the expiry date.

**75**     There is a good deal of evidence to suggest that the cheques were mailed to Bishop and Thatcher after the expiry date. But the trial judge found otherwise, and had some evidence to support that. I would not have found as he did, but I cannot say there is palpable and overriding error. So we must take it that the two cheques were mailed before the dead-line, even though they may well have arrived after it expired.

**76**     The trial did not turn upon the onus of proof, and I cannot see how it affects the result, so long as those fact findings stand.

###     C.     Is Mailing Alone Timely Payment?

**77**     The respondents contend that merely mailing Mr. Thatcher's delay rental cheque in time sufficed, whether or not it reached his address in time, or at all. I do not agree with this proposition. Under ordinary law, mailing is not payment. There is an old English idea that a cheque which never arrives is payment. That idea is bizarre, and I believe that the Canadian business community will be astonished to hear such a rule. Chitty on Contracts suggests that mailing a cheque is payment, if the creditor expressly or impliedly authorized sending a cheque by post (para. 21-044, 27th ed. 1994). But the two English cases cited for that proposition are old, and give few reasons. The footnote in Chitty seriously qualifies the proposition, and the two cases cited in the footnote which are more recent say obiter that mere mailing is not pay-ment: Tankexpress v. Cie. Financière Belge des Petroles [1949] A.C. 76, 91-92, 100 (H. L.); The Effy [1972] 1 Ll. R. 18.

**78**     One Canadian case holds that mailing is not payment, though it provides no positive reasons: Bordo v. 403512 Ont. (1983) 41 O.R. (2d) 68, 75. It does, however, reject the theory that the post office is an agent, or the like (pp. 73 ff.).

**79**     McClung J.A. clearly decided that mailing a cheque was not payment: Sask. R. Bungalows v. Marit. Life Assce. Co. [1992] I.L.R. 1-2895, 127 A.R. 43, 64 (C.A.). He was dissenting, but the Supreme Court of Canada reversed the majority: [1994] 2 S.C.R. 490, [1994] 7 W.W.R. 37, [1994] I.L.R. 1-3077, 168 N.R. 381, 155 A.R. 321. The Supreme Court of Canada plainly assumed the same thing as McClung J.A. decided. The waiver issues they discussed would not arise if mailing were payment.

**80**     When an offer may be accepted by mail, acceptance is effective immediately when mailed, whether or not it is received late or never. Acceptance by mail of an offer made in person has also been held valid and effective upon mailing, in limited circumstances, where it was implied that acceptance would be by mail. However, this is not a case of offer and acceptance. It is one of payment.

**81**     The Alberta Court of Appeal has held that where a lease provides that payment may be made by mail, it could be implied that the parties intended or agreed that payment was made on the date that payment was mailed: Texas Gulf Sulphur Co. v. Ballem (1970) 72 W.W.R. 273 (Alta. C.A.), affd. briefly [1971] 1 W.W.R. 560 (S.C.C.). A U.S. Court said that the Lessor must have contemplated and intended that the payments should be forwarded to him by mail, although the lease was silent concerning how payment was to be made, since the Lessor knew that the Lessee lived in another city: Gloyd v. Midwest Refining Co. (1933) 62 F.2d 483 (C.C.A.).

**82**     But, just because the parties to an oil or gas lease guess that a certain type of performance might be used, does not mean that they intend or permit it. I note the phrase "contemplated and intended". The term "contemplated" has several meanings. "Contemplated" may refer to what one might guess would happen, or to what is impliedly required or permitted as sufficient. In the law of contracts, what one party guessed that the other would do to perform is irrelevant. If I contract to buy a load of coal, I may well guess, even expect, that the vendor will get the coal from his usual supplier. But the vendor does not break the contract if he gets the coal elsewhere. And if his usual supplier goes out of business, or has a fire, that in no way excuses the vendor's nonperformance.

**83**     Suppose that the Lessee here had decided to extend the lease by drilling rather than paying the delay rental, and had hired a drilling contractor to drill in time. Undoubtedly the parties would guess that the Lessee would use a contractor rather than drill personally, and in that sense they "contemplated" a contractor. But if the contractor misled the Lessee and did nothing, merely hiring a contractor to drill in time, without anything more, would not constitute drilling. The lease would expire.

**84**     The Thatcher lease contains no clause providing that payment could be made by mail as in Texas Gulf, supra. Therefore, it is unreasonable to imply that Thatcher intended that payment would be effective upon posting the cheque. Even if one held that the parties to the Thatcher lease guessed that payment might be made by mail (as in Gloyd, supra,) that does not mean that it was intended or permitted.

**85**     Furthermore, it is clearly an error of law to find an implied term in a contract contrary to one of its express terms: C.N.R. v. Volker Stevins Contr. Co. (1991) 120 A.R. 39, 44 (C.A.). To hold that the Thatcher lease intended or permitted the payment to be mailed would be an error of law in two ways, in my respectful opinion.

**86**     First, clause 23 of the Thatcher lease (A.B. 208) expressly excludes implied terms from the contract. The underlying theory that terms can be implied in a contract to provide business efficacy is based on adding those missing terms that the parties intended. That intention cannot be the opposite of the express terms of the contract.

**87**     I am completely unable to confine clause 23 to excluding parol evidence, for it expressly bars an "implied covenant or liability of any kind". A distinction between implying a term, and interpreting a contract to find a term which is not express, is one which unfortunately I cannot see.

**88**     Second, the Bishop lease states that the Lessee may "mail or deliver" payments, but the Thatcher lease does not mention mailing payments. It says that the money shall be paid to the Lessor at the address specified. How can one then hold that the contract called for mailing, and not any other means of delivery?

**89**     The suggestion of the respondents seems to be that an express contract to pay in San Francisco is met by mailing in Calgary, even if the cheque is delayed or lost in the mail. The only rationale is that the payment was small. But early mailing by double registered mail would solve the expense. Anyway, the consequences were large.

###### D.    Other Binding Authority?

**90**    Canadian Fina Oil v. Paschke (1957) 21 W.W.R. 260 is a decision of the Alberta Court of Appeal on this general topic. The lease there contained the clause providing that all payments or tenders might be made by cheque or draft mailed or delivered to the Lessor or to said depository, as in the Bishop Lease. Most of the discussion in Canadian Fina Oil was on a different point (precisely which day was the anniversary, i.e. deadline).

**91**    This Court said in Canadian Fina Oil that the cheque had to arrive at the address named before the deadline, and that mailing it by then did not suffice. The Court took judicial notice of the fact that time is of the essence in the oil business, and that therefore the twin privileges of mailing payments, and paying by cheque, must mean that the cheque must arrive by the stipulated time.

**92**    In Texas Gulf, supra, the Alberta Court of Appeal held that those portions of Paschke, supra, were obiter, but did not say that they were wrong. Nor did it use any reasoning inconsistent with them. I see no reason not to follow the words in Paschke, even if they are dicta.

###### E.    Authorities of the Respondent

**93**    None of the five cases relied on by the respondents is binding or persuasive in the present case.

####### 1.    Gloyd v. Midwest Refining Co. (1993) 62 F.2d 483 (C.C.A.)

**94**    The facts in Gloyd are much like those of the present case. The Lessor and Lessee were located in different states, and the lease was silent with respect to how payment was to be made. This American judgment held that since the Lessor knew the Lessee resided in a different state he impliedly authorized payment by mail, which was effective upon mailing. I reject that reasoning above. Gloyd's discussion is extremely brief.

####### 2.    Henthorn v. Fraser [1892] 2 Ch. 27 (C.A.)

**95**    This case extends the rule of acceptance of offers by mail to other offers not made by mail as previously mentioned. Yet the Thatcher lease is not a case of offer and acceptance, so Henthorn is not relevant.

**96**    Nor does this case contain any general reasoning which would help the Lessee. Rather, it exposes the logical fallacy in suggesting that because the offeror knows that the offeree will probably use the post, he thereby authorizes use of the post. The judges say that the offeror does not authorize anything, and it is up to the offeree to decide how he will accept: see pp. 33, 36.

####### 3.    Texas Gulf Sulphur Co. v. Ballem (1970) 72 W.W.R. 273 (Alta. C.A.), affd. briefly [1971] 1 W.W.R. 560 (S.C.C.)

**97**    As noted, the oil lease in this case provided that payment could be made by mail, as does the Bishop lease. The Thatcher lease does not. The Alberta Court of Appeal relied on this precise clause in the Texas Gulf lease when it held that payment under these circumstances by mail was effective on the date of posting (p. 283). Indeed in the next paragraph the Court said:

> "An option is nothing more than an offer and the manner of acceptance is stated therein and where it is specified how it may be accomplished, namely, by mail, then the date of posting is the date of acceptance."

<center>(p. 283; emphasis added)</center>

**98**    The Court stated that if it were not for this clause contained in the Texas Gulf lease, which is also contained in the Bishop lease, the money would have had to been paid or tendered to the Lessor (p. 282). Since the Thatcher lease lacks this provision, I distinguish the Texas Gulf case.

**99**    The Supreme Court of Canada also focussed on the particular wording of the lease when affirming the Alberta Court of Appeal:

> We are all of the opinion that the respondent complied with <u>the requirements</u> of <u>the</u> oil and gas <u>lease</u> in effecting payment of the delay rental in question here within the time required by <u>such lease</u>.

<p style="text-align:center">(p. 560 W.W.R., emphasis added)</p>

**100**    In other words, the Supreme Court held that it was a matter of the wording of the individual lease.

<p style="text-align:center">4.    Paramount Petroleum and Mineral Corp. v. Imperial Oil (1970) 73 W.W.R. 417 (Sask.)</p>

**101**    The lease in this Saskatchewan judgment also contained wording like that in Texas Gulf, supra, and the Bishop lease. The judge held that mailing in time sufficed, and that receipt in time was not necessary. He gave a number of reasons, none of which convince me. For example, he stressed the uncertainties of the mail. But that is a reason not to permit it, still less make mailing payment, still less put the risk on the lessor who has no control over mailing. Speaking of dates on postmarks is obsolete. Businesses use meters and the post office does not cancel or date metered mail. This case is not binding as it is from another province, and declines to follow Alberta Court of Appeal decisions.

**102**    More importantly, the Paramount case is distinguishable because the Thatcher lease lacks the wording contained in the Paramount lease.

<p style="text-align:center">5.    Plummer Enterprises (1983) v. R. [1997] G.S.T.C. 35. (T.C.C.)</p>

**103**    The judge in this case held that payment is made where the letter is mailed unless the parties stipulate otherwise, and that the time of payment is the time of mailing. This case is clearly distinguishable from the Thatcher lease. It is the decision of a Tax Court judge concerning the technical concept of carrying on business. The only authority he cited is the very judgment of Chrumka J. under appeal in the present case, plus the Gloyd, Texas Gulf, and Paramount cases, supra, which are plainly distinguishable.

### G.    Conclusion

**104**    Under ordinary law, mailing is not payment. The Thatcher Lease and the Alberta cases say nothing to the contrary. No Canadian case says the contrary where the lease is silent on the point. So the Thatcher Lease expired, even on the trial judge's fact findings.

**105**    The Bishop Lease expressly deemed mailing to be payment, and so on the trial judge's fact findings it was renewed in time.

**106**    I would allow the appeal, in response to the Thatcher expiry.

**107**    The appellant had to appeal, and had some success. I would give it 2/3 of one set of costs of the trial and appeal. Column 5 of new Schedule C will be used unless either party asks in writing for a different column within twenty-one (21) days of these reasons.

CÔTÉ J.A.

*Case Name:*

# Paddon Hughes Development Co. v. Pancontinental Oil Ltd.

**Paddon Hughes Development Co. Ltd.**
**v.**
**Pancontinental Oil Ltd., Inverness Resources Inc.,**
**and Inverness Energy Ltd.**

[1998] S.C.C.A. No. 600

File No.: 27030

Supreme Court of Canada

Record created: December 17, 1998.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ALBERTA

**Status:**

Application for leave to appeal dismissed with costs (without reasons) June 17, 1999.

**Catchwords:**

 *Commercial law -- Property law -- Leases -- Contracts -- Interpretation -- Extrinsic evidence -
Parol evidence rule -- Whether Court of Appeal erred in failing to consider clauses which had been
deleted from a contract on the basis of the parol evidence rule -- Whether Court of Appeal erred in
interpreting contract to permit payment of a delay rental by mail -- Whether Court of Appeal erred
in interpreting contract to provide that payment was effected when mailed rather than delivered.*

**Counsel:**

John Bishop Ballem (Ballem MacInnes), for the motion.
James Rose, Q.C. (Fraser Milner), contra.

**Chronology:**

1.    Application for leave to appeal:

> FILED: December 17, 1998. S.C.C. Bulletin, 1999, p. 6.
> SUBMITTED TO THE COURT: May 10, 1999. S.C.C. Bulletin,
> 1999, p. 755.
> DISMISSED WITH COSTS: June 17, 1999 (without reasons).
> S.C.C. Bulletin, 1999, p. 988.
> Before: L'Heureux-Dubé, Gonthier and Bastarache JJ.

**Procedural History:**

> Judgment at first instance: Action dismissed.
Alberta Court of Queen's Bench, Chrumka J., September
5, 1995.
[1995] A.J. No. 811.

> Judgment on appeal: Appeal dismissed.
Alberta Court of Appeal, Côte, O'Leary and Russell
JJ.A., October 20, 1998.
[1998] A.J. No. 1120.