

**PFIZER INC., Plaintiff, v. ELAN PHARMACEUTICAL RESEARCH CORP. and ELAN CORPORATION, PLC, Defendants.**

**Civil Action No. 92-402 LON**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*812 F. Supp. 1352*; *1993 U.S. Dist. LEXIS 1685*; *27 U.S.P.Q.2D (BNA) 1161*

**February 4, 1993, Decided**

**DISPOSITION:**     [**1] The Defendants' motion for summary judgment on the ground of Pfizer's lack of standing, in the absence of Bayer as a party, is granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion to dismiss plaintiff's claim for infringement of a patent pursuant to *Fed. R. Civ. P. 12(b)(6)*, on the ground that plaintiff lacked standing to assert a claim for infringement where the owner of the patent was not a party.

**OVERVIEW:** Plaintiff brought an action seeking injunctive relief, damages, and attorney fees against defendants, claiming defendants infringed plaintiff's patents by filing a new drug application and conducting clinical studies that were not protected activity under *35 U.S.C.S. § 271(e)(1)*. Defendants claimed plaintiff lacked standing to bring an infringement action since the owner of the patent was not a party to the suit, requiring the dismissal of the action unless and until the owner was joined as a plaintiff. Under the agreement between plaintiff and the patent owner, plaintiff's right to sue for infringement was conditioned upon the owner's right of first refusal. The owner's grant to plaintiff of the right to sue in plaintiff's own name was required. Plaintiff was a licensee that could not sue in its own name. Accordingly, plaintiff did not have standing, as a matter of patent law, to sue for infringement of the patent.

**OUTCOME:** The court granted defendants' motion for summary judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN1] Standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. Additionally, the party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
*Patent Law > Remedies > Damages > Time Limitations*
[HN2] Standing to sue for infringement generally rests with the legal title holder to the patent. A party who does not hold legal title to a patent during the time of infringement as a general rule is not permitted to recover damages at law for patent infringement. Moreover, a mere licensee does not have standing to sue for patent infringement in its own name.

812 F. Supp. 1352, *; 1993 U.S. Dist. LEXIS 1685, **1;
27 U.S.P.Q.2D (BNA) 1161

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*

[HN3] When deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court may consider the terms of an agreement referenced in the complaint.

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN4] Summary judgment is appropriate under *Fed. R. Civ. P. 56(c)* when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law. Materiality is determined by the substantive law that governs the case. In this inquiry, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN5] Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law. Once the moving party has made and supported its motion, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN6] Any doubts as to the existence of genuine issues of fact will be resolved against the party moving for summary judgment and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment.

*Contracts Law > Contract Interpretation > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*

[HN7] The general rules of construction for contracts are applicable to the construction of patent licenses. The construction of patent license agreements is governed by state law.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*

[HN8] *28 U.S.C.S. § 1338* provides in pertinent part that district courts have original jurisdiction of any civil action arising under any act of Congress relating to patents. *28 U.S.C.S. § 1338(a).*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*

[HN9] In federal question cases, federal courts are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*

[HN10] The applicable law depends upon which state has the most contacts with the action and which state has the greater public policy interest in having its law applied. The following factors should be taken into account: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Patent Law > Ownership > Conveyances > Assignments*

812 F. Supp. 1352, *; 1993 U.S. Dist. LEXIS 1685, **1;
27 U.S.P.Q.2D (BNA) 1161

***Patent Law > Ownership > Conveyances > Licenses***
***Patent Law > Ownership > Patents as Property***
[HN11] Standing to sue for infringement generally rests with the legal titleholder to the patent. Thus, the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot, under *35 U.S.C.S. § 281*. In order to sue for patent infringement, the plaintiff must be the owner of the patent, the patentee or assignee of the patent.

***Civil Procedure > Parties > Real Parties in Interest > Assignees***
***Patent Law > Ownership > Conveyances > Assignments***
***Patent Law > Ownership > Patents as Property***
[HN12] As a matter of patent law, status as an assignee or patentee is a crucial prerequisite to bringing suit on infringement grounds.

***Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use***
***Patent Law > Ownership > Conveyances > Assignments***
***Patent Law > Ownership > Conveyances > Licenses***
[HN13] The patentee or its assigns may, by instrument in writing, assign, grant, and convey, either, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States, or an undivided part or share of that exclusive right; or, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere licensee no title in the patent and no right to sue at law in his own name for an infringement.

***Patent Law > Ownership > Conveyances > Assignments***
[HN14] Whether one is an assignee or not is crucial because the failure to assign all rights under the patent bars a claim for infringement unless the owner is made party to the suit.

***Patent Law > Ownership > Conveyances > Licenses***
[HN15] In construing whether a contract provides a licensee with enough rights to the patent to enable the

licensee to bring a lawsuit, courts examine whether the transferor granted the transferee essential rights to the patent.

***Patent Law > Ownership > Conveyances > Licenses***
[HN16] A patent owner should be viewed as a necessary party to an infringement action, if it retains any interest in the patent.

***Civil Procedure > Parties > Joinder > Indispensable Parties***
***Patent Law > Originality > Joinder of Inventors***
***Patent Law > Ownership > Conveyances > General Overview***
[HN17] Once a party is deemed necessary under *Fed R. Civ. P. 19(a)*, a court must undertake the second step of the analysis. If the party cannot be joined because it is not subject to process, then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. *Fed. R. Civ. P. 19(b)*.

***Patent Law > Ownership > Conveyances > General Overview***
[HN18] A patent owner has long been held to be an indispensable party in an enforcement action by its licensee.

**COUNSEL:** William J. Wade, Esquire of Richards, Layton & Finger, Wilmington, Delaware; Joseph A. Tate, Esquire (argued), Stephen D. Brown, Esquire, Judy L. Leone, Esquire and Christine C. Levine, Esquire of Dechert Price & Rhoads, Philadelphia, Pennsylvania; William W. Vodra, Esquire, Robert N. Weiner, Esquire and Donald O. Beers, Esquire of Arnold & Porter, Washington, D.C.; Attorneys for Plaintiff.

Jack B. Blumenfeld, Esquire (argued) and Julia Heaney, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Morgan Chu, Esquire, Kenneth A. Liebman, Esquire, Gary N. Frischling, Esquire (argued) and Jeremy J. F. Gray, Esquire of Irell & Manella, Los Angeles, California; Attorneys for Defendant Elan Pharmaceutical Research Corporation.

**JUDGES:** LONGOBARDI

**OPINION BY:** JOSEPH J. LONGOBARDI

812 F. Supp. 1352, *; 1993 U.S. Dist. LEXIS 1685, **1;
27 U.S.P.Q.2D (BNA) 1161

OPINION

[*1354] **OPINION**

February 4, 1993

Wilmington, Delaware

LONGOBARDI, Chief Judge

## I. NATURE AND STAGE OF THE PROCEEDINGS

[**2] This is an action for patent infringement. Presently before the Court is the question of whether the Plaintiff, Pfizer Inc. ("Pfizer"), has standing to bring an infringement action against Defendants Elan Pharmaceutical [*1355] Research Corporation ("EPRC") and its parent, Elan Corporation, PLC ("Elan").

### A. Background

On July 9, 1992, Pfizer filed an action for patent infringement against the Defendants. Docket Item ("D.I.") 1. The complaint contains two infringement counts. In Count I, Pfizer alleges that EPRC has infringed and is infringing United States Letters Patent No. 4,412,986 ("the '986 patent") by filing a New Drug Application ("NDA") under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act. Id. at P 29. Pfizer alleges in Count II that EPRC and Elan conducted clinical studies which are not protected activity under *35 U.S.C. § 271(e)(1)*, thereby infringing the '986 patent. Id. at P 33. Pfizer seeks injunctive relief, damages, attorney's fees and costs.

Defendant EPRC filed a motion to dismiss the complaint, D. I. 13, pursuant to *Rules 12(b)(6), 12(b)(7) and 19 of the Federal Rules of Civil Procedure* on the ground that Pfizer [**3] lacks standing to assert a claim for infringement of the '986 patent and that Bayer AG ("Bayer"), the owner of the '986 patent, is not a party. [1]

1    EPRC also moved to dismiss on second and third grounds, as follows: (1) that Count I fails to state a claim for relief because Pfizer does not have a drug covered by the patent alleged to be infringed by the submission of EPRC's Food and Drug Administration ("FDA") NDA and (2) that Count II fails to state a claim for relief because Pfizer has not alleged any acts of infringement by

EPRC. See EPRC's Opening Brief in Support of Motion to Dismiss, D.I. 14.

Defendant Elan also filed a motion to dismiss the complaint, D.I. 21, pursuant to *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction over Elan, and pursuant to *Fed. R. Civ. P. 12(b)(6), 12(b)(7)* and *19(b)* on all three grounds set forth by Defendant EPRC. Elan's motion to dismiss has been briefed, D.I. 36-37, 43 and 49, and is awaiting resolution.

The Court's decision in the instant opinion, however, renders the resolution of the second and third grounds of EPRC's motion to dismiss, described above, unnecessary. Likewise, the Court's holding renders resolution of Defendant Elan's motion to dismiss on these grounds and on the ground of lack of personal jurisdiction unnecessary.

[**4] Subsequent to briefing, but prior to the Court's rendering a decision on Defendant EPRC's motion to dismiss, Pfizer filed motions for a temporary restraining order and expedited relief pursuant to *Fed. R. Civ. P. 65*. Pfizer sought a temporary restraining order staying the FDA's effective approval date of EPRC's NDA pending a hearing on Pfizer's motion for expedited relief, D.I. 90, and also relief pursuant to *35 U.S.C. § 271(e)(4)(A)* staying the effective approval date of EPRC's NDA pending a full trial on the merits of this action, D.I. 89. [2]

2    During a telephone conference with Pfizer and EPRC on November 23, 1992, the Court consolidated the motion for temporary restraining order with the motion for expedited relief and ruled that the Court would treat the remaining motion for expedited relief, D.I. 89, as a motion for a preliminary injunction. See Order, D.I. 107.

Pfizer and EPRC briefed the motion for expedited relief, [3] D.I. 92-93 and 113-118, and on December 23, 1992, [**5] the Court heard oral argument. To the extent that arguments on EPRC's motion to dismiss for lack of standing were incorporated by the parties into arguments related to Pfizer's motion for expedited relief, the Court considered both motions to be before the Court at oral argument. [4]

3    Pfizer's motion for expedited relief deals

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 5 of 554

Page 5

812 F. Supp. 1352, *1355; 1993 U.S. Dist. LEXIS 1685, **5;
27 U.S.P.Q.2D (BNA) 1161

solely with allegations contained in Court I of the complaint. Because Count I states a claim against Defendant EPRC only, Defendant Elan was not required to respond to Pfizer's motion for expedited relief.

4    At the start of the hearing, the Court stated that the parties were before the Court on "cross-motions." Transcript, D.I. 119 at 2. Moreover, both parties directly addressed EPRC's first and second grounds for dismissing the complaint, i.e., that Pfizer lacks standing and that Pfizer does not have a drug covered by the patent alleged to be infringed by the submission of EPRC's NDA.

**B. Treatment Of Standing Issue**

Although the ultimate issue before the Court is somewhat [**6] narrow, the parties have made it procedurally complex. By a motion to dismiss, Defendant EPRC challenges Pfizer's showing of standing in its complaint. Further, EPRC argues that Pfizer is not entitled to expedited relief in part because it lacks standing. EPRC's [*1356] argument is that to obtain such preliminary relief, a party must show, inter alia, that it has a reasonable likelihood of success on the merits of the action at trial. See, e.g., *New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992)*; *E.I. duPont de Nemours & Co. v. Polaroid Graphics Imaging, Inc., 706 F. Supp. 1135, 1140 (D. Del.), aff'd without opinion, 887 F.2d 1095 (Fed. Cir. 1989)*. Manifestly, if Pfizer lacks standing to sue for patent infringement, it cannot establish a reasonable likelihood of success on the merits.

Federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdiction] doctrines." *FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 107 L. Ed. 2d 603, 110 S. Ct. 596 (1990)* (quoting *Allen v. Wright, 468 U.S. 737, 750, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984))*. [**7] Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992)* (quoting *Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975))*.

It is well settled that [HN1] standing cannot be "inferred argumentatively from averments in the pleadings," *Grace v. American Cent. Ins. Co., 109 U.S. 278, 284, 27 L. Ed. 932, 3 S. Ct. 207 (1883)*, but rather "must affirmatively appear in the record," *Mansfield, C. & L. M. R. Co. v. Swan, 111 U.S. 379, 382, 28 L. Ed. 462, 4 S. Ct. 510 (1884)*. *FW/PBS, 493 U.S. at 231*. Additionally, the party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. Id. (citing *McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 80 L. Ed. 1135, 56 S. Ct. 780 (1936)*; *Warth, 422 U.S. at 518*).

Thus, the task facing the Court is to determine whether Pfizer's standing to sue for infringement of the '986 patent "affirmatively [**8] appears in the record." See *FW/PBS, 493 U.S. at 231*. [HN2] Standing to sue for infringement generally rests with the legal title holder to the patent. See *Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991)* (a party who does not hold legal title to a patent during the time of infringement as a general rule is not permitted to recover damages at law for patent infringement). [5] Moreover, a mere licensee does not have standing to sue for patent infringement in its own name. See *Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334 (1891)*.

5    While Arachnid was a case in which the plaintiff sought to recover monetary damages for patent infringement, i.e., an action "at law," Pfizer does not argue that the general rules for standing to sue for patent infringement differ in the instant action. Pfizer seeks equitable relief in Count I of the complaint against EPRC and both equitable relief and monetary damages in Count II against EPRC and Elan. Although Arachnid recognized that a determination of standing may differ when equitable relief is sought, the cases cited and distinguished by the court for this proposition involved "equitable title holders" seeking injunctive relief. See *Arachnid, 939 F.2d at 1578-80* ("a federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding equitable relief for that infringement"). Pfizer does not claim to be an equitable title holder of the '986 patent.

[**9] Pfizer alleges that Bayer was assigned "the entire right, title and interest in and to the invention contained in the . . . '986 patent," and that Bayer and Pfizer entered into a license agreement (the "Bayer/Pfizer

Agreement" or the "Agreement") which "gave Pfizer an exclusive license in the United States to make, use and sell Bayer's patented products or processes related to the compound nifedipine." D.I. 1 at PP 8-10. Pfizer also alleges that "among the Bayer patents covered by Pfizer's exclusive license is the 'Nifedipine Containing Solid Preparation Composition ' patented in the '986 patent." Id. at P 11. While referring to the Bayer/Pfizer Agreement as granting Pfizer certain rights related to the '986 patent, Pfizer failed to incorporate [*1357] the Agreement as an exhibit to the complaint.

Pfizer has not alleged that it is the owner of the patent. In fact, Pfizer alleges that Bayer owns the entire right, title and interest in and to the invention contained in the '986 patent. D.I. 1 at P 8. Clearly, Pfizer must allege that its standing to sue for infringement arises from a source other than legal title to the patent. According to the complaint, Pfizer apparently finds that source [**10] in the Bayer/Pfizer Agreement.

EPRC initially asserts that the Agreement demonstrates that Pfizer lacks standing to sue for infringement of the '986 patent. Second, EPRC contends that Pfizer is a mere licensee under the terms of the Agreement and thus lacks standing to sue for infringement as a matter of law. Third, EPRC argues that Bayer is a necessary party under *Fed. R. Civ. P. 19(a)* and an indispensable party under *Fed. R. Civ. P. 19(b)*, requiring the dismissal of the action unless and until Bayer joins as a plaintiff. See D.I. 14.

The Court notes that Defendant EPRC moved to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. [6] For the present analysis, the Court will consider the standing issue in the context of *Rule 12(b)(6)*. In support of its motion, EPRC filed a declaration from outside counsel which contained attachments including a redacted copy of the Bayer/Pfizer Agreement. See Declaration in Support of EPRC's Motion to Dismiss, D.I. 15, Exhibit ("Ex.") A. When matters outside the pleading are presented to and not excluded by the court, the *Rule 12(b)(6)* motion is normally treated as one for summary judgment under *Rule 56*. See *Fed. R. Civ. P. 12(b)*; *Rose v. Bartle, 871 F.2d 331, 340 (3d Cir. 1989)*; [**11] *JM Mechanical Corp. v. United States, 716 F.2d 190, 197 (3d Cir. 1983)*. Here, the Court must consider the Bayer/Pfizer Agreement to determine the standing issue.

[6]   EPRC moved to dismiss the entire action pursuant to *Fed. R. Civ. P. 12(b)(6), 12(b)(7)* and

*19*. Although not articulated, EPRC essentially argues in part that because Pfizer lacks standing, it fails to state a claim for relief. Additionally, because *Fed. R. Civ. P. 12(b)(7)* and *19* relate to the failure to join as indispensable party, a corollary of the standing issue, the Court concludes that EPRC's motion to dismiss the complaint for lack of standing under the Bayer/Pfizer Agreement and as a matter of law is grounded upon *Fed. R. Civ. P. 12(b)(6)*.

Some motions to dismiss, while not falling within the seven enumerated defenses allowed by motion under *Rule 12(b)*, nonetheless are presented to and determined by the federal courts as a matter of course. See 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1360, at 430-31 (1990). A motion to dismiss for lack of standing may be treated as a motion to dismiss for failure to state a claim for relief. *Id. at 436*; see also *United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992)* (in ruling on a motion to dismiss for want of standing, the trial court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party; in practical effect, the standard is much the same as that traditionally applied to motions to dismiss under *Fed. R. Civ. P. 12(b)(6)*). The AVX Corp. court recognized, as does this Court, that a *Rule 12(b)(1)* motion to dismiss for want of subject matter jurisdiction arguably provides a closer analogy. *AVX Corp., 962 F.2d at 114-15 n.6*. Here, as jurisprudence of *Rule 12(b)(1)*. See id.

[**12] [HN3] When deciding a *Rule 12(b)(6)* motion, the Court may consider the terms of an agreement referenced in the complaint. See *Brill v. Burlington Northern, Inc., 590 F. Supp. 893, 895 n.2 (D. Del. 1984)* (holding that court properly considered "those documents which were referred to in the plaintiff's amended complaint"); see also 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1327, at 762-63 (1990); *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., 405 F. Supp. 370, 374 n.1 (M.D. Pa. 1975)* (in considering an agreement referred to in the complaint on a *Rule 12(b)(6)* motion, the Court observed that the "better practice would have been for plaintiffs to set forth the entire contract or to attach that document to

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 7 of 554

Page 7
812 F. Supp. 1352, *1357; 1993 U.S. Dist. LEXIS 1685, **12;
27 U.S.P.Q.2D (BNA) 1161

the complaint in the first place"), aff'd in relevant part, *544 F.2d 1207 (3d Cir. 1976)*. Cf. *Warth v. Seldin, 422 U.S. 490, 501-02, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)* (explaining that it is within the trial court's power to allow or require a plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations [**13] of fact deemed [*1358] supportive of plaintiff's standing; if after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed). Consideration of the terms of a document referenced in the complaint, therefore, does not convert the motion to dismiss for lack of standing into one for summary judgment. Moreover, Pfizer does not question the authenticity and validity of the redacted Bayer/Pfizer Agreement and, in fact, cites the Agreement in its argument opposing the motion. Accordingly, if the only matters before the Court were the complaint and the Bayer/Pfizer Agreement, the Court would treat EPRC's motion solely as one to dismiss under *Fed. R. Civ. P. 12(b)(6)*.

Both parties, however, have placed additional matters outside of the pleadings before the Court. 7 Because the parties relied on matters outside of the complaint, the Court will treat Defendant EPRC's motion to dismiss on the ground of lack of standing as one for summary judgment. 8 See, e.g., *Public Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 70 (3d Cir. 1990)* (when additional evidence outside [**14] the pleadings is submitted on the issue of standing, the district court should treat the motion as one for summary judgment), cert. denied, *112 L. Ed. 2d 1100, 111 S. Ct. 1018 (1991)*.

7   Pfizer relied in part on documents elated to the Bayer/Pfizer Agreement. See id.; D.I. 92, Appendix, Ex. J-K. In opposing Pfizer's motion for expedited relief, Defendant EPRC likewise placed additional documents related to the Bayer/Pfizer Agreement before the Court in arguing that Pfizer lacks standing. See D.I. 113 at 12-16; Appendix, D.I. 114. Further, for the first time in the course of the proceedings, Pfizer included a copy of the Bayer/Pfizer Agreement as an exhibit to its reply brief. See D.I. 118, Ex. B. Pfizer additionally submitted the declaration of Paul S. Miller, Senior Vice President and General Counsel of Pfizer, along with various documents related to the Bayer/Pfizer Agreement, in support of its arguments for standing. See D.I. 117,

Affidavit ("Aff.") 2 and accompanying exhibits. Finally, at oral argument on standing, both parties relied on matters outside of both the complaint and the Agreement.

[**15]
8   The Court additionally placed the parties on notice that, absent objection, it intended to treat EPRC's motion to dismiss as one for summary judgment because the parties relied on matters outside the pleadings. Neither party objected to the Court's suggested treatment, nor did either party ask to supplement the evidence in the record.

C. Summary Judgment Standard

[HN4] Summary judgment is appropriate under *Federal Rule of Civil Procedure 56(c)* when the moving party establishes that there is no genuine issue of material fact that can be resolved and that the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. In this inquiry, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. A dispute is "genuine" only if a reasonable jury could return [**16] a verdict for the nonmoving party. Id. [HN5] Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law.

Once the moving party has made and supported its motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*.

[HN6] Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v.*

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 8 of 554

Page 8

812 F. Supp. 1352, *1358; 1993 U.S. Dist. LEXIS 1685, **16;
27 U.S.P.Q.2D (BNA) 1161

*Oberly, 632 F. Supp. 1225, 1231* [*1359] *(D. Del. 1986)* (citing *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)),* [**17] aff'd, *822 F.2d 388 (3d Cir. 1987).* If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983),* rev'd on other grounds, *475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).*

## II. DISCUSSION

### A. Pfizer's Standing To Sue In Its Own Name For Infringement Of The '986 Patent Under The Bayer/Pfizer Agreement

Defendant EPRC initially argues that Pfizer lacks standing because the Bayer/Pfizer Agreement is pertinent to the issue. The resolution of whether this provision grants Pfizer the right to sue EPRC and Elan requires interpretation of its terms. Thus, any discussion of the merits must be preceded by a decision of what law to apply to this question of pure contract interpretation.

As discussed at length in subsection II.C., however, the Court conducts this analysis not to determine the rights and obligations of the parties to the Bayer/Pfizer Agreement, but solely to determine if the evidence in the record [**18] supports a conclusion that Pfizer has demonstrated standing to sue sufficiently to survive the Defendants' motion for summary judgment. To the extent that the Court would be required to construe Bayer's rights and obligations under the Agreement, the Court chooses not to do so, concluding in subsection II.C. that Bayer is an indispensable party to this action.

### 1. Choice of Law

As a preliminary matter, the Court must decide whether a federal district court, sitting in a federal question jurisdiction patent case, [9] should rely on state contract law or apply some sort of federal common law of contracts to matters of contract interpretation. See *Amgen, Inc. v. Chugai Pharmaceutical Co., 808 F. Supp. 894 (D. Mass. Dec. 1992) (1992 U.S. Dist. LEXIS 19042, at *21 n.9).* The Amgen court adopted the view found in 6 Lipscomb, Walker on Patents § 20:58 at 202 (1987), which states that [HN7] "the general rules of construction for contracts are applicable to the construction of patent licenses. The Construction of patent license agreements is

governed by state law." *Amgen, 808 F. Supp. 894, 1992 U.S. Dist. LEXIS 19042,* at *21 n.9. [**19] This Court agrees, and will apply state law to the matter of pure contract interpretation.

> 9   Subject matter jurisdiction in the instant case is based [HN8] upon *28 U.S.C. § 1338,* which provides in pertinent part that district courts have original jurisdiction of any civil action arising under any act of Congress relating to patents. *28 U.S.C. § 1338(a).*

Essentially, a patent license agreement in its most basic form is nothing more than a commercial contract between private parties. See *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc., 871 F.2d 1082, 1085 (Fed. Cir. 1989)* (explaining that a license agreement is a contract governed by ordinary principles of state contract law). Cf. *Kiwanis Int'l v. Ridgewood Kiwanis Club, 806 F.2d 468, 472 n.8 (3d Cir. 1986)* (explaining that trademark license agreement is a contract to be interpreted under state law). The Third Circuit Court of Appeals [**20] instructs that "the construction of contracts is usually a matter of state, not federal, common law." *General Eng'g Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 356 (3d Cir. 1986).*

This case invokes the federal question jurisdiction of the Court. [HN9] In federal question cases, federal courts are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply. *Gluck v. Unisys Corp., 960 F.2d 1168, 1179 n.8 (3d Cir. 1992); Wells Fargo Asia Ltd. v. Citibank, N.A., 936 F.2d 723, 726 (2d Cir. 1991),* cert. denied, *120 L. Ed. 2d 868, 112 S. Ct. 2990 (1992).* See, e.g., *Schoenberg* [*1360] *v. Exportadora del, S.A. de C.V., 930 F.2d 777, 782 (9th Cir. 1991); Edelmann v. Chase Manhattan Bank, N.A., 861 F.2d 1291, 1294 (1st Cir. 1988); Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1003 (9th Cir. 1987); Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980),* cert. denied, [**21] *449 U.S. 1080, 66 L. Ed. 2d 804, 101 S. Ct. 863 (1981).* Courts have relied on the Restatement (Second) of Conflict of Laws (the "Restatement") as a source of federal common law choice of law principles. See, e.g., *Chuidian v. Philippine Nat'l Bank, 976 F.2d 561, 564 (9th Cir. 1992); Harris, 820 F.2d at 1003.* See also *Schoenberg, 930 F.2d at 782* (explaining that federal common law follows the approach of the Restatement); *Edelmann, 861 F.2d at*

812 F. Supp. 1352, *1360; 1993 U.S. Dist. LEXIS 1685, **21;
27 U.S.P.Q.2D (BNA) 1161

*1295* (relying on Restatement principles in determining federal choice of law).

Pursuant to *section 187 of the Restatement,* if reasonable, a contractual choice of law provision should be given effect. See *Restatement (Second) of Conflict of Laws § 187* (1988); *Morgan Guar. Trust Co. v. Republic of Palau, 693 F. Supp. 1479, 1494* (S.D.N.Y.), reconsideration granted on other grounds, *702 F. Supp. 60 (1988).* Upon a close examination of the Agreement, the Court noted that it contains a "choice of law" provision, which the parties had failed to cite to the Court. Paragraph [**22] 11.1 provides that "[Bayer and Pfizer] . . . agree that the validity of this License Agreement and their respective rights and obligations under it shall be governed by the Law of the Federal of Germany." D.I. 118, Ex. B at P 11.1. Presumably, interpretation of the contract is governed by German law.

Notwithstanding an apparent choice of foreign law in the Agreement, neither Pfizer or EPRC gave notice under *Fed. R. Civ. P. 44.1* that it intended to raise an issue of foreign law. *Federal Rule of Civil Procedure 44.1* provides in part that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Due to the parties' failure to raise the choice of law issue, the Court brought the choice of law provision and *Fed. R. Civ. P. 44.1* to their attention and requested them to present their positions on why it was ignored.

In response, Pfizer submitted the affidavit of a German attorney, Oliver Axster, which purports to set forth, inter alia, German law principles of contract interpretation. [10] D.I. 128, Axster Aff. Pfizer belatedly argues that because the Bayer/Pfizer Agreement expressly provides that [**23] German law should govern Pfizer's "respective rights and obligations under it," German law should be applied to matters of contract interpretation. While the Court does not disagree that a choice of law provision in a contract carries import in a choice of law determination, Pfizer has failed to provide in its response adequate information on German law principles of contract interpretation.

10    Pfizer's expert opines a great length as to whether a German court would interpret the Bayer/Pfizer Agreement as granting to Pfizer the right to sue EPRC and Elan in its own name as a matter of law. The question of whether a party has standing to sue in a United States District Court

for infringement of a United States patent is a matter of United States law, as discussed more fully infra note 23.

The Court is free to disregard the Axster Affidavit under *Rule 44.1.* See, e.g., *Chantier Naval Voisin v. M/Y Daybreak, 677 F. Supp. 1563, 1567 (S.D. Fla. 1988)* (court not bound by evidence submitted [**24] by party's expert on foreign law). See also *Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1006-07 (5th Cir. 1990)* (party obligated to present to the district court clear proof of relevant foreign law). According to *Rule 44.1,* the Court "may consider any relevant material or source, including testimony . . . ." The Axster Affidavit, however, lacks any probative exposition of German principles of contract interpretation, and references no authority on German law principles. [11] Under *Rule 44.1,* a court is not required to engage in its own [*1361] research and has the right to insist that the proponent of the foreign law present evidence on the question. See *Cunningham v. Quaker Oats Co., 107 F.R.D. 66, 77 (W.D.N.Y. 1985).* According to commentators, "in many instances the [court] will not utilize the prerogatives found in the second sentence of *Rule 44.1* [stated above]." 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2444, at 408 (1971). Nothing in *Rule 44.1* requires a court to engage in private research; the rule preserves the court's right to insist upon a complete presentation by counsel [**25] on the foreign-law issue. Id. [12]

11    The sole averments related to general principles of contract interpretation in the affidavit of Pfizer's expert are his unsupported stated that "under German law, subsequent course of dealing under a particular contractual provision is relevant to construing contracts. The language of the contract need not be ambiguous for course of dealing evidence to be admissible." D.I. 128, Axster Aff. The Court does not disregard these principles in their entirety but simply notes at this point that if they indeed are correct statements of German law, they in no way affect the Court's decision. Further, to the extent that Pfizer's expert opines as to how German courts would rule on matters of interpretation of the Bayer/Pfizer Agreement, the Court disregards his testimony as usurping the function of this Court. The determination of foreign law is a question of law for the Court. See *Fed. R. Civ. P. 44.1.*

12     In *Commercial Ins. Co. v. Pacific-Peru Constr. Corp., 558 F.2d 948, 952 (9th Cir. 1977)*, the court was guided by Restatement principles, stating that

[where] either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law . . . . The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties . . . . When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law or the forum.

(quoting *Restatement (Second) of Conflicts of Laws § 136 cmt. h* (1971)) (emphasis added). Accord *Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1006-07 (5th Cir. 1990)* ("absent sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the district court should apply the law of the forum"). This Court finds the cited authority persuasive.

[**26] Moreover, research by this Court into German law principles of contract interpretation is rendered unnecessary by Pfizer's concession that the same result would obtain by utilizing New York law. According to Pfizer, New York law is the only other conceivably applicable law to the Agreement's interpretation. The Court agrees.

Moreover, research by this Court into German principles of contract interpretation is rendered unnecessary by Pfizer's concession that the same result would obtain by utilizing New York law. According to Pfizer, New York law is the only other conceivably applicable law to the Agreement's interpretation. The Court agrees.

Under the Restatement, [HN10] the applicable law depends upon (1) which state has the most contacts with the action and (2) which state has the greater public policy interest in having its law applied. *Union of Flight Attendants, Local No. 1 v. Air Micronesia, Inc., 684 F. Supp. 1520, 1528 (D. Haw. 1988)*, aff'd without opinion, *902 F.2d 1579 (9th Cir. 1990)*. The following factors should be taken into account: (a) the place of contracting, (b) the place of negotiation of the contract, [**27] (c)

the place of performance, (d) the location of the subject matter of the contract, (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. *Restatement (Second) of Conflict of Laws § 188(2)* (1971).

Bayer, the party to the Agreement who is not presently before the Court, is incorporated and headquartered in Germany. See D.I. 118, Ex. B. Pfizer is incorporated in Delaware and has its principal place of business in New York. See id.; D.I. 1 at P 1. Under the Agreement, any notice required to be given under its terms to Pfizer must be addressed to Pfizer's headquarters in New York. See D.I. 118, Ex. B. at P 15.1. All correspondence submitted by the parties regarding negotiations concerning Pfizer's right to prosecute infringement actions under the Agreement shows that the negotiations appear to have taken place between Pfizer's headquarters in New York and Bayer's headquarters in Germany. See D.I. 92, Ex J-K; D.I. 118, Ex. C; D.I. 114 at A69-74 and A116-122; D.I. 117, Aff. 2 and accompanying exhibits. No information before the Court suggests that any state other than New York has a greater interest in the interpretation of [**28] the Bayer/Pfizer Agreement. Accordingly, the Court will apply principles of contract interpretation under New York law.

## 2. Paragraph 5.1 of the Bayer/Pfizer Agreement

In examining the express language of paragraph 5.1, the Court notes that the [*1362] proper interpretation of a contract is a question of law for the court. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 970 F.2d 1138, 1147-48 (2d Cir. 1992)* (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)* (applying New York law)), petition for cert. filed, *61 U.S.L.W. 3481* (U.S. Dec. 22, 1992) (No. 92-1074). "Where the language of a contract is clear, summary judgment is appropriate, and the fact that one party may have a different interpretation of the language does not make it any less plain." *Harris Trust, 970 F.2d at 1147* (citing *Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 104 (2d Cir. 1990)* (applying New York law)). Moreover, "extrinsic evidence is unnecessary where it is determined that the contractual [**29] language is unambiguous." *Harris Trust, 970 F.2d at 1148* (holding that district court properly limited itself to the unambiguous contractual language in resolving an issue of contract interpretation) (citing *Chimart Assoc. v. Paul, 66 N.Y.2d 570, 573-74,*

812 F. Supp. 1352, *1362; 1993 U.S. Dist. LEXIS 1685, **29;
27 U.S.P.Q.2D (BNA) 1161

*498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 234 (1986)).* See also *Investors Ins., 917 F.2d at 104* (holding that party precluded from introducing evidence of contract's purpose in order to vary the plain meaning of the writing).

In Hunt Ltd., the Second Circuit precisely defined the standards for interpreting contracts under New York law. The court stated

contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Co. of N. Am., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978).* Language whose meaning is otherwise plain does not become [**30] ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would "strain[] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957).* If the terms of a contract are unambiguous, the obligations it imposes are to be determined without reference to extrinsic evidence, see *Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (1979),* . . . .

*Hunt Ltd., 889 F.2d at 1277* (additional citations omitted). Moreover, in the summary judgment context, the "mere assertion by [a party] that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *Bethlehem Steel, 2 N.Y.2d at 460, 161 N.Y.S.2d at 93, 141 N.E.2d at 593.* [**31]

Under paragraph 5.1, Bayer and Pfizer addressed those instances in which Pfizer would be given the right to prosecute an action for infringement of the '986 patent in its own name. It provides in relevant part that:

In the event that a third party should sell the PRODUCT or PFIZER's COMBINATION PRODUCT in the USA in competition with PFIZER infringing BAYER's PATENT RIGHTS, PFIZER may call such infringement to BAYER's attention in writing and request

that BAYER take action to abate the infringement.

If within six (6) months after receipt of such notice BAYER has not (i) caused such infringement to be terminated or (ii) initiated legal action against the infringer, then upon request of PFIZER, BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name. BAYER then will execute and deliver all documents legally necessary for PFIZER to prosecute such infringement in PFIZER's name. (Emphasis added.)

See D.I. 118, Ex. B at P 5.1 (emphasis added). According to the affidavit of Paul S. Miller, Pfizer's General Counsel, paragraph 5.1 was a product of negotiations between [*1363] Bayer and Pfizer. See D.I. 117, Aff. B at P 3.

The express [**32] language of paragraph 5.1 conditions Pfizer's right to sue for infringement without joining Bayer as a party. The conditional nature of the language is shown unequivocally by the use of the words "in the event that," "if" and "then" prior to the language that "BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name."

According to the express language of the provision, there are several prerequisites before Pfizer can claim the right to prosecute an action against an infringer in its own name. The first condition is that there be a sale by a third party (EPRC in the case sub judice) in the United States which infringes the '986 patent. The Court finds that this language is plain and unambiguous. The phrase "in the event that" is commonly defined to mean "if it should happen that." See, e.g., Webster's New World Dictionary 471 (3d College ed. 1988). Clearly, Pfizer's notice to Bayer under paragraph 5.1 is conditioned upon the occurrence of an infringing sale. Any other construction renders the phrase "in the event that" mere surplusage. Thus, by its plain and unambiguous language, paragraph 5.1 does not give Pfizer the express [**33] right to sue in its own name for pre-sales infringement.

Pfizer does not allege in its complaint that EPRC has sold a drug product in the United States that infringes the '986 patent. Instead, Pfizer asserts in Count 1 that EPRC's filing of an NDA with the FDA to secure approval for the marketing of Nifelan, the allegedly infringing drug, itself constitutes infringement. See D.I. 1 at P 29 (emphasis added). This claim against EPRC is based on an alleged artificial act of infringement as defined in *35 U.S.C. §*

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 12 of 554

Page 12

812 F. Supp. 1352, *1363; 1993 U.S. Dist. LEXIS 1685, **33;
27 U.S.P.Q.2D (BNA) 1161

*271(e)(2)(A)*. See *Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 678, 110 L. Ed. 2d 605, 110 S. Ct. 2683 (1990)* (*section 271(e)(2)* creates a highly artificial act of infringement consisting of the submission of an Abbreviated New Drug Application ("ANDA") or a paper NDA containing a certification that is in error as to whether commercial manufacture, use, or sale of the new drug (none of which has actually occurred) violates the relevant patent). In Count II, Pfizer alleges that EPRC infringed the '986 patent by using the formulation of the patent in clinical studies conducted in the United States in connection with the commercialization [**34] of Nifelan, an alleged act of infringement which is not protected activity under *35 U.S.C. § 271(e)(1)*. See D.I. 1 at P 31-33 (emphasis added). Indeed, nowhere in Pfizer's submissions to the Court does Pfizer contend that EPRC has sold a drug product in the United States that infringes the '986 patent. It is undisputed, therefore, that the express condition of paragraph 5.1 of an infringing sale has not been met.

In response to the plain and unambiguous language of the contract, Pfizer relies on its own interpretation of paragraph 5.1 as permitting Pfizer to sue in its own name for any act of infringement so long as Pfizer gives the required notice. [13] In support of its contention, Pfizer argues that

at the time the Agreement was executed, the filing of a § 505(b)(2) NDA was not recognized as an act of infringement. The Waxman-Hatch Amendments did not even create a right to sue for infringement based on the filing of a § 505(b)(2) NDA until 1984, well after the Agreement was signed. Since the passage of these Amendments, Bayer's and Pfizer's correspondence and conduct relating to other infringement actions based on the filing of abbreviated [**35] NDAs clearly indicates that Pfizer has the right to sue for such infringement under the Bayer/Pfizer Agreement.

D.I. 42 at 7 n.2. Pfizer further argues that EPRC's assertion that Pfizer must wait until EPRC sells an infringing product in the United States before requesting that Bayer abate the infringement or sue misconstrues the Agreement. D.I. 42 at 21. Pfizer contends that EPRC's interpretation removes from the Agreement a remedy [*1364] that both Bayer and Pfizer clearly intended Pfizer to have, i.e., the right to sue for infringement under *35 U.S.C. § 271(e)(2)(A)*. Id.

13    Notice under paragraph 5.1 is discussed at

length infra.

When a writing is clear on its fact, there is no room for a search for the intent of the parties. Cf. *Bethlehem Steel, 2 N.Y.2d at 459, 161 N.Y.S.2d at 93, 141 N.E.2d at 593* (court is not required to find language ambiguous where interpretation urged by one party strains the contract [**36] language beyond its reasonable and ordinary meaning). This Court need not accept Pfizer's interpretation, therefore, when "there is not reasonable basis for a difference in opinion." *Breed, 46 N.Y.2d at 355, 413 N.Y.S.2d at 355, 385 N.E.2d at 1282*. [14]

> 14    EPRC points out that Pfizer asserts in its brief that "prior to 1984, [third] parties wishing to market a drug still patented by another could not even begin to do the studies necessary to obtain FDA approval until after the 'pioneer' patent expired because the studies themselves were held to be acts of infringement" D.I. 42 at 23. Accordingly, EPRC argues, "Bayer and Pfizer had every reason under then-existing law to include in paragraph 5.1 such non-selling 'acts of infringement' as manufacture or use, including 'studies necessary to obtain FDA approval.' But they chose not to." D.I. 40 at 6 n.4. EPRC's argument is persuasive and further supports the Court's conclusion that it should not rewrite the plain and unambiguous language of paragraph 5.1 negotiated by Bayer and Pfizer.

[**37] In further support of its interpretation, Pfizer cites the parties' course of dealings to establish that paragraph 5.1 gives Pfizer the right to bring an action or an infringement under *35 U.S.C. § 271(e)(2)(A)*. D.I. 92 at 14 n.12. Specifically, Pfizer offers evidence of correspondence exchanged between Bayer and Pfizer through which Bayer authorized Pfizer in writing to sue in its own name under paragraph 5.1 for alleged acts in infringements under *35 U.S.C. § 271(e)(2)(A)* when third parties filed ANDAs with the FDA. D.I. 92, Ex. J (emphasis added). Extrinsic evidence in generally unnecessary where it has been determined that the contractual language is unambiguous. See *Harris Trust, 970 F.2d at 1148 Investors Ins., 917 F.2d at 104*. According to the affidavit of Pfizer's expert, however, German law permits a court to consider course of dealing evidence even when the language of the contract is not ambiguous. To the extent that this principle of German contract interpretation may differ from New York law,

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 13 of 554

Page 13
812 F. Supp. 1352, *1364; 1993 U.S. Dist. LEXIS 1685, **37;
27 U.S.P.Q.2D (BNA) 1161

consideration of Bayer's and Pfizer's subsequent [**38] course of dealing does not affect the analysis.

The Court notes that there is a non-waiver provision in the Bayer/Pfizer Agreement which directs that the parties' course of dealing does not operate to nullify any express contract terms. Specifically, paragraph 14.1 provides that "[a] waiver by either party of any term or condition of the License Agreement in any one instance shall not be deemed or construed to be a waiver of such term or condition for any similar instance of the future . . . . " D.I. 118, Ex. B. at P 14.1. Plainly, Bayer's written authorizations to Pfizer to sue for infringement under *35 U.S.C. § 271(e)(2)(A)* based on other instances constitute a waiver of the express condition in those instances but those waivers should not be construed as a waiver of the condition for any subsequent instance. [15]

> 15   To the extent that Pfizer's arguments support a conclusion that the course of dealing of the parties to the Bayer/Pfizer Agreement in some way constituted an amendment to the infringing sale condition, the Court notes that paragraph 10.2 of the Agreement provides that "no amendment of this License Agreement shall be valid or binding upon the PARTIES hereto unless made in writing and duly executed on behalf of each party hereto." D.I. 118, Ex. B at P 10.2.

Through other extrinsic evidence presented to the Court, it is clear that paragraph 5.1 as expressly written does not permit Pfizer to sue for pre-sales infringement absent a waiver from Bayer. Pfizer proposed, for instance, that paragraph 5.1 be amended to read in part that "in the event that a third party should infringe BAYER'S PATENT RIGHTS, PFIZER may call such infringement to BAYER'S attention in writing and request that BAYER take action to abate the infringement." Id. at A71 (emphasis added). Obviously, the proposed amendment eliminated the condition of an infringing sale, and substituted any act of infringement. Bayer responded [*1365] in part by proposing different language. Id. at A73-74. Bayer proposed that the provision begin "in the event that a third party should sell or prepare to sell, as the case may be, the PRODUCT or PFIZER'S COMBINATION PRODUCT in the USA in competition with PFIZER infringing BAYER'S patent rights . . . ." Id. at A73 (emphasis added). Thus, it is obvious that Bayer and Pfizer were well aware of the import and meaning of the express condition of an

infringing sale contained in paragraph 5.1. Needless to say, based on the record before the Court, neither proposed amendment became a part of the Agreement. Consequently, Pfizer's course of dealing argument is unavailing. [16]

> 16   To the extent that Pfizer interprets paragraph 5.1 of the Bayer/Pfizer Agreement to permit Pfizer to sue in its own name upon giving the notice required under the provision absent an infringing sale, the Court notes that Bayer's interpretation of the Agreement is not a matter before the Court because Bayer is not a party to the instant action. This situation highlights the difficulties presented to the Court in resolving issues of interpretation and performance of the Agreement in the absence of Bayer, a key party to the Agreement. In Bayer's absence, the Court declines to construe the Agreement to implicate Bayer's rights and obligations thereunder, as discussed more fully in subsection II.C. infra.

[**39]  Absent an infringing sale or a waiver of that condition, Pfizer has no authority under the Bayer/Pfizer Agreement to sue EPRC in its own name for infringement of the '986 patent. Further, no genuine issue of material fact exists because it is undisputed that EPRC has not sold a product in the United States which infringes the '986 patent and Pfizer has produced no evidence of an express waiver of this condition by Bayer authorizing Pfizer to institute suit against EPRC in its own name.

Were it not otherwise sufficient, the Court also concludes that Pfizer has not established that it has met paragraph 5.1's remaining express conditions precedent to Pfizer's right to sue for infringement in its own name. By its express terms, paragraph 5.1 contains three additional conditions. First, Pfizer must give notice to Bayer by calling the alleged infringement to Bayer's attention in writing and requesting that Bayer take action to abate the infringement. Second, Bayer has six months after receipt of Pfizer' notice to abate the infringement or initiate legal action against the infringer. Third, after the six month period has passed, Pfizer must request that Bayer authorize Pfizer to bring suit [**40] in its own name.

Specifically, as to the notice condition, paragraph 5.1 provides that upon an infringing sale, "PFIZER may call such infringement to BAYER's attention in writing the request that BAYER take action to abate the

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 14 of 554

Page 14

812 F. Supp. 1352, *1365; 1993 U.S. Dist. LEXIS 1685, **40;
27 U.S.P.Q.2D (BNA) 1161

infringement." D.I. 118, Ex. B at P 5.1. The notice requirement is plain and unambiguous on its face. This obtains even though the use of the word "may" in this phrase, when viewed in isolation, seems to grant discretion to Pfizer. The notice condition, however, clearly is not discretionary when the provision is read as a whole. Bayer's authorization to Pfizer under paragraph 5.1 to sue in its own name for infringement is predicated upon such notice. Demonstrating the mandatory nature of the notice condition is the next sentence, which begins "if within six (6) months after receipt of such notice," Bayer has not abated the infringement or initiated legal action against the infringer, then upon Pfizer's request, Bayer will grant the authorization. See D.I. 118, Ex. B at P 5.1 (emphasis added). Pfizer's requisite notice to Bayer starts the six month clock.

Pfizer does not dispute that it is required to give notice of infringement to Bayer under this provision. [**41] [17] Rather, Pfizer argues that it gave the notice as required.

> [17]    Indeed, Pfizer admits that the notice provision is a condition precedent. See Pfizer's Answering Brief in Opposition to EPRC's Motion to Dismiss, D.I. 42 at 12 ("before filing its complaint, Pfizer fulfilled the conditions precedent under the contract"); id. at 15 (Pfizer required to give notice to Bayer of EPRC's infringement and full opportunity to bring suit).

Under the notice provision's express and unambiguous terms, Pfizer must establish that it did two things to fulfill the notice requirement: first, that Pfizer brought the [*1366] infringement to Bayer's attention and requested that Bayer take action to abate the infringement, and second, that the request was in writing. Although offering as evidence some communications from Pfizer to Bayer relating to EPRC's alleged infringement, Pfizer has not produced any document which demonstrates that it requested in writing that Bayer take action to abate the infringement. [18]

> [18]    In support of its standing argument, Pfizer submitted a copy of a draft version of the Bayer/Pfizer Agreement. in the event of an infringing sale, "PFIZER may give notice of such infringement to BAYER requesting that BAYER take action to abate the infringement." D.I. 117, Aff. 2, Ex. A. As stated by Pfizer's inside General Counsel in his affidavit, the "draft of the

Bayer/Pfizer Licensing Agreement . . . contains language significantly different from what appears in the final version of the Agreement." D.I. 117, Aff. 2 at P 3 (emphasis in original). The language of the draft version is less precise than that of the executed Agreement. In the executed Agreement, the corresponding provision requires Pfizer to "call [the] infringement to BAYER's attention in writing and request that BAYER take action to abate the infringement." D.I. 118, Ex. B at P 5.1 (emphasis added). The use of the word "and" as a conjunctive in the final version clearly sets apart the requirement that Pfizer must request in its notice that Bayer take action to abate the infringement. Thus, as discussed at length infra, the Court is unwilling to consider either of these requirements mere surplusage and considers both of them necessary components of proper notice under paragraph 5.1.

[**42] Pfizer argues that its documents clearly show that "Pfizer first notified Bayer of EPRC's acts of infringement as early as 1989. Pfizer requested Bayer to take action, which, despite numerous communications between Pfizer and Bayer on the issue, Bayer did not do." D.I. 42 at 7. Pfizer further asserts that "Bayer was given notice of this suit and was invited to become involved," D.I. 42 at 17, and that "Bayer elected not to become involved," D.I. 42 at 18.

Initially, Pfizer refers the Court to a letter dated September 13, 1989. The letter simply states that Elan recently filed an NDA for nifedipine, n19 and that Pfizer wished to arrange a conference call to discuss the matter. See D.I. 117, Aff. 2, Ex. B. Paul S. Miller ("Miller"), Pfizer's General Counsel, indicates in his affidavit that this letter was Pfizer's first contact with Bayer giving "notice of our concerns regarding possible infringement and ask[ing Bayer] to assist us in obtaining relevant information to determine whether infringement had occurred." D.I. 117, Aff. 2 at PP 10-11. Manifestly, the letter itself does not go so far, and cannot be construed as providing any notice whatever to Bayer pursuant to paragraph [**43] 5.1.

Pfizer's next communication to Bayer on this subject was a letter dated May 18, 1990, which confirmed a meeting with Bayer to "discuss technical issues relating to US patent No. 4,412,986 and its coverage of the Elan sustained release nifedipine formulations." D.I. 117, Aff.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 15 of 554

Page 15

812 F. Supp. 1352, *1366; 1993 U.S. Dist. LEXIS 1685, **43;
27 U.S.P.Q.2D (BNA) 1161

2, Ex. C. Likewise, this communication in no way may be construed as providing the requisite notice.

The third document produced by Pfizer is a letter from Miller to Bayer dated December 13, 1990. Pfizer asserts that this letter establishes "that Pfizer gave Bayer the six month notice required under the Agreement." D.I. 92 at 14 n.12; D.I. 92, Ex. K. The letter purports to review the "history of our discussions" on the Elan issue, stating, inter alia, that

in the fall of 1989, we[, i.e., Pfizer,] learned that Elan had filed an application to FDA for approval of a sustained release formulation of nifedipine. We subsequently learned that Miles had taken a license to market the formulation.

We have concerned that this filing and other activities in which Elan has engaged may constitute infringement of U.S. Patent No. 4,412,986, licensed to Pfizer under agreement with Bayer. . . .

In a good faith [**44] effort to resolve the matter, Pfizer notified Bayer of this infringement at a meeting held in London on November 27, 1989. We also agreed [*1367] in response to your request not to send a written notice of infringement. At the meeting, we asked that Bayer waive the 6 month notice period pursuant to Section 5.1 of the Pfizer/Bayer license agreement dated December 31, 1981. In response to Bayer's request made at that meeting, we attempted to set up a meeting to discuss certain technical issues related to the infringement. . . . [A] meeting was finally held on May 23, 1990.

At the May 23 meeting, we discussed the scope of the claims of [the '986 patent] as they relate to the examples in [Elan's European Patent Application Nos. 232,155 and 274,176]. . . . In our opinion, there are very substantial reasons to believe that the Elan formulation is within the scope of the claims of the '986 patent, which is licensed to Pfizer.

In order to move forward in fair [sic] and expeditious manner, we request responses to [questions related to Elan's NDA filing and product for which Elan sought FDA approval] . . . .

. . .

Finally, I would like to comment on the six month period for notice of infringement [**45] under the Bayer/Pfizer license agreement. It is my understanding that you have agreed to waive this notice period. In any event, we believe that the period expired since our first notice to you was in November, 1989 and we discussed the basis for our position in May, 1990, both dates being more than six months ago.

D.I. 117, Aff. 2, Ex. D (emphasis added). The letter mainly purports to recount "discussions" between Pfizer and Bayer. Discussions between the parties do not satisfy the requirement that Pfizer give written notice of infringement to Bayer. The Court observes, however, that the letter calls an alleged act of infringement to Bayer's attention in writing. The highlighted portion of the letter does not simply recount discussion, but instead gives written notice that Pfizer then believed that Elan was infringing the '986 patent. Whether this satisfies the first prong of the notice requirement, i.e., that Pfizer call to Bayer's attention an "infringing sale," is less clear. The Court need not resolve this question because it concludes below that Pfizer has not met the second prong of the notice requirement.

Contrary to Pfizer's assertion, the December 13, 1990 letter does [**46] not satisfy the second prong of the notice requirement, i.e., that Pfizer request that Bayer take action to abate the infringement. Nowhere in the letter does Miller request that Bayer take action to abate Elan's alleged infringement of the '986 patent. Rather, Pfizer asks Bayer to provide responses to questions related to Elan's NDA and the product for which it sought approval from the FDA.

Moreover, references in the letter to purported discussions do not substitute for the express contractual requirement under paragraph 5.1 that Pfizer request in writing that Bayer take action to abate the infringement. Indeed, the references in the letter to discussions between Pfizer and Bayer do not state that Pfizer requested Bayer to take action to abate the alleged infringement during the discussions. Instead, Miller states in the letter that "at a meeting held in London on November 27, 1989, we also agreed in response to your request not to send a written notice of infringement." Thus, Pfizer here concedes that it has not given the written notice required under paragraph 5.1. Miller's later assertion, that "our first notice to you was in November, 1989," directly contradicts [**47] this earlier concession and is accorded no weight by the Court because the purported November, 1989 notice was

812 F. Supp. 1352, *1367; 1993 U.S. Dist. LEXIS 1685, **47;
27 U.S.P.Q.2D (BNA) 1161

not in writing.

Miller likewise does not assert in his affidavit that Pfizer asked Bayer to abate the infringement at the meeting in November, 1989. See D.I. 117, Aff. 2 at P 12. Similarly, Miller does not aver in his affidavit that Pfizer made such a request during the meeting in May, 1990. Id. at P 13. Indeed, Pfizer undoubtedly did not request at the May, 1990 meeting that Bayer take action to abate the infringement because [*1368] according to Miller, "Bayer . . . suggested that the Elan formulation was unlikely to infringe [the '986 patent]." Id.

Particularly illuminating on the notice issue is Bayer's written response to Pfizer's letter of December 13, 1990, which, significantly, Pfizer did not present to the Court. Referring to notice under paragraph 5.1, Bayer states that

. . . we would like to point out that, at not time, we were under the impression of Pfizer having notified Bayer of infringement of the . 986 patent by any activities which Elan may have engaged. It was our understanding that Pfizer indeed had raised certain concern and that it was in the [**48] interest of both Pfizer and Bayer to clarify the situation so far. . . . We rather proposed first to complete the fact finding and to discuss consequences thereof.

Furthermore, we never requested Pfizer not to send a written notice of infringement, and we never understood having been asked by Pfizer to waive the six month notice period pursuant to section 5.1 of the Bayer-Pfizer to waive the six month notice period pursuant to section 5.1 of the Bayer-Pfizer Nifedipine License Agreement dated Mai 24/25, 1979. During our waiver of the six month notice period in a number of cases in the so-called ANDA litigation; in those cases, however, patent infringements were rather obvious, third parties' competing sales could easily be predicted and there were time limits for the plaintiffs due to the ANDA regulations. Insofar ANDA on the one side and Elan on the other wee, and still are, different cases.

. . .

In addition, in the [May 23, 1990] meeting we pointed out that the . 986 patent pertains to a technical concept that is opposite to a controlled-release system and that, therefore, an "infringement" appeared to be unlikely.

. . .

In a fair and reasonable evaluation of all these circumstances [**49] we do believe that Pfizer has not reason to maintain its view of an infringement within the meaning of section 5.1 of the License Agreement, a view that Pfizer had brought to Bayer's attention neither prior to nor in the May 23, 1990 meeting.

D.I. 114 at A116-119 (Letter dated February 7, 1991). Plainly, Bayer's letter informed Pfizer that, as of February, 1991, Bayer held the view that Pfizer had not complied with any prong of the notice provision in paragraph 5.1, and that Bayer likewise had not waived the provision related to Elan's alleged infringement. [20]

20    The divergence between the arguments of Pfizer's inside and outside counsel and the views set forth by Bayer in its February 7, 1991 letter only serve to illustrate the difficulties the Court faces in construing the performance of one party to an agreement when the other party is not before the Court. If Bayer and Pfizer indeed have a genuine dispute as to Pfizer's performance of the terms of paragraph 5.1, the Agreement requires arbitration of the dispute if the parties cannot resolve it amicably. See D.I. 118, Ex. B at PP 13.1 and 13.2.

These disputes no doubt are compounded because Bayer's subsidiary, Miles, plans to market Nifelan for Elan under a provision of the Bayer/Pfizer Agreement through which Bayer reserved the right for it or its affiliate (Miles in the case sub judice) to obtain a sublicense to make, have made, use or sell in the United States the product encompassed by the '986 patent. See D.I. 118, Ex. B at P 2.1. If Pfizer and Bayer are unable to resolve their disputes amicably, the Agreement mandates that they submit the disputes to arbitration. In the face of such disagreement, Pfizer could have submitted the disputes to arbitration at any point after receiving notice of Elan's purported infringement of the '986 patent by the Nifelan NDA filing, which according to Pfizer, it received in the fall of 1989. See D.I. 117, Aff. 2 at P 5. Having decided not to do so, Pfizer instead either seeks to avoid, or petitions this Court to decide, its controversies with Bayer. The Court, however, will not engage in deciding Bayer's rights and obligations in Bayer's absence.

812 F. Supp. 1352, *1368; 1993 U.S. Dist. LEXIS 1685, **49;
27 U.S.P.Q.2D (BNA) 1161

[**50] Subsequent to Bayer's response, Pfizer apparently has never requested in writing that Bayer take action to abate the alleged infringement. Pfizer relies on its December, 1990 letter as establishing the condition precedent of notice under paragraph 5.1 and has not submitted any other writing which expressly requests Bayer to take the specified action.

The Court notes, however, that in a letter from Pfizer to Bayer dated March 14, 1991, [*1369] Pfizer asserted that "at this time, we are contacting Miles and Elan directly with respect to the infringement issue. We ask that Bayer demonstrate its intent to cooperate by facilitating a response." D.I. 117, Aff. 2, Ex. E. Pfizer's request to Bayer in this instance relates back to Pfizer's request to Bayer in this instance relates back to Pfizer's request in its December, 1990 letter that Bayer provide certain information about Elan's NDA, which Bayer later claimed to be unable to provide. Pfizer does not point to this language as showing that Pfizer asked Bayer to take action to abate the infringement, nor does the Court believe it could do so. Rather, Pfizer was requesting Bayer's cooperation in obtaining "the information." In fact, Miller avers [**51] in his affidavit that he as again asking Bayer for assistance in obtaining information about the Elan product. D.I. 117, Aff. 2 at P 16. Miller does not assert that he asked Bayer to abate the infringement.

Pfizer's letter of March, 1991 contains no language expressly requesting that Bayer take action to abate the infringement. [21] The Court concludes, therefore, that Pfizer has not established as a matter of law that it met all the requirements of the notice provision under paragraph 5.1. Moreover, in the absence of evidence to the contrary, there exists no genuine dispute of fact.

21    Pfizer's latest writing relating to the issue of notice is a letter to Bayer dated July 9, 1992. Pfizer stated that "as you are aware, we have had several discussions with you concerning the potential infringement by Elan of [the '986 patent]. In order to protect our interests, we have now had to file suit against Elan for patent infringement." D.I. 117, Aff. 2, Ex. I. This letter is dated the same day that Pfizer filed suit for infringement against Elan and EPRC in this Court. On July 28, 1992, Bayer sent a letter to EPRC's outside counsel, in which Bayer stated that

[**52] we confirm, that Pfizer never gave the notice more precisely described in section 5.1 of the Bayer/Pfizer Agreement. For good orders' sake however we may point out that Pfizer takes the position that in the course of the correspondence between the companies Pfizer has requested Bayer to waive the six months period under Article 5.1 second paragraph of the above mentioned agreement; we do not concur with Pfizer so far.

D.I. 114 at A123-124. Like Bayer, the Court cannot find a writing from Pfizer to Bayer plainly meeting "the notice more precisely described in section 5.1 of the Bayer/Pfizer Agreement."

Because Pfizer has not established that it properly gave notice, the third condition precedent under paragraph 5.1, i.e., that Bayer then has six months after receipt of Pfizer's notice to abate the infringement or initiate legal action against the infringer, has not been met. The express language provides that "*if within six (6) months after receipt of such notice BAYER has not* (i) caused such infringement to be terminated or (ii) initiated legal action against the infringer, then upon request of PFIZER, BAYER will grant to PFIZER the right to prosecute an action against [**53] the infringer in PFIZER's own name." D.I. 118, Ex. B at P 5.1 (emphasis added).

Finally, after the six month period has passed, Pfizer then must request that Bayer authorize Pfizer to bring suit in its own name. Pfizer does not claim that it made such a request. In fact, Pfizer stated in its March 14, 1991 letter to Bayer that it hesitated to seek authorization to file a complaint for infringement against Elan in its own name. See D.I. 117, Aff. 2, Ex. E. Instead, Pfizer's evidence shows that it simply notified Bayer that it had filed suit against Elan on the day the complaint in the instant action was filed. See D.I. 117, Aff. 2, Ex. I.

Pfizer likewise has presented no evidence that it received such authorization from Bayer. Instead, Pfizer argues that "Bayer was given notice of this suit and was invited to become involved," D.I. 42 at 17, and that "Bayer elected not to become involved," D.I. 42 at 18. Miller further avers in his affidavit that "Bayer did not object to our filing" suit against EPRC and Elan. D.I. 117, Aff. 2 at P 22. According to paragraph 5.1, not only must Bayer grant authorization to Pfizer for Pfizer to sue for infringement in its own name, Bayer must [**54] then "execute and deliver all documents legally necessary

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 18 of 554

Page 18

812 F. Supp. 1352, *1369; 1993 U.S. Dist. LEXIS 1685, **54;
27 U.S.P.Q.2D (BNA) 1161

for PFIZER to prosecute such infringement in PFIZER's name." See D.I. 118, Ex. B at P 5.1. Pfizer has presented no evidence whatever that Bayer has done so. Pfizer must present something [*1370] more than conclusory allegations that Bayer gave Pfizer authorization to prosecute an infringement action against EPRC and Elan before the Court is willing to reach such a conclusion. [22]

> 22    Again, this highlights another apparent dispute between Pfizer and Bayer, i.e., whether Bayer has given Pfizer authorization to sue for infringement. Such a dispute is more appropriately resolved through arbitration as mandated by the Agreement.

Accordingly, the Court finds as a matter of law that Pfizer has not shown that it met the conditions precedent under the express language of paragraph 5.1 of the Bayer/Pfizer Agreement which are prerequisites to Pfizer's prosecuting an infringement action against Elan and/or EPRC in its own name. Summary judgment as to Pfizer's standing [**55] under paragraph 5.1 of the Bayer/Pfizer Agreement to sue EPRC and Elan in the present action is granted to Defendants EPRC and Elan.

### B. Standing As A Matter Of Patent Law

Defendant EPRC argues alternatively that even if the Bayer/Pfizer Agreement did not preclude the bringing of this action, Pfizer lacks standing as a matter of law. EPRC contends that Pfizer may by construed only as a mere "licensee" under the terms of the Bayer/Pfizer Agreement, and as a mere licensee has no standing to sue for infringement of the '986 patent without joining Bayer, the patent owner. Conversely, Pfizer argues the it is an exclusive licensee pursuant to the Bayer/Pfizer Agreement, and as an exclusive licensee granted substantially all of the rights in the '986 patent, it has standing to sue for infringement in its own name. [23]

> 23    Pfizer attempts to direct the Court to apply German law to the legal issue of standing pursuant to the choice of law provision contained in the Bayer/Pfizer Agreement. Pfizer submitted the Axster Affidavit in support of its argument. Such a result, however, is contrary to United States patent law principles. Although the parties' rights and obligations under the Agreement may be governed by German law, the question of standing to sue for patent infringement is a matter of United States law. See, e.g., *Afros, S.P.A. v.*

*Krauss-Maffei Corp., 671 F. Supp. 1402, 1442-46 (D. Del. 1987)* (white contract interpretation was governed by German law, question of standing was a matter of United States law), aff'd without opinion, *848 F.2d 1244 (Fed. Cir. 1988)*; *Calgon Corp. v. Nalco Chem. Co., 726 F. Supp. 983 (D. Del. 1989)*. Consequently, the Court disregards in its entirety those portions of the Axster Affidavit which purport to argue that the terms of the Bayer/Pfizer Agreement would be sufficient to give Pfizer standing to sue in Pfizer's name in a German court. This case involves a suit on a United States patent in a United States court under a United States statute, *35 U.S.C. § 281*. The issue is whether United States law permits Pfizer to sue without joining Bayer as a party, regardless of what German law might allow.

[**56] [HN11] Standing to sue for infringement generally rests with the legal title holder to the patent. See *Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991)*. Thus, "the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot," *Calgon Corp. v. Nalco Chem. Co., 726 F. Supp. 983, 985 (D. Del. 1989)*. [24] See also *Maruzen Int'l, Co. v. Bridgeport Merchandise, Inc., 770 F. Supp. 155, 158 (S.D.N.Y. 1991)* (under *35 U.S.C. § 281*, in order to sue for patent infringement, the plaintiff must be the owner of the patent, i.e., the patentee or assignee of the patent); *Afros, S.P.A. v. Krauss-Maffei Corp., 671 F. Supp. 1402, 1444 (D. Del. 1987)* (same), aff'd without opinion, *848 F.2d 1244 (Fed. Cir. 1988)*. In short, [HN12] as a matter of patent law, "status as an assignee or patentee is a crucial prerequisite to bringing suit on infringement grounds." *Maruzen, 770 F. Supp. at 158*. Accord 6A Charles A. [**57] Wright et al., Federal Practice and Procedure§ 1547, at 365 (1990) (patent grantee or assignee always is the real party in interest in an action involving the [*1371] patent) (citing *Waterman v. Mackenzie, 138 U.S. 252, 34 L. Ed. 923, 11 S. Ct. 334 (1891))*.

> 24    According to the Calgon court,
>
> > licensees may be multiple and the extent and nature of their interests in the patented article may be of great variety and of different extents. Multiple litigation by licensees might permit differing decisions on the validity or infringement of a patent. For this reason, the patent holder or

812 F. Supp. 1352, *1371; 1993 U.S. Dist. LEXIS 1685, **57;
27 U.S.P.Q.2D (BNA) 1161

assignee is a necessary party to an infringement action in order to achieve consistency of interpretation and to avoid multiplicity of litigation. Under federal law, the patentee is the real party in interest in such litigation.

*Calgon, 726 F. Supp. at 985* (citations omitted).

In the recent case of *Ciba-Geigy Corp. v. Alza Corp., 804 F. Supp. 614 (D.N.J. 1992)*, the district [**58] court described the applicable legal standard for determining whether a transfer is an assignment or a license. The court explained that

in the seminal case of *Waterman v. Mackenzie, 138 U.S. 252, 34 L. Ed. 923, 11 S. Ct. 334 (1891)*, the Supreme Court delineated the different types of interests in a patent that a licensor could convey to a licensee. The Supreme Court stated [HN13] "the patentee or [its] assigns may, by instrument in writing, assign, grant, and convey, either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere licensee no title in the patent and no right to sue at law in his own name [**59] for an infringement." *Id. at 255*. Additionally, the Court noted that the term given to the agreement through which a patentee or his or her assigns transfers rights to a patent does not determine the transfer's legal effect. Instead, the Supreme Court cautioned that a court must examine the provisions contained in the agreement. . . . *Id. at 256*.

*Ciba-Geigy, 804 F. Supp. at 630*. [HN14] "Whether one is an assignee or not is crucial because the failure to assign all rights under the patent bars a claim for infringement unless the owner is made party to the suit." *Afros, 671 F. Supp. at 1444* (emphasis added). Consequently, whether Pfizer has standing as a matter of law to commerce an infringement action without Bayer depends on the rights granted to Pfizer and the rights retained by Bayer under the Bayer/Pfizer Agreement.

In examining the Agreement, the Court notes that Waterman retains its vitality today [25] and directs this Court to disregard the "term" given to the Agreement in determining the legal effect of the transfer. Accord *Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991)* [**60] (whether a provision in as agreement constitutes an assignment or a license is determined by the intention of the parties and the substance of what was granted); [26] *Maruzen, 770 F. Supp. at 158* (whether an agreement transferring patent rights is an assignment or license is governed by its substance, not its label); *Afros, 671 F. Supp. at 1444* (particular name given to instrument does not control its construction as a license or assignment). The substance of the rights granted and retained will determine the question of whether Pfizer has standing in its own right as a matter of law.

> 25    "The Waterman rule is the settled law in the federal courts . . . ." 6A Charles A. Wright et al., Federal Practice and Procedure § 1547, at 366 (1990). Accord *Raber v. Pittway Corp., 23 U.S.P.Q.2d 1313 (N.D. Cal. 1992) (1992 U.S. Dist. LEXIS 6379, at *4)* (explaining that modern courts continue to follow Waterman).
>
> 26    Again, to the extent that the Court must necessarily determine Bayer's rights and obligations under the Agreement in construing the intention of the parties as to what rights were granted and retained, the Court concludes that Bayer is an indispensable party to this action under *Fed. R. Civ. P. 19(b)*, as discussed in subsection II.C.

[**61] Instantly, Bayer owns the entire right, title and interest in and to the invention contained in the '986 patent. Bayer transferred certain rights to Pfizer under the Bayer/Pfizer Agreement, which is titled a "License Agreement." The relevant provisions pertaining to Pfizer's rights are PP 2.1 and 2.2. Paragraph 2.1 states:

[*1372] Subject to the terms and conditions of this License Agreement, BAYER agrees to grant and hereby grants to PFIZER an exclusive right to manufacture and/or have manufactured the COMPOUND, the PRODUCT and/or PFIZER's COMBINATION PRODUCT in the USA under BAYER's PATENT RIGHTS [27] and to use for that purpose BAYER's KNOW-HOW; provided, however, that BAYER or BAYER's AFFILIATE shall, upon at least one hundred

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 20 of 554

Page 20

812 F. Supp. 1352, *1372; 1993 U.S. Dist. LEXIS 1685, **61;
27 U.S.P.Q.2D (BNA) 1161

and eighty (180) days' notice to PFIZER, have a non-exclusive, royalty-free sublicense to manufacture, have manufactured, use and/or sell under BAYER's PATENT RIGHTS and BAYER's KNOW-HOW, said sublicense, however, only becoming effective at the earliest at least four (4) years after the date that PFIZER has the legal right to sell in the USA. BAYER or BAYER's AFFILIATE shall have the right to use PFIZER's KNOW-HOW under the sublicense.

D.I. 118, Ex. B. at [**62] P 2.1 (emphasis added). By its terms, paragraph 2.1 grants to Pfizer an exclusive license to use, sell, make and have made the product under the '986 patent in the United States. Under paragraph 2.2, Pfizer is given the right to grant sublicenses to third parties in the United States. [28]

> 27    It is undisputed that BAYER's PATENT RIGHTS as they are defined in the Agreement include the '986 patent.
> 28    Paragraph 2.2 provides in relevant part that:
>
>    PFIZER shall have the right hereunder to grant sublicenses to any third party for the USA provided, however, that PFIZER has not been given notice by BAYER of default according to 6.2; and provided furthermore, if PFIZER has been given notice of such default, PFIZER's right to grant sublicenses shall be reinstated upon PFIZER's remedying such default within sixty (60) days of receipt of such notice.
>
>    D.I. 118, Ex. B at P 2.2 (emphasis).

Paragraph 2.1 additionally retains specified rights for Bayer and/or its affiliate, including manufacturing rights, and the right [**63] to obtain a non-exclusive sublicense to use, sell, make or have made the product under the '986 patent in the United States. Pfizer concedes throughout its papers the Bayer has the right to obtain from Pfizer a sublicense for itself or its affiliate for the United States. See D.I. 1 at P 10, D.I. 42 at 5. According to Pfizer, after paragraph 2.1's four year period had passed, "Pfizer agreed to grant back to Bayer or its affiliate a non-exclusive royalty-free sublicense to manufacture, use or sell in the United States nifedipine or pharmaceutical products containing nifedipine," under the '986 patent, among others. D.I. 42 at 6. It is undisputed, therefore, that Bayer or one of its affiliates presently retains a non-exclusive sublicense to use, sell, make or have made a product under the ' 986 patent in the

United States.

[HN15] In construing whether a contract provides a licensee with enough rights to the patent to enable the licensee to bring a lawsuit, courts examine whether the transferor granted the transferee "essential rights to the patent." *Ciba-Geigy Corp. v. Alza Corp., 804 F. Supp. 614, 630 (D.N.J. 1992).* Accord *Maruzen Int'l, Co. v. Bridgeport Merchandise, Inc., 770 F. Supp. 155, 158 (S.D.N.Y. 1991)* [**64] (whether an agreement is an assignment depends on whether the agreement effectively transfers the entire bundle of rights residing in the patent). "These rights are the 'right of exclusivity, the right to transfer and most importantly the right to sue infringers.'" Id. (quoting *Calgon Corp. v. Nalco Chem. Co., 726 F. Supp. 983, 986 (D. Del. 1989))* (other citations omitted). The Court will examine each in turn.

As to the right of exclusivity under Wateman, an agreement which grants the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States, is considered an assignment, with a right to sue infringers. *Waterman, 138 U.S. at 255.* At first blush, it would appear that the rights granted to Pfizer under paragraphs 2.1 and 2.2 of the Bayer/Pfizer Agreement constituted an assignment because [*1373] Pfizer was given the exclusive rights to make, have made use and sell the invention under the '986 patent in the United States and the right to sublicense others under the patent in the United States. Pfizer indeed argues that under the Waterman test, it is an assignee of the [**65] '986 patent with standing to sue for infringement in its name alone. [29]

> 29    Pfizer's citation to *Maruzen Int'l, Co. v. Bridgeport Merchandise, Inc., 770 F. Supp. 155, 158 (S.D.N.Y. 1991)*, as support for its argument is unavailing. Maruzen teaches that labels are to be disregarded, and the substance of the rights transferred must be examined in determining whether there has been an assignment which grants the right to sue to the assignee in his own name, or merely the transfer of a license, which does not. Id. The court explained that "where an agreement effectively transfers the entire bundle of rights residing in a patent, that agreement is an assignment." Id. (emphasis added) (citation omitted). Maruzen then held that an exclusive licensee who was assigned all intellectual property rights in a patented invention obtained a

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 21 of 554

Page 21

812 F. Supp. 1352, *1373; 1993 U.S. Dist. LEXIS 1685, **65;
27 U.S.P.Q.2D (BNA) 1161

complete assignment of the patent and had standing to sue in its own name. Id. Unlike the present case, under the assignment in Maruzen, the patent owner had reserved no rights to itself. Id.

[**66] Pfizer's rights, however, are not exclusive. Bayer retained the title to the '986 patent. Bayer retained manufacturing rights under the patent for itself and/or its affiliate. Bayer additionally retained the right under the Agreement to obtain a non-exclusive, royalty-free sublicense for itself or its affiliate to make, have made, use and sell under the '986 patent in the United States. Bayer exercised the right to obtain a non-exclusive sublicense, and in fact obtained a sublicense under the Agreement. Like the plaintiff in Calgon, Pfizer's rights under the Agreement are subject to the right of Bayer or its affiliate to make and market products commercially under the '986 patent in the United States. See Calgon, 726 F. Supp. at 986. Thus, Pfizer's interests in the '986 patent within the United States are not exclusive, and the transfer of rights under the Agreement does not meet Waterman's definition of exclusivity.

The second factor in the analysis is the right to transfer. Instantly Pfizer's right of transferability is governed by paragraph 9.1 of the Agreement. Paragraph 9.1 provides in relevant part that "neither party shall be entitled [**67] to assign its rights hereunder without the express written consent of the other party hereto . . . ." D.I. 118, Ex. B at P 9.1. Under paragraph 9.1, Pfizer cannot assign its interests in the '986 patent without written permission from Bayer. In Calgon, the plaintiff could not assign its rights under the patent at issue without obtaining the transferor's written consent. See Calgon, 726 F. Supp. at 986. The court stated that "just as the right to alienate personal property is an essential incident of ownership, the right to further assign patent rights is implicit in ay true assignment." Id. In light of this harsh restriction on alienation in the present case, this Court need look no further in determining that Bayer reserved substantial rights under the Agreement. See, e.g., Raber v. Pittway Corp., 23 U.S.P.Q.2d 1313 (N.D. Cal. 1992) (1992 U.S. Dist. LEXIS 6379, at *8) (citation omitted).

The third factor concerns the right to sue infringers. Like the plaintiff in Calgon, Pfizer cannot commence an infringement action unless it first has notified Bayer of the infringement and given Bayer the opportunity [**68]

to bring an action in Bayer's own name. See Calgon, 726 F. Supp. at 986. This requirement essentially amounts to a right of first refusal retained by Bayer to sue for infringement of the '986 patent. Notwithstanding this Court's conclusion that Pfizer has not complied with the conditions in the Agreement for bringing suit in its name alone, here, as in Calgon, Pfizer cannot be said to stand on "equal footing" with Bayer with respect to the right to sue when Pfizer's right to sue is conditioned upon Bayer's right of first refusal. See id. at 987. [30]

> 30    Moreover, the language of paragraph 5.1 unequivocally shows that Bayer has reserved the right to sue for infringement under the Bayer/Pfizer Agreement. Upon an infringing sale and proper notice from Pfizer, and after the six month period has expired during which Bayer may take action against the infringer, the provision provides that "then upon request of PFIZER, BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name." D.I. 118, Ex. B at P 5.1. If Pfizer obtained the right to sue under the Agreement, it would be unnecessary for Bayer to grant to Pfizer the right to sue an infringer in its own name. The retention of this substantial right indicates that Bayer did not intend to assign to Pfizer the entire bundle of its rights in the '986 patent. Indeed, it was intended by the parties that evidence of Bayer's permission to sue would be needed to help effectuate Pfizer's standing. No other import can be ascribed to the provision of the Agreement that has reserved so much of the rights to the patent that this licensee would need the "permission" of the owner to sue and the execution of all necessary documents to establish standing.

[**69] [*1374] Pfizer attempts to distinguish Calgon by relying on the decision in Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A., 944 F.2d 870 (Fed. Cir. 1991). At the outset, the Court observes that the rights retained by the patentee in Vaupel were not the type of substantial rights retained by Bayer. The Vaupel court held that the reserved rights (a veto right on sublicensing by the licensee, the right to obtain patents on the invention in other countries, a reversionary right to the patent in the event of bankruptcy or termination of production by the licensee and a right to receive infringement damages) were not so substantial as

812 F. Supp. 1352, *1374; 1993 U.S. Dist. LEXIS 1685, **69;
27 U.S.P.Q.2D (BNA) 1161

to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights. *id. at 875*. This Court does not rest its conclusion on any of the types of rights cited in Vaupel, although Bayer retained some of the rights cited in Vaupel. [31] While Bayer did not retain the veto right over sublicensing, it retained the more substantial right to veto Pfizer's assignment of rights under the '986 patent.

> 31    Here, Bayer did not grant to Pfizer patent rights in the '986 patent in countries other than the United States. See D.I. 118, Ex. B. Bayer retained a reversionary right to the '986 patent in the event of bankruptcy and also retained the right to fifty percent of any infringement damages in the event Bayer prosecuted an infringement action. See id. at PP 6.2 and 5.1, respectively.

[**70] The agreement in Vaupel granted the licensee the sole right to sue for past, present and future infringement, subject only to the obligation to inform the patentee. *Id. at 874-75*. The court found that the agreement's transfer of the right to sue for infringement was particularly dispositive because the ultimate issue confronting the court was whether the licensee could bring suit on its own or whether the patentee must be joined as a party. *Id. at 875*. The Vaupel court also reasoned that the policy underlying the requirement to join the owner, that of preventing the possibility of two suits on the same patent against a single infringer, was not undercut because the right to sue rested solely with the exclusive licensee. Id. This situation is distinguishable from the present case, however, where Bayer retains the right of first refusal to institute suit against EPRC under the Bayer/Pfizer Agreement.

Because Bayer retained for itself title to the '986 patent, because Pfizer's interests in the '986 patent are not exclusive, because Pfizer does not have the right to assign its interests in the patent without Bayer's written consent, because Pfizer's right to sue [**71] for infringement is conditioned upon Bayer's right of first refusal, because Bayer retained the right to question whether infringing sales had occurred and because Bayer must grant to Pfizer the right to sue in its own name and execute whatever documents necessary to allow Pfizer to sue, Bayer has not transferred to Pfizer substantially all of its rights in the '986 patent under the Bayer/Pfizer Agreement.

Pfizer, therefore, is a licensee who cannot sue in its own name. Accordingly, Pfizer does not have standing to sue in its name for infringement of the '986 patent as a matter of patent law. Summary judgment as to Pfizer's standing as a matter of law to sue EPRC and Elan in the present action is granted to Defendants EPRC and Elan.

## C. Bayer Is An Indispensable Party Under *Fed. R. Civ. P. 19(b)*

Defendant EPRC raises another alternative argument related to standing. EPRC argues that even if Pfizer did have standing [*1375] to sue, Bayer is an indispensable party under *Fed. R. Civ. P. 19(b)* and, because Bayer was not joined as a plaintiff, the complaint should be dismissed.

[HN16] "A patent owner should be viewed as a necessary party if it retains 'any interest' in the patent." *Erbamont Inc. v. Cetus Corp., 720 F. Supp. 387, 393 (D. Del. 1989)* [**72] (quoting 5 D. *Chisum, Patents § 21.03[3]*, at 21-167 (1988)). As discussed at length in subsection II.B., Bayer retained substantial rights in the '986 patent and Pfizer is a mere licensee under the Bayer/Pfizer Agreement.

Moreover, the Court finds that under *Rule 19(a)*, as a practical matter, the disposition of the action in Bayer's absence may impair or impede Bayer's ability to protect that interest. In the absence of Bayer, Pfizer disputes numerous issues related to standing arising from its license agreement with Bayer, not the least of which is Pfizer' interpretation of whether an infringing sale is a prerequisite to Pfizer's right to sue for infringement. Pfizer additionally contests whether it gave proper notice as a condition of the Agreement prior to acquiring the right to sue for infringement in its own name. Finally, Pfizer arguably contest the transferor's intent under the Bayer/Pfizer Agreement as to whether Pfizer, the transferee, is a licensee or assignee. All of these items turn on Pfizer's interpretations and arguments as to the intent and construction of the Bayer/Pfizer Agreement.

The only evidence before the Court from the perspective of Bayer is its February [**73] 7, 1991 letter to Pfizer and Bayer's July 28, 1992 letter to EPRC's outside counsel, both of which state that in Bayer's opinion, Pfizer has yet to comply with the notice provisions of paragraph 5.1 as they relate to the instant suit. The fact that Bayer disputes many items related to Pfizer's standing is demonstrated conclusively by the evidence of the parties' correspondence related to this

action and discussed at length in subsection II.A.

Bayer plainly contests that Pfizer has the right to proceed presently. Contrary to Pfizer's assertion that Bayer has acquiesced to Pfizer's suing the Defendants in its own name, EPRC produced a letter from Bayer dated after the filing of Pfizer's infringement action which confirms that the parties dispute whether Pfizer has the right to pursue this action. In the light of these very obvious disputes between the parties to the license agreement, it is more appropriate that they be resolved pursuant to the terms of the Agreement which mandates arbitration.

The Court further finds that due to Bayer's interest in the '986 patent, disposition of the action in Bayer's absence may leave the Defendants subject to a risk of incurring double or otherwise [**74] inconsistent obligations. Such a risk arises because Pfizer has failed to demonstrate that the right to sue these Defendants for infringement of the '986 patent vests entirely in Pfizer thereby eliminating the risk of inconsistent obligations.

[HN17] Once a party is deemed necessary under *Rule 19(a)*, a court must undertake the second step of the analysis, i.e., if the party cannot be joined because it is not subject to process, [32] then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. *Fed. R. Civ. P. 19(b)*; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A., 944 F.2d 870, 876 n.1 (Fed. Cir 1991)*; *Suprex Corp. v. Lee Scientific, Inc., 660 F. Supp. 89, 93 (W.D. Pa. 1987)*.

> 32   No showing has been made to this Court that Bayer is subject to service of process of the Court.

[HN18] "A patent owner has long been held to be an indispensable party in an enforcement action by its licensee." *Suprex, 660 F. Supp. at 94* [**75] (citations omitted). In this case, the Court is presented with extensive evidence that Pfizer and Bayer dispute Pfizer's standing to sue the Defendants for infringement of the '986 patent. A determination by this Court that Pfizer has standing under paragraph 5.1 of the Bayer/Pfizer Agreement and as a matter of [*1376] patent law to sue

in its own name instantly would fix the rights and obligations of Bayer under the Agreement in Bayer's absence. Indeed, the Court would be resolving disputes and determining the rights and obligations of the parties under the Agreement when the parties themselves have agreed to resolve these matters by arbitration. Such a finding comports with the first factor a court considers for a *Rule 19(b)* analysis, i.e., to what extent a judgment rendered in the absence of a necessary party might be prejudicial to him or those already parties. This factor weighs so strongly against Pfizer under the totality of circumstances of the instant action that it renders unnecessary an analysis of the remaining three factors under *Rule 19(b)*.

Other courts have held that where there is a dispute regarding the terms and conditions of the patent transfer, i.e., whether the [**76] transferee is a licensee or assignee, it would be improper under *Fed. R. Civ. P. 19* to make such a determination absent evidence from the transferor. *Refac Int'l, Ltd. v. Mastercard Int'l, 758 F. Supp. 152, 157 (S.D.N.Y. 1991)* (citing Dentsply Int'l, Inc. v. *Centrix, Inc. v. Centrix, Inc., 553 F. Supp. 289, 294 (D. Del. 1982)* (in determining if a patentee is an indispensable party, the critical focus is upon the entity who is the real party in interest in the controversy)).

Thus, if the Court had not concluded that Pfizer lacks standing on the grounds previously discussed, the Court alternatively concludes that in equity and good conscience, Bayer is an indispensable party to any resolution of the issues raised herein at this juncture of the proceedings. Additionally, any disputes between Pfizer and Bayer related to the Bayer/Pfizer Agreement and rights thereunder for the '986 patent are more appropriately resolved through arbitration as provided for in the Agreement.

## III. CONCLUSION

For the reasons stated herein, the Defendants' motion for summary judgment on the ground of Pfizer's lack of standing, in the absence [**77] of Bayer as a party, is granted. An order in accordance with this opinion shall be entered.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 24 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

2012 ONCA 862
Ontario Court of Appeal

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne

2012 CarswellOnt 15402, 2012 ONCA 862, 115 O.R. (3d) 287,
225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 82 E.T.R. (3d) 165

# In the Matter of the Primo Poloniato Grandchildren's Trust

The Canada Trust Company Trustee of the Primo Poloniato Grandchildren's Trust, Applicant (Respondent) and Russell Browne, John Mori Jr., Andrea L. Mori-Mickus, Laura Lee, Marla L. Ashmore, Teresa O'Neil, Michael Poloniato, Kristen Wiley, Brandon Ashmore, and The Children's Lawyer on behalf of the minors, Rachel Browne, Hailey Browne, Michelle Wiley, Jessica Ashmore, Julia Mickus, Robert Mickus, Olivia Mickus, John Mickus, Marissa Lee, Erica Lee and on behalf of the unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust, Respondents (Appellant/Respondents)

K. Feldman, Janet Simmons, E.A. Cronk JJ.A.

Heard: April 11, 2012

Judgment: December 7, 2012[*]

Docket: CA C53262

Proceedings: affirming *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne* (2011), 2011 ONSC 731, 65 E.T.R. (3d) 113, 2011 CarswellOnt 29 (Ont. S.C.J.)

Counsel: Earl A. Cherniak, Q.C., Cynthia B. Kuehl, for Appellant
Archie J. Rabinowitz, David Lobl, Jeremy C. Millard, for Respondent, Canada Trust Company
Mark Abradjian, Christopher R. Durdan, Brad Wiseman, for Respondents, John Mori Jr., Marla L. Ashmore and Teresa O'Neil

Subject: Estates and Trusts; Civil Practice and Procedure

### Headnote

**Estates and trusts --- Trusts — Express trust — Interpretation**

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

**Estates and trusts --- Trustees — Powers and duties of trustees — Supervision by court — Review of discretionary powers**

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

**Estates and trusts --- Trustees — Powers and duties of trustees — Duties to life tenant and remainderman — Evenhandedness**

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 26 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...
2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

**Estates and trusts --- Trustees — Powers and duties of trustees — Duties to life tenant and remainderman — Encroaching on capital — Implied right**

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

**Table of Authorities**

**Cases considered by *K. Feldman J.A.*:**

*Armstrong, Re* (1924), 55 O.L.R. 639 (Ont. Div. Ct.) — considered

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — followed

*Finnell v. Schumacher Estate* (1990), 37 E.T.R. 170, 74 O.R. (2d) 583, 38 O.A.C. 258, 1990 CarswellOnt 479 (Ont. C.A.) — referred to

*Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317, 101 B.C.A.C. 62, 164 W.A.C. 62, 1997 CarswellBC 2836 (B.C. C.A.) — considered

*Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97, 4 C.P.C. (5th) 35, 2001 CarswellOnt 9, 11 B.L.R. (3d) 197 (Ont. C.A.) — followed

*Irving, Re* (1975), 66 D.L.R. (3d) 387, 11 O.R. (2d) 443, 1975 CarswellOnt 581 (Ont. H.C.) — considered

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 27 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

*Russ v. British Columbia (Public Trustee)* (1994), 1994 CarswellBC 131, 89 B.C.L.R. (2d) 35, 3 E.T.R. (2d) 170, 43 B.C.A.C. 209, 69 W.A.C. 209 (B.C. C.A.) — referred to

*Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155, (sub nom. *Teichman Estate, Re*) 110 Man. R. (2d) 114, (sub nom. *Teichman Estate, Re*) 118 W.A.C. 114, 1996 CarswellMan 158 (Man. C.A.) — referred to

**Statutes considered:**

*Trustee Act*, R.S.O. 1990, c. T.23
    Generally — referred to

*Variation of Trusts Act*, R.S.O. 1990, c. V.1
    s. 1(2) — considered

APPEAL from judgment reported at *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne* (2011), 2011 ONSC 731, 65 E.T.R. (3d) 113, 2011 CarswellOnt 29 (Ont. S.C.J.).

*K. Feldman J.A.*:

**Introduction**

1      The Children's Lawyer brings this appeal on behalf of the minor, unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust (the "Trust"). The Trust was settled in October 1980 by Primo Poloniato, the founder of Primo Foods Ltd., in favour of his grandchildren (the income beneficiaries) and their issue, his great-grandchildren (the capital beneficiaries). The Trust's principal asset is shares in 679312 Alberta Ltd. (the "Holding Company"), a private investment company controlled by the Trust. While the value of the Trust has fluctuated over the years, at its peak it was worth in excess of $130 million.

2      Since its inception, the Trust has been varied with court approval twice — in December 1988 and again by a deed of arrangement, dated December 1997, which was approved in March 1998. Both variations were made based on the agreement and consent of all parties, including the Children's Lawyer (in 1988, the Official Guardian) on behalf of minor, unborn and unascertained beneficiaries.

3      The application that gives rise to this appeal was brought by Canada Trust, the Trust's current trustee, for the court's advice and direction to clarify the trustee's obligations under the Trust agreement as varied by the 1997 trust deed (the "Trust Deed as Varied"). That variation changed the nature of the Trust to a "percentage trust" or a "unitrust". It allowed the trustee to have a freer hand to make investments within the Holding Company in order to maximize the value of the Trust for the benefit of all beneficiaries, without concern as to whether those investments were income-producing or growth-oriented.

4      The Trust Deed as Varied provides that the income beneficiaries receive a fixed percentage of the net fair market value of a defined percentage of the Trust's assets as their distribution each year. This provides the income beneficiaries with a guaranteed annual income, allowing them to be able to plan their spending priorities and obligations with confidence. As a percentage trust, if the income-producing investments chosen by the trustee do not produce sufficient income to make the distributions, the trustee may sell equities or other capital investments held by the Holding Company in order to generate sufficient funds to make the percentage payments to the income beneficiaries.

5      For the residuary capital beneficiaries, the benefit of the 1997 variation is that the trustee may invest in equities and other appreciating assets, which will ultimately be available for the capital beneficiaries, rather than being constrained by the obligation to earn income and preserve capital.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

6    The 1997 variation application was based on accounting projections of the future value of the Trust that were prepared by Ernst & Young based on past market performance. Those projections saw the value of the Trust continue to increase over time.

7    Unfortunately, because economic conditions since 2001 have resulted in lower than expected investment returns, the trustee has had to continue to sell a significant portion of the underlying assets owned by the Holding Company in order to make the annual percentage distributions to the income beneficiaries, resulting in an ongoing depletion of the value of the Trust as a whole.

8    The application judge interpreted the Trust Deed as Varied to require the trustee to make the percentage distributions to the income beneficiaries in spite of the downturn in the market and its effect on the capital value of the Trust.

9    The Children's Lawyer appeals from the application judge's decision, arguing that the application judge ignored trust principles and failed to take into account the proper factual matrix in interpreting the terms of the Trust Deed as Varied. Counsel submits that the effect of the decision is to erode the interests of the capital beneficiaries to the point of elimination, which could not have been what was intended when the 1997 variation received court approval.

10    For the reasons that follow, I would dismiss the appeal. In my view, the application judge interpreted the Trust Deed as Varied in accordance with proper trust principles and in the way it was understood and intended by all the consenting parties and by the approving court at the time.

**Facts**

11    Mr. Poloniato, who died in 1984, had seven grandchildren. All are now of full age and capacity. At the time of the application there were 12 great-grandchildren, six of full age and capacity and six minors.

12    The Trust was settled as part of an estate freeze. Initially, the Trust held the growth shares of Primo Foods through an Ontario numbered company. Upon Mr. Poloniato's death, the shares were sold and the proceeds were invested in securities and near cash equivalents, which are now held by the Holding Company.

13    Under the original terms of the Trust, income from the Trust would be accumulated until the earlier of the expiration of 21 years from the settling of the Trust, or the death of the settlor's first grandchild (the latter defined as the "Time of Division"). At the Time of Division, the Trust would be split equally into sub-trusts for each grandchild then living or who had issue living. Subsequent to the Time of Division, the income from each sub-trust would be paid to each grandchild during his or her lifetime and, on the death of the grandchild, the capital of each sub-trust would be payable to one or more of the grandchild's issue as designated by him or her pursuant to a power of appointment. The trustee was given no specific power to encroach on capital.

14    By the mid-1980s, the value of the Trust had grown significantly. The grandchildren, who were the income beneficiaries, sought earlier access to some of the income from the Trust to assist them in addressing their immediate financial needs and to prepare them for the anticipated receipt of a large sum of money beginning in October 2001 (the expiration of 21 years from the settlement of the Trust).

15    In December 1988, the court approved a trust variation that accelerated payment of income to the income beneficiaries beginning in 1988 and continuing to 2001. The variation sought by the trustee was consented to by all the adult beneficiaries and the Official Guardian.

16    The main elements of the 1988 variation (also referred to as the Settlement) were the following:

• The income beneficiaries became entitled to receive 1/7 of the "gross annual income" of the Trust in 1988 and an increasing percentage each year up to 1/3 of the gross annual income for the years 1998, 1999 and 2000; the distributable income was to be paid to those grandchildren alive in each of those years, divided in equal shares *per capita*.

• From January 1, 2001 onwards on an annual basis, all the net income from the Trust fund was to be divided in equal shares *per capita* among the grandchildren.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 29 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

• The trustee was permitted to encroach on capital to a maximum of $200,000 for each family unit for the benefit of the great-grandchildren.

• The income beneficiaries released their power of appointment in respect of their capital interests under the Trust so that every one of their issue (all the great-grandchildren) would be equal capital beneficiaries.

17    Some problems arose following the 1988 variation, including uncertainty about the meaning of the term "gross annual income". Also, the grandchildren (the income beneficiaries) wanted to receive a predictable annual amount of money so that they could plan and live knowing what amount would be available each year. Finally, because by 1997 the equity markets were performing very well while interest rates were in decline, it was felt that both classes of beneficiaries were losing out on overall returns because of the investment restrictions on the trustee regarding the need for income-producing assets. The trustee was not able to maximize the value of the Trust at a time when there were significant growth opportunities in the market for those with a more unconstrained investment mandate.

18    According to an affidavit on the motion to approve the 1997 variation sworn by Mike Ruf, a trust officer of the then trustee, National Trust Company, the second variation in 1997 was meant to resolve the interpretive issue, to give the trustee more discretion as to the management of the investments, and to make distributions to income beneficiaries more predictable.

19    Among other things, the 1997 variation was designed as a percentage trust or a unitrust, a new type of trust that had been recommended by the Ontario Law Reform Commission's *Report on the Law of Trusts* (Ministry of the Attorney General, 1984). The percentage trust or unitrust would allow the trustee to use a balanced portfolio strategy of investing. Paragraph 26 of the Ruf affidavit explains:

The principal advantage of the revised method of distribution is that it will enable the Trustee to adopt a balanced portfolio strategy which most likely in the longer term will provide the greatest asset base for the capital beneficiaries, being the minor children and unborn issue of the Grandchildren.

20    As counsel for the trustee at the time of the 1997 variation, Mr. Martin Rochwerg explained in his evidence on this application that the advantage of a percentage trust is that it allows the trustee to invest for maximum returns, regardless of whether they result in capital gains or income. The total growth is then split between the income and capital beneficiaries on a specified percentage basis. He explained further that the interests of the income and capital beneficiaries would therefore be "in tandem", because they would "either both benefit or they both lose." The effect of the conversion to a percentage trust was that the income beneficiaries were no longer entitled to receive income from the Trust; instead they would receive a fixed amount of money from the Trust each year, based on a percentage formula that included mandatory minimum and maximum limits.

21    Prior to the approval of the 1997 variation, a "no-tax" ruling was sought and obtained from Revenue Canada (now the Canada Revenue Agency or "CRA"). By letter of June 1997 addressed to Revenue Canada, Mr. Rochwerg enclosed a memorandum that explained the reasons for the proposed variation and that addressed the issue whether the proposed variation would result in a disposition of a capital interest for tax purposes.

22    One of the points covered in the memorandum was the legal requirement that the arrangement be for the benefit of minors and unborn and unascertained beneficiaries, who, in this case, were the capital beneficiaries. The memorandum opined that the court would not approve the proposed arrangement on behalf of those beneficiaries if the result was that their interest would be diminished. In this case, the benefit to the capital beneficiaries was said to come "primarily from the Trustee being freed from restrictions on investing so that the Trustee [could] adopt an investment policy which will further enhance the value of the Trust."

23    After some back and forth between the CRA and the Trust's advisors, the CRA granted an advance tax ruling based on the facts as set out in the ruling letter, which included the following paragraph:

10. In no event will the annual distribution [to the Income Beneficiaries] be less than the previous year's distribution. Where it is determined that the amount to be distributed based on the formula is less than the previous year's distribution, the

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

current year's distribution will be adjusted to the amount of the prior year's distribution. The new system will also provide that the current year's distribution cannot exceed 115% of the previous year's distribution. *The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from [the] Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of the Income Beneficiaries.* These provisions will have the effect of providing the Income Beneficiaries with a stable annual income, and ensuring some growth to the Capital Beneficiaries. In determining the appropriate Distribution Percentage (70%) for the years 2001 and onward, various asset mixes were tested and compared with the results using a rigid asset mix. Rates of return for the last 10 years were used in these projections. Provided these rates of return are a reasonable indication of future rates of return, the new formula will provide an after-tax increase for the Capital Beneficiaries and should also provide a slightly greater after-tax return for the Income Beneficiaries over the longer term.

[Emphasis added.]

24    The basis for selecting 70 per cent in setting the Yearly Income to be distributed to income beneficiaries starting in 2002, which was the amount recommended and accepted as part of the arrangement, was explained in the Ruf affidavit at para. 23. The distribution percentages of 25 per cent for 1997 and 33-1/3 per cent for 1998-2000 were the same as in the Trust deed as varied in 1988, which he refers to as the Settlement. He then states: "In all years thereafter the Distribution Percentage represents a reduction of 30% from that set out in the Settlement." This was because the Settlement provided that, beginning in 2001, the trustee was to administer the Trust Fund's annual income by dividing 100 per cent of the net income among the grandchildren on a *per capita* basis. Therefore, a 70 per cent distribution represented a 30 per cent reduction from what they would have received under the Settlement.

25    The CRA ruling required that income distributions be in the form of cash dividends paid by the Holding Company to the Trust in any year in order to ensure that there would be no encroachment on the capital of the Trust (the shares of the Holding Company). On that basis, the CRA was prepared to give the ruling that "[t]here will not be a disposition of any income or capital interest in the Trust as a result of the proposed transactions". This ruling was needed in order to implement the proposed 1997 variation without adverse tax consequences.

26    The Children's Lawyer consented to the 1997 variation on behalf of the capital beneficiaries who were unable to consent, namely those who were minor, unborn or unascertained persons.

27    Ernst & Young had prepared a number of calculations for the purpose of advising on the proposed variation, including a comparison of the projected capital using the then existing portfolio mix of 70 per cent debt and 30 per cent equities, and comparing that to an asset mix of 70 per cent equities and 30 per cent debt. Those calculations, which were provided to the Children's Lawyer, showed an expected benefit to the capital beneficiaries of approximately $2 million after five years and $12 million after ten years.

28    In a 1996 letter to the Children's Lawyer explaining the background to the proposal, Mr. Rochwerg summarized five benefits of the proposed variation for the capital beneficiaries. It would: 1) increase growth from better investment performance; 2) reduce costs of administration; 3) address the issue of 21-year planning to reduce imminent tax liability; 4) impose a cap on the income entitlement that would leave more growth for the capital beneficiaries; and 5) accelerate the use of significant tax-free and refundable tax amounts.

29    This letter also explained the concept of the percentage trust that had been endorsed in 1984 by Ontario's Law Reform Commission in its *Report on the Law of Trusts*. The percentage trust allows the trustee to invest to increase the overall value of the trust and to allocate funds to the income or capital beneficiaries without regard to whether those funds themselves are income or capital of the trust. In that regard, the *Report* recommended that the percentage payment to the income beneficiaries come first from the annual income, and if insufficient, then from capital: p. 303.

30    Justice Donna Haley, a Superior Court judge with significant expertise in wills and trusts, approved the 1997 variation. In her endorsement, she found that the proposed variation was in the best interests of the great-grandchildren as they would

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 31 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

benefit "both directly as capital beneficiaries and by the certainty of income provided by the variation to their parents who are all grandchildren under the trust".

31     Commenting on the context in which the 1997 variation application was made, the application judge below observed that at the time, interest rates were declining and capital markets were heating up. "It was anticipated by all parties", he noted, "that the rates of return which had been historically achieved on the assets of the Holding Company would be equalled or exceeded in the future."

32     However, a few years after the 1997 variation was approved, it transpired that investment returns were not consistently as strong as predicted, which has had a significant effect on the Trust and its value.

33     The application judge further observed:

[A] decrease in market performance of the Trust's assets has resulted in the calculation of Yearly Income in each year being less than the Yearly Income which was paid to the income beneficiaries in 2002. Because the definition of "Yearly Income" in clause 0.1(g) of the Trust Deed as Varied provides that the Yearly Income cannot be less than the prior year's Yearly Income, the result has been that the amount the Trust has distributed to the income beneficiaries for each year after 2002 has been the 2002 amount.

In order to be able to pay the Yearly Income to the income beneficiaries as required, the trustee was obliged to cause the Holding Company to sell assets.

34     In 2003, the trustee commissioned a report on the expected life of the Trust, assuming distributions were maintained at then current levels. The report indicated that, depending on investment returns, the capital of the Trust would be expended in 18 to 20 years.

35     The respondent income beneficiaries rely on a more recent report obtained by the trustee in 2007 that estimates that the projected value of the Trust in 2022 could be about $90 million depending on investment returns.

36     Because of the concerns of the trustee, the Children's Lawyer and other beneficiaries that the minimum annual percentage distributions to the income beneficiaries were depleting the Trust capital, the trustee applied to the court for direction on the extent of the trustee's discretion not to make the minimum percentage distributions to the income beneficiaries in order to preserve the value of the Trust corpus for the capital beneficiaries.

37     In particular, the trustee wanted to know whether it retained a duty to maintain an even hand between the income and capital beneficiaries in managing Trust distributions, and therefore a discretion to stop making the prescribed percentage payments to the income beneficiaries that were eroding the value of the Trust.

**Application Judge's Decision and Reasons**

38     The application judge provided detailed reasons explaining his interpretation of the Trust Deed as Varied. The relevant provisions of the Trust deed are set out in the Appendix to these reasons.

39     He found the provisions of the Trust Deed as Varied to be clear and unequivocal and thus all that needed to be considered apart from the agreement was the factual matrix. In his view, the Ruf affidavit best summarized the circumstances at the time of the 1997 variation. He concluded that the evidence of the discussions leading up to the agreement and subsequent approval of the 1997 variation, communications with the CRA, the parties' understandings as to what was intended by the 1997 variation or what was communicated to them subsequently, and any legal opinions as to what the 1997 variation means, constituted extrinsic evidence that was inadmissible for the purposes of interpreting the Trust Deed as Varied.

40     In bringing the application, the trustee set out two questions to be answered by the application judge. The first question was: does the trustee have the discretion to cause the Holding Company that is controlled by the Trust to distribute sufficient income to the Trust to meet the minimum annual distribution requirements to the income beneficiaries? In order to answer that

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

question, the application judge was required to consider the meaning of the following provisions of the Trust Deed as Varied: the definitions of "Yearly Income", "Applicable Percentage", "Net Income", and paras. 1(a), 1(c) and 5(vi).

41     The application judge first found that clause 1(a) together with the definition of "Yearly Income" in clause 0.1(g)(vi) are clear and unambiguous. He concluded that the requirement in clause 1(a) to pay the Yearly Income and associated taxes to the income beneficiaries was mandatory. Those provisions read:

"Yearly Income" for a calendar year shall mean the amount equal to:

. . .

(vi) in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income *shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year*....

1. The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a) *the Trustee shall pay the Yearly Income* to or for the benefit of the Grandchildren in equal shares in each calendar year.... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the Income Tax Act in respect of the Yearly Income from the trust. The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

[Emphasis added.]

42     He observed that the mandatory duty created in clause 1(a) is qualified by clause 1(c), which ensures that the mandatory payments are made from the Net Income of the Trust, which means cash dividends paid by the Holding Company (or income from other assets of the trust) and not from a sale or other disposition of the shares of the Holding Company, which would constitute a disposition of the capital of the trust. Paragraph 1(c) provides:

(c) notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

43     The application judge then turned to clause 5(vi) which reads:

5. The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions:

. . .

(vi) to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and *to manage the investments of the trust, including any distributions from any corporations controlled by the Trustee in order that the Net Income, of any trust hereunder shall be no less than the amount required to be distributed to a Grandchild during a calendar year*;

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 33 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

[Emphasis added.]

44    He concluded that this clause grants powers to the trustee, including the power to manage the investments and pay the distributions, in a manner that will achieve the objective of creating sufficient net income to pay the minimum annual amounts to the income beneficiaries. The highlighted portion of clause 5(vi) did not create a duty or obligation on the trustee, but an objective or purpose to guide the trustee.

45    The application judge found that the power to manage investments in clause 5(vi) carried with it a discretion in the trustee to determine the way in which the investments would be managed. It followed that the power to manage distributions, which by the wording of clause 5(vi) was included in the power to manage investments, must also give rise to discretion in the trustee to determine how distributions were managed.

46    Moreover, clause 5(vi) made clear that the trustee's discretion to manage investments, including distributions from the Holding Company of cash dividends, was guided by the investment objective to ensure that the Net Income "shall be no less than the amount required to be distributed to a Grandchild during a calendar year".

47    Based on this analysis, the application judge concluded in answer to the first question that, under the Trust Deed as Varied, the trustee does have a discretion regarding both the investment and distribution of the Trust assets.

48    The second question put to the application judge was: if the answer to the first question is "yes", is the trustee still subject to the duty to maintain an even hand between the income beneficiaries and the capital beneficiaries when exercising the discretion to manage distributions?

49    Citing *Waters' Law of Trusts in Canada*, the application judge noted that the duty to maintain an even hand could be excluded by the terms of the trust deed. The duty can be ousted either by express words or by implication. In every case it is a matter of construction: Donovan W.M. Waters, Mark R. Gillen & Lionel D. Smith, *Waters' Law of Trusts in Canada*, 3d ed. (Toronto: Thomson Carswell, 2005) at pp. 966 - 969.

50    In this case, the application judge considered whether the even hand principle continued to apply in two contexts — the investment of the Trust assets and their distribution to the beneficiaries.

51    Dealing first with the trustee's duty with respect to the investment of the Trust assets, the application judge found it was clear that, when read together, the terms of the Trust Deed as Varied ousted the duty on the trustee to maintain an even hand. Because the income beneficiaries were now entitled to receive their percentage share from the total return on investment, whether by income or capital appreciation, there was no longer any necessity to maintain a distinction between interest and capital for investment purposes. Instead, the trustee could invest in a balanced portfolio for the benefit of all. He noted that this finding was consistent with the intentions of the parties as reflected in the Trust Deed as Varied.

52    The application judge came to a similar conclusion regarding the trustee's obligation to maintain an even hand in managing distributions. He found that, too, had been ousted by the terms of the Trust Deed as Varied and the way it was designed to operate with a prescribed minimum payment to the income beneficiaries each year.

53    The power to manage distributions in clause 5(vi) was included in the power to manage investments. He reasoned that if the duty to maintain an even hand did not apply to the power to manage the investments of the Trust, it could not apply to the included power to manage distributions.

54    The application judge found that the wording of the Trust Deed as Varied clearly required that capital assets held by the Holding Company would be sold, if necessary, to fund the obligations to the income beneficiaries. For the trustee to meet the obligation to pay the Yearly Income to the income beneficiaries, it must require the Holding Company to pay sufficient cash dividends to the Trust and those dividends must be sourced from the Holding Company's returns on its investments, which included both income and capital appreciation. To the extent that the obligations of the Trust could not be met from the income

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

earned on investments, it was intended that they would be met from the sale of assets in the Holding Company sufficient to generate the required cash dividends.

55     The application judge also found that to interpret the Trust deed to require the trustee to maintain an even hand between income and capital in respect of the distribution of monies from the Holding Company, so that the trustee could distribute only income from the Holding Company to the Trust to fund the obligations to the income beneficiaries, would render the clear language of clause 1(a) and the definition of "Yearly Income" in clause 0.1(g) completely ineffective.

56     He further concluded that that interpretation would also fly in the face of the stated objective of the parties to the 1997 variation — to permit the income beneficiaries to share (with the capital beneficiaries) in the overall appreciation of the Trust's assets on an annual basis, while still providing them with a degree of certainty in respect of the annual amount they would receive.

57     The application judge rejected the submission that the settlor's original intent, as discerned from the original Trust deed, was relevant to the interpretation of the Trust Deed as Varied. He also rejected the relevance of the court approval of the 1997 variation by Haley J. He said that it had no bearing on the issue before the court on the application, as the issue before the court was whether the 1997 variation was in the best interests of the capital beneficiaries and the material before the court at that time "clearly confirmed that it was".

58     Finally, he did not agree that the 1997 variation would "obliterate" the interests of the capital beneficiaries. There was an indirect benefit to the capital beneficiaries — who were all children of the income beneficiaries — and, as well, a return to previously projected rates of return would "no doubt go a long way to maintaining and perhaps increasing the capital." The negative projections were all based on the assumption that current low rates would continue.

59     To conclude, in answer to the second question, the application judge found that the duty to maintain an even hand was ousted by the terms and necessary operation of the Trust Deed as Varied.

## Issue on Appeal

60     The issue on appeal is whether the application judge made a fundamental error in his interpretation of the Trust Deed as Varied by finding that minimum percentage payments to the income beneficiaries were mandatory and that the even hand rule had been ousted with respect to the management of Trust distributions, leaving open the potential for depletion of the capital of the Trust to the detriment of the capital beneficiaries.

61     The appellant takes the position that the application judge erred in the following specific ways:

1) He erred in law by applying only contractual as opposed to trust interpretation principles to the interpretation of the Trust Deed as Varied and in particular:

   a) He narrowly construed the factual matrix so as to exclude any consideration of the role of the court and its jurisdiction in approving the 1997 variation.

   b) He excluded other evidence relevant to the factual matrix, specifically the CRA ruling.

   c) He ignored the intention of the settlor in the interpretive exercise.

   d) He made inconsistent interpretive findings concerning the trustee's ability to encroach.

   e) He failed to consider the objective of the 1997 variation that there be capital growth.

   f) He failed to consider whether his interpretation was consistent with the language of the Trust agreement when read as a whole.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

2) He erred in law by finding, contrary to trust principles and the language of the Trust Deed as Varied, when read as a whole, that the obligation of the trustee to maintain an even hand with respect to the management of Trust distributions was ousted.

62     Three of the income beneficiaries participated in this appeal. They take the position that the appellant is essentially asking the court to find that the trustee may pay less than the stipulated Yearly Income in the years in which the investment portfolio does not create sufficient returns in the form of income to fund the Yearly Income. They say that there is nothing in the wording of the Trust Deed as Varied or the factual matrix to support this interpretation.

63     The current trustee says it takes a "neutral" position on this appeal.

**Analysis**

*Principles of Interpretation*

64     The appellant argues that the application judge erred by interpreting the Trust Deed as Varied only as a contract, and that he failed to apply trust principles as part of the interpretive process. When the court is interpreting a trust that has been varied on consent of the beneficiaries, contractual interpretation principles are applied to determine the objective intent of the parties. However, because the agreement is a trust, trust principles must also inform that interpretation.

65     Before he embarked on the interpretation of the Trust Deed as Varied, the application judge acknowledged that "regard must also be had to the fact that the document under review is a trust deed and not strictly a commercial instrument." The appellant's specific concerns will be addressed individually in the course of the following analysis.

*Issue 1 - Factual Matrix — General Principles*

66      Before addressing the appellant's specific arguments, it is important to review what is meant by the factual matrix of an agreement.

67     It is well established that in interpreting a contract, the court may consider the "factual matrix" surrounding the contract, even where there is no ambiguity. "Indeed, because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case": *Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (Ont. C.A.), at para. 23.

68     In *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.), at para. 53, this court affirmed the relevance of the factual matrix to contractual interpretation:

[53] The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement ...

69     This court noted in *Dumbrell*, at para. 55, that while there is some debate about the outer limits of the scope of factual matrix, it clearly encompasses "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made".

70     In *Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317 (B.C. C.A.), at para. 18, the British Columbia Court of Appeal described the factual matrix as the "background" of the contract:

The factual matrix is the background of relevant facts, that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement. It can throw light on what the parties must have meant by the words they chose to express their intention....

Case 09-10138-MFW   Doc 14394-2   Filed 09/10/14   Page 36 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

The factual matrix is the background which may deepen an understanding of what the parties meant by the language they used, but the Court cannot make a new agreement.

71    While the scope of the factual matrix is broad, it excludes evidence of negotiations, except perhaps in the most general terms, and evidence of a contracting party's subjective intentions: Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012), at p. 27. As the cases above suggest, the factual matrix includes only objective facts known to the parties at or before the date of the agreement, and what is common to both parties: Hall, p. 30. Hall goes on to state that while the factual matrix can "be used to clarify the parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, or have the effect of making a new agreement": p. 31 (footnotes omitted). Ultimately, the words of the agreement are paramount.

### Issue 1(a) - Court Approval of the 1997 Variation

72    The appellant's position is that if the interpretation of the 1997 variation is not one that could have been approved by the court, then it could not have been what the parties intended or the court understood or approved at that time. The appellant submits that the application judge erred in finding that the approval of the variation "has no bearing on the issue before the Court in this application". To the contrary, the basis for the court's approval must form part of the factual matrix.

73    Under s. 2 of the *Variation of Trusts Act*, R.S.O. 1990, c. V.1, the court must be assured that any variation approved constitutes a benefit for those whose interests it has a duty to protect. It cannot ever have been intended, argues the appellant, that the interests of the capital beneficiaries would be diminished or defeated entirely. Had that been the intention or considered a reasonable consequence of the proposed variation, it would not have been approved by the court, nor could the Children's Lawyer have consented to it.

74    The problem with the appellant's submission is that the variation application was brought on a record that explained how the variation would be beneficial to the capital beneficiaries, primarily by increasing the value of the capital through investment in equities with growth potential as part of a balanced portfolio. The expert evidence suggested that, based on past performance, such a portfolio would increase in value in the future. The Children's Lawyer agreed to the variation on that basis and the court approved it on that basis.

75    The application from which this appeal is brought is not a variation application, nor is it a late appeal from that application. Rather, it is an application to the court to interpret the Trust Deed as Varied.

76    The appellant's submission is that the approving court would not have found the variation to be for the benefit of the minor, unborn and unascertained capital beneficiaries had it known that markets would fall and not continue to perform as they did through the late 1990's. Therefore this court should interpret the words of the variation in a manner that would allow the trustee to disregard the mandatory provisions of the Trust Deed as Varied. Instead, the court should read the deed as implicitly giving the trustee a discretion to reduce the payments to the income beneficiaries in order to preserve the capital of the Trust for the capital beneficiaries, on the basis that the even hand principle remains in effect under the Trust Deed as Varied.

77    Stated another way, the appellant submits in para. 47 of its factum that: "if [the application judge's] interpretation of the 1997 Variation is not one that could have been approved by the court, then of necessity, it could not have been what the parties intended or the court understood or approved at that time."

78    The appellant's first argument to support this submission is that the application judge erred by stating that the variation approval and its basis were irrelevant to his interpretation of the Trust Deed as Varied. The appellant says the factual matrix includes the court approval and the record that formed the basis of the approval application and that the application judge was required to consider those factors as part of the factual matrix.

79    I agree with the appellant's submission that the court approval of the 1997 variation and the material that supported it are an important part of the factual matrix that informs the interpretation of the Trust Deed as Varied. And I agree that it would

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

have been an error for the application judge to ignore the court approval of the 1997 variation in his analysis. However, it is clear that that is not what occurred.

80    As the basis for the factual matrix he considered, the application judge relied on the affidavit of Mr. Ruf that was used to support the court approval variation application. The application judge explicated in detail how the variation had to benefit the capital beneficiaries before it could be approved and that the court found, and the material stated, that it did so.

81    What the application judge stated near the end of his reasons is that, on the application before him, the court was not performing an approval function but an interpretation function. In other words, on this application — as distinct from the 1997 variation application — the court was not deciding what was in the best interests of the capital beneficiaries.

82    That said, the application judge also went on to dispute the position of the appellant that the effect of the 1997 variation would necessarily be to "obliterate" the interests of the capital beneficiaries. The value of the Trust did increase for a few years following 1997. Although markets later took a downturn, the appellant's pessimistic forecasts are based on a continuation of that downturn. The application judge observed that a return to previously projected rates of return "would go a long way to maintaining and possibly even increasing the capital". Obviously no one knows the future. However, it was open to the application judge to make this observation based on the evidence in the record before him, including the 2007 projection report.

### Issue 1(b) - CRA Tax Ruling

83    The second aspect of the factual matrix that the appellant says the application judge failed to consider was the CRA tax ruling and related correspondence. In the appellant's submission, the CRA ruling made explicit that the definition of "Net Income" was included to ensure that there would be no disposition of the capital assets of the Trust for the benefit of the income beneficiaries. Moreover, the CRA stated that the purpose of the 1997 variation was to ensure growth of the capital assets for the benefit of the capital beneficiaries and trustee's counsel confirmed in correspondence to the CRA that capital assets would not be diminished as a result of the 1997 variation.

84    Contrary to this submission, it is clear that the application judge considered, as part of the factual matrix, the CRA ruling that was appended to the Ruf affidavit, as important relevant background.

85    To the extent that the application judge did not consider the correspondence to the CRA and from the tax authorities, I agree with the appellant that this correspondence is helpful in understanding the full factual context of the 1997 variation and I have included some references to it in the statement of facts in these reasons. However, the appellant has not pointed to anything in the ruling or in that correspondence that contradicts or changes the factual matrix as described by the application judge or the basis on which the court approval was obtained in 1998.

86    The appellant also argues that the CRA inserted clause 1(c) and the definition of "Net Income" as cash dividends from the Holding Company into the Trust Deed as Varied to ensure that the trustee would not encroach on capital to the detriment of the capital beneficiaries.

87    I would not accede to this argument. This interpretation is not supported by anything in the correspondence from the CRA. That correspondence was directed to ensuring that cash dividends would be paid from the Holding Company to the Trust. It was the form of those dividends as income to the Trust that would govern their tax treatment, which was the sole concern of the CRA. This is consistent with the "form rule", used in the administration of trusts, which says that for trust accounting purposes, the form of a distribution determines its characterization as income or capital: *Report on the Law of Trusts*, p. 292. In its submission to the CRA dated November 26, 1997, Ernst & Young stated:

> The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of Income Beneficiaries.

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

88      The "capital of the Trust" being referred to is the shares of the Holding Company. Their disposal would amount to a capital disposition that would be taxable as such. Clause 1(c) ensures that income distributions will only come from cash dividends paid by the Holding Company, taking the form of income.

*Other Correspondence that is Part of the Factual Matrix*

89      In my view, the correspondence by the trustee's lawyer and by the income beneficiaries' lawyer with the Children's Lawyer that explained the purpose of the variation and its intended effect and benefits also forms part of the factual matrix. In that correspondence, reference was made to the fact that the variation was to be a percentage trust, a new financial approach to the investment and disbursement of trust funds by trustees that was approved by the Ontario Law Reform Commission in its 1984 *Report on the Law of Trusts*.

90      In *Waters' Law of Trusts in Canada*, the authors explain that a percentage trust allows the trustee to maximize the overall value of the trust assets for the benefit of all beneficiaries. It dispenses with the distinction between income and capital, instead guaranteeing the "income beneficiary" "a regular return of a fixed percentage on the value of the trust property": p.1059. If, in a particular year, the traditional income from investments exceeds the percentage to be paid to the income beneficiaries, the excess "remains part of the trust property". However, "if the income is less, the percentage is made up out of the trust property": p. 1059.

*Issue 1(c) - Intention of the Settlor*

91      The appellant next submits that the application judge erred in finding the intention of the settlor was irrelevant in interpreting the Trust Deed as Varied. Relying on *Irving, Re* (1975), 11 O.R. (2d) 443 (Ont. H.C.), the appellant argues that before a trust can be varied, one of the issues is whether the variation keeps intact the settlor's basic intention. Here the basic intention of the settlor was to benefit two generations of the Poloniato family through the creation of income and capital beneficiaries. Yet the interpretation of the 1997 variation by the application judge, the appellant argues, permits unlimited capital encroachment, thus possibly destroying any benefit of the Trust for the second generation.

92      In my view, there are three responses to this submission. The first is one already referred to — that this was not an application for a variation, but an application to interpret a Trust Deed as Varied. Therefore, if the varying court approved a variation that did not take the settlor's intent into account, and its meaning is clear, it is not the role of the interpreting court to distort the meaning of the deed as varied.

93      Second, the case law both in Ontario since *Irving, Re*, as well as in other provinces, suggests that the original intention of the settlor need not be considered when the court approves a variation as long as the necessary criteria are met: See *Russ v. British Columbia (Public Trustee)* (1994), 89 B.C.L.R. (2d) 35 (B.C. C.A.); *Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155 (Man. C.A.); *Finnell v. Schumacher Estate* (1990), 74 O.R. (2d) 583 (Ont. C.A.). However, because of my first and third responses to the appellant's submission, it is not necessary in this case to finally decide this issue.

94      The third response is that I do not agree with the appellant's suggestion that the intent and effect of the 1997 variation was to benefit only the income beneficiaries at the expense of the capital beneficiaries. That was clearly not the intent of the approving court, which was obliged to approve the variation only if it was for the benefit of the capital beneficiaries on whose behalf the approval was given. As the application judge was entitled to find, if the economy improves, the value of the trust should also see improvement. Moreover, the capital beneficiaries have had the indirect benefit, referred to by Haley J., of a consistent income flowing to their parents since the date of the variation.

*Issue 1(d) - Inconsistent Findings*

95      The appellant contends that the application judge erred in making an inconsistent finding. On the one hand, he found the parties intended that the trustee would have the power to encroach on capital assets of the Trust by selling the assets of the Holding Company. That finding is inconsistent, says the appellant, with his earlier finding, at para. 50 of his reasons, that the purpose of the definition of "Net Income" was to ensure that there would be no encroachment on the capital of the Trust.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 39 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

96    As discussed above, the premise of this submission is incorrect. This submission has been answered in the section dealing with the factual matrix surrounding the CRA ruling.

### Issue 1(e) - Objective of 1997 Variation

97    In the appellant's view, the application judge erred in failing to take into account an important objective of the 1997 variation: to ensure some growth to the capital beneficiaries. There is no merit in this submission. The application judge did not fail to take this objective into account: see, for example, paras. 37-39 of his reasons. For economic reasons, the trustee has been unable, at least up until the application, to continue to achieve the hoped for growth of the Trust corpus, despite the clear objective of the Trust and of the trustee to do so.

### Issue 1(f) - Interpretation of the Trust Deed as Varied, Read as a Whole

98    In the appellant's submission, the application judge erred in failing to consider whether his interpretation was consistent with the language of the Trust Deed as Varied, when read as a whole. For instance, counsel points to the fact that the 1988 variation gave the trustee an express power of encroachment on capital to a limited amount for the purpose of benefitting capital beneficiaries. It is argued that when the parties intended to permit encroachment on the capital of the Trust, they did so in clear and unequivocal terms.

99    In my view, this submission fails. In his analysis, which is set out in detailed and comprehensive reasons, the application judge takes into account the agreement as a whole. The appellant has provided no suggestion as to how to read the Trust Deed as Varied without giving full effect to the mandatory language to which it objects.

100    The Trust document is internally consistent in providing the mandatory percentage distribution scheme to the income beneficiaries. As already explained, to the extent that satisfaction of the percentage distribution may require using capital assets, this is a function of the balanced investment strategy employed in a percentage trust to achieve overall growth of the trust corpus. It is not an encroachment on capital in the traditional sense, which is a discretionary exercise by a trustee to benefit a specific beneficiary for specific or general needs, over and above that beneficiary's regular entitlement under the trust.

### Issue 2 - Even Hand Rule

101    The appellant submits that the application judge erred in his interpretation of the Trust Deed as Varied by failing to recognize and give effect to the duty of the trustee to maintain an even hand between the interests of the income and capital beneficiaries. The obligation of a trustee to treat different classes of beneficiaries fairly and impartially can only be displaced, contends the appellant, by an express intention to the contrary in the trust deed. In the appellant's submission, the 1997 variation did not displace the duty to maintain an even hand in managing distributions.

102    It is trite law that executors and trustees have a duty to maintain an even hand between the interests of the income and the capital beneficiaries, unless that duty is ousted explicitly or implicitly by the words of the instrument. Justice Middleton described this duty in the following way in *Armstrong, Re* (1924), 55 O.L.R. 639 (Ont. Div. Ct.), at p. 8:

> [I]t must be borne in mind by trustees that they are trustees not for the remaindermen alone in disregard of the rights of the life-tenant, nor for the life-tenant disregarding the interests of the remaindermen. Trustees must preserve an even hand as between these two conflicting interests. The duty towards the capital is to preserve it intact. The duty towards the tenant for life is to obtain as large a yield as is consistent with safety and the observance of the law under the instrument of trust as to the class of investment made; and, furthermore, so to adjust the investments that the life-tenant will receive annually his due proportion.

103    However, in a percentage trust, the trustee's duty is not to obtain a large income yield while preserving the capital but, instead, to increase the size of the entire trust for the benefit of both classes of beneficiaries. This includes increasing the capital rather than preserving it, and therefore involves an investment strategy that may include more risk. Because in a percentage

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 40 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

trust the trustee is investing to increase the entire value of the trust to benefit all, the issue is not whether the trustee's even hand duty is ousted in respect of the management of the trust's investments. What is disputed is whether the duty has been ousted in respect of the obligation of the trustee to make distributions to the beneficiaries.

104    The role of the even hand duty in the administration of a percentage trust was addressed in the Law Reform Commission's *Report on the Law of Trusts*. That *Report* recommends that when trustees administer a percentage trust, they continue to maintain an even hand in the periodic valuation of the trust and when making the distributions. Specifically, the *Report* states at p. 303:

> We therefore recommend that the revised [Trustee] Act should contain a provision to the effect that, where trustees are expressly directed by the trust instrument to hold trust assets "on percentage trusts", they shall value the assets periodically and, instead of any income arising from the assets, pay to the person who would otherwise be the income beneficiary a percentage of that valuation in each year of the valuation period. *In so doing, trustees should be required to maintain an even hand between income and capital beneficiaries*.
>
> [Emphasis added.] [1]

105    There is no clear explanation as to what the Commission means when it says that the trustees should maintain an even hand when valuing the assets and making the annual percentage payment to the income beneficiaries. My interpretation is that the Commission contemplates a periodic review and, if necessary, a re-set of the percentage payable to income beneficiaries, based on the value of the trust assets and on the even hand rule.

106     The problem here is that in the Trust Deed as Varied, the percentage payable to the income beneficiaries is based on a fixed formula for determining the "Applicable Percentage" and the amount to be paid can never go below the highest amount previously paid in a year. That is why the trustee continues to be obliged to cause the Holding Company to sell assets, if necessary, to meet the obligation to the income beneficiaries, despite the effect on the Trust corpus.

107     To the extent the Trust Deed as Varied sets forth a minimum annual payment to the income beneficiaries, the even hand duty on the trustee has been ousted, implicitly, by the words and intended operation of the Trust Deed as Varied. The application judge made no error in making that finding.

*Conclusion*

108    The experience of this Trust has reinforced the need for percentage trusts to be drafted with specific safeguard mechanisms in place that will allow the trustee to review and revise the annual percentage payable to the income beneficiaries based on the changing value of the trust to ensure that one set of beneficiaries is not favoured over the other. Commentators on the percentage trust concept have recommended including a "force majeure" clause to protect against unforeseen anomalies: see for example, Anne Werker, "The Percentage Trust — Uniting the Objectives of the Life Tenant and Remainderperson in Total Return Investing by Trustees" (Paper delivered at the Law Society of Upper Canada's 8th Annual Estates and Trusts Summit, November 30, 2005), p. 251.

109     Two options would be to include a clause providing for a periodic reset by the trustee of the percentage payable to income beneficiaries, or an option for the trustee to apply to the court for advice and directions on such a reset.

110     It is also clear that the material provided to the court in support of a variation application seeking to convert a trust into a percentage trust must include not only upside projections but also potential downside projections that take into account a possible future market downturn. This will give the approving court the basis to include the appropriate safeguards that will ensure, to the extent possible, that the variation will in fact continue to be for the benefit of the future capital beneficiaries.

111     However, there are no such provisions in this Trust Deed as Varied. The trustee is obliged to continue to make the minimum percentage distributions provided by its terms.

**Disposition of the Appeal**

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

112    For these reasons, I would dismiss the appeal. In the circumstances of this case, I would award full indemnity costs in accordance with their Bills of Costs to each of the parties, payable out of the estate. To the Children's Lawyer, $116,855.13; to the trustee, $145,061.32; to the respondents on the appeal, $122,473.29, all inclusive of disbursements and H.S.T.

*Janet Simmons J.A.*:

I agree

*E.A. Cronk J.A.*:

I agree

*Appeal dismissed.*

## Appendix

0.1 In this Trust Deed ... the following terms shall have the following meanings:

. . .

(a) "**Applicable Percentage**" for a calendar year shall mean the average Rate of Return of the trust over the previous three calendar years.

. . .

(d) "**Net Fair Market Value**" shall mean the fair market value of the trust's assets at the particular time, provided that where the trust owns shares in a private corporation, the fair market value of such shares shall be deemed to be equal to the fair market value of the assets of the corporation less all the corporation's liabilities, including an amount equal to the current tax liabilities of the corporation with respect to unrealized capital gains on its assets, less:

(i) liabilities of the trust;

(ii) an amount equal to the current tax liabilities of the trust with respect to unrealized capital gains on its assets other than shares in a private corporation; and

(iii) the value of any outstanding interest-free loans to Grandchildren;

(e) "**Net Income**" of the trust for a calendar year shall mean the cash dividends received by the trust in the calendar year from 679312 Alberta Limited ... and any income that is earned on the other assets of the trust, net of expenses incurred and taxes paid by the Trustee in the calendar year on account of the income of the trust;

(f) "**Rate of Return**" for a calendar year shall mean the resulting percentage when [sic] the difference determined when

(A) the Fair Market Value of the trust calculated on the first business day of the next calendar year is added to the Yearly Income Distribution and other permissible distributions to beneficiaries in respect of the calendar year, and is reduced by receipts during the calendar year for life insurance proceeds

is then reduced by

(B) the Fair Market Value if the trust calculated on the first business day of the calendar year,

is then divided by

(C) the Fair Market Value of the trust on the first business day of the calendar year;

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 42 of 554

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne, 2012 ONCA 862, 2012...

2012 ONCA 862, 2012 CarswellOnt 15402, 115 O.R. (3d) 287, 225 A.C.W.S. (3d) 281...

(g) "**Yearly Income**" for a calendar year shall mean the amount equal to:

. . .

(vi) in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year.

1. The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a) the Trustee shall pay the Yearly Income to or for the benefit of the Grandchildren in equal shares in each calendar year.... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the *Income Tax Act* in respect of distributions of the Yearly Income from the trust. The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

. . .

(c) notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

5. The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions: ...

(vi) to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and to manage the investments of the trust, including any distributions from any corporations controlled by the Trustee in order that the Net Income, of any trust hereunder shall be no less than the amount required to be distributed to a Grandchild during a calendar year;

Footnotes

\*    A corrigendum issued by the court on December 14, 2012 has been incorporated herein.

1    This recommendation has not been incorporated into the *Trustee Act*, R.S.O. 1990, c. T.23.

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2008 ONCA 176
Ontario Court of Appeal

PUC Distribution Inc. v. Brascan Energy Marketing Inc.

2008 CarswellOnt 1301, 2008 ONCA 176, 164 A.C.W.S. (3d) 793

# PUC DISTRIBUTION INC. (Applicant / Respondent) and BRASCAN ENERGY MARKETING INC. (Respondent / Appellant)

J. MacFarland J.A., M.J. Moldaver J.A., and S.E. Lang J.A.

Heard: February 13, 2008
Judgment: March 11, 2008
Docket: CA C46729

Proceedings: reversing *PUC Distribution Inc. v. Brascan Energy Marketing Inc.* (2006), 2006 CarswellOnt 3785 (Ont. S.C.J.) [Ontario]

Counsel: Alan H. Mark, Kelly L. Friedman for Appellant
James D.G. Douglas, Morgana Kellythorne for Respondent

Subject: Contracts; Civil Practice and Procedure

**Headnote**

**Contracts --- Construction and interpretation — General principles**

Respondent municipality entered into contract with GLP Ltd. in 1928 whereby GLP Ltd. agreed to supply municipality with 5000 horsepower ("5000 hp block") of electricity at preferential rate — Appellant company was assignee of 1928 contract and marketer of power for GLP — Among other things, 1928 contract provided that 5000 hp block was renewable for successive ten-year terms in perpetuity provided that written notice was given by municipality to GLP before end of each term — In 1987, municipality failed to deliver timely notice of renewal as result of which 1928 contract lapsed with respect to 5000 hp block — Parties entered into new agreements in 1989 and 1998, which included supply of 5000 hp block, but no provisions were made for right of renewal — In 2003, 1989 and 1998 agreements came to end when parties could not agree on rates going forward — Parties disagreed over whether 1928 contract continued to exist and whether there was continued obligation to supply 5000 hp block at rates specified in 1928 contract in perpetuity, subject to notice of renewal every ten years — Dispute was heard by arbitrator who determined that perpetual right to renew had been extinguished — Municipality's successor successfully appealed arbitrator's decision — Company appealed — Appeal allowed — Appeal judge erred in interpreting agreements between parties as leaving perpetual renewal provision extant — Appeal judge erred in failing to give adequate weight to fact that 1928 contract lapsed in respect of 5000 hp block in 1987, when municipality failed to deliver timely notice of renewal.

In 1928, GLP Ltd. and the respondent municipality, entered into a written contract whereby GLP Ltd. agreed to supply the municipality with 5000 horsepower of electricity at a preferential rate ("the 5000 hp block"). The appellant company was the assignee of 1928 contract and the marketer of power for GLP Ltd.

Among other things, the 1928 contract provided that the 5000 hp block was renewable for successive ten-year terms in

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

perpetuity, provided that written notice was given by municipality to GLP Ltd. six months before end of each term.

The parties entered into numerous ten-year agreements regarding the 5000 hp block at rates specified in the 1928 contract. In 1987, municipality failed to deliver a timely notice of renewal, and therefore, the 1928 contract lapsed with respect to the 5000 hp block.

In 1989, the parties entered into a new ten-year agreement ("the 1989 agreement"), which included supply by GLP Ltd. of the 5000 hp block at the rates specified in the 1928 contract, but no provision was made for any right of renewal.

In 1998, the parties entered into a further agreement ("the 1998 agreement") that amended and extended the 1989 agreement for a further potential ten-year term. The 1998 agreement expressly provided that only those provisions of the 1928 agreement that had been incorporated by reference into the 1989 agreement continued to exist. As with 1989 agreement, the 1998 agreement made no provision for any right of renewal with respect to the 5000 hp block.

In 2003, the 1989 agreement as amended by the 1998 agreement came to an end when the parties could not agree on rates going forward. The parties disagreed as to whether the 5000 hp block component of the 1928 agreement, including the perpetual renewal provision continued to exist or whether it expired in accordance with its terms in 1987.

The dispute was heard by an arbitrator pursuant to the parties' contractual agreement to submit disputes to arbitration. The arbitrator determined that perpetual right to renew had been extinguished. The municipalities' successor successfully appealed arbitrator's decision. The appeal judge found that there was no ambiguity in the 1989 agreement and that it included both a right to the 5000 hp block, as well as the perpetual right to renew that right. The company appealed.

**Held:** The appeal was allowed

Per MacFarland J. (Moldaver, Lang JJ. concurring):

Properly construed, the 1989 and 1998 agreements did not revive the perpetual renewal provision of the 1928 contract in relation to the 5000 hp block. These agreements had provided the municipality with a preferential price for a fixed term only.

The appeal judge erred in failing to give adequate weight to the fact that the 1928 contract lapsed in respect of the 5000 hp block in 1987, when municipality failed to deliver a timely notice of renewal. Given the lapse of the perpetual renewal provision with respect to the 5000 hp block in 1987, if the parties intended to resurrect it, clear language was required. No such language existed in either the 1989 or the 1998 agreements.

The appeal judge also made several errors in his interpretation of the 1989 agreement and 1998 agreement in supporting his conclusion that the 1928 agreement continued to exist with respect to perpetual renewal provision. The appeal judge relied on a recital to the 1989 agreement that references the 1928 contract as evidence of a mutual promise between the parties that the 1928 agreement was alive. The elevation of a recital to a mutual promise or operative provision was material to the interpretation reached by the appeal judge; the approach was in error.

The 1989 and 1998 agreements were silent as to the timing of the notice required for any future renewal and/or the manner in which the right of renewal was to be exercised. The absence of such important terms, particularly in a clause of this far-reaching nature, was neither reasonable nor commercially sound. This supported view that parties did not intend to resurrect the perpetual renewal provision in the 1989 and 1998 agreements.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

**Table of Authorities**

**Cases considered:**

*McKellar, Re* (1972), 27 D.L.R. (3d) 289, [1972] 3 O.R. 16, 1972 CarswellOnt 350 (Ont. H.C.) — referred to

*McKellar, Re* (1973), [1973] 3 O.R. 178, 36 D.L.R. (3d) 202n, 1972 CarswellOnt 449 (Ont. C.A.) — referred to

APPEAL by company of judgment reported at *PUC Distribution Inc. v. Brascan Energy Marketing Inc.* (2006), 2006 CarswellOnt 3785 (Ont. S.C.J.) [Ontario], granting municipality's appeal of arbitrator's decision.

**Per Curiam:**

**Introduction**

1    This appeal relates to the interpretation of a series of contracts for the supply of electrical power. The sole issue on appeal is whether these contracts continue to include a perpetual right to renew a supply of 5000 horsepower of electricity at a preferential rate, as originally provided in the initial 1928 contract. The arbitrator, Earl Cherniak, Q.C., held that the perpetual right to renew had been extinguished. On appeal to the Superior Court of Justice, Perell J. held that the perpetual right to renew remained extant and overturned the arbitrator's decision. For the reasons that follow, we would allow the appeal and restore the arbitrator's award, although for reasons that differ somewhat from those expressed by the arbitrator.

**Background**

*(a) The Facts*

2    The appellant, Brookfield Energy Marketing Inc., formerly known as Brascan Energy Marketing Inc., is the marketer of power for Great Lakes Power Company, Limited ("GLP") and is the assignee of the contracts at issue in this appeal. GLP was a supplier of electricity to the respondent, PUC Distribution Inc. (PUC), which is the successor to the Public Utilities Commission of the City of Sault Ste. Marie.

3    In 1928, the parties entered into a written agreement (the "1928 Agreement"). GLP agreed to supply PUC with 5000 horsepower of electricity at a preferential rate (the "5000 hp block"). Specifically, paragraphs 1(a) and (b) of the 1928 Agreement provided the following:

    1. The COMPANY [GLP] AGREES:

        (A) To continue to reserve and to supply and deliver to the Corporation [PUC] the four thousand (4000) horsepower hereinbefore referred to, at the rate of Twenty-two Dollars ($22.00) per horse-power per annum;

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

> (B) To reserve, to supply and deliver to the Corporation [PUC] one thousand (1,000) horse-power additional electric energy, within three (3) months from the execution of this agreement, the same to be delivered and to be paid for in amounts as and when used by the Corporation [PUC], at Twenty Dollars ($20.00) per horse-power per annum, for said one thousand (1,000) horsepower;

In addition to the 5000 hp block, the parties agreed that GLP would deliver an additional block of electricity at a separate price.

4     The 1928 Agreement had a term of ten years, and provided that the entire contract was renewable for three additional ten-year terms. However, it also provided that the 5000 hp block was renewable for successive ten-year terms in perpetuity, provided that written notice was given by PUC to GLP six months before the end of each term (the "perpetual renewal provision"). The terms of renewal were set out in paragraph 12 of the 1928 Agreement as follows:

> This contract shall be and remain in full force and effect for a period of ten (10) years from the date hereof and at the expiration of the said ten (10) years the Corporation [PUC] shall have the right to renew the said contract on the same terms and conditions, for a further period of ten (10) years and on the expiration of the said renewal then for further renewals of ten (10) years each up to and including a third renewal so as to make the term of this contract with renewals, optional to the Corporation [PUC], a period of forty (40) years, and *in so far as this contract refers to and deals with the blocks of power referred to in clauses "a" and "b" in paragraph 1, hereof, the Corporation [PUC] shall have the right beyond the said forty (40) year period for such further renewal periods of ten (10) years each as the Corporation [PUC], at its option, may decide to enter into.* In case of any renewal the Corporation [PUC] shall give the Company [GLP] six (6) months' notice in writing of its intention so to do.

> This agreement shall be binding upon and enure to the benefit of the parties hereto and the successors and assigns of the parties hereto. [Emphasis added.]

5     Further ten-year agreements were entered into between the parties in 1937, 1949, 1959, 1969 and 1979 regarding the provision of the 5000 hp block at the rates specified in the 1928 Agreement and the provision of an additional electricity block.

6     In 1987, PUC failed to deliver a timely notice of renewal, and therefore the 1928 Agreement lapsed with respect to the 5000 hp block.

7     However, in 1989, the parties entered into a new ten-year agreement (the "1989 Agreement") under which GLP agreed to provide electricity to meet all of PUC's needs. This included supply of the 5000 hp block at the rates specified in the 1928 Agreement, but no provision was made for any right of renewal.

8     Subsequently, in 1998, the parties entered into a further agreement (the "1998 Agreement") that amended and extended the 1989 Agreement for a further potential ten-year term (two potential renewals of five years each), dependent on the parties' agreement on rates. The 1998 Agreement expressly provided that only those provisions of the 1928 Agreement that had been incorporated by reference into the 1989 Agreement continued to exist. As with the 1989 Agreement, the 1998 Agreement made no provision for any right of renewal with respect to the 5000 hp block.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

9    In 2003, the 1989 Agreement as amended by the 1998 Agreement came to an end when the parties could not agree on rates going forward. PUC contended that notwithstanding the termination of that agreement, the 1928 Agreement continued to exist and continued the obligation to supply the 5000 hp block at the rates specified in the 1928 Agreement in perpetuity, subject to the required notice of renewal every ten years. GLP, on the other hand, argued that the 5000 hp block component of the 1928 Agreement, including the perpetual renewal provision, expired in accordance with its terms in 1987; that the 1989 Agreement as amended by the 1998 Agreement did not provide for any further renewals; and that the parties' entire relationship ended in 2003.

*(b) The Arbitrator's Decision*

10    This dispute was heard by an arbitrator, pursuant to the parties' contractual agreement to submit disputes to arbitration. In reasons dated February 25, 2005, the arbitrator found in favour of GLP. He found that although the 1989 Agreement was ambiguous as to whether PUC had a separate and perpetual right to renew the 5000 hp block, the 1998 Agreement resolved that ambiguity and made it clear that no such right to renew continued to exist.

11    On the interpretation of the 1989 Agreement, the arbitrator found at para. 51 of his reasons:

The question to be addressed is whether the 1989 agreement, and by extension the 1998 agreement, entirely apart from the question of waiver, was intended by the parties to renew the 5,000 horsepower block as provided for in the 1928 agreement, or to acknowledge the continued independent existence of the 1928 agreement as it applied to the 5,000 horsepower block. If I was only interpreting the 1989 agreement, I would find ambiguity, because of the conflict between clause 1.0 which reads:

**1.0 Term of Agreement**

1.1 This Agreement shall commence on the first day of January, 1989, hereinafter referred to as the "Commencement Date" and, subject to paragraph 1.2 hereof, shall continue in force until December 31, 1998, unless earlier terminated in accordance with clauses 5.5 [supply of power after termination deemed not to renew] or 5.7 [right to discontinue supply to safeguard life or property or for construction, etc.] or by mutual agreement.

1.2 In the event that power is supplied by Great Lakes [GLP] to the Commission [PUC] after the expiration of the Term of this Agreement as defined above, the provisions of this Agreement shall continue in full force and effect until this Agreement is terminated by either party by giving written notice of such termination to the other party.

and those clauses of the 1989 agreement which refer to the 1928 agreement as if still extant, including the second preamble, cl. 2.1 (a), cl. 5.2 and clauses 7.3 and 7.4. On the one hand, the 1928 agreement had not been renewed in accordance with its terms prior to the 1989 agreement, and the 1989 agreement provides for termination at the end of December 31, 1998, with no renewal clause, together with the right to remove all its apparatus equipment and works at the end of the term, making it impossible to continue to supply power. On the other hand, the preamble and cl. 2.[1] (a), read with cl. 7.4, seem to acknowledge the continued existence of the 1928 agreement, at least with respect to the 5,000 horsepower block, and to allow for the existence of the 1989 agreement notwithstanding cl. 10 of the 1928 agreement, though the 1928 agreement expired by its terms in 1968, except for the 5,000 horsepower block. There was no evidence of any objective surrounding circumstances or commercial context in the 1989 time frame that would shed light on the parties' intentions to clear up this ambiguity.

12    The arbitrator then considered whether the 1998 Agreement resolved the ambiguity in the 1989 Agreement. Based on his interpretation of the 1998 Agreement, the arbitrator concluded at para. 54 of his reasons that the terms of the 1928

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

Agreement that were incorporated by reference into the 1989 Agreement did not include the perpetual renewal provision:

> Reading the preamble to the 1998 agreement makes it clear that the 1928 agreement had been "amended and extended" by the 1989 agreement, and when the parties recited that they desired "to further amend and extend the terms of the 1989 agreement", they were incorporating into that extension and amendment the entire relationship between them, including what remained of the 1928 agreement. That conclusion is reinforced by cl. 5, referring to "those terms of the 1928 agreement incorporated by reference therein" and by clauses 2.1(a) and 5.2 of the 1989 agreement, which had the effect of providing for the 5,000 horsepower block at the prices agreed to in 1928. The circumstances make it clear that the terms of the 1928 agreement that were incorporated in the 1989 agreement did not include the right of renewal. In the economic climate that faced them in 1998, the parties were providing for the short term, with the hope, but not necessarily the expectation, that the relationship could continue beyond the 5 year fixed term they agreed to. In 1989, they had provided for a 10 year term, but no right of renewal.

13    Moreover, the arbitrator based his conclusion on the commercial sense of the situation, noting at para. 58 of his reasons:

> The interpretation advocated by the PUC ... would leave, notwithstanding the termination of the relationship, the requirement for delivery by GLP of a very small fraction of the power requirements of Sault Ste. Marie, while at the same time making it impossible for GLP to exercise its contractual right to remove its equipment, works and apparatus from the city on termination. The continuation of the 5,000 horsepower block first agreed in 1928 made commercial sense as a benefit given to the PUC while GLP was the exclusive supplier of power to Sault Ste. Marie. It made no commercial sense thereafter.

### (c) The Appeal Judge's Decision

14    PUC appealed the arbitrator's award to the Superior Court of Justice. In reasons dated June 21, 2006, the appeal judge allowed PUC's appeal and held that the perpetual renewal right remained extant. As a result, he granted a declaration requiring GLP to sell the 5000 hp block to PUC in accordance with the rates specified in the 1928 Agreement.

15    Applying the principles of contract interpretation, the appeal judge found that there was no ambiguity in the 1989 Agreement. Rather, he held that the 1989 Agreement included both a right to the 5000 hp block, as well as the perpetual right to renew that right. The appeal judge provided the following reasons for his conclusion:

> [74] The recital of the [1989 Agreement] contains the words "is now under original contract bearing date February 8, 1928," which is the identical language found in the [1969 Agreement] and the [1979 Agreement]. The recital, standing alone and supported by the contractual provisions that I will describe momentarily bring me to the conclusion that the parties intended that the [1928 Agreement] in so far as it dealt with the 5,000 units of energy continued to exist, notwithstanding that there is no evidence that PUC gave the formal written notice of renewal as required by the [1928 Agreement].

> [75] As a conceptual matter, I do not think it matters whether the un-renewed [1928 Agreement] was dead and revived by the [1989 Agreement] or whether the un-renewed [1928 Agreement] was incorporated by reference into the [1989 Agreement], the continued existence of the [1928 Agreement] is in effect a promise or commitment made by the parties in the [1989 Agreement]. Conceptually, the [1928 Agreement] could exist as a separate contract or as an embedded contract within the [1989 Agreement]. The fundamental point is that the parties promised each other that GLP "is now under the [1928 Agreement]."

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

The appeal judge noted that this conclusion was confirmed by the recitals and by clauses 2.1(a), 5.2(a), 7.3, and 7.4 of the 1989 Agreement.

16    Having found the 1989 Agreement to be unambiguous, the appeal judge further concluded at para. 88 of his reasons that:

> To the extent that the Arbitrator's conclusion is an interpretation of the [1998 Agreement], I disagree with it. In my opinion, properly interpreted, the [1998 Agreement] gave the parties the unilateral means to terminate the [1998 Agreement], but it did not give the parties the unilateral means to terminate their "relationship". In my opinion, the termination of the "relationship" would depend upon PUC releasing GLP from its obligation to supply the 5,000-unit block of energy, pursuant to the [1928 Agreement].

**Analysis**

17    The sole issue on appeal is whether the appeal judge erred in interpreting the agreements between the parties as leaving the perpetual renewal provision extant.

18    For the reasons set out below, we are of the view that the appeal judge erred in failing to give adequate weight to the fact that the 1928 Agreement lapsed in respect of the 5000 hp block in 1987, when PUC failed to deliver a timely notice of renewal. Further, the appeal judge made several errors in his interpretation of the 1989 Agreement and 1998 Agreement in supporting his conclusion that the 1928 Agreement continued to exist with respect to the perpetual renewal provision. As a result, his conclusion that that provision remained extant cannot stand.

*(a) Lapse of the 1928 Agreement*

19    In construing the 1989 Agreement and 1998 Agreement as he did, the appeal judge failed to give adequate weight to the fact that the provision in the 1928 Agreement regarding the 5000 hp block lapsed entirely in 1987 due to PUC's failure to give the required renewal notice. Thus, the perpetual renewal provision was no longer in effect when the parties entered into the 1989 Agreement. Accordingly, the appeal judge's reliance on the wording of the 1969 and 1979 agreements in construing the 1989 Agreement was misplaced, as the perpetual renewal provision was still in effect for those agreements. As a result, in comparing the language of the 1969 and 1979 agreements to that of the 1989 Agreement and 1998 Agreement, the appeal judge was effectively comparing apples and oranges. The intervening lapse of the 1928 Agreement in 1987 means that the 1969 and 1979 agreements cannot be equated with the later agreements for comparison purposes.

20    The error becomes especially apparent in light of the unique and highly unusual nature of the perpetual renewal provision. That provision enabled PUC to take advantage of favourable rates in perpetuity. As such, it represented a significant benefit to PUC and an equally significant detriment to GLP. In the circumstances, given the lapse of the perpetual renewal provision with respect to the 5000 hp block in 1987, we are of the view that if the parties intended to resurrect it, clear language was required. No such language exists in either the 1989 Agreement or the 1998 Agreement.

21    In so concluding, we note that waiver of the 1987 lapse is a non-issue as found by both the arbitrator and the appeal judge.

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

*(b) Interpretation errors*

22      The appeal judge also made several specific errors in his interpretation of the 1989 Agreement that further undermine the finding that the perpetual renewal provision of the 1928 Agreement remained extant.

23      First, the appeal judge erred in his interpretation of clause 7.4 of the 1989 Agreement, which amended paragraph 10 of the 1928 Agreement. Paragraph 10 provided that "this agreement shall constitute the sole and only contract dealing with the supply of electrical energy between the parties". However, clause 7.4 of the 1989 Agreement amended paragraph 10 of the 1928 Agreement as follows:

> Paragraph 10 of the original contract bearing date February 8, 1928, hereinbefore mentioned, is hereby amended to allow the existence of this present separate contract for the supply of additional power. It is expressly understood and agreed by the parties hereto that the mentioned Paragraph 10 of earlier contract shall in no way act to jeopardize or mitigate any of the provisions of this present contract.

24      The appeal judge relied heavily on this clause to conclude that all of the terms of the 1928 Agreement were incorporated into the later agreements, including the perpetual renewal provision, unless specifically altered by the later agreements.

25      In our view, clause 7.4 of the 1989 Agreement cannot operate in the manner suggested by the appeal judge, given the unusual nature of the perpetual renewal provision and the fact that, to the knowledge of the parties, it had lapsed prior to the 1989 Agreement. Rather, clause 7.4 can be explained by the fact that other provisions of the 1928 Agreement remained extant, and to the extent that those provisions were not altered, the parties intended that they be carried forward on the same terms. For example, the definition provision in paragraph 2(e) of the 1928 Agreement would have been carried forward into the 1989 Agreement.

26      Second, the appeal judge erred in his reliance on clause 7.3 of the 1989 Agreement in support of his conclusion. Clause 7.3 maintained the existing rights of the parties under existing agreements. Specifically, it provided:

> It is further understood and agreed that nothing herein contained, save and except for the sale, delivery and use of power, shall affect, abridge, alter or curtail any of the existing rights of the parties hereto under any existing agreement dealing in any way with the relations of the parties hereto or any rights, benefits, or privileges of either of the parties hereto under said agreements, particularly in regard to property rights under said agreements.

27      In our view, because clause 7.3 refers to "existing rights" under an "existing agreement", it does not support the appeal judge's conclusion. The 1928 Agreement was no longer an "existing agreement" except insofar as some of its provisions, like the definition provision in paragraph 2(e), had been carried forward in the later agreements. The perpetual renewal provision was not such a provision, hence it was not an "existing right"; rather, it was a right that had been extinguished.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

28     Third, we are of the view that the appeal judge erred in his reliance on clauses 2.1(a) and 5.2(a) of the 1989 Agreement in support of his conclusion. Clause 2.1(a) provided:

Great Lakes [GLP] agrees:

(a) To continue to reserve for and deliver to the Commission [PUC] the electrical energy hereinbefore referred to and specified in the said original contract bearing date February 8, 1928.

29     Clause 5.2(a) provided:

The Commission [PUC] shall pay to Great Lakes [GLP] for power hereunder the aggregate of the Demand Charge for the month and the Energy Charge for the month, calculated as follows:

(a) Power Supplied under the Contract dated February 28, 1928

4,000 HP at the rate of $22.00 per HP per year

1,000 HP at the rate of $20.00 per HP per year

30     In our view, clauses 2.1(a) and 5.2(a) merely relate to the continued supply of the 5000 hp block and not to the perpetual renewal provision. We note that in the 1928 Agreement, the perpetual renewal provision was clearly separated from the supply provision. Accordingly, if the parties had intended to resurrect the perpetuity aspect of the 1928 Agreement, it should have been specifically referred to.

31     Finally, at a critical point in his analysis, the appeal judge appears to have relied on a recital to the 1989 Agreement that references the 1928 Agreement as evidence of a mutual promise between the parties that the 1928 Agreement was alive. This elevation of a recital to a mutual promise or operative provision was material to the interpretation reached by the appeal judge. With respect, that approach was in error: see *McKellar, Re*, [1972] 3 O.R. 16 (Ont. H.C.), at 26; aff'd [1973] 3 O.R. 178 (Ont. C.A.).

*(c) Other errors*

32     In our opinion, the appeal judge's reasons disclose two other errors in his general approach to the interpretation of the agreements.

33     First, we note that PUC did not give the required notice of its intention to renew in 1997, as would have been required by the terms of the perpetual renewal provision in the 1928 Agreement. This fact also belies the appeal judge's interpretation that the perpetual renewal provision of the 1928 Agreement had been revived.

34     Second, as a matter of practical concern, on the construction given to them by the appeal judge, the 1989 Agreement

and 1998 Agreement are silent as to the timing of the notice required for any future renewal and/or the manner in which the right of renewal is to be exercised. The absence of such important terms, particularly in a clause of this far-reaching nature, is in our view neither reasonable nor commercially sound. This also supports our view that the parties did not intend to resurrect the perpetual renewal provision in the 1989 Agreement and 1998 Agreement.

*(d) Conclusion*

35     Properly construed, the 1989 Agreement and 1998 Agreement did not revive the perpetual renewal provision of the 1928 Agreement in relation to the 5000 hp block. On the contrary, these agreements provided PUC with a preferential price for a fixed term only.

**Disposition**

36     Accordingly, we would allow the appeal, set aside the decision of the appeal judge and restore the award of the arbitrator.

37     The costs of the appeal and of the application for leave to appeal are awarded to the appellant in the total amount of $21,000, inclusive of disbursements and GST. Costs below should follow the disposition of this appeal.

*Appeal allowed.*

End of Document                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Her Majesty The Queen** *Appellant*

*v.*

**Chikmaglur Mohan** *Respondent*

INDEXED AS: R. *v.* MOHAN

File No.: 23063.

1993: November 9; 1994: May 5.

Present: Lamer C.J. and La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Evidence — Admissibility — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

*Criminal law — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

Respondent, a practising pediatrician, was charged with four counts of sexual assault on four female patients, aged 13 to 16 at the relevant time, during medical examinations conducted in his office. His counsel indicated that he intended to call a psychiatrist who would testify that the perpetrator of the alleged offences would be part of a limited and unusual group of individuals and that respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The psychiatrist testified in a *voir dire* that the psychological profile of the perpetrator of the first three complaints was likely that of a pedophile, while the profile of the perpetrator of the fourth complaint that of a sexual psychopath. The psychiatrist intended to testify that the respondent did not fit the profiles but the evidence was ruled inadmissible at the conclusion of the *voir dire*.

Respondent was found guilty by the jury and appealed. The Court of Appeal allowed respondent's

**Sa Majesté la Reine** *Appelante*

*c.*

**Chikmaglur Mohan** *Intimé*

RÉPERTORIÉ: R. *c.* MOHAN

Nº du greffe: 23063.

1993: 9 novembre; 1994: 5 mai.

Présents: Le juge en chef Lamer et les juges La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci et Major.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Preuve — Admissibilité — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

*Droit criminel — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne correspondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

L'intimé, un pédiatre, fait face à quatre chefs d'accusation d'agression sexuelle commise sur quatre patientes, âgées à l'époque de 13 à 16 ans, pendant leur examen médical dans le bureau de l'intimé. Son avocat a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le psychiatre a témoigné au voir-dire que le profil psychologique de l'auteur des trois premières agressions alléguées était probablement celui d'un pédophile alors que celui de la quatrième était celui d'un psychopathe sexuel. Le psychiatre avait l'intention de témoigner que l'intimé ne correspondait pas à ces profils, mais son témoignage a été jugé inadmissible à l'issue du voir-dire.

Déclaré coupable par le jury, l'intimé a interjeté appel. La Cour d'appel a accueilli l'appel de l'intimé,

appeal, quashed the convictions and ordered a new trial. The Court of Appeal therefore found it unnecessary to deal with the Crown's sentence appeal. At issue here was the determination of the circumstances in which expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involved an examination of the rules relating to (i) expert evidence, and (ii) character evidence.

*Held*: The appeal should be allowed.

The evidence should be excluded.

## Expert Evidence

Admission of expert evidence depends on the application of the following criteria: (a) relevance; (b) necessity in assisting the trier of fact; (c) the absence of any exclusionary rule; and (d) a properly qualified expert. Relevance is a threshold requirement to be decided by the judge as a question of law. Logically relevant evidence may be excluded if its probative value is overborne by its prejudicial effect, if the time required is not commensurate with its value or if it can influence the trier of fact out of proportion to its reliability. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence. Expert evidence should not be admitted where there is a danger that it will be misused or will distort the fact-finding process, or will confuse the jury.

Expert evidence, to be necessary, must likely be outside the experience and knowledge of a judge or jury and must be assessed in light of its potential to distort the fact-finding process. Necessity should not be judged by too strict a standard. The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions. Experts, however, must not be permitted to usurp the functions of the trier of fact causing a trial to degenerate to a contest of experts.

Expert evidence can be excluded if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. The evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

annulé les déclarations de culpabilité et ordonné un nouveau procès. La Cour a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel du ministère public contre la sentence. Il faut déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière (i) de preuve d'expert, et (ii) de preuve de moralité.

*Arrêt*: Le pourvoi est accueilli.

La preuve est exclue.

## Preuve d'expert

L'admission de la preuve d'expert repose sur l'application des critères suivants: a) la pertinence; b) la nécessité d'aider le juge des faits; c) l'absence de toute règle d'exclusion; et d) la qualification suffisante de l'expert. La pertinence est une exigence liminaire déterminée par le juge comme question de droit. La preuve logiquement pertinente peut être exclue si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si son effet sur le juge des faits est disproportionné par rapport à sa fiabilité. Le facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert. La preuve d'expert ne devrait pas être admise si elle risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits, ou de dérouter le jury.

Pour être nécessaire, la preuve d'expert doit, selon toute vraisemblance, dépasser l'expérience et la connaissance d'un juge ou d'un jury et être évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. La nécessité ne devrait pas être jugée selon une norme trop stricte. La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées. Les experts ne doivent toutefois pas pouvoir usurper les fonctions du juge des faits, ce qui pourrait réduire le procès à un simple concours d'experts.

La preuve d'expert peut être exclue si elle contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. La preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

In summary, expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

En résumé, la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

## Expert Evidence as to Disposition

## Preuve d'expert quant à la prédisposition

The Crown cannot lead expert evidence as to disposition in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. The accused, however, can adduce evidence as to disposition, but this evidence is generally limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testimony may also rely on specific acts of good conduct. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. Although the exception has been applied to abnormal behaviour usually connoting sexual deviance, its underlying rationale is based on distinctiveness.

Le ministère public ne peut produire une preuve d'expert quant à la prédisposition que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. L'accusé peut en revanche produire une preuve quant à la prédisposition, mais cette preuve se limite, en règle générale, à la preuve de la réputation de l'accusé au sein de la collectivité relativement aux traits de caractère concernés. L'accusé peut aussi invoquer dans son propre témoignage des actes particuliers de bonne conduite. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune de ces catégories. Cependant, une autre exception de portée limitée a été créée. Bien que cette exception ait été appliquée à des comportements anormaux liés usuellement à une déviance sexuelle, sa raison d'être est le caractère distinctif.

Before an expert's opinion as to disposition is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. A finding that the scientific community has developed a standard profile for the offender who commits this type of crime will satisfy the criteria of relevance and necessity. The evidence will qualify as an exception to the exclusionary rule relating to character evidence provided the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

Avant d'admettre en preuve l'opinion d'un expert sur la prédisposition, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. La conclusion que la profession scientifique a élaboré un profil type du délinquant qui commet ce genre de crime satisfera aux critères de pertinence et de fiabilité. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition que le juge soit convaincu que l'opinion proposée se situe dans le domaine d'expertise du témoin expert.

R. *v.* MOHAN                              [1994] 2 S.C.R.

Application to This Case

Nothing in the record supported a finding that the profile of a paedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these indicia of reliability, it could not be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury.

The similarities detailed by the judge dealt with the perpetrator's *modus operandi* of the acts subject to the individual counts. These were not matters to which the expert evidence related. Moreover, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence.

**Cases Cited**

**Considered:** *R. v. Lupien*, [1970] S.C.R. 263; *R. v. Chard* (1971), 56 Cr. App. R. 268; *Lowery v. The Queen*, [1974] A.C. 85; *R. v. Turner*, [1975] Q.B. 834; **referred to:** *R. v. Robertson* (1975), 21 C.C.C. (2d) 385; *R. v. McMillan* (1975), 23 C.C.C. (2d) 160, aff'd [1977] 2 S.C.R. 824; *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201; *R. v. Taylor* (1986), 31 C.C.C. (3d) 1; *R. v. C. (M.H.)*, [1991] 1 S.C.R. 763; *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. B.(G.)*, [1990] 2 S.C.R. 30; *Morris v. The Queen*, [1983] 2 S.C.R. 190; *R. v. Béland*, [1987] 2 S.C.R. 398; *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672; *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699; *R. v. Marquard*, [1993] 4 S.C.R. 223; *R. v. Morin*, [1988] 2 S.C.R. 345; *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, leave to appeal refused [1981] 1 S.C.R. xi; *Thompson v. The King*, [1918] A.C. 221; *R. v. Garfinkle* (1992), 15 C.R. (4th) 254.

**Statutes and Regulations Cited**

*Criminal Code*, R.S.C., 1985, c. C-46, s. 693.

Application à l'espèce

Rien dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence de ces indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches.

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. La preuve d'expert ne visait pas ces questions. De plus, la question de savoir si le crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert.

**Jurisprudence**

**Arrêts examinés:** *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Chard* (1971), 56 Cr. App. R. 268; *Lowery c. The Queen*, [1974] A.C. 85; *R. c. Turner*, [1975] Q.B. 834; **arrêts mentionnés:** *R. c. Robertson* (1975), 21 C.C.C. (2d) 385; *R. c. McMillan* (1975), 23 C.C.C. (2d) 160, conf. par [1977] 2 R.C.S. 824; *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201; *R. c. Taylor* (1986), 31 C.C.C. (3d) 1; *R. c. C. (M.H.)*, [1991] 1 R.C.S. 763; *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. B.(G.)*, [1990] 2 R.C.S. 30; *Morris c. La Reine*, [1983] 2 R.C.S. 190; *R. c. Béland*, [1987] 2 R.C.S. 398; *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672; *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699; *R. c. Marquard*, [1993] 4 R.C.S. 223; *R. c. Morin*, [1988] 2 R.C.S. 345; *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, autorisation de pourvoi refusée [1981] 1 R.C.S. xi; *Thompson c. The King*, [1918] A.C. 221; *R. c. Garfinkle* (1992), 15 C.R. (4th) 254.

**Lois et règlements cités**

*Code criminel*, L.R.C. (1985), ch. C-46, art. 693.

Authors Cited

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

Doctrine citée

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

APPEAL from a judgment of the Ontario Court of Appeal (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, allowing an appeal from convictions by Berstein J. sitting with jury and ordering a new trial. Appeal allowed.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, qui a accueilli un appel des déclarations de culpabilité prononcées par le juge Berstein, siégeant avec jury, et ordonné un nouveau procès. Pourvoi accueilli.

*Jamie C. Klukach*, for the appellant.

*Jamie C. Klukach*, pour l'appelante.

*Brian H. Greenspan* and *Sharon E. Lavine*, for the respondent.

*Brian H. Greenspan* et *Sharon E. Lavine*, pour l'intimé.

The judgment of the Court was delivered by

Version française du jugement de la Cour rendu par

SOPINKA J. — In this appeal we are required to determine under what circumstances expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involves an examination of the rules relating to expert and character evidence.

LE JUGE SOPINKA — Nous sommes appelés à déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière de preuve d'expert et de moralité.

I. Facts

I. Les faits

A. *The Events*

A. *Les événements*

The respondent, a practising pediatrician in North Bay, was charged with four counts of sexual assault on four of his female patients, aged 13 to

L'intimé, un pédiatre exerçant à North Bay, fait face à quatre chefs d'accusation d'agression sexuelle sur quatre de ses patientes, âgées à

R. *v.* MOHAN   *Sopinka J.*                    [1994] 2 S.C.R.

16 at the relevant time. The alleged sexual assaults were perpetrated during the course of medical examinations of the patients conducted in the respondent's office. The complainants had been referred to the respondent for conditions which were, in part, psychosomatic in nature.

Evidence relating to each complaint was admitted as similar fact evidence with respect to the others. The complainants did not know one another. Three of them came forth independently. Following a mistrial, which was publicized, the fourth victim came forward, having heard about the other charges. Three of the four complainants had been victims of prior sexual abuse. With respect to two of them, the respondent knew about their sexual abuse at the hands of others. The alleged assaults consisted of fondling of the girls' breasts and digital penetration and stimulation of their vaginal areas, accompanied by intrusive questioning of them as to their sexual activities. All of the complainants testified that the respondent did not wear gloves while examining them internally. The respondent, who testified in his own defence, denied the complainants' evidence.

At the conclusion of the respondent's examination in chief, counsel for the respondent indicated that he intended to call a psychiatrist who would testify that the perpetrator of the offences alleged to have been committed would be part of a limited and unusual group of individuals and that the respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The Crown sought a ruling on the admissibility of that evidence. The trial judge held a *voir dire* and ruled that the evidence tendered on the *voir dire* would not be admitted.

The jury found the respondent guilty as charged on November 16, 1990. He was sentenced to nine months' imprisonment on each of the four counts, to be served concurrently, and to two years' probation. The respondent appealed his convictions and the Crown appealed the sentence. The Court of Appeal allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal found it was not neces-

l'époque de 13 à 16 ans. Les agressions sexuelles auraient été commises pendant l'examen médical des patientes dans le bureau de l'intimé. Les plaignantes lui avaient été référées pour des problèmes qui, en partie, étaient de nature psychosomatique.

La preuve relative à chaque plainte a été admise comme preuve de faits similaires à l'égard des autres. Les plaignantes ne se connaissaient pas. Trois d'entre elles ont porté plainte de façon indépendante. Après l'annulation d'un procès rendu public, la quatrième victime, ayant pris connaissance des accusations, s'est fait connaître. Des quatre plaignantes, trois avaient auparavant été victimes d'abus sexuels. En outre, l'intimé savait que deux d'entre elles l'avaient été par d'autres. Les agressions alléguées consistaient à avoir caressé les seins des filles et avoir pénétré et stimulé la région vaginale avec les doigts, et à leur avoir posé des questions indiscrètes sur leurs activités sexuelles. Toutes les plaignantes ont témoigné que l'intimé ne portait pas de gants pendant l'examen interne. L'intimé, qui a témoigné pour sa propre défense, a nié les témoignages des plaignantes.

À l'issue de l'interrogatoire principal de l'intimé, l'avocat de ce dernier a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le ministère public a demandé au juge du procès de se prononcer sur l'admissibilité de cette preuve. Ce dernier a tenu un voir-dire, à la suite duquel il a conclu à l'inadmissibilité de la preuve présentée au voir-dire.

Le 16 novembre 1990, le jury a déclaré l'intimé coupable des infractions reprochées. Il a été condamné à neuf mois d'emprisonnement relativement à chacun des quatre chefs, à purger concurremment, et à deux années de probation. L'intimé a interjeté appel des déclarations de culpabilité et le ministère public a interjeté appel de la sentence. La Cour d'appel a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un

sary to deal with the Crown's sentence appeal and refused the Crown leave to appeal.

The appellant sought leave to appeal to this Court against the decision of the Ontario Court of Appeal pursuant to s. 693 of the *Criminal Code*, R.S.C., 1985, c. C-46. On December 10, 1992 leave to appeal was granted by this Court, [1992] 3 S.C.R. viii.

B. *The Excluded Evidence*

In the *voir dire*, Dr. Hill, the expert, began his testimony by explaining that there are three general personality groups that have unusual personality traits in terms of their psychosexual profile perspective. The first group encompasses the psychosexual who suffers from major mental illnesses (*e.g.*, schizophrenia) and engages in inappropriate sexual behaviour occasionally. The second and largest group contains the sexual deviation types. This group of individuals shows distinct abnormalities in terms of the choice of individuals with whom they report sexual excitement and with whom they would like to engage in some type of sexual activity. The third group is that of the sexual psychopaths. These individuals have a callous disregard for people around them, including a disregard for the consequences of their sexual behaviour towards other individuals. Another group would include pedophiles who gain sexual excitement from young adolescents, probably pubertal or post-pubertal.

Dr. Hill identified pedophiles and sexual psychopaths as examples of members of unusual and limited classes of persons. In response to questions hypothetically encompassing the allegations of the four complainants, the expert stated that the psychological profile of the perpetrator of the first three complaints would likely be that of a pedophile, while the profile of the perpetrator of the fourth complaint would likely be that of a sexual psychopath. Dr. Hill also testified that, if but one perpetrator was involved in all four complaints described in the hypothetical questions, he would

nouveau procès. Elle a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel de la sentence interjeté par le ministère public, et a refusé à ce dernier l'autorisation d'appeler.

L'appelante a demandé à notre Cour l'autorisation de se pourvoir contre la décision de la Cour d'appel de l'Ontario conformément à l'art. 693 du *Code criminel*, L.R.C. (1985), ch. C-46. Le 10 décembre 1992, notre Cour a accordé l'autorisation, [1992] 3 R.C.S. viii.

B. *Les éléments de preuve écartés*

Lors du voir-dire, le Dr Hill, l'expert, a d'abord expliqué qu'il existait trois groupes généraux de personnalité possédant des traits de personnalité inhabituels du point de vue de leur profil psychosexuel. Le premier groupe comprend le psychosexuel qui souffre de maladie mentale grave (par exemple, la schizophrénie) et qui adopte à l'occasion un comportement sexuel inapproprié. Le deuxième groupe, le plus large, inclut les personnes ayant des déviations sexuelles. Les individus appartenant à ce groupe présentent des anomalies marquées quant au choix des personnes auxquelles ils relient l'excitation sexuelle et avec lesquelles ils aimeraient avoir une certaine forme d'activité sexuelle. Le troisième groupe comprend les psychopathes sexuels. Ils sont totalement insensibles à l'égard des gens qui les entourent, et indifférents aux conséquences de leur comportement sexuel envers autrui. Les pédophiles formeraient un quatrième groupe. Ils sont sexuellement excités par de jeunes adolescents qui sont vraisemblablement à l'âge pubertaire ou postpubertaire.

Le Dr Hill a qualifié les pédophiles et les psychopathes sexuels d'exemples d'individus membres d'une catégorie inhabituelle et restreinte de personnes. En réponse à des questions hypothétiques réunissant les allégations des quatre plaignantes, l'expert a déclaré que le profil psychologique de l'auteur des trois premières infractions serait probablement celui d'un pédophile, alors que le profil de l'auteur de la quatrième infraction serait probablement celui d'un psychopathe sexuel. Le Dr Hill a également témoigné que, si un seul auteur était impliqué relativement aux quatre

uniquely categorize that perpetrator as a sexual psychopath. He added that such a person would belong to a very small, behaviourally distinct category of persons. Dr. Hill was asked whether a physician who acted in the manner described in the hypothetical questions would be a member of a distinct group of aberrant persons. His answer was that such behaviours could only flow from a significant abnormality of character and would be part of an unusual and limited class. In cross-examination, Dr. Hill said: "You bring an extra abnormal, extra component for the abnormality when you talk about a physician in his or her office." According to Dr. Hill, physicians who were also sexual offenders would be a small group because not only would they be breaking the usual norms of society, but they would also be breaking out against the norms of the medical profession which are very strict given the intimate contact necessary to treat patients. It was contemplated that Dr. Hill would go on to testify "to the effect that Doctor Mohan does not have the characteristics attributable to any of the three groups in which most sex offenders fall."

## II. Judgments Below

### A. *High Court of Justice* (Ruling on *Voir Dire*) (Bernstein J.)

In ruling on the admissibility of Dr. Hill's evidence, the trial judge stated the issues as follows:

One: Did the offences alleged to have been committed by the accused have unusual features which would indicate that anyone who committed them was a member of a limited and distinguishable group?

Two: Did the psychiatrist have the necessary qualifications and expertise to venture an opinion on the first issue so as to be helpful to the jury?

The trial judge noted that Dr. Hill had personally interviewed and treated three doctors who engaged in criminal sexual misconduct with their patients. He also noted that Dr. Hill admitted that

plaintes décrites dans les questions hypothétiques, il le qualifierait de psychopathe sexuel uniquement. Il a ajouté qu'une telle personne appartiendrait à un groupe très restreint de personnes distinctes du point de vue de leur comportement. On a demandé au Dʳ Hill si un médecin agissant de la manière décrite dans les questions hypothétiques ferait partie d'un groupe distinct de personnes anormales. Il a répondu que de tels comportements ne pouvaient que découler d'une grave anomalie du caractère et feraient partie d'une catégorie inhabituelle et restreinte. En contre-interrogatoire, le Dʳ Hill a dit: [TRADUCTION] «Vous apportez une anomalie supplémentaire, un élément supplémentaire d'anomalie lorsque vous parlez d'un médecin dans son bureau.» Selon le Dʳ Hill, les médecins qui sont également des délinquants sexuels seraient peu nombreux parce que non seulement ils violent les normes ordinaires de la société, mais aussi les normes de la profession médicale, qui sont très strictes étant donné le contact intime inhérent au traitement des patients. On prévoyait que le Dʳ Hill témoignerait ensuite [TRADUCTION] «que le Dʳ Mohan ne possède pas les caractéristiques attribuables à l'un des trois groupes auxquels appartiennent la plupart des délinquants sexuels.»

## II. Les juridictions inférieures

### A. *La Haute Cour de Justice* (décision relativement au voir-dire) (le juge Bernstein)

En se prononçant sur l'admissibilité du témoignage du Dʳ Hill, le juge du procès a formulé ainsi les questions en litige:

[TRADUCTION]

(1) Les infractions imputées à l'accusé avaient-elles des caractéristiques inhabituelles indiquant que quiconque les a commises appartient à un groupe restreint et distinctif?

(2) Le psychiatre possédait-il les compétences et l'expérience nécessaires pour exprimer sur la première question une opinion qui soit utile au jury?

Le juge du procès a signalé que le Dʳ Hill avait lui-même interrogé et traité trois médecins ayant eu un comportement sexuel criminel avec leurs patients. Il a également signalé que le Dʳ Hill avait

he was not aware of any scientific study or literature related to the psychiatric make-up of doctors who sexually abuse their patients and that his experience with three admitted offenders who were doctors was not a sufficient basis to allow him to make any generalizations on the subject. Dr. Hill acknowledged that he, as a psychiatrist, is unable to diagnose individuals as having the distinct characteristics of a pedophile or of a homosexual until the patient has performed an overt act which suggests the existence of the characteristic.

The trial judge reviewed the case law in which the use of such psychiatric evidence had been discussed (*i.e., R. v. Lupien*, [1970] S.C.R. 263; *R. v. Robertson* (1975), 21 C.C.C. (2d) 385 (Ont. C.A.); *R. v. McMillan* (1975), 23 C.C.C. (2d) 160 (Ont. C.A.); *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201 (Ont. C.A.); *R. v. Taylor* (1986), 31 C.C.C. (3d) 1 (Ont. C.A.)). From these cases, the trial judge concluded that the use of psychiatric evidence has been greatly expanded since *R. v. Lupien*. He cited the following words of Martin J.A. in *R. v. Robertson* (at p. 423):

Evidence that the offence has distinctive features which identified the perpetrator as a person possessing unusual personality traits constituting him a member of an unusual and limited class of persons would render admissible evidence that the accused did not possess the personality characteristics of the class of persons to which the perpetrator of the crime belonged.

The trial judge also relied on the following passage of *R. v. McMillan* (at p. 175):

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible.

admis qu'il ne connaissait aucune étude ou documentation scientifique relative au portrait psychiatrique des médecins qui abusent sexuellement de leurs patients, et que son expérience acquise auprès des trois délinquants reconnus, qui étaient des médecins, ne lui permettait pas de faire des généralisations sur le sujet. Le Dr Hill a reconnu qu'à titre de psychiatre, il n'était pas en mesure de diagnostiquer chez des individus les caractéristiques distinctes d'un pédophile ou d'un homosexuel, tant que le patient n'avait pas commis d'acte manifeste pouvant indiquer l'existence de la caractéristique.

Le juge du procès a passé en revue la jurisprudence dans laquelle l'utilisation de la preuve psychiatrique a été analysée (p. ex., *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Robertson* (1975), 21 C.C.C. (2d) 385 (C.A. Ont.); *R. c. McMillan* (1975), 23 C.C.C. (2d) 160 (C.A. Ont.); *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201 (C.A. Ont.); *R. c. Taylor* (1986), 31 C.C.C. (3d) 1 (C.A. Ont.)). Fort de ces arrêts, le juge du procès a conclu que l'utilisation de la preuve psychiatrique a considérablement été élargie depuis l'arrêt *R. c. Lupien*. Il a repris les propos suivants du juge Martin de la Cour d'appel dans l'arrêt *R. c. Robertson* (à la p. 423):

[TRADUCTION] La preuve que l'infraction présente des caractéristiques distinctives qui identifient l'auteur du crime comme une personne possédant des traits de personnalité inhabituels, qui le rattachent ainsi à une catégorie inhabituelle et restreinte de personnes, rendrait admissible la preuve que l'accusé ne possédait pas les traits de personnalité propres à la catégorie à laquelle l'auteur du crime appartient.

Le juge du procès a également invoqué le passage suivant de l'arrêt *R. c. McMillan* (à la p. 175):

[TRADUCTION] Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible.

R. v. MOHAN    *Sopinka J.*                [1994] 2 S.C.R.

After relying on *R. v. McMillan*, the trial judge held:

> Doctor Hill is of the opinion that sexual assault is a crime committed by a distinguishable group. As I read the cases, I came to the conclusion that it is the size and the degree of distinctiveness of the "unusual and limited class of persons" which determines whether expert opinion will be helpful in defining the class and categorizing accused persons within or without the group. These days it is trite to say that a large number of men from all walks of life commit sexual offences on young women. While all may have some type of character disorder, I doubt that expert evidence regarding the normality of any given accused would be of assistance to a trier of fact absent some more distinguishing within the wide spectrum of sexual assault.

> The evidence of Doctor Hill is not sufficient, I believe, to establish that doctors who commit sexual assaults on patients are in a significantly more limited group in psychiatric terms than are other members of society. There is no scientific data available to warrant that conclusion. A sample of three offenders is not a sufficient basis for such a conclusion. Even the allegations of the fourth complainant . . . are not so unusual, as sex offenders go, to warrant a conclusion that the perpetrator must have belonged to a sufficiently narrow class.

> I conclude that if the evidence was received as proposed, it would merely be character evidence of a type that is inadmissible as going beyond evidence of general reputation, and does not fall within the proper sphere of expert evidence.

## B. *Ontario Court of Appeal* (1992), 8 O.R. (3d) 173

It was apparent for Finlayson J.A., who wrote the court's judgment, that the trial judge's conclusions were based on a misapprehension of the evidence of Dr. Hill. Finlayson J.A. stated that Dr. Hill did not base his opinion on case studies of the three physicians he had as patients who were accused of sexual crimes. Rather, Finlayson J.A. was of the view at p. 177 that, in concluding that the perpetrators in the hypothetical examples would fall into an unusual and limited class of persons, and that, if the perpetrator were a physician, the class into which he would fall would be even

Après avoir invoqué l'arrêt *R. c. McMillan*, le juge du procès a déclaré:

> [TRADUCTION] Selon le Docteur Hill, l'agression sexuelle est un crime commis par un groupe distinctif. Compte tenu de la jurisprudence, je conclus que c'est l'importance et le degré de distinction de la «catégorie inhabituelle et restreinte de personnes» qui détermine si l'opinion d'un expert contribuera à définir la catégorie et à inclure les accusés dans ce groupe ou à les en exclure. Il va sans dire qu'un grand nombre d'hommes de tous les milieux commettent des infractions sexuelles sur de jeunes femmes. S'il se peut que tous souffrent d'une forme de désordre mental, je doute que la preuve d'expert portant sur la normalité d'un accusé soit utile au juge des faits en l'absence d'un élément plus distinctif se situant à l'intérieur du large spectre de l'agression sexuelle.

> À mon avis, le témoignage du Docteur Hill ne suffit pas à établir que les médecins qui agressent sexuellement leurs patients forment un groupe beaucoup plus restreint sur le plan psychiatrique que les autres membres de la société. Aucune donnée scientifique ne justifie cette conclusion. Un échantillon de trois délinquants ne suffit pas comme fondement à une telle conclusion. Même les allégations de la quatrième plaignante [. . .] ne sont pas inhabituelles, en ce qui concerne les délinquants sexuels, au point de justifier la conclusion que l'auteur du crime devait appartenir à une catégorie suffisamment restreinte.

> Je conclus que, si la preuve proposée était admise, elle ne serait qu'une preuve de moralité sous une forme inadmissible puisqu'elle excède la preuve de la réputation générale, et qu'elle n'entre pas dans la sphère de la preuve d'expert.

## B. *La Cour d'appel de l'Ontario* (1992), 8 O.R. (3d) 173

Il était évident pour le juge Finlayson, qui s'est prononcé au nom de la cour, que le juge du procès avait tiré des conclusions fondées sur une mauvaise compréhension du témoignage du Dr Hill. Le juge Finlayson a déclaré que l'opinion du Dr Hill ne reposait pas sur le cas des trois médecins qu'il avait traités et qui avaient été accusés de crimes sexuels. Au contraire, le juge Finlayson s'est dit d'avis, à la p. 177, que pour conclure que les auteurs, dans les exemples hypothétiques, tomberaient dans une catégorie inhabituelle et restreinte de personnes et que, si l'auteur du crime était un

narrower, Dr. Hill based his opinion on all of his experience:

With respect, I think the learned trial judge was in error, in that he ruled on the sufficiency of the evidence of Dr. Hill, not its admissibility. It was up to the jury to consider what weight should be given to the expert opinion. Crown counsel suggested on appeal that the trial judge was ruling on the qualifications of the expert witness to give the opinion that he did. I do not think that is a correct interpretation of the trial judge's reasons. Dr. Hill's qualifications are outstanding and no attempt was made at trial to challenge them. I think the trial judge was saying that Dr. Hill's personal experience in dealing with sex-offending physicians and the lack of scientific literature specific to such physicians did not justify Dr. Hill giving the opinion that he did. In my opinion, in restricting his interpretation of Dr. Hill's testimony to "doctors who commit sexual assaults on patients", the trial judge misapprehended the opinion of Dr. Hill and the broad psychiatric experience upon which it was based.

Finlayson J.A. went on to say that the evidence of Dr. Hill was admissible on two bases. On the first basis, given that similar fact evidence was admitted showing that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, Dr. Hill's testimony was admissible to show that the offences alleged were unlikely to have been committed by the same person (*R. v. C. (M.H.)*, [1991] 1 S.C.R. 763).

On the second basis, it was admissible to show that the respondent was not a member of either of the unusual groups of aberrant personalities which could have committed the offenses alleged. Referring to *R. v. Lupien, supra*, at pp. 275-78, *R. v. Robertson, supra*, at p. 425, and *R. v. McMillan, supra*, Finlayson J.A. held that it is settled law that opinion evidence showing that the accused did or did not possess the distinguishing characteristics of an abnormal group is admissible in a criminal case, where it would appear that the perpetrator of the crime alleged is a person with an abnormal propensity or disposition which stamps him or her as being a member of that special and extraordi-

médecin, la catégorie à laquelle il appartiendrait serait encore plus restreinte, le Dr Hill a fondé son ·opinion sur son expérience générale:

[TRADUCTION] Avec égards, j'estime que le juge du procès a commis une erreur puisqu'il s'est prononcé sur la suffisance du témoignage du Dr Hill et non son admissibilité. Il appartenait au jury d'apprécier la valeur de l'opinion d'expert. Le ministère public a donné à entendre en appel que le juge du procès se prononçait sur les compétences du témoin expert pour exprimer l'opinion en cause. Je ne crois pas qu'il s'agisse là d'une interprétation juste des motifs du juge du procès. Les compétences du Dr Hill sont remarquables et personne n'a tenté de les contester au procès. À mon avis, le juge du procès affirmait que l'expérience personnelle du Dr Hill acquise auprès des médecins auteurs d'infractions sexuelles, d'une part, et l'absence de documentation scientifique sur de tels médecins, d'autre part, ne permettaient pas au Dr Hill d'exprimer l'opinion en cause. À mon avis, en restreignant aux «médecins qui agressent sexuellement leurs patients» son interprétation de l'opinion du Dr Hill, le juge du procès a mal interprété celle-ci et la grande expérience psychiatrique sur laquelle elle est fondée.

Le juge Finlayson a ensuite ajouté que le témoignage du Dr Hill était admissible pour deux motifs. D'une part, étant donné que la preuve de faits similaires admise démontre que les actes comparés sont si inhabituels et d'une similitude si frappante qu'on ne peut attribuer celle-ci à la coïncidence, le témoignage du Dr Hill était admissible pour démontrer qu'il était peu probable que les infractions alléguées aient été commises par la même personne (*R. c. C. (M.H.)*, [1991] 1 R.C.S. 763).

Par ailleurs, il était admissible pour démontrer que l'intimé n'était pas membre des groupes inhabituels de personnalités anormales qui auraient pu commettre les infractions alléguées. Invoquant les arrêts *R. c. Lupien*, précité, aux pp. 275 à 278; *R. c. Robertson*, précité, à la p. 425 et *R. c. McMillan*, précité, le juge Finlayson a conclu qu'il est établi en droit que le témoignage d'opinion qui démontre que l'accusé possédait ou ne possédait pas les caractéristiques distinctives d'un groupe anormal est admissible dans une affaire criminelle lorsqu'il appert que l'auteur du crime reproché a une propension ou une prédisposition anormale qui indique qu'il est membre de cette catégorie (ou

nary class (or group). In this case, the psychiatrist showed that pedophiles and sexual psychopaths are members of special and extraordinary classes. Considering also the issues put to the jury in the case at bar (complex psychological issues, testimonial trustworthiness), Finlayson J.A. held that evidence of persons with professional psychiatric experience in dealing with sexual offences would be of assistance (based on: *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. Lavallee, supra; R. v. B.(G.)*, [1990] 2 S.C.R. 30).

The court allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal refused leave to the Crown's sentence appeal.

### III. Analysis

The admissibility of the rejected evidence was analyzed in argument under two exclusionary rules of evidence: (1) expert opinion evidence, and (2) character evidence. I have concluded that, on the basis of the principles relating to exceptions to the character evidence rule and under the principles governing the admissibility of expert evidence, the limitations on the use of this type of evidence require that the evidence in this case be excluded.

### (1) *Expert Opinion Evidence*

Admission of expert evidence depends on the application of the following criteria:

(a) relevance;

(b) necessity in assisting the trier of fact;

(c) the absence of any exclusionary rule;

(d) a properly qualified expert.

#### (a) Relevance

Relevance is a threshold requirement for the admission of expert evidence as with all other evidence. Relevance is a matter to be decided by a judge as question of law. Although *prima facie* admissible if so related to a fact in issue that it

groupe) spéciale et extraordinaire. En l'espèce, le psychiatre a démontré que les pédophiles et les psychopathes sexuels appartiennent à des catégories spéciales et extraordinaires. Tenant compte également des questions soumises au jury en l'espèce (questions psychologiques complexes, fiabilité du témoignage), le juge Finlayson a conclu que le témoignage de personnes dotées d'une expérience psychiatrique professionnelle dans le domaine des infractions sexuelles serait utile (fondé sur: *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. Lavallee*, précité; *R. c. B.(G.)*, [1990] 2 R.C.S. 30).

La cour a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un nouveau procès. Elle n'a donc pas autorisé le ministère public à en appeler de la sentence.

### III. Analyse

L'admissibilité de la preuve écartée a été analysée en plaidoirie au regard de deux règles d'exclusion de la preuve: (1) le témoignage d'opinion d'un expert et (2) la preuve de moralité. Compte tenu des principes qui gouvernent les exceptions à la règle en matière de preuve de moralité et de ceux qui gouvernent l'admissibilité de la preuve d'expert, j'ai conclu que les restrictions imposées à l'utilisation de ce type de preuve exigent d'écarter le témoignage en l'espèce.

### (1) *Témoignage d'opinion d'un expert*

L'admission de la preuve d'expert repose sur l'application des critères suivants:

a) la pertinence;

b) la nécessité d'aider le juge des faits;

c) l'absence de toute règle d'exclusion;

d) la qualification suffisante de l'expert.

#### a) La pertinence

Comme pour toute autre preuve, la pertinence est une exigence liminaire pour l'admission d'une preuve d'expert. La pertinence est déterminée par le juge comme question de droit. Bien que la preuve soit admissible à première vue si elle est à

tends to establish it, that does not end the inquiry. This merely determines the logical relevance of the evidence. Other considerations enter into the decision as to admissibility. This further inquiry may be described as a cost benefit analysis, that is "whether its value is worth what it costs." See *McCormick on Evidence* (3rd ed. 1984), at p. 544. Cost in this context is not used in its traditional economic sense but rather in terms of its impact on the trial process. Evidence that is otherwise logically relevant may be excluded on this basis, if its probative value is overborne by its prejudicial effect, if it involves an inordinate amount of time which is not commensurate with its value or if it is misleading in the sense that its effect on the trier of fact, particularly a jury, is out of proportion to its reliability. While frequently considered as an aspect of legal relevance, the exclusion of logically relevant evidence on these grounds is more properly regarded as a general exclusionary rule (see *Morris v. The Queen*, [1983] 2 S.C.R. 190). Whether it is treated as an aspect of relevance or an exclusionary rule, the effect is the same. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence.

There is a danger that expert evidence will be misused and will distort the fact-finding process. Dressed up in scientific language which the jury does not easily understand and submitted through a witness of impressive antecedents, this evidence is apt to be accepted by the jury as being virtually infallible and as having more weight than it deserves. As La Forest J. stated in *R. v. Béland*, [1987] 2 S.C.R. 398, at p. 434, with respect to the evidence of the results of a polygraph tendered by the accused, such evidence should not be admitted by reason of "human fallibility in assessing the proper weight to be given to evidence cloaked under the mystique of science". The application of this principle can be seen in cases such as *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348, in which Moldaver J. applied a threshold test of reliability to what he described, at p. 353, as "a new scientific

ce point liée au fait concerné qu'elle tend à l'établir, l'analyse ne se termine pas là. Cela établit seulement la pertinence logique de la preuve. D'autres considérations influent également sur la décision relative à l'admissibilité. Cet examen supplémentaire peut être décrit comme une analyse du coût et des bénéfices, à savoir «si la valeur en vaut le coût.» Voir *McCormick on Evidence* (3e éd. 1984), à la p. 544. Le coût dans ce contexte n'est pas utilisé dans le sens économique traditionnel du terme, mais plutôt par rapport à son impact sur le procès. La preuve qui est par ailleurs logiquement pertinente peut être exclue sur ce fondement si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si elle peut induire en erreur en ce sens que son effet sur le juge des faits, en particulier le jury, est disproportionné par rapport à sa fiabilité. Bien qu'elle ait été fréquemment considérée comme un aspect de la pertinence juridique, l'exclusion d'une preuve logiquement pertinente, pour ces raisons, devrait être considérée comme une règle générale d'exclusion (voir *Morris c. La Reine*, [1983] 2 R.C.S. 190). Qu'elle soit traitée comme un aspect de la pertinence ou une règle d'exclusion, son effet est le même. Ce facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert.

La preuve d'expert risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits. Exprimée en des termes scientifiques que le jury ne comprend pas bien et présentée par un témoin aux qualifications impressionnantes, cette preuve est susceptible d'être considérée par le jury comme étant pratiquement infaillible et comme ayant plus de poids qu'elle ne le mérite. Comme le juge La Forest l'a dit dans l'arrêt *R. c. Béland*, [1987] 2 R.C.S. 398, à la p. 434, relativement au témoignage sur les résultats d'un détecteur de mensonges produits par l'accusé, une telle preuve ne devrait pas être admise en raison de «la faillibilité humaine dans l'évaluation du poids à donner à la preuve empreinte de la mystique de la science». On a appliqué ce principe dans des décisions comme *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348, dans laquelle le juge Moldaver a appliqué un

R. *v.* MOHAN   *Sopinka J.*                    [1994] 2 S.C.R.

technique or body of scientific knowledge". Moldaver J. also mentioned two other factors, *inter alia*, which should be considered in such circumstances (at p. 353):

(1) Is the evidence likely to assist the jury in its fact-finding mission, or is it likely to confuse and confound the jury?

(2) Is the jury likely to be overwhelmed by the "mystic infallibility" of the evidence, or will the jury be able to keep an open mind and objectively assess the worth of the evidence?

A similar approach was adopted in *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.), where, in ruling upon a *voir dire* concerning the admissibility of D.N.A. evidence, Flanigan J. admitted most of the evidence but excluded statistical evidence about the probability of a match between the DNA contained in samples taken from the accused and those taken from the scene of a crime. The learned judge explained:

This Court does not think that the criminal jurisdiction of Canada is yet ready to put such an additional pressure on a jury, by making them overcome such fantastic odds and asking them to weigh it as just one piece of evidence to be considered in the overall picture of all the evidence presented. There is a real danger that the jury will use the evidence as a measure of the probability of the accused's guilt or innocence and thereby undermine the presumption of innocence and erode the value served by the reasonable doubt standard. As said in the Schwartz case: "dehumanize our justice system".

I would therefore, rule admissible the D.N.A. testing evidence but not the statistic probabilities. This restriction can be easily overcome by evidence that "such matches are rare" or "extremely rare" or words to the same effect, which will put the jury in a better position to assess such evidence and protect the right of the accused to a fair trial.

It should be noted that, subsequently, other courts have rejected the distinction drawn by Flanigan J. and have admitted both DNA evidence and the evi-

critère préliminaire de fiabilité à ce qu'il a qualifié de [TRADUCTION] «nouvelle technique ou discipline scientifique» (p. 353). Le juge Moldaver a également mentionné deux facteurs, entre autres, qui devraient être considérés dans de telles circonstances (à la p. 353):

[TRADUCTION]

(1) La preuve est-elle susceptible de faciliter la tâche de recherche des faits du jury, ou susceptible de l'embrouiller et de le dérouter?

(2) Le jury est-il susceptible d'être écrasé par l'«infaillibilité mystique» de la preuve, ou sera-t-il capable de garder l'esprit ouvert et d'en apprécier objectivement la valeur?

Un point de vue semblable a été adopté dans la décision *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.) où, se prononçant sur un voir-dire concernant l'admissibilité de la preuve d'ADN, le juge Flanigan a admis la plus grande partie de la preuve en excluant toutefois les statistiques sur la probabilité que l'ADN prélevé sur des échantillons recueillis sur l'accusé concorde avec celui prélevé sur la scène du crime. Le juge s'est exprimé ainsi:

[TRADUCTION] Notre Cour ne croit pas que la juridiction criminelle au Canada soit prête à imposer une pression supplémentaire aux membres du jury en exigeant d'eux qu'ils surmontent des obstacles aussi énormes et qu'ils la pondèrent comme un simple élément de preuve à examiner dans le cadre de l'ensemble de la preuve produite. Il y a un danger réel que le jury utilise la preuve comme une mesure de la probabilité de la culpabilité ou de l'innocence de l'accusé et que cela mine la présomption d'innocence et la valeur que présente la norme du doute raisonnable. Comme on l'a dit dans l'affaire Schwartz, «déshumaniser notre système de justice».

Je déclarerais par conséquent admissible la preuve de l'analyse d'A.D.N., mais pas les probabilités statistiques. Cette restriction peut facilement être surmontée par la preuve qu'«une telle concordance est rare» ou «extrêmement rare» ou par une formulation de ce genre, ce qui permettra au jury de mieux apprécier la preuve en question et protégera le droit de l'accusé à un procès équitable.

Il y a lieu de signaler que, par la suite, d'autres tribunaux ont rejeté la distinction établie par le juge Flanigan et ont admis tant la preuve d'ADN que la

dence regarding statistical probabilities of a match. (See, *e.g.*, *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). I rely on *R. v. Bourguignon*, *supra*, simply to illustrate the mode of approach adopted there and leave the specific issue decided by Flanigan J. to be considered when it arises.

(b) Necessity in Assisting the Trier of Fact

In *R. v. Abbey*, *supra*, Dickson J., as he then was, stated, at p. 42:

With respect to matters calling for special knowledge, an expert in the field may draw inferences and state his opinion. An expert's function is precisely this: to provide the judge and jury with a ready-made inference which the judge and jury, due to the technical nature of the facts, are unable to formulate. "An expert's opinion is admissible to furnish the Court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of the expert is unnecessary" (*Turner* (1974), 60 Crim. App. R. 80, at p. 83, *per* Lawton L.J.)

This pre-condition is often expressed in terms as to whether the evidence would be helpful to the trier of fact. The word "helpful" is not quite appropriate and sets too low a standard. However, I would not judge necessity by too strict a standard. What is required is that the opinion be necessary in the sense that it provide information "which is likely to be outside the experience and knowledge of a judge or jury": as quoted by Dickson J. in *R. v. Abbey*, *supra*. As stated by Dickson J., the evidence must be necessary to enable the trier of fact to appreciate the matters in issue due to their technical nature. In *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672, at p. 684, this Court, quoting from *Beven on Negligence* (4th ed. 1928), at p. 141, stated that in order for expert evidence to be admissible, "[t]he subject-matter of the inquiry must be such that ordinary people are unlikely to form a correct judgment about it, if unassisted by persons with special knowledge". More recently, in *R. v. Lavallee*, *supra*, the above passages from *Kelliher* and *Abbey* were applied to admit expert

preuve relative aux probabilités statistiques d'une concordance. (Voir, p. ex., *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). Je m'appuie sur l'arrêt *R. c. Bourguignon*, précité, seulement pour illustrer la méthode adoptée dans cette affaire et je laisse la question précise tranchée par le juge Flanigan à considérer quand elle sera soulevée.

b) La nécessité d'aider le juge des faits

Dans l'arrêt *R. c. Abbey*, précité, le juge Dickson, plus tard Juge en chef, a dit à la p. 42:

Quant aux questions qui exigent des connaissances particulières, un expert dans le domaine peut tirer des conclusions et exprimer son avis. Le rôle d'un expert est précisément de fournir au juge et au jury une conclusion toute faite que ces derniers, en raison de la technicité des faits, sont incapables de formuler. [TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire» (*Turner* (1974), 60 Crim. App. R. 80, à la p. 83, le lord juge Lawton).

Cette condition préalable est fréquemment reprise dans la question de savoir si la preuve serait utile au juge des faits. Le mot «utile» n'est pas tout à fait juste car il établit un seuil trop bas. Toutefois, je ne jugerais pas la nécessité selon une norme trop stricte. L'exigence est que l'opinion soit nécessaire au sens qu'elle fournit des renseignements «qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury»: cité par le juge Dickson, dans *Abbey*, précité. Comme le juge Dickson l'a dit, la preuve doit être nécessaire pour permettre au juge des faits d'apprécier les questions en litige étant donné leur nature technique. Dans l'arrêt *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672, à la p. 684, notre Cour, citant *Beven on Negligence* (4e éd. 1928) à la p. 141, a déclaré que la preuve d'expert était admissible si [TRADUCTION] «l'objet de l'analyse est tel qu'il est peu probable que des personnes ordinaires puissent former un jugement juste à cet égard sans l'assistance de personnes possédant des connaissances spéciales». Plus récemment, dans

evidence as to the state of mind of a "battered" woman. The judgment stressed that this was an area that is not understood by the average person.

As in the case of relevance, discussed above, the need for the evidence is assessed in light of its potential to distort the fact-finding process. As stated by Lawton L.J. in *R. v. Turner*, [1975] Q.B. 834, at p. 841, and approved by Lord Wilberforce in *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699, at p. 718:

"An expert's opinion is admissible to furnish the court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of an expert is unnecessary. In such a case if it is given dressed up in scientific jargon it may make judgment more difficult. The fact that an expert witness has impressive scientific qualifications does not by that fact alone make his opinion on matters of human nature and behaviour within the limits of normality any more helpful than that of the jurors themselves; but there is a danger that they may think it does."

The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions.

There is also a concern inherent in the application of this criterion that experts not be permitted to usurp the functions of the trier of fact. Too liberal an approach could result in a trial's becoming nothing more than a contest of experts with the trier of fact acting as referee in deciding which expert to accept.

These concerns were the basis of the rule which excluded expert evidence in respect of the ultimate issue. Although the rule is no longer of general application, the concerns underlying it remain. In light of these concerns, the criteria of relevance and necessity are applied strictly, on occasion, to exclude expert evidence as to an ultimate issue.

l'arrêt *R. c. Lavallee*, précité, les passages précités des arrêts *Kelliher* et *Abbey* ont été appliqués pour admettre une preuve d'expert sur l'état d'esprit d'une femme «battue». On a souligné qu'il s'agissait là d'un domaine que la personne ordinaire ne comprend pas.

Comme la pertinence, analysée précédemment, la nécessité de la preuve est évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. Comme le lord juge Lawton l'a remarqué dans l'arrêt *R. c. Turner*, [1975] Q.B. 834, à la p. 841, qui a été approuvé par lord Wilberforce dans l'arrêt *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699, à la p. 718:

[TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire. Dans un tel cas, si elle est exprimée dans un jargon scientifique, elle rend la tâche de juger plus difficile. Le seul fait qu'un témoin expert possède des qualifications scientifiques impressionnantes ne signifie pas que son opinion sur les questions de la nature et du comportement humains dans le cadre de la normalité est plus utile que celle des jurés eux-mêmes; ces derniers risquent toutefois de croire qu'elle l'est.»

La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées.

Il y a également la crainte inhérente à l'application de ce critère que les experts ne puissent usurper les fonctions du juge des faits. Une conception trop libérale pourrait réduire le procès à un simple concours d'experts, dont le juge des faits se ferait l'arbitre en décidant quel expert accepter.

Ces préoccupations sont le fondement de la règle d'exclusion de la preuve d'expert relativement à une question fondamentale. Bien que la règle ne soit plus d'application générale, les préoccupations qui la sous-tendent demeurent. En raison de ces préoccupations, les critères de pertinence et de nécessité sont à l'occasion appliqués strictement

Expert evidence as to credibility or oath-helping has been excluded on this basis. See *R. v. Marquard*, [1993] 4 S.C.R. 223, *per* McLachlin J.

### (c) The Absence of any Exclusionary Rule

Compliance with criteria (a), (b) and (d) will not ensure the admissibility of expert evidence if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. For example, in *R. v. Morin*, [1988] 2 S.C.R. 345, evidence elicited by the Crown in cross-examination of the psychiatrist called by the accused was inadmissible because it was not shown to be relevant other than as to the disposition to commit the crime charged. Notwithstanding, therefore, that the evidence otherwise complied with the criteria for the admission of expert evidence it was excluded by reason of the rule that prevents the Crown from adducing evidence of the accused's disposition unless the latter has placed his or her character in issue. The extent of the restriction when such evidence is tendered by the accused lies at the heart of this case and will be discussed hereunder.

### (d) A Properly Qualified Expert

Finally the evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

In summary, therefore, it appears from the foregoing that expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

pour exclure la preuve d'expert sur une question fondamentale. La preuve d'expert sur la crédibilité ou la justification a été exclue pour ce motif. Voir l'arrêt *R. c. Marquard*, [1993] 4 R.C.S. 223, les motifs du juge McLachlin.

### c) L'absence de toute règle d'exclusion

Le respect des critères a), b) et d) n'assurera pas l'admissibilité de la preuve d'expert si celle-ci contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. Ainsi, dans l'arrêt *R. c. Morin*, [1988] 2 R.C.S. 345, la preuve obtenue par le ministère public en contre-interrogatoire du psychiatre cité par l'accusé a été jugée inadmissible parce qu'il n'avait pas été établi qu'elle était pertinente autrement que relativement à la propension à commettre le crime reproché. En dépit du fait que la preuve respectait par ailleurs les critères d'admissibilité de la preuve d'expert, elle a donc été exclue sur le fondement de la règle qui interdit au ministère public de produire une preuve de la propension de l'accusé à moins que ce dernier n'ait mis sa moralité en jeu. La portée de la restriction, lorsqu'une telle preuve est produite par l'accusé, est au cœur même de la présente affaire, et sera analysée ci-après.

### d) La qualification suffisante de l'expert

Enfin, la preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

En résumé, il ressort donc de ce qui précède que la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

R. v. MOHAN  *Sopinka J.*

(2) *Expert Evidence as to Disposition*

In order to decide what principles should govern the admissibility of this kind of evidence, it is necessary to consider the limitations imposed by the rules relating to character evidence, having regard to the restrictions imposed by the criteria in respect of expert evidence.

I have already referred to *R. v. Morin*, wherein an unanimous court decided that the Crown cannot lead such evidence in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. As I stated, at p. 371:

In my opinion, in order to be relevant on the issue of identity the evidence must tend to show that the accused shared a distinctive unusual behavioural trait with the perpetrator of the crime. The trait must be sufficiently distinctive that it operates virtually as a badge or mark identifying the perpetrator. The judgment of Lord Hailsham in *Boardman*, quoted above, provides one illustration of the kind of evidence that would be relevant.

. . .

Conversely, the fact that the accused is a member of an abnormal group some of the members of which have the unusual behavioural characteristics shown to have been possessed by the perpetrator is not sufficient. In some cases it may, however, be shown that all members of the group have the distinctive unusual characteristics. If a reasonable inference can be drawn that the accused has those traits then the evidence is relevant subject to the trial judge's obligation to exclude it if its prejudicial effect outweighs its probative value. The greater the number of persons in society having these tendencies, the less relevant the evidence on the issue of identity and the more likely that its prejudicial effect predominates over its probative value.

When, however, the evidence is tendered by the accused, other considerations apply. The accused is permitted to adduce evidence as to disposition both in his or her own evidence or by calling witnesses. The general rule is that evidence as to character is limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testi-

(2) *Preuve d'expert quant à la prédisposition*

Pour déterminer les principes qui devraient gouverner l'admissibilité de ce genre de preuve, il faut considérer les restrictions imposées par les règles relatives à la preuve de moralité, eu égard aux restrictions imposées par les critères relatifs à la preuve d'expert.

J'ai cité plus haut l'arrêt *R. c. Morin* dans lequel notre Cour unanime a décidé que le ministère public ne peut produire une telle preuve en premier lieu que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. Comme je l'ai mentionné, à la p. 371:

À mon avis, pour être pertinente relativement à la question de l'identité, la preuve doit tendre à démontrer que l'accusé partageait avec l'auteur du crime un trait de comportement distinctif inhabile. Le trait doit être distinctif au point d'agir presque comme une étiquette ou une marque qui identifie l'auteur du crime. L'extrait précité des motifs de lord Hailsham dans l'arrêt *Boardman* donne un exemple du genre de preuve qui serait pertinente.

. . .

Inversement, l'appartenance de l'accusé à un groupe anormal dont certains membres présentent des caractéristiques de comportement inhabituelles que possédait l'auteur du crime, n'est pas suffisante. Dans certains cas, cependant, il peut être démontré que tous les membres du groupe ont les caractéristiques distinctives inhabituelles. Si on peut raisonnablement en déduire que l'accusé possède ces traits, la preuve est alors pertinente sous réserve de l'obligation du juge du procès de l'exclure si son effet préjudiciable l'emporte sur sa valeur probante. Plus le nombre de personnes dans la société présente ces tendances, moins la preuve est pertinente relativement à la question de l'identité et plus il est vraisemblable que son effet préjudiciable soit supérieur à sa valeur probante.

Néanmoins, lorsque la preuve est celle de l'accusé, d'autres facteurs entrent en jeu. L'accusé peut produire une preuve sur la prédisposition tant par son propre témoignage que par celui d'autres témoins. Suivant la règle générale, la preuve de moralité se limite à la preuve de la réputation de l'accusé au sein de la collectivité relativement au trait de caractère concerné. L'accusé peut toutefois

mony, however, may rely on specific acts of good conduct. See *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, at p. 348; leave to appeal refused, [1981] 1 S.C.R. xi. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. I propose to examine the extent of this exception.

In England, with the exception of non-insane automatism, expert psychiatric and psychological evidence is not admissible to show the accused's state of mind unless it is contended that the accused is abnormal in the sense of suffering from insanity or diminished responsibility. In *R. v. Chard* (1971), 56 Cr. App. R. 268, the trial judge refused to allow medical evidence that the accused who was not alleged to be suffering from a disease of the mind lacked the necessary *mens rea*. In the Court of Appeal, Roskill L.J. stated at p. 271 that it was "not permissible to call a witness, whatever his personal experience, merely to tell the jury how he thinks an accused man's mind — assum[ing] a normal mind — operated at the time of the alleged crime . . . ."

In *Lowery v. The Queen*, [1974] A.C. 85 (P.C.), such evidence was admitted when tendered by one co-accused against another. It was a case involving the sadistic murder of a young girl. Lowery and King were both charged, and it was obvious that one, the other, or both of them were guilty. In this context, King sought to prove that he feared Lowery and that Lowery dominated him. The Privy Council held that the trial judge acted properly in allowing King to call a psychiatrist to swear that he was less likely to have committed the crime than Lowery. That is, character evidence tendered by a psychiatrist was held to be admissible. Lord

invoquer dans son propre témoignage des actes particuliers de bonne conduite. Voir *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, à la p. 348; autorisation de pourvoi refusée, [1981] 1 R.C.S. xi. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune des catégories concernées. Une autre exception de portée limitée a toutefois été créée. Je propose d'en examiner l'étendue.

En Angleterre, à l'exception de l'automatisme non fondé sur l'aliénation mentale, la preuve d'expert psychiatrique et psychologique n'est pas admissible pour démontrer l'état d'esprit de l'accusé, sauf si on fait valoir qu'il est anormal parce qu'il souffre d'aliénation mentale ou de responsabilité amoindrie. Dans l'arrêt *R. c. Chard* (1971), 56 Cr. App. R. 268, le juge du procès a refusé d'accueillir la preuve médicale portant que l'accusé, dont on n'alléguait pas qu'il souffrait d'une maladie mentale, n'avait pas la *mens rea* requise. En Cour d'appel, le lord juge Roskill a déclaré, à la p. 271, qu'il était [TRADUCTION] «interdit de citer un témoin, quelle que soit son expérience personnelle, simplement pour dire au jury comment il pense que l'esprit de l'accusé — en suppos[ant] qu'il ait un esprit normal — fonctionnait à l'époque du crime reproché . . .»

Dans l'arrêt *Lowery c. The Queen*, [1974] A.C. 85 (C.P.), un témoignage semblable, rendu par un coaccusé contre l'autre, a été admis. L'affaire portait sur le meurtre sadique d'une jeune fille. Lowery et King étaient tous deux accusés, et il était évident que l'un ou l'autre, ou les deux, étaient coupables. C'est dans ce contexte que King a cherché à établir qu'il craignait Lowery et que ce dernier exerçait sur lui sa domination. Le Conseil privé a conclu que le juge du procès avait agi correctement en permettant à King d'appeler un psychiatre pour témoigner sous serment qu'il était moins susceptible d'avoir commis le crime que Lowery. La preuve de moralité produite par un psychiatre a ainsi été jugée admissible. Lord

R. v. MOHAN    *Sopinka J.*    [1994] 2 S.C.R.

Morris of Borth-y-Gest of the Privy Council stated, at p. 103:

Lowery and King were each asserting that the other was the completely dominating person at the time Rosalyn Nolte was killed: each claimed to have been in fear of the other. In these circumstances it was most relevant for King to be able to show, if he could, that Lowery had a personality marked by aggressiveness whereas he, King, had a personality which suggested that he would be led and dominated by someone who was dominant and aggressive . . . . Not only however was the evidence which King called relevant to this case: its admissibility was placed beyond doubt by the whole substance of Lowery's case.

Moreover, in *R. v. Turner, supra,* the accused unsuccessfully pleaded provocation in answer to a charge of murder of his girlfriend whom he alleged that he had killed in a fit of rage caused by her sudden confession of infidelity. He appealed on the grounds that the trial judge had wrongly refused to admit the evidence of a psychiatrist. That psychiatrist was to testify to the effect that the accused was not mentally ill, that he had a great affection toward the victim and that he deeply regretted his act of murder. The evidence was rejected on the basis that it was not the proper subject of expert evidence. As for *Lowery v. The Queen,* it was confined to its own facts.

C. Tapper in *Cross on Evidence* (7th ed. 1990), at p. 492, reconciled *Lowery v. The Queen* and *R. v. Turner* using a principled approach:

Juries do not need to be told that normal men are liable to lose control of themselves when their women admit to infidelity, but they require all the expert assistance they can get to help them determine which of two accused has the more aggressive personality.

Tapper then proceeded to reconcile the two cases using a more technical approach:

Another way of reconciling the cases would be to treat the fact that Lowery had put his character in issue as crucial to the decision of the Privy Council, the psychiatric evidence then being admissible to impugn the credibility of his testimony. Unfortunately we are left with-

out any guidance on the subject from the Court of Appeal who contented themselves with saying that *Lowery*'s case was decided on its special facts.

With respect to the development of the exception in Canada, *R. v. Lupien, supra*, is a good starting point. It involved a respondent who was convicted of attempting to commit an act of gross indecency, and whose defence was that he lacked the requisite intent to commit the act because he thought his companion was a woman. He sought to prove his "lack of intent" by tendering psychiatric evidence which showed that he reacted violently against any type of homosexual activity and, therefore, could not have knowingly engaged in an act of gross indecency. Ritchie J. concluded, at pp. 277-78, that the evidence was admissible for the following reasons:

I am far from saying that as a general rule psychiatric evidence of a man's disinclination to commit the kind of crime with which he is charged should be admitted, but the present case is concerned with gross indecency between two men and I think that crimes involving homosexuality stand in a class by themselves in the sense that the participants frequently have characteristics which make them more readily identifiable as a class than ordinary criminals. See *Reg. v. Thompson* [(1917), 13 Cr. App. R. 61 at 81]. In any event, it appears to me that the question of whether or not a man is homosexually inclined or otherwise sexually perverted is one upon which an experienced psychiatrist is qualified to express an opinion and that if such opinion is relevant it should be admitted at a trial such as this even if it involves the psychiatrist in expressing his conclusion that the accused does not have the capacity to commit the crime with which he is charged.

It is this passage that created the abnormal group exception which is often sought to be applied to various contexts other than the homosexual context.

The Ontario Court of Appeal, and specifically Martin J.A., further looked into this exception of proving the disposition of the accused through psychiatric evidence in the following two cases: *R. v. McMillan, supra*, aff'd [1977] 2 S.C.R. 824, and *R. v. Robertson, supra*.

reusement, nous sommes laissés sans autre assistance à cet égard que la simple déclaration de la Cour d'appel portant que l'affaire *Lowery* a été décidée en fonction de ses faits propres.

L'arrêt *R. c. Lupien*, précité, est un bon point de départ de l'évolution de l'exception au Canada. Déclaré coupable d'avoir tenté de commettre un acte de grossière indécence, l'intimé plaidait qu'il n'avait pas l'intention requise pour commettre l'acte, parce qu'il croyait que son compagnon était une femme. Il a tenté d'établir son «absence d'intention» en produisant une preuve psychiatrique démontrant qu'il réagissait violemment à tout genre d'activité homosexuelle et que, par conséquent, il ne pouvait avoir sciemment commis un acte de grossière indécence. Le juge Ritchie a conclu à l'admissibilité de la preuve pour les motifs suivants (aux pp. 277 et 278):

Je suis loin de poser comme règle générale que la preuve psychiatrique des prédispositions d'une personne à ne pas commettre le genre de crime dont il est accusé doit être admise, mais dans cette affaire-ci il s'agit de grossière indécence entre deux hommes et je pense que les crimes relatifs à l'homosexualité sont dans une catégorie à part, en ce sens que leurs auteurs possèdent souvent des caractéristiques qui les rendent collectivement plus facilement identifiables que les criminels ordinaires. Voir *Regina v. Thompson* [(1917), 13 Cr. App. R. 61 à 81]. De toute façon, il me paraît qu'un psychiatre est qualifié pour exprimer un avis sur la question de savoir si un homme est prédisposé à l'homosexualité, ou autrement sexuellement perverti. Si un tel avis est pertinent, il doit être recevable dans un procès comme celui-ci, même s'il amène le psychiatre à exprimer l'avis que l'inculpé ne possède pas la capacité de commettre le crime dont il est accusé.

C'est ce passage qui a créé l'exception relative au groupe anormal que l'on tente fréquemment d'appliquer dans des contextes autres que celui de l'homosexualité.

La Cour d'appel de l'Ontario, et en particulier le juge Martin, a examiné plus amplement l'exception qui consiste à démontrer la prédisposition de l'accusé à l'aide de la preuve psychiatrique, dans les deux affaires suivantes: *R. c. McMillan*, précité, conf. par [1977] 2 R.C.S. 824, et *R. c. Robertson*, précité.

*R. v. McMillan* involved an accused who was charged with the murder of his infant child and whose defence was that it was in fact his wife and not he who killed the child. The trial judge allowed the accused to call a psychiatrist who testified that the accused's wife had a psychopathic personality disturbance with brain damage. This psychiatric evidence showed that a third party, the accused's wife, was more likely to have committed the crime because of her abnormal personality/disposition. Martin J.A., speaking for the Court, found that disposition to commit a crime is generally relevant since it goes to the probability/propensity of the person doing or not doing the act charged. He then referred to *R. v. Lupien*, at p. 169, as creating the following exception:

One of the exceptions to the general rule that the character of the accused, in the sense of disposition, when admissible, can only be evidenced by general reputation, relates to the admissibility of psychiatric evidence where the particular disposition or tendency in issue is characteristic of an abnormal group, the characteristics of which fall within the expertise of the psychiatrist.

After having noted the applicability of *R. v. Lupien*, Martin J.A. engaged in a lengthy discussion of the exception and in fact extended *R. v. Lupien*. This extension, at pp. 173-75 of *R. v. McMillan*, was affirmed by the Supreme Court of Canada:

I do not consider that, because the crime under consideration was not one that could only be committed by a person with a special or abnormal propensity, psychiatric evidence with respect to Mrs. McMillan's disposition, was, therefore, inadmissible, in the circumstances of this case.

All evidence to be admissible must, of course, be relevant to some issue in the case. Psychiatric evidence with respect to the personality traits or disposition of a person, whether of the accused or another, may be admissible for different purposes. While those purposes are not mutually exclusive, evidence which is relevant for one purpose may not be for another.

Dans l'affaire *R. c. McMillan*, l'accusé était inculpé du meurtre de son jeune enfant. Il plaidait que c'était en fait sa femme, et non lui, qui avait tué l'enfant. Le juge du procès a permis à l'accusé d'appeler un psychiatre qui a témoigné que l'épouse de l'accusé souffrait d'un trouble psychopathique de la personnalité et de lésions cérébrales. Cette preuve psychiatrique a démontré qu'un tiers, l'épouse de l'accusé, était plus susceptible d'avoir commis le crime en raison de sa personnalité et de sa prédisposition toutes deux anormales. Exprimant l'opinion de la Cour, le juge Martin a conclu que la prédisposition à commettre un crime est généralement pertinente puisqu'en ce qui concerne la perpétration de l'acte reproché, elle vise la propension et la probabilité. Il a ensuite indiqué que l'arrêt *R. c. Lupien*, à la p. 169, créait l'exception suivante:

[TRADUCTION] L'une des exceptions à la règle générale suivant laquelle, lorsqu'elle est admissible, la moralité de l'accusé (dans le sens de la prédisposition) ne peut être démontrée que par la preuve de la réputation générale, porte sur l'admissibilité de la preuve psychiatrique lorsque la prédisposition ou la propension en question est propre à un groupe anormal, dont les caractéristiques relèvent de l'expertise du psychiatre.

Après avoir noté l'applicabilité de cet arrêt, le juge Martin a longuement analysé l'exception et il a en fait élargi la portée de l'arrêt *R. c. Lupien*. Cette expansion, aux pp. 173 à 175 de l'arrêt *R. c. McMillan*, a été confirmée par la Cour suprême du Canada:

[TRADUCTION] Je ne considère pas que, du fait qu'il ne s'agit pas d'un crime qui n'aurait pu être commis que par une personne dotée d'une propension particulière ou anormale, la preuve psychiatrique relative à la prédisposition de Mᵐᵉ McMillan était par conséquent inadmissible dans les circonstances de l'espèce.

Pour être admissible, toute preuve doit évidemment être pertinente relativement à certaines questions soulevées dans l'affaire. La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, peut être admissible à différentes fins. Si ces fins ne sont pas mutuellement exclusives, la preuve pertinente quant à une fin peut ne pas l'être quant à une autre.

Psychiatric evidence with respect to the personality traits or disposition of an accused, or another, is admissible provided:

(a) the evidence is relevant to some issue in the case;

(b) the evidence is not excluded by a policy rule;

(c) the evidence falls within the proper sphere of expert evidence.

One of the purposes for which psychiatric evidence may be admitted is to prove identity when that is an issue in the case, since psychical as well as physical characteristics may be relevant to identify the perpetrator of the crime.

Where the offence is of a kind that is committed only by members of an abnormal group, for example, offences involving homosexuality, psychiatric evidence that the accused did or did not possess the distinguishing characteristics of that abnormal group is relevant either to bring him within, or to exclude him from, the special class of which the perpetrator of the crime is a member. In order for psychiatric evidence to be relevant for that purpose, the offence must be one which indicates that it was committed by a person with an abnormal propensity or disposition which stamps him as a member of a special and extraordinary class.

Psychiatric evidence with respect to the personality traits or disposition of the accused, or another, if it meets the three conditions of admissibility above set out, is also admissible, however, as bearing on the *probability* of the accused, or another, having committed the offence.

It would appear that it was upon this latter ground that the psychologist's evidence was held to be admissible in *Lowery v. The Queen, supra,* although the features of the offence in that case were sufficiently indicative of the possession of an abnormal propensity by the perpetrator, that the expert evidence might have been relevant to the issue of identity as well. Since in that case the evidence was offered by the accused King, it was not excluded from the policy rule which prevents the prosecution from introducing evidence to prove that the accused by reason of his criminal propensities is likely to have committed the crime charged. Both accused in *Lowery v. The Queen* had psychopathic personalities (although the features of King's psychopathic personality were

La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est admissible à trois conditions:

a) la preuve est pertinente quant à une question soulevée dans l'affaire;

b) la preuve n'est exclue par aucune règle de principe;

c) la preuve entre dans le domaine de la preuve d'expert.

La preuve psychiatrique peut être admise entre autres pour établir l'identité lorsque cet élément est soulevé dans l'affaire, puisque des caractéristiques tant psychiques que physiques peuvent être pertinentes relativement à l'identification de l'auteur du crime.

Lorsque l'infraction est de celles qui sont commises uniquement par les membres d'un groupe anormal, par exemple les infractions relatives à l'homosexualité, la preuve psychiatrique que l'accusé possédait ou non les caractéristiques distinctives de ce groupe anormal est pertinente relativement à son inclusion dans la catégorie particulière dont l'auteur du crime fait partie, ou à son exclusion. Pour que la preuve psychiatrique soit pertinente quant à cette fin, l'infraction doit indiquer qu'elle a été commise par un individu doté d'une propension ou d'une prédisposition anormale qui le désigne comme faisant partie d'une catégorie spéciale et extraordinaire.

Si elle satisfait aux trois conditions d'admissibilité énoncées ci-dessus, la preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est toutefois également admissible comme portant sur la *probabilité* que l'accusé ou une autre personne ait commis l'infraction en cause.

Il semble que ce soit pour ce dernier motif que le témoignage du psychologue a été jugé admissible dans l'arrêt *Lowery c. The Queen,* précité, bien que les caractéristiques de l'infraction dans cette affaire aient suffisamment indiqué une propension anormale de l'auteur du crime pour que la preuve d'expert ait pu être pertinente relativement à la question de l'identité également. Puisque dans cette affaire la preuve a été produite par l'accusé King, elle n'a pas été exclue par la règle de principe qui interdit à la poursuite d'introduire une preuve pour établir qu'en raison de sa propension criminelle, l'accusé est susceptible d'avoir commis le crime reproché. Les deux accusés dans l'affaire *Lowery c. The Queen* ayant des personnalités de psychopathes (bien que les caractéristiques de la personnalité psychopathique de King soient moins marquées que celles de

R. v. MOHAN    *Sopinka J.*                [1994] 2 S.C.R.

less severe than Lowery's) and hence their personality traits fell within the proper sphere of expert evidence.

. . .

Where the crime under consideration does not have features which indicate that the perpetrator was a member of an abnormal group, psychiatric evidence that the accused has a normal mental make-up but does not have a disposition for violence or dishonesty or other relevant character traits frequently found in ordinary people is inadmissible. The psychiatric evidence in the circumstances postulated is not relevant on the issue of identity to exclude the accused as the perpetrator any more than the possession of violent or dishonest tendencies by the accused or a third person would be admissible to identify the accused or the third person as the perpetrator of the crime.

"So common a characteristic is not a recognisable mark of the individual." (*Per* Lord Sumner in *Thompson v. Director of Public Prosecutions* (1918), 26 Cox C.C. 189 at p. 199.)

While such evidence is relevant as bearing on the probability of the accused having committed the crime, the psychiatric evidence proffered in such circumstances really amounts to an attempt to introduce evidence of the accused's good character, as a normal person, through a psychiatrist. Such evidence does not fall within the proper sphere of expert evidence and is subject to the ordinary rule applicable to character evidence which, in general, requires the character of the accused to be evidenced by proof of general reputation.

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible. [Emphasis in original.]

The evidence of the psychiatrist was held to be admissible.

Martin J.A. elaborated on the reasoning set out above in *R. v. Robertson, supra.* That case involved a 16-year-old accused charged with bru-

Lowery), leurs traits de caractère entraient dans le domaine de la preuve d'expert.

. . .

Lorsque le crime en cause ne présente aucune caractéristique indiquant que l'auteur faisait partie d'un groupe anormal, la preuve psychiatrique que l'accusé a une constitution mentale normale, mais qu'il n'a pas de prédisposition à la violence ou à la malhonnêteté ou d'autres traits de caractère pertinents que possèdent fréquemment les personnes ordinaires, est inadmissible. Dans les circonstances énoncées, la preuve psychiatrique n'est pas plus pertinente relativement à la question de l'identité en vue de déterminer que l'accusé n'est pas l'auteur du crime que ne serait admissible la preuve que l'accusé ou un tiers a une tendance violente ou malhonnête en vue de déterminer que l'accusé ou le tiers est l'auteur du crime.

«Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu.» (Les motifs de lord Sumner dans l'arrêt *Thompson c. Director of Public Prosecutions* (1918), 26 Cox C.C. 189, à la p. 199.)

Si une telle preuve est pertinente parce qu'elle porte sur la probabilité que l'accusé ait commis le crime, la preuve psychiatrique produite dans de telles circonstances équivaut réellement à une tentative d'introduire une preuve de la bonne moralité de l'accusé, comme une personne normale, par l'entremise d'un psychiatre. Une telle preuve n'entre pas dans le domaine de la preuve d'expert. Elle est assujettie à la règle ordinaire en matière de preuve de moralité qui, en général, requiert que la moralité de l'accusé soit démontrée au moyen de la preuve de sa réputation générale.

Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible. [En italique dans l'original.]

Le témoignage du psychiatre a été jugé admissible.

Le juge Martin a commenté le raisonnement énoncé ci-dessus dans l'arrêt *R. c. Robertson*, précité, où l'accusé de 16 ans était inculpé d'avoir tué

tally murdering a nine-year-old girl by kicking her. The defence sought to introduce expert psychiatric evidence to show that a propensity for violence or aggression was not a part of the accused's psychological make-up. This tended to rebut evidence led by the Crown as to the accused's violent character. Martin J.A. summed up, at p. 426:

While the judgment of Ritchie, J., deals only with the admissibility of psychiatric evidence with respect to disposition in offences involving homosexuality, there would appear to be no logical reason why such evidence should not be admitted on the same principle in other cases where there is evidence tending to show that, by reason of the nature of the offence, or its distinctive features, its perpetrator was a person who, in the language of Lord Sumner, was a member of "a specialized and extraordinary class", and whose psychological characteristics fall within the expertise of the psychiatrist, for the purpose of showing that the accused did not possess the psychological characteristics of persons of that class. Obviously, where such evidence is adduced by the accused, the prosecution is entitled to call psychiatric evidence in order to rebut the evidence introduced by the defence.

In my view, however, the judgment of Ritchie, J., in *R. v. Lupien, supra*, provides no support for a conclusion that, in the case of ordinary crimes of violence, psychiatric evidence is admissible to prove that the accused's psychological make-up does not include a tendency or disposition for violence.

Martin J.A. further stated, at pp. 429-30:

In my view, psychiatric evidence with respect to disposition or its absence is admissible on behalf of the defence, if relevant to an issue in the case, where the disposition in question constitutes a characteristic feature of an abnormal group falling within the range of study of the psychiatrist, and from whom the jury can, therefore, receive appreciable assistance with respect to a matter outside the knowledge of persons who have not made a special study of the subject. A *mere* disposition for violence, however, is not so uncommon as to constitute a feature characteristic of an abnormal group falling within the special field of study of the psychiatrist and permitting psychiatric evidence to be given of the absence of such disposition in the accused. [Emphasis in original.]

brutalement à coups de pied une fille de neuf ans. La défense avait tenté d'introduire une preuve psychiatrique d'expert pour démontrer que la constitution psychologique de l'accusé n'indiquait aucune propension à la violence ou à l'agression. Cette preuve visait à réfuter la preuve introduite par la ministère public au sujet de la nature violente de l'accusé. Le juge Martin a résumé à la p. 426:

[TRADUCTION] Si les motifs du juge Ritchie ne portent que sur l'admissibilité de la preuve psychiatrique relative à la prédisposition à commettre des infractions relatives à l'homosexualité, il ne paraît exister aucune raison logique de ne pas admettre une telle preuve en se fondant sur le même principe dans d'autres affaires où la preuve tend à démontrer qu'en raison de la nature de l'infraction ou de ses caractéristiques distinctives, son auteur faisait partie, dans les termes de lord Sumner, d'une «catégorie spéciale et extraordinaire», dont les caractéristiques psychologiques relèvent du domaine d'expertise du psychiatre, dans le but de démontrer que l'accusé ne possédait pas les caractéristiques psychologiques propres aux personnes de cette catégorie. De toute évidence, lorsqu'une telle preuve est produite par l'accusé, la poursuite peut produire une preuve psychiatrique pour la réfuter.

À mon avis, toutefois, l'opinion du juge Ritchie dans *R. c. Lupien*, précité, n'offre aucun appui à la conclusion que, dans le cas de crimes ordinaires de violence, la preuve psychiatrique est admissible pour démontrer que la constitution psychologique de l'accusé n'inclut aucune tendance ou prédisposition à la violence.

Le juge Martin a ajouté aux pp. 429 et 430:

[TRADUCTION] À mon avis, la preuve psychiatrique relative à la prédisposition ou à son absence est admissible pour le compte de la défense si elle est pertinente relativement à une question soulevée dans l'affaire, lorsque la prédisposition en question constitue un élément caractéristique d'un groupe anormal qui entre dans le domaine d'étude du psychiatre, et duquel le jury peut donc recevoir une aide appréciable à l'égard d'une question qui se situe à l'extérieur de la connaissance des personnes qui n'ont pas étudié le sujet. Une *simple* prédisposition à la violence n'est toutefois pas inhabituelle au point de constituer un élément caractéristique d'un groupe anormal qui entre dans le domaine particulier d'étude du psychiatre et qui permet que la preuve psychiatrique de l'absence d'une telle prédisposition chez l'accusé soit produite. [En italique dans l'original.]

Given this reasoning, Martin J.A. concluded that the crime was not specially marked and so the conditions for the admissibility of psychiatric evidence were not met.

A useful summary of the principles that emerge from the cases is made by Alan W. Mewett, "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29, at pp. 35-36, of his article where he points out the various contexts in which an accused can tender character evidence by way of an expert:

There are thus three basic requirements that must be met before such psychiatric evidence can even be considered as potentially admissible. First, it must be relevant to an issue. Second, it must be of appreciable assistance to the trier of fact and third, it must be evidence that would otherwise be unavailable to the ordinary layman without specialized training, but these requirements only set forth the general requirements for the admissibility of expert testimony.

Once these hurdles have been passed, a number of different scenarios may be postulated. The crime may be an "ordinary" one (which I take to mean a crime for which no special mental characteristics on the part of the perpetrator would be required) and the accused is an "ordinary" person; the crime may be an "ordinary" one, but the accused an "extraordinary" person (*i.e.*, having some peculiar mental make-up that would tend to show that he would not commit that "ordinary" crime); the crime may be "extraordinary", but the accused "ordinary"; or the crime may be "extraordinary" and the accused "extraordinary", in a different direction.

In the first scenario, the evidence is irrelevant because it is simply not probative of anything. In the second it is probative and admissible but only if the extraordinary characteristic of the accused tends to show that he would not commit an ordinary crime of that nature (such as a homosexual being charged with a heterosexual offence). In the third, if it is shown that the crime is such that it could only, or in all probability would only, be committed by a person having identifiable peculiarities that the accused does not possess, it would be admissible. In the last scenario, the situation is the same provided that the difference in the abnormalities tends to exclude the accused from the probable group of perpetrators.

Suivant ce raisonnement, le juge Martin a conclu que le crime n'était pas spécialement marqué, et que les conditions d'admissibilité de la preuve psychiatrique n'étaient donc pas remplies.

Alan W. Mewett, dans un article intitulé «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29, aux pp. 35 et 36, résume utilement les principes qui ressortent de la jurisprudence. Il souligne les différents contextes dans lesquels un accusé peut produire une preuve de moralité par l'entremise d'un expert:

[TRADUCTION] Il faut donc satisfaire à trois exigences fondamentales pour que la preuve psychiatrique puisse même être considérée comme peut-être admissible. Premièrement, elle doit être pertinente relativement à une question en litige. Deuxièmement, elle doit apporter une aide appréciable au juge des faits et troisièmement, elle ne pourrait être obtenue autrement par le profane ordinaire qui ne possède aucune formation spécialisée. Ces conditions ne font toutefois qu'énoncer les exigences générales d'admissibilité du témoignage d'expert.

Une fois surmontés ces obstacles, différents scénarios peuvent être posés. Le crime peut être «ordinaire» (ce qui à mon avis signifie un crime pour lequel aucune caractéristique mentale particulière ne serait requise chez l'auteur du crime) et l'accusé, une personne «ordinaire»; le crime peut être «ordinaire», et l'accusé, une personne «extraordinaire» (c'est-à-dire que sa constitution mentale particulière tendrait à démontrer qu'il ne commettrait pas ce crime «ordinaire»); le crime peut être extraordinaire, mais l'accusé «ordinaire»; ou le crime et l'accusé peuvent tous deux être «extraordinaires», dans un sens différent.

Dans le premier scénario, la preuve n'est pas pertinente parce qu'elle ne prouve simplement rien. Dans le second, elle n'est probante et admissible que si la caractéristique extraordinaire de l'accusé tend à établir qu'il ne commettrait pas un crime ordinaire de cette nature (comme l'homosexuel accusé relativement à une infraction de nature hétérosexuelle). Dans le troisième, s'il est démontré que le crime est tel qu'il ne pourrait être ou, selon toutes les probabilités, ne serait commis que par une personne ayant des caractéristiques identifiables que l'accusé ne possède pas, elle serait admissible. Dans le dernier scénario, la situation est identique, pour autant que la différence entre les éléments anormaux tende à exclure l'accusé du groupe probable d'auteurs.

I question whether use of the terms "abnormal" and "normal" is the best way to describe the concept that underlies their use. The term "abnormal" is derived from the English cases in which it usually connotes the mental state of insanity or diminished responsibility. See *R. v. Chard, supra*, at p. 270. The basic rationale of these cases is that "normal" human behaviour is a matter which a judge or jury can assess without the assistance of expert evidence. Canadian cases have extended the exception to include what has been described as sexually deviant behaviour. See Rosemary Pattenden, "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92, at p. 100. The rationale underlying this extension is the relevance of the evidence based on the distinctiveness of the behavioural traits of either the putative perpetrator of the crime or the accused. This distinctiveness tends to exclude the accused from the category of persons that could or would likely commit the crime.

There are other reasons why the use of the term "abnormal" is no longer satisfactory. Even in medical circles there are differing views as to what constitutes abnormality. See Pattenden, *supra*, at p. 100, and David C. Rimm and John W. Sommervill, *Abnormal Psychology* (1977), at pp. 31 and 32. Moreover, it imports a value judgment on the lifestyle of some groups in society. This is aptly illustrated by considering the statement of Lord Sumner in *Thompson v. The King*, [1918] A.C. 221, at p. 235:

The evidence tends to attach to the accused a peculiarity which, though not purely physical, I think may be recognized as properly bearing that name. Experience tends to show that these offences against nature connote an inversion of normal characteristics which, while demanding punishment as offending against social morality, also partake of the nature of an abnormal physical property. A thief, a cheat, a coiner, or a housebreaker is only a particular specimen of the genus rogue, and, though no doubt each tends to keep to his own line of business, they all alike possess the by no means extraordinary mental characteristic that they propose somehow to get their livings dishonestly. So common a

Je me demande si les termes «anormal» et «normal» sont la meilleure façon de décrire le concept qui sous-tend leur utilisation. Le terme «anormal» découle des affaires survenues en Angleterre, et dans lesquelles il dénote ordinairement l'état mental d'aliénation mentale ou de responsabilité amoindrie. Voir l'arrêt *R. c. Chard*, précité, à la p. 270. Selon le raisonnement qui sous-tend ces affaires, le comportement humain «normal» est une question que le juge ou le jury peut apprécier sans l'aide de la preuve d'expert. Au Canada, on a étendu l'exception pour y inclure ce qui a été qualifié de comportement sexuel déviant. Voir Rosemary Pattenden, «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92, à la p. 100. Cet élargissement est motivé par la pertinence de la preuve fondée sur le caractère distinctif des traits de comportement soit de l'auteur putatif du crime, soit de l'accusé. Ce caractère distinctif tend à exclure l'accusé de la catégorie de personnes qui pourraient commettre le crime ou qui seraient susceptibles de le commettre.

Il existe d'autres raisons pour lesquelles l'utilisation du terme «anormal» n'est plus satisfaisante. Même dans les milieux médicaux, il existe des opinions contradictoires quant à ce qui constitue l'anormalité. Voir Pattenden, *op. cit.*, à la p. 100, et David C. Rimm et John W. Sommervill, *Abnormal Psychology* (1977), aux pp. 31 et 32. En outre, le terme en question implique un jugement de valeur sur le style de vie de certains groupes de la société. Cela est bien illustré dans la déclaration de lord Sumner dans l'arrêt *Thompson c. The King*, [1918] A.C. 221, à la p. 235:

[TRADUCTION] La preuve tend à attacher à l'accusé une caractéristique qui, bien que n'étant pas purement physique, peut, à mon avis, être reconnue comme portant à juste titre ce nom. L'expérience tend à démontrer que ces infractions contraires à la nature dénotent une inversion de caractéristiques normales qui, bien qu'elles commandent une punition parce qu'elles offensent la moralité sociale, tiennent également d'une propriété physique anormale. Le voleur, le tricheur, le faux monnayeur ou le cambrioleur n'est qu'un modèle particulier du genre escroc, et bien qu'il ne fasse pas de doute que chacun tend à s'en tenir à son propre domaine, ils possèdent tous la caractéristique mentale aucunement extraor-

R. v. MOHAN   *Sopinka J.*   [1994] 2 S.C.R.

characteristic is not a recognizable mark of the individual. Persons, however, who commit the offences now under consideration seek the habitual gratification of a particular perverted lust, which not only takes them out of the class of ordinary men gone wrong, but stamps them with the hall-mark of a specialized and extraordinary class as much as if they carried on their bodies some physical peculiarity.

The difficulty in defining what is abnormal was recently referred to by McCarthy J.A. in *R. v. Garfinkle* (1992), 15 C.R. (4th) 254. At pages 256-57, speaking for the court, he stated:

What dispositions are to be classified as abnormal, as outside ordinary human experience, for the purpose of admitting psychiatric evidence may be a difficult question. A disposition for sadism is clearly abnormal. Dispositions for violence (short of sadism or something akin thereto), or for dishonesty, are clearly too common to be classified as abnormal. In sexual offences, classification is less easy. However, it seems to me that, whether it be called pedophilia or something else, a disposition in an adult to use boys of 10 and 11 for sexual gratification must be classified as abnormal. Accordingly, in the present case, psychiatric evidence is admissible to show that Garfinkle does not have such a disposition.

In my opinion, the term "distinctive" more aptly defines the behavioural characteristics which are a pre-condition to the admission of this kind of evidence.

How should the criteria for the admission of this type of evidence be applied? I find the following statement of Professor Mewett, *supra*, at p. 36, to be an apt characterization of the nature of the decision which the trial judge must make:

The categorization of crimes into the "ordinary" and the "extraordinary" is therefore a legal question to be determined by the judge, as is the "normality" or "abnormality" of the accused — to the despair, no doubt, of psychiatrists. But admissibility of evidence is a legal question and depends primarily upon relevance, that is, upon its

dinaire qu'ils se proposent d'une façon ou d'une autre de gagner leur vie malhonnêtement. Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu. Toutefois, les auteurs des infractions qui sont en cause en l'espèce recherchent la gratification habituelle d'une certaine luxure pervertie, qui non seulement les exclut de la catégorie des hommes ordinaires qui se sont écartés du droit chemin, mais indique également qu'ils appartiennent à une catégorie spéciale et extraordinaire, tout autant que si leur corps était marqué par un trait physique particulier.

La difficulté à déterminer ce qui est anormal a récemment été mentionnée par le juge McCarthy de la Cour d'appel dans l'arrêt *R. c. Garfinkle* (1992), 15 C.R. (4th) 254. Aux pages 256 et 257, s'exprimant au nom de la cour, il a déclaré:

[TRADUCTION] La question de savoir quelles prédispositions doivent être qualifiées d'anormales, d'étrangères à la nature humaine ordinaire, dans le but d'admettre la preuve psychiatrique, peut être difficile à trancher. Une prédisposition au sadisme est manifestement anormale. Les prédispositions à la violence (sauf le sadisme ou quelque chose de semblable) ou à la malhonnêteté sont manifestement trop communes pour être qualifiées d'anormales. Les infractions sexuelles sont plus difficiles à classer. Toutefois, qu'on l'appelle pédophilie ou autre, il me semble que la prédisposition chez un adulte à utiliser des garçons de 10 et 11 ans pour obtenir une gratification sexuelle doit être qualifiée d'anormale. En conséquence, en l'espèce, la preuve psychiatrique est admissible pour démontrer que Garfinkle n'a pas une telle prédisposition.

À mon avis, le terme «distinctif» définit mieux les caractéristiques de comportement qui sont une condition préalable à l'admission de cette forme de preuve.

Comment les critères d'admission de cette preuve devraient-ils être appliqués? À mon avis, les propos suivants du professeur Mewett, précité, à la p. 36, qualifient bien la nature de la décision que le juge du procès doit prendre:

[TRADUCTION] La classification des crimes comme «ordinaires», ou «extraordinaires», est donc une question de droit, comme l'est la «normalité» ou l'«anormalité» de l'accusé — au désespoir, sans doute, des psychiatres. Mais, l'admissibilité de la preuve est une question de droit et dépend principalement de sa perti-

assistance to the trier of fact in his inference-drawing process, and this is governed, not by expertise, but by common sense and experience; words like "ordinary", "extraordinary" or "abnormal" are not meant to be scientific expressions but assessments of relevance and are thus clearly within the domain of the judge.

Before an expert's opinion is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, as Professor Mewett suggests, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. Put another way: Has the scientific community developed a standard profile for the offender who commits this type of crime? An affirmative finding on this basis will satisfy the criteria of relevance and necessity. Not only will the expert evidence tend to prove a fact in issue but it will also provide the trier of fact with assistance that is needed. Such evidence will have passed the threshold test of reliability which will generally ensure that the trier of fact does not give it more weight than it deserves. The evidence will qualify as an exception to the exclusionary rule relating to character evidence provided, of course, that the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

### (3) *Application to This Case*

I take the findings of the trial judge to be that a person who committed sexual assaults on young women could not be said to belong to a group possessing behavioural characteristics that are sufficiently distinctive to be of assistance in identifying the perpetrator of the offences charged. Moreover,

nence, c'est-à-dire de l'aide qu'elle apporte au juge des faits en lui permettant de tirer des conclusions. Cette question repose non pas sur l'expertise, mais sur le bon sens et l'expérience; des mots tels «ordinaire», «extraordinaire» ou «anormal» ne sont pas destinés à être des expressions scientifiques, mais plutôt des appréciations de la pertinence. Par conséquent ils relèvent clairement du domaine du juge.

Avant d'admettre en preuve l'opinion d'un expert, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, comme le professeur Mewett l'indique, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. En d'autres termes, la profession scientifique a-t-elle élaboré un profil type du délinquant qui commet ce genre de crime? Une conclusion affirmative sur ce fondement satisfera aux critères de pertinence et de fiabilité. Non seulement la preuve d'expert tendra à prouver un fait en litige, mais elle offrira aussi au juge des faits l'aide dont il a besoin. Une telle preuve aura satisfait au critère préliminaire de la fiabilité qui fera généralement en sorte que le juge des faits ne lui accorde pas plus de poids qu'elle ne le mérite. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition bien sûr que le juge du procès soit convaincu que l'opinion exprimée se situe dans le domaine d'expertise du témoin expert.

### (3) *Application à l'espèce*

À mon sens, le juge du procès a conclu qu'on ne peut dire de la personne qui a commis des agressions sexuelles sur de jeunes femmes qu'elle appartient à un groupe possédant des caractéristiques de comportement suffisamment distinctives pour faciliter l'identification de l'auteur des infrac-

the fact that the alleged perpetrator was a physician did not advance the matter because there is no acceptable body of evidence that doctors who commit sexual assaults fall into a distinctive class with identifiable characteristics. Notwithstanding the opinion of Dr. Hill, the trial judge was also not satisfied that the characteristics associated with the fourth complaint identified the perpetrator as a member of a distinctive group. He was not prepared to accept that the characteristics of that complaint were such that only a psychopath could have committed the act. There was nothing to indicate any general acceptance of this theory. Moreover, there was no material in the record to support a finding that the profile of a pedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these *indicia* of reliability, it cannot be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury. Given these findings and applying the principles referred to above, I must conclude that the trial judge was right in deciding as a matter of law that the evidence was inadmissible.

tions reprochées. En outre, le fait que l'auteur allégué du crime est un médecin n'a pas facilité la question parce qu'il n'existe aucune preuve acceptable indiquant que les médecins qui commettent des agressions sexuelles tombent dans une catégorie distinctive à laquelle se rattachent des caractéristiques identifiables. En dépit de l'opinion du Dr Hill, le juge du procès n'était pas non plus convaincu que les caractéristiques reliées à la quatrième plainte identifiaient l'auteur comme membre d'un groupe distinctif. Il n'était pas disposé à accepter que les caractéristiques de cette plainte étaient telles que seul un psychopathe pouvait avoir commis l'acte. Rien ne démontre que cette théorie soit généralement acceptée. Par ailleurs, aucun document dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence d'indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches. Compte tenu de ces conclusions, et appliquant les principes mentionnés ci-dessus, je dois conclure que le juge du procès a conclu à juste titre que, du point de vue juridique, la preuve était inadmissible.

The Court of Appeal also supported the admissibility of the evidence on the basis that Dr. Hill's evidence tended to rebut alleged similarities between the evidence on the respective counts. On this point, Finlayson J.A. stated at p. 178:

La Cour d'appel avait aussi conclu à l'admissibilité de la preuve pour le motif que le témoignage du Dr Hill tendait à réfuter les similitudes alléguées entre la preuve relative aux divers chefs. À cet égard, le juge Finlayson a dit à la p. 178:

Where, as here, the Crown alleges that the probative value of the similar fact evidence arises from the circumstance that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, the defence is equally entitled to lead evidence as to features of the alleged acts which demonstrate dissimilarities . . . .

[TRADUCTION] Lorsque, comme en l'espèce, le ministère public allègue que la valeur probante de la preuve de faits similaires naît du fait que les actes comparés sont si inhabituels et d'une similitude si frappante que cette similitude ne peut être attribuée à la coïncidence, la défense a elle aussi le droit de produire une preuve relative aux caractéristiques des actes allégués qui démontrent des différences . . .

R. *c.* MOHAN    *Le juge Sopinka*

The judgment of the Court of Appeal was not supported on this ground either in the respondent's factum or in the oral argument.

The use to which the jury could put the evidence was explained by the trial judge in his charge to the jury. The key passage in the charge in this respect was the following:

If you conclude when considering any of the specific counts that evidence relating to any or all of the other counts is so similar that common sense dictates the relevancy of such evidence to one or more of the issues I mentioned earlier, then you may not must, draw the inferences to which I have referred. [Emphasis added.]

The similarities, which were detailed by the judge, were with respect to the *modus operandi* of the perpetrator of the acts which were the subject of the individual counts. No objection was taken to this aspect of the charge. This use of the similar fact evidence relates to a different issue from the subject matter of the proposed evidence of Dr. Hill. As discussed above, the dissimilarities addressed in Dr. Hill's proposed evidence are not as to *modus operandi* but rather with respect to the comparative psychological make-up of the respondent on the one hand and the alleged perpetrator of the acts charged, on the other. Furthermore, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence. As stated by the trial judge, it is a matter of common sense.

I would allow the appeal, set aside the judgment of the Court of Appeal, restore the convictions and remit the matter to the Court of Appeal for disposition of the sentence appeal.

*Appeal allowed.*

*Solicitor for the appellant: The Ministry of the Attorney General, Toronto.*

Le jugement de la Cour d'appel n'a pas été appuyé à cet égard ni dans le mémoire de l'intimé, ni dans les débats.

Dans son exposé au jury, le juge du procès a expliqué l'utilisation que le jury pouvait faire de la preuve. Le passage clé de l'exposé à cet égard est le suivant:

[TRADUCTION] Si vous déterminez, après avoir considéré un des chefs d'accusation, que la preuve relative à un ou à l'ensemble des autres chefs est semblable au point que le bon sens commande la pertinence d'une telle preuve quant à l'une ou plusieurs questions que j'ai mentionnées précédemment, vous pouvez alors tirer les conclusions que j'ai mentionnées. [Je souligne.]

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. Aucune objection n'a été soulevée sur cet aspect de l'exposé. Cette utilisation de la preuve de faits similaires porte sur une question différente de l'objet du témoignage proposé du Dr Hill. Comme cela est indiqué plus haut, les différences dont traitait la preuve proposée par le Dr Hill ne concernaient pas le *modus operandi* mais plutôt la constitution psychologique du requérant comparée à celle de l'auteur des actes allégués. En outre, la question de savoir si le crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert. Comme le juge du procès l'a dit, c'est une question de bon sens.

Je suis d'avis d'accueillir le pourvoi, d'infirmer le jugement de la Cour d'appel, de rétablir les déclarations de culpabilité et de renvoyer l'affaire à la Cour d'appel pour qu'elle tranche l'appel de la sentence.

*Pourvoi accueilli.*

*Procureur de l'appelante: Le ministère du Procureur général, Toronto.*

*Solicitors for the respondent: Greenspan, Humphrey, Toronto.*

*Procureurs de l'intimé: Greenspan, Humphrey, Toronto.*

*Indexed as:*

# Elliott Estate (Re)

**IN THE MATTER OF Consolidated Rules 611 and 612
AND IN THE MATTER OF the partnership between George Andrew
Elliott, deceased, and James L. Wedlake**

[1962] O.J. No. 164

Ontario Supreme Court - Court of Appeal
Toronto, Ontario

**Roach, Gibson and Kelly JJ.A.**

Heard: March 5 and 6, 1962.
Judgment: released June 28, 1962.

(24 pp.)

**Counsel:**

G.D. Finlayson, for the appellant.
R.L. Kellock, Q.C., and D.J. Wright, for the respondent.

---

The judgment of the Court was delivered by

**1    KELLY J.A.**:-- This is an appeal by James L. Wedlake from the Judgment of the Honourable Mr. Justice Smily, dated 17th January, 1962, upon an application for a declaration of the rights of the parties under an agreement of Partnership dated 21st June, 1954.

**2**    The facts giving rise to the application may be summarized as follows: George Andrew Elliott and James L. Wedlake had been carrying on business in partnership as hardware merchants under the terms of an agreement dated 1st October, 1937. In 1954 Elliott decided to withdraw from active participation in the business and the parties signed an agreement dated 21st June, 1954 (hereinafter referred to as the 1954 agreement). This agreement superseded the pre-existing partnership

agreement and purported to create Elliott a limited partner and Wedlake a general partner in a partnership constituted under the provisions of The Limited Partnerships Act, R.S.O. 1950, c. 208, now R.S.O. 1960, c. 215.

**3**    From 1st July, 1954 until Elliott's death on 6th August, 1955, Wedlake operated the business as the general partner; thereafter Elliott's executors and Wedlake continued in partnership, the estate purporting to be a limited partner. This arrangement prevailed until 25th May, 1961 when by mutual consent the partnership was dissolved and Wedlake liquidated the assets; after satisfying all liabilities, other than those to the partners, there remains on hand the sum of $36,608.99.

**4**    The Elliott executors applied to the Court for judgment -

> "declaring the rights of the said Executors with respect to the sum of $36,608.99 arising from the liquidation of the assets of the above named partnership and the liability of the said Wedlake to the said Executors as vendors of the interest of the said George Andrew Elliott, deceased and his estate in the said partnership under the agreement of the 21st June, 1954 with respect to the balance of the purchase price owing to the said Executors thereunder."

The Elliott executors' position may be stated as follows:

> "The 1954 agreement was an agreement by Wedlake to purchase the interest of Elliott for $90,000; at the date of dissolution $53,000 of the purchase price was unpaid; therefore the Elliott executors are entitled to the whole of the sum of $36,608.99 and are, in addition, entitled to personal judgment against Wedlake for the balance of the sum of $53,000."

**5**    Wedlake contends that the sum of $36,608.99 should be divided between himself and the Elliott executors rateably in accordance with the respective standings of the capital accounts of the two partners at the date of dissolution.

**6**    Since the memorandum of 25th May, 1961 providing for the dissolution and liquidation of the partnership does not alter the status of the parties, their respective rights must be determined by construing the 1954 agreement with assistance from such facts and circumstances as to which reference may properly be made.

**7**    In the preparation of the 1954 agreement, three main problems seem to have been in the minds of Elliott and Wedlake: (a) the termination of the former partnership and the recovery from it by Elliott of that part of his investment in excess of the amount which was carried forward as his capital in the new partnership; (b) the creation of the new partnership in which Elliott would be a limited partner within the meaning of The Limited Partnerships Act and Wedlake a general partner; (c) the ultimate purchase by Wedlake of Elliott's interest in the new limited partnership. The 1954 agreement dealt effectively with the first mentioned problem, but the economy of detail providing

for the latter two matters and the complete failure to anticipate the circumstances which now prevail has presented a situation for which the parties are unable to find any mutually acceptable solution in the 1954 agreement: hence this application.

**8**    While it is doubtful, in my opinion, if a limited partnership ever did exist between the parties, whether it did or not is not now material. The only persons who would have been affected if Elliott and his executors had been a limited partner would have been the creditors of the partnership, of which there are now none: consequently the situation as between the partners is not affected one way or the other by whether the firm is a limited or a general partnership. As I have said, the agreement purported to deal with three principal matters; it contained three recitals and eleven operative clauses, the last of which clauses is the usual omnibus clause extending the operation to the heirs, executors, administrators and assigns of the parties. Of the three recitals the first refers to the existence of the former business under the agreement of 1st October, 1937; the second states that the parties had agreed to dissolve that partnership and to enter into a limited partnership "under the provisions of the Limited Partnerships Act, R.S.O. c. 208, on the terms and conditions hereinafter set out"; the third recital which is the only one really material to the matters before the Court is as follows:

> "AND WHEREAS it is the intention of the parties hereto that the Party of the Second Part shall purchase the interest of the Party of the First Part in the said Limited Partnership in accordance with the terms hereinafter set forth in this agreement,"

Of the first ten operative clauses, clauses 1, 2 and 3 are referable only to the dissolution of the former partnership. Clauses 4, 5, 8, 9 and 10 refer solely to the formation and operation of the new limited partnership. Paragraphs 6 and 7 are the only paragraphs which have any possible reference to the purchase by Wedlake of the Elliott interest. These two paragraphs read as follows:

> "6.    Interest at 5% is to be paid to the Party of the first Part on said sum of $90,000.00 or on such capital of the Party of the First Part as may remain in the partnership from time to time, payable quarterly or as may be required, and the Party of the Second Part is also to pay the sum of Two Thousand Dollars ($2,000.00) on account of the purchase of the share of the Party of the First Part each year during the remainder of the lifetime of the Party of the First Part, such payments to be made on the 31st day of January in each year commencing January 31st, 1955.
>
> 7.    In the event of the death of the Party of the First Part during the continuance of the partnership, the personal representatives of the Party of the First Part shall continue the partnership as limited partners on the same terms and conditions as are herein contained excepting that the Party of the Second Part shall be entitled to increase the annual payment on account of the purchase of the share of the Party of the First Part to any amount desired by him on giving the personal

representatives of the Party of the First Part two (2) months' notice in writing of the amount intended to be paid by him."

**9**    If as contended by the Elliott executors there be any enforceable contract for the sale and purchase of the Elliott interest, it must be found in those parts of the 1954 agreement above quoted, i.e. the third recital and clauses 6 and 7. While there can be no doubt that such an agreement must be construed as a whole and every part must be looked at, it is however equally clear that the operative parts of the agreement are those by which the parties are intended to be bound. The distinction as to the purposes served by the recitals and the operative parts of a document have been stated by Lord Warrington of Clyffe in Inland Revenue Commissioners v. Raphael and Others, (1935) A.C. 96 at p. 135 as follows:

> "The fact is that the narrative and operative parts of a deed perform quite different functions, and 'intention' in reference to the narrative and the same word in reference to the operative parts respectively bear quite different significations. As appearing in the narrative part it means 'purpose'. In considering the intention of the operative part the word means significance or import -- 'The way in which anything is to be understood' (Oxford English Dictionary), supported by the illustration: 'The intention of the passage was sufficiently clear.'"

**10**    Considered by themselves, clauses 6 and 7, in my opinion, lack the essential ingredients of an agreement for sale; there is no mutual undertaking to buy on the one hand and to sell on the other; there is no purchase price stated or capable of being determined by any means specified in the agreement; there is no obligation on the part of Wedlake to pay anything beyond the sum of $2,000 a year during the lifetime of Elliott. In my view, unless the operative parts of the agreement can be bolstered up by the words of the third recital, the agreement fails completely to be an effective agreement of sale of which the Elliott executors can enforce performance.

**11**    I turn therefore to consider to what extent the recital may be used to overcome the patent deficiencies of clauses 6 and 7 and in fact of the whole operative parts of the agreement. In the first instance it must be borne in mind that a recital is not a necessary part of a document and its use in the interpretation of the document as a whole is strictly limited.

> "The reciting Part of a Deed is not at all a necessary Part either in Law or Equity. It may be made use of to explain a Doubt of the Intention and Meaning of the Parties but it hath no Effect or Operation. But when it comes to limit the estate, there the Deed is to have its Effect according to what Limitations are therein set forth."

Per Holt, C.J., Bath and Montague's Case (1693) 3 Cas. in Ch. 55 at 101; 22 E.R. 963 at 991. An oft quoted statement of the extent to which reference may be had to recitals is contained in the judgment of Lord Esher, M.R. in Ex Parte Dawes. In Re Moon, (1886) 17 Q.B.D. 275 at p. 286:

"Now there are three rules applicable to the construction of such an instrument. If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred."

It is to be noted that the qualifying condition for the use of a recital in the interpretation of the operative parts is that there must be ambiguity in the operative parts; in such a case the preferred meaning to be given to the operative words should be that consistent with the intention expressed in the recital, provided that the words of the operative part are by themselves capable of such an interpretation. MacKenzie v. Duke of Devonshire, (1896) App. Cas. 400; Ex Parte Dawes. In Re Moon, Supra; In re Sugden's Truts, Sugden v. Walker, (1917) 2 Ch. 92. It is essential, however, that the construction to be placed upon the operative part in the light of the recital be a construction which the words themselves of the operative part are capable of bearing. Where, however, the operative parts of a document, due to the lack of appropriate words, are incapable of a construction which will fulfil the intention expressed in recitals, the recital may not be used for the purpose of reading into the operative clause a meaning which it is incapable of conveying when considered by itself.

**12**    This is a situation presented by the 1954 agreement. So far as it purports to deal with the sale of the Elliott interest in the partnership, there is a complete absence of the provisions essential as a minimum to create an enforceable contract of sale and purchase of that interest. In short, assuming that the recital be an expression that the purpose of the agreement was immediately to enter into a contract of sale valid and enforceable between the parties, the parties did not in the operative portions to which they committed themselves carry out that purpose.

**13**    Clauses 6 and 7 are not ambiguous in the sense that they are capable of alternative constructions to choose between which the Court may be assisted by reference to the recitals. Clauses 6 and 7 are vague in the sense that by themselves they do not support a construction which would lead to establish an enforceable contract of purchase or sale. Resort to the recitals may not be had to clear up the vagueness and to incorporate words which it would be necessary to insert in order that those clauses expressed the agreement of sale and purchase sought to be found in them by the Elliott executors.

**14**    Since I consider the 1954 agreement does not embody an enforceable agreement for the sale of the Elliott interest, it follows that there remains no liability on the part of Wedlake to the Elliott executors save that resulting from the relationship of partners. Consequently the rights, if any, of the Elliott executors to the sum of the $36,608.99 are those rights which flow from the partnership created by the 1954 agreement and the conduct of the parties in the course of that partnership.

**15**    As I have already stated, I do not consider it material to the question before the Court whether this partnership be considered as a limited partnership or a general partnership.

**16**    If the 1954 agreement be not an agreement for the sale and purchase of the Elliott interest, the rights of the partners to the net proceeds of the realization of the assets of the partnership must be found either in those parts of the agreement which create the partnership or in the provisions of The Partnerships Act, which are applicable to determine the rights of the partners in the absence of any express agreement to the contrary.

**17**    The following facts are established by the material before the Court and are those from reference to which the rights of the parties must be determined.

**18**    A partnership was formed between Elliott and Wedlake on 21st June, 1954. This partnership was carried on without change of partners until the death of Elliott on 6th August, 1955; on Elliott's death the partnership was continued by the Elliott executors, along with Wedlake, until 25th May, 1961, when by mutual agreement of the partners it was dissolved and its assets were liquidated by Wedlake. After satisfying all liabilities, other than those to the partners, the net realization was $36,608.99. The 1954 agreement was singularly silent as to the rights of the partners inter se, the only significant part being clause 9, reading as follows:

> " It is agreed between the Parties hereto that the Party of the First Part shall not be entitled to any profits arising from the operation of the said business with the exception of the payments herein set forth of interest at 5% on the invested capital of the Party of the First Part and 2% increase of rent calculated on invested capital of the Party of the First Part."

**19**    For each of the fiscal years ending in 1955 to 1961 inclusive, annual statements were prepared by Wedlake and delivered to the Elliott executors. These annual statements consisted of a statement of assets and liabilities as of the 31st January, a trading statement for the year ending 31st January and a profit and loss statement for the year ending 31st January; presumably they were certified by the auditors as required by the 1954 agreement. The most recent of these statements, that of 31st January, 1961, which was identified as an exhibit to the affidavit of Thomas Norman Strong, filed on behalf of the Elliott executors, contained in the statement of assets and liabilities under the heading of "Capital" the following entries:

CAPITAL

G.A. Elliott Estate


Investment Account Jan. 31/60          78,000.00


Less Reduction                  20,000.00
                                ---------

Balance Jan. 31/61                    58,000.00


                    J.L, Wedlake


Investment Account
Jan. 31/60                    56,049.60


    Less:    Drawing
             Account        2,578.52


Loss per Profit
& Loss Account 14,262.30                    16,840.82
---------                                   ---------
Balance Jan. 31/61                          39,208.79 97,208.78

Since this statement was produced by the Elliott executors without any objection being raised as to its accuracy, I take it that it admittedly reflects the capital position as between the two partners as of its date.

**20**    On 29th March, 1961 Wedlake made to the Elliott executors a payment of $5,000 which had the effect of reducing the capital balance of the executors on the books of the partnership to $53,000.

**21**    The statement of 31st January, 1961, prepared by Wedlake and delivered to the Elliott executors and the adoption of it by the Elliott executors, creates an account stated and settled between the parties and precludes any examination of the dealings between the parties reflected by or prior to such statement. In the absence of fraud, such an account cannot be reopened in favour of a party who has acquiesced in it. Halsbury, 3rd Ed., Vol. 28, para. 1071, p. 551.

**22**    By reference to the aforementioned statements as of 31st January, 1961 the respective interests of the parties in the capital partnership is readily determinable. The Elliott executors' capital stood at $58,000 and Wedlake's capital at $39,208.78.

**23**    No doubt that state of these accounts would have changed by the date of the dissolution on 25th May, 1961, but statements as of that date prepared on the same basis as the statements of 31st January, 1961 should disclose the respective capital interests of the parties as of the date of dissolution. Since it appears that it was customary to charge any operating loss to the Wedlake interest, in arriving at the balance according to such statements the net loss for the period from 31st

January, 1961 to 25th May, 1961, according to a trading statement to be prepared in a manner similar to that appearing in the statements of the 31st January, 1961, should be deducted from the Wedlake capital interest.

**24**     There being no provision in the partnership agreement to the contrary, the rights of the parties will fall to be settled according to sec. 44 of The Partnerships Act, R.S.O. 1960, c. 288. I assume that in arriving at the net amount of $36,608.99, effect has already been given to the provisions of clause 1 and clause 2, sub-clauses (a) and (b) of sec. 44. Since the cash remaining as the sole asset of the partnership obviously is less than the combined total of the partnerships capital accounts according to the books of the partnership, it should be applied in paying to each partner rateably what is due from the firm in respect of capital according to the final statement of accounts to be prepared as above indicated. This having been done, the whole matter in issue between the partners will have been finally settled and each one will be released from any further obligation to the other.

**25**     The appeal will therefore be allowed and the judgment of 17th January, 1962 set aside and in its place judgment should be entered declaring the rights of the parties with respect to the sum of $36,608.99 arising from the liquidation of the assets of the partnership to be as I have set out in the immediately preceding paragraph, and declaring that Wedlake is under no obligation to the Elliott executors with respect to any balance of the purchase price of the interests of George Andrew Elliott and his estate in the partnership.

**26**     There should be no order as to costs either in this Court or the Court of first instance save to protect the rights of the Elliott executors to their costs out of the estate of the said George Andrew Elliott.

KELLY J.A.
 ROACH J.A.:-- I concur.
 GIBSON J.A.:-- I agree.

qp/s/cbk/sab

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

1994 CarswellOnt 319
Ontario Court of Appeal

Axelrod, Re

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161, 20 O.R. (3d) 133, 29 C.B.R. (3d) 74, 50 A.C.W.S. (3d) 897, 74 O.A.C. 376, 8 P.P.S.A.C. (2d) 1

# Re bankruptcy of DR. SAMUEL S. AXELROD

Re bankruptcy of SEAX MANAGEMENT LTD.

Blair, Griffiths and Arbour JJ.A.

Heard: May 25, 1994
Judgment: October 12, 1994
Docket: Doc. CA 17764

Counsel: *Symon Zuker*, for appellant, Dr. Samuel S. Axelrod.
*William D. Dunlop*, for respondent, Medi-Dent Service.

Subject: Corporate and Commercial; Insolvency; Property

## Headnote

**Bankruptcy --- Priorities of claims — Secured claims — Dealings with security after bankruptcy — By secured creditor — Realization of security**

Secured creditors — General security agreement — Creditor's general security agreement covering patient lists and files of debtor dentist — Creditor having right to realize upon files and lists provided patients' rights to confidentiality and access protected — Judgment upheld on appeal.

A dentist and his management company borrowed money under a loan agreement. The loan was evidenced by promissory notes and secured by a general security agreement ("GSA"). The GSA granted the creditor a security interest in all equipment, book debts, inventory, raw material, contractual rights, and in all records, invoices and files, including patient lists and files, of the practice. After the bankruptcies of the dentist and the management company, a creditor was successful in its motion for an order that it was entitled to enforce its security against the property of the dentist to the extent that that property included "patient lists" and "patient files". The creditor was also granted an order restraining the dentist from attending the leased premises in which he operated his practice for the purposes of carrying on his dental practice.

The dentist appealed the order regarding the patient lists and files. He argued that the motions court judge erred in holding that the GSA entitled the creditor to take possession of the patient records and that he erred in enjoining the dentist from contacting his patients and in ordering that a letter be sent to the patients without reference to the new location of the dentist's practice. The issue to be determined was whether the dentist's fiduciary obligations to his patients precluded him from pledging his patient lists and files as security under the GSA.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

**Held:**

The appeal was dismissed.

A dentist is entitled to dispose of his or her assets, while at the same time fulfilling his or her obligation to protect the confidential information contained in patient files. There is no difference between a dentist's entitlement to sell his or her practice and the dentist's entitlement to pledge the records of the practice. Both can be done in a manner compatible with the dentist's professional responsibilities, provided the dentist acts with the utmost good faith and loyalty in protecting the patients' confidence.

Superimposed on a dentist's right to pledge patient lists and files in order to obtain credit is a statutory obligation under s. 17 of Reg. 853/93, made under the *Dentistry Act* (Ont.), not to disclose information about a patient without the patient's consent. At the same time, the dentist had a contractual obligation under the terms of the GSA to give physical possession of the lists and files to the creditor. That obligation could, however, be carried out while protecting the patients' rights to confidentiality. A problem will arise only if the dentist is unwilling to discharge his obligation of utmost good faith and loyalty to his patients in a manner consistent with the obligation incurred in the dentist's pursuit of his financial interest.

**Table of Authorities**

**Cases considered:**

*Goodman v. Newman* (1986), 34 B.L.R. 23, 13 C.P.R. (3d) 48 (Ont. H.C.) — *considered*

*Josephine V. Wilson Family Trust v. Swartz* (1993), 23 C.B.R. (3d) 88, 107 D.L.R. (4th) 160, 16 O.R. (3d) 268, 6 P.P.S.A.C. (2d) 76 (Gen. Div.) — *considered*

*Kiedynk v. John Doe* (1991), 79 Alta. L.R. (2d) 72, 116 A.R. 313 (Q.B.) — *referred to*

*Kronick v. Lamarche-Craven* (May 21, 1991), Doc. Toronto 312341/88, Somers J. (Ont. Gen. Div.), [1991] O.J. No. 907 — *considered*

*McInerney v. MacDonald*, [1992] 2 S.C.R. 138, 137 N.R. 35, 7 C.P.C. (3d) 269, 93 D.L.R. (4th) 415, 12 C.C.L.T. (2d) 225, 126 N.B.R. (2d) 271, 317 A.P.R. 271 — *considered*

*Norberg v. Wynrib*, [1992] 2 S.C.R. 226, [1992] 4 W.W.R. 577, 12 C.C.L.T. (2d) 1, 68 B.C.L.R. (2d) 29, 138 N.R. 81, 9 B.C.A.C. 1, 19 W.A.C. 1, 92 D.L.R. (4th) 449 [additional reasons at [1992] 2 S.C.R. 318, [1992] 6 W.W.R. 673, 74 B.C.L.R. (2d) 2] — *followed*

**Statutes considered:**

Dentistry Act, 1991, S.O. 1991, c. 24.

Health Disciplines Act, R.S.O. 1990, c. H. 4.

Hospitals Act, R.S.A. 1980, c. H-11 —

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

s. 40

Personal Property Security Act,

R.S.O. 1990, c. P.10.

**Regulations considered:**

Dentistry Act, 1991, S.O. 1991, c. 24 —

Professional Misconduct,

O. Reg. 853/93,

s. 2¶17

Health Disciplines Act, R.S.O. 1990, c. H.4 —

Dentistry,

O. Reg. 547,

s. 37(1)¶30


Appeal from judgment reported at (1994), 24 C.B.R. (3d) 149, 16 O.R. (3d) 649, 6 P.P.S.A.C. (2d) 255, 111 D.L.R. (4th) 540 (Gen. Div. [Commercial List]) allowing motion for order entitling creditor to enforce its security against property of debtor dentist.


**The judgment of the court was delivered by *Arbour J.A.*:**


1    This appeal involves the single issue of whether a creditor may enforce its security under a general security agreement against the patient list and records of a dentist.

**The Facts**


2    The salient facts are not in dispute. The respondent Medi-Dent Service (Medi-Dent) is engaged in the financing of health professionals in Ontario and elsewhere in Canada. The appellant Dr. Axelrod (Axelrod) is a dental surgeon licensed to practise in Ontario. He was adjudged bankrupt on November 18, 1993. Axelrod and his wholly owned management company, which was also adjudged bankrupt, are indebted to Medi-Dent in the amount of $346,630. That indebtedness is secured by a general security agreement (GSA) entered into on February 20, 1993 which grants, inter alia, a general security interest in all of the equipment, book debts, records, files, patient lists and patient files of Axelrod's practice. The security interest was properly perfected as required by the *Personal Property Security Act*, R.S.O. 1990, c. P.10.


3    Medi-Dent views Axelrod's patient lists and files as the most valuable part of his practice. Accordingly, Medi-Dent brought a Motion for an order that it is entitled to enforce its security against the patient lists and files, subject to Axelrod's

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

duty to protect the confidentiality of the information contained in the patient records. Medi-Dent undertook to protect the patients' confidentiality and proposed a detailed plan to do so. The plan was essentially accepted by the Motions Court judge and incorporated in his order.

**The Order**

4     The motion was heard by Ground J. who gave detailed reasons for an order that Medi-Dent is entitled to enforce its GSA against Axelrod's property. His reasons are reported in *Re Axelrod* (1994), 16 O.R. (3d) 649 (Gen. Div. [Commercial List]). Ground J.'s order also contained the following provisions:

•that Medi-Dent, through its agents or representative, be permitted to carry on all or part of Axelrod's practice,

•that Medi-Dent, to the exclusion of Axelrod, occupy the property covered by the GSA

•that Medi-Dent take possession of the patient lists and patient files and other records of Axelrod, and that these be transferred to a dentist licensed and qualified to practice in the Province of Ontario (the incoming dentist)

•that the incoming dentist shall notify each patient named in the patient lists and patient files by sending to them the following letter:

Dear Patient: (Name)

I wish to advise you that effective February , 1994, I have taken over the dental practice of Dr. Samuel S. Axelrod at 26 Gibbons Street, Oshawa, Ontario. All patient records remain at that location.

I look forward to continuing to treat you with the high level of dental care you have grown to expect.

If you wish to have your dental records transferred to another dentist, please call _____ or write to me at the above address.

Yours truly,

[Qualified Dentist]

•that Axelrod shall have the right to full access to the patient lists and files for the purpose of any matter arising under the *Health Disciplines Act*, R.S.O. 1990, c. H-4.

•that Axelrod is restrained from entering the premises to which the GSA relates

•that Axelrod is restrained from soliciting or contacting existing patients of the dental practice.

5     This order reflected the conditions that Medi-Dent had proposed as a means of protecting the confidentiality interest of Axelrod's patients while enforcing its GSA against Axelrod's patient lists and files.

6     We were advised that the parties had agreed to a preservation of the status quo pending appeal and that the order had not yet been enforced.@

**The Issues**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Axelrod, Re, 1994 CarswellOnt 319

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

7    The appellant raises two issues. He argues that Ground J. erred in holding that the GSA entitled Medi-Dent to take possession of the confidential patient records. He also contends that Ground J. erred in enjoining him from contacting his own patients and in ordering that a letter be sent to the patients without reference to the new location of his practice.

8    The Appellant does not dispute the fact that he entered into the GSA with Medi-Dent. The appellant willingly and voluntarily entered into the agreement with the respondent. There is nothing to suggest that that contract was defective or otherwise invalid. Therefore, the only live issue before this court is whether the appellant's fiduciary obligations vis-à-vis his patients precludes him from pledging the patient list and files as security.

9    The relationship between doctor and patient is one that is inherently grounded in trust. McLachlin J., in *Norberg v. Wynrib*, [1992] 2 S.C.R. 226, held that, "[a]ll the authorities agree that the relationship of physician to patient ... falls into that special category of relationships which the law calls fiduciary." (at p. 271)

10    Trust is at the heart of a fiduciary relationship. As between physician and patient this trust is a function of the unequal distribution of power between the parties. The physician is possessed of expertise and knowledge, while the patient is typically in a position of vulnerability and need. McLachlin J. described the nature of this trust, at p. 272, as:

the trust of a person with inferior power that another person who has assumed superior power and responsibility will exercise that power for his or her good and only for his or her good and in his or her best interests.

In the present case, the Appellant owes a duty to his patients to serve their best interests. "Best interests" are not strictly limited to medical needs, but also encompass privacy and confidentiality. As McLachlinJ. said (at pp. 272-273):

The beneficiary entrusts the fiduciary with information or other sources of power over the beneficiary, but does so only within a circumscribed area, for example entrusting his or her lawyer with power over his or her legal affairs or his or her physician with power over his or her body.

11    In her discussion of the physician-patient fiduciary relationship, McLachlin J. referred to *McInerney v. MacDonald*, [1992] 2 S.C.R. 138. That case involved a patient's right of access to the contents of her own medical file. La Forest J. accepted that the physician, institution, or clinic responsible for compiling a medical record owns the *physical* record. He held, however, that certain duties arose from the special relationship of trust and confidence between doctor and patient which lead to a fiduciary duty on the part of the doctor. This duty includes allowing the patient to have access to his or her own medical record. Since the information contained in a medical record originates essentially from the patient, the patient retains a beneficial interest in, and maintains control over, the information contained in the record. With respect to the fiduciary duty of confidentiality, La Forest J. said at pp. 149-150:

In characterizing the physician-patient relationship as "fiduciary", I would not wish it to be thought that a fixed set of rules and principles apply in all circumstances or to all obligations arising out of the doctor-patient relationship. As I noted in *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534, not all fiduciary relationships and not all fiduciary obligations are the same; these are shaped by the demands of the situation. A relationship may properly be described as "fiduciary" for some purposes, but not for others. That being said, certain duties do arise from the special relationship of trust and confidence between doctor and patient. Among these are the duty of the doctor to act with

Axelrod, Re, 1994 CarswellOnt 319

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

utmost good faith and loyalty, and to hold information received from or about a patient in confidence. (Picard, *supra*, at pp. 3 and 8; Ellis, *supra*, at pp. 10-1 and 10-2, and Hopper, *supra*, at pp. 73-74). When a patient releases personal information in the context of the doctor-patient relationship, he or she does so with the legitimate expectation that these duties will be respected.

12     In *McInerney*, supra, there was no regulatory legislation governing the patient's right of access to her medical record. The Supreme Court held that, subject to the supervisory jurisdiction of the court, the patient was entitled, upon request, to inspect and copy all information contained in her medical file, and that the onus was on the physician to justify denying access.

13     In this case, the parallel duty of confidentiality expressed in *McInerney* is the subject of statutory legislation. Section 17 of Ontario Regulation 853/93, made under the *Dentistry Act*, S.O. 1991, c. 24, states that it is professional misconduct for a dentist to give "information about a patient to a person other than the patient or his or her authorized representative except with the consent of the patient or his or her authorized representative or as required or allowed by law". Section 17 was enacted in 1993 and is phrased more broadly than the preceding s. 37(30) of Reg. 547 made under the *Health Disciplines Act*, supra, which merely prohibited the giving, without the patient's consent, of information concerning a patient's dental condition or any professional service performed for a patient to any person.

14     This case presents an apparent conflict between the dentist's commercial obligations under the GSA and his fiduciary professional obligations. The issue is essentially whether a dentist can pledge his or her proprietary interest in the patient medical records while concurrently respecting the patient's right of confidentiality as expressed in *McInerney*, supra, and reflected in the regulations dealing with professional misconduct. In *Josephine V. Wilson Family Trust v. Swartz* (1993), 16 O.R. (3d) 268 (Gen. Div.), Blair J. held that the information in dental records is confidential and that the patient has a trust-like beneficial interest in them. He was of the view that dental records cannot be pledged as an asset of a dentist, despite the fact that the physical record belongs to the dentist. If the records were used by the dentist as an asset for the purpose of raising financing, the patients' legitimate expectation of confidence, he said, could not be respected. The issue in *Swartz* presented itself slightly differently than it does in the present case in that the GSA did not specifically purport to apply to the patient files. The issue before Blair J. was, in part, whether the GSA should be interpreted to extend to the patient charts and records.

15     Both Blair J. in *Swartz*, supra, and Ground J. in the present case, purported to apply the principles set out in *McInerney*, supra. I agree with them that there is no difference between medical and dental records with respect to a patient's right of confidentiality. Both doctors and dentists are practitioners under the *Health Disciplines Act*, supra. As Blair J. noted, information disclosed by a patient to a dentist may be just as sensitive as information provided to a physician. After referring to the patient's legitimate expectation that information revealed to a dentist would be treated in confidence, Blair J. held that such expectation cannot be properly protected if the dentist is allowed to use the records as pledged assets. He said in *Swartz*, supra, at p. 275:

It is an impossibility, in this context, to disengage the physical records themselves — which the Supreme Court of Canada has said are the "property" of the practitioner — from the contents of those records — which give them their true character, and in which the Supreme Court of Canada has said the patient has a "trust-like 'beneficial interest'". In my view, while the dental records may be the physical property of the dentist, they are property affixed with an inseverable trust of confidentiality in favour of the patient. Just as trust property is not property belonging to a bankrupt, the dental records are not property which belongs to the dentist for purposes of pledging as part of his or her "undertaking, assets and property".

16    Ground J. in the present case disagreed with that conclusion. He said [at pp. 657-658]:

> With great respect, I have some difficulty with the concept that the relationship of trust which undoubtedly exists between doctor or dentist and patient results in the patients' files or records being analogous to trust property for purposes of the B.I.A., that is to say, property in which the bankrupt holds a bare legal title but has no beneficial interest. It seems to me that the case law already establishes that the files or records are property beneficially owned by the medical practitioner. The full use and enjoyment of that property by the medical practitioner is, however, subject to common law and statutory rights of the patient with respect to maintaining confidentiality and with respect to access. Property interests subject to certain restrictions or rights of third parties are capable of being charged. In my view, so long as such rights are preserved by the creditor realizing upon its security, that creditor ought not to be deprived of realization and enforcement rights granted pursuant to a security agreement. ...

17    In my respectful view, the approach taken by Ground J. is consistent with the dentist's entitlement to dispose of his or her assets while at the same time respecting his or her professional obligation to fully protect the confidential information contained in the patient files. I see no difference between a dentist's entitlement to sell his or her practice, and a dentist's entitlement to pledge records. Both can be accomplished in a manner compatible with a dentist's professional responsibilities, as long as the dentist acts with the utmost good faith and loyalty in protecting the patient's confidence.

18    The doctor may use the records to pursue his or her self interest, so long as it does not conflict with the duty to act in the patients' best interests. As McLachlin J. wrote in *Norberg*, supra, at p. 274:

> The freedom of the fiduciary is limited by the obligation he or she has undertaken — an obligation which "betokens loyalty, good faith and avoidance of a conflict of duty and self-interest": *Canadian Aero Service Ltd. v. O'Malley*, [1974] S.C.R. 592, at p. 606.

The dentist can only pledge his assets to the extent of his or her interest in them. A dentist who pledges his or her patient files has a continuing duty of utmost good faith and loyalty to the patients when the creditor executes on the security. This involves a duty on the part of the dentist who has pledged his or her patient records, to seek and obtain the patients' consent to the transfer of files in execution of the security. This mirrors the duty a dentist would have if he or she were to sell his or her dental practice.

19    Medi-Dent recognizes that its security is subject to the patients' consent to be treated by the incoming dentist that it wishes to put in place taking over the appellant's practice. The appellant argues that the pledging of his assets was illegal because it necessitates a breach of confidentiality. This is only so, in my opinion, if he is in breach of his duty of utmost good faith and loyalty towards his patients, and of his ethical duty to protect the confidence of his patients. The appellant pledged his patient lists and files in order to obtain credit. He was entitled to do so, in the same way as he was entitled to sell his practice. Superimposed on this, however, is the appellant's statutory obligation, under s. 17 of Reg 853/93, made under the *Dentistry Act*, supra, not to disclose information about a patient without the patient's consent. The appellant also faces a contractual obligation, under the terms of the GSA, to give physical possession of his patient lists and files to the respondent. That obligation can, in my judgment, be carried out while at the same time protecting the confidentiality interest of the patients in the content of their files. An incompatibility only arises if the dentist is unwilling to discharge his obligation of utmost good faith and loyalty to his patients, in a manner consistent with the obligations that he has incurred in the legitimate pursuit of his own financial interest.

20    The appellant's unwillingness to write to his patients to inform them that he will turn over their files to a new dentist

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

who is taking over his practice, unless he receives other instructions from them, should not defeat the right of a bona fide creditor to execute on its security, if this can be done with maximum protection for the confidentiality of the information contained in the patient files.

21    The appellant's unwillingness to contact his patients in order to assist the respondent in executing on its security creates an additional problem if the duty of confidentiality extends to a duty to keep the patients' identity confidential. In other words, is the dentist duty bound to keep the very existence of the dentist-patient relationship confidential, except with the patients' consent, or except when otherwise compelled by law to disclose the existence of that relationship? (See, for example *Kiedynk v. John Doe* (1991), 79 Alta. L.R. (2d) 72 (Q.B.) where a duty of confidentiality expressed in the *Hospitals Act*, R.S.A. 1980, c. H-11, s. 40 was held to prohibit disclosure of the identity of a patient.) The language of section 17 of Reg.853/93 appears broad enough to encompass a duty to keep the dentist-patient relationship in confidence, even to another dentist, except with the consent of the patient. Without the appellant's cooperation, it would be impossible in this case to protect that confidence. This is something that the appellant may have to answer for to the appropriate authorities. Meanwhile, the best accommodation of the rights of the creditor and rights of the patients is reflected in Ground J.'s order.

22    It remains to consider the appellant's argument that Ground J. erred in prohibiting Axelrod from contacting those patients. In *Kronick v. Lamarche-Craven*, [1991] O.J. No. 907, Somers J. referred with approval to the decision of Potts J. in *Goodman v. Newman* (1986), 34 B.L.R. 23, 13 C.P.R. (3d) 48 (Ont. H.C.). Somers J. held that after the sale of a dental practice which contained a restrictive covenant in place for three years, the vendor dentist was free to communicate with his patients, at the expiration of the period provided for in the contract, for the purpose of informing them of the new location of his practice. In both cases, it was held that patients should have a freedom of choice and not be "handcuffed" to a practice.

23    When a dentist sells or pledges his patient list, as the appellant did in this case, I think that he or she should be held to have parted with his or her own interest in the patient list, subject to his or her patients' rights to confidentiality and access. In my view, the patient's right to access to his or her record includes a right of access for the purpose of determining which dentist the patient wishes to consult in the future. The interest of the patient in having access to a dentist of his or her choice is adequately protected in this case, by the letter that the incoming dentist would send to the patients notifying them of the change. That letter contains no indication of whether the appellant was continuing to practice at another location. However, it invites patients to obtain their records if they wish to retain a dentist other that the one who has taken over the appellant's practice. Should patients inquire about the possibility of a continued relationship with the appellant, the incoming dentist would have to assist them by providing them with whatever information was available to him or her about the appellant's whereabouts.

24    The order prohibiting Dr. Axelrod from contacting his former patients is consistent with the fact that he specifically pledged not only his patient records, but also his patient list. In the circumstances of this case, I think that the order of Ground J. adequately protects the various interests at issue.

25    Finally, I wish to add that the central interest advanced in this case, that is the interest of the patients, was not properly represented. By arguing that the GSA violated his patients' rights, the appellant was essentially attempting to avoid the consequences of the obligations which he willingly undertook. It would have been vastly preferable to have the patients' interests independently represented, possibly through notice of the proceedings to the Royal College of Dental Surgeons. At this stage of the proceedings however, I think that the patients' interests will be sufficiently protected by a copy of the order, as well as a copy of these reasons being served upon the College, which will then be at liberty to act in accord with its statutory mandate.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Axelrod, Re, 1994 CarswellOnt 319**

1994 CarswellOnt 319, [1994] O.J. No. 2277, 119 D.L.R. (4th) 37, 17 B.L.R. (2d) 161...

26    For these reasons, I would dismiss the appeal with costs.

*Appeal dismissed.*

End of Document                          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

2005 SCC 38
Supreme Court of Canada

Ryan v. Moore

2005 CarswellNfld 157, 2005 CarswellNfld 158, 2005 SCC 38, [2005] 2 S.C.R. 53, [2005] R.R.A.
694, [2005] S.C.J. No. 38, 18 E.T.R. (3d) 163, 247 Nfld. & P.E.I.R. 286, 254 D.L.R. (4th) 1, 25
C.C.L.I. (4th) 1, 32 C.C.L.T. (3d) 1, 334 N.R. 355, 735 A.P.R. 286, J.E. 2005-1188, EYB 2005-91679

# Cabot Insurance Company Limited and Rex Gilbert Moore, deceased, by his Administratix, Muriel Smith, Appellants v. Peter Ryan, Respondent

McLachlin C.J.C., Major, Bastarache, LeBel, Deschamps, Abella, Charron JJ.

Heard: December 7, 2004

Judgment: June 16, 2005 [*]

Docket: 29849

Proceedings: reversing in part *Ryan v. Moore* (2003), 2003 NLCA 19, 2003 CarswellNfld 109, 50 E.T.R. (2d) 8, 224 Nfld. &
P.E.I.R. 181, 669 A.P.R. 181 (N.L. C.A.); reversing in part *Ryan v. Moore* (2001), 2001 CarswellNfld 277, 205 Nfld. & P.E.I.R.
211, 615 A.P.R. 211, 41 E.T.R. (2d) 287, 19 M.V.R. (4th) 120, 18 C.P.C. (5th) 95 (Nfld. T.D.)

Counsel: Sandra Chaytor, Jorge Segovia, for Appellants
Ian F. Kelly, Q.C., Gregory A. French, for Respondent

Subject: Civil Practice and Procedure; Insurance; Estates and Trusts; Torts; Contracts

## Headnote

**Civil practice and procedure --- Limitation of actions — Estates — Claim against estate — In tort**

Vehicles operated by plaintiff, driver and another person were involved in accident in 1997 — Driver died in 1998 of
causes unrelated to accident — Letters of Administration were granted to driver's administratrix in February 1999 — In
October 1999, plaintiff issued statement of claim — Insurer applied to have action dismissed — Trial judge determined that
plaintiff's action was not statute-barred — On appeal, it was determined that estoppel by convention had been established
— Insurer and administratrix were estopped from pleading that driver had died or that letters of administration were granted
prior to May 2000 in order to invoke shorter Survival of Actions Act limitation period — Insurer and driver's estate by
his administratrix appealed — Appeal allowed — Statement of claim was struck at all levels of court — Plaintiff met
prescribed limitation period in Limitations Act — Section 5 of Survival of Actions Act prohibits action brought six months
after letters of probate or administration of estate of deceased have been granted and after expiration of one year from date
of death — Judge-made discoverability rule did not apply to extend period legislature prescribed — By using specific event
as starting point for "limitation clock", legislature was displacing discoverability rule in all situations to which Survival
of Actions Act applied — Driver's subsequent death had no impact whatsoever on accrual of plaintiff's cause of action —
Survival of Actions Act was itself legislative exception to common law rule and it would displace intention of legislature
to stretch limitation period.

**Civil practice and procedure --- Limitation of actions — Actions in tort — Statutory limitation periods — When
statute commences to run — Continuing torts**

Vehicles operated by plaintiff, driver and another person were involved in accident in 1997 — Driver died in 1998 of
causes unrelated to accident — Letters of Administration were granted to driver's administratrix in February 1999 — In
October 1999, plaintiff issued statement of claim — Insurer applied to have action dismissed — Trial judge determined that

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 103 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

plaintiff's action was not statute-barred — On appeal, it was determined that estoppel by convention had been established — Insurer and administratrix were estopped from pleading that driver had died or that letters of administration were granted prior to May 2000 in order to invoke shorter Survival of Actions Act limitation period — Insurer and driver's estate by his administratrix appealed — Appeal allowed — Statement of claim was struck at all levels of court — Plaintiff met prescribed limitation period in Limitations Act — Section 5 of Survival of Actions Act prohibits action brought six months after letters of probate or administration of estate of deceased have been granted and after expiration of one year from date of death — Judge-made discoverability rule did not apply to extend period legislature prescribed — By using specific event as starting point for "limitation clock", legislature was displacing discoverability rule in all situations to which Survival of Actions Act applied — Driver's subsequent death had no impact whatsoever on accrual of plaintiff's cause of action — Survival of Actions Act was itself legislative exception to common law rule and it would displace intention of legislature to stretch limitation period.

### Civil practice and procedure --- Limitation of actions — Actions in tort — Statutory limitation periods — When statute commences to run — General

Survival of Actions Act — Vehicles operated by plaintiff, driver and another person were involved in accident in 1997 — Driver died in 1998 of causes unrelated to accident — Letters of Administration were granted to driver's administratrix in February 1999 — In October 1999, plaintiff issued statement of claim — Insurer applied to have action dismissed — Trial judge determined that plaintiff's action was not statute-barred — On appeal, it was determined that estoppel by convention had been established — Insurer and administratrix were estopped from pleading that driver had died or that letters of administration were granted prior to May 2000 in order to invoke shorter Survival of Actions Act limitation period — Insurer and driver's estate by his administratrix appealed — Appeal allowed — Statement of claim was struck at all levels of court — Plaintiff met prescribed limitation period in Limitations Act — Section 5 of Survival of Actions Act prohibits action brought six months after letters of probate or administration of estate of deceased have been granted and after expiration of one year from date of death — Judge-made discoverability rule did not apply to extend period legislature prescribed — By using specific event as starting point for "limitation clock", legislature was displacing discoverability rule in all situations to which Survival of Actions Act applied — Driver's subsequent death had no impact whatsoever on accrual of plaintiff's cause of action — Survival of Actions Act was itself legislative exception to common law rule and it would displace intention of legislature to stretch limitation period.

### Civil practice and procedure --- Limitation of actions — Actions in tort — Statutory limitation periods — Suspension and interruption of statute — Confirmation of cause of action

Accident involving three vehicles took place in 1997 — Driver died in 1998 of causes unrelated to accident — Letters of Administration were granted to driver's administratrix in February 1999 — In October 1999, plaintiff issued statement of claim — Insurer applied to have action dismissed — Trial judge determined that plaintiff's action was not statute-barred — On appeal, it was determined that estoppel by convention had been established — Insurer and administratrix were estopped from pleading that driver had died or that letters of administration were granted prior to May 2000 in order to invoke shorter Survival of Actions Act limitation period — Insurer and driver's estate by his administratrix appealed — Appeal allowed — Statement of claim was struck at all levels of court — Section 16 of Limitations Act could only apply to limitation period which limits time during which action can be taken — Since limitation period which arises under Survival of Actions Act superseded first limitation period of Limitations Act, and did not create or revive action, s. 16 could not apply.

### Estoppel --- Estoppel in pais — Elements — Detrimental reliance — Sufficiency of prejudice

Accident involving three vehicles took place in 1997 — Driver died in 1998 of causes unrelated to accident — Letters of Administration were granted to driver's administratrix in February 1999 — In October 1999, plaintiff issued statement of claim — Insurer applied to have action dismissed — Trial judge determined that plaintiff's action was not statute-barred — On appeal, it was determined that estoppel by convention had been established — Insurer and administratrix were estopped from pleading that driver had died or that letters of administration were granted prior to May 2000 in order to invoke shorter Survival of Actions Act limitation period — Insurer and driver's estate by his administratrix appealed — Appeal allowed — Statement of claim was struck at all levels of court — Mutual assent distinguished estoppel by convention from other

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 104 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

types of estoppel — Exchanged letters did not prove existence of common assumption — Court of Appeal erred by giving weight to subject line of letters — Fact that parties were conferring without regard to limitation period did not establish shared assumption that limitation defence would not be relied on — Not only did plaintiff not rely on alleged assumption but his conduct did not show intention to affect legal relations between parties — There were no reasons based on estoppel, or any other legal doctrine, to preclude driver's estate or insurer from relying on Survival of Actions Act limitation period.

**Procédure civile --- Prescription des actions — Successions — Réclamation contre la succession — En matière de responsabilité délictuelle**

Véhicules conduits par le demandeur, le conducteur et une autre personne ont été impliqués dans un accident en 1997 — Conducteur est décédé en 1998 de causes non liées à l'accident — Lettres d'administration ont été délivrées à l'administratrice de la succession du conducteur en février 1999 — Demandeur a déposé une déclaration en octobre 1999 — Assureur a demandé le rejet de l'action — Premier juge a estimé que l'action du demandeur n'était pas prescrite — Il a été décidé, en appel, que l'on avait démontré l'existence de la préclusion par convention — Assureur et administratrice étaient préclus d'invoquer le délai de prescription plus court fixé par la Survival of Actions Act en faisant valoir que le conducteur était décédé ou que des lettres d'administration avaient été délivrées avant le mois de mai 2000 — Assureur et administratrice, au nom de la succession du conducteur, ont interjeté appel — Pourvoi accueilli — Déclaration a été radiée à toutes les instances judiciaires — Demandeur satisfaisait au délai de prescription prévu par la Limitations Act — Article 5 de la Survival of Actions Act interdit l'action intentée plus de six mois après la délivrance des lettres d'homologation ou d'administration de la succession du défunt et après l'expiration d'un an suivant la date du décès — Règle prétorienne sur la possibilité de découvrir le dommage ne pouvait permettre d'allonger le délai de prescription prévu par le législateur — En désignant un fait particulier comme élément déclencheur du « compte à rebours de la prescription », le législateur se trouvait à écarter la règle de la possibilité de découvrir le dommage dans tous les cas où la Survival of Actions Act s'appliquait — Décès subséquent du conducteur n'avait absolument aucune incidence sur la naissance de la cause d'action du demandeur — Survival of Actions Act constituait en soi une exception législative à la règle de common law; prolonger le délai de prescription aurait pour effet d'écarter l'intention du législateur.

**Procédure civile --- Prescription des actions — Actions en responsabilité délictuelle — Délais de prescription prévus par la loi — Point de départ du délai de prescription — Délits civils continus**

Véhicules conduits par le demandeur, le conducteur et une autre personne ont été impliqués dans un accident en 1997 — Conducteur est décédé en 1998 de causes non liées à l'accident — Lettres d'administration ont été délivrées à l'administratrice de la succession du conducteur en février 1999 — Demandeur a déposé une déclaration en octobre 1999 — Assureur a demandé le rejet de l'action — Premier juge a estimé que l'action du demandeur n'était pas prescrite — Il a été décidé, en appel, que l'on avait démontré l'existence de la préclusion par convention — Assureur et administratrice étaient préclus d'invoquer le délai de prescription plus court fixé par la Survival of Actions Act en faisant valoir que le conducteur était décédé ou que des lettres d'administration avaient été délivrées avant le mois de mai 2000 — Assureur et administratrice, au nom de la succession du conducteur, ont interjeté appel — Pourvoi accueilli — Déclaration a été radiée à toutes les instances judiciaires — Demandeur satisfaisait au délai de prescription prévu par la Limitations Act — Article 5 de la Survival of Actions Act interdit l'action intentée plus de six mois après la délivrance des lettres d'homologation ou d'administration de la succession du défunt et après l'expiration d'un an suivant la date du décès — Règle prétorienne sur la possibilité de découvrir le dommage ne pouvait permettre d'allonger le délai de prescription prévu par le législateur — En désignant un fait particulier comme élément déclencheur du « compte à rebours de la prescription », le législateur se trouvait à écarter la règle de la possibilité de découvrir le dommage dans tous les cas où la Survival of Actions Act s'appliquait — Décès subséquent du conducteur n'avait absolument aucune incidence sur la naissance de la cause d'action du demandeur — Survival of Actions Act constituait en soi une exception législative à la règle de common law; prolonger le délai de prescription aurait pour effet d'écarter l'intention du législateur.

**Procédure civile --- Prescription des actions — Actions en responsabilité délictuelle — Délais de prescription prévus par la loi — Point de départ du délai de prescription — En général**

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 105 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

Survival of Actions Act — Véhicules conduits par le demandeur, le conducteur et une autre personne ont été impliqués dans un accident en 1997 — Conducteur est décédé en 1998 de causes non liées à l'accident — Lettres d'administrations ont été délivrées à l'administratrice de la succession du conducteur en février 1999 — Demandeur a déposé une déclaration en octobre 1999 — Assureur a demandé le rejet de l'action — Premier juge a estimé que l'action du demandeur n'était pas prescrite — Il a été décidé, en appel, que l'on avait démontré l'existence de la préclusion par convention — Assureur et administratrice étaient préclus d'invoquer le délai de prescription plus court fixé par la Survival of Actions Act en faisant valoir que le conducteur était décédé ou que des lettres d'administration avaient été délivrées avant le mois de mai 2000 — Assureur et administratrice, au nom de la succession du conducteur, ont interjeté appel — Pourvoi accueilli — Déclaration a été radiée à toutes les instances judiciaires — Demandeur satisfaisait au délai de prescription prévu par la Limitations Act — Article 5 de la Survival of Actions Act interdit l'action intentée plus de six mois après la délivrance des lettres d'homologation ou d'administration de la succession du défunt et après l'expiration d'un an suivant la date du décès — Règle prétorienne sur la possibilité de découvrir le dommage ne pouvait permettre d'allonger le délai de prescription prévu par le législateur — En désignant un fait particulier comme élément déclencheur du « compte à rebours de la prescription », le législateur se trouvait à écarter la règle de la possibilité de découvrir le dommage dans tous les cas où la Survival of Actions Act s'appliquait — Décès subséquent du conducteur n'avait absolument aucune incidence sur la naissance de la cause d'action du demandeur — Survival of Actions Act constituait en soi une exception législative à la règle de common law; prolonger le délai de prescription aurait pour effet d'écarter l'intention du législateur.

**Procédure civile --- Prescription des actions — Actions en responsabilité délictuelle — Délais de prescription prévus par la loi — Suspension et interruption de la prescription — Confirmation de la cause d'action**

Accident impliquant trois véhicules a eu lieu en 1997 — Conducteur est décédé de causes non liées à l'accident en 1998 — Lettres d'administration ont été délivrées à l'administratrice du conducteur en février 1999 — Demandeur a déposé une déclaration en octobre 1999 — Assureur a demandé le rejet de l'action — Premier juge a estimé que l'action du demandeur n'était pas prescrite — Il a été décidé, en appel, que l'on avait démontré l'existence de la préclusion par convention — Assureur et administratrice étaient préclus d'invoquer le délai de prescription plus court fixé par la Survival of Actions Act en faisant valoir que le conducteur était décédé ou que des lettres d'administration avaient été délivrées avant le mois de mai 2000 — Assureur et administratice, au nom de la succession du conducteur, ont interjeté appel — Pourvoi accueilli — Déclaration a été radiée à toutes les instances judiciaires — Article 16 de la Limitations Act n'était applicable qu'au délai de prescription qui restreint le délai dans lequel l'action peut être intentée — Article 16 ne pouvait s'appliquer, étant donné que le délai de prescription prévu par la Survival of Actions Act supplantait le délai de prescription prévu par la Limitations Act et ne pouvait créer l'action ou la faire vivre à nouveau.

**Préclusion --- Préclusion en raison de la conduite — Éléments — Acte de confiance préjudiciable — Suffisance du préjudice**

Accident impliquant trois véhicules a eu lieu en 1997 — Conducteur est décédé de causes non liées à l'accident en 1998 — Lettres d'administration ont été délivrées à l'administratrice du conducteur en février 1999 — Demandeur a déposé une déclaration en octobre 1999 — Assureur a demandé le rejet de l'action — Premier juge a estimé que l'action du demandeur n'était pas prescrite — Il a été décidé, en appel, que l'on avait démontré l'existence de la préclusion par convention — Assureur et administratrice étaient préclus d'invoquer le délai de prescription plus court fixé par la Survival of Actions Act en faisant valoir que le conducteur était décédé ou que des lettres d'administration avaient été délivrées avant le mois de mai 2000 — Assureur et administratice, au nom de la succession du conducteur, ont interjeté appel — Pourvoi accueilli — Déclaration a été radiée à toutes les instances judiciaires — Assentiment réciproque distingue la préclusion par convention des autres types de préclusion — Lettres échangées n'établissaient pas l'existence d'une présupposition commune — Cour d'appel a commis une erreur en accordant de l'importance à la mention de l'objet de ces lettres — Fait que les parties se soient entretenues sans tenir compte du délai de prescription n'établissait pas non plus l'existence d'une présupposition commune que la prescription ne serait pas invoquée comme moyen de défense — Non seulement le demandeur ne s'est pas fondé sur la présupposition alléguée, mais son comportement ne démontrait pas d'intention d'affecter les rapports juridiques entre les parties — Aucuns motifs fondés sur la préclusion, ou fondés sur toute autre doctrine juridique, n'existaient pour

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 106 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

empêcher la succession du conducteur ou l'assureur de celui-ci d'invoquer le délai de prescription prévu par la Survival of Actions Act.

Vehicles operated by the plaintiff, the driver and another person were involved in an accident in November 1997. Correspondence was exchanged between the plaintiff and the adjuster assigned by the driver's insurer. The plaintiff forwarded his hospital chart to the adjuster and was reimbursed. In December 1998, the driver died of causes unrelated to the accident. In January 1999, the adjuster wrote to the plaintiff and referred to the driver as "Our Insured". Letters of Administration were granted to the driver's administratrix in February. A cheque for payment of a medical report was forwarded by the adjuster and the driver was referred to as "Our Insured". The plaintiff issued his statement of claim in October 1999. The plaintiff wrote to the adjuster referring to the driver as "Your Insured". The adjuster learned of the driver's death in May 2000. The plaintiff learned of the driver's death in September 2000. In November 2000, the insurer refused to settle the plaintiff's claim because the action was outside the limitation period.

The insurer applied to intervene in the proceedings and sought an order striking out the statement of claim as being out of time. The plaintiff applied to amend the description of the driver in the statement of claim. The applications judge dismissed the application to have the action dismissed. The insurer appealed and the plaintiff cross-appealed. The majority of the Court of Appeal allowed, in part, both the appeal and the cross-appeal. The applications judge's order to permit the intervention of the insurer and the amendment of the statement of claim was affirmed. The majority held that the applications judge had erred in holding that the cause of action against the driver was a cause of action to which the Survival of Actions Act did not apply. The majority held that the applications judge had erred in holding that the confirmation provisions of the Limitations Act also applied to the limitation period under the Survival of Actions Act. The majority held that the driver's estate and the insurer were barred by the principle of estoppel from relying on the fact of the driver's death and the granting of letters of administration. As a result, nullity could not be established and the statement of claim was amended to name the driver's administratrix as defendant in the action. The insurer and the driver's estate by his administratrix appealed.

**Held:** The appeal was allowed and the statement of claim struck at all levels of court.

The situation was governed by two limitation periods: s. 5 of the Limitations Act and s. 5 of the Survival of Actions Act. The plaintiff met the prescribed limitation period in the Limitations Act. Section 5 of the Survival of Actions Act prohibits an action brought six months after letters of probate or administration of the estate of the deceased have been granted and after the expiration of one year from the date of death. Pursuant to the Survival of Actions Act, the limitation period is triggered by the death of the defendant or the granting by a court of the letters of administration or probate. The Survival of Actions Act does not establish a relationship between these events and the injured party's knowledge. The judge-made discoverability rule did not apply to extend the period the legislature had prescribed. By using a specific event as the starting point of the "limitations clock", the legislature was displacing the discoverability rule in all situations to which the Survival of Actions Act applied. The plaintiff's cause of action arose prior to the driver's death and the plaintiff was aware of his cause of action before the driver's death and before the expiration of the Survival of Actions Act limitation period. The plaintiff did not need to have knowledge of the death to prove his claim or to issue and serve the statement of claim. The driver's subsequent death had no impact whatsoever on the accrual of the plaintiff's cause of action. The Survival of Actions Act was itself a legislative exception to a common law rule. It would displace the intention of the legislature to stretch the limitation period.

Section 16 of the Limitations Act can only apply to a limitation period which limits the time during which an action may be taken. Since the limitation period which arises under the Survival of Actions Act supersedes the first limitation period of the Limitations Act, and does not create or revive an action, s. 16 cannot apply to it.

Mutual assent is what distinguishes estoppel by convention from other types of estoppel. It is not enough that each of the two parties acts on an assumption not communicated to the other. The estopped party must have communicated to the other

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 107 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

that he or she was indeed sharing the other party's mistaken assumption. None of the letters exchanged by the plaintiff and the adjuster with respect to the plaintiff's personal injury claim proved the existence of a common assumption. The mere fact that communications occurred between the parties did not establish that they both assumed that the driver was alive. The Court of Appeal erred by giving weight to the subject line of the letters which, properly interpreted, provided no evidence of a mutual assumption that the driver was alive. The fact that the parties were conferring without regard to the limitation period did not establish a shared assumption that the limitation defence would not be relied on. Even if one were to assume the existence of a communicated common assumption between the parties, there was no evidence that the plaintiff relied upon this assumption. The plaintiff never put his mind to the shorter Survival of Actions Act limitation period. From the date of the accident to the date of the expiry of the Survival of Actions Act limitation period, there was never any discussion by the plaintiff of the limitation period. Not only did the plaintiff not rely on this alleged assumption, but his conduct did not show an intention to affect the legal relations between the parties. Given that there was no shared assumption or reliance, the detriment criterion did not need to be addressed.

Silence or inaction would be considered a representation if a legal duty was owed by the representor to the representee to make a disclosure or to take steps the omission of which was relied upon as creating an estoppel. There was no duty on the insurer or the administratrix, who were at the time only potential defendants, to advise the plaintiff of a limitation period, to assist him in the prosecution of the claim or to advise him of the consequences of the death of one of the parties. There was no representation, no duty to speak, no intention to affect legal relations and no reliance. There were no reasons based on estoppel, or any other legal doctrine, to preclude the driver's estate or the insurer from relying on the Survival of Actions Act limitation period.

Les véhicules conduits par le demandeur, le conducteur et une autre personne ont été impliqués dans un accident en novembre 1997. Des lettres ont été échangées entre le demandeur et l'expert en sinistres nommé par l'assureur du conducteur. Le demandeur a envoyé à l'expert en sinistres son dossier hospitalier et a été remboursé. Le conducteur est décédé de causes non liées à l'accident en décembre 1998. En janvier 1999, l'expert en sinistres a écrit au demandeur, faisant référence au conducteur comme « Notre assuré ». Les lettres d'administration ont été délivrées à l'administratrice de la succession du conducteur en février. L'expert en sinistres a envoyé un chèque pour payer pour la copie du rapport médical et le conducteur y était indiqué comme étant « Notre assuré ». Le demandeur a déposé sa déclaration en octobre 1999. Il a écrit à l'expert en sinistres en indiquant que le conducteur était « Votre assuré ». L'expert en sinistres a été informé du décès du conducteur en mai 2000. Le demandeur a été informé du décès du conducteur en septembre 2000. En novembre 2000, l'assureur a refusé de payer la réclamation du demandeur au motif que son action était prescrite.

L'assureur a demandé la permission d'intervenir dans les procédures et a demandé une ordonnance radiant la déclaration parce que prescrite. Le demandeur a demandé la permission de modifier la description du conducteur dans la déclaration. La demande de rejet de l'action a été rejetée par le juge qui en était saisi. L'assureur a interjeté appel et le demandeur a fait un pourvoi incident. Les juges majoritaires de la Cour d'appel ont accueilli en partie le pourvoi et le pourvoi incident. Ils ont confirmé l'ordonnance du premier juge permettant l'intervention de l'assureur et la modification de la déclaration. Ils ont par ailleurs estimé que le premier juge s'était trompé en concluant que la cause d'action contre le conducteur était une cause d'action non visée par la Survival of Actions Act. Ils ont conclu que le premier juge avait commis une erreur en statuant que les dispositions de la Limitations Act relatives à la confirmation s'appliquent également au délai de prescription fixé par la Survival of Actions Act. Ils ont estimé que la règle de la préclusion empêchait la succession du conducteur et l'assureur d'invoquer le décès du conducteur et la délivrance des lettres d'administration. Par conséquent, la nullité ne pouvait être établie et la déclaration a été modifiée afin de désigner l'administratrice de la succession du conducteur comme partie défenderesse dans l'action. L'assureur et l'administratrice, au nom de la succession du conducteur, ont interjeté appel.

**Arrêt:** Le pourvoi a été accueilli et la déclaration a été radiée à toutes les instances.

La situation était régie par deux délais de prescription: l'art. 5 de la Limitations Act et l'art. 5 de la Survival of Actions Act. Le demandeur a respecté le délai de prescription prévu par la Limitations Act. Par ailleurs, l'art. 5 de la Survival of Actions

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 108 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

Act prévoit qu'aucune action ne peut être intentée après les six mois qui suivent la délivrance de lettres d'homologation ou d'administration de la succession du défunt et après l'expiration d'un délai d'un an suivant la date du décès. Selon la Survival of Actions Act, le délai de prescription commence à courir à partir du décès du défendeur ou de la délivrance, par le tribunal, des lettres d'administration ou d'homologation. La Survival of Actions Act n'établit aucun lien entre ces faits et le moment où la partie lésée en prend connaissance. La règle prétorienne de la possibilité de découvrir le dommage ne s'appliquait pas pour prolonger le délai fixé par le législateur. En désignant un fait particulier comme élément déclencheur du « compte à rebours de la prescription », le législateur se trouvait à écarter la règle de la possibilité de découvrir le dommage dans tous les cas où la Survival of Actions Act s'appliquait. La cause d'action du demandeur a pris naissance avant le décès du conducteur; le demandeur était bien au fait de sa cause d'action tant avant le décès qu'avant l'expiration du délai de prescription fixé par la Survival of Actions Act. Le demandeur n'avait pas besoin d'être au courant du décès pour établir le bien-fondé de sa réclamation ou pour déposer et signifier sa déclaration. Le décès subséquent du conducteur n'avait absolument aucune incidence sur la naissance de la cause d'action du demandeur. La Survival of Actions Act constituait en soi une exception législative à une règle de common law. Prolonger le délai de prescription aurait pour effet d'écarter l'intention du législateur.

L'article 16 de la Limitations Act ne peut s'appliquer qu'au délai dans lequel une action peut être intentée. Il ne pouvait s'appliquer, parce que le délai de prescription prévu par la Survival of Actions Act supplantait le délai de prescription prévu par la Limitations Act et ne pouvait créer l'action ou la faire vivre à nouveau.

C'est l'assentiment réciproque qui distingue la préclusion par convention des autres types de préclusion. Il ne suffit pas que chacune des deux parties agisse sur la foi d'une présupposition non communiquée à l'autre. La partie préclue doit avoir informé l'autre qu'elle partageait effectivement sa présupposition erronée. Aucune des lettres échangées par le demandeur et l'expert en sinistres, relativement à la réclamation du demandeur pour le préjudice corporel subi, n'établissait l'existence d'une présupposition commune. Le simple fait que les parties aient communiqué entre elles n'établissait pas le fait qu'elles avaient toutes deux présupposé que le conducteur était en vie. La Cour d'appel a commis une erreur en accordant de l'importance à la mention de l'objet de ces lettres qui, interprétée correctement, n'établissait pas l'existence d'une présupposition commune que le conducteur était vivant. Le fait que les parties se soient entretenues sans tenir compte du délai de prescription n'établissait pas non plus l'existence d'une présupposition commune que la prescription ne serait pas invoquée comme moyen de défense. Même si l'on pouvait présumer l'existence d'une présupposition commune entre les parties, rien n'établissait que le demandeur s'était fondé sur cette présupposition. Le demandeur ne s'est jamais préoccupé du délai de prescription plus court prévu par la Survival of Actions Act. Entre la date de l'accident et celle de l'expiration du délai de prescription fixé par la Survival of Actions Act, le demandeur n'a jamais abordé la question du délai de prescription. Non seulement le demandeur ne s'est pas fondé sur la présupposition alléguée, mais son comportement ne démontrait aucune intention d'affecter les rapports juridiques entre les parties. Étant donné l'absence de présupposition commune ou d'acte de confiance, il n'est pas nécessaire d'examiner le critère du préjudice.

Le silence ou l'inaction seront considérés comme une assertion si l'auteur de l'assertion avait envers le destinataire de celle-ci une obligation légale de divulguer ou de prendre des mesures, et que l'omission de le faire est invoquée comme donnant lieu à la préclusion. Ni l'assureur ni l'administratrice, qui étaient à l'époque des défendeurs éventuels, n'avaient l'obligation d'informer le demandeur de l'existence d'un délai de prescription, de l'aider à intenter son action ou de l'informer des conséquences du décès d'une partie. Il n'y avait aucune assertion, aucune obligation de parler, aucune intention de modifier les rapports juridiques ni aucun acte de confiance. Aucuns motifs fondés sur la préclusion, ou fondés sur toute autre doctrine juridique, n'existaient pour empêcher la succession du conducteur ou l'assureur de celui-ci d'invoquer le délai de prescription prévu par la Survival of Actions Act.

**Table of Authorities**

**Cases considered by *Bastarache J.*:**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 109 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

*Amalgamated Investment & Property Co. (In Liquidation) v. Texas Commerce International Bank Ltd.* (1981), [1982] Q.B. 84, [1981] 3 All E.R. 577, [1981] 3 W.L.R. 565 (Eng. C.A.) — considered

*Baird Textile Holdings Ltd v. Marks & Spencer Plc* (2001), [2002] 1 All E.R. (Comm) 737, [2001] C.L.C. 999 (Eng. C.A.) — referred to

*Burt v. LeLacheur* (2000), 2000 NSCA 90, 2000 CarswellNS 208, 189 D.L.R. (4th) 193, 6 M.V.R. (4th) 1, 49 C.P.C. (4th) 53, 186 N.S.R. (2d) 109, 581 A.P.R. 109, 2 C.C.L.T. (3d) 206, 18 C.P.C. (5th) 1 (N.S. C.A.) — distinguished

*Canacemal Investment Inc. v. PCI Realty Corp.* (1999), 1999 CarswellBC 2012 (B.C. S.C.) — considered

*Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (2003), 2003 CarswellOnt 1721 (Ont. C.A.) — referred to

*Capro Investments Ltd. v. Tartan Development Corp.* (1998), 1998 CarswellOnt 1968 (Ont. Gen. Div.) — considered

*Central & Eastern Trust Co. v. Rafuse* (1986), 37 C.C.L.T. 117, *(sub nom. Central Trust Co. v. Rafuse)* [1986] 2 S.C.R. 147, *(sub nom. Central Trust Co. v. Rafuse)* 31 D.L.R. (4th) 481, *(sub nom. Central Trust Co. v. Rafuse)* 69 N.R. 321, *(sub nom. Central Trust Co. v. Rafuse)* 75 N.S.R. (2d) 109, *(sub nom. Central Trust Co. v. Rafuse)* 186 A.P.R. 109, 1986 CarswellNS 40, 1986 CarswellNS 135, 42 R.P.R. 161, 34 B.L.R. 187, *(sub nom. Central Trust Co. c. Cordon)* [1986] R.R.A. 527 (headnote only) (S.C.C.) — considered

*Edwards v. Law Society of Upper Canada* (2000), 2000 CarswellOnt 1963, *(sub nom. Edwards v. Law Society of Upper Canada (No. 1))* 48 O.R. (3d) 321, 133 O.A.C. 305, 50 C.P.C. (4th) 231, 36 E.T.R. (2d) 192 (Ont. C.A.) — referred to

*Fehr v. Jacob* (1993), 14 C.C.L.T. (2d) 200, 14 C.P.C. (3d) 364, [1993] 5 W.W.R. 1, 85 Man. R. (2d) 63, 41 W.A.C. 63, 1993 CarswellMan 109 (Man. C.A.) — referred to

*Good v. Parry* (1963), [1963] 2 All E.R. 59, [1963] 2 Q.B. 418 (Eng. C.A.) — considered

*Grundt v. Great Boulder Property Gold Mines Ltd.* (1937), 59 C.L.R. 641 (Australia H.C.) — considered

*Harper v. Cameron* (1893), 2 B.C.R. 365, 1893 CarswellBC 17 (B.C. C.A.) — referred to

*India v. India Steamship Co. Ltd.* (1997), [1998] A.C. 878, [1997] 3 W.L.R. 818, [1997] 4 All E.R. 380, [1998] 1 Lloyd's Rep. 1, [1997] C.L.C. 1581, [1998] I.L.Pr. 511, 147 N.L.J. 1581, 141 S.J.L.B. 230 (U.K. H.L.) — considered

*J. (A.) v. Cairnie Estate* (1993), [1993] 6 W.W.R. 305, 105 D.L.R. (4th) 501, 17 C.C.L.T. (2d) 1, 88 Man. R. (2d) 43, 51 W.A.C. 43, 1993 CarswellMan 116 (Man. C.A.) — considered

*John v. George* (September 4, 1995), Brown L.J., Evans L.J., Morritt L.J. (Eng. C.A.) — considered

*K. Lokumal & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* (1985), [1985] 2 Lloyd's Rep. 28 (Eng. C.A.) — considered

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 110 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

*Litwin Construction (1973) Ltd. v. Kiss* (1988), 29 B.C.L.R. (2d) 88, *(sub nom. Litwin Construction (1973) Ltd. v. Pan)* 52 D.L.R. (4th) 459, 1988 CarswellBC 276 (B.C. C.A.) — considered

*London Borough of Hillingdon v. Arc Ltd.* (2000), [2001] C.P. 33, [2000] 3 E.G.L.R. 97 (Eng. C.A.) — considered

*M. (K.) v. M. (H.)* (1992), 142 N.R. 321, *(sub nom. M. c. M.)* [1992] 3 S.C.R. 6, 96 D.L.R. (4th) 289, 57 O.A.C. 321, 14 C.C.L.T. (2d) 1, 1992 CarswellOnt 841, 1992 CarswellOnt 998 (S.C.C.) — considered

*MacKay v. Lemley* (1997), 98 B.C.A.C. 260, 161 W.A.C. 260, 1997 CarswellBC 2249, 44 B.C.L.R. (3d) 382, 17 C.P.C. (4th) 234 (B.C. C.A.) — followed

*MacKenzie v. MacKenzie* (1992), [1993] 3 W.W.R. 520, *(sub nom. MacKenzie Estate v. MacKenzie)* 84 Man. R. (2d) 149, 48 E.T.R. 134, 1992 CarswellMan 162 (Man. Q.B.) — considered

*National Westminster Finance NZ Ltd. v. National Bank of NZ Ltd.* (1996), [1996] 1 N.Z.L.R. 548 (New Zealand C.A.) — referred to

*Nielsen v. Kamloops (City)* (1984), [1984] 5 W.W.R. 1, [1984] 2 S.C.R. 2, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1, 29 C.C.L.T. 97, 8 C.L.R. 1, 26 M.P.L.R. 81, 66 B.C.L.R. 273, 1984 CarswellBC 476, 1984 CarswellBC 821 (S.C.C.) — considered

*Norwegian American Cruises A/S v. Paul Mundy Ltd.* (1988), [1988] 2 Lloyd's Rep. 343 (Eng. C.A.) — considered

*Page v. Austin* (1884), 10 S.C.R. 132, 1884 CarswellAlta 1 (S.C.C.) — considered

*Payne v. Brady* (1996), 22 M.V.R. (3d) 85, 140 D.L.R. (4th) 88, 144 Nfld. & P.E.I.R. 91, 451 A.P.R. 91, 7 C.P.C. (4th) 44, 1996 CarswellNfld 219 (Nfld. C.A.) — considered

*Payne v. Brady* (1997), [1997] 2 S.C.R. xiii, 153 Nfld. & P.E.I.R. 90 (note), 475 A.P.R. 90 (note) (S.C.C.) — referred to

*Peixeiro v. Haberman* (1997), 217 N.R. 371, 1997 CarswellOnt 2928, 1997 CarswellOnt 2929, 151 D.L.R. (4th) 429, 103 O.A.C. 161, 30 M.V.R. (3d) 41, [1997] 3 S.C.R. 549, 12 C.P.C. (4th) 255, 46 C.C.L.I. (2d) 147 (S.C.C.) — considered

*Podovinikoff v. Montgomery* (1984), 30 M.V.R. 19, 58 B.C.L.R. 204, 46 C.P.C. 77, 10 C.C.L.I. 169, 14 D.L.R. (4th) 716, 1984 CarswellBC 385 (B.C. C.A.) — considered

*Queen v. Cognos Inc.* (1993), 45 C.C.E.L. 153, 93 C.L.L.C. 14,019, 99 D.L.R. (4th) 626, 60 O.A.C. 1, 14 C.C.L.T. (2d) 113, [1993] 1 S.C.R. 87, 147 N.R. 169, 1993 CarswellOnt 801, 1993 CarswellOnt 972 (S.C.C.) — distinguished

*Seechurn v. Ace Insurance SA NV* (2002), [2002] 2 Lloyd's Rep. 390 (Eng. C.A.) — referred to

*Snow (Guardian ad litem of) v. Kashyap* (1995), *(sub nom. Snow v. Kashyap)* 125 Nfld. & P.E.I.R. 182, *(sub nom. Snow v. Kashyap)* 389 A.P.R. 182, *(sub nom. Snow v. Kashyap)* 29 C.R.R. (2d) 336, 1995 CarswellNfld 233 (Nfld. C.A.) — considered

*Surrenda Overseas Ltd. v. Sri Lanka* (1976), [1977] 1 W.L.R. 565, [1977] 2 All E.R. 481, [1977] 1 Lloyd's Rep. 653, 121 S.J. 13 (Eng. Q.B.) — considered

*Troop v. Gibson* (1986), [1986] 1 E.G.L.R. 1, 277 E.G. 1134 (Eng. C.A.) — considered

*Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc.* (2002), 2002 BCSC 934, 2002 CarswellBC 1471 (B.C. S.C.) — referred to

*Waschkowski v. Hopkinson Estate* (2000), 2000 CarswellOnt 470, 47 O.R. (3d) 370, 184 D.L.R. (4th) 281, 129 O.A.C. 287, 32 E.T.R. (2d) 308, 44 C.P.C. (4th) 42 (Ont. C.A.) — followed

*Wheaton v. Palmer* (2001), 2001 NFCA 43, 2001 CarswellNfld 233, 205 Nfld. & P.E.I.R. 304, 615 A.P.R. 304, 10 C.P.C. (5th) 245 (Nfld. C.A.) — not followed

*32262 B.C. Ltd. v. Companions Restaurant Inc.* (1995), 17 B.L.R. (2d) 227, 1995 CarswellBC 368 (B.C. S.C.) — referred to

**Statutes considered:**

*Fatal Accidents Act*, R.S.N. 1990, c. F-6
    Generally — considered

*Fatal Injuries Act*, R.S.N.S. 1989, c. 163
    s. 10 — considered

*Limitations Act*, S.N. 1995, c. L-16.1
    Generally — considered

    s. 5 — considered

    s. 5(a) — considered

    s. 16 — considered

    s. 16(1) — considered

    s. 16(1)(a) — considered

    s. 16(2) — considered

    s. 16(3) — considered

    s. 16(5) — considered

*Survival of Actions Act*, R.S.N. 1990, c. S-32
    Generally — considered

    s. 2 — considered

    s. 2(b) — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 112 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

s. 5 — considered

s. 8(1) — considered

*Trustee Act*, R.S.O. 1990, c. T.23

s. 38(3) — considered

**Words and phrases considered**

**estoppel by convention**

Estoppel by convention operates where the parties have agreed that certain facts are deemed to be true and to form the basis of the transaction into which they are about to enter (G. H. L. Fridman, *The Law of Contract in Canada* (4th ed. 1999), at p. 140, note 302). If they have acted upon the agreed assumption , then, as regards that transaction, each is estopped against the other from questioning the truth of the statement of facts so assumed if it would be unjust to allow one to go back on it (S. Bower, *The Law Relating to Estoppel by Representation* (4th ed. 2004), at pp. 7-8).

The crucial requirement for estoppel by convention, which distinguishes it from the other types of estoppel, is that at the material time both parties must be of "a like mind" (*Troop v. Gibson*, [1986] 1 E.G.L.R. 1 (Eng. C.A.), at p. 5; *London Borough of Hillingdon v. Arc Ltd.*, [2000] E.W.J. No. 3278 (Eng. C.A.), at para. 49). The court must determine what state of affairs the parties have accepted, and decide whether there is sufficient certainty and clarity in the terms of the convention to give rise to any enforceable equity: *Troop*, at p. 6; see also *Baird Textile Holdings Ltd v. Marks & Spencer Plc*, [2002] 1 All E.R. (Comm) 737 (Eng. C.A.), at para. 84.

While it may not be necessary that the assumption by the party raising estoppel be created or encouraged by the estopped party, it must be shared in the sense that each is aware of the assumption of the other (*John v. George*, [1995] E.W.J. No. 4375 (Eng. C.A.), at para. 37). Mutual assent is what distinguishes the estoppel by convention from other types of estoppel (Bower, at p. 184). The courts have described communications complying with this requirement as "crossing the line". In *K. Lokumal & Sons (London) Ltd.*, at pp. 34-35, Kerr L.J. held that

[a]ll estoppels must involve some statement or conduct by the party alleged to be estopped on which the alleged representee was entitled to rely and did rely. In this sense <u>all estoppels may be regarded as requiring some manifest representation which crosses the line between representor and representee, either by statement or conduct</u>. It may be an express statement or it may be implied from conduct, e.g. a failure by the alleged representor to react to something said or done by the alleged representee so as to imply a manifestation of assent which leads to an estoppel by silence or acquiescence. Similarly, in cases of so-called estoppels by convention, there must be some mutually manifest conduct by the parties which is based on a common but mistaken assumption....

There cannot be any estoppel unless the alleged representor has said or done something, or failed to do something, with the result that — across the line between the parties — his action or inaction has produced some belief or expectation in the mind of the alleged representee, so that, depending on the circumstances, it would thereafter no longer be right to allow the alleged representor to resile by challenging the belief or expectation which he has engendered. To that extent at least, therefore, the alleged representor must be open to criticism. [Emphasis added.]

The appellants submit that detrimental reliance is a requirement that must be proven in order to find convention estoppel. I agree. The Court of Appeal erred in finding this condition fulfilled by simple proof that a detriment would flow to the party asserting the estoppel if the other party were permitted to resile from the assumed stated facts, without a finding of reliance.

Once the party seeking to establish estoppel shows that he acted on a shared assumption, he must prove detriment. For the plea to succeed, it must be unjust or unfair to allow a party to resile from the common assumption (Wilken, at p. 228). It is often said that the fact that there will have been a change from the presumed legal position will facilitate the

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 113 of 554

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

establishment of detriment: "This is because there is an element of injustice inherent within the concept of the shared assumption — one party has acted unjustly in allowing the belief or expectation to 'cross the line' and arise in the other's mind": Wilken, at p. 228.

This final requirement of estoppel has been described as proving that it would be "unjust", "unconscionable" or "unfair" to permit a party to resile from the mutual assumption (see, e.g., Bower, at p. 181; *John; India; Norwegian American Cruises A/S*). However, it may be preferable to refrain from using "unconscionable", in order to avoid confusion with this last concept which has developed a special meaning in relation to inequality of bargaining power in the law of contracts (where we speak of unconscionable transactions, for instance) (see *Litwin Construction*, at p. 468).

**detrimental reliance**

Detrimental reliance encompasses two distinct, but interrelated, concepts: reliance and detriment. The former requires a finding that the party seeking to establish the estoppel changed his or her course of conduct by acting or abstaining from acting in reliance upon the assumption, thereby altering his or her legal position. If the first step is met, the second requires a finding that, should the other party be allowed to abandon the assumption, detriment will be suffered by the estoppel raiser because of the change from his or her assumed position (see Wilken, at p. 228; *Grundt v. Great Boulder Property Gold Mines Ltd.* (1937), 59 C.L.R. 641 (Australia H.C.), at p. 674).

**estoppel by representation**

Estoppel by representation requires a positive representation made by the party whom it is sought to bind, with the intention that it shall be acted on by the party with whom he or she is dealing, the latter having so acted upon it as to make it inequitable that the party making the representation should be permitted to dispute its truth, or do anything inconsistent with it (*Page v. Austin* (1884), 10 S.C.R. 132 (S.C.C.), at p. 164).

Where there is no shared assumption, as in the present case, there can be no estoppel by convention, no matter how unjust the other party's conduct may appear to be. However, in some circumstances, the party seeking to establish estoppel may be able to rely on estoppel by representation, an alternative here advocated by the respondent. The added difficulty in such a case is that an estoppel by representation cannot arise from silence unless a party is under a duty to speak. Silence or inaction will be considered a representation if a legal duty is owed by the representor to the representee to make a disclosure, or take steps, the omission of which is relied upon as creating an estoppel: see Wilken, at p. 227; Bower, at pp. 46-47.

[The plaintiff /respondent] submits that in the present case silence constituted a representation grounding estoppel because there was a duty to disclose relevant information as it would be unfair for the appellants to benefit from non-disclosure. I disagree. In the present case, there was no duty on the appellants, who were at the time only potential defendants, to advise [the plaintiff /respondent] of a limitation period, to assist him in the prosecution of the claim, or to advise him of the consequences of the death of one of the parties. There is no fiduciary or contractual relationship here (contrast with *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 (S.C.C.)). The appellants had no duty to exercise reasonable care, nor to divulge any information.

APPEAL by insurer and driver's estate by his administratrix from judgment reported at *Ryan v. Moore* (2003), 2003 NLCA 19, 2003 CarswellNfld 109, 50 E.T.R. (2d) 8, 224 Nfld. & P.E.I.R. 181, 669 A.P.R. 181 (N.L. C.A.), allowing appeal from dismissal of application for dismissal of action.

POURVOI de l'assureur et de l'administratrice, au nom de la succession du conducteur, à l'encontre de l'arrêt publié à *Ryan v. Moore* (2003), 2003 NLCA 19, 2003 CarswellNfld 109, 50 E.T.R. (2d) 8, 224 Nfld. & P.E.I.R. 181, 669 A.P.R. 181 (N.L. C.A.), qui a accueilli le pourvoi à l'encontre du jugement rejetant la demande visant à obtenir le rejet de l'action.

***Bastarache J.*:**

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 114 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

1     We are asked to decide whether or not a shortened limitation period under s. 5 of the *Survival of Actions Act*, R.S.N.L. 1990, c. S-32 (see Appendix A), applicable upon the death of one of the parties to an action, can be enforced against a party who had no knowledge of the death until after the limitation period had expired. The respondent, Peter Ryan ("Ryan"), argues that the answer should be no; he invoked in front of our Court and in the courts below a number of legal principles which I shall address: discoverability, confirmation, estoppel by convention and estoppel by representation. The issue of estoppel was raised for the first time by the Court of Appeal itself.

2     The discoverability rule dictates that a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence (*Central & Eastern Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 (S.C.C.), at p. 224).

3     Section 16(1) of the *Limitations Act*, S.N.L. 1995, c. L-16.1 (see Appendix A), prescribes that confirmation of a cause of action occurs when a person acknowledges the cause of action of another person or makes a payment in respect of that cause of action. Thus, at that moment, the limitation clock is restarted, and the time before the date of the confirmation will not be counted.

4     Estoppel by convention operates where the parties have agreed that certain facts are deemed to be true and to form the basis of the transaction into which they are about to enter (G. H. L. Fridman, *The Law of Contract in Canada* (4th ed. 1999), at p. 140, note 302). If they have acted upon the agreed assumption , then, as regards that transaction, each is estopped against the other from questioning the truth of the statement of facts so assumed if it would be unjust to allow one to go back on it (S. Bower, *The Law Relating to Estoppel by Representation* (4th ed. 2004), at pp. 7-8).

5     Estoppel by representation requires a positive representation made by the party whom it is sought to bind, with the intention that it shall be acted on by the party with whom he or she is dealing, the latter having so acted upon it as to make it inequitable that the party making the representation should be permitted to dispute its truth, or do anything inconsistent with it (*Page v. Austin* (1884), 10 S.C.R. 132 (S.C.C.), at p. 164).

6     None of these doctrines can find application in the present case. I will address each of these doctrines and in most cases adopt the reasons of the Court of Appeal with mere comment. One legal concept requires more attention from this Court, given that it is being asked to develop a legal test with regard to its application: estoppel by convention.

## I. Background

### *A. Facts*

7     On November 27, 1997, three vehicles were involved in an accident. They were operated by the respondent, Ryan, the appellant, Rex Gilbert Moore, and a third party (not involved in this matter), David Crummey. Ryan decided to pursue a personal injury claim against Moore. He was unaware that, on December 26, 1998, Moore had died of causes unrelated to the accident. On February 16, 1999, Letters of Administration were granted to Moore's administratrix, Muriel Smith. On October 28, 1999, Ryan issued his statement of claim; it was within the two-year limitation period prescribed by the *Limitations Act*, but outside the applicable six-month limitation period from the granting of the letters of administration under the *Survival of Actions Act*. Ryan argues that the appellant is estopped from relying upon the shorter limitation period. Alternatively, he argues that the discoverability principle or the confirmation rule apply to extend this shorter limitation period.

8     As this case is centred on issues related to limitation periods, it is important to recollect the important events leading up to this litigation:

| | |
|---|---|
| November 27, 1997 | The accident |
| November 28, 1997 | Cabot Insurance Co. ("Cabot Insurance") appoints adjuster Brian Lacey to look after the claim against its insured Moore. |

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 115 of 554

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

| | |
|---|---|
| | Ryan retains counsel who contacts the adjuster advising of his retainer and that Ryan, while his injuries are being assessed, will pursue his property damage claim directly with the adjuster. |
| December 1997 - December 1998 | Cabot Insurance pays Ryan's property damage claim directly to him. |
| | Correspondence is exchanged between Ryan's counsel and the adjuster concerning Ryan's medical condition, the adjuster seeking documentation and updates on Ryan's condition, and the counsel providing the information requested. The counsel forwards Ryan's hospital chart to the adjuster, for which Cabot Insurance reimburses counsel the $40 fee. |
| December 26, 1998 | Moore dies at age 75 from causes unrelated to the accident. |
| January 25, 1999 | The adjuster writes to Ryan's counsel seeking medical information and reiterating that the insurer would pay a reasonable fee for a medical report. He refers to Moore as "Our Insured". |
| February 16, 1999 | Letters of Administration of the Estate of Rex Moore are granted to Muriel Smith. |
| April 5, 1999 | Ryan's counsel forwards to the adjuster an invoice for a medical report of Ryan's examination by an orthopaedic surgeon. |
| July 29, 1999 | The adjuster forwards to Ryan's counsel a cheque for payment of the medical report. The cheque is payable to Dr. Landells. He refers to Moore as "Our Insured". |
| August 16, 1999 | Six months have passed since the grant of letters of administration of Moore's estate. |
| October 28, 1999 | The statement of claim is issued naming Rex Moore as defendant. |
| February 10, 2000 | Ryan's counsel writes to the adjuster seeking payment for the cost of obtaining the chart from Ryan's family physician. He refers to Moore as "Your Insured" |
| March 2, 2000 | Ryan's counsel writes to the adjuster requesting payment for the chart of another physician. He refers to Moore as "Your Insured". |
| May 18, 2000 | The adjuster learns of Moore's death. |
| September 22, 2000 | Ryan's counsel learns of Moore's death after attempting to serve the statement of claim. |
| October 24, 2000 | Ryan's counsel suggests to Cabot Insurance's claims examiner, Valerie Moore, in a meeting (to discuss claims unrelated to this case) that there might be a problem with the limitation period. |
| November 9, 2000 | Cabot Insurance refuses to settle Ryan's claim because the action is outside the limitation period. |

9      Cabot Insurance applied to intervene in the proceedings and sought an order striking out the statement of claim for being out of time. It further claimed that the statement of claim naming a dead person as defendant was a nullity and was not capable of being amended. Ryan also filed an application to amend the statement of claim to describe the defendant as "Rex Moore, Deceased, by his administratrix, Muriel Smith".

**B. Supreme Court of Newfoundland and Labrador ((2001), 205 Nfld. & P.E.I.R. 211 (Nfld. T.D.))**

10      At the Supreme Court of Newfoundland and Labrador, Orsborn J. denied Cabot Insurance's application to have the action dismissed. First, he held that the discoverability rule did not apply to postpone the running of the *Survival of Actions*

Case 09-10138-MFW   Doc 14394-2   Filed 09/10/14   Page 116 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

*Act* limitation period, since the fact of death was not an element of the cause of action and was not required to complete the cause of action (paras. 50-51). Second, Orsborn J. held that the confirmation provisions of s. 16 of the *Limitations Act* are not expressly confined to the limitation periods fixed by the *Limitations Act*. He saw no reason in principle why a cause of action continued under the *Survival of Actions Act* could not be confirmed and the limitation period fixed by that Act thus continued. He concluded that Cabot Insurance's payment for the medical report on July 29, 1999 constituted a confirmation of Ryan's cause of action. Since the action was commenced within six months of this payment, the proceeding was still within the short *Survival of Actions Act* limitation period and was not statute barred (paras. 52-63). Third, Orsborn J. concluded that in any event, on the facts of this case, the cause of action against Moore was not a cause of action to which the *Survival of Actions Act* applies. The *Survival of Actions Act* permits a cause of action to survive "for the benefit of or against" an estate (s. 2(b)). The *Survival of Actions Act* deals with the potential acquisition or dissipation of estate assets. However, in this case, Ryan's claim poses no risk to the assets of the estate. Instead, the risk lies on the insurer. Moore was a defendant in name only, and the real party to the action was the insurer. Thus, Ryan's cause of action was not extinguished on Moore's death (paras. 66-76). Fourth, Orsborn J. held that if Ryan's cause of action had not been confirmed and if the *Survival of Actions Act* was indeed applicable (which he held it was not), then the action would have been a nullity for being commenced outside the limitation period. However, as this was not the case, the plaintiff was not statute barred.

### C. Court of Appeal of Newfoundland and Labrador (*(2003), 224 Nfld. & P.E.I.R. 181, 2003 NLCA 19* (N.L. C.A.))

*(1) Wells C.J. (for the majority)*

11     The majority of the Court of Appeal allowed, in part, both the appeal and cross-appeal. The applications judge's order to permit the intervention of Cabot Insurance and the amendment of the statement of claim was affirmed. Wells C.J. held that the applications judge made no error in considering the existence of insurance in determining whether or not the action posed a financial risk to the estate. He nevertheless held that the applications judge erred in holding that the cause of action against Moore is a cause of action to which the *Survival of Actions Act* did not apply. The court explained that unless the *Survival of Actions Act* applies, the action will be a nullity. The right to institute a tort action after death, or continue an action after death, derives from the statute. Without such a statute, this right does not otherwise exist.

12     The majority agreed with the applications judge that the discoverability rule does *not* apply to postpone the running of the limitation period under the *Survival of Actions Act*. Concluding that the limitation period in the statute runs from an event that occurs without regard to the injured party's knowledge, the majority deemed that allowing the application of the discoverability rule would disrupt the exception to the common law rule, the courts thereby intruding into the legislature's jurisdiction.

13     The majority disagreed with Orsborn J.'s holding that the confirmation provisions of the *Limitations Act* also apply to the limitation period under the *Survival of Actions Act*. Wells C.J. held that s. 16 of the *Limitations Act* provides confirmation of a cause of action and not of the right to commence it. The majority pointed out that the nature of the cause of action, or whether it is confirmed, is not relevant to the date of death or of grant of probate which triggers the limitation period created by the *Survival of Actions Act*. Confirmation did not arise in relation to the limitation period stemming from the *Limitations Act* because the statement of claim was issued within two years of the collision, i.e. within the prescribed delay.

14     Turning to the last issue, the majority held that Moore's estate and Cabot Insurance were barred by the principle of estoppel from relying on the fact of Moore's death and the granting of letters of administration. The particular form of estoppel invoked was estoppel by convention. Wells C.J., having reviewed Canadian and foreign authorities and decisions, concluded that estoppel by convention was established (para. 79). The majority held that detrimental reliance was not required. Consequently, Cabot Insurance and Moore were estopped from pleading that Moore died or that letters of administration were granted prior to May 2000 in order to invoke the shorter *Survival of Actions Act* limitation period. As a result, nullity could not be established and the statement of claim was amended to name the administratrix of Moore as defendant in the action.

*(2) Cameron J.A. (dissenting)*

15    In dissenting reasons, concurred in by Welsh J.A., Cameron J.A. disagreed with the estoppel analysis and held that it did not apply to the case at bar. After analysing case law and doctrine, she concluded that mutual misunderstanding (both parties assuming that Moore was alive) did not amount to a common assumption. The dissenting judges did not find that the letters sent by Cabot Insurance to Ryan's counsel referring to "Our Insured — Rex Moore" formed the basis on which the parties governed their conduct. The failure to commence the action within the *Survival of Actions Act*'s limitation period was *not* due to any arrangement between the parties, and consequently, there was no reliance on any convention. Therefore, this principle did not apply. Ryan's action was therefore time barred. The dissenting judges would have allowed the appeal.

## II. Analysis

### A. Discoverability

#### (1) Statutory Limitation Periods

16    The situation here is governed by two limitation periods: s. 5 of the *Limitations Act* (see Appendix A) and s. 5 of the *Survival of Actions Act*. The limitation period in s. 5 of the *Limitations Act* applies initially. Section 5 of the *Survival of Actions Act* superimposes itself on s. 5 at a later point of time, but does not eliminate it. This follows from the fact that the *Survival of Actions Act* does not create a new cause of action, as will be explained later.

17    Pursuant to s. 5 of the *Limitations Act*, a person can bring an action for damages in respect of injury based on contract or tort within two years of the date on which the right to do so arose. Ryan, by issuing a statement of claim on October 28, 1999, naming Rex Moore as the defendant, therefore, met the prescribed limitation period in the *Limitations Act*. Nevertheless, unknown to the parties, Rex Moore had died on December 26, 1998, altering the fact scenario.

18    As stated by the Court of Appeal, it is well known that at common law a personal action in tort is extinguished on the death of the victim or the wrongdoer: *actio personalis moritur cum persona* (see G. Mew, *The Law of Limitations* (2nd ed. 2004), at p. 253). Being unable to sue the estate of a deceased tortfeasor was particularly severe as it left injured survivors of motor vehicle accidents without any means of recovery. This led legislatures to enact statutes to diminish the hardship of the common law rule. The *Fatal Accidents Act*, R.S.N.L. 1990, c. F-6, and the *Survival of Actions Act* were such statutes. Under the *Fatal Accident Act*, the estate of a person who died as a result of the accident, or the survivors of that person, are accorded the right to maintain an action for death by wrongful act. Also, pursuant to s. 2 of the *Survival of Actions Act*, (see Appendix A) an action vested in or existing against a person who has died can be maintained by or against the deceased person's estate. However, s. 5 of the *Survival of Actions Act* prohibits an action brought six months after letters of probate or administration of the estate of the deceased have been granted, and after the expiration of one year from the date of death. Hence, the provision is meant to keep the action "alive" for a specific period of time. The *Survival of Actions Act* imposes an additional limitation period. As eloquently affirmed by Orsborn J., the *Survival of Actions Act* does not create a cause of action. It grafts its provision onto an existing cause of action, one which is complete in all of its elements before the operation of the *Survival of Actions Act* (para. 45).

19    In the case at bar, the *Survival of Actions Act* has the effect of shortening the time period within which the action could be taken because "an action founded in tort may only be taken by or against the estate of a deceased person if it is commenced within that period of time that is common to both limitations periods": Wells C.J., at para. 37.

20    Ryan argues that the *Survival of Actions Act* contemplates that a cause of action can arise under the *Survival of Actions Act*. I fail to see how the expression "[c]auses of action under this Act" or "an action ... under this Act" found in ss. 8(1) and 5 respectively can be seen to indicate the *creation* of a new cause of action. The *Survival of Actions Act* expressly contemplates the *survival* of causes of action *existing* against a person who has died (s. 2). I take that to mean that the cause of action existed prior to the application of the *Survival of Actions Act*. The survival of a cause of action for a time and its creation are two different things.

#### (2) Discoverability: The Judge-Made Rule

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 118 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

21    The debate concerning the use of the discoverability principle in tort actions has been settled by this Court in *Nielsen v. Kamloops (City)*, [1984] 2 S.C.R. 2 (S.C.C.), *Central Trust* and *M. (K.) v. M. (H.)*, [1992] 3 S.C.R. 6 (S.C.C.).

22    The discoverability principle provides that "a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence": *Central Trust*, at p. 224. In some provinces, the discoverability rule has been codified by statute; in others, it has been deemed redundant because of other remedial provisions.

23    While discoverability has been qualified in the past as a "general rule" (*Central Trust*, at p. 224; *Peixeiro v. Haberman*, [1997] 3 S.C.R. 549 (S.C.C.), at para. 36), it must not be applied systematically without a thorough balancing of competing interests (*Peixeiro*, at para. 34). The rule is an interpretative tool for construing limitation statutes. I agree with the Manitoba Court of Appeal when it writes:

> In my opinion, the judge-made discoverability rule is nothing more than a rule of construction. Whenever a statute requires an action to be commenced within a specified time from the happening of a specific event, the statutory language must be construed. When time runs from "the accrual of the cause of action" or from some other event which can be construed as occurring only when the injured party has knowledge of the injury sustained, the judge-made discoverability rule applies. But, when time runs from an event which clearly occurs without regard to the injured party's knowledge, the judge-made discoverability rule may not extend the period the legislature has prescribed. [Emphasis added.]

(*Fehr v. Jacob* (1993), 14 C.C.L.T. (2d) 200 (Man. C.A.), at p. 206). See also *Peixeiro*, at para. 37; *Snow (Guardian ad litem of) v. Kashyap* (1995), 125 Nfld. & P.E.I.R. 182 (Nfld. C.A.).

24    Thus, the Court of Appeal of Newfoundland and Labrador is correct in stating that the rule is "generally" applicable where the commencement of the limitation period is related by the legislation to the arising or accrual of the cause of action. The law does not permit resort to the judge-made discoverability rule when the limitation period is explicitly linked by the governing legislation to a fixed event unrelated to the injured party's knowledge or the basis of the cause of action (see Mew, at p. 55).

*(3) Discoverability Principle Does Not Apply to the Survival of Actions Act*

25    Ryan submits that the discoverability rule applies to the limitation period contained in s. 5 of the *Survival of Actions Act*. He argues that the limitation period should not begin to run until he knew, or ought reasonably to have known, the material facts which determine (i) his cause of action under the *Survival of Actions Act* and (ii) the limitation period. In sum, Ryan claims that the death of Moore is integral to the cause of action and that the limitation period should not start to run until he knew that he had a cause of action against the estate of Rex Moore. The appellants submit that the discoverability rule does not apply to the *Survival of Actions Act* as it would transcend the logic of statutory interpretation and the scheme enacted by the legislature. In addition, they say that the rule does not apply where time runs from a fixed event.

26    Like the Court of Appeal, I am of the view that the appellants' position is correct. For ease of reference, I reproduce s. 5 of the *Survival of Actions Act*:

> **5.** An action shall not be brought under this Act unless proceedings are started within 6 months after letters of probate or administration of the estate of the deceased have been granted and proceedings shall not be started in an action under this Act after the expiration of 1 year after the date of death of the deceased.

27    Pursuant to the *Survival of Actions Act*, the limitation period is triggered by the death of the defendant or the granting by a court of the letters of administration or probate. The section is clear and explicit: time begins to run from one of these two specific events. The Act does not establish a relationship between these events and the injured party's knowledge. I agree with the appellants that knowledge is not a factor: the death or granting of the letters occurs regardless of the state of mind of the plaintiff. We face here a situation in respect of which, as recognized by this Court in *Peixeiro*, the judge-made discoverability rule does not apply to extend the period the legislature has prescribed. Thus, I agree with the Court of Appeal that by using

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 119 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

a specific event as the starting point of the "limitation clock", the legislature was displacing the discoverability rule in all the situations to which the *Survival of Actions Act* applies.

28    A number of the appellate courts have dealt with the question of discoverability in the context of actions by or against estates of deceased persons. The appellants rely extensively on *Payne v. Brady* (1996), 140 D.L.R. (4th) 88 (Nfld. C.A.), leave to appeal refused, [1997] 2 S.C.R. xiii (S.C.C.). While the facts of that case are very similar to the present, it is not clear whether the Court of Appeal of Newfoundland and Labrador decided that the rule of discoverability did not apply because death is always a possibility or because the appellant Payne had ample time after she became aware of the death of Brady to commence her action. What is clear is the point advanced by O'Neill J.A.: the death of a prospective defendant and the possibility of a shortened period to commence an action is a reality that claimants and their counsel have to guard against: *Payne*, at p. 94.

29    The Nova Scotia Court of Appeal decision in *Burt v. LeLacheur* (2000), 189 D.L.R. (4th) 193 (N.S. C.A.), is invoked by the respondent. However, the reasoning of that case cannot be applied in the case at bar. In *Burt*, the Court of Appeal held that the discoverability rule applied to s. 10 of the *Fatal Injuries Act*, R.S.N.S. 1989, c. 163. The Nova Scotia Court of Appeal stated its position in the following manner (at p. 208):

> If the discoverability rule applies to a limitation period running from "when the damages were sustained" (*Peixeiro*) and from "the final determination of the action against the insured" (*Grenier*), I think it is not unreasonable to apply it to the period one year after the death so as to start time running only when the claimant knows or ought to know that the death might be a <u>wrongful</u> one. This, having in mind the statutory scheme of the *Fatal Injuries Act*, is no greater a stretch of the language than was made by the courts in *Peixeiro, Grenier* and other cases, all for the purpose of preventing a potential injustice.

> <u>We must avoid the accusation of usurping the role of the Legislature</u>, but in my opinion to apply the discoverability rule here is consistent with what has already been done before. <u>On the true consideration of s. 10 of the *Fatal Injuries Act*, time does not run simply from a fixed event, but from constituent elements of the cause of action created by the statute.</u> [Emphasis added.]

30    In *Burt*, the death of a person for which an action can be brought under the *Fatal Injuries Act* does not merely refer to the time of death as provided in the *Survival of Actions Act*, but to a "<u>wrongful</u> death". It is not an event totally unrelated to the accrual of the cause of action. Hence, the death of the person there is in fact a "constituent elemen[t] of the cause of action", contrary to the present case.

31    In my view, the case that best assists this Court in the present matter is the one giving rise to the Ontario Court of Appeal's decision in *Waschkowski v. Hopkinson Estate* (2000), 47 O.R. (3d) 370 (Ont. C.A.). The court had to determine the possible application of the discoverability rule to s. 38(3) of the *Trustee Act*, R.S.O. 1990, c. T.23, the statutory provision in Ontario permitting an action in tort by or against the estate of a deceased person and limiting the period during which such actions may be commenced. Abella J.A., as she then was, concluded, at para. 16, that the discoverability rule did not apply to the section since the state of actual or attributed knowledge of an injured person in a tort claim is not germane when a death has occurred. She explained at paras. 8-9:

> In s. 38(3) of the *Trustee Act*, the limitation period runs from a death. Unlike cases where the wording of the limitation period permits the time to run, for example, from "when the damage was sustained" (*Peixeiro*) or when the cause of action arose (*Kamloops*), <u>there is no temporal elasticity possible when the pivotal event is the date of a death</u>. Regardless of when the injuries occurred or matured into an actionable wrong, s. 38(3) of the *Trustee Act* prevents their transformation into a legal claim unless that claim is brought within two years of the death of the wrongdoer or the person wronged.

> The underlying policy considerations of this clear time limit are not difficult to understand. The draconian legal impact of the common law was that death terminated any possible redress for negligent conduct. <u>On the other hand, there was a benefit to disposing of estate matters with finality. The legislative compromise in s. 38 of the *Trustee Act* was to open a</u>

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 120 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

two-year window, making access to a remedy available for a limited time without creating indefinite fiscal vulnerability for an estate. [Emphasis added.]

See also *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*, [2003] O.J. No. 5669 (Ont. C.A.), and *Edwards v. Law Society of Upper Canada* (2000), 48 O.R. (3d) 321 (Ont. C.A.).

32     Ryan's cause of action arose prior to Moore's death and Ryan was well aware of his cause of action both before Moore's death and before the expiration of the *Survival of Actions Act* limitation period. In fact, the day following the accident, Ryan retained a solicitor to pursue a claim for damages against Moore for injuries alleged to have resulted from the accident. At that point, Ryan could have sued Moore as all the elements of his cause of action were known. He did not need to have knowledge of the death in question to prove his claim or issue and serve the statement of claim. Moore's subsequent death had no impact whatsoever on the accrual of Ryan's cause of action. Consequently, I agree with the conclusion of the applications judge, at para. 50:

> The fact of death is of no relevance to the cause of action in question. It is not an element of the cause of action and is not required to complete the cause of action. Whatever the nature of the cause of action, it is existing and complete before the *Survival of Actions Act* operates, in the case of a death, to maintain it and provide a limited time window within which it must be pursued. The fact of the death is irrelevant to the cause of action and serves only to provide a time from which the time within which to bring the action is to be calculated.

33     A further reason for the non-application of the discoverability rule is the evident impact such a rule would have on the distribution of assets to the beneficiaries. Without a time limit, an executor or an administrator would not feel free to distribute the assets of an estate until all reasonable possibilities of claim had been addressed. This would be cumbersome and unrealistic. "An estate should not be held to ransom interminably by the advancement of claims which are not proceeded with in a timely manner": *MacKenzie v. MacKenzie* (1992), 84 Man. R. (2d) 149 (Man. Q.B.), para. 18, cited in *J. (A.) v. Cairnie Estate* (1993), 105 D.L.R. (4th) 501 (Man. C.A.), p. 510.

34     The *Survival of Actions Act* is itself a legislative exception to a common law rule. Thus, it would displace the intention of the legislature to "stretch" the limitation period. Borrowing the words of Marshall J.A. in *Snow (Guardian ad litem of)*, at para. 43, to apply the rule of construction of reasonable discoverability to such a provision would be tantamount to mounting a fiction transcending the limits of logical statutory interpretation. Hence, it would constitute an impermissible incursion into the legislative process.

*(4) Special Circumstances*

35     Ryan submits, as an alternative, that if the discoverability rule does not apply, the limitation period should be extended because of the "special circumstances" principle. He claims that, pursuant to this principle, fairness and justice require that an innocent plaintiff should not be deprived of compensation through no fault of his own. This argument was not invoked in front of the applications judge or the Court of Appeal, and is not supported by any evidence; under these circumstances, it is, in my view, without merit.

**B. Confirmation**

36     Ryan claims that the confirmation of the cause of action pursued under s. 16 of the *Limitations Act* applies to extend the limitation period contained in s. 5 of the *Survival of Actions Act*. He argues that the correspondence exchanged between Cabot Insurance's adjuster and his previous counsel, the payment made by Cabot Insurance for his property damage claim, as well as a payment of $500 to his previous counsel for a medical report, prove acknowledgment (as contemplated by the *Limitations Act*) and therefore confirmation.

37     The appellants submit that s. 16 of the *Limitations Act* does not apply to the *Survival of Actions Act*. They claim that any confirmation of the cause of action would have no effect on the *Survival of Actions Act* limitation period because the *Survival of Actions Act* does not create a cause of action but simply confers a right to pursue a claim notwithstanding the fact that one

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 121 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

of the parties has died. Finally, they argue that there was no confirmation of the cause of action in this case as there was no admission of liability through the letters nor the payments made.

38    I agree with the appellants' position as accepted by the Court of Appeal.

39    The relevant portions of s.16 of the *Limitations Act* provide:

**16.** (1) A confirmation of a cause of action occurs where a person

(a) acknowledges that cause of action, right or title of another person; or

(b) makes a payment in respect of that cause of action, right or title of another.

(2) Where a person against whom an action lies confirms that cause of action, the time before the date of that confirmation shall not count when determining the limitation period for a person having the benefit of the confirmation against the person bound by that confirmation.

(3) Subsection (2) applies only to a right of action where the confirmation is given before the expiration of the limitation period for that right of action.

. . . . .

(5) In order to be effective a confirmation must be in writing and signed by

(a) the person against whom that cause of action lies; or

(b) his or her agent

and given to the person or agent of the person having the benefit of that cause of action.

40    When a person acknowledges the cause of action of another person or makes a payment in respect of that cause of action, a confirmation of that cause of action occurs. Consequently, the time accrued before the date of that confirmation shall not be considered when determining the limitation period (s. 16(2)). Confirmation must, of course, be made prior to the expiration of the limitation period (s. 16(3)).

41    Section 16 can only apply to a limitation period which limits the time during which an action may be taken. Since the limitation period which arises under the *Survival of Actions Act* supersedes the first limitation period of the *Limitations Act*, and does not create or revive an action, but merely permits it to continue, s. 16 cannot apply to it as found by the Court of Appeal (para. 67).

42    Even if this were not the case, the facts here do not support a finding of confirmation on the part of the appellants. I will address this issue briefly as a matter of principle.

43    In order to establish confirmation, one of two events must be proven: 1) that the party acknowledged the cause of action; or 2) that there was a payment made in respect of the cause of action (see Mew, at p. 115).

44    The term "acknowledges" as used in s. 16(1)(a) of the *Limitations Act* has been described by Lord Denning in *Good v. Parry*, [1963] 2 All E.R. 59 (Eng. C.A.), at p. 61, as requiring an "admission". While care must be shown when applying English case law, as the English *Limitation Act, 1939, 2 & 3 Geo. 6*, c. 21, does not provide for the acknowledgment of the "cause of action" but the acknowledgment of the "claim", it is still persuasive authority for the present interpretation.

45    Thus, a party can only be held to have acknowledged the claim if that party has in effect admitted his or her liability to pay that which the claimant seeks to recover (see *Surrendra Overseas Ltd. v. Sri Lanka* (1976), [1977] 2 All E.R. 481 (Eng. Q.B.)). As the British Columbia Court of Appeal concluded in *Podovinikoff v. Montgomery* (1984), 14 D.L.R. (4th) 716 (B.C. C.A.), at p. 721, a person can acknowledge as a bare fact that someone has asserted (by making a claim) a cause of action against him,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

without acknowledging any liability. Simple acknowledgment of the "existence" of a cause of action is insufficient to meet the requirements of s. 16(1)(a). Acknowledgment must involve acknowledgment of some liability.

46    Consequently, the letters from the adjuster to Ryan's counsel (i.e., letters of November 18, 1998 and January 25, 1999) do not restart the clock as they do not constitute an admission of liability on the part of Cabot Insurance. These were obviously only requests for information and part of the normal investigation process. As submitted by the appellants, if mere investigation of claims were to constitute confirmation, then potential defendants, in order to protect limitation defence, would have no choice but to refuse to investigate until a statement of claim is issued. This would destroy the possibility of early settlements and lead to increased litigation and costs.

47    The same conclusion applies to the second way that confirmation can occur, through payment. Of importance is the fact that both payments mentioned by Ryan, payments for Ryan's medical chart and Dr. Landells' medical report, were not evidence of liability by Cabot Insurance; nor did they indemnify Ryan, at least in part, for damages caused by the accident. Thus, they cannot be payments in respect of the "cause of action". Ryan relies on the Newfoundland and Labrador Court of Appeal decision in *Wheaton v. Palmer* (2001), 205 Nfld. & P.E.I.R. 304 (Nfld. C.A.), for the proposition that a payment made to a physician, but sent to the plaintiff's solicitor will constitute confirmation. With respect, I am of the view that the Court of Appeal erred in this determination. I prefer the contrary position of the British Columbia Court of Appeal in *MacKay v. Lemley* (1997), 44 B.C.L.R. (3d) 382 (B.C. C.A.), at para. 21. Payment for a medical report with a cheque payable to a physician, but sent to the plaintiff's solicitor, does not constitute confirmation of the plaintiff's cause of action:

> The mere fact that the payment, although made payable to the doctor, was directed through the lawyer's office for forwarding does not, in my view, bring the payment into the express wording of the section. The payment here, as in *Germyn*, was intended to pay to the doctor. The doctor was not a person through whom the appellant could claim. This was not a reimbursement to anyone for having paid for the medical report but a direct payment to the doctor by [the Insurance Corporation of British Columbia].

48    The purpose for which these types of payments and correspondence are made is critical. In this case, they were not intended as admissions of liability, but only to promote investigation and early resolution of certain aspects of the claim.

*C. Estoppel*

49    Moore's estate and Cabot Insurance submit that the majority of the Court of Appeal erred when it concluded that they were estopped from relying on the fact of Moore's death and the granting of letters of administration, thus preventing them from arguing that Ryan's action was outside the *Survival of Actions Act* limitation period. They claim that neither estoppel by convention nor estoppel by representation applies to the facts of the present case. Ryan argues that the appellants are precluded or estopped from relying on the limitation period in the *Survival of Actions Act* because of the application of either of these two types of estoppel.

50    While the principle of estoppel is often referred to in connection with cases of waiver, election, abandonment, acquiescence and laches, in the context of commercial and contractual relationships, the case law in Canada on this subject is not as abundant as that in the United Kingdom. It is therefore useful for this Court to address the issue in some detail, especially where it has long been accepted that estoppels are to be received with caution and applied with care (see *Harper v. Cameron* (1893), 2 B.C.R. 365 (B.C. C.A.), at p. 383).

51    The state of the law of estoppel was articulated by Lord Denning in *Amalgamated Investment & Property Co. (In Liquidation) v. Texas Commerce International Bank Ltd.* (1981), [1982] Q.B. 84 (Eng. C.A.), at p. 122, as follows:

> The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 123 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption — either of fact or of law — whether due to misrepresentation or mistake makes no difference — on which they have conducted the dealings between them — neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

52      The jurisprudence discloses six types of estoppel: estoppel by representation of fact, proprietary estoppel, promissory estoppel, estoppel by convention, estoppel by deed and estoppel by negligence (see Bower, at pp. 3-9). I will examine here the ones at the centre of this dispute, estoppel by convention and estoppel by representation.

*(1) Estoppel by Convention*

**(a) Definition and Principles**

53      The origin of the doctrine of estoppel by convention can be traced to estoppel by deed for which sealing and delivery were essential, and for which the foundation of duty lay not in the agreement itself, or any reliance thereon, but in the formal solemnity of the deed, reflecting the concern of ancient jurisprudence with form as opposed to substance. The modern rule has evolved enormously (see Bower, at pp. 179-80; T. B. Dawson, "Estoppel and obligation: the modern role of estoppel by convention" (1989), 9 *L.S.* 16)

54      Spencer Bower defines the modern concept of estoppel by convention as follows (p. 180):

An estoppel by convention, it is submitted, is an estoppel by representation of fact, a promissory estoppel or a proprietary estoppel, in which the relevant proposition is established, not by representation or promise by one party to another, but by mutual, express or implicit, assent. This form of estoppel is founded, not on a representation made by a representor and believed by a representee, but on an agreed statement of facts or law, the truth of which has been assumed, by convention of the parties, as a basis of their relationship. When the parties have so acted in their relationship upon the agreed assumption that the given state of facts or law is to be accepted between them as true, that it would be unfair on one for the other to resile from the agreed assumption, then he will be entitled to relief against the other according to whether the estoppel is as to a matter of fact, or promissory, and/or proprietary.

55      S. Wilken, *Wilken and Villiers: The Law of Waiver, Variation and Estoppel* (2nd ed. 2002), at p. 223, affirms that estoppel by convention will occur where:

(i) the parties have established, by their construction of their agreement or a common apprehension as to its legal effect, a convention basis;

(ii) on that basis the parties have regulated their subsequent dealings;

(iii) one party would suffer detriment if the other were to be permitted to resile from that convention.

See also *Chitty on Contracts* (29th ed. 2004), vol. 1, at p. 283.

56      The Court of Appeal of Newfoundland and Labrador, after a review of the case law in the United Kingdom and in Canada, formulated the following four elements which need to be proven (para. 79):

(i) The evidence establishes an assumption in common between the parties as to a state of facts;

(ii) The parties have adopted the common assumption as the conventional basis for a transaction into which they have entered;

(iii) The dispute in respect of which the estoppel by convention is asserted arises out of that transaction; and,

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 124 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

(iv) A detriment would flow to the party asserting the estoppel if the other party is permitted to resile from the assumed stated facts.

These requirements were accepted by the respondent.

57      The appellants submit that there are six requirements for the estoppel by convention. They cite as support the New Zealand Court of Appeal decision in *National Westminster Finance NZ Ltd. v. National Bank of NZ Ltd.*, [1996] 1 N.Z.L.R. 548 (New Zealand C.A.), at p. 550. In fact, they simply advocate a more detailed description of the requirements also found in other foreign cases.

58      The jurisprudence in the United Kingdom is indeed abundant in contrast to that in Canada (see, e.g., *India v. India Steamship Co. Ltd.*, [1998] 1 Lloyd's Rep. 1 (U.K. H.L.), at p. 10; *K. Lokumal & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.*, [1985] 2 Lloyd's Rep. 28 (Eng. C.A.), at pp. 34-35; *Norwegian American Cruises A/S v. Paul Mundy Ltd.*, [1988] 2 Lloyd's Rep. 343 (Eng. C.A.), at pp. 349-53).

59      This Court is not bound by any of the above analytical frameworks. After having reviewed the jurisprudence in the United Kingdom and Canada as well as academic comments on the subject, I am of the view that the following criteria form the basis of the doctrine of estoppel by convention:

1) The parties' dealings must have been based on a shared assumption of fact or law: estoppel requires manifest representation by statement or conduct creating a mutual assumption. Nevertheless, estoppel can arise out of silence (impliedly).

2) A party must have conducted itself, i.e. acted, in reliance on such shared assumption, its actions resulting in a change of its legal position.

3) It must also be unjust or unfair to allow one of the parties to resile or depart from the common assumption. The party seeking to establish estoppel therefore has to prove that detriment will be suffered if the other party is allowed to resile from the assumption since there has been a change from the presumed position.

See Wilken, at pp. 227-28; *Canacemal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (B.C. S.C.), at para. 35; *Capro Investments Ltd. v. Tartan Development Corp.*, [1998] O.J. No. 1763 (Ont. Gen. Div.), at para. 31.

**(b) Application of the Law**

60      The majority of the Court of Appeal held that estoppel by convention applied in the circumstances of this case. It concluded that there was an assumption between the parties as to a state of facts, namely: that Moore was alive; that the parties adopted this assumption as the basis upon which their transactions relating to Ryan's claim were to be conducted; that the dispute in respect of which the estoppel was asserted arose out of the transactions between the parties in dealing with Ryan's claim; and that detriment would flow to Ryan if Moore's estate or the insurer were permitted to resile from the common assumption. As will be evidenced from the analysis below, I cannot agree with this conclusion.

*(i) Assumption Shared and Communicated*

61      The crucial requirement for estoppel by convention, which distinguishes it from the other types of estoppel, is that at the material time both parties must be of "a like mind" (*Troop v. Gibson*, [1986] 1 E.G.L.R. 1 (Eng. C.A.), at p. 5; *London Borough of Hillingdon v. Arc Ltd.*, [2000] E.W.J. No. 3278 (Eng. C.A.), at para. 49). The court must determine what state of affairs the parties have accepted, and decide whether there is sufficient certainty and clarity in the terms of the convention to give rise to any enforceable equity: *Troop*, at p. 6; see also *Baird Textile Holdings Ltd v. Marks & Spencer Plc*, [2002] 1 All E.R. (Comm) 737 (Eng. C.A.), at para. 84.

Case 09-10138-MFW   Doc 14394-2   Filed 09/10/14   Page 125 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

62    While it may not be necessary that the assumption by the party raising estoppel be created or encouraged by the estopped party, it must be shared in the sense that each is aware of the assumption of the other (*John v. George*, [1995] E.W.J. No. 4375 (Eng. C.A.), at para. 37). Mutual assent is what distinguishes the estoppel by convention from other types of estoppel (Bower, at p. 184). The courts have described communications complying with this requirement as "crossing the line". In *K. Lokumal & Sons (London) Ltd.*, at pp. 34-35, Kerr L.J. held that

> [a]ll estoppels must involve some statement or conduct by the party alleged to be estopped on which the alleged representee was entitled to rely and did rely. In this sense all estoppels may be regarded as requiring some manifest representation which crosses the line between representor and representee, either by statement or conduct. It may be an express statement or it may be implied from conduct, e.g. a failure by the alleged representor to react to something said or done by the alleged representee so as to imply a manifestation of assent which leads to an estoppel by silence or acquiescence. Similarly, in cases of so-called estoppels by convention, there must be some mutually manifest conduct by the parties which is based on a common but mistaken assumption....

> There cannot be any estoppel unless the alleged representor has said or done something, or failed to do something, with the result that — across the line between the parties — his action or inaction has produced some belief or expectation in the mind of the alleged representee, so that, depending on the circumstances, it would thereafter no longer be right to allow the alleged representor to resile by challenging the belief or expectation which he has engendered. To that extent at least, therefore, the alleged representor must be open to criticism. [Emphasis added.]

See also *Norwegian American Cruises A/S*, at p. 350. Thus, it is not enough that each of the two parties acts on an assumption not communicated to the other (*India*, at p. 10). Further, the estopped party must have, at the very least, communicated to the other that he or she is indeed sharing the other party's (ex *hypothesi*) mistaken assumption (*John*, at para. 81; Bower at p. 184).

63    In the present case, the record discloses fourteen letters exchanged by Ryan's counsel and the adjuster with respect to the respondent's personal injury claim (A.R., Vol. II, at pp. 150-70). However, none of these prove the existence of a common assumption. The letters lack clarity and certainty. The mere fact that communications occurred between the parties does not establish that they both assumed that Moore was alive. It is unlikely the question of whether Moore was alive or dead crossed the minds of either the appellants or the respondent. The fact that Ryan's counsel had originally diarized the claim as having a two-year limitation period under the *Limitations Act* shows that he had not turned his mind to the possibility of a shorter limitation period under the *Survival of Actions Act*. Effectively, this Court is in the presence of mutual ignorance, not mutual assumption.

64    Ryan submits, and it was agreed by the Court of Appeal, that the subject line in the letters exchanged between his counsel and the adjuster which read "Your Insured: Rex Moore" or "Our Insured: Rex Moore" is self-explanatory and indicates an assumption by both parties, that Moore was alive. I strongly disagree. This is an unrealistic interpretation of the subject line in the letters. Such an expression can mean one thing only: the named insured under the automobile insurance policy was Rex Moore. The words are a mere identification of the file the undersigned is dealing with. The Court of Appeal erred by giving weight to the subject line of these letters, which, properly interpreted, provide no evidence of a mutual assumption that Moore was alive.

65    Nor did the fact that the parties were conferring without regard to the limitation period establish a shared assumption that the limitation defence would not be relied on. The letters contain limited and simple requests for details of the claim, and do not establish a convention between the parties (see *Hillingdon London Borough*, at paras. 57 and 60; *Seechurn v. Ace Insurance SA NV*, [2002] 2 Lloyd's Rep. 390 (Eng. C.A.), at p. 396). In fact, the matter did not proceed beyond the preliminary stage of investigating the merits of the personal injury claim. There were no negotiations or settlement discussions, no admission of liability, and no agreement to forego a possible limitation defence.

66    Even if one could conclude that there was a mutual assumption between the parties, I am of the view that it cannot realistically be asserted that the respondent communicated to the appellants that he indeed shared the mistaken assumption. In this regard, I agree with the dissenting members of the Court of Appeal when they affirm (at para. 108):

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

It is true that both parties assumed Mr. Moore was alive. That, as noted above, is not sufficient to establish estoppel by convention. Prior to Mr. Moore's death, any reference to him implying he was alive was a reflection of the truth at that time. That cannot be said to be a communication which becomes the basis of a convention that they will proceed on the assumption that Mr. Moore is alive, even beyond his death. There is no direct or circumstantial evidence which would lead to such a conclusion. The question becomes: could any agreement have arisen after Mr. Moore's death? The two letters written by the adjuster after Mr. Moore's death were in error when they said "Our insured — Rex Moore" but there is no communication to the other party and acceptance that they are to govern their future conduct on that basis.

### (ii) Detrimental Reliance

67    The appellants submit that detrimental reliance is a requirement that must be proven in order to find convention estoppel. I agree. The Court of Appeal erred in finding this condition fulfilled by simple proof that a detriment would flow to the party asserting the estoppel if the other party were permitted to resile from the assumed stated facts, without a finding of reliance.

68    The jurisprudence and academic comments support the requirement of detrimental reliance as lying at the heart of true estoppel (see Bower, at pp. 6 and 184; *John*, at para. 86; *Hillingdon London Borough; K. Lokumal & Sons (London) Ltd.*, at p. 35; *Litwin Construction (1973) Ltd. v. Kiss* (1988), 52 D.L.R. (4th) 459 (B.C. C.A.), at pp. 469-70; *Canacemal*, at paras. 33-35; *Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc.*, [2002] B.C.J. No. 1417, 2002 BCSC 934 (B.C. S.C.), at para. 74; 32262 *32262 B.C. Ltd. v. Companions Restaurant Inc.* (1995), 17 B.L.R. (2d) 227 (B.C. S.C.), at pp. 235-36.

69    Detrimental reliance encompasses two distinct, but interrelated, concepts: reliance and detriment. The former requires a finding that the party seeking to establish the estoppel changed his or her course of conduct by acting or abstaining from acting in reliance upon the assumption, thereby altering his or her legal position. If the first step is met, the second requires a finding that, should the other party be allowed to abandon the assumption, detriment will be suffered by the estoppel raiser because of the change from his or her assumed position (see Wilken, at p. 228; *Grundt v. Great Boulder Property Gold Mines Ltd.* (1937), 59 C.L.R. 641 (Australia H.C.), at p. 674).

70    Returning to the case at bar, even if one were to assume the existence of a communicated common assumption between the parties, there is no evidence that the respondent relied on this assumption. The evidence suggests that the respondent never put his mind to the shorter *Survival of Actions Act* limitation period. First, Ryan's counsel diarized the matter as a two-year limitation period. Second, the issue of estoppel by convention was raised for the first time by the Court of Appeal itself and was never discussed before the applications judge. Moreover, in the affidavit of Ryan's counsel, nowhere does he state that he believed the adjuster intended him to act or refrain from acting in reliance on any agreement (A.R., Vol. II, at pp. 137-46). From the date of the accident, November 27, 1997, to the expiry of the *Survival of Actions Act* limitation period, August 16, 1999, there was never any discussion by the respondent of the limitation period. On October 24, 2000, when Ryan's counsel indicated for the first time to Cabot Insurance's claim examiner that there might be a problem with the limitation period, he did not refer to a mutual understanding that Moore was to be treated as being alive for the purposes of Ryan's claim, nor did he raise the existence of an agreement.

71    It was not open to Ryan's counsel to refrain from bringing an action against Rex Gilbert Moore based solely on the limited communications between counsel. The letters relied upon were limited to the collection of medical information and documentation about Ryan's alleged injuries — nothing more. I have already spoken about the subject line; one cannot disregard the fact that all negotiations/communications were also done on a "without prejudice" basis.

72    Consequently, I agree with the dissenting members of the Court of Appeal that the respondent not only did not rely on this alleged assumption, but his conduct does not show an intention to affect the legal relations between the parties. The record does not disclose that the respondent changed in any way his position on the basis of this alleged mutual assumption.

### (iii) Detriment

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 127 of 554

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

73     Once the party seeking to establish estoppel shows that he acted on a shared assumption, he must prove detriment. For the plea to succeed, it must be unjust or unfair to allow a party to resile from the common assumption (Wilken, at p. 228). It is often said that the fact that there will have been a change from the presumed legal position will facilitate the establishment of detriment: "This is because there is an element of injustice inherent within the concept of the shared assumption — one party has acted unjustly in allowing the belief or expectation to 'cross the line' and arise in the other's mind": Wilken, at p. 228.

74     This final requirement of estoppel has been described as proving that it would be "unjust", "unconscionable" or "unfair" to permit a party to resile from the mutual assumption (see, e.g., Bower, at p. 181; *John; India; Norwegian American Cruises A/S*). However, it may be preferable to refrain from using "unconscionable", in order to avoid confusion with this last concept which has developed a special meaning in relation to inequality of bargaining power in the law of contracts (where we speak of unconscionable transactions, for instance) (see *Litwin Construction*, at p. 468).

75     In the case at bar, given that there was no shared assumption or reliance, the detriment criterion does not need to be addressed. I would note, however, that a detriment is not established by a reduced limitation period, as suggested by the respondent. Limitation periods and prescriptions, in the diverse areas of the law, have the similar effect and impact. The *Survival of Actions Act* has provided a benefit not available at common law; this benefit cannot legitimately be characterized as unfair and unjust.

*(2) Estoppel by Representation*

76     Where there is no shared assumption, as in the present case, there can be no estoppel by convention, no matter how unjust the other party's conduct may appear to be. However, in some circumstances, the party seeking to establish estoppel may be able to rely on estoppel by representation, an alternative here advocated by the respondent. The added difficulty in such a case is that an estoppel by representation cannot arise from silence unless a party is under a duty to speak. Silence or inaction will be considered a representation if a legal duty is owed by the representor to the representee to make a disclosure, or take steps, the omission of which is relied upon as creating an estoppel: see Wilken, at p. 227; Bower, at pp. 46-47.

77     Ryan submits that in the present case silence constituted a representation grounding estoppel because there was a duty to disclose relevant information as it would be unfair for the appellants to benefit from non-disclosure. I disagree. In the present case, there was no duty on the appellants, who were at the time only potential defendants, to advise Ryan of a limitation period, to assist him in the prosecution of the claim, or to advise him of the consequences of the death of one of the parties. There is no fiduciary or contractual relationship here (contrast with *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 (S.C.C.)). The appellants had no duty to exercise reasonable care, nor to divulge any information.

78     Hence, there was no representation, no duty to speak, no intention to affect legal relations and no reliance in this case.

## III. Conclusion

79     The legislature created an exception to the common law rule by enacting the *Survival of Actions Act*. It extended the rights of the parties to permit them to continue an action against a deceased. The relevant provision modifies the common law. It is not this Court's role to interfere with the scheme established by the legislature.

80     There are no reasons based on estoppel, or any other legal doctrine, to preclude Moore's estate or Cabot Insurance from relying on the *Survival of Actions Act* limitation period. Accordingly, I would allow the appeal on the issue of estoppel, affirm the decision of the Court of Appeal on the other issues, and strike the statement of claim, with costs throughout, at all levels of court.

*Appeal allowed.*

*Pourvoi accueilli.*

**Appendix A**

*Limitations Act*, S.N.L. 1995, c. L-16.1

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 128 of 554

Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

**[Limitation period 2 years]**

**5.** Following the expiration of 2 years after the date on which the right to do so arose, a person shall not bring an action

> (a) for damages in respect of injury to a person or property, including economic loss arising from the injury whether based on contract, tort or statutory duty;

> . . . . .

**[Confirmation]**

**16.** (1) A confirmation of a cause of action occurs where a person

> (a) acknowledges that cause of action, right or title of another person; or

> (b) makes a payment in respect of that cause of action, right or title of another.

(2) Where a person against whom an action lies confirms that cause of action, the time before the date of that confirmation shall not count when determining the limitation period for a person having the benefit of the confirmation against the person bound by that confirmation.

(3) Subsection (2) applies only to a right of action where the confirmation is given before the expiration of the limitation period for that right of action.

> . . . . .

(5) In order to be effective a confirmation must be in writing and signed by

> (a) the person against whom that cause of action lies; or

> (b) his or her agent

and given to the person or agent of the person having the benefit of that cause of action.

*Survival of Actions Act*, R.S.N.L. 1990, c. S-32

**[Causes of action to survive]**

**2.** Actions and causes of action

> (a) vested in a person who has died; or

> (b) existing against a person who has died,

shall survive for the benefit of or against his or her estate.

**[Limitation of action]**

**5.** An action shall not be brought under this Act unless proceedings are started within 6 months after letters of probate or administration of the estate of the deceased have been granted and proceedings shall not be started in an action under this Act after the expiration of 1 year after the date of death of the deceased.

Footnotes

\*     Corrigenda issued by the court on September 9, 2005 and September 27, 2005 respectively have been incorporated herein.

**Ryan v. Moore, 2005 SCC 38, 2005 CarswellNfld 157**

2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, [2005] 2 S.C.R. 53...

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Sable Offshore Energy Inc. v. Ameron International Corp., 2013 SCC 37, 2013...

2013 SCC 37, 2013 CarswellNS 428, 2013 CarswellNS 429, [2013] 2 S.C.R. 623...

2013 SCC 37
Supreme Court of Canada

Sable Offshore Energy Inc. v. Ameron International Corp.

2013 CarswellNS 428, 2013 CarswellNS 429, 2013 SCC 37, [2013] 2 S.C.R. 623, [2013] S.C.J. No. 37, 1052 A.P.R. 1, 228 A.C.W.S. (3d) 78, 22 C.L.R. (4th) 1, 332 N.B.R. (2d) 1, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 446 N.R. 35, J.E. 2013-1134

# Sable Offshore Energy Inc., as agent for and on behalf of the Working Interest Owners of the Sable Offshore Energy Project, ExxonMobil Canada Properties, Shell Canada Limited, Imperial Oil Resources, Mosbacher Operating Ltd., Pengrowth Corporation, ExxonMobil Canada Properties, as operator of the Sable Offshore Energy Project, Appellants and Ameron International Corporation, Ameron B.V., Allcolour Paint Limited, Amercoat Canada, Rubyco Ltd., Danroh Inc. and Serious Business Inc., Respondents

McLachlin C.J.C., LeBel, Abella, Cromwell, Moldaver, Karakatsanis, Wagner JJ.

Heard: March 25, 2013
Judgment: June 21, 2013
Docket: 34678

Proceedings: reversing *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129, 2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C. (7th) 1 (N.S. C.A.); reversing *Sable Offshore Energy Inc. v. Ameron International Corp.* (2010), 299 N.S.R. (2d) 216, 947 A.P.R. 216, 2010 CarswellNS 907, 2010 NSSC 473 (N.S. S.C.)

Counsel: Robert Belliveau, Q.C., Kevin Gibson, for Appellants
John P. Merrick, Q.C., Darlene Jamieson, Q.C., for Respondents, Ameron International Corporation and Ameron B.V.
Terrence L.S. Teed, Q.C., Ronald J. Savoy, for Respondents, Allcolour Paint Limited, Amercoat Canada, Rubyco Ltd., Danroh Inc. and Serious Business Inc.

Subject: Civil Practice and Procedure; Evidence

## Headnote

### Civil practice and procedure --- Disposition without trial — Settlement — Miscellaneous

Privilege with respect to amount of settlement — Plaintiffs were involved in litigation with multiple defendants — Plaintiffs reached settlement with some defendants ("settling defendants") — Plaintiffs and settling defendants executed Pierringer agreement — Remaining defendants brought unsuccessful application for disclosure of quantum of settlement under R. 20 of Civil Procedure Rules (1972) — Chambers judge held quantum met relevancy threshold for disclosure under R. 20, but not until after trial — Chambers judge held disadvantage to remaining defendants of not knowing quantum did not outweigh benefit of encouraging settlement in future multi-party litigation — Chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings — Non-settling defendants successfully appealed timing of disclosure of settlement amount — Plaintiffs appealed — Appeal allowed — It was not clear how knowledge of settlement amounts materially affected

Sable Offshore Energy Inc. v. Ameron International Corp., 2013 SCC 37, 2013...

2013 SCC 37, 2013 CarswellNS 428, 2013 CarswellNS 429, [2013] 2 S.C.R. 623...

ability of non-settling defendants to know and present case — Defendants remained fully aware of claims they must defend themselves against and of overall amount that plaintiffs was seeking — It was true that knowing settlement amounts might allow defendants to revise estimate of how much they want to invest in case, but this did not rise to sufficient level of importance to displace public interest in promoting settlements.

### Evidence --- Documentary evidence — Privilege as to documents — Miscellaneous

Privilege with respect to amount of settlement — Plaintiffs were involved in litigation with multiple defendants — Plaintiffs reached settlement with some defendants ("settling defendants") — Plaintiffs and settling defendants executed Pierringer agreement — Remaining defendants brought unsuccessful application for disclosure of quantum of settlement under R. 20 of Civil Procedure Rules (1972) — Chambers judge held quantum met relevancy threshold for disclosure under R. 20, but not until after trial — Chambers judge held disadvantage to remaining defendants of not knowing quantum did not outweigh benefit of encouraging settlement in future multi-party litigation — Chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings — Non-settling defendants successfully appealed timing of disclosure of settlement amount — Plaintiffs appealed — Appeal allowed — It was not clear how knowledge of settlement amounts materially affected ability of non-settling defendants to know and present case — Defendants remained fully aware of claims they must defend themselves against and of overall amount that plaintiffs was seeking — It was true that knowing settlement amounts might allow defendants to revise estimate of how much they want to invest in case, but this did not rise to sufficient level of importance to displace public interest in promoting settlements.

### Procédure civile --- Jugement rendu sans procès — Règlement — Divers

Secret concernant le montant d'une transaction — Demandeurs étaient engagés dans un litige avec de nombreuses défenderesses — Demandeurs ont conclu une transaction avec certaines d'entre elles (les « défenderesses parties à la transaction ») — Demandeurs et les défenderesses parties à la transaction ont exécuté des ententes de type Pierringer — Autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès — Juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès — Juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties — Juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais — Défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès — Demandeurs ont formé un pourvoi — Pourvoi accueilli — Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des défenderesses non parties à la transaction à connaître et à présenter leurs arguments — Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les demandeurs — Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

### Preuve --- Preuve documentaire — Confidentialité en ce qui concerne les documents — Divers

Secret concernant le montant d'une transaction — Demandeurs étaient engagés dans un litige avec de nombreuses défenderesses — Demandeurs ont conclu une transaction avec certaines d'entre elles (les « défenderesses parties à la transaction ») — Demandeurs et les défenderesses parties à la transaction ont exécuté des ententes de type Pierringer — Autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès — Juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès — Juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties — Juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais — Défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès — Demandeurs ont formé un pourvoi — Pourvoi accueilli — Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des défenderesses non parties à la transaction à

Sable Offshore Energy Inc. v. Ameron International Corp., 2013 SCC 37, 2013...

2013 SCC 37, 2013 CarswellNS 428, 2013 CarswellNS 429, [2013] 2 S.C.R. 623...

connaître et à présenter leurs arguments — Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les demandeurs — Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

The plaintiffs were involved in litigation with multiple defendants. The plaintiffs reached settlement with some defendants. The remaining defendants brought an unsuccessful application for disclosure of the quantum of settlement under R. 20 of Civil Procedure Rules (1972).

The chambers judge held that the quantum met the relevancy threshold for disclosure under R. 20, but not until after the trial. The chambers judge held that the disadvantage to the remaining defendants of not knowing quantum did not outweigh the benefit of encouraging settlement in future multi-party litigation. The chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings.

The non-settling defendants successfully appealed the timing of disclosure of the settlement amount.

The plaintiffs appealed.

**Held:** The appeal was allowed.

Per Abella J. (McLachlin C.J.C., LeBel, Cromwell, Moldaver, Karakatsanis, Wagner JJ. concurring): It was not clear how knowledge of the settlement amounts materially affected the ability of the non-settling defendants to know and present their case. The defendants remained fully aware of the claims they must defend themselves against and of the overall amount that the plaintiffs were seeking.

It was true that knowing the settlement amounts might allow the defendants to revise their estimate of how much they wanted to invest in the case, but this did not rise to a sufficient level of importance to displace the public interest in promoting settlements.

Les demandeurs étaient engagés dans un litige avec de nombreuses défenderesses. Les demandeurs ont conclu une transaction avec certaines d'entre elles. Les autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès.

Le juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès. Le juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties. Le juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais.

Les défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès.

Les demandeurs ont formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli.

Abella, J. (McLachlin, J.C.C., LeBel, Cromwell, Moldaver, Karakatsanis, Wagner, JJ., souscrivant à son opinion) : Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des

Sable Offshore Energy Inc. v. Ameron International Corp., 2013 SCC 37, 2013...

2013 SCC 37, 2013 CarswellNS 428, 2013 CarswellNS 429, [2013] 2 S.C.R. 623...

défenderesses non parties à la transaction à connaître et à présenter leurs arguments. Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les demandeurs.

Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

**Table of Authorities**

**Cases considered by *Abella J.*:**

*Amoco Canada Petroleum Co. v. Propak Systems Ltd.* (2001), [2001] 6 W.W.R. 628, 2001 CarswellAlta 575, 2001 ABCA 110, 281 A.R. 185, 248 W.A.C. 185, 4 C.P.C. (5th) 20, 200 D.L.R. (4th) 667, 91 Alta. L.R. (3d) 13 (Alta. C.A.) — referred to

*Bioriginal Food & Science Corp. v. Gerspacher* (2012), 2012 SKQB 469, 2012 CarswellSask 823 (Sask. Q.B.) — considered

*Brown v. Cape Breton (Regional Municipality)* (2011), 2011 NSCA 32, 2011 CarswellNS 186, 331 D.L.R. (4th) 307, 955 A.P.R. 84, 302 N.S.R. (2d) 84 (N.S. C.A.) — followed

*Cutts v. Head* (1984), [1984] 1 All E.R. 597, [1984] 2 W.L.R. 349, [1984] Ch. 290 (Eng. C.A.) — considered

*Dos Santos (Committee of) v. Sun Life Assurance Co. of Canada* (2005), 249 D.L.R. (4th) 416, 40 B.C.L.R. (4th) 245, [2005] 7 W.W.R. 1, *(sub nom. Dos Santos Estate v. Sun Life Assurance Co. of Canada)* 207 B.C.A.C. 54, *(sub nom. Dos Santos Estate v. Sun Life Assurance Co. of Canada)* 341 W.A.C. 54, 2005 BCCA 4, 2005 CarswellBC 5, 17 C.C.L.I. (4th) 180, 5 C.P.C. (6th) 278 (B.C. C.A.) — referred to

*Hudson Bay Mining & Smelting Co. v. Fluor Daniel Wright* (1997), 12 C.P.C. (4th) 94, 1997 CarswellMan 388, *(sub nom. Hudson Bay Mining & Smelting Co. v. Wright)* 120 Man. R. (2d) 214, [1997] 10 W.W.R. 622 (Man. Q.B.) — referred to

*Loewen, Ondaatje, McCutcheon & Co. c. Sparling* (1992), *(sub nom. Kelvin Energy Ltd. v. Lee)* 97 D.L.R. (4th) 616, *(sub nom. Kelvin Energy Ltd. v. Lee)* [1992] 3 S.C.R. 235, *(sub nom. Kelvin Energy Ltd. v. Lee)* 51 Q.A.C. 49, 143 N.R. 191, 1992 CarswellQue 126, 1992 CarswellQue 126F (S.C.C.) — considered

*Middelkamp v. Fraser Valley Real Estate Board* (1992), 1992 CarswellBC 267, 71 B.C.L.R. (2d) 276, 10 C.P.C. (3d) 109, 96 D.L.R. (4th) 227, 17 B.C.A.C. 134, 29 W.A.C. 134, 45 C.P.R. (3d) 213 (B.C. C.A.) — considered

*Pierringer v. Hoger* (1963), 124 N.W.2d 106, 21 Wis. 2d 182 (U.S. Wis. S.C.) — considered

*Rush & Tompkins Ltd. v. Greater London Council* (1988), [1988] 3 All E.R. 737, 104 N.R. 392, [1989] A.C. 1280, [1988] 3 W.L.R. 939 (U.K. H.L.) — considered

*Sparling v. Southam Inc.* (1988), 66 O.R. (2d) 225, 1988 CarswellOnt 121, 41 B.L.R. 22 (Ont. H.C.) — considered

*Underwood v. Cox* (1912), 26 O.L.R. 303, 4 D.L.R. 66, 21 O.W.R. 757, 1912 CarswellOnt 200 (Ont. Div. Ct.) — referred to

*Unilever Plc v. Procter & Gamble Co.* (1999), [2000] 1 W.L.R. 2436, [2001] 1 All E.R. 783 (Eng. C.A.) — referred to

**Statutes considered:**

*Competition Act*, R.S.C. 1985, c. C-34
        Generally — referred to

**Rules considered:**

*Civil Procedure Rules (1972)*, N.S. Civ. Pro. Rules
        R. 20.02 — considered

        R. 20.06 — considered

**Authorities considered:**

Bryant, Alan W., Sidney N. Lederman and Michelle K. Fuerst, *The Law of Evidence in Canada*, 3rd ed. (Markham, Ont.: LexisNexis, 2009)

Knapp, Peter B., "Keeping the *Pierringer* Promise: Fair Settlements and Fair Trials" (1994), 20 *Wm. Mitchell L. Rev.* 1

Vaver, David, "'Without Prejudice' Communications — Their Admissibility and Effect" (1974), 9 *U.B.C. L. Rev.* 85

APPEAL by plaintiffs from decision reported at *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129, 2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C. (7th) 1 (N.S. C.A.), which granted non-settling defendants' appeal of timing of disclosure of settlement amount.

POURVOI formé par les demandeurs à l'encontre d'une décision publiée à *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129, 2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C. (7th) 1 (N.S. C.A.), ayant accueilli l'appel des défenderesses non parties à une transaction à l'encontre du moment choisi pour la divulgation du montant de la transaction.

*Abella J.*:

1      The justice system is on a constant quest for ameliorative strategies that reduce litigation's stubbornly endemic delays, expense and stress. In this evolving mission to confront barriers to access to justice, some strategies for resolving disputes have proven to be more enduringly successful than others. Of these, few can claim the tradition of success rightfully attributed to settlements.

2      The purpose of settlement privilege is to promote settlement. The privilege wraps a protective veil around the efforts parties make to settle their disputes by ensuring that communications made in the course of these negotiations are inadmissible.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

3    Sable Offshore Energy Inc. sued a number of defendants. It settled with some of them. The remaining defendants want to know what amounts the parties settled for. The question before us is whether those negotiated amounts should be disclosed or whether they are protected by settlement privilege.

**Background**

4    Sable undertook the Sable Offshore Energy Project, whose purpose was the building of several offshore structures and onshore gas processing facilities in Nova Scotia. Ameron International Corporation and Ameron B.V. (Ameron) and Allcolour Paint Limited, Amercoat Canada, Rubyco Ltd., Danroh Inc. and Serious Business Inc. (collectively Amercoat) supplied Sable with paint for parts of the Sable structures. Sable brought three lawsuits alleging that the paint failed to prevent corrosion.

5    In the lawsuit that is the subject of this appeal, Sable sued Ameron, Amercoat, and 12 other contractors and applicators who were responsible for preparing surfaces and applying the paint coatings. The claims against Ameron and Amercoat were for negligence, negligent misrepresentation and breach of a collateral warranty. The claims against the other defendants were similar.

6    Sable entered into three Pierringer Agreements with some of the defendants. Named for the 1963 Wisconsin case of *Pierringer v. Hoger*, 124 N.W.2d 106 (U.S. Wis. S.C. 1963), a Pierringer Agreement allows one or more defendants in a multi-party proceeding to settle with the plaintiff and withdraw from the litigation, leaving the remaining defendants responsible only for the loss they actually caused. There is no joint liability with the settling defendants, but non-settling defendants may be jointly liable with each other.

7    As part of the terms of the Agreements, Sable agreed to amend its statement of claim against the non-settling defendants to pursue them only for their share of liability. In addition, all the relevant evidence in the possession of the settling defendants, would, in accordance with the Agreements, be given to the Plaintiffs and be discoverable by the non-settling defendants.

8    Ameron and Amercoat did not settle. All the terms of the Pierringer Agreements were disclosed to Ameron and Amercoat except the amounts agreed to.

9    These settlement agreements were approved by court order on April 27, 2010. On December 3, 2010, Ameron filed an application pursuant to Rules 20.02 and 20.06 of Nova Scotia's 1972 *Civil Procedure Rules* (which the parties previously agreed would govern the litigation) for disclosure of the settlement amounts paid under the Pierringer Agreements. Sable's position was that the amounts were subject to settlement privilege.

10    Hood J. dismissed the defendants' application for disclosure of the settlement amounts. She concluded that the public interest was best served by preserving settlement privilege and keeping the settlement amounts confidential. The Court of Appeal overturned that decision and ordered the amounts disclosed.

**Analysis**

11      Settlements allow parties to reach a mutually acceptable resolution to their dispute without prolonging the personal and public expense and time involved in litigation. The benefits of settlement were summarized by Callaghan A.C.J.H.C. in *Sparling v. Southam Inc.* (1988), 66 O.R. (2d) 225 (Ont. H.C.):

> [T]he courts consistently favour the settlement of lawsuits in general. To put it another way, there is an overriding public interest in favour of settlement. This policy promotes the interests of litigants generally by saving them the expense of trial of disputed issues, and it reduces the strain upon an already overburdened provincial Court system. [p. 230]

This observation was cited with approval in *Loewen, Ondaatje, McCutcheon & Co. c. Sparling,* [1992] 3 S.C.R. 235 (S.C.C.), at p. 259, where L'Heureux-Dubé J. acknowledged that promoting settlement was "sound judicial policy" that "contributes to the effective administration of justice".

12      Settlement privilege promotes settlements. As the weight of the jurisprudence confirms, it is a class privilege. As with other class privileges, while there is a *prima facie* presumption of inadmissibility, exceptions will be found "when the justice of the case requires it" (*Rush & Tompkins Ltd. v. Greater London Council,* [1988] 3 All E.R. 737 (U.K. H.L.), at p. 740).

13      Settlement negotiations have long been protected by the common law rule that "without prejudice" communications made in the course of such negotiations are inadmissible (see David Vaver, "'Without Prejudice' Communications — Their Admissibility and Effect" (1974), 9 *U.B.C. L. Rev.* 85, at p. 88). The settlement privilege created by the "without prejudice" rule was based on the understanding that parties will be more likely to settle if they have confidence from the outset that their negotiations will not be disclosed. As Oliver L.J. of the English Court of Appeal explained in *Cutts v. Head,* [1984] 1 All E.R. 597 (Eng. C.A.), at p. 605:

> [P]arties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations ... may be used to their prejudice in the course of the proceedings. They should, as it was expressed by Clauson J in *Scott Paper Co v. Drayton Paper Works Ltd* (1927) 44 RPC 151 at 157, be encouraged freely and frankly to put their cards on the table.

What is said during negotiations, in other words, will be more open, and therefore more fruitful, if the parties know that it cannot be subsequently disclosed.

14      *Rush & Tompkins* confirmed that settlement privilege extends beyond documents and communications expressly designated to be "without prejudice". In that case, a contractor settled its action against one defendant, the Greater London Council (the GLC), while maintaining it against the other defendant, the Carey contractors. The House of Lords considered whether communications made in the process of negotiating the settlement with the GLC should be admissible in the ongoing litigation with the Carey contractors. Lord Griffiths reached two conclusions of significance for this case. First, although the privilege is often referred to as the rule about "without prejudice" communications, those precise words are not required to invoke the privilege. What matters instead is the intent of the parties to settle the action (p. 739). Any negotiations undertaken with this purpose are inadmissible.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

15    Lord Griffiths' second relevant conclusion was that although most cases considering the "without prejudice" rule have dealt with the admissibility of communications once negotiations have failed, the rationale of promoting settlement is no less applicable if an agreement is actually reached. Lord Griffiths explained that a plaintiff in Rush & Tompkins' situation would be discouraged from settling with one defendant if any admissions it made during the course of its negotiations were admissible in its claim against the other:

> In such circumstances it would, I think, place a serious fetter on negotiations ... if they knew that everything that passed between them would ultimately have to be revealed to the one obdurate litigant. [p. 744]

16    *Middelkamp v. Fraser Valley Real Estate Board* (1992), 71 B.C.L.R. (2d) 276 (B.C. C.A.), subsequently endorsed the view that settlement privilege covers any settlement negotiations. The plaintiff James Middelkamp launched a civil suit against Fraser Valley Real Estate Board claiming that it had engaged in practices that were contrary to the *Competition Act*, R.S.C. 1985, c. C-34, and caused him to suffer damages. He also complained about the Board's conduct to the Director of Investigation and Research under different provisions of the *Act*, resulting in an investigation by the Director and criminal charges against the Board. The Board negotiated a settlement with the Department of Justice, leading to the criminal charges being resolved. Middelkamp sought disclosure of any communications made during the course of negotiations between the Board and the Department of Justice. McEachern C.J.B.C. refused to order disclosure of the communications on the basis of settlement privilege, explaining:

> ... the public interest in the settlement of disputes generally requires "without prejudice" documents or communications created for, or communicated in the course of, settlement negotiations to be privileged. I would classify this as a "blanket, *prima facie*, common law, or 'class'" privilege because it arises from settlement negotiations and protects the class of communications exchanged in the course of that worthwhile endeavour.

> In my judgment this privilege protects documents and communications created for such purposes both from production to other parties to the negotiations and to strangers, and extends as well to admissibility, *and whether or not a settlement is reached*. This is because, as I have said, a party communicating a proposal related to settlement, or responding to one, usually has no control over what the other side may do with such documents. Without such protection, the public interest in encouraging settlements will not be served. [Emphasis added; paras. 19-20.]

17    As McEachern C.J.B.C. pointed out, the protection is for settlement negotiations, whether or not a settlement is reached. That means that successful negotiations are entitled to no less protection than ones that yield no settlement. The reasoning in *Brown v. Cape Breton (Regional Municipality)*, 2011 NSCA 32, 302 N.S.R. (2d) 84 (N.S. C.A.), is instructive. A plaintiff brought separate claims against two defendants for unrelated injuries to the same knee. She settled with one defendant and the Court of Appeal had to consider whether the trial judge was right to order disclosure of the amount of the settlement to the remaining defendant. Bryson J.A. found that disclosure should not have been ordered since a principled approach to settlement privilege did not justify a distinction between settlement *negotiations* and what was ultimately negotiated:

> Some of the cases distinguish between extending privilege from negotiations to the concluded agreement itself.... *The distinction ... is arbitrary*. The reasons for protecting settlement communications from disclosure are not usually spent when a deal is made. *Typically parties no more wish to disclose to the world the terms of their agreement than their negotiations in achieving it*.

> [Emphasis added; para. 41.]

Notably, this is the view taken in Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst, *The Law Of Evidence in Canada* (3rd ed. 2009), where the authors conclude:

Sable Offshore Energy Inc. v. Ameron International Corp., 2013 SCC 37, 2013...

2013 SCC 37, 2013 CarswellNS 428, 2013 CarswellNS 429, [2013] 2 S.C.R. 623...

... the privilege applies not only to failed negotiations, but also to the *content of successful negotiations*, so long as the existence or interpretation of the agreement itself is not in issue in the subsequent proceedings and none of the exceptions are applicable.

[Emphasis added; para. 14. 341.]

18    Since the negotiated amount is a key component of the "content of successful negotiations", reflecting the admissions, offers, and compromises made in the course of negotiations, it too is protected by the privilege. I am aware that some earlier jurisprudence did not extend the privilege to the concluded agreement (see *Amoco Canada Petroleum Co. v. Propak Systems Ltd.*, 2001 ABCA 110, 281 A.R. 185 (Alta. C.A.), at para. 40, citing *Hudson Bay Mining & Smelting Co. v. Fluor Daniel Wright* (1997), 120 Man. R. (2d) 214 (Man. Q.B.)), but in my respectful view, it is better to adopt an approach that more robustly promotes settlement by including its content.

19    There are, inevitably, exceptions to the privilege. To come within those exceptions, a defendant must show that, on balance, "a competing public interest outweighs the public interest in encouraging settlement" (*Dos Santos (Committee of) v. Sun Life Assurance Co. of Canada*, 2005 BCCA 4, 207 B.C.A.C. 54 (B.C. C.A.), at para. 20). These countervailing interests have been found to include allegations of misrepresentation, fraud or undue influence (*Unilever Plc v. Procter & Gamble Co.* (1999), [2001] 1 All E.R. 783 (Eng. C.A.), *Underwood v. Cox* (1912), 26 O.L.R. 303 (Ont. Div. Ct.)), and preventing a plaintiff from being overcompensated (*Dos Santos*).

20    The non-settling defendants argue that there should be an exception to the privilege for the amounts of the settlements because they say they need this information to conduct their litigation. I see no tangible prejudice created by withholding the amounts of the settlements which can be said to outweigh the public interest in promoting settlements.

21    The particular settlements negotiated in this case are known as Pierringer Agreements. Pierringer Agreements were developed in the United States to address the obstacles to settlement that arose in multi-party litigation. Professor Peter B. Knapp summarized the value — and complexity — of trying to settle multi-party litigation as follows:

Settlement of complicated multi-defendant civil litigation is particularly valuable, because complicated civil trials can consume enormous amounts of a judge's time and can be expensive for the parties. However, settling multi-defendant civil litigation can be especially difficult. Different defendants have different tolerances for risk, and some defendants are simply far less willing to settle than others.

"Keeping the *Pierringer* Promise: Fair Settlements and Fair Trials" (1994), 20 *Wm. Mitchell L. Rev.* 1, at p. 5.

22    Professor Knapp also explained why, prior to Pierringer Agreements, settlements had been difficult to encourage:

On one hand, a plaintiff contemplating settlement with one of several defendants faced the possibility that release of the one defendant would also extinguish all claims against the nonsettling defendants. On the other hand, in jurisdictions which permitted contribution among joint tortfeasors, a settling defendant faced the possibility of post-settlement contribution claims made by the nonsettling defendants. [pp. 6-7]

23    In the United States, Pierringer Agreements were found to significantly attenuate the obstacles in the way of

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

negotiating settlements in multi-party litigation. Under a Pierringer Agreement, the plaintiff's claim was only "extinguished" against those defendants with whom it settled; the claims against the non-settling defendants continued. The settling defendants, meanwhile, were assured that they could not be subject to a contribution claim from the non-settling defendants, who would be accountable only for their own share of liability at trial.

24    Pierringer Agreements in Canada built on these American foundations and routinely included additional protections for non-settling defendants, such as requiring that non-settling defendants be given access to the settling defendants' evidence. In this case, for example, the court order approving the settlement required that the plaintiffs get production of all relevant evidence from the settling defendants and make this evidence available to the non-settling defendants on discovery. It also ordered that, with respect to factual matters, there be no restrictions on the non-settling defendants' access to experts retained by the settling defendants. In addition, the Agreements in this case specified that their non-financial terms would be disclosed to the court and non-settling defendants "to the extent required by the laws of the Province of Nova Scotia and the rulings and ethical guidelines promulgated by the Nova Scotia Barristers' Society" (A.R., at pp. 142 and 184).

25    The non-settling defendants have in fact received all the non-financial terms of the Pierringer Agreements. They have access to all the relevant documents and other evidence that was in the settling defendants' possession. They also have the assurance that they will not be held liable for more than their share of damages. Moreover, Sable agreed that at the end of the trial, once liability had been determined, it would disclose to the trial judge the amounts it settled for. As a result, should the non-settling defendants establish a right to set-off in this case, their liability for damages will be adjusted downwards if necessary to avoid overcompensating the plaintiff.

26    As for any concern that the non-settling defendants will be required to pay more than their share of damages, it is inherent in Pierringer Agreements that non-settling defendants can only be held liable for their share of the damages and are severally, and not jointly, liable with the settling defendants.

27    It is therefore not clear to me how knowledge of the settlement amounts materially affects the ability of the non-settling defendants to know and present their case. The defendants remain fully aware of the claims they must defend themselves against and of the overall amount that Sable is seeking. It is true that knowing the settlement amounts might allow the defendants to revise their estimate of how much they want to invest in the case, but this, it seems to me, does not rise to a sufficient level of importance to displace the public interest in promoting settlements.

28    The non-settling defendants also argued that refusing disclosure impedes their own possible settlement initiatives since they are more likely to settle if they know the settlement amounts already negotiated. Perhaps. But they may also, depending on the amounts, arguably come to see them as a disincentive. In any event, theirs is essentially a circular argument that the interest in *subsequent* settlement outweighs the public interest in encouraging the *initial* settlement. But the likelihood of an initial settlement decreases if the amount is disclosable.

29    Someone has to go first, and encouraging that first settlement in multiparty litigation is palpably worthy of more protection than the speculative assumption that others will only follow if they know the amount. The settling defendants, after all, were able to come to a negotiated amount without the benefit of a guiding settlement precedent. The non-settling defendants' position is no worse. As Smith J. noted in protecting the settlement amount from disclosure in *Bioriginal Food & Science Corp. v. Gerspacher*, 2012 SKQB 469 (Sask. Q.B.):

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

... imperfect knowledge is virtually always the case in settlement negotiations. There are always knowns and known unknowns ... [para. 33].

And Bryson J.A. compellingly summarized the competing arguments in *Brown* as follows:

Some courts have argued that it is necessary to go further and disclose the settlement amount itself.... They hold either that the agreement (unlike negotiations) is not privileged or that the settling parties have an advantage which should be redressed by disclosure. ... If indeed settling parties thereby enjoy an advantage over non-settling parties, it is one for which they have bargained. The court should hesitate to expropriate that advantage by ordering disclosure at the instance of non-settling parties, intransigent or otherwise. The argument that disclosure would facilitate settlement amongst the remaining parties ignores that, but for the privilege, the first settlement would often not occur. [Citations omitted; para. 67.]

30    A proper analysis of a claim for an exception to settlement privilege does not simply ask whether the non-settling defendants derive some tactical advantage from disclosure, but whether the reason for disclosure *outweighs* the policy in favour of promoting settlement. While protecting disclosure of settlement negotiations and their fruits has the demonstrable benefit of promoting settlement, there is little corresponding harm in denying disclosure of the settlement amounts in this case.

31    I would therefore allow the appeal with costs throughout.

*Appeal allowed.*

*Pourvoi accueilli.*

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



**SAFEWAY, INC., Plaintiff, v. SUGARLOAF PARTNERSHIP, LLC, Defendant; SUGARLOAF PARTNERSHIP, LLC, Plaintiff, v. SAFEWAY, INC., Defendant.**

**Case No. RWT 04cv3929, Case No. RWT 05cv679**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

*423 F. Supp. 2d 531*; *2006 U.S. Dist. LEXIS 13924*; *69 Fed. R. Evid. Serv. (Callaghan) 898*

**March 27, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** To resolve a dispute over whether defendant landlord's termination of plaintiff food retailer's lease was effective, each party filed suit against the other. Before the court were several motions, including the retailer's motion to consolidate the actions, the landlord's motion to remand its case to state court or in the alternative to abstain, the landlord's motion for partial summary judgment, and the retailer's motion to amend its complaint.

**OVERVIEW:** The landlord's motions to remand or abstain were denied because the landlord failed to comply with *Md. Code Ann., Real Prop. § 8-402.1(a)(2)(ii)* (neither it nor anyone else ever sent the retailer notice of the eviction proceeding by first-class mail, and notice of the landlord's termination of the lease was insufficient), and thus, the retailer did not have actual notice until February 15, 2005 and the notice of removal was timely. Further, even if Burford abstention were theoretically applicable, it would have been inappropriate because the case revolved around the interpretation of an ordinary commercial contract (a type of legal question that was the daily bread of a federal court sitting in diversity). The landlord's motion for partial summary judgment was denied because the retailer's claim for reformation of the lease (based on a typographical error) was not barred by laches. Finally, the retailer's motion to amend was granted because both amendments arose from new circumstances that had developed during litigation, and although the amendments arose late in the proceedings, neither was likely to require much, if any, additional discovery.

**OUTCOME:** The landlord's motions to remand or abstain were denied, the retailer's motion to consolidate was granted, the landlord's motion for partial summary judgment was denied, the landlord's motion to strike was granted, and the retailer's motion for leave to amend was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Removal > Proceedings > Time Limitations*
[HN1] See *28 U.S.C.S. § 1446(b)*.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > General Overview*
[HN2] See *Md. Code Ann., Real Prop. § 8-402.1(a)(2)*.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > General Overview*

423 F. Supp. 2d 531, *; 2006 U.S. Dist. LEXIS 13924, **;
69 Fed. R. Evid. Serv. (Callaghan) 898

[HN3] The presence of different or more expeditious procedures in state court is not a reason to deny the existence of federal diversity jurisdiction.

### *Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > Summary Eviction*

[HN4] Though summary, the Maryland action for breach of lease under *Md. Code Ann., Real Prop. § 8-402.1* is recognizably a civil action, brought in a court of limited but broad jurisdiction, for a judgment at law that a federal district court is equally competent to enter.

### *Civil Procedure > Jurisdiction > Diversity Jurisdiction > Amount in Controversy > Determinations*

[HN5] When the validity of a contract or a right to property is called into question in its entirety, the value of the property controls the amount in controversy.

### *Civil Procedure > Federal & State Interrelationships > Abstention*

[HN6] Federal courts have no more right to decline the exercise of a jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Although this "treason" is not absolute in "exceptional circumstances," abstention remains the exception rather than the rule.

### *Civil Procedure > Federal & State Interrelationships > Abstention*

[HN7] Federal courts have the power to dismiss or remand cases based on abstention principles-- in other words, practice Burford abstention--only where the relief being sought is equitable or otherwise discretionary. In an action for damages, a federal district court cannot abstain under Burford.

### *Civil Procedure > Pretrial Matters > Consolidation of Actions*

[HN8] Under *Fed. R. Civ. P. 42*, the court may order the actions consolidated if they involve a common question of law or fact. *Fed. R. Civ. P. 42(a).*

### *Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*

### *Evidence > Scientific Evidence > Daubert Standard*

[HN9] Laches, an equitable doctrine, will only apply when delay in bringing a claim is both inexusable and prejudicial to the opposing party.

### *Evidence > Scientific Evidence > Daubert Standard*

[HN10] *Fed. R. Evid. 702* provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a qualified expert may testify thereto. Thus, under this rule, an expert's report should be admitted only if it meets two criteria: (1) it will be helpful to the trier of fact, and (2) it concerns scientific, technical, or other specialized knowledge.

### *Evidence > Testimony > Experts > Admissibility*

[HN11] It is the responsibility-and the duty-of the court to state the meaning and applicability of the appropriate law, and -- when aided by the capable legal argumentation of counsel-it has ample legal expertise to do so. Evidence supplied by experts as to legal conclusions is not admissible, nor indeed evidence at all.

### *Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*

[HN12] *Fed. R. Civ. P. 15(a)* requires that leave to amend shall be freely given when justice so requires.

**COUNSEL:** [**1] For Safeway Inc., Plaintiff: Margaret Melissa Glassman, McGuire Woods LLP, McLean, VA.

For Sugarloaf Partnership, LLC, Defendant: Glenn Curtis Etelson, Michael J Lichtenstein, Shulman Rogers Gandal Pordy and Ecker PA, Rockville, MD.

**JUDGES:** ROGER W. TITUS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROGER W. TITUS

**OPINION**

[*533] **MEMORANDUM OPINION**

These two cases concern the same dispute between Sugarloaf Partnership, LLC, the landlord of a shopping plaza in Germantown, Maryland, and Safeway, Inc., a food retailer that at one time operated a supermarket in that shopping plaza. The dispute concerns the terms of

423 F. Supp. 2d 531, *533; 2006 U.S. Dist. LEXIS 13924, **1;
69 Fed. R. Evid. Serv. (Callaghan) 898

the lease for that supermarket. Safeway closed the supermarket on June 6, 2000, and notified Sugarloaf of the closure on January 10, 2001, but has maintained its lease and paid rent on the property since then. On October 12, 2004, Sugarloaf notified Safeway that it was exercising its claimed right to terminate the lease because Safeway had left the property vacant.

Safeway's position is that this notification was ineffective, because under the terms of the lease as Safeway reads it -- incorporating the Second Lease Modification Agreement, dated October 9, 1985 -- Sugarloaf had only [**2] thirty days from Safeway's store closure notification to terminate Safeway's lease. Sugarloaf's position is that it had no time limit, because the original lease does not provide for one, and the Second Lease Modification Agreement says that it modifies "the second sentence of Paragraph 30" of the lease, not Paragraph 13(c), the "Abandonment" provision that permits Sugarloaf to terminate the lease in response to a vacancy.

To resolve this dispute, each party filed suit against the other. Safeway filed a complaint in this Court (the "Safeway action," Civil Case No. 04-3929) on December 14, 2004, seeking reformation of the lease to make the amendment clear, a declaration that Sugarloaf did not and can not terminate the lease, and various monetary damages. Also on December 14, 2004, Sugarloaf filed a Complaint and Summons Against Tenant in Breach of Lease, seeking possession of the premises, in the District Court of Maryland for Montgomery County. Safeway ultimately removed this action (the "Sugarloaf action," Civil Case No. 05-679) to this Court.

The underlying merits of the dispute are not yet ripe for adjudication. Rather, now pending before the Court are several motions that were [**3] filed over the course of the spring, summer, and fall of 2005: Safeway's Motion to Consolidate [Case No. 04cv3929, Paper No. 14]; Sugarloaf's Motion to Remand and for Costs or in the Alternative to Abstain [Case No. 05cv679, Paper No. 18]; Sugarloaf's Motion for an Abstention and Remand Order [Case No. 04cv3929, Paper No. 20]; Sugarloaf's Motion for Partial Summary Judgment [Case No. 04cv3929, Paper No. 49]; Sugarloaf's [*534] Motion to Strike Safeway's Expert Report [Case No. 04cv3929, Paper No. 46]; and Safeway's Motion to Amend Complaint [Case No. 04cv3929, Paper No. 52]. A hearing on three of these motions was scheduled for October 31,

2005, see Case No. 04cv3929, Paper No. 33, but was cancelled after the Court was advised that a settlement in this case was likely and after it became clear that the motions were suitable for disposition on the papers pursuant to Local Rule 105.6, see Case No. 04cv3929, Paper No. 60.

The Court has withheld disposition of the motions in the continuing hope that a peaceful resolution of this case would be forthcoming. However, more than a year has passed since the first of these pending motions was filed, and more than five months have [**4] passed since the first suggestion that this case would imminently settle. It is therefore prudent to assume that this case will proceed further in litigation. Accordingly, the Court now rules on each motion, but with the hope that the parties can conclude their efforts at a mutually satisfactory resolution of these cases. Failing that, the business of justice will proceed without further delay.

### I. Sugarloaf's Motions to Remand or Abstain

In the Sugarloaf action, Sugarloaf has moved under *28 U.S.C. § 1447(c)* to remand the Sugarloaf action to Maryland District Court because, it argues, Safeway's notice of removal was untimely. In the alternative, it argues that this Court should remand the case or abstain from hearing it under *Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943)*, because this Court does not allow summary landlord-tenant eviction actions and because such cases are better tried in the specialized state courts that Maryland offers. Case No. 05cv679, Paper No. 18. In the Safeway action, Sugarloaf likewise moves to abstain under *Burford*, or in the alternative, to stay the Safeway action pending disposition of the Sugarloaf action [**5] in state court.

The Court declines to remand or abstain in either case on any of these grounds.

### A. The Timeliness of Safeway's Notice of Removal

In the Sugarloaf action, Sugarloaf filed a complaint in the Maryland District Court for Montgomery County on December 14, 2004. Case No. 05cv679, Paper No. 2. On December 20, 2004, the Montgomery County Sheriff's Department effected service by posting a copy of the complaint and summons at the premises, which had been vacant since 2000. Case No. 05cv679, Paper No. 8 (Opp. to Mot. to Revise, Vacate, and Stay) at 2. Trial was held on December 29, 2004, but Safeway did not answer

or otherwise appear -- apparently because it had not received any actual notice of the proceedings -- and consequently was found in default. *Id.* It appears to be undisputed that Safeway first received actual notice of the Sugarloaf action and the default on February 15, 2005, when Sugarloaf filed an answer in the Safeway action in this Court, and first received a copy of the complaint and summons when it obtained them from the District Court for Montgomery County on February 17, 2005. On March 9, 2005, the state court vacated the default on fairness grounds. [**6] *See* Case No. 05cv679, Paper No. 19 (Opp. to Motion to Remand) at 4, 6-8; Paper No. 18 (Mot. to Remand) at 5. Not until March 11, 2005, did Safeway file a notice of removal in the Sugarloaf action.

Under *28 U.S.C. § 1446(b)*, a [HN1] "notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon [*535] which such action or proceeding is based." Sugarloaf argues that this period began to run when the complaint and summons were posted on December 20, 2006, because the posting constituted "receipt . . . through service or otherwise." Sugarloaf's argument, however, requires a misreading of the service of process requirements imposed by the Maryland Code. Although Sugarloaf is correct that summary eviction proceedings in local District Court are not subject to the requirements normally imposed on civil actions, Sugarloaf failed to comply even with the minimal requirements Maryland law regarding eviction for breach of lease.

*Md. Code Ann., Real Property § 8-402.1(a)(2)* provides that [**7]

> [HN2] (i) If, for any reason, the tenant or person in actual possession cannot be found, the constable or sheriff shall affix an attested copy of the summons conspicuously on the property.

> (ii) After notice is sent to the tenant or person in possession by first-class mail, the affixing of the summons on the property shall be conclusively presumed to be a sufficient service to support restitution.

Sugarloaf failed to comply with *§ 8-402.1(a)(2)(ii)*:

neither it nor anyone else ever sent Safeway notice of the eviction proceeding by first-class mail. Notice of Sugarloaf's termination of the lease is insufficient; Safeway was entitled to notice, by first-class mail, *of the filing of the action.* The standard District Court "Complaint and Summons Against Tenant in Breach of Lease" recognizes this; it states that "IT IS ORDERED, that [the Sheriff] notify [] by first class mail and summon the above-named Defendant . . . [and] that if [the Sheriff is] unable to serve the Summons on the Defendant . . . [he is] to affix a copy of the Summons conspicuously upon the property." Case No. 05cv679, Paper No. 2. Moreover, although the state court did not explicitly hold [**8] that service was defective, it did so *sub silentio* when it vacated the default judgment and concluded that it would be unfair to treat Safeway as having been on constructive notice of the proceeding.

Because Safeway did not have actual notice until February 15, 2005, at the earliest, and because it did not have any other kind of notice "through service or otherwise," *see 28 U.S.C. § 1446(b)*, before that, the notice of removal that it filed on March 11, 2005, was timely.

### B. Original Jurisdiction and Burford Abstention

Sugarloaf also moves to remand because, it argues, under *Glen 6 Associates, Inc. v. Dedaj, 770 F. Supp. 225 (S.D.N.Y. 1991)*, this Court lacks original jurisdiction, and therefore removal jurisdiction, over a summary possession proceeding. In *Glen 6*, the court held that because "a summary process [in an eviction proceeding] and a plenary civil trial, shaped by the federal rules, are very different," and because "the summary process filed by plaintiff could not have been brought" in federal district court, the court lacks subject matter jurisdiction. *770 F. Supp. at 228.* Alternatively, Sugarloaf [**9] argues that this Court should abstain from deciding the Sugarloaf action under *Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943)*, which held that federal courts should decline jurisdiction "as a matter of sound equitable discretion" in certain circumstances wherein exercising their jurisdiction would interfere with the implementation of a complex regulatory scheme under state law.

These arguments are without merit. As to this Court's original jurisdiction, [HN3] the presence of different or more expeditious procedures in state court is not a [*536] reason to deny the existence of federal diversity

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 145 of 554

Page 5

423 F. Supp. 2d 531, *536; 2006 U.S. Dist. LEXIS 13924, **9;
69 Fed. R. Evid. Serv. (Callaghan) 898

jurisdiction. *See Hanna v. Plumer, 380 U.S. 460, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)*. The holding of the district court in *Glen 6 Assoc., Inc. v. Dedaj, 770 F. Supp. 225 (S.D.N.Y. 1991)* appears to be that the "summary process" available to landlords under New York landlord-tenant law is such a specialized proceeding that similar relief is simply unavailable through a civil action in federal court, and that the federal court accordingly lacks original jurisdiction. *770 F. Supp. at 227-28.* Whatever the merits of such a determination as to New York's summary proceedings, a similar [**10] determination is inappropriate as to Maryland's. [HN4] Though summary, the Maryland action for breach of lease under *Md. Code Ann., Real Prop. § 8-402.1* is recognizably a civil action, brought in a court of limited but broad jurisdiction, for a judgment at law that this Court is equally competent to enter. Because the parties are diverse and the amount in controversy requirement is met, this Court has subject-matter jurisdiction. [1]

> 1 Sugarloaf has not raised any challenge to the jurisdiction of this Court on the grounds that the jurisdictional threshold of $ 75,000 has not been met. Although this Court has the power and duty to examine its subject-matter jurisdiction *sua sponte*, there appears to be no reason for concern here: the net present value of the lease at issue, which has monthly rent in the tens of thousands of dollars, amply satisfies the jurisdictional requirement. *Cf. Waller v. Professional Ins. Corp., 296 F.2d 545, 547-48 (5th Cir. 1961)* [HN5] (" When the validity of a contract or a right to property is called into question in its entirety, the value of the property controls the amount in controversy.").

[**11] As to Sugarloaf's arguments that this Court should nevertheless abstain from deciding either or both actions, the inquiry must begin with the observation that [HN6] federal courts have "no more right to decline the exercise of a jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution." *Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L. Ed. 257 (1821)* (Marshall, J.). Although later decisions have clarified that this "treason" is not absolute in "exceptional circumstances," *see Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996)*, abstention remains the exception rather than the rule. Indeed, *Quackenbush* held explicitly that [HN7] "federal courts have the power

to dismiss or remand cases based on abstention principles" -- in other words, practice *Burford* abstention-"only where the relief being sought is equitable or otherwise discretionary." *517 U.S. at 731*. In an action for damages-or in the Sugarloaf action, which is an action for possession of realty seeking a nondiscretionary judgment at law rather than an equitable decree -- a federal district court cannot abstain under [**12] *Burford*. And although a court may, for instance, "postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law," *id. at 730-31*, this is not an option in this case because the Sugarloaf action has been properly removed and there is no action to defer to in state court. [2] Under *Quackenbush*, the inquiry is at an end: this Court cannot abstain.

> 2    Likewise, because the Safeway action was brought originally in federal court, it cannot be remanded. With no state court action to yield to, it too must proceed.

Even if *Burford* abstention were theoretically applicable, however, it would still be inappropriate here. Unlike the complicated oil and gas regulatory scheme in *Burford* or New York's comprehensive system of landlord-tenant law in *Glen 6*, this case revolves around the interpretation [*537] of an ordinary commercial contract -- a type of legal question that is the daily bread of a federal court sitting in diversity. The instant [**13] cases not only fail to implicate a complicated statutory scheme, but they seem unlikely to implicate any questions of statutory interpretation at all; rather, they hinge on straightforward questions of contractual interpretation.

Accordingly, Sugarloaf's motions to remand or abstain in both actions will be denied by separate order.

## II. Safeway's Motion to Consolidate

Safeway has moved under *Fed. R. Civ. P. 42* to consolidate the two actions. [HN8] Under that rule, the Court "may order . . . the actions consolidated" if they "involve a common question of law or fact." *Fed. R. Civ. P. 42(a)*.

Seldom is there a clearer example of two cases that should be consolidated. The issues in the Sugarloaf action are entirely common to those in the Safeway action; although the latter action contains some additional

423 F. Supp. 2d 531, *537; 2006 U.S. Dist. LEXIS 13924, **13;
69 Fed. R. Evid. Serv. (Callaghan) 898

claims, the primary question in both actions is the interpretation -- and thus the effectiveness of Sugarloaf's attempted termination -- of the same lease. The two actions merely represent the parties' race to two different courthouses, a race which the parties ultimately tied. Since the Sugarloaf action [**14] was removed here, the actions have been -- rightly -- treated essentially as one, and they should become one action formally as well.

Accordingly, by separate order, the two actions will be consolidated. The Sugarloaf action will be closed, and all further pleadings and orders in this dispute are to be filed in the Safeway action, Case No. 04cv3929.

### III. Sugarloaf's Motion for Partial Summary Judgment

Sugarloaf has moved for summary judgment that Safeway's claim for reformation of the lease (Count II in the Safeway action) is barred by laches. Safeway, Sugarloaf argues, waited too long after the signing of the disputed modification of the lease to bring the claim, because the Second Lease Modification Agreement was signed in 1985 and this action was not brought until 2004. Safeway, of course, was in possession of the lease and amendments that it signed all along. *See* Case No. 04cv3929, Paper No. 49.

Nevertheless, the doctrine of laches is not appropriate to this case. [HN9] Laches, an equitable doctrine, will only apply when delay in bringing a claim is both inexcusable and prejudicial to the opposing party. *See Ross v. State Bd. of Elections, 387 Md. 649, 876 A.2d 692, 704 (Md. 2005).* [**15] In this case, there was no inexcusable or unreasonable delay. Even though Safeway was in possession of the now-disputed Second Lease Modification Agreement from the day it was signed, the mistake that it alleges is in the nature of a typographical error. Sugarloaf cites to *Keedy v. Nally, 63 Md. 311 (1885),* for the proposition that Safeway was obligated to exercise due diligence in discovering the mistake, but unlike the "remarkable" and "queerly phrased" document in that case, the amendment here is not obviously flawed unless one notices a discrepancy in how paragraphs are numbered. Even if Safeway had noticed the discrepancy in 1985, it would have had little reason to believe that Sugarloaf would not resolve the discrepancy the same way that it did, and no reason to file a civil action for reformation of a such a minor-seeming error. Only on October 12, 2004, when Sugarloaf notified Safeway that it wished to terminate the lease, did the alleged error in

the Second Lease Modification Agreement ripen into a live dispute. This action was filed just over two months later, on December 14, 2004, which under [*538] the circumstances was not an unreasonable or inexcusable delay.

[**16] Having determined that there was no inexcusable delay, it is unnecessary to decide whether Sugarloaf was prejudiced. Nonetheless, although the Court recognizes that twenty years after a lease is signed, it may be difficult to find reliable witnesses to the parties' intent at the time, this is an unfortunate circumstance common to many disputes over long-term leases and does not, by itself, mean that Sugarloaf was prejudiced. Moreover, given the clearly flawed numbering of the disputed lease amendment, it is difficult to conclude that Sugarloaf could have reasonably relied on the amendment's lack of effectiveness. Thus, this Court finds that there was no prejudice.

Accordingly, Sugarloaf's motion for partial summary judgment on Count II will be denied by separate order.

### IV. Sugarloaf's Motion to Strike Safeway's Expert Report

Sugarloaf has moved to strike the expert report of Emanuel Halper, an expert retained by Safeway to opine "in the context of the custom and usage of the real estate and shopping center industries and commercial leasing specialists who actively participate in shopping center lease negotiations" as to "the Tenant's contention that the Landlord and Tenant [**17] intended that Paragraph 13c of the Original Lease be deleted by Section Thirteenth of the Second Lease Modification Agreement and that the language set forth on the top of Page 7 of the Second Lease Modification Agreement be substituted" and "the Landlord's denial of the Tenant's contention." Case No. 04cv3929, Paper No. 47, exh. 1 (report of Emanuel B. Halper, Esq.).

[HN10] *Federal Rule of Evidence 702* provides that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert may testify thereto. Thus, under this rule, as applied by *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1995)*, Mr. Halper's report should be admitted only if it meets two criteria: (1) it will be helpful to the

423 F. Supp. 2d 531, *538; 2006 U.S. Dist. LEXIS 13924, **17;
69 Fed. R. Evid. Serv. (Callaghan) 898

trier of fact, and (2) it concerns "scientific, technical, or other specialized knowledge."

Mr. Halper's report fails both tests. At issue in this case are (1) the interpretation of the language of a contract, and (2) if that contract is ambiguous, the intent of the parties when it [**18] was signed. *See Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC, 376 Md. 157, 829 A.2d 540, 546 (Md. 2003).* Mr. Halper's testimony is proffered as being potentially relevant to "the intent and effect of continuous operation clauses'" and "how those provisions were typically included or excluded from shopping center leases during the relevant time period." Case No. 04cv3929, Paper No. 47 (Opp. to Mot. to Strike) at 4. To the extent his report speaks to the intent of the parties, it is unhelpful because Mr. Halper was not present at the signing of the lease or any of its modifications and has no personal knowledge of the parties' intent. If Mr. Halper had such knowledge, his appropriate role would be as a fact witness, not an expert witness.

To the extent his report speaks instead to "the effect of continuous operation clauses,'" its foundation is not "scientific, technical, or other specialized knowledge" under *Rule 702*, but rather *legal* knowledge drawn from Mr. Halper's experience as a real estate attorney. [HN11] "It is the responsibility-and the duty-of the court to state . . . the meaning and applicability of the appropriate law,"*Adalman v. Baker, Watts, & Co., 807 F.2d 359, 366 (4th Cir. [*539] 1986)*, [**19] and -- when aided by the capable legal argumentation of counsel-it has ample legal expertise to do so. Evidence supplied by experts as to legal conclusions is not admissible, "nor indeed evidence' at all." *Nutrition 21 v. United States, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991).*

Accordingly, Sugarloaf's motion to strike will be granted by separate order.

## V. Safeway's Motion to Amend Complaint

The final motion before the Court is Safeway's motion to amend the Complaint. Safeway's proposed amendments make two changes to the Complaint in the Safeway action. First, Count IV of the Complaint, "Breach of Lease for Failing to Provide Evidence of Common Area Maintenance Expenses" is amended to "Breach of Lease for Improperly Billing Common Area Maintenance Expenses." Through discovery in this case, Safeway has received the evidence that it had faulted

Sugarloaf for not providing; accordingly, it wishes to amend the Complaint to reflect its newfound knowledge and to better reflect the dispute as it has now been refined. [3] Second, Safeway adds a new Count V: "Breach of Lease for Failing to Allow Sublet." Safeway alleges that on September 9, 2005, it advised Sugarloaf [**20] that it intended to sublet the disputed property to Sungwon, Inc., and that Sugarloaf refused to permit this on the grounds that the lease had been terminated.

> 3   In so doing, Safeway apparently wishes to abandon any claim it may have had that Sugarloaf's failure to provide the evidence sooner was itself a breach of the lease.

Sugarloaf opposes these amendments under *Fed. R. Civ. P. 15(a)* and *16(b)*. Under *Rule 16(b)*, Sugarloaf argues that Safeway has not shown good cause for the Court to modify its scheduling order to permit a belated amendment to the Complaint. Under *Rule 15(a)*, it argues that it is prejudiced by the fact that discovery had almost concluded when the motion was filed (and has concluded entirely now).

The Court, however, will permit the amendments. Both amendments arise from new circumstances that have developed during litigation: the Count *IV amendment* arises from new information revealed in discovery, and the [**21] Count *V amendment* arises from Safeway's recent efforts to find a subtenant (which, it would seem, would be in Sugarloaf's best interests as well, and might aid a peaceful resolution of this dispute). Good cause is thus present. As to prejudice, the Court notes that although the amendments arise late in the proceedings, neither is likely to require much, if any, additional discovery. The Count *IV amendment* is intended to make the Complaint conform with the dispute as it has evolved through discovery, and depends on materials that Safeway received from Sugarloaf. Sugarloaf is hardly prejudiced by this. The Count *V amendment* seeks relief from an injury different in degree and kind from the relief Safeway initially sought, but that arises from the same general dispute -- Sugarloaf denied the existence of the lease on the same grounds that it contests the entire action. Count V appears to rise or fall with the remainder of the dispute: if Safeway's construction of the contract is the correct one, Sugarloaf has compounded Safeway's injuries, but if Sugarloaf's construction is correct, then Sugarloaf was within its rights to forbid a sublease.

423 F. Supp. 2d 531, *539; 2006 U.S. Dist. LEXIS 13924, **21;
69 Fed. R. Evid. Serv. (Callaghan) 898

[HN12] *Rule 15(a)* requires that "leave [to amend] [**22] shall be freely given when justice so requires." Justice so requires. Thus, Safeway's motion for leave to amend will be granted, and a deadline to answer the Amended Complaint will be established by separate order.

DATE: March 27, 2006

ROGER W. TITUS

UNITED STATES DISTRICT JUDGE

[*540] **ORDER**

Upon consideration of Sugarloaf Partnership, LLC's Motion to Remand and for Costs or in the Alternative to Abstain [Case No. 05cv679, Paper No. 18], Sugarloaf Partnership, LLC's Motion for an Abstention and Remand Order [Case No. 04cv3929, Paper No. 20], Safeway, Inc.'s Motion to Consolidate [Case No. 04cv3929, Paper No. 14], Sugarloaf Partnership, LLC's Motion for Partial Summary Judgment [Case No. 04cv3929, Paper No. 49], Sugarloaf Partnership, LLC's Motion to Strike Safeway, Inc.'s Expert Report [Case No. 04cv3929, Paper No. 46], Safeway, Inc.'s Motion to Amend Complaint [Case No. 04cv3929, Paper No. 52], and the oppositions and replies to each motion, and for the reasons stated in the accompanying memorandum opinion, it is this 27th day of March, 2006, by the United States District Court for the District of Maryland,

**ORDERED,** that Sugarloaf Partnership, LLC's [**23] Motion to Remand and for Costs or in the Alternative to Abstain [Case No. 05cv679, Paper No. 18] is **DENIED**; and it is further

**ORDERED,** that Sugarloaf Partnership, LLC's Motion for an Abstention and Remand Order [Case No. 04cv3929, Paper No. 20] is **DENIED;** and it is further **ORDERED,** that Safeway, Inc.'s Motion to Consolidate [CaseNo. 04cv3929, Paper No. 14] is **GRANTED**; and it is further

**ORDERED,** that **CASE NOS. 04cv3929 and 05cv679 are CONSOLIDATED**, all further pleadings shall be filed in Case No. 04cv3929, and the Clerk of the Court is directed to **ADMINISTRATIVELY CLOSE CASE NO. 05cv679**; and it is further

**ORDERED**, that all scheduling orders entered in Case No. 04cv3929 shall apply to the consolidated case; and it is further

**ORDERED**, that Sugarloaf Partnership, LLC's Motion for Partial Summary Judgment [Case No. 04cv3929, Paper No. 49] is **DENIED**; and it is further

**ORDERED**, that Sugarloaf Partnership, LLC's Motion to Strike Safeway, Inc.'s Expert Report [Case No. 04cv3929, Paper No. 46] is **GRANTED**; and it is further

**ORDERED**, that Safeway, Inc.'s Motion to Amend Complaint [Paper No. 52] [**24] is **GRANTED**; and it is further **ORDERED**, that Sugarloaf Partnership, LLC, shall answer or otherwise respond to the Amended Complaint on or before April 10th, 2006.

ROGER W. TITUS

UNITED STATES DISTRICT JUDGE

*\*\* Preliminary Version \*\**

*Case Name:*

# Sattva Capital Corp. v. Creston Moly Corp.

**Sattva Capital Corporation (formerly Sattva Capital Inc.),
Appellant;
v.
Creston Moly Corporation (formerly Georgia Ventures Inc.),
Respondent, and
Attorney General of British Columbia and BCICAC Foundation,
Interveners.**

[2014] S.C.J. No. 53

[2014] A.C.S. no 53

**2014 SCC 53**

File No.: 35026.

Supreme Court of Canada

Heard: December 12, 2013;
Judgment: August 1, 2014.

**Present: McLachlin C.J. and LeBel, Abella, Rothstein,
Moldaver, Karakatsanis and Wagner JJ.**

(125 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

*Court Catchwords:*

*Arbitration -- Appeals -- Commercial arbitration awards -- Parties entering into agreement providing for payment of finder's fee in shares -- Parties disagreeing as to date on which to price shares for payment of finder's fee and entering*

*into arbitration -- Leave to appeal arbitral award sought pursuant to s. 31(2) of the Arbitration Act -- Leave to appeal denied but granted on appeal to Court of Appeal -- Appeal of award dismissed but dismissal reversed by Court of Appeal -- Whether Court of Appeal erred in granting leave to appeal -- What is appropriate standard of review to be applied to commercial arbitral decisions made under Arbitration Act -- Arbitration Act, R.S.B.C. 1996, c. 55, s. 31(2).*

*Contracts -- Interpretation -- Parties entering into agreement providing for payment of finder's fee in shares -- Parties disagreeing as to date on which to price the shares for payment of finder's fee and entering into arbitration -- Whether arbitrator reasonably construed contract as a whole -- Whether contractual interpretation is question of law or of mixed fact and law.*

**Court Summary:**

S and C entered into an agreement that required C to pay S a finder's fee in relation to the acquisition of a molybdenum mining property by C. The parties agreed that under this agreement, S was entitled to a finder's fee of US$1.5 million and was entitled to be paid this fee in shares of C. However, they disagreed on which date should be used to price the shares and therefore the number of shares to which S was entitled. S argued that the share price was dictated by the date set out in the Market Price definition in the agreement and therefore that it should receive approximately 11,460,000 shares priced at $0.15. C claimed that the agreement's "maximum amount" proviso prevented S from receiving shares valued at more than US$1.5 million on the date the fee was payable, and therefore that S should receive approximately 2,454,000 shares priced at $0.70. The parties entered into arbitration pursuant to the B.C. *Arbitration Act* and the arbitrator found in favour of S. C sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *Arbitration Act*, but leave was denied on the basis that the question on appeal was not a question of law. The Court of Appeal reversed the decision and granted C's application for leave to appeal, finding that the arbitrator's failure to address the meaning of the agreement's "maximum amount" proviso raised a question of law. The superior court judge on appeal dismissed C's appeal, holding that the arbitrator's interpretation of the agreement was correct. The Court of Appeal allowed C's appeal, finding that the arbitrator reached an absurd result. S appeals the decisions of the Court of Appeal that granted leave and that allowed the appeal.

*Held*: The appeal should be allowed and the arbitrator's award reinstated.

Appeals from commercial arbitration decisions are narrowly circumscribed under the *Arbitration Act*. Under s. 31(1), they are limited to questions of law, and leave to appeal is required if the parties do not consent to the appeal. Section 31(2)(*a*) sets out the requirements for leave at issue in the present case: the court may grant leave if it determines that the result is important to the parties and the determination of the point of law may prevent a miscarriage of justice.

In the case at bar, the Court of Appeal erred in finding that the construction of the finder's fee agreement constituted a question of law. Such an exercise raises a question of mixed fact and law, and therefore, the Court of Appeal erred in granting leave to appeal.

The historical approach according to which determining the legal rights and obligations of the parties under a written contract was considered a question of law should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix of the contract.

It may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law, however, the close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. The goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. Accordingly, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Legal errors made in the course of contractual interpretation include the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor. Concluding that C's application for leave to appeal raised no question of law is sufficient to dispose of this appeal, however the Court found it salutary to continue with its analysis.

In order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(*a*), an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case. According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscar-

riage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law by the leave court is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case. The appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit, meaning that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law.

Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the standard of review. The leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal.

The words "may grant leave" in s. 31(2) of the *Arbitration Act* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met. Discretionary factors to consider in a leave application under s. 31(2)(*a*) include: conduct of the parties, existence of alternative remedies, undue delay and the urgent need for a final answer. These considerations could be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria have been met. However, courts should exercise such discretion with caution.

Appellate review of commercial arbitration awards is different from judicial review of a decision of a statutory tribunal, thus the standard of review framework developed for judicial review in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. As a result, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise. The question at issue here does not fall into one of those categories and thus the standard of review in this case is reasonableness.

In the present case, the arbitrator reasonably construed the contract as a whole in determining that S is entitled to be paid its finder's fee in shares priced at $0.15. The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both that definition and the "maximum amount" proviso and reconciles them in a manner that cannot be said to be unreasonable. The arbitrator's reasoning meets the reasonableness threshold of justifiability, transparency and intelligibility.

A court considering whether leave should be granted is not adjudicating the merits of the case. It decides only whether the matter warrants granting leave, not whether the appeal will be successful, even where the determination of whether to grant leave involves a preliminary consideration of the question of law at issue. For this reason, comments by a leave court regarding the merits cannot bind or limit the powers of the court hearing the actual appeal.

**Cases Cited**

**Referred to:**  *British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122; *King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63; *Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945; *Prenn v. Simmonds*, [1971] 3 All E.R. 237; *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570; *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII); *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221; *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78; *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748; *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744; *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69; *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300; *Investors Compensation Scheme Ltd. v. West Bromwich Building Soci-*

*ety*, [1998] 1 All E.R. 98; *Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316; *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63; *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257; *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712; *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262; *R. v. Fedossenko*, 2013 ABCA 164 (CanLII); *Enns v. Hansey*, 2013 MBCA 23 (CanLII); *R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174; *R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270; *Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326; *MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6; *R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509; *R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651; *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297; *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011; *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190; *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654; *Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3; *Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, leave to appeal refused, [2013] 3 S.C.R. viii; *Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566.

## Statutes and Regulations Cited

*Administrative Tribunals Act*, S.B.C. 2004, c. 45, ss. 58, 59.

*Arbitration Act*, R.S.B.C. 1996, c. 55 [formerly *Commercial Arbitration Act*], s. 31.

*Civil Code of Québec*.

## Authors Cited

Brown, Donald J. M., and John M. Evans, with the assistance of Christine E. Deacon. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated May 2014).

Dyzenhaus, David. "The Politics of Deference: Judicial Review and Democracy", in Michael Taggart, ed., *The Province of Administrative Law*. Oxford: Hart, 1997, 279.

Hall, Geoff R. *Canadian Contractual Interpretation Law*, 2nd ed. Markham, Ont.: LexisNexis, 2012.

Lewison, Kim. *The Interpretation of Contracts*, 5th ed. London: Sweet & Maxwell, 2011 & Supp. 2013.

McCamus, John D. *The Law of Contracts*, 2nd ed. Toronto: Irwin Law, 2012.

## History and Disposition:

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Low and Levine JJ.A.), 2010 BCCA 239, 7 B.C.L.R. (5th) 227, 319 D.L.R. (4th) 219, [2010] B.C.J. No. 891 (QL), 2010 CarswellBC 1210, setting aside a decision of Greyell J., 2009 BCSC 1079, [2009] B.C.J. No. 1597 (QL), 2009 CarswellBC 2096, and from a subsequent judgment of the British Columbia Court of Appeal (Kirkpatrick, Neilson and Bennett JJ.A.), 2012 BCCA 329, 36 B.C.L.R. (5th) 71, 326 B.C.A.C. 114, 554 W.A.C. 114, 2 B.L.R. (5th) 1, [2012] B.C.J. No. 1631 (QL), 2012 Carswell BC 2327, setting aside a decision of Armstrong J., 2011 BCSC 597, 84 B.L.R. (4th) 102, [2011] B.C.J. No. 861 (QL), 2011 CarswellBC 1124. Appeal allowed.

## Counsel:

*Michael A. Feder* and *Tammy Shoranick*, for the appellant.

*Darrell W. Roberts*, *Q.C.*, and *David Mitchell*, for the respondent.

*Jonathan Eades* and *Micah Weintraub*, for the intervener the Attorney General of British Columbia.

*David Wotherspoon* and *Gavin R. Cameron*, for the intervener the BCICAC Foundation.

# TABLE OF CONTENTS

I.      Facts
II.     Arbitral Award
III.    Judicial History

        *A. British Columbia Supreme Court -- Leave to Appeal Decision, 2009 BCSC 1079*

        *B. British Columbia Court of Appeal -- Leave to Appeal Decision, 2010 BCCA 239*

        *C. British Columbia Supreme Court -- Appeal Decision, 2011 BCSC 597*

        *D. British Columbia Court of Appeal -- Appeal Decision, 2012 BCCA 329*

IV.     Issues
V.      Analysis

        *A. The Leave Issue Is Properly Before This Court*

        *B. The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

        (1)   Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*
        (2)   The Result Is Important to the Parties
        (3)   The Question Under Appeal Is Not a Question of Law

                *(a) When Is Contractual Interpretation a Question of Law?*

                *(b) The Role and Nature of the "Surrounding Circumstances"*

                *(c) Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

                *(d) Application to the Present Case*

        (4)   May Prevent a Miscarriage of Justice

                *(a) Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

                *(b) Application to the Present Case*

        (5)   Residual Discretion to Deny Leave

                *(a) Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

                *(b) Application to the Present Case*

        *C. Standard of Review Under the AA*

        *D. The Arbitrator Reasonably Construed the Agreement as a Whole*

        *E. Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

VI.     Conclusion

**APPENDIX I**

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

**APPENDIX II**

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

**APPENDIX III**

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

The judgment of the Court was delivered by

**1**    ROTHSTEIN J.:-- When is contractual interpretation to be treated as a question of mixed fact and law and when should it be treated as a question of law? How is the balance between reviewability and finality of commercial arbitration awards under the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (now the *Arbitration Act*, hereinafter the "*AA*"), to be determined? Can findings made by a court granting leave to appeal with respect to the merits of an appeal bind the court that ultimately decides the appeal? These are three of the issues that arise in this appeal.

I.    Facts

**2**    The issues in this case arise out of the obligation of Creston Moly Corporation (formerly Georgia Ventures Inc.) to pay a finder's fee to Sattva Capital Corporation (formerly Sattva Capital Inc.). The parties agree that Sattva is entitled to a finder's fee of US$1.5 million and is entitled to be paid this fee in shares of Creston, cash or a combination thereof. They disagree on which date should be used to price the Creston shares and therefore the number of shares to which Sattva is entitled.

**3**    Mr. Hai Van Le, a principal of Sattva, introduced Creston to the opportunity to acquire a molybdenum mining property in Mexico. On January 12, 2007, the parties entered into an agreement (the "Agreement") that required Creston to pay Sattva a finder's fee in relation to the acquisition of this property. The relevant provisions of the Agreement are set out in Appendix I.

**4**    On January 30, 2007, Creston entered into an agreement to purchase the property for US$30 million. On January 31, 2007, at the request of Creston, trading of Creston's shares on the TSX Venture Exchange ("TSXV") was halted to prevent speculation while Creston completed due diligence in relation to the purchase. On March 26, 2007, Creston announced it intended to complete the purchase and trading resumed the following day.

**5**    The Agreement provides that Sattva was to be paid a finder's fee equal to the maximum amount that could be paid pursuant to s. 3.3 of Policy 5.1 in the TSXV Policy Manual. Section 3.3 of Policy 5.1 is incorporated by reference into the Agreement at s. 3.1 and is set out in Appendix II of these reasons. The maximum amount pursuant to s. 3.3 of Policy 5.1 in this case is US$1.5 million.

**6**    According to the Agreement, by default, the fee would be paid in Creston shares. The fee would only be paid in cash or a combination of shares and cash if Sattva made such an election. Sattva made no such election and was therefore entitled to be paid the fee in shares. The finder's fee was to be paid no later than five working days after the closing of the transaction purchasing the molybdenum mining property.

**7**    The dispute between the parties concerns which date should be used to determine the price of Creston shares and thus the number of shares to which Sattva is entitled. Sattva argues that the share price is dictated by the Market Price definition at s. 2 of the Agreement, i.e. the price of the shares "as calculated on close of business day before the issuance of the press release announcing the Acquisition". The press release announcing the acquisition was released on March 26, 2007. Prior to the halt in trading on January 31, 2007, the last closing price of Creston shares was $0.15. On this interpretation, Sattva would receive approximately 11,460,000 shares (based on the finder's fee of US$1.5 million).

**8**    Creston claims that the Agreement's "maximum amount" proviso means that Sattva cannot receive cash or shares valued at more than US$1.5 million on the date the fee is payable. The shares were payable no later than five days after May 17, 2007, the closing date of the transaction. At that time, the shares were priced at $0.70 per share. This valuation is based on the price an investment banking firm valued Creston at as part of underwriting a private placement of shares on April 17, 2007. On this interpretation, Sattva would receive approximately 2,454,000 shares, some 9 million fewer shares than if the shares were priced at $0.15 per share.

**9**       The parties entered into arbitration pursuant to the *AA*. The arbitrator found in favour of Sattva. Creston sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *AA*. Leave was denied by the British Columbia Supreme Court (2009 BCSC 1079 (CanLII) ("SC Leave Court")). Creston successfully appealed this decision and was granted leave to appeal the arbitrator's decision by the British Columbia Court of Appeal (2010 BCCA 239, 7 B.C.L.R. (5th) 227 ("CA Leave Court")).

**10**       The British Columbia Supreme Court judge who heard the merits of the appeal (2011 BCSC 597, 84 B.L.R. (4th) 102 ("SC Appeal Court")) upheld the arbitrator's award. Creston appealed that decision to the British Columbia Court of Appeal (2012 BCCA 329, 36 B.C.L.R. (5th) 71 ("CA Appeal Court")). That court overturned the SC Appeal Court and found in favour of Creston. Sattva appeals the decisions of the CA Leave Court and CA Appeal Court to this Court.

     II.   <u>Arbitral Award</u>

**11**       The arbitrator, Leon Getz, Q.C., found in favour of Sattva, holding that it was entitled to receive its US$1.5 million finder's fee in shares priced at $0.15 per share.

**12**       The arbitrator based his decision on the Market Price definition in the Agreement:

> What, then, was the "Market Price" within the meaning of the Agreement? The relevant press release is that issued on March 26 ... . Although there was no closing price on March 25 (the shares being on that date halted), the "last closing price" within the meaning of the definition was the $0.15 at which the [Creston] shares closed on January 30, the day before trading was halted "pending news" ... . This conclusion requires no stretching of the words of the contractual definition; on the contrary, it falls literally within those words. [para. 22]

**13**       Both the Agreement and the finder's fee had to be approved by the TSXV. Creston was responsible for securing this approval. The arbitrator found that it was either an implied or an express term of the Agreement that Creston would use its best efforts to secure the TSXV's approval and that Creston did not apply its best efforts to this end.

**14**       As previously noted, by default, the finder's fee would be paid in shares unless Sattva made an election otherwise. The arbitrator found that Sattva never made such an election. Despite this, Creston represented to the TSXV that the finder's fee was to be paid in cash. The TSXV conditionally approved a finder's fee of US$1.5 million to be paid in cash. Sattva first learned that the fee had been approved as a cash payment in early June 2007. When Sattva raised this matter with Creston, Creston responded by saying that Sattva had the choice of taking the finder's fee in cash or in shares priced at $0.70.

**15**       Sattva maintained that it was entitled to have the finder's fee paid in shares priced at $0.15. Creston asked its lawyer to contact the TSXV to clarify the minimum share price it would approve for payment of the finder's fee. The TSXV confirmed on June 7, 2007 over the phone and August 9, 2007 via email that the minimum share price that could be used to pay the finder's fee was $0.70 per share. The arbitrator found that Creston "consistently misrepresented or at the very least failed to disclose fully the nature of the obligation it had undertaken to Sattva" (para. 56(k)) and "that in the absence of an election otherwise, Sattva is entitled under that Agreement to have that fee paid in shares at $0.15" (para. 56(g)). The arbitrator found that the first time Sattva's position was squarely put before the TSXV was in a letter from Sattva's solicitor on October 9, 2007.

**16**       The arbitrator found that had Creston used its best efforts, the TSXV could have approved the payment of the finder's fee in shares priced at $0.15 and such a decision would have been consistent with its policies. He determined that there was "a substantial probability that [TSXV] approval would have been given" (para. 81). He assessed that probability at 85 percent.

**17**       The arbitrator found that Sattva could have sold its Creston shares after a four-month holding period at between $0.40 and $0.44 per share, netting proceeds of between $4,583,914 and $5,156,934. The arbitrator took the average of those two amounts, which came to $4,870,424, and then assessed damages at 85 percent of that number, which came to $4,139,860, and rounded it to $4,140,000 plus costs.

**18**       After this award was made, Creston made a cash payment of US$1.5 million (or the equivalent in Canadian dollars) to Sattva. The balance of the damages awarded by the arbitrator was placed in the trust account of Sattva's solicitors.

III.    Judicial History
A.    *British Columbia Supreme Court -- Leave to Appeal Decision, 2009 BCSC 1079*

**19**    The SC Leave Court denied leave to appeal because it found the question on appeal was not a question of law as required under s. 31 of the *AA*. In the judge's view, the issue was one of mixed fact and law because the arbitrator relied on the "factual matrix" in coming to his conclusion. Specifically, determining how the finder's fee was to be paid involved examining "the TSX's policies concerning the maximum amount of the finder's fee payable, as well as the discretionary powers granted to the Exchange in determining that amount" (para. 35).

**20**    The judge found that even had he found a question of law was at issue he would have exercised his discretion against granting leave because of Creston's conduct in misrepresenting the status of the finder's fee to the TSXV and Sattva, and "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41).

B.    *British Columbia Court of Appeal -- Leave to Appeal Decision, 2010 BCCA 239*

**21**    The CA Leave Court reversed the SC Leave Court and granted Creston's application for leave to appeal the arbitral award. It found the SC Leave Court "err[ed] in failing to find that the arbitrator's failure to address the meaning of s. 3.1 of the Agreement (and in particular the 'maximum amount' provision) raised a question of law" (para. 23). The CA Leave Court decided that the construction of s. 3.1 of the Agreement, and in particular the "maximum amount" proviso, was a question of law because it did not involve reference to the facts of what the TSXV was told or what it decided.

**22**    The CA Leave Court acknowledged that Creston was "less than forthcoming in its dealings with Mr. Le and the [TSXV]" but said that "these facts are not directly relevant to the question of law it advances on the appeal" (para. 27). With respect to the SC leave judge's reference to the preservation of the integrity of the arbitration system, the CA Leave Court said that the parties would have known when they chose to enter arbitration under the *AA* that an appeal on a question of law was possible. Additionally, while the finality of arbitration is an important factor in exercising discretion, when "a question of law arises on a matter of importance and a miscarriage of justice might be perpetrated if an appeal were not available, the integrity of the process requires, at least in the circumstances of this case, that the right of appeal granted by the legislation also be respected" (para. 29).

C.    *British Columbia Supreme Court -- Appeal Decision, 2011 BCSC 597*

**23**    Armstrong J. reviewed the arbitrator's decision on a correctness standard. He dismissed the appeal, holding the arbitrator's interpretation of the Agreement was correct.

**24**    Armstrong J. found that the plain and ordinary meaning of the Agreement required that the US$1.5 million fee be paid in shares priced at $0.15. He did not find the meaning to be absurd simply because the price of the shares at the date the fee became payable had increased in relation to the price determined according to the Market Price definition. He was of the view that changes in the price of shares over time are inevitable, and that the parties, as sophisticated business persons, would have reasonably understood a fluctuation in share price to be a reality when providing for a fee payable in shares. According to Armstrong J., it is indeed because of market fluctuations that it is necessary to choose a specific date to price the shares in advance of payment. He found that this was done by defining "Market Price" in the Agreement, and that the fee remained US$1.5 million in $0.15 shares as determined by the Market Price definition regardless of the price of the shares at the date that the fee was payable.

**25**    According to Armstrong J., that the price of the shares may be more than the Market Price definition price when they became payable was foreseeable as a "natural consequence of the fee agreement" (para. 62). He was of the view that the risk was borne by Sattva, since the price of the shares could increase, but it could also decrease such that Sattva would have received shares valued at less than the agreed upon fee of US$1.5 million.

**26**    Armstrong J. held that the arbitrator's interpretation which gave effect to both the Market Price definition and the "maximum amount" proviso should be preferred to Creston's interpretation of the agreement which ignored the Market Price definition.

**27**    In response to Creston's argument that the arbitrator did not consider s. 3.1 of the Agreement which contains the "maximum amount" proviso, Armstrong J. noted that the arbitrator explicitly addressed the "maximum amount" proviso at para. 23 of his decision.

D.    *British Columbia Court of Appeal -- Appeal Decision, 2012 BCCA 329*

**28**    The CA Appeal Court allowed Creston's appeal, ordering that the payment of US$1.5 million that had been made by Creston to Sattva on account of the arbitrator's award constituted payment in full of the finder's fee. The court reviewed the arbitrator's decision on a standard of correctness.

**29**    The CA Appeal Court found that both it and the SC Appeal Court were bound by the findings made by the CA Leave Court. There were two findings that were binding: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but shares valued at approximately $8 million if Sattva took its fee in shares; and (2) the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement.

**30**    The Court of Appeal found that it was an absurd result to find that Sattva is entitled to an $8 million finder's fee in light of the fact that the "maximum amount" proviso in the Agreement limits the finder's fee to US$1.5 million. The court was of the view that the proviso limiting the fee to US$1.5 million "when paid" should be given paramount effect (para. 47). In its opinion, giving effect to the Market Price definition could not have been the intention of the parties, nor could it have been in accordance with good business sense.

IV.    Issues

**31**    The following issues arise in this appeal:

(a)    Is the issue of whether the CA Leave Court erred in granting leave under s. 31(2) of the *AA* properly before this Court?
(b)    Did the CA Leave Court err in granting leave under s. 31(2) of the *AA*?
(c)    If leave was properly granted, what is the appropriate standard of review to be applied to commercial arbitral decisions made under the *AA*?
(d)    Did the arbitrator reasonably construe the Agreement as a whole?
(e)    Did the CA Appeal Court err in holding that it was bound by comments regarding the merits of the appeal made by the CA Leave Court?

V.    Analysis
A.    *The Leave Issue Is Properly Before This Court*

**32**    Sattva argues, in part, that the CA Leave Court erred in granting leave to appeal from the arbitrator's decision. In Sattva's view, the CA Leave Court did not identify a question of law, a requirement to obtain leave pursuant to s. 31(2) of the *AA*. Creston argues that this issue is not properly before this Court. Creston makes two arguments in support of this point.

**33**    First, Creston argues that this issue was not advanced in Sattva's application for leave to appeal to this Court. This argument must fail. Unless this Court places restrictions on the order granting leave, the order granting leave is "at large". Accordingly, appellants may raise issues on appeal that were not set out in the leave application. However, the Court may exercise its discretion to refuse to deal with issues that were not addressed in the courts below, if there is prejudice to the respondent, or if for any other reason the Court considers it appropriate not to deal with a question.

**34**    Here, this Court's order granting leave to appeal from both the CA Leave Court decision and the CA Appeal Court decision contained no restrictions (2013 CanLII 11315). The issue -- whether the proposed appeal was on a question of law -- was expressly argued before, and was dealt with in the judgments of, the SC Leave Court and the CA Leave Court. There is no reason Sattva should be precluded from raising this issue on appeal despite the fact it was not mentioned in its application for leave to appeal to this Court.

**35**    Second, Creston argues that the issue of whether the CA Leave Court identified a question of law is not properly before this Court because Sattva did not contest this decision before all of the lower courts. Specifically, Creston states that Sattva did not argue that the question on appeal was one of mixed fact and law before the SC Appeal Court and that it conceded the issue on appeal was a question of law before the CA Appeal Court. This argument must also fail. At the SC Appeal Court, it was not open to Sattva to reargue the question of whether leave should have been granted. The SC Appeal Court was bound by the CA Leave Court's finding that leave should have been granted, including the determination that a question of law had been identified. Accordingly, Sattva could hardly be expected to reargue before the SC Appeal Court a question that had been determined by the CA Leave Court. There is nothing in the *AA* to indicate that Sattva could have appealed the leave decision made by a panel of the Court of Appeal to another panel of the same

court. The fact that Sattva did not reargue the issue before the SC Appeal Court or CA Appeal Court does not prevent it from raising the issue before this Court, particularly since Sattva was also granted leave to appeal the CA Leave Court decision by this Court.

36     While this Court may decline to grant leave where an issue sought to be argued before it was not argued in the courts appealed from, that is not this case. Here, whether leave from the arbitrator's decision had been sought by Creston on a question of law or a question of mixed fact and law had been argued in the lower leave courts.

37     Accordingly, the issue of whether the CA Leave Court erred in finding a question of law for the purposes of granting leave to appeal is properly before this Court.

B.     *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

(1)     Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

38     Appeals from commercial arbitration decisions are narrowly circumscribed under the *AA*. Under s. 31(1), appeals are limited to either questions of law where the parties consent to the appeal or to questions of law where the parties do not consent but where leave to appeal is granted. Section 31(2) of the *AA*, reproduced in its entirety in Appendix III, sets out the requirements for leave:

> (2)     In an application for leave under subsection (1) (b), the court may grant leave if it determines that
>
> (a)     the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,
> (b)     the point of law is of importance to some class or body of persons of which the applicant is a member, or
> (c)     the point of law is of general or public importance.

39     The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* give the courts judicial discretion to deny leave even where the statutory requirements have been met (*British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122 ("*BCIT*"), at paras. 25-26). Appellate review of an arbitrator's award will only occur where the requirements of s. 31(2) are met and where the leave court does not exercise its residual discretion to nonetheless deny leave.

40     Although Creston's application to the SC Leave Court sought leave pursuant to s. 31(2)(a), (b) and (c), it appears the arguments before that court and throughout focused on s. 31(2)(a). The SC Leave Court's decision quotes a lengthy passage from *BCIT* that focuses on the requirements of s. 31(2)(a). The SC Leave Court judge noted that both parties conceded the first requirement of s. 31(2)(a): that the issue be of importance to the parties. The CA Leave Court decision expressed concern that denying leave might give rise to a miscarriage of justice -- a criterion only found in s. 31(2)(a). Finally, neither the lower courts' leave decisions nor the arguments before this Court reflected arguments about the question of law being important to some class or body of persons of which the applicant is a member (s. 31(2)(b)) or being a point of law of general or public importance (s. 31(2)(c)). Accordingly, the following analysis will focus on s. 31(2)(a).

(2)     The Result Is Important to the Parties

41     In order for leave to be granted from a commercial arbitral award, a threshold requirement must be met: leave must be sought on a question of law. However, before dealing with that issue, it will be convenient to quickly address another requirement of s. 31(2)(a) on which the parties agree: whether the importance of the result of the arbitration to the parties justifies the intervention of the court. Justice Saunders explained this criterion in *BCIT* as requiring that the result of the arbitration be "sufficiently important", in terms of principle or money, to the parties to justify the expense and time of court proceedings (para. 27). The parties in this case have agreed that the result of the arbitration is of importance to each of them. In view of the relatively large monetary amount in dispute and in light of the fact that the parties have agreed that the result is important to them, I accept that the importance of the result of the arbitration to the parties justifies the intervention of the court. This requirement of s. 31(2)(a) is satisfied.

    (3)    <u>The Question Under Appeal Is Not a Question of Law</u>
    (a)    *When Is Contractual Interpretation a Question of Law?*

**42**    Under s. 31 of the *AA*, the issue upon which leave is sought must be a question of law. For the purpose of identifying the appropriate standard of review or, as is the case here, determining whether the requirements for leave to appeal are met, reviewing courts are regularly required to determine whether an issue decided at first instance is a question of law, fact, or mixed fact and law.

**43**    Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law (*King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63, at para. 20, *per* Steel J.A.; K. Lewison, *The Interpretation of Contracts* (5th ed. 2011 & Supp. 2013), at pp. 173-76; and G. R. Hall, *Canadian Contractual Interpretation Law* (2nd ed. 2012), at pp. 125-26). This rule originated in England at a time when there were frequent civil jury trials and widespread illiteracy. Under those circumstances, the interpretation of written documents had to be considered questions of law because only the judge could be assured to be literate and therefore capable of reading the contract (Hall, at p. 126; and Lewison, at pp. 173-74).

**44**    This historical rationale no longer applies. Nevertheless, courts in the United Kingdom continue to treat the interpretation of a written contract as always being a question of law (*Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945, at paras. 58 and 82-83; and Lewison, at pp. 173-77). They do this despite the fact that U.K. courts consider the surrounding circumstances, a concept addressed further below, when interpreting a written contract (*Prenn v. Simmonds*, [1971] 3 All E.R. 237 (H.L.); and *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570 (H.L.)).

**45**    In Canada, there remains some support for the historical approach. See for example *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII), at para. 10; *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84, at para. 26; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221, at paras. 11-12; and *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78, at para. 34. However, some Canadian courts have abandoned the historical approach and now treat the interpretation of written contracts as an exercise involving either a question of law or a question of mixed fact and law. See for example *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1, at para. 11; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98, at para. 13; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230, at para. 44; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81, at paras. 22-23 (majority reasons, *per* Blair J.A.) and paras. 133-35 (*per* Gillese J.A. in dissent, but not on this point); and *King*, at paras. 20-23.

**46**    The shift away from the historical approach in Canada appears to be based on two developments. The first is the adoption of an approach to contractual interpretation which directs courts to have regard for the surrounding circumstances of the contract -- often referred to as the factual matrix -- when interpreting a written contract (Hall, at pp. 13, 21-25 and 127; and J. D. McCamus, *The Law of Contracts* (2nd ed. 2012), at pp. 749-51). The second is the explanation of the difference between questions of law and questions of mixed fact and law provided in *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 35, and *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235, at paras. 26 and 31-36.

**47**    Regarding the first development, the interpretation of contracts has evolved towards a practical, common-sense approach not dominated by technical rules of construction. The overriding concern is to determine "the intent of the parties and the scope of their understanding" (*Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at para. 27 *per* LeBel J.; see also *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69, at paras. 64-65 *per* Cromwell J.). To do so, a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract. Consideration of the surrounding circumstances recognizes that ascertaining contractual intention can be difficult when looking at words on their own, because words alone do not have an immutable or absolute meaning:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed... . In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> (*Reardon Smith Line*, at p. 574, *per* Lord Wilberforce)

**48**    The meaning of words is often derived from a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement (see *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300, at para. 15, *per* Hamilton J.A.; see also Hall, at p. 22; and McCamus, at pp. 749-50). As stated by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 (H.L.):

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. [p. 115]

**49**    As to the second development, the historical approach to contractual interpretation does not fit well with the definition of a pure question of law identified in *Housen* and *Southam*. Questions of law "are questions about what the correct legal test is" (*Southam*, at para. 35). Yet in contractual interpretation, the goal of the exercise is to ascertain the objective intent of the parties -- a fact-specific goal -- through the application of legal principles of interpretation. This appears closer to a question of mixed fact and law, defined in *Housen* as "applying a legal standard to a set of facts" (para. 26; see also *Southam*, at para. 35). However, some courts have questioned whether this definition, which was developed in the context of a negligence action, can be readily applied to questions of contractual interpretation, and suggest that contractual interpretation is primarily a legal affair (see for example *Bell Canada*, at para. 25).

**50**    With respect for the contrary view, I am of the opinion that the historical approach should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix.

**51**    The purpose of the distinction between questions of law and those of mixed fact and law further supports this conclusion. One central purpose of drawing a distinction between questions of law and those of mixed fact and law is to limit the intervention of appellate courts to cases where the results can be expected to have an impact beyond the parties to the particular dispute. It reflects the role of courts of appeal in ensuring the consistency of the law, rather than in providing a new forum for parties to continue their private litigation. For this reason, *Southam* identified the degree of generality (or "precedential value") as the key difference between a question of law and a question of mixed fact and law. The more narrow the rule, the less useful will be the intervention of the court of appeal:

> If a court were to decide that driving at a certain speed on a certain road under certain conditions was negligent, its decision would not have any great value as a precedent. In short, as the level of generality of the challenged proposition approaches utter particularity, the matter approaches pure application, and hence draws nigh to being an unqualified question of mixed law and fact. See R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at pp. 103-108. Of course, it is not easy to say precisely where the line should be drawn; though in most cases it should be sufficiently clear whether the dispute is over a general proposition that might qualify as a principle of law or over a very particular set of circumstances that is not apt to be of much interest to judges and lawyers in the future. [para. 37]

**52**    Similarly, this Court in *Housen* found that deference to fact-finders promoted the goals of limiting the number, length, and cost of appeals, and of promoting the autonomy and integrity of trial proceedings (paras. 16-17). These principles also weigh in favour of deference to first instance decision-makers on points of contractual interpretation. The legal obligations arising from a contract are, in most cases, limited to the interest of the particular parties. Given that our legal system leaves broad scope to tribunals of first instance to resolve issues of limited application, this supports treating contractual interpretation as a question of mixed fact and law.

**53**    Nonetheless, it may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law (*Housen*, at paras. 31 and 34-35). Legal errors made in the course of contractual interpretation include "the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor" (*King*, at para. 21). Moreover, there is no question that many other issues in contract law do engage substantive rules of law: the requirements for the formation of the contract, the capacity of the parties, the requirement that certain contracts be evidenced in writing, and so on.

**54**    However, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Given the statutory requirement to identify a question of law in a leave application pursuant to s. 31(2) of the

*AA*, the applicant for leave and its counsel will seek to frame any alleged errors as questions of law. The legislature has sought to restrict such appeals, however, and courts must be careful to ensure that the proposed ground of appeal has been properly characterized. The warning expressed in *Housen* to exercise caution in attempting to extricate a question of law is relevant here:

> Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" ... . [para. 36]

**55**    Although that caution was expressed in the context of a negligence case, it applies, in my opinion, to contractual interpretation as well. As mentioned above, the goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. The close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. In the absence of a legal error of the type described above, no appeal lies under the *AA* from an arbitrator's interpretation of a contract.

    (b)    *The Role and Nature of the "Surrounding Circumstances"*

**56**    I now turn to the role of the surrounding circumstances in contractual interpretation and the nature of the evidence that can be considered. The discussion here is limited to the common law approach to contractual interpretation; it does not seek to apply to or alter the law of contractual interpretation governed by the *Civil Code of Québec*.

**57**    While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement (*Hayes Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract. The interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract (Hall, at pp. 15 and 30-32). While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement (*Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62).

**58**    The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case. It does, however, have its limits. It should consist only of objective evidence of the background facts at the time of the execution of the contract (*King*, at paras. 66 and 70), that is, knowledge that was or reasonably ought to have been within the knowledge of both parties at or before the date of contracting. Subject to these requirements and the parol evidence rule discussed below, this includes, in the words of Lord Hoffmann, "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" (*Investors Compensation Scheme*, at p. 114). Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

    (c)    *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

**59**    It is necessary to say a word about consideration of the surrounding circumstances and the parol evidence rule. The parol evidence rule precludes admission of evidence outside the words of the written contract that would add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing (*King*, at para. 35; and Hall, at p. 53). To this end, the rule precludes, among other things, evidence of the subjective intentions of the parties (Hall, at pp. 64-65; and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, at paras. 54-59, *per* Iacobucci J.). The purpose of the parol evidence rule is primarily to achieve finality and certainty in contractual obligations, and secondarily to hamper a party's ability to use fabricated or unreliable evidence to attack a written contract (*United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at pp. 341-42, *per* Sopinka J.).

**60**    The parol evidence rule does not apply to preclude evidence of the surrounding circumstances. Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. The sur-

rounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.

**61**      Some authorities and commentators suggest that the parol evidence rule is an anachronism, or, at the very least, of limited application in view of the myriad of exceptions to it (see for example *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63 (C.A.), at paras. 19-20; and Hall, at pp. 53-64). For the purposes of this appeal, it is sufficient to say that the parol evidence rule does not apply to preclude evidence of surrounding circumstances when interpreting the words of a written contract.

(d)      *Application to the Present Case*

**62**      In this case, the CA Leave Court granted leave on the following issue: "Whether the Arbitrator erred in law in failing to construe the whole of the Finder's Fee Agreement ..." (A.R., vol. 1, at p. 62).

**63**      As will be explained below, while the requirement to construe a contract as a whole is a question of law that could -- if extricable -- satisfy the threshold requirement under s. 31 of the *AA*, I do not think this question was properly extricated in this case.

**64**      I accept that a fundamental principle of contractual interpretation is that a contract must be construed as a whole (McCamus, at pp. 761-62; and Hall, at p. 15). If the arbitrator did not take the "maximum amount" proviso into account, as alleged by Creston, then he did not construe the Agreement as a whole because he ignored a specific and relevant provision of the Agreement. This is a question of law that would be extricable from a finding of mixed fact and law.

**65**      However, it appears that the arbitrator did consider the "maximum amount" proviso. Indeed, the CA Leave Court acknowledges that the arbitrator had considered that proviso, since it notes that he turned his mind to the US$1.5 million maximum amount, an amount that can only be calculated by referring to the TSXV policy referenced in the "maximum amount" proviso in s. 3.1 of the Agreement. As I read its reasons, rather than being concerned with whether the arbitrator ignored the maximum amount proviso, which is what Creston alleges in this Court, the CA Leave Court decision focused on how the arbitrator construed s. 3.1 of the Agreement, which included the maximum amount proviso (paras. 25-26). For example, the CA Leave Court expressed concern that the arbitrator did not address the "incongruity" in the fact that the value of the fee would vary "hugely" depending on whether it was taken in cash or shares (para. 25).

**66**      With respect, the CA Leave Court erred in finding that the construction of s. 3.1 of the Agreement constituted a question of law. As explained by Justice Armstrong in the SC Appeal Court decision, construing s. 3.1 and taking account of the proviso required relying on the relevant surrounding circumstances, including the sophistication of the parties, the fluctuation in share prices, and the nature of the risk a party assumes when deciding to accept a fee in shares as opposed to cash. Such an exercise raises a question of mixed fact and law. There being no question of law extricable from the mixed fact and law question of how s. 3.1 and the proviso should be interpreted, the CA Leave Court erred in granting leave to appeal.

**67**      The conclusion that Creston's application for leave to appeal raised no question of law would be sufficient to dispose of this appeal. However, as this Court rarely has the opportunity to address appeals of arbitral awards, it is, in my view, useful to explain that, even had the CA Leave Court been correct in finding that construction of s. 3.1 of the Agreement constituted a question of law, it should have nonetheless denied leave to appeal as the application also failed the miscarriage of justice and residual discretion stages of the leave analysis set out in s. 31(2)(a) of the *AA*.

(4)  May Prevent a Miscarriage of Justice

(a)      *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

**68**      Once a question of law has been identified, the court must be satisfied that the determination of that point of law on appeal "may prevent a miscarriage of justice" in order for it to grant leave to appeal pursuant to s. 31(2)(a) of the *AA*. The first step in this analysis is defining miscarriage of justice for the purposes of s. 31(2)(a).

**69**      In *BCIT*, Justice Saunders discussed the miscarriage of justice requirement under s. 31(2)(a). She affirmed the definition set out in *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257 (C.A.), which required the error of law in question to be a material issue that, if decided differently, would lead to a different result: "... if the point of law were decided differently, the arbitrator would have been led to a different result. In other words, was the alleged error of law material to the decision; does it go to its heart?" (*BCIT*, at para. 28). See also *Quan v. Cusson*, 2009 SCC 62, [2009] 3

S.C.R. 712, which discusses the test of whether "some substantial wrong or miscarriage of justice has occurred" in the context of a civil jury trial (para. 43).

**70**    Having regard to *BCIT* and *Quan*, I am of the opinion that in order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(a) of the *AA*, an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case.

**71**    According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

**72**    At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case.

**73**    *BCIT* sets the threshold for this preliminary assessment of the appeal as "more than an arguable point" (para. 30). With respect, once an arguable point has been made out, it is not apparent what more is required to meet the "more than an arguable point" standard. Presumably, the leave judge would have to delve more deeply into the arguments around the question of law on appeal than would be appropriate at the leave stage to find *more* than an arguable point. Requiring this closer examination of the point of law, in my respectful view, blurs the line between the function of the court considering the leave application and the court hearing the appeal.

**74**    In my opinion, the appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit. The arguable merit standard is often used to assess, on a preliminary basis, the merits of an appeal at the leave stage (see for example *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262, at para. 5; and *R. v. Fedossenko*, 2013 ABCA 164 (CanLII), at para. 7). "Arguable merit" is a well-known phrase whose meaning has been expressed in a variety of ways: "a reasonable prospect of success" (*Quick Auto Lease*, at para. 5; and *Enns v. Hansey*, 2013 MBCA 23 (CanLII), at para. 2); "some hope of success" and "sufficient merit" (*R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174, at para. 11); and "credible argument" (*R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270, at para. 8). In my view, the common thread among the various expressions used to describe arguable merit is that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law. In order to decide whether the award should be set aside, a more thorough examination is necessary and that examination is appropriately conducted by the court hearing the appeal once leave is granted.

**75**    Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the applicable standard of review. As I will later explain, reasonableness will almost always apply to commercial arbitrations conducted pursuant to the *AA*, except in the rare circumstances where the question is one that would attract a correctness standard, such as a constitutional question or a question of law of central importance to the legal system as a whole and outside the adjudicator's expertise. Therefore, the leave inquiry will ordinarily ask whether there is any arguable merit to the position that the arbitrator's decision on the question at issue is unreasonable, keeping in mind that the decision-maker is not required to refer to all the arguments, provisions or jurisprudence or to make specific findings on each constituent element, for the decision to be reasonable (*Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708, at para. 16). Of course, the leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal. As such, this should not be taken as an invitation to engage in extensive arguments or analysis about the standard of review at the leave stage.

**76**    In *BCIT*, Saunders J.A. considered the stage of s. 31(2)(a) of the *AA* at which an examination of the merits of the appeal should occur. At the behest of one of the parties, she considered examining the merits under the miscarriage of justice criterion. However, she decided that a consideration of the merits was best done at the residual discretion stage. Her reasons indicate that this decision was motivated by the desire to take a consistent approach across s. 31(2)(a), (b) and (c):

> Where, then, if anywhere, does consideration of the merits of the appeal belong? Mr. Roberts for the Student Association contends that any consideration of the merits of the appeal belongs in the determination of whether a miscarriage of justice may occur; that is, under the

second criterion. I do not agree. In my view, the apparent merit or lack of merit of an appeal is part of the exercise of the residual discretion, and applies equally to all three subsections, (*a*) through (*c*). Just as an appeal woefully lacking in merit should not attract leave under (*b*) (of importance to a class of people including the applicant) or (*c*) (of general or public importance), so too it should not attract leave under (*a*). Consideration of the merits, for consistency in the section as a whole, should be made as part of the exercise of residual discretion. [para. 29]

**77**    I acknowledge the consistency rationale. However, in my respectful opinion, the desire for a consistent approach to s. 31(2)(a), (b) and (c) cannot override the text of the legislation. Unlike s. 31(2)(b) and (c), s. 31(2)(a) requires an assessment to determine whether allowing leave to appeal "may prevent a miscarriage of justice". It is my opinion that a preliminary assessment of the question of law is an implicit component in a determination of whether allowing leave "may prevent a miscarriage of justice".

**78**    However, in an application for leave to appeal pursuant to s. 31(2)(b) or (c), neither of which contain a miscarriage of justice requirement, I agree with Justice Saunders in *BCIT* that a preliminary examination of the merits of the question of law should be assessed at the residual discretion stage of the analysis as considering the merits of the proposed appeal will always be relevant when deciding whether to grant leave to appeal under s. 31.

**79**    In sum, in order to establish that "the intervention of the court and the determination of the point of law may prevent a miscarriage of justice" for the purposes of s. 31(2)(a) of the *AA*, an applicant must demonstrate that the point of law on appeal is material to the final result and has arguable merit.

       (b)    *Application to the Present Case*

**80**    The CA Leave Court found that the arbitrator may have erred in law by not interpreting the Agreement as a whole, specifically in ignoring the "maximum amount" proviso. Accepting that this is a question of law for these purposes only, a determination of the question would be material because it could change the ultimate result arrived at by the arbitrator. The arbitrator awarded $4.14 million in damages on the basis that there was an 85 percent chance the TSXV would approve a finder's fee paid in $0.15 shares. If Creston's argument is correct and the $0.15 share price is foreclosed by the "maximum amount" proviso, damages would be reduced to US$1.5 million, a significant reduction from the arbitrator's award of damages.

**81**    As s. 31(2)(a) of the *AA* is the relevant provision in this case, a preliminary assessment of the question of law will be conducted in order to determine if a miscarriage of justice could have occurred had Creston been denied leave to appeal. Creston argues that the fact that the arbitrator's conclusion results in Sattva receiving shares valued at considerably more than the US$1.5 million maximum dictated by the "maximum amount" proviso is evidence of the arbitrator's failure to consider that proviso.

**82**    However, the arbitrator did refer to s. 3.1, the "maximum amount" proviso, at two points in his decision: paras. 18 and 23(a). For example, at para. 23 he stated:

               In summary, then, as of March 27, 2007 it was clear and beyond argument that under the Agreement:

             (a)    <u>Sattva was entitled to a fee equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange - section 3.1. It is common ground that the quantum of this fee is US$1,500,000.</u>

             (b)    The fee was payable in shares based on the Market Price, as defined in the Agreement, unless Sattva elected to take it in cash or a combination of cash and shares.

             (c)    The Market Price, as defined in the Agreement, was $0.15.

            [Emphasis added.]

**83**    Although the arbitrator provided no express indication that he considered how the "maximum amount" proviso interacted with the Market Price definition, such consideration is implicit in his decision. The only place in the contract that specifies that the amount of the fee is calculated as US$1.5 million is the "maximum amount" proviso's reference to s. 3.3 of the TSXV Policy 5.1. The arbitrator acknowledged that the quantum of the fee is US$1.5 million and awarded

Sattva US$1.5 million in shares priced at $0.15. Contrary to Creston's argument that the arbitrator failed to consider the proviso in construing the Agreement, it is apparent on a preliminary examination of the question that the arbitrator did in fact consider the "maximum amount" proviso.

**84**    Accordingly, even had the CA Leave Court properly identified a question of law, leave to appeal should have been denied. The requirement that there be arguable merit that the arbitrator's decision was unreasonable is not met and the miscarriage of justice threshold was not satisfied.

(5) <u>Residual Discretion to Deny Leave</u>

(a)    *Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

**85**    The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met (*BCIT*, at paras. 9 and 26). In *BCIT*, Saunders J.A. sets out a non-exhaustive list of considerations that would be applicable to the exercise of discretion (para. 31):

1. "the apparent merits of the appeal";
2. "the degree of significance of the issue to the parties, to third parties and to the community at large";
3. "the circumstances surrounding the dispute and adjudication including the urgency of a final answer";
4. "other temporal considerations including the opportunity for either party to address the result through other avenues";
5. "the conduct of the parties";
6. "the stage of the process at which the appealed decision was made";
7. "respect for the forum of arbitration, chosen by the parties as their means of resolving disputes"; and
8. "recognition that arbitration is often intended to provide a speedy and final dispute mechanism, tailor-made for the issues which may face the parties to the arbitration agreement".

**86**    I agree with Justice Saunders that it is not appropriate to create what she refers to as an "immutable checklist" of factors to consider in exercising discretion under s. 31(2) (*BCIT*, at para. 32). However, I am unable to agree that all the listed considerations are applicable at this stage of the analysis.

**87**    In exercising its statutorily conferred discretion to deny leave to appeal pursuant to s. 31(2)(a), a court should have regard to the traditional bases for refusing discretionary relief: the parties' conduct, the existence of alternative remedies, and any undue delay (*Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326, at pp. 364-67). Balance of convenience considerations are also involved in determining whether to deny discretionary relief (*Mining-Watch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6, at para. 52). This would include the urgent need for a final answer.

**88**    With respect to the other listed considerations and addressed in turn below, it is my opinion that they have already been considered elsewhere in the s. 31(2)(a) analysis or are more appropriately considered elsewhere under s. 31(2). Once considered, these matters should not be assessed again under the court's residual discretion.

**89**    As discussed above, in s. 31(2)(a), a preliminary assessment of the merits of the question of law at issue in the leave application is to be considered in determining the miscarriage of justice question. The degree of significance of the issue to the parties is covered by the "importance of the result of the arbitration to the parties" criterion in s. 31(2)(a). The degree of significance of the issue to third parties and to the community at large should not be considered under s. 31(2)(a) as the *AA* sets these out as separate grounds for granting leave to appeal under s. 31(2)(b) and (c). Furthermore, respect for the forum of arbitration chosen by the parties is a consideration that animates the legislation itself and can be seen in the high threshold to obtain leave under s. 31(2)(a). Recognition that arbitration is often chosen as a means to obtain a fast and final resolution tailor-made for the issues is already reflected in the urgent need for a final answer.

**90**    As for the stage of the process at which the decision sought to be appealed was made, it is not a consideration relevant to the exercise of the court's residual discretion to deny leave under s. 31(2)(a). This factor seeks to address the concern that granting leave to appeal an interlocutory decision may be premature and result in unnecessary fragmenta-

tion and delay of the legal process (D. J. M. Brown and J. M. Evans, with the assistance of C. E. Deacon, *Judicial Review of Administrative Action in Canada* (loose-leaf), at pp. 3-67 to 3-76). However, any such concern will have been previously addressed by the leave court in its analysis of whether a miscarriage of justice may arise; more specifically, whether the interlocutory issue has the potential to affect the final result. As such, the above-mentioned concerns should not be considered anew.

**91**    In sum, a non-exhaustive list of discretionary factors to consider in a leave application under s. 31(2)(a) of the *AA* would include:

> * conduct of the parties;
> * existence of alternative remedies;
> * undue delay; and
> * the urgent need for a final answer.

**92**    These considerations could, where applicable, be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria of s. 31(2)(a) have been met. However, courts should exercise such discretion with caution. Having found an error of law and, at least with respect to s. 31(2)(a), a potential miscarriage of justice, these discretionary factors must be weighed carefully before an otherwise eligible appeal is rejected on discretionary grounds.

(b)    *Application to the Present Case*

**93**    The SC Leave Court judge denied leave on the basis that there was no question of law. Even had he found a question of law, the SC Leave Court judge stated that he would have exercised his residual discretion to deny leave for two reasons: first, because of Creston's conduct in misrepresenting the status of the finder's fee issue to the TSXV and Sattva; and second, "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41). The CA Leave Court overruled the SC Leave Court on both of these discretionary grounds.

**94**    For the reasons discussed above, fostering and preserving the integrity of the arbitral system should not be a discrete discretionary consideration under s. 31(2)(a). While the scheme of s. 31(2) recognizes this objective, the exercise of discretion must pertain to the facts and circumstances of a particular case. This general objective is not a discretionary matter for the purposes of denying leave.

**95**    However, conduct of the parties is a valid consideration in the exercise of the court's residual discretion under s. 31(2)(a). A discretionary decision to deny leave is to be reviewed with deference by an appellate court. A discretionary decision should not be interfered with merely because an appellate court would have exercised the discretion differently (*R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509, at paras. 18 and 30). An appellate court is only justified in interfering with a lower court judge's exercise of discretion if that judge misdirected himself or if his decision is so clearly wrong as to amount to an injustice (*R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651, at para. 15; and *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297, at para. 117).

**96**    Here, the SC Leave Court relied upon a well-accepted consideration in deciding to deny discretionary relief: the misconduct of Creston. The CA Leave Court overturned this decision on the grounds that Creston's conduct was "not directly relevant to the question of law" advanced on appeal (at para. 27).

**97**    The CA Leave Court did not explain why misconduct need be directly relevant to a question of law for the purpose of denying leave. I see nothing in s. 31(2) of the *AA* that would limit a leave judge's exercise of discretion in the manner suggested by the CA Leave Court. My reading of the jurisprudence does not support the view that misconduct must be directly relevant to the question to be decided by the court.

**98**    In *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011, at pp. 1037-38, misconduct by a party not directly relevant to the question at issue before the court resulted in denial of a remedy. The litigation in *Homex* arose out of a disagreement regarding whether the purchaser of lots in a subdivision, Homex, had assumed the obligations of the vendor under a subdivision agreement to provide "all the requirements, financial and otherwise" for the installation of municipal services on a parcel of land that had been subdivided (pp. 1015-16). This Court determined that Homex had not been accorded procedural fairness when the municipality passed a by-law related to the dispute (p. 1032). Nevertheless, discretionary relief to quash the by-law was denied because, among other things, Homex had sought "throughout all these proceedings to avoid the burden associated with the subdivision of the lands" that it owned (p. 1037), even though the Court held that Homex knew this obligation was its re-

sponsibility (pp. 1017-19). This conduct was related to the dispute that gave rise to the litigation, but not to the question of whether the by-law was enacted in a procedurally fair manner. Accordingly, I read *Homex* as authority for the proposition that misconduct related to the dispute that gave rise to the proceedings may justify the exercise of discretion to refuse the relief sought, in this case refusing to grant leave to appeal.

**99**    Here, the arbitrator found as a fact that Creston misled the TSXV and Sattva regarding "the nature of the obligation it had undertaken to Sattva by representing that the finder's fee was payable in cash" (para. 56(k)). While this conduct is not tied to the question of law found by the CA Leave Court, it is tied to the arbitration proceeding convened to determine which share price should be used to pay Sattva's finder's fee. The SC Leave Court was entitled to rely upon such conduct as a basis for denying leave pursuant to its residual discretion.

**100**    In the result, in my respectful opinion, even if the CA Leave Court had identified a question of law and the miscarriage of justice test had been met, it should have upheld the SC Leave Court's denial of leave to appeal in deference to that court's exercise of judicial discretion.

**101**    Although the CA Leave Court erred in granting leave, these protracted proceedings have nonetheless now reached this Court. In light of the fact that the true concern between the parties is the merits of the appeal -- that is how much the Agreement requires Creston to pay Sattva -- and that the courts below differed significantly in their interpretation of the Agreement, it would be unsatisfactory not to address the very dispute that has given rise to these proceedings. I will therefore proceed to consider the three remaining questions on appeal as if leave to appeal had been properly granted.

      C.    *Standard of Review Under the AA*

**102**    I now turn to consideration of the decisions of the appeal courts. It is first necessary to determine the standard of review of the arbitrator's decision in respect of the question on which the CA Leave Court granted leave: whether the arbitrator construed the finder's fee provision in light of the Agreement as a whole, particularly, whether the finder's fee provision was interpreted having regard for the "maximum amount" proviso.

**103**    At the outset, it is important to note that the *Administrative Tribunals Act*, S.B.C. 2004, c. 45, which sets out standards of review of the decisions of many statutory tribunals in British Columbia (see ss. 58 and 59), does not apply in the case of arbitrations under the *AA*.

**104**    Appellate review of commercial arbitration awards takes place under a tightly defined regime specifically tailored to the objectives of commercial arbitrations and is different from judicial review of a decision of a statutory tribunal. For example, for the most part, parties engage in arbitration by mutual choice, not by way of a statutory process. Additionally, unlike statutory tribunals, the parties to the arbitration select the number and identity of the arbitrators. These differences mean that the judicial review framework developed in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. For example, the *AA* forbids review of an arbitrator's factual findings. In the context of commercial arbitration, such a provision is absolute. Under the *Dunsmuir* judicial review framework, a privative clause does not prevent a court from reviewing a decision, it simply signals deference (*Dunsmuir*, at para. 31).

**105**    Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. Both involve a court reviewing the decision of a non-judicial decision-maker. Additionally, as expertise is a factor in judicial review, it is a factor in commercial arbitrations: where parties choose their own decision-maker, it may be presumed that such decision-makers are chosen either based on their expertise in the area which is the subject of dispute or are otherwise qualified in a manner that is acceptable to the parties. For these reasons, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

**106**    *Dunsmuir* and the post-*Dunsmuir* jurisprudence confirm that it will often be possible to determine the standard of review by focusing on the nature of the question at issue (see for example *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654, at para. 44). In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise (*Alberta Teachers' Association*, at para. 30). The question at issue here, whether the arbitrator interpreted the Agreement as a whole, does not fall into one of

those categories. The relevant portions of the *Dunsmuir* analysis point to a standard of review of reasonableness in this case.

> D.    *The Arbitrator Reasonably Construed the Agreement as a Whole*

**107**    For largely the reasons outlined by Justice Armstrong in paras. 57-75 of the SC Appeal Court decision, in my respectful opinion, in determining that Sattva is entitled to be paid its finder's fee in shares priced at $0.15 per share, the arbitrator reasonably construed the Agreement as a whole. Although Justice Armstrong conducted a correctness review of the arbitrator's decision, his reasons amply demonstrate the reasonableness of that decision. The following analysis is largely based upon his reasoning.

**108**    The question that the arbitrator had to decide was which date should be used to determine the price of the shares used to pay the finder's fee: the date specified in the Market Price definition in the Agreement or the date the finder's fee was to be paid?

**109**    The arbitrator concluded that the price determined by the Market Price definition prevailed, i.e. $0.15 per share. In his view, this conclusion followed from the words of the Agreement and was "clear and beyond argument" (para. 23). Apparently, because he considered this issue clear, he did not offer extensive reasons in support of his conclusion.

**110**    In *Newfoundland and Labrador Nurses' Union*, Abella J. cites Professor David Dyzenhaus to explain that, when conducting a reasonableness review, it is permissible for reviewing courts to supplement the reasons of the original decision-maker as part of the reasonableness analysis:

> "Reasonable" means here that the reasons do in fact or in principle support the conclusion reached. That is, even if the reasons in fact given do not seem wholly adequate to support the decision, <u>the court must first seek to supplement them before it seeks to subvert them</u>. For if it is right that among the reasons for deference are the appointment of the tribunal and not the court as the front line adjudicator, the tribunal's proximity to the dispute, its expertise, etc, then it is also the case that its decision should be presumed to be correct even if its reasons are in some respects defective. [Emphasis added by Abella J.; para. 12.]

> (Quotation from D. Dyzenhaus, "The Politics of Deference: Judicial Review and Democracy", in M. Taggart, ed., *The Province of Administrative Law* (1997), 279, at p. 304.)

Accordingly, Justice Armstrong's explanation of the interaction between the Market Price definition and the "maximum amount" proviso can be considered a supplement to the arbitrator's reasons.

**111**    The two provisions at issue here are the Market Price definition and the "maximum amount" proviso:

### 2. DEFINITIONS

> **"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

And:

### 3. FINDER'S FEE

> 3.1 ... the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. <u>Such finder's fee is to be paid in shares of the Company based on Market Price</u> or, at the option of the Finder, any combination of shares and cash, <u>provided the</u>

amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations. [Emphasis added.]

**112**     Section 3.1 entitles Sattva to be paid a finder's fee in shares based on the "Market Price". Section 2 of the Agreement states that Market Price for companies listed on the TSXV should be "calculated on close of business day before the issuance of the press release announcing the Acquisition". In this case, shares priced on the basis of the Market Price definition would be $0.15 per share. The words "provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations" in s. 3.1 of the Agreement constitute the "maximum amount" proviso. This proviso limits the amount of the finder's fee. The maximum finder's fee in this case is US$1.5 million (see s. 3.3 of the TSXV Policy 5.1 in Appendix II).

**113**     While the "maximum amount" proviso limits the amount of the finder's fee, it does not affect the Market Price definition. As Justice Armstrong explained, the Market Price definition acts to fix the date at which one medium of payment (US$) is transferred into another (shares):

> The medium for payment of the finder's fee is clearly established by the fee agreement. The market value of those shares at the time that the parties entered into the fee agreement was unknown. The respondent analogizes between payment of the $1.5 million US finder's fee in shares and a hypothetical agreement permitting payment of $1.5 million US in Canadian dollars. Both agreements would contemplate a fee paid in different currencies. The exchange rate of the US and Canadian dollar would be fixed to a particulate date, as is the value of the shares by way of the Market Price in the fee agreement. That exchange rate would determine the number of Canadian dollars paid in order to satisfy the $1.5 million US fee, as the Market Price does for the number of shares paid in relation to the fee. The Canadian dollar is the form of the fee payment, as are the shares. Whether the Canadian dollar increased or decreased in value after the date on which the exchange rate is based is irrelevant. The amount of the fee paid remains $1.5 million US, payable in the number of Canadian dollars (or shares) equal to the amount of the fee based on the value of that currency on the date that the value is determined.

(SC Appeal Court decision, at para. 71)

**114**     Justice Armstrong explained that Creston's position requires the Market Price definition to be ignored and for the shares to be priced based on the valuation done in anticipation of a private placement.

**115**     However, nothing in the Agreement expresses or implies that compliance with the "maximum amount" proviso should be reassessed at a date closer to the payment of the finder's fee. Nor is the basis for the new valuation, in this case a private placement, mentioned or implied in the Agreement. To accept Creston's interpretation would be to ignore the words of the Agreement which provide that the "finder's fee is to be paid in shares of the Company based on Market Price".

**116**     The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both the Market Price definition and the "maximum amount" proviso. The arbitrator's interpretation of the Agreement, as explained by Justice Armstrong, achieves this goal by reconciling the Market Price definition and the "maximum amount" proviso in a manner that cannot be said to be unreasonable.

**117**     As Justice Armstrong explained, setting the share price in advance creates a risk that makes selecting payment in shares qualitatively different from choosing payment in cash. There is an inherent risk in accepting a fee paid in shares that is not present when accepting a fee paid in cash. A fee paid in cash has a specific predetermined value. By contrast, when a fee is paid in shares, the price of the shares (or mechanism to determine the price of the shares) is set in advance. However, the price of those shares on the market will change over time. The recipient of a fee paid in shares hopes the share price will rise resulting in shares with a market value greater than the value of the shares at the predetermined price. However, if the share price falls, the recipient will receive shares worth less than the value of the shares at the predetermined price. This risk is well known to those operating in the business sphere and both Creston and Sattva would have been aware of this as sophisticated business parties.

**118**     By accepting payment in shares, Sattva was accepting that it was subject to the volatility of the market. If Creston's share price had fallen, Sattva would still have been bound by the share price determined according to the Market Price definition resulting in it receiving a fee paid in shares with a market value of less than the maximum

amount of US$1.5 million. It would make little sense to accept the risk of the share price decreasing without the possibility of benefitting from the share price increasing. As Justice Armstrong stated:

> It would be inconsistent with sound commercial principles to insulate the appellant from a rise in share prices that benefitted the respondent at the date that the fee became payable, when such a rise was foreseeable and ought to have been addressed by the appellant, just as it would be inconsistent with sound commercial principles, and the terms of the fee agreement, to increase the number of shares allocated to the respondent had their value decreased relative to the Market Price by the date that the fee became payable. Both parties accepted the possibility of a change in the value of the shares after the Market Price was determined when entering into the fee agreement.

(SC Appeal Court decision, at para. 70)

**119**    For these reasons, the arbitrator did not ignore the "maximum amount" proviso. The arbitrator's reasoning, as explained by Justice Armstrong, meets the reasonableness threshold of justifiability, transparency and intelligibility (*Dunsmuir*, at para. 47).

E.    *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

**120**    The CA Appeal Court held that it and the SC Appeal Court were bound by the findings made by the CA Leave Court regarding not simply the decision to grant leave to appeal, but also the merits of the appeal. In other words, it found that the SC Appeal Court erred in law by ignoring the findings of the CA Leave Court regarding the merits of the appeal.

**121**    The CA Appeal Court noted two specific findings regarding the merits of the appeal that it held were binding on it and the SC Appeal Court: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but allowed it to receive shares valued at approximately $8 million if Sattva received its fee in shares; and (2) that the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement:

> The [SC Appeal Court] judge found the arbitrator had expressly addressed the maximum amount payable under paragraph 3.1 of the Agreement and that he was correct.

> This finding is contrary to the remarks of Madam Justice Newbury in the earlier appeal that, if Sattva took its fee in shares valued at $0.15, it would receive a fee having a value at the time the fee became payable of over $8 million. If the fee were taken in cash, the amount payable would be $1.5 million US. Newbury J.A. specifically held that the arbitrator did not note this anomaly and did not address the meaning of paragraph 3.1 of the Agreement.

> The [SC Appeal Court] judge was bound to accept those findings. Similarly, absent a five-judge division in this appeal, we must also accept those findings. [paras. 42-44]

**122**    With respect, the CA Appeal Court erred in holding that the CA Leave Court's comments on the merits of the appeal were binding on it and on the SC Appeal Court. A court considering whether leave should be granted is not adjudicating the merits of the case (*Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3, at para. 88). A leave court decides only whether the matter warrants granting leave, not whether the appeal will be successful (*Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, at para. 27, leave to appeal refused, [2013] 3 S.C.R. viii). This is true even where the determination of whether to grant leave involves, as in this case, a preliminary consideration of the question of law at issue. A grant of leave cannot bind or limit the powers of the court hearing the actual appeal (*Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566 (C.A.), at para. 32).

**123**    Creston concedes this point but argues that the CA Appeal Court's finding that it was bound by the CA Leave Court was inconsequential because the CA Appeal Court came to the same conclusion on the merits as the CA Leave Court based on separate and independent reasoning.

**124**    The fact that the CA Appeal Court provided its own reasoning as to why it came to the same conclusion as the CA Leave Court does not vitiate the error. Once the CA Appeal Court treated the CA Leave Court's reasons on the mer-

its as binding, it could hardly have come to any other decision. As counsel for Sattva pointed out, treating the leave decision as binding would render an appeal futile.

VI.    Conclusion

**125**    The CA Leave Court erred in granting leave to appeal in this case. In any event, the arbitrator's decision was reasonable. The appeal from the judgments of the Court of Appeal for British Columbia dated May 14, 2010 and August 7, 2012 is allowed with costs throughout and the arbitrator's award is reinstated.

\* \* \* \* \*

## APPENDIX I

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

(a)    "Market Price" definition:

### 2. DEFINITIONS

**"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

(b)    Finder's fee provision (which contains the "maximum amount" proviso):

### 3. FINDER'S FEE

3.1 ... the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations.

## APPENDIX II

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

### 3.3 Finder's Fee Limitations

The finder's fee limitations apply if the benefit to the Issuer is an asset purchase or sale, joint venture agreement, or if the benefit to the Issuer is not a specific financing. The consideration should be stated both in dollars and as a percentage of the value of the benefit received. Unless there are unusual circumstances, the finder's fee should not exceed the following percentages:

| Benefit | Finder's Fee |
| --- | --- |
| On the first $300,000 | Up to 10% |
| From $300,000 to $1,000,000 | Up to 7.5% |
| From $1,000,000 and over | Up to 5% |

As the dollar value of the benefit increases, the fee or commission, as a percentage of that dollar value should generally decrease.

## APPENDIX III

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

### Appeal to the court

**31** (1) A party to an arbitration may appeal to the court on any question of law arising out of the award if

    (a)    all of the parties to the arbitration consent, or

    (b)    the court grants leave to appeal.

(2)    In an application for leave under subsection (1) (b), the court may grant leave if it determines that

    (a)    the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,

    (b)    the point of law is of importance to some class or body of persons of which the applicant is a member, or

    (c)    the point of law is of general or public importance.

(3)    If the court grants leave to appeal under this section, it may attach conditions to the order granting leave that it considers just.

(4)    On an appeal to the court, the court may

    (a)    confirm, amend or set aside the award, or

    (b)    remit the award to the arbitrator together with the court's opinion on the question of law that was the subject of the appeal.

*Appeal allowed with costs throughout.*

**Solicitors:**

*Solicitors for the appellant: McCarthy Tétrault, Vancouver.*

*Solicitors for the respondent: Miller Thomson, Vancouver.*

*Solicitor for the intervener the Attorney General of British Columbia: Attorney General of British Columbia, Victoria.*

*Solicitors for the intervener the BCICAC Foundation: Fasken Martineau DuMoulin, Vancouver.*

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 173 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

2013 ONSC 1300
Ontario Superior Court of Justice [Commercial List]

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.

2013 CarswellOnt 2558, 2013 ONSC 1300, 226 A.C.W.S. (3d) 732

# Stetson Oil & Gas Ltd., Plaintiff and Stifel Nicolaus Canada Inc., Defendant

Newbould J.

Heard: January 9, 2013; January 10, 2013; January 11, 2013; January 16, 2013; January 18, 2013; January 21, 2013; January 22, 2013; January 23, 2013; January 24, 2013; January 28, 2013; February 5, 2013
Judgment: March 1, 2013
Docket: CV-08-7809-00CL

Counsel: William J. Burden, Arthur Hamilton, Lara Jackson, for Plaintiff
Joseph Groia, Kellie Seaman, David Sischy, for Defendant

Subject: Contracts; Civil Practice and Procedure; Corporate and Commercial; Natural Resources; Securities

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Contracts --- Performance or breach — Breach — Miscellaneous

Under engagement letter, W agreed to purchase for resale subscription receipts in capital of S at 55 cents per subscription receipt for aggregate gross proceeds of $25 million — W did not close agreement — S made agreement with C for financing which resulted in gross proceeds to S of $12 million for issuance of 60 million units at 20 cents per unit — S brought action for damages for breach of contract against W for different between proceeds it should have received and proceeds received — Action allowed — S was entitled to judgment against W for $16 million and interest — It was not open to W to rely on material adverse change-out clause and disaster out clause — W attempted to rely on clauses for first time at trial — W never attempted to negotiate underwriting agreement before W failed to close transaction as required by engagement letter — There was no agreement containing out clauses that W could rely on in refusing to close — Even if out clauses relied on by W were applicable, there were no facts present that would have entitled W to rely on out clauses.

## Table of Authorities

### Cases considered by *Newbould J.*:

*Baud Corp., N.V. v. Brook* (1978), 1978 CarswellAlta 268, 1978 CarswellAlta 302, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* [1979] 1 S.C.R. 633, [1978] 6 W.W.R. 301, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* 89 D.L.R. (3d) 1, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* 23 N.R. 181, 12 A.R. 271, 5 B.L.R. 225 (S.C.C.) — referred to

*Café La France, Inc. v. Schneider Securities, Inc.* (2003), 281 F.Supp.2d 361 (U.S. D. R.I.) — referred to

*Calvan Consolidated Oil & Gas Co. v. Manning* (1959), [1959] S.C.R. 253, 17 D.L.R. (2d) 1, 1959 CarswellAlta 83 (S.C.C.) — considered

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 174 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...
2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205, 1981 CarswellOnt 124 (Ont. C.A.) — considered

*Health & Community Living, Inc. v. Goldis Financial Group, Inc.* (March 13, 1998), Doc. 96 CV 0459 (U.S. Dist. Ct. E.D. N.Y.) — referred to

*Inmet Mining Corp. v. Homestake Canada Inc.* (2002), 2002 CarswellBC 53, 2002 BCSC 61, 99 B.C.L.R. (3d) 93 (B.C. S.C.) — considered

*Jamal v. Moola Dawood, Sons & Co.* (1915), [1916] 1 A.C. 175 (Lower Burma P.C.) — referred to

*Johnson v. Agnew* (1979), [1979] 1 All E.R. 883, [1980] A.C. 367 (U.K. H.L.) — considered

*Kerr v. Danier Leather Inc.* (2007), 2007 SCC 44, 2007 CarswellOnt 6445, 2007 CarswellOnt 6446, 87 O.R. (3d) 398 (note), 36 B.L.R. (4th) 95, 231 O.A.C. 348, 286 D.L.R. (4th) 601, [2007] 2 S.C.R. 331, 48 C.P.C. (6th) 205, 368 N.R. 204 (S.C.C.) — considered

*Leitch Transport Ltd. v. Neonex International Ltd.* (1979), 27 O.R. (2d) 363, 8 B.L.R. 257, 106 D.L.R. (3d) 315, 1979 CarswellOnt 171 (Ont. C.A.) — considered

*Mull v. Dynacare Inc.* (1998), 44 B.L.R. (2d) 211, 1998 CarswellOnt 3892 (Ont. Gen. Div.) — considered

*R. v. Mohan* (1994), 18 O.R. (3d) 160 (note), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 1994 CarswellOnt 1155, 1994 CarswellOnt 66 (S.C.C.) — considered

*Salah v. Timothy's Coffees of the World Inc.* (2010), 2010 CarswellOnt 7643, 2010 ONCA 673, 74 B.L.R. (4th) 161, 268 O.A.C. 279 (Ont. C.A.) — considered

*Semelhago v. Paramadevan* (1996), 1996 CarswellOnt 2737, 1996 CarswellOnt 2738, 197 N.R. 379, 3 R.P.R. (3d) 1, 28 O.R. (3d) 639 (note), 136 D.L.R. (4th) 1, 91 O.A.C. 379, [1996] 2 S.C.R. 415 (S.C.C.) — considered

*Treaty Group Inc. v. Drake International Inc.* (2007), 2007 ONCA 450, 2007 CarswellOnt 4018, 227 O.A.C. 72, (sub nom. *Leather Treaty v. Drake International Inc.)* 2007 C.L.L.C. 210-051, 86 O.R. (3d) 366, 51 C.C.L.T. (3d) 5 (Ont. C.A.) — referred to

*UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2008), 45 B.L.R. (4th) 105, 2008 CarswellOnt 2503 (Ont. S.C.J.) — considered

*UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2009), 95 O.R. (3d) 93, 2009 CarswellOnt 2082, 2009 ONCA 328, 248 O.A.C. 146, 58 B.L.R. (4th) 60 (Ont. C.A.) — referred to

*Von Hatzfeldt-Wildenburg v. Alexander* (1911), [1912] 1 Ch. 284, [1911-13] All E.R. Rep. 148, 81 L.J. Ch. 184 (Eng. Ch. Div.) — considered

**Statutes considered:**

*Securities Act*, R.S.O. 1990, c. S.5

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

s. 1(1) "material change" — referred to

ACTION for damages for breach of contract.

*Newbould J.*:

1    The plaintiff Stetson Oil & Gas Ltd. ("Stetson") sues for breach of a "bought deal" underwriting agreement contained in a signed letter agreement (the "engagement letter") under which Thomas Weisel Partners Canada Inc. ("Weisel") [1] agreed to purchase for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately \$25,000,030. Weisel did not close the agreement. Stetson then made an agreement with Canaccord Capital Corporation for financing which resulted in gross proceeds to Stetson of \$12,000,000 for the issuance of 60,000,000 units (each consisting of a share and warrant) at 20 cents per unit. Stetson claims damages for breach of contract against Weisel, being the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs.

2    For the reasons that follow, the action is allowed and Stetson is entitled to judgment against Weisel for \$16,042,669 and interest.

**Pertinent History**

3    Stetson is a junior oil and gas exploration company which trades on the TSX Venture Exchange. [2] Weisel at material times operated as an investment bank and securities dealer specializing in the growth sectors of the economy.

4    In June, 2008 Stetson made a proposal to the Fort Berthold Tribe of North Dakota to lease tribal lands to explore in the Bakken Formation in North Dakota. In 2008 the Bakken was one of the hottest oil and gas plays in the United States, due in part to new horizontal fracturing technology that allows for exploration and development in property that under conventional techniques could not be profitably explored. The Bakken in North Dakota and Saskatchewan has the potential to become a world class producer of oil and gas. Today it produces over 700,000 barrels of oil a day, mostly in North Dakota.

5    Stetson needed to raise funds in order to pursue the Bakken opportunity. Stetson's market capitalization at the time was \$15 to \$20 million

6    Stetson wanted to raise funds through a bought deal financing because it wanted a guarantee with no financing risk. In a bought deal, the underwriter agrees to purchase the issuer's securities at a fixed price and takes the risk of selling them in the market at a profit. A bought deal in this respect is fundamentally different from an agency or best efforts underwriting in which an underwriter makes best efforts to sell the securities of the issuer but provides no guarantee of the amount or value of the securities that will be sold. The issuer takes the market risk.

7    Stetson began canvassing the underwriting market in June, 2008 in anticipation of acquiring the lease rights in the Bakken. Mr. Stan Bharti, the founder and Chairman of Forbes & Manhattan, a very successful resource merchant bank, had been a director of Stetson since 2006. Forbes & Manhattan and Mr. Bharti had existing investment banking relationships with, among others, Canaccord and Macquarie Capital Markets Inc., but had no relationship with Weisel.

8    Weisel was very interested in doing business with Mr. Bharti as he was viewed as a very successful businessman who had been involved in many successful start-up ventures. When Weisel learned of his involvement in Stetson and Stetson's interest in the Bakken play in North Dakota, Weisel reached out to Mr. Bharti and Stetson. They viewed Mr. Bharti as the key decision maker for Stetson.

9    Mr. Alex Wylie of Calgary acted as the lead banker for Weisel in dealing with Stetson. Mr. Alec Rowlands of Weisel had known Mr. Bharti since 1993 and he and Mr. Wylie agreed to pursue Mr. Bharti and Stetson. Meetings were arranged

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

for the president of Stetson, Mr. Bill Ward, to meet with Mr. Wylie and after that there were a number of meetings between Stetson and Weisel.

10    Weisel had detailed research coverage on the Bakken play. It had extensively analyzed Kodiak Oil & Gas Corp. ("Kodiak"), a successful oil exploration company with lands near the lands that Stetson was pursuing. After his meeting with Mr. Ward, Mr. Wylie sent him several research reports Weisel had done on Kodiak and on another company involved in the Bakken named Tristar Oil & Gas.

11    Weisel promoted its expertise and knowledge of the Bakken formation as something that would be of assistance to Stetson. Messrs. Wylie and Rowlands told Mr. Bharti that they and their analysts knew the Bakken well, and that Weisel wanted to get involved in the deal and to build a relationship with Mr. Bharti and Forbes & Manhattan.

12    Weisel understood from discussions with Mr. Bharti and Mr. Said, another director of Stetson, that Stetson was looking to raise $25 million through a bought deal and that it could be expected that obtaining an underwriting agreement would be a competitive situation. There is no question but that Weisel was very anxious to get the business. An internal Weisel e-mail of July 4, 2008 from Mr. Wylie was indicative of this:

Stetson is a Stan Bhardhi [sic] company with assets in the Bakken...

. . .

They are ging [sic] to want a bought deal...Stan's last deal out here was a few weeks back for Vast...Niko took a big chunk...apparently they had $75MM in orders on a $25MM deal... Stan is going to be the decision maker on this ... they will have a syndicate but you need to put up a deal to get in the game on this one ...

13    Vast Exploration was a company in the Forbes & Manhattan group and the reference to it was to a recent financing for Vast that had received $75 million in orders for a limited $25 million financing.

14    On July 7, shortly after Mr. Ward met with the sales force of Weisel in Toronto, Mr. Wylie said in another internal Stetson e-mail that Stan Bharti was clearly the decision maker and that Mr. Rowlands "has the best relationship with Stan and he needs to start working him over". Mr. Wylie's evidence that all he was indicating was that he wanted Weisel to be prepared in case Stetson won the lands was not convincing. More indicative of Weisel's frame of mind was an e-mail from Mr. Rowlands to Mr. Bharti of July 9 which said "...this is a deal we want to lead, we believe that our coverage of the Bakken and the US players in the area will benefit Stetson, let's talk today, when are u available?" On the same day Mr. Wylie e-mailed Mr. Said of Stetson and said "The firm is very enthusiastic about getting behind the Stetson story and will be putting up a deal to Stetson once you are ready for bids."

15    The lease sought by Stetson required approval by the Tribal Council which was expected in early July. On July 11, 2008 Stetson announced that it had received Tribal Council approval to the lease of 8,570 acres of what were referred to as tribal lands that were adjacent to another 4,500 acres of freehold lands that it was leasing, subject to approval of the Bureau of Indian Affairs.

16    On that day, the Commitment Committee of Weisel met and decided to offer 50 cents a share on a bought deal that would see Stetson receive $25 million less fees to Weisel. Mr. Wylie called Mr. Bharti and Mr. Said and said that Weisel was prepared to deliver a bought deal letter at 50 cents a share. Mr. Bharti said that 50 cents was not enough and proposed 55 cents. The Commitment Committee of Weisel met a second time and agreed to the price of 55 cents a share.

17    At 8:53 p.m. on July 11, 2008, Weisel e-mailed a signed engagement letter from Mr. Wylie to Mr. Bharti and others. In the e-mail, Mr. Wylie outlined the terms of the "bought deal letter", including the following:

Syndicate: 65% TWP [Weisel], 35% Canaccord — the deal is not subject to syndication

18    This arose as a result of discussions between Messrs. Bharti and Mr. Said of Stetson and Messrs. Rowlands and Wylie of Weisel who knew that Forbes & Manhattan had a close relationship with Canaccord and that Canaccord was very interested

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

in the financing. Canaccord had been the lead banker for oil and gas deals that Forbes & Manhattan had done. Weisel thought that it would be easier to obtain Mr. Bharti's agreement to use Weisel for the financing if Weisel offered some of the deal to Canaccord. In early discussions Weisel had said to Mr. Bharti that if Stetson wanted syndication they could do that. Syndication means that the underwriter brings in other underwriters to reduce its liability or risk. Weisel told Mr. Bharti that if he felt syndication was important because of his relationships with other bankers, they would be open to it.

19    The engagement letter stated that the deal was not subject to syndication, and all Weisel witnesses confirmed that the deal did not require that Canaccord participate in it and that Weisel was quite prepared to proceed with the deal alone. It is quite clear that the participation of Canaccord was not required, or even asked for, by Weisel. Weisel told Mr. Bharti that their first preference was to go without any syndication. Mr. Bharti told Weisel that if Canaccord agreed, he would like to see Canaccord in the syndicate because of their long-term relationship and over the week-end after the engagement letter was sent by Weisel, he told them that he would like to see Canaccord with 40% rather than 35% but that it would be entirely up to Weisel how they would structure the syndicate.

20    Over the week-end there were communications between Mr. Gleeson, Stetson's in-house counsel, and Mr. Wylie of Weisel regarding terms of the engagement letter. Some terms were changed. On Sunday, July 13, 2008 at 11:11 pm Mr. Gleeson e-mailed to Mr. Wylie a copy of the engagement letter signed by him on behalf of Stetson. The terms had been changed somewhat from the previous version signed and sent by Weisel on July 11, 2008.

21    The engagement letter provided that Weisel, as the Lead Underwriter, would on a bought deal basis purchase by way of private placement for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel was granted an option to purchase an additional 9,091,000 subscription receipts for 55 cents each. Each subscription receipt was to be automatically exchanged for one common share of Stetson upon approval of the Bureau of Indian Affairs to the lease of the 8,570 acres already approved by the Tribal Council.

22    One of the terms of the engagement letter was that it was subject to reconfirmation by 5 a.m. Calgary time on July 14, 2008. It is apparently quite common if a bought deal is done at night that there must be reconfirmation in the morning. That is done to give a party time to react to something that may happen overnight before the morning. In this case Mr. Wylie of Weisel reconfirmed the deal at 5 a.m. Calgary time in a call to Mr. Said of Stetson.

23    Shortly before 7 a.m. Toronto time Mr. Pocrnic of Weisel telephoned Canaccord to invite Canaccord to participate in a syndicate. He recalls little of the discussion. A few minutes later he got a call back from Canaccord saying they were going to pass on the transaction. Mr. Wylie called Mr. Said who suggested he call Genuity as Genuity had indicated late on Sunday evening that if Canaccord did not participate, which Genuity though highly remote, Genuity would certainly play a syndicate role. Mr. Pocrnic then spoke to the head of institutional sales at Genuity who indicated they would not participate. Mr. Wylie informed Mr. Said of this and said that Weisel was going ahead with the marketing of the deal.

24    At 7:31 a.m. Toronto time, Weisel released a press release announcing on behalf of Stetson that Stetson had entered into an agreement with Weisel as lead underwriter on behalf of a syndicate of underwriters to purchase on a bought deal private placement basis 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. In the parlance of the underwriting market, the deal at that point went "live".

25    On July 13, Weisel advised its sales and trading personnel that it would be going live on a bought deal for Stetson the next morning at 7:30 a.m. Weisel intended and expected to sell the entire bought deal by 9:15 am, within two hours of announcing the deal, and fifteen minutes before the TSX opened at 9:30am. This was consistent with both the timelines for a bought deal in Weisel's Deal Book, the guide used by Weisel to conduct its business. Mr. Wylie testified that once Canaccord backed out, Weisel was not sure that the entire position would sell by the opening of the market that day. I have some trouble with that evidence. Mr. Wylie had said that putting a provision in the engagement letter that the deal was not subject to syndication had

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 178 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

been intended to show a sign of strength on the part of Weisel and that Weisel did not need Canaccord in the deal but could do it alone.

26    Weisel was not able to sell any of its position in Stetson on the 13th. Mr. Rowlands, the managing director of institutional equity sales for Weisel, said that at the same time the Stetson press release was issued to announce the bought deal with Weisel, Shell Canada announced it was going to buy Duvernet Oil, an oil and gas play in Alberta, for $6.5 billion dollars. Most of the people Weisel wanted to talk to were shareholders of either Shell or Duvernet and it was very difficult to get them on the telephone as they were pre-occupied with the larger deal. There was no suggestion that the fact that Canaccord was not part of the syndicate was any impediment to the deal. Mr. Rowlands kept Mr. Bharti informed on a daily basis that week and for the first half of the week told Mr. Bharti that they were confident that the deal would be sold.

27    However, by July 17, 2008 Weisel had managed to place only $2 million of its position. Mr. Bharti's evidence, which I accept, was that in his experience involving 30 or 40 bought deals, they can sell out in one hour, sometimes in two or three days and usually are always sold out in the first four or five days. He said it was that it was in no one's interest for a bought deal to be a hung deal, meaning for the underwriters to be holding the stock. The market would understand that the stock could not be sold and it would hurt the price of the stock.

28    Mr. Bharti offered later that month to have Aberdeen, a Forbes & Manhattan fund, buy $2 million of Weisel's position if the rest was sold, and said that Stetson was open to discussions if Weisel wanted to change some terms to help them resell the deal. He testified that he made it clear to Weisel that Stetson needed the money by the end of July or early August to meet their obligations, that Stetson had to be pragmatic, and that if Weisel came back with a proposal that would help them sell the deal, for example with a different price or incentives, Stetson would be open to looking at. Weisel never came back with any new fixed proposal before closing.

29    The engagement letter provided that the deal was to close on July 31, 2008. On that date Stetson was to receive the agreed amount from Weisel. However, on July 28, 2008 Weisel's lawyers wrote to Stetson's lawyers and said that Weisel did not intend to close the deal on July 31, 2008. No reason was provided.

30    By letter of July 31, 2008 e-mailed on August 1, 2008, Stetson's lawyers wrote to Weisel's lawyers and said that Stetson "agrees to allow the extension of the closing past July 31, 2008 to a later date that reasonably coincides with the Corporation's capital expenditure requirements". There had been no request for an extension from Weisel and it cannot be said that the extension was made by agreement with Weisel. Mr. Bharti's evidence, which I accept, was that Stetson had no choice but to state that there was an extension as Weisel had gone silent and had not said why they would not close or provided new terms. He said that Stetson had commitments and that its business was in jeopardy. Because they had had some discussion on terms, he felt an extension would give time to perhaps come to new terms that would allow them to fulfill their commitments. He said he had to be practical and pragmatic and was trying to look for a solution. Mr. Said's evidence, which I also accept, was to the same effect.

31    A press release announcing the extension was made on August 8th. Mr. Bharti's evidence, which I accept, was that they had not heard back from Weisel regarding the extension letter and they had statutory disclose requirements to announce the extension contained in the July 31, 2008 letter e-mailed the following day. Mr. Said testified that Stetson was stuck because of the failure of Weisel to close the transaction and that announcing anything other than that the deal was extended would be terrible for Stetson. He said that there was no agreement with Weisel about the extension. I accept that evidence. I do not accept the evidence of Mr. Wylie that he had discussions with Mr. Bharti and Mr. Said regarding the extension or that Weisel agreed or participated in extended the closing. There was no discussion in the conversation between Stetson and Weisel people on August 1, 2008 about any extension of the closing. Weisel had no interest or intention of closing the deal reached in the engagement letter. It sought a new deal for much less and for terms more favourable to it.

32    Around the time of the extension, Mr. Bharti received a call from Mr. Lionel Conacher, the president and chief operating office of Weisel, who was based in San Francisco at the time. They met in Toronto on August 13, 2008. They differ as to what exactly was said. I viewed Mr. Bharti as having the better recollection, but it is perhaps unimportant. No new agreement was reached. On August 14, 2008 Weisel offered to make a debt investment of $8 million in return for a release of its obligations

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

under the engagement letter. On August 18, 2008 the solicitors for Stetson replied that Stetson would not release Weisel from the terms of the engagement letter and that if Weisel did not fulfill its obligations, it would take action.

33    As early as August 1, 2008 Stetson began to consider alternatives to the Weisel deal. On that day they received a proposal from First Energy that was not acceptable. They went to Canaccord and Macquarie for advice. Canaccord suggested considering a strategic partner and Mr. Said met with Crescent Point at Canaccord's suggestion. However Mr. Said testified that Stetson had no leverage and Crescent Point knew they had a financing problem. No agreement was made. They also met with Tristar and although it looked promising at the outset, Tristar knew that Stetson had no leverage and in Mr. Said's words, were trying to squeeze Stetson. Tristar knew that if Stetson did not get financing, they could go themselves to the Tribal Council and get the lands themselves.

34    Eventually Stetson signed an agreement with Canaccord effective August 28, 2008 pursuant to which Canaccord agreed to provide a $12 million financing on a "best efforts" basis in exchange for 60,000,000 units, each unit consisting of a share and warrant of Stetson, at 20 cents per unit. In addition, Stetson agreed to issue approximately 85 million preferred shares to every existing shareholder of Stetson who would be entitled to "the proceeds of any final judgment or settlement monies paid to and received by the Corporation in connection with its claim against Thomas Weisel...". The preferred shares were the idea of Canaccord as a sweetener to assist the sale of the Stetson shares.

35    Mr. Said testified that Canaccord was doing Stetson, and particular Mr. Bharti, a favour. He testified that Stetson was tainted because of the failed bought deal and that Canaccord were uncertain what they could do. Stetson trusted Canaccord would do its best. I accept this evidence.

36    The Canaccord financing closed on September 17, 2008 for net proceeds to Stetson of $11,215,928.92 after fees paid to Canaccord.

37    Before the closing, Stetson had to obtain two bridge loans from Longford Energy Inc., a public company that is a member of the Forbes & Manhattan group, to make lease payments that had become due. These bridge loans and the associated fees ($100,000) and accrued interest ($33,559) were repaid from the proceeds received on closing of the Canaccord financing.

38    There were not sufficient funds from the Canaccord financing for Stetson to undertake its development in the Bakken. Another $23 or $24 million was needed. Mr. Ward, the president of Stetson, thought a strategic partner was needed and he canvassed potential parties. Eventually a proposal was made in early October 2008 by Red Willow Great Plains, LLC. Red Willow was a business enterprise of the Southern Ute Indian Tribe with sizeable oil and gas production.

39    Under the Red Willow deal, Stetson assigned 50% of its oil and gas mineral rights in the allotment lands and 60% of its rights in the tribal lands to Red Willow. In exchange, Red Willow agreed to pay for Stetson's first $3,500,000 of drilling costs and also to pay for its share of all land, drilling and exploration costs, to provide its considerable technical expertise and to act as the operator of the programme.

40    Eventually only one well was drilled before Red Willow decided not to proceed further, and the project was terminated and the leases lost. During the trial, a ruling was made refusing a motion by Weisel to amend its pleading to rely on the Red Willow transaction and subsequent activity under it, and thus geological evidence regarding the leased lands and their economic potential was not led.

**Was there a binding agreement?**

41    Weisel takes the position that the engagement letter was not a binding agreement, but only an agreement to agree, and that before there could be a binding agreement, there had to be an underwriting agreement signed by the parties prior to closing.

42    The principles to be considered in assessing whether the parties entered into a binding agreement or merely agreed to agree were recently discussed by Pepall J. (as she then was) in *UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.*

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 180 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...
2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

(2008), 45 B.L.R. (4th) 105 (Ont. S.C.J.) at paras. 40 to 43; aff'd (2009), 95 O.R. (3d) 93 (Ont. C.A.). I take from her discussion the following principles:

(a) The test as to whether there was *consensus ad idem* is an objective one. The parties will be found to have reached a meeting of the minds where it is clear to the objective reasonable bystander, in light of all the material facts, that the parties intended to contract and the essential terms of that contract can be determined within a reasonable degree of certainty.

(b) The investigation to determine whether a reasonable observer would think that two parties intended to contract extends to all the circumstances of the agreement. This has been held to include words and conduct, future actions and representations by both parties and reliance. This determination frequently involves an assessment of the credibility of witnesses

(c) An agreement is not incomplete simply because it calls for some further agreement between the parties or because it provides for the execution of a further formal document. It is a question of construction whether the execution of the further contract is a condition or term of the bargain, or whether it is a mere expression of the desire of the parties as to the manner in which the transaction already agreed to will in fact go through.

43    In *Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250 (Ont. C.A.), which involved an issue as to whether a letter sufficed to make a binding agreement or required a formal contract, Morden J.A. cited Professor Waddams for the proposition that subsequent conduct of the parties, while not conclusive and to be looked at with caution, may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date. He also cited Corbin on Contracts for the proposition that the fact that the parties have acted by rendering some substantial performance or by taking other material action in reliance upon their existing expressions of agreement is itself a circumstance bearing upon the question of completeness of their agreement.

44    Morden J.A. also said, quoting Cardozo J., that it is important to consider, as a part of the context of the document, "the genesis and aim of the transaction".

45    There are a number of provisions in the engagement letter that suggest it constitutes a binding agreement. There is also a provision requiring an underwriting agreement to be made prior to closing. Included are the following provisions:

Thomas Weisel Partners Canada Inc. ("Thomas Weisel" or the "Lead Underwriter"), hereby offers, on a "bought deal" basis by way of private placement, to purchase for resale...

**1. Terms of Engagement**

...The Offer shall be open for acceptance by the Company until 10 a.m. (Calgary time) on July 13, 2008 unless otherwise extended...and is subject to reconfirmation prior to 5 a.m. (Calgary time) on July 14, 2008. Upon the reconfirmation of this engagement letter, the Company authorizes Thomas Weisel to disseminate the press release attached in Schedule C...The Company agrees upon reconfirmation of this engagement letter to have the trading of its securities halted, if necessary,...

**3. Underwriting Agreement**

The definitive terms of this agreement will be governed by a formal underwriting agreement to be entered into prior to closing of the purchase by Thomas Weisel (the "Underwriting Agreement") in respect of the Offering. The Underwriting Agreement will be negotiated in good faith between the Company and Thomas Weisel, on behalf of the Underwriters, and will contain representations, warranties, covenants, conditions (including, without limitation, the delivery of certificates of responsible officers of the Company on behalf of the Company, and legal opinions from counsel to the Company regarding relevant corporate and securities matters with respect to the Offering, and the principal subsidiaries and properties of the Company, together with other relevant corporate and securities matters, acceptable to Thomas Weisel and its counsel), indemnity and termination provisions (including without limitation, standard "due diligence-out", "disaster-out", "material

adverse change-out", and "regulatory-out" rights) customary in agreements of this type and will be consistent in all material respects with this letter agreement, unless otherwise agreed between the parties.

**5. Indemnification**

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. Such indemnity shall be executed and delivered to Thomas Weisel on the execution of this agreement. The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. This agreement and the indemnity provisions contained in Schedule B shall enure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties, and the obligations and liabilities assumed in the agreement and in the indemnity contained in Schedule B shall be binding upon their respective successors and assigns. ...

**8. Other matters**

(e) Any dispute arising out of this agreement (including any Schedule) will exclusively be submitted to an arbitrator for binding and conclusive resolution.... [3]

**9. Acceptance**

Please confirm that the foregoing is in accordance with the Company's understanding by signing and returning the attached duplicate copy of this letter, which shall thereupon constitute a binding agreement between the Company and Thomas Weisel. (Underlining added)

46    The language of this engagement letter certainly indicates an intention that it be a binding agreement. It states so expressly in paragraph 9 and the expression "this agreement" is referred to many times. The provision in paragraph 3 calling for the negotiation of an underwriting agreement does not state that until there is such an underwriting agreement there is no binding agreement between the parties.

47    The inclusion of an arbitration clause is a clear indication that a binding agreement was made. Otherwise there would be no purpose in an arbitration provision. The same is the case with respect to the indemnity provided in the engagement letter.

48    What is the "genesis and aim" of the transaction? It was a bought deal underwriting transaction that was intended to be acted upon within hours of the signing of the engagement letter. The time for acceptance by Stetson of the offer contained in the engagement letter was very short. The price of 55 cents per share (or subscription receipt) had been settled by Weisel after taking into account the trading price of Stetson's shares late on the afternoon of Friday, July 11, 2008 with the intention that if the engagement letter was signed by Stetson the deal would go "live" before the opening of the markets on Monday morning, and if normal events occurred, would be sold out shortly thereafter.

49    The engagement letter was to be reconfirmed by Weisel by 5 a.m. Calgary time, Monday morning, which it was. There would be no need for a reconfirmation if there were no binding agreement. Weisel intended to thereupon contact Canaccord to offer them part of the Stetson position that it had agreed to underwrite, which it did, and to issue the press release announcing the agreement by the parties to a bought deal, which it did. All of this before the market opened in Toronto at 9:30 a.m. Weisel then met with a number of its institutional clients to try to sell them a position. Weisel could not have taken these steps if it thought that it had no binding agreement with Stetson. It would make no commercial sense to view things differently.

50    The form of the engagement letter was a standard form used by Weisel, and any substantive changes had to be approved by its Commitment Committee. The form of the letter was contained in Weisel's Deal Book, the guide used by Weisel to conduct its business. That Deal Book also contained the following statement about the engagement letter:

The engagement letter specifies the terms of the deal and serves as the primary agreement defining the obligations of the dealer to the issuer and vice versa.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

51    Mr. Wylie, the lead banker for Weisel on this transaction, agreed on cross-examination that the statement was a correct statement at the time the engagement letter was signed. That is, Weisel itself acted on the basis that the engagement letter was the primary agreement that defined the obligations of Stetson and Weisel. While the test as to whether there was a binding agreement is not a subjective test, this evidence is consistent with what a reasonable observer would consider to have occurred, i.e. that a binding agreement had been made by the parties. The same can be said for the lack of evidence of any Weisel witness that the engagement letter was not a binding agreement. No Weisel witness testified that Weisel acted as it did on the basis that the engagement letter was not a binding agreement or that the engagement letter was viewed by them as not being a binding agreement.

52    There are other indications that Weisel understood that it was making a binding agreement. Mr. Wylie testified that at the first meeting of the Weisel Commitment Committee dealing with Stetson on July 11, 2008, the thrust of the conversation was that Weisel had to be confident in putting up the firm's capital that the deal "would sell" in the market place, i.e. not that they would be committing capital only after they had gone to the market and learned that the deal had sold, but before.

53    After Weisel had gone to the market and had difficulty in selling its position, Mr. Conacher, the president and chief operating officer of Weisel, e-mailed Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, and others at Weisel on July 19, 2008. He stated:

Nick - I'd like to have a review first thing on Monday of exactly which accounts we've approached on Stetson, which ones are outstanding, which accounts are likely buyers of the deal and for you to review the action plan for the coming week. I think we should include Seth and/or Mo in the discussion so that we make sure we are thinking about ALL possible alternatives to get off this liability. This is by far the most important thing we need to do between now and month end and I want to make sure that we are utilizing all of the Firm's resources to manage this situation. Going forward I want a full daily report that includes all of the above. I want a full Court press on this. Nobody goes on vacation until this deal is sold. If people are on vacation, call them back. (Underlining added)

54    This was a clear indication that Weisel was acting on an understanding that it had a liability to Stetson and that it wanted to sell out the position before it was required to close the deal with Stetson on July 31, 2008. No reasonable observer could view it otherwise.

55    Stetson clearly acted on the basis that it had a binding agreement with Weisel and it relied on the agreement being binding. Stetson consented to the press release announcing the bought deal to be released in its name on July 14, 2008 and Stetson personnel attended the meetings set up by Weisel with prospective purchasers in accordance with the terms of the engagement letter. No reasonable observer would expect Stetson to have done these things if there was no binding agreement.

56    This is not a case such as two U.S. cases relied upon by Weisel [4] in which the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement.

57    Weisel contends that its offer was subject to due diligence and the execution of an underwriting agreement, and that was an indication that a formal agreement was necessary, absent which the engagement letter was merely an agreement to agree. However, this is not what the language of the engagement letter says.

58    So far as due diligence is concerned, the engagement letter stated that "completion of the offering was subject to due diligence to be completed prior to the closing", which was to be on July 31, 2008, a little over two weeks after the engagement letter was open for acceptance and long after it was expected that the Stetson position would have been sold by Weisel. Due diligence was not a condition for the offer in the engagement letter and its acceptance to be binding, but a potential reason for Weisel not to close the transaction if there were material matters undisclosed at the time of the acceptance of the engagement letter affecting Stetson's affairs.

59    So far as the requirement for an underwriting agreement is concerned, it was also something to be negotiated prior to closing. The engagement letter did not state that it was a condition of the engagement letter being binding. It is ironic that such

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

reliance is made by Weisel of the need for an underwriting agreement. Weisel made no attempt at all to negotiate one, and a request by Stetson's solicitors on July 24, 2008 to Weisel's solicitors for a draft of the underwriting agreement went unanswered.

60    While the engagement letter contemplated that an underwriting agreement would be made prior to closing, the underwriting agreement, in the language of Parker J. in *Von Hatzfeldt-Wildenburg v. Alexander* [(1911), [1911-13] All E.R. Rep. 148 (Eng. Ch. Div.)] quoted by Judson J. in *Calvan Consolidated Oil & Gas Co. v. Manning*, [1959] S.C.R. 253 (S.C.C.) at page 5, was not a condition of the bargain but rather it was an expression of the desire of the parties as to the manner in which the transaction already agreed to was to go through.

61    Stetson called as an expert witness Mr. Stephen Halperin, a lawyer practising at the Toronto law firm of Goodmans LLP, where he is a partner, member of the firm's executive committee and co-chair of the corporate securities group. Mr. Halperin was called to give evidence as to how a "Reasonable Market Actor" would view the engagement letter in the circumstances of this case. His Reasonable Market Actor was a proxy for how he believed a reasonably sophisticated participant in an underwriting process would have construed the situation. His qualifications as an expert witness were not challenged by Mr. Groia, but surprisingly in light of that concession, the weight to be placed on his evidence is now challenged on the basis that he has little experience in what he testified to.

62    Mr. Halperin was an impressive witness. It is the case that he is a highly regarded lawyer in his field, which no doubt was the reason why he was not challenged as an expert, but it is also the case that he has had business experience in the area and dealings in his career with the issues involved in this case. He has been involved in a variety of significant transactions in the areas of corporate finance and mergers and acquisitions and as acted for both issuers and underwriters. In his capacity as a director, he has participated in probably 6 private placements and has been involved in bought deals. He is currently a member of the OSC's Senior Securities Lawyers Advisory Group and is a past member of the OSC's Securities Advisory Committee. It was evident throughout his testimony that he is very knowledgeable and I accept his views without qualification.

63    Mr. Halperin was clear to say that he was not offering a legal opinion as to whether the engagement letter constituted a binding contract, but an opinion of whether a Reasonable Market Actor would consider the engagement letter to be a binding agreement. I expressed some concern that he was trespassing on the purview of the judge who is to decide this issue, but was reminded that as the case law has developed, particularly in *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.), the rule which excluded expert evidence on the ultimate issue before a court is no longer of general application, although the concerns underlying it remain.

64    In determining whether expert evidence is a necessity in assisting the trier of fact, what is required is that the opinion be necessary in the sense that it provides information which is likely to be outside the experience and knowledge of a judge or jury. See *R. v. Mohan* at para. 26.

65    It is Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I appreciate that Mr. Halperin does not purport to opine on the legal meaning of the engagement letter but rather how a Reasonable Market Actor would view it. In that sense, he is looking at it from the perspective of a reasonable man, or put differently, from the perspective of what objectively can be taken from the engagement letter and the surrounding circumstances. That however is not really something that is outside the experience and knowledge of a judge. It is commonplace for judges to consider whether parties have arrived at a meeting of the minds to form a binding contract. The tests for doing so are contained in the jurisprudence, some of which I have referred to.

66    Mr. Levy, who filed an expert report on behalf of Weisel and who testified at the trial, referred in his report to the engagement letter as a letter of intent. He stated in his report that the letter of intent "is an agreement" used within the Canadian securities industry to set the intended terms, conditions and indemnifications of a financing. On cross-examination, Mr. Levy said he agreed with the statement in the Weisel Deal Book that the engagement letter serves as the primary agreement defining the obligations of the dealer and issuer. Thus in that regard his evidence on this point was not inconsistent with Mr. Halperin's opinion.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 184 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...
2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

67    In the circumstances I decline to rely on Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I also decline to rely on Mr. Levy's statement that the engagement letter was an agreement. These are not matters for which evidence is necessary in order for a judge understand and deal with the issue.

### Applicability of the "out clauses"

68    The engagement letter provided in paragraph 5 that the definitive terms of "this" agreement would be governed by a formal underwriting agreement to be entered into prior to closing of the purchase, to be negotiated in good faith between the parties, and that the underwriting agreement would contain certain terms, including standard "due diligence out", "disaster out", "material adverse change-out", and "regulatory out" rights customary in agreements of this type, to be consistent in all material respects with "this" letter agreement.

69    In the first offer from Weisel sent to Stetson, the word "broad" preceded the out clauses. This word was changed in the final signed engagement letter at the request of Mr. Gleeson of Stetson to "standard", so that the clauses were to be standard out clauses customary in agreements of this type.

70    Weisel contends that the inclusion of the out provisions in the underwriting agreement was a fundamental term of its participation in the financing and that it would not have committed to any obligation with respect to the financing unless an agreement explicitly included standard out clauses. Two things can be said to that argument. First, Weisel did commit to the obligation by reason of the language and provisions in the engagement letter that I have already discussed. Second, the engagement letter in paragraph 5 provided that what was to be contained in the underwriting agreement regarding out clauses were to be standard provisions customary in agreements of this type. Presumably Weisel must have been satisfied with this description.

71    Weisel relies on two of the clauses in its closing argument, being the "material adverse change-out" and "disaster out" clauses. In my view, it is not open for Weisel to rely on these clauses.

72    First, Weisel never attempted to negotiate an underwriting agreement before it failed to close the transaction on July 31, 2008 as required by the engagement letter. The Weisel Deal Book checklist for bought deals in which Weisel was the lead underwriter required Weisel to draft an underwriting agreement with legal counsel. Counsel for Stetson's request for Weisel's draft underwriting agreement went unanswered. Therefore there was no agreement containing these out clauses that Weisel could rely on in refusing to close.

73    Second, at no time did Weisel purport to rely on these clauses. They were first raised during this litigation. The form of clauses relied on by Weisel as being the standard clauses were by their language to be available to Weisel to refuse to close the transaction (i) if Weisel came to the opinion that the conditions in them were not met and (ii) written notice to that effect was given prior to the time of closing. When Weisel announced through its lawyers on July 28, 2008 that it did not intend to close on July 31, 2008, no suggestion was made by its lawyers that Weisel had formed the opinion that it had a right to refuse to close because of any out clause nor was anything said by anyone at Weisel to anyone at Stetson that it was relying on any out clause in deciding not to close on July 31, 2008.

74    Mr. Levy, Weisel's expert witness, in discussing the out clauses, stated that if Weisel determined as a result of its ongoing review of the Bakken project that the potential profitability had been materially reduced as a result of an oil price decline (which Weisel relied on at the trial), Weisel could consider termination by use of the due diligence out clause and/or the material change out clause. While I disagree with Mr. Levy's opinion that these clauses could have been relied on by Weisel, it is noteworthy that he said that before considering termination of the agreement, Weisel had to first make a determination after reviewing the Stetson Bakken project that its profitability had been materially reduced. Weisel had made no review of Stetson's Bakken project after signing the engagement letter nor had it made any determination that its profitability had been reduced before it announced that it was not going to close on July 31, 2008 as required by the engagement letter. Thus even according to Weisel's own expert, there was no basis to be purporting to rely on the out clauses.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 185 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

75    Mr. Levy's opinion reflects the two clauses relied on by Weisel. The clauses require that in order to terminate its obligations, the underwriter must form an opinion prior to the time of closing that the conditions in the clause have occurred and must give written notice of its exercise of the rights contained in the clauses. None of that occurred in this case.

76    The standard material adverse change out clause relied on by Weisel provides:

If, after the date hereof and prior to the Time of Closing, there shall occur any material change or change in a material fact which, in the reasonable opinion of the Underwriters (or any of them), would be expected to have a significant adverse effect on the market price or value of the Securities, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing.

77    The standard disaster out clause relied on by Weisel provides:

The obligations of the Underwriter (or any of them) to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

78    Weisel argues that oil price changes were sufficient to enable it to rely on these clauses. It points to no evidence, and there is none, that prior to July 31, 2008 it formed an opinion required by the material change out clause that oil price changes would be expected to have a significant adverse effect on the market price or value of the Stetson securities. Nor is there any evidence that prior to July 31, 2008 Weisel formed an opinion required by the disaster out clause that because of oil price changes there had developed, occurred or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which seriously adversely affected, or involved, or would seriously affect, or involve, the financial markets or the business, operations or affairs of Stetson.

79    Nor did Weisel give written notice that it was terminating its obligations under the engagement letter because of the out clauses. On August 1, 2008 there was a conference call participated in by Messrs. Bharti and Said and others on behalf of Stetson and by Messrs. Conacher, Wylie, Rowlands and others on behalf of Weisel. During that call there was nothing said by anyone on behalf of Weisel about the price of oil, or the state of the markets or the Stetson share price, and nothing was said about using any out clause to terminate their obligations under the engagement letter.

80    This argument of Weisel that the out clauses entitle it to deny liability to Stetson because of oil price declines is nothing more than a *post facto* attempt to rely on something said to fall within the material adverse change and disaster out clauses. It is supported by no plausible evidence. No Weisel witness testified that Weisel refused to close because of any drop in oil prices.

81    When one looks at the oil prices changes, they can hardly be said to rise to the level that would support any reasonable opinion that the out clauses now relied on by Weisel permitted the termination of the engagement letter.

82    Weisel argues that as at July 14, 2008, the price of oil reached a near-peak price of $145.16 per barrel. As at September 5, 2008, the price of oil had dropped to $106.47 per barrel, representing a 27% drop in less than two months and said to be the first substantive material decline in oil prices since December 2006.

83    However, Stetson was an exploration play and the daily price of oil was of less importance than for an oil producer. Stetson would likely have not been in production for four years. The evidence of Mr. Bharti, which I accept, was that with an exploration play such as Stetson's project, short term price movements were not important when compared to the long term view on oil pricing and that the long term view of oil was bullish with oil prices staying at or above $80 to $85 per barrel. Mr. Said's evidence, which I also accept, was to the same effect. What was of importance to Stetson, and fully recognized by Weisel, was that oil prices would not likely drop below the forecasted oil prices used in their future value models.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 186 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

84    In its various reports at relevant times, Weisel used conservative oil prices much below market prices in forecasting future values of oil plays. Also, Mr. Wylie, the lead banker for Weisel on this transaction, acknowledged that oil by nature has a high beta, i.e. high volatility and that he would look at pricing over a one or two month period to give him a trend line. It was only two weeks after the deal went live on July 14, 2008 that Weisel through its lawyers said on July 28, 2008 that it would not close on July 31, 2008.

85    On March 12, 2008, Weisel prepared a research report in respect of Kodiak Oil & Gas Corp. Under the heading Unproven Resource Potential, Weisel stated that it estimated Kodiak's unproven Bakken resource potential based on a number of assumptions. The assumption for oil was an average NYMEX oil price of $75 per barrel and an average realized oil price of $65 per barrel. Kodiak was also an exploration play in the Bakken and no drilling had yet occurred. On the day of its report the spot price for WTI oil closed at $109.86.

86    On April 25, 2008, Weisel prepared a research report with respect to another Bakken player, TriStar Oil & Gas Ltd, an oil producer, and used as commodity prices in its valuation a WTI price of $110 per barrel for 2008 and $100 per barrel for 2009. On that day, April 25, 2008, the WTI spot price for oil closed at $132.99.

87    On May 21, 2008, Weisel produced another research report on Kodiak. In its net asset value sensitivity analysis, it used three price point cases — the low case at $75 per barrel, the mid-range case at $85 per barrel, and the high case at $95 per barrel. On May 21, 2008 the WTI spot price for oil closed at $132.99.

88    In an investor presentation dated July 3, 3008 which was provided to Weisel shortly afterwards, Stetson used initial production price assumptions in its two forecasted cases of WTI $90 and $115 per barrel. On that date, the spot price for WTI oil closed at $145.31. After this report was made to the Weisel sales team on July 8, 2008, Mr. Wylie told Stetson that Weisel was very enthusiastic about Stetson and would be putting up a deal to Stetson once it was ready for bids. By July 10, 2008 Weisel had prepared a presentation to be used by its sales team that used the same price assumptions of $90 and $115 that Stetson had used. On July 28, 2008, the date that Weisel's lawyers advised Stetson that it would not close, the spot price for TWI oil closed at $124.72.

89    Throughout July, Weisel's equity sales team used its sales presentation in trying to market the Stetson position. As well, Weisel continued to promote Stetson as being similar to Kodiak. On July 21, 2008 Weisel sent to potential equity investors the two Kodiak reports of March 12 and 21 which contained the price assumptions already referred to. On that date Weisel was valuing the Stetson shares, which it had agreed to purchase for 55 cents, at $1.50. It would hardly be right for Weisel to now take the position that the oil prices had dropped to the point that the material adverse market and disaster out clauses were applicable when at the same time it was marketing its Stetson position with oil price forecast assumptions that were lower than the then current price of oil.

90    What also belies Weisel's argument on oil pricing is how it reacted to oil pricing at relevant times. On July 3, 2008, oil closed at its highest price to date, at $145.31 per barrel. However, in the next two trading days, oil retreated by more than $9 per barrel to close on July 8 at a price of $136.06 per barrel. July 8 was the day Stetson made its presentation to Weisel's sales desk. There is no evidence that anyone within Weisel, whether connected with the sales desk or otherwise, registered any concern about the drop in the price of oil and it was after this presentation that Mr. Wylie stated, in an e-mail to Mr. Said of Stetson that Weisel was very enthusiastic about getting behind the Stetson story and would be putting up a deal to Stetson once Stetson was ready for bids.

91    In light of all of this, it is not surprising that no one from Weisel testified that Weisel refused to close because of any drop in oil prices. To have asserted that would not have been plausible or reasonable.

92    Mr. Rowlands did testify that the markets began to turn around negatively at about the time that oil prices hit their high. Both he and Mr. Conacher testified that the markets were buoyant leading up to the engagement letter but that by the end of July (Mr. Conacher) or third week of July (Mr. Rowlands), they had turned negative. This evidence was given to support a

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

case that it was oil pricing that caused a turn in the markets. I have considerable doubt about the admissibility of this evidence, which is opinion evidence.

93    Mr. Rowlands also asserted that by July 28 the decline in oil pricing from July 14th was a reflection of a growing concern for the debt crisis. I do not think he had any qualifications to make such a statement. He was a trader of stocks, not an economist or someone trained in the analysis of markets and the cause and effect of factors on those markets.

94    In any event, I think the evidence of Mr. Rowlands and Mr. Conacher on these issues is unreliable. Their assertions were made baldly, with no objective evidence given by them to support them. While they testified in chief that the markets were buoyant at the time of the engagement letter, in fact the major indices such as the TSX, the Dow and the S & P 500 were down considerably since their highs earlier in the year. Mr. Conacher could not recall the date of the major economic event that year, the collapse of Lehman Brothers that occurred on September 15, 2008 and he acknowledged that it had an immense impact on the financial markets. The world financial markets, of course, suffered from the debt crisis much earlier than July, 2008, as witness the collapse of the asset backed commercial paper market in 2007. I do not accept the implication of their evidence that the failure of Weisel to sell its position in Stetson was caused by the price of oil starting to drop shortly after the engagement letter was agreed on the evening of July 13, 2008.

95    In my view, and I so find, even if the out clauses relied on by Weisel were applicable, there were no facts present that would have entitled Weisel to rely on them or that entitle Weisel to rely on them in this trial.

*(i) Material adverse change out clause*

96    On the premise, however, that the out clauses were a part of the agreement between the parties, I will consider material adverse change out and disaster out clauses as they are the two clauses relied on by Weisel.

97    In this connection the expert opinions of Mr. Halperin and Mr. Levy must be considered. What would be considered to be standard material adverse change or disaster out clauses is something that is not within the knowledge of a judge and is the proper purview of expert evidence. For the reasons that follow, I prefer the evidence of Mr. Halperin rather than Mr. Levy.

98    The engagement letter provided that the underwriting agreement was to contain "a standard material adverse change-out... customary in agreements of this type". I assume, although it is not clear, that "agreements of this type" refers to a bought deal by way of a private placement. A material adverse change out provision is referred to in the jargon of the industry as a "MAC out" provision.

99    The handbook of the Investment Industry Association of Canada (IIAC), which sets out the standard features of an underwriting agreement and the particular wording that "parties in the business have come to expect", contains a "material change out" clause that would be applicable to both a bought deal and an agency best efforts deal. It says that "material change out" clause means a provision substantially in the following form:

> If, after the date hereof and prior to the Time of Closing, there shall occur any <u>material change or change in a material fact</u> which, in the reasonable opinion of the Underwriters (or any of them), <u>would be expected to have a significant adverse effect on the market price or value of the Securities</u>, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing. (Underlining added).

100    There are two other MAC out clauses in the record that apply to agency agreements and not bought deals. I view them as not determinative, although the one in the Weisel Deal Book is some indication of what Weisel would want in a negotiated material adverse change out clause. [5]

101    The IIAC material change out clause does not define what is meant by material change or change in a material fact. These are not loose terms but have particular meaning in the securities industry.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

102     Mr. Halperin's opinion is that MAC out clauses in the securities underwriting context (again subject to the specific language of the relevant provision) would typically be expected to be interpreted by reference to the legal definition of "material change" in the *Securities Act* (Ontario) and comparable provisions under other Canadian provincial securities legislation, which define a "material change", in pertinent part, as: "a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer ...". He went on to say:

> In my experience, "MAC out" provisions in underwriting agreements tend to be based upon the statutory definition of material change (adding the adjective "adverse"). Thus, in the underwriting context, Reasonable Market Actors would expect that a "MAC out" would be available to the underwriter in the event of a change in the business, operations or capital of the issuer of the securities that would rise to the level of a defined material change, with the change "trigger" being the price or value of the issuer's securities, without regard to whether the change is permanent or transformational.

103     Mr. Halperin went on to say that there is some debate and uncertainty as to whether a MAC out in this context only gives rise to an underwriter termination right if the MAC out is specific to the issuer as opposed to being of general application. Mr. Halperin said that the issue is sometimes addressed through specific drafting of the provision in the underwriting agreement. In this case Weisel never attempted to negotiate an underwriting agreement.

104     Mr. Halperin's opinion is that in the absence of drafting specificity, the Reasonable Market Actor would derive some guidance on the issue from two sources, being National Policy 51-201 of the Canadian Securities Administration dealing with disclosure standards for reporting issuers and a decision of the Supreme Court of Canada in *Kerr v. Danier Leather Inc.*, [2007] 2 S.C.R. 331 (S.C.C.) which he said became well known in the business community.

105     National Policy 51-201 states that it is only external developments that have a direct effect on a business not generally experienced by other business in the same industry that require disclose of changes, as follows:

> Companies are not generally required to interpret the impact of external political, economic and social developments on their affairs. However, if an external development will have or has had a direct effect on the business and affairs of a company that is both material and uncharacteristic of the effect generally experienced by other companies engaged in the same business or industry, the company is urged to explain, where practical, the particular impact on them. For example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, such companies should make an announcement.

106     In *Danier*, the trial judge held that a significant change in weather patterns was not a change in the business of *Danier* and thus not a material change within the definition of material change in the Securities Act. The Supreme Court agreed with that finding and pointed out that the distinction between a material fact and a material change was deliberate. Binnie J. stated:

> The distinction between "material change" and "material fact" is deliberate and policy-based, as explained by a former chairman of the O.S.C.:

>> The term "material fact" is necessary when an issuer is publishing a disclosure document, such as a prospectus or a take-over bid circular, where all material information concerning the issuer at a point in time is published in one document which is convenient to the investor. The term "material change" is limited to a change in the business, operations or capital of the issuer. This is an attempt to relieve reporting issuers of the obligation to continually interpret external political, economic and social developments as they affect the affairs of the issuer, unless the external change will result in a change in the business, operations or capital of the issuer, in which case, timely disclosure of the change must be made.

107     Thus the purport of Mr. Halperin's opinion is that absent a specific contractual provision to the contrary, a Reasonable Market Actor would consider that a standard material adverse change out clause would require a change to the business of Stetson and not a change in oil pricing generally in order for Weisel to attempt to rely on the clause.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

108    Weisel takes the position that a MAC out clause as contained in the IIAC form of clause is applicable and that any material change in oil prices is not required to have an effect on the business of the issuer, in this case Stetson. This position is somewhat ironic as the form of MAC out clause in Weisel's Deal Book for an agency agreement restricts its applicability to a material change in the business of the issuer, and one would think that in any negotiations that clause would be the starting position for Weisel and accepted by Stetson. The language of the engagement letter was changed between the first draft and the signed letter to change the out clauses to be included in the underwriting agreement from "broad" to "standard" out clauses. [6] No evidence was given as to what that difference would be so far as a material adverse change out clause is concerned, but it suggests that perhaps the clause would have been restricted to changes to the business of Stetson rather than to the industry in general.

109    Weisel says that there is a distinction between materiality in a legislative context and in contractual context, and that the objectives behind legislative provisions to protect the public are different from contractual objectives. It relies on the following passage from *Inmet Mining Corp. v. Homestake Canada Inc.*, 2002 BCSC 61 (B.C. S.C.):

> There is an important distinction to be made between the tests for materiality that the courts have applied in cases of legislated disclosure, such as that found in the Securities Act, Real Estate Act, etc., and the test for materiality in a contract. In the former cases the tests have to be more objective because the legislation is aimed at protection of the general public. It would be impossible to know what would affect the mind of every purchaser. <u>By contrast, the parties to a contract have the opportunity to tailor make their own terms and a purchaser is able to build in its own protections. In a contract the court is bound to use a more subjective standard in determining what was material and adverse to a particular purchaser's decision to buy.</u> (Underlining added)

110    I take the point of the underlined passage relied on by Weisel. However, unlike the situation posited in *Inmet*, there was no material adverse change out clause tailored by Weisel. Another case relied on by Weisel, *Mull v. Dynacare Inc.* (1998), 44 B.L.R. (2d) 211 (Ont. Gen. Div.) makes clear that whether the defendant purchaser could refuse to close because of changes to the business being acquired was to be determined on the wording of the agreement. See Sanderson J. at paras. 113 to 125.

111    In this case, where there was no material adverse change out clause negotiated by the parties, other than a reference in the engagement letter to the parties negotiating in good faith an underwriting agreement that was to contain a standard material change out clause, I accept the opinion of Mr. Halperin that a Reasonable Market Actor would be guided by the provisions that he referred to in thinking that a material adverse change out clause would restrict changes to those that materially affected Stetson rather than just affecting businesses in the industry generally.

112    There is another reason why Mr. Halperin considered this to be so, and it has to do with the difference between a market out clause and a material adverse change out clause.

113    A market out clause allows an underwriter to refuse to close if the securities to be acquired by the underwriter cannot be marketed profitably. A typical clause is contained in the IIAC Handbook as follows:

> If, after the date hereof and prior to the Time of Closing, the state of financial markets in Canada or elsewhere where it is planned to market the Securities is such that, in the reasonable opinion of the Underwriters (or any of them), the Securities cannot be marketed profitably, any Underwriter shall be entitled, at its option, to terminate its obligations under this agreement by notice to that effect given to the Company at or prior to the Time of Closing.

114    All witnesses agreed that a bought deal cannot contain a market out clause. This is because a principal element of a bought deal is that the market risk is transferred to the underwriter on the execution of the agreement. Whether the underwriter will be able to sell the securities for more than it paid to the issuer is entirely the risk of the underwriter. For that reason a market out clause is never contained in a bought deal agreement, and is inconsistent with a bought deal.

115    Mr. Halperin's opinion, which I accept, is that Reasonable Market Actors would understand that, on balance, in the context of a "bought deal" arrangement where there is axiomatically no "market out" in favour of the underwriter, the MAC out clause should not be construed so as to effectively provide the underwriters with a "market out" by another name. Stetson

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

contends that is what Weisel is effectively doing in this case by arguing that because it could not sell its Stetson position profitably, it should be relieved of its obligation to purchase the Stetson shares (or subscription receipts). I agree with Stetson on this point. What Weisel says would fall within a MAC out clause would also fall within a market out clause.

116    This notion that a MAC out clause should not be construed so as to effectively provide an underwriter with a market out clause is particularly important in this case in which no specific MAC out clause was negotiated. I would not construe the language of a "standard material adverse change out clause" contained in the engagement letter as to be negotiated by the parties as permitting a market out clause by another name. No reasonable market actor would think otherwise.

117    Finally, even if the form of MAC out clause contended by Weisel should govern, I do not think that it would be of assistance to Weisel. That is because any change would have to be material, and in my view the evidence on this point is against Weisel.

118    First, Weisel knew that the price of oil was very volatile, that it had a high beta. It could not possibly think that when it reached an all-time high that it would stay there. The oil prices during the second half of July, 2008 continued to be above the assumed pricing used by Weisel in its analysis of the share price of Stetson as well as other companies such as Kodiak, and no witness testified that at the time it was thought that the oil pricing would drop below those levels.

119    Second, Weisel did not believe that the oil pricing had materially affected the value of Stetson. On July 21, 2008 Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, said in an internal engagement letter-mail that based on the Stetson land package and a comparison to the Kodiak Bakken lands "we come to a valuation of approximately $1.50 per share (with $.31 in cash)." When this is compared to the 55 cents per share that Weisel agreed to pay Stetson, it hardly can be said that if there were an adverse change by reason of the oil price movements, it was material to the risk that Weisel had taken on, or that it would be reasonable to conclude that the change would expect to have a significant adverse effect on the market price or value of the Stetson shares.

120    It is significant, in my view, that there is no evidence that the reasons given to Weisel by prospective purchasers of the Stetson position for not wanting to purchase Stetson shares was any concern for oil pricing. Mr. Pocrnic prepared an account tracking document that listed the feedback Weisel sales personnel had received from various accounts concerning the Stetson offering. A significant majority of the feedback from those accounts that had passed on the Stetson offering reported "too small", and Mr. Pocrnic confirmed that this feedback referred to Stetson's market capitalization size or size of the deal. None of the feedback listed in the account tracking maintained by Mr. Pocrnic, and distributed by e-mail on July 23, disclosed any account that expressed concern about the current price of oil.

121    Mr. Levy in his report referred to the WTI spot price of oil on July 11, 2008 of $144.96 and on August 15, 2008 of $113.46, a drop of 21.73%. He then referred to five corporations in the energy sector and compared their share prices on July 11, 2008 and August 15, 2008, which had a drop in trading of between 7.56 % and 58.62%. He then stated that it was his opinion that:

    (i) If Weisel determined as a result of its ongoing review of the Bakken project, that the potential profitability had been materially reduced as a result of the oil price decline, they could consider termination by use of the due diligence out clause and/or the material change out clause.

    (ii) If Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then the material change out clause and/or the disaster out clause could be considered.

122    I have considerable concerns with Mr. Levy's opinions. It was unclear whether Mr. Levy had any or much relevant experience in bought deals, or what that experience was. He acknowledged that he is not an expert in the oil and gas industry. He is now a consultant but when in business was involved in areas of management, compliance and supervision.

123    Of considerable concern are the five corporations he chose for his comparison to oil price declines. It is clear that he knew very little of these corporations and he admitted he did no analysis to determine if the companies were comparable to Stetson. On cross-examination he said he did not say they were true comparables. He acknowledged that many factors affect

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

share prices and that he did not look at the individual companies to consider what other factors might have affected their share prices. His use of the date of August 15, 2008 was not explained other than a reference in his report to negotiations going on between Stetson and Weisel at the time. It was July 31, 2008 that was the date for closing and it was three days earlier on July 28, 2008 that Weisel announced through its lawyers that it was not going to close.

124     Mr. Levy acknowledged that the failure of a bought deal would be viewed as a negative for the Stetson share price. The expectation was that the Stetson position would be closed on the day it went live on July 14, 2008. As time passed and the position had not sold, Mr. Bharti's evidence, which I accept was that the failure was viewed as a negative for Stetson. The Stetson shares closed at 60 cents on Friday, July 11, 2008 when Weisel made its offer at 55 cents, and on July 14, 2008, the date that the deal went live. By July 28, 2008 when Weisel announced it was not going to close on July 31, 2008, the closing price of the Stetson shares had drifted down to 44 cents at the close on light volume. It is possible that the slide was because of the bought deal going awry. It may have been because of falling oil prices, although if that were the case it would mean the market was not valuing the exploration play on a longer term basis, or any other factor that causes share prices to go up or down. Two days later the shares closed on July 30, 2008 at fifty cents.

125     Mr. Levy in my view had no basis to state, as he did, that the price decline in oil from July 11 to August 15, 2008 "had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities, many of which suffered material declines in prices." He was not qualified to express such an opinion and his analysis (or lack of analysis) did not support it. Nor did he have a basis to state that Weisel could rely on a market adverse change out clause or a disaster out clause. He did say, which I have previously discussed, that in order for Weisel to rely on such clauses, it would have had to consider the issues referred to in those clauses, which Weisel did not do.

126     Mr. Halperin's opinion was that Reasonable Market Actors would not have an expectation that a bought deal underwriter would be entitled to terminate its commitment by invoking standard disaster out or MAC out provisions solely on the basis of a decline in the price of oil which neither results in or leads to a serious deterioration in financial markets generally, nor affects the issuer in question in a manner disproportionate to its effect upon other entities in the issuer's industry sector. I accept that opinion. I am not prepared to find on the evidence that any decline in oil prices at the relevant times led to a serious deterioration in financial markets generally, nor affected Stetson in a manner disproportionate to its effect upon other entities in Stetson's sector. Weisel has not established those things.

127     In all the circumstances, I find that Weisel may not rely on a material adverse change out clause to contend that it was entitled to terminate its obligations under the engagement letter.

*(ii) Disaster out clause*

128     Weisel relies on a form of disaster out clause contained in the IIAC Handbook:

The obligations of the Underwriter to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

129     Weisel asserts that the 27% drop in oil price from July 14, 2008 to September 5, 2008 and the 62% drop in the value of Stetson's common shares in the same time period entitled Weisel to terminate any obligations it had under the engagement letter pursuant to the disaster-out clause.

130     Even assuming that Weisel formed the necessary opinion and acted pursuant to a disaster out clause, which I have held it did not, I cannot accept the argument that it had grounds to act under such a clause.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

131    The relevant date is not September 5, 2008, but July 28 or the latest July 31, 2008. The drop in oil from July 14 to July 31, 2008 was from $145.16 to $124.17, or approximately 14.5% and the price of the shares of Stetson during that period declined from 60 cents to 50 cents, or 16.67%.

132    On what basis can one conclude that the drop in the price of oil of 14.5% was a major financial occurrence of national or international consequence that *seriously adversely affected or involved the financial markets* or the *business, operations or affairs of Stetson*? There was no evidence to support such an assertion. With oil having a high beta, or volatility, one would expect prices to go up or down and even Mr. Wylie said he would want to look at a longer period of over one or two months to see a trend line. I have already disregarded the assertion of Mr. Levy that the price decline in oil from July 11 to August 15, 2008 had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities.

133    Mr. Halperin's opinion is that a disaster out clause in the underwriting context is generally understood by Reasonable Market Actors to be somewhat analogous to a *force majeure* provision in other contractual contexts. The clause contemplates termination of an underwriting obligation, and Reasonable Market Actors would expect that it could only be invoked, in the event of a catastrophic "macro" event, circumstance or change in law of national or international general application which is not specific to a particular issuer or (except in the most extraordinary circumstances) industry. That opinion is consistent with the IIAC form of disaster out clause and I accept it.

134    Mr. Halperin further opined that most significantly, in the context of a "bought deal" arrangement which is typified by the absence of a "market out" provision, Reasonable Market Actors would have an expectation that a disaster out clause would not be used by, or interpreted as being available to, underwriters to terminate commitments, in the absence of a "disaster" properly so called, on the basis solely of facts and circumstances that affect the state of the financial markets such that the underwriters have determined that the underwritten securities, in the language of standard "market out" provisions, cannot be marketed profitably. I accept that opinion as well.

135    Without discussing any of the specifics of the disaster out clause contained in the IIAC Handbook, Mr. Levy asserted:

> If however, Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then in our opinion, as to CSI practice that termination under the due diligence out clause, the material change out clause and/or the disaster out clause could be considered.

136    Weisel made no analysis or determination that the exploration relating to Stetson's Bakken leases was no longer viable. But even had it done so, Mr. Levy has not explained how the oil price decline reached the level required by the disaster out clause. I do not accept his opinion that the disaster out clause could be considered.

137    In all the circumstances, I find that Weisel may not rely on a disaster out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**Indemnity agreement**

138    Section 5 of the engagement letter provided, in part:

> **5. Indemnification**

> The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. ...The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. ...

139    What those more comprehensive indemnity provisions would have been in the underwriting agreement is unknown as there was no underwriting agreement.

140    Schedule B contained an indemnity provision, portions of which are as follows:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 193 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

In connection with the engagement (the "Engagement") of Thomas Weisel Partners Canada Inc. ("Thomas Weisel") pursuant to an engagement letter (the "Engagement Letter") between Thomas Weisel and Stetson Oil & gas Ltd. (the "Company") dated July 11, 2008, the Company agrees to indemnify and hold harmless Thomas Weisel and other members of the syndicate formed in connection with the Engagement, and any of their respective affiliates (herein referred to collectively as the "Underwriters") and the Underwriters' respective directors, officers, employees, partners, each other person, if any, controlling any of the Underwriters or any of their respective subsidiaries and each shareholder of the Underwriters (collectively, the "Indemnified Parties" and individually, an Indemnified party"), from and against any and all losses (other than lost profits), claims (including shareholder actions, derivative or otherwise), actions, suits, proceedings, damages, liabilities or expenses of whatever nature or kind, joint or several, including the aggregate amount paid in reasonable settlement of any actions, suits, proceedings, investigation or claims and the reasonable fees, expenses and taxes of their counsel that may be incurred for advising with respect to and/or defending any action, suit, proceedings, investigation or claim that may be made or threatened against any Indemnified Party or in enforcing this indemnity (collectively the "Claims") to which any Indemnified Party may become subject or otherwise involved in any capacity insofar as the Claims relate to, are caused by, result from, arise out of or are based upon, directly or indirectly, the Engagement whether performed before or after the Company's execution of the Engagement Letter and to reimburse each Indemnified Party forthwith, upon demand, for any legal or other expenses reasonably incurred by such Indemnified Party in connection with any Claim. <u>The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.</u> (Underlining added)

141     Weisel contends that the underlined words prevent Stetson from suing Weisel for more than the fees actually received by Weisel, which in this case were nothing as Weisel did not close the transaction. Thus, if it is the case that Weisel breached the engagement letter by failing to close, Weisel reads the indemnity provision to prevent Stetson from suing Weisel for breach of contract.

142     The issue therefore is to interpret this contractual provision. The principles of contract interpretation are well known and were recently summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 (Ont. C.A.) at para. 16 as follows:

16. The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole — like a complex commercial transaction — and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.

143     I do not read Schedule B as being the only relevant provision. Paragraph 5 of the engagement letter is also part of the agreement, and it provides that Stetson agrees to indemnify the underwriters in accordance with Schedule B. One cannot read paragraph 5 in any way other than that what was intended by the parties was an indemnity.

144     The language of Schedule B is hardly a model of draftsmanship. The portions relied on by Weisel are not all of its contents. Its form is contained in Weisel's Deal Book and was apparently drafted by its outside counsel (not Mr. Groia's firm). The language is prolix, difficult to follow and unclear.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 194 of 554

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

145    The language of Schedule B provides that the indemnified parties include Weisel, any other underwriter who becomes a member of the syndicate and the directors, employees, partners, etc. of Weisel or other syndicate underwriters. It contains many clauses typical of indemnities, including requirements to notify Stetson of a claim made against an indemnified party and the right of Stetson to approve any settlement of a claim. Down to the underlined portion of the quoted part of Schedule B relied on by Weisel, it is relatively clear that the indemnity refers to losses etc. caused to an indemnified party by some third party other than the indemnified party. That is the nature of an indemnity.

146    For ease of reference, the last sentence of the quoted part of Schedule B states:

The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.

147    By agreeing that an indemnified party will not be liable or obligated for any damages in excess of fees received by Weisel, the Company, being Stetson, could not literally restrict what a third party could successfully claim against an indemnified party, and that could not have been the purpose of that provision. Stetson argues, and I tend to agree, that in the context of an indemnity given to an indemnified party, the provision means (i) that Stetson must pay to the indemnified party any liability of the indemnified party to a third party in excess of the fees actually received by Weisel and (ii) Stetson may not sue or claim against any such third party any amount in excess of those fees. Thus if Weisel were the indemnified party in any situation, the issuer, in this case Stetson, would have to indemnify Weisel against any liability it had to a third party in excess of the fees received by Weisel and Stetson could not sue the third party for anything in excess of those fees.

148    The reference in the provision limiting liability to the amount of fees actually received by Weisel pursuant to the engagement letter suggests that the provision is intended to apply only if the engagement letter has been closed. Weisel could not have actually received any fees if the engagement letter did not close. Mr. Groia in argument said that if Weisel were found to be in breach of agreement, it would not object to a judgment against it in the amount of the fees that it would have received had the agreement closed. However, that would be providing a result not in accordance with the language of the agreement. The concession, however, was a reflection I believe of the difficulty in arguing that Schedule B means that a breach of agreement by Weisel results in no damages payable to Stetson.

149    There is another provision in Schedule B that lends support to the interpretation of the provision as not applying to a claim by Stetson against Weisel for failure to close the engagement letter. Schedule B contains the following:

The foregoing indemnity shall not apply to the extent that a court of competent jurisdiction in a final judgment that has become non-appealable shall determine that such losses, expenses, claims, actions, damages or liabilities to which the Indemnified Party may be subject were caused by the negligence or wilful misconduct of the Indemnified Party.

150    This provision clearly would mean that if Weisel is the indemnified party, it may not be indemnified for something caused by its negligence or wilful misconduct. Wilful means intentional as opposed to accidental. Misconduct is defined in the Concise Oxford English Dictionary as "unacceptable or improper behaviour". The American Heritage Dictionary includes in its definition of misconduct "Behaviour not conforming to prevailing standards or laws; impropriety". Businessdictionary.com defines wilful misconduct as "Conscious or intentional disregard of the rights or the safety of others; misconduct in which an individual is doing what he or she intends to do".

151    It is hard to think that wilful misconduct could not include intentional breach of contract. Breach of contract is certainly unacceptable and improper in the eyes of the law and it disregards the rights of the other party to the contract. The sense of the provision that the indemnity does not cover damages caused by Weisel's negligence or wilful conduct is clear. If Weisel was involved in such conduct as found by a court, it is not entitled to be indemnified. In this case, Weisel has been involved in intentional breach of contract by not closing the engagement letter on July 31, 2008 and thus the provision relied on by Weisel, even if it did otherwise prevent Stetson from suing Weisel, could not apply.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

152     Mr. Groia argued that the provision dealing with wilful misconduct does not apply to the provision Weisel relies on regarding damages in excess of the fees actually received by Weisel. This is because, he says, the provision dealing with wilful misconduct begins by stating that the foregoing "indemnity" shall not apply if there is wilful misconduct, whereas the provision regarding damages in excess of fees is not an indemnity. The reason why this latter provision is not an indemnity, he says, is because it refers to "damages", which is to be distinguished from a Claim that is the subject of the indemnification in the lengthy paragraph that precedes the sentence Weisel relies on.

153     This interpretation appears to me to be a completely strained and artificial interpretation, one that might be made by wordsmiths but which lacks any commercial or common sense. Technically it ignores the definition of "Claim" in the indemnity that includes the word "damages". The sentence relied on by Weisel begins with the words "The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any "damages"...in excess of fees actually received...". This is a reference obviously to a claim for damages and it is part of the indemnity provisions contained in the paragraph. The provision regarding wilful misconduct begins with the words "The foregoing indemnity shall not apply...". There is no basis to say that "the foregoing indemnity" was anything but the indemnity provision contained earlier in Schedule B, including the sentence dealing with no liability or obligation in excess of fees received by Weisel.

154     There is another reason why the clause should not prevent Stetson from suing Weisel in this case. One of the principles of contract interpretation as summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.*, *supra*, is that a court should interpret a contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. It would be a commercial absurdity to conclude that the parties intended that Weisel would have a free pass to break the contract by not closing it without any liability. That would make no commercial sense, and any such result would have to be expressly and explicitly stated in the agreement. In my view, the language of the paragraph 5 of the engagement letter and Schedule B is not so explicit.

155      Finally, Stetson points out that the arbitration provision dealing with disputes between Stetson and Weisel provides that the arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. Stetson contends that the arbitration provision is the only provision dealing directly with claims between the parties, that it is an indication that the parties directed their minds to what damages the arbitrator could not award, and that there is no limitation of damages against Weisel to its fees received. [7] Weisel contends that the arbitration clause is not the only provision in the agreement dealing with claims between the parties and there is nothing in the arbitration provision that affects, limits or supersedes the indemnity agreement in Schedule B.

156     I think there is force to this argument of Stetson. The parties directed their mind in the arbitration clause to the kinds of damages that could not be awarded. There was no limitation of the damages that could be awarded against Weisel to only the fees received by Weisel. I recognize that it is a general arbitration clause, and if the provision in Schedule B clearly and explicitly provided that Weisel could not be sued by Stetson for its breach of contract when it had not received any fees, that might survive in spite of the language of the arbitration provision. However in my view it does not so explicitly provide.

157     Weisel led evidence from some if its witnesses as to what protection was sought by the indemnity agreement. In my view, this evidence does not affect the issue. While there may have been some ambiguity in the language of Schedule B, any such ambiguity could be resolved without the need to consider extrinsic evidence. In any event, evidence of Weisel's intentions regarding an indemnity would be inadmissible. See Geoff R. Hall, *Canadian Contractual Interpretation*, 2d ed. (LexisNexus) at 2.4.3.

158     In the result, any damages suffered by Stetson are not to be reduced to nil by reason of Weisel not actually receiving any fees.

**Damages**

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

159    Stetson claims damages based on the difference between the 55 cents per share that Weisel agreed to pay and the 20 cents per share that Canaccord paid, after taking into account the extra shares that Stetson had to sell to Canaccord, plus expenses incurred in obtaining the interim loans pending the Canaccord underwriting.

160    Losses recoverable for breach of contract are limited to those that will put the injured party in the same position as he or she would have been in had the wrongdoer performed the contract. See *Baud Corp., N.V. v. Brook* (1978), [1979] 1 S.C.R. 633 (S.C.C.) at para. 18. What are the damages that a seller of an asset may be entitled to on a breach by the purchaser to complete the purchase? The authorities make clear that the seller is entitled to the difference between the contract price and the market price subject to the obligation of the seller to take reasonable steps to mitigate the loss by selling on the market. See S.M. Waddams, *The Law of Damages*, Looseleaf, (Canada Law Book, November 2012) at para. 13.110. See also *Jamal v. Moola Dawood, Sons & Co.* (1915), [1916] 1 A.C. 175 (Lower Burma P.C.)

161    Normally the seller has an obligation to mitigate damages by selling on the date of the breach for the best price possible. But that is not always the case if the shares could not be sold on that date. In *Leitch Transport Ltd. v. Neonex International Ltd.*, [1979] O.J. No. 1093 (Ont. C.A.) the defendant Neonex failed to purchase a large block of shares of Maple Leaf Mills Limited, a public company trading on the Toronto Stock Exchange. It was not realistic to sell the shares on the stock exchange on the date of the breach, but rather the block had to be sold to an investment dealer who would make a secondary offer. It was held that the law permits a realistic approach to valuation and does not insist upon an arbitrary sale on the date of the breach. The Court stated:

> Under a contract for the sale of shares in a company upon a breach by the purchaser, the measure of damages is the difference between the contract price and the market price at the date of the breach; the seller has, however, an obligation to mitigate damages by selling the shares for the best price obtainable on that date: *Jamal v. Moolla Dawood & Sons & Co.* [1916] A.C. 175. Since Maple Leaf was a public company whose shares traded on the TSE, the market price would ordinarily be the price at which the shares were trading on the Exchange on the date of the breach. Here, however, because of the limited market for the shares and the large quantity that was being sold under the contract, it was not possible to sell the shares on the Exchange. In these circumstances, the law permits a realistic approach to the valuation of shares and does not insist upon an arbitrary sale on the date of the breach: *Hooper v. Herts* [1906] 1 Ch. 549. We agree with the trial judge that the only realistic way to have disposed of the directly held shares was to sell them to a broker or investment dealer who would have made a secondary offering of them, and that the amount which could have been obtained by such a sale constituted the market price in this case.

162    See also *Treaty Group Inc. v. Drake International Inc.* (2007), 86 O.R. (3d) 366 (Ont. C.A.) and *Johnson v. Agnew* (1979), [1980] A.C. 367 (U.K. H.L.). In the latter case, in a passage adopted in *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415 (S.C.C.), Lord Wilberforce stated:

> (2) The general principle for the assessment of damages is compensatory, i.e., that the innocent party is to be placed, so far as money can do so, in the same position as if the contract had been performed. Where the contract is one of sale, this principle normally leads to assessment of damages as at the date of the breach — a principle recognised and embodied in section 51 of the Sale of Goods Act 1893. But this is not an absolute rule: if to follow it would give rise to injustice, the court has power to fix such other date as may be appropriate in the circumstances.

163    Weisel contends that the shares of Stetson traded at fifty cents on or about July 31, 2008, five cents less than what Weisel had agreed to pay, and therefore if damages for breach of contract are to be awarded, the damages should be limited to five cents per share on the 45,454,600 shares that Weisel agreed to purchase, for damages of $2,272,730.

164    Apart from the fact that the shares of Stetson traded on July 31, 2008 at a closing price of 45 cents, which on the argument of Weisel would double the damages to approximately $4.5 million, this argument is completely unrealistic. Stetson was a company with a very small market cap. The volume of shares of Stetson that traded that day was 56,000. No one suggests that Stetson could have issued 45,454,600 shares and sold them that day on the TSX. To suggest that such a large block of stock

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

had a market value that day equal to what a minute fraction of those shares traded for defies common sense and no evidence was led to support this value for such a large block of stock.

165     Stetson had to consider how to proceed to raise the money it was supposed to have received from Weisel, including obtaining advice from Canaccord and Macquarie, and negotiating with other companies such as Crescent Point and Tristar. Stetson had been damaged by the failure of the bought deal to close and did not have a lot of leverage. After canvassing the market it was able to conclude an underwriting on a best efforts basis with Canaccord, which was uncertain as to what could be done but was doing Stetson and Mr. Bharti a favour.

166     The steps taken by Stetson to mitigate their damages by entering into the agreement with Canaccord were reasonable. Taking into account the principles discussed in *Leitch Transport Ltd. v. Neonex International Ltd.* and *Johnson v. Agnew*, the appropriate measure of damages in my view is the amount per share that Stetson would have received from Weisel had the engagement letter closed on July 31, 2008 less the amount per share received by Stetson from the Canaccord transaction.

167     Mr. Groia contended at the end of the trial that the Bakken project for Stetson had no prospect of success as after only one well was drilled, Red Willow decided not to proceed further. He contends therefore that had Weisel provided funding under the engagement letter, Stetson would have ended up with nothing, and thus will gain a windfall if successful in this action. This issue has already been the subject of a ruling I made after the first week of trial refusing leave to the defendant to amend its pleading. Evidence regarding the feasibility of the project was not led as a result, and during argument Mr. Groia conceded that as no expert evidence was called, I was in no position to be making a finding that the property had no prospect of success.

168     In any event, the authorities make clear, as discussed, that the damages for failure to purchase shares is the difference between the purchase price and the value of the shares at the time of the breach, subject to an obligation to mitigate and to a discretion as to the appropriate date. What the plaintiff would have done with its money had it been received under the contract, or what it did with the replacement money, is not relevant.

169     In principle as well, I do not think the argument of Weisel is correct. Suppose instead of issuing equity shares, Stetson had agreed to borrow the necessary funds from a lender at say 5% interest but after the lender reneged, Stetson was only able to borrow the money at 10% interest. Suppose Stetson then took all of the borrowed money and drilled nothing but empty wells and ended up with nothing. Stetson still would have suffered damages to the tune of the extra 5% in interest payments it had to pay for the loan. In this case, Stetson had to issue shares at 20 cents instead of 55 cents. It received less for its shares than it would have had Weisel not breached its contract. It has suffered those damages.

170     At the opening of trial Weisel contended that it was not Stetson that would suffer any damages but rather the holders of the preferred shares issued at the time of the Canaccord financing on the advice of Canaccord as a sweetener to entice the market to accept the Stetson shares sold by Canaccord. These holders will be entitled to the proceeds of any final judgment or settlement money paid to Stetson for this action. This argument was not pursued at the conclusion of the case. In any event, there is nothing to it. What Stetson does with its money is its business. Whether it pays the money from the judgment to its bankers, its common shareholders or its preferred shareholders is irrelevant.

171     Stetson acknowledges that there are two possible ways that its damages can be calculated. The first is based on the difference between the 55 cents that Weisel was to pay to purchase the Stetson shares and the 20 cents that Canaccord agreed to pay, which is 35 cents, multiplied by the 45,454,600 shares provided for in the bought deal. This results in an award of $15,909,110. Stetson contends that damages should be calculated on a per share, rather than an aggregate basis so that Weisel does not obtain the benefit of the fact that Stetson required to sell 14,545,400 more shares for lower proceeds under the Canaccord transaction. Stetson had to sell these additional shares and is entitled to consideration for that fact.

172     The second method is to calculate damages on an aggregate basis, which would simply involve taking the difference between the $25,000,030 contract price that Weisel was to pay Stetson under the engagement letter and the $12 million Stetson received from the Canaccord transaction, which results in an award of $13,000,030.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

173    I agree with Stetson that the first method is the appropriate method as it reflects the fact that it had to sell far more shares to Canaccord than it would have to Weisel. It is not in a company's interest to issue more shares than necessary to obtain equity financing. Weisel did not argue otherwise and, as discussed, contended that the damages, if to be awarded, should be on the same basis as the first method chosen by Stetson, albeit by using five cents a share rather than 35 cents.

174    Stetson is also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have been required had Weisel not breached the engagement letter. The interim loans were repaid from the money received from Canaccord. These expenses were incurred by Stetson to mitigate its loss and totaled $133,559.

175    Stetson is therefore entitled to judgment for $15,909,110 and $133,559, totalling $16,042,669.

176    Stetson is entitled to interest. No argument was made as to what basis interest should be awarded. If interest cannot be agreed, Stetson may make written submissions within 10 days and Weisel will have a further 10 days to make submissions.

177    Stetson is entitled to its costs. If these cannot be agreed, Stetson may make written submissions within 10 days, including a cost outline in accordance with the rules, and Weisel will have a further 10 days to make submissions.

*Action allowed.*

Footnotes

1    At the conclusion of the trial, the name of the defendant was changed from Thomas Weisel Partners Canada Inc. to Stifel Nicolaus Canada Inc. For ease of reference, the defendant will be referred to as Weisel.

2    Statements of fact in these reasons are findings of fact unless stated otherwise.

3    The parties agreed to litigate rather than arbitrate this dispute.

4    *Health & Community Living, Inc. v. Goldis Financial Group, Inc.* [, Doc. 96 CV 0459 (U.S. Dist. Ct. E.D. N.Y. March 13, 1998)], 1998 WL 117928 at *4 (E.D.N.Y March 13, 1998) and *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F.Supp.2d 361 (U.S. D. R.I. 2003).

5    Weisel has a material adverse change out clause in its Deal Book precedent for an agency agreement. The clause applies only to a change in the business of the issuer. In the Canaccord agency agreement made by Stetson with Canaccord, it contains a material adverse change clause that applies to a material adverse change or change to a material fact that could have a material adverse effect on the business of Stetson or the market price of the offered units. The evidence indicates that in an agency agreement less attention is paid to the language of a material change out provision as the underwriter is not obliged to buy the position of the issuer but only make best efforts to sell the position on behalf of the issuer. Mr. Halperin's opinion, which I accept, is that the Canaccord agreement should not be looked at in considering the issues in this case.

6    Schedule A to the engagement letter is an "indicative term sheet", which contains in summary form the terms of the offer. It refers to "broad" rather than "standard" out clauses. No evidence was given why there was this difference between the engagement letter and Schedule A. One can perhaps infer that it was overlooked when the change was made to paragraph 3 of the engagement letter. However, the indicative term sheet was a document intended to be given by Weisel to any underwriter who joined the syndicate, and presumably would have been the subject of negotiations between Weisel and the particular underwriter. It was not argued that the out clauses so far as Stetson and Weisel are concerned should have been "broad" out clauses.

7    This argument was made by correspondence following the conclusion of oral argument. Weisel contends that it was improper for Stetson to make the argument in this manner without giving counsel for Weisel advance notice. It may have been preferable for Mr. Burden to have given advance notice to Mr. Groia, but I fail to see what difference that would have made. It would have been counter-productive to have an oral hearing on this point, and Mr. Groia does not suggest he wanted an oral hearing. He made his reply argument by letter. Mr. Groia also contended that by his letter, Mr. Burden was attempting to file new evidence about the arbitration provision. I do not understand that. It is not a matter of evidence but an argument about the proper interpretation of the agreement, which in this case is a legal rather than an evidentiary matter.

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

1998 CarswellOnt 2565

Ontario Court of Justice, General Division [Commercial List]

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1, 81 A.C.W.S. (3d) 117

# The Toronto-Dominion Bank, Plaintiff and Peat Marwick Thorne Inc. in its capacity as Trustee of the Estate of Leigh Instruments Limited, a bankrupt; The Plessey Company plc; GEC Siemens plc; and The General Electric Company plc, Defendants

Winkler J.

Heard: January 13, 1997-May 1, 1998

Judgment: June 24, 1998 [*] [**]

Docket: 51353/90, B195/94

Proceedings: additional reasons at *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (October 26, 1998), 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List])

Counsel: *John A. Campion*, *Peter Downard* and *Paul F. Monahan*, for Plaintiff.
*Earl A. Cherniak, Q.C.*, *Robert J. Morris*, *Susan B. Wortzman* and *Lisa C. Munro*, for Defendant The Plessey Company plc.
*Peter F.C. Howard*, *Johanna Superina* and *Adrian C. Lang*, for Defendant The General Electric Company plc.

Subject: Contracts; Corporate and Commercial; Torts

### Headnote

#### Banking and banks --- Loans and discounts — General

Bank opened line of credit for subsidiary of parent company — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — No binding contract existed between bank and parent Co. — Comfort letter contained policy statement that subsidiary would be managed to always meet financial obligations — Comfort letter contained explicit statement that it was not legally binding commitment — Policy was self evident statement that subsidiary was under own management — Comfort letter was not contractual promise by parent Co. to cause subsidiary to meet its financial obligations — Comfort letter did not bind parent Co. to pay debts of its subsidiary — No collateral contract or collateral warranty existed.

#### Contracts --- Construction and interpretation — Resolving ambiguities — Contra proferentem rule

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Comfort letter did not bind parent Co. to pay debts of subsidiary — Comfort letter was unambiguous — Bank agreed to language contained in comfort letter — Doctrine of contra proferentem did not apply.

#### Contracts --- Rectification or reformation — General

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million before went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Bank read and accepted comfort letter upon receipt — Bank failed to make comment or complaint from time of delivery up to bankruptcy of subsidiary — Parent Co. reasonably concluded bank accepted revised comfort letter — Rectification of letter, to remove statement, was denied.

### Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Detrimental reliance

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank letter of comfort — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on negligent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary be managed to always be in position to meet financial obligations — Policy statement disclosed parent Co. was not required to do anything to ensure subsidiary could pay bank — Policy remained in place through material time, until bankruptcy of subsidiary — No negligent misrepresentations were made — Conduct which did amount to misrepresentation was not relied upon by bank.

### Fraud and misrepresentation --- Fraudulent misrepresentation — Specific elements — Recklessness of truth or falsity

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on fraudulent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary would be managed to always be in position to meet its financial obligations — Comfort letter contained explicit statement that it did not constitute legally binding commitment — Parent Co.'s representative did not fraudulently misrepresent to bank that financial statements were not available — Representative did not act deliberately or recklessly when statement made — Dishonest intent, sufficient to attract liability to parent Co. or corporation, was not established.

## Table of Authorities

**Cases considered by *Winkler J.*:**

*Abel v. McDonald*, [1964] 2 O.R. 256, 45 D.L.R. (2d) 198 (Ont. C.A.) — considered

*Alampi v. Swartz*, [1964] 1 O.R. 488, 43 D.L.R. (2d) 11 (Ont. C.A.) — applied

*Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.*, [1983] 5 W.W.R. 61, 26 Alta. L.R. (2d) 133, 30 R.P.R. 207, 146 D.L.R. (3d) 731, 44 A.R. 67 (Alta. C.A.) — applied

*Anns v. Merton London Borough Council* (1977), [1978] A.C. 728, [1977] 2 W.L.R. 1024, *(sub nom. Anns v. London Borough of Merton)* [1977] 2 All E.R. 492 (U.K. H.L.) — applied

*Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 13 C.L.R. (2d) 185, *(sub nom. Andersen (Arthur) Inc. v. Toronto Dominion Bank)* 71 O.A.C. 1, 17 O.R. (3d) 363, 14 B.L.R. (2d) 1 (Ont. C.A.) — applied

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 202 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*Asiatic Petroleum Co. v. Lennard's Carrying Co.* (1914), [1915] A.C. 705, [1914-15] All E.R. Rep. 280, 13 Asp. Mar. Law Cas. 81, 31 T.L.R. 294 (U.K. H.L.) — considered

*Atlantic Computers plc, Re,* [1995] B.C.C. 696 (Eng. Ch. Div.) — applied

*Banque Brussels Lambert S.A. v. Australian National Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.) — distinguished

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, 41 C.L.R. 1, 4 C.C.L.T. (2d) 161, 44 B.C.L.R. (2d) 145, [1990] 3 W.W.R. 690 (B.C. C.A.) — considered

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173 (S.C.C.) — referred to

*Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) — considered

*Canadian Pacific Hotels Ltd. v. Bank of Montreal*, 77 N.R. 161, [1987] 1 S.C.R. 711, 21 O.A.C. 321, 41 C.C.L.T. 1, 40 D.L.R. (4th) 385 (S.C.C.) — referred to

*Caparo Industries plc v. Dickman*, [1990] 1 All E.R. 568, [1990] 2 W.L.R. 358, [1990] 2 A.C. 605 (U.K. H.L.) — applied

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.*, 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321 (Ont. C.A.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) — applied

*Esso Petroleum Co. v. Mardon*, [1976] Q.B. 801, [1976] 2 All E.R. 5, 2 Lloyd's Rep. 305 (Eng. C.A.) — referred to

*H.L. Bolton Engineering Co. v. T.J. Graham & Sons Ltd.* (1956), [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.) — considered

*Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673 (S.C.C.) — referred to

*Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, 211 N.R. 352, 115 Man. R. (2d) 241, 139 W.A.C. 241, *(sub nom. Hercules Managements Ltd. v. Ernst & Young)* 146 D.L.R. (4th) 577, 35 C.C.L.T. (2d) 115, 31 B.L.R. (2d) 147, [1997] 8 W.W.R. 80 (S.C.C.) — applied

*Hill v. Nova Scotia (Attorney General)*, 142 D.L.R. (4th) 230, 206 N.R. 299, [1997] 1 S.C.R. 69, 157 N.S.R. (2d) 81, 462 A.P.R. 81, 60 L.C.R. 161 (S.C.C.) — applied

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 25 D.L.R. (4th) 649, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353 (S.C.C.) — referred to

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, 43 B.L.R. 40, [1989] 1 All E.R. 785 (Eng. C.A.) — considered

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 at 798 (Eng. C.A.) — referred to

*Kripps v. Touche Ross & Co.*, 89 B.C.A.C. 288, 145 W.A.C. 288, 35 C.C.L.T. (2d) 60, [1997] 6 W.W.R. 421, 33 B.C.L.R. (3d) 254 (B.C. C.A.) — considered

*Kripps v. Touche Ross & Co.* (1997), 102 B.C.A.C. 238 (note), 166 W.A.C. 238 (note), 225 N.R. 236 (note) (S.C.C.) — referred to

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161 (Ont. H.C.) — applied

*Peek v. Derry*, 38 W.R. 33, 1 Meg. 292, 14 App. Cas. 337, [1889] All E.R. Rep. 1, 58 L.J. Ch. 864, 61 L.T. 265, 54 J.P. 148, 5 T.L.R. 625 (Eng. H.L.) — applied

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — applied

*Queen v. Cognos Inc.*, 45 C.C.E.L. 153, 93 C.L.L.C. 14,019, 99 D.L.R. (4th) 626, 60 O.A.C. 1, 14 C.C.L.T. (2d) 113, [1993] 1 S.C.R. 87, 147 N.R. 169 (S.C.C.) — applied

*R. v. McNamara (No. 1)*, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 45 C.R. (3d) 289, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 9 O.A.C. 321, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 C.C.C. (3d) 1, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 D.L.R. (4th) 314, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 59 N.R. 241, *(sub nom. R. v. Canadian Dredge & Dock Co.)* [1985] 1 S.C.R. 662 (S.C.C.) — applied

*R. v. Mohan*, 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 18 O.R. (3d) 160 (note) (S.C.C.) — referred to

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 46 C.C.L.T. 112, *(sub nom. Rainbow Industrial Caterers Ltd. v. C.N.R. Co.)* 54 D.L.R. (4th) 43, 30 B.C.L.R. (2d) 273, [1989] 1 W.W.R. 673 (B.C. C.A.) — considered

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway*, 8 C.C.L.T. (2d) 225, 59 B.C.L.R. (2d) 129, [1991] 6 W.W.R. 385, 84 D.L.R. (4th) 291, 126 N.R. 354, 3 B.C.A.C. 1, 7 W.A.C. 1, [1991] 3 S.C.R. 3, [1991] R.R.A. 850 (S.C.C.) — referred to

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Smith v. Scrimgeour Vickers*, [1996] 4 All E.R. 769 (Eng. H.L.) — referred to

*Spinks v. R.*, 19 C.C.E.L. (2d) 1, 12 C.C.P.B. 81, *(sub nom. Spinks v. Canada)* 134 D.L.R. (4th) 223, *(sub nom. Spinks v. Canada)* 195 N.R. 184, *(sub nom. Spinks v. Canada)* [1996] 2 F.C. 563 (Fed. C.A.) — considered

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 204 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473, 22 D.L.R. (4th) 410, 11 O.A.C. 318, 30 B.L.R. 193 (Ont. C.A.) — considered

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1986), 53 O.R. (2d) 663 (note), 65 N.R. 78 (note), 15 O.A.C. 237 (note) (S.C.C.) — referred to

*Tesco Supermarkets v. Nattrass* (1971), [1972] A.C. 153, 2 W.L.R. 1166, [1971] 2 All E.R. 127 (U.K. H.L.) — considered

*TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447, 146 D.L.R. (3d) 293 (Ont. C.A.) — applied

*White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293, 17 E.T.R. 78, 140 A.P.R. 293 (N.B. C.A.) — applied

**Statutes considered:**

*Canada Evidence Act*, R.S.C. 1985, c. C-5
    s. 9 — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43
    Generally — referred to

*Evidence Act*, R.S.O. 1990, c. E.23
    s. 5 — referred to

ACTION by bank against parent company and corporation for monies advanced to subsidiary.

*Winkler J.*:

1      This is an action on a comfort letter brought by *The Toronto-Dominion Bank against The Plessey Company plc.*, the U.K. parent of a Canadian company Leigh Instruments Ltd., and one of Plessey's shareholders General Electric Company plc.. The claim is for damages for breach of contract and in the alternative damages for the tort of negligent misrepresentation. The bank alleges fraud.

**Part I**

*Introduction*

2      The short unhappy life of Leigh Instruments Ltd. provides the centre-piece for this action. Leigh was a high-tech company on the leading edge of the Canadian defence industry. The events described here occurred during the brief period of two years from April 1988 to April 1990.

3      In April 1988, Leigh was acquired as the result of a successful takeover bid by The Plessey Company plc., a large U.K. company with a focus on electronics and defence products. A year and a half later, in September 1989, GEC Siemens plc, a joint venture consisting of General Electric Company plc. and Siemens A.G., completed a hostile takeover of Plessey. GEC has been described as the largest industrial enterprise in the U.K., Siemens is a vast German multinational company. Both companies are heavily into the electronics and defence businesses.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

4     The Toronto-Dominion Bank is one of Canada's five main chartered banks with operations world wide. TD is the plaintiff in this action and was banker to Leigh. Over the two-year period in question Leigh's borrowing increased from nil at the time of the take-over by Plessey in April 1988, to $40.5 million in April 1990 when Leigh went into bankruptcy.

5     Although the Bank's line of credit to Leigh was unsecured and the parent company had not formally guaranteed the loan, the Bank did have a letter of comfort issued in its favour by Plessey in respect of the Leigh loan.

6     In this proceeding, TD seeks to recover from Plessey and GEC the amount advanced by it to Leigh. It bases its claim on the letter of comfort and alleges breach of contract and negligent misrepresentation. The bank also alleges fraud. My overview of the facts, key findings and points of argument follow.

*Overview*

7     Leigh's banking relationship with TD dated back to 1982. At that time Leigh was a public company with operations at Kanata, Ontario. In 1983 the bank had been concerned about Leigh's financial condition and the reliability of its security for the borrowing, to the extent that it considered forcing Leigh into bankruptcy or ridding itself of Leigh as a customer. With the assistance of a bank work-out specialist and the bank's co-operation, Leigh survived this crisis.

8     The relationship continued and on March 1, 1988, Leigh and TD entered into a facility agreement pursuant to which Leigh had a $5.4 million loan facility, secured by a floating charge debenture and an assignment of book debts. Leigh, however, did not draw down on the facility and had approximately $10 million in its treasury. At the same time, Leigh had entered into a number of long-term, fixed-price contracts with the Canadian government to design and build defence products. Two of the largest programs were the Ship Interior Communications System Program (SHINCOM) and Tactical Air Navigational System Program (TACAN). All of this must have seemed attractive because at least two takeover bids for Leigh were mounted in the early spring of 1988.

9     The bid by the Plessey Company plc. through its acquisition vehicle Plessey Canada (1988) Inc. was successful and Leigh was acquired for $104 million in April 1988.

10     In order partially to assist with the financing of the acquisition, TD made available to Plessey Canada a $10 million uncommitted loan facility. This was a short-term acquisition loan, unsecured and payable on demand. It was understood that this facility would be re-paid from the $10 million in the Leigh treasury once Plessey had complete ownership of Leigh, expected to occur about three months later.

11     The loan was based on the creditworthiness of the parent company, since there were no financial statements for the acquisition vehicle, Plessey Canada. Operating in the mistaken belief, at least initially, that Plessey did not provide guarantees for loans to its subsidiaries but more pointedly because a guarantee from the parent company was not on offer, TD proposed that Plessey supply it with a letter of comfort, which Plessey agreed to provide. TD noted that a "strong letter of comfort" would be obtained by TD in London and forwarded to the bank in Toronto. The first comfort letter dated April 20, 1988 was sent to TD on April 27, two to three weeks after the funds were drawn down.

12     The internal structure of the bank was such that Corporate Banking Division was responsible for direct customer contact, monitoring accounts, preparation of credit applications and documentation. Credit Division, on the other hand, was charged with reviewing credit risks to the bank and approving loans subject to whatever terms it felt appropriate.

13     TD's willingness to accommodate Plessey, as demonstrated above, was it seems motivated to no small extent by its desire to retain the Leigh business in Canada, since it had no prior relationship with Plessey, TD also hoped to use this as a bridgehead for development of business with Plessey itself in Canada and abroad. Therefore, although the line with Plessey Canada was clearly a short-term bridge loan, TD put it through as an operating line. The facility contained no financial reporting provision.

14     Letters of comfort are at the heart of this proceeding. A letter of comfort is an improvisation of the banking industry which grew out of the increased competitiveness between banks, making it more difficult for banks to obtain parent company

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

guarantees for loans to subsidiaries. A comfort letter may be described as a letter provided by a parent company to a bank concerning the borrowings of a subsidiary intended to give to the bank a degree of comfort about the transaction but also intended to fall short of a guarantee to repay the debts of the subsidiary. Comfort letters generally are not legally binding in terms of imposing an obligation to repay the debt of the subsidiary, and are perceived in the business world as moral agreements.

15    Typically a comfort letter may contain statements or obligations such as an acknowledgment of awareness of the debt facility, an obligation to maintain ownership of the subsidiary or to provide notice of any change in such ownership. It may contain a statement of general corporate policy.

16    Those commercial considerations which might impact on a bank's decision to accept a comfort letter as opposed to insisting on a formal and legally enforceable guarantee could include the overall relationship of the bank with the corporate group involved, its general reputation, the volume of business and profit margins that the bank enjoyed from them as well as the degree of risk inherent in the instant transaction. In short, the terms which comprise a letter of comfort will likely be negotiated individually, address some or all of the above issues and be somewhat idiosyncratic reflecting the respective bargaining power of the parties.

17    Moving from the general to the particular, the Plessey letter of comfort referenced the loan to Plessey Canada. It stated that Plessey would not change its ownership position in the subsidiary without providing prior notice to TD. Finally, it contained a policy paragraph which stated:

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc., be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts owing under the above facility.

Two points were clear. The Plessey letter of comfort was not formal security and it was not a formal guarantee. Nonetheless, Plessey included it in its guarantee register for convenience.

18    On June 30, 1988, Plessey Canada was amalgamated with Leigh; the new entity was known as of July 1, 1988 as Leigh Instruments Limited. When it came time, however, to pay down the Plessey Canada loan from the funds in the Leigh treasury, as had been the plan, it was determined that the cash had been depleted. As a consequence, the loan was rolled over, with Plessey acknowledging on August 1, 1988, that the comfort letter applied to what was now a loan to Leigh. This became known as the second comfort letter.

19    The financial structure of Leigh was settled by Plessey and Leigh, largely in accordance with the initial plan, with approximately $25 million in equity and $69 million in inter-company debt owed to Plessey, plus the $10 million loan from TD. As a result of acquisition accounting adjustments made to bring Leigh's accounting policies into line with those of Plessey, the book value of the assets of Leigh was devalued from $51 million to $13 million. All of this was known to TD.

20    Deloitte, Haskins and Sells, Plessey's auditors, had prepared a due diligence report for Plessey prior to the acquisition of Leigh, in March, 1988. The report stated that Plessey's policies regarding valuation of inventory and revenue recognition were more conservative than those of Leigh. It noted also that there were missed milestones and projected margins regarding certain of Leigh's major contracts. It drew attention to liquidated damages consequences in certain of the contracts for delays. These prognostications boded ill for the future, for in the summer and fall of 1988 the bank loan began an upward climb due to these very problems, culminating ultimately in the bankruptcy of Leigh on April 12, 1990.

21    Although the bank was aware of all of this, it is clear to me that the pre-occupation of the bank throughout this period was with its relationship with Plessey and business development. At the same time, the bank's credit division was concerned about the need for financial information from Leigh. The corporate banking division was less than diligent in obtaining such information for them.

22    In September 1988, it became apparent to Leigh and Plessey that Leigh would require an increase in its borrowing limit to $30 million to the end of December, due to slippage in production in the two major contracts, SHINCOM and TACAN. Notwithstanding that an existing facility letter between Leigh and the bank provided security for the demand loan in the form

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

of a floating charge debenture and an assignment of book debts, and notwithstanding the existence of Plessey comfort letter number two, the bank extended the line of $15.4 million on a temporary basis only to October 31, 1988, due to the absence of audited financial statements, and in order to obtain fresh documentation and a new letter of comfort.

23    On October 6, 1988, Jonathan Exton manager of corporate finance at the bank's office in London, together with a Toronto-based vice-president of the bank, made a courtesy call on Ian Musgrave, group treasurer of Plessey. Leigh was discussed only briefly, the conversation centering on the bank's £5 million participation in a Plessey £200 million Multi-Option Facility.

24    By the beginning of November, what had begun as a short-term bridge loan of $10 million to assist Plessey with the Leigh acquisition had been transformed in a little more than seven months into an operating line of about $17 million to Leigh. The bank continued to be driven by a desire to retain the Leigh business, obtain the Plessey business in Canada from the Bank of Montreal, and to position itself to obtain $2 billion of business which it projected Plessey would generate in Canada over the next ten years. This hope had been expanded by TD's participation in the Multi-Option Facility. However, Leigh had not repaid the $10 million acquisition loan as planned, the acquisition accounting would significantly affect Leigh's balance sheet and income statement negatively, and Leigh's financial situation was deteriorating, as evidenced by the increasing bank loan. Although the bank's motivation had not changed, the underlying purpose and circumstances relating to the loan had shifted dramatically, without, it seems, the bank's Corporate Banking Division adjusting its approach to reflect this reality. Credit Division, mindful of the problem flew storm warnings throughout the bank saying that the facility should be regularized, and the bank should avoid being dragged along.

25    In the fall of 1988, Plessey requested that the bank release the Leigh security. A further temporary increase or "bulge" to $20 million in the bank line was required in November, and it was expected that Leigh might need a further extension to $30 million. In this period Leigh went into an overdraft position several times. On December 16 Credit Division approved an increase to $25 million to regularize the exposure of more than $24 million, pending fresh documentation.

26    The bank appeared to concede internally that the comfort letter did not amount to a formal guarantee, noting "we are confident Plessey will support Leigh as required". The concern was expressed that the parent might not honour the comfort letter in the event of a hostile takeover. In the context of commenting on the lack of reliable financials for Leigh, the comfort letter was characterized by a Senior Vice-President Credit Division in a November note as "support, albeit informal" from Plessey. More conclusively, in the Corporate Credit Reviews of Leigh prepared by Corporate Banking Division and sent to Credit Division for processing, the bank consistently rated the risk of Leigh as opposed to that of Plessey thus making it clear that they did not hold the belief that the comfort letter was in the nature of a guarantee or that it constituted a legally binding obligation to pay.

27    In November, 1988, GEC Siemens launched a hostile takeover bid for Plessey, an earlier bid by GEC having failed in 1985. The bid was referred to the U.K. Mergers and Monopolies Commission in January, 1989. Jonathan Exton of the bank's London office met with a Plessey representative the day after the bid was announced and offered the bank's support in resisting the hostile takeover bid. Also around this time, the bank's account manager for Leigh, Greg Young expressed a concern in an internal memorandum that the comfort letter for Leigh might not be honoured in the event of a successful hostile takeover.

28    Leigh's borrowing came up for annual review by the bank in January 1989. Credit Division reviewed the request for an increase in the bank line to $35 million, and approved the requested release of security contingent upon a postponement of the inter-company debt of $69 million. This would subordinate the inter-company debt to the bank loan which would now be unsecured. Also required was a "strong" comfort letter in the same form as the second letter. The audited financial statements for Leigh as at June 30, 1988 and an unaudited balance sheet at September 30, 1988 were provided to the bank at this time.

29    As background, at the time of the January review, both Corporate Banking and the Credit Division were aware that: Leigh faced cash and working capital deterioration: Leigh had problems with major contracts; and that in light of the known details of the financial structure, debt and tax considerations of Leigh, Leigh could not support the debt on its own. The bank noted that the relationship with Plessey was growing, but remained cognizant of the outstanding hostile takeover bid.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

30     Ultimately, over the next three months, the Corporate Banking Division took it upon itself to waive the Credit Division's condition that the inter-company debt be postponed and agreed to release its security over the assets of Leigh. Meanwhile however, because of its effect on the Leigh balance sheet and tax considerations, reasons entirely unrelated to the banking issues, Plessey decided to convert the Leigh intercompany debt to equity, capitalizing the debt as preferred shares, and thereby rendering the postponement of debt problem moot, effective April 1, 1989. The bank did not agree to remove its security over the assets of Leigh based on anything that Plessey said or did but rather for its own purposes.

31     On March 29, 1989, TD revised the $35 million facility, deleting reference to the inter-company debt. Security was to be released upon receipt of a revised comfort letter. On April 4 and 10, the form of the third comfort letter was approved by Plessey and TD respectively. On April 20, 1989 an executed comfort letter dated March 31, 1989 was delivered to the bank. The third comfort letter by its terms replaced the prior two. The $34 million facility letter was executed by Leigh on June 27, 1989, and an executed copy was received by the bank on July 21, accompanied by Leigh's year-end and quarterly financial. With this process completed Leigh had fulfilled the conditions set out in the April 7 letter from the bank for release of the security over its assets.

32     In the months that followed, attention within Plessey began to focus on defending against the hostile GEC Siemens bid. At Leigh the cash problems continued with a request of TD for a $4 million bulge from $34 to $38 million.

33     The negotiation and delivery of the new facility between Leigh and TD and third comfort letter between TD and Plessey took place over a period of some six months in early 1989. While this was happening two events of note occurred. The first was the launching of the GEC Siemens takeover bid of which mention has been made. The second was a decision of the English Court of Appeal, released February 2, 1989, which has a direct bearing in several ways on the instant case. *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.,* [1989] 1 All E.R. 785 (Eng. C.A.) (Leave to appeal to the House of Lords refused [[1989] 1 All. E.R. 785 at 798 (Eng. C.A.)]) involved the enforceability of a letter of comfort, and overturned the trial decision which had held that the comfort letter was enforceable. This was a landmark decision in the world of banking and commerce, not because of the result, which seems not to have been unexpected, but rather due to the dearth of court authority on the subject. All parties to this proceeding were aware generally of both the trial and appeal decisions in *Kleinwort Benson*. The timing of the decision as it pertains to the case at bar is striking especially in light of the bank's decision some six weeks later in March of 1989 to rest its exposure with Leigh solely on the comfort letter from Plessey.

34     In the summer of 1989, Leigh requested and received approval for a further temporary $4 million bulge from the bank, necessary due to delays in the SHINCOM and TACAN contracts. Plessey did not provide another comfort letter to secure the additional borrowing, although it undertook to do so if the funds were required beyond the end of August. Although TD made no request for delivery of the further comfort letter, Plessey nevertheless on September 7, forwarded a fourth comfort letter dated August 31, 1989, revised to cover the full amount of the Leigh borrowings. The letter was sent, in part, as a consequence of the impending hostile takeover. This letter was the same as the prior one except for the amount and by its terms replaced the earlier letters. Approval of the comfort letter was one of the last acts performed by Plessey group treasurer Ian Musgrave, before leaving the company on August 31, 1989.

35     During this period, Leigh also underwent personnel changes at the executive level. On August 8, 1989 Frank Driscoll took over as president of Leigh from Barry Flower who had departed Leigh for Plessey in June. At the very outset of his tenure, Driscoll began a review of progress on all major outstanding Leigh contracts. This revealed that the estimates to completion for both the SHINCOM and TACAN contracts were woefully inaccurate.

36     Slightly more than one week later, on August 17, 1989, GEC Siemens submitted its final offer for Plessey. The bid was successful on September 8, 1989, and GEC Siemens took over Plessey in late September.

37     Somewhat obliquely, the TD account manager Greg Young reported to Credit Division at TD on August 30, 1989 that the bank has enjoyed a long relationship with Leigh and a good relationship with Plessey. He commented mistakenly that the GEC Siemens takeover was unlikely to succeed before October 31 st . He reported as well that he had met the new president of

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Leigh. He concluded with reference to goodwill generation and potential new business. He characterized the comfort letter as "quite strong" and his superiors concurred that the letter was "strong".

38      Shortly after the takeover, Young referred in a corporate credit review of Leigh to the hostile takeover, stated he was comfortable with the quality of GEC Siemens' credit, and expressed the hope of developing a relationship with GEC. On the other hand he identified a "significant weakness" in terms of the uncertain fate of Leigh as a result of the takeover. Canadian Marconi, a GEC subsidiary and client of the Royal Bank of Canada, might be merged with Leigh. Young noted TD had been unable to establish a relationship with GEC in London, despite several attempts. As of October 2, 1989, the Leigh loan was about $36 million.

39      September was a long month at GEC Siemens. Plessey was not a single business enterprise. It consisted, between 1988 and 1989 of between 80 and 100 companies located in 43 different countries around the world. The strategy of the joint venture was a matter of public record. In the bid document made public in August 1989, the proposal was to disband Plessey and divide the spoils between GEC and Siemens 50-50; certain of its businesses were intended to be transferred 100 per cent to GEC: others 100 per cent to Siemens, with the remainder to remain within Plessey, where they would be operated jointly until such time as they were sold or otherwise disposed of.

40      The bid package revealed that Leigh was intended to be owned 100 per cent by GEC. Also noteworthy was the fact that Leigh was but a tiny piece of the Plessey pie. To put this in perspective, Leigh had comprised two per cent of the group sales of Plessey and three and a half per cent of its group assets. Plessey was a £1.5 billion to £1.8 billion company. The significance of Leigh paled even further in the context of GEC Siemens. GEC alone was a £6.5 billion company, and held over 100 companies world-wide prior to the Plessey acquisition. Both Plessey and GEC were holding companies with small, central staffs. Plessey was headquartered at Ilford, England. GEC maintained its head office at Stanhope Gate, in London. Plessey had arranged that the MOF would fund its acquisitions. GEC, on the other hand, was cash rich and referred to as a cash mountain with over £1 billion in cash reserves on its balance sheet. Thus, in either case, Leigh and its borrowings did not make a significant impact within the framework of Plessey or GEC Siemens.

41      It was understood in a firm sense between GEC Siemens and the UK regulatory agencies that the Plessey companies would be divided or "hived-up" between the two parent companies by March 8, 1990. Additionally, there were constraints as to which company could acquire certain parts of Plessey. Indeed, it was a requirement of the bid approval by the Mergers and Monopolies Commission that Siemens, as a German company, was not permitted to own certain of the defence industry businesses. As a consequence, GEC and Siemens had to decide the ultimate destinations, and transfer ownership of all the Plessey companies by this deadline. As part of this process, GEC and Siemens had to agree on valuations for all the Plessey companies, since the division was to be approximately 50-50. The purchase price of Plessey was £2.2 billion. Since the takeover was a hostile one, the new parents had very little information about the financial situation of the Plessey businesses. In essence, they walked into Plessey "blind". In addition, shortly after the takeover most of those Plessey executives who had not already resigned were terminated by the new owners. The departure of these executives signaled the departure of valuable information about the operation of the Plessey empire, and created hurdles for the new owners both in terms of valuing the companies and also their ongoing administration.

42      To fill this vacuum, each shareholder appointed a point person to act in concert as managing directors of Plessey. GEC's representative was Simon Weinstock, a GEC executive and manager and son of the GEC managing director Lord Weinstock. Siemens appointed Dr. Philip Gerdine, an experienced mergers and acquisitions accountant from its U.S. operation. Those companies slated to be transferred 100 per cent to either GEC or Siemens were to be supervised directly by the intended parent until the transfer was completed, while the companies to be held jointly within Plessey were supervised through it.

43      Leigh was earmarked in the bid document to go to GEC, GEC in turn was considering a possible merger of Leigh with one of its Canadian subsidiaries, Canadian Marconi where there would be obvious synergies. Jonathan Exton learned of this possibility for Leigh on a goodwill call to David Newlands, finance director at GEC on October 3, 1989, although it was clear a final decision on the merger was not expected until mid-1990. The bank was made aware of GEC Siemens plan for Plessey when it received a refinancing package from the joint venture, containing a copy of the bid document. As a consequence of the

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

takeover, it was necessary to refinance Plessey, and on October 30, 1989, the joint venture company and Plessey invited some 40 banks on the open market to provide quotes for the refinancing. One of these was TD.

44    Due to the possible merger of Leigh with CMC, it was natural that GEC Marconi, also a GEC subsidiary would provide technical and finance people to assume responsibility for evaluating Leigh. To this end, David Newlands, GEC finance director, and David Rickard, finance director for GEC Marconi, visited Leigh on October, 20, 1989, to appraise Leigh. Newlands had in hand a briefing document from Colin Justice at Plessey who was assigned to Leigh, in which Justice alerted Newlands to the fact that the technical baseline at Leigh was sufficiently insecure that the financial results of the company could not be relied upon. Newlands was quick to identify problems at Leigh. He was critical of management, in particular David Dean, the vice-president of finance. Newlands concluded that Plessey's budgets for Leigh were hopelessly optimistic. Included in the material presented to Newlands and Rickard were the draft six-month financial results for the period ended September 30, 1989, which showed a cumulative loss of $2.858 million to the end of September and the bank line outstanding at approximately $36 million. Leigh was trading at a loss, absorbing cash, and there was no indication it would improve.

45    Plessey described Leigh internally in the August 1989 as a "major loss maker". Between the October 20 meeting at Kanata with Newlands and Rickard, and the end of November, Frank Driscoll provided numerous reports and financial information to GEC and GEC Marconi, as well as to Lord Weinstock personally. These included a President's report for October and revised half-yearly reports to September 30, 1989 with forecasts to the end of the financial year in March 1990. The seriousness of the problems at Leigh was apparent to Driscoll and the recipients of his reports, and were underscored by the variances from previous budgets and forecasts. Leigh was pursuing explanations for the variances from budget and was seeking cost-cutting solutions. As of mid-November 1989 there was a variance from budgeted profit of negative $19 million.

46    Back at the bank, on October 3, 1989 account manager Greg Young sent to Leigh the facility letter for $38 million, which was to become the last facility agreement entered into by the bank and Leigh. Young stated that the facility was contingent upon the year-end financials at July 31, 1990 and referenced the fourth comfort letter. This was accepted by Leigh on October 26, 1989. The following day Dean returned the facility to Young, referred to problems with SHINCOM and enclosed cash flow forecasts. There seems to have been no suggestion from anyone at TD that they seek to obtain a new comfort letter from GEC or Siemens.

47    Jonathan Exton, in England, was pursuing larger fish, and met with David Newlands on October 3 at Stanhope Gate to discuss possible new business with GEC, in his words. "to further our marketing relationship with GEC". They discussed the plan to dismantle Plessey and also Leigh's tax position and low profits.

48    As noted earlier, GEC, Siemens and Plessey on October 30, 1989 wrote to some 40 banks including TD with a view to replacing the Plessey MOF, which was to be canceled on November 23. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a £50 million facility for Plessey to Ross Anderson, group treasurer for GEC, Plessey never drew down on the facility.

49    On October 31, 1989, Greg Young, the account manager for Leigh, left the bank's employ. He was replaced by Rob Wilson. Wilson was given the sparest of briefing by Young on his hand over, but was left on his own to review the files. Young and Wilson met once with Dean at Leigh. Wilson's supervisor at TD, Wendy Leaney also gave him little help in familiarizing himself with his accounts, which included the troubled Leigh. Wilson did not see or review the comfort letter.

50    Upon Ian Musgrave's departure from the position of finance director at Plessey on August 31, 1989, his duties had been assumed by his former assistant, Denise Beard. On November 3, 1989, Denise Beard also left Plessey. Beard had been deeply involved in Leigh's affairs, particularly the first comfort letter and the details surrounding the lifting of security on the Leigh assets at the time of the negotiation of the facility agreement and the third comfort letter in early 1989. The exit of Musgrave, Young and Beard from the scene all at about the same time did not enhance the ability of TD and Plessey to adapt to the GEC Siemens takeover. To make matters worse, all Plessey's senior management left following the takeover, including managing director Stephen Walls, signatory to the first four comfort letters. As replacement TD account manager Rob Wilson observed

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

in a memorandum to file in late November 1989, Leigh's numbers were getting worse and the comfort letter was from the old Plessey management.

51    The unaudited quarterly financial statements of Leigh were due to be provided to the bank of Leigh, according to the terms of the facility agreement, by the end of October for the quarter ending September 30, 1989. These were not sent. On November 8, 1989, in a meeting with Young and Wilson, David Dean advised them the financial statements were unavailable due to the implementation of the purchase accounting adjustments necessitated by the GEC Siemens takeover. The bankers did not ask for any alternative financial information. Colin Justice of Plessey assisting at Leigh gave this identical explanation to the bank on December 21, 1989. Dean left Leigh on December 18, 1989, as part of a cost-cutting general layoff. Dean was replaced by his assistant, Patrick Smith. Frank Driscoll, president of Leigh, was personally unaware of this reporting obligation to the bank. The bank was not provided with financial statements until March 21, 1990.

52    The figures reported by Leigh in October and November indicate the state of disarray of Leigh. At the October 20 meeting with Newlands and Rickard, Leigh reported a cumulative loss to September 30 of $2.85 million and the bank line at $36.081 million. Six days later in the President's Report for September, Driscoll reported a revised loss, to date, of $15.634 million and a bank loan of $37.17 million. Financial results for that period were due to the bank four days later. On November 17 in the President's Report for October, he reported a loss for the seven months to October 27 of $16.677 million and the loan at $38.534 million. At the end of November, at the six-month review at Stanmore, he reported a cumulative loss to September 30 of $18.850 million and a bank line of $38.745 as at November 24.

53    Leigh was in breach of the facility agreement by not providing to TD the unaudited quarterly financial statements, given that there were in fact some statements in existence, albeit not in the form that Leigh wished to provide. However, up until his departure in December, Dean spoke by telephone with Wilson, and conveyed to him some details of Leigh's cash flow position and the contract overruns. Although the messages were at best mixed, they were such that they ought to have given rise to questions which inexplicably were never put by the bank to Leigh.

54    The half-year review for Leigh was to take place at Stanmore in the U.K., the home of GEC Marconi, on November 28 and 29, 1989. In attendance were representatives of Leigh, GEC Marconi and GEC. Although Driscoll's approach was seen as positive, two serious problems were presented. To begin with, Leigh predicted a $19.6 million loss for the year. As a cost-cutting measure they proposed a staff reduction of 250 persons. Also, Leigh was preparing a plan for sale of its components division. Problems with the SHINCOM and TACAN contracts were reported in detail. Leigh was asked to re-attend later to deal with the operational problems.

55    To make matters worse however, Leigh was anticipating a problem meeting its payroll, and submitted a proposal for approval of an increase in its bank line from $38 million to $45 million. An increase to the borrowing limit of Leigh required prior approval of Plessey and GEC, in order for Leigh to make a request to the bank. David Newlands and Simon Weinstock considered the request and Newlands "reluctantly" approved the increase in the Leigh bank line, on the basis that any drawdown over $41 million had to be approved specifically by Anderson or someone else with similar authority. Leigh was given the go-ahead to request the increase from the bank.

56    Wilson at TD meanwhile, produced a detailed corporate credit review of Leigh on December 6, 1989, in which he referred to the proposed layoffs, an $8.4 million contract payment due to Leigh in early January, 1990, the support by Plessey in converting the inter-company debt to equity, and the possible sale to or merger with Canadian Marconi. As negatives, he referred to the dynamic of the defence industry, delays and slow payments, and uncertainty about Leigh ultimate ownership. His recommendation of approval for the request for an increase to $45 million was accepted by Credit Division on the condition that the fifth comfort letter be delivered by Plessey in the same form and substance as the fourth letter of August 31, 1989, especially the third paragraph, the policy paragraph noted above. These conditions were never communicated to Leigh. Plessey or GEC by anyone at TD. Wilson included reference in the CCR to TD's intention to bid on providing a fairness opinion in the event that the CMC purchase of Leigh proceeded, and reference to the London office's continued attempts to build a relationship with GEC.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

57     At GEC, Ross Anderson was advised that David Newlands had approved the increase to Leigh's bank line. Anderson was charged with preparing the fifth comfort letter. Working on his prior experience, he revised the existing comfort letter, adding among other things an additional phrase which stated that the letter "... does not constitute a legally binding commitment". The policy paragraph was unchanged. This letter, as had its predecessors, by its terms replaced the prior letters. Anderson ran the draft of the revised letter past David Newlands, who approved the wording, in a brief meeting in the corridor outside his office. Anderson then forwarded the letter to Plessey company secretary Bernard Huntbatch for his review and processing. Copies were sent to a number of GEC and Siemens executives, including the Siemens treasury person Andy Hafner and Dr. Gerdine. There were no representations to TD by anyone on behalf of Plessey that the letter would be in the same form as the prior letters. Nor were the conditions stipulated by Noonan regarding the comfort letter communicated by Wilson or anyone else to Plessey or to Anderson. The signed letter became the fifth comfort letter in the piece, dated December 15, 1989, received by the bank's London office on December 27, TD filed the letter without commenting on the changes to either Leigh, Plessey, GEC or Siemens. No one at TD acknowledges having read the comfort letter until sometime in April 1990. I find, however, that Wendy Leaney received, read and accepted the letter on behalf of the bank in January 1990.

58     The Leigh President's Report for November, dated December 14, 1989, recorded a loss of $18.6 million, $21.4 million below budget. The report was not sent to the bank.

59     On January 8 and 9, 1990 representatives of Leigh re-attended in London for budget meetings and to review Leigh's status. Leigh management were dispatched at the conclusion of this meeting to review five options available to the company. At the same time, GEC and Siemens were engaged in valuing the Plessey companies. On January 8, Exton and Wilson called Anderson at GEC from Canada to advise of Leigh's loan balance and to introduce Wilson. On January 11. Newlands wrote to Dr. Mackenrodt Vice President at Siemens, describing Leigh's situation as "very serious". Appended to the letter was a proposal showing Leigh in the Plessey rump of jointly-held companies rather than going to GEC.

60     In late January, representatives of Leigh and GEC Marconi were debating the intended future of Leigh, which had been expressed as a series of options at the meetings in early January. These options included shut down or wind down of Leigh, sale to a third party or fold in to Canadian Marconi, the original plan. One of the options considered was to re-negotiate the TACAN and SHINCOM contracts with the Canadian Government. Newlands and Gerdine based on their experience still thought this was a possibility. An $8.4 million payment was received from Paramax in mid-January, with a corresponding effect on the bank loan. One executive noted 'so far so good'. On February 1 and 2, 1990 representatives of Leigh and GEC Marconi met again to discuss Leigh's analysis of the five options.

61     Bill Alexander of GEC Marconi met Canadian government officials in Ottawa on January 22 and 23, 1990, in an attempt to negotiate some relief from the provisions of the government contracts. The government was advised of the "desperate situation" at Leigh, heavy losses on SHINCOM and acute cash problems. He reported back that there was some sympathy and that he was less pessimistic than previously. Simon Weinstock, appearing to be losing patience, contacted Shearson. Lehmann, an American investment banking firm, seeking an evaluation of Leigh. Copying Gerdine, Weinstock described the viability of the company as being in question. Others at GEC and Siemens disagreed. The prospect of Leigh going to CMC was still being debated.

62     On February 8, 1990, GEC and Siemens met to finalize the valuations and disposition of the Plessey companies. It was agreed that Leigh would be placed in the Plessey rump, to be held 50-50 until sold. Leading up to this, Dr. Gerdine had become involved with Leigh at the end of January 1990, at the insistence of Dr. Mackenrodt of Siemens. Shortly thereafter at the instance of Simon Weinstock, he met with Shearson Lehmann, the investment banking firm, to canvas the possibility of selling the three Plessey companies in North America, including Leigh, together as a package. By late January it is clear that GEC had decided not to take 100 per cent ownership of Leigh. Dr. Gerdine knew this around this same time, at least by February 8, 1990.

63     Newlands, since his visit to Leigh on October 20, 1989 had seen Leigh's long-term, fixed price contracts with the Canadian government as a problem. Dr. Gerdine was of the same view after becoming involved with Leigh in late January. Both were highly experienced in the defence industry and felt relief through contract re-negotiations was possible. It was commonplace in

the industry for the customer to agree to re-negotiation, so why not here? This had been broached at the meetings held with the Canadian government on January 22 and 23, 1990. Further such meetings, attended by Dr. Gerdine, took place on March 27.

64    A more serious problem however, was the technical problem with the contracts, in particular SHINCOM, and the issue of whether they could be performed by Leigh at all. As a consequence, the GEC Marconi technical review of Leigh was pivotal in the decision as to what was to be done with Leigh. The technical team assigned this task was dubbed the Red Team and their report was expected in early April, 1990. On February 28, Dr. Gerdine visited Leigh on behalf of Siemens, and was shocked by the projected year-end loss of $68.3 million. If this was accurate, he felt bankruptcy for Leigh was not out of the question. On March 6, Shearson Lehmann concluded Leigh was unsaleable to a third party, a view with which Simon Weinstock and Dr. Gerdine reluctantly agreed.

65    Frank Driscoll inadvertently brought the matter to a head. On February 26 he had become aware for the first time of the reporting obligation of Leigh contained in the facility letter with the Bank. For some unexplained reason, he felt he needed the direction of GEC and Siemens before complying with this obligation. Despite repeated requests for such a direction, none was forthcoming, although Dr. Gerdine is adamant that he advised Driscoll orally to do so on at least two occasions, at the February 28 meeting and again on March 15. Finally, on March 21, 1990, not having heard from GEC, Driscoll instructed Pat Smith to send the financials to the bank.

66    In fact, the six-month results forwarded were outdated numbers which had been presented to Newlands when he visited Leigh on October 20, 1989. However, the financial statements provided to TD also included the nine-month results to the end of December, 1989, which showed a loss of $21.3 million. Even this information was not sufficient to prod TD into action. It was not until Dr. Gerdine telephoned Wendy Leaney and Rob Wilson at the bank on March 26th or 27th, to inquire whether they knew what was going on at Leigh financially that they reacted to the data. As a consequence, the bank line was frozen on March 27, 1990 following Gerdine's indication that GEC and Siemens might not commit to the Plessey comfort letter.

67    GEC Siemens did not give up on Leigh without further effort. On April 9, 1990, Dr. Gerdine and others met again with Government officials in Ottawa, in the hope of negotiating contract relief, but to no avail. By this time, on April 3, the GEC Marconi technical RED Team had completed its review of SHINCOM, confirming that Leigh had serious technical problems and casting doubt on its ability to complete the contracts, absent new personnel and funding. When GEC and Siemens refused to guarantee the Leigh loan, the bank called the loan on April 11, 1990. The next day, on April 12, Leigh made an assignment in bankruptcy. Thus ended ignominiously the short, unhappy life of Leigh instruments and set the stage for this lawsuit.

68    This concludes the basic chronology. The following observations emerge.

69    The transitional effect of the movement of personnel on and off of the scene was highly disruptive to all parties. Frank Driscoll arrived as president of Leigh on August 8, 1989. One month later to the day the hostile takeover occurred. Ian Musgrave left Plessey at the end of August after approving the fourth comfort letter. Almost all of the senior management at Plessey departed at this time. GEC and Siemens people were required to assist. The account manager at TD. Greg Young left at the end of October. The treasury person at Plessey. Denise Beard, left on November 3. All of these people filled critical roles at a material time in the life of Leigh. However, the most significant change from the standpoint of the fifth, operative comfort letter, was the change in the management group at Plessey, as noted by Rob Wilson in late November 1989.

70    The bank at the same time as it was advancing funds to Leigh was pre-occupied with the parent companies' business potential and appeared heedless of its exposure at Leigh. The bank paid scant attention to detail at Leigh and reaped the consequences.

71    From the time of the third comfort letter in April, 1989 and the decision of the bank to remove its security over Leigh's assets, the bank rested its risk solely on the comfort letter. Although at first glance it might appear from the bank's lack of diligence in monitoring the financial situation at Leigh, that Wilson and Leaney were not acting as prudent bankers, rather, the approach by TD toward Leigh makes it plain and obvious that TD was not relying upon the financial condition of Leigh or any representations in that regard, since it knew Leigh was not capable of repaying the loan without assistance. The bank assumed

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

this assistance would come from Leigh's parents, and to that end, relied upon the moral obligation they believed the comfort letter to contain. The final proof of this lies in the fact that TD did not cap the loan until it was advised by Dr. Gerdine in March, 1990 that Plessey might not honour the comfort letter.

72      There were many victims of the disaster which befell Leigh. One such victim was certainly the TD bank. But also victims of almost equal proportion were Plessey and ultimately GEC Siemens which lost their total investment. On a personal level, Frank Driscoll and the other employees of Leigh were casualties. The Government of Canada likewise suffered losses at the hands of Leigh.

73      The question in this proceeding is, simply put, whether Plessey and GEC are responsible to TD for the losses of the bank.

### The Trial

74      This trial commenced January 13, 1997 and concluded on May 1, 1998. There are more than 15,000 pages of trial transcript, and thousands of pages of exhibits some lengthy and many detailed. The parties submitted extensive written argument consisting of more than 1200 pages, followed by oral submissions.

75      During the openings by counsel it was stated that the amended amended statement of claim contained more than one hundred and fifty alleged causes of action. During the trial the issues were not narrowed, even though the court urged the plaintiff to do so. This did not occur until the time of filing of written submissions. Any alleged causes of action not pursued in argument are abandoned.

### Disposition

### The Claim in Contract

76      I have concluded that Wendy Leaney received, read and accepted on behalf of the bank the fifth comfort letter dated December 15, 1989 in January 1990. This letter by its terms supersedes all prior comfort letters. There was no representation that the fifth comfort letter would be in the same form as the prior ones. There are no collateral agreements or warranties. Hence, the operative comfort letter is the fifth comfort letter which was delivered to the bank by Plessey in December 1989.

77      The bank asserts that this comfort letter contains in paragraph three, the policy paragraph, a contractual commitment by Plessey to directly or indirectly pay the bank the amount of the Leigh loan. The added words in the fifth comfort letter that "The letter ... does not constitute a legally binding commitment." are a complete answer to this contention and dispose of the claim in contract. Moreover, even disregarding those words, a literal reading of the paragraph which I find to be clear and unambiguous is to like effect. The paragraph does not contain a contractual promise enforceable in law. Rather it is a statement of present policy of Plessey. The added words do not alter that meaning. Indeed, the extrinsic evidence, if admitted, does not assist the bank. Instead it confirms two things: first, the paragraph does not contain a latent ambiguity, and second, the literal reading of the paragraph discloses its true meaning. The claim in contract fails.

### The Claim in Tort

78      The bank asserts a number of causes of action in negligent and fraudulent misrepresentation, based on the statement of policy in the third paragraph of all of the comfort letters, and in the alternative, based solely on the policy statement in the fifth letter. For the reasons that follow, I find that the statement of policy in the comfort letters was not misleading and the claim in this respect is dismissed. The bank also claims damages for misrepresentation based on certain alleged statements made by Justice, Anderson and Musgrave to the bank. For the reasons below, I find that none of these claims have been made out, either because the statements did not take place, were not misleading, or were not relied upon by the bank.

79      The bank has alleged fraud against Plessey and GEC based on their conduct in failing to direct Leigh to provide the financial statements, and also based upon alleged statements by Colin Justice and Ross Anderson to the bank. There is no basis

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

in the evidence for a finding of fraud. Accordingly, and in light of my appreciation of the totality of the evidence, I decline to make a finding of fraud against Plessey, GEC or either of Justice and Anderson. The claim in fraud is dismissed.

80    A review of the evidence, my findings and reasons follow.

**Part II**

***The Evidence***

*The Bank and Leigh prior to April 1988.*

81    The relationship between TD and Leigh dates back to the early 1980s, when Leigh acquired a company called Marsland Engineering Limited. At that time, Marsland had been a client of TDs for several years, however Leigh terminated the relationship with TD following the takeover. In consequence, TD solicited the business of Leigh and eventually succeeded in bringing Leigh in as a client. From the outset however, the bank had concerns about Leigh's financial performance. By July of 1983, the Leigh account had been classified by the bank as unsatisfactory and removed from the discretion of the branch manager. In an internal bank memo, F.G. McDowell, then vice-chairman of the bank, described the Leigh account as a "persistent worry" and recommended that the bank divest itself of the relationship with Leigh.

82    In 1983 the bank appointed management consultants Woods Gordon to review the Leigh contracts and management. Following on recommendations of Woods Gordon, Leigh sold certain subsidiaries, raised capital and changed management. The company began to turn a profit and the bank decided to continue the banking relationship.

83    In March of 1984 the Leigh risk was again classed as unsatisfactory, and the bank expressed concern that the working capital of Leigh was being used to pay off secured debt, to the detriment of the bank's position.

*Spring 1988- The Takeover by Plessey, First Comfort Letter and Amalgamation*

84    Leigh Instruments was a supplier of high-technology products and systems for the defence and aerospace markets. The company's main products included secure voice communications systems, ground-based navigation systems and flight data recording systems.

85    The bulk of Leigh's business was composed of contracts to supply two sophisticated products, SHINCOM and TACAN, SHINCOM was a ship interior communications system program and TACAN was a tactical air navigation program. The bulk of Leigh's contracts were with the Canadian Department of National Defence either directly or as subcontractor to other companies with government contracts, and were long-term contracts for fixed prices. SHINCOM was being installed by the Canadian Navy as part of its program to refit older destroyers.

86    In January 1988, Leigh acquired all the shares of a Nova Scotia based company known as Micronav Ltd. for $2.8 million. Micronav had developed a microwave landing system, which was a leading-edge airport landing system. TD was the banker for Micronav both before and after the takeover, and noted in a credit review of Leigh on February 29th, 1988 that "MLS is widely recognized as the next generation of airport landing systems with a world market estimated to be several billion dollars during the next decade. For example, Transport Canada has recommended MLS for up to 40 airports in Canada."

87    At this time, Leigh was a publicly traded company. In late February of 1988, a Halifax based Aerospace company, IMP Group Ltd., made a public offer of $80 million for all the shares of Leigh. Leigh's board of directors rejected the bid and retained Dominion Securities and First Boston to advise it on defensive strategies.

88    In order to assist in the defence of the takeover bid, TD offered Leigh a $10 million operating line with a number of conditions attached. In approving the credit application on February 29, 1988 however, senior vice president James Laitner noted: "this is not the type of company that should have a lot of debt." The bank rated the risk of this borrowing at 3A and included as a condition that Leigh provide to the bank quarterly unaudited financial statements and audited year end statements. Leigh did not accept this offer, but chose instead to accept the straight renewal of its existing operating facility of $5.4 million,

which to date had not been drawn upon. That facility included a requirement that Leigh provide to the bank its quarterly/annual financial statements within $^{30}/_{90}$ days from the end of the respective financial period.

89      In early March, 1988, while the hostile IMP takeover bid was still outstanding, Plessey announced a friendly takeover bid for Leigh, offering $96.4 million for the outstanding shares of Leigh. When TD learned of the bid. Howard Baker of TD's London office immediately telephoned the Plessey treasury department, and then wrote to Ian Musgrave, group treasurer of Plessey, offering to provide financial assistance in connection with the takeover. On March 24, Plessey increased its offer for Leigh to $104 million, leading IMP to drop out of the running and withdraw its offer on April 5th. The Plessey bid succeeded that same day.

90      In connection with the bid, Plessey retained Deloitte, Haskins & Sells to prepare a due diligence report on Leigh, which was delivered on March 6th. This report was reviewed in detail by Ian Musgrave, who was in charge of structuring Leigh's acquisition, and others at Plessey. The report noted that Leigh's major source of revenue was from government contracts associated with the TACAN, SHINCOM, and LSI programs, and that Leigh's revenue recognition policies for the contract were, from an accounting perspective, less conservative than Plessey's. Other accounting policies were also less conservative than Plessey's and the report cautioned that application of the accounting principles used by Plessey would result in a significant writedown of the value of Leigh's inventories. Deloitte's also noted that Leigh had failed to meet certain contract milestones for the TACAN program, had not yet filed its corporate tax return for 1987, and had made no payments towards its tax liabilities for the 1987 or 1988 fiscal years. The report failed to note the security held by TD over Leigh's assets.

91      As treasurer, Ian Musgrave was responsible for the structure of the Leigh acquisition. In evidence, he explained the structure was designed to provide the most favorable tax results for Plessey. In order to minimize the amount of profit on which Leigh would have to pay tax, Plessey imposed a capital structure on Leigh of 25 percent equity and 75 percent interest-bearing intercompany debt. The intercompany debt was payable to Plessey, with the notion that the interest payments on the debt would reduce or eliminate Leigh's taxable profits. In the final analysis, the structure consisted of $69 million intercompany debt, $25 million in equity, plus the TD loan for the total purchase price of $104 million. There was a $3 million acquisition cost for a total outlay of $107 million.

92      In order to facilitate the transition, Plessey incorporated a holding company called Plessey Canada (1988) Inc., with the 75-25 debt to equity capital structure. This company was to be used to purchase the shares of Leigh and then the two companies were to be amalgamated, with the merged company assuming the intercompany debt held by the acquisition vehicle. At the time of the acquisition, the Leigh balance sheet showed approximately $10 million in cash. Accordingly, Plessey decided to borrow $10 million of the acquisition financing from the TD bank, through Plessey Canada, with the intention that this $10 million would be re-paid to the bank from Leigh's cash balances following the amalgamation.

93      TD had approached Plessey immediately after the announcement of the takeover bid, and offered to assist with acquisition financing. Initially, TD offered Plessey a $50 million facility, with the provision that $10 million be made available to Plessey Canada (1988) Inc. directly.

94      The procedures and responsibilities within the bank in terms of processing and approving credit applications for customers was addressed by numerous bank witnesses in the course of the trial. The Corporate Banking Division ("Corporate Banking") had responsibility for direct customer contact. It was charged with the responsibility for preparing documentation of a credit request which was then submitted to the Credit Division. Corporate Banking had no lending authority. The Credit Division's role was that of decision maker - it had no liaison with customers or documentation role after a credit was approved. Those duties were left to Corporate Banking, and included responsibility for ensuring that any condition placed on an approval of a credit by the Credit Division was implemented. There was no procedure in place within the bank by which the Credit Division could ensure that its conditions had been complied with, and the Credit Division simply relied on Corporate Banking to do so. For example, the account manager in Corporate Banking was responsible for obtaining the requisite security or other documentation for a loan, in keeping with the bank's requirements. Similarly, if a loan went into an overdraft position, it was the responsibility of the account manager to obtain approval of an increased loan limit from the Credit Division. Once that approval was obtained,

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

the account manager was charged with obtaining a new facility agreement from the customer reflecting the increased amount, and obtaining any other associated documentation.

95     For the purpose of standardizing credit applications, the bank had in place a Credit Procedures Manual. This manual was described by bank witnesses as a "guideline" on how to complete a Corporate Credit Review (CCR). Although its purpose was described variously by bank witnesses as to standardize the format of submissions for ease of processing or as being "mechanical", there were aspects of it which were admitted to be requirements, as opposed to discretionary guidelines. Portions of the manual were for use by Corporate Banking and were available to every manager responsible for the Leigh account, and certainly Wendy Leaney.

96     The manual expressly provided that a corporate guarantee be accompanied by a solicitor's opinion and a resolution of the board of directors authorizing the guarantee. No such stipulation applied to comfort letters, which the manual described as "documentation" rather than "security", unlike a guarantee. It stated that comfort letters were "not legally enforceable in the collection of our loan." In contrast, guarantees were to be in the bank's standard form. Guarantees not conforming with the standard form were to be vetted and approved by the bank's legal counsel.

97     Within the Credit Division, each person had an authorized credit approval limit, which conferred upon them the discretion to approve any loan which fell within that limit, as long as they were satisfied with the risk. If a credit application exceeded the authorized limit, the person to whom it had been sent would review it and add whatever comments were appropriate. The application would be forwarded up the chain to someone with a higher limit, and this might happen several times before the credit was approved by the ultimate decision maker. Each person who signed off on a credit would review it and the comments of the persons below them in the chain of approval. Persons reviewing a credit also had the authority to recommend changes in the terms and conditions of the credit, or to recommend rejection.

98     Once the credit was approved, the application was returned to the Corporate Banking Division, along with the comments or conditions added by the Credit Division. It fell then to the Corporate Banking people to ensure that the conditions were complied with and documentation obtained, and Wendy Leaney testified the department had its own internal procedures in this regard. If these terms and conditions were not complied with, it was the responsibility of the account manager to report this to the Credit Division.

99     Patrick Noonan senior vice president. Credit Division, testified that he assumed everyone below him on a credit approval application had read all of the material he received, because any recommendation was based upon it. Since a recommendation could be approved with conditions attached, he assumed it would be read by everyone on its way back down the chain. There was no process by which Credit Division could ensure those below adhered to conditions it imposed so that the responsibility for this rested on the account manager in Corporate Banking. Hence, it was not for Credit Division to pass on a comfort letter. It was for the account manager to see to it that a comfort letter was satisfactory to the bank. Noonan testified that he had never spoken to anyone at Plessey, GEC, GEC Marconi or CMC at any time material to this proceeding.

100     In accordance with standard bank procedure for the approval of credit applications, a Corporate Credit Review of Plessey was prepared by the account manager, in this case Howard Baker, manager of corporate finance in the Bank's London office. The account was given a risk rating of 2, a rate which the bank reserved for corporate borrowers with strong balance sheets, strong earnings, good access to public markets and a top corporate credit. Although the CCR indicated the bank had had a relationship with Plessey since 1982, it listed facilities then available to Plessey, none of which had been drawn upon. In the section entitled purpose of review/use of credit, Baker noted "We view Plessey risk as entirely acceptable for this transaction. A successful bid will enhance our relationship with Plessey in London (which currently consists only of occasional FX business), and of course in Canada where we hope to maintain our relationship with Leigh, and further build on Plessey's growth in Canada. ...Plessey intends to use Leigh as its platform to sell communications, avionics and defence equipment in Canada, estimating that it would be able to bid for £500 million of Canadian contracts over the next five years." Under pricing Baker noted "we would therefore seek your guidance on lowering the pricing ... on the basis of our relationship with Leigh in Canada and the important one-off opportunity we have been presented with." The security for the $50 million short-term, uncommitted line was listed as nil, with

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

the explanatory note "Borrowings by Plessey Canada (1988) Inc. will not be guaranteed by the parent. Plessey & Co. plc do not provide guarantees for any subsidiaries borrowing." The CCR was sent to the bank's Credit Division in Toronto for approval.

101      Ian Musgrave testified that Baker's observation was incorrect, and while Plessey had a group policy of ordinarily avoiding guarantees, that Plessey did guarantee the borrowings of its subsidiaries in certain circumstances. I accept his evidence, Although Musgrave was not involved in negotiation of the terms of this facility, he was treasurer of the Company at the time. The negotiations were conducted largely by Denise Beard, who reported directly to Musgrave. No evidence was led as to the source of Baker's mistaken conclusion that Plessey did not give guarantees. This observation was critical however, in that it led Patrick Noonan, then a senior vice president in TDs Credit Division, to recommend as a condition of the credit approval, that a letter of comfort be obtained from the parent, Plessey Company plc. Musgrave did confirm in evidence that bank was correct in noting that a Plessey guarantee was not on offer for the Plessey Canada borrowing.

102      In recommending that the credit be approved, Noonan noted:

Credit risk of U.K. parent acceptable. Appl'n requests Cdn $10MM to Plessey Canada (1988) Inc. which is obviously a new vehicle for this investment. It is not listed as a subsidiary of the U.K. parent in last annual report. No gtee will be provided.

As there are no financials we should have an appropriate comfort letter from parent. Would agree on this basis in light of interim finance requested.

103      In this period, Noonan testified he was reviewing well over 1000 CCRs a year. Noonan explained he was not surprised to see that a guarantee was not on offer because "it was common for major companies not to guarantee borrowings of subsidiaries and I was aware that the common practice was to provide comfort letters in some cases". He testified that he specified an "appropriate comfort letter" because the bank had no financials for Plessey Canada and therefore no basis upon which to assess the company's debt service capacity, its ability to repay, nor at that time, information on how the loan was to be re-paid. Hence, he explained that he wanted "a clear undertaking from the Plessey Company Plc that they would see the bank whole on any portion that may be taken by the Canadian company." Regarding his reference to an ongoing Canadian bank role, Noonan testified that since they were the sole bankers for Leigh and had no active relationship with Plessey, he hoped the bank would preserve the relationship with Leigh. He described this aspect of the credit as a marketing aspect between the corporate account manager at the bank and Plessey. He explained that each member of the bank's Credit Division had a discretionary lending limit. If the credit application was for an amount within that limit, then the person reviewing it had authority to approve the risk. If not, the application would be passed to a more senior member of the department who had a higher lending limit. Noonan testified that he reviewed the Plessey application from the perspective of acceptance of credit risk. As the $50 million limit was in excess of his discretionary lending authority, he recommended that the credit be approved, and forwarded the CCR to the senior executive.

104      In the case of the $50 million Plessey facility, the CCR was passed above to William T. Brock, Executive Vice President, Credit, who recommended that the application be approved and noted "this is a short term bridge loan and we are bankers to Leigh which will now be expanded by Plessey. We would not want to lose this to a Canadian competitor." The credit application was ultimately approved by the chairman of the bank himself, Richard Thomson, and the requirement that an appropriate comfort letter be obtained was left unchanged.

105      The credit was approved the same day as the application was made. In notifying the London office of the approval, Noonan advised:

Insofar as CDN $10,000,000 being available under the name of Plessey Canada (1988) Inc., which is obviously a new vehicle for this investment, as there are no financials, we should have an appropriate comfort letter from the parent. We note your remarks that no guarantee would be available. However in light of short-term requested, we are agreeable on the above basis.... We would not want to lose this financing to Canadian competitor, particularly with our long-standing account relationship in Canada where we are the sole bankers to Leigh.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

106    Noonan explained in evidence that while it was his idea to obtain a comfort letter, he did not provide any of the language or participate in the drafting of the letter. Nor could he recall indicating what, in his view constituted an appropriate comfort letter. He explained that according to bank procedure it was the responsibility of the account manager, in consultation with legal counsel, to obtain the appropriate documentation, including in this case, the comfort letter. While on occasion he would provide some verbal guidance to Corporate Banking officers if approached by them. Noonan said he could not recall having spoken to Baker or his assistant J.A. Read concerning the Plessey letter.

107    The bank learned subsequently that Plessey did not intend to use the $50 million loan facility, but did wish to draw upon the $10 million amount which had been carved out for use by Plessey Canada.

108    Howard Baker, of TDs London office, and Greg Young, a manager of Corporate Banking in Toronto, were responsible for obtaining an "appropriate letter of comfort" from Plessey. Young had been in charge of the Leigh account in Toronto since early 1987, and was responsible for determining that the comfort letter was acceptable. Since Baker was the bank officer then in charge of the relationship with Plessey, he was charged with obtaining the letter from Plessey and forwarding it to Young for approval. Young testified it was reasonable to assume that Baker had received Noonan's comments when he contacted Plessey.

109    Baker had available to him a draft comfort letter, which he used as a template for drafting the Plessey letter. The template letter stated:

We understand that Toronto-Dominion Bank has agreed to place at the disposal of [blank] a subsidiary of [blank] banking facilities of C$3,750.000 (three million seven hundred and fifty thousand Canadian dollars).

This letter will confirm that [blank] is aware of and approves of the above-mentioned facilities. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of [blank] will be conducted on a sound basis. Furthermore, we undertake to retain control of this subsidiary company as long as any indebtedness to you may be outstanding.

It is our policy that our subsidiary companies including [blank] be managed and operated in such a way as to be always in a position to meet their financial obligations when they become due and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity.

110    Baker did not use the template letter verbatim, and instead sent Plessey an amended version. No evidence was led as to the reason for these changes. On April 7, 1988, Baker faxed to Ms. Beard a draft of a proposed comfort letter which stated:

We understand that the Toronto-Dominion Bank ("the bank") has in place at the disposal of Plessey Canada (1988) Inc., a wholly-owned subsidiary of The Plessey Company PLC, borrowing facilities of up to C$10,000,000 (ten million Canadian dollars).

This letter confirms that The Plessey Company Plc is aware of and approves of this facility, and undertakes to advise the Bank if any reduction in ownership of Plessey Canada (1988) Inc. is contemplated. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis.

That same day, Denise Beard responded by sending Baker the following draft comfort letter, which was in a form Plessey had used on other occasions:

This is to confirm that The Plessey Company plc has full knowledge of the facility of c$10,000,000 (ten million Canadian dollars) which has been granted by Toronto-Dominion Bank to Plessey Canada (1988) Inc.

Plessey Canada (1988) Inc is currently a wholly-owned subsidiary of Plessey Overseas Limited which is a wholly-owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 220 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves

It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

111    In evidence, Musgrave said it was common for Plessey to negotiate the language of the comfort letters it gave, and that quite often the bank concerned would produce a form and Plessey would then respond with its own form of letter. He said there was some degree of negotiation in most cases and that Plessey's comfort letters were reviewed by its in-house counsel. Tony Noon, "as a matter of course." In respect of comfort letter number one, no party called Baker or Beard to give evidence about the extent of the negotiations.

112    Upon receipt of the Plessey draft, Baker in London forwarded the letter to Young in Toronto with a note saying that Plessey wanted the line in place by the next day. Young had previously been involved in several other files involving comfort letters, however this was his first experience in actually taking one. Upon receipt of the draft, Young showed it to Alex Norton, in-house counsel at the bank. Young testified that following the brief meeting with Norton, he believed the Plessey letter was "a strong comfort letter" and "legally binding." Neither Plessey's counsel. Tony Noon, nor TD's counsel. Alex Norton, testified at trial.

113    Young did not show the draft letter to Noonan in the Credit Division, nor did Noonan see the first comfort letter until after it had been executed. On April 7, Baker faxed a letter to Beard confirming that TD had made available a short-term $10 million facility for use by Plessey Canada, noting "documentation to formalize this facility will follow due course."

114    On April 11, 1988, Young sent a facility letter to J. Palazzi of Plessey U.S. containing the terms of the $10 million loan facility. This term sheet described the borrower as Plessey Canada, noted that repayment was on demand, that the loan was unsecured, and did not contain any financial reporting requirements. It listed that documentation would include "a Comfort Letter from the Plessey Company PLC in the form attached." The attached comfort letter was in the same form as that which Plessey had forwarded to the bank and which Young had shown to Norton. On April 12, prior to receipt of an executed comfort letter by the bank, Plessey Canada drew down the amount of $10 million from the bank, which it used as part of the acquisition financing for Leigh. Plessey group treasurer Ian Musgrave explained in evidence that from time to time the drawdown of cash would precede completion of the formal documentation with a bank. He said that normally by that time all the terms and conditions would be pretty well agreed, and there would be no contentious items left unresolved. The documentation would amount to the completion of paperwork in the terms agreed. Plessey Canada accepted the terms as offered and signed the facility letter on April 15, 1988.

115    In connection with this facility, the bank prepared a second, separate Corporate Credit Review of Plessey Canada, on April 19, after the loan facility had been offered by the bank and accepted by Plessey Canada. The CCR was prepared by Randi Winston, of the Corporate Banking Division in Toronto. It rated the risk of the borrowing as 2 low risk, which was the same as the risk rating given to Plessey Plc in the April 5 CCR, and listed security as nil. Documentation was "to be obtained" and included "comfort letter from The Plessey Company PLC."

116    The April 19 CCR enclosed the draft Plessey comfort letter and a copy of the April 5 CCR of Plessey Plc. In the remarks section Winston noted:

The purchase of Leigh should enable Plessey Company to bid for about $2 billion in Canadian contracts over the next 10 years. The Department of National Defence proposes to spend several billion dollars to acquire a fleet of nuclear powered submarines which should provide Plessey with an opportunity to market its sonar equipment, currently used on the British submarines.

While Bank of Montreal is Plessey Canada's banker, the company has expressed in interest in adding another financial institution and splitting their banking business. For the time being. Plessey has indicated that Leigh's facilities with the TD bank will remain intact.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Under "Use of Credit and Repayment" the CCR noted that the loan was to assist in the purchase of Leigh and that repayment of the advances under the facility was to be derived from Leigh's cash balances. The loan was to mature in 90 days, on July 11. Winston also observed:

Plessey Canada has advised us that this is a short-term need and have not requested a formal operating line of credit. However, having available an authorized facility would place TD in good standing in the event that Plessey decides to split its banking business. At this time we note that EMEA division was unsuccessful in winning Plessey Company PLC's $50 million deal.

The security section stated that "While there is no security per se, a strong comfort letter from the Plessey Company Plc will be obtained by EMEA division and forwarded to us shortly." Winston explained the risk assessment as follows: "Given the short term nature of this facility and the comfort letter to be obtained the risk is acceptable to the bank. Given the strong financial position of the Plessey Company PLC we are recommending account rating of 2." Young also signed the CCR which was ultimately approved by Noonan, who stipulated that the bank should obtain financials of the borrowing entity as soon as possible.

117     In reviewing the credit application Noonan testified that he noted the purchase of Leigh should enable Plessey to bid for Canadian contracts over the next 10 years and that while Bank of Montreal were the bankers for Plessey Canada, there might be opportunity for TD to be involved in their ongoing banking requirements. He testified that while this was a noteworthy point, it had no bearing on his risk assessment. Noonan testified that he noted the facility was for a short-term and that a formal operating line was not requested by the customer. He said other points of note were that the $10 million was to be repaid from Leigh's cash balances once Plessey had obtained the 100 percent ownership, and that while there was no security per se, a strong comfort letter would be forwarded by Plessey.

118     Noonan said he read the attached draft comfort letter, and in particular, paragraph 3. He said that, at the time, he took the view that the language of the comfort letter provided a commitment from Plessey to see that Plessey Canada was in funds or solvent to meet its financial obligations, including the amounts due under the TD facility. Noonan testified he formed this view based on the wording of the third paragraph and based also on the standing, strength and reputation of Plessey, which he described as "of paramount importance." In that regard, he said when a draft comfort letter was given by a company with a reputation that, enjoyed access to the public markets of the world, then he believed it was a company which valued its reputation, and that the bank in turn could believe in its word. As well, he said he took Plessey at its word, as expressed in the letter, because the comfort letter had been signed by two authorized signatories, and because he believed the people who gave the comfort letter also controlled finances and were in a position to provide the flow of funds to the appropriate subsidiaries. He said "in my view it's a quasi-solvency guarantee that they, in turn, will always meet their financial obligations." He elaborated that while he did not view the comfort letter as a guarantee per se, he viewed it as a quasi-guarantee from the point of view of ensuring that the subsidiary was in a solvent position.

119     Meanwhile, within Plessey, Denise Beard was arranging for formal approval of the comfort letter. While group treasurer Musgrave was not involved in negotiating the comfort letter, he testified that Beard would "almost certainly" have shown him the final draft before it was signed. Musgrave explained that Plessey controlled the borrowings of its subsidiaries and that approval of the Plessey main board was required for both a borrowing limit and a guarantee limit for each of its subsidiaries. Once approved by the board, the borrowing limit would entitle the subsidiary to borrow in amounts up to that limit, without exceeding it. The guarantee limit was Musgrave's authority to negotiate with the banks the degree of support Plessey could offer in connection with those borrowings. He said the degree of support to be offered by Plessey was within his discretion, and that he could choose to offer no support, a comfort letter, or a guarantee if one was necessary. Once a guarantee limit had been approved, it was not necessary to have the support approved by the main board, although in light of the group policy, Musgrave testified that if a guarantee was offered, he would consult with Stephen Walls, managing director of Plessey, first. He said the main board would not have seen the wording of the comfort letter itself.

120     On April 20, Denise Beard sent a memo to Stephen Walls requesting authorization of the comfort letter by him and one other board member, and the letter was in fact signed by Walls and Mayes. Musgrave explained that it was somewhat unusual

to issue a comfort letter without prior main board approval of a guarantee limit, but that this happened from time to time if a transaction was taking place at high speed and there wasn't a board meeting scheduled in time. Hence, on April 29, after the letter had already been issued, Musgrave placed the issue of retrospective approval of a guarantee limit for Plessey Canada on the agenda of the next main board meeting. On May 6, 1988, the Plessey main board retrospectively approved both a borrowing limit and guarantee limit for Plessey Canada of $10 million.

121     Musgrave testified that the Plessey treasury department maintained a "guarantee register" in which it recorded all guarantees and comfort letters, including the comfort letter provided to TD. Although designated as a guarantee register, Musgrave explained in evidence that the title of the register did not mean every document recorded there was a guarantee. He said that in addition to guarantees, comfort letters were recorded there for the sake of convenience, but were separately identified. Musgrave testified that the register included documents which did not require Plessey to pay the debt of a subsidiary. I accept Musgrave's explanation, and hence his evidence on this point.

122     Although the TD comfort letter was recorded in the guarantee register, Musgrave stated in evidence that his personal intention at the time was that the comfort letter would not bind Plessey to repay the indebtedness of Plessey Canada. Further, he testified that while he could not recall discussing the question specifically with Stephen Walls, Walls was a highly experienced finance director and Musgrave stated he would be very surprised if Walls did not understand the difference between a comfort letter and a guarantee.

123     Notwithstanding this however, Musgrave testified that in his view, the comfort letter still had value for the bank. In respect of the first paragraph of the letter, Musgrave said the statement that Plessey was aware of the facility should prevent the bank from feeling vulnerable that it was advancing money to a subsidiary without knowledge of the parent. Regarding paragraph 2, Musgrave said it was his belief at the time that this statement would have significant value to the bank. He said notification of any intention of Plessey's to reduce its shareholding would give the bank the opportunity to withdraw its facility, which was a demand loan. He said the third paragraph would also have value for the bank in that Plessey was stating its policy that its subsidiaries are expected to manage their affairs so as to be always in position to meet their financial obligations. Musgrave testified that he expected the bank to take the statements into account in deciding whether to make the facility available to Plessey Canada, that he expected the bank to rely upon the statements as being factually correct, and that they were intended to give the bank a degree of comfort about the proposed facility. He said he and Plessey would have known that the bank would not advance the funds without the comfort letter.

124     On April 27, 1988, Plessey forwarded to the bank a comfort letter dated April 20, 1988 executed by authorized signatories Stephen Walls and Derek Mayes, which was identical to the draft previously submitted to the bank by Beard. This first comfort letter, stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$10,000,000 (Ten million Canadian dollars) which has been granted by Toronto Dominion Bank to Plessey Canada (1988) Inc.

> Plessey Canada (1988) Inc is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

125     By this time the acquisition of Leigh had been completed, and Plessey Canada held the shares of Leigh. As an acquisition vehicle, Plessey Canada simply held the shares of Leigh. It did not carry on business and was run by Plessey's lawyers in Canada acting on direction from Plessey in London. Once the transaction had been completed, Musgrave said all the cash holdings in Plessey Canada were paid out, and conceded that Plessey Canada would not have had the cash to pay the TD loan, if payment had been demanded. He said there were options available to Plessey Canada however, and at least one other bank was interested

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

in assisting. At the time of the takeover, Leigh had available to it a $5.4 million facility from TD, although it had not drawn down upon it, and the amount outstanding was nil.

126      Although Plessey paid $104 million for the shares of Leigh, when the transaction was completed Plessey determined that the book value of Leigh's assets was about $50 million. Of that $104 million, $10 million was drawn down on the TD bank line. The remaining $94 million was structured as $69 million intercompany debt held by Plessey and $25 million equity. In consequence, Leigh's total debt load was within the order of $79 million.

*The Second Comfort Letter*

127      Following the acquisition. Plessey commenced a process of purchase accounting adjustments, whereby the Leigh balance sheet was adjusted to reflect the introduction of Plessey accounting principles. Although this process was not completed until several months later, it spoke as of the date of the takeover. Due to the fact that Plessey's accounting principles were more conservative than Leigh's, their introduction led to a $38.5 million reduction in the book value of Leigh's assets, leaving Leigh with a book value, on paper, of $13.1 million.

128      On June 30, 1988, Leigh and Plessey Canada were amalgamated under the name Leigh Instruments Limited. Thus, Leigh became responsible for the $10 million acquisition loan from TD held by Plessey Canada. Around this time, Musgrave spoke to Greg Young, the account manager for Leigh at TD's Corporate Banking Division in Toronto, and assured him the bank needn't worry about the amalgamation and that "as far as we were concerned, the letter of comfort still stood."

129      Following the amalgamation, Plessey determined that, in fact, Leigh did not have the anticipated $10 million in cash on its books. At the same time, Leigh advised Plessey it required an additional $2 million working capital. As a result, Leigh was unable to repay the $10 million facility to TD on its maturity date of July 11. On July 4, Musgrave sent a memo to Stephen Walls, apprising him of the situation and proposing that the $10 million facility be rolled over. As well, he requested permission from Walls to advance the additional $2 million to Leigh. Walls approved both requests.

130      Musgrave then requested an explanation for the Leigh shortfall from Andrew Akerman the financial analyst at PESL, the group to which Leigh belonged. Akerman reported that most of the shortfall was due to adverse phasing variances on the TACAN contract. In evidence, Musgrave explained this sort of shortfall was fairly common within Plessey. He said most of Plessey's business consisted of long-term advanced technology contracts, and that it would not be unusual at any point in time for several of these contracts to experience difficulties on a technical level. He said such technical difficulties resulted in cash flow variances, since often the customer would only make progress payments on the contract once specific technical milestones had been met. If there was a delay in meeting these milestones, it would affect the company's cash flow. Musgrave testified that while Leigh did not have sufficient cash to repay the loan at this point, it did have other options available to it. He said if TD had called the loan, Leigh could have sold some of its assets or perhaps approached the Bank of Montreal, which he said was keen to get involved.

131      In a July 11 memo to Noonan at TD Credit Division, Young reported the conversation with Musgrave about the comfort letter and that he had confirmed with the bank's legal department that the comfort letter would continue to apply. He also noted that contrary to prior expectation. Leigh did not have the $10 million to repay the outstanding loan, and that Leigh's cash balances had declined due to a temporary delay on a major contract. Young requested that the existing loan be rolled over for a further 90 days and continued in the name of Leigh, concluding "We are satisfied that the risk is still acceptable based on the comfort letter".

132      Plessey delivered written confirmation to the bank in a letter dated August 1, 1988, that the comfort letter applied to Leigh. This letter was vetted by Plessey in-house counsel before being sent, and was signed by Walls and Huntbatch. This second comfort letter stated: "We confirm that the comfort letter dated April 20, 1988 remains valid and now applies to Leigh Instruments Limited."

*The Multi-Option Facility*

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 224 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

133    In August 1988, Jonathan Exton of the Bank's London office received an invitation from Plessey to submit a bid to participate in a £250 million multi-option facility, which Exton explained was a "facility which permitted the borrower to draw down in different currencies of its choice". Due to the size of the facility, this invitation had been extended to a number of banks. Exton testified that when he received the invitation, he prepared a Corporate Credit Review of Plessey, which he sent to the Credit Division in Toronto. The CCR, dated August 24, described its purpose as a request for approval to underwrite £5 million of the £200/250 million five-year multi-option facility, arranged for Plessey by Barclays de Zoete Wedd Limited. The CCR gave Plessey a risk rating of 2 (unchanged). Under documentation, Exton noted that the MOF agreement included standard events of default, including a material adverse change clause and a negative pledge.

134    In the section pertaining to use of credit. Exton noted that TD had been invited to participate due to its "close relationship in Canada as the principal banker of its subsidiary Leigh Instruments of Canada ... since the acquisition TD has also taken the banking business of Plessey Canada, who were formerly with the bank of Montreal." Exton went on to state that the pricing on the MOF would not provide much profit for the bank. Nevertheless, he was seeking approval to participate for "relationship reasons and the opportunity to gain future business," and added that the bank had recently offered Plessey a £20 million uncommitted short-term facility which had been fully drawn down. In his financial summary of Plessey, Exton observed that the company's turnover had fallen by 9 percent as senior management had devoted resources to fighting off a recent hostile takeover bid by GEC. Also, Plessey's net worth had been reduced by £335 million from £623 million as a result of a write-off of goodwill associated with a series of recent acquisitions, one of which was Leigh. Despite this, Exton described the company as "financially strong". The CCR was also signed by Hugh Rising, vice president of corporate finance for the EMEA division, who added: "We are proposing to participate in this facility at the minimum level for existing relationship reasons, feeling as well opportunities will be presented going forth. This will assure our prominent position as bankers to the Canadian operations and afford us with opportunities in the US and specifically the UK relative to FX and Capital Market products." The application was approved by McDowell, who noted that the bank should obtain a capital adequacy clause. In evidence, McDowell said concern about losing the Plessey business to a competitor would not have affected his decision, but agreed that building up the relationship with Plessey was an important consideration for the bank. The MOF was signed on September 20, 1988.

*September 1988 to April 1989 - The Third Comfort Letter*

135    Plessey completed the purchase accounting adjustments for Leigh by early September 1988. The opening balance sheet showed Leigh's assets were valued at $51.66 million on March 31, 1988. This figure was arrived at using Leigh's accounting principles. Once the asset value had been calculated using Plessey's more conservative accounting principles, Leigh's assets were reduced to $13.16 million as at April 5, 1988. Musgrave explained in evidence that Plessey took a more conservative view than Leigh on the valuation of contracts in progress. He explained that Leigh and Plessey were both involved in large long-term contracts, and with such contracts it was necessary to book profit on the contract as it progressed. He said if the contract ran over a period of several years, profit would accrue over the life of the contract and there was a certain amount of discretion as to how and when the profit was booked or recognized on the balance sheet. Plessey was more conservative than Leigh in recognizing profit, so when Leigh's balance sheet was adjusted according to Plessey principles, it resulted in the write-down to $13.16 million.

136    In late September 1988, only five months after the Leigh acquisition, Leigh advised that it would have a total borrowing requirement for the quarter ended December 1988, of $30 million. Leigh's cash requirements included $3.55 million for the payment to Plessey of interest on the $69 million intercompany debt which had been imposed following the acquisition.

137    Although the interest payment on the intercompany debt was payable on September 15, Leigh did not make this payment. Plessey was not pleased at this turn of events. In a memo to file in late October. Musgrave recorded that he had been informed by David Dean, the vice president, finance at Leigh, that the loan interest payments to Plessey might have to be further deferred due to contract slippages. Musgrave noted "we cannot allow trading cash flow slippages to be accommodated by the deferral of loan obligations."

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

138    In late September, Andrew Akerman, financial analyst at PESL, advised Musgrave that Leigh required increased working capital due to delays in start-up of the TACAN program, and due to technical problems plaguing the SHINCOM program. However, Leigh was forecasting that its bank borrowings would decrease from $30 million at the end of December, to $19.89 million by the end of March 1989.

139    Based on the information from Akerman, Musgrave drafted a submission to Plessey's main board, requesting an increase in Leigh's borrowing and guarantee limit to $30 million. Board approval was granted on September 30, 1988.

140    On September 26, Greg Young at TD prepared a Corporate Credit Review of Leigh for the purpose of renewing the outstanding facilities, and placing the $10 million acquisition facility in Leigh's name, since it had previously been in the name of Plessey Canada. The total of Leigh's outstanding borrowings at the date of the review was $13.782 million.

141    In the CCR, the Leigh account was given the risk rating of 3A for all the facilities which. Noonan explained, denoted a normal banking risk, with the A indicating an improving trend. It is significant that this was the same risk rating which had been applied by the bank to the Leigh operating line prior to the acquisition. The $10 million acquisition facility had been given a lower risk rating of 2 when it was held by Plessey Canada, 2 being the same rating as the parent, Plessey Plc. In evidence, Noonan testified that the $10 million acquisition facility, as secured by the comfort letter, was still rated at 2, but that the practice and policy of the bank was that if a portion of the credit facilities of the borrower had a more adverse rating than any other, then the total account rating for the borrower would receive the higher risk.

142    Notwithstanding Noonan's evidence, it is clear that the risk rating applied by the bank to all the facilities was that of Leigh and not Plessey. Plessey Canada was merely a shell company incorporated for the sole purpose of the Leigh acquisition. Since it was not an operating company, there was no basis for a risk rating other than the risk of the parent. Once the acquisition loan had been placed in Leigh's name following the amalgamation, the risk was rated as that of Leigh rather than Plessey. This conclusion is further reinforced by the risk rating given by the bank subsequently in the January 10, 1989 CCR. As is set out in more detail below, in that CCR the bank merged all the Leigh facilities into one operating line, released all its formal security and rested its exposure solely on the comfort letter. The risk rating of the account remained that of Leigh however. This risk rating is inconsistent with the bank's subsequently professed view that the comfort letter contained an obligation to pay or was in the nature of a guarantee.

143    Security was listed in the September 26 CCR as a registered general assignment of book debts and documentation for the $5.4 million operating line was listed as a loan agreement containing normal representations, warranties and covenants. For the second line of credit, documentation was described as a letter agreement and the comfort letter from Plessey. Repayment was "As funds permit on demand (subject to contract maturities)."

144    In the remarks section. Young noted that Leigh's financing requirements had increased substantially due to the acquisition and subsequent amalgamation, and that Leigh had advised they would request an increased operating facility of $25 million. Young reported that the introduction of Plessey accounting principles had altered Leigh's balance sheet significantly, but recommended the risk as acceptable, despite the deterioration in Leigh's financial position. He made his recommendation, in part, on the basis that the lines were payable on demand and fully secured by receivables, and because "facility #2 is backed by a strong comfort letter from Plessey and we are confident that Plessey will support Leigh as required". The review concluded that the low pricing on the $10 million facility had been recommended by Credit Division to ensure that the bank kept the Leigh relationship.

145    Although this CCR was intended to serve as Leigh's annual review, Noonan refused to approve it on that basis. He renewed Leigh's facilities only until October 31 and noted that based on a review of Leigh's balance sheet, outside security such as a comfort letter would be required for the expected loan increase.

146    Noonan testified that he limited the renewal period of the facilities to Oct. 31 because the bank had only the draft accounts, and he wanted to see a full set of audited financials for the company. Noonan said he specified a new comfort letter because the amount of the anticipated increase would exceed the value of the receivables over which the bank held a charge.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 226 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

147    A subsequent Credit for Executive Circulation dated September 30, 1988, reviewed the Leigh facilities and concluded "our lines are fully secured by the assets of the company and supported by comfort letter from Plessey. We are confident that Plessey will support Leigh as required." This document was initialed by Brock, McDowell, and Noonan.

148    That same day, Young sent Noonan a memo requesting a temporary increase or bulge in Leigh's operating line of $1 million, until the company could provide the amalgamated financials. Young reported that the Leigh borrowings were at $15.8 million (an increase of $2 million over the past four days), some $400,000 in excess of the authorized limit. In recommending approval of the bulge, Wendy Leaney, general manager, Corporate Banking Division and Young's immediate superior, described Plessey as a "valued connection." The request was approved, and initialed by both Noonan and McDowell.

149    On October 6, 1988, Brock, who was visiting the U.K., attended a meeting with Musgrave at Plessey, accompanied by Jonathan Exton, manager, corporate finance in the bank's London office. Musgrave explained that this sort of visit happened quite frequently. He said someone senior would visit from overseas and would be taken around to meet major customers or potential customers of the bank. In fact, requests for appointments like this were so common. Musgrave had instructed his secretary to limit them to two per week.

150    In his reporting memo following the meeting. Exton commented that the bank's last visit to Plessey had been more than two and half years earlier. Plessey had not been prepared to accept visits, despite repeated attempts, and so he was pleased to be able to make this call. Exton did not record any discussion about Leigh, but did note that Plessey intended to drawdown on the MOF sometime in the next month.

151    By the first of November, Leigh again requested a temporary increase in its loan facility, this time of $4 million. In a memorandum to Noonan on that date, Young stated the bank was still awaiting a copy of the amalgamated financial statements, which they expected to receive by mid-November. The total outstandings to Leigh at this point were $16.851 million. No explanation was provided in the memo regarding the need for an increase, however Young did point out that the London office felt the Leigh relationship had assisted in the efforts with Plessey, and that Brock had recently called on the company. As well, he reported that Plessey's board had approved Leigh's request for an increased operating line of $30 million. Included in the description of security was the comfort letter.

152    In recommending the increase, Young's supervisor Wendy Leaney, noted that while the Leigh relationship was taking a long time to "regularize", this was the bank's only relationship with Plessey, although this latter observation was in error. Leaney explained in evidence that she did not object to the inclusion of the comfort letter under security, because she considered it part of the security package.

153    This particular credit did not go to Noonan, who was away from the office. Instead, it was reviewed by Sid Owen, senior vice president, Credit Division. Owen approved the requested increase until months end, but commented that the lack of presentation of reasonable figures was difficult to understand, and that they must be tabled if the bank was to consider restructuring the loan. He concluded cautiously "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by Nov 30/88. We must resist being dragged along."

154    When asked in evidence about the reference to informal support, Noonan said that, although he had not seen the note at that time, the comfort letter in his view amounted to a quasi-guarantee. He explained that while a comfort letter might not be supported by a formal resolution and all the protective clauses that accompany a guarantee, he believed it could convey a quasi-guarantee to perform certain functions.

155    Meanwhile, on November 16, GEC announced a second hostile takeover bid for Plessey, this time in partnership with Siemens, a German company. The two companies formed GEC Siemens plc as a vehicle for the joint venture. As Musgrave explained, this was the second such hostile bid from GEC, and it was most certainly not welcomed by Plessey, which wished to remain independent. Also, Musgrave said there had been a long-standing adversarial relationship between the chairman of Plessey and the chairman of GEC. Exton at the bank's London office wasted no time in offering the bank's support to Plessey.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

He met with Denise Beard of Plessey's Treasury Department on Nov, 17. In evidence, Exton explained the purpose of the call was to develop further business opportunities with Plessey. In his report of the meeting, Exton described the purpose of the call as, among other things, to advise of the bank's willingness to support Plessey in any defence strategy against the hostile bid, and to follow up on amendments to credit facilities for Leigh. Exton reported that Plessey would put a freeze on meeting other bankers while the bid was on, and that they were Plessey's last visitors for the time being. He noted that the bank's pledge of support was greatly appreciated by Plessey, and that Plessey's main need was credit facilities.

156      Also in this meeting, Beard requested that the bank release its formal security over the assets of Leigh. Exton testified that he understood the request for release of security was related to the terms of the MOF, which restricted negative pledges on the assets of Plessey. He said it was his understanding that Plessey was concerned about its level of encumbrances, which was approaching the percentage allowable under the MOF, and consequently it wished to reduce them.

157      This contrasts with the evidence of Musgrave, who indicated it was merely Plessey's preference not to have security over the assets of its subsidiaries, as it restricted Plessey's ability to deal with these assets, and because if security was granted to one bank, others might wish to follow suit. He explained that the Deloitte's due diligence report on Leigh had omitted any reference to the security TD held over Leigh's assets. Plessey only discovered the security when preparing for the MOF, since as an appendix to the MOF. Plessey had to list all the secured assets in the group at the time of signing. He said the MOF was signed with the Leigh security in place and listed in the appendix. As well, he testified that Plessey was well within the allowable limit in secured assets contained in the MOF. As such, the terms of the MOF did not require that the security be released. However, when Musgrave became aware of the security, he asked Beard to try and have it removed. He said it was simply a matter of good housekeeping that the security be released.

158      To the extent that Musgrave's evidence conflicts with that of Exton regarding the reason for the requested release of security, I prefer the evidence of Musgrave. He was intimately acquainted with Plessey's policy on secured assets as group treasurer. Moreover, although Ms. Beard did not testify, she would have been aware that TD was a signatory to the MOF, and thus would have a copy of the MOF agreement. Accordingly, I conclude that Plessey requested the security be released simply because it preferred not to grant security over assets of the group, and not because it was required to do so by the MOF.

159      Leigh continued to experience cash flow problems and on November 18, Dean at Leigh advised A.G. Finnis, group taxation manager at Plessey, that the $3.5 million in interest owing on the intercompany debt, which had been due September 15, would not be paid before January. Leigh also advised that it would require a further increase in its borrowing limit. Musgrave responded to Finnis in a memo dated November 28 that a request would be submitted to the Plessey main board for an increase in the borrowing limit, in part to enable Leigh to pay the interest on the intercompany debt. In evidence however, Musgrave explained that payment of the interest had always been factored into Leigh's financing requirements, and that the need for an increased borrowing limit stemmed from cash flow problems related to Leigh's contracts.

160      By November 28, Leigh was in an "out of order" position on its TD facility. This prompted Leaney to write to the senior vice president advising that Leigh's credit had been renewed to November 30, with an operating line increased to $10 million in addition to the $10 million acquisition loan. On November 29, Young advised Leigh's local account manager in Ottawa that a credit exposure for Leigh of $21 million had been verbally approved by the bank and was not to be exceeded.

161      In his record of the conversation, the account manager noted "the bank is concerned that the letter of comfort provided by Leigh Instruments' parent company (Plessey) will not be honoured in the event of a successful hostile takeover from G.E. and Simmons [sic] group."

162      The credit authorization was followed by a memo from Leaney and Young to the Ottawa account manager on November 30, authorizing a temporary renewal of the Leigh facilities, with the operating line at $11 million for total of $21 million. The memo observed that the bank was still awaiting updated financial information, expected on December 5, before proceeding with Leigh's request for lines totaling $30 million. Leaney added a handwritten note that "in the interim, no security is to be released."

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

163    Leigh's cash flow difficulties did not abate however, and by December 12th Leigh was again in an out of order position, with a credit exposure of over $22 million. The branch manager in Ottawa called Leaney concerning this, and Leaney authorized the branch to manage the account over the $21 million which had been authorized. At the same time, she stipulated the Leigh position be reported to Corporate Banking Division on a daily basis. In evidence, Leaney said this was a judgment call she made, knowing Plessey had approved a $30 million limit, and that she knew it was only a matter of time before the bank received an increased comfort letter. Leaney conceded that it was beyond her authority to grant approval to manage the account above the authorized limit, and that she should have obtained approval from Credit Division. She said it was a judgment call she made, given that she had been delegated responsibility to manage the relationship, and she took it upon herself to give the approval. Leaney said she wasn't concerned about the account in view of the security package the bank had, but was annoyed at the way the account was being managed.

164    By December 16, the Leigh outstandings had risen to $24 million, and accordingly, Young and Leaney met with Noonan on that date and sought from him an exceptional approval of an increase in the Leigh limit to $25 million, to regularize the company's position on the books. Leaney advised Noonan that Plessey had approved a borrowing limit of $30 million, and that a credit review of Leigh was underway. Noonan approved the increase, on the basis that the credit review would be received in the week of December 19. Leaney and Young failed to provide the credit review within the stipulated time.

165    At Plessey, Musgrave was taking steps to have the Leigh borrowing limit increased even further, to $34 million, following a request from Dean on December 12. In his record of the conversation with Dean, Musgrave noted that the bank was "getting a little uneasy about the security for the local borrowings, in light of the GEC bid for Plessey," despite the $10 million letter of comfort and floating charge on inventory and receivables. Musgrave told Dean he would prefer to secure the bank's position by an increased letter of comfort, "matched at the same time by an elimination of the bank's security on the inventory and receivables."

166    Musgrave prepared a main board submission in the name of Walls, requesting that the Leigh borrowing and guarantee limits be increased from $30 million to $34 million. The need for the increase was attributed to delivery slippages and higher costs on the TACAN and SHINCOM programs. The submission noted that technical problems plaguing SHINCOM had been resolved and borrowing levels were expected to fall to $29 million by March 1989. The increase was approved by Plessey's executive committee on December 21.

167    Meanwhile, at Leigh, steps were being taken to find a new president of the company. To that end, Barry Flower and John Shepherd, president and chairman of the board of Leigh, respectively, met with Frank Driscoll, an engineer with an army background and long experience working for the military and later in the defence industry. Driscoll ultimately was to become president of Leigh in August, 1989. In that initial meeting however, both Flower and Shepherd expressed concern to Driscoll about the performance of David Dean. Driscoll testified that they expressed reservations to him about Dean's ability to perform in his role as vice president of finance, in view of the growth they had planned for Leigh.

168    On January 10, 1989. Leaney and Young finally submitted the credit review Noonan had expected in the week of December 19. By this time, Leigh had again exceeded its authorized credit of $25 million and had outstanding $25.552 million. The purpose of the review was to cancel the separate operating line and $10 million acquisition facility, and replace them with a single operating line of $35 million. The credit was ultimately approved by McDowell upon Noonan's recommendation, however both imposed changes and conditions in the proposal as submitted by Young. Young and Leaney had proposed that the account risk rating remain at 3 A. however Noonan changed the rating to 3 B, denoting a stable rather than improving trend. I note at this stage that the prior $10 million acquisition facility was given a risk rating of 2 by the bank, based on the comfort letter. However this new facility, which was also to be supported by a comfort letter, was given a much lower risk rating though still normal. This reinforces my conclusion above that the risk rating applied by the bank was clearly that of Leigh rather than that of Plessey. As such, the risk rating was inconsistent with any belief on the part of the bank that the comfort letter contained an obligation to pay Leigh's debts or amounted to a guarantee.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 229 of 554
Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

169    Security was listed in the credit review as the general assignment of book debts and floating charge debenture. Leaney had handwritten next to the description of security that it was to be released, however Noonan struck out her note and substituted "No! See below," in reference to his lengthy typewritten additional recommendations, set out below.

170    Under documentation, Young had listed the letter and loan agreements and comfort letter from Plessey Company. Beside the reference to the loan agreements for the canceled facilities, Leaney had handwritten "to be released." to which Noonan added "only when new security package is in place." To the reference to the comfort letter, Noonan added the handwritten notations: "for $35 million and in the same form, wording and sign off as existing letter, including final paragraph." and "with negative pledge by Leigh Instruments Limited." Noonan explained in evidence his reason for adding this condition was to ensure, if the bank gave up its security on these assets, that Leigh would not be in a position to place security on them in favor of another party.

171    In the conditions section, Young included a requirement that Plessey maintain a majority interest in the voting stock of Leigh. In evidence, Young explained that he included this condition in view of the GEC/Siemens takeover bid and the uncertainty surrounding the ownership of Leigh. Even though the comfort letter contained an ownership clause, he explained that he wished to be able to trigger the loan agreement in the event that Leigh was no longer a subsidiary of Plessey. Young also included a condition that the intercompany debt be postponed in priority to the TD debt, to which Noonan added the word "formally." Attached as enclosures to the review were Leigh's audited financial statements for the period ending June 30, 1988, draft financials as at September 30 and a copy of the existing comfort letter.

172    Under use of credit and repayment, Young noted that while Leigh's balance sheet indicated some of Leigh's debt should be "termed out" they were prepared to increase Leigh's operating line based on the comfort letter from Plessey, noting as well that the facility was payable on demand. In the security section. Young commented that Plessey had requested that the security be released, since it was Plessey's policy that all its debt and that of its subsidiaries be unsecured. He recommended acceding to this request in return for the comfort letter. In fact, Young's observation on this point was in error, as Musgrave testified. I accept Musgrave's evidence that Plessey did, on occasion, provide guarantees and other security where circumstances warranted. In support of this finding. I note that in April 1989, Musgrave issued a memo permitting a creditor of Micronav to maintain security over Micronav's assets in the amount of $700,000. Musgrave explained in evidence that there were good commercial reasons in that instance to leave the Micronav security in place.

173    In the section on risk assessment. Young observed that the six month delay in the TACAN project had adversely affected Leigh's cash flow and earnings to tune of about $5 million per month. He stated that the acquisition by Plessey and related financing has had a "major negative impact on Leigh's financial position" and that of the $81 million in debt carried by Leigh, $71 million of it was intercompany debt. "Clearly Leigh cannot support this level of debt on its own and consequently this credit depends on the support of Plessey," Young stated, noting that Plessey was prepared to provide a "strong" comfort letter similar to the one attached, and that the risk rating for Plessey itself was 2-low risk. He added that the bank's relationship with Plessey was growing and the Leigh account must be considered in that context, noting again that Plessey was the target of hostile takeover bid.

174    Leaney recommended the credit be approved, although she observed that "there is no question that the Plessey support is required here and on that basis, credit is recommended."

175    Noonan appended lengthy comments to the credit review and was clearly cautious about the risk. In respect of the request to release the security, he noted that the existing security predated the negative pledge in the MOF and should not be released until acceptable security package was in place. Noonan also observed that the existing comfort letter was "indeed strong," but stipulated that Corporate Banking Division request subordination of the intercompany debt to the TD facility. He recommended the credit on the basis, among other things, that the comfort letter be in the "same form, wording and sign-off as the existing letter, particularly paragraph 3". In cross-examination, Noonan said that although the facility was for an increased amount, and although it was now an operating line, rather than a short-term acquisition loan, he did not see any need to change the wording of the comfort letter, which was substantially the same as comfort letter number one.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

176    Noonan also noted in the credit review that if a negative pledge was obtained from Leigh he would be flexible on the debt subordination. He retracted this suggestion in handwriting however, in light of the comments of McDowell, who ultimately approved the credit. Noonan testified that he added his own written retraction because he wanted to be absolutely sure the account manager realized that McDowell had overruled and wanted a full subordination of the intercompany debt.

177    McDowell noted "it is preferable to have full subordination of the inter-company loan because Leigh will be in no position to repay for some time and in the absence of a call on assets, subordination adheres to spirit of the comfort letter." McDowell testified that it was not his practice to review the documentation accompanying a credit review, and that responsibility rested with the senior vice president who recommended the credit, in this case Noonan. McDowell said he had tremendous respect for Noonan and trusted him implicitly. In the board sheet remarks relating to the CCR, it was noted in reference to the comfort letter: "We are confident that Plessey will support Leigh as required."

178    In evidence, Noonan testified he felt the comfort letter was strong, in part because it was signed by people with authority to commit the company, and because in his view the third paragraph, coming from a company with the stature to fulfill its obligations, was a clear commitment to the bank that they would see that Leigh was in funds to repay the amounts due under the loan facility. He said the reputation of Plessey was significant to him, and that with its standing the bank could believe in what Plessey said.

179    Accordingly, the bank agreed to release its security and rest its risk on the comfort letter, without stipulating any changes to the wording of the comfort letter, notwithstanding that the form and substance of the letter had been initially approved in the context of a short-term acquisition facility. I must infer from all of this evidence that the bank made this decision based on a desire to foster its relationship with Plessey, as noted in the CCR.

180    On February 2 1989, less than a month after the credit was approved, and before a new facility agreement was in place, the English Court of Appeal released its decision in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused), overturning the trial decision and refusing to enforce payment on a letter of comfort. Noonan testified that he was aware of both the trial and appeal decisions, but that the appeal decision did not change his approach to comfort letters, as he had always practiced a policy of handling comfort letters with caution.

181    At this point, TD did not have an updated facility agreement to cover the outstanding Leigh borrowings. Indeed, the bank had not obtained a facility agreement with Leigh since its amalgamation with Plessey Canada following the acquisition, and the most recent facility agreement had been executed by Plessey Canada the previous April regarding the acquisition loan. The other facility agreement outstanding was for the $5.4 million Leigh operating line, which was dated March 1, 1988, and also predated the acquisition. On February 9, Dean forwarded to Beard at Plessey a proposed facility letter received from TD, which contained a clause requiring the subordination of the intercompany debt and attached a draft resolution to that end. Plessey did not wish to enter into this agreement. Musgrave explained in evidence that Plessey did not wish to subordinate the debt for reasons similar to their reluctance to grant security, and that if subordination had been agreed to, it would restrict Plessey's ability to deal as it liked with the capital structure of the group.

182    On the January 10 CCR, Young made a handwritten note on the last page, which he dated March 6 1989, and which read: "Plessey has refused to provide postponement of the intercompany loan as they view comfort letter as tantamount to a guarantee, which it is. In consultation with WAL, we have agreed to waive that condition." In the body of the CCR, beside the reference to the request for postponement. Young wrote "Plessey has refused, since comfort letter is very strong. We waived postponement."

183    In evidence, Mr. Young testified that he wrote this note following a telephone conversation with Ian Musgrave, and that someone from the bank's London office was also on the line, although he could not recall who. Young said Musgrave told him the bank did not need the postponement, that Plessey viewed the comfort letter as tantamount to a guarantee, and that Musgrave's words were exactly as he had recorded them. He said the words "which it is" reflected his own view, arrived at after consultation with the bank's in-house counsel, Norton. This was the extent of Mr. Young's recollection.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 231 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565
1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

184    Ms. Leaney testified that Young told her about this conversation immediately after it took place. She said that she and Young had discussed the question of the postponement, and that she had approved the decision to waive that requirement. I note that this was despite McDowell's condition that subordination be obtained.

185    This conversation, alleged to have taken place between Young and Musgrave, was a contentious issue in this trial, particularly the statement attributed to Musgrave that the comfort letter was "tantamount to a guarantee". Mr. Musgrave testified that he had no recollection of any conversation with the bank, apart from the call in spring of 1988, when he advised that the first comfort letter would continue to apply following the amalgamation. He said specifically he could not recall ever discussing the meaning and intent of the comfort letter with the bank, and that he did not hold the views expressed in the note. Musgrave conceded on cross-examination that it was possible he spoke to Young and told him there would be no postponement of the intercompany loan, although he could not recall doing so.

186    Musgrave said that comfort letters and guarantees were quite different, and that he would be "amazed" if anyone at Plessey had said that a comfort letter was "tantamount to a guarantee". He elaborated that he and Beard had developed a standard response to the question of what a comfort letter meant, which was to tell anyone who asked that, as a matter of fact, in the entire time he had been at Plessey, the main board had never walked away from a comfort letter. He said the statement was intended to give the banks a degree of comfort, but at the same time they would make it quite clear as part of the response that the board saw comfort letters and guarantees as something quite different. Musgrave said he "certainly" didn't believe that the Leigh comfort letter was tantamount to a guarantee. In cross-examination, he had to concede that since he had no recollection of such a conversation, it was possible the conversation took place, however he thought it was highly unlikely.

187    I have considered the evidence of both Mr. Young and Mr. Musgrave on this point, and I prefer the evidence of Mr. Musgrave. Mr. Musgrave was group treasurer of Plessey, and used to dealing with banks and bank security on a daily basis. He was intimately acquainted with Plessey's policy and views regarding comfort letters. He had no recollection of saying a comfort letter was tantamount to a guarantee and thought it was highly unlikely that he had done so. Such a statement was contrary to his set response. Further, he testified that it was his practice, when he had dealings on a file in which someone else was involved, to dictate a note concerning the conversation. Musgrave said he had no recollection of making such a note, nor was he aware of the existence of one.

188    There is no reference in Young's note to Musgrave, nor indeed to a telephone call. Jonathan Exton, formerly of the bank's London office, gave evidence in this trial. He was the contact person for Plessey, and Young testified it was "a reasonable assumption" that Exton was the other person on the call. Yet Exton testified he could not recall any telephone conversation with Musgrave up to March 6, 1989, nor could he recall any conversation jointly with Musgrave and Young. No one else was ever identified as being the person from the bank's London office on the line.

189    Mr. Young himself, had very little recollection of this conversation, apart from the note. He conceded in cross-examination that the note was not contemporaneous with the phone call, but was made on March 6, 1989, following a conversation with Ms. Leaney. He could not recall how much time had elapsed between the phone call and when he wrote the note. The plaintiff did not produce any contemporaneous note of the phone call. Further, the note was made to record the decision which Young and Leaney had taken it upon themselves to make, to waive the requirement that Plessey postpone the intercompany debt, despite the strong comments from McDowell.

190    Finally, Young never again referred to the phone call, or to Plessey's alleged description of the comfort letter as tantamount to a guarantee, in any subsequent bank documentation. Nor did he refer to it in any other communication, written or oral, with Plessey. This description, as attributed to Plessey, would have been significant, and would certainly have been recorded in internal bank documents or raised by the bank upon renewal of the comfort letter. However, there is no evidence that the bank ever made any further reference to the alleged statement, although it would have been in the bank's interest to have done so, had the statement actually been made. Since it is improbable that such a key statement, if made, would not have been referred to again in some fashion, the allegation lacks any ring of credibility. I conclude that the conversation between Young and Musgrave and the unnamed third person, did not take place, and that Musgrave did not state to Young that the comfort

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 232 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

letter was tantamount to a guarantee. I find that TD did not give up its security, nor did it make any further advances to Leigh after this date, on the basis that such a statement had been made or was purported to have been made by Musgrave.

191       In the meantime, unbeknownst to the bank, Plessey was considering an alteration to Leigh's capital structure. In a February 16 memo to Musgrave, Alan Jones the managing director of PESL, expressed concern about the capital structure of Leigh and the high level of interest-bearing debt which had been imposed upon Leigh for tax reasons. He informed Musgrave the government, as Leigh's main customer had expressed concerns about Leigh's long-term viability in the context of the debt load. At this point in time, Leigh had still not paid any of the interest owing on the intercompany debt from September 15, 1988, despite the increases in its bank line. Musgrave testified that in this period, Plessey began to realize that the financial structure of Leigh was not appropriate. He said that at some point in February or March, Plessey decided to waive any further payments of the interest owing on the debt, and on April 1, converted the intercompany debt into preference shares. He explained the debt had been put in place initially, to offset taxation of Leigh's profits, however Leigh was not generating enough profit to cover the expense. Conversion of the debt to equity removed the burden of the interest expense from Leigh.

192       This conversion essentially supplied the bank with the subordination they had requested, since the conversion of debt to equity removed the threat to priority of the bank's loan posed by the intercompany debt. Musgrave testified, however, that the decision was taken purely for tax reasons, and not in response to the bank's request for subordination.

193       At the same time, TD was continuing its efforts to generate business with Plessey on other fronts. On March 16, Exton met again with Musgrave and Beard, and presented them with a revised facility letter for a short-term loan to Plessey of £20 million. At this meeting, Exton also tried to interest Plessey in participating in a Canadian commercial paper program in connection with Leigh. Exton noted Plessey was interested in such a program, but wished to wait until the GEC/Siemens bid situation was over. Exton discussed the bid with Beard and Musgrave and noted that "the tables may be turning in favor of Plessey." They also discussed the Leigh account briefly. Leigh and TD had not yet agreed upon terms for the new facility agreement and Plessey requested a revised copy of the facility be sent to them.

194       On March 29, Young forwarded a fresh proposed facility to Exton, who in turn sent it to Beard the following day. By this point the Leigh borrowings were about $29 million and the bank still did not have a facility in place. Moreover, Young conceded on cross-examination that Leigh was well in excess of its authorized credit. Although the January 10 CCR had been approved, the conditions in it had not yet been fulfilled and Young agreed the approval was not operative. The prior authorization was only for $25 million, some $4 million less than the amount outstanding.

195       The revised facility letter did not contain a subordination clause. It provided an operating line of $35 million, payable on demand, and noted that the existing security was to be released upon receipt of a new comfort letter. The facility contained a negative pledge against Leigh's assets and requirement that Plessey maintain a majority interest in the voting stock of Leigh. The facility agreement also contained a reporting clause, requiring Leigh to provide the bank with audited financial statements within 90 days of Leigh's fiscal year end unaudited financial statements within 30 days of the end of each quarter.

196       On April 4, Beard responded by sending Exton a proposed draft of the comfort letter, asking him to confirm that its content was acceptable, and that the security held by TD would be released as of March 31, 1989 (Plessey's year end and the date proposed for the comfort letter). Exton wrote Beard on April 10, enclosing a copy of a letter from Young confirming that the draft comfort letter was acceptable to the bank and that the bank would treat the Leigh facility as unsecured as of March 31, provided that Leigh accepted the proposed credit facility and that the letter of comfort was dated the 31st March.

197       On April 20, Beard sent Exton an executed copy of the letter of comfort, signed by Walls and Huntbatch and dated March 31. This, the third letter, stated:

> To this is to confirm that The Plessey Company plc has full knowledge of the facility of C$34,000.000 (Thirty four million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.
>
> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

This letter replaces our letters of 20th April 1988 and 1st August 1988.

198    Exton testified that when he received the letter, he simply checked to ensure the letter was for the right amount, and then forwarded it to Young in Toronto. He said he took no steps to determine whether the letter was acceptable to the bank, because this was the responsibility of the account manager. This proposed facility letter was never executed by Leigh.

199    Four days later, on April 24, Leigh received its audited financial statements for the year ending March 31, 1989, which showed a profit for the year, before taxes and one extraordinary item, of $4.659 million. The net income for the period was the same figure.

200    Meanwhile, the GEC/Siemens bid for Plessey was proceeding apace. Plessey had obtained an injunction to prevent GEC and Siemens for making the offer to its shareholders in December, however the injunction was overturned and GEC/Siemens issued the offer in late December. The GEC/Siemens bid document indicated that the existing Plessey businesses were intended to be divided between GEC and Siemens and that GEC intended to take a majority interest in Plessey's North American defence electronics industries. The offer was referred to the British Monopolies and Mergers Commission in January, and in April the commission ruled the bid could proceed. The Commission stipulated, however, that certain of the Plessey businesses could not go to Siemens, a German company, for security reasons. Similarly, UK monopoly restrictions prevented certain of the businesses from going to GEC.

201    In response, Plessey continue to resist the bid. In a May 2 memo to all Plessey's businesses, managing director Stephen Walls stated:

As part of our defence we will almost certainly be publishing a profit forecast to demonstrate the financial benefits starting to flow from strategies we have adopted.

The provisional budget does not yet represent a sufficiently strong performance to fully achieve our objectives. The timing of our forecast requirements is as yet unclear but it is vital that we use forecast to be submitted with April results as the first opportunity to add profit improvement plans onto the budget to create a better platform for our bid defence. Would you please ensure, therefore that profit forecasts and improvements are closely scrutinized to enable us to maximise performance.

Musgrave said that while he did not recall seeing this memo at the time, he would expect it to be sent to stand alone subsidiaries like Leigh.

*The Fourth Comfort Letter and the Bulge*

202    By the 13th of June, Leigh was again experiencing financial difficulties. Dean contacted Musgrave and requested authorization for a further $4 million bulge in the bank line. That same day, Musgrave sent a memo to Walls asking for approval of "an emergency increase in the borrowing limit". Musgrave explained in evidence that although he could not recall the precise reason for the urgency, the request had to be turned around very quickly. He said Dean would have needed the money fairly rapidly, and could not wait until the next scheduled board meeting for approval of the increase. Walls approved the request, and Beard informed Dean on June 15 that the borrowing and guarantee limits had been increased by $4 million to $38 million. The increase was approved to the end of August only, at which time it would revert back to $34 million.

203    Having received Plessey approval, Dean then wrote to Young at TD and requested the $4 million bulge, leading Young to prepare a CCR of Leigh dated June 15. Young described the submission as urgent and requested a decision as soon as possible. The purpose of the CCR was to lower the amount of the operating line from $35 million to $34 million, which was the amount

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

supported by the third comfort letter, and to obtain approval for a temporary $4 million line until August 31st. The risk rating remained unchanged at 3B (normal risk). In the remarks section, Young noted that Leigh had missed milestones on both the TACAN and SHINCOM contracts, with a consequent impact on cash flow leading to the bulge request. Young pointed out that the bulge had been approved by Plessey, but that Plessey was reluctant to amend the comfort letter for such a short period. However, "Plessey has agreed to provide a new comfort letter if outstandings are not back in order by August 31/89." Young then observed that the general assignment of book debts and floating charge debenture over Leigh's assets had not yet been released, despite the fact the bank had received the new third comfort letter from Plessey, and that the security would not be released until the outstandings were back in order. He noted that TD London confirmed Plessey's account rating of 2 - low risk - and concluded "believe the risk is acceptable." Leaney recommended approval of the credit, which was then forwarded to James Laitner, senior vice president, Credit Division. Although he recommended approval as well, he stipulated that the security was not to be released until the bulge was repaid or a new comfort letter received for the increased amount. The credit was ultimately approved by William Brock, the executive vice president, Credit Division, without comment.

204    On June 26, Young sent Noonan a memo updating him on Leigh's credit situation and the condition that security not be released. He reported that in-house counsel had advised TD would be in a conflict of interest if it retained the security, given that TD had signed the MOF containing a negative pledge, and given the agreement in writing to release the security. Noting that Plessey had agreed to provide a new comfort letter if the bulge was required beyond the end of August, he stated "We have a good relationship with Plessey and believe the risk is acceptable. Although the hostile takeover bid by Siemens and GEC is a concern, it will likely take beyond Aug. 31/89 to complete or resolve. We request that the condition for the approval of the bulge, that our security not be released, be waived."

205    Leaney agreed, although she observed "clearly a higher comfort letter is the best solution but for relationship reasons would go along." Noonan added his own comments: "The new comfort letter is certainly strong & I am told by CBD actually boarded by Plessey Co PLC." He added that the bulge was clearly to the end of August only, but pointed out that the MOF did permit encumbrance of 10 percent of Plessey's group assets and that the bank security predated the MOF in any event. He concluded that he would agree to release the security "if it is the Co *request* to do so." The decision to release the security was alternately taken by Brock: "We have agreed to release the security and would proceed to do so, resting the exposure on the comfort letter." An executive review sheet regarding the release of security was initialed by Noonan, Brock, McDowell, bank president Robin Korthalls and Thomson, the chairman and CEO of the bank. It noted the risk rating of Leigh at 3B (unchanged) and specified the audited year-end financials be obtained prior to Leigh's annual review date of September 30, 1989. I note that Young's letter sent to Beard on April 10 stated the security would be released when the comfort letter was delivered and the credit facility accepted by Leigh. This latter condition had not yet been met.

206    On June 27, Young sent a new facility letter to Leigh. At this point, the most recent executed facilities remained that accepted by Plessey Canada in April, 1988 and the Leigh facility executed March 1, 1988. The facility offered an operating line of $34 million, was payable on demand, and listed security as nil, with a note that the existing security was to be released. The facility contained the same terms and conditions regarding Plessey majority interest in Leigh's voting stock and Leigh's financial reporting requirements as had been contained in the last proposed letter. In a separate letter, Young offered the $4 million temporary bulge, on the understanding that Plessey would provide a further comfort letter if the funds were required past the end of August. Both facility letters were accepted by Leigh the same day.

207    In London, Exton wrote to Beard on June 29, enclosing a draft letter of undertaking for Plessey to sign regarding the possible extension of the comfort letter at the end of August. Musgrave executed the letter without any change to the draft:

We are writing to confirm our agreement with Mr. Michael Walzak on the telephone last week with respect to the temporary increase in the operating facilities for Leigh. We are aware that Leigh requires its operating line to be increased from C $34 million to C$38 million for a period of two months. Since at this time this is only a temporary requirement we will not revise the Letter of Comfort (dated 31st March 1989) to reflect the increased amount. However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the Letter of Comfort accordingly.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Exton forwarded the letter to Young on June 30th. The $34 million guarantee limit and $38 million borrowing limit for Leigh received retrospective approval of the Plessey main board on July 28.

208    On July 8, Leigh received its unaudited first-quarter financial statements for the quarter ending June 30. These financials showed net earnings for the quarter of $131,000 before deductions for taxes and an internal Plessey Group payment. After deductions, the financials showed a loss of $181,000 the financial statements included a quarterly forecast to the end of the fiscal year, projecting net earnings as at March 31, 1990 of $8.379 million. The information contained in these financial statements was sent to the bank pursuant to Leigh's reporting obligations, by letter of July 21, 1989, together with the executed facilities for the $34 million operating line and the $4 million bulge.

209    By the end of July however, Leigh was showing an increased loss. In the Plessey corporate finance report for the month of August, Leigh was listed under the heading "major loss makers". Leigh had budgeted a profit of £1.246 million for the period to the end of July, but in fact reported a loss of £326,000. Hence Leigh reported a negative variance from its budget of £1.572 million. The Plessey corporate finance reports were produced monthly by the Plessey treasury department. In evidence, Binnie Sammon, group chief accountant at Plessey, testified that the corporate finance reports were distributed to a restricted list of recipients, including Walls, Musgrave and Huntbatch. Musgrave testified that while Leigh was showing a loss in that period, there were other subsidiaries with worse numbers, and there was nothing in the report which would have caused him to get "too excited".

210    On August 17, GEC and Siemens released their proposals for the Plessey businesses in the event that the takeover was successful. David Newlands, the GEC finance director, explained in evidence that there were two components of the Plessey businesses which particularly interested GEC and Siemens; the telecommunications aspect of the business and the defence electronics aspect. He said the original plan had been for GEC and Siemens to operate the Plessey businesses in partnership, however the Monopolies and Mergers Commission in Britain refused to permit Siemens to participate in certain defence businesses and refuse to allow GEC takeover other of the Plessey businesses for monopoly reasons. The conditions imposed by the commission led to the GEC/Siemens final offer document on August 17. In that document, GEC and Siemens set out their plans for restructuring Plessey and indicated that Leigh was intended to be wholly-owned by GEC if the bid was successful.

211    In TD's annual Corporate Credit Review of Plessey, dated August 25, the bank noted that a £20 million facility and the MOF were still in place, but had not been drawn upon. The CCR of Plessey also contained an update on the status of the takeover bid, however Brock noted "financial covenants protect if there were a takeover and restructuring."

212    Frank Driscoll had assumed his new role as president of Leigh on Aug. 8, and on August 23 had a short meeting with Young and Leaney, although he described it as a social, get acquainted meeting rather then a business meeting.

213    On August 29, Pat Smith of the Leigh finance department contacted Beard at Plessey and requested that the $4 million bulge be extended past the end of August to the end of November. The Leigh outstandings at that date were $34.8 million. The next day, Young relayed to Noonan a request for extension of the bulge to the end of October.

214    Young recommended approval of the request provided Leigh supply their written acknowledgment, and added that he did not believe it was necessary to obtain a new undertaking from Plessey. He based this recommendation on the fact that Leigh's balance sheet had improved dramatically with the conversion of intercompany debt, and noted that he and Leaney had met with Driscoll and believed this gesture would demonstrate the bank's support, thus generating goodwill and new business. Although he referred to the hostile takeover bid, he erroneously stated that it was unlikely to be completed before October 31st. Young noted in conclusion that the potential market for Leigh's MLS program was $300 million in Canada and $4 billion worldwide. The request was reviewed by Owen, who recommended the bulge be extended as long as Plessey was notified of the extension and Leigh formally requested it. Brock approved the extension without comment.

215    Meanwhile, several weeks earlier Musgrave had informed Walls he was leaving Plessey at the end of August. Notwithstanding that the bank had not requested a further comfort letter relating to the bulge extension, Plessey nevertheless

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

prepared one on its own initiative, in substantially the same form as the earlier letters. One of Musgrave's last acts before leaving the company was to review a draft of this letter. The comfort letter was executed by Walls and Huntbatch on behalf of Plessey and sent to Exton, who faxed it on to Young on September 7, with the explanation that "Plessey appreciated that the Bank was not requesting a revised Letter of Comfort, but as they had promised one, if the facility was required beyond August, and in view of GEC/Siemens bid, it was considered appropriate to do so." Exton testified he simply checked the amount and that the document was a comfort letter before forwarding it to Young. The fourth comfort letter stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$38,000,000 (Thirty eight million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

> This letter replaces our letters of 31st March 1989 and 30th June 1989.

*The GEC Siemens Takeover*

216    On September 8, 1989 the GEC/Siemens offer to purchase the shares of Plessey was accepted by more than 50 percent of Plessey's shareholders, and the hostile takeover of Plessey succeeded. GEC and Siemens ultimately paid £2.2 billion for Plessey shares. On September 22nd the new owners held a Plessey board meeting, at which they elected a new Board of Directors composed of representatives of GEC and Siemens, including GEC finance director David Newlands. Shortly following the takeover a great many of the Plessey senior management left the company, either having resigned or having been terminated by the new owners. Stephen Walls left on October 6th and Denise Beard left on November 3rd.

217    On September 28, each of GEC and Siemens put forward a candidate for managing director of Plessey. The two nominees were to work together to manage Plessey from that date forward. Simon Weinstock was appointed by GEC and Phillip Gerdine by Siemens. Gerdine testified that from the outset he and Weinstock proceeded with several goals in mind. He said they intended to separate the Plessey businesses into units to be acquired by GEC and by Siemens. Those businesses remaining in the Plessey "rump" following this "hive-up" of the Plessey companies were to be liquidated. Gerdine explained that GEC and Siemens had purchased Plessey for about $4.5 billion U.S. and held the interest roughly 50-50. He stated that the hive-up exercise was a two-step process. The first step was that GEC and Siemens had to decide what companies would go where and then, how much the companies were valued at. He said allocation of the companies fell into two categories; those mandated by the U.K. government and those which were discretionary. Because it was a hostile takeover, the discretionary companies had been allocated preliminarily on the basis of very little information. Gerdine said GEC and Siemens put in place teams of people to determine the fair value of Plessey's assets, and each of the subsidiaries was subject to a review based on revenue earnings and net book value. Those values then had to be reconciled within the $4.5 billion purchase price.

218    Gerdine testified GEC and Siemens each took responsibility at the outset for the companies intended ultimately to be held solely by them. He said he took responsibility for the Siemens companies, Simon Weinstock for the GEC companies, and companies remaining in the rump were administered jointly. At the time of the takeover, Plessey had in place a set of rules and procedures governing financial reporting of the subsidiaries to the parent, and the new owners left those in place for the purpose of public filing of Plessey's financial reports. Each of GEC and Siemens applied additional internal financial reporting requirements in accordance with their respective practice.

219    News of the takeover was greeted by Exton as a further opportunity to develop business. He forwarded the original of the fourth comfort letter to Young in mid-September with the note: "As you know the GEC/Siemens bid for Plessey has

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

been successful, and we now hope to develop our relationship with GEC. Hugh Rising and I will be visiting David Newlands, Finance Director, on 3rd October, 1989 and if you have any items for discussion, please advise me."

220     Almost immediately, the bank began to consider the effect of the takeover on Leigh. Ernest Mercier, executive vice president of the Corporate Banking Division contacted the bank's Montreal office which in turn contacted Canadian Marconi, which was owned 51 percent by GEC. A Montreal based vice-president of Corporate Banking wrote to Mercier on September 13, noting that CMC had accepted in principal the notion of a merger with Leigh, in view of the similarity in their product lines.

221     On September 19, Mercier had an executive luncheon with Leigh president Frank Driscoll, the purpose of which was to solicit any business opportunities arising out of the takeover. In a briefing memo prepared in advance of the luncheon, Young advised Mercier of Leigh's contract related cash flow problems and of the Plessey comfort letters. Young pointed out the possibilities for merger with CMC, and repeated the market estimates for the MLS system. He reminded Mercier that TD was Leigh's only banker, and that CMC did all its banking with the Royal Bank. He concluded that the London office had been unable to establish a meaningful relationship with GEC and "In addition to identifying opportunities arising out of the Plessey acquisition (e.g. fairness opinion on Leigh), we have a substantial interest to protect." Driscoll testified that when he met with Mercier, the discussion focused on the prospects for Micronav, and on the future of Leigh's banking relationship with TD in light of the possible CMC merger. The comfort letter was not discussed.

222     Driscoll testified that Leigh was aware it was intended to be wholly-owned by GEC fairly shortly after the takeover, if not earlier. He said that Dean attended a briefing on GEC accounting policies in England in late September or the first week of October.

223     The day after Driscoll's lunch with Mercier, on September 20, 1989, Young prepared a new CCR of Leigh in order to renew the existing facilities on the same terms, and to downgrade Leigh's risk rating from 3B to 4. In the remarks section, Young noted the recent acquisition of Plessey by GE Siemens and that Leigh was slated to go to GEC. "Although we were aware of the hostile takeover bid by GEC/Siemens, we are comfortable with the quality of their credit and hope to use our positions with Leigh/Plessey to develop a relationship with GEC." Young describe the uncertainty about Leigh's ownership and possible merger with CMC as a weakness however, leading to the revised risk rating of 4.

224     This CCR also mentioned the contract delays and missed milestones on SHINCOM and TACAN, observing that "A restructuring of the company's debt is clearly required". Young speculated that in view of GEC's cash resources and Leigh's tax position, it was likely that Leigh would receive an equity injection to pay out the bank. Young elaborated in evidence that Leigh had a number of research and development tax credits and carryforwards and that they were not taxable as a result. In that situation, he said it made sense for a parent with taxable cash to put in into the nontaxable subsidiary. He testified he vaguely recalled discussing this issue with Dean. The CCR concluded that TD Montreal would solicit opportunities arising out of the Plessey acquisition, including the possibility of providing a fairness opinion to CMC. Young explained in evidence that given 49 percent of CMC was publicly held, a fairness opinion on any acquisition or merger with Leigh would be required.

225     Leaney reviewed the CCR and recommended renewal of the facility but suggested, while the risk was increasing, that a rating of 3C was more appropriate, and Young agreed. Noonan in turn recommended the rating remain at 3 B in light of the "strong and renewed comfort letter" and the intercompany debt conversion. He testified that he reviewed the attached comfort letter at this time. McDowell agreed and authorized the credit.

226     An October 2 Credit for Executive Circulation distributed to senior bank executives regarding the Leigh credit misstated the terms of a comfort letter, describing it as at commitment "to maintain ownership and to manage Leigh Instruments in such a way as to be always in a position to meet their financial obligations."

227     Just two weeks after the new Plessey board was in place, on October 3, Exton and Rising met with Newlands and reported GEC's intention to integrate Plessey's operating subsidiaries into its own businesses. Exton pointed out the bank's relationship with Leigh and observed that Newlands was familiar with Leigh's tax position and low profits, however Newlands advised refinancing of Leigh was premature. Exton noted GEC had not yet decided whether to sell Leigh to CMC but that

Newlands noted the bank's interest in providing a fairness opinion. As follow-up, Exton advised that the bank should maintain close contact with Leigh and CMC in Canada, and attempt to develop a relationship with GEC Treasury Department in the U.K.. Newlands testified they did not discuss the Leigh comfort letter.

*Fall 1989 and the Fifth Comfort Letter*

228    Back at Leigh, by mid-October Driscoll had received some financial results for the month of September, which revealed a further deterioration. In September, shortly after arriving at Leigh, Driscoll had initiated an ETC review of all Leigh's SHINCOM and TACAN contracts in progress to estimate the cost of completing the contracts. The review involved the calculation of the ETC or estimate of the cost of completing the contract. That figure, combined with the actual cost incurred to date, would generate an estimated cost at completion of the contract of EAC. The EAC would then be compared to the contract price to measure the financial success of the contract. Driscoll testified that to the extent that a business had a fixed price contract, periodic calculation of EAC's was an important indicator of performance.

229    Driscoll explained that he attended reviews of Leigh's programs in August and became aware that the actual cost spent on SHINCOM had already exceeded the most recent EAC for that project, and there were several months left before completion of the contracts. He said this information, combined with the fact that there had not been a rigorous ETC review since early in the year, led him to implement the review. He said quarterly ETC reviews were ordinarily standard on larger contracts. When he arrived at Leigh, he said the company had about 20 major contracts and that the SHINCOM and TACAN programs comprised the larger part of the business.

230    David Newlands, finance director of GEC, visited Leigh in person on October 20, 1989, accompanied by David Rickard, finance director at GEC Marconi to learn more about the new acquisition. In preparation for the meeting, Newlands received a briefing memorandum on Leigh prepared by Colin Justice, divisional finance director at PESL, who was at Leigh participating the fair value exercise for the GEC Siemens hive up of Plessey. In addition, on October 2nd, very shortly after the takeover, Newlands had reviewed the opening balance sheet for Leigh incorporating the purchase accounting adjustments implemented by Plessey as of April 5.

231    Justice's briefing memo to Newlands noted the difficulties with SHINCOM and expressed the concern that Leigh's performance might not be technically adequate. He pointed out SHINCOM had failed to meet some technical tests in the contract, giving rise to a need for additional program management and engineering expense. Justice observed that this was an area where they should be highly conservative in the fair value exercise. Newlands explained in evidence that accounting provision should be made for the contract risks in the context of the fair value exercise.

232    The Justice memo pointed out that there had been major program deterioration for both TACAN and SHINCOM and that the EAC's had worsened substantially. Regarding SHINCOM, Justice wrote that the product was not "technically secure and underwritten". Newlands testified that this statement put him on notice that all the financial information about the project was open to "extreme doubt." He said if the program was not technically secure, it could not produce a reliable EAC. The memo showed a forecast loss for the year ending March 1990, of $2.316 million.

233    The Newlands and Rickard visit took place in Leigh's Kanata, Ontario offices on Oct. 20. Leigh prepared a presentation for Newlands and Rickard on the company's programs and financial condition, including the ongoing ETC review and fair value exercise. The transition to GEC accounting principles was also discussed and Newlands instructed the company to take care to distinguish between operational issues, such as the ETC results, and adjustments to the balance sheet resulting from the fair value exercise.

234    Included in the material presented to Newlands and Rickard at the meeting were second-quarter financial statements, in Leigh accounting format, to the end of September. These results showed an actual loss to the end of September of $2.85 million and a forecast loss of $1.5 million to the end of the fiscal year. Newlands was also given a preliminary draft of the purchase accounting adjustments following the GEC takeover, and a copy of Leigh's cash requirements forecast. The forecast

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

showed the bank line outstanding at $36.081 million as at October 16, with a forecast overdraft of $35.774 million at the year-end on March 31st 1990.

235    Newlands drafted a memo to file following his visit to Leigh in which he recorded his view that the business was in poor shape and, using GEC accounting principles, trading at a loss and absorbing cash. He noted that "The businesses have prepared September management accounts in GEC format but do not reflect current contract cost to complete reviews and changes to GEC accounting policies. As a result of the half year reviews, adoption of GEC accounting principles and purchase accounting, there will be significant changes to the results to 30 September, and the Balance Sheet will have to be restated in the October management accounts." Newlands added that these changes would leave Leigh showing a "significant loss."

236    He observed that, in his view, the Plessey budgets for the business were "hopelessly optimistic and should be disregarded," and that support from Marconi would be required to turn the business around. Newlands noted that Driscoll was "showing the right attitude," but that Dean was under pressure and in Newlands view not up to the job.

237    Six days later on Oct. 26, Leigh produced a revised half year forecast, which showed an actual loss of $15.634 million to Sept. 30 and forecast a loss for the year of $12.813 million. Driscoll testified that these figures reflected an incorporation of some of the ETC results, including a loss on the SHINCOM program of $6.88 million. The report noted that the results would likely require further re-statement to reflect purchase accounting adjustments, and that a number of unquantifiable risks regarding SHINCOM and TACAN had not been provided for. This report was forwarded to Rickard, Justice, Flower and Shepherd.

238    Pursuant to the financial reporting obligations contained in Leigh's facility agreement, Leigh was obliged to provide TD with unaudited quarterly financial statements within 30 days of the end of the quarter. Thus, the quarterly statements for the period ending September 30 were due on October 30, four days after Driscoll's six-month results were prepared. Driscoll conceded in cross-examination that the six-month results did constitute an unaudited interim quarterly report.

239    Also on October 26, Young wrote to Dean, to confirm that the bank had agreed to discharge its security and would do so forthwith. The next day Dean wrote to Young and requested a further extension of the $4 million bulge to July 31, 1990, due to persisting problems with the SHINCOM program. Dean attached a copy of the cash flow forecast which had been presented to Newlands on Oct. 20 and which showed an estimate of the bank line at $35.57 million as at the end of December, and $35.774 million as at March 31, 1990. He enclosed an executed facility agreement renewing the operating line on the same terms and conditions, and a facility executed September 18 regarding extension of the bulge. The bulge facility offered an extension only until October 31st however, and the offer to extend had expired on September 15. The package sent to Young did not include the October 26 half year results, with their actual and forecast losses.

240    In a letter dated October 30, and sent to Exton along with about 40 other banks, GEC, Siemens and Plessey invited TD to provide Plessey with an uncommitted bank facility. The invitation was signed by Anderson, Huntbatch and Gerdine. Anderson testified that following the takeover, GEC and Siemens decide to cancel Plessey's MOF and instead borrow from one of a number of available bank facilities, depending on terms offered on any particular day. The package included a copy of the GEC Siemens final offer for Plessey with details of the proposed restructuring of Plessey. The letter noted "Siemens and GEC are prepared to guarantee, on a $^{50}/_{50}$ several basis, such new borrowings. Therefore the terms of these new borrowing facilities should be based on the creditworthiness of Siemens and GEC." The letter added that in view of the security offered and the reduction in treasury staff at Plessey, preference would be given to those banks who accept the shortest, simplest, standard documentation. A committee of the GEC board passed a resolution prior to the issuance of this letter, authorizing Anderson to sign, on behalf of the company, this letter which included a commitment to provide a several guarantee.

241    Several of the key players in the piece changed at the end of October. On November 3, Denise Beard, who had been assistant treasurer, left Plessey. On the same day, Greg Young, who had been in charge of the Leigh account since 1987, left TD and was replaced by Rob Wilson. His evidence was that there was a two or three week period when he overlapped with Young. During that period, he said he shadowed Young day-to-day to "assimilate" the relationships he would be taking over. Wilson said he familiarized himself with Leigh account by discussing it with Young and reviewing the file. He said he did not

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

discuss the Leigh file with his supervisor Leaney, nor did he review the comfort letters. Also during this period, GEC treasurer Ross Anderson began to receive weekly cash reports from Plessey.

242    On November 8, Young and Wilson met with David Dean at Leigh. In the meeting, Dean advised the bankers that Leigh's numbers were getting worse, and told them there were legal disputes with some of the contractors involved in the SHINCOM program. Wilson said Dean told them he could live with a $38 million operating line, but if there was no change, Leigh might require further funds from TD or GEC. In his notes of the meeting. Wilson jotted "new forecast forthcoming". In evidence, he said at this point in the meeting he asked Dean for financial statements. He said Dean told him there would be a new forecast forthcoming but that the financial statements were not available because the acquisition accounting issues had not been resolved. Wilson also noted "fold in or fund $10 million or more". He said Dean told him Leigh had a couple of options available to it. One was an acquisition by CMC, or in the alternative they would need further funding of $10 million. Wilson testified Dean told them if other money was required from TD another comfort letter could be provided: "Q.. From Whom? A. He said GEC, once they took it over, but I understood at this time that it would be a Plessey comfort letter consistent with the previous ones." Young testified he had no recollection of the meeting.

243    On November 15, Exton and three other managers of Corporate Banking produced a CCR of Plessey in relation to the invitation of Oct. 30 to provide Plessey with an uncommitted facility. The risk rating was 1 and was described as that of the parents, and the proposal was to increase the £20 million facility already available to Plessey to £50 million. Under security, they noted that GEC and Siemens were offering unconditional and irrevocable 50-50 several guarantees. Documentation referred to a facility agreement containing a material adverse change clause. In the remarks section they noted that despite the fine pricing, TD had enjoyed a strong relationship with Plessey but had not had a relationship with GEC, and they hoped to forge such a relationship through Plessey. They noted other opportunities with CMC and Leigh merited this business for relationship reasons. Senior vice president, credit division, Sid Owen recommended the credit on the basis that the guarantees be supported by a directors' resolution and solicitors' letters of opinion. Brock also recommend the credit, which was ultimately approved by McDowell who reduced the risk rating to 2 on the basis that 1 was reserved for governments.

244    In mid-November, the corporate finance report for October showed a cumulative Leigh loss of $15.6 million to the end of October, and a forecast loss to year end of £8.45 million. On Nov. 17, Driscoll forwarded a copy of the October President's Report to Lord Weinstock, managing director of GEC, directly. The financial results to October 27, which were attached, showed a cumulative loss to October 27 of $16.677 million, and the Leigh loan outstanding at $38.5 million, some $500,000 in excess of the authorized credit.

245    In the week of November 20, Leigh completed the ETC review process and Justice returned to Leigh to assist in preparation for the half-year review meetings to be held at GEC's Marconi's offices in Stanmore, U.K. the following week. Wilson testified he had a conversation with Dean on November 23rd, in which Dean indicated his concern that Leigh might go into overdraft the next day. He said Dean also advised that Paramax, the major contractor in connection with SHINCOM, wished to withhold a $5 million payment due to Leigh until early in the new year. As a consequence, Dean asked for a further $5 million from the bank. Wilson said he wasn't concerned as Dean advised they would be invoicing Paramax about $10 million in December. Wilson's note of the call stated: "full comfort from Plessey, even GEC." He said Dean told him any additional borrowings would have full comfort from Plessey, and even GEC. Wilson said he did not ask about the overdue financial statements. It is clear to me, and I so find, that the term "full comfort" refers to the full amount of the authorized line of credit.

246    In late November, Dean called Wilson. Justice was on the call and since Wilson and Justice had not met previously, Dean introduced him to Wilson as the PESL divisional finance director. There was discussion concerning additional short term borrowing up to $41 million. Justice raised the possibility of a floating letter of comfort, but Wilson rejected this concept. Wilson testified that either Dean or Justice confirmed that the Paramax payments would be coming in January. Wilson was advised that Leigh planned to reduce its work force in the near future, possibly in March, but perhaps earlier, with consequent severance obligations. Wilson did not commit to the increased borrowings. He took the lay-off as "somewhat positive". There was no discussion of Leigh's financial statements.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

247    Wilson stated in cross-examination that Justice had "indicated" to him during this conversation that "We'd get the same comfort letter." He conceded when pressed that Justice did not "expressly say that." "He did not say those words" but he said "we'd get full comfort" and "I clearly understood that we were getting the same comfort letter." Wilson said it was clear to him what Justice meant, and he took it the letter would be in the same form. He conceded further that Justice did not say the comfort letter would be in the same form. His note was silent on this point.

248    I am not satisfied that there was any discussion during this telephone conversation in late November concerning the form of the comfort letter or that it would be in the same form as the previous letters, and I find that Justice made no such statements, or representations to this effect to Wilson.

249    On November 28 and 29 Driscoll, Dean and Justice attended a series of meetings at GEC Marconi offices in Stanmore. The purpose of these meetings was the GEC half-year review. The first day, Driscoll testified they met with representatives of GEC Marconi and the second meeting was attended as well by Simon Weinstock and David Newlands. He said they presented a package of financial material on the first day and essentially responded to questions. The material had been prepared in Canada with the assistance of Justice and then finally revised the day before the meetings in England.

250    The financial information presented at the meeting disclosed a forecast loss to year end of $19.608 million. Driscoll said this increase in the projected loss from the October estimates was due in large part to the ETC review. The revised six-month figures to the end of September, also included in the package, showed an actual loss of $18.85 million.

251    Driscoll testified that the meeting on November 28 was largely a fact-finding meeting and that the GEC Marconi representatives commented from time to time but gave no broad reaction to the size of the losses, nor did they comment on any options for Leigh for the future. On the second day, the meeting was attended by Simon Weinstock and David Newlands. Driscoll said this meeting was much shorter and that Newlands zeroed in on SHINCOM and TACAN which Driscoll said were the largest components of the losses. He said again there was no comment on any future options for Leigh, but that Leigh's position in the GEC group could be characterized at this time as uncertain.

252    Driscoll testified that at the conclusion of the second day, he with the assistance of Justice, presented a written request for an increase in the bank line. He said some combination of Justice, Newlands, and Rickard said they would take care of the request, and that Justice and Rickard were charged with doing further work on the issue.

253    In cross-examination, Driscoll was asked whether Newlands was left in charge of the issue and he answered that he was not sure Newlands was. This is consistent with the evidence of Newlands, who testified that he probably led the discussion, and that Leigh and Marconi management were then charged with producing more support for the request. He said the request would have come back to him because he had led the discussion, but that treasury actually reported to Simon Weinstock. Newlands also testified that he had no recollection of any mention in the meeting that Leigh ought to be allowed to go bankrupt. Following the meetings Leigh was instructed to provide a weekly cash report to GEC, which Newlands explained was an attempt put pressure on the business to utilize its cash resources as sparingly as possible.

254    Driscoll testified that following these meetings he was of the opinion that Leigh was terminal, absent a significant change in its capital structure or relief from contractual requirements. There was no evidence that he expressed this view to anyone at Plessey or GEC at the time. In cross-examination, Newlands disagreed with Drisoll's assessment that the company was terminal on the basis that the technical baseline was not secure and hence, Driscoll didn't necessarily have all the information he needed to reach such a conclusion. However, I do note that a concerted effort to negotiate contract relief with the Canadian government was commenced by Leigh in early January, with the assistance of GEC and Plessey. These efforts continued right up until Leigh's bankruptcy.

255    Rickard wrote to Newlands on December 1 that Leigh had now demonstrated a need for essential payments, particularly payroll. He noted Justice would visit Leigh the following week to review the cash requirement in depth, and report back to him. In the meantime, he wrote that it would be sensible to extend the limit to $41 million and monitor it weekly. He closed by noting that this would require an uplift in the comfort letter.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

256    On November 30, Derek Thorn, Plessey finance director, group services, faxed GEC treasurer Ross Anderson, with information on Leigh's line of credit and cash forecast, and a copy of the fourth comfort letter. Anderson and Hafner had been made available to assist the Plessey treasury department on an as-needed basis in view of the depletion of their personnel following the takeover. Regarding the proposed increase in the bank line, Thorn noted that Leigh had asked for an increase to $45 million but Justice had recommended it only be increased to $41 million. Thorn suggested that if Simon Weinstock and David Newlands approved the increase to $45 million, the company be instructed not to exceed $41 million without a specific approval from the U.K.. In conclusion, Thorn asked Anderson to notify him when the increase had been approved, and "can we then discuss the mechanics, particularly the form of comfort letter that may be required."

257    Anderson said when he received the memo he probably looked at the attached cash forecast but it did not indicate anything of significance to him. He said he could not recall discussing the increase with Newlands or Simon Weinstock but that he must have done to get their approval. Newlands reluctantly approved the requested increase, and Justice, who was at Leigh, was informed of the approval on Dec. 6.

258    Upon receiving the package from Thorn, Anderson said he reviewed the copy of the fourth comfort letter which was included and made some changes to it. He explained in evidence that he did this in order to make the letter as accurate and as clear as he could. Anderson did two different markups on the comfort letter. He testified he would have done the first one at the same time or immediately after receiving the comfort letter and a second, more detailed markup a few days later. Anderson added to the third paragraph of the letter the words: "and does not constitute a legally binding commitment."

259    Anderson testified that he did not make any inquiries into the terms of the Leigh facility, the history of the loan, or how the comfort letter had been arrived at. He did not view the comfort letter as a legally binding commitment, but testified that he added the words "does not constitute a legally binding commitment" to eliminate any doubt or uncertainty. He said he did not consider it to be a change of any substance, but he felt that with the added words, it was 100 percent certain that the letter was not binding, and without them it was slightly less certain. David Newlands testified that Anderson stopped him in the hall and showed him the comfort letter with the handwritten changes. He said Anderson asked him to read and "bless" it, which he did.

260    Exton testified that Anderson called him on December 6 or 7 and advised that permission had been granted to increase the loan facility to $45 million but that the borrowings were not to go above $41 million without Anderson's explicit approval. Exton said this struck him as being an unusual request as Anderson was taking direct control of the advances to be made to a subsidiary of a joint venture involving GEC, and that he had never received such a request in his banking career.

261    Exton testified that he and Anderson also discussed the possibility of TD providing a fairness opinion on the possible Leigh CMC merger. As well, he said Anderson told him he would forward to Exton a revised comfort letter for $45 million, and that this would be done with the full knowledge and approval of GEC and Siemens. Exton passed this information on to Wilson.

262    Anderson testified in relation to this conversation that he might well have told Exton he would forward a new comfort letter. Although he could not recall the conversation, he did not believe he would have told Exton the comfort letter would be revised with respect to the amount of the facility alone, because he had already started to amend the comfort letter by this time. He said he did not discuss the changes in the comfort letter with Exton, nor did he tell him about the added words "does not constitute a legally binding commitment." Anderson testified that if he had felt he was making changes of substance, he likely would have told Exton. He said he had expected the bank to read the letter, which was only a one page document, and said if the bank had not agreed to any of the language of the comfort letter, he had expected they would indicate this upon receipt of it. I accept Anderson's evidence. He was a credible and forthright witness.

263    Wilson at TD prepared a CCR of Leigh dated December 6, to formally cancel the $4 million bulge and authorize an increased operating line of $45 million. The risk rating remained at 3B and security was listed as nil. Documentation was described as a $45 million comfort letter and letter agreement. The terms and conditions remained the same as the prior facility.

264    In the remarks section, Wilson noted that the funding was necessary due to the delays in receiving cash payments from Paramax, the main contractor on the SHINCOM contracts. He observed that:

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Any additional borrowings will be fully supported by a Plessey letter of comfort. Jonathan Exton of TD-London has been in contact with Ross Anderson, Group Treasurer of GEC regarding this. Anderson is providing a letter of comfort from Plessey with the full knowledge and approval of GEC and Siemens to cover Leigh borrowings up to $45.0 million. Internally, Plessey will cap Leigh's borrowings on a weekly basis at levels below the $45.0 MM to keep pressure on Leigh to manage its cash flow; consequently, while we will have authorized availability of $45.0 MM, Anderson will personally approve any excess borrowing requirements above $41.0 MM and he does not plan to disclose to Leigh the full extent of Plessey's letter of comfort support.

265    In the next paragraph, Wilson referred to Leigh's revised cash flow forecasts projecting peak borrowings of $43.3 million in December, and expected to fall below $36 million upon receipt of the Paramax payments in January.

266    Wilson noted as well that TD intended to bid on a fairness opinion for CMC regarding its potential acquisition of Leigh, and that the bank had recently offered Plessey a £50 million uncommitted facility. Under strengths. Wilson observed that the revised comfort letter covered borrowings of Leigh, and that Plessey was ultimately owned by GEC and had access to significant parent company resources. He listed Leigh's weaknesses as delayed contract payments which had impacted cash flow and dependence on defence industry expenditures which had suffered cutbacks. Finally, he noted: "There is still continued uncertainty over Leigh's ultimate ownership; however, we believe that this does not represent a significant credit risk in view of strong existing parent company support." Leaney concurred and recommended approval with the note "the support letter justifies."

267    Noonan reviewed the application on December 8th and recommended the credit on condition that the comfort letter was in the same form and substance as the Aug. 31/89 letter attached to the review, "particularly to include para.3", and that no borrowings be extended beyond $41 million without the prior approval of GEC's group treasurer. These conditions were never communicated to Leigh. McDowell approved the credit on the assumption the bank was satisfied with the financial condition of Paramax and its ability to pay the amounts owing to Leigh.

268    Noonan testified it was incumbent on the Corporate Banking Division personnel to obtain a new facility agreement as condition of the credit, and that he received no request from Corporate Banking Division that this requirement be waived. He said he also expected Corporate Banking to read both the Aug. 31 comfort letter and the one received in connection with the credit. McDowell testified that he agreed with Noonan's expectation of the Corporate Banking department. McDowell said he expected they would read and compare the comfort letters, and if the new document was in a different form than that stipulated, Corporate Banking would have to seek authorization from the Credit Division before accepting it. Noonan testified he received no such request.

269    Wilson sent a letter to Leigh's Ottawa branch advising of the approval on December 8 and cautioned that the $45 million limit was not to be disclosed to Leigh, "as it is an internal matter how GEC/Plessey manages a subsidiary's borrowings. Therefore, Leigh should be informed that availability only totals $41.0 MM."

270    On December 13, a Credit for Executive Circulation relating to the Leigh line was circulated among the bank's senior executive. The document referred to the GEC takeover and contained the same erroneous description of the comfort letter as had been included in the earlier Credit for Executive Circulation. The document was initialed by Noonan, McDowell, president Robin Korthalls, and the chairman and CEO of the bank, Richard Thomson.

271    Driscoll had completed the Presidents Report for the month of November by December 14. This report, which was forwarded to GEC, disclosed an actual loss as at November 24 of $20.301 million with an outstanding bank line of $38.745 million. Driscoll attributed these figures to the results of the ETC review and SHINCOM and TACAN contract delays.

272    On approximately the 14th of December, in the course of revising the comfort letter, Anderson called Dean at Leigh to ascertain whether there was a holding company in the corporate structure between Leigh and Plessey. Anderson testified he did not discuss Leigh's financial condition with Dean.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

273     Anderson sent the revised comfort letter to Bernard Huntbatch at Plessey on December 15, with a copy to Andy Hafner, treasurer at Siemens' offices in London, Rickard, Justice, Simon Weinstock and Newlands. Anderson testified he sent the letter to everyone who had an interest in it, to give them an opportunity to comment. Mr. Huntbatch, who is now deceased, was Plessey's Company Secretary, a solicitor, and one of the few remaining members of the Plessey old guard. He had signed the second, third and fourth comfort letters as well. Anderson said in evidence that Huntbatch did not call him to comment on the letter or query it. Anderson said he would expect Huntbatch to review the letter and if he had any comments, to make them or to change the letter if necessary.

274     The other signatory to the letter was Brendan Sammon, group chief accountant at Plessey. Sammon testified that he knew the final paragraph constituted a change from the fourth letter and discussed this with Huntbatch. He said they concluded Plessey had never considered comfort letters to be binding, that this was simply GEC's "belt and braces", and hence they signed the letter. The letter was not forwarded to TD's London office until December 27. The fifth comfort letter stated:

> This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31 st August 1989, 31 st March 1989 and 30 th June 1989 and does not constitute a legally binding commitment.

275     On December 18, Leigh laid off 80 people, including David Dean, the vice-president of finance and the bank's main contact person. Pat Smith took over his role. Driscoll testified the layoff was due in part to a decline in manufacturing, which meant Leigh had excess staff for its needs. He said it was also due in part to Leigh's losses.

276     Colin Justice had been traveling back and forth between Britain and Canada throughout the fall and was back at Leigh during this period. On December 21 Justice called Wilson at the bank to advise him of the staff layoff and that Dean was no longer with the company. Justice attributed the layoff to difficult market conditions and told Wilson a second wave of layoffs might be forthcoming. In a memo to file following phone call, which he copied to Leaney and others, Wilson reported details of the call, including the staff layoff and the termination of Dean. Wilson noted that Justice would continue to be actively involved in the affairs of Leigh, having spent four of the past seven weeks in Canada, that he expected to be in Canada regularly, and would be returning for budget meetings in January. Wilson noted he took the opportunity to discuss with Justice the possibility of a Leigh merger with CMC in some detail, indicating TD would be "very interested" in providing a fairness opinion. Justice told him the question of the CMC acquisition of Leigh would be reviewed early in the new year. Wilson recorded in detail the aspects of the conversation dealing with the layoff and the fairness opinion.

277     In evidence, Wilson testified that although he had not recorded this in his memo, he had asked Justice in this conversation for Leigh's financial statements. He said Justice told him the financial statements were not ready due to the acquisition accounting issues related to the GEC/Siemens takeover. Wilson said he did not ask him about the accounting issues because this was consistent with what he had been told by Dean. This conversation is admitted by the defendant Plessey, who did not call Justice as a witness.

278     Also on December 21, Driscoll forwarded a draft budget for Leigh to Bill Alexander, managing director at GEC Marconi, in which Driscoll commented that "cash flow is awful" and that dramatic improvement would likely come only from a politically directed renegotiation of the TACAN and SHINCOM contracts, or a radical restructuring of their operations. The draft budget

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.     45

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

projected a worsening overdraft of $39 million in March of 1990 and $62 million by March of 1991. It estimated the bank line would be at $41.576 million by December 31st of the current year.

279      Justice had requested authorization from Newlands on December 19 to increase Leigh's line to $42.5 million, and on December 22, Anderson called Exton to tell him the increase had been approved. Exton did not receive the fifth comfort letter however, until December 27, at which point he sent it on to Wilson. Exton testified that when he received the letter he checked to see the amount was correct and that was the extent of his review of the comfort letter. He did not notice the added line that the comfort letter did not constitute a legally binding commitment. Exton said that his role regarding the letter was merely to pass it on to the account manager and no more. I accept his evidence on this point.

280      Wilson's evidence was that when he received the comfort letter, he advised his supervisor Leaney of its arrival and sent her a copy for her information, but did not discuss it with her any further.

281      Wilson testified that following the December 6 conversation with Anderson, Exton advised him that Anderson had said the new comfort letter would be the same form and substance as the prior letters, revised only as to amount. Wilson said that as a consequence, when he received the fifth comfort letter, he simply checked to see the amount was accurate and instructed his secretary to file it. He said he felt he had fulfilled his responsibilities by doing this. Although he had never read the prior comfort letters, he did not compare the wording of the 4th and fifth comfort letters, nor did he notice the changed wording. Wilson said he felt Anderson made a verbal commitment that the letter would be changed only in amount, and so that was the only part of the letter he checked. He said he felt Noonan's condition that the comfort letter be in the same form and substance was satisfied based on his confirmation of the amount. He conceded in cross-examination he had not advised anyone at Leigh or Plessey about Noonan's condition.

282      I am unable to accept his explanation for this. Wilson did not record this alleged representation by Anderson in any note, credit review, or other document. Wilson was not party to the conversation between Anderson and Exton. None of the exhibits corroborates Wilson's evidence. Jonathan Exton was a witness at this trial and gave evidence about the conversation with Anderson. He did not testify that Anderson had said the letter would be in the same form and substance. Anderson also testified at trial and said he did not believe he would have said such a thing, as he had already changed the language of the letter by the time he spoke to Exton.

283      I accept the evidence of Anderson and Exton and I find as a fact that Anderson did not represent or state to Exton that the letter would be the same form and substance as the previous comfort letter. Hence, any failure on Wilson's part to read the fifth comfort letter was not due to the representation Wilson attributed to Anderson. I accept Wilson's statement that he had not read the prior letters before receiving comfort letter number five. Hence, either Wilson read the letter and did not realize the letter had been changed, or he did not read the letter at all. Even if he had read the letter, not having read the fourth comfort letter, he had no basis for comparison, and likely would not have noticed the alteration. In my view, however, responsibility for this oversight lies squarely on the shoulders of Wendy Leaney.

284      Leaney was general manager, corporate Banking and Wilson's direct supervisor. She knew he had only been in his position for two months. She testified in another context that responsibility for managing the relationship had been delegated to her. She was aware of Leigh's climbing bank line, contracts difficulties, and of the recent hostile takeover, with the consequent changes in management personnel at Plessey. Wilson told her the letter had arrived and sent her a copy to review. She, at least, was familiar with the language of the prior letters, and knew of Noonan's condition that the fifth letter be of the same form and substance. She received the letter and placed her initials on the covering memo from Wilson to which the comfort letter was attached.

285      Leaney's evidence is that she did not read the comfort letter on or about December 28 when it was transmitted by Exton in London to Wilson in Toronto. She stated the covering memo from Wilson with the executed comfort letter attached was passed up to her "...in January 1990 when I returned from Christmas vacation, and it was just -- it was passed to me by Rob [Wilson]." She stated that she did not read it. "I expected that he would have read it and I -- I didn't read it myself."

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

286    She said she first heard about the words "does not constitute a legally binding obligation" the day she went on vacation on March 29, 1900, from Ernest Mercier, who had been in touch with the bank's office in London. She testified she was concerned about the words. She had not seen the letter, had not been "apprised" by Plessey "that there was going to be any change, that we assumed the letter was the same as we'd had before."

287    Leaney's evidence on discovery was that she had been told by Wilson in December that the bank had received the comfort letter, but in January she did not "look at it." Leaney testified at trial that she subsequently realized she did see the memo, but did not read the comfort letter. She conceded on cross examination that her evidence on discovery had been mistaken. The covering memo has "Wendy FYI" handwritten on it in red ink, and the initials "W.L." in her handwriting in blue ink. She acknowledged on cross-examination she had only discovered the memo several months prior to trial, and then realized that she must have looked at the covering memo.

288    In cross-examination when asked to explain her initials on the covering memorandum she stated: "I didn't read the comfort letter for certain, and the covering memo I don't recall specifically reading. Obviously I saw it because my initials are there. But it was one of many pieces of paper that came across my desk, especially after coming back from vacation." "It was a piece of paper ... that was it. It was just information only."

289    Other exhibits in this trial contain Leaney's handwritten initials, which she testified meant she had read the document in question. Of all the 20 documents initialed by Leaney and made exhibits at this trial, neither she nor her counsel could point to one other she had initialed but not reviewed. The bank's outstanding exposure for some $40 million rested solely on the comfort letter and she conceded that she knew the letter was an important document. Nevertheless, Ms. Leaney maintained that when she received the fifth comfort letter, she merely glanced at it, and did not review it in depth because it had been sent to her for information purposes.

290    In the CCR of March 28, internal memos, and conversations with Anderson and Gerdine subsequently, no bank official ever raised the issue of the added sentence in comfort letter number five. Leaney had no explanation for this, nor could she explain the reference by Wilson to "the integrity of both GEC and Siemens, consistently demonstrated to us" in an April 5 letter to Newlands and Gerdine.

291    I find that Ms. Leaney read and accepted the fifth comfort letter dated December 15, 1989, when she received the letter and covering memo and initialed it in January, 1990. She could point to no other document she had initialed without reading it. Her explanation of relying on Wilson to read it is not credible. He was new on the job and had no involvement with the previous comfort letters. This was a large loan and the line was increasing steadily. The bank was resting its position entirely on the comfort letter and knew Leigh could not pay the debt itself.

292    The issue of the form and content of the comfort letter was never raised prior to the bankruptcy of Leigh on April 12, 1990. It was not referred to in any internal bank document, including the March 28 CCR. Nor was it raised in the subsequent conversations with GEC and Siemens concerning Leigh. The reference in Wilson's April 5 letter to the integrity of GEC and Siemens is not consistent with the behaviour of a party upon whom a fraud has just been perpetrated. All of these facts are consistent however, with Leaney having read and accepted the comfort letter when she received it in January.

293    Leaney was disciplined by Ernest Mercier in June, 1990, and did not receive the bonus part of her compensation package that year, on the basis that she had accepted the fifth comfort letter. Mercier wrote to Leaney on June 25:

**Re: Credit Portfolio Management**

Referring to your memorandum of May 22nd, 1990, and our discussions with regard to the captioned situation.

Upon review of your memorandum as well as the events surrounding the four accounts mentioned in said correspondence, we acknowledge that your actions on these accounts have generally demonstrated a positive commitment towards exercising appropriate credit judgment. *The one situation which falls short of this standard is in the case of Leigh*

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*Instruments, and the acceptance of the Comfort Letter in December 1989 that was deficient in form from previous Comfort Letters we had received as a Bank.* This was a serious oversight. This matter and its severity is accentuated by the significant exposure which the Bank has in regard to this credit facility.

Given the serious nature of this situation it has been decided that no Incentive Compensation Award will be granted to you this year.

A review of future Long Term Incentive Plan Awards will be considered at the appropriate time.

This letter will be placed in your Human Resource file and we ask that you acknowledge receipt by signing below. [Emphasis added]

294    This reprimand letter supports my conclusion that Ms. Leaney read and accepted the fifth comfort letter when it was received by TD, and that the bank shared this view.

*Winter-Spring 1990 - The Bankruptcy of Leigh*

295    GEC and Siemens were continuing the hive-up process and the valuation of the Plessey businesses. By January 8, a further valuation proposal exchanged between Siemens and GEC showed Leigh in the category of businesses to be held 50-50 or to be sold, and not in the list of businesses to go to GEC. In that document, GEC did not place a value on Leigh, but inserted a question mark rather than a number. Siemens, who had had little direct involvement with Leigh to that point, had assigned it a value of £70 million.

296    GEC Marconi budget meetings were held annually within the first three or four months of the calendar year. Driscoll and Smith attended meetings at GEC Marconi's Stanmore offices in England on January 8 and 9, including a meeting January 9 chaired by Dr. Ian McBean, managing director of GEC Marconi, to discuss the preliminary Leigh budget for 1991. Following this review, at the end of the meeting, future options for Leigh were discussed very briefly. McBean instructed Driscoll and Smith to return to Canada and develop a series of options for Leigh, to be reviewed later in the month. Most of the options were identified in a brief discussion at the meeting, and included a restructuring of Leigh, integration with CMC, sale of Leigh to a third party, controlled shutdown and windup of the business, and immediate closing. Driscoll testified these were intended to cover the range of available options.

297    By January 11, Newlands' evidence was that he was of the view that the Leigh situation was serious. He said his initial impression from his visit in the fall was that the North American businesses were in poor shape and the monthly management accounts had not shown the position to be improving. He explained that GEC Marconi were analyzing the position and that McBean would have to determine whether the management of Leigh and personnel were capable of completing their contracts in a sensible time, or at all. He said no conclusion regarding the future of Leigh had been reached by this time in January, however he conceded that GEC was uncertain by this time whether they wanted to take Leigh, and in a further valuation proposal had listed it under 50-50 or to be sold.

298    Meanwhile, Leigh's financial position was still grim. The Plessey finance reports for December, available mid-January, showed a cumulative loss for Leigh to the end of December of £10.721 million or roughly $20 million. By the 16th of January however, Leigh had received the expected Paramax payments and applied them to its overdraft, thus reducing the bank line to $31.646 million

299    Driscoll and Shepherd had written several letters to the Canadian government in early January, outlining Leigh's financial situation, in the hope that relief could be negotiated on the TACAN and SHINCOM contracts. To that end, Driscoll, Shepherd, and Alexander attended a series of meetings with various Canadian government officials from Investment Canada, The Department of Industry, Trade and Technology and the Department of National Defence on January 22 and 23. At these meetings, Driscoll advised that there was a serious threat to the viability of Leigh and that one of the options under consideration was the closure of Leigh. Driscoll also presented financial information on Leigh's situation giving a clear indication of the

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

gravity of the situation. At the conclusion of the meeting with the Department of National Defence, Driscoll and Alexander were advised that the government would deal with the Leigh issues on an urgent basis.

300    On January 25th, Driscoll forwarded to GEC his presidents report for December, which showed a cumulative loss to the end-of that month of $21.387 million.

301    Driscoll, Smith and Justice re-attended at Stanmore February 1 and 2 to review the list of options for Leigh, which they had prepared pursuant to McBean's direction in early January. Also present at the meeting were Rickard, McBean and Alexander. The options tabled for discussion included a restructuring of Leigh with a recapitalization to eliminate the bank debt; an integration with Canadian Marconi; sale of the company to a third party; a controlled shutdown and windup of the business; and immediate closure. Payment of the bank debt was listed as one of the steps to be taken pursuant to the last option and Driscoll testified it was discussed briefly. No decision was arrived at concerning what, if any option would be chosen for Leigh, and GEC Marconi took the matter under advisement.

302    Rickard wrote to Justice on February 6 as a follow-up to the options meeting held at Stanmore earlier in the week, and advised that the financial data presented at that meeting represented an "unacceptable deterioration over what appeared to have been a firmly established position on January 9th." He asked Driscoll to respond to McBean's requirement for a concise explanation for each item of deterioration.

303    On February 1, Gerdine was contacted by Simon Weinstock, who expressed concern that Leigh was losing a lot of money. Shortly after that he received a copy of Alexander's memorandum concerning the Ottawa meetings with government in which Alexander observed that Leigh was "running out of money" and "could be insolvent." On February 2nd, Rickard sent Simon Weinstock a copy of the preliminary purchase accounting adjustments for Leigh, which showed a writedown in Leigh's assets of $33 million.

304    Driscoll's evidence was that during this period he felt the likely outcome would be consolidation with CMC. However, on or about February 2, 1990, G. Stuurop, treasurer of CMC and Anderson met. Stuurop told Anderson that upon seeing the comfort letter, CMC seriously considered advising Plessey to walk away. Anderson had no recollection of this but testified he thought it meant that CMC no longer wanted to buy Leigh.

305    On February 8, GEC and Siemens formally decided to place Leigh in the Plessey rump, pending sale, closure or other solution. As a result, Philip Gerdine, the Siemens representative who was co-managing director of Plessey, became more involved with Leigh. Gerdine testified that prior to this time he did not pay much attention to Leigh.

306    Gerdine also testified that by early February, Siemens and GEC were considering selling three of Plessey's North American companies, including Leigh, to a third party. To that end, Simon Weinstock wrote to investment bankers Shearson Lehman in New York, to arrange assistance in the sale of the companies. Gerdine had had previous dealings with the Shearson bankers and thus was asked to attend two meetings with them in early February, to discuss due diligence on the companies and preparation of a sales package.

307    Meanwhile, on other fronts the negotiations with the Canadian government were continuing. The government had not responded directly to the earlier approaches by Leigh, and on February 13, Driscoll and others again met with officials in the Department of National Defence in the hope of negotiating some contract relief. Driscoll presented the government with a detailed package of financial material, including analysis of the five options being considered for Leigh's future, and a revised a six-month balance sheet showing a loss as at September 30 1989, of $63.628 million. The projected loss to March 31st, 1990 was $67.7 million. Driscoll testified that these figures included adjustments reflecting both the ETC reviews, which were operational losses, and GEC fair value adjustments. On Feb. 14 Driscoll reported to Alexander on the outcome of the meeting and noted that "some assurance will be required from GEC before the government will proceed in any significant contractual areas."

308    Gerdine met with Justice the next day, on Feb. 15, to be briefed on the Leigh situation. Justice informed him of the projected $68 million loss, leading Gerdine to write to Simon Weinstock "we are appalled at the projected losses and bankruptcy is not out of the question if much of this is true." He questioned in the letter whether the sale of Leigh would even be possible.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 249 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Weinstock had written on Feb. 5 to Shearson Lehman, copying Gerdine, stating that there were "major problems in the business" and noting that the future viability of the company was in question.

309     Wilson at TD telephoned Smith at Leigh on February 21, to get an update on the company's progress, find out more information about Leigh's contracts, and ask about the financial statements. In a memorandum of the conversation made the same day, Wilson noted that Smith told him there was some difficulty with the SHINCOM qualification testing, and that this might have an impact on the profitability of Leigh's fixed-price contracts if costs escalate, but that Leigh was negotiating with the Department of National Defence in this regard.

310     Wilson recorded that Smith had told him the budget for the fiscal year ending March 31, 1991 had not yet been finalized, but that Smith was predicting the sales for the year would be relatively flat, with a modest profit pre-debt service. Wilson testified that this meant a modest profit prior to interest payment on the outstanding debt. Wilson testified that he asked Smith for updated financial statements and Smith told him that the current year's results were difficult to forecast in view of the GEC Siemens takeover, but that he believed GEC would adopt conservative accounting, requiring Leigh to take up-front provisions for projects such as SHINCOM on Leigh's opening balance sheet. Wilson noted that "this is still under active discussion and results are therefore difficult to predict." Wilson testified this did not concern him as there had also been a delay in producing financial statements following the Plessey takeover of Leigh.

311     Smith told Wilson that a merger with CMC was not imminent, given that GEC and Siemens had not yet decided how to divide Leigh's assets, and that Colin Justice was no longer actively involved with Leigh, as he was concentrating on the hive-up and valuation of Plessey's assets. Wilson noted that Siemens was scheduled to visit Leigh the following week. Wilson concluded the memo, referring to the current fiscal year: "In summary, Smith will therefore be closely managing his cash position, but acknowledged that it will be a "tight" year for Leigh.... Smith expects to operate within his budget but is concerned with the high level of debt and related servicing burden. I confirmed that we are comfortable with the support provided by Plessey for Leigh's borrowings." Wilson testified that he took the reference to "tight" to mean modest profit to break even, although he conceded that Smith had not said that. Wilson noted as follow-up to keep Anderson informed, through Exton, which he testified referred to the Leigh borrowing levels. As follow up Wilson also listed a reminder to schedule a visit to Leigh in mid-March, although he testified that this visit never took place, but he could not recall why. Wilson testified that following this conversation he still had the same view that Leigh was performing satisfactorily, and that Smith did not tell him anything which would lead him to think otherwise. At the bottom of the memo, Wilson noted that a copy was to go to Exton.

312     In London, Exton met with Anderson in person on February 22 for the first time. He testified that he advised Anderson of the amount outstanding on the Leigh loan and discussed the bank generally. No evidence was led at trial that Anderson and Exton discussed the conversation between Smith and Wilson which had taken place the previous day. Nor did Anderson tell Exton of Leigh's financial condition, although he knew of the deterioration. Anderson testified that he asked Exton for a £50 million facility for GEC at this meeting.

313     Driscoll learned for the first time on February 23 that Leigh had a financial reporting requirement in its facility with the bank, and that Leigh was in violation of this term of the facility. He also discovered that the most recent financial information the bank had was the quarterly financial statements to the end of June 1989 and the 1989 year-end financials, which showed Leigh trading at a modest profit.

314     This discovery prompted Driscoll to write to Alexander on February 26, informing him that Leigh had not fulfilled its reporting requirements for the September and December quarters and noting that, although the bank had not requested the financial statements, he expected a request in light of the continually rising bank line. He asked Alexander for direction as to what information should be provided to the bank in terms of Leigh's current financial position and projected cash flow. He sent a copy of the letter to Justice and Rickard, and Rickard noted in handwriting on the side of his copy of the memo "must tell if they ask". All parties agreed on this transcription of Rickard's note, although he was not called to give evidence about it. Driscoll testified that he expected some guidance from Alexander, but that he never received any response to the letter.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

315    Also on February 26, Exton wrote Anderson at GEC, thanking him for the recent meeting and undertaking to keep him advised of Leigh outstanding levels of borrowing.

316    Two days later, Gerdine visited Leigh with Shearson Lehman as part of the due diligence process for the potential sale of Leigh through the investment bankers. This was his first visit to the company. Driscoll and Smith presented him with a detailed financial package similar to the material presented to the Department of National Defence earlier in the month. Gerdine became aware for the first time in this meeting of the depth and seriousness of the problems facing Leigh, including the TACAN and SHINCOM delays and technical problems. Gerdine testified that they advised him Leigh was in violation of its reporting requirements to the bank and Gerdine stated in evidence that he suggested forcibly to them that they send the financial information to the bank. In contrast, Driscoll's evidence was that while he did discuss reporting requirements with Gerdine, Gerdine gave him no direction he could recall. If he had received direction, he testified that he thought he would have acted upon it. Driscoll's version of events is supported by the memo he wrote to both Gerdine and Alexander on March 1, reiterating his request for guidance on the question of the information to be provided to the bank. Driscoll testified he could not recall receiving any guidance in response to the memo. Although I do not prefer his version of events to that of Gerdine, it is clear that if Driscoll thought any guidance was required, he thought it was required from both GEC and Siemens. Given Siemens' relatively recent involvement with Leigh, it seems unlikely that Driscoll would have acted on Gerdine's direction alone.

317    Also in this meeting, Gerdine became aware of the comfort letter in connection with the $37 million TD loan. Although he had seen the draft comfort letter in December, he testified he had not connected it with the Leigh loan.

318    Gerdine concluded following the meeting that, based on Leigh's losses, the company was technically insolvent and its future uncertain, although its ultimate viability was still unclear. Also uncertain was whether Leigh could pay its debts on a standalone basis without some form of financial assistance. Gerdine had not, by this point, given up on Leigh as a going concern, and felt that Driscoll and Shepherd were taking positive steps regarding Leigh's future.

319    On March 5, following his visit, Gerdine reported to Simon Weinstock that he had found Leigh to be out of financial control, and confirmed that Shearson had informed him that morning Leigh was "unsellable at this time". He noted however that shutting Leigh down "might hurt us all" in light of Leigh's close ties to the Canadian government.

320    The process of valuing and allocating the Plessey businesses was continuing, and by Feb. 22, GEC and Siemens had finalized division of the companies between GEC and Siemens, and determined which companies would remain in the Plessey "rump" ultimately to be liquidated or sold. The destination of each company was a matter of negotiation between the parties, with a view to the value allocated to each company and the overall acquisition cost of Plessey. Leigh was relegated to the Plessey "rump". As the companies in the "rump" were assigned one, lump sum value, the parties never agreed on a specific valuation for Leigh. The hive-up transaction closed on March 8.

321    Driscoll flew to New York to meet with Gerdine, who was there on other business, on March 12. Driscoll testified he once again raised the issue of the financial reporting to the bank with Gerdine but received no direction he could recall. Gerdine testified, to the contrary, that he instructed Driscoll again to send the statements, although his note of the meeting does not record such an instruction. It is apparent that Driscoll received no direction from GEC, but I am not prepared to find that Gerdine did not so direct.

322    On March 15 Driscoll wrote to Gerdine, Alexander, and Rickard, regarding guidance about the reporting requirements and noting "I propose to provide a copy of our September and December results and discuss our present cash flow position with the bank unless you advise otherwise." Driscoll testified he again received no response and on March 21st, acting on his own initiative, he instructed Smith to forward the financial statements to the bank. In view of Driscoll's repeated requests in writing, his evidence that if he had received instruction to provide the statements to the bank he likely would have done so, and in view of the fact that he did ultimately provide the statements to the bank on his own initiative, I accept his evidence that he received no response to his requests for guidance from GEC. That said, the obligation to provide the financial statements to the bank was that of Leigh and not the parent companies. Driscoll was the president of Leigh and thus ultimately responsible

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 251 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

for delivering the statements to the bank. I must infer that his repeated requests for direction from GEC and Siemens were an attempt to transfer responsibility to them for his oversight in not knowing of the obligation to provide the statements to the bank, and for Leigh's failure to comply with the reporting requirements in the facility. GEC's failure to respond is understandable in this light. This inference is supported by the fact that Driscoll ultimately did provide the statements to the bank without any direction to do so from GEC.

323     On March 21, at Driscoll's direction, Smith sent a package of financial data to Wilson at the bank. The documents sent by Smith included financial information for the quarters ending September 30 and the end of December, 1989, and cash flow forecasts. Unfortunately, the financial statements that Smith sent to the bank were inaccurate. The six-month results to the end of September only reflected the Leigh financial position as it was known in October, and did not reflect the magnitude of the losses as they were known on March 21st. Indeed, the six-month results were the same figures as had been presented to David Newlands on October 20, 1989, when he visited Leigh, and showed an actual loss, as at September 30, 1989 of $2.858 million. The third-quarter results were more up-to-date, and included the president's report for the month of December. The consolidated management report for the quarter, included in the package, disclosed an actual loss to December 29, 1989 of $21.387 million. The cash flow forecast projected an overdraft of $40.976 million at the end of March 1990. All the financial statements were, according to Driscoll, prepared in Plessey format, and not using GEC accounting principles.

324     Driscoll conceded on cross-examination that the information provided to the bank did not reflect all the information Leigh knew at the time, and did not include the revised loss figure of $63.628 which had been disclosed by that time to GEC, Siemens, Plessey, and the Government of Canada. Driscoll testified that he did not review the financial statements before they were sent to the bank, but simply instructed Smith to send them. The president's report prepared only two days previously showed an operational loss to the end of February of $24.402 million, although this data was not sent to the bank.

325     Wilson's evidence was that he received the financial information on or about March 22, and reviewed the financial statements and enclosures, particularly the profit and loss statements. He testified that he had not been aware of the technical and manufacturing problems associated with SHINCOM and TACAN, although I note that he had referred to contract delays in prior CCRs.

326     Gerdine attended a board meeting at Leigh on March 26, 1990, at which a number of proposals regarding the future of Leigh were discussed, including a five-year plan for the company. The issue of the reporting requirement to the bank was also placed on the agenda. Following the meeting, Gerdine testified that he telephoned the bank, and spoke to Wilson and Leaney. Gerdine asked Leaney if she was aware of the serious financial situation at Leigh, and that she sounded surprised that anything was wrong. He said it seemed evident to him that she had not seen the financial package which had been sent to the bank. He said she then brought up the subject of the letter of comfort and asked if GEC and Siemens would countersign it. Gerdine testified that he did not know what the legal effect of that would be, but that it seemed to be a "quick fix" to a lot of the problems. He testified that Leaney pointed out Leigh was near its authorized credit limit, and indicated that the bank would be willing to increase the line to $50 million if GEC and Siemens signed the comfort letter. Gerdine testified that he told Leaney he would look into the question of whether the comfort letter would be signed by the parents. Gerdine said he suggested that the bank arrange for the assistance of a work-out specialist for Leigh, and that Leaney was receptive to the idea, suggesting the same specialist who had worked with Leigh in the early 1980s. He said the conversation concluded that he would speak to the treasury department at Siemens and the bank would look into arranging a work-out specialist.

327     Gerdine testified that the next day, he again spoke with Leaney and Wilson and that the tone of the conversation "suddenly changed about 180 degrees." Leaney advised Gerdine she was freezing the loan, and Gerdine said the potential to involve a work-out specialist seemed to evaporate at that point. Gerdine ultimately told Leaney that a letter of comfort was "just that" and that parent company signatures on the letter of comfort were not "going to be forthcoming" in his estimation.

328     Leaney testified that she felt Gerdine was "back-pedalling" from association with Leigh. She testified regarding this conversation:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 252 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Well, I brought the comfort letter up because I felt that at this point, given the serious situation at Leigh and the fact that Dr. Gerdine seemed to be back-pedalling from the association with Leigh, I -- I can't put specific words in his mouth, but he -- the impression I got was they were not -- Siemens was not fully in support of the comfort letter that we had, uhm, from Plessey and, uhm, we -- we said, you know, the only reason we were lending was because we had the comfort letter, *and he said, Well, a comfort letter was just that*, and, uhm, — but he did agree that he would review -

329     Later that day, Gerdine attended a meeting with the Canadian government, which he described as more positive than he would have expected. He said he proposed a "save Leigh" program which would require participation from all the various parties, and that he thought at this time there was still a chance that Leigh could be saved. He said the government indicated it would want parent company guarantees. On the 29 th of March, Gerdine composed a list of possible options for Leigh, which he forwarded to Driscoll.

330     Following the conversations with Gerdine, Wilson at the bank prepared a memo to Noonan, in which he summarized the discussion with Gerdine. Apart from a number of minor discrepancies and the fact that the memo appears to collapse the two conversations into one, Gerdine confirmed in evidence that the memo accurately reflected the conversations. Wilson noted in the memo, which was incorporated into a CCR of Leigh dated March 28, that Gerdine had indicated Siemens felt there were two potential alternatives in dealing with Leigh; to do nothing and go away, or to inject capital and turn the company around. The CCR recommended that the risk rating for Leigh be reclassified at 5, and that Leigh be placed on the "watch list". The CCR was reviewed by Yovhan Burega, vice president of corporate banking, who noted "GEC and Siemens will have to provide us with a *very strong* letter of comfort. If that was the case we should immediately call the loan; also, we will not provide any concessions and GEC/Siemens must honour all of Plessey's commitments." Pierre Boulanger, senior vice president in the Credit Division, noted that "The situation is of concern and a firm stance is needed. We agree that we should make it very clear to Siemens that we do not view the "do nothing" option as a viable alternative for the company and we agree with Mr. Burega's position that unless we can shore-up our position we should immediately call the loan in order to force their hand." He concluded that the bank should not advance further funds to help the company pay interest when it was operating at a loss. The CCR was initialed by Brock and Thomson. Wilson confirmed in evidence that the bank decided in this period it would not offer Leigh any concessions, nor would it intercede with the Canadian government to seek concessions on behalf of Leigh.

331     Wilson sent Exton a copy of the memo regarding the conversation with Gerdine, and indicated he would be interested to hear the views expressed by GEC. In consequence, Exton called Anderson on March 29 th, and advised him of the bank's concern following the conversation with Gerdine. He said Anderson told him Gerdine did not have authority to speak for the joint venture, and that "the original intention for GEC is not abandoned, but has not happened," which Exton interpreted as Anderson telling him GEC still intended to take over Leigh. After speaking to Anderson, Exton called Wilson, who told him the line had been capped at $41 million. Exton then called Anderson back the same day to advise him of this development. He said Anderson was "upset and disappointed" that the bank had decided not to stand by its arrangement. Exton testified that he told Anderson the bank definitely wanted the Plessey comfort letter to be acknowledged by GEC and Siemens, and that Anderson told him this was unlikely. Exton told Anderson someone from the bank in Toronto would call him.

332     Wendy Leaney did call Anderson shortly thereafter, and gave the following evidence regarding the call:

I talked to him about the situation at Leigh and the fact that we capped the line of credit, and we had a conversation. He said that GEC had never reneged on any of its obligations and a number of other things, such as commenting about social life, that he and his wife would not be invited anywhere if they did renege on any of their obligations, and we just left it at that.

333     Anderson testified that while he did have a conversation with Leaney, he would not have made the remarks attributed to him, particularly since his wife had died of brain cancer five years earlier. His evidence in this regard was as follows:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 253 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Q. ...Mr. Anderson, it is alleged by the bank that during a phone call with Ms. Leaney on or about March 29 you said to her that you and your wife could not show up at social functions if such a letter of comfort was not honoured. Do you have any recollection of making that statement to her?

A. No recollection of saying that.

Q. Do you have any belief as to whether it is possible you said that?

A. Well, I think now that it's inconceivable I could have said that.

Q. Why do you say that, sir?

A. Well, this is what date, March, 1990. My wife had died five years before then and it was not a very nice death and I haven't gone to a social function with ladies since then so I just feel that I couldn't have said such a thing.

334     Although Ms. Leaney was told of the death of Mrs. Anderson, in cross-examination she insisted that Mr. Anderson had made the statements in question:

Q. Ms Leaney, have you become aware since the date of that conversation that Mr. Anderson was, at the time, widowed and his wife had died of brain cancer?

A. No.

Q. I suggest to you that -- is it possible your memory in that regard is mistaken?

A. Absolutely not. He talked about his -- he and his wife had been -- they were guests all the time at functions, and business -- corporate functions, if they did not honour their obligations, they wouldn't be invited. It was a bizarre statement. That's why I'm so strongly -

Q. You agree especially bizarre for a man who was a widower whose wife had died of brain cancer?

A. Maybe he was talking in the past. I don't know. He might well have been.

335     In my view, Ms. Leaney's evidence on this point is incapable of belief. I observed the demeanor of Mr. Anderson when questioned on this point. He was visibly upset by the line of questioning. Although Mr. Anderson had no recollection of the substance of the conversation, I prefer his evidence. Moreover, he testified in a different context that he did not view comfort letters as binding obligations. Accordingly I find as a fact that he did not make the statements attributed to him by Ms. Leaney, and in particular those concerning the comfort letter.

336     Ms. Leaney testified that following the conversation with Anderson, she met with Ernest Mercier, to update him on the situation. She said Mercier told her of the added line in the comfort letter, which she said was the first indication she had that the letter had been amended. In light of my finding above that she had read and accepted the letter when it was received, I do not accept her evidence on this point. She testified she told Mercier they had not been advised of the change by Plessey and she had assumed the letter would be the same as the prior letters. Leaney left on vacation following the conversation with Mercier and did not return until April 16, by which time Leigh had made an assignment in bankruptcy.

337     Meanwhile, on April 3, the Red Team delivered its report on Leigh, at a meeting attended by Simon Weinstock and Gerdine, among others. The Red Team was composed of technical people from GEC Marconi who had been hand-picked by MacBean and put in place in mid-February to review the technical assumptions underlying the Leigh contracts and the cost estimates of completing the SHINCOM contracts. Driscoll testified that this was a technical review rather than financial, and that it validated his belief about the state of the contracts. The report concluded that there were numerous engineering problems in relation to the contracts that would require significant investment, and that without changes in both investment and personnel,

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Leigh would not be able to deliver the product. David Newlands testified that he concluded from the review that Leigh had terminal problems unless Leigh could negotiate some relief from its customer, the Canadian government.

338     Also on April 3, Exton testified that he called Anderson concerning a shareholders meeting. Exton reported the call to Wilson by facsimile, stating that "given Leigh's financial performance and position, a joint guarantee would obviously be preferable, but I doubt whether this would be forthcoming." Exton explained himself in his testimony, stating "...I was aware that Toronto was very concerned about the letter of comfort that they had and whether or not it would be good security..."

339     Wilson drafted a new comfort letter in consultation with Norton, the bank's in-house counsel, and sent it to Newlands and Gerdine on April 5, 1990. In his covering letter, he requested that the letter be executed by both GEC and Siemens, noting: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." Wilson made no mention of the added wording in the fifth comfort letter, nor that Musgrave had allegedly told Young the comfort letter was tantamount to a guarantee, explaining in evidence that they were trying to be conciliatory and co-operative. The proposed letter stated:

> This is to confirm that we have full knowledge of the facility of C$45 million (Forty Five million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh Instruments Limited ("Leigh").
>
> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc which is a wholly owned subsidiary of Plessey Overseas Limited which is in turn a wholly owned subsidiary of The Plessey Company plc which is owned jointly by GEC plc and Siemens AG. We undertake not to reduce out respective share-holdings in Leigh or its holding companies without your prior consent.
>
> We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates.

340     On cross-examination, Wilson conceded there was no reference in the letter to the added language of the fifth comfort letter, namely that it did not constitute a legally binding obligation. Given that he testified that he felt "shock and dismay" when he read the fifth letter, his explanation of the reference to the integrity of GEC and Siemens is not believable. He was hard pressed to explain this apparent inconsistency, saying only that the reference to the parents' integrity was "somewhat of an overstatement on my part".

341     In late March or early April, TD decided that it would not offer concessions as part of an overall solution for Leigh. Wilson testified that the bank had indicated it would not provide any concessions and would not approach the government with the shareholders to seek concessions.

342     On April 6, Wilson and Anderson spoke. Wilson testified that Anderson told him "the news was not good" and that it was possible that neither GEC or Siemens would take Leigh. During the conversation, Wilson did not complain about the added words in the fifth comfort letter. His explanation for not doing so was that it should have been clear to Anderson by the deletion of the words from the proposed letter. Wilson makes no reference to this issue in his note of the call. I find his explanation unconvincing and that no complaint was registered concerning the added words.

343     On April 9, Gerdine and Alexander came to Canada to meet with members of the Canadian government. Gerdine testified that the government officials refused any assistance, following which he concluded the only alternative was bankruptcy for Leigh. He said the group returned to the offices of their legal counsel and that Gerdine then called the bank. He spoke to Yovhan Burega, who he said was insistent that the parent companies sign "some kind of an instrument" regarding the Leigh borrowings and Gerdine told him that they might not be able to do it. He said he told Burega "we will all have to do what we have to do" which ended the call. He said that since it was manifest that the shareholders were not going to put any cash into Leigh, following the call bankruptcy was the only alternative. During these final calls no mention was made of the wording of the fifth comfort letter by anyone at the bank. On April 10 Hugh Rising of the bank's London office called David Newlands.

Newlands testified that Rising was seeking comfort that GEC would stand behind the Leigh loan. Newlands did not give him the comfort he was seeking.

344    On April 11, 1990, Exton, in a memorandum recording discussions between himself, Rising, Walzak, Burega and Wilson, concerning events between April 5 and April 11, outlined "key strategic areas identified by Rob Wilson." These included, "GEC & Siemens worldwide reputation - negative publicity, if the companies do not stand behind the Comfort Letter," government pressure, and poor relations with the Canadian government. Also a possible injunction which could "cause costly delays and be a major nuisance factor." In a separate memorandum of the same date, Wilson adverted to the these factors and added "Need to give GEC/Siemens lessons on doing business in Canada ... moreover, they are reneging on a commitment to a major Canadian bank, with public sympathy clearing [sic] falling on the side of TD rather than 2 European multinationals."

345    On April 11 and 12, abortive discussions were held between the government and Leigh in a last attempt to save Leigh. When these failed, Leigh applied for bankruptcy protection on April 12, 1990.

346    Newlands took part in GEC's decision not to pay TD. He could not recall who was in attendance at the meeting, but he believes it took place in Lord Weinstock's office. He testified they had a brief discussion and concluded that there was no reason why GEC should pay. Newlands participated in the a similar discussion regarding whether Plessey should pay TD and the same conclusion was reached.

347    The process followed by both the Plessey board and GEC accords with Musgrave's view of what a company issuing a letter of comfort ought to do when demand is made. Musgrave testified that, while he never saw a legal obligation for Plessey to pay under a comfort letter of this kind, he personally felt that the board of directors of the issuer had a moral obligation at least to consider a bank's request for payment. If the directors reviewed the matter but decided not to pay the borrower's outstanding loan, then they had, in his view, discharged that obligation.

*The Parties' Understanding of Comfort Letters.*

348    At the outset, I note that where the views of the witnesses constitute legal conclusions on issues before this court, I place no weight on their evidence.

349    The bank and Plessey were both large and sophisticated business organizations. Their states of mind was placed squarely in issue in this trial. Their knowledge of the use of comfort letters in the marketplace in which they both operated was the subject of considerable evidence.

350    Dealing first with the bank, Noonan testified that he used comfort letters with caution. It was he who first proposed that a comfort letter be obtained from Plessey, given that a guarantee was not on offer. The bank characterized the Plessey comfort letter as "strong" throughout, and knew that comfort letters varied in strength, according to their wording.

351    F.G. McDowell, vice chairman of the Credit Division and the most senior credit person involved with the Leigh facility (other than the chairman of the bank), testified that the bank was aware of the distinction between a comfort letter binding a parent to pay a subsidiary's debt and one that did not, even though he did not review the specific comfort letters accepted by the bank.

352    TD's Legal department was mindful of concerns about the enforceability of comfort letters. In a memo and dated September 8, 1982, as senior member TD's legal department, T. G. O'Connor identified a series of weaknesses and legal technicalities which accompanied comfort letters and concluded that "comfort letters are only of use where political assurances are better than legal assurances (which is seldom the case) or where a shadow of a guarantee is better than nothing at all. They are inappropriate for lenders who require a serious legal claim."

353    Neither Noonan nor McDowell had seen this memorandum but McDowell was aware that the TD legal department had "reservations" about comfort letters. Young did not know of the memorandum either but was aware of the "uncertainty of enforceability" of comfort letters.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

354    On September 16, 1988 a "head office circular" emanated from the bank's general counsel and secretary, R. G. Bumstead, dealing with the use of comfort letters. Bumstead stated that comfort letters "invariably" fall short of a guarantee, are not a suitable substitute for a standard form of guarantee, and should not "normally" be used unless the bank is "otherwise well protected or secured." Where a comfort letter is all that is on offer and the bank is prepared to lend on that basis, he advised as to procedures to be followed. McDowell testified that this permanent circular reflected the legal department's opinion of comfort letters, he would have seen it and it would have been circulated to staff, including to the corporate bank banking department, and retained by them. He added that it was merely an opinion however, and not binding. Evaluating credits was a matter of personal judgment, he stated, but the circular should have been read and considered.

355    McDowell stated that he did not agree with everything in the legal department memos, although he did not see them at the time. Noonan's evidence was substantially in line with that of McDowell. Leaney testified that she was not aware of the circular or the views expressed in it, either through the circular or other sources. Exton, Young and Wilson all testified that they also had not seen the circular. Leaney Young and Wilson differed somewhat as to what effect knowledge of the memo would have had on their actions, but all agreed they would have had to at least consider it.

356    In a memorandum dated March 16, 1989 the bank's legal department reported on the decision of the English Court of Appeal in *Kleinwort Benson*, stating that "the enforceability of comfort letters is limited." The memorandum concluded:

If a fully protected legal obligation is sought, a standard guarantee, resolution and solicitor's letter of opinion should be obtained. The Bank cannot rely on comfort letters to do more than state a fact, which may or may not change in the future. If there is misrepresentation in the letter, the Bank may have an action against the signatory for misrepresentation but not in contract. A comfort letter is cold comfort for the Bank.

357    This document was addressed to the Credit Division, Corporate Banking Division, and senior vice presidents of the Line Division, and bore the handwritten notation "Sent -Mar 28" with the names of McDowell and Mercier, and "all Division SVPs".

358    McDowell and Noonan both testified they could not recall having received this memo. Noonan would have felt obliged to follow it he said, but not necessarily where existing customers or comfort letters were involved. McDowell would have expected persons required to deal with comfort letters to receive it, however, Leaney apparently did not. Exton, Young and Wilson had not seen the memo either. Exton and Young knew of *Kleinwort Benson* independently of the memo, but Wilson did not know of the case.

359    Noonan testified that he was aware of the trial decision in *Kleinwort Benson* and had, indeed drawn to the attention of Bumstead a financial Times of London clipping dealing with *Kleinwort Benson* in January, 1988. Noonan and Young were both involved in the first four Plessey comfort letters. Both testified that they were aware of the trial decision in *Kleinwort Benson*, and also of the subsequent Court of Appeal decision, reversing it. Young had consulted with a lawyer in the bank's legal department, Alex Norton, when he learned of the appellate decision. Leaney testified she never learned of the *Kleinwort Benson* decision at any time. Young however, said he thought it "likely" he would have discussed the case with her. Young recalled that at least one source of his knowledge of *Kleinwort Benson* was from a law firm circular, and any information circulated to him would have gone to Leaney as well.

360    TD had used comfort letters in other facilities and examples were introduced in evidence. McDowell stated that he expected the legal department to keep on top of developments in commercial law, including comfort letters, and advise the lending and credit officers of developments to the extent they felt appropriate. Non-lawyers were not expected to keep abreast of developments in the law on their own.

361    McDowell and Noonan agreed the bank would be or ought to be aware of major developments affecting the usefulness and enforceability of comfort letters, to the extent this received attention in the marketplace. There was evidence of a plethora of law firm circulars, articles, and other documents dealing with comfort letters, over and above those generated within the bank.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

362    Noonan and Young had a general working familiarity with comfort letters based on their experience, but no formal education regarding them.

363    Noonan testified that his characterization of the comfort letter as strong was based on the language in the letter, the fact that two authorized persons signed it, and the company's reputation and ability pay. He testified he believed Plessey would do what it had said in the letter, although, as he stated, he never spoke to anyone at any of the corporate defendants. He stated that of paramount importance was the reputation of the giver of the letter, whether it had access to world markets, valued its reputation, and whether the bank could believe their word. He felt Plessey met all the above criteria; it was a "major world corporation" with the resources to flow money to the subsidiary to see the commitment fulfilled. Noonan said he thought the language of the comfort letter was appropriate and Plessey's reputation was such that the bank could take it at its word. He said he thought the same was true after the GEC Siemens takeover.

364    McDowell testified that he knew Plessey as a very respectable U.K. corporation. Sir Alastair Frame was a director of both Plessey and the bank. The bank was soliciting an opportunity to do business with Plessey. McDowell noted, on a September, 1988 Group Credit for Board Presentation for the Plessey group including Leigh, that Plessey was "a leading U.K. high tech company and the parent of Leigh Instruments Ltd. in Canada. Well capitalized, profitable, and considered responsible. Loans to Leigh are supported by comfort letter."

365    McDowell's personal view was that a well-written comfort letter was one which was from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfil it." McDowell did not see any of the Plessey comfort letters, and thus these views were of comfort letters generally and not a construction of any particular letter.

366    I turn next to Plessey, and its knowledge of and experience with comfort letters.

367    Musgrave was head of Plessey's Treasury Department. He was responsible for all comfort letters issued by Plessey. Since becoming group treasurer in 1982, he had acquired knowledge of comfort letters from varied sources ranging from professional organizations such as the Association of Corporate Treasurers, discussions with Plessey in-house counsel, a review of all of the Plessey comfort letters on file, and by following the literature on the subject. He learned of the *Kleinwort Benson* decisions through this professional literature, but testified that the decisions and subsequent comment upon them did not lead him to alter his views on comfort letters.

368    Musgrave testified that he knew the essential nature of a guarantee, which he described as a direct obligation to pay someone else's debt. Conversely, a comfort letter in most cases was intended to provide, in his view, "a degree of comfort" to the bank about a transaction, while falling short of the guarantee to repay the debt of a subsidiary. There was, he said, a "clear distinction between a comfort letter and a guarantee". He was aware of the range of language used in comfort letters, from mere awareness of a facility to "just short of a guarantee". He said comfort letters could include legal or moral obligations.

369    Musgrave stated comfort letters were a means of avoiding giving a guarantee, and that Plessey did not like to give guarantees, except where necessary, such as for a large contract or at government insistence. His and Plessey's view was that a comfort letter did not impose an obligation to repay a subsidiary's debt. Lenders, he testified, accepted such letters based on commercial considerations such as the overall relationship with the lending group, the amount of business from the group, and an overall assessment of the risk in the transaction. He expected that a bank would look at the particular comfort letter and the overall relationship with the group in arriving at its decision.

370    Musgrave testified that during the period of his involvement from 1982 to 1989, it was a buyers market, and since Plessey was credit worthy, many banks wished to do business with it. He testified that comfort letters would be negotiated between the bank and Plessey in any given transaction. Since Plessey was reluctant to give guarantees, comfort letters were sought from time to time, as a lesser form of support for the facility sought by the subsidiary. Plessey produced several comfort letters it had used

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

over the years, and Musgrave testified about two examples where Plessey had paid on a non-binding comfort letter. He said on one of those occasions, Plessey paid for relationship reasons, because public knowledge they had walked away could make future dealings with banks difficult. He stated that he would be "embarrassed" if Plessey signed a comfort letter and decided not to pay the debt associated with it, without first giving a request for payment reasonable consideration, because Plessey would have failed to live up to the spirit of the letter. He said he viewed comfort letters as imparting a moral obligation to consider whether or not to pay the debt of the subsidiary, and that as long as Plessey gave the comfort letter that consideration, that was all that was required. He said once Plessey had given that consideration, a decision not to pay would not embarrass him.

371     The evidence of Musgrave, Noonan and McDowell was not inconsistent in substance. Each of them essentially viewed comfort letters as gentlemen's agreements, and placed emphasis on considerations of reputation in the business community and ability to pay, when assessing a comfort letter.

**The Witnesses**

372      In light of my evidentiary findings, it is perhaps useful to share my impressions of the witnesses called by the three parties to the action.

373     This is a fact driven case, however there was no significant controversy about much of the evidence, with the exception of the evidence of the three witnesses to whom I now turn. It is necessary to make adverse credibility findings in respect of these three witnesses only.

*The Bank Witnesses*

374     I must comment generally on the evidence of the three bank witnesses from the Corporate Banking Division; Mr. Young, Mr. Wilson, and their supervisor, Ms. Leaney. Ms. Leaney graduated from the University of Toronto with a B.A. (Hons.) and immediately thereafter joined the TD Bank. After a brief training period she became a senior accounting officer at a branch and then moved up the ranks into middle management. She held a series of positions and gained experience in lending, credit and marketing. She had been involved with Leigh in 1983, in the period when it had experienced financial difficulties, resolved with the help of a work-out specialist. After a period in Corporate Finance, she returned to the Corporate Banking Division in 1988 as a general manager. The account manager responsible for the Leigh account, Young, and then Wilson, reported to her. She herself reported to Ernest Mercier, executive vice president of Corporate Banking. In 1990 she moved to the Corporate and Investment Banking Group as a vice president, and then into TD Securities Inc., from which she retired in 1996. I found Ms. Leaney to be alternatively aggressive, argumentative and defensive when giving evidence. Her evidence at trial contained a plethora of inconsistencies and contradictions with the evidence she gave on discovery.

375      Greg Young also has an MBA and worked as a chartered accountant at Clarkson Gordon until 1980. From 1981 until 1987 when he joined TD he held a series of positions at the Bank of Montreal, Citibank Canada and Royal Trust. He remained in TDs Corporate Banking Department until November, 1989, when he was replaced by Rob Wilson. He is presently self-employed as a management consultant.

376      Rob Wilson obtained a B.A. from University of Toronto in 1978 and an M.B.A. in 1980. He joined the Continental Illinois Bank following graduation and stayed there until the fall of 1983, when he entered a forestry program at the University of Toronto. Upon obtaining his diploma in resource management from the Department of Forestry, he attempted unsuccessfully to obtain employment in the forestry industry, and then joined the Bank of Nova Scotia in 1984. In 1985 he rejoined the Corporate Banking department of the Continental Illinois Bank, where he remained until 1987 when he again moved, this time to a merchant bank called Canadian Corporate Funding Limited. He left that position and joined TD in October, 1989. He is presently a vice president of TD Securities, where he has been since 1994.

377      These three members of the Corporate Banking Department were involved in management of the Leigh account during the period of time material to this proceeding. During that interval their handling of the account for the bank left much to be desired. In December, 1988 Leaney and Young extended credit to Leigh with Noonan's authorization, on condition that a revised credit review was received the following week. The credit review was not prepared until almost one month later.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

378      On the occasion of the taking of the third comfort letter, Young and Leaney acted contrary to the specific direction of the Credit Division in waiving the requirement that the intercompany debt be postponed of their own volition, and releasing the security notwithstanding that the debt had not been postponed. Upon the assumption of Young's responsibilities by Wilson, the degree of supervision provided by Leaney to ensure continuity was unsatisfactory. From time to time the account was out of order, facility letters were not updated and fresh documentation not obtained as directed by Credit Division, and good banking practice not always followed. Ms. Leaney authorized an extension of the authorized credit for Leigh when Leigh was in an overdraft position without consulting the Credit Division, and even though, as she conceded, she did not have the authority to do so. Mr. Wilson did not read the fourth comfort letter when he took over responsibility for the Leigh account, nor did he do so upon receipt of the fifth comfort letter. Thus, while he failed to read the fifth comfort letter, he would not, in any event, have been able to draw an informed comparison if he had done so. Ms. Leaney claims not to have read the comfort letter, which was the only support for a loan of over $40 million, even though her initials appear on the covering memorandum, and she was responsible for the account. When the Leigh situation came to a head, with Leigh on the brink of bankruptcy and the parent companies "back-pedalling" from the association with Leigh, Leaney left for a two-week vacation without, she maintains, having bothered to read the fifth comfort letter.

379      Throughout, the monitoring of the Leigh account was less than diligent, although it is apparent all three knew a good deal more about Leigh than they admitted to. There was a pre-occupation with maintaining existing business and generating new business which pervaded their approach and clouded their judgment. These three bank witnesses were the persons directly responsible for supervision and control of the Leigh account. All of this resulted, to varying degrees, in a retrospective reconstruction of events by each of these three witnesses in testimony, perhaps inadvertently, in an attempt to explain or minimize their errors and oversights and to cover their mistakes.

380      For all of these reasons, I must conclude that, where the evidence of these three witnesses conflicts with that of any other witness, I cannot rely on the evidence of the Corporate Banking witnesses, and I prefer the evidence of the others. These observations have no bearing, however, upon my perception of the evidence of the witnesses from the bank's Credit Division or that of Mr. Exton.

381      The other bank witnesses were Patrick Noonan and Ted McDowell. McDowell joined the bank out of high school in 1947 and rose through the ranks by dint of hard work. He was the senior credit officer for the bank, a post he had held from 1972 until his retirement in 1990. He was appointed vice-chair of the bank in 1981, and reported directly to the chairman and chief executive officer of the bank. He remained on the board of directors of the bank until 1995. Patrick Noonan began his banking career in 1948 with the Canadian Imperial Bank of Commerce, and joined TD in 1968. He held numerous senior positions in the bank, and was posted in the U.K. and Singapore, as well as Canada. He was appointed senior vice president, credit, in 1982, a position he held until his retirement in 1991. In 1986 he became one of only four senior vice presidents responsible for all credit, globally. Both these witnesses were seasoned professional bankers, who conducted themselves with integrity, and I found them to be knowledgeable and credible.

382      Jonathan Exton is a graduate of the City of London Business school, and received his MBA from the University of British Columbia in Canada. He held positions with Canadian Pacific and the Bank of Montreal, before joining TDs London office in 1988 as manager of corporate finance. He subsequently was promoted to the position of director of corporate finance, a position he held until he left TD in 1994. He is presently the head of the European multi-nationals group for the Industrial Bank of Japan. I found him to be an honest, credible and forthright witness.

*The Plessey Witnesses*

383      Ian Musgrave is a chartered accountant, and joined Plessey in 1978. He became group finance director seven months later and group treasurer in 1982, a post he held until August, 1989, when he resigned shortly before the hostile takeover succeeded. He was an informed and experienced businessman, who gave his evidence in a responsive, forthright and credible manner. The word which comes to mind in connection with his evidence and his demeanor is honourable.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 260 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

384    Brendon Sammon was Plessey group chief accountant from 1972 until he left in September, 1990. His, experience, duties and responsibilities at Plessey were in the accounting area and not general management. He executed the fifth comfort letter, not because it fell naturally within his purview, but more because the senior management of Plessey was depleted following the GEC Siemens takeover. He was a forthright witness, but I gave little, if any, weight to his evidence where it went beyond his area of experience and responsibility, for instance in the area of the general enforceability of comfort letters.

385    Dr. Philip Gerdine is a vice president of Siemens in New York, seconded to Siemens in Munich, in the mergers and acquisitions department. Dr. Gerdine has both an MBA and a Ph.D. and is a certified public accountant. Prior to joining Siemens, he served for about five years as manager in charge of acquisitions services for Price Waterhouse. Following the GEC Siemens acquisition of Plessey in September, 1990, he became the co-managing director of Plessey, along with Simon Weinstock. I found him to be a candid, forthright and credible witness, with a high degree of business acumen and sophistication.

*The GEC Witnesses*

386    David Newlands was finance director and a director of GEC plc until his retirement last year. He and Gerdine were both highly involved in the integration of the Plessey businesses into GEC and Siemens. This was a gargantuan task, especially given the lack of prior knowledge of Plessey due to the information constraints associated with a hostile takeover. Leigh was a minute portion of the Plessey whole, and more so in context of the size of the two parents, GEC and Siemens. The GEC group comprised some 145,000 employees, and the group sales in the 1989-90 fiscal year were £6.5 billion, with a profit of £797 million. GEC had cash reserves at the time of about £1 billion and no borrowings. Newlands testified that a "miniscule" amount of his time, less than one per cent of it, was taken up with Leigh matters. I found his evidence to be straightforward, informed, and credible.

387    Ross Anderson joined GEC in London as deputy treasurer in 1975, and was promoted to treasurer in 1979. He has an M.A. from Oxford in jurisprudence and is a chartered accountant. His principal duty as treasurer was the regular, almost daily, investment of GECs sizable resources. I found him to be a responsive, ingenuous witness who was believable in his testimony.

388    Simon Weinstock, who is now deceased, was a manager and executive director of GEC in the period of time material to this action, and reported directly to Lord Weinstock, the managing director of GEC and his father. He was the GEC appointee to act as co-managing director of Plessey following the hostile takeover and was intimately involved in the GEC Siemens hive-up of Plessey. Simon Weinstock was originally named as a defendant to this action and was examined for discovery prior to his death. At trial, the plaintiff vigorously cross-examined David Newlands on a number of areas touching upon the conduct of Simon Weinstock as a directing mind of Plessey. As a consequence, GEC moved to introduce the discovery transcript of Simon Weinstock, which I allowed. I have placed little weight on this discovery evidence however, in view of the fact that I did not have an opportunity to observe his viva voce evidence, and because the cross-examination of Simon Weinstock on discovery was likely less extensive than would have been the case at trial.

*The Leigh Witness*

389    Frank Driscoll became president and CEO of Leigh on August 8, 1989. His background was in the technical area with little, if any, experience in finance. At or about the time of the Stanmore meetings on Nov. 28 and 29, 1989, Driscoll became aware that the past president of Leigh, Barry Flower, who was then working with Plessey, was attempting to place blame for Leigh's contractual and other difficulties on Driscoll. Driscoll was of the view that these difficulties had their genesis prior to his arrival at Leigh, during Flower's watch. It is apparent that he felt taken advantage of and vulnerable, and felt in retrospect he had been deceived about the condition of Leigh when he was hired. Prior to the collapse of Leigh he asked for and was given an indemnity agreement by GEC and Siemens. Driscoll was originally named as a defendant in this action. When he was called by the bank to testify, the bank stated that though it had discontinued the action against him, it reserved the right to reinstate or recommence those claims at the end of trial. Prior to testifying, Driscoll invoked the protection of s. 9 of the *Canada Evidence Act* and s. 5 of the *Ontario Evidence Act*. His evidence must be considered in the light of all of these circumstances, and I have apportioned weight to it accordingly.

*The Expert Banking Witness*

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

390    The defendants proffered as expert banking evidence the report and testimony of Robert Wickham. He is a retired banker who spent 25 years with the Royal Bank of Scotland, based in London, until his retirement in 1993. This court ruled he was qualified as an expert in the area of banking, and particularly corporate lending in England, subject to later argument on admissibility.

391    Wickham's expert evidence related to banking practices generally and the use of comfort letters during the period of time material to this action. His evidence also describes the commercial context in which the Plessey letters were delivered to the bank. TD, through its bank witnesses, continually characterised the Plessey letters as strong. TD has pleaded and argued in the alternative that the comfort letters are ambiguous. Wickham's evidence was intended to counter these characterizations. In my opinion, Wickham's evidence meets the test of relevance necessary to assist the trier of fact, and is not subject to an exclusionary rule. It is given by a properly qualified expert. See: *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.) at 20 per Sopinka J.. It is accordingly admissible. Wickham's evidence was useful in respect of the commercial context in which the comfort letters were exchanged and buttressed other evidence in that regard, but was not essential to any findings. Where his evidence overlapped with issues which were to be decided by this Court, it was given no weight.

## Part III

### Issues and Law

#### Overview

392    The plaintiff submits that several causes of action arise from Leigh and Plessey's failure to pay the TD loan and Leigh' assignment in bankruptcy, and has advanced claims against the defendants in both contract and tort. In the statement of claim, the plaintiff asserted approximately 150 causes of action against the defendants, however in argument many of these claims were abandoned. As set out below, the plaintiff's claims against Plessey in contract and tort remain outstanding, as do the claims against GEC in tort. All claims of the plaintiff other than those dealt with below have been abandoned.

#### The Claims in Contract

393    The bank claims as against Plessey for breach of contract, and submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Leigh to be managed so as to be always in a position to meet its financial obligations, including all amounts owed to the bank pursuant to the bank's loan to Leigh. The plaintiff asserts that Plessey is in breach of this contractual promise to cause Leigh to be so managed, and is therefore liable to the bank in contract. The bank also seeks an order that the fifth comfort letter be rectified to conform with the agreement between the parties, or that it be set aside.

#### The Claims in Tort

394    The plaintiff submits that Plessey is liable to the bank in misrepresentation on the basis that the third paragraph of the Plessey comfort letters misrepresented the Plessey policy regarding management of its wholly-owned subsidiaries. Specifically, the plaintiff claims that the letters misrepresented the policy because the letters did not disclose the following: that the policy was regarding the management of the subsidiaries by their own management rather than by Plessey; that the policy in the third paragraph did not require Plessey to do anything so that the subsidiaries would always be in a position to pay their debts; that the letters were only a statement of Plessey's policy as at the date of the letter; and that the letter was so "commercially hollow" Leigh could go bankrupt and the bank would receive nothing under its loan facility. In the alternative, the plaintiff claims the third paragraph of each letter was a material misrepresentation because Plessey had adopted no policy regarding the management of its subsidiaries.

395    The bank claims in the alternative that if the policy did exist, it had ceased to exist or was subject to material qualifications by or after December 27, 1989. The plaintiff submits that GEC and Plessey knew the policy statement in the fourth comfort letter had been made and "knew, recklessly disregarded or should have known" of these material qualifications, and should not

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

have made the statement of policy in the third comfort letter, or should have disclosed the material qualifications. The plaintiff submits the defendants' actions in this regard amount to fraud or negligent misrepresentation.

*Conduct outside the Comfort Letters*

396     In the further alternative, the plaintiff claims the defendants are liable in contract and tort for conduct separate and apart from the comfort letters. In particular, the bank submits that the alleged statement of Ian Musgrave, Plessey group treasurer, that the comfort letters were "tantamount to a guarantee" amounted to a misrepresentation upon which the bank relied to its detriment. Further, the plaintiff claims that certain statements of Colin Justice, made to the bank in November and December 1989, regarding the Leigh financial statements, were negligently or fraudulently made. In addition, the bank claims that certain statements allegedly made by Ross Anderson to Exton constituted negligent misrepresentations.

397     Finally, the bank claims that from no later than February 26, 1990, Plessey and GEC were aware that Leigh was knowingly withholding its unaudited financial statements from the bank, in breach of its express contractual requirements to deliver them. The plaintiff submits that Leigh's conduct in knowingly withholding the statements while continuing to take further funds constituted a deceit upon the bank, and that Plessey and GEC were parties to this deceit through their silence.

**The Claims in Contract**

398     The plaintiff submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Plessey Canada and Leigh to be managed so as to be always in a position to meet their financial obligations, including all amounts due pursuant to the banks loan to Leigh. The bank claims that Plessey is in breach of that contractual promise to cause Leigh to be so managed and is liable to the bank for the amount of the bank's advances to Leigh.

399     In addition, the bank submits it is entitled to rectification of the fifth comfort letter to eliminate the words "and does not constitute a legally binding commitment" on the basis that it does not reflect the agreement of the parties. In the alternative, the plaintiff seeks an order that the defendants cannot rely upon those words, or that the fifth comfort letter be set aside in its entirety.

400     In response, Plessey submits that the operative document is the fifth comfort letter, and asserts that the letter creates no legally binding obligation upon Plessey to directly or indirectly make good the indebtedness of Leigh to TD, regardless of the concluding words which, it submits, simply reinforce the plain meaning of the document.

401     Regarding the bank's assertions as to the contractual promises contained in the comfort letters, Plessey argues that such an interpretation would require the court to insert words into the third paragraph which are not there, and which would, if added, convert a statement of policy or representation into a promise amounting to a guarantee.

402     Plessey resists the request for rectification on the basis that the fifth comfort letter accurately records the understanding between Plessey and TD that the comfort letter did not create a binding legal obligation to pay Leigh's debt to the bank.

*Principles of Contractual Interpretation*

403     The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand. See: *Chitty on Contracts* Volume 1, General Principles, 27th ed. (1994) at 580.

404     Where the agreement has been reduced to writing, the parol evidence rule operates to prohibit the introduction of extrinsic evidence to vary the written contract. This rule of interpretation is enunciated in G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at pp. 455-456:

> The fundamental rule is that if the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary, or interpret in any way the words used in the writing.

See also: *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.) per Judson J..

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

405    This is consistent with the principle that where a document purports on its face to be the final and conclusive expression of the parties' agreement, the document will be taken to be a reliable record of the parties' latest agreement, and evidence of the negotiations leading up to it will not be admissible. See: S.M. Waddams, *The Law of Contracts* (3 rd ed.) (Toronto: Canada Law Book, 1993) at 210. This principle was articulated by Lord Wilberforce in *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 (U.K. H.L.) at 1384-1385:

> The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to.

406    These principles were adopted by the Court of Appeal for Ontario in *Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) at 126:

> This case obviously demonstrates the practical sense of the parol evidence rule. When equals negotiate at length and arrive at a written agreement which can be interpreted by itself or by reference to matters which must be taken to have been known to both of them and which show the sense or meaning that the words must be taken to have had when the agreement was made, it verges on idle activity for a court to rehash the negotiations, activities and conduct of the parties and hear their now professed expression of what their intentions were at an earlier time.

*Factual Matrix*

407    The court need not be confined to a strict, literal interpretation of the language of the document however, and may admit evidence of the "factual matrix" or circumstances surrounding the conclusion of the agreement as an aid in interpretation. Lord Wilberforce stated in *Prenn v. Simmonds, supra* at 1383-4:

> In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ...We must ... inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 ... it has been clear enough that evidence of mutually known facts may be admitted to identify the meaning of a descriptive term.

He rejected the notion, however, that evidence of the parties' subjective intentions ought to be admissible, at 1385:

> And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. *Far more, and indeed totally, dangerous is it to admit evidence of one party's objective -- even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised...*

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori Dr. Simmonds' intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction. [Emphasis added]

Lord Wilberforce returned to this theme and elaborated upon the notion that evidence of the factual matrix may be admitted to construe a term in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.) at 574-575:

When it comes to ascertaining whether particular words apply to a factual situation or, if one prefers, whether a factual situation comes within particular words, it is undoubtedly proper, and necessary, to take evidence as to the factual situation.

. . . . .

It is less easy to define what evidence may be used in order to enable a term to be construed. ...[I]t does not follow that ...one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

. . . . .

It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that judges are found using words like 'knew or must be taken to have known'....

. . . . .

I think that all of their Lordships are saying, in different words, the same thing - what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognize that, in the search for the relevant background, there may be facts, which form part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts, so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed.

408     The Supreme Court of Canada has adopted the notion that a court may look at evidence of the surrounding circumstances when construing a document. In *Hill v. Nova Scotia (Attorney General)*, [1997] 1 S.C.R. 69 (S.C.C.), the court cited with approval the *dicta* of LaForest J. (as he then was), in *White v. Central Trust Co.* (1984), 54 N.B.R. (2d) 293 (N.B. C.A.) at 310-311:

What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about.

409     From these authorities can be gleaned certain principles which should guide the court in interpreting an agreement. The document should be looked at as a whole, with each contractual term considered in the context of the entire document. See: G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at 469. The court should make every effort to construe the document on its face, without regard to extrinsic evidence.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

410     Where an agreement is clear and unambiguous on its face, the parol evidence rule operates to prohibit admission of evidence to alter or vary the written terms of the contract. However, the court may admit evidence of the surrounding circumstances, including evidence of the commercial purpose of the contract, the genesis of the transaction, the background, the context and the market in which the parties were operating. In this regard, evidence to be admitted must be objective in the sense that what reasonable persons in the position of the parties would have had in mind, rather than subjective evidence of the parties' actual intentions.

*Ambiguity*

411     A contract which appears clear and unambiguous on its face may, nevertheless, contain a latent ambiguity. Such an ambiguity may only become apparent when the court seeks to apply the language of the agreement to the facts. Extrinsic evidence of the factual matrix of the agreement may also disclose such an ambiguity, by revealing a meaning attributable to the language of the document apparent only in light of evidence of the commercial context. Where the court determines that a document contains a latent ambiguity, further extrinsic evidence is admissible to clear up the ambiguity. See: *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469 (Ont. H.C.). The role of the court in interpreting an ambiguous commercial contract was stated by Estey J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901:

> [T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

412     The nature of the evidence to be admitted as an aid to interpretation was considered by the Court of Appeal for Ontario in the seminal case of *Alampi v. Swartz,* [1964] 1 O.R. 488 (Ont. C.A.). In that case, McGillivray J. A. for the court held that extrinsic evidence was not admissible to vary the terms of a written contract, but could be admitted to explain the document and to prove the facts upon which interpretation of the document depends, including the validity of the document, the identity of the parties and to explain technical terms or commercial usage. Mr. Justice McGillivray held that such evidence may not contradict a term of the contract, but is adduced to relate the terms of the contract to the proper subject matter or to assign to the terms a definite meaning. Once such evidence is admitted, it may disclose that a term of the contract is ambiguous and capable of more than one meaning. In that case, he noted at p. 493, "Such an ambiguity, a "latent ambiguity", because not apparent on the face of the writing, demands evidence of intention to establish whether there was an agreement at all, or if the parties intended a particular one of alternate meanings to prevail." Evidence of intention may only be admitted however, once the latent ambiguity has been established.

413     This issue was later considered by Cory J.A. (as he then was), in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447 (Ont. C.A.), who noted that every effort should be made to construe the contract based on the wording. Where, however, a doubt arises as to the true sense and meaning of the words or there is difficulty in their application to the circumstances, resort may be had to extrinsic evidence. Mr. Justice Cory held that once the court is of the opinion the contract is difficult to interpret, extrinsic evidence may be admitted to determine whether, in fact, the agreement contains a latent defect, and noted that if, at a later stage, another court was able to interpret the document without regard to that evidence, no harm would result from its admission. At p. 452 Cory J.A. adopted and paraphrased the reasoning of Gale C.J.O. in *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.*, *supra*:

> (1) The extrinsic evidence admitted may establish that there is no latent ambiguity in the written document relevant to the issue in dispute. In such a case obviously the written document governs.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

(2) The extrinsic evidence may demonstrate that there is latent ambiguity in the terms of the written document which are in dispute. Nonetheless, upon a consideration of all the surrounding circumstances, it requires the choice to be made in favour of the meaning of the agreement which would appear from a reading of the whole document without any extrinsic evidence to show ambiguity.

(3) The extrinsic evidence establishes that there is a latent ambiguity. However, a consideration of the surrounding circumstances requires the choice of a meaning consistent with the words of the document but different from their patent meaning. The party contending that there is a latent ambiguity must not only establish that there is such an ambiguity but also resolve that ambiguity by evidence from which the court can find what agreement was made and what the choice of alternative meanings should be. The party contending for the latent ambiguity must show that the extrinsic evidence dictates the selection of a meaning which is generally consistent with the wording of the written document but different from its patent meaning.

(4) The extrinsic evidence indicates that there is a latent ambiguity of such an extent that the true agreement between the parties is different from the agreement expressed in the written document. That is, the extrinsic evidence established that there is a case of mistake.

(5) The extrinsic evidence establishes that there is a latent ambiguity and goes further and demonstrates that the minds of the parties never really met upon the subject matter concerning which there is an agreement. In other words, there is in fact no agreement upon the terms which would decided the issue between the parties. The court then cannot, on the balance of probabilities, make the necessary finding of *consensus ad idem*.

Similarly in *Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 17 O.R. (3d) 363 (Ont. C.A.), Grange and McKinlay JJ.A. stated at 372:

First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and evidence of subsequent conduct of the parties to the agreement.

414    Accordingly, where there is some doubt as to the meaning of language used in the contract, or the court has difficulty in applying it to the facts, the court should, in light of the factual matrix, search for an interpretation which would appear to advance the true intent of the parties. The more reasonable construction of the words, which produces a fair result consistent with the commercial atmosphere, is the interpretation which the court should adopt.

415    The court may have regard to extrinsic evidence in order to resolve the ambiguity, and no harm will come from its admission, however extrinsic evidence of facts leading up to the making of the agreement, circumstances existing at the time of the agreement and subsequent conduct of the parties may only be considered once an ambiguity has been found. Extrinsic evidence demonstrating the intention of the parties is only admissible however, once an ambiguity has been found, and in my view, should be objective, rather than subjective evidence of the parties' intentions.

*Application to the Circumstances of This Case*

*Interpretation of the Comfort Letter on its Face*

416    The starting point of any analysis must be identification of the document to be construed. In the present case, the operative document is clearly the fifth comfort letter, dated December 15, 1989 and delivered to the bank on December 27, 1989. This was the last comfort letter delivered to TD prior to the bankruptcy of Leigh in April, 1990. Moreover, the letter states on its face "This letter replaces our letters of 31 st August 1989, 31 st March 1989 and 30 th June 1989...." Applying the principles enunciated by Professor Waddams, *supra*, the fifth comfort letter purports on its face to be the most recent iteration

of the parties' agreement. Subject to the plaintiff's submission that the letter should be rectified or set aside, the fifth letter is the document to be construed by the court in the context of the claim in contract.

417    Applying the principles of contractual interpretation set out above, the first step in any analysis must be an attempt on the part of the court to construe the document according to the language on its face, without reference to extrinsic evidence of any sort. The fifth comfort letter states, in its entirety:

> This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31 $^{st}$ August 1989, 31 $^{st}$ March 1989 and 30 $^{th}$ June 1989 and does not constitute a legally binding commitment.

418    The last line of the letter is, in my view, dispositive of the plaintiff's contract argument. Having regard to the principle that contracting parties are presumed to intend what they say, the fifth comfort letter states on its face that it replaces all prior comfort letters, and must therefore be taken to be a reliable record of the parties' latest agreement. Moreover, the letter states that it does not constitute a legally binding agreement and must be taken as conclusive of Plessey's intention that it not be so bound. This is a full and complete answer to the plaintiff's claim in contract.

*The Statement of Policy in the Third Paragraph*

419    The plaintiff submits that the statement of policy in the third paragraph of the comfort letter amounts to a contractual promise by Plessey that it had and would have a policy, as long as the bank's loans were outstanding, to cause Leigh to be managed in such a way that it could pay the bank when called upon to do so. Hence, the plaintiff asserts that the added words in the last line of the document operate to eliminate the contractual promise contained in the third paragraph.

420    In response, Plessey asserts that, notwithstanding the added words in the last line, the statement in the third paragraph is merely a representation as to its policy speaking as at the date of the letter, and not a binding contractual promise. As such, the added words in the last line do not change the effect or alter the meaning of the third paragraph. Plessey argues that the interpretation urged by the plaintiff amounts to a contractual promise that Plessey would see to it that the bank be paid, either directly or indirectly, and that in order to arrive at such an interpretation, the court would have to read into the comfort letter words that are not there.

421    The difference between a contractual promise and a representation was articulated by Professor Fridman in *The Law Of Contract in Canada, supra*, at 3-4 as follows:

> Promises are fundamental to the idea of contract. A promise is an *undertaking* as to the future conduct of the party promising, the promisor, with respect to the party to whom the promise is given, the promisee. ...It is the idea of promise which distinguishes contract from representation. A representation is not an undertaking, although, sometimes, it may resemble a promise in its form, for example, where a seller of goods states that the goods in question are "top quality". Representations are statements as to an existing or past fact, not promises as to future events or states of affairs. Although representations can have legal consequences, if made falsely or negligently, or, on occasion, without either fraud or negligence on the part of the representor, such consequences are non-contractual in their nature. They stem from the misleading nature of a statement, not from any promissory character.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

[Emphasis added]

422    The leading case on the interpretation of comfort letters in the decision of the English court of appeal in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused). In that case, Ralph Gibson L.J. held that a comfort letter given in support of a subsidiaries borrowing did not have contractual effect.

423    The plaintiffs seek to rely upon the decision of Rogers C.J. in *Banque Brussels Lambert S.A. v. Australian National Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.), in which the Supreme Court of New South Wales held that a comfort letter was a legally enforceable obligation. In my view, that case can have no application to the facts before me. In this regard I adopt the reasoning of Chadwick J. in *Atlantic Computers plc, Re*, [1995] B.C.C. 696 (Eng. Ch. Div.) at 699:

> I was referred also, understandably, to the decision of Rogers CJ in the Supreme Court of New South Wales in the case of *Banque Brussels Lambert SA v. Australian National Industries Ltd.* (1989) 21 NSWLR 502. It is clear from remarks on p. 523 that the Chief Justice found the approach of the Court of Appeal in *Kleinwort Benson* somewhat unreal. He took the view that the construction reached by the Court of Appeal rendered the document in that case nothing but a scrap of paper.

> It would not be open to me to follow the Chief Justice's decision, even if I were to accept his criticism of the Court of Appeal's approach; but I draw attention to the fact that, as he acknowledged, the test prescribed by the law of Australia to determine whether a statement is promissory or only representational is different from that in England (see p. 524A). In my view, the law of England is clear. A document in the terms of these two letters of comfort does not impose a contractual promise as to future conduct.

424    In *Kleinwort Benson*, as in the present case, the paragraph in issue was the third paragraph containing a statement of policy of the parent company that: "*It is our policy to ensure* that the business of MMC Metals Limited is at all times in a position to meet its liabilities to you under the above arrangements." I note in passing that the language used in that comfort letter, including the word "ensure" is arguably stronger than that used in the comfort letter before me.

425    The question before the court in *Kleinwort Benson* was whether the paragraph was a contractual promise as to the parent company's future conduct, or, whether it was simply a statement of present fact regarding the company's intentions. Although the wording and factual matrix of that comfort letter differ from those in the case at bar, nevertheless I find the reasoning to be instructive. In holding that the paragraph was a representation, the court stated at 792:

> In my judgment the defendants made a statement as to what their policy was, and did not in para 3 of the comfort letter expressly promise that such policy would be continued in future. It is impossible to make up for the lack of express promise by implying such a promise, and indeed, no such implied promise is pleaded. My conclusion rests on what, in my judgment, is the proper effect and meaning which, on the evidence, is to be given to para 3 of the comfort letters.

426    In my view, the statement in the third paragraph of the comfort letter is, on its face, a representation and not a contractual promise or warranty. The paragraph does not use promissory language or language of undertaking. It simply contains a statement or representation as to Plessey policy at the time the letter was executed, and does not contain a contractual promise that it will cause Leigh to be so managed nor a promise that the bank will be paid. Moreover, the paragraph must be construed in the context of the document as a whole. A comparison of the wording in the second and third paragraphs is instructive in this regard. The second paragraph states: "We undertake not to reduce our share-holding in Leigh..." The use of words of promise or undertaking stands in sharp contrast to the wording of paragraph three: "It is our policy...."

427    In order to arrive at the construction urged by the plaintiff, it would be necessary to add or imply the words "It is Plessey's policy to *cause Leigh to be managed* in such a way..." or "Plessey *undertakes to ensure* that Leigh be managed..." or other, similar language. The word policy itself, given its common usage, means a guideline or principle, and does not amount to a promise to do anything or a requirement that the terms of the policy be adhered to. A consideration of the policy statement, placed in the context of the letter as a whole, supports this construction of the word, for the reasons set out below. Further, the words "it is our policy" are, in my view, a representation of present policy and not a contractual undertaking to have the policy

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 269 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565
1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

in the future. The paragraph does not say "it is *and will be* our policy", and in order to construe the statement of policy as a statement of future intention, it would again be necessary to imply into it words which are not there. The word "always" in the third paragraph has the effect of making the representation as to policy a continuing representation, although subject to change. Absent the word "always", the policy statement could be taken as speaking only as at the date of the letter. The word "always" does not have the effect of elevating the policy statement to the level of a contractual promise to have the policy in the future.

428     If the construction urged by the plaintiff is adopted, namely that Plessey promises to have the policy as long as the loan is outstanding and that Plessey will cause Leigh to be managed in accordance with the policy, the effect is to emasculate the preceding two paragraphs of the comfort letter. In this regard, the reasoning in *Kleinwort Benson* at 795-796 is apposite:

> Next, the first draft of the comfort letter was produced by the plaintiffs. Paragraph 1 contained confirmation that the defendants knew of and approved of the granting of the facilities in question by the plaintiffs to Metals, and para 2 contained the express confirmation that the defendants would not reduce their current financial interest in Metals until (in effect) facilities had been paid or the defendants consented. Both are relevant to the present and future moral responsibility of the defendants. *If the words of para 3 are to be treated as intended to express a contractual promise by the defendants as to their future policy, which Hirst J. held the words to contain, then the recitation of the plaintiffs' approval and the promise not to reduce their current financial interest in Metals would be of no significance. If the defendants have promised that at all times in the future it will be the defendants' policy to ensure that Metals is in a position to meet its liabilities to the plaintiffs under the facility, it would not matter whether they had approved or disapproved, or whether they had disposed of their shares in Metals.* Contracts may, of course, contain statements or promises which are caused to be of no separate commercial importance by the width of a later promise in the same document. Where, however, the court is examining a statement which is by its express words no more than a representation of fact, in order to consider whether it is shown to have been intended to be of the nature of a contractual promise or warranty, it seems to me to be a fact suggesting at least the absence of such intention if, as in this case, to read the statement as a contractual promise is to reduce to no significance two paragraphs included in the plaintiff's draft, both of which have significance if the statement is read as a representation of fact only. [Emphasis added]

429     Similarly, in the case at bar, the first paragraph of the comfort letter contains a statement of Plessey's awareness of the facility extended by TD to Leigh, and the second paragraph contains an undertaking on the part of Plessey not to reduce its shareholding without prior notification to the bank. If the third paragraph is read as a contractual obligation that Plessey will continue to have the policy while the facility is outstanding, and that it will cause Leigh to be managed so that it can meet its obligations under the facility, the preceding two paragraphs would become irrelevant. To paraphrase Ralph Gibson L.J., there would be no reason to waste ink or paper on the first two paragraphs.

430     Finally, in interpreting the document as a whole, the third paragraph must also be construed in light of the last line, stating that the comfort letter (and thus the third paragraph) does not constitute a legally binding commitment. Hence, the fifth comfort letter is clear and unambiguous on its face, does not contain any contractual promise, and the bank's claim in contract must fail.

*The Factual Matrix*

431     A consideration of the comfort letter in its factual matrix does not alter this conclusion. Plessey and TD have both made submissions as to the appropriate evidence of the surrounding circumstances which the court ought to consider. I have reviewed the evidence carefully, and having regard to the principles outlined above, in my view the following evidence is admissible to place the comfort letter in its factual matrix. Plessey was a large, multinational corporation with subsidiaries in 43 countries. TD is a Canadian Bank with branches throughout the world. Both are large, sophisticated parties, and both were intimately familiar with commercial lending transactions and the various forms of security used in such transactions, including loan guarantees. Prior to the delivery of the Leigh comfort letters, both parties had been involved in other transactions involving comfort letters. Both parties knew that there was no single "standard form" of comfort letter in use in the financial marketplace, and both knew that the legal effect of a comfort letter depended on the wording of the letter. Plessey and the Bank were both aware that in the commercial context in which they were operating, a confirmation by a parent company that it was aware of the borrowings of its subsidiary was considered to have some significance, as was an undertaking to notify the bank of any reduction by the

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

parent in its shareholding in the subsidiary. It would also have been known to both parties that banks competed for the business of companies of the size and prominence of Plessey and actively solicited them to develop business opportunities. TD had solicited Plessey for business unsuccessfully in the past. The aim of the transaction was to arrange bank financing for Leigh on terms that were acceptable to both parties.

432      Regarding the specific transaction in issue and its genesis, as is outlined above the bank approached Plessey when the Leigh takeover bid was announced, and offered to assist in financing the purchase of Leigh. Plessey ultimately availed itself of a $10 million short-term acquisition loan, to be used by the acquisition vehicle, Plessey Canada (1988) Inc.. Plessey also provided a letter of comfort to the bank, in a form which was agreed upon following negotiation, and which the bank accepted. The first comfort letter was in substantially the same form as the fifth letter, absent the last sentence.

433      The factual matrix surrounding the comfort letter does not alter my conclusion that the comfort letter is clear and unambiguous. The parties were sophisticated and accustomed to operating in international financial markets. The comfort letter contained statements of commercial significance to the bank. The first paragraph contained a representation that Plessey was aware of the facility which had been granted to Leigh by the bank. The second paragraph contained an undertaking, using express contractual language, that Plessey would not reduce its shareholding in Leigh without prior notification to the bank. Such notification would provide the bank with an opportunity to call the loan or take whatever steps it deemed necessary.

434      The third paragraph contained a representation as to the policy of Plessey. The paragraph does not contain express promissory language, in direct contrast with the contractual undertaking given in the second paragraph. This contrast is significant given that both parties were sophisticated and used to negotiating the terms of security. Both parties also knew what a guarantee was and the appropriate language of guarantee. The comfort letter was arrived at in a commercial marketplace in which banks, including TD, solicited large companies like Plessey for business, and competed with other banks for that business. In that context, to construe the third paragraph as a promise to do anything, including a promise to pay the bank, in the absence of express language to that effect, defies both legal and commercial sense.

435      The plaintiff asserts that to construe the third paragraph as a representation makes no commercial sense, in that the bank would be no better off than it would have been with a letter from Leigh itself, saying that it intended to manage its own affairs in such a way as to be always in a position to meet its financial obligations. I do not agree with this submission. While Plessey is not obliged to pay the bank, nor to have the policy stated, the letter nevertheless has commercial value. Delivery of the letter provides the bank with a recourse it would not otherwise have had, namely, to approach the parent company and ask it to pay. The possibility that the parent will consider paying must give the bank more comfort than such a letter from Leigh standing alone, without potential recourse to a parent. Moreover, to interpret the third paragraph as a representation rather than a contractual promise is not to render it commercially hollow or devoid of meaning. An interpretation of the paragraph as not obliging Plessey to do anything to have or enforce such a policy does not mean that, in fact, Plessey did not take such steps. A comfort letter containing a representation as to policy must, in my view, have more commercial value than a letter which did not contain such a statement.

436      The third paragraph does not amount to a contractual promise by Plessey to have the policy described, either at the date of the letter or in the future. Nor is it a promise by Plessey to cause Leigh to be managed in accordance with the policy, or that Plessey would cause the bank to be paid. In order to reach such conclusions, it would be necessary to read into the paragraph words which are not there, and there is no basis in the evidence for the implication of such terms. See: *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.); *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd. (1994), 19 O.R. (3d) 205* (Ont. C.A.). My conclusion is reinforced when the paragraph is viewed in the context of the entire letter, including the final sentence disavowing any binding legal obligation.

*Ambiguity*

437      Both the bank and Plessey assert that the comfort letter is not ambiguous, although each urges the court to adopt a different construction of the third paragraph, based upon the same wording. The bank asserts that the third paragraph amounts to an ongoing contractual promise to have the policy set out in the paragraph for as long as the loan was outstanding, and a

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

contractual promise that Plessey would cause Leigh to be managed so that it could pay the bank. Plessey, on the other hand, submits that the paragraph contains no contractual obligation, and is simply a statement of present intention. In their submission, the paragraph is merely a representation that on the date of the comfort letter Plessey had the policy described, and that a policy, as opposed to a obligation of some kind, merely speaks to Plessey's expectation as to the management of Leigh, and not to any requirement that it be so managed.

438    As was noted by Cory J.A. (as he then was) in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.*, *supra*, a document which appears clear on its face, may nevertheless disclose an ambiguity if a doubt arises as to the true meaning of the words, or if the court has difficulty in applying the language to the facts. I agree with the submissions of both parties that the letter is not ambiguous on its face and, for the reasons outlined above, a consideration of the letter in its factual matrix does not disclose any ambiguity, nor any reason to depart from a construction of the document based upon its express wording. I find the document contains no latent ambiguity. However, even had I found there was such an ambiguity, the extrinsic evidence which would then be admissible does not assist the plaintiff. Although it is not necessary that I review it, the extrinsic evidence supports the conclusion that there is no latent ambiguity and defeats the construction urged by the plaintiff. The salient details of this extrinsic evidence are outlined below.

*Circumstances Leading up to the First Comfort Letter*

439    The starting point must be that the bank knew from the outset that a guarantee was not on offer by Plessey. When Plessey announced its friendly takeover bid for Leigh, the bank approached Plessey and offered to assist with funding for the acquisition. Although the bank had made loan facilities available to Plessey prior to this, none had been drawn upon, and Baker referred to the possibilities for developing business opportunities with Plessey in his CCR recommending that the loan be approved. Baker also noted in the CCR that a guarantee was not on offer for the borrowing, which would be unsecured. Indeed, it was this notation which led Noonan in the Credit Division to stipulate that an appropriate comfort letter be obtained from Plessey, instead.

440    The form of comfort letter which was ultimately delivered to the bank was the subject of negotiation between the bank and Plessey. Drafts were exchanged. Howard Baker sent an initial draft to Plessey, based on a template comfort letter. The template Baker was working from included a line which contained language which, in my view, amounted to a contractual promise: "and in this particular instance, we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Baker deleted this line from the proposed draft which he sent to Plessey. Baker's draft concluded "We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis." Plessey responded with its own draft, which was accepted by the bank without amendment.

441    I can only conclude from the foregoing that the bank was aware Plessey was not prepared to provide a guarantee for the borrowings of Plessey Canada, that the bank agreed to accept a comfort letter rather than a guarantee in order to develop the business relationship with Plessey, and that the bank was consulted as to the terms of the comfort letter to be provided. In this regard, it is significant that in October 1989, the bank was invited to (and did) tender a bid to provide Plessey with an uncommitted facility, security for which was offered as the unconditional and irrevocable 50-50 several guarantees of GEC and Siemens. In my opinion, none of this evidence supports a finding that the comfort letter contains a latent ambiguity, nor that the third paragraph of the letter contains any contractual promise.

*Evidence Regarding the Subsequent Comfort Letters.*

442    The corporate credit reviews of the Leigh account are replete with references to the bank's relationship with Plessey and later GEC, and to the bank's desire to generate further business with these companies. Throughout, the comfort letter is listed as documentation rather than security, in accordance with the bank's Credit Procedures Manual. At the same time, from the time of delivery of the third comfort letter, the risk rating in these credit reviews is clearly that of Leigh, and not that of the parent companies. The risk rating deteriorates as the Leigh bank line grows, a fact which is inconsistent with an understanding on the part of the bank that they had a guarantee or enforceable contractual commitment from Plessey that they would be paid. Indeed, the bank explicitly recognized that the support from Plessey was informal. In his comment on the Nov. 1, 1988 request that the

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Leigh line be extended by $4 million, Sid Owen noted: "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by November 30, 1988. We must resist being dragged along." This observation is, in my view, completely inconsistent with the notion that the bank thought it had a contractual promise from Plessey that it be paid.

443    In the fall of 1988, Plessey discovered that bank held security over the assets of Leigh in the form of a general assignment of book debts and a floating charge debenture. Plessey requested that the bank release this security and the bank agreed. The Credit Division required as a term of this agreement that Plessey subordinate its intercompany debt in priority to the debt of the bank. Plessey refused to do this, and the Corporate Banking Division agreed to waive that condition, and also agreed to release its security over Leigh's assets. At no time did the bank suggest that the wording of the comfort letter be altered or amended in any way, notwithstanding that the line of credit was now an operating loan rather than a short-term acquisition loan, and that the amount of the loan had increased substantially. This is so even though Plessey forwarded a draft of the third comfort letter to the bank and requested confirmation that its terms were acceptable, thus providing TD with an opportunity to suggest changes in the wording. It is noteworthy that the loan was repayable on demand, and thus could have been called by the bank at any time.

444    Prior to delivery of the fourth comfort letter, the bank agreed to extend credit to Leigh in excess of the amount referred to in the comfort letter. Plessey executed a letter to this effect which had been provided in draft form by the bank, without amending its terms, which stated: "However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the letter of comfort accordingly." This document contains words which amount to a contractual promise to provide a further comfort letter if one was needed, in language which was supplied by the bank. Plessey complied with the terms of this undertaking, and forwarded the fourth comfort letter to the bank, despite the fact the bank had not requested it. This is significant, both because the bank clearly was familiar with promissory language and requested it when it felt such language was appropriate, and also because having given an enforceable undertaking, Plessey honoured it.

445    In the fall of 1989, Plessey was the subject of a successful hostile takeover. The bank was aware of this, and noted the GEC Siemens plan to divide up the assets of Plessey in the September 20, 1989 CCR. Almost all of the senior personnel at Plessey left shortly after the takeover, and were replaced by representatives of GEC and Siemens. The bank viewed this as an opportunity to develop a business relationship with GEC, and made no effort to renegotiate the terms of the comfort letter or call the loan.

446    Finally, as I have found above, the bank read and accepted the fifth comfort letter, including the last line which stated that the comfort letter did not constitute a legally binding obligation.

447    All of this extrinsic evidence displays a clear focus on the part of the bank on generation of further business with Plessey and GEC, and, in a competitive marketplace, indicates to me that the bank was prepared to assume risks and make concessions in order to further that goal. Moreover, all of this evidence, including Plessey's refusal to provide a guarantee at the outset; the descriptions of the support from Plessey as informal; the fact that the relevant risk rating was that of Leigh rather than Plessey; the parties' use of contractual language prior to delivery of the fourth comfort letter; and the offer of joint and several guarantees in the October 1989 Plessey uncommitted facility; all of this is inconsistent with an understanding on the part of the bank that they had obtained a contractual promise in the comfort letter that they would be paid directly or indirectly by Plessey. It is also inconsistent with a belief by the bank that it had obtained a promise that Leigh would remain solvent.

*Evidence of Subsequent Conduct.*

448    The bank read and accepted the fifth comfort letter. At no time up until the bankruptcy of Leigh on April 12, 1990, did anyone from the bank comment or complain to any of the defendants regarding the additional wording in the last line, let alone ask that the language be deleted. In conversations with Gerdine and Anderson, the bank requested that GEC and Siemens formally acknowledge the existing Plessey comfort letter. On April 5, 1990, the bank sent both GEC and Siemens a letter enclosing a draft comfort letter which it requested that they execute. The covering letter stated: "Our comfort and support for

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." The bank's reference to its reliance on the integrity of the parent companies is, in my view, inconsistent with an understanding on their part that they were in possession of a binding contract in the comfort letter. Further, the accompanying comfort letter contained no reference to Plessey's policy, but did contain express promissory language which might well have amounted to a contractual obligation, had the letter been executed: "We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates."

449    The subsequent conduct of the bank is consistent with an understanding on its part that it did not have a binding contract with Plessey. It is also consistent with an understanding that the third paragraph did not contain a promise that the bank would be paid, nor a promise that Plessey would cause Leigh to be managed in accordance with the policy. In light of all of my findings above, there is no basis in the evidence for a finding of any collateral contract or collateral warranty. See: *Hawrish v. Bank of Montreal, supra*, and *Esso Petroleum Co. v. Mardon,* [1976] 2 All E.R. 5 (Eng. C.A.). For all of the foregoing reasons, I conclude that the comfort letter is clear and unambiguous, and the construction of the comfort letter urged by the plaintiff is not supported either by the wording of the document or the evidence.

*Contra Proferentem*

450    TD seeks to rely upon the doctrine of contra proferentem and argues that any ambiguity in the comfort letters should be resolved in favour of the bank. In my view, even had I found an ambiguity in the comfort letter, the doctrine of *contra proferentum* would have no application on these facts.

451    Only where the court finds an ambiguity and the other rules of construction fail to resolve that ambiguity may the court invoke the *contra proferentem* doctrine and interpret the document strictly against its drafter. *Contra proferentem* is a principle of last resort. See *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.,* [1986] 1 S.C.R. 57 (S.C.C.) at 68-69; *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 900-901; and *Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.,* [1983] 5 W.W.R. 61 (Alta. C.A.). In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd., supra,* at p. 69, Le Dain J. speaking for the court, quoted from Anson's *Law of Contract,* 25th ed., (1979) at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing, more to his advantage.

452    Le Dain J., in *Hillis Oil*, also made it clear that, as a general principle relevant to the construction of all contracts, *contra proferentum* may only be applied where there has been no opportunity for the other side to review and modify the disputed or ambiguous terms. He said (at p. 68):

> [T]he rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording.

453    Even if I had found the comfort letter to be ambiguous, which I have not, TD cannot rely upon the doctrine of *contra proferentum* on the facts of this case. The bank was consulted on the wording of the first and third comfort letters, and given an opportunity to modify the language used. The bank agreed to the language contained in the third paragraph, and accepted the comfort letters as drafted. The bank read and accepted the fifth comfort letter. If it was dissatisfied with the language used, it could have requested a revision, refused to advance further funds until the revision was obtained, or indeed, it could have called the loan, which was repayable on demand. It did none of these things. Accordingly, in my view, the comfort letter is not ambiguous and in any event, the plaintiff had a full opportunity to modify its wording. The doctrine of *contra proferentum* has no application.

*Rectification*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

454       The plaintiff requests an order of this court that the fifth comfort letter be rectified to conform with the agreement between the parties by striking out the last line, or in the alternative, seeks an order that the fifth comfort letter be set aside in its entirety. It is not necessary to deal with these arguments in depth, in light of my finding above, that the bank, and specifically Wendy Leaney, read and accepted the fifth comfort letter upon its receipt. In light of the bank's failure to make any comment or complaint regarding the last line of the letter at the time of its delivery or at any time up to the bankruptcy of Leigh on April 12, 1990, it was reasonable for Plessey to conclude that the bank had accepted the revised comfort letter, including the final sentence. It is not now open to the bank to claim rectification.

455       In any event, in view of my conclusions above regarding the interpretation of the third paragraph of the comfort letter, the orders sought by the plaintiff would be of no effect. All parties concede that the fourth comfort letter is substantially the same as the fifth, but for the last line, and I agree. While an order granting rectification might have some effect on the promissory wording contained in the second paragraph, that paragraph is not in issue, and in my view the third paragraph does not contain any contractual promise. Hence, rectification would be of no assistance to the plaintiff.

### Negligent and Fraudulent Misrepresentation

456       In the alternative to its claim in contract, the plaintiff has advanced a number of causes of action in negligent and fraudulent misrepresentation. The bank claims that the statement in paragraph three of all five of the comfort letters amounted to a material misrepresentation because, it submits, the paragraph failed to disclose the following: that the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility.

457       In the alternative, TD claims that the third paragraph of each of the letters of comfort was a material misrepresentation because Plessey had, in fact, adopted no policy regarding any of its subsidiaries, including Leigh. In support of this allegation, the bank asserts that nowhere in any of Plessey's internal documentation is it demonstrated that the Board of Plessey actually adopted the policy described in the letters.

458       In the further alternative, TD claims that even if Plessey had a policy which was accurately described in the letters of comfort, that policy ceased to exist or became subject to material qualifications prior to receipt by the bank of the fifth comfort letter on December 27, 1989. In the alternative, the bank pleads that the policy ceased to exist or became subject to material qualifications between receipt by the bank and the bankruptcy of Leigh on April 12, 1990. The bank submits that Plessey and GEC knew, recklessly disregarded or should have known of these material qualifications to the statement of policy in the August 31, 1989 letter, and had an obligation to disclose them to the bank. The bank alleges that GEC and Plessey's conduct in this regard amounts to fraudulent misrepresentation or negligent misrepresentation.

459       In addition to claims arising out of the comfort letters, the plaintiff alleges certain representations made by representatives of GEC and Plessey amount to fraudulent or negligent misrepresentation.

### The Law

### Negligent Misrepresentation

460       The law of negligent misrepresentation in Canada was set out by the Supreme Court of Canada in the seminal case of *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 (S.C.C.). In that case, Iacobucci J., speaking for the court, stated the five elements of a claim in negligent misrepresentation at 110:

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

The required elements for a successful *Hedley Byrne* claim have been stated in many authorities, sometimes in varying forms. The decisions of this court cited above suggest five general requirements:

(1) There must be a duty of care based on a "special relationship" between the representor and the representee;

(2) The representation in question must be untrue, inaccurate or misleading;

(3) The representor must have acted negligently in making said misrepresentation;

(4) The representee must have relied, in a reasonable manner, on said negligent misrepresentation; and

(5) The reliance must have been detrimental to the representee in the sense that damages resulted.

461    Each of these elements must be made out in order for the plaintiff to be successful in its claim of negligent misrepresentation.

*1. There must be a Duty of Care based on a "Special Relationship"*

462    In *Queen*, *supra*, Iacobucci J. considered the nature of the special relationship that must exist between the parties before a duty of care will arise, and applied the approach adopted by the House of Lords in *Caparo Industries plc v. Dickman*, [1990] 1 All E.R. 568 (U.K. H.L.), in which their Lordships held that three criteria determine the imposition of a duty of care, and hence, the existence of a "special relationship": forseeability of damage, proximity of relationship and the reasonableness of imposing a duty. In so doing, he noted at p. 117-118 that the duty of care is no longer restricted to situations of reliance on professional advice:

In my opinion, confining this duty of care to "professionals" who are in the business of providing information and advice, such as doctors, lawyers, bankers, architects and engineers, reflects an overly simplistic view of the analysis required in cases such as the present one. The question of whether a duty of care with respect to representations exists depends on a number of considerations including, but not limited to, the representor's profession. While this factor may provide a good indication as to whether a "special relationship" exists between the parties, it should not be treated in all cases as a threshold requirement. There may be situations where the surrounding circumstances provide sufficient *indicia* of a duty of care, notwithstanding the representor's profession.

463    The Supreme Court revisited and refined the criteria for establishment of a "special relationship" in the recent case *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 (S.C.C.). In that case, LaForest J. held for the court that there ought not, in principle, to be any difference between the criteria used to establish a duty of care in negligent misrepresentation and the criteria applied in any other negligence case, and adapted the two-part test first described in *Anns v. Merton London Borough Council* (1977), [1978] A.C. 728 (U.K. H.L.). The *Anns* test mandates that where there is a sufficient relationship of proximity between the parties such that carelessness on the part of one may be likely to cause damage to the other, it will give rise to a *prima facie* duty of care. Once the court has found that such a duty of care exists, it is then necessary to consider whether there are any considerations which ought to limit the scope of the duty or the class of persons to whom it is owed.

464    In adapting the notion of proximity to cases of negligent misrepresentation, LaForest J. stated at 188:

In cases of negligent misrepresentation, the relationship between the plaintiff and defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. *To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts*: (*a*) *the defendant ought reasonably to foresee that the plaintiff will rely on his or her representations: and* (*b*) *reliance by the plaintiff would, in the particular circumstances of the case, be reasonable*. To

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

use the term employed by my colleague, Iacobucci J., in *Cognos*, ... the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere. [Emphasis added]

465      Regarding the second limb of the *Anns* test, Mr. Justice LaForest held at p. 197 that the court, in a claim of negligent misrepresentation, may look to such factors as "knowledge of the plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared", in order to determine whether there are any policy considerations which should limit the scope of the duty, such as the potential for indeterminate liability on the part of the defendants.

*2. The Representation in Question must be Untrue, Inaccurate or Misleading*

466      In order to satisfy the second requirement of a claim in misrepresentation, the plaintiff must establish that the statement relied upon was untrue, inaccurate or misleading. In this regard, Iacobucci J. held in *Cognos, supra*, at p. 653 that failure to divulge highly pertinent information may, in some circumstances, amount to a negligent misrepresentation.

467      In addition, the court held at p. 658-659 that in some circumstances, an implied representation, as opposed to an actual representation, may give rise to actionable negligence:

In my view, there is no compelling reason in principle, authority or policy for the proposition that, as a general rule, an implied representation cannot under any circumstances give rise to actionable negligence.... On the other hand, there is considerable authority for the more flexible view that, *in appropriate circumstances*, implied representations can and often do, give rise to actionable negligence.

In my opinion, a flexible approach to this issue is preferable. It is arbitrary and premature to declare as a general rule that nothing less than express or direct representations can succeed under the *Hedley Byrne* doctrine. ...It is unnecessary for me to set out in detail the circumstances in which so-called implied representations can be enough to sustain an action in tort for negligent misrepresentation. I prefer to leave this task to trial judges dealing with specific factual situations. [Emphasis in original]

468      This reasoning was followed by Mr. Justice Linden in *Spinks v. R.* (1996), 134 D.L.R. (4th) 223 (Fed. C.A.) who noted that silence as to a fact may give rise to an implied representation. He stated at 236;

A person may be "misled" by a failure to divulge as much as by advice that is inaccurate or untrue. In the same way that absent information can be "erroneous", as discussed above, missing information can be misleading. ...Consequently, the duty may be breached not only by positive misstatements but also my omissions, for they may be just as misleading.

469      In *Cognos*, it was argued that only representations of existing facts, and not those relating to future occurrences, can give rise to actionable negligence. Mr. Justice Iacobucci noted that there were a number of authorities cited in support of this proposition, and proceeded on the assumption that these authorities were correct, without deciding the point, on the basis that the representations at the heart of the case before him concerned representations of existing fact.

470      The question of when a representation will amount to a material misrepresentation was considered by the British Columbia Court of Appeal in *Kripps v. Touche Ross & Co.* (1997), 35 C.C.L.T. (2d) 60 (B.C. C.A.) (Leave to appeal to the Supreme Court of Canada refused Nov. 7, 1997 [Reported (1997), 102 B.C.A.C. 238 (note) (S.C.C.)]). Following a review of the case law, Finch J.A. stated at 85:

From these submissions it would appear that there are two or three different tests for materiality. The first test is whether a representation *might possibly* affect a decision [made by a representee]; the second is whether a representation *is capable* of affecting a decision; and the third is whether a representation *would probably* affect a decision. I think that the first two tests are the same, and that the real distinction is between a representation that *might possibly* affect a decision and one that *would probably* affect a decision. [Emphasis in original]

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

471     The court did not decided which of these two tests was applicable, as on the facts before it. Finch J.A. was of the view that even the higher standard was met. In either case, the test is an objective one of the effect that the statement would have had on a reasonable person in the circumstances of the representee.

*3. The Representor must have acted Negligently in Making the Misrepresentation*

472     The standard of care to be exercised by the representor is the same standard as is applied in other negligence cases, that of the reasonable person. This standard of care is an objective one, namely, what a reasonable person would do in the circumstances. The duty requires not only that the representor be honest and truthful, but that the representor exercise such reasonable care as the circumstances of the case dictate, to ensure that representations made are accurate and not misleading. See: *Queen v. Cognos, supra*. At p. 651-652 Iacobucci J. cited with approval the following passage from L.N. Klar, *Tort Law* (Toronto: Thomson Professional Publishing Canada, 1991) at 160:

> An advisor does not guarantee the accuracy of the statements made, but is only required to exercise reasonable care with respect to it. As with the issue of standard of care in negligence in general, this is a question of fact which must be determined in the circumstances of the case. Taking into account the nature of the occasion, the purpose for which the statement was made, the foreseeable use of the statement, the probable damage which will result from an inaccurate statement, the status of the advisor and the level of competence generally observed by others similarly placed, the trier of fact will determine whether the advisor was negligent.

Iacobucci J. elaborated upon the requirements of the duty, noting that it was not a duty of full disclosure, but rather a duty to take reasonable care. He added at p. 654 that the representor's belief in the truth of his representations is not relevant to a determination of whether the duty has been breached:

> Although the representor's subjective belief in the accuracy of the representations and his moral blameworthiness, or lack thereof, is highly relevant when considering whether or not a misrepresentation was fraudulently made, it serves little, if any, purpose in an inquiry into negligence. As noted above, the applicable standard of care is that of the objective reasonable person. The representor's belief in the truth of his or her representations is irrelevant to that standard of care. The position adopted by the Court of Appeal seems to absolve those who make negligent misrepresentations from liability if they believe that their representations are true. Such a position would virtually eliminate liability for negligent misrepresentation as liability would result only where there is actual knowledge that the representation made is not true; the basis of *fraudulent* misrepresentation. [Emphasis in original]

*4. The Representee must have Relied, in a Reasonable Manner, on the Negligent Misrepresentation*

473     The fourth element of the tort is that the plaintiff must reasonably have relied upon the representation made by the defendant. As Mr. Justice Linden observed in *Spinks v. R.*, *supra*, at p. 239, this is simply the universal requirement of proof of causation, necessary in all negligence cases in order to found liability.

474     In *Kripps*, *supra*, the British Columbia Court of Appeal considered the nature of reasonable reliance in a negligent misrepresentation case, and concluded that in some circumstances, reliance may be inferred by the court. However, the circumstances in that case were unusual, in that the trial judge had heard no oral evidence but proceeded on the basis of affidavits and transcripts of cross-examinations. As well, the trial judge had made no findings on the reliance issue, having previously found there was no misrepresentation. In addition, the plaintiff's claims of presumed or deemed reliance had been struck at the pleadings stage of the action, leaving only the claims of actual reliance. Hence, the court of appeal held it was in as good a position to draw these inferences as the trial judge had been. Finch J.A. stated at 89-90:

> Whether a representation was made negligently or fraudulently, reliance upon that representation is an issue of fact as to the representee's state of mind. There are cases where the representee may be able to give direct evidence as to what, in fact, induced him to act as he did. Where such evidence is available, its weight is a question for the trier of fact. In many

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

cases however, as the authorities point out, it would be unreasonable to expect such evidence to be given, and if it were it might well suspect as self-serving. This is such a case.

The distinction between cases of negligent and fraudulent misrepresentation is that proof of a dishonest or fraudulent frame of mind on the defendant's part is required in actions of deceit. That, too, is an issue of fact and one which may also, of necessity, fall to be resolved by way of inference. There is, however, nothing in that which touches on the issue of the plaintiff's reliance. I can see no reason why the burden of proving reliance by the plaintiff, and the drawing of inferences with respect to the plaintiff's state of mind, should be any different in cases of negligent misrepresentation than it is in cases of fraud.

475      The court concluded that it was sufficient, in a negligent misrepresentation action, for the plaintiff to prove that the misrepresentation was at least one factor which induced the plaintiff to act to his or her detriment. Where the misrepresentation was one which was calculated to induce the plaintiff to act, or one which would naturally induce the plaintiff to act, the court held that reliance may be inferred. The inference of reliance may be rebutted by the representor.

476      Proof of the element of reliance on a misrepresentation involves a two step test. The first is a factual test, namely, whether the plaintiff relied upon the representation in fact. The second limb of the test requires a determination by the court, on an objective basis, as to whether the reliance was reasonable. This second requirement was described in Allen M. Linden, *Canadian Tort Law*, 6th ed (Butterworths: Toronto, 1997) at 445-446:

Reliance not only must be proven in fact but also must be demonstrated to be *reasonable*. The second part of the fourth requirement, therefore, means that only those injuries resulting from reliance reasonably placed on a defendant will be compensable. It follows that, to the extent injuries were sustained as a result of unreasonable reliance, recovery may be barred. In most cases, however, a plaintiff will be barred from recovery only to the extent the reliance was unreasonable. The notion of unreasonableness here simply suggests a limit on the degree of reliance a given factual scenario may bear. It does not suggest that, if a plaintiff steps beyond that limit, all recovery must be lost.

Nevertheless, where the facts suggest that any reliance whatsoever is unreasonable, recovery is rightly barred.

*Fraudulent Misrepresentation*

477      Fraud is the most serious civil tort which can be alleged, and must be both strictly pleaded and strictly proved. The main distinction between the elements of fraudulent misrepresentation and negligent misrepresentation has been touched upon above, namely the dishonest state of mind of the representor. The state of mind was described in the seminal case *Peek v. Derry* (1889), 14 App. Cas. 337 (Eng. H.L.) which held fraud is proved where it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. The intention to deceive or reckless disregard for the truth is critical.

478      Where fraudulent misrepresentation is alleged against a corporation, the intention to deceive must still be strictly proved. Further, in order to attach liability to a corporation for fraud, the fraudulent intent must have been held by an individual person who is either a directing mind of the corporation, or who is acting in the course of their employment through the principle of respondeat superior or vicarious liability. In *BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1990), 4 C.C.L.T. (2d) 161 (B.C. C.A.) at 223 (Aff'd, [1993] 1 S.C.R. 12 (S.C.C.)), Hinkson J.A., writing for the majority, traced the jurisprudence on corporate responsibility in the context of a claim in fraudulent misrepresentation at 222-223:

Subsequently, in *H.L. Bolton (Engineering) Co. v. T.J. Graham & Sons Ltd.*, [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.), Denning L.J. said at p. 172:

. . . . .

A company may in many ways be likened to a human body. It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre. Some of the

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

people in the company are mere servants and agents who are nothing more than hands to do the work and cannot be said to represent the mind or will. Others are directors and managers who represent the directing mind and will of the company, and control what it does. The state of mind of these managers is the state of mind of the company and is treated by the law as such. So you will find that in cases where the law requires personal fault as a condition of liability in tort, the fault of the manager will be the personal fault of the company. That is made clear by Lord Haldane's speech in *Leonard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.*

. . . . .

In the field of criminal law, corporate responsibility has its roots in civil law. In *R. v. McNamara (No. 1)*, [1985] 1 S.C.R. 662 (S.C.C.) ...Estey J., speaking for the Supreme Court of Canada, discussed the directing mind or identification theory and the respondeat superior approaches to corporate liability in a criminal context.

In tracing the development of the law, Estey J. referred to the decision of the Lord Chancellor, Viscount Haldane in *Asiatic Petroleum Co. v. Lennard's Carrying Co.* [(1914), [1915] A.C. 705 (U.K. H.L.)] supra. He also made reference to the decision in *Tesco Supermarkets v. Nattrass* [(1971), [1972] A.C. 153 (U.K. H.L.)], supra. After analyzing the previous decisions in this field of the law, Estey J. said at p. 311 [of C.R., p. 691 of S.C.R.]:

> In summary, therefore, the courts in this country can be said to this date to have declined generally to apply the principle of respondeat superior in the determination of corporate criminal responsibility. Criminal responsibility in our courts thus far has been achieved in the mens rea offences by the attribution to the corporation of the acts of its employees and agents on the more limited basis of the doctrine of the directing mind or identification. Corporate responsibility in both strict and absolute liability offences has been found to arise on the direct imposition of a primary duty in the corporation in the stature in question, as construed by the court. By what appears to be the same purely pragmatic reasoning, the courts of the United Kingdom find criminal liability in a corporation only by the attribution to it of the conduct of its employees and agents where those natural persons represent the core, mind and spirit of the corporation. The United States federal courts are inclined, as we have seen, to find criminal liability in the corporation by vicarious liability where any employee-agent commits in the course of his employment, the criminal act.

. . . . .

> It is apparent that the law in Canada dealing with the responsibility of a corporation for the tort of deceit is still evolving. In view of the English decisions and the decision of the Supreme Court of Canada in the *R. v. McNamara (No. 1)*, supra, it would appear that the concept of vicarious responsibility based upon respondeat superior is too narrow a basis to determine the liability of a corporation. The structure and operations of corporations are becoming more complex. However, the fundamental proposition that the plaintiff must establish an intention to deceive on the part of the defendant still applies.

See also: *Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473 (Ont. C.A.) (Leave to appeal to Supreme Court of Canada refused Feb. 3, 1986) [Reported (1986), 53 O.R. (2d) 663 (note) (S.C.C.)].

479    In the case of fraudulent misrepresentation, there are circumstances where silence may attract liability. If a material fact which was true at the time a contract was executed becomes false while the contract remains executory, or if a statement believed to be true at the time it was made is discovered to be false, then the representor has a duty to disclose the change in circumstances. The failure to do so may amount to a fraudulent misrepresentation. See: P. Perell, "False Statements", [1996] 18 *Advocates' Quarterly* 232 at 242.

480    In *Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 54 D.L.R. (4th) 43 (B.C. C.A.) (Aff'd on other grounds [1991] 3 S.C.R. 3 (S.C.C.)), the British Columbia Court of Appeal overturned the trial judge's finding of fraud through non-disclosure on the basis that the defendant did not remain silent as to the changed fact but was simply slow to respond to the change, and could only be criticized for its "communications arrangements". In so doing, the court adopted the approach to fraud through silence established by the House of Lords in *Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) at 950. Esson J.A. stated at 67-68:

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

There is much emphasis in the plaintiff's submissions and in the reasons of the trial judge on the circumstance that this is not a case of fraud "of the usual-kind" involving positive representations of fact but is, rather, one concerned only with non-disclosure by a party which has become aware of an altered set of circumstances. It is, I think, potentially misleading to regard these as different categories of fraud rather than as a different factual basis for a finding of fraud. Where the fraud is alleged to arise from failure to disclose, the plaintiff remains subject to all of the stringent requirements which the law imposes upon those who allege fraud. The authority relied upon by the trial judge was the speech of Lord Blackburn in *Brownlie v. Campbell.* ...The trial judge quoted this excerpt:

> ...when a statement or representation has been made in the *bona fide* belief that it is true, and the party who has made it afterwards comes to find out that it is untrue, and discovers what he should have said, he can no longer honestly keep up that silence on the subject after that has come to his knowledge, thereby allowing the other party to go on, and still more, inducing him to go on, upon a statement which was honestly made at the time at which it was made, but which he has not now retracted when he has become aware that it can be no long honestly perservered in.

The relationship between the two bases for fraud appears clearly enough if one reads that passage in the context of the passage which immediately precedes it:

> I quite agree in this, that whenever a man in order to induce a contract says that which is in his knowledge untrue with the intention to mislead the other side, and induce them to enter into the contract, that is downright fraud; in plain English, and Scotch also, it is a downright lie told to induce the other party to act upon it, and it should of course be treated as such. I further agree in this: that when a statement or representation...

481    Fraud through "active non-disclosure" was considered by the Court of Appeal for Ontario in *Abel v. McDonald*, [1964] 2 O.R. 256 (Ont. C.A.) in which the court held at 259: "By active nondisclosure is meant that the defendants, with knowledge that the damage to the premises had occurred actively prevented as far as they could that knowledge from coming to the notice of the appellants."

*Application to the Facts of this Case*

*Misrepresentation in the First Four Comfort Letters*

482    The plaintiff asserts a cause of action in negligent misrepresentation against Plessey based on the wording of the third paragraph of the first four comfort letters. In particular, the bank claims that the paragraph did not disclose that the policy referred to the management of Plessey Canada and Leigh by their own management, rather than by Plessey; that the policy did not require Plessey to do anything so that its subsidiaries would be in a position to pay their debts: that the letters were only statements of policy as at the date of the letters, and could not be taken to be statements of Plessey's policy as at the date of receipt of the letters by the bank, when the policy "might or might not" be that stated in the letter; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank receive nothing. In the alternative, the bank pleads that the third paragraph was a material misrepresentation because Plessey had, in fact, adopted no policy regarding Leigh, and asserts that there was no direct evidence led at trial that the board of Plessey had adopted the policy. I propose to deal with the latter submission first.

*Existence of a "Special Relationship"*

483    Plessey concedes that there exists a special relationship between it and the bank regarding the text of the comfort letters, and I agree. Applying the principles set out in *Hercules Management, supra*, it is reasonably forseeable that the bank would rely on the statements in the comfort letter and reliance upon those statements, in the circumstances, would be reasonable. There are no policy considerations, such as indeterminate liability of the defendant, to preclude a finding that Plessey owed TD a duty of care.

*The Representation Must be Untrue, Inaccurate or Misleading*

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 281 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*The Plaintiff's Interpretation of the Comfort Letter.*

484    The plaintiff submits that the third paragraph of the letters is materially misleading because Plessey had, in fact, adopted no policy with respect to any of its subsidiaries, including Leigh. TD's misrepresentation argument is premised on the same interpretation of the comfort letter as was advanced above in the contract argument, namely that the bank understood the policy paragraph to mean that Plessey would manage its subsidiaries, including Leigh so that the subsidiaries would always be in a position to meet their financial obligations, and that Plessey had not adopted this policy. Hence, they assert that the policy paragraph was misleading. I have rejected this construction of the comfort letter above, in the contract portion of these reasons, and I adopt and reiterate that reasoning here. The interpretation urged by the plaintiff requires that words be implied into the third paragraph which are not there. In my view there is no basis in the evidence to find such an implied representation.

485    The bank's interpretation of the comfort letter is based upon the testimony of Patrick Noonan that this was his subjective understanding of the policy paragraph. The proper test however, is not what the plaintiff subjectively thought of the representation, but what a reasonable person, in all of the circumstances of the plaintiff, would have thought. See: *Cognos, supra,* at 131-132. In my view, the bank's interpretation of the comfort letter is not reasonable in the circumstances, nor is it supported by the totality of the evidence of Noonan and McDowell.

486    Noonan testified that he read the letter with a high regard for Plessey's standing, strength and reputation, and financial capacity to give effect to the stated policy. This is consistent with McDowell's evidence as to what constituted a strong comfort letter. McDowell testified that a well-written comfort letter was one from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if'l make a commitment, I expect to fulfill it." These criteria are consistent with a perception of comfort letters as moral, rather than legal obligations.

487    Noonan testified that he was not involved in the negotiation or drafting of the first comfort letter, he never discussed the wording of the letter with anyone at Leigh, Plessey or GEC, nor did he direct the terms to be used in it. It was not his practice to discuss the wording of comfort letters with bank counsel, nor did he do so regarding the Leigh letter. He did not discuss the letter with Baker, who negotiated the letter from the bank's London office. In fact, it was never the responsibility of Noonan or anyone else in the Credit Division to negotiate the terms of documents like comfort letters. That responsibility rested with the account manager in the Corporate Banking Division.

488    Further, Howard Baker, who did negotiate the wording of the first letter, worked from a template comfort letter, which contained in the policy paragraph the additional words: "and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Those words were deleted by Baker from the draft comfort letter he sent to Plessey and were never included in the Leigh letters.

489    Finally, a Plessey guarantee was not on offer for the Leigh loan, and the bank knew this prior to negotiating the first comfort letter. I am of the view that the interpretation urged by the bank, based on the evidence of Patrick Noonan's subjective view of the letter, is not one which would be held by a reasonable person in all the circumstances. The evidence does not support a finding that Plessey impliedly represented that it would cause Leigh to be managed in accordance with the policy. Such an interpretation amounts to a promise that directly or indirectly, the bank would be paid, and both parties knew a guarantee was not on offer.

*Untrue, Inaccurate or Misleading*

490    The plaintiff submits that the statement of policy in the third paragraph of the comfort letters was materially misleading because Plessey had adopted no policy at all with respect to Leigh. In this regard, the plaintiff asserts that nowhere in the internal Plessey documentation produced was there any evidence that the Plessey board had adopted a formal policy regarding management of its subsidiaries. The bank argues that if Plessey had such a company-wide policy, it would have to have been

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

in writing and published throughout the company so that everyone required to know about the policy would be aware of it and understand it. I do not accept this submission, and the evidence is to the contrary.

491    I find as a fact that Plessey did have the policy stated in the third paragraph of the comfort letter. Indeed, such a policy is virtually axiomatic from a business management perspective. While the Plessey board may not have published a company-wide policy statement to the effect of paragraph three, Musgrave prepared a submission for the Plessey main board regarding each of the comfort letters, and the board did formally approve the issuance of each. The Plessey board did authorize the signatories to sign the comfort letters on behalf of the company, and this, in my view, is sufficient formal confirmation that Plessey had the policy.

492    It was the evidence of Ian Musgrave, which I accept, that Plessey did have the policy set out in the third paragraph, regarding both Plessey Canada and later Leigh, for the duration of his tenure at Plessey. Musgrave gave the following evidence regarding board's adoption of the policy:

> Q. So just to be absolutely certain, the general instructions in writing dealt with the company policy that the wholly-owned subsidiaries of Plessey Company plc would be managed in such a way as to always be in a - or to be - such as to always be in a position to pay or to meet their financial obligations.

> A. That's my understanding. Yes.

> Q. Now, we - where is that written general instruction?

> A. The section I'd always read as covering this is actually in general instruction number 215, which is at tab "C" in 227. ...It reads:

>> This instruction supersedes all current General Instructions in matters relating to levels of delegated authority where in conflict. However, it must be noted that it does not remove any statutory, legal or contractual obligations of the directors or employees of The Plessey Company or any of its subsidiaries.

> Certainly in the context of U.K. company law, it was a statutory, legal obligation of the directors of U.K. subsidiaries to manage the affairs of the company concerned so that they could meet all their obligations as they fell due. If they didn't, I think they were trading illegally, going under U.K. company law, and they should legally stop trading. So that's the section I had always looked at on that point. There is another section in the finance manual itself. Let me just find this, if I might. Yes. If you look at Exhibit 227, 1C. ...This section is headed "Policies Financial Accounting Balance Sheet". ...And then on the third page there's a paragraph at the top headed "Creditors":

>> It is company policy to pay suppliers in accordance with the agreed credit terms. It is not permitted to take excessive credit, which may damage the Group's reputation or result in difficulty in obtaining supplies or services. Creditors and liabilities are recorded by reference to goods delivered and services received...

> Now, I fully expect that was written with trade creditors in mind, but I think the principle equally applies to any supply of services, which would include supply of credit.

> So those are the bits I looked at to, if you like, to back up the claim that the company had a policy in that area. It's not something that I'm looking at post the event. These are sections which I looked at at the time to justify that type of statement.

Musgrave was pressed on the point and said:

> A. The policy is not defined precisely in the general instruction, nor anywhere else, as far as I can see, in precisely the same words that were used in Paragraph 3 of the comfort letter. However, my view at the time was that the second paragraph of the introduction section to GIP. 215 set out a policy which had the same meaning, did not use the same words, or it didn't get there in quite the same way, but the meaning is the same. I don't think there was any particular need in the comfort letter to use precisely the same words as might have appeared in an internal company document.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

493    In addition, Musgrave testified as to the application of the policy to the Plessey group:

A. Yes, I do. This was a policy that Plessey applied to the whole group, to all its subsidiaries and to joint venture companies where it was able to apply it. Essentially, the policy was that the management of the company concerned should manage the business of that company in such a way as to be always in a position, etc., etc.

Q. What role did the Plessey plc management have in that policy?

A. Well, they laid down the policy in the first place and I think if it came to their attention that the policy was not being applied by the management of any particular subsidiary, they would clearly, at least in the first instance, remind the management of the policy. That would hopefully be enough to ensure policy was applied by the management.

Q. During your time, and did that policy pre-date this day, December 22nd, 1988?

A. I'm certain it did.

Q. And in your time at Plessey till you left Plessey at the end of August, 1989, did that policy ever change?

A. No.

Musgrave elaborated on the meaning of the policy under cross-examination:

THE WITNESS: Excuse me, your Honour. There's actually something I'd like to say just before we start. There was an answer I gave to Mr. Campion on Thursday afternoon which, at the time, I wasn't comfortable with. I've reflected quite a lot on the weekend and I think - I gave him the wrong answer. It concerns the area of participation in a company's management. I think Mr. Campion suggested that a parent company, by setting down through policies, procedures, levels of delegated authority, but the parent company was actually participating in the management of the subsidiary concerned. I agreed with that. I was uncomfortable with it at the time. I have reflected on it. I don't now agree with the suggestion. *It seems to me that the legal responsibility for managing the affairs of a subsidiary lies with the board of the subsidiaries concerned. That is certainly the case in English law, and I expect it is in Canadian law, as well. And nobody can take that away from them.*

Now, having said that, the management has to manage the affairs of the company, manage the business within a whole series of constraints. They might be constraints laid down by the government in the form of law, environmental laws, labour laws, customer protection laws. The management has to have regard to all of those. The management may have to regard - have regard to policies laid down by a regulator, if it's operating a regulated industry. The management might have to have regard to policies and procedures laid down by some professional body, if that's relevant. In the case of a company which is a subsidiary within a group, almost certainly it will have to have regard to the policies and procedures laid down by the parent company of the group. But I don't see any difference with any of that - I don't think any of those situations involve the person who is setting out the policies, procedures, laws, regulations, whatever, participating in the management of the group. I think the management of the subsidiary have to manage the affairs of the company concerned within those policies and procedures.

So, on reflection, I disagree with Mr. Campion's suggestion. I think you can actually take it a stage further. *As I said earlier, certainly in the U.K. it is the board of a company who are responsible for the management of that company. And they can't give away that responsibility. If they allowed someone else who wasn't a member of that board or didn't report to that board to participate in the management of the company, I think they would be in a very shaky legal position, and I'm certain that Plessey did not structure its delegated authorities to put the members of all its subsidiaries' boards in that sort of position.* So I'm afraid I have got to change my mind on that one. [Emphasis added]

494    In addition to the evidence of Musgrave, I note that shortly following its takeover of Leigh. Plessey implemented a series of financial controls, in order to monitor Leigh's performance. These included a requirement that Leigh provide Plessey with key financial data on a monthly basis, including external sales, operating profit, profit before tax and cash flow. Binnie Sammon

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

testified that Plessey would have begun receiving this information from Leigh by July, 1988. In addition, Plessey controlled the borrowing and guarantee limits of Leigh, which were set by the Plessey main board. Leigh could not exceed these limits without main board approval. Leigh, along with the other Plessey subsidiaries, was required to produce an annual budget, for approval by Plessey. This requirement was continued by GEC following the takeover of Plessey. When it became apparent, in the spring of 1989, that Leigh could not support the interest payments associated with the intercompany debt, Plessey converted the debt to preference shares, thus increasing the equity capital on Leigh's books and eliminating the interest payments. Finally, throughout the period of the first four comfort letters, Leigh did meet its financial obligations, and no evidence has been led to the contrary. All of this evidence supports the finding that Plessey did have the policy as stated on the face of the comfort letters, and acted in accordance with it, even though it had no legal obligation to do so. Accordingly, I find that the comfort letter was not misleading in this respect, and the bank's claim in this regard must fail.

495    In the alternative, the bank claims that the comfort letter was materially misleading because the policy paragraph did not disclose that: 1. the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; 2. that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; 3. that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and 4. that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility. These submissions are premised upon an acceptance by the bank of the evidence of Ian Musgrave as to the interpretation of the comfort letters and an assertion that this evidence is inconsistent with the bank's interpretation of the comfort letters. I have rejected the bank's interpretation for the reasons set out above.

496    Ian Musgrave left Plessey in 1989 prior to the hostile takeover by GEC Siemens, and prior to Leigh's demise. He was approached by National Power plc in 1989 and accepted an offer from them. For the past three years he has been employed as group cash manager for a Norwegian company called Kvaerner, which has between 400 and 500 subsidiaries worldwide. In that position, Musgrave is responsible for setting up the group banking systems globally and controlling the day to day liquidity of the entire group. Borrowings for the group are in the range of £1.5 billion, and Musgrave testified that he deals with banks on a daily basis. I accept Musgrave's evidence, which in my view is in accord with a reasonable, objective interpretation of the comfort letter. In addition, I note that Musgrave's evidence was consistent with that of Robert Wickham, the expert banking witness.

497    The first of the bank's assertions is that the policy statement was misleading because it did not disclose that Leigh was to be managed by its own officers and directors. I cannot accede to this submission. In my view, it is self evident, and would be to any reasonable person in the circumstances of the bank, that Leigh was to be managed by its own management. In this regard, I note the evidence of Musgrave, above, that it would be an improper delegation of authority of the board of directors of Leigh to permit the company to be managed by a party other than an office holder of the company. I agree. A bank is a commercially sophisticated plaintiff, and a reasonable party in the position of the bank would have been aware of this provision of company law.

498    The second assertion of the bank is that the paragraph was misleading in that it did not disclose that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay the bank. On the contrary, I am of the view that this is exactly what the policy paragraph says, clearly and on its face. I have set out the reasons for this conclusion in the section on contract, and need not repeat them again here. Similarly, the comfort letter does carry a degree of value in the commercial context, and for the reasons outlined above, is not commercially hollow.

499    Regarding the third assertion, while I found above that the wording of the third paragraph does not contain a contractual promise by Plessey to have the policy into the future, I am of the view that the comfort letter does contain a continuing representation as to Plessey policy. The letter is not misleading in this respect, as this is consistent with the bank's reading of the letter and also with Musgrave's evidence:

Q. I take it that it was your understanding that this was a statement of continuing policy.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

A. I think, as the word stands, it's a statement of our policy at that point in time. It is our policy. We don't say our policy will continue to be. But I think, if the policy changed, if it had changed at any point in time, I would, I think almost certainly, have gone back to the bank, this bank and any other bank who had a similar comfort letter, and say; Look, our policy has changed

Q. I see. So you'd feel obliged to go to the bank, policy changed?

A. Yes. I don't think we were obliged in the legal sense, because it's simply a statement of policy at the time saying it doesn't commit us to notify the bank of a change of policy. But as a matter of good practice, I think I would have gone back and informed the banks, not just Toronto-Dominion but any bank, if policy in this area had changed.

Q. But you weren't legally obliged here?

A. I don't think we were.

Hence, for all of the above reasons, I find that the first four comfort letters are neither untrue, inaccurate, nor misleading, and the bank's claim in negligent misrepresentation must fail.

*Fraud and Negligent Misrepresentation in the Fifth Comfort Letter*

500      In the alternative, the bank claims that even if Plessey had a policy which was accurately described in the first four comfort letters, that policy ceased to exist or became subject to "material qualifications" prior to the bank's receipt of the fifth letter. In the further alternative, the bank asserts that the policy changed at some time following receipt of the letter on December 27, 1989 and the bankruptcy of Leigh on April 12, 1990. The bank claims that Plessey and GEC knew, recklessly disregarded, or should have known of the "material qualifications" to the policy, and had an obligation to disclose them to TD. Their failure to do so, the bank asserts, amounts to fraudulent or negligent misrepresentation.

501      The bank submits, as the basis for this claim, that GEC, knowing of Leigh's financial results following the Stanmore meetings in late November, had not adopted any settled policy with respect to Leigh. I cannot accede to these submissions. While GEC, in the months following the Stanmore meetings, may have had reservations as to whether it wanted to become 100 per cent owner of Leigh, these reservations and the uncertainty as to Leigh's ultimate ownership, were unrelated to the management policy for Leigh as stated in the fifth comfort letter, and the letter is not misleading in this respect.

502    The bank also asserts, as the basis for this claim, that Plessey, GEC and Siemens did not have a common understanding of what their policy was for Leigh and that GEC and Siemens never discussed or came to a specific agreement as to what Plessey's policy for Leigh was to be. I disagree. Anderson testified that following his revisions to the comfort letter, he sent a copy of it to everyone at GEC, Siemens and Plessey who had an interest in the letter, in order that they might comment upon it. Both Andy Hafner and Philip Gerdine received a copy of the letter, and neither commented upon it to Anderson, who interpreted this as approval from Siemens. Moreover, I find that the evidence of Gerdine and Newlands is consistent as to the application and substance of the policy.

503      The policy stated in the third paragraph was a policy as to Leigh's management, and I find as a fact, based on a consideration of all the evidence, that policy remained in place throughout the material period of time, right up until immediately before the bankruptcy of Leigh.

504      Both David Newlands and Philip Gerdine gave evidence in this trial, and both testified that Plessey continued to have the policy stated in the third paragraph of the comfort letter following the takeover. Gerdine, who was the co-managing director of Plessey following the takeover, stated in evidence:

Q. I'm suggesting to you that in April, 1990, as you look back on the period September '89 to April '90, you must have concluded that Plessey never had the policy referred to in the third paragraph of the letter we have just referred to during that period, namely September '89 to April '90. Do you agree with me?

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

A. I don't agree for this reason: That I think that with respect to worldwide operations, Plessey had this policy, which is a very simple policy, which says that we are going to supply the direction on the resources so that - and delegate to the 178 affiliates of Plessey so that they would be in a position to be managed in this way to meet financial obligations, because there are just so many alternatives available. The opposite one is simply unacceptable, that they would be unable to meet any financial obligations. So that would not be acceptable. There's another one which is Plessey's policy to run each of these subsidiaries, and it certainly didn't do that, it delegated. And I thought about this at some length about what this policy meant. It had to be in place during the entire period, and then come shortly before all the facts were in, that there was something terribly wrong here, that policy would change with respect to Leigh on that day. And that was a unique event. But frankly, even today, Plessey's policy is as stated here, in my opinion.

Gerdine also testified as to the substance of the policy:

Q. Do I take it that what you're saying is, is that Plessey had a policy that - Plessey would see that Leigh would be managed in such a way as to always be in a position to meet its financial obligations?

A. Well, yes, again, it's just slightly different from that. It's that Plessey would provide the resources in management, in financial instruction, in various things that would permit Leigh to run its business in a position to meet its financial obligations. And there is an important distinction there of what Plessey was doing, because there is a policy at Plessey on delegation which is important, that these people operate their own businesses, and Plessey sets the guidelines.

Q. As I understand your answer, as part of that, Plessey would supply resources, management, and financial instructions and various things to Leigh as part of that policy.

A. Yes.

Q. And when you use the term "resources", that would include the financial support from Plessey.

A. It would include basic investment, because the way Plessey or any parent would manage a subsidiary, at least in my view, is, it provides the management and the basic financial resource to carry on its business. And it - then the business itself does the business itself.

Q. And when you say that, it would, in this resources, provide financial support if needed.

A. I'm not sure you can say that. It might or it might not, depending on the circumstances.

Q. And I take it, then, having regard to those answers, that I'm correct in saying that you read this policy as saying - read this paragraph as saying that as long as the policy was in place, Leigh would be able to pay The Toronto-Dominion Bank.

A. I'm not sure if that follows. I mean, the policy was in place for the fundamental input, but I'm not sure that the last part of that sentence would apply necessarily. We would hope it would apply, but what Plessey did was provide this fundamental policy guidance and support by making the investment and putting the management, and that was Plessey's policy. What they do with it is their business. That's how I understood it.

505    David Newlands was the finance director of GEC and the person who "blessed" Anderson's revisions of the comfort letter prior to its signature and delivery. His evidence was, in substance, the same as that of Gerdine:

A. Thirdly, that it was Plessey's policy that Leigh be managed so that it could pay its bills as they fell due.

Q. Yes.

A. And fourthly, the letter replaced earlier letters and did not constitute a legally binding commitment.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

Q. And again, I want you to focus on what you thought at the time. Do you recall anything further as to why you thought it was fine?

A. I thought all those statements were explicit and statements that Plessey could properly make. This was from a common sense point of view.

Q. I take it that except by agreement during the period takeover date to the corridor conversation date, this policy, as stated in the latter August 31, 1989 found at tab 21, was not in place.

A. I wouldn't take that at all. I can't envisage how, when a company has a policy, that its subsidiaries be managed in such a way that they meet their bills as and when they fall due can ever be a policy that wouldn't exist. It would be a very odd company that didn't have such a policy. Any company - I mean, it's almost a statement of the obvious, that you would seek to have your subsidiaries run in such - in that sort of way, which is why I didn't have any problem with the policy in the 31st of August letter, and I don't believe that Ross's changes actually changed the meaning of that statement, either. So it seemed to me - I don't mean to put it the wrong way, but a motherhood statement, it seems a sensible policy for any company to have.

· · · · ·

Q. Now, obviously in the letter, in the third paragraph, there is the Plessey policy statement.

A. Yes.

Q. Or statement about the Plessey policy. I take it that the policy, as far as you understood, was in place certainly when the letter was sent and was true when the letter was sent.

A. Yes.

506     In addition to the evidence of Newlands and Gerdine, I find that Plessey and GEC acted in accordance with the policy throughout the material time. Colin Justice, divisional finance director of PESL was dispatched to Leigh to assist with the transition to GEC accounting principles and to assist the Plessey management with the ETC reviews, which were ongoing. Justice visited Leigh periodically through the fall of 1989 and assisted in the preparation of financial data presented at the Nov. 28 and 29 meetings at Stanmore, and at the meetings with Dr. MacBean in early January, 1990. At these January meetings, MacBean, who by then was aware of the increasingly bleak financial picture at Leigh, tasked Driscoll with preparation of a feasibility analysis of the various options available to Leigh. While these options did include closure of the business, other options contemplated the continued viability of Leigh, including restructuring, integration with Canadian Marconi, and sale to a third party. Justice assisted in the analysis. It is clear that Plessey and GEC were still trying to find solutions which would enable Leigh to continue as a viable entity. In this period, Driscoll, along with various representatives of Plessey and GEC Marconi met repeatedly with the Canadian government. The government was Leigh's main customer, and the purpose of the meetings was to negotiate some contractual relief for Leigh.

507     In the same period, the Red Team review was initiated to investigate the technical situation at Leigh and to ascertain the source of Leigh's contractual difficulties. Throughout this period, Leigh continued to meet its obligations as they became due.

508     Once Plessey co-managing director Philip Gerdine became involved with Leigh, he too made vigorous efforts on Leigh's behalf, attending a number of meetings with the Canadian government, and meeting with Leigh management. Even after the bank had frozen the loan, Gerdine prepared a "save Leigh" proposal. In early April, the Red Team had reported that Leigh had numerous serious engineering problems in relation to the SHINCOM contracts, and that Leigh was incapable of performing its contracts from a technological perspective. Nevertheless, Gerdine and others continued their efforts on Leigh's behalf and made further attempts to negotiate relief from the Canadian government. It was not until the government finally indicated on April 9 that no relief would be forthcoming, that the decision was taken to place Leigh into bankruptcy. Throughout this period, Leigh continued to meet its obligations as they became due.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

509      Accordingly, if Plessey did change its stated policy regarding the management of Leigh, I find that such change did not take place until the decision was taken that Leigh was terminal and bankruptcy was the only option. Only then did the policy of Plessey, as stated in the third paragraph of the comfort letter, become misleading. Up until that point, Plessey had actively supervised the management of Leigh and endeavored to solve its problems. By the time the decision was made to abandon Leigh, the bank had already frozen the loan, no further funds had been advanced, and no damages incurred by the bank. Hence, there is no basis for a finding of negligent or fraudulent misrepresentation in the fifth comfort letter.

510      Even if I had found that the statement of policy in the fifth comfort letter was materially misleading, I am of the view that any reliance placed upon the statement of policy by the bank was not reasonable, having regard to all the evidence.

511      Plessey became the target of a hostile takeover bid by GEC and Siemens in November, 1988. The bank was aware of this from the time the hostile bid was announced, and was also aware that GEC and Siemens intended to dismantle Plessey and divide up its assets between them. One of Musgrave's last acts at Plessey was to review the fourth comfort letter, which Plessey sent to the bank even though the bank had not asked for it. When Exton forwarded the letter to Young, he noted that Plessey felt it was "appropriate" to send the letter, due in part to the hostile takeover bid.

512      Following the success of the hostile takeover bid in September 1989, the Plessey management was decimated. Virtually all of the prior Plessey executive and managers either resigned or were terminated by the new owners. These were the people with whom the bank had been dealing regarding Leigh. The new owners, and particularly GEC, were large companies with whom TD had no existing relationship, despite repeated attempts to develop one over the years.

513      Plessey was a borrower of funds from banks, while GEC was referred to as a "cash mountain" with over £1 billion in cash reserves, over and above its other assets. One of Anderson's main responsibilities was the daily investment of this surplus on the most favourable terms possible. Rather than being dependant on banks and their goodwill for funding, GEC dealt with banks as a depositor of huge sums of money. Banks eagerly vied for GEC's business, including TD.

514      Throughout the piece, both before and after the hostile takeover, Leigh kept the bank informed of its contract difficulties, including delays and missed milestones, all of which had a negative impact on Leigh's cash flow. The bank knew that the Leigh loan was continually climbing. On several occasions Leigh exceeded its authorized credit and went into an overdraft position. Leigh provided cash flow forecasts to the bank, including a forecast in late November projecting a peak of borrowings in December of $43.3 million. In December, the bank was informed that Leigh had laid off 80 people, and that a second tranche of layoffs was anticipated early in the new year.

515      Finally, Leaney read and accepted the fifth comfort letter, which included the added language in the last paragraph that the letter did not constitute a legally binding commitment. This was the first comfort letter received from Plessey since the hostile takeover, and the change from the wording of the four prior letters should have signaled a warning to the bank.

516      In all of these circumstances, I find that any reliance placed upon the policy paragraph by the bank was not reasonable, and hence the claim in misrepresentation must be dismissed.

*Conduct Outside the Letters*

517      In addition to the causes of action arising out of delivery of the comfort letters, the bank asserts a number of causes of action in negligent or fraudulent misrepresentation arising out of the conduct of several individuals.

*Tantamount to a Guarantee*

518      In particular, the bank asserts that Plessey is liable in negligent misrepresentation for the alleged statement by Ian Musgrave to Greg Young at TD that the Plessey comfort letter was "tantamount to a guarantee". Following a careful consideration of all the evidence, and for reasons which are set out above in my recounting of the evidence, I have found as a fact, on a balance of probabilities, that Musgrave did not make this statement to Wilson. Consequently, the bank's claim in this regard must fail.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*The Justice Statements*

519    In addition, the bank claims that statements made by Colin Justice in two telephone conversations with Wilson of the bank constituted fraudulent or negligent misrepresentations. Regarding both conversations, the evidence is uncontroverted. TD urges the court to draw an adverse inference from the fact that Plessey chose not to call Justice as a witness, though the nature of the inference to be drawn is not particularized. I decline to draw an adverse inference, on the basis that the statements attributed to Justice were admitted by the defendant, and his evidence was not necessary. I observe that the plaintiff did not call Smith or Dean from Leigh's finance department to testify.

520    The bank alleges that in the first conversation, which took place in late November, Justice and Dean were both on the call. Either Justice or Dean discussed the financial condition of Leigh and advised Wilson that Leigh would be receiving payments totaling $11.4 million in January. The bank alleges that Justice was aware at the time of the call that Leigh was reporting a loss to the end of September, 1989 of $18.85 million, and knew of the ETC results regarding Leigh's contracts. The bank asserts that "Justice was conveying to the bank that the Bank could increase the line to Leigh because Leigh was merely suffering cash flow problems" and that Justice's statements amount to negligent misrepresentations.

521    I am unable to accede to this submission. This conversation must be placed in context. The late November conversation was the first of only two occasions on which Justice ever spoke to the bank. On November 8, Wilson met with Dean at Leigh's offices, and Dean informed him that "Leigh's numbers are getting worse" that there were legal disputes with some of the SHINCOM contractors, and that Leigh might require a further $10 million from the bank. On November 23, Wilson had a conversation with Dean alone, in which Dean requested a further $5 million from the bank, as Paramax was withholding payments owed to Leigh. In that conversation, Dean informed Wilson that Leigh would invoice Paramax for about $10 million in December, which they expected to receive in January.

522    Regarding the conversation in which Justice participated, this was the first time Justice had had any contact with anyone at TD. Wilson was unable to recall who had said Leigh would receive Paramax payments in January, Justice or Dean. On this basis alone, I am not prepared to find that Justice made a negligent misrepresentation to TD. Moreover, regardless of who made the statement, it was true. Leigh did expect to receive the payments, did in fact receive them in early January, and applied them to pay down the TD operating line. Finally, I am not persuaded that even if Justice had said the payments were due in January, that Wilson would have relied upon the statement from Justice. Wilson had never spoken to Justice before. He knew that Dean was the vice president of finance at Leigh and had spoken to him on several occasions. Dean was the person who had previously broached the subject of the extended line of credit and the expected payments in January. If Wilson did rely on these representations, it is more probable that he relied on the statements made by Dean, and I so find.

523    The second conversation between Justice and Wilson took place on December 21. In that conversation. Wilson asked Justice for financial statements for Leigh, and Justice responded that the statements were "not available", "due to the takeover with acquisition accounting issues". The fact that Justice made these statements is admitted by Plessey. The bank asserts that to Justice's knowledge, some financial statements for Leigh were available and that this statement by Justice was intentionally false, or made so recklessly as to amount to fraud. In the alternative, the bank asserts that the statement amounted to a negligent misrepresentation.

524    In my view, the explanation given by Justice to Wilson, that the financial statements were not ready due to the acquisition accounting issues, was misleading. Although the explanation was accurate as far as it went, in that the adjusted financial statements were not available (and indeed were never finalized prior to Leigh's bankruptcy), the statement was misleading in what it failed to disclose. By the time Justice made this statement to Wilson, he had assisted in the preparation of the financial information presented at the Stanmore meetings on November 28 and 29. He had attended those meetings with Dean and Driscoll, and knew that Leigh had some financial data available, even though the reports were not finalized using GEC format. He also knew that by this time, Leigh was reporting a loss to the end of September 1989 of more than $16 million, and that it was the quarterly financial statements for this same period, to the end of September, which had been due to the bank almost two

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

months earlier. In these circumstances, it was misleading of Justice to simply tell Wilson that the statements were not available due to the purchase accounting issues, and to omit any reference to the financial results Leigh did have.

525     However, while the statement made by Justice was misleading, I am not prepared, on the evidence before me, to find that the bank relied upon it. Again, the December conversation must be placed in context. At the November 8 meeting at Leigh, Dean was asked for the financial statements for the third quarter and he responded that they were not available "due to the acquisition accounting issues had not been resolved." As noted above, Dean told Wilson at this meeting that Leigh's numbers were getting worse, that there were difficulties with the SHINCOM program, and that Leigh might require an increase in its bank line. Dean also said that a new cash flow forecast would be forthcoming, and subsequently sent the bank a revised forecast projecting peak borrowings of $43.3 million in December.

526     In the late November phone call, Justice was introduced to Wilson as the Plessey Divisional Finance Director. His explanation of his role was that he was "assisting GEC with respect to Leigh," without further elaboration. In this phone call, Wilson was advised of the intended layoff at Leigh, which he considered somewhat positive. He did not ask about the overdue financial statements. By December 6, Wilson had received the revised cash flow forecast from Leigh, and also knew that Ross Anderson at GEC was personally monitoring the Leigh borrowings weekly, and that Plessey had authorized availability of $45 million but had only advised Leigh of a $41 million limit in order to "keep pressure on Leigh to manage its cash flow".

527     The conversation on December 21 was initiated by Justice to tell Wilson of the layoff at Leigh and to advise him that Dean had been terminated and replaced by Pat Smith. This was the second and final conversation Justice had with the bank. Wilson noted in his memo of the call that he took the opportunity to discuss with Justice "in some detail" the possibility of TD providing a fairness opinion in connection with the potential merger with Canadian Marconi, and that he told Justice TD "would be very interested" in providing the opinion. In his detailed record of the call, Wilson devoted half of his memo to discussion of the layoff at Leigh, and the other half to the fairness opinion issue. Wilson made no reference whatever in his memo to the request for financial statements or Justice's reply that they were not ready due to the acquisition accounting issues. Nor did he ask Justice any questions about the accounting issues in the phone call, or if there were any financial statements available in some other format.

528     Justice told Wilson that he would return to Canada in January to assist with Leigh's budget meetings. Implicit in the notion of budget meetings is that there is a budget to be discussed, yet Wilson never followed up on this. He neither asked for the results of the budget meetings in January, nor did he ask for a copy of the budget or any underlying documentation. Indeed, he did not contact Leigh to ask about the financial statements again until February 21, two months later.

529     Finally, when the bank did receive the financial statements in March, 1990, they did not react to them. It was not until Gerdine called the bank himself, several days after the statements had been delivered, that anyone from the bank made any comment upon them. Even then it was Gerdine's evidence that Leaney sounded surprised that anything was wrong, and he testified that it was evident to him she had not seen the financial package. In all of these circumstances, and particularly in light of the scant contact between Justice and the bank; the fact that Wilson failed to record any reference to the statement by Justice in his detailed memo of the call; the fact that the responsibility for providing the statements lay with Leigh and not Justice; the fact that the bank did not know the extent of Justice's involvement with Leigh's finances; the fact that Dean had made the same statement to the bank himself two months earlier; and in light of the bank's failure to react to the statements until contacted by Gerdine, I am unable to find that the bank relied or acted upon the statement made by Justice. Hence, one of the essential elements of negligent and fraudulent misrepresentation has not been made out. Further, the Justice statement was not a representation of a continuing nature and, as is set out below, the plaintiff has suffered no damages. The claims in negligent and fraudulent misrepresentation are dismissed.

530     I note in passing that the question of any liability which may attach to Leigh for misrepresentation or fraud is not before this court, and thus I make no comment upon it.

531     Even if I had found that the remarks made by Justice amounted to a negligent misrepresentation, I would not have found the statement to be fraudulent. I am mindful of the requirement that fraud must be strictly pleaded and strictly proved.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

In order to prove fraud, the dishonest mind must be established. The statements made by Justice were, strictly speaking, true. Leigh never produced a finalized set of financial statements adjusted for purchase accounting issues prior to the bankruptcy. In addition, Newlands testified that Justice had provided him with a memo in October, 1989 indicating the technical baseline at Leigh was insecure, thus casting doubt on the accuracy of all the numbers Leigh produced. For these reasons, and given the paucity of evidence, I am not prepared, on a balance of probabilities, to draw the inference that Justice acted deliberately or recklessly in making the statement to Wilson.

532      Moreover, applying the principles set out in *Canadian Dredge & Dock Co*., and *supra, B.G. Checo, supra*, I am not persuaded, on the basis of the evidence before me, that Justice was a directing mind of either GEC or Plessey, such that the corporations should be liable in fraud. Justice was not directly employed by GEC. He was the divisional finance director for PESL, however, no evidence was led as to the nature or scope of his responsibilities in that position. I am unable to conclude that he represented a directing mind of either GEC or Plessey, nor that he was acting within the scope of his authority as an employee when he discussed the financial statements of Leigh with the bank. For this reason as well, the claim in fraud must fail.

*The Anderson Statement*

533      On February 22, 1990, at a meeting in London, Anderson told Exton that the possibilities for Leigh "include Marconi acquisition or Siemens acquisition but the main problem is valuation of Leigh's worth to GEC or Siemens." The bank asserts that prior to this conversation, on February 2, Anderson had been told by the treasurer of CMC, Gerry Stuurop, that "Leigh will owe banks $50 to $60 million soon and is worth about negative C$30 million versus cost $110 million" and that Stuurop had told him, as he recorded in a note: "CMC very seriously considered advising Plessey to walk away when they saw "my" letter of support to Toronto Dominion." The bank had asserted a cause of action against GEC in fraud based upon these statements, however, the fraud allegation was abandoned by the plaintiff in argument. In any event, I find that there is absolutely no evidence to support such an allegation.

534      The bank submits that Anderson did not convey this information to Exton and that as a consequence, GEC is liable in negligent misrepresentation. I am not persuaded by this submission. Mr. Anderson had virtually no recollection of either the meeting with Stuurop or the meeting with Exton, and his evidence regarding both was purely reconstructed. He said under cross-examination that he did not recall receiving the information from Stuurop on Feb. 2, but that it was possible. He gave this evidence based on an entry in his diary, and because his notes of the information from Stuurop were written on the face of a memo dated December 21. The next document on top of this in his file was a letter from Wilson dated Feb. 21. Anderson testified his practice was to make notes on the top memo in his file until the document was superceded by a new addition to the file, although he also testified that the documents were sometimes out of order, as they were simply placed loosely in a plastic file and were not held together in order by any kind of document clip.

535      Further, the meeting must be placed in context. Mr. Exton was not responsible for the Leigh account. Anderson was the treasurer of a huge multinational corporation, with whom the bank, and particularly Mr. Exton, had been attempting to develop a direct business relationship for some time. Leigh was a minuscule part of the GEC group. Leigh was purchased by Plessey for $107 million cdn.. Plessey was itself purchased by GEC and Siemens for $4.5 billion U.S., and GEC alone was worth £6.5 billion. The purpose of the meeting was not to discuss Leigh and I find that Leigh was discussed in the meeting only in passing. Exton used the Leigh relationship only as a door-opener with GEC, in order to develop business opportunities with the company. Indeed, Anderson asked Exton for a separate £50 million loan facility in the meeting.

536      In these circumstances, I cannot find that Anderson owed Exton a duty of care. In my view, it was not reasonably foreseeable that Exton or the bank would rely on the statement about the valuation of Leigh, or any omission from that statement, to its detriment. This claim in negligent misrepresentation is dismissed.

*The February 26 Memo*

537      The bank asserts that GEC and Plessey are liable in fraud for their failure to direct Driscoll to deliver the financial statements due to the bank, following his February 26 memo asking for direction in this regard. The bank argues that Leigh's

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

behaviour in knowingly failing to produce the financial statements amounts to fraud and deceit, and that Plessey and GEC were parties to this deception, as "Plessey and GEC must be taken to have known that Leigh was not going to deliver the financial statements to the bank without their direction." I cannot accede to this submission.

538     In the first instance, I note that TD raised this allegation of fraud for the very first time in its written argument submitted at the conclusion of trial. It was not pleaded in the statement of claim, although the claim has been amended twice, most recently in April, 1996 when several new claims were added. The parties spent over six years in pre-trial preparation. The statement of claim does refer to Driscoll's February 26 memo, and hence, the bank could have pleaded the fraud allegation, since it was aware of the document upon which it is based.

539     The defendants were denied the opportunity to respond to this very serious allegation through cross-examining witnesses or calling witnesses of their own in order to refute it. The prejudice to the defendants in this regard is considerable.

540     Moreover, the bank has not identified any specific person at GEC or Siemens who is alleged to have had the dishonest mind which is an integral part of any fraud claim. In order to attach liability to a corporation for fraud, as noted above, the fraudulent intent must be established on the part of a natural person. I reiterate that fraud must be strictly pleaded and strictly proved.

541     Notwithstanding that the defendants have not had an opportunity to properly meet this allegation, in my view the plaintiff has failed to establish a case for fraud. The contractual obligation to provide the financial statements was that of Leigh and not of either GEC or Plessey. The memo was sent by Driscoll to Rickard and Alexander, both of GEC Marconi, and to Justice. None of these people gave evidence at this trial, nor was detailed evidence led about the nature or scope of their duties and responsibilities. No evidence was led as to their reaction, if any, to the memo. The only evidence of any response to Driscoll's memo is a copy of the memo, produced by GEC, with the handwritten notation "must tell if they ask". This notation is admitted by GEC to be in the handwriting of David Rickard. Rickard and Alexander were not employed by GEC, but by GEC Marconi, a GEC subsidiary which is not a party to this action. The plaintiff has failed to establish a dishonest intent on the part of any person sufficient to attach liability to either GEC or Plessey. I am not prepared to draw an inference of dishonest intent in these circumstances, and this claim in fraud must fail. In this respect, the observation of Essen J.A. in *Rainbow Industrial, supra* at p. 69 is apt:

> It seems, most regrettably, to have become fashionable to allege fraud in commercial cases without much regard for the fundamental rule that fraud must be strictly pleaded and strictly proven. To some extent, this may be an off-shoot of the mistaken notion, to which I referred earlier, that those stringent requirements do not apply to fraud by non-disclosure.

**Part IV**

*Damages*

542     I have not found either GEC or Plessey liable in either contract or tort under any of the causes of action asserted. However, if I had done so, I would have assessed the damages in the following amounts.

543     The applicable principles concerning the measure of damages in contract and for the tort of negligent misrepresentation are set out by the majority of the Supreme Court of Canada in *BG Checo International Ltd.*, *supra* at 37:

> The measure of damages in contract and for the tort of negligent misrepresentation are:

> Contract The plaintiff is to be put in the position it would have been in had the contract been performed as agreed.

> Tort The plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

See also *MacGregor on Damages*, 15th ed. (London: Sweet & Maxwell, 1997) at pp. 9-11.

544     I assess the damages in respect of each of the plaintiffs claims as follows:

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

*The Claim in Contract*

545      I have held that the comfort letter does not contain a contractual obligation on Plessey to pay the bank nor to have the policy referenced in the third paragraph. I have also found that there was no breach of the policy paragraph. If there was a contract which was breached, the plaintiff should be placed in the same position as it would have been had the contract been performed. I assess the damages flowing from a breach of that contract as follows. The amount of the Leigh loan outstanding at the time of the bankruptcy was $40,489,427.09. Leigh had in its account a positive cash balance of $1 million, which the bank seized and applied to the outstanding loan. Accordingly, the damages must be reduced by this amount. As well, the bank recovered $398,710.87 in an action against Leigh's auditors Deloitte. Haskins & Sells regarding the Leigh loan. The damages should be reduced by this amount as well. Accordingly, I assess damages for breach of contract at $39,090,716.22.

546      I am not prepared to reduce the damages by the amount of any taxation provision taken by the bank on account of the loss. The evidence does not establish with certainty what the bank's tax treatment of the Leigh loan was, nor the amount of any tax saving which may have accrued to the bank. In the event that damages were awarded the bank, any recapture of this provision could be adjusted for in future tax returns.

*The Claim in Misrepresentation based on the Comfort Letters*

547      I have held that the comfort letters did not contain a misrepresentation from their inception in April 1988 forward. If I had held Plessey liable in misrepresentation from the date of the first comfort letter, I would assess the damages in the same amount as in the contract claim above, that is $39,090,716.22.

548      I have held that the fifth comfort letter dated December 15, 1989 and delivered on December 27, 1989 did not amount to a negligent or fraudulent misrepresentation and could not be reasonably relied upon by the bank. Had I held otherwise, I would assess the damages so as to put the plaintiff in the same position it would have been in if the misrepresentation had not been made. Given that this representation was a continuing representation, in my view the plaintiff would be entitled to recovery of all amounts advanced in reliance on the representation. In this case, Leigh received payments which reduced its loan balance in January, however further amounts were advanced by the bank thereafter. In fact, the full amount of funds advanced following the reduction in the Leigh loan and prior to the bankruptcy was $8,843,140.04, although the loan balance was actually slightly higher at the date of delivery of the comfort letter than it was at the date of the bankruptcy. Accordingly, I would assess damages at $8,843,140.04, less the plaintiff's recovery of $1 million from the Leigh bank account and $398,710.87 from the Deloitte's settlement for a total of $7,444,429.17.

*Conduct Outside the Letters*

549      I have found that the bank did not give up its security at the time of delivery of the third comfort letter in April 1989 nor did it make advances thereafter based on the alleged statements by Musgrave that the letter was tantamount to a guarantee. I have found such statement was not made by him. The bank did not give up its security or make further advances based on anything Plessey said or did at that time. Had I found liability on the basis of the alleged statement by Musgrave, I would assess damages flowing from such a claim as follows. The value of TD's security over Leigh's assets was $14,300.000.00. Assuming that the bank would have called the Leigh loan as at the date of the representation by Musgrave, from March 6, 1989 to the date of bankruptcy, the bank advanced to Leigh the sum of $12,279,290.03, for a total of $26,579,290.03. I would subtract the sums recovered from the Deloitte's settlement and the Leigh bank account above, for a total damages award of $25,180,579.16.

550      Had I found liability on the basis of the statements made by Colin Justice to the bank in late November, 1989 and on December 21, 1989, I would have assessed damages as at November 30 at $919,698.09, being the difference between the loan balance on that date of $38,171,018.13 and at the date of bankruptcy, less the recovery above. Applying the same calculation to December 21, I would assess the damages at that date as ($330,052.04). Hence, the plaintiff would have suffered no damages.

551      Regarding the Anderson meeting with Exton, applying the same calculation to the loan balance outstanding on February 22 of $36,482,251.92, I would assess damages at $2,608,464.30.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

552    TD claims damages in respect of Plessey's and GEC failure to direct Leigh to provide to the bank the financial information which Leigh was required to provide pursuant to the terms of the facility letter reporting provisions. I would assess any damages flowing therefrom if liability had been found, at $2,544,543.81, based on a loan balance of $36,546,172.41 on February 26, 1990, and applying the calculation above.

553    The bank has pleaded fraud against GEC and Plessey. I have found that there is a total absence of any evidence of fraud and I have rejected this assertion by TD. Nevertheless, the measure of damages would be the same as for negligent misrepresentation. See *Smith v. Scrimgeour Vickers*, [1996] 4 All E.R. 769 (Eng. H.L.) at 792 and S.M. Waddams. *The Law of Damages*, 2 nd ed. (Toronto: Canada Law Book, 1993) at 5-19.M

*Interest*

554    During the period up to the freezing of the line by the bank interest was either included in the amount of the loan or paid. Accordingly, I would assess pre-judgment interest from March 30, 1990. I would assess both pre-judgment and post judgment interest in accordance with the Courts of Justice Act.

**Part V**

*Conclusion*

555    Letters of comfort are just that, comfort. They are not guarantees or formal security nor are they enforceable as such. They are gentlemen's agreements and moral obligations. This is common knowledge in the business community. The bank recognized this fact of life in its credit manual and in its references to comfort letters in its CCRs and other internal documents

556    Mr. McDowell, one of the most senior officers of the bank, stated that he expected the bank's legal department to follow and provide updates on issues such as comfort letters to those persons at the bank making and approving loans. Noonan, Leaney, Young and Wilson acknowledged that this would be important to them although they either could not recall or denied receiving information from the legal department. If those opinions were not circulated, or if circulated not paid due attention, this is sparse consolation. The opinions of the bank's highly qualified legal department accurately reflected the quality, in law, of comfort letters.

557    One might rightfully ask why it is that parties exchange language such as that in the policy paragraph of the Plessey comfort letter. More so, when the language conspicuously lacks words of promise or contract, and where there has been no attempt to provide otherwise. In such circumstances one may only conclude that it was not intended that such words be enforceable as a contract. These were both, after all, large commercially sophisticated parties.

558    The defendants criticize the bank for its characterization of the comfort letters as "strong". It seems to me that this censure is unfair. To begin with, the bank did not state the letters to be strong in law. This would have been wrong, both in the face of the bank's legal advice and in general principle. A comfort letter may nevertheless be strong, even though not legally strong because its essence is that of a gentleman's agreement or moral obligation. Hence the test of the true strength of such a document is whether it will be honoured and paid on when presented for payment. Musgrave testified that Plessey had paid pursuant to two comfort letters which were not legally enforceable. Whether Plessey, prior to the GEC-Siemens hostile takeover, would have paid on their letter to TD is a matter for speculation.

559    As Musgrave, and the expert banker Wickham testified, companies may pay on nonbinding comfort letters based on commercial considerations, such as corporate reputation and concern that a refusal to honour a comfort letter may undercut the company's relationship with the affected bank or become public knowledge and make future dealings with other banks difficult. Plessey paid on one comfort letter for these exact reasons, although this was not known to TD. Based on such considerations of which McDowell and Noonan were certainly mindful, TD was perhaps justified in regarding the Plessey comfort letter as "strong" given the reputation of Plessey in the marketplace, up to the time of the hostile takeover in September 1989.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 295 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

560     The takeover is a clear break point in this chronology. Although not a factor in anything that followed, TD had backed Plessey in its losing gamut to fend off the GEC-Siemens bid. It had no prior relationship with the new Plessey shareholders. It also knew that the takeover proposal was to dismantle Plessey and distribute the Plessey companies between GEC and Siemens. The Plessey management with whom TD had been dealing, as is to be expected in such circumstances, was decimated after the takeover. TD, lacking any relationship with the GEC and Siemens personnel, attempted to use the Plessey situation as a beachhead to develop a relationship and generate new business with GEC. In this environment, however, for the bank to rest its risk on a comfort letter which in turn depends for its integrity on relationship, was not only decidedly unwise, it was foolhardy. It is not as though TD was without options. Its facility with Leigh was payable on demand. As such it could have called the loan prior to the takeover. Or, it could have re-negotiated the arrangement with Plessey immediately afterwards by broaching the subject directly.

561     The leverage available to the lender in enforcing a comfort letter is that stated above - a possible impairment, in the event of refusal to honour the letter, of the creditworthiness of the giver of the letter in the marketplace. In short, the reputation of the giver is on the line should it fail to honour a moral commitment, notwithstanding it is unenforceable at law. Plessey, pre takeover, was a user of credit. GEC, on the other hand, was variously described as a cash mountain, debt free, and one of the richest companies in the U.K. The GEC treasurer Ross Anderson had as one of his main duties the almost daily investment of the company's cash surplus measured in billions of pounds. Such a company was not dependent on the banking industry for its goodwill. It was a lender not a borrower. Thus leverage of reputation among and access to the banking industry was not a factor in the case of GEC. TD overlooked this critical distinction.

562     Nevertheless, when TD asked Plessey to pay on the comfort letter and was met with a refusal, it sought to fall back on the traditional strategy in such a situation, marketplace pressure and the threat of its consequences, only to learn to its chagrin that Plessey with its new shareholders was immune to such tactics. This trial appears to be the last move by TD in its execution of this strategy.

563     At the beginning of these reasons I said that this case had at the center Leigh Instruments and TD, a bank and its customer. It also involves TD and, like itself, Plessey, another large multinational company, not in a banker-customer relationship and an effort by one to recover on a moral commitment, unsuccessfully.

564     It is not the role of the courts to re-write bargains, to substitute a better bargain than the one that the parties made for themselves or to enforce moral obligations and gentlemen's agreements. McDowell stated that, in his world, his word was his bond and if he made a commitment he expected to fulfill it. Unfortunately, the converse of that proposition is that if one accepts another person's word instead of taking their bond, one does so at their own peril. This does not however, condone the actions of a large multinational company with over a billion pounds sterling in cash reserves in walking away from a gentleman's business agreement to support its subsidiary.

565     I may be spoken to regarding costs.

*Action dismissed.*

## Appendix A

**Dramatis Personae**

### *The Toronto-Dominion Bank*

| | |
|---|---|
| Baker, Howard M. | Manager, Corporate Finance, London, England |
| Boulanger, Pierre de G. | Senior Vice-President, Credit Division (from September 1988) |
| Brock, William T. | Executive Vice-President, Credit |
| Bumstead, R. Glenn | Senior Vice-President & General Counsel and Secretary |
| Burega, Yovhan M. | Vice-President, Corporate Banking Division |
| Exton, Jonathan | Manager, Corporate Finance, London, England (from May 1988 to end of 1989) |

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

|  |  |
|---|---|
|  | Director, Corporate Finance, London, England (from end of 1989) |
| Klingenstierna, Goran G. | Manager, Corporate Banking Division |
| Kriss, Merle | Assistant General Manager, Corporate Banking Division |
| Laitner, James | Senior Vice-President, Credit Division |
| Leaney, Wendy A. | General Manager, Corporate Banking Division |
| Mercier, Ernest C. | Executive Vice-President, Corporate Banking Division |
| McDowell, F.G. (Ted) | Vice-Chairman, Credit Division |
| Noonan, Patrick C. | Senior Vice-President, Credit Division |
| Norton, Alec I. | Assistant General Counsel |
| Owen, Sidney C. | Senior Vice-President, Credit Division |
| Read, J.A. | Assistant General Manager, London, England |
| Rising, Hugh | Vice-President, Corporate Finance, London, England |
| Thomson, Richard | Chairman and CEO |
| Walzak, Mike | Assistant General Manager, Credit, London, England |
| Wilson, Robert | Manager, Corporate Banking (as of October 31, 1989) |
| Winston, Randi | Assistant Manager, Corporate Banking Division |
| Young, Gregory G. | Manager, Corporate Banking Division |

### Leigh Instruments Limited

|  |  |
|---|---|
| Dean, David | Vice-President, Finance (laid off on December 20, 1989) |
| Driscoll, Frank | President and CEO (from August 8, 1989) |
| Flower, Barry | President and CEO (to June, 1989) |
| Plumley, Kent | Secretary |
| Shepherd, John | Chairman/Director |
| Smith, Pat | Finance Director (replaced Dean) |

### The Plessey Defendants

*The Plessey Company plc:*

|  |  |
|---|---|
| Beard, Denise | Treasury Department: Group Banking Manager (to August 31, 1989); Assistant Treasurer (Sept. 1, 1989); (left Plessey November 3, 1989) |
| Finnis. A. G. | Group Taxation Manager |
| Dr. Gerdine, Philip V. | (a director, as of February, 1990); Co-managing Director of Plessey (Siemens representative) after GEC/Siemens takeover of Plessey |
| Huntbatch, Kenneth Bernard | Company Secretary and Director of Administration (to Jan. 3, 1989); Director of Administration (from Jan. 3, 1989) (Company Secretary until his resignation on June 29, 1990) (died in latter part of 1990) (a director) |
| Musgrave. Ian C. | Group Treasurer (previously Group Finance Director) resigned as Group Treasurer on August 31, 1989 |
| Noon, Anthony J. | Director of Legal and Contract Services |
| Sammon, Brendon P. (Binny) | Group Chief Accountant (to September 1990) |
| Thorn, Derek G. | Finance Director, Group Services (deceased- December, 1989) |
| Walls, Stephen R. | Managing Director (a director) (promoted from Finance Director in 1988) (resigned October 6, 1989) |

*Plessey Incorporated, White Plains, New York*

|  |  |
|---|---|
| Palazzi. J.L. | Finance Director |

*Plessey Electronic Systems Limited ("PESL")*

|  |  |
|---|---|
| Akerman, Andrew C. | Financial Analyst (to February, 1989) |
| Flower, Barry | Managing Director - International Defense (from July 1, 1989) |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565
1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | |
|---|---|
| Justice, Colin J. | Finance Director (from Aug. 1, 1988) |

**The Gec Defendants**

*The General Electric Company plc*

| | |
|---|---|
| Anderson, Ross K. | Treasurer |
| Bates, Malcolm | Deputy Managing Director/Director |
| MacBean, Ian | Director |
| Newlands, David | Finance Director/Director (from September 1989) |
| Robinson, Tony | Assistance Finance Director |
| Weinstock, Lord | Managing Director/Director |
| Weinstock, Simon | Commercial Director/Director |

*GEC Marconi*

| | |
|---|---|
| Alexander, Bill | Managing Director, GEC Avionics |
| MacBean, Ian | Managing Director, GEC Marconi |
| Rickard, David | Finance Director, GEC Marconi |

*Canadian Marconi*

| | |
|---|---|
| Simons, John | President |
| Stuurop, G. | Treasurer |

**Siemens Aktiengesellschaft**

| | |
|---|---|
| Baumann, Dr. Karl | Executive Vice-President, Finance |
| Gerdine, Dr. Philip | Executive Director |
| Hafner, Andreas | Treasurer |
| Mackenrodt, Dr. Jochen | Vice-President, Central Finance, Foreign Affiliates |

## Appendix B

**Corporate Structure**

### Graphic 1

## Appendix C

**Leigh Loan Balances**

May 17, 1990

**LEIGH BORROWINGS:**

| MONTH | B/A's | OVERDRAFT | TOTAL |
|---|---|---|---|
| January 1989 | | | |
| 1 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| 2 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| 3 | 10,600,000 | 12,176,688.72 | 22,776,688.72 |
| 4 | 10,600,000 | 12,214,143.35 | 22,814,143.35 |
| 5 | 10,600,000 | 12,333,052.16 | 22,933,052.16 |
| 6 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 7 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 8 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 9 | 10,600,000 | 13,146,357.80 | 23,746,357.80 |
| 10 | 10,600,000 | 13,255,838.06 | 23,855,838.06 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565
1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | | |
|---|---|---|---|---|
| R/O-11 | | 20,000,000 | 4,200,956.94 | 24,200,956.94 |
| | 12 | 20,000,000 | 4,274,752.88 | 24,274,752.88 |
| | 13 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 14 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 15 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 16 | 20,000,000 | 4,513,489.16 | 24,513,489.16 |
| | 17 | 20,000,000 | 4,805,016.65 | 24,805,016.65 |
| | 18 | 20,000,000 | 4,955,113.19 | 24,955,113.19 |
| | 19 | 20,000,000 | 4,920,040.60 | 24,920,040.60 |
| | 20 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 21 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 22 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 23 | 20,000,000 | 5,892,985.50 | 25,892,985.50 |
| | 24 | 20,000,000 | 5,989,040.15 | 25,989,040.15 |
| | 25 | 20,000,000 | 6,282,432.32 | 26,282,432.32 |
| | 26 | 20,000,000 | 6,878,134.17 | 26,878,134.17 |
| | 27 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 28 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 29 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 30 | 20,000,000 | 6,898,160.20 | 26,898,160.20 |
| | 31 | 20,000,000 | 7,021,523.63 | 27,021,523.63 |
| February 1989 | | | | |
| | 1 | 20,000,000 | 7,126,693.17 | 27,126,693.17 |
| | 2 | 20,000,000 | 7,413,772.56 | 27,413,772.56 |
| | 3 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| | 4 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| | 5 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| | 6 | 20,000,000 | 8,290,740.86 | 28,290,740.86 |
| | 7 | 20,000,000 | 8,328,058.19 | 28,328,058.19 |
| | 8 | 20,000,000 | 8,289,384.74 | 28,289,384.74 |
| | 9 | 20,000,000 | 8,426,878.83 | 28,426,878.83 |
| | 10 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| | 11 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| | 12 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| | 13 | 20,000,000 | 9,421,372.38 | 29,421,372.38 |
| | 14 | 20,000,000 | 9,666,167.87 | 29,666,167.87 |
| R/O-15 | | 25,200,000 | 3,529,973.98 | 28,729,973.98 |
| | 16 | 25,200,000 | 3,627,371.46 | 28,827,371.46 |
| | 17 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| | 18 | 25,200,000 | 3,659,017.88 | 28,859,017.08 |
| | 19 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| | 20 | 25,200,000 | 3,797,809.52 | 28,997,809.52 |
| | 21 | 25,200,000 | 3,971,011.66 | 29,171,011.66 |
| | 22 | 25,200,000 | 3,978,941.88 | 29,178,941.88 |
| | 23 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| | 24 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| | 25 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| | 26 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| | 27 | 25,200,000 | 4,479,813.36 | 29,679,813.36 |
| | 28 | 25,200,000 | 2,645,394.72 | 27,845,394.72 |
| March 1989 | | | | |
| | 1 | 25,200,000 | 2,778,153.15 | 27,978,153.15 |
| | 2 | 25,200,000 | 2,347,556.87 | 27,547,556.87 |
| | 3 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| | 4 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| | 5 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| | 6 | 25,200,000 | 3,010,137.06 | 28,210,137.06 |
| | 7 | 25,200,000 | 2,942,566.24 | 28,142,566.24 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | |
|---|---|---|---|
| 8 | 25,200,000 | 875,753.18 | 26,075,753.18 |
| 9 | 25,200,000 | 613,084.43 | 25,813,084.43 |
| 10 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 11 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 12 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 13 | 25,200,000 | 967,037.38 | 26,167,037.38 |
| 14 | 25,200,000 | 1,019,345.36 | 26,219,345.36 |
| 15 | 25,200,000 | 1,385,809.09 | 26,585,809.09 |
| 16 | 25,200,000 | 1,393,298.34 | 26,593,298.34 |
| 17 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 18 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 19 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 20 | 25,200,000 | 2,185,732.95 | 27,385,732.95 |
| R/O-21 | 25,300,000 | 2,459,049.45 | 27,759,049.45 |
| 22 | 25,300,000 | 1,654,251.16 | 26,954,251.16 |
| 23 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 24 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 25 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 26 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 27 | 25,300,000 | 2,147,265.65 | 27,447,265.85 |
| 28 | 25,300,000 | 2,106,861.67 | 27,406,861.67 |
| 29 | 25,300,000 | 2,113,873.01 | 27,413,873.01 |
| 30 | 25,300,000 | 1,881,398.58 | 27,181,398.58 |
| 31 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| April 1989 | | | |
| 1 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 2 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 3 | 25,300,000 | 2,442,323.39 | 27,742,323.39 |
| 4 | 25,300,000 | 2,536,700.93 | 27,836,700.93 |
| 5 | 25,300,000 | 2,296,313.54 | 27,596,313.54 |
| 6 | 25,300,000 | 2,384,335.89 | 27,684,335.89 |
| 7 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 8 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 9 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 10 | 25,300,000 | 3,512,317.61 | 28,812,317.61 |
| 11 | 25,300,000 | 3,732,516.46 | 29,032,516.46 |
| 12 | 25,300,000 | 3,761,812.59 | 29,061,812.59 |
| 13 | 25,300,000 | 3,773,262.71 | 29,073,262.71 |
| 14 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 15 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 16 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 17 | 25,300,000 | 4,685,046.55 | 29,985,046.55 |
| 18 | 25,300,000 | 4,729,857.98 | 30,029,857.98 |
| 19 | 25,300,000 | 4,828,939.81 | 30,128,939.81 |
| 20 | 25,300,000 | 2,782,380.50 | 28,082,380.50 |
| 21 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 22 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 23 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 24 | 25,300,000 | 2,914,336.09 | 28,214,336.09 |
| R/O-25 | 30,000,000 | 615,774.45 | 30,615,774.45 |
| 26 | 30,000,000 | 595,369.26 | 30,595,369.26 |
| 27 | 30,000,000 | 1,611,577.04 | 31,611,577.04 |
| 28 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 29 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 30 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| May 1989 | | | |
| 1 | 30,000,000 | 572,124.83 | 30,572,124.83 |
| 2 | 30,000,000 | 312,673.05 | 30,312,673.05 |

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | |
|---|---|---|---|
| 3 | 30,000,000 | 332,028.81 | 30,332,028.81 |
| 4 | 30,000,000 | 316,847.53 | 30,316,847.53 |
| 5 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 6 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 7 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 8 | 30,000,000 | 446,373.25 | 30,446,373.25 |
| 9 | 30,000,000 | 330,426.43 | 30,330,426.43 |
| 10 | 30,000,000 | 3,369.55 | 30,003,369.55 |
| 11 | 30,000,000 | 165,814.06 | 30,165,814.06 |
| 12 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 13 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 14 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 15 | 30,000,000 | 1,314,848.53 | 31,314,848.53 |
| 16 | 30,000,000 | 1,464,716.98 | 31,464,716.98 |
| 17 | 30,000,000 | 1,631,817.02 | 31,631,817.02 |
| 18 | 30,000,000 | 1,221,046.01 | 31,221,046.01 |
| 19 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 20 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 21 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 22 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 23 | 30,000,000 | 1,862,398.81 | 31,862,398.81 |
| 24 | 30,000,000 | 1,984,855.44 | 31,984,855.44 |
| 25 | 30,000,000 | 2,450,199.76 | 32,450,199.76 |
| 26 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 27 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 28 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 29 | 30,000,000 | 3,169,024.65 | 33,169,024.65 |
| 30 | 30,000,000 | 3,272,847.14 | 33,272,847.14 |
| 31 | 30,000,000 | 3,421,007.24 | 33,421,007.24 |
| June 1989 | | | |
| 1 | 30,000,000 | 3,807,906.22 | 33,807,906.22 |
| 2 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 3 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 4 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 5 | 30,000,000 | 4,183,246.54 | 34,183,246.54 |
| 6 | 30,000,000 | 4,221,107.60 | 34,221,107.60 |
| 7 | 30,000,000 | 4,286,095.12 | 34,286,095.12 |
| 8 | 30,000,000 | 4,276,486.77 | 34,276,486.77 |
| 9 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 10 | 30,000,000 | 3,927,642.66 | 33,927,642.68 |
| 11 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 12 | 30,000,000 | 3,869,384.91 | 33,869,384.91 |
| 13 | 30,000,000 | 3,870,629.94 | 33,870,629.94 |
| 14 | 30,000,000 | 3,906,792.83 | 33,906,792.83 |
| 15 | 30,000,000 | 3,901,483.73 | 33,901,483.73 |
| 16 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 17 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 18 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 19 | 30,000,000 | 1,326,243.09 | 31,326,243.09 |
| 20 | 30,000,000 | 1,792,483.59 | 31,792,483.59 |
| 21 | 30,000,000 | 1,940,661.74 | 31,940,661.74 |
| 22 | 30,000,000 | 114,015.07 | 30,114,015.07 |
| 23 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 24 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 25 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 26 | 30,000,000 | 1,699,284.94 | 31,699,264.94 |
| 27 | 30,000,000 | 1,740,425.93 | 31,740,425.93 |
| 28 | 30,000,000 | 1,619,155.96 | 31,619,155.96 |

Case 09-10138-MFW Doc 14394-2 Filed 09/10/14 Page 301 of 554

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | |
|---|---|---|---|
| 29 | 30,000,000 | 1,645,231.57 | 31,645,231.57 |
| R/O-30 | 30,000,000 | 1,659,173.91 | 31,659,173.91 |

July 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 2 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 3 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 4 | 30,700,000 | 904,935.09 | 31,604,935.09 |
| 5 | 30,700,000 | 1,132,744.32 | 31,832,744.32 |
| 6 | 30,700,000 | 1,933,687.99 | 32,633,687.99 |
| 7 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 8 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 9 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 10 | 30,700,000 | 3,362,740.73 | 34,062,740.73 |
| 11 | 30,700,000 | 3,219,776.51 | 33,919,776.51 |
| 12 | 30,700,000 | 3,210,332.88 | 33,910,332.88 |
| 13 | 30,700,000 | 3,481,122.61 | 34,181,122.61 |
| 14 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 15 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 16 | 30,700,000 | 3,550,869.80 | 34,250,969.80 |
| 17 | 30,700,000 | 2,887,189.99 | 33,587,189.99 |
| 18 | 30,700,000 | 2,920,771.73 | 33,620,771.73 |
| 19 | 30,700,000 | 3,013,625.52 | 33,713,625.52 |
| 20 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 21 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 22 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 23 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 24 | 30,700,000 | 4,588,772.15 | 35,286,772.15 |
| 25 | 30,700,000 | 5,023,958.06 | 35,723,958.06 |
| 26 | 30,700,000 | 4,762,514.74 | 35,462,514.74 |
| 27 | 30,700,000 | 4,828,507.48 | 35,528,507.48 |
| 28 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 29 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 30 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 31 | 30,700,000 | 4,280,482.57 | 34,980,482.57 |

August 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 6,059,098.65 | 36,759,098.65 |
| R/O- 2 | 30,700,000 | 6,004,154.56 | 36,704,154.56 |
| 3 | 30,700,000 | 2,375,802.44 | 33,075,802.44 |
| 4 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 5 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 6 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 7 | 30,700,000 | 3,104,314.68 | 33,804,314.68 |
| 8 | 30,700,000 | 3,164,696.67 | 33,864,896.67 |
| 9 | 30,700,000 | 3,000,534.07 | 33,700,534.07 |
| 10 | 30,700,000 | 3,365,019.83 | 34,065,019.83 |
| 11 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 12 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 13 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 14 | 30,700,000 | 3,474,923.56 | 34,174,923.56 |
| 15 | 30,700,000 | 3,561,681.48 | 34,261,681.48 |
| 16 | 30,700,000 | 3,751,602.27 | 34,451,602.27 |
| 17 | 30,700,000 | 3,780,700.45 | 34,480,700.45 |
| 18 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 19 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 20 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 21 | 30,700,000 | 4,392,378.08 | 35,092,378.08 |
| 22 | 30,700,000 | 4,904,112.81 | 35,604,112.81 |
| 23 | 30,700,000 | 5,006,737.32 | 35,706,737.32 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

|  |  |  |  |  |
|---|---|---|---|---|
|  | 24 | 30,700,000 | 5,308,323.67 | 36,008,323.67 |
|  | 25 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
|  | 26 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
|  | 27 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
|  | 28 | 30,700,000 | 4,364,417.93 | 35,064,417.93 |
|  | 29 | 30,700,000 | 4,228,592.01 | 34,928,592.01 |
|  | 30 | 30,700,000 | 4,306,706.93 | 35,006,706.93 |
|  | 31 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |
| September 1989 |  |  |  |  |
|  | 1 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |
|  | 2 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
|  | 3 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
|  | 4 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| R/O- 5 |  | 30,700,000 | 4,210,666.17 | 34,910,666.17 |
|  | 6 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| R/O- 7 |  | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
|  | 8 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
|  | 9 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
|  | 10 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
|  | 11 | 30,700,000 | 3,735,418.60 | 34,435,418.60 |
| R/O-12 |  | 30,700,000 | 3,841,093.34 | 34,541,093.34 |
|  | 13 | 30,700,000 | 4,418,509.99 | 35,118,509.99 |
| R/O-14 |  | 30,700,000 | 4,478,971.44 | 35,178,971.44 |
|  | 15 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
|  | 16 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
|  | 17 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
|  | 18 | 30,700,000 | 5,515,347.94 | 36,215,347.94 |
| R/O-19 |  | 30,700,000 | 4,152,908.82 | 34,852,908.82 |
|  | 20 | 30,700,000 | 4,307,175.52 | 35,007,175.52 |
| R/O-21 |  | 31,000,000 | 4,023,254.92 | 35,023,254.92 |
|  | 22 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
|  | 23 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
|  | 24 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
|  | 25 | 31,000,000 | 5,139,590.56 | 36,139,590.56 |
|  | 26 | 31,000,000 | 5,170,884.55 | 36,170,884.55 |
|  | 27 | 31,000,000 | 5,265,858.00 | 36,265,858.00 |
|  | 28 | 31,000,000 | 5,109,688.79 | 36,109,688.79 |
| R/O-29 |  | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
|  | 30 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| October 1989 |  |  |  |  |
|  | 1 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
|  | 2 | 31,000,000 | 5,005,795.86 | 36,005,795.86 |
|  | 3 | 31,000,000 | 5,064,463.04 | 36,064,463.04 |
|  | 4 | 31,000,000 | 5,108,529.51 | 36,108,529.51 |
|  | 5 | 31,000,000 | 3,147,895.01 | 34,147,895.01 |
| R/O- 6 |  | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
|  | 7 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
|  | 8 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
|  | 9 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
|  | 10 | 30,000,000 | 5,071,166.84 | 35,071,186.84 |
|  | 11 | 30,000,000 | 5,032,946.25 | 35,032,946.25 |
|  | 12 | 30,000,000 | 5,025,761.02 | 35,025,761.02 |
|  | 13 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
|  | 14 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
|  | 15 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
|  | 16 | 30,000,000 | 6,148,109.84 | 36,148,109.84 |
|  | 17 | 30,000,000 | 6,272,575.37 | 36,272,575.37 |
|  | 18 | 30,000,000 | 6,475,771.31 | 36,475,771.31 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | |
|---|---|---|---|
| 19 | 30,000,000 | 6,520,320.96 | 36,520,320.96 |
| R/O-20 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 21 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 22 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 23 | 30,000,000 | 6,937,449.81 | 36,937,449.81 |
| 24 | 30,000,000 | 6,756,758.68 | 36,756,758.68 |
| 25 | 30,000,000 | 7,246,658.57 | 37,246,658.57 |
| 26 | 30,000,000 | 7,177,329.10 | 37,177,329.10 |
| R/O-27 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 28 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 29 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 30 | 30,000,000 | 9,192,083.03 | 39,192,083.03 |
| 31 | 30,000,000 | 9,111,727.71 | 39,111,727.71 |
| November 1989 | | | |
| 1 | 30,000,000 | 9,177,322.75 | 39,177,322.75 |
| 2 | 30,000,000 | 9,093,386.46 | 39,093,386.46 |
| 3 | 30,000,000 | 6,604,835.68 | 36,604,835.88 |
| 4 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 5 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 6 | 30,000,000 | 6,770,013.70 | 36,770,013.70 |
| 7 | 30,000,000 | 6,794,751.71 | 36,794,751.71 |
| 8 | 30,000,000 | 6,910,148.70 | 36,910,148.70 |
| 9 | 30,000,000 | 6,983,774.72 | 36,983,774.72 |
| 10 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 11 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 12 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 13 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 14 | 30,000,000 | 7,357,647.97 | 37,357,647.97 |
| 15 | 30,000,000 | 7,532,161.84 | 37,532,161.84 |
| 16 | 30,000,000 | 7,554,032.80 | 37,554,032.80 |
| 17 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 18 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 19 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 20 | 30,000,000 | 7,808,426.72 | 37,808,426.72 |
| 21 | 30,000,000 | 7,757,066.84 | 37,757,066.84 |
| 22 | 30,000,000 | 7,915,046.19 | 37,915,046.19 |
| 23 | 30,000,000 | 7,940,170.04 | 37,940,170.04 |
| 24 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 25 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 26 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 27 | 30,000,000 | 8,087,463.15 | 38,087,463.15 |
| 28 | 30,000,000 | 8,071,525.94 | 38,071,525.94 |
| 29 | 30,000,000 | 8,192,922.73 | 38,192,922.73 |
| 30 | 30,000,000 | 8,171,018.13 | 38,171,018.13 |
| December 1989 | | | |
| 1 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 2 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 3 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 4 | 30,000,000 | 8,317,144.93 | 38,317,144.93 |
| 5 | 30,000,000 | 8,398,592.62 | 38,398,592.62 |
| 6 | 30,000,000 | 8,482,020.38 | 38,482,020.38 |
| 7 | 30,000,000 | 8,501,066.61 | 38,501,066.61 |
| 8 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 9 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 10 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 11 | 30,000,000 | 9,419,747.97 | 39,419,747.97 |
| 12 | 30,000,000 | 9,353,653.80 | 39,353,653.80 |
| 13 | 30,000,000 | 9,401,980.70 | 39,401,980.70 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

|  | | | |
|---|---|---|---|
| 14 | 30,000,000 | 9,482,030.69 | 39,482,030.69 |
| 15 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 16 | 30,000,000 | 9,672,803.33 | 39,672,603.33 |
| 17 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 18 | 30,000,000 | 9,399,857.48 | 39,399,857.48 |
| 19 | 30,000,000 | 9,527,175.77 | 39,527,175.77 |
| 20 | 30,000,000 | 9,552,579.42 | 39,552,579.42 |
| 21 | 30,000,000 | 9,420,768.26 | 39,420,768.26 |
| 22 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 23 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 24 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 25 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 26 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 27 | 30,000,000 | 10,635,970.30 | 40,635,970.30 |
| 28 | 30,000,000 | 10,697,291.73 | 40,697,291.73 |
| 29 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 30 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 31 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| January 1990 | | | |
| 1 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 2 | 30,000,000 | 10,754,186.13 | 40,754,186.13 |
| 3 | 30,000,000 | 11,481,214.94 | 41,481,214.94 |
| 4 | 30,000,000 | 9,818,104.83 | 39,818,104.83 |
| 5 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 6 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 7 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 8 | 30,000,000 | 8,519,719.51 | 38,519,719.51 |
| 9 | 30,000,000 | 8,793,567.82 | 38,793,567.82 |
| 10 | 30,000,000 | 9,391,486.94 | 39,391,486.94 |
| 11 | 30,000,000 | 4,519,480.36 | 34,519,480.36 |
| 12 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 13 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 14 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 15 | 30,000,000 | 4,859,292.27 | 34,859,292.27 |
| 16 | 30,000,000 | 1,646,287.05 | 31,646,287.05 |
| 17 | 30,000,000 | 1,760,211.90 | 31,760,211.90 |
| 18 | 30,000,000 | 1,787,825.23 | 31,787,825.23 |
| 19 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 20 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 21 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 22 | 30,000,000 | 2,934,734.46 | 32,934,734.46 |
| 23 | 30,000,000 | 3,207,365.71 | 33,207,365.71 |
| 24 | 30,000,000 | 3,906,014.36 | 33,906,014.36 |
| 25 | 30,000,000 | 3,976,907.17 | 33,976,907.17 |
| 26 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 27 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 28 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| R/O-29 | 30,000,000 | 3,377,469.60 | 33,377,469.60 |
| 30 | 30,000,000 | 3,487,811.03 | 33,487,811.03 |
| 31 | 30,000,000 | 3,604,761.96 | 33,604,761.96 |
| February 1990 | | | |
| 1 | 30,000,000 | 3,783,285.08 | 33,783,285.08 |
| 2 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 3 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 4 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 5 | 30,000,000 | 4,494,132.41 | 34,494,132.41 |
| 6 | 30,000,000 | 4,132,872.96 | 34,132,872.96 |
| 7 | 30,000,000 | 4,507,118.28 | 34,507,118.28 |

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of), 1998 CarswellOnt 2565

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

| | | | |
|---|---|---|---|
| 8 | 30,000,000 | 4,608,245.77 | 34,608,245.77 |
| 9 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 10 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 11 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 12 | 30,000,000 | 4,781,593.95 | 34,781,593.95 |
| 13 | 30,000,000 | 4,774,292.88 | 34,774,292.88 |
| 14 | 30,000,000 | 4,775,563.95 | 34,775,563.95 |
| 15 | 30,000,000 | 4,907,788.81 | 34,907,788.81 |
| 16 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 17 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 18 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 19 | 30,000,000 | 5,821,451.91 | 35,821,451.91 |
| 20 | 30,000,000 | 5,982,391.96 | 35,982,391.96 |
| 21 | 30,000,000 | 6,430,392.55 | 36,430,392.55 |
| 22 | 30,000,000 | 6,482,251.92 | 36,482,251.92 |
| 23 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 24 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 25 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 26 | 30,000,000 | 6,546,172.41 | 36,546,172.41 |
| 27 | 30,000,000 | 7,070,969.01 | 37,070,969.01 |
| 28 | 30,000,000 | 7,179,650.03 | 37,179,650.03 |

March 1990

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 7,161,620.64 | 37,161,620.64 |
| 2 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 3 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 4 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| R/O- 5 | 30,000,000 | 7,822,176.33 | 37,822,176.33 |
| 6 | 30,000,000 | 7,941,922.94 | 37,941,922.94 |
| 7 | 30,000,000 | 8,286,889.99 | 38,286,889.99 |
| 8 | 30,000,000 | 8,480,590.42 | 38,480,590.42 |
| 9 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 10 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 11 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 12 | 30,000,000 | 8,709,952.06 | 38,709,952.06 |
| 13 | 30,000,000 | 8,537,558.70 | 38,537,558.70 |
| 14 | 30,000,000 | 8,712,265.42 | 38,712,265.42 |
| 15 | 30,000,000 | 8,542,273.30 | 38,542,273.30 |
| 16 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| 17 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| 18 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| 19 | 30,000,000 | 9,443,816.07 | 39,443,816.07 |
| 20 | 30,000,000 | 9,565,672.22 | 39,565,672.22 |
| 21 | 30,000,000 | 9,926,127.87 | 39,926,127.87 |
| 22 | 30,000,000 | 10,210,851.53 | 40,210,851.53 |
| 23 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 24 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 25 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 26 | 30,000,000 | 10,216,162.75 | 40,216,162.75 |
| 27 | 30,000,000 | 10,425,698.00 | 40,425,698.00 |
| 28 | 30,000,000 | 10,409,060.50 | 40,409,060.50 |
| 29 | 30,000,000 | 10,482,581.14 | 40,482,581.14 |
| 30 | 30,000,000 | 10,489,427.09 | 40,489,427.09 |

Footnotes

\*     Additional reasons at (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div.).

1998 CarswellOnt 2565, [1998] O.J. No. 2637, 40 B.L.R. (2d) 1, 63 O.T.C. 1...

**\*\***       A corrigendum delivered by the court on September 3, 1998 has been incorporated herein.

---

**End of Document**       Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



2 of 2 DOCUMENTS

**THORN EMI NORTH AMERICA, INC., Plaintiff, v. HYUNDAI ELECTRONICS INDUSTRIES CO., LTD. and HYUNDAI ELECTRONICS AMERICA, INC., Defendants.**

**Civil Action No. 94-332-RRM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1996 U.S. Dist. LEXIS 21170*

**July 12, 1996, Decided**

**SUBSEQUENT HISTORY:** [*1] Motion for Reconsideration Denied September 17, 1996, Reported at: *1996 U.S. Dist. LEXIS 21188.*
Reconsideration denied by *Thorn EMI N. Am. v. Hyundai Elecs. Indus. Co., 1996 U.S. Dist. LEXIS 21188 (D. Del., Sept. 17, 1996)*

**COUNSEL:** Donald F. Parsons, Jr., Esquire, and Lisa B. Baeurle, Esquire, Morris, Nichols, Arsht and Tunnell, Wilmington, Delaware; James P. Bradley, Esquire, Dale B. Nixon, Esquire, Michael Rocco Cannatti, Esquire, and D. Scott Hemingway, Esquire, Richards, Medlock and Andrews, Dallas, Texas; Ivan S. Kavrukov, Esquire, and Peter J. Phillips, Esquire, Cooper and Dunham LLP, New York, New York, for plaintiff Thorn EMI North America, Inc.

William J. Marsden, Jr., Esquire, and Joanne Ceballos, Esquire, Potter, Anderson and Corroon, Wilmington, Delaware; Daniel J. Furniss, Esquire, Theodore G. Brown, III, Esquire, K.T. Cherian, Esquire, and Susan M. Spaeth, Esquire, Townsend and Townsend and Crew, Palo Alto, California; Kenneth L. Nissly, Esquire, and

Susan G. van Keulen, Esquire, Thelen, Marrin, Johnson and Bridges, San Jose, California, for defendants Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America.

**JUDGES:** McKELVIE, District Judge

**OPINION BY:** McKELVIE

**OPINION**

**MEMORANDUM OPINION**

Wilmington, Delaware

July 12, 1996

McKELVIE, District Judge

This is a patent infringement case. In a complaint filed June 17, 1994, Thorn EMI North America, Inc. ("TENA") alleges that Hyundai

[*2] Electronics Industries Co., Ltd. and Hyundai Electronics America ("Hyundai"), infringe six of its patents on computer memory chips. Hyundai filed a counterclaim alleging unfair competition and seeking to invalidate the patents.

On April 21, 1995, the parties filed a stipulation settling all issues between them except for one. The remaining issue concerned memory chips that Hyundai sold to International Business Machines, Inc. ("IBM"), which is not a party to this suit. IBM purchased the microprocessors at issue from Hyundai "off the shelf," meaning that Hyundai did not custom-make the parts specifically for IBM, but sold them in a ready-made form. Hyundai raised the defense that the products in question were covered by a licensing agreement between INMOS International plc ("INMOS"), TENA's corporate predecessor, and IBM. Hyundai contends that the IBM/INMOS agreement permits IBM to purchase off the shelf products, and that therefore Hyundai did not induce infringement by selling the memory chips to IBM. The parties agreed to a bench trial on this single issue and stipulated that if the court found that the licensing rights granted to IBM under the licensing agreement did not include

[*3]  the off the shelf Hyundai parts, Hyundai would pay additional royalties to TENA in an amount agreed upon by the parties.

The parties tried this case before this court over several days in July of 1995. The parties have also filed post-trial briefs and have presented oral argument on the licensing issue.

## I. *FACTUAL BACKGROUND*

TENA holds U.S. patents on certain types of Dynamic Random Access Memory chips ("DRAMs"), memory modules containing DRAMs ("DRAM modules"), and Static Random Access Memory chips ("SRAMs"). DRAMs, SRAMs, and DRAM modules fall into the larger category of "Information Handling Systems" ("IHS"), defined broadly as any instrumentality designed to store or process information. IBM uses these components in its computers. As is the case with many of the parts for its computers, IBM does not manufacture its own memory chips, but purchases them from outside manufacturers such as Hyundai. Because many of the components utilized in IBM computers are patented, IBM has entered into numerous licensing agreements with the holders of those patents. During the trial, John Gosselin, one of the principal license negotiators for IBM, testified as to IBM's policy under which

[*4] it sought broad licenses from the originators of patented components that it used, or planned to use, in IBM products. The value of these agreements, according to Mr. Gosselin, lay in the "freedom of action" IBM obtained:

> IBM receives freedom to use in its business any patented inventions of the licensor in any way it sees fit and whenever it sees fit, and eliminates the need for avoiding use of those patented inventions in the design [of] products. It saves attorney time. It saves engineering time. And ultimately it would save royalties if there [were] an infringement

Gosselin TR A54:15-21.

IBM and INMOS entered into the licensing agreement at issue in this case in 1986. At that time, IBM had been purchasing memory chips, including DRAMs and SRAMs, "off the shelf" from various manufacturers for use in IBM computers. INMOS, which was then a wholly owned subsidiary of Thorn EMI plc ("Thorn"), had been marketing its products for approximately eight years. The agreement IBM and INMOS entered into gives each party the right to make, use, and transfer patented IHS products of the other, and provides for a payment to balance the relative value of the rights each party

[*5] receives. The agreement contains special restrictions regarding the right to "have made" the licensed products. It also contains a mutual release for all past acts of infringement that the agreement would have permitted had it been in place at the time the infringement occurred.

Hyundai Electronics Industries Co., Ltd., a South Korean corporation, and its subsidiary, Hyundai Electronics America, Inc., which is based in California, manufacture memory chips, including DRAMs, SRAMs, and DRAM modules. The parties agree that these memory chips are IHS products covered by TENA's patents. IBM purchased some of Hyundai's memory chips "off the shelf," thus giving rise to the instant suit. Hyundai manufactured and sold the memory chips at issue in Korea. Although TENA's patents do not protect against acts of infringement occurring entirely outside the United States, TENA claims that by selling the memory chips to IBM, Hyundai induced or contributed to IBM's infringement. In its defense, Hyundai argues that IBM has an unrestricted right under the license agreement to use IHS products, regardless of their source. The clause granting license rights to IBM states:

2.8 INMOS, on behalf of

[*6] itself and its Subsidiaries, grants to IBM a worldwide, fully paid-up nonexclusive license under the INMOS Licensed Patents:

2.8.1. to make, use, lease, sell and otherwise transfer IHS Products and to practice any process involved in the manufacture or use thereof;

Because this clause contains no restriction on the source of IHS products, Hyundai argues, IBM has not infringed, and Hyundai cannot have induced or contributed to an act of infringement that never took place.

TENA, on the other hand, argues that IBM's purchase of "off the shelf" components violated the agreement's restrictions on IBM's right to "have made"

IHS products. The agreement grants IBM a license

2.8.2. to make, have made, use and have used IHS Manufacturing Apparatus and to practice and have practiced any method involved in the manufacture or use thereof; *provided, however,* that the rights granted in this Section 2.8.2 shall not serve to enlarge the scope of the rights granted in Section 2.8.3; and

2.8.3. to have made IHS Products by another manufacturer for the use, lease, sale or transfer by IBM, only when all the following conditions are met:

2.8.3.1 the designs, specifications

[*7] and working drawings for the manufacture of said IHS Products are furnished by, and originate with, IBM (or with IBM's contractor, whether or not said contractor is also said other manufacturer, provided that any patents and patent applications, based upon inventions made in the course of the contract, which cover any IHS Product or any portion thereof which is the subject of the contract, are licensable by IBM to INMOS hereunder), and

2.8.3.2 said designs, specifications and working drawings are in sufficient detail that no additional designing by the manufacturer is required other than adaptation to the production processes and standards normally used by the manufacturer which changes the characteristics of the products only to a negligible extent.

The agreement defines "Information Handling Systems" as follows:

1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle, or utilize any form of information, intelligence, or data for business, scientific, control

[*8] or other purposes.

IBM and INMOS also released each other from liability stemming from prior infringement, as long as the agreement would have permitted the infringing use had it occurred after the date of the agreement. The release, contained in § 4.1 of the agreement, covers:

> ... all claims of infringement of any patents, which claims have been made or which might be made at any time, with respect to any apparatus manufactured, used, leased, sold, or otherwise transferred by or for the other party ... before the effective date of this Agreement,... but only to the extent that such apparatus or

method would have been licensed or the subject of an immunity under said patent pursuant to this Agreement had it been manufactured, used, leased, sold or otherwise transferred or practiced after the date of this Agreement.

TENA, as INMOS' corporate successor, has stipulated that it is bound by the terms of the IBM/INMOS agreement. Both parties acknowledge that IBM has purchased DRAMs, SRAMs, and DRAM modules from Hyundai in ready-made, "off the shelf" form. The parties agree that TENA holds the patents on these products and that DRAMs, SRAMs, and DRAM modules were

[*9] among the products licensed to IBM by the IBM/INMOS agreement.

## II. *DISCUSSION*

Hyundai contends that under the IBM/INMOS agreement, IBM was licensed to purchase "off the shelf" parts. According to Hyundai's interpretation of the contract, § 2.8.1 unambiguously grants IBM an unrestricted license to make, use, sell, lease, or otherwise transfer any IHS products, including "off the shelf" products. Hyundai argues that such a reading is compelled by the clear language of the agreement, the fact that IBM routinely purchased parts "off the shelf"

before and after the agreement was executed, and the expressions of intent regarding "freedom of action" that IBM made during its negotiations with INMOS.

TENA argues that the agreement, read as a whole, permits IBM to use IHS products made by third parties only when the third parties manufacture those products in accordance with the restrictions contained in § 2.8.3. TENA contends that the court must construe § 2.8.3 as a limitation on IBM's § 2.8.1 rights in order to give § 2.8.3 meaning. According to TENA, construing the agreement otherwise would permit IBM to serve as a legitimizing conduit by which infringing manufacturers

[*10] overseas could circumvent U.S. patent laws. At trial, TENA presented evidence of trade practices in the semiconductor industry. This evidence, it contends, established that license clauses such as those at issue here are generally construed in the industry as prohibiting the purchase of "off the shelf" products.

TENA alternatively contends that if the court finds the agreement ambiguous, the ambiguity must be resolved against the drafter, in this case IBM. TENA also argues that the extrinsic evidence of the negotiations between IBM and INMOS produced at trial bolsters its contention that the parties did not intend for IBM to have a license to use "off the shelf" IHS products.

A. *Does the Language of the Agreement Restrict IBM's Right to Purchase "Off the Shelf" Products?*

According to the terms of the IBM/INMOS agreement, the court must interpret the contract according to the law of New York. Under New York law, "the primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Telephone Corp. Supp. Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993)*,

[*11]  *quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).* A court must construe a contract as a whole, giving effect to each provision. *Thomas v. Price, 631 F. Supp. 114, 123 (S.D.N.Y. 1986).* "A court should not 'adopt an interpretation which will operate to leave a provision of a contract without force and effect.'" *Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 176 N.E.2d 37, 39, 217 N.Y.S.2d 1 (N.Y. 1961).* The parties contend, and the court agrees, that the language of the IBM/INMOS agreement is unambiguous. Therefore, the court may not consider extrinsic evidence. *Schulman Investment Co. v. Olin Corp., 477 F. Supp. 623, 627*

*(S.D.N.Y. 1979).*

The Court of Appeals for the Federal Circuit recently analyzed language nearly identical to that of the IBM/INMOS agreement *Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996).* In that case, Cyrix designed microprocessors but did not have the facilities to manufacture them. Instead, it contracted with IBM to have the microprocessors manufactured according to Cyrix's designs. By virtue of this agreement, IBM acted as a foundry for Cyrix. *Id. at 1383.* Intel Corporation held patents on the

[*12] microprocessors IBM produced for Cyrix. Cyrix filed for a declaration that it had not infringed Intel's patents, claiming that IBM's license agreement with Intel permitted IBM to manufacture Intel's patented products, regardless of whose design IBM used. Because IBM acted within the scope of its license, Cyrix argued, no infringement had taken place. *Id. at 1384*.

Like the license at issue in this case, the IBM/Intel license granted IBM the rights "to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method or process involved in the manufacture or use thereof...." *Id. at 1383*. The agreement defined "IBM Licensed Products" as "IHS Products, IHS Complexes, IHS Programs, Supplies, and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times." *Id.* The agreement also granted IBM the rights "to have made and/or have designed Semiconductor Apparatus" and "to have made IBM Licensed Products (other than Semiconductor Apparatus) by another manufacturer for the use,

 [*13] lease, sale or other transfer by IBM."

The Federal Circuit affirmed the district court's ruling that Cyrix had not infringed Intel's patents. In reaching this conclusion, the Court relied on the definition of "IBM Licensed Products," which, like the definition of "Information Handling Systems" in the IBM/INMOS agreement, is not limited to products designed by the licensee. *Id. at 1385-86*.

This analysis applies equally well to this case. On its face, § 2.8.1 grants unrestricted rights to "make, use, sell, lease, or otherwise transfer" IHS products. The granting clause itself is silent as to the source of those products or their components. Unlike § 2.8.2, which is explicitly limited by § 2.8.3, § 2.8.1 contains no restrictions on the rights granted therein. Section 2.8.3 applies only to IBM's use of foundries, those manufacturers specifically commissioned to manufacture products of IBM's design. It does not apply to the manufacturers of "off the shelf" parts.

The definition of IHS products is likewise not limited as to the manufacturer. The license grants the rights to sell, use, lease, and otherwise transfer in the same section as the right to make the licensed products.

[*14] The section granting these rights does not restrict them to products of IBM's design. Thus, reading § 2.8.1 in the context of the entire agreement, IBM has unrestricted rights to use, sell, or otherwise transfer "off the shelf" parts.

B. *Would Reading the Agreement as Permitting the Purchase of "Off the Shelf" Parts Lead to an Absurd Result?*

TENA argues that unless § 2.8.3 is construed as limiting IBM's rights to purchase "off the shelf" parts, it will be deprived of any real meaning and lead to the absurd result of allowing infringing manufacturers overseas to circumvent TENA's patents via the legitimizing conduit of the IBM/INMOS agreement. The "have made" restrictions of the IBM/INMOS agreement, TENA argues, would be useless if IBM were permitted to circumvent them simply by purchasing ready-made parts. The parties, TENA contends, could not have intended the license agreement to permit IBM to act as a conduit for infringing parts made overseas.

Hyundai counters, convincingly, that the purpose of § 2.8.3 is to extend the license protections to the foundry and to protect IBM from inducement suits. A license that grants "have made" rights to a licensee protects

[*15] a third party manufacturer to the extent that it produces for the use or sale of the original licensee. *Carey v. United States, 164 Ct. Cl. 304, 326 F.2d 975, 979-80 (Ct. Cl. 1964)*. Thus, a foundry commissioned by IBM to manufacture IHS products would have the protection of the license agreement, subject to the restrictions of § 2.8.3. A manufacturer of "off the shelf" products is not a foundry. Such a manufacturer, therefore, whether or not it sold the products to IBM, would not be protected by the agreement. In ordinary circumstances, TENA would have recourse directly against a manufacturer who produced "off the shelf" products. In

this particular instance, however, the act of manufacturing occurred in Korea, where TENA does not have patent protection for its products. This lack of protection, rather than the IBM/INMOS agreement itself, is responsible for TENA's inability to proceed against Hyundai for manufacturing the allegedly infringing "off the shelf" products.

That the agreement leads to such a result in this case does not invalidate the terms upon which the parties agreed. The contract itself evidences IBM's goals: "patent freedom" and protection from suit. INMOS agreed

[*16] to IBM's terms, apparently with the expectation that it could pursue infringing manufacturers who sold "off the shelf" parts directly. The court concludes that INMOS simply failed to consider the risk of overseas infringers selling "off the shelf" parts to INMOS' licensees and accordingly failed to protect itself against that risk. Having agreed to be bound by the terms of the agreement, TENA must accept the consequences of INMOS' drafting error.

TENA also relies *on E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del. 1985)* for the proposition that, in certain circumstances, otherwise permissible actions may be held to violate a licensing agreement if they are taken with the intent to circumvent the agreement's restrictions. In the *duPont* case, the Supreme Court of Delaware found that a licensee, Shell, did not have the right to sell products back to its foundry under an agreement that prohibited sublicensing. The licensing agreement in that case provided the licensee with unrestricted rights to sell and resell, as well as the right to "have made" the patented product The agreement explicitly prohibited sublicensing. The licensee entered into simultaneous

[*17] agreements with a third party to have the third party make the product and then resell it back to the third party. Finding in favor of duPont, the court held that if the agreements had been separate, they would have been within the rights of the licensee. However, the manner in which the agreements were entered into indicated that the parties had, in reality, entered into a scheme to avoid the sublicensing prohibition. Taken together, the agreement to have made and the agreement to sell back constituted a sublicense and were therefore prohibited. *Id.*

Contrary to TENA's assertion, *duPont* is not controlling authority here, the parties have stipulated that New York law governs the interpretation of the contract. Even assuming that New York law would produce the same result, there is no indication in the record that IBM and Hyundai structured their transaction to avoid prohibitions contained in the licensing agreement. IBM had purchased parts "off the shelf" before entering into the licensing agreement with INMOS, and continued to do so after. In addition, the IBM/INMOS agreement contains no explicit prohibitions comparable to the sublicensing prohibition in the duPont/Shell agreement.

[*18]  The *IBM/INMOS* agreement merely extends license protections to the licensee's foundries when they operate under the restrictions of § 2.8.3. In light of these distinctions, the court finds no basis for concluding that IBM's purchase of "off the shelf" parts violated the IBM/INMOS agreement.

C. *Does Trade Practice Imply a Restriction on the Use of "Off the Shelf" Parts?*

A court may consider trade custom and usage in deciding whether the language of a contract is ambiguous. *Sayers, 7 F.3d at 1095*. Evidence concerning trade custom may not be used to contradict the terms of an unambiguous contract, *Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277-78 (2d Cir. 1989)*, but such evidence may aid the court in understanding the basic, unstated assumptions of parties contracting within a particular field. *Hutner v. Greene, 734 F.2d 896, 900 (2d Cir. 1984)*. A party offering evidence of trade custom or usage for the purpose of establishing ambiguity or implying a term in the contract must establish its universality. *Id.*

In this case, the licensing agreement does not explicitly prohibit the purchase of "off the shelf" parts. To read in such a restriction

[*19] where none is explicitly set out, plaintiffs would have to prove that such an understanding was "so universal as to create a presumption that everyone knows of the custom and contracts with reference to it." *Doyle Dane Bernbach, Inc. v. Avis, 526 F. Supp. 117, 120 (S.D.N.Y. 1981)*. Plaintiffs have offered as evidence of the claimed trade custom the expert testimony of Mr. Roger § . Borovoy, a patent attorney with substantial experience in the semiconductor industry; testimony from Dr. Richard A.A. Hurst, a patent agent who has negotiated numerous patent licenses and who participated in the initial stages of the IBM/INMOS negotiations; and

an article on design-limited have made rights authored by Texas Instruments in-house counsel Richard Donaldson.

Mr. Borovoy testified that in the semiconductor industry, parties negotiating a licensing agreement would understand that "have made" rights do not include rights to use or sell "off the shelf" parts. He also testified, however, to his belief that in IBM's "insular" world, the interpretation of the agreement which Hyundai is now urging the court to accept prevailed. Mr. Borovoy's testimony, therefore, does not establish a universal

 [*20] understanding that a limitation on "have made" rights prohibits a licensee from purchasing "off the shelf" parts. Dr. Hurst testified that he personally would not interpret the language of the IBM/INMOS agreement as granting IBM the right to sell parts it had purchased "off the shelf". However, he stated that he did not know whether the parties to the agreement themselves shared his interpretation. His testimony, therefore, also falls short of demonstrating that TENA's interpretation is universal in the industry. In addition, Hyundai presented the expert testimony of Arlen T. Stein, a patent attorney with substantial experience in negotiating and interpreting licensing agreements. Mr. Stein testified that under the circumstances of the IBM/INMOS negotiations, there would not have been an automatic understanding that the have made provisions restricted IBM's right to sell "off the shelf" parts. The disagreement among these experts, Mr. Borovoy's admission that his interpretation was probably not held by IBM, and the qualified nature of Dr. Hurst's testimony, indicate that there was no universal understanding that the limited "have made" right would prohibit IBM from purchasing "off

[*21] the shelf" parts.

The article by Richard Donaldson on standard clauses in license agreements also fails to establish a trade custom that a clause granting design-limited "have made" rights would be interpreted as prohibiting the use of "off the shelf" parts. The article examines several standard clauses commonly found in license agreements and discusses issues of interpretation with respect to each. In the short section devoted to "have made" rights, Donaldson discusses the advantages of encouraging a licensee to use foundries rather than purchasing "off the shelf" products. To that end, he recommends the use of

restricted "have made" clauses which will not extend the protections of the license to manufacturers of "off the shelf" parts. Under Hyundai's interpretation of the IBM/INMOS agreement, the "have made" clause achieves that objective. It does not extend the protections of the license to the *manufacturer* of "off the shelf" parts. As discussed above, however, TENA does not have recourse against the manufacturer because the act of infringement occurred outside the geographical zone of its patent protection. Because neither the Donaldson article nor the testimony of TENA's

1996 U.S. Dist. LEXIS 21170, *22

[*22] expert witnesses establishes that TENA's interpretation of the IBM/INMOS agreement is a universally understood trade custom, the court will not read into the contract an implied prohibition against purchasing "off the shelf" parts.

For the reasons set out above, the court finds that the unambiguous language of the IBM/INMOS agreement does not prohibit the purchase and resale of "off the shelf" parts, and that TENA has failed to establish that such a restriction should be implied either by the structure and purpose of the agreement or by trade custom. Thus, the answer to the stipulated issue is yes, and Hyundai has met its burden of establishing a license defense to TENA's suit for infringement



### UNITED STATES OF AMERICA v. JOHN G. BENNETT, JR., Appellant

### No. 97-1816

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*161 F.3d 171*; *1998 U.S. App. LEXIS 28607*; *82 A.F.T.R.2d (RIA) 7204*; *50 Fed. R. Evid. Serv. (Callaghan) 909*

**June 4, 1998, Argued**
**November 16, 1998, Filed**

**SUBSEQUENT HISTORY:**    [**1] Certiorari Denied October 4, 1999, Reported at: *1999 U.S. LEXIS 5035*.

**PRIOR HISTORY:**    On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Criminal No. 96-cr-00503).

**DISPOSITION:**    Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant entered a plea in the United States District Court for the Eastern District of Pennsylvania of nolo contendere to an 82-count indictment for offenses related to a pyramid scheme in which he told victims an anonymous donor would double their charitable contributions if entrusted to him. Defendant appealed the district court's ruling excluding testimony on his mental condition and sentencing under the U.S. Sentencing Guidelines Manual.

**OVERVIEW:** Defendant routinely diverted the funds donated for charity for private purposes, and used false filings to gain and retain tax-exempt status. The court held (1) questions that went beyond merely assisting the jury concerning defendant's mental disorder to stating whether he possessed the requisite intent to commit the crimes were properly excluded, (2) the district court's late-filed sentencing memorandum was a helpful amplification that did not prejudice defendant, (3) *U.S.*

*Sentencing Guidelines Manual § 2F1.1(b)(3)(A)* did not require that the charitable organization be fraudulent from its inception and in every facet of its operations, (4) *U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(B)* applied because securities company had to pay $ 18 million to settle related litigation and defendant individually derived more that $ 1 million, (5) *U.S. Sentencing Guidelines Manual § 3B1.1(b)* did not require that individuals who assisted the criminal activity know of it, (6) defendant occupied a fiduciary position for purposes of *U.S. Sentencing Guidelines Manual § 3B1.3*, and *(7)* defendant did not accept responsibility for purposes of *U.S. Sentencing Guidelines Manual § 3E1.1*.

**OUTCOME:** The court affirmed the judgment of sentence the district court imposed.

**LexisNexis(R) Headnotes**

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
*Governments > Courts > Judges*
[HN1] The court reviews the district court's rulings on the admissibility of expert testimony for abuse of discretion. The court notes the trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact. The trial judge has broad discretion to admit or exclude expert testimony under the

161 F.3d 171, *; 1998 U.S. App. LEXIS 28607, **1;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

test of helpfulness. In determining the admissibility of expert evidence, the trial judge must also consider whether the general relevancy requirements of *Fed. R. Evid. 401-403* are met.

***Evidence > Testimony > Experts > Criminal Trials***
[HN2] See *Fed. R. Evid. 704*.

***Evidence > Testimony > Experts > Admissibility***
***Evidence > Testimony > Experts > Criminal Trials***
***Evidence > Testimony > Experts > Ultimate Issue***
[HN3] The basic approach to opinions, lay and expert, in the federal rules of evidence is to admit them when helpful to the trier of fact. The so-called ultimate issue rule is specifically abolished by *Fed. R. Evid. 704*. The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under *Fed. R. Evid. 701* and *702*, opinions must be helpful to the trier of fact, and *Fed. R. Evid. 403* provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. *Fed. R. Evid. 704* advisory committee's note.

***Criminal Law & Procedure > Scienter > General Overview***
***Evidence > Testimony > Experts > Admissibility***
***Evidence > Testimony > Experts > Criminal Trials***
[HN4] *Fed. R. Evid. 704* prohibits testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea. Therefore, expert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.

***Evidence > Testimony > Experts > Criminal Trials***
[HN5] *Fed. R. Evid. 704(b)* prohibits both the prosecution and the defense from inquiring of expert psychiatrists whether the defendant, at the time of the crime, was able to appreciate the wrongfulness or the nature and quality of his acts.

***Criminal Law & Procedure > Scienter > General Overview***
***Evidence > Scientific Evidence > Psychiatric & Psychological Evidence***
***Evidence > Testimony > Experts > Criminal Trials***
[HN6] Congressional prohibition of diminished responsibility defenses requires trial courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires. Therefore, district courts should admit evidence of mental abnormality on the issue of mens rea only when, if believed, it would support a legally acceptable theory of lack of mens rea.

***Criminal Law & Procedure > Defenses > Insanity > Insanity Defense***
[HN7] See *18 U.S.C.S. § 17*.

***Criminal Law & Procedure > Sentencing > Imposition > General Overview***
***Criminal Law & Procedure > Sentencing > Presentence Reports***
[HN8] See *Fed. R. Crim. P. 32(c)(1)*.

***Criminal Law & Procedure > Trials > Judicial Discretion***
***Criminal Law & Procedure > Sentencing > Presentence Reports***
***Criminal Law & Procedure > Sentencing > Ranges***
[HN9] *Fed. R. Crim. P. 32(c)(1)* is not intended to require that resolution of objections and imposition of sentence occur at the same time or during the same hearing. It requires only that the trial court rule on any objections before sentence is imposed. The rule speaks in terms of the trial court's discretion, but the U.S. Sentencing Guidelines Manual specifically provides that the trial court must provide the parties with a reasonable opportunity to offer information concerning a sentencing factor reasonably in dispute. *Rule 32(c)(1)* indicates that the court need not resolve controverted matters which will not be taken into account in, or will not affect, sentencing. The words "will not affect" were added in the revision in recognition that there might be situations, due to overlaps in the sentencing ranges, where a

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 331 of 554

Page 3

161 F.3d 171, *; 1998 U.S. App. LEXIS 28607, **1;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

controverted matter would not alter the sentence even if the sentencing range were changed. *Fed. R. Crim. P. 32* advisory committee's note.


***Criminal Law & Procedure > Sentencing > Imposition > General Overview***

[HN10] See 3d Cir. R. 3.1.


***Criminal Law & Procedure > Sentencing > Imposition > General Overview***

[HN11] The accompanying comments to 3d Cir. R. 3.1 suggest a flexible approach is consistent with the spirit of the rule: A district court may properly prepare an opinion or memorandum explaining a decision after an appeal is taken. The rule is not intended to inhibit or discourage district courts from preparing opinions as they presently do. To the contrary, the rule was designed to provide more flexibility. 3d Cir. R. 3.1 committee comments.


***Criminal Law & Procedure > Sentencing > Imposition > Findings***
***Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > Findings of Fact***
***Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > Sentences***

[HN12] When reviewing the imposition of a sentence under the federal sentencing guidelines, the district court's findings of facts are measured by the clearly erroneous test, but the court's review of the legal component of its conclusion is plenary.


***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***

[HN13] See *U.S. Sentencing Guidelines Manual § 2F1.1(b)(3)(A).*


***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
***Education Law > Administration & Operation > Student Financial Aid > Debt Collection***
***Governments > Federal Government > Employees & Officials***

[HN14] Examples of conduct to which *U.S. Sentencing Guidelines Manual § 2F1.1(b)(3)(A)* applies would include a group of defendants who solicit contributions to a non-existent famine relief organization by mail, a defendant who diverts donations for a religiously

affiliated school by telephone solicitations to church members in which the defendant falsely claims to be a fund raiser for the school, or a defendant who poses as a federal collection agent in order to collect a delinquent student loan. *U.S. Sentencing Guidelines Manual § 2F1.1 application note 4.*


***Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses > Elements***
***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
***Estate, Gift & Trust Law > Trusts > General Overview***

[HN15] The *U.S. Sentencing Guidelines Manual § 2F1.1* commentary to the fraud guideline instructs: This guideline is designed to apply to a wide variety of fraud cases. Use of false pretenses involving charitable causes and government agencies enhances the sentences of defendants who take advantage of victims' trust in government or law enforcement agencies or their generosity and charitable motives. Taking advantage of a victim's self interest does not mitigate the seriousness of fraudulent conduct. However, defendants who exploit victims' charitable impulses or trust in government create particular social harm.


***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
***Criminal Law & Procedure > Appeals > Standards of Review > Plain Error > General Overview***

[HN16] That the victims may not have wholeheartedly believed defendant's representations and sought independent verification does not mitigate the seriousness of defendant's conduct. Rather, the focus of the trial court's inquiry regarding application of *U.S. Sentencing Guidelines Manual § 2F1.1* must be on the defendant's motivation for making the prohibited representation.


***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***

[HN17] The court finds no authority for the proposition that the enhancement applies only if the "charitable" organization is fraudulent from its inception and in every facet of its operations. Nor does it matter that many of defendant's victims acted at least partially out of self interest. Regardless of their motivation in giving money, donors have a right to expect that their contributions would be used in the manner that defendant promises.

161 F.3d 171, *; 1998 U.S. App. LEXIS 28607, **1;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
[HN18] See *U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(B)*.

***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
[HN19] The accompanying application note explains "gross receipts from the offense" generally means that the gross receipts to the defendant individually, rather than to all participants, exceeded $ 1,000,000. "Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." *U.S. Sentencing Guidelines Manual § 2F1.1 application note 16*.

***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
[HN20] The U.S. Sentencing Guidelines Manual requires only (1) that the offense affect a financial institution, and (2) that the defendant derived more than $ 1,000,000 from the offense. *U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(B)*. It applies even if the defendant receives the million dollars in an indirect manner. The offense need only "affect" a financial institution to qualify for the adjustment; it does not have to jeopardize the soundness of the institution.

***Criminal Law & Procedure > Sentencing > Guidelines > General Overview***
[HN21] It is irrelevant how defendant spends the money after he obtains it.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Aggravating Role***
[HN22] See *U.S. Sentencing Guidelines Manual § 3B1.1(b)*.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Aggravating Role***
[HN23] The sentencing court should enhance the more culpable offenders' levels under *U.S. Sentencing Guidelines Manual § 3B1.1(b)* so long as there are five or more participants or so long as the criminal activity is otherwise extensive.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Aggravating Role***
[HN24] Even when there is only one other participant, the enhancement under *U.S. Sentencing Guidelines Manual § 3B1.1(b)* can be appropriate when the criminal activity is "otherwise extensive."

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Aggravating Role***
[HN25] The U.S. Sentencing Guidelines Manual defines a "participant" as a person who is criminally responsible for the commission of the offense, but need not have been convicted. *U.S. Sentencing Guidelines Manual § 3B1.1 commentary, application note 1*. The U.S. Sentencing Guidelines Manual also instructs that in assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive. *U.S. Sentencing Guidelines Manual § 3B1.1 commentary, application note 3*.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Aggravating Role***
[HN26] The determination of whether a criminal enterprise is "extensive" under *U.S. Sentencing Guidelines Manual § 3B1.1* derives from the totality of the circumstances, including not only the number of participants, but also the width, breadth, scope, complexity, and duration of the scheme.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Special Skills***
[HN27] See *U.S. Sentencing Guidelines Manual § 3B1.3*.

***Banking Law > Criminal Offenses > Schemes to Defraud > Penalties***
***Criminal Law & Procedure > Criminal Offenses > Property Crimes > Embezzlement > Elements***
***Criminal Law & Procedure > Criminal Offenses > Sex Crimes > Sexual Assault > Abuse of Adults > Penalties***
[HN28] "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to

161 F.3d 171, *; 1998 U.S. App. LEXIS 28607, **1;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. *U.S. Sentencing Guidelines Manual § 3B1.3* commentary, note 1, 2.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Special Skills***
[HN29] The court identifies several factors relevant to determining what constitutes a "position of trust" for purposes of *U.S. Sentencing Guidelines Manual § 3B1.3*: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there is reliance on the integrity of the person occupying the position. These factors should be considered in light of the guiding rationale of the section--to punish "insiders" who abuse their position rather than those who take advantage of an available opportunity.

***Criminal Law & Procedure > Preliminary Proceedings > Entry of Pleas > General Overview***
***Criminal Law & Procedure > Guilty Pleas > No Contest Pleas***
***Criminal Law & Procedure > Sentencing > Fines***
[HN30] A plea of nolo contendere, like the plea of guilty, is an admission of guilt for the purposes of the case. More specifically, it is the type of plea which may be entered with leave of court to a criminal complaint or indictment by which the defendant does not admit or deny the charges, though a fine or sentence may be imposed pursuant to it. The principal difference between a plea of guilty and a plea of nolo contendere is that the latter may not be used against the defendant in a civil action based upon the same acts.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Acceptance of***

***Responsibility***
[HN31] See *U.S. Sentencing Guidelines Manual § 3E1.1(a)*.

***Criminal Law & Procedure > Preliminary Proceedings > Entry of Pleas > General Overview***
***Criminal Law & Procedure > Guilty Pleas > Admissibility at Trial***
***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Acceptance of Responsibility***
[HN32] In determining whether a defendant qualifies for a reduction under *U.S. Sentencing Guidelines Manual § 3E1.1(a)*, the district court is not required to limit its analysis solely to whether the defendant entered a guilty plea: Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under *U.S. Sentencing Guidelines Manual § 1B1.3* (relevant conduct) will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right. *U.S. Sentencing Guidelines Manual § 3E1.1* commentary, note 1, 3.

***Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Acceptance of Responsibility***
***Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > Sentences***
[HN33] The district court's decision whether to grant the adjustment for acceptance of responsibility is entitled to great deference on review because the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. *U.S. Sentencing Guidelines Manual § 3E1.1* commentary, note 5.

**COUNSEL:** PETER GOLDBERGER, ESQUIRE (ARGUED), Ardmore, Pennsylvania, Attorney for Appellant.

RICHARD W. GOLDBERG, ESQUIRE (ARGUED), JUDY GOLDSTEIN-SMITH, ESQUIRE (ARGUED),

161 F.3d 171, *; 1998 U.S. App. LEXIS 28607, **1;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

Office of the United States Attorney, Philadelphia, Pennsylvania, Attorneys for Appellee.

**JUDGES:** Before: SCIRICA, NYGAARD and SEITZ, * Circuit Judges.

    \* Judge Seitz heard argument in this matter but was unable to clear the opinion.

  [**2]

**OPINION BY:** SCIRICA

**OPINION**

  [*174] **OPINION OF THE COURT**

    SCIRICA, *Circuit Judge.*

    This is an appeal from a judgment of sentence and certain pretrial rulings on a nolo contendere plea entered by defendant John G. Bennett, Jr., President of New Era Philanthropy. Bennett was sentenced to 144 months in prison for perpetrating the largest charity fraud in history, a six-year scheme in which he solicited over $ 350 million in contributions for a bogus "matching" program. We will affirm.

# I.    FACTUAL   BACKGROUND   AND PROCEEDINGS

    In 1989, Bennett encountered financial difficulties in connection with several of his businesses. As a consequence, he devised a check-kiting scheme using his bank accounts at Philadelphia National Bank and Merrill Lynch, writing checks from one account to another on insufficient funds and creating false balances reflecting fictitious amounts. To cover the overdrafts, Bennett solicited participation in a new program called the New Concepts in Philanthropy Program, using the initial checks received from New Concepts donors to pay down the overdrafts at Merrill Lynch and the Philadelphia National Bank.

    Under the New Concepts Program, individual donors [**3] gave money for charitable purposes to be held for several months by another Bennett organization, the Foundation for New Era Philanthropy. Bennett told potential investors that a wealthy donor, who wished to remain anonymous, would match their contributions at the end of the holding period. The doubled funds would

then be transferred to a charity of the donor's choice. [1] In reality, there was no anonymous donor. Bennett used the donations of subsequent investors to "double" the deposits of the original investors, and he routinely invaded the held funds to benefit his for-profit businesses.

    1   Bennett made the following sales pitch to wealthy individuals:

        An anonymous donor wants to encourage giving by offering to match charitable gifts to various organizations. To participate, wealthy individuals deposit their funds with New Era for a period of time. At the end of the holding period, the gift will be matched by the anonymous donor and the now doubled funds will be sent to the charity chosen by the original donor.

    (Presentence Investigation Report (PIR) P 18.)

  [**4] The "ponzi" scheme grew into a pyramid scheme as the base of investors grew. Bennett expanded the New Concepts Program to allow nonprofit organizations to participate. [2] Eventually, the Foundation for New Era Philanthropy received both tax-exempt status and a license to act as a charity in Pennsylvania. Bennett established and maintained these licenses through a series of falsehoods. For example, he omitted any mention of the matching program from all documents filed with the Internal Revenue Service or state authorities. In these submissions, Bennett also listed a nonexistent board of directors consisting of prominent individuals and he significantly underestimated New Era's liabilities. During a subsequent I.R.S. audit, Bennett provided fabricated board-of-directors minutes, again failed to disclose the existence of the New Concepts Program, and [*175] misrepresented the true condition of New Era's assets. As a result, New Era received a favorable audit letter from the I.R.S.

    2   While the basic proposal did not change during the existence of New Era, features of the offer did change; for example, Bennett broadened the donor base and delayed the payout period:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 335 of 554

Page 7

161 F.3d 171, *175; 1998 U.S. App. LEXIS 28607, **4;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

a) Expanding base of participation: The parties eligible to have their funds matched grew from the small number of original donors to over a hundred individuals. Later, in 1993, non-profit organizations were also permitted to participate, and by the end, hundreds had sent funds to New Era. New Era also opened offices in London and Hong Kong and made overtures to the mainland government. Meanwhile, in New Era's literature, the number of alleged anonymous donors grew from one to nine.

b) Fewer deposit restrictions: At first, non-profit organizations could only deposit newly raised money with New Era. This restriction was later dropped and organizations were permitted to deposit their endowment funds.

c) Longer holding period and greater payout: Just months before the end, New Era offered a fund which would pay 150 interest ($ 2.50 would be returned for each $ 1.00 invested). The holding period would be nine months rather than six months.

(PIR P 19.)

[**5] In response to due diligence inquiries by potential donors, Bennett made additional false representations:

a) The anonymous donors had signed trust agreement s pledging to match contributions made through New Era.

b) The anonymous donors matched the funds deposited with New Era.

c) Bennett received no compensation from New Era.

d) New Era had a board of directors made up of prominent individuals.

e) Funds deposited with New Era were held in escrow or 'quasi-escrow' accounts.

f) The expense of running New Era was paid from the interest earned by deposited funds during the holding period.

Having satisfied investors and auditors that New Era was a legitimate charity, Bennett then systematically transferred New Era funds to his struggling for-profit businesses through loans and stock purchases.

By 1994, Bennett could no longer cover the "doubled" funds solely through new donations. Consequently, he obtained a loan from a brokerage account at Prudential Securities to cover the shortfall. The loan was secured by United States treasury bills that Bennett had purchased with funds donated to New Era by charitable organizations. Bennett informed several [**6] of these organizations their money was invested in United States treasury bills and they could call Prudential to confirm that a treasury bill had been purchased in the name of the organization. But instead of revealing the treasury bills were serving as collateral for a loan, Bennett told the organizations their money was being held in low-risk, interest-bearing accounts and escrow or "quasi-escrow" accounts at major financial institutions. The Prudential loan eventually totalled $ 50 million.

In the final nine months before New Era's collapse, Bennett drew increasingly larger margin loans on his account at Prudential. In May 1995 Prudential called the loan. Unable to meet his obligations, Bennett agreed to place New Era into bankruptcy and then revealed the anonymous donors had never existed.

In September 1996, Bennett was charged in an eighty-two-count indictment for offenses committed in connection with the Merrill Lynch and Philadelphia National Bank accounts. The indictment charged Bennett with one count of bank fraud (*18 U.S.C. § 1344*), sixteen counts of mail fraud (*18 U.S.C. § 1341*), eighteen counts of wire fraud (*18 U.S.C. § 1343*), [**7] one count of making false statements to the government (*18 U.S.C. § 1001*), three counts of filing false tax returns (*26 U.S.C. § 7206*), one count of impeding the administration of

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 336 of 554

Page 8

161 F.3d 171, *175; 1998 U.S. App. LEXIS 28607, **7;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

revenue laws (*26 U.S.C. § 7212*), fifteen counts of money laundering (*18 U.S.C. § 1957*), and twenty-seven counts of money laundering to promote unlawful activity (*18 U.S.C. § 1956(a)(1)(A)(1)*). Bennett originally pleaded not guilty and prepared for trial. Before trial, the District Court ruled to exclude certain questions that Bennett proposed to ask of his expert witness regarding Bennett's mental capacity.

In March 1997, Bennett decided to enter a conditional plea of nolo contendere to all the charges. [3] In an accompanying press release, Bennett emphasized he did not admit guilt or "adopt as true the government's version of the facts, insofar as those facts relate in any way to the issue of his intent to commit the crimes alleged in the indictment." Following Bennett's entry of the nolo contendere plea, the Probation Office compiled its Presentence Investigation Report in anticipation [**8] of the sentencing hearing.

> 3    Bennett reserved the right to appeal pretrial rulings as to the admissibility of his expert's testimony on mental health.

**A. The Presentence Investigation Report**

The presentence report grouped the charges as follows: (1) bank fraud; (2) mail fraud; (3) wire fraud; (4) false statements; (5) false tax returns; and (6) impeding the administration of revenue laws. It then calculated [*176] Bennett's adjusted offense level beginning with a base offense level of six under *U.S.S.G. § 2F1.1*. The presentence report recommended against a reduction in the base offense level for acceptance of responsibility under *U.S.S.G. § 3E1.1*:

> The defendant has entered a plea of nolo contendere in this case. However, he continues to deny any factual guilt and criminal intent for his actions. In his press release dated March 26, 1997, announcing his plea of nolo contendere, the defendant stated that he does not admit or adopt as true, the government's version of the facts, insofar as [**9] those facts relate in any way to the issue of his intent to commit the crimes alleged in the Indictment. The defendant further stated in his press release that he believes that his choice to cooperate with the bankruptcy trustee by surrendering substantially all of his assets

to the trustee, which he claims had no relation to New Era, and to cooperate with the Attorney General of the Commonwealth of Pennsylvania and the United States Securities and Exchange Commission regarding civil enforcement activities brought by those entities regarding the collapse of New Era, indicates that he has accepted responsibility. It appears that his choice to cooperate with the bankruptcy trustee and the other parties bringing civil action against him benefits him in the same way as his plea of nolo contendere in the criminal matter. In other words, the defendant arrives at an outcome which may have been inevitable anyway, but with much less negative publicity and stress to himself and his family. His cooperation is not an indication that he admits wrongdoing. In fact, he stated as much in his press release. Furthermore, the defendant's for profit companies received approximately $ 7 million as a result [**10] of his fraudulent activities, which ultimately resulted in benefit to him.

The presentence report also called for an eighteen-level increase for the loss caused by Bennett's conduct, suggesting "the loss in this case at the time the offense was discovered was approximately $ 135,000,000; although the total amount of funds taken from the victims was approximately $ 354 million. Pursuant to *§ 2F1.1(b)(1)(S)*, because the loss in this case was over $ 80 million, 18 levels are added." It also recommended that two levels be added because the offense involved "more than minimal planning" under *§ 2F1.1(2)(A)* and *(B)*: "The defendant committed repeated fraudulent acts over a period of time, and . . . this offense involved a scheme to defraud more than one victim."

The report suggested an additional two-level increase because the criminal conduct involved the misrepresentation that Bennett was acting on behalf of a charitable, educational, religious, or political organization:

> The misrepresentation took place in three ways. First, the defendant was able

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 337 of 554

Page 9

161 F.3d 171, *176; 1998 U.S. App. LEXIS 28607, **10;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

to secure a favorable rating from the Internal Revenue Service for the Foundation for New Era Philanthropy as a charitable organization, [**11] by submitting fraudulent documentation to the IRS, and by failing to disclose information regarding the New Concepts program to the IRS. The defendant did this knowing that the New Concepts program was in fact, a fraudulent scheme. The second aspect of the misrepresentation was the New Concept program itself, wherein the defendant told the victims of non-existent anonymous donors, in an effort to solicit contributions from them. In addition, the defendant used the favorable rating that he fraudulently received from the IRS to solicit funds from the victims. The third aspect to the misrepresentation is that the defendant used the charitable image of New Era to divert several million dollars to his for profit companies, which ultimately benefitted the defendant personally. Pursuant to *§ 2F1.1(b)(3)(A)*, two levels are added.

Invoking *§ 2F1.1(b)(6)(B)*, the report also recommended a four-level increase because Bennett derived more than one million dollars in gross receipts from an offense affecting a financial institution. Specifically, the report noted Bennett "used a brokerage account at Prudential Securities to obtain sufficient funds to facilitate this offense. Overall, the [**12] loan from Prudential to New Era was approximately $ 50 million."

The report also recommended upward adjustments for Bennett's "aggravating role" in [*177] the offense and for his abuse of a position of trust. First, it described Bennett's role in the offense:

[Bennett] was the organizer and leader of New Era, which was used in the commission of an extremely extensive fraud. Several employees carried out the defendant's orders which served to facilitate this offense. Most of the employees were unaware of the defendant's fraudulent activities; however,

to date the defendant's accountant has entered a plea of guilty to charges related to this offense. In addition, the defendant utilized the services of many other innocent individuals to promote the goals of New Era. Pursuant to *§ 3B1.1(a)*, the offense level is increased by four levels.

Next, the report discussed the position of trust Bennett occupied: "[Bennett] was entrusted as a fiduciary by the victim organizations. The defendant abused the trust placed in him by these organizations by diverting money to his for profit companies, which had been entrusted to him for charitable purposes."

These enhancements [**13] created a subtotal adjusted base offense level of thirty-eight for the first group of closely related counts. The second group of closely related counts consisted of money laundering and money laundering to promote unlawful activity. Under *U.S.S.G. § 2S1.1(a)(1)*, Bennett had a base offense level of twenty-three. The presentence report called for a three-level enhancement based on the amount of money laundered: "approximately $ 528,016. Pursuant to *§ 2S1.1(b)(2)(D)*, since the value of the funds was more than $ 350,000, but less than $ 600,001, the base offense level is increased by three levels." The District Court explicitly adopted the factual findings and guideline application of the presentence report in its judgment and commitment order.

**B. The Sentencing Hearing**

In September 1997 the District Court held a four-day sentencing hearing. At the close of testimony, the court commented on the burden of proof: "The defense's position is that the government must meet its burden of proof by clear and convincing evidence. While I believe the correct standard is a preponderance of the evidence, the evidence presented is sufficient to meet the higher standard." The court then made [**14] several findings with respect to enhancements to the base offense level:

For the amount of the loss 18 levels are added because the loss was more than $ 80 million, in this case at least $ 100 million. Next, two levels are added for more than minimal planning, which is not in dispute. Next, two levels are added because the offense involved misrepresentation that

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 338 of 554

Page 10

161 F.3d 171, *177; 1998 U.S. App. LEXIS 28607, **14;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

the defendant was acting on behalf of a charity. Next, two levels are added because the offense affected a financial institution and the defendant derived more than $ 1 million in gross receipts from the offense.

Next, four levels are added because of the defendant's role in the offense as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. And next, two levels are added because defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense.

Correction as to the specific offense characteristic involving a financial institution and that defendant derived more than a $ 1 million in gross receipts from the offense, it should be four levels are added, not two as I mis-spoke.

After I [**15] ruled that certain testimony from his mental health experts would be inadmissible at trial, Mr. Bennett entered a conditional nolo contendere plea, conditional in that he reserved the right to appeal my ruling.

* * *

The request by the defense for a decrease based on acceptance of responsibility must be denied. To obtain this decrease the guidelines require that the defendant clearly demonstrates acceptance of responsibility for the offense, which did not occur in this case.

At the close of sentencing, the District Court made additional remarks addressing the "aggravating [*178] role" and "abuse of a position of trust" enhancements:

Moreover, the argument that others, such as Prudential, Andrew Cunningham and the lawyers helped walk Mr. Bennett down the garden path must also be rejected. Whether or not anyone whose

services he utilized assisted him in his request in carrying out these offenses does not diminish his role in it. It can well be argued to the contrary. Unfortunately, a person's conduct often differs from what one says or professes to believe in.

* * *

In addition to misapplying funds that were entrusted to him, he also obtained very large [**16] amounts of money for his personal benefit. He had total control over both New Era and his for profit corporation and thereby channeled money that came into New Era to pay himself, while maintaining that he was serving New Era without charge.

Bennett's offense level and criminal history category targeted a guideline range of 235-293 months imprisonment. But the District Court determined a downward departure was appropriate:

The law requires that the sentence imposed reflect the seriousness of the offense. Given the enormity and gravity of this case, a guidelines range sentence on that basis could be justified. The amount of harm and the number of persons harmed and the still ongoing repercussions experienced by the charities and nonprofit organizations and those who benefit from their activities are incalculable. It may well be that any lesser sentence than within the guidelines range will be criticized as under-representing or depreciating the inordinate size and gravity of the damage done in this case.

However, I have determined to make a downward departure from the guidelines range by reason of the presence of three factors or grounds. Each of these departure [**17] factors is found to be sufficient by itself to support the extent of the departure. But whether taken singularly or in any combination, they do not in my view justify any further departure because of the seriousness of the offense.

161 F.3d 171, *178; 1998 U.S. App. LEXIS 28607, **17;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

Moreover, certain departure factors requested by the defense must be denied. The sentencing guidelines contain policy statements that discourage the consideration of various factors in determining whether a sentence should be outside the guidelines range. The reason is that these factors, at least to the extent that they are generally present in a case, have already been included in the sentencing guideline categories.

The Supreme Court has said that these so-called discouraged factors may be a basis for departure only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. Discouraged factors include age, family responsibilities and community ties and employment records. And none of these factors in this case is sufficient individually or in combination to be the basis for a departure.

One discouraged factor that is present to an exceptional degree [**18] is called military, civic, charitable or public service employment related contributions, record of prior good works. It is evident that for many years leading up to 1989 Mr. Bennett made a large number of civic, charitable and public service contributions and performed good works in the areas of substance abuse, children and youth, juvenile justice.

These went far beyond the community contributions generally made even by very civic minding and good-hearted people. They are the first basis for the downward departure. No credit is given for contributions and activities after 1989 because of their interrelationship with the offense conduct.

The next separate basis for departure is extraordinary cooperation and restitution. Through the exceptional work of the trustee, the Bankruptcy Court and Judge [Dalzell] of this Court, the amount

of the New Era loss was reduced from over $ 100 million to about $ 20 million. Mr. Bennett's cooperation and his turning over the bulk of his personal and company held assets [*179] greatly facilitated this process and occurred to an unusual degree. Our Court of Appeals has recognized that such efforts may distinguish a case and if so, may [**19] warrant departure.

The third basis for departure involved Bennett's mental capacity, which the District Court considered "problematical":

On the one hand, a discouraged departure factor is called mental and emotional conditions. On the other hand, an encouraged factor is called diminished capacity.

* * *

If a factor is an encouraged factor, it is a basis for departure unless the applicable guidelines already take it into account, which is not this case. The subject of Mr. Bennett's clinical condition and applicable diagnoses has been hotly debated by a number of prestigious mental health experts. While it appears unlikely that he had a delusional disorder or more than, at worst, a mild organic brain dysfunction, there is evidence of severe personality disorders, including narcissism, hypomania, obsessive-compulsive personality, at least some of which is agreed to or not contested by the government's experts.

A complicating factor is that while personality disorders are listed in the Authoritative Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association, many clinicians do not believe a personality disorder is [**20] any more than a description of one's personality. They therefore distinguish it from a mental disease or disability and reject it as a basis for legal judgment.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 340 of 554

Page 12

161 F.3d 171, *179; 1998 U.S. App. LEXIS 28607, **20;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

Court cases, however, have not seen fit to make that distinction, particularly recently. In the present case, Mr, Bennett devised and developed and completely managed what became an extremely large financial enterprise. The evidence is that on one level he believed his work was consistent with his religious beliefs and God ordained mission. It appears that he not only was convinced himself, which usually is basic to convincing others, but he also convinced many responsible established and highly successful executives and religious, educational and other community institutions, as well as many social and political leaders.

Here, whether this basis for departure is grounded in an extraordinary mental and emotional condition under the discouraged factors or in a diminished capacity under the encouraged factors it appears from all the evidence that Mr. Bennett's cognition of volition or both were subject to a very unusual distortion and significantly reduced mental capacity.

Therefore, the District Court departed [**21] downward 91 months and imposed a sentence of 144 months imprisonment.

## II. DISCUSSION

### A. Pretrial Rulings Concerning Expert Testimony

Before deciding to plead nolo contendere, Bennett had filed notice of his intent to rely on the defense of insanity and to offer both lay and expert testimony on his mental condition. After Bennett requested a hearing to determine the admissibility of expert testimony on his mental disorders, he and the Government filed a joint submission containing a "Summary of Questions and Anticipated Responses." The District Court held the requested hearing and thereafter issued an order disallowing certain submitted questions.

Ten "General Questions" were submitted, two of which were:

Q: In your opinion, to a reasonable

degree of medical certainty, do you believe that the mental orders you state Mr. Bennett suffers from precluded him from forming the intent to defraud?

Q: In your opinion, to a reasonable degree of medical certainty, do you believe the mental disorders you state Mr. Bennett suffers from make it highly unlikely that he could form the intent to defraud?

The District Court determined:

1. As to all General Questions [**22] excepting the last two, objections based on *F.R.E. 702* and *403* are overruled. Rulings are deferred as to relevance, [*180] *F.R.E. 401*. To have probative value, answers must provide sufficient fact basis for a finding of lack of actual mens rea. Objection to the use of the word 'facts' in the third question is sustained.

2. As to the last two General Questions (opinions as to

forming intent to defraud), objections are sustained. *F.R.E. 704(b)*.

*United States v. Bennett*, No. 96-503, slip op. at 1 (E.D. Pa. Mar. 17, 1997) (Pretrial Rulings). Three questions relating to bank fraud were submitted, the last of which stated:

Q: In your opinion, to a reasonable degree of medical certainty, did any of the mental disorders that Mr. Bennett suffers from make it unlikely that he would have engaged in conduct designed to defraud a bank?

Citing *Federal Rule of Evidence 704(b)*, the District Court sustained the Government's objection to this question, but overruled the objection to the first two bank fraud questions: "The words 'affected' and 'affect,' in the context used, are vague and unclear, and to the extent that they request an opinion or inference as to 'whether [**23]

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 341 of 554

Page 13

161 F.3d 171, *180; 1998 U.S. App. LEXIS 28607, **23;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

defendant possessed a mental state or condition constituting an element of bank fraud,' objections are sustained. Otherwise, rulings as to relevance are deferred." *Id.* at 2.

The District Court sustained the Government's objections to four questions on mail and wire fraud, again invoking *Rule 704(b)*. The questions were:

Q: In your opinion, to a reasonable degree of medical certainty, did Mr. Bennett's mental disorders preclude him from forming the specific intent to defraud individuals through the operation of the New Concepts program?

Q: If so, how?

Q: In your opinion, to a reasonable degree of medical certainty, did Mr. Bennett's mental disorders make it unlikely that he could defraud the individuals and entities involved with New Concepts?

Q: If so, how?

The District Court sustained all objections to the questions on false statements because the "questions do not relate to actual mens rea. They also appear to ask for impermissible opinion or inference in violation of *Fed. R. Evid. 704(b).*" *Id.* at 3. On the same basis, the District Court sustained objections to the questions about false tax returns, impeding the administration of the I.R.S., and [**24] money laundering.

In conjunction with its rulings on the proposed questions, the District Court issued a Memorandum explaining its decision:

The government's experts disagreed with most of the conclusions reached by defendant's experts . . . .[The Government's disputes] are with a narrower approach to *Rule 702* and as to *Rule 403* admissibility. However, there is little evidence that defendant's experts

performed their evaluations improperly or irregularly--or unscientifically. They may have been remiss in not looking into the economic operation of defendant's organization and ascertaining the enormity of its losses. Those matters could reflect on their assessment of defendant's condition as well as its relationship to his mens rea, both in clinical and legal terms . . . .It appears that the government's initial objections raise issues as to weight and not admissibility.

The relevance, scope, and form of the testimony of defendant's experts must also be decided. *[United States v. Pohlot, 827 F.2d 889 (3d Cir. 1987)]* teaches that evidence bearing on mens rea is admissible because it relates to an essential element of guilt. The mental state at issue is [**25] 'actual' mens rea--which is not a matter of the individual's mental capacity but of the state of mind at the particular time in question. What is involved is a rule of evidence, not a defense. Relevance, therefore, depends on the legal ingredients, or definition, of the pertinent mens rea. Where mens rea includes specific intent or knowledge, it goes beyond mere conscious awareness of conduct. The question is whether the expert evidence, if believed, [*181] would support a legally acceptable theory of lack of mens rea.

* * *

The mental health expert may testify to the expert's examination and diagnosis and to other clinical information, such as the patient's history and the patient's version of what occurred, in order to give the jury information from which to determine whether actual mens rea was present. The mental health expert may not testify to the expert's opinion or inference on that issue, directly or by hypothetical question.

A further limitation is that under

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 342 of 554

Page 14

161 F.3d 171, *181; 1998 U.S. App. LEXIS 28607, **25;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

*F.R.E. 702* the expert's testimony must assist the fact-finder. Here, the expert testimony relating to defendant's alleged delusion or fantasy regarding 'anonymous donors' may be relevant to the mens [**26] rea for mail fraud . . . . However, before such evidence may surmount the F.R.E. relevance and *F.R.E. 702* hurdles, it must be shown that, given the actual facts and circumstances, it supports a legally acceptable theory of lack of mens rea. The expert must be prepared to testify to information that supplies at least a partial basis for, or leads to, the logical finding that the mens rea--for example, in the case of mail fraud, the specific intent to defraud--was or may not have been present. Merely conclusory or speculative testimony is not enough.

The same probative value principle pertains to the expert testimony regarding defendant's belief that he was acting as God's agent. His experts drew the conclusion that since he considered himself to be carrying out God's will, he could not have possessed the requisite mens rea for commission of the crimes charged. Regardless of their validity, the expert's opinions or inferences as to defendant's mental state--in the legal sense--are barred by *F.R.E. 704(b)*. However, the question remains as to the probative value of any expert testimony that defendant believed his actions were at God's behest. Motive is not an essential element of [**27] guilt and need not be proven by the government. The morality of one's conduct may be relevant to a legal insanity defense. But, by itself, moral rectitude, regardless of the supremacy of the authority for such approbation, will not negate mens rea. Here, too, it is necessary for defendant to show how God's influence or direction fits into a legally acceptable theory that he lacked the state of mind at issue.

* * *

As to each of the crimes charged in the present case, while the mens rea requirements vary, all of them involve some type of intentionally false representation. As a matter of law, no amount of honest belief that an enterprise will succeed--or is worthwhile--can justify false, baseless, or reckless assertions or promises.

* * *

In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment. If his clinical condition and symptomology can be logically connected to his subjective belief that his assertions were not false, baseless, or reckless vis-a-vis the truth, such evidence is admissible to show lack of mens rea. Otherwise, it is not--despite a strongly held [**28] religious conviction, whether or not arising from mental disorder, that his conduct was morally upright and would be societally beneficial.

* * *

For a mental health expert's testimony to have probative value as to statutory willfulness, it must have some bearing, in factual terms, on the issue of whether there was a voluntary, intentional violation of a known legal duty. The generalized conclusion, without more, that defendant believed he was doing God's work is not sufficient to negate the mens rea of statutory willfulness. What it tends to prove--the morality or goodness of defendant's conduct--is not necessarily inconsistent with a guilty mens rea. It does not by itself tend to show that the alleged violation, here the filing of false tax returns, was not voluntary or intentional or was not a violation of a known legal duty.

Inasmuch as the rulings on relevance objections have been deferred, defendant will be given a further opportunity, within

[*182] the guidelines set forth in this memorandum, to develop the mental health theory of his case. It is not necessary for the mental health expert's testimony to provide the fact basis for defendant's theory or theories [**29] in their entirety or even large part. But the testimony must show some *Rule 401* or *Rule 702* connection to the lack of actual mens rea for the particular crime charged in the indictment.

*United States v. Bennett, 29 F. Supp. 2d 236*, slip op. at 6-13 (E.D. Pa. Mar. 18, 1997) (Memorandum) (citations omitted).

## B. Propriety of Pretrial Rulings Concerning Expert Testimony

Bennett argues the District Court erred in ruling his proffered psychiatric evidence was inadmissible under *Federal Rule of Evidence 704(b)*, which forbids experts from stating an "opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *Fed. R. Evid. 704(b)*. Bennett maintains the proffered questions did not call for such an opinion or inference, but sought admissible evidence of whether Bennett: (a) harbored the specific intent to defraud; (b) knew and believed that the tax returns and other information given to the IRS were false; (c) knew the money he handled represented the proceeds of criminal activity (as is required under the money laundering statute); or (d) harbored [**30] the specific intent to promote illegal activity.

[HN1] We review the District Court's rulings on the admissibility of expert testimony for abuse of discretion. *See United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992)*; *Habecker v. Copperloy Corp., 893 F.2d 49, 51 (3d Cir. 1990)*. We note the trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trial of fact. *See Fed. R. Evid. 702*; 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 702.02[2]* (Joseph M. McLaughlin ed., 2d ed. 1997) ("The trial judge has broad discretion to admit or exclude expert testimony under the test of 'helpfulness' . . . . In determining the admissibility of expert evidence, the trial judge must also consider whether the general relevancy requirements of Rules 401-403 are met.").

*Rule 704* provides:

### [HN2] **Opinion on Ultimate Issue (a)**

Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

**(b)** No expert witness testifying [**31] with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

*Fed. R. Evid. 704*. The accompanying advisory committee's note states:

[HN3] The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule is specifically abolished by the instant rule.

* * *

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under *Rules 701* and *702*, opinions must be helpful to the trier of fact, and *Rule 403* provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately [**32] explored legal criteria.

161 F.3d 171, *182; 1998 U.S. App. LEXIS 28607, **32;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

*Fed. R. Evid. 704* advisory committee's note.

[HN4] *Rule 704* prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *United States v. Morales, 108 F.3d 1031, 1037 (9th* [*183] *Cir. 1997).* Therefore, expert testimony is admissible if it merely "supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *Id. at 1038* (allowing expert testimony that a defendant charged with willfully making false entries in a union ledger had a weak grasp of bookkeeping principles, because to hold otherwise "would exclude an expert's opinion on any matter from which the factfinder might infer a defendant's mental state"). [4]

> 4    *See also United States v. Levine, 80 F.3d 129, 134 (5th Cir. 1996)* (noting that a majority of circuits find that "hypothetical questions mirroring the fact patterns of the evidence in the trial case [violate *Rule 704(b)*] when the answering testimony contains a necessary inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto"); *United States v. Richard, 969 F.2d 849, 854-55 (10th Cir. 1992)* ("*Rule 704(b)* only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state."); *United States v. Foster, 939 F.2d 445, 454 (7th Cir. 1991)* (allowing expert testimony that "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for them"); *United States v. Dunn, 269 U.S. App. D.C. 373, 846 F.2d 761, 762 (D.C. Cir. 1988)* ("It is only as to the last step in the inferential process--a conclusion as to the defendant's mental state--that *Rule 704(b)* commands the expert to be silent.").

[**33] Nonetheless, "courts have interpreted [HN5] *Rule 704(b)* to prohibit both the prosecution and the defense from inquiring of expert psychiatrists whether the defendant, at the time of the crime, was able to appreciate the wrongfulness or the nature and quality of his acts." *United States v. Brown, 32 F.3d 236, 238 (7th Cir. 1994); see also United States v. West, 962 F.2d 1243, 1246 (7th Cir. 1992)* (holding that *Rule 704* forbids psychiatric testimony as to whether defendant charged with bank robbery understood the wrongfulness of his act at the time of the offense).

We believe the District Court properly excluded the questions asking whether Bennett's mental disorders (1) "precluded him from forming the intent to defraud"; (2) made it "highly unlikely that he could form the intent to defraud"; (3) made it "unlikely that he would have engaged in conduct designed to defraud"; (4) precluded him "from forming the specific intent to defraud individuals"; (5) made it "unlikely that he could defraud the individuals and entities"; (6) "affected his ability to knowingly and willfully submit false statements to the I.R.S."; and (7) made "it unlikely that he would [**34] knowingly and willfully submit false statements to the I.R.S." These questions go beyond merely assisting the jury, explaining the nature of Bennett's mental disease, or describing the typical effect of Bennett's disorders on his mental state. Instead, they require the expert witness to state expressly whether Bennett possessed the requisite intent to commit the crimes charged in the indictment. Accordingly, we find no abuse of discretion in the District Court's refusal to admit the questions.

In his argument to the contrary, Bennett relies principally on *United States v. Hayden, 64 F.3d 126 (3d Cir. 1995), United States v. Theodoropoulos, 866 F.2d 587 (3d Cir. 1989),* and *United States v. Pohlot, 827 F.2d 889 (3d Cir. 1987),* all of which allowed the introduction of expert testimony on the defendant's mental condition at the time of the offense. In all three cases, however, the proffered testimony was limited to a factual description of the defendant's mental capacity, without any opinion or inference as to whether the defendant had the mental state required for commission of the offense.

In *Hayden,* the defendant had been [**35] convicted of receiving a firearm while under a felony information, in violation of a statute punishing those who "willfully violate[]" its provisions. *18 U.S.C. § 924(a)(1)(D) (1988 & Supp. V 1993).* While completing forms for the purchase of the firearm, the defendant had responded "no" to a question asking whether he was "under

161 F.3d 171, *183; 1998 U.S. App. LEXIS 28607, **35;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

indictment or information." *64 F.3d at 127*. In fact, the defendant was under a criminal information for receiving stolen property, and he acknowledged having received a copy of the information in the mail. At trial, the District Court prevented [*184] the defendant's expert witness from testifying the defendant had low intelligence and poor reading skills.

In reversing, we held such evidence was relevant to determine whether the defendant's failure to provide truthful information on the form was "willful," as required by the statute. *See id. at 134* (holding that "the government must prove Hayden knew or deliberately disregarded the fact that he was under an information and that his purchase of a firearm was therefore unlawful" and "the excluded evidence had a direct bearing on willfulness"). [**36] Accordingly, we remanded for a new trial but specifically instructed that "any use of expert testimony on remand must, of course, comply with *Federal Rule of Evidence 704(b)*." *Id. at 134 n.13*.

In *Theodoropoulos*, we assessed the testimony of an FBI cryptanalyst who translated code words used in intercepted conversations and testified about his inferences of the roles played by the individual defendants in a drug trial. [5] We held this testimony did not "fall within the narrow range of opinions still prohibited under *Rule 704* . . . .[because it consisted of] factual conclusions rather than opinions." *Theodoropoulos, 866 F.2d at 591* (citing, *inter alia, United States v. Brown, 776 F.2d 397, 400-02 (2d Cir. 1985)* (holding expert testimony that defendant was a "steerer" in a drug organization was admissible)).

> 5    We note that *Theodoropoulos* was overruled on other grounds by *United States v. Price, 76 F.3d 526 (3d Cir. 1996)*.

[**37] Finally, in *Pohlot* we considered "what, if any, evidence of a criminal defendant's mental abnormality is admissible to prove the defendant's lack of specific intent to commit an offense, following the passage of the Insanity Defense Reform Act of 1984." *Pohlot, 827 F.2d at 890*. [6] The defendant had been charged with using interstate commerce facilities in a plot to murder his wife. At trial, his psychiatric expert testified at length about the defendant's emotional development, his history of abuse by his wife, and his supposed feeling that the murder plot was an elaborate fantasy. *See id. at 892*. But the expert did not express an opinion whether the defendant had the requisite intent to

be guilty of the crime charged. We concluded the Insanity Defense Reform Act barred admission of evidence of mental abnormality to support a diminished capacity or diminished responsibility defense, but did not bar admission of such evidence to negate an element of mens rea:

> Although Congress intended *§ 17(a)* to prohibit the defenses of diminished responsibility and diminished capacity, Congress distinguished those defenses from the use of evidence [**38] of mental abnormality to negate specific intent or any other mens rea, which are elements of the offense. While the contours of the doctrines of diminished responsibility and diminished capacity are unclear, the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate mens rea.
>
> Despite our disagreement with the government's broad contention [that the Act barred all evidence of mental abnormality from the jury's consideration of mens rea], we agree that the [HN6] Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

[*185] *Id. at 890*. Therefore, "district courts should [**39] admit evidence of mental abnormality on the issue of mens rea only if when, if believed, it would support a legally acceptable theory of lack of mens rea. *Id. at 905-06*. [7] We upheld Pohlot's conviction because

161 F.3d 171, *185; 1998 U.S. App. LEXIS 28607, **39;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

even if the psychiatric testimony were credited, it did not negate a finding of specific intent. *See id. at 906-07.*

6    The Insanity Defense Reform Act of 1984 provides in part:

> [HN7] **(a) Affirmative Defense.--** It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

*18 U.S.C.A. § 17 (West Supp. 1998).*

7    *Pohlot* mentioned *Rule 704(b)*, albeit briefly, in dicta:

> The Senate Judiciary Committee wished to abolish only diminished responsibility and capacity defenses not to abolish the use of psychiatric evidence to disprove mens rea.
>
> A later portion of the Senate Report confirms this view of the Committee's intent. In addition to changing the insanity defense, the Insanity Defense Reform Act altered *Federal Rule of Evidence 704* to prevent psychiatric experts from providing opinions on ultimate issues. The Report explained: 'The Committee has fashioned its *Rule 704* provision to reach all such ultimate issues, e.g., *premeditation in a homicide case*, or lack of predisposition in entrapment.' Premeditation is, of course, an element of mens rea. If the Judiciary Committee had intended § 17(a) to prevent psychiatrists from testifying about

mens rea at all, its report would almost certainly not have indicated its approval of psychiatric evidence on mens rea.

*Id. at 898-99* (citations omitted).

[**40] Unlike the defendants in *Hayden*, *Theodoropoulos*, and *Pohlot*, Bennett sought to introduce expert testimony expressly stating that he lacked the mental capacity to commit the charged crimes. All of the excluded questions asked the expert to state, in conclusory terms, how Bennett's mental disorders affected his criminal culpability. That decision is exclusively within the province of the jury. We find no abuse of discretion in the District Court's decision to exclude the proposed testimony.

## C. Sentencing Issues

Bennett maintains the District Court erred during sentencing in failing to make specific findings of fact and resolve disputed issues as required by *Federal Rule of Criminal Procedure 32(c)(1)*. That Rule provides:

> [HN8] **(1) Sentencing Hearing.** At the sentencing hearing, the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony or other evidence of the objections. For [**41] each matter controverted, the court must make either a finding on the allegation or determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

*Fed. R. Crim. P. 32(c)(1)*. The accompanying advisory committee note provides:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 347 of 554

Page 19

161 F.3d 171, *185; 1998 U.S. App. LEXIS 28607, **41;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

[HN9] Subdivision (c)(1) is not intended to require that resolution of objections and imposition of sentence occur at the same time or during the same hearing. It requires only that the court rule on any objections before sentence is imposed . . . . The rule speaks in terms of the court's discretion, but the Sentencing Guidelines specifically provide that the court must provide the parties with a reasonable opportunity to offer information concerning a sentencing factor reasonably in dispute.

\* \* \*

Subdivision (c)(1) (formerly subdivision (c)(3)(D)) indicates that the court need not resolve controverted matters which will 'not be taken into account in, or will not affect, sentencing.' The words 'will not affect' did not [**42] exist in the former provision but were added in the revision in recognition that there might be situations, due to overlaps in the sentencing ranges, where a controverted matter would not alter the sentence eve if the sentencing range were changed. 8

*Fed. R. Crim. P. 32* advisory committee's note.

8    *See United States v. Singh, 923 F.2d 1039, 1044 (3d Cir. 1991)* ("*Rule 32* requires the judge, as a predicate for sentencing, either to resolve all disputes as to facts recited in the presentence report, or to make clear that the matters in dispute will not be a factor in sentencing."); *United States v. Furst, 918 F.2d 400, 408 (3d Cir. 1990)* ("[*Rule 32*] directs the District Court, as to each matter converted, either expressly to disclaim reliance upon the matter or to make a finding as to the allegation."); *United States v. Rosa, 891 F.2d 1063, 1070 (3d Cir. 1989)* ("The purpose of *Rule 32* will not be fulfilled unless the court either resolves the dispute or expressly disavows reliance on the disputed information.").

[**43]    **1. Consideration of the Sentencing Memorandum**

Initially, we must decide whether to consider the Sentencing Memorandum filed [*186] by the District Court after Bennett had appealed his sentence. As noted, the District Court made oral findings of fact at the sentencing hearing and expressly adopted the findings of the Presentence Investigation Report in its judgment order. The Sentencing Memorandum contains a more comprehensive explanation of the District Court's factual findings and conclusions of law with respect to the issues contested on this appeal. *See United States of America v. Bennett, 9 F. Supp. 2d 513, 1998 U.S. Dist. LEXIS 7751*, No. 96-cr-503, slip op. (E.D. Pa. May 28, 1998) (Sentencing Memorandum). Although we do not condone late filing, we will nonetheless consider the Sentencing Memorandum.

Bennett argues consideration of the Sentencing Memorandum would violate our Local Rules of Appellate Procedure and could unfairly prejudice his case. Local Rule of Appellate Procedure 3.1 provides, in part:

[HN10]  **Notice To Trial Judge; Opinion In Support Of Order**

At the time of the filing of a notice of appeal, the appellant shall mail [**44] a copy thereof by ordinary mail to the trial judge. Within 15 days thereafter, the trial judge may file and mail to the parties a written opinion or a written amplification of a prior written or oral recorded ruling or opinion.

3d Cir. R. 3.1. Notably, [HN11] the accompanying comments suggest a flexible approach is consistent with the spirit of the rule: "A District Court may properly prepare an opinion or memorandum explaining a decision after an appeal is taken. The rule is not intended to inhibit or discourage District Courts from preparing opinions as they presently do. To the contrary, the rule was designed to provide more flexibility." 3d Cir. R. 3.1 committee comments.

The District Court filed its Sentencing Memorandum long after the 15-day window of Local Rule 3.1 had expired. 9 Bennett does not ask that we strictly enforce the rule's 15-day limit, but proposes instead a bright-line rule forbidding consideration of any District Court opinion filed less than 30 days before the due date for the

appellant's brief. He advocates 30 days because "that is the shortest period of time under this Court's practice that an appellant is deemed to need to prepare the opening brief." [**45] (Appellant's Post-Argument Letter Br. at 4.) Thus, Bennett argues a 30-day rule would fulfill Local Rule 3.1's purpose of ensuring that appellants are not prejudiced by post-appeal clarifications of rulings in response to the appellant's formulation of issues and the identity of the panel.

> 9    After being sentenced in September 1997, Bennett filed a notice of appeal on October 2, 1997, and his brief to this Court on February 24, 1998. The government filed its brief on April 15, 1998 and Bennett filed a reply brief on May 21, 1998. Both parties based their arguments on the presentence report and the District Court's findings as reflected in the transcript of the sentencing hearing. Thereafter, on May 28, 1998, the District Court filed the Sentencing Memorandum.

Although Bennett's argument carries some appeal, we decline to adopt a bright-line rule. Instead we will look to the nature of the supplemental memorandum and whether its consideration would prejudice the defendant. In this case, we believe the Sentencing [**46] Memorandum is a helpful amplification of the District Court's sentencing decisions and its consideration will not prejudice Bennett. Bennett concedes the District Court did not alter or clarify its rulings to address the arguments raised in his appellate brief or cater to the identity of the panel. Nor was Bennett prejudiced by a lack of opportunity to address the content of the Sentencing Memorandum, since we allowed both parties to submit supplemental briefs on whether we should accept the Sentencing Memorandum and to respond to its content. Thus we fail to see how consideration of the Sentencing Memorandum could prejudice Bennett.

Finally, we note that even in the absence of the Sentencing Memorandum, we believe [*187] the District Court's explicit adoption of the factual findings in the presentence report, along with its own factual findings and legal conclusions at the sentencing hearing, were sufficient. Accordingly, we will consider the Sentencing Memorandum as an amplification of the District Court's sentencing decisions.

## 2. The Sentencing Memorandum

The Sentencing Memorandum focuses largely on the enhancements applied. On the calculation of the "amount of loss" [**47] for purposes of *U.S.S.G. § 2F1.1(b)(1)(S)*, the Sentencing Memorandum explains:

> The government's evidence demonstrated that the offense conduct was commenced in 1988-89 with check-kites that permitted defendant to pay off old loans with monies received from new investors . . . . The New Concepts program was begun as a check-kite/"Ponzi" scheme to cover cash shortages in defendant's then companies, and the scheme grew, in the form of a pyramid, as the base of investors widened. There was no collateral or other safety net to prevent the ultimate--predictable--catastrophic loss. Moreover, the huge pre-sentence restitution to the victims resulted from the considerable efforts of many individuals other than defendant. The loss was calculated to be in excess of $ 100 million based on the undisputed evidence as to the amount owed investors when New Era collapsed. Given the alternatives, that figure best approximated the extent of loss attributable to the New Concepts matching program. Because the amount was greater than $ 80 million, the upper limit of the highest Guideline's bracket for amount of loss, 18 levels, were added.

*Bennett*, at 9-10 (citations omitted).

Next, [**48] the District Court explained its decision to enhance Bennett's base offense level by two levels because of Bennett's misrepresentation that he was acting on behalf of a charitable organization:

> In the opinion of New Era's tax counsel it was 'important and appropriate' that the New Concepts program be disclosed on New Era's applications for tax-exempt status. Nevertheless, there was no reference to it on either New Era's application for federal 501(c)(3) exemption or the application for Pennsylvania charitable organization. Nor

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 349 of 554

Page 21

161 F.3d 171, *187; 1998 U.S. App. LEXIS 28607, **48;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

were inter-connected relationships between defendant's for-profit and not-for-profit entities disclosed. In October, 1994 an I.R.S. agent was sent to New Era to investigate the existence of a suspected Ponzi-like scheme. At that audit, defendant himself represented that there was no matching program. At sentencing, defendant admitted having concealed the matching program from the I.R.S.

Defendant's claim that he was unaware of New Era's financial operations is incomprehensible and not credible. The staff consisted of a handful of individuals all of whom were responsible to defendant and supervised by him. When called as government witnesses, their [**49] testimony portrayed him to be a micro-manager of the programmatic and financial activities of New Era as well as of the other entities that were subject to his control. He was an active and forceful CEO who created and organized his companies in his own image. He put together the programs, laid out all policies and directed their implementation, and selected personnel. He retained and conferred with attorneys and accountants. He solicited and met with representatives of potential investors--and made or approved all major corporate decisions.

At defendant's direction, New Era misrepresented or withheld information essential to its tax exempt status. As related in unrebutted testimony, defendant falsely conveyed to his own staff and to corporate counsel, as well as the public, that there was a board of directors. However, there were no directors other than defendant, although from time to time he talked about appointing them. As one of his attorneys testified, an I.R.S. requirement for tax-exempt status is the existence of a genuine board of directors. Another conceded that although defendant submitted to the I.R.S. a list of board members, in actuality none of the

documents concerning [**50] the board 'matched up'--causing the attorney to be [*188] concerned. Ironically, in a lecture series conducted by him, defendant admonished charitable organizations about the importance of a board of directors and of proper record-keeping for I.R.S. purposes. Credible evidence was received at sentencing that to satisfy the 1994 I.R.S. audit, defendant had dictated and submitted fictitious minutes of board meetings for 1992 and 1993.

Defendant's misrepresentations allowed New Era to present itself as a legitimate, tax-exempt foundation and facilitated the success of its illegal operation.

*Id.* at 11-13 (citations omitted).

The Sentencing Memorandum also describes how Bennett "affected a financial institution" and derived more than one million dollars in gross receipts, resulting in an enhancement under *U.S.S.G. § 2F1.1(b)(6)(B)*:

The offense 'affected a financial institution' in that defendant maintained personal and New Era accounts at several financial institutions, including Founder's Bank, the National Bank of the Main Line, and Prudential Securities.

Defendant's 'gross receipts' took two forms. One consisted of payments directly from New Era--money [**51] that came almost entirely from the New Concepts matching program. The other involved expenditures made for the benefit of defendant or his family.

Evidence showed that during the operation of New Era, there were transfers in excess of $ 4 million to defendant's personal accounts or to those of his for-profit companies. In the words of a government auditor, $ 4,208,637 was transferred from New Era to 'entities in which 100 percent interest is to John G. Bennett, Jr.' This total corresponded with

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 350 of 554

Page 22

161 F.3d 171, *188; 1998 U.S. App. LEXIS 28607, **51;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

the report of defendant's accountant less $ 800,000 credit for pre-collapse returns of previously transferred assets. Accepting defendant's figures, the amount still exceeds $ 3 million.

As to the expenditures that benefitted defendant or his family, it was proven that more than $ 2 million went directly to defendant's personal expenses and investments, including the purchase of a house, travel, loans, an expensive car, and transfers of money through for-profit company accounts.

As computed by the government auditor, the total of salary paid defendant, together with payments to his family members, Main Line Travel Agency, Merrill Lynch Investments, a Lexus dealership, personal [**52] credit card accounts, and for baseball tickets came to $ 2,449,960.

*Id.* at 14-15 (citations omitted).

The District Court also applied a four-level enhancement for Bennett's role in the offense. The Sentencing Memorandum explains this decision, characterizing Bennett's role as an organizer or leader of a criminal activity that was "otherwise extensive" within the meaning of *U.S.S.G. § 3B1.1(a)*.

In this action, there appears to have been just one other 'criminal participant,' an accountant. The application of the enhancement rests on the 'otherwise extensive' prong.

Andrew Cunningham, one of the outside accountants, pleaded guilty in this court to fraud in relation to his accounting work for New Era. In 1994, Cunningham became suspicious and asked defendant about several matters, including payments from New Era to defendant's for-profit consulting firm (Bennett Group International); fabricated minutes of board meetings presented to the I.R.S.; and lack of documentation to support the matching

program. Some time after these inquiries, Cunningham informed defendant that he himself was in financial difficulty and needed about $ 50,000. Defendant promptly agreed [**53] to give him that amount and said: 'I guess this means there won't be any more hard questions.' According to his testimony at defendant's sentencing, Cunningham felt that he had been 'bought.' From then on, when asked critical questions about New Era's activities, he falsified his answers. Cunningham became a criminal participant working at defendant's direction.

However, defendant also used a number of ostensibly innocent individuals to facilitate the operation of the matching program, rendering the activity 'otherwise extensive.' [Seven New Era employees [*189] worked under his direction] . . . Each performed a job that related and contributed to the overall scheme.

As an illustration--defendant's assistant, acting at his behest, did not give the monthly 'payment schedules' to New Era's lawyers and accountants who had asked for them. She also withheld the list of New Era's board members. Defendant utilized the services of several respected outside attorneys and accountants. Their work products, which gave defendant's companies the imprimatur of legality and reliability, reflected the carefully delimited information supplied to them by defendant. Moreover, he specifically [**54] directed Prudential Securities employees who handled investor inquiries not to divulge the non-segregated nature of these so-called 'escrow' accounts.

Since none of these individuals would appear to have acted with knowledge of New Era's illegal activities, they do not bear 'equal responsibility' with defendant for his conduct. Contrary to defendant's view, the enhancement was not based on defendant's position as president and sole

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 351 of 554

Page 23

161 F.3d 171, *189; 1998 U.S. App. LEXIS 28607, **54;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

director of New Era. Instead, the evidence supports the application of the enhancement because defendant led or directed one criminal participant and at least 13 innocent individuals to assist in the commission of the crimes for which he was indicted.

*Id.* at 16-19 (citations omitted).

The District Court further explained its decision to enhance Bennett's offense level for abusing "a position of trust" in a way that "significantly facilitated" the commission of a crime. *U.S.S.G. § 3B1.3*. The Sentencing Memorandum states:

As regards the nonprofit organizations and individuals who invested or donated money to be 'matched,' New Era and defendant occupied positions of trust as fiduciaries. Additionally, as its lone director, defendant [**55] had a fiduciary relationship with New Era. When defendant caused significant misrepresentations to be made in order to secure and maintain New Era's 'tax exempt' status, defendant violated his fiduciary duties both to the public and to New Era.

Next, as the government proved, defendant used these positions of trust to enable the perpetration of crimes. While defendant may have been impelled by his intense hopes to 'Save the World,' he not only was aware that monies were entrusted to New Era, but he also took fraudulent steps to develop and encourage that trust. Defendant's letter to prospective individual investors of January 1995 enclosed an informational manual about New Concepts and referred investors and donors to New Era's form 990 and state due-diligence registration. This is just one instance in which defendant knowingly disseminated material misrepresentations that were undeniably false.

To say that investors were greedy and, therefore, took their chances is but a half,

self-serving truth. As a Guidelines Commentary aptly observes: 'Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct.' Similarly, the argument that others, [**56] such as Prudential Securities, the accountant, Andrew Cunningham, and counsel helped lead defendant down the garden path, must also be flatly rejected. That reputable professionals, at his request, assisted him in carrying out these offenses hardly diminishes his role in them. If anything, the more cogent conclusion is to the contrary. As repeatedly shown by the evidence, defendant knowingly, purposefully, and repeatedly misrepresented the nature and characteristics of the matching program in order to market it and effectuate large scale participation. At its outset, he claimed that there was an 'anonymous benefactor' whose giving made the program feasible. Later, as he admitted, New Era distributed to organizations across the United States and, eventually, in England, prospectus-type literature asserting that the 'original' benefactor was 'extremely pleased' with the progress of the program.

Acting at defendant's sole direction, the Foundation constantly borrowed against and invaded funds that investors had deposited to be held, doubled and returned-- [*190] not encumbered or spent. Defendant assured potential investors that their money would be held for them in accounts [**57] at Prudential Securities. Nevertheless, as testified to by Prudential employees, all money received was put into a single 'command account,' which was under defendant's total control and in which funds were merely designated 'F.B.O.'--'for the benefit of'--the investing organization. Defendant explained to investors that they money would have to be held in 'escrow' for set periods of time because of the 'anonymous benefactors'' purported instructions. But as

defendant well knew, all the funds received by New Era were commingled and were transferred, at his discretion, to cover shortfalls and to make other improper payments. These various dealings constituted fact-specific knowing abuses of trust.

*Bennett*, at 19-21 (citations omitted).

Finally, the District Court reiterated its refusal to grant a two-level downward adjustment for acceptance of responsibility:

Here, although conceding his knowledge of the occurrence of many of the transactions forming the fact basis of the charges and accepting personally responsibility for them, defendant disavowed having any criminal intent. He denied knowledge of account balances or of checks signed by him, of tax forms that he [**58] signed, and of giving his accountants a fabricated list of board members to be submitted to the I.R.S. He disclaimed any wrongdoing. Even if the 'anonymous benefactors' had actually existed, that position is untenable, given defendant's numerous admitted misrepresentations of material facts and his unauthorized use of investor's monies. He cannot be said to have clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct, as required by *§ 3E1.1*. Instead, he demonstrated a non-recognition and non-acceptance of personal responsibility.

*Id.* at 22-23 (citations omitted).

## D. Resolution of Sentencing Issues

Bennett argues the District Court erred in imposing: (1) a two-level increase in the offense level for Bennett's misrepresentation of acting on behalf of a charity; (2) a four-level increase for deriving more than $ 1 million from a fraud offense that affected a financial institution; (3) a four-level increase for Bennett's role leadership role

in the offense; (4) a two-level increase for his abuse of a position of trust; and (5) no reduction in the offense level for Bennett's acceptance of responsibility. [HN12] When [**59] reviewing the imposition of a sentence under the federal sentencing guidelines, "the District Court's findings of facts are measured by the clearly erroneous test, but our review of the legal component of its conclusion is plenary." *United States v. Hillstrom, 988 F.2d 448, 450 (3d Cir. 1993); see also United States v. Bush, 56 F.3d 536, 537-38 (3d Cir. 1995).*

### 1. Misrepresentation of Acting on Behalf of a Charity

As noted, the District Court imposed a two-level enhancement under *U.S.S.G. § 2F1.1(b)(3)(A)* for Bennett's misrepresentation of acting on behalf of a charity. Bennett argues the District Court failed to make proper factual findings in response to his objections that (1) he never falsely represented his authority to act as an agent or employee of the New Era organizations; (2) the New Era organizations were bona fide; and (3) there is insufficient evidence to prove the New Era organizations were frauds from their inception or that Bennett intentionally provided false information to or deceived either the I.R.S. or other government agencies.

We believe the District Court's fact-finding supports application of the adjustment. The [**60] presentence report found that Bennett secured a favorable I.R.S. rating for New Era by submitting fraudulent documentation that failed to reveal the New Concepts Program, he enticed participants to provide funds with false statements that anonymous donors would match their donations, and he used New Era's charitable image to divert funds to private businesses. The District Court adopted these findings and determined that Bennett's conduct caused a loss of over $ 100 million. The court also recited the presentence [*191] report's determination that Bennett diverted many of these funds to his personal use, in direct violation of his promise to hold the money in escrow until it was matched by the alleged anonymous donor. Bennett did all of this under the pretense of running a legitimate charitable organization.

Bennett also argues that as a matter of law, the adjustment applies only when a defendant falsely claims to be soliciting on behalf of a genuine charity with which the defendant has no connection, solicits on behalf of a fictitious charity, or uses a position as the actual representative of a genuine charitable organization to

embezzle money. According to Bennett, the adjustment [**61] does not apply here because the Foundation for New Era Philanthropy was a genuine "charitable organization" and Bennett actually acted on its behalf at all times.

We disagree with this narrow interpretation of the enhancement. The guideline provides that if the offense involved [HN13] "misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency . . . increase by 2 levels." *U.S.S.G. § 2F1.1(b)(3)(A)*. The application note states:

> [HN14] Examples of conduct to which this factor applies would include a group of defendants who solicit contributions to a non-existent famine relief organization by mail, a defendant who diverts donations for a religiously affiliated school by telephone solicitations to church members in which the defendant falsely claims to be a fund raiser for the school, or a defendant who poses as a federal collection agent in order to collect a delinquent student loan.

*U.S.S.G. § 2F1.1* cmt. (n.4). This list of examples is illustrative, not exhaustive. *See United States v. Ferrera, 107 F.3d 537, 541 (7th Cir. 1997)* ("The commentators could not have intended these [**62] examples to be exhaustive, and as a practical matter, these examples could not be exhaustive, as the devious mind would easily escape that limited net.") (citation omitted). *But see United States v. Frazier, 53 F.3d 1105, 1113 (10th Cir. 1995)* (noting that the hypotheticals "demonstrate that the purview of the guideline is narrower than that which may be discerned from a literal reading of the guideline").

[HN15] The background commentary to the fraud guideline instructs:

> This guideline is designed to apply to a wide variety of fraud cases . . . . Use of false pretenses involving charitable causes and government agencies enhances the sentences of defendants who take advantage of victims' trust in government or law enforcement agencies or their

generosity and charitable motives. Taking advantage of a victim's self interest does not mitigate the seriousness of fraudulent conduct. However, defendants who exploit victims' charitable impulses or trust in government create particular social harm.

*U.S.S.G. § 2F1.1* cmt. (backg'd). [10] Furthermore, "[HN16] that the victims may not have wholeheartedly believed [defendant's] representations and sought independent verification [**63] does not mitigate the seriousness of [defendant's] conduct. Rather, the focus of our inquiry must be on the defendant's motivation for making the prohibited representation." *Ferrera, 107 F.3d at 541*.

> 10  *See Stinson v. United States, 508 U.S. 36, 38, 123 L. Ed. 2d 598, 113 S. Ct. 1913 (1993)* ("Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

Assuming the Foundation for New Era Philanthropy constituted a genuine charitable organization in some respects, it is clear Bennett used his position there to ensnare donors with falsehoods designed to generate contributions. He exploited his victims' altruism to reap personal, pecuniary gain. [HN17] We find no authority for the proposition that the enhancement applies only if the "charitable" organization is fraudulent from its inception and in every facet of [**64] its operations. Nor does it matter that many of Bennett's victims acted at least partially out of self interest. *See id.* Regardless of their motivation in giving money to New Era, donors had a right to expect that their contributions would be [*192] used in the manner that Bennett had promised. [11]

> 11  *See, e.g., United States v. Smith, 133 F.3d 737, 741 (10th Cir. 1997)* (approving enhancement where defendant obtained contributions as telephone solicitor for a bogus organization supposedly devoted to helping children stay off drugs where the organization actually retained collected funds); *Ferrera, 107 F.3d at 541* (affirming enhancement where defendant issued falsified promissory notes purportedly guaranteed by the Mexican government and falsely claimed to be a prominent

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 354 of 554

Page 26

161 F.3d 171, *192; 1998 U.S. App. LEXIS 28607, **64;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

figure in the Mexican military and government); *United States v. Marcum, 16 F.3d 599, 603 (4th Cir. 1994)* (upholding enhancement for defendant who skimmed proceeds from bingo games conducted on behalf of a charitable organization).

[**65] In response, Bennett relies largely on the Tenth Circuit's decision in *United States v. Frazier*, cited above. Frazier was the president of a non-profit corporation that provided technical and social services to Native Americans. He was indicted for, *inter alia*, misusing government funds and making false statements to a government agency. The Tenth Circuit held that an enhancement for misrepresentation of acting on behalf of a charity was not warranted, because the enhancement applies only when a defendant exploits victims' generosity and charitable motives by misrepresenting one's authority. *Frazier* therefore limits application of *U.S.S.G. § 2F1.1(b)(3)(A)* to defendants who falsely represent they have authority to act on behalf of a charitable, religious, educational, or political organization. *See 53 F.3d at 1114 n.7 (citing United States v. Starr, 986 F.2d 281, 282-83 (8th Cir. 1993)).*

The facts of this case are quite different. The defendant in *Frazier* "did not affirmatively solicit contributions from the public, but rather [misapplied government funds]," "did not exploit the 'generosity' and 'charitable motives' of his [**66] victim," and "did not solicit funds the purpose of which was, at least in part, to serve his *own personal interest*." *Frazier, 53 F.3d at 1114*; *see also Smith, 133 F.3d at 744* (noting Frazier "used grant funds for unauthorized purposes, but did not 'appeal to the generosity and charitable or trusting impulses of his victim' ") (citation omitted); *Ferrera, 107 F.3d at 542* & n.4 (distinguishing *Frazier* on the same grounds). In contrast, Bennett actively solicited contributions from individuals and organizations, exploiting their charitable impulses to extract donations that were eventually funneled to his for-profit businesses and personal use. Surely these donors would not have contributed the funds had they known the true nature of New Era: namely, that it was an organization premised on falsehoods and serving as a vehicle for Bennett's personal gain.

We conclude the District Court properly applied a two-level enhancement for Bennett's misrepresentation that he acted on behalf of a charity.

## 2. Affecting a Financial Institution

The District Court applied a four-level enhancement because Bennett derived more than [**67] $ 1 million in gross receipts from an offense that affected a financial institution. Bennett argues the District Court failed to make specific factual findings to support application of this enhancement.

*U.S.S.G. § 2F1.1(b)(6)(B)* provides: [HN18] "If the offense . . . affected a financial institution and the defendant derived more than $ 1,000,000 in gross receipts from the offense, increase by four levels. If the resulting offense level is less than level 24, increase to level 24." [HN19] The accompanying application note explains "gross receipts from the offense" generally means "that the gross receipts to the defendant individually, rather than to all participants, exceeded $ 1,000,000. 'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." *U.S.S.G. § 2F1.1* cmt. (n.16); *see United States v. Kohli, 110 F.3d 1475, 1477 (9th Cir. 1997)* ("Application note 16 confirms the broad sweep of this guideline.").

[HN20] The guideline requires only (1) that the offense "affected a financial institution," and (2) that the defendant "derived more than $ 1,000,000 from the offense. [**68] " *U.S.S.G. § 2F1.1(b)(6)(B)*. It applies "even if the defendant receives the million dollars in an indirect manner." *United States v. Monus, 128 F.3d 376, 397 (6th Cir. 1997)*; *see also Kohli, 110 F.3d at 1477* ("The critical factor [*193] in the application of this enhancement is that it turns on the culpability of the individual defendant."). The offense need only "affect" a financial institution to qualify for the adjustment; it does not have to jeopardize the soundness of the institution. *See United States v. Wilson, 41 F.3d 399, 401 (8th Cir. 1994)* (finding "no qualification indicating that Congress sought to punish such conduct only when the safety and soundness of a financial institution was jeopardized").

We believe Bennett's offense met these criteria. Both the presentence report and the District Court expressly found that Bennett personally derived more than $ 1 million from his criminal conduct. This finding was fully supported by the evidence. Bennett's forensic accountant and the government's expert agreed that Bennett transferred $ 4,280,637 to businesses in which he possessed a 100 percent interest. Reducing this [**69] amount by the $ 800,000 that Bennett returned after being caught, the gross receipts still far exceed $ 1 million.

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 355 of 554

Page 27
161 F.3d 171, *193; 1998 U.S. App. LEXIS 28607, **69;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

Bennett's expert nevertheless concluded that Bennett did not receive all of these funds "individually" because he subsequently transferred much of the money to consultants and others who did work for New Era. But [HN21] it is irrelevant how Bennett spent the money after he obtained it. *See United States v. Wong, 3 F.3d 667, 668 (3d Cir. 1993)* (holding that " 'gross receipts from the offense' includes all property which is obtained either directly or indirectly as a result of the offense"). The District Court did not err in finding Bennett individually derived more than $ 1 million from his offense.

We also find support for the District Court's conclusion that the offense affected several financial institutions, most directly Prudential Securities. As the presentence report and the Sentencing Memorandum note, Bennett obtained a $ 50 million loan for New Era from Prudential and used his account there to facilitate the offenses. He then defrauded investors by telling them their funds were deposited in Prudential "quasi-escrow" accounts. In the aftermath, the bankruptcy [**70] trustee sued Prudential for over $ 150 million. Prudential ultimately agreed to pay $ 18 million to settle litigation resulting from the collapse of the New Era organizations and suffered negative publicity that harmed its reputation. [12]

> [12]  *See, e.g.*, *Monus, 128 F.3d at 397-98* (finding corporate officer who concealed losses and falsified corporate financial records, some of which were submitted to financial institutions, "affected a financial institution"); *United States v. Schinnell, 80 F.3d 1064, 1070 (5th Cir. 1996)* (upholding enhancement where defendant improperly withdrew funds from her employer's bank account, because "direct harm to the banks involved was certainly reasonably foreseeable" and "the banks [were] realistically exposed to substantial potential liability as the result of [defendant's] fraud").

The District Court expressly adopted these findings from the presentence report. It also expressly found at the sentencing hearing that Bennett individually [**71] derived more than $ 1 million from offenses affecting a financial institution. We believe these findings were more than adequate to support application of the enhancement.

**3. Leadership Role in the Offense**

According to Bennett, the District Court made only

conclusory findings to support its decision to enhance his base offense level for being an organizer or leader of a criminal activity under *U.S.S.G. § 3B1.1(a)*. Bennett further claims the District Court failed to identify individuals Bennett organized, supervised, and managed, or the offenses in which these individuals participated, and failed to determine whether Bennett's accountant Andrew Cunningham was a culpable participant in the criminal activity.

The Sentencing Guidelines provide: [HN22] "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." If the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." *U.S.S.G. § 3B1.1(b)*. Thus, [HN23] the sentencing court should enhance the more culpable offenders' [**72] levels "so long as there were five or more participants *or* so long as the criminal [*194] activity was 'otherwise extensive.' " *United States v. Katora, 981 F.2d 1398, 1405 (3d Cir. 1992)*.

In the Sentencing Memorandum, the District Court explains [HN24] there was only one other "participant" (accountant Andrew Cunningham), but the enhancement was appropriate because the criminal activity was "otherwise extensive." *See United States v. Bennett, 9 F. Supp. 2d 513, 1998 U.S. Dist. LEXIS 7751, at *21, No. 96-cr-503 (E.D. Pa. May 28, 1998).* We believe this holding was correct. [HN25] The Sentencing Guidelines define a "participant" as a "person who is criminally responsible for the commission of the offense, but need not have been convicted." *U.S.S.G. § 3B1.1* cmt. (n.1). Only Cunningham, who pleaded guilty to charges related to Bennett's offenses, appears to fit this description. However, the Guidelines also instruct that in assessing whether an organization is "otherwise extensive," "all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of [**73] many outsiders could be considered extensive." *U.S.S.G. § 3B1.1*, cmt. (n.3). [13]

> [13]  The Sentencing Commission describes the purpose of the enhancement as follows:
>
> > This section provides a range of adjustments to increase the offense

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 356 of 554

Page 28

161 F.3d 171, *194; 1998 U.S. App. LEXIS 28607, **73;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

In relatively small criminal enterprises that are otherwise to be considered extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility.

*U.S.S.G. § 3B1.1* cmt. (backg'd).

[**74] In addition to enlisting Cunningham's services, Bennett actively used his New Era staff to perpetrate extensive fraud. The Sentencing Memorandum identifies by name seven employees who, unwittingly and at Bennett's direction, contributed to Bennett's scheme by withholding requested documents and information from investors. *See Bennett, 9 F. Supp. 2d 513, 1998 U.S. Dist. LEXIS 7751,* at *17-18. It also notes that Bennett hired several attorneys and accountants to prepare reports based on false information that Bennett had given them, and then used their imprimatur of propriety to pass off New Era as a legitimate charitable organization. Additionally, Bennett instructed employees at Prudential

Securities not to reveal that New Era funds on deposit there were not held in "escrow or quasi-escrow" accounts, as Bennett had told investors. In all, the District Court counted "at least 13 innocent individuals" whom Bennett used to assist him in the commission of his crimes. *Id.* at *27.

All of these findings are amply supported by the presentence report and by the District Court's findings at the sentencing hearing. Accordingly, we believe the District Court adequately [**75] articulated the factual bases for concluding that Bennett was the leader of an "otherwise extensive" criminal enterprise. [14]

> 14  *See also United States v. D'Andrea, 107 F.3d 949, 957 (1st Cir. 1997)* (holding that [HN26] the determination of whether a criminal enterprise is "extensive" under *U.S.S.G. § 3B1.1* derives from the " 'totality of the circumstances,' " including not only the number of participants, but also the " 'width, breadth, scope, complexity, and duration of the scheme' "); *United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991)* (noting when sentencing court finds defendant's scheme involved one other criminal participant "the court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is 'extensive' within the contemplation of *section 3B1.1*").

### 4. Abuse of a Position of Trust

Bennett argues the District Court failed to make the necessary findings to support its determination that Bennett should receive a two-level upward [**76] adjustment for abusing a "position of trust" under *U.S.S.G. § 3B1.3.* According to Bennett, the enhancement is unwarranted because he held no "insider" position facilitating the offense or causing the victims to rely on his integrity. [*195] Bennett also argues the enhancement is designed to apply to those who misuse their own positions of trust or special skills, and therefore should not be based on Bennett's use of fiduciaries such as lawyers, accountants, and stock brokers to assist the New Era organizations.

The Sentencing Guidelines provide for a two-level upward adjustment if the defendant [HN27] "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ." *U.S.S.G. § 3B1.3.* The application notes state:

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 357 of 554

Page 29

161 F.3d 171, *195; 1998 U.S. App. LEXIS 28607, **76;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

[HN28] "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary [**77] in nature. For this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

*U.S.S.G. § 3B1.3* cmt. (nn.1, 2). [HN29] We have identified several factors relevant to determining what constitutes a "position of trust" for purposes of *U.S.S.G. § 3B1.3*:

> (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person [**78] occupying the position. These factors should be considered in light of the guiding rationale of the section--to punish "insiders" who abuse their position rather than those who take advantage of an available opportunity.

*United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994)* (finding the defendant did not occupy a position of trust merely because he was the friend of the bank manager in a check-kiting and loan fraud scheme). [15]

[15] *See also United States v. Turner, 102 F.3d 1350, 1360 (4th Cir. 1996)* (finding mine owners and operators who falsified forms abused positions of trust because they exercised managerial discretion, employees trusted them and deferred to their judgment regarding mine safety, and the public trusted them to follow mine safety laws); *United States v. Sokolow, 91 F.3d 396, 413 (3d Cir. 1996)* (upholding enhancement because president and owner of company "was able to commit difficult-to-detect wrongs, as he had sole control over [the company's] accounts without oversight or supervision"); *United States v. Lilly, 37 F.3d 1222, 1227 (7th Cir. 1994)* (holding that a position of trust is characterized by " 'access or authority over valuable things' ") (citations omitted); *Marcum, 16 F.3d at 603-04* (finding enhancement appropriate because "as president, Marcum was responsible for running the games and completing and mailing the financial returns; without this position of trust, he would not have the had the opportunity to commit the crime"); *United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1996)* ("The question of whether an individual occupies a position of trust should be addressed from the perspective of the victim.").

[**79] Evaluating these criteria, we find the enhancement for abuse of a position of trust was fully justified. Bennett's position as president and sole director of the New Era organizations greatly reduced the probability that the fraudulent offenses would be detected. His absolute control over the organizations enabled him to conceal his crimes from detection for approximately six years. In particular, Bennett's authority allowed him to disseminate falsehoods about trust agreements and anonymous benefactors, misrepresent that he received no compensation for his charitable efforts, create a phony board of directors made up of prominent individuals, deceive investors that funds deposited with New Era organizations were held in escrow or quasi-escrow accounts, and provide false information to the I.R.S. and investors.

[*196] In all of these undertakings, it was Bennett's position of trust that cloaked him with the requisite authority to deceive. Because New Era had no genuine board of directors, Bennett acted without supervision and exercised unlimited managerial discretion over the organizations and their staffs. Additionally, he had unchecked authority to make withdrawals and deposits [**80] from company accounts, to invade the "command" account in which all donations were held,

Case 09-10138-MFW    Doc 14394-2    Filed 09/10/14    Page 358 of 554

Page 30

161 F.3d 171, *196; 1998 U.S. App. LEXIS 28607, **80;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

and to transfer funds from one organization to another.

Furthermore, it is clear the victims relied on Bennett's integrity when making donations. They believed, based on his representations, that their money would be held in low-risk accounts to be matched by anonymous donors and ultimately used for charitable purposes. It was this fiduciary position that Bennett occupied--not his use of additional fiduciaries such as lawyers and accountants--that caused the District Court to find Bennett held a position of trust relative to his victims. We believe the District Court properly increased Bennett's offense level for abuse of a position of trust.

### 5. Acceptance of Responsibility

Bennett asserts the District Court failed to make adequate findings of fact to explain its denial of a two-level downward adjustment for acceptance of responsibility under *U.S.S.G. § 3E1.1*. He claims his acceptance of responsibility is demonstrated by his guilty plea, his decision to cooperate prior to the initiation of a criminal investigation with the Bankruptcy Trustee and Bankruptcy Court, and his surrender [**81] of a large portion of his personal assets. He further argues that as a matter of law, there is no categorical rule against granting an acceptance-of-responsibility adjustment when the defendant pleads nolo contendere rather than guilty. [16]

16    [HN30] A plea of nolo contendere, "like the plea of guilty . . . is an admission of guilt for the purposes of the case." *Hudson v. United States, 272 U.S. 451, 455, 71 L. Ed. 347, 47 S. Ct. 127 (1926)*. More specifically, it is the

type of plea which may be entered with leave of court to a criminal complaint or indictment by which the defendant does not admit or deny the charges, though a fine or sentence may be imposed pursuant to it . . . . The principal difference between a plea of guilty and a plea of nolo contendere is that the latter may not be used against the defendant in a civil action based upon the same acts.

Black's Law Dictionary 1048 (6th ed. 1990).

*U.S.S.G. § 3E1.1(a)* provides: [HN31] "If the defendant clearly demonstrates acceptance [**82] of responsibility for his offense, decrease the offense level by 2 levels." [HN32] In determining whether a defendant qualifies for a reduction under this provision, the District Court is not required to limit its analysis solely to whether the defendant entered a guilty plea:

Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under *§ 1B1.3* (Relevant Conduct) . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

*U.S.S.G. § 3E1.1* cmt. (nn.1, 3); *see United States v. Singh, 923 F.2d 1039, 1043 (3d Cir. 1991)* ("[A] plea of guilty is not dispositive as to the defendant's acceptance of responsibility."). Moreover, [HN33] the District Court's decision whether to grant the adjustment [**83] is entitled to "great deference" on review because "the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." *U.S.S.G. § 3E1.1* cmt. (n.5); *see also United States v. Cianscewski, 894 F.2d 74, 83 (3d Cir. 1990)* (holding the District Court's determination that defendant did not accept responsibility will be reversed only if "clearly erroneous"). The defendant bears the burden of proving that he is entitled to the downward adjustment. *See, e.g., United States v. Bermea, 30 F.3d 1539, 1577 (5th Cir. 1994); United States v. Barry, 295 U.S. App. D.C. 173, 961 F.2d 260, 266 (D.C. Cir. 1992)*.

[*197] We find the District Court did not err in declining to reduce Bennett's offense level for acceptance of responsibility. The presentence report recommended against such an adjustment because Bennett continued "to deny factual guilt and criminal intent for his actions." In

161 F.3d 171, *197; 1998 U.S. App. LEXIS 28607, **83;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

the press release announcing his decision to plead nolo contendere, Bennett made a point of stating he did not admit to the government's version of the facts. [17] More importantly, at the sentencing hearing Bennett continued [**84] to deny culpability:

> Though I know if I were to state my guilt in regard to certain facts of this case, my sentence would be less, I just can't do that. I never intended to defraud or hurt anyone. The benefactors were real to me at that time and I never bribed Mr. Cunningham . . . . The words he stated I said to him after helping him are completely alien to my nature.

[17] In a press release dated March 26, 1997, Bennett explained his reasons for entering the nolo contendere plea:

> By entering this nolo contendere plea, Mr. Bennett accepts responsibility for the consequences of his conduct in operating the Foundation for New Era Philanthropy ("New Era"). Mr. Bennett's decision is based, in part, on the Court's pretrial ruling which limited his ability to present psychiatric evidence on the issue of his intent. For this reason, Mr. Bennett's plea is conditional, thereby enabling him to appeal the court's ruling . . . .

> * * *

> After careful consideration of all of his options, including proceeding to trial or plea bargaining for a lesser sentence, Mr. Bennett chose to enter his nolo contendere plea. A plea of nolo contendere has historically been viewed 'not as an express admission of guilt but as a consent by the defendant that he may be punished if he were guilty and a prayer for leniency.' A nolo

contendere plea was particularly appropriate in this case since, by his plea, Mr. Bennett does not admit or adopt as true the government's version of the facts, insofar as those facts relate in any way to the issue of his intent to commit the crimes alleged in the indictment.

On April 16, 1997, Bennett distributed a letter to "those affected by the collapse of the Foundation for New Era Philanthropy" in which he stated that "I realize that by going to trial I could have defended myself against the allegations, many of which are untrue." In the letter, Bennett states he did not want to put his family, friends, staff, former associates, and charities through the experience of a trial. He also reveals:

> I could not plead guilty and plea bargain for a lesser sentence. All the counts charge me with the intent to defraud. By plea bargaining to those charges, I would be lying before my God to get a lesser sentence because I would have to admit an intent to defraud. There was never any intent, never a preconceived scheme, never a thought of devising a way to defraud anyone. I am responsible for my actions and I am prepared to accept responsibility for them. But I can never plead guilty to nor admit to the intent to defraud which I did not possess.

[**85] Bennett also denied that he transferred New Era funds to his personal accounts and for-profit businesses, created a fictitious board of directors, or fabricated minutes of their "meetings." Bennett's testimony provided a sufficient basis for the District Court to conclude Bennett had not accepted responsibility for his actions. *See, e.g., United States v. Muhammad, 146 F.3d 161, 168 (3d Cir. 1998)* (upholding denial of

161 F.3d 171, *197; 1998 U.S. App. LEXIS 28607, **85;
82 A.F.T.R.2d (RIA) 7204; 50 Fed. R. Evid. Serv. (Callaghan) 909

adjustment for acceptance of responsibility where defendant offered no "genuine show of contrition"); *United States v. Veksler, 62 F.3d 544, 551 (3d Cir. 1995)* (upholding denial where defendant did not admit to the crimes charged in the indictment).

We also reject Bennett's argument that he is entitled to the adjustment because his nolo contendere plea is equivalent to a guilty plea. Even if the pleas are equivalent, the Guidelines make clear that a guilty plea does not carry with it an automatic entitlement to credit for acceptance of responsibility. *See U.S.S.G. § 3E1.1* cmt. (nn. 1, 3). Nor does Bennett's cooperation with the Bankruptcy Trustee and other government agencies automatically qualify him for the adjustment. [**86] These actions may constitute evidence of acceptance of responsibility, but the sentencing court was free to consider other evidence that is inconsistent with acceptance of responsibility, such as Bennett's repeated denials of culpability. Here, the District Court weighed the evidence and determined Bennett had not truly accepted responsibility for his crimes. Supported by the facts set forth in the presentence report (which the District Court expressly adopted) and by Bennett's own testimony at the sentencing hearing, the District Court

was in the best position to [*198] ascertain the genuineness of Bennett's contrition. We decline to disturb its finding.

### III. CONCLUSION

We hold the District Court did not abuse its discretion in excluding proposed questions for Bennett's expert witness under *Federal Rule of Evidence 704(b)*. The questions called for responses stating expressly whether Bennett possessed the requisite mental state constituting elements of the crimes charged. We also hold the District Court made sufficient findings of fact as required by *Federal Rule of Criminal Procedure 32* to resolve disputed points at sentencing relating to Bennett's misrepresentation [**87] of acting on behalf of a charity, his deriving more than $ 1 million from a fraud offense that affected a financial institution, his aggravating role in the offense, his abuse of a position of trust, and his acceptance of responsibility. Similarly, we approve the District Court's application of the Sentencing Guidelines on these issues.

Accordingly, we will affirm the judgment of sentence imposed by the District Court.



5 of 7 DOCUMENTS

**United Rentals, Inc. v. RAM Holdings, Inc., et al.**

**Civil Action No. 3360-CC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2007 Del. Ch. LEXIS 179*

**December 13, 2007, Submitted**
**December 13, 2007, Decided**

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Motion granted by *United Rentals, Inc. v. Ram Holdings, Inc., 2007 Del. Ch. LEXIS 180 (Del. Ch., Dec. 17, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff rental company sued defendants, a holding company and an acquisitions company, regarding the interpretation of a contract. Defendants proffered the expert report and testimony of a professor.

**OVERVIEW:** In the report, the professor discussed customary deal structures for buyouts of public companies by private buyout funds and changes in those deal customs over time, and customary practices for lawyers negotiating agreements for mergers and acquisitions such as buyouts. Under Del. R. Evid. 702, the court determined that the factual testimony about deal structure contained in the report were admissible because the testimony satisfied the relevance and reliability requirements. However, the testimony in the report regarding the customs and practices of drafting in mergers and acquisitions negotiations was inadmissible

because the proffered testimony was legal opinion since it opined on contract interpretation.

**OUTCOME:** The court allowed the portion of the report that described buyout deal structures, but excluded the remainder of the report that purported to explain drafting practices.

**LexisNexis(R) Headnotes**

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
[HN1] Del. R. Evid. 702 directs that expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue. Del. R. Evid. 702. In addition to this relevance requirement, the Rule requires that the proffered testimony is reliable. Del. R. Evid. 702.

*Evidence > Testimony > Experts > Admissibility*
[HN2] It is improper for witnesses to opine on legal issues governed by Delaware law. It is within the exclusive province of the court to determine such issues of domestic law.

**COUNSEL:** [*1] Collins J. Seitz, Jr., Matthew F. Boyer, Christos T. Adamopoulos, Connolly Bove Lodge & Hutz LLP, Wilmington, DE.

2007 Del. Ch. LEXIS 179, *1

Gregory P. Williams, Raymond J. DiCamillo, Richard P. Rollo, John D. Hendershot, Richards, Layton & Finger, P.A., Wilmington, DE.

## OPINION

Defendants RAM Holdings, Inc. and RAM Acquisition Corp. proffer to this Court the expert report and testimony of Professor John C. Coates. In this report, Professor Coates describes and discusses two topics: (1) "customary deal structures for buyouts of public companies by private buyout funds and changes in those deal customs over time" and (2) "customary practices for lawyers negotiating agreements for M&A such as buyouts." [1] After thoroughly reviewing Professor Coates's report and both parties' briefs, I find that the portion of the report that describes buyout deal structures is admissible as factual testimony and that the remainder of the report that purports to explain drafting practices is inadmissible as impermissible legal opinion.

1   Expert Report of Professor John C. Coates IV ("Report") P 4.

With respect to the solely factual testimony about deal structure contained in Professor Coates's report, this Court will admit and give such testimony [*2] weight--however little or much--as the Court determines it merits. [HN1] Rule 702 directs that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." [2] In addition to this relevance requirement, the Rule requires that the proffered testimony is reliable. [3] That I will find any factual discussion in the report helpful to determine a fact in issue in this case is--at best--a dubious proposition. To the extent, however, that any observations regarding deal structure are ultimately helpful, I conclude that only these observations are sufficiently reliable to warrant their consideration.

2   DEL. R. EVID. 702.
3   *Id.*

The rest of the testimony in the report--the "customs and practices of drafting in M&A negotiations" section [4] --is inadmissible. This description of "customs and practices" is testimony that, in reality, opines on contract interpretation. Defendants do nothing to dissuade this Court from the conclusion that the testimony is bare legal opinion. In fact, defendants' arguments confirm that the proffered testimony is legal opinion. For example,

defendants argue that "Professor Coates explains that phrases such as 'subject to' and 'notwithstanding' [*3] allow the parties 'to avoid the need to attempt to synthesize every provision of every related agreement . . . .'" [5] It is therefore obvious that defendants' expert intends to instruct this Court on how such "succinct but legal terms of art" [6] should be interpreted. [7] This Court, however, has made it unmistakably clear that [HN2] it is improper for witnesses to opine on legal issues governed by Delaware law. [8] It is within the exclusive province of this Court to determine such issues of domestic law. [9] I, in interpreting the disputed contractual provisions at issue in this case, need not--indeed, *may not*--look beyond the well-established precedent of the Delaware courts, with which I am intimately familiar. The report, by opining on Delaware law and the application thereof under the guise of informing the Court of drafting "customs and trends," impermissibly encroaches on the province of this Court. [10] Therefore, any and all of the proffered testimony in Professor Coates's report that opines on the interpretation of an agreement under Delaware contract law is inadmissible.

4   Report PP 26-29.
5   Defs.' Br. in Opp'n to Pl.'s Mot. to Exclude the Expert Report and Testimony of John C. Coates IV at [*4] 4 (citing Report P 26).
6   Report P 26.
7   Remarkably, in his report, Professor Coates appears to excuse practices that can only be described as inartful drafting as "one of the ways that the parties [to buyout negotiations] commonly economize on time and costs." *Id.* Professor Coates states that the parties, in contravention of basic principles of contract interpretation and drafting, use certain phrases (*e.g.,* "subject to" or "notwithstanding") so as to "avoid the need to attempt to synthesize every provision of every related agreement that is or may be partly or wholly in conflict with the provision in question." *Id.* Not surprisingly, disputes often arise precisely because of provisions that are "partly or wholly in conflict" with each other.
8   *See, e.g., In re Walt Disney Co. Derivative Litig.,* No. 15452-NC, 2004 Del. Ch. LEXIS 27, 2004 WL 550750, at *1 (Del. Ch. Mar. 9, 2004) ("In this Court, witnesses do not opine on Delaware corporate law.").
9   *See, e.g., id.* (citing *Itek Corp. v. Chicago*

*Aerial Indus., Inc., 274 A.2d 141, 143 (Del. 1971)*; *N. Am. Philips Corp. v. Aetna Cas. and Sur. Co., No. 88C-JA-155, 1995 Del. Super. LEXIS 340, 1995 WL 628447, at *3 (Del. Super. Apr. 22, 1995)*; *State v. Hodges, Nos. CR 95-12-0405, CR 95-12-0406, 1996 Del. Super. LEXIS 391, 1996 WL 33655975, at *2 (Del. Super. Sept. 10, 1996)*).

10    The [*5] report attempts to instruct this Court on interpretation of the agreement, which is the ultimate issue of law in this case. As this Court has concluded previously, the "proposed testimony [is] inadmissible not *merely* because it embraces an ultimate issue, but also because it embraces domestic law." *In re Walt Disney Co. Derivative Litig., 2004 WL 550750, at *1* (relying on Rule 704 and *Itek, 274 A.2d 141*) (emphasis in original).

IT IS SO ORDERED.

William B. Chandler III

William B. Chandler III



**UNITED STATES v. DUBILIER CONDENSER CORP.**

**Nos. 316, 317, and 318**

**SUPREME COURT OF THE UNITED STATES**

*289 U.S. 178*; *53 S. Ct. 554*; *77 L. Ed. 1114*; *1933 U.S. LEXIS 175*; *85 A.L.R. 1488*

**January 13, 16, 1933, Argued**
**April 10, 1933, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

*CERTIORARI, 287 U.S. 588*, to review the affirmance of decrees dismissing the bills in three suits brought by the United States to compel the exclusive licensee under certain patents to assign all its right, title and interest in them to the United States, and for an accounting.
*United States v. Dubilier Condenser Corp., 59 F.2d 381, 1932 U.S. App. LEXIS 3371 (3d Cir. Del., 1932)*

**DISPOSITION:** *59 F.2d 387*, affirmed.

**LAWYERS' EDITION HEADNOTES:**

PATENTS, §5 ;

nature of right conferred. -- ;

Headnote:[1]

A patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent, since an inventor deprives the public of nothing which it enjoyed before his discovery but gives something of value to the community by adding to the sum of human knowledge.

PATENTS, §7 ;

character as property. -- ;

Headnote:[2]

A patent is property.

PATENTS, §210 ;

transfer of title -- necessity of assignment. -- ;

Headnote:[3]

Title to a patent can pass only by assignment.

SPECIFIC PERFORMANCE, §6 ;

agreement to assign patent when issued. -- ;

Headnote:[4]

An agreement to assign, when issued, a patent not yet issued, if valid as a contract, will be specifically enforced.

PATENTS, §88 ;

master's right in invention by servant -- in general. -- ;

Headnote:[5]

289 U.S. 178, *; 53 S. Ct. 554, **;
77 L. Ed. 1114, ***; 1933 U.S. LEXIS 175

The respective rights and obligations of employer and employee touching an invention conceived by the latter spring from the contract of employment.

PATENTS, §90 ;

master's right in invention by servant -- persons employed to make invention. -- ;

Headnote:[6]

One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained.

PATENTS, §88 ;

master's right in invention by servant -- invention by one not employed for purpose of making it. -- ;

Headnote:[7]

If one's employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract of employment will not be construed as requiring an assignment of the patent.

CONTRACTS, §4 ;

implied agreement by employee to assign to employer patent for invention made during employment. -- ;

Headnote:[8]

The courts are reluctant to imply or infer an agreement by an employee to assign to his employer the patent for an invention made by him during his employment.

PATENTS, §16 ;

invention -- what constitutes, in general. -- ;

Headnote:[9]

Invention consists in discovering how natural laws may be utilized or applied for some beneficial purpose by a process, a device, or a machine which in tangible form

demonstrates the truth of the concept.

PATENTS, §5 ;

concept as subject of patent. -- ;

Headnote:[10]

The mental concept, and not its embodiment, is the subject of a patent.

PATENTS, §88 ;

master's right in invention by servant -- employment to design, or to construct, or to devise methods of manufacture. -- ;

Headnote:[11]

Employment merely to design, or to construct, or to devise methods of manufacture is not the same as employment to invent.

PATENTS, §229 ;

license -- employee's duty to grant to employer. -- ;

Headnote:[12]

A servant who, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, must on equitable principles accord his master a nonexclusive right to practice the invention; but the employer in such case has no equity to demand a conveyance of the invention.

PATENTS, §89 ;

right of government in inventions of employees. -- ;

Headnote:[13]

The rights of the United States with respect to inventions of its employees are no other than those of a private employer.

PATENTS, §8 ;

rights of patentee as against government. -- ;

Headnote:[14]

The title of a patentee is subject to no superior right of the government.

PATENTS, §6 ;

statutory foundation of patent rights. -- ;

Headnote:[15]

The extent and the limitations of the respective rights of the inventor and the public in a patented invention are governed solely by the laws passed by Congress regarding patents.

PATENTS, §89 ;

who entitled -- government employee engaged in scientific research. -- ;

Headnote:[16]

Employment in scientific research does not give rise to an implied obligation on the part of a government employee to relinquish to the public inventions made by him.

PATENTS, §89 ;

who entitled -- government employees -- public policy. -- ;

Headnote:[17]

No public policy forbids one employed by the United States in scientific research to obtain a patent for what he invents.

PATENTS, §89 ;

power of administrative officers to require government employees to dedicate inventions to public. -- ;

Headnote:[18]

Administrative officers of the United States are

without power to require employees of the government to dedicate to the public inventions made by them in the course of their employment.

**SYLLABUS**

1. One who is employed to invent is bound by contractual obligation to assign the patent for the invention to his employer.  P. 187.

2. Where the contract of employment does not contemplate invention, but an invention is made by the employee during the hours of his employment and with the aid of the employer's materials and appliances, the right of patent belongs to the employee, and the employer's interest in the invention is limited to a non-exclusive right to practice it -- a "shop-right."  P. 188.

3. These principles are settled as respects private employment and they apply also as between the United States and its employees.  P. 189.

4. No servant of the United States has by statute been disqualified from applying for and receiving a patent for his invention, save officers and employees of the Patent Office during the period for which they hold their appointments.  P. 189.

5. Scientists employed by the United States in the Radio Section of the Electric Division of the Bureau of Standards, while assigned to research concerning use of radio in airplanes, made discoveries concerning the use of alternating current in broadcast receiving sets -- a subject not within their assignment and not being investigated by the Section; and, having with the consent of their superior perfected their inventions in the Bureau laboratory, obtained patents. *Held*, upon the facts, that there was no employment to invent and no basis for implying a contract to assign to the United States, or a trust in its favor, save as to shop-rights.  P. 193.

6. The proposition that anyone who is employed by the United States for scientific research should be forbidden to obtain a patent for what he invents is at variance with the policy heretofore evidenced by Congress.  P. 199.

7. If public policy demands such a prohibition, Congress, and not the courts, must declare it.  Pp. 197, 208.

**COUNSEL:** Solicitor General Thacher, with whom Assistant Attorney General Rugg and Messrs. Alexander Holtzoff, Paul D. Miller, and H. Brian Holland were on the brief, for the United States.

This Court has held that if one is expressly hired for the purpose of making a specific invention, or is designated or directed to develop such invention, the patent rights arising out of such invention become the property of the employer. The ratio decidendi of this holding is that in making the invention the employee is merely doing what he was hired to do, having contracted in advance for the performance of work of an inventive character, and therefore the fruits of his work belong to the employer.

The same result should follow if an employee, instead of being hired or being assigned to make a specific invention, is hired for the purpose of doing inventive work in a particular field. If in such event the employee makes an invention within that field, he has only done that which he was hired to do and accordingly the patent rights to such invention are the property of the employer.

The employment of Lowell and Dunmore included the duty to exercise their inventive faculties within the general field to which they were assigned. It is not disputed that they were in the actual performance of their employment while engaged in the research which led to the inventions in question. Their duties were not confined to the solution of specially designated problems, but they were expected to and did follow "leads" uncovered during the progress of their work. The inventions in question represented a natural and progressive development of the work which they were pursuing under the direction of their superiors, and which they systematically described in their official reports.

Essentially the purpose of industrial research is to apply to industry the discoveries of science. When one is employed for scientific research to meet the needs of a rapidly advancing industrial art, such as radio, his employment necessarily includes the duty to employ his talent in devising new and useful appliances for the improvement of the art. If, in this process, discovery and application to useful purposes rise to the level of invention, the invention is the fruit of the employment.

There is no basis for the holding that because "research" and "invention" are not synonymous, the research work of Lowell and Dunmore did not include the duty to make inventions. The research work in which they were

engaged had for its express purpose the improvement of the radio art by invention.

In the efficient conduct of modern research laboratories it is necessary to permit scientists to exercise initiative and freedom in the solution of particular problems and in following suggestions or leads arising out of a specific task. Discoveries and inventions seldom can be anticipated and, hence, it is often impossible to assign the development of a particular invention as a task to be performed.

Research work regularly resulting in numerous inventions is continually being carried on in laboratories conducted by governmental agencies. It is against public interest that private individuals should collect royalties for the use of inventions developed at public cost.

The rule adopted by the courts below, if allowed to stand, would tend to demoralize the Bureau of Standards as a center for scientific and industrial research. The experience of private industry shows that invention is not discouraged where the employer retains property rights to the inventions of employees engaged in inventive work.

The Act of March 3, 1883, as amended by the Act of April 30, 1928, does not express the entire governmental policy with regard to patent rights on inventions of government employees. Its obvious purpose was to accord the privilege of obtaining patents without charge to government employees who might make an invention under such circumstances that the Government would have neither title to the patent nor a license under it.

Mr. James H. Hughes, Jr., with whom Messrs. E. Ennalls Berl and John B. Brady were on the brief, for respondent.

**JUDGES:** Hughes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Stone, Roberts, Cardozo

**OPINION BY:** ROBERTS

**OPINION**

[*182] [**555] [***1116] MR. JUSTICE ROBERTS delivered the opinion of the Court.

Three suits were brought in the District Court for Delaware against the respondent as exclusive licensee under three separate patents issued to Francis W. Dunmore and Percival D. Lowell. The bills recite that

289 U.S. 178, *182; 53 S. Ct. 554, **555;
77 L. Ed. 1114, ***1116; 1933 U.S. LEXIS 175

the inventions were made while the patentees were employed in the radio laboratories of the Bureau of Standards, and are therefore, in equity, the property of the United States. The prayers are for a declaration that the respondent is a trustee for the Government, and, as such, required to assign to the United States all its right, title and interest in the patents; for an accounting of all moneys received as licensee, and for general relief. The District Court consolidated the cases for trial, and after a hearing dismissed the bills. [1] The Court of Appeals for the Third Circuit affirmed the decree. [2]

1  *49 F.2d 306.*
2  *59 F.2d 381.*

The courts below concurred in findings which are not challenged and, in summary, are:

The Bureau of Standards is a subdivision of the Department of Commerce. [3] Its functions consist in the custody of standards; the comparison of standards used in scientific investigations, engineering, manufacturing, commerce, and educational institutions with those adopted

[*183] or recognized by the Government; the construction of standards, their multiples or subdivisions; the testing and calibration of standard measuring apparatus; the solution of problems which arise in connection with standards; and the physical properties of materials. In 1915 the Bureau was also charged by Congress with the duty of investigation and standardization of methods and instruments employed in radio communication, for which special [**556] appropriations were made. [4] In recent years it has been engaged in research and testing work of various kinds for the benefit of private industries, other departments of the Government, and the general public. [5]

3   See Act of March 3, 1901, 31 Stat. 1449; Act of February 14, 1903, *§ 4*, 32 Stat. 826.

4   Act of March 4, 1915, 38 Stat. 1044; Act of May 29, 1920, 41 Stat. 684; Act of March 3, 1921, 41 Stat. 1303.

5   The fees charged cover merely the cost of the service rendered, as provided in the Act of June 30, 1932, § 312, 47 Stat. 410.

The Bureau is composed of divisions, each charged with a specified field of activity, one of which is the electrical division. These are further subdivided into sections. One section of the electrical division is the radio section. In 1921 and 1922 the employees in the laboratory of this section numbered approximately twenty men doing technical work, and some draftsmen and mechanics. The twenty were engaged in testing radio apparatus and methods and in radio research work. They were subdivided into ten groups, each group having a chief. The work of each group was defined in outlines by the chief or alternate chief of the section.

Dunmore and Lowell were employed in the radio section and engaged in research and testing in the laboratory. In the outlines of laboratory work the subject of "airplane radio" was assigned to the group of which Dunmore was chief and Lowell a member. The subject of "radio receiving sets" was assigned to a group of which J. L. Preston was chief, but to which neither Lowell nor Dunmore belonged.

289 U.S. 178, *183; 53 S. Ct. 554, **556;
77 L. Ed. 1114, ***1116; 1933 U.S. LEXIS 175

[*184] [***1117]  In May, 1921, the Air Corps of the Army and the Bureau of Standards entered into an arrangement whereby the latter undertook the prosecution of forty-four research projects for the benefit of the Air Corps.  To pay the cost of such work, the Corps transferred and allocated to the Bureau the sum of $ 267,500.  Projects Nos. 37 to 42, inclusive, relating to the use of radio in connection with aircraft, were assigned to the radio section and $ 25,000 was allocated to pay the cost of the work.  Project No. 38 was styled "visual indicator for radio signals," and suggested the construction of a modification of what was known as an "Eckhart recorder."  Project No. 42 was styled "airship bomb control and marine torpedo control."  Both were problems of design merely.

In the summer of 1921 Dunmore, as chief of the group to which "airplane radio" problems had been assigned, without further instructions from his superiors, picked out for himself one of these navy problems, that of operating a relay for remote control of bombs on airships and torpedoes in the sea, "as one of particular interest and having perhaps a rather easy solution, and worked on it." In September he solved it.

In the midst of aircraft investigations and numerous routine problems of the section, Dunmore was wrestling in his own mind, impelled thereto solely by his own scientific curiosity, with the subject of substituting houselighting alternating current for direct battery current in radio apparatus.  He obtained a relay for operating a telegraph instrument which was in no way related to the remote control relay devised for aircraft use.  The conception of the application of alternating current concerned particularly broadcast reception.  This idea was conceived by Dunmore August 3, 1921, and he reduced the invention to practice December 16, 1921. Early in 1922 he advised his superior of his invention and spent additional

289 U.S. 178, *185; 53 S. Ct. 554, **556;
77 L. Ed. 1114, ***1117; 1933 U.S. LEXIS 175

[*185] time in perfecting the details. February 27, 1922 he filed an application for a patent.

In the fall of 1921 both Dunmore and Lowell were considering the problem of applying alternating current to broadcast receiving sets. This project was not involved in or suggested by the problems with which the radio section was then dealing and was not assigned by any superior as a task to be solved by either of these employees. It was independent of their work and voluntarily assumed.

While performing their regular tasks they experimented at the laboratory in devising apparatus for operating a radio receiving set by alternating current with the hum incident thereto eliminated. The invention was completed on December 10, 1921. Before its completion no instructions were received from and no conversations relative to the invention were held by these employees with the head of the radio section, or with any superior.

They also conceived the idea of energizing a dynamic type of loud speaker from an alternating current houselighting circuit, and reduced the invention to practice on January 25, 1922. March 21, 1922, they filed an application for a "power amplifier." The conception embodied in this patent was devised by the patentees without suggestion, instruction, or assignment from any superior.

Dunmore and Lowell were permitted by their chief, after the discoveries had been brought to his attention, to pursue their work in the laboratory and to perfect the devices embodying their inventions. No one advised them prior to the filing of applications for patents that they would be expected to assign the patents to the United States or to grant the Government exclusive rights thereunder.

The respondent concedes that the United States may practice the inventions without payment of royalty, but asserts that all others [**557] are excluded, during the life of the

 [*186] patents, [***1118] from using them without the respondent's consent.  The petitioner insists that the circumstances require a declaration either that the Government has sole and exclusive property in the inventions or that they have been dedicated to the public so that anyone may use them.

*First*.  By *Article I, § 8, clause 8 of the Constitution*, Congress is given power to promote the progress of science and the useful arts by securing for limited times to inventors the exclusive rights to their respective discoveries.  R.S. 4886 as amended (*U.S. Code, Title 35, § 31*) is the last of a series of statutes which since 1793 have implemented the constitutional provision.

[1]Though often so characterized, a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. *Seymour v. Osborne, 11 Wall. 516, 533*.The term monopoly connotes the giving of an exclusive privilege for buying, selling, working or using a thing which the public freely enjoyed prior to the grant. [6] Thus a monopoly takes something from the people.  An inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge. *United States v. Bell Telephone Co., 167 U.S. 224, 239*; *Paper Bag Patent Case, 210 U.S. 405, 424*; *Brooks* v. *Jenkins*, 3 McLean 432, 437; *Parker* v. *Haworth*, 4 McLean 370, 372; *Allen* v. *Hunter*, 6 McLean 303, 305-306; *Attorney General* v. *Rumford Chemical Works*, 2 Bann. & Ard. 298, 302.  He may keep his invention secret and reap its fruits indefinitely.  In consideration of its disclosure and the consequent benefit to the community, the patent is granted.  An exclusive enjoyment is guaranteed him for

[*187] seventeen years, but upon the expiration of that period, the knowledge of the invention enures to the people, who are thus enabled without restriction to practice it and profit by its use. *Kendall v. Winsor, 21 How. 322, 327*; *United States v. Bell Telephone Co., supra, p. 239*. To this end the law requires such disclosure to be made in the application for patent that others skilled in the art may understand the invention and how to put it to use. [7]

6    Webster's New International Dictionary: "Monopoly."

7   *U.S. Code, Tit. 35, § 33*.

[2][3][4][5]A patent is property and title to it can pass only by assignment. If not yet issued an agreement to assign when issued, if valid as a contract, will be specifically enforced. The respective rights and obligations of employer and employee, touching an invention conceived by the latter, spring from the contract of employment.

[6] [7]One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. *Standard Parts Co*. v. *Peck, 264 U.S. 52*. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the [***1119] patent. *Hapgood v. Hewitt, 119 U.S. 226*; *Dalzell v. Dueber Watch Case Mfg. Co. 149 U.S. 315*. In the latter case it was said [p. 320]:

"   But a manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles

[*188] there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect."

[8][9]The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention, which consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form. *Clark Thread Co*. v. *Willimantic Linen Co., 140 U.S. 481, 489*;*Symington Co*. v. *National Castings Co., 250 U.S. 383, 386*;*Pyrene Mfg. Co*. v. *Boyce, 292 Fed. 480, 481*.

[10][11][12]Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. [**558] This distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent. Recognition of the nature of the act of invention also defines the limits of the so-called shop-right, which shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention. *McClurg v. Kingsland, 1 How. 202*; *Solomons v. United States, 137 U.S. 342*; *Lane & Bodley Co*. v. *Locke, 150 U.S. 193*. This is an application of equitable principles. Since the servant uses his master's time, facilities and materials to attain a

[*189] concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits. These principles are settled as respects private employment.

[13]*Second.* Does the character of the service call for different rules as to the relative rights of the United States and its employees?

[14][15]The title of a patentee is subject to no superior right of the Government. The grant of letters patent is not, as in England, a matter of grace or favor, so that conditions may be annexed at the pleasure of the executive. To the laws passed by the Congress, and to them alone, may we look for guidance as to the extent and the limitations of the respective rights of the inventor and the public. *Attorney* [***1120] *General* v. *Rumford Chemical Works, supra,* at pp. 303-4. And this court has held that the Constitution evinces no public policy which requires the holder of a patent to cede the use or benefit of the invention to the United States, even though the discovery concerns matters which can properly be used only by the Government; as, for example, munitions of war. *James v. Campbell, 104 U.S. 356, 358. Hollister v. Benedict Mfg. Co., 113 U.S. 59, 67.*

No servant of the United States has by statute been disqualified from applying for and receiving a patent for his invention, save officers and employees of the Patent Office during the period for which they hold their appointments.[8]

289 U.S. 178, *190; 53 S. Ct. 554, **558;
77 L. Ed. 1114, ***1120; 1933 U.S. LEXIS 175

[*190]  This being so, this court has applied the rules enforced as between private employers and their servants to the relation between the Government and its officers and employees.

8   R.S. 480; *U.S. Code, Tit. 35, § 4.*

*United States v. Burns, 12 Wall. 246*, was a suit in the Court of Claims by an army officer as assignee of a patent obtained by another such officer for a military tent, to recover royalty under a contract made by the Secretary of War for the use of the tents.  The court said, in affirming a judgment for the plaintiff [p. 252]:

"If an officer in the military service, *not specially employed to make experiments with a view to suggest improvements*, devises a new and valuable improvement in arms, tents, or any other kind of war material, he is entitled to the benefit of it, and to letters-patent for the improvement from the United States, equally with any other citizen not engaged in such service; and the government cannot, after the patent is issued, make use of the improvement any more than a private individual, without license of the inventor or making compensation to him."

In *United States v. Palmer, 128 U.S. 262*, Palmer, a lieutenant in the army, patented certain improvements in infantry accoutrements.  An army board recommended their use and the Secretary of War confirmed the recommendation.  The United States manufactured and purchased a large number of the articles.  Palmer brought suit in the Court of Claims for a sum alleged to be a fair and reasonable royalty.  From a judgment for the plaintiff the United States appealed.  This court, in affirming, said [p. 270]:

"It was at one time somewhat doubted whether the government might not be entitled to the use and benefit of every patented invention, by analogy to the English law which reserves this right to the crown.  But that

289 U.S. 178, *191; 53 S. Ct. 554, **558;
77 L. Ed. 1114, ***1120; 1933 U.S. LEXIS 175

[*191] notion no longer exists. It was ignored in the case of Burns."

These principles were recognized in later cases involving the relative rights of the Government and its employees in instances where the subject-matter of the patent was useful to the public generally. While these did not involve a claim to an assignment of the patent, the court reiterated the views earlier announced.

In *Solomons v. United States, 137 U.S. 342, 346*, it was said:

"The government has no more power to appropriate a man's property invested in a patent [**559] than it has to take his property invested in real estate; *nor does the mere fact that   an inventor is at the time of  his invention in the employ of the government transfer to it any title to, or interest in it*. An employe, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. *There is no difference between the government and any other employer in this respect*."

And in *Gill v. United States, 160 U.S. 426, 435*:

[***1121]  "There is no doubt whatever of the proposition laid down in *Solomons case*, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property, and that in such case the government would have no more right to seize upon and appropriate such property, than any other proprietor would have. . . ."

The distinction between an employment to make an invention and a general employment in the course of

[*192] which the servant conceives an invention has been recognized by the executive department of the Government. A lieutenant in the navy patented an anchor while he was on duty in the Bureau of Equipment and Recruiting, which was charged with the duty of furnishing anchors for the navy; he was not while attached to the bureau specially employed to make experiments with a view to suggesting improvements to anchors or assigned the duty of making or improving. The Attorney General advised that as the invention did not relate to a matter as to which the lieutenant was specially directed to experiments with a view to suggesting improvements, he was entitled to compensation from the Government for the use of his invention in addition to his salary or pay as a navy officer. [9]

9   19 Opinions Attorney-General, 407.

A similar ruling was made with respect to an ensign who obtained a patent for improvements in "B.L.R. ordnance" and who offered to sell the improvements, or the right to use them, to the Government. It was held that the navy might properly make a contract with him to this end. [10]

10   20 Opinions Attorney-General, 329. And compare Report Judge Advocate General of the Navy, 1901, p. 6; Digest, Opinions Judge Advocate General of the Army, 1912-1930, p. 237; Opinions, Judge Advocate General of the Army, 1918, Vol. 2, pp. 529, 988, 1066.

The United States is entitled, in the same way and to the same extent as a private employer, to shop-rights, that is, the free and non-exclusive use of a patent which results from effort of its employee in his working hours and with material belonging to the Government. *Solomons v. United States, supra, pp. 346-7; McAleer v. United States, 150 U.S. 424; Gill v. United States, supra.*

The statutes, decisions and administrative practice negate the existence of a duty binding one in the service of the Government different from the obligation of one in private employment.

[*193] [16]*Third*. When the United States filed its bills it recognized the law as heretofore declared; realized that it must like any other employer, if it desired an assignment of the respondent's rights, prove a contractual obligation on the part of Lowell and Dunmore to assign the patents to the Government. The averments clearly disclose this. The bill in No. 316 is typical. After reciting that the employees were laboratory apprentice and associate physicist, and laboratory assistant and associate physicist, respectively, and that one of their duties was "to carry on investigation research and experimentation in such problems relating to radio and wireless *as might be assigned to them* by their superiors," it is charged "in the course of his employment as aforesaid, *there was assigned* to said Lowell by his superiors in said radio section, for *investigation and research*, the problem of developing a radio receiving set capable of operation by alternating current. . . ."

Thus the Government understood that respondent

could be deprived of rights under the patents only by proof that Dunmore and Lowell were employed to devise the inventions. The findings of the courts below show how far the proofs fell short of sustaining these averments.

The Government is consequently [***1122] driven to the contention that though the employees were not specifically assigned the task of making the inventions (as in *Standard Parts Co*. v. *Peck, supra*), still, as the discoveries were "within the general field of their research and *inventive work*," the United States is entitled to an assignment of the patents. The courts below expressly found that Dunmore and Lowell did not agree to exercise their inventive faculties in their work, and that invention was not within its scope. In this connection it is to be remembered that the written evidence of their employment does not mention research, much less invention; that never was there

289 U.S. 178, *194; 53 S. Ct. 554, **559;
77 L. Ed. 1114, ***1122; 1933 U.S. LEXIS 175

[*194] a word said to either of them, prior to their discoveries, concerning invention or patents or [**560] their duties or obligations respecting these matters; that as shown by the records of the patent office, employees of the Bureau of Standards and other departments had, while so employed, received numerous patents and enjoyed the exclusive rights obtained as against all private persons without let or hindrance from the Government. [11] In no proper

289 U.S. 178, *195; 53 S. Ct. 554, **560;
77 L. Ed. 1114, ***1122; 1933 U.S. LEXIS 175

[*195] sense may it be said that the contract of employment contemplated invention; everything that Dunmore and Lowell knew [***1123] negatived the theory that they were employed to invent; they knew, on the contrary, that the past and then present practice was that the employees of the Bureau were allowed to take patents on their inventions and have the benefits thereby conferred save as to use by the

[*196] United States. The circumstances preclude the implication of any agreement to assign their inventions or patents.

11    No exhaustive examination of the records has been attempted. It is sufficient, however, for present purposes, to call attention to the following instances.

Dr. Frederick A. Kolster was employed in the radio section, Bureau of Standards, from December, 1912, until about March 1, 1921. He applied for the following patents: No. 1,609,366, for radio apparatus, application dated November 26, 1920. No. 1,447,165, for radio method and apparatus, application dated January 30, 1919. No. 1,311,654, for radio method and apparatus, application dated March 25, 1916. No. 1,394,560, for apparatus for transmitting radiant energy, application dated November 24, 1916. The Patent Office records show assignments of these patents to Federal Telegraph Company, San Francisco, Cal., of which Dr. Kolster is now president. He testified that these are all subject to a non-exclusive license in the United States to use and practice the same.

Burten McCollum was an employee of the Bureau of Standards between 1911 and 1924. On the dates mentioned he filed the following applications for patents, which were issued to him. No. 1,035,373, alternating current induction motor, March 11, 1912. No. 1,156,364, induction motor, February 25, 1915. No. 1,226,091, alternating current induction motor, August 2, 1915. No. 1,724,495, method and apparatus for determining the slope of subsurface rock boundaries, October 24, 1923. No. 1,724,720, method and apparatus for studying subsurface contours, October 12, 1923. The last two inventions were assigned to McCollum Geological Explorations, Inc., a Delaware corporation.

Herbert B. Brooks, while an employee of the Bureau between 1912 and 1930, filed, November 1, 1919, an application on which *patent No. 1,357,197*, for an electric transformer, was issued.

William W. Coblentz, an employee of the Bureau of Standards from 1913, and still such at the date of the trial, on the dates mentioned, filed applications on which patents issued as follows: No. 1,418,362, for electrical resistance, September 22, 1920. No. 1,458,165, system of electrical control, September 22, 1920. No. 1,450,061, optical method for producing pulsating electric current, August 6, 1920. No. 1,563,557, optical means for rectifying alternating currents, September 18, 1923. The Patent Office records show that all of these stand in the name of Coblentz, but are subject to a license to the United States of America.

August Hund, who was an employee of the Bureau from 1922 to 1927, on the dates mentioned filed applications on which letters patent issued: No. 1,649,828, method of preparing Piezo-electric plates, September 30, 1925. No. 1,688,713, Piezo-electric-crystal oscillator system, May 10, 1927. No. 1,688,714, Piezo-electric-crystal apparatus, May 12, 1927. No. 1,648,689, condenser transmitter, April 10, 1926. All of these patents are shown of record to have been assigned to Wired Radio, Inc., a corporation.

Paul R. Heyl and Lyman J. Briggs, while employees of the Bureau, filed an application January 11, 1922, for *patent No. 1,660,751*, on inductor compass, and assigned the same to the Aeronautical Instrument Company of Pittsburgh, Pennsylvania.C. W. Burrows was an employee of the Bureau of Standards between 1912 and 1919. While such employee he filed applications on the dates mentioned for patents, which were issued: No. 1,322,405, October 4, 1917, method and apparatus for testing magnetizable objects by magnetic leakage; assigned to Magnetic Analysis Corporation, Long Island City, N. Y. No. 1,329,578, relay, March 13, 1918; exclusive license issued to make, use and sell for the field of railway signaling and train control, to Union Switch & Signal Company, Swissvale, Pa. No. 1,459,970, method of and apparatus for testing magnetizable objects, July 25, 1917; assigned to Magnetic Analysis Corporation, Long Island City, N. Y.

John A. Willoughby, an employee of the Bureau of Standards between 1918 and 1922,

289 U.S. 178, *196; 53 S. Ct. 554, **560;
77 L. Ed. 1114, ***1123; 1933 U.S. LEXIS 175

while so employed, on June 26, 1919, applied for and was granted a patent, No. 1,555,345, for a loop antenna.

The record affords even less basis for inferring a contract on the part of the inventors to refrain from patenting their discoveries than for finding an agreement to assign them.

The bills aver that the inventions and patents are held in trust for the United States, and that the court should so declare. It is claimed that as the work of the Bureau, including all that Dunmore and Lowell did, was in the public interest, these public servants had dedicated the offspring of their brains to the public, and so held their patents in trust for the common weal, represented here in a corporate capacity by the United States. The patentees, we are told, should surrender the patents for cancellation, and the respondent must also give up its rights under the patents.

The trust cannot be express. Every fact in the case negatives the existence of one. Nor can it arise *ex maleficio*. The employees' conduct was not fraudulent in any respect. They promptly disclosed their inventions. Their superiors encouraged them to proceed in perfecting and applying the discoveries. Their note books and reports disclosed [**561] the work they were doing, and there is not a syllable to suggest their use of time or material was clandestine or improper. No word was spoken regarding any claim of title by the Government until after applications for patents were filed. And, as we have seen, no such trust has been spelled out of the relation of master and servant, even in the cases where the employee has perfected his invention by the use of his employer's time and materials. The cases recognizing the doctrine of shop rights may be said to fix a trust upon the employee in favor of his master as respects the use of the invention

289 U.S. 178, *197; 53 S. Ct. 554, **561;
77 L. Ed. 1114, ***1123; 1933 U.S. LEXIS 175

 [*197]  by the latter, but they do not affect the title to the patent and the exclusive rights conferred by it against the public.

[17]The Government's position in reality is, and must be, that a public policy, to be declared by a court, forbids one employed by the United States, for scientific research, to obtain a patent for what he invents, though neither the Constitution nor any statute so declares.

Where shall the courts set the limits of the doctrine? For, confessedly, it must be limited.  The field of research is as broad as that of science itself.  If the petitioner is entitled to a cancellation of the patents in this case, would it be so entitled if the employees had done their work at home, in their own time and with their own appliances and materials?  What is to be said of an invention evolved as the result of the solution of a problem in a realm apart from that to which the employee is assigned by his official  [***1124]  superiors?  We have seen that the Bureau has numerous divisions.  It is entirely possible

that an employee in one division may make an invention falling within the work of some other division.  Indeed this case presents that exact situation, for the inventions in question had to do with radio reception, a matter assigned to a group of which Dunmore and Lowell were not members.  Did the mere fact of their employment by the Bureau require these employees to cede to the public every device they might conceive?

Is the doctrine to be applied only where the employment is in a bureau devoted to scientific investigation *pro bono publico*?  Unless it is to be so circumscribed, the statements of this court in *United States v. Burns, supra, Solomons v. United States, supra*, and *Gill v. United States, supra*, must be held for naught.

Again, what are to be defined as bureaus devoted entirely to scientific research?  It is common knowledge that many in the Department of Agriculture conduct researches

289 U.S. 178, *198; 53 S. Ct. 554, **561;
77 L. Ed. 1114, ***1124; 1933 U.S. LEXIS 175

 [*198] and investigations; that divisions of the War and Navy Departments do the like; and doubtless there are many other bureaus and sections in various departments of government where employees are set the task of solving problems all of which involve more or less of science. Shall the field of the scientist be distinguished from the art of a skilled mechanic? Is it conceivable that one working on a formula for a drug or an antiseptic in the Department of Agriculture stands in a different class from a machinist in an arsenal? Is the distinction to be that where the government department is, so to speak, a business department operating a business activity of the government, the employee has the same rights as one in private employment, whereas if his work be for a bureau interested more particularly in what may be termed scientific research he is upon notice that whatever he invents in the field of activity of the bureau, broadly defined, belongs to the public and is unpatentable? Illustrations of the difficulties which would attend an attempt to define the policy for which the Government contends might be multiplied indefinitely.

    The courts ought not to declare any such policy; its formulation belongs solely to the Congress. Will permission to an employee to enjoy patent rights as against all others than the Government tend to the improvement of the public service by attracting a higher class of employees? Is there in fact greater benefit to the people in a dedication to the public of inventions conceived by officers of government, than in their exploitation under patents by private industry? Should certain classes of invention be treated in one way and other classes differently? These are not legal questions, which courts are competent to answer. They are practical questions, and the decision as to what will accomplish the greatest good for the inventor, the Government and the public rests

[*199] with the Congress. We should not read into the patent laws limitations and conditions which the legislature has not expressed.

*Fourth*. Moreover, we are of opinion Congress has approved a policy at variance with the petitioner's contentions. This is demonstrated by examination of two statutes, with their legislative history, and the hearings and debates respecting proposed legislation which failed of passage.

Since 1883 there has been in force an act [12] which provides:

12   Act of March 3, 1883, c. 143, 22 Stat. 625.

"The Secretary of the Interior [now the Secretary of Commerce, Act of February 14, 1903, c. 552, § 12, 32 Stat. 830] and the Commissioner of Patents are authorized to grant any officer of the government, except officers [**562] and employees of the Patent Office, a patent for any [***1125] invention of the classes mentioned in section forty eight hundred and eighty six of the Revised Statutes, when such invention is used or to be used in the public service, without the payment of any fee: *Provided*, That the applicant in his application shall state that the invention described therein, if patented, may be used by the government or any of its officers or employees in the prosecution of work for the government, or by any other person in the United States, without the payment to him of any royalty thereon, which stipulation shall be included in the patent."

This law was evidently intended to encourage government employees to obtain patents, by relieving them of the payment of the usual fees. The condition upon which the privilege was accorded is stated as the grant of free use by the government, "its officers or employees in the prosecution of work for the government, *or by any*

[*200]  *other person in the United States.*" For some time the effect of the italicized phrase was a matter of doubt.

In 1910 the Judge Advocate General of the Army rendered an opinion to the effect that one taking a patent pursuant to the act threw his invention "open to public and private use in the United States." [13] It was later realized that this view made such a patent a contradiction in terms, for it secured no exclusive right to anyone. In 1918 the Judge Advocate General gave a well-reasoned opinion [14] holding that if the statute were construed to involve a dedication to the public, the so-called patent would at most amount to a publication or prior reference. He concluded that the intent of the act was that the free use of the invention extended only to the Government or those doing work for it. A similar construction was adopted in an opinion of the Attorney General. [15] Several federal courts referred to the statute and in *dicta* indicated disagreement with the views expressed in these later opinions. [16]

13  See *Squier v. American T. & T. Co., 21 F.2d*

747, 748.

14    November 30, 1918; Opinions of Judge Advocate General, 1918, Vol. 2, p. 1029.

15  32 Opinions Attorney General, 145.

16    See *Squier v. American Tel. & Tel. Co., 7 F.2d 831, 21 F.2d 747*; *Hazeltine Corporation v. Electric Service Engineering Corp., 18 F.2d 662*; *Hazeltine Corporation v. A. W. Grebe & Co., 21 F.2d 643*; *Selden Co.* v. *National Aniline & Chemical Co., 48 F.2d 270.*

The departments of government were anxious to have the situation cleared, and repeatedly requested that the act be amended. Pursuant to the recommendations of the War Department an amendment was enacted April 30, 1928. [17] The proviso was changed to read:

17  45 Stat. 467, 468.

"*Provided*, That the applicant in his application shall state that the invention described therein, if patented,

289 U.S. 178, *201; 53 S. Ct. 554, **562;
77 L. Ed. 1114, ***1125; 1933 U.S. LEXIS 175

[*201] may be manufactured or used by or for the Government for governmental purposes without the payment to him of any royalty thereon, which stipulation shall be included in the patent."

The legislative history of the amendment clearly discloses the purpose to save to the employee his right to exclude the public. [18] In the report of the Senate Committee on Patents submitted with the amendment, the object of the bill was said to be the protection of the interests of the Government, primarily by securing patents on inventions made by officers and employees, presently useful in the interest of the national defense or those which may prove useful in the interest of national defense in the future; and secondarily, [***1126] to encourage the patenting of inventions by officers and employees of the Government with the view to future protection of the Government against suits for infringement of patents. The committee stated that the bill had the approval of the Commissioner of Patents and was introduced at the request of the Secretary of War.

Appended to the report is a copy of a letter of the Secretary of War addressed to the committees of both Houses stating that the language of the legislation then existing was susceptible of two interpretations contrary to each other. The letter quoted the proviso of the section as it then stood, and continued:

18   Report No. 871, 70th Cong., 1st Sess., House of Representatives, to accompany H. R. 6103; Report No. 765, 70th Cong., 1st Sess., Senate, to accompany H. R. 6103; Cong. Rec., House of Representatives, March 19, 1928, 70th Cong., 1st Sess., p. 5013; Cong. Rec., Senate, April 24, 1928, 70th Cong., 1st Sess., p. 7066.

"It is clear that a literal construction of this proviso would work a dedication to the public of every patent taken out under the act. If the proviso must be construed literally we would have a situation wherein all the patents taken out under the act would be nullified by the

[*202] very terms of the act under which they were granted, for the reason that a patent which does not carry with it the limited monopoly referred to in the Constitution is in reality not a patent at all. The only value that a patent has is the right that it extends to the patentee to exclude all others from making, using, or selling the invention for a certain period of years. A patent that is dedicated to the public is virtually the same as a patent that has expired."

After referring to the interpretation of the [**563] Judge Advocate General and the Attorney General and mentioning that no satisfactory adjudication of the question had been afforded by the courts, the letter went on to state:

"Because of the ambiguity referred to and the unsettled condition that has arisen therefrom, it has become the policy of the War Department to advise all its personnel who desire to file applications for letters patent, to do so under the general law and pay the required patent-office fee in each case."

And added:

"If the proposed legislation is enacted into law, Government officers and employees may unhesitatingly avail themselves of the benefits of the act with full assurance that in so doing their patent is not dedicated to the public by operation of law. The War Department has been favoring legislation along the lines of the proposed bill for the past five or six years."

When the bill came up for passage in the House a colloquy occurred which clearly disclosed the purpose of the amendment. [19] The intent was that a government

289 U.S. 178, *203; 53 S. Ct. 554, **563;
77 L. Ed. 1114, ***1126; 1933 U.S. LEXIS 175

[*203] employee who in the course of his employment conceives [***1127] an invention should afford the Government free use thereof, but should be protected in his right to exclude all others. If Dunmore and Lowell, who tendered the Government a non-exclusive license without royalty, and always understood that the Government might use their inventions freely, had proceeded under the act of 1883, they would have retained their rights as against all but the United States. This is clear from the executive interpretation of the act. But for greater security they pursued the very course then advised by the law officers of the Government. It would be surprising if they thus lost all rights as patentees; especially so, since Congress has now confirmed the soundness of the views held by the law officers of the Government.

19   Cong. Rec., 70th Cong., 1st Sess., Vol. 69, Part 5, p. 5013:

"Mr. LaGuardia. Mr. Speaker, reserving the right to object, is not the proviso too broad? Suppose an employee of the Government invents some improvement which is very valuable, is he compelled to give the Government free use of it?

"Mr. Vestal [who reported the bill for the Committee and was in charge of it]. If he is employed by the Government and the invention is made while working in his capacity as an agent of the Government. If the head of the bureau certifies this invention will be used by the Government, then the Government, of course gets it without the payment of any royalty.

"Mr. LaGuardia. *The same as a factory rule*

"Mr. Vestal. *Yes; but the man who takes out the patent has his commercial rights outside*.

"Mr. LaGuardia. *Outside of the Government*

"Mr. Vestal. *Yes*.

"Mr. LaGuardia. But the custom is, and without this bill, the Government has the right to the use of the improvement without payment if it is invented in Government time and in Government work.

"Mr. Vestal. That is correct; and then on top of that, may I say that a number of instances have occurred where an employee of the Government, instead of taking out a patent had some one else take out the patent and the Government has been involved in a number of suits. There is now $600,000,000 worth of such claims in the Court of Claims."

It will be noted from the last statement of the gentleman in charge of the bill that Congress was concerned with questions of policy in the adoption of the amendment. These, as stated above, are questions of business policy and business judgment -- what is to the best advantage of the Government and the public. They are not questions as to which the courts ought to invade the province of the Congress.

289 U.S. 178, *204; 53 S. Ct. 554, **563;
77 L. Ed. 1114, ***1127; 1933 U.S. LEXIS 175

[*204]  Until the year 1910 the Court of Claims was without jurisdiction to award compensation to the owner of a patent for unauthorized use by the United States or its agents.  Its power extended only to the trial of claims based upon an express or implied contract for such use. [20] In that year Congress enlarged the jurisdiction to embrace the former class of claims. [21] In giving consent to be sued, the restriction was imposed that it should not extend to owners of patents obtained by employees of the Government while in the service.  From this it is inferred that Congress [**564] recognized no right in such patentees to exclude the public from practicing the invention. But

[*205] an examination of the legislative record completely refutes the contention.

20   See *Belknap v. Schild, 161 U.S. 10, 16*; *Eager v. United States, 35 Ct. Cls. 556.*

21   Act of June 25, 1910, 36 Stat. 851: (See *Crozier v. Krupp, 224 U.S. 290.*)

"That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof *or lawful right to use the same*, such owner may recover reasonable compensation for such use by suit in the Court of Claims: *Provided, however*, That said Court of Claims shall not entertain a suit or reward [*sic*] compensation under the provisions of this Act where the claim for compensation is based on the use by the United States of any article heretofore owned, leased, used by, or in the possession of the United States: *Provided further*, That in any such suit the United States may avail itself of any and all defenses, general or special, which might be pleaded by a defendant in an action for infringement, as set forth in Title Sixty of the Revised Statutes, or otherwise: *And provided further*, That the benefits of this Act shall not inure to any patentee, who, when he makes such claim is in the employment or service of the Government of the United States; or the assignee of any such patentee; nor shall this Act apply to any device discovered or invented by such employee during the time of his employment or service."

The Act was amended in respects immaterial to the present question, July 1, 1918, 40 Stat. 705. See *William Cramp & Sons Co.* v. *Curtis Turbine Co., 246 U.S. 28*; *Richmond Screw Anchor Co.* v.

*United States, 275 U.S. 331, 343.* As amended it appears in *U. S. C., Tit. 35, § 68.*

The House Committee in reporting the bill, after referring to the law as laid down in the *Solomons* case, said: "The United States in such a case has an implied license to use the patent without compensation, for the reason that the inventor used the time or the money or the material of the United States in perfecting his invention. The use by the United States of such a patented invention without any authority from the owner thereof is a lawful use [***1128] under existing law, and we have inserted the words 'or lawful right to use the same' in order to make it plain that we do not intend to make any change in existing law in this respect, and do not intend to give the owner of such a patent any claim against the United States for its use." [22] From this it is clear that Congress had no purpose to declare a policy at variance with the decisions of this court.

22   House Report 1288, 61st Cong., 2d Sess.

The executive departments have advocated legislation regulating the taking of patents by government employees and the administration by government agencies of the patents so obtained. In 1919 and 1920 a bill sponsored by the Interior Department was introduced. It provided for the voluntary assignment or license by any government employee, to the Federal Trade Commission, of a patent applied for by him, and the licensing of manufacturers by the Commission, the license fees to be paid into the Treasury and such part of them as the President might deem equitable to be turned over to the patentee. [23] In the hearings and reports upon this measure stress was laid not only upon the fact that action by an employee thereunder would be voluntary, but that the inventor would be protected at least to some extent in his private

289 U.S. 178, *206; 53 S. Ct. 554, **564;
77 L. Ed. 1114, ***1128; 1933 U.S. LEXIS 175

[*206]  right of exclusion.  It was recognized that the Government could not compel an assignment, was incapable of taking such assignment or administering the patent, and that it had shop-rights in a patent perfected by the use of government material and in government working time.  Nothing contained in the bill itself or in the hearings or reports indicates any intent to change the existing and well understood rights of government employees who obtain patents for their inventions made while in the service.  The measure failed of passage.

23   S. 5265, 65th Cong. 3d Sess.; S. 3223, 66th Cong., 2d Sess.; H. R. 9932, 66th Cong., 2d Sess.; H. R. 11984, 66th Cong., 3d Sess.

In 1923 the President sent to the Congress the report of an interdepartmental patents-board created by executive order to study the question of patents within the government service and to recommend regulations establishing a policy to be followed in respect thereof.  The report adverted to the fact that in the absence of a contract providing otherwise a patent taken out by a government employee, and any invention developed by one in the public service, is the sole property of the inventor. The committee recommended strongly against public dedication of such an invention, saying that this in effect voids a patent, and, if this were not so, "there is little incentive for anyone to take up a patent and spend time, effort, and money . . . on its commercial development without at least some measure of protection against others free to take the patent as developed by him and compete in its use.  In such a case one of the chief objects of the patent law would be defeated." [24] In full accord is the statement on behalf of the Department of the Interior in a memorandum furnished with respect to the bill introduced in 1919. [25]

24   Sen. Doc. No. 83, 68th Cong., 1st Sess., p. 3.
25   Hearings, Senate Patent Committee, 66th Cong., 2d Sess., January 23, 1920, p. 11.

With respect to a policy of permitting the patentee to take a patent and control it in his own interest (subject,

289 U.S. 178, *207; 53 S. Ct. 554, **564;
77 L. Ed. 1114, ***1128; 1933 U.S. LEXIS 175

[*207] of course, to the Government's right of use, if any) the committee said:

". . . it must not be lost sight of that in general it is the constitutional right of every patentee to exploit his patent as he may desire, however expedient it may appear to endeavor to modify this right in the interest of the public when the patentee [***1129] is in the Government service." [26]

26  Sen. Doc. No. 83, 68th Cong., 1st Sess., p. 3.

Concerning a requirement that all patents obtained by government employees be assigned to the United States or its agent, the committee said:

". . . it would, on the one hand, render difficult securing the best sort of technical men for the service and, on the other, would influence technical workers to resign in order to exploit inventions which they might evolve and suppress while still in the service.  There has always been more or less of a tendency for able men in the service to do this, particularly in view of the comparative meagerness of Government salaries; thus the Government has suffered loss among its most capable class of workers." [27]

27  *Ibid*., p. 4.

The committee recommended legislation to create an Interdepartmental Patents Board; and further that the law make it part of the express terms of employment, having the effect of a contract, that any patent application made or patent granted for an invention discovered or developed during the period of government service and incident to the line [**565] of official duties, which in the judgment of the board should, in the interest of the national defense, or otherwise in the public interest, be controlled by the Government, should upon demand by the board be assigned by the employee to an agent of the Government.  The recommended measures were not adopted.

[*208] [18]*Fifth*. Congress has refrained from imposing upon government servants a contract obligation of the sort above described. At least one department has attempted to do so by regulation. [28] Since the record in this case discloses that the Bureau of Standards had no such regulation, it is unnecessary to consider whether the various departments have power to impose such a contract upon employees without authorization by act of Congress. The question is more difficult under our form of government than under that of Great Britain, where such departmental regulations seem to settle the matter. [29]

28    See Annual Report, Department of Agriculture, for 1907, p. 775. See *Selden Co.* v. *National Aniline & Chemical Co., 48 F.2d 270, 273*.

29    Queen's Regulations (Addenda 1895, 1st February); Ch. 1, Instructions for Officers in General, pp. 15-16.

All of this legislative history emphasizes what we have stated -- that the courts are incompetent to answer the difficult question whether the patentee is to be allowed his exclusive right or compelled to dedicate his invention to the public. It is suggested that the election rests with the authoritative officers of the Government. Under what power, express or implied, may such officers, by administrative fiat, determine the nature and extent of rights exercised under a charter granted a patentee pursuant to constitutional and legislative provisions? Apart from the fact that express authority is nowhere to be found, the question arises, who are the authoritative officers whose determination shall bind the United States and the patentee? The Government's position comes to this -- that the courts may not reexamine the exercise of an authority by some officer, not named, purporting to deprive the patentee of the rights conferred upon him by law. Nothing would be settled by such a holding, except that the determination of the reciprocal rights and obligations of the Government and its employee as respects

[*209] inventions are to be adjudicated, without review, by an unspecified department head or bureau chief. Hitherto both the executive and the legislative branches of the Government have concurred in what we consider the correct view, -- that any such declaration of policy must come from Congress and that no power to [***1130] declare it is vested in administrative officers.

The decrees are

*Affirmed.*

**DISSENT BY:** STONE; HUGHES

**DISSENT**

MR. JUSTICE STONE, dissenting.

I think the decrees should be reversed.

The Court's conclusion that the employment of Dunmore and Lowell did not contemplate that they should exercise inventive faculties in their service to the government, and that both courts below so found, seems to render superfluous much that is said in the opinion. For it has not been contended, and I certainly do not contend, that if such were the fact there would be any foundation for the claim asserted by the government. But I think the record does not support the Court's conclusion of fact. I am also unable to agree with the reasoning of the opinion, although on my view of the facts it would lead to the reversal of the decree below, which I favor.

When originally organized [1] as a subdivision of the Department of Commerce, the functions of the Bureau of Standards consisted principally of the custody, comparison, construction, testing and calibration of standards and the solution of problems arising in connection with standards. But in the course of its investigation of standards of quality and performance it has gradually expanded into a laboratory for research of the broadest character in various branches of science and industry and particularly [*210] in the field of engineering. [2] Work of this nature is carried on for other government departments, [3] the general public [4] and private industries. [5] It [**566] is almost entirely supported by public funds, [6] and is maintained in the public [*211] [***1131] interest. In 1915, as the importance of radio to the government and to the public increased, Congress appropriated funds [7] to the Bureau

"for investigation and standardization of methods and instruments employed in radio communication." Similar annual appropriations have been made since and public funds were allotted by Acts of July 1, 1916, c. 209, 39 Stat. 262, 324 and October 6, 1917, c. 79, 40 Stat. 345, 375, for the construction of a fireproof laboratory building "to provide additional space to be used for research and testing in radio communication," as well as "space and facilities for cooperative research and experimental work in radio communication" by other departments of the government. Thus, the conduct of research and scientific investigation in the field of radio has been a duty imposed by law upon the Bureau of Standards since 1915.

1   Act of March 3, 1901, 31 Stat. 1449; Act of February 14, 1903, § 4, 32 Stat. 825, 826. For an account of the origin and development of the Bureau and its predecessor, see Weber, The Bureau of Standards, 1-75.
2   Much of the expansion of the Bureau's activities in this direction took place during the war. See Annual Report of the Director, Bureau of Standards, for 1919, p. 25; War Work of the Bureau of Standards (1921), Misc. Publications of the Bureau of Standards No. 46. The scope of the Bureau's scientific work is revealed by the annual reports of the Director. See also the bibliography of Bureau publications for the years 1901-1925, Circular of the Bureau of Standards No. 24 (1925).
3   The Act of May 29, 1920, 41 Stat. 631, 683, 684, permitted other departments to transfer funds to the Bureau of Standards for such purposes, though even before that time it was one of the major functions of the Bureau to be of assistance to other branches of the service. See *e. g.* Annual Reports of the Director for 1915, 1916, 1917, p. 16; Annual Report for 1918, p. 18; compare Annual Report for 1921, p. 25; for 1922, p. 10.
4   The consuming public is directly benefited not only by the Bureau's work in improving the standards of quality and performance of industry, but also by the assistance which it lends to governmental bodies, state and city. See Annual Reports of the Director for 1915, 1916, 1917, p. 14; Annual Report for 1918, p. 16; National Bureau of Standards, Its Functions and Activity, Circular of the Bureau of Standards, No. 1 (1925), pp. 28, 33.

5  Cooperation with private industry has been the major method relied upon to make the accomplishments of the Bureau effective. See Annual Report for 1922, p. 7; Annual Report for 1923, p. 3. A system of research associates permits industrial groups to maintain men at the Bureau for research of mutual concern. The plan has facilitated cooperation. See Annual Report for 1923, p. 4; Annual Report for 1924, p. 35; Annual Report for 1925, p. 38; Annual Reports for 1926, 1928, 1929, 1931, 1932, p. 1; Research Associates at the Bureau of Standards, Bureau Circular No. 296 (1926). For a list of cooperating organizations as of December 1, 1926, see Misc. Publications No. 96 (1927).

6  No fees have been charged except to cover the cost of testing, but the Act of June 30, 1932, c. 314, § 312, 47 Stat. 410, directs that "for all comparisons, calibrations, tests or investigations, performed" by the Bureau except those performed for the Government of the United States or a State, "a fee sufficient in each case to compensate the . . . Bureau . . . for the entire cost of the services rendered shall be charged. . . ."

7  Act of March 4, 1915, c. 141, 38 Stat. 997, 1044.

Radio research has been conducted in the Radio Section of the Electric Division of the Bureau. In 1921 and 1922, when Dunmore and Lowell made the inventions in controversy, they were employed in this section as members of the scientific staff. They were not, of course, engaged to invent, in the sense in which a carpenter is employed to build a chest, but they were employed to conduct scientific investigations in a laboratory devoted principally to applied rather than pure science with full knowledge and expectation of all concerned that their investigations might normally lead, as they did, to invention. The Bureau was as much devoted to the advancement of the radio art by invention as by discovery which falls short of it. Hence, invention in the field of radio was a goal intimately related to and embraced within the purposes of the work of the scientific staff.

[*212]  Both courts below found that Dunmore and Lowell were impelled to make these inventions "solely by their own scientific curiosity." They undoubtedly proceeded upon their own initiative beyond the specific problems upon which they were authorized or directed to

work by their superiors in the Bureau, who did not actively supervise their work in its inventive stages. But the evidence leaves no doubt that in all they did they were following the established practice of the Section. For members of the research staff were expected and encouraged to follow their own scientific impulses in pursuing their researches and discoveries to the point of useful application, whether they involved invention or not, and even though they did not relate to the immediate problem in hand. After the inventions had been conceived they were disclosed by the inventors to their chief and they devoted considerable time to perfecting them, with his express approval. All the work was carried on by them in the government laboratory with the use of government materials and facilities, during the hours for which they received a government salary. Its progress was recorded throughout in weekly and monthly reports which they were required to file, as well as in their laboratory notebooks. It seems clear that in thus exercising their inventive powers in the pursuit of ideas reaching beyond their specific assignments, the inventors were discharging the duties expected of scientists employed in the laboratory; Dunmore as well as his supervisors, testified that such was their conception of the nature of the work. The conclusion is irresistible that their scientific curiosity was precisely what gave the inventors value as research workers; the government employed it and gave it free rein in performing the broad duty of the Bureau of advancing the radio art by discovery and invention.

The courts below did not find that there was any agreement between the government and the inventors as to [*213] their relative rights in the patents and there was no evidence to [***1132] support such a finding. They did not find, and upon the facts in evidence and within the range of judicial notice, they could not find that the work done by Dunmore and Lowell leading to the inventions in controversy was not within the scope of their employment. Such a finding was unnecessary to support the decisions below, which proceeded on the theory relied on by the respondent here, that in the absence of an express contract to assign it, an employer is entitled to the full benefit of the patent granted to an employee, only when it is for a particular invention which the employee was specifically hired or directed to make. The bare references by the court below to the obvious facts that "research" and "invention" are not synonymous, and that all research work [**567] in the Bureau is not concerned with invention, fall far short of a finding that

the work in the Bureau did not contemplate invention at all. Those references were directed to a different end, to the establishment of what is conceded here, that Dunmore and Lowell were not *specifically* hired or directed to make the inventions because in doing so they proceeded beyond the assignments given them by their superiors. The court's conception of the law, applied to this ultimate fact, led inevitably to its stated conclusion that the claim of the government is without support in reason or authority "unless we should regard a general employment for research work as synonymous with a particular employment (or assignment) for inventive work."

The opinion of this Court apparently rejects the distinction between specific employment or assignment and general employment to invent, adopted by the court below and supported by authority, in favor of the broader position urged by the government that wherever the employee's duties involve the exercise of inventive powers, the employer is entitled to an assignment of the patent [*214] on any invention made in the scope of the general employment. As I view the facts, I think such a rule, to which this Court has not hitherto given explicit support, would require a decree in favor of the government. It would also require a decree in favor of a private employer, on the ground stated by the court that as the employee "has only produced what he is employed to invent," a specifically enforceable "term of the agreement necessarily is that what he is paid to produce belongs to his paymaster." A theory of decision so mechanical is not forced upon us by precedent and cannot, I think, be supported.

What the employee agrees to assign to his employer is always a question of fact. It cannot be said that merely because an employee agrees to invent, he also agrees to assign any patent secured for the invention. Accordingly, if an assignment is ordered in such a case it is no more to be explained and supported as the specific enforcement of an agreement to transfer property in the patent than is the shop-right which equity likewise decrees, where the employment does not contemplate invention. All the varying and conflicting language of the books cannot obscure the reality that in any case where the rights of the employer to the invention are not fixed by express contract, and no agreement in fact may fairly be implied, equity determines after the event what they shall be. In thus adjudicating *in invitum* the consequences of the employment relationship, equity must reconcile the conflicting claims of the employee who has evolved the

idea and the employer who has paid him for his time and supplied the materials utilized in experimentation and construction. A task so delicate cannot be performed by accepting the formula advanced by the petitioner any more than by adopting that urged by the respondent, though both are not without support in the [*215] opinions of this Court. Compare *Hapgood v. Hewitt, 119 U.S. 226; Dalzell v. Dueber Mfg. Co., 149 U.S. 315;* [***1133] *Solomons v. United States, 137 U.S. 342, 346; Gill v. United States, 160 U.S. 426, 435; Standard Parts Co. v. Peck, 264 U.S. 52.*

Where the employment does not contemplate the exercise of inventive talent the policy of the patent laws to stimulate invention by awarding the benefits of the monopoly to the inventor and not to someone else leads to a ready compromise: a shop-right gives the employer an adequate share in the unanticipated boon. [8] *Hapgood v. Hewitt, supra; Lane & Bodley Co. v. Locke, 150 U.S. 193; Dalzell v. Dueber Mfg. Co., supra; Pressed Steel Car Co. v. Hansen, 137 Fed. 403; Amdyco Corp. v. Urquhart, 39 F.2d 943,* aff'd *51 F.2d 1072; Ingle v. Landis Tool Co., 272 Fed. 464;* see *Beecroft & Blackman v. Rooney, 268 Fed. 545, 549.*

[8]    See the cases collected in 30 Columbia Law Rev. 1172; 36 Harvard Law Rev. 468.

But where, as in this case, the employment contemplates invention, the adequacy of such a compromise is more doubtful not because it contravenes an agreement for an assignment, which may not exist, but because, arguably, the patent is the fruit of the very work which the employee is hired to do and for which he is paid, it should no more be withheld from the employer, in equity and good conscience, than the product of any other service which the employee engages to render. This result has been reached where the contract was to devise a means for solving a defined problem, *Standard Parts Co. v. Peck, supra,* and the decision has been thought to establish the employer's right wherever the employee is hired or assigned to evolve a process or mechanism for meeting a specific need. *Magnetic Mfg. Co. v. Dings Magnetic Separator Co., 16 F.2d 739; Goodyear Tire & Rubber* [*216] *Co. v. Miller, 22 F.2d 353, 356; Houghton v. United States, 23 F.2d 386.* But the court below and others have thought (*Pressed Steel Car Co. v. Hansen, supra; Houghton v. United States, supra; Amdyco Corp. v. Urquhart, supra*), as the respondent argues, that only in cases where the

employment or assignment is thus specific may the employer demand all the benefits of the employee's invention. The basis of such a limitation is [**568] not articulate in the cases. There is at least a question whether its application may not be attributed, in some instances, to the readier implication of an actual promise to assign the patent, where the duty is to invent a specific thing (see *Pressed Steel Car Co.* v. *Hansen, supra, 415*), or, in any case, to the reluctance of equity logically to extend, in this field, the principle that the right to claim the service includes the right to claim its product. The latter alternative may find support in the policy of the patent laws to secure to the inventor the fruits of his inventive genius, in the hardship which may be involved in imposing a duty to assign all inventions, see *Dalzell v. Dueber Mfg. Co., supra, 323*, cf. *Aspinwall Mfg. Co.* v. *Gill, 32 Fed. 697, 700*, and in a possible inequality in bargaining power of employer and employee. But compare *Goodyear Tire & Rubber Co.* v. *Miller, supra, 355*; *Hulse v. Bonsack Mach. Co., 65 Fed. 864, 868*; see 30 Columbia Law Rev. 1172, 1176-8. There is no reason for determining now the weight which should be accorded [***1134] these objections to complete control of the invention by the employer, in cases of ordinary employment for private purposes. Once it is recognized, as it must be, that the function of the Court in every case is to determine whether the employee may, in equity and good conscience retain the benefits of the patent, it is apparent that the present case turns upon considerations which distinguish it from any which has thus far been decided.

[*217] The inventors were not only employed to engage in work which unmistakably required them to exercise their inventive genius as occasion arose; they were a part of a public enterprise. It was devoted to the improvement of the art of radio communication for the benefit of the people of the United States, carried on in a government laboratory, maintained by public funds. Considerations which might favor the employee where the interest of the employer is only in private gain are therefore of slight significance; the policy dominating the research in the Bureau, as the inventors knew, was that of the government to further the interests of the public by advancing the radio art. For the work to be successful, the government must be free to use the results for the benefit of the public in the most effective way. A patent monopoly in individual employees, carrying with it the power to suppress the invention, or at least to exclude others from using it, would destroy this freedom; a

shop-right in the government would not confer it. For these employees, in the circumstances, to attempt to withhold from the public and from the government the full benefit of the inventions which it has paid them to produce, appears to me so unconscionable and inequitable as to demand the interposition of a court exercising chancery powers. A court which habitually enjoins a mortgagor from acquiring and setting up a tax title adversely to the mortgagee, *Middletown Savings Bank v. Bacharach, 46 Conn. 513, 524*; *Chamberlain v. Forbes, 126 Mich. 86*; *85 N. W. 253*; *Waring v. National Savings & Trust Co., 138 Md. 367*; *114 Atl. 57*; see 2 Jones on Mortgages (8th ed.), § 841, should find no difficulty in enjoining these employees and the respondent claiming under them from asserting, under the patent laws, rights which would defeat the very object of their employment. The capacity of equitable doctrine for growth and of courts of equity to mould it to [*218] new situations, was not exhausted with the establishment of the employer's shop-right. See *Essex Trust Co.* v. *Enwright, 214 Mass. 507*; *102 N. E. 441*; *Meinhard v. Salmon, 249 N. Y. 458*; *164 N. E. 545*.

If, in the application of familiar principles to the situation presented here, we must advance somewhat beyond the decided cases, I see nothing revolutionary in the step. We need not be deterred by fear of the necessity, inescapable in the development of the law, of setting limits to the doctrine we apply, as the need arises. That prospect does not require us to shut our eyes to the obvious consequences of the decree which has been rendered here. The result is repugnant to common notions of justice and to policy as well, and the case must turn upon these considerations if we abandon the illusion that equity is called upon merely to enforce a contract, albeit, one that is "implied." The case would be more dramatic if the inventions produced at public expense were important to the preservation of human life, or the public health, or the agricultural resources of the country. The principle is the same here, though the inventions are of importance only in the furtherance of human happiness. In enlisting their scientific talent and curiosity in the performance of the public service in which the Bureau was engaged, Dunmore and Lowell necessarily renounced the prospect of deriving from their work commercial [***1135] rewards incompatible with it. [9] Hence, there is nothing [**569] oppressive or [*219] unconscionable in requiring them or their licensee to surrender their patents at the instance of the United States, as there probably would be if the inventions had

not been made within the scope of their employment or if the employment did not contemplate invention at all.

9    It has been said that many scientists in the employ of the government regard the acceptance of patent rights leading to commercial rewards in any case as an abasement of their work. Hearings on Exploitation of Inventions by Government Employees, Senate Committee on Patents, 65th Cong., 3d Sess. (1919), pp. 16, 17; see also the Hearings before the same Committee, January 23, 1920, 66th Cong., 2d Sess. (1920), p. 5. The opinion of the Court attributes importance to the fact, seemingly irrelevant, that other employees of the Bureau have in some instances in the past taken out patents on their inventions which, so far as appears, the government has not prevented them from enjoying. The circumstances under which those inventions were made do not appear. But even if they were the same as those in the present case there is no basis for contending that because the government saw fit not to assert its rights in other cases it has lost them in this. Moreover, there is no necessary inconsistency in the government's position if it concluded in those cases that the public interest would be served best by permitting the employees to exploit their inventions themselves, and adopted a contrary conclusion here.

The issue raised here is unaffected by legislation. Undoubtedly the power rests with Congress to enact a rule of decision for determining the ownership and control of patents on inventions made by government employees in the course of their employment. But I find no basis for saying that Congress has done so or that it has manifested any affirmative policy for the disposition of cases of this kind, which is at variance with the considerations which are controlling here.

The Act of June 25, 1910, 36 Stat. 851, as amended July 1, 1918, 40 Stat. 704, 705, permitted patentees to sue the government in the Court of Claims for the unauthorized use of their patents. It was in effect an eminent domain statute by which just compensation was secured to the patentee, whose patent had been used by the government. See *Richmond Screw Anchor Co*. v. *United States, 275 U.S. 331*. This statute excluded government employees from the benefits of the Act in order, as the House Committee Report explicitly points

out, to leave unaffected the shop-rights of the government. See H. R. Report No. 1288, 61st Cong. 2d Sess. A statute thus [*220] aimed at protecting in every case the minimum rights of the government can hardly be taken to deny other and greater rights growing out of the special equity of cases like the present.

The Act of April 30, 1928, 45 Stat. 467, 468, amending an earlier statute of 1883 (22 Stat. 625), so as to permit a patent to be issued to a government employee without payment of fees, for any invention which the head of a department or independent bureau certifies "is used or liable to be used in the public service," and which the application specifies may, if patented, "be manufactured and used by or for the Government for governmental purposes without the payment of . . . any royalty," was passed, it is true, with the general purpose of encouraging government employees to take out patents on their inventions. But this purpose was not, as the opinion of the Court suggests, born of a Congressional intent that a government employee who conceives an invention in the course of his employment should be protected in his right to exclude all others but the government from using it. Congress was concerned neither with enlarging nor with narrowing the relative rights of the government and its [***1136] employees. 10 This is apparent from the language of the statute that the patent shall be issued without a fee "subject to existing law," as well as from the records of its legislative history. [11]

10    Throughout the various speculations in committee as to what those rights were, it was generally agreed that they were intended to remain unchanged by the bill. See Hearings before the House Committee on Patents, 68th Cong., 2d Sess., on H. R. 3267 and 11403 (1925); Hearings before the same Committee, 70th Cong., 1st Sess. (1928), especially at pp. 8-13. The discussion on the floor of the House, referred to in the opinion of the Court (see note 19) does not indicate the contrary.

11    In addition to the hearings cited *supra*, note 10, see H. R. Report No. 1596, 68th Cong., 2d Sess.; H. R. Report No. 871, Senate Report No. 765, 70th Cong., 1st Sess. The bill was originally a companion proposal to the Federal Trade Commission bill discussed *infra*, note 13. See the references given there.

[*221] The purpose of Congress in facilitating the patenting of inventions by government employees was to protect the existing right of the government to use all devices invented in the service, whether or not the patentee was employed to use his inventive powers. Experience had shown that this shop-right was jeopardized unless the employee applied for a patent, since without the disclosure incident to the application the government was frequently hampered in its defense of claims by others asserting priority of invention. But doubt which had arisen whether an application for a patent under the Act of 1883 did not operate to dedicate the patent to the public, [12] and reluctance to pay the fees otherwise required, had led government employees to neglect to make applications, even when they were entitled to the benefits of the monopoly subject only to the government's right of use. This doubt the amendment removed. It can hardly be contended that in removing it in order to aid the government in the protection of its shopright, Congress declared a policy that it should have no greater right to control a patent procured either under this special statute or under the general patent laws by fraud or any other type of inequitable conduct. Had such a policy been declared, it is difficult to see on what basis we could award the government a remedy, as it seems to be agreed we would, if [**570] Dunmore and Lowell had been specifically employed to make the inventions. There is nothing to indicate that Congress adopted one policy for such a case and a contrary one for this.

12    See *Selden Co.* v. *National Aniline & Chemical Co., 48 F.2d 270, 272*; *Squier v. American Telephone & Telegraph Co., 7 F.2d 831, 832*, affirmed *21 F.2d 747*.

[*222] Other legislation proposed but not enacted, [13] requires but a word. [***1137] Even had Congress expressly rejected a bill purporting to enact into law the rule of decision which I think applicable here, its failure to act could not be accorded the force of law. But no such legislation has been proposed to Congress, and that which was suggested may have been and probably was defeated for reasons unconnected with the issue presented in this case. The legislative record does show, as the opinion of the Court states, that it is a difficult question which has been the subject of consideration at least since the war, whether the public interest is best served by the [*223] dedication of an invention to the public or by its exploitation with patent protection under license from the government or the inventor. But the difficulty of resolving the question does not justify a decree which does answer it in favor of permitting government employees such as these to exploit their inventions without restriction, rather than one which would require the cancellation of their patents or their assignment to the United States.

13    The bill referred to in the opinion of the Court was one sponsored by the executive departments to endow the Federal Trade Commission with the power to accept assignments of patents from government employees and administer them in the public interest. It passed the Senate on one occasion and the House on another but failed to become a law. (S. 5265, 65th Cong., 3d Sess., S. 3223, 66th Cong., 1st Sess., H. R. 9932, 66th Cong., 1st Sess., H. R. 11984, 66th Cong., 3d Sess.) In the course of hearings and debates many points of view were expressed. See Hearings on Exploitation of Inventions by Government Employees, Senate Committee on Patents, 65th Cong., 3d Sess. (1919); Hearing before the same Committee, 66th Cong., 2d Sess. (1920); Senate Report No. 405, H. R. Report No. 595, 66th Cong., 2d Sess., recommending passage. See 59 Cong. Rec., 2300, 2421, 2430, 3908, 4682, 4771, 8359, 8360, 8483, 8490; 60 *ibid.* 356; Conference Report, H. R. No. 1294, Sen. Doc. No. 379, 66th Cong., 3d Sess. And see 60 Cong. Rec., 2890, 3229, 3264-3269, 3537. Differences were stressed in the purposes and needs of different agencies of the Government. See especially Hearings (1919), *supra, pp. 22, 24-5.* The need of commercial incentives to private exploiters, as well as the general desirability of such exploitation were admitted, but the dangers were recognized as well. It was thought that the public interest would best be served by the establishment of a single agency for government control, with the power to determine upon some compensation for the inventor.

After the death of this bill in the Senate, February 21, 1921, the subject was again considered by an Interdepartmental Board established by executive order of President Harding, August 9, 1922. Its report was transmitted to Congress by President Coolidge, in December, 1923. Sen. Doc. No. 83, 68th Cong., 1st Sess. The Board found that there had never

289 U.S. 178, *223; 53 S. Ct. 554, **570;
77 L. Ed. 1114, ***1137; 1933 U.S. LEXIS 175

been any general governmental policy established with respect to inventions, that whether public dedication, private exploitation or governmental control and administration is desirable, depends largely on the nature of the invention. Accordingly, legislation was recommended establishing a permanent Interdepartmental Patents Board with the power to demand assignments of patents on those inventions thereafter developed in the service which "in the interest of the national defense, or otherwise in the public interest" should be controlled by the Government. No action was taken upon this proposal.

Since that time the Director of the Bureau of Standards has recommended that a "uniform, equitable policy of procedure" be defined for the government by legislation. (Annual Report for 1925, p. 40.) In the Report for 1931 it is said (p.

46) that the "patent policy of this Bureau has always been that patentable devices developed by employees paid out of public funds belong to the public," and the Report for 1932 adds (p. 40) "if not so dedicated directly, the vested rights should be held by the Government."

The decrees should be reversed.

MR. JUSTICE CARDOZO concurs in this opinion.

MR. CHIEF JUSTICE HUGHES, dissenting:

I agree with Mr. Justice Stone's analysis of the facts showing the nature of the employment of Dunmore and Lowell, and with his conclusions as to the legal effect [*224] of that employment. As the people of the United States should have the unrestricted benefit of the inventions in such a case, I think that the appropriate remedy would be to cancel the patents.

*Indexed as:*

**Vasquez v. Delcan Corp.**


**Between**
**Gualberto Vasquez, plaintiff, and**
**Delcan Corporation and Delcan International Corporation,**
**defendants**

[1998] O.J. No. 2833

38 C.C.E.L. (2d) 230

80 A.C.W.S. (3d) 1027

Court File No. 96-CU-97193


Ontario Court of Justice (General Division)

**Swinton J.**

Heard: June 15-18 and 23, 1998.
Judgment: July 7, 1998.

(23 pp.)


*Master and servant -- Dismissal of employees -- Grounds -- Unsuitability -- Dismissal without*
*cause -- Notice of dismissal -- What constitutes reasonable notice -- Conflict of laws -- Contracts --*
*Choice of law -- By parties -- Jurisdiction with closest and most substantial connection.*


Action by Vasquez against Delcan Corp. for damages for wrongful dismissal. Vasquez was a
48-year-old professional engineer, who was trained in Chile. He was hired by Delcan on a contract
basis in February 1993. In October 1993, he was offered full-time employment. The employment
agreement provided that he could be terminated at any time without cause, and that he would
receive maximum notice of 12 weeks. In December 1994, Delcan entered into a contract with the
Venezuelan government to rehabilitate the municipal sewage and water treatment infrastructure of a
particular region. Vasquez agreed to work in Venezuela on this project. The project required
Vasquez to relocate his family to Venezuela. The term of the overseas agreement was 24 months.
He was to be paid in Canadian dollars, which would be deposited in his Canadian bank account. His

main task was to facilitate the procurement process carried out by Delcan in Canada. He was subject to termination for cause if he were rejected by the client. In such circumstances the original employment agreement applied. The overseas agreement provided that it was to be interpreted under the laws of Ontario. Vasquez started work on the project in July 1995. The client could not work with him. In November 1995, Delcan notified him that he was terminated for cause because he had been rejected by the client. He was also terminated by Delcan under the original agreement, as there was no position available for him in Canada. Vasquez was paid $7,800 in lieu of notice, which was approximately six weeks salary under the overseas agreement. He also received an additional sum for his move back to Canada. He claimed that Delcan violated Venezuelan law by dismissing him before the contract term was completed. Venezuelan law applied to foreign citizens who worked in Venezuela, and it could not be waived by private agreement.

HELD: Action dismissed. The overseas agreement was governed by Ontario law, and not by the laws of Venezuela. Ontario was the jurisdiction to which this transaction was the most closely connected. Vasquez was employed by Delcan, which was an Ontario-based company. The agreement was entered into in Ontario. His supervisors were in Ontario. Even if Venezuelan law did apply, the manner in which the contract was terminated was valid. When Delcan terminated the overseas agreement, it did not terminate the employment relationship with Vasquez. Vasquez was still governed by the initial agreement. The application of Ontario law was not contrary to public policy. Under Ontario law, Delcan did not breach its contract with Vasquez. There was no evidence of bad faith or dishonesty on its part. Rejection by the client was grounds for termination. This was a normal provision for this type of agreement. The success of the project depended on a good relationship between the client and the Delcan employee. The termination under the initial agreement was valid. Delcan exercised its contractual right to terminate Vasquez without cause, and with payment in lieu of notice.

**Counsel:**

D.B. Prentice and D. Condon, for the plaintiff.
W.R. Gale, for the defendants.

---

**1    SWINTON J.**:-- The plaintiff Gualberto Vasquez has brought an action for wrongful dismissal against his former employer, Delcan Corporation and Delcan International Corporation.

**2**    The plaintiff is a 48 year old Professional Engineer trained in Chile, and a member of the Association of Professional Engineers of Ontario since 1989. In 1993, he began his relationship with Delcan Corporation, a firm of consulting engineers which provides services for the implementation of infrastructure projects, mainly in the areas of transportation and environment. Commencing February 4, 1993, he was hired on contract through TES Contract Services Inc., an

employment agency, to work on a feasibility study related to Margarita Island in Venezuela. His fluency in Spanish and his background in municipal engineering were important qualifications in his selection for the project. The contract continued to October 8, 1993, when he was offered full time employment with Delcan.

**3**    At that time, Mr. Vasquez signed an Application for Employment form, and he received a letter dated October 7, 1993 offering him a six month probationary contract. As well, he signed an Acceptance of Employment Form on October 18, 1993, which stated that he could be terminated at any time without cause on being provided with the greater of the of notice required by provincial employment standards legislation applicable to the location of employment, or four weeks notice plus one week's notice for each year of service to a maximum notice period of 12 weeks. The law of that agreement was stated to be the law of the location of employment. Sometime in February, 1994, Mr. Vasquez signed a document indicating that he had received a copy of the Employee Manual, although he testified that he never actually received the document. He became a permanent employee on April 11, 1994, when he received a further letter, making his start date retroactive to October 12, 1993. This letter stated that the agreement would be governed by the laws of Ontario.

**4**    Mr. Vasquez began what was to be a six month assignment in Maracaibo, Venezuela in October, 1994, where he managed a group of Venezuelan engineers and one Canadian engineer. Prior to that assignment, he signed an Overseas Fixed Term Agreement with Delcan International, the subsidiary of Delcan which employed all employees working outside Canada or the United States. While he was in Maracaibo, his family remained in Canada.

**5**    In early 1995, he was asked by Delcan if he would be willing to work in Venezuela on the Margarita Island project as the Resident Project Coordinator. The project was estimated to last from two to five years. After discussing this with his family, Mr. Vasquez indicated that he was interested. The project was attractive to the family, because it presented a good career opportunity for Mr. Vasquez and would allow the children to learn Spanish fluently, although the decision to move also imposed many burdens on the family, as they had to rent their house in Burlington, Mrs. Vasquez had to resign from her employment, and proper schools had to be found in Venezuela for the three children.

**6**    Mr. Vasquez negotiated the terms of his contract with Brian Henderson, then Vice-President of the Toronto Region. These terms were set out in another Overseas Fixed Term Agreement made with Delcan International. The document states that "the agreement will be interpreted under the laws of the province of Ontario, Canada, except as expressly provided herein". The Agreement also states that the Delcan Employee Manual will apply, and

> any conditions in the Company's contract with the Client or otherwise imposed by the Client with regard to the assignment of personnel to the project will be interpreted as if they were part of this agreement unless stated otherwise herein.

**7**    The terms included a salary of $76,000. per year; $2,000 per month for living expenses; $2,000

and $1,500. to be paid for mobilization and demobilization respectively; and a schooling allowance for each of the three children of up to $5,000 per year. The term of the contract is stated to be 24 months commencing June 1, 1995, and renewable for a further term. While Mr. Vasquez gave evidence that he expected the contract to last for at least two years, he was aware of the termination provisions of the contract set out below, which allow termination for cause if the client rejected him, and he discussed with his wife the possibility that the assignment would not last the full period.

**8**    Article A.4 deals with "termination of agreement". It sets out terms for dismissal with cause, which included the following:

> (a)    With Cause: The Company may terminate this agreement at any time for just cause without notice or compensation to the Employee. Notwithstanding the generality of the foregoing, the Employee expressly agrees that the following reasons shall constitute just cause:
>
> ...
>
> (2) rejection by the Client or a determination by the Company that the Employee is unsuitable for employment or is unable to perform any part of or all of the duties required under Section A.2.
>
> The existence of just cause as described in (1) and (2) above shall be determined in the sole discretion of the Company. In the event the Agreement is terminated for just cause, the Company may pay for the costs of repatriation in its sole discretion.
>
> ...
>
> (e)    The parties agree and acknowledge that upon termination of this agreement as contemplated herein, the Employee shall return to the same or substantially similar employment position in the location previously held before the Commencement Date of this agreement. Particularly, the terms and conditions of the Employee's employment contract with the Company prevailing before the Commencement Date of this agreement, including but not limited to, the provisions in the Delcan Employee Manual and the terms and conditions in the Acceptance of Employment Form and Application Form (if applicable), shall continue in turn force and effect after termination of this agreement, as may have been amended from time to time by the Company during the term of this

agreement ...

**9**    Mr. Vasquez moved to Margarita Island around mid-July, 1995, and his family moved there shortly after.

**10**    The purpose of the Margarita Island project was to rehabilitate the municipal sewage and water treatment infrastructure of that area. Delcan had entered into a contract with the Ministry of Environment and Renewable Natural Resources of the Government of Venezuela ("MARNR") in December, 1994 to provide services in procuring necessary equipment and materials for the rehabilitation. The contract was for $26,880,000 Canadian, with funding provided through a loan to Venezuela from the Export Development Corporation of Canada ("EDC"). Article 19 of that agreement states, in part, that the consultant, Delcan, "will comply with all the national, state, and municipal laws related to its obligations according to this Contract".

**11**    A contract between the Government of Venezuela, Delcan International Corporation, and the Export Development Corporation dated December 12, 1994 governed disbursement procedures. It provided that 85% of the funds were to be used for equipment and supplies. The remaining 15% could be used for the purchase of local goods and services in Venezuela. Delcan International also entered a Memorandum of Understanding with EDC, whereby Delcan promised to comply with EDC policy and procedures, including the requirement that 90% of the funds for equipment and supplies would be spent in Canada.

**12**    The contract with the Government of Venezuela contemplated a fairly complex system for procurement, which started with a letter of Request for Quotation from the Venezuelan engineering team working on the project. This would specify the equipment or material needed, and be sent through Mr. Vasquez as Resident Project Coordinator. One of his tasks was to review the specifications for completeness before sending the request to Toronto, where it would be translated into English, and then circulated to approved lists of suppliers by Delcan in order to obtain at least three bids. When bids were received, Delcan would choose the one which best met the client's specifications, at the lowest price, and then send a Proforma to the Venezuelan consulate in Toronto and the Board of Trade. After obtaining certification from them, the Proforma was translated and sent to both the Venezuelan government office in New York and to Venezuela. In Venezuela, the Proforma had to be approved by the necessary officials on the project, as well as the Office of the National Comptroller. Only then, could the equipment or material be ordered. This process took at least three to four months, and often met with delays, because more information was needed about the specifications or the product.

**13**    With respect to local expenses, Mr. Vasquez's role was to ensure that invoices related to the project were signed by the client to indicate approval. If these related to expenses incurred by Delcan, reimbursement was then sought from EDC. Mr. Vasquez indicated in testimony that he had more or less done his duties once the client signed the invoices.

**14**    Mr. Vasquez's first task on the Margarita Island project was to find office space for the project

adequate for himself, the Venezuelan engineers and other staff. He made efforts to find suitable office space with the Project Advisor, Jose Paradela, a Vice-President of Delcan Corporation and Vice-President Latin America for Delcan International, who was based in Toronto. They eventually found suitable space in May, 1995, but it required extensive cleaning and renovations.

The renovations took up a lot of Mr. Vasquez's time from mid-July, but they were completed by mid-August.

**15**    The Venezuelan team on the project was headed by Antonio Rodriguez, an engineer who was based in Caracas, and oversaw this and other projects for the Venezuelan government on a contract basis. Mr. Vasquez expressed a number of concerns about the use of funds for local expenditures, including the fact that Mr. Rodriguez and the other Venezuelan engineers were paid through Delcan, the interior decoration for the office was overseen by Mr. Rodriguez's daughter from Caracas, there were some questionable repairs done to Mr. Rodriguez's automobile, a computer disappeared, and the cleaning bill for the office seemed excessive.

**16**    Mr. Vasquez testified that he expressed concerns to Mr. Paradela several times respecting irregularities in some of the local expenses. He did not describe the expenses as "improper", but "exaggerated" or excessive. There is some disagreement about the response, with Mr. Vasquez indicating that Mr. Paradela said that the Venezuelans thought there was a well of money, and something would have to be done. However, Mr. Paradela denied this in his testimony, stating that he indicated it was the client's call as to how they wanted to spend their money.

**17**    There is no evidence that Mr. Vasquez indicated concerns to the Venezuelans on the project. The only concern expressed in writing to Delcan before the dismissal is a memo dated October 11, 1995 to Mr. Paradela, in which Mr. Vasquez notes that some office renovation expenses were excessive, in his opinion, but properly approved by the client, and "therefore, I could not have objections". It was only after notice of the termination of his assignment in Venezuela that he put further criticisms of the financial administration in writing.

**18**    Mr. Rodriguez became discontented with the pace of the procurement project, and sought a meeting with Mr. Paradela in late October. Mr. Paradela suggested that Mr. Henderson attend the meeting, given that he was in Venezuela at the time, and Mr. Paradela had just returned to Toronto. A meeting was held on October 30, 1995 in Caracas, at which Mr. Rodriguez expressed his concerns about the slow pace of the procurement process. Mr. Vasquez was present, and testified that nothing was said about his performance.

**19**    The evidence is not clear as to when Mr. Rodriguez indicated his opposition to working further with Mr. Vasquez. According to Mr. Henderson's testimony in chief, Mr. Rodriguez spoke to him after the meeting and expressed the view that the process could not function properly with Mr. Vasquez as Project Coordinator. In cross-examination, he conceded that he might have been in error, and Mr. Rodriguez may have communicated his opposition to Mr. Paradela, who then spoke to Mr. Henderson. In his examination for discovery, he had indicated that Mr. Rodriguez stated

during the meeting that the facilitator function was not working.

**20**    Mr. Vasquez followed up the meeting with a letter on October 31 to Mr. Rodriguez, assuring him that efforts would be made to speed up the process and promising greater involvement of Delcan in decisions related to the request for Canadian equipment and supplies. Mr. Rodriguez responded by letter on November 14, stating that Mr. Vasquez misunderstood the client's needs. They did not want Delcan involved with decisions relating to materials and equipment requests; rather, they wanted the resident engineer to assume responsibility for reviewing the conformity of materials offered with the specifications for materials requested. Mr. Vasquez then replied, indicating that Mr. Rodriguez did not understand the procurement process.

**21**    Mr. Paradela testified that he had received a call from Mr. Rodriguez on October 31, stating that he wanted Mr. Vasquez off the job. Mr. Rodriguez indicated that he had not communicated this to Mr. Henderson because of the latter's unfamiliarity with the project and the degree of his fluency in Spanish, although Mr. Henderson claims fluency in that language.

**22**    Mr. Vasquez was notified through a telephone call from Mr. Henderson in Barbados on November 1, 1995. It is agreed that Mr. Henderson said that the client wanted Mr. Vasquez off the job, but Mr. Henderson also told Mr. Vasquez that the only possibility for him to stay was by approaching Mr. Rodriguez and trying to change his mind. The company agreed to pay for the Vasquezs' return to Canada. Mr. Vasquez testified that he was told that there was no job for him in Canada, although in his letter to Mr. Henderson dated November 21, 1995, he indicates his understanding that the company is unlikely to have a position in Canada.

**23**    Mr. Paradela telephoned shortly after, urging Mr. Vasquez to approach Mr. Rodriguez to try to resolve the problem by persuading Mr. Rodriguez that the relationship could work. He also advised Mr. Vasquez on how to approach Mr. Rodriguez - for example, by enlisting support from another of the Venezuelan employees, Mr. Aguilar.

**24**    Mr. Vasquez testified that until this point, no one had criticized his performance on the Margarita Island project, and this evidence was not contradicted by the company's witnesses. He felt unhappy about having to approach Mr. Rodriguez in what he described as a "submissive" manner, for he felt that this was undignified. He testified that he would not have approached Mr. Rodriguez if the company had not suggested it.

**25**    After several phone calls to Mr. Rodriguez's office, Mr. Vasquez was able to obtain an appointment for Monday, November 6. However, he cancelled that appointment and flew to Toronto to obtain legal advice, without telling the company officials his whereabouts.

**26**    He returned later that week, and met with Mr. Rodriguez around November 13. According to Mr. Vasquez, Mr. Rodriguez indicated that he had no professional or ethical complaints about Mr. Vasquez, but he just could not work with him because of a personality conflict. Therefore, Mr. Rodriguez did not change his mind about wanting Mr. Vasquez off the project. In a fax dated

November 14, 1995, Mr. Vasquez confirmed that "The Venezuelan Ministry of Environment, maintained his decision, that is, to request my removal of the Project".

**27**    While Mr. Henderson asked Mr. Vasquez to remain in Margarita Island until mid-December, so that he could be replaced, Mr. Vasquez insisted on leaving quickly, because of fears for his family's safety. He mentioned this in a letter to Delcan on November 21, which also raised concerns about financial irregularities on the project.

**28**    Mr. Henderson testified that he then caused inquiries to be made by Diane Stone, who was responsible for the financial administration of all overseas projects. Following her report, he concluded that the statements about financial irregularities were unfounded. On November 24, 1995, he wrote Mr. Vasquez to that effect, and also gave notice pursuant to Article A.4(2) of the Overseas Agreement that Mr. Vasquez's employment was being terminated for cause - namely, rejection by the client. The letter also gave notice that there was no position available in Toronto, upon his return, and therefore, he was being terminated in accordance with paragraph 3(e) of the Acceptance of Employment Form. He was flown back to Toronto at the company's expense, while his family was flown to Miami and then to Chile, with open returns to Toronto. As their house was still rented, the family did not return to Canada until June, 1996. Mr. Vasquez was paid $7,749. in lieu of notice. He also received $1,500. for demobilization expenses, in accordance with the Overseas Agreement, although he claimed a larger sum for shipment of goods. He also claims, in this action, sums to compensate him for rent which he had pre-paid in Venezuela and furniture that he left behind and was unable to sell because the family left so quickly.

The Issues

**29**    There are a number of issues to be determined in this action:

> 1.    Does the law of Venezuela apply to this contract, so as to confer remedies under Venezuelan labour law?
> 2.    Was the employer in breach of the Overseas Fixed Term Agreement, either in terminating the contract as it did or in failing to offer the plaintiff employment in Ontario?
> 3.    What are the remedies to which the plaintiff is entitled?

The Applicable Law

**30**    The Overseas Fixed Term Agreement states that it is to be interpreted under the laws of Ontario, except as otherwise expressly provided. Nevertheless, the plaintiff argues that Venezuelan law should apply in the circumstances.

**31**    In accordance with Canadian conflict of laws principles, courts respect the parties' express choice of the law to govern their contract, absent vitiating factors. In the leading case, Vita Food Products Inc. v. Onus Shipping Co. Ltd., [1939] A.C. 277, the Privy Council held that the parties'

==expressed intention should determine the proper law of a contract, provided that the application of that law is not contrary to public policy, and the choice was bona fide and legal.== This was rephrased by Adams J., in Cardel Leasing Ltd. v. Maxmenko (1991), 2 P.P.S.A.C. (2d) 302 (Ont. Ct. (Gen. Div.), who relied on J.G. Castel, Canadian Conflict of Laws (2d ed., Toronto: Butterworths, 1986) for the proposition that courts will disregard the choice of a law expressly made to evade the system of law with which the transaction, objectively considered, is most closely connected.

32    Here, the Overseas Fixed Term Agreement states expressly that it will be interpreted under the laws of Ontario, except as otherwise expressly provided herein. I accept that these words indicate an express choice that Ontario law shall govern that agreement.

33    The plaintiff argued that Venezuelan law was the proper law of the contract because the Acceptance of Employment form signed by Mr. Vasquez states that his employment shall be governed by the laws of the location where he was employed. However, that agreement can not apply to Mr. Vasquez's employment in Venezuela, given that the Overseas Agreement expressly states that this agreement "serves as a summary of all known conditions and details of the Employee's overseas employment". The Acceptance of Employment form did not govern the relationship until after the termination of the Overseas Fixed Term Agreement. At that point, in accordance with Article A.4(e), the employee was to return to employment in his previous location - in the case of Mr. Vasquez, Toronto. In accordance with the Acceptance of Employment form, following the termination in Venezuela, Mr. Vasquez was an employee of the Toronto region, and, again, Ontario law would apply to the employment contract.

34    It was also argued that Venezuelan law should apply because of the employer's promise to abide by Venezuelan laws in its contract with the government, and the following phrase in the Overseas Agreement, "... any conditions in the Company's contract with the Client or otherwise imposed by the Client with regard to the assignment of personnel will be interpreted as if they were part of this agreement unless stated otherwise herein". There are several problems with this argument: first, the Overseas Agreement expressly states that Ontario law is chosen to interpret the agreement; second, the obligations of the employer incorporated from the other contract are obligations related to the assignment of personnel, not all parts of its other contract; third, even if the employer committed itself to the observance of Venezuelan laws in performing its obligations under that other contract, that commitment does not incorporate those laws in the contracts of employment with its employees, especially given the express choice of Ontario law.

35    While the parties' express choice of law may be disregarded in certain circumstances, as set out above, the choice here was not an attempt to avoid the system of law with which the transaction was most closely connected. An examination of the facts shows that Ontario is, in fact, the jurisdiction with which the transaction is most closely connected. Mr. Vasquez was an employee of Delcan and Delcan International, both Ontario-based companies; the agreement was entered into in Toronto; he had a right to return to employment in Toronto on termination of the overseas assignment; he was paid in Canadian dollars deposited to his bank in Burlington; his main task was

to facilitate the procurement process carried out by Delcan in Canada; and his supervisors were based in Toronto. Therefore, Ontario law is the law with the greatest connection to the contract, even though Mr. Vasquez physically performed his duties in Venezuela.

**36**    Nevertheless, courts have refused to enforce a contract, legal under the proper law of contract, where the plaintiff relies on actions illegal in the place of performance of the contract. In Gillespie Management Corp. v. Terrace Properties (1989), 39 B.C.L.R.(2d) 337 (C.A.) at 343, 344, the plaintiff sought to recover monies in British Columbia under a contract governed by British Columbia law, relying on acts performed in Washington which were illegal in that state, because he had lacked the necessary real estate broker's licence. On grounds of public policy, the Court refused to sustain the plaintiffs claim based on its illegal acts in another jurisdiction.

**37**    Similarly, in Cardel, supra, Adams J. refused to allow the plaintiff in an Ontario action to sue for outstanding rental payments after it had seized a leased automobile in British Columbia, even though the contract specified Ontario law as the proper law of the contract, and Ontario law permitted both remedies. British Columbia law required an election between the two remedies. The Agreement specifically stated that where any provision of the contract contravenes the law of any province where the agreement is to be performed, so as to be invalid or unenforceable, the provision was deemed not to be part of the agreement. Adams J. referred to this clause and concluded that the contract had its most substantial connection with British Columbia. As the law of that province extinguished the right to recover the amounts owing if the vehicle was seized, he refused the plaintiff's claim in Ontario.

**38**    Here, the plaintiff argues that the defendants acted contrary to the Venezuelan General Labour Act in dismissing him prior to the completion of his fixed term contract. Expert evidence was given by two Venezuelan labour lawyers about the application of this Act, Carlos Terán for the plaintiff and Dr. Rafael Echeverria for the defendants. According to Article 10 of the Act, the provisions of this law are of public order and of territorial application. They rule both Venezuelan and foreign citizens in relation to work performed or agreed to be rendered in Venezuela, and, under no circumstances, may they be waived or relaxed through private covenants.

**39**    Article 98 states that "[a]n employment relationship may terminate by means of dismissal, resignation, mutual agreement between the parties, or by causes beyond their will." Both experts agreed that the Venezuelan labour law applies to work performed in Venezuela, even if the proper law of the contract was stated to be that of another jurisdiction. They also agreed that the parties can, by mutual agreement, agree on the terms of termination of their relationship, so long as the conditions do not go beyond the labour law. However, they disagreed on what terms would go beyond that law.

**40**    The plaintiff argued that the term in the Overseas Agreement allowing termination for cause because of rejection by the client was illegal. It was his position that the agreement should not be enforced in Ontario because of its illegality in the place of performance. Mr. Terán was of the

opinion that Article 102 contains an exhaustive list of the actions deemed to be justified causes for dismissal, and the General Labour Act contains minimum standards which the employee cannot waive. In his view, in accordance with Article 108, an employee on a fixed term contract who is dismissed without justification has a right to salary, broadly defined, for the rest of the fixed term - here, for the remainder of the 24 month term. In contrast, Dr. Echeverria testified that the parties can express their will and agree to terms, such as what constitutes grounds for termination, in accordance with Articles 98 and 186.

**41**    Having considered the evidence of both experts, I conclude that there was no illegality in the termination of the Overseas Agreement. Therefore, there is no basis to refuse to apply Ontario law, as specified in the Agreement, on grounds of public policy. First, I do not find that there is a "dismissal without justification" here within Article 110, which deals with fixed term agreements. "Dismissal" is defined at the commencement of Article 99 as the employer's manifestation of its will to bring to an end the employment relationship binding it to one or more workers". When Delcan terminated the Overseas Agreement, it did not thereby terminate the employment relationship with Mr. Vasquez; rather, it brought to an end the overseas assignment, and Mr. Vasquez reverted to his employment status with Delcan in Toronto. Dr. Echeverria was of the opinion that a contract with the provisions for termination in the Overseas Agreement was valid under the Venezuelan law, and Mr. Terán also conceded that parties could agree to the termination of an overseas assignment, provided that the employee returned to his prior employment status at conditions equal to the ones enjoyed under the fixed term agreement. Therefore, I do not find that there was a contravention of the Venezuelan law.

**42**    In the alternative, even if the parties' consent to the termination of the Overseas Agreement on rejection by the client was contrary to Venezuelan law, this is not a situation where the application of the proper law of the contract - Ontario law - is contrary to public policy. This is not a situation, as in Gillespie or Cardel, supra, where the plaintiff seeks to rely on acts illegal in the place of performance in enforcing the contract in another jurisdiction. The Venezuelan labour law does not render the employment contract illegal if it contains terms less protective than the labour law; rather, it prohibits reliance on terms less beneficial to the employee than those in the law and ensures the employee certain monetary relief and, in some circumstances, reinstatement to employment. The Act also provides enforcement mechanisms, which include the intervention of various actors within the Venezuelan system for the administration of justice, including the Labour Stability Judge and administrative authorities. Mr. Vasquez clearly could have sought relief in Venezuela, but he chose not to do so. In the circumstances, it is not contrary to Ontario public policy to apply Ontario law, given that Ontario is the place with the strongest connection to the parties' employment relationship, and there was no illegality in the performance of the employment contract.

**43**    Therefore, this case falls to be determined only in accordance with Ontario law, as provided in the two relevant agreements.

Breach of Contract

**44**    The plaintiff argues that the employer has breached the Overseas Agreement in dismissing him, because the employer failed to demonstrate good faith in its actions. Even though the Agreement states that it can be terminated for cause if the client rejects the employee, the plaintiff that this clause must be applied in good faith (see, for example, Greenberg v. Meffert (1985), 7 C.C.E.L. 152 (Ont. C.A.) at 152). Here, it is argued that the plaintiff may have been dismissed because of the concerns he voiced about financial irregularities, rather than his performance, or because the employer wanted to make him a scapegoat in a procurement process that was not proceeding as quickly as desired by the Venezuelans.

**45**    In Greenberg, the Court of Appeal noted that matters to be determined on the basis of taste, sensibility or personal compatibility are likely to be measured by a subjective standard, but such exercises of discretion are still subject to an obligation of good faith and honesty (at 159). In that case, the Court held that the former employer of a real estate agent was required to act reasonably and in good faith in exercising its discretion regarding the payment of commission earned on listings acquired before the employment relationship ended. There was evidence of collusion between two employees to deprive the plaintiff of commission and to direct it to themselves, leading the Court to comment that the "patently improper conduct vitiated not only the reasonableness required in the objective criteria but the good faith and honesty required whether the discretion is objective or subjective" (at 162).

**46**    Here, while the results of the termination were harsh for the Vasquez family, there is no evidence of bad faith or dishonesty on the part of the employer, as in Greenberg supra. According to the Overseas Agreement, which Mr. Vasquez signed for the Margarita Island project and which he had signed for Maracaibo earlier, rejection by the client is cause for termination. Mr. Henderson testified that this is a fairly normal clause in overseas agreements, sine a great deal of the success of a project depends on the relationship of the client and the Delcan employee. The evidence is clear that the client, acting through Mr. Rodriguez, wanted Mr. Vasquez off the job. There is evidence from both Mr. Henderson and Mr. Paradela to that effect, and Mr. Vasquez, in his fax of November 14, 1995, confirms that the client does not want him on the project because of a personality conflict.

**47**    The evidence is insufficient to establish that the reason for Mr. Vasquez's dismissal was the fact that he raised concerns about financial improprieties. His concerns were not voiced to the Venezuelans, nor pursued in writing before termination of his assignment. Moreover, some of his concerns were clearly misguided - for example, the fact that the Venezuelan personnel were employed by Delcan and paid through the project. This was contemplated in the contract between Delcan and from the outset. With respect to the office expenditures, the Venezuelans were the ones who had to sign off, and once they did so, Mr. Vasquez acknowledged that he had no further role. On the evidence, I find that the client rejected Mr. Vasquez because of discontent with his performance of the facilitator function at Margarita Island and personality conflicts, and he knew this was so.

**48**    The plaintiff argues that the employer was still bound by a duty of good faith in exercising the power to terminate, and therefore, Mr. Henderson or Mr. Paradela should have intervened with Mr. Rodriguez and tried to explain that the difficulties in the project were due to start up problems and inevitable delays. Given the drastic consequences for the Vasquez family caused by the termination of the contract, that would have been a humane thing to do. However, the failure to intervene does not equate with "bad faith" by the defendants. In cases where the employer has been held to have abused its discretion, there is evidence that the employer acted for an ulterior motive or acted capriciously (see, for example, Truckers Garage Inc. v. Bell (1993), 3 C.C.E.L. (2d) 157 (Ont. C.A.); Greenberg, supra at 162). The evidence here indicates that the employer terminated the employment because the client rejected Mr. Vasquez - as the contract allowed it to do to meet the client's demands.

**49**    What the plaintiff seeks to do here is read in requirements to bind the company in exercising its discretion to terminate when the client rejects an employee, when the contract contains no such terms. The Supreme Court of Canada in Wallace refused to imply into employment contracts an obligation of good faith that would govern the reasons for dismissal that is, a requirement that dismissal must be for cause or legitimate business reasons (at 735). Nevertheless, the majority held that an employer had an obligation of good faith in the manner of dismissal - for example, an obligation not to press unfounded charges of cause or to act in an unacceptably harsh manner when terminating (at 742). Failure to comply with that obligation may extend the period of notice awarded for wrongful dismissal.

**50**    Here, the employer had cause for termination of the overseas Agreement, so Wallace is not applicable. The plaintiff has argued that the employer nevertheless breached its obligation in that agreement to return the plaintiff to a similar or substantially similar position in the previous location, and therefore, should not be able to rely on the termination provisions of the agreement because of the doctrine of fundamental breach.

**51**    This argument misconstrues the terms of the Overseas Agreement. With cause, the employer can terminate the Agreement, with the effect that the employment relationship resumes under the terms of the earlier agreement in the previous location. While the employee is said to be entitled to return to his previous employment or similar employment, the clause goes on to emphasize that the previous terms of employment apply. In this case, the terms of the Acceptance of Employment form came back into effect, and allowed the employer to terminate without cause on payment of the specified sums in lieu of notice. The employer paid for the return of the Vasquez family to Canada, and provided Mr. Vasquez with the amount owing in lieu of notice, as well as the $1,500. in demobilization expenses provided in the Overseas Agreement. In these circumstances, there has been no breach of the Overseas Agreement.

**52**    The plaintiff argued that the employer could not terminate under the Acceptance of Employment Form, because it contained specific provisions regarding regular performance appraisals and an opportunity to improve performance before termination. Mr. Vasquez testified

that he had not received such appraisals. However, these provisions are not applicable, as they are relevant to a termination for cause based on poor performance. Here, the employer did not purport to terminate the employment for cause, but rather exercised the contractual right to terminate without cause and with payment in lieu of notice. Therefore, the lack of performance appraisals is not relevant.

**53**    Therefore, I find that there has been no breach of the Overseas Fixed Term Agreement, and Delcan also acted in compliance with the Acceptance of Employment form. While the Vasquez family has suffered a great deal of unhappiness and hardship as a result of the termination of Mr. Vasquez's employment, the defendants have acted in reliance on contractual documents to which Mr. Vasquez agreed and which he signed. The terms are not contrary to Ontario law, nor do I find that they are unenforceable because of the impact of Venezuelan law. Therefore, the action is dismissed. If the parties are unable to agree with respect to costs, I may be spoken to.

SWINTON J.

qp/s/bbd/DRS

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

2007 ONCA 205
Ontario Court of Appeal

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

2007 CarswellOnt 1705, 2007 ONCA 205, [2007] O.J. No. 1083, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R.
(4th) 163, 85 O.R. (3d) 254

# VENTAS, INC., 2124678 ONTARIO INC., and 2124680 ONTARIO INC. (Applicants / Respondents in Appeal) and SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, SUNRISE REIT GP, INC., SUNRISE SENIOR LIVING INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Appellants in Appeal)

SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, and SUNRISE REIT GP, INC. (Applicants / Appellants in Appeal) and VENTAS SSL ONTARIO II, INC. (FORMERLY 2124678 ONTARIO INC.), VENTAS SSL ONTARIO I, INC. (FORMERLY 2124680 ONTARIO INC.), VENTAS INC., SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Respondents in Appeal / Ventas Inc. and numbered companies) (Appellant by Cross-Appeal / Health Care Property Investors, Inc.)

R.A. Blair, J. MacFarland, H.S. LaForme JJ.A.

Heard: March 20, 2007
Judgment: March 23, 2007
Docket: CA C46790, C46791

Proceedings: affirming *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.)

Counsel: Peter F.C. Howard, Eliot Kolers for Appellants, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP Inc.
Jeffrey S. Leon, Derek J. Bell for Appellants, Health Care Property Investors Inc.
Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas Inc., Numbered Companies
Luis G. Sarabia, Cynthia Spry for Respondent, Sunrise Senior Living Inc.

Subject: Corporate and Commercial; Contracts; Property; Public

## Headnote

**Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues**

Real estate investment trust was publicly traded entity — Board of trustees decided to sell assets and developed two-stage auction process to maximize value of units — Parties interested in purchasing were required to enter into confidentiality agreements with trust — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter discussions with representatives from its subsidiary — Corporation refused to waive standstill terms of agreement —

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

Corporation's application for declaration that trust was obliged to enforce standstill terms in confidentiality agreement was granted — Trust appealed — Third party cross-appealed for declaration that communications between it and subsidiary of trust were permitted — Appeal dismissed; cross-appeal dismissed — Trust was obliged to enforce standstill terms — Judge correctly outlined and applied principles of contract interpretation — Judge was correct that important purpose of s. 4.4 of purchase agreement was to ensure enforcement of standstill agreements entered into by previous players in auction process — Fiduciary out clause did not apply where unsolicited proposal was tendered in breach of non-solicitation provisions of purchase agreement — Fiduciary out clause did not allow trust to resile from terms of its standstill agreements with earlier bidders — Judge was sensitive to fiduciary out provisions that permitted other bona fide written unsolicited acquisition proposals — Judge found this was balanced by requirement that trust ensure enforcement of standstill agreements signed as part of auction process in order to protect successful bidder — This interpretation made commercial sense — Judge did not err in her assessment and use of term "bona fide" — Issue on cross-appeal was moot since ruling precluded third party proposal from being pursued.

**Table of Authorities**

**Cases considered by *R.A. Blair J.A.*:**

*ACE Ltd. v. Capital Re Corp.* (1999), 747 A.2d 95 (U.S. Del. Ch.) — referred to

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755, 160 D.L.R. (4th) 131, 1998 CarswellOnt 1891, 38 B.L.R. (2d) 196 (Ont. Gen. Div. [Commercial List]) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — considered

*Paramount Communcations Inc. v. QVC Network Inc.* (1994), 637 A.2d 34, 62 U.S.L.W. 2530, Fed. Sec. L. Rep. P 98,063 (U.S. Del. Super.) — referred to

*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 113 O.A.C. 253, *(sub nom. Maple Leaf Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115 (Ont. C.A.) — considered

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — referred to

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

> *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

> *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — referred to

APPEAL by public real estate trust from decision reported at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 184, 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.), granting application by corporation for declaration that trust was obligated to enforce confidentiality agreement; CROSS-APPEAL by third party for declaration that communications between it and subsidiary of trust were permitted.

*R.A. Blair J.A.:*

**Overview**

1      Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2      To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3      Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid — after it knew what Ventas had offered — "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4      Hence the urgency of this appeal.

5      The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

6    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

**Facts**

8    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

9    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

10    In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

11    Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

12    Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

13    On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

14    Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

15    On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder

*Ventas Inc. v. Sunrise Senior Living Real Estate...*, 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

16    On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

17    On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

18    The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however — after learning of the HCPI Proposal — Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

19    On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

20    The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**The Provisions of the Agreement**

21    Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

    4.4(1) <u>Following the date hereof, Sunrise REIT shall not</u>, directly or indirectly, through any trustee, officer, director,

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

    (i) <u>solicit</u>, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or <u>proposals</u> regarding, or other action that constitutes, or may reasonably be <u>expected to lead to, an actual or potential Acquisition Proposal</u>,

    (ii) <u>participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries</u>,

    (iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

    (iv) accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

    (v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (<u>that did not result from a breach of this Section 4.4</u>), from furnishing or disclosing non-public information to such Person if and only to the extent that:

    (i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

    (ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (<u>that did not result from a breach of this Section 4.4</u>) ("Proposed Agreement") if and only to the extent that:

    (i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

    (ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

    (iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

    (iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    7

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

(v) <u>not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties</u>.

22      The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

**Analysis**

23      The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

24      Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated — without reproducing in full the relevant passages from her reasons (paras. 29-34) in full — she held that a commercial contract is to be interpreted,

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[1]

(b) by determining the intention of the parties in accordance with the language they have used in the written

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

document and based upon the "cardinal presumption" that they have intended what they have said;[2]

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[3] and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[4]

25     The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

   a) by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement, and in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

   b) by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

26     I do not agree.

### The Application Judge's Reasoning

27     The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

[Footnote omitted.]

### The Scheme and Interpretation of Section 4.4

28    I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills — unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction — and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

29    From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available — one worth the risk of rejecting the Ventas proposal — they may well vote to reject the Ventas proposal at their meeting on March 30.

30    The language used by the parties in the Purchase Agreement supports this interpretation.

31    Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

32    As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (*that are not in breach of the provisions of section 4.4*) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3)-4.4(7)).[5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

> (v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties ...

33    Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party *that is not in breach of section 4.4 of the Agreement.*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

34    Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) — "notwithstanding anything contained in Section 4.4(1)" — do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

35    In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

*The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)*

36    Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) — namely, sections 4.4(8)(ii) and (iii) — refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

37    There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise — whether made before or after the close of the auction — constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

38    Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case — whether a prior bidder or not — from continuing to participate in the bidding process.

39    It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    11

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

40      Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

    4.4(1) Following the date hereof, Sunrise REIT shall not ...

        (ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

41      Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

42      Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

***An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible", and Accords with the Fiduciary Obligations of the Sunrise Trustees***

43      Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

44      In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

***The Factual Matrix***

45      Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken*, *supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

46      Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

> a) the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

> b) the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

> c) Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

> d) Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

> e) Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

47      Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role — the interpretation of a commercial contract — and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

48      At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

49      I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

50    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken*, *supra*, at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

51    The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

52    As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

53    On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid — or, in this case, the Trustees — have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755 (Ont. Gen. Div. [Commercial List]), at 768 and 774. That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

54    It is not necessary — nor would it be wise, in my view — to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communcations Inc. v. QVC Network Inc.*, 637 A.2d 34 (U.S. Del. Super. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (U.S. Del. Ch. 1999) at 105. That is not what happened in this case.

55    The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

56     An auction process is well-accepted as being one — although only one — "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) at 200. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.


57     It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.


58     Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... *the Board is not prevented from* ...". I would not ascribe to it the expanded role that HCPI proposes.


### *The Meaning of "Bona Fide"*


59     The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".


60     There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[7] She found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

entire situation.

61      In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated — particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) — I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

*Miscellaneous*

62      Two additional points were made by the appellants, but need not be dealt with at length.

63      First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

64      Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

*The HCPI Cross-Appeal*

65      HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

66      I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

**Conclusion**

67      For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

68      If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

69      In closing, I would like to thank all counsel for their able presentations and assistance.


**J. MacFarland J.A.:**


I agree.


**H.S. LaForme J.A.:**


I agree.

*Appeal dismissed; cross-appeal dismissed.*

Footnotes

1       *BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.) at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

2       *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, aff'd (1999), 45 O.R. (3d) 417 (Ont. C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para. 26; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at 166-68 [*Eli Lilly*].

3       *Eli Lilly*, *ibid.* at 166; *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at paras. 25-27 [*Kentucky Fried Chicken*].

4       *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901; *Kentucky Fried Chicken*, *ibid.*

5       The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

6       That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

7       2d ed., *s.v.* "bona fide".

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Date: 20100603**

**Docket: T-1236-01**

**Citation: 2010 FC 602**

BETWEEN:

**WEATHERFORD CANADA LTD.,
WEATHERFORD CANADA PARTNERSHIP,
EDWARD GRENKE AND GRENCO INDUSTRIES LTD.**

**Plaintiffs
(Defendants by Counterclaim)**

**and**

**CORLAC INC., NATIONAL-OILWELL CANADA LTD.
AND NATIONAL OILWELL INCORPORATED**

**Defendants
(Plaintiffs by Counterclaim)**

**<u>REASONS FOR JUDGMENT</u>**

<u>INDEX</u>

|  |  | <u>Para.</u> |
|---|---|---|
| I. | Introduction | 1 |
| II. | The Parties | 9 |
|  | Plaintiffs | 9 |
|  | Defendants | 15 |
| III. | The Actions | 18 |
| IV. | The Patent | 26 |
| V. | Plaintiffs' Expert Witnesses | 34 |
|  | Cam Matthews | 35 |
|  | Paul Skoczylas | 36 |
|  | Dr. Richard Salant | 37 |
| VI. | Plaintiffs' Fact Witnesses | 41 |
|  | Edward Grenke | 42 |
|  | Wesley Grenke | 45 |
|  | John Aboussafy | 46 |
|  | Roland Moneta | 47 |
|  | Scott Dudley | 48 |
| VII. | Defendants' Expert Witnesses | 49 |
|  | Allan Nelson | 50 |
|  | Gerard Muller | 51 |

VIII.    Defendants' Fact Witnesses ........................................................................... 54

    Art Britton ........................................................................... 55

    Barry George ........................................................................... 58

    Ken Krucik ........................................................................... 59

    Shane Fair ........................................................................... 60

    Ronald Johnson ........................................................................... 61

    Kurt Uhrich ........................................................................... 62

    Andreas Reincke ........................................................................... 63

    Michael Engelen ........................................................................... 64

    Roy Manicke ........................................................................... 65

    Magda Torfs ........................................................................... 66

    Brian Derewynka ........................................................................... 67

IX.    The Factual Background ........................................................................... 68

X.    Issues ........................................................................... 114

XI.    A.    Construction of '937 Patent Claims ........................................................................... 116

    Claim 1 ........................................................................... 123

    (1)    Seal Cartridge ........................................................................... 128

    (2)    Dynamic Seal ........................................................................... 138

    Claims 2-5 ........................................................................... 148

    Claim 6 ........................................................................... 149

    Claims 9-12 ........................................................................... 156

    Claims 13-17 ........................................................................... 165

XII.    B.    Infringement by the Defendants ............................................................. 166

                Infringement Analysis ............................................................. 168

                Claim 1 ............................................................. 182

                Claim 6 ............................................................. 184

                Claims 9 and 11 ............................................................. 186

                Claims 14-16 ............................................................. 192

                Claim 17 ............................................................. 199

                Infringement Conclusions ............................................................. 200

                Liability Issues ............................................................. 205

                Limitation Periods ............................................................. 221

                Entitlement to Action and Remedies ............................................................. 225

XIII.   C.    Inventorship of the '937 Patent ............................................................. 235

                Edward Grenke ............................................................. 244

                Andreas Reincke ............................................................. 255

                Michael Engelen ............................................................. 256

                Art Britton ............................................................. 261

                Walter Torfs ............................................................. 273

XIV.    D.    Validity of the '937 Patent ............................................................. 282

                Disclosure more than One Year prior to the Filing Date ............................................................. 283

                Disclosure to Amoco/Pan Canadian ............................................................. 290

                Obviousness by Reason of Prior Disclosure ............................................................. 319

                Misrepresentations/Misleading Statements ............................................................. 323

Other Alleged Misrepresentations ................................................................ 340

Abandonment................................................................................................... 342

Ambiguous Terms ........................................................................................... 354

XV.        E.      Rectification of the Patent Office................................................................... 356

XVI.       F.      Infringement by the Plaintiffs ........................................................................ 358

XVII.      G.      Licence Agreements ....................................................................................... 360

XVIII.             Conclusion ...................................................................................................... 378

**PHELAN J.**

I.        INTRODUCTION

[1]        These are the reasons for judgment in an action and counterclaim in respect to Canadian

Patent No. 2,095,937 (the '937 Patent) owned by Edward Grenke (Grenke) and licensed to GrenCo

Industries Ltd. (GrenCo) which sublicensed the patent rights to Weatherford PC Pump Ltd. and

subsequently Weatherford Canada Inc. and Weatherford Canada Partnership.

[2]        The '937 Patent claims a seal assembly combination designed to fix a problem of leaking

stuffing boxes on rotary progressive cavity pumps (PCPump) that troubled all the heavy oil

producers since the early 1980s. An example of a rotary PCPump with the stuffing box is shown

below:



[3]     There are two parts to a PCPump – a rotor and a stator. The rotor is a steel member that is

machined in the form of a single helix. The stator is a steel tube with rubber elastomer bonded to the

steel tube and it has a core that is formed in the shape of a double helix. The rotor rotates inside the

stator. The single helix rotor and the double helix stator form cavities. As the rotor turns, the cavities

progress from bottom to top drawing the liquid to the top – in this case the liquid is oil.


[4]     At the top end, surrounding the shaft which turns the rotor, is a stuffing box which is

designed to prevent the oil escaping by the shaft. The material inside the stuffing box designed to

prevent oil escaping would wear causing oil leakage, unplanned maintenance and repair – the cause of considerable concern amongst heavy oil producers.

[5]     This litigation centred on the claim that the Defendants had been infringing, since at least 1999, the '937 Patent in the manufacture and sale of their drive systems for rotary oil well pumps. The Defendants, aside from denying the allegations and attacking the Patent, also counterclaimed against the Plaintiffs, claiming that they, the Defendants, were the owners by assignment/licence of the '937 Patent and that the Plaintiffs had in fact infringed their patent rights.

[6]     The two actions were tried together as one, such that the evidence and submissions in one were also the evidence and submissions in the other.

[7]     This matter was subject to a bifurcation order under which damages would be tried separately from the issue of liability.

[8]     This litigation involved numerous and complex technical and legal issues; however, at its root was an assessment of credibility in respect of inventorship and a consideration of the behaviour of the key actors in this case. While the Court had the opportunity to observe the principal witnesses, the credibility assessment was made more difficult because of the passage of time and the absence of notes and other documents to assist in setting matters in context.

II.    THE PARTIES

*Plaintiffs*

[9]    Edward Grenke is a machinist by trade living in the Edmonton area, the controlling

shareholder of GrenCo and the claimed inventor and owner of the '937 Patent which was filed

May 11, 1993 and issued December 22, 1998.

[10]    GrenCo is an Alberta corporation with its head office in Edmonton. The company had, from

the 1980s to 1991, worked on plunger pump stuffing box applications and metal heat treating and

related work. In 1990 it became a distributor of equipment seals for the German company Martin

Merkel GmbH (Merkel) in Western Canada, mainly to the oil and gas and pulp and paper industries.

It ultimately became the patent licensee of the '937 Patent.

[11]    The Plaintiff, Weatherford Canada Ltd. (corporate number 2010240824) (Weatherford

Canada) is an Alberta corporation with a head office in Calgary, Alberta. It claimed as a person

claiming under the patentee, being the amalgamation successor to Weatherford PC Pump Ltd. who

was the sole sub-licensee from GrenCo from February 11, 2000 until February 1, 2001.

[12]    The Plaintiff, Weatherford Canada Partnership (Weatherford Partnership), claims as a

person claiming under the patentee, the sole sub-licensee of GrenCo from February 1, 2001 to the

present.

[13]     Weatherford Canada is the successor through multiple amalgamations commencing with

Highland Corod Inc., a company at which a key figure in this litigation, Art Britton, worked

commencing in October 1995. Weatherford Partnership was formed through the transfer of assets

from Weatherford Artificial Lift Systems Canada Ltd. (a successor of Weatherford PC Pump Ltd.,

the first licensee from GrenCo) and from a predecessor corporation of Weatherford Canada.


[14]     The various corporate reorganizations are not challenged here but the state of the licences

from GrenCo is. For ease of reference, the term "Weatherford Plaintiffs" refers to either or both of

Weatherford Canada and Weatherford Partnership (as the case may be), as well as their

predecessors, unless otherwise stipulated or apparent from the context.


   *Defendants*

[15]     The Defendant Corlac Inc. (Corlac) is an Alberta corporation with a registered head office in

Lloydminster. Corlac Inc. (Corlac) was the parent company of Corlac Equipment Ltd. (Corlac

Equipment) which manufactured and assembled equipment for oil producers. Prior to the purchase

of Corlac Equipment by National-Oilwell Canada Ltd. (NOC), Corlac owned all the shares of

Corlac Equipment. Corlac Equipment was responsible for the manufacture and sale of drive heads

and stuffing boxes.


[16]     NOC is an Alberta corporation, with its registered office in Calgary, Alberta. It purchased

the shares of Corlac Equipment from Corlac on November 20, 2003 and on January 1, 2004, NOC

amalgamated with Corlac Equipment. NOC reports its financial information as part of the financial filings of National Oilwell Varco Inc.

[17]     The Defendant National Oilwell Incorporated is now known as National Oilwell Varco Inc. (NOI, NOV respectively). NOV is a corporation established under the laws of Delaware with a head office in Houston, Texas and is the ultimate parent of NOC.

III.    THE ACTIONS

[18]     Between the time of initiation by the Plaintiffs of this action for infringement and the trial, the pleadings were subject to a number of amendments, reiterations and validations. In the action by the Plaintiffs, they seek a declaration that the '937 Patent, and in particular claims 1, 2, 3 and 6 to 17 inclusive, are valid and have been infringed by the Defendants. They also seek relief in the nature of an injunction, destruction of infringed materials and damages or accounting, including exemplary punitive and aggravated damages along with pre-judgment and post-judgment interest. In essence, the Plaintiffs claim that the Defendants manufactured and sold drive systems for rotary oil well pumps including an assembly for restraining oil leakage, all of which infringes the claims in the '937 Patent as stated above. The Plaintiffs also claim that the Defendants have induced and procured others including their customers to infringe the '937 Patent.

[19]     The Plaintiffs also claim that the sealing devices were made and sold through NOC's predecessor Corlac Equipment and that NOI (now NOV) is a directing mind behind the infringing activities of NOC and is therefore liable for such activities.

[20]    The Plaintiffs assert, in addition, that Corlac and Corlac Equipment each infringed the '937 Patent in the same manner and that Corlac was a directing mind behind the infringing activities of Corlac Equipment and Corlac Industries (1998) Ltd. and is therefore liable for those activities. NOI is alleged to have purchased or orchestrated and directed the purchase of Corlac Equipment knowing of the ongoing infringing activities of the Corlac companies.

[21]    The Defendants' basic defence is that Grenke was not entitled to the '937 Patent, in that he was not an inventor thereof, and therefore the Weatherford Plaintiffs have no valid rights under the '937 Patent. In respect of infringement, the Defendants claim the usual broad denials of invalidity and infringement and further challenge the claim for damages on, *inter alia*, the remoteness of damage and the absence of profit.

[22]    The Defendants further claim that the '937 Patent is invalid because the subject matter of the patent was disclosed more than one year prior to the filing date, because Grenke was not the true inventor and because the patent was void by virtue of untrue material allegations in the patent petition which named Grenke and Walter Torfs as inventor. The Defendants claimed the true inventor to be Art Britton and/or Walter Torfs or, alternatively, a number of other named individuals.

[23]    The Defendants further claim invalidity on the basis of untrue material misstatements by Grenke in the 1994 amendments to the petition which had the effect of removing Walter Torfs as an

inventor from the patent petition. The Defendants also claim invalidity on the basis of abandonment by virtue of failure to deal in good faith with the Patent Office, that the asserted claims of the '937 Patent are obscure and ambiguous and the patent is broader in scope than the alleged invention.

[24]    The Defendants then counterclaim for a declaration that the '937 Patent is invalid and alternatively, if the patent is valid, NOC claimed for an order pursuant to section 52 of the *Patent Act* that the entry and the records of the Canadian Patent Office relating to the title of '937 Patent be expunged and that the title be varied to name Art Britton as the true inventor and National-Oilwell Canada Ltd. as the owner.

[25]    The Defendants, Plaintiffs by Counterclaim, also sought a declaration that the patent, and in particular claims 1, 2, 3 and 6-17, have been infringed by the Plaintiffs Grenke, GrenCo and the Weatherford Plaintiffs. The Defendants also seek the usual orders in the nature of injunction, delivery up, damages and disgorgement of profit.

IV.    THE PATENT

[26]    The '937 Patent was designed to address a problem common in the heavy oil industry in North-Eastern Alberta and North-Western Saskatchewan where heavy oil wells which use PCPumps were experiencing failures of their stuffing boxes.

[27]    The PCPumps operate the oil well by turning a shaft which was sunk into the ground and which drove a number of sucker rods (long pieces of tubing made up of inter-connected rods) which

went out to the pockets that contained the oil. The sucker rods turned a stator (device somewhat

akin to an auger) which then drew up the oil to the surface. Some of these sucker rods would extend

several kilometres underground.

[28]    The oil coming from these pockets contained elements of dirt, salt and sand. The existing

stuffing boxes – the device which sealed off the top of the oil well from the oil being drawn up –

had the rotating shaft running through it. The combination of friction in the stuffing box and the

pressure and debris coming up from below ground caused the stuffing boxes to fail. Failure of the

stuffing boxes resulted in loss of oil, environmental damage and unplanned shut down of the wells

in order to be able to conduct the necessary repairs. All the oil companies in the area experienced

the same problem and all were extremely interested in finding a solution to the stuffing box failures

or at least a manner by which they could anticipate when the stuffing box repairs would be

necessary so that planned maintenance could be undertaken. The '937 Patent was designed to

address this problem and to allow for planned maintenance by having the seals in the stuffing box

fail in sequence and by permitting inspection of the progress of seal failure.

[29]    The '937 Patent is described as:

> An assembly for restraining oil leakage in a rotary oil well pump
> includes a stationary member and a rotary member. The rotary
> member is secured to the rotating rod and is sealed against the rod by
> conventional compressed packing. The rotary member has a
> cylindrical portion rotating with a cylindrical recess of the stationary
> member, with an annular recess defined between them. The recess
> contains two or more annular seal cartridges stacked one after the
> other in the annular space. The cartridges are designed to
> individually resist the ingress of the pressurized oil, so that leakage
> takes place sequentially past the individual cartridges. Leak passages

are provided in the stationary member and are in communication
with each of the cartridges respectively. When oil appears at any
given leak passage, this signifies that the oil has bridged the defences
of that cartridge and any cartridge or cartridges which are upstream
of the leaking cartridge.



[30]    The Patent's field of invention is:

>This invention relates generally to the oil production industry, and
>has to do particularly with improving the efficiency of the seals used
>to seal a rotary rod of a progressive gravity *[sic]* oil well pump, in
>order to prevent leakage of oil.

[31]    The '937 Patent describes the background of the invention and the problem alluded to

earlier.

>Many conventional oil wells are operated by a downhole pump at or
>close to the bottom of the well, the pump being of a conventional
>reciprocating kind actuated by a rod string which in turn is
>reciprocated vertically by a pump jack. Recently, many conventional
>reciprocating pumps have been replaced by rotary-drive progressive
>cavity pumps. The rotary pumps are particularly suited for the
>production of crude oil laden with sand and water.

>In the conventional vertically reciprocating pumps, the apparatus is
>typically constructed in such a way that a single stuffing box

provides control of leakage and loss of oil. This conventional stuffing box is stationary and is secured to a stationary housing. The part of the upper portion of the rod which actually contacts the stuffing is usually highly polished, thus ensuring minimal leakage and minimal damage to the packing material. With the introduction of rotary pumps, it has been generally found that, if the conventional stuffing box (developed for vertical pumps) is used for the rotary pumps, oil leakage develops relatively early, requiring frequent maintenance and frequent replacement of the packing material.

[32]    The '937 Patent contains a broad statement of the invention:

Broadly stated, the present invention provides an improved assembly for restraining oil leakage from rotary oil well pumps by providing a special sleeve to surround the rod with packing, the sleeve rotating with the rod and therefore not requiring a dynamic seal between them. The sleeve in turn is rotatably mounted within a recess defined by a stationary member, and a plurality of annular seal cartridges are provided to occupy the space between the sleeve and the stationary member. The seal cartridges are constructed in such a way as to resist the leakage of oil on a sequential basis. Thus, oil must first get past an initial seal cartridge before gaining access to the second in line, and the second cartridge must break down before the oil gains access to the third cartridge. Leak passages corresponding to the plurality of seal cartridges indicate by the appearance of oil the furthest downstream cartridge to which the oil has gained access.

[33]    For ease of reference, the claims being challenged by the Defendants and being asserted by the Plaintiffs are set forth in Annex A to this judgment.

V.    PLAINTIFFS' EXPERT WITNESSES

[34]    The Plaintiffs called two expert witnesses in direct, Cam Matthews (Matthews) and Paul Skoczylas (Skoczylas) and one expert witness in reply, Dr. Richard Salant (Salant).

_Cam Matthews_

[35]    Matthews was qualified to give testimony about the impact of failures in and the

functionality of stuffing boxes in oil production with the limitation that he was not an expert on

seals or stuffing boxes. He also testified as a fact witness concerning the practice in the oil industry

relating to the confidentiality of test equipment. Matthews is an employee of C-FER Technologies

which is a consulting company for whom both he and Skoczylas work.

_Paul Skoczylas_

[36]    Skoczylas was qualified as an expert in mechanical engineering with some knowledge of

PCPumps.

_Dr. Richard Salant_

[37]    Dr. Salant was accepted by the Court as a mechanical engineering and seal expert generally

in the field of sealing rotary shafts but not as an expert in PCPumps or oil tools generally. Dr. Salant

has a long career in research and teaching, particularly at the Georgia Institute of Technology. He

has written a vast number of papers on the subject of seals and sealing devices and he holds six

patents relating to pumping and sealing technologies.

[38]    Dr. Salant's evidence which rebutted that of the evidence of the Defendants' experts was

clear, cogent and persuasive, both in written form and in his oral testimony. He survived a detailed

and excellent cross-examination and survived it largely unblemished. His evidence was delivered in a manner which was helpful to the Court, non-combative, and to the point.

[39]     The Defendants' criticism that he was not an expert in the oil industry is not truly significant, given that he was to address seals and sealing technology which is at the core of this litigation. Except for the fact that he is educated and experienced far beyond the "notional skilled person", he most closely replicated that skill set which he defined and which the parties have generally accepted as the "person skilled in the art" – being a mechanical engineer who has dealt with the design, evaluation or application of sealing methods for a range of services over a period of at least five years. The Defendants would have added a mechanical technologist that had acquired a practical knowledge of the operation of various seal designs and various services over the span of at least 10 years and/or a millwright or machinist mechanically inclined with experience in the field of oil and gas drilling or production, or, alternatively, who have attended courses or seminars dealing with such areas. The essential field of knowledge was seals and sealing methods.

[40]     The Court accepts Dr. Salant's evidence and prefers it over that of the evidence of the Defendants, most particularly evidence of Gerard Muller.

VI.     PLAINTIFFS' FACT WITNESSES

[41]     The Plaintiffs called as fact witnesses Edward Grenke, Wesley Grenke, John Aboussafy, Roland Moneta and Scott Dudley.

*Edward Grenke*

[42]    Edward Grenke's testimony was essentially the cornerstone of the Plaintiffs' case in terms of the development and inventorship of the '937 Patent, the dealings with the customers Amoco and Pan-Canadian Oil, his relationship with Art Britton and his agreements and relationship with Walter Torfs. He also testified in respect of the changes made to filings with the Canadian Patent Office wherein Walter Torfs' name was removed as an inventor, a subject matter on which the Defendants placed considerable reliance as evidence of bad faith and false and misleading dealings with the Patent Office.

[43]    Grenke's evidence suffered from the same disability of many witnesses – the passage of time and the absence of corroborative documents. He was also experiencing some medical difficulties. Taking these factors into account nevertheless, he was vague about some details which might not have assisted him and obviously motivated to put the best face on his own activities.

[44]    While the Court approaches his evidence with some caution, the core of his narrative was consistent with other evidence and was more believable than that of other witnesses who tended to downgrade Grenke's activities in inventing and creating a useful invention. The Court generally prefers his evidence to that of opposing witnesses, particularly Art Britton. On a balance of probabilities (more likely than not) test, Grenke's evidence is generally accepted unless otherwise indicated.

### _Wesley Grenke_

[45]    Wesley Grenke is the son of Edward Grenke and works for GrenCo. Wes Grenke's evidence was not particularly pertinent to the case in that he was largely supporting his father's evidence (as one would expect). The testimony was not particularly persuasive or germane and suffered from the fact that he sat through his father's evidence and was well aware of the stakes involved in this litigation and the competing stories being advanced. The Court is therefore giving less weight to his evidence than might otherwise be the case.

### _John Aboussafy_

[46]    John Aboussafy is the Global Business Unit Vice-President for Fluid Power Systems, a part of the Weatherford Canada Partnership. In 1995 he was a general manager for Highland/Corod and was responsible for hiring Art Britton (Britton) in October 1995 after Britton had ceased employment with GrenCo. He was knowledgeable about the relevant aspects of the business and the relationship between GrenCo and the Weatherford companies and their royalty arrangements. He gave evidence about Britton joining Highland/Corod and his selling of a line of variable frequency device motors (VFD). He spoke also to Britton's dissatisfaction with not being named as an inventor of the Grenke patent.

### _Roland Moneta_

[47]    Roland Moneta is the Operations Manager with Weatherford Canada Partnership and as of 2006 he was responsible for the licence agreements with Weatherford. His evidence was helpful in

understanding the relationship between GrenCo and the Weatherford companies and the corporate

history but he had little personal knowledge of details of the disputes regarding royalties.

### *Scott Dudley*

[48]    Scott Dudley was a production foreman at Amoco in the early 1990s but was not part of the

maintenance group on the Amoco site at Elk Point at which Britton worked. He described the

problems with the PCPumps and some of the efforts being made by Amoco to find a resolution for

the leaking stuffing box problem. He gave evidence as to the ingenuity of Grenke's concept as well

as evidence about public access to oil sites, and about the confidentiality of testing and testing

equipment.

### VII.    DEFENDANTS' EXPERT WITNESSES

[49]    The Defendants called two expert witnesses, Allan Nelson and Gerard Muller.

### *Allan Nelson*

[50]    Mr. Nelson was accepted as an expert in mechanical engineering with experience in oil field

equipment. Nelson's evidence was directed in part towards the prior art and the obviousness which

the Defendants claim in respect of the '937 Patent. He also spoke to the absence of infringement of

the Corlac device by not having a "dynamic knife edge" in the packing cartridge. His evidence was

at times vague and outdated and while he testified as to the search for a solution to the industry

problem, he was unable to articulate a reason or an explanation, that if the solution in the '937 Patent

was so obvious, why no one else had discovered it previously.

### *Gerard Muller*

[51]    Gerard Muller was accepted as an expert in mechanical engineering and sales for rotary

pumps generally and rotary pumps for use in oil production and processing in particular. He gave

his analysis of the claims and of the validity and infringement issues. He also spoke to the functions

and nature of seals and seal cartridges. His evidence was the cornerstone of the Defendants' attack

on the Plaintiffs' patent and the Defendants' explanation of non-infringement of the '937 Patent.

[52]    Muller's testimony did not stand up under cross-examination and he was shown to be

evasive, aggressive, arrogant and unhelpful. Mr. Muller's evidence was significantly undermined by

his failure to directly answer questions which admitted of only a direct answer, and by his disrespect

and arrogance towards opposing counsel and his longwinded diatribes in giving unresponsive

answers.

[53]    The Court must conclude that his evidence was of little specific assistance and particularly

where it conflicted with that of the Plaintiffs and in particular Dr. Salant, the Court accepts the

Plaintiffs' evidence. While no doubt sincere in trying to assist his client, Mr. Muller was apparently

unaware of the obligations that an expert owes to the Court and the assistance which an expert is to

render in aiding the Court's understanding.

VIII.    <u>DEFENDANTS' FACT WITNESSES</u>

[54]    The Defendants called as fact witnesses Brian Derewynka, Art Britton, Barry George, Ken Krucik, Shane Fair, Ronald Johnson, Kurt Uhrich, Roy Manicke, Andreas Reincke, Michael Engelen and Magda Torfs.

### *Art Britton*

[55]    Art Britton was the principal antagonist in this contest. He testified as to his involvement in developing the rotating stuffing box and his claim that it was his "idea" which was stolen by Grenke, the confidentiality surrounding the Amoco local unit at Elk Point and his sales activities and other career highlights, both while he was with GrenCo and after leaving GrenCo.

[56]    Britton obviously felt that he had been cheated out of credit for his contribution to the '937 Patent. He had a clear and continuing animus against Grenke, best summed up as anything which harmed Grenke was of comfort to Britton. That animus so coloured Britton's evidence that the Court cannot depend on it to any great extent. Britton's evidence also suffered from faulty recollection on key matters including but not limited to the source of his own stuffing box concept.

[57]    Britton, who took no steps to assert any alleged patent rights during or after he left GrenCo, assigned his rights much later to what became the Defendants and now contends that it was principally he who invented the stuffing box solution. That is an untenable position given all the credible evidence in this case.

*Barry George*

[58]     Barry George was a witness called under subpoena and compensated for his time – a point made by the Plaintiffs but which quite frankly does not undermine the strength of his evidence. It would be unusual in today's circumstances that one could easily secure witnesses without at least compensating for their time and expenses. George's testimony revolved around the Amoco EI (sometimes called CI) (a maintenance group) meetings in the late fall of 1990 and early winter of 1991 regarding the solutions to stuffing box leakage problems. George's testimony suffered from the problem earlier alluded to by the Court of the recollection of events that are well in excess of 10 years past. Therefore, the specifics of what was said or done on any particular date are highly questionable. This does not undermine the integrity or the honesty of the witness' evidence but simply its reliability.

*Ken Krucik*

[59]     Ken Krucik was likewise a member of the Amoco maintenance team in the early 1990s and participated in the Amoco EI meetings in the late fall of 1990 and early winter of 1991. His evidence suffered from the same frailties as that of George and all that it established was that in and about those dates there was considerable discussion on the problems of stuffing box leakage which is consistent with other evidence before the Court.

*Shane Fair*

[60]     Shane Fair worked at the Elk Point site in 1991 and was responsible for reporting on the first

stuffing box delivered to Amoco and the result of its operation.

*Ronald Johnson*

[61]     Ronald Johnson was the district foreman at Amoco Elk Point facility in 1990 and was

Britton's direct supervisor. His evidence related particularly to the absence of a specific

confidentiality agreement with respect to the test equipment. He described a generally corroborative

relationship between Amoco and GrenCo. Finally, he confirmed that Amoco's lawyers in Chicago

were not interested in asserting any patent rights in respect of the first units delivered to Amoco. He

confirmed that for any member of the general public to see the actual mechanics of the PCPump,

including the stuffing box equipment, they would have been prevented from doing so by Amoco

employees. Importantly, he confirmed that Amoco considered that any testing and development of

product such as the stuffing box was confidential within the company.

*Kurt Uhrich*

[62]     Kurt Uhrich was the production engineer for the Amoco Elk Point facility in

January/February 1991 and reported to Johnson. His evidence was to some extent contrary to that of

his supervisor, Johnson, in that he testified that there was no confidentiality surrounding the

equipment or the tests of the use of the first devices from GrenCo. As indicated later, the Court

concludes that Johnson's evidence, as a more senior employee of Amoco, more closely reflects the corporate position and the understanding between Amoco and Grenke/GrenCo.

### Andreas Reincke

[63]     Andreas Reincke was an application engineer working at Merkel in Hamburg, Germany in 1991. His testimony related to the visit in April 1991 by Grenke and Britton. While he tended to downplay the inventiveness of Grenke's device, his actual recollection of specifics of the meeting and what one person contributed or knew at the time was vague and unreliable. His chief complaint seemed to be that he was not named as an inventor on the patent.

### Michael Engelen

[64]     Michael Engelen was involved in the design work and development of seals and sealing arrangements at Merkel. He claimed that the design work and ideas for Grenke's invention, in particular a seminal document (Exhibit 10, P145), was his idea and that he contributed a number of other ideas to the eventual patent. He likewise seemed to complain that he was not named on the patent. His evidence was largely directed at claiming a great deal of the inventiveness in the '937 Patent despite the fact that he had no idea whether those ideas would work and his recollection of specifics suffered the same difficulty as that of Uhrich.

_Roy Manicke_

[65]    Roy Manicke worked for GrenCo between 1989 and 1995 and his evidence related to the

relationship between Britton and Grenke, Britton's role in designing new equipment at GrenCo and

the design and manufacture of stand-alone rotating stuffing box units. He also gave testimony with

respect to the manner in which items were shipped from GrenCo and the requirement for packing

slips and related documents. He also indicated that Grenke had suggested that Britton had an idea

and that it would "make them a lot of money". He was unceremoniously let go by Grenke and it

was apparent that circumstance coloured his view of Grenke.


_Magda Torfs_

[66]    Magda Torfs was the widow and executor of the late Walter Torfs, the former president of

Flender Canada. Walter Torfs was to work with Grenke in the development of the solution to oil

leakage problems and the creation of the integrated drive unit to operate with the stuffing box. Her

evidence, overlaid with the desire to protect her late husband's good name, was directed to his

contribution to the integrated drive unit and to the '937 Patent. She confirmed that she had signed

away any rights that she or her husband's estate might have in the '937 Patent (if any) and had done

so after speaking with her son-in-law who is a lawyer. She had no specific knowledge of what was

done or contributed as between Grenke and her husband and her efforts to decipher documents to

prove her husband's contribution, while well intentioned, were of little assistance to the Court.

*Brian Derewynka*

[67]    Brian Derewynka is an employee of Weatherford Canada and had previously been a maintenance foreman and mechanic with Pan-Canadian from 1990 to 1994. He was called as a witness by the Defendants and declared adverse. He testified as to the purchase of stuffing boxes in 1992 including the handling of the first unit delivered to Pan-Canadian and the possibility that invoicing for product could follow after the product was received.

IX.    THE FACTUAL BACKGROUND

[68]    By the late 1980s there was increasing concern about the problem of leaking stuffing boxes on rotary PCPumps which had been experienced by the heavy oil producers since at least the early 1980s. With increasing concern over environmental damage, more frequent use of slap wells, increasing polishing rod speeds (polishing rods are the rods from the top of the well that drive the sucker rods located below ground), mounting loss from production down time, and the exigencies of unplanned oil shutdowns. Every heavy oil producer was interested in finding a solution. The sealing assembly combination claimed in the '937 Patent was designed to fix that very problem.

[69]    In late 1990, H & R Valve, a company operating in Alberta, was testing a prototype stuffing box employing a static seal against the polished rod. At that time Britton, then an Amoco maintenance crew foreman, knew of this prototype and had watched it run. He then began discussing the idea of a stuffing box employing a static seal around the polished rod. The idea was that one could avoid the wear and tear of polished rods and packing by not turning the polished rod

inside the packing. Effectively this means that the polished rod and packing would turn together. This H & R Valve prototype and the concept behind it was discussed by Britton and his maintenance crew referred to as EI (or sometimes CI) crew sometime in the first half of 1991 but there was never any concrete description of how this would be accomplished, much less any development of the apparatus itself.

[70]     Britton claimed that he had come up with the idea of turning the polished rod with the packing but that evidence was effectively destroyed on cross-examination. He was also vague as to whether he showed any drawing or plan of his concept at the first of these EI meetings. Britton's inconsistencies regarding the origin of his "claimed" concept significantly undermines the credibility of his narrative that he was the inventor.

[71]     Sometime in January or February 1991 Grenke who had been selling, to the oil producers, polished rods that were induction hardened to resist wear from packing, met with Britton in the course of a usual sales call. There is conflicting evidence as to whether or not Britton showed Grenke his sketch of the type of apparatus (if such drawing existed) which would solve the problem or whether they simply discussed the problem and possible solutions.

[72]     On or about February 23, 1991, Grenke and his son Wes Grenke prepared a drawing of the concept of the sleeve having static seals around the polished rod with a recess in a stationary housing where dynamic seal could be placed on the sleeve. With that concept, Grenke forwarded a

drawing to Merkel, a seal manufacturer, in Germany for advice as to the type of seals made by

Merkel that were possible to use with this concept.

[73]    At Grenke's request, on March 11, 1991, Britton prepared a first video of the site and wells

which were experiencing the stuffing box failures. The video was prepared to inform Merkel of the

nature of the problem and the operating conditions. While Britton prepared the video and performed

the narrative, he does not suggest in the video any solution to the problem. The video was for

Grenke's use with Merkel to find the type of seals which would work best in Grenke's proposed

device.

[74]    By late March 1991, in response to another drawing sent by Grenke showing the concept

and the place for the seals to Merkel, Merkel forwarded a number of suggestions for sealing

arrangements which might work.

[75]    On April 8, 1991 Grenke and Britton met with Merkel in Hamburg where Merkel

employees discussed with Grenke and Britton the various types of seals available and the options

that could be used. Despite the varying claims as to who suggested what to whom and when, the

end result was that a U-ring arrangement was selected from the various options presented. The

weight of the credible evidence is that it was Grenke who decided what type of seal he would use in

his device. Seals are only one aspect of the patented device.

[76]     Following the meeting with Merkel, Grenke took Britton with him to a trade show at

Hanover for the purposes of meeting Walter Torfs, the Canadian representative of Flenders (a

manufacturer of drive heads for various pumps), with the view of discussing a way to make and sell

a whole well head drive unit incorporating the seal assembly. Since Grenke was unable to find

Torfs, he left Britton at the airport and returned to Merkel to work on the project.

[77]     At about the same time, Merkel modified Grenke's drawings to show additional apparatus

which would permit the conversion from static seals to dynamic seals and vice versa when the seals

failed. Grenke added to the drawings and made various amendments including the change to the

type of rings and the creation of a leak passage out of the side of the stationary housing. While

Merkel employees made certain suggestions and gave technical advice on the seals, Grenke was in

charge of the project and made the decision as to what was to be used and what other aspects of

design and operation were needed.

[78]     Following Grenke's return to Canada in May 1991, he finalized his working drawings using

the drawings as amended at Merkel to build a prototype of the sealing arrangement and shipped it to

Amoco.

[79]     In that same period Grenke met with Torfs and a David Scott of Flenders to discuss the

drive components. An attempt to use an off-the-shelf gearbox was unsuccessful. As a result,

Flenders agreed to design a gearbox for GrenCo. Grenke had had in his mind the integration of a

power unit and stuffing box since as early as his attempted meeting with Torfs in Germany. At

about this time, Grenke and Torfs discussed joint inventorship of ensuing patents and a 50-50

ownership arrangement.


[80]      The testing of the prototype unit began on June 21, 1991, with the consent and active

participation of Amoco and the test demonstrated to both organizations that Grenke's concept

actually could work.


[81]      A second prototype stuffing box was installed at Amoco in August 1991. At the time

Grenke was working on modifications to the stuffing box to prevent lubricant leakage which had

been a problem observed with the first prototype.


[82]      In an exception to much of the evidence of meetings, Grenke made notes of a meeting with

Merkel on September 20, 1991 confirming that a senior officer on behalf of Merkel indicated that

the company had no interest in any patent rights which might arise from the work it was doing with

Grenke.


[83]      In the fall of 1991 Britton left Amoco. At that time Amoco, after consultation with counsel

in Chicago, advised Britton that the company had no interest in patent rights on the developing

stuffing box and driveheads. At that time Britton, in his capacity as an employee of Amoco, had

been working with Grenke on the improvements to the prototypes.


[84]      Britton began working for GrenCo as a salaried sales manager on October 1, 1991.

[85]    Throughout the fall of 1991 and into the spring of 1992, Grenke continued to work on the stuffing box design to address leakage problems. There were problems with the use of U-rings in the housing. On a parallel track, design work on a gearbox system was ongoing with Torfs.

[86]    The original prototype was eventually redesigned to remove the conversion apparatus, to add additional leak detection passages and to create an integral drive for the sealing assembly. It is these embodiments of the invention which are claimed in the '937 Patent.

[87]    On May 11, 1993, Torfs and Grenke, as joint inventors, filed the '937 Patent application in Canada. Torfs, who was responsible for the patent prosecution of this patent and other patents developed in association with Grenke, had retained Thomas Reider to act as the patent agent.

[88]    The evidence concerning the respective contribution of Torfs and Grenke to the patent ultimately developed is unclear. The documentary evidence is ambiguous as to who contributed what, Torfs is deceased and Thomas Reider was too ill to testify. Grenke's claim that he conceived the additional leak passages and integral drive and then discussed these concepts with Torfs is consistent with documentary evidence. The Defendants did not call any witnesses from Flenders to counter Grenke's evidence.

[89]    June 19, 1992 is the date of an invoice from GrenCo to Pan Canadian regarding a packing slip and work order as well as a credit note from GrenCo to Pan Canadian in respect of the invoice.

It is in part this transaction which the Defendants say showed a sale prior to June 19, 1992, based upon a credit note, more than one year prior to the filing date of the patent – May 11, 1993.

[90]     By July 6, 1992, Grenke had a drawing of an electric gearbox well head drive and GrenCo sold integral type drive for oilwells. There is no evidence that anyone else sold such units prior to the July 6, 1992 date.

[91]     From the summer through to May 11, 1993, there were a series of drawings and design changes to the integrated well head units and improvements to the stuffing box seal arrangements. These included exchanges between Torfs and Grenke and between Grenke and employees of Merkel.

[92]     Two days after the Canadian '937 Patent was filed, Grenke signed the documents for the U.S. equivalent patent; Torfs having signed them in February.

[93]     Walter Torfs died in June 1993.

[94]     On November 3, 1993, Flenders agreed to Grenke taking over the patents filed on its behalf by Torfs and those jointly filed. Flenders agreed to absorb the costs to date but Grenke was to pay future costs as the patents were now his property. Grenke was responsible for the transfer of the patents. The formal assignment covering the '937 Patent was dated March 24, 1994.

[95]    By February 14, 1994, Magda Torfs, on her own behalf and as executrix of Torfs' estate,

agreed to assign all rights and duties in the "Sealing Assembly for Rotary Oil Pumps and Method of

Using Same" application. The date of the actual assignment of the '937 patent application was

November 11, 1994.

[96]    After the formal assignment from Flenders and after the agreement with Magda Torfs but

before the formal assignment, Grenke executed an affidavit to be filed with the Commissioner of

Patents who was still prosecuting the '937 Patent. The affidavit was signed on August 17, 1994, and

sent by the patent agent to the Commissioner on December 8, 1994 to have Torfs removed as one of

the inventors.

[97]    The affidavit contained a number of inaccuracies, the most important of which (at least in

the view of the Defendants) is:

> … the inclusion of Mr. Torfs as a sole and joint inventor and the
> failure to identify me as a sole inventor on all the applications were
> the result of inadvertence or mistake and were not for the purposes of
> delay.

[98]    Under penetrating cross-examination at trial, Grenke admitted that Torfs was an inventor.

[99]    By August 1994 relations between Grenke and Britton were strained. Britton was evidently

frustrated about his role in the development of the '937 Patent and the lack of recognition of his

alleged contribution to the project. Shortly after Grenke made it clear that Britton would not be

named on the '937 Patent, Britton resigned from GrenCo on August 5, 1995 and began to work for himself as a distributor of an unrelated product, a variable frequency drive (VFDs).

[100]    A few months later Britton joined Highland/Corod Inc. and brought his VFD business into that company's line of business.

[101]    Highland/Corod Inc., through an amalgamation in 1999, became one of the Weatherford Canada Ltd. corporations which ultimately through amalgamations became one of the Plaintiffs. Britton moved on to South America to start up an electronics division.

[102]    Sometime in 1999, Glen Schneider, the head engineer of a company called BMW Pump Inc. (which later became Weatherford PC Pump Ltd. and which designed rotating stuffing boxes) joined Corlac Equipment Ltd. Shortly thereafter Corlac Equipment Ltd. began the sale and manufacture of a rotating stuffing box under the name "Enviro" which is alleged to infringe the '937 Patent.

[103]    From early 2000 to December 2003 Corlac Equipment sold "Enviro" stuffing boxes in Canada.

[104]    In November 2003 NOC purchased the shares of Corlac with the full knowledge of the Plaintiffs' position with respect to the '937 Patent. From January 2004 to the present, NOC has continued to sell the Enviro stuffing boxes in Canada.

[105]    Although the Defendants sell different stuffing box designs, all sealing assembies are

similar and are said to infringe.

[106]    A startling feature of this litigation is the absence of officers of the Defendants called to

address the development of the allegedly infringing stuffing box or to otherwise explain (except

through an expert) the non-infringement of the '937 Patent.

[107]    GrenCo licensed the Weatherford PCPump effective February 11, 2000.

[108]    By a series of amalgamations in September 2003, Weatherford Canada (208951723)

became the successor to Weatherford Canada (208127241) which was the amalgamation successor

of EVI Tools Canada Ltd., formerly Highland/Corod.

[109]    On January 26, 2001, counsel for Weatherford requested a new licence from GrenCo in the

name of Weatherford Canada Partnership due to the various amalgamations and reorganizations of

the Weatherford companies. Problems occurred between GrenCo and the Weatherford companies

and in January 2003 the Weatherford Plaintiffs began making royalty payments in trust pending the

resolution of issues related to the requested new licence.

[110]    The dispute between the Weatherford Plaintiffs and GrenCo was resolved in August 2004

with a licence effective February 1, 2001, and all royalties which had been paid into trust were then

released to GrenCo.

[111]    On June 17, 2004, Britton assigned his alleged interests in what is the '937 Patent to Corlac Inc., which was followed up with an assignment from Britton to Corlac Equipment, now known as National-Oilwell Canada Ltd., on March 22, 2005.

[112]    In the absence of any proof or any evidence from the Defendants, the evidence is that Corlac was acting in concert with Corlac Equipment in manufacturing and selling their stuffing boxes which the Court finds, as later described, infringes the '937 Patent.

[113]    The particular facts in relation to the specific issues raised are addressed further in these reasons.

X.    ISSUES

[114]    The parties have agreed to a "Statement of Issues for Trial" comprising 27 issues. Not all of the issues are "live" or continuing once the Court concluded that Grenke is the lawful owner of the '937 Patent and that the Defendants infringed the '937 Patent and the Defendants' defence is to be dismissed. The Counterclaim and the issues raised fall away in the face of the Plaintiffs' success on their Statement of Claim. For ease of reference, the Court's analysis will follow, to a large extent, the Statement of Issues.

[115]    The issues are:

## A.        Construction of the '937 Patent

**Issue 1** – What is the proper construction of claims 1-19 of Canadian Patent No. 2,095,937 entitled "Sealing Assembly for Rotary Oil Pumps and Method of Using Same" (the "'937 Patent")?

## B.        Infringement by the Defendants

**Issue 2** – Do the "Enviro" stuffing box products (including the "Griffin" retrofit units) [collectively the "Defendants' Units"] sold by Corlac Equipment Ltd. and National-Oilwell Canada Ltd. infringe any of claims 1, 6, 9, 11, 13-17?

**Issue 3** – Is one or more of the Defendants liable for infringement by the manufacture and/or sale of the Defendants' Units in Canada, or by inducing their customers to use the Defendants' Units in Canada?

**Issue 4** – Did Corlac Inc. exercise such direction and control over Corlac Equipment Ltd. or did Corlac Inc. and Corlac Equipment Ltd. act together, so as to be jointly liable for the alleged infringing activities of Corlac Inc. and Corlac Equipment Ltd. as pleaded in paragraphs 9, 33 or 34(c) of the Amended Statement of Claim (the "Claim")?

**Issue 5** - Did National Oilwell Inc. (now National Oilwell Varco Inc.): (1) exercise such direction and control over National Oilwell Canada Ltd. so as to be jointly liable for the allegedly infringing activities of National-Oilwell Canada Ltd. as pleaded at paragraphs 11 and 33 of the Claim; or (2) induce National Oilwell Canada Ltd. to infringe the '937 Patent as pleaded in paragraph 34(b) of the Claim?

**Issue 6** – Is National Oilwell Inc. liable for inducing the infringement of the '937 Patent by Corlac Inc. and/or Corlac Equipment Ltd. during the period of negotiation for the purchase of Corlac Equipment Ltd. from as early as January 2003 until the ultimate merger of National Oilwell Canada Ltd. and Corlac Equipment Ltd. on January 1, 2004 as pleaded in paragraph 34(d) of the Claim?

**Issue 7** – Is any claim by any Plaintiff statute barred or limited by reason of a limitation period pleaded in paragraph 20 of the Second Amended Statement of Defence and Counterclaim (the "Defence and CC")?

**Issue 8** – Are one or more of the Plaintiffs entitled to maintain an action for infringement of the '937 Patent and/or are the Plaintiffs entitled to equitable remedies?

## C.    Inventorship of the '937 Patent

**Issue 9** – Whether one or more of the following individuals are inventors of the subject matter described and claimed in the '937 Patent: Art Britton, Edward Grenke, Walter Torfs, Michael Engelen, and/or Andreas Reincke?

## D.    Validity of the '937 Patent

**Issue 10** – Was the subject matter of each claim of the '937 Patent anticipated contrary to section 28.2 of the *Patent Act* by being made available to the public by Grenke more than one year prior to the filing date, or by others prior to the filing date, by reason of the disclosures alleged in paragraphs 22(1) and (2) of the Defence and CC?

**Issue 11** – Was the subject matter of each claim of the '937 Patent obvious contrary to section 28.3 of the *Patent Act* in light of the alleged disclosures pleaded in paragraphs 22(1) and 22(3) of the Defence and CC?

**Issue 12** – Is the '937 Patent void or invalid pursuant to section 53(1) of the *Patent Act* by reason of misrepresentations in the petition or statements made wilfully for the purpose of misleading by Mr. Grenke, personally and/or through his agent, Thomas Reider, as alleged in paragraphs 22(4), 22(5) and 22(7) of the Defence and CC?

**Issue 13** – Is the '937 Patent void pursuant to section 53(1) of the *Patent Act* or invalid by reason of misrepresentations in the petition or statements made by Walter Torfs, personally and/or through his agent, Thomas Reider, as alleged in paragraph 22(6) of the Defence and CC?

**Issue 14** – Is the '937 Patent invalid or deemed abandoned by reason of the allegation that Mr. Grenke did not deal in good faith with the Canadian Patent Office and did not reply in good faith to all requisitions made by the Examiner contrary to section 73(1)(*a*) of the *Patent Act* because of the following particulars, which are also in issue both as to the facts alleged and their legal significance:

(1)     Mr. Grenke did not advise the Patent Office of alleged disclosures to Amoco, Pan Canadian and the oil industry at large more than one year before the filing date of the '937 Patent as pleaded at paragraphs 22(8)(i) and (iv) of the Defence and CC.

(2)     Mr. Grenke knowingly and wilfully provided an Affidavit dated August 17, 1994 to the Patent Office alleging that Mr. Grenke was the sole inventor and sole owner of the '937, '324 and '473 Patents when he was allegedly not an inventor or the sole inventor of any of the '937, '324 and '473 Patents as pleaded at paragraph 22(8)(ii) of the Defence and CC.

(3)     Mr. Grenke responded to all requisitions made by the Examiner as if Mr. Grenke was the sole inventor and/or sole owner of the '937 Patent when Mr. Grenke was not an inventor, the sole inventor, an owner or the sole owner of the '937 Patent as pleaded at paragraph 22(8)(iii) of the Defence and CC.

**Issue 15** – Is the '937 Patent invalid for ambiguity on the basis of the facts pleaded in paragraph 22(9) of the Defence and CC?

### E.     Rectification of the Patent Office Record

**Issue 16** – If Mr. Britton is an inventor or co-inventor of the '937 Patent, did National-Oilwell Canada Ltd. acquire Art Britton's interest, if any, in the '937 Patent as referred to at paragraph 28 of the Defence and CC?

**Issue 17** – Does this Court have the jurisdiction pursuant to section 52 of the *Patent Act* to vary the title to the '937 Patent as claimed in paragraph 27(1) or (2) of the Defence and CC?

**Issue 18** – Is the remedy claimed in paragraph 27 of the Defence and Counterclaim pursuant to section 52 of the *Patent Act* to expunge the entry relating to title of the '937 Patent in the records of the Patent Office, or to vary the records to show Art Britton as an inventor or co-inventor and National Oilwell Canada Ltd. as owner or co-owner statute barred by any of the limitation periods pleaded in paragraph 7 of the Amended Reply and Defence to Counterclaim?

**F.      Infringement by the Plaintiffs**

**Issue 19** – Which of the rotating stuffing boxes sold by the Plaintiffs, if any, infringe claims 1-3 and 6-17 of the '937 Patent?

**Issue 20** – Did Art Britton release Highland/Corod from all claims relating to his alleged involvement in the invention described and claimed in the '937 Patent?

**Issue 21** – Which, if any, of the Weatherford Plaintiffs is/are entitled to claim the benefit of the alleged release provided by Art Britton as referred to in paragraph 6 of the Amended Reply and Defence to Counterclaim?

**Issue 22** – Is/are one or more of the Plaintiffs liable for infringing and/or inducing infringement of claims 1-3 or 6-17 of the '937 Patent?

**Issue 23** – Is National-Oilwell Canada Ltd. entitled to equitable remedies?

**Issue 24** – Is the claim for infringement by National-Oilwell Canada Ltd. barred or limited by a statutory limitation period as pleaded in paragraph 7 of the Amended Reply and Defence to Counterclaim?

**G.      Licence Agreements**

**Issue 25** – Whether Grenco Industries is validly licenced under the '937 Patent?

**Issue 26** – Are Weatherford Canada Ltd. and Weatherford Canada Partnership persons claiming under the patentee? In particular:

      (1)      Whether the February 2000 Sub-Licence Agreement is valid?

      (2)      Whether the Sub-Licence Agreement dated effective February 2001 and executed in August 2004 is valid?

      (3)      Which of Weatherford Canada Ltd. and Weatherford Canada Partnership is the successor to Weatherford PC Pumps Ltd.'s damages claim as licensee under the alleged February 2000 Sub-Licence Agreement?

Issue 27 – If one or more of the Defendants are liable for infringing
and/or inducing the infringement of the '937 Patent, are Weatherford
Canada Ltd. and/or Weatherford Canada Partnership entitled to claim
a remedy during the entire period from 1994 until present?

XI.    A.    CONSTRUCTION OF '937 PATENT CLAIMS

[116]    The starting point for this patent case is the Claim Construction – the interpretation of the

claims made – from which many of the issues, infringement in particular, flow.

[117]    The interpretation of a patent is to be conducted purposively, in light of the patent as a

whole. The proper approach is now well settled and set out by the Supreme Court in *Whirlpool*

*Corp. v. Camco Inc.*, [2000] 2 S.C.R. 1067 at 1089 and 1093-1095 and in *Free World Trust v.*

*Électro Santé Inc.*, [2000] 2 S.C.R 1024 at 1050:

> The courts have traditionally protected a patentee from the effects
> of excessive literalism. The patent is not addressed to an ordinary
> member of the public, but to a worker skilled in the art described
> by Dr. Fox as
>
>> a hypothetical person possessing the ordinary skill
>> and knowledge of the particular art to which the
>> invention relates, and a mind willing to understand
>> a specification that is addressed to him. This
>> hypothetical person has sometimes been equated
>> with the "reasonable man" used as a standard in
>> negligence cases. He is assumed to be a man who is
>> going to try to achieve success and not one who is
>> looking for difficulties or seeking failure.

[118]    The Federal Court of Appeal in *Pfizer Canada Inc. v. Canada (Minister of Health)*, 2007

FCA 209, has summarized the rules or steps in the construction of patents:

**39**     The Principles set forth by the Supreme Court in *Whirlpool*, *supra*, and *Free World*, *supra*, can be summarized as follows:

- The task of the Court is to construe the claims of the patent with the aid of expert witnesses (*Whirlpool* at paragraphs 43, 45 and 57).

- Construction of the claims is not to be a result-oriented exercise and must be conducted by the Court prior to its consideration of the issue of infringement (*Whirlpool* at paragraphs 43 and 49(a)).

- The claims are to be construed as of the publication date of the patent (*Whirlpool* at paragraph 42; *Free World* at paragraph 54).

- In construing the claims of the patent, the Court is called upon to determine, on an objective basis, what a skilled reader would have understood the inventor to mean (*Whirlpool*, at paragraph 48; *Free World* at paragraph 44).

- The claim of the patent which is to be construed by the Court must be read in the context of the rest of the specification. I would add to this, however, that reference to the rest of the specification cannot be used to expand the patentee's monopoly as expressed in the claim (*Whirlpool* at paragraphs 48, 49(f) and 52).

- The expert witnesses are there to help the Court understand the invention and its context, as well as the meaning of the terms used in the patent. Needless to say, it is the Court's duty to construe the claims and not that of the experts (*Whirlpool* at paragraphs 45 and 57).

- In construing the claims, the Court is to keep in mind that the patent is addressed to the "ordinary person skilled in the art", i.e. a hypothetical person possessing the ordinary skill and knowledge of the particular art to which the invention relates, and a mind willing to understand a specification that is addressed to him (*Whirlpool* at paragraphs 53, 70, 71 and 74).

-   The "disclosure" found in the patent must describe the invention in a sufficiently complete and accurate manner so to allow the person skilled in the art to construct or use the invention when the period of monopoly has expired (*Whirlpool* at paragraph 42). The resulting construction of the claims should be one which is "in the interest of fairness both to the patentee and the public" (*Free World* at paragraph 50). As a result, the construction of the claim may lead to an expansion or limitation of the text of the claim. As Binnie J. said in *Free World* at paragraph 51:

> 51.    The involvement in claims construction of the skilled addressee holds out to the patentee the comfort that the claims will be read in light of the knowledge provided to the Court by expert evidence on the technical meaning of the terms and concepts used in the claims. The words chosen by the inventor will be read in the sense the inventor is presumed to have intended and in a way that is sympathetic to accomplishment of the inventor's purpose express or implicit in the text of the claims. However, if the inventor has misspoken or otherwise created an unnecessary or troublesome limitation in the claims, it is a self-inflicted wound. The public is entitled to rely on the words used provided the words used are interpreted fairly and knowledgeably.

[119]   In giving meaning to a patent, there are limits on what a Court can and should do. The exercise is the responsibility of the judge aided by expert evidence. Regard to the disclosure portion of the patent's specification is unnecessary where the terms used in the claim are plain and unambiguous but may be used where there is ambiguity. Further, where the words in the claim are plain and unambiguous, they should not be narrowed or limited to a patent's preferred embodiment.

[120]    The key to purposive construction is the identification by the Court, with the assistance of expert evidence, as to what a "skilled person" would know and understand of the particular words or phrases in the claims that describe what the inventor intended to be the "essential" elements of the invention.

[121]    In regard to claim construction, the Defendants were in a difficult position. On the one hand to avoid liability they sought to find ambiguities in the claims which would affect the patent's validity and the alleged infringement. On the other hand, the Defendants claimed that they, through one of the alleged inventors Art Britton, own the substance of the '937 Patent. Thus the patent must be valid to support their ownership of the claim. It is the problem of riding too many horses in too many directions, all at the same time.

[122]    The Plaintiffs are asserting only Claims 1, 6, 9, 11 and 14-17 of the '937 Patent to have been infringed. Of these, construction of aspects of Claims 1, 6, 9, 11 and 14 are in issue.

### *Claim 1*

[123]    There are two terms used which are the critical areas of dispute:

    1.    The term "seal cartridges" as contrasted with "cartridge seals".

    2.    The term "dynamic seal", particularly the phrase "knife edge corner".

[124]   The preamble to Claim 1 is "for use with a rotary pump for oil wells in which an elongate

rod supports and rotates the rotor of a down-hole pump, an assembly for restraining oil leakage,

comprising …". This refers to a stuffing box for a PC pump drive head.

[125]   There are five (5) aspects to Claim 1:

-       a stationary first member;

-       a rotary second member;

-       a plurality of annular seal cartridges;

-       for each seal cartridge a leak passage through the first member; and

-       a plug means for closing at least one of the passages.

[126]   Claim 1 sets out the essence of Grenke's invention in terms of the system to seal and detect

wear in the stuffing box. It is this particular combination of features which was directed at the

problem plaguing the heavy oil business at the time.

[127]   Claim 1 describes and means an annular space formed between a housing (the stationary

first member) and a sleeve (the rotary second member) where seal cartridges are stacked within that

annular space and where there are leak passages in the housing for detecting seal failures and where

a plug closes at least one passage.

(1)    <u>Seal Cartridge</u>

[128]   The "seal cartridges" are claimed as follows:

> A plurality of annular seal cartridges stacked within the annular
>
> space, each cartridge having in axial section:
>
> (a)    a dynamic seal slidably contacting the cylindrical portion;
>
> (b)    a first open space downstream of the dynamic seal and
>
> adjacent the cylindrical portion and a second open space adjacent the
>
> cylindrical wall; and
>
> (c)    passageway means through which the two open spaces are in
>
> communication.

[129]   The dispute is whether the term seal cartridge describes a function or describes an article. The Defendants' expert Muller described the position best by drawing an analogy to a cartridge pen where the cartridge is a single unit generally disposable. The dispute is whether the description of a seal cartridge means a cartridge or unit being an item in which seals are bound together in an integrated unit - where the emphasis is on the cartridge - or whether it is a series of items making a seal.

[130]   Both Muller and Nelson, experts for the Defendants, said that what was meant was a series of individual components bound together in an integrated unit.

[131]    However, Nelson admitted that the seal cartridges in the '937 Patent are not bound together in a cartridge. He also admitted that the Corlac unit is similar to the '937 Patent in this regard.

[132]    Salant, on behalf of the Plaintiffs, on the other hand, whose evidence is preferred over the Defendants' experts as indicated earlier, attributed the term "seal cartridge" to mean a sub-assembly of elements that perform a certain function – in this case, to provide a seal.

[133]    Salant acknowledged that the '937 Patent does not provide a detailed description about how to manufacture a dynamic seal or a seal cartridge. However, in his opinion, the patent described the open spaces, the leak passages and the other elements in a manner that enables a skilled person to understand how it could be made and how it works. He further opined that a skilled person reading the patent in 1994 would readily specify the elements and their function to enable a seal manufacturer to make a seal cartridge.

[134]    Skoczylas' evidence was to the same effect that a skilled person would know that a "plurality of annular seal cartridges" meant more than one unit, each having a group of elements to make up the seal to be fitted into the annular space around the cylindrical portion of the sleeve (the rotary second member).

[135]    The Defendants correctly describe the resolution of this particular issue as a choice of expert evidence. The Defendants undermine the Plaintiffs' experts by saying that either they were too

young in the case of Skoczylas or not knowledgeable about oil field production equipment as in the case of Salant.

[136]    As to knowledge of oil field production equipment, the Defendants agreed to the attributes of the "skilled person" and yet only one of these alternate attributes referred to experience "in the field of oil and gas drilling or production". The two other attributes related to knowledge and experience with seals and sealing – Salant's very expertise. An expert need not be alive or grown up at the time of the event or relevant period in order to express an opinion on the past and therefore the criticism of Skoczylas on these grounds is without merit.

[137]    The Court accepts the interpretation of "seal cartridges" as outlined most particularly by Salant. It rejects the interpretation that in effect describes a "cartridge seal" and therefore does not accept the Defendants' interpretation.

    (2)    Dynamic Seal

[138]    The other phase of claim construction regarding Claim 1 is in element (a) of the cartridge:

        -    a plurality of annular seal cartridges stacked within said
            annular space, each cartridge having, in axial section:

                a)    a dynamic seal slidably contacting said
                cylindrical portion, …

[139]    The Defendants seek to narrow that description to refer to only one type of seal at one location - a vertical hermetical seal against a rotating shaft, i.e. a knife edge corner at location 92

found on Figure 4 of the '937 Patent (see below). Therefore, they say that any variation from this specific type and place would not fall within the claim. The Plaintiffs say that the description refers to and includes a slip seal and not a mechanical seal like a knife edge mechanical piece which would not be functional as a seal in these conditions.



[140]   Therefore, there are two different types of interpretation being urged on the Court. The Defendants seek to narrow the scope of the invention, to limit the monopoly by reference to descriptions outside the specific words of the claim. The Plaintiffs urge a functional interpretation consistent with what they say is the purpose of the invention and the known functions of the constituent parts of the invention. Again, this is a battle of the experts and for the same reasons referred to in paragraphs 38-40, the Court finds Salant's evidence to be more persuasive.

[141]   All the experts agree that what is at issue is a seal which operates between a moving surface and a stationary surface. Given a purposive approach to the language of the claim, the issue breaks down to whether a skilled person would understand the phrase to relate to a seal that works in

practice or as alleged by the Defendants, Grenke caused a "self inflicted wound" by using words that teach an unworkable solution.

[142]    As Salant testified, a mechanical seal could not properly seal against a cylindrical surface. A skilled person would know that and therefore be directed to a lip seal. Muller acknowledges that a skilled person would reasonably think of a lip seal.

[143]    The term "knife edge corner" is taken by the Defendants to refer to an absolute and static type seal. However, Salant says that the phrase is consistent with a dynamic seal – a proposition generally agreed to by Muller, consistent with Nelson's evidence and supported by a key publication in the field of seals, the 4th edition of the Seals and Sealing Handbook.

[144]    The expert evidence confirms that other seals made of different and harder substances would not work. Therefore, the Defendants' interpretation leads to an unworkable situation which is inconsistent with the purpose of the invention and its components and inconsistent with a Skilled Person's understanding – a mind willing to understand.

[145]    The Plaintiffs' interpretation is more reasonable and consistent with the basic principles of claim construction. The reference to the disclosure in the patent (a reference which is not strictly necessary) is also consistent with the conclusion that "dynamic seal" includes lip seals.

[146]   Lastly, but not necessarily determinatively, the seals must be able to account for wobble and vibration. The Defendants' thesis would ignore the physical properties of a moving shaft operating in the conditions in which it was to be used.

[147]   Therefore, the Court accepts the Plaintiffs' interpretation. The reference in Figure 4 does not limit the invention as alleged by the Defendants.

### *Claims 2-5*

[148]   The important and disputed issues in these claims are resolved by the interpretation of Claim 1.

### *Claim 6*

[149]   The phrase initially at issue is "… annular space … closed by an annular wall at its upstream end …". The dispute is over the word "closed".

[150]   The dispute is essentially over how closed must the annular space be. The Defendants raised the issue in their experts' reports but have not pushed the matter in either their written or oral arguments.

[151]   The Defendants take the position that the annular space in the '937 Patent must be closed because they claim that the Corlac device does not have a closed annular space.

[152]    The Plaintiffs' expert Skoczylas says that the annular wall provides a seat upon which to stack the seal cartridges during assembly. That view was confirmed by Nelson. Having determined the meaning of seal cartridges, the purpose – to provide a seat – is met so long as the seal cartridges are supported.

[153]    The gap between the edge of the annular wall and the spindle is not material and is not functionally relevant. The Defendants' strict construction serves no purpose other than to try to avoid infringement.

[154]    The Court accepts the Plaintiffs' interpretation as being consistent with a purposive interpretation of the patent.

[155]    The issues relating to Claims 7 and 8 are subsumed in the interpretation of Claims 3, 6 and 1.

### *Claims 9-12*

[156]    The claims describe a threadable connection between the rotary second member and the packing portion that defines an annular cavity which includes a packing portion surrounding the rod.

[157]    The dispute relates to the meaning of "packing elements compressed within said annular cavity". These elements make a static seal between the rotating sleeve and the rod.

[158]   The Defendants interpret the claims to be restricted to conventional static packing that is compressed to seal through axial compression by mechanical means – this is what is meant by the "third element" in Muller's report.

[159]   The evidence is that the term "packing elements compressed within said annular cavity" would refer to compression seals generally and that a Skilled Person would not limit their understanding to packing that is being compressed using a third element.

[160]   In responding to Muller's thesis, Salant outlined the manner in which compression seals operate to create the packing element compressed within the annular space.

43.     The term compression seal refers to seals where a sealing material (such as rope packing) is arranged between two co-axial supporting surfaces and the sealing function is accomplished (i.e. the seal is activated) when the sealing material exerts a radial pressure on the support surfaces. One could say the seals are squeezed into a confined space in order to work. It is the force opposing compression that exerts the radial pressure and so such seals are referred to as "compression seals".

44.     One method of creating the necessary radial seal pressure is to apply an axial compression force continuously to the sealing material using a mechanical means or "third element" as described by Mr. Muller. This was typical of traditional rope packing. However, a resilient sealing material may be compressed radially when it is inserted into a packing gland and remain compressed and exert a radial sealing pressure during service without the need for continuous axial compression. Examples of this type of compression seal are the Polypak® brand squeeze seals marketed by Parker Hannifin Corp. and the machinery seal shown in US

4,193,606 attached as Exhibit B-4 to Mr. Muller's affidavit. I would refer to these seals as "packing elements".

45.     Claims 9 and 11 provide for "a plurality of packing elements compressed within said annular cavity." A skilled person would understand that this refers to a compression seal in which compression of the seal material or "packing" exerts a radial pressure to make a seal between two co-axial support surfaces. Such person would know in 1994 that there were resilient packing materials available which would not require a continuous axial load to maintain the radial pressure.

[161]    Packing is accepted as meaning the media that is placed in a closed space between a static member and a rotating member under compression to prevent the passage of a fluid or a gas. The packing, whatever its composition, is squeezed in a manner to prevent leakage.

[162]    The Defendants' Nelson admits that the above definition of packing would include a U cup seal and U rings as they are commonly referred to as packing. Muller then admitted that the U cup seals in the Corlac device are commonly referred to as packing. Nelson also accepted that a seal held in place by an interference fit would have a radial expansion of the seal sufficient to create a good seal. The use of a screw or some device to tighten down on the seal axially to cause radial expansion was unnecessary.

[163]    Salant described the purpose of packing elements is to make a static seal between the walls of the cavity – between the rotating hollow shaft and the rotating polish rod.

[164]   Therefore, the Court accepts that "packing elements compressed within said annular cavity" includes compression seals generally and U cup and U rings are included in that meaning. The Court further accepts that a Skilled Person would not interpret the claims to require that the packing must be compressed (axially) by a third element.

*Claims 13-17*

[165]   There are no issues of claim construction not already dealt with in the earlier discussions.

XII.   B.   INFRINGEMENT BY THE DEFENDANTS

[166]   The issues to be addressed under this section are Issues 2-8 (except Issues 4-6).

[167]   Issues 4-6 dealing with the liability of specific Defendants are subsumed in Issue 3.

*Infringement Analysis*

[168]   The law on infringement is not in issue. Section 42 of the *Patent Act* gives a holder of a patent the right to exclude others, for the term of the patent, from making, constructing or using the claimed invention or selling it to others to be used.

[169]   There is infringement if a person takes the substance of the invention and it does not matter if the person omits a non-essential feature or substitutes an equivalent for it (*Mobil Oil Corp. v. Hercules Canada Inc.* (1996), 63 C.P.R. (3d) 473 (C.A.) at para. 39).

[170]    The burden of proving infringement rests on the Plaintiffs based on the balance of

probabilities. (*Lubrizol Corp. v. Imperial Oil Ltd. (F.C.A.)* (1992), 45 C.P.R. (3d) 449)

[171]    Once the construction and scope of the claim have been determined, as was done in

Section XI, the question of whether the claim has been infringed is a question of mixed fact and

law. The approach to infringement is based upon the purposive construction of the claims (see *Free

World*, above).

[172]    While the Defendants say that only the Corlac retrofit and the integral stuffing boxes are in

issue, the Plaintiffs also claim that the Griffin Enviro stuffing box is infringing. The Court concludes

that all the Defendants' stuffing boxes are in issue.

[173]    The Defendants' Enviro stuffing boxes function as follows:

-    the housing forms a cylinder around the polished rod;

-    the polish rod goes through a hollow spindle or mandrel that rotates along with the

    polish rod;

-    there is a space between the inner wall of the housing and the outer surface of the

    spindle;

-    there are "seal carriers" that hold a seal;

-    the seals held by the carrier are stationary and form a dynamic seal between the

    moving spindle and the stationary seals;

-      there are open spaces with passages between them;

-      the "Polypak" seals in the Enviro devices are intended to rotate with the spindle and

       polish rod and make a "static seal";

-      the spindle of the Enviro stuffing boxes rotates on its bearings.

[174]    As indicated in Exhibit 10, P305, the Corlac integral stuffing box has a hex connection

between the drivehead shaft and the spindle. The female hex is built into the configuration of the

shaft.

[175]    Claim 17 is a stand alone claim which teaches a method of restraining oil leakage in a PC

pump that includes a) injecting a lubricant, b) monitoring a leak passage for leaking oil and c) when

leaking oil is detected, shutting down the pump and replacing at least those seal cartridges past

which the oil has leaked.

[176]    The Defendants provided manuals with instructions on how to use the rotating stuffing box.

The operating instruction for the Defendants retro and integral Enviro stuffing boxes provides the

correct information; the Griffin situation is unclear.

[177]    Neither side called customer witnesses and the Court is left with the only logical conclusion

it can make which is that customers are more likely than not to follow the instructions in the

manuals – particularly sophisticated customers like the oil well operators to whom the products are

directed.

[178]   The instruction manual contains the following:

- images of the retrofit and integral units;

- a schematic of the stuffing box; and

- the operating procedures.

[179]   The Plaintiffs' expert Skoczylas concluded that the Defendants' devices have the same sealing assembly described in Claims 1, 6, 9, 11, 14-16 (although the retrofit units do not include a drive means as per Claims 15 and 16) and the manuals for the devices teach the practice in Claim 17.

[180]   Dr. Salant reaches the same conclusions but only with respect to Claims 1, 6, 9 and 11. Even the Defendants' expert Muller concludes that the Corlac devices and the '937 Patent share the same primary sealing elements and configuration.

[181]   The Defendants' case against infringement relies significantly on its interpretation of the terms "seal cartridge" and "dynamic seal" (the knife edge corner 92"). Since the Court has not accepted the Defendants' efforts to distinguish its devices based on their claim construction and the Enviro stuffing boxes have the same elements contained in various Claims, it follows that their devices infringe the claim construction advanced by the Plaintiffs and accepted by the Court.

*Claim 1*

[182]   The Defendants' defence to infringement lies in the meaning of the terms already defined by the Court. The expert evidence confirms that those essential features of the '937 Patent, as the claim is construed, appear in the Defendants' devices. Therefore, the Defendants' devices infringe Claim 1 of the '937 Patent.

[183]   Claims 6, 9, 11 and 13 through 16 of the '937 Patent each depend directly or indirectly on Claim 1. Since Claim 1 is infringed, these other Claims are likewise infringed.

*Claim 6*

[184]   The additional feature affecting this Claim is whether the annular wall of the Enviro stuffing box closes the annular space defined by the cylindrical wall of the housing and the outside surface of the rotating sleeve. The question is how "closed" is "closed". The Enviro stuffing boxes have a slightly larger gap between the wall and the sleeve. That gap is immaterial as the purpose of the annular wall is to hold the cartridges in place pressed against the annular wall where the ring is compressed into a recess in one of the carriers.

[185]   Therefore, the Corlac devices have both the "seal cartridges" and "annular spaces" described in Claim 6. Claim 6 is infringed.

*Claims 9 and 11*

[186]    Claims 9 and 11 require "a plurality of packing elements compressed within said annular cavity". While the Defendants say that this refers only to conventional static packing, the Court has not agreed with that construction of the Claim.

[187]    The terms used encompass U cups and U seals such as the Polypaks used by the Defendants. The terms are not limited to axial compression by a third member.

[188]    The evidence establishes that the Enviro stuffing boxes have Polypak seals that are compressed into the annular space at the top of the sleeve to form a static seal and achieve the same function as the packing in the preferred embodiment of the '937 Patent by pressing radially against the rod.

[189]    The evidence also establishes that a Skilled Person would contemplate U ring seals as "packing"; thus the term is not restricted to one type of packing so long as it fulfills the function in the same way as outlined in the '937 Patent.

[190]    Therefore, Claims 9 and 11 are infringed in at least two aspects.

[191]    The Plaintiffs have withdrawn their assertion that Claim 13 has been infringed.

<u>*Claims 14-16*</u>

[192]    Both Claims 14 and 15 depend on Claim 1 and to that extent they are infringed. The other feature is whether the two-part sleeve used by the Defendants' integral devices performs the same function, in the same way, to achieve the same result as the two-part sleeve in the '937 Patent.

[193]    The Plaintiffs have not made out any case that the retrofit device infringes these claims.

[194]    The Defendants rely on the fact that the integral units do not have a framework that includes external thrust and radial bearings, nor does the Corlac sleeve drive the rod.

[195]    However, in the integral model, the spindle is connected to the hollow drive sleeve with a hex connection to form a single two-part second member that is supported for rotation by thrust and radial bearings. The spindle has a drive means connected to it for receiving drive torque and has connection means allowing the rod to be supported by the second member.

[196]    There is some distinction in form between the integral unit and the '937 Patent (for example, the bearings are located in the annular space and are not external to the stuffing box or positioned within an attached framework).

[197]    However, these are distinctions without a difference. Once the two shafts of the Corlac unit are connected by means of the hex connection, they act as a unit to transfer torque. The combined hollow shafts operating as a unit transfer torque to the rod. The Corlac unit is similar to Figures 1

and 2 of the '937 Patent. Therefore, the distinctions relied on by the Defendants are merely of form not substance.

[198]   Therefore, Claims 14-15 are infringed in at least two ways by breach of Claim 1 as well as on their own terms. Claim 16 relies on Claim 9 which has been infringed and is also infringed on its own terms.

### *Claim 17*

[199]   To the extent that Claim 17 imparts the terms "seal cartridge" and "dynamic seal" as construed with respect to Claim 1, Claim 17 is infringed. However, Claim 17 is a method for restraining oil which involves monitoring a leak passage to determine when seals fail. This involves leaving a leak passage open; the Corlac devices are closed. Claim 17 is a method claim but the Plaintiffs concede that they do not have evidence of actual use of the method. They rely on the adverse inference from the Defendants' failure to call evidence to counter the obvious conclusion that customers would follow instructions. They also rely on expert evidence to the same effect.

### *Infringement Conclusions*

[200]   As indicated at the beginning of these Reasons, the absence of direct evidence from one or more employees of the Defendants was startling. There was no corporate evidence as to the development of the Defendants' devices, the knowledge of competing devices, efforts to create a differentiated product or anything else to suggest that there was no intended infringement.

[201]    What is evident is that Glenn Schneider, the head engineer of what became Weatherford PC Pump Ltd. which designed rotating stuffing boxes, left his employment shortly before GrenCo licensed his employer. Schneider joined Corlac Equipment and Corlac Equipment began the manufacture and sale of infringing product.

[202]    The timing of the change of jobs, the nature of the competitive market for this product then and later and the timing and similarity of the Corlac products calls out for an explanation. Absent an explanation and given the Plaintiffs' evidence of infringement, the Court can and does draw the conclusion that Corlac intentionally set out to create a product which they knew or ought to have known would infringe the '937 Patent.

[203]    The Court draws an adverse inference from the failure to call any evidence to explain these actions. The inference is that such evidence would not have assisted the Defendants, indeed in this case it would have more likely than not confirmed the Plaintiffs' allegations.

[204]    Therefore, Claims 1, 6, 9, 11, 14, 15, 16 and 17 have been infringed by the Defendants.

*Liability Issues*

[205]    As to whether the Defendants induced third parties, the customers, to infringe the '937 Patent, as distinct from the Defendants' own liability for infringement by manufacture and sale, there was no evidence before the Court from any customers. It is only common sense that sales were

made to customers. The amount of sales and related financial information has been bifurcated from this phase of the litigation which in some respects may limit the Court's assessment of the extent of any inducement by the Defendants.

[206]   In any event, the Court, having found that there has been infringement by one or more of the Defendants, finds the answer to Issue 3 is affirmative.

[207]   As to the issue of joint and several liability with respect to Corlac Equipment and Corlac, the discovery evidence read-in at trial established that Corlac was the parent company of Corlac Equipment, owned all the shares and exercised control over the operations of Corlac Equipment and Corlac Equipment (1998) Ltd. The major shareholder of the Corlac group of companies, Dan Echino, was also President and Director of Corlac and Corlac Equipment.

[208]   Corlac Equipment manufactured and sold the drive heads and the stuffing boxes in issue in this litigation.

[209]   The integrated operations and business of the Corlac group of companies is evident from not only the common control but the fact that such items as manufacturer's label were firstly in Corlac's name, then that of Corlac Equipment's and drawings of the infringing stuffing boxes and associated parts' lists were under Corlac's name.

[210]   Further, stuffing box invoices and work orders were on Corlac Equipment's letterhead and stuffing box sales orders were under Corlac's name from 1999-2001. Finally, the audited consolidated financial statements of Corlac included the earnings and expenses for the sales of rotating stuffing boxes.

[211]   The Plaintiffs have raised a reasonable basis from which to conclude that the Corlac group of companies are jointly and severally liable by virtue of common direction and control and benefit from the infringement of the '937 Patent.

[212]   As held in *Nedco Ltd. v. Clark et al* (1973), 43 D.L.R. (3d) 714 at paragraph 19, which decision was cited with approval in *Northeast Marine Services Ltd. v. Atlantic Pilotage Authority* (1995), 179 N.R. 17 (F.C.A.), a court will "pierce the corporate veil" to find joint and several liability where one corporation is controlled by the other to the extent that they operate as a unit.

[213]   The Defendants, again as with respect to the issue of infringement, put no witness forward to show the absence of control and dominance of the Corlac group. These Defendants were in the best position to put forward that evidence and in the context of this case, the Court is prepared to draw the adverse inference that such evidence would be harmful to these Defendants.

[214]   With regard to the National Oilwell defendants, in addition to the common control, direction and benefit from Corlac's infringing activities, they are jointly and severally liable on a related basis. NOC purchased the shares of Corlac Equipment from Corlac Inc. on November 20, 2003. It

was advised by Corlac of GrenCo's claim for infringement prior to making the acquisition. NOC then amalgamated with Corlac Equipment on January 1, 2004.

[215]    Having amalgamated, Corlac Equipment continues as a corporation under NOC with all its assets and liabilities including those in respect of the infringement. (See *R. v. Black & Decker Manufacturing Co.*, [1975] 1 S.C.R. 411). *Black and Decker* was cited in *Hoffmann-La Roche Ltd. v. Canada (Minister of Health)*, 2005 FC 1415 for the proposition that under Canadian law after amalgamation two separate corporations continue as one. The British Columbia Supreme Court similarly interpreted the case in *Shoal Point Management Ltd. et al v. ICI Canada Inc.*, 2006 BCSC 857. The Court there also cited a Supreme Court of Canada case where the Court refused to overturn the lower Court's finding that an amalgamation agreement which agreed to all liabilities, duties and obligations "immediately proceeding amalgamation" did not limit liability:

> i.    Generally, an entity that results from the amalgamation of companies carries with it the liabilities of the previous entities subject to the applicable legislation: *R. v. Black & Decker Manufacturing Co.*, [1975] 1 S.C.R. 411; *British Columbia Hydro & Power Authority v. British Columbia (Environmental Appeal Board)*, [2005] 1 S.C.R. 3, 2005 SCC 1.

[216]    National Oilwell Incorporated (NOI) is the ultimate parent of the amalgamated NOC. NOC's financial results are reported as part of NOI's financial filings. Therefore, absent any contrary persuasive evidence, NOI is the beneficiary of NOC's activities including its infringing activities and liable for the consequences thereof.

[217]    NOI is ultimately responsible for the activities of its subsidiaries including NOC.

[218]    The evidence establishes that NOI controlled NOC and was the beneficiary of its infringing activities. The precise nature and extent of the benefits is an issue of damages and the Court reserves its further comments on the extent of NOC and NOI liabilities until that phase of this litigation is concluded and where a tracing of profits or disgorgement may be a remedy sought.

[219]    The National Oilwell Defendants put in no evidence to counter the evidence of common and complete control by NOI, nor any evidence that NOC and NOI were not beneficiaries of the infringing activities. The Court is then left to draw the adverse inference that the failure to do so confirms that the Plaintiffs' plea as to joint and several liability is correct.

[220]    The Court concludes that Corlac and Corlac Equipement are jointly and severally liable for infringement; that National Oilwell Inc. (now National Oilwell Varco Inc.) is jointly liable with National Oilwell Canada Ltd. Due to the amalgamation consequences of NOC and Corlac Equipment, the Defendants are jointly and severally liable with each other for infringement.

### *Limitation Periods*

[221]    The Defendants have pleaded that the Plaintiffs' claim for infringement is statute barred or limited by reason of the limitation periods cited in paragraph 20 of the Second Amended Statement of Defence and Counterclaim. That paragraph cites the *Patent Act*, the limitation legislation of each province and territory (except Nunavut) and that of the *Federal Courts Act*.

[222]    The relevant legislation is the *Patent Act*, R.S., 1985, c. P-4, s. 55.01:

<table>
<tr>
<td><b>55.01</b> No remedy may be awarded for an act of infringement committed more than six years before the commencement of the action for infringement.</td>
<td><b>55.01</b> Tout recours visant un acte de contrefaçon se prescrit à compter de six ans de la commission de celui-ci.</td>
</tr>
</table>

[223]    The Defendants by their own argument concede since the earliest of the consolidated actions that had the Statement of Claim issued July 6, 2001, the Plaintiffs are only statute barred from any remedies that may exist prior to July 6, 1995.

[224]    As the infringing activities of Corlac and/or Corlac Equipment commenced in late 1999-early 2000, there is no real issue as to limitation periods. The six-year limitation period does not bar the GrenCo/Grenke Plaintiffs' claim, as made, in respect of the Corlac companies or of National Oilwell companies.

    *Entitlement to Action and Remedies*

[225]    The Defendants' position is that because Art Britton was the true inventor/owner of the '937 Patent and the Plaintiffs had no assignment from him, they had no right to commence this action.

[226]    For the reason set forth in the following section "C – Inventorship of the '937 Patent", Art

Britton is neither "the" nor "an" inventor of the '937 Patent nor was he entitled to ownership of the

Patent. Any assignment of his rights therein to the Defendants was devoid of substance.


[227]    The Defendants contend that the actions of the Plaintiffs, most particularly Grenke in his

dealings with the Patent Office in removing Tofts as an inventor, ought to deprive the Plaintiffs of

any entitlement to equitable relief particularly injunctive relief.


[228]    As outlined in Section D – Validity of the '937 Patent, while Grenke's conduct raises issues,

it is not such as to disentitle him from his ownership of the '937 Patent.


[229]    The issuance of injunctive relief is not only a benefit to a successful party but in the public

interest to ensure the enforceability of the Canadian patent system.


[230]    The precise nature of other remedies, damages, disgorgement and other relief must await the

damages phase of this litigation.


[231]    Whatever the dealings of Grenke, the fact remains that the Defendants infringed and

continue to infringe the '937 Patent. They have used a stuffing box design, subject to some small

changes as to packing, connecting apparatus and inconsequential placement of seals, which is the

same as the Grenke design.

[232]    The Defendants have continued to profit from the sale of the infringing articles and would continue to do so unless injunctive type relief is available. Their actions are unjustified and egregious.

[233]    The Defendants have not yet advanced any other arguments to disentitle the Plaintiffs from equitable relief.

[234]    The Plaintiffs are entitled to maintain their action and to obtain equitable relief. Issue 8 is answered in the affirmative.

XIII.    C.    INVENTORSHIP OF THE '937 PATENT

[235]    Issue 9 under this heading concerns whether one or more of Ed Grenke, Art Britton, Walter Torfs, Michael Engelen and/or Andreas Reincke are inventors of the subject matter described and claimed in the '937 patent. There appears to be no shortage of people who had some involvement with the '937 Patent and who now seek the credit and more tangible benefits of being "the" or "an" inventor of this patent.

[236]    The key precedent on the issue of determining who is an inventor is *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] 4 S.C.R. 153 which requires a court to determine "who was responsible for the inventive concept".

> **97**   Section 34(1) requires that at least at the time the patent application is filed, the specification "correctly and fully describe the invention ... to enable any person skilled in the art or science to

which it appertains ... to ... use it". It is therefore not enough to have a good idea (or, as was said in *Christiani, supra*, at p. 454, "for a man to say that an idea floated through his brain"); the ingenious idea must be "reduced ... to a definite and practical shape" (*ibid.*). Of course, in the steps leading from conception to patentability, the inventor(s) may utilize the services of others, who may be highly skilled, but those others will not be co-inventors unless they participated in the conception as opposed to its verification. As Jenkins J. notes in *May & Baker Ltd. v. Ciba Ltd.* (1948), 65 R.P.C. 255 (Ch. D.), at p. 281, the requisite "useful qualities" of an invention, "must be the inventor's own discovery as opposed to mere verification by him of previous predictions".

**98**   More recently, in *Henry Brothers (Magherafelt) Ltd. v. Ministry of Defence and the Northern Ireland Office*, [1997] R.P.C. 693 (Pat. Ct.), in response to a submission that an invention could be divided into contributed elements and patents awarded accordingly, Jacob J. stated, at p. 706:

> I do not think it is right to divide up the claim for an invention which consists of a combination of elements and then to seek to identify who contributed which element. I think the inquiry is more fundamental than that. <u>One must seek to identify who in substance made the combination. Who was responsible for the inventive concept, namely the combination?</u> [Emphasis added.]

[237]   Germane to this issue is the Supreme Court's conclusion that a person who contributes to the inventive concept may be a co-inventor while those who help the invention to completion, but whose ingenuity is directed to verification rather than original inventive concept, are not co-inventors.

[238]   The burden of proof of co-inventorship rests on the party asserting the claim to sharing in the inventorship. In the present circumstances the Defendants had the burden of proof that on a

balance of probabilities, one or more of Britton, Torfs, Engelen and/or Reincke were "an" or "the" inventor of the '937 Patent. The Defendants must undercut Grenke's claim to inventorship (as opposed to ownership – the two are not synonymous).

[239]    It is important on this issue, as explained in *Apotex*, above, at paragraph 85, that the "inventor" is not just a person who comes up with a general idea or thesis. The inventor must have reduced the idea or thesis to a definite and practical shape by building it as described or by fully describing how it will be practised - showing that there is utility in the claimed invention.

[240]    While the same analytical issue arises whether the invention is a combination patent or not, it is the combination itself which is the novelty not the elements of it. As held in *Lovell Manufacturing Co. v. Beatty Brothers Ltd.* (1962), 41 C.P.R. 18, even where certain elements have been contributed by persons other than the inventor named, this would not make them joint inventors of the combination.

[241]    The Defendants have taken the approach of breaking down the '937 Patent into various elements, the rotating sleeve, the U ring seals, various arrangements and then attributing contribution by various persons to each of these elements. This is an approach which runs contrary to that laid out in *Apotex*, above.

[242]    The ascribed contributions are based on witnesses' recollection of what was said, or not said, on dates certain or approximated – in few instances is there documentary or other

corroboration. The Defendants try to put Grenke in the role of nothing more than an "assembler" of others' contributions.

[243]    The better approach is to examine the evidence as a whole taking account of the "selective" memories, the dimness of recollection and the general absence of documents.

*Edward Grenke*

[244]    Grenke's evidence is that he came up with key concepts (a) sealing over a rotating shaft, (b) having multiple leak passages, and (c) including the system integrally with a drive shaft. He acknowledged that others made suggestions but it was he who made the choices of options, determined how the invention should function, and made it function.

[245]    The basic thrust of Grenke's evidence is supported by such actions as his visits to Germany to meet with Merkel and Flenders. It was he who led the charge in this case, not Britton. It was he who sought out others for advice, not the other way around. The Court accepts his version of these events as more likely to have happened than other propositions advanced by the Defendants.

[246]    Grenke's role in coming up with the idea and turning it into a practical device is supported by the documents. Set out below are the drawings from three inter-related exhibits – Exhibit 10, P144; Exhibit 10, P145 (page 2) and Exhibit 10, P147.

Exhibit 10, P144 (February 1991)



Exhibit 10, P145 (page 2) (March 26, 1991)



Exhibit 10, P147 (April 22, 1991)



[247]   The evidence is that Grenke had his son, Wes (an architectural draftsman), draw a diagram

showing an annular space to accept dynamic seals surrounding a rotating shaft or mandrel

(Exhibit 10, P144).


[248]   Following Grenke's first visit to Merkel, Engelen sent some suggestions for what was in the

first diagram but this second diagram (Exhibit 10, P145 (page 2)) shows Grenke's handwritten

changes.


[249]   The final diagram, Exhibit 10, P147, created under Grenke, was used in the manufacture of

the first prototype units in the first half of 1991.

[250]   There is other documentary evidence showing Grenke's work on the seal system integrated

with the Flenders' gear box, which gear box work was performed with Torfs. Grenke made a sketch

of what the system looked like (Exhibit 10, P153) and then had his son put it into proper form in

July 1992 (Exhibit 10, P158).

Exhibit 10, P153



Exhibit 10, P158



[251]   Given some of the issues surrounding the first integral sealing units made by Grenke, it was

Grenke who redesigned the units in late 1992 and early 1993 to incorporate flanged U rings and two

leak passages in the cylindrical portion of the housing as well as a passage in the flange.

[252]   The documents support Grenke's evidence that it was he who came up with the three

aspects of the '937 Patent referred to in paragraph 244.

[253]   The Court concludes that Grenke was "an" inventor of the '937 Patent. The other persons

identified by the Defendants (except in the special case of Torfs) as co-inventors are not.

[254]    With the exception of Torfs, none of these other inventor claimants asserted any claim of co-inventorship at the Patent Office. Indeed they never asserted the claim against each other. None of Britton, Reincke or Engelen said that they were inventors with each other. None took any legal actions to enforce their claim, either within any limitation period or otherwise.

### Andreas Reincke

[255]    Reincke, who did not claim to be an inventor, suggested to Grenke that he use alternatives to the rope type packing in the prototype units. As an employee of Merkel, Reincke steered Grenke to Merkel products, a situation entirely satisfactory to Grenke. However, the '937 Patent, properly construed, did not include any claims directed to the particular packing suggested by Reincke and he did not co-invent the '937 Patent.

### Michael Engelen

[256]    Engelen, who was the seal expert at Merkel, made a proposal as to the appropriate seals to use in the annular space shown on the drawing (Exhibit 10, P144) sent by Grenke. His proposal was related to the type of dynamic seals not the concept of using dynamic seals in the annular space to seal around the rotating sleeve. The seals proposed by Engelen came from Merkel's standard catalogue as did the proposal for a seal carrier.

[257]    Although Engelen met with Grenke, it was Grenke who made the changes to the proposal that eventually led to the design to be tested. Figure 3 in the '937 Patent included several variations by Grenke of what Engelen had originally proposed.

[258]    While Engelen discussed with Grenke the possibility of using multiple leak detection passageways, he confirmed that at that time, April 1991, the prevailing view was that a single leak detection port was sufficient and having more than one such port had several disadvantages.

[259]    Engelen's suggestion of flanged U rings as an alternative is not relevant as the claims regarding these rings are not asserted against the Defendants. However, the evidence on this point is that Grenke made the selection of the standard flange arrangement from the various proposals made by Engelen and that Merkel employees were unsure as to whether its seals would work in the concepts which Grenke had.

[260]    The Court concludes that while Engelen made some suggestions, he did not contribute "inventive concepts" and cannot be considered as a "co-inventor".

### Art Britton

[261]    The other person, on some basis, said to be the inventor or a co-inventor of the '937 Patent is Britton. His complaint against Grenke, his allegation that in effect Grenke stole his idea, goes back to the allegation that Grenke copied Britton's idea which was outlined on some sort of board in Britton's office at Elk Point in late 1990/early 1991. The attempt by the Defendants to have Britton

draw what was on his office board at the time is extremely tenuous evidence. The exhibit, D-19, was drawn by Britton from memory as if it was a "parlour trick" but his evidence on this aspect was inconsistent with pre-trial evidence.

[262]   The Defendants' claim is that Britton is responsible for the idea of rotating the packing with the polish rod using the sleeve and sealing outside of that sleeve. However, in the fall of 1990, H&R Valve had a similar idea of moving the packing with the rod which likely was the genesis of the concept and what may have been in Britton's office (if anything).

[263]   Moreover, the Defendants cannot establish that Grenke took that concept. At the best there was a concept, an idea, but there is no patent in an idea. H&R Valve had not been able to make the concept work and it is evident that Britton had no idea how to go about giving the concept functionality.

[264]   Before Britton met with Grenke in January or February of 1991, neither Britton nor anyone in his EI/CI group at Amoco had a concrete idea about how to solve the leakage problem plaguing the heavy oil industry.

[265]   Britton's evidence on the events in and around Fall 1990 to Spring 1991 is vague, inconsistent and unreliable. Other ex-Amoco witnesses could provide no corroboration of Britton's account. His subsequent actions in preparing a video in March 1990 which makes no reference to his design and his failure to take a copy of his design to Germany in April 1991 is not consistent

with his claim that he had the idea and the method behind the '937 Patent. As indicated earlier,

Britton's animus against Grenke distorts his recollection of events and his evidence at trial was not

convincing.

[266]    Britton was careful and not open in his dealings with Grenke in 1991. Britton had prepared a

first video for the Germany meeting to outline the nature of the problem. He then had a second

video prepared which was never shown to Grenke. That video gave credit to Britton's alleged

efforts but airbrushed out GrenCo and Grenke.

[267]    Britton claims that he had some type of arrangement or contract with Grenke to share in the

inventorship, if not the ownership, of what became the '937 Patent. However, Britton was hired by

GrenCo as a salaried sales manager from October 1991 to August 1995 with no mention of

inventions or rights therein.

[268]    There is no doubt that Britton had ideas and that he saw a market for finding a solution to

the stuffing box leakage problem. So did Grenke. Britton even went to GrenCo's competitor

Highland/Corod in 1991, prior to joining GrenCo, to seek a partner in developing a solution.

[269]    The relationship between Grenke and Britton while Britton was an employee could be

charitably characterized as "careful". Any response by Grenke to Britton's inquiries about patents

and participation were non-committal. It is evident that Grenke had no intention of sharing anything

about the inventorship or ownership of the '937 Patent with Britton – a fact which Britton knew for a considerable period of time.

[270]    The fact remained that Britton never had an arrangement for sharing in the patent and his most direct *ex post facto* attempt in 1995 to claim a meaningful role in the development of the patent was rebuffed by Grenke.

[271]    When Britton resigned, his resignation letter made no mention of patent rights, inventorship royalties or ownership. He took no steps subsequent to 1996 when he left GrenCo to assert any rights or claims with respect to the '937 Patent when he knew or ought to have known that Grenke was pursuing this path including seeking patent protection without any recognition of Britton.

[272]    The Court concludes that Britton has no claim to inventorship and/or ownership in whole or in part to the '937 Patent.

### Walter Torfs

[273]    The evidence regarding Torf's contribution to the '937 Patent is more enigmatic. The Court is asked to divine from snippets of documentary evidence and hazy recollections of others, since Torfs unfortunately is deceased and the trade mark agent Reider was too ill to testify, that Torfs was "an" inventor of the '937 Patent.

[274]    Given Torfs' expertise with drivehead assemblies, it is improbable that he was the source of inventiveness for the sealing assembly which was Grenke's area. Even Britton, who interestingly does not claim co-inventorship with Torfs, cannot recall Torfs making specific suggestions with respect to the sealing arrangements.

[275]    Although Torfs gave Reider his own drawings of the sealing assembly, the key aspects of Torfs' drawings came from Grenke and Torfs' drawings were consistent although not identical to those of Grenke.

[276]    The most opaque area is the contribution to the integration of the GrenCo sealing assembly with the drivehead. The evidence establishes that it was Grenke who initiated the work on the integration of the drivehead commencing with his effort to locate Torfs at the Hanover trade show in April 1991. But it was Torfs who had the drivehead expertise and was essential to any integration efforts.

[277]    The Defendants placed considerable emphasis on an undated hand drawn sketch purportedly made by Torfs (Exhibit 10, D341, page 1008) shown below:



The sketch presumably shows more than one leak passage in the sealing assembly. The Defendants use this document to suggest that Torfs came up with the idea for multiple leak detection points. This is inconsistent with Manicke's evidence that Britton came up with the idea – an idea for which Britton himself makes no claim.

[278]    The only witness who tries to guess at the documents (and others related to it) and the significance thereof is Manicke. No one from Flenders was called to explain what is in reality the property of Flenders, Torfs' employer. Manicke's evidence on this is unreliable and involved guess work. He recalls a meeting discussing multiple leak detection passageways, a recollection said to be stimulated by seeing the drawing. No one else supposedly at this meeting testified on the point and the substance of the meeting was never put to either Grenke, his son Wes or even Britton.

[279]    Magda Torfs was called and, as indicated, she was intent on preserving her husband's good name. However, her identification of two arrow figures on the exhibit as being in her husband's handwriting adds nothing to what they signify – she simply did not know what any of the writing meant.

[280]    Everything about this document and a great deal of whatever else was said about Torfs' contribution to the '937 Patent was speculation. It does not meet in and of itself the burden put on the Defendants to show that someone else, Torfs in this case, was a co-inventor.

[281]    Were it not for Grenke's arrangement with Torfs that they would share in the patents equally, the Court would be uncomfortable with concluding that Torfs contributed any creative concept to the '937 Patent itself. However, Grenke cannot resile from that arrangement and his efforts to do so are considered later with respect to misrepresentation to the Patent Office. Moreover, Torfs as a contributor in the area of drive heads on an integral unit is consistent with a conclusion that he was "an" inventor.

XIV.    D.        VALIDITY OF THE '937 PATENT

[282]    The Defendants raised a number of challenges to validity of the '937 Patent including

anticipation more than one year prior to the filing date, obviousness on the same basis,

misrepresentation in the Patent petition by Grenke, misrepresentations by Torfs, abandonment of the

Patent by reason of not acting in good faith in dealings with the Patent Office and lastly ambiguity

in the claim. These matters are covered in Issues 10-15.

### *Disclosure more than One Year prior to the Filing Date*

[283]    The Defendants claim that the '937 Patent was anticipated because its subject matter was

disclosed to the public contrary to s. 28.2(1)*(a)* of the Act as early as April 1991 a) during the trip to

Merkel, b) to Flenders Canada and c) from as early as June 21, 1991, to Amoco and other non-

Amoco personnel when a rotating stuffing box was installed at Elk Point, and to the oil industry and

to Pan Canadian in particular. The Defendants also claim that a number of prior publications

disclose the subject matter of the Patent claims.

[284]    There is no real issue between the parties on the legal principles to be applied to whether the

'937 Patent was anticipated. Section 28.2(1) sets out the basic principles:

> **28.2** (1) The subject-matter
> defined by a claim in an
> application for a patent in
> Canada (the "pending
> application") must not have
> been disclosed

> **28.2** (1) L'objet que définit
> la revendication d'une
> demande de brevet ne doit pas:

| | |
|---|---|
| (*a*) more than one year before the filing date by the applicant, or by a person who obtained knowledge, directly or indirectly, from the applicant, in such a manner that the subject-matter became available to the public in Canada or elsewhere; | *a*) plus d'un an avant la date de dépôt de celle-ci, avoir fait, de la part du demandeur ou d'un tiers ayant obtenu de lui l'information à cet égard de façon directe ou autrement, l'objet d'une communication qui l'a rendu accessible au public au Canada ou ailleurs; |
| (*b*) before the claim date by a person not mentioned in paragraph (*a*) in such a manner that the subject-matter became available to the public in Canada or elsewhere; | *b*) avant la date de la revendication, avoir fait, de la part d'une autre personne, l'objet d'une communication qui l'a rendu accessible au public au Canada ou ailleurs; |
| (*c*) in an application for a patent that is filed in Canada by a person other than the applicant, and has a filing date that is before the claim date; or<br><br>… | *c*) avoir été divulgué dans une demande de brevet qui a été déposée au Canada par une personne autre que le demandeur et dont la date de dépôt est antérieure à la date de la revendication de la demande visée à l'alinéa (1)*a*);<br><br>… |

[285]   There are two aspects which the Defendants must establish to succeed as outlined in *Apotex Inc. v. Sanofi-Synthelabo Canada Inc.*, 2008 SCC 61:

1. the prior publication must disclose subject matter that would infringe the claim at issue if practised – "what would infringe if later, anticipates if earlier".

2. the prior publication must enable a person skilled in the art to practise that subject matter without undue trial and error.

[286]    At the disclosure stage, the skilled person is deemed to be trying to understand what the author meant in the description of the prior art publication. There is no reason for trial and error or experimentation but simply reading for purposes of understanding.

[287]    At the enablement stage, following disclosure, a certain amount of trial and error or experimentation is permitted to get the subject matter to work.

[288]    The skilled person may use common general knowledge to supplement information contained in the prior publication but not to the extent of undue burden or inventive steps.

[289]    Germane to the issue of anticipation is the principle that a prior unrestricted sale may constitute anticipation. The subject matter has to "become available to the public in Canada or elsewhere".

### *Disclosure to Amoco/Pan Canadian*

[290]    The Defendants have alleged that sales to Amoco and Pan Canadian were made more than one year prior to the filing date. As such, the Defendants have alleged invalidity due to obviousness, anticipation and deemed abandonment by virtue of failure to disclose the sales to the Commissioner of Patents. The issue of those sales is addressed below and the findings apply to all the issues in which these sales have been raised.

[291]    The Defendants have alleged, both under a claim of obviousness, anticipation and

abandonment by reason of failure to disclose prior art, that the sales of stuffing boxes to Amoco and

Pan Canadian in 1991 and 1992 constituted disclosure to the public more than one year prior to the

patent filing.


[292]    A single sale can constitute public disclosure, as held in *Baker Petrolite Corp. v. Canwell-*

*Enviro Industries Ltd.* (2002), 17 C.P.R. (4th) 478 (FCA). The issue is not the sale itself but what

flows from it – disclosure of the invention. The relevant issue here is the circumstances of that

disclosure and whether such disclosure was to the public.


[293]    The evidence on whether the sales were subject to some form of confidentiality obligation

or limitation on disclosure is somewhat inconsistent. Generally those "in the field", working on the

wellhead equipment, thought that they could say or do anything they wanted with any of the

knowledge of the stuffing box invention, those further up the corporate chain recognized the need

for confidentiality, the obligation not to disclose and the limitations continued even where the

companies had been invoiced for the product.


[294]    The relationship between Amoco and Grenke was closer than that of Pan Canadian but each

of those companies was engaged in a "common cause" to find a way to eliminate leakage from

stuffing boxes. It was essential in finding the solution that products be tested and proven. There

were no test facilities available to Grenke, as was apparent to the two companies. The only way to

establish utility, to make necessary improvements on design and to finalize the invention to be

patented was to engage in field tests. This was obvious to both companies and both had an interest in the eventual perfection of the invention.

[295]    In Amoco's case, it was involved with Grenke in the creation and showing of a video outlining the problems faced and to be shown to Merkel. Britton, acting for Amoco, attended a meeting with Merkel as well for the purpose of development of the invention. Amoco's assistance was integral and essential to proving the invention.

[296]    The units in question, the retrofit models, were a limited production of six to eight. Units were sold to each of Amoco and Pan Canadian at a time when Grenke continued to work on the product development based in part on feedback from the companies on how the units were performing in the field. Even Britton acknowledged that testing on the units extended into mid-1992.

[297]    It may have been unwise for Grenke not to have established a confidentiality regime with Amoco and Pan Canadian but given the nature of the cooperative working arrangement, it was not unreasonable for him to believe that he had no fear that disclosure would permit Amoco and Pan Canadian to do with the product what they wished – including producing their own. Nor would he have reason to believe that disclosure to those companies was for anything other than a limited purpose and certainly not a disclosure to the public. Both companies' behaviour was consistent with Grenke's view of the confidentiality of the product.

[298]    As held in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574, a

relationship of trust and cooperation is a factor in determining whether a communication takes place

with an expectation of confidence. That type of relationship existed here as between Grenke and

Amoco and Grenke and Pan Canadian.


[299]    Again, referring to *Lac Minerals*, industry practice may be considered in determining what

reasonable expectation parties may have regarding confidentiality and how the parties may behave

as a result.


[300]    Industry evidence in this case confirmed that parties acting in a common cause and those

using prototypes or proposing tentative solutions expected and received confidential treatment. This

is consistent with ethical business practices, acknowledged to be part of the *modus operandi* of both

corporations, and particularly the case where parties are facing a common problem, local in nature

at the time and in field operations in remote areas where the sense of interdependence may be

heightened. That degree of dependence and thus of good faith is elevated by the working

circumstances.


[301]    While personnel in the maintenance departments may have felt no compunction to speak

about the products, especially among their colleagues in the area, supervisors such as Ron Johnson,

District Foreman of Amoco, recognized that the units were prototypes under test with Amoco. He

expected that his Amoco people would keep those units (or at least their internal workings) within

the Amoco group of personnel.

[302]    There was one instance of an Amoco presentation on the Grenke units made to 30-50 people at a community hall outside the Amoco facility. The evidence is not sufficiently precise and persuasive that what was disclosed was the essence of the invention. The fact that the units were being tested by Amoco was well-known in the area; a testament to the close relationship between Grenke and Amoco but that knowledge is not disclosure of the invention itself.

[303]    While Pan Canadian did not work as closely with Grenke as Amoco in the development of the stuffing box, the Defendants in their submissions rely on largely similar factual basis to claim that the sale on April 30, 1992 (more than one year before the filing date) was a disclosure to the public.

[304]    While there is some debate about the actual delivery date and the documentation supporting a sale earlier than one year was not entirely complete, it is clear that at some time at least as late as April-May 1992, Britton disclosed the inner workings to Pan Canadian representatives negotiating the purchase of the units.

[305]    Given that Pan Canadian was in a similar situation as Amoco, with the same problem, seeking the same solution and knowing that Grenke was working on that solution, the disclosure to Pan Canadian was intended to be limited to Pan Canadian. This is a fact which Pan Canadian knew or ought to have known. There is nothing to suggest that Pan Canadian saw this disclosure as

anything other than for a limited purpose related to development of the commonly sought solution to the stuffing box problem.

[306]   It is evident that Grenke did not disclose the information (or permit Britton to disclose if he ever had that permission) to either Amoco or Pan Canadian with a view that it was a public disclosure nor was he reckless in the matter of disclosure. Under all the circumstances, he had good reason to believe that the essence of his invention would not be disclosed to the public and until he was ready to do so and in fact that was the case in respect of both corporations.

[307]   The Defendants also rely on what they describe as disclosures to third parties – rig crews, flush-by crews, service crews and even casual observers – occurred when the units were installed and serviced at Amoco and Pan Canadian. There is no evidence of what these people were told about the inner workings of the units or what they observed. Observation of the assembled unit, as presented as Exhibit P-28-A, would disclose nothing about the internal workings.

[308]   The Defendants have strenuously argued that the prototype units contained all the essential embodiments of the '937 Patent and therefore disclosure of the prototype was disclosure of the invention. Considerable reliance is placed on Grenke's admissions on discovery that the prototypes had all the essential elements and the opinions of the Defendants' experts.

[309]   The Plaintiffs have attempted to resile from the discovery admission without leave of the Court. Since the Defendants knew of the Plaintiffs' changed position and admissions at discovery

are matters which can be withdrawn, the Court fails to see much merit in the Defendants' position.

Moreover, the admission is one at least of mixed fact and law, an area where a witness has limited

ability to comment. What is germane is that Grenke believed that with the prototype he had

essentially solved the problem of leaking stuffing boxes. The balance of work to the final design

was improvements but they were significant. There is a difference between believing that one has

the solution to the problem and finalizing the design and function so that the invention operates as

intended. Grenke's admissions must be seen in that light.

[310]    To the extent that the Defendants' position relies on its expert evidence versus that of the

Plaintiffs, for reasons earlier stated, the Court prefers the Plaintiffs' expert evidence.

[311]    The resolution of the issue of the early disclosure has been based on the assumption or

presumption that the disclosure of the prototype was the disclosure of the invention. That disclosure

did not constitute obviousness or abandonment (as pleaded by the Defendants) because the

disclosure was not to the "public".

[312]    The Defendants rely upon the disclosures to Merkel and Flenders Canada prior to April

1991 as one of the basis for alleging anticipation. Whatever the state of the subject matter prior to

April 1991 – whether it was patentable or not – Grenke and GrenCo's relationship with both Merkel

and Flenders was such that any disclosure was subject to a duty of confidentiality, and no such

disclosure could be considered as making the invention "available to the public".

[313]    In the case of Merkel, it was working with a customer to help with solutions and to sell its

own products with the common object of finding some solutions to the stuffing box problem. To

suggest that Merkel could legally take the Plaintiffs' ideas and work and use them as its own is not

sustainable. Merkel did not have that right and never claimed it had any such right. There is no

evidence that it behaved in any manner other than with a duty of confidence.

[314]    To an even greater extent, Flenders was subject to confidentiality obligations and

expectations. There is no suggestion that Grenke could have purloined Flenders' (Torfs) work on

the rotary engine or Flenders could take and use Grenke's work. These parties were engaged in a

common endeavour which was recognized in the co-inventorship arrangement between Grenke and

Torfs.

[315]    The principle of confidentiality is well described in *Lac Minerals*, above, at page 612:

> In particular, where information of commercial or industrial
> value is given on a business-like basis and with some
> avowed common object in mind, such as a joint venture or
> the manufacture of articles by one party for the other, I
> would regard the recipient as carrying a heavy burden if he
> seeks to repel a contention that he was bound by an
> obligation of confidence:

[316]    In the circumstances of this case, there are the interrelated obligations of confidence and the

absence of making the invention "available to the public". The disclosure by Grenke to Merkel and

Flenders did not constitute making the subject matter of the '937 Patent available to the public. The

disclosure was private and for a limited purpose to facilitate the development of the invention.

Given the nature of the respective relationships, while in hindsight it might have been preferable, it was not necessary to set up a formal non-disclosure regime. The parties understood the nature of the relationship and their duties to each other.

[317]    The Defendants also alleged that the subject matter of the Patent was disclosed in a list of U.S. patents, industry handbooks and other publications contrary to s. 28.2(1)*(b)* of the Act.

[318]    However, the expert evidence referred to earlier in this decision, as accepted by this Court, has rejected the argument that the prior art disclosed the subject matter of the Patent. Therefore, there was no anticipation by reason of disclosure in the prior art as pleaded by the Defendants.

### *Obviousness by Reason of Prior Disclosure*

[319]    The issue raised by the Defendants is an attack on the '937 Patent based upon the lack of inventiveness in the Patent. Section 28.3 of the Act sets forth the legal criteria for this challenge to validity:

> **28.3** The subject-matter defined by a claim in an application for a patent in Canada must be subject-matter that would not have been obvious on the claim date to a person skilled in the art or science to which it pertains, having regard to
>
> (*a*) information disclosed more than one year before the filing date by the applicant, or by a

> **28.3** L'objet que définit la revendication d'une demande de brevet ne doit pas, à la date de la revendication, être évident pour une personne versée dans l'art ou la science dont relève l'objet, eu égard à toute communication :
>
> a) qui a été faite, plus d'un an avant la date de dépôt de la demande, par le demandeur ou

| | |
|---|---|
| person who obtained knowledge, directly or indirectly, from the applicant in such a manner that the information became available to the public in Canada or elsewhere; and | un tiers ayant obtenu de lui l'information à cet égard de façon directe ou autrement, de manière telle qu'elle est devenue accessible au public au Canada ou ailleurs; |
| (*b*) information disclosed before the claim date by a person not mentioned in paragraph (*a*) in such a manner that the information became available to the public in Canada or elsewhere. | *b*) qui a été faite par toute autre personne avant la date de la revendication de manière telle qu'elle est devenue accessible au public au Canada ou ailleurs. |

[320]   The most commonly cited articulation of the test for obviousness is Justice Hugessen's

statement at page 294 of *Beloit Canada Ltd. v. Valmet Oy* (1986), 8 C.P.R. (3d) 289:

> The test for obviousness is not to ask what competent inventors did or would have done to solve the problem. Inventors are by definition inventive. The classical touchstone for obviousness is the technician skilled in the art but having no scintilla of inventiveness or imagination; a paragon of deduction and dexterity, wholly devoid of intuition; a triumph of the left hemisphere over the right. The question to be asked is whether this mythical creature (the man in the Clapham omnibus of patent law) would, in the light of the state of the art and of common general knowledge as at the claimed date of invention, have come directly and without difficulty to the solution taught by the patent. It is a very difficult test to satisfy.

That test has been modified by Rothstein J. in *Sanofi*, above.

[321]   The Defendants rely in this regard on the same disclosure referred to in paragraph 283 of

these Reasons, as being "available to the public". For the same reasons, this Court holds that there

was no such disclosure to the public.

[322]    The Defendants rely on the same prior art described in paragraphs 317-318 and which the expert evidence does not support a conclusion that the claims in the '937 Patent would have been obvious to a person having reasonable skill in the art.

_Misrepresentation/Misleading Statements_

[323]    At issue here is whether Grenke made <u>material</u> misrepresentations or <u>material</u> willful misstatements in the Patent petition by claiming that he was the inventor of the '937 Patent. In that regard the Defendants repeat some of their allegations of inventorship by persons other than Grenke.

[324]    The Defendants' Statement of Defence alleges that the misstatements/misrepresentations are that Grenke is the inventor whereas in fact:

-        Grenke is not the true inventor; Art Britton is.

-        <u>or</u> Art Britton is a co-inventor with Merkel representatives and/or Torfs.

-        <u>or</u> Art Britton, Grenke and/or Torts are co-inventors.

[325]    The Defendants further claimed that Grenke amended the Patent petition so as to claim sole inventorship and ownership of the '937 Patent and two other patents not in issue by removing Torfs as the co-inventor and co-owner.

[326]    The last misstatement/misrepresentation alleged is that of Grenke as the person entitled to

ownership of the '937 Patent whereas the persons entitled to ownership include one or more of Art

Britton, National Oilwell Canada, Corlac, Merkel, Messrs. Reincke, Engelen, Dunn and Manicke.


[327]    Section 53(1) of the Act relied upon by the Defendants voids a patent which is grounded on

a material untruth in the petition. The provision also refers to omissions or additions in the

specifications and drawings but this part of s. 53(1) is not relevant here.

> **53.** (1) A patent is void if any material allegation in the petition of the applicant in respect of the patent is untrue, or if the specification and drawings contain more or less than is necessary for obtaining the end for which they purport to be made, and the omission or addition is wilfully made for the purpose of misleading.
>
> **53.** (1) Le brevet est nul si la pétition du demandeur, relative à ce brevet, contient quelque allégation importante qui n'est pas conforme à la vérité, ou si le mémoire descriptif et les dessins contiennent plus ou moins qu'il n'est nécessaire pour démontrer ce qu'ils sont censés démontrer, et si l'omission ou l'addition est volontairement faite pour induire en erreur.


[328]    The Court has earlier concluded on the allegations of inventorship or ownership of the

multitude advanced by the Defendants. The only substantive issue to be resolved is that regarding

Grenke's amendment application to remove Torfs as an inventor and thereby be listed as the sole

inventor.


[329]    The law, as set out in *Apotex Inc. v. Wellcome Foundation Ltd.*, above, requires that in order

for s. 53(1) to void a patent, the statement was <u>material</u> and <u>untrue</u>. The statement must be material

to the granting of the patent – to whether the patent would be granted on those terms in the patent. It is important to note that in this case, the misrepresentation was not contained in the petition itself.

[330]    The issue date of the patent is the relevant date for the application of s. 53(1) such that if a prior statement was untrue but became true by the issue date or the statement was corrected, the patent would not be void. As held in *Jules R. Gilbert Ltd. v. Sandoz Patents Ltd.*, [1970] Ex. C.J. No. 1; 64 C.P.R. 14 at para. 117:

> I do not accept this interpretation of s.55(1). The section is expressed in the present tense and it commences with the words, "A patent is void."This I take to mean that the patent is void from the time of its issue but as I read it it cannot refer to any earlier time. The time of issue of the patent accordingly is I think the time at which the truth of the allegations in the patent must be considered. It is at that moment that they become the basis on which patent rights are granted. If at that moment they are untrue and if they are material the basis for the grant of a patent is lacking and the patent is void, but an untrue allegation made earlier but corrected before issue of the patent would not, in my opinion, avoid the grant.

[331]    While there may be debate that s. 53(1) always requires willfulness to mislead, the weight of authority suggests that the focus is on materiality. While willfulness may add colour to the misstatement, as acknowledged by the Defendants, even an untrue statement made with something less than a purpose to mislead, will void a patent if it is material.

[332]    What is material is fact specific and must be considered as of the time that the grant is made. The question is whether Grenke's affidavit, in which he claimed sole inventorship and that the

naming of Torfs on the petition was a mistake, was a material misrepresentation at the time the '937

Patent was issued.

[333]    As held in *Procter & Gamble Co. v. Bristol-Myers Ltd.* (1978), 39 C.P.R. (2d) 145 (FCTD),

the misstatement must be material to the "public" and in a practical sense material to the

Commissioner of Patents. The question is whether the misstatement made a difference to the

issuance of the patent – the rights contained therein.

[334]    The Plaintiffs suggest that the naming of the inventors is not particularly important and is

more in the nature of a formality in part because inventorship does not necessarily equate with

ownership. That position is partly true but where inventorship is important, such as according a

person notice of the petition, the correct naming of the inventor may be material (see *Procter &

Gamble*, above).

[335]    The Plaintiffs have attempted to explain away Grenke's request for amendment to delete

Torfs as an inventor and his affidavit justifying the change as based on his confusing or mixing the

concepts of inventorship and ownership. The Court does not accept that explanation. Grenke made

the change not only because he had acquired all the rights to the Patent through the assignments

from Flenders and the Torfs estate but because he perceived that Torfs had "cut him out" of other

patents which he believed should be in their joint names.

[336]    Grenke had by agreement acknowledged Torfs as a joint inventor – indeed under cross-examination he conceded the same. The Court does not find his explanation credible.

[337]    However, from the standpoint of validity of the Patent, Grenke's misstatement is not material at the time of the Patent's issuance. At that time Grenke had acquired, to the extent necessary, all the right title and interest in the Patent from Torfs' employer who had the legal interest in the Patent and from Torfs' estate to the extent that the estate might have had a claim. The naming of Torfs on the Patent as a co-inventor after he had died would have been a nice gesture of recognition but would have had no relevance to the validity of the Patent, its ownership or any rights of inventorship.

[338]    To the extent that Grenke signed an affidavit which contained an untrue statement, the appropriate recourse is not to void the Patent and allow the Defendants' infringement to continue. If the matter is as serious as alleged, the proper recourse is to refer the matter to the Attorney General of Canada and/or the Commissioner of Patents for such action as they may deem appropriate. Since the patent agent was involved with the offending affidavit, and he was unable to testify, it would be improper to find that he was knowingly involved in advancing material untruths.

[339]    Therefore, the Patent is not void by reason of Grenke's misstatement in respect to the amendment to the petition for the '937 Patent. The other patents referred to by the Defendants are not relevant to this litigation.

*Other Alleged Misrepresentations*

[340]   This issue is an alternative plea based on the assumption that Torfs was not a co-inventor and therefore the original petition contained a misleading statement.

[341]   For reasons already given, Torfs was a co-inventor and therefore this issue is irrelevant. Further, if Torfs was not a co-inventor, his misstatement was corrected before the Patent issued.

*Abandonment*

[342]   The Defendants, although not pleading s. 73(1)*(a)* of the Act, rely upon it to challenge the validity of the Patent, on facts raised either under "obviousness" (prior disclosure) or under "s. 53" (misstatements).

[343]   Section 73(1)*(a)* reads:

| | |
|---|---|
| **73.** (1) An application for a patent in Canada shall be deemed to be abandoned if the applicant does not | **73.** (1) La demande de brevet est considérée comme abandonnée si le demandeur omet, selon le cas : |
| *(a)* reply in good faith to any requisition made by an examiner in connection with an examination, within six months after the requisition is made or within any shorter period established by the Commissioner; | *a)* de répondre de bonne foi, dans le cadre d'un examen, à toute demande de l'examinateur, dans les six mois suivant cette demande ou dans le délai plus court déterminé par le commissaire; |

[344]    The Defendants argue that s. 73(1)*(a)* gives them a right to challenge the validity of the

Patent on the basis of this subsection as if it is a supplement to s. 53. However, at paragraph 61 of

*G.D. Searle & Co. v. Novopharm Ltd.* (2007), 56 C.P.R. (4th) 1, the Court held that there is no right

in a third party to invalidate a patent for fraud or lack of good faith during the prosecution of the

application.  It would be stretching the meaning of s. 73 to read in a right to strike down a patent

after it is issued on the basis of deemed abandonment during its prosecution unless all the

constituent elements of s. 73 are met.

[345]    Section 73 read as a whole is not directed primarily at the validity of a patent once issued.

The provision is directed at controlling the prosecution of the patent process. The term

"abandonment" itself gives an indication that the provision is not directed to post-issuance validity.

[346]    Section 73(3) which allows for reinstatement of the patent prosecution upon rectification of

the various steps of "deemed abandonment" also shows that the provision is not directed at validity

challenges but at prosecution stages.

| | |
|---|---|
| **73.** (3) An application deemed to be abandoned under this section shall be reinstated if the applicant | **73.** (3) Elle peut être rétablie si le demandeur : |
| (*a*) makes a request for reinstatement to the Commissioner within the prescribed period; | *a*) présente au commissaire, dans le délai réglementaire, une requête à cet effet; |
| (*b*) takes the action that should have been taken in order to avoid the abandonment; and | *b*) prend les mesures qui s'imposaient pour éviter l'abandon; |

|  |  |
|---|---|
| (*c*) pays the prescribed fee before the expiration of the prescribed period. | *c*) paie les taxes réglementaires avant l'expiration de la période réglementaire. |

[347]    There is no doubt a duty to act in good faith in dealing with the Patent Office, as recognized by Justice Hughes in *G.D. Searle*, above, but that duty must be read in the context of other provisions such as s. 28(3) (obviousness) and s. 53(1) (material misstatement). Unless an examiner issued a requisition, a matter which did not fall within either of these provisions would not give rise to any duty under s. 73.

[348]    Even if the Defendants had a right to challenge the validity of the '937 Patent on the basis of s. 73(1), there is no evidence that an examiner in the Patent Office made any "requisition" as to prior art (which includes the sales to Amoco/Pan Canadian) nor as to inventorship or anything else germane to this issue.

[349]    While s. 73(1)*(a)* was enacted in 1989 and cases prior to that date concerning the duty of candor must be read with some degree of caution, the Federal Court of Appeal in *Bourgeault Industries Ltd. v. Flexi-Coil Ltd.* (1999), 86 C.P.R. (3d) 221 at paragraphs 26-31 has rejected the notion that a patent can be held to be invalid for alleged breach of the duty of candor, which goes beyond compliance with the provisions of the Act.

> **29**    With respect to the alleged duty of general disclosure of prior art, the trial judge properly found that the disclosure required under Patent Rule 21 and Form 24 does not extend to a description of prior art. Furthermore, and contrary to what the trial judge found, no request for prior art in a foreign country was made by the examiner under Patent Rule 40.

**30**    At the hearing, counsel for Flexi-Coil relied heavily on the most recent decision of the Supreme Court of Canada in *Cadbury Schweppes Inc. v. FBI Foods Ltd* to suggest a higher duty of disclosure than that already required by law or by the jurisprudence. He referred in particular to the following passage from Mr. Justice Binnie's reasons, at paragraph 46:

> I do not think that the respondents' reliance on intellectual property law is of much assistance here. It ignores "the bargain" that lies at the heart of patent protection. A patent is a statutory monopoly which is given in exchange for a full and complete disclosure by the patentee of his or her invention. The disclosure is the essence of the bargain between the patentee, who obtains a 17-year monopoly on exploiting the invention, and the public, which obtains open access to all of the information necessary to practise the invention. Accordingly, at least one of the policy objectives underlying the statutory remedies available to a patent owner is to make disclosure more attractive, and thus hasten the availability of useful knowledge in the public sphere in the public interest [...]

**31**    Counsel reads more into this passage than is permissible. The issue before the Court related to breach of confidence and trade secrets. The "full and complete disclosure by the patentee of his or her invention" to which Binnie J. refers can only be, in my view, that which the statute, the rules and the jurisprudence already require. Furthermore, even if the duty of disclosure had been extended as suggested by counsel, the impact of the extension would be felt not at the level of the validity of the patent but at the level of the remedies where equitable considerations might come into play.

[350]    In responding to the Patent Office through his patent agent, Grenke was entitled to do so as an owner and ultimately the owner. Therefore there was nothing improper in the agent responding on behalf of one or more of the owners.

[351]    The issue of the provision of Grenke's affidavit claiming sole inventorship has already been held not to be a material misstatement nor a willful misleading as contemplated in s. 53(1). Further, there was no requisition from an examiner at issue in this litigation.

[352]    With respect to prior art, the examiner never requisitioned the production of "all" prior art. The key prior art non-disclosure is the disclosure to Amoco and Pan Canadian, matters already dealt with under "Obviousness".

[353]    Consequently, the '937 Patent is not invalid or deemed abandoned by reason of s. 73(1) as alleged by the Defendants.

*Ambiguous Terms*

[354]    The Defendants have not provided any cogent evidence that the terms complained of in the '937 Patent are obscure or ambiguous. Further, this point was not addressed in substance (if at all) during the trial.

[355]    On the facts said to constitute "deemed abandonment", a) the prior art said not to be disclosed is the sale of rotating stuffing boxes to Amoco and Pan Canadian in 1991 and 1992, b) providing the affidavit that Grenke was the sole inventor, and c) responding to all requisitions as if Grenke was the sole inventor and/or sole owner. These have been dealt with earlier in these Reasons.

XV.    E.    RECTIFICATION OF THE PATENT OFFICE

[356]    Issues 16-18 address the manner in which the Court should deal with the ownership of the Patent by National Oilwell Canada. It assumes that Art Britton is the inventor or co-inventor.

[357]    As this Court has found that Art Britton was neither an inventor nor co-inventor and had no right, title or interest in the Patent, Issues 16-18 are irrelevant and need not be answered.

XVI.    F.    INFRINGEMENT BY THE PLAINTIFFS

[358]    Issues 19-24 are subsumed under this heading and deal with the Plaintiffs' alleged infringement of the "Defendants'" '937 Patent and the remedies which flow therefrom.

[359]    Again, as the Court has found that the Defendants have no interest in the '937 Patent and that they have been infringing the Plaintiffs' Patent, the issues are irrelevant and need not be answered.

XVII.    G.    LICENCE AGREEMENTS

[360]    The Defendants have challenged the validity of the licence and sub-licence between the Plaintiffs and, if valid, alleged that they are not effective in respect of the Weatherford Plaintiffs during the time that the Grenke Plaintiffs and Weatherford Plaintiffs were disputing the existence and terms of the sub-licence.

[361]    Grenke exclusively licensed the '937 Patent to GrenCo Industries Limited in December

1992. At the time of the grant of the '937 Patent, December 22, 1998, when the licensed rights

became enforceable, Grenke was listed as and has been found by this Court, to be the sole owner of

the '937 Patent.


[362]    The Defendants' basis for the challenge to the licence between Grenke and GrenCo is that

Britton is the inventor/true owner of the '937 Patent or Britton and/or Engelen and Mrs. Torfs are

co-owners. Since the Defendants' factual underpinning is not supported, the challenge to the licence

falls.


[363]    The Defendants raised a few technical points as to the form of the licence suggesting that

these flaws render the licence void. The complete answer to these so-called flaws is well set out in

*Apotex Inc. v. Wellcome Foundation Ltd.* (2000), 10 C.P.R. 4th 65 at para. 99 (F.C.A.):

> It is difficult to conceive of what more is necessary to prove the
> existence of a licence than to have the licensor and licensee both
> attesting to the validity of the licence.


[364]    That is the situation as well in this present case – GrenCo is validly licensed.


[365]    The first sub-licence was from GrenCo to Weatherford PC Pump effective February 11,

2000. Wes Grenke admitted that "Weatherford" had always been licensed since February 11, 2000.

[366]    As a result of corporate reorganization within the Weatherford Group and the creation of

Weatherford Canada Partnership, in January-February 2001, a new sub-licence was requested for

the new entity.


[367]    There then followed a protracted period of negotiation, dispute, termination and counter-

termination while the parties settled out the terms of the new sub-licence. As part of this

negotiation-dispute, Weatherford paid royalties owed to GrenCo in trust.


[368]    Finally, in August 2004, GrenCo and Weatherford Canada parties signed a new sub-licence

agreement effective February 1, 2001 and the accumulated royalties with interest were paid from

trust to GrenCo.


[369]    Against this background, the Defendants challenge the right of the Weatherford Plaintiffs to

bring this action, claim the 2004 sub-licence void because GrenCo had no rights to sub-licence and

in any event the Weatherford Plaintiffs are not entitled to damages because (i) the sub-licence was

backdated or (ii) for a period of time, royalties were not paid or (iii) for a period of time GrenCo

took the position that the sub-licence was terminated.


[370]    The Weatherford Plaintiffs' standing to bring this action stems from its position as a person

claiming under the '937 Patent because it had the right to use the '937 Patent. The rights of GrenCo

as a licensee have been confirmed in this judgment. The right to claim under a patent has been

confirmed in *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée* (1992), 46 C.P.R. (3d) 199 (F.C.A.).

[371]    The Defendants' assertion that the 2004 sub-licence is void because GrenCo did not have a valid licence has no substance in view of the Court's finding as to the validity of the Grenke-GrenCo licence.

[372]    The Defendants' reliance on *Union Carbide Canada Ltd. v. Trans-Canadian Feeds Ltd.*, [1966] Ex. C.R. 884 is misplaced. The case is distinguishable on its facts both as to the right to assign "choses in action" and the specificity of the grant.

[373]    In the case at bar, the sub-licence was simply the right to use the patent; it was clear as to those rights. The Weatherford Plaintiffs' rights in this action arise not from an assignment of a chose-in-action but from its right to use – its "claiming under" the patent.

[374]    As confirmed by the Court of Appeal in *Eli Lilly & Co. v. Novopharm Ltd.* (2000), 10 C.P.R. (4th) 10, retroactive amendments to licensing arrangements are valid. There is no reason why the retroactivity of the sub-licensing between GrenCo and Weatherford Partnership should be an impediment to a claim for damages or in some manner alleviate the Defendants' liability for infringement.

[375]   Likewise, the fact that royalties were paid in trust pending finalization of the sub-licensing

terms and were ultimately paid out constitutes consideration for the sub-license. It does not lie to the

Defendants to complain about the arrangement and seek to diminish its liability or quantum of

damages arising from infringement. There was in fact payment of royalties and therefore the ratio in

*Bayer Aktiengesellschaft v. Apotex Inc.* (1998), 82 C.P.R. (3d) 526 (Ont. C.A.) where there were no

payments has no application here.

[376]   With respect to the period of time that GrenCo claimed the sub-licence was terminated, the

Defendants are not in any position to seek shelter under this legal posturing. There was neither

acceptance nor a determination that the purported termination occurred. Indeed the Weatherford

Plaintiffs continued to sell product and make royalty payments. In any event, GrenCo accepted the

moneys paid in trust and owed over the period of alleged termination and accepted the retroactive

sub-licence and payment.

[377]   Therefore, the Defendants remain liable to the Weatherford Plaintiffs during all periods

covered by the sub-licence agreements.

XVIII.  <u>CONCLUSION</u>

[378]   For all these reasons, the Plaintiffs are entitled to judgment and the Defendants' Defence

and its Counterclaim are dismissed.

[379]   The Plaintiffs are entitled to:

(a)     a declaration that Canadian Patent No. 2,095,937 and in particular claims 1, 6, 9, 11

        and 14-17 are valid and have been infringed by the Defendants jointly and severally.

(b)     a permanent injunction restraining the Defendants and anyone claiming under them,

        their officers, directors, employees, agents, servants, successors and assigns and any

        entity exercising control under them from:

        (i)     infringing the said Patent;

        (ii)    making, selling or inducing the sale in Canada of a sealing assembly or a

                rotary oilwell pump drive system containing a sealing assembly in

                infringement of any one of claims 1, 6, 9, 11 and 14-17 of the Patent; the

                specifics of the injunction to be more fully set out in the Judgment Order;

        (iii)   an Order for "delivering up" as set out in the Judgment Order;

        (iv)    damages to be assessed by the Court at a later date including all claims for

                exemplary or punitive damages, pre and post-judgment interest as of the date

                hereof; and

        (v)     their respective costs in this matter to be determined by the Court.

[380]   A more precise formal order will issue. The matter of quantum of damages will be dealt

with in a separate proceeding.

"Michael L. Phelan"
_____
Judge

Ottawa, Ontario
June 3, 2010

ANNEX A

1.      For use with a rotary pump for oil wells in which an elongate rod supports and rotates the
        rotor of a down-hole pump, an assembly for restraining oil leakage, comprising:

        --      a stationary first member defining a through-bore for the rod and further defining a
                substantially cylindrical recess coaxial with said bore, the cylindrical recess being
                defined by a cylindrical wall, the first member having an external wall,

        --      a rotary second member also defining a through-bore, the rod extending through the
                through-bore of the second member and rotating therewith, the second member
                having a substantially cylindrical portion received coaxially in said recess, the
                cylindrical portion being defined by an outer cylindrical surface which has a smaller
                diameter than the recess so as to leave an annular space between them, the annular
                space having an upstream end where oil under pressure seeks to enter the space, and
                a downstream end opposite the upstream end,

        --      a plurality of annular seal cartridges stacked within said annular space, each
                cartridge having, in axial section:

                a)      a dynamic seal slidably contacting said cylindrical portion,

                b)      a first open space downstream of the dynamic seal and adjacent the
                        cylindrical portion, and a second open space adjacent the cylindrical wall,
                        and

                c)      passageway means through which the two spaces are in communication,

        --      for each seal cartridge a leak passage through the first member, the leak passage
                communicating the respective open spaces with said external wall, and

        --      plug means for closing at least one of the passages.


2.      The assembly claimed in claim 1, in which each seal cartridge further has:

                d)      an inwardly open groove downstream of the first open space and

                e)      a resilient ring in said groove, the resilient ring being adapted to be
                        compressed by the freezing and expansion of any water within the open
                        spaces and

        passageway means of the seal cartridge.

3.      The assembly claimed in claim 2, in which each seal cartridge further has:

      f)      a support surface substantially parallel with said outer cylindrical surface, located downstream of said groove, and

      g)      an O-ring seal element which is U-shaped in radial section, including two arms of which one is adapted to lie against said outer cylindrical surface, and of which the other is adapted to lie against said support surface, such that the interior of the U-shape is open toward said first open space, the O-ring seal element further having an outwardly projecting integral flange lying in a flange recess in the respective seal cartridge, such that the flange is compressed and gripped between the respective cartridge and the next adjacent cartridge.

6.      The assembly claimed in claim 1, in which the annular space defined between said cylindrical wall and said cylindrical surface is closed by an annular wall at its upstream end, each seal cartridge further having an outer peripheral recess adjacent the cylindrical wall of the first member, and an O-ring seal compressed within said peripheral recess.

7.      The assembly claimed in claim 3, in which the annular space defined between said cylindrical wall and said cylindrical surface is closed by an annular wall at its upstream end, each seal cartridge further having an outer peripheral recess adjacent the cylindrical wall of the first member, and an O-ring seal compressed within said peripheral recess, and lock means urging said annular seal cartridges against said annular wall.

8.      The assembly claimed in claim 7, in which the lock means includes at least one annular member located downstream of the annular seal cartridges, and, immediately downstream of the annular member, a circlip lodged in a groove in the cylindrical wall.

9.      The assembly claimed in claim 1, in which the rotary second member includes a packing portion defining an annular cavity surrounding the rod and closed at both ends, and a plurality of packing elements compressed within said annular cavity.

10.     The assembly claimed in claim 3, in which the rotary second member includes a packing portion defining an annular cavity surrounding the rod and closed at both ends, and a plurality of packing elements compressed within said annular cavity.

11.     The assembly claimed in claim 6, in which the rotary second member includes a packing portion defining an annular cavity surrounding the rod and closed at both ends, and a plurality of packing elements compressed within said annular cavity.

12.     The assembly claimed in claim 7, in which the rotary second member includes a packing portion defining an annular cavity surrounding the rod and closed at both ends, and a plurality of packing elements compressed within said annular cavity.

13.     The assembly claimed in claim 9, in which the packing portion is threadably connected to said cylindrical portion of the second member.

14.     The assembly claimed in claim 1, in which the said assembly further includes a stationary framework to which said first member is secured, the framework including thrust and radial bearing means supporting the second member for rotation.

15.     The assembly claimed in claim 1, to which the assembly further includes drive means connected to the second member for receiving drive torque, and connection means allowing the rod to be both supported and rotated by said second member.

16.     The assembly claimed in claim 9, in which the said assembly further includes a stationary framework to which said first member is secured, the framework including thrust and radial bearing means supporting the second member for rotation, drive means connected to the second member for receiving drive torque, and connection means allowing the rod to be both supported and rotated by said second member.

17.     A method for restraining oil leakage in a pump for oil wells in which an elongate rod supports and rotates the rotor of a down-hole pump, utilizing an assembly including a stationary first member defining a through bore for the rod and further defining a substantially cylindrical recess coaxial with said bore, the cylindrical recess being defined by a cylindrical wall, the first member having an external wall, a rotary second member also defining a through-bore, the rod extending through the through-bore of the second member and rotating therewith, the second member having a substantially cylindrical portion received coaxially in said recess, the cylindrical portion being defined by an outer cylindrical surface with a smaller diameter than the recess so as to leave an annular space between them, the annular space having an upstream end where oil under pressure seeks to enter the space, and a downstream end opposite the upstream end; said method comprising the steps:

a)      providing a plurality of stacked annular seal cartridges within said annular space, each cartridge having, in axial section: a dynamic seal in sliding contact with said cylindrical portion, a first open space downstream of said dynamic seal and adjacent the cylindrical portion, a second open space adjacent the cylindrical wall, and passageway means through which the two spaces are in communication,

b)      providing, for each seal cartridge, a leak passage through the first member, each leak passage communicating the respective open spaces with said external wall,

c)      injecting a lubricant through the leak passage of the furthest upstream seal cartridge and then plugging that leak passage, while leaving open the leak passage of a seal cartridge downstream of the furthest upstream cartridge,

d)      monitoring the left-open leak passage for leaking oil, and

e)      when such leaking oil is detected, shutting down the pump and replacing at least those seal cartridges past which oil has leaked.

FEDERAL COURT

SOLICITORS OF RECORD

DOCKET:                          T-1236-01

STYLE OF CAUSE:                  WEATHERFORD CANADA LTD., WEATHERFORD
                                 CANADA PARTNERSHIP, EDWARD GRENKE and
                                 GRENCO INDUSTRIES LTD.

                                 and

                                 CORLAC INC., NATIONAL-OILWELL CANADA
                                 LTD. and NATIONAL OILWELL INCORPORATED


PLACE OF HEARING:                Toronto, Ontario

DATE OF HEARING:                 April 20-23 and 27-30, 2009
                                 May 4-7, 11-14, 19-22 and 27-29, 2009
                                 June 1, 2009

REASONS FOR JUDGMENT:            Phelan J.

DATED:                           June 3, 2010


APPEARANCES:

Mr. Robert MacFarlane                          FOR THE PLAINTIFFS,
Mr. Adam Bobker                    WEATHERFORD CANADA LTD. and
Mr. Joshua Spicer                          WEATHERFORD CANADA
                                                   PARTNERSHIP

Mr. Bruce Stratton                             FOR THE PLAINTIFFS,
Mr. Vincent Man                             EDWARD GRENKE and
                                      GRENCO INDUSTRIES LTD.

Mr. Christopher Kvas                     FOR THE DEFENDANTS
Mr. William Regan
Ms. Mala Joshi

<u>SOLICITORS OF RECORD</u>:

BERESKIN & PARR                                   FOR THE PLAINTIFFS,
Barristers & Solicitors                    WEATHERFORD CANADA LTD. and
Toronto, Ontario                               WEATHERFORD CANADA
                                                         PARTNERSHIP


DIMOCK STRATTON LLP                               FOR THE PLAINTIFFS,
Barristers & Solicitors                          EDWARD GRENKE and
Toronto, Ontario                            GRENCO INDUSTRIES LTD.


RIDOUT & MAYBEE LLP                              FOR THE DEFENDANTS
Barristers & Solicitors
Toronto, Ontario