

**DAVID J. YETTER, Plaintiff, v. WISE POWER SYSTEMS, INC., a Delaware corporation, and WILLIAM and CECILIA RAWHEISER, in the their individual capacity, Defendants.**

**Civil Action No. 1:11-cv-00040-RGA**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**929 F. Supp. 2d 329; 2013 U.S. Dist. LEXIS 35255**

**March 14, 2013, Decided**
**March 14, 2013, Filed**

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN1] On a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), a court applies the same standard as it does to a Fed. R. Civ. P. 12(b)(6) motion. To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain enough facts to state a claim to relief that is plausible on its face.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN2] The doctrine of judicial estoppel bars a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding. This equitable remedy is applied to preserve the integrity of the system. Its focus is on the relationship between the litigant and the judicial system. There is a three part test for determining when judicial estoppel is warranted. The two legal positions taken by the party must be irreconcilably inconsistent, bad faith must be the basis for the change in position, and judicial estoppel is not to be used unless that remedy is tailored to address the harm identified and no lesser sanction is adequate for that purpose.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN3] In the context of judicial estoppel, a party has knowledge of a potential claim when the events underlying the claim have occurred prior to the filing of a bankruptcy petition.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
*Evidence > Inferences & Presumptions > Presumptions > General Overview*
[HN4] There is a presumption of bad faith when the party does not disclose in a bankruptcy proceeding a potential claim of which the party had knowledge.

*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN5] In the context of judicial estoppel, actual reaping of a benefit by the taking of two inconsistent legal positions is not a requisite to finding bad faith. Further, a party seeking the protection of bankruptcy has a motive for not disclosing assets as the non-disclosure would shield those funds from creditors.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*

Case 09-10138-MFW    Doc 14394-3    Filed 09/10/14    Page 2 of 128

Page 2

929 F. Supp. 2d 329, *; 2013 U.S. Dist. LEXIS 35255, **

[HN6] Judicial estoppel should be applied only to avoid a miscarriage of justice.

***Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN7] In bankruptcy proceedings the integrity of the disclosure requirements are crucial to the system as creditors must rely upon the debtor's asserted assets in determining whether to settle the debt for a lesser amount than owed. This harm is not one that can be cured by a lesser sanction than judicial estoppel.

***Civil Procedure > Parties > Intervention > Right to Intervene***
[HN8] See Fed. R. Civ. P. 24(a)(2).

**COUNSEL:** [**1] Timothy J. Wilson, Esq., The Wilson Firm, LLC, Newark, DE, Attorney for the Plaintiff.

Kathleen Furey McDonough, Esq., Michael B. Rush, Esq., Potter Anderson & Corroon, LLP, Wilmington, DE, Attorneys for the Defendant.

**JUDGES:** RICHARD G ANDREWS, U.S. DISTRICT JUDGE.

**OPINION BY:** RICHARD G ANDREWS

**OPINION**

[*330]  **MEMORANDUM OPINION**

/s/ Richard G Andrews

ANDREWS, U.S. DISTRICT JUDGE:

Before the court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (D.I. 37). In March of 2010, David Yetter filed a complaint in Delaware Justice of the Peace Court 9 against William Rawheiser alleging non-payment of commissions earned pursuant to Plaintiff's employment with Wise Power Systems, Inc. (D.I. 37, Ex. B). The JP Court dismissed the complaint without prejudice as the cause of action was against Wise Power Systems and not Rawheiser. (D.I. 37, Ex. C). In October of 2010, Yetter filed a Chapter 7 Voluntary Petition for Bankruptcy and completed the required Statement of Financial Affairs form. (D.I. 37, Ex. D). Section 4(a) of the Statement required Yetter to list "all suits and administrative [*331] proceedings to which the debtor is or was a party within one year immediately preceeding the filing [**2] of this bankruptcy case." (*Id.*) In answer to Section 4(a) Yetter indicated "none." (*Id.*) In the Voluntary Petition, Schedule B, question 21 requires a listing of "contingent and unliquidated claims of every nature," and an estimated value for those claims. Yetter indicated that there were none. (*Id.*) The Plaintiff's bankruptcy was discharged on January 11, 2011. (D.I. 37, Ex. H). On that same day, this complaint was brought against the Defendants for non-payment of earnings. (D.I. 1).

The Defendants argue that the doctrine of judicial estoppel bars the complaint now before the court. (D.I. 37). The Defendants contend the doctrine is invoked because Yetter had knowledge of the claims in the current action prior to filing the Voluntary Petition in which he indicated having no such pending claims. (*Id.*) It is Yetter's contention that this omission was a good faith mistake resulting from following his attorney's advice. (D.I. 40).

[HN1] On a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the court applies the same standard as it does to a Federal Rule of Civil Procedure 12(b)(6) motion. *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). [**3] To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

[HN2] The doctrine of judicial estoppel bars a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988). This equitable remedy is applied to preserve the integrity of the system. Its focus is on the relationship between the litigant (i.e., Yetter) and the judicial system. *Id.* The Third Circuit has established a three part test for determining when judicial estoppel is warranted. *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 1996). The two legal positions taken by the party must be irreconcilably inconsistent, bad faith must be the basis for the change in position, and judicial estoppel is not to be used unless that remedy is "tailored to address the harm identified" and no lesser sanction is adequate for that purpose. *Id.* at 778.

Yetter asserted the [**4] legal position that he had no claims against the Defendants in his submission of both Section 4(a) of the Statement of Financial Affairs and Section B of the Voluntary Petition. [HN3] A party has knowledge of a potential claim when the events underlying the claim have occurred prior to the filing of the bankruptcy petition. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F.3d 314, (3d Cir. 2003). Yetter asserts numerous claims against the Defendants

Case 09-10138-MFW    Doc 14394-3    Filed 09/10/14    Page 3 of 128

Page 3

929 F. Supp. 2d 329, *; 2013 U.S. Dist. LEXIS 35255, **

based upon allegations of unpaid wages and commissions. (D.I. 1). The Plaintiff's complaint in the JP Court, which was filed prior to the Chapter 7 Voluntary Petition, was also based upon these unpaid earning claims. (D.I. 37, Ex. B). Yetter had knowledge of the potential for this complaint while answering "none" on the bankruptcy proceeding forms when required to disclose such claims. These two legal positions are completely inconsistent.

[HN4] There is a presumption of bad faith when the party does not disclose in a bankruptcy proceeding a potential claim of which the party had knowledge. *See Oneida Motor Freight, Inc.*, 848 F.2d at 416-18. Yetter did not disclose in the bankruptcy the potential claims of which he had knowledge. [HN5] Actual [**5] reaping of a benefit by the taking of two inconsistent [*332] legal positions is not a requisite to finding bad faith. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 320. Further, a party seeking the protection of bankruptcy has a motive for not disclosing assets as the non-disclosure would shield those funds from creditors. *See Hardee-Guerra v. Shire Pharmaceuticals*, 737 F. Supp.2d 318, 329 (E.D. Pa. 2010). Plaintiff cites reliance upon his legal counsel's advice against disclosing the potential claim to overcome this bad faith presumption. (D.I. 40).[1] This excuse has been found to be insufficient. *See Meisinger v. Prudential Ins. Companies of America*, 2011 U.S. Dist. LEXIS 55319, 2011 WL 2036508, *3 (D.N.J. 2011); *Hardee-Guerra*, 737 F. Supp.2d at 330.

1    Plaintiff submitted an Affidavit. (D.I. 40, Ex. 1). Plaintiff submitted nothing from the attorney Yetter alleges provided the advice.

[HN6] Judicial estoppel should be applied only to "avoid a miscarriage of justice." *Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 319. Yetter's creditors were harmed by his failure to disclose the potential for this complaint. [HN7] In bankruptcy proceedings the integrity of the disclosure requirements are crucial to the system [**6] as creditors must rely upon the debtor's asserted assets in determining whether to settle the debt for a lesser amount than owed. *See Oneida Motor Freight, Inc.*, 848 F.2d at 417. This harm is not one that can be cured by a lesser sanction than judicial estoppel. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 325.

Plaintiff's subsequent notice to the Trustee has resulted in the bankruptcy being reopened. (D.I. 54, ¶ 7). The Trustee has also filed a motion to intervene pursuant to Federal Rule of Civil Procedure 24(a) so that the debtors can share in any damages awarded upon these claims. (D.I. 54). Plaintiff's proposal is that any recoveries go to the bankruptcy creditors, up to the value of the claims, with the balance going to Yetter. This is not a

sufficient remedy as it does not address the harm to the integrity of the system.

> The Bankruptcy rules were clearly not intended to encourage this kind of inadequate and misleading disclosure by creating an escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of candor is discovered.

*Krystal Cadillac-Oldsmobile*, 337 F.3d at 321. Judicial estoppel is warranted in the present case as the non-disclosure [**7] of the potential claims has been detrimental to Yetter's creditors and to the integrity of the bankruptcy process. No appropriate lesser sanction against Yetter has been suggested, and the court has not thought of one.

For the above stated reasons, the Defendant's motion for judgment on the pleadings will be granted.

Also before the court is the Chapter 7 Trustee's motion to intervene as the proper plaintiff pursuant to Federal Rule of Civil Procedure 24(a). Pursuant to Fed. R. Civ. P. 24 (a):

> [HN8] (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Pursuant to 11 U.S.C. § 323, the Chapter 7 Bankruptcy Trustee of Yetter's estate has an interest in the claim to the extent of [*333] recovering the value of what is owed the creditors. The motion to intervene will be granted.

**ORDER**

Upon consideration of the Defendants' motion for judgment on the pleadings (D.I. 36) and related briefing, it is hereby

ORDERED, that the Motion is **GRANTED**.

Upon consideration of Jeoffrey L. Burtch's motion to intervene (D.I. 54) and related briefing, it is hereby

929 F. Supp. 2d 329, *; 2013 U.S. Dist. LEXIS 35255, **

ORDERED, that the Motion is **GRANTED**.

The Trustee and the Defendants should confer and advise the court of their proposal as to how to proceed.

Dated March 14, 2013.

/s/ Richard G Andrews

United States District Judge

2007 CarswellOnt 5796

Ontario Superior Court of Justice

York Bremner Developments Ltd. v. FHR Properties Inc.

2007 CarswellOnt 5796, [2007] O.J. No. 3484, 160 A.C.W.S. (3d) 81, 61 R.P.R. (4th) 268

# York Bremner Developments Limited (Applicant) and FHR Properties Inc. (Respondent)

Allen J.

Heard: August 30, 2007
Judgment: September 14, 2007
Docket: 07-CV-333259PD3

Counsel: John A.M. Judge for Applicant
Awanish Sinha for Respondent

Subject: Property; Corporate and Commercial; Civil Practice and Procedure; Contracts

**Table of Authorities**

**Cases considered by *Allen J.*:**

*Bank of Credit & Commerce International SA (In Liquidation) v. Ali (No.1)* (2001), [2001] 1 All E.R. 961, [2001] 2 W.L.R. 735, [2002] 1 A.C. 251 (Eng. H.L.) — referred to

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Canadian Indemnity Co. v. Parsons* (1982), 62 N.S.R. (2d) 377, 136 A.P.R. 377, 21 B.L.R. 86, 142 D.L.R. (3d) 765, [1983] I.L.R. 1-1620, 1982 CarswellNS 29 (N.S. C.A.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(*sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Gilchrist v. Western Star Trucks Inc.* (2000), 2000 BCCA 70, 2000 CarswellBC 176, 24 C.C.P.B. 62, 2000 C.L.L.C. 210-030, 73 B.C.L.R. (3d) 102, 133 B.C.A.C. 144, 217 W.A.C. 144 (B.C. C.A.) — referred to

*Lampson v. Quebec (City)* (1920), 28 R.L. 6, [1921] 1 A.C. 294, 54 D.L.R. 344 (Quebec P.C.) — followed

*Prenor Trust Co. of Canada v. Kerkhoff Properties Inc.* (1994), 1994 CarswellAlta 149, 21 Alta. L.R. (3d) 122, 39 R.P.R. (2d) 191, [1994] 9 W.W.R. 170 (Alta. Q.B.) — followed

2007 CarswellOnt 5796, [2007] O.J. No. 3484, 160 A.C.W.S. (3d) 81, 61 R.P.R. (4th) 268

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

R. 14.05(3)(d) — pursuant to

R. 14.05(3)(h) — pursuant to

APPLICATION by purchaser for determination of rights of parties under charge.

*Allen J.*:

1      The Applicant brings this application under Rules 14.05(3)(d) and 14.05(3)(h) of the *Rules of Civil Procedure* for a determination of the rights of the parties under a charge (hereinafter "the Charge"). The Charge was registered on title to the Block 5 Railway Lands East in the City of Toronto on July 18, 2006.

2      The material facts in this matter are not in dispute. The Applicant has asked the Court to interpret the meaning of certain paragraphs of the Schedule to the Charge as it affects its rights.

3      The Applicant entered into an agreement with the Respondent to purchase land for development purposes. The agreement underwent a number of amendments some of which provided for various discounts and reductions. The Charge was given to the Applicant by the Respondent by means of a vendor take back mortgage (hereinafter the "VTBM").

4      A discount in price was provided to account for the cost to the Applicant of remedying a problem on Block 5 in connection with pipes and equipment that had been installed by the City that blocked access to a service tunnel.

5      The transfer of Block 5 to the Applicant was completed on July 18, 2006. The term of the agreement was two years.

6      The dispute in this matter revolves around an interpretation of rights and obligations that arise under Paragraphs 2 and 3 of the Schedule to Charge. Paragraph 2 states:

> Provided that this Charge will mature and be repaid in full at the expiry of the Vendor Take Back Mortgage from the Closing Date, interest on the principal amount owing is payable and due under the Charge, semi-annually at the rate of 2% per annum. **On the date the Charge is due and payable, the principal amount thereunder shall be reduced by the amount of One Million Five Hundred Thousand dollars ($1,500,000.00) (the "Reduction Amount"). There will be no interest computed under this Charge. Notwithstanding the foregoing, the amount owing under the Charge will become due and payable five (5) days after the Chargor obtains a shoring and excavation permit for the lands.** [Emphasis added.]

Paragraph 3 of the Schedule to Charge provides:

> The Charge shall be open to repayment. Such repayment may only be made in full and on the fifteenth day of January and the fifteenth day of July of each year of the Term. **In the event the Purchaser makes a prepayment in accordance this Section 3, the principal amount will be reduced by an amount equal to interest calculated on such principal amount for the period of the Term otherwise remaining**, which interest will be calculated at the prime rate posted by Canadian Imperial Bank of Commerce on the date of such prepayment less 2% calculated on the same basis as the interest payable on the Charge. [Emphasis added.]

7      In accordance with Paragraph 2, the Applicant applied in September 2006 to the City for a building permit for shoring and excavation (hereinafter the "Permit") in connection with the work required to remedy a blocked access to a service tunnel. Under Paragraph 2, the Charge was to become due and payable five days after the Applicant obtained the Permit and the Applicant would be entitled to a $15,000,000 discount on the principal. The Applicant anticipated it would obtain the Permit in up to six

months. The idea behind the arrangement was, once the Applicant obtained the Permit and was prepared to begin construction, it was anticipated financing would be available to the Applicant which would make the need for the VTBM unnecessary.

8      Under Paragraph 3, if prepayment were made before the July 17, 2008 maturity date, the Applicant would be allowed a reduction in the principal amount equal to the amount of interest on the principal for the balance of the two-year term.

9      The Applicant advised the Respondent in early December 2006 it intended to put the financing together to exercise the prepayment option. The Applicant in fact was able to arrange the financing and be in a position on January 15, 2007 to exercise the prepayment option. The Applicant prepared a discharge statement for the VTBM which provided, taking into account the two deductions under Paragraph 3, that the interest deduction on the prepayment was $1,164,916. There is no dispute about that amount. On January 15, 2007, the Applicant tendered a cheque in the amount of $18,019,412.68, the balance owing, taking into account the prepayment deductions.

10      On January 17, 2007, the Respondent acknowledged receipt of the payment and requested confirmation the Permit had not yet been issued.

11      As it turned out, unknown to the Applicant at the time it exercised its prepayment option, the City had issued the Permit on January 10, 2007. Since the Permit was issued on January 10, Paragraph 2 contemplates the Charge would become due five days later, on January 15. The result was the prepayment right and discount provided under Paragraph 3, and the maturity date under Paragraph 2, coincidently occurred on the same day, January 15, 2007.

12      The Respondent returned the cheques, taking the position the VTBM became due and payable under paragraph 2 on January 15, 2007 and it was not required to allow the Applicant the prepayment option and reduction under Paragraph 3. The Respondent therefore refused to provide the mortgage discharge on Block 5 unless the Applicant made a payment of $1,163,916, the amount of the interest deduction on the prepayment under Paragraph 3.

13      The Applicant received the benefit of the $1,500,000 reduction provided for in Paragraph 2. That payment is not in dispute. What is in dispute is whether the Applicant is entitled to the $1,163,916 interest reduction under Paragraph 3.

**The Parties' Arguments**

*The Applicant*

14      The Applicant argues it is entitled to the benefit of the prepayment option under Paragraph 3. It submits the most reasonable interpretation of the maturity provision in Paragraph 2 is that the parties intended, when negotiating the terms of the agreement, that the Charge would become due five *business* days after the Applicant obtained the Permit. The maturity date under Paragraph 2 would therefore be January 17 with the result that the January 15 prepayment option would have been exercised before the amount owing under the Charge was payable.

15      The goal in interpreting a contract is to arrive at an understanding of the objective intentions of the parties at the time the contract was made. [*Bank of Credit & Commerce International SA (In Liquidation) v. Ali (No.1)* (2001), [2002] 1 A.C. 251 (Eng. H.L.)]. To achieve that goal, the courts have interpreted the various parts of an agreement in the context of the intentions of the parties as evident from the contract as a whole. The Applicant argues the language of the Charge should be read in the context of the surrounding circumstances at the time the agreement was entered into. [*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.); *Gilchrist v. Western Star Trucks Inc.* (2000), 24 C.C.P.B. 62 (B.C. C.A.)].

16      The Charge was entered into in a commercial context. The Applicant cites *Consolidated Bathurst*, *supra*, for the proposition that Paragraphs 2 and 3 must be construed such that the interpretation of their words takes into account the commercial atmosphere and the objectives of the parties. The Applicant says the interpretation of the term "day" to mean "business day" is reasonable in the context of a mortgage agreement where millions of dollars can become due within days after the occurrence of an event. In the Applicant's estimation, that reality reasonably contemplates having five business days to arrange financing.

17    The Applicant advanced an alternative argument as to how the coincidence in the dates might be resolved. It argues the rights under Paragraph 3 have priority over those in Paragraph 2.

18    The Applicant argues Paragraph 3 is a specific and certain term in the Charge, whereas Paragraph 2 is a general term. According to that position, Paragraph 2 is based on a formula and uncertain external events and Paragraph 3 provides for a right to make payment on specified terms. That is, to exercise the prepayment option, the party must make full payment and on either January 15 or July 15 within the two-year term. It is the Applicant's position that Paragraph 2, involving unknown and uncontrollable events, cannot have priority over the specific and explicit terms agreed on in Paragraph 3. Where a specific and certain term appears to conflict with a more general term, the court should give effect to the specific term and narrow the scope of the general term to arrive at reconciliation in order to give effect to the parties' intentions. [*BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.)].

19    The Applicant submits there is no ambiguity in the actual language in the two Paragraphs. The Paragraphs anticipate the occurrence of different events — that the Charge becomes due and payable five days after the Applicant obtains the Permit, and the Applicant has an option to prepay before the expiry of the two-year term and receive a reduction in the principal. The parties at the time of drafting contemplated both of those possible events.

20    The parties expressly agreed to the specific terms of the prepayment option, and it was exercised by the Applicant in accordance with those terms on January 15. The Applicant argues since the prepayment option is only unavailable if the Charge becomes due before the date of the prepayment right, it would result in an absurdity to extinguish the prepayment right in circumstances where the maturity date under Paragraph 2 and the prepayment date under Paragraph 3 coincide. It is only in the circumstances of that type of conflict, argues the Applicant, where to avoid an absurd result, the terms of Paragraph 2 would usurp the terms of Paragraph 3.

### The Respondent

21    The Respondent argues it should not be prejudiced and expected to waive its contractual rights under the Charge as a result of an unfortunate coincidence of dates.

22    The fact that the Charge became due and payable under Paragraph 2 on the same day of the prepayment option under Paragraph 3, the Respondent says, is irrelevant to the interpretation of the Paragraphs. The Respondent argues the clear and simple rules of contractual interpretation should be applied. On the plain reading of Paragraph 2, the VTBM became due and payable on January 15, 2007. In those circumstances, the prepayment option under Paragraph 3 cannot be exercised.

23    The words of a contract must be given their plain, literal and ordinary meaning unless to do otherwise would result in an absurdity. While the surrounding commercial context to an agreement can be admitted, the Respondent submits, this should only be done to show the purpose of the impugned words, not to vary their meaning. [G.H.L. Fridman, *The Law of Contracts*, 5th ed. (Toronto, Carswell, 2006) at 441-442; *Canadian Indemnity Co. v. Parsons* (1982), 62 N.S.R. (2d) 377 (N.S. C.A.).

24    Regarding the use of the words "five days" in Paragraph 2, the Respondent argues the parties intended that the Charge become due and payable five "calendar days" after the Applicant obtained the Permit. The absence of the word "business" is a clear indication the parties did not contemplate the Applicant being allowed five business days after the issuance of the Permit to arrange financing. The Respondent submits the Applicant and Respondent are sophisticated business entities who negotiated the terms of the Charge through a number of amendments over a period of time and had an opportunity to make the time period "five business days" if that is what they wanted.

25    The Respondent agrees with the applicability of the principle that commercial documents ought to be interpreted such that the meaning attributed to the documents avoids an absurd outcome and makes sense in a business context. The Respondent argues no commercial absurdity results from the extinguishment of the prepayment option. It points out that the Applicant has advanced no evidence the parties intended the prepayment option to "trump" the full payment provision triggered by the issuance of the Permit.

26    The Respondent's position is that although the Court need not go outside the agreement to arrive at the intention of parties, a look at subsequent conduct reveals the parties intended the scenario contemplated by Paragraph 2 because the Applicant in fact obtained alternative financing and applied for the Permit.

27    The meaning of the word "prepayment", the Respondent submits, is unambiguous. The gist of the meanings from the authorities cited is that the payment must be made *before* or *in advance* of its due date or the date of maturity. From this, the Respondent argues, the meaning of "prepayment" is unassailable and logically the payment under Paragraph 3 could not be made *after* the loan became due and payable.

28    The Respondent looks at the two possible scenarios that could result under the two Paragraphs: (1) that the Applicant obtain a shoring and excavation permit that causes the mortgage to mature before the pre-payment option can be exercised and (2) that the Applicant exercise the prepayment option before the maturity of the Charge. By extension, the Respondent points out that exercising the prepayment option "implicitly requires" that the maturity payment under Paragraph 2 has not been triggered, in view of the ordinary meaning of "prepayment" and the subordinate nature of the prepayment privilege.

29    The Respondent says logic and equity dictate that the prepayment option be extinguished and that the tie in dates be decided by the Court in favour of the Respondent. The Applicant took a risk the Permit would not be issued before its first opportunity to exercise the prepayment option. That risk should not be allocated to the Respondent because obtaining the Permit, the event that triggers the payment in Paragraph 2, was entirely in the Applicant's hands. The fact the Applicant miscalculated when the Permit would issue should not result in prejudice to the Respondent. The Applicant argues fairness requires it should not have to bear the financial consequences of circumstances not unfolding as the Applicant anticipated.

**Analysis**

30    I considered the parties' submissions and reviewed the case authorities and materials filed and I accept the Respondent's position for the following reasons.

31    I find the language in Paragraphs 2 and 3 of the Charge are clear and unambiguous. There is therefore no need to insert the word "business" before the word "day" in Paragraph 2. The Courts have consistently held the intent of the parties is arrived at through the actual words used by the parties in the contract unless there is ambiguity. In *Lampson v. Quebec (City)* (1920), 54 D.L.R. 344 (Quebec P.C.) at p. 350, Lord Atkinson, speaking for the English Privy Council, held at p. 350 (as cited in *Eli Lilly & Co. v. Novopharm Ltd.* (1998), 161 D.L.R. (4th) 1 (S.C.C.) at para 55):

> ... the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself... [i]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of Justice and say: Our intention was wholly different from that which the language of our deed expresses...

32    The principle stated in *Lampson*, *supra*, is applicable here. The words in Paragraph 2 are clear and unambiguous, and the Court need not add language or look to extraneous evidence to clarify the intentions of the Applicant and Respondent. I disagree with the Applicant that the Court should look at the circumstances at the time of signing, the subsequent conduct of the parties and the whole context of the contract to arrive at the parties' objective intentions.

33    *Consolidated Bathurst*, *supra*, and subsequent decisions, have held the commercial context underlying an agreement can be of assistance in arriving at the intentions of the parties. However, I find, as other courts have held, the commercial context can be referred to not to vary the meaning of a contract but to assist with understanding the purpose for an impugned provision. [*Prenor Trust Co. of Canada v. Kerkhoff Properties Inc.* (1994), 21 Alta. L.R. (3d) 122 (Alta. Q.B.) at para. 15.].

34    It is not the role of the court to change the plain and ordinary words in an agreement to bring about a fair result. In *Prenor*, *supra*, Fruman J., looking at the interpretation of mortgage agreements, held at para 17:

2007 CarswellOnt 5796, [2007] O.J. No. 3484, 160 A.C.W.S. (3d) 81, 61 R.P.R. (4th) 268

I do not want to lose sight of the fact that it is the Court's obligation to interpret a contract according to the words used. It is not the Court's duty to remake a contract or to give it a fair result. Evidence cannot be used to vary the words of a written contract and evidence of intention is inadmissible. However the Court has to construe a contract in an intelligent manner. Evidence of commercial context can be used to interpret the words used in a consistent and intelligent manner, to show the parties intention in light of the circumstances in which the words were used.

35    I accept the Respondent's argument that the Applicant is an experienced and sophisticated commercial enterprise capable, with the direction of its solicitors, of ensuring its interests are reflected in a negotiated agreement. I agree that under circumstances where the agreement underwent numerous amendments, the Applicant had ample opportunity to negotiate that the word "business" be added to Paragraph 2. The Applicant sees an unfair result if the word "business" is not added. While I understand that view, I do not find the absence of the word results in an absurdity or ambiguity. In the normal course of business dealings, it is not unusual for commercial agreements to contain provisions for either "calendar days" or "business days", or both, to set timelines to trigger future events. In fact, both types of provisions are used in the agreement between the Applicant and Respondent.

36    Under the circumstances, I find the clear language in Paragraph 2 establishes the parties' intention that the maturity payment in Paragraph 2 be triggered on January 15, 2007, five calendar days after the Applicant obtained the Permit.

37    Given that finding, the Court is required to determine whether the terms of Paragraphs 2 or Paragraph 3 should take priority.

38    I do not accept the Applicant's approach that the coincidence in dates should be settled by giving priority to the prepayment provision, nor the Applicant's conclusion that an absurdity would otherwise result. I find in looking at the coincidence in dates, a more straightforward approach is reasonable in these circumstances. I agree with the Respondent that to resolve the "tie", it is reasonable to look at the unambiguous meaning of the word "prepayment". As the Respondent put it simply, that type of payment by its nature must be made before a maturity payment is due and payable. That did not occur in this case.

39    It is an unfortunate coincidence that the maturity payment and the prepayment, by an unexpected turn of events, fell on the same date. While the result is unfortunate for the Applicant, I find, as the court did in *Prenor*, *supra*, that considerations of fairness should have no bearing on the interpretation given to the provisions of the Charge.

40    I also find the equities of the situation fall on the side of the Respondent. The Respondent had absolutely no control over the application for the Permit, the event that triggered the maturity payment. That was totally in the Applicant's hands. It is not clear to me that the risk taken by the Applicant was reasonable. Considering the time sensitivities around the issuance of the Permit and the maturity payment, the restriction on possible prepayment dates, and the time-dependent financial benefit that could accrue to the Applicant, it might not have been unreasonable for the Applicant to have done periodic checks on the status of the Permit since the six month wait time for the Permit was speculative.

41    I agree with the Respondent it should not have to bear the financial repercussions of the Applicant's mistaken estimation of when the Permit would be issued.

42    In all the circumstances, I find the maturity payment under Paragraph 2 of the Charge under the VTBM takes priority over and extinguishes the prepayment option under Paragraph 3 of the Charge. The Applicant is therefore not entitled to the $1,163,916 interest reduction under Paragraph 3.

## Order

43    THIS COURT DECLARES the Applicant York Bremner Development Limited is not entitled to exercise the prepayment option under Paragraph 3 of the Charge registered on title on July 18, 2006 as Instrument No. AT1200171 to the property (the "Charge") known as 15 York Street, being Block 5 Railway Lands East in the City of Toronto.

44    THIS COURT ORDERS the Application dismissed.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2007 CarswellOnt 5796, [2007] O.J. No. 3484, 160 A.C.W.S. (3d) 81, 61 R.P.R. (4th) 268

**Costs**

45    If the parties cannot agree on costs, they shall provide their Cost Outlines and brief written submissions on the costs of this Application within 30 days of the date of this Order.

*Order accordingly.*

End of Document              Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



**Young & Rubicam L.P. et al., Respondents, v. Gramercy Court Associates et al., Appellants.**

**47684**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT**

*190 A.D.2d 518*; *593 N.Y.S.2d 20*; *1993 N.Y. App. Div. LEXIS 881*

**February 2, 1993, Decided**
**February 2, 1993, Entered**

**JUDGES:** [***1] Concur--Sullivan, J. P., Wallach, Ross and Asch, JJ.

**OPINION**

[*518] [**21] Order and judgment (one paper), Supreme Court, New York County (Myriam J. Altman, J.), entered June 12, 1992, granting plaintiffs' motion for summary judgment and awarding them damages of $ 823,780.99, inclusive of interest and costs and disbursements, unanimously reversed, on the law, and the motion denied, without costs or disbursements.

The landlord (defendants) rebuilt and renovated an office building, which was to be entirely occupied by the tenant (plaintiffs). In accordance with the lease, the tenant was to be responsible for construction costs over $ 8,450,000 in the work required for its space (tenant work) while the landlord would be responsible for the costs of the work on the structural parts of the building unrelated to tenant space requirements (core

[*519] work). Both core and tenant work were to be performed by the same contractors and costs were to be allocated between core and tenant work by the construction manager, a third party. It subsequently became difficult to separate core from tenant work and the parties disagreed as to which costs should be allocated to the landlord [***2] and which to the tenant. Eventually, the dispute affected payment to the contractors, which brought mechanic's lien actions against both the landlord and the tenant. One such lienor was East End Wrecking Corp., which sought $ 721,488.63 for core and $ 593,003.80 for tenant work, asserting a total lien of $ 1,314,492.43. The tenant asserted that its share of East End's claim was no more than $ 72,000.

During the pendency of the lien foreclosure proceeding, the landlord and tenant agreed to a close-out agreement, dated November 12, 1987, which provided, *inter alia,* that the tenant had paid $ 530,596.82 * for tenant work, representing East End's claim of tenant work over the $ 8,450,000 threshold. As between the landlord and tenant, the agreement provided for two ways in which to resolve East End's claim, either by a final non-appealable judgment or negotiated settlement agreed to by the landlord and East End with the tenant's consent, which would not be unreasonably withheld. After the

total amount of East End's claim was fixed, the landlord and tenant were, "promptly" thereafter, to determine between themselves the aliquot share of the amount paid East End payable by the [***3] tenant for tenant work. If they could not agree within 30 days, the issue was to be arbitrated or litigated. If allocation resulted in a determination that the tenant work was less than $ 520,990, the landlord would refund the difference to the tenant. Any refund was to be guaranteed by a bond obtained by the landlord. If it was determined that the tenant's share was more than the reserve, the tenant had no further responsibility.

* Although the amount specified in agreement is $ 530,596.82, the actual amount was apparently $ 520,990.

The landlord contends that after execution of the close-out agreement it repeatedly sought the tenant's approval to negotiate a settlement with East End. Insisting that East End's claim was inflated and that in no event was its claim for tenant work worth more than $ 72,000, the tenant refused to authorize any settlement, even a settlement for core work, unless it were first determined that the tenant's share for tenant work would not exceed $ 72,000. After the lien [***4] foreclosure

190 A.D.2d 518, *520; 593 N.Y.S.2d 20, **21;
1993 N.Y. App. Div. LEXIS 881, ***4

[*520] action had been discontinued by stipulation against the tenant and on the eve of trial, the landlord, faced with the possibility that it might be liable for East End's full claim of $ 1,314,492.43 with interest unless it acceded to the tenant's demand that its share of any settlement be limited to $ 72,000 and that the tenant would not be liable for more than the $ 520,990 reserved, settled, without obtaining the tenant's approval, East End's claim for both core and tenant work for $ 700,000, allocating $ 50,000 to core and $ 650,000 to tenant work. The landlord contends that the settlement was prudent, conceding, [**22] as it must, that the allocation was not binding on the tenant.

The tenant thereafter commenced this action, alleging breach of contract and seeking refund of the $ 520,990. After joinder of issue, the tenant was awarded summary judgment, the IAS Court finding that the landlord had breached the close-out agreement by failing to obtain the tenant's consent before settling the East End claim and ordering the landlord to return the entire $ 520,990. The court also found, as a matter of law, that it was sheer speculation to argue, as the [***5] landlord does, that the tenant would not have given its consent to the settlement, had it been sought. We reverse.

The close-out agreement clearly provided that any determination as to each party's allocable share of the amount due East End gas to be postponed until after such amount was judicially determined or fixed by settlement. The tenant did not have the right, as allegedly it asserted it had, to withhold approval of any settlement that would obligate it to pay more than $ 72,000; the close-out agreement implicitly imposed upon the parties the obligation to negotiate in good faith. *(See, Smith v United Traction & Elec. Co., 49 App Div 641, affd 168 NY 597; A/S Apothekernes Laboratorium v I.M.C. Chem. Group, 873 F2d 155, 158.)* Notably, the tenant has not responded to the landlord's factual assertions in this regard. Inasmuch as the landlord was faced with exposure to East End's entire claim of $ 1,314,492.43 plus interest, the tenant's approval to any settlement could not unreasonably be withheld. Since the tenant had allegedly asserted a veto power over any settlement negotiations except on its terms, namely, a $ 72,000 cap on its allocable share of any settlement, [***6] a question of fact is presented as to whether the tenant acted in bad faith, thereby breaching the contract and waiving its right to require the landlord to seek the tenant's consent. *(See, Marquette Co. v Norcem, Inc., 114 AD2d 738, 739.)*

Since there are unresolved issues of fact, the motion for

190 A.D.2d 518, *521; 593 N.Y.S.2d 20, **22;
1993 N.Y. App. Div. LEXIS 881, ***6

[*521]  summary judgment should have been denied.

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

2003 ABQB 319
Alberta Master

Zaccardelli v. Kraus

2003 CarswellAlta 490, 2003 ABQB 319, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

# LUIGI ZACCARDELLI AND 472468 ALBERTA LTD. (Plaintiffs) and MICHAEL KRAUS, NINEM INVESTMENTS LTD. AND ORION PLASTICS INC., FORMERLY RPC MANUFACTURING INC. (Defendants)

Master Funduk

Heard: March 20, 2003
Judgment: April 8, 2003
Docket: Edmonton 0103-06310

Counsel: Ms. L.H. Bruyer for Plaintiffs
H.E. Ebern for Defendant, Ninem Investments Ltd.

Subject: Contracts; Corporate and Commercial; Civil Practice and Procedure

**Headnote**

**Contracts --- Rectification or reformation — Evidence — Parol evidence**

Defendant purchased plaintiffs' shares in corporation and shareholder loans owing by corporation — Corporation owed additional amounts to personal plaintiff — Plaintiffs brought action for amounts owing under contract — Defendant applied for summary judgment dismissing action — Application granted — Defendant fully performed obligations under contract — Evidence of plaintiff's understanding of contract was inadmissible to prove what contract meant — Entire agreement clause in contract excluded any collateral contract — Contract expressly defined shareholders' loans — Defendant did not assume liability under contract for any other debts of corporation — It was irrelevant that defendant was sole shareholder of corporation.

**Table of Authorities**

**Cases considered by *Master Funduk*:**

*Anderson v. Chaba* (1977), [1978] 1 W.W.R. 631, 81 D.L.R. (3d) 449, 7 A.R. 469, 1977 CarswellAlta 271 (Alta. C.A.) — referred to

*Bank of British Columbia v. Turbo Resources Ltd.*, 27 Alta. L.R. (2d) 17, 46 A.R. 22, 23 B.L.R. 152, 148 D.L.R. (3d) 598, 1983 CarswellAlta 112 (Alta. C.A.) — referred to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Bower v. J.M. Schneider Inc.*, 9 B.C.L.R. (2d) 145, 34 D.L.R. (4th) 77, 16 C.C.E.L. 129, 1986 CarswellBC 397 (B.C. C.A.) — referred to

*Can-Dive Services Ltd. v. Pacific Coast Energy Corp.*, 2000 BCCA 105, 2000 CarswellBC 262, 74 B.C.L.R. (3d) 30, 1 C.L.R. (3d) 169, [2000] 5 W.W.R. 683, 134 B.C.A.C. 19, 219 W.A.C. 19 (B.C. C.A.) — considered

*Canadiana Gifts Ltd. v. Friedman*, 15 Alta. L.R. (2d) 237, 32 A.R. 354, 1981 CarswellAlta 25 (Alta. Q.B.) — referred to

*Collingwood Investments Ltd. v. Bank of America Canada Mortgage Corp.*, *(sub nom. Bank of America Can. Mortgage Corp. v. Collingwood Investments Ltd.)* 50 D.L.R. (4th) 17, [1988] 3 W.W.R. 673, 48 R.P.R. 180, 58 Alta. L.R. (2d) 1, *(sub nom. Bank of America Can. Mortgage Corp. v. Collingwood Investments Ltd.)* 85 A.R. 241, 1988 CarswellAlta 33 (Alta. C.A.) — followed

*Gainers Inc. v. Pocklington Holdings Inc.*, 2000 CarswellAlta 508, 255 A.R. 373, 220 W.A.C. 373, 81 Alta. L.R. (3d) 17, 2000 ABCA 151 (Alta. C.A.) — referred to

*Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673, 1969 CarswellSask 9 (S.C.C.) — referred to

*"M. F. Whalen" (The) v. Point Anne Quarries Ltd.*, 63 S.C.R. 109, 63 D.L.R. 545, 1921 CarswellNat 38 (S.C.C.) — considered

*Marwood Cedar Homes Ltd. v. Hanson Food Processing Ltd.*, 86 A.R. 207, 1988 CarswellAlta 401 (Alta. Master) — referred to

*National Trust Co. v. Mead*, 12 R.P.R. (2d) 165, [1990] 2 S.C.R. 410, 71 D.L.R. (4th) 488, 112 N.R. 1, [1990] 5 W.W.R. 459, 87 Sask. R. 161, 1990 CarswellSask 165, 1990 CarswellSask 412 (S.C.C.) — referred to

*Royal Bank v. Lane*, 81 Alta. L.R. (2d) 289, [1991] 6 W.W.R. 344, 2 B.L.R. (2d) 109, 10 C.B.R. (3d) 307, *(sub nom. ABC Color & Sound Ltd. v. Royal Bank)* 117 A.R. 271, *(sub nom. ABC Color & Sound Ltd. v. Royal Bank)* 2 W.A.C. 271, 1991 CarswellAlta 299 (Alta. C.A.) — referred to

*Sullivan v. Newsome*, 52 Alta. L.R. (2d) 304, 78 A.R. 297, 38 D.L.R. (4th) 1, 1987 CarswellAlta 116 (Alta. C.A.) — referred to

*W.C. Fast Enterprises Ltd. v. All-Power Sports (1973) Ltd.*, 40 C.B.R. (N.S.) 182, 16 Alta. L.R. (2d) 47, 126 D.L.R. (3d) 27, 29 A.R. 483, 1981 CarswellAlta 198 (Alta. C.A.) — referred to

*Woodridge Lincoln Mercury Sales Ltd. v. Paramount Towing Ltd.*, 2000 ABCA 147, 2000 CarswellAlta 502, 82 Alta. L.R. (3d) 47, 261 A.R. 372, 225 W.A.C. 372 (Alta. C.A.) — referred to

*395432 Alberta Ltd. v. Broadcast Hill Holdings Ltd.*, 2003 ABCA 96, 2003 CarswellAlta 417 (Alta. C.A.) — considered

**Statutes considered:**

*Business Corporations Act*, R.S.A. 2000, c. B-9
    s. 46(1) — referred to

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Zaccardelli v. Kraus, 2003 ABQB 319, 2003 CarswellAlta 490

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

**Tariffs considered:**

*Alberta Rules of Court*, Alta. Reg. 390/68
      Sched. C, Tariff of Costs, column 2 — referred to


APPLICATION by defendant for summary judgment dismissing action.


*Master Funduk***:**


1     This is an application by the Defendant Ninem Investments Ltd. for summary judgment.


2     The Plaintiff 472468 was one of 13 shareholders of Orion. The Plaintiff Zaccardelli is not a shareholder of Orion but he is the main shareholder of 472468.


3     The Plaintiffs had made some loans to Orion.


4     On February 1, 2000 Ninem made a written offer to all the shareholders and Zaccardelli to buy all their shares in Orion and shareholders' loans to Orion for $300,000, being $1.00 total for the shares and $299,999 for the shareholders' loans.


5     The offer has four articles relevant to today's application. They are these:


      1.1.43 "PPC Shareholders' Loans mean those loans totalling, in the aggregate Five Hundred Ninety Two Thousand Seven Hundred Twenty Eight ($592,728.00) Dollars as at December 31, 1999, made by the Vendors, and each of them, to the Corporation as more particularly set out on Schedule "B" hereto;

      . . . . .

      1.5 Entire Agreement

      This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representations, or other agreements between the Parties in connection with the subject matter hereof, except as specifically set forth herein. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by all Parties to this Agreement.

      . . . .

      4.1 The Parties acknowledge and agree that, as of the Closing Date, the Corporation is indebted to Zaccardelli and 472468 in the approximate amount of Seventy Five Thousand ($75,000.00) Dollars, such sum representing monies advanced by Zaccardelli and 472468, and each of them, on behalf of the Corporation (the "472468 Advances") and do not form a part of the RPC Shareholders' Loans being purchased hereunder.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

4.2 Zaccardelli and 472468 acknowledge that the 472468 Advances are accounts payable of the Corporation and that they will not require payment for a period of ninety (90) days from the Closing Date.

　. . . . .

7.1 The Vendors, and each of them, hereby individually covenant, represent and warrant, as of the date of execution of this Agreement and as of the Closing Date with and to the Purchaser as follows, and acknowledge that the Purchaser is relying upon such representations and warranties, all of which are material to the Purchaser in connection with its purchase of the RPC Shares and the RPC Shareholders' Loans as outlined in this Agreement.

. . . . .

7.1.9 Following the Closing Date, and upon completion by the Purchaser of its obligations under this Agreement, there will not be any outstanding debts or obligations of RPC to any of the Vendors, except for those owing to the Vendor 472468 and set out in Article 4 hereof and, without restricting the generality of the foregoing, there will not be any outstanding management fees, consulting fees, or other debts or obligations or any other form of compensation owed by RPC to any fo the Vendors.

(emphasis mine)

6　　There is no schedule B to the offer in evidence but that is not today critical.

7　　If the offer was accepted by all the shareholders and Zaccardelli, which it was, the articles become part of the contract.

8　　The Plaintiffs and the vendors had the defendant Kraus, a lawyer, act for them. Ninem had its own lawyer.

9　　A more formal contract was drafted and signed by everyone. The total amount under article 1.1.43 was changed to $606,778.07. There is a schedule B. It says this:

10

| Name of Shareholder | Amount Owing on Loan |
|---|---|
| Gerry Baker | $76,000.00 |
| 472468 Alberta Ltd. (Luigi Zaccardelli | $236,875.00 |
| Lou Zaccardelli | $85,953.07 |
| Stone Manor (Peter Moritz) | $19,200.00 |
| Weatherman Holdings (Peter Gerbeth) | $40,000.00 |
| Peter Gerbeth | $11,000.00 |
| APG Contracting (Al) | $45,000.00 |
| 739349 Alberta Ltd. (Doring) | $47,500.00 |
| PTC Portuscal Trading Corporation | $45,250.00 |
| *TOTAL AMOUNT OWING:* | |

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.　4

11    Article 1.5 remains the same.

12    Article 4.1 was changed. It says:

4.1 The Parties acknowledge and agree that, as of the Closing Date, the Corporation is indebted to Zaccardelli, Christine Zaccardelli and/or 472468, in the approximate amount of Thirty Two Thousand Eight Hundred Sixty Two ($32,682.00) Dollars, such sum representing monies advanced by Zaccardelli, Christine Zaccardelli and 472468, and each of them, to the Corporation during the Interim Period (the "472468 Advances") and do not form a part of the RPC Shareholders' Loans being purchased hereunder. Such 472468 Advances are identified in Schedule "J". Further, the Parties acknowledge and agree that Christine Zaccardelli has a short term Shareholder Loan in the sum of Five Thousand Seven Hundred ($5,700.00) Dollars, which shall be treated as an accounts payable as at December 31, 1999 and repaid in accordance with Article 4.2 herein.

4.2 Zaccardelli and 472468 acknowledge that the 472468 Advances are accounts payable of the Corporation and that they will not require payment for a period of ninety (90) days from the Closing Date.

13    There is a schedule J. I need not set it out.

14    Articles 7.1 and 7.1.9 remain the same.

15    Ninem paid the $300,000 and thought that it had fully performed all its obligations. The Plaintiffs have a different view. In March 2001 they started this lawsuit.

16    The Plaintiffs allegations are this:

9. On or about the 1st day of February 2000, Ninem Investments Ltd. ("Ninem") offered to purchase the shares and shareholders loans of RPC; the first written agreement entitled Offer to Purchase Shares and Loans ("the Original Offer") was forwarded by Counsel for Ninem to Counsel for the Plaintiffs.

10. Under the terms of the Original Offer, Ninem proposed the following:

a) Pursuant to paragraph 2.1 to purchase the RPC shares and shareholder's loans from the vendors, one of whom was the Plaintiff 472468;

b) Pursuant to paragraph 2.2, to pay the sum of Three Hundred Thousand ($300,000.00) Dollars, subject to adjustments provided for in paragraph 3.1, for the purchase of the shares and shareholder's loans in RPC;

c) Pursuant to paragraph 4.1, to pay the approximate sum of Seventy-Five Thousand ($75,000.00) Dollars to the Plaintiff Zaccardelli and the Plaintiff 472468, with said payment not to be considered part of the shareholder loans to be purchased.

11. The Plaintiff Zaccardelli and the Plaintiff 472468 were aware of and agreed to the term in the Original Offer providing for the repayment to them of the Seventy-Five Thousand ($75,000.00) Dollars as outlined in paragraph 10

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

herein.

. . . . .

14. The terms of the Original Offer were subsequently amended; the payment to the Plaintiff Zaccardelli and the Plaintiff 472468 as provided for in paragraph 4.1 of the Original Offer was changed to a payment of Thirty Two Thousand Eight Hundred and Sixty Two ($32,862.00) Dollars payable to the Plaintiff Zaccardelli, the Plaintiff 472868 and Christine Zaccardelli for advances made by them to RPC during the interim period (defined as December 31, 1999 to the closing date of March 1, 2000 or such other date as agreed to between the parties.

15. The amendments to the Original Offer, and specifically paragraph 4.1, were inserted into the final draft of the Offer to Purchase Shares and Loans ("the Final Agreement").

. . . . .

18. The accounts payable were assumed by the Defendant Ninem in its purchase of the RPC shares and shareholder's loans under the terms of the Final Agreement and a schedule of the accounts payable was appended to, and formed a part of, the Final Agreement.

19. The Defendant Kraus specifically advised the Plaintiffs that the monies owing to them, being the total sum fo Seventy Three Thousand One Hundred and Sixty Seven ($73,167.37) Cents being Fifty-Seven Thousand Four Hundred Thirty-Eight dollars and Thirty Seven ($57,438.37) Cents to the Plaintiff Zaccardelli and Fifteen Thousand Seven Hundred and Twenty Nine ($15,729.00) Dollars to the Plaintiff 472468 Alberta Ltd. (collectively "the Debt") was still payable and owing to them by Ninem as an account payable referenced in the schedule appended to, and forming a party of, the Final Agreement.

. . . . .

21. The Debt as outlined in paragraph 19 herein is due and payable by the Defendant Ninem and the Defendant Orion, or either or them.

. . . . .

23. The failure of the Defendant Ninem and the Defendant Orion, or either of them, to pay the Debt has deprived the Plaintiff of money due and owing to them and resulted in the said Defendants being unjustly enriched.

24. In the alternative, the payment of the Debt as outlined in paragraph 19 herein constituted a material term of the Final Agreement; the failure of which to pay by the Defendant Ninem or the Defendant Orion constitutes a breach of contract.

17     The accounts payable referred to in paragraph 18 are the debts owing by Orion.

18     Ninem and Orion delivered a joint defence. Today Ninem's defence is that it performed all its obligations under the contract and so there is no liability by it to the Plaintiffs for any amount.

19     Article 4.1 of the offer speaks of a $75,000 liability. Article 4.1 of the formal contract speaks of a $32,862 liability (I leave aside the reference to the $5,700 liability to Christine Zaccardelli because she is not a co-plaintiff).

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

20      Based simply on the two documents it might be reasonably concluded that the $75,000 liability was found to be just $32,862 and so the amount was changed in the formal contract.

21      But Zaccardelli says that is not so. As I understand his evidence the $75,000 is an earlier liability to the $32,862. He says:

> 3. Under the terms of their original offer, the Defendant Ninem was to pay approximately $75,000.00 to myself and the Plaintiff 472468; the said payment was not to be considered part of the shareholder loans which were being purchased by the Defendant Ninem. A copy of that original offer is attached hereto and marked Exhibit "A" to this my Affidavit.

> 4. At no time was I, in my personal capacity, ever a shareholder of the company RPC.

> 5. On the basis that the payment was referenced in paragraph 3 was to be forwarded, I and the Plaintiff 472468 agreed to the terms of the original offer. I, on behalf of myself and Plaintiff 472468 executed the signatory pages to form a part of the ultimate agreement and also executed releases in favor of the defendant Ninem.

> 6. It came to my attention that the terms of the original offer were in fact amended. I had become concerned that unless interim payments that I and the Plaintiff 472468 were specifically referenced in the agreement they would not be paid. These payments were made by myself and the Plaintiff 472468 from December 31, 1999 to March 1, 2000. The payments owing to myself and the Plaintiff 472468 as referenced in paragraph 3 herein were incurred prior to this interim period. Paragraph 3 was amended between Counsel for the Defendant Ninem and our Counsel, who was acting on behalf of the shareholders and myself with respect to the transaction, to provide for these interim payments. I was advised by my Counsel that he and the Defendant Ninem's Counsel, who prepared the Share Purchase Agreement as is attached as Exhibit "A" to the Affidavit of Wayne Minion, were satisfied that the Defendants were still responsible for the approximate payment of $75,000.00 to myself and the Plaintiff 472468 as an account payable referenced in the schedule appended to the said agreement. My Counsel confirmed that both Counsel felt that myself and the Plaintiff 472468 were adequately protected as a result.

22      Zaccardelli was not cross-examined. There was no need to do so.

23      Ninem's witness was cross-examined. His evidence is straightforward. Essentially it is - look at the contract. He was cross-examined. His evidence still comes down to - look at the contract.

**Issues**

**One**

24      I am prepared to assume, without deciding, that the $75,000 now claimed is separate from the $32,862.

25      [1]

**Two**

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

26    The offer is in writing and it was accepted. The formal contract is in writing.


27    Ms. Bruyer, for the Plaintiff, says that this lawsuit should go to trial so oral evidence is given about Zaccardelli's "understanding", what was said between the two lawyers, and to show that there was a "collateral verbal agreement".


28    I do not agree.


29    What Zaccardelli thinks the documents mean is irrelevant and so not admissible, Côté, An Introduction to the Law of Contract, pp. 147-48:

   What is the proper construction of a contract (as with any other document) is a question of law to be decided by the judge (subject to appeal) and not by the jury. It is therefore not a subject for evidence, but simply one for argument. The only exceptions to this are special customs or trade usages, and latent ambiguity.


30    What Zaccardelli understood or intended is not relevant and so not admissible: *Anderson v. Chaba* (1977), 7 A.R. 469 (Alta. C.A.), para. 23; *W.C. Fast Enterprises Ltd. v. All-Power Sports (1973) Ltd.* (1981), 16 Alta. L.R. (2d) 47 (Alta. C.A.) , p. 51; *Royal Bank v. Lane* (1991), 117 A.R. 271 (Alta. C.A.) paras. 7 and 8.


31    Even if evidence of the commercial setting in which a contract is made is admissible evidence of the parties intention is not admissible: *Bank of British Columbia v. Turbo Resources Ltd.*, (1983) 46 A.R. 22 (C.A.), para. 30-31.


32    Both the offer, which was accepted, and the formal contract have an "entire agreement" clause: article1.5.


33    [31] *Can-Dive Services Ltd. v. Pacific Coast Energy Corp.*, [2000] 5 W.W.R. 683 (B.C. C.A.) is about a contract which had this term:

   No verbal agreement with any agent either before or after the execution of this Subcontract shall affect or modify any of the terms or obligations herein contained and this contract shall be conclusively considered as containing and expressing all of the terms and conditions agreed upon by the parties hereto. ...

After referring to *"M. F. Whalen" (The) v. Point Anne Quarries Ltd.* [1921 CarswellNat 38 (S.C.C.)] the Court says, p. 748:

   Mr. Justice Duff did not find it necessary to say why businessmen would wish to preclude subsequent disputes, presumably because he assumed everyone would know. The obvious reason is to avoid the costs of litigation. I would estimate that this litigation has cost the parties, in all, several millions of dollars. To my mind, there is another reason. When it comes to determining who said what to whom, judges are not infallible and sensible businessmen and their solicitors know this. There is only one human being invested with infallibility and his infallibility is limited to matters of faith. Clauses such as this are, in effect, an agreement by the parties that words not written in their contract are irrelevant to their legal obligations to each other and their agreement that a judge is not to concern himself or herself with their

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

other words in the absence of fraud.

34    See also *Gainers Inc. v. Pocklington Holdings Inc.* (2000), 81 Alta. L.R. (3d) 17 (Alta. C.A.) and *Woodridge Lincoln Mercury Sales Ltd. v. Paramount Towing Ltd.* (2000), 82 Alta. L.R. (3d) 47 (Alta. C.A.) , and *395432 Alberta Ltd. v. Broadcast Hill Holdings Ltd.*, 2003 ABCA 96 (Alta. C.A.), March 26, 2003. In the last case the contract had this provision:

15. This Agreement constitutes the entire Agreement between the parties and there are no statements, representations, warranties, undertakings or agreements, written or oral, expressed or implied, between the parties hereto, except as herein set forth.

35    The Court says this:

The other allegations of misrepresentation, breach of trust or unjust enrichment, to the extent they are intended to give rise to **in rem** remedies, and to the extent allegedly exist independently of Clause 4(a), cannot succeed because of the provisions of Clause 15 of the contract.

36    A term cannot be implied in a contract which has an "entire agreement" clause because an implied term would conflict with that clause. Implied terms cannot conflict with or modify express terms.

37    It is not possible to imply a term which conflicts with express terms: *Marwood Cedar Homes Ltd. v. Hanson Food Processing Ltd.* (1988), 86 A.R. 207 (Alta. Master); *Sullivan v. Newsome* (1987), 78 A.R. 297 (Alta. C.A.); *Canadiana Gifts Ltd. v. Friedman* (1981), 15 Alta. L.R. (2d) 237 (Alta. Q.B.) ; *Bower v. J.M. Schneider Inc.* (1986), 9 B.C.L.R. (2d) 145 (B.C. C.A.) , dissent of Lambert J.A. which I prefer; *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.).

38    The parties have occupied the whole field with the combined "whole agreement" and "no representations" article so nothing can be implied.

39    The same approach governs when a contract has a "no representations" clause, other than what is expressed in the contract itself, which article 1.5 in the two documents does.

40    I do not agree with Ms. Bryyer's submission that this lawsuit should go to trial so oral evidence can be given. None of the possible exceptions to the parol evidence rule apply here.

41    Article 8.2 of each document says that Ninem's "covenants, representations and warranties ... in or pursuant to this Agreement" survive the closing. That encompasses only representations by Ninem found in the documents because the "no representations" article, 1.5, excludes any representations except those found in the documents. In other words, article 8.2 is not a basis for arguing that there were oral representations by Ninem.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Three**

42    I turn now to 472468's claim for $15,729, paragraph 19 of the statement of claim.

43    472468 cannot now say that this amount is still an amount owing to it which Ninem is liable for. The simple answer is found in articles 7.1 and 7.1.9 of both documents. 472468 "covenants, warrants and represents" that there is nothing owing to it, after the closing date and completion by Ninem of its obligations, except what is set out in article 4. 472468's position is contrary to articles 7.1 and 7.1.9 and the "whole agreement" article. There is nothing except what is found in the documents.

**Four**

44    I turn now to Zaccardelli's claim for $57,438, paragraph 19 of statement of claim.

45    There are three legal possibilities for Ninem being liable to the Zaccardelli, for this sum. The first possibility is that it was part of the shareholders loans bought by Ninem. The second possibility is that it was, instead, the subject of a novation. The third possibility is that Ninem became jointly and severally liable with Orion for it.

46    All three possibilities are of course matters of contract, that is, there must be facts to support the existence of a particular contract.

47    As to the first legal possibility, the Plaintiffs say that the sum was not part of the shareholders loans package bought by Ninem for $300,000.

48    Article 1.1.43 in each document defines what Orion's shareholders loans means. The amount is higher in the second document but that does not matter. The second document says this:

1.1.43 "RPC Shareholders' Loan mean those loans totaling, in the aggregate Six Hundred Six Thousand Seven Hundred Seventy Eight Dollars and Seven Cents ($606,778,07) as at December 31, 1999, made by the Vendors, and each of them, to the corporation as more particularly set out on Schedule "B" hereto;

49    Schedule B says this:

50

| NAME OF SHAREHOLDERS | AMOUNT OWING ON LOAN |
| --- | --- |
| Gerry Baker | $76,000.00 |
| 472468 Alberta Ltd. (Luigi Zaccardelli | $236,875.00 |
| Lou Zaccardelli | $85,953.07 |
| Stone Manor (Peter Moritz) | $19,200.00 |
| Weatherman Holdings (Peter Gerbeth) | $40,000.00 |
| Peter Gerbeth | $11,000.00 |

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

| | |
|---|---|
| APG Contracting (Al) | $45,000.00 |
| 739349 Alberta Ltd. (Doring) | $47,500.00 |
| PTC Portuscal Trading Corporation | $45,250.00 |
| **TOTAL AMOUNT OWING:** | **$606,778.07** |

51     Zaccardelli was not a shareholder of Orion.

52     Each document has a definition of "Vendors",article 1.1.48, which includes 472468. The definition does not include Zaccardelli, who has his own useless definition, article 1.1.50. It says that Zaccardelli means Luigi Zaccardelli.

53     Each document has an identical article 2.1 which says:

On the Closing Date and effective as of the Effective Date, the Purchaser agrees to purchase the RPC Shares and the RPC Shareholders' Loans from the Vendors, and each of them, and the Vendors, and each of them agree to sell to the Purchaser the RPC Shares and the RPC Shareholders' Loans, together with all right, title and interest thereto, free and clear of all liens, security interests, charges, encumbrances and any other rights in favour of third parties whatsoever.

54     Given the definitions in the two documents and the terminology in article 2.1 I will assume for the present application that (a) there was a liability by Orion to Zaccardelli for $57,438.37, (b) this amount is "prior to" and separate from the amount in article 4.1 and, (c) this amount was not purchased by Ninem as part of the $300,000 package. I will assume that notwithstanding schedule B includes a liability to Zaccardelli by Orion.

55     But where does that leave Zaccardelli's claim against Ninem?

56     Ms. Bruyer does not point to any term in either document which makes Ninem liable to Zaccardelli for this amount. I do not see any such term.

57     Article 3 of each document says that the $300,000 purchase price will be adjusted <u>down</u> in specified situations, but that article is irrelevant. I refer to this article only because the Plaintiff's refer to it in their pleading, paras. 10(b) and 17. The $300,000 was not adjusted down so the relevance of the reference to article 3 in the Plaintiffs' pleading escapes me.

58     I see nothing in either document where Ninem agrees to buy from Zaccardelli what Orion owes to him.

59     As to the second possibility, novation, it just does not exist. Neither document meets the test for novation discussed in *Collingwood Investments Ltd. v. Bank of America Canada Mortgage Corp.* (1988), 58 Alta. L.R. (2d) 1 (Alta. C.A.) and *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 (S.C.C.). The first requirement of the triparte test in *Collingwood Investments Ltd.* is not even met. There is no assumption of liability by Ninem for whatever might be owing by Orion to

**Zaccardelli v. Kraus, 2003 ABQB 319, 2003 CarswellAlta 490**

2003 ABQB 319, 2003 CarswellAlta 490, [2003] A.J. No. 442, 122 A.C.W.S. (3d) 58

Zaccardelli.

60     The third possibility, that Ninem became jointly and severally liable with Orion to Zaccardelli, also does not exist. Neither document supports such a position.

61     Article 4.1 does not create a liability by Ninem for anything. The article acknowledges a liability <u>by Orion</u>, that the liability is Orion's "accounts payable" and that it has a 90 days period to pay.

**Five**

62     On the cross-examination much was made of the fact that Ninem is the sole shareholder of Orion.

63     That is irrelevant.

64     A corporation is a person in law separate from its shareholders. Case law should not be necessary. The very simple answer today is that shareholder is not liable for the corporation's debts. That is now codified in s. 46(1) Business Corporations Act.

**Decision**

65     The Plaintiffs want the Court to rewrite the contract. That cannot be done.

66     There is no genuine issue for trial as between the Plaintiffs and Ninem. The lawsuit is entirely dismissed against Ninem with costs of the lawsuit to it on column 2.

*Application granted.*

End of Document     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# THE LAW OF EVIDENCE IN CANADA

## THIRD EDITION

### Alan W. Bryant
Justice of the Superior Court of Justice for Ontario

### Sidney N. Lederman
Justice of the Superior Court of Justice for Ontario

### Michelle K. Fuerst
Justice of the Superior Court of Justice for Ontario





**Sopinka, Lederman & Bryant: The Law of Evidence in Canada, Third Edition**

© LexisNexis Canada Inc. 2009

June 2009

All rights reserved. No part of this publication may be reproduced, stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the Copyright Act. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

**Members of the LexisNexis Group worldwide**

| | |
|---|---|
| **Canada** | LexisNexis Canada Inc., 123 Commerce Valley Dr. E., MARKHAM, Ontario |
| **Australia** | Butterworths, a Division of Reed International Books Australia Pty Ltd, CHATSWOOD, New South Wales |
| **Austria** | ARD Betriebsdienst and Verlag Orac, VIENNA |
| **Czech Republic** | Orac sro, PRAGUE |
| **France** | Éditions du Juris-Classeur SA, PARIS |
| **Hong Kong** | Butterworths Asia (Hong Kong), HONG KONG |
| **Hungary** | Hvg Orac, BUDAPEST |
| **India** | Butterworths India, NEW DELHI |
| **Ireland** | Butterworths (Ireland) Ltd, DUBLIN |
| **Italy** | Giuffré, MILAN |
| **Malaysia** | Malayan Law Journal Sdn Bhd, KUALA LUMPUR |
| **New Zealand** | Butterworths of New Zealand, WELLINGTON |
| **Poland** | Wydawnictwa Prawnicze PWN, WARSAW |
| **Singapore** | Butterworths Asia, SINGAPORE |
| **South Africa** | Butterworth Publishers (Pty) Ltd, DURBAN |
| **Switzerland** | Stämpfli Verlag AG, BERNE |
| **United Kingdom** | Butterworths Tolley, a Division of Reed Elsevier (UK), LONDON, WC2A |
| **USA** | LexisNexis, DAYTON, Ohio |

**Library and Archives Canada Cataloguing in Publication**

Bryant, Alan W., 1943-
    Sopinka, Lederman & Bryant : the law of evidence in Canada / Alan W.
Bryant, Sidney N. Lederman, Michelle K. Fuerst. — 3rd ed.

Previous eds. published under title: The law of evidence in Canada / John
    Sopinka, Sidney N. Lederman, Alan W. Bryant.
Includes bibliographical references and index.
ISBN 978-0-433-45678-0 (bound)
ISBN 978-0-433-45724-4 (pbk.)

    1. Evidence (Law)—Canada. I. Lederman, Sidney N., 1943- II. Fuerst, Michelle K. III.
Sopinka, John, 1933-1997. Law of evidence in Canada. IV. Title.
V. Title: Sopinka, Lederman and Bryant.

| | | |
|---|---|---|
| KE8440.B79 2009 | 347.71'06 | C2009-902714-3 |
| KF8935.ZA2B79 2009 | | |

Printed and bound in Canada.

*The Law of Evidence in Canada*

[T]here is a growing consensus that while expert evidence on the ultimate cre-
dibility of a witness is not admissible, expert evidence on human conduct and
the psychological and physical factors which may lead to certain behaviour
relevant to credibility, is admissible, provided the testimony goes beyond the
ordinary experience of the trier of fact.[370]

Opinion evidence is also receivable to explain behaviour that might otherwise
appear to be inconsistent with sexual abuse or inconsistent with the
complainant's testimony of sexual abuse.[371] In both scenarios, the expert
evidence is capable of supporting the credibility of the witness.[372] The expert
witness may not testify, however, that he or she believes the child witness is
telling the truth since such evidence contravenes the rule against oath-helping.[373]
Since this distinction is very fine,[374] it requires the trial judge to instruct the trier
of fact on the limited use of the evidence.

**§12.154** The rationale for the admissibility of this type of evidence is that certain
aspects of human behaviour which are important to the fact-finder's assessment
of credibility may not be understood by the layperson and hence require
elucidation by experts in human behaviour.[375] Even though the opinion deals
with a matter at the core of the dispute between the parties and it is relevant to
the witness' credibility, it is not excluded.[376]

**§12.155** Questions of domestic law as opposed to foreign law are not matters
upon which a court will receive opinion evidence.[377] In *R. v. Century 21 Ramos
Realty Inc.*,[378] the sole principal of a real estate company was charged with
income tax evasion as a result of appropriation of property belonging to the

---

[370] *Ibid.*, at 249 (S.C.R.); *R. v. J. (F.E.)* (1990), 53 C.C.C. (3d) 64, at 70, [1989] O.J. No. 2724
(Ont. C.A.); *R. v. Millar* (1989), 49 C.C.C. (3d) 193, [1989] O.J. No. 829 (Ont. C.A.).

[371] *R. v. Marquard*, [1993] 4 S.C.R. 223, 85 C.C.C. (3d) 193, at 228-29, [1993] S.C.J. No. 119
(S.C.C.); *R. v. C. (R.A.)* (1990), 57 C.C.C. (3d) 522, [1990] B.C.J. No. 1366 (B.C.C.A.); *R. v. R.
(D.)*, [1996] 2 S.C.R. 291, [1996] S.C.J. No. 8 (S.C.C).

[372] *R. v. B. (F.F.)*, [1993] 1 S.C.R. 697, 79 C.C.C. (3d) 112, at 135, [1993] S.C.J. No. 21 (S.C.C.),
where Iacobucci J. held that the evidence "would tend to prove the truthfulness of the witness,
rather than the truth of the witness's statements".

[373] *R. v. D. (D.)*, [2000] 2 S.C.R. 275, [2000] S.C.J. No. 44, at para. 19 (S.C.C.); *R. v. Marquard*,
[1993] 4 S.C.R. 223, [1993] S.C.J. No. 119 (S.C.C.); *R. v. R. (D.)*, [1996] 2 S.C.R. 291, [1996]
S.C.J. No. 8 (S.C.C.); see also *R. v. R. (S.)* (1992), 8 O.R. (3d) 679, [1992] O.J. No. 1126 (Ont.
C.A.) re: anticipatory impeachment.

[374] *R. v. K. (A.)* (1999), 45 O.R. (3d) 641, [1999] O.J. No. 3280, at paras. 95-96 (Ont. C.A.).

[375] *R. v. Marquard*, [1993] 4 S.C.R. 223, 85 C.C.C. (3d) 193, at 229, [1993] S.C.J. No. 119 (S.C.C.).

[376] *R. v. R. (D.)*, [1996] 2 S.C.R. 291, [1996] S.C.J. No. 8 (S.C.C.); *R. v. Burns*, [1994] 1 S.C.R. 656,
89 C.C.C. (3d) 193, at 201, [1994] S.C.J. No. 30 (S.C.C.); *Khan v. College of Physicians and
Surgeons of Ontario* (1992), 9 O.R. (3d) 641, [1992] O.J. No. 1725 (Ont. C.A.).

[377] Kenneth S. Broun (ed.), *McCormick on Evidence*, 6th ed. (St. Paul: Thomson West Publishing,
2006), Vol. 1, at 62-63; 2 Wigmore, *Evidence* (Chadbourn rev., 1979), §§ 564-566, at 776-79.

[378] (1987), 58 O.R. (2d) 737, [1987] O.J. No. 178 (Ont. C.A.), leave to appeal refused (1987), 62
O.R. (2d) ix (S.C.C.).

company. An issue at trial was the taxation year when the appropriation took place. The Crown called an employee of Revenue Canada to give expert evidence as to when the accused had appropriated the property. The Ontario Court of Appeal held that such evidence was inadmissible:

> It was a question of law for the judge as to what constitutes an appropriation. It was for the judge to determine, in compliance with the legal definition, if and when an appropriation took place. This was not something on which an expert witness could give evidence.[379]

**§12.156** The case law illustrates that there are certain subject matters which go to the very heart of judicial decision-making and courts remain wary of expert witnesses providing advice as to how they should decide issues such as whether a witness is telling the truth or the meaning of English words. Perhaps it is just a matter of sensitivity over the way in which the expert gives his or her evidence. For example, a court would be loath to receive explicit evidence from an expert that an accused is guilty or innocent or that a defendant was negligent or not, or that an individual was insane or not. However, it will readily receive evidence which is not so direct but which, if accepted, inescapably leads to that conclusion. For example, it would appear that an expert can testify that the perpetrator of a crime had distinctive mental or physical characteristics and that the accused's mental make-up fell within the distinct group of offenders; or that with respect to a particular activity a certain standard of conduct was required and that anything below it amounted to negligence and that in the expert's opinion the defendant's conduct fell below the standard of care; or that the individual's behaviour exhibited abnormal traits which could lead one to the conclusion that the individual was not mentally balanced; or that a child's behaviour was consistent with being sexually abused.

**§12.157** In the final analysis, the closer the experts' testimony approaches an opinion on the ultimate issue, the stricter the courts will apply the requirements of reliability and necessity before admitting such evidence.[380] This is so because the evidence then begins to overlap not only the fact-finding function of the court but the legal analysis that must be applied to the facts in rendering the ultimate decision.

**§12.158** It is now generally said that if expert testimony is rejected it is excluded not because of any "ultimate issue" doctrine, but because such evidence is superfluous and the court can just as readily draw the necessary inference

---

[379] *Ibid.*, at 752 (O.R.). In *Teskey v. Canadian Newspapers Co.* (1989), 68 O.R. (2d) 737, [1989] O.J. No. 828 (Ont. C.A.), the Ontario Court of Appeal held that an expert's views on the Rules of Professional Conduct would be admissible since they are not rules of law but rather reflect what members of the profession have decided is proper or improper.

[380] *R. v. Mohan*, [1994] 2 S.C.R. 9, 89 C.C.C. (3d) 402, at 415, [1994] S.C.J. No. 36 (S.C.C.).

# PRINCIPLES OF PROPERTY LAW

## FIFTH EDITION

by

### BRUCE ZIFF

Professor of Law

University of Alberta

**CARSWELL®**

©2010 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

ISBN 978-0-7798-2798-5 (bound)
ISBN 978-0-7798-2731-2 (pbk.)

**A cataloging record for this publication is available from Library and Archives Canada**

Composition: Computer Composition of Canada Inc.

Printed in the United States by Thomson Reuters.

 **THOMSON REUTERS**

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

| One Corporate Plaza | Customer Relations |
| --- | --- |
| 2075 Kennedy Road | Toronto 1-416-609-3800 |
| Toronto, Ontario | Elsewhere in Canada/U.S. 1-800-387-5164 |
| M1T 3V4 | Fax: 1-416-298-5082 |
| | www.carswell.com |
| | E-mail www.carswell.com/email |

# 1

# THE NATURE OF PROPERTY

Oh dear me,
The warld's ill-divided.
Them that work the hardest
Are aye wi' least provided.

Mary Brooksbank[1]

## 1.  INTRODUCTION

This chapter introduces the idea of property as a legal concept. The discussion is devoted mainly to questions of definition and to a consideration of the philosophical foundations that are said to support that institution. Coming to terms with the ideologies behind private ownership rights is of some significance, given the place of property in our culture. It has been offered that "[o]ne of the major themes of Western political theory during the past 2,500 years has been controversy over the benefits and drawbacks of private ownership".[2] Just as grand is the suggestion that "[p]roperty has been at the core of most social upheavals in human history, including those of the recent past".[3]

What emerges from the examination of these fundamental ideas is, perhaps predictably, a collage of different perspectives about the meaning of private property and its *raison d'être*. The discussion that follows is of an introductory nature, and will certainly not add up to tidy solutions to the questions that are posed. It would be misleading to suggest that solving the central puzzles of property law can be easily accomplished. Instead, my objective here is to air some central issues that can then resonate throughout the remainder of the text. In the succeeding chapters I hope to show how the justifications considered here influence the composition of Canadian property law. The theoretical grounds for conferring ownership form threads that bind (or at least that might serve to bind) together the myriad property rules covered in this textbook.

## 2.  THE 'PROPERTIES' OF PROPERTY

### (a)    an introductory foray[4]

What is property? The derivation of the word is simple enough, arising from the Latin *proprietas* or "ownership," in turn stemming from *proprius*, meaning "own" or "proper." But, this ety-

---

1  See N. Buchan & P. Hall, *The Scottish Folksinger* (Glasgow: Collins, 1978) at 33-4.
2  R. Pipes, *Property and Freedom* (New York: A.A. Knopf, 1999) at xi-xii.
3  R. Vogt, *Whose Property? The Deepening Conflict Between Private Property and Democracy in Canada* (Toronto: U.T.P., 1999) at 3.
4  See further T.C. Grey, "The Disintegration of Property" in J.R. Pennock & J.W. Chapman, eds.,

mology reveals little. Philosophers such as Aristotle, Cicero, Seneca, Grotius, Pufendorf and Locke each, in turn, have debated the meaning of this term, as later did legal luminaries such as Blackstone, Madison and Holmes, and even economists such as Coase.[5]

From an intuitive perspective the idea of property is perfectly straightforward: the term refers to those things one can own. Although it is both sensible and common to use such language, the law offers a different slant, one that tends to dwell more on the owning element. Property is sometimes referred to as a bundle of rights.[6] That characterization means that property is not in fact a thing, but rather a right, or better, a collection of rights (over things) enforceable against others.[7] Likewise, it has been said that "[t]he concept of ownership is no more than a convenient global description of different collections of rights held by persons over physical and other things".[8] Explained another way, the term property signifies a set of relationships among people that concern claims to tangible and intangible items.

The reference to *rights* reveals that property, to a legal positivist, means entitlements created by law. In Jeremy Bentham's words, "[p]roperty and law are born and die together. Before laws were made there was no property; take away laws and property ceases."[9] Under that conception, property is necessarily a legal construct, born and bred under law. However, there is no complete catalogue of the objects that are regarded as property. Likewise, the *subjects* of property, that is, those who may acquire ownership, are also part of a fluctuating class. We look to the juridical definition of property to tell us not only what may be owned, but who among the citizenry can qualify to be an owner.

Take a closer look at these ideas: first, at the notion of a bundle. This imagery suggests that property is a collection of incidents. Professor A.M. Honoré, in a classic treatment of the nature of ownership, identified eleven elements that he claimed provided the most ample conception of property to be found within a mature legal system. He said this:

> Ownership comprises the right to possess, the right to use, the right to manage, the right to the income of the thing, the right to the capital, the right to security, the rights or incidents of

*Property: Nomos XXII* (New York: N.Y.U.Pr., 1980) 69; J.E. Penner, *The Idea of Property in Law* (Oxford: Clarendon Pr., 1997); A. Bell & G. Parchomovsky, "A Theory of Property", 90 Cornell L.Rev. 531 (2005); A. Mossoff, "What is Property? Putting the Pieces Back Together", 45 Ariz.L.Rev. 371 (2003); D. Lametti, "The Concept of Property: Relations Through Objects of Social Wealth" (2003) 53 U.T.L.J. 325; L.S. Underkuffler, *The Idea of Property: Its Meaning and Power* (Oxford: O.U.P., 2003).

5    *Klamath Irrigation Dist. v. U.S.*, 2005 W.L. 2100579 (Fed.Cl.) at 1 (*per* Allegra J.).

6    *Cf.* Penner, *supra*, note 4. It has been argued that the bundle of rights description is a phallic metaphor: see J.L. Schroeder, "Chix Nix Bundle-O-Stix: A Feminist Critique of the Disaggregation of Property", 93 Mich.L.Rev. 239 (1994).

7    See C.B. Macpherson, "The Meaning of Property" in C.B. Macpherson, ed., *Property: Mainstream and Critical Positions* (Toronto: U.T.P., 1978) at 2.

8    *Yearworth v. North Bristol N.H.S. Trust*, [2009] EWCA Civ 37, at para. 28 (*per* Lord Judge C.J.).

9    J. Bentham, *The Theory of Legislation* (Bristol: Thoemmes Pr., 2004 ed., 1802) vol. 1, at 113. Moreover, "[l]aw alone is able to create a fixed and durable possession which merits the name of property": *ibid.* at 110.

transmissibility and absence of term, the duty to prevent harm, liability to execution, and the incident of residuarity.[10]

I see this list as describing rights to: (i) possession, management and control; (ii) income and capital; (iii) transfer *inter vivos*[11] and on death; and (iv) protection under law. The "absence of [a] term", found in Honoré's list, means that rights might last forever. Furthermore, Honoré saw property in its most complete sense as involving two additional features: (v) liability to seizure (which he calls liability to execution); and (vi) prohibitions on harmful use.

The Honoré bundle contains a wide range of entitlements. Included are *claims* against others: the owner of a plot of land (which will be called Blackacre, following a tradition in writings about land law that dates back at least 400 years[12]) has the right to ask a trespasser to leave, and the interloper has a reciprocal duty to comply. An owner holds *powers* of disposal. Some entitlements are *privileges* or *liberties*, in that the owner's use cannot be abridged by others. The right to destroy property is a privilege in the sense used here. The owner of Blackacre also enjoys *immunities*, including exemptions from certain acts of expropriation.[13]

The prohibition against harmful use as a component of a plenary description of property is a controversial move.[14] This is certainly not a *right* enjoyed by an owner: instead it appears to be a subtraction from, not an element of, the largest notion of ownership imaginable. That is also true of the liability to seizure. We learn at least two things from Honoré's decision to include these features.

First, ownership usually entails duties as well as rights: the bitter accompanies the sweet.[15] Responsibilities to the public are sometimes assumed by a property owner: a person owning firearms is duty-bound to take certain precautions; a landowner is typically required to keep noxious weeds under control, *etc.* Under property law regimes it is common to find a large number of ownership-based duties scattered throughout the law.

Occasionally the obligations aspect of ownership can overwhelm the rights-based side of the ledger. In the Ontario decision of *Abeziz v. Harris Estate*, a question arose about the disposal of a corpse by an executor (*i.e.*, the person responsible for dealing with a deceased person's estate). The Court stated that

---

10  A.M. Honoré, "Ownership" in *Making Law Bind* (Oxford: Clarendon Pr., 1987) at 165.

11  An *inter vivos* transfer is one made between living persons.

12  See, *e.g.*, *Butt's Case* (1600) 7 Co.Rep. 23a, 77 E.R. 445.

13  These labels are taken from W.N. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning", 23 Yale L.J. 16 (1913). An analysis of the interrelationship between the work of Hohfeld and Honoré can be found in L.C. Becker, "The Moral Basis of Property Rights" in *Nomos XXII*, *supra*, note 4, 187, at 190-1. *Cf.* S.R. Munzer, *A Theory of Property* (Cambridge: C.U.P., 1990) at 18.

14  See also A. Carter, *The Philosophical Foundations of Property Rights* (London: Harvester, Wheatsheaf, 1989) at 5-6; A. Ryan, *Property* (Minneapolis: U. of Minn.Pr., 1987) at 54-5.

15  See further D. Lametti, "The (Virtue) Ethics of Private Property: A Framework and Implications" in A Hudson, ed., *New Perspectives on Property Law, Obligations and Restitution* (London: Cavendish, 2004) 39; G.S. Alexander, "The Social Obligation Norm in American Property Law", 94 Cornell L.Rev. 745 (2009); H. Dagan, "The Social Responsibility of Ownership", 92 Cornell L.Rev. 1255 (2007).

4.   THE NATURE OF PROPERTY

"there is no legal right in a corpse. *Rather than rights there are only obligations.* . . . The fundamental obligation is that the body be appropriately dealt with — that is, disposed of in a dignified fashion."[16] That view goes slightly too far. To carry out this duty the executor must surely have a right of possession over the corpse that is enforceable against a wrongdoer, for otherwise the executor would be unable to seek the law's aid to prevent or recover possession. Nevertheless, it is safe to say that such a possessory right is a derivative of the burial obligation, which is the primary aspect of the executor's legal connection to the body.

Second, Honoré's suggestion that the duty to prevent harm[17] is actually to be found *inside* the definition of property reminds us that not all rights of ownership are absolute. The influential English jurist William Blackstone famously described property as "that sole and despotic dominion which one man [sic] claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe".[18] That language conjures up some impressive images about property entitlements. However, few of the components that make up the bundle are totally unfettered by some qualification or limitation. Blackstone knew this perfectly well, for in his *Commentaries on the Laws of England* it is acknowledged that individual rights may be restrained by positive laws enacted in furtherance of public policy.[19] In other words, plenary property rights are resisted when they might produce unacceptable harm, defined broadly.[20]

Consider the following examples of restricted property rights. A homeowner knows that the right of privacy may be curtailed in many ways, including through a lawful search and seizure of the premises. English law now confers extensive rights to wander over designated areas of the countryside even if these are in private hands.[21] Human rights legislation prevents owners from engaging in discriminatory practices in renting, selling, as well as in the provision of services.[22] The right to destroy one's own property may generally exist during the owner's life, though a testamentary direction (*i.e.*, one contained in a will) to destroy property may not be enforceable.[23] In general, pressing societal needs and countervailing values may result in the imposition of limits on ownership rights. One

---

16  *Abeziz v. Harris Estate*, 1992 CarswellOnt 3803 (Gen.Div.) at para. 28 (*per* Farley J.) (emphasis added). See generally D. Sperling, *Posthumous Interests: Legal and Ethical Perspectives* (Cambridge: C.U.P., 2008).

17  *Supra*, note 10, at 165.

18  W. Blackstone, *Commentaries on the Laws of England* (Chicago: U. of Chi. ed. 1979, 1765-9) vol. 2, at 2.

19  *Ibid.* at 411.

20  See further A.J. van der Walt, *Property in the Margins* (Oxford: Hart, 2009).

21  *Countryside and Rights of Way Act, 2000*, c. 37, discussed in J.L. Anderson, "Britain's Right to Roam: Dedefining the Landowner's Bundle of Sticks", 19 Geo.Int'l Envtl.L.Rev. 375 (2007).

22  For an argument that this common law obligation extended to others who offered services to the public, see J.W. Singer, "No Right to Exclude: Public Accommodations and Private Property", 90 Nw.U.L.Rev. 1283 (1996) especially (for our present purposes) at 1304*ff*. See also Part 5, Chapter 10.

23  See further *Re Wishart* (1992) 46 E.T.R. 311, 1992 CarswellNB 69 (Q.B.); L.J. Strahelevitz, "The Right to Destroy", 114 Yale L.J. 781 (2005). See also K. Mackie, "Testamentary Conditions" (1998) 20 U.Q.L.J. 38, at 50-1.

might go even further: so ubiquitous are the qualifications on the owner's right of exclusion, that it may be more faithful to the idea of property to say that rights of *inclusion* by others are integral to the concept. These rights of non-owners can sometimes be justified on the same grounds that support private property rights in the first place.[24]

A thread runs through the examples mentioned above. In each instance, the imposed limitation results from some prior ownership decision. So, if I choose to purchase a gun, I am constrained as to when and how I can use it. If I choose to operate a retail business, I surrender some rights to control who may enter on my premises. I cannot discriminate on specified prohibited grounds such as race. Certain restrictions will come with the territory (literally and figuratively).[25]

Property rights can be aggregated in a host of ways. There are a variety of different bundles that the law might construct. Parliament and the courts can augment or reduce the number of incidents that apply to any particular kind of property interest. That being so, to say that something is regarded in law as property does not give us complete information as to what an owner can do. Going further, an object may be property for some purposes in the law but not for others: for example, confidential information may not be susceptible to theft according to the criminal law, even if it might be treated as property in the sphere of the private law of obligations.[26]

As well, it is sometimes fruitless to try to single out one person as *the* owner of a particular thing. The law accepts that two or more persons may co-own Blackacre; a tract of land belonging to A may be encumbered with a right of use held by B; both a landlord and a tenant have a proprietary interest in land that is held under a lease; and one person may have title to Blackacre for life, with others being entitled to possession once the life estate ends. Ownership is divisible, indeed infinitely so.[27]

Pausing here, one sees that Honoré's list does not identify an irreducible core element. It talks about the idea of property in its most robust sense, not its essential minimum element(s). Some suggest that no single attribute is required. On this account, it is all a matter of nominalism[28] – property is that which the law

---

24 See further H. Dagan, "Exclusion and Inclusion in Property", online: <http://ssrn.com/abstract=1416580>. The justifications for private property are discussed in Part 3, *infra*.

25 The analysis in this paragraph is, I believe, consistent with Larissa Katz's thesis that the exclusivity associated with ownership means the exclusive right to set the agenda as to how property is to be used, and the law therefore should enforce only the actions of others that interfere with that agenda: L. Katz, "Exclusion and Exclusivity in Property Law" (2008) 58 U.T.L.J. 275. My point here is that the agenda once set triggers certain fetters, applicable even if the owner may wish to define the agenda without such limitations.

26 *R. v. Stewart*, [1988] 1 S.C.R. 963, 1988 CarswellOnt 110. Even in a non-criminal law setting, "the ... characterization of confidential information as property is controversial": *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142, 1999 CarswellBC 77, at 169 S.C.R. (*per* Binnie J.). See further the analysis at 169 S.C.R.*ff*. Note also that title to property may pass under contract law, but not for the purposes of the criminal law: *R. v. Milne*, [1992] 1 S.C.R. 697, 1992 CarswellAlta 225.

27 See further J.W. Singer, "The Reliance Interest in Property", 40 Stan.L.Rev. 614 (1988) at 637*ff*.

28 See further T.W. Merrill, "Property and the Right to Exclude", 77 Neb.L.Rev. 730 (1998).

decides should bear that label.[29] By contrast, some judicial decisions have suggested that certain features are essential. Hence, it has been said that a right cannot subsist as property unless it is "definable, identifiable by third parties, capable in its nature of assumption by third parties, and [has] some degree of permanence or stability".[30] A more stripped down version of the same basic idea provides that to be property, the rights must be binding on third parties and capable of being assigned. That kind of approach, called multi-variable essentialism,[31] is sound enough as a normative ideal, though it is not accurate as the law now stands.[32] The power to transfer need not always form part of the bundle,[33] and is only truly essential in the case of money or money-like holdings.[34]

It has been said that property refers to a state-enforced right of exclusion over things, good (generally) against the world. Felix Cohen concluded that the term private property describes a relationship among people that allows an owner to exclude or include others from certain activities, and that in either case the law would back up that decision.[35] Such a formulation (a form of single-variable essentialism[36]) goes a long way toward providing a helpful functional definition of property, one that emphasizes the right of *exclusion* as the essential part of the bundle. However, the power to exclude means more than the right of physical expulsion. The overarching idea is that of exclusivity: the owner holds a *monopoly* over whatever rights of use, transfer, income, *etc.*, are recognized as part of a given proprietary package. The owner gets to make these decisions; others must respect them.[37] It has been said that property law constructs not a wall but rather a gate, which an owner may open or shut according to his or her preferences.[38] This metaphor also reminds us that property creates power relationships among

---

29  The majority judgment in *Yanner v. Eaton* (1999) 201 C.L.R. 351 (H.C.) exemplifies a nominalist approach.

30  *National Provincial Bank Ltd. v. Ainsworth*, [1965] A.C. 1175, [1965] 2 All E.R. 472 (H.L.) at 1248 A.C. (*per* Lord Wilberforce). See also *Halwood Corp. Ltd. v. Chief Commissioner of Stamp Duties* (1992) 33 N.S.W.L.R. 395 (S.C.).

31  Merrill, *supra*, note 28.

32  "An interest may qualify as 'property' for some purposes even though it lacks some attributes. For example, an individual can have a 'property' right in his job yet the job is not assignable, transferable, descendible, or devisable. The 'right to publicity' is transferable during life but may not be devisable": *First Victoria National Bank v. United States*, 620 F.2d 1096 (5th Cir., 1980) at 1104 (*per* Goldberg J.).

33  See *The Queen v. Toohey* (1982) 158 C.L.R. 327 (H.C.) at 342; *Dorman v. Rodgers* (1982) 148 C.L.R. 365 (H.C.) at 374.

34  J.W. Harris, *Property and Justice* (Oxford: Clarendon Pr., 1996) at 48.

35  F. Cohen, "Dialogue on Private Property", 9 Rutgers L.Rev. 357 (1954) at 373. "Suppose we say, that is property to which the following label can be attached: To the World: Keep off X unless you have my permission, which I may grant or withhold. Signed: Private Citizen. Endorsed: The State.": *ibid.* at 374. See also K.J. Gray, "Property in Thin Air", [1991] C.L.J. 252, especially at 292*ff*; T.W. Merrill & H.E. Smith, "The Morality of Property", 48 Wm. & Mary L.Rev. 1849 (2007).

36  Merrill, *supra*, note 28.

37  See further Katz, *supra*, note 25.

38  J.E. Penner, *The Idea of Property in Law* (Oxford: Clarendon Pr., 1997) at 74.

# Black's Law Dictionary®

## Tenth Edition

**Bryan A. Garner**
Editor in Chief



THOMSON REUTERS™

Mat # 41372510
Mat # 41513461—deluxe

**Disclaimer**

Although this publication was created to provide you with accurate and authoritative information about legal terminology, it was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice, and this publication is not a substitute for an attorney's advice. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

**Copyright Clearence Center**

For authorization to photocopy, please contact the Copyright Clearance Center at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or West's Copyright Services at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute, and the purpose or format of the use.

**Copyright information**

"BLACK'S LAW DICTIONARY" is a registered trademark of Thomson Reuters.

Registered in U.S. Patent and Trademark Office
COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979, 1990 West Publishing Co.
© West, a Thomson business, 1999, 2004
© 2009, 2014 Thomson Reuters
          610 Opperman Drive
          St. Paul, MN 55123
          1-800-313-9378
Printed in the United States of America

ISBN: 978-0-314-61300-4
ISBN: 978-0-314-62130-6 (deluxe)

**own**                                                      **1280**

**own,** *vb.* **(bef. 12c) To rightfully have or possess as property; to have legal title to.**

**owned-property exclusion.** See EXCLUSION (3).

**owner.** (bef. 12c) Someone who has the right to possess, use, and convey something; a person in whom one or more interests are vested. ● An owner may have complete property in the thing or may have parted with some interests in it (as by granting an easement or making a lease). See OWNERSHIP.

▸ **adjoining owner.** (18c) Someone who owns land abutting another's; ABUTTER. — Also termed *adjoiner.*

▸ **beneficial owner.** (18c) **1.** One recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust. — Also termed *equitable owner.* **2.** A corporate shareholder who has the power to buy or sell the shares, but who is not registered on the corporation's books as the owner. **3.** *Intellectual property.* A person or entity who is entitled to enjoy the rights in a patent, trademark, or copyright even though legal title is vested in someone else. ● The beneficial owner has standing to sue for infringement. A corporation is typically a beneficial owner if it has a contractual right to the assignment of the patent that the employee who owns the patent has failed to assign it. Similarly, a patent or copyright owner who has transferred title as collateral to secure a loan would be a beneficial owner entitled to sue for infringement.

▸ **copyright owner.** See COPYRIGHT OWNER.

▸ **disponent owner.** (1958) *Scots law.* The conveying owner; SELLER (2).

▸ **equitable owner.** See *beneficial owner* (1).

▸ **general owner.** (18c) Someone who has the primary or residuary title to property; one who has the ultimate ownership of property. Cf. *special owner.*

▸ **innocent owner.** (18c) The owner of property that another person uses without the owner's knowledge or consent while committing a wrongful act or omission. See *innocent-owner defense* under DEFENSE (1).

▸ **legal owner.** (17c) One recognized by law as the owner of something; esp., one who holds legal title to property for the benefit of another. See TRUSTEE (1).

▸ **limited owner.** (1836) A tenant for life; the owner of a life estate. See *life estate* under ESTATE (1).

▸ **naked owner.** (1882) *Civil law.* A person whose property is burdened by a usufruct. ● The naked owner has the right to dispose of the property subject to the usufruct, but not to derive its fruits. See USUFRUCT.

▸ **owner of record.** See *record owner.*

▸ **owner pro hac vice** (proh hahk vee-chay). See *bareboat charter* under CHARTER (8).

▸ **record owner.** (1863) **1.** A property owner in whose name the title appears in the public records. **2.** STOCKHOLDER OF RECORD.

▸ **sole and unconditional owner.** (1871) *Insurance.* The owner who has full equitable title to, and exclusive interest in, the insured property.

▸ **special owner.** (18c) One (such as a bailee) with a qualified interest in property. Cf. *general owner.*

**owners' association.** (1968) **1.** The basic governing entity for a condominium or planned unit developments. ● It is usu. an unincorporated association or a nonprofit corporation. — Also termed *homeowners' association.* **2.** See *homeowners' association* under ASSOCIATION.

**owners' equity.** (1935) The aggregate of the owners' financial interests in the assets of a business entity; the capital contributed by the owners plus any retained earnings. ● Owners' equity is calculated as the difference in value between a business entity's assets and its liabilities. — Also termed *owner's equity; book value; net book value;* (in a corporation) *shareholders' equity; stockholders' equity.*

**ownership.** (16c) The bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others. ● Ownership implies the right to possess a thing, regardless of any actual or constructive control. Ownership rights are general, permanent, and heritable. Cf. POSSESSION; TITLE (1).

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional powers of those who use it." *Marsh v. Alabama,* 326 U.S. 501, 506, 66 S.Ct. 276, 278 (1946).

> "Possession is the *de facto* exercise of a claim; ownership is the *de jure* recognition of one. A thing is owned by me when my claim to it is maintained by the will of the state as expressed in the law; it is possessed by me, when my claim to it is maintained by my own self-assertive will. Ownership is the guarantee of the law; possession is the guarantee of the facts. It is well to have both forms if possible; and indeed they normally co-exist." John Salmond, *Jurisprudence* 311 (Glanville L. Williams ed., 10th ed. 1947).

▸ **bare ownership.** See *trust ownership.*

▸ **beneficial ownership.** (18c) **1.** A beneficiary's interest in trust property. — Also termed *equitable ownership.* **2.** A corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner.

▸ **bonitary ownership** (bahn-a-tair-ee). (1875) *Roman law.* A type of equitable ownership recognized by the praetor when the property was conveyed by an informal transfer, or by a formal transfer by one not the true owner. — Also termed *bonitarian ownership; in bonis habere.*

▸ **complete ownership.** *Hist. Louisiana law.* See *perfect ownership.*

▸ **contingent ownership.** (1886) Ownership in which title is imperfect but is capable of becoming perfect on the fulfillment of some condition; conditional ownership. Cf. *vested ownership.*

▸ **corporeal ownership.** (1894) The actual and complete ownership of land or chattels with the right to use and control.

▸ **cross-ownership.** (1940) Ownership by a single person or entity of two or more related businesses such that the owner can control competition.

▸ **equitable ownership.** See *beneficial ownership* (1).

▸ **full ownership.** *Hist. Louisiana law.* See *perfect ownership.*

▸ **imperfect ownership.** (1846) *Louisiana law.* Ownership of property subject to a usufruct interest held by

another. See La. Civ. Code art. 478. — Also termed *naked ownership*.

> **incorporeal ownership.** (1931) An ownership interest in land or chattels without the right to use or control, as with mineral rights.

> **joint ownership.** (18c) Undivided ownership shared by two or more persons. • Typically, an owner's interest, at death, passes to the surviving owner or owners by virtue of the right of survivorship.

> **naked ownership.** *Louisiana law.* See *imperfect ownership*.

> **ownership in common.** (1838) Ownership shared by two or more persons whose interests are divisible. • Typically their interests, at death, pass to the dead owner's heirs or successors.

> **perfect ownership.** (1847) *Hist. Louisiana law.* The complete bundle of rights to use, enjoy, and dispose of property without limitation. — Also termed *full ownership; complete ownership*.

> **public ownership.** (1846) Government ownership.

> **qualified ownership.** (18c) Ownership that is shared, restricted to a particular use, or limited in the extent of its enjoyment.

> **trust ownership.** (1893) A trustee's interest in trust property. — Also termed *bare ownership.*

> **unqualified ownership.** (1829) Absolute ownership.

> **vested ownership.** (1867) Ownership in which title is perfect; absolute ownership. Cf. *contingent ownership.*

**ownership-in-place theory.** (1928) *Oil & gas.* A characterization of oil-and-gas rights used in a majority of jurisdictions, holding that the owner has the right to present possession of the oil and gas in place as well as the right to use the land surface to search, develop, and produce from the property, but that the interest in the minerals terminates if the oil and gas flows out from under the owner's land. • This theory is used in Texas, New Mexico, Kansas, Mississippi, and other major producing states. The rights of a severed-mineral-interest owner to oil and gas in these states are often described as an estate in fee simple absolute, but ownership of specific oil-and-gas molecules is subject to the rule of capture. See also NON-OWNERSHIP THEORY.

**owner's policy.** *Real estate.* A title-insurance policy covering the owner's title as well as the mortgagee's interest. Cf. MORTGAGEE POLICY.

**own-product exclusion.** See EXCLUSION (3).

**own-work exclusion.** See EXCLUSION (3).

**oxfild** (oks-fild). *Hist.* A restitution made by a county or hundred for a wrong done by someone within that region.

**oxgang** (oks-gang). (14c) *Hist.* An indefinite quantity of land equal to what an ox plows in one year, usu. 12 to 15 acres. • An oxgang, equaling one-eighth of a carucate, was used to assess land for tax purposes. — Also termed *oxgate; bovate; bovata terrae.* Cf. CARUCATE.

**oyer** (oy-ər *or* oh-yər). [fr. Old French *oïr* "to hear"] (15c) *Hist.* **1.** A criminal trial held under a commission of oyer and terminer. See COMMISSION OF OYER AND TERMINER. **2.** The reading in open court of a document (esp. a deed) that is demanded by one party and read by the other. **3.** *Common-law pleading.* A prayer to the court by a party opposing a profert, asking to have the instrument on which the opponent relies read aloud. • Oyer can be demanded only when a profert has been properly made, but it is disallowed for a private writing under seal.

> "A party having a right to demand oyer is yet not obliged, in all cases, to exercise that right; nor is he obliged, in all cases, after demanding it, to notice it in the pleading he afterwards files or delivers. Sometimes, however, he is obliged to do both, namely, where he has occasion to found his answer upon any matter contained in the deed of which profert is made, and not set forth by his adversary. In these cases the only admissible method of making such matter appear to the court is to demand oyer, and, from the copy given, set forth the whole deed verbatim in his pleading." Benjamin J. Shipman, *Handbook of Common-Law Pleading* § 289, at 483 (Henry Winthrop Ballantine ed., 3d ed. 1923).

**oyer, demand of.** See DEMAND OF OYER.

**oyer and terminer** (oy-ər an[d] tər-mə-nər). [Law French *oyer et terminer* "to hear and determine"] (15c) **1.** See COMMISSION OF OYER AND TERMINER. **2.** COURT OF OYER AND TERMINER (2).

**oyez** (oh-yay *or* oh-yez *or* oh-yes). [Law French] (15c) Hear ye. • The utterance *oyez, oyez, oyez* is usu. used in court by the public crier to call the courtroom to order when a session begins or when a proclamation is about to be made.

**time unity.**      **1712**

**time unity.** See *unity of time* under UNITY.

**time value.** The price associated with the length of time that an investor must wait until an investment matures or the related income is earned. Cf. YIELD TO MATURITY.

**timocracy** (ti-mok-rə-see). (15c) **1.** An aristocracy of property; government by propertied, relatively rich people. **2.** A government in which the rulers' primary motive is the love of honor.

**TIN.** *abbr.* TAX-IDENTIFICATION NUMBER.

**tin parachute.** (1987) An employment-contract provision that grants a corporate employee (esp. one below the executive level) severance benefits in the event of a takeover. ● These benefits are typically less lucrative than those provided under a golden parachute. — Also termed *silver parachute.* Cf. GOLDEN PARACHUTE.

**tip,** *n.* (18c) **1.** A piece of special information; esp., in securities law, advance or inside information passed from one person to another. See INSIDE INFORMATION; INSIDER TRADING. **2.** A gratuity for service given. ● Tip income is taxable. IRC (26 USCA) § 61(a).

**tippee.** (1961) *Securities.* Someone who acquires material nonpublic information from someone in a fiduciary relationship with the company to which that information pertains.

**tipper.** *Securities.* Someone who is in a fiduciary relationship with a company that the person possesses material inside information about, and who selectively discloses that information for trading or other personal purposes <the tippee traded 5,000 shares after her conversation with the tipper>.

**tippling house.** See PUBLIC HOUSE.

**TIPS.** *abbr.* See *TIPS bond* under TREASURY BOND.

**TIPS bond.** See TREASURY BOND.

**tip sheet.** (1945) A newspaper or website that gives information and advice about what shares should be bought and sold.

**tipstaff.** (16c) A court crier. ● The name derives from the crier's former practice of holding a staff tipped with silver as a badge of office. See CRIER. Pl. **tipstaves, tipstaffs.**

**tip-stave.** See SERVITOR OF BILLS.

**TIS.** *abbr.* Taken in satisfaction.

**tithe** (tith), *n.* (12c) **1.** A tenth of one's income, esp. in reference to a religious or charitable gift or obligation. **2.** *Hist.* A small tax or assessment, esp. in the amount of one-tenth. — Also termed *tenth.* — **tithe,** *vb.* — **tithable,** *adj.*

> "A tithe was the right of a rector to a tenth part of the produce of all the land in his parish. In some cases a rector was an individual, while in others the rectory was vested in a monastery, which appointed a vicar to perform the necessary ecclesiastical duties 'vicariously' for the monastery. On the dissolution of the monasteries in the reign of Henry VIII many rectories passed into the royal hands and were granted to laymen; the result was that the right to tithes in many cases passed into lay hands. Like advowsons, tithes were deemed to be land in which the various estates could exist." Robert E. Megarry & P.V. Baker, *A Manual of the Law of Real Property* 415 (4th ed. 1969).

> "As it had evolved by the sixteenth century, the canon law held that every person owed to his parish church a full tenth of the yearly increase of his crops and his flocks. This was the praedial tithe. He also owed a tenth of the income of his industry, as for instance that earned from weaving, calculated after deducting legitimate expenses. This was

the personal tithe. There was also a 'mixed' tithe, covering income that partook of both kinds, such as that derived from making cheese from the milk of cows. A distinction was also drawn between the lesser and the greater tithes, a distinction that normally determined which tithes would go to the rector, which to the vicar, of each parish. In practice, there was room for disagreement about the class into which particular tithes should be put, and there was considerable local variation in their incidence and destination, so that academic definitions sometimes served merely as starting points." R.H. Helmholz, *Roman Canon Law in Reformation England* 90 (1990).

▶ **great tithe.** (*usu. pl.*) (17c) A tithe paid in kind and therefore considered more valuable than other tithes. ● The great tithes often consisted of corn, peas, beans, hay, and wood.

▶ **mixed tithes.** (16c) A tithe consisting of a natural product, such as milk or wool, obtained or cultivated by human effort.

> "A second species of incorporeal hereditaments is that of tithes . . . the first species being usually called *predial*, as of corn, grass, hops, and wood; the second *mixed*, as of wool, milk, pigs, etc., consisting of natural products, but nurtured and preserved in part by the care of man; and of these the tenth must be paid in gross: the third *personal*, as of manual occupations, trades, fisheries, and the like; and of these only the tenth part of the clear gains and profits is due." 2 William Blackstone, *Commentaries on the Laws of England* 24 (1766).

▶ **personal tithe.** (16c) A tithe of profits from manual occupations or trades.

▶ **predial tithe.** (16c) A tithe of crops (such as corn). — Also spelled *praedial tithe.*

▶ **vicarial tithe** (vi-kair-ee-əl). (18c) A small tithe payable to a vicar.

**tithe of agistment** (ə-jist-mənt). (16c) *Hist.* A church-levied charge on grazing land. ● The tithe was paid by the occupier of the land rather than the person whose cattle grazed on the land. See AGISTMENT.

**tithing.** See DECENARY.

***Titius heres esto*** (tish-ee-əs heer-eez es-toh). [Latin] *Roman law.* Let Titius be my heir. ● The phrase was the testamentary form for appointing an heir. Titius was a fictitious name often used by way of example in legal writing, esp. in forms.

<mark>**title.** (15c) **1.** The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself <no one has title to that land>. Cf. OWNERSHIP; POSSESSION. **2.** Legal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence <record your title with the county clerk>.</mark>

> <mark>"Though employed in various ways, [title] is generally used to describe either the manner in which a right to real property is acquired, or the right itself. In the first sense, it refers to the conditions necessary to acquire a valid claim to land; in the second, it refers to the legal consequences of such conditions. These two senses are not only interrelated, but inseparable: given the requisite conditions, the legal consequences or rights follow as of course; given the rights, conditions necessary for the creation of those rights must have been satisfied. Thus, when the word 'title' is used in one sense, the other sense is necessarily implied." Kent McNeil, *Common Law Aboriginal Title* 10 (1989).</mark>

▶ **aboriginal title.** (18c) **1.** Land ownership, or a claim of land ownership, by an indigenous people in a place

# WATERS' LAW OF TRUSTS IN CANADA

## Third Edition

By

### Editor-in-Chief

### Donovan W.M. Waters, Q.C.

M.A., D.C.L. (Oxon.), Ph. D. (London), LL.D. (Hons.) Victoria, F.R.S.C.
Emeritus Professor, University of Victoria, B.C., of Lincoln's Inn, Barrister at
Law, Counsel, Horne Coupar, Barristers and Solicitors, Victoria, B.C.

### Contributing Editors

### Mark R. Gillen

B.Comm. (Toronto), M.B.A. (York), LL.B. (Osgoode), LL.M. (Toronto),
Faculty of Law, University of Victoria

### Lionel D. Smith

B.Sc., LL.M. (Cantab.), D. Phil., M.A. (Oxon.),
James McGill Professor of Law, McGill University,
of the Bar of Alberta

THOMSON
———— ✳ ———— ™
CARSWELL

© 2005 Thomson Canada Limited

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein. No one involved in this publication is attempting herein to render legal, accounting, or other professional advice.

**Library and Archives Canada Cataloguing in Publication**

Waters' law of trusts in Canada / editor-in-chief, Donovan W.M.
Waters; contributing editors, Lionel D. Smith, Mark R. Gillen.—3rd ed.

Previously published under title: Law of trusts in Canada / by D.W.M. Waters
Includes bibliographical references and index.
ISBN 0-459-24164-8 (bound).—ISBN 0-459-24165-6 (pbk.)

1. Trusts and trustees—Canada.  I. Waters, D. W. M.  II. Smith, Lionel D.  III. Gillen, Mark R., 1957-  IV. Waters, D. W. M. Law of trusts in Canada.

KE787.W38 2005 346.7105'9
C2005-901583-7
KF730.W38 2005

Composition: Computer Composition of Canada Inc.



One Corporate Plaza, 2075 Kennedy Road, Toronto, Ontario M1T 3V4
**Customer Relations:**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5162
Fax 1-416-298-5094

6. The Exceptional Retention of Presumptions in the Matrimonial Property
Legislation  435
E. Exhaustion or Failure of Express Trust Objects  437
    1. Failure of Settlor to Dispose of the Whole Equitable Interest  438
    2. Total or Partial Failure of the Trust to Take Effect  442
        (a) Vitiated Intention to Create Trust  442
        (b) Uncertainty of Objects  443
        (c) Impossibility of Objects  443
        (d) Improvidence  446
        (e) Non-Compliance with Rules of Law  446
        (f) Conclusion  447
    3. The Rule in *Hancock v. Watson*  448
III.  CONCLUSION  450

# I. THE TERM "RESULTING TRUST"

Broadly speaking, a resulting trust arises whenever legal or equitable title to property is in one party's name, but that party, because he is a fiduciary or gave no value for the property, is under an obligation to return it to the original title owner, or to the person who *did* give value for it.

The courts and the various legislatures of the common law world have used interchangeably the terms "implied trust", "resulting trust" and "constructive trust", and the terminology is therefore somewhat confusing.[1] But essentially, while express trusts are those which come into existence because settlors have expressed their intention to that effect, constructive trusts arise not because of anyone's expression of trust intent but because B ought to surrender property to A and this is the machinery the court employs in order to get B to do that. In between the express trust, a product of the settlor's intention, and the constructive trust, a machinery imposed by law, are the implied trust and the resulting trust.[2]

The term "implied trust" is commonly used for two situations. The first occurs where the intention to create a trust is not clearly expressed, but has to be discovered from indirect and ambiguous language. This is all that distinguishes such an implied trust from the express trust. A second common use is where one person has gratuitously transferred his property to another, or paid for property and had the property put into another's name. The intention of the transferor or purchaser is implied to be that the transferee is to hold the property on trust for the transferor or purchaser. The implication arises out of the fact that Equity assumes bargains, not gifts,[3] and requires the donee to prove that a gift was intended.

---

[1] E.g., *Gissing v. Gissing* (1970), [1971] A.C. 886, [1970] 2 All E.R. 780 (U.K. H.L.).

[2] Like all trusts, a resulting trust in no way depends upon the knowledge of the trustee as to the existence of the trust, and it can arise when a person has become a trustee as a consequence of error: *Tattersfield v. Leo Tattersfield Ltd.* (1981), 7 N.Z. Recent Law 79.

[3] This old tag probably arose from the desire that the person alleging he took as donee should have to prove that he was not an agent of the transferor or purchaser. However, the tag may have been a seventeenth century rationalization of the resulting trust that Courts of Equity inferred by analogy with the then well-established doctrine of resulting use. See, *infra*, Part II C.

The term "resulting trust", on the other hand, does not allude in any way to intention; it describes what happens to the property in question. It results or goes back to the person who, for reasons we shall examine, is entitled to call for the property.[4] For example, because Equity does not assume gifts, the transferee holds title for the transferor or purchaser. In other words, in this "implied trust" situation the property results or goes back to the transferor or purchaser. However, is it correct to describe this resulting trust as one which arises out of implied intent, when it seems more to come about because of the rule of law that Equity does not assume gifts? The view is held that this resulting trust, like all resulting trust situations, arises by operation of law.[5] Such an explanation can clearly be given of the resulting trust which arises when, for any reason, the objects of an express trust fail. Since the trustee cannot take beneficially, the property results to the settlor or his estate. This outcome could also be said to be the implied intention of the settlor, and sometimes the courts have said as much, but commonly this is regarded as a resulting back by operation of law.[6] The *Statute of Frauds* explicitly envisages the resulting trust, like the constructive trust, as one which arises by operation of law.

Distinguishing the resulting trust from the constructive trust is also not easy because the lines have been blurred. In *Rupar v. Rupar*,[7] for example, where a mother had assisted her son in the purchase of a house taken in the son's name, the trial judge said that the mother's claim was based "upon implied or constructive trust". The situation clearly gave rise to a resulting trust, but the court saw all trusts arising

---

[4] The word "results" in this sense derives from the Latin *resaltare,* "to jump back": Barber (ed.), *Canadian Oxford Dictionary* (Toronto: Oxford University Press Canada, 1998), s.v. "result."

[5] For a thorough and significant argument along these lines, see Chambers, *Resulting Trusts* (1997); for a contrary view, W. Swadling, "A New Role for Resulting Trusts?" (1996) 16 Legal Studies 110. Swadling's argument was mentioned with approval by Lords Goff and Browne-Wilkinson in *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*, [1996] A.C. 669 (U.K. H.L.). Since the whole operation of the presumptions of resulting trust and of advancement assume a search for the intent of the transferor or purchaser, these pages proceed on the basis that what the courts are concerned with is the intent of the transferor or purchaser. That Equity puts the initial burden of proof on the transferee to prove a gift is undeniable, but it only gives rise to the search for intent. It is because intention is crucial that the indiscriminate use of the terms, "resulting, implied or constructive trust", in *Gissing v. Gissing, supra*, note 1, is so unfortunate. Is this the constructive trust of *Rochefoucauld v. Boustead* (1896), [1897] 1 Ch. 196 (Eng. C.A.)? The principles were apparently considered to be related by Hogg J. in *Nicholson v. Nicholson Estate* (1994), 4 E.T.R. (2d) 267 (Ont. Gen. Div.) at paras. 14-24. See further, D.W.M. Waters, (1975) 53 Can. Bar Rev. 366. Also see, *infra*, Part II D 5.

[6] In *Goodfellow v. Robertson* (1871), 18 Gr. 572 (Ont. Ch.), A bought land with money of his own, and money received on behalf of R, who was insane. The Court held that because a resulting trust arose by operation of law, no evidence as to any intention of R was necessary.

[7] (1964), 49 W.W.R. 226, 46 D.L.R. (2d) 553 (B.C. S.C.) at 233 [W.W.R.]. "Implied" was taken as synonymous with "constructive". See further *McTaggart v. Boffo* (1975), 10 O.R. (2d) 733, 64 D.L.R. (3d) 441 (Ont. H.C.) at 746 [O.R.] *et seq.* The distinction might have been expected to become much clearer in the light of *Becker v. Pettkus*, [1980] 2 S.C.R. 834, 117 D.L.R. (3d) 257 (S.C.C.), but the terminology remains unstable.

by operation of law as coming within the ambit of constructive trust.[8] The distinction between resulting and constructive trusts is perhaps best put in this way — while constructive trusts have nothing to do with intention, express or implied, resulting trusts can be explained either on the basis of intention or imposition of law. A good example of both a typical constructive trust and a resulting trust occurring on the same set of facts can be seen in *Denny v. Lithgow*.[9] An infant and his mother claimed that certain land, bought by the defendant, in his own name, had in fact been bought on behalf of D, father and husband respectively of the plaintiffs. D had paid part of the price, and for many years prior to his death had had possession of the land. Spragge V.C. found that the defendant had indeed bought the land on behalf of D. This meant that the defendant had acted in the purchase as an agent and, as an agent withholding property from his principal, he became a constructive trustee for D's estate. In so far, however, as he took in his own name property which had partly been paid for by another, he was a resulting trustee for D's estate.[10]

## II.  THE RESULTING TRUST SITUATIONS

These situations can be divided into two groups. First, if property is purchased by A, and conveyance or transfer is taken in the name of B, or in the names of both A and B, B becomes a resulting trustee of his interest for A. Similarly, if A voluntarily transfers property into the name of B or the names of himself and B, B becomes a resulting trustee of his interest. The second group deals with the situation consequent on the failure of an express trust. If a settlor has failed to dispose of the whole beneficial interest, either because he has created only limited interests in the trust property or the trust objects do not exhaust the trust fund, the trustees hold on resulting trust for the settlor or his estate. They cannot, of course, take beneficially, unless the trust terms make them beneficiaries also. Similarly, if an express trust fails for uncertainty or failure of the trust objects, mistake, fraud, duress or undue influence, or contravention of the perpetuity rules, the trustees again hold on resulting trust for the settlor or his estate.[11]

---

[8]  *Cf. Taylor v. Taylor* (1879), (sub nom. *Taylor v. Wallbridge*) 2 S.C.R. 616 (S.C.C.) at 680, per Henry J.: where A and B purchase in the name of B, a constructive trust arises in favour of A. Cited with approval in *Jones v. Lucas* (1952), [1953] 2 D.L.R. 225 (N.S. S.C.) at 229. In the latter case Isley C.J. (at 230) would consequently have been prepared to apply *Bannister v. Bannister*, [1948] 2 All E.R. 133 (Eng. C.A.), a clear constructive trust authority, had the facts enabled him so to do. *Bannister v. Bannister* has subsequently been explained by the Court of Appeal in England: *Chandler v. Kerley*, [1978] 1 W.L.R. 693, [1978] 2 All E.R. 942 (Eng. C.A.).

[9]  (1869), 16 Gr. 619 (Ont. Ch.).

[10]  The plaintiffs were ordered to reimburse the defendant for the moneys he had put into the purchase of the property, and for the taxes on the property which he had paid.

[11]  Illegality of trust objects, or a voluntary transfer for illegal purposes, will not prevent a resulting trust arising, but the Courts may not enforce it. See, *infra*, Part II C 5 b. In *White v. Vandervell Trustees Ltd.*, [1974] Ch. 209 at 294, [1974] 1 All E.R. 47, reversed on appeal on other grounds, [1974] 1 Ch. 269, (sub nom. *Re Vandervell's Trust (No. 2)*) [1974] 3 All E.R. 205 (Eng. C.A.) at 308 [Ch.]), Megarry J. distinguished the two groups as "presumed resulting trusts" and "automatic resulting trusts." See *Underhill and Hayton Law of Trusts and Trustees*, 16th ed. (2003) at 330-31; Chambers,

# ESSENTIALS OF
## CANADIAN LAW

# INTELLECTUAL PROPERTY LAW
## COPYRIGHT · PATENTS · TRADE-MARKS

### SECOND EDITION

## DAVID VAVER

Professor of Intellectual Property Law,
Osgoode Hall Law School, York University
Emeritus Professor of Intellectual Property &
Information Technology Law, University of Oxford

2011



Intellectual Property Law: Copyright, Patents, Trade-marks
© David Vaver, 2011

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior written permission of the publisher or, in the case of photocopying or other reprographic copying, a licence from Access Copyright (Canadian Copyright Licensing Agency), 1 Yonge Street, Suite 800, Toronto, ON, M5E 1E5.

Published in 2011 by

Irwin Law Inc.
14 Duncan Street
Suite 206
Toronto, ON
M5H 3G8

www.irwinlaw.com

ISBN: 978-1-55221-209-7
e-book ISBN: 978-1-55221-210-3


Library and Archives Canada Cataloguing in Publication

Vaver, D.
    Intellectual property law : copyright, patents, trade-marks / David Vaver — 2nd ed.

(Essentials of Canadian law)
Includes bibliographical references and index.
Issued also in electronic format.
ISBN 978-1-55221-209-7

    1. Intellectual property—Canada.  2. Copyright—Canada.  3. Patent laws and legislation—Canada.  4. Trademarks—Law and legislation—Canada.  I. Title.
II. Series: Essentials of Canadian law

KE2779.V38 2011          346.7104'8          C2011-902787-9
KF2979.V38 2011


The publisher acknowledges the financial support of the Government of Canada through the Canada Book Fund for its publishing activities.

We acknowledge the assistance of the OMDC Book Fund, an initiative of Ontario Media Development Corporation.

Printed and bound in Canada.

1 2 3 4 5   15 14 13 12 11



CHAPTER 5

# MANAGEMENT AND ENFORCEMENT

## A. INTRODUCTION

The statutory IP regimes have been deliberately organized to facilitate a free national and international market in rights. The rights can, subject to the occasional minor irritation from competition or other general laws,[1] be bought and sold in combination, donated, or used to secure finance.[2] They may usually be split up horizontally and vertically—by territory, time, market, and so on—and dealt with accordingly. The maximum extraction of rents is thus assured. The right-holder may also transfer or license some rights while retaining others. So the copyright owner of a book may assign the German translation right for electronic books for Germany to one person and may license the dramatization right for ten years to another, while retaining all other rights.[3] The main obligations on the right-holder are to pay periodic maintenance fees for some rights (e.g., patents), to renew others periodically (e.g., registered trade-marks),

---

1    E.g., the *Bills of Exchange Act*, R.S.C. 1985, c. B-4, s. 13, still contains an old provision requiring a bill of exchange or promissory note given to purchase an interest in a patent to be marked "Given for a patent right;" otherwise the bill or note is void except against a holder in due course without notice of the consideration: *Gallagher v. Murphy*, [1929] S.C.R. 288.

2    Current security systems for IP need reform: see sections C(1)(a) "Priority" and (b) "Secured Financing," in this chapter.

3    *Théberge v. Galerie d'Art du Petit Champlain Inc.*, [2002] 2 S.C.R. 336 at [163] [*Théberge*].

and to record title in national IP registries, which then operate as a rough public database of who holds some of what in the IP world.[4]

This framework ought to be flexible enough to accommodate changes in practice that respond to new distribution and communication methods. The Internet, for example, provides opportunities for freelance authors to deal directly with users without the intervention of middlemen like publishers, record companies, or art dealers. In this milieu, speedy standard click-on licences are more common than signed transfers of rights.

Other deals may be harder to conclude. A researcher may find that a subject she wants to pursue is strewn with patents and that her project falls outside any relevant user right.[5] Getting every right-holder's consent may be costly or impossible. Pooling and cross-licensing patents may work, but only for those with something attractive to pool and license. So the area may have to be left vacant or be under-explored. The so-called tragedy of the commons, where a resource is depleted by overuse, can dissolve into a tragedy of the anti-commons, where too many blocking rights lead to under-use.[6]

The framework has other snags. Management provisions vary among IP regimes nationally and internationally. In Canada, the IP statutes use different language to deal with transfer, licensing, registration, and cancellation, even where these concepts are and should be identical. Traps await those who deal with multiple IP rights and assume that the same framework provisions regulate them nationally.[7] Problems escalate where deals are international.

## B. ASSIGNMENTS AND LICENCES

### 1) Interpretation

What right is assigned or licensed is a matter of negotiation, and the ordinary principles of contract interpretation apply to the result. Inter-

---

4    The database is far from complete. Few copyrights are registered, the performing rights societies do not put their inventory online (they need respond only to reasonable requests: *Copyright Act*, R.S.C. 1985, c. C-42, s. 67 [*C Act*]), and no registry exists for trade secrets or common law trade-marks. But see S. McJohn, "Patents: Hiding from History" 24 Santa Clara Computer & High Tech. L.J. 961 (2008), on the usefulness of patent records.

5    See section H, "Users' Rights: Free Use," in chapter 3.

6    M. Heller & R. Eisenberg, "Can Patents Deter Innovation? The Anticommons in Biomedical Research" 280:5364 Science 698 (1998); compare R. Epstein & B. Kuhlik, "Is There a Biomedical Anticommons?" 27 Regulation 54 (Summer 2004).

7    But see section B(3)(b), "Buying and Selling Rights," in this chapter.

pretation is not necessarily a neutral exercise, nor do the same principles apply worldwide. In copyright and patents, for example, continental European judges often favour individual authors or inventors over distributors, construing grants of rights strictly against the grantee and leaving new uses under the control of the grantor (often the author or inventor). Some Canadian courts are similarly inclined,[8] but the trend is hardly strong or universal. For example, media distributors with an eye towards electronic delivery and future means of exploitation may ask freelancers to sign contracts that contain a clause transferring "all now or hereafter existing rights of every kind and character whatsoever pertaining to said work, whether or not such rights are now known, recognized or contemplated for all purposes whatsoever" to the distributor. Will Canadian courts "construe" this in a limited way, or will they hold it to mean that the grantor has relinquished all control over the work forever in favour of the distributor?[9]

Freelancers have not fared very well in such disputes in common law jurisdictions.[10] Courts purport to apply "neutral" principles of contract interpretation but often ignore the reality that most distribution contracts are written by and for distributors. Interpreting contracts neutrally works best where both parties have equal knowledge and power; otherwise neutrality, applied to unequals, simply produces more inequality. That lesson is continually relearned by those enmeshed in the boilerplate contracts common to the movie and music industry. Contracts that deal only with existing technologies are often extended to a new technology by treating it as just an extension or development — effectively, the old thing in a new guise. Thus, the grantor of performing rights under a document signed when cinema was unknown found the grantee automatically had the film rights when movies appeared; grantors of motion picture rights acquired during the silent era often found they had also magically transferred the talking picture rights when "talkies" came along; and the sale of motion picture rights in 1939 was

---

8   E.g., *Bishop v. Stevens*, [1990] 2 S.C.R. 467 [*Bishop*]; *Marquis v. DKL Technologies Inc.* (1989), 24 C.I.P.R. 289 at 295–96 (Que. S.C.); *Comstock Canada v. Electec Ltd.* (1991), 38 C.P.R. (3d) 29 at 51ff. (Fed. T.D.) [*Comstock*] (patents and designs).

9   For example, *Muller v. Walt Disney Productions Inc.*, 871 F. Supp. 678 (S.D.N.Y. 1994).

10   E.g., *Campbell Connelly & Co. v. Noble*, [1963] 1 W.L.R. 252 (Ch.) (English contract assigning full copyright in all countries of musical work together with "all rights he now has or may hereafter become entitled to" includes U.S. reversion rights and (*obiter*) any new rights later enacted anywhere in the world); G. D'Agostino, "Copyright Treatment of Freelance Work in the Digital Era" 19 Santa Clara Computers & High Tech. L.J. 37 (2002).

# WATERS' LAW OF TRUSTS IN CANADA

## Fourth Edition

© 2012 Thomson Reuters Canada Limited

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein. No one involved in this publication is attempting herein to render legal, accounting, or other professional advice.

**Library and Archives Canada Cataloguing in Publication**

Waters' law of trusts in Canada / editor-in-chief, Donovan W.M.
Waters; contributing editors, Lionel D. Smith, Mark R. Gillen.—4th ed.

Previously published under title: Law of trusts in Canada / by D.W.M. Waters
Includes bibliographical references and index.
ISBN 978-0-7798-5165-2 (bound).—ISBN 978-0-7798-5166-9 (pbk.)

1. Trusts and trustees—Canada.  I. Waters, D. W. M.  II. Smith, Lionel D.  III. Gillen, Mark R., 1957-  IV. Waters, D. W. M. Law of trusts in Canada.

KE787.W38 2005 346.7105'9
C2005-901583-7
KF730.W38 2005

Composition: Computer Composition of Canada Inc.

**Printed in the United States by Thomson Reuters**

 **THOMSON REUTERS**

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

One Corporate Plaza, 2075 Kennedy Road, Toronto, Ontario M1T 3V4
**Customer Relations:**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5162
Fax 1-416-298-5094

42    CHAPTER 3    DISTINCTION BETWEEN THE TRUST AND OTHER CONCEPTS

IV.   TRUST AND CONTRACT   66
    A.   Trusts of Choses in Action   68
        1.   Situation One: Promisee of Another's Promise to Benefit a Third Party
            as Trustee for that Third Party   68
            (a)   Evidence of Intention to Create an Express Trust   69
            (b)   The Ability of A and B to Vary the Terms of the Arrangement   73
            (c)   Policy and Possible Reform   75
            (d)   Promisee as Constructive Trustee   75
            (e)   Performance Bonds, and Labour and Materials Payment Bonds   77
        2.   Situation Two: Person Promising to Act as Trustee for Third Party on
            Receipt of Property   80
        3.   Situation 3: Trustee as Assignee of Contractual Rights   83
    B.   Burdening Assignee of Property Which is Subject to Contractual Rights   83
V.    TRUST AND BAILMENT   86
VI.   TRUST AND DEBT   90
VII.  TRUSTS AND POWERS   97
    A.   The Various Types of Trusts and Powers   97
    B.   Evidence of a Power, and of a Power Followed by a Trust   102
    C.   Certainty of Objects: Trust, Trust Powers, and Mere Powers   105
VIII. TRUST AND EQUITABLE CHARGE   108
IX.   TRUST, CONDITIONAL GIFT, AND PERSONAL OBLIGATION   111

Several types of legal relationships share common features with the trust relationship while being distinct in other ways. Comparing trusts to these other concepts yields not only a better appreciation of trust relationships, but an understanding of the important practical consequences the characterization of a relationship, as trust or otherwise, can have.

# I.  TRUST AND FIDUCIARY RELATIONSHIP

## A.  Trustees as Fiduciaries

The hallmark of a trust is the fiduciary relationship which the trust creates between the trustee and the beneficiary. The whole purpose of a trustee's existence is to administer property on behalf of another, to hold it exclusively for the other's enjoyment. The express trustee is expected to put the interests of the trust and the beneficiaries first in his thinking whenever he is exercising the powers, or performing the duties of, his office. His duty is one of selfless service. And the object of describing a man as a resulting or constructive trustee is to emphasize that he is a person who is under the express trustee's fiduciary obligation to hold property, of which he is technically the owner, for the benefit of another.

It was in Equity that the notion of the fiduciary was first conceived, and it originated to explain the position of one who at law held title and had all the appearance of full enjoyment, but who nevertheless because of Equity's intervention had no right of personal enjoyment. Here was a man who had the capacity to bring

140   CHAPTER 5   THE THREE CERTAINTIES

# I. INTRODUCTION

For a trust to come into existence, it must have three essential characteristics. As Lord Langdale M.R. remarked in *Knight v. Knight*,[1] in words adopted by Barker J. in *Renehan v. Malone*[2] and considered fundamental in common law Canada,[3] (1) the language of the alleged settlor must be imperative; (2) the subject-matter or trust property must be certain; (3) the objects of the trust must be certain. This means that the alleged settlor, whether he is giving the property on the terms of a trust or is transferring property on trust in exchange for consideration, must employ language which clearly shows his intention that the recipient should hold on trust. No trust exists if the recipient is to take absolutely, but he is merely put under a moral obligation as to what is to be done with the property. If such imperative language exists, it must, second, be shown that the settlor has so clearly described the property which is to be subject to the trust that it can be definitively ascertained.[4] Third, the objects of the trust must be equally and clearly delineated. There must be no uncertainty as to whether a person is, in fact, a beneficiary. If any one of these three certainties does not exist, the trust fails to come into existence or, to put it differently, is void.

The principle of the three certainties has been fundamental at least since the days of Lord Eldon, and no one today could seek to challenge the principle; the problems that exist concern the issue of what constitutes certainty.

---

[1]   (1840), 3 Beav. 148, 49 E.R. 58 (Eng. Ch.).

[2]   (1897), 1 N.B. Eq. 506 (N.B. S.C. [In Equity]).

[3]   Numerous Canadian cases have referred to the three certainties as essential to the existence of an express trust. A few relatively recent examples include *Goodman Estate v. Geffen* (1987), (sub nom. *Goodman v. Geffen*) 52 Alta. L.R. (2d) 210 (Alta. Q.B.), reversed (1989), 68 Alta. L.R. (2d) 289 (Alta. C.A.), additional reasons at (1990), 80 Alta. L.R. (2d) 289 (Alta. C.A.), reversed (1991), 80 Alta. L.R. (2d) 293 (S.C.C.), leave to appeal allowed (1989), 101 A.R. 160 (note) (S.C.C.); *Quesnel & District Credit Union v. Smith* (1987), 19 B.C.L.R. (2d) 105 (B.C. C.A.); *Bank of Nova Scotia v. Société Générale (Canada)* (1988), 58 Alta. L.R. (2d) 193 (Alta. C.A.); *Faucher v. Tucker Estate* (1993), [1994] 2 W.W.R. 1 (Man. C.A.); *Howitt v. Howden Group Canada Ltd.* (1999), 170 D.L.R. (4th) 423, 26 E.T.R. (2d) 1 (Ont. C.A.); *Canada Trust Co. v. Price Waterhouse Ltd.* (2001), 288 A.R. 387 (Alta. Q.B.); *Arkay Casino Management & Equipment (1985) Ltd. v. Alberta (Attorney General)* (1998), 227 A.R. 280, (sub nom. *Arkay Casino Ltd. v. Alberta (Attorney General)*) 64 Alta. L.R. (3d) 368, [1999] 4 W.W.R. 334 (Alta. Q.B.); *Parsons v. Cook* (2004), 238 Nfld. & P.E.I.R. 16, 7 E.T.R. (3d) 92 (N.L. T.D.); *McMillan v. Hughes* (2004), 11 E.T.R. (3d) 290 (B.C. S.C.); *Saugestad v. Saugestad*, 2006 CarswellBC 3170, 28 E.T.R. (3d) 210 (B.C. S.C.) at para. 82, reversed in part on other grounds 2008 CarswellBC 123, 37 E.T.R. (3d) 19, 77 B.C.L.R. (4th) 170 (B.C. C.A.); *Re Graphicshoppe Ltd.*, 2005 CarswellOnt 7008, 78 O.R. (3d) 401 (Ont. C.A.) at para. 10; *VanDenBussche v. Craig VanDenBussche Trust (Trustee of)*, 2009 CarswellMan 557, (sub nom. *VanDenBussche v. VanDenBussche Trust*) 247 Man. R. (2d) 174, 55 E.T.R. (3d) 179 (Man. Q.B.); and *Sun Life Assurance Co. of Canada v. Taylor* (2008), 2008 CarswellSask 678, 322 Sask. R. 153, [2009] 2 W.W.R. 286 (Sask. Q.B.).

[4]   The property interest which each beneficiary is to take must also be clearly defined. See *infra*, Part III D.

the claim of a trust for the children to be pure sham," said the court. "If there is any trust, it is for the benefit of the husband."[84]

However, if the trust is set up by the husband in circumstances that showed no intention to defeat the wife's entitlement, the court may refuse to declare the trust void. This is so even though the husband always treated the property as his own, included the trust assets in statements as to his personal assets, the trustees were his friends, and during his time as trustee he controlled the trust property. The court, concerned with these "facts", agreed with the husband's submission that it would be "turning trust law upside down" to say that the trust was a sham.[85]

# III. CERTAINTY OF SUBJECT-MATTER

For a trust to be validly created, it must also be possible to identify clearly the property which is to be subject to the trust.[86] Moreover, even if the trust property is thus clearly defined, the shares in that property which the beneficiaries are each to take must also be clearly defined. Certainty of subject-matter as a term refers to both of these required certainties.

If the language employed provides clear evidence of the intention to create a trust, no trust can yet come into existence if it is impossible to determine what the trust property is. This is so whether the settlor purports to transfer property or declares himself trustee of his property. "The bulk of my residuary estate" is uncertain; nothing can therefore pass to the trustees or be held by the settlor as trustee.[87] But,

---

[84] *Merklinger v. Merklinger* (1992), 11 O.R. (3d) 233 (Ont. Gen. Div.) at 241-242, affirmed (1996), 30 O.R. (3d) 575 (Ont. C.A.).

[85] *Sagl v. Sagl* (1997), 31 R.F.L. (4th) 405 (Ont. Gen. Div.), additional reasons at (1997), 35 R.F.L. (4th) 107 (Ont. Gen. Div.).

[86] This concept applies to all trusts, including alleged statutory trusts. In *Green v. Ontario* (1972), [1973] 2 O.R. 396, 34 D.L.R. (3d) 20 (Ont. H.C.), the plaintiff claimed that s. 2 of the *Provincial Parks Act*, R.S.O. 1970, c. 371, imposed a statutory trust upon the province with regard to dedicated parkland in Ontario. Apart from the fact that the learned judge could find no obligation as trustee imposed on the province, nor who could be the trust beneficiary, he drew attention to the power of the province under the Act "to increase, decrease or even put an end to or 'close down' any park" (at 34 D.L.R. (3d) 31). There was, therefore, he said, no certainty of subject-matter of the alleged trust.

It is sufficient that the property be clearly identified so, for instance, a reference to "Group Insurance coverage provided by the deceased's employer, Moor Business Forms" was sufficient to identify the proceeds of a particular insurance policy. See *Shannon v. Shannon*, 1985 CarswellOnt 699, 19 E.T.R. 1 (Ont. H.C.); and similarly in *Schorlemer Estate v. Schorlemer*, 2006 CarswellOnt 8155, 29 E.T.R. (3d) 181 (Ont. S.C.J.) a reference to "any policies of life insurance on his life through his employer" was sufficient where the person had only one employer and only one policy of insurance. Though it must be possible to identify the trust property, it is also essential, unless the trustee has given value, that the property is held in title by the trustee. Only then can there be a valid trust.

[87] Certainty of subject-matter (or of the initial trust fund assets) is an essential element in establishing the segregation of the trust fund from other property: *Palmer v. Simmonds* (1854), 2 Drew. 221, 61 E.R. 704; *Bromley v. Tryron* (1951), [1952] A.C. 265, [1951] 2 All E.R. 1058 (U.K. H.L.). Similarly, a reference to "other property" that was to be sold and the proceeds used to form the corpus of a trust was found not to be sufficiently certain because the expression "other property" was capable of several plausible interpretations in the circumstances – see *Re Romaniuk* (1986), 48 Alta. L.R. (2d) 225, 23 E.T.R. 294 (Alta. Surr. Ct.). See also *Almecon Industries Ltd. v. Anchortek Ltd.* (2004), 48 C.B.R.

*Oxygen Co., Inc.,* 695 F.2d 883 (5th Cir. 1983); *Bauman v. Volkswagenwerk Aktiengesellschaft,* 621 F.2d 230, 232 (6th Cir. 1980); *Flaminio v. Honda Motor Company, Ltd.,* 733 F.2d 463, 469 (7th Cir. 1984); *Gauthier v. AMF, Inc.,* 788 F.2d 634, 636–37 (9th Cir. 1986).

Although this amendment adopts a uniform federal rule, it should be noted that evidence of subsequent remedial measures may be admissible pursuant to the second sentence of Rule 407. Evidence of subsequent measures that is not barred by Rule 407 may still be subject to exclusion on Rule 403 grounds when the dangers of prejudice or confusion substantially outweigh the probative value of the evidence.

*GAP Report on Rule 407.* The words ''injury or harm'' were substituted for the word ''event'' in line 3. The stylization changes in the second sentence of the rule were eliminated. The words ''causing 'injury or harm'*''* were added to the Committee Note.

COMMITTEE NOTES ON RULES—2011 AMENDMENT

The language of Rule 407 has been amended as part of the general restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Rule 407 previously provided that evidence was not excluded if offered for a purpose not explicitly prohibited by the Rule. To improve the language of the Rule, it now provides that the court may admit evidence if offered for a permissible purpose. There is no intent to change the process for admitting evidence covered by the Rule. It remains the case that if offered for an impermissible purpose, it must be excluded, and if offered for a purpose not barred by the Rule, its admissibility remains governed by the general principles of Rules 402, 403, 801, etc.

## Rule 408. Compromise Offers and Negotiations

(a) PROHIBITED USES. Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) EXCEPTIONS. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1933; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

NOTES OF ADVISORY COMMITTEE ON PROPOSED RULES

As a matter of general agreement, evidence of an offer-to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim. As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. The validity of this position will vary

as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances. (2) a more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes. McCormick §§76, 251. While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person.

The same policy underlies the provision of Rule 68 of the Federal Rules of Civil Procedure that evidence of an unaccepted offer of judgment is not admissible except in a proceeding to determine costs.

The practical value of the common law rule has been greatly diminished by its inapplicability to admissions of fact, even though made in the course of compromise negotiations, unless hypothetical, stated to be ''without prejudice,'' or so connected with the offer as to be inseparable from it. McCormick §251, pp. 540–541. An inevitable effect is to inhibit freedom of communication with respect to compromise, even among lawyers. Another effect is the generation of controversy over whether a given statement falls within or without the protected area. These considerations account for the expansion of the rule herewith to include evidence of conduct or statements made in compromise negotiations, as well as the offer or completed compromise itself. For similar provisions see California Evidence Code §§1152, 1154.

The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lessor sum. McCormick §251, p. 540. Hence the rule requires that the claim be disputed as to either validity or amount.

The final sentence of the rule serves to point out some limitations upon its applicability. Since the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule. The illustrative situations mentioned in the rule are supported by the authorities. As to proving bias or prejudice of a witness, see Annot., 161 A.L.R. 395, *contra, Fenberg v. Rosenthal,* 348 Ill. App. 510, 109 N.E.2d 402 (1952), and negativing a contention of lack of due diligence in presenting a claim, 4 Wigmore §1061. An effort to ''buy off'' the prosecution or a prosecuting witness in a criminal case is not within the policy of the rule of exclusion. McCormick §251, p. 542.

For other rules of similar import, see Uniform Rules 52 and 53; California Evidence Code §1152, 1154; Kansas Code of Civil Procedure §§60–452, 60–453; New Jersey Evidence Rules 52 and 53.

NOTES OF COMMITTEE ON THE JUDICIARY, HOUSE
REPORT NO. 93–650

Under existing federal law evidence of conduct and statements made in compromise negotiations is admissible in subsequent litigation between the parties. The second sentence of Rule 408 as submitted by the Supreme Court proposed to reverse that doctrine in the interest of further promoting non-judicial settlement of disputes. Some agencies of government expressed the view that the Court formulation was likely to impede rather than assist efforts to achieve settlement of disputes. For one thing, it is not always easy to tell when compromise negotiations begin, and informal dealings end. Also, parties dealing with government agencies would be reluctant to furnish factual information at preliminary meetings; they would wait until ''compromise negotiations'' began and thus hopefully effect an immunity for themselves with respect to the evidence supplied. In light of these considerations, the Committee recast the Rule so that admissions of liability or opinions given during compromise negotiations continue inadmissible, but evidence of unqualified factual assertions is admissible. The latter aspect of the

Rule is drafted, however, so as to preserve other possible objections to the introduction of such evidence. The Committee intends no modification of current law whereby a party may protect himself from future use of his statements by couching them in hypothetical conditional form.

NOTES OF COMMITTEE ON THE JUDICIARY, SENATE REPORT NO. 93–1277

This rule as reported makes evidence of settlement or attempted settlement of a disputed claim inadmissible when offered as an admission of liability or the amount of liability. The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible.

Under present law, in most jurisdictions, statements of fact made during settlement negotiations, however, are excepted from this ban and are admissible. The only escape from admissibility of statements of fact made in a settlement negotiation is if the declarant or his representative expressly states that the statement is hypothetical in nature or is made without prejudice. Rule 408 as submitted by the Court reversed the traditional rule. It would have brought statements of fact within the ban and made them, as well as an offer of settlement, inadmissible.

The House amended the rule and would continue to make evidence of facts disclosed during compromise negotiations admissible. It thus reverted to the traditional rule. The House committee report states that the committee intends to preserve current law under which a party may protect himself by couching his statements in hypothetical form [See House Report No. 93–650 above]. The real impact of this amendment, however, is to deprive the rule of much of its salutary effect. The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements—the encouragement of which is the purpose of the rule. Further, by protecting hypothetically phrased statements, it constituted a preference for the sophisticated, and a trap for the unwary.

Three States which had adopted rules of evidence patterned after the proposed rules prescribed by the Supreme Court opted for versions of rule 408 identical with the Supreme Court draft with respect to the inadmissibility of conduct or statements made in compromise negotiations. [Nev. Rev. Stats. §48.105; N. Mex. Stats. Anno. (1973 Supp.) §20–4–408; West's Wis. Stats. Anno. (1973 Supp.) §904.08].

For these reasons, the committee has deleted the House amendment and restored the rule to the version submitted by the Supreme Court with one additional amendment. This amendment adds a sentence to insure that evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation.

NOTES OF CONFERENCE COMMITTEE, HOUSE REPORT NO. 93–1597

The House bill provides that evidence of admissions of liability or opinions given during compromise negotiations is not admissible, but that evidence of facts disclosed during compromise negotiations is not inadmissible by virtue of having been first disclosed in the compromise negotiations. The Senate amendment provides that evidence of conduct or statements made in compromise negotiations is not admissible. The Senate amendment also provides that the rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

The House bill was drafted to meet the objection of executive agencies that under the rule as proposed by the Supreme Court, a party could present a fact during compromise negotiations and thereby prevent an opposing party from offering evidence of that fact at trial even though such evidence was obtained from independent sources. The Senate amendment expressly precludes this result.

The Conference adopts the Senate amendment.

COMMITTEE NOTES ON RULES—2006 AMENDMENT

Rule 408 has been amended to settle some questions in the courts about the scope of the Rule, and to make it easier to read. First, the amendment provides that Rule 408 does not prohibit the introduction in a criminal case of statements or conduct during compromise negotiations regarding a civil dispute by a government regulatory, investigative, or enforcement agency. See, e.g., United States v. Prewitt, 34 F.3d 436, 439 (7th Cir. 1994) (admissions of fault made in compromise of a civil securities enforcement action were admissible against the accused in a subsequent criminal action for mail fraud). Where an individual makes a statement in the presence of government agents, its subsequent admission in a criminal case should not be unexpected. The individual can seek to protect against subsequent disclosure through negotiation and agreement with the civil regulator or an attorney for the government.

Statements made in compromise negotiations of a claim by a government agency may be excluded in criminal cases where the circumstances so warrant under Rule 403. For example, if an individual was unrepresented at the time the statement was made in a civil enforcement proceeding, its probative value in a subsequent criminal case may be minimal. But there is no absolute exclusion imposed by Rule 408.

In contrast, statements made during compromise negotiations of other disputed claims are not admissible in subsequent criminal litigation, when offered to prove liability for, invalidity of, or amount of those claims. When private parties enter into compromise negotiations they cannot protect against the subsequent use of statements in criminal cases by way of private ordering. The inability to guarantee protection against subsequent use could lead to parties refusing to admit fault, even if by doing so they could favorably settle the private matter. Such a chill on settlement negotiations would be contrary to the policy of Rule 408.

The amendment distinguishes statements and conduct (such as a direct admission of fault) made in compromise negotiations of a civil claim by a government agency from an offer or acceptance of a compromise of such a claim. An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault. In that case, the predicate for the evidence would be that the defendant, by compromising with the government agency, has admitted the validity and amount of the civil claim, and that this admission has sufficient probative value to be considered as evidence of guilt. But unlike a direct statement of fault, an offer or acceptance of a compromise is not very probative of the defendant's guilt. Moreover, admitting such an offer or acceptance could deter a defendant from settling a civil regulatory action, for fear of evidentiary use in a subsequent criminal action. See, e.g., Fishman, Jones on Evidence, Civil and Criminal, §22:16 at 199, n.83 (7th ed. 2000) ("A target of a potential criminal investigation may be unwilling to settle civil claims against him if by doing so he increases the risk of prosecution and conviction.").

The amendment retains the language of the original rule that bars compromise evidence only when offered as evidence of the "validity," "invalidity," or "amount" of the disputed claim. The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim. See, e.g., Athey v. Farmers Ins. Exchange, 234 F.3d 357 (8th Cir. 2000) (evidence of settlement offer by insurer was properly admitted to prove insurer's bad faith); Coakley & Williams v. Structural Concrete Equip., 973 F.2d 349 (4th Cir. 1992) (evidence of

settlement is not precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release); *Cates v. Morgan Portable Bldg. Corp.*, 708 F.2d 683 (7th Cir. 1985) (Rule 408 does not bar evidence of a settlement when offered to prove a breach of the settlement agreement, as the purpose of the evidence is to prove the fact of settlement as opposed to the validity or amount of the underlying claim); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th Cir. 1997) (threats made in settlement negotiations were admissible; Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations). So for example, Rule 408 is inapplicable if offered to show that a party made fraudulent statements in order to settle a litigation.

The amendment does not affect the case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to prove notice. *See, e.g., United States v. Austin*, 54 F.3d 394 (7th Cir. 1995) (no error to admit evidence of the defendant's settlement with the FTC, because it was offered to prove that the defendant was on notice that subsequent similar conduct was wrongful); *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) (in a civil rights action alleging that an officer used excessive force, a prior settlement by the City of another brutality claim was properly admitted to prove that the City was on notice of aggressive behavior by police officers).

The amendment prohibits the use of statements made in settlement negotiations when offered to impeach by prior inconsistent statement or through contradiction. Such broad impeachment would tend to swallow the exclusionary rule and would impair the public policy of promoting settlements. *See McCormick on Evidence* at 186 (5th ed. 1999) ("Use of statements made in compromise negotiations to impeach the testimony of a party, which is not specifically treated in Rule 408, is fraught with danger of misuse of the statements to prove liability, threatens frank interchange of information during negotiations, and generally should not be permitted."). *See also EEOC v. Gear Petroleum, Inc.*, 948 F.2d 1542 (10th Cir. 1991) (letter sent as part of settlement negotiation cannot be used to impeach defense witnesses by way of contradiction or prior inconsistent statement; such broad impeachment would undermine the policy of encouraging uninhibited settlement negotiations).

The amendment makes clear that Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations. If a party were to reveal its own statement or offer, this could itself reveal the fact that the adversary entered into settlement negotiations. The protections of Rule 408 cannot be waived unilaterally because the Rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury. Moreover, proof of statements and offers made in settlement would often have to be made through the testimony of attorneys, leading to the risks and costs of disqualification. *See generally Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 828 (2d Cir. 1992) (settlement offers are excluded under Rule 408 even if it is the offeror who seeks to admit them; noting that the "widespread admissibility of the substance of settlement offers could bring with it a rash of motions for disqualification of a party's chosen counsel who would likely become a witness at trial").

The sentence of the Rule referring to evidence "otherwise discoverable" has been deleted as superfluous. *See, e.g.*, Advisory Committee Note to Maine Rule of Evidence 408 (refusing to include the sentence in the Maine version of Rule 408 and noting that the sentence "seems to state that the law would be if it were omitted"); Advisory Committee Note to Wyoming Rule of Evidence 408 (refusing to include the sentence in Wyoming Rule 408 on the ground that it was "superfluous"). The intent of the sentence was to prevent a party from trying to immunize admissible information, such as a pre-existing document, through the pretense of disclosing it during compromise negotiations. *See*

*Ramada Development Co. v. Rauch*, 644 F.2d 1097 (5th Cir. 1981). But even without the sentence, the Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations.

*Changes Made After Publication and Comments.* In response to public comment, the proposed amendment was changed to provide that statements and conduct during settlement negotiations are to be admissible in subsequent criminal litigation only when made during settlement discussions of a claim brought by a government regulatory agency. Stylistic changes were made in accordance with suggestions from the Style Subcommittee of the Standing Committee. The Committee Note was altered to accord with the change in the text, and also to clarify that fraudulent statements made during settlement negotiations are not protected by the Rule.

COMMITTEE NOTES ON RULES—2011 AMENDMENT

The language of Rule 408 has been amended as part of the general restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Rule 408 previously provided that evidence was not excluded if offered for a purpose not explicitly prohibited by the Rule. To improve the language of the Rule, it now provides that the court may admit evidence if offered for a permissible purpose. There is no intent to change the process for admitting evidence covered by the Rule. It remains the case that if offered for an impermissible purpose, it must be excluded, and if offered for a purpose not barred by the Rule, its admissibility remains governed by the general principles of Rules 402, 403, 801, etc.

The Committee deleted the reference to "liability" on the ground that the deletion makes the Rule flow better and easier to read, and because "liability" is covered by the broader term "validity." Courts have not made substantive decisions on the basis of any distinction between validity and liability. No change in current practice or in the coverage of the Rule is intended.

# Rule 409. Offers to Pay Medical and Similar Expenses

Evidence of furnishing, promising to pay, or offering to pay medical, hospital, or similar expenses resulting from an injury is not admissible to prove liability for the injury.

(Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1933; Apr. 26, 2011, eff. Dec. 1, 2011.)

NOTES OF ADVISORY COMMITTEE ON PROPOSED RULES

The considerations underlying this rule parallel those underlying Rules 407 and 408, which deal respectively with subsequent remedial measures and offers of compromise. As stated in Annot., 20 A.L.R.2d 291, 293:

"[G]enerally, evidence of payment of medical, hospital, or similar expenses of an injured party by the opposing party, is not admissible, the reason often given being that such payment or offer is usually made from humane impulses and not from an admission of liability, and that to hold otherwise would tend to discourage assistance to the injured person."

Contrary to Rule 408, dealing with offers of compromise, the present rule does not extend to conduct or statements not a part of the act of furnishing or offering or promising to pay. This difference in treatment arises from fundamental differences in nature. Communication is essential if compromises are to be effected, and consequently broad protection of statements is needed. This is not so in cases of payments or offers or promises to pay medical expenses, where factual statements may be expected to be incidental in nature.

# Canadian Contractual Interpretation Law

## SECOND EDITION

### Geoff R. Hall

B.A. (McGill), M.A., LL.B. (Toronto), LL.M. (Harvard)

Partner, McCarthy Tétrault LLP

*2012*

 LexisNexis

**Canadian Contractual Interpretation Law, Second Edition**
© LexisNexis Canada 2012
February 2012

All rights reserved. No part of this publication may be reproduced or stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

**Library and Archives Canada Cataloguing in Publication**

Hall, Geoff R. (Geoffrey Robert), 1966-
   Canadian contractual interpretation Law / Geoff R. Hall.

Includes index.
ISBN 978-0-433-46512-6

   1. Contracts—Canada—Interpretation and construction. 2. Law—Language. I. Title.

KE850.H34 2007        346.7102        C2007-903709-7
KF801.H34 2007

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665 • Fax: (905) 479-2826
Toll-Free Phone: 1-800-668-6481 • Toll-Free Fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Web Site: www.lexisnexis.ca

Printed and bound in Canada.

necessary to consider not only the words of the contract but also, as mandated by article 1426, the external context.[131]

At the same time, as in the common law, the factual matrix may not overwhelm the text of the contract. This result flows from articles 2863 and 2864 of the *Civil Code of Québec*:

> 2863. The parties to a juridical act set forth in a writing may not contradict or vary the terms of the writing by testimony unless there is a commencement of proof.
>
> 2864. Proof by testimony is admissible to interpret a writing, to complete a clearly incomplete writing or to impugn the validity of the juridical act which the writing sets forth.[132]

The point has also been made in the case law.[133]

## 2.4    INTERPRETATION IS AN OBJECTIVE EXERCISE

### 2.4.1    The principle

It is a fundamental precept of the law of contractual interpretation that the exercise is objective rather than subjective. "The goal in interpreting an agreement is to discover, *objectively*, the parties' intention at the time the contract was made."[134] [Emphasis added.] The objective approach applies to both the words of a contract and their context. Therefore, the exercise is not to determine what the parties subjectively intended but what a reasonable person would objectively have understood from the words of the document read as a whole and from the factual matrix:[135] "Bearing in mind the relevant background, the purpose of the document, and considering the entirety of the document, what would the parties to the document *reasonably* have understood the contested words to mean?"[136] [Emphasis added.] Put another way, "[i]n interpreting a

---

[131] *STMicroelectronics inc. v. Matrox Graphics inc.*, [2007] J.Q. no 14364 at para. 59 (Qué. C.A.). See also *Vanier v. Ville de Montréal*, [2004] J.Q. no 6523 at para. 21 (Qué. C.A.) and *Shaughnessy Village Realties Inc. v. Syndicate of the Co-Owners of Complexe du Fort*, [2008] J.Q. no 8914 at para. 25 (Qué. C.A.).

[132] S.Q. 1991, c. 64, arts. 2863 and 2864.

[133] *Sobeys Québec Inc. v. Coopérative des consommateurs de Sainte-Foy*, [2005] J.Q. no 17876 at para. 54 (Qué. C.A.).

[134] *Gilchrist v. Western Star Trucks Inc.*, [2000] B.C.J. No. 164, 73 B.C.L.R. (3d) 102 at para. 17 (B.C.C.A.).

[135] The first edition of this book was cited with approval for this point in *Golden Capital Securities Ltd. v. Investment Industry Regulatory Organization of Canada*, [2010] B.C.J. No. 1458, 8 B.C.L.R. (5th) 227 at para. 44 (B.C.C.A.).

[136] *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, [1999] O.J. No. 3290, 45 O.R. (3d) 417 at para. 9 (Ont. C.A.). There are numerous judicial pronouncements to a similar effect. See, for example, *Alberta (Treasury Branches) v. Macleod Dixon*, [2001] A.J. No. 114, [2001] 6 W.W.R. 265 at para. 32 (Alta. Q.B.); *Barque Investments Ltd. v. DKT Computer Learning Centre Inc.*, [2001] A.J. No. 1190, 297 A.R. 337 at para. 12 (Alta. Q.B.); *Greenholls Golf and Country Club 617654 Saskatchewan Ltd. v. Morhart*, [2002] S.J. No. 6, 215 Sask. R. 124 at para. 8 (Sask. Q.B.); and *CISH Care Institute of Safety and Health Inc. v. West Fraser Home Centres Inc.*, [2004] B.C.J. No. 1318 at para. 98 (B.C.S.C.).

contract, what is relevant is the parties' outward manifestations ...".[137]

The proposition that contractual interpretation is objective rather than subjective is universally accepted by the courts and is only occasionally challenged in academic literature.[138]

The objective nature of the endeavour affects the entire interpretive exercise. It defines the perspective for interpretation — the words in their context mean not what the parties subjectively believe them to mean but rather what a reasonable third party would take them to mean — and renders evidence of subjective intention absolutely inadmissible.

### 2.4.2    The words mean what a reasonable person would take them to mean

Since interpretation of the words of a contract is objective, meaning must therefore be assessed from the perspective of a reasonable person. This perspective is nicely illustrated by *642718 Alberta Ltd. (c.o.b. CNE Centre) v. Alberta (Minister of Public Works, Supply and Services)*.[139] The issue was whether an offer to purchase document (referred to as the "Third Offer") forwarded to the plaintiffs by the defendant Province of Alberta constituted an acceptance of a purported oral agreement to purchase land. Interpretation of the Third Offer was approached on the following basis: "The question then becomes, what should the Plaintiffs reasonably have concluded was intended by the Province when they forwarded this document."[140] This formulation aptly demonstrates the objective perspective to contractual interpretation: the question was not what the *Defendant* intended by the words it used but rather "what should the *Plaintiffs reasonably* have concluded was intended ...". [Emphasis added.]

### 2.4.3    The parties' subjective intentions must not be considered

There is an obvious but profound implication to the requirement that the words of a contract must be interpreted objectively: the parties' subjective intentions are irrelevant, and evidence of them is inadmissible. "The goal is to determine the objective intentions of the parties in the sense of a reasonable person in the

---

[137]  *Lacroix v. Loewen*, [2010] B.C.J. No. 833, 4 B.C.L.R. (5th) 282 at para. 37 (B.C.C.A.).

[138]  For example, Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 S.C.L.R. (2d) 369 argues that the concept of objective intention is incoherent because under the "classical theory" of contract law, which justifies the enforcement of contracts by the fact that they are entered into freely by autonomous individuals, only enforcement of subjective intention would make sense.

[139]  [2004] A.J. No 870, [2005] 10 W.W.R. 555 (Alta. Q.B.), vard [2005] A.J. No. 1177, 371 A.R. 390 (Alta. C.A.).

[140]  *Ibid.*, at para. 48 (Alta. Q.B.).

context of those surrounding circumstances and not the subjective intentions of the parties."[141]

This point was made most forcefully in *Eli Lilly*.[142] The trial judge had held that the ultimate goal of contractual interpretation was to ascertain the true intent of the parties at the time of entry into the contract, and had held that in undertaking this inquiry it was open to a trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. Speaking with considerable understatement on behalf of a unanimous Court, Iacobucci J. stated that "this approach is not quite accurate":

> The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. *Evidence of one party's subjective intention has no independent place in this determination.*[143] [Emphasis added.]

Thus even if the written words are clear, evidence of subjective intention cannot be used to help interpret them.[144]

The inadmissibility of evidence of subjective intention has two separate aspects. First, evidence of a party's subjective understanding of the meaning of the words used in a contract is irrelevant and inadmissible. Second, evidence of what a party truly intended, independent from the words of the contract, is irrelevant and inadmissible (absent a claim for rectification). These two aspects are well illustrated in a pithy case in which summary judgment was granted over the objection that the case should have been sent to trial so that oral evidence could be given about the understanding of one of the parties as to what was said in the course of negotiations and to show a collateral verbal agreement. "What [a party] thinks the documents mean is irrelevant and so not admissible. ... What [a party] understood or intended is not relevant and so not admissible."[145]

## 2.4.4   The factual matrix must be assessed objectively

The factual matrix of a contract consists only of objective facts known to the parties at or before the date of contracting.[146] It also consists only of what is common to both parties, as opposed to individualized versions of the factual matrix particular to only one of the contracting parties.[147] To permit the factual matrix to include subjective elements or facts known only to one side would undermine the principle that interpretation must be an objective exercise.

---

[141] *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League (c.o.b. CAA Manitoba)*, [2003] M.J. No. 191, [2003] 9 W.W.R. 385 at para. 26 (Man. C.A.).

[142] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59, [1998] 2 S.C.R. 129 (S.C.C.).

[143] *Ibid.*, at para. 54.

[144] *Gainers Inc. v. Pocklington Financial Corp.*, [2000] A.J. No. 626, 81 Alta. L.R. (3d) 17 at para. 20 (Alta. C.A.).

[145] *Zaccardelli v. Kraus*, [2003] A.J. No. 442 at paras. 27-28 (Alta. Master).

[146] *Lewis v. Union of B.C. Performers*, [1996] B.C.J. No. 133, 18 B.C.L.R. (3d) 382 (B.C.C.A.), leave to appeal to S.C.C. refused [1996] S.C.C.A. No. 182 (S.C.C.).

[147] *Taggart v. McLay*, [1998] B.C.J. No. 3079 at para. 7 (B.C.C.A.).

# Chapter 3

# ELEMENTS OF CONTRACTUAL INTERPRETATION

## 3.1    PRIOR DRAFTS AND EVIDENCE OF NEGOTIATIONS

### 3.1.1    The principle

It has long been established in Canada that prior drafts and evidence of the negotiations leading up to a final agreement may not be considered as part of the interpretive process. This represents one of the few areas to which the factual matrix does not extend.[1] The rule is seemingly categorical, and has not been questioned by Canadian courts. While a few academic articles in England and the Commonwealth have questioned it, such critiques have acquired no traction in Canada, either in the courts or in the academy.

However, the rule has an important exception: it does not extend to preclude the admission of evidence of prior drafts and negotiations showing pertinent surrounding circumstances other than the parties' subjective intentions. From the perspective of contractual interpretation, there would seem to be considerable logic to this exception. Contractual interpretation is fundamentally about finding the correct meaning by considering both the words the parties agreed upon and the context in which the words were used. Prior drafts and evidence of negotiation may in some cases be quite helpful in setting the context for a final agreement and thereby assist in ascertaining meaning correctly. As long as such evidence does not touch upon subjective intention, it is difficult to see such evidence as objectionable in principle.

### 3.1.2    The categorical rule: prior drafts and evidence of negotiations are inadmissible to assist in contractual interpretation

The rule appears, at least superficially, to be a categorical one: prior drafts and expressions of intention made in the course of negotiations are not admissible to assist in contractual interpretation. The principle was firmly established in 1951 by the reasons of Estey J. in *Indian Molybdenum Ltd. v. The King*[2] and has not

---

[1]    See section 2.3.4.

[2]    [1951] 3 D.L.R. 497 (S.C.C.).

been questioned since. The seminal decision of the House of Lords in *Prenn v. Simmonds*,[3] which is widely followed in Canada,[4] reinforced the principle. *Prenn v. Simmonds* justified the rule on the basis that prior drafts and evidence of negotiation are unhelpful because only the final words agreed upon by the parties embody a consensus.[5] A similar rationale for the rule has been adopted in Canada.[6]

A few academic articles in England and the Commonwealth have questioned the logic of the rule excluding evidence of negotiations, arguing that it is inconsistent with other aspects of contract law which require courts to examine the course of negotiations closely (such as contract formation, where a court may need to wade through a huge volume of correspondence to determine whether a contract arose), and that it is inconsistent with international principles of contract law which allow consideration of prior negotiations (such as the principles set out in the UNIDROIT Principles of International Commercial Contracts).[7] However, these critiques have been ignored both by Canadian courts and by Canadian academics, indicating a lack of appetite for revisiting the rule in Canada.

### 3.1.3    However, the rule does not preclude admission of evidence of pertinent surrounding circumstances

While setting down a seemingly categorical rule in *Indian Molybdenum Ltd. v. The King*, Estey J. recognized that the rule does not preclude admission of evidence of what would now be called surrounding circumstances or the factual matrix. While prior drafts and evidence of negotiations cannot themselves form part of the factual matrix, to the extent that they show the factual matrix, such evidence is admissible. From the perspective of the law of contractual interpretation, this is a potentially important exception to the rule.

In *Indian Molybdenum Ltd. v. The King*, the plaintiff had contracted with the federal government during World War II to supply molybdenum, a metal needed for the war effort. The contract entitled the plaintiff to an additional payment if it failed to make a fair profit under the contract. The issue was how to calculate profit. Specifically, the parties disagreed on the appropriate treatment of capital assets. The plaintiff contended that the capital assets had no other use following completion of the contract and, as a result, their value should be entirely deducted as an expense when calculating profit. The government contended for the rate of depreciation permitted under income tax legislation at the relevant time, which was less than the full value of the assets.

---

[3]   [1971] 1 W.L.R. 1381 (H.L.).

[4]   It has been cited by Canadian courts approximately 50 times on the issue of the admissibility of evidence of negotiations.

[5]   *Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 at 1384-85 (H.L.).

[6]   *Labrador Inuit Assn. v. Newfoundland (Minister of Environment and Labour)*, [1997] N.J. No. 223, 152 D.L.R. (4th) 50 at paras. 48-50 (Nfld. C.A.).

[7]   David McLauchlan, "A Contract Contradiction" (1999) 30 V.U.W.L.R. 175 and Gerard McMeel, "Prior Negotiations and Subsequent Conduct — The Next Step Forward for Contractual Interpretation?" (2003) 119 Law Q. Rev. 272.

In resolving this dispute, Estey J. held prior drafts of the parties' agreement to be inadmissible, but also held that a number of other important contextual facts were admissible even though they had arisen in the course of negotiations:

It follows that not only the draft letters, but all expressions of intention made by the respective parties in the course of negotiations would not be admissible. *However, the evidence admissible would include the facts in proof of the urgent need of the molybdenum, the acquisition of the mine and the results of the diamond drilling, as known to the parties, as well as the fact that all parties to the negotiations were associated with mining enterprises.*[8] [Emphasis added.]

This exception is often overlooked, and in an era in which context takes on greater importance in contractual interpretation than it did in 1951, it is worth keeping in mind. Under general principles of contractual interpretation, it is now well accepted that the words of a contract cannot be accurately construed without regard for the context from which they arose. In that light, it is difficult to see why negotiations should categorically be excluded from the context. As *Prenn v. Simmonds* noted, such evidence may be unhelpful, but even it appears to have left open some scope for the use of prior drafts of a contract to the extent that they are relevant to the factual matrix, provided that they are not taken as evidence of the parties' subjective intentions:

It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact. Cardozo J. thought so in the *Utica Bank* case [*Utica City National Bank v. Gunn*, 118 N.E. 607 (N.Y. 1918) at 608]. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. ...

But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways.[9]

The prohibition against evidence of subjective intention is clearly one that should be categorical, since it is a fundamental precept of contractual interpretation that the exercise is objective. However, evidence of prior drafts and negotiations leading up to an agreement may be a very different thing than evidence of subjective intention. Thus whether a categorical prohibition of such evidence is warranted in an era in which context is considered such an important part of ascertaining the intentions of contracting parties accurately remains unclear.

---

[8]  *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 at 503 (S.C.C.), *per* Estey J., concurring.

[9]  *Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 at 1385 (H.L.).

## 3.2    SUBSEQUENT CONDUCT

### 3.2.1    The principle

Evidence of the parties' post-contracting performance of their contractual obligations can be admitted as an aid to interpretation of the agreement in question. However, such evidence is admissible only if it is first determined that the provision being interpreted is ambiguous. Even then, the evidence may be given little or no weight.[10]

Canadian courts have long accepted the potential usefulness of subsequent conduct in interpreting a contract. The law in this regard has not changed significantly since the Supreme Court of Canada held as follows in 1919 in *Adolph Lumber Co. v. Meadow Creek Lumber Co.*:[11]

> In my opinion the contract on which this action was brought was so ambiguously worded that it was almost impossible to determine from its language what the parties really intended and meant it to express.
>
> In these circumstances we have the right and the duty, as by their subsequent conduct the parties have themselves put a construction upon the contract, to adopt and apply that as the proper construction.[12]

Subsequent conduct is admitted in cases of ambiguity because it tends to illustrate the parties' intentions at the time of contracting. As expressed by the Ontario Court of Appeal in 1995, evidence of subsequent conduct "may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date".[13] In this regard, Canadian law is significantly different from English law, which generally holds evidence of subsequent conduct inadmissible because of the concern that such evidence could cause a contract to mean one thing at the time of execution but something different at a later time.[14]

---

[10] See also the non-interpretive doctrine of estoppel by convention, which also looks to subsequent conduct to define the contractual meaning that will be enforced by a court, and which is not subject to the same strictures as is the use of subsequent conduct as a general aid to contractual interpretation. Estoppel by convention is discussed in section 6.2.

[11] [1919] S.C.J. No. 11, 58 S.C.R. 306 (S.C.C.).

[12] *Ibid.*, at 307.

[13] *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.*, [1995] O.J. No. 1609, 24 O.R. (3d) 97 at 108 (Ont. C.A.) (quoting S.M. Waddams, *The Law of Contracts*, 3rd ed. (Toronto: Canada Law Book, 1993) at para. 323). *Edmonton (City) v. Protection Mutual Insurance Co.*, [1996] A.J. No. 753 at paras. 17-20 (Alta. Q.B.) took this rationale one step further, holding that evidence of an insurer's previous treatment of an identical policy might be helpful in showing the insurer's intentions at the time of contract formation and also held that "[i]f evidence of subsequent conduct was not allowed to be considered, a situation would be created in which the insurer could argue alternate and conflicting policy interpretations based on the facts of any given case".

[14] See *James Miller and Partners Ltd. v. Whitworth Street Estates (Manchester) Ltd.*, [1970] A.C. 583 at 594 (H.L.) and *Schuler A.G. v. Wickman Machine Tool Sales Ltd.*, [1974] A.C. 235 (H.L.).

A good example of the use of subsequent conduct to aid in the interpretation of a contract is *Toronto (City) v. Greenspoon Brothers Ltd.*[15] A demolition company contracted with a municipality to tear down a building. An adjacent building, also owned by the city, caught fire at night and was damaged. The city claimed that the contract governing the demolition job required the demolition company to have a night guard to protect against fire. The demolition company disagreed, claiming it had no such obligation. After finding an ambiguity in the agreement, the court considered a number of aspects of the parties' subsequent conduct: at no time, either before or after the fire, had the city suggested to the demolition company that it had breached a contractual duty to guard the premises; the demolition company had made it clear to city officials after the fire, without contradiction from them, that it had no responsibility for the damaged building; and the city had paid for the demolition work and had refunded a deposit which was only payable upon satisfactory completion of the work. All of these factors were found to be instructive and to support the demolition company's interpretation: "We are of the view that the conduct of both parties, including the return of the deposit, is consistent with [the demolition company's] interpretation of its obligations under the contract and does assist in resolving any ambiguity."[16]

## 3.2.2    Ambiguity is an absolute prerequisite to the admissibility of evidence of subsequent conduct

Evidence of subsequent conduct is only admissible if there is an ambiguity in a written contract. Thus, as expressed by *Arthur Andersen Inc. v. Toronto-Dominion Bank*,[17] a two-stage inquiry is necessary. First, the factual matrix must be considered. Second, if an ambiguity is revealed (in the sense of the words having at least two possible meanings), evidence of subsequent conduct is admissible:

> First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and *evidence of subsequent conduct of the parties to the agreement*.[18] [Emphasis added.]

The prerequisite of ambiguity is well established. Several years before *Arthur Andersen* the Ontario Court of Appeal had also made this requirement clear:

---

[15]   [1980] O.J. No. 3647, 29 O.R. (2d) 158 (Ont. C.A.), leave to appeal to S.C.C. refused 34 N.R. 353*n* (S.C.C.).

[16]   *Ibid.*, at 164-65.

[17]   [1994] O.J. No. 427, 17 O.R. (3d) 363 (Ont. C.A.), leave to appeal to S.C.C. refused [1994] S.C.C.A. No. 189, 19 O.R. (3d) xvi (note) (S.C.C.) [*Arthur Andersen*].

[18]   *Ibid.*, at para. 18.

In my view, the language of the ground lease, as amended, is the only language which the court needs to construe. In my opinion, it is clear and unambiguous, *but, if there is any ambiguity*, it is evident that the parties, by their conduct, adopted the interpretation that Manulife placed on the document for the years 1971 to 1982 inclusive.

     .....

> *I am entitled to look to the conduct* of the parties and method of performance of the contract as evidence of what the parties intended (*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co. (Incorporated)*, [1969] 1 O.R. 469 at pp. 523-5, 3 D.L.R. (3d) 161 at pp. 215-7 (H.C.J.); *Re C.N.R. and C.P. Ltd.* (1978), 95 D.L.R. (3d) 242 at pp. 262-4, [1979] 1 W.W.R. 358 (B.C.C.A.); *Watcham v. East Africa Protectorate* (1918), [1919] A.C. 533 (P.C.) at 538-540).[19] [Emphasis added.]

The requirement of ambiguity is important because it ensures that the interpretive exercise is grounded in the text chosen by the parties. However, where that text is ambiguous, it is sensible to look to the parties' subsequent conduct because no other reliable indicator of the parties' intentions may exist. *Warren General Contracting Ltd. v. Robichaud* nicely illustrates the point:

> The letter is so loosely drawn that it is difficult if not impossible to ascertain from it alone what the contracting parties actually agreed to. In such circumstances it is permissible to look at the surrounding circumstances and the conduct of the parties.[20]

The contextual approach to contractual interpretation followed by Canadian courts gives priority to the words chosen by the parties and will not allow context (including subsequent conduct) to overwhelm the words. However, when the parties have not expressed themselves clearly in words such that the best evidence of their mutual intention (the words they chose to govern their relationship) is inconclusive, resort can and should be had to the next-best available evidence, which is their own post-contracting conduct.

*Arthur Andersen*'s two-step formulation implies that the initial consideration of the factual matrix is made without regard for subsequent conduct. This point was made expressly by the Newfoundland Court of Appeal in *Eco-Zone Engineering Ltd. v. Grand Falls — Windsor (Town)*,[21] which held that while the factual matrix includes evidence regarding the purpose, aims and objectives of the contract it does not (at least generally) include evidence of subsequent conduct of the parties (or evidence of contractual negotiations).

---

[19]  *Corporate Properties Ltd. v. Manufacturers Life Insurance Co.*, [1989] O.J. No. 2278 at paras. 24, 26, 70 O.R. (2d) 737 (Ont. C.A.), leave to appeal to S.C.C. refused [1990] S.C.C.A. No. 48, 68 D.L.R. (4th) vii (S.C.C.). See also *Keefer Laundry Ltd. v. Pellerin Milnor Corp.*, [2009] B.C.J. No. 1189, 94 B.C.L.R. (4th) 205 at para. 66 (B.C.C.A.) and *Dinney v. Great-West Life Assurance Co.*, [2009] M.J. No. 116, [2009] 8 W.W.R. 30 at para. 59 (Man. C.A.), leave to appeal to S.C.C. refused [2009] S.C.C.A. 257 (S.C.C.), both of which reiterated the ambiguity precondition.

[20]  [1973] N.B.J. No. 106, 6 N.B.R. (2d) 821 at para. 18 (N.B.C.A.).

[21]  [2000] N.J. No. 377, 5 C.L.R. (3d) 55 at para. 11 (Nfld. C.A.).

*Arthur Andersen*'s formulation also implies that subsequent conduct is merely a subset of extrinsic evidence which may be considered if the initial threshold requirement of ambiguity is met. This understanding accords with the approach of the British Columbia Court of Appeal's leading authority on the point, *C.N.R. v. C.P. Ltd.*,[22] which clearly established subsequent conduct as merely one of many types of extrinsic evidence that can be admitted to resolve an ambiguity:

> The types of extrinsic evidence that will be admitted, if they meet the test of relevance and are not excluded by other evidentiary tests, include evidence of the facts leading up to the making of the agreement, evidence of the circumstances as they exist at the time the agreement is made and, in Canada, *evidence of subsequent conduct of the parties to the agreement.*[23] [Emphasis added.]

Subsuming evidence of subsequent conduct within the general category of extrinsic evidence is sensible because it is difficult to see why different types of evidence from outside the four corners of a written document should be treated differently once a finding of ambiguity establishes the need to resort to such evidence.

### 3.2.3   The weight to be given to evidence of subsequent conduct may be quite limited

While Canadian courts quite universally accept the admissibility of evidence of subsequent conduct where the precondition of ambiguity is met, the weight that such evidence is given depends on all the circumstances and can be quite limited. The British Columbia Court of Appeal has formulated the weighing of such evidence in the following terms:

> In the case of evidence of subsequent conduct, the evidence is likely to be most cogent where the parties to the agreement are individuals, the acts considered are the acts of both parties, the acts can relate only to the agreement, the acts are intentional and the acts are consistent only with one of the alternative interpretations. ... In no case is it necessary that weight be given to evidence of subsequent conduct. In some cases it may be most misleading to do so, and it is to this danger that allusions are made throughout the recent English cases ... .[24]

Some courts have gone so far as to assert that evidence of subsequent conduct will carry little weight unless it is "unequivocal".[25] The Ontario Court of Appeal has recently described evidence of subsequent conduct as having "some

---

[22]   [1979] 1 W.W.R. 358 (B.C.C.A.), affd [1979] S.C.J. No. 62, [1979] 2 S.C.R. 668 (S.C.C.).

[23]   *Ibid.*, at 372 (B.C.C.A.).

[24]   *C.N.R. v. C.P. Ltd.*, [1978] B.C.J. No. 1298, [1979] 1 W.W.R. 358 at 372-73 (B.C.C.A.), affd [1979] S.C.J. No. 62, [1979] 2 S.C.R. 668 (S.C.C.).

[25]   *Lewis v. Union of B.C. Performers*, [1996] B.C.J. No. 133, 18 B.C.L.R. (3d) 382 at para. 14 (B.C.C.A.), leave to appeal to S.C.C. refused [1996] S.C.C.A. No. 182 (S.C.C.), citing *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.*, [1968] O.J. No. 605, 3 D.L.R. (3d) 161 at 238 (Ont. H.C.J.) and *Qualico Developments Ltd. v. Calgary (City)*, [1987] A.J. No. 530, [1987] 5 W.W.R. 361 at 372 (Alta. Q.B.).

relevance" which "may be of assistance" in choosing between competing interpretations, although the evidence in that case was "overwhelmingly" supportive of one particular interpretation.[26]

The Supreme Court of Canada has suggested that evidence of subsequent conduct should be restricted to the events which are most illustrative of the parties' intentions at the time of contracting, which are those actions that immediately follow execution:

> If a contract is ambiguous the surrounding circumstances must be considered by way of illuminating that which may have been imperfectly expressed. In other words, if we would understand what men have expressed we must realize the business they were about. That cannot be extended beyond the immediate acts following the signing of their contract.[27]

Limiting evidence of subsequent conduct in this fashion would address the concern expressed in the English cases about such evidence potentially changing the meaning of an agreement over time. However, it does not appear to have been subsequently applied by the courts, except for the proposition that evidence of subsequent conduct cannot be extended to subsequent contracts down the line.[28]

## 3.2.4   Subsequent conduct in Québec

Under Québec law, subsequent conduct is an important element of contractual interpretation, and its consideration does not depend on the existence of an ambiguity. Article 1426 of the *Civil Code of Québec* provides that "the interpretation which has already been given to [a contract] by the parties" is to be considered:

> 1426. In interpreting a contract, the nature of the contract, the circumstances in which it was formed, *the interpretation which has already been given to it by the parties or which it may have received*, and usage, are all taken into account.[29] [Emphasis added.]

Like the common law version of the rule, the logic behind article 1426 is that the parties' subsequent conduct demonstrates the intentions of the parties at the time of contract formation, as it is presumed that parties seek to perform their obligations rather than evade them (at least until a dispute arises).[30]

There are numerous cases in which Québec courts have applied subsequent conduct to affect contractual meaning quite significantly. In *Richer v. Mutuelle*

---

[26] *Chippewas of Mnjikaning First Nation v. Ontario (Minister of Native Affairs)*, [2010] O.J. No. 212, 265 O.A.C. 247 at para. 162 (Ont. C.A.), leave to appeal to S.C.C. refused [2010] S.C.C.A. No. 91 (S.C.C.).

[27] *Union Natural Gas Co. of Canada v. Chatham Gas Co.*, [1918] S.C.J. No. 5, 56 S.C.R. 253 at 270 (S.C.C.).

[28] *Telestar Resources Ltd. v. Coseka Resources Ltd.*, [1980] A.J. No. 623, 12 Alta. L.R. (2d) 187 at 192 (Alta. C.A.).

[29] *Civil Code of Québec*, S.Q. 1991, c. 64, art. 1426.

[30] Sébastien Grammond, "The Interpretation of Contracts in Civil Law" (2010) 52 Sup. Ct. L. Rev. (2d) 411 at 421.

*du Canada cie d'assurance sur la vie*,[31] a longstanding practice was essentially held to prevail over the terms of the contract. In *Placements Monique Lacroix inc. v. Galerie Madeleine Lacerte inc.*,[32] a landlord was precluded from recovering sums payable under a lease because of the parties' subsequent conduct in relation to the payments in question. In *Trudeau v. Cochrane*,[33] the parties' subsequent conduct was considered to be a waiver of contractual rights.

## 3.3    DELETED WORDS

### 3.3.1    The principle

Words which have been deleted from a contract are not to be considered in interpreting it. Instead, they are to be ignored, as if they had never been written in the first place. This principle is an excellent illustration of the importance to contractual interpretation of the text chosen by the parties. If the parties have deliberately removed words from their agreement, those words are completely discarded. The only possible exception to this rule is that deleted words might be able to be considered where the written contract is ambiguous, although the existence of this exception, and its potential scope if in fact it does exist, are unclear.

### 3.3.2    The evolution of the rule

The law with respect to deleted words as inherited from England was contradictory. In 1834, *Strickland v. Maxwell*[34] held that words which had been stroked out of a contract could be considered in interpreting the contract. However in 1878, *Inglis v. John Buttery & Co.*[35] came to the opposite conclusion:

> With reference to the deleted words, it is of great importance to have it understood that there is no doubt on that point in the mind of any one of your Lordships. When those words were removed from the paper which had presented the full contract between the parties, they ceased to exist to all intents and purposes: and whether it was possible, as in fact it was, still to read them, in consequences of their simply having a line drawn through them, or whether they had been absolutely obliterated, appears to me not to make the smallest difference. The contract was complete after the deletion.[36]

The conflict between *Strickland v. Maxwell* and *Inglis* was considered by the Supreme Court of Canada in *Knight Sugar Co. v. Webster*,[37] which came

---

[31]    [1987] J.Q. no 1415, 13 Q.A.C. 107 (Qué. C.A.), leave to appeal refused [1988] C.S.C.R. no 13 (S.C.C.).

[32]    [1996] J.Q. no 392 (Qué. C.A.).

[33]    [1976] S.C.J. No. 54, [1977] 2 S.C.R. 55 (S.C.C.).

[34]    (1834), 2 Cr. & M. 539, 3 L.J. Ex. 161.

[35]    (1878), 3 App. Cas. 552 (H.L.) [*Inglis*].

[36]    *Ibid.*, at 571.

[37]    [1930] S.C.J. No. 25, [1930] S.C.R. 518 (S.C.C.) [*Knight Sugar*].



# Title 26—Internal Revenue

(This book contains part 1, §§ 1.1401 to 1.1550)

|  | Part |
|---|---|
| CHAPTER I—Internal Revenue Service, Department of the Treasury (Continued) .......................................................... | 1 |

1



# SUBCHAPTER A—INCOME TAX (CONTINUED)

## PART 1—INCOME TAXES (CONTINUED)

Normal Taxes and Surtaxes (Continued)

**DEFERRED COMPENSATION, ETC. (CONTINUED)**

ACCOUNTING PERIODS AND METHODS OF ACCOUNTING

Accounting Periods

Sec.
1.441–0  Table of contents.
1.441–1  Period for computation of taxable income.
1.441–2  Election of taxable year consisting of 52–53 weeks.
1.441–3  Taxable year of a personal service corporation.
1.441–4  Effective date.
1.442–1  Change of annual accounting period.
1.443–1  Returns for periods of less than 12 months.
1.444–0T  Table of contents (temporary).
1.444–1T  Election to use a taxable year other than the required taxable year (temporary).
1.444–2T  Tiered structure (temporary).
1.444–3T  Manner and time of making section 444 election (temporary).
1.444–4  Tiered structure.

Methods of Accounting

Methods of Accounting in General

1.446–1  General rule for methods of accounting.
1.446–2  Method of accounting for interest.
1.446–3  Notional principal contracts.
1.446–4  Hedging transactions.
1.446–5  Debt issuance costs.
1.446–6  REMIC inducement fees.
1.448–1  Limitation on the use of the cash receipts and disbursements method of accounting.
1.448–1T  Limitation on the use of the cash receipts and disbursements method of accounting (temporary).
1.448–2  Nonaccrual of certain amounts by service providers.

Taxable Year For Which Items of Gross Income Included

1.451–1  General rule for taxable year of inclusion.
1.451–2  Constructive receipt of income.
1.451–4  Accounting for redemption of trading stamps and coupons.
1.451–5  Advance payments for goods and long-term contracts.
1.451–6  Election to include crop insurance proceeds in gross income in the taxable year following the taxable year of destruction or damage.
1.451–7  Election relating to livestock sold on account of drought.
1.453–1—1.453–2  [Reserved]
1.453–3  Purchaser evidences of indebtedness payable on demand or readily tradable.
1.453–4  Sale of real property involving deferred periodic payments.
1.453–5  Sale of real property treated on installment method.
1.453–6  Deferred payment sale of real property not on installment method.
1.453–7—1.453–8  [Reserved]
1.453–9  Gain or loss on disposition of installment obligations.
1.453–10  Effective date.
1.453–11  Installment obligations received from a liquidating corporation.
1.453–12  Allocation of unrecaptured section 1250 gain reported on the installment method.
1.453A–0  Table of contents.
1.453A–1  Installment method of reporting income by dealers on personal property.
1.453A–2  Treatment of revolving credit plans; taxable years beginning on or before December 31, 1986.
1.453A–3  Requirements for adoption of or change to installment method by dealers in personal property.
1.454–1  Obligations issued at discount.
1.455–1  Treatment of prepaid subscription income.
1.455–2  Scope of election under section 455.
1.455–3  Method of allocation.
1.455–4  Cessation of taxpayer's liability.
1.455–5  Definitions and other rules.
1.455–6  Time and manner of making election.
1.456–1  Treatment of prepaid dues income.
1.456–2  Scope of election under section 456.
1.456–3  Method of allocation.
1.456–4  Cessation of liability or existence.
1.456–5  Definitions and other rules.
1.456–6  Time and manner of making election.
1.456–7  Transitional rule.
1.457–1  General overviews of section 457.
1.457–2  Definitions.
1.457–3  General introduction to eligible plans.
1.457–4  Annual deferrals, deferral limitations, and deferral agreements under eligible plans.
1.457–5  Individual limitation for combined annual deferrals under multiple eligible plans.
1.457–6  Timing of distributions under eligible plans.
1.457–7  Taxation of Distribution Under Eligible Plans.
1.457–8  Funding rules for eligible plans.

5

1.457–9  Effect on eligible plans when not administered in accordance with eligibility requirements.
1.457–10  Miscellaneous provisions.
1.457–11  Tax treatment of participants if plan is not an eligible plan.
1.457–12  Effective dates.
1.458–1  Exclusion for certain returned magazines, paperbacks, or records.
1.458–2  Manner of and time for making election.
1.460–0  Outline of regulations under section 460.
1.460–1  Long-term contracts.
1.460–2  Long-term manufacturing contracts.
1.460–3  Long-term construction contracts.
1.460–4  Methods of accounting for long-term contracts.
1.460–5  Cost allocation rules.
1.460–6  Look-back method.

TAXABLE YEAR FOR WHICH DEDUCTIONS TAKEN

1.461–0  Table of contents.
1.461–1  General rule for taxable year of deduction.
1.461–2  Contested liabilities.
1.461–3  Prepaid interest. [Reserved]
1.461–4  Economic performance.
1.461–5  Recurring item exception.
1.461–6  Economic performance when certain liabilities are assigned or are extinguished by the establishment of a fund.
1.465–1T  Aggregation of certain activities (temporary).
1.465–8  General rules; interest other than that of a creditor.
1.465–20  Treatment of amounts borrowed from certain persons and amounts protected against loss.
1.465–27  Qualified nonrecourse financing.
1.466–1  Method of accounting for the redemption cost of qualified discount coupons.
1.466–2  Special protective election for certain taxpayers.
1.466–3  Manner of and time for making election under section 466.
1.466–4  Manner of and time for making election under section 373(c) of the Revenue Act of 1978.
1.467–0  Table of contents.
1.467–1  Treatment of lessors and lessees generally.
1.467–2  Rent accrual for section 467 rental agreements without adequate interest.
1.467–3  Disqualified leasebacks and long-term agreements.
1.467–4  Section 467 loan.
1.467–5  Section 467 rental agreements with variable interest.
1.467–6  Section 467 rental agreements with contingent payments. [Reserved]
1.467–7  Section 467 recapture and other rules relating to dispositions and modifications.
1.467–8  Automatic consent to change to constant rental accrual for certain rental agreements.
1.467–9  Effective dates and automatic method changes for certain agreements.
1.468A–0  Nuclear decommissioning costs; table of contents.
1.468A–1  Nuclear decommissioning costs; general rules.
1.468A–2  Treatment of electing taxpayer.
1.468A–3  Ruling amount.
1.468A–4  Treatment of nuclear decommissioning fund.
1.468A–5  Nuclear decommissioning fund qualification requirements; prohibitions against self-dealing; disqualification of nuclear decommissioning fund; termination of fund upon substantial completion of decommissioning.
1.468A–6  Disposition of an interest in a nuclear power plant.
1.468A–7  Manner of and time for making election.
1.468A–8  Special transfers to qualified funds pursuant to section 468A(f).
1.468A–9  Effective/applicability date.
1.468B  Designated settlement funds.
1.468B–0  Table of contents.
1.468B–1  Qualified settlement funds.
1.468B–2  Taxation of qualified settlement funds and related administrative requirements.
1.468B–3  Rules applicable to the transferor.
1.468B–4  Taxability of distributions to claimants.
1.468B–5  Effective dates and transition rules applicable to qualified settlement funds.
1.468B–6  Escrow accounts, trusts, and other funds used during deferred exchanges of like-kind property under section 1031(a)(3).
1.468B–7  Pre-closing escrows.
1.468B–8  Contingent-at-closing escrows. [Reserved]
1.468B–9  Disputed ownership funds.
1.469–0  Table of contents.
1.469–1  General rules.
1.469–1T  General rules (temporary).
1.469–2  Passive activity loss.
1.469–2T  Passive activity loss (temporary).
1.469–3  Passive activity credit.
1.469–3T  Passive activity credit (temporary).
1.469–4  Definition of activity.
1.469–4T  Definition of activity (temporary).
1.469–5  Material participation.
1.469–5T  Material participation (temporary).
1.469–6  Treatment of losses upon certain dispositions. [Reserved]
1.469–7  Treatment of self-charged items of interest income and deduction.
1.469–8  Application of section 469 to trust, estates, and their beneficiaries. [Reserved]
1.469–9  Rules for certain rental real estate activities.

6

**Internal Revenue Service, Treasury**

1.469–10  Application of section 469 to publicly traded partnerships.
1.469–11  Effective date and transition rules.

INVENTORIES

1.471–1  Need for inventories.
1.471–2  Valuation of inventories.
1.471–3  Inventories at cost.
1.471–4  Inventories at cost or market, whichever is lower.
1.471–5  Inventories by dealers in securities.
1.471–6  Inventories of livestock raisers and other farmers.
1.471–7  Inventories of miners and manufacturers.
1.471–8  Inventories of retail merchants.
1.471–9  Inventories of acquiring corporations.
1.471–10  Applicability of long-term contract methods.
1.471–11  Inventories of manufacturers.
1.472–1  Last-in, first-out inventories.
1.472–2  Requirements incident to adoption and use of LIFO inventory method.
1.472–3  Time and manner of making election.
1.472–4  Adjustments to be made by taxpayer.
1.472–5  Revocation of election.
1.472–6  Change from LIFO inventory method.
1.472–7  Inventories of acquiring corporations.
1.472–8  Dollar-value method of pricing LIFO inventories.
1.475–0  Table of contents.
1.475(a)–1—1.475(a)–2  [Reserved]
1.475(a)–3  Acquisition by a dealer of a security with a substituted basis.
1.475(a)–4  Valuation safe harbor.
1.475(b)–1  Scope of exemptions from mark-to-market requirement.
1.475(b)–2  Exemptions—identification requirements.
1.475(b)–3  [Reserved]
1.475(b)–4  Exemptions—transitional issues.
1.475(c)–1  Definitions—dealer in securities.
1.475(c)–2  Definitions—security.
1.475(d)–1  Character of gain or loss.
1.475(g)–1  Effective dates.

ADJUSTMENTS

1.481–1  Adjustments in general.
1.481–2  Limitation on tax.
1.481–3  Adjustments attributable to pre-1954 years where change was not initiated by taxpayer.
1.481–4  Adjustments taken into account with consent.
1.481–5  Effective dates.
1.482–0  Outline of regulations under section 482.
1.482–1  Allocation of income and deductions among taxpayers.
1.482–2  Determination of taxable income in specific situations.

1.482–3  Methods to determine taxable income in connection with a transfer of tangible property.
1.482–4  Methods to determine taxable income in connection with a transfer of intangible property.
1.482–5  Comparable profits method.
1.482–6  Profit split method.
1.482–7  Methods to determine taxable income in connection with a cost sharing arrangement.
1.482–8  Examples of the best method rule.
1.482–9  Methods to determine taxable income in connection with a controlled services transaction.
1.483–1  Interest on certain deferred payments.
1.483–2  Unstated interest.
1.483–3  Test rate of interest applicable to a contract.
1.483–4  Contingent payments.

REGULATIONS APPLICABLE FOR TAXABLE YEARS BEGINNING ON OR BEFORE APRIL 21, 1993

1.482–1A  Allocation of income and deductions among taxpayers.
1.482–2A  Determination of taxable income in specific situations.
1.482–7A  Methods to determine taxable income in connection with a cost sharing arrangement.
1.484–1.500  [Reserved]

AUTHORITY: 26 U.S.C. 7805.

Section 1.441–2T also issued under 26 U.S.C. 441(f).

Section 1.441–3T also issued under 26 U.S.C. 441.

Section 1.442–2T and 1.442–3T also issued under 26 U.S.C. 422, 706, and 1378.

Section 1.444–0T through 1.444–3T and

Section 1.444–4 is also issued under 26 U.S.C. 444(g).

Section 1.446–1 also issued under 26 U.S.C. 446 and 461(h).

Section 1.446–4 also issued under 26 U.S.C. 1502.

Section 1.446–6 also issued under 26 U.S.C. 446 and 26 U.S.C. 860G.

Section 1.451–5 also issued under 96 Stat. 324, 493.

Section 1.453–11 also issued under 26 U.S.C. 453(j)(1) and (k).

Section 1.453A–3 also issued under 26 U.S.C. 453A.

Section 1.458–1 also issued under 26 U.S.C. 458.

Section 1.460–1 also issued under 26 U.S.C. 460(h).

Section 1.460–2 also issued under 26 U.S.C. 460(h).

Section 1.460–3 also issued under 26 U.S.C. 460(h).

Section 1.460–4 also issued under 26 U.S.C. 460(h) and 1502.

7

Section 1.460–5 also issued under 26 U.S.C. 460(h).

Section 1.460–6 also issued under 26 U.S.C. 460(h).

Section 1.461–1 also issued under 26 U.S.C. 461(h).

Section 1.461–2 also issued under 26 U.S.C. 461(h).

Section 1.461–4 also issued under 26 U.S.C. 461(h).

Section 1.461–4(d) also issued under 26 U.S.C. 460 and 26 U.S.C. 461(h).

Section 1.461–5 also issued under 26 U.S.C. 461(h).

Section 1.461–6 also issued under 26 U.S.C. 461(h).

Section 1.465–8 also issued under 26 U.S.C. 465.

Section 1.465–20 also issued under 26 U.S.C. 465.

Section 1.465–27 also issued under 26 U.S.C. 465(b)(6)(B)(iii).

Section 1.466–1 through 1.466–4 also issued under 26 U.S.C. 466.

Section 1.467–1 is also issued under 26 U.S.C. 467.

Section 1.467–2 is also issued under 26 U.S.C. 467.

Section 1.467–3 is also issued under 26 U.S.C. 467.

Section 1.467–4 is also issued under 26 U.S.C. 467.

Section 1.467–5 is also issued under 26 U.S.C. 467.

Section 1.467–6 is also issued under 26 U.S.C. 467.

Section 1.467–7 is also issued under 26 U.S.C. 467.

Section 1.467–8 is also issued under 26 U.S.C. 467.

Section 1.467–9 is also issued under 26 U.S.C. 467.

Section 1.468A–5 also issued under 26 U.S.C. 468A(e)(5).

Section 1.468A–5T also issued under 26 U.S.C. 468A(e)(5).

Section 1.468B–1 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–2 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–3 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–4 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–5 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–7 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.468B–9 also issued under 26 U.S.C. 461(h) and 468B(g).

Section 1.469–1 also issued under 26 U.S.C. 469.

Section 1.469–1T also issued under 26 U.S.C. 469.

Section 1.469–2 also issued under 26 U.S.C. 469(l).

Section 1.469–2T also issued under 26 U.S.C. 469(l).

Section 1.469–3 also issued under 26 U.S.C. 469(l).

Section 1.469–3T also issued under 26 U.S.C. 469(l).

Section 1.469–4 also issued under 26 U.S.C. 469(l).

Section 1.469–5 also issued under 26 U.S.C. 469(l).

Section 1.469–5T also issued under 26 U.S.C. 469(l).

Section 1.469–7 also issued under 26 U.S.C. 469(l).

Section 1.469–9 also issued under 26 U.S.C. 469(c)(6), (h)(2), and (l)(1).

Section 1.469–11 also issued under 26 U.S.C. 469(l).

Section 1.471 also issued under 26 U.S.C. 471.

Section 1.471–4 also issued under 26 U.S.C. 263A.

Section 1.471–5 also issued under 26 U.S.C. 263A.

Section 1.471–6 also issued under 26 U.S.C. 471.

Section 1.472–8 also issued under 26 U.S.C. 472.

Section 1.475(a)–3 also issued under 26 U.S.C. 475(e).

Section 1.475(a)–4 also issued under 26 U.S.C. 475(g).

Section 1.475(b)–1 also issued under 26 U.S.C. 475(b)(4) and 26 U.S.C. 475(e).

Section 1.475(b)–2 also issued under 26 U.S.C. 475(b)(2) and 26 U.S.C. 475(e).

Section 1.475(b)–4 also issued under 26 U.S.C. 475(b)(2), 26 U.S.C. 475(e), and 26 U.S.C. 6001.

Section 1.475(c)–1 also issued under 26 U.S.C. 475(e).

Section 1.475(c)–2 also issued under 26 U.S.C. 475(e) and 26 U.S.C. 860G(e).

Section 1.475(d)–1 also issued under 26 U.S.C. 475(e).

Section 1.475(e)–1 also issued under 26 U.S.C. 475(e).

Section 1.481–1 also issued under 26 U.S.C. 481.

Section 1.481–2 also issued under 26 U.S.C. 481.

Section 1.481–3 also issued under 26 U.S.C. 481.

Section 1.481–4 also issued under 26 U.S.C. 481.

Section 1.481–5 also issued under 26 U.S.C. 481.

Section 1.482–1 also issued under 26 U.S.C. 482 and 936.

Section 1.482–2 also issued under 26 U.S.C. 482.

Section 1.482–3 also issued under 26 U.S.C. 482.

Section 1.482–4 also issued under 26 U.S.C. 482.

Section 1.482–5 also issued under 26 U.S.C. 482.

**Internal Revenue Service, Treasury**　　　　　　　§ 1.441–0

Section 1.482–7 is also issued under 26 U.S.C. 482.

Section 1.482–7T also issued under 26 U.S.C. 482.

Section 1.482–9 also issued under 26 U.S.C. 482.

Section 1.482–2A also issued under 26 U.S.C. 482.

Section 1.482–7A also issued under 26 U.S.C. 482.

Section 1.482–9 also issued under 26 U.S.C. 482.

Section 1.483–1 through 1.483–3 also issued under 26 U.S.C. 483(f).

Section 1.483–4 also issued under 26 U.S.C. 483(f).

DEFERRED COMPENSATION, ETC. (CONTINUED)

ACCOUNTING PERIODS AND METHODS OF ACCOUNTING

Accounting Periods

**§ 1.441–0   Table of contents.**

This section lists the captions contained in §§ 1.441–1 through 1.441–4 as follows:

*§ 1.441–1   Period for computation of taxable income.*

(a) Computation of taxable income.
(1) In general.
(2) Length of taxable year.
(b) General rules and definitions.
(1) Taxable year.
(i) Required taxable year.
(i) In general.
(ii) Exceptions.
(A) 52–53-week taxable years.
(B) Partnerships, S corporations, and PSCs.
(C) Specified foreign corporations.
(3) Annual accounting period.
(4) Calendar year.
(5) Fiscal year.
(i) Definition.
(ii) Recognition.
(6) Grandfathered fiscal year.
(7) Books.
(8) Taxpayer.
(c) Adoption of taxable year.
(1) In general.
(2) Approval required.
(i) Taxpayers with required taxable years.
(ii) Taxpayers without books.
(d) Retention of taxable year.
(e) Change of taxable year.
(f) Obtaining approval of the Commissioner or making a section 444 election.

*§ 1.441–2   Election of taxable year consisting of 52–53 weeks*

(a) In general.
(1) Election.

(2) Effect.
(3) Eligible taxpayer.
(4) Example.
(b) Procedures to elect a 52–53-week taxable year.
(1) Adoption of a 52–53-week taxable year.
(i) In general.
(ii) Filing requirement.
(2) Change to (or from) a 52–53-week taxable year.
(i) In general.
(ii) Special rules for short period required to effect the change.
(3) Examples.
(c) Application of effective dates.
(1) In general.
(2) Examples.
(3) Changes in tax rates.
(4) Examples.
(d) Computation of taxable income.
(e) Treatment of taxable years ending with reference to the same calendar month.
(1) Pass-through entities.
(2) Personal service corporations and employee-owners.
(3) Definitions.
(i) Pass-through entity.
(ii) Owner of a pass-through entity.
(4) Examples.
(5) Transition rule.

*§ 1.441–3   Taxable year of a personal service corporation*

(a) Taxable year.
(1) Required taxable year.
(2) Exceptions.
(b) Adoption, change, or retention of taxable year.
(1) Adoption of taxable year.
(2) Change in taxable year.
(3) Retention of taxable year.
(4) Procedures for obtaining approval or making a section 444 election.
(5) Examples.
(c) Personal service corporation defined.
(1) In general.
(2) Testing period.
(i) In general.
(ii) New corporations.
(3) Examples.
(d) Performance of personal services.
(1) Activities described in section 448(d)(2)(A).
(2) Activities not described in section 448(d)(2)(A).
(e) Principal activity.
(1) General rule.
(2) Compensation cost.
(i) Amounts included.
(ii) Amounts excluded.
(3) Attribution of compensation cost to personal service activity.
(i) Employees involved only in the performance of personal services.
(ii) Employees involved only in activities that are not treated as the performance of personal services.

9

(iii) Other employees.
(A) Compensation cost attributable to personal service activity.
(B) Compensation cost not attributable to personal service activity.
(f) Services substantially performed by employee-owners.
(1) General rule.
(2) Compensation cost attributable to personal services.
(3) Examples.
(g) Employee-owner defined.
(1) General rule.
(2) Special rule for independent contractors who are owners.
(h) Special rules for affiliated groups filing consolidated returns.
(1) In general.
(2) Examples.

*§ 1.441–4   Effective date*

[T.D. 8996, 67 FR 35012, May 17, 2002]

### § 1.441–1   Period for computation of taxable income.

(a) *Computation of taxable income*—(1) *In general.* Taxable income must be computed and a return must be made for a period known as the taxable year. For rules relating to methods of accounting, the taxable year for which items of gross income are included and deductions are taken, inventories, and adjustments, see parts II and III (section 446 and following), subchapter E, chapter 1 of the Internal Revenue Code, and the regulations thereunder.

(2) *Length of taxable year.* Except as otherwise provided in the Internal Revenue Code and the regulations thereunder (e.g., § 1.441–2 regarding 52–53-week taxable years), a taxable year may not cover a period of more than 12 calendar months.

(b) *General rules and definitions.* The general rules and definitions in this paragraph (b) apply for purposes of sections 441 and 442 and the regulations thereunder.

(1) *Taxable year.* Taxable year means—
(i) The period for which a return is made, if a return is made for a period of less than 12 months (short period). See section 443 and the regulations thereunder;
(ii) Except as provided in paragraph (b)(1)(i) of this section, the taxpayer's required taxable year (as defined in paragraph (b)(2) of this section), if applicable;

(iii) Except as provided in paragraphs (b)(1)(i) and (ii) of this section, the taxpayer's annual accounting period (as defined in paragraph (b)(3) of this section), if it is a calendar year or a fiscal year; or

(iv) Except as provided in paragraphs (b)(1)(i) and (ii) of this section, the calendar year, if the taxpayer keeps no books, does not have an annual accounting period, or has an annual accounting period that does not qualify as a fiscal year.

(2) *Required taxable year*—(i) *In general.* Certain taxpayers must use the particular taxable year that is required under the Internal Revenue Code and the regulations thereunder (the required taxable year). For example, the required taxable year is—

(A) In the case of a foreign sales corporation or domestic international sales corporation, the taxable year determined under section 441(h) and § 1.921–1T(a)(11), (b)(4), and (b)(6);

(B) In the case of a personal service corporation (PSC), the taxable year determined under section 441(i) and § 1.441–3;

(C) In the case of a nuclear decommissioning fund, the taxable year determined under § 1.468A–4(c)(1);

(D) In the case of a designated settlement fund or a qualified settlement fund, the taxable year determined under § 1.468B–2(j);

(E) In the case of a common trust fund, the taxable year determined under section 584(i);

(F) In the case of certain trusts, the taxable year determined under section 644;

(G) In the case of a partnership, the taxable year determined under section 706 and § 1.706–1;

(H) In the case of an insurance company, the taxable year determined under section 843 and § 1.1502–76(a)(2);

(I) In the case of a real estate investment trust, the taxable year determined under section 859;

(J) In the case of a real estate mortgage investment conduit, the taxable year determined under section 860D(a)(5) and § 1.860D–1(b)(6);

(K) In the case of a specified foreign corporation, the taxable year determined under section 898(c)(1)(A);

(3) Commissioner's authority to impute contingent-payment terms.

(4) Evaluation of arm's length charge.

(5) Examples.

(j) Total services costs.

(k) Allocation of costs.

(1) In general.

(2) Appropriate method of allocation and apportionment.

(i) Reasonable method standard.

(ii) Use of general practices.

(3) Examples.

(l) Controlled services transaction.

(1) In general.

(2) Activity.

(3) Benefit.

(i) In general.

(ii) Indirect or remote benefit.

(iii) Duplicative activities.

(iv) Shareholder activities.

(v) Passive association.

(4) Disaggregation of transactions.

(5) Examples.

(m) Coordination with transfer pricing rules for other transactions.

(1) Services transactions that include other types of transactions.

(2) Services transactions that effect a transfer of intangible property.

(3) Coordination with rules governing cost sharing arrangements.

(4) Other types of transactions that include controlled services transactions.

(5) Examples.

(n) Effective/applicability dates.

(1) In general.

(2) Election to apply regulations to earlier taxable years.

[T.D. 8552, 59 FR 34988, July 8, 1994, as amended by T.D. 8632, 60 FR 65557, Dec. 20, 1995; 61 FR 7157, Feb. 26, 1996; T.D. 8670, 61 FR 21956, May 13, 1996; T.D. 9088, 68 FR 51177, Aug. 26, 2003; T.D. 9278, 71 FR 44479, Aug. 4, 2006; T.D. 9441, 74 FR 348, Jan. 5, 2009, 74 FR 9571, Mar. 5, 2009; T.D. 9456, 74 FR 38837, Aug. 4, 2009; T.D. 9568, 76 FR 80087, Dec. 22, 2011]

EDITORIAL NOTE: At 71 FR 44479, Aug. 8, 2006, section 1.482–0 was amended by revising the entry for (f)(2)(ii)(B). However, because of inaccurate amendatory language, this amendment could not be incorporated. For the convenience of the user, the language at 71 FR 44479 is set forth as follows:

**§ 1.482–0  Outline of regulations under section 482.**

*        *        *        *        *

(f) * * *

(2) * * *

(ii) * * *

(A) [Reserved]. For further guidance, see § 1.482–0T, the entry for § 1.482–1T(f)(2)(ii)(A).

(iii) * * *

(B) [Reserved]. For further guidance, see § 1.482–0T, the entry for § 1.482–1T(f)(2)(iii)(B).

**§ 1.482–1  Allocation of income and deductions among taxpayers.**

(a) *In general*—(1) *Purpose and scope.* The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482. Section 1.482–2 provides rules for the determination of the true taxable income of controlled taxpayers in specific situations, including controlled transactions involving loans or advances or the use of tangible property. Sections 1.482–3 through 1.482–6 provide rules for the determination of the true taxable income of controlled taxpayers in cases involving the transfer of property. Section 1.482–7T sets forth the cost sharing provisions applicable to taxable years beginning on or after January 5, 2009. Section 1.482–8 provides examples illustrating the application of the best method rule. Finally, § 1.482–9 provides rules for the determination of the true taxable income of controlled taxpayers in cases involving the performance of services.

(2) *Authority to make allocations.* The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income. In such case, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations). The appropriate allocation may take the form of an increase or decrease in any relevant amount.

(3) *Taxpayer's use of section 482.* If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply

**Internal Revenue Service, Treasury**                          **§ 1.482–1**

such provisions. Therefore, no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions. See §1.6662–6T(a)(2) or successor regulations.

(b) *Arm's length standard*—(1) *In general.* In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. See §1.482–1(d)(2) (Standard of comparability). Evaluation of whether a controlled transaction produces an arm's length result is made pursuant to a method selected under the best method rule described in §1.482–1(c).

(2) *Arm's length methods*—(i) *Methods.* Sections 1.482–2 through 1.482–7 and 1.482–9 provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result. This section provides general principles applicable in determining arm's length results of such controlled transactions, but do not provide methods, for which reference must be made to those other sections in accordance with paragraphs (b)(2)(ii) and (iii) of this section. Section 1.482–7 provides the specific methods to be used to evaluate whether a cost sharing arrangement as defined in §1.482–7 produces results consistent with an arm's length result.

(ii) *Selection of category of method applicable to transaction.* The methods listed in §1.482–2 apply to different types of transactions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated transactions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see §1.482–1(f)(2)(i) (Aggregation of transactions). In addition, other applicable provisions of the Code may affect the characterization of a transaction, and therefore affect the methods applicable under section 482. See for example section 467.

(iii) *Coordination of methods applicable to certain intangible development arrangements.* Section 1.482–7 provides the specific methods to be used to determine arm's length results of controlled transactions in connection with a cost sharing arrangement as defined in §1.482–7. Sections 1.482–4 and 1.482–9, as appropriate, provide the specific methods to be used to determine arm's length results of arrangements, including partnerships, for sharing the costs and risks of developing intangibles, other than a cost sharing arrangement covered by §1.482–7. See also §§1.482–4(g) (Coordination with rules governing cost sharing arrangements) and 1.482–9(m)(3) (Coordination with rules governing cost sharing arrangements).

(c) *Best method rule*—(1) *In general.* The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result. Thus, there is no strict priority of methods, and no method will invariably be considered to be more reliable than others. An arm's length result may be determined under any method without establishing the inapplicability of another method, but if another method subsequently is shown to produce a more reliable measure of an arm's length result, such other method must be used. Similarly, if two or more applications of a single method provide inconsistent results, the arm's length result must be determined under the application that, under the facts and

603

circumstances, provides the most reliable measure of an arm's length result. See § 1.482–8 for examples of the application of the best method rule. See § 1.482–7 for the applicable methods in the case of a cost sharing arrangement.

(2) *Determining the best method.* Data based on the results of transactions between unrelated parties provides the most objective basis for determining whether the results of a controlled transaction are arm's length. Thus, in determining which of two or more available methods (or applications of a single method) provides the most reliable measure of an arm's length result, the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis. In addition, in certain circumstances, it also may be relevant to consider whether the results of an analysis are consistent with the results of an analysis under another method. These factors are explained in paragraphs (c)(2)(i), (ii), and (iii) of this section.

(i) *Comparability.* The relative reliability of a method based on the results of transactions between unrelated parties depends on the degree of comparability between the controlled transaction or taxpayers and the uncontrolled comparables, taking into account the factors described in § 1.482–1(d)(3) (Factors for determining comparability), and after making adjustments for differences, as described in § 1.482–1(d)(2) (Standard of comparability). As the degree of comparability increases, the number and extent of potential differences that could render the analysis inaccurate is reduced. In addition, if adjustments are made to increase the degree of comparability, the number, magnitude, and reliability of those adjustments will affect the reliability of the results of the analysis. Thus, an analysis under the comparable uncontrolled price method will generally be more reliable than analyses obtained under other methods if the analysis is based on closely comparable uncontrolled transactions, because such an analysis can be expected to achieve a higher degree of com-

parability and be susceptible to fewer differences than analyses under other methods. See § 1.482–3(b)(2)(ii)(A). An analysis will be relatively less reliable, however, as the uncontrolled transactions become less comparable to the controlled transaction.

(ii) *Data and assumptions.* Whether a method provides the most reliable measure of an arm's length result also depends upon the completeness and accuracy of the underlying data, the reliability of the assumptions, and the sensitivity of the results to possible deficiencies in the data and assumptions. Such factors are particularly relevant in evaluating the degree of comparability between the controlled and uncontrolled transactions. These factors are discussed in paragraphs (c)(2)(ii) (A), (B), and (C) of this section.

(A) *Completeness and accuracy of data.* The completeness and accuracy of the data affects the ability to identify and quantify those factors that would affect the result under any particular method. For example, the completeness and accuracy of data will determine the extent to which it is possible to identify differences between the controlled and uncontrolled transactions, and the reliability of adjustments that are made to account for such differences. An analysis will be relatively more reliable as the completeness and accuracy of the data increases.

(B) *Reliability of assumptions.* All methods rely on certain assumptions. The reliability of the results derived from a method depends on the soundness of such assumptions. Some assumptions are relatively reliable. For example, adjustments for differences in payment terms between controlled and uncontrolled transactions may be based on the assumption that at arm's length such differences would lead to price differences that reflect the time value of money. Although selection of the appropriate interest rate to use in making such adjustments involves some judgement, the economic analysis on which the assumption is based is relatively sound. Other assumptions may be less reliable. For example, the residual profit split method may be based on the assumption that capitalized intangible development expenses

reflect the relative value of the intangible property contributed by each party. Because the costs of developing an intangible may not be related to its market value, the soundness of this assumption will affect the reliability of the results derived from this method.

(C) *Sensitivity of results to deficiencies in data and assumptions.* Deficiencies in the data used or assumptions made may have a greater effect on some methods than others. In particular, the reliability of some methods is heavily dependent on the similarity of property or services involved in the controlled and uncontrolled transaction. For certain other methods, such as the resale price method, the analysis of the extent to which controlled and uncontrolled taxpayers undertake the same or similar functions, employ similar resources, and bear similar risks is particularly important. Finally, under other methods, such as the profit split method, defining the relevant business activity and appropriate allocation of costs, income, and assets may be of particular importance. Therefore, a difference between the controlled and uncontrolled transactions for which an accurate adjustment cannot be made may have a greater effect on the reliability of the results derived under one method than the results derived under another method. For example, differences in management efficiency may have a greater effect on a comparable profits method analysis than on a comparable uncontrolled price method analysis, while differences in product characteristics will ordinarily have a greater effect on a comparable uncontrolled price method analysis than on a comparable profits method analysis.

(iii) *Confirmation of results by another method.* If two or more methods produce inconsistent results, the best method rule will be applied to select the method that provides the most reliable measure of an arm's length result. If the best method rule does not clearly indicate which method should be selected, an additional factor that may be taken into account in selecting a method is whether any of the competing methods produce results that are consistent with the results obtained from the appropriate application of another method. Further, in evaluating different applications of the same method, the fact that a second method (or another application of the first method) produces results that are consistent with one of the competing applications may be taken into account.

(d) *Comparability*—(1) *In general.* Whether a controlled transaction produces an arm's length result is generally evaluated by comparing the results of that transaction to results realized by uncontrolled taxpayers engaged in comparable transactions under comparable circumstances. For this purpose, the comparability of transactions and circumstances must be evaluated considering all factors that could affect prices or profits in arm's length dealings (comparability factors). While a specific comparability factor may be of particular importance in applying a method, each method requires analysis of all of the factors that affect comparability under that method. Such factors include the following—

(i) Functions;

(ii) Contractual terms;

(iii) Risks;

(iv) Economic conditions; and

(v) Property or services.

(2) *Standard of comparability.* In order to be considered comparable to a controlled transaction, an uncontrolled transaction need not be identical to the controlled transaction, but must be sufficiently similar that it provides a reliable measure of an arm's length result. If there are material differences between the controlled and uncontrolled transactions, adjustments must be made if the effect of such differences on prices or profits can be ascertained with sufficient accuracy to improve the reliability of the results. For purposes of this section, a material difference is one that would materially affect the measure of an arm's length result under the method being applied. If adjustments for material differences cannot be made, the uncontrolled transaction may be used as a measure of an arm's length result, but the reliability of the analysis will be reduced. Generally, such adjustments must be made to the results of the uncontrolled comparable and must be based on commercial practices, economic principles, or

statistical analyses. The extent and re-liability of any adjustments will affect the relative reliability of the analysis. See § 1.482–1(c)(1) (Best method rule). In any event, unadjusted industry average returns themselves cannot establish arm's length results.

(3) *Factors for determining comparability.* The comparability factors listed in § 1.482–1(d)(1) are discussed in this section. Each of these factors must be considered in determining the de-gree of comparability between trans-actions or taxpayers and the extent to which comparability adjustments may be necessary. In addition, in certain cases involving special circumstances, the rules under paragraph (d)(4) of this section must be considered.

(i) *Functional analysis.* Determining the degree of comparability between controlled and uncontrolled trans-actions requires a comparison of the functions performed, and associated re-sources employed, by the taxpayers in each transaction. This comparison is based on a functional analysis that identifies and compares the economi-cally significant activities undertaken, or to be undertaken, by the taxpayers in both controlled and uncontrolled transactions. A functional analysis should also include consideration of the resources that are employed, or to be employed, in conjunction with the activities undertaken, including con-sideration of the type of assets used, such as plant and equipment, or the use of valuable intangibles. A func-tional analysis is not a pricing method and does not itself determine the arm's length result for the controlled trans-action under review. Functions that may need to be accounted for in deter-mining the comparability of two trans-actions include—

(A) Research and development;

(B) Product design and engineering;

(C) Manufacturing, production and process engineering;

(D) Product fabrication, extraction, and assembly;

(E) Purchasing and materials man-agement;

(F) Marketing and distribution func-tions, including inventory manage-ment, warranty administration, and advertising activities;

(G) Transportation and warehousing; and

(H) Managerial, legal, accounting and finance, credit and collection, training, and personnel management services.

(ii) *Contractual terms*—(A) *In general.* Determining the degree of com-parability between the controlled and uncontrolled transactions requires a comparison of the significant contrac-tual terms that could affect the results of the two transactions. These terms include—

(*1*) The form of consideration charged or paid;

(*2*) Sales or purchase volume;

(*3*) The scope and terms of warranties provided;

(*4*) Rights to updates, revisions or modifications;

(*5*) The duration of relevant license, contract or other agreements, and ter-mination or renegotiation rights;

(*6*) Collateral transactions or ongoing business relationships between the buyer and the seller, including arrange-ments for the provision of ancillary or subsidiary services; and

(*7*) Extension of credit and payment terms. Thus, for example, if the time for payment of the amount charged in a controlled transaction differs from the time for payment of the amount charged in an uncontrolled trans-action, an adjustment to reflect the difference in payment terms should be made if such difference would have a material effect on price. Such com-parability adjustment is required even if no interest would be allocated or im-puted under § 1.482–2(a) or other appli-cable provisions of the Internal Rev-enue Code or regulations.

(B) *Identifying contractual terms*—(*1*) *Written agreement.* The contractual terms, including the consequent alloca-tion of risks, that are agreed to in writing before the transactions are en-tered into will be respected if such terms are consistent with the economic substance of the underlying trans-actions. In evaluating economic sub-stance, greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the par-ties (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). If the contractual terms are inconsistent

**Internal Revenue Service, Treasury** § 1.482–1

with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.

(2) *No written agreement.* In the absence of a written agreement, the district director may impute a contractual agreement between the controlled taxpayers consistent with the economic substance of the transaction. In determining the economic substance of the transaction, greatest weight will be given to the actual conduct of the parties and their respective legal rights (see, for example, §1.482–4(f)(3) (Ownership of intangible property)). For example, if, without a written agreement, a controlled taxpayer operates at full capacity and regularly sells all of its output to another member of its controlled group, the district director may impute a purchasing contract from the course of conduct of the controlled taxpayers, and determine that the producer bears little risk that the buyer will fail to purchase its full output. Further, if an established industry convention or usage of trade assigns a risk or resolves an issue, that convention or usage will be followed if the conduct of the taxpayers is consistent with it. See UCC 1–205. For example, unless otherwise agreed, payment generally is due at the time and place at which the buyer is to receive goods. See UCC 2–310.

(C) *Examples.* The following examples illustrate this paragraph (d)(3)(ii).

*Example 1. Differences in volume.* USP, a United States agricultural exporter, regularly buys transportation services from FSub, its foreign subsidiary, to ship its products from the United States to overseas markets. Although FSub occasionally provides transportation services to URA, an unrelated domestic corporation, URA accounts for only 10% of the gross revenues of FSub, and the remaining 90% of FSub's gross revenues are attributable to FSub's transactions with USP. In determining the degree of comparability between FSub's uncontrolled transaction with URA and its controlled transaction with USP, the difference in volumes involved in the two transactions and the regularity with which these services are provided must be taken into account if such difference would have a material effect on the price charged. Inability to make reliable adjustments for these differences would affect the reliability of the results derived from the uncontrolled transaction as a measure of the arm's length result.

*Example 2. Reliability of adjustment for differences in volume.* (i) FS manufactures product XX and sells that product to its parent corporation, P. FS also sells product XX to uncontrolled taxpayers at a price of $100 per unit. Except for the volume of each transaction, the sales to P and to uncontrolled taxpayers take place under substantially the same economic conditions and contractual terms. In uncontrolled transactions, FS offers a 2% discount for quantities of 20 per order, and a 5% discount for quantities of 100 per order. If P purchases product XX in quantities of 60 per order, in the absence of other reliable information, it may reasonably be concluded that the arm's length price to P would be $100, less a discount of 3.5%.

(ii) If P purchases product XX in quantities of 1,000 per order, a reliable estimate of the appropriate volume discount must be based on proper economic or statistical analysis, not necessarily a linear extrapolation from the 2% and 5% catalog discounts applicable to sales of 20 and 100 units, respectively.

*Example 3. Contractual terms imputed from economic substance.* (i) FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. In year 1, FP enters the United States market by selling YY wristwatches to its newly organized United States subsidiary, USSub, for distribution in the United States market. USSub pays FP a fixed price per wristwatch. USSub and FP undertake, without separate compensation, marketing activities to establish the YY trademark in the United States market. Unrelated foreign producers of trademarked wristwatches and their authorized United States distributors respectively undertake similar marketing activities in independent arrangements involving distribution of trademarked wristwatches in the United States market. In years 1 through 6, USSub markets and sells YY wristwatches in the United States. Further, in years 1 through 6, USSub undertakes incremental marketing activities in addition to the activities similar to those observed in the independent distribution transactions in the United States market. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. Assume that, aside from these incremental activities, and after any adjustments are made to improve the reliability of the comparison, the price paid per wristwatch by the independent, authorized distributors of wristwatches would provide the most reliable measure of the arm's length price paid per YY wristwatch by USSub.

(ii) By year 7, the wristwatches with the YY trademark generate a premium return in

607

the United States market, as compared to wristwatches marketed by the independent distributors. In year 7, substantially all the premium return from the YY trademark in the United States market is attributed to FP, for example through an increase in the price paid per watch by USSub, or by some other means.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, *ex ante*, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' attribution to FP in year 7 of substantially all the premium return from the enhanced YY trademark in the United States market. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the YY trademark wristwatches. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for its incremental marketing activities in years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive agreement to exploit the YY trademark in the United States that allows USSub to benefit from the incremental marketing activities it performed. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term, exclusive agreement to exploit the YY trademark in the United States, an agreement that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

*Example 4. Contractual terms imputed from economic substance.* (i) FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries worldwide. In year 1, FP enters into a licensing agreement that affords its newly organized United States sub-

sidiary, USSub, exclusive rights to certain manufacturing and marketing intangible property (including the AA trademark) for purposes of manufacturing and marketing athletic gear in the United States under the AA trademark. The contractual terms of this agreement obligate USSub to pay FP a royalty based on sales, and also obligate both FP and USSub to undertake without separate marketing activities. Unrelated foreign businesses license independent United States businesses to manufacture and market athletic gear in the United States, using trademarks owned by the unrelated foreign businesses. The contractual terms of these uncontrolled transactions require the licensees to pay royalties based on sales of the merchandise, and obligate the licensors and licensees to undertake without separate compensation specified types and levels of marketing activities. In years 1 through 6, USSub manufactures and sells athletic gear under the AA trademark in the United States. Assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts in paragraph (ii) of this *Example 4.*

(ii) In years 1 through 6, USSub performs incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the license agreement with FP, that are also incremental as compared to those observed in the comparables. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. By year 7, AA trademark athletic gear generates a premium return in the United States, as compared to similar athletic gear marketed by independent licensees. In year 7, USSub and FP enter into a separate services agreement under which FP agrees to compensate USSub on a cost basis for the incremental marketing activities that USSub performed during years 1 through 6, and to compensate USSub on a cost basis for any incremental marketing activities it may perform in year 7 and subsequent years. In addition, the parties revise the license agreement executed in year 1, and increase the royalty to a level that attributes to FP substantially all the premium return from sales of the AA trademark athletic gear in the United States.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP and the parties' course of conduct

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of a future benefit. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' adoption in year 7 of contractual terms by which FP compensates USSub on a cost basis for the incremental marketing activities that it performed. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the AA trademark athletic gear. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for the incremental activities it performed during years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive United States license agreement that allows USSub to benefit from the incremental activities. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term United States license agreement, a license that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in this particular case.

*Example 5. Non-arm's length compensation.* (i) The facts are the same as in paragraph (i) of *Example 4.* As in *Example 4,* assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts described in paragraph (ii) of this *Example 5.*

(ii) In years 1 through 4, USSub performs certain incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the basic license agreement, that are also incremental as compared with those activities observed in the comparables. At the start of year 1, FP enters into a separate services agreement with USSub, which states that FP will compensate USSub quarterly, in an amount equal to specified costs plus X%, for these incremental marketing functions. Further, these written agreements reflect the intent of the parties that USSub receive such compensation from FP throughout the term of the agreement, without regard to the success or failure of the promotional activities. During years 1 through 6, USSub performs marketing activities pursuant to the separate services agreement and in each year USSub receives the specified compensation from FP on a cost of services plus basis.

(iii) In evaluating year 4, the Commissioner performs an analysis of independent parties that perform promotional activities comparable to those performed by USSub and that receive separately-stated compensation on a current basis without contingency. The Commissioner determines that the magnitude of the specified cost plus X% is outside the arm's length range in each of years 1 through 4. Based on an evaluation of all the facts and circumstances, the Commissioner makes an allocation to require payment of compensation to USSub for the promotional activities performed in year 4, based on the median of the interquartile range of the arm's length markups charged by the uncontrolled comparables described in paragraph (e)(3) of this section.

(iv) Given that based on facts and circumstances, the terms agreed by the controlled parties were that FP would bear all risks associated with the promotional activities performed by USSub to promote the AA trademark product in the United States market, and given that the parties' conduct during the years examined was consistent with this allocation of risk, the fact that the cost of services plus markup on USSub's services was outside the arm's length range does not, without more, support imputation of additional contractual terms based on alternative views of the economic substance of the transaction, such as terms indicating that USSub, rather than FP, bore the risk associated with these activities.

*Example 6. Contractual terms imputed from economic substance.* (i) Company X is a member of a controlled group that has been in operation in the pharmaceutical sector for many years. In years 1 through 4, Company X undertakes research and development activities. As a result of those activities, Company X developed a compound that may be more effective than existing medications in the treatment of certain conditions.

(ii) Company Y is acquired in year 4 by the controlled group that includes Company X. Once Company Y is acquired, Company X makes available to Company Y a large amount of technical data concerning the new

compound, which Company Y uses to register patent rights with respect to the compound in several jurisdictions, making Company Y the legal owner of such patents. Company Y then enters into licensing agreements with group members that afford Company Y 100% of the premium return attributable to use of the intangible property by its subsidiaries.

(iii) In determining whether an allocation is appropriate in year 4, the Commissioner may consider the economic substance of the arrangements between Company X and Company Y, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that an uncontrolled taxpayer operating at arm's length would make available the results of its research and development or perform services that resulted in transfer of valuable know how to another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, Company X's undertaking the research and development activities and then providing technical data and know-how to Company Y in year 4 is inconsistent with the registration and subsequent exploitation of the patent by Company Y. Therefore, the Commissioner may impute one or more agreements between Company X and Company Y consistent with the economic substance of their course of conduct, which would afford Company X an appropriate portion of the premium return from the patent rights. For example, the Commissioner may impute a separate services agreement that affords Company X contingent-payment compensation for its services in year 4 for the benefit of Company Y, consisting of making available to Company Y technical data, know-how, and other fruits of research and development conducted in previous years. These services benefited Company Y by giving rise to and contributing to the value of the patent rights that were ultimately registered by Company Y. In the alternative, the Commissioner may impute a transfer of patentable intangible property rights from Company X to Company Y immediately preceding the registration of patent rights by Company Y. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

(iii) *Risk*—(A) *Comparability.* Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant risks that could affect the prices that would be charged or paid, or the profit that would be earned, in the two transactions. Relevant risks to consider include—

(1) Market risks, including fluctuations in cost, demand, pricing, and inventory levels;

(2) Risks associated with the success or failure of research and development activities;

(3) Financial risks, including fluctuations in foreign currency rates of exchange and interest rates;

(4) Credit and collection risks;

(5) Product liability risks; and

(6) General business risks related to the ownership of property, plant, and equipment.

(B) *Identification of taxpayer that bears risk.* In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of §1.482–1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers after the outcome of such risk is known or reasonably knowable lacks economic substance. In considering the economic substance of the transaction, the following facts are relevant—

(1) Whether the pattern of the controlled taxpayer's conduct over time is consistent with the purported allocation of risk between the controlled taxpayers; or where the pattern is changed, whether the relevant contractual arrangements have been modified accordingly;

(2) Whether a controlled taxpayer has the financial capacity to fund losses that might be expected to occur as the result of the assumption of a risk, or whether, at arm's length, another party to the controlled transaction would ultimately suffer the consequences of such losses; and

(3) The extent to which each controlled taxpayer exercises managerial or operational control over the business activities that directly influence the amount of income or loss realized. In arm's length dealings, parties ordinarily bear a greater share of those

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

risks over which they have relatively more control.

(C) *Examples*. The following examples illustrate this paragraph (d)(3)(iii).

*Example 1.* FD, the wholly-owned foreign distributor of USM, a U.S. manufacturer, buys widgets from USM under a written contract. Widgets are a generic electronic appliance. Under the terms of the contract, FD must buy and take title to 20,000 widgets for each of the five years of the contract at a price of $10 per widget. The widgets will be sold under FD's label, and FD must finance any marketing strategies to promote sales in the foreign market. There are no rebate or buy back provisions. FD has adequate financial capacity to fund its obligations under the contract under any circumstances that could reasonably be expected to arise. In Years 1, 2 and 3, FD sold only 10,000 widgets at a price of $11 per unit. In Year 4, FD sold its entire inventory of widgets at a price of $25 per unit. Since the contractual terms allocating market risk were agreed to before the outcome of such risk was known or reasonably knowable, FD had the financial capacity to bear the market risk that it would be unable to sell all of the widgets it purchased currently, and its conduct was consistent over time, FD will be deemed to bear the risk.

*Example 2.* The facts are the same as in *Example 1*, except that in Year 1 FD had only $100,000 in total capital, including loans. In subsequent years USM makes no additional contributions to the capital of FD, and FD is unable to obtain any capital through loans from an unrelated party. Nonetheless, USM continues to sell 20,000 widgets annually to FD under the terms of the contract, and USM extends credit to FD to enable it to finance the purchase. FD does not have the financial capacity in Years 1, 2 and 3 to finance the purchase of the widgets given that it could not sell most of the widgets it purchased during those years. Thus, notwithstanding the terms of the contract, USM and not FD assumed the market risk that a substantial portion of the widgets could not be sold, since in that event FD would not be able to pay USM for all of the widgets it purchased.

*Example 3.* S, a Country X corporation, manufactures small motors that it sells to P, its U.S. parent. P incorporates the motors into various products and sells those products to uncontrolled customers in the United States. The contract price for the motors is expressed in U.S. dollars, effectively allocating the currency risk for these transactions to S for any currency fluctuations between the time the contract is signed and payment is made. As long as S has adequate financial capacity to bear this currency risk (including by hedging all or part of the risk) and the conduct of S and P is consistent with the terms of the contract (i.e., the contract price is not adjusted to reflect exchange rate movements), the agreement of the parties to allocate the exchange risk to S will be respected.

*Example 4.* USSub is the wholly-owned U.S. subsidiary of FP, a foreign manufacturer. USSub acts as a distributor of goods manufactured by FP. FP and USSub execute an agreement providing that FP will bear any ordinary product liability costs arising from defects in the goods manufactured by FP. In practice, however, when ordinary product liability claims are sustained against USSub and FP, USSub pays the resulting damages. Therefore, the district director disregards the contractual arrangement regarding product liability costs between FP and USSub, and treats the risk as having been assumed by USSub.

(iv) *Economic conditions*. Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant economic conditions that could affect the prices that would be charged or paid, or the profit that would be earned in each of the transactions. These factors include—

(A) The similarity of geographic markets;

(B) The relative size of each market, and the extent of the overall economic development in each market;

(C) The level of the market (e.g., wholesale, retail, etc.);

(D) The relevant market shares for the products, properties, or services transferred or provided;

(E) The location-specific costs of the factors of production and distribution;

(F) The extent of competition in each market with regard to the property or services under review;

(G) The economic condition of the particular industry, including whether the market is in contraction or expansion; and

(H) The alternatives realistically available to the buyer and seller.

(v) *Property or services*. Evaluating the degree of comparability between controlled and uncontrolled transactions requires a comparison of the property or services transferred in the transactions. This comparison may include any intangible property that is embedded in tangible property or services being transferred (embedded intangibles). The comparability of the embedded intangibles will be analyzed

**§ 1.482–1**

using the factors listed in §1.482–4(c)(2)(iii)(B)(*1*) (comparable intangible property). The relevance of product comparability in evaluating the relative reliability of the results will depend on the method applied. For guidance concerning the specific comparability considerations applicable to transfers of tangible and intangible property and performance of services, *see* §§1.482–3 through 1.482–6 and §1.482–9; *see also* §§1.482–3(f), 1.482–4(f)(4), and 1.482–9(m), dealing with the coordination of intangible and tangible property and performance of services rules.

(4) *Special circumstances*—(i) *Market share strategy.* In certain circumstances, taxpayers may adopt strategies to enter new markets or to increase a product's share of an existing market (market share strategy). Such a strategy would be reflected by temporarily increased market development expenses or resale prices that are temporarily lower than the prices charged for comparable products in the same market. Whether or not the strategy is reflected in the transfer price depends on which party to the controlled transaction bears the costs of the pricing strategy. In any case, the effect of a market share strategy on a controlled transaction will be taken into account only if it can be shown that an uncontrolled taxpayer engaged in a comparable strategy under comparable circumstances for a comparable period of time, and the taxpayer provides documentation that substantiates the following—

(A) The costs incurred to implement the market share strategy are borne by the controlled taxpayer that would obtain the future profits that result from the strategy, and there is a reasonable likelihood that the strategy will result in future profits that reflect an appropriate return in relation to the costs incurred to implement it;

(B) The market share strategy is pursued only for a period of time that is reasonable, taking into consideration the industry and product in question; and

(C) The market share strategy, the related costs and expected returns, and any agreement between the controlled taxpayers to share the related costs, were established before the strategy was implemented.

(ii) *Different geographic markets*—(A) *In general.* Uncontrolled comparables ordinarily should be derived from the geographic market in which the controlled taxpayer operates, because there may be significant differences in economic conditions in different markets. If information from the same market is not available, an uncontrolled comparable derived from a different geographic market may be considered if adjustments are made to account for differences between the two markets. If information permitting adjustments for such differences is not available, then information derived from uncontrolled comparables in the most similar market for which reliable data is available may be used, but the extent of such differences may affect the reliability of the method for purposes of the best method rule. For this purpose, a geographic market is any geographic area in which the economic conditions for the relevant product or service are substantially the same, and may include multiple countries, depending on the economic conditions.

(B) *Example.* The following example illustrates this paragraph (d)(4)(ii).

*Example.* Manuco, a wholly-owned foreign subsidiary of P, a U.S. corporation, manufactures products in Country Z for sale to P. No uncontrolled transactions are located that would provide a reliable measure of the arm's length result under the comparable uncontrolled price method. The district director considers applying the cost plus method or the comparable profits method. Information on uncontrolled taxpayers performing comparable functions under comparable circumstances in the same geographic market is not available. Therefore, adjusted data from uncontrolled manufacturers in other markets may be considered in order to apply the cost plus method. In this case, comparable uncontrolled manufacturers are found in the United States. Accordingly, data from the comparable U.S. uncontrolled manufacturers, as adjusted to account for differences between the United States and Country Z's geographic market, is used to test the arm's length price paid by P to Manuco. However, the use of such data may affect the reliability of the results for purposes of the best method rule. See §1.482–1(c).

(C) *Location savings.* If an uncontrolled taxpayer operates in a different

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

geographic market than the controlled taxpayer, adjustments may be necessary to account for significant differences in costs attributable to the geographic markets. These adjustments must be based on the effect such differences would have on the consideration charged or paid in the controlled transaction given the relative competitive positions of buyers and sellers in each market. Thus, for example, the fact that the total costs of operating in a controlled manufacturer's geographic market are less than the total costs of operating in other markets ordinarily justifies higher profits to the manufacturer only if the cost differences would increase the profits of comparable uncontrolled manufacturers operating at arm's length, given the competitive positions of buyers and sellers in that market.

(D) *Example.* The following example illustrates the principles of this paragraph (d)(4)(ii)(C).

*Example.* Couture, a U.S. apparel design corporation, contracts with Sewco, its wholly owned Country Y subsidiary, to manufacture its clothes. Costs of operating in Country Y are significantly lower than the operating costs in the United States. Although clothes with the Couture label sell for a premium price, the actual production of the clothes does not require significant specialized knowledge that could not be acquired by actual or potential competitors to Sewco at reasonable cost. Thus, Sewco's functions could be performed by several actual or potential competitors to Sewco in geographic markets that are similar to Country Y. Thus, the fact that production is less costly in Country Y will not, in and of itself, justify additional profits derived from lower operating costs in Country Y inuring to Sewco, because the competitive positions of the other actual or potential producers in similar geographic markets capable of performing the same functions at the same low costs indicate that at arm's length such profits would not be retained by Sewco.

(iii) *Transactions ordinarily not accepted as comparables*—(A) *In general.* Transactions ordinarily will not constitute reliable measures of an arm's length result for purposes of this section if—

(*1*) They are not made in the ordinary course of business; or

(*2*) One of the principal purposes of the uncontrolled transaction was to establish an arm's length result with respect to the controlled transaction.

(B) *Examples.* The following examples illustrate the principle of this paragraph (d)(4)(iii).

*Example 1. Not in the ordinary course of business.* USP, a United States manufacturer of computer software, sells its products to FSub, its foreign distributor in country X. Compco, a United States competitor of USP, also sells its products in X through unrelated distributors. However, in the year under review, Compco is forced into bankruptcy, and Compco liquidates its inventory by selling all of its products to unrelated distributors in X for a liquidation price. Because the sale of its entire inventory was not a sale in the ordinary course of business, Compco's sale cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

*Example 2. Principal purpose of establishing an arm's length result.* USP, a United States manufacturer of farm machinery, sells its products to FSub, its wholly-owned distributor in Country Y. USP, operating at nearly full capacity, sells 95% of its inventory to FSub. To make use of its excess capacity, and also to establish a comparable uncontrolled price for its transfer price to FSub, USP increases its production to full capacity. USP sells its excess inventory to Compco, an unrelated foreign distributor in Country X. Country X has approximately the same economic conditions as that of Country Y. Because one of the principal purposes of selling to Compco was to establish an arm's length price for its controlled transactions with FSub, USP's sale to Compco cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

(e) *Arm's length range*—(1) *In general.* In some cases, application of a pricing method will produce a single result that is the most reliable measure of an arm's length result. In other cases, application of a method may produce a number of results from which a range of reliable results may be derived. A taxpayer will not be subject to adjustment if its results fall within such range (arm's length range).

(2) *Determination of arm's length range*—(i) *Single method.* The arm's length range is ordinarily determined by applying a single pricing method selected under the best method rule to two or more uncontrolled transactions of similar comparability and reliability. Use of more than one method

613

may be appropriate for the purposes described in paragraph (c)(2)(iii) of this section (Best method rule).

(ii) *Selection of comparables.* Uncontrolled comparables must be selected based upon the comparability criteria relevant to the method applied and must be sufficiently similar to the controlled transaction that they provide a reliable measure of an arm's length result. If material differences exist between the controlled and uncontrolled transactions, adjustments must be made to the results of the uncontrolled transaction if the effect of such differences on price or profits can be ascertained with sufficient accuracy to improve the reliability of the results. See §1.482–1(d)(2) (Standard of comparability). The arm's length range will be derived only from those uncontrolled comparables that have, or through adjustments can be brought to, a similar level of comparability and reliability, and uncontrolled comparables that have a significantly lower level of comparability and reliability will not be used in establishing the arm's length range.

(iii) *Comparables included in arm's length range*—(A) *In general.* The arm's length range will consist of the results of all of the uncontrolled comparables that meet the following conditions: the information on the controlled transaction and the uncontrolled comparables is sufficiently complete that it is likely that all material differences have been identified, each such difference has a definite and reasonably ascertainable effect on price or profit, and an adjustment is made to eliminate the effect of each such difference.

(B) *Adjustment of range to increase reliability.* If there are no uncontrolled comparables described in paragraph (e)(2)(iii)(A) of this section, the arm's length range is derived from the results of all the uncontrolled comparables, selected pursuant to paragraph (e)(2)(ii) of this section, that achieve a similar level of comparability and reliability. In such cases the reliability of the analysis must be increased, where it is possible to do so, by adjusting the range through application of a valid statistical method to the results of all of the uncontrolled comparables so se-

lected. The reliability of the analysis is increased when statistical methods are used to establish a range of results in which the limits of the range will be determined such that there is a 75 percent probability of a result falling above the lower end of the range and a 75 percent probability of a result falling below the upper end of the range. The interquartile range ordinarily provides an acceptable measure of this range; however a different statistical method may be applied if it provides a more reliable measure.

(C) *Interquartile range.* For purposes of this section, the interquartile range is the range from the 25th to the 75th percentile of the results derived from the uncontrolled comparables. For this purpose, the 25th percentile is the lowest result derived from an uncontrolled comparable such that at least 25 percent of the results are at or below the value of that result. However, if exactly 25 percent of the results are at or below a result, then the 25th percentile is equal to the average of that result and the next higher result derived from the uncontrolled comparables. The 75th percentile is determined analogously.

(3) *Adjustment if taxpayer's results are outside arm's length range.* If the results of a controlled transaction fall outside the arm's length range, the district director may make allocations that adjust the controlled taxpayer's result to any point within the arm's length range. If the interquartile range is used to determine the arm's length range, such adjustment will ordinarily be to the median of all the results. The median is the 50th percentile of the results, which is determined in a manner analogous to that described in paragraph (e)(2)(iii)(C) of this section (Interquartile range). In other cases, an adjustment normally will be made to the arithmetic mean of all the results. See §1.482–1(f)(2)(iii)(D) for determination of an adjustment when a controlled taxpayer's result for a multiple year period falls outside an arm's length range consisting of the average results of uncontrolled comparables over the same period.

(4) *Arm's length range not prerequisite to allocation.* The rules of this paragraph (e) do not require that the district director establish an arm's length

**Internal Revenue Service, Treasury**                                    **§ 1.482–1**

range prior to making an allocation under section 482. Thus, for example, the district director may properly propose an allocation on the basis of a single comparable uncontrolled price if the comparable uncontrolled price method, as described in §1.482–3(b), has been properly applied. However, if the taxpayer subsequently demonstrates that the results claimed on its income tax return are within the range established by additional equally reliable comparable uncontrolled prices in a manner consistent with the requirements set forth in §1.482–1(e)(2)(iii), then no allocation will be made.

(5) *Examples.* The following examples illustrate the principles of this paragraph (e).

*Example 1. Selection of comparables.* (i) To evaluate the arm's length result of a controlled transaction between USSub, the United States taxpayer under review, and FP, its foreign parent, the district director considers applying the resale price method. The district director identifies ten potential uncontrolled transactions. The distributors in all ten uncontrolled transactions purchase and resell similar products and perform similar functions to those of USSub.

(ii) Data with respect to three of the uncontrolled transactions is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these three uncontrolled comparables is significantly lower than that of the other seven. Further, of those seven, adjustments for the identified material differences can be reliably made for only four of the uncontrolled transactions. Therefore, pursuant to §1.482–1(e)(2)(ii) only these four uncontrolled comparables may be used to establish an arm's length range.

*Example 2. Arm's length range consists of all the results.* (i) The facts are the same as in *Example 1.* Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to §1.482-1(d)(2), the district director derives the following results:

| Comparable | Result (price) |
|---|---|
| 1 | $44.00 |
| 2 | 45.00 |
| 3 | 45.00 |
| 4 | 45.50 |

(ii) The district director determines that data regarding the four uncontrolled transactions is sufficiently complete and accurate so that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, such differences have a definite and reasonably ascertainable effect, and appropriate adjustments were made for such differences. Accordingly, if the resale price method is determined to be the best method pursuant to §1.482–1(c), the arm's length range for the controlled transaction will consist of the results of all of the uncontrolled comparables, pursuant to paragraph (e)(2)(iii)(A) of this section. Thus, the arm's length range in this case would be the range from $44 to $45.50.

*Example 3. Arm's length range limited to interquartile range.* (i) The facts are the same as in *Example 2,* except in this case there are some product and functional differences between the four uncontrolled comparables and USSub. However, the data is insufficiently complete to determine the effect of the differences. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to §1.482–1(d)(2), the district director derives the following results:

| Uncontrolled comparable | Result (price) |
|---|---|
| 1 | $42.00 |
| 2 | 44.00 |
| 3 | 45.00 |
| 4 | 47.50 |

(ii) It cannot be established in this case that all material differences are likely to have been identified and reliable adjustments made for those differences. Accordingly, if the resale price method is determined to be the best method pursuant to §1.482–1(c), the arm's length range for the controlled transaction must be established pursuant to paragraph (e)(2)(iii)(B) of this section. In this case, the district director uses the interquartile range to determine the arm's length range, which is the range from $43 to $46.25. If USSub's price falls outside this range, the district director may make an allocation. In this case that allocation would be to the median of the results, or $44.50.

*Example 4. Arm's length range limited to interquartile range.* (i) To evaluate the arm's length result of controlled transactions between USP, a United States manufacturing company, and FSub, its foreign subsidiary, the district director considers applying the comparable profits method. The district director identifies 50 uncontrolled taxpayers within the same industry that potentially could be used to apply the method.

(ii) Further review indicates that only 20 of the uncontrolled manufacturers engage in activities requiring similar capital investments and technical know-how. Data with respect to five of the uncontrolled manufacturers is very limited, and although some

material differences can be identified and adjusted for, the level of comparability of these five uncontrolled comparables is significantly lower than that of the other 15. In addition, for those five uncontrolled comparables it is not possible to accurately allocate costs between the business activity associated with the relevant transactions and other business activities. Therefore, pursuant to §1.482–1(e)(2)(ii) only the other fifteen uncontrolled comparables may be used to establish an arm's length range.

(iii) Although the data for the fifteen remaining uncontrolled comparables is relatively complete and accurate, there is a significant possibility that some material differences may remain. The district director has determined, for example, that it is likely that there are material differences in the level of technical expertise or in management efficiency. Accordingly, if the comparable profits method is determined to be the best method pursuant to §1.482–1(c), the arm's length range for the controlled transaction may be established only pursuant to paragraph (e)(2)(iii)(B) of this section.

(f) *Scope of review*—(1) *In general.* The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer is other than it would have been had the taxpayer, in the conduct of its affairs, been dealing at arm's length with an uncontrolled taxpayer.

(i) *Intent to evade or avoid tax not a prerequisite.* In making allocations under section 482, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances.

(ii) *Realization of income not a prerequisite*—(A) *In general.* The district director may make an allocation under section 482 even if the income ultimately anticipated from a series of transactions has not been or is never realized. For example, if a controlled taxpayer sells a product at less than an arm's length price to a related taxpayer in one taxable year and the second controlled taxpayer resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, even though the second controlled taxpayer had not realized any gross income from the resale of the product in the first year. Similarly, if a controlled taxpayer lends money to a related taxpayer in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second controlled taxpayer does not realize income during such year. Finally, even if two controlled taxpayers realize an overall loss that is attributable to a particular controlled transaction, an allocation under section 482 is not precluded.

(B) *Example.* The following example illustrates this paragraph (f)(1)(ii).

*Example.* USSub is a U.S. subsidiary of FP, a foreign corporation. Parent manufactures product X and sells it to USSub. USSub functions as a distributor of product X to unrelated customers in the United States. The fact that FP may incur a loss on the manufacture and sale of product X does not by itself establish that USSub, dealing with FP at arm's length, also would incur a loss. An independent distributor acting at arm's length with its supplier would in many circumstances be expected to earn a profit without regard to the level of profit earned by the supplier.

(iii) *Nonrecognition provisions may not bar allocation*—(A) *In general.* If necessary to prevent the avoidance of taxes or to clearly reflect income, the district director may make an allocation under section 482 with respect to transactions that otherwise qualify for nonrecognition of gain or loss under applicable provisions of the Internal Revenue Code (such as section 351 or 1031).

(B) *Example.* The following example illustrates this paragraph (f)(1)(iii).

*Example.* (i) In Year 1 USP, a United States corporation, bought 100 shares of UR, an unrelated corporation, for $100,000. In Year 2, when the value of the UR stock had decreased to $40,000, USP contributed all 100 shares of UR stock to its wholly-owned subsidiary in exchange for subsidiary's capital stock. In Year 3, the subsidiary sold all of the UR stock for $40,000 to an unrelated buyer, and on its U.S. income tax return, claimed a loss of $60,000 attributable to the sale of the UR stock. USP and its subsidiary do not file a consolidated return.

(ii) In determining the true taxable income of the subsidiary, the district director may

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

disallow the loss of $60,000 on the ground that the loss was incurred by USP. *National Securities Corp. v Commissioner*, 137 F.2d 600 (3rd Cir. 1943), cert. denied, 320 U.S. 794 (1943).

(iv) *Consolidated returns.* Section 482 and the regulations thereunder apply to all controlled taxpayers, whether the controlled taxpayer files a separate or consolidated U.S. income tax return. If a controlled taxpayer files a separate return, its true separate taxable income will be determined. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer must be determined consistently with the principles of a consolidated return.

(2) *Rules relating to determination of true taxable income.* The following rules must be taken into account in determining the true taxable income of a controlled taxpayer.

(i) *Aggregation of transactions*—(A) *In general.* The combined effect of two or more separate transactions (whether before, during, or after the taxable year under review) may be considered, if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions. Generally, transactions will be aggregated only when they involve related products or services, as defined in §1.6038A–3(c)(7)(vii).

(B) *Examples.* The following examples illustrate this paragraph (f)(2)(i).

*Example 1.* P enters into a license agreement with S1, its subsidiary, that permits S1 to use a proprietary manufacturing process and to sell the output from this process throughout a specified region. S1 uses the manufacturing process and sells its output to S2, another subsidiary of P, which in turn resells the output to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P, it may be appropriate to consider the arm's length character of the transfer prices charged by S1 to S2 and the aggregate profits earned by S1 and S2 from the use of the manufacturing process and the sale to uncontrolled parties of the products produced by S1.

*Example 2.* S1, S2, and S3 are Country Z subsidiaries of U.S. manufacturer P. S1 is the exclusive Country Z distributor of computers manufactured by P. S2 provides mar-

keting services in connection with sales of P computers in Country Z, and in this regard uses significant marketing intangibles provided by P. S3 administers the warranty program with respect to P computers in Country Z, including maintenance and repair services. In evaluating the arm's length character of the transfer price paid by S1 to P, of the fees paid by S2 to P for the use of P marketing intangibles, and of the service fees earned by S2 and S3, it may be appropriate to consider the combined effects of these separate transactions because they are so interrelated that they are most reliably analyzed on an aggregated basis.

*Example 3.* The facts are the same as in *Example 2.* In addition, U1, U2, and U3 are uncontrolled taxpayers that carry out functions comparable to those of S1, S2, and S3, respectively, with respect to computers produced by unrelated manufacturers. R1, R2, and R3 are a controlled group of taxpayers (unrelated to the P controlled group) that also carry out functions comparable to those of S1, S2, and S3 with respect to computers produced by their common parent. Prices charged to uncontrolled customers of the R group differ from the prices charged to customers of U1, U2, and U3. In determining whether the transactions of U1, U2, and U3, or the transactions of R1, R2, and R3 would provide a more reliable measure of the arm's length result, it is determined that the interrelated R group transactions are more reliable than the wholly independent transactions of U1, U2, and U3, given the interrelationship of the P group transactions.

*Example 4.* P enters into a license agreement with S1 that permits S1 to use a propriety process for manufacturing product X and to sell product X to uncontrolled parties throughout a specified region. P also sells to S1 product Y which is manufactured by P in the United States, and which is unrelated to product X. Product Y is resold by S1 to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P for the use of the manufacturing process for product X, and the transfer prices charged for unrelated product Y, it would not be appropriate to consider the combined effects of these separate and unrelated transactions.

(ii) *Allocation based on taxpayer's actual transactions*—(A) *In general.* The Commissioner will evaluate the results of a transaction as actually structured by the taxpayer unless its structure lacks economic substance. However, the Commissioner may consider the alternatives available to the taxpayer in determining whether the terms of the controlled transaction would be acceptable to an uncontrolled taxpayer faced with the same alternatives and

617

operating under comparable circumstances. In such cases the Commissioner may adjust the consideration charged in the controlled transaction based on the cost or profit of an alternative as adjusted to account for material differences between the alternative and the controlled transaction, but will not restructure the transaction as if the alternative had been adopted by the taxpayer. *See* paragraph (d)(3) of this section (factors for determining comparability; contractual terms and risk); §§1.482–3(e), 1.482–4(d), and 1.482–9(h) (unspecified methods).

(B) *Example.* The following example illustrates this paragraph (f)(2)(ii).

*Example.* P and S are controlled taxpayers. P enters into a license agreement with S that permits S to use a proprietary process for manufacturing product X. Using its sales and marketing employees, S sells product X to related and unrelated customers outside the United States. If the license agreement between P and S has economic substance, the district director ordinarily will not restructure the taxpayer's transaction to treat P as if it had elected to exploit directly the manufacturing process. However, the fact that P could have manufactured product X may be taken into account under §1.482–4(d) in determining the arm's length consideration for the controlled transaction. For an example of such an analysis, see *Example* in §1.482–4(d)(2).

(iii) *Multiple year data—*(A) *In general.* The results of a controlled transaction ordinarily will be compared with the results of uncontrolled comparables occurring in the taxable year under review. It may be appropriate, however, to consider data relating to the uncontrolled comparables or the controlled taxpayer for one or more years before or after the year under review. If data relating to uncontrolled comparables from multiple years is used, data relating to the controlled taxpayer for the same years ordinarily must be considered. However, if such data is not available, reliable data from other years, as adjusted under paragraph (d)(2) (Standard of comparability) of this section may be used.

(B) *Circumstances warranting consideration of multiple year data.* The extent to which it is appropriate to consider multiple year data depends on the method being applied and the issue being addressed. Circumstances that may warrant consideration of data from multiple years include the extent to which complete and accurate data are available for the taxable year under review, the effect of business cycles in the controlled taxpayer's industry, or the effects of life cycles of the product or intangible property being examined. Data from one or more years before or after the taxable year under review must ordinarily be considered for purposes of applying the provisions of paragraph (d)(3)(iii) of this section (risk), paragraph (d)(4)(i) of this section (market share strategy), §1.482–4(f)(2) (periodic adjustments), §1.482–5 (comparable profits method), §1.482–9(f) (comparable profits method for services), and §1.482–9(i) (contingent-payment contractual terms for services). On the other hand, multiple year data ordinarily will not be considered for purposes of applying the comparable uncontrolled price method of §1.482–3(b) or the comparable uncontrolled services price method of §1.482–9(c) (except to the extent that risk or market share strategy issues are present).

(C) *Comparable effect over comparable period.* Data from multiple years may be considered to determine whether the same economic conditions that caused the controlled taxpayer's results had a comparable effect over a comparable period of time on the uncontrolled comparables that establish the arm's length range. For example, given that uncontrolled taxpayers enter into transactions with the ultimate expectation of earning a profit, persistent losses among controlled taxpayers may be an indication of non-arm's length dealings. Thus, if a controlled taxpayer that realizes a loss with respect to a controlled transaction seeks to demonstrate that the loss is within the arm's length range, the district director may take into account data from taxable years other than the taxable year of the transaction to determine whether the loss was attributable to arm's length dealings. The rule of this paragraph (f)(2)(iii)(C) is illustrated by *Example 3* of paragraph (f)(2)(iii)(E) of this section.

(D) *Applications of methods using multiple year averages.* If a comparison of a controlled taxpayer's average result over a multiple year period with the

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

average results of uncontrolled comparables over the same period would reduce the effect of short-term variations that may be unrelated to transfer pricing, it may be appropriate to establish a range derived from the average results of uncontrolled comparables over a multiple year period to determine if an adjustment should be made. In such a case the district director may make an adjustment if the controlled taxpayer's average result for the multiple year period is not within such range. Such a range must be determined in accordance with §1.482–1(e) (Arm's length range). An adjustment in such a case ordinarily will be equal to the difference, if any, between the controlled taxpayer's result for the taxable year and the mid-point of the uncontrolled comparables' results for that year. If the interquartile range is used to determine the range of average results for the multiple year period, such adjustment will ordinarily be made to the median of all the results of the uncontrolled comparables for the taxable year. See *Example 2* of §1.482–5(e). In other cases, the adjustment normally will be made to the arithmetic mean of all the results of the uncontrolled comparables for the taxable year. However, an adjustment will be made only to the extent that it would move the controlled taxpayer's multiple year average closer to the arm's length range for the multiple year period or to any point within such range. In determining a controlled taxpayer's average result for a multiple year period, adjustments made under this section for prior years will be taken into account only if such adjustments have been finally determined, as described in §1.482–1(g)(2)(iii). See *Example 3* of §1.482–5(e).

(E) *Examples.* The following examples, in which S and P are controlled taxpayers, illustrate this paragraph (f)(2)(iii). *Examples 1* and *4* also illustrate the principle of the arm's length range of paragraph (e) of this section.

*Example 1.* P sold product Z to S for $60 per unit in 1995. Applying the resale price method to data from uncontrolled comparables for the same year establishes an arm's length range of prices for the controlled transaction from $52 to $59 per unit. Since the price charged in the controlled transaction falls outside the range, the district di-

rector would ordinarily make an allocation under section 482. However, in this case there are cyclical factors that affect the results of the uncontrolled comparables (and that of the controlled transaction) that cannot be adequately accounted for by specific adjustments to the data for 1995. Therefore, the district director considers results over multiple years to account for these factors. Under these circumstances, it is appropriate to average the results of the uncontrolled comparables over the years 1993, 1994, and 1995 to determine an arm's length range. The averaged results establish an arm's length range of $56 to $58 per unit. For consistency, the results of the controlled taxpayers must also be averaged over the same years. The average price in the controlled transaction over the three years is $57. Because the controlled transfer price of product Z falls within the arm's length range, the district director makes no allocation.

*Example 2.* (i) FP, a Country X corporation, designs and manufactures machinery in Country X. FP's costs are incurred in Country X currency. USSub is the exclusive distributor of FP's machinery in the United States. The price of the machinery sold by FP to USSub is expressed in Country X currency. Thus, USSub bears all of the currency risk associated with fluctuations in the exchange rate between the time the contract is signed and the payment is made. The prices charged by FP to USSub for 1995 are under examination. In that year, the value of the dollar depreciated against the currency of Country X, and as a result, USSub's gross margin was only 8%.

(ii) UD is an uncontrolled distributor of similar machinery that performs distribution functions substantially the same as those performed by USSub, except that UD purchases and resells machinery in transactions where both the purchase and resale prices are denominated in U.S. dollars. Thus, UD had no currency exchange risk. UD's gross margin in 1995 was 10%. UD's average gross margin for the period 1990 to 1998 has been 12%.

(iii) In determining whether the price charged by FP to USSub in 1995 was arm's length, the district director may consider USSub's average gross margin for an appropriate period before and after 1995 to determine whether USSub's average gross margin during the period was sufficiently greater than UD's average gross margin during the same period such that USSub was sufficiently compensated for the currency risk it bore throughout the period. See §1.482–1(d)(3)(iii) (Risk).

*Example 3.* FP manufactures product X in Country M and sells it to USSub, which distributes X in the United States. USSub realizes losses with respect to the controlled transactions in each of five consecutive taxable years. In each of the five consecutive

619

years a different uncontrolled comparable realized a loss with respect to comparable transactions equal to or greater than USSub's loss. Pursuant to paragraph (f)(3)(iii)(C) of this section, the district director examines whether the uncontrolled comparables realized similar losses over a comparable period of time, and finds that each of the five comparables realized losses in only one of the five years, and their average result over the five-year period was a profit. Based on this data, the district director may conclude that the controlled taxpayer's results are not within the arm's length range over the five year period, since the economic conditions that resulted in the controlled taxpayer's loss did not have a comparable effect over a comparable period of time on the uncontrolled comparables.

*Example 4.* (i) USP, a U.S. corporation, manufactures product Y in the United States and sells it to FSub, which acts as USP's exclusive distributor of product Y in Country N. The resale price method described in §1.482–3(c) is used to evaluate whether the transfer price charged by USP to FSub for the 1994 taxable year for product Y was arm's length. For the period 1992 through 1994, FSub had a gross profit margin for each year of 13%. A, B, C and D are uncontrolled distributors of products that compete directly with product Y in country N. After making appropriate adjustments in accordance with §§1.482–1(d)(2) and 1.482–3(c), the gross profit margins for A, B, C, and D are as follows:

|   | 1992 | 1993 | 1994 | Average |
|---|---|---|---|---|
| A .................................. | 13 | 3 | 8 | 8.00 |
| B .................................. | 11 | 13 | 2 | 8.67 |
| 7C ................................ | 4 | 7 | 13 | 8.00 |
| 7D ................................ | 7 | 9 | 6 | 7.33 |

(ii) Applying the provisions of §1.482–1(e), the district director determines that the arm's length range of the average gross profit margins is between 7.33 and 8.67. The district director concludes that FSub's average gross margin of 13% is not within the arm's length range, despite the fact that C's gross profit margin for 1994 was also 13%, since the economic conditions that caused S's result did not have a comparable effect over a comparable period of time on the results of C or the other uncontrolled comparables. In this case, the district director makes an allocation equivalent to adjusting FSub's gross profit margin for 1994 from 13% to the mean of the uncontrolled comparables' results for 1994 (7.25%).

(iv) *Product lines and statistical techniques.* The methods described in §§1.482–2 through 1.482–6 are generally stated in terms of individual transactions. However, because a taxpayer may have controlled transactions in-

volving many different products, or many separate transactions involving the same product, it may be impractical to analyze every individual transaction to determine its arm's length price. In such cases, it is permissible to evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings. In addition, the arm's length results of all related party transactions entered into by a controlled taxpayer may be evaluated by employing sampling and other valid statistical techniques.

(v) *Allocations apply to results, not methods*—(A) *In general.* In evaluating whether the result of a controlled transaction is arm's length, it is not necessary for the district director to determine whether the method or procedure that a controlled taxpayer employs to set the terms for its controlled transactions corresponds to the method or procedure that might have been used by a taxpayer dealing at arm's length with an uncontrolled taxpayer. Rather, the district director will evaluate the result achieved rather than the method the taxpayer used to determine its prices.

(B) *Example.* The following example illustrates this paragraph (f)(2)(v).

*Example.* (i) FS is a foreign subsidiary of P, a U.S. corporation. P manufactures and sells household appliances. FS operates as P's exclusive distributor in Europe. P annually establishes the price for each of its appliances sold to FS as part of its annual budgeting, production allocation and scheduling, and performance evaluation processes. FS's aggregate gross margin earned in its distribution business is 18%.

(ii) ED is an uncontrolled European distributor of competing household appliances. After adjusting for minor differences in the level of inventory, volume of sales, and warranty programs conducted by FS and ED, ED's aggregate gross margin is also 18%. Thus, the district director may conclude that the aggregate prices charged by P for its appliances sold to FS are arm's length, without determining whether the budgeting, production, and performance evaluation processes of P are similar to such processes used by ED.

(g) *Collateral adjustments with respect to allocations under section 482*—(1) *In general.* The district director will take into account appropriate collateral adjustments with respect to allocations

under section 482. Appropriate collateral adjustments may include correlative allocations, conforming adjustments, and setoffs, as described in this paragraph (g).

(2) *Correlative allocations*—(i) *In general.* When the district director makes an allocation under section 482 (referred to in this paragraph (g)(2) as the primary allocation), appropriate correlative allocations will also be made with respect to any other member of the group affected by the allocation. Thus, if the district director makes an allocation of income, the district director will not only increase the income of one member of the group, but correspondingly decrease the income of the other member. In addition, where appropriate, the district director may make such further correlative allocations as may be required by the initial correlative allocation.

(ii) *Manner of carrying out correlative allocation.* The district director will furnish to the taxpayer with respect to which the primary allocation is made a written statement of the amount and nature of the correlative allocation. The correlative allocation must be reflected in the documentation of the other member of the group that is maintained for U.S. tax purposes, without regard to whether it affects the U.S. income tax liability of the other member for any open year. In some circumstances the allocation will have an immediate U.S. tax effect, by changing the taxable income computation of the other member (or the taxable income computation of a shareholder of the other member, for example, under the provisions of subpart F of the Internal Revenue Code). Alternatively, the correlative allocation may not be reflected on any U.S. tax return until a later year, for example when a dividend is paid.

(iii) *Events triggering correlative allocation.* For purposes of this paragraph (g)(2), a primary allocation will not be considered to have been made (and therefore, correlative allocations are not required to be made) until the date of a final determination with respect to the allocation under section 482. For this purpose, a final determination includes—

(A) Assessment of tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such allocation;

(B) Acceptance of a Form 870–AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(C) Payment of the deficiency;

(D) Stipulation in the Tax Court of the United States; or

(E) Final determination of tax liability by offer-in-compromise, closing agreement, or final resolution (determined under the principles of section 7481) of a judicial proceeding.

(iv) *Examples.* The following examples illustrate this paragraph (g)(2). In each example, X and Y are members of the same group of controlled taxpayers and each regularly computes its income on a calendar year basis.

*Example 1.* (i) In 1996, Y, a U.S. corporation, rents a building owned by X, also a U.S. corporation. In 1998 the district director determines that Y did not pay an arm's length rental charge. The district director proposes to increase X's income to reflect an arm's length rental charge. X consents to the assessment reflecting such adjustment by executing Form 870, a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The assessment of the tax with respect to the adjustment is made in 1998. Thus, the primary allocation, as defined in paragraph (g)(2)(i) of this section, is considered to have been made in 1998.

(ii) The adjustment made to X's income under section 482 requires a correlative allocation with respect to Y's income. The district director notifies X in writing of the amount and nature of the adjustment made with respect to Y. Y had net operating losses in 1993, 1994, 1995, 1996, and 1997. Although a correlative adjustment will not have an effect on Y's U.S. income tax liability for 1996, an adjustment increasing Y's net operating loss for 1996 will be made for purposes of determining Y's U.S. income tax liability for 1998 or a later taxable year to which the increased net operating loss may be carried.

*Example 2.* (i) In 1995, X, a U.S. construction company, provided engineering services to Y, a U.S. corporation, in the construction of Y's factory. In 1997, the district director determines that the fees paid by Y to X for its services were not arm's length and proposes to make an adjustment to the income of X. X consents to an assessment reflecting

such adjustment by executing Form 870. An assessment of the tax with respect to such adjustment is made in 1997. The district director notifies X in writing of the amount and nature of the adjustment to be made with respect to Y.

(ii) The fees paid by Y for X's engineering services properly constitute a capital expenditure. Y does not place the factory into service until 1998. Therefore, a correlative adjustment increasing Y's basis in the factory does not affect Y's U.S. income tax liability for 1997. However, the correlative adjustment must be made in the books and records maintained by Y for its U.S. income tax purposes and such adjustment will be taken into account in computing Y's allowable depreciation or gain or loss on a subsequent disposition of the factory.

*Example 3.* In 1995, X, a U.S. corporation, makes a loan to Y, its foreign subsidiary not engaged in a U.S. trade or business. In 1997, the district director, upon determining that the interest charged on the loan was not arm's length, proposes to adjust X's income to reflect an arm's length interest rate. X consents to an assessment reflecting such allocation by executing Form 870, and an assessment of the tax with respect to the section 482 allocation is made in 1997. The district director notifies X in writing of the amount and nature of the correlative allocation to be made with respect to Y. Although the correlative adjustment does not have an effect on Y's U.S. income tax liability, the adjustment must be reflected in the documentation of Y that is maintained for U.S. tax purposes. Thus, the adjustment must be reflected in the determination of the amount of Y's earnings and profits for 1995 and subsequent years, and the adjustment must be made to the extent it has an effect on any person's U.S. income tax liability for any taxable year.

(3) *Adjustments to conform accounts to reflect section 482 allocations*—(i) *In general.* Appropriate adjustments must be made to conform a taxpayer's accounts to reflect allocations made under section 482. Such adjustments may include the treatment of an allocated amount as a dividend or a capital contribution (as appropriate), or, in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner (see §601.601(d)(2) of this chapter), repayment of the allocated amount without further income tax consequences.

(ii) *Example.* The following example illustrates the principles of this paragraph (g)(3).

*Example. Conforming cash accounts.* (i) USD, a United States corporation, buys Product from its foreign parent, FP. In reviewing USD's income tax return, the district director determines that the arm's length price would have increased USD's taxable income by $5 million. The district director accordingly adjusts USD's income to reflect its true taxable income.

(ii) To conform its cash accounts to reflect the section 482 allocation made by the district director, USD applies for relief under Rev. Proc. 65–17, 1965–1 C.B. 833 (see §601.601(d)(2)(ii)*b* of this chapter), to treat the $5 million adjustment as an account receivable from FP, due as of the last day of the year of the transaction, with interest accruing therefrom.

(4) *Setoffs*—(i) *In general.* If an allocation is made under section 482 with respect to a transaction between controlled taxpayers, the Commissioner will take into account the effect of any other non-arm's length transaction between the same controlled taxpayers in the same taxable year which will result in a setoff against the original section 482 allocation. Such setoff, however, will be taken into account only if the requirements of paragraph (g)(4)(ii) of this section are satisfied. If the effect of the setoff is to change the characterization or source of the income or deductions, or otherwise distort taxable income, in such a manner as to affect the U.S. tax liability of any member, adjustments will be made to reflect the correct amount of each category of income or deductions. For purposes of this setoff provision, the term arm's length refers to the amount defined in paragraph (b) of this section (arm's length standard), without regard to the rules in §1.482–2(a) that treat certain interest rates as arm's length rates of interest.

(ii) *Requirements.* The district director will take a setoff into account only if the taxpayer—

(A) Establishes that the transaction that is the basis of the setoff was not at arm's length and the amount of the appropriate arm's length charge;

(B) Documents, pursuant to paragraph (g)(2) of this section, all correlative adjustments resulting from the proposed setoff; and

(C) Notifies the district director of the basis of any claimed setoff within 30 days after the earlier of the date of a letter by which the district director

**Internal Revenue Service, Treasury**                    **§ 1.482–1**

transmits an examination report notifying the taxpayer of proposed adjustments or the date of the issuance of the notice of deficiency.

(iii) *Examples.* The following examples illustrate this paragraph (g)(4).

*Example 1.* P, a U.S. corporation, renders construction services to S, its foreign subsidiary in Country Y, in connection with the construction of S's factory. An arm's length charge for such services determined under §1.482–9 would be $100,000. During the same taxable year P makes available to S the use of a machine to be used in the construction of the factory, and the arm's length rental value of the machine is $25,000. P bills S $125,000 for the services, but does not charge S for the use of the machine. No allocation will be made with respect to the undercharge for the machine if P notifies the district director of the basis of the claimed setoff within 30 days after the date of the letter from the district director transmitting the examination report notifying P of the proposed adjustment, establishes that the excess amount charged for services was equal to an arm's length charge for the use of the machine and that the taxable income and income tax liabilities of P are not distorted, and documents the correlative allocations resulting from the proposed setoff.

*Example 2.* The facts are the same as in *Example 1,* except that, if P had reported $25,000 as rental income and $25,000 less as service income, it would have been subject to the tax on personal holding companies. Allocations will be made to reflect the correct amounts of rental income and service income.

(h) *Special rules*—(1) *Small taxpayer safe harbor.* [Reserved]

(2) *Effect of foreign legal restrictions*—(i) *In general.* The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2) (iii) and (iv) of this section (Deferred income method of accounting).

(ii) *Applicable legal restrictions.* Foreign legal restrictions (whether tem-

porary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii) (A) through (D) of this section are met.

(A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

(B) The taxpayer (or other member of the controlled group to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

(C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

(D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

(iii) *Requirement for electing the deferred income method of accounting.* If a foreign legal restriction prevents the payment or receipt of part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met—

(A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

(B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of

§ 1.482-1                                                          26 CFR Ch. I (4–1–13 Edition)

this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664–2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

(iv) *Deferred income method of accounting.* If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against any amount so deferred, are subject to deferral under the provisions of § 1.461– 1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

(v) *Examples.* The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

*Example 1.* Parent licenses an intangible to Sub. FC law generally prohibits payments by any person within FC to recipients outside the country. The FC law meets the requirements of paragraph (h)(2)(ii) of this section. There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will

not be taken into account in determining the arm's length amount. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC. However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

*Example 2.* (i) The facts are the same as in *Example 1,* except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied. Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

*Example 3.* The facts are the same as in *Example 1,* except that the laws of FC do not prevent distributions from corporations to their shareholders. Sub distributes an amount equal to 8% of its sales in country FC. Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

*Example 4.* The facts are the same as in *Example 1,* except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%. Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

624

**Internal Revenue Service, Treasury**                                    **§ 1.482–1**

(3) *Coordination with section 936*—(i) *Cost sharing under section 936.* If a possessions corporation makes an election under section 936(h)(5)(C)(i)(I), the corporation must make a section 936 cost sharing payment that is at least equal to the payment that would be required under section 482 if the electing corporation were a foreign corporation. In determining the payment that would be required under section 482 for this purpose, the provisions of §§ 1.482–1 and 1.482–4 will be applied, and to the extent relevant to the valuation of intangibles, §§ 1.482–5 and 1.482–6 will be applied. The provisions of section 936(h)(5)(C)(i)(II) (Effect of Election—electing corporation treated as owner of intangible property) do not apply until the payment that would be required under section 482 has been determined.

(ii) *Use of terms.* A cost sharing payment, for the purposes of section 936(h)(5)(C)(i)(I), is calculated using the provisions of section 936 and the regulations thereunder and the provisions of this paragraph (h)(3). The provisions relating to cost sharing under section 482 do not apply to payments made pursuant to an election under section 936(h)(5)(C)(i)(I). Similarly, a profit split payment, for the purposes of section 936(h)(5)(C)(ii)(I), is calculated using the provisions of section 936 and the regulations thereunder, not section 482 and the regulations thereunder.

(i) *Definitions.* The definitions set forth in paragraphs (i)(1) through (i)(10) of this section apply to this section and §§ 1.482–2 through 1.482–9.

(1) *Organization* includes an organization of any kind, whether a sole proprietorship, a partnership, a trust, an estate, an association, or a corporation (as each is defined or understood in the Internal Revenue Code or the regulations thereunder), irrespective of the place of organization, operation, or conduct of the trade or business, and regardless of whether it is a domestic or foreign organization, whether it is an exempt organization, or whether it is a member of an affiliated group that files a consolidated U.S. income tax return, or a member of an affiliated group that does not file a consolidated U.S. income tax return.

(2) *Trade* or *business* includes a trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place of operation. Employment for compensation will constitute a separate trade or business from the employing trade or business.

(3) *Taxpayer* means any person, organization, trade or business, whether or not subject to any internal revenue tax.

(4) *Controlled* includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(5) *Controlled taxpayer* means any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers. *Uncontrolled taxpayer* means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests.

(6) *Group, controlled group,* and *group of controlled taxpayers* mean the taxpayers owned or controlled directly or indirectly by the same interests.

(7) *Transaction* means any sale, assignment, lease, license, loan, advance, contribution, or any other transfer of any interest in or a right to use any property (whether tangible or intangible, real or personal) or money, however such transaction is effected, and whether or not the terms of such transaction are formally documented. A transaction also includes the performance of any services for the benefit of, or on behalf of, another taxpayer.

(8) *Controlled transaction* or *controlled transfer* means any transaction or transfer between two or more members of the same group of controlled taxpayers. The term *uncontrolled transaction* means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers.

**Internal Revenue Service, Treasury**                    **§ 1.482–4**

property), it may be necessary to determine the arm's length consideration for such intangible separately from the tangible property, applying methods appropriate to determining the arm's length result for a transfer of intangible property under § 1.482–4. For example, if the transfer of a machine conveys the right to exploit a manufacturing process incorporated in the machine, then the arm's length consideration for the transfer of that right must be determined separately under § 1.482–4.

[T.D. 8552, 59 FR 35011, July 8, 1994; 60 FR 16382, Mar. 30, 1995]

**§ 1.482–4  Methods to determine taxable income in connection with a transfer of intangible property.**

(a) *In general.* The arm's length amount charged in a controlled transfer of intangible property must be determined under one of the four methods listed in this paragraph (a). Each of the methods must be applied in accordance with all of the provisions of § 1.482–1, including the best method rule of § 1.482–1(c), the comparability analysis of § 1.482–1(d), and the arm's length range of § 1.482–1(e). The arm's length consideration for the transfer of an intangible determined under this section must be commensurate with the income attributable to the intangible. See § 1.482–4(f)(2) (Periodic adjustments). The available methods are—

(1) The comparable uncontrolled transaction method, described in paragraph (c) of this section;

(2) The comparable profits method, described in § 1.482–5;

(3) The profit split method, described in § 1.482–6; and

(4) Unspecified methods described in paragraph (d) of this section.

(b) *Definition of intangible.* For purposes of section 482, an intangible is an asset that comprises any of the following items and has substantial value independent of the services of any individual—

(1) Patents, inventions, formulae, processes, designs, patterns, or know-how;

(2) Copyrights and literary, musical, or artistic compositions;

(3) Trademarks, trade names, or brand names;

(4) Franchises, licenses, or contracts;

(5) Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, or technical data; and

(6) Other similar items. For purposes of section 482, an item is considered similar to those listed in paragraph (b)(1) through (5) of this section if it derives its value not from its physical attributes but from its intellectual content or other intangible properties.

(c) *Comparable uncontrolled transaction method*—(1) *In general.* The comparable uncontrolled transaction method evaluates whether the amount charged for a controlled transfer of intangible property was arm's length by reference to the amount charged in a comparable uncontrolled transaction. The amount determined under this method may be adjusted as required by paragraph (f)(2) of this section (Periodic adjustments).

(2) *Comparability and reliability considerations*—(i) *In general.* Whether results derived from applications of this method are the most reliable measure of an arm's length result is determined using the factors described under the best method rule in § 1.482–1(c). The application of these factors under the comparable uncontrolled transaction method is discussed in paragraphs (c)(2)(ii), (iii), and (iv) of this section.

(ii) *Reliability.* If an uncontrolled transaction involves the transfer of the same intangible under the same, or substantially the same, circumstances as the controlled transaction, the results derived from applying the comparable uncontrolled transaction method will generally be the most direct and reliable measure of the arm's length result for the controlled transfer of an intangible. Circumstances between the controlled and uncontrolled transactions will be considered substantially the same if there are at most only minor differences that have a definite and reasonably ascertainable effect on the amount charged and for which appropriate adjustments are made. If such uncontrolled transactions cannot be identified, uncontrolled transactions that involve the transfer of comparable intangibles under comparable circumstances may be used to apply this method, but the

645

§ 1.482–4

reliability of the analysis will be reduced.

(iii) *Comparability*—(A) *In general.* The degree of comparability between controlled and uncontrolled transactions is determined by applying the comparability provisions of §1.482–1(d). Although all of the factors described in §1.482–1(d)(3) must be considered, specific factors may be particularly relevant to this method. In particular, the application of this method requires that the controlled and uncontrolled transactions involve either the same intangible property or comparable intangible property, as defined in paragraph (c)(2)(iii)(B)(*1*) of this section. In addition, because differences in contractual terms, or the economic conditions in which transactions take place, could materially affect the amount charged, comparability under this method also depends on similarity with respect to these factors, or adjustments to account for material differences in such circumstances.

(B) *Factors to be considered in determining comparability*—(*1*) *Comparable intangible property.* In order for the intangible property involved in an uncontrolled transaction to be considered comparable to the intangible property involved in the controlled transaction, both intangibles must—

(*i*) Be used in connection with similar products or processes within the same general industry or market; and

(*ii*) Have similar profit potential. The profit potential of an intangible is most reliably measured by directly calculating the net present value of the benefits to be realized (based on prospective profits to be realized or costs to be saved) through the use or subsequent transfer of the intangible, considering the capital investment and start-up expenses required, the risks to be assumed, and other relevant considerations. The need to reliably measure profit potential increases in relation to both the total amount of potential profits and the potential rate of return on investment necessary to exploit the intangible. If the information necessary to directly calculate net present value of the benefits to be realized is unavailable, and the need to reliably measure profit potential is reduced because the potential profits are rel-

atively small in terms of total amount and rate of return, comparison of profit potential may be based upon the factors referred to in paragraph (c)(2)(iii)(B)(*2*) of this section. See *Example 3* of §1.482–4(c)(4). Finally, the reliability of a measure of profit potential is affected by the extent to which the profit attributable to the intangible can be isolated from the profit attributable to other factors, such as functions performed and other resources employed.

(*2*) *Comparable circumstances.* In evaluating the comparability of the circumstances of the controlled and uncontrolled transactions, although all of the factors described in §1.482–1(d)(3) must be considered, specific factors relevant to this method include the following—

(*i*) The terms of the transfer, including the exploitation rights granted in the intangible, the exclusive or non-exclusive character of any rights granted, any restrictions on use, or any limitations on the geographic area in which the rights may be exploited;

(*ii*) The stage of development of the intangible (including, where appropriate, necessary governmental approvals, authorizations, or licenses) in the market in which the intangible is to be used;

(*iii*) Rights to receive updates, revisions, or modifications of the intangible;

(*iv*) The uniqueness of the property and the period for which it remains unique, including the degree and duration of protection afforded to the property under the laws of the relevant countries;

(*v*) The duration of the license, contract, or other agreement, and any termination or renegotiation rights;

(*vi*) Any economic and product liability risks to be assumed by the transferee;

(*vii*) The existence and extent of any collateral transactions or ongoing business relationships between the transferee and transferor; and

(*viii*) The functions to be performed by the transferor and transferee, including any ancillary or subsidiary services.

(iv) *Data and assumptions.* The reliability of the results derived from the

646

**Internal Revenue Service, Treasury**                                       **§ 1.482–4**

comparable uncontrolled transaction method is affected by the completeness and accuracy of the data used and the reliability of the assumptions made to apply this method. See § 1.482–1(c) (Best method rule).

(3) *Arm's length range.* See § 1.482–1(e)(2) for the determination of an arm's length range.

(4) *Examples.* The following examples illustrate the principles of this paragraph (c).

*Example 1.* (i) USpharm, a U.S. pharmaceutical company, develops a new drug Z that is a safe and effective treatment for the disease zeezee. USpharm has obtained patents covering drug Z in the United States and in various foreign countries. USpharm has also obtained the regulatory authorizations necessary to market drug Z in the United States and in foreign countries.

(ii) USpharm licenses its subsidiary in country X, Xpharm, to produce and sell drug Z in country X. At the same time, it licenses an unrelated company, Ydrug, to produce and sell drug Z in country Y, a neighboring country. Prior to licensing the drug, USpharm had obtained patent protection and regulatory approvals in both countries and both countries provide similar protection for intellectual property rights. Country X and country Y are similar countries in terms of population, per capita income and the incidence of disease zeezee. Consequently, drug Z is expected to sell in similar quantities and at similar prices in both countries. In addition, costs of producing and marketing drug Z in each country are expected to be approximately the same.

(iii) USpharm and Xpharm establish terms for the license of drug Z that are identical in every material respect, including royalty rate, to the terms established between USpharm and Ydrug. In this case the district director determines that the royalty rate established in the Ydrug license agreement is a reliable measure of the arm's length royalty rate for the Xpharm license agreement.

*Example 2.* The facts are the same as in *Example 1,* except that the incidence of the disease zeezee in Country Y is much higher than in Country X. In this case, the profit potential from exploitation of the right to make and sell drug Z is likely to be much higher in country Y than it is in Country X. Consequently, the Ydrug license agreement is unlikely to provide a reliable measure of the arm's length royalty rate for the Xpharm license.

*Example 3.* (i) FP, is a foreign company that designs, manufactures and sells industrial equipment. FP has developed proprietary components that are incorporated in its products. These components are important in the operation of FP's equipment and some of them have distinctive features, but other companies produce similar components and none of these components by itself accounts for a substantial part of the value of FP's products.

(ii) FP licenses its U.S. subsidiary, USSub, exclusive North American rights to use the patented technology for producing component X, a heat exchanger used for cooling operating mechanisms in industrial equipment. Component X incorporates proven technology that makes it somewhat more efficient than the heat exchangers commonly used in industrial equipment. FP also agrees to provide technical support to help adapt component X to USSub's products and to assist with initial production. Under the terms of the license agreement USSub pays FP a royalty equal to 3 percent of sales of USSub equipment incorporating component X.

(iii) FP does not license unrelated parties to use component X, but many similar components are transferred between uncontrolled taxpayers. Consequently, the district director decides to apply the comparable uncontrolled transaction method to evaluate whether the 3 percent royalty for component X is an arm's length royalty.

(iv) The district director uses a database of company documents filed with the Securities and Exchange Commission (SEC) to identify potentially comparable license agreements between uncontrolled taxpayers that are on file with the SEC. The district director identifies 40 license agreements that were entered into in the same year as the controlled transfer or in the prior or following year, and that relate to transfers of technology associated with industrial equipment that has similar applications to USSub's products. Further review of these uncontrolled agreements indicates that 25 of them involved components that have a similar level of technical sophistication as component X and could be expected to play a similar role in contributing to the total value of the final product.

(v) The district director makes a detailed review of the terms of each of the 25 uncontrolled agreements and finds that 15 of them are similar to the controlled agreement in that they all involve—

(A) The transfer of exclusive rights for the North American market;

(B) Products for which the market could be expected to be of a similar size to the market for the products into which USSub incorporates component X;

(C) The transfer of patented technology;

(D) Continuing technical support;

(E) Access to technical improvements;

(F) Technology of a similar age; and

(G) A similar duration of the agreement.

(vi) Based on these factors and the fact that none of the components to which these

647

license agreements relate accounts for a substantial part of the value of the final products, the district director concludes that these fifteen intangibles have similar profit potential to the component X technology.

(vii) The 15 uncontrolled comparables produce the following royalty rates:

| License | Royalty rate (percent) |
|---|---|
| 1 | 1.0 |
| 2 | 1.0 |
| 3 | 1.25 |
| 4 | 1.25 |
| 5 | 1.5 |
| 6 | 1.5 |
| 7 | 1.75 |
| 8 | 2.0 |
| 9 | 2.0 |
| 10 | 2.0 |
| 11 | 2.25 |
| 12 | 2.5 |
| 13 | 2.5 |
| 14 | 2.75 |
| 15 | 3.0 |

(viii) Although the uncontrolled comparables are clearly similar to the controlled transaction, it is likely that unidentified material differences exist between the uncontrolled comparables and the controlled transaction. Therefore, an appropriate statistical technique must be used to establish the arm's length range. In this case the district director uses the interquartile range to determine the arm's length range. Therefore, the arm's length range covers royalty rates from 1.25 to 2.5 percent, and an adjustment is warranted to the 3 percent royalty charged in the controlled transfer. The district director determines that the appropriate adjustment corresponds to a reduction in the royalty rate to 2.0 percent, which is the median of the uncontrolled comparables.

*Example 4.* (i) USdrug, a U.S. pharmaceutical company, has developed a new drug, Nosplit, that is useful in treating migraine headaches and produces no significant side effects. Nosplit replaces another drug, Lessplit, that USdrug had previously produced and marketed as a treatment for migraine headaches. A number of other drugs for treating migraine headaches are already on the market, but Nosplit can be expected rapidly to dominate the worldwide market for such treatments and to command a premium price since all other treatments produce side effects. Thus, USdrug projects that extraordinary profits will be derived from Nosplit in the U.S. market and other markets.

(ii) USdrug licenses its newly established European subsidiary, Eurodrug, the rights to produce and market Nosplit in the European market. In setting the royalty rate for this license, USdrug considers the royalty that it established previously when it licensed the right to produce and market Lessplit in the

European market to an unrelated European pharmaceutical company. In many respects the two license agreements are closely comparable. The drugs were licensed at the same stage in their development and the agreements conveyed identical rights to the licensees. Moreover, there appear to have been no significant changes in the European market for migraine headache treatments since Lessplit was licensed. However, at the time that Lessplit was licensed there were several other similar drugs already on the market to which Lessplit was not in all cases superior. Consequently, the projected and actual Lessplit profits were substantially less than the projected Nosplit profits. Thus, USdrug concludes that the profit potential of Lessplit is not similar to the profit potential of Nosplit, and the Lessplit license agreement consequently is not a comparable uncontrolled transaction for purposes of this paragraph (c) in spite of the other indicia of comparability between the two intangibles.

(d) *Unspecified methods—(1) In general.* Methods not specified in paragraphs (a)(1), (2), and (3) of this section may be used to evaluate whether the amount charged in a controlled transaction is arm's length. Any method used under this paragraph (d) must be applied in accordance with the provisions of §1.482–1. Consistent with the specified methods, an unspecified method should take into account the general principle that uncontrolled taxpayers evaluate the terms of a transaction by considering the realistic alternatives to that transaction, and only enter into a particular transaction if none of the alternatives is preferable to it. For example, the comparable uncontrolled transaction method compares a controlled transaction to similar uncontrolled transactions to provide a direct estimate of the price the parties would have agreed to had they resorted directly to a market alternative to the controlled transaction. Therefore, in establishing whether a controlled transaction achieved an arm's length result, an unspecified method should provide information on the prices or profits that the controlled taxpayer could have realized by choosing a realistic alternative to the controlled transaction. As with any method, an unspecified method will not be applied unless it provides the most reliable measure of an arm's length result under the principles of the best method

rule. See § 1.482–1(c). Therefore, in accordance with § 1.482–1(d) (Comparability), to the extent that a method relies on internal data rather than uncontrolled comparables, its reliability will be reduced. Similarly, the reliability of a method will be affected by the reliability of the data and assumptions used to apply the method, including any projections used.

(2) *Example.* The following example illustrates an application of the principle of this paragraph (d).

*Example.* (i) USbond is a U.S. company that licenses to its foreign subsidiary, Eurobond, a proprietary process that permits the manufacture of Longbond, a long-lasting industrial adhesive, at a substantially lower cost than otherwise would be possible. Using the proprietary process, Eurobond manufactures Longbond and sells it to related and unrelated parties for the market price of $550 per ton. Under the terms of the license agreement, Eurobond pays USbond a royalty of $100 per ton of Longbond sold. USbond also manufactures and markets Longbond in the United States.

(ii) In evaluating whether the consideration paid for the transfer of the proprietary process to Eurobond was arm's length, the district director may consider, subject to the best method rule of § 1.482–1(c), USbond's alternative of producing and selling Longbond itself. Reasonably reliable estimates indicate that if USbond directly supplied Longbond to the European market, a selling price of $300 per ton would cover its costs and provide a reasonable profit for its functions, risks and investment of capital associated with the production of Longbond for the European market. Given that the market price of Longbond was $550 per ton, by licensing the proprietary process to Eurobond, USbond forgoes $250 per ton of profit over the profit that would be necessary to compensate it for the functions, risks and investment involved in supplying Longbond to the European market itself. Based on these facts, the district director concludes that a royalty of $100 for the proprietary process is not arm's length.

(e) *Coordination with tangible property rules.* See § 1.482–3(f) for the provisions regarding the coordination between the tangible property and intangible property rules.

(f) *Special rules for transfers of intangible property*—(1) *Form of consideration.* If a transferee of an intangible pays nominal or no consideration and the transferor has retained a substantial interest in the property, the arm's length consideration shall be in the form of a royalty, unless a different form is demonstrably more appropriate.

(2) *Periodic adjustments*—(i) General rule. If an intangible is transferred under an arrangement that covers more than one year, the consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (f)(2) shall be consistent with the arm's length standard and the provisions of § 1.482–1. In determining whether to make such adjustments in the taxable year under examination, the district director may consider all relevant facts and circumstances throughout the period the intangible is used. The determination in an earlier year that the amount charged for an intangible was an arm's length amount will not preclude the district director in a subsequent taxable year from making an adjustment to the amount charged for the intangible in the subsequent year. A periodic adjustment under the commensurate with income requirement of section 482 may be made in a subsequent taxable year without regard to whether the taxable year of the original transfer remains open for statute of limitation purposes. For exceptions to this rule see paragraph (f)(2)(ii) of this section.

(ii) *Exceptions*—(A) *Transactions involving the same intangible.* If the same intangible was transferred to an uncontrolled taxpayer under substantially the same circumstances as those of the controlled transaction; this transaction serves as the basis for the application of the comparable uncontrolled transaction method in the first taxable year in which substantial periodic consideration was required to be paid; and the amount paid in that year was an arm's length amount, then no allocation in a subsequent year will be made under paragraph (f)(2)(i) of this paragraph for a controlled transfer of intangible property.

(B) *Transactions involving comparable intangible.* If the arm's length result is derived from the application of the comparable uncontrolled transaction method based on the transfer of a comparable intangible under comparable

649

circumstances to those of the controlled transaction, no allocation will be made under paragraph (f)(2)(i) of this section if each of the following facts is established—

(1) The controlled taxpayers entered into a written agreement (controlled agreement) that provided for an amount of consideration with respect to each taxable year subject to such agreement, such consideration was an arm's length amount for the first taxable year in which substantial periodic consideration was required to be paid under the agreement, and such agreement remained in effect for the taxable year under review;

(2) There is a written agreement setting forth the terms of the comparable uncontrolled transaction relied upon to establish the arm's length consideration (uncontrolled agreement), which contains no provisions that would permit any change to the amount of consideration, a renegotiation, or a termination of the agreement, in circumstances comparable to those of the controlled transaction in the taxable year under review (or that contains provisions permitting only specified, non-contingent, periodic changes to the amount of consideration);

(3) The controlled agreement is substantially similar to the uncontrolled agreement, with respect to the time period for which it is effective and the provisions described in paragraph (f)(2)(ii)(B)(2) of this section;

(4) The controlled agreement limits use of the intangible to a specified field or purpose in a manner that is consistent with industry practice and any such limitation in the uncontrolled agreement;

(5) There were no substantial changes in the functions performed by the controlled transferee after the controlled agreement was executed, except changes required by events that were not foreseeable; and

(6) The aggregate profits actually earned or the aggregate cost savings actually realized by the controlled taxpayer from the exploitation of the intangible in the year under examination, and all past years, are not less than 80% nor more than 120% of the prospective profits or cost savings that were foreseeable when the comparability of the uncontrolled agreement was established under paragraph (c)(2) of this section.

(C) *Methods other than comparable uncontrolled transaction.* If the arm's length amount was determined under any method other than the comparable uncontrolled transaction method, no allocation will be made under paragraph (f)(2)(i) of this section if each of the following facts is established—

(1) The controlled taxpayers entered into a written agreement (controlled agreement) that provided for an amount of consideration with respect to each taxable year subject to such agreement, and such agreement remained in effect for the taxable year under review;

(2) The consideration called for in the controlled agreement was an arm's length amount for the first taxable year in which substantial periodic consideration was required to be paid, and relevant supporting documentation was prepared contemporaneously with the execution of the controlled agreement;

(3) There have been no substantial changes in the functions performed by the transferee since the controlled agreement was executed, except changes required by events that were not foreseeable; and

(4) The total profits actually earned or the total cost savings realized by the controlled transferee from the exploitation of the intangible in the year under examination, and all past years, are not less than 80% nor more than 120% of the prospective profits or cost savings that were foreseeable when the controlled agreement was entered into.

(D) *Extraordinary events.* No allocation will be made under paragraph (f)(2)(i) of this section if the following requirements are met—

(1) Due to extraordinary events that were beyond the control of the controlled taxpayers and that could not reasonably have been anticipated at the time the controlled agreement was entered into, the aggregate actual profits or aggregate cost savings realized by the taxpayer are less than 80% or more than 120% of the prospective profits or cost savings; and

**Internal Revenue Service, Treasury**                                    **§ 1.482-4**

(2) All of the requirements of paragraph (f)(2)(ii) (B) or (C) of this section are otherwise satisfied.

(E) *Five-year period.* If the requirements of §1.482-4 (f)(2)(ii)(B) or (f)(2)(ii)(C) are met for each year of the five-year period beginning with the first year in which substantial periodic consideration was required to be paid, then no periodic adjustment will be made under paragraph (f)(2)(i) of this section in any subsequent year.

(iii) *Examples.* The following examples illustrate this paragraph (f)(2).

*Example 1.* (i) USdrug, a U.S. pharmaceutical company, has developed a new drug, Nosplit, that is useful in treating migraine headaches and produces no significant side effects. A number of other drugs for treating migraine headaches are already on the market, but Nosplit can be expected rapidly to dominate the worldwide market for such treatments and to command a premium price since all other treatments produce side effects. Thus, USdrug projects that extraordinary profits will be derived from Nosplit in the U.S. and European markets.

(ii) USdrug licenses its newly established European subsidiary, Eurodrug, the rights to produce and market Nosplit for the European market for 5 years. In setting the royalty rate for this license, USdrug makes projections of the annual sales revenue and the annual profits to be derived from the exploitation of Nosplit by Eurodrug. Based on the projections, a royalty rate of 3.9% is established for the term of the license.

(iii) In Year 1, USdrug evaluates the royalty rate it received from Eurodrug. Given the high profit potential of Nosplit, USdrug is unable to locate any uncontrolled transactions dealing with licenses of comparable intangible property. USdrug therefore determines that the comparable uncontrolled transaction method will not provide a reliable measure of an arm's length royalty. However, applying the comparable profits method to Eurodrug, USdrug determines that a royalty rate of 3.9% will result in Eurodrug earning an arm's length return for its manufacturing and marketing functions.

(iv) In Year 5, the U.S. income tax return for USdrug is examined, and the district director must determine whether the royalty rate between USdrug and Eurodrug is commensurate with the income attributable to Nosplit. In making this determination, the district director considers whether any of the exceptions in §1.482-4(f)(2)(ii) are applicable. In particular, the district director compares the profit projections attributable to Nosplit made by USdrug against the actual profits realized by Eurodrug. The projected and actual profits are as follows:

|         | Profit projections | Actual profits |
|---------|-------------------:|---------------:|
| Year 1  | 200               | 250            |
| Year 2  | 250               | 300            |
| Year 3  | 500               | 600            |
| Year 4  | 350               | 200            |
| Year 5  | 100               | 100            |
| Total   | 1400              | 1450           |

(v) The total profits earned through Year 5 were not less than 80% nor more than 120% of the profits that were projected when the license was entered into. If the district director determines that the other requirements of §1.482-4(f)(2)(ii)(C) were met, no adjustment will be made to the royalty rate between USdrug and Eurodrug for the license of Nosplit.

*Example 2.* (i) The facts are the same as in *Example 1*, except that Eurodrug's actual profits earned were much higher than the projected profits, as follows:

|         | Profit projections | Actual profits |
|---------|-------------------:|---------------:|
| Year 1  | 200               | 250            |
| Year 2  | 250               | 500            |
| Year 3  | 500               | 800            |
| Year 4  | 350               | 700            |
| Year 5  | 100               | 600            |
| Total   | 1400              | 2850           |

(ii) In examining USdrug's tax return for Year 5, the district director considers the actual profits realized by Eurodrug in Year 5, and all past years. Accordingly, although Years 1 through 4 may be closed under the statute of limitations, for purposes of determining whether an adjustment should be made with respect to the royalty rate in Year 5 with respect to Nosplit, the district director aggregates the actual profits from those years with the profits of Year 5. However, the district director will make an adjustment, if any, only with respect to Year 5.

*Example 3.* (i) FP, a foreign corporation, licenses to USS, its U.S. subsidiary, a new airfiltering process that permits manufacturing plants to meet new environmental standards. The license runs for a 10-year period, and the profit derived from the new process is projected to be $15 million per year, for an aggregate profit of $150 million.

(ii) The royalty rate for the license is based on a comparable uncontrolled transaction involving a comparable intangible under comparable circumstances. The requirements of paragraphs (f)(2)(ii)(B)(*1*) through (*5*) of this section have been met. Specifically, FP and USS have entered into a written agreement that provides for a royalty in each year of the license, the royalty rate is considered arm's length for the first taxable year in which a substantial royalty was required to be paid, the license limited the use of the process to a specified field,

651

consistent with industry practice, and there are no substantial changes in the functions performed by USS after the license was entered into.

(iii) In examining Year 4 of the license, the district director determines that the aggregate actual profits earned by USS through Year 4 are $30 million, less than 80% of the projected profits of $60 million. However, USS establishes to the satisfaction of the district director that the aggregate actual profits from the process are less than 80% of the projected profits in Year 3 because an earthquake severely damaged USS's manufacturing plant. Because the difference between the projected profits and actual profits was due to an extraordinary event that was beyond the control of USS, and could not reasonably have been anticipated at the time the license was entered into, the requirement under §1.482-4(f)(2)(ii)(D) has been met, and no adjustment under this section is made.

(3) *Ownership of intangible property*— (i) *Identification of owner*—(A) *In general.* The legal owner of intangible property pursuant to the intellectual property law of the relevant jurisdiction, or the holder of rights constituting an intangible property pursuant to contractual terms (such as the terms of a license) or other legal provision, will be considered the sole owner of the respective intangible property for purposes of this section unless such ownership is inconsistent with the economic substance of the underlying transactions. *See* §1.482-1(d)(3)(ii)(B) (identifying contractual terms). If no owner of the respective intangible property is identified under the intellectual property law of the relevant jurisdiction, or pursuant to contractual terms (including terms imputed pursuant to §1.482-1(d)(3)(ii)(B)) or other legal provision, then the controlled taxpayer who has control of the intangible property, based on all the facts and circumstances, will be considered the sole owner of the intangible property for purposes of this section.

(B) *Cost sharing arrangements.* The rules in this paragraph (f)(3) regarding ownership with respect to cost shared intangibles and cost sharing arrangements will apply only as provided in §1.482-7.

(ii) *Examples.* The principles of this paragraph (f)(3) are illustrated by the following examples:

*Example 1.* FP, a foreign corporation, is the registered holder of the AA trademark in the United States. FP licenses to its U.S. subsidiary, USSub, the exclusive rights to manufacture and market products in the United States under the AA trademark. FP is the owner of the trademark pursuant to intellectual property law. USSub is the owner of the license pursuant to the terms of the license, but is not the owner of the trademark. *See* paragraphs (b)(3) and (4) of this section (defining an intangible as, among other things, a trademark or a license).

*Example 2.* The facts are the same as in *Example 1.* As a result of its sales and marketing activities, USSub develops a list of several hundred creditworthy customers that regularly purchase AA trademarked products. Neither the terms of the contract between FP and USSub nor the relevant intellectual property law specify which party owns the customer list. Because USSub has knowledge of the contents of the list, and has practical control over its use and dissemination, USSub is considered the sole owner of the customer list for purposes of this paragraph (f)(3).

(4) *Contribution to the value of intangible property owned by another*—(i) *In general.* The arm's length consideration for a contribution by one controlled taxpayer that develops or enhances the value, or may be reasonably anticipated to develop or enhance the value, of intangible property owned by another controlled taxpayer will be determined in accordance with the applicable rules under section 482. If the consideration for such a contribution is embedded within the contractual terms for a controlled transaction that involves such intangible property, then ordinarily no separate allocation will be made with respect to such contribution. In such cases, pursuant to §1.482-1(d)(3), the contribution must be accounted for in evaluating the comparability of the controlled transaction to uncontrolled comparables, and accordingly in determining the arm's length consideration in the controlled transaction.

(ii) *Examples.* The principles of this paragraph (f)(4) are illustrated by the following examples:

*Example 1.* A, a member of a controlled group, allows B, another member of the controlled group, to use tangible property, such as laboratory equipment, in connection with B's development of an intangible that B owns. By furnishing tangible property, A makes a contribution to the development of

**Internal Revenue Service, Treasury**                    **§ 1.482-4**

intangible property owned by another controlled taxpayer, B. Pursuant to paragraph (f)(4)(i) of this section, the arm's length charge for A's furnishing of tangible property will be determined under the rules for use of tangible property in §1.482-2(c).

*Example 2.* (i) *Facts.* FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. FP enters into an exclusive, five-year, renewable agreement with its newly organized U.S. subsidiary, USSub. The contractual terms of the agreement grant USSub the exclusive right to resell YY trademark wristwatches in the United States, obligate USSub to pay a fixed price per wristwatch throughout the entire term of the contract, and obligate both FP and USSub to undertake without separate compensation specified types and levels of marketing activities.

(ii) The consideration for FP's and USSub's marketing activities, as well as the consideration for the exclusive right to re-sell YY trademarked merchandise in the United States, are embedded in the transfer price paid for the wristwatches. Accordingly, pursuant to paragraph (f)(4)(i) of this section, ordinarily no separate allocation would be appropriate with respect to these embedded contributions.

(iii) Whether an allocation is warranted with respect to the transfer price for the wristwatches is determined under §§1.482-1, 1.482-3, and this section through §1.482-6. The comparability analysis would include consideration of all relevant factors, including the nature of the intangible property embedded in the wristwatches and the nature of the marketing activities required under the agreement. This analysis would also take into account that the compensation for the activities performed by USSub and FP, as well as the consideration for USSub's use of the YY trademark, is embedded in the transfer price for the wristwatches, rather than provided for in separate agreements. *See* §§1.482-3(f) and 1.482-9(m)(4).

*Example 3.* (i) *Facts.* FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries. In year 1, FP licenses to a newly organized U.S. subsidiary, USSub, the exclusive rights to use certain manufacturing and marketing intangible property to manufacture and market athletic gear in the United States under the AA trademark. The license agreement obligates USSub to pay a royalty based on sales of trademarked merchandise. The license agreement also obligates FP and USSub to perform without separate compensation specified types and levels of marketing activities. In year 1, USSub manufactures and sells athletic gear under the AA trademark in the United States.

(ii) The consideration for FP's and USSub's respective marketing activities is embedded

in the contractual terms of the license for the AA trademark. Accordingly, pursuant to paragraph (f)(4)(i) of this section, ordinarily no separate allocation would be appropriate with respect to the embedded contributions in year 1. *See* §1.482-9(m)(4).

(iii) Whether an allocation is warranted with respect to the royalty under the license agreement would be analyzed under §1.482-1, and this section through §1.482-6. The comparability analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of the license, the nature of the intangible property subject to the license, and the nature of the marketing activities required to be undertaken pursuant to the license. Pursuant to paragraph (f)(4)(i) of this section, the analysis would also take into account the fact that the compensation for the marketing services is embedded in the royalty paid for use of the AA trademark, rather than provided for in a separate services agreement. For illustrations of application of the best method rule, *see* §1.482-8 *Examples 10, 11,* and *12.*

*Example 4.* (i) *Facts.* The year 1 facts are the same as in *Example 3,* with the following exceptions. In year 2, USSub undertakes certain incremental marketing activities in addition to those required by the contractual terms of the license for the AA trademark executed in year 1. The parties do not execute a separate agreement with respect to these incremental marketing activities performed by USSub. The license agreement executed in year 1 is of sufficient duration that it is reasonable to anticipate that USSub will obtain the benefit of its incremental activities, in the form of increased sales or revenues of trademarked products in the U.S. market.

(ii) To the extent that it was reasonable to anticipate that USSub's incremental marketing activities would increase the value only of USSub's intangible property (that is, USSub's license to use the AA trademark for a specified term), and not the value of the AA trademark owned by FP, USSub's incremental activities do not constitute a contribution for which an allocation is warranted under paragraph (f)(4)(i) of this section.

*Example 5.* (i) *Facts.* The year 1 facts are the same as in *Example 3.* In year 2, FP and USSub enter into a separate services agreement that obligates USSub to perform certain incremental marketing activities to promote AA trademark athletic gear in the United States, above and beyond the activities specified in the license agreement executed in year 1. In year 2, USSub begins to perform these incremental activities, pursuant to the separate services agreement with FP.

653

(ii) Whether an allocation is warranted with respect to USSub's incremental marketing activities covered by the separate services agreement would be evaluated under §§ 1.482–1 and 1.482–9, including a comparison of the compensation provided for the services with the results obtained under a method pursuant to § 1.482–9, selected and applied in accordance with the best method rule of § 1.482–1(c).

(iii) Whether an allocation is warranted with respect to the royalty under the license agreement is determined under § 1.482–1, and this section through § 1.482–6. The comparability analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of the license, the nature of the intangible property subject to the license, and the nature of the marketing activities required to be undertaken pursuant to the license. The comparability analysis would take into account that the compensation for the incremental activities by USSub is provided for in the separate services agreement, rather than embedded in the royalty paid for use of the AA trademark. For illustrations of application of the best method rule, see § 1.482–8 Examples 10, 11, and 12.

*Example 6.* (i) *Facts.* The year 1 facts are the same as in *Example 3.* In year 2, FP and USSub enter into a separate services agreement that obligates FP to perform incremental marketing activities, not specified in the year 1 license, by advertising AA trademarked athletic gear in selected international sporting events, such as the Olympics and the soccer World Cup. FP's corporate advertising department develops and coordinates these special promotions. The separate services agreement obligates USSub to pay an amount to FP for the benefit to USSub that may reasonably be anticipated as the result of FP's incremental activities. The separate services agreement is not a qualified cost sharing arrangement under § 1.482–7T. FP begins to perform the incremental activities in year 2 pursuant to the separate services agreement.

(ii) Whether an allocation is warranted with respect to the incremental marketing activities performed by FP under the separate services agreement would be evaluated under § 1.482–9. Under the circumstances, it is reasonable to anticipate that FP's activities would increase the value of USSub's license as well as the value of FP's trademark. Accordingly, the incremental activities by FP may constitute in part a controlled services transaction for which USSub must compensate FP. The analysis of whether an allocation is warranted would include a comparison of the compensation provided for the services with the results obtained under a method pursuant to § 1.482–9, selected and applied in accordance with the best method rule of § 1.482–1(c).

(iii) Whether an allocation is appropriate with respect to the royalty under the license agreement would be evaluated under §§ 1.482–1 through 1.482–3, this section, and §§ 1.482–5 and 1.482–6. The comparability analysis would include consideration of all relevant factors, such as the term and geographical exclusivity of USSub's license, the nature of the intangible property subject to the license, and the marketing activities required to be undertaken by both FP and USSub pursuant to the license. This comparability analysis would take into account that the compensation for the incremental activities performed by FP was provided for in the separate services agreement, rather than embedded in the royalty paid for use of the AA trademark. For illustrations of application of the best method rule, see § 1.482–8, *Example 10, Example 11,* and *Example 12.*

(5) *Consideration not artificially limited.* The arm's length consideration for the controlled transfer of an intangible is not limited by the consideration paid in any uncontrolled transactions that do not meet the requirements of the comparable uncontrolled transaction method described in paragraph (c) of this section. Similarly, the arm's length consideration for an intangible is not limited by the prevailing rates of consideration paid for the use or transfer of intangibles within the same or similar industry.

(6) *Lump sum payments*—(i) *In general.* If an intangible is transferred in a controlled transaction for a lump sum, that amount must be commensurate with the income attributable to the intangible. A lump sum is commensurate with income in a taxable year if the equivalent royalty amount for that taxable year is equal to an arm's length royalty. The equivalent royalty amount for a taxable year is the amount determined by treating the lump sum as an advance payment of a stream of royalties over the useful life of the intangible (or the period covered by an agreement, if shorter), taking into account the projected sales of the licensee as of the date of the transfer. Thus, determining the equivalent royalty amount requires a present value calculation based on the lump sum, an appropriate discount rate, and the projected sales over the relevant period. The equivalent royalty amount is subject to periodic adjustments under § 1.482–4(f)(2)(i) to the same extent as an

**Internal Revenue Service, Treasury**

§ 1.482–5

actual royalty payment pursuant to a license agreement.

(ii) *Exceptions.* No periodic adjustment will be made under paragraph (f)(2)(i) of this section if any of the exceptions to periodic adjustments provided in paragraph (f)(2)(ii) of this section apply.

(iii) *Example.* The following example illustrates the principle of this paragraph (f)(5).

*Example.* Calculation of the equivalent royalty amount. (i) FSub is the foreign subsidiary of USP, a U.S. company. USP licenses FSub the right to produce and sell the whopperchopper, a patented new kitchen appliance, for the foreign market. The license is for a period of five years, and payment takes the form of a single lump-sum charge of $500,000 that is paid at the beginning of the period.

(ii) The equivalent royalty amount for this license is determined by deriving an equivalent royalty rate equal to the lump-sum payment divided by the present discounted value of FSub's projected sales of whopperchoppers over the life of the license. Based on the riskiness of the whopperchopper business, an appropriate discount rate is determined to be 10 percent. Projected sales of whopperchoppers for each year of the license are as follows:

| Year | Projected sales |
|---|---|
| 1 | $2,500,000 |
| 2 | 2,600,000 |
| 3 | 2,700,000 |
| 4 | 2,700,000 |
| 5 | 2,750,000 |

(iii) Based on this information, the present discounted value of the projected whopperchopper sales is approximately $10 million, yielding an equivalent royalty rate of approximately 5%. Thus, the equivalent royalty amounts for each year are as follows:

| Year | Projected sales | Equivalent royalty amount |
|---|---|---|
| 1 | $2,500,000 | $125,000 |
| 2 | 2,600,000 | 130,000 |
| 3 | 2,700,000 | 135,000 |
| 4 | 2,700,000 | 135,000 |
| 5 | 2,750,000 | 137,500 |

(iv) If in any of the five taxable years the equivalent royalty amount is determined not to be an arm's length amount, a periodic adjustment may be made pursuant to § 1.482–4(f)(2)(i). The adjustment in such case would be equal to the difference between the equivalent royalty amount and the arm's length royalty in that taxable year.

(g) *Coordination with rules governing cost sharing arrangements.* Section 1.482–7 provides the specific methods to be used to determine arm's length results of controlled transactions in connection with a cost sharing arrangement. This section provides the specific methods to be used to determine arm's length results of a transfer of intangible property, including in an arrangement for sharing the costs and risks of developing intangibles other than in a cost sharing arrangement covered by § 1.482–7. In the case of such an arrangement, consideration of the principles, methods, comparability, and reliability considerations set forth in § 1.482–7 is relevant in determining the best method, including an unspecified method, under this section, as appropriately adjusted in light of the differences in the facts and circumstances between such arrangement and a cost sharing arrangement.

(h) *Effective/applicability date*—(1) *In general.* Except as provided in the succeeding sentence, the provisions of paragraphs (f)(3) and (4) of this section are generally applicable for taxable years beginning after December 31, 2006. The provisions of paragraphs (f)(3)(i)(B) and (g) of this section are generally applicable on January 5, 2009.

(2) *Election to apply regulation to earlier taxable years.* A person may elect to apply the provisions of paragraphs (f)(3) and (4) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9(n)(2).

[T.D. 8552, 59 FR 35016, July 8, 1994; T.D. 9278, 71 FR 44484, Aug. 4, 2006; T.D. 9456, 74 FR 38842, Aug. 4, 2009; T.D. 9568, 76 FR 80090, Dec. 22, 2011]

§ 1.482–5 **Comparable profits method.**

(a) *In general.* The comparable profits method evaluates whether the amount charged in a controlled transaction is arm's length based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances.

(b) *Determination of arm's length result*—(1) *In general.* Under the comparable profits method, the determination of an arm's length result is based on the amount of operating profit that the tested party would have earned on

655

CASTEL & WALKER

# CANADIAN CONFLICT OF LAWS

### SIXTH EDITION

### VOLUME 2

## Janet Walker

C.D., B.A. (Hons), M.A. (York), J.D. (Osgoode), D.Phil. (Oxon), F.C.I. Arb
*of the Ontario Bar*
Professor
Osgoode Hall Law School of York University

Founding Author
### Jean-Gabriel Castel
O.C., O.O., Q.C., L.S.M., Chevalier de la Légion d'honneur
J.D. (Michigan), S.J.D. (Harvard), D. *hon. causa* (Aix)
*of the Ontario Bar*

 LexisNexis®

**Canadian Conflict of Laws, Sixth Edition**
**Volume 2**
© LexisNexis Canada Inc. 2005
(Including update issues 2005–2014)

All rights reserved. No part of this publication may be reproduced or stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act.* Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

The publisher, (Author(s)/General Editor(s)) and every person involved in the creation of this publication shall not be liable for any loss, injury, claim, liability or damage of any kind resulting from the use of or reliance on any information or material contained in this publication. While every effort has been made to ensure the accuracy of the contents of this publication, it is intended for information purposes only. When creating this publication, none of the publisher, the (Author(s)/General Editor(s)) or contributors were engaged in rendering legal or other professional advice. This publication should not be considered or relied upon as if it were providing such advice. If legal advice or expert assistance is required, the services of a competent professional should be sought and retained. The publisher and every person involved in the creation of this publication disclaim all liability in respect of the results of any actions taken in reliance upon information contained in this publication and for any errors or omissions in the work. They expressly disclaim liability to any user of the work.

**Library and Archives Canada Cataloguing in Publication**

Walker, Janet 1959—

      Canadian conflict of laws.—6th ed.

Previous ed. written by Jean-Gabriel Castel and Janet Walker. Frequency of updates varies. Includes bibliographical references and index. ISBN 0-433-44985-3 (loose-leaf: set) ISSN 1714-7964.

      1. Conflict of laws—Canada. I. Title.

KE470.A6W34 2005   340.9   C2005-901328-1
KF411.W35 2005

———————————

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665 • Fax: (905) 479-2826
Toll Free phone: 1-800-668-6481 • Toll Free fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Website: www.lexisnexis.ca

**[The next page is 0-iii]**

[4] The place of performance was also sometimes a candidate for the choice of law rule: see, for instance, *Re Naubert*, [1919] O.J. No. 34, 46 O.L.R. 210 (H.C.J.).

[5] See *Sharn Importing Ltd. v. Babchuk*, [1971] B.C.J. No. 477, 21 D.L.R. (3d) 349 (S.C.), in which the place in which a guarantee was executed was regarded as less significant than where it would be performed; but see the comments in *Canaccord Capital Corp. v. 884003 Alberta Inc.*, [2005] B.C.J. No. 413, 2005 BCCA 124, 46 B.C.L.R. (4th) 64, at para. 18. See also *Imperial Life Assurance Co. of Canada v. Colmenares*, [1967] S.C.J. No. 30, [1967] S.C.R. 443, at 447.

[6] Courts were sometimes forced to decide this issue by service *ex juris* rules that were framed in terms of where the contract was made: see, for instance, *Brinkibon Ltd. v. Stahag Stahl und Stahlwarenhandelsgesellschaft mbH*, [1983] 2 A.C. 34 (H.L.), applying *Entores Ltd. v. Miles Far East Corp.*, [1955] 2 Q.B. 327 (C.A.).

[7] See also *Hamlyn & Co. v. Talisker Distillery*, [1894] A.C. 202, at 212 (H.L.) ("which of these systems must be applied to its construction depends upon their mutual intention, either as expressed in their contract, or as derivable by fair implication from its terms" (Lord Watson)).

[8] The agreement is objectively determined and may be implied as well as express.

[9] *Lloyd v. Guibert* (1865), L.R. 1 Q.B. 115, at 121 (Ex. Ch.) (emphasis added). Compare A.V. Dicey, *The Conflict of Laws* (5th ed. by A. Berriedale Keith) (London: Stevens & Sons, 1932), at 628, rule 155: "The law, or laws, by which the parties to a contract intended, or may fairly be presumed to have intended, the contract to be governed."

[10] *"Assunzione"*, [1954] P. 150, at 174 (C.A.) (Singleton L.J.).

[11] Starting with *Bonython v. Commonwealth of Australia*, [1951] A.C. 201, at 219 (P.C.).

[12] *Imperial Life Assurance Co. of Canada v. Colmenares*, [1967] S.C.J. No. 30, [1967] S.C.R. 443, at 448.

[13] The former was used in *Bonython v. Commonwealth of Australia*, [1951] A.C. 201 (P.C.).; the latter, in *Imperial Life Assurance Co. of Canada v. Colmenares*, [1967] S.C.J. No. 30, [1967] S.C.R. 443.

[14] Below, §31.3.c Proper Law Objectively Determined.

[15] *Amin Rasheed Shipping Corp. v. Kuwait Insurance Co.*, [1984] A.C. 50, at 61 (H.L.), *per* Lord Diplock.

## §31.3  DETERMINING THE GOVERNING LAW

### a.  Proper Law Expressly Agreed

### i.  Party Autonomy

The leading Anglo-Canadian case on the parties' freedom to agree on a governing law for their contract is *Vita Food Products Inc. v. Unus Shipping Co.*[1] A cargo owner brought an action in Nova Scotia against the owner of a Canadian-registered ship for damage to the plaintiff's cargo of herring during the ship's voyage from a port in Newfoundland, then an independent Dominion, to New York. The defendant was resident in Nova Scotia. The contract of carriage was contained in the bills of lading, which expressly stated that the contract was to be governed by English law. This was contrary to the requirements of the Newfoundland *Carriage of Goods by Sea Act*.[2] Section 1 provided that a contract for carriage from a Newfoundland port was subject to the Hague Rules (a standard set of provisions relating to the rights and obligations of cargo owner and carrier), and section 3 stipulated that every bill of lading issued in Newfoundland for a voyage from a Newfoundland port must contain an express statement that it was to have effect subject to the Hague Rules. If the Hague Rules applied, the owner was exempted from liability under the circumstances, and the same was true if the actual terms of the bills of lading applied.

                                                    (Rel. 39-8/2013  Pub.5911)

§31.3                    CANADIAN CONFLICT OF LAWS

The plaintiff contended, however, that noncompliance with section 3 of the Act rendered the contract illegal and void and exposed the ship owner to the liability of a common carrier.

The Privy Council held that the proper law of the contract was English law because the parties had so agreed; that the failure to comply with the Act, whatever effect it might have as a matter of Newfoundland law, did not make the (English) contract illegal in the eyes of the Nova Scotia court; that, again from the point of view of the Nova Scotia court, the Newfoundland statute did not make the Hague Rules applicable to the contract; and that the terms of the contract itself thus applied to exempt the ship owner from liability. The decision therefore stands for two fundamental principles of choice of law. One is that the parties' choice of a system of law to govern their agreement will be given effect. The other is that provisions of a law other than the proper law will generally not be regarded as affecting the parties' contractual obligations.[3]

As was recognized even in the case itself, both these propositions are subject to at least some qualification. On the first one, the Judicial Committee acknowledged that the parties' freedom to agree on the proper law was not absolute, although the court did not spell out the exact limitations on it. These limitations are discussed below.[4] On the second point, the judges said *obiter* that a Newfoundland court, had the case come before it, might have been bound to apply the Act even to an English contract, because the Act (if this were its proper construction) would be a command to this effect by the Newfoundland legislature.[5] This and other exceptions to the second principle are also discussed below.[6]

### ii.    Whether the Parties Agreed on the Proper Law

Whether the parties have agreed on a law to govern their contract is a question of construction of the contract. For example, if there are contradictory choice of law clauses in different parts of the agreement, it must be determined as a matter of construction which clause is the applicable one.[7] Likewise, if the clause is on a printed form, it must be determined whether the form was part of the contract.[8] If the clause refers only indirectly to the governing law by designating, for instance, the law of the flag of the vessel to be used, it is a question of interpretation whether the clause indicates the parties' intention as to the proper law with enough certainty.[9] If the clause is unclear because a system of law is referred to[10] without saying in so many words that it will "apply to"[11] or "govern"[12] the contract, it is a question of interpretation whether the reference amounts to a choice of law. Thus a clause that a contract will be "interpreted" or "construed" according to a particular system of law has been held equivalent to a choice of governing law.[13]

The existence and meaning of an agreement to choose the proper law may itself raise a choice of law issue, because the facts surrounding the agreement may have little connection with the *lex fori*. There is no clear case authority dealing with how such an issue should be resolved. A distinction must be made between cases in which there was an agreement on the governing law but the question is as to its validity or effect, and cases in which the issue is whether there was any agreement on the governing law at all. In the former situation, the validity or effect of the choice of law clause, like any other question of validity or interpretation, is referable to the proper law the parties chose.[14]

If the issue is whether the choice of law clause was agreed to at all, the logical

31-6                                        (Rel. 39-8/2013    Pub.5911)

# Falconbridge on Mortgages

## *Fifth Edition*

**Walter M. Traub, B.A., LL.B., LL.M.**
**Editor-in-Chief**

# CANADA LAW BOOK ®

April 2014

© 2014 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written consent of the publisher (Canada Law Book).

Canada Law Book and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Canada Law Book, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting, or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**A cataloguing record for this publication is available from Library and Archives Canada**

**ISBN 0-88804-367-8**

Printed in Canada by Thomson Reuters

**TELL US HOW WE'RE DOING**
Scan the QR code to the right with your smartphone to send your comments regarding our products and services.
Free QR Code Readers are available from your mobile device app store.
You can also email us at carswell.feedback@thomsonreuters.com



 **THOMSON REUTERS**

**CANADA LAW BOOK, A DIVISION OF THOMSON REUTERS CANADA LIMITED**

**One Corporate Plaza**
**2075 Kennedy Road**
**Toronto, ON**
**M1 T 3V4**

**Customer Relations**
**Toronto 1-416-609-3800**
**Elsewhere in Canada/U.S. 1-800-387-5164**
**Fax 1-416-298-5082**
**www.carswell.com**
**E-mail www.carswell.com/email**

# PART VI

# MORTGAGE ACTIONS

# Chapter 22

# ACTION FOR POSSESSION[*]

§22:10    History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-1
§22:20    Proviso for Quiet Possession Until Default . . . . . . . . . . . . . . . . . .    22-3
§22:30    Rights of Mortgagor in Possession . . . . . . . . . . . . . . . . . . . . . .    22-4
§22:40    Elements of Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-6
§22:50    Action During Prohibited Period in Section 42 . . . . . . . . . . . . . . . .    22-10
§22:60    Obtaining Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-11
§22:70    Possible Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-13
    §22:70.10    Mortgagor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-13
    §22:70.20    Spouses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-13
    §22:70.30    Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-14
§22:80    Mortgagee's Rights Against Third Parties . . . . . . . . . . . . . . . . . .    22-14
§22:90    General — Other Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-15

## §22:10  History

Historically, at common law a mortgage was a contract whereby the owner of real property transferred the legal title to the property to the mortgagee as security for a debt. The transfer was a deed of conveyance similar to any other deed of conveyance and contained the usual covenants. Essentially, the mortgagee became the legal owner of the property subject to one important qualification. The mortgage contract contained a proviso for redemption in favour of the mortgagor. The proviso for redemption effectively stated that if the mortgage debt were paid in full, strictly in accordance with the mortgage contract, the conveyance of the legal title to the property to the mortgagee would be null and void. In effect, the deed of conveyance to the mortgagee was conditional and would be found to be void once the mortgage debt was repaid in full. The common law courts interpreted the proviso for redemption strictly and required the mortgage debt to be repaid in accordance with the terms of the contract. If on the date for redemption the mortgage moneys were not paid, the mortgagor lost the legal right to redeem the property. Accordingly, at law, if the mortgagor tendered the mortgage proceeds on the day following the maturity date, the mortgagee could refuse the funds and retain the property. The amount owing on the mortgage debt the day after the contractual date of redemption was irrelevant and the mortgagee could retain ownership of the property even if virtually all of the debt had been repaid. The proviso for redemption

[*] This chapter has been prepared with the assistance of Eric C. Haslett whose contribution is hereby gratefully acknowledged. We also acknowledge with thanks the assistance of Craig Carter in revising and updating the within chapter.

or the ability of the mortgagor to essentially cause the deed of conveyance to be null and void was therefore lost.

The courts of equity concluded this to be immensely unfair and created an equitable right of redemption. This equitable right of redemption could be exercised by the mortgagor at any time up until the rights of the mortgagor were foreclosed by an equitable action for foreclosure. However, the equitable right of the mortgagee to foreclose could be affected by whether the mortgagee had itself acted fairly and come to court with "clean hands".

Essentially, a mortgage at common law was the conveyance to the mortgagee of legal title to the property with an equitable right of the mortgagor to redeem. While this fiction of the conveyance of legal title with an equitable right of redemption was abolished in 1984 pursuant to s. 6(1) of the *Land Registration Reform Act, 1984*, S.O. 1984, c. 32 [now *Land Registration Reform Act*, R.S.O. 1990, c. L.4] (the "LRRA"), all rights and remedies of the mortgagor and all rights and remedies of the mortgagee were preserved pursuant to s. 6(3) of the LRRA. Section 6 of the LRRA provides as follows:

> 6(1) A charge does not operate as a transfer of the legal estate in the land to the chargee.
>
> . . . . .
>
> (3) Despite subsection (1), a chargor and chargee are entitled to all the legal and equitable rights and remedies that would be available to them if the chargor had transferred the land to the chargee by way of mortgage, subject to a proviso for redemption.

Due to the fact that at common law a mortgage was the conveyance to the mortgagee of the legal title to the property and because exclusive possession of property is one of the indices of ownership, the mortgagee at common law was entitled to possession of the mortgaged property. The right is paramount.[1] By contract, however, the mortgagee permits the mortgagor to be in possession until default. The mortgagee's right to possession arises because the legal title to the property is conveyed to the mortgagee. It is not a contractual right. It is inherent in a mortgage being a conveyance.

Possession is one of the rights preserved by s. 6(3) of the LRRA. For the purpose of determining the mortgagee's right to possession, s. 6(3) effectively deems the charge to be a conveyance of the legal title. As such, the mortgagee under a charge has the right to possession even if not expressly set out in the charge.

Section 7(a)(iv) of the *Mortgages Act*, R.S.O. 1990, c. M.40, states that a mortgage is deemed to include a covenant by the mortgagor that "on default, the mortgagee shall have quiet possession of the land, free from all encumbrances". This deemed covenant does not apply to mortgages of land situate in a part of Ontario that has been designated under Part I of the LRRA, where the mortgage is executed after the designation. The entire province has been so designated since April 1, 1985. Accordingly, the deemed covenant in the *Mortgages Act* does not apply to Ontario mortgages executed after April 1, 1985.

---

[1] See *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.* (1997), 32 O.R. (3d) 657 (Gen. Div.), vard 41 O.R. (3d) 321 (C.A.), leave to appeal to S.C.C. refused 173 D.L.R. (4th) vi, for the effect of the mortgagee's paramount right to possession as against a subsequent tenant.

Section 7(1) of the LRRA states that a mortgage in the prescribed form shall be deemed to include a number of covenants by the chargor unless the deemed covenants are specifically excluded or varied in a schedule to the charge. Section 7(1), para. 1(v) states that the "chargee on default of payment for the number of days specified in the charge or in the *Mortgages Act,* whichever is longer, may on giving the notice specified in the charge or required by that Act, whichever is longer, enter on and take possession of, receive the rents and profits of, lease or sell the land".

This deemed covenant requires a period of default and notice before the mortgagee is entitled to take possession. Since the *Mortgages Act* does not provide any default period or notice period for a mortgagee to take possession, the terms of the mortgage will dictate. Most mortgages also do not require any default period or notice period before taking possession. It should be noted, however, that it is still open to the courts to find that the default and notice provisions in s. 7(1) of the LRRA refer to the sale notice provisions in the *Mortgages Act.*

### §22:20    Proviso for Quiet Possession Until Default

In the absence of any provision in the mortgage reserving the right to possession to the mortgagor, or of any agreement express or implied to the same effect, a legal mortgagee is entitled, after the making of the mortgage and by virtue of the conveyance to it of the legal estate, to take possession of the mortgaged lands at any time.[2] Notwithstanding that the mortgagee is entitled by law to possession, it is usual in Ontario to insert in a mortgage a proviso that the mortgagor until default shall have quiet possession of the lands, and in any case, until the mortgagee demands possession, the mortgagor's possession is lawful. In light of s. 7(1) of the LRRA, the mortgagee would have to expressly exclude the mortgagor's covenant for possession.

The mortgagor in possession is in effect a tenant at will or a tenant at sufferance. In *Noyes v. Pollock,*[3] the court states: "When . . . the mortgagor has been left in occupation of the estate by the mortgagee, the mortgagor is either tenant at will or tenant by sufferance to the mortgagee". It is not clear whether categorizing the mortgagee as a tenant at will or a tenant at sufferance is strictly necessary. The covenant in the mortgage to give the mortgagor exclusive possession until default certainly looks like a form of lease. However, the mortgage is a special document and the mortgagor has or should have greater rights than a mere tenant because of the mortgagor's equity of redemption. The courts should be open to discard any rights or obligations of a tenant at will or a tenant at sufferance if those rights do not accord with the mortgagor being in a favoured position. Despite the legal fiction, equity treats the mortgagor as the real owner of the property.

If a mortgagee is entitled to possession as between itself and the mortgagor, and the land is in the occupation of the mortgagor or of any other person whose title is not superior to that of the mortgagee,[4] the mortgagee may enter on the land, if the

---

[2] *Four-Maids Ltd. v. Dudley Marshall (Properties) Ltd.,* [1957] Ch. 317.
[3] (1886), 32 Ch. D. 53 (C.A.), at p. 64.
[4] For example, a tenant under a lease made by a prospective purchaser (mortgagor) before he or she had any title or possession of the property. See *Hughes v. Waite,* [1957] W.L.R. 713 (Ch. D.). Another