# TAB 1

<div style="border:1px solid">

United States Code Annotated

  Title 11. Bankruptcy (Refs & Annos)

    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)

</div>

11 U.S.C.A. § 1501

§ 1501. Purpose and scope of application

Currentness

**(a)** The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of--

  **(1)** cooperation between--

    **(A)** courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

    **(B)** the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

  **(2)** greater legal certainty for trade and investment;

  **(3)** fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

  **(4)** protection and maximization of the value of the debtor's assets; and

  **(5)** facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

**(b)** This chapter applies where--

  **(1)** assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding;

  **(2)** assistance is sought in a foreign country in connection with a case under this title;

  **(3)** a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently; or

  **(4)** creditors or other interested persons in a foreign country have an interest in requesting the commencement of, or participating in, a case or proceeding under this title.

**(c)** This chapter does not apply to--

    **(1)** a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b);

    **(2)** an individual, or to an individual and such individual's spouse, who have debts within the limits specified in section 109(e) and who are citizens of the United States or aliens lawfully admitted for permanent residence in the United States; or

    **(3)** an entity subject to a proceeding under the Securities Investor Protection Act of 1970, a stockbroker subject to subchapter III of chapter 7 of this title, or a commodity broker subject to subchapter IV of chapter 7 of this title.

**(d)** The court may not grant relief under this chapter with respect to any deposit, escrow, trust fund, or other security required or permitted under any applicable State insurance law or regulation for the benefit of claim holders in the United States.

**CREDIT(S)**

    (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 135.)

Notes of Decisions (6)

11 U.S.C.A. § 1501, 11 USCA § 1501
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
         Subchapter I. General Provisions

11 U.S.C.A. § 1502

§ 1502. Definitions

Currentness

For the purposes of this chapter, the term--

**(1)** "debtor" means an entity that is the subject of a foreign proceeding;

**(2)** "establishment" means any place of operations where the debtor carries out a nontransitory economic activity;

**(3)** "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

**(4)** "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has the center of its main interests;

**(5)** "foreign nonmain proceeding" means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment;

**(6)** "trustee" includes a trustee, a debtor in possession in a case under any chapter of this title, or a debtor under chapter 9 of this title;

**(7)** "recognition" means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter; and

**(8)** "within the territorial jurisdiction of the United States", when used with reference to property of a debtor, refers to tangible property located within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within that territory, including any property subject to attachment or garnishment that may properly be seized or garnished by an action in a Federal or State court in the United States.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 135.)

Notes of Decisions (19)

11 U.S.C.A. § 1502, 11 USCA § 1502
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter I. General Provisions

11 U.S.C.A. § 1503

§ 1503. International obligations of the United States

Currentness

To the extent that this chapter conflicts with an obligation of the United States arising out of any treaty or other form of agreement to which it is a party with one or more other countries, the requirements of the treaty or agreement prevail.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 136.)

11 U.S.C.A. § 1503, 11 USCA § 1503
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

End of Document                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter I. General Provisions

---

11 U.S.C.A. § 1504

§ 1504. Commencement of ancillary case

Currentness

A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 136.)

Notes of Decisions (13)

11 U.S.C.A. § 1504, 11 USCA § 1504
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter I. General Provisions

11 U.S.C.A. § 1505

§ 1505. Authorization to act in a foreign country

Currentness

A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541. An entity authorized to act under this section may act in any way permitted by the applicable foreign law.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 136.)

11 U.S.C.A. § 1505, 11 USCA § 1505
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter I. General Provisions

11 U.S.C.A. § 1506

§ 1506. Public policy exception

Currentness

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 136.)

Notes of Decisions (9)

11 U.S.C.A. § 1506, 11 USCA § 1506
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter I. General Provisions

11 U.S.C.A. § 1507

§ 1507. Additional assistance

Currentness

**(a)** Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

**(b)** In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure--

**(1)** just treatment of all holders of claims against or interests in the debtor's property;

**(2)** protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

**(3)** prevention of preferential or fraudulent dispositions of property of the debtor;

**(4)** distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

**(5)** if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 136.)

Notes of Decisions (2)

11 U.S.C.A. § 1507, 11 USCA § 1507
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
         Subchapter I. General Provisions

---

11 U.S.C.A. § 1508

§ 1508. Interpretation

Currentness

In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.

**CREDIT(S)**

   (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 137.)

Notes of Decisions (1)

11 U.S.C.A. § 1508, 11 USCA § 1508
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    1

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter II. Access of Foreign Representatives and Creditors to the Court

11 U.S.C.A. § 1509

§ 1509. Right of direct access

Currentness

**(a)** A foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.

**(b)** If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter--

    **(1)** the foreign representative has the capacity to sue and be sued in a court in the United States;

    **(2)** the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and

    **(3)** a court in the United States shall grant comity or cooperation to the foreign representative.

**(c)** A request for comity or cooperation by a foreign representative in a court in the United States other than the court which granted recognition shall be accompanied by a certified copy of an order granting recognition under section 1517.

**(d)** If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.

**(e)** Whether or not the court grants recognition, and subject to sections 306 and 1510, a foreign representative is subject to applicable nonbankruptcy law.

**(f)** Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor.

**CREDIT(S)**

    (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 137.)

Notes of Decisions (3)

---

11 U.S.C.A. § 1509, 11 USCA § 1509
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                                                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
 Title 11. Bankruptcy (Refs & Annos)
  Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
   Subchapter II. Access of Foreign Representatives and Creditors to the Court

---

11 U.S.C.A. § 1510

§ 1510. Limited jurisdiction

Currentness

The sole fact that a foreign representative files a petition under section 1515 does not subject the foreign representative to the jurisdiction of any court in the United States for any other purpose.

**CREDIT(S)**

 (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 138.)

11 U.S.C.A. § 1510, 11 USCA § 1510
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
     Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter II. Access of Foreign Representatives and Creditors to the Court

---

11 U.S.C.A. § 1511

§ 1511. Commencement of case under section 301, 302, or 303

Effective: December 22, 2010
Currentness

**(a)** Upon recognition, a foreign representative may commence--

   **(1)** an involuntary case under section 303; or

   **(2)** a voluntary case under section 301 or 302, if the foreign proceeding is a foreign main proceeding.

**(b)** The petition commencing a case under subsection (a) must be accompanied by a certified copy of an order granting recognition. The court where the petition for recognition has been filed must be advised of the foreign representative's intent to commence a case under subsection (a) prior to such commencement.

**CREDIT(S)**

   (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 138; amended Pub.L. 111-327, § 2(a)(45), Dec. 22, 2010, 124 Stat. 3562.)

11 U.S.C.A. § 1511, 11 USCA § 1511
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter II. Access of Foreign Representatives and Creditors to the Court

11 U.S.C.A. § 1512

§ 1512. Participation of a foreign representative in a case under this title

Currentness

Upon recognition of a foreign proceeding, the foreign representative in the recognized proceeding is entitled to participate as a party in interest in a case regarding the debtor under this title.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 138.)

Notes of Decisions (1)

11 U.S.C.A. § 1512, 11 USCA § 1512
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 11. Bankruptcy (Refs & Annos)
Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
Subchapter II. Access of Foreign Representatives and Creditors to the Court

11 U.S.C.A. § 1513

§ 1513. Access of foreign creditors to a case under this title

Currentness

**(a)** Foreign creditors have the same rights regarding the commencement of, and participation in, a case under this title as domestic creditors.

**(b)(1)** Subsection (a) does not change or codify present law as to the priority of claims under section 507 or 726, except that the claim of a foreign creditor under those sections shall not be given a lower priority than that of general unsecured claims without priority solely because the holder of such claim is a foreign creditor.

**(2)(A)** Subsection (a) and paragraph (1) do not change or codify present law as to the allowability of foreign revenue claims or other foreign public law claims in a proceeding under this title.

**(B)** Allowance and priority as to a foreign tax claim or other foreign public law claim shall be governed by any applicable tax treaty of the United States, under the conditions and circumstances specified therein.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 138.)

11 U.S.C.A. § 1513, 11 USCA § 1513
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter II. Access of Foreign Representatives and Creditors to the Court

11 U.S.C.A. § 1514

§ 1514. Notification to foreign creditors concerning a case under this title

Currentness

**(a)** Whenever in a case under this title notice is to be given to creditors generally or to any class or category of creditors, such notice shall also be given to the known creditors generally, or to creditors in the notified class or category, that do not have addresses in the United States. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

**(b)** Such notification to creditors with foreign addresses described in subsection (a) shall be given individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letter or other formality is required.

**(c)** When a notification of commencement of a case is to be given to foreign creditors, such notification shall--

  **(1)** indicate the time period for filing proofs of claim and specify the place for filing such proofs of claim;

  **(2)** indicate whether secured creditors need to file proofs of claim; and

  **(3)** contain any other information required to be included in such notification to creditors under this title and the orders of the court.

**(d)** Any rule of procedure or order of the court as to notice or the filing of a proof of claim shall provide such additional time to creditors with foreign addresses as is reasonable under the circumstances.

**CREDIT(S)**

  (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 138.)

11 U.S.C.A. § 1514, 11 USCA § 1514
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1515

§ 1515. Application for recognition

Currentcy

**(a)** A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

**(b)** A petition for recognition shall be accompanied by--

  **(1)** a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

  **(2)** a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

  **(3)** in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

**(c)** A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

**(d)** The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

**CREDIT(S)**

  (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

Notes of Decisions (8)

11 U.S.C.A. § 1515, 11 USCA § 1515
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext' © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1516

§ 1516. Presumptions concerning recognition

Currentness

**(a)** If the decision or certificate referred to in section 1515(b) indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume.

**(b)** The court is entitled to presume that documents submitted in support of the petition for recognition are authentic, whether or not they have been legalized.

**(c)** In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

**CREDIT(S)**

   (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

Notes of Decisions (11)

11 U.S.C.A. § 1516, 11 USCA § 1516
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 11. Bankruptcy (Refs & Annos)
Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1517

§ 1517. Order granting recognition

Currentness

**(a)** Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--

**(1)** such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

**(2)** the foreign representative applying for recognition is a person or body; and

**(3)** the petition meets the requirements of section 1515.

**(b)** Such foreign proceeding shall be recognized--

**(1)** as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

**(2)** as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

**(c)** A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter.

**(d)** The provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under this chapter may be closed in the manner prescribed under section 350.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

Notes of Decisions (17)

11 U.S.C.A. § 1517, 11 USCA § 1517

Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
         Subchapter III. Recognition of a Foreign Proceeding and Relief

---

11 U.S.C.A. § 1518

§ 1518. Subsequent information

Currentness

From the time of filing the petition for recognition of a foreign proceeding, the foreign representative shall file with the court promptly a notice of change of status concerning--

**(1)** any substantial change in the status of such foreign proceeding or the status of the foreign representative's appointment; and

**(2)** any other foreign proceeding regarding the debtor that becomes known to the foreign representative.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 140.)

11 U.S.C.A. § 1518, 11 USCA § 1518
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1519

§ 1519. Relief that may be granted upon filing petition for recognition

Effective: December 22, 2010
Currentness

**(a)** From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including--

**(1)** staying execution against the debtor's assets;

**(2)** entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

**(3)** any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

**(b)** Unless extended under section 1521(a)(6), the relief granted under this section terminates when the petition for recognition is granted.

**(c)** It is a ground for denial of relief under this section that such relief would interfere with the administration of a foreign main proceeding.

**(d)** The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

**(e)** The standards, procedures, and limitations applicable to an injunction shall apply to relief under this section.

**(f)** The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 140; amended Pub.L. 111-327, § 2(a)(46), Dec. 22, 2010, 124 Stat. 3562.)

Notes of Decisions (6)

11 U.S.C.A. § 1519, 11 USCA § 1519
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.    2

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
     Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1520

§ 1520. Effects of recognition of a foreign main proceeding

Currentness

**(a)** Upon recognition of a foreign proceeding that is a foreign main proceeding--

**(1)** sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

**(2)** sections 363, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

**(3)** unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552; and

**(4)** section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

**(b)** Subsection (a) does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor.

**(c)** Subsection (a) does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such a case.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 141.)

Notes of Decisions (11)

11 U.S.C.A. § 1520, 11 USCA § 1520
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

| End of Document | © 2014 Thomson Reuters. No claim to original U.S. Government Works. |
|---|---|

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1521

§ 1521. Relief that may be granted upon recognition

Effective: December 22, 2010
Currentness

**(a)** Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including--

  **(1)** staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

  **(2)** staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

  **(3)** suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

  **(4)** providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

  **(5)** entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

  **(6)** extending relief granted under section 1519(a); and

  **(7)** granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

**(b)** Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

**(c)** In granting relief under this section to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

**(d)** The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

**(e)** The standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1), (2), (3), and (6) of subsection (a).

**(f)** The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 141; amended Pub.L. 111-327, § 2(a)(47), Dec. 22, 2010, 124 Stat. 3562.)

Notes of Decisions (13)

11 U.S.C.A. § 1521, 11 USCA § 1521
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
     Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

---

11 U.S.C.A. § 1522

§ 1522. Protection of creditors and other interested persons

Currentness

**(a)** The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

**(b)** The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond.

**(c)** The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

**(d)** Section 1104(d) shall apply to the appointment of an examiner under this chapter. Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

**CREDIT(S)**

  (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 142.)

Notes of Decisions (6)

11 U.S.C.A. § 1522, 11 USCA § 1522
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1523

§ 1523. Actions to avoid acts detrimental to creditors

Currentness

**(a)** Upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a).

**(b)** When a foreign proceeding is a foreign nonmain proceeding, the court must be satisfied that an action under subsection (a) relates to assets that, under United States law, should be administered in the foreign nonmain proceeding.

**CREDIT(S)**

    (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 142.)

Notes of Decisions (1)

11 U.S.C.A. § 1523, 11 USCA § 1523
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
         Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1524

§ 1524. Intervention by a foreign representative

Currentness

Upon recognition of a foreign proceeding, the foreign representative may intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party.

**CREDIT(S)**

  (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 142.)

11 U.S.C.A. § 1524, 11 USCA § 1524
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter IV. Cooperation with Foreign Courts and Foreign Representatives

11 U.S.C.A. § 1525

§ 1525. Cooperation and direct communication between the court and foreign courts or foreign representatives

Currentness

**(a)** Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.

**(b)** The court is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or a foreign representative, subject to the rights of a party in interest to notice and participation.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

Notes of Decisions (1)

11 U.S.C.A. § 1525, 11 USCA § 1525
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter IV. Cooperation with Foreign Courts and Foreign Representatives

11 U.S.C.A. § 1526

§ 1526. Cooperation and direct communication between
the trustee and foreign courts or foreign representatives

Currentness

**(a)** Consistent with section 1501, the trustee or other person, including an examiner, authorized by the court, shall, subject to the supervision of the court, cooperate to the maximum extent possible with a foreign court or a foreign representative.

**(b)** The trustee or other person, including an examiner, authorized by the court is entitled, subject to the supervision of the court, to communicate directly with a foreign court or a foreign representative.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

Notes of Decisions (1)

11 U.S.C.A. § 1526, 11 USCA § 1526
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

End of Document                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter IV. Cooperation with Foreign Courts and Foreign Representatives

11 U.S.C.A. § 1527

§ 1527. Forms of cooperation

Currentness

Cooperation referred to in sections 1525 and 1526 may be implemented by any appropriate means, including--

**(1)** appointment of a person or body, including an examiner, to act at the direction of the court;

**(2)** communication of information by any means considered appropriate by the court;

**(3)** coordination of the administration and supervision of the debtor's assets and affairs;

**(4)** approval or implementation of agreements concerning the coordination of proceedings; and

**(5)** coordination of concurrent proceedings regarding the same debtor.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

11 U.S.C.A. § 1527, 11 USCA § 1527
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 11. Bankruptcy (Refs & Annos)
     Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter V. Concurrent Proceedings

---

11 U.S.C.A. § 1528

§ 1528. Commencement of a case under this title after recognition of a foreign main proceeding

Currentness

After recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States. The effects of such case shall be restricted to the assets of the debtor that are within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination under sections 1525, 1526, and 1527, to other assets of the debtor that are within the jurisdiction of the court under sections 541(a) of this title, and 1334(e) of title 28, to the extent that such other assets are not subject to the jurisdiction and control of a foreign proceeding that has been recognized under this chapter.

**CREDIT(S)**

  (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

11 U.S.C.A. § 1528, 11 USCA § 1528
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**　　　　　　　　　　　　　　　　　© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

> United States Code Annotated
>> Title 11. Bankruptcy (Refs & Annos)
>>> Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
>>> Subchapter V. Concurrent Proceedings

11 U.S.C.A. § 1529

§ 1529. Coordination of a case under this title and a foreign proceeding

Effective: December 22, 2010

Currentness

If a foreign proceeding and a case under another chapter of this title are pending concurrently regarding the same debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527, and the following shall apply:

**(1)** If the case in the United States is pending at the time the petition for recognition of such foreign proceeding is filed--

**(A)** any relief granted under section 1519 or 1521 must be consistent with the relief granted in the case in the United States; and

**(B)** section 1520 does not apply even if such foreign proceeding is recognized as a foreign main proceeding.

**(2)** If a case in the United States under this title commences after recognition, or after the date of the filing of the petition for recognition, of such foreign proceeding--

**(A)** any relief in effect under section 1519 or 1521 shall be reviewed by the court and shall be modified or terminated if inconsistent with the case in the United States; and

**(B)** if such foreign proceeding is a foreign main proceeding, the stay and suspension referred to in section 1520(a) shall be modified or terminated if inconsistent with the relief granted in the case in the United States.

**(3)** In granting, extending, or modifying relief granted to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the laws of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

**(4)** In achieving cooperation and coordination under sections 1528 and 1529, the court may grant any of the relief authorized under section 305.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 144; amended Pub.L. 111-327, § 2(a)(48), Dec. 22, 2010, 124 Stat. 3562.)

---

Notes of Decisions (2)

11 U.S.C.A. § 1529, 11 USCA § 1529
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter V. Concurrent Proceedings

11 U.S.C.A. § 1530

§ 1530. Coordination of more than 1 foreign proceeding

Currentness

In matters referred to in section 1501, with respect to more than 1 foreign proceeding regarding the debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527, and the following shall apply:

**(1)** Any relief granted under section 1519 or 1521 to a representative of a foreign nonmain proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding.

**(2)** If a foreign main proceeding is recognized after recognition, or after the filing of a petition for recognition, of a foreign nonmain proceeding, any relief in effect under section 1519 or 1521 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding.

**(3)** If, after recognition of a foreign nonmain proceeding, another foreign nonmain proceeding is recognized, the court shall grant, modify, or terminate relief for the purpose of facilitating coordination of the proceedings.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 144.)

11 U.S.C.A. § 1530, 11 USCA § 1530
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
        Subchapter V. Concurrent Proceedings

11 U.S.C.A. § 1531

§ 1531. Presumption of insolvency based on recognition of a foreign main proceeding

Currentness

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under section 303, proof that the debtor is generally not paying its debts as such debts become due.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 144.)


11 U.S.C.A. § 1531, 11 USCA § 1531
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
            Subchapter V. Concurrent Proceedings

11 U.S.C.A. § 1532

§ 1532. Rule of payment in concurrent proceedings

Currentness

Without prejudice to secured claims or rights in rem, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title regarding the debtor, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

**CREDIT(S)**

    (Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 145.)

11 U.S.C.A. § 1532, 11 USCA § 1532
Current through P.L. 113-162 (excluding P.L. 113-128, 113-146, 113-150, 113-157, and 113-159) approved 8-8-14.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

TAB 2

35 U.S.C.A. § 154

§ 154. Contents and term of patent; provisional rights

Currentness

**(a) In general.--**

**(1) Contents.**--Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

**(2) Term.**--Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c), from the date on which the earliest such application was filed.

**(3) Priority.**--Priority under section 119, 365(a), or 365(b) shall not be taken into account in determining the term of a patent.

**(4) Specification and drawing.**--A copy of the specification and drawing shall be annexed to the patent and be a part of such patent.

**(b) Adjustment of patent term.--**

**(1) Patent term guarantees.--**

**(A) Guarantee of prompt Patent and Trademark Office responses.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to--

**(i)** provide at least one of the notifications under section 132 or a notice of allowance under section 151 not later than 14 months after--

**(I)** the date on which an application was filed under section 111(a); or

**(II)** the date of commencement of the national stage under section 371 in an international application;

**(ii)** respond to a reply under section 132, or to an appeal taken under section 134, within 4 months after the date on which the reply was filed or the appeal was taken;

**(iii)** act on an application within 4 months after the date of a decision by the Patent Trial and Appeal Board under section 134 or 135 or a decision by a Federal court under section 141, 145, or 146 in a case in which allowable claims remain in the application; or

**(iv)** issue a patent within 4 months after the date on which the issue fee was paid under section 151 and all outstanding requirements were satisfied,

the term of the patent shall be extended 1 day for each day after the end of the period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken.

**(B) Guarantee of no more than 3-year application pendency.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the United States Patent and Trademark Office to issue a patent within 3 years after the actual filing date of the application under section 111(a) in the United States or, in the case of an international application, the date of commencement of the national stage under section 371 in the international application, not including--

**(i)** any time consumed by continued examination of the application requested by the applicant under section 132(b);

**(ii)** any time consumed by a proceeding under section 135(a), any time consumed by the imposition of an order under section 181, or any time consumed by appellate review by the Patent Trial and Appeal Board or by a Federal court; or

**(iii)** any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C),

the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

**(C) Guarantee of adjustments for delays due to derivation proceedings, secrecy orders, and appeals.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to--

**(i)** a proceeding under section 135(a);

**(ii)** the imposition of an order under section 181; or

**(iii)** appellate review by the Patent Trial and Appeal Board or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability,

the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

**(2) Limitations.**--

**(A) In general.**--To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

**(B) Disclaimed term.**--No patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer.

**(C) Reduction of period of adjustment.**--

**(i)** The period of adjustment of the term of a patent under paragraph (1) shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application.

**(ii)** With respect to adjustments to patent term made under the authority of paragraph (1)(B), an applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of 3 months that are taken to respond to a notice from the Office making any rejection, objection, argument, or other request, measuring such 3-month period from the date the notice was given or mailed to the applicant.

**(iii)** The Director shall prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application.

**(3) Procedures for patent term adjustment determination.**--

**(A)** The Director shall prescribe regulations establishing procedures for the application for and determination of patent term adjustments under this subsection.

**(B)** Under the procedures established under subparagraph (A), the Director shall--

**(i)** make a determination of the period of any patent term adjustment under this subsection, and shall transmit a notice of that determination no later than the date of issuance of the patent; and

**(ii)** provide the applicant one opportunity to request reconsideration of any patent term adjustment determination made by the Director.

**(C)** The Director shall reinstate all or part of the cumulative period of time of an adjustment under paragraph (2)(C) if the applicant, prior to the issuance of the patent, makes a showing that, in spite of all due care, the applicant was unable to respond within the 3-month period, but in no case shall more than three additional months for each such response beyond the original 3-month period be reinstated.

**(D)** The Director shall proceed to grant the patent after completion of the Director's determination of a patent term adjustment under the procedures established under this subsection, notwithstanding any appeal taken by the applicant of such determination.

**(4) Appeal of patent term adjustment determination.**--

**(A)** An applicant dissatisfied with the Director's decision on the applicant's request for reconsideration under paragraph (3)(B)(ii) shall have exclusive remedy by a civil action against the Director filed in the United States District Court for the Eastern District of Virginia within 180 days after the date of the Director's decision on the applicant's request for reconsideration. Chapter 7 of title 5 shall apply to such action. Any final judgment resulting in a change to the period of adjustment of the patent term shall be served on the Director, and the Director shall thereafter alter the term of the patent to reflect such change.

**(B)** The determination of a patent term adjustment under this subsection shall not be subject to appeal or challenge by a third party prior to the grant of the patent.

**(c) Continuation.**--

**(1) Determination.**--The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers.

**(2) Remedies.**--The remedies of sections 283, 284, and 285 shall not apply to acts which--

**(A)** were commenced or for which substantial investment was made before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act; and

**(B)** became infringing by reason of paragraph (1).

**(3) Remuneration.**--The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)).

**(d) Provisional rights.**--

**(1) In general.**--In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent under section 122(b), or in the case of an international application filed under the treaty defined in section 351(a) designating the United States under Article 21(2)(a) of such treaty, the date of publication of the application, and ending on the date the patent is issued--

**(A)(i)** makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; or

**(ii)** if the invention as claimed in the published patent application is a process, uses, offers for sale, or sells in the United States or imports into the United States products made by that process as claimed in the published patent application; and

**(B)** had actual notice of the published patent application and, in a case in which the right arising under this paragraph is based upon an international application designating the United States that is published in a language other than English, had a translation of the international application into the English language.

**(2) Right based on substantially identical inventions.**--The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

**(3) Time limitation on obtaining a reasonable royalty.**--The right under paragraph (1) to obtain a reasonable royalty shall be available only in an action brought not later than 6 years after the patent is issued. The right under paragraph (1) to obtain a reasonable royalty shall not be affected by the duration of the period described in paragraph (1).

**(4) Requirements for international applications.**--

**(A) Effective date.**--The right under paragraph (1) to obtain a reasonable royalty based upon the publication under the treaty defined in section 351(a) of an international application designating the United States shall commence on the date of publication under the treaty of the international application, or, if the publication under the treaty of the international application is in a language other than English, on the date on which the Patent and Trademark Office receives a translation of the publication in the English language.

**(B) Copies.**--The Director may require the applicant to provide a copy of the international application and a translation thereof.

## CREDIT(S)

(July 19, 1952, c. 950, 66 Stat. 804; Pub.L. 89-83, § 5, July 24, 1965, 79 Stat. 261; Pub.L. 96-517, § 4, Dec. 12, 1980, 94 Stat. 3018; Pub.L. 100-418, Title IX, § 9002, Aug. 23, 1988, 102 Stat. 1563; Pub.L. 103-465, Title V, § 532(a)(1), Dec. 8, 1994, 108 Stat. 4983; Pub.L. 104-295, § 20(e)(1), Oct. 11, 1996, 110 Stat. 3529; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, §§ 4402(a), 4504], Nov. 29, 1999, 113 Stat. 1536, 1501A-557, 1501A-566; Pub.L. 107-273, Div. C, Title III, §§ 13204, 13206(a) (8), Nov. 2, 2002, 116 Stat. 1902, 1904; Pub.L. 112-29, §§ 3(j)(1), (2)(B), 9(a), 20(j)(1), Sept. 16, 2011, 125 Stat. 290, 316, 335; Pub.L. 112-274, § 1(h), Jan. 14, 2013, 126 Stat. 2457.)

## AMENDMENT OF SUBSECTION (A)(2), (3)

<Pub.L. 112-211, Title I, §§ 102(6)(A), 103(a), Dec. 18, 2012, 126 Stat. 1531, 1532, provided that effective on the later of the date that is 1 year after Dec. 18, 2012, or the date of entry into force of the treaty with respect to the United States, subsec. (a)(2) is amended by striking "section 120, 121, or 365(c)" and inserting "section 120, 121, 365(c), or 386(c)"; and subsec. (a)(3) is amended by striking "section 119, 365(a), or 365(b)" and inserting "section 119, 365(a), 365(b), 386(a), or 386(b)".>

## AMENDMENT OF SUBSECTION (D)(1)

<Pub.L. 112-211, Title I, §§ 102(6)(B), 103(a), Dec. 18, 2012, 126 Stat. 1531, 1532, provided that effective on the later of the date that is 1 year after Dec. 18, 2012, or the date of entry into force of the treaty with respect to the United States, subsec. (d)(1) is amended by inserting " or an international design application filed under the treaty defined in section 381(a)(1) designating the United States under Article 5 of such treaty" after "Article 21(2)(1) of such treaty".>

Notes of Decisions (487)

35 U.S.C.A. § 154, 35 USCA § 154
Current through P.L. 113-120 approved 6-10-14

TAB 3



CANADA

CONSOLIDATION

CODIFICATION

# Canada Business Corporations Act

# Loi canadienne sur les sociétés par actions

R.S.C., 1985, c. C-44

L.R.C. (1985), ch. C-44

Current to June 12, 2014

À jour au 12 juin 2014

Last amended on November 29, 2011

Dernière modification le 29 novembre 2011

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca



**R.S.C., 1985, c. C-44**

**L.R.C., 1985, ch. C-44**

An Act respecting Canadian business corporations

Loi régissant les sociétés par actions de régime fédéral

## SHORT TITLE

## TITRE ABRÉGÉ

Short title

**1.** This Act may be cited as the *Canada Business Corporations Act*.

R.S., 1985, c. C-44, s. 1; 1994, c. 24, s. 1(F).

**1.** *Loi canadienne sur les sociétés par actions*.

L.R. (1985), ch. C-44, art. 1; 1994, ch. 24, art. 1(F).

Titre abrégé

## PART I

## PARTIE I

### INTERPRETATION AND APPLICATION

### DÉFINITIONS ET APPLICATION

#### INTERPRETATION

#### DÉFINITIONS

Definitions

**2.** (1) In this Act,

"affairs"
« *affaires internes* »

"affairs" means the relationships among a corporation, its affiliates and the shareholders, directors and officers of such bodies corporate but does not include the business carried on by such bodies corporate;

"affiliate"
« *groupe* »

"affiliate" means an affiliated body corporate within the meaning of subsection (2);

"articles"
« *statuts* »

"articles" means the original or restated articles of incorporation, articles of amendment, articles of amalgamation, articles of continuance, articles of reorganization, articles of arrangement, articles of dissolution, articles of revival and includes any amendments thereto;

"associate"
« *liens* »

"associate", in respect of a relationship with a person, means

    (*a*) a body corporate of which that person beneficially owns or controls, directly or indirectly, shares or securities currently convertible into shares carrying more than ten per cent of the voting rights under all circumstances or by reason of the occurrence of an event that has occurred and is continuing, or a currently exercisable option or right to purchase such shares or such convertible securities,

**2.** (1) Les définitions qui suivent s'appliquent à la présente loi.

«action rachetable» Action que la société émettrice, selon le cas :

    *a*) peut acheter ou racheter unilatéralement;

    *b*) est tenue, par ses statuts, d'acheter ou de racheter à une date déterminée ou à la demande d'un actionnaire.

«administrateur» Indépendamment de son titre, le titulaire de ce poste; «conseil d'administration» s'entend notamment de l'administrateur unique.

«affaires internes» Les relations, autres que d'entreprise, entre la société, les personnes morales appartenant au même groupe et leurs actionnaires, administrateurs et dirigeants.

«assemblée» Assemblée d'actionnaires.

«convention unanime des actionnaires» Convention visée au paragraphe 146(1) ou déclaration d'un actionnaire visée au paragraphe 146(2).

Définitions

« action rachetable » *"redeemable share"*

« administrateur » et « conseil d'administration » *"director", "directors" and "board of directors"*

« affaires internes » *"affairs"*

« assemblée » *French version only*

« convention unanime des actionnaires » *"unanimous shareholder agreement"*

*Canada Business Corporations — June 12, 2014*

(*b*) a partner of that person acting on behalf of the partnership of which they are partners,

(*c*) a trust or estate or succession in which that person has a substantial beneficial interest or in respect of which that person serves as a trustee or liquidator of the succession or in a similar capacity,

(*d*) a spouse of that person or an individual who is cohabiting with that person in a conjugal relationship, having so cohabited for a period of at least one year,

(*e*) a child of that person or of the spouse or individual referred to in paragraph (*d*), and

(*f*) a relative of that person or of the spouse or individual referred to in paragraph (*d*), if that relative has the same residence as that person;

"auditor"
« vérificateur »

"auditor" includes a partnership of auditors or an auditor that is incorporated;

"beneficial interest"
« véritable propriétaire » et « propriété effective »

"beneficial interest" means an interest arising out of the beneficial ownership of securities;

"beneficial ownership"
« véritable propriétaire » et « propriété effective »

"beneficial ownership" includes ownership through any trustee, legal representative, agent or mandatary, or other intermediary;

"body corporate"
« personne morale »

"body corporate" includes a company or other body corporate wherever or however incorporated;

"call"
« option d'achat »

"call" means an option transferable by delivery to demand delivery of a specified number or amount of securities at a fixed price within a specified time but does not include an option or right to acquire securities of the corporation that granted the option or right to acquire;

"corporation"
« société par actions » ou « société »

"corporation" means a body corporate incorporated or continued under this Act and not discontinued under this Act;

"court"
« tribunal »

"court" means

(*a*) in the Provinces of Newfoundland and Prince Edward Island, the trial division of the Supreme Court of the Province,

(*a.1*) in the Province of Ontario, the Superior Court of Justice,

«Cour d'appel» La cour compétente pour juger les appels interjetés contre les décisions des tribunaux.

« Cour d'appel »
"court of appeal"

«directeur» Personne nommée à ce titre en vertu de l'article 260.

« directeur »
"Director"

«dirigeant» Particulier qui occupe le poste de président du conseil d'administration, président, vice-président, secrétaire, trésorier, contrôleur, chef du contentieux, directeur général ou administrateur délégué d'une société ou qui exerce pour celle-ci des fonctions semblables à celles qu'exerce habituellement un particulier occupant un tel poste ainsi que tout autre particulier nommé à titre de dirigeant en application de l'article 121.

« dirigeant »
"officer"

«entité» S'entend d'une personne morale, d'une société de personnes, d'une fiducie, d'une coentreprise ou d'une organisation ou association non dotée de la personnalité morale.

« entité »
"entity"

«envoyer» A également le sens de remettre.

« envoyer »
"send"

«fondateur» Tout signataire des statuts constitutifs d'une société.

« fondateur »
"incorporator"

«groupe» L'ensemble des personnes morales visées au paragraphe (2).

« groupe »
"affiliate"

«liens» Relations entre une personne et :

« liens »
"associate"

*a*) la personne morale dont elle a, soit directement, soit indirectement, la propriété effective ou le contrôle d'un certain nombre d'actions ou de valeurs mobilières immédiatement convertibles en actions, conférant plus de dix pour cent des droits de vote en tout état de cause ou en raison soit de la réalisation continue d'une condition, soit d'une option ou d'un droit d'achat immédiat portant sur lesdites actions ou valeurs mobilières convertibles;

*b*) son associé dans une société de personnes, agissant pour le compte de celle-ci;

*c*) la fiducie ou la succession sur lesquelles elle a un droit découlant des droits du véritable propriétaire ou à l'égard desquelles elle remplit les fonctions de fiduciaire, d'exécuteur testamentaire, de liquidateur de la succession ou des fonctions analogues;

*d*) son époux ou la personne qui vit avec elle dans une relation conjugale depuis au moins un an;

(*b*) in the Provinces of Nova Scotia and British Columbia, the Supreme Court of the Province,

(*c*) in the Provinces of Manitoba, Saskatchewan, Alberta and New Brunswick, the Court of Queen's Bench for the Province,

(*d*) in the Province of Quebec, the Superior Court of the Province, and

(*e*) the Supreme Court of Yukon, the Supreme Court of the Northwest Territories and the Nunavut Court of Justice;

"court of appeal" « *Cour d'appel* »

"court of appeal" means the court to which an appeal lies from an order of a court;

"debt obligation" « *titre de créance* »

"debt obligation" means a bond, debenture, note or other evidence of indebtedness or guarantee of a corporation, whether secured or unsecured;

"Director" « *directeur* »

"Director" means the Director appointed under section 260;

"director", "directors" and "board of directors" « *administrateur* » et « *conseil d'administration* »

"director" means a person occupying the position of director by whatever name called and "directors" and "board of directors" includes a single director;

"distributing corporation" « *société ayant fait appel au public* »

"distributing corporation" means, subject to subsections (6) and (7), a distributing corporation as defined in the regulations;

"entity" « *entité* »

"entity" means a body corporate, a partnership, a trust, a joint venture or an unincorporated association or organization;

"going-private transaction" « *opération de fermeture* »

"going-private transaction" means a going-private transaction as defined in the regulations;

"incorporator" « *fondateur* »

"incorporator" means a person who signs articles of incorporation;

"individual" « *particulier* »

"individual" means a natural person;

"liability" « *passif* »

"liability" includes a debt of a corporation arising under section 40, subsection 190(25) and paragraphs 241(3)(*f*) and (*g*);

"mandatary" « *mandataire* »

"mandatary", in Quebec, includes a successor;

"Minister" « *ministre* »

"Minister" means such member of the Queen's Privy Council for Canada as is designated by

*e*) ses enfants ou ceux des personnes visées à l'alinéa *d*);

*f*) ses autres parents — ou ceux des personnes visées à l'alinéa *d*) — qui partagent sa résidence.

«mandataire» Au Québec, s'entend notamment de l'ayant cause.

« mandataire » "*mandatary*"

«ministre» Le membre du Conseil privé de la Reine pour le Canada chargé par le gouverneur en conseil de l'application de la présente loi.

« ministre » "*Minister*"

«opération d'éviction» Opération exécutée par une société — qui n'est pas une société ayant fait appel au public — et exigeant une modification de ses statuts qui a, directement ou indirectement, pour résultat la suppression de l'intérêt d'un détenteur d'actions d'une catégorie, sans le consentement de celui-ci et sans substitution d'un intérêt de valeur équivalente dans des actions émises par la société conférant des droits et privilèges égaux ou supérieurs à ceux attachés aux actions de cette catégorie.

« opération d'éviction » "*squeeze-out transaction*"

«opération de fermeture» S'entend au sens des règlements.

« opération de fermeture » "*going-private transaction*"

«option d'achat» Option négociable par livraison qui permet d'exiger que soit livré un nombre précis de valeurs mobilières à un prix et dans un délai déterminés. Est exclu de la présente définition l'option ou le droit d'acquérir des valeurs mobilières de la société qui l'a accordé.

« option d'achat » "*call*"

«option de vente» Option négociable par livraison qui permet de livrer un nombre précis de valeurs mobilières à un prix et dans un délai déterminés.

« option de vente » "*put*"

«particulier» A le sens de personne physique.

« particulier » "*individual*"

«passif» Sont assimilées au passif les dettes résultant de l'application de l'article 40, du paragraphe 190(25) ou des alinéas 241(3)*f*) et *g*).

« passif » "*liability*"

«personne» Particulier, société de personnes, association, personne morale ou représentant personnel.

« personne » "*person*"

«personne morale» Toute personne morale, y compris une compagnie, indépendamment de son lieu ou mode de constitution.

« personne morale » "*body corporate*"

*Canada Business Corporations — June 12, 2014*

the Governor in Council as the Minister for the purposes of this Act;

"officer"
« dirigeant »

"officer" means an individual appointed as an officer under section 121, the chairperson of the board of directors, the president, a vice-president, the secretary, the treasurer, the comptroller, the general counsel, the general manager, a managing director, of a corporation, or any other individual who performs functions for a corporation similar to those normally performed by an individual occupying any of those offices;

"ordinary resolution"
« résolution ordinaire »

"ordinary resolution" means a resolution passed by a majority of the votes cast by the shareholders who voted in respect of that resolution;

"person"
« personne »

"person" means an individual, partnership, association, body corporate, or personal representative;

"personal representative"
« représentant personnel »

"personal representative" means a person who stands in place of and represents another person including, but not limited to, a trustee, an executor, an administrator, a liquidator of a succession, an administrator of the property of others, a guardian or tutor, a curator, a receiver or sequestrator, an agent or mandatary or an attorney;

"prescribed"
« prescrit » ou « réglementaire »

"prescribed" means prescribed by the regulations;

"put"
« option de vente »

"put" means an option transferable by delivery to deliver a specified number or amount of securities at a fixed price within a specified time;

"redeemable share"
« action rachetable »

"redeemable share" means a share issued by a corporation

(a) that the corporation may purchase or redeem on the demand of the corporation, or

(b) that is required by its articles to purchase or redeem at a specified time or on the demand of a shareholder;

"resident Canadian"
« résident canadien »

"resident Canadian" means an individual who is

(a) a Canadian citizen ordinarily resident in Canada,

(b) a Canadian citizen not ordinarily resident in Canada who is a member of a prescribed class of persons, or

---

« prescrit » ou « réglementaire »
"prescribed"

«prescrit» ou «réglementaire» Prescrit ou prévu par règlement.

« représentant personnel »
"personal representative"

«représentant personnel» Personne agissant en lieu et place d'une autre, notamment le fiduciaire, l'exécuteur testamentaire, l'administrateur successoral, le liquidateur de succession, l'administrateur du bien d'autrui, le tuteur, le curateur, le séquestre, le mandataire et le fondé de pouvoir.

« résident canadien »
"resident Canadian"

«résident canadien» Selon le cas :

a) le citoyen canadien résidant habituellement au Canada;

b) le citoyen canadien qui ne réside pas habituellement au Canada, mais fait partie d'une catégorie prescrite de personnes;

c) le résident permanent au sens du paragraphe 2(1) de la *Loi sur l'immigration et la protection des réfugiés* qui réside habituellement au Canada, à l'exclusion de celui qui y a résidé de façon habituelle pendant plus d'un an après avoir acquis pour la première fois le droit de demander la citoyenneté canadienne.

« résolution ordinaire »
"ordinary resolution"

«résolution ordinaire» Résolution adoptée à la majorité des voix exprimées.

« résolution spéciale »
"special resolution"

«résolution spéciale» Résolution adoptée aux deux tiers au moins des voix exprimées ou signée de tous les actionnaires habiles à voter en l'occurrence.

« réunion »
French version only

«réunion» Réunion du conseil d'administration ou de l'un de ses comités.

« série »
"series"

«série» Subdivision d'une catégorie d'actions.

« société ayant fait appel au public »
"distributing corporation"

«société ayant fait appel au public» Sous réserve des paragraphes (6) et (7), s'entend au sens des règlements.

«société de personnes» [Abrogée, 1994, ch. 24, art. 2]

« société par actions » ou « société »
"corporation"

«société par actions» ou «société» Personne morale constituée ou prorogée sous le régime de la présente loi.

« statuts »
"articles"

«statuts» Les clauses, initiales ou mises à jour, réglementant la constitution ainsi que toute modification, fusion, prorogation, réorganisation,

(*c*) a permanent resident within the meaning of subsection 2(1) of the *Immigration and Refugee Protection Act* and ordinarily resident in Canada, except a permanent resident who has been ordinarily resident in Canada for more than one year after the time at which he or she first became eligible to apply for Canadian citizenship;

"security" «*valeur mobilière*» "security" means a share of any class or series of shares or a debt obligation of a corporation and includes a certificate evidencing such a share or debt obligation;

"security interest" «*sûreté*» "security interest" means an interest or right in or charge on property of a corporation to secure payment of a debt or performance of any other obligation of the corporation;

"send" «*envoyer*» "send" includes deliver;

"series" «*série*» "series", in relation to shares, means a division of a class of shares;

"special resolution" «*résolution spéciale*» "special resolution" means a resolution passed by a majority of not less than two-thirds of the votes cast by the shareholders who voted in respect of that resolution or signed by all the shareholders entitled to vote on that resolution;

"squeeze-out transaction" «*opération d'éviction*» "squeeze-out transaction" means a transaction by a corporation that is not a distributing corporation that would require an amendment to its articles and would, directly or indirectly, result in the interest of a holder of shares of a class of the corporation being terminated without the consent of the holder, and without substituting an interest of equivalent value in shares issued by the corporation, which shares have equal or greater rights and privileges than the shares of the affected class;

"unanimous shareholder agreement" «*convention unanime des actionnaires*» "unanimous shareholder agreement" means an agreement described in subsection 146(1) or a declaration of a shareholder described in subsection 146(2).

Affiliated bodies corporate (2) For the purposes of this Act,

(*a*) one body corporate is affiliated with another body corporate if one of them is the subsidiary of the other or both are subsidiaries of the same body corporate or each of them is controlled by the same person; and

(*b*) if two bodies corporate are affiliated with the same body corporate at the same

dissolution, reconstitution ou tout arrangement de la société.

«sûreté» Droit, intérêt ou charge grevant les biens d'une société pour garantir le paiement de ses dettes ou l'exécution de ses obligations. « sûreté » "security interest"

«titre de créance» Toute preuve d'une créance sur la société ou d'une garantie donnée par elle, avec ou sans sûreté, et notamment une obligation, une débenture ou un billet. « titre de créance » "debt obligation"

«tribunal» « tribunal » "court"

*a*) La Section de première instance de la Cour suprême de Terre-Neuve ou de l'Île-du-Prince-Édouard;

*a.1*) la Cour supérieure de justice de l'Ontario;

*b*) la Cour suprême de la Nouvelle-Écosse et de la Colombie-Britannique;

*c*) la Cour du Banc de la Reine du Manitoba, de la Saskatchewan, de l'Alberta ou du Nouveau-Brunswick;

*d*) la Cour supérieure du Québec;

*e*) la Cour suprême du Yukon, la Cour suprême des Territoires du Nord-Ouest ou la Cour de justice du Nunavut.

«valeur mobilière» Action de toute catégorie ou série ou titre de créance sur une société, y compris le certificat en attestant l'existence. « valeur mobilière » "security"

«vérificateur» S'entend notamment des vérificateurs constitués en société de personnes ou en personne morale. « vérificateur » "auditor"

«véritable propriétaire» S'entend notamment du propriétaire de valeurs mobilières inscrites au nom d'un intermédiaire, notamment d'un fiduciaire ou d'un mandataire; et «propriété effective» s'entend du droit du véritable propriétaire. « véritable propriétaire » et « propriété effective » "beneficial ownership" "beneficial interest"

(2) Pour l'application de la présente loi : Groupements

*a*) appartiennent au même groupe deux personnes morales dont l'une est filiale de l'autre ou qui sont sous le contrôle de la même personne;

*b*) sont réputées appartenir au même groupe deux personnes morales dont chacune appartient au groupe d'une même personne morale.

TAB 4

## INTERNATIONAL INSOLVENCIES

**Definitions**

**18.6** (1) In this section,

"foreign proceeding"
*« procédures intentées à l'étranger »*

"foreign proceeding" means a judicial or administrative proceeding commenced outside Canada in respect of a debtor under a law relating to bankruptcy or insolvency and dealing with the collective interests of creditors generally;

"foreign representative"
*« représentant étranger »*

"foreign representative" means a person, other than a debtor, holding office under the law of a jurisdiction outside Canada who, irrespective of the person's designation, is assigned, under the laws of the jurisdiction outside Canada, functions in connection with a foreign proceeding that are similar to those performed by a trustee in bankruptcy, liquidator or other administrator appointed by the court.

**Powers of court**

(2) The court may, in respect of a debtor company, make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of proceedings under this Act with any foreign proceeding.

**Terms and conditions of orders**

(3) An order of the court under this section may be made on such terms and conditions as the court considers appropriate in the circumstances.

**Court not prevented from applying certain rules**

(4) Nothing in this section prevents the court, on the application of a foreign representative or any other interested person, from applying such legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives as are not inconsistent with the provisions of this Act.

**Court not compelled to give effect to certain orders**

(5) Nothing in this section requires the court to make any order that is not in compliance with the laws of Canada or to enforce any order made by a foreign court.

**Court may seek assistance from foreign tribunal**

(6) The court may seek the aid and assistance of a court, tribunal or other authority in a foreign proceeding by order or written request or otherwise as the court considers appropriate.

**Foreign representative status**

(7) An application to the court by a foreign representative under this section does not submit the foreign representative to the jurisdiction of the court for any other purpose except with regard to the costs of the proceedings, but the court may make any order under this section conditional on the

compliance by the foreign representative with any other order of the court.

*Claims in foreign currency*

(8) Where a compromise or arrangement is proposed in respect of a debtor company, a claim for a debt that is payable in a currency other than Canadian currency shall be converted to Canadian currency as of the date of the first application made in respect of the company under section 10 unless otherwise provided in the proposed compromise or arrangement.

1997, c. 12, s. 125.

TAB 5



CANADA

| CONSOLIDATION | CODIFICATION |
| --- | --- |
| Copyright Act | Loi sur le droit d'auteur |
| R.S.C., 1985, c. C-42 | L.R.C. (1985), ch. C-42 |

| Current to August 5, 2014 | À jour au 5 août 2014 |
| --- | --- |
| Last amended on November 7, 2012 | Dernière modification le 7 novembre 2012 |

| Published by the Minister of Justice at the following address: http://laws-lois.justice.gc.ca | Publié par le ministre de la Justice à l'adresse suivante : http://lois-laws.justice.gc.ca |
| --- | --- |

*Copyright — August 5, 2014*

dar year of the death of the author who dies last.

Nationals of other countries

(2) Authors who are nationals of any country, other than a country that is a party to the North American Free Trade Agreement, that grants a term of protection shorter than that mentioned in subsection (1) are not entitled to claim a longer term of protection in Canada.

R.S., 1985, c. C-42, s. 9; 1993, c. 44, s. 60.

**10.** [Repealed, 2012, c. 20, s. 6]

**11.** [Repealed, 1997, c. 24, s. 8]

Cinematographic works

**11.1** Except for cinematographic works in which the arrangement or acting form or the combination of incidents represented give the work a dramatic character, copyright in a cinematographic work or a compilation of cinematographic works shall subsist

(*a*) for the remainder of the calendar year of the first publication of the cinematographic work or of the compilation, and for a period of fifty years following the end of that calendar year; or

(*b*) if the cinematographic work or compilation is not published before the expiration of fifty years following the end of the calendar year of its making, for the remainder of that calendar year and for a period of fifty years following the end of that calendar year.

1993, c. 44, s. 60; 1997, c. 24, s. 9.

Where copyright belongs to Her Majesty

**12.** Without prejudice to any rights or privileges of the Crown, where any work is, or has been, prepared or published by or under the direction or control of Her Majesty or any government department, the copyright in the work shall, subject to any agreement with the author, belong to Her Majesty and in that case shall continue for the remainder of the calendar year of the first publication of the work and for a period of fifty years following the end of that calendar year.

R.S., 1985, c. C-42, s. 12; 1993, c. 44, s. 60.

OWNERSHIP OF COPYRIGHT

Ownership of copyright

**13.** (1) Subject to this Act, the author of a work shall be the first owner of the copyright therein.

(2) [Repealed, 2012, c. 20, s. 7]

Auteurs étrangers

(2) Les auteurs ressortissants d'un pays — autre qu'un pays partie à l'Accord de libre-échange nord-américain — qui accorde une durée de protection plus courte que celle qui est indiquée au paragraphe (1) ne sont pas admis à réclamer une plus longue durée de protection au Canada.

L.R. (1985), ch. C-42, art. 9; 1993, ch. 44, art. 60.

**10.** [Abrogé, 2012, ch. 20, art. 6]

**11.** [Abrogé, 1997, ch. 24, art. 8]

Oeuvre cinématographique

**11.1** Sauf dans le cas d'oeuvres cinématographiques auxquelles les dispositifs de la mise en scène ou les combinaisons des incidents représentés donnent un caractère dramatique, le droit d'auteur sur une oeuvre cinématographique ou une compilation d'oeuvres cinématographiques subsiste :

*a*) soit jusqu'à la fin de la cinquantième année suivant celle de sa première publication;

*b*) soit jusqu'à la fin de la cinquantième année suivant celle de sa création, dans le cas où elle n'a pas été publiée avant la fin de cette période.

1993, ch. 44, art. 60; 1997, ch. 24, art. 9.

Quand le droit d'auteur appartient à Sa Majesté

**12.** Sous réserve de tous les droits ou privilèges de la Couronne, le droit d'auteur sur les oeuvres préparées ou publiées par l'entremise, sous la direction ou la surveillance de Sa Majesté ou d'un ministère du gouvernement, appartient, sauf stipulation conclue avec l'auteur, à Sa Majesté et, dans ce cas, il subsiste jusqu'à la fin de la cinquantième année suivant celle de la première publication de l'oeuvre.

L.R. (1985), ch. C-42, art. 12; 1993, ch. 44, art. 60.

POSSESSION DU DROIT D'AUTEUR

Possession du droit d'auteur

**13.** (1) Sous réserve des autres dispositions de la présente loi, l'auteur d'une oeuvre est le premier titulaire du droit d'auteur sur cette oeuvre.

(2) [Abrogé, 2012, ch. 20, art. 7]

# TAB 6

United States Code Annotated
    Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
        Title V. Disclosures and Discovery (Refs & Annos)

Federal Rules of Civil Procedure Rule 26

Rule 26. Duty to Disclose; General Provisions Governing Discovery

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 26 are displayed in two separate documents. Notes of Decisions for subdivisions I to III are contained in this document. For Notes of Decisions for subdivisions IV to end, see second document for 28 USCA Federal Rules of Civil Procedure Rule 26.>

**(a) Required Disclosures.**

   **(1)** *Initial Disclosure.*

   **(A)** *In General.* Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

   **(i)** the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

   **(ii)** a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

   **(iii)** a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

   **(iv)** for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

   **(B)** *Proceedings Exempt from Initial Disclosure.* The following proceedings are exempt from initial disclosure:

   **(i)** an action for review on an administrative record;

**(ii)** a forfeiture action in rem arising from a federal statute;

**(iii)** a petition for habeas corpus or any other proceeding to challenge a criminal conviction or sentence;

**(iv)** an action brought without an attorney by a person in the custody of the United States, a state, or a state subdivision;

**(v)** an action to enforce or quash an administrative summons or subpoena;

**(vi)** an action by the United States to recover benefit payments;

**(vii)** an action by the United States to collect on a student loan guaranteed by the United States;

**(viii)** a proceeding ancillary to a proceeding in another court; and

**(ix)** an action to enforce an arbitration award.

**(C)** *Time for Initial Disclosures--In General.* A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan. In ruling on the objection, the court must determine what disclosures, if any, are to be made and must set the time for disclosure.

**(D)** *Time for Initial Disclosures--For Parties Served or Joined Later.* A party that is first served or otherwise joined after the Rule 26(f) conference must make the initial disclosures within 30 days after being served or joined, unless a different time is set by stipulation or court order.

**(E)** *Basis for Initial Disclosure; Unacceptable Excuses.* A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

**(2)** *Disclosure of Expert Testimony.*

**(A)** *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

**(B)** *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially

employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;

> **(ii)** the facts or data considered by the witness in forming them;

> **(iii)** any exhibits that will be used to summarize or support them;

> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;

> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

**(C)** *Witnesses Who Do Not Provide a Written Report*. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

> **(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

> **(ii)** a summary of the facts and opinions to which the witness is expected to testify.

**(D)** *Time to Disclose Expert Testimony*. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

> **(i)** at least 90 days before the date set for trial or for the case to be ready for trial; or

> **(ii)** if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

**(E)** *Supplementing the Disclosure*. The parties must supplement these disclosures when required under Rule 26(e).

**(3)** *Pretrial Disclosures.*

**(A)** *In General*. In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:

**(i)** the name and, if not previously provided, the address and telephone number of each witness--separately identifying those the party expects to present and those it may call if the need arises;

**(ii)** the designation of those witnesses whose testimony the party expects to present by deposition and, if not taken stenographically, a transcript of the pertinent parts of the deposition; and

**(iii)**an identification of each document or other exhibit, including summaries of other evidence--separately identifying those items the party expects to offer and those it may offer if the need arises.

**(B)** *Time for Pretrial Disclosures; Objections.* Unless the court orders otherwise, these disclosures must be made at least 30 days before trial. Within 14 days after they are made, unless the court sets a different time, a party may serve and promptly file a list of the following objections: any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(A)(ii); and any objection, together with the grounds for it, that may be made to the admissibility of materials identified under Rule 26(a)(3)(A)(iii). An objection not so made--except for one under Federal Rule of Evidence 402 or 403--is waived unless excused by the court for good cause.

**(4)** *Form of Disclosures.* Unless the court orders otherwise, all disclosures under Rule 26(a) must be in writing, signed, and served.

**(b) Discovery Scope and Limits.**

**(1)** *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

**(2)** *Limitations on Frequency and Extent.*

**(A)** *When Permitted.* By order, the court may alter the limits in these rules on the number of depositions and interrogatories or on the length of depositions under Rule 30. By order or local rule, the court may also limit the number of requests under Rule 36.

**(B)** *Specific Limitations on Electronically Stored Information.* A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(C)** *When Required.* On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

**(i)** the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

**(ii)** the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

**(iii)** the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

**(3)** *Trial Preparation: Materials.*

**(A)** *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

**(i)** they are otherwise discoverable under Rule 26(b)(1); and

**(ii)** the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

**(B)** *Protection Against Disclosure.* If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

**(C)** *Previous Statement.* Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. If the request is refused, the person may move for a court order, and Rule 37(a)(5) applies to the award of expenses. A previous statement is either:

**(i)** a written statement that the person has signed or otherwise adopted or approved; or

**(ii)** a contemporaneous stenographic, mechanical, electrical, or other recording--or a transcription of it--that recites substantially verbatim the person's oral statement.

**(4)** *Trial Preparation: Experts.*

**(A)** *Deposition of an Expert Who May Testify*. A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided.

**(B)** *Trial-Preparation Protection for Draft Reports or Disclosures*. Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded.

**(C)** *Trial-Preparation Protection for Communications Between a Party's Attorney and Expert Witnesses*. Rules 26(b)(3) (A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications:

  **(i)** relate to compensation for the expert's study or testimony;

  **(ii)** identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or

  **(iii)** identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

**(D)** *Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:

  **(i)** as provided in Rule 35(b); or

  **(ii)** on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

**(E)** *Payment*. Unless manifest injustice would result, the court must require that the party seeking discovery:

  **(i)** pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and

  **(ii)** for discovery under (D), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions.

**(5)** *Claiming Privilege or Protecting Trial-Preparation Materials.*

**(A)** *Information Withheld*. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

**(B)** *Information Produced.* If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

**(c) Protective Orders.**

**(1)** *In General.* A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

**(A)** forbidding the disclosure or discovery;

**(B)** specifying terms, including time and place, for the disclosure or discovery;

**(C)** prescribing a discovery method other than the one selected by the party seeking discovery;

**(D)** forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;

**(E)** designating the persons who may be present while the discovery is conducted;

**(F)** requiring that a deposition be sealed and opened only on court order;

**(G)** requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and

**(H)** requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

**(2)** *Ordering Discovery.* If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery.

**(3)** *Awarding Expenses.* Rule 37(a)(5) applies to the award of expenses.

## (d) Timing and Sequence of Discovery.

**(1)** *Timing.* A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order.

**(2)** *Sequence.* Unless, on motion, the court orders otherwise for the parties' and witnesses' convenience and in the interests of justice:

**(A)** methods of discovery may be used in any sequence; and

**(B)** discovery by one party does not require any other party to delay its discovery.

## (e) Supplementing Disclosures and Responses.

**(1)** *In General.* A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:

**(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

**(B)** as ordered by the court.

**(2)** *Expert Witness.* For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

## (f) Conference of the Parties; Planning for Discovery.

**(1)** *Conference Timing.* Except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B) or when the court orders otherwise, the parties must confer as soon as practicable--and in any event at least 21 days before a scheduling conference is to be held or a scheduling order is due under Rule 16(b).

**(2)** *Conference Content; Parties' Responsibilities.* In conferring, the parties must consider the nature and basis of their claims and defenses and the possibilities for promptly settling or resolving the case; make or arrange for the disclosures required by Rule 26(a)(1); discuss any issues about preserving discoverable information; and develop a proposed discovery plan. The attorneys of record and all unrepresented parties that have appeared in the case are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan. The court may order the parties or attorneys to attend the conference in person.

**(3)** *Discovery Plan.* A discovery plan must state the parties' views and proposals on:

**(A)** what changes should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement of when initial disclosures were made or will be made;

**(B)** the subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused on particular issues;

**(C)** any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced;

**(D)** any issues about claims of privilege or of protection as trial-preparation materials, including--if the parties agree on a procedure to assert these claims after production--whether to ask the court to include their agreement in an order;

**(E)** what changes should be made in the limitations on discovery imposed under these rules or by local rule, and what other limitations should be imposed; and

**(F)** any other orders that the court should issue under Rule 26(c) or under Rule 16(b) and (c).

**(4)** *Expedited Schedule.* If necessary to comply with its expedited schedule for Rule 16(b) conferences, a court may by local rule:

**(A)** require the parties' conference to occur less than 21 days before the scheduling conference is held or a scheduling order is due under Rule 16(b); and

**(B)** require the written report outlining the discovery plan to be filed less than 14 days after the parties' conference, or excuse the parties from submitting a written report and permit them to report orally on their discovery plan at the Rule 16(b) conference.

**(g) Signing Disclosures and Discovery Requests, Responses, and Objections.**

**(1)** *Signature Required; Effect of Signature.* Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented--and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

  **(A)** with respect to a disclosure, it is complete and correct as of the time it is made; and

  **(B)** with respect to a discovery request, response, or objection, it is:

    **(i)** consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

    **(ii)** not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

    **(iii)** neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

**(2)** *Failure to Sign.* Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention.

**(3)** *Sanction for Improper Certification.* If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

## CREDIT(S)

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 30, 1970, effective July 1, 1970; April 29, 1980, effective August 1, 1980; April 28, 1983, effective August 1, 1983; March 2, 1987, effective August 1, 1987; April 22, 1993, effective December 1, 1993; April 17, 2000, effective December 1, 2000; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007; April 28, 2010, effective December 1, 2010.)

TAB 7

United States Code Annotated
    Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
        Title V. Disclosures and Discovery (Refs & Annos)

Federal Rules of Civil Procedure Rule 37

Rule 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions

Currentness

**(a) Motion for an Order Compelling Disclosure or Discovery.**

**(1)** ***In General.*** On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

**(2)** ***Appropriate Court.*** A motion for an order to a party must be made in the court where the action is pending. A motion for an order to a nonparty must be made in the court where the discovery is or will be taken.

**(3)** ***Specific Motions.***

**(A)** *To Compel Disclosure.* If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions.

**(B)** *To Compel a Discovery Response.* A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if:

**(i)** a deponent fails to answer a question asked under Rule 30 or 31;

**(ii)** a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a)(4);

**(iii)** a party fails to answer an interrogatory submitted under Rule 33; or

**(iv)** a party fails to respond that inspection will be permitted--or fails to permit inspection--as requested under Rule 34.

**(C)** *Related to a Deposition.* When taking an oral deposition, the party asking a question may complete or adjourn the examination before moving for an order.

**(4)** ***Evasive or Incomplete Disclosure, Answer, or Response.*** For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.

**(5)** *Payment of Expenses; Protective Orders.*

**(A)** *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

**(i)** the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

**(ii)** the opposing party's nondisclosure, response, or objection was substantially justified; or

**(iii)** other circumstances make an award of expenses unjust.

**(B)** *If the Motion Is Denied.* If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

**(C)** *If the Motion Is Granted in Part and Denied in Part.* If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

**(b) Failure to Comply with a Court Order.**

**(1)** *Sanctions Sought in the District Where the Deposition Is Taken.* If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending.

**(2)** *Sanctions Sought in the District Where the Action Is Pending.*

**(A)** *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

**(i)** directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

**(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

**(iii)** striking pleadings in whole or in part;

**(iv)** staying further proceedings until the order is obeyed;

**(v)** dismissing the action or proceeding in whole or in part;

**(vi)** rendering a default judgment against the disobedient party; or

**(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

**(B)** *For Not Producing a Person for Examination.* If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any of the orders listed in Rule 37(b)(2)(A)(i)-(vi), unless the disobedient party shows that it cannot produce the other person.

**(C)** *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

**(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.**

**(1)** *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

**(A)** may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

**(B)** may inform the jury of the party's failure; and

**(C)** may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

**(2)** *Failure to Admit.* If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:

**(A)** the request was held objectionable under Rule 36(a);

**(B)** the admission sought was of no substantial importance;

**(C)** the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or

**(D)** there was other good reason for the failure to admit.

**(d) Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.**

**(1)** *In General.*

**(A)** *Motion; Grounds for Sanctions.* The court where the action is pending may, on motion, order sanctions if:

**(i)** a party or a party's officer, director, or managing agent--or a person designated under Rule 30(b)(6) or 31(a)(4)--fails, after being served with proper notice, to appear for that person's deposition; or

**(ii)** a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

**(B)** *Certification.* A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

**(2)** *Unacceptable Excuse for Failing to Act.* A failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c).

**(3)** *Types of Sanctions.* Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

**(e) Failure to Provide Electronically Stored Information.** Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

**(f) Failure to Participate in Framing a Discovery Plan.** If a party or its attorney fails to participate in good faith in developing and submitting a proposed discovery plan as required by Rule 26(f), the court may, after giving an opportunity to be heard, require that party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the failure.

**CREDIT(S)**

   (Amended December 29, 1948, effective October 20, 1949; March 30, 1970, effective July 1, 1970; April 29, 1980, effective August 1, 1980; amended by Pub.L. 96-481, Title II, § 205(a), October 21, 1980, 94 Stat. 2330, effective October 1, 1981; amended March 2, 1987, effective August 1, 1987; April 22, 1993, effective December 1, 1993; April 17, 2000, effective December 1, 2000; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007; April 16, 2013, effective December 1, 2013.)

TAB 8



CANADA

| | |
|---|---|
| CONSOLIDATION | CODIFICATION |

# Patent Act

# Loi sur les brevets

R.S.C., 1985, c. P-4

L.R.C. (1985), ch. P-4

Current to August 5, 2014

À jour au 5 août 2014

Last amended on June 26, 2013

Dernière modification le 26 juin 2013

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

*Patent — August 5, 2014*

granted a patent, he shall refuse the application and, by registered letter addressed to the applicant or his registered agent, notify the applicant of the refusal and of the ground or reason therefor.

R.S., c. P-4, s. 42.

à obtenir la concession d'un brevet, il rejette la demande et, par courrier recommandé adressé au demandeur ou à son agent enregistré, notifie à ce demandeur le rejet de la demande, ainsi que les motifs ou raisons du rejet.

S.R., ch. P-4, art. 42.

Appeal to Federal Court

**41.** Every person who has failed to obtain a patent by reason of a refusal of the Commissioner to grant it may, at any time within six months after notice as provided for in section 40 has been mailed, appeal from the decision of the Commissioner to the Federal Court and that Court has exclusive jurisdiction to hear and determine the appeal.

R.S., 1985, c. P-4, s. 41; R.S., 1985, c. 33 (3rd Supp.), s. 16.

Appel à la Cour fédérale

**41.** Dans les six mois suivant la mise à la poste de l'avis, celui qui n'a pas réussi à obtenir un brevet en raison du refus ou de l'opposition du commissaire peut interjeter appel de la décision du commissaire à la Cour fédérale qui, à l'exclusion de toute autre juridiction, peut s'en saisir et en décider.

L.R. (1985), ch. P-4, art. 41; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16.

## GRANT OF PATENTS

## OCTROI DES BREVETS

Contents of patent

**42.** Every patent granted under this Act shall contain the title or name of the invention, with a reference to the specification, and shall, subject to this Act, grant to the patentee and the patentee's legal representatives for the term of the patent, from the granting of the patent, the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to adjudication in respect thereof before any court of competent jurisdiction.

R.S., 1985, c. P-4, s. 42; R.S., 1985, c. 33 (3rd Supp.), s. 16.

Contenu du brevet

**42.** Tout brevet accordé en vertu de la présente loi contient le titre ou le nom de l'invention avec renvoi au mémoire descriptif et accorde, sous réserve des autres dispositions de la présente loi, au breveté et à ses représentants légaux, pour la durée du brevet à compter de la date où il a été accordé, le droit, la faculté et le privilège exclusif de fabriquer, construire, exploiter et vendre à d'autres, pour qu'ils l'exploitent, l'objet de l'invention, sauf jugement en l'espèce par un tribunal compétent.

L.R. (1985), ch. P-4, art. 42; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16.

## FORM AND TERM OF PATENTS

## FORME ET DURÉE DES BREVETS

Form and duration of patents

**43.** (1) Subject to section 46, every patent granted under this Act shall be issued under the seal of the Patent Office, and shall bear on its face the filing date of the application for the patent, the date on which the application became open to public inspection under section 10, the date on which the patent is granted and issued and any prescribed information.

Délivrance

**43.** (1) Sous réserve de l'article 46, le brevet accordé sous le régime de la présente loi est délivré sous le sceau du Bureau des brevets. Il mentionne la date de dépôt de la demande, celle à laquelle elle est devenue accessible au public sous le régime de l'article 10, celle à laquelle il a été accordé et délivré ainsi que tout renseignement réglementaire.

Validity of patent

(2) After the patent is issued, it shall, in the absence of any evidence to the contrary, be valid and avail the patentee and the legal representatives of the patentee for the term mentioned in section 44 or 45, whichever is applicable.

R.S., 1985, c. P-4, s. 43; R.S., 1985, c. 33 (3rd Supp.), s. 16; 1993, c. 15, s. 42.

Validité

(2) Une fois délivré, le brevet est, sauf preuve contraire, valide et acquis au breveté ou à ses représentants légaux pour la période mentionnée aux articles 44 ou 45.

L.R. (1985), ch. P-4, art. 43; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16; 1993, ch. 15, art. 42.

# TAB 9

## EXPERT WITNESSES

### *Experts' Reports*

53.03  (1)  A party who intends to call an expert witness at trial shall, not less than 90 days before the pre-trial conference required under Rule 50, serve on every other party to the action a report, signed by the expert, containing the information listed in subrule (2.1). O. Reg. 438/08, s. 48.

**Note: On January 1, 2015, subrule (1) is amended by striking out "not less than 90 days before the pre-trial conference required under Rule 50" and substituting "not less than 90 days before the pre-trial conference scheduled under subrule 50.02 (1) or (2)". (See: O. Reg. 170/14, ss. 17, 26 (1))**

(2)  A party who intends to call an expert witness at trial to respond to the expert witness of another party shall, not less than 60 days before the pre-trial conference, serve on every other party to the action a report, signed by the expert, containing the information listed in subrule (2.1). O. Reg. 438/08, s. 48.

(2.1)  A report provided for the purposes of subrule (1) or (2) shall contain the following information:

1. The expert's name, address and area of expertise.
2. The expert's qualifications and employment and educational experiences in his or her area of expertise.
3. The instructions provided to the expert in relation to the proceeding.
4. The nature of the opinion being sought and each issue in the proceeding to which the opinion relates.
5. The expert's opinion respecting each issue and, where there is a range of opinions given, a summary of the range and the reasons for the expert's own opinion within that range.
6. The expert's reasons for his or her opinion, including,
    i. a description of the factual assumptions on which the opinion is based,
    ii. a description of any research conducted by the expert that led him or her to form the opinion, and
    iii. a list of every document, if any, relied on by the expert in forming the opinion.
7. An acknowledgement of expert's duty (Form 53) signed by the expert. O. Reg. 438/08, s. 48.

### *Schedule for Service of Reports*

(2.2)  Within 60 days after an action is set down for trial, the parties shall agree to a schedule setting out dates for the service of experts' reports in order to meet the requirements of subrules (1) and (2), unless the court orders otherwise. O. Reg. 438/08, s. 48.

### *Sanction for Failure to Address Issue in Report or Supplementary Report*

(3)  An expert witness may not testify with respect to an issue, except with leave of the trial judge, unless the substance of his or her testimony with respect to that issue is set out in,

(a) a report served under this rule; or

(b) a supplementary report served on every other party to the action not less than 30 days before the commencement of the trial. O. Reg. 348/97, s. 3.

TAB 10

1972 CarswellOnt 1010, [1972] 2 O.R. 280, 25 D.L.R. (3d) 386



1972 CarswellOnt 1010, [1972] 2 O.R. 280, 25 D.L.R. (3d) 386

### 80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd.

### 80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al.

Ontario Court of Appeal

MacKay, J.A., McGillivray, J.A., Brooke, J.A.

Oral reasons: February 25, 1972
Docket: None given.

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: B. Chernos, for plaintiff, appellant

R.G. Lord, for defendants, respondents

Subject: Property; Insolvency; Contracts

Sale of Land --- Agreement of purchase and sale — Assignment of rights and obligations under contract — By purchaser — Rights as between assignee and vendor

Purchaser assigning agreement — Registration of assignment on title to secure return of deposit — Application to expunge registration — Jurisdiction of Court — Judicature Act, R.S.O. 1970, c. 228, s. 19(1).

Plaintiff agreed to sell lands to F. but the transaction was not closed. F. assigned the agreement to C. and the assignment was registered on the title to the lands. Plaintiff subsequently agreed to sell the lands to another party and applied for an order expunging the assignment from the title. F. and C. counterclaimed asserting a lien against the property to secure return of the deposit paid to plaintiff. Plaintiff had offered adequate security for return of the deposit. Held, the application should be allowed. In view of the security offered, plaintiff had the right to have its title cleared. S. 19(1) of the Act gave the Court jurisdiction to make a mandatory order, even though interlocutory, directed to a party to the action, if it was just and convenient to do so, and in this way to require defendants to do such acts as might be necessary to effectively remove the assignment.

**Brooke, J.A.:**

1      This is an appeal from the order of the Honourable Mr. Justice Wright dated January 26, 1972, whereby he dismissed the plaintiff's application for an order expunging or vacating the assignment in writing of an agreement of purchase and sale from the title to the plaintiff's lands upon the plaintiff furnishing adequate security in

1972 CarswellOnt 1010, [1972] 2 O.R. 280, 25 D.L.R. (3d) 386

lieu of the interest in land, if any, created by the assignment.

2     The action arises out of an agreement of purchase and sale dated December 3, 1968, between the plaintiff and the defendant Fundy Bay Builders Limited of the plaintiff's lands which transaction was to close on June 30, 1970, but did not close. By assignment in writing dated December 30, 1968, the defendant Fundy Bay Builders Ltd. assigned the agreement to the defendant Cape Jones Securities Limited and this assignment was registered on the title to the plaintiff's lands on January 10, 1969, in the Registry Office for the Registry Division of the East and West Riding of the Country of York.

3      On October 2, 1970, the plaintiff commenced this action and the defendants served their defence and counterclaim on March 14, 1971. By an agreement in writing dated both February 25, 1971, and March 1, 1971, the plaintiff agreed to sell the lands in question for $415,000. The lands are subject to a first mortgage in the sum of $205,000 and this was so at the time of the proposed sale to the defendant Fundy Bay Builders Ltd. As a part of the purchase price in the pending transaction the plaintiff has agreed to take back a second mortgage of $130,000 (a sum which is $30,000 in excess of the amount claimed by the defendant in the pending action as a return of its deposit).

4     The material before Wright, J., made it clear that if the assignment in question is not removed from the title to the plaintiff's lands, the pending transaction will abort. The plaintiff proposes then that the second mortgage in the sum of $130,000 which bears interest at the rate of $8\,^1/_2$% per annum and matures on June 30, 1975, be held in trust pending the determination of the action in place of, and as security for, the lien which the defendants contend they are entitled to in the sum of $100,000 to secure the return of the deposit moneys which they have paid. It is significant that the lien, if it exists, was subsequent to the first mortgage above referred to.

5     Briefly, the action can be described as an action in which the plaintiff claims for an order to expunge the assignment of the agreement of purchase and sale from its title and for a judgment declaring that the defendants have no interest in the land. The plaintiff claims that the defendants were in default under the agreement and not entitled to the return of the deposit moneys and that the plaintiff terminated the contract. The defendants defend alleging the agreement of purchase and sale was unenforceable as it was void for uncertainty and, alternatively, that the plaintiff had failed to fulfill certain of its covenants in the agreement and, finally, that the defendants were ready, willing and able to carry out the transaction but that the plaintiff elected to terminate it and the defendants are therefore entitled to be repaid the deposit moneys together with interest.

6     The defendants assert a lien against the property to secure the return of the deposit moneys. By way of counterclaim the defendants claim for the lien and the return of the deposit moneys and interest and damages.

7     It appears Wright, J., believed that the security which was proposed was adequate but found that he had no jurisdiction to require the defendants to look to such security for satisfaction of their claim in lieu of the assignment. His brief reasons for judgment are as follows:

Although I agree with Mr. Teplitsky that what he offers is reasonably better than what the defendants now have, I consider that I have no power to force it on an unwilling defendant as trustee.

8     The plaintiff sought and obtained leave from the Honourable Mr. Justice Lerner to appeal to this Court, who, in his reasons expressly agreed with the view of Wright, J., with respect to the adequacy of the security proposed and after considering some of the authorities, concluded that there was good reason to doubt that there

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1972 CarswellOnt 1010, [1972] 2 O.R. 280, 25 D.L.R. (3d) 386

was an absence of jurisdiction to make the order sought.

9        In our view, Wright, J., was in error. As a superior Court of general jurisdiction, the Supreme Court of Ontario has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters. In *Re Michie Estate and City of Toronto et al.*, [1968] 1 O.R. 266 at pp. 268-9, 66 D.L.R. (2d) 213 at pp. 215-6, Stark, J., after considering the relevant provisions of the *Judicature Act* and the authorities, said:

> It appears clear that the Supreme Court of Ontario has broad universal jurisdiction over all matters of substantive law unless the Legislature divests from this universal jurisdiction by legislation in unequivocal terms. The rule of law relating to the jurisdiction of superior Courts was laid down at least as early as 1667 in the case of *Peacock v. Bell and Kendall* (1667), 1 Wms. Saund. 73 at p. 74, 85 E.R. 84:
>
>> ...And the rule for jurisdiction is, that nothing shall be intended to be out of the jurisdiction of a Superior Court, but that which specifically appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an Inferior Court but that which is so expressly alleged.

In *Board v. Board* (1919), 48 D.L.R. 13 at pp. 17-8, [1919] A.C. 956, [1919] 2 W.W.R. 940, Viscount Haldane for the Privy Council in dealing with the question of the nature of jurisdiction of a superior Court said:

> If the right exists, the presumption is that there is a Court which can enforce it, for if no other mode of enforcing it is prescribed, that alone is sufficient to give jurisdiction to the King's Courts of justice. In order to oust jurisdiction, it is necessary, in the absence of a special law excluding it altogether, to plead that jurisdiction exists in some other Court. This is the effect of authorities, such as the well-known judgment of Lord Mansfield in *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021, and the judgment of Lord Hardwicke in *Earl of Derby v. Duke of Athol* (1749), 1 Ves.Sen.201, 27 E.R.982. They are collected in the admirable opinion of Stuart, J., in the Supreme Court in the present case, from whose reasoning, as well as from the arguments employed by the other learned Judges there, their Lordships have derived much assistance. They only desire to add that independently of the rule just referred to, there is another principle of construction which would in their opinion have been by itself sufficient to dispose of the question whether the words of the Act of 1907 excluded matrimonial jurisdiction. That Act set up a superior Court, and it is the rule as regards presumption of jurisdiction in such a Court that, as stated by Willes, J., in *Mayor of London v. Cox* (1867) 2 E. & I. App. 239, at p. 259, nothing shall be intended to be out of the jurisdiction of a superior Court, but that which specially appears to be so.

10        In addition, and of importance, is that the justice of the situation requires a cause such as this will not fail for want of a remedy. In *Williams and Rees v. Local Union No. 1562 of United Mine Workers of America* (1919), 45 D.L.R. 150 at p. 178, [1919] 1 W.W.R. 217, 14 Alta. L.R. 251 [reversed on other grounds 59 S.C.R. 240, 49 D.L.R. 578, [1919] 3 W.W.R. 828], Beck, J., said, and I agree with his view:

> I believe my brother judges accept the opinion I expressed some time ago as follows: —

>> That every superior court is the master of its own practice is a proposition laid down by Tindal, C.J., in *Scales v. Cheese* (1844), 12 M. & W. 685, 152 E.R. 1374, and adopting this, I think that, without any statutory rules of practice, the court can, should a case arise, even though the law be fixed as to the substantial rights of the parties, award such remedies, though they be new, as may appear to be necessary

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1972 CarswellOnt 1010, [1972] 2 O.R. 280, 25 D.L.R. (3d) 386

to work out justice between the parties.

Where the plaintiff is desirous of selling its land and provides adequate security to meet its possible obligations to the defendants, surely it has a right to have its title cleared and proceed, and this Court has the power to make any order necessary in the circumstances. In my opinion, then, the Court had jurisdiction at law to deal with this matter in addition to its powers by reason of its equitable jurisdiction.

11      In my view, s. 19(1) of the *Judicature Act*, R.S.O. 1970, c. 228, gives to the Court jurisdiction to make a mandatory order, even though interlocutory, directed to a party to the action if it is just and convenient to do so and in this way to require the defendants here to do such acts as may be necessary as to effectively remove the assignment in question from the title to the lands. Here the defendants seek to invoke the Court's equitable jurisdiction by asserting a claim for lien against the lands to secure the return of the moneys which they have paid.

12      While I have some doubts that the defendants are able to assert such a claim in these circumstances, conceding for the moment that they are entitled to do so and will succeed, if they seek equity  — they must do equity. The security offered by the plaintiff is more than adequate and the defendants ought to be required to accept that security in lieu of the lien which they claim. The result to them is the same but the continuation of the registration of the assignment is a cause of loss to the plaintiff which ought to be avoided, if possible. On the face of it, it therefore appears just and convenient that the order sought should be made.

13      In all the circumstances, then, we think that Mr. Justice Wright was in error  — that he had jurisdiction to make the order sought before him and an order should go that upon the providing of the security proposed, which is a second mortgage on the property which matures June 30, 1975, in the sum of $130,000 bearing interest at the rate of $8\frac{1}{2}$% payable to the defendants and assigned to a trustee, to be agreed upon, to abide the outcome of this action, the defendants should remove from the title to the lands the assignment of the agreement of purchase and sale here in question.

14      The plaintiff is entitled to its costs of the motion before Wright, J., the application for leave to appeal and its costs in this Court.

15      *Appeal allowed*.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 11

  Federal Court of Appeal

**Date: 20131018**

**Docket: A-483-12**

**Citation: 2013 FCA 241**

CORAM:     NOËL J.A.
           GAUTHIER J.A.
           MAINVILLE J.A.

BETWEEN:

### HER MAJESTY THE QUEEN

**Appellant**

**and**

### 9101-2310 QUÉBEC INC.

**Respondent**

Heard at Montréal, Quebec, on September 9, 2013.

Judgment delivered at Ottawa, Ontario, on October 18, 2013.

REASONS FOR JUDGMENT BY:                          NOËL J.A.

CONCURRED IN BY:                                  GAUTHIER J.A.
                                                  MAINVILLE J.A.

  **Federal Court of Appeal**

**Date: 20131018**

**Docket: A-483-12**

**Citation: 2013 FCA 241**

CORAM:    NOËL J.A.
          GAUTHIER J.A.
          MAINVILLE J.A.

BETWEEN:

### HER MAJESTY THE QUEEN

**Appellant**

**and**

### 9101-2310 QUÉBEC INC.

**Respondent**

## REASONS FOR JUDGMENT

**NOËL J.A.**

[1]    This is an appeal from a decision of Justice Archambault of the Tax Court of Canada (the TCC judge) allowing the appeal of 9101-2310 Québec Inc. (the respondent or 2310) from an assessment made under subsection 160(1) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.), (the Act).

[2]     The purpose of this provision is to facilitate the collection of outstanding taxes by making the transferee in a property transfer made by a tax debtor solidarily liable for the latter's tax debt up to the value of the transferred property. In the present case, the assessment at issue holds 2310 solidarily liable for the tax debt of Alain-Guy Garneau (Mr. Garneau or the tax debtor) after the sum of $305,441.32 belonging to the tax debtor was deposited in 2310's bank account in the year 2002.

[3]     The TCC judge vacated the assessment on the ground that no transfer had taken place because the parties had entered into an agreement to the effect that the sum in question still belonged to the tax debtor despite the deposit.

[4]     For the reasons that follow, I would allow the appeal because, in light of the evidence, there was simulation within the meaning of article 1451 of the *Civil Code of Québec*, R.S.Q., c. C-1991 (C.C.Q.), and by application of article 1452 of the C.C.Q., the assessment made against the respondent is valid even if the ownership of the money remained unchanged.

## BACKGROUND

[5]     In 2002, an insurance company issued a cheque for $305,441.32 to Mr. Garneau as compensation for damages incurred when a building which he owned was destroyed by fire (Reasons at paragraph 5). At that time, Mr. Garneau, a resident of Val d'Or, in Abitibi, was embroiled in a considerable number of legal difficulties both civil and seemingly criminal (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 294, lines 1 to 13). In addition to being indebted to the fisc, Mr. Garneau owed a significant amount of money to the Federal Business Development Bank (FBDB) which had already seized some of his assets (Reasons at paragraphs 5

and 10; testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 348 and page 293, lines 12 to 17).

[6]    Before the TCC judge, the respondent took the position that had Mr. Garneau deposited the insurance proceeds in his own bank account, they would have been seized by the FBDB. The TCC judge accepted this testimony (Reasons at paragraph 5). In fact, Mr. Garneau did not have a personal bank account, for fear of having it seized (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at pages 295 and 296). He nonetheless wanted to have access to this money. These are the circumstances that led Mr. Garneau to agree to rely on Daniel Pratte, a long-time friend who offered to deposit the funds in the bank account of 2310 (Reasons at paragraph 5), a company held by Mr. Pratte in which Mr. Garneau had no interest and to which he had no apparent connection (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 317, lines 12 to 25).

[7]    Mr. Pratte described the circumstances leading to the deposit into 2310's account as follows (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 295, lines 15 to 25, and at page 296, lines 1 and 2):

> [TRANSLATION]
> It came out that the . . . It happened in Amos, and at one point, Alain came and said, "Look, I've settled." That's what he told us. We had a beer on Friday or Thursday: "I've settled, etcetera, etcetera." Then later, at one point, we were all alone, and he said, "So, I have a cheque for $305,000, and I don't have a bank account." Because we knew what was going on, you know? Everything was seized, I think, at that time. So, I thought about it, and I told him, "Well, maybe one of my companies could help you out by depositing it and managing it for you. . . .

[8]    The cheque was deposited in 2310's account. The TCC judge does not explain how the cheque was delivered, but according to the evidence, Mr. Garneau endorsed the cheque made out in his name by the insurance company and gave it to Mr. Pratte, who then deposited it in 2310's account (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 296, lines 7 to 11, at page 298, lines 19 to 25, and at page 299, lines 1 to 7; deposit slip, Appeal Book, Vol. 1 at page 154).

[9]    In order to confirm that the money remained his, Mr. Garneau signed a letter addressed to Mr. Pratte in his capacity as president of 2310, dated March 23, 2002, the contents of which read as follows (Appeal Book, Vol. 1 at page 70):

> [TRANSLATION]
> I hereby request that, through your company, you manage the money that I deposit in your account for the purpose of paying my accounts due or that become due in the future.
>
> I therefore release you from liability for income tax and other implications of the effects that may result.

[10]    Mr. Pratte explained that he was the one who had requested this letter. He recounts the discussions he had with Mr. Garneau on this subject as follows (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 296, lines 11 to 17):

> [TRANSLATION]
> So, well, sign me a paper to the effect that this has nothing to do with me. I'll put it in that account because you need a bank account, and when you ask me for cheques, I'll write you cheques for the amount you want because I don't want this to have any real-life impact . . . .

[11]  Mr. Garneau ended up settling his dispute with the FBDB which appears to have accepted a lesser amount than that which it was seeking to collect (*idem* at page 296, lines 24 and 25, and at page 297, lines 1 to 3). The evidence showed that even after this settlement, 2310 held on to what remained of the deposited funds until there was nothing left. When asked why the set-up remained in place, Mr. Pratte explained that after the settlement, [TRANSLATION] "Mr. Garneau's business [was not doing] much better" (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at page 310, line 16).

[12]  The deposited funds were paid out by 2310 in accordance with Mr. Garneau instructions, as he saw fit. A little more than half of the funds were used to pay the sum that he had agreed to give to the FBDB (Reasons at paragraph 6). Some of Mr. Garneau's current expenses were paid using these funds, and a significant portion was returned to Mr. Garneau and his children (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at pages 336 to 341; cheques and reconciliation, Appeal Book, Vol. 1 at pages 113, 199 to 201, 203, 204, 214, 338 and 340).

[13]  The evidence showed that Mr. Garneau had access to a debit card for a short period, but Mr. Pratte stated that he himself had made all the withdrawals (testimony of Mr. Pratte, transcript, Appeal Book, Vol. 2 at pages 334 and 335).

[14]  Mr. Garneau declared bankruptcy in 2007, and his tax debt has remained unpaid.

[15]  Assuming that the deposit of funds into 2310's account was a transfer within the meaning of subsection 160(1) of the Act, the Minister of National Revenue (the Minister) issued an assessment

holding 2310 solidarily liable for Mr. Garneau's tax debt, which totalled $63,433.46 at the time of the deposit.

[16]  The only argument that the respondent raised against this assessment in the notice of appeal filed in the Tax Court of Canada was that the tax debtor and 2310 were dealing with each other at arm's length at the time of the deposit (Notice of Appeal, Appeal Book, Vol. 1 at page 50). The issue of whether or not ownership of the deposited funds had been transferred was not raised until the matter came to trial. It was in this context that Mr. Pratte produced the letter dated March 23, 2002, in order to show that the funds continued to belong to Mr. Garneau.

[17]  The evidence otherwise revealed that Mr. Garneau divested himself of other assets during the same period and that subsection 160(1) was also invoked with respect to these transfers (testimony of Nathalie Laurier, Appeal Book, Vol. 2 at page 379, lines 15 to 23).

[18]  Subsection 160(1) reads as follows:

| | |
|---|---|
| **160.** (1) Where a person has, on or after May 1, 1951, transferred property, either directly or indirectly, by means of a trust or by any other means whatever, to | **160.** (1) Lorsqu'une personne a, depuis le 1er mai 1951, transféré des biens, directement ou indirectement, au moyen d'une fiducie ou de toute autre façon à l'une des personnes suivantes : |
| (*a*) the person's spouse or common-law partner or a person who has since become the person's spouse or common- law partner, | *a*) son époux ou conjoint de fait ou une personne devenue depuis son époux ou conjoint de fait; |
| (*b*) a person who was | *b*) une personne qui |

under 18 years of age, or

 (*c*) a person with whom the person was not dealing at arm's length,

the following rules apply:

 (*d*) the transferee and transferor are jointly and severally liable to pay a part of the transferor's tax under this Part for each taxation year equal to the amount by which the tax for the year is greater than it would have been if it were not for the operation of sections 74.1 to 75.1 of this Act and section 74 of the *Income Tax Act*, chapter 148 of the Revised Statutes of Canada, 1952, in respect of any income from, or gain from the disposition of, the property so transferred or property substituted therefor, and

 (*e*) the transferee and transferor are jointly and severally liable to pay under this Act an amount equal to the lesser of

 (i) the amount, if any, by which the fair market value of the property at the time it was transferred exceeds the fair market value at that time of the consideration given for the property, and

 (ii) the total of

---

était âgée de moins de 18 ans;

 *c*) une personne avec laquelle elle avait un lien de dépendance,

les règles suivantes s'appliquent :

 *d*) le bénéficiaire et l'auteur du transfert sont solidairement responsables du paiement d'une partie de l'impôt de l'auteur du transfert en vertu de la présente partie pour chaque année d'imposition égale à l'excédent de l'impôt pour l'année sur ce que cet impôt aurait été sans l'application des articles 74.1 à 75.1 de la présente loi et de l'article 74 de la *Loi de l'impôt sur le revenu*, chapitre 148 des Statuts revisés du Canada de 1952, à l'égard de tout revenu tiré des biens ainsi transférés ou des biens y substitués ou à l'égard de tout gain tiré de la disposition de tels biens;

 *e*) le bénéficiaire et l'auteur du transfert sont solidairement responsables du paiement en vertu de la présente loi d'un montant égal au moins élevé des montants suivants :

 (i) l'excédent éventuel de la juste valeur marchande des biens au moment du transfert sur la juste valeur marchande à ce moment de la contrepartie donnée pour le bien,

 (ii) le total des

| | |
|---|---|
| all amounts each of which is an amount that the transferor is liable to pay under this Act in or in respect of the taxation year in which the property was transferred or any preceding taxation year, | montants dont chacun représente un montant que l'auteur du transfert doit payer en vertu de la présente loi au cours de l'année d'imposition dans laquelle les biens ont été transférés ou d'une année d'imposition antérieure ou pour une de ces années; |
| but nothing in this subsection shall be deemed to limit the liability of the transferor under any other provision of this Act.<br>… | aucune disposition du présent paragraphe n'est toutefois réputée limiter la responsabilité de l'auteur du transfert en vertu de quelque autre disposition de la présente loi.<br>[…] |

## DECISION OF THE TAX COURT OF CANADA

[19]  The TCC judge devoted most of his reasons to the arguments of the appellant (respondent before him) that were based on the decision of this Court in *Canada v. Livingston*, 2008 FCA 89 (*Livingston*). He categorically rejected the argument that *Livingston* establishes that any deposit that a tax debtor seeking to evade paying tax makes into the account of a non-arm's length person is a transfer within the meaning of subsection 160(1).

[20]  According to the TCC judge, a deposit of money into a third party's account may constitute a transfer, but such is not necessarily the case (Reasons at paragraph 58). In order for there to be a transfer for the purposes of subsection 160(1), the transferor must intend to transfer ownership of the deposited funds to the transferee (Reasons at paragraph 84). In other words, there must be a transfer of ownership of the sum in question.

[21]  Furthermore, if the rule laid down in *Livingston* is that depositing funds in a third party's

account constitutes a transfer even if the tax debtor retains ownership of the deposited funds, as

counsel for the appellant submit, then *Livingston* marks a departure from settled law and was

rendered without regard for the traditional approach and the legal precedents that apply in such

cases (Reasons at paragraph 47). The TCC rejected the interpretation proposed by counsel for the

appellant (Reasons at paragraph 58).

[22]  After analyzing the facts and the law, the TCC judge concluded that despite the deposit in

2310's account, no transfer of ownership to 2310 had taken place.

[23]  Indeed, Mr. Garneau had no intention of transferring to 2310 ownership of the funds.

Although the arrangement was designed to conceal from the FBDB the fact that these funds were

part of the tax debtor's patrimony in order to prevent them from being seized, the agreement as

reflected in the letter dated March 23, 2002, was to the effect that the tax debtor remained the owner

of this money, which was to be paid out in accordance with his instructions under a mandate

governed by the C.C.Q. Therefore, there had been no transfer within the meaning of

subsection 160(1).

[24]  Regarding the non-arm's length relationship requirement set out in paragraph 160(1)(*c*), the

TCC judge held as follows (Reasons at paragraph 83):

> . . . [S]ince there has been no transfer of ownership between the two parties, it is
> difficult to determine how the existence of a *de facto* non-arm's length relationship
> between 2310 and Mr. Garneau could be established. There was no statutory non-
> arm's length relationship between the parties, since Mr. Garneau and Mr. Pratte
> were unrelated to each other. Under the contract of mandate, 2310 was required to

carry out Mr. Garneau's instructions—specifically, to pay his debts. Under such circumstances, there is no reason to be concerned with the concept of non-arm's length relationship because, by definition, a mandatary must always follow his mandator's instructions and because, for income tax purposes, no transfer has been made between the mandator and the mandatary.

[25]   Considering the intended effect of depositing the funds in 2310's account, and considering the

agreement of March 23, 2002, which confirmed that despite the deposit, Mr. Garneau was still the

owner of the funds, the TCC judge felt it necessary to add on his own initiative a few remarks

concerning simulation in Quebec law (Reasons at paragraphs 67 and 68):

> [67]     There is no doubt that, if Mr. Garneau had represented to the tax authorities that the amount remitted to 2310 was no longer in his patrimony because there had been a transfer of ownership, and if he had given them an apparent contract or a document supporting this description of the transaction even though a counter-letter created a contract of mandate, the situation would have been different. In such an event, the Minister could have relied on the apparent contract to recover the amounts owed to him by making an assessment under subsection 160(1) of the Act, and, under articles 1451 *et seq.* of the [C.C.Q.], he could have disregarded the hidden contract. In this regard, see *inter alia* my decision in *Bolduc v. The Queen*, [2002] T.C.J. No. 664 (QL), 2003 DTC 221, affirmed by the Federal Court of Appeal, 2003 FCA 411, 2003 DTC 5735, [2004] 2 C.T.C. 173. It should be noted here that the Reply to the Notice of Appeal alleges no simulation on Mr. Garneau's part in handing over the sum of $305,441.32 to 2310. Nor did the evidence adduced at the hearing disclose the existence of such a simulation.

> [68]     It is important to note that the amount deposited in 2310's bank account was used to pay off debts of Mr. Garneau or of certain members of his family. Under such circumstances, it is difficult to see how a third party could have believed that the payments made by 2310 were being made on its own behalf, since the creditor knew perfectly well that the debtor was Mr. Garneau or a member of his family, not 2310. Therefore, there is no ground to find that a simulation existed here.

## POSITIONS OF THE PARTIES

[26]  First, the appellant submits that the TCC judge erred in construing the notion of a transfer for the purposes of applying subsection 160(1) and that his interpretation was inconsistent with the object and spirit of this provision. The purpose of subsection 160(1) is to prevent the Minister's efforts to collect taxes owing to him from being thwarted (Appellant's Memorandum at paragraph 41). The appellant argues that the TCC judge was bound to apply the decision of this Court in *Livingston*, which according to the appellant establishes that any deposit made by a tax debtor in a third party's bank account is a transfer within the meaning of section 160 (Appellant's Memorandum at paragraph 43).

[27]  On a different note, the appellant maintains that the tax debtor's intention was to elude his creditors and that in order to achieve this goal, there had to be a transfer of ownership, if only in appearance (Appellant's Memorandum at paragraph 46).

[28]  If there is a mandate, as the TCC judge concluded, the appellant submits that it has no effect as against the Minister (Appellant's Memorandum at paragraphs 54 and 60). In allowing the funds to be deposited in its own account, 2310 acted as a front and allowed the tax debtor to hide from third parties, including the FBDB, the fact that he was the owner of these funds (Appellant's Memorandum at paragraph 58). Therefore, in accordance with articles 1451 and 1452 of the C.C.Q., the Minister could avail himself of the appearance of a transfer created by the parties (Appellant's Memorandum at paragraph 63).

[29]  Furthermore, the evidence shows that there was a non-arm's length relationship between Mr. Pratte and 2310 on the one hand and the tax debtor on the other because even though they are not persons related by blood or marriage, they all acted in concert to allow the tax debtor to hide his assets (Appellant's Memorandum at paragraphs 76 et 77).

[30]  The appellant added at the hearing that in any event, Mr. Pratte's mandate had an unlawful object and that, in light of article 1413 of the C.C.Q., the TCC judge could not enforce it. On this point, the appellant cites the decision of the Court of Appeal of Québec in *Durand c. Drolet*, 1993 CanLII 4058 (QC CA) at page 11.

[31]  The respondent, on the other hand, submits that the TCC judge reached the right conclusion. Subsection 160(1) of the Act cannot apply unless there is a transfer of the ownership of the funds in the account. In the present case, since each party's patrimony remained unchanged, there cannot have been a transfer, and subsection 160(1) cannot apply (Respondent's Memorandum at paragraph 29).

[32]  According to the respondent, it is incorrect to claim that the sole reason for the agreement was to remove the cheque in the amount of $305,441.32 from the tax debtor's patrimony (Respondent's Memorandum at paragraph 32). The goal was also to give the tax debtor time to settle his dispute with the FBDB and, [TRANSLATION] "above all", was necessary because the tax debtor did not have a bank account (Respondent's Memorandum at paragraph 34).

[33]  Finally, it is inaccurate to speak of a counter letter because the transactions made do not

suggest that there was a transfer of ownership. On the contrary, the only contract between the parties

is the contract of mandate, as reflected in the letter dated March 23, 2002 (Respondent's

Memorandum at paragraph 36).


## ANALYSIS AND DECISION

[34]  To dispose of the appeal, it is enough to refer to the testimony of Mr. Pratte before the TCC

judge, according to which the cheque was given to Mr. Pratte and deposited in 2310's account in

order to prevent the funds from being seized in the hands of the tax debtor. The only inference that

can be drawn from this testimony is that the FBDB would have seized these funds if Mr. Garneau

had let it be known that they belonged to him. In the present case, in giving the endorsed cheque to

Mr. Pratte so that he could deposit it in 2310's account, the tax debtor gave the impression that the

money belonged to 2310 despite the fact that, according to the agreement with Mr. Pratte, the

money remained his. This amounts to a simulation within the meaning of article 1451 of the C.C.Q.:

**1451.** Simulation exists where the parties agree to express their true intent, not in an apparent contract, but in a secret contract, also called a counter letter.

Between the parties, a counter letter prevails over an apparent contract.

**1451.** Il y a simulation lorsque les parties conviennent d'exprimer leur volonté réelle non point dans un contrat apparent, mais dans un contrat secret, aussi appelé contre-lettre.

Entre les parties, la contre-lettre l'emporte sur le contrat apparent.

[35]  When the Minister takes collection action, he may avail himself of the apparent contract, just

as the FBDB could have done (*Transport H. Cordeau Inc. v. Canada*, [1999] F.C.J. No. 1659

(FCA) (QL); *Garas c. Canada (Procureur général)*, 2009 QCCS 2838, aff'd 2011 QCCA 528;

*Vigneault v. Canada*, [2001] T.C.J. No. 880 (QL); *Bolduc v. Canada*, [2002] T.C.J. No. 664 (QL),

aff'd 2003 CAF 411). Such is the effect of article 1452 of the C.C.Q.:

| | |
|---|---|
| **1452.** Third persons in good faith may, according to their interest, avail themselves of the apparent contract or the counter letter; however, where conflicts of interest arise between them, preference is given to the person who avails himself of the apparent contract. | **1452.** Les tiers de bonne foi peuvent, selon leur intérêt, se prévaloir du contrat apparent ou de la contre-lettre, mais s'il survient entre eux un conflit d'intérêts, celui qui se prévaut du contrat apparent est préféré. |

[36]  The fact that Mr. Pratte stated before the TCC judge that he had been unaware of

Mr. Garneau's tax debt (Reasons at paragraph 10) is irrelevant for the purposes of applying

subsection 160(1) (*Wannan v. Canada*, 2003 FCA 423 at paragraph 3). Mr. Garneau, on the other

hand, was well aware of this debt, and what is important for our purposes he and Mr. Pratte knew

that the set-up could have the desired effect on any unsuspecting creditor. On this point, I note that

Mr. Pratte explained during his testimony that the remaining funds in 2310's account were not

returned to Mr. Garneau after the settlement with the FBDB was reached, specifically because

Mr. Garneau was still having financial problems (testimony of Mr. Pratte, transcription, Vol. 2 at

page 310, line 16). The only conclusion that can be drawn from this testimony is that the set-up

remained useful vis-à-vis other creditors.

[37]  Contrary to what the TCC judge writes at paragraph 67 of his reasons, the tax debtor did not

have to "represent" to the tax authorities that the funds did not belong to him in order for

article 1452 to operate in favour of the Minister (Reasons at paragraph 67). It is enough that he

made it appear to third parties that the funds belonged to 2310 when in reality they were part of his patrimony.

[38]  The TCC judge's comments at paragraph 68 of his reasons to the effect that it is difficult to see how a third party could have been misled by the arrangement is contradicted by the evidence because the desired objective in respect of the FBDB—as the TCC judge himself identified it—was achieved. Moreover, as is explained above, the only reason for keeping the set-up in place after the settlement with the FBDB had been reached was that it remained effective as against other creditors.

[39]  Regarding the existence of a non-arm's length relationship between the tax debtor on the one hand and Mr. Pratte and his company on the other, the evidence could not be any clearer. Mr. Pratte, by allowing the tax debtor to use 2310's bank account to conceal the fact that the tax debtor was the true owner of the deposited funds, worked in concert with the tax debtor, acting strictly as a front (testimony of Mr. Pratte, Appeal Book, Vol. 2 at page 303, lines 18 to 25). A non-arm's length relationship may arise from the legal relationship between the parties or from the factual situation (*Swiss Bank Corporation v. M.R.N.*, [1974] S.C.R. 1144). Based on the facts the tax debtor was not dealing at arm's length with Mr. Pratte and his company.

[40]  Finally, it is true that the Minister did not raise simulation in his reply to the notice of appeal, but this does not preclude the appellant's argument (Reasons at paragraph 67). The evidence adduced before the TCC judge shows that the arrangement was designed to remove the amount of the cheque from the tax debtor's assets and place it beyond the reach of his creditors, and the TCC judge was obliged to make a finding that is consistent with this evidence. In my opinion, the TCC

judge drew a conclusion that was contradicted by the evidence in holding that there was no simulation.

[41]  It follows that the Minister was entitled to rely on the apparent transfer made by the parties. Thus the liability of 2310 is engaged by the combined effect of article 1452 of the C.C.Q. and subsection 160(1).

- *Livingston*

[42]  I think it is nevertheless useful to comment briefly on the impact of this Court's decision in *Livingston* on the case at hand, given the controversy that *Livingston* has raised, as evidenced by the reasons of the TCC judge (Reasons at paragraphs 41 to 66).

[43]  Before I address that decision, it is helpful to refer to the definition of "property" in subsection 248(1) of the Act:

| | |
|---|---|
| "*property*" – "property" means property of any kind whatever whether real or personal or corporeal or incorporeal and, without restricting the generality of the foregoing, includes | « *biens* » - « biens » Biens de toute nature, meubles ou immeubles, corporels ou incorporels, y compris, sans préjudice de la portée générale de ce qui précède : |
| (*a*) a right of any kind whatever, a share or a chose in action, | *a*) les droits de quelque nature qu'ils soient, les actions ou parts; |
| (*b*) unless a contrary intention is evident, money, | *b*) à moins d'une intention contraire évidente, l'argent; |
| (*c*) a timber resource property, and | *c*) les avoirs forestiers; |

<table>
<tr><td>(<em>d</em>) the work in progress of a business that is a profession;</td><td><em>d</em>) les travaux en cours d'une entreprise qui est une profession libérale.</td></tr>
</table>

[44]  A brief comment on the role of provincial law in the application of the Act is also appropriate. It is settled law that unless Parliament provides otherwise, the private law of the provinces plays a suppletive role (see section 8.1 of the *Interpretation Act*, R.S.C., 1985, c. I-21), so that a transfer of the ownership of property for the purposes of the Act takes place where ownership has changed under the civil law of Quebec or the common law of each of the other provinces of Canada depending on where the cause of action arises.

[45]  According to the C.C.Q., ownership consists of the right to use, enjoy and dispose of property fully and freely, subject to the limits and conditions determined by law (article 947 of the C.C.Q.), such that intent to divest oneself of all these attributes and a concurrent intent to acquire them give rise to a change in ownership of the property in question.

[46]  The common law does not provide a clear definition of ownership. It does however consist of two elements, legal title and beneficial ownership, which confer very distinct rights. As the decision of the Supreme Court in *Pecore v. Pecore*, [2007] 1 S.C.R. 795 (*Pecore*), illustrates, the nature of these rights can only be understood from an historical perspective (*Pecore* at paragraph 84):

> . . . In the 15th century, it was not uncommon for landowners in England to have title to their property held by other individuals on the understanding that it was being held for the "use" of the landowner and subject to his direction. This had the effect of separating legal [title] and beneficial ownership. The purpose of the scheme was to avoid having to pay feudal taxes when land passed from a landowner to his heir.

[47]  For our purposes, there is no need to delve deeper into these two forms of ownership under the common law, except to note that despite their dual nature (*Pecore* at paragraph 4),

> . . . [t]he beneficial owner of property has been described as "the real owner of property even though it is in someone else's name": *Csak v. Aumon* (1990), 69 D.L.R. (4th) 567 (Ont. H.C.J.), at p. 570. . . .

[48]  This explains why for tax purposes one is usually concerned with beneficial ownership and legal title is of little consequence when the common law applies (see for example the following cases, which confirm that where these two forms of ownership are separated, property cannot be disposed of – *i.e.* sold – for the purposes of the Act unless the seller divests him or herself of the beneficial ownership of the property: *M.N.R. v. Wardean Drilling Limited*, 69 D.T.C. 5194 (Exchequer Court); *The Queen v. Henuset Bros. Ltd.*, 1977 C.T.C. 228, 77 D.T.C. 5169 (TCC); *Kamsel Leasing Inc. v. Canada (M.N.R.)*, [1993] T.C.J. No. 12 (QL); *Gartz v. Canada*, [1994] T.C.J. No. 240 (QL)).

[49]  *Livingston* deals with a situation that is similar to the one at issue here, but the facts arose in British Columbia. In order to help a tax debtor hide funds from the tax authorities and prevent their seizure, Ms. Livingston allowed the tax debtor to deposit the funds in question in her personal bank account. The scheme worked, and the tax debtor eventually declared bankruptcy without paying the income tax she owed. The Minister relied on subsection 160(1) to hold Ms. Livingston jointly and severally liable for the tax debtor's debt, arguing that there had been a transfer of the funds deposited in Ms. Livingston's bank account.

[50]  The Court of Appeal confirmed the assessment. It rejected the appellant's argument that there had been no transfer because beneficial ownership of the deposited funds remained with the tax debtor (*Livingston* at paragraph 20).

[51]  Relying on a contextual interpretation of subsection 160(1), the Court concluded that, in the circumstances, it was enough that the tax debtor had transferred legal title in the deposited funds to Ms. Livingston for subsection 160(1) to apply. Even though this provision applies without regard to the intention of the parties, the Court found the fact that Ms. Livingston and the tax debtor had conspired in order to deceive the tax authorities to be "crucial" (*Livingston* at paragraph 12).

[52]  The crux of the argument raised by Ms. Livingston and of the Court's reasons for rejecting that argument emerges from the following paragraphs (*Livingston* at paragraphs 20, 21 and 22):

> [20]    . . . The respondent argues that depositing funds into a bank account is not, in and of itself, a transfer of property to the account holder. Rather, there must also be a divesting by the transferor of the funds deposited into the bank account, which, it is submitted, never occurred. As a result, claims the respondent, there was no transfer of property, and the beneficial title to the funds remained with Ms. Davies, and not the respondent. The respondent therefore asks the Court to find a resulting trust to Ms. Davies. I do not find this argument at all convincing.
>
> [21]    The deposit of funds into another person's account constitutes a transfer of property. To make the point more emphatically, the deposit of funds by Ms. Davies into the account of the respondent permitted the respondent to withdraw those funds herself anytime. The property transferred was the right to require the bank to release all the funds to the respondent. The value of the right was the total value of the funds.
>
> [22]    In addition, there is a transfer of property for the purposes of section 160 even when beneficial ownership has not been transferred. Subsection 160(1) applies to any transfer of property—"by means of a trust or by any other means whatever". Thus, subsection 160(1) categorizes a transfer to a trust as a transfer of property. Certainly, even where the transferor is the beneficiary under the trust, nevertheless, legal title has been transferred to the trustee. Obviously, this

constitutes a transfer of property for the purposes of subsection 160(1) which, after all, is designed, *inter alia*, to prevent the transferor from hiding his or her assets, including behind the veil of a trust, in order to prevent the [Canada Revenue Agency] from attaching the asset. Therefore it is unnecessary to consider the respondent's argument that beneficial title to the funds remained with Ms. Davies.

[Emphasis added.]

[53] The rule to be gleaned from this decision, as I understand it, is that the transfer of legal title in a sum of money may give rise to a transfer for the purposes of subsection 160(1) where it is intended to conceal the fact that the tax debtor is the beneficial owner of this sum and thwart the tax authorities' collection efforts.

[54] It is neither necessary nor appropriate to consider the merits of this rule in the context of the present case because being based on the common law, it does not apply in Quebec. The TCC judge's task was to analyze the legal relationship between the parties in accordance with the C.C.Q., which is what he did.

[55] This analysis led him to conclude that Mr. Pratte was holding the tax debtor's funds pursuant to a mandate and that the amounts remained those of the tax debtor. This conclusion is grounded in the evidence and gives effect to the provisions of the C.C.Q. that governed the relationship (articles 2130, 2132, 2133 and 2146). It is also consistent with article 911 of the C.C.Q., which deals with an administrator who has title to property belonging to someone else.

[56] The TCC judge also considered whether the mandatary's right to withdraw from its account the funds that belonged to the tax debtor could give rise to a transfer of property for the purposes

of subsection 160(1) (Reasons at paragraph 55). This right to withdraw funds is an incident of the mandate given by the tax debtor and is in the nature of a personal right from a civil law perspective.

[57] A personal right may be considered to be property within the meaning of articles 899 to 907 of the C.C.Q.—more specifically, incorporeal movable property—so long as it has some economic value (Pierre-Claude Lafond, *Précis de droit des biens*, 2d ed. Montréal: Thémis, 2007, at page 35). In the present case, the TCC judge enquired into the economic value of the mandatary's right to access the money belonging to the tax debtor and found that there was none, given the mandatary's obligation to withdraw the funds for the sole benefit of the tax debtor (Reasons at paragraph 56).

[58] This conclusion is consistent with the evidence. The value of the transferred property must be established at the moment of the alleged transfer (*Heavyside v. Canada*, [1996] F.C.J. No. 1608 (C.A.) (QL) at paragraph 9), and it is impossible to attribute any value to this right unless one accepts as a given that the mandatary was going to use the right to withdraw funds for his personal benefit. This requires that we assume that the mandatary would act contrary to the mandate conferred upon him. Under the civil law, good faith is to be presumed (article 6 of the C.C.Q.), and governs the conduct of the parties to a contract throughout from the moment when it is entered into (article 1375 of the C.C.Q.). The TCC judge correctly concluded that the right to withdraw funds had no value.

[59]  Accordingly,  this right  was not property under the civil law,  and in any event,  the
attribution  of this right  was of no consequence  because subsection  160(1) limits  a transferee's
liability  to the value  of the transferred  property.

[60]  I believe  it useful  to add that the sole purpose of subsection  160(1) is to protect the integrity
of the tax debtor's patrimony.  This provision  has been described  as a draconian  measure  because
it applies  even if the transfer  is made in good faith  – *i.e.* not for tax reasons  – and because  it
allows  tax to be collected  from a person other than the primary  debtor,  without  any time
limitation  and without  regard to what may have happened  to the property  transferred  or its value
since the transfer.  In short, subsection  160(1) protects the tax authorities  against  any
vulnerability  that may result  from a transfer  of property  between non-arm's  length  persons for a
consideration  that is less than fair market value  regardless  of the circumstances  which  give rise
to the transfer.

[61]  Given the intended  purpose,  there is no basis for applying  subsection  160(1) where the tax
debtor's  patrimony  remains  intact.  The problems  stemming  from simulated  property  transfers  are
undeniable,  but they are not among the problems  that subsection  160(1) was intended  to solve.  In
contrast,  articles  1451 and 1452 of the C.C.Q. which  were designed  to foil simulation,  do address
these problems,  where  applicable.

[62]  Finally,  I would note that in *Yates v. Canada*, 2009 FCA 50 (*Yates*), this Court does not
give  subsection  160(1) the effect  that counsel for appellant  argue it has (Appellant's
Memorandum  at paragraph 43). The Court's  finding  in that case was based on the fact that

Mr. Yates had "divested himself" of the funds deposited into his wife's account (*Yates* at paragraph 5). The trial judge in that case had held that the deposit evidenced a transfer in favour of his wife (2007 TCC 498 at paragraph 15). The only issue to be resolved was whether the wife had given any consideration for the transfer (*Yates* at paragraphs 6 to 21).

[63]  I therefore conclude that the TCC judge was right to reject the argument of counsel for the appellant that *Livingston* dictated the outcome of the appeal before him.

## **DISPOSITION**

[64]  On the basis of the conclusion I reach at paragraph 41 of these reasons, I would allow the appeal with costs, set aside the decision of the TCC judge and, rendering the decision that should have been rendered, dismiss the appeal of 2310 with costs.

<div style="text-align:right">

_____
"Marc Noël"
J.A.

</div>

"I agree
    Johanne Gauthier J.A."

"I agree
    Robert M. Mainville J.A."

Certified true translation

## FEDERAL COURT OF APPEAL

## SOLICITORS OF RECORD

**DOCKET:**                          A-483-12

**(APPEAL FROM A JUDGMENT OF THE HONOURABLE MR. JUSTICE ARCHAMBAULT OF THE TAX COURT OF CANADA DATED JUNE 12, 2012, DOCKET NO. 2009-2880(IT)G.)**

**DOCKET:**                                              A-483-12

**STYLE OF CAUSE:**                              HER MAJESTY THE QUEEN v.
                                                            9101-2310 QUÉBEC INC.

**PLACE OF HEARING:**       MONTRÉAL, QUEBEC

**DATE OF HEARING:**       SEPTEMBER 9, 2013

**REASONS FOR JUDGMENT**
**BY:**    NOËL J.A.

**CONCURRED IN BY:**                         GAUTHIER J.A.
                                                             MAINVILLE J.A.

**DATED:**       OCTOBER 18, 2013

**APPEARANCES:**

Sophie-Lyne Lefebvre                         FOR THE APPELLANT
Benoît Mandeville

Simon Corbeil                                     FOR THE RESPONDENT

**SOLICITORS OF RECORD:**

William F. Pentney                             FOR THE APPELLANT
Deputy Attorney General of Canada

CAIN LAMARRE CASGRAIN WELLS         FOR THE RESPONDENT
Val-d'Or, Quebec

# TAB 12

1993 CarswellQue 49, 27 C.B.R. (3d) 36



1993 CarswellQue 49, 27 C.B.R. (3d) 36

A. & F. Baillargeon Express Inc., Re

Re bankruptcy of each of A. & F. BAILLARGEON EXPRESS INC., WESTERN CRATING & MOVING LIM-
ITED, KENWOOD'S MOVING & STORAGE (1986) INC., A. & F. BAILLARGEON EXPRESS (CANADA)
INC., and BORISKO BROTHERS MOVING INC. (debtors); RICHTER & ASSOCIATES INC.
(trustee-petitioner)

Quebec Superior Court, Bankruptcy and Insolvency Division

Greenberg J.

Judgment: May 28, 1993
Docket: Docs. S.C. Montreal 500-11-000476-933, 500-11-000519-930, 500-11-000520-938,
500-11-000477-931, 500-11-000478-939

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Counsel: *Mark Schrager*, for trustee-petitioner.

Subject: Corporate and Commercial; Insolvency; Estates and Trusts

Bankruptcy --- Administration of estate — Trustees — Legal proceedings by trustee

Practice — Consolidation of administration of bankrupt estates — Twenty-six companies forming highly com-
plex group and intermingling assets, operations and liabilities as though they were one company — Five com-
panies in group being bankrupt — Practical approach being appropriate — Expenses of bankruptcy likely to in-
crease if trustee required to administer each of five companies separately — Consolidation of administration of
bankrupt estates ordered.

Procédure — Consolidation de l'administration des actifs de sociétés faillies — Vingt-six sociétés formant un re-
groupement complexe et confondant leurs actifs, opérations et responsabilités comme s'il ne s'agissait que d'une
seule compagnie — Cinq sociétés faillies au sein du groupe — Approche pratique étant appropriée — Frais de la
faillite susceptibles d'augmenter si le syndic est tenu d'administrer chacune des cinq sociétés séparément —
Consolidation de l'administration des actifs des sociétés faillies ordonnée.

The appellant was appointed trustee for each of the five bankrupt companies, as well as interim receiver for 21
other companies. All those companies formed a highly complex group. The five bankrupt companies operated as
if they were one, with no distinction as to their customers, banks and assets, and with total disregard for corpor-
ate identity and separate judicial personalities. The 26 companies held only four operating bank accounts and

1993 CarswellQue 49, 27 C.B.R. (3d) 36

one concentration account into which all moneys funnelled through other accounts. There was a total intermingling of assets, operations and liabilities. As interim receiver, the trustee was responsible for collecting the receivables of the 21 non-bankrupt companies.

The trustee brought motions seeking the consolidation of the administration of the five bankrupt estates. The registrar dismissed the motions and the trustee appealed.

**Held:**

The appeal was allowed.

The concept of protection incorporated into Canadian bankruptcy law in the recent major amendments to the *Bankruptcy and Insolvency Act* (the "Act") justified the court to refer to, and to some extent rely upon, American jurisprudence and authorities, as opposed to the traditional reference to British bankruptcy law and authorities.

In that context, the following statement must be considered in consolidation matters: "If the relationships between affiliates are so obscured that it is impossible to disentangle their affairs, of course their bankruptcy proceedings should be consolidated. In such a situation, even a simplistic reliance argument could not seriously be advanced."

The trustee testified that the records had become hopelessly confused and in many instances were non-existent, so that it was impossible to identify which fixed assets belonged to which of those companies. Also, the customers were billed by whichever company management deemed would be the most expedient.

It was extremely unlikely that there would be any dividend for ordinary creditors but, to the extent that there was any possibility, it was important that the secured creditors realize the maximum possible on their claim. Therefore, if the trustee was required to perform a separate body of work in respect of each of the five companies separately, the expenses of the bankruptcy would be increased and the realization by the secured creditors would be reduced, thereby diminishing the already faint hope of any dividend to the ordinary creditors.

The concern that one creditor might receive an advantage because of the consolidation while another was disadvantaged was diminished by the fact that the likelihood of realization was remote and that it would have been an unnecessary waste of money, time and effort to oblige the trustee to go through the full exercise in respect of each one of those five companies.

The trustee brought the motions in order to be able to have one consolidated list of creditors for the purpose of sending the notice of the calling of the first meeting of creditors, since it would have been nearly impossible to distinguish which creditors related to which specific one of those five companies. The Act contains no statutory provisions dealing with consolidations, nor does the United States *Bankruptcy Act*. However, courts in the United States have adopted that approach when it is necessary and where to do otherwise would be impractical.

Also, the *Companies' Creditors Arrangement Act* does not contain a statutory provision authorizing consolidation, but it has been permitted where companies' affairs were intermingled in a similar fashion.

In bankruptcy matters, the court exercises an equitable as well as a legal jurisdiction and practicality is always necessary. The Act is a businessmen's law and practical business considerations should not be disregarded.

The registrar did not err in his judgment since he did not have the chance to consider the evidence presented on

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellQue 49, 27 C.B.R. (3d) 36

appeal as well as the arguments in law and the jurisprudence, both Canadian and American.

If a creditor feels unjustly prejudiced by the consolidation, it may petition the court pursuant to s. 187(5) of the Act to have the judgment modified, varied, rescinded or otherwise dealt with and the notice to all creditors would contain such information.

. . . . .

L'appelante a été nommée syndic de chacune des cinq sociétés faillies, et séquestre intérimaire de 21 autres sociétés. Toutes ces compagnies formaient un regroupement extrêmement complexe. Les cinq sociétés faillies fonctionnaient comme s'il ne s'agissait que d'une seule compagnie, sans faire de distinction quant à leurs clients, leurs institutions bancaires ou leurs actifs, et sans tenir compte des identités corporatives et personnalités juridiques distinctes de chacune. Les 26 sociétés ne détenaient que quatre comptes d'opérations bancaires et un seul compte consolidé réunissant tout l'argent provenant des autres comptes. Les actifs, opérations et responsabilités étaient entièrement entremêlés. En sa qualité de séquestre intérimaire, le syndic avait la responsabilité de percevoir les comptes recevables des 21 sociétés non faillies.

Le syndic a présenté des requêtes afin que soit ordonnée la consolidation de l'administration des actifs des cinq sociétés faillies. Le registraire a rejeté les requêtes et le syndic en a appelé de cette décision.

**Arrêt:**

Le pourvoi a été accueilli.

La notion de protection incorporée au droit de la faillite au Canada par les modifications récemment apportées à la *Loi sur la faillite et l'insolvabilité* (la "Loi") justifiait la Cour de référer et, dans une certaine mesure, de s'en remettre à la jurisprudence et à la doctrine américaines, par opposition au renvoi traditionnel au droit de la faillite britannique.

Dans ce contexte, il faut tenir compte de la proposition suivante en matière de consolidation : [Traduction] "Si les rapports existant entre des entreprises affiliées sont tellement embrouillés qu'il est impossible de démêler leurs affaires, alors les procédures de faillite qui les concernent devraient être consolidées. Dans une telle situation, même le plus simple argument de confiance ne pourrait sérieusement être invoqué."

Le syndic a déclaré que les dossiers étaient devenus désespérément confus et, dans plusieurs cas, littéralement inexistants, de sorte qu'il était impossible d'identifier à laquelle de ces sociétés appartenaient les immobilisations. De plus, les factures adressées aux clients provenaient de la société considérée comme étant la plus expéditive.

Il était très peu probable qu'un dividende puisse être versé aux créanciers ordinaires mais, dans la mesure où cela demeurait possible, il était important que les créanciers garantis réalisent le plus gros montant possible de leurs réclamations. Par conséquent, si le syndic se voyait obligé d'exécuter des tâches distinctes pour chacune des cinq sociétés prises séparément, les frais de la faillite augmenteraient et la réalisation des créanciers garantis diminuerait, réduisant ainsi l'espoir déjà précaire qu'un dividende soit éventuellement versé aux créanciers ordinaires.

La crainte qu'un créancier soit avantagé par la consolidation au détriment d'un autre créancier était tempérée par le fait que la probabilité de la réalisation était assez éloignée, et que le fait d'obliger le syndic à effectuer toutes

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellQue 49, 27 C.B.R. (3d) 36

ces tâches pour chacune des cinq sociétés individuellement aurait entraîné une perte inutile d'argent, de temps et d'énergie.

Le syndic a présenté ces requêtes afin de n'avoir qu'une seule liste consolidée des créanciers lorsqu'il serait temps d'envoyer l'avis de convocation de la première assemblée des créanciers, puisqu'il aurait été virtuellement impossible de distinguer à laquelle des cinq sociétés spécifiquement était lié chacun des créanciers. La Loi ne comporte aucune disposition statutaire concernant les consolidations, non plus que la loi américaine sur la faillite. Toutefois, les tribunaux des États-Unis ont adopté cette approche lorsque cela s'avérait nécessaire, et lorsqu'une autre méthode se serait avérée peu pratique.

Par ailleurs, la *Loi sur les arrangements avec les créanciers des compagnies* ne comporte aucune disposition statutaire autorisant la consolidation, bien qu'elle ait été permise dans des cas où les affaires de sociétés étaient confondues de façon similaire.

En matière de faillite, la Cour exerce une juridiction d'équité aussi bien que juridique, et l'aspect pratique est toujours important. La Loi est une loi d'hommes d'affaires, et des considérations d'affaires pratiques ne devraient pas être négligées.

Le registraire n'a pas fait erreur en rendant sa décision puisqu'il n'a pas eu l'opportunité de se pencher sur la preuve soumise en appel, ni sur les arguments invoquant la loi et la jurisprudence, canadiennes et américaines.

Si un créancier devait se considérer injustement désavantagé par suite de la consolidation, il pourrait toujours présenter à la Cour une requête en vertu du par. 187(5) de la Loi afin que le jugement soit modifié, annulé ou autrement révisé, et l'avis aux créanciers comporterait une mention à cet effet.

**Cases considered:**

*Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1996) — *considered*

*Northland Properties Ltd., Re*, (sub nom. *Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, 34 B.C.L.R. (2d) 122, [1989] 3 W.W.R. 363 (C.A.) — *applied*

**Statutes considered:**

Bankruptcy Act (U.S.).

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 183

s. 187(5)

s. 192(4)

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Appeal from registrar's decision to dismiss trustee's motions seeking consolidation of administration of five bankruptcy estates.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

*Greenberg J.* (**orally**):

1      In the five bankruptcy files which appear on today's Roll and which we will now enumerate: A. & F. Baillargeon Express Inc., Western Crating & Moving Limited, Kenwood's Moving & Storage (1986) Inc., A. & F. Baillargeon Express (Canada) Inc. and Borisko Brothers Moving Inc., each of those companies has been declared bankrupt and Richter & Associates Inc. named as Trustee.

2       Those five companies, together with twenty-one others not in bankruptcy, form together what is commonly referred to in the moving trade as the "Baron Group of Companies" and, technically, the parent company bears the name "Baron Moving Systems Inc."

3      The Trustee had petitioned the Registrar of the Court to order the Consolidation of the administration of those five bankruptcy estates, and all five Motions were dismissed by the Registrar on May 26th last. The Trustee now comes before this Court on appeal from those decisions in virtue of s. 192(4) of the *Bankruptcy and Insolvency Act*,[FN1] hereinafter "the Act".

4      The organigram of the group of twenty-six companies was filed as Exhibit R-1 and is, to say the least, a highly complex one. It has also been proven by the Exhibits and the testimony of the representative of the Trustee that, in the language of the trade, these five companies comprised the "Montreal Branch" in the case of three of them and the "Toronto Branch" in the case of the two others. The three in the first instance, the Montreal Branch, were A. & F. Baillargeon Express Inc., Western Crating & Moving Limited and Kenwood's Moving & Storage (1986) Inc., and the Toronto Branch consisted of the other two companies, A. & F. Baillargeon Express Canada Inc. and Borisko Brothers Moving Inc.

5       It has been demonstrated in the evidence that these five companies operated as if they were one, indistinctly as to their customers, their bank and their assets, with intermingling; trucks being registered with the Provincial authorities as being the property of one company and yet appearing on the books of another, and moves being booked and executed by one company or another and billed by even a third. There was a total disregard for the niceties of corporate identity and separate juridical personalities.

6       The leading Exhibit in that regard is Exhibit R-2, which is the "Joint Banking Agreement" between the Canadian Imperial Bank of Commerce (hereinafter "the CIBC") and the companies enumerated therein. We note with interest that, even though there is that Agreement a list of those twenty-six companies, there are among them only four operating accounts with that Bank, so that certainly it is not true to say that each company had its own bank account, which again is in keeping with the total intermingling of assets, operations, liabilities, etc.

7      Part II of that Schedule is entitled the "Concentration Accounts" and indicates only the name of the lead borrower, Baron Moving Systems Inc. & al. Hence, Baron Moving Systems Inc., as the lead borrower, is the only company of the Group which operated a "Concentration Account". It has been explained in evidence and argument how this account is the "nest to which all the robins returned", and this is the resting place of all monies funnelled through other accounts and that, in effect, it is as though we were dealing with only one company.

8      In respect of the other twenty-one not-bankrupt companies of the group of twenty-six, and not therefore among the five companies in respect of which the Trustee now petitions this Court, the Court has previously appointed the same Trustee in the capacity of Interim Receiver, but with powers and seizin limited only to the collection of the accounts receivable.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

9      All of those accounts receivable are part of the security of the CIBC, which had invited in the Bank of Nova Scotia as a co-participant, and the latter bank was co-Petitioner on the Bankruptcy Petitions. Accordingly, it is only in respect of the five bankrupt companies that the present proceedings are taken, but the same Trustee is proceeding, as Interim Receiver, to collect the receivables of the other twenty-one companies as well.

10      Traditionally, until the recent major amendments to the Act, Canadian bankruptcy law has been inspired by British bankruptcy law. Thus, it has been common to refer to British authorities and only less frequently to American authorities. However, as a result of those recent amendments, one now speaks of "protection under the Bankruptcy Act", a concept which has been long known to American bankruptcy law but not known to Canadian bankruptcy law as expressed in the former version of the Act.

11      This explains in large part the frequent recourse in the past by debtor companies to the *Companies' Creditors Arrangement Act*,[FN2] (hereinafter the "CCAA"). The Act now has been reformed to bring it more in line with the spirit of the United States Bankruptcy Act, which we believe gives this Court even greater justification to refer to and to some extent rely upon American jurisprudence and authorities.

12      The attorney for the Trustee has brought to our attention a very well researched article published in the *California Law Review*[FN3] relative to Consolidations in matters of Bankruptcy and the "Flow-of- Assets Approach". We read in that article[FN4] the following very interesting citation:

> An alternative theme of some recent case law is that the bankruptcy proceedings of affiliated corporations should be consolidated whenever it is impractical to separate their financial affairs. The outstanding example of this proposition is the majority opinion in *Chemical Bank New York Trust Company* vs. *Kheel* ... [FN5]

a decision of the second American Circuit Court of Appeals.

13      The enterprise in that case consisted of eight affiliates, which the Referee found were "operated as a single unit with little or no attention paid to the formalities usually observed in independent corporations ...". Upon motion by a major creditor, the assets and liabilities of the corporations were consolidated. Chemical Bank, a creditor of one of the stronger affiliates, appealed. The majority opinion in *Kheel* is said in that Article [FN6] to reflect the following proposition:

> If the relationships between affiliates are so obscured that it is impossible to disentangle their affairs, of course their bankruptcy proceedings should be consolidated. In such a situation even a simplistic reliance argument could not seriously be advanced.

14      Further on in that same Article, and in the actual *Kheel* case itself, the extract which is of interest[FN7] reads as follows:

> The debtor corporations are all owned or controlled by the former shipping magnate, Manuel E. Kulukundis. The Referee found that the debtor corporations were operated as a single unit with little or no attention paid to the formalities usually observed in independent corporations, that the officers and directors of all, so far as ascertainable, were substantially the same and acted as figureheads for Kulukundis, that funds were shifted back and forth between the corporations in an extremely complex pattern and in effect pooled together,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

loans were made back and forth, borrowings made by some to pay obligations of others, freights due some pledged or used to pay liabilities and expenses of others, and withdrawals and payments made from and to corporate accounts by Kulukundis personally not sufficiently recorded on the books.

15    That recitation reflects very closely the situation in the case of the Baron Group and specifically the five companies with which we are here concerned. It is interesting to note that the resolution of each participating company affixed to that Joint Banking Agreement, Exhibit R-2, is in all cases signed by the same Mr. B. Baillargeon, so that he can readily be seen to be the equivalent of Mr. Kulukundis in the American case cited above.

16    Also, the Trustee has testified here that the records became so hopelessly confused, and in many instances were non-existent, that it is impossible to know which fixed assets belong to which of those companies. People who did business with them, either as suppliers (therefore creditors) or customers (therefore debtors in respect of those accounts receivable), were simply calling the Montreal office or Branch of that Group of companies, often without distinguishing among them, and were billed indiscriminately as among the Group of companies by the one which management felt was most expedient.

17    The evidence of the Trustee is also to the effect that, in this case, it is extremely unlikely that there will be any dividend for ordinary creditors. However, to the extent that there is any possibility, it is important that the Banks, which are secured, realize the maximum possible on their claims. If we were to oblige the Trustee to perform a separate body of work in respect of each of these five companies, thereby increasing the expenses of the bankruptcy and reducing the realisation by the secured creditors, that would only further diminish the already faint hope of any dividend to the ordinary creditors.

18    During the argument and the evidence, we expressed the concern that a creditor of one of those five companies who might stand to get a larger dividend on an individual company basis than through an intermingled and consolidated basis could be prejudiced, whereas other creditors in respect of other specific companies might be benefited by the mechanism of consolidation.

19    That first concern is largely diminished by the fact that the likelihood of realization is remote and that it would be an unnecessary waste of money, time and effort to oblige the Trustee to go through the full exercise in respect of each one of those five companies. Moreover, the Trustee must by next Monday, today being Friday, send out lists and Notices of the calling of the First Meetings of Creditors.

20    We understand that one meeting will be held in Toronto with respect to the two companies to which we referred as the "Toronto Branch" and another in Montreal with respect to the three to which we referred as the "Montreal Branch" and that, on a practical basis, it would be nearly impossible to distinguish without simply guessing which creditors relate to which specific one of those five companies. The Trustee and the attorneys on his behalf have presented these proceedings in order to be able to have one consolidated list of creditors used to send out the notices for those meetings.

21    It is important to note that the Act has no statutory provision dealing with Consolidations. Of interest also is the fact that the United States Bankruptcy Act has none either. Yet, in spite of the absence of any statutory authority for such a process, the doctrine and the Judgments of the Courts in the United States have adopted that approach where it is necessary and where to do otherwise would be impractical.

22    Another interesting analogy is the case of *Re Northland Properties Ltd.* [FN8] That case also involved a Group of companies and it was a plan of reorganization under the CCAA, which statute also does not contain a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

statutory provision authorizing Consolidation. There, the Consolidation for the purposes of that Law in respect of the group of companies whose affairs were intermingled in a similar fashion to that of the Baron Group here was approved by the Appeal Court of British Columbia.

23      There is also the consideration that in Bankruptcy matters the Court exercises an equitable[FN9] as well as a legal jurisdiction, and that practicality is always the order of the day. It is frequently said in the jurisprudence that the Act is a "businessman's law" and that practical business considerations should not be disregarded, as they sometimes are in other domains where a strict interpretation of the law must be followed and observed.

24      The decision of this Court is to grant the request of the Trustee in this case. Hence, we wish to make clear that this in no way implies that the Registrar erred in his Judgment, from which this is an Appeal. Most of the evidence presented to us was not presented before him. He did not hear any witness, as we did, and, more importantly, the arguments in law and the jurisprudence, both Canadian and American, as well as the American doctrine, were not laid out before him due to the exigencies of *ex parte* procedures before the Registrar in this Jurisdiction.

25      It is therefore without in any way concluding that he erred in misinterpreting any part of the Act, since no specific provision of the Act was in play before him.

26      Moreover, in virtue of s. 187(5) of the Act, it is always open for this Court to review an Order or Judgment already rendered and to rescind, modify or revise it. Therefore, this Judgment will also require, in its Notice to all the creditors of the five companies, that the Trustee advise that by Judgment of the Court on this day, an Order was given consolidating the administration of the five bankruptcy estates.

27      This must be explained to the creditors at the two meetings, in terms of the reasons which underlay that decision, and it must be pointed out specifically to them that any creditor who feels itself or himself unjustly prejudiced by such a Consolidation may petition the Court pursuant to s. 187(5) to modify, vary, rescind or otherwise deal with or affect the present Judgment.

28      FOR THE REASONS GIVEN ORALLY AND RECORDED, THE COURT:

29      MAINTAINS the appeal in each of the five files;

30      REVERSES and ANNULS the decision of the Registrar in each of those five cases rendered by him on May 26, 1993 with respect to the "Motion for the Consolidation of the Administration of Bankruptcy Estates" dated May 21, 1993 in each of those files and, rendering Judgment on each of those five Motions of May 21, 1993;

31      GRANTS Judgment in accordance with the conclusions thereof;

32      ORDERS the Trustee to inform all Creditors of the five Bankrupt Companies of the present Judgment and generally of the reasons for same and moreover inform them of their right under s. 187(5) of the *Bankruptcy and Insolvency Act* to apply to the Court to review, rescind or vary this Order, if they allege a particular prejudice and can prove same;

33      THE WHOLE with costs against the mass.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1993 CarswellQue 49, 27 C.B.R. (3d) 36

*Appeal allowed.*

FN1 R.S.C. 1985, c. B-3.

FN2 R.S.C. 1985, c. C-36.

FN3 Volume LXV, p. 720.

FN4 At pp. 733 and 734.

FN5 369 F.2d 845 (2d Cir. 1966).

FN6 At pp. 734 and 735.

FN7 At p. 846.

FN8 (1989), *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 34 B.C.L.R. (2d) 122 (C.A.).

FN9 Section 183 of the Act.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 13

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 126 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

2004 BCSC 1201

British Columbia Supreme Court

Adtronics Signs Ltd. v. Sicon Group Inc.

2004 CarswellBC 2148, 2004 BCSC 1201, [2004] B.C.W.L.D. 1226, [2004] B.C.J. No. 1885

# Adtronics Signs Ltd. and Adtronics Inc., Plaintiffs and Sicon Group Inc., 32262 B.C. Ltd., Armitage Holdings Ltd., Sign-O-Lite Plastics Ltd., Wallace Sign-Crafters West Limited and Donald Armitage, Defendants

Garson J.

Heard: January 26-30, 2004
Heard: February 2-6, 2004
Heard: February 9-13, 2004
Heard: February 16-19, 2004
Heard: March 1-3, 2004
Heard: March 8-9, 2004
Heard: March 22-25, 2004
Heard: April 5-8, 2004
Heard: April 13-14, 2004
Judgment: September 15, 2004
Docket: Vancouver C943436

Counsel: B.M. Shaw, for Plaintiffs
D.H. Clarke, for Defendants

Subject: Corporate and Commercial; Contracts

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Business associations --- Changes to corporate status — Amalgamations and takeovers — Amalgamations — Miscellaneous issues**

MA had successful electronic sign company A Ltd. — MA's father DA owned group of electronic sign companies known as S Group — From 1987 to 1993, A Ltd. operated under umbrella of S Group in amalgamation — Terms of operation were stipulated in September 1987 agreement — Under 1987 agreement, rent was not payable by A Ltd. but proportionate amount of all costs to operate building was payable — S Group had responsibility for all banking and accounting of group, which included A Ltd. — A Ltd. brought action against S Group for $10,055,244.43, alleging that S Group had, through improper accounting methods, miscalculated inter-corporate operating account in favour of S Group — Action allowed — Rent charged must be reversed and proportionate costs allocated on basis of agreed percentage of space used by A Ltd., which was 13.24 per cent — No agreement to use by DA of formula he called 30/40/30 formula to calculate charge to A Ltd. for administrative expenses — A Ltd. should not have been charged for management salaries, administration salaries, sales expenses and other general administrative charges on basis that S Group was only providing accounting services — Allocations between A Ltd. and S Group for period of September 1987 to September 1993 must be recalculated and judgment will issue against defendants in favour of A Ltd. for amount found due and owing to A Ltd.

**Contracts --- Construction and interpretation — Resolving ambiguities — Conduct of parties**

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 127 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Evidence of post-contractual conduct can be considered in event of ambiguity in contract.

## Table of Authorities

### Cases considered by *Garson J.*:

*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60, 1989 CarswellBC 4 (B.C. C.A.) — considered

*Bauer v. Bank of Montreal* (1980), [1980] 2 S.C.R. 102, 32 N.R. 191, 10 B.L.R. 209, 110 D.L.R. (3d) 424, 33 C.B.R. (N.S.) 291, 1980 CarswellOnt 141, 1980 CarswellOnt 638 (S.C.C.) — distinguished

*Brikom Investments Ltd. v. Carr* (1979), [1979] 1 Q.B. 467, [1979] 2 W.L.R. 737, [1979] 2 All E.R. 753 (Eng. C.A.) — considered

*Canacemal Investment Inc. v. PCI Realty Corp.* (1999), 1999 CarswellBC 2012 (B.C. S.C.) — referred to

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205, 1981 CarswellOnt 124 (Ont. C.A.) — referred to

*Conwest Exploration Co. v. Letain* (1963), [1964] S.C.R. 20, 41 D.L.R. (2d) 198, 1963 CarswellBC 209 (S.C.C.) — referred to

*Coupal v. Strata Plan LMS2503* (2002), 2002 BCSC 1444, 2002 CarswellBC 2348, 6 B.C.L.R. (4th) 372, 5 R.P.R. (4th) 77 (B.C. S.C.) — referred to

*Engineered Homes Ltd. v. Mason* (1983), [1983] 1 S.C.R. 641, 146 D.L.R. (3d) 577, 47 N.R. 379, 51 B.C.L.R. 273, 49 C.B.R. (N.S.) 257, 1983 CarswellBC 564, 1983 CarswellBC 726 (S.C.C.) — considered

*Gallen v. Allstate Grain Co.* (1984), 25 B.L.R. 314, 9 D.L.R. (4th) 496, *(sub nom. Gallen v. Butterley)* 53 B.C.L.R. 38, 1984 CarswellBC 104 (B.C. C.A.) — referred to

*Hawrish v. Bank of Montreal* (1969), [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673, 1969 CarswellSask 9 (S.C.C.) — distinguished

*John Burrows Ltd. v. Subsurface Surveys Ltd.* (1968), [1968] S.C.R. 607, 68 D.L.R. (2d) 354, 1968 CarswellNB 6 (S.C.C.) — considered

*Ossory Canada Inc. v. Wendy's Restaurants of Canada Inc.* (1997), 36 O.R. (3d) 483, 105 O.A.C. 321, 1997 CarswellOnt 4961, 16 R.P.R. (3d) 204 (Ont. C.A.) — referred to

*Pentagon Construction (1969) Co. v. United States Fidelity & Guaranty Co.* (1977), [1977] 4 W.W.R. 351, 77 D.L.R. (3d) 189, [1977] I.L.R. 1-889, 1977 CarswellBC 372, [1978] 1 Lloyd's Rep. 93 (B.C. C.A.) — referred to

*W.J. Alan & Co. v. El Nasr Export & Import Co.* (1972), [1972] 2 Q.B. 189, [1972] 2 All E.R. 127, [1972] 1 Lloyd's Rep. 313 (Eng. C.A.) — referred to

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 128 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*32262 B.C. Ltd. v. Companions Restaurant Inc.* (1995), 17 B.L.R. (2d) 227, 1995 CarswellBC 368 (B.C. S.C.) — referred to

**Statutes considered:**

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)

Generally — referred to

s. 85(1) — referred to

s. 125 — referred to

s. 194(4) — referred to

s. 248 — referred to

ACTION for accounting with respect to amalgamation of companies.

***Garson J.*:**

**1. Introduction**

1    At the age of twelve, Mark Armitage began working part-time in his father's sign manufacturing and leasing business. Now at the age of 50 he is the owner of a successful electronic sign company. Mark Armitage's development into the owner of an independent company has unfortunately been accompanied by a fractious relationship with his father, an acrimonious separation of their respective business interests, and the commencement and prosecution of this law suit which consumed 34 days at trial. Through his company, Mark Armitage sues his father and his father's companies for $10,055,244.43. He says that this amount is owing to the plaintiffs from the years 1986 to 1993, the years his companies operated under the umbrella of his father's companies, known as the Sicon Group. The Sicon Group had responsibility for all banking and accounting of the group, which included the Adtronics division. It is alleged by the plaintiffs that by the time of the separation in September 1993, the Sicon Group had, through improper accounting methods, miscalculated the inter-corporate operating account in favour of the Sicon Group in an amount which together with interest now equals in excess of $10 million.

2    Donald Armitage is 75. He began his adult working life as a sign painter. He started his own company in 1950. By the time of the events with which this law suit is concerned, his group of companies had gross revenues of about $15 million a year. Donald Armitage has always employed family members, sons, daughters, and sons-in-law in his business. Indeed today the general manager of his business is his son-in-law, Timothey MacLean, and another senior manager is his son, Tom Armitage. His older son, Michael Armitage, broke off his business associations with his father in 1985.

3    In 1987, for reasons concerning taxation and loan financing, Donald Armitage persuaded his son Mark Armitage to amalgamate Mark's electronic sign company with the Sicon Group. An agreement signed in September 1987 (the "September Agreement") was entered into. The Agreement stipulates a method by which the two corporate groups would share expenses and facilities and how they would account for this sharing. At issue in this lawsuit is the proper interpretation of this Agreement. The central controversy between the parties concerning the interpretation of the Agreement is put this way by the defendants: it is said that the Agreement was not adhered to by the parties but now that it is in issue, when properly interpreted, the accounting between the parties results in the plaintiffs owing the defendants the sum of $392,000 claimed in the counter-claim. The plaintiffs put the controversy this way: they say that the conduct of the parties during the currency of the Agreement is evidence of the correct interpretation of the Agreement or alternatively is evidence of subsequent agreements. It is said by the plaintiffs that an accounting performed according to a correct interpretation of the agreement results in the above-noted amount owing to the plaintiffs.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

4    Although this action could be described as an accounting between the parties, there are issues of contractual interpretation which overlie the minutia of the controversy between the parties and which concern items as small as office supplies and as large as hundreds of thousands of dollars in imputed income tax. I propose to address the larger contractual interpretation issues first because the disposition of the contractual issues will to some extent determine the outcome of the accounting for the numerous disputed charges. I will not in this judgment recalculate the accounts of the companies. As agreed by the parties at trial, if with these reasons for judgment they are unable to settle the accounting, they are at liberty to speak to the matters remaining in issue between them. Before turning to the contractual interpretation issues, I will describe in more detail the parties, the issues, and the factual background to this dispute.

## 2. The Parties

5    Adtronics Signs Ltd. is a British Columbia company. Mark Armitage owns 100% of the shares of the company. It was incorporated in 1978. When it was incorporated, Mark Armitage and his brother Michael were each 50% shareholders and Michael Armitage was president. Mark Armitage has been the president and sole shareholder of the company since 1983. Its business is to design and manufacture electronic messaging and picture signs (light bulbs which illuminate in a sequence creating word, picture or design messages), which it sells to wholesalers. It does not lease signs.

6    Adtronics Inc. was a United States company. Adtronics Signs Ltd. owned 100% of the shares of Adtronics Inc. This company was incorporated to employ sales personnel in the United States to sell Adtronics Inc.'s signs. It is no longer a registered company and all its assets were assigned to Adtronics Signs Ltd. in 1998.

7    The Sicon Group is a business name used by Donald Armitage to describe his entire corporate operation. The business of the Sicon Group is to manufacture, sell, and lease painted signs, neon tubing type signs, and plastic illuminated signs.

8    Armitage Holdings Ltd. is a company owned and controlled by Donald Armitage. This company owns 100% of the voting shares of Sicon Group Inc.

9    Sicon Group Inc. is a company in which Donald Armitage, through Armitage Holdings Ltd., holds the controlling voting shares, and in which four of Donald Armitage's children, including Mark Armitage, hold non-voting shares. At all material times, Sicon Group Inc. was the parent company of the co-defendants 32262 B.C. Ltd., Sign-O-Lite Plastics Ltd., and Wallace Sign-Crafters West Ltd. (now 150671 B.C. Ltd.).

10    32262 B.C. Ltd., Sign-O-Lite Plastics Ltd. and 150671 B.C. Ltd. are all companies owned and/or controlled by Donald Armitage.

## 3. Background Facts

11    The background facts which follow are not in dispute.

12    Mark Armitage began working part-time for his father at the age of twelve. He began doing what he describes as menial work and gradually learned all aspects of the sign business. He continued working part-time for his father's companies while he attended university; upon graduation in 1977, with a commerce degree, he joined the family business. He was then 23 years old. He began work in 1977 as production manager for Sign-O-Lite Plastics Ltd. Mark Armitage was then transferred to Toronto as production manager of Wallace Sign-Crafters West Ltd., another of his father's companies. He returned to Vancouver in 1980 as manager of the art department and estimating. For a short time he ran another of the companies at a different location in Vancouver. He then returned to Sign-O-Lite as an estimator. From about 1977 to 1982, Mark Armitage's older brother Michael Armitage was the general manager of the companies. Mark Armitage understood from his father that his father's long-term plan was to turn over the management of the Sicon Group to his two sons - Mark to run production and Michael to run the operations. In December 1982, Donald Armitage advised Mark Armitage that he had decided to turn the whole company over to Michael Armitage and because Michael did not want Mark to work for him as an employee, Mark's employment in the family business was terminated. Donald Armitage moved his own personal office out of the company premises and began some

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 130 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

property development venture. Michael Armitage gifted his 50% ownership in Adtronics Signs Ltd. to Mark Armitage, making him the sole owner, and Mark was told by his father that he could develop the electronic sign business. There was no ongoing electronic sign business to take over, so Mark Armitage continued working at his old job for several months before the Sicon Group controller told him that he was not being paid. He then began the process of developing the electronic sign business, which ultimately has proven to be immensely successful.

13    Mark Armitage began to develop the business of Adtronics Signs Ltd., operating from the Sicon Group premises at 2771 Simpson Road in Richmond. He took over a Sign-O-Lite Plastics Ltd. employee and with that employee began to research the electronic sign business and to work out a marketing plan.

14    When Mark Armitage began developing the electronic sign business of Adtronics Signs Ltd., it had no assets, liabilities, nor revenues. Adtronics Signs Ltd. became profitable by 1985 according to Mark Armitage. Adtronics Signs Ltd. borrowed money from Michael Armitage's administration company, North American Sign Services Ltd., in order to develop and run Adtronics Signs Ltd.

15    By the end of 1983, Adtronics Signs Ltd. owed North American Sign Services Ltd. about $200,000 and by the end of 1984 it owed about $400,000. It paid interest on the accumulated debt.

16    Rather than pay for the use of space in the Simpson Road premises, Adtronics Signs Ltd. and North American Sign Services Ltd. agreed that North American Sign Services Ltd. would receive a 15% discount from Adtronics Signs Ltd. on any signs or components it purchased from that company. North American Sign Services Ltd. provided the use of its facilities and also handled the day to day bookkeeping and accounting for Adtronics Signs Ltd.

17    On March 31, 1985, disagreements between Michael and Donald Armitage came to a head and Michael Armitage separated his businesses from the companies in which Donald Armitage had an interest. For the purposes of this litigation, it is unnecessary to describe in detail this dispute except to say that much of the existing sign lease portfolio and many employees were taken out of the Sicon Group by Michael Armitage. Donald Armitage took back the management of the Sicon Group and had to rebuild the Sicon Group business after the departure of Michael.

18    The Adtronics' debt, which by the end of the 1985 fiscal year was $382,951, was assigned to a Donald Armitage-owned company, Wallace Sign-Crafters West Ltd., from Michael Armitage's company, North American Sign Services Ltd. Adtronics Signs Ltd. continued to pay interest on this debt at the same rate that the Sicon Group paid to its bank, Canadian Commercial Bank ("CCB").

19    Before the separation of Michael Armitage's companies from the Sicon Group, the whole group had been financed by CCB. In 1985 the balance of the loan owing to CCB was about $16 million. CCB eventually forced Michael Armitage and Donald Armitage to settle their differences over the split in order to regularize their loan. CCB went into receivership in 1985 and the receiver would not advance any additional funds to the Sicon Group. Donald Armitage began the process of seeking a new source of financing. In September 1987 he was successful in securing financing from Canadian Corporate Funding Limited ("CCFL").

20    In 1986 Adtronics Signs Ltd., at the request of Donald Armitage, began to pay rent for its use of the Simpson Road premises. Adtronics Signs Ltd. did not have its own bank account, but rather all deposits and payments were processed through the Sicon Group accounting system and bank account. Adtronics Signs Ltd. did its own invoicing and accounts payable and purchasing. For the years 1985 and 1986, Donald Armitage told Mark Armitage that he would allocate expenses between Adtronics Signs Ltd. and the Sicon Group. There was no specific formula for allocations discussed until the negotiation of the 1987 agreement, which I will describe in further detail below.

21    Mark Armitage testified, and it was not disputed, that he was entirely responsible for all aspects of the management of the Adtronics Signs Ltd. business except for the accounting and banking functions.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 131 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

22    In late 1986 and early 1987, Donald Armitage began discussions with Mark Armitage concerning an amalgamation of Adtronics Signs Ltd. with the Sicon Group. One reason that Donald Armitage suggested the merger take place was because two of the Sicon Group companies, Sign-O-Lite Plastics Ltd. and Wallace Sign-Crafters West Ltd., had accumulated unused capital cost allowance which could not be used because the Sicon Group companies were not then profitable, whereas Adtronics was profitable and therefore taxable. The proposed amalgamation would permit Adtronics Signs Ltd.'s profits to be sheltered, for income tax purposes, by offsetting the profits against the unused depreciation. There is a conflict between the evidence of Donald Armitage and Mark Armitage about other reasons for the amalgamation and I will consider that evidence later in these Reasons.

23    Mark Armitage did eventually agree to the merger and an agreement, drawn and negotiated between their respective lawyers, was signed on September 25, 1987, between Mark Armitage, Donald Armitage, their various companies, and other shareholders (the "September Agreement" or the "Agreement").

24    The corporate vehicle used to accomplish the merger was 32262 B.C. Ltd., a company that was owned by Sicon Group Ltd. The electronics sign business became a division of 32262 B.C. Ltd. but continued to carry on business as Adtronics. The first fiscal year of the merged entity under 32262 was 1987.

25    About once per year, Donald Armitage gave Mark Armitage a memorandum setting out the inter-corporate allocations. These allocations purported to show all the charges that the Sicon Group had made to the books of account between the Adtronics division and the Sicon Group for the sharing of services, facilities, and inter-corporate debt. Every year Mark Armitage complained about the allocations. The main issue between the parties in this action concerns the correctness of these allocations.

26    On September 22, 1993, Adtronics Signs Ltd. began business from a new location separate from the Sicon Group. It had re-acquired the business and assets of the Adtronics division of 32262 as was contemplated by the September Agreement.

27    The year before Adtronics moved out of the Sicon Group's facilities, Mark Armitage had hired a chartered accountant, Brenda Leung. She was hired as the controller of the Adtronics division and became the controller of Adtronics Signs Ltd. after the separation in 1993.

28    Mark Armitage asked her to examine the accounts between the done since 1986. Brenda Leung began an exhaustive examination of the accounts and on November 5, 1993, a copy of the report she prepared was delivered to Sicon. The report, prepared by Ms. Leung, contained two volumes of detailed schedules of accounts redoing the allocations between the Adtronics division and 32262 for the years 1986 to 1993. The report demanded payment to Adtronics Signs Ltd. from Sicon of $3,927,164.65.

29    The defendants have not paid the amount demanded and have counter-claimed for $392,000, which is the sum they say is owing to them as a consequence of their re-examination of the accounts in this litigation.

**4. The September Agreement**

30    The terms of the September Agreement are central to this dispute. Accordingly, I have reproduced the entire agreement and it appears as Appendix I to the Reasons.

31    The sections that are of particular importance for an understanding of the method by which the parties agreed to allocate expenses and share facilities begin with Recital F, which emphasizes the importance of Adtronics remaining a distinct and separate entity from the other business operations of the Sicon Group. By Clause 1, Adtronics Signs Ltd. transferred to 32262 B.C. Ltd. all its business and assets, other than the business and assets directly related to the manufacture of electronic signs and its shares in Adtronics Inc., and became the "Adtronics division" of 32262 B.C. Ltd. The Adtronics Group is defined as all aspects of the businesses carried on by the Adtronics division, Adtronics Signs Ltd., and Adtronics Inc. The Sicon Group

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

is defined as Sicon Group Inc. and all its subsidiaries as set out in Recital D; essentially it includes all the business that is not Adtronics.

32    Clause 9 of the September Agreement gave authority to Mark Armitage, as general manager of the Adtronics division, to operate the Adtronics division of 32262 as if it were still a separate entity. By Clause 9(c) Mark Armitage was given "sole and exclusive authority to .... [make] the decision whether to share administrative and accounting services provided by other members of the Sicon Group".

33    Sicon agreed by Clause 11 to continue to grant credit to the Adtronics division.

34    Clause 16 applies to common facilities or services. If the facility or service is not common, then Clause 16 is not applicable. Mr. Shaw says that step 1 of the allocation process is therefore a prior determination that the facility or service is shared. If it is, then the balance of the formula in Clause 16 is applied. So, for example, the salary of Mark Armitage is not a shared service and would not be subject to the allocation process.

35    Mr. Shaw says that Clause 16(a) is step 2 in the analysis. This step requires the parties to determine if the cost could "be specifically borne by [a] Group." If it could be, then it would be charged to that group. The one example cited in the September Agreement is long distance telephone charges. I would interpret this to mean that the long distance telephone service is a shared service, but the cost can be specifically attributed to the user Group.

36    Clause 16(b) requires that any costs that relate to the premises will be shared by each Group on the proportionate basis that each Group uses space. Two examples are given in the September Agreement: property taxes and electricity. In this action the parties agreed that the proportionate space ratio is 13.24%.

37    Clause 16(c) opens with the words "other overhead expenses." By this, I would interpret the clause to apply to those costs or expenses which: (1) are shared; (2) cannot be specifically attributed; and (3) do not relate to the operation of the premises.

38    Clause 16(c) must be interpreted with Clause 9(c) which, as I have described, gave Mark Armitage sole and exclusive authority to decide if Adtronics would share administrative and accounting services provided by other members of the Sicon Group. Clause 16(c) requires the two Groups "forthwith after execution of this Agreement" to identify facilities and services to be "paid for on a shared basis". It is common ground that this formal identification of shared services did not occur forthwith after execution of the September Agreement. There was never any formal process whereby the parties identified a list of shared services. Mr. Shaw says that Adtronics did from time to time (usually when engaged in discussions concerning the allocations) take positions that could be construed as an identification of a shared service.

39    Clause 16(c) continues. The clause specifies the formula for the sharing of the cost of shared facilities. Each Group is to pay a percentage of the cost, which percentage is calculated using the Adtronics Group's gross revenue as a numerator and the Sicon Group's gross revenue as a denominator. The parties have agreed on the fraction for each of the years 1988 to 1993. That is not to say they have agreed on the application of the formula. The application of the formula is a contested issue in this litigation.

40    Clause 16 continues with the statement that "No Group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service."

41    Finally, Clause 16 contains what the parties have called the "opt-out clause." It says that either Group may advise the other that it no longer wishes to use a service.

42    There are certain threshold issues arising from the interpretation of this agreement and the conduct of the parties, the disposition of which will resolve some of the disputed accounting in this litigation.

## 5. Threshold Issues

43    These threshold issues concern the following:

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 133 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

• Is there an agreement to charge a specific amount for rent, as opposed to charging for the cost of the facility on the basis of the proportionate cost ratio?

• Is there an agreement to the use by Donald Armitage of a formula he called the 30/40/30 formula to calculate the charge to Adtronics for administrative expenses instead of the gross revenue formula specified in the September Agreement?

• Is there an agreement to the charge by Sicon to Adtronics for head office type administration charges as a shared cost on the basis that Sicon provided a variety of indirect services for the whole Group including external relationships, maintenance of the plants, supervision of the accounting function, etc.?

• Which party bears the onus of proof to prove that a charge made by Sicon to Adtronics was a breach of the September Agreement where Sicon has been unable to provide an explanation of the charge, owing to its destruction or loss of documentation?

44      Adtronics argues that I should consider the subsequent conduct of the parties as an aid to the interpretation of the September Agreement. For example, if it is not clear that the September Agreement contemplates the partition of an expense, such as the salary of the general manager, then I should consider the conduct of the parties, whereby Sicon's controller, Ester Gale, agreed during the currency of the September Agreement that the general manager's salary should be partitioned 5% to Adtronics and the balance to Sicon.

45      Sicon argues that I should approach the interpretation of the September Agreement as a "clean slate" and I should disregard the conduct of the parties during the currency of the September Agreement. So it is said by Sicon, in reference to the example given about the general manager, that the September Agreement does not contemplate the partitioning of a single expense and I should ignore what the parties did during the currency of the September Agreement, that is to charge Adtronics only 5%, but rather Adtronics should be charged for the general manager the pro-rata share based on the revenue sharing formula contained in the September Agreement. Sicon says that the parol evidence rule precludes consideration of extrinsic evidence to interpret the written agreement.

46      I begin an examination of the September Agreement by examining the history of the parties' association. The relevant history begins in early 1986. By this date Mark Armitage was operating the Adtronics business independently from a corporate perspective - that is Adtronics was a separate legal entity from the other companies in the Sicon Group - but was sharing the facilities of the Sicon Group, including its financing. There was no written agreement in place that would dictate how Adtronics would be charged for its use of shared services and facilities. The disagreement over the 1986 administration allocations was raised in about June 1987 in a conversation between Mark Armitage and Sicon's external auditor, Craig Wilson. Mark Armitage's complaints were communicated to Donald Armitage and Donald Armitage wrote a lengthy memorandum dated June 12, 1987, explaining the allocations from his perspective. Donald Armitage wrote, in the memorandum, that the charges would be put through as is on the financial statements then being prepared but that they could be adjusted later - "[i]f it turns out that there is something that has been done wrong." Mark Armitage continued to communicate his disagreement with the allocations over the summer of 1987, but Donald Armitage was understandably occupied with his attempts to refinance the Sicon Group. He asked Mark Armitage to stop complaining about the charges while the financing application was in a critical stage. In a memorandum dated July 30, 1987, he wrote to Mark "Quit rocking the bloody boat & when we've got everything in place we can discuss lots of things but don't disturb things now."

47      Negotiations over the terms of the amalgamation between the Adtronics Group and the Sicon Group occupied the balance of the summer of 1987 and continued into October. The next exchange of memoranda regarding the allocations commenced in March 1988 and concerned the 1987 allocations. In Donald Armitage's memorandum of March 28, 1988, he explains that he was using what has been called the "30/40/30" formula. By this he meant that he considered that 30% of Sicon's administration costs concerned lease costs (almost all of Sicon's signs were leased), and 40% of Sicon's administrations costs concerned administration of Sicon's leases, and 30% of Sicon's administration costs concerned Sicon's cash sales. Adtronics had only cash sales. Donald Armitage assumed that about 50% of the cash sales of the whole combined group was attributable to

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 134 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Adtronics after deducting Adtronics' administration expenses. He therefore charged Adtronics 50% of 30% of the Sicon Group administration costs.

48    Mark Armitage responded in a memorandum dated March 31, 1988. He stated, "The agreement we have with the Sicon Group specifically states how admin is to be divided, a copy attached, and it states that only shared services and facilities that cannot be directly allocated are to be paid for on a shared basis. This is not what is being done."

49    On November 28, 1988, Donald Armitage sent a memorandum to Mark Armitage concerning the allocations. He opened the memorandum with the statement, "Throughout the year we have been trying to arrive at a division of costs that you would find equitable." He noted that the Adtronics Group had been charged $2,612 per month for rent and said that he presumed Mark was satisfied with that. He said that he was trying to do what was equitable. I conclude from this memorandum that he was not following Clause 16 of the September Agreement. Mark Armitage replied by memorandum on December 12, 1988, that he did not agree to the rent Adtronics was being charged.

50    On July 4, 1989, Mark Armitage's solicitor, Doug Morley, wrote to Craig Wilson, the Sicon Group Auditor, objecting to Sicon's failure to adhere to Clause 16. In his letter, Mr. Morley writes, in part:

Section 16 was introduced to the Management Agreement because the Sicon Group had been preparing journal entries at the end of each year which charged the Adtronics Group for a portion of the common expenses. The amount borne by the Adtronics Group had been arbitrarily established and was believed to be excessive. Section 16 was inserted to establish a reasonable basis for allocating common expenses. It is the belief of the Adtronics Group that they continue to be charged excess amounts.

51    Mr. Wilson replied to Mr. Morley's letter on July 13, 1989. He enclosed schedules of the 1988 administration expense allocations. He wrote, in part:

We appreciate your concern over Section 16 of the management agreement, however, at least on the surface it appeared to us that the accounting department had made every effort to comply with the agreement in allocating costs. While Mr. Armitage has verbally indicated some displeasure with the allocations to the writer, he has not ever, to the best of our knowledge, laid out in writing what costs are excessive or what costs are acceptable in our over three years of involvement. We appreciate the difficulty in arriving at costs that are acceptable to all managers in the organization, however, the method of charging these costs to the Adtronics Group appears to have been reasonably consistent from year to year. We note that some costs previously of concern to Mr. Armitage have not been charged (e.g. collection costs).

52    On September 12, 1989, Mr. Morley responded to Sicon's new auditor, Mike Essex. He re-iterated that Adtronics required Sicon to comply with Clause 16. He wrote, in part:

There has been no agreement as required by paragraph 16(c) to identify the overhead facilities and services whose costs are to be shared. Without this agreement, Sicon Group is not entitled to charge overhead expenses which it has incurred to the Adtronics Group (or vice versa). An agreement as to which costs are to be shared is required first.

53    Attached to Mr. Morley's letter was a detailed schedule setting out Adtronics' position on the allocations. In particular, the schedule noted that Adtronics had never agreed to the basic rental charge, and Adtronics agreed to pay only 5% of Deo Zabat-Fran's salary. (Deo Zabat-Fran is Donald Armitage's son-in-law and was then the Sicon Group general manager.)

54    On November 8, 1989, Donald Armitage replied to Mr. Morley. The gist of his reply is that it was his view that Adtronics was being treated fairly. He complained bitterly that Mark Armitage failed to respond to information in a timely way. He suggested that Mark Armitage's accountant meet with the Sicon controller to work out the allocations.

55    This latest exchange illustrated the two vastly different methods the two Groups adopted to their financial relationship. Adtronics expected Sicon to adhere to Clause 16 of the September Agreement, whereas Donald Armitage considered that he was treating the Adtronics Group fairly and that Mark should stop complaining. Other fundamental disagreements began to emerge.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 135 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

One such disagreement was concern over the amount to be charged for senior management, although both Groups seemed to agree it was appropriate to partition expenses such as the general manager. Another is Donald Armitage's application of the 30/40/30 formula to sharing administration expenses which is a departure from the September Agreement. Still another is the charge to Adtronics for head office type expenses, such as Donald Armitage's travel and expenses in Toronto to meet with his lenders, and the maintenance of an office for Donald Armitage and his assistant in a separate building.

56    In Mr. Morley's response letter of January 5, 1990, he reiterated Adtronics' position that Sicon was contravening Clause 16 of the September Agreement. Mr. Morley noted that according to Clause 16, Adtronics need only pay for services and facilities that it used. Mr. Morley advised that Adtronics intended to commence litigation for an accounting of the amount owing by the Adtronics Group since September 30, 1987. Mr. Morley said that legal action would not be commenced before January 22, 1990, in order to give Sicon the opportunity to recalculate the accounts in accordance with the September Agreement.

57    Exchange of correspondence between Adtronics accountants and Donald Armitage or his accountants continued in the same vein for the balance of 1990, 1991, 1992 and into 1993. In each letter or memorandum Adtronics complained about excessive charges and Sicon's failure to adhere to Clause 16 of the September Agreement. Donald Armitage generally responded by attacking the competence of Adtronics' lawyers and accountants for failing to understand the facts, Mark for failing to understand how to operate a business, and both for failing to appreciate that what he was doing was ultimately "fair" for Mark.

58    In a letter dated January 2, 1992, Mark Armitage's accountant, Doug Reid, suggested hiring an independent consultant to review the accounts. In a letter dated February 10, 1992, Donald Armitage wrote to Doug Reid acknowledging that the allocations were not done in accordance with the September Agreement, but that they had been done according to Ester Gale's opinion as to what was fair. This statement was misleading because at the examination for discoveries of Donald Armitage and Ester Gale, they both admitted that Donald Armitage would decide annually what amount the allocation to Adtronics should total and then it was left to Ester Gale to work backwards from that number and create allocations that would equal the number already selected by Donald Armitage.

59    On February 21, 1992, Doug Reid wrote to Donald Armitage setting out in some detail the categories of dispute and offering to meet and discuss them.

60    In a letter dated March 17, 1992, Donald Armitage wrote to Doug Reid that in those instances where Sicon was not following the September Agreement, Sicon was charging Adtronics less than would be charged if Sicon followed the September Agreement. This statement was also misleading. On December 13, 1991, Perry Munton, Sicon's auditor, prepared a letter reviewing, at Donald Armitage's request, the reasonableness of the administrative expenses charged to Adtronics and their compliance with Clause 16 of the September Agreement. The allocations then under review were for 1990. Mr. Munton prepared an opinion dated December 18, 1991, noting, "While Sicon's calculations may not be in strict compliance with Section 16 of the Management Agreement, the various methods of calculating the allocations appear to achieve a reasonable result." Donald Armitage forwarded this opinion to Mark Armitage as support of the position that he was being treated fairly. However Perry Munton had prepared an earlier letter dated December 13, 1991 (not sent to Adtronics), which concluded that if the formula in Clause 16 of the September Agreement was followed, Adtronics' share would be $118,866, not the $175,888 that was charged to Adtronics. Accordingly, it was misleading for Donald Armitage to assert that following the September Agreement would result in a higher charge to Adtronics. Donald Armitage testified that he could not remember looking at the two Munton letters.

61    In April 1992 Mark Armitage objected to the 1991 allocations. He wrote to Donald Armitage, "As in past years, you have made these allocations without consulting with or having prior agreement from us and we are not prepared to accept any charges from the Sicon Group under these circumstances."

62    In a memo dated January 25, 1993, Mark wrote to his father concerning Adtronics' efforts to find financing for Adtronics' move to its own premises and noted that Adtronics had not yet agreed to the cost allocations for "each of the past 6 years."

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 136 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

63    Donald Armitage replied to the January 25, 1993, memo on February 3, 1993. He wrote that he had noted Mark's comment about the six years of allocations still not agreed, and advised Mark that when Mark moved Adtronics to its own premises and separated the companies Sicon would demand a general release before paying any money owed to Adtronics.

64    Relationships between the Adtronics Group personnel and the Sicon Group personnel continued to deteriorate throughout 1993. Donald Armitage wrote a letter to Mark attempting to persuade him to remain in the Sicon Group, but Adtronics moved into separate premises on September 22, 1993.

65    Adtronics and Mark Armitage refused to sign a release as demanded by Sicon, and Sicon refused to pay the balance owing under the Agreement to Adtronics on the operating account, which even by Sicon's calculations was then thought to be about $500,000.

66    Unbeknownst to Sicon or Donald Armitage, Brenda Leung had, since the commencement of her employment at Adtronics on January 1, 1993, examined the allocations between Adtronics and the Sicon Group. On November 5, 1993, Adtronics delivered to the Sicon Group her report regarding the allocation of expenses. Her report calculated that Sicon owed Adtronics Signs Ltd. $3,391,321.86.

67    From this summary of correspondence between the parties, I conclude that there was no agreement not to be bound by the terms of the September Agreement. Mark Armitage never agreed to the 30/40/30 formula for the sharing of administration expenses. He never agreed to the flat amount being charged for rent. However, there is evidence about objections made by Mark Armitage, over the years, to specific items in the administrative allocations which the plaintiffs say in some cases resulted in certain amendments to the annual allocations. The plaintiffs say that the Sicon Group, through Ester Gale or Donald Armitage, agreed with some of Adtronics' objections and changed the particular allocation accordingly. It is asserted by the plaintiffs that these changes to the allocations which were then carried forward each year may be characterized as so-called "mini-agreements," or alternatively are evidence of the parties' interpretation of the September Agreement. Examples of these are: charitable donations, collection department expenses and salaries, courier expenses, Donald Armitage's separate office (the "Shellbridge office"), the U.S. Office Rent, sales expenses, and service costs. The plaintiffs submit that these mini-agreements (or the conduct of ceasing to charge for certain expenses after receiving complaints) constitute evidence of the defendants' belief that these expenses were not "shared facilities or services." I will consider if these so called mini-agreements are binding on the parties when I consider the individual allocations because the facts and circumstances vary with each item.

68    I now return to the threshold issues I identified above.

• *(a) Is there an agreement to charge a specific amount for rent as opposed to charging for the cost of the facility on the basis of the proportionate cost ratio?*

69    The defendants say that there is no agreement on rent. Mr. Clarke contends that, "There is no basis at law for the Court to interfere to establish rent. If there is a mini-agreement on rent its terms are that Don [Armitage] fixes the rent. On the agreement property costs are allocated on a space percentage."

70    The plaintiffs contend that there is an agreement to pay rent plus the proportionate facility costs that were charged during the currency of the Agreement. The plaintiffs say that the amount of rent charged was excessive and the court should accept its experts' opinion as to a reasonable rent. I infer from this argument that Mr. Shaw contends that this court should find as a fact that the parties agreed that Adtronics would pay a reasonable amount of rent.

71    The September Agreement is not ambiguous on its terms concerning the payment for use of the physical facility. Rent is not payable under the September Agreement but a proportionate amount of all costs to operate the building are payable by Adtronics.

72    The question is whether the conduct of the parties evidences an agreement, where the written Agreement is not ambiguous.

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 137 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

73    On December 12, 1988, Mark Armitage wrote to Donald Armitage concerning the allocations. In part he stated:

I do not agree with the costs you are charging for rent and services. I don't know how you arrived at the rate of $2612/ month for rent but I think its [*sic*] high for this part of Richmond considering the area of plant and office space I use.

74    About a year later, on September 12, 1989, Mark Armitage's solicitor wrote to Sicon's accountant, stating in part:

This basic rental charge has never been agreed to by Adtronics and we have always claimed it to be excessive.

75    Although the evidence seems clear that Mark Armitage did not object in principle to being charged rent, I can find no evidence that he ever agreed as to the amount.

76    Essentially the facts come to this. Both parties agreed in principle that Adtronics would pay rent notwithstanding the written agreement to the contrary but on the evidence I cannot find that this alleged contract was certain as to the amount of rent or the manner in which rent would be calculated or settled. The amount of rent in a lease is an essential term of the lease and it cannot be left to the court to substitute for the parties a term that they did not agree upon. (*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250 (Ont. C.A.), at 258-259; *Ossory Canada Inc. v. Wendy's Restaurants of Canada Inc.* (1997), 36 O.R. (3d) 483 (Ont. C.A.), at 489.)

77    In the absence of such a binding agreement, the parties must be bound by the September Agreement and consequently share the proportionate cost of the facility as specified in that agreement. The rent charge must be reversed and proportionate costs allocated on the basis of the agreed percentage of space used by Adtronics, which is 13.24%. Below in these reasons I will make findings concerning what specific facility charges may be allocated to Adtronics.

**• *(b) Is there an agreement to the use by Donald Armitage of a formula he called the 30/40/30 formula to calculate the charge to Adtronics for administrative expenses instead of the gross revenue formula specified in the September Agreement?***

78    The defendants argue that the plaintiffs did not complain about the gross revenue percentage used by Sicon and an estoppel will arise to prevent them from complaining about it now. I disagree. I can find no evidence that Mark Armitage ever agreed to the 30/40/30 formula. I conclude from the correspondence chronicled above and the testimony of the parties that Mark Armitage objected to the use of the 30/40/30 formula and demanded on numerous occasions that Sicon adhere to the September Agreement. In the face of his repeated objections, there can be no defence based on estoppel. It is alleged by Adtronics that even in the application of the formula, Sicon removed certain items from cash sales or charged certain expenses before applying the formula, always in favour of Sicon. It is unnecessary to consider this evidence because I have concluded that the 30/40/30 formula was never agreed to and the parties are bound to apply the gross revenue formula in the September Agreement.

79    However, the defendants also say:

[T]he plaintiffs are estopped from now asserting that the proper gross revenue percentage can be utilized against all the other interpretative assumptions, calculations, pro-rations, concessions and other calculations found in the allocation working papers. If the gross revenue percentage is to be utilized, it must be utilized against a fresh calculation under the agreement. To utilize that revenue percentage against a series of mini agreements, concessions and prorations works a hardship on the defendants because it gets to the wrong number....

80    I will consider this argument below as I consider individual items and whether the alleged mini-agreements were premised on assumptions that have now been shown to be inapplicable.

81    At trial, the parties agreed on the appropriate percentage for each year and the allocations must be redone for the years in question with the agreed percentage.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 138 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

**• (c) Is there an agreement to the charge by Sicon to Adtronics for head office type administration charges as a shared cost on the basis that Sicon provided a variety of indirect services for the whole Group including external relationships, maintenance of the plants, supervision of the accounting function, etc.?**

82     The defendants argue that indirect costs which are in the nature of "head office" type costs are for the benefit of the whole organization and must be borne on a pro rata basis by the Adtronics Group.

83     In his letter of February 21, 1992, Doug Reid wrote, in part:

*Financing Costs*:

We believe that the amortization of the financing costs should be borne entirely by Sicon Group. You have previously advised that Mark's group had come to the table on the basis that the financing might not proceed without his participation. In that he agreed to the arrangement for the good of the overall organization, he should not have to contribute to the refinancing which was primarily for the benefit of the Sicon Group.

However, to the extent that he shares any portion of these costs, his sharing of costs should be limited to the pro rata share of the total borrowing. Recall that Mark is pretty well self financed except for a requirement to use a small portion of the revolving line of credit. To suggest that Mark should bear an allocation based on percentage of sales is unreasonable and certainly not in accordance with the agreement. The measurement of the use of borrowing is already calculated since you allocate interest expense on that basis.

*Managerial Sales Expenses*:

This relates to your travel on "Sicon Group" business and administration. It does not pertain to Mark or his company's and he should not be charged any portion thereof. Those services are provided to Sicon Group and do not relate to the administration of Adtronics.

*Management Expense*:

It is inappropriate that Mark's group bear any portion of management salaries. These costs relate to the administration of the business of Sicon Group, not to the business of Adtronics Group. Recall that Mark is to pay only for services that he uses.

84     In Mr. Selman's expert report prepared for the Sicon Group, he recalculated the allocations using a number of assumptions. Two of those assumptions are stated by Mr. Selman in this way:

As Sicon's management provided a variety of indirect services for the Group, including external relationships, maintenance of the plant, supervision of the accounting function, etc., general management costs are a shared cost.

The Group made commitments to specific courses of action that resulted in ongoing costs. Where those costs are initially shared under the agreement, they continue to be shared in subsequent years unless notice was given under the opting out provision of the agreement. This applies in particular to financing fees and interest.

85     The September Agreement includes the provision that Mark Armitage had the sole and exclusive authority to decide if Adtronics would share administrative and accounting services provided by other members of the Sicon Group (Clause 9). Clause 16 includes a provision that no Group shall be obliged to share in any cost incurred by the other Group in respect of a service if it does not use the service. Either Group can opt out of a service on reasonable notice.

86     In the letter forwarded to Donald Armitage on March 25, 1988 concerning the 1987 allocations (part of which period predate the written agreement), Adtronics objected to being charged for management salaries, administration salaries, sales expenses and other general administrative charges, on the basis that essentially Sicon was only providing accounting services. Donald Armitage replied, in part, that management salaries were justified because of his time and his assistant's time devoted

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 139 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

to the 1997 refinancing and reorganization, and that other members of management supervised the accounting staff. As noted above, Mark Armitage replied by memo on March 31, 1988, attaching a copy of the September Agreement, and continued to object to charges which I have now called indirect head office type charges.

87    Mark Armitage wrote a memorandum dated December 12, 1988, to Donald Armitage in which he said, in part:

As far as other charges I do not think Adtronics gains any advantage by sharing in the Groups overall costs. I get charged for services I don't use or don't need and then your charges for those I do use seem to be as high or higher than what it would cost me to provide the same services myself. I don't know how you can expect to come up with an equitable division of costs without first discussing it with myself and my accountant.

88    The defendants' argument is premised on the assumption that it is *fair* to charge an overall or head office type administrative cost to a division. The defendants may be correct, but that is not the test under the September Agreement. It is in Mark Armitage's sole discretion as to whether he will use a service, and in his sole discretion as to whether he will opt out of a service. His correspondence, beginning within eight months of the signing of the September Agreement, makes his position very clear. He did not consider Adtronics liable to pay any part of the overall administration costs of the Sicon Group that he did not use. He was entitled to take such a position under the September Agreement. Such an interpretation of the September Agreement is consistent with the overall arrangement, which is described, in part, in Recital F where it is agreed that Adtronics will remain a distinct and separate entity from the other business operations of Sicon.

89    I therefore conclude that Adtronics should be charged only for those head office type services it used directly. In other words, Adtronics should not be charged for indirect administration expenses on the basis that such expenses are chargeable only when they are incurred for the maintenance of the overall group. So, for example, Donald Armitage's business trips to Toronto should not be charged to Adtronics as a shared expense. Donald Armitage's Shellbridge office and telephone should not be charged to Adtronics. Legal work in other provinces associated with security for the overall financing of the Group should not be charged to Adtronics as a shared expense; such legal work could also be considered specifically related to Sicon's lease business and so for that reason is not a shared cost. Below when I consider the individual items of account, I will detail those charges that should be reversed on the basis I have described as indirect head office charges.

*(d) Which party bears the onus of proof to prove that a charge made by Sicon to Adtronics was a breach of the September Agreement where Sicon has been unable to provide an explanation of the charge, owing to its destruction or loss of documentation?*

90    It is common ground that a number of accounting documents belonging to Sicon and pertaining to the 1986 to 1988 period were lost or destroyed by Sicon after 1993. When Adtronics left the Sicon group, Donald Armitage requested a release of claims from Mark Armitage. Mark Armitage refused to provide the requested release. Donald Armitage stated in a memorandum at the time that he anticipated a legal claim. This action was commenced on June 17, 1994. Brenda Leung's report was delivered in November 1993. I conclude that Sicon was aware in 1993, if not earlier, that the allocations for the years 1986 to 1993 would probably be the subject of a legal action. Sicon's explanation at trial for the loss or destruction of these documents is that they were destroyed in a general office cleanup performed by the office manager Sheila Roell. Ester Gale's evidence (at Discovery) was that Sheila Roell could not remember why or when she destroyed the documents. During her preparation of her report between January and September of 1993, Brenda Leung copied many documents from Sicon's accounting records. Some of these same copied documents were then lost or destroyed by Sicon. I therefore conclude that the documents were destroyed after 1993. I have concluded that Sicon should have preserved the documents given its knowledge of the claim.

91    What, if any, result follows in respect to the burden of proof?

92    Adtronics contends that the burden of proof should shift to Sicon where it is shown that a document has been lost or destroyed by Sicon.

93    The burden of proof to show that the charges made by Sicon were in breach of the Agreement lies with the plaintiff. However, once Adtronics has raised a reasonable challenge to a charge and Adtronics is unable from its own sources to explain

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the charge, in my view it is appropriate that an inference be drawn that the charge was improper unless Sicon adduces evidence to support it. I reach this conclusion regardless of the destruction of documents, although the destruction of documents is a secondary ground for drawing an inference adverse to Sicon. Below I return to this issue in respect to the specific circumstances of the individual claims.

## 6. Discrete Issues

94    There are a number of claims made by the plaintiffs that are not part of the dispute over allocations. These claims are as follows:

1. $70,000 Scientific Research and Tax Credit loan.

2. 1986 Extraordinary Loss.

3. The inducement agreement.

### (a) The $70,000 Scientific Research and Tax Credit Loan

95    Adtronics Signs Ltd. had been carrying out scientific research and development after April 19, 1983, in respect of which it incurred at least $70,000 in expenses. Adtronics Signs Ltd. was entitled to claim a scientific research tax credit on its tax return ("SRTC"). The combined federal and provincial SRTC available to Adtronics Signs Ltd. was 50% of the expenses, or $35,000. Adtronics Signs Ltd. was not in a position to utilize the SRTC in 1983 or 1984 because it had cumulative losses in those years.

96    In 1984, Donald Armitage approached Mark Armitage with a tax plan that had been recommended by Campbell Sharp, his accountants. The tax plan required a transfer of the SRTC from Adtronics Signs Ltd. to Donald Armitage personally in exchange for a $70,000 loan from Donald Armitage to Adtronics Signs Ltd.

97    The essential elements of the tax plan (as implemented) were as follows:

1. Donald Armitage loaned $70,000 to Adtronics Signs Ltd. for 5 years;

2. In February 1984, Adtronics Signs Ltd. executed and delivered to Donald Armitage a promissory note evidencing the $70,000 loan;

3. The promissory note stated that Adtronics Signs Ltd. would pay interest on the $70,000 loan at an interest rate of 5% per annum for the 5-year term;

4. Adtronics Signs Ltd. paid interest on the $70,000 loan at an interest rate of 5% per annum for the 5-year term;

5. In February 1984, Adtronics Signs Ltd. designated the expenditures in favour of Donald Armitage, and filed the required documents under subsection 194(4) of the *Income Tax Act* as it was required to do;

6. Donald Armitage's cost for income tax purposes of the $70,000 loan was $35,000, or 50% of the amount designated under subsection 194(4) of the *Income Tax Act*;

7. Donald Armitage received a $35,000 SRTC as a result of Adtronics Signs Ltd.'s designation of the expenditures in favour of Donald Armitage; and

8. Donald Armitage realized a personal income tax savings of $35,000 in 1984 by applying the SRTC on filing his 1983 income tax return before April 30, 1984.

98    The plaintiffs say that the uncontradicted evidence of the agreement Mark Armitage made on behalf of Adtronics Signs Ltd. with his father was that at the end of the 5-year term of the $70,000 loan, Adtronics Signs Ltd. would be required to re-

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

pay $35,000 of the $70,000 loan and the remaining $35,000 was to be forgiven by Donald Armitage. The defendants disagree and say the entire amount is owing.

99    Mark Armitage's evidence (under cross-examination) on the SRTC agreement is as follows:

Q: So Don calls you down to the office and Mary Powers is there and maybe somebody else.

A: Right.

Q: Mary Powers explains the deal, right?

A: Right.

Q: Mary Powers has the documents all ready to roll, right?

A: Yes.

Q: And you sign up and leave?

A: Yeah.

Q: And Don didn't say to you, Mark, you only have to repay $35,000 of this"?

A: Yes, he did.

Q: Well —

A: He said it was going to be a great deal and that's why — it wasn't costing anything, it was just — it was a wash.

Q: But it's Mary Powers who told you about how the deal would work, right?

A: Well, she explained the accounting side of it, why I would have to keep it to five years and —

Q: Why do you have to keep it for five years?

A: Well, because if I had — if it hadn't been for five years it would have been forgiveness of debt problem.

Q: What would the forgiveness of debt problem be?

A: Well, it would be like a taxable gain, I guess, that if —

Q: A taxable gain to Adtronics, right?

A: Um, yes, because we would have gotten $70,000 and only paid 35 back.

Q: Right?

A: That's why they felt it should go for five years.

Q: But you signed the $70,000 note on Adtronics's behalf and you made no contemporaneous memorandum with Don to the effect that the note really didn't mean what it appeared to mean, right?

A: Well, he had said to me that he was — that, you know, the end of the term I only had to pay back 35 and I believed him at the time.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 142 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

100     Mark Armitage created a contemporaneous memorandum of that agreement, in a handwritten note that he made in the meeting with Donald Armitage and the accountant, Mary Powers, on the second page of the tax plan which says, "Don to be paid $35,000 in settlement of note".

101     The plaintiffs argue that if Donald Armitage actually denies telling his son that he would forgive $35,000 of the $70,000 loan, presumably he would have testified to that effect. He did not. The tax plan was not a topic in his direct examination.

102     The plaintiffs also argue that the documentary evidence does not support the defendants' version of events. On or about October 5, 1984, Campbell Sharp responded to some questions posed by Donald Armitage regarding the tax plan. Campbell Sharp recommended that Donald Armitage hold the promissory note for five years. They go on to say: "If you do not Adtronics may face an approximate $25,000 to $30,000 forgiveness of debt problem". The plaintiffs assert that the only way Adtronics could face a $25,000 to $30,000 forgiveness of debt problem would be if Donald Armitage was anticipating forgiving part of the debt.

103     Mark Armitage testified about the agreement. Under cross-examination he said that he would not have agreed to the tax plan if he was giving up the $35,000 tax benefit for nothing. The defendants rely on the fact that in Brenda Leung's November 1993 report she claimed $25,000 and not $35,000 as repayment. In other words, Brenda Leung appeared to take the position that $25,000 should be forgiven and not $35,000. Mr. Clarke argues that if Mark Armitage was so certain that he had the agreement of Donald Armitage to forgive $35,000, he would have told Brenda Leung of the agreement and would not have authorized the November 1993 report to say otherwise. As already mentioned, Donald Armitage did testify at trial, but he gave no testimony concerning the SRTC. If he had a different version of events than that given by Mark concerning the obligation to repay the SRTC loan, I would have expected him to testify about it.

104     The plaintiffs' expert accountant, Mr. Harder, testified that in order to implement the tax plan recommended by Sicon and Donald Armitage's accountants in such a way that Donald Armitage would not make money on the transaction (which was Mark Armitage's evidence regarding the intent of the parties), Adtronics Signs Ltd. would have to re-pay only $35,000 of the $70,000.

105     The defendants also argue that Mark Armitage's evidence is parol evidence insofar as it contradicts the express written terms of the promissory note. The facts in this case are distinguishable from the case of *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 2 D.L.R. (3d) 600 (S.C.C.), and *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102, 110 D.L.R. (3d) 424 (S.C.C.). In those cases the agreements in issue, the bank guarantees, were in writing and constituted the whole agreement between the parties. Here there is no suggestion that the promissory note was the whole agreement between the parties. The promissory note was security for the promise to repay the loan, but the whole agreement included: an agreement to transfer the SRTC, an agreement to make the necessary income tax elections, an agreement to document the transfer and loan in accordance with the *Income Tax Act* and an agreement specifying the repayment terms of the loan. Accordingly, the parol evidence rule is inapplicable. (*Gallen v. Allstate Grain Co.* (1984), 53 B.C.L.R. 38, 9 D.L.R. (4th) 496 (B.C. C.A.).)

106      I accept the uncontradicted evidence of Mark Armitage and I find that he and Donald Armitage agreed that Donald Armitage would forgive $35,000 of the SRTC loan. If Donald Armitage did not agree he ought to have testified to that. I infer from his silence on this topic that he could not truthfully testify otherwise. Accordingly, I find that the defendants were not entitled to charge Adtronics the full $70,000 in February 1989 when the note became due, but rather $35,000 as was agreed.

*(b) Extraordinary Loss on Termination of Management Agreement*

107     In 1986, pursuant to a settlement terminating a management agreement between the Sicon Group and National Signcorp Investments Ltd., a company owned by Michael Armitage, the Sicon Group was unable to collect the full amounts due from National Signcorp Investments Ltd., resulting in an extraordinary loss to the Sicon Group on termination of the management contract.

108     The Adtronics Group was profitable in 1986, so Adtronics and Sicon agreed to transfer $179,914 of this extraordinary loss to the Adtronics Group to reduce taxes payable, with a provision that the Sicon Group would credit back to the Adtronics Group

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 143 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

$4,200 per month until the full $179,914 had been repaid. This $179,914 loss was reflected in the 1986 Financial Statements of Adtronics Signs Ltd. There is no dispute about the terms of this agreement.

109      Only $50,400 ($4,200/month from January 1986 to December 1986) of this $179,914 was credited to the Adtronics Group by the Sicon Group, leaving a balance of $129,514 owing to the Adtronics Group.

110      Mr. McLean prepared a chart on or about March 4, 2004, in an attempt to demonstrate that the $129,514 owing by the Sicon Group to the Adtronics Group was arguably "repaid" because the administration allocations in 1988 and 1989 were collectively $153,732 less than the average administration allocations in other years.

111      It is submitted by the plaintiffs that Mr. McLean's chart should be disregarded because:

(a) Donald Armitage did not testify that he had attempted, or intended, to repay the $129,514 owing by the Sicon Group to the Adtronics Group by using this procedure. Presumably, if he had intended to do so, he would have testified to that effect;

(b) Mr. McLean only prepared the chart the Thursday before giving evidence at trial;

(c) Ester Gale was examined for discovery on this topic in 2000 and admitted that the $129,514 was still owing.

112      Donald Armitage did not testify about the extraordinary loss. In closing submissions, the defendants do not attempt to explain why the payments stopped, but only take issue with what they say is a lack of particularization by the plaintiffs of how much is owing. No plausible explanation was given in evidence as to why the payments stopped. Tim McLean's evidence on this matter is entirely implausible and in any event not corroborated by Donald Armitage. I find that Sicon repaid only $50,400 of the original $179,914 and there remains the sum of $129,514 owing to Adtronics which according to the agreement made between the parties on this issue was to be repaid at $4,200 per month from January 1987 to July 1989.

*(c) The Inducement Agreement - Corporate Income Tax*

113      There were two main reasons for the 1987 amalgamation between the Sicon Group and the Adtronics Group. The first related to the re-financing and the second related to income tax. There is no doubt that Mark Armitage was reluctant to amalgamate his companies with his father's companies for a variety of reasons, some personal and some financial. In the course of Donald Armitage's efforts to persuade his son to amalgamate the companies, it is alleged by the plaintiffs that he offered an inducement to Adtronics. The alleged inducement was an offer to give Adtronics the benefit of Sicon's unused depreciation/capital cost allowance for income tax purposes, which in turn would shelter Adtronics income from income tax for several years. The amount of tax that Adtronics could save by this method was estimated to be in excess of $1 million. Mark Armitage says that he was unaware until 1993 that after the amalgamation, on an annual basis, Sicon's accountants estimated the amount of tax that Adtronics would have paid if it had not used the Sicon Group's capital cost allowance, and then charged that amount to the Adtronics Group in the inter-company account along with the other allocations charges. In essence, the defendants charged the plaintiffs a fee for using the Sicon Group's capital cost allowance. The total amount that was credited to Sicon's account was $1,066,000. Sicon disputes that it ever agreed Adtronics would not have to pay its tax and says that the inducement offered was to benefit the group as a whole by saving on income tax.

114      The September Agreement is silent on this issue. Or put a different way, the September Agreement does not authorize Sicon to allocate an income tax cost as it purported to do.

115      In a memorandum dated August 28, 1992, Donald Armitage took a retrospective look at the reasons for the amalgamation, writing to Mark Armitage:

You know Mark, we used to be pretty good friends at one time and you used to talk to me about things and we would discuss things and I can really pinpoint the date that changed, I don't know if you can.

It was October or November of 1986 when I suggested to you that it looked like you were going to become very profitable and we should consider putting your company in with ours so we could protect your profits with our depreciation and do

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

so, so that you would have effective control and could leave when it was necessary, or you weren't having your promise protected anymore because we ran out of depreciation. At that point you perceived that I wanted to steal your business and as I have told you before, I don't want your business, I don't know anything about it and I wouldn't have given it to you in the first place if I had wanted to keep it. I have said before, I do think that you have taken advantage of my generosity by wanting to have Adtronics all to yourself and still keep $^{1}$/4 of Sicon. ... Anyway, this estrangement, if that is the term, was strengthened when in December of 1986 CCFL insisted on this as part of the conditions under which they would seek a loan for us.

116     In a memorandum dated March 19, 1993, Donald Armitage wrote to Brenda Leung:

As you know we have protected his income from taxation with our depreciation over the last number of years, but when he goes on his own that can't happen. That is, he will have to find his own money for taxes.

117     Mr. Clarke argues that there was no necessity to induce Adtronics to amalgamate with the Sicon Group from the perspective of the Sicon Group. I do not agree with this submission. I conclude from the evidence that Donald Armitage put out his financing proposals including Adtronics in the group. Adtronics was presented in that way as a profitable division of the overall enterprise. He did not seek nor receive Mark Armitage's consent to his doing so. When CCFL, who brokered the loan, put out the financing package to all their clients, the proposal included Adtronics. CCFL then said that they could not backtrack and rewrite the loan proposal without Adtronics. This was a particularly sensitive matter because of the history of Michael Armitage's withdrawal from the group. Donald Armitage perceived Adtronics' participation in the amalgamation as critical to a successful refinancing. Donald Armitage's accountant wrote to Mark Armitage's accountant on September 14, 1987 that "funding will be lost to all parties" in the absence of advice that week that Adtronics would consent to the amalgamation. Sicon's accountant also wrote a memo to Adtronics advising that Sicon's attempt to keep Adtronics out of the financing package "were met with complete disapproval by CCFL."

118     Donald Armitage testified as to his understanding of the arrangement at his examination for discovery, read in at trial:

Q: You go to say: In effect nothing would happen during this period — Now, you're referring to the next four or five years, right?

A: Right, yeah.

Q: After 1987?

A: Yeah.

Q: — other than you would not pay tax. That was your intention?

A: Yeah.

Q: That Mark's companies would not pay tax?

A: Right, yeah.

. . .

Q: One of the benefits of this arrangement was that you were able to use the group's depreciation — which was your — a depreciation of capital cost allowance in your companies, correct?

A: Yeah.

Q: — five to seven years earlier than you otherwise would have been able to use that capital cost allowance deduction?

A: Yeah, but it was no gain to us. It was a saving to Mark —

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 145 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

. . .

Q: But one of the arrangements that you're proposing was that Mark would not pay tax?

A: That's right, he could then use the money to grow with.

Q: And you go on to say: The above was my original proposal and my only reason for it was for taxes. Is that true?

A: That's true.

Q: And you say: If you don't — you do not want to go along with it then you are not as smart as I give you credit for.

A: Yeah.

Q: You said that to your son?

A: That's to Mark, right.

Q: All right. And that's because in your view this was such a favourable proposal to Mark that he would be crazy not to go along with it?

A: Correct.

Q: You're essentially offering to him that he could come and become part of the group and for the next four or five years not pay any tax?

A: Right. Right.

119    The plaintiffs submit that it is nonsensical for the Sicon Group to say that the Adtronics Group would not pay any tax, and at the same time require that the Adtronics Group pay "dollar for dollar" for every tax dollar saved. They say there simply would be no benefit to the Adtronics Group in that scenario. The plaintiffs submit that the truth is that the Sicon Group offered its tax losses to the Adtronics Group (without any fees attached) because Donald Armitage was desperate for Mark's commitment to the re-organization, which the plaintiffs say was critical to the financing.

120    The plaintiffs characterize the fee charged as secretive. They say the fee was never disclosed in the annual allocations. The fee was recorded in the general ledger as a "deferred tax adjustment". It was not shown to Adtronics until Ester Gale gave Mark Armitage a memorandum on June 8, 1993, setting out the amount of the adjustments for the previous years. No evidence was tendered as to why the "deferred tax adjustment" was not disclosed together with the annual allocations.

121    Mr. Clarke says that there never was an agreement about the use by Adtronics of Sicon's tax losses. He relies particularly on the fact that when Brenda Leung prepared her report and delivered it to Sicon in November of 1993 the claim for credit arising from the income tax charges was framed not in terms of an objection to the charge but as a question of fairness. She said in her report:

The corporate income taxes as calculated by Smythe Ratcliffe & Associates for each of the years are calculated properly if Adtronics Division of 32262 B.C. Ltd. were taxed separately, however, as the Adtronics Group and the Sicon Group were amalgamated so the Sicon Group could use the cash savings from the Adtronics Group using the tax losses of the Sicon Group, the tax savings are benefited by both groups and hence the tax should be discounted. Tax losses usually sell on the open market for 5 to 10 cents on the dollar at the low end and 20 - 25 cents on the dollar at the high end. As the Sicon Group has enjoyed the cash flow of the Adtronics Group tax savings, the tax savings should be split 50/50.

122    Ms. Leung was acting on Mark Armitage's instructions when she prepared and delivered her report. She explained the failure to demand full repayment of the tax charges taken by Sicon on the grounds that she could not in 1993 find the

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 146 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

memorandum from Donald Armitage in support of Mark's assertion that he was to be charged nothing for corporate tax, that these memoranda (some quoted above), became available later, and that in the absence of supporting documentation she did not feel it was appropriate as a chartered accountant to advance the position that the full charges should be reversed. Mark Armitage testified to the same effect.

123    I conclude that Sicon needed Adtronics to participate as a member of its group to obtain financing. It matters not whether this was because Adtronics was profitable and Sicon was not, or whether the need for Adtronics' participation developed out of Donald Armitage's ill-conceived decision to include Adtronics in his first proposals to CCFL without first obtaining Mark's concurrence. The fact is that by 1997 Sicon desperately needed Adtronics to participate. Mark Armitage was at first resolute that he would not join the Sicon Group. He was persuaded by his father to join after receiving a number of strongly worded memoranda and by promises that he would save income taxes in excess of a million dollars. As Donald Armitage expressed it, he would be stupid not to go along with that kind of benefit. I accept Mark Armitage's evidence that he was induced to amalgamate by a promise of the tax saving. It is implausible that Mark Armitage would have agreed to be charged a dollar for every dollar saved, so as to exclusively benefit the Sicon Group. I do not accept that Mark Armitage was motivated to join the Sicon Group in order to extend such generosity to his father. I conclude that the full amount of the charges for corporate income taxes must be paid to the plaintiffs. Sicon promised the tax credits to Adtronics in consideration for Adtronics amalgamating with it. Sicon breached the September Agreement by charging imputed tax.

124    I now turn to the individual items in the allocations.

## 7. Allocations

125    In this part of my judgment I will follow the plaintiffs' numbering system and the plaintiffs' descriptions of individual items from the plaintiffs' opening and closing arguments and Scott Schedule.

### Audit Expenses — Section A

126    The plaintiffs' position with respect to audit expenses is as follows:

(b) The only expense that should be included in the audit pool for allocation to the plaintiffs are the invoices related to the year-end audit.

(c) Invoices other than those related to the year-end audit in the audit pool should have been classified as professional fees (Section B).

(d) Generally accepted accounting principles ("GAAP") of matching and the accrual basis of accounting should apply to the audit expenses.

(e) To the extent that any cost can be specifically attributed to one Group (as per Clause 16(a) of the September Agreement), that should be done first before applying the gross revenue percentage.

127    The difficulty in allocating the audit fees clearly illustrates, as Mr. Clarke puts it, the fault line between the parties. The plaintiffs' position is that Ester Gale allocated a percentage of audit fees that was specifically attributable to the Sicon Group every year. To the resulting figure she then applied a gross revenue percentage.

128    The plaintiffs argue that because Ester Gale agreed every year to specifically allocate a portion of the audit fee, this forms an agreement that is now binding on the parties. The defendants argue several propositions:

• The audit fee is one expense and under the September Agreement it cannot be partitioned. They argue that it is an incorrect use of the word "specifically" in Clause 16(a) of the September Agreement to use an estimate to partition a unitary cost. That they say is not a specific attribution, but an estimated attribution.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 147 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

• The correct approach, they say, is to apply the now agreed gross revenue percentage to the whole of the audit fee as contemplated by the September Agreement.

• They say it is "cherry picking" to accept Ester Gale's specific allocation for each year, i.e. the 50% or 70%, but not the revenue percentage which she used. The defendants acknowledge that the revenue percentage used by Ester Gale was not the revenue percentage calculation specified in the September Agreement, but they say the revenue percentage calculation she used was part and parcel of her estimate of the fair attribution of the audit fee to Adtronics.

129    I disagree with the defendants that Ester Gale's agreement to use the percentage shown at line two of Brenda Leung's chart, below, was part and parcel of her estimate of an attribution to Adtronics. The evidence is that Donald Armitage had a fairly good idea of the amount of administration resources devoted to each part of his company. He consistently said that administration resources devoted to leases and East cash sales should not be considered in the calculation of shared resources.

130    The plaintiffs also argue that even if Ester Gale's estimate of the allocation shown in line two of Brenda Leung's chart, below, is not a binding agreement, it is nevertheless evidence that audit fees are in part capable of specific allocation under Clause 16 of the September Agreement. In other words, Ms. Gale with the approval of Donald Armitage, was able to estimate from year to year the amount of the audit that related to leases and was unrelated to the business of Adtronics.

131    The reason that the parties specifically allocated a portion of the audit fee is that Adtronics (from an auditing perspective) has a relatively simple business. Adtronics manufactured and sold electronic signs. Compared to Sicon its annual sales were relatively few in number; probably less than 50 per year. Each transaction compared to Sicon was large in the dollar sense. On the other hand, Sicon had hundreds of transactions per year; 70% of its transactions were leases; its business involved collections, lease renewals, and the appropriate entries on the balance sheet; it had offices in several provinces and in the United States; it had numerous subsidiary companies; and it had significant assets. It is not difficult to understand that the greater portion of the audit fee related to the Sicon divisions other than the Adtronics division, as Ester Gale acknowledged. Line two of the following chart prepared by Brenda Leung illustrates the historical annual allocations made by Ester Gale on Donald Armitage's instructions. The following charts also illustrate the difference in approach of the parties to the treatment of this expense.

|  | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | Jan-Sep 1993 |
|---|---|---|---|---|---|---|---|---|
| Audit Fee Specifically Attributed to Sicon Group | 45,075.00 70% | 69,227.00 70% | 51,461.00 50% | 70,000.00 45% | 81,180.54 50% | 63,000.00 50% | 63,000.00 50% | 45,000.00 100% |
| Net pool Gross Revenue | 13,522.50 11.95% | 20,768.10 16.02% | 25,730.50 16.64% | 38,500.00 25.28% | 40,590.27 19.66% | 31,500.00 19.35% | 31,500.00 34.51% | 0.00 27.21% |
| Allocation subtotal | 1,615.94 | 3,327.05 | 4,281.56 | 9,732.80 | 7,980.05 | 6,095.25 | 10,870.65 | 0.00 |
| Direct Charges to be (reversed) or added |  | 408.00 |  |  |  |  |  | (2,500.00) |
| Total audit Charges to the Plaintiffs | 1,615.94 | 3,735.05 | 4,281.56 | 9,732.80 | 7,980.05 | 6,095.25 | 10,870.65 | (2,500.00) |
| $6,624.00 invoice to be allocated |  |  |  |  |  | 1,281.74 (6624.00 × 19.35%) |  |  |
| Total Charges to the | 1,615.94 | 3,735.05 | 4,281.56 | 9,732.80 | 7,980.05 | 7,376.99 | 10,870.65 | (2,500.00) |

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Plaintiffs

132     Brenda Leung has calculated the defendants' position in this litigation on the allocation of the audit expenses in a comparable form as follows:

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | Jan-Sep 1993 |
|---|---|---|---|---|---|---|---|---|
| Audit Expense as per General Ledger | does not address 1986 | does not address 1987 | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $50,250 |
| Trial Exhibit #130 | | | | | | | | $5,000 |
| Audit expense pool | | | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $55,250 |
| Specifically Attributed to Sicon Group | | | 0% | 0% | 0% | 0% | 0% | 0% |
| Net pool | | | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $55,250 |
| Gross Revenue | | | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Allocation Total | | | $14,318 | $17,696 | $13,762 | $13,177 | $42,782 | $15,034 |

133     Although Mark Armitage testified that in his opinion the allocation to Sicon was too low, I can find no evidence that for the 1987 to 1992 annual allocations he communicated his disagreement to Ester Gale or Donald Armitage.

134     In this litigation he seeks a further concession. Mark Armitage says that the correct allocation to Sicon is larger than used by Ester Gale historically. In this litigation, the defendant contends that there should *not* be a specific allocation, but rather that the whole audit fee should be considered a shared expense to which the gross revenue formula should be applied. Sicon's position would result in a charge that is greater than that which Sicon agreed to charge during the currency of the Agreement.

135     Adtronics argues that the parties' interpretation of the Agreement as evidenced by their conduct should govern the interpretation of the Agreement. Adtronics also says that this method of apportioning could be considered a mini-agreement and is enforceable as such.

136     Sicon further contends that there was no "mini-agreement" because the parties did not agree on the amount of the allocation each year, or in other words, because there was no consensus. According to Sicon the Court should ignore the conduct of the parties over the years and literally apply the September Agreement which results in the application of the gross revenue formula to the audit fee for each year in question.

137     I begin by observing that the September Agreement has two phases. First is the formulaic part of the Agreement entered into in September 1987. Second is the implementation stage which is an ongoing annual process requiring the parties to interpret the Agreement and apply it to the changing circumstances of their business relationship. Looked at from this perspective, it is important to examine what the parties did agree was the correct interpretation of the Agreement.

138     There were three people involved in the implementation phase of this Agreement - Ester Gale, Donald Armitage and Mark Armitage. Based on all the evidence including testimony, Ester Gale's working papers, the memorandum and written communications between the parties, I conclude that these three people agreed that a correct interpretation of the implementation

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

phase of the Agreement was to first specifically allocate a portion of the audit fee related only to Sicon. I find that their conduct in doing so is evidence of their intention as to how the Agreement should be interpreted. That portion of Clause 16 says:

> ...to the extent that any cost can be specifically attributed to one Group or another it shall be specifically borne by such Group (e.g. long distance telephone calls)

139     Mr. Clarke also points out that there was no agreement as to the amount of the audit that should have been specifically allocated to Sicon, therefore, the Court should apply a strict interpretation of this clause of the Agreement and refuse to apportion a unitary cost.

140     There are several approaches the court could take to this problem. First would be to apply what Sicon says is the strict literal interpretation of the Agreement and ignore the historical conduct of the parties. Second would be to interpret the Agreement in a manner consistent with the conduct of the parties, accepting that the parties' conduct is evidence of their contractual intention. Third would be to consider that the parties entered into a collateral, or mini-agreement, or amendment to the Agreement. Fourth would be to consider that Sicon is estopped by its conduct from relying on the strict terms of the contract.

141     If the Agreement is looked at as a whole, the idea that one cost could, in part, be specifically allocated to one party is consistent with the central formula of the Agreement which is that the allocation process would reflect the parties' respective use of the shared services or facilities.

142     "The law is clear that in Canada evidence of post-contractual conduct can be considered in the event of an ambiguity in the contract." (*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60, [1989] B.C.J. No. 39 (B.C. C.A.)).

143     The question of the evidentiary value of subsequent conduct in the interpretation of a contract is discussed by E.H.L. Fridman, in *The Law of Contract in Canada* 4th ed. (Scarborough: Carswell, 1999) at 489:

> Canadian courts have adopted the view that subsequent conduct can be a useful guide to the interpretation of a written contract. Cases before the decision of House of Lords in the *Whitworth* case permitted the admission of such evidence as long as it did not add to, or vary the document to be interpreted but simply helped the court to arrive at a conclusion as to the true intent and meaning of the words used in the document. The effect of such conduct was, in a sense, to *fix* the interpretation of the language of the document. In one case, which was concerned with whether a restrictive covenant in a contract was personal to the parties or went with the land, Thomson J. of the Supreme Court of Saskatchewan, said than in cases involving an ambiguity in an agreement, "there is no better way of determining what the parties intended than to look to what they did under it." There is much to be said for this approach, as many Canadian judges have declared. In the words of Lord Denning, when the contract is unclear, the parties "are themselves the very best guides to the way in which it was used." This did not appeal to Lord Reid, who referred to the possibility that a contract might mean one thing the day it was signed, but by reason of subsequent events mean something different a month or a year later. This may be an over-reaction, in that the dangers of shifting meaning may have been exaggerated by Lord Reid and others. When the matter came before the Manitoba Court of Appeal and was thoroughly canvassed, the judges in that court found no difficulty in rejecting the more rigid approach of the House of Lords and accepting the admissibility of subsequent conduct in an appropriate case, where there is ambiguity. [internal footnotes deleted]

144     Mr. Clarke contends that there is no ambiguity. I do not agree. Given that the central purpose of the whole contract was to allocate costs to the user, there is an ambiguity when considering whether the words "to the extent that any cost can be specifically attributed" in clause 16 means, the whole cost or a portion of the cost.

145     If the contract is not ambiguous and Sicon's interpretation is the correct one, I would nevertheless reach the same result on the basis of estoppel.

146     Two potential versions of estoppel may be applicable here. The first is promissory estoppel, which applies where a party has made a representation to another party indicating that it will not claim its full rights under the contract. Where the promisee relies upon that representation to its detriment, the promissor will not be allowed to enforce its full rights under the

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 150 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

contract. The elements of promissory estoppel may be summarized in the following way (E.H.L. Fridman, *The Law of Contract in Canada*, 3d ed. (Scarborough: Carswell, 1994) at 129-136):

(a) The parties must have been in an existing legal relationship at the time that the statement was made.

(b) There must have been a clear promise or representation made by the party against whom the estoppel is raised that establishes that party's intent to be bound by the representation. (*Conwest Exploration Co. v. Letain* (1963), [1964] S.C.R. 20, at 28, (1963), 41 D.L.R. (2d) 198 (S.C.C.) )

The representation can be expressed through either words or conduct. In *Engineered Homes Ltd. v. Mason* (1983), 146 D.L.R. (3d) 577, at 581, [1983] 1 S.C.R. 641 (S.C.C.) McIntyre J. cited Ritchie J. in *John Burrows Ltd. v. Subsurface Surveys Ltd.* (1968), 68 D.L.R. (2d) 354, at 360, [1968] S.C.R. 607 at 615 (S.C.C.), who stated:

> It seems clear to me that this type of equitable defence cannot be invoked unless there is some evidence that one of the parties entered into a course of negotiation which had the effect of leading the other to suppose that the strict rights under the contract would not be enforced, and I think that this implies that there must be evidence from which it can be inferred that the first party intended that the legal relations created by the contract would be altered as a result of the negotiations.

(c) The promissee must have relied upon the statement or conduct of the party against whom the estoppel was raised.

Lord Denning in *Brikom Investments Ltd. v. Carr*, [1979] 2 All E.R. 753, [1979] 2 W.L.R. 737 (Eng. C.A.) suggested that reliance can be proven by showing that the promissee altered his position on the faith of the representation, by going ahead with a transaction then under discussion, or by any other way of reliance.

(d) The party to whom the representation was made must have acted upon it to his detriment.

Fridman indicates that this element is a matter of dispute. Some courts have stated that when a party alters its position due to the representation, this is enough (e.g. *W.J. Alan & Co. v. El Nasr Export & Import Co.*, [1972] 2 Q.B. 189, at 213, [1972] 2 All E.R. 127 (Eng. C.A.) (*per* Lord Denning)). Other courts have indicated in *obiter dicta* that there is a requirement that the representee establish detriment (e.g. *Pentagon Construction (1969) Co. v. United States Fidelity & Guaranty Co.* (1977), 77 D.L.R. (3d) 189, [1977] 4 W.W.R. 351 (B.C. C.A.)).

(e) The representee must have acted equitably.

147    In this case, the first and fifth elements are uncontroversial. The parties clearly were in a contractual relationship at the time of the alleged promise, and there is nothing to indicate that the representee did not act equitably.

148    The evidence of Sicon's conduct in apportioning the audit fee establishes the second element (clear representation or promise). In the implementation phase of the Agreement, Sicon agreed to apportion the audit fee before applying the gross revenue formula to the balance. This inevitably resulted in a lesser charge to Adtronics for this expense. This pattern of conduct can be characterized as a repeatedly renewed, clear promise not to implement the Agreement in allocating this expense in the same way as the Agreement was implemented for other expenses.

149    The third and fourth elements — detriment and reliance — are also established by the evidence. Because of Sicon's promise to apportion the audit fee, Mark Armitage altered his own conduct to his detriment by refraining from objecting to an allocation he otherwise would have made annually.

150    Given that all of these elements are made out, Sicon would, on the basis of promissory estoppel, be barred from returning to the "clean slate" of the Agreement.

151    The second form of estoppel that may apply is estoppel by convention. Estoppel by convention operates when the parties rely on an agreed state of facts or a common apprehension of fact or law which has been assumed, by convention of

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 151 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the parties, to be the basis of the transaction they are about to enter. When parties have acted on the agreed assumption that a given set of facts is to be accepted, this prevents the other from questioning the truth of the statement of facts so assumed (*32262 B.C. Ltd. v. Companions Restaurant Inc.*, [1995] B.C.J. No. 342, 17 B.L.R. (2d) 227 (B.C. S.C.), per Esson C.J.; *Coupal v. Strata Plan LMS2503*, 2002 BCSC 1444, [2002] B.C.J. No. 2313 (B.C. S.C.) ). In order to rely on the defence of estoppel by convention, a party must establish that they relied on the assumed set of facts to their detriment (much like in promissory estoppel) (*Canacemal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (B.C. S.C.)).

152     In this case it could be said that the way in which the agreement was applied with respect to audit fees was an apprehension of fact or law that amounted to an convention shared by the parties. The parties' conduct indicates that they were both operating under the understanding that the way to implement the agreement with respect to this expense was to divide it on a pro rata rather than gross formula basis. As indicated above in the analysis of promissory estoppel, Adtronics relied upon this common understanding to its detriment. According to the doctrine of estoppel by convention, Sicon should therefore be prevented from now questioning this common assumption.

153     I therefore conclude that Sicon cannot rely on what it now says was the correct interpretation of the contract to the detriment of Adtronics when it never applied the contract in that way during the administration of the contract. If Sicon had interpreted the contract as it now contends for, Adtronics would have objected at the time and utilized the mechanism provided by the contract for either party to refuse to share in a service or facility. Consequently Adtronics must be taken to have relied on Sicon's interpretation of the Agreement to permit specific allocation of a portion of one expense category.

154     The evidence is compelling that the parties agreed to apportion the audit fee. Either on an estoppel analysis or the interpretation of the Agreement based on subsequent conduct I reach the same result which is that the parties agreed to apportion the audit fee.

155     Accordingly, with respect to the Audit expense, I order that the allocation be calculated for the years 1987 to 1992 as a shared expense in accordance with the now agreed upon gross revenue percentages for each of those years, using the historical allocation shown at line two of Brenda Leung's table shown above. (The 1993 audit expense is *not* a shared expense, because plaintiffs/defendants did their own year ends in 1993.)

156     Under the heading of Audit Expenses, Sicon included its other professional fees (including other accounting fees). All other professional fees should be classified as professional fees and I will consider the allocations for those fees when I consider professional fees.

157     Brenda Leung separated the year end audit fees in her analysis in the chart above. I accept her evidence that line one of her chart is an accurate summary of the fees for the year end audits and it is those numbers to which the shared services formula in the September Agreement should be applied. All the other accounting fees will be considered below.

158     That leaves the issue concerning the application of GAAP to the calculation of the audit allocations. There is no doubt that a correct application of GAAP requires that the expense be matched in a temporal sense to the income to which the expense relates. For example, audit fees incurred to audit the 1990 year end should be expensed in the 1990 financial statements. Because the audit is done after the fiscal year end and invoiced and paid several months later, Sicon charged the audit fee in the following year. So in the example above, the 1990 financial statements included the 1989 audit fee and the 1991 financial statements, included the 1990 audit fee. Sicon's accountants corrected the company's practice in this regard for the fiscal year ending in 1992.

159     The issue in this action is whether for the purposes of calculating the audit allocations the correction should be backdated. It is important to the plaintiffs because its revenue relative to the Sicon Group revenue became proportionately larger in later years and thus it would pay a proportionately larger share of the audit fee.

160     The September Agreement contains two references to GAAP. The first is in Clause 2 and relates to Adtronics' transfer of its business and assets to 32262. The second concerns the redemption of the preference shares issued to Adtronics (Clause 13). There is no specific reference to GAAP in Clause 16 of the September Agreement. The issue is whether the September Agreement should be read to imply a term that shared expenses will be allocated in the year in which they are incurred.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 152 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

161    The plaintiffs argue that because the sharing of expenses is tied to a formula that specifically incorporates a fraction based on the parties' revenue, the September Agreement should be interpreted to mean that the shared expense should be matched to the revenue for the same time period.

162    The contrary argument is that Sicon was responsible for its own accounting and that if it chose to account for the audit fees on a cash rather than accrual method, that is, something that is within Sicon's discretion under the September Agreement. I agree that it is not necessary for a company to comply with GAAP for matters that are entirely internal and have no impact on the financial statement for external users, but in this case the proportionate revenue sharing formula makes no sense unless there is a matching of revenue and expenses incurred to earn that revenue. Accordingly I would imply into the September Agreement a term requiring the matching of expenses and revenue incurred and earned in the same fiscal period.

### Professional Fees - Section B

163    Most of the professional fees can be allocated on the following basis. I will consider all fees associated with the 1987 financing under the heading "deferred financing costs". Part of the professional fees have been considered under the Audit section. The majority of the remainder of the professional fees that are in issue relate to what I have earlier described as head office costs and which I have already concluded are not costs which should be shared by Adtronics. At trial the defendants conceded that many of the items included as shared professional fees should not have been so included. I will indicate in this section which items were conceded by the defendants. As one further general comment I have found that Adtronics should not be charged professional fees related to the 1993 Royal Bank financing. The defendants contend that this financing was to be used in part to pay out Adtronics. For reasons which I expand upon below, I find that that is not a compelling argument. I have for the convenience of the parties referred to each disputed item by the same numbering description used by the parties in the Scott Schedule.

*(a) A 1990 professional fee expense in the sum of $3,180.23 described at Trial Exhibit #10, Tab 196 (which was originally specifically attributed to the Adtronics Group) should have been included in the professional fee allocation pool for location to both the Sicon Group and the Adtronics Group*

164    The parties now agree this item should not have been allocated to Adtronics but should have been a shared expense.

*(b) A 1990 professional fee expense in the sum of $249.00 described at Trial Exhibit #10, Tab 197 (which was originally specifically attributed to the Adtronics Group)*

165    In 1990, an invoice of the Sicon Group's lawyers, Mullholland Webster, in the sum of $249.00 was charged directly (100%) to the Adtronics Group. This invoice relates to legal advice obtained by Donald Armitage with respect to a dispute with Mark Armitage. I find this invoice is a head office expense and should not be included in the pool as contended by the defendants. It should be attributed to Sicon.

*(c) A 1993 professional fee expense in the sum of $2,500.00 at Trial Exhibit #10, Tab 242 (which was originally included in the allocation pool)*

166    The plaintiffs contend this invoice should have been specifically attributed 50% to the Sicon Group, and 50% to the Adtronics Group. At trial the defendants agreed with the plaintiff's position and it is so ordered.

### Specific Invoices Charges from 1986-1993

*1986*

167    All 1986 allocations will be considered below.

*1987*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 153 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(a) Jan-87 MiniFin 151884Rep - $30.00*

168      This charge was for the Minister of Finance for the filing of the Sicon Group Inc. annual report with the corporate registry. This is a head office charge for Sicon and should be allocated directly to Sicon.

*(b) Feb-87 MiniCom Late Fee - $15.00 and Feb-87 MiniCom Late Fees - $45.00*

169      This charge relates to corporate filing fees and should be charged directly to Sicon as a head office type charge. Furthermore, the defendants have not produced any back-up documentation for these items.

*(c) Mar-87 Clarkson Gordon 251236 - $3,270.00*

170      This item is part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs. I will consider this below (Section Z).

*(d) Mar-87 ElliJon 1490 - $609.19*

171      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(e) Apr-87 ElliJon 1490 - $127.50*

172      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(f) Apr-87 MontPur 52043 - $10.34*

173      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(g) Jun-87 ThomRog 69/643 - $1,787.05 re Wallace Sign-Crafters v Strohmer & Branstone*

174      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(h) Jun-87 MontPur - 0006015 USX #26075 - $8.64*

175      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(i) Jun-87 Reverse 86 Accrual Fee 86/87 ($5,500.00)*

176      This item is to reverse a 1986 accrual fee. Mark Armitage testified that he does not know anything about this item, and the defendants have not provided any documentation for this item. The defendants destroyed the documentary back-up for this item. In my view this is one of those instances in which the onus shifts to the defendants to justify the charge. They have not done so and the charge should be reversed.

*(j) Jul-87 ElliJon 1490/61987 - $117.00*

177      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(k) Aug-87 ElliJon 1490/61987 - $78.00*

178      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(l) Aug-87 CampMur 24575 - $1,607.20*

179      Mark Armitage testified that this account is for a law firm called Campney & Murphy, from which the Adtronics Group did not seek services in 1987, and the defendants have not provided any documentation for this item. In the absence of

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 154 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

documentary or *viva voce* evidence from the defendants on this point, I accept Mark Armitage's testimony that there is no basis to allocate this item to the shared expense pool. I order that this item be allocated to Sicon.

*(m) Aug-87 ElliJon wrong acct - $702.00*

*(n) Sep-87 ElliJon File 1490 - $52.36*

*(o) Sep-87 Mulholland Webster 11,367 - $175.00 re C.M.G. Neon Sign Crafters*

180      At trial the defendants conceded that these three items should be allocated to Sicon and I so order.

*(p) Sep-87 Mulholland Webster FL#9960 (19445) - $288.56 re change of name from 151884 B.C. Limited to Sicon Group Inc. (Trial Exhibit #10, Tab 200)*

181      The defendants contend that this item is properly a shared expense. Mark Armitage testified that this invoice relates to legal services provided by Mulholland Webster to change Sicon's registered name from the numbered company to Sicon Group Inc. This legal service was associated with the refinancing and reorganization of the companies in 1987. Mark Armitage testified that professional fees would properly be shared if they related to the cancellation of the CCB loan, or the 1987 corporate reorganization. Mark Armitage agreed to the amalgamation so inferentially he must have agreed to share in the cost of accomplishing it. I therefore conclude that this invoice relates to the 1987 corporate reorganization and is properly a shared expense. Below in Section Z I have found that the deferred financing costs, as differentiated from the corporate re-organization costs, are not a shared expense but rather a specifically allocatable expense based on the amount of the financing used by each party.

*(q) Oct-87 Mulholland Webster Sept Stmt - $21,108.44 re refinancing & reorganization required by the lenders therefor*

182      To the extent that this legal fee relates to the corporate re-organization it is a shared cost. Legal services related to refinancing as opposed to corporate re-organization, should be considered below under the heading of deferred financing costs (Section Z).

*(r) Oct-87 Mulholland Webster 10502 - $427.08 re Michael Armitage, Sign-O-Lite & Adtronics - portion of $1227.08 bill re telephone conference with Don Armitage re Bank of Nova Scotia & goods held; revise letter to M. Paine*

183      At trial the defendants agreed that this item should be charged directly to Sicon and I so order.

*(s) Oct-87 Mulholland Webster 11467 (10147) - $4,231.31 re Sign-O-Lite Plastics vs. Beverley Walker display rental agreement #010-14811*

184      The plaintiff says in its closing submission that this expense is part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs. This expense relates to a law suit with one of Sicon's lease customers. It should not be classified as deferred financing but should be charged directly to Sicon. It is not a shared expense.

*(t) Oct-87 MiniCor Annual Rpt - $20.00 and Oct-87 MiniCor Annual Report - $20.00*

185      Mark Armitage testified that these two items should not have been included in the pool for allocation because they appear to be related to the filing of the annual report and Mark Armitage paid for his own filings. The defendants characterized this item as services to the parent company and contended that it should be shared. I find that this is a head office charge and should be allocated to Sicon.

*(u) Oct-87 Clarkson Gordon 87228 - $17,434.00 re bank financing - Bank of B.C., National Trust*

*(v) Oct-87 Clarkson Gordon 87085 - $4,800.00 re lease contracts receivable @ Nov 24/86 per Bank of Nova Scotia re accuracy & reasonability of lease portfolio (Trial Exhibit #10, Tab 202)*

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 155 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(w) Oct-87 Clarkson Gordon 87088 - $10,500.00 bank proposals - CCF, TD Bank, Bank of Nova Scotia, Bank of B.C. re bank financing*

186    These items are part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs and I will consider them below (Section Z).

*(x) Oct-87 CK Legal & L of C 0010009 - $3,591.05*

187    Mark Armitage testified that he has no idea what this item is, but that it appears to refer to a letter of credit. He testified that no letter of credit was obtained for Adtronics in 1987, and no back-up documentation was ever provided by the defendants for this item. In the absence of documentary or *viva voce* evidence from the defendants on this point I accept the testimony of the plaintiffs. Accordingly this item should be allocated to Sicon.

*(y) Nov-87 Mulholland Webster 11,367B - $19.83 re C.M.G. Neon Sign Crafters (Trial Exhibit #10, Tab 203)*

188    At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(z) Nov-87 Mulholland Webster 11467-06 - $11,036.46 re Sicon Group reorganizing & refinancing*

*(aa) Nov-87 Mulholland Webster 11467-406 - $12,000.00 re Sicon Group reorganizing & refinancing*

*(bb) Nov-87 Mulholland Webster 11467/406 - $12,000.00 re Sicon Group reorganizing & refinancing*

189    In Sicon's books of accounts the defendants reclassified these amounts as deferred financing costs. Consequently they should be allocated as such in section Z below. As already mentioned, to the extent that these fees relate to the corporate re-organization they should be considered a shared cost.

*(cc) Nov-87 TheLaw legal fees - $955.00*

190    Mark Armitage testified that he does not know what this item is. He said Adtronics did not authorize this expenditure for legal fees in November of 1987, and the defendants have not produced any documentary back-up for this charge. In the absence of documentary or *viva voce* evidence on this point, I accept the plaintiffs' evidence and conclude that this item should be allocated to Sicon.

*(dd) Nov-87 CanaCor Dep Tfr 0011029 - $10,000.00*

*(ee) Nov-87 CanaCor Jun Dep Trf 0011029 - $25,000.00*

*(ff) Nov-87 Tfr Blake Cassels 0011031 - $69,160.00*

*(gg) Dec-87 Mulholland Webster Jan Stmt - $22,221.30 re reorganization, CCB and Bancorp claim for commission on refinancing*

191    These items will all be considered below as deferred financing charges (Section Z).

*1988*

*(a) Jan-88 MiniFll A/C 1365 - $250.00 to bring cash balance up for Sign-O-Lite re its search fee account #1365 with Minister of Finance (Trial Exhibit #10, Tab 204)*

192    Mark Armitage testified that this expense was for the Sicon collection department to do company searches on individual businesses through the registry in Victoria, and relates to Sicon's lease business. Mark Armitage said he specifically refused to use the Sicon credit department. Timothey McLean testified that the Sicon Group maintained a search fee account with the Ministry of Finance in Victoria to do credit checks on future proposed clients. I find that this fee is specifically allocable to Sicon.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 156 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(b) Feb-88 ElliRoad 1490G1987 - $65.00 review proposed cash sale agreement (Trial Exhibit #10, Tab 205)*

193      At trial the defendants conceded that this expense should be allocated to Sicon and I so order.

*(c) Feb-88 JoanMcM Per Joan $16,000.00*

194      At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(d) Mar-88 BourCon 3073 - $238.55 re Sign-O-Lite Signs & Mam Pizza (Millwoods) Ltd. (Trial Exhibit #10, Tab 206)*

195      This item is an invoice from the law firm Bourassa, Conway & Company in Calgary. This appears to be a dispute between the Sicon Group, or Sign-O-Lite Signs Ltd. specifically, and a Mam Pizza in Millwoods, Calgary. I conclude that this item should be attributed to Sicon.

*(e) Jun-88 Mulholland Webster 11,889 - $709.75 re Bancorp claim for commission on refinancing (Trial Exhibit #10, Tab 207)*

196      This invoice relates to the issue of deferred financing, which I will deal with below (Section Z).

*(f) Jul-88 Mulholland Webster 12,202 - $753.78 re Roylease Limited - search of vehicles in Alberta & B.C. (Trial Exhibit #10, Tab 208)*

197      At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(g) Aug-88 Mulholland Webster 12,202 - $126.00 re Royal Bank of Canada financing (Trial Exhibit #10, Tab 209)*

198      This invoice is from Mulholland Webster in regards to the Royal Bank financing. Mark Armitage said that Adtronics did not use the any part of the Royal Bank financing. The defendants contend that this expense relates to the operating line of credit for the whole business and is therefore a shared expense. I conclude that this expense relates to Sicon's head office expense and should be charged to Sicon.

*(h) Aug-88 ElliRoa 1490/A - $65.00 re Rick Austin and his termination & withholding of company vehicle & assets (Trial Exhibit #10, Tab 210)*

199      At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(i) Nov-88 Mulholland Webster 9960 (21,043) - $634.45 re Don Armitage re control to avoid delay in redemption of preference shares on his death, shareholdings in Sicon by 258374, increase directors in Sicon, Armitage & Neasden, alternative directors of Sign-O-Lite Plastics & Wallace (Trial Exhibit #10, Tab 211)*

200      This invoice from Mulholland Webster concerns the manner in which Donald Armitage's shares will be handled when he passes away, the settlement with Signcorp, the assignment of leases and other corporate matters. I conclude that this is a head office expense and should be charged to Sicon.

*(j) Dec-88 Mulholland Webster 11,889 - $3,082.15 re Bankcorp Mortgage Limited v Sicon Group Inc. et al.*

201      This is an invoice from Mulholland Webster with the reference to litigation styled as *Bankcorp Mortgage Limited v. Sicon Group Inc*. Donald Armitage had hired Bankcorp to find financing. When Donald Armitage found financing through the CCFL, he refused to pay Bankcorp their commission, so Bankcorp sued the Sicon Group. I agree with the plaintiffs' contention that this is a head office cost for which Sicon is wholly responsible.

*(k) Dec-88 1988 A/P Accruals 0012059 - $593.00 (Trial Exhibit #10, Tab 213)*

202      This entry corresponds to an invoice of Clarkson Gordon addressed to 32262 B.C. Ltd. Mark Armitage testified that the expense should not have been included in the pool for allocation because the expense relates to a Revenue Canada assessment

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 157 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

of the Sicon Group for late payment or remittance of payroll deductions. The assessment arose out of errors in the Sicon payroll department. Mark Armitage testified that he did not think he should share in the cost of mistakes made by the Sicon payroll department. I agree that penalties, fines and expenses of that nature are a head office type expense and cannot under the September Agreement become the liability of Adtronics.

*(l) Dec-88 MulhWeb Apr-88 - $3,221.05 re Royal Bank financing to review commitment letter, security documents, debenture, declaration of value, directors resolutions, statutory declarations, opinion letter (Trial Exhibit #10, Tab 214)*

203      This is a legal expense from Mulholland Webster concerning the Royal Bank financing that has nothing to do with Adtronics and was not used by Adtronics. This expense should therefore be characterized as a head office expense and allocated to Sicon.

### *1989*

*(a) Mar-89 SincPit 210502 RRM - $195.84 re Sicon Group of Companies re discharge of 6 debentures (Trial Exhibit #10, Tab 215)*

204      This is an invoice from a Calgary law firm, Sinclair Pittman, incurred for the purpose of discharging debentures. This is a head office type expense and should be charged to Sicon.

*(b) Mar-89 SincPit 210582 RRM - $126.15 re Sicon Group of companies re discharge of 6 debentures (Trial Exhibit #10, Tab 216)*

205      This is also an invoice from Sinclair Pittman incurred for the purposes of discharging debentures and should be characterized as a head office type expense and charged to Sicon.

*(c) May-89 MulhWeb 9960 (21832) - $344.50 re bank & fraudulent endorsements on cheques & statutory declaration re Adtronics (Trial Exhibit #10, Tab 217)*

206      This is an invoice from Mulholland Webster for legal services. Mark Armitage contends that it should not be included as a shared expense because it appears to relate to legal advice Donald Armitage obtained from his lawyers concerning Adtronics. He points to line items in the invoice that particularize communications with Adtronics' solicitor at Davis & Company. No one, including Mark Armitage, gave evidence from which I can draw any conclusions about the nature of the legal services invoiced. The burden of proof is on the plaintiffs. Evidence was available as to the nature of the legal services and accordingly I decline to make any order altering the original allocation of this item. It is not for the Court to speculate about the nature of the expense.

*(d) May-89 KellTre 8245JT - $811.25 (Trial Exhibit #10, Tab 218)*

207      At trial the defendants conceded this expense should be charged to Sicon, and I so order.

*(e) Jul-89 NewmMac 88\2509\he - $195.65 re discharge of financing statements (Trial Exhibit #10, Tab 219)*

208      This is an invoice from a Winnipeg law firm, Newman MacLean, to Mulholland Webster. Mark Armitage testified that this should not have been included in the pool for allocation because Adtronics did not carry on any business in Winnipeg, and the legal services relate to the discharge of financing statements. The defendants contend that this expense related to the original CCB financing. I conclude that this is an indirect head office type expense and should be charged to Sicon.

*(f) Sep-89 SincPit 210502 - $60.24 re Alberta corporate registry*

209      This is an invoice from Sinclair Pittman, a Calgary law firm, referring to legal research and attending at the central registry in Alberta. This invoice relates to the extra-provincial registration of the Sicon companies and is a necessary component of the Sicon business because it is doing business and securing financing in other provinces. I conclude that under the September Agreement such head office expenses are specifically attributable to Sicon or are indirect head office type expenses.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 158 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(g) Oct-89 HlecKan 12602 - $240.78 re Saskatchewan personal property registry (Trial Exhibit #10, Tab 221)*

210      At trial the defendant conceded that this expense should be charged to Sicon, and I so order.

*(h) Dec-89 0012009 Prof Fees - $5,000.00*

211      Mark Armitage testified that he has no idea what this expense is for and the defendants have not provided any back-up for this item. The defendants made no submissions concerning this item. There is no documentary evidence as to the nature of the expense that was charged. As noted above, the evidentiary onus shifts in this instance to the defendants and they have not discharged that onus. The defendants have not provided any explanation as to why the plaintiff was so charged. Accordingly I find that the expense is attributable to Sicon.

*(i) Dec-89 MulhWeb 11,559 - $733.80 re Blundell No. 2 Road Shopping center - Macy Neon (Trial Exhibit #10, Tab 222)*

212      At trial the defendants conceded that this expense should be attributed to Sicon and I so order.

***1990***

*(a) Jan-90 ElliRoad 1490/A - $169.37*

213      At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(b) Feb-90 MulhWeb 9960 - $353.75 re shareholder agreement re redemption of shares (Trial Exhibit #10, Tab 223)*

214      This is an invoice from Mulholland Webster for general corporate work on behalf of Sicon. As I have determined, head office type charges should be allocated to Sicon.

*(c) Apr-90 BurchMac Annual Stmt - $80.78 (Burchell MacAdam Hayman)*

215      No particulars of this charge, which relates to filing an annual statement, have been provided to the plaintiffs and it should be charged to Sicon.

*(d) Apr-90 TomArm Rep/Course - $160.00 (Trial Exhibit #10, Tab 224)*

216      This item relates to a training course taken by Tom Armitage. Tom Armitage was a Sicon executive responsible for the collection department. This is a head office type charge. Also, Adtronics specifically elected not to use the collection department. For both reasons, I find that this expense should be charged to Sicon.

*(e) Apr-90 TomArm Rep/Course - $41.95 (Trial Exhibit #10, Tab 224)*

217      This item relates to a textbook for Tom Armitage. This item should be charged to Sicon for the same reasons as the item above.

*(f) May-90 PittLav 210502 JWC- $105.68 to file discharge of debenture with Corp registry (Trial Exhibit #10, Tab 225)*

218      This invoice is from a Calgary law firm and relates to the discharge of security in Alberta. It is specifically attributable to Sicon's lease business or alternately is a head office type charge. For both reasons, I find that it should be charged to Sicon.

*(g) May-90 ElliRoad L-Tec - $2,116.25*

219      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(h) Dec-90 MulhWeb 130,11 - $3,067.00 re Bancorp Mortgage Limited v Sicon Group Inc. (Trial Exhibit #10, Tab 228)*

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 159 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

220    This invoice is from Mulholland Webster, regarding the litigation mentioned at item (j) in 1988, *Bancorp Mortgage Limited v. Sicon Group Inc.* Again, I will consider this item under deferred financing (Section Z).

*(i) Dec-90 MulhWeb 14,438 - $562.80 re sale & lease of equipment from Roylease (Trial Exhibit #10, Tab 229)*

221    At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(j) Dec-90 0012042 Half Signcorp - $27,713.56 Adtronics directly charged $27,713.56*

222    At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*1991*

*(a) Jun-91 CGA Ester Due - $529.65 (Trial Exhibit #10, Tab 230)*

223    This expense is for Ester Gale's membership in the Society of Certified General Accountants. Ester Gale provided services directly to Adtronics. Her professional membership was a reasonable part of her compensation package and I find that Adtronics should share in that expense.

*(b) Nov-91 MulhWeb 15805 - $180.55 re Sicon Group re Chandry, registration of Sicon in Ontario (Trial Exhibit #10, Tab 231)*

224    This is an invoice from Mulholland Webster for legal services for acting as agent for Sicon concerning various Ontario legal matters. I would characterize this account as head office type charges and I conclude that they should be charged to Sicon.

*(c) Dec-91 BiamCai 7079 - $99.00*

225    Mark Armitage testified that he does not know what the acronym BIAMCAI stands for, and he has never received any information from the defendants with respect to this item. The defendants have not provided any explanation for this account. The defendants have not provided any documentary back-up other than the entry on the company' books. Accordingly, I find that the charge should be allocated to Sicon.

*(d) Dec-91 HlecKan C4476 - $103.60 (Trial Exhibit #10, Tab 232)*

226    This is an invoice from the Saskatchewan law firm of Hleck Kanuka Thuringer. The invoice states that the legal services provided were for extra-provincial registration. Donald Armitage testified that the reason why the Sicon Group extra-provincially registered was because one must be extra-provincially registered in the jurisdictions in which one wishes to sue and maintain a court action. Such expenses relate directly to Sicon's lease business. I have already found that such a head office charge should be specifically allocated to Sicon.

*1992*

*(a) Jan-92 Annual Fee - $50.00 annual return fee - Minister of Finance - Saskatchewan (Trial Exhibit #10, Tab 233)*

227    This item is a cheque requisition payable to the director of the corporations branch in Regina, Saskatchewan and is a head office type charge, chargeable to Sicon. It is not a shared expense.

*(b) Mar-92 BurcMac 1008479 - $80.84 (Trial Exhibit #10, Tab 234)*

228    This invoice is from the Nova Scotia law firm of Burchell MacAcam & Hayman. The legal services provided are to register the Sicon business name in that province. Similar to the two preceding items, this charge should be specifically allocated to Sicon as a head office charge.

*(c) Mar-92 AltmKah 15545 - $113.50*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14410-1 Filed 09/16/14 Page 160 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

229    The plaintiffs challenge this account and the defendants have not provided any explanation as to why this expense was included as a shared expense. The defendants lead no evidence and made no specific submissions on this account. Accordingly, I find that it should be allocated to Sicon.

*(d) Jun-92 James Wong 8227 - $4,882.00 (Trial Exhibit #10, Tab 235)*

230    This is an invoice from James Wong, chartered accountant. Mark Armitage testified that the portion of the invoice relating to reviewing life insurance for Donald Armitage should not have been included in the pool for allocation. The defendants contend that life insurance for the C.E.O. of an organization is a legitimate business expense. In my view, it may be a legitimate business expense but it is a head office type charge and should be allocated to Sicon. The remaining portion related to Donald Armitage's capital cost allowance should, according to Mark Armitage, be included in the pool for allocation and accordingly, it is so ordered.

*(e) Jul-92 ElliRoa 1490\1 - $152.04*

231    This invoice is for Sicon's account collection lawyers, Ellis Roadburg. Mark Armitage testified that he does not know anything about the expense. The defendants have not provided any explanation for this expense. In the absence of any explanation or documentary back-up, I find that this item should be charged to Sicon.

*(f) Sep-92 TreaOntExta Prov - $50.00 (Trial Exhibit #10, Tab 236)*

232    This is a cheque requisition for the Ontario Registrar for extra-provincial corporations. I have already held that such extra-provincial registration expenses should be allocated to Sicon.

**1993**

*(a) Jan-93 MiniFin AnnuRep - $30.00*

233    This expense is for the Minister of Finance regarding an annual report. Mark Armitage testified that he was always billed directly for annual reports for his company and paid for them directly. I find that this general corporate expense should be charged to Sicon.

*(b) Jan-93 MiniSask Annual - $50.00 Saskatchewan annual report (Trial Exhibit #10, Tab 238)*

234    This is a cheque requisition for the Minister of Finance in Saskatchewan for an extra-provincial annual return. As above, I find that this should be charged to Sicon.

*(c) Feb-93 MulhWeb 12,602 - $59.90*

235    This item appears in the shared expense category on the accounts, but neither the plaintiffs nor the defendants know what it is for. Accordingly, in the absence of any evidence from the defendants, I find that this charge should be allocated to Sicon.

*(d) Feb-93 0002015 Tfr to Prof Fee - $4,812.15 A/C 272 - deferred financing costs (Trial Exhibit #10, Tab 239: $4,812.13 made up of three invoices: A. $2,838.87 (McMillan Binch) + B. $1,673.60 (Milner Fenerty) + C. $299.66 (Royal Bank))*

236    The defendants say that these three accounts concern the Royal Bank financing, and should be shared. I have already held that Sicon should be charged for all expenses concerning the Royal Bank financing. This financing was secured by Sicon to replace the CCFL funding, which in turn had been obtained to replace the financing from CCB. Adtronics had no involvement in the Royal Bank financing. The argument that some of the money obtained was to be used for the purposes of paying Adtronics what it was owed is not a compelling reason to saddle Adtronics with a portion of the cost of obtaining the funding.

*(e) Feb-93 0002015 Adj Ppd/Accrual- $19,700.00 A/C 183.003 relates to consulting re Tim McLean, Tom Armitage, Shirley and Smythe Ratcliffe audit fee (Trial Exhibit #10, Tab 240-244)*

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 161 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*A. Tab 241 ($16,000 less $2,500 related to audit = $13,500 remaining)*

237     This is an invoice from Smythe Ratcliffe in the amount of $16,000, of which $2,500 has been posted to audit; leaving a balance of $13,500 posted to professional fees. A review of this invoice discloses that it relates to assets in Eastern Canada "as requested by Ontario Courts", discussions about internal matters, discussions about employee compensation under the *Income Tax Act* and the possible use of holding companies by key employees to reduce U.I.C. payments, special investigations regarding share valuations of various Sicon companies, estate planning, review of B.C. capital tax information, and tax planning. All these services are general corporate head office services and I find that they should be allocated to Sicon.

*B. Tab 242 ($10,700 less $5,500 related to audit = $5,200 remaining)*

238     This is an invoice from Smythe Ratcliffe in the amount of $10,700, of which $5,500 has been posted to audit; leaving a balance of $5,200 posted to professional fees. Of this $5,200 remaining balance, Mark Armitage testified that the $2,500 entry relating to the U.S. audit of affiliated companies should be allocated between the Adtronics Group and the Sicon Group. This $2,500 has been accounted for by Adtronics. The remaining account is stated to be for estate planning and cannot be considered an appropriate shared expense. I find that it should be charged to Sicon.

*C. Tab 243 ($5,500 less $4,500 related to audit = $1,000 remaining)*

239     This is an invoice from Smythe Ratcliffe in the amount of $5,500, of which $4,500 has been posted to audit, leaving a balance of $1,000 posted to professional fees. The $1,000 balance relates to accounting services for share valuations of various Sicon companies and should be considered to be a head office expense and allocated to Sicon.

*(f) Feb-93 0002020 Tfr fr 06 - $1,000.00 deferred financing costs (Trial Exhibit #10, Tab 246)*

240     At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(g) Apr-93 BurcMac 1008479 Ann - $71.29 (Trial Exhibit #10, Tab 247)*

241     This is an invoice from the Halifax law firm of Burchell MacAdam & Hayman, for legal services related to business name registration, and I find that it should be charged to Sicon.

*(h) Jun-93 0006004 Smytrat to 18 - ($2,250.00)*

242     This journal entry is a transfer of $2,250.00 in costs from the Sicon professional fees to the Adtronics division, and is made up of two entries:

| (i) | $1,800.00 | (part of $4,800.00 from *Exhibit 10, Tab 248*), and |
| (ii) | $ 450.00 | (part of $2,500.00 from *Exhibit 10, Tab 189*). |
| | *$2,250.00* | *Total* |

These two costs are part of the next two items, (i) and (j), and are discussed below.

*(i) Jun-93 SmytRat 4331 - $4,800.00 see Doc 3361 - relates to 1992 T-1 personal tax returns for Tom and Monica Armitage, Lynn Muirhead, Mr. Muirhead and Mr. MacDonald; review in change of lease to achieve max tax benefits; tfr of Simpson Road property among related parties (Trial Exhibit #10, Tab 248: $4,800.00 = $1,800.00 + $1,300.00 + $950.00 + $750.00)*

*A. $1,800.00 entry*

243     At trial the defendants conceded that this amount should be charged to Sicon and I so order.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 162 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*B. $1,300.00 entry*

244     At trial the defendants conceded that this amount should be charged to Sicon and I so order.

*C. $950.00 entry*

245      This $950.00 entry relates to various meetings and discussions regarding transferring of the Simpson Road property among related parties, possible split off of Adtronics at some further date, and other corporate matters. The defendants contend that this relates to general corporate matters. I agree that it does and as such it should be charged to Sicon.

*D. $750.00 entry*

246      This $750.00 entry relates to the preparation of the 1992 personal tax returns for individuals Thomas and Monica Armitage, Lynn Muirhead, Mr. Muirhead and Mr. MacDonald. Mark Armitage says this should be charged directly to the Sicon Group because none of these people worked for the Adtronics Group, and Mark Armitage was charged directly for his own personal tax return preparation. As above this item relates to general corporate matters and I find that it should be charged to Sicon.

*(j) Jun-93 SmytRat 4596 $2,500.00 (Trial Exhibit #10, Tab 189: $2,500.00 = $500.00 + $1,000.00 + $450.00 + $550.00)*

*A. $500.00 entry*

247     At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*B. $1,000.00 entry*

248     The $1,000.00 entry relates to the various discussions regarding the possible split of Adtronics from the Sicon Group including preparation of draft taxes payable of the Adtronics division from 1987 through 1992. This expense relates to Sicon's general corporate position regarding the split with Adtronics. It should be specifically allocated to Sicon, or alternatively considered general head office corporate accounting. In either event, I find that it is chargeable to Sicon.

*C. $450.00 entry*

249     At trial the plaintiffs conceded that this expense should be charged to Adtronics and I so order. The $450.00 entry relates to continued discussions, correspondences and planning with regard to the current IRS audit of Adtronics Inc. Mark Armitage testified that this should be charged directly to the Adtronics Group as Smythe Ratcliffe was acting on Mark Armitage's behalf.

*D. $550.00 entry*

250     At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(k) Jul-93 0006014 Rev Adj - $3,000.00 JE adjustment only (Trial Exhibit #10, Tab 190)*

251      Mark Armitage testified that he does not know anything about this item. The defendants lead no evidence (other than the journal entry) specifically on this charge. In the absence of an explanation as to why this was charged to Adtronics, I order that the expense be reversed and charged to Sicon.

*(l) Jul-93 CampPou Appraisal - $250.00 appraisal (Trial Exhibit #10, Tab 249*

252     This item is for an appraisal invoice and cheque requisition for Campbell & Pound. Ester Gale testified that the appraisal relates to an update valuation of 2771 Simpson Road and believes it was done in connection with the financing that was put in place for Donald Armitage's companies in 1993. I have already said that expenses related to the 1993 Royal Bank refinancing are head office charges and should be charged to Sicon. As already stated, the fact that Adtronics hoped to be repaid from

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 163 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the financing does not, as the defendants contended in respect to this item, mean that it must share in the cost of obtaining the financing.

*(m) Aug-93 MiniFin 151884 - $30.00 (Trial Exhibit #10, Tab 250)*

253      This expense is for the annual report for the Sicon Group's numbered company, 151884, to the Minister of Finance. I find that this general corporate expense should be charged to Sicon.

*(n) Sep-93 SymtRat 5058 - $2,500.00 (Trial Exhibit #9, Tab 130)*

254      At trial the defendants conceded that this item should be excluded and charged to Sicon, and I so order.

**Property Insurance - Section C**

255      In the original allocations, Sicon included automobile insurance under the classification of property insurance. Both parties now agree that it should not have been included in the property insurance allocation and both parties further agree that Sicon should be charged directly for its own motor vehicle insurance.

256      Sicon included the property insurance for all its buildings in the calculation of the historical allocations. The Agreement states in ¶ 16(b):

> To the extent that any costs relate to the operation of premises (e.g. property taxes, electricity) the costs shall be borne by each Group in proportion to the space used by each Group at such premises.

257      In a memorandum dated December 6, 1988, Donald Armitage wrote to Ester Gale concerning the allocation of property insurance as follows:

> Common costs consist of property and business taxes, light, heat and water, repairs and maintenance, insurance for the B.C. building, tenant improvements. Adtronics is supposed to pay 15.39% of these cost for B.C., and then common costs shared by everybody based on the volume which I will give you later. Common costs everybody shares in liability insurance everywhere, ....

258      There is no difficulty in interpreting clause 16 of the Agreement in conformity with Donald Armitage's understanding; that is that property insurance for the B.C. building would be charged on the proportionate space formula. I also have no difficulty finding that liability insurance is a shared "common cost" and ought to have been charged to Adtronics in accordance with the formula in Clause 16(c). The difficulty arises because Ms. Gale did not purchase insurance on a separate basis. Rather she purchased insurance coverage for casualty and liability for the whole Sicon operation.

259      I agree with the plaintiffs when they say that only the insurance for the building and operations in British Columbia and third party liability coverage are shared services or facilities.

260      The plaintiffs contend that the property insurance expense pool includes insurance for buildings in Ontario, Calgary, Edmonton and B.C., and Sicon did not separate the cost of insurance for the buildings from the cost of the third party liability coverage. Similarly, the Sicon Group did not provide a breakdown by jurisdiction of the insurance costs for each of the properties in the various jurisdictions. The Plaintiff says that only the insurance coverage for the Building (in B.C.), and third party liability coverage, could be characterized as shared services or facilities. The plaintiffs say that owing to the aforesaid lack of information, they have used the more conservative allocation percentage - the gross revenue percentage on the entire pool of insurance expenses (as opposed to using the proportionate space percentage for the B.C. Building insurance, and excluding the insurance for the Ontario and Alberta buildings.)

261      I do not agree with the defendants when they say that this is an example of pro-rating a single expense. The insurance should have been priced for the facility used by the plaintiff; because it was not, the defendant can hardly complain that to do so is pro-ration.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 164 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

262    Accordingly I find that the best evidence of the cost of insurance is as calculated by the plaintiff as follows:

| | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *1993* |
|---|---|---|---|---|---|---|---|
| Total Pool Specifically attributed to Defendants - auto insurance | $971.00 | $10,290.00 | $19,498.00 ($3,115.00) | $18,896.00 | $19,984.00 | $18,245.00 | $16,022.97 |
| Specifically attributed to Defendants - 12% not related | | | ($1,965.96) | | | | |
| Net pool | $971.00 | $10,290.00 | $14,417.04 | $18,896.00 | $19,984.00 | $18,245.00 | $16,022.97 |
| Gross Revenue % | 16.02% | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Total Charges to the Plaintiff | $155.55 | $1,712.26 | $3,644.63 | $3,714.95 | $3,866.90 | $6,296.35 | $4,359.85 |

### *Donations- Section D*

263    The defendants state in their submissions the following:

A donation is a cost incurred by the head office within the managerial discretion of the CEO, and inconsequential to boot. It is significant how little there is; no apparent attempt by Don Armitage to build himself up at other peoples' expense; just neighbourhood donations.

264    The following facts are relevant to the issue concerning donations. Although Sicon made donations in all years in question, it was only in 1992 and 1993 that it allocated the cost to Adtronics. The only way these expenses could be allocated to Adtronics is as a shared service, yet donations are clearly not a shared facility. Donations are a personal choice - it is not a service that was used by Adtronics. Furthermore, it is easily capable of specific attribution under clause 16(a). The defendants contend that donations are a reasonable head office expense, but I have already found that that argument is not a reason for an allocation. Accordingly all the donations must be charged to Sicon.

### *Miscellaneous Government Taxes - Section E*

265    Between the years 1986 and 1991 Sicon allocated small amounts of miscellaneous government taxes to the shared expense pool and in some cases directly to Adtronics.

266    The defendants have not produced any documentation other than the accounting entries themselves to explain the nature of the tax. The only evidence on the issue is the evidence of Mark Armitage who testified (and was not challenged on this point) that Adtronics paid PST, federal sales tax and Washington State taxes, all of which were charged and paid directly by Adtronics. In regards to the $4,396.45 that is the subject of this dispute, Mark Armitage says no other taxes were payable by Adtronics and therefore it cannot be allocatable to him.

267    Mr. Clarke contends that the plaintiff cannot prove what the payment is for and therefore is not entitled to "a money judgment for this sum".

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 165 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

268    I disagree. Mark Armitage gave uncontradicted evidence that it could not have been a tax for which Adtronics is taxable, and the defendants having charged it to Adtronics have failed to provide particulars of the purpose of the payment. I conclude that this amount must be charged to Sicon.

*Consulting Fees - Section F*

269    The first issue to decide under this section is the correct amount of Timothey McLean's consulting fees. The defendants have made no submission disputing the plaintiffs' correction to the accounting records. The review of the records conducted by Brenda Leung appears to be correct, and accordingly I find that Timothey McLean's actual income in 1992 was $73,914.97 and in 1993 January to September is $65,050.51.

270    The second issue raised by the plaintiffs in this section concerns the appropriateness of reclassifying Timothey McLean and other senior executives as consultants as opposed to employees. I agree with the defendants that the classification has no pecuniary consequence and I do not consider this an issue that is necessary for me to decide.

271    The third issue concerns the correct allocation of Timothey McLean's salary as between Sicon and Adtronics. Timothey McLean's salary is deducted by the plaintiffs from the classification of consulting fees and added back as management salaries. Timothey McLean was the general manager and I will consider the appropriate allocation of his salary under management salaries. The plaintiffs have also reversed the consulting fee for Tom Armitage, manager of the collection department, and included Tom Armitage's salary under the collection department. I will do likewise. The only other large item under consulting fees is a 1989 severance payment to Deo Zabat-Fran and his wife Valerie Armitage (Donald Armitage's daughter). Before 1989 Deo Zabat-Fran was the general manager of Sicon. In 1989 he quit and moved to California. Originally this severance allowance was not charged to Adtronics in the annual allocations, but in this litigation the defendants say that Adtronics should bear a portion of this cost on the basis that this severance allowance is a shared cost as is the salary of the general manager. The defendants say that this court should not second-guess management's decision to pay this severance. Donald Armitage admitted in discovery testimony read in at trial that Deo Zabat-Fran quit for personal reasons and returned to California. There was no evidence of any corporate purpose for which the payment was made. I conclude, as did Mark Armitage, that the payment was made as a generous gesture by Donald Armitage to help Deo Zabat-Fran and Valerie Armitage to resettle in California. Consequently, it should be reallocated to Sicon as it was originally.

272    The remaining payments in dispute in this section could collectively be described as professional fees, course fees, and professional books provided as a benefit to the various senior managers and assistants at Sicon. To the extent that Adtronics shares in the costs of the particular staff member as a shared service, I do not consider that these modest amounts should be excluded from the calculation of Adtronics share in their respective compensation packages, provided that any particular item can be proven to be linked to an individual providing a shared service.

*Collection Department - Section G*

273    The first issue under this section is the proper allocation of $556.00 charged to Adtronics in 1987 and $437 charged to Adtronics in 1988 in connection with a law suit styled *Sign-O-Lite v. Pachena*. The law suit had nothing to do with Adtronics. In a memorandum, Donald Armitage acknowledged that the charges were an error. They were never reversed. These two amounts should be charged to Sicon.

274    The second issue in this section concerns Adtronics use of the collection department. I have considered all the evidence concerning the alleged use by Adtronics of the collection department and I find that Adtronics made no use of the collection department from 1987 onward. I further find that Mark Armitage specifically said that he would not use the collection department. On March 25, 1988, Adtronics' accountant wrote to Sicon concerning objections to the 1987 allocations:

> The charge of 15% of the total collection department salaries and benefits is excessive. Adtronics does not make any use of that department and, accordingly, no charge should be levied. Rather, if use is made of the department a specific charge should be made for the service provided at the time it is provided.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 166 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

275    Mr. Clarke says that "shared use equals occasional use." Donald Armitage complained about Adtronics' receivables and to no avail pressed Mark Armitage to use Sicon's collection department. I am satisfied that there was no use at all made of the collection department by Adtronics after 1987 and that Mark Armitage gave adequate notice in the March 1988 memorandum pursuant to clause 16, the relevant portion of which states:

> No group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service. Either Group may at any time advise the other on reasonable notice that it no longer wishes to use a facility or service provided by the other in which event it shall no longer be obliged to share in the cost.

276    I therefore conclude that there should be no allocation to Adtronics for the cost of the collection department for the years 1987 to 1993.

*Office Salaries - Section H*

277    This section covers office staff (not management salaries) except Ester Gale, the controller, and Sheila Roell, the office manager, who are included in this section on the Scott Schedule and the submissions. I will do likewise.

278    The defendants' position is stated thus:

> This is another example of pro-ration. The whole office was shared. Ester Gale broke it out in the course of not observing the Agreement ...the office generally was a shared service.

279    The first issue I must address in this section is the effect of Ester Gales' conduct over the course of administering the agreement. Ester Gale charged Adtronics, as shared services, the cost of employees who performed services for Adtronics. She did not charge the costs of the entire office staff for inclusion as a shared service as the defendants contended at trial.

280    Mark Armitage testified that his company was basically self-sufficient except for reception, payroll, and maintenance of the general ledger and banking. Adtronics did all its own purchasing, invoicing, and computer entry of invoices on Sicon's computer system.

281    Over the years 1988 to September 1993, Ester Gale allocated as a shared expense the cost of the following positions; controller, office manager, payroll clerk, accounts payable clerk, receptionist. In 1988 only, she allocated the cost of a billing customer service clerk to Adtronics as a shared expense, and in 1992 and 1993 only, she allocated as a shared expense the cost of the executive secretary.

282    At trial the defendants expert included all office salaries, some of whom he was not able to identify, either by name or position.

283    At trial the plaintiffs' position is that the payroll clerk and Donald Armitage's executive secretary should not be included as a shared expense.

284    I accept the plaintiffs' estimate or calculations of the salaries of the office staff. In some cases T4 slips were not available but I conclude that the estimates are reasonable and I do not believe that the defendants' dispute the calculation of the salaries for each individual; rather, their objection is the principled objection that the office staff must be treated as one indivisible whole.

285    The fact that Ester Gale allocated the cost of only the office staff that performed services for Adtronics has some relevance. Clause 16 of the agreement requires that the parties share only identified expenses. Although not in a formal way, the parties did over the years identify which office positions were to be shared. If Sicon had identified the whole office staff, Adtronics would have had an opportunity under Clause 16 to give notice that it did not wish to use a particular service. However, as the parties were ad idem on at least the question of which positions were shared, it cannot now be suggested that the office can be considered an indivisible entity.

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 167 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

286    Accordingly, I find that Adtronics' calculation of the shared portion of office staff for the years 1987 to September 1993 is correct. I can see no justification for the 1992 and 1993 inclusion of Donald Armitage's executive secretary. She had never been included before and I heard no evidence that there was a change in services shared that would justify her inclusion.

287    The correct calculation of the office expense pool is set out by the plaintiffs in their submission as follows:

| | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *Jan-Sep 1993* |
|---|---|---|---|---|---|---|---|
| Controller | $41,524 | $43,600 | $52,320 | $49,936 | $52,332 | $55,286 | $43,953 |
| Office Manager | $24,914 | $26,160 | $32,700 | $21,358 | $35,456 | $38,669 | $31,239 |
| Payroll Clerk | $21,177 | $22,236 | $23,544 | $23,799 | $25,171 | $26,634 | $21,174 |
| Receptionist | $12,457 | $13,080 | $17,004 | $17,004 | $18,312 | $19,620 | $15,696 |
| Net Pool | *$100,072* | *$105,076* | *$125,568* | *$113,405* | *$132,579* | *$140,209* | *$112,062* |
| Gross Revenue % | 16.02% | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Total Charges to the Plaintiff | *$16,031.53* | *$17,484.64* | *$31,743.59* | *$22,295.42* | *$25,654.04* | *$48,386.13* | *$30,492.07* |

288     I have considered the evidence concerning Adtronics' use of Sicon's office located in the United States. I will discuss this in somewhat more detail below, but I have concluded that no charge to Adtronics should be made for shared services of U.S. office staff.

*Office Expenses - Section J*

289    The type of expenses included in this category are general office supplies, stationery, office equipment, coffee, magazine subscriptions and similar expenses.

290     Many of the expenses could have been specifically allocated to Sicon or Adtronics at the time they were incurred. Adtronics did pay directly for some of its own office expenses. However, Ester Gale did not allocate each item but rather, once per year, she took a percentage of the total as a rough estimate and removed that amount from the pool. One obvious example of an expense that could have been specifically attributed to Sicon was the maintenance agreement for a fax machine in the Calgary office. It is not possible now to review all office expenses for the years 1988 to 1993. Many of the documents are no longer available and it is not practical from an economic point of view to perform such an exercise.

291    The plaintiffs contend that the estimated specific allocations that Sicon used for each year should be used. The agreed gross revenue percentage should then be applied to the remainder.

292    The defendants disagree. They say that:

This is another example of pro-ration. The whole of office expense was shared. Ester Gale broke it out in the course of not observing the agreement. ... The plaintiffs [acquiescence] in the defendants' [historical] percentage [is] a tacit admission that there is no scientific or contractual basis for it. The plaintiffs have not put forward anything else. It would follow that the defendants' revenue basis of allocating costs should be allowed. This is the theory of estoppel by convention.

293    There is no doubt that the agreement was not followed by the parties in dealing with the allocation of office expenses, and as I have said, there is no way of calculating the specific attribution now. I do not agree with the defendants' contention that this is pro-ration. Office expense is not one expense; it is a large number of individual items each of which could have been individually identified (pursuant to Clause 16 of the September Agreement) at the time as either specifically attributable to Sicon or Adtronics, or shared.

294     What is the legal effect of the parties' conduct in annually estimating the specific attribution? From my review of the exchange of memoranda over the life of the September Agreement, I conclude that the parties agreed to the method of estimating

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 168 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the specific attribution, rather than reviewing the attribution item by item. That agreement is evidenced by the conduct of both parties. That agreement is enforceable against or at the behest of either party. I therefore agree with the plaintiffs' calculation.

### Postage - Section K

295     On June 1, 1991, Adtronics acquired its own postage meter. That acquisition and notice of the acquisition to Sicon is tantamount to notice under Clause 16 of the September Agreement that Adtronics would no longer share the cost of postage service. Up to that date Sicon made an allocation of postage in accordance with the 30/40/30 formula. My review of the memoranda concerning the allocations leads me to conclude that there was never any agreement concerning the appropriate allocation of postage expenses. Accordingly, up to June 1, 1991, postage should be considered entirely a shared expense and then divided in accordance with the revenue formula in the September Agreement. I recognize that this results in Adtronics likely paying more than its fair share of the postage. Sicon's business consumed a far larger proportion of the cost of postage than did Adtronics. Sicon had about 2000 leases on its books whereas Adtronics sold only to wholesalers and those sales were cash, not lease, sales. However, this is not an exercise in determining what is fair. That would be wrongly imposing upon the Court the task of rewriting the agreement. The Court's task is to apply the contract to the accounting, or where appropriate, to apply oral variations.

### Telephone - Section L

296     The only issue under this section is whether the cost of Donald Armitage's separate telephone line at the Shellbridge office is a shared service. For the period from September 25, 1987, to October 15, 1992, Adtronics and Sicon did not identify the cost for the separate telephone line as a shared expense as contemplated in Clause 16 of the September Agreement and in this litigation Adtronics now says that cost should be specifically attributed to Sicon.

297     I agree with the defendants that it is not the task of the Court to second-guess management. The Court does not have any role in assessing the merits of management decisions made by Donald Armitage.

298     The only issue is whether the cost of the telephone line to the Shellbridge office is specifically attributable to Sicon. The only basis upon which it is contended that the Shellbridge telephone line is a shared service is on the basis that Adtronics shares in head office costs. I have already decided that the September Agreement cannot be so interpreted and therefore the cost of the separate Shellbridge telephone line must be allocated to Sicon.

### Fax - Section M

299     At trial the defendants agreed that the expense for the fax line should be based on the correct revenue formula and I so order.

### Computer Expenses - Section N

300     In Ms. Gale's 1988 allocations she wrote:

Computer Expense - [total] 38,850.19 - 40% (Lease) - 10.1% (East Cash sales) - [Adtronics share] $6,552.55

301     In her 1989 allocations she wrote:

Computer Expense - [total] 35,551 - 40% Lease - 5% East cash [Adtronics portion] $10,754

302     In the 1990 allocations, Ms. Gale wrote:

Computer - Maintenance $910 per month × 12 = 10,920. Depreciation 559.79 per month × 12 = 6,717.48 = 17,637.48 × 40.1% = 7,072.63

303     In the 1991 allocations, Sicon's memorandum states:

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 169 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Computer: Allocation to Adtronics is based on the monthly maintenance charge plus depreciation times their percentage of total revenue. No programming costs have been allocated to Adtronics.

. . .

The allocation for 1988 and 1989 were based on similar rationale as the above.

304    The plaintiffs say that the allocation methods are evidence of agreement that only computer maintenance and depreciation would be considered a shared service or facility under the September Agreement. The plaintiffs say that Mark Armitage agreed with this method, and therefore had no reason to refuse to share in any computer services because none were being charged to him.

305    In this litigation the defendants now seek to charge to Adtronics a variety of other computer-related expenses including: third party software, computer hardware and software purchases for the Sicon Group's art department and collections department, and other unidentified items. The defendants say that the plaintiff's argument is another example of pro-ration. I disagree. "Computer expenses" is a designation for a variety of expenses related to a number of different computers. Sicon was able to specifically attribute some of the computer expenses, such as the art department McIntosh computers, to Sicon during the currency of the September Agreement. There is no basis upon which I would construe the September Agreement as prohibiting the specific attribution that Ms. Gale determined was appropriate at the time. Accordingly, I accept the plaintiffs' calculations of the computer expenses.

### Courier Expenses - Section O

306    During the currency of the September Agreement the parties specifically attributed courier expenses to the user of the service. In this litigation, Sicon argues that courier expenses should be considered a shared service.

307    I agree with the plaintiffs that the courier expenses were capable of specific attribution to the party using the courier, and that there should be no allocation of the Sicon Group's courier costs to Adtronics.

308    Accordingly, I accept the plaintiffs' calculations as correct.

### Property Leases/Property Costs and Rent - Section Q

309    I have already concluded that there was no agreement to pay rent [see ¶ 69 and following above]. Consequently, Clause 16 of the September Agreement governs the allocation of property costs between the parties. The parties agreed at trial on the amount of the square footage used by Adtronics and therefore the ratio to be used under Clause 16 of the September Agreement is agreed, at 13.24%.

310    Mr. Selman calculated the property costs in his report on the basis that there was no basic rent. During the currency of the September Agreement the property costs were treated akin to a triple net lease. That is, Adtronics was charged the basic rent plus its proportionate share of insurance, property taxes, utilities, repairs and maintenance, and parking. At trial, Sicon said that if the September Agreement is to govern the allocation of property costs, then Adtronics should also be responsible for its share of mortgage interest and building depreciation. Mortgage interest and building depreciation were not charged during the currency of the September Agreement.

311    Adtronics introduced expert evidence as to the market rate for rental costs of similar buildings in a similar location. This evidence is irrelevant to the issues I must decide. It is not for the Court to write an agreement for the parties. I must, in construing the September Agreement, determine what costs can properly be described as "costs relat[ing] to the operation of premises". I look to the conduct and expectation of the parties in my interpretation of this clause. (*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60 (B.C. C.A.)). Clearly Adtronics never contemplated that its contribution

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 170 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

to the "operation of the premises" would be limited to the allocations that were made during the currency of the September Agreement but without any payment for rent. That would represent a windfall to Adtronics. In June 1987, Mark Armitage wrote to Donald Armitage to complain about the property cost allocation for 1986. This was before the September Agreement was drawn. But it is instructive to note that even then, Mark Armitage's expectation was that he would be charged rent, although he objected to the amount as well as the proportionate costs. The fact that the September Agreement is silent as to rent is somewhat puzzling. I expect that the parties did contemplate that Mark Armitage would continue to pay rent, however, because I cannot on the evidence find that agreement was reached on the amount of rent, all costs relating to the operation of the premises must be included in the pool to calculate Adtronics' share. I would include in this pool mortgage interest and building depreciation.

312     There are some other issues relating to this category of expenses.

313     The next issue is whether Adtronics should have been charged over and above the other charges for the parking area adjacent to the Simpson Road building. Having concluded that there was no agreement concerning rent, the plaintiffs' argument that rent should include parking is not of assistance. The defendants did charge Adtronics $39,000 for parking lot rent. This is puzzling in light of Donald Armitage's testimony at discovery that Adtronics was not charged rent for the parking lot. The September Agreement does not provide for parking lot rental in a fixed amount. I therefore order that the allocation of parking lot rental to Adtronics be reversed. It is not a property cost *per se*.

314     At trial the defendants agreed that the Shellbridge office costs for the separate office for Donald Armitage should not be charged to Adtronics and accordingly I order that that cost be reversed.

315     The next property cost issue is the U.S. office.

316     I heard evidence from John Temple, Adtronics' salesman for the U.S., and from Donald and Mark Armitage concerning Adtronics' use of the U.S. office. I am satisfied from that evidence that any use Adtronics did make of the U.S. office was trivial. The fact that Adtronics used old letterhead which erroneously indicated a U.S. office does not satisfy me that Adtronics used the U.S. office. Accordingly, all charges for the U.S. office should be allocated to Sicon.

317     The next issue pertains to the U.S. and Mexican condominiums owned by Sicon for company and employee use. Mark Armitage says that he and his employees did use the vacation condominiums and Adtronics paid the agreed $500 fee. He objects to paying a proportionate share of the costs over and above the fees. He also objects to Sicon's expert's calculation of the costs which fails to net out the $500 user fee.

318     I agree that the condominiums are a shared facility. Adtronics and its employees enjoyed the benefit of these accommodations. But clearly the cost allocated to Adtronics must be net of the $500 user fees. I did not understand Mr. Selman to disagree with this proposition.

### *Property and Business Taxes - Section R*

319     I agree with the defendants that the property taxes for the parking lot are expenses that relate to the operation of the premises. The parking lot was used for parking and for access and also storage. Accordingly, Adtronics is liable for its proportionate share of the property taxes for the parking lot. However, the lot rented to Winfield has nothing to do with the Adtronics sign business and should be excluded from the calculations as agreed by the defendants at trial.

### *Light, Heat and Water - Section S*

320     Any charges for utilities for rental signs should be charged directly to Sicon, as agreed at trial.

### *Repairs and Maintenance - Section T*

321     The plaintiffs say that a landlord would not normally charge a tenant for the cost of re-roofing a building. I agree, but in this case the September Agreement governs a relationship that is not a "normal" landlord and tenant relationship. In my view, re-roofing is a cost of operating the building in the sense that repairs and maintenance are a cost of operating the building. The

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 171 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

plaintiffs' expert testified that the proper accounting treatment of the expense of a major roof replacement is to amortize it over the useful life of the roof, about 30 months.

322    Mr. Selman testified that sometimes it is difficult from an accounting perspective to decide if a repair is betterment to a capital asset, in which case it should be depreciated over the life of the asset, or is simply a replacement, in which case it could be charged as repairs and maintenance in one year. In this case the expense of $28,813 was a substantial re-roofing of a large part of the building. As Mr. Selman says, some costs could be described as "hybrid" situations, and it is difficult to definitively say one way or the other if it should be expensed in one year or capitalized. Mr. Selman was not permitted to opine on the particular cost because it was not mentioned in his report.

323    At the time Sicon chose somewhat of a compromise and capitalized the re-roofing expense over 30 months. I would not alter Sicon's allocation of that expense or the treatment of the 1990 roof repair of $7,527.60.

324    However, extraordinary renovation expenses are in the nature of capital improvements and cannot under the September Agreement cannot be charged to Adtronics. Therefore, I find that all expenses related to the renovations commenced in November 1992 should be charged to Sicon.

325    Any double charges identified by Adtronics in this section should be reversed and attributed to Sicon.

***Sundry Expenses - Section U***

326    Between 1987 and 1991 Sicon specifically attributed the following amounts to Adtronics as sundry expenses:

| | |
|---|---|
| 1987 | $14,276 |
| 1988 | $357 |
| 1989 | $2,577 |
| 1990 | $70 |
| 1991 | $9 |

327    In the year-end allocation for 1987, Sicon charged Adtronics 15% of the sundry expenses. On March 25, 1988, Mark Armitage objected to charges for any portion of the 1987 sundry expenses without being provided with any information as to the content of that account.

328    On March 28, 1988, within a detailed response by Donald Armitage to all the objections about the 1987 accounts, Donald Armitage wrote:

He is entirely correct that a greater review should be made of everything before any statements are made, similar to the ones commented on above.

329    Sicon did not provide Adtronics with any particulars of the "sundry account" for any of the years in question.

330    At trial Sicon argued that, "These are apparently regular administrative expenses - 'a small administrative expense that couldn't properly be located elsewhere'".

331    On February 7, 1992, Donald Armitage wrote, "Sundry Expens: [*sic?*] No allocation To Adtronics ... The allocation for 1988 and 1989 were based on similar rational as the above."

332    I conclude from this exchange of memoranda that Sicon agreed not to charge Sundry expenses to Adtronics. I see no basis under the September Agreement for it to do so now. Adtronics objected to the charge. Sicon agreed not to impose the charge. No explanation was ever given by Sicon as to what the charge was for.

333    Sundry expenses should be specifically allocated to Sicon for the years in question, 1987 to 1991, under the September Agreement.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 172 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*Sales Expense, Miscellaneous Advertising, Condominium and Managerial Sales Expenses - Section V*

334    In the original accounts of Sicon, the U.S. condominium expenses were included in this account. I have considered the condominium expense above in Section Q in accordance with the Scott Schedule.

335    The remaining accounts in Section V are for Donald Armitage's travel expenses, the cost of an advertising brochure, and the costs associated with the Sicon sales force.

336    Sicon says these expenses should be included as shared expenses because:

The Sicon sales people offered the Adtronics product for sale. That was the reason for the creation and funding of the division in the first place. The brochure described the Adtronics product. Getting the two sides promoted in common - that is why they made the presentation together to the Gateway Theatre. Sales by Sicon is a shared expense.

337    Historically Donald Armitage did not charge sales expenses to Adtronics. In his March 28, 1988, memorandum concerning the allocations, Donald Armitage wrote that "sales expense" has nothing to do with Adtronics and Adtronics had not been charged with sales expense.

338    In the 1988 and 1889 allocation memoranda given to Mark Armitage, the sales expense was not allocated or charged to Adtronics. In a memorandum prepared by Ester Gale for Donald Armitage and given to Mark Armitage concerning the 1990 allocations, it is noted that 25% of Donald Armitage's travelling expense is a shared cost because that is the amount that pertains to the CCFL meetings and it is noted that "no other unattributed costs accumulated in this account ... are allocated to Adtronics."

339    At trial Sicon argued that sales expenses should be shared and should include: advertising, car allowances, general sales expenses, managerial sales expenses, sales travel expenses, and managerial travel expenses. I see no basis upon which such an argument can succeed. As Donald Armitage said during the currency of the agreement, sales expenses had nothing to do with Adtronics. The September Agreement stipulates that Mark Armitage "shall have sole responsibility and exclusive authority to manage all of the aspects of the [Adtronics] businesses", specifically including marketing (Clause 9). Sicon marketing had nothing to do with Adtronics except that Sicon did sell a product which they called 'The Sicon 5000', an electronic sign that they usually sourced from Adtronics. The fact that Sicon sold a product sourced from Adtronics was not joint marketing, particularly because Mark Armitage had no involvement in the Sicon marketing program and specifically did not authorize, use, or agree to pay for the brochure. The Adtronics' salesman testified that he did not use the Sicon brochure, and his testimony was not challenged on this point.

340    I conclude that all sales expenses are specifically attributable to Sicon. The expense for Donald Armitage's travel is an indirect head office cost that should not be charged to Adtronics.

*Service Costs - Gas & Oil, Auto & Truck Repairs - Section W*

341    The charges at issue in this section are the costs for the gas, oil, automobile and truck costs, and repairs and maintenance on the automotive fleet that the Sicon Group had for servicing signs.

342    In Sicon's original working papers for the years 1988 to 1993 all service costs were specifically attributed to Sicon. This is not surprising because of the nature of the business of Sicon and Adtronics. Sicon serviced, delivered, and installed its signs. Adtronics did not need or use any service vehicles.

343    Because no charge was ever identified or allocated under this account to Adtronics, no objection was ever made during the currency of the September Agreement. Sicon cannot now impose the charge having never identified the charge during the currency of the September Agreement. In any event, on the evidence I heard there could be no basis for concluding that this charge was not specifically allocable to Sicon.

344    I therefore order that this expense be specifically allocated to Sicon.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 173 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*Miscellaneous Income - Section X*

345    There is no provision in the September Agreement to share income and it was an error for Sicon to do so. I order that the income should be attributed to Sicon.

*Bank Charges, Interest Income and Interest Expense - Section Y*

*Interest Income and Expense*

346    I shall first consider Adtronics' submission that it is owed interest on the inter-corporate account for the period during which the September Agreement was in effect as well as following the termination of the September Agreement in 1993. Section Y does not deal with interest charged by the bank. I consider bank and financing charges below.

347    The September Agreement contains provisions relating to the inter-corporate operating account:

11. *Financial Assistance*

Sicon also agrees not to require unreasonable repayment of the intercompany debt from time to time owing by Adtronics during the term of this Agreement and further agrees to continue the credit arrangements currently in effect.

. . .

18. *Term*

... In the event there is an intercompany debt outstanding between a member of the Adtronics Group and a member of the Sicon Group at the time of the purchase, (including a debt arising from the change in the redemption price contemplated by this paragraph) such debt shall be repaid in four equal annual instalments commencing on the date of purchase. The debt shall bear interest at the rate per annum from time to time charged by Sicon's bankers on its operating form.

348    The plaintiffs say that the correct operating account balance cannot be calculated until this Court determines all the other allocations and claims between the parties. Adtronics' calculation of the operating account balance after adjustments it says should be made, including interest, is $4,968,725.43 as at September 1993. Without adjustment for interest, Adtronics' calculation of the operating account is $1,801,746.84.

349    Mark Armitage testified that in 1985 and 1986, the Adtronics' debt to Sicon was recorded in the operating account balance, and was represented by the monthly operating account balance for Adtronics Signs Ltd. He also testified that interest was calculated and charged monthly on Adtronics Signs Ltd.'s negative operating account balance at the Sicon Group's external borrowing rate from the CCB. Mark Armitage testified that he had specific discussions with his father as to how interest would be charged on any negative monthly operating account balance and credited on any positive operating account balance. His testimony was as follows:

Q: Now, in 1986 we've seen that you were — your companies were in a debit position in terms of the intercompany operating account that is you owed money to the Sicon Group; correct?

A: Yes.

Q: And you've indicated that you were paying interest on that money monthly?

A: Yes.

Q: Now, did you have any discussions with your father about the basis upon which interest would be paid or credited in the intercompany operating account on the balance in the intercompany account?

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 174 of 245

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

A: Yes. Umm, interest was to be paid or charged monthly based on the balance in the intercompany operating account. If you owed money umm, which is what I did in that year, I was paying interest based on the rate that the Sicon Group was borrowing from their external bankers, and if I was — if money had been owed to me I would have been — received interest at bank rates as well.

Q: And were those arrangements acceptable to you?

A: Yes.

350     Donald Armitage admitted to the interest arrangement in his examination for discovery read in at trial:

**XFD Donald Armitage September 27/99 - Q2999-3000**

2999 Q: No, I mean there's an intercompany account where a record was kept as to whether your companies owed monies to Mark's companies or vice versa?

A: I believe it's correct.

3000 Q: And was it part of your arrangement, can you recall, part of your arrangement was that you would pay interest to Mark's companies if you owed money to Mark's companies and he would pay interest to your companies if he owed money to your companies?

A: I believe that's correct.

**XFD Donald Armitage September 28/99 - Q3516-3518**

3516 Q: You remember yesterday we were talking about at the beginning of the day the state of the inter-company balance between your companies and Mark's companies. And I was asking you about the payment of — or the crediting of interest on the inter-company balance. And you remember we discussed how if your companies owed money to Mark's companies that he would be credited interest?

A: Yeah. That's generally correct, as far as I know, yeah. It goes both ways.

3517 Q: You remember we discussed that yesterday?

A: Yes.

3518 Q: And vice versa, if Mark's companies owed money to your companies that you would be credited interest?

A: Right.

3519 Q: And we also discussed the amount of that interest and I think your evidence was that the credit would be at least the amount that you're paying to your lending institution?

A: Right.

**XFD Ester Gale Feb 15/99 — Q 649 — 651**

650 Q: For example, was interest a factor in that if one company owed money to the other was interest credited or debited?

A: It was, yes.

Q 651 Q: Was that for your whole tenure from the time you were there from 1988 through 1993?

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 175 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

A: Yes.

351     Donald Armitage confirmed again at Examination for Discovery questions 3889 — 3899 that interest would be paid at 11% to any division with a positive operating account balance, or charged if the division had a negative operating account balance.

352     Donald Armitage's understanding of this arrangement is further confirmed in a memo to Ester Gale written in November 1988.

353     On August 28, 1991, Ester Gale wrote to Mark Armitage's accountant, Doug Reid, concerning inter-corporate allocations. In that letter he wrote:

The interest for each company is based on the balances of the following accounts:

Intercompany account — Division 38 is paid 11% interest on its debit balance

Accounts receivable

Inventory

Fixed assets

354     The accounting records of Sicon included a working paper titled "The Sicon Group Interest & Bank Allocation". On this working paper Sicon calculates the operating account balance for Adtronics for every month between May 1989 and September 1983. The working paper also calculates the interest owed (either credit or debit) on the operating account.

355     The original calculation of the operating account balance, agreed to by Ester Gale, included interest credits and debits on the operating account as between Sicon and Adtronics.

356     Adtronics argues that these documents and the testimony noted above of Mark and Donald Armitage and Ester Gale is evidence that there was an agreement that Sicon would pay or charge interest on the operating account balance due to or from Adtronics during the currency of the September Agreement.

357     In its written submission Sicon acknowledges that it was the "practice" to calculate interest on the inter-corporate account balances. But Sicon says that despite the practice of calculating the interest on a current basis, there was no agreement to do so any more than there are enforceable agreements on the question of the percentage to be applied for expense allocations. If I correctly understand Sicon's argument on this point, it is that the September Agreement is silent on the point and a consistent application of the September Agreement would result in no interest payable on the intercorporate account during the currency of the September Agreement. Sicon further says that Adtronics should be charged for its share of the bank interest based on the gross revenue formula in the September Agreement.

358     Both Mark and Donald Armitage did testify (in Donald's case at discovery) that there was such an interest agreement. Donald Armitage did not testify otherwise at trial. I accept Mark Armitage's testimony that he and Donald Armitage did agree interest would be paid on the inter-corporate account. In any event, Clause 11 of the September Agreement requires Sicon to continue the existing credit arrangements, that is, those that existed before the September Agreement.

359     From the testimony and the documents I have referred to, I conclude that Donald and Mark Armitage agreed before and during the currency of the September Agreement that interest was payable at 11% (or whatever the rate paid by Sicon from time, to its bankers) on the inter-corporate account balance. I see no reason why such an agreement should not be enforceable. In any event, such an agreement is not in conflict with, but is contemplated by, the September Agreement, and the "interest agreement" was performed during the currency of the September Agreement.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 176 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

360     Ester Gale offset the interest payable to Adtronics by a calculation of the net asset values. This resulted in Adtronics owing interest on the inter-corporate account. For example, in 1992 Sicon calculated that Adtronics owed to it $72,250. I accept Mark Armitage's testimony that he did not agree to this method of calculating interest and that it was never explained to him. From an accounting perspective it makes no sense, and indeed at the trial Sicon did not contend that this calculation was agreed to or provided for under the Agreement. Sicon's position is simply that there is no express provision in the September Agreement to pay interest and there was no oral or other agreement to do so. I have already found that the September Agreement should be interpreted to provide that interest is payable or alternatively that the parties agreed to do so.

361     Consequently, I order that the calculation of the inter-company accounts reflect payment of interest owed by or to Adtronics at the rates used by Sicon's bank during the currency of the September Agreement.

*Bank Charges*

362     Section Y also includes miscellaneous bank charges, excluding bank interest. Sicon and Adtronics have agreed that a number of these charges specifically attributed to Adtronics should be reversed and included in the shared expense pool. The remaining disputes concerning bank charges are set out in Adtronics' written submission which for convenience I reproduce here:

**USEX 1809 SOLSGN INC $6.80 (1987)**

(a) This was a US exchange on a cheque for Sign-O-Lite Signs Inc.,

(b) It should have been attributed directly to Sign-O-Lite Signs Inc., and

(c) Similar exchanges on Adtronics cheques were charged directly to the Adtronics Group.

**USEX 1805 SOLSGN SER $12.80 (1987)**

(d) This is a US exchange for Sign-O-Lite Services,

(e) It should have been attributed directly to Sign-O-Lite Services, and

(f) Similar exchanges on Adtronics cheques were charged directly to the Adtronics Group.

**OVERDRAFT INTEREST $7,937.59 (1988); $909.55 (1989); $646.17 (1990); $43.07 (1991); $71.11 (1992)**

(a) The Adtronics Group had a positive balance in the operating account during this period of time.

Ester Gale says that when the Sicon Group went over the limit on the operating line of credit with the bank, an overdraft interest charge was put through the bank statement rather than the regular monthly interest payment.

**UNITED PARCELS US EX $25.00 (1988)**

(a) It appears to be a charge for United Parcel Service, maybe US exchange on the cheque,

(b) United Parcel Service is a courier company, and

(c) courier should not be in bank charges.

**LETTER OF CREDIT CHARGE $227.70 (1989); $279.64 (1990)**

(a) Mark Armitage did not obtain a letter of credit in these two years.

**LOAN FEE $500.00 (1990); $678.50 (1991); $1,585.25 (1993)**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 177 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

(a) The Adtronics Group had a positive balance in the operating account during this period of time.

Ester Gale says she does not know what the $1,585.25 was for and it appears to be a standby fee. A standby fee is a fee on the amount of money that is available to be borrowed but have not borrowed. [*sic*]

**BC ON LINE $544.35 (1992); $1,879.26 (1993)**

(a) This is for B.C. Online; where one could get corporate information on companies,

(b) The Sicon credit department used B.C. Online to check credit on individuals, and

(c) the Adtronics Group did not use the collection department in 1992 and 1993.

Ester Gales [*sic*] says the $1,879.26 B.C. Online was used on a sign lease where the financial status of the customer is unknown to the Sicon Group, depending on whether or not they signed personally on the contract, how long they have been in business, et cetera. B.C. Online was also used after the fact as part of the collection process.

**COURIER $4.28 (1993)**

(a) courier charges should not be in bank charges, and

(b) Mark Armitage paid directly for courier charges related to the Adtronics Group.

**TRAVEL CHARGES $50.00 (1987)**

(a) travel charges should not be in bank charges, and

(b) Mark Armitage paid directly for any travel charges he incurred.

**SEARCH SERVICE CHARGE $469.00 (1988)**

(a) Mark Armitage did not use any search services through the bank, and

(b) Mark Armitage is only guessing that this would be bank searches for credit or something.

**CCFL#1 J & T LATE CHARGES $1,365.65 (1986); $13.30 (1987)**

(a) Mark Armitage is not sure what this charge is for,

(b) the 1986 entry is prior to the CCFL loan being in place,

(c) Mark Armitage was borrowing from CCB, not CCFL, in 1986, and

(d) no backup was ever provided with respect to these items.

The Defendants destroyed their 1987 and 1987 [*sic*] documents as well.

**PAP SERVICE CHARGES (PREAUTHORIZED PMTS) $978.03 (1986); $1,456.25 (1987); $874.51 (1988); $2,424.15 (1989); $1,066.53 (1990); $622.11 (1991)**

(a) The Sicon Group for their leases, had a preauthorized payment program set up so that people who had monthly payments could have it come directly off their bank account and remit it to Sicon's bank account, and

(b) Mr. Clarke confirms that this has been conceded.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 178 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

As per Don Selman's Report, ... these amounts have been removed from the bank charge pool as per *Trial Exhibit #59, page 6, assumption 5.01 (t)*:

all pre-authorized payment service charges relate to lease payments and are Sicon costs

**PERMIT ACCOUNT SERVICE CHARGE $133.12 (1986); $121.66 (1987); $151.51 (1988); $38.74 (1989); $29.22 (1990); $28.63 (1991)**

(a) The Sicon Group had to get sign permits in order to install electric signs. Each sign required a permit, and because there were many of them and they were small amounts, the permit department had a separate bank account for paying sign permits.

(b) Mark Armitage did not use this service at all.

**CREDIT REPORT $141.40 (1990); $40.00 (1991)**

(a) Mark Armitage did not ever obtain credit reports, and

(b) Mark Armitage did not use the collection department in these years.

**PST - MINFIN $5,047.38 (1990)**

(a) The Adtronics Group would only charge PST if they sold a sign directly to the end user, which was rare. If the Adtronics Group did collect the PST, it would be remitted directly to the provincial government and charged directly to the Adtronics Group.

**SALES TRAVEL EXPENSE $2,160.44 (1991)**

(a) The Sicon sales expense has nothing to do with the Adtronics Group.

As per Don Selman's Report, *Trial Exhibit #59, Appendix 3, Schedule Y,* this amount has been removed from the bank charge pool and not added back to *Trial Exhibit #59, Appendix 3, Schedule V (Sales Expenses)*.

**PAP SERVICE CHARGES (PREAUTHORIZED PMTS) $68.80 (1993)**

(a) The Sicon Group for their leases, had a preauthorized payment program set up so that people who had monthly payments could have it come directly off their bank account and remit it to Sicon's bank account, and

(b) Mr. Clarke confirms that this has been conceded.

As per Don Selman's Report, *Trial Exhibit #59, Appendix 3, Schedule Y,* these amounts have been removed from the bank charge pool as per *Trial Exhibit #59, page 6, assumption 5.01 (t)*:

all pre-authorized payment service charges relate to lease payments and are Sicon costs

**PERMIT ACCOUNT SERVICE CHARGE**

(a) The Sicon Group had to get sign permits in order to install electric signs. Each sign required a permit, and because there were many of them and they were small amounts, the permit department had a separate bank account for paying sign permits.

(b) Mark Armitage did not use this service at all.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

363    Mr. Clarke did not make specific submissions concerning these charges, nor was there evidence refuting the evidence of Mark Armitage that the disputed charges have nothing to do with the business of Adtronics and under the September Agreement should have been specifically allocated to Sicon.

364    On the basis of the evidence and submissions before me, I conclude that the disputed bank charges should be allocated to Sicon as claimed by Adtronics.

### Amortization of Financing Costs — Section Z

365    The threshold issue that the Court must decide is whether the charges by Sicon for financing costs should be considered a commitment of Adtronics for the duration of the September Agreement in the absence of Adtronics opting out of that expense. Here I consider both deferred financing costs and direct interest costs.

366    I have stated above that many items, particularly those classified originally as professional fees, were reclassified by Sicon in its accounts as deferred financing costs. In these Reasons for Judgment I will not make orders with respect to each of those specific items. If the parties are unable with these Reasons to determine the treatment of each item, they have leave to re-appear before me to make further submissions.

367    The operating account prepared by Sicon (Tab 448) shows that by November 1987 Adtronics was no longer borrowing from Sicon. The plaintiffs assert that the accounts when corrected will result in Adtronics being in a credit position earlier in 1987 and therefore not using the financing at all. Adtronics says that it should not share in the financing costs at all.

368    Sicon's position is set out in its written submissions and 1 quote therefrom:

The Don Selman report treats all of the interest expense as a shared cost because the financing with C.C.F.L. was a shared facility. The plaintiffs have reiterated many times that there should be no interest charge because "Mark wasn't borrowing any money." In fact at the time that Mark Armitage agreed to go forward with the reorganization Adtronics was in deficit in its intercompany account and its future was uncertain. On the terms of the agreement it was entered into to secure financing for the Group. Interest is a shared expense.

Reasons why interest is a shared expense:

1. The financing was part of the programme and in contemplation of all parties at the time the Agreement was drafted. The initial purpose for the creation of Adtronics was for Sicon to obtain a source of supply of message centres for leased signs. The group had worked on the project for year [*sic*] before the Agreement was made and were in deficit at that time;

2. Sicon made the investment for the purpose of buying the message centres interdivisionally and leasing them out;

3. Without the large financial burden there would be no CCA, which was "bought" in a manner of speaking with the financing that C.C.F.L. replaced. On Mark Armitage's version of events the entire benefit of that would flow to Adtronics and all of the burden to Sicon. In fact at the outset the availability of the CCA affected the joint cash flow. It was occasioned by the use of the loan and was a shared expense;

4. The plaintiffs claim that the line-of-credit borrowing was only utilized by Sicon. The stated reason was that the intercorporate account was in surplus. In fact that logic would apply only if the financial burden of the inventory, work-in-progress and accounts receivable was less than the intercorporate account;

5. Also it could not have been known at any time that sales of message centres might be in the offing with a potential immediate need for financing via the lease portfolio;

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 180 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

6. Thus even if it were possible to specifically allocate interest expense (as the expression "specifically allocate" is used in the Agreement) there is no means of ascertaining what the number should be;

7. The result is that the interest expense short and long term falls to be distributed in accordance with the gross revenue percentage.

369    If interest is a shared expense then Adtronics would pay its share of the interest on the CCFL loan of $13 million regardless of its use of that loan. So for example in 1992, a year in which Adtronics' gross revenues were 34.51% of Sicon's revenue, Adtronics would be paying 34.51% of Sicon's interest charges even when, by Sicon's own calculations, Adtronics was not using any credit and was then owed at various times in the year up to $1 million. Sicon calculates the shared portion of its bank interest charges for 1992 at $791,812.

370    In my view, that interpretation of the September Agreement results in an absurdity. I conclude that a proper interpretation of the September Agreement is to consider bank interest as specifically allocatable under Clause 16 of the September Agreement. During the currency of the September Agreement the yearly allocations did not include interest and thus there was no basis for Mark Armitage to object to the allocation. I would not attribute interest costs to Adtronics, except to the extent that Adtronics used financing, in which case it should be specifically attributed. That is, Adtronics should be charged interest on any portion of the financing that it used. That calculation cannot be done until all the accounts are revised based on these Reasons for Judgment. Furthermore, the charging of direct interest cannot duplicate the charging of interest on the inter-corporate account. Because Sicon agreed to allow Adtronics to use Sicon's credit facility, Sicon can either charge direct bank interest or inter-corporate interest at the same rate, but not both.

371    The yearly allocations did disclose that Adtronics was being charged annually on the revenue formula for an amount called "amortization of financing costs."

372    Sicon incurred $297,961.51 in financing costs when the business of Adtronics and Sicon was consolidated and financing was arranged through the CCFL. These costs were the fees for arranging for and placing financing, including brokerage fees and professional fees. These fees were originally recorded as "professional fees" in 1987, but were then capitalized and amortized in an account as "Amortization of Financing Costs" over approximately the 5-year term of the CCFL loan.

373    In March 1988, Adtronics, in the context of the ongoing allocation dispute, agreed that a direct charge to Adtronics for financial assistance was appropriate. At the time Adtronics was informed by Sicon that Adtronics owed money to Sicon through its inter-corporate account.

374    In the exchange of memoranda and correspondence that continued over the years to 1993 concerning the allocation dispute, there is no specific agreement between Adtronics and Sicon that Adtronics should pay the deferred financing costs.

375    The burden of Sicon's argument is similar to its argument that Adtronics should share in the cost of indirect head office expenses. Or put another way, the argument is that what is good for the whole Sicon organization is good for Adtronics and Adtronics should not get a 'free ride'. As I have already said, this is not an exercise in determining what is fair. The parties' relations are for the most part governed by the September Agreement. The financing costs are capable of being specifically ascertained on the basis of use of the financing. If, when the accounts are recalculated, Adtronics used the financing, then it must bear its proportionate share of that specifically allocatable cost. In other words, if Adtronics used, for example, 5% of the financing, then it must bear 5% of the whole cost of obtaining that financing. I do not consider that the financing costs are a shared cost.

376    However, that does not entirely dispose of the allocation of all professional fees included as deferred financing costs. Some of these fees were incurred for the purpose of the corporate re-organization. As I have said above, that 1987 cost is a shared cost. The parties must therefore examine the professional account (primarily the legal accounts) to ascertain which portions of those accounts relate to the corporate re-organization. That portion should then be treated as a shared cost and allocated accordingly.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 181 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

### Depreciation - Equipment - Section AA

377      During the currency of the September Agreement, Sicon made no allocation to Adtronics for the cost of depreciation of office equipment. In this litigation Sicon contends that depreciation of office equipment is a shared expense. Sicon has not separated the accounts as to equipment that is shared and equipment that is not shared. Adtronics owned its own desks, chairs, filing cabinets, computer equipment, printers, and calculators. There is also no doubt that Adtronics shared the photocopier, the fax machine, the postage machine (until June 1, 1990), and the telephone system. Under the Agreement, Adtronics would share in the cost of depreciation of that furniture and equipment listed above that it used as a shared expense but because Sicon did not identify this as a shared cost in the allocations during the currency of the Agreement, Adtronics had no opportunity to object to the charge and it cannot now be charged.

### Building Depreciation - Section BB

378      I have already decided that there was no agreement as to the amount of rent and therefore the September Agreement should govern. In the absence of an agreement to pay rent, depreciation is properly a cost of operating the building occupied by Adtronics, that is the Simpson Road building. I accept that the correct amount of building depreciation to be charged to Adtronics is set out at Table D, page 592 of Adtronics' closing submissions.

### Management Salaries - Section CC

379      There are two issues to determine with respect to management salaries. The first issue is which managers' salaries are shared. The second issue is the basis upon which Adtronics should share in the salary expense.

380      Adtronics says that either under the September Agreement or as a collateral agreement, certain expenses may be apportioned. Sicon refutes this suggestion. Sicon contends that the September Agreement does not contemplate the apportioning of one expense and consequently the contractual revenue formula should be applied to the management salary expenses.

381      Earlier in these Reasons for Judgment, I have alluded to the alleged agreement to charge Adtronics 5% of the general manager's salary rather than the proportionate share based upon the revenue sharing formula (see ¶ 74).

382      Adtronics agrees that it should pay a portion of the salaries of Donald Armitage, Deo Zabat-Fran, Timothey McLean, and Joan MacDonald. Adtronics does not agree that Tom Armitage's salary is a shared expense. Sicon contends that management is a shared resource and all management salaries should be shared on a gross revenue basis.

383      I have already found that Adtronics does not share in the cost of the collection department, therefore it does not have to share in the cost of the expense of its manager, Tom Armitage. (e.g. see ¶ 190, 191, 166.)

384      In its written submissions, Adtronics has calculated the correct *quantum* of the salaries. Sicon does not dispute those figures and I accept Adtronics' calculations of the quantum of the salaries and benefits.

385      I turn to a review of the evidence on the question of management salaries.

386      In a June 12, 1987 memorandum, Donald Armitage wrote to Mark Armitage concerning Mark's complaints about the allocations, stating:

> Management salaries - you were charged with approximately $35,000 and your drawings alone are worth more than that. You were not charged for my time or Joan's time.

387      This memorandum was written before the parties entered into the September Agreement and reflects an approach that was more in the nature of estimation than formulaic.

388      In reply Mark Armitage wrote:

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

There is little or no crossover of management between Sicon and Adtronics and this should at least be increased to full value of my salary.

389    In a further memorandum dated July 20, 1987, Mark Armitage wrote to Donald Armitage:

If you want to hire and support friends, relatives and dead wood you pay for it. If you want to grossly overpay your so called management staff (and I mean Tim and Tom) why the hell should I have to pay. I don't object to them getting a fair wage based on their experience, ability, and contribution but you pay Tom more than I earn.

390    In 1988, Adtronics' accountant wrote to Sicon disputing the allocation in respect to management salaries and suggesting a charge of 15% of management salaries was appropriate. Adtronics noted that Adtronics made almost no use of Sicon management.

391    In a reply dated March 28, 1988, Donald Armitage pointed out the considerable work performed by him with respect to the reorganization and refinancing. He also pointed out the work done by the general manager directing the office staff who processed Adtronics' accounting.

392    Mark Armitage replied to Donald Armitage and attached a copy of the September Agreement and requested compliance with that agreement. He said:

The Agreement we have with the Sicon Group specifically states how admin is to be divided, a copy attached, and it states that only shared services and facilities that cannot be directly allocated are to be paid for on a shared basis. This is not what is being done.

393    In an enclosure to a letter dated September 12, 1989 to Sicon concerning the allocations, Mark Armitage wrote:

Adtronics has been allocated 16.9% Don's salary, 33.8% Joan's salary and 11.42% Deo's salary, none of whom normally provide services to Adtronics.

Don normally divides his time between renewals, existing accounts, Macey Neon and Seattle. I have not discussed Adtronics business with Don for more than two years. I do not visit with him socially. For any of Don's time to be charged I would expect an itemized account of the hours spent working [on] Adtronics behalf.

Joan does not work in this office but she does from time to time deal with the accountants on Adtronics' behalf. I would be surprised if Joan spends as much as 5% of her time acting on Adtronics' behalf and a charge of 33.8% is totally unacceptable. This charge should be reduced accordingly.

Deo was General Manager of the Sicon Group during 1988. He did not normally expend any time on Adtronics behalf and he has told me that to his own estimation less than 5% of his time could reasonably be chargeable. He will be providing Adtronics with a letter confirming this.

394    The 1991 allocation records contain a note:

The allocations are based on the actual amount of time certain individuals spend on Adtronics, rather than just allocating a percentage of the total Management Salaries based on revenue. These individuals are as follows: Don Armitage - 20%, Joan MacDonald 50% (due to inordinate time spent on Signcorp case during 1990), Tim McLean - 5%, Ester Gale - 20% and Sheila Roell - 20%.

395    The actual allocations made by Ester Gale varied somewhat from year to year. However, it appears that Sicon did not generally apply the contractual revenue formula, but rather estimated a percentage of the management salary attributable to Adtronics based upon Sicon's view of the amount of time the manager spent on Adtronics business. For example Ester Gales's

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 183 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

working papers show that in respect to the General Manager she included as a shared cost the following percentage of the manager's salary:

| | | |
|---|---|---|
| 1988 | - | 33.8% |
| 1989 | - | 50% |
| 1990 | - | 5% direct allocation |
| 1991 | - | 5% direct allocation |
| 1992 | - | application of gross revenue percentage of |
| 35.69% to 50% of his salary | | |
| 1993 | - | application of gross revue percentage of |
| 29.36% to 50% of his salary | | |

396    Adtronics argues that the parties' interpretation of the Agreement, as evidenced by their conduct, should govern. Adtronics says that the parties interpreted the Agreement so as to allocate a portion of a single expense (the managers' salaries) to Sicon and Adtronics or in some years to allocate a portion to Sicon and treat the remainder as a shared expense to which the gross revenue formula applied. I considered this argument - that a unitary expense cannot be apportioned - above in respect to the Audit allocations.

397    As with audit, there were three people involved in the implementation phase of this Agreement - Ester Gale, Donald Armitage and Mark Armitage. Based on all the evidence, I conclude that these three people agreed that a correct interpretation of the implementation phase of the Agreement was to first specifically allocate a portion of the managers' salary that applied only to Sicon.

398    Mr. Clarke also points out that there was no agreement as to the portion of the managers' salary that should have been specifically allocated to Sicon; therefore, the Court should apply a strict interpretation of this clause of the Agreement and refuse to apportion a unitary cost.

399    There is also the difficulty of determining what the apportionment should have been in each year because in many years Adtronics expressed its disagreement with the apportionment Sicon chose. Should this court award damages based on a *quantum meruit* argument, that is, a sum representing the value of the services rendered by Sicon to Adtronics?

400    The evidence is compelling that the parties agreed to apportion the salaries of the general manager, Donald Armitage and Joan MacDonald. Either on an estoppel analysis, or the interpretation of the Agreement based on conduct, I reach the same result, which is that the parties agreed to apportion salaries. I therefore conclude that the managers' salaries should be apportioned.

401    Ester Gale agreed for at least two years that the apportionment of the General Manager's salary should be 5% as a direct allocation (not 5% in the pool to then be shared). There was no evidence that the general manager's duties changed insofar as management of Adtronics was concerned. I find that 5% of the general manager's salary should be directly attributed to Adtronics in each of the years in question.

402    Donald Armitage chose 20% or 30% as the correct apportionment of his own salary, but he included in that estimate duties that he described as benefiting the whole of Sicon. I have found that head office type charges should not be charged to Adtronics. Adtronics estimated the appropriate amount at 5%. I would place the estimate at 33% for 1987, and 20% thereafter on a *quantum meruit* basis.

403    Joan MacDonald was Donald Armitage's executive secretary. Adtronics agrees to a 50% allocation in 1990 owing to special services she provided to it. Otherwise, Adtronics says that it notified Sicon in respect to the 1988 allocations that it would only pay 5% of her salary. I accept Adtronics' estimate of the value of her services at 5% to the date of her retirement.

***Section DD - Corporate Income Tax of the Scott Schedule is Above at ¶ 113***

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*Section FF - Extraordinary Loss of the Scott Schedule is Above at ¶107*

*Section GG - $70,000 Scientific Research and Development Tax Credit of the Scott Schedule is Above at ¶95*

*Section HH - Directors' Fees*

404    From 1986 to 1993 Sicon did not charge directors' fees as a shared administrative expense. Mark Armitage testified that he agreed with Sicon's original allocation of zero for directors' fees.

405    Sicon now contends that directors' fees are a shared expense.

406    I agree with Adtronics that the 1992 and 1993 fees paid to Joan MacDonald and entered in the company's accounts as directors' fees were in fact a retiring allowance for Joan MacDonald.

407    I find that the directors' fees should be charged directly to Sicon. First, they were not charged during the currency of the September Agreement and therefore Mark Armitage had no opportunity to object, and second, part of the amount claimed has been mischaracterized as directors' fees.

*Profit Sharing - Section II*

408    The 1992 payment by Sicon to the four Armitage children of $12,000 each as a dividend cannot, in my view, be characterized as a shared expense and should be attributed directly to Sicon.

## 8. Accounting for the 1986 Fiscal Periods

409    As will be readily apparent from these Reasons, the September Agreement does not apply to 1986 fiscal periods allocations. Sicon made the 1986 allocations at the end of the 1986 fiscal period and Adtronics continued to complain about the allocations even after the September Agreement was executed.

410    Adtronics admits that based on the evidence, the parties never actually came to an agreement on how the 1986 expenses would be allocated prior to entering into the September Agreement.

411    Adtronics argues that I should construe an implied agreement between the parties that expenses for common services or facilities were to be allocated by Sicon on such basis as the parties specifically agreed and failing agreement, on a reasonable basis measured by relative use of the service or facility.

412    The parties did not agree on the amount or method of allocating the 1986 expenses and an implied agreement that payment be made on a reasonable basis is equivalent to a *quantum meruit* analysis.

413    I cannot on the evidence before me discern the precise terms of an oral agreement covering 1986 that this Court could enforce for the 1986 fiscal periods. In fact, I conclude that the September Agreement was drafted and concluded in part because Adtronics was not satisfied with the allocation process then in existence. Mark Armitage complained that he was overcharged for the year 1986. He was charged 11.8% of the total of Sicon's administration charges. In the absence of any agreement, the only basis upon which I could alter the accounts is on a *quantum meruit* type basis. In other words, I would have to assess whether, in respect to each disputed item of account, Adtronics received fair value. On the evidence before me I can determine that the parties have opposing views about the fairness of the charges, but the evidence is insufficient for me to determine that the charges made in those years were not a reasonable payment for the service provided, considered on a *quantum meruit* basis. Accordingly, I make no order in respect to the 1986 fiscal periods.

## 9. Accounting for the 1987 Fiscal Period

414    The September Agreement is silent as to the effective date of the Agreement. The parties did immediately put the agreement into effect upon executing it on September 25, 1987 in the sense that they immediately amalgamated the corporate

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 185 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

entities. After the 1987 fiscal period concluded, both parties addressed the 1987 allocations as if the Agreement applied to it (at least to the extent that Sicon ever followed the mechanisms in the Agreement). In this trial, Sicon never addressed either the 1986 or 1987 allocations. I assume Sicon's exclusion of the 1987 allocations was based on its interpretation that the Agreement was inapplicable. Considering the conduct of the parties subsequent to December 31, 1987, I find that they then considered the Agreement did apply. I would therefore apply the Agreement to the 1987 allocations.

## 10. Court Order Interest or Contractual Interest

415    Issues remain outstanding concerning the correct calculation of interest. Once the parties have recalculated the accounts the parties may make submissions concerning interest if they are unable to agree. I will require further submissions concerning the issue of compound interest in this action as well as the associated action #C930042. The parties should contact the registry to arrange a brief hearing to address my concerns concerning the claims for compound interest in both actions.

## 11. Personal Guarantee of Donald Armitage

416    Donald Armitage personally covenanted the performance of Sicon under the September Agreement. He does not dispute that he is liable to Adtronics to the same extent as the corporate defendants are liable to the plaintiffs.

## 12. Disposition

417    In accordance with these Reasons for Judgment, the allocations between the Adtronics division of Sicon and Sicon for the period September 1987 to September 1993 must be recalculated and there will be judgment against all defendants in favour of Adtronics Signs Ltd. for the amount found due and owing to Adtronics.

418    The counter-claim in respect to the years 1986 and 1987 should be dismissed because Sicon tendered no evidence concerning those years. The balance of the counter-claim as calculated by Sicon's expert, Mr. Selman, is $391,236.06. Although I have not recalculated the accounts of the companies, the plaintiffs have been largely successful and will be entitled to payment from Sicon of the recalculated amounts. Adtronics will not owe money to Sicon, therefore, the counter-claim is dismissed. I have not addressed the issue of Adtronics withholding its receivables from Sicon during 1993. That may be relevant to the interest claim and I will hear further submissions on that issue.

419    I order that Adtronics prepare the revised accounts within 30 days of the date of these Reasons for Judgment and deliver those revised accounts with the appropriate explanatory working papers to Sicon's solicitor. Sicon shall have a further 30 days to advise Adtronics of its agreement or disagreement on each category of account. If Sicon disagrees with Adtronics' calculations, it shall provide Adtronics with the appropriate working papers explaining the basis of its disagreement with respect to each item of account that is not agreed, within the stipulated 30-day period.

420    If the parties are unable to agree as to any calculations, they have liberty to apply for a further hearing. Both parties have liberty to apply to seek clarification of these Reasons if the Reasons for Judgment are insufficient to enable the parties to recalculate the accounts. The parties also have liberty to speak to any items of account that I may have inadvertently overlooked.

421    The parties are at liberty to speak to the question of costs once the accounts have been finalized and may contact the Court Registry to arrange a convenient time to do so.

*Action allowed.*

## Appendix I

THIS AGREEMENT made the day of September, 1987.

BETWEEN:

MARK ARMITAGE, businessman of 13933 -
34th Avenue, White Rock, B.C.
(hereinafter called "Mark")

OF THE FIRST PART

AND:

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 186 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

DONALD ARMITAGE, businessman, of 1076
Jackson Way, Delta, B.C.
(hereinafter called "Don")

<div align="right">OF THE SECOND PART</div>

AND:

ADTRONICS SIGNS LTD., a body corporate
with a registered office at 2771 Simpson
Road, Richmond, B.C.
(hereinafter called "Adtronics")

<div align="right">OF THE THIRD PART</div>

AND:

ADTRONICS INC., a body corporate with an
office at 7020 - 196th Street, Lynnwood,
Washington
(hereinafter called "Adtronics U.S.")

<div align="right">OF THE FOURTH PART</div>

AND:

ARMITAGE HOLDINGS LTD., a body corporate
with an office at 2771 Simpson Road,
Richmond, B.C.
(hereinafter called "Armitage")

<div align="right">OF THE FIFTH PART</div>

AND:

SICON GROUP INC., a body corporate with a
registered office at 2771 Simpson Road,
Richmond, B.C.
(hereinafter called "Sicon")

<div align="right">OF THE SIXTH PART</div>

AND:

32262 BRITISH COLUMBIA LTD., a body
corporate with a registered office at
2271 Simpson Road, Richmond, B.C.
(hereinafter called "32262")

<div align="right">OF THE SEVENTH PART</div>

AND:

TOM ARMITAGE, of 1044 Jackson Way, Delta,
B.C.,
VALERIE ZABAT-FRAN, of 5591 Jaskow,
Richmond, B.C. and
JANICE MCLEAN of 1220 Morris Crescent,
Delta, B.C.
(hereinafter called "Other Shareholders")

<div align="right">OF THE EIGHTH PART</div>

WHEREAS:

A. Adtronics is in the business of manufacturing and marketing electronic signs in Canada and elsewhere either directly or through its wholly-owned U.S. subsidiary Adtronics U.S.

B. Mark owns 2000 Common Shares in the capital of Adtronics representing all the issued and outstanding shares of Adtronics.

C. Mark is the Chief Operating Officer of Adtronics and Adtronics U.S.

D. Armitage Holdings Ltd. is or will be the registered owner of all of the voting shares of Sicon Group Inc. which in turns owns or will own all the issued and outstanding shares of:

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 187 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Sign-O-Lite Signs Inc.

32262

Sign-O-Lite Plastics Ltd.,

Wallace Sign Crafters West Ltd.

E. Sicon and its subsidiaries including those companies identified in the immediately preceding recital (hereinafter collectively referred to as the "Sicon Group") are proposing to arrange financing with Canadian Corporate Funding Limited ("CCFL") and it is a term of the financing that the assets and business of Adtronics including the shares of Adtronics U.S. are to be transferred from Mark to the Sicon Group either by a transfer of the assets, a transfer of shares or a combination thereof in order that its assets and revenues can form part of the security for the proposed loan.

F. Mark will consent to the proposed arrangement subject to the strict condition that;

(a) the assets and business of Adtronics and Adtronics U.S. remain within the sole and exclusive management and control of Mark;

(b) that Adtronics and Adtronics U.S. remain distinct separate entities from the other business operations of the Sicon Group;

(c) the assets of Adtronics and Adtronics U.S. not be encumbered by Sicon or any other member of the Sicon Group except to the extent required to obtain the proposed financing with CCFL;

(d) Mark is entitled to reacquire its [*sic*] ownership in the assets and business of Adtronics and Adtronics U.S. at the earliest possible date.

G. In order to facilitate the financing arrangements it is proposed to transfer all of the business operations of Adtronics other than the manufacture of electrical signs and the shares of Adtronics U.S. to 32262.

H. Mark is the registered and beneficial owner of one half of the shares in the capital stock of Mimar Holdings Ltd. which he wishes to sell and Sicon wishes to purchase on the terms set out in this Agreement.

J. [*sic*] The Other Shareholders together with Mark are the holders of all of the participating shares in the capital of Sicon.

K. The parties wish to make arrangements for the purchase and sale of their respective goods and services and the sharing of common facilities and services between the respective business operations.

NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the sum of $1.00 paid by each person who is a party to this Agreement to each other person (the receipt of which and the sufficiency of which is hereby acknowledged) and mutual covenants and agreements, the parties hereto agree as follows:

## A. Transfer of Assets and Business

### *1. Transfer*

Adtronics hereby transfers to 32662 all of its business and assets other than:

(a) the business of the manufacture of electronic signs and the assets directly related to that business; and

(b) its shares in Adtronics Inc.

the business and assets transferred hereunder shall hereinafter be referred to as the "Adtronics Division".

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

### 2. Purchase Price

The purchase price paid to Adtronics shall be 100 non-voting preference shares in the capital of 32262. The preference shares shall be redeemable or retractable for an amount equal to the sum of the fair market value of the assets transferred under paragraph 1 and the net income after taxes of the Adtronics Division (computed in accordance with generally accepted accounting principles) subsequent to the transfer less all dividends issued in respect of such shares. The shares shall have a priority as to dividends to the extent the redemption amount at the time of any dividend distribution exceeds the initial redemption amount of such shares.

The parties agree to cause 32262 to forthwith establish the class of preference shares contemplated by this Agreement (subject to the approval of Mark as to form) and immediately thereafter issue 100 of the shares to Mark as required by this paragraph 2.

### 3. Election

32262 and Adtronics agree to execute and file in the prescribed form and within the prescribed time an election under Section 85(1) of the *Income Tax Act* whereby the proceeds of disposition to Adtronics and the cost to 32262 for each of the assets transferred hereunder will be equal to the cost amount of such assets as defined under section 248 of the *Income Tax Act* (Canada).

### 4. Option to Repurchase

Adtronics shall have the right to purchase the Adtronics Division from 32262. The purchase shall occur on a date 30 days after Adtronics has delivered a written notice to 32262 exercising its right. The purchase price shall be the redelivery to 32262 of the share consideration received by Adtronics at the time of the purchase of the Adtronics Division by 32262 pursuant to this Agreement, subject to an adjustment equal to the amount of the difference between the redemption price at the time of [*sic*] preference shares were issued and the redemption price at the time of repurchase. The amount of the adjustment shall be due & [*sic*] owing at the time of repurchase.

The procedure and method of repurchase shall be determined by Mark and Mark agreed to give consideration to income tax consequences to all parties in selection the appropriate procedures.

### B. Transfer of Shares

### 5. Reorganization

Adtronics agrees to reorganize its capital structure to create two new classes of shares:

(a) Class "A" common shares (Voting Shares") *[sic]* which have the right to vote at meetings of the shareholders of Adtronics and to execute a resolution of the shareholder in lieu of a meeting but no right to participate in dividends;

(b) Class "B" common shares ("Participating Shares") which have the right to participate in dividends but no right to vote at meetings or execute a resolution of shareholders in lieu of a meeting.

### 6. Escrow Agreement

Prior to the completion of the reorganization Mark agrees to transfer the voting rights with respect to his voting shares of Adtronics to Sicon on the terms and conditions of the escrow agreement attached as Schedule A.

### 7. Post-Reorganization Arrangements

As part of the reorganization, Sicon agrees to subscribe for 100 Voting Shares and Mark agrees to exchange his common shares of Adtronics for 100 Participating Shares. Adtronics agrees to issue the Voting Shares to Sicon and Participating Shares to Mark.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14410-1 Filed 09/16/14 Page 189 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Sicon agrees that it shall not cause Adtronics to issue any further shares in the capital of Adtronics without the consent of Mark.

## C. Management of Adtronics

### 8. Appointment as General Manager

32262, Adtronics and Adtronics U.S. agree to appoint Mark to be general manager of the Adtronics Division, Adtronics and Adtronics U.S. respectively. Adtronics and Adtronics U.S. also agree to appoint Mark as president of their respective companies.

### 9. Duties

As general manager, Mark shall have sole responsibility and exclusive authority to manage all of the aspects of the businesses carried on by the Adtronics Division, Adtronics and Adtronics U.S. (collectively referred to as the "Adtronics Group") including without restricting the generality of the foregoing:

(a) marketing including authority to determine products and services to be marketed and authority to license any other party to sell, either on a wholesale or retail basis, the products or services;

(b) manufacturing including authority to determine the products to be manufactured and authority to contract with any other person for the manufacture of such products;

(c) administration including sole and exclusive authority to deal with every facet of the administration of each member of the Adtronics Group including the expenditure of money, either of a capital or a current nature (the use of funds other than those generated through the operations of Adtronics will be subject to availability), the use of the assets of the Adtronics Group as security for any loans of a capital or current nature (other than the security required to be provided under the CCFL financing or security required to finance operating loans required by the CCFL financing), the purchase and sale of any of the assets and the decision whether to share administrative and accounting services provided by other members of the Sicon Group;

(d) employee relations including exclusive jurisdiction to hire and terminate employees of the Adtronics Group and to determine the duties to be performed by such employees;

It is understood and agreed that the authority granted to Mark as general manager shall not include the authority to sell or wind-up any business carried on by the Adtronics Group.

### 10. Capital Budget

Mark agrees to prepare a capital budget for each fiscal year for each member of the Adtronics Group prior to the commencement of such fiscal year and submit it for approval by the Board of Directors of Adtronics and Sicon.

Adtronics and Sicon agree to approve the budgets as submitted by Mark provided that the amount of the budget does not exceed the Adtronics Group's percentage of the total capital budget available to the Sicon Group and the Adtronics Group for such fiscal period. Timing of the capital expenditures shall be as determined by Mark provided however that Mark shall use his reasonable efforts to coordinate the costs with the cash flow of operations.

The Adtronics Group's percentage of the total capital budget for a particular fiscal period will be equal to the percentage of the total combined gross revenue for the most recently completed fiscal period of the Sicon Group and the Adtronics Group represented by the total gross revenues of the Adtronics Group during such fiscal period.

### 11. Financial Assistance

Sicon also agrees not to require unreasonable repayment of the intercompany debt from time to time owing by Adtronics during the term of this Agreement and further agrees to continue the credit arrangements currently in effect.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

In the event that Adtronics Group requires additional working capital to finance expansion, etc., Sicon agrees to continue the existing financial arrangements and to use its best efforts to assist in arranging financing from other sources.

### 12. Remuneration

As consideration for his service as president and general manager of Adtronics and Adtronics U.S., Mark shall receive such compensation as is determined from time to time by Mark.

In the event Mark elects to increase the compensation payable to him he agrees that one of the matters he shall take into consideration in making such election is the effect such increased compensation may have on CCFL financing arrangements.

It is understood and agreed that the compensation paid to Mark may be in the form of salary, dividends or benefits as Mark shall in his sole discretion determine to be appropriate. Adtronics agrees to cause such cash dividends to be issued on account of compensation as may be reasonably requested by Mark provided that unless otherwise agreed the maximum amount available for dividends shall be a percentage of the maximum dividends permitted by the CCFL financing (presently $300,000 per year). The percentage shall be equal to the percentage that the net income after tax of the Adtronics Group bears to the combined net income after tax of the Adtronics Group and Sicon Group.

### 13. Redemption Value of Preference Shares

32262 agrees to determine the net income (or net loss) of the Adtronics Division within 6 months of the end of each fiscal year to 32662 [*sic*] and that the redemption value of the preference shares acquired by Adtronics pursuant to paragraph 2 of this Agreement shall increase (or decrease) by an amount equal to the net income (or net loss) after taxes (calculated in accordance with generally accepted accounting principles) of the Adtronics Division in the immediately preceding fiscal year.

In the event that the preference shares are redeemed or retracted, the parties also agree, immediately prior to such redemption or retraction, to adjust the redemption or retraction price of the shares to include the net income (or net loss) after taxes up to the date of redemption or retraction.

### 14. Directorship

Sicon agrees to cause Mark to be appointed as a director of 32262 and as the sole director of Adtronics. Armitage agrees to cause Mark to be a director of Sicon and Adtronics agrees to cause Mark to be the sole director of Adtronics U.S.

The parties acknowledge and agree that CCFL may not consent to Mark being a director of Sicon. Armitage covenants and agrees to use its best efforts to obtain the consent of CCFL to Mark's appointment as a director of Sicon. If CCFL refuses to give such consent, Mark shall not be entitled to be a director of Sicon but Mark shall be entitled to attend all directors' meetings and to view all resolutions of directors prior to passing or execution thereof as the case may be and to review all such information of Sicon as he would be entitled to review if he were a director of Sicon. Upon the request of Mark, Armitage will again, from time to time request such consent from CCFL and in the event CCFL gives such consent, Armitage shall cause Mark to be appointed a director of Sicon forthwith thereafter.

### D. Relationship with Sicon Group

### 15. Disability of Mark

In the event that Mark should die or be unable to perform his duties as general manager due to a mental or physical disability for a period of 90 days or more, a new general manager for the Adtronics Group shall be appointed. The new general manager shall be selected by a committee consisting of a representative of Sicon and a representative of Mark (appointed by Mark's executor (in the case of Mark's death) or Marilyn Armitage or other person having control of Mark's assets (in the case of Mark's disability)). In such event the directorship of Adtronics and Adtronics U.S. shall be increased to 2 persons consisting of a representative of Sicon and a representative of Mark (appointed in the manner described above).

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 191 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

The cessation of Mark as general manager due to death or disability shall not constitute a termination of Mark for the purposes of paragraph 18.

In the event that Mark is subsequently able to resume the duties contemplated by this Agreement, the parties agree to immediately reappoint him as general manager of the Adtronics Group and as sole director of Adtronics and Adtronics U.S.

### 16. Sharing of Facilities and Services

To the extent that the Sicon Group and the Adtronics Group shall *[sic]* common facilities or services, each Group shall bear its proportionate share of such facilities or services.

The allocation of proportionate costs shall be as follows:

(a) to the extent that any cost can be specifically attributed to one Group or another it shall be specifically borne by such Group (e.g. long distance telephone calls);

(b) to the extent that any costs relate to the operation of premises (e.g. property taxes, electricity) the costs shall be borne by each Group in proportion to the space used by each Group at such premises;

(c) other overhead expenditures - forthwith after execution of this Agreement the Sicon Group and Adtronics Group agree to identify all other facilities and services which are to be paid for on a shared basis. Each Group agrees to pay a percentage of the cost of such shared facilities and services provided to such Group by the other Group; the percentage shall be equal to the percentage that the gross revenue of the Group receiving the facilities or services is of the gross revenue of both Groups. If one Group wishes to use the facilities or services of the other and there has been no agreement to pay for same on a shared basis, the Group wishing to use such facility or service will, prior to the use of same, pay such amount as is agreed upon between the Groups.

No Group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service. Either Group may at any time advise the other on reasonable notice that it no longer wishes to use a facility or service provided by the other in which event it shall no longer be obliged to share in the cost. In determining reasonable notice the parties agree that an important criteria is the length of the time required for the person providing such facility or service to reduce the additional costs it has incurred to be able to provide such cost or service to the other Group as well as itself.

### 17. Transfer Pricing

Mark agrees to provide a price schedule of the products supplied by the Adtronics Group setting out a purchase price for such products by the Sicon Group. Adtronics shall be entitled to revise the schedule from time to time provided the prices shall not at any time exceed the prices which it charges other customers for such products. In the event that the Sicon Group wishes to pay a lower price than the price set out in the schedule (whether as a result of a reduced return to the Sicon Group due to pricing competition or otherwise) it must negotiate such price with the Adtronics Group prior to ordering same. If a reduced price has not been agreed upon at the time of the order, the price set out in the schedule shall be applicable.

### E. Term

### 18. Term

This agreement shall remain in force and effect until the earlier of:

(a) the parties mutually agree to terminate the agreement;

(b) the Sicon Group is no longer required by its financing arrangements to maintain ownership and control of the assets and business of Adtronics; or

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 192 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

(c) delivery of notice by Mark or Sicon terminating this Agreement which will only be exercisable if Mark is terminated as general manager of a member of the Adtronics Group as President of Adtronics or Adtronics U.S. or there is any other material breach of the terms of this agreement.

In the event of termination of this Agreement Mark shall purchase the Adtronics shares from Sicon. The consideration shall be the delivery by Mark of the shares in the capital stock of Sicon received by Mark under this Agreement.

In the event that Mark is entitled to purchase hereunder Adtronics shall purchase and 32262 shall sell the Adtronics Division. The purchase price shall be the delivery of the shares which Adtronics received pursuant to this Agreement at the time of sale of the Adtronics Division to 32262. In the event that the redemption price at the date of sale is greater or less than the redemption price at the time of purchase, the amount of the difference will be due and owing by the appropriate party at the time of sale. The method of repurchase (e.g. redemption of shares, use of nominee company, etc.) shall be determined by Mark. In the event there is an intercompany debt outstanding between a member of the Adtronics Group and a member of the Sicon Group at the time of the purchase, (including a debt arising from the change in the redemption price contemplated by this paragraph) such debt shall be repaid in four equal annual instalments commencing on the date of purchase. The debt shall bear interest at the rate per annum from time to time charged by Sicon's bankers on its operating form.

### 19. Preservation of Assets

Except as specifically provided by the CCFL financing arrangement, Sicon agrees that it will not transfer, assign or pledge any of the Adtronics shares and 32262 agrees it will not transfer, assign or pledge any of the business or assets of the Adtronics Division. Adtronics agrees that it will not transfer, assign or pledge any of the Adtronics U.S. shares without the prior written consent of Mark. It is understood and agreed that the share certificates representing the common shares of Adtronics shall specifically state that the assignment or other transfer is subject to the consent of Mark.

Neither Adtronics nor Adtronics U.S. will allot or issue any addition [*sic*] shares in their capital without the written consent of Mark.

## F. Mimar Holdings Ltd.

### 20. Assets to be Sold

Mark or his assignee hereby agrees to sell and Sicon agrees to purchase the shares owned by Mark in the capital stock of Mimar Holdings Ltd. representing $1/2$ of the issued and outstanding capital stock.

### 21. Purchase Price

The purchase price of the shares will be for the sum of $140,000 payable on execution of this Agreement. Mark agrees or shall cause his Assignee to agree to advance the full amount of the purchase proceeds to Adtronics to be applied against its intercompany debt to Sicon.

## G. General

### 22. Covenant by Donald Armitage

Donald hereby personally covenants and agrees that Sicon and any other companies in the Sicon Group shall perform each of the obligations contemplated by this Agreement and that he shall not take any steps either personally or in his capacity as an officer, director or shareholder of any company in the Sicon Group which is inconsistent with this Agreement.

### 23. Covenant by Mark Armitage

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 193 of 245

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Mark hereby personally covenants and agrees that Adtronics and the Adtronics Group shall (to the extent that Mark is in control of same) perform each of the obligations contemplated by this Agreement and he shall not take any steps either personally or in his capacity as officer, director or shareholder of any company in the Adtronics Group or in any company which is a party to this Agreement which is inconsistent with this Agreement.

### 24. Covenant by Other Shareholders

The Other Shareholders by execution of this Agreement acknowledge that they are aware of the terms and conditions and agree that they will use their best efforts to assist in the implementation of this Agreement in accordance with its terms.

### 25. Allocation of Small Business Deduction

Sicon agrees to cause an equal share of the small business deduction under section 125 of the *Income Tax Act* to be allocated to each of the companies or groups of companies that enjoyed a separate small business deduction prior to the reorganization arising from the CCFL financing arrangements. In the event that any company or group of companies is unable to utilise all or part of its share of the small business deduction in any fiscal year, the unused portion shall be allocated equally between the other companies or groups of companies.

### 26. Enurement

This agreement shall enure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

### 27. Shareholder Agreement

Mark, the Other Shareholders, Holdings & [*sic*] Don agree that they shall further negotiate and execute an agreement between themselves with respect to their respective interests as shareholders in Sicon.

### 28. Sicon Shares

It is understood and agreed that except for the preferred shares in the capital of Sicon presently held by Mark, the Other Shareholders and Mark shall each hold the same number of equity shares in the capital of Sicon and each of the shares shall have the same terms and conditions.

### 29. CCFL Financing Arrangements

It is understood and acknowledged by the parties that certain of the terms and conditions of this Agreement may require the consent of the lenders under the CCFL financing in order to be implemented or may be inconsistent with the CCFL financing arrangements. Except for paragraph 18, the provisions of and rights and obligations contained in this Agreement (including specifically the rights and obligations in paragraphs 2, 4, 12 and 13) will be subject in all respects to any agreement which forms part of the CCFL financing arrangement and will not be effective to the extent they are contrary to the CCFL financing arrangement. If any term or condition of this Agreement requires consent of the lenders Sicon agrees to use its best efforts to obtain such consent from time to time as required. If any term or condition of this Agreement is inconsistent with the CCFL financing arrangements Sicon agrees to use its best efforts as required from time to time to obtain approval to carry out such term or condition notwithstanding the provisions of the financing arrangements. Mark and the Adtronics Group agree to provide all assistance to Sicon as may be reasonable or necessary to obtain such consent or approval.

The provisions of paragraph 18 relating to the right of Mark to repurchase the Adtronics shares and of Adtronics to repurchase the Adtronics Division will, in the event of the termination of Mark, be in full force and effect notwithstanding that it may contravene the CCFL financing arrangement and may cause an event of default under such arrangements.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Signed, Sealed and Delivered                        )
by MARK ARMITAGE in the                             )
presence of:                                        )
                                                    )
                                                    )        [Signed]
Name                                                )        MARK ARMITAGE
                                                    )
                                                    )
Address                                             )
                                                    )
                                                    )
Occupation                                          )
Signed, Sealed and Delivered                        )
by DONALD ARMITAGE in the                           )
presence of:                                        )
                                                    )
                                                    )        [Signed]
Name                                                )        DONALD ARMITAGE
                                                    )
                                                    )
Address                                             )
                                                    )
                                                    )
Occupation                                          )
The Corporate Seal of                               )
ADTRONICS SIGNS LTD. was                            )
hereunto affixed in the                             )
presence of:                                        )
                                                    )
                                                    )
[Signed]                                            )        c/s
Authorized Signatory                                )
                                                    )
[Signed]                                            )
Authorized Signatory                                )
The Corporate Seal of                               )
ADTRONICS INC. was hereunto                         )
affixed in the presence of:                         )
                                                    )
                                                    )
[Signed]                                            )        c/s
Authorized Signatory                                )
                                                    )
[Signed]                                            )
Authorized Signatory                                )
The Corporate Seal of                               )
ARMITAGE HOLDINGS LTD. was                          )
hereunto affixed in the                             )
presence of:                                        )
                                                    )
                                                    )
[Signed]                                            )        c/s
Authorized Signatory                                )
                                                    )
[Signed]                                            )
Authorized Signatory                                )

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

| | | |
|---|---|---|
| The Corporate Seal of SICON | ) | |
| GROUP INC. was hereunto | ) | |
| affixed in the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |
| The Corporate Seal of | ) | |
| 32262 BRITISH COLUMBIA LTD. | ) | |
| was hereunto affixed in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 14

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 197 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

2012 ABQB 524
Alberta Court of Queen's Bench

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd.

2012 CarswellAlta 1438, 2012 ABQB 524, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676, 7 B.L.R. (5th) 142

# Alberta Oil Sands Pipeline Ltd. in its capacity as General Partner of Pembina Oil Sands Pipeline L.P., Plaintiffs/Defendants by Counterclaim and Canadian Oil Sands Limited, Imperial Oil Resources, Suncor Energy Oil & Gas Partnership, Sinopec Oil Sands Partnership, Nexon Oil Sands Partnership, Mocal Energy Limited and Murphy Oil Company Ltd., Defendants/Plaintiffs by Counterclaim

B.E. Romaine J.

Judgment: August 17, 2012
Docket: Calgary 1001-18956

Counsel: John B. Laskin, Andrew A. Finkelstein, for Plaintiffs / Defendants by Counterclaim
Clarke Hunter, Q.C., Allison G. Kuntz, for Defendants / Plaintiffs by Counterclaim

Subject: Natural Resources; Civil Practice and Procedure; Corporate and Commercial; Public

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Natural resources --- Oil and gas — Statutory regulation — Pipelines

From 1978 to 2008, company AOSPL transported production from oil sands project operated by defendants to refineries and tank farms using 22-inch pipeline, to which had been added some newer looping sections of 24 or 30 inch pipe — By expansion support amendment (ES Amendment), new 24 or 30 inch pipeline was to be segregated both commercially and operationally from old 22 inch pipeline — AOSPL did not complete last 4.1 kilometres of new 24 or 30 inch pipeline to service defendants — Defendants alleged that there was breach of ES Amendment and that certain invoices sent to it were objectionable — Defendants served AOSPL with notice of submission for arbitration — AOSPL brought action seeking declaration that defendants' claims were not subject to arbitration and were statute-barred — Hearing to determine whether certain claims that were subject of litigation were arbitrable claims under terms of pipeline services agreement — Claims at issue were stayed and referred to arbitration — It was unreasonable commercially to accept that intention of parties was to resort to two different forums for resolution of disputes about single aspect of pipeline tariff.

**Table of Authorities**

**Cases considered by *B.E. Romaine J.*:**

*Atco Electric Ltd. v. Alberta (Energy & Utilities Board)* (2004), 2004 ABCA 215, 31 Alta. L.R. (4th) 16, 361 A.R. 1, 339 W.A.C. 1, 2004 CarswellAlta 949, 18 Admin. L.R. (4th) 243, [2004] 11 W.W.R. 220 (Alta. C.A.) — referred to

*Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358, 95 D.L.R. (3d) 242, 1978 CarswellBC 525 (B.C. C.A.) — considered

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 198 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co. (1979), (sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Hammer Pizza Ltd. v. Domino's Pizza of Canada Ltd.* (1997), 1997 CarswellAlta 1233 (Alta. Q.B.) — distinguished

*Huras v. Primerica Financial Services Ltd.* (2001), 2001 CarswellOnt 2848, 148 O.A.C. 396, 55 O.R. (3d) 449, 10 C.C.E.L. (3d) 239, 13 C.P.C. (5th) 108 (Ont. C.A.) — considered

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161, 1968 CarswellOnt 318 (Ont. H.C.) — considered

*Meduk v. Soja* (1958), [1958] S.C.R. 167, 1958 CarswellAlta 69, 12 D.L.R. (2d) 289 (S.C.C.) — considered

*New Era Nutrition Inc. v. Balance Bar Co.* (2004), 2004 ABCA 280, 2004 CarswellAlta 1200, 47 B.L.R. (3d) 296, 357 A.R. 184, 334 W.A.C. 184, 245 D.L.R. (4th) 107, 33 Alta. L.R. (4th) 1 (Alta. C.A.) — distinguished

*Ryan v. Moore* (2005), 254 D.L.R. (4th) 1, 334 N.R. 355, [2005] 2 S.C.R. 53, 2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, 247 Nfld. & P.E.I.R. 286, 735 A.P.R. 286, 25 C.C.L.I. (4th) 1, 32 C.C.L.T. (3d) 1, [2005] R.R.A. 694, 18 E.T.R. (3d) 163 (S.C.C.) — distinguished

*Scurry-Rainbow Oil Ltd. v. Kasha* (1996), 39 Alta. L.R. (3d) 153, 135 D.L.R. (4th) 1, 184 A.R. 177, 122 W.A.C. 177, 1996 CarswellAlta 402 (Alta. C.A.) — referred to

*Western Irrigation District v. Alberta* (2002), 2002 ABCA 200, 2002 CarswellAlta 1110, 33 M.P.L.R. (3d) 62, 312 A.R. 358, 281 W.A.C. 358 (Alta. C.A.) — referred to

**Statutes considered:**

*Arbitration Act*, R.S.A. 2000, c. A-43
    s. 7 — considered

    s. 17(2) — referred to

HEARING to determine whether certain claims that were subject of litigation were arbitrable claims under terms of pipeline services agreement.

***B.E. Romaine J.***:

**Introduction**

1    The narrow issue in this application is whether certain claims that are the subject of litigation commenced in this Court are arbitrable claims under the terms of a pipeline services agreement between the parties. If so, the Defendants/Plaintiffs by Counterclaim submit they should be stayed and referred to arbitration.

**Relevant Facts**

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 199 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

2    From 1978 to 2008, Alberta Oil Sands Pipeline Ltd. ("AOSPL") transported production from the Syncrude oil sands project near Fort McMurray, Alberta operated by the Defendants/Plaintiffs by Counterclaim (the "Syncrude Participants") to refineries and tank farms near Edmonton using a 22-inch pipeline (the "Old 22 Inch Pipeline"), to which had been added some newer looping sections of 24 or 30 inch pipe.

3    The original agreement relating to the construction and operation of the pipeline was superseded by a 1993 Pipeline Agreement which, among other things, mandates the process for the invoicing, payment, and audit of the pipeline tariff (also known as the "Cost of Service").

4    By a 2005 Expansion Support Amendment (the "ES Amendment"), AOSPL committed to build additional sections of 24 or 30 inch pipe so as to complete a new pipeline to service the requirements of Syncrude Participants (the "New 24/30 Inch Pipeline"). Once completed, the New 24/30 Inch Pipeline was to be segregated both commercially and operationally from the Old 22 Inch Pipeline. The Old 22 Inch Pipeline would then be used to service the requirements of the Horizon oil sands project operated by Canadian Natural Resources Ltd. ("CNRL").

5    However, AOSPL did not complete the last 4.1 kilometers of the New 24/30 Inch Pipeline to service the Syncrude Participants. AOSPL instead used the Old 22 inch Pipeline for that segment and dedicated the last segment of the New 24/30 Inch Pipeline to CNRL, using different routing.

6    The Syncrude Participants allege that AOSPL imposed this arrangement on them on July 1, 2008 by commencing segregated operation of the two pipelines - one for Syncrude and one for CNRL. For Syncrude shipments, AOSPL used the New 23/30 Inch Pipeline except for the last 4.1 km. near Edmonton in an area known as Pipeline Alley. There it continued to use the Old 22 Inch Pipeline. The Syncrude Participants allege that this is a breach of the ES Amendment.

7    AOSPL takes the position that the Syncrude Participants should accept the last 4.1 km. of the Old 22 Inch Pipeline as compliant with the ES Amendment on the basis that it is functionally equivalent to the New 23/30 Inch Pipeline. The Syncrude Participants do not agree.

8    After July 1, 2008, the parties continued to engage in discussions with a view to resolving this issue. Under the ES Amendment, AOSPL was to sell the line fill in the Old 22 Inch Pipeline and credit the sales proceeds to the capital asset account, which affects calculation of the pipeline tariff. AOSPL did sell the line fill and obtained proceeds of nearly $60 million. During the period of time that AOSPL and the Syncrude Participants were negotiating the 4.1 km. issue, and while the Syncrude Participants were continuing to refuse to accept that situation, AOSPL did not credit the $60 million to the capital asset account. AOSPL takes the position that the "In-Service Date" under the ES Amendment could not occur unless and until the Syncrude Participants confirmed the acceptability of the last 4.1 km. The In-Service Date is defined as being "the first day the [new pipeline construction] has been completed, is available to be commissioned, and is found to be acceptable by the Syncrude Participants to provide service for Products on the 24/30 Inch Pipeline."

9    On June 11, 2009, the parties entered into a Tolling and Pipeline Severance Agreement ("the TPSA"). The stated purpose of the TPSA was to preserve the rights of the parties to any claims or defences in respect of the allegations that AOSPL breached the ES Amendment, while "avoiding any need to commence Litigation to prevent the expiry of limitation periods." "Litigation" was defined as including an action or arbitration.

10    The TPSA provided for the application of the line fill credit to the capital asset account as of June 11, 2009, but preserved the Syncrude Participants' claim that the line fill credit ought to have been credited at an earlier date or dates.

11    At about the same time, AOSPL increased the pipeline tariff to the Suncrude Participants by including a charge for a notional capital gains tax on the line fill proceeds as of the dates on which the line fill sales actually took place, with a resulting increase in the tariff. The Syncrude Participants allege that the inclusion of any capital gains tax in the tariff is contrary to the 1993 Pipeline Agreement and the ES Amendment, and is inconsistent with the economics projections that AOSPL provided to the Syncrude Participants when they were considering the ES Amendment.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

12    Under the 1993 Pipeline Agreement, AOSPL calculates and invoices the Syncrude Participants for the Cost of Service in two phases: (i) the Provisional Cost of Service; and (ii) the actual Cost of Service.

13    The Provisional Cost of Service is defined as "a written good faith estimate identified as such and prepared each Year by AOSPL, setting out the estimated Cost of Service for the following Year". AOSPL invoices the Syncrude Participants for the Provisional Cost of Service on a monthly basis, and the Syncrude Participants are required to pay the invoices within ten days of receipt.

14    The actual Cost of Service is calculated for any given year on or before February 15th of the following year, crediting all amounts paid by the Syncrude Participants pursuant to the Provisional Cost of Service invoices and any other amounts that AOSPL is required to credit to the Syncrude Participants pursuant to the 1993 Pipeline Agreement. To the extent that payment of the Provisional Cost of Service invoices results in either an overpayment or an underpayment by the Syncrude Participants in respect of the actual Cost of Service, a credit from or a further payment to AOSPL is required.

15    The Syncrude Participants submit that the Provisional Cost of Service invoices do not provide sufficient detail for them to conduct any meaningful review of the amounts charged therein. Accordingly, they say, it has become their standard practice to pay those invoices with minimal review and as a matter of course, and instead to conduct a thorough assessment of the amounts charged through the audit process provided by the 1993 Agreement.

16    AOSPL disagrees about the detail of the invoices, and submits that the AOSPL invoices do provide sufficient detail for the Syncrude Participants to conduct a meaningful review of the amounts charged. For the purpose of this application, and given my interpretation of Article 18 and Article 19.3 of the 1993 Pipeline Agreement and the interplay among these provisions, nothing turns on this difference of views.

17    Article 18.2 of the 1993 Pipeline Agreement provides as follows:

> [The Syncrude Participants] shall have the right, at their expense, to inspect, examine and audit, at all reasonable times, but not more than once each Year, the books of accounts and records of AOSPL which relate to the Operations to the extent necessary to verify the accuracy of all amounts used in the calculation of the Cost of Service and all invoices and bills hereunder.

> (emphasis added)

18    This audit right can be exercised within two years of any particular tariff year. The Syncrude Participants exercise their audit rights once every two years.

19    Pursuant to Article 18.3 of the 1993 Pipeline Agreement, any "discrepancies" identified in AOSPL's invoices as a result of an audit must be dealt with as follows:

> (a) The Syncrude Participants must submit any audit claims to AOSPL within 60 days of the completion of the audit field work;

> (b) AOSPL must respond in writing to the audit claims within 60 days of receipt;

> (c) Any audit claims that remain unresolved after 180 days from the day on which they were made "shall be submitted to Arbitration unless both AOSPL and the [Syncrude] Participants agree to an extension" of the said 180 day period.

20    The Syncrude Participants began their audit of AOSPL's 2008 tariff in the fourth quarter of 2009, after having received the actual Cost of Service invoice for 2008 in February 2009.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

21    The Syncrude Participants allege that the 2009 audit revealed a number of substantial discrepancies in respect of the Cost of Service in 2008. As a result, they submitted a number of what they characterize as Audit Claims within the meaning of Article 18.3 to AOSPL on April 26, 2010. The claims that remain outstanding and form the basis for this application are as follows:

(a) *The Proceeds Claim*, which concerns the issue of the line fill having been sold in 2008, but AOSPL not having credited the capital assets account (also referred to as the "Capital Disposals Account") with the $60 million in line fill sales proceeds until June 11, 2009.

(b) *The Tax Claim*, which concerns AOSPL's inclusion in the 2008 Cost of Service of what the Syncrude Participants describe as a theoretical capital gains tax of $6,508,140 in respect of the line fill sales, which the Syncrude Participants allege is not authorized by either the 1993 Pipeline Agreement or the ES Amendment and is contrary to the reasoning in a 2005 arbitration decision with respect to a different tax charge imposed by AOSPL.

(c) *The Maintenance Claims*, which concern a number of charges for work relating to the Old 22 Inch Pipeline undertaken shortly before the expansion, which the Syncrude Participants allege provided no benefit to them.

22    Another Audit Claim related to an alleged discrepancy between the amount of the proceeds of the sale of the line fill and the amount of the line fill credit to the capital assets account. AOSPL acknowledges that this claim is a proper Audit Claim and arbitrable under the 1993 Pipeline Agreement.

23    AOSPL responded to the Audit Claims on June 25, 2010, exactly 60 days after they were submitted by the Syncrude Participants, conforming with the timing prescribed by Article 18.3 of the 1993 Pipeline Agreement. For each issue, AOSPL inserted its "Operator Response" into the "Audit Query" document that had been submitted on behalf of the Syncrude Participants.

24    The Syncrude Participants replied to AOSPL's June 25, 2010 responses in July and September 2010, providing AOSPL with further information in support of the Audit Claims. This was within the 180 day period specified by Section 18.3 before the claims had to be submitted to arbitration.

25    On November 4, 2010, when the claims had remained unresolved for 180 days, the Syncrude Participants served AOSPL with a Notice of Submission for Arbitration and a Statement of Claim (collectively, "the Notice of Arbitration").

26    On December 22, 2010, AOSPL commenced an action by way of Statement of Claim seeking declarations that the Proceeds Claim and the Tax Claim were not subject to arbitration and were statute-barred (the "Audit Claim Action"). AOSPL later amended its Statement of Claim to seek the same declarations with respect to the Maintenance Claims. On December 29, 2010, the Syncrude Participants filed a Statement of Defence alleging that the claims were subject to arbitration and seeking a stay of the action. They also filed an application for a stay of the Audit Claim Action and a referral of the disputes to arbitration.

27    On March 9, 2011, AOSPL gave the Syncrude Participants 60 days notice of the termination of the TPSA. In response, the Syncrude Participants commenced an action for declarations and damages resulting from AOSPL's breach of the ES Amendment in failing to complete the last 4.1 km. of the New 24/30 Inch Pipeline (the "4.1 km Action"). The parties agree that this claim is not an "Audit Claim" relating to the pipeline tariff and that it is not arbitrable under the 1993 Pipeline Agreement. AOSPL has filed a cross-motion to consolidate the Audit Claim Action and the 4.1 km Action.

28    The Syncrude Participants concede that if the stay application fails, AOSPL's crossmotion to consolidate the Audit Claim and the 4.1 km Action should be allowed. They submit, however, that as the claims advanced in the 4.1 km Action are not arbitrable under the 1993 Pipeline Agreement, the cross-motion necessarily fails if the stay application succeeds. They suggest that it would then be for the parties to consider whether to agree to include the 4.1 km Action in the arbitration.

**Issues**

a) *Are the Audit Claims subject to the audit and arbitration provisions of the 1993 Pipeline Agreement?*

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 202 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

b) *If so, should they be stayed and referred to arbitration, or should this Court allow them to be resolved in conjunction with the 4.1 km Action?*

**Analysis**

*a) Are the Audit Claims subject to the audit and arbitration provisions of the 1993 Pipeline Agreement?*

*General Principles of Interpretation*

29     Contracts are to be construed as a whole and in accordance with the intentions of the parties as expressed by the written document. A court should search for the interpretation that would appear to promote or advance the true intent of the parties at the time of entry into the contract: *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at p. 11.

30     Each term of the contract must be interpreted harmoniously with other terms of the agreement. If possible, effect should be given to all provisions: John D. McCamus, *The Law of Contracts*, Irwin Law Inc., 2005 at page 717-719.

31     If the contract is clear and unambiguous on its face, it is unnecessary to consider any extrinsic evidence: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para 55. The court is not searching for the subjective intention of the parties at the time the contract was made, but is making an objective judgment of the intention of the parties based on the material before it: *Atco Electric Ltd. v. Alberta (Energy & Utilities Board)*, 2004 ABCA 215 (Alta. C.A.) at para. 77.

32     Where a contract may bear two interpretations, the more reasonable one, "that which produces a fair result", should be adopted as promoting the intention of the parties: *Consolidated-Bathurst* at p. 11.

33     Where there are reasonable alternative interpretations of a contract, "evidence of the subsequent conduct of the parties is admissible as an aid to resolving the ambiguity if the conduct is more consistent with one interpretation than the other": *Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358, 95 D.L.R. (3d) 242 (B.C. C.A.), cited in *Western Irrigation District v. Alberta*, 2002 ABCA 200 (Alta. C.A.) at para. 21; *Scurry-Rainbow Oil Ltd. v. Kasha* (1996), 184 A.R. 177 (Alta. C.A.) at para. 45. As a general rule, evidence of prior agreements is of limited assistance: *McCamus* at pages 711-713.

34     The same rules of contractual interpretation that govern any clause in a contract apply to the interpretation of an arbitration clause, including that "the governing consideration ... must be the precise terms of the language in which the arbitration clause is framed": *Huras v. Primerica Financial Services Ltd.*, [2001] O.J. No. 3318 (Ont. C.A.) at para. 11.

*Applied to These Provisions*

35     The Syncrude Participants submit that interpreting Articles 18.2 and 18.3 of the 1993 Pipeline Agreement in accordance with their plain meaning and purpose mandates that the Audit Claims be referred to arbitration. They note that Article 18.2 of the 1993 Pipeline Agreement gives the Syncrude Participants the right of audit "*to the extent necessary to verify the accuracy of all amounts used in* the calculation of the Cost of Service and *all invoices and bills hereunder*" (emphasis added). They submit that verifying the accuracy of AOSPL's invoices necessarily requires a determination that they conform with the terms of the 1993 Pipeline Agreement. How else, they say, could an invoice be regarded as "verified" if the amounts used in the calculation of the Cost of Service are in violation of the terms of the agreement?

36     AOSPL submits that Article 18.2 gives the Syncrude Participants only a limited right of audit, confined to verifying that the amounts used in the calculation of the Cost of Service were mathematically accurate or in accordance with acceptable accounting principles, and not extending to issues of contractual interpretation. It submits that only disputes about inconsistencies (or "discrepancies") are arbitrable under the 1993 Pipeline Agreement, referring to the words of Article 18.3 relating to the submission of "claims of discrepancies" resulting from the audit.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

37    AOSPL relies on the American case of *S. Joseph Co. v. Golde* 185 F. Supp. 521(1960) for its narrow interpretation of the meaning of "claims of discrepancies". The issue in that case was whether a clause submitting to arbitration "all discrepancies which might eventually arise from this contract" included a dispute involving the repudiation or rescission of the contract before any goods had been delivered. In a brief judgment, the Court concluded that the arbitration clause did not cover a dispute that arose prior to the performance of the contract. In the course of reaching this conclusion, the Court agreed with the restrictive interpretation of "discrepancies" put forward by one party, being that this term simply referred to a variation between contractual standards and the character of product actually delivered, and not to a repudiation of the contract before it could be performed.

38    Given the nature of its facts, the case is not persuasive. The dispute in this case arises from the operation of a contact, not from its repudiation before performance. The reference to "discrepancies" in Section 18.3 takes its meaning from that context.

39    AOSPL also submits that the interpretation it puts forward is supported by two other terms of the 1993 Pipeline Agreement: Article 18.6 and Article 19.3.

40    Article 18.6 provides that items established to be inaccurate as a result of an audit shall be rectified as soon as possible after completion of the audit and credited with interest "as provided in Article 19 of this Agreement". This, submits AOSPL, is an indiction that Section 18.2 only refers to accounting type corrections that address any problems with mathematical calculation of the Cost of Service, and not problems arising from differences in contractual interpretation. I fail to see how a reference to timely rectification and interest would narrow the scope of what could be an "Audit Claim". AOSPL submits that the use of the word "inaccurate" implies a narrow audit right, but that stretches plain meaning. However, the reference to "interest" gives rise to a review of Article 19.3.

41    Article 19.3 provides that if a Syncrude Participant disagrees with any charge or amount shown in an invoice or statement of account, it shall advise AOSPL by prompt written notice and "shall nevertheless pay the full amount of the invoice or statement of account on or before the required date for payment." The article then provides for AOSPL to conduct a review to determine whether the charge or amount in dispute is correct. If it is determined that the amount was incorrectly paid, AOSPL is to immediately refund the overpayment with interest. There is no reference in the article to arbitration, and the article is not among those listed in Article 21.1 of the 1993 Pipeline Agreement which provides for submission of issues to arbitration.

42    AOSPL submits that the effect of the interpretation of the 1993 Pipeline Agreement advanced by the Syncrude Participants would be to extend the audit provisions of Article 18 with its arbitration provision to all disputes about amounts charged, and that this interpretation would render Article 19.3 meaningless.

43    I cannot accept this submission. The purpose of Article 19.3 is to ensure that AOSPL is paid promptly in accordance with the invoices and statements of account it issues during the period in which it conducts a review of any concerns or complaints raised by a Syncrude Participant. If such a review results in an outcome that is satisfactory to both the Syncrude Participant and AOSPL, that is the end of it. If not, either party may resort to litigation over the result of the review, or a Syncrude Participant may chose to rely on its audit rights set out under Section 18.2. This does not render Section 19.3 meaningless, as it creates in AOSPL's favour an absolute obligation of payment pending a review of complaints by Syncrude Participants that arise from a particular invoice or statement of account. It creates a process that is an alternative to the independent audit envisaged by Section 18.2 and creates a right to interest on any refund that is found to be due and owing as a result. I agree with the Syncrude Participants that Section 19.3 is complementary to Section 18.2, and not inconsistent with it.

44    The Syncrude Participants submit that AOSPL's argument that Articles 18 and 19.3 establish mutually exclusive processes for resolving disputes of different types was refuted by a decision in a arbitration between AOSPL and the Syncrude Participants (as they then were) in December, 2005. The arbitrator in that decision dealt with a question of interpretation of Article 18.6 and Article 19 in the context of an interest calculation dispute. The issue before him was which sub-article of the Article 19 regime was intended to be referred to in Article 18.6 when it provided that interest on items established to be inaccurate as a result of an Article 18.6 audit shall be "credited appropriately with interest as provided in Article 19 of this Agreement." The arbitrator commented as follows on page 19 of the decision:

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 204 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

Reading all of the relevant provisions described above in the context of the entire 1993 Agreement leads me to the conclusion that the audit rights of Article 18 are intended (as stated in Article 18.2) to allow the [Syncrude Participants] to verify the work that AOSPL does in tracking the costs that are included in the Cost of Service and the invoices and bills submitted by AOSPL. This is necessary because obviously one cannot verify the correctness of amounts included in an invoice without access to the data on which they are based.

In the similar circumstances of a disputed amount where a Shipper is able to ascertain from an invoice that an incorrect amount has been wrongly included (for example, where an invoice contained an amount which clearly related to work done on the Scotford Lateral), the parties have clearly indicated in Article 19.3 that interest accrues from the time of payment by a [Syncrude Participant] of the successfully disputed amount.

45     Following from this, the arbitrator found that interest on settled audit claims arising from Article 18.6 accrues from the date of payment of the invoice that contained the amount subject to the audit claim, as contemplated by Article 19.3, rather than from the date of settlement, as argued by AOSPL. While the decision of an arbitrator, even in a case involving the same parties, is not binding on this Court, I agree with the implicit recognition by the arbitrator that Articles 18 and 19 are complementary.

46     AOSPL during oral submissions agreed that Article 18.3 and Article 19.3 are complementary, but suggested that Article 19.3 is a broader provision covering any kind of dispute over billing, and that Article 18.3 deals only with a subset of what Article 19.3 encompasses. This is an overly tortuous interpretation that finds no support in the words of the two provisions.

47     AOSPL also suggests that the Syncrude Participants are in essence putting forward an interpretation of Section 18.2 that would entitle it to conduct audits "to the extent necessary to determine whether the Syncrude Participants are being billed in accordance with the Agreement", and that this is somehow unreasonable. It is not unreasonable that the parties would provide for a periodic right of audit of Cost of Service billings to ensure that they are in compliance with the agreement generally, and not just mathematically correct.

48     On this issue, AOSPL points out that the audit right in Article 18 is not expressed in terms of a "compliance audit" as such term is defined in the National Energy Board's online reference document entitled Pipeline Tolls and Tariffs: A Compendium of Terms. It submits that, therefore, the audit right does not extend to issues of contractual interpretation. This document relates to publicly-regulated pipelines, and what it has to say about a term of art in that regard in a 2012 web posting is of little or no assistance to the interpretation of provisions in a contract relating to a private pipeline drafted in 1993, even as they have been amended from time to time. The choice of the word "accuracy" to describe the purpose of the audit, instead of "compliance", is not determinative of the interpretation of these provisions.

49     There is no significance to the fact that neither the ES Amendment nor the TPSA contains an arbitration clause. The ES Amendment is expressly an amendment to the 1993 Pipeline Agreement, which contains the arbitration clauses in issue. The TPSA is an interim agreement that allowed the continuation of negotiations while allowing the parties to preserve their rights. The TPSA does not form the primary basis for any of the Audit Claims, although it may be relevant factually to the Proceeds Claim.

50     The intrinsic factors that AOSPL submits support its narrow interpretation do not do so when the 1993 Pipeline Agreement is viewed as a whole, in its reasonable commercial context. AOSPL, however, refers to extrinsic factors that it submits supports its interpretation.

*Extrinsic Aids to Interpretation*

51     AOSPL submits that the arbitration provisions of the predecessor agreement to the 1993 Pipeline Agreement assist in interpreting the 1993 Pipeline Agreement.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

52      It submits that the previous agreement contained a much broader arbitration provision, referring to "any dispute or discrepancy with respect to the rights or obligation of the Parties", and the change to narrower language in the 1993 Pipeline Agreement is thus instructive.

53      The Syncrude Participants concede that the arbitration provisions of the 1993 Pipeline Agreement are more restrictive than the previous agreement, but submit that this does not help with the question of whether the audit rights set out in Article 18 include issues of contractual interpretation of the proper calculation of Cost of Service. I must agree. The Syncrude Participants do not suggest that all issues among the parties with respect to the 1993 Pipeline Agreement are subject to referral to arbitration. In fact, they point to the 4.1 km Action as an example of an issue that is not arbitrable under the agreement.

54      The difference between the broad referral language of the previous agreement and the more restrictive language of the 1993 Agreement is not helpful in the more subtle question of whether all issues relating to the calculation of Cost of Service and billings, including issues of contractual interpretation, are included under Section 18.3.

55      AOSPL submits that the fact that the Syncrude Participants seek a series of declarations rather than a mathematical rectification of specific numbers is a sign that the Audit Claims are not arbitrable. However, the Syncrude Participants seek declarations that would result, if successful, in such changes to the Cost of Service calculation.

56      I see nothing in the way the relief sought is framed that would indicate arbitrability one way or another, and note that an arbitral tribunal may determine questions of law that arise during the arbitration: Section 17(2) of the *Arbitration Act*, R.S.A. 2000, c. A-43.

57      It is unreasonable commercially to accept that the intention of the parties was to resort to two different forums for the resolution of disputes about a single aspect of the pipeline tariff: whether the Cost of Service has been calculated correctly. As noted by the Syncrude Participants, the position of AOSPL about this particular dispute illustrates the problems of that approach. AOSPL accepts that the issue of the correct amount of the line fill proceeds credit is arbitrable, but says that the question of when that amount should be credited must be litigated in the courts. It is not difficult to imagine that there are a myriad of such questions that could be characterized as being both issues of calculation and issues of interpretation. If the parties wished to parse their ability to refer disputes to arbitration in the manner suggested by the AOSPL, the contractual language could have done this clearly. The existing words do not support this interpretation, and it lacks commercial sense.

58      In summary, I agree with the interpretation of Articles 18.2 and 18.3 put forward by the Syncrude Participants, and find that the language of the articles is clear and unambiguous and broad enough to include issues of contractual interpretation relating to the accuracy of the invoices and bills rendered by AOSPL. I find that the interpretation promoted by AOSPL ignores the language of Section 18.2 that refers to verify the accuracy of "all invoices and bills" and concentrates too narrowly on the language that refers to verifying the accuracy of "amounts used".

59      I am satisfied that Articles 18.2 and 18.3 were intended to enable the parties to determine through arbitration the issue of whether they were being billed correctly and in conformity with the 1993 Pipeline Agreement, as amended. Thus, the Audit Claims in issue are arbitrable claims.

*Subsequent Conduct of the Parties*

60      If I am incorrect, and Articles 18.2 and 18.3 are reasonably susceptible of more than one meaning, I may take into account the subsequent conduct of the parties as an aid to resolving any ambiguity.

61      The Syncrude Participants point out that at no time during the audit process or the communications regarding the Audit Claims did AOSPL raise any issue with respect to whether the claims were properly the subject of audit queries or arbitration under Article 18.3 of the 1993 Pipeline Agreement. AOSPL first raised this issue shortly after the Syncrude Participants issued their Notice to Arbitrate. They submit further that AOSPL's own records show that during the audit process and later discussions up to the Notice to Arbitrate, AOSPL considered the Audit Claims to be arbitrable, referring to Minutes of a Meeting of the

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

Audit Committee of Pembina (the limited partnership of which AOSPL is the general partner) dated May 5, 2010, which refer to the "audit queries" of the Syncrude Participants, and state that "[i]n the event that [the Syncrude Participants] are not satisfied with our response, these issues are likely to proceed to arbitration."

62    The Syncrude Participants also refer to notes taken by one of AOSPL's in-house counsel at a meeting of the parties held on October 5, 2010, which state that "linefill, timing, interest and capital gains tax - likely we will be going to arbitration on this."

63    The Syncrude Participants refer to Minutes of the Audit Committee of Pembina dated November 2, 2010 which note a "potential arbitration with Syncrude for $11.6 million".

64    AOSPL does not deny this course of conduct during the 2009 audit, nor these references in its own documents, but merely submits that there was no "common assumption" that the subject claims were arbitrable, without addressing the specific conduct that appears to suggest otherwise.

65    The Syncrude Participants also submit that the conduct of the parties with respect to previous audits and arbitrations with respect to such audits support their interpretation of Article 18.2 and Article 18.3. They submit that the subject claims are consistent in nature with claims that the parties have agreed in the past were proper audit claims subject to arbitration under the 1993 Pipeline Agreement.

66    The Syncrude Participants refer to the following events:

1. In 2001, they issued a Statement of Claim in respect of a large number of claims that had accumulated for the 1994 - 2001 tariff years in order to ensure that no limitation period expired for prosecuting them. They point out that AOSPL itself then referred the claims to arbitration under the audit provisions of the 1993 Pipeline Agreement. The Syncrude Participants agreed that the issues were arbitrable, and their action was stayed on consent.

2. The Syncrude Participants submit that in the subsequent 2002 arbitration, AOSPL took the position that some of the 1994 - 2001 Audit Claims were beyond the jurisdiction of the arbitrators. It did so on the basis that the 1993 Pipeline Agreement had not "conferred regulatory jurisdiction over AOSPL's affairs" upon the arbitrators, nor had it "created a just and reasonable" toll-making regime, and arbitral powers associated with such regime." AOSPL took the position that the arbitrators were limited to applying the provisions of the 1993 Pipeline Agreement.

The Syncrude Participants submit that, consistent with that position (with which they agree), AOSPL conceded that issues that "raise questions about the correct interpretation of the Agreements" are proper audit claims, and that the audit rights in the 1993 Pipeline Agreement were inserted "to provide the Syncrude Participants with an opportunity to determine that they were properly billed for service". AOSPL disagrees with that interpretation of its position in the 2002 arbitration, and submits that it took the position, consistent with that taken in this proceeding, that the arbitration rights are limited to dealing with the verification of the accuracy of amounts used in the calculation of the Cost of Service.

Having examined the arguments made to the arbitrators at the time, I must agree that AOSPL conceded in that arbitration that questions of contractual interpretation were properly the subject of audit claims, while arguing that the arbitrators were restricted to determining the Cost of Service as set out in the 1993 Pipeline Agreement, rather than substituting an amunt not contemplated or authorized by the agreement. As the 1994-2001 Audit Claims were eventually settled, there is no arbitration decision to refer to.

3. The Syncrude Participants acknowledge that in December, 2003, they included the cash tax issue that was later the subject of the 2005 arbitration referred to previously in this decision in litigation that was commenced to preserve their rights in respect of certain other contingent claims that were clearly beyond the scope of the arbitration provisions in the 1993 Pipeline Agreement. However, they point out that their Statement of Claim specifically recognized that the cash tax and other audit issues raised therein were likely subject to arbitration. They engaged with AOSPL in negotiations to resolve the issue, and they point out that it was AOSPL that issued the Notice of Arbitration when negotiations failed,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

referring to arbitration a claim that was clearly one of contractual interpretation and similar to the claims at issue here. What the Syncrude Participants say is unequivocal is AOSPL's position that a similar claim was arbitrable.

4. In the 2005 arbitration, the principal issue was whether, on a proper interpretation of the 1993 Pipeline Agreement, AOSPL was entitled to include in the tariff an allowance for "cash taxes" which it did not in fact pay after its acquisition by an income trust.

The Syncrude Participants submit that, like the Proceeds Claim and the Tax Claim in issue here, the cash tax issue in the 2005 arbitration was based entirely on contractual interpretation rather than mere accounting or mathematics. They submit that this is clear from the arbitration award. I agree.

Again, AOSPL submits that it took the position that the arbitration rights were limited to dealing with the verification of the accuracy of the amounts used in the calculation of the Cost of Service, but this cannot be sustained, given that the arbitrator specifically noted in his decision that:

> (a) his jurisdiction over the dispute arose from the 1993 Pipeline Agreement and from AOSPL's Notice of Arbitration;

> (b) both parties had either expressly or by implication asserted that each of the disputed matters were an issue of contractual interpretation; and

> (c) he agreed that the disputes were issues of contractual interpretation.

67     The Syncrude Participants submit that all of this conduct, both in the course of the 2009 Audit and with respect to previous disputes involving the 1993 Pipeline Agreement, is important for two reasons:

> a) to aid in the interpretation of Articles 18.2 and 18.3, and

> b) to prevent AOSPL from denying that the subject claims are arbitrable.

As an aid to interpretation, I am satisfied that this conduct helps to resolve any ambiguity in favour of an interpretation that would include the Audit Claims in the category of arbitrable claims. Despite AOSPL's submissions to the contrary, this conduct is unequivocal and signals a clear intention to treat claims such as the subject Audit Claims as arbitrable, whether or not they involve issues of contractual interpretation.

68     AOSPL submits that the conduct in question must also be shown to be intentional, citing *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), 3 D.L.R. (3d) 161 (Ont. H.C.) at p. 237. While it is not clear what the term "intentional" means in these circumstances, nor whether such an additional gloss on the concept of "unequivocal" is necessary, there is nothing to indicate that these acts of AOSPL were anything but intentional. Taken together, they show a pattern of behaviour.

69     AOSPL also points out that the 1993 Pipeline Agreement contains the usual contractual provisions regarding waiver. While this is so, the issue is whether the conduct aids in resolving an ambiguity in the contractual language, not whether AOSPL agreed to waive any of the terms of the agreement.

70     With respect to whether AOSPL is prevented by this conduct from denying that the claims are arbitrable, the Syncrude Participants rely on estoppel by representation as described by the Supreme Court of Canada in *Meduk v. Soja*, [1958] S.C.R. 167 (S.C.C.), at 175 as follows:

> Where one has either by words or conduct made to another a representation of fact, either with knowledge of its falsehood, or with the intention that it should be acted upn, or has so conducted himself that another would, as a reasonable man, understand that a certain representation of fact was intended to be acted on, and that the other has acted on the representation and thereby altered his position to his prejudice, an estoppel arises against the party who made the representation, and he is not allowed to aver that the fact is otherwise than he represented it to be.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 208 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

71    AOSPL submits that the Syncrude Participants have put forward no evidence of any positive representations made by AOSPL that the subject claims are arbitrable with the intention that such a representation be acted on, and that thus the doctrine of estoppel by representation is inapplicable here.

72    The test set out by the Supreme Court is not limited to positive representations, although it is arguable that AOSPL's insertion of "Operator's Responses" into the "Audit Claims" as submitted by the Syncrude Participants may fall within that category. Estoppel by representation includes representation by conduct; a party conducting itself in a manner that another would reasonably understand that such representation was intended to be acted on. There is certainly evidence of this in the conduct of AOSPL in the course of the 2990 Audit, evidence of more than just a passive course of conduct. The conduct and words of AOSPL led the Syncrude Participants to conclude that the audit procedure that they had commenced in accordance with Article 18.3 was not disputed. With respect to the issue of whether the Syncrude Participants acted on such representations and altered their position to their prejudice, they note that, if AOSPL had advised them that it considered the subject claims to be outside the audit and arbitration process, they could have immediately issued a Statement of Claim and avoided the limitations issue now raised by AOSPL in the litigation before this Court.

73    AOSPL submits that the estoppel argument fails because an estoppel by representation cannot arise from silence unless a party is under a duty to speak: *Ryan v. Moore*, [2005] 2 S.C.R. 53 (S.C.C.) at paras. 26. The short answer is that AOSPL's conduct amounted to more than silence. The parties had a contractual relationship that set out a process to be followed with respect to audit claims, and AOSPL by its conduct followed the time-lines and requirements of that process to the point of referral to arbitration. AOSPL responded to the audit queries not just in compliance with the contractual time limits set out in Article 18.3 but with content consistent with the audit claims documentation prepared by the Syncrude Participants in accordance with the mandated process.

74    *Ryan* is distinguishable, in that the case did not involve a contractual relationship between the parties. Here, there was a contractual duty to respond and AOSPL complied with tha duty.

75    AOSPL also submits that, if estoppel by representation does not apply, neither does estoppel by convention. Given that I have found that the Syncrude Participants have established estoppel by representation, it is not necessary that I address estoppel by convention. If I am wrong about estoppel by representation, however, I note that while estoppel by convention requires a mutual assumption, that mutual assumption can be established by either statement or conduct, and there is clear evidence of conduct here: *Ryan* at para. 58.

76    I note that the Syncrude Participants do not allege that AOSPL was hiding its position, but that it changed it after the Syncrude Participants issued the Notice to Arbitrate, and that, until then, AOSPL was operating under the same shared assumption.

77    In conclusion, if I am wrong regarding the interpretation of Article 18, I would find that AOSPL is estopped by its conduct from denying that the subject claims are arbitrable.

*b) Should the Audit Claims be stayed and referred to arbitration, or should this Court allow them to be resolved with the 4.1 km Action?*

78    Pursuant to section 7 of the *Arbitration Act*, the Court must stay an action where the parties and subject matter of the dispute are governed by an arbitration agreement.

79    AOSPL submits that, in the particular circumstances of this case, I have the discretion to refuse a stay, and should exercise that discretion. It submits that the issues that arise from the Audit Claims and the issues in the 4.1 km Action are inter-twined and should be heard together.

80    AOSPL relies on *New Era Nutrition Inc. v. Balance Bar Co.*, 2004 ABCA 280 (Alta. C.A.), an odd case in which New Era had filed both a Statement of Claim for damages and a Notice to Arbitrate. New Era conceded that the issues overlapped,

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...

2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

but it was clear that the litigation was necessary because New Era was seeking relief against other parties involved in related transactions outside the scope of the agreement that included an arbitration clause. The same concern, that of the rights of defendants in litigation that are involved in a cause of action but not privy to a contract that is subject to an arbitration clause, was raised in *Hammer Pizza Ltd. v. Domino's Pizza of Canada Ltd.*, [1997] A.J. No. 67 (Alta. Q.B.). These cases are distinguishable on their facts. No third parties are involved in the 4.1 km Action and the Syncrude Participants submit, and I am satisfied from a review of the pleadings, that the Audit Claims and the 4.1 km Action are fundamentally different. While arising from the same background facts, the 4.1 km Action claims future or potential damages arising from the alleged breach of an agreement to provide an entirely new and segregated pipeline. The Audit Claims would be unaffected by whether the 4.1 km Action succeeds or fails.

81    AOSPL submits that the acceptability of the last 4.1 km of pipeline as constructed is at issue in both proceedings. However, the issue in the Process Claim is not the same. The central question in that claim is when the In-Service Date occurred, and when the line fill proceeds should have been credited to the Capital assets account. I am not satisfied that there is any real risk of inconsistent verdicts, nor any manifest unfairness to AOSPL if these issues are determined in separate forums.

82    There is, however, an issue of prejudice to the Syncrude Participants if I were to refuse a stay even though I have found that the Audit Claims are arbitrable. AOSPL raises a limitations defence in the litigation, which the Syncrude Participants submit is one of its motives for seeking to resolve the subject issues through litigation rather than through arbitration. AOSPL denies this as a motive and submits that it would raise the limitations defence even if the subject claims are arbitrable and the issues are dealt with in an arbitration. It is, however, apparent that AOSPL's limitations defence would be more difficult to establish if the subject claims are resolved through arbitration in accordance with Articles 18.2 and 18.3, since the parties have complied with the time limits set out in those sections.

83    To the extent that I have any discretion to refuse the stay despite my decision that the Audit Claims are arbitrable, I see no reason to exercise that discretion in this case.

**Conclusion**

84    The Audit Claims in question are subject to the audit and arbitration provisions of the 1993 Pipeline Agreement. To the extent that I would have any jurisdiction to refuse a stay in the circumstances and order that the Audit Claims be resolved in conjunction with the 4.1 km Action in this Court, I decline to do so. The claims are stayed and referred to arbitration. Given my conclusion on this issue, the cross-application to consolidate the Audit Claim and the 4.1 km Action necessarily fails.

85    If the parties are unable to agree on costs, they may submit written argument on that issue within 60 days.

**Schedule A — 1993 Pipeline Agreement**

**Article 18 Audit**

. . . . .

18.2 *Audit* Shippers shall have the right, at their expense, to inspect, examine and audit, at all reasonable times, but not more than once each Year, the books of accounts and records of AOSPL which relate to the Operations to the extent necessary to verify the accuracy of all amounts used in the calculation of the Cost of Service and all invoices and bills hereunder. Shippers will make reasonable efforts to conduct such audit jointly or simultaneously with Other Shippers so as to minimize any inconvenience to AOSPL.

18.3 *Audit Claims* Any Shipper performing an audit shall submit any claims of discrepancies within sixty (60) Days of completion of audit field work to AOSPL (the "Audit Claim"). AOSPL shall respond in writing to such claims within sixty (60) Days of receipt of such claims. Upon expiration of a one-hundred and eighty (180) Day period, following the submission by any Shipper for an Audit Claim, AOSPL shall forthwith credit the Shippers with the full amount of any claims to which AOSPL has failed to respond unless AOSPL has obtained the approval of the Shippers for a time extension. Claims remaining

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 210 of 245

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

unanswered by AOSPL after the said time extension shall be credited forthwith to the Shippers account as originally submitted. Claims remaining unresolved after a period of one-hundred and eighty (180) Days following the submission of any Audit Claim by any Shipper shall be submitted to Arbitration unless both AOSPL and the Participants agree to an extension to said one-hundred and eighty (180) Day period.

. . . . .

18.6 *Corrections* Items established to be inaccurate as a result of any audit shall be rectified as soon as possible after completion of such audit and credited appropriately with interest as provided in Article 19 of this Agreement.

**Article 19 Late Payment**

. . . . .

19.3 *Disputes* If a Shipper disagrees with any charge to amount shown in any invoice or statement of account submitted by AOSPL under this Agreement, then the Shipper shall so advise AOSPL by prompt written notice and shall nevertheless pay the full amount of the invoice or statement of account on or before the required date for payment. After receipt of such written notice, AOSPL shall promptly conduct a review to determine the correctness of the charge or amount in dispute. If it is determined that such charge or amount or any portion thereof, was incorrectly paid by the Shipper then AOSPL shall immediately refund to the Shipper the amount of any overpayment, together with interst as provided in Article 19.2, from the date of payment by Shippers of the invoice or statement of account to the date the refund is paid in full.

**Article 21 Arbitration**

21.1 *General* AOSPL or the Participants may by written notice to the other submit to Arbitration, in accordance with the provisions of this Article 21, any dispute or disagreement with respect to the rights or obligations of the Parties under Articles 8.1, 8.2(f), 14.4, 15, 16.6(e) and Articles D4.2 of Schedule "D" of this Agreement, or any other Articles or Schedules of this Agreement containing therein reference of any dispute to Arbitration.

*Order accordingly.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 15

86 F.3d 1455
United States Court of Appeals,
Seventh Circuit.

AMERICAN INTERNATIONAL ADJUSTMENT

CO., Plaintiff–Appellee, Cross–Appellant,

v.

Frank J. Galvin, Jr., and Galvin,
Stalmack and Kirschner, Defendants–
Appellants, Cross–Appellees.

Nos. 95–1966, 95–2089.   |   Argued
Nov. 27, 1995.   |   Decided June 20,
1996.   |   Rehearing and Suggestion for
Rehearing En Banc Denied Aug. 1, 1996.

Client's insurer brought legal malpractice action against law firm and attorney who defended client in tort action. The United States District Court for the Northern District of Indiana, Andrew P. Rodovich, United States Magistrate Judge, entered judgment on jury verdict against firm and attorney, and they appealed. The Court of Appeals, Bauer, Circuit Judge, held that: (1) attorney did not breach duty as a matter of law under Indiana law by failing to determine prior to trial cause of tort victim's death and instead invoking election of remedies, but (2) contributory negligence was not defense to insurer's malpractice claim.

Reversed in part and remanded.

Posner, Chief Judge, dissented and filed opinion.

West Headnotes (20)

[1]    **Death**
   ⚷ Nature and form of remedy

Under Indiana law, owner of vehicle involved in accident could be held liable under survival statute or wrongful death statute, but not both. West's A.I.C. 34–1–1–1, 34–1–1–2.

5 Cases that cite this headnote

[2]    **Death**
   ⚷ Suffering of deceased

**Death**
   ⚷ Medical and funeral expenses

**Death**
   ⚷ Pecuniary loss to plaintiff or beneficiary in general

In case governed by Indiana survival statute, estate could receive full damages, including pain and suffering; under wrongful death statute, estate could recover only decedent's medical and funeral expenses plus any other pecuniary or other loss suffered by her survivors. West's A.I.C. 34–1–1–1, 34–1–1–2.

6 Cases that cite this headnote

[3]    **Federal Courts**
   ⚷ Summary judgment

**Federal Courts**
   ⚷ Summary judgment

Court of Appeals reviews district court's grant of summary judgment de novo, taking the record in the light most favorable to the nonmovant. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

Cases that cite this headnote

[4]    **Federal Civil Procedure**
   ⚷ Absence of genuine issue of fact in general

**Federal Civil Procedure**
   ⚷ Right to judgment as matter of law

Summary judgment is appropriate where there are no genuine disputes of material fact and where the movant is entitled to judgment as a matter of law. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

Cases that cite this headnote

[5]    **Federal Civil Procedure**
   ⚷ Summary Judgment

Although summary judgment is an effective tool for district courts to manage their caseload, they must avoid the temptation to use summary judgment "as an abbreviated trial." Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

1 Cases that cite this headnote

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 213 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

**[6]    Attorney and Client**
    ☞ Elements of malpractice or negligence action in general

To prove legal malpractice under Indiana law, a plaintiff must show: employment of the attorney, the attorney's failure to exercise ordinary skill and knowledge, and damages to the plaintiff proximately resulting from that failure.

Cases that cite this headnote

**[7]    Attorney and Client**
    ☞ Conduct of litigation

In typical legal malpractice case, plaintiff must prove that as a result of defendant's incompetence, client lost his case or paid a larger judgment than would have been awarded had defendant performed competently.

Cases that cite this headnote

**[8]    Attorney and Client**
    ☞ Trial and judgment

In legal malpractice case, whether attorney committed legal error is question of law.

2 Cases that cite this headnote

**[9]    Attorney and Client**
    ☞ Trial and judgment

In legal malpractice case, whether error amounted to negligence is normally question of fact to be decided by the jury (or judge as fact finder).

3 Cases that cite this headnote

**[10]    Federal Courts**
    ☞ Particular cases

Failure by attorney and his law firm to challenge breach of contract judgment entered by district court did not require affirmance of legal malpractice judgment; while complaint raised both tort and contract claims, those claims were identical.

1 Cases that cite this headnote

**[11]    Federal Civil Procedure**
    ☞ Tort cases in general

In legal malpractice action under Indiana law against law firm and attorney who defended client in tort action, in which critical issue was whether action was survival action or wrongful death action, material fact issue existed as to whether attorney breached standard of care in failing to ascertain cause of death prior to trial and instead seeking to have plaintiff make election of remedies, precluding summary judgment for client's insurer. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

3 Cases that cite this headnote

**[12]    Federal Civil Procedure**
    ☞ Alternate, Hypothetical and Inconsistent Claims

Doctrine of election of remedies has been abolished in federal court. Fed.Rules Civ.Proc.Rule 8(e)(2), 28 U.S.C.A.

3 Cases that cite this headnote

**[13]    Attorney and Client**
    ☞ Acts and omissions of attorney in general

Under Indiana law, risk of a violation of professional ethics by opposing counsel is unforeseeable, and therefore any damages flowing from a failure to foresee the violation cannot support a malpractice finding. Ind.Rules of Prof.Conduct, Rule 3.3.

Cases that cite this headnote

**[14]    Attorney and Client**
    ☞ Candor, and disclosure to opponent or court

Under Indiana Rules of Professional Conduct, there are circumstances where attorney's failure to make disclosure is the equivalent of an affirmative misrepresentation. Ind.Rules of Prof.Conduct, Rule 3.4(e).

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 214 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

2 Cases that cite this headnote

**[15]     Federal Civil Procedure**
🔑 Alternate, Hypothetical and Inconsistent Claims

Pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

22 Cases that cite this headnote

**[16]     Attorney and Client**
🔑 Conduct of litigation

Although it cannot be said that failure to conduct discovery will never constitute legal malpractice as a matter of law, it will be the rare exception.

Cases that cite this headnote

**[17]     Attorney and Client**
🔑 Pleading and evidence

Under Indiana law, expert testimony is normally required to demonstrate standard of care by which attorney's conduct is measured in legal malpractice case.

8 Cases that cite this headnote

**[18]     Attorney and Client**
🔑 Pleading and evidence

Whether counsel breached standard of care in pursuing election of remedies strategy in tort action against client did not fall within exception to Indiana's expert witness requirement for circumstances in which breach is so obvious that any lay person would recognize it; it was not likely that lay people would know about the doctrine of election of remedies, let alone whether it had been abolished by federal rules.

4 Cases that cite this headnote

**[19]     Attorney and Client**
🔑 Elements of malpractice or negligence action in general

Contributory negligence generally is available as a defense to a legal malpractice action in Indiana.

1 Cases that cite this headnote

**[20]     Attorney and Client**
🔑 Trial and judgment

In legal malpractice action under Indiana law, contributory negligence defense asserted by attorney and his firm failed as a matter of law; defense was essentially that client's insurer was negligent in failing to settle underlying case prior to trial, and there is no legal duty to settle a case and failure to do so bore no causal connection to injury claimed.

5 Cases that cite this headnote

## Attorneys and Law Firms

**\*1457** Robert P. Vogt, argued, James R. Branit, Bullaro, Carton & Stone, Chicago, IL, for American Intern. Adjustment Co. in No. 95–1966.

David C. Jensen, argued, Frederick H. Link, Michael E. O'Neill, Eichhorn & Eichhorn, Hammond, IN, for Frank J. Galvin, Jr. and Galvin, Stalmack & Kirschner.

Robert P. Vogt, argued, William G. Stone, James R. Branit, Susan L. Hartman, Bullaro, Carton & Stone, Chicago, IL, for American Intern. Adjustment Co.

Before POSNER, Chief Judge, BAUER, and DIANE P. WOOD, Circuit Judges.

## Opinion

BAUER, Circuit Judge.

Frank J. Galvin, Jr. and his law firm ("Galvin") appeal a legal malpractice judgment entered after a jury trial. Actually, Galvin appeals the final judgment as well as certain summary judgments entered by the district court prior to trial. The appellee and cross-appellant, American International Adjustment Company ("AIAC"), appeals the district court's order of remittitur which reduced the damage award from $1,250,000 to $1,000,000. To summarize our conclusions in advance: we reverse the judgment entered against Galvin and remand for a new trial. However, we affirm the district

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 215 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

court's elimination of contributory negligence as a defense to AIAC's legal malpractice claim. Given these conclusions, AIAC's cross-appeal is moot.

## BACKGROUND

[1]    [2]    This diversity, legal malpractice action arose out of a personal injury lawsuit. In 1989, a Tri–State Transport Company truck ran into Virginia Dickinson's car, seriously injuring Ms. Dickinson. Ms. Dickinson never left the hospital and died of a pulmonary embolism a month after the accident. Prior to her death, she filed suit against TriState, which retained Galvin as legal counsel.[1] Dickinson's two-count complaint raised alternative claims, seeking damages under both the Indiana survival statute, Ind.Code 34–1–1–1, and the Indiana wrongful death statute, Ind.Code 34–1–1–2. Under Indiana law, Tri–State could be liable under **either** statute but not both. If the victim had died from the accident, the case was for wrongful death. If the victim died from unrelated causes, the case was a survival action. The distinction is important because each statute **\*1458** allows for different recoveries. In a case governed by the survival statute, Ms. Dickinson's estate could receive full damages including pain and suffering. Under the wrongful death statute, the estate could recover only Ms. Dickinson's medical and funeral expenses plus any other pecuniary or other loss suffered by her survivors.

As any attorney would recognize from the above description, one significant pre-trial task for Galvin would be to ascertain the cause of death in the hopes of limiting his client's exposure. Most critically, if there were no evidence that Ms. Dickinson died from a cause other than Tri–State's negligence, then the case would be a wrongful death action and evidence of her pain and suffering would be inadmissible at trial.

This distinction became especially important to AIAC and Galvin because there was little doubt about Tri–State's liability. The trial would focus on damages, and the plaintiff had made a "day-in-the-life" video of Ms. Dickinson's last day and intended to offer it as evidence to show her pain and suffering. The full length video consisted primarily of Ms. Dickinson sleeping, but the version edited for trial focused on her periods of intense suffering. Galvin estimated prior to trial that if the case proceeded to the jury as a survival action, i.e. if the jury saw the videotape, the verdict would be around $2.5 million. If, however, it were solely a wrongful death case, the verdict would be closer to $850,000.

Normally, a defense attorney in Galvin's position would utilize various discovery tools to pin down the cause of death. Galvin might have served requests for admission and/or interrogatories on his opposing counsel, or deposed the treating physicians. Instead, on the eve of trial, he filed a "Motion in Limine" asking the district court to force the plaintiff to choose between the mutually exclusive theories of survival and wrongful death. Plaintiff's counsel responded that the cause of death was a question of fact that was for the jury. The district court pressed the plaintiff's lawyer about which theory the plaintiff would be pursuing at trial. The lawyer responded, "I haven't interviewed Dr. Walsh in depth, and I haven't interviewed Dr. Kaufman in depth as to the [cause of death] and until they testify under oath, I honestly don't know what they're going to say." Possibly sensing a lack of candor in that response, the district court instructed plaintiff's counsel to report back the next day about what testimony he would present as to the cause of death. The next day however, the district court did not revisit its concerns because it ruled that it had no authority to force the plaintiff to elect one theory over the other.

Prior to trial, the district court opined that the case could be settled for $853,000. AIAC refused to budge from its last offer of $700,000, and the case proceeded to trial. At trial, the plaintiff introduced the edited videotape—the fifteen worst minutes of Virginia Dickinson's last day. At the close of the plaintiff's case, Galvin moved for a directed verdict on the survival claim. Plaintiff's counsel acknowledged that he had not presented any competent medical testimony or expert testimony showing the cause of death to be anything but the accident, and the district court granted Galvin's directed verdict motion. The case went to the jury solely on the wrongful death count. However, Galvin did not ask the district court for a jury instruction precluding the jury's consideration of the videotape. The jury returned a verdict for the plaintiff in the amount of $2.6 million. The parties settled for $2.3 million with post-trial motions pending. This legal malpractice suit followed.

AIAC raised nine specific instances of alleged malpractice, the most significant of which was that Galvin failed to ascertain the cause of death prior to trial. AIAC contended that had Galvin done so, he could have obtained summary judgment on the survival claim and kept from the jury all evidence of pain and suffering, especially the videotape. The magistrate judge presiding over the malpractice trial granted partial summary judgment for AIAC, ruling that Galvin had

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 216 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

breached his standard of care as a matter of law by failing to ascertain the cause of death. The judge permitted the causation and damages aspect of this claim to go to the jury. The court also allowed AIAC's other allegations, including Galvin's failure to object to **\*1459** the plaintiff's opening statement and closing argument and Galvin's stipulation to the fact that TriState had 126 traffic accidents within a two-year period, to go to the jury. Finally, the magistrate judge precluded Galvin from presenting the defenses of incurred risk and contributory negligence. The jury returned a general verdict for AIAC of $1.25 million, which the court reduced to $1 million.

### ANALYSIS

**[3]   [4]   [5]**   We review the district court's grant of summary judgment *de novo*, taking the record in the light most favorable to the non-movant. *Harris v. City of Marion, Ind., 79 F.3d 56, 58 (7th Cir.1996).* Summary judgment is appropriate where there are no genuine disputes of material fact and where the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56.* Although summary judgment is an effective tool for district courts to manage their caseload, they must avoid the temptation to use summary judgment "as an abbreviated trial." *Door Systems, Inc. v. Pro–Line Door Systems, Inc., 83 F.3d 169, 172 (7th Cir.1996).*

**[6]   [7]   [8]   [9]**   To prove legal malpractice under Indiana law, a plaintiff must show: (1) employment of the attorney, (2) the attorney's failure to exercise ordinary skill and knowledge, and (3) damages to the plaintiff proximately resulting from that failure. *Hacker v. Holland, 570 N.E.2d 951, 955 (Ind.App. 1 Dist.1991).* In a typical legal malpractice case, the plaintiff must prove that "as a result of the lawyer's incompetence ... the client ... lost his case or paid a larger judgment than would have been awarded had the defendant performed competently." *Transcraft v. Galvin, Stalmack, Kirschner, & Clark, 39 F.3d 812, 815 (7th Cir.1994), cert. denied, 514 U.S. 1123, 115 S.Ct. 1990, 131 L.Ed.2d 876 (1995).* There are two components to evaluating Galvin's performance. First, whether he committed legal error is undoubtedly a question of law. 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice,* § 32.11 at 183 (4th ed.1996). Next, whether that error amounted to negligence is normally a question of fact to be decided by the jury (or judge as fact finder). *Id.* With those introductory matters out of the way, we turn to the substance of this case.

### A. *Tort vs. Contract*

**[10]**   We give short shrift to AIAC's initial argument that we should affirm because Galvin failed to challenge the breach of contract judgment entered by the district court. While it is true that AIAC's complaint raised both tort and contract claims, these claims were identical. Given that the alleged "breach" complained of is the failure to adhere to the appropriate standard of care, there is no difference between the tort and breach of contract claims. Thus, courts have held repeatedly that legal malpractice claims are governed by tort principles regardless of whether they are brought as a tort, a breach of contract, or both. [2] *See, e.g., Shideler v. Dwyer, 275 Ind. 270, 417 N.E.2d 281, 285–88 (1981); Keystone Distribution Park v. Kennerk, Dumas, Burke, Backs, Long & Salin, 461 N.E.2d 749, 751 (Ind.App.1984); FDIC v. Clark, 768 F.Supp. 1402, 1410–11 (D.Colo.1989),* aff'd. *978 F.2d 1541 (10th Cir.1992);* 1 Mallen & Smith, *Legal Malpractice,* §§ 8.1, 8.6.

### B. *Partial Summary Judgment on Liability*

**[11]**   The main issue on appeal is not whether Galvin performed poorly, but whether the district court correctly ruled that Galvin's conduct was malpractice **as a matter of law.** We conclude that the deposition testimony of Galvin's expert witness and the behavior of Dickinson's counsel **taken together** created a factual dispute about whether Galvin's conduct fell below the applicable standard of care.

There is no question that the best method of ascertaining the cause of death would have been some discovery tool —requests for admissions, interrogatories, or depositions. Instead, **\*1460** Galvin filed a motion in limine on the eve of trial seeking to force the plaintiff's counsel to state what the plaintiff's evidence would show on this vital fact. The central question, therefore, is whether Galvin's method of ascertaining the cause of death was negligent as a matter of law.

**[12]**   Galvin's motion essentially sought to force the plaintiff to elect a remedy. However, *Fed.R.Civ.P. 8(e)(2)* abolished the doctrine of election of remedies in federal court. *See Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1371 (7th Cir.1990).* Thus, it seems that Galvin's motion was doomed to failure. If so, maybe that means that filing such a motion automatically would fall below the applicable standard of care. We think not.

First, the gambit almost worked. At the hearing on the motion in limine, the district court instructed the plaintiff's counsel:

Case 09-10138-MFW Doc 14410-1 Filed 09/16/14 Page 217 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

I want you to find out today from all your evidence ... whether or not there is going to be testimony over and above what you have indicated already, that the cause of death was related to [ ] causes other than this accident, i.e. the main area would be of course this possibility of malpractice that you have mentioned. And I want you to advise me of that tomorrow morning when we start.... I would be very concerned with allowing evidence in and then at the eleventh hour, striking everything, because once it's in, the damage may be done.

This instruction followed repeated attempts during the hearing by both the district court and Galvin to ascertain the theory on which the plaintiff planned to proceed at trial. In response to the court's questions about the cause of Ms. Dickinson's death and the substance of her treating physician's testimony, the plaintiff's lawyer said:

I haven't interviewed Dr. Walsh in depth, and I haven't interviewed Dr. Kaufman in depth as to these issues [i.e. cause of death] and until they testify under oath, I honestly don't know what they're going to say.

This fails the laugh test by two country miles. The plaintiff's counsel knew exactly what the treating physicians would say on the witness stand. Their testimony was crucial to the plaintiff's case. Plaintiff's counsel feigned ignorance only to get the damaging videotape into evidence. He knew very well that he had no evidence of any cause of death beyond the accident. Plaintiff's counsel did not suggest any other causes during his opening statement. He did not introduce any such evidence during his case in chief. And in response to the district court's queries during a hearing on defendant's motion for directed verdict, he agreed with the district court that the plaintiff had not presented any competent medical testimony or expert testimony showing the cause of death to be anything but the accident. Indeed, plaintiff's counsel acknowledged that "the weight of the evidence shows that she died as a result of the accident." He had to have known that the day before trial, at the time of the hearing on the motion in limine.

**[13]** **[14]** Assuming that Galvin's opposing counsel acted unethically in misleading the court on the cause-of-death evidence, perhaps attorneys should anticipate such behavior from opposing counsel. And regardless, plaintiff's counsel's actions were supported by the apparently ethical argument that Fed.R.Civ.P. 8(e)(2) abolished the doctrine of election of remedies. We do not think much of either argument. First, we conclude that the risk of a violation of professional ethics by opposing counsel is unforeseeable, and therefore any damages flowing from a failure to foresee the violation cannot support a malpractice finding. Rule 3.3 of the Indiana Rules of Professional Conduct ("Candor Toward the Tribunal") declares that "a lawyer shall not knowingly make a false statement of material fact ... to the tribunal." The Official Commentary to the Rules states further that:

an assertion ... [made] in open court, may properly be made only when the attorney knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.

Rule 3.4(e) ("Fairness to Opposing Party and Counsel") provides that a lawyer shall not "in **\*1461** trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." Plaintiff's counsel did not act in accordance with these rules and we will not ignore his unethical conduct in deciding whether Galvin acted negligently as a matter of law.

**[15]** As for the abolition of election of remedies, a pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question. Fed.R.Civ.P. 11; *Great Lakes Higher Education Corp. v. Austin Bank of Chicago,* 837 F.Supp. 892, 894 (N.D.Ill.1993). Here there could have been no legitimate doubt. While Rule 11 does not impose a continuing obligation to revise pleadings, counsel should not have opposed Galvin's motion in limine. *Thomas v. Capital Sec. Services, Inc.,* 836 F.2d 866, 874 n. 9 (5th Cir.1988) (citation omitted). But counsel did respond, stating that "it was up to the jury to determine if this is a wrongful death action or survival action." That may be, assuming available evidence for each of the two possibilities, but it does not excuse blatantly misrepresenting the facts of the case to opposing counsel, and even more importantly, to the district court.

**[16]**   Next, we are extremely wary of holding that pre-trial discovery is required as a matter of law. As we explained in *Transcraft,* we are reluctant to encourage the practice of "defensive law." 39 F.3d at 816. Of course, this does not mean that failure to conduct discovery will never constitute legal malpractice as a matter of law. Nevertheless, it will be the rare exception. The recent trend in the Federal Rules of Civil Procedure has been to prevent the overuse of pre-trial discovery, and we do not wish to buck that trend.

**[17]**   Finally, even conceding that Galvin's chosen method of knocking out the survival claim was ill-conceived, Galvin presented expert testimony to the effect that he did not breach the relevant standard of care. Under Indiana law, "expert testimony is normally required to demonstrate the standard of care by which the defendant attorney's conduct is measured." *See Hacker,* 570 N.E.2d at 953. In fact, the requirement of expert testimony in proving most types of malpractice claims has been adopted so widely that it may be legal malpractice to litigate a legal malpractice claim without expert testimony. See *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 206 n. 16 (1st Cir.1995) (citation omitted). Expert testimony is crucial for defending as well as prosecuting a legal malpractice action. 4 Mallen & Smith, *Legal Malpractice,* § 32.23 at 238–39. Finally, under Fed.R.Evid. 704(a), an expert may testify about the ultimate issue to be decided by the trier of fact.

**[18]**   The only exception to the expert witness requirement even remotely relevant here is where the breach is so obvious that any lay person would recognize it. 4 Mallen & Smith, *Legal Malpractice,* § 32.16 at 207. Here, however, it is hardly likely that lay people know about the doctrine of election of remedies, let alone whether it has been abolished by something called the "Federal Rules of Civil Procedure." Therefore, expert testimony about the standard of care was required in this case.

Galvin's expert—a former Indiana state court judge—gave extensive deposition testimony on the standard of care issue. He explained that asking the court to force the plaintiff to choose a theory was "a reasonable tactic." He conceded that a motion for summary judgment would have had a higher likelihood of success, but that nevertheless Galvin's chosen method did not breach the standard of care. In response to probing questions by plaintiff's counsel at his deposition, Galvin's expert stated repeatedly that "it was reasonable for [Galvin] to attempt to persuade the judge that the plaintiff had to choose from the onset." Although this opinion runs

squarely into the abolition of election of remedies, neither the district court nor the plaintiff's lawyers, in opposing Galvin's motion in limine, referred to the Federal Rules of Civil Procedure or, for that matter, the doctrine of election of remedies.

The expert explained that in Indiana, in the ordinary negligence case, "more frequently than not, the defendant does not take the deposition of the plaintiff's doctors." The expert also explained in greater detail about different avenues available for a defendant's **\*1462** attorney to ascertain information crucial to his or her client's defense. He testified repeatedly that he believed that Galvin's use of the motion in limine did not breach the standard of care. He suggested a couple of strategic reasons for choosing a motion in limine, but he conceded that he did not know Galvin's actual strategy. He also pointed out that Dickinson's counsel "lost a little credibility with the judge when he asserted to the judge that he didn't know what his doctors were going to say." All in all, the expert's testimony provides sufficient "hint of inferential process" to pass muster under Fed.R.Civ.P. 56(e). *Mid–State Fertilizer v. Exchange Nat. Bank,* 877 F.2d 1333, 1339 (7th Cir.1989). The district court believed that Galvin's expert was simply wrong. That may be, but it is for the jury to determine.

This is a close case, and were we reviewing a jury verdict against Galvin, the result might be different. Nevertheless, we conclude that Galvin's expert's testimony was material and, **taken together** with the questionable conduct of the plaintiff's lawyers in opposing the motion in limine, created a genuine factual dispute as to whether Galvin's failure to ascertain the cause of death prior to trial breached the standard of care. Accordingly, we reverse and remand for a new trial on all of AIAC's malpractice allegations. [3]

### C. *Contributory Negligence*

**[19]**   **[20]**   While a new trial is necessary, Galvin may not present his contributory negligence and incurred risk defenses. [4] Although contributory negligence generally is available as a defense to a legal malpractice action in Indiana, *see Hacker,* 570 N.E.2d at 958, Galvin's proffered defense fails as a matter of law. In effect, Galvin argues that AIAC was negligent in failing to settle the Dickinson case prior to trial. However, there is no legal duty to settle a case. Even assuming that AIAC's failure to settle the case was stupid, such stupidity bore no causal connection to the injury it claims.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 219 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

The lack of merit to Galvin's defense is further illustrated by taking it to its logical conclusion. Let's say that Tri–State turns out to have been a bad risk. Does that mean that Galvin can raise AIAC's "negligent" decision to underwrite Tri–State as a defense to this lawsuit? Of course not. As a general matter, people and corporations often retain attorneys because they somehow have created their own problems. Once retained, the attorney is not shielded from liability because of the initial mistake. A criminal defendant suing his attorney for legal malpractice would not be contributorily negligent merely because he actually had committed the charged crime. This is not to say that a client's conduct can never be contributorily negligent vis-a-vis his or her attorney. If AIAC actively had prevented Galvin from deposing the doctors, or had assisted Galvin in devising the motion in limine "strategy," then perhaps Galvin's defense would be viable. 2 Mallen & Smith, *Legal Malpractice*, § 20.2 at 641. Here, however, we agree with the district court that Galvin's contributory negligence defense fails.

**CONCLUSION**

For the foregoing reasons, we REVERSE in part the judgment of the district court and remand for a new trial, at which Galvin will be precluded from raising the defenses of contributory negligence and incurred risk.

REVERSED IN PART AND REMANDED.

POSNER, Chief Judge, dissenting.

I would affirm on liability and reverse on damages, directing the district court to enter judgment for the full award. To explain why will take a while, because of the number of issues.

A truck driver for Tri–State Motor Transport Company, AIAC's insured, had hit an automobile driven by Virginia Dickinson, seriously **\*1463** injuring her. She died in the hospital a month later of a pulmonary embolism. The suit brought on her behalf against Tri–State sought damages under both the Indiana survival statute, Ind.Code 34–1–1, and the Indiana wrongful-death statute, Ind.Code 34–1–1–2. In a case governed by the survival statute, as amended shortly before the accident, the personal representative of a deceased tort victim can obtain the full common law damages sustained by the victim, including damages for pain and suffering, but probably excluding punitive damages. *Mundell v. Beverly Enterprises–Indiana, Inc.,* 778 F.Supp. 459, 461–64 (S.D.Ind.1991). In a case governed by the wrongful-death

statute, the only damages recoverable are the victim's medical and funeral expenses plus any pecuniary or other loss incurred by the victim's survivors. If the victim dies as a result of the accident, the case is governed by the wrongful-death statute; if the victim dies from unrelated causes, the case is governed by the survival statute. Since the victim's pain and suffering are not recoverable under the wrongful-death statute, evidence of pain and suffering is inadmissible at the trial of a wrongful-death case.

Mrs. Dickinson had suffered acutely as a result of the injuries that she sustained in the accident. Some of this suffering was captured on a videotape that had been made of her in the hospital, no doubt with litigation in mind—for the suit on her behalf was brought before her death. As it happened, the videotape recorded the last day of her life; she died on camera. It was apparent that the extent of Tri–State's (and hence AIAC's) financial exposure depended critically on whether the suit brought on Mrs. Dickinson's behalf was a survival suit or a wrongful-death suit. There was no doubt about Tri–State's liability; the only issue was damages. The amount of those damages depended on whether damages for pain and suffering, graphically depicted in the videotape, were recoverable. This depended in turn on whether the suit was a survival suit or a wrongful-death suit. The likelihood that it was the latter was very great. Mrs. Dickinson had been gravely injured in the accident; had spent a month in the hospital; and had died there, of a pulmonary embolism, a not infrequent complication of a protracted hospital stay. Had it not been for the accident, she would not have been in the hospital; and the protracted hospitalization had made it more likely that she would have a pulmonary embolism. The two requirements for attributing the embolism (and hence her death) to the tort were satisfied—that but for the defendant's wrongful conduct the death would not have occurred and that the defendant's conduct made the death antecedently more likely to occur. *Creek v. Village of Westhaven,* 80 F.3d 186, 189 (7th Cir.1996); *United States v.1990 Toyota 4Runner,* 9 F.3d 651, 652–53 (7th Cir.1993); Guido Calabresi, "Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr.," 43 *U.Chi.L.Rev.* 69 (1975).

Thus Galvin had only to establish that the tort had been the cause of Mrs. Dickinson's death and his client would have little reason to fear a large verdict. Galvin knew this, but for unfathomable reasons decided against serving interrogatories or requests for admissions on his adversary, deposing the doctors who had attended Mrs. Dickinson in the hospital, or

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 220 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

otherwise establishing the cause of death and then moving for summary judgment on the survival claim. Instead he filed in advance of trial what he styled a "motion in limine." A motion in limine is a useful device for trying to exclude evidence before trial in order to prevent the trial from being interrupted by wrangles over admissibility or the jury from getting a whiff of prejudicial evidence that may in fact be inadmissible. Galvin's motion contained some requests to exclude evidence but its main thrust was different. Pointing out correctly that the survival and wrongful-death statutes could not apply to the same case, Galvin asked the judge to make the plaintiff choose between them. The plaintiff replied that it was an issue of fact what the cause of Mrs. Dickinson's death had been, that issues of fact are for the jury, that before the issue was resolved no one could know which statute applied, and that the federal rules do not require an election of remedies. The judge took the motion under advisement, and the jury was sworn and opening arguments presented.

**\*1464** On the second day of trial, the judge denied Galvin's motion in limine. The fatal videotape, edited down to 15 minutes or less—15 minutes of pain and suffering—was introduced. Other evidence of Mrs. Dickinson's agonies as a consequence of the tort was introduced as well. After the doctors testified about the cause of her death Galvin moved for a directed verdict on the survival claim and the motion was granted. The jury was instructed only on wrongful death, yet Galvin did not ask the judge to instruct the jury not to consider the videotape and the other evidence bearing on Mrs. Dickinson's pain and suffering.

AIAC's suit against Galvin for legal malpractice complains primarily about his failure to find out the cause of Mrs. Dickinson's death before the trial began. Had he investigated he would have discovered that her death had resulted from the tort, and he could therefore have obtained summary judgment for the insurance company on the survival claim. Then no evidence concerning Mrs. Dickinson's suffering would have been placed before the jury, and the verdict would have been much smaller.

A question of negligence, including professional negligence (malpractice), is deemed one of fact in the sense that it is to be resolved by the trier of fact, in this case the jury. But whenever the evidence on a question is so one-sided that a reasonable jury could answer it in only one way, the judge takes the question away from the jury. *Fed.R.Civ.P. 56(c)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.,*

*47 F.3d 928, 931 (7th Cir.1995).* This would not have been the proper course here had the testimony of Galvin's expert witness, a former Indiana state judge, provided some basis for thinking that the "motion in limine" complied with minimum standards of competent legal representation. But it did not.

As the majority opinion points out, expert testimony is required not only to establish malpractice but also to rebut a charge (properly supported by expert testimony) of malpractice. This means that where, as in this case, the plaintiff presents expert evidence of the defendant's malpractice, and the defendant's expert falls flat on his face, the plaintiff is entitled to summary judgment. See 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 32.23, pp. 238–39 (4th ed.1996).

Even though an expert witness is not forbidden to testify concerning the ultimate issue in a case, *Fed.R.Evid. 704(a),* a party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue, a conclusion for which the expert cannot offer any substantiation when pressed at his deposition. To allow this would be to confuse admissibility with weight and to disregard the judge-crafted limitations on the admissibility of expert testimony. The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements. E.g., *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1338–39 (7th Cir.1989); *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977). The opinion in *Mid–State Fertilizer* is blunt. The Federal Rules of Evidence permit "experts to present naked opinions," but "admissibility does not imply utility.... An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," and his "naked opinion" does not preclude summary judgment. *877 F.2d at 1339.* To put this differently, an expert's opinion based on "unsupported assumptions" and "theoretical speculations" is no bar to summary judgment. *Merit Motors, Inc. v. Chrysler Corp., supra,* 569 F.2d at 673; but cf. *Ambrosini v. Labarraque,* 966 F.2d 1464, 1470–71 (D.C.Cir.1992).

The point has been made with specific reference to summary judgment in cases of legal malpractice. To avoid summary judgment, "the expert testimony must be more than a bare conclusion or a denial. The evidence must include those facts

Case 09-10138-MEW   Doc 14410-1   Filed 09/16/14   Page 221 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

that support the conclusions and be legally sufficient. The legal premises, the factual basis and the **\*1465** expert's reasoning should be explained." 4 Mallen & Smith, *supra*, § 32.23, pp. 239–40.

The authorities that I have cited are inconsistent with the position taken by the majority today. (*Mid–State* does not hold, as the majority's quotation out of context suggests, that a mere "hint" of the expert's "inferential process" leading to his conclusion is enough. See *877 F.2d at 1339*. But there isn't even a hint here.) They are also correct. The test for summary judgment is whether, if the evidence presented at the summary judgment stage were the evidence at trial, the party that is moving for summary judgment would be entitled to a directed verdict. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)*; *Sokaogon Chippewa Community v. Exxon Corp., 2 F.3d 219, 225 (7th Cir.1993)*. He would be if the only evidence that his opponent had was the testimony of an expert witness who could not give any reason for his conclusion. Otherwise there could never be summary judgment in a malpractice case, since it is always possible to find an expert witness who will testify to the conclusion that the party hiring him wants, provided the expert doesn't have to come up with any reasons for his conclusion.

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)*, concerning the admissibility of scientific expert testimony, has implications for nonscientific expert testimony as well. *Daubert* makes clear that it is the responsibility of the district court to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Braun v. Lorillard Inc., 84 F.3d 230, 234 (7th Cir. 1996)*; *Rosen v. Ciba–Geigy Corp., 78 F.3d 316, 318 (7th Cir.1996)*; *Bammerlin v. Navistar Int'l Transportation Corp., 30 F.3d 898, 901 (7th Cir.1994)*. This principle, which is a principle of evidentiary admissibility and not just of weight or evaluation, applies to any expert, although what counts as intellectual rigor will be different in different fields. A lawyer who is asked to testify about the standard of care in trying a personal injury case is not expected to employ the scientific method, because he doesn't use that method in his ordinary professional work. But he is expected to defend his conclusion with reasons. That is the essence of professionalism. Galvin's expert failed to defend his conclusion with reasons, although given ample opportunity to do so. Twice the majority opinion remarks that the expert

testified "repeatedly" that Galvin had not been negligent. That is true. But a conclusion is not rationally strengthened by being reiterated.

It was evident from the outset of the Dickinson suit that almost the only thing that Galvin could do for his client was to defeat the claim for damages under the survival statute and make it a wrongful-death case. The way to do this was to submit a request for an admission; if that failed, to depose the doctors; and if, as expected and indeed came to pass, the doctors attributed Mrs. Dickinson's death to the accident, to move for summary judgment on the survival claim. Galvin's expert conceded that following this course of action—laying an evidentiary foundation for summary judgment and then moving for summary judgment—would have had brighter prospects of success than the course that Galvin chose. The question is whether that course had *any* prospects for success. The expert's testimony is not illuminating on this critical issue, because it does not explain how Galvin's course of action could be thought reasonable. In the absence of an explanation, the record that was before the magistrate judge when he granted the motion for partial summary judgment in favor of the plaintiff was bereft of any reason to think that Galvin could have achieved his object by the course he chose.

The inept choice of title for the motion ("motion in limine") is not the problem, cf. *Northwestern Nat'l Ins. Co. v. Corley, 503 F.2d 224, 231 (7th Cir.1974)*, but merely the clue to the problem. Had Galvin done his pretrial homework and presented in support of the motion evidence that Mrs. Dickinson had died as a result of the trucking company's negligence, the judge would probably have granted the motion and ruled that the case was a wrongful-death case, thus in effect treating the motion as one for partial summary judgment. But lacking, as the motion **\*1466** did, any supporting evidence, it could not be treated as a motion for summary judgment, but only as a motion to compel an election of remedies—to make the plaintiff choose between proceeding under the survival statute and proceeding under the wrongful-death statute, which is exactly what the motion asked for. The motion was bound to fail because the doctrine of election of remedies has, since 1938, been defunct in the federal courts, *Fed.R.Civ.P. 8(a), (e)(2)* and Advisory Committee Notes; *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., 984 F.2d 223, 229 (7th Cir.1993)*; *Berry Refining Co. v. Salemi, 353 F.2d 721 (7th Cir.1965)*; *Allstate Ins. Co. v. James, 779 F.2d 1536, 1540–41 (11th Cir.1986)*, except when used to prevent a double recovery and thus serve a substantive function rather than being merely a

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 222 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

rule of pleading. *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1371 (7th Cir.1990); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., supra,* 984 F.2d at 230. Double recovery was not an issue here. Even if the survival claim had survived to the submission of the case to the jury, and the jury had calculated damages for both the survival claim and the wrongful-death claim, the plaintiff would not have been permitted to add the amounts together. The domains of the two statutes do not overlap and the entitlements created by them are alternative rather than cumulative, as everyone connected with the case knew.

Given the inapplicability of the doctrine of election of remedies to this case, one is not surprised that Galvin's expert was unable to explain how the "motion in limine" could have done his client any good. The judge could not have granted the motion without violating Rule 8. (Remember: Galvin presented no evidence in support of the motion; this made it a motion to force an election of remedies. Had Galvin filed a real motion in limine, a motion to bar evidence bearing only on the survival claim because there was no basis for such a claim, it would have been granted.) The expert acknowledged that without offering evidence of the cause of Mrs. Dickinson's death, Galvin would not be able to eliminate the survival claim from the case. This was tantamount to admitting that the course Galvin followed was futile.

Lawyers often have reasons for not going by the book—not making all the objections that might be well founded in the law of evidence, not cross-examining every witness for the other side, not calling every potential witness, not fussing over the particular wording of an instruction, not using up all one's peremptory challenges, and so forth. Lawyers have, that is to say, tactical as well as legal grounds for the decisions they make in the conduct of a lawsuit, and a good lawyer relies on both types, combining them in proportions calculated to produce the best prospects for success for his client. But Galvin's expert did not identify any tactical motive for the choice of the "motion in limine" approach. Would the judge somehow have been offended by a motion for summary judgment? Might the doctors, acting in cahoots with the plaintiff's lawyer, if deposed have changed their opinion about the cause of Mrs. Dickinson's death in a manner damaging to Galvin's client had they known he wanted to knock out the survival claim? (Yet the plaintiff's lawyer already knew that the damages would be greater if the survival claim survived to trial.) Did Galvin thus gain a litigating advantage by not tipping his hand? No answers to any such

questions were forthcoming from the expert. Instead, when asked what strategy Galvin might have had in mind when he filed the motion in limine without supporting evidence, the expert replied, "I don't know what was in his mind. I could not know without asking him, and I have not asked him." Earlier, it is true, the expert had opined that Galvin "may have wanted to befuddle the plaintiffs in the presentation of their case by prevailing on this motion in limine at the onset of the trial." And, yes, we can see how filing senseless motions might befuddle the opposition. But the expert dropped this line of defense when asked the ultimate question, what Galvin's strategy might have been. The expert was as baffled as we are.

A lawyer does not buy immunity from a malpractice suit by hiring an expert to call his pratfalls "strategic." If a lawyer fails to bring suit within the statute of limitations he **\*1467** will not be heard to say that his "strategy" was to surprise the defendant with a stale suit and hope the defendant neglected to plead the statute of limitations. Galvin's expert acknowledged that "strategy can be malpractice," for example when it is based on "failure to prepare."

The expert, a former Indiana state judge, may have thought he was in an Indiana state court. For he explained, as the majority opinion puts it, "that in Indiana, in the ordinary negligence case, 'more frequently than not, the defendant does not take the deposition of the plaintiff's doctors.' " No doubt lawyers do a lot of things differently in the state courts of Indiana. Maybe the doctrine of election of remedies still operates there. Maybe Galvin, too, was confused about what judicial system he was in. Anyway, this was not an ordinary negligence case.

I must consider what difference it makes that the plaintiff in the Dickinson case did not contest Galvin's motion *primarily* by reference to the abolition of the (procedural) doctrine of election of remedies, which made the motion groundless. (The majority opinion says that the plaintiff did not refer to the doctrine at all in opposing the motion. That is incorrect.) The plaintiff's main argument was that the cause of Mrs. Dickinson's death was a question of fact and therefore for the jury to resolve. Yet the plaintiff's lawyer must have talked to Mrs. Dickinson's doctors and therefore learned their view of the cause of her death. His statement in response to the judge's questions about the cause of death that he hadn't interviewed the doctors "in depth" and "honestly [did]n't know what they're going to say" is difficult to credit. If the lawyer was indeed lying to the judge and thus violating the standards of professional ethics, it might be argued that Galvin was not

negligent after all. Negligence is a failure to respond sensibly to foreseeable risks, and the risk of a violation of professional ethics might be thought unforeseeable. Ordinarily one is entitled, in deciding how much care to use, to assume that potential injurers are using due care; otherwise pedestrians would have to walk around in armor, on pain of being found contributorily negligent when hit by a drunk driver. See *Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914, 919– 20 (7th Cir.1991), and cases cited there, including *Pilkington v. Hendricks County Rural Electric Membership Corp.,* 460 N.E.2d 1000, 1004–06 (Ind.App.1984).

There is no proof that the plaintiff's lawyer actually lied. Galvin's expert, whose testimony is all that stands between Galvin and summary judgment for AIAC, suggested no such excuse for Galvin's reckless tactic. The Dickinsons' lawyer may have been highly confident that the accident had caused Mrs. Dickinson's death yet unsure what the jury would conclude after examination and cross examination of the doctors. He may have avoided questioning the doctors in depth precisely to avoid having to acknowledge that he had no survival claim. Such ostrich behavior would skirt the line that separates canny from unethical lawyering. Maybe there is lurking somewhere a violation of Rule 11 of the civil rules as it then stood, though as far as I know sanctions were never sought or imposed. That is not the issue. Among the foreseeable risks of the practice of law is that one's opponent may not be a paragon of professional ethics. A lawyer should not assume, without evidence, that his opponent is a crook, and act accordingly (producing the forensic equivalent of the armored pedestrian); that far I go in agreement with the majority; but he does need to assume, unless he has good evidence to the contrary, that his opponent will steer close to the line, resolving all close questions in favor of his client. He needs to assume this not because all lawyers behave so, but because a significant number do, see, e.g., John S. Dzienkowski, "The Regulation of the American Legal Profession and Its Reform," 68 *Tex. L.Rev.* 451, 471 (1989), and also because the line between zealous advocacy, which the ethics of the legal profession require, and overzealous advocacy, which those ethics forbid, is hazy. A lawyer gravely disserves his client if he assumes without any basis that the opposing lawyer is a prissily straight shooter. See *Pilkington v. Hendricks County Rural Electric Membership Corp., supra,* 460 N.E.2d at 1006. It was in the plaintiff's interest in the Dickinson case to keep the survival claim alive as long as possible. Galvin knew this and should have been prepared.

**\*1468**  The question whether a lawyer's duty of professional care extends to protecting his client from the consequences of the opposing lawyer's not being a paragon of the ethical practitioner is at once important and undeveloped. What is not open to doubt is that the lawyer who is so unrealistic about the litigation process profoundly disserves his client. Suppose that you had a promising claim and took it to a lawyer who told you he would represent you in a suit to establish the claim but added, "In conducting this litigation, I will at all times assume, unless and until I learn otherwise, that opposing counsel complies in every particular with the code of professional ethics, and I will therefore take no steps to protect you against the consequences if the assumption is incorrect." You wouldn't hire him. The personality of trial lawyers and the agonistic, emotional character of the American adversarial system of justice place enormous pressure on adherence to ethical norms. A lawyer who ignores this reality is like a military commander who takes absolutely no precautions against a gas attack by a signatory of the Geneva Convention because the Convention outlawed the use of poison gas. He needn't take as many precautions as he would against a nonsignatory, but he shouldn't wholly ignore the possibility of a breach, given the emotional and fiercely adversarial character of war with which of course litigation has often been compared. Galvin let down his client by assuming (if that is what he did, which seems unlikely) that his opponent, the personal-injury plaintiff's lawyer, was hyperethical.

Even if the majority is justified in assuming that the plaintiff's lawyer was not just a tricky ostrich, but a veritable serpent in the Eden that is the Northern District of Indiana, Galvin must lose because he had actual evidence that his opponent was being disingenuous in responding to the ill-fated motion in limine. To fail to take precautionary measures against the *known* misconduct of another person is uncontroversially negligent. E.g., *id.* at 1005; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 33, pp. 198–99 (5th ed.1984); cf. *id.,* § 65, p. 480. If you see a truck bearing down on you while you are crossing the street and you fail to make an effort to get out of the way, you are negligent even if the truck was speeding. The majority's speculations about the dishonesty of the plaintiff's lawyer in the Dickinson case are based not on testimony by that lawyer or other evidence that came to light only later; they are based solely on matters as they appeared to Galvin when the lawyer responded to the motion in limine. The lawyer claimed not to know what the doctors would testify yet the majority says that it was *obvious* that he had spoken to the lawyers and so he *must* have known what

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 224 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

they would testify to; his coyness suggested that he wanted to cling to the survival claim, regardless of its merit, as long as possible. All this was as obvious to Galvin as it is to the judges of this panel. His failure to react must have been, in the eyes of the majority, as careless as the behavior of my hypothetical pedestrian. If so, he was negligent.

The plaintiff's lawyer, moreover, even if he knew perfectly well that the cause of Mrs. Dickinson's death was the tort, was free to oppose the motion in limine on the sole ground that it sought what the Federal Rules of Civil Procedure no longer entitle a defendant to seek—that the plaintiff make an election of his remedies. Had the lawyer done so, the motion would still have been denied, because it had no basis in law. So Galvin was not *injured* by the lawyer's allegedly unethical behavior, because had the lawyer acted ethically and confined his opposition to the unquestionably sound technical ground that it asked for something to which the Federal Rules of Civil Procedure did not entitle the movant, the motion would still have been denied and Galvin would still have been in the soup. There is no suggestion that the plaintiff's lawyer, whether unethically or otherwise, *induced* Galvin to file his foolish motion. The alleged breach of ethics occurred later, in response to the motion, and thus could not have caused Galvin to act negligently in filing such a motion.

I hope I will not be misunderstood to be advocating a rule that due care in the practice of law always requires the deposing of witnesses, even key ones. I am in entire agreement with the majority that it would be a bad rule. As we said in another malpractice case against Galvin, we do not want to **\*1469** encourage "defensive law," the analogue in legal malpractice to "defensive medicine." *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark,* 39 F.3d 812, 816 (7th Cir.1994). I wrote the *Transcraft* opinion, and have no desire to undermine it. Many suits are conducted in federal court without any discovery, because the costs, which can of course be considerable, are deemed to exceed the benefits; this is especially likely in a case with modest stakes. But a flat rule that forgoing discovery is never negligent would be as absurd as a flat rule that failure to engage in discovery is always negligent. This is plain from the judicial response to claims of ineffective assistance of counsel in criminal cases. A failure to investigate a client's defenses in advance of trial is one of the most common grounds for a finding of ineffective assistance, see, e.g., *Brewer v. Aiken,* 935 F.2d 850, 857 (7th Cir.1991); *Antwine v. Delo,* 54 F.3d 1357, 1367 (8th Cir.1995), which is a form of legal malpractice. It is not ineffective assistance per se, because there may be a strategic reason in a particular case

for not investigating a particular issue, *Government of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir.1996), though there was none here.

In civil cases, too, a failure to find out key facts in advance of trial may be negligent. As this case shows. Galvin *had* to find out before trial what the cause of Mrs. Dickinson's death had been, for unless he did the verdict was likely to shoot up by a million and a half dollars or even more. Neither the testimony of Galvin's expert witness nor the shenanigans of the plaintiff's lawyer in the Dickinson case touch this dispositive fact about Galvin's catastrophic failure. I doubt that Galvin would even have had to depose Mrs. Dickinson's doctors. A simple request for an admission should have sufficed. Maybe no more would have been required than to have his medical expert review Mrs. Dickinson's hospital charts.

I turn now to another issue presented by the appeal. Galvin argues that even if he was negligent (as I believe and the jury is quite likely to find in the next trial), so was the insurance company in failing to settle the Dickinson suit before the trial began—at least the jury should have been allowed to consider this possibility. Had AIAC settled for $853,000, as the judge in the Dickinson case thought it could have done, the injury of which it complains—the excess verdict due to Galvin's negligence—would have been averted completely. When AIAC turned down the offer, the survival claim had not been disposed of, so that the jury's verdict might be far above $853,000 and was very unlikely to be significantly below it. I therefore assume that AIAC was foolish to reject the settlement. The district court was nonetheless correct not to let Galvin interpose a defense of contributory negligence —or of "incurred risk" (a "state of venturousness on the part of the actor," *Get–N–Go, Inc. v. Markins,* 544 N.E.2d 484, 486 (Ind.1989), on rehearing, 550 N.E.2d 748 (Ind.1990)), a related defense that need not be discussed separately. Here I am in agreement with the majority, but I think the issue is a difficult and important one that would benefit from a fuller treatment.

Suppose Galvin, against the advice of all his friends and family, decides to take up hang-gliding. Even more foolishly, he fails to take any instruction or employ even the most elementary precautions and as a result is seriously injured in a crash of his hang glider. A doctor is summoned. The doctor treats him negligently, aggravating Galvin's injuries. Would it be a defense to Galvin's suit for medical malpractice that if only he hadn't been a fool, he wouldn't have been

Case 09-10138-MEW    Doc 14410-1    Filed 09/16/14    Page 225 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

injured in the first place? Obviously not. *Cates v. Morgan Portable Building Corp.,* 780 F.2d 683, 689 (7th Cir.1985). What would be true is that he couldn't recover for the full loss inflicted by the injury but only for the difference between the loss that he would have sustained had he been treated competently and the loss he did sustain. The difference would be the loss caused by the doctor, and the rest of his loss would be the loss due to his own folly. The total loss would be properly allocated between the parties in accordance with their relative responsibility without any defense of contributory negligence or assumption of risk. Here is another example. Suppose it was pure folly for AIAC to agree to insure Tri–State, with its 63 accidents per year, against liability for **\*1470** injuring other users of the roads. Had it exercised proper underwriting caution it would not have insured Tri–State and so would have lost nothing as a consequence of Galvin's negligence in defending Tri–State. Obviously AIAC's underwriting error would not be admissible to show contributory negligence in its suit against Galvin. Yet, just as in the hang-gliding accident, the law would automatically adjust the respective responsibility of foolish victim and careless professional. AIAC was out of pocket $2,050,000. All it got from the jury was $1.25 million and the difference was the loss that, in our hypothetical case (as in the real case), the insurance company would have averted by not insuring Tri–State in the first place.

The principle that animates these examples is an extended notion of mitigation of damages. People are careless and make mistakes. The mistakes have costs. But the costs can often be reduced by the intervention of skilled professionals. If those professionals botch the job, the costs of the mistakes are greater than they have to be. In a sense, the professionals have the "last clear chance" to minimize the consequences of a mistake, so by analogy to that doctrine they are held liable for their negligence even though their intervention would have been unnecessary had the victim of their ineffective ministrations been more careful in the first place. Were it easy to be careful all the time, the law might put the entire burden of cost avoidance on potential victims; but unflagging, unwavering, ceaselessly vigilant care requires a degree of self-discipline that is not realistic to expect. It is therefore not a defense to a malpractice case that there would have been no risk of harm from the lawyer's or the doctor's carelessness had the potential victim followed a course of action that would have avoided the need for a lawyer or a doctor. Had AIAC assigned a lawyer to assist Galvin and the lawyer had agreed to Galvin's foolish strategy of filing a motion in limine instead of deposing the doctors, or if AIAC had refused to

allow Galvin to conduct any depositions, then AIAC would have been contributing to the risk that its "rescuer" (from its mistake in refusing to settle) would screw up the rescue, that is, botch the trial. That is a different risk from the risk of making foolish underwriting decisions or turning down reasonable settlements and therefore of having to go to trial.

Here is another way to see this. AIAC's negligence, if negligence it was, in refusing to settle the case in advance of trial did not make it more likely that Galvin would botch the trial. For, if the case had been settled, Galvin would have had some extra time that he might have used for conducting another trial and he would have been as likely to botch that trial. Recall my earlier discussion of "cause" in this case. AIAC's negligence was not a cause of the botched trial because it did not make such a disaster significantly more likely to occur, and contributory negligence is never a defense when it is not a cause of the injury of which the plaintiff is complaining. This has long been understood. In *Berry v. Sugar Notch Borough,* 191 Pa. 345, 43 A. 240 (1899), for example, the plaintiff was the motorman of a trolley that he was driving too fast when a tree fell on it and injured him. Had he been driving within the speed limit the tree would not have fallen on the trolley, because the trolley would not yet have arrived at the place where the tree fell at the time of the fall. So speeding was a "but for" cause of the accident to the motorman, yet the defense of contributory negligence failed. As it did in another famous case, *Ehret v. Village of Scarsdale,* 269 N.Y. 198, 199 N.E. 56 (1935). The plaintiff's decedent had entered a recently completed but not yet occupied house and, while asleep, was asphyxiated as a result of the negligence of the developer, who had accidentally spliced the gas main in the street to a pipe leading into the house. The plaintiff's decedent was a trespasser, but the defense of no duty to trespassers, akin to the defense of contributory negligence, failed. As it did, to take another well-known example, in *Herrick v. Wixom,* 121 Mich. 384, 80 N.W. 117 (1899). The plaintiff snuck into a circus tent without paying and sat down in the audience section, and his eye was injured when a firecracker exploded on the stage. He was, of course, a trespasser, yet the defense of no duty of care to trespassers was again rejected.

In none of the cases did the plaintiff's misconduct make an accident more likely to **\*1471** occur. Berry's speeding did not make it more likely that a tree would fall on him. Had he started his journey a few minutes later and traveled within the speed limit, he would have been injured, and had he started later and sped, he would not have been injured. His speed was irrelevant to his injury except, of course, that it was a

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    14

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 226 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

necessary condition, which is not enough to count as a cause. Had Ehret not been a trespasser, but the purchaser of the house, he would have been asphyxiated just the same; and similarly if Herrick had bought a ticket and sat down in the same seat. These cases would have been decided differently if the plaintiffs' misconduct had made it more likely that they would be injured in the way they were—if Berry had driven so fast that the trolley jumped the rails and hit the tree, causing it to fall on him; if Ehret had entered the house before it was completed and the utilities checked; if Herrick had snuck onto the stage and been injured because of his unauthorized proximity to the firecracker. And so in the present case: had AIAC given Galvin bad directions on how to conduct the case, it would have made the mishandling of the case more likely. But all AIAC did by failing to settle the case was set the stage for Galvin to screw up. The stage would have been equally well set if the plaintiff's lawyer had demanded a $10 million settlement and AIAC had rightly refused.

Galvin's argument for invoking the defense of contributory negligence not only is contrary to common law doctrine but also comes perilously close to arguing that if you turn down a "reasonable" settlement you have no right to complain if your lawyer botches the trial. That is obviously wrong. There is no legal duty to settle a case. Anyone who has a good enough case to get all the way to trial is entitled to fight for victory at trial, and if his lawyer is incompetent he has a right to sue for malpractice.

Although the district court was right not to submit a defense of contributory negligence to the jury, I think very little of the argument that AIAC precluded any defense of contributory negligence simply by including in its complaint a claim for breach of contract as well as a tort claim. It is true that its oral contract with Galvin implicitly but unmistakably required Galvin to exercise due care in the performance of the contract. It is also true that contributory negligence as such is not a defense to a suit for breach of contract. But apart from some procedural and remedial differences between tort and contract law, there are not many differences between these two fields of common law beyond those of terminology, reflecting the origins of the two fields in different English forms of action. A pertinent example is that contributory negligence in the law of tort is the failure to mitigate damages in the law of contracts. *Cates v. Morgan Portable Building Corp., supra,* 780 F.2d at 689. It would be shocking if identical conduct, here the failure of a professional to exercise due care, would have different legal consequences if the failure were complained of in the name of contract rather than in the name of tort.

(It would be different if the contract for professional services specified a standard of care different from the tort standard, but that is not the case here.) Courts recognize this and so hold, as the majority notes, that the doctrines governing professional malpractice are the same whether the suit against the professional is brought as a tort suit or as a contract suit or, as here, as both types of suit.

The majority does not discuss the cross-appeal, and strictly speaking need not because it is vacating the judgment. But the issue raised by the cross-appeal is likely to recur, and we could save ourselves some time by resolving it now. The jury verdict against Tri–State (after being reduced by the judge) came to $2,300,000 and AIAC paid $2,050,000. The jury in the malpractice suit should have decided what the verdict would have been had Galvin not been negligent, and subtracted $250,000 from that amount since Tri–State would have paid the first $250,000 of any verdict. The jury was told about the $250,000 deductible, and the computation would have been a simple one. But it was told something else as well, which is why the judge cut down the verdict by $250,000 (from $1.25 million to $1 million). It was told in the instruction on damages that "the actual amount of damages sustained by [AIAC had been] ... $2.3 million" and that the jury's job was to determine "the amount which you **\*1472** believe the verdict should have been." In light of the references to the $2.3 million and to the "verdict" it is apparent that the jury was being asked what the verdict against TriState would have been had Galvin not been negligent; and that verdict would have included the $250,000 deductible. The district court assumed that when the jury awarded AIAC damages of $1,250,000, it meant that the verdict in the Dickinson case would have been $1.25 million less but for Galvin's negligence, and $250,000 of this savings would have gone to Tri–State rather than to the insurance company, and so the judge subtracted this amount.

Yet the verdict was explicit that "We, the jury, ... award *damages* in the amount of" $1.25 million (emphasis added), and the jury had been informed about the $250,000 deductible. There was, moreover, no necessary incompatibility between the instruction referring to the verdict and the verdict's reference to damages. There was a verdict in Dickinson's suit for $2.3 million, as the instruction stated, and to determine damages in the malpractice action the jury *would* have to figure out what the verdict in Dickinson's case would have been but for Galvin's negligence and subtract that amount from $2.3 million. If the jury did that—if, for example, it believed that the verdict would have been

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 227 of 245

American Intern. Adjustment Co. v. Galvin, 86 F.3d 1455 (1996)

$1,050,000—it came up with the correct amount of damages. Alternatively, it could have figured out what AIAC had to pay out of the $2.3 million verdict—$2,050,000—and what it would have had to pay had the jury returned a verdict for only $1,050,000—$800,000—and subtract the second number from the first, and again the result would be $1,250,000. There is no solid reason to believe that the

jury did not do either of these things and without a solid reason the judge should have left the verdict alone. *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1143–44 (7th Cir.1994); *Wassell v. Adams,* 865 F.2d 849, 856 (7th Cir.1989).

Footnotes

1    In May 1990, Tri–State tendered its defense to AIAC, its liability carrier.

2    Often the only reason a plaintiff couches a legal malpractice action as a breach of contract suit is to avoid a fatal tort-based statute of limitations. See *Sherman Industries, Inc. v. Goldhammer,* 683 F.Supp. 502, 506 (E.D.Pa.1988). AIAC resorts to its contract argument to avoid Galvin's contributory negligence defense. However, as we discuss in section C, AIAC does not need this argument in order to prevail on this issue.

3    The failure to ascertain the cause of death was only one of a laundry list of malpractice allegations that went to the jury. However, given its preeminence, and the fact that the jury delivered a general verdict of liability, we must reverse the jury verdict and the earlier summary judgment ruling and remand for a new trial.

4    We treat the two defenses as interchangeable and refer to them jointly as "contributory negligence."

**End of Document**                                                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 16

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 229 of 245

Anderson v. Wachovia Morg. Corp., 621 F.3d 261 (2010)

621 F.3d 261
United States Court of Appeals,
Third Circuit.

Tolano ANDERSON; Cathy Anderson; Richard
Wilkins; Brenda Wilkins; Lloyd Wheatley;
Audria Wheatley, Appellants No. 09–2275
v.
WACHOVIA MORTGAGE CORPORATION;
Wachovia Corporation, Appellants No. 09–2336.

Nos. 09–2275, 09–2336.    |    Argued
Jan. 25, 2010.    |    Filed: Sept. 13, 2010.

**Synopsis**
**Background:** African-American mortgagors brought state court action against mortgagee, alleging racially-based lending discrimination. Action was removed. The United States District Court for the District of Delaware, Sue L. Robinson, J., 609 F.Supp.2d 360, granted partial summary judgment in favor of mortgagee. Parties cross-appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit Judge, held that:

[1] mortgagors failed to establish direct evidence of discrimination;

[2] mortgagors failed to establish that mortgagee's race-neutral reasons for actions were pretextual;

[3] district court did not err in dismissing breach of contract claim sua sponte;

[4] Delaware law did not allow tortious interference claim based on expensive or burdensome contractual performance;

[5] district court properly denied mortgagors' motion to compel responses to discovery requests; and

[6] district court properly remanded pendent good faith and fair dealing claim.

Affirmed.

West Headnotes (18)

[1]    **Civil Rights**
       Weight and Sufficiency of Evidence

       Under § 1981, direct evidence of discrimination must be so revealing of discriminatory animus that it is unnecessary to rely on burden-shifting framework under which burden of proof remains with plaintiff. 42 U.S.C.A. § 1981.

       23 Cases that cite this headnote

[2]    **Civil Rights**
       Presumptions, Inferences, and Burdens of Proof

       Once plaintiff produces direct evidence of discrimination under § 1981, defendant has burden of producing evidence to show that it would have made same decision in absence of discriminatory animus. 42 U.S.C.A. § 1981.

       22 Cases that cite this headnote

[3]    **Civil Rights**
       Weight and Sufficiency of Evidence

       To qualify as direct evidence of discrimination under § 1981, evidence must be such that it demonstrates that decision-makers placed substantial negative reliance on illegitimate criterion in reaching their decision. 42 U.S.C.A. § 1981.

       4 Cases that cite this headnote

[4]    **Civil Rights**
       Weight and Sufficiency of Evidence

       To qualify as direct evidence of discrimination under § 1981, evidence must be: (1) strong enough to permit fact-finder to infer that discriminatory attitude was more likely than not motivating factor in defendant's decision, and (2) connected to decision being challenged by plaintiff. 42 U.S.C.A. § 1981.

       4 Cases that cite this headnote

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 230 of 245

Anderson v. Wachovia Morg. Corp., 621 F.3d 261 (2010)

**[5]    Civil Rights**

   🗝 Weight and Sufficiency of Evidence

Any statements made by defendant's employees must be made at time proximate to challenged decision and by person closely linked to that decision to qualify as direct evidence of discrimination under § 1981. 42 U.S.C.A. § 1981.

3 Cases that cite this headnote

**[6]    Civil Rights**

   🗝 Property and housing

African-American mortgagors who sued mortgagee, alleging racially-based lending discrimination, failed to establish direct evidence of discrimination, as required to maintain claim under § 1981; loan officer's use of phrase "you people" in reference to mortgagors was not alone so revealing of discriminatory animus that it would enable fact-finder to conclude that discriminatory attitude was, more likely than not, motivating factor in decision to impose challenged loan conditions. 42 U.S.C.A. § 1981.

8 Cases that cite this headnote

**[7]    Civil Rights**

   🗝 Contracts, trade, and commercial activity

To make out prima facie case of lending discrimination under § 1981, plaintiff must show that: (1) he belongs to protected class; (2) he applied and was qualified for credit that was available from defendant; (3) his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions; and (4) some additional evidence exists that establishes causal nexus between harm suffered and plaintiff's membership in protected class, from which reasonable juror could infer, in light of common experience, that defendant acted with discriminatory intent. 42 U.S.C.A. § 1981.

32 Cases that cite this headnote

**[8]    Civil Rights**

   🗝 Weight and Sufficiency of Evidence

Plaintiff under § 1981 may rebut defendant's proffered non-discriminatory reasons for adverse action by: (1) discrediting proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not determinative cause of action. 42 U.S.C.A. § 1981.

22 Cases that cite this headnote

**[9]    Civil Rights**

   🗝 Loans and financing

African-American mortgagors who sued mortgagee, alleging racially-based lending discrimination, failed to establish that mortgagee's proffered race-neutral reasons for actions were pretextual, as required to maintain claim under § 1981; there was no evidence that first loan could have been approved without repairs to property, or that second loan could have been approved as conventional loan without repairs or as exception loan without 20 percent down payment and verification by accountant. 42 U.S.C.A. § 1981.

Cases that cite this headnote

**[10]    Federal Civil Procedure**

   🗝 Motion

District courts possess power to enter summary judgment sua sponte, so long as losing party was on notice that he had to come forward with all of his evidence. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

7 Cases that cite this headnote

**[11]    Federal Civil Procedure**

   🗝 Motion

Notice requirement for sua sponte dismissal on summary judgment is satisfied when case involves presence of fully developed record, lack of prejudice, and decision based on purely legal issue. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

5 Cases that cite this headnote

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 231 of 245

**[12]**    **Federal Civil Procedure**
👉 Civil rights cases in general

**Federal Civil Procedure**
👉 Motion

District court did not err in entering summary judgment sua sponte on breach of contract claim brought under Delaware law by African-American mortgagors against mortgagee in connection with alleged lending discrimination, since court had previously notified mortgagors that claim was inadequately pled, and mortgagors offered no explanation as to how they would have benefited from opportunity to submit further evidence or briefing on claim. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

3 Cases that cite this headnote

**[13]**    **Torts**
👉 Injury and causation

Delaware law does not allow tortious interference claim based on allegation that defendant caused plaintiff's performance to be more expensive or burdensome.

2 Cases that cite this headnote

**[14]**    **Federal Courts**
👉 Depositions and discovery

Court of Appeals reviews district court's discovery orders for abuse of discretion, and will not disturb such order absent showing of actual and substantial prejudice.

12 Cases that cite this headnote

**[15]**    **Federal Civil Procedure**
👉 Sufficiency; supplementation of answers

District court did not abuse its discretion in denying African-American mortgagors' motion to compel mortgagee's responses to discovery requests in action alleging lending discrimination, where information sought by interrogatories was contained in documents produced to mortgagors, and discovery regarding mortgagee's approval rates was not crucial to mortgagors' prima facie case.

2 Cases that cite this headnote

**[16]**    **Removal of Cases**
👉 Review

In determining whether district court abused its discretion in remanding pendent claim, court considers whether dismissal of claim best serves principles of judicial economy, convenience, fairness, and comity. 28 U.S.C.A. § 1367(c)(3).

3 Cases that cite this headnote

**[17]**    **Contracts**
👉 Acts or Omissions Constituting Breach in General

Under Delaware law, party breaches implied covenant of good faith and fair dealing by engaging in arbitrary or unreasonable conduct which has effect of preventing other party to contract from receiving fruits of bargain, or by frustrating overarching purpose of contract by taking advantage of its position to control implementation of agreement's terms.

Cases that cite this headnote

**[18]**    **Federal Courts**
👉 Effect of dismissal or other elimination of federal claims

**Removal of Cases**
👉 Want of jurisdiction or cause for removal

District court did not abuse its discretion in remanding pendent good faith and fair dealing claim brought under Delaware law by African-American mortgagors against mortgagee in connection with alleged lending discrimination, since court's dismissal of § 1981 claim was not fatal to state-law claim, and state court was adequately positioned to resolve all aspects of claim, including whether it was preempted by federal law. 28 U.S.C.A. § 1367(c)(3); 42 U.S.C.A. § 1981.

2 Cases that cite this headnote



Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 232 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

## Attorneys and Law Firms

**\*264**  John S. Grady, Esq. **[ARGUED],** Grady & Hampton, Dover, DE, for Appellants Cross Appellees.

Michael J. Barrie, Esq., Benesch, Wilmington, DE, Stephen A. Fogdall, Esq. **[ARGUED],** Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Appellees Cross Appellants.

Before: RENDELL and JORDAN, Circuit Judges, and PADOVA, District Judge [*].

## Opinion

## OPINION OF THE COURT

RENDELL, Circuit Judge.

This case is brought by three African–American couples who, in 2004, purchased adjacent houses in a Dover, Delaware, community known as "Silver Lake." Plaintiffs received mortgages from Wachovia Mortgage Corporation, but only after Wachovia imposed several conditions on the approvals of these mortgages. Plaintiffs allege that these conditions were racially motivated, and brought suit against Wachovia under 42 U.S.C. § 1981 and various state law causes of action.

This appeal requires us to identify, as a matter of first impression, the elements of a prima facie case of lending discrimination under § 1981. Whether plaintiffs have made out a prima facie case of discrimination is a close call, but even if they have, they have not undermined Wachovia's legitimate reasons for imposing the conditions it did. Thus, we conclude that they have not shown that the mortgage conditions were imposed for discriminatory reasons. The District Court therefore properly granted summary judgment to Wachovia on the § 1981 claim. We also conclude that the District Court correctly granted summary judgment on plaintiffs' breach of contract and tortious interference claims, and that it acted within its discretion in denying plaintiffs' motion to compel certain discovery. Finally, we find that the District Court acted within its discretion in remanding plaintiffs' good faith and fair dealing claim to Delaware state court. We will therefore affirm the District Court's orders and judgment.

## I.

## A.

Plaintiffs Tolano and Cathy Anderson, Richard and Brenda Wilkins, and Lloyd and Audria Wheatley purchased adjacent houses in the Silver Lake community from an individual named Peter Aigner. On **\*265** June 18, 2004, plaintiffs agreed to go to settlement on August 6, and agreed that if the houses were not purchased by that date they would forfeit their joint deposit of $40,000 on the total purchase price for all three homes of $800,000. After reaching this agreement, plaintiffs contacted Wachovia to arrange financing.

Several individuals at Wachovia were involved with plaintiffs' loans. J.D. Hogsten was assigned as plaintiffs' loan officer, and appears to have had the most contact with them. Colleen Fazzino acted as the underwriter for the Anderson and Wheatley loans, George Akerley acted as the underwriter for the Wilkins loan, and Terri Hamm acted as an "exception officer" to address issues specific to the Wheatley loan.

Each of the couples' loans was subject to a unique set of conditions. With respect to the Anderson loan, plaintiffs claim that Wachovia mandated extensive, pre-sale repairs to the house's drywall, insulation, and plumbing, after an independent appraiser informed Hogsten that the property could not be appraised without such repairs. The Andersons contend that these repairs were especially challenging both because of the accelerated timetable and because they needed to obtain permission from Aigner to make repairs before purchasing the house. Nonetheless, the repairs were completed, and the sale closed on schedule.

Wachovia imposed several conditions on the Wheatley loan. It initially denied his application for a non-income-verification loan, which would have required a 15% down payment, because Mr. Wheatley's credit score was too low for that type of loan. [1] The Wheatleys then changed their application to a "stated income loan," JA488, for which the credit score was sufficient, and which would have required a 10% down payment. [2] Wachovia, however, then found the property's condition to be inadequate and required repairs to the house's roof, heating system, pipes, and floors. After those repairs were completed and an appraiser submitted a completion certificate, Wachovia required the Wheatleys to submit an additional completion certificate from a roofing

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 233 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

specialist showing that the necessary repairs to the roof had been completed. The Wheatleys were not told of this new requirement until the day of closing, preventing the closing from occurring on schedule. (Aigner granted an extension of the sale deadline, however, and the Wheatley sale closed on August 13.) In addition, after conditionally approving the Wheatleys for the loan requiring only a 10% down payment, Wachovia reclassified the loan as an "exception loan" and required them to provide a 20% down payment. When the Wheatleys attempted to use funds from their small business toward the down payment, Wachovia required them to have an accountant verify details of the business's tax filings.

Finally, Wachovia challenged the Wilkinses' use of a convenience check issued by their credit card company to pay their earnest money deposit to Aigner. However, once the underwriter learned that Mr. **266** Wilkins had obtained a secured loan and used its proceeds to pay the balance due on his credit card, he determined that this issue had been resolved.

### B.

Plaintiffs attempt to support their claims that Wachovia imposed discriminatory conditions on their loans with the following three types of evidence.

First, plaintiffs provide anecdotal evidence of the racial makeup of the Silver Lake community to support their contention that Wachovia imposed the mortgage conditions to prevent them, as African–Americans, from moving into a predominantly Caucasian neighborhood. They testified that the Silver Lake community is "almost exclusively ... white," and that they believed that the community "desired that it remain that way." JA369. They also presented an affidavit from a Dover insurance agent stating that it was common knowledge that the homes in Silver Lake "were almost all owned by white families." JA191. Mr. Anderson testified that Deanne Wicks, a Wachovia employee who was not involved in these transactions, told him that " '[t]here are a lot of people that are not happy with you all purchasing homes on Silver Lake,' " and that " 'Silver Lake is an exclusive lily white community and now here you guys come.' " JA384–85.

Second, plaintiffs offer comparative evidence based on their experiences. They claim that the banks in their prior real estate transactions, which involved purchases of property in minority neighborhoods, did not impose such stringent

conditions. Mr. Anderson testified that Wachovia itself had not imposed similar requirements when it financed his prior purchases of several investment properties and an unimproved lot. Mr. Wheatley testified that he had not experienced difficulties in real estate transactions involving other banks. Mr. Wilkins testified that he had never been questioned about the source of his earnest money deposits in prior real estate transactions, although he conceded that he had never used a credit card convenience check for such a purpose before.

Third, plaintiffs testified to a number of comments made by Hogsten that they believe demonstrated discriminatory animus. According to Mr. Anderson, Hogsten said to him, " 'you people don't understand how the process works,' " which Anderson believed indicated racial prejudice. JA387. Mr. Wheatley also testified that Hogsten said to him that "you people don't understand the loan process"; Wheatley "infer[red]" that this was a reference to "the Afrocentric race." JA448. Mr. Anderson further testified that Hogsten said, " 'I'm getting a lot of pressure on this transaction' " and " 'a lot of heat.' " JA398. Although Hogsten did not identify who was pressuring him, Anderson construed his comments to mean that "people did not want this deal to go through and he was being pressured to cause it to collapse." JA398. Mr. Wheatley also testified that Hogsten said "that I'm getting a lot of pressure and there are people who do not want you all to buy these properties." JA442. According to Mr. Wilkins, Hogsten had "a nasty attitude" and was "unprofessional." JA520–21. [3]

### C.

This case was initially filed in Delaware state court, and was removed by Wachovia **267** to federal court. Plaintiffs then amended their complaint, asserting that Wachovia had violated 42 U.S.C. § 1981, had breached a contract with plaintiffs, had breached the covenant of good faith and fair dealing, and had tortiously interfered with plaintiffs' contracts with Aigner. Wachovia moved to dismiss the amended complaint. The District Court granted the motion with respect to the breach of contract and tortious interference claims but denied it with respect to plaintiffs' § 1981 and good faith and fair dealing claims. *Anderson v. Wachovia Mortg. Corp. ("Anderson I"),* 497 F.Supp.2d 572 (D.Del.2007).

After discovery was nearly complete, plaintiffs filed a second amended complaint, which asserted essentially the same legal

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MFW   Doc 14410-1   Filed 09/16/14   Page 234 of 245

claims as in the first amended complaint but slightly adjusted the supporting factual allegations.[4] Wachovia moved for summary judgment, and the District Court granted summary judgment on the § 1981, breach of contract, and tortious interference claims. However, the Court remanded the case to state court for consideration of the good faith and fair dealing claim. *Anderson v. Wachovia Mortg. Corp. ("Anderson II"),* 609 F.Supp.2d 360 (D.Del.2009). Plaintiffs now appeal the grant of summary judgment, as well as an earlier order denying plaintiffs' motion to compel certain discovery. Wachovia cross-appeals the remand of the good faith and fair dealing claim.

The District Court had jurisdiction over plaintiffs' claims under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 1291.

## II.

We exercise plenary review of a District Court's grant of summary judgment, using the same standard applied by the district courts. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). Under this standard, the movant must demonstrate that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "In reviewing the grant of a motion for summary judgment, we (i) resolve conflicting evidence in favor of the nonmovant, (ii) do not engage in credibility determinations, and (iii) draw all reasonable inferences in favor of the nonmovant." *Fuentes,* 32 F.3d at 762 n. 1.

Plaintiffs' discrimination claims are brought under 42 U.S.C. § 1981, which provides, as relevant here, that "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts." § 1981(a). "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

We have previously applied the tests used to evaluate employment discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* to employment discrimination claims brought under § 1981, since "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181–82 (3d Cir.2009). Thus, both the

direct evidence test introduced by *268 *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting framework introduced by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), may be used to determine whether an employer has discriminated against a plaintiff in violation of § 1981. *See Brown,* 581 F.3d at 182; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796–97 (3d Cir.1990). This too is a case brought under § 1981, and we deem it best to employ the same frameworks in the context of claims of discriminatory lending under § 1981. We thus hold that the direct evidence and *McDonnell Douglas* tests should be applied to lending discrimination claims brought under § 1981.[5]

In doing so, we part ways with the Court of Appeals for the Seventh Circuit, which opined in *Latimore v. Citibank Federal Savings Bank,* 151 F.3d 712 (7th Cir.1998), that *McDonnell Douglas* should be applied only where there is a "basis for comparing the defendant's treatment of the plaintiff with the defendant's treatment of other, similarly situated persons," and thus not in lending discrimination cases, which typically do not involve a "competitive situation" between different borrowers. *Id.* at 714. In *Latimore,* the court indicated that a plaintiff can still "try to show in a conventional way, without relying on any special doctrines of burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue." *Id.* at 715. We disagree with this approach, as the *McDonnell Douglas* burden-shifting framework has generally been used in § 1981 discrimination cases and it would be a significant departure, we think, from litigants' settled expectations about the applicable law to single out cases involving alleged discriminatory lending practices for different treatment. We will apply a variation of the *McDonnell Douglas* test that requires plaintiffs to show "additional evidence" under the fourth prong of the test for establishing a prima facie case.

As addressed in greater detail below, we do not agree that *McDonnell Douglas* is limited to cases where a plaintiff can produce evidence of a defendant's treatment of directly comparable individuals. The burden of a § 1981 plaintiff is to "prove purposeful discrimination," and the *McDonnell Douglas* framework assists in this endeavor by structuring the evidence on the issue of "whether the defendant intentionally discriminated against the plaintiff." *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superseded in part by* 42 U.S.C. § 1981(b). Although comparative *269 evidence is often highly probative of discrimination, it is not an essential

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 235 of 245

element of a plaintiff's case. *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 353 (3d Cir.1999). Instead, the permissible evidence under this framework "may take a variety of forms," including, for example, "evidence of [a defendant's] past treatment of" a plaintiff. *Patterson,* 491 U.S. at 187–88, 109 S.Ct. 2363.

## A.

Plaintiffs contend that they have direct evidence of discrimination and thus need not resort to a *McDonnell Douglas* analysis. We disagree.

[1] [2] Direct evidence of discrimination must be "so revealing of [discriminatory] animus that it is unnecessary to rely on the [*McDonnell Douglas* ] burden-shifting framework, under which the burden of proof remains with the plaintiff." *Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 512 (3d Cir.1997). Once a plaintiff produces such evidence, the defendant has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory animus. *Id.* at 512–13.

[3] [4] [5] To qualify as direct evidence, "the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' " *Walden,* 126 F.3d at 513 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)). Thus, direct evidence must satisfy two requirements. First, the evidence must be strong enough "to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision." *Id.* (internal quotation marks and alteration omitted). Second, the evidence must be connected to the decision being challenged by the plaintiff. *Id.* at 515–16. Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision. *Id.* at 513–16. We have referred to these requirements as creating a "high hurdle" for plaintiffs. *Id.* at 513.

[6] Plaintiffs have not cleared this hurdle. For the direct evidence test they rely exclusively on Hogsten's alleged comments that "you people don't understand how the process works," JA387, and that "you people don't understand the loan process," JA448.[6] We are skeptical that Hogsten's use of the phrase "you people" in this context is, alone, so revealing

of discriminatory animus that it would enable a factfinder to conclude that a discriminatory attitude was, more likely than not, a motivating factor in the decision to impose the challenged loan conditions. Although plaintiffs cite various cases in support of their argument that the phrase "you people" should be considered direct evidence, none of these cases actually support their position. *See, e.g., Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1056 (8th Cir.2000) (using the phrase "you people" as evidence in a *McDonnell Douglas* analysis, and finding its use "innocuous"); *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 923, 924 (11th Cir.1990) (finding that the use of the phrase "you people" was a "stray remark" that would not satisfy the direct evidence test). Instead, several courts have determined that the phrase "you people" is too ambiguous to constitute direct evidence of discrimination when used in isolation, as it was here. *See, e.g., Estate of Daramola v. Coastal Mart, Inc.,* 170 Fed.Appx. 536, 547 (10th Cir.2006) ("After **\*270** all, they are your people."); *Clay v. Interstate Nat'l Corp.,* No. 95–3430, 1997 WL 452316, at \*1, \*3 (7th Cir. Aug.7, 1997) ("You people are causing problems."); *Steinhauser v. City of St. Paul,* 595 F.Supp.2d 987, 1004 (D.Minn.2008) ("I don't think you people deserve to be in this country."); *Kishaba v. Hilton Hotels Corp.,* 737 F.Supp. 549, 566 (D.Haw.1990) ("I don't know how you people run things down here ...." and "Why can't you people get things organized?").

Even if we were persuaded that the use of the phrase "you people" in this context could constitute direct evidence, however, plaintiffs have not shown that Wachovia's decisionmakers—Fazzino, Hamm, and Akerley—relied on plaintiffs' race in imposing the challenged loan conditions. According to the evidence offered by Wachovia, it was not Hogsten who decided to impose the challenged conditions on plaintiffs' loans. Rather, Hogsten denied imposing any of these conditions. With respect to the Anderson loan, Hogsten testified that he told Mr. Anderson that "we were going to have problems getting a sufficient appraisal unless there [were] some ... renovations to the property to get a decent appraisal." JA457. However, since Hogsten did not underwrite loans, he testified that "[w]hat I did for Mr. Anderson is tell him what is normally done, and an underwriter would then make the decision as to what if anything would be done." JA460. With respect to the Wheatley loan, Hogsten testified that after being told by the underwriter that the appraisal indicated problems with the habitability of the Wheatley property and that the Wheatleys' down payment would need to be increased, he communicated those problems to Mr. Wheatley.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 236 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Hogsten's testimony is corroborated by the testimony of his supervisor, Joseph Skowronski, who testified that loan officers like Hogsten do not impose conditions on loans, although they may discuss with customers the conditions imposed by others. He described Hogsten's role as limited to selling loans and communicating requirements to customers. According to Skowronski, it is the underwriters, not loan officers like Hogsten, who impose loan conditions. Fazzino also testified that Hogsten was not a decisionmaker, and that Hogsten repeatedly urged her to approve the Wheatley loan without the conditions that she and Hamm had imposed. This indicates that Hogsten lacked the authority to impose (or remove) the conditions himself. Fazzino also testified that she and Hamm imposed the challenged conditions on the Wheatley loan, and Akerley submitted an affidavit indicating that he flagged the potential problem with the Wilkins loan.

Plaintiffs have offered no evidence to refute this testimony. Although they contend that Hogsten *acted as if* he were the decisionmaker when communicating Wachovia's requirements to them, this contention does not create a genuine issue of fact regarding the salient question of whether Hogsten *actually was* a decisionmaker who imposed the conditions. Since plaintiffs do not contend that Fazzino, Hamm, or Akerley harbored discriminatory intent—and there is no evidence that they did—the District Court properly rejected plaintiffs' claims to the extent that they rely on the direct evidence test.

**B.**

In the absence of direct evidence of discrimination, we consider a plaintiff's claims under *McDonnell Douglas.* This familiar framework requires the following three-step analysis.

The plaintiff must first establish a prima facie case of discrimination. In *Burdine,* the Supreme Court explained that "[t]he ***271*** burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The goal at this stage is to "eliminate [ ] the most common nondiscriminatory reasons" for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory. *Id.* at 254, 101 S.Ct. 1089.

If a plaintiff makes out a prima facie case, then the "burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 974 n. 2 (3d Cir.1998). The defendant satisfies its burden at this step "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." *Fuentes,* 32 F.3d at 763. The defendant need not even prove that the tendered reason was the actual reason for its behavior. *Id.*

At the third step, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the [defendant's] explanation is pretextual." *Id.* At this stage, a plaintiff may defeat a motion for summary judgment by either discrediting the defendant's proffered reasons or adducing evidence that discrimination was "more likely than not a ... determinative cause of the adverse ... action." *Id.* at 764.[7] "[T]hroughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* at 763.

**1.**

We have not previously identified the elements of a prima facie case of lending discrimination in a suit brought under § 1981. The District Court therefore applied a prima facie test containing the following three elements: "(1) Plaintiffs were members of a protected class; (2) Plaintiffs applied for and were extended credit from Defendant; and (3) Defendant treated Plaintiffs differently than others outside of the protected class who were otherwise similarly situated." *Anderson II,* 609 F.Supp.2d at 369.[8] The Court determined that plaintiffs satisfied the first two elements of this test, but not the third. The Court also found that, even if plaintiffs had made out a prima facie case, Wachovia had proffered legitimate nondiscriminatory reasons for its actions, and that plaintiffs had not adequately rebutted those reasons so as to show them to be pretextual.

Although we agree with the District Court's ultimate conclusion that plaintiffs did not carry their burden as to pretext, we disagree as to the nature of the showing to be made to establish a prima facie case in a case such as this. The District ***272*** Court required plaintiffs to produce evidence that they were treated differently from similarly situated mortgage applicants. However, the critical question in this case is not simply whether plaintiffs were subjected to

different conditions than white mortgage applicants; rather, the allegation is more layered. Granted, it is, in part, whether they were subjected to more onerous conditions because of their race—that is, because they were African–Americans—but, also, because they intended to move into a "white" community. Notably, plaintiffs had previous borrowing experience with Wachovia without incident, so it is this latter aspect that distinguishes this situation, and calls for an approach to the last prong that is tailored to the nature of the claim. The issue is, were barriers put in their way because of their race in order to dissuade them from moving into a "white" community? Given this, and given the noncompetitive nature of the lending business—an applicant does not lose a loan to another applicant—comparisons among borrowers do not get to the heart of the matter. Moreover, requiring plaintiffs to ferret out, and the bank to produce, evidence as to others with myriad different factual situations in order to find "similar" borrowers, goes beyond what is required for a prima facie case.

We have repeatedly stated that comparative, or competitive, evidence is not a necessary component of a discrimination plaintiff's prima facie case. As we have said in the context of employment discrimination, "a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class," since an inability to make this showing "is not necessarily inconsistent with her demonstrating that the employer treated her less favorably than others because of her race, color, religion, sex, or national origin." *Pivirotto,* 191 F.3d at 353 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (internal quotation marks and alteration omitted)); *see also Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 939 (3d Cir.1997) ("By holding that favorable treatment outside the protected class is an 'alternative' element to a prima facie case, we [have] made clear that this element can be present but by no means must be present."). [9] This precedent is controlling. [10]

As noted above, a plaintiff's burden at the prima facie stage is not intended to be "onerous"; rather, the purpose of the prima facie test is to "eliminate [ ] the most **\*273** common nondiscriminatory reasons" for the defendant's actions. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089. Thus, we have stated that the fourth prong of the prima facie case should be "relaxed in certain circumstances." *Pivirotto,* 191 F.3d at 357 (quoting *Torre v. Casio, Inc.,* 42 F.3d 825, 831 (3d Cir.1994)). Requiring plaintiffs to produce comparative evidence in cases involving the lending process would not

be productive due to the discrete and varying circumstances inherent in individual loan applications and approvals.

Indeed, *McDonnell Douglas* itself did not require a showing as to "similarly situated" individuals. In *McDonnell Douglas,* the Court held that a prima facie case of racial discrimination in an employment discrimination case generally requires a plaintiff to show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, ... the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. 1817. The Court also noted that this test should be tailored to conform "to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. 1817.

When invoking *McDonnell Douglas* for lending discrimination claims brought under § 1981, the first three things a plaintiff must show at the prima facie stage are (1) that he belongs to a protected class, (2) that he applied and qualified for available credit from the defendant, [11] and (3) that his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions. [12] In the employment context, we have held that the fourth prong of the prima facie case may be established by satisfying the original fourth prong articulated in *McDonnell Douglas,* or, as an alternative to the original fourth prong, by showing that similarly situated individuals outside the plaintiff's class were treated more favorably. *Matczak,* 136 F.3d at 939–40; *Olson v. Gen.* **\*274** *Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996).

However, as plaintiffs rightly point out, "[t]his is not an employment case where it is frequently easy to identify similarly situated individuals." Appellants' Op. Br. at 33. Further, requiring evidence of similarly situated individuals in the lending context would be overly burdensome during discovery because it would require banks to turn over hundreds of loan applications—once confidentiality issues are addressed—and the parties would likely have considerable difficulty determining which applicants are similarly situated. Thus, we agree with plaintiffs that they should not be required to satisfy the fourth prong of the *McDonnell Douglas* prima facie case as it has been articulated in the employment context, so long as in some other way they are able to show "circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 238 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

The question, then, is what will suffice to satisfy the last prong of the prima facie case in the lending discrimination context. The Court of Appeals for the Sixth Circuit had occasion in *Lindsay v. Yates,* 578 F.3d 407 (6th Cir.2009), to consider a discrimination claim in connection with a real estate transaction. The seller had terminated the agreement of sale within a few days after meeting the buyers—who happened to be African–American—twelve days after signing the agreement, deciding not to sell the house " 'for sentimental reasons.' " *Id.* at 412. The court noted the flexibility of *McDonnell Douglas* and the fact that in *Shah v. General Electric Co.,* 816 F.2d 264 (6th Cir.1987), an employment discrimination case, it had previously indicated that it was enough if a plaintiff could adduce " 'some additional evidence' " to establish the " 'inference of discrimination.' " *Id.* at 416 (quoting *Shah,* 816 F.2d at 269). In *Shah,* the court had concluded that the fact that a position did not remain available was not fatal to the claim, as long as there existed " 'additional evidence' from which a reasonable juror could find an inference of discrimination." *Lindsay,* 578 F.3d at 416 (quoting *Shah,* 816 F.2d at 269). While noting that "comparative evidence" could constitute "additional evidence," the court stated that *McDonnell Douglas* and its progeny do not *require* this. *Id.* at 417. The inquiry "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.* (internal quotation marks and citation omitted). The court then reasoned:

> A prima facie case is established whenever the actions taken by the property owner lead one to reasonably infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criterion such as race. Keeping this ultimate inquiry in mind, we find that so long as "additional evidence" exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in "light of common experience," the required "inference of discrimination" can be made in satisfaction of the prima facie case. This holds true even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably.

The "additional evidence" which can be relied upon to establish a prima facie claim depends on the attendant facts and circumstances. In this case, the suspicious timing of the termination of the purchasing agreement provides the evidentiary basis for inferring the [defendants] **\*275** acted with discriminatory motives.

*Id.* at 417–18 (internal quotation marks and citations omitted).

 **[7]**  We adopt this approach. In order to make out a prima facie case of lending discrimination in a § 1981 case, a plaintiff must show (1) that he belongs to a protected class, (2) that he applied and was qualified for credit that was available from the defendant, (3) that his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions, and (4) that some additional evidence exists that establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent.

Here, all of the plaintiffs are African–American, applied for types of mortgage loans being offered by Wachovia, and were qualified for these loans.[13] Thus, they satisfy the first and second prongs of the prima facie case. Whether the plaintiffs have satisfied the third and fourth prongs is a closer call.

As to the third prong, with respect to the Wilkinses, we are not persuaded that it was unduly burdensome for Wachovia to have required them to use their own assets, rather than assets effectively borrowed from their credit card issuer, to fund their escrow payment. However, with respect to the Andersons and the Wheatleys, we agree that it may be unreasonable or overly burdensome to require a borrower to make improvements to a property he does not own, and to double the amount of the borrower's down payment at the last minute.[14]

As to the fourth prong, the evidence that would connect the conditions to racial animus is not that clear. Plaintiffs have produced some evidence that the conditions may have been imposed because they were African–Americans moving into a predominantly Caucasian neighborhood. A Wachovia employee, Deanne Wicks, told Mr. Anderson that "[t]here are a lot of people that are not happy" with plaintiffs' purchase of homes in Silver Lake, which she described as a "lily white community." JA384–85. Hogsten allegedly said that he was "getting a lot of pressure on this transaction" and referred to plaintiffs as "you people," JA387, JA398, potentially corroborating Wicks's statements. Moreover, plaintiffs had not experienced similar treatment when purchasing homes, using Wachovia financing, in other neighborhoods. Together,

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 239 of 245

this evidence may be sufficient to support at least an inference that Wachovia imposed the conditions it did for racially discriminatory reasons. On the other hand, the timing of the sellers' change of heart in *Lindsay* certainly supplies a stronger nexus between the complained-of conduct and the plaintiffs' race.

Regardless of whether plaintiffs have in fact satisfied the third and fourth prongs, the conditions were grounded in applicable regulations, as we explain below, so even if plaintiffs could convince us that they had made out a prima facie case, they must **\*276** clear an additional hurdle at the third stage of the *McDonnell Douglas* analysis.

**2.**

Wachovia urges that it carried its burden of production at the second stage of *McDonnell Douglas* by tendering nondiscriminatory reasons for all of its actions, because all of the conditions it imposed were driven by its underwriting guidelines and by the requirements imposed by Fannie Mae (which parallel Wachovia's own guidelines). Wachovia sells most of its residential mortgages to Fannie Mae, and Fannie Mae will not purchase loans that do not comply with its requirements. Thus, Wachovia contends that its underwriters are obligated to ensure that these requirements are satisfied before approving a loan.

According to Wachovia, the repair requirements for the Anderson and Wheatley properties were necessitated by underwriting guidelines that require a home to be inhabitable and an appraisal to be completed before a mortgage can be issued. Under these guidelines, a property may not "have any physical deficiencies or conditions that would affect its livability." JA302. When there are such problems, "the property must be appraised subject to completion of the specific alterations or repairs," and Wachovia "must obtain a certificate of completion from an appraiser before it delivers the mortgage to the investor." JA302.

The appraiser retained by Wachovia to evaluate the Anderson property, John Mullens, informed Hogsten that he could not appraise the property because there were significant problems with its livability. Mullens stated that there was "extensive water damage," some missing drywall, mold on some of the remaining drywall, and exposed, water-damaged insulation. JA352. He explained that because of these problems, he "determined that he could not appraise the property" without,

at a minimum, an assessment by a mold specialist, a plumbing certification, certifications that the water had not damaged the structure or electrical systems, and an estimate from a contractor of the costs to repair the damage. JA352–53. Mullens also stated that he "knew of no comparable properties in the Dover area that were in a similar state of disrepair and in a similar location," and thus could not appraise the property without the repairs. JA353.

An appraiser was able to determine the value of the Wheatley property, but stated in his appraisal report that there was no heat on the second floor, that the roof needed repair, that the second floor landing needed a " 'finished floor covering,' " and that some of the basement pipes appeared to be wrapped with asbestos. JA428–29. According to Fazzino, these problems raised concerns about the livability of the property and necessitated repairs. On August 4, the appraiser sent a certificate to Fazzino stating that the repairs had been completed. However, the report indicated that the appraiser was relying on a contractor's statement that the "roof was in adequate condition with no known leakage," which the appraiser had "assumed to be accurate." JA321. Fazzino determined that she could not rely on this assumption, and therefore required the Wheatleys to obtain a roofing certificate to show that the property was inhabitable.

According to Wachovia, the other conditions imposed on the Wheatley loan resulted from an effort to approve the loan despite the livability problems, in light of Aigner's mandate that all three transactions settle at one time. An "exception loan" was eventually approved for the Wheatleys by an "exception officer" named Terri Hamm, in part because Mr. Wheatley **\*277** was a "five star customer." JA469. This meant that the Wheatley loan would be maintained in Wachovia's own portfolio, without being sold to Fannie Mae, and could thus be approved under different guidelines. However, reclassifying the loan as an exception loan triggered a new requirement under the underwriting guidelines, which specify that an exception loan may only be issued if the customer makes a 20% down payment; thus, the Wheatleys would no longer be permitted to make a 10% down payment as they had planned. The Wheatleys decided to obtain the additional 10% from the assets of their business, but that triggered another requirement under the underwriting guidelines: that an accountant "confirm that the borrower files the business on the Schedule C" of his tax return. JA308.

These reasons suffice to satisfy Wachovia's burden of production, which demands only that it "introduc[e] evidence

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 240 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

which, taken as true, would permit the conclusion that there was a nondiscriminatory reason" for the adverse action. *Fuentes,* 32 F.3d at 763. Although plaintiffs argue that Wachovia failed to meet its burden at the second stage of this analysis, it appears that this argument is actually directed at the issue of pretext, and we will consider it in that context.

### 3.

[8]    At the third stage of the *McDonnell Douglas* analysis, a plaintiff "may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, *or* (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a ... determinative cause of the adverse ... action." *Fuentes,* 32 F.3d at 764. The plaintiff can discredit the proffered reasons by "demonstrat [ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal quotation marks, alteration, and citations omitted). Alternatively, to show that discrimination was the likely cause of the adverse action, a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to "unlawful discriminatory treatment," that it had "treated other, similarly situated persons not of his protected class more favorably," or that it had "discriminated against other members of his protected class or other protected categories of persons." *Id.*

[9]    We conclude that plaintiffs have not offered sufficient evidence of pretext to survive summary judgment. Plaintiffs have proffered no evidence to support their contention that Wachovia's reliance on its underwriting guidelines and the Fannie Mae requirements was pretextual. There is no evidence that the Anderson loan could have been approved without repairs to the property, or that the Wheatley loan could have been approved as a conventional loan without repairs to the property or as an exception loan without a 20% down payment and verification by an accountant. Despite plaintiffs' contentions to the contrary, the underwriting guidelines are consistent with all of these requirements. Although plaintiffs do note that the Fannie Mae guidelines were inapplicable to the Wheatley loan because it was ultimately approved as an "exception loan," this does not undermine Wachovia's reliance on its underwriting

guidelines; the reclassification as an exception loan occurred very late in the process, after Wachovia had already indicated that it could not approve the Wheatley loan without **\*278** repairs. Plaintiffs do not dispute that the repairs required by Wachovia were necessary to make the Anderson and Wheatley properties livable; in fact, Mr. Wheatley conceded this as to his property during his deposition.

Plaintiffs argue that Wachovia's reliance on its underwriting guidelines is pretextual because Wachovia deviated from its procedures by allowing Hogsten (rather than Fazzino, Akerley, and Hamm) to impose the loan conditions on plaintiffs. We have recognized that "[a] violation of company policy can constitute a pretext for unlawful discrimination" under certain circumstances. *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 322 (3d Cir.2000). Here, however, there is no evidence that any Wachovia procedures were violated, since there is no evidence that Hogsten improperly imposed loan conditions. Indeed, as discussed in more detail above with regard to the direct evidence test, the evidence showed that Fazzino, Akerley, and Hamm—not Hogsten—actually imposed the conditions, while Hogsten communicated them to plaintiffs. Plaintiffs have not offered any evidence to refute this or to otherwise demonstrate that Wachovia deviated from its policies.

Plaintiffs also compare their experiences in the Silver Lake transaction with their experiences in other real estate transactions. They claim that Wachovia and other banks did not impose similar conditions on their loans in the other transactions, which assertedly did not involve property located in a predominantly Caucasian neighborhood. However, those transactions are not readily comparable to the Silver Lake transaction: they appear not to have involved a requirement that three sales happen simultaneously, on an accelerated timetable, and many involved investment properties, which are not subject to the Fannie Mae requirements. Moreover, plaintiffs have offered no demographic evidence to substantiate their claims that the racial makeups of the communities involved in those other transactions were meaningfully different from that of the Silver Lake area. These anecdotal comparisons are thus not probative of discrimination in this case.

Plaintiffs also suggest that Hogsten is not credible because he testified that he did not know the racial makeup of the Silver Lake community, but, according to an affidavit submitted on plaintiffs' behalf, "[a]nyone who has ever lived for any period of time in Dover would know that ...

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 241 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

the homes around Silver Lake in Dover were almost all owned by white families." JA191. However, this affidavit is unsupported by any data or other evidence, and does nothing more than recite the personal viewpoint of one member of the Dover community. It is also inconsistent with census data in the record, which show that 29.6% of the 544 residents of the "census tract" in which plaintiffs' houses were located were African–American. JA263. [15] Accordingly, the affidavit would not suffice to convince a reasonable factfinder that Wachovia's proffered reasons were unworthy of credence, especially in the face of Fazzino's testimony and the clear language of the underwriting guidelines, both of which corroborated Hogsten's explanations of why Wachovia imposed the conditions that it did. Nor are we persuaded by plaintiffs' argument that Fazzino lacked credibility because she could not remember **\*279** certain details of the Silver Lake transactions during her deposition. That claim is belied by the record, as Fazzino was able to testify in considerable detail after refreshing her recollection with notes and other documents.

Finally, plaintiffs cite Hogsten's unfriendly attitude, use of the phrase "you people," and the comment that he was receiving "pressure" regarding the transactions. [16] They also point to the comment by Wicks that "a lot of people ... are not happy" with the Silver Lake sale, apparently because plaintiffs were moving into "an exclusive lily white community." JA384, 385. When we give plaintiffs the benefit of any inferences that can be drawn, as we must when reviewing a grant of summary judgment, these comments, taken together, might hint at discrimination. However, a rational jury could not say they are sufficient to show, by a preponderance of the evidence, "that discrimination was more likely than not a ... determinative cause of" Wachovia's actions. *Fuentes,* 32 F.3d at 764. Nor do they suffice to discredit the nondiscriminatory reasons proffered by Wachovia by demonstrating such weaknesses in those reasons that a reasonable juror could rationally find them unworthy of credence. *Id.* at 765. Moreover, the loans were ultimately approved and the sales did close. While not conclusive, this tends to detract from a finding of purposeful discrimination.

It was therefore proper for the District Court to enter summary judgment in Wachovia's favor on the § 1981 claim. [17]

**III.**

Plaintiffs argue that the District Court inappropriately granted summary judgment on their breach of contract claim. As noted above, we exercise plenary review of a district court's grant of summary judgment.

The District Court initially dismissed this claim in deciding Wachovia's motion to dismiss. The Court concluded that plaintiffs had not satisfied the requirement of Delaware law that a breach of contract claim identify the contractual provision that was allegedly breached. *Anderson I,* 497 F.Supp.2d at 581. Plaintiffs then filed a second amended complaint, which retained the breach of contract claim. The only changes plaintiffs made to this claim in the second amended complaint were to replace the phrase "[b]reach of contract for a mortgage" with the phrase "[b]reach of the mortgage application contract" and to adjust the amount of damages that they claimed. JA616, JA620, JA624.

**\*280** Wachovia then moved for summary judgment. Although the motion did not explicitly address the breach of contract claim, it did indicate that Wachovia was seeking judgment on what it said were the only two claims remaining in the case (the § 1981 and good faith and fair dealing claims), and it was not styled as a motion for partial summary judgment. Even though Wachovia had not specifically requested dismissal of the breach of contract claim in this motion, the Court dismissed the claim, noting that it had been "previously dismissed ... for failure to identify 'any express contract provision that was breached,' " and that plaintiffs had "again fail[ed] to identify an express contract provision that was breached." *Anderson II,* 609 F.Supp.2d at 366 (quoting *Anderson I,* 497 F.Supp.2d at 581). Plaintiffs argue that it was improper for the Court to have granted judgment on this claim, since Wachovia had not explicitly sought summary judgment.

[10]  [11]  We disagree. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The notice requirement is satisfied when a case involves "the presence of a fully developed record, the lack of prejudice, [and] a decision based on a purely legal issue." *Gibson v. City of Wilmington,* 355 F.3d 215, 224 (3d Cir.2004).

[12]  Plaintiffs here were on adequate notice that this claim was subject to dismissal. The District Court entered summary

judgment on this claim as a matter of law on the ground that it was inadequately pled, for the same reasons stated in the Court's previous decision. Plaintiffs have offered no explanation as to how they would have benefitted from an opportunity to submit further evidence or briefing on this claim; indeed, they appear to have essentially disregarded the District Court's earlier admonition explaining why the claim was inadequately pled. [18] Although we reiterate that "the *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims," *Gibson,* 355 F.3d at 224, we find no error in the District Court's disposition of the breach of contract claim in this case. [19]

## IV.

Plaintiffs argue that the District Court erred in dismissing their claim that Wachovia tortiously interfered with their contracts with Aigner by requiring unnecessary repairs. As stated above, we exercise plenary review of a district court's grant of summary judgment.

Plaintiffs' tortious interference claim is grounded in § 766A of the Restatement (Second) of Torts, which states as follows:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

**\*281** The key difference between § 766A and the more traditional form of a tortious interference claim, which is embodied in § 766 of the Restatement and has been expressly adopted by Delaware courts, *see Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987), [20] is that a § 766A claim can rest on an allegation that the plaintiff's "performance [was caused] to be more expensive or burdensome." Thus, unlike a § 766 plaintiff, a § 766A plaintiff is not required to show that the defendant caused the *breach* of the plaintiff's contract.

The District Court dismissed this claim because "no state court in Delaware has ever recognized a cause of action

under § 766A," noting that we had predicted in *Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile Insurance Co.,* 40 F.3d 63, 66 (3d Cir.1994), that Pennsylvania would not recognize § 766A as a cause of action because allowing such a claim would be "too speculative and subject to abuse." *Anderson I,* 497 F.Supp.2d at 583–84.

Plaintiffs contend that the District Court erred in this determination. They argue that § 766A has been incorporated into Delaware law by two decisions: *DeBonaventura v. Nationwide Mutual Insurance Co.,* 419 A.2d 942, 947 (Del.Super.Ct.1980), and *Nelson v. Fleet National Bank,* 949 F.Supp. 254, 260 (D.Del.1996). However, nothing in *DeBonaventura* indicates that the Court intended to adopt § 766A as part of Delaware law. Nor does *Nelson* offer any support for plaintiffs, since it is a decision issued by a federal court without any analysis of whether Delaware courts would recognize § 766A.

 [13]  We are aware of no cases in which the Delaware courts have adopted § 766A, and plaintiffs offer no argument as to why Delaware would recognize § 766A as a new cause of action. We explained at some length in *Windsor Securities, Inc. v. Hartford Life Insurance Co.,* 986 F.2d 655, 661–63 (3d Cir.1993), why Pennsylvania courts would be unlikely to adopt § 766A, and we relied on this analysis in *Gemini* to predict that Pennsylvania courts would not adopt § 766A. We similarly believe that Delaware courts would not allow a tortious interference claim based on an allegation that the defendant caused the plaintiff's performance to be more expensive or burdensome, since such an allegation would be "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Gemini,* 40 F.3d at 66 (internal quotation marks and citation omitted). We therefore hold that the District Court properly dismissed the tortious interference claim.

## V.

 [14]  Plaintiffs argue that the District Court erred by denying their motion to compel responses to certain discovery requests. We review a district court's discovery orders for abuse of discretion, and will not disturb such an order absent a showing of actual and substantial prejudice. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1032 (3d Cir.1997); *Hewlett v. Davis,* 844 F.2d 109, 113 (3d Cir.1988).

Case 09-10138-MFW    Doc 14410-1    Filed 09/16/14    Page 243 of 245

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Plaintiffs moved to compel responses to two categories of discovery requests. The first category comprised interrogatories **\*282** regarding plaintiffs' loan applications, such as the names of various people involved in the approval process and the dates on which certain events occurred. The second category sought information regarding Wachovia's approval rates of mortgages for African–American applicants. The District Court denied the motion on the ground that the discovery sought was unduly burdensome or irrelevant. With respect to the first category, the Court accepted Wachovia's representations that the responsive information was available in plaintiffs' loan files (which amounted to about 1000 pages and had already been produced to plaintiffs), and that plaintiffs were in as good a position to compile the information as Wachovia. The Court therefore instructed plaintiffs to review the documents they had received and to notice depositions if necessary to obtain additional information. With respect to the second category, the Court noted that information regarding approval rates would not be meaningful unless it was evaluated in the context of all of the criteria used by Wachovia to approve or deny specific mortgages. However, the Court determined that this additional information could be obtained only through a detailed review of application files, which would constitute "an incredible invasion of privacy." JA19.

Wachovia's principal argument on appeal is that plaintiffs were required to file an affidavit under Federal Rule of Civil Procedure 56(f) in order to preserve their challenge to the discovery order. We disagree. Nothing in Rule 56(f) or the cases cited by Wachovia supports this argument. While a Rule 56(f) affidavit must be filed to preserve an argument that *summary judgment* was improperly granted because they were denied discovery, that requirement does not prevent plaintiffs from challenging the District Court's *discovery order* itself.

**[15]**   Nonetheless, in light of plaintiffs' failure to show any prejudice from the discovery order, we believe that the District Court acted within its discretion in denying plaintiffs' motion. According to Wachovia's unrefuted representations, the information sought by plaintiffs' interrogatories was contained in the documents produced to plaintiffs. Nor is there any basis for us to conclude that the District Court abused its discretion in denying discovery regarding the approval rates, since this information was not crucial to plaintiffs under the prima facie case that we have set forth above,[21] and since compiling meaningful statistics about Wachovia's approval rates would have been highly burdensome and would have entailed a substantial invasion of the privacy of other Wachovia customers.

## VI.

After granting summary judgment on plaintiffs' other claims, the District Court remanded their good faith and fair dealing claim to Delaware state court. Wachovia argues that this was an abuse of discretion, principally because the dismissal of the § 1981 claim was fatal to the good faith and fair dealing claim, and the District Court could thus have easily disposed of the state law claim. Wachovia also contends that the good faith and fair dealing claim is preempted by federal law, and **\*283** that the District Court had greater expertise to resolve that issue.

**[16]**   We review a district court's decision to remand a claim under 28 U.S.C. § 1367(c)(3) for abuse of discretion. *Lazorko v. Pa. Hosp.,* 237 F.3d 242, 247 (3d Cir.2000). In determining whether the district court abused its discretion, we consider "whether the dismissal of the pendent claims best serves the principles of judicial economy, convenience, fairness, and comity." *Annulli v. Panikkar,* 200 F.3d 189, 202 (3d Cir.1999), *abrogated on other grounds, Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

**[17]**   **[18]**   Under Delaware law, a party breaches the implied covenant of good faith and fair dealing by engaging in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain," or by "frustrat[ing] the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms." *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005). Plaintiffs' good faith and fair dealing claim thus raises different issues from their § 1981 claim. Even if Wachovia did not act with discriminatory intent, a jury might find that Wachovia had acted arbitrarily or had taken advantage of its position to control the implementation of any contract between Wachovia and the plaintiffs.[22] Thus, the disposition of the § 1981 claim was not fatal to the good faith and fair dealing claim. Contrary to Wachovia's contention, the state court is adequately positioned to resolve all aspects of this claim, including the issue of whether it is preempted by federal law. We therefore find no abuse of discretion in the District Court's decision to remand this claim, and we need not reach Wachovia's arguments regarding its merits.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

## VII.

For the foregoing reasons, we will affirm the orders and judgment of the District Court.

Footnotes

\*     Honorable John R. Padova, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1     Non-income-verification loan applicants are not required to provide certain financial information, such as their income, as part of the application process. JA488, JA500. Non-income-verification loans with a loan-to-value ratio over 75% were only available to applicants with a credit score at a level that the Wheatleys' credit score did not reach. JA681.

2     In some instances, a "stated income" loan can be acquired with a lesser down payment than a non-income-verification loan, but applicants are required to provide financial information and show that they have sufficient assets and annual income for their desired loan. JA308, JA488, JA501–02.

3     As noted later in connection with our discussion of pretext, Hogsten explains that his statements about "pressure" in the loan process were based on the expedited time frame, the combined nature of the three sales, and constant calls from plaintiffs.

4     Plaintiffs had also asserted a claim in the first amended complaint under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, which they voluntarily dismissed with prejudice prior to the District Court's decision on the motion to dismiss. See Anderson I, 497 F.Supp.2d at 574 n. 1. Plaintiffs omitted this claim from the second amended complaint.

5     We note that other courts of appeals have similarly applied the McDonnell Douglas framework to claims of discrimination in the extension of credit brought pursuant to the ECOA. See Mays v. Buckeye Rural Elec. Coop., Inc., 277 F.3d 873, 876 (6th Cir.2002) ("Given the similar purposes of the ECOA and Title VII, the burden-allocation system of federal employment discrimination law provides an analytical framework for claims of credit discrimination."); Mercado–García v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir.1992); Thompson v. Marine Midland Bank, No. 99–7051, 1999 WL 752961, at *2 (2d Cir. Sept.16, 1999). In addition, we and the Court of Appeals for the Eighth Circuit have identified prima facie tests for ECOA claims that mirror the elements of the McDonnell Douglas prima facie test. See Chiang v. Veneman, 385 F.3d 256, 259 (3d Cir.2004) ("To establish a prima facie case under ECOA [a plaintiff] must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit."); Rowe v. Union Planters Bank of Se. Mo., 289 F.3d 533, 535 (8th Cir.2002) ("[Plaintiff] must demonstrate that (1) she was a member of a protected class, (2) she applied for and was qualified for a loan with the Bank, (3) the loan was rejected despite her qualifications, and (4) the Bank continued to approve loans for applicants with similar qualifications.").

6     Hogsten was not asked about these statements during his deposition.

7     Fuentes speaks of a "motivating or determinative cause," but, to be precise, the terminology of "motivating" causes is inapt when discussing the burden-shifting framework in a pretext case such as this. See Watson v. SEPTA, 207 F.3d 207, 211 (3d Cir.2000) (holding that the 1991 Civil Rights Act did not affect "the distinction between the standards of causation applicable in, on the one hand, so-called 'mixed-motive' cases, in which ... a defendant may be held liable upon a showing that an illegitimate factor was a 'motivating' factor in the adverse action and, on the other hand, so-called 'pretext' cases, in which ... a defendant may be held liable upon a showing that an illegitimate factor was a 'determinative' factor in the adverse action").

8     The District Court borrowed this test from Visconti v. Veneman, No. 01–cv–5409, 2005 WL 2290295, at *4 (D.N.J. Sept.20, 2005), a case brought under the ECOA and "based not on [the plaintiffs'] application for (and denial of) credit but, rather, on the [defendant's] collection efforts regarding credit that had already been extended."

9     Indeed, we have traced our suggestions that comparative evidence might be required to "occasionally imprecise language in dicta in certain cases." Pivirotto, 191 F.3d at 357.

10     Wachovia relies in part on our decision in Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 527 (3d Cir.1992), in which we considered comparative evidence to evaluate the plaintiff's claims. Ezold does not support Wachovia's argument. First, we only considered the comparative evidence proffered by the plaintiff in Ezold at the final stage of the McDonnell Douglas analysis, in order to determine whether the defendant's asserted nondiscriminatory reasons were pretextual. Second, even at the pretext stage of the analysis, we did not require comparative evidence. To the contrary, we recognized, for instance, that "sufficiently strong evidence of an employer's past treatment of a plaintiff may prove pretext." 983 F.2d at 539. This is consistent with the Supreme Court's statement in Patterson, 491 U.S. at 187–88, 109 S.Ct. 2363, that "[t]he evidence which [a plaintiff] can present in an attempt to establish that [a defendant's] stated reasons are pretextual may take a variety of forms," and its acknowledgment in McDonnell Douglas, 411 U.S. at 804–05, 93 S.Ct. 1817, that evidence of pretext could include the defendant's "treatment of [the plaintiff] during his prior term of employment; [and the defendant's] reaction, if any, to [the plaintiff's] legitimate civil rights activities."

11    We note that whether a plaintiff is "qualified" for a loan under the third prong should focus on the general form of credit and qualifications for such credit rather than on every possible condition that might need to be fulfilled to proceed to closing. Just as in the employment context "qualifications" are the minimum prerequisites, and do not include every conceivable trait that an employer desires in an employee, here, the qualifications should encompass minimum requirements. For instance, a plaintiff who applied for a home mortgage offered by the defendant only to borrowers of a certain income level should be required to establish that the defendant was issuing home mortgages, and that the borrower satisfied the income requirement established by the lender for that type of loan.

12    Wachovia contends that denial of the loan is necessary to give rise to an inference of discrimination, and thus that only borrowers whose loan applications are denied can make out a prima facie case. It urges that the imposition of restrictive conditions by a lender cannot support "a prima facie case of discrimination as traditionally understood." Appellees' Opening Br. at 34. We disagree. Section 1981 specifically brings discriminatory conditions into its ambit by defining "the term 'make and enforce contracts' [to] include[ ] ... the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Thus, § 1981 is violated not only when a lender discriminatorily rejects applicants, but also when the lender engages in other conduct that amounts to discrimination with respect to the "terms" and "conditions" of the borrower's contractual relationship with the lender. Indeed, in the employment context we have modified the third prong of the McDonnell Douglas prima facie case to require evidence of an adverse employment action, as opposed to outright rejection. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 411 (3d Cir.1999). We see no reason why a similar modification should not be made to the third prong in the credit context.

13    Although Mr. Wheatley's credit score was not sufficient to qualify him for the non-income-verification loan he initially sought, it appears that the Wheatleys were qualified for the stated income loan and the exception loan that they subsequently pursued.

14    The third prong could also be satisfied by evidence that the complained-of conditions, even if facially reasonable, were not applied evenhandedly among individuals of different races. Such conditions are per se unreasonable and/or unduly burdensome for purposes of the McDonnell Douglas analysis. Here, there is no such evidence.

15    The same data show considerable variation in the racial composition of the other areas bordering Silver Lake. Although a small area bordering the Silver Lake waterfront falls in the demographic category of "0–7.7%" African–Americans, and another area falls into the "8.3–24.5%" category, the majority of the waterfront is made up of over 24.9% African–Americans. JA263.

16    Hogsten did not recall referring to "pressure" in conversations with plaintiffs, but explained that the comment may have referred to the pressure of "getting all [the plaintiffs] to the settlement table all at the same time," and given such a short time frame, which was especially difficult because of "the properties" and the bank's "guidelines." JA459. In other words, "the pressure was from the underwriter," and "from Mr. Anderson because he was the spokesman for all three of the loan applications" and was calling Hogsten every day about them. JA459. Hogsten denied having received any pressure from any members of the Silver Lake community. However, he was not asked during his deposition to comment on his alleged use of the phrase "you people."

17    Plaintiffs also argue that the entry of summary judgment was inappropriate because they had been denied discovery about Wachovia's mortgage approval rates. Since, as we discuss above, plaintiffs should not have been required to produce comparative evidence, this argument is moot. In any event, we would not consider such an argument in light of plaintiffs' failure to file an affidavit under Rule 56(f). See, e.g., Bradley v. United States, 299 F.3d 197, 207 (3d Cir.2002).

18    Plaintiffs do not appear to argue that the disposition of this claim was wrong on the merits, and, in any event, we agree with the District Court that plaintiffs failed to plead the breach of contract claim adequately.

19    We do not accept Wachovia's argument that plaintiffs waived this cause of action simply by informing the Court that the claims in the second amended complaint would not require additional discovery.

20    Section 766 provides as follows:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

21    Moreover, in light of plaintiffs' allegation that Wachovia discriminated against them specifically because they wished to purchase homes in the Silver Lake community, we are not persuaded that a general breakdown along racial lines of Wachovia's approval rates "in Delaware or nationally," JA255–56, would have been probative of plaintiffs' claims.

22    We of course express no opinion regarding the merits of this claim.

---

End of Document                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.